LISA D. HARDIE, OSB # 080783
Troutman Sanders LLP
805 SW Broadway, Suite 1560
Portland, OR  97205
Telephone:  (503) 290-2334;  Facsimile:  (503) 290-2405
Email:  lisa.hardie@troutmansanders.com

MATTHEW D. MURPHEY, CSB #194111 (*admitted pro hac vice*)
Troutman Sanders LLP
5 Park Plaza, Suite 1400
Irvine, CA  92614
Telephone:  (949) 622-2756;  Facsimile:  (949) 769-2090
Email:  matt.murphey@troutmansanders.com

PAUL E. MCGOWAN, GSB #360460 (*admitted pro hac vice*)
Troutman Sanders LLP
600 Peachtree St. NE, Suite 5200
Atlanta, GA 30308
Telephone:  (404) 885-3000;  Facsimile:  (404) 962-6842
Email:  paul.mcgowan@troutmansanders.com

Attorneys for Defendant Seirus Innovative Accessories, Inc.

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| **COLUMBIA SPORTSWEAR NORTH AMERICA, INC.**, an Oregon corporation,<br><br>**PLAINTIFF,**<br><br>v.<br><br>**SEIRUS INNOVATIVE ACCESSORIES, INC.**, a Utah corporation,<br><br>**DEFENDANT.** | No. 3:15-cv-64-HZ<br><br><br>**DEFENDANT SEIRUS INNOVATIVE ACCESSORIES, INC.'S OPENING CLAIM CONSTRUCTION BRIEF** |

## TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ........................................................................................... 1

II.    BACKGROUND ............................................................................................ 2

    A.    Procedural History/Asserted Patents.................................................. 2

    B.    Prosecution History ............................................................................ 5

        1.    U.S. Prosecution History – Utility Patents................................ 5

        2.    U.S. Prosecution History – Design Patent ................................. 7

        3.    Foreign Prosecution History ..................................................... 7

III.   LEGAL STANDARDS .................................................................................. 8

    A.    Claim Construction Principles ............................................................ 8

        1.    Intrinsic Evidence ..................................................................... 9

            a.    Claim Language ............................................................. 9

            b.    Specification ................................................................ 10

            c.    Prosecution History...................................................... 10

        2.    Extrinsic Evidence .................................................................. 10

    B.    Design Patent Principles .................................................................. 11

    C.    Indefiniteness Standard .................................................................... 13

    D.    Level Of Ordinary Skill In The Art ................................................. 14

IV.    ARGUMENT................................................................................................ 14

    A.    Agreed Claim Terms ........................................................................ 14

    B. Disputed Claim Terms ......................................................................... 15

        1.    "Heat Management" Terms ..................................................... 15

        2.    "Adapted" Terms .................................................................... 18

        3.    "Heat Directing" / "Heat Reflecting" / "Positioned On" Terms.............. 21

        4.    "Discontinuous Array" Terms ................................................. 24

        5.    "Different on Different Portions" Terms ................................. 26

            a.    The Agreed Construction Renders The Term Indefinite ............ 27

            b.    The Patents' Failure To Teach "Portions" Also Renders The Term Indefinite ................................................. 29

        6.    Design Patent ......................................................................... 31

# TABLE OF CONTENTS

**Page**

a.    Seirus' Proposed Construction Limits The Design to its Overall Visual Impression ...................................................................................... 31

b.    Seirus' Construction of "Uninterrupted Pattern" Clarifies the Claim Language .......................................................................................... 33

c.    Seirus' Construction Properly Excludes Functional Aspects of the Patented Design ........................................................................................ 34

V.    CONCLUSION .............................................................................................. 35

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*Berry Sterling Corp. v. Prescor Plastics, Inc.*,
  122 F.3d 1452 (Fed. Cir. 1997)........................................................................35

*Datamize, LLC v. Plumtree Software, Inc.*,
  417 F.3d 1342 (Fed. Cir. 2005)........................................................................31

*Deering, Milliken & Co., Inc. v. Temp-Resisto Corp.*,
  274 F.2d 626 (2d Cir. 1960)..............................................................................3

*Dexas Int'l, LTD v. Tung Yung Int'l, Inc.*,
  C.A. No. 6:07-cv-334, 2008 U.S. Dist. LEXIS 48324 (E.D. Tex. June 24, 2008)............32

*Dow Chem. Co. v. Nova Chems. Corp. (Can.)*,
  803 F.3d 620 (Fed. Cir. 2015).....................................................................14, 16

*Egyptian Goddess, Inc. v. Swisa Inc.*,
  543 F.3d 665 (Fed. Cir. 2008)................................................................. passim

*Goodyear Tire & Rubber Co. v. Hercules Tire & Rubber Co.*,
  162 F.3d 1113 (Fed. Cir. 1998)...................................................................12, 34

*HR US LLC v. Mizco Int'l, Inc.*,
  C.A. No. CV-07-2394, 2009 U.S. Dist. LEXIS 27056 (E.D.N.Y. Mar. 31, 2009)............32

*In re Mann*,
  861 F.2d 1581 (Fed. Cir. 1988)........................................................................34

*Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*,
  381 F.3d 1111 (Fed. Cir. 2004)..........................................................................9

*Interval Licensing LLC v. AOL, Inc.*,
  766 F.3d 1364 (Fed. Cir. 2014)........................................................13, 14, 29, 31

*Lee v. Dayton-Hudson Corp.*,
  838 F.2d 1186 (Fed. Cir. 1988)........................................................................12

*Markman v. Westview Instruments, Inc.*,
  517 U.S. 370 (1996)...........................................................................9, 10, 11

*Medrad, Inc. v. MRI Devices Corp.*,
  401 F.3d 1313 (Fed. Cir. 2005)..........................................................................9

*Nautilus, Inc. v. Biosig Instruments, Inc.*,
    134 S. Ct. 2120 (2014) ................................................................ passim

*Network Commerce, Inc. v. Microsoft Corp.*,
    422 F.3d 1353 (Fed. Cir. 2005) ............................................................11

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*,
    521 F.3d 1351 (Fed. Cir. 2008) ...................................................... passim

*OddzOn Prods., Inc. v. Just Toys, Inc.*,
    122 F.3d 1396 (Fed. Cir. 1997) .................................................12, 31, 34

*Omega Eng'g, Inc. v. Raytek Corp.*,
    334 F.3d 1334 (Fed. Cir. 2003) ............................................................17

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005) (*en banc*) ...................................... passim

*Reddy v. Lowe's Cos., Inc.*,
    60 F. Supp. 3d 249, 256 (D. Mass. 2014). ............................................34

*Retractable Techs., Inc. v. Becton*,
    653 F.3d 1296 (Fed. Cir. 2011) ............................................................26

*Richardson v. Stanley Works, Inc.*,
    597 F.3d 1288 (Fed. Cir. 2010) ............................................................13

*Seymour v. Osborne*,
    78 U.S. (11 Wall.) 516 (1871) .............................................................11

*Shop*TV, Inc. v. Bed Bath & Beyond, Inc.*,
    C.A. No. 09-cv-00057, 2009 U.S. Dist. LEXIS 71659 (D. Colo. June 15, 2009) .................32

*Teva Pharms. USA, Inc. v. Sandoz, Inc.*,
    789 F.3d 1335 (Fed. Cir. 2015) ............................................................14

*Times Three Clothier, LLC v. Spanx, Inc.*
    13 Civ. 1257, 2014 U.S. Dist. LEXIS 59448 (S.D.N.Y. Apr. 29, 2014) ................................33

*Universal Trim Supply Co. v. K&K Cos. Group*,
    Case No. 2:09-CV-18, 2010 U.S. Dist. LEXIS 129894 (D. Utah Dec. 8, 2010) ....................12

*Vitronics Corp. v. Conceptronic, Inc.*,
    90 F.3d 1576 (Fed. Cir. 1996) ......................................................9, 10, 11

*Z Produx, Inc. v. Make-Up Art Cosmetics, Inc.*,
    Case No. CV 13-00734, 2013 U.S. Dist. LEXIS 159256 (C.D. Cal. Nov. 5, 2013),
    *aff'd* 568 F. App'x 897 (Fed. Cir. 2014) ........................................12, 33

**STATUTES**

35 U.S.C. § 112(b) .........................................................................................................................13

Pursuant to the Court's Scheduling Order, Defendant Seirus Innovative Accessories, Inc. (Seirus) hereby submits its Opening Claim Construction Brief regarding terms used in Asserted Claims 2, 16, 22, 23 of U.S. Patent No. 8,424,119 ('119 Patent); Claims 2, 22, 23 of U.S. Patent No. 8,453,270 ('270 Patent); and Claim 1 of U.S. Patent No. D657,093 ('D093 Patent).

## I.       INTRODUCTION

This action involves three patents asserted by Plaintiff Columbia Sportswear North America, Inc. (Columbia) – two utility patents and one design patent – relating to "Patterned Heat Management Material."  The Asserted Patents relate to "heat management materials" such as "heat directing elements" and "heat reflecting elements" arranged on a base fabric, for which the earliest application was filed in May 2010.  The Asserted Patents issued despite the fact that it has been known for decades to apply heat reflective elements to a base fabric, and Columbia brought suit despite the Korean Patent Office having invalidated Columbia's related foreign patent with claims similar to the asserted Utility Patents.

Seirus' products accused of infringement include cold-weather apparel such as gloves, socks, and hats.  To show infringement, Columbia has stretched the patent law past its limits, especially that relating to claim construction.  For example, it attempts to impose an "intent" requirement in certain claim terms that is narrower than the specification entails in its effort to overcome mountains of prior art.  It presents inconsistent constructions for nearly identical claim elements.  It argues that terms are not indefinite when infringement is entirely subjective and in direct contravention of the Supreme Court's teachings in *Nautilus*.  And it seeks an overly-specific design patent claim construction that grafts negative claim limitations despite Federal Circuit law dictating that this approach is improper.  These tactics and litigation-driven constructions are not supported by the law, and must be rejected.  For the reasons discussed herein, Seirus' proposed constructions should be adopted.

Page 1 – DEFENDANT SEIRUS INNOVATIVE ACCESSORIES, INC.'S OPENING CLAIM CONSTRUCTION BRIEF

## II.     BACKGROUND

### A.     Procedural History/Asserted Patents

The instant dispute dates back to December 4, 2013 when Columbia sued Seirus for patent infringement in the Western District of Washington.  Columbia later dismissed that suit and filed suit in this Court on January 12, 2015.

Columbia alleges infringement of three patents – the '119 and '270 Patents (collectively, "Utility Patents") and the 'D093 Patent.  Exs. A-C.[1]  The 'D093 Patent is entitled "Heat Reflective Material" and issued on April 3, 2012.  It lists Zach Snyder as an inventor.  It claims "the ornamental design of a heat reflective material" and all diagrams depict the following uninterrupted pattern:



*See also* 'D093 Patent ("Fig. 2 is an enlarged elevational view . . .  taken from any area of the design.")

The '119 Patent is a continuation application of the '270 Patent, so both of the Utility Patents have identical specifications.  Both are entitled "Patterned Heat Management Material" and list Woody Blackford as an inventor.  The '119 Patent issued on April 23, 2013, and the '270 Patent issued on June 4, 2013.  As the specifications describe, the alleged inventions of the

---

[1] All referenced exhibits are attached to the accompanying Declaration of Matthew D. Murphey.

Utility Patents "relate generally to body gear," which the Utility Patents identify as jackets, boots, gloves, hats, pants, socks, sleeping bags, tent rain flies, and tents that might incorporate the "patterned heat management material." *See, e.g.*, '270 Patent, 7:18-25.  The Utility Patents teach the use of "an array of heat managing elements coupled to a base material to direct body heat while also maintaining the desired transfer properties of the base material." *Id.* at Abstract. Such "heat managing elements" may "reflect heat or conduct heat . . . towards the body of a user or away from the body of the user." *Id.*  In the "Background" section of the Utility Patents, however, the patentee admitted that the prior art at the time of the invention already included attaching "heat reflective materials" to the interior layer of body gear (such as a jacket) "to inhibit thermal radiation by reflecting the body heat of the wearer and thereby keeping the garment wearer warm in cold conditions." *See, e.g.*, '270 Patent, 1:32-37.[2]  Further, as a result of prior art rejections during prosecution (discussed below), the claims all require that "a surface area ratio of heat-directing elements to base material is from about 7:3 to about 3:7."

Columbia asserts the following claims of the Utility Patents:

| Asserted Patent | Asserted Claim(s) |
|---|---|
| '119 Patent | 2, 16, 22, and 23 |

---

[2] Indeed, the Second Circuit – in 1960, fifty years prior to Columbia's patent applications – upheld the invalidity of a patent related to one Seirus contends anticipates Columbia's Utility Patents. Ex. R, *Deering, Milliken & Co., Inc. v. Temp-Resisto Corp.*, 274 F.2d 626 (2d Cir. 1960).  The invalidated patent provided, much like Columbia's patents, "that its fundamental object is to provide a textile fabric bearing a thin superficial application of heat reflective metallic material which would retain its porosity, hand and cleaning properties unimpaired." *Id.* at 627 (internal quotations omitted).  *Deering* evaluated the state of the prior art, which ranged from 1924-1943 and included application of reflective elements on a base fabric so as to retain porosity, flexibility and breathability in systems such as "linings for overcoats," "cot and tent fabrics," "metal-bearing fabrics in clothing," "ironing board covers," and "military garments." *Id.* at 629-33.  The court concluded that the patentee "had available to it *an idea propounded many years before 1949* and with skilled artisans . . .  experimented with, and ultimately produced, a coated fabric to which it ascribed certain qualities." *Id.* at 633 (emphasis added). *Deering* also rejected that the "discontinuous" nature of reflective elements was patentably novel, *id.* at 632, and further rejected any reliance on commercial success where the "invention is plainly lacking," *id.* at 633.

| Asserted Patent | Asserted Claim(s) |
|---|---|
| '270 Patent | 2, 22, and 23 |
| 'D093 Patent | 1 |

Independent Claims 1 of both Utility Patents (from which both Asserted Claims 2

depend) are reproduced below with those few differing terms emphasized:

| Claim 1 of the '119 Patent | Claim 1 of the '270 Patent |
|---|---|
| A heat management material adapted for use with body gear, comprising: | A heat management material adapted for use with body gear, comprising: |
| a base material having a transfer property that is adapted to allow, impede, and/or restrict passage of a natural element through the base material; | a base material having a transfer property that is adapted to allow, impede, and/or restrict passage of a natural element through the base material; and |
| *one or more* heat-directing elements, | *a discontinuous array of discrete* heat-directing elements, |
| each coupled to a first side of a base material, | each *independently* coupled to a first side of a base material, |
| the *one or more* heat-directing elements being positioned to direct heat in a desired direction, | the heat directing elements being positioned to direct heat in a desired direction, |
| wherein a surface area ratio of heat-directing elements to base material is from about 7:3 to about 3:7, | wherein a surface area ratio of heat-directing elements to base material is from about 7:3 to about 3:7 |
| and wherein *the surface area ratio of heat-directing elements to base material* permits the base material to retain partial performance of the transfer property. | and wherein *the placement and spacing of the heat-directing elements* permits the base material to retain partial performance of the transfer property. |

As shown, both independent claims are strikingly similar.  Moreover, apart from the "7:3

to about 3:7" surface area ratio limitation, the claims (and specifications) are devoid of metrics or

performance measure such as what it means to "direct" (or "reflect") heat or for the base material

to "retain partial performance of the transfer property," or even how much heat must be directed.

This is especially troubling given that the concept of "heat direction" is inherently ambiguous.

Heat scatters (much like light), and there is no teaching in the patents on what it means to direct

heat, or even to know whether it has been directed.

B.      Prosecution History

1.      U.S. Prosecution History – Utility Patents

The application resulting in the '270 Patent was filed on May 7, 2010, and claimed

priority to a series of design applications and a provisional application.  Independent claim 1

(that corresponds to issued independent claim 1), recited the following four elements:

| Element No. | '270 Patent Claim 1 – As Filed |
|---|---|
| 1 | A heat management material adapted for use with body gear, comprising: |
| 2 | a base material having a transfer property that is adapted to allow, impede, and/or restrict passage of a natural element through the base material; |
| 3 | an array of heat-directing elements coupled to a first side of a base material, the heat directing elements being positioned to direct heat in a desired direction, and |
| 4 | wherein the placement and spacing of the heat-directing elements helps enable the base material to perform the element transfer property |

Ex. E, p. 1.  In the first Non-Final Office Action, the Patent Office rejected independent claim 1

as being anticipated by U.S. Patent No. 4,622,253 to Levy entitled "Thermal laminated lining

and method of manufacture" (*Levy*).  Ex. L.  Among other elements, the Examiner concluded

that *Levy* disclosed:

- an insulated laminate lining material (which does provide heat management) that is disclosed as used in all sorts of applications including body gear, garments and apparel;

- a material 40, of any common fabric material which will inherently "allow, impede, and/or restrict passage" to some degree of "natural elements-air, moisture, water vapor, or heat"; and

- an array of heat directing elements (element 50 in FIG. 3) coupled to a first side of material 40, where the process creates an array of foil heat directing elements (50) "positioned to direct heat in a desired direction" and "placed and spaced" to "help enable the base material to perform the element transfer property."

Ex. F, pp. 2-3.

In response, the applicant amended independent claim 1, in part, to claim "*a*

*discontinuous* array of *discrete* heat-directing elements, *each independently* coupled to a first

side of a base material . . . ." Ex. G, p. 2.  The applicant argued that the array of heat-directing

elements in *Levy* failed to disclose this limitation.  *Id.* at 9.  The Examiner disagreed, again

rejecting independent claim 1 as anticipated by *Levy*, finding that it disclosed a discontinuous

array of heat directing elements 50 "independently coupled" to a first side of the material 40:



Ex. H, p. 3.

Although it disagreed with the Examiner, the applicant amended independent claim 1 yet

again, this time adding the limitation "wherein a surface area ratio of heat-directing elements to

base material is from about 7:3 to about 3:7."  Ex. I, p. 2.  To overcome the long-standing patent

prosecution presumption that changes in proportion of elements are not enough to overcome

otherwise identical prior art disclosure, applicant submitted the Declaration of Michael E.

"Woody" Blackford – its employee and named inventor.  *Id.* at 11.  Mr. Blackford claimed that

"fabrics, which have a percentage of surface area coverage of heat-directing elements of between

30% and 70%, are unexpectedly superior to other heat management fabrics having a percentage

of surface area coverage outside this range."  *Id.*

In response to that submission, the Examiner issued a Notice of Allowance.  Ex. J.  No

statement including reasons for allowance was provided.  Shortly thereafter, applicant filed the

application that resulted in the '119 Patent.  The claims in that application also required the

"about 7:3 to about 3:7" ratio, and the application was granted after Columbia filed a terminal

disclaimer in response to a double patenting rejection.  Ex. D, p. 7.

### 2.      U.S. Prosecution History – Design Patent

The application that resulted in the 'D093 Patent was filed on November 5, 2009.  The

Examiner issued a first-action Notice of Allowance subject to an Examiner's Amendment.

Among other things, the Examiner's Amendment noted:

> Descriptions of the figures are not required to be written in any particular
> format, however, they must describe the views of the drawing clearly and
> accurately.  MPEP 1503.01 (II)
>
> Accordingly, the specification has been amended; therefore, the descriptions
> of Fig. 1, 2 and 3 have been cancelled and replaced with the following:
>
> **-- Fig. 1 is an elevational view of a heat reflective material;**
>
> **Fig. 2 is an enlarged elevational view thereof, taken from any area in the
> design;**
>
> **Fig. 3 is a cross-sectional side elevational view thereof, taken in the
> direction of line 3-3 in Fig. 1;--**

Ex. K, p. 3 (emphasis in original).  The applicant did not object, and the 'D093 Patent issued

accordingly.

### 3.      Foreign Prosecution History

Columbia's foreign counterpart to the Utility Patents was rejected and ultimately

invalidated by the Korean Patent Office on December 20, 2013 – more than a year **before**

Columbia alleged infringement of the related patents in this Court.  Ex. M.  Independent claim 1

(rejected by the Korean Patent Office) and those asserted here are reproduced below, with those

few differences emphasized:

| Claim 1 of the '119 Patent | Claim 1 of the '270 Patent | Claim Invalidated in Korea |
| --- | --- | --- |
| A heat management material adapted for use with body gear, comprising: | A heat management material adapted for use with body gear, comprising: | A heat management material adapted for use with body gear, comprising: |
| a base material having a transfer property that is adapted to allow, impede, | a base material having a transfer property that is adapted to allow, impede, | a base material having a transfer property that is adapted to allow, impede, and/or restrict |

| Claim 1 of the '119 Patent | Claim 1 of the '270 Patent | Claim Invalidated in Korea |
|---|---|---|
| and/or restrict passage of a natural element through the base material; | and/or restrict passage of a natural element through the base material; and | passage of a natural element through the base material; |
| *one or more* heat-directing elements, | *a discontinuous array of discrete* heat-directing elements, | *an array* of heat directing elements |
| *each* coupled to a first side of a base material, | *each independently* coupled to a first side of a base material, | coupled to a first side of a base material, |
| the *one or more* heat-directing elements being positioned to direct heat in a desired direction, | the heat directing elements being positioned to direct heat in a desired direction, | the heat directing elements being positioned to direct heat in a desired direction, and |
| wherein a surface area ratio of heat-directing elements to base material is from about 7:3 to about 3:7, | wherein a surface area ratio of heat-directing elements to base material is from about 7:3 to about 3:7 | wherein *the placement and insulation of the heat directing elements helps to make* the surface area ratio of the mentioned heat directing elements to the mentioned base material be from 7:3 to 3:7, |
| and wherein the surface area ratio of heat-directing elements to base material *permits the base material to retain partial performance of the transfer property*. | and wherein the placement and spacing of the heat-directing elements *permits the base material to retain partial performance of the transfer property*. | and *enable the base material to perform the element transfer property, the base material is exposed between the heat directing elements* |

As the table shows, the invalidated claim is strikingly similar to those at-issue in this case.[3]

Moreover, Columbia's national stage Japanese patent application – with similarly-worded claims – currently stands rejected by the Chief Appeal Board Examiner in that tribunal.  Ex. O.

## III.   LEGAL STANDARDS

### A.   Claim Construction Principles

The words of a claim are generally given their ordinary and customary meaning as

_____

[3] The Columbia Korean Patent was ultimately invalidated in its entirety, and that decision was affirmed by the Korean Supreme Court that rejected Columbia's appeal of the lower decision. Ex. N.

understood by a person of ordinary skill in the art at the time of the invention. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312-13 (Fed. Cir. 2005) (*en banc*). To determine a particular claim term's ordinary and customary meaning within the field of art, the court should look to "'those sources available to the public that show what a person of skill in the art would have understood [the] disputed claim language to mean,'" including "'the words of the claims themselves, the remainder of the specification, the prosecution history, and extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art.'" *Id.* at 1314 (quoting *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1116 (Fed. Cir. 2004)).

### 1.    Intrinsic Evidence

A claim term "can be defined only in a way that comports with the instrument as a whole." *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 389 (1996); *see also Phillips*, 415 F.3d at 1313 (explaining that a claim term must be read "in the context of the entire patent"). "We cannot look at the ordinary meaning of the term . . . in a vacuum. Rather, we must look at the ordinary meaning in the context of the written description and the prosecution history." *Medrad, Inc. v. MRI Devices Corp.*, 401 F.3d 1313, 1319 (Fed. Cir. 2005).

"It is well-settled that, in interpreting an asserted claim, the court should look first to the intrinsic evidence of record, *i.e.*, the patent itself, including the claims, the specification and, if in evidence, the prosecution history." *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996). Intrinsic evidence constitutes the "public record of the patentee's claim, a record on which the public is entitled to rely." *Id.* at 1583; *see also Markman*, 52 F.3d at 978-79.

### a.    Claim Language

Claim construction begins with the language of the claims because "[i]t is a bedrock principle of patent law that the claims of a patent define the invention to which the patentee is

entitled the right to exclude." *Phillips*, 415 F.3d at 1312 (internal quotations and citations omitted). Again, the claim terms are generally given their ordinary and customary meaning. *Id.* at 1312-13. Alternatively, "a patentee may choose to be his own lexicographer and use terms in a manner other than their ordinary meaning, as long as the special definition of the term is clearly stated in the patent specification or file history." *Vitronics*, 90 F.3d at 1582.

### b. Specification

The person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification. *Phillips*, 415 F.3d at 1313. The focus is on "how the patentee used the claim term in the claims, specification, and prosecution history." *Id.* at 1321. The specification may also act as a dictionary, which may explain the context of claimed subject matter. *Markman*, 52 F.3d at 979.

### c. Prosecution History

In construing the claims, the Court "may also consider the prosecution history of the patent, if in evidence." *Vitronics*, 90 F.3d at 1582. "[T]he record before the Patent and Trademark Office is often of critical significance in determining the meaning of the claims." *Id.* This history can guide the interpretation of claim terms by revealing "how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be." *Phillips*, 415 F.3d at 1317.

### 2. Extrinsic Evidence

Extrinsic evidence encompasses "all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." *Markman*, 52 F.3d at 980. Extrinsic evidence may not be used to contradict the language of the claims or

other intrinsic evidence.  *Vitronics*, 90 F.3d at 1584-85.  However, "[t]he court may, in its discretion, receive extrinsic evidence in order 'to aid the court in coming to a correct conclusion' as to the 'true meaning of the language employed' in the patent."  *Markman*, 52 F.3d at 980 (quoting *Seymour v. Osborne*, 78 U.S. (11 Wall.) 516, 546 (1871)).

Although "extrinsic evidence in the form of expert testimony can be useful to a court for a variety of purposes, such as to provide background on the technology at issue, to explain how an invention works, to ensure that the court's understanding of the technical aspects of the patent is consistent with that of a person of skill in the art, or to establish that a particular term in the patent or the prior art has a particular meaning in the pertinent field," "[c]onclusory, unsupported assertions by experts as to the definition of a claim term are not useful to a court."  *Phillips*, 415 F.3d at 1318.  Expert opinion that is clearly at odds with the intrinsic record is to be discounted.  *See Network Commerce, Inc. v. Microsoft Corp.*, 422 F.3d 1353, 1361 (Fed. Cir. 2005).

### B.    Design Patent Principles

The Federal Circuit has confirmed that claim construction applies to design patents.  *Egyptian Goddess, Inc. v. Swisa Inc.*, 543 F.3d 665, 679 (Fed. Cir. 2008).  In that case, the Federal Circuit explained that the district court has considerable discretion in construing design patents; it does not "prescribe[] any particular form that the claim construction must take," but rather "recognize[s] that design patents typically are claimed as shown in drawings, and that claim construction is adapted accordingly."  *Id.* at 679 (internal citations and quotation marks omitted).  Accordingly, the district court is not required to "attempt to provide a ***detailed*** verbal description of the claimed design," but the court can provide some "verbal elaboration" of the claim if "necessary or helpful."  *Id.* (emphasis added).  Indeed, "[w]hile it may be unwise to attempt a full description of the claimed design, a court may find it helpful to point out [to the trier of fact] . . . various features of the claimed design as they relate to the accused design and

the prior art." *Id.* at 680 ("for example, there would be nothing wrong with the court pointing out to a jury that in the patented design only three sides have buffers attached, while in the accused product (and in the three-sided Nailco patent), all of the sides have buffers attached").[4]

The Federal Circuit also explained that a trial court can "usefully guide the finder of fact by addressing a number of other issues that bear on the scope of the claim," including providing clarity regarding "the role of particular conventions in design patent drafting," "the effect of any representations that may have been made in the course of the prosecution history," and "distinguishing between those features of the claimed design that are ornamental and those that are purely functional." *Egyptian Goddess*, 543 F.3d at 680.

The prosecution history is relevant in a design case because any amendments made during prosecution for patentability may be used to limit the design patent claim scope. *Id.* (citing *Goodyear Tire & Rubber Co. v. Hercules Tire & Rubber Co.*, 162 F.3d 1113, 1116 (Fed. Cir. 1998)). In *Goodyear*, the Federal Circuit affirmed the district court's reliance upon representations by the patentee during prosecution of its design patent claim for the ornamental design for a tire tread to determine the scope of the claim. 162 F.3d at 1118-19.

The issue of functionality is equally important because "[a] design patent protects only the novel, ornamental features of the patented design," not its functional elements. *OddzOn Prods., Inc. v. Just Toys, Inc.*, 122 F.3d 1396, 1404-05 (Fed. Cir. 1997); *see also Lee v. Dayton-Hudson Corp.*, 838 F.2d 1186, 1188-90 (Fed. Cir. 1988) ("[I]t is the non-functional, design aspects that are pertinent to determinations of infringements. . . . A device that copies the

---

[4] Since *Egyptian Goddess*, several district courts have adopted verbal constructions of design patent claims. *See, e.g.*, *Z Produx, Inc. v. Make-Up Art Cosmetics, Inc.*, Case No. CV 13-00734, 2013 U.S. Dist. LEXIS 159256, at *17 (C.D. Cal. Nov. 5, 2013), *aff'd* 568 F. App'x 897 (Fed. Cir. 2014) (adopting a brief verbal description of the relevant claimed ornamental elements); *Universal Trim Supply Co. v. K&K Cos. Group*, Case No. 2:09-CV-18, 2010 U.S. Dist. LEXIS 129894, at *6 (D. Utah Dec. 8, 2010) (finding that a verbal construction, offering "no more description than is necessary" to assist the jury in identifying the scope of the claim, was appropriate).

utilitarian or functional features of a patented design is not an infringement. . . . [While] infringement can be found for designs that are not identical to the patented design, such designs must be equivalent in their ornamental, not functional, aspects."). So, where a design is found to include both functional and ornamental features, the court must "factor[] out" the functional aspects of the design for the purposes of claim construction. *Richardson v. Stanley Works, Inc.*, 597 F.3d 1288, 1293 (Fed. Cir. 2010).

### C.    Indefiniteness Standard

A patent must "conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as [her] invention." 35 U.S.C. § 112(b). Affirming the importance of providing "clear notice of what is claimed," the Supreme Court defined the applicable "definiteness" legal standard under Section 112(b): "[A] patent is invalid for indefiniteness if its claims, read in light of the specification delineating the patent, and the prosecution history, fail to inform, ***with reasonable certainty***, those skilled in the art about the scope of the invention." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S. Ct. 2120, 2124 (2014) (emphasis added). As the Supreme Court articulated, determining indefiniteness under § 112(b) is a "delicate balance": "On the one hand, the definiteness requirement must take into account the inherent limitations of language. Some modicum of uncertainty . . . is the 'price of ensuring the appropriate incentives for innovation.'" *Id.* at 2128. At the same time, a patent must be precise enough to afford clear notice of what is claimed, thereby "appris[ing] the public of what is still open to them." *Id.* at 2129. Otherwise, there would be a "zone of uncertainty which enterprise and experimentation may enter only at the risk of infringement claims." *Id.*

The Federal Circuit has applied *Nautilus* to invalidate patent claims that are unduly subjective, holding that "[t]he claims, when read in light of the specification and the prosecution history, must provide objective boundaries for those of skill in the art." *Interval Licensing LLC*

*v. AOL, Inc.*, 766 F.3d 1364, 1371 (Fed. Cir. 2014). "[T]here is an indefiniteness problem if the claim language might mean several different things and no informed and confident choice is available among the contending definitions." *Id.* (internal quotation marks omitted) (quoting *Nautilus*, 134 S. Ct. at 2130 & n.8). *See also Teva Pharms. USA, Inc. v. Sandoz, Inc.*, 789 F.3d 1335, 1345 (Fed. Cir. 2015) (finding that "average molecular weight" created uncertainty as to which type of average was intended, rendering the claim indefinite); *Dow Chem. Co. v. Nova Chems. Corp. (Can.)*, 803 F.3d 620, 633 (Fed. Cir. 2015) (ruling that multiple methods to determine "slope of strain hardening," producing different results made that claim indefinite).

### D.     Level Of Ordinary Skill In The Art

As explained by Dr. Block, a person of ordinary skill in the art in the field of textile materials would hold at least a master's degree in textile engineering or have at least three or more years of experience in a related field. Declaration of Ira Block (Block Decl.) ¶ 9. Such training would allow this hypothetical person of ordinary skill to understand the chemical, physical, mechanical, and heat management properties of textile materials. *Id.*

## IV.   ARGUMENT

### A.     Agreed Claim Terms

As set forth in the Joint Claim Construction and Prehearing Statement (DE 67) (JCCS), the parties agree on the construction of the following four claim terms:

| Claim Term | Patent and Claim | Parties' Construction |
|---|---|---|
| "surface area ratio of heat-directing elements to base material" | '119 Patent, Claims 2, 16, 22, 23<br><br>'270 Patent, Claims 2, 22, 23 | "the amount of the surface area of a side of the base material that is covered by the heat directing elements divided by the total surface area of the side of the base material onto which the elements are attached" |
| "pairing the heat management body gear material with a piece of body gear" | '119 Patent, Claim 16 | "using the heat management material with other components to form a piece of body gear" |

| Claim Term | Patent and Claim | Parties' Construction |
|---|---|---|
| "uniformly-sized" | '270 Patent, Claim 22 | "the same size" |
| "heat" | '119 Patent, Claims 2, 16, 22, 23<br><br>'270 Patent, Claims 2, 22, 23 | "heat seen as a form of energy that may be transferred by conduction, convection, or radiation" |

### B.    Disputed Claim Terms

The parties disagree on the construction of numerous claim terms.  For convenience,

Seirus has grouped its discussion of similar terms into a few groups – identifying each term by

number as it appeared in the JCCS.

### 1.    "Heat Management" Terms[5]

| Claim Term | Columbia Construction | Seirus Construction |
|---|---|---|
| "heat management material" (JCCS Term No. 1)<br><br>'119 Patent, Claims 2, 22, 23<br><br>'270 Patent, Claims 2, 22, 23 | The plain and ordinary meaning is sufficient.  To the extent an alternate is needed:<br><br>"textile material designed to maintain or control heat." | "any textile material able to affect the loss or increase of heat" |
| "heat management body gear material" (JCCS Term No. 2)<br><br>'119 Patent, Claim 16 | The plain and ordinary meaning is sufficient.  To the extent an alternate is needed:<br><br>"textile material in body gear designed to manage or control heat" | "any textile material incorporated into body gear that is able to affect the loss or increase of body heat" |
| "body heat management" (JCCS Term No. 3)<br><br>'119 Patent, Claim 16 | The plain and ordinary meaning is sufficient.  To the extent an alternate is needed:<br><br>"direction or control over body heat." | "an ability to affect the loss or increase of body heat" |

Although the parties disagree on the meaning of three "heat management" terms, there is

agreement on the definition of "heat" (see § IV.A).  And, for the first two terms, "heat

management material" and "heat management body gear material," the parties appear to agree

that the claimed "material" must be a "textile material."  With regard to the parties' disputes,

---

[5] Seirus revised its proposed construction of "body heat management" after the parties submitted the JCCS.

only Seirus' constructions recognize that the textile material is but one component of a piece of body gear and it will have the ***capability*** to affect or influence whether heat—in this case body heat—increases or is lost.  Seirus' proposed constructions are correct for the following reasons.

First, Seirus' constructions are ***consistent*** for the common term "heat management" found in all three disputed claim terms.  Although the Utility Patent specifications provide no metrics on what the Utility Patents mean by "manage heat," the intrinsic record consistently confirms that "heat management" requires the ability to "affect the loss or increase of body heat."  For example, the specifications confirm the use of "a pattern of heat management material coupled to a base fabric ***to manage, for example, body heat by directing the heat towards or away from the body as desired***, while still maintaining the desired transfer properties of the base fabric."  *See, e.g.*, '119 Patent, 3:29-34 (emphasis added).  *See also id.* at 3:39-42 ("The heat directing function of the heat management elements may be generally towards the body through reflectivity or away from the body through conduction and/or radiation or other heat transfer property.")  Indeed, the specifications define "the desired degree of ***heat management***" as "e.g., heat reflection toward the body to enhance warmth, or heat conductance away from the body to help induce cooling."  *See, e.g., id.* at 3:43-47.  Columbia, on the other hand, provides inconsistent definitions for the identical claim language, without any explanation as to why it should be construed differently in each term:

| Claim Term | Columbia's Apparent Construction Of Heat Management |
| --- | --- |
| "**heat management** material" | "***maintain*** or control heat." |
| "**heat management** body gear material" | "***manage*** or control heat" |
| "body **heat management**" | "***direction*** or control" |

Accordingly, although the parties agree on the definition of "heat," Columbia's proposed

constructions for the "heat management" element are inconsistent and there is no basis for construing them differently as Columbia proposes. *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1334 (Fed. Cir. 2003) ("the same claim term in the same patent or related patents carries the same construed meaning.")

Further, Columbia's proposed constructions should not be adopted because they do not further the claim construction process or aid the jury in understanding the term. *See O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1360 (Fed. Cir. 2008) (assigning a construction that is more unhelpful than the term by itself undercuts the purpose of the claim construction process). Specifically, Columbia's constructions fail to identify what "heat management" entails. With respect to "heat management body gear material," Columbia just repeats the ambiguous term "manage." And all three of its proposed constructions use the "control" language which is also vague and ambiguous because the specifications do not discuss any concept of "control." Instead, the specifications describe that any "management" is done by directing heat. *See, e.g.*, '119 Patent, 3:29-34. The specifications are silent on any concept of "control" such that a wearer can control how much heat is directed towards or away from their body. In sum, Columbia's varied definitions are not consistent and not supported. This is especially problematic because the Utility Patents provide no metric to determine when heat has been "managed" in any respect.

The remaining dispute appears to be whether the "heat management" terms are ***able to*** "manage heat," as Seirus proposes, or whether they must be more restrictively ***designed to*** "manage heat," as Columbia proposes. Columbia's construction cannot be adopted as it seeks to impose an intent requirement. Under Columbia's construction, if all elements are present, but there is no evidence that the textile material was "designed" to "manage heat," is there no

infringement?  This is an unduly narrow reading that is divorced from the context of the

specifications because the specifications do not delve into any such "intent."  Further, although

the Utility Patents' specifications may use terms that denote a "designed" aspect, the concept is

already built-in to the various claim elements.  For example, the specifications disclose that "[i]n

various embodiments, ***allowing a designated percentage of the base fabric to remain uncovered***

***by the heat management material elements allow [sic] that portion of the base fabric to***

***perform the desired function***" and that "the heat management elements ***may be positioned*** in

such a way and be made of a material that is conducive for directing heat generated by the

body."  *See, e.g.*, '119 Patent, 4:15-24 (emphasis added).  But these elements are already claimed

separately.  *See, e.g.*, *id.* at 8:15-18 (Claim 1) ("one or more heat-directing elements ***being***

***positioned to direct heat in a desired direction*** . . .")  Moreover, Columbia's proposed

construction states that the "textile material" is designed to maintain or control heat.  This raises

more questions than answers:  What is the textile material?  Is it the base material?  Is it the heat

directing elements?  As discussed above, the specifications support an interpretation that it is

only the arrangement or position of heat directing elements on a base material that is selected,

and this does not support Columbia's assertion that the textile material has been "designed to

maintain or control heat."  Accordingly, Columbia's construction is an unduly narrow reading of

the claim terms and should be rejected.

### 2.    "Adapted" Terms[6]

| Claim Term | Columbia Construction | Seirus Construction |
| --- | --- | --- |

---

[6] Seirus is not separately addressing "adapted for" / "adapted to" (JCCS Term No. 4), and instead addresses those terms in the larger phrases "adapted for use with body gear" and "adapted to allow, impede, and/or restrict passage."

| Claim Term | Columbia Construction | Seirus Construction |
|---|---|---|
| "adapted for use with body gear" (JCCS Term No. 5) <br><br> '119 Patent, Claims 2, 22, 23 <br><br> '270 Patent, Claims 2, 22, 23 | "suited by design for use with body gear." | "[something that is] capable of being incorporated into body gear" |
| "adapted to allow, impede, and/or restrict passage" (JCCS Term No. 6) <br><br> '119 Patent, Claims 2, 16 <br><br> '270 Patent, Claims 2, 23 | "suited by design to allow, impede, and/or restrict passage." | "[something that is] capable of regulating the passage [of a natural element]" |

The parties' disagreement on the "adapted" terms relates to two claim terms: "adapted for use with body gear" and "adapted to allow, impede, and/or restrict passage." Only Seirus' proposed constructions recognize that these terms are used in the claims as explanatory phrases to introduce the capability of the apparatus being claimed, while Columbia seeks to impose some sort of subjective design or intent requirement not otherwise present in the claims.

With regard to the first – "a heat management material *adapted for use with body gear*," Seirus proposes that the term be construed as "[something that is] capable of being incorporated into body gear." This is entirely consistent with the specifications that describe various "patterned heat management fabric used in a variety of body gear applications," including jackets, boots, gloves, hats, pants, socks, tents, and sleeping bags. *See, e.g.*, '119 Patent, 7:18-20. The patent specifications merely state that the heat management material *may* be used in body gear. *See, e.g.*, *id.* at 7:28-30 ("the heat management material elements may be used on the outside of body gear"). But, these are not manufacturing patents; there is no disclosure of *how* the material can be designed to do so. Nor is there any disclosure of *how* the selection or placement of elements makes it any more or less likely to be used with body gear. Moreover, during prosecution of the '270 Patent, the Examiner rejected claim 1 in view of *Levy* finding that

it "discloses an insulated laminate lining material (which does provide heat management) that is disclosed *as used in all sorts of applications including body gear, garments, and apparel*."  Ex. H, p. 3 (emphasis added).  This interpretation is consistent with Seirus' proposed construction. Columbia, on the other hand, proposes that the "heat management material" be "suited by design for use with body gear."  Its construction is inconsistent with the prosecution history – Columbia did not argue that there was some sort of intent requirement when this element was rejected in view of *Levy*.

Further, Columbia's construction is vague and ambiguous, because it begs the question: what is "*suited by design for use*"?  For example, does a separate, large sheet of "a base material" with "one or more heat directing elements" on it satisfy Columbia's construction even though it is not yet capable of being incorporated into body gear?  As noted, the Utility Patents do not disclose this manufacturing step, and adopting Columbia's construction would expand its rights beyond those claimed or disclosed in the Utility Patents.  Moreover, consider Claim 15 of the '119 Patent, which is the method claim counterpart to Claim 1 of the '119 Patent.  Claim 1 contains the "adapted for use with body gear" language, while the method claim requires "pairing the heat management body gear material with a piece of body gear."  *Compare* '119 Patent, Claim 1 *with id.* at Claim 15.  The parties agreed that "pairing the heat management body gear material with a piece of body gear" should be construed as "using the heat management material with other components *to form a piece of body gear*."  *See* § IV.A.  This supports the notion that the textile material is "incorporated into" the body gear, which is consistent with Seirus' construction and inconsistent with Columbia's.  *Cf.* '119 Patent, 3:51-52 ("the base fabric *may be a part of* any form of body gear") (emphasis added).

Next, the parties dispute the meaning of "adapted to allow, impede or restrict passage" in "a base material having a transfer property that is ***adapted to allow, impede, and/or restrict passage of a natural element*** through the base material."  *See, e.g.*, '119 Patent, Claim 1.  As alluded to above, Columbia's proposal that the term be construed as "suited by design" to allow, impede, or restrict passage is illogical.  "Allow, impede, and/or restrict" covers the entire waterfront of possibilities (i.e., it "allows" or "retards" or "prevents" passage) and thus, it arguably includes any known material.  Columbia's proposal that the material be "designed" for a property that it already necessarily has thus makes no sense and should not be adopted.  Indeed, during prosecution, the Examiner rejected independent claim 1 and found that this limitation was ***inherently disclosed in any common fabric material***:

> [*Levy*] discloses a material 40, of any common fabric material which will inherently "allow, impede, and/or restrict passage" to some degree of "natural elements . . ."

Ex. H, p. 3.  Thus, it is nonsensical for Columbia to then argue that such material must be "***suited by design*** to allow, impede, and/or restrict passage."  Indeed, if a plastic garbage bag was used as the base material because it has "a transfer property that is adapted to allow, impede, and/or restrict passage of a natural element" through the garbage bag, ***the garbage bag itself is not "suited by design to allow, impede, and/or restrict passage,"*** but rather, it already possesses those properties.  Finally, Seirus' proposed construction of "regulate" is meant to be synonymous for "allow, impede or restrict."  Ex. P.  Seirus therefore proposes a construction that is more simple and easier for a jury to understand, and its construction should be adopted.

### 3. "Heat Directing" / "Heat Reflecting" / "Positioned On" Terms

| Claim Term | Columbia Construction | Seirus Construction |
|---|---|---|

| Claim Term | Columbia Construction | Seirus Construction |
|---|---|---|
| "heat-directing elements" (JCCS Term No. 7)<br><br>'119 Patent, Claims 2, 16, 22, 23<br><br>'270 Patent, Claims 2, 22, 23 | The plain and ordinary meaning is sufficient. To the extent an alternate is needed:<br><br>"elements that alter the direction of heat" | "elements that are capable of altering the direction of heat flow" |
| "direct heat" (JCCS Term No. 8)<br><br>'119 Patent, Claims 2, 16, 23<br><br>'270 Patent, Claims 2, 23 | The plain and ordinary meaning is sufficient. To the extent an alternate is needed:<br><br>"alter the direction of heat." | "alter the direction of heat flow" |
| "heat-reflective elements" (JCCS Term No. 9)<br><br>'119 Patent, Claims 22, 23<br><br>'270 Patent, Claim 22 | "elements that alter the direction of heat by reflection" | "elements that are capable of altering the direction of heat flow by reflection" |
| "reflect heat" (JCCS Term No. 10)<br><br>'119 Patent, Claims 22, 23<br><br>'270 Patent, Claims 22, 23 | The plain and ordinary meaning is sufficient. To the extent an alternate is needed:<br><br>"alter the direction of heat by reflection." | "alter the direction of heat flow by reflection" |
| "positioned on the innermost surface to direct heat towards the body of a body gear user" (JCCS Term No. 13)<br><br>'119 Patent, Claim 2 | "positioned on the surface of the body gear closest to a user's body so as to alter the direction of heat toward the user's body" | "[something] positioned on the surface [of something] closest to a user's body in such a way as to alter the direction of heat flow toward the user's body" |

All asserted claims refer to elements that "direct" or "reflect" heat, but only Seirus' proposed constructions help explain what that means. Each of the five "heat directing/reflecting" and "positioned on" terms involve two disputes. First, whether "heat-directing" and "heat-reflective" elements **must** "alter the direction of heat" or simply be **capable of** "alter[ing] the direction of heat." And second, whether it is heat "**flow**" that is directed or reflected.

First, Seirus reiterates its earlier discussion of how the "adapted" terms must only be "capable of altering the direction of heat." The intrinsic record shows that the "heat directing" and "heat reflecting" elements need not actually alter the direction of heat. For example, the

specifications confirm that "heat directing elements [] are primarily ***configured*** to conduct heat . . ." and "configured to" is synonymous with Seirus' "capable of" construction.  *See, e.g.*, '119 Patent, 3:39-42 ("The heat directing function of the heat management elements ***may be*** generally towards the body through reflectivity or away from the body through conduction and/or radiation or other heat transfer property.") (emphasis added).  Indeed, the claim language confirms Seirus' "capable of" construction as the claims merely require "one or more heat-directing elements ***being positioned*** to direct heat in a desired direction," without requiring that they actually direct heat.  *See, e.g.*, *id.* at Claim 1.  The lack of any metrics in the claims to determine if heat has been directed (and, if so, how much heat) supports this construction.  Moreover, Columbia would not concede that the claimed "body gear" does not infringe Claim 1 if it were placed in an environment in which there was no exchange of heat such that no heat was being directed (e.g., placing it in isolation in an isothermal chamber or similar device).  Reviewing the intrinsic record confirms that any alleged infringement occurs upon creation of the apparatus, not when the apparatus is placed in a specific condition.  Accordingly, there is no teaching for Columbia's unduly narrow reading.

Second, Seirus specifies that it is the direction of "heat ***flow***" that is capable of being altered.  Although the specifications do not use the term "flow," the concept is well-understood.  As Dr. Block states, applying the concept of "flow" is required when discussing a change or alteration in the direction of "heat."  Indeed, the parties agreed that "heat" should be construed as "a form of energy that may be transferred by conduction, convection, or radiation."  This "transfer" of energy suggests movement of the heat, which is captured in the concept of "flow." For example, a change in the direction of "heat" can be conceptualized as a set of vectors each having its own direction and magnitude, thereby representing "movement" or the "flow" of the

heat.  The concept of "heat flow" is similar to that of water – one would not discuss altering the direction of water, but rather altering the direction of water *flow*.  Indeed, the claim language confirms that heat is being directed "in a ***desired direction***," thereby necessitating the "flow" concept.  Seirus' proposal is also more helpful to a jury as it explains where the heat is going.  For example, if a runner takes off their shirt in cool weather, heat will naturally escape in a direction away from the body.  This is how Seirus is using the "flow" concept.  Otherwise, heat is an ambiguous concept that requires additional construction under Columbia's proposal because the meaning of altering the direction of "heat" is unclear.

Further, the Utility Patents provide no metrics for what it means to "direct heat," and Columbia's construction fails to explain what happens to the heat.  Columbia's construction is merely another way of saying "direct heat" and thus is unhelpful.  Accordingly, the concept of "flow" makes it more understandable to a jury.

Finally, for the "positioned on" term, the dispute appears to be on the sub-element "to direct heat."  Seirus does not dispute that something is being "positioned on the surface of the body gear closest to a user's body" as set forth in Columbia's construction.  Accordingly, the sole dispute here is whether "to direct heat" requires the concept of "heat flow," and for the aforementioned reasons, it does and Seirus' proposed construction should be adopted.

### 4.  "Discontinuous Array" Terms

| Claim Term | Columbia Construction | Seirus Construction |
|---|---|---|
| "discontinuous array" (JCCS Term No. 14)<br><br>'270 Patent, Claims 2, 22, 23 | An arrangement of multiple, discrete, elements, whereby some of the base fabric is exposed between adjacent elements. | "set of [something] that are not connected (i.e., do not touch)" |

| Claim Term | Columbia Construction | Seirus Construction |
|---|---|---|
| "discontinuous array of uniformly-sized heat-reflective elements" (JCCS Term No. 15)<br><br>'270 Patent, Claim 22 | "Discontinuous array" is construed separately above. Otherwise, this term has its plain and ordinary meaning. | "set of elements that are capable of altering the direction of heat flow, in which the elements are not connected and are all the same size (i.e., do not touch)" |

The concept of a "discontinuous array," which is used only in the '270 Patent, should be straightforward but is obfuscated by Columbia's construction.

Seirus' construction follows the plain and ordinary meaning of the term – i.e., an array is a "set of [something]" and discontinuous means that the [somethings] "are not connected" or "do not touch." In other words, a discontinuous array is a way of describing the presentation or display of something [in this case the so-called heat management elements], as in a "discontinuous array" of marbles on a table would connote a set of marbles on a table, where the marbles are not touching. This is confirmed by the intrinsic record, as it shows a "discontinuous array" in FIGS. 1A-1E:



All are a set of dots that are not connected and do not touch. Indeed, the specifications state that "[a]lthough the illustrated embodiments show the heat management material elements *as discrete elements* [e.g., as a 'discontinuous array'], in some embodiments, some or all of the

heat management material elements may be arranged *such that they are in connection with one another*." *See, e.g.*, '119 Patent, 5:35-39.  Accordingly, the intrinsic record contrasts "discontinuous array" with elements that "are in connection with one another."

Columbia's construction is needlessly complicated and unhelpful to a jury as it uses seventeen words to describe two.  It also improperly grafts the concept of "the base fabric" onto its construction, which is unnecessary and will only serve to confuse the jury.  Indeed, the stand-alone concept of a "discontinuous array" has nothing to do with the base fabric.  Further, Columbia's proposed construction is taken directly from the specifications as a description of *one embodiment*: "*For example, referring to FIGS. 1B-1E, in one embodiment*, a plurality of heat management or heat directing elements 10 may be disposed on a base fabric 20 in a generally non-continuous array, whereby some of the base fabric is exposed between adjacent heat management elements." *See, e.g.*, '119 Patent, 3:34-39 (emphasis added).  Columbia's proposed construction is a classic case of improperly importing a limitation from the specification, especially given that the specifications unambiguously state that the limitation is directed to one embodiment.  *See Retractable Techs., Inc. v. Becton*, 653 F.3d 1296, 1313 (Fed. Cir. 2011) ("It is improper to import limitations from the specification into the claims, and this court has expressly and repeatedly warned against confining claims to specific embodiments of the invention set forth in the specification." (citing *Phillips*, 415 F.3d at 1323)).  Moreover, Columbia's construction fails to account for the difference between Claim 1 of both Utility Patents.  A comparison of the two (*see* § II.A.) shows that the primary difference is Claim 1 of the '119 Patent claims "one or more heat-directing elements" while Claim 1 of the '270 Patent claims "a discontinuous array of discrete heat-directing elements."  Adopting Columbia's construction – "An arrangement of multiple, discrete, elements, whereby some of the base fabric

is exposed between adjacent elements" – renders Claim 1 of '270 Patent nearly identical to

Claim 1 of the '119 Patent, and thus violates the doctrine of double-patenting.

**5.   "Different on Different Portions" Terms**

| Claim Term | Columbia Construction | Seirus Construction |
|---|---|---|
| "surface area ratio of heat-directing elements to base material is different on different portions of the body gear" (JCCS Term No. 11) <br><br> '119 Patent, Claim 22 <br><br> '270 Patent, Claim 22 | Plain and ordinary meaning. | Indefinite |
| "different on different portions of the body gear" (JCCS Term No. 12) <br><br> '119 Patent, Claim 22 <br><br> '270 Patent, Claim 22 | Plain and ordinary meaning. | Indefinite |

The term "surface area ratio of heat-directing elements to base material is different on

different portions of the body gear" (and specifically, the sub-term "different on different

portions of the body gear") is indefinite because the "claims, read in light of the specification

delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those

skilled in the art about the scope of the invention." *Nautilus*, 134 S. Ct. at 2124. The terms are

indefinite for at least two reasons. First, the parties have agreed on a construction of "surface

area ratio of heat-directing elements to base material" that is consistent with the specification,

but that construction is unworkable in Claim 22 of both of the Utility Patents. Second, although

the parties have agreed on the meaning of "surface area ratio of heat-directing elements to base

material" and while there is no dispute what "body gear" means, there is no understanding to a

person of ordinary skill on how to apply that ratio to "different portions" without knowing what

those portions might be.

**a.      The Agreed Construction Renders The Term Indefinite**

First, both parties agree that the "surface area ratio of heat-directing elements to base material" means "the amount of the ***surface area of a side of the base material*** that is covered by the heat directing elements divided by the ***total surface area of the side of the base material*** onto which the elements are attached." *See* § IV.A.  Thus, the parties agree that calculating this ratio requires dividing the total surface area of heat-directing elements that are placed ***on a given side of the base material*** by the total surface area of ***that same side of the base material***.  So, this term represents how much of a given side of the base material is covered by the heat management elements, expressed in ratio form.  For a given base material (or piece of "body gear"), this ratio is a fixed value.  Block Decl. ¶¶ 30-32.

This agreed construction dictates use of the ***entirety of the surface area*** of a side of the base material to calculate the claimed surface area ratio.  As an example, consider a side of base material represented as a square divided into four quadrants, with the red shading (quadrant 1) indicating heat-directing elements on that ***side*** of the base material (see figure below).  Under the agreed construction, the "surface area ratio of heat-directing elements to base material" for this example is 1:4 or 25% coverage (i.e., the "surface area of a side of the base material that is covered by the heat directing elements" is represented as the red square comprising quadrant 1; and according to the agreed construction, it is divided by the "total surface area of the side of the base material onto which the elements are attached" that is represented as the larger square comprising quadrants 1-4; so the claimed surface area ratio is simply 1/4 or 25%).



But in view of this agreed-upon construction, there is no reasonable way of determining whether the "surface area ratio of heat-directing elements to base material is different on different portions of the body gear" limitation is met because the "***surface area ratio of heat-directing elements to base material***" cannot change for a given base material.  In other words, the definition does not account for or contemplate "portions."  Even assuming one knew how to identify a portion – and, in fact, we do not, as noted in the next sub-section – the "surface area ratio" will be the same for a given design because the parties agree that the total surface area of a side must be used and that total surface area cannot change.  Block Decl. ¶¶ 30-32.  So, in the example above, even assuming that each quadrant is a different "portion," the "surface area ratio of heat-directing elements to base material" will be the same in quadrant 1 (1:4) as in quadrant 2 (1:4) because, as the parties agree, the ratio requires determining "***the amount of the surface area of a side*** of the base material that is covered by the heat directing elements divided ***by the total surface area of the side of the base material onto which the elements are attached***."

> **b.**     **The Patents' Failure To Teach "Portions" Also Renders The Term Indefinite**

The term is indefinite for the additional reason that there is no teaching of what the "portions" may be.  The analysis is entirely subjective (as confirmed by Columbia's infringement

contentions) such that the claim can always be met when it is so desired.  This is the hallmark of indefiniteness.  *See Interval Licensing*, 766 F.3d at 1373 (finding claim indefinite when "the facially subjective claim language [has no] objective boundary.")  Indeed, Columbia's Amended Infringement Contentions underscore the point that the "portions" language has no objective boundary as Columbia indiscriminately selected the allegedly-infringing portions (the "Portion 1" and "Portion 2" terminology was supplied by Columbia):



Ex. Q.  But without guidance on what constitutes "portions" and other related questions (e.g., how does one select them? How big are they?), a person of ordinary skill has no reasonable guidance from the specifications as to what "portions" might be.  For example, Columbia could have identified the following two "portions" (highlighted in red), and determined that the claim is not satisfied:



Although the specifications use the term "portion" in a different context, Dr. Block confirms that the intrinsic record provides no guidance on how to define or determine the "portion."  Block Decl. ¶¶ 32-33.  Instead the term is boundless (as Columbia showed in its Amended Infringement Contentions), thus "leaving the skilled artisan to consult the 'unpredictable vagaries of any one person's opinion.'"  *Interval Licensing*, 766 F.3d at 1374 (quoting *Datamize, LLC v. Plumtree Software, Inc.*, 417 F.3d 1342, 1350 (Fed. Cir. 2005)).  Because the claim language fails to "afford clear notice of what is claimed," and rather creates a "zone of uncertainty which enterprise and experimentation may enter only at the risk of infringement claims," Claim 22 of both Utility Patents are invalid for indefiniteness. *Nautilus*, 134 S. Ct. at 2123, 2124.

### 6.     Design Patent[7]

| Claim Term | Columbia Construction | Seirus Construction |
|------------|----------------------|---------------------|

---

[7] Seirus revised its proposed construction of Claim 1 of the 'D093 Patent after the parties submitted the JCCS.

| Claim Term | Columbia Construction | Seirus Construction |
|---|---|---|
| "The ornamental design of a heat reflective material, as shown and described." (JCCS Term No. 16)<br><br>'D093 Patent, Claim 1 (entirety of claim) | A repeating pattern of adjacent wavy lines of contrasting colors on a material designed to reflect heat, without regard to (i) any trade names or logos in the pattern, (ii) orientation of the pattern, and (iii) the choices of the colors used. | "the ornamental aspects of an uninterrupted pattern of ~~uniformly sized~~ wave shaped elements ~~on a contrasting material~~ as shown and described" |

The parties disagree on the extent to which the 'D093 Patent's sole claim should be construed. Seirus' proposed construction covers the design patent's overall visual impression, while clarifying the features of the claim and the figures. This accounts for Columbia's disclaimer during prosecution and properly limits the claim to its non-functional (ornamental) features. Columbia's proposed construction should be rejected as it is overly-verbose, imposes additional limitations beyond the claim scope, ignores the prosecution history, and encompasses language drawn to functional features of its design contrary to Federal Circuit precedent.

### a.    Seirus' Proposed Construction Limits The Design to its Overall Visual Impression

As a threshold matter, a design is limited to its overall visual impression. *OddzOn Prods.*, 122 F.3d at 1405. Thus, a design patent cannot be any broader than that which is shown in its drawings. Seirus' proposed construction of "the ornamental aspects of an uninterrupted wave pattern" satisfies this requirement because it is grounded in what the 'D093 Patent depicts in its drawings. For example, each wave shown in Figure 1, and in the exploded view of Figure 2, is continuous with no interruptions or adornments in the pattern. This same pattern is repeated throughout the design patent. *See* 'D093 Patent, Figs. 1-10. Accordingly, Seirus' proposed construction is appropriate and should be adopted to assist the trier of fact.

In stark contrast to identifying its overall visual impression, Columbia's proposed claim construction improperly focuses attention on a list of specific elements – in the form of negative

limitations – such as the absence of "trade names or logos," without concern for "orientation of the pattern" or "choices of colors used." Columbia's construction therefore creates a "risk of placing undue emphasis on particular features of the design . . . rather than on the design as a whole." *Egyptian Goddess*, 543 F.3d at 680. Columbia's verbose construction is not helpful as it would only serve to confuse the jury. *See, e.g.*, *Dexas Int'l, LTD v. Tung Yung Int'l, Inc.*, C.A. No. 6:07-cv-334, 2008 U.S. Dist. LEXIS 48324, at *15 (E.D. Tex. June 24, 2008) (stating that adopting a construction that "meticulously describe[d]" each aspect of the patented design would be "confusing" to jurors). The Court should reject Columbia's lengthy, litigation-driven construction in favor of Seirus' proposal, which is a simpler interpretation of the patent that limits the design to its overall visual impression. *See Shop*TV, Inc. v. Bed Bath & Beyond, Inc.*, C.A. No. 09-cv-00057, 2009 U.S. Dist. LEXIS 71659, at *6-8 (D. Colo. June 15, 2009) ("lengthy, detailed verbal description" was "unnecessary" while a simpler construction that noted "the general nature of the design while specifically directing the jurors to observe all seven figures contained in the patent" was appropriate); *HR US LLC v. Mizco Int'l, Inc.*, C.A. No. CV-07-2394, 2009 U.S. Dist. LEXIS 27056, at *28 (E.D.N.Y. Mar. 31, 2009) ("detailed verbal description" was unnecessary, but inconsistencies in the drawings "warrant[ed] a brief description" of the claim.")

> **b.** **Seirus' Construction of "Uninterrupted Pattern" Clarifies the Claim Language**

The 'D093 Patent includes a single claim: "the ornamental design of a heat reflective material as shown ***and described***" (emphasis added). The description is therefore relevant to interpreting the claim scope. In *Times Three Clothier, LLC v. Spanx, Inc.*, the design patent claim concluded with "as shown and described" and the patent included a description of what shading meant in the design. The Court found that by doing so, "the Patents' own descriptions

limit their claims." 13 Civ. 1257, 2014 U.S. Dist. LEXIS 59448, at *17 (S.D.N.Y. Apr. 29,

2014). Similarly, here, the design patent description states that "Fig. 2 is an enlarged elevational

view thereof, ***taken from any area of the design***." (emphasis added). Thus, ***any area*** of the

claimed design must be a ***continuous or otherwise uninterrupted wave pattern***. *See id.* This

description also comports with what is depicted in each of the figures of the design patent.

Seirus' construction clarifies the language of the description of Figure 2 (as taught by *Times*

*Three Clothier*) by adding the language "***uninterrupted*** pattern of wave-shaped elements." *See*

*Egyptian Goddess*, 543 F.3d at 680 (trial court can explain "various features of the claimed

design" to aid trier of fact); *see also Z Produx, Inc. v. Make-Up Art Cosmetics, Inc.*, Case No.

CV 13-00734, 2013 U.S. Dist. LEXIS 159256, at *17 (C.D. Cal. Nov. 5, 2013), *aff'd* 568 F.

App'x 897 (Fed. Cir. 2014) (courts have discretion to "provide a brief verbal description of the

relevant claimed ornamental elements"). Moreover, the description of Figure 2 was added by

amendment during prosecution after the Examiner found that the figures were not descriptive

enough. *See* § II.B.2. A patentee's prosecution history with the PTO may be used to limit the

scope of its patent claims and accordingly, Seirus' construction of "uninterrupted wave patterns"

should be adopted. *See, e.g.*, *Egyptian Goddess*, 543 F.3d at 680; *Phillips*, 415 F.3d at 1317;

*Goodyear*, 162 F.3d at 1116.

　　　Columbia improperly seeks to broaden the scope of the claim by adding elements that are

altogether absent from the patent and its related figures. It is well-settled that "[d]esign patents

have almost no scope. ***The claim . . . is limited to what is shown in the application drawings***."

*In re Mann*, 861 F.2d 1581, 1582 (Fed. Cir. 1988) (emphasis added). "[A]ny written description

that goes beyond the scope of the figures would be unprotected by the patent, and thus ought not

be part of the construed claim." *Reddy v. Lowe's Cos., Inc.*, 60 F. Supp. 3d 249, 256 (D. Mass.

2014).  Consequently, Columbia's reference to unsubstantiated negative limitations – such as the claimed pattern "without regard to" features like "any trade names or logos in the pattern," "orientation of the pattern," and "choices of the colors" – are not contemplated by the figures as shown and described, and thus would improperly "stretch beyond the patent."  *Id.*  Columbia's construction also misses the mark because it ignores the prosecution history limiting its claim.

### c. Seirus' Construction Properly Excludes Functional Aspects of the Patented Design

Seirus' proposed construction refers only to the "uninterrupted pattern of wave-shaped elements," thereby preserving the distinction between protectable "ornamental features of the patented design," from unprotectable functional elements.  *See OddzOn Prods.*, 122 F.3d at 1404-05.  Columbia's proposed construction, in contrast, improperly covers ***functional*** aspects of the article of manufacture.  Specifically, it includes the functional language "[o]n a material designed to reflect heat, a . . . pattern of . . . lines," which goes beyond the ornamental aspects of that material or the ornamental aspects of the lines on that material.

There can be little doubt that a "heat reflective material" includes functional elements.[8] Accordingly, Seirus' proposed construction properly distinguishes between functional and non-functional features, and highlights only the ornamental aspects of the claimed design by avoiding any reference to the functional features of the claimed design.  It should therefore be adopted.

## V. CONCLUSION

For the foregoing reasons, Seirus requests that the Court adopt its proposed constructions and find Claim 22 of both the '119 Patent and '270 Patent invalid as indefinite.

---

[8] Indeed, Columbia's ***Utility Patents*** are titled "Patterned Heat Management Material" and, the Federal Circuit has explained that the existence of utility patents covering the same or similar features provides some evidence of functionality.  *Berry Sterling Corp. v. Prescor Plastics, Inc.*, 122 F.3d 1452, 1456 (Fed. Cir. 1997) (identifying "concomitant utility patents" as relevant to the functionality analysis).  Here, the 'D093 Patent includes functional features covered by at least the two asserted utility patents in this case.  *See, e.g.*, '270 Patent, 5:39-46, Fig. 3D; '119 Patent 5:41-48, Fig. 3D.

DATED:  March 7, 2016.

TROUTMAN SANDERS LLP

*s/ Matthew D. Murphey*

LISA D. HARDIE, OSB # 080783
Troutman Sanders LLP
805 SW Broadway, Suite 1560
Portland, OR 97205
Telephone: (503) 290-2334
Facsimile: (503) 290-2405
Email: lisa.hardie@troutmansanders.com

MATTHEW D. MURPHEY (*admitted pro hac vice*)
5 Park Plaza, Suite 1400
Irvine, CA  92614
Telephone: (949) 662-2700
Facsimile: (949) 622-2739
Email: matt.murphey@troutmansanders.com

PAUL E. MCGOWAN (*admitted pro hac vice*)
Troutman Sanders LLP
600 Peachtree St. NE, Suite 5200
Atlanta, GA 30308
Telephone:  (404) 885-3000
Facsimile:  (404) 962-6842
Email:  paul.mcgowan@troutmansanders.com

Attorneys for Defendant Seirus Innovative
Accessories, Inc.

## CERTIFICATE OF SERVICE

I hereby certify that on March 7, 2016, I caused the foregoing document to be electronically filed with the Clerk of the Court for the United States District Court of Oregon by using the CM/ECF system.  Participants in Case No. 3:15-cv-64 who are registered CM/ECF users will be served by the CM/ECF system.  To the extent any documents relevant to this matter are filed under seal, I certify that full and unredacted copies of such documents will be served on counsel of record for Plaintiff Columbia Sportswear North America, Inc.:

*s/ Matthew D. Murphey*
Matthew D. Murphey