# JOINT APPENDIX A
# (PUBLIC)

1

1                     UNITED STATES DISTRICT COURT

2                    SOUTHERN DISTRICT OF CALIFORNIA

3

4    COLUMBIA SPORTSWEAR NORTH        )
     AMERICA, INC., AN OREGON         )
5    CORPORATION,                     )
                                      )
6                    PLAINTIFF,       ) CASE NO. 17CV1871-HZ
                                      )
7    VS.                              ) SAN DIEGO, CALIFORNIA
                                      )
8    SEIRUS INNOVATIVE ACCESSORIES,)   MONDAY,
     INC., A UTAH CORPORATION,        ) SEPTEMBER 18, 2017
9                                     ) 9:05 A.M.
                     DEFENDANT.       )
10   _____)

11

12

13              REPORTER'S TRANSCRIPT OF PROCEEDINGS

14                           JURY TRIAL

15                    VOLUME 1 - AM SESSION

16                         PAGES 1 - 70

17          BEFORE THE HONORABLE MARCO A. HERNANDEZ
                 UNITED STATES DISTRICT JUDGE

18

19

20

21

22   REPORTED BY:   CAMERON P. KIRCHER
                    CSR NO. 9427, RPR, CRR, RMR
23                  333 W. BROADWAY, SUITE 420
                    SAN DIEGO, CALIFORNIA  92101
24                  E-MAIL:  CPKIRCHER@GMAIL.COM

25

                   COMPUTER-AIDED TRANSCRIPTION

2

```
 1    APPEARANCES:

 2    FOR THE PLAINTIFF:     SCHWABE, WILLIAMSON & WYATT, P.C.
                             BY:  NIKA F. ALDRICH, JR., ESQ.
 3                                DAVID W. AXELROD, ESQ.
                                  BRENNA LEGAARD, ESQ.
 4                           1211 SW 5TH AVENUE
                             SUITE 1900
 5                           PORTLAND, OREGON  97204

 6
      FOR THE DEFENDANT:     FISH & RICHARDSON, P.C.
 7                           BY:  CHRISTOPHER S. MARCHESE, ESQ.
                                  SETH M. SPROUL, ESQ.
 8                           12390 EL CAMINO REAL
                             SAN DIEGO, CALIFORNIA  92130
 9
                             MARKOWITZ HERBOLD, P.C.
10                           BY:  RENEE ROTHAUGE, ESQ.
                             1211 SW FIFTH AVENUE
11                           SUITE 3000
                             PORTLAND, OREGON  97204
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

3

1        SAN DIEGO, CALIFORNIA - MONDAY, SEPTEMBER 18, 2017

2                        9:05 A.M.

3            THE CLERK:  CALLING MATTER NO. 1 ON THE CALENDAR,

4   17CV1781, COLUMBIA SPORTSWEAR NORTH AMERICA VERSUS SEIRUS

5   INNOVATIVE ACCESSORIES.

6            COUNSEL, PLEASE STATE YOUR PRESENCE.

7            MR. ALDRICH:  YOUR HONOR, NIKA ALDRICH, JOINED BY

8   BRENNA LEGAARD AND DAVID AXELROD OF SCHWABE, WILLIAMSON &

9   WYATT ON BEHALF OF COLUMBIA SPORTSWEAR.

10           MR. MARCHESE:  GOOD MORNING, YOUR HONOR.

11  CHRISTOPHER MARCHESE FROM FISH & RICHARDSON, HERE FOR SEIRUS

12  INNOVATION.  AND WITH ME IS SETH SPROUL AND RENEE ROTHAUGE.

13  ALSO AT COUNSEL TABLE IS MIKE CAREY, WHO IS THE CEO OF THE

14  COMPANY.

15           THE COURT:  GOOD MORNING, EVERYBODY.

16           OVER THE WEEKEND, I NOTICED THAT THERE WERE A NUMBER

17  OF FILINGS.  I HAVE NOT HAD AN OPPORTUNITY TO DIGEST THOSE

18  FILINGS AND WILL NOT HAVE AN OPPORTUNITY TO DO SO PRIOR TO

19  THE TIME THAT WE HAVE THE JURY SEATED AND READY TO GO IN THIS

20  COURT.  SO MY PLAN IS TO MARCH AHEAD AND GET THE JURY SEATED

21  AND GET THIS CASE STARTED.

22           THERE WERE SOME THINGS THAT WE NEEDED TO CIRCLE

23  AROUND TO THAT I HAD NOT YET COMPLETED TALKING TO YOU ABOUT.

24  ONE OF THE THINGS WAS THE DESIGNATIONS OF YOUR DEPOSITIONS.

25  AND WE WERE HAVING TROUBLE FINDING SEIRUS' OBJECTIONS TO THE

4

1    DESIGNATIONS.

2         I'M SURE YOU FILED THEM.  IT'S JUST THAT THERE ARE

3    SO MANY ENTRIES, WE HAD TROUBLE FINDING THEM; SO IF YOU COULD

4    RESEND THOSE TO US, THAT WOULD BE HELPFUL.

5         MR. MARCHESE:  WE'D BE HAPPY TO DO THAT, YOUR

6    HONOR.

7         THE COURT:  THANK YOU.

8         AND THEN OTHER THAN THAT, I WENT BACK AND LOOKED --

9    BECAUSE I TOLD YOU I WOULD -- TO MAKE SURE I WAS COMFORTABLE

10   WITH THE RULINGS THAT I'VE ALREADY MADE IN THIS CASE.  AND I

11   AM COMFORTABLE WITH THE RULINGS I'VE MADE IN THIS CASE.

12   NOTHING IS CHANGING.  WE'RE GOING ON WITH THE RULINGS I MADE

13   AT THE PRETRIAL CONFERENCE.  THOSE RULINGS STAND.  OTHER THAN

14   THAT, I'M READY TO START THIS TRIAL.

15        IS THERE ANYTHING ELSE FROM PLAINTIFF BEFORE WE GET

16   GOING?

17        MR. ALDRICH:  THERE WERE A FEW MOTIONS IN LIMINE

18   THAT YOUR HONOR HAD NOT RULED ON AND WAS RESERVING JUDGMENT

19   FOR FROM THE PRETRIAL CONFERENCE.

20        THE COURT:  REMIND ME.

21        MR. ALDRICH:  THERE WAS A MOTION IN LIMINE WITH

22   RESPECT TO THE PRIOR ART COMBINATIONS THAT THEY ARE ALLOWED

23   TO ASSERT AT TRIAL.  AND IN CONJUNCTION WITH THAT, THERE IS A

24   MOTION IN LIMINE TO EXCLUDE VAUGHN FROM THE CASE BECAUSE IT'S

25   NO LONGER RELEVANT PURSUANT TO THE COURT'S SUMMARY JUDGMENT

5

1    RULING IN COMBINATION WITH DR. BLOCK'S REPORT.

2         THE COURT:  I TOLD YOU AT THE PRETRIAL CONFERENCE

3    THAT THOSE RULINGS THAT WERE CONNECTED TO THE GRANTING OF

4    YOUR SUMMARY JUDGMENT MOTIONS STOOD AND WOULD NOT BE -- THEY

5    WOULD NOT OFFER CONTRARY EVIDENCE TO THOSE RULINGS.

6         I THINK THAT ANSWERS YOUR QUESTION.

7         MR. ALDRICH:  NOT QUITE.  SO THEY HAVE AN EXPERT

8    REPORT THAT SAYS THAT ONE OF ORDINARY SKILL IN THE ART WOULD

9    BE MOTIVATED TO COMBINE FOTTINGER WITH VAUGHN FOR A SPECIFIC

10   PURPOSE, BUT THAT PURPOSE WAS UNDERMINED BY YOUR HONOR'S

11   RULING.

12        AND OUR MOTION IN LIMINE SAID, THEREFORE, VAUGHN IS

13   NO LONGER RELEVANT TO THE CASE BECAUSE IT HAS NO APPLICATION

14   AFTER CONSIDERATION IS MADE OF THE MOTION IN LIMINE IN

15   COMBINATION -- SORRY.  AFTER COMBINATION IS MADE BETWEEN

16   DR. BLOCK'S REPORT AND YOUR HONOR'S PRIOR RULING.

17        THE COURT:  I DON'T THINK THAT'S CORRECT, BECAUSE I

18   THINK -- I'M TRYING TO REMEMBER WHAT I SAID IN SUMMARY

19   JUDGMENT REGARDING VAUGHN AND WORLEY.  I THINK I TOOK THOSE

20   UP TOGETHER IN MY SUMMARY JUDGMENT RULING.  I DON'T REMEMBER

21   IF THEY EVEN RAISED SUMMARY JUDGMENT AS -- OR YOU DID AS

22   REGARDS ANTICIPATION.

23        I THINK I GRANTED YOUR SUMMARY JUDGMENT MOTION WITH

24   REGARDS TO ANTICIPATION REGARDING VAUGHN AND WORLEY.

25        MR. ALDRICH:  SO IT'S HARTMAN AND WORLEY THAT WENT

6

1    TOGETHER, AND THEN VAUGHN WAS A SEPARATE ONE.  AND ON ALL

2    THREE OF THOSE, YOU SAID NONE OF THOSE HAVE HEAT DIRECTION.

3              THE COURT:  CORRECT.

4              MR. ALDRICH:  AND THEN THEIR EXPERT REPORT SAYS ONE

5    WOULD HAVE BEEN MOTIVATED TO COMBINE FOTTINGER WITH

6    VAUGHN BECAUSE VAUGHN HAS HEAT DIRECTION.

7              THE COURT:  AND THEY ARE SAYING -- GO AHEAD.

8              GO AHEAD.

9              MR. SPROUL:  YOUR HONOR, CONSISTENT WITH WHAT WE

10   TOLD YOU AT THE PRETRIAL HEARING, WE DO NOT INTEND TO ARGUE

11   THAT VAUGHN DISCLOSES HEAT-DIRECTING ELEMENTS.  BUT

12   MR. ALDRICH IS TRYING TO TAKE THAT NARROW RULING THAT YOU

13   MADE, THAT VAUGHN DOES NOT DISCLOSE HEAT-DIRECTING ELEMENTS,

14   AND LEVERAGE IT AGAINST OUR OBVIOUSNESS ANALYSIS IN THE

15   OBVIOUSNESS CASE.

16             AND, IN FACT, DR. BLOCK HAS MULTIPLE REASONS WHY YOU

17   WOULD COMBINE VAUGHN WITH FOTTINGER AND OTHER REFERENCES, IN

18   ADDITION TO THE SINGLE ISSUE THAT YOU DECIDED ON SUMMARY

19   JUDGMENT.

20             SO OUR OBVIOUSNESS CASE IS FULLY INTACT.  VAUGHN

21   DISCLOSES A 30- TO 70-PERCENT COVERAGE, AND ONE OF ORDINARY

22   SKILL WOULD COMBINE THAT WITH FOTTINGER AND THESE OTHER

23   REFERENCES, NOT BECAUSE OF THE HEAT-DIRECTING ELEMENTS, BUT

24   BECAUSE OF ITS IMPACT ON THE FABRIC.  PUT MORE STUFF ON, YOU

25   GET LESS AIR FLOW.  TAKE IT OFF --

7

1    THE COURT:  ARE YOU USING VAUGHN FOR THE 30- TO

2    70-PERCENT COVERAGE ISSUE?

3    MR. SPROUL:  YES.

4    THE COURT:  THAT'S DIFFERENT.

5    DO YOU HAVE ANYTHING ELSE?

6    MR. ALDRICH:  WE CAN START, YOUR HONOR.  THANK

7    YOU.

8    THE COURT:  ANYTHING ELSE?

9    MR. MARCHESE:  YOUR HONOR, WE HAVE SOME OUTSTANDING

10   OBJECTIONS BETWEEN THE PARTIES ABOUT OPENING DEMONSTRATIVE

11   SLIDES AND JUST QUESTIONING WHETHER -- HOW WE WOULD RESOLVE

12   THOSE.  SOME OF THEM MAY NEED SOME INPUT FROM YOUR HONOR.

13   THE COURT:  YOU SENT THOSE TO ME LAST NIGHT, I

14   THINK; RIGHT?

15   MR. MARCHESE:  I BELIEVE THAT'S CORRECT, YOUR HONOR.

16   THE COURT:  YOU THINK THAT I SPENT LAST NIGHT

17   LOOKING AT YOUR OBJECTIONS, COMING TO THIS LOVELY CITY OF

18   SAN DIEGO TO TRY THIS CASE, AND YOU'RE SENDING ME OBJECTIONS

19   TO SLIDES.

20   NO, I HAVEN'T LOOKED AT THEM ALL.  I COULDN'T EVEN

21   OPEN IT.  SO I HAVEN'T HAD A CHANCE TO LOOK AT THEM.  I WAS

22   AWARE THAT YOU HAD SENT THOSE.

23   WHAT'S THE NATURE OF THE OBJECTIONS?  THEY ARE

24   OBJECTING TO YOURS, AS I RECALL.

25   MR. MARCHESE:  BOTH DIRECTIONS.

COMPUTER-AIDED TRANSCRIPTION

8

1          THERE WERE OBJECTIONS THAT THEY MADE TO SOME SLIDES

2     THAT WE HAD ABOUT PRIOR ART REFERENCE THAT WAS CITED IN THE

3     PROSECUTION HISTORY OF THE '270 PATENT.  IT'S THE CASTELLI

4     JACKET.  I THINK WE TALKED ABOUT IT AT THE PRETRIAL

5     CONFERENCE.

6          THE COURT:  YEAH.

7          MR. MARCHESE:  SO WE HAVE I BELIEVE IT'S THREE

8     SLIDES JUST SHOWING WHAT WAS DISCLOSED, AND THEN SHOWING THE

9     JACKET FROM THEIR EXPERT, DR. COLE'S REPORT.  AND WE WANTED

10    TO SHOW THOSE TO THE JURY AND KIND OF WALK THEM THROUGH IT,

11    BECAUSE WE'RE GOING TO ASK DR. COLE ABOUT THEM.

12         THE COURT:  SO THERE IS GOING TO BE EVIDENCE ABOUT

13    THIS DURING THE COURSE OF THE TRIAL?

14         MR. MARCHESE:  CORRECT, YOUR HONOR.

15         THE COURT:  WHAT'S YOUR PROBLEM?

16         MR. ALDRICH:  YOUR HONOR, THEY REPRESENTED THAT THEY

17    WERE NARROWING THEIR PRIOR ART CASE TO FOUR PIECES OF PRIOR

18    ART.  THAT'S NOT ONE OF THEM.  AND IT WASN'T DISCLOSED IN

19    THEIR SECTION 82 FILING, SO IT'S NOT PRIOR ART RELEVANT TO

20    102 OR 103.  THEY DON'T HAVE AN EXPERT REPORT ON THAT.

21         THE COURT:  THE OBJECTION IS OVERRULED.  I'M GOING

22    TO LET YOU GUYS PUT ON YOUR OWN SLIDES.  THE INSTRUCTIONS ARE

23    GOING TO TAKE CARE OF THE ISSUES THAT YOU'RE RAISING

24    REGARDING THE SLIDES.  BECAUSE THE INSTRUCTIONS ARE GOING TO

25    TELL THE JURY THAT YOUR OPENING STATEMENTS AND ALL THE SLIDES

9

1    AND ALL THOSE PRESENTATIONS ARE NOT EVIDENCE, AND THEY WILL

2    DECIDE THIS CASE UPON THE EVIDENCE.

3             AND YOU CAN POINT THAT OUT TO THE JURY IN YOUR

4    CLOSING ARGUMENT AND YOU CAN POINT OUT THE CONTRARY TO THE

5    JURY IN YOUR CLOSING ARGUMENT AND VICE VERSA.

6             UNDERSTOOD?

7             MR. MARCHESE:  UNDERSTOOD.  THANK YOU.

8             THE COURT:  ANYTHING ELSE?

9             MR. MARCHESE:  NOTHING FROM US.

10            THE COURT:  LET'S WRAP THE JURY UP AND GET GOING.

11            LET ME KNOW WHEN YOU'RE READY.

12            (RECESS, 9:12 A.M. TO 9:30 A.M.)

13            (PROSPECTIVE JURORS SWORN, 9:31 A.M.)

14            (BRIEF PAUSE IN PROCEEDINGS.)

15            THE COURT:  GOOD MORNING TO ALL OF YOU.  WELCOME.

16            THE CLERK:  CALLING MATTER NO. 1 ON THE CALENDAR,

17   17CV1781, COLUMBIA SPORTSWEAR NORTH AMERICA, INC. VERSUS

18   SEIRUS INNOVATIVE ACCESSORIES.

19            THE COURT:  MEMBERS OF THE JURY, WE'RE GOING TO BE

20   SELECTING A JURY FOR THE CASE OF COLUMBIA SPORTSWEAR NORTH

21   AMERICA, INC. VERSUS SEIRUS INNOVATIVE ACCESSORIES, INC.

22            MY NAME IS MARCO HERNANDEZ.  THIS IS BERNADETTE

23   BORJA.  SHE WILL BE SWEARING WITNESSES AND ACTING AS THE

24   BAILIFF IN THIS CASE.

25            THE PLAINTIFF IS BEING REPRESENTED BY DAVID AXELROD

1    AND NICHOLAS ALDRICH.  THEY ARE SEATED THERE.  AND YOU CAN

2    INTRODUCE EVERYBODY ELSE THAT'S AT YOUR TABLE.

3         MR. ALDRICH:  MY NAME IS NIKA ALDRICH.  THIS IS

4    DAVID AXELROD.  THIS IS BRENNA LEGAARD, AND THIS IS ADAM

5    KELLY FROM COLUMBIA SPORTSWEAR.

6         THE COURT:  THANK YOU.

7         THE DEFENDANT IS BEING REPRESENTED BY CHRISTOPHER

8    MARCHESE --

9         MR. MARCHESE:  MARCHESE.

10        THE COURT:  -- MARCHESE.  I'M SORRY, MR. MARCHESE.

11   AND SETH SPROUL.

12        MR. SPROUL:  THAT'S RIGHT, YOUR HONOR.

13        THE COURT:  OKAY.  YOU CAN GO AHEAD AND INTRODUCE

14   THE PEOPLE AT YOUR TABLE.

15        MR. MARCHESE:  THANK YOU, YOUR HONOR.  I AM CHRIS

16   MARCHESE.  SETH SPROUL.  RENE ROTHAUGE.  MIKE CAREY, WHO IS

17   THE CEO OF SEIRUS.

18        THANK YOU.

19        THE COURT:  THANK YOU.

20        YOUR JOB AS JURORS IS TO APPLY THE FACTS TO THE LAW

21   WHICH I WILL GIVE YOU.

22        THIS IS A CIVIL CASE.  IT'S NOT A CRIMINAL CASE.

23   YOU MAY HAVE SEEN CRIMINAL CASES ON TV OR IN THE MOVIES AND

24   KNOW THAT IN A CRIMINAL CASE, A PROSECUTOR MUST PROVE THE

25   DEFENDANT GUILTY BEYOND A REASONABLE DOUBT.

11

1          CIVIL CASES ARE DIFFERENT.  IN A CIVIL CASE, THE

2     PARTY WHO HAS TO PROVE SOMETHING ONLY HAS TO PROVE IT IN MOST

3     CASES MORE LIKELY TRUE THAN NOT.  SOMETIMES THE BURDEN OF

4     PROOF IS BY CLEAR AND CONVINCING EVIDENCE IN A CIVIL CASE.

5          THIS TRIAL INVOLVES A DISPUTE RELATING TO UNITED

6     STATES PATENTS.  AT THE BEGINNING OF THE TRIAL, I WILL TELL

7     YOU MORE ABOUT THAT.  FOR NOW, I'M JUST GOING TO SAY THAT

8     PATENTS ARE GRANTED BY THE UNITED STATES PATENT AND TRADEMARK

9     OFFICE.  SOMETIMES IT'S CALLED THE P.T.O.

10          A VALID UNITED STATES PATENT GIVES THE PATENT OWNER

11    THE RIGHT TO PREVENT OTHERS FROM MAKING, USING, OFFERING TO

12    SELL OR SELLING THE PATENTED INVENTION WITHIN THE UNITED

13    STATES, OR FROM IMPORTING INTO THE UNITED STATES DURING THE

14    TERM OF THE PATENT WITHOUT THE PATENTHOLDER'S PERMISSION.

15          VIOLATION OF THE PATENT OWNER'S RIGHTS IS CALLED

16    INFRINGEMENT.  A PATENT OWNER MAY TRY TO ENFORCE A PATENT

17    AGAINST PERSONS THEY DEEM TO BE INFRINGERS BY FILING A

18    LAWSUIT IN FEDERAL COURT.

19          ONCE MORE, THERE ARE TWO PARTIES IN THIS CASE.  THE

20    PLAINTIFF IS COLUMBIA SPORTSWEAR NORTH AMERICA, INC., WHICH I

21    WILL REFER TO SIMPLY AS COLUMBIA.  THE PLAINTIFF, COLUMBIA,

22    IS THE PARTY THAT FILED THE LAWSUIT AGAINST THE DEFENDANT.

23          THE DEFENDANT IS SEIRUS INNOVATIVE ACCESSORIES,

24    WHICH I WILL SIMPLY REFER TO AS SEIRUS.

25          THE LAWSUIT INVOLVES TWO UNITED STATES PATENTS

12

1    OBTAINED BY COLUMBIA.  THE D-093 PATENT, WHICH I WILL REFER

2    TO AS THE DESIGN PATENT, AND THE '270 PATENT, WHICH I WILL

3    REFER TO AS THE UTILITY PATENT.

4         BOTH PATENTS RELATE TO COLUMBIA'S OMNI-HEAT

5    TECHNOLOGY, WHICH IS A REFLECTIVE MATERIAL USED INSIDE OF

6    OUTDOOR GEAR.  IT REFLECTS BODY HEAT BACK TO THE USER, BUT

7    ALLOWS FOR BREATHABILITY AND MOISTURE WICKING.

8         COLUMBIA FILED THIS LAWSUIT IN FEDERAL COURT SEEKING

9    DAMAGES FROM DEFENDANT SEIRUS FOR ALLEGED PATENT

10   INFRINGEMENT.  COLUMBIA ALLEGES THAT SEIRUS' HEATWAVE

11   TECHNOLOGY USED IN ITS OWN LINE OF OUTDOOR GEAR INFRINGES

12   COLUMBIA'S PATENTS.

13        AMONG OTHER DEFENSES, SEIRUS DENIES THAT IT HAS

14   INFRINGED COLUMBIA'S PATENTS.  INDEED, SEIRUS CLAIMS THAT THE

15   PATENTS ARE INVALID.

16        IN A FEW MOMENTS I'M GOING TO BE ASKING YOU SOME

17   QUESTIONS.  AFTER I'VE COMPLETED MY QUESTIONS, I'M GOING TO

18   GIVE THE LAWYERS AN OPPORTUNITY TO ASK FOLLOW-UP QUESTIONS.

19   THE PURPOSE OF THE QUESTIONS IS NOT TO ARGUE THE CASE, AND

20   IT'S CERTAINLY NOT TO EMBARRASS YOU, BUT RATHER IT'S TO

21   DETERMINE YOUR QUALIFICATIONS TO ACT AS JURORS IN THIS

22   SPECIFIC TRIAL.

23        PLEASE RESPOND TO OUR QUESTIONS HONESTLY AND

24   SINCERELY.  IF YOU DON'T UNDERSTAND A QUESTION, ASK US TO

25   REPEAT IT OR ASK IT IN ANOTHER WAY.

13

1          SINCE YOU ARE IN AN UNFAMILIAR SETTING AMONG

2     STRANGERS, IT MAY BE UNCOMFORTABLE FOR YOU TO BE OPEN, HONEST

3     AND COMPLETE IN YOUR ANSWERS TO OUR QUESTIONS.  AND THIS

4     PROCESS REQUIRES YOU TO OVERCOME YOUR DISCOMFORT AND DO THE

5     BEST TO BE OPEN, HONEST AND COMPLETE WHEN YOU ANSWER.  IT'S

6     EXTREMELY IMPORTANT, AND THE FAIRNESS OF THIS TRIAL

7     DEPENDS ON IT.

8          WHEN THE QUESTIONING IS COMPLETED, THE LAWYERS WILL

9     EXERCISE THEIR CHALLENGES.  IF YOU'RE NOT SELECTED FOR THIS

10    JURY, PLEASE DO NOT FEEL THAT YOUR ATTENDANCE IS WITHOUT

11    VALUE.  WE NEED A SUBSTANTIAL GROUP OF POTENTIAL JURORS SO

12    THAT AN IMPARTIAL PANEL CAN BE SELECTED.  AND ALL OF YOU WHO

13    ARE HERE TODAY PROVIDE AN IMPORTANT CONTRIBUTION TO THIS

14    PROCESS.  YOUR PRESENCE HERE TODAY ASSURES FAIRNESS.

15         BEFORE WE BEGIN WITH THE MORE SPECIFIC QUESTIONS

16    THAT I'M GOING TO DIRECT, I BELIEVE EACH OF YOU WAS GIVEN A

17    PIECE OF PAPER THAT HAS ON IT SOME POINTS FOR BIOGRAPHICAL

18    BACKGROUND.  AND WHAT WE'RE GOING TO DO IS JUST HAVE EACH OF

19    YOU LOOK AT THOSE PARTICULAR POINTS.

20         BERNADETTE IS GOING TO GIVE YOU A MICROPHONE, AND

21    WE'RE GOING TO GO JUST DOWN THE ROW ONE BY ONE UNTIL ALL OF

22    YOU HAVE ADDRESSED THE BIOGRAPHICAL POINTS THAT ARE ON THOSE

23    PIECES OF PAPER.  I MIGHT ASK YOU A FOLLOW-UP QUESTION OR

24    TWO, DEPENDING UPON HOW YOU RESPOND TO THE BIOGRAPHICAL

25    POINTS.

14

1           MS. FLORES, YOU GET TO GO FIRST BECAUSE YOU ARE IN

2    SEAT NO. 1, AT LEAST IN THE WAY MY ARRANGEMENT OF CHAIRS

3    GOES.  SO IF YOU WOULDN'T MIND, PLEASE BEGIN

4           PROSPECTIVE JUROR NO. 1:  MY NAME IS TERI FLORES.  I

5    LIVE IN SAN DIEGO, NEAR SAN DIEGO STATE.  I LIVE WITH MY

6    MOTHER, MY FATHER AND MY THREE BOYS.

7           I AM A LEGAL SUPPORT ASSISTANT WITH THE DISTRICT

8    ATTORNEY'S OFFICE IN EL CAJON.

9           EDUCATION, I DO HAVE A DEGREE IN ACCOUNTING.

10   HOWEVER, OBVIOUSLY I'M NOT IN THAT FIELD.

11          ORGANIZATIONS OR CLUBS I BELONG TO:  NONE.

12          HOBBIES OR ACTIVITIES:  HAVING A YOUNG SON AT HOME,

13   IT'S WHATEVER HE'S INTO FOR THE WEEK.

14          I HAVE APPEARED IN COURT PROCEEDINGS AS A JUROR.

15          THE COURT:  HOW LONG AGO WERE YOU A JUROR?

16          PROSPECTIVE JUROR NO. 1:  IT'S BEEN PROBABLY ABOUT

17   THREE YEARS NOW.

18          THE COURT:  AND DO YOU REMEMBER WHAT TYPE OF A CASE

19   IT WAS?  WAS IT A CRIMINAL CASE OR A CIVIL CASE?

20          PROSPECTIVE JUROR NO. 1:  IT WAS CRIMINAL.

21          THE COURT:  YOU ALSO SAID THAT YOU WORKED IN THE

22   D.A.'S OFFICE, WHICH MEANS YOU KNOW LOTS OF LAWYERS.

23          PROSPECTIVE JUROR NO. 1:  THAT IS CORRECT.

24          THE COURT:  DO YOU KNOW ANY OF THE LAWYERS IN THIS

25   COURTROOM?

15

1          PROSPECTIVE JUROR NO. 1:  I AM NOT FAMILIAR WITH ANY

2     OF THEM IN HERE, NO.

3          THE COURT:  ALL RIGHT.  IS THERE ANYTHING ABOUT YOUR

4     EXPERIENCE AT THE D.A.'S OFFICE OR YOUR SERVICE AS A JUROR

5     THAT WOULD CAUSE YOU DIFFICULTY IN BEING NEUTRAL AS REGARDS

6     TO THIS CASE?

7          PROSPECTIVE JUROR NO. 1:  NO, SIR.

8          THE COURT:  ALL RIGHT.  THANK YOU VERY MUCH.  PASS

9     THE MICROPHONE DOWN.

10          PROSPECTIVE JUROR NO. 2:  HELLO.  MY NAME IS BRET

11     WAHL.  I'M FROM ESCONDIDO, CALIFORNIA.  I LIVE THERE WITH MY

12     WIFE AND FAMILY.  I HAVE FOUR BOYS.

13          I AM A TRAINED ENGINEER.  I WORK -- I HEAD UP A

14     PRODUCT DEVELOPMENT GROUP RIGHT NOW FOR TAYLORMADE ADIDAS

15     GOLF COMPANY.  MY WIFE IS ALSO A TRAINED ENGINEER.  HIGHEST

16     LEVEL OF EDUCATION FOR ME IS A MASTER'S DEGREE IN BIOMEDICAL

17     ENGINEERING FROM TULANE UNIVERSITY.

18          I ENJOY RUNNING.  I'M A GOLFER.  AND I ENJOY OUTDOOR

19     ACTIVITIES IN GENERAL.

20          NO TO BOTH CLUBS AND ORGANIZATIONS.

21          AND I HAVE NOT SERVED AS A WITNESS OR A JUROR OR A

22     PARTY IN A COURT CASE.

23          THE COURT:  SO IN YOUR WORK WITH ADIDAS, ARE YOU

24     INVOLVED IN ANY WORK THAT INVOLVES APPAREL?

25          PROSPECTIVE JUROR NO. 2:  NO.  I WORK WITH HARD

1    GOODS.

2         THE COURT:  OKAY.  SO WHAT IS IT THAT YOU WORK WITH?

3         PROSPECTIVE JUROR NO. 2:  GOLF CLUBS.  GOLF CLUB

4    DESIGN AND DEVELOPMENT.

5         THE COURT:  ALL RIGHT.  AND IN WORKING WITH DESIGN

6    AND DEVELOPMENT AS REGARDS GOLF CLUBS, DO YOU HELP ADIDAS

7    OBTAIN PATENTS FOR THEIR GOLF CLUBS?

8         PROSPECTIVE JUROR NO. 2:  YES.

9         THE COURT:  ARE YOU FAMILIAR WITH THE PATENT

10   PROCESS?

11        PROSPECTIVE JUROR NO. 2:  YES.

12        THE COURT:  HAVE YOU YOURSELF BEEN INVOLVED IN

13   GETTING PATENTS FOR ADIDAS?

14        PROSPECTIVE JUROR NO. 2:  YES.

15        THE COURT:  HAS ANYBODY -- HAVE YOU EVER BEEN

16   INVOLVED IN ADIDAS SUING ANYBODY BECAUSE THEY BELIEVED THAT

17   SOMEBODY WAS INFRINGING ONE OF THEIR PATENTS?

18        PROSPECTIVE JUROR NO. 2:  YES.  I'VE BEEN INVOLVED

19   IN PREPARATION FOR DEPOSITIONS AND THINGS LIKE THAT, COURT

20   APPEARANCES.

21        THE COURT:  HAVE YOU DRAFTED THE LANGUAGE FOR CLAIMS

22   WHICH MAKE UP PATENTS, OR SEEN THAT KIND OF LANGUAGE?

23        PROSPECTIVE JUROR NO. 2:  YES.

24        THE COURT:  IT SOUNDS LIKE YOU'RE PRETTY FAMILIAR

25   WITH THE PATENT PROCESS?

17

1          PROSPECTIVE JUROR NO. 2:  I AM.

2          THE COURT:  HAS ADIDAS EVER BEEN INVOLVED WITH

3    EITHER OF THE COMPANIES THAT ARE INVOLVED IN THIS CASE IN ANY

4    OF THEIR PATENT CASES?

5          PROSPECTIVE JUROR NO. 2:  NOT TO MY KNOWLEDGE.

6          THE COURT:  OKAY.  DO YOU HAVE STRONG FEELINGS ABOUT

7    THE PATENTING PROCESS OR ABOUT THE PROTECTION OF PATENTS ONE

8    WAY OR THE OTHER?

9          PROSPECTIVE JUROR NO. 2:  NO.

10         THE COURT:  OKAY.  IS THERE ANYTHING ABOUT YOUR

11   EXPERIENCE WORKING IN THE PATENTING PROCESS WITH ADIDAS THAT

12   WOULD CAUSE YOU DIFFICULTY IN BEING NEUTRAL IN THIS CASE?

13         PROSPECTIVE JUROR NO. 2:  I DON'T BELIEVE SO.

14         THE COURT:  OKAY.  ONE OF THE THINGS THAT THE

15   LAWYERS ARE GOING TO BE WORRIED ABOUT IS THE INFORMATION THAT

16   YOU WILL USE IN YOUR OWN EXPERIENCE IN HELPING PERHAPS THE

17   REST OF THE JURORS UNDERSTAND AND DECIDE THIS CASE.  THAT'S

18   NOT YOUR JOB.

19         THE EVIDENCE THAT YOU WILL HEAR FROM THIS CASE WILL

20   COME SOLELY FROM THE TESTIMONY OF THE WITNESSES, FROM THE

21   EXHIBITS WHICH ARE RECEIVED IN EVIDENCE AND FROM THE LAW THAT

22   I WILL GIVE YOU.

23         DO YOU UNDERSTAND THAT?

24         PROSPECTIVE JUROR NO. 2:  YES.

25         THE COURT:  AND EVEN IF YOU THINK THAT I'VE GOTTEN

COMPUTER-AIDED TRANSCRIPTION

18

1    IT WRONG AS REGARDS THE LAW, BECAUSE YOUR EDUCATION AND

2    EXPERIENCE TELLS YOU DIFFERENTLY, YOU'RE GOING TO HAVE TO

3    FOLLOW MY RULES NOTWITHSTANDING THAT.

4         DO YOU UNDERSTAND?

5         PROSPECTIVE JUROR NO. 2:  YES.

6         THE COURT:  ARE YOU GOING TO BE ABLE TO DO THAT?

7         PROSPECTIVE JUROR NO. 2:  YES.

8         THE COURT:  THANK YOU.

9         PROSPECTIVE JUROR NO. 3:  MY NAME IS MATTHEW

10   LU BIEN.  I LIVE IN VALLEY CENTER, CALIFORNIA.  I CURRENTLY

11   RESIDE WITH MY SPOUSE AND MY SON AND PART-TIME WITH MY

12   DAUGHTER, WHO IS A COLLEGE STUDENT AT THE UNIVERSITY OF

13   OREGON, WHO I JUST TOOK BACK TO SCHOOL.

14        MY OCCUPATION IS CHIEF OPERATING OFFICER FOR K2

15   INSURANCE SERVICES.  IT'S AN INSURANCE HOLDING COMPANY.  MY

16   SPOUSE IS AN ACCOUNTANT.  SHE WORKS PART-TIME AT OUR LOCAL

17   CHURCH, AND ALSO AN ADMINISTRATOR THERE.

18        MY HIGHEST LEVEL OF EDUCATION IS A BACHELOR'S DEGREE

19   IN BUSINESS ADMINISTRATION.  AND MY WIFE RECEIVED HER

20   ACCOUNTING DEGREE.

21        NO NOTABLE CLUBS OR ORGANIZATIONS.

22        HOBBIES INCLUDE OUTDOOR ACTIVITIES, CAMPING,

23   MOUNTAIN BIKING, GOLF, SPORTS, ATTENDING MY SON'S EVENTS.  I

24   HAVE NEVER APPEARED IN A COURT PROCEEDING.

25        THE COURT:  THANK YOU.

19

1      NEXT.

2           PROSPECTIVE JUROR NO. 4:  MY NAME IS INGA HEROLD.  I

3  LIVE IN SPRING VALLEY.  I LIVE WITH MY PARENTS, AND I AM A

4  CLERK AT MICHAEL'S CRAFT STORE.

5           I AM A HIGH SCHOOL GRADUATE AND HAVE SOME COLLEGE.

6  AND I ENJOY VIDEO GAMES AND FANTASY STORIES AND ALL THAT.

7  AND I HAVE NOT YET BEEN ON A JURY OR APPEARED IN COURT.

8           THE COURT:  THANK YOU.

9           PROSPECTIVE JUROR NO. 5:  HELLO.  MY NAME IS KARLA

10  CASTRO.  I LIVE IN BONITA, CALIFORNIA WITH MY HUSBAND AND SON

11  AND DAUGHTER.  I AM A SECRETARY AT A LOCAL IMMACULATE

12  CHURCH -- I MEAN SCHOOL.

13           AND I HAVE A BACHELOR'S IN BUSINESS ADMINISTRATION.

14  MY HUSBAND IS IN REAL ESTATE IN MEXICO.  I DO NOT BELONG TO

15  ANY CLUBS OR ORGANIZATIONS.  AND I LIKE TO READ AND WALK.

16  AND I HAVE BEEN A JUROR BEFORE.

17           THE COURT:  HOW LONG AGO WERE YOU A JUROR?

18           PROSPECTIVE JUROR NO. 5:  ABOUT THREE YEARS.

19           THE COURT:  AND CAN YOU -- DO YOU REMEMBER WHETHER

20  IT WAS A CRIMINAL CASE OR A CIVIL CASE?  CAN YOU HOLD THE

21  MICROPHONE TO YOU.

22           PROSPECTIVE JUROR NO. 5:  NO.

23           THE COURT:  CAN YOU TELL ME MAYBE WHAT THE CASE WAS

24  ABOUT, IF YOU RECALL.

25           PROSPECTIVE JUROR NO. 5:  THEY WERE COMING ACROSS

20

1    THE BORDER HAVING INGESTED DRUGS.

2              THE COURT:  OKAY.  SO WAS IT IN FEDERAL COURT?

3              PROSPECTIVE JUROR NO. 5:  NO.  IN CHULA VISTA.

4              THE COURT:  I'M SORRY?

5              PROSPECTIVE JUROR NO. 5:  CHULA VISTA.

6              THE COURT:  OH, OKAY.  AND WHEN YOU SAY YOU SAT AS A

7    JUROR, DID YOU SIT IN THE JURY BOX, GO INTO THE JURY ROOM AND

8    RENDER A VERDICT?

9              PROSPECTIVE JUROR NO. 5:  YES.

10             THE COURT:  ALL RIGHT.  WAS THERE ANYTHING ABOUT

11   THAT EXPERIENCE THAT LEFT A NEGATIVE TASTE IN YOUR MOUTH

12   ABOUT THE JUSTICE SYSTEM?

13             PROSPECTIVE JUROR NO. 5:  NO.

14             THE COURT:  ALL RIGHT.  IS THERE ANYTHING ABOUT YOUR

15   PRIOR EXPERIENCES THAT WOULD CAUSE YOU DIFFICULTY BEING

16   NEUTRAL IN THIS CASE?

17             PROSPECTIVE JUROR NO. 5:  NO.

18             THE COURT:  THANK YOU.

19             PROSPECTIVE JUROR NO. 6:  I'M DAN VAUGHT.  I LIVE IN

20   SAN DIEGO.  I LIVE WITH MY GIRLFRIEND.  I'M A MENTAL HEALTH

21   COUNSELOR.  MASTER'S DEGREE.  NO ORGANIZATIONS OR CLUBS.  I

22   LIKE COMPUTER GAMES.  I HAVE BEEN A WITNESS BEFORE.  AND

23   THAT'S IT.

24             THE COURT:  AND WHAT KIND OF A CASE WERE YOU A

25   WITNESS IN?

21

1          PROSPECTIVE JUROR NO. 6:  IT WAS -- I WAS CALLED BY

2     ONE OF MY CLIENTS REGARDING CHILD CUSTODY.

3          THE COURT:  OKAY.  ANYTHING ABOUT THAT EXPERIENCE --

4     THAT'S A COURTROOM EXPERIENCE.  ANYTHING ABOUT THAT THAT

5     WOULD CAUSE YOU DIFFICULTY BEING NEUTRAL IN THIS CASE?

6          PROSPECTIVE JUROR NO. 6:  NO.

7          THE COURT:  THANK YOU.

8          PROSPECTIVE JUROR NO. 7:  GOOD MORNING.  MY NAME IS

9     NORMA CUPP.  I LIVE IN -- ACTUALLY, SPRING VALLEY.  I LIVE

10    WITH A FRIEND OF MINE AT HER HOME.  AND THEN SHE IS A RETIRED

11    SCHOOLTEACHER.  RIGHT NOW I'M UNEMPLOYED.  LAST 17 YEARS I

12    WAS A CONCIERGE AT THE CORONADO MARRIOTT.

13          LET'S SEE.  I DO NOT BELONG TO ANY ORGANIZATIONS OR

14    CLUBS.  I DO LIKE GARDENING, HIKING, AND I DO USHER AT THE

15    OLD GLOBE.  AND I WAS A JUROR ABOUT 45 YEARS AGO IN

16    RIVERSIDE.

17          THE COURT:  I ASSUME THERE ISN'T -- THAT'S 45 YEARS

18    AGO.  THERE IS NOTHING ABOUT THAT EXPERIENCE THAT CAUSES YOU

19    DIFFICULTY BEING A JUROR IN THIS CASE?

20          PROSPECTIVE JUROR NO. 7:  NO.

21          THE COURT:  ALL RIGHT.  THANK YOU.

22          WE CAN GO UP THIS DIRECTION.  WE'LL GO THAT

23    DIRECTION.

24          THAT'S FINE.  GO AHEAD.

25          PROSPECTIVE JUROR NO. 14:  YES.  MY NAME IS STEVE

COMPUTER-AIDED TRANSCRIPTION

22

1    CONNOLLY.  I LIVE IN THE RANCHO BERNARDO AREA OF SAN DIEGO.

2    I LIVE THERE WITH MY WIFE.  WE'RE BOTH RETIRED.  WHEN WE WERE

3    WORKING, WE WERE BOTH IN THE FINANCIAL SERVICES BUSINESS.

4    SHE IN THE MORTGAGE BUSINESS, AND I WAS IN THE BANKING

5    BUSINESS.  GOT A BACHELOR'S DEGREE IN ACCOUNTING.

6         CURRENTLY NO ORGANIZATIONS.  I WAS INVOLVED WITH

7    ROTARY FOR YEARS.  HOBBIES INCLUDE GOLFING AND

8    GRANDPARENTING.  AND I HAVEN'T SERVED IN ANY OF THE

9    CAPACITIES THAT THE COURT HAS LISTED.

10        THE COURT:  THANK YOU.

11        NEXT.

12        PROSPECTIVE JUROR NO. 13:  MY NAME IS MARY MULLER.

13   I LIVE IN ESCONDIDO, AND I LIVE WITH MY MOM AND MY SON.  I'M

14   A MEDICAL ASSISTANT.  I'VE GONE TO THREE YEARS OF COLLEGE.

15   I'VE BEEN DIVORCED TEN YEARS.  AND I LIKE TO DANCE AND BIKE

16   RIDE AND WATCH MOVIES.  AND I SERVED AS A JUROR ABOUT TEN

17   YEARS AGO.

18        THE COURT:  ALL RIGHT.  DO YOU REMEMBER WHAT KIND OF

19   CASE THAT WAS?

20        PROSPECTIVE JUROR NO. 13:  CRIMINAL.

21        THE COURT:  ANYTHING ABOUT THAT EXPERIENCE THAT LEFT

22   A NEGATIVE TASTE IN YOUR MOUTH ABOUT THE JUSTICE SYSTEM?

23        PROSPECTIVE JUROR NO. 13:  NO.

24        THE COURT:  THANK YOU.

25        PROSPECTIVE JUROR NO. 12:  HI.  MY NAME IS ANDREA

23

1    PERKINS.  I LIVE IN RANCHO SAN DIEGO.  I LIVE WITH MY HUSBAND

2    AND MY TEN-YEAR-OLD DAUGHTER.

3         I WORK AS A CUSTOMER SERVICE REP AT SAN DIEGO COUNTY

4    CREDIT UNION, AND MY HUSBAND WORKS AS A SYSTEM ENGINEER AT

5    PROCOPIO.

6         LET'S SEE.  MY HUSBAND AND I BOTH HAVE SOME COLLEGE.

7    NO DEGREES.

8         I DON'T BELONG TO ANY CLUBS OR ORGANIZATIONS.  I

9    ENJOY HIKING AND TRAVELING.  AND I HAVE APPEARED AS A WITNESS

10   IN A CRIMINAL TRIAL.

11        THE COURT:  HOW LONG AGO WAS THAT?

12        PROSPECTIVE JUROR NO. 12:  MAYBE ABOUT 16 YEARS AGO.

13        THE COURT:  OKAY.  ANYTHING ABOUT THAT EXPERIENCE

14   THAT WOULD CAUSE YOU DIFFICULTY BEING NEUTRAL IN THIS CASE?

15        PROSPECTIVE JUROR NO. 12:  NO.

16        THE COURT:  ALL RIGHT.  THANK YOU.

17        PROSPECTIVE JUROR NO. 11:  MY NAME IS MARKHAM GATES.

18   I LIVE IN MISSION BEACH WITH MY WIFE.  MY CURRENT OCCUPATION

19   IS PROPERTY MANAGEMENT.  WE HAVE SOME RENTALS THAT I TAKE

20   CARE OF.  PRIOR TO THAT, I WAS AN ENGINEER IN AEROSPACE.  MY

21   WIFE IS A REAL ESTATE AGENT.

22        I HAVE A BACHELOR'S DEGREE IN PSYCHOLOGY.  MY WIFE

23   HAS A BACHELOR'S DEGREE ALSO IN PSYCHOLOGY, PLUS A MASTER'S

24   IN PUBLIC ADMINISTRATION.

25        I BELONG TO THE SAN DIEGO STATE ALUMNI ASSOCIATION.

24

1    I LIKE GOLFING.  I LIKE BIKING.  AND I WAS A JUROR IN A CIVIL

2    COURT -- CIVIL CASE.

3                THE COURT:  HOW LONG AGO?

4                PROSPECTIVE JUROR NO. 11:  ABOUT 16, MAYBE 20 YEARS

5    AGO.  LATE '80S.

6                THE COURT:  DO YOU REMEMBER THE NATURE OF THE CASE?

7                PROSPECTIVE JUROR NO. 11:  IT WAS A MEDICAL

8    MALPRACTICE.

9                THE COURT:  OKAY.  YOU ALSO SAID YOU WERE AN

10   ENGINEER IN AEROSPACE.  WERE YOU EVER INVOLVED IN THE --

11   TRYING TO GET A PATENT?

12               PROSPECTIVE JUROR NO. 11:  NO.  NO EXPERIENCE WITH

13   PATENTS AT ALL.

14               THE COURT:  OKAY.  ANYTHING ABOUT ANYTHING IN YOUR

15   BACKGROUND THAT WOULD CAUSE YOU DIFFICULTY BEING NEUTRAL IN

16   THIS CASE?

17               PROSPECTIVE JUROR NO. 11:  NO.

18               THE COURT:  THANK YOU.

19               PROSPECTIVE JUROR NO. 10:  MY NAME IS LAURIE

20   HARBOLT.  I'M FROM EL CENTRO, CALIFORNIA.  I LIVE WITH MY

21   DAUGHTER, MY PARENTS AND MY GRANDPARENTS.  I AM A PERSONAL

22   ASSISTANT AND A CHILD CARE PROVIDER FOR MY NIECE WHO HAS

23   BRITTLE BONE DISEASE.

24               I HAVE -- I GRADUATED HIGH SCHOOL AND I HAVE SOME

25   COLLEGE.  I HELP OUT WITH THE LOCAL P.T.O.  I ENJOY -- WHERE

25

1    WE LIVE, WE HAVE FAIRS.  SO EVERY TIME THAT COMES AROUND, I

2    DO A LOT OF WORK WITH THAT, WITH THE FAIR ANIMALS.

3         AND I WAS SELECTED ON A JURY BUT I WAS RELEASED

4    BECAUSE I KNEW THE WITNESS.  AND IT WAS A CRIMINAL CASE.

5         THE COURT:  HOW LONG AGO WAS THAT?

6         PROSPECTIVE JUROR NO. 10:  OH, I DON'T KNOW.  TEN,

7    FIFTEEN YEARS AGO, MAYBE.

8         THE COURT:  OKAY.  ANYTHING ABOUT YOUR EXPERIENCES

9    THAT WOULD CAUSE YOU DIFFICULTY BEING NEUTRAL IN THIS CASE?

10         PROSPECTIVE JUROR NO. 10:  NO.

11         THE COURT:  THANK YOU.

12         PROSPECTIVE JUROR NO. 9:  KYLEE MCDOWELL.  I LIVE IN

13    ESCONDIDO WITH MY SON.  AND I RUN AN ART GALLERY.

14         MY EDUCATION, I HAVE A BACHELOR'S DEGREE AND A

15    TEACHING CREDENTIAL.  SO I'M A PART-TIME TEACHER ALSO.

16         I HAVE NO ORGANIZATIONS OR CLUBS.  AND HOBBIES.  I'M

17    AN ARTIST IN MANY MEDIUMS.  AND I HAVE BEEN A WITNESS 20

18    YEARS AGO.  IT WAS A MURDER TRIAL.

19         THE COURT:  OH, OKAY.  THAT'S A PRETTY PROFOUND

20    EXPERIENCE.  IS THERE ANYTHING ABOUT THAT EXPERIENCE THAT

21    CAUSES YOU DIFFICULTY BEING NEUTRAL IN THIS CASE?

22         PROSPECTIVE JUROR NO. 9:  NO, NO.  AND IT WAS SO

23    MANY YEARS AGO.

24         THE COURT:  ALL RIGHT.  THANK YOU.

25         PROSPECTIVE JUROR NO. 8:  MY NAME IS ANGELICA

26

1    CORONA.  I'M FROM CARLSBAD.  I LIVE WITH MY HUSBAND AND MY

2    DAUGHTER.  MY HUSBAND IS A WAITER, AND I'M RETIRED.  WE BOTH

3    GRADUATED FROM JUNIOR COLLEGE, AND I USED TO WORK AS A

4    LIBRARY TECHNICIAN.

5            I DON'T BELONG TO ANY CLUBS.  I LIKE READING AND

6    WALKING.  AND I THINK I WAS A WITNESS TO MY MOTHER'S ESTATE.

7    I THINK.  I DON'T KNOW.

8            THE COURT:  ALL RIGHT.

9            PROSPECTIVE JUROR NO. 8:  I FORGOT.  BUT YEARS AGO.

10           THE COURT:  ALL RIGHT.  THANK YOU.

11           PROSPECTIVE JUROR NO. 15:  MY NAME IS KAREN RUSSO.

12   I LIVE IN LA MESA.  AND I LIVE WITH MY HUSBAND AND MY TWO

13   CHILDREN, WHICH ARE COLLEGE AGE; SO THEY ARE SOMETIMES THERE

14   AND SOMETIMES NOT.

15           LET'S SEE.  MY SPOUSE AND I, WE HAVE A LANDSCAPING

16   BUSINESS AND WE OWN RENTAL PROPERTIES, SO THAT'S THE KIND OF

17   LINE OF WORK I'M IN AND MY HUSBAND AS WELL.

18           I HAVE A BACHELOR, A B.S. IN FINANCE FROM UNIVERSITY

19   OF SOUTHERN CALIFORNIA, AND I'M -- I ENJOY WORKING OUT AND

20   TRAVELING.  AND I'VE APPEARED IN COURT AS A JUROR AND I'VE

21   BEEN A PARTY IN THE COURT.

22           THE COURT:  SO LET'S TAKE THE JUROR PART OF IT

23   FIRST.  HOW LONG AGO WERE YOU A JUROR?

24           PROSPECTIVE JUROR NO. 15:  ABOUT 15 YEARS AGO.  IT

25   WAS A SHOPLIFTING CASE.

1          THE COURT:  OKAY.  AND THEN YOU WERE A PARTY IN A

2     CASE?

3          PROSPECTIVE JUROR NO. 15:  THAT WAS A LANDLORD

4     DISPUTE ABOUT 20 YEARS AGO.

5          THE COURT:  ALL RIGHT.  ANYTHING ABOUT YOUR PRIOR

6     EXPERIENCES THAT WOULD CAUSE YOU DIFFICULTY BEING NEUTRAL IN

7     THIS CASE?

8          PROSPECTIVE JUROR NO. 15:  NO.

9          THE COURT:  THANK YOU.

10         PROSPECTIVE JUROR NO. 16:  MY NAME IS EVERARDO

11    GARCIA FLORES.  I LIVE IN SAN DIEGO WITH MY WIFE.  SHE IS A

12    MANUFACTURING ENGINEER.  I AM A MATERIALS ENGINEER.  I

13    CURRENTLY WORK AT A START-UP IN CARLSBAD.

14         I DO BELONG TO THE SAN DIEGO START-UP WEEK

15    ORGANIZATION.  I ENJOY TRAVEL, BASKETBALL, SOCCER, OTHER

16    SPORTS.  AND I'VE NEVER APPEARED IN COURT AS A JUROR OR

17    WITNESS.

18         THE COURT:  HAVE EITHER YOU OR YOUR WIFE BEEN

19    INVOLVED IN THE PATENTING PROCESS IN YOUR LINE OF WORK?

20         PROSPECTIVE JUROR NO. 16:  I DID SOME WORK FOR A

21    PATENT.  I DREW SOME DIAGRAM FOR A PATENT, BUT THAT WAS THE

22    EXTENT OF IT.

23         THE COURT:  ALL RIGHT.  AND AS A RESULT OF YOUR

24    INVOLVEMENT IN YOUR DRAWINGS OF PATENTS, DO YOU HAVE ANY

25    FEELINGS ABOUT PATENT LAW OR PATENTS ONE WAY OR THE OTHER?

28

1          PROSPECTIVE JUROR NO. 16:  NOT REALLY.  IT WAS VERY

2     MINIMAL.

3          THE COURT:  OKAY.  THANK YOU.

4          PROSPECTIVE JUROR NO. 17:  HI.  MY NAME IS PAUL

5     LUNA.  I RESIDE IN KENSINGTON AREA.  I RESIDE WITH MY

6     HUSBAND.  HE IS A GRAPHIC DESIGNER.  I CAME FROM 22 YEARS OF

7     RETAIL MANAGEMENT.  CURRENTLY AN UBER DRIVER.

8          I HAVE AN ASSOCIATE'S DEGREE.  I DO NOT REALLY

9     BELONG TO ANY CLUBS.  I JUST ENJOY HANGING OUT WITH MY

10    FRIENDS.  AND I HAVE BEEN A JUROR ABOUT 15 YEARS AGO.

11         THE COURT:  WHAT KIND OF CASE WAS IT?

12         PROSPECTIVE JUROR NO. 17:  CRIMINAL.

13         THE COURT:  ANYTHING ABOUT YOUR EXPERIENCE AS A

14    JUROR THAT WOULD CAUSE YOU DIFFICULTY BEING NEUTRAL IN THIS

15    CASE?

16         PROSPECTIVE JUROR NO. 17:  NO.

17         THE COURT:  OKAY.  THANK YOU, MR. LUNA.  WOULD YOU

18    MIND HANDING THE MICROPHONE OVER FOR US.

19         PROSPECTIVE JUROR NO. 18:  HI THERE.  MY NAME IS

20    KATHLEEN ALLEGRI-SULLIVAN.  I LIVE IN POINT LOMA WITH MY

21    BOYFRIEND OF OVER 25 YEARS.  WE BOTH HAVE HIGH SCHOOL.  I

22    HAVE SOME COLLEGE.

23         I WORK AS AN OPERATOR AT AN ANSWERING SERVICE.  MANY

24    DIFFERENT TYPES OF COMPANIES AND BUSINESSES I ANSWER THE

25    PHONE FOR.  MY BOYFRIEND IS A SOUS CHEF AT THE SHERIDAN IN

1    LA JOLLA.

2           WE -- I ENJOY TRAVEL, READING, GARDENING AND

3    FOOTBALL.  AND I -- DOES IT COUNT IF I WAS DIVORCED AND IN

4    COURT FOR THAT?

5           THE COURT:  YOU ALREADY SAID IT, SO THAT'S OKAY.

6           PROSPECTIVE JUROR NO. 18:  ALL RIGHT.  AND THAT'S

7    ALL.

8           THE COURT:  ALL RIGHT.  THANK YOU.

9           PROSPECTIVE JUROR NO. 19:  GOOD MORNING.  MY NAME IS

10   CHRISTINA STREY.  I LIVE IN RANCHO SAN DIEGO WITH MY HUSBAND.

11   AND I AM RETIRED REGISTERED NURSE.  MY HUSBAND IS RETIRED

12   FIRE DIVISION CHIEF.

13          I HAVE AN ASSOCIATE DEGREE IN REGISTERED NURSING.

14   MY HUSBAND HAS A FIRE SCIENCE-RELATED DEGREE.

15          I BELONG TO THE ELK LODGE AT 1812 IN EL CAJON, AND I

16   ALSO BELONG TO THE SAN DIEGO SWING DANCE CLUB.  I ENJOY

17   KARAOKE, AND I DO DIFFERENT KINDS OF DANCING.  I DO HULA,

18   FLAMENCO AND A BALLET CLASS ONCE A WEEK.

19          I DON'T -- ABOUT THE COURT PROCEEDINGS.  I DON'T

20   KNOW IF SMALL CLAIMS COURT COUNTS.  I WAS A PARTY IN THAT --

21          THE COURT:  OKAY.

22          PROSPECTIVE JUROR NO. 19:  -- MANY, MANY YEARS AGO.

23   IT WAS A TRAFFIC-RELATED THING.

24          THE COURT:  ALL RIGHT.  ANYTHING ABOUT THE

25   EXPERIENCE THAT LEFT A STRONG FEELING ABOUT THE JUSTICE

30

1    SYSTEM ONE WAY OR THE OTHER?

2              PROSPECTIVE JUROR NO. 19:  NO.  IF ANYTHING, I WAS

3    IMPRESSED BY IT.

4              THE COURT:  THANK YOU.

5              PROSPECTIVE JUROR NO. 20:  GOOD MORNING.  MY NAME IS

6    GEORGE UZDAVINES.  I LIVE IN LOMA PORTAL.  I LIVE ALONE, BUT

7    I'VE GOT YOU BEAT.  MY GIRLFRIEND AND I HAVE BEEN TOGETHER

8    FOR 28 YEARS.  SHE'S A RETIRED TEACHER.  I'M A RETIRED

9    FIREFIGHTER WITH THE CITY OF SAN DIEGO.

10             NO ORGANIZATIONS.  I LOVE MOTORCYCLES, RACE CARS,

11   PEDAL BIKE RIDING, HIKING.

12             AND I'VE BEEN A WITNESS AND A JUROR ALONG THE WAY.

13   THE JUROR WAS PROBABLY 12 OR 15 YEARS AGO.  IT WAS CRIMINAL,

14   DRUGS.  AND I WAS A WITNESS IN A WORKMAN'S COMP CASE.

15             THE COURT:  ANYTHING ABOUT YOUR EXPERIENCES WITH THE

16   JUSTICE SYSTEM THAT WOULD CAUSE YOU DIFFICULTY BEING NEUTRAL?

17             PROSPECTIVE JUROR NO. 20:  NOTHING AT ALL.

18             THE COURT:  THANK YOU SO MUCH.

19             I'VE ALREADY ASKED THIS QUESTION, THAT IS WHETHER --

20   AT LEAST AS TO SOME OF YOU, WHETHER OR NOT ANY OF YOU KNOW

21   THE LAWYERS OR PARTIES IN THIS CASE.  I'LL ASK THE LAWYERS TO

22   STAND UP -- AND KIND OF LET -- MAKE SURE THAT EVERYBODY

23   BEHIND YOU CAN SEE YOUR FACES.

24             IF YOU RECOGNIZE ANY OF THEIR FACES, YOU THINK YOU

25   MIGHT KNOW THEM BY NAME, PLEASE RAISE A HAND.  IF YOU LAWYERS

1    CAN MAKE SURE THEY CAN SEE YOUR FACES BEHIND YOU.

2              ALL RIGHT.  THANK YOU.

3              DOES ANYBODY RECOGNIZE ANY OF THE LAWYERS OR PARTIES

4    IN THIS CASE?  IF SO, RAISE YOUR HAND.

5              NO HANDS HAVE BEEN RAISED.  THANK YOU.

6              NEXT, THE LAWYERS ARE GOING TO TELL US WHO THEIR

7    POTENTIAL WITNESSES ARE.  I WANT YOU TO LISTEN TO THE NAMES.

8    AFTER YOU HEAR THE NAMES, I'M GOING TO ASK YOU THE SAME

9    QUESTION, WHETHER YOU THINK YOU MIGHT KNOW THOSE PEOPLE OR

10   NOT.  I'LL BEGIN WITH THE PLAINTIFF

11             MR. ALDRICH:  SCOTT TREPANIER, MICHAEL "WOODY"

12   BLACKFORD, ZACHARY SNYDER, MATTHEW MERRIMAN.  AND I THINK WE

13   HAVE TWO EXPERT WITNESSES, DR. CHRISTINE COLE AND SERENA

14   MORONES.  AND I'M SORRY, DEBORAH CHRIS.

15             THE COURT:  AROUND EIGHT WITNESSES.  IF ANYBODY

16   RECOGNIZES THOSE NAMES, OR THINKS THEY MIGHT KNOW THOSE

17   INDIVIDUALS, PLEASE RAISE THEIR HAND.

18             FOR THE DEFENSE.

19             MR. MARCHESE:  THANK YOU, YOUR HONOR.

20             WE HAVE MIKE CAREY AND WENDY CAREY, BOB MURPHY,

21   MORGAN CHIN.  AND THEN WE HAVE TWO EXPERT WITNESSES.  WE HAVE

22   DR. IRA BLOCK AND CARRIE DISTLER.

23             THE COURT:  OKAY.  THE SAME QUESTION.  IF ANY OF YOU

24   THINK YOU MIGHT -- THERE IS A HAND IN THE BACK.

25             SIR, YOUR NAME IS MR. LUNA.

32

1          PROSPECTIVE JUROR NO. 17:  CORRECT.

2          THE COURT:  MR. LUNA, WHO IS IT THAT YOU THINK YOU

3   MIGHT KNOW?

4          PROSPECTIVE JUROR NO. 17:  MORGAN CHIN.

5          THE COURT:  AND HOW DO YOU KNOW MORGAN CHIN?

6          PROSPECTIVE JUROR NO. 17:  SHE WAS AN EX-EMPLOYEE OF

7   MINE.

8          THE COURT:  WHERE?

9          PROSPECTIVE JUROR NO. 17:  AT BROOKS BROTHERS.  AND

10  WE'RE ALSO GOOD FRIENDS.

11         THE COURT:  HAVE YOU TALKED -- HAVE YOU TALKED ABOUT

12  THIS CASE?

13         PROSPECTIVE JUROR NO. 17:  NO.

14         THE COURT:  HOW WELL DO YOU KNOW HER?

15         PROSPECTIVE JUROR NO. 17:  VERY WELL.

16         THE COURT:  OKAY.  ONE OF THE THINGS THAT HAPPENS IS

17  YOU HAVE TO DECIDE THE CREDIBILITY OF WITNESSES AND EVALUATE

18  THEIR TESTIMONY AS THOUGH YOU DON'T KNOW THEM.

19         IS THAT SOMETHING YOU'RE GOING TO BE ABLE TO DO?

20         PROSPECTIVE JUROR NO. 17:  I'M AFRAID, PROBABLY NOT.

21         THE COURT:  I'M GOING TO EXCUSE YOU, MR. LUNA, FROM

22  SERVICE IN THIS CASE.

23         BEFORE YOU TAKE OFF, I NEED TO TALK TO -- SO THERE

24  IS OTHER TRIALS THAT DON'T INVOLVE MS. CHIN.  YOU GET TO GO

25  BACK TO THE JURY ROOM.  DO YOU KNOW WHERE IT IS?

33

1          PROSPECTIVE JUROR NO. 17:  I DO.

2          THE COURT:  SO HEAD BACK TO THE JURY ROOM.

3     APPARENTLY THERE IS OTHER CASES.  THANK YOU SO MUCH FOR YOUR

4     SERVICE.  IT'S MUCH APPRECIATED.

5          ANYBODY ELSE KNOW POTENTIAL WITNESSES?  THANK YOU.

6          AS I TOLD YOU AT THE BEGINNING, THIS CASE INVOLVES

7     OMNI-HEAT-RELATED DESIGN UTILITY PATENTS AND SEIRUS AND

8     COLUMBIA.

9          HAVE ANY OF YOU HEARD ABOUT THIS CASE OR THE FACTS

10    REGARDING THIS CASE OR READ ABOUT IT?  IF SO, PLEASE RAISE

11    YOUR HAND.

12         THE HARD QUESTION.  THIS CASE IS GOING TO TAKE ABOUT

13    TWO WEEKS TO TRY.  THAT IS ALL OF THIS WEEK AND ALL OF NEXT

14    WEEK.  ON FRIDAY OF NEXT WEEK, I EXPECT THE JURY WILL BE

15    DELIBERATING.  I DON'T KNOW WHEN ON FRIDAY THEY WILL BE

16    DELIBERATING, BUT THAT'S WHAT MY EXPECTATION IS, THAT THEY

17    WILL BE DELIBERATING ON FRIDAY.

18         ONCE THE CASE BEGINS OR IS GIVEN TO THE JURY AND

19    THEY BEGIN THEIR DELIBERATIONS, A JUDGE, THE ULTIMATE CONTROL

20    PERSON, LOSES CONTROL HERE, BECAUSE IT'S UP TO THE JURY TO

21    DECIDE HOW THEY ARE GOING TO DELIBERATE, HOW LONG THEY ARE

22    GOING TO DELIBERATE, HOW LONG THEY ARE GOING TO STAY AT NIGHT

23    AND WHEN THEY RETURN THE VERDICT.  THAT'S ENTIRELY UP TO THE

24    JUDGE -- OR TO THE JURY.  SO THAT PROCESS MAY CARRY OVER TO

25    THE SUBSEQUENT WEEK.  I DON'T KNOW.  IT WILL BE UP TO THE

34

1    JURY TO FIGURE THAT PART OF IT OUT.

2            SO ALL OF THIS WEEK, ALL OF NEXT WEEK AND MAYBE, MY

3    BEST GUESS IS MONDAY OF THE FOLLOWING WEEK.  AND I ANTICIPATE

4    THAT THE JURY WILL BE DONE BY THEN.  THAT'S MY BEST ESTIMATE.

5    HAVING TRIED ABOUT 600 TRIALS, THAT'S MY BEST GUESS.

6            SO IF THAT SCHEDULE PRESENTS AN IMPOSSIBILITY FOR

7    YOU, YOU CAN RAISE YOUR HAND.  BUT BEFORE YOU RAISE YOUR

8    HAND, PLEASE UNDERSTAND THAT YOUR DEFINITION OF IMPOSSIBILITY

9    AND MY DEFINITION OF IMPOSSIBILITY WILL BE DIFFERENT.

10           SO DOES ANYBODY HAVE AN IMPOSSIBILITY THAT THEY

11   CANNOT SERVE ON THAT SCHEDULE?  OKAY.  I HAVE ONE PERSON IN

12   THE BOX.

13           AND YOU ARE MS. HARBOLT?  YOU HAVE CARE ISSUES?

14           PROSPECTIVE JUROR NO. 10:  YES.

15           THE COURT:  SO I DON'T WANT TO SPEAK FOR YOU.  TELL

16   ME WHAT THE NATURE OF YOUR ISSUE IS.

17           PROSPECTIVE JUROR NO. 10:  I TAKE CARE OF MY NIECE.

18   SHE HAS BRITTLE BONE DISEASE.  SO SHE ALWAYS -- I GO TO THE

19   SCHOOL AND CHECK ON HER AND --

20           THE COURT:  YOU CAN'T BE GONE FOR THAT LONG --

21           PROSPECTIVE JUROR NO. 10:  YEAH.

22           THE COURT:  -- AS A RESULT?

23           OKAY.  MS. HARBOLT, I'M GOING TO HAVE YOU HANG ON

24   FOR A SECOND.  THERE IS ANOTHER HAND --

25           PROSPECTIVE JUROR NO. 15:  KAREN RUSSO.

1           THE COURT:  MS. RUSSO.

2           PROSPECTIVE JUROR NO. 15:  I HAVE A TRIP THAT I'M

3   LEAVING OUT OF -- I'M GOING TO WASHINGTON AND CANADA, LEAVING

4   ON SATURDAY.  AND BEING GONE ALL NEXT WEEK.

5           THE COURT:  OKAY.  ALL RIGHT.  THANK YOU.

6           THERE IS A HAND OVER HERE.  MS. STREY.

7           PROSPECTIVE JUROR NO. 19:  YES.  I WAS HOPING I

8   COULD ASK TO BE EXCUSED ON THE 28TH, WHICH IS THURSDAY.  MY

9   HUSBAND IS HAVING A MEDICAL PROCEDURE, AND I NEED TO BE WITH

10  HIM.  HE CANNOT DRIVE.  JUST THE ONE DAY.

11          THE COURT:  OKAY.  THANK YOU.

12          ANYBODY ELSE?  A RELUCTANT HAND IN THE BACK.

13  MS. CASTRO.

14          PROSPECTIVE JUROR NO. 5:  ALSO, MY HUSBAND, ON THE

15  29TH, HE HAS A MEDICAL PROCEDURE, AND HE CAN'T DRIVE.

16          THE COURT:  ANYBODY ELSE?

17          OKAY.  MS. CASTRO, HARBOLT, RUSSO, STREY, YOU ARE

18  ALL EXCUSED.  THANK YOU FOR YOUR SERVICE.  MUCH APPRECIATED.

19  YOU NEED TO RETURN TO THE JURY ROOM TO SEE IF THERE IS A CASE

20  THAT WON'T TAKE SO LONG.

21          PROSPECTIVE JUROR NO. 11:  I'M SORRY.  WHAT WAS THE

22  LAST NAME OF THE PEOPLE EXCUSED?

23          THE COURT:  IT WAS THOSE PEOPLE THAT HAD RAISED

24  THEIR HAND.

25          PROSPECTIVE JUROR NO. 11:  I'M SORRY.

36

1          THE COURT:  DID I SAY IT WRONG?  I SAID HARBOLT,

2     CASTRO, STREY AND RUSSO.

3          OKAY.  AND I SAW NO OTHER HANDS REGARDING THE

4     SCHEDULING ISSUE.

5          NOW WE'RE GOING TO DIG IN A LITTLE BIT DEEPER AS TO

6     THE NATURE OF THIS PARTICULAR CASE.  HAVE ANY OF YOU OR

7     MEMBERS OF YOUR FAMILY, AND WE'LL EVEN SAY CLOSE FRIENDS OR

8     ASSOCIATES, EVER WORKED FOR COLUMBIA OR FOR SEIRUS?  IF SO,

9     PLEASE RAISE THEIR HAND.

10          PROSPECTIVE JUROR NO. 20:  JUDGE, I KNOW ABOUT

11     COLUMBIA.  I'M NOT SURE WHAT THIS OTHER COMPANY DOES.  I

12     DON'T KNOW IF ANYBODY WOULD BE INTERESTED IN KNOWING WHAT

13     THEY DO.  THEY ARE JUST SPORTS CLOTHING?

14          THE COURT:  WE'LL GET TO THAT.  YOU'RE GOING TO

15     LEARN SO MUCH OVER THE COURSE OF THE TRIAL.  BUT RIGHT NOW

16     I'M JUST TRYING TO FIGURE OUT WHETHER OR NOT ANYBODY HAS

17     FAMILIARITY WITH THE PARTIES AT A LEVEL THAT WOULD MAKE IT SO

18     THAT THEY COULDN'T SIT AS JURORS.  THAT'S REALLY THE POINT OF

19     THESE QUESTIONS RIGHT NOW.  THANK YOU.

20          HAVE ANY OF YOU, OTHER THAN PERHAPS THE I.R.S., AND

21     THINKING ABOUT THE I.R.S., HAVE ANY OF YOU HAD ISSUES WITH A

22     GOVERNMENT ENTITY BESIDES THE I.R.S.?  I'M NOT TALKING ABOUT

23     THE FEDERAL GOVERNMENT.  IF SO, PLEASE RAISE THEIR HAND.

24          THANK YOU.

25          ARE ANY OF YOU FAMILIAR WITH COLUMBIA'S PRODUCT, THE

1    OMNI-HEAT PRODUCT?  IF YOU'RE FAMILIAR WITH THAT PRODUCT,

2    THAT RINGS A BELL TO YOU, PLEASE RAISE YOUR HAND.

3         ARE ANY OF YOU FAMILIAR WITH SEIRUS HEATWAVE

4    PRODUCTS?  IF SO, PLEASE RAISE THEIR HAND.

5         FOR THOSE OF YOU, I HEARD SOME OF YOU DO BIKING AND

6    OUTDOOR KINDS OF ACTIVITIES.  AND I'M GOING TO MAKE AN

7    ASSUMPTION THAT YOU BUY OUTDOOR WEAR, WHETHER THAT BE COATS,

8    HATS, GLOVES OR WHATEVER.

9         DO ANY OF YOU WHO PURCHASE SUCH THINGS CONSIDER THE

10   TECHNOLOGY BEHIND THEM IN MAKING SUCH PURCHASES?  IS THAT AN

11   IMPORTANT ASPECT TO YOU TO MAKING SUCH PURCHASES?  IF SO,

12   PLEASE RAISE THEIR HAND.

13        AND YOU ARE MR. WAHL?

14        PROSPECTIVE JUROR NO. 2:  YES.

15        THE COURT:  CAN YOU TELL ME JUST A LITTLE BIT ABOUT

16   WHAT YOUR PROCESS IS AND WHAT YOU THINK ABOUT IN MAKING IT.

17   AND I'M TALKING ABOUT APPAREL PURCHASES, NOT OTHER KINDS OF

18   TECHNOLOGY.

19        PROSPECTIVE JUROR NO. 2:  I THINK I WOULD LOOK AT

20   THE FEATURES OF THE PRODUCT TO TRY TO UNDERSTAND WHAT THEY

21   DO, WHAT BENEFIT THEY WOULD PROVIDE, AND THAT WOULD BE A PART

22   OF MY PROCESS OF PURCHASING GEAR OR APPAREL.

23        THE COURT:  OKAY.  AND WHEN YOU ARE PURCHASING

24   OUTDOOR GEAR, WHAT'S YOUR PRIMARY SOURCE FOR MAKING

25   PURCHASES?  DO YOU DO IT ONLINE?  DO YOU GO INTO A BIG BOX

38

1    STORE?  HOW DO YOU GO ABOUT THIS?

2                PROSPECTIVE JUROR NO. 2:  BOTH, I WOULD SAY, BIG BOX

3    AND ONLINE.

4                THE COURT:  OKAY.  AND IN FIGURING OUT THE

5    TECHNOLOGY PART OF IT, ARE YOU THE KIND OF PERSON THAT GOES

6    FURTHER ONLINE IN ORDER TO KIND OF LOOK AT WHAT CONSUMERS ARE

7    SAYING AND WHAT OTHER SCIENTIFIC REPORTS MIGHT BE ABOUT THAT

8    PRODUCT?  IS THAT YOU?

9                PROSPECTIVE JUROR NO. 2:  YES.

10               THE COURT:  OKAY.  YOU'RE THAT GUY?

11               PROSPECTIVE JUROR NO. 2:  THAT GUY.

12               THE COURT:  OKAY.  THANK YOU.

13               I THINK WE'VE COVERED THIS ALREADY, BUT JUST IN

14   CASE, TO PUT A STRONGER POINT ON IT.  HAVE ANY OF YOU WORKED

15   FOR A PATENT OR TRADEMARK OFFICE, ANYTHING LIKE THAT?  IF SO,

16   PLEASE RAISE YOUR HAND.

17               AND I KNOW THAT MR. WAHL HAS TOLD US THAT HE'S BEEN

18   INVOLVED IN THE PATENTING PROCESS.  HAS ANYBODY ELSE BEEN

19   INVOLVED IN PATENTS OR THE SECURING OF PATENTS OR THE

20   PROTECTING OF PATENTS?  IF SO, PLEASE RAISE YOUR HAND.

21               DO ANY OF THE POTENTIAL JURORS HAVE STRONG FEELINGS

22   ABOUT THE PATENTING PROCESS OR JUST PATENTS IN GENERAL?  THEY

23   ARE GOOD BECAUSE THEY PROTECT PEOPLE THAT ARE INNOVATIVE.

24   THEY ARE BAD BECAUSE THEY ARE BAD FOR FREE TRADE OR WHATEVER.

25   IF THAT DESCRIBES YOU, AND YOU HAVE STRONG FEELINGS ABOUT IT,

39

1    PLEASE RAISE THEIR HAND.

2            DO ANY OF YOU HAVE AN ACCOUNTING BACKGROUND?  IF SO,

3    PLEASE RAISE YOUR HAND.

4            MS. FLORES, REMIND ME.

5            PROSPECTIVE JUROR NO. 1:  I HAVE AN ASSOCIATE'S

6    DEGREE IN ACCOUNTING.  I WORKED PROBABLY ABOUT A YEAR IN THE

7    FIELD.  THAT'S IT.

8            THE COURT:  OKAY.  ALL RIGHT.  THANK YOU.

9            PROSPECTIVE JUROR NO. 14:  I'M SORRY, SIR.  WAS YOUR

10   QUESTION ACCOUNTING?

11           THE COURT:  YES.

12           PROSPECTIVE JUROR NO. 14:  I HAVE AN ACCOUNTING

13   DEGREE, TOO.

14           THE COURT:  OKAY.  AND DO YOU DO ACCOUNTING WORK?

15           PROSPECTIVE JUROR NO. 14:  MY FATHER WAS A CPA.  I

16   USED TO WORK FOR HIM.  MOSTLY MY EXPERIENCE HAS BEEN IN

17   BANKING.

18           THE COURT:  OKAY.  AND YOU USED YOUR ACCOUNTING

19   EXPERIENCE IN THE BANKING FIELD?

20           PROSPECTIVE JUROR NO. 14:  YES.

21           THE COURT:  I SEE.  THANK YOU.

22           DOES ANYBODY HAVE A LEGAL BACKGROUND?  I KNOW

23   SOMEBODY WORKED IN A LEGAL OFFICE.  I THINK SHE'S GONE.  DOES

24   ANYBODY HAVE A LEGAL BACKGROUND?

25           PROSPECTIVE JUROR NO. 9:  I HAVE AN UNCLE WHO IS A

40

1   JUDGE.

2           THE COURT:  THAT DOESN'T MEAN ANYTHING.

3           LET'S SEE.  HAVE ANY OF YOU WORKED IN TRYING TO

4   FIGURE OUT BUDGETING OR PREDICTING COSTS FOR BUSINESSES, OR A

5   BUSINESS?

6           PROSPECTIVE JUROR NO. 3:  (INDICATING.)

7           THE COURT:  I'M SORRY.  AND YOU ARE MR. LU BIEN?

8           PROSPECTIVE JUROR NO. 3:  CORRECT.

9           THE COURT:  TELL ME ABOUT THAT.

10          PROSPECTIVE JUROR NO. 3:  AT OUR COMPANY, I'M KIND

11  OF PRIMARILY RESPONSIBLE FOR --

12          THE COURT:  CAN YOU KEEP YOUR VOICE UP.

13          PROSPECTIVE JUROR NO. 3:  I'M SORRY.

14          SO AT MY COMPANY, IN MY ROLE, PART OF MY JOB IS TO

15  FORECAST AND BUDGET FOR FUTURE YEARS.  I THINK THAT WAS PART

16  OF YOUR QUESTION.

17          THE COURT:  YEAH.  THAT'S BUDGETING AND PREDICTING

18  COSTS FOR YOUR BUSINESS?

19          PROSPECTIVE JUROR NO. 3:  CORRECT.

20          THE COURT:  OKAY.  THANK YOU.

21          DO ANY OF YOU HAVE PRIOR EXPOSURE OR FAMILIARITY

22  WITH THE CONCEPTS OF DIRECT, INVARIABLE OR FIXED COSTS,

23  TOLLED PROFITS, THE COST OF GOODS SOLD, OR OTHERWISE KNOWN AS

24  COGS?

25          IF THOSE CONCEPTS ARE FAMILIAR TO YOU, JUST RAISE

1    YOUR HAND.  OKAY.  THANK YOU.

2            DO ANY OF YOU HAVE STRONG FEELINGS ABOUT ANY OF THE

3    PARTIES ASSOCIATED WITH THIS CASE, COLUMBIA OR SEIRUS?  IF

4    SO, PLEASE RAISE THEIR HAND.

5            HAVE ANY OF YOU HEARD OF OR KNOW WHO MR. CAREY IS?

6    IF YOU KNOW WHO HE IS OR HAVE SEEN HIM OR HEARD ABOUT HIM,

7    PLEASE RAISE YOUR HAND.

8            DO ANY OF YOU KNOW WHO CURT BOYLE OR TIM BOYLE IS?

9    IF SO, PLEASE RAISE THEIR HAND.

10            DO ANY OF YOU HAVE ANY EDUCATION OR TRAINING IN

11    TEXTILE, FABRICS OR CLOTHING MANUFACTURE?  IF SO, PLEASE

12    RAISE THEIR HAND.

13            HAVE ANY OF YOU OR A FAMILY MEMBER EVER WORKED FOR A

14    COMPANY THAT SUED ANOTHER FOR PATENT INFRINGEMENT?  IF SO,

15    PLEASE RAISE THEIR HAND.

16            AND FINALLY, IS THERE ANYTHING THAT I MIGHT NOT HAVE

17    ASKED BUT MAYBE I SHOULD HAVE?  AND THE POINT OF THE QUESTION

18    IS, IS THERE ANYTHING ABOUT YOU THAT WOULD CAUSE YOU

19    DIFFICULTY BEING NEUTRAL IN THIS CASE?  IF SO, PLEASE RAISE

20    YOUR HAND.

21            I'M NOW GOING TO TURN THE MATTER OVER TO THE

22    LAWYERS.  AND THEY WILL GET TO ASK FOLLOW-UP QUESTIONS TO THE

23    QUESTIONS THAT I HAVE ASKED.

24            I WILL TURN FIRST TO THE PLAINTIFF.  DO YOU HAVE ANY

25    FOLLOW-UP QUESTIONS?

42

1           MR. ALDRICH:  I HAD ONLY ONE QUESTION, YOUR HONOR.

2           MS. PERKINS, I THINK YOU MENTIONED THAT YOUR

3     HUSBAND, IS THAT CORRECT, WORKS FOR A COMPANY CALLED

4     PROCOPIO?

5           PROSPECTIVE JUROR NO. 12:  YES.

6           MR. ALDRICH:  WHAT'S PROCOPIO?

7           PROSPECTIVE JUROR NO. 12:  IT'S A LAW FIRM.

8     PROCOPIO, CORY, HARGREAVES & SAVITCH.

9           MR. ALDRICH:  AND WHAT DO THEY DO, IF YOU KNOW, MORE

10    SPECIFICALLY?

11          PROSPECTIVE JUROR NO. 12:  I'M NOT SURE EXACTLY WHAT

12    TYPE OF LAW THEY DO.  I MEAN --

13          MR. ALDRICH:  WHAT DOES YOUR HUSBAND DO THERE?

14          PROSPECTIVE JUROR NO. 12:  HE'S A SYSTEMS ENGINEER.

15    SO HE, YOU KNOW, WORKS IN THE I.T. DEPARTMENT.

16          THE REPORTER:  I'M SORRY.  I CAN'T HEAR YOU.

17          PROSPECTIVE JUROR NO. 12:  HE WORKS ON SERVERS AND

18    THINGS LIKE THAT.

19          MR. ALDRICH:  THAT WAS MY ONLY QUESTION, YOUR HONOR.

20    THANK YOU.

21          THE COURT:  THANK YOU.

22          FOR THE DEFENSE, FOLLOW-UP QUESTIONS.

23          MS. ROTHAUGE:  YOUR HONOR, IN ORDER TO SPEED UP THE

24    PROCESS, MAY I ADDRESS THE PANEL IN ITS ENTIRETY?

25          THE COURT:  SURE.

43

1              MS. ROTHAUGE:  I AM RENEE ROTHAUGE.  IT'S MY HONOR

2       TO REPRESENT SEIRUS INNOVATIVE ACCESSORIES.

3              AND I WANT TO TURN TO YOU.  NOW, YOU'RE GOING TO

4       LEARN AND MEET THE REST OF THE TEAM, BUT I WANT TO START WITH

5       YOU AND SOME OF THE VIEWS THAT YOU MAY HOLD THAT MIGHT BE

6       RELEVANT TO OUR DECISION HERE TODAY.

7              SO THE FIRST THING I WANT TO ASK ABOUT IS LAWSUITS.

8       BECAUSE YOU WERE ALL ASKED ABOUT YOUR INVOLVEMENT IN

9       LAWSUITS, AND SOME OF YOU SAID THAT YOU WERE INVOLVED IN

10      LAWSUITS.

11             MY FIRST QUESTION FOR ALL OF YOU IS:  HOW MANY

12      PEOPLE, HOW MANY OF YOU BELIEVE THAT THERE ARE TOO MANY

13      LAWSUITS FILED IN THE UNITED STATES TODAY?  DOES ANYBODY

14      BELIEVE THAT?

15             MR. CONNOLLY.

16             OKAY.  WELL, SINCE YOU RAISED YOUR HAND FIRST,

17      MR. CONNOLLY, CAN YOU EXPLAIN TO US WHAT YOUR VIEW IS ON

18      LAWSUITS THAT ARE FILED TODAY.

19             PROSPECTIVE JUROR NO. 14:  I JUST GENERALLY THINK

20      OUR COUNTRY IS TOO LITIGIOUS AND THERE NEEDS TO BE LESS OF

21      IT.  IF THERE IS A WAY TO SIMPLIFY IT, IN THE SAME WAY OUR

22      TAX LAW IS TOO VOLUMINOUS.

23             MS. ROTHAUGE:  GREAT.  DO THE OTHERS THAT RAISED

24      THEIR HAND, DO YOU AGREE WITH WHAT MR. CONNOLLY SAID, OR DO

25      YOU HAVE A DIFFERENT TAKE ON IT?

44

```
1                I SEE YOU NODDING.  WHAT DO YOU THINK?

2                PROSPECTIVE JUROR NO. 6:  BASICALLY THE SAME.

3                MS. ROTHAUGE:  TOO COMPLICATED, TOO LITIGIOUS?

4    OKAY.

5                WHAT ABOUT YOU?

6                PROSPECTIVE JUROR NO. 12:  I DON'T KNOW.  I JUST

7    THINK THAT THERE IS, YOU KNOW, A LOT OF PEOPLE TRYING TO GET

8    MONEY FROM BIG COMPANIES.

9                THE REPORTER:  I'M SORRY.  I CAN'T HEAR YOU.

10               PROSPECTIVE JUROR NO. 12:  I JUST THINK THERE IS A

11   LOT OF FRIVOLOUS LAWSUITS.  I JUST THINK THAT THERE IS A LOT

12   OF PEOPLE THAT ARE LOOKING FOR A REASON TO SUE, YOU KNOW, TO

13   GET MONEY FROM A BIG COMPANY.

14               MS. ROTHAUGE:  DO YOU -- NOW, YOU USED THE TERM "BIG

15   COMPANY."  DO YOU FEEL MORE PROTECTIVE OF BIG COMPANIES?  DO

16   YOU TEND TO SORT OF FAVOR THEM AND THINK THAT THEY KIND OF

17   TAKE TOO MUCH ABUSE IN THE COURTS?

18               PROSPECTIVE JUROR NO. 12:  YEAH.  I MEAN, I JUST --

19   I JUST DON'T LIKE, YOU KNOW, PEOPLE THAT ARE UNTRUTHFUL, YOU

20   KNOW, AND, YOU KNOW, JUST TRYING TO -- TO HAVE A FRIVOLOUS

21   LAWSUIT JUST TO GET MONEY OUT OF A BIG COMPANY.

22               MS. ROTHAUGE:  OKAY.  THANK YOU.

23               LAST BUT NOT LEAST, DO YOU HAVE ANYTHING THAT

24   YOU'RE --

25               PROSPECTIVE JUROR NO. 20:  I'M JUST BOTHERED BY
```

1    FRIVOLOUS STUFF THAT COMES TO THE COURT.  WASTES THE COURT'S

2    TIME.

3             MS. ROTHAUGE:  OKAY.  I REPRESENT THE DEFENDANT IN

4    THIS CASE, SO THIS ONE IS A REALLY IMPORTANT QUESTION TO US.

5             IS THERE ANYONE HERE WHO THINKS THAT IF YOU'VE BEEN

6    SUED AND YOU'RE A DEFENDANT, YOU'VE DONE SOMETHING WRONG?

7    DOES ANYONE BELIEVE THAT?  ANYONE?  ALL RIGHT.

8             I KNOW THAT NONE OF YOU RAISED YOUR HANDS WHEN WE

9    INTRODUCED OR YOU WERE ASKED ABOUT MR. CAREY.  MR. CAREY USED

10   TO WORK WITH THE NFL.  YOU'RE GOING TO LEARN MORE ABOUT THAT.

11   BUT I WANT TO FIND OUT NOW, IS THERE ANYBODY WHO HOLDS ANY

12   NEGATIVE VIEWS ABOUT THE NFL?

13            PROSPECTIVE JUROR NO. 14:  OTHER THAN THE CHARGERS

14   LEAVING?

15            MS. ROTHAUGE:  AND I'M REALLY SORRY ABOUT THAT.  I'D

16   BRING THEM BACK, IF I COULD.  OTHER THAN THE CHARGERS.

17            ANYONE ELSE?  ANYONE ELSE?

18            HE WAS A REFEREE.  I DON'T KNOW IF THAT REFRESHES

19   YOUR MEMORY.  DOES THAT REFRESH YOUR RECOLLECTION?

20            PROSPECTIVE JUROR NO. 14:  UH-HUH.

21            MS. ROTHAUGE:  THIS IS AN IMPORTANT QUESTION FOR

22   YOU.  DO YOU REMEMBER ANY PLAYS THAT HE CALLED THAT YOU'RE

23   STILL MAD ABOUT OR ANYTHING?  YOU SEEM LIKE YOU MIGHT HOLD A

24   GRUDGE.

25            PROSPECTIVE JUROR NO. 14:  NO.  I WOULDN'T REMEMBER

1    HIM IN THAT LIGHT.

2            MS. ROTHAUGE:  OKAY.  GREAT.  THANKS.

3            YOU WERE ASKED ABOUT COLUMBIA CLOTHES.  I THINK YOU

4    WERE ASKED IF ANYONE HAD PURCHASED ANY.  AND I JUST WANTED TO

5    KNOW IF YOU KNOW -- THEY MAKE JACKETS.  THEY MAKE A LOT OF

6    APPAREL YOU'LL HEAR ABOUT.

7            DOES ANYONE -- HAS ANYONE OWNED ONE?  DOES ANYONE

8    HAVE ANY IMPRESSION ABOUT COLUMBIA APPAREL?  ANYTHING?

9            PROSPECTIVE JUROR NO. 2:  YEAH.  I OWN A COUPLE OF

10   THINGS.  MY WIFE HAS A JACKET, COLUMBIA.

11           MS. ROTHAUGE:  SO DO YOU HAVE -- BASED ON OWNING

12   THOSE PRODUCTS, DO YOU HAVE ANY IMPRESSION ABOUT THE BRAND OR

13   THE PRODUCTS?

14           PROSPECTIVE JUROR NO. 2:  I THINK IT'S A NICE

15   OUTDOOR BRAND.  QUALITY OF PRODUCTS, GOOD.  AND I'VE BEEN

16   SATISFIED WITH THE PURCHASES.

17           MS. ROTHAUGE:  OKAY.  I ACTUALLY HAD SOME SPECIFIC

18   QUESTIONS FOR YOU, SO MAYBE I'LL TAKE A BREAK FROM OUR

19   GENERAL QUESTIONS AND GO TO YOU, MR. WAHL.

20           YOU HAD TALKED ABOUT BEING INVOLVED IN THE PATENT

21   PROCESS FOR ADIDAS.  AND YOU'RE GOING TO HEAR IN THIS CASE

22   ABOUT -- THERE IS GOING TO BE A CHALLENGE TO VALIDITY OF

23   PATENTS.

24           AND I WAS WONDERING, IN YOUR EXPERIENCE THAT YOU

25   HAD, OR THAT YOU WERE TELLING US ABOUT, DID THE PARTY THAT

1    ADIDAS WAS SEEKING TO ENFORCE THE PATENT AGAINST, DID THEY

2    CHALLENGE THE VALIDITY OF ADIDAS' PATENTS, DO YOU RECALL?

3         PROSPECTIVE JUROR NO. 2:  I'VE BEEN EXPOSED TO BOTH

4    SIDES, WHERE WE'VE BEEN CHALLENGED FOR INFRINGEMENT AGAINST

5    EXISTING PATENTS.  AND THEN WE HAVE BEEN INVOLVED WITH

6    INVALIDATING OTHER PATENTS OR BRINGING SUIT AGAINST PEOPLE

7    WHO WE FELT INFRINGED OUR CLAIMS.

8         MS. ROTHAUGE:  INTERESTING.  DO YOU -- SO DOES

9    ADIDAS GO AFTER -- I MEAN, IN THAT LITIGATION, DID IT INVOLVE

10   A COMPETITOR?

11        PROSPECTIVE JUROR NO. 2:  IT HAS, YES.

12        MS. ROTHAUGE:  CAN YOU GIVE US AN EXAMPLE OF WHICH

13   COMPETITOR.

14        PROSPECTIVE JUROR NO. 2:  YES.  I WORK SPECIFICALLY

15   FOR TAYLORMADE, WHICH IS A DIVISION OF ADIDAS.  SO WE HAVE

16   BEEN IN SUIT WITH CALLAWAY, WITH OTHER GOLF COMPANIES

17   GENERALLY.

18        MS. ROTHAUGE:  OKAY.  DO YOU HAVE ANY VIEWS, ONE WAY

19   OR THE OTHER, ABOUT THOSE WHO CHALLENGE THE VALIDITY OF

20   PATENTS?  YOU KNOW, YOU'VE BEEN ON THE SUING SIDE.  WHAT DO

21   YOU THINK ABOUT THAT?

22        PROSPECTIVE JUROR NO. 2:  I MEAN, I THINK PATENTS

23   ARE GENERALLY GOOD TO PROTECT YOUR INTELLECTUAL PROPERTY, BUT

24   I UNDERSTAND SOMETIMES THERE IS DISAGREEMENT ABOUT THE

25   CLAIMS, CLAIM STRUCTURE, AND IDEAS AND TIMING AND, YOU KNOW,

1    THE LAYERS OF THAT PROCESS.

2            SO I CAN CERTAINLY -- I HAVE OPINIONS ABOUT THAT,

3    BUT I WOULD SAY I'M GENERALLY TOLERANT OF THE PROCESS AND,

4    YOU KNOW, WHAT COMES ABOUT THROUGH THAT.

5            MS. ROTHAUGE:  ALL RIGHT.  OKAY.  THANK YOU.

6            SITTING NEXT TO MR. WAHL.  MR. LU BIEN, DID I --

7            PROSPECTIVE JUROR NO. 3:  LU BIEN.

8            MS. ROTHAUGE:  LU BIEN.  I APOLOGIZE.

9            PROSPECTIVE JUROR NO. 3:  NO WORRIES.

10           MS. ROTHAUGE:  MY HANDWRITING IS HORRIFIC.

11           HOW BIG IS THE COMPANY YOU WORK FOR?  I KNOW YOU

12   SAID YOU'RE THE C.O.O. AND YOU HANDLE FORECASTING.  I WANT TO

13   KNOW HOW BIG THE COMPANY IS.

14           PROSPECTIVE JUROR NO. 3:  WE HAVE APPROXIMATELY 275

15   EMPLOYEES.  WE WRITE INSURANCE.  SO TO PUT IN IT INSURANCE

16   TERMS, WE WILL GENERATE THIS YEAR APPROXIMATELY 375 MILLION

17   DOLLARS IN WRITTEN PREMIUM IF THAT KIND OF HELPS.

18           MS. ROTHAUGE:  AND DO ALL OF THAT -- HOW MANY OF

19   THOSE EMPLOYEES REPORT TO YOU AS C.O.O.?

20           PROSPECTIVE JUROR NO. 3:  I GUESS TECHNICALLY

21   PROBABLY ALL OF THEM EVENTUALLY.  WE'RE BROKEN UP INTO, WE

22   HAVE 13 DIFFERENT DIVISIONS; SO IT'S TYPICALLY THOSE DIVISION

23   HEADS THAT DIRECTLY REPORT UP TO ME.  SO DIRECT REPORTS,

24   PROBABLY ANYWHERE BETWEEN I'D SAY 15 TO 20, OFF THE TOP OF MY

25   HEAD.

49

1          MS. ROTHAUGE:  WHO DO YOU SELL INSURANCE TO?  ARE

2   THERE PARTICULAR COMPANIES YOU TARGET, OR IS IT INDIVIDUALS?

3          PROSPECTIVE JUROR NO. 3:  WE WRITE A VARIETY OF

4   PRODUCTS.  WE DO BOTH PERSONAL AND COMMERCIAL LINES.  OUR

5   PRIMARY PERSONAL LINES CUSTOMER IS ACTUALLY INDIVIDUALS'

6   MANUFACTURED HOME, SO IN LOW-VALUE DWELLINGS.  WE WRITE

7   PERSONAL PROPERTY PRODUCT IN CALIFORNIA.

8          IN THE COMMERCIAL SIDE, WE FOCUS ON WORKERS'

9   COMPENSATION IS OUR PRIMARY LINE.  WE ALSO DO TRUCKING

10  BUSINESS.  WE DO NOT -- NEXT QUESTION.  WE DON'T DO ANY

11  PROFESSIONAL LIABILITY.  WE DON'T DO ANY PRODUCTS LIABILITY.

12  WE DON'T DO ANY MEDICAL LIABILITY, EITHER.

13         MS. ROTHAUGE:  YOU DON'T WRITE ANY INTELLECTUAL

14  PROPERTY POLICIES?  THAT WAS MY OTHER QUESTION, TOO.

15         PROSPECTIVE JUROR NO. 3:  NO, WE DO NOT.

16         MS. ROTHAUGE:  SPEAKING OF WORKERS' COMP.  BEFORE I

17  FORGET, YOU WERE A WITNESS IN A WORKERS' COMP CASE?

18         PROSPECTIVE JUROR NO. 20:  YES, I WAS.

19         MS. ROTHAUGE:  CAN YOU TELL ME A LITTLE BIT ABOUT

20  THE CIRCUMSTANCES OF THAT.

21         PROSPECTIVE JUROR NO. 20:  IT WAS A RETIRED

22  BATTALION CHIEF THAT HAD COLON CANCER, AND IT WAS RELATED TO

23  ASBESTOS EXPOSURE.

24         MS. ROTHAUGE:  SO IT WASN'T -- IT WAS A PUBLIC

25  ENTITY CASE.  WAS IT A PUBLIC-UNION TYPE SITUATION?

50

1          PROSPECTIVE JUROR NO. 20:  NO.  IT WAS JUST HIM

2     APPLYING FOR WORKERS' COMP.

3          MS. ROTHAUGE:  WHAT WAS YOUR TESTIMONY ABOUT?

4          PROSPECTIVE JUROR NO. 20:  WELL, BEING A CAPTAIN FOR

5     AS LONG AS I WAS, IT WAS ABOUT WHEN WE WERE IN TRAINING, WE

6     USED TO USE ASBESTOS BLANKETS AND ASBESTOS GLOVES.  SO HIS

7     EXPOSURE WAS IN TRAINING.  HE WAS EXPOSED TO IT ON A DAILY

8     BASIS.  AND HE ENDED UP WINNING HIS CASE, YES.

9          MS. ROTHAUGE:  AND YOU BASICALLY TESTIFIED FOR HIM?

10         PROSPECTIVE JUROR NO. 20:  YES.

11         MS. ROTHAUGE:  DO I HAVE THAT RIGHT?  ALL RIGHT.

12    THANKS SO MUCH.

13         ALL RIGHT.  MS. HEROLD, YOU WORK AT MICHAEL'S?

14         PROSPECTIVE JUROR NO. 4:  YES.

15         MS. ROTHAUGE:  ONE OF MY FAVORITE PLACES.

16         THERE IS GOING TO BE SOME DISCUSSION IN THIS CASE

17    ABOUT FABRICS AND TEXTILES AND SOMETHING CALLED FOIL

18    PRINTING, WHERE YOU KIND OF PUT SHINY FOIL PRINTING ON

19    FABRICS.

20         DO YOU HAVE THOSE KIND OF PRODUCTS AT MICHAEL'S?

21         PROSPECTIVE JUROR NO. 4:  I DON'T KNOW OF ANY SORT

22    OF FOIL PRINTING OR ANYTHING.  HEAT-REFLECTIVE BASED, I DON'T

23    KNOW OF ANYTHING LIKE THAT.

24         NO, I CAN'T IMAGINE -- WE'RE NOT JOANNE'S SO WE

25    DON'T HAVE AS MUCH FABRIC, NEARLY AS MUCH.  NO.  I DON'T

1    BELIEVE WE HAVE ANYTHING LIKE THAT.

2           MS. ROTHAUGE:  BUT BASED ON YOUR ANSWER, IT SOUNDED

3    LIKE YOU KNEW WHAT I WAS TALKING ABOUT WHEN I SAID FOIL

4    PRINTING.  I DIDN'T KNOW ANYTHING ABOUT IT UNTIL I GOT IN

5    THIS CASE.

6           DO YOU HAVE ANY KIND OF EXPERIENCE WITH GENERALLY

7    WHAT IT IS AND HOW IT WORKS?

8           PROSPECTIVE JUROR NO. 4:  IS IT LIKE SOLAR PANELS?

9           MS. ROTHAUGE:  NO.  IT'S JUST LIKE ALUMINUM FOIL

10   THAT YOU PUT ON THE FABRIC, MAKES IT SHINY WITH DIFFERENT

11   PATTERNS.

12          PROSPECTIVE JUROR NO. 4:  NOT REALLY, NO.

13          MS. ROTHAUGE:  OKAY.  GREAT.  THANK YOU.

14          MS. MCDOWELL, I HAD SORT OF THE SAME SORT OF

15   QUESTION FOR YOU.  I UNDERSTAND YOU OWN A GALLERY.

16          PROSPECTIVE JUROR NO. 9:  NO, I DON'T OWN IT.

17          MS. ROTHAUGE:  YOU WORK AT IT?

18          PROSPECTIVE JUROR NO. 9:  I WORK --

19          MS. ROTHAUGE:  ARE YOU A TRAINED ARTIST?

20          PROSPECTIVE JUROR NO. 9:  YEAH.

21          MS. ROTHAUGE:  ARE YOU FAMILIAR WITH ANY OF THOSE

22   TECHNIQUES WHERE YOU USE --

23          PROSPECTIVE JUROR NO. 9:  YEAH.

24          MS. ROTHAUGE:  -- FOIL PRINT?

25          TELL ME WHAT YOU KNOW ABOUT ALL THAT.

1            PROSPECTIVE JUROR NO. 9:  I'VE DONE SCREEN PRINTING

2    AND THINGS LIKE THAT, AND DONE PLENTY OF PAINTING ON FABRICS

3    AND CANVASSES AND ADHERING, THINGS LIKE THAT, YEAH.

4            MS. ROTHAUGE:  HAVE YOU WORKED WITH -- I THINK THE

5    WORD THAT MS. HEROLD USED WAS REFLECTIVES.  HAVE YOU WORKED

6    WITH KIND OF REFLECTIVE PAINTS AND THINGS, SO YOU HAVE SOME

7    EXPERIENCE WITH THAT?

8            PROSPECTIVE JUROR NO. 9:  UH-HUH, YEAH.

9            MS. ROTHAUGE:  ABOUT HOW LONG HAVE YOU BEEN -- AT

10   LEAST BEEN EXPOSED TO THAT KIND OF TECHNIQUE?

11           PROSPECTIVE JUROR NO. 9:  IT WOULD BE HARD TO SAY.

12   I MEAN, I'VE BEEN DOING ALL THAT KIND OF STUFF FOR WELL OVER

13   20 YEARS, YEAH.

14           MS. ROTHAUGE:  OKAY.  EXCELLENT.  THANK YOU.

15           ALL RIGHT.  OUR AEROSPACE ENGINEER.  SO YOU ARE A

16   ROCKET SCIENTIST?

17           PROSPECTIVE JUROR NO. 11:  I WOULDN'T SAY THAT, NO.

18           MS. ROTHAUGE:  NO.  OKAY.  WELL, THAT WAS MY

19   QUESTION FOR YOU, ACTUALLY.  WHAT KIND OF ENGINEER ARE YOU?

20           PROSPECTIVE JUROR NO. 11:  I STARTED OFF IN

21   MANUFACTURING ENGINEERING.  I WORKED AT GENERAL DYNAMICS ON

22   THE TOMAHAWK MISSILE SYSTEMS.  AND THEN I TRANSITIONED INTO

23   SOFTWARE ENGINEERING AND ULTIMATELY ENDED UP AT BOEING.

24           MS. ROTHAUGE:  HOW LONG WERE YOU AT BOEING?

25           PROSPECTIVE JUROR NO. 11:  I'M SORRY?

53

1          MS. ROTHAUGE:  HOW LONG WERE YOU AT BOEING?

2          PROSPECTIVE JUROR NO. 11:  THREE YEARS.

3          MS. ROTHAUGE:  DID YOU MOVE UP TO SEATTLE?

4          PROSPECTIVE JUROR NO. 11:  NO, NO.  I COMMUTED.  I

5    FLEW UP MONDAY, FLEW BACK FRIDAY.  DID THAT FOR THREE YEARS.

6    BECAUSE MY WIFE HAD HER OWN BUSINESS, WHICH WAS FAIRLY

7    LUCRATIVE AT THE TIME, SO IT WAS POINTLESS TO MOVE UP THERE.

8    SHE WASN'T GOING TO MOVE OUT OF THE NICE WEATHER.

9          MS. ROTHAUGE:  YOU SAID WHAT BUSINESS, WAS SHE REAL

10   ESTATE?

11         PROSPECTIVE JUROR NO. 11:  SHE WAS REAL ESTATE.

12         MS. ROTHAUGE:  REAL ESTATE.  THAT'S WHAT I THOUGHT.

13   OKAY.  GREAT.

14         I THINK I HAD THE SAME QUESTION FOR MS. PERKINS.

15   OH, MS. PERKINS, I HAD A QUESTION FOR YOU ABOUT THE

16   ACCOUNTING, YOUR ACCOUNTING BACKGROUND.

17         DO I HAVE MY -- MS. PERKINS, YOU MENTIONED THAT YOU

18   HAD SOME SORT OF FINANCIAL --

19         PROSPECTIVE JUROR NO. 12:  I WORK AT A CREDIT UNION.

20         MS. ROTHAUGE:  SO, YEAH, SO TELL ME ABOUT WHAT YOU

21   DO THERE AND SORT OF WHAT SORT OF NUMBERS YOU'RE WORKING

22   WITH.

23         PROSPECTIVE JUROR NO. 12:  I'M NOT IN THE ACCOUNTING

24   DEPARTMENT.  I JUST -- I ANSWER CALLS.  YOU KNOW, PEOPLE

25   WANTING TO KNOW THEIR BALANCES OR WANTING TO TRANSFER, GET

54

1    FEES REVERSED; SO CUSTOMER SERVICE.

2              MS. ROTHAUGE:  OKAY.  GREAT.  THANK YOU.

3              A FOLLOW-UP QUESTION TO YOU, MR. CONNOLLY.  WHEN YOU

4    TOLD ME THAT YOU USED TO WORK WITH -- YOUR DAD WAS A CPA --

5              PROSPECTIVE JUROR NO. 14:  UH-HUH.

6              MS. ROTHAUGE:  -- AND YOU USED TO WORK FOR HIM.

7              FOR HOW MANY YEARS DID YOU DO THAT?

8              PROSPECTIVE JUROR NO. 14:  SOME YEARS WHILE I WAS

9    STILL GOING TO COLLEGE PART-TIME.

10             MS. ROTHAUGE:  WHAT KIND OF CLIENTS DID HE -- DID

11   YOU AND HE WORK ON?

12             PROSPECTIVE JUROR NO. 14:  I WAS ALWAYS IN A

13   COMMUNITY BANK, SO MUCH -- USUALLY SMALLER CLIENTS.  BUT I'M

14   AN OLD-BANK BANKER.  WE DID OUR OWN UNDERWRITING AND SENT IT

15   TO A LENDER.  MY ACCOUNTING BACKGROUND CAME IN HANDY WHEN I

16   WAS TRYING TO ACQUIRE NEW CLIENTS AND GET THEM CREDIT

17   APPROVED.

18             MS. ROTHAUGE:  MS. FLORES -- MR. FLORES, THERE YOU

19   ARE.  I HAD A QUESTION FOR YOU.

20             YOU ARE A MATERIALS ENGINEER?

21             PROSPECTIVE JUROR NO. 16:  YES.

22             MS. ROTHAUGE:  WHAT TYPE OF MATERIALS DO YOU WORK

23   WITH?

24             PROSPECTIVE JUROR NO. 16:  I WORK MOSTLY WITH CARBON

25   FIBER.

55

1          MS. ROTHAUGE:  FOR THOSE OF US WHO DON'T KNOW WHAT

2     THAT IS, WHAT IS CARBON FIBER?

3          PROSPECTIVE JUROR NO. 16:  SO IT'S -- YOU HAVE LONG

4     STRANDS OF CARBON, AND THEN YOU REINFORCE THEM IN PLASTIC.

5     SO YOU TAKE THE PLASTIC, PUT THEM IN AN OVEN AND IT'S A SOLID

6     PIECE, A SOLID PIECE OF PLASTIC REINFORCED CARBON FIBER.

7          MS. ROTHAUGE:  IT'S KIND OF A -- SO IT'S A SEPARATE

8     PRODUCT, THIS CARBON STUFF, AND THEN IT GOES INTO A -- GOES

9     ON TO GET PUT INTO A PRODUCT SOMEWHERE?

10          PROSPECTIVE JUROR NO. 16:  I WORK IN AEROSPACE SO

11     WE --

12          THE REPORTER:  I'M SORRY.  I CANNOT HEAR.

13          MS. ROTHAUGE:  COULD YOU REPEAT.

14          PROSPECTIVE JUROR NO. 16:  I WORK IN AEROSPACE.  AND

15     WE WOULD PUT CARBON FIBER -- WE WOULD MAKE CARBON FIBER PARTS

16     FOR AEROSPACE.

17          WHAT WAS YOUR QUESTION?

18          MS. ROTHAUGE:  I WANTED TO KNOW WHAT HAPPENED WITH

19     THE CARBON FIBER THAT YOU MADE.

20          PROSPECTIVE JUROR NO. 16:  YEAH.

21          MS. ROTHAUGE:  SO IT ENDS UP IN PLANES AND STUFF?

22          PROSPECTIVE JUROR NO. 16:  YEAH.  PLANES, YEAH.

23          MS. ROTHAUGE:  OKAY.  THANK YOU.

24          LET ME JUST CHECK.  ANY MORE QUESTIONS?

25          I BELIEVE THAT'S ALL THE QUESTIONS I HAD.  THANK YOU

56

1    ALL VERY MUCH FOR YOUR TIME.

2         THE COURT:  MEMBERS OF THE JURY, AT THIS JUNCTURE,

3    THE LAWYERS ARE GOING TO BE TAKING THEIR CHALLENGES.  BEFORE

4    I DO THAT, I NEED TO ASK EACH OF THEM WHETHER OR NOT THEY

5    HAVE ANY CHALLENGES FOR CAUSE.

6         FOR THE PLAINTIFFS, ANY CHALLENGES FOR CAUSE?

7         MR. ALDRICH:  (NO AUDIBLE RESPONSE.)

8         THE COURT:  I'LL TAKE THAT AS A NO.

9         FOR DEFENSE?

10        MS. ROTHAUGE:  WE HAVE NONE.

11        THE COURT:  ALL RIGHT.  YOU MAY EXERCISE YOUR FIRST

12   PEREMPTORY CHALLENGE.

13        BERNADETTE WILL BE AT YOUR TABLE IN A MINUTE.

14        MEMBERS OF THE JURY, BERNADETTE IS GOING TO ESCORT

15   YOU INTO THE JURY ROOM, WHICH IS LOCATED TO MY LEFT BEHIND

16   THE JURY BOX.  AND YOU CAN JUST TAKE YOUR BREAK IN THERE

17   BECAUSE THIS MIGHT TAKE A LITTLE BIT.

18        GO AHEAD.

19        (PROSPECTIVE JURORS ABSENT, 10:37 A.M.)

20        (DISCUSSION HELD WITH PROSPECTIVE JUROR NO. 9 ONLY.)

21        THE COURT:  PLEASE BE SEATED.

22        PROSPECTIVE JUROR NO. 9:  I'M JUST THINKING THAT TWO

23   WEEKS IS GOING TO BE KIND OF A HARDSHIP FOR ME.  MY SON HAS

24   PRIMARY PROGRESSIVE MS, AND HE RELIES ON ME DURING THE DAY.

25        THE COURT:  I UNDERSTAND.  THANK YOU FOR YOUR

57

1    SERVICE.  I'LL GO AHEAD AND EXCUSE YOU AT THIS TIME.

2              PROSPECTIVE JUROR NO. 9:  OKAY.  THANK YOU.

3              THE CLERK:  AND YOU'RE MS. MCDOWELL?

4              THE COURT:  GO AHEAD AND RETURN TO THE JURY ROOM.

5    THANK YOU.

6              MR. MARCHESE:  YOUR HONOR, MAY WE TAKE A QUICK

7    BREAK?

8              THE COURT:  SURE.  WE'LL GO AHEAD AND TAKE OUR BREAK

9    THIS MORNING.  WE'LL BE IN RECESS FOR ABOUT TEN MINUTES.  I

10   WANT THE LAWYERS BACK AND WORKING ON THIS.

11             MR. MARCHESE:  THANK YOU.

12             THE COURT:  TEN MINUTES.

13             (RECESS, 10:38 A.M. TO 10:55 A.M.)

14             THE COURT:  WELCOME BACK.  PLEASE BE SEATED.

15             I'M GOING TO BE READING SOME NAMES.  IF I SAY YOUR

16   NAME, PLEASE STAND UP.

17             TERRY FLORES, INGA HEROLD, DANIEL VAUGHT, NORMA

18   CUPP, ANGELICA CORONA.  I CAN DO IT IF I SAY IT IN SPANISH.

19   MARKHAM GATES, MARY MULLER AND KATHLEEN --

20             PROSPECTIVE JUROR NO. 18:  ALLEGRI.

21             THE COURT:  -- ALLEGRI-SULLIVAN.

22             PLEASE RAISE YOUR HAND AND BE SWORN.

23             (JURY SWORN, 10:57 A.M.)

24             THE CLERK:  THANK YOU.

25             THE COURT:  GO AHEAD AND BE SEATED.

COMPUTER-AIDED TRANSCRIPTION

58

1          IF I DID NOT CALL YOUR NAME, YOU ARE EXCUSED.  YOUR

2     SERVICE IS COMPLETE.

3          DO THEY NEED TO REPORT BACK TO THE JURY ROOM?

4          THE CLERK:  YES, PLEASE.

5          THE COURT:  PLEASE REPORT BACK TO THE JURY ASSEMBLY

6     ROOM.  I STILL BELIEVE THERE IS OTHER TRIALS THAT ARE WAITING

7     FOR YOUR SERVICE.  THANK YOU SO MUCH FOR YOUR SERVICE IN THIS

8     MATTER.

9          (PROSPECTIVE JURORS DISCHARGED, 10:58 A.M.)

10          THE COURT:  BERNADETTE IS GOING TO ARRANGE YOU SO WE

11     HAVE FOUR AND FOUR.

12          LADIES AND GENTLEMEN, YOU ARE NOW THE JURY IN THIS

13     CASE, AND I WANT TO TAKE A FEW MINUTES TO TELL YOU SOMETHING

14     ABOUT YOUR DUTIES AS JURORS AND TO GIVE YOU SOME

15     INSTRUCTIONS.  AT THE END OF THE TRIAL, I WILL GIVE YOU MORE

16     DETAILED INSTRUCTIONS AND THOSE INSTRUCTIONS WILL CONTROL

17     YOUR DELIBERATIONS.

18          IT IS YOUR DUTY TO DECIDE WHAT THE FACTS ARE FROM

19     THE EVIDENCE.  YOU AND YOU ALONE ARE THE JUDGES OF THE FACTS.

20     YOU WILL HEAR THE EVIDENCE, DECIDE THE FACTS AND THEN APPLY

21     THOSE FACTS TO THE LAW WHICH I WILL GIVE YOU.  THAT IS HOW

22     YOU WILL REACH YOUR VERDICT.  IN DOING SO, YOU MUST FOLLOW

23     THE LAW, WHETHER YOU AGREE WITH IT OR NOT.

24          THE EVIDENCE WILL CONSIST OF THE TESTIMONY OF

25     WITNESSES, DOCUMENTS AND OTHER THINGS RECEIVED INTO EVIDENCE

1    AS EXHIBITS, AND ANY FACTS ON WHICH THE LAWYERS AGREE OR

2    WHICH I HAVE INSTRUCTED YOU TO ACCEPT.

3         YOU SHOULD NOT TAKE ANYTHING I SAY OR DO DURING THE

4    TRIAL AS INDICATING WHAT I THINK OF THE EVIDENCE OR WHAT YOUR

5    VERDICT SHOULD BE.

6         THE FOLLOWING THINGS ARE NOT EVIDENCE.  YOU MUST NOT

7    CONSIDER THEM AS EVIDENCE IN DECIDING THE CASE.

8         ONE, THE STATEMENTS AND ARGUMENTS BY THE ATTORNEYS.

9    TWO, QUESTIONS AND OBJECTIONS OF THE ATTORNEYS.  THREE,

10   TESTIMONY THAT I INSTRUCT YOU TO DISREGARD.  FOUR, ANYTHING

11   YOU MAY HAVE SEEN OR HEARD WHEN THE COURT IS NOT IN SESSION.

12        DO NOT COMMUNICATE ANY PRIVATE OR SPECIAL KNOWLEDGE

13   ABOUT ANY OF THE FACTS OF THIS PARTICULAR CASE TO YOUR FELLOW

14   JURORS.  DECIDE THE CASE ONLY ON THE EVIDENCE RECEIVED HERE

15   IN COURT.

16        SOME EVIDENCE MAY BE ADMITTED FOR A LIMITED PURPOSE

17   ONLY.  WHEN I INSTRUCT YOU THAT SOME EVIDENCE IS ADMITTED FOR

18   A LIMITED PURPOSE, YOU MUST CONSIDER IT ONLY FOR THAT LIMITED

19   PURPOSE.

20        EVIDENCE MAY BE DIRECT OR CIRCUMSTANTIAL.  DIRECT

21   EVIDENCE IS TESTIMONY BY A WITNESS ABOUT WHAT THAT WITNESS

22   PERSONALLY SAW OR HEARD OR DID.  CIRCUMSTANTIAL EVIDENCE IS

23   INDIRECT EVIDENCE, AND THAT IS, IT IS PROOF OF ONE OR MORE

24   FACTS FROM WHICH ONE CAN FIND ANOTHER FACT.

25        YOU ARE TO CONSIDER BOTH DIRECT AND CIRCUMSTANTIAL

1    EVIDENCE.  THE LAW PERMITS YOU TO GIVE EQUAL WEIGHT TO BOTH,

2    BUT IT IS FOR YOU TO DECIDE HOW MUCH WEIGHT TO GIVE ANY

3    EVIDENCE.

4         THERE ARE RULES OF EVIDENCE WHICH CONTROL WHAT CAN

5    BE RECEIVED INTO EVIDENCE.  WHEN A LAWYER ASKS A QUESTION OR

6    OFFERS AN EXHIBIT INTO EVIDENCE AND THE LAWYER ON THE OTHER

7    SIDE THINKS THAT IT IS NOT PERMITTED BY THE RULES OF

8    EVIDENCE, THAT LAWYER MAY OBJECT.

9         IF I OVERRULE AN OBJECTION, THE QUESTION MAY BE

10   ANSWERED OR THE EXHIBIT RECEIVED.  IF I SUSTAIN AN OBJECTION,

11   THE QUESTION CANNOT BE ANSWERED AND THE EXHIBIT CANNOT BE

12   RECEIVED.  WHENEVER I SUSTAIN AN OBJECTION TO A QUESTION,

13   IGNORE THE QUESTION AND DO NOT GUESS WHAT THE ANSWER WOULD

14   HAVE BEEN.

15        SOME EVIDENCE MAY BE SEALED FROM THE PUBLIC BECAUSE

16   IT CONTAINS HIGHLY CONFIDENTIAL BUSINESS INFORMATION OF THE

17   PARTIES.  YOU MUST NOT DRAW ANY INFERENCES ABOUT THE NATURE

18   OF THE EVIDENCE OR GIVE ANY GREATER OR LESSER WEIGHT TO THE

19   EVIDENCE BASED ON WHETHER IT IS SEALED.

20        SOMETIMES I MAY ORDER THAT EVIDENCE BE STRICKEN FROM

21   THE RECORD AND THAT YOU DISREGARD OR IGNORE THE EVIDENCE.

22   THAT MEANS THAT WHEN YOU'RE DECIDING THE CASE, YOU MUST NOT

23   CONSIDER THE EVIDENCE WHICH I TOLD YOU TO DISREGARD.

24        IN DECIDING THE FACTS OF THIS CASE, YOU MAY HAVE TO

25   DECIDE WHICH TESTIMONY TO BELIEVE AND WHICH TESTIMONY NOT TO

1    BELIEVE.  YOU MAY BELIEVE EVERYTHING A WITNESS SAYS OR PART

2    OF IT OR NONE OF IT.

3              CONSIDERING THE TESTIMONY OF ANY WITNESS, YOU MAY

4    TAKE INTO ACCOUNT THE OPPORTUNITY AND ABILITY OF THE WITNESS

5    TO SEE OR HEAR OR KNOW THE THINGS TESTIFIED TO; THE WITNESS'

6    MEMORY; THE WITNESS' MANNER WHILE TESTIFYING; THE WITNESS'

7    INTEREST IN THE OUTCOME OF THE CASE AND ANY BIAS OR

8    PREJUDICE; WHETHER OTHER EVIDENCE CONTRADICTED THE WITNESS'

9    TESTIMONY; THE REASONABLENESS OF THE WITNESS' TESTIMONY IN

10   LIGHT OF ALL THE EVIDENCE; AND ANY OTHER FACTORS THAT BEAR ON

11   BELIEVABILITY.

12             THE WEIGHT OF THE EVIDENCE AS TO A FACT DOES NOT

13   NECESSARILY DEPEND ON THE NUMBER OF WITNESSES WHO TESTIFY.

14   YOU ARE TO WEIGH THE EVIDENCE AND NOT SIMPLY COUNT THE

15   WITNESSES.

16             FROM TIME TO TIME DURING THE TRIAL IT MAY BE

17   NECESSARY FOR ME TO TALK WITH THE ATTORNEYS OUT OF THE

18   HEARING OF THE JURY, EITHER BY HAVING A CONFERENCE AT THE

19   BENCH, WHEN THE JURY IS PRESENT IN THE COURTROOM, OR BY

20   CALLING A RECESS.

21             PLEASE UNDERSTAND THAT WHILE YOU ARE WAITING, WE'RE

22   WORKING.  THE PURPOSE OF THESE CONFERENCES IS NOT TO KEEP

23   RELEVANT INFORMATION FROM YOU, BUT TO DECIDE HOW CERTAIN

24   EVIDENCE IS TO BE TREATED UNDER THE RULES OF EVIDENCE AND TO

25   AVOID CONFUSION AND ERROR.

                                                                          62

1           WE WILL, OF COURSE, DO WHAT WE CAN TO KEEP THE

2   NUMBER AND LENGTH OF THESE CONFERENCES TO A MINIMUM.  I MAY

3   NOT ALWAYS GRANT AN ATTORNEY'S REQUEST FOR A CONFERENCE.  DO

4   NOT CONSIDER MY GRANTING OR DENYING A REQUEST FOR A

5   CONFERENCE AS ANY INDICATION OF MY OPINION OF THE CASE OR

6   WHAT YOUR VERDICT SHOULD BE.

7           I WILL NOW SAY A FEW WORDS ABOUT YOUR CONDUCT AS

8   JURORS.  FIRST, KEEP AN OPEN MIND THROUGHOUT THE TRIAL AND DO

9   NOT DECIDE WHAT THE VERDICT SHOULD BE UNTIL YOU AND YOUR

10  FELLOW JURORS HAVE COMPLETED YOUR DELIBERATIONS AT THE END OF

11  THE CASE.

12          SECOND, BECAUSE YOU MUST DECIDE THE CASE ONLY ON THE

13  EVIDENCE RECEIVED IN THE COURT AND ON MY INSTRUCTIONS AS TO

14  THE LAW THAT APPLIES, YOU MUST NOT BE EXPOSED TO ANY OTHER

15  INFORMATION ABOUT THE CASE OR TO THE ISSUES IT INVOLVES

16  DURING THE COURSE OF YOUR JURY DUTY.

17          THUS, UNTIL THE END OF THE CASE, OR UNLESS I TELL

18  YOU OTHERWISE, DO NOT COMMUNICATE WITH ANYONE IN ANY WAY AND

19  DO NOT LET ANYONE ELSE COMMUNICATE WITH YOU IN ANY WAY ABOUT

20  THE MERITS OF THE CASE OR ANYTHING TO DO WITH IT.

21          THIS INCLUDES DISCUSSING THE CASE IN PERSON, IN

22  WRITING, BY PHONE OR ELECTRONIC MEANS, VIA E-MAIL, TEXT

23  MESSAGE, CHAT ROOMS, BLOGS, WEBSITE OR OTHER FEATURE.  THIS

24  APPLIES TO COMMUNICATING WITH YOUR FELLOW JURORS UNTIL I GIVE

25  YOU THE CASE FOR DELIBERATIONS.  AND IT APPLIES TO

63

1    COMMUNICATING WITH EVERYONE ELSE, INCLUDING YOUR FAMILY

2    MEMBERS, YOUR EMPLOYER, THE MEDIA OR PRESS, AND THE PEOPLE

3    INVOLVED IN THE TRIAL.

4          ALTHOUGH YOU MAY NOTIFY YOUR FAMILY AND YOUR

5    EMPLOYER THAT YOU'VE BEEN SEATED AS A JUROR IN THIS CASE, DO

6    NOT DISCUSS THE MERITS OF THE CASE.  BUT, AND IN ADDITION, IF

7    YOU ARE ASKED OR APPROACHED IN ANY WAY ABOUT YOUR JURY

8    SERVICE OR ANYTHING ABOUT THIS CASE, YOU MUST RESPOND THAT

9    YOU'VE BEEN ORDERED NOT TO DISCUSS THE MATTER.  AND THEN

10   REPORT THAT CONTACT TO THE COURT.

11         BECAUSE YOU WILL RECEIVE ALL THE EVIDENCE AND THE

12   LEGAL INSTRUCTION YOU PROPERLY MAY CONSIDER TO RETURN A

13   VERDICT, DO NOT READ, WATCH OR LISTEN TO ANY NEWS OR MEDIA

14   ACCOUNTS OR COMMENTARY ABOUT THE CASE OR ANYTHING TO DO WITH

15   IT.

16         DO NOT DO ANY RESEARCH, SUCH AS READING DICTIONARIES

17   OR SEARCHING THE INTERNET OR USING OTHER REFERENCE MATERIALS.

18   AND DO NOT MAKE ANY INVESTIGATION OR IN ANY OTHER WAY TRY TO

19   LEARN ABOUT THE CASE ON YOUR OWN.

20         THE LAW REQUIRES THESE RESTRICTIONS TO ENSURE THAT

21   THE PARTIES HAVE A FAIR TRIAL BASED ON THE SAME EVIDENCE THAT

22   EACH PARTY HAS HAD AN OPPORTUNITY TO ADDRESS.  A JUROR WHO

23   VIOLATES THESE RESTRICTIONS JEOPARDIZES THE FAIRNESS OF THESE

24   PROCEEDINGS.  IF ANY JUROR IS EXPOSED TO OUTSIDE INFORMATION,

25   PLEASE NOTIFY THE COURT IMMEDIATELY.

64

1          AT THE END OF THE TRIAL, YOU WILL HAVE TO MAKE YOUR

2    DECISION BASED ON WHAT YOU RECALL OF THE EVIDENCE.  AND

3    ALTHOUGH YOU WILL HAVE ALL OF THE EXHIBITS WHICH HAVE BEEN

4    RECEIVED WITH YOU IN THE JURY ROOM, YOU WILL NOT HAVE A

5    WRITTEN TRANSCRIPT TO REFER TO.  AND IT'S DIFFICULT FOR THE

6    COURT REPORTER TO READ BACK TESTIMONY.  SO I URGE YOU TO PAY

7    CLOSE ATTENTION TO TESTIMONY AS IT IS GIVEN.

8          IF YOU WISH, YOU MAY TAKE NOTES TO HELP YOU REMEMBER

9    WHAT WITNESSES SAID.  IF YOU DO TAKE NOTES, PLEASE KEEP THEM

10   TO YOURSELF UNTIL YOU AND YOUR FELLOW JURORS GO INTO THE JURY

11   ROOM TO DECIDE THE CASE.  DO NOT LET YOUR NOTE-TAKING

12   DISTRACT YOU FROM HEARING ANSWERS OR WATCHING WITNESSES.

13   IT'S IMPORTANT THAT YOU WATCH WITNESSES, AS THEIR APPEARANCE

14   MAY ASSIST YOU IN DECIDING WHETHER TO BELIEVE THEIR TESTIMONY

15   AND HOW MUCH WEIGHT TO GIVE THEIR TESTIMONY.

16         WHEN YOU LEAVE IN THE EVENING, YOUR NOTES SHOULD BE

17   LEFT IN THE JURY ROOM.  IF YOU DO NOT TAKE NOTES, YOU SHOULD

18   RELY ON YOUR OWN MEMORY ABOUT WHAT WAS SAID AND NOT BE OVERLY

19   INFLUENCED BY THE NOTES OF OTHER JURORS.

20         IF AT ANY TIME YOU CANNOT HEAR A WITNESS OR A LAWYER

21   OR CANNOT SEE DOCUMENTS THAT ARE PRESENTED ON THE EVIDENCE

22   PRESENTATION SYSTEM, PLEASE SPEAK UP AND ALERT THE COURT TO

23   THE PROBLEM.

24         IF YOU NEED TO COMMUNICATE WITH ME, SIMPLY GIVE A

25   SIGNED NOTE TO OUR BAILIFF, AND THEN SHE WILL GIVE IT TO ME.

65

1            AS MENTIONED IN MY WELCOMING INSTRUCTIONS, THERE ARE

2    TWO PATENTS AT ISSUE IN THIS CASE.  FIRST, UNITED STATES

3    PATENT NO. D-657,093, SOMETIMES REFERRED TO BY THE PARTIES AS

4    THE D-093 PATENT, WHICH I WILL REFER TO AS THE DESIGN PATENT.

5    THE DESIGN PATENT LISTS ZACH SNYDER AS THE INVENTOR.

6            SECOND, UNITED STATES PATENT NO. 8,453,270,

7    SOMETIMES REFERRED TO BY THE PARTIES AS THE '270 PATENT.

8    I'LL REFER TO THIS PATENT SIMPLY AS THE UTILITY PATENT.  THE

9    UTILITY PATENT LISTS LEE BLACKFORD AS THE INVENTOR.

10           I WILL GIVE YOU A BRIEF SUMMARY OF EACH SIDE'S

11   CONTENTIONS IN THIS CASE, AND I WILL THEN TELL YOU WHAT EACH

12   SIDE MUST PROVE TO WIN ON EACH OF ITS CONTENTIONS.

13           AS I PREVIOUSLY TOLD YOU, COLUMBIA SEEKS MONEY

14   DAMAGES FROM SEIRUS FOR ALLEGEDLY INFRINGING THE '270 PATENT

15   BY IMPORTING, SELLING AND PROFFERING FOR SALE PRODUCTS THAT

16   COLUMBIA ARGUES ARE COVERED BY CLAIMS 2 AND 23 OF THE '270

17   PATENT.  THESE ARE THE ASSERTED CLAIMS IN THE '270 PATENT.

18           SEIRUS DENIES IT HAS INFRINGED THE ASSERTED CLAIMS

19   IN THE '270 PATENT AND ARGUES THAT IN ADDITION, THE CLAIMS

20   ARE INVALID.

21           YOUR JOB IS TO DECIDE WHETHER THE ASSERTED CLAIMS OF

22   THE '270 PATENT HAVE BEEN INFRINGED AND WHETHER ANY OF THE

23   ASSERTED CLAIMS OF THE '270 PATENT ARE INVALID.

24           IN ADDITION, YOU WILL THEN NEED TO DECIDE ANY MONEY

25   DAMAGES TO BE AWARDED TO COLUMBIA TO COMPENSATE IT FOR

66

1    INFRINGEMENT OF THE D-093, THE DESIGN PATENT, AS WELL AS FOR

2    ANY CLAIM OF THE '270 PATENT THAT YOU DECIDE HAS BEEN

3    INFRINGED AND ARE NOT INVALID.

4         YOU WILL ALSO NEED TO MAKE A FINDING AS TO WHETHER

5    ANY INFRINGEMENT WAS WILLFUL.  IF YOU DECIDE THAT ANY

6    INFRINGEMENT WAS WILLFUL, THAT DECISION SHOULD NOT AFFECT ANY

7    DAMAGE AWARD YOU MAKE.  I WILL TAKE WILLFULNESS INTO ACCOUNT

8    LATER.

9         I HAVE WRESTLED WITH THIS NEXT ISSUE AND HAVE

10   DECIDED TO ALLOW YOU TO ASK QUESTIONS.  YOU WILL BE ALLOWED

11   TO PROPOSE WRITTEN QUESTIONS TO WITNESSES AFTER THE LAWYERS

12   HAVE COMPLETED THEIR QUESTIONING OF EACH WITNESS.

13        YOU MAY PROPOSE QUESTIONS IN ORDER TO CLARIFY THE

14   TESTIMONY, BUT YOU ARE NOT TO EXPRESS ANY OPINION ABOUT THE

15   TESTIMONY OR ARGUE WITH THE WITNESS.  IF YOU PROPOSE ANY

16   QUESTIONS, REMEMBER THAT YOUR ROLE IS THAT OF A NEUTRAL

17   FACT-FINDER; NOT AN ADVOCATE.

18        BEFORE I EXCUSE EACH WITNESS, IF I REMEMBER, AND

19   REMINDED, BECAUSE SOMETIMES I FORGET, I WILL OFFER YOU AN

20   OPPORTUNITY TO WRITE OUT A QUESTION ON THE FORM PROVIDED BY

21   THE COURT.  AND PROBABLY IT WILL JUST BE ON A PIECE OF PAPER

22   FROM YOUR NOTEBOOK.  THAT'S OUR FORM.

23        DO NOT SIGN THE QUESTION.  I WILL REVIEW THE

24   QUESTION.  I WILL THEN REVIEW IT WITH THE ATTORNEYS TO

25   DETERMINE IF IT IS LEGALLY PROPER.  THERE ARE SOME PROPOSED

67

1    QUESTIONS THAT I WILL NOT PERMIT OR WILL NOT ASK IN THE

2    WORDING SUBMITTED BY THE JUROR.  THIS MIGHT HAPPEN EITHER DUE

3    TO THE RULES OF EVIDENCE OR OTHER LEGAL REASONS, OR BECAUSE

4    THE QUESTION IS EXPECTED TO BE ANSWERED LATER IN THE CASE.

5         IF I DO NOT ASK A PROPOSED QUESTION OR IF I REPHRASE

6    IT, DO NOT SPECULATE ABOUT AS TO THE REASONS, AND DO NOT GIVE

7    UNDUE WEIGHT TO QUESTIONS YOU OR OTHER JURORS PROPOSE.  YOU

8    SHOULD EVALUATE THE ANSWERS TO THOSE QUESTIONS IN THE SAME

9    MANNER YOU EVALUATE ALL OTHER EVIDENCE.

10        BY GIVING YOU THE OPPORTUNITY TO PROPOSE QUESTIONS,

11   I AM NOT REQUESTING OR SUGGESTING THAT YOU SHOULD DO SO.  IT

12   WILL OFTEN BE THE CASE THAT THE LAWYER HAS NOT ASKED THE

13   QUESTION BECAUSE IT IS LEGALLY OBJECTIONABLE OR BECAUSE A

14   LATER WITNESS MAY BE ADDRESSING THAT PARTICULAR SUBJECT.

15        FINALLY, I WILL PROVIDE YOU WITH A GLOSSARY OF SOME

16   OF THE TERMS THAT ARE RELEVANT AND USED IN PATENT LITIGATION

17   CASES.  AND THE REASON I'M GIVING YOU THAT GLOSSARY IS

18   BECAUSE YOU WILL HEAR TERMS THAT YOU RECOGNIZE BUT ARE USED

19   DIFFERENTLY WHEN IT COMES TO PATENT LAW.

20        WHILE I WILL GIVE YOU THAT GLOSSARY, I WOULD URGE

21   YOU IF YOU HEAR A TERM THAT YOU DON'T RECOGNIZE OR SEE WHEN

22   YOU HAVE YOUR GLOSSARY, DON'T LOOK AT IT RIGHT THEN.  WAIT

23   UNTIL YOU GO INTO THE JURY ROOM DURING A BREAK AND THEN YOU

24   CAN LOOK UP THE WORD TO SEE WHAT IT MEANS IN THAT GIVEN

25   CONTEXT.

68

1          ARE WE READY FOR OPENING STATEMENT?

2          MR. ALDRICH:  YOUR HONOR, WE HAD A PATENT VIDEO THAT

3   BOTH PARTIES AGREED WOULD BE PLAYED.

4          THE COURT:  WE DID.  THANK YOU.

5          LET ME GIVE NOTEBOOKS TO THE JURORS, AND WE'LL PLAY

6   THE PATENT VIDEO.  THE VIDEO TAKES ABOUT HOW LONG?

7          MR. ALDRICH:  I THINK IT'S 17, 18 MINUTES.

8          THE COURT:  PERFECT.  THANK YOU FOR REMINDING ME.

9          MR. ALDRICH:  IT WILL TAKE A COUPLE OF MINUTES, YOUR

10  HONOR.

11         THE COURT:  I ASSUME THE PARTIES DON'T NEED THE

12  VIDEO TRANSCRIBED?  AGREED?

13         MR. MARCHESE:  AGREED FROM THIS END, YOUR HONOR.

14         MR. ALDRICH:  THAT'S AGREED, YOUR HONOR.

15         THE COURT:  THANK YOU.

16         (TECHNICAL DIFFICULTIES PLAYING PATENT VIDEO.)

17         THE COURT:  IS THIS A VIDEO THAT WE CAN ACTUALLY

18  LISTEN TO AS OPPOSED TO WATCHING?  I HAVEN'T SEEN IT SO I

19  DON'T KNOW IF IT NEEDS TO BE WATCHED.

20         MR. MARCHESE:  I THINK IT'S HELPFUL TO SEE IT, YOUR

21  HONOR.  THERE ARE -- THERE IS A LOT OF VISUALS.

22         THE COURT:  OKAY.  SO SOMETIMES THIS HAPPENS.  AND

23  THEY TRIED A LONG TIME AGO TO GET THIS TO WORK, AND IT DID

24  WORK EARLIER TODAY.

25         SO WHY DON'T WE TAKE AN HOUR FOR LUNCH RIGHT NOW.  I

69

1    HAVE 11:20.  LET'S ALL GET BACK TOGETHER AT 12:20.  BY THEN

2    WE'LL HAVE THIS READY TO GO.  THEN WE'LL WATCH THE VIDEO, DO

3    OPENING STATEMENTS AND GET THIS TRIAL STARTED.

4            BERNADETTE WILL GO INTO THE JURY ROOM WITH YOU TO

5    GIVE YOU INSTRUCTIONS ON WHERE TO GO TO LUNCH AND THINGS LIKE

6    THAT.

7            ALSO, ONE OF THE THINGS THAT HAPPENS IN THIS KIND OF

8    COURTHOUSE IS THAT YOU MAY RUN INTO THE LAWYERS IN THE

9    HALLWAY OR AS YOU'RE PASSING BACK AND FORTH.  THEY WILL NOT

10   SPEAK WITH YOU.  AND IT'S NOT BECAUSE THEY WANT TO BE

11   UNFRIENDLY.  IT'S BECAUSE I TOLD THEM DON'T SPEAK TO YOU.  SO

12   IF YOU GET ON THE ELEVATOR AND THEY GET OFF, DON'T BE

13   OFFENDED.  IT'S JUST THE WAY IT WORKS HERE.  IT'S JUST PART

14   OF THE INSTRUCTION IS NOT TO DISCUSS THE CASE WITH ANYONE.

15   WE WANT TO AVOID ANY APPEARANCE OF IMPROPRIETY, AND SO THAT'S

16   WHY THEY MAY BEHAVE IN WAYS THAT MIGHT OTHERWISE SEEM

17   UNSOCIABLE.

18           SO WITH THAT, HAVE A PLEASANT LUNCH.  I WILL SEE YOU

19   IN ONE HOUR.

20           SHE'S GOING TO HAVE YOU WAIT OUTSIDE IN FRONT OF THE

21   COURTROOM, SO HEAD OUT.  I WILL SEE YOU IN AN HOUR.

22           AS YOU HEARD, MY PLAN IS TO WATCH THE VIDEO AND MOVE

23   DIRECTLY INTO OPENING STATEMENTS THEREAFTER.

24           GOOD LUCK.

25           MR. ALDRICH:  THANK YOU, YOUR HONOR.

70

1          MR. MARCHESE:  THANK YOU.

2          (RECESS, 11:23 A.M.)

3                    --OOO--

4          C E R T I F I C A T I O N

5          I HEREBY CERTIFY THAT I AM A DULY APPOINTED,
   QUALIFIED AND ACTING OFFICIAL COURT REPORTER FOR THE UNITED
6  STATES DISTRICT COURT; THAT THE FOREGOING IS A TRUE AND
   CORRECT TRANSCRIPT OF THE PROCEEDINGS HAD IN THE
7  AFOREMENTIONED CAUSE; THAT SAID TRANSCRIPT IS A TRUE AND
   CORRECT TRANSCRIPTION OF MY STENOGRAPHIC NOTES; AND THAT THE
8  FORMAT USED HEREIN COMPLIES WITH THE RULES AND REQUIREMENTS
   OF THE UNITED STATES JUDICIAL CONFERENCE.

9
          DATED:  SEPTEMBER 18, 2017, AT SAN DIEGO,
10 CALIFORNIA.

11                         S/CAMERON P. KIRCHER
                           CAMERON P. KIRCHER
12

13

14

15

16

17

18

19

20

21

22

23

24

25

COMPUTER-AIDED TRANSCRIPTION

1           United States District Court

2        For the Southern District of California

3

4                                    )
    COLUMBIA SPORTSWEAR NORTH        )
5   AMERICA, INC., an Oregon         )    No. 17CV1871-HZ
    corporation,                     )
6                                    )    September 18, 2017
             Plaintiff,              )
7                                    )    San Diego, California
             v.                      )
8                                    )
    SEIRUS INNOVATIVE ACCESSORIES.   )
9   INC., a Utah Corporation         )
                                     )
10                                   )
             Defendant.              )
11

12

13              Volume 1 - PM Session

14        Reporter's Transcript of Proceedings

15     BEFORE THE HONORABLE MARCO A. HERNANDEZ

16           United States District Judge

17

18

19

20

21

22

23  Court Reporter:        Dana Peabody, RDR, CRR
                           District Court Clerk's Office
24                         333 West Broadway, Suite 420
                           San Diego, California, 92101
25                         DanaPeabodyCSR@gmail.com

APPEARANCES:


For the Plaintiff:          SCHWABE, WILLIAMSON & WYATT, P.C.
                            NIKA F. ALDRICH, JR., ESQ.
                            DAVID W. AXELROD, ESQ.
                            BRENNA LEGAARD, ESQ.
                            1211 SW 5th Avenue, Suite 1900
                            Portland, Oregon 97204

For the Defendant:          FISH & RICHARDSON, P.C.
                            CHRISTOPHER S. MARCHESE, ESQ.
                            SETH M. SPROUL, ESQ.
                            12390 El Camino Real
                            San Diego, California 92130


For the Defendant:          MARKOWITZ HERBOLD, P.C.
                            RENEE ROTHAUGE, ESQ.
                            1211 SW Fifth Avenue, Suite 3000
                            Portland, Oregon 97204

1  Case:   Columbia v. Seirus
   Date:   September 18, 2017
2

3
                    INDEX OF WITNESSES
4
   FOR THE PLAINTIFF:
5                                E X A M I N A T I O N
                                DIRECT   CROSS REDIRECT RECROSS
6
   Scott Trepanier
7    Mr. Axelrod                    152
     Mr. Sproul                              202
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1  Case:   Columbia v. Seirus
   Date:   September 18, 2017
2

3

4                          INDEX OF EXHIBITS

5  EXHIBIT                                              EVIDENCE

6  31                                                      174

7  32                                                      174

8  36                                                      167

9  39                                                      169

10 40                                                      172

11 43                                                      173

12 45                                                      186

13 50                                                      176

14 56                                                      187

15 57                                                      187

16 61                                                      187

17 64                                                      166

18 65                                                      170

19 66                                                      187

20 73                                                      177

21 86                                                      183

22 117                                                     193

23 129                                                     199

24 133                                                     198

25 134                                                     197

```
 1    Index Continued

 2
      249                                          190
 3
      689                                          158
 4
      691A                                         163
 5
      693                                          165
 6
      1103                                         217
 7
      1192                                         195
 8
      1196                                         200
 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1          San Diego, California, September 18, 2017

2                          *   *   *

3      (Proceedings held in the presence of the jury panel.)

4          THE COURT:  Do you have your video ready to go?  Go

12:26  5   ahead and play it.

6      (A video was played for the jury.)

7          THE COURT:  So apparently there was a handout that I

8   didn't give you.  I apologize for that.

9      Opening statement for plaintiff.

12:44  10      MR. ALDRICH:  Hi.  My name is Nika Aldrich, and I'm an

11  attorney for Columbia Sportswear, and I've already introduced

12  other members of my team.  David Axelrod is sitting over here,

13  and Brenna Legaard is also working with us, and this is Adam

14  Kelly from Columbia Sportswear.  He's in the legal department.

12:44  15      I want to apologize and say thank you.  I recognize that

16  you all have far better things to do with your time than be

17  here for us today, but I want to thank you, because your role

18  here today is really a pivotal part of how our justice system

19  works.  We had a dispute with another company, and our

12:45  20  constitution says that when there are disputes like this

21  between companies or people that we rely on an ordinary citizen

22  to help us resolve those disputes, and that's what you're here

23  to do for us for the next couple weeks, and I just want to

24  thank you for taking the time out of your days and the other

12:45  25  things that I know you have to do in order to help us resolve

1    our dispute.

2        As I said, we represent Columbia Sportswear.  Columbia

3    Sportswear is a company based in Portland, Oregon.  It was

4    founded in 1938 by the Boyles who fled the Holocaust and

5    started the Columbia Hat Company on the banks of the Columbia

6    River up in Portland, Oregon.  And Gert Boyle was a teenager at

7    the time and is currently 93 and wanted to be with us here

8    today but wasn't able to make it.  She's still the CEO of the

9    company, and the company is also run by her son, Tim Boyle.

10   And they've grown to be a very successful company in the field

11   of outdoor gear, jackets, ski gloves, hats, the types of things

12   you would wear if you're an outdoor enthusiast, if you run, go

13   hiking, skiing, boating, or fishing.  That's what they

14   primarily make.

15       They have between 3 and 4,000 employees in the

16   United States, 300 here in California, and they sell clothing

17   both at stores like Dick's Sporting Goods, Big 5 Sporting

18   Goods, places like that, but also they sell clothing at their

19   own stores.  They have about a hundred stores around the

20   country, and they also sell around the world.

21       This is your typical Dick's Sporting Goods store.  It's

22   your typical outdoor store.  And what you see here is a whole

23   lot of jackets, a whole lot of outdoor gear that you as the

24   consumer are supposed to be picking from, right?  And they try

25   to change the colors, and they try to change the style, but at

12:45

12:46

12:46

12:46

12:47

1    the end of the day, most of that outdoor clothing companies end

2    up using the same basic fundamental textiles, things like

3    Gore-Tex.  You may have heard of Gore-Tex.  It's like a

4    waterproof material a lot of jackets are made out of.  There

12:47    5    are other ones like that like Polartec.  Thinsulate is a type

6    of material that's used in a lot of these jackets.  And a lot

7    of these companies use basically the same materials that are

8    made by the same companies, and they're trying to repackage it

9    and sell it in a different way.  They try to distinguish it

12:47    10    from everybody else, but it's very difficult to stand out.

11         And I don't know if you can see on the screen in the very

12    back there where the word "Columbia" shows up.  You know,

13    Columbia is trying to stand out with everybody else, you know,

14    crowding the market, basically making in essence the same

12:48    15    jackets, the same gloves, the same whatever it is.  And this

16    was a -- something that Columbia about ten years ago decided to

17    get away from.  And the way they did that was by creating their

18    own innovation lab.  They spent millions of dollars to develop

19    their own in-house facility to develop proprietary materials

12:48    20    that would be basically only for Columbia.  They weren't

21    looking to develop materials that they would license to other

22    people.  They were looking for something that they could use by

23    themselves to distinguish themselves from everybody in the

24    marketplace.  And then that's all they wanted to do, something

12:48    25    so that they could say, "This is ours.  We're not Gore-Tex.  We

1    are Columbia, and once you become familiar with Columbia's

2    technology or Columbia's innovations, you'll be inclined to buy

3    Columbia's products."

4        And it's been very successful for them.  Over the course of

12:49    5    the past ten years, they've obtained about 200 patents that

6    have come out of this innovation lab that they created.

7        This is Woody Blackford.  Woody is actually here with us

8    today.  He's in the back row, and he's going to be testifying

9    either later today or tomorrow.  He's the director of the

12:49   10    innovation lab and is the person at Columbia who is responsible

11    for their innovative technologies and attempts at creating new

12    technologies that help you as the consumer be comfortable in

13    your outdoor clothing.

14        And back in 2008, Woody was dealing -- struggling with a

12:49   15    question, and that question was this:  How do you lose your

16    sweat but keep your heat all without adding weight or bulk to

17    your garment?  Now, it's very easy to make somebody warmer,

18    right?  It's very easy to make a jacket that's going to be

19    warmer than somebody else's jacket.  All you have to do is put

12:50   20    more insulation in it.  If you build enough insulation into the

21    jacket, you can make it warmer, but the problem is if you put

22    more insulation in the jacket, at some point it's going to

23    become uncomfortable to wear.  I don't know who's seen the Home

24    Alone movie were the kid is trying to be a snow angel, right,

12:50   25    and he couldn't even move his arms.  I've got a kid, and you

1    put them in a snowsuit, and they can hardly move anymore

2    because the insulation is so big on that.  It's very easy to

3    make clothing warmer.  That's never been the problem.

4        How do you make it warmer and still lightweight?  Still

12:50    5    breathable, lightweight clothing.  The industry has long had

6    high-performance fabrics.  We've been dealing with

7    high-performance fabrics for some time.  These are fabrics that

8    have good breathability.  When you wear them, they're

9    comfortable because your sweat breathes out of the clothing.

12:51    10    They breathe air.  I mean they're lightweight, good breathable

11    clothing and moisture wicking.  When you sweat, it wicks into

12    the clothing.  This is old stuff in the field of outdoor

13    clothing, and these clothes have been made with

14    high-performance textiles for some time, and also these wear

12:51    15    very well.  So high-performance clothes are designed so that

16    when you put them on, they drape well over your body, right?

17    They're comfortable to wear.  They're not rigid like my suit,

18    but they're actually comfortable.  They flow well.  They drape

19    well.  They have what they call good hand.  They feel

12:51    20    comfortable against the skin.

21        But the problem is, as I described, with this high-tech

22    clothing, again, if you want to make it warmer, you have to

23    make it bigger, and that adds more bulk and more weight.

24        Now, there's another technology that's been known for a

12:52    25    while -- it was actually developed by NASA -- called "the space

blanket."  And I don't know if you all are familiar with a
space blanket, but I brought one here.  A space blanket is this
super thin sheet of -- called Mylar, and it's reflective.  And
so it actually reflects your heat back to you.  It
reflects -- it's super shiny as you can see, and it reflects
your heat back to you.

     And these space blankets are used oftentimes in emergency
situations.  If you have a search and rescue situation or if
somebody's suffering from hypothermia and you need to make
somebody warm in a hurry, you can open up a space blanket like
this and wrap it around them outside their clothing, and it's
like almost instant heat.  Okay?  I have a picture here.
Somebody -- this is typically used -- I don't know if you all
have ever like been at the end of a marathon, but they give
these out to people that -- they give these out to people who
finish marathons or triathlons or other events like that
because after sweating for four or five hours, these people
tend to lose a lot of heat in a hurry.  You wrap this thing
around, and you see a parade of a thousand people walking away
from the end of a marathon wearing these space blankets.

     But this does not make for the best clothing, as you can
imagine.  Not only it would be extremely uncomfortable to wear,
but it also would trap all of your moisture and all of your,
you know -- trap everything inside, and you end up
essentially -- I've heard Woody say this a few times -- it's

1    like wearing a big sweat bag.  And so you wouldn't be inclined

2    to use this in clothing.  I mean it's really noisy to start

3    with, but rather awkward, and people that have experimented in

4    the past with trying to -- I'll put that down.

12:54    5    People have experimented in the past with trying to put

6    sheets of foil like that inside clothing, but the problem is

7    then the clothes don't breathe, and it quickly heats you up.

8    But at the same time, they trap all your sweat inside, and

9    pretty soon you're as cold and clammy as though you just

12:54    10    finished working out and you've got sweat all over you.  That's

11    not very comfortable to wear.

12    And Woody was at a -- he was trying to come up with some

13    new textiles.  He was at a room with a conference table, and

14    there were fabrics spread all over the table, and there was a

12:54    15    technology like that sitting on the table, and he's going to

16    tell you that he was -- he was sitting there thinking why can't

17    we get this but in clothing in a better way?  What -- why can't

18    we improve upon our high-performance fabrics that we're using

19    but somehow get this in there as well?  And he had a moment.

12:55    20    He came up with an invention.  And that idea that he came up

21    with was what if I just only put it in partially?  And that's

22    what he came up with.  It's called Omni-Heat, and it is taking

23    that reflective foil and applying it to a breathable,

24    water-wicking base fabric, but doing it in such a way that you

12:55    25    still get the performance of the base fabric, right?  It still

breathes.  It still feels good to wear, but at the same time,
it reflects heat back to you and can make you warmer.

This is an advertisement that Columbia came up with in
order to try to explain this to the consumers.  You can see the
moisture goes out, and the heat reflects back to you.

And that is the solution to the problem that Woody came up
with, and it's also the first of the inventions that came out
of Columbia's innovation lab, and it has been an enormous
success for the company, enormous such that in the past seven
years, I think you're going to hear from Mr. Drozdowski, who
works in the finance company at Columbia, about $1.3 billion.

And this is, again, something they made for themselves.
This is Columbia's proprietary idea.  They're not -- they
didn't develop this in order to try to license it out to
everybody else so North Face could sell jackets with this or
anybody else.  This is something that they're trying to keep to
themselves for their own use and to distinguish themselves in
the market.

Now, this poses another little challenge for Columbia, and
the problem is when you think about why you buy clothes and how
you buy clothes, you tend to buy clothes based on how they
look.  And when clothes are advertised to you, they're
advertised based on how they look.  There's often a model who's
wearing something, and you look at how it fits on the model,
you look at the color, you look at the style, you look at it

1    hanging on the rack, right?  What did Columbia invent?  They

2    invented something here that's not going to improve how you

3    look.  It's not going to make you look any better at all.

4        And they invented something that's not going to advertise

12:57    5    very well either.  After all, having a model wearing an

6    Omni-Heat jacket isn't going to help that much because

7    Omni-Heat's on the inside.  It goes on the inside surface.  I

8    can show you an example here.  Here's a shirt.  This is like a

9    base layer, something somebody would wear maybe if they're

12:58    10   going hiking.  Omni-Heat is on the inside.  If you have a model

11   wear this, you, the consumer, aren't going to know anything

12   more about why to buy this shirt than any other shirt on the

13   shelf.  So even though they created something that's going to

14   make you warmer, they had a hard time figuring out how to sell

12:58    15   this to consumers.  So they came up with a rather unique

16   advertising campaign to try to launch the product.

17       And here it is.  The idea is show the consumer what the

18   inside looks like, and not just show the consumer what the

19   inside looks like, emphasize the inside and try to explain to

12:59    20   the consumer that you're buying into technology here.  You're

21   not buying into the same jacket as everybody else.  You're

22   buying something that's unique.  You're buying something that's

23   different.  You're buying something that's going to work to

24   keep you warmer.

12:59    25       Here's another advertisement, again focusing on what's

happening on the inside of the jacket, right?  And look at the
text at the top.  "Omni-Heat.  Shockingly warm.  Amazingly
breathable.  Incredibly photogenic."

The whole idea is it's the technology:  Buy the technology.
Focus on the technology when you're buying this.

Columbia applied for patents to cover this invention, and
they were awarded -- you've heard of it as the '270 patent.  We
actually have the original copy right here.  We'll be looking
at photocopies throughout the week, but I thought you might be
interested to see what an actual patent looks like.  This is
the '270 patent that was issued to Woody Blackford back in
2013, and this is the official copy issued by the patent
office.

And so they gave him a patent, and as you heard in the
video, the patent has claims.  Okay?  And we're going to be
focusing through the next two weeks on two of the claims in the
'270 patent.  And we can call this "the utility patent."  And
it's a utility patent because it's useful, right?  It's a new
technology, it's a new science, it's a new development that is
useful.  And so I thought I'd walk you through real quick
exactly what claim 2 is about.  Claim 2, as I put it on the
screen, you'll see that it starts with 1.  So the way this
works is there's claim 1, and then when we get down to claim 2,
it says everything that's in claim 1, plus a couple more
things.  So as we look at claim 2 in the patent, we have to

1    look at everything that's in claim 1 and also look at what's in

2    claim 2, and you read that all together, and that is claim 2 of

3    the patent.  Okay.

4        So reading claim 2 all together -- I'll try to take it

01:01  5    slowly here, but it starts off, and it says it's "a

6    heat-management material that's adapted for use with body

7    gear," and, as you can see, that's what Woody came up with.

8    Heat-management material that's designed to be used in -- it

9    says "body gear," but we're talking about clothing, right?

01:01  10    The second thing it says is "a base material having a

11    transfer property that's adapted to allow, impede, or restrict

12    passage of a natural element," and what that basically means is

13    it has a base material that's designed to breathe.  And

14    that's -- that's what's shown in Columbia's figure.  The

01:02  15    underlying base fabric that the reflective dots are put on,

16    that's a base material, and it's designed to be a breathable

17    fabric.  Moisture, vapor, and air are designed to pass through

18    it.

19        And then the patent says "a discontinuous array of discrete

01:02  20    heat-directing elements, each independently coupled to a first

21    side of a base material."  So that's basically saying it's a

22    pattern of heat-directed or reflecting elements, pieces of

23    aluminum foil, and each of them has to be independently coupled

24    to the base material.  Not put together, but coupled to -- each

01:02  25    independently into this pattern, okay.  It says "the

1    heat-directing elements being positioned to direct heat in a

2    desired direction." So again we're trying to direct heat back

3    to the user, right? So in a desired direction back to the

4    user.

01:03    5    And "wherein a surface area ratio of heat-directing

6    elements to base material is from about 7:3 to about 3:7."

7    That's math. Everybody will tell you lawyer's don't do math,

8    so I'm going to make it easy for you. All that means is if you

9    compare the amount of the area that is the reflective part

01:03    10    against the background, it's going to be 30 to 70 percent

11    coverage. Somewhere between 30 and 70 percent of the base

12    material is going to be covered with these heat-directing

13    elements or this aluminum foil. Okay?

14    And "wherein the placement and spacing of the

01:04    15    heat-directing elements permits the base material to retain

16    partial performance of the transfer property." And all that

17    means is that even when you put these reflective elements on,

18    it's at least going to still be partially breathable. Okay.

19    That's all that that says.

01:04    20    And then -- so that's all claim 1. But, again, we're not

21    talking about claim 1; we're talking about claim 2, so we have

22    to continue reading on to the other parts of claim 2. And the

23    first one says it's everything in claim 1, but also "the base

24    material comprises the innermost layer of the garment." So

01:04    25    we're talking about only using it on the inside of the

1  clothing.

2      And then the last -- the last phrase says "wherein the

3  heat-directing elements are positioned on the innermost

4  surface."  So we're talking about having the heat-directing

01:05  5  or the reflecting elements on the innermost surface, not facing

6  away from the user, but right there on the skin side facing the

7  user to direct heat towards -- back towards the user.  Okay.

8  That is -- you just walked through your first patent claim.

9      That's claim 2 of the utility patent.  And we also have

01:05  10  claim 23 in the case.  I'm not going to bother to walk you

11  through that one now.  It's very similar to claim 2, and we can

12  spend some more time with that later.

13      Now, that covers the basic idea.  That covers the useful

14  invention that Woody came up with, which is how do I make

01:05  15  somebody warmer?  There's a new question that has to be

16  answered, though, which is how am I going to implement it?

17  What do I want it to look like?

18          THE COURT:  Mr. Aldrich, I apologize, but I need to

19  take a break.  I'm sorry to interrupt you.  Can the jurors step

01:06  20  into the jury room, please.

21      (Proceedings held outside the presence of the jury panel.)

22          THE COURT:  Please be seated.

23  I just need to take a break.  I apologize.

24  (Recess.)

01:09  25  (Proceedings held outside the presence of the jury panel.)

1     THE COURT:  I apologize.  Please be seated.

2     (Proceedings held in the presence of the jury panel.)

3     THE COURT:  Go ahead and be seated, everybody.

4     Mr. Aldrich, you may continue.

01:10  5     MR. ALDRICH:  So as I was saying, the first idea is

6  the useful idea of putting 30 to 70 percent partial coverage of

7  reflective material on the inside of clothing.  But the second

8  issue then is what do we want it to look like?  How do we want

9  it to appear?  And you're going to hear from Woody Blackford,

01:11  10  and you're also going to hear from Zachary Snyder that this is

11  actually far more difficult than it seems.  We need to come up

12  with some sort of way of putting these pieces of aluminum foil

13  on the inside of the clothing in a way that's actually going to

14  work, and that's going to fit within that coverage range, and

01:11  15  that's going to work for all the different parts of the

16  manufacturing process, and it can be very challenging.

17     But they designed -- they came up with six different

18  designs, and part of the idea was they were going to launch

19  one, but they were thinking about in the future, if we have

01:11  20  sort of spinoff implementations of it, we want to have other

21  ways of introducing this idea.  So the main design that you

22  will be seeing a lot of, because this is what Columbia

23  primarily makes, is this one here.  It's called -- that's just

24  called Omni-Heat Reflective, and -- well from there it probably

01:12  25  looks extremely reflective, but it's a whole bunch of dots,

1    kind of like what I showed you in the video.  And they make

2    this on not just this fabric, but dozens of different types of

3    base material that they use for all sorts of different purposes

4    from shoes to hats to gloves to jackets, so they have different

01:12    5    colors, and so they make this in a lot of different styles, but

6    this is, you know, one example of it.

7         And that's dots.  But, as I said, at the same time, they

8    wanted to make sure that they could launch other variations on

9    this -- in the future, and so they came up with five other

01:12    10    designs that you see here.  And they went and got what's called

11    a design patent.  They didn't talk about this in the video, but

12    a design patent is a patent for a new ornamental design that's

13    to be used on something that's functional, something that's

14    useful.

01:13    15         And so they got a -- design patents, including a design

16    patent that's at issue in this case called the '093 patent,

17    and, as I said, Zachary Snyder is the inventor of this patent,

18    and he's going to be coming in.  And this is the original '093

19    design patent, and this one covers the idea of wavy -- kind of

01:13    20    shown here, it's a wavy line design.  It's a wavy line design

21    that Mr. Blackford is going to explain is -- here's a close-up

22    of it actually.  It's a design that's pretty easy to implement

23    on clothing.  It's easy on the manufacturing process, and there

24    are a bunch of figures in the '093 patent as well that show

01:13    25    the -- what are called "the articles of manufacture" that it's

1   meant to be used on.

2       So as with their other designs, Omni-Heat can be used on

3   sleeping bags and boots.  Over on the far right you've got a

4   picture of a sock; it can be used in socks.  It can be used in

01:14   5   gloves, jackets.  And that design, the wavy line design that is

6   patented on the design patent we've got here today, it was

7   shown in the utility patent, but they got a separate patent,

8   this design patent in the case.  So we've got two patents in

9   the case.  We've got one that covers this wavy line design that

01:14   10   Columbia patented as a way of implementing the idea, and then

11   you have the utility patent that covers the general idea of

12   using this reflective material on the inside of clothing in a

13   30 to 70 percent ratio.

14       And that's their property.  They apply for patents to cover

01:15   15   that property.  They put fences around that and said, "That's

16   our proprietary domain, and we don't want anybody else in

17   there.  You're happy -- you're welcome to do anything that's

18   outside of there.  But we want to protect what we came up

19   with," and they put a fence around it, and the government gave

01:15   20   them the right to do that.  They said that's a new and useful

21   invention.  That's a new and creative and different design.

22   And gave them the right to that.

23       And on the design patent, it's actually very specific.  It

24   says that it's only for heat-reflective materials.  So they're

01:15   25   not trying to -- they didn't get a patent that covers the idea

1   of wavy line designs on just any piece of clothing or any

2   garment or anything that might be made ever, right?  It's

3   specific for heat-reflective clothing.  And so I think of that

4   as -- that's a pretty small fence, if you will.  That's a

01:16   5   pretty small piece of territory, right?  It's only that

6   specific design, and it's only as it's used on heat-reflective

7   clothing.  And so those are the two patents at issue, and the

8   government gave them a patent for each of those ideas.

9       About three years later, Seirus enters the program, and

01:16   10  they started a program that they called "the Omni program" --

11          MR. MARCHESE:  Objection to this slide.  This was

12  objected to, and I thought there was an agreement made to

13  remove it.

14          THE COURT:  Overruled.

01:16   15      Go ahead.

16          MR. ALDRICH:  They started a program called "the

17  Omni-Heat program."  And you're going to hear testimony about

18  the creation of the Omni-Heat program.  So in early 2012, a

19  public relations person that was hired by Seirus notified

01:16   20  Columbia -- or sorry, notified Seirus about -- sending a

21  bulletin about competitors in the news and did a search and

22  combined the word "glove" with a whole bunch of names of

23  competitors, and this popped up:  "Columbia.  Just in," it

24  says.  "Columbia Omni-Heat base layer.  We've been very

01:17   25  impressed with previous Columbia technologies.  We've tried" --

1    and it goes on at the bottom of that, and it gives a link.

2    This is early 2012.  It gives a link to a website showing this

3    new news report about Columbia's Omni-Heat fabric.  And here's

4    that website.  That's the, "Just in, Columbia Omni-Heat base

5    layers," the same one that's mentioned here, Columbia Omni-Heat

6    base layer.

7        So this article was, you know, triggered in this memo that

8    went to Seirus' executives.  "Just in is one of the most

9    unusual base layer tops we've come across.  Columbia's

10   Omni-Heat heavyweight, long-sleeve top complete with innovative

11   reflective inner surface."

12       Yep.  The inside incorporates a reflective metallic

13   treatment which Columbia calls Omni-Heat, Omni-Heat thermal

14   reflective.  It goes onto explain how it's basically the same

15   as a space blanket with an inside surface that reflects heat

16   back to your body giving increased warmth while keeping bulk

17   low.

18       Anyway, this is the email, and this is the website that was

19   linked to in that email that was sent to Seirus' executives.

20   And two weeks later, here's an email that was sent out from

21   Seirus to its suppliers in China.  Very important.  It starts,

22   "We are interested in the Columbia Omni-Heat material and

23   understand that we are unable to use the same print Columbia

24   uses.  Can you please advise if you have any other existing

25   prints that are available that we may use without paying a

1    tooling charge?  If so, please urgently send me a couple of

2    yards for sampling."

3        Again, this is Columbia's fabric.  This is our proprietary

4    property.  They actually obtained some fabric.  They obtained

01:19   5    five yards of fabric, and we still have no idea how they

6    obtained them because our factories, Columbia's factories, are

7    all under contract that they make this only for Columbia, but

8    somehow Seirus managed to get five yards, about the length of

9    the jury area here.  They got five yards of fabric and started

01:19   10   sending it out to have sample gloves made.

11       Here's a message that went out to one of their glove

12   manufacturers.  Seirus makes primarily ski gloves, and they're

13   made in Asia, and it said, "Today I sent you sample material

14   for" -- you know, FedEx tracking number, et cetera, and it

01:20   15   says, "I'm sending you one-quarter yard of reflective lining."

16   And it goes on to say that "Please make sure that 'Omni-Heat'

17   and 'Patent Pending' words show on the sample you make.  See

18   attached photos for reference."  And it attached two

19   photographs, one of them showing the name "Omni-Heat" and one

01:20   20   of them showing the words "Patent Pending."  They sent that out

21   to the supplier and said, "Please make some sample gloves, and

22   make sure you show this 'Omni-Heat,' and make sure you show the

23   words 'patent pending.'"

24       There's another email.  This is a little later in 2012, a

01:20   25   few months later:  "Can you please provide cost information for

1    Omni-Heat lining material?  We would like to add this style

2    over the next year."

3        And here's another email.  This is an internal email from

4    one of the employees at Seirus to management saying, "How

01:21   5    should I be referring to the Ventex -- Ventex is the Korean

6    supplier that they ended up using to make this.  "How should I

7    be referring to the Ventex material with 'Omni-Heat' printing?"

8    Omni-Heat is -- that's Columbia's name.  That's Columbia's

9    brand.  And yet they're referring to it in the company as their

01:21   10   version of the Omni-Heat material.  "How should I be referring

11   to this on the instructions?"

12       And then this is an email from somebody within Seirus to

13   Mike Carey sending him a copy of the hangtag that's used on

14   Columbia's products in July of 2012 while they're still in

01:21   15   development.  "Here is an image of the Omni-Heat header," and

16   sent a photograph of the Columbia pair of gloves, Omni-Heat

17   gloves, with that little circular piece you see there is the

18   Omni-Heat tag that explains to users how this technology works.

19       And this is what Seirus eventually came up with.  It's

01:22   20   gloves that they call HeatWave, and you can see it's a series

21   of wavy line design that the Court's going to tell you is

22   basically the same as the wavy line design that Columbia had

23   already patented.

24       And they sell these products.  Again, they call them

01:22   25   HeatWave.  You'll be able to draw your own conclusions about

1    why they call them HeatWave, but on their own header, on their

2    own hangtags that go with their gloves -- so here's an example

3    here.  This is -- these are the Seirus gloves.  We'll probably

4    be able to hand those around, but for purposes of right now,

01:23    5    you can see that's the reflective lining on the inside, and

6    this is the -- that's the hangtag right there, HeatWave, and

7    that's what I'm showing you on the screen there, the HeatWave

8    glove, and right in the lower left-hand corner here, they have

9    a graphic that explains how it works, and I'll show you that in

01:23    10    a second.

11         And so that -- that was launched back in 2013.  They

12    launched this about three years after Columbia launched the

13    Omni-Heat line.

14         Now, why did people buy these products?  We talked about

01:23    15    this earlier.  This is Columbia's hangtag.  This is how

16    Columbia advertises its products.  This is how Columbia wants

17    people to think about its products, and we see up there in the

18    upper left-hand corner is the graphic that shows how it works.

19    Right?

01:24    20         And here's Seirus' hangtag as well, again with a graphic

21    showing how it works.  This is Columbia's graphic on the left

22    and Seirus' graphic on the right.  Both of them show moisture

23    going through the fabric.  Both of them show heat being

24    reflected downward from those reflective elements.

01:24    25         This is Columbia's website showing how the technology

1    works, right, advertising the technology prominently.   They use

2    this slogan, "Magic in a little silver dot."   This is Seirus'

3    website.   "HeatWave.   Look for the silver lining."   Columbia's

4    website advertises how it reflects body heat.   Seirus' website

01:24   5    advertises how it increases your body's heat.

6        This is Columbia's advertisement inviting people to buy it

7    focusing on what the inside of it looks like.   This is Seirus'

8    focused on what's on the inside of your glove, focusing on the

9    inside.   Columbia's advertisement, advertising how much warmer

01:25   10    it's going to be.   It's going to be 20 percent warmer.   Seirus'

11    advertisement, advertising 20 percent warmer.   Columbia's

12    focusing on warmth, the future of warmth, technology.   Seirus'

13    advertisement focusing on the HeatWave of the future.   Columbia

14    focusing on that silver dot inside.   Seirus focusing on that

01:25   15    silver lining.

16        The first question -- you're basically going to be asked

17    three questions over the course of this lawsuit.   The first

18    question is the question of whether Seirus infringes.   All

19    right.   And with respect to the design patent, your life is

01:26   20    easy.   And it's easy for this reason:   The judge already

21    decided.   You guys don't have to decide that.   The judge issued

22    an order on August 10th of 2016 that said Seirus infringes the

23    design patent.   It said you guys don't have to consider that at

24    all.   And we'll talk about that in a little bit.

01:26   25        And so the only question that you guys have with respect to

1    infringement is about the '270 patent.  That's the utility

2    patent, how it works.  Right?

3          And you're going to hear from Dr. Christine Cole who is in

4    the back of the room.  Dr. Christine Cole has 40 years as a

01:26   5    professor working in textiles at Clemson University doing a lot

6    of military research.  She's a specialist in textiles.  She's

7    going to come here and explain to you how Seirus' product

8    works.  She's going to walk you through the claims, that they

9    have a base material that's breathable; that they have a

01:27  10    discontinuous array of heat-directing elements; that they are

11    positioned to direct heat in the desired direction back to the

12    user; that they're on the inside surface of the glove, as you

13    can see.  She's going to explain that they are still

14    breathable.  She's got some scientific testing she can show you

01:27  15    that she did to show how breathable they actually are, both

16    moisture vapor and air permeability, and I mean she doesn't

17    really have to show you.  You guys can look and see where it is

18    on the gloves; it's on the inside.

19          And that only leaves this question about whether they cover

01:28  20    30 to 70 percent of the fabric.  Right?  And Dr. Cole is going

21    to walk you through some testing that she did and some analysis

22    that she did using a several-thousand-dollar camera setup and

23    using Photoshop and doing imagery and -- it's beyond me.  She's

24    going to be happy to explain that to you, but I think more

01:28  25    importantly, Seirus' expert, Dr. Block, who is also in the back

1   of the room, Dr. Block already gave an opinion about this, and

2   this was Dr. Block's opinion.

3        "Did you do any experiments on Seirus' fabric?"

4        His answer:  "I did measure the surface covered by

01:28   5   reflective elements or heat-directing elements."

6        The question:  "And what did you conclude from your

7   measurement?"

8        And his answer:  "That it lays somewhere between 30 and 70

9   percent."  So the two experts are already in agreement on this.

01:29   10       But that's -- basically the first question you guys are

11   going to be asked to answer is, does Seirus infringe the

12   utility patent?  And as I mentioned, there's also claim 23

13   which is very similar, and, again, Dr. Cole will walk through

14   claim 23.

01:29   15       Now, Seirus also has a separate product called "the

16   HeatWave Plus product," and the only difference in the HeatWave

17   Plus product, as we see in the top one there, the shiny

18   metallic surface is on the entire inside, but it causes your

19   palms to get very sweaty, and so they took -- on the palm side,

01:29   20   they flipped that fabric over, all right, but you still have

21   the reflective fabric on the inside surface, and as long as

22   they have any reflective fabric on the inside surface, you're

23   going to hear from Dr. Cole that based on the judge's

24   instructions, that would still constitute infringement.  That's

01:30   25   something we'll get into later on in the week.

1    So that's the first question, do they infringe or not, and

2  you'll hear the evidence, and you'll make up your mind about

3  whether they infringe the utility patent.  The design patent

4  has already been answered.

01:30    5    And then you're going to be asked how much money is

6  Columbia entitled to receive in compensation for their

7  infringement, and, again, infringement has already been

8  established for one of the patents, so unfortunately you guys

9  are going to have to answer this question regardless.  Since

01:30   10  they've already been found to infringe, you guys are going to

11  be asked how much money is appropriate to compensate Columbia

12  for the infringement.  And the way this is measured is what's

13  called "a reasonable royalty."

14    The idea is, let's say hypothetically Columbia and Seirus

01:30   15  sat down in a room together, and everybody got along, and they

16  were asked a hypothetical question, the question at the time,

17  how much would you agree on a license?  How much would you

18  agree -- how much would Columbia accept?  How much with Seirus

19  be willing to pay?  And you're going to be asked to kind of

01:31   20  figure out what that would come to, and that's what the statute

21  says.  That's what you guys are going to be asked to apply,

22  that law.  "The Court shall award claimant damages adequate to

23  compensate for the infringement, but in no event less than a

24  reasonable royalty for the use made of the invention by the

01:31   25  infringer."

1    Seirus has sold since 2013 about ████████ worth of

2    their HeatWave gloves, hats, socks, and their gross profit is

3    about ██ percent.   And you're going to hear testimony from a

4    couple of people on our side.   You're going to hear testimony

01:32   5    from a professional accountant who's going to talk about what a

6    reasonable royalty would have been.

7    And you're also going to hear from Columbia's director of

8    licensing, and he's going to testify that they don't want to

9    license.   They're not interested in having competitors using

01:32   10    Omni-Heat technology and selling against Columbia.   The whole

11    idea here was to have something that's proprietary to Columbia.

12    And so you're going to hear him testify that if he was in a

13    room with Seirus and he had to strike a deal with them to sell

14    something that's going to compete against Columbia that he

01:32   15    would have not negotiated a deal that wasn't for a pretty high

16    royalty amount, right?   And he's going to say it would have

17    been as high as about 30 percent, maybe 20 percent, somewhere

18    between 20 and 30 percent is what he says.   30 percent would

19    have been a ████████ damages at this point, and he'll

01:32   20    explain to you, you know, "At the end of the day, I would still

21    leave a healthy amount of money on the table for them.   I'd

22    still make sure that they're profitable, but I would make sure

23    that a significant portion of the profits from the sales of

24    Omni-Heat -- from their product, the HeatWave product, that a

01:33   25    significant portion of that comes to Columbia as compensation

1     for us allowing them to use our proprietary technology."

2          So that's the first part of the damages analysis that you

3     guys are going to be asked to answer which is how much money

4     would Columbia be entitled to in the form of a royalty.

01:33    5          But there's a little kink in the law that actually for the

6     design patent, there's two different ways of measuring the

7     damages, and you're going to be asked to answer both questions.

8     You're going to be answering the question both based on the

9     idea of a reasonable royalty, and you're also going to be asked

01:33   10    to answer the question based on what are Seirus' total profits,

11    and the judge is going to decide later which one Columbia would

12    be entitled to in this case.   So all you have to answer is the

13    two questions, what would a reasonable royalty be and what

14    would Seirus' profits be.

01:34   15          And here's the statute.   This is very specific for design

16    patents.   Okay.   And the idea here is that, again, we've got a

17    fence around our property, but with a design patent, it's a

18    pretty small piece of property.   It's very small.   You have to

19    do basically exactly that design and only on heat-reflective

01:34   20    fabrics, and so that's a pretty small piece of property.   And

21    in exchange for that, you're entitled to compensation in the

22    form of the other party's profits for the sales of any articles

23    of manufacture that they have that have the design on them.

24          And I already showed you that Seirus' total sales are about

01:34   25    ██████.   And you're going to be asked -- I didn't bother to

1    put the numbers on here, but you're going to be asked to figure

2    out what their profits are on ███████.   That's the other

3    piece of the damages component you're going to be asked to

4    figure out.

5        Now, Seirus is going to argue throughout the case that the

6    profits that they make from selling these gloves, from

7    infringing the design patent, isn't the sale of the glove.

8    They're going to say the profits they make from selling the

9    glove is just the profit that's attributable to the fabric.

10    That's their argument.  And I mean they call the glove a

11    HeatWave glove, and this is the hangtag that they use to sell

12    the glove, advertising the wavy line design as you'll see.

13    This is the article of manufacture, one of them that's shown in

14    the patent, in the design patent, and that's a picture of their

15    gloves as they're selling their gloves, and, again, that's the

16    hangtag.  They're going to say, "Well, people buy our gloves

17    for a lot of different reasons, and not all the time is it

18    necessarily because it has the HeatWave fabric."

19        Even though I'm -- you're going to hear that on most of

20    their gloves that is the advertisement that goes on the front,

21    and they're going to show you a glove that costs $400.  It's

22    got HeatWave in it, battery packs, all kind of technology

23    wizardry in it, and they're going to say, "Nobody buys that

24    glove just because of the HeatWave.  People buy that glove

25    because it has battery packs and keeps you warm

1    electronically."  That's going to be the argument you're going

2    to hear from them, and I would just ask you to keep in mind as

3    you go through this how many of those gloves do they sell.  And

4    we'll hear about that as the week goes on.  But I think you'll

01:36    5    see that most of their gloves are kind of in this form here.

6    All right.  They sell them based on this HeatWave tag that goes

7    on the front of them.

8         So that's the second question you're going to be asked to

9    answer.  Question number 1, do they infringe?  Question

01:37   10    number 2, the sort of two-part question about how much money is

11    involved, reasonable royalty, and Seirus' profits, and you'll

12    have to answer both.  Okay.

13         And then third question is the question of validity.  And,

14    again, the judge has made your lives a little bit easier --

01:37   15    actually, Seirus made your lives a little bit easier on this

16    one because with respect to the design patent, Seirus already

17    agreed that the design patent is valid.  They filed the

18    stipulation with the Court which the Court entered in March of

19    2016.  They agreed that the design patent is valid, so that's

01:37   20    not being challenged in this case.  Design patent already ruled

21    infringed, already ruled valid, and that's why I said

22    regardless of where you come out on anything else, you still

23    have to figure out what the damages are on that patent because

24    there are no defenses left.  All right.  They admit -- or they

01:37   25    admit it's valid, and the Court has said they infringed.

1    So that question is off the table.  The question they're

2    going to want you to answer is about the utility pattern.

3    They're going to ask you on the utility pattern that they want

4    you to find that it's invalid, and the primary piece of

01:38    5    priority -- you'll remember from the video, prior art is things

6    that came before, right?  The primary piece of prior art that

7    they're going to raise for you is one called "Fottinger."

8    Fottinger is a -- he worked at a German company called

9    Freudenberg that primarily makes the fabric that goes between

01:38    10    the layers of the clothes.  So they mostly make what are called

11    interfacings or inner linings, but they also make linings for

12    jackets and suit clothes, okay?

13    And they applied for a patent in Great Britain, and their

14    argument is that the British patent application from 1980,

01:39    15    1981, they're going to argue that that renders the utility

16    patent invalid.

17    And the first thing you need to know about Fottinger is

18    that it was already considered by the patent office.  All

19    right.  Backing up here, you can see on the right

01:39    20    screen -- well, you can't see.  I apologize.  But on the right

21    screen is a list of every prior art patent, article, jacket,

22    publication, patent application, patent that the examiner

23    looked at in the process of allowing the utility patent to

24    issue, and there are -- I don't exaggerate, and I don't

01:39    25    understate -- there are 100.  There are exactly 100 pieces of

1  prior art.  I counted them myself.  Exactly 100 pieces of prior

2  art that the examiner had beforehand when he made the decision

3  that this patent was a valid patent.  All right.

4  And Fottinger was one of them.  It's a two-page

01:40   5  application.  And so Columbia learned about it.  This is kind

6  of an interesting story.  They already had the patent granted.

7  The patent office had already said, "We're going to allow your

8  patent to issue.  We've looked at it.  We've studied it."

9  They're going to walk you through a lot of the examination

01:40   10  process and the prior art that the examiner looked at and back

11  and forth correspondence with the patent office, and at the end

12  of that, the examiner said, "Good to go, you guys.  That's an

13  invention.  That's a patentable idea," and they issued what's

14  called a notice of allowance.  That means, you know, you pay

01:40   15  your filing fee, and that patent is going to be published.

16  But Columbia found out about Fottinger, and with that duty

17  of candor that you heard about, ran to the patent office and

18  said, "Here's another piece of prior art that you should look

19  at," and there was another one as well.  You may hear about it

01:41   20  in the case as well.  And they said, "Here's another one to

21  look at," and the examiner looked at that and issued a

22  subsequent notice of allowance based on Fottinger.  What's on

23  the screen is kind of garbled, we apologize.  But the bottom

24  line is the examiner said based on this new disclosure, a month

01:41   25  later they said still a valid patent.  "I'm allowing that one

1    to issue.  Here's a supplemental notice of allowability."

2        So there are several issues and whatnot with Fottinger, but

3    Fottinger -- it's kind of interesting.  Fottinger did an

4    experiment that's detailed in his patent.  What he did is he

01:41  5    took -- Dr. Cole is going to walk you through all of this later

6    in the week, but what he does, he took -- rather than using

7    like aluminum foil like this, he took little bits of aluminum

8    flakes and mixed them in the glue and then put glue, like

9    polymer, plastic, plastic dots that had little aluminum flakes

01:42  10   in it and put them in --you know, it's not exactly clear where

11   in the jacket he put them, but he put them on materials that

12   are meant to be used as linings or inner linings of jackets,

13   and they actually tested his experiment.  He wrote in his

14   patent application that it's reflective.  But he tested his

01:42  15   experiment -- and as far as I can tell, Dr. Cole is the first

16   one to figure this out; she's going to testify about it this

17   week.  But what he showed in his experiment was that it didn't

18   actually work right.  It actually did the opposite of what it

19   was supposed to do.  So he, like, had somebody wear the jacket

01:42  20   in a room and had them, you know, stand in a room for 20

21   minutes and at the end of the 20 minutes took a thermal imaging

22   camera and took a photograph of the inside of the jacket to see

23   whether it got warmer or cooler.  And, indeed, the side of the

24   jacket that had the aluminum flakes in it was warmer, but what

01:43  25   that means is that the heat didn't reflect back to the user.

1    The heat radiated right out of that jacket.  In fact, if

2    anything, the aluminum flakes helped maybe conduct that heat

3    out of the jacket so that the outside of the jacket was warmer

4    rather than the inside.

01:43    5    And so Fottinger has some issues, and it's maybe why the

6    examiner said the patent's good.  Again, Columbia's patents

7    direct heat back towards the user.  And Dr. Block -- we've

8    already talked about Dr. Block.  He's going to testify for

9    Seirus, but earlier in this case, at a deposition he was asked,

01:43    10    "Fottinger's experiment does not support the idea that his

11    invention worked because it reflected heat, correct?"

12    And Dr. Block's answer was, "Does not work specifically

13    because it reflected heat.  No.  He -- truly cannot make that

14    statement."

01:44    15    And so we'll have Dr. Block, and he can explain more about

16    this, and Dr. Cole will explain more about this experiment that

17    Fottinger did, but at the end of the day, there are -- Dr. Cole

18    is going to explain there are a number of problems with

19    Fottinger.  These are all the issues.  It doesn't have these

01:44    20    heat-directed elements; it doesn't direct heat back to the

21    user; it doesn't have a 30 to 70 percent coverage ratio.  So

22    we'll go through that as the week goes on.  So Seirus says, and

23    they're going to argue, well, if Fottinger itself

24    doesn't -- we'll call it anticipate -- if Fottinger itself

01:44    25    doesn't cover every claimed limitation, every piece of the

1    patent claim, at least the patent would have been obvious.

2    Somebody sitting there looking at Fottinger would have

3    eventually figured out Woody Blackford's idea.  They would have

4    figured it out if they had only looked at one of four other

01:45    5    pieces of prior art, and they're going to show you these other

6    pieces of prior art.  They're going to say if you combined

7    Fottinger with these other pieces of art, you come up with

8    Woody's invention.

9        There's a problem there.  And the Court's already decided

01:45    10    that actually that none of those are about heat direction.

11    They're like about rain jackets and putting plastic on the

12    inside of a rain jacket so that it slips over your clothes

13    easier.  They're going to say all of those have this 30 to 70

14    percent coverage ratio.  That's going to be their argument.  If

01:45    15    you just take the 30 to 70 percent coverage and you combine it

16    with Fottinger, then you end up with Woody's idea, but Dr. Cole

17    is going to explain, and the judge has already explained, and

18    he'll be directing you on this, if those aren't about heat

19    direction, then 30 to 70 percent coverage of what?  Anyway,

01:46    20    that's a question you guys will be -- you guys will be tasked

21    with.

22        And so even combining Fottinger with these four

23    other -- one of these four other patents that's about rain

24    jackets or stuff like that, you're going to be left with

01:46    25    basically still missing some stuff, and, again, the examiner

1    looked not just at Fottinger, but the examiner's job was to

2    look at Fottinger and all those 99 other pieces of art, right?

3    And at the end of looking at Fottinger and everything else, the

4    examiner said, "That's a patent.  I'm granting you a patent."

01:46    5    Now, I apologize because early in my presentation I made a

6    misrepresentation.  And I said you were going to answer three

7    questions, and, in fact, there are four.  And so I have to

8    tackle the fourth one real quick, and that is the question of

9    willful infringement.

01:46    10    Now, as you heard in the video, there are about 600,000

11    patent applications per year, and we're currently at 9 million

12    patents that have been issued since back in Thomas Jefferson's

13    day.  There are a lot of patents out there, and it does happen

14    that people accidentally find that they are infringing a

01:47    15    patent.  All right?  It does happen that somebody in some

16    company works on some idea and only to find out that somebody

17    else already had that idea first and had already gotten a

18    patent on it, and, lo and behold, they accidentally infringed.

19    And those situations get dealt with, and sometimes there's

01:47    20    litigation, and sometimes they settle, and sometimes they walk

21    away.

22    You're going to be asked, though, whether Seirus'

23    infringement in this case was willful.  And that means did they

24    act reasonably, or did they act recklessly?  Did they act with

01:47    25    disregard of Columbia's patent rights?  Did they act like a

01:48

1    pirate trying to take something that wasn't theirs, or did they

2    act reasonably?  That's the question of willful infringement.

3    And you're going to be asked to answer that question.  And,

4    again, you're going to hear this evidence that they started an

5    Omni-Heat program knowing that it was patent pending.  They're

6    going to argue, and you're going to hear from them, that

7    Mr. Blackford got a patent -- he actually got not just the

8    patent in the United States, but he got patents elsewhere

9    around the world.

01:48

10        And you're going to hear that in Korea, Columbia got a

11   patent for Omni-Heat that the Korean court ultimately found it

12   should not have been granted.  It was a patent that was drafted

13   in Korean.  It was submitted under Korean law, and a Korean

14   court found that that Korean patent in the Korean language

01:49

15   wasn't valid.  And they're going to say, "We learned about that

16   fact, and based on the fact that the Korean court decided

17   something under Korean law, we thought that it was okay to

18   infringe that patent in the United States.  We thought it was

19   okay to infringe a U.S. patent under U.S. law in the

01:49

20   United States," and that's going to be the defense.  They're

21   going to say, "We acted reasonably here in the United States

22   because of what happened in Korea."  All right.

23        Well, this is the design patent.  In 2013 Seirus got an

24   email from Ventex.  That's the supplier in Korea.  And the

01:49

25   email said, "I believe you already considered the similarity

1    with Columbia's Omni-Heat and MegaHeat RX.   As we are expanding

2    business to America, we are checking patents.   We found a

3    little similar pattern."   They sent that email in April 2013,

4    and they attached a copy of Columbia's design patent.   And

01:50    5    through this case, you're going to be asked to figure out what

6    happened with that email.   Where did that email go?   What was

7    Seirus' response when they got this email that said, "Hey,

8    here's this design patent.   You should know about it.   We're

9    currently making fabric for you that this fabric -- we're

01:50   10    currently making this fabric for you.   We're doing some patent

11    searches, and we found a little similar pattern."   All right?

12        And then you answer for yourself the question when we get

13    to -- through the next couple weeks whether Seirus acted

14    responsibly or whether they acted recklessly and willfully.

01:50   15        And I also ask this question for you to think about over

16    the next couple of weeks:   In March of 2016, Seirus agreed and

17    stipulated for the Court that the design patent was valid, and

18    in August of 2016 the Court ruled that Seirus infringed.   What

19    happened next?   Did Seirus withdraw all the products from the

01:51   20    market?   Did they do what a reasonable person would do after

21    the Court ruled?   Or did they keep infringing?   And with that,

22    you can answer the question perhaps whether they acted

23    willfully or not.   So I'll just leave that question out there

24    for you and conclude my presentation.   Thank you very much for

01:51   25    listening.

1    THE COURT:  Thank you.  Do any of the jurors need to

2  take a break before we continue?  Okay.  Let's take a

3  ten-minute recess, and then we'll begin defense opening.  Thank

4  you.

01:51    5    (Recess.)

6    (Proceedings held in the presence of the jury panel.)

7    THE COURT:  Please be seated.

8  Opening statement for defense.

9    MR. MARCHESE:  Thank you, Your Honor.

02:02   10    Hopefully the mike is on.  My wife would be unhappy if she

11  knew I was miked up.

12    I'm Christopher Marchese, and I'm here on behalf of Seirus

13  this afternoon, and I want to thank you all very, very much for

14  your participation.  We really appreciate it, and it's an honor

02:02   15  for me and for the rest of the Seirus team here to be present

16  before you and to present our case.

17    Why are we here?  Why are we here?  I think you've heard a

18  lot of statements made by Columbia's counsel.  There was

19  outright statements that there was copying.  You saw a lot of

02:02   20  side-by-sides of advertising materials and so on.  The reason

21  we're here is because this is an extremely important case for

22  Seirus.  You've heard the allegations that they've made:

23  Copying, they've showed you emails, they claimed it was the

24  Omni-Heat program by Seirus.  These are very serious

02:03   25  allegations against a very good company.

1       You're going to hear that this is a homegrown San Diego

2   company built up from the ground by a family that's here today,

3   and I'll introduce you to them in a minute.  They're here

4   because they believe that the patent's not infringed, the

02:03  5   patent's invalid, the damages that are being sought by Columbia

6   are way too much, and to protect their stellar reputation and

7   their business.  They're known in the industry, in this

8   business, in this city as an upstanding company.

9       And first I'd like to introduce you to Mr. Mike Carey.  He

02:03  10  is the CEO and president.  He's a founder.  He's been with it

11  since the very beginning.  We'll talk more about him in a

12  minute.

13      I mention it's a family company.  We have Wendy Carey out

14  here.  She's the CFO.  Mike and Wendy have been married 40

02:04  15  years today, and their daughter Danica is here as well.  Danica

16  Carey, she's the head of the marketing department.  It's truly

17  a family company, and you're also going to hear from some other

18  employees in the company in this case.

19      And we believe when it's all said and done, you will get to

02:04  20  be the judge.  You will get to determine whether you think

21  these people you'll meet, you'll hear them testify, you'll hear

22  them tell their story, whether they're the type of people that

23  would copy, that would take -- that would take things that are

24  not theirs, and I submit that you will not when you hear all

02:04  25  the evidence.

1       What you're going to hear is this is a company that was

2   built from the ground up, as I mentioned.  It's a company

3   that's well respected, not just in the city, not just around

4   the country for its developments and its innovations, its

02:05   5   products, but also within the industry, very well respected.

6   You're going to hear about that.

7       I think you're also going to hear that the attacks on

8   Seirus, the credibility of its witnesses, the credibility of

9   its employees is absolutely unfounded, untrue.  As I mentioned,

02:05   10  these are good people doing good things for a good company.

11      Now, you're also going to hear evidence that

12  Seirus -- well, you heard evidence from Columbia that they

13  believe that Seirus copied.  But what you're going to hear is

14  that Seirus did nothing of the sort.  What it did was it

02:05   15  innovated.  It created its own product, and it did so as it

16  always does and as it always had.  And you're going to hear

17  also that Columbia, some of these accusations against Seirus,

18  that Columbia does just as much or worse.  And this is the kind

19  of thing -- it's a tight industry.  You saw a picture, I think,

02:06   20  of a shop with lots of coats and jackets and things.  This is a

21  very busy industry with a lot of competitors.  There's a lot of

22  companies in the industry.  And people go out, as you'll hear,

23  and they look at each other's equipment.  They look at each

24  other's materials.  They look at each other's products, and

02:06   25  then they try to make something better.  And that's what

1    happened here.

2        So why is Columbia doing this?  You know, you're probably

3    aware now that Columbia is a giant company, very big, much

4    bigger than Seirus.  Seirus is comparatively tiny.  You heard

02:06    5    Columbia talk about how important its Omni-Heat is, and what

6    you're going to hear, though, is that it's actually a

7    technology that's built on marketing, on a marketing machine.

8    It's not built on patents.  What you heard about was -- I think

9    it was a million-dollar lab that they had.  There was a slide

02:07   10    that went up.  Well, they spend $120 million a year on

11    advertising, 1 million versus 120 million.  You saw 200 patents

12    from this lab.  The one, one utility patent in this case, one

13    design patent as you'll hear that they don't even use.  So this

14    is really a marketing machine, a company with a marketing

02:07   15    machine, a company that's using a marketing machine to try to

16    drive a smaller company to take a license, to take a license

17    that we've -- that you'll hear that we believe is unfair and

18    unreasonable.

19        Now, let's talk about the '270 patent.  The '270 patent as

02:07   20    you will hear should never have been granted.  It shouldn't

21    have been granted.  The same technologies you'll hear exists

22    for decades before.  Seirus had its own version of reflective

23    foil technology.  I'll show you that in a minute.  And there

24    were others.  Mr. Fottinger, who you heard about, Vaughn,

02:08   25    Haley, there are many.  And when the evidence is in, we believe

1    you'll conclude that the '270 patent's invalid.  And you're

2    also going to hear that the HeatWave products by Seirus do not

3    infringe that patent.

4        Let's talk about now quickly the design patent.  The design

02:08  5    patent is for a wave pattern, a wave pattern.  It's not a

6    function.  It's not a heat generator.  It's not something that

7    makes it more durable -- the glove more durable.  It's not

8    something that makes the glove more waterproof, nothing like

9    that.  It's a pattern, and, as you saw, it's not even on the

02:08  10   outside of the glove.  You can't even see it until you open it

11   up.  And all that is is a wave pattern.  It's a wave pattern

12   that Columbia doesn't use.  They use dots.  They don't even use

13   it, yet they want every penny, every single penny that Seirus

14   has ever made from this glove, which was like a 40 or $50

02:09  15   glove, and from this glove, which is a $400 glove with battery

16   technology.  They want every penny.

17       So when the evidence is in and you've heard from the

18   witnesses, we think you're going to conclude that the '270

19   patent is invalid.  It's not infringed, and we think you're

02:09  20   going to conclude that the design patent is -- they're asking

21   for way too much money on that.

22       And you're going to hear importantly from the witnesses in

23   this case, from the people that work for Seirus, and you're

24   going to hear they did not copy, and you get to judge for

02:09  25   yourself.  You get to meet them.  You get to hear their story.

1  You get to hear them talk about how they run their business.

2     And so what you're going to hear and what you haven't heard

3  until I'm going to talk now, until the witnesses really come in

4  and tell you the story, is the other side.

02:09  5     So let's talk about -- I think there's some drawing on

6  here.  I'll clear it.

7     Seirus is a company based in Poway.  They have over 300

8  products.  Their products are in snow sports, military,

9  hunting, and they have over 20 patents of their own.  This is a

02:10  10  company that does about █████████████ a year.  They've got 20

11  patents.  A company that does 3 or $4 billion a year has 200,

12  only one of which is a utility in this case, one of which

13  Columbia doesn't even use, the design.

14     Here's their headquarters out in Poway.  You're going to

02:10  15  hear from Mr. Carey about how they built this.  They started in

16  their garage, and they were able to build up a head of steam,

17  and they were successful, and they were able to build their own

18  building, have their own facility, and it's a real success

19  story.

02:10  20     Well, who are they?  I told you it's a little company,

21  about 50 to 60 employees.  It's seasonal.  When they're in the

22  ski season, the number of employees goes up a little bit, but

23  here you can see it's a fun company, and it's a small company

24  compared to a 2 or $3 billion Columbia company.

02:11  25     This is going to be an important product that you never

1    heard about in the case.  You never heard about the Thermalux

2    glove.  As you'll hear this glove has heat -- well, let me show

3    it to you -- heat-conducting fibers in it made of foil.  Made

4    of -- I believe it's aluminum-type foil called Lurex.  The

02:11    5    space industry was the developer of it.  This particular

6    product was developed in the early 1990s by Seirus and nearly

7    20 years before Omni-Heat, 20 years before.  You didn't hear a

8    word about it.

9         Let's take a look at it close up.  Omni-Heat on the right,

02:11    10    Thermalux on the left.  20 years before, Seirus was doing the

11    same kind of thing.  So something you need to know about this

12    product as you can see right now, it's on the outside.  When

13    they did this in the -- you can pass it around if you like.

14    When they did it in the early 1990s, they actually had it

02:12    15    flipped around so that the aluminum part was against your skin.

16    Now they have it out, and you'll hear reasons why they did it,

17    but in part because it made it smoother and more comfortable

18    against your skin, but, still, it's a heat-radiating product

19    with fibers in it.  20 years before.  Seirus' own homegrown

02:12    20    innovative product.

21         What are some other products that Seirus has innovated?

22    The All Weather glove.  You will hear Mr. Carey tell you about

23    this form-fitting, warm without bulk glove that they developed

24    in the mid-1990s.  It's a glove of choice for the military, and

02:12    25    today 20 years later, it's a top seller.  This is a glove that

1    helped put Seirus on the map.  It's still a very good product

2    for them.  And they innovated it.  And you'll hear all about

3    it.

4         Well, you don't have to take my word for it.  You can see

02:13  5    from the history of the company it is a company built on

6    innovation.  You can see these are just awards from the past

7    couple years.  We could go back in time, and we could see more

8    and more and more.  SKI magazine is recognized as the top

9    magazine in the ski industry.  They get best gloves of 2016.

02:13  10   Show-stopper gear.  Outside magazine, a very respected magazine

11   for outdoor, backpacking, all that, also won awards.  So you

12   can see this is a company that is built on innovation.  That's

13   the name of the company.

14        Who are the people that you'll hear from in this case?

02:13  15   Mike Carey, cofounder, CEO.  He was an NFL referee.  You're

16   going to hear that he was elevated to the level where he'd

17   refereed a Super Bowl.  Mike Carey, you'll hear about his

18   experiences as a referee and why that indicates his good

19   character, why he runs a company that can be trusted, fair,

02:14  20   unbiased, and who would not copy.  Wendy Carey, his wife, the

21   CFO, they founded the company together.  They founded companies

22   before that together.  They built it.

23        Bob Murphy, vice president, you'll meet him.  You'll hear

24   from him.  And he'll tell you about what his experiences are in

02:14  25   this case.  Morgan Chin, she's a buyer.  You saw her name, I

1    believe, on one of the emails that was shown before.  She will

2    also testify.  She'll tell you their story.

3        You see here's Mr. Carey refereeing an NFL game.  You're

4    going to hear him talk about why his experience as an NFL

02:14    5    referee has enabled him to understand the rules, to understand

6    how to be fair, understand how to be biased and -- unbiased,

7    and how to run a company that represents itself well, that has

8    good ethics, good character.

9        He is also an innovator.  He's also a person who's a patent

02:15    10    holder, many patents that he's gotten over the years.  So he's

11    not just a man of great integrity and great character.  He's

12    also a man who's a thinker and an innovator.

13        Ms. Carey, she's been a CFO from the beginning.  She is

14    also on the board of directors for the Snow Sports Industries

02:15    15    of America.  What does that mean?  Well, in this industry, you

16    have the big players and the little players.  You have the K2s

17    of the world, you have the Rossignols of the world, Burtons of

18    the world, snowboarding, skiing equipment, and then you have

19    smaller players, Seirus, other companies, about a hundred-plus

02:15    20    companies in this trade association, the biggest ones, as I

21    understand it, for the -- for all of the ski, snowboard, and

22    outdoor industry of this nature.  And Ms. Carey was

23    elected -- she was entrusted and elected to become on the board

24    of directors for the trade association.  And even previously,

02:16    25    Mr. Carey was the chairman of the board.  So they are entrusted

1   by their own trade association to run it.  They're people of

2   high moral character.

3        Bob Murphy has been with the company since the very

4   beginning.  And Morgan Chin, been there with the company for a

02:16   5   along time.  You're going to hear it's a company with low

6   turnover, good loyalty, a great company to work for.

7        Now, let's talk about the development of the product.  How

8   did that happen?

9        Well, what we're looking at now is the Thermalux glove from

02:16   10   the early 1990s.  We've seen that, and we're going to build up

11   through the development cycle.  What you'll see in the end is

12   that all the development was completed by the time that the --

13   that Seirus ever learned of the Columbia patents.  They were

14   done.  They'd finished the product.  They didn't copy.  They

02:17   15   didn't copy these patents.

16        So in December of 2011, they have what's called a steering

17   committee meeting.  This is where the company gets together,

18   and they're trying to figure out what kind of new products

19   should we make.  What's something new and innovative that we

02:17   20   want to develop.  And they started to have some thoughts about

21   what they should do with this HeatWave product line, and they

22   decided they wanted to take a very innovative product called

23   MegaHeat and combine it with foil, combine it with foil.  And

24   they knew that there were vendors out there, including the

02:17   25   company Ventex that you heard about, and over the course of the

1    next three or four months, they began to work on gathering

2    fabric and materials.

3        Now, you saw reference to some slides that said

4    Omni-Heat -- Omni-Heat material I believe it said on it -- that

02:17  5    Columbia put up.  It's during this period of time, a little bit

6    afterwards where you'll see references to that.  That's because

7    the Omni-Heat material wasn't secret.  It wasn't secret.  It

8    had been sold for two-plus years before.  It was on the market.

9    You could go out and buy one of these jackets or shirts.  You

02:18  10   could grab it and cut the Omni-Heat material out of it and do

11   what you want with it.  There was nothing secret here.  They

12   had a vendor who sent them a fabric sample.  Nothing secret in

13   doing that.  This is old fabric.  It's been on the market.

14       And so what they wanted to do was they wanted to take foil

02:18  15   and combine it with this MegaHeat fabric, and they eventually

16   did that.  They eventually did that, and you'll hear all about

17   it.  And in combining the foil, they wanted to create a really

18   special fabric that had the MegaHeat properties, which was kind

19   of a heat-retaining fabric you'll hear about, and foil to add

02:18  20   to it.  And so they were just looking for a way to get foil

21   printed on fabric.  They'd been doing foil with fabric, as you

22   can see here, for 20 years.  Thermalux.  This wasn't an earth

23   shattering thing for them.  It's old to them.

24       And so they keep progressing forward.  And in July of 2012,

02:18  25   they meet again.  And they come up with the HeatWave name, and

1    they come up with the wavy design that you've heard about, and

2    then moving forward, they finalize the design, the product

3    concepts and all that, and they begin selling it in November of

4    2012.

02:19    5        And then in January of 2013, they openly show it at trade

6    shows.  Openly.  Is that what a copyist does?  When somebody

7    plagiarizes or copies or takes somebody's work, they try to

8    conceal it.  They try to hide it.  What Seirus is doing is

9    they're going to the biggest trade show, SIA, the one I told

02:19    10   you about, Snow Sports Industries of America, and they're

11   showing -- you can see right here -- the cornerstone of their

12   display HeatWave.  That's not a copyist.  That's not somebody

13   who's trying to secretly take somebody else's work and use it

14   as their own.  That's somebody who's saying, "We came up with

02:19    15   an innovative product.  We have it.  We're interested in it,

16   and we'd like to advertise it to you to see if you'd like to

17   buy it."  That's what they did.

18       So when you move forward to April 2013, this is the very

19   first time the evidence will show that Seirus learns about the

02:20    20   design patent.  But what you're going to see in the email that

21   Seirus got which came from Ventex -- it's a vendor -- was that

22   Ventex wrote on that that the load -- because -- well, let me

23   show you this.  It's important.

24       This is the Seirus HeatWave fabric.  It's not just the

02:20    25   wave.  It's the logo all over the fabric, about every inch.

1    That's Seirus' logo.  That's not Columbia.  Nothing else,

2    that's Seirus.

3        And this person from Ventex writes to Columbia -- excuse

4    me -- to Seirus and says, "Here's a design patent, but you have

02:21  5    your logo all over it.  Our lawyers" -- she mentioned something

6    about "our lawyers looking at it, and you're okay.  You're

7    okay."  It's reasonable at this point for Seirus -- and you're

8    going to hear testimony to this effect -- reasonable for them

9    to believe that they're different.  They put their own logo on

02:21  10   there intentionally.  They put their own logo all over the

11   fabric for a reason because they're proud of their company.

12   They're proud of their name, and they're trying to advertise

13   it.  They're not trying to steal or copy anybody else's design.

14       So we continue down the timeline, and at this point, all

02:21  15   the way through product development, all the way through sales

16   beginning, all the way through the trade show, the '270 patent

17   doesn't even exist.  It doesn't even exist.  So how can they be

18   copying that patent if it doesn't exist?  They can't.  They

19   can't.

02:22  20       And then six or so months later, Columbia sues Seirus

21   without warning, didn't pick up the phone, no precheck to say

22   what's going on?  Files a lawsuit in Oregon -- excuse me -- in

23   Washington State, far, far from Seirus' home, and the

24   litigation begins.

02:22  25       Well, shortly after -- only a matter of a week or two,

02:22

1   Ventex -- they've been working with Ventex.  They've developed

2   a fabric which combines the foil with the MegaHeat I talked

3   about.  Ventex is the vendor.  They're the one providing that

4   fabric that you're looking at.  That is MegaHeat with foil

5   printed on it.  And Ventex informs Seirus, as you will hear,

6   that the equivalent South Korean patents from the '270 patent,

7   which has been over in Korea pending and it's gotten in front

8   of the courts over there, it's been invalidated.  It's been

9   knocked out.  And Seirus learns of this.

02:23

10       Now, you're going to hear allegations -- or you have heard

11   allegations of willful infringement.  Seirus had a good faith

12   basis to believe that they could proceed.  The South Korean

13   court had knocked out the equivalent of the '270 patent based

14   on Fottinger, the very prior art reference that you've heard a

02:23

15   lot about and you'll hear a lot about in the case as we

16   proceed, knocked it out.  So they have a reasonable good faith

17   basis to believe that they can proceed in what they're doing.

18   And they defend the lawsuit.

19       They also, though, as we know, have Thermalux, and you'll

02:23

20   hear testimony that they had a good faith basis to believe that

21   Thermalux was also good prior art, good solid prior art 20

22   years before, 20 years before.  They had been doing what they

23   considered to be the same thing for 20 years before.

24       So here it is again.  You can see a side-by-side.

02:24

25   It's -- we submit it would be reasonable to conclude that you

1    could proceed in what you're doing, and that Columbia's patent

2    is not valid.

3         So then let's take a quick look at one of the emails that

4    you -- I believe you saw.  I think you did.  This email came

02:24    5    from Morgan Haas, who is now Morgan Chin.  She got married, and

6    her name has changed from Haas to Chin, so you'll see both

7    names.

8         And so you see the term "Omni-Heat" in here, and this is a

9    communication with a vendor, not Ventex, a different vendor,

02:24    10    who had foil printing capabilities.  And the issue here is that

11    this company, Chenqing, is Chinese, and there's a language

12    barrier.  It's hard to communicate, so you're trying to find a

13    terminology that you can use when you're communicating with a

14    Chinese vendor, and earlier in the course of their history

02:25    15    together, Chenqing had a particular material called "Fuzz,"

16    they called it "the fuzz material."  It didn't have a product

17    code.  It didn't have a style code as they call it in the

18    industry.  And so Chenqing would call it "the fuzz," and so

19    Seirus would say, "If I want to communicate with Chenqing about

02:25    20    the fuzz material and order it and get it, I have to call it

21    "fuzz," and that's what they did.  If you look to the bottom of

22    the email highlighted here, this section, what you see is

23    product codes, style codes.  These are actually Chenqing

24    fabrics that you could order by giving them the numbers, so you

02:26    25    could talk in a language of numbers and letters.  Much easier

1    to communicate.  The problem was that the Columbia Omni-Heat

2    material referenced here, it didn't have a style code.  And

3    Chenqing called it Omni-Heat; they called it Columbia

4    Omni-Heat, and so Seirus did the same thing.  And so they're

02:26    5    talking to each other in a language that they can understand.

6    Seirus can communicate with this Chenqing vendor, and they can

7    understand one another.

8        Let's see if I can erase.

9        So we've heard the accusations, the allegations about

02:26    10   copying.  Let's see what Columbia itself does.  You're going to

11   hear evidence on this.  Mr. Blackford, we've heard about him,

12   he's the inventor of the '270 patent.  You're going to hear him

13   testify, and you'll hear a lot of things from him.  One thing

14   you're going to hear from him is about an email that will come

02:26    15   into evidence, and he asked eight factories to cost two TNF.

16   TNF in the -- if you know a little bit about this industry, TNF

17   stands for The North Face.  Everybody's heard of The North

18   Face.  Famous company.  He wants to cost two of their jackets

19   cloaked as Columbia styles.  Cloaked as Columbia styles.  As an

02:27    20   acid test on "how profitable it would be if we were making

21   their product.  If we were making their product."  And then he

22   goes on to conclude, "That's very interesting info that we

23   should review more closely."

24       So I'd say this is more than the pot calling the kettle

02:27    25   black.

1      But it goes on.  Mr. Blackford testifies in a deposition in

2   this case.  And he's asked:

3      "Question:  As part of your duties, do you take it upon

4   yourself to review other products in the marketplace for

02:27   5   comparison to the products Columbia sells?

6      "Yes."  Yes.  Of course he does.

7      "Do you ever personally go into sporting goods, for

8   example, and look at what products are being sold?

9      "Answer:  Yes, I do," and then he says -- he goes on, "In

02:28  10   the last two weeks I've gone to -- like I went to REI."  It's a

11   big outdoor clothing store.  They are here in town.  "And I did

12   a clinic for their staff."  And he goes on, "I walked around

13   the floor while I was there, looked at what was on the floor

14   being sold, obviously was competitors' products as well as our

02:28  15   own."  He's looking at competitors' products.  Everybody does

16   it in the industry.

17      Well, let's talk about the patent.  Let's get into the

18   details.  We've talked about some of the history, some of the

19   background, some of the allegations of copying, how there was

02:28  20   independent development by Seirus, and how they were reasonable

21   to defend this case and continue on.

22      The '270 patent, we've seen it a lot.  I won't spend a

23   bunch of time on the background information.  I want to jump in

24   to what I believe is relevant here in the story that you

02:29  25   haven't heard yet, the other side of the story.  And as I

1    understood it, this claim 2 here, 1 and 2, is portrayed as a

2    pretty significant advance maybe.  I'm not quite sure -- I

3    don't want to put words in the other lawyer's mouth, but I

4    think you can kind of take away that implication.  But what

02:29    5    you're going to see when we march through this, and the

6    evidence will show, that what they ended up getting, what their

7    barbed-wire fence protects is something here in yellow.

8    Everything else they surrendered during prosecution as being

9    old.  Known.  Done before.

02:29    10        So we have the -- if you look in the claim, it's a little

11    confusing because it says "a ratio of 7:3 to 3:7."  I think

12    it's easier to understand as a percentage, 30 to 70 percent,

13    that's what counsel from Columbia has been saying.  We'll all

14    use that same terminology to make it easy.

02:30    15        So we've got a little graph that we're going to use

16    throughout the presentation to help you understand it.  So

17    here's what they got:  They got the middle.  And so their

18    position, Columbia's position, would be if you hit any point in

19    the middle, you would infringe their patent.  That's their

02:30    20    position.

21        Now, what happened during the patent prosecution?  You

22    remember that term?  Judge Vogel, we watched the video, he

23    talked about -- showed people examining patents and all this,

24    and he talked about the prosecution history.  That's the

02:30    25    back-and-forth between the applicant, Columbia, and the patent

1    office about what they can and cannot have.  And what they

2    ended up giving up is not new, is everything listed here on my

3    list.  The evidence will show this.  And ended up -- the only

4    thing that they did not surrender was the range.  That's it.

02:30    5    And we're going to show you that the range is old.

6        So here's the originally filed claim.  This is what they

7    submitted to the patent office right here.  They told the

8    patent office, "We should get a patent on this."

9        The patent office examiner came back and said, "Rejected.

02:31    10   No.  You can't have it."  And he cited a patent to Levy, a U.S.

11   patent, prior patent, and here you can see some of the language

12   the examiner says that "the claims" -- we're looking at 1

13   through 2 -- "are rejected under this statute of Congress,

14   patent statute, as being anticipated," which means that Levy

02:31    15   has everything.  "Anticipation" means it has everything in the

16   claim.  That's what the examiner says.  Goes on to explain.

17   Here's Levy.  Here's what the examiner relied on.  A patent

18   from 1986, 15 years before -- almost 15 years before Columbia.

19   And so originally filed claim 2 is rejected.

02:31    20       And, by the way, the other claim asserted, 23, we've heard

21   counsel for Columbia say -- I think he said substantially the

22   same or almost the same.  We're going to focus on 2.  They

23   focused on 2.  23 a similar analyses, same thing happened in

24   the patent office.

02:32    25       So what does Columbia do?  It doesn't push back.  Columbia

1   doesn't say, "You're wrong.  You're absolutely wrong.  Our
2   original language is great, that our barbed wire goes out here,
3   and you have to stay off of our land that far out."  No, they
4   didn't do that.  They brought it back.  They said, "Okay.  We
02:32   5   don't have ten acres.  We've got five acres.  So we'll draw it
6   in."  How do you that?  You amend your claims.  You actually
7   add words to the claim, and I know that's counter-intuitive.
8   Adding seems like it makes it bigger.  In the patent world,
9   when you add words to your claim, you make your property
02:32   10   smaller because you add limitations.  You say, "Okay.  It's not
11   anything from 0 to 100, it's 10 to 20," whatever it is.  You
12   constrict it.

13       And then, lo and behold, the examiner said the same thing.
14   Rejected.  Can't have it.  Same deal.  Levy.  Examiner says,
02:33   15   "Levy has everything."

16       Well, what did Columbia do?  Again, it didn't push back.
17   It didn't stand on the claims as they were.  It brought the
18   fence in again.  Brought it back in.  And said this time,
19   "Okay.  We're going to just -- we're not going to stand on the
02:33   20   claim.  We're not going to argue with you that you're wrong.
21   We're not going to -- we're going to basically concede.  And
22   we're going to go and tell you that, well, as long as it's
23   30:70.  With every other thing that's old, then we have an
24   invention."

02:33   25       So now you see the other side of the story.  Now you see

1    this isn't some gee-whiz, incredible invention.  This is a lot

2    smaller.  It's a lot smaller.  In fact -- can I have that

3    fabric real quick?  Thank you.

4        What you're going to hear and the evidence will show is if

02:34    5    you flip it around like that and put it against your skin like

6    that, it doesn't infringe.  But if you -- this is their

7    position.  If you put it like this, their position is it does

8    infringe.  Well, if that's such a big deal invention or worth

9    so much money, how come I can avoid it just by flipping the

02:34    10   fabric over?

11       So here now they finally get their claims allowed.  Patent

12   examiner says, "Okay.  If you have the range, you can have it."

13       Allows the range of 30 to 70 percent, but as we will see,

14   30 to 70 percent is nothing new.

02:34    15       So summarizing the prosecution history, Columbia doesn't

16   push back on anything in Levy until it gets to this 30 to 70

17   points, and the examiner said, "You can have that."  Levy has

18   all of that.  What do they get?  They got the middle.  Common

19   sense.  It's like little too little doesn't work that well.

02:35    20   Not enough foil doesn't work that well.  A little too much foil

21   doesn't work that well.  We'll take the middle.  What does that

22   remind you of?  Goldilocks.  It's a little too hot.  It's a

23   little too cold.  I want it in the middle.  If it's a little

24   too much, not enough, I want it right in the middle.  But they

02:35    25   didn't ask for just what's just right.  They asked for a lot,

1    they asked for 30 to 70.   They didn't pick a narrow range, 30

2    to 40, 40 to 50, something like that that they thought was

3    really optimal.   They picked a big, wide range.   When you make

4    a land grab like that, when you try to make your land as big as

02:35    5    you can, you frequently run into other people's property, and

6    they certainly did that here.   They built their property on

7    somebody else's, and they can't do that.   You can't -- your

8    neighbor can't -- say you have an acre in your backyard, but

9    you don't have a fence.   Your neighbor comes -- if you're out

02:36    10    of town -- and builds a shed on your half-acre, and you come

11    home and discover it.   Your neighbor can't do that.   That was

12    your property before.   Your neighbor can't take your property

13    when it was already yours.

14         This is like the Oklahoma Land Rush where you go out and

02:36    15    grab free land.   There was land that was already taken.   And so

16    what was taken here?   What was taken?

17         And, by the way, I wanted to mention one thing that I think

18    is an interesting point I forgot to mention.   You know, you saw

19    the dots.   And you're going to see other evidence of holes

02:36    20    being punched, dots and lines and all kinds of things, but, you

21    know, this concept in this patent is to say, "Well, if I

22    have -- I don't have total foil coverage.   I'll let some of the

23    air go out, but if I have a little bit of foil coverage, I'll

24    keep some of the heat in."   It's not rocket science, I would

02:37    25    submit.

1    But in any event, think about when you're cooking.

2  Everybody's cooked.  Everybody's probably covered a pot with

3  foil or with plastic wrap.  If you cover the pot with plastic

4  wrap or foil and you put no holes in it, what happens?

02:37    5  Eventually it will boil over.  It traps too much air.  If you

6  poke holes in it, and we've all done it, poke some holes, take

7  your fork, take a knife, poke some holes, the air will get out.

8  It will keep it nice and warm.  It will sort of steam it in

9  there, but it will let enough of the steam come out so that it

02:37    10  won't boil over.

11    This is -- we would submit, and you will see, that this is

12  not -- this is common sense.  This is something people have

13  been doing forever.  It's nothing new.

14    So we look to Fottinger.  What does Fottinger teach us?

02:37    15  Well, Fottinger says, "I've got a textile sheet.  I'm going to

16  put a discontinuous coding" -- the same words in the patent

17  claim, "discontinuous" -- "and I'm going to lay it down on a

18  backing, a base layer, and I'm going to have it go from 5 to 40

19  percent overlap."  And here you can see that language, 5 to 40

02:38    20  percent.  30 to 70 overlaps -- sorry -- 30 to 40.

21    Well, Mr. Blackford was asked about it:  "What about this

22  Fottinger reference with the 5 to 40 percent coverage?"  And he

23  said, "Well, the ratio's written in our patent, and then look

24  at this ratio.  I think mathematically you would see it

02:38    25  overlap."  Not earth shattering, but he recognizes the overlap.

02:39

1    Here is an article quoting Mr. Blackford.  He says, "Our

2 solution takes a by-component approach, noting that the foil

3 dots cover about 35 percent of the fabric."  Fottinger, right

4 in the Fottinger range.  And here you can see the fabric

5 beneath.

6    Dr. Cole, who I believe is here, Dr. Cole did some of her

7 own work here.  She came up with Omni-Heat having 37 percent

8 Fottinger.  She did more.  33.8.  35.8.  32.4.  This is all

9 Omni-Heat.  This is Columbia's fabric.  It's all Fottinger.

02:39  10 All in the Fottinger range.  And so when you look at it, all

11 these measurements that we have in here, and you compare it to

12 Fottinger, you've got overlap.  And you've got overlap right in

13 the sweet spot.

14    So basically what Columbia has done is it's said, "I'm

02:39  15 going to build my barbed-wire fence out for an acre," and they

16 landed on Fottinger, and you can't land on somebody else's

17 property and have a patent when they were before you, just like

18 you can't take somebody else's property when they were before

19 you.

02:39  20    So what are we looking at here?  I think I said before it's

21 common sense.  Here's some other prior art references.  Vaughn,

22 you'll hear about Vaughn.  You'll hear about Haley.  They had

23 exactly the same range as the '270 patent.  Exactly.  30 to 70.

24 So when you lay it down in a timeline, what do you get?  You've

02:40  25 got the '270 patent in 2010.  If you rewind back 20 years,

1    you've got Fottinger overlapping right where Omni is.  You've

2    got Vaughn and Haley at 30 to 70 percent.  It's not surprising.

3    It's poking holes.  Poking holes in your tinfoil.  You want to

4    make sure you have -- you don't want to rip the whole piece of

02:40   5    tinfoil off because then it won't do anything, and you don't

6    want to have the tinfoil with no holes in it because it will

7    boil over.

8        And so when we get to the end of the day, we've got

9    Fottinger with everything.  And comparing to Levy now, we've

02:40   10   picked up the one missing ingredient that the examiner couldn't

11   find in Levy.

12       So before I move on to the next topic, I just wanted to

13   mention two things.  First here there was some statements made

14   by Columbia's counsel about what Fottinger was missing, and I

02:41   15   wrote them down here.  Heat-directing elements, and I think it

16   was he may have talked about whether or not Fottinger's

17   dots -- I think they're dots or squares -- are placed on the

18   innermost lining of fabric.  So in other words, whether -- you

19   know, whether they're inside your jacket or outside your

02:41   20   jacket.  And when you hear the evidence, I think you're going

21   to see it's clear that Fottinger has both.  Fottinger says

22   first as to the heat-directing elements, "The different degrees

23   of radiated heat from these zones is reflected by a sheet of

24   the invention."  Heat is reflected.  As to the innermost

02:42   25   surface, Fottinger says in his invention, "They may also be

1    used as outer fabrics for articles of clothing, in which case

2    the coded face will be on the inside of the article."   The

3    innermost surface.

4        So this next slide tells a little bit of a story.   We heard

02:42   5    some statements by Columbia's counsel about the Fottinger

6    patent -- excuse me -- Fottinger patent application which was

7    published, it was made public in that case, in the 1980s -- was

8    provided the patent office, but the problem is as you look

9    here, and Columbia's counsel conceded this because it's just a

02:42   10   fact, that it happened after the examination was all done.   The

11   examiner -- you saw all the steps of the examination.   This

12   came in after the examiner had done all the work and had said

13   okay.   It doesn't have 30 to 70, and then Fottinger comes in.

14   It's been passed off effectively, but the examiner does check

02:43   15   it off, but as you heard from the video and from Columbia's

16   counsel that the patent office is examining 600,000 patent

17   applications per year -- I think it was in 2015.

18       And Judge Vogel said that examiners have a lot of work to

19   do -- I think those were his words -- and you got to see files

02:43   20   stacked up, and he said they're very busy.   Well, this comes in

21   after the examiner has already done the work.   And busy

22   examiner comes in late, already done all the examination.

23       We submit that this was, you know, a piece of prior art

24   that had it come in at the right time, it would have made a

02:44   25   difference.

1    Now, the other thing that's really important to note here,

2    when you're in front of an examination of a patent application,

3    nobody else gets to participate.  So Seirus couldn't submit

4    anything.  You know, any of the other big companies out there,

02:44    5    none of them could write in to the patent office and say,

6    "Here's Fottinger.  You've got to do something about this.

7    They can't have this patent."  It is a proceeding that is only

8    between the patent office and the applicant.  And, therefore,

9    there's no chance for Seirus to participate.  And this is our

02:44    10    opportunity to tell the story, our opportunity to put on

11    evidence about Fottinger.  First time.  Not before the patent

12    office, no chance to participate.

13    Let's talk about something that got in the file for the

14    prosecution, but got in the file -- well, you be the judge.

02:44    15    See what got in and what didn't.  The Castelli radiation

16    jacket, Columbia disclosed it to the patent office during

17    prosecution pretty early on.  I think it was like in 2010, so

18    it's about a year or two before the patent comes out.

19    And Mr. Blackford's asked about the Castelli jacket at his

02:45    20    deposition.  And he says -- these are his words:

21    "Question:  Do you recall seeing any products like that

22    where the elements weren't touching?"  Meaning the foil

23    elements here, whether they were separated from one another.

24    "Do you recall seeing anything like that?

02:45    25    "Answer:  No, I don't recall.  I mean really what I recall,

02:45

1    the big one for me is that Castelli jacket.  That's the one
2    that's really in my memory."  Castelli, if you don't know, and
3    I didn't know this, is an Italian road bike equipment maker,
4    apparel and so on, apparently kind of high end, nice jackets
5    and pants and things that you'd wear if you were a road biker.
6    So Castelli had come up with a jacket called the Radiation, and
7    the Radiation, as you will see and hear, have foil inside of
8    it, innermost layer.

02:46

9         And here's what was disclosed.  Here is what Mr. Blackford
10   and Columbia disclosed to the patent office.  That.  Can't see
11   the inside of it.  Told the patent office.  This is the big
12   one, by the way.  This is the big one.  Shows it on the
13   outside, not the inside.  One other thing disclosed?  Shows on
14   the inside, but it's so far away and so grainy that you can't

02:46

15   tell what Castelli really looks like.  And when you look at
16   Castelli up close as Dr. Cole did, their own expert, you'll see
17   it has holes.  Holes poked in it.  It's like the fork into the
18   foil.  Let the air go through.  On the innermost surface.  This
19   wasn't before the patent office.  The patent office did not get

02:46

20   to see this.

21        Now, there was a lot of discussion that I heard about
22   advertising and showing -- I showed you this one.  You go into
23   a shop, and you see Columbia in the shop, and there were
24   other -- I'm trying to see here.  There's the million-dollar

02:47

25   secret innovation lab.  You've got 200 patents.  But you only

02:47

1    see one utility patent in this case, one design patent that

2    they don't even use.  And you've got, as we see up here,

3    $120-plus million in advertising.  That's a marketing machine.

4    That's what the evidence is going to show.  This is a marketing

5    machine.  This is not a patent driving.  This patent should

6    never have been granted, this '270 patent.  It's old.  They

7    don't use the design patent.  Here are the dots.  We know it's

8    waves in the design patent.  Clearly, the design patent's not

9    driving the sales of their dots because they don't even use it.

02:48

10         It's a marketing machine.  That's what the evidence is

11   going to show.  This is a company that's driven the sales of

12   Omni-Heat by marketing, not by having strong patents.

13         So I want to talk about noninfringement, and I won't spend

14   a lot more time on this.  I'm going to try to get through it

02:48

15   quickly because I know I've been going for a while.

16         I talked about the middle.  I don't think I need to go

17   through that anymore.  It's common sense, but one thing I

18   haven't talked about yet is the words "about."  In the patent

19   claim it doesn't say 30 to 70 exactly.  It says 30 to 70 about.

02:48

20   It says about 30.  About 70.  Is that more?  Is that less?

21   Regardless, I'm going to talk to you a little bit about the

22   testing that was done where there was conclusions about

23   infringement by Dr. Cole.

24         Dr. Cole created a setup here.  The evidence is going to

02:49

25   show that she created her own setup, and you're going to see

1    pictures of it closer than I have here.  To me it's old-looking

2    wood.  It looked to me like it's rusty clamps, old clamps.  I

3    think the evidence may show it might be a little shaky, but

4    that aside, what you are going to hear is that there are

02:49    5    third-party labs that can do this kind of work.  You could send

6    out to figure out what the foil coverage is to a third-party

7    lab, have an independent test done, not a test of an expert

8    that you've hired.

9        Moreover, what you could do is when Dr. Cole does the test,

02:49    10    she knows the patent quite well.  She knows exactly what she's

11    aiming for, 30 to 70.  When you send it out to an independent

12    lab, you could do what's called "a blind test."  I think

13    everybody's heard about that when you do pharmaceutical tests.

14    We're trying to figure out how well a pill or a drug works on

02:49    15    people; you do blind tests.  That's what you do.  You don't

16    want the people to know what they're supposed to feel.  You

17    don't want the people to know what they're supposed to get.

18    And so in this instance what could have been done was this

19    could have been sent out to an independent testing lab, and

02:50    20    they could have said, "We're not going to tell you what you're

21    looking for.  Here's the thing that you're going to test.  Tell

22    us what you got."  That's what they could have done, and that

23    would be a good way to do it because then the independent lab

24    would not be biased, but that's not what was done.  You'll hear

02:50    25    Dr. Cole did it herself.

1          And you're also going to hear evidence that she didn't test

2     once, but she actually tested twice, but not because she

3     was -- the evidence is going to show not because she was

4     saying, "I did a great job the first time.  I'm going to do a

02:50    5     great job a second time" and just confirm she did it, because

6     after she did her first set of photos from this setup, she

7     finished her report; she submitted a report, and she concluded

8     that there was infringement in her reporter.

9          But then Dr. Block, the expert for Seirus, got a chance to

02:50    10    respond to it, and he said, "I criticize her work.  I don't

11    think it was done that well."  And she didn't stand on it.  She

12    went back and did it a second time, made some changes.

13         So her first round, I think you're going to hear that it

14    didn't go so well, and that the second time when she came back,

02:51    15    she tried to fix it.

16         You're also going to hear, as I understand it from looking

17    at this picture, and hopefully we'll blow it up more when we

18    get there, it looks to me like it's a piece of fabric down on

19    this setup that she has, and it's not a glove.  She didn't lay

02:51    20    a glove down in there.  And their claim -- Columbia's

21    claiming -- you're going to see it -- they're going to claim

22    that this patent covers a glove and a glove having a range of

23    30 to 70 percent of coverage.  That's what they're going to

24    tell you.  But when you take the fabric out of the glove,

02:51    25    you're not necessarily testing the right thing.  There's no

1    glove.  I don't see a glove set down there, and what I'm

2    looking at here is a piece of fabric, and so I think you're

3    going to hear at the end of all this that Dr. Cole's analysis

4    or measurements are not reliable.  Not reliable.

02:52    5        Well, what does she get?  She got -- we saw some of the

6    numbers she got for Omni-Heat before.  They varied.  They went

7    from 32 to 37 or so.  When she did the HeatWave product she

8    ended had up right at the edge of the "about."  She got 69s and

9    68s and 67s.

02:52    10       Now, there is something that you're going to hear about on

11   this point, and I'm going to just give you a quick summary of

12   it called "variability" in these fabrics.  Variability is

13   something that Mr. Blackford has recognized, and you'll hear

14   testimony from him about this.

02:52    15       Now, what he -- what you'll see from his testimony is that

16   Columbia was measuring their own stuff, and they were getting

17   in the 30s, but they were also getting in the teens, the 20s.

18   You're not going to see a critique of those as being bad or not

19   being useful or anything like that.  Those teens and 20s are

02:53    20   measurements they got.  But when Mr. Blackford got deposed, he

21   was asked about variability, and he said they had variants.  He

22   said Columbia has variants, and he was asked about what kind of

23   things could cause variance of the coverage, either the

24   percentage would go up or down, and he said, "The size of the

02:53    25   dot, the spacing of the dot, the material that we use."  He

1   went on.  He was asked, "What could cause variation?"

2       He said, "Usually it's a manufacturing outcome where

3   depending on the materials involved and the rollers and even

4   things like the humidity and temperature of the adhesive at the

02:53   5   time of application, we can get variance."  Rollers, by the

6   way, are when they make these fabrics, they're putting foil

7   together with a backing fabric, and they send it through

8   rollers to heat it up.  The rollers have the print of the

9   pattern.  He said, "Depending on the rollers that are used, we

02:53   10   can get variance, changes the coverage percentage."

11       And here we see again some of the ones that Dr. Cole got

12   when she measured the Omni-Heat fabric, but what the evidence

13   is going to show in this case in terms of variance is that

14   Seirus has had many different lots of fabric made.  They've

02:54   15   made this -- this HeatWave fabric has been run through and been

16   manufactured quite a few times.  They get a big roll of it,

17   maybe a thousand yards or something like that, get a big roll,

18   and when they run out, they get another one made, and what

19   they -- what you're going to hear is that Ventex, the company

02:54   20   they work with, has different fabricators.  So different

21   factories are making these rolls, and they're

22   different -- there are different conditions.  There are

23   different rollers -- there are different -- you know, it could

24   be the humidity could be higher.  There's all kind of

02:54   25   variables, and, in fact, you'll hear from Seirus that some of

1    the lots that they receive from Ventex were rejected for

2    issues.  Some of them were accepted at a discount when they had

3    minor problems.  But in any event, what you'll hear is Dr. Cole

4    never considered any of that.  Didn't consider it.

02:55    5         And so at the end of the day, it's Columbia's burden to

6    prove infringement.  The testing data is unreliable.  It's

7    shaky.  It can't be trusted, and consequently there's no

8    infringement in this case.

9         Last I wanted to say in terms of infringement, you

02:55    10    heard -- I think you saw a snippet from Dr. Block, the Seirus

11    expert, about his testing.  You will hear from him, and he will

12    provide the testimony and explain to you what he did.

13         All right.  What's the damages?  I won't spend a lot of

14    time on this because I don't think you should ever get to it

02:55    15    for the '270 patent.  As we said, that patent should never have

16    been granted, but if you do, you do something called "a

17    hypothetical negotiation."  Think about what the parties kind

18    of a deal they would have made if they sat down at a table when

19    the issues had first arisen.  What kind of a deal would they

02:56    20    have arrived at?

21         Well, the most important thing or one of the most important

22    things for them to consider would be what is the value of the

23    invention.  And here's the words that you heard from the video:

24    "The inventor must enhance the public knowledge by adding

02:56    25    something new and useful to it."  Something new and valuable.

1        What you've heard is the '270 patent, it wasn't new.  It

2    wasn't valuable.  So you shouldn't even get to damages for that

3    patent, but even if you were to, it couldn't be that much money

4    because nobody pays much money for a tiny piece of land.  You

02:56   5    might pay a bunch for a hundred acres, but you pay a lot less

6    for an acre, and you have to take that into consideration.

7        You also have to take into consideration what I said as

8    well:  If you flip this fabric, they would agree that there's

9    no infringement.  You have to consider that.  It's such a

02:56   10   simple way to avoid the patent, that goes into the calculus of

11   how much money somebody would pay.  You pay a lot more for

12   something that was hard to avoid.  You'd pay a lot less if you

13   said, "I can easily design around it.  I'd like to have it.

14   I'll pay you a little less to have this ability to put it on my

02:57   15   skin as opposed to not put it on the skin."  You have to

16   consider that too.

17       Now, you're going to hear from two experts on damages,

18   Ms. Morones and Ms. Distler.  Ms. Morones is from Columbia, and

19   Ms. Distler is from Seirus.  Ms. Morones has three different

02:57   20   figures that she puts in for her reasonable royalty.  She's --

21   I don't know.  I'd call it all over the map, but she has a lot

22   of different numbers.  Ms. Distler said 10 percent, and here

23   you're going to hear evidence in the case about what

24   Ms. Distler did, but what Ms. Morones did not.

02:58   25       The design patent damages:  Again, you only heard one side

1    of the story.  You didn't hear the other side.  And what you're

2    looking at here is the patent, an important piece of the

3    patent, an important language from the patent that you need to

4    know:  "It is an ornamental design of heat-reflective

02:58    5    material," but then it says, "The broken lines" -- if you look

6    right here, "The broken lines form no part of the claimed

7    design."  So when you look at these figures, the broken lines

8    are on the glove, they're on the boot.  Those are not part of

9    the claimed design.  It's just the wave in the fabric.

02:58    10   You're also going to see evidence that this was done

11   before.  You'll see the Blauer patent.  Five years before they

12   had a wave design.  They also had designs that look just like

13   what's in the Columbia patent, squares, dots.  It looks like

14   hexagons.  And also what you didn't hear is when you're doing

02:59    15   your damages analysis for the design patent, you have to

16   consider a four-factor test for what is the article of

17   manufacture.  It's Seirus' position that the article of

18   manufacture is the fabric.  It's made, and it's placed into a

19   glove.  It's a separate article that's manufactured.  You can

02:59    20   buy it.  I'll show you a figure here in a minute, and that

21   fabric is separate.  It's a separate article that they

22   purchased, and then they ship off to a manufacturer who then

23   goes and puts it into a glove which becomes a different, later

24   on down the line, article of manufacture.  You're supposed to

02:59    25   think about what is the article of manufacture that's patented,

1    and that's the wave, and that's just in the fabric.  It's not

2    on the glove anywhere outside.  It's not in the insulation.

3    It's not on the palm.  It's not on the back.  It's not on the

4    buckle.  Nowhere else.

02:59    5       So when you're considering these factors, what you need to

6    think about is what's the scope of the patent design.  We saw

7    that.  All the dashed lines meant the glove is out.  The

8    relative prominence of the design?  Here you're going to see

9    and have seen that it's just in the liner.  It's not the whole

03:00   10    glove.  It's not covering.  It's not Louis Vuitton.  Louis

11    Vuitton, the design is everywhere.  It's all over.  The design

12    sells the bag.  In this case you can't even see it unless you

13    walk up and open the glove.

14       The third factor is conceptually distinct, whether the

03:00   15    design is.  In this case, similarly made up of many components,

16    the design is not driving all these components.  It's only in

17    the inner.

18       And last, the physical relationship between the design and

19    the glove, again.  The design's only in the liners, not in the

03:00   20    rest of the gloves in this instance.

21       So what is the article of manufacture?  You are going to

22    hear evidence that the fabric is made and put on a roll and

23    sold separately, and then Seirus sends it off to a

24    manufacturer.  The article of manufacture is the fabric.  That

03:01   25    carries the wave.

1    You're also going to hear evidence that those rolls of
2  fabric are sold by Ventex to other people like Athleta, which
3  is a Gap company.  So what is the article of manufacture?  It's
4  the liner.  What does Columbia say it is?  The whole glove.  I
03:01  5  think I showed you this before.  The $400 heated glove, they
6  would tell you that they should get every penny, every penny.
7  I'll pass this around if you'd like to see it.

8    Columbia will say that they should get every penny for the
9  fabric inside that has the wave on it.  But this product has
03:01  10  battery-powered heating.  This product is a two-part component
11  system that has a battery cell and packs that go in the gloves.
12  They want every penny for it based on a design, a wave design
13  that's on the inside of one of the two parts.

14    On these gloves here, like I'm showing you, they were made
03:01  15  up of many elements.  And here's just some samples of them.
16  You're going to hear about all this stuff in the testimony.
17  You're going to hear that they have liners.  They have
18  insulation.  They have waterproof breathables like Gore-Tex,
19  and so these are complex.

03:02  20    And so last what you're going to hear is that there's a
21  dispute on what the profits are that Columbia says they can
22  get.  If you think about this, gross revenue is every dollar
23  that Seirus made from the product, and then you have to figure
24  out what the profits are, and there's something called "gross
03:02  25  profits" and something called "net profits."  Columbia wants

1   gross profits which is more, no surprise.  Seirus' position is

2   that all the costs that go into the glove should be subtracted

3   out, and you'll be asked to make that decision.  And their

4   number is ▓ percent profit margin approximately, and Seirus'

03:02   5   is about ▓ percent.  And we submit in the end when you hear

6   the evidence, you will agree that the margin should be 33

7   percent, and that the fabric is the article of manufacture, so

8   that's what you should figure out.

9        If the fabric was worth a million dollars, subtract down 33

03:03   10   percent to $330,000.  That's the damages.  They would say the

11   fabric goes into a glove.  You sell ▓▓▓▓▓▓▓ of it, then

12   they get 50 percent of ▓▓▓▓▓▓.  They want to take

13   everything that Seirus contributed to these gloves, buckles,

14   insulation, waterproofing, all that, they want the profit from

03:03   15   that.  And that's just too much.  That's a grab, and they

16   shouldn't be allowed to do it.

17        Well, in summation I would just, again, thank you very much

18   for your time and for listening to me go on for quite some

19   time, and I apologize if it was kind of long, but there's a lot

03:03   20   of ground to cover.  It's a complicated case.  I mean these

21   are -- we all know what these are.  Everybody knows what gloves

22   are.  This is not a case with software or microchips or

23   something like that.  It's understandable, but there's a lot of

24   history, and there's a lot of information for you guys to

03:03   25   understand, and I want to leave you with just remember that

1    you're going to hear from the witnesses.  You're going to hear

2    from Seirus.  You're going to hear their people come up here

3    and tell you what they did, and I'd like you to try to see if

4    you agree that they are not the type of people that would copy,

03:04    5    that would take other people's work, and I submit that we hope

6    in the end you agree with us that they are not.  But thank you

7    very much again, and we really appreciate your time.

8              THE COURT:  Does anybody on the jury need a break?

9         Call your first witness.

03:04    10              MR. AXELROD:  Thank you, Your Honor.  Columbia calls

11    Scott Trepanier.

12                        SCOTT TREPANIER,

13                   PLAINTIFF'S WITNESS, SWORN

14              THE CLERK:  Would you state and spell your full name

03:05    15    for the record.

16              THE WITNESS:  Scott Trepanier, T-r-e-p-a-n-i-e-r.

17              THE CLERK:  Thank you.

18              THE COURT:  You may inquire.

19                        DIRECT EXAMINATION

03:05    20    BY MR. AXELROD:

21    Q.   Mr. Trepanier, who do you work for?

22    A.   I work for Columbia Sportswear Company.

23    Q.   And what's your position at Columbia?

24    A.   I'm the director of global brand communications.

03:05    25    Q.   And what does the director of global brand communications

1    do?

2    A.    That's a fancy way of saying I work on marketing.

3    Q.    How long have you worked for Columbia?

4    A.    I've been with Columbia for seven years.

03:05    5    Q.    So you came about some time in 2010?

6    A.    Yes, end of May 2010.

7    Q.    Were you director of global brand communications then?

8    A.    No, I was the public relations manager at that point.

9    Q.    And what did a public relations manager do?

03:05    10    A.    My job was to tell the story about our products and our

11    brand to editors, reporters, people who write things in

12    newspapers and magazines.

13    Q.    Can you describe for the jury the additional

14    responsibilities you assumed over the years that brought you to

03:06    15    be the director of global brand communications?

16    A.    Sure.    A big part of my job was working with the other

17    elements of marketing to make sure that our story was

18    consistent, but over seven years, I took on additional

19    responsibilities, things like social media.    That's how we talk

03:06    20    about our products and our brand on Facebook, Instagram, places

21    like that.    I took on events and sponsorships.    So we sponsor

22    athletes.    We do things like trade shows, managing the

23    processes there, and then eventually I took on advertising

24    which is the ads we place in magazines, TV, and the stories we

03:06    25    tell as well.

1    Q.    What's your background?

2    A.    My background, I have a bachelor's degree in communications

3    from the University of West Florida, and a certificate in

4    analyst relations.

03:06    5    Q.    What is a certificate in analyst relations?

6    A.    It's a very niche certification, talking to third parties

7    that recommend software in the technology industry, so it's

8    about if a company has a piece of software and they're looking

9    to sell it to other businesses, it's managing that

03:07    10    relationship.

11    Q.    So it's helping people who have to sell specialized

12    products to specialized customers?

13    A.    Exactly.

14    Q.    After you got your certification, what work did you do?

03:07    15    A.    I worked -- previously at Columbia, I worked for an agency

16    called Wagner Engstrom.  They managed a Microsoft business, so

17    I worked on a number of their online services promoting them,

18    encouraging their use.  Yes, a big product I worked on was

19    Microsoft Bing, which -- a big competitor of Google.  It's a

03:07    20    search engine.  So I worked on that for several years.

21    Q.    When you first came to Columbia Sportswear, what was your

22    initial tasks?

23    A.    I think the initial task was, like arriving at any other

24    new business, it was learning about, you know, how did Columbia

03:08    25    fit into the market; what were the products they sold; who were

1    the competitors; what were the, you know, the products they

2    were bringing out to market in the next several month.  It was

3    just a lot of reading and learning.

4    Q.   Can you describe for the jury how Columbia started and how

03:08  5    it grew over time?

6    A.   Sure.  I mean the story goes back to 1937.  That's when

7    Gert Boyle, who is our chairman, 93-year-old.  Her family

8    escaped from Nazi Germany.  They moved to Portland, Oregon,

9    founded the Columbia Hat Company, named after the Columbia

03:08  10    River.  That company grew, and in 1970 -- at that time Gert's

11    husband was running the company -- he had a heart attack, and

12    the business was going bankrupt.  So she stepped in with no

13    business background, took over the company, pulled her son who

14    was a senior at the University of Oregon out of school, and

03:08  15    they ran the company, saved it from bankruptcy, and over the

16    next few decades got the company to where it was today.

17    Q.   Is she still involved with the company?

18    A.   She is.  She's there most days.

19    Q.   You heard a few minutes ago Mr. Marchese talk about

03:09  20    $120 million annual budget for Columbia.  Can you describe for

21    the jury what that breaks down to and what it really

22    represents?

23    A.   Sure.  So that $120 million number applies to quite a few

24    things.  So Columbia Sportswear Company has a lot of different

03:09  25    brands underneath Columbia Sportswear Company.  You have

1    Piranha which makes sportswear based in Carlsbad, California.

2    You have Mountain Hardwear which sells sportswear.  It's based

3    in Richmond, California.  And you have Sorel which is a

4    footwear company based in Portland, Oregon.  These are a number

03:09    5    of the companies, so when you hear that $120 million number, it

6    applies to all of these brands and support across all of our

7    markets globally.  It also supports salaries, things like

8    fixtures, hangers, hard goods that, you know, that allow us to

9    showcase our products as well.

03:10    10    Q.    Are Piranha, Sorel, and Mountain Hardwear separate

11    companies?

12    A.    Yes, they are separate companies.

13    Q.    We're going to be talking about Omni-Heat Reflective.

14    Whose product is Omni-Heat Reflective?

03:10    15    A.    Columbia Sportswear.

16    Q.    So distinct from Piranha, Sorel, and Mountain Hardwear?

17    A.    That's correct.

18    Q.    How many people does Columbia employ?

19    A.    In the U.S. it's just shy of 4,000, about 300 of those in

03:10    20    California.

21    Q.    How much of that $120 million, what Mr. Marchese called an

22    advertising budget, goes to employing people that are working

23    for Columbia?

24    A.    I don't know the exact number of that, but obviously

03:10    25    there's a large number of employees, so it's a good portion of

1    that budget.

2    Q.   Does Columbia measure its actual media or other purchasing

3    as a percentage of retail dollars?

4    A.   Yes, we do.   We look at our percentage of marketing as a

03:11    5    percentage of our total sales.

6    Q.   And what is the percentage that actually goes for media?

7    A.   For the Columbia brand, it's about 3.9 percent of sales.

8    Q.   How does that compare to other players in the industry?

9    A.   That's the bottom of the industry average.   Most brands are

03:11    10   between 5 and 10 percent.

11   Q.   Columbia spends less than half of most brands --

12   A.   That's correct.

13   Q.   -- on what's called advertising?

14        What was happening at Columbia when you arrived in the

03:11    15   middle of 2010?

16   A.   I think the brand -- the company was really revitalizing.

17   For a long time you heard a lot about how this -- a lot of

18   technology industry became commoditized.   Columbia had a

19   different vision for the benefit it could provide consumers and

03:11    20   a way to differentiate the product.   So it was bringing this

21   new vision to life.

22   Q.   When you're talking about commoditization, let me -- would

23   you look at Exhibit --

24        MR. AXELROD:   May I approach?

03:12    25        THE COURT:   Sure.

1          MR. AXELROD:  Your Honor, these are all the exhibits

2     that will be used with Mr. Trepanier.

3          THE COURT:  Thank you.

4     BY MR. AXELROD:

03:12  5     Q.  For the record, Mr. Trepanier, would you turn to

6     Exhibit 689.  And would you tell the jury what Exhibit 689 is.

7     A.  Yes, this is a -- this is a report -- a presentation

8     prepared for customers and internal audiences of Columbia, so

9     it's explaining what our strategy of the company is.

03:12  10    Q.  Would you describe how this document reflects the strategy

11    that you referenced about seeking to move away from the

12    commoditization that was dominating the sportswear market?

13    A.  Yes, I think the report starts with an analogy between the

14    sportswear industry and the PC and Apple industry.

03:13  15    Q.  Could we -- if you go a little slower, I'll try to catch

16    up.

17    A.  Sure.

18    Q.  Turn to --

19         MR. AXELROD:  We offer Exhibit 689.  I believe there's

03:13  20    no objection.

21         MR. SPROUL:  No objection.

22         THE COURT:  Received.

23      (Exhibit 689 admitted.)

24    BY MR. AXELROD:

03:13  25    Q.  You started to describe an analogy?

1   A.   Yes.   So if you think about, you know, PC companies like

2   Dell and HP, if you've heard of these companies, they really

3   dominated the PC industry for a number of years.   That's the

4   type of computers people bought.   The problem is they were

03:14   5   using what we call "commoditized technology."   They bought

6   their chips from Intel.   They bought their hard drives from

7   other companies.   At the end of the day, all these PCs, they

8   kind of were the same thing.   It really didn't matter who you

9   bought.   They were all kind of selling the same technologies.

03:14   10   And because of that, you saw the rise of Apple.   Apple came

11   with a different -- they were selling a different idea, a

12   different technology, and because of that, their profits grew

13   while a lot of the PC brands, their businesses shrunk

14   significantly.

03:14   15   Q.   How did this apply to the sportswear industry?

16   A.   Quite a bit of similarity actually.   When you think about

17   the technology that exists in outdoor products, again, these

18   are technologies that are largely purchased or licensed from

19   other companies.   If you want waterproofing, you go to

03:15   20   Gore-Tex.   If you want cushioning in your shoes, you go to

21   Vibram.

22       The problem is when you go to a store floor as a customer,

23   when you pick up two jackets, what makes these things

24   different?   It's like looking at an HP and Sony.   The only

03:15   25   thing that's different is the brand and if you think one of the

1    brands is more valuable.    The products are often very similar.

2    Q.    What is portrayed on page 7176 as it relates to the

3    strategy that you're describing?

4    A.    Yes.    So this is -- what you're looking at is an overhead

03:15    5    view of a typical retail store where you might have brands like

6    Patagonia, the North Face selling outerwear, footwear, gloves,

7    whatever it may be, and the idea here is very similar

8    technology is used across all of those brands.    The idea is

9    Columbia stands alone.    We really wanted to have -- our

03:15    10    strategy was to have a point of differentiation.    That was

11    better for our company because we had -- we have unique things

12    to talk about, but ultimately it's better for the consumer as

13    well because they get to the store floor, and they have a

14    choice.    They may not choose our products, but they have a

03:16    15    choice between more than just one technology.

16    Q.    What is portrayed on page 7178?

17    A.    This is a chart that -- you heard about the innovation

18    group that was built at Columbia.    This is a chart tracking

19    when technologies were introduced, so this idea of technologies

03:16    20    that Columbia owns and when they came on to the market.

21    Q.    When you came in 2010, what was the status of Omni-Heat

22    Reflective?

23    A.    Omni-Heat Reflective, it was not a secret at that point.

24    It had been unveiled.    It was not yet ready for purchase,

03:16    25    meaning we kind of announced that it would be coming, but it

1    was six months out from -- several months out from being

2    available on store shelves.  So we were very much in the

3    process of finalizing how we were going to talk about the

4    product, coordinating with each other, and getting those

03:17    5    messages out in our marketing materials.

6    Q.    Now, 7178 portrays a number of different -- would you call

7    these technologies?

8    A.    Yes.

9    Q.    And are these distinct?

03:17    10    A.    Yes, they're distinct.

11    Q.    When you arrived in 2010, was there a hierarchy among

12    these, or was one emphasized more than the other?

13    A.    It was made 100 percent clear to me that we were to focus

14    on Omni-Heat Reflective.

03:17    15    Q.    Why?

16    A.    I think there was consensus that it was a unique

17    technology, that the benefit was easy -- you know, could be

18    understood and communicated, and that it had significant

19    potential to change the market.

03:17    20    Q.    Did the company develop a strategy for how it would present

21    Omni-Heat Reflective to the consumer and to the trade?

22    A.    It did, and I think it really started with the product.

23    You know, it started with the product and the technology first.

24    What was the consumer benefit?  What made these products

03:18    25    different than anything else out there?  And it came back to

1    the idea of heat reflection and breathability.  Those are the

2    two things, and that keeps you warmer and keeps you more

3    comfortable.  We thought that was the best -- that was the best

4    part of the product, so we should lead with that.

03:18    5    Q.    When you came to Columbia and did your dive-in, what's in

6    the market, what's Columbia about and the like, did you run

7    into any similar product, a heat-reflective product with

8    reflective materials appended discretely to the base layer that

9    also breathed?

03:18    10    A.    No.

11    Q.    What are the channels of -- not distribution, but the media

12    channels that you work with to get a message out for a product,

13    just generally, not particularly Omni-Heat Reflective?

14    A.    So when we launch a product, we want to talk about it

03:19    15    everywhere we can.  So we talk about that on our website,

16    columbia.com.  We work with editors, people who are writing for

17    magazines and newspapers, to make sure they're aware of our

18    stories.  We work, you know, with traditional advertising --

19    advertisers like newspapers and magazines and TV to run ads,

03:19    20    and then we tell the story at a store, Dick's Sporting Goods or

21    our own stores, whether that be a window in a front display,

22    packaging, hangtags, signage within the store.

23        The key really is making sure our story is consistent, you

24    know, with the message we're delivering across all of these

03:19    25    different channels.

1    Q.   Was there essentially a single story for Omni-Heat

2    Reflective?

3    A.   Yes.  It was the idea of added warmth with breathability

4    and 20 percent warmer.

03:19    5    Q.   And was it all focused on the structure of the material

6    within the gear?

7    A.   Yes.  Our entire story to launch it was focused on

8    Omni-Heat Reflective as a technology.

9    Q.   Could you turn to Exhibit -- what's been marked as

03:20    10   Exhibit 691A?

11            MR. AXELROD:  And we would offer this.

12            MR. SPROUL:  Your Honor, we object to this exhibit

13   because they've taken pages out of the original document.  It's

14   unclear to me why they did that.  We told them we had no

03:20    15   objection to the entire document.  It seems to be one of their

16   marketing documents, but for some reason, they do not wish to

17   have certain pages part of the exhibit.  We think it's

18   inappropriate.

19            THE COURT:  The objection is overruled.  You may

03:20    20   proceed.

21      (Exhibit 691A admitted.)

22            MR. AXELROD:  Thank you, Your Honor.

23   BY MR. AXELROD:

24   Q.   Mr. Trepanier, would you turn to page 613 which is the ad

03:20    25   which I think was shown before.

1       Would you explain to the jury how this advertisement is

2   used to drive the message that Columbia is seeking to relate as

3   to Omni-Heat Reflective?

4   A.   Yes.   A general rule of advertising -- I mean you guys look

5   at advertising all the time, so you're exposed to a lot of

6   advertising -- is we only get a second to grab your attention.

7   So we try to lead with a very primary message, and if we have

8   time, we try to sneak in a second or third message, but the

9   idea is we need to capture your attention right away with what

10  we think is the most important part of the story.

11      So in case of Omni-Heat Reflective, really we knew the most

12  important story was what was going on inside the jacket, the

13  technology benefit there.   So we wanted to make sure that's the

14  first thing we captured when we -- when you looked at an

15  advertisement was the inside of this jacket.   Not typical,

16  unusual way to build an ad, and we would hope that that would

17  capture your attention and you'd want to learn more.

18      Then if we get the chance for that second message, it's

19  really about what is -- okay.   What are we doing?   Why are we

20  showing you this?   And the idea is, hey, we're showing you a

21  technology because there's a benefit we think you care about,

22  and the idea is that this jacket, this technology, it keeps you

23  20 percent warmer.   It allows you to stay warmer while

24  remaining breathable.

25  Q.   Is that second supporting message shown in the -- what do

1   you call that?

2   A.   Yes.   We would call that the body copy of the

3   advertisement.

4   Q.   Would you turn to Exhibit 693.

03:22    5          MR. AXELROD:   We would offer 693.

6          THE COURT:   Any objection to 693?

7          MR. SPROUL:   No, Your Honor.

8          THE COURT:   Received.

9   (Exhibit 693 admitted.)

03:22   10   BY MR. AXELROD:

11   Q.   Mr. Trepanier, is Exhibit 693 a similar example of

12   advertising copy?

13   A.   Yes.   This is a -- of the same campaign, so really trying

14   to be consistent here with what our primary message is, again,

03:22   15   the same idea.   We're trying to draw attention to the inside of

16   the jacket, the new technology, and then communicating the

17   benefit, in this case 20 percent warmer.

18   Q.   Where does this advertising get placed?   Where would I see

19   it if I was a consumer?

03:23   20   A.   You might see this as you're browsing a website, the little

21   annoying ads on the right-hand rail.   You might see this in

22   email advertising.   You might see this when you're reading your

23   favorite magazine.   You might see something similar to this on

24   television.

03:23   25   Q.   So basic print ads?

1    A.   Yes, you could see this virtually -- the idea is we want to

2    get it in front of you as many places as possible.

3    Q.   Would you turn to Exhibit 64.

4         MR. AXELROD:   Which we'll offer.  I believe there's no

03:23  5    objection.

6         MR. SPROUL:   No objection.

7         THE COURT:   Received.

8    (Exhibit 64 admitted.)

9    BY MR. AXELROD:

03:23  10   Q.   What is Exhibit 64?

11   A.   This is another advertisement.  This lived on columbia.com,

12   our web page.  I think what's unique about this is it focuses

13   on a swatch of fabric.  Very atypical for us to take half of an

14   ad and say, you know, "Here is a piece of fabric."  Typically

03:24  15   it just wouldn't be that interesting, or there wouldn't be a

16   story to tell about it.  In this case we want to draw attention

17   to the silver dots because there's a product benefit there, and

18   we want people to associate the idea of staying warmer and

19   being able to breathe with those silver dots.

03:24  20   Q.   Where would this advertising type of copy be placed to --

21   A.   This would live on columbia.com or other websites.

22        MR. AXELROD:   Would you turn to Exhibit 36, which I

23   will offer, for which there's no objection.

24        MR. SPROUL:   No objection.

03:24  25        THE COURT:   Received.

1        (Exhibit 36 admitted.)

2    BY MR. AXELROD:

3    Q.    What is Exhibit 36?

4    A.    This is a sales catalog.  This isn't a catalog that you

03:24  5    might expect to receive in the mail as a customer.  This is a

6    catalog that's distributed to people who are buying the product

7    for big companies like Dick's Sporting Goods or REI, et cetera,

8    so it's to communicate what we're trying to sell.

9    Q.    So this goes to the professional trade buyer, if you will?

03:24  10   A.    Exactly.

11   Q.    Where do I find in the catalog the principal message to the

12   trade buyer for this fall 2013 catalog?

13   A.    In this case we relied heavily on the design element.  By

14   2013, which this is a 2013 catalog, there was already awareness

03:25  15   within the buyers of this, of what Omni-Heat Reflective was.

16   They associated it with Columbia, and we wanted to reinforce

17   the message that, hey, Omni-Heat Reflective will continue to be

18   our most important story.  So in this instance, we use a design

19   element on the cover of the catalog, so immediately when they

03:25  20   saw this design, they knew that was our story.

21   Q.    We saw from the prior slide in Exhibit 689 that there are a

22   number of technologies within the Columbia group.  Is that

23   fair?

24   A.    That's true, yes.

03:25  25   Q.    If you're communicating to the professional trade buyers in

1    your catalog, where would you place your principal technology

2    emphasis?

3    A.    Front and center.

4    Q.    And where do you find that in Exhibit 36?

03:26    5    A.    Our Omni-Heat message is on the first page, so you flip

6    over the cover, and the next page is a -- is talking about

7    Omni-Heat Thermal Reflective as being the most important

8    product we're looking to sell that season.   And then you're

9    seeing an explainer.   So on the off chance someone who's

03:26    10    getting this catalog didn't already know what this technology

11    does, we're using this very consistent diagram to talk about

12    the idea of reflective heat while moisture escapes the product.

13    Q.    Could you explain the diagram and what it represents?

14    A.    Yes.   So what you're seeing is silver dots, the idea of

03:26    15    reflecting your body heat, returning that heat to keep you

16    warmer, and then space between the dots allowing moisture to

17    escape so that you're not sweating.

18    Q.    Is any other technology of Columbia highlighted in the 2013

19    fall catalog the way Omni-Heat Reflective is?

03:27    20    A.    Not with the same emphasis.   We do have secondary messages

21    related to technology.

22    Q.    Could you turn to page 239 -- excuse me -- 229.   What is

23    shown on page 239?

24    A.    This is the cover, a cover page, for a section of the

03:27    25    catalog focused on gloves.

1    Q.    Do I find "Omni-Heat Reflective" anywhere here?

2    A.    You do.  It's listed on the lower right portion of the page

3    as a secondary message.

4    Q.    And why is Omni-Heat Reflective not the principal message

03:27    5    on each page?

6    A.    In this case this was our third season, third winter season

7    where we had had Omni-Heat Reflective in this line of products,

8    and we had a new story.  You know, we thought there was good

9    awareness about that technology in this line.  So it was

03:28    10    introducing a new feature that we were rolling out for that

11    season, which is three-point precurve.

12    Q.    Can you turn to Exhibit 39, which I'll offer.

13          THE COURT:   Any objection to 39?

14          MR. SPROUL:   No objection.

03:28    15          THE COURT:   Received.

16    (Exhibit 39 admitted.)

17    BY MR. AXELROD:

18    Q.    What is Exhibit 39?

19    A.    This is a page on our website, columbia.com, that is an

03:28    20    explainer of the technologies that we provide.

21    Q.    And do you know what time period this reflects what was on

22    your website?

23    A.    I would guess 2013 to '14.

24    Q.    And, again, what was the message for Omni-Heat Reflective?

03:29    25    A.    Again, the Omni-Heat Reflective message here is again very

1    consistent.  We're using the reflective dots to kind of

2    reinforce the visual association with the technology, and then

3    we have the graphic here which showcases the idea of reflecting

4    heat while moisture escapes.

03:29   5    Q.   And on the page 017, what is reflected there?

6    A.   This is a video that lived underneath that previous image

7    that you could click to play and learn more about the

8    technology.

9    Q.   Would you turn to Exhibit 65.

03:29   10       THE COURT:   Any objection to 65?

11       MR. SPROUL:   No, Your Honor.

12       THE COURT:   Received.

13       (Exhibit 65 admitted.)

14   BY MR. AXELROD:

03:29   15   Q.   Thank you.   What is Exhibit 65?

16   A.   This is a hangtag.  You'll find it attached to jackets,

17   pants, gloves, anything when you go to a store to buy a

18   product.

19   Q.   And is Exhibit 65 a series of different hangtags?

03:30   20   A.   Yes, it is a number of hangtags.

21   Q.   Would you turn to page -- the second page of the exhibit.

22   Do you recognize this hangtag?

23   A.   Yes, I do.

24   Q.   Do you know when this hangtag was used by Columbia?

03:30   25   A.   Approximately 2012 to '13.

1   Q.   And in each of these hangtags, is the message essentially

2   the same?

3   A.   Yes.   Again, my job is driving consistency, so I think

4   again here you see the same story.   We're using Omni-Heat

03:30   5   Reflective as a design element.   We want to associate that with

6   the product benefit, and in this case, we're using that graphic

7   to showcase heat reflecting, moisture escaping.

8   Q.   Would these hangtags be used in a variety of products that

9   had Omni-Heat Reflective in it?

03:31   10   A.   Yes.   This could be used in gloves, footwear, jackets,

11   anything we would use with the product.

12   Q.   Are hangtags a different medium relative to the consumer

13   than the print ads or going to the website?

14   A.   Yes.   Hangtags, I like to describe them as our last best

03:31   15   chance to get a customer to buy our products.   You can assume

16   by the time a customer sees a hangtag, they're at the store.

17   They're probably going to buy something.   They've made a

18   decision to go to a store.   They may be looking at, you know,

19   two or three items comparing, and it's our last chance to

03:31   20   explain that this product is different for this reason.   This

21   is why you should buy product A versus B.   This is the benefit

22   it's providing.

23   Q.   What's Exhibit 40?

24        MR. AXELROD:   We'll offer Exhibit 40.

03:32   25        MR. SPROUL:   No objection.

1          THE COURT:  Received.

2          (Exhibit 40 admitted.)

3          THE WITNESS:  This is another example of a print

4    advertisement.  A little bit of a different feel, but, again,

03:32    5    very consistent elements.  First and foremost you see how we

6    photograph the jacket.  Again, this is atypical for how we

7    would generally photograph a product.  We're focusing on the

8    inside of the jacket because that's where we believe the

9    primary selling point for this jacket is, is the benefit.  You

03:32   10    also see us using Omni-Heat Reflective as a graphic element

11    underneath the jacket, reinforcing the idea that Omni-Heat

12    Reflective is something Columbia is associated with.  And then,

13    again, we deliver the message about silver dots and the benefit

14    they provide.  So what is Omni-Heat Reflective doing for you?

03:32   15    It's keeping you 20 percent warmer while remaining breathable.

16    And then there's a call to action here to learn more if you

17    want to go watch the video and learn about Omni-Heat

18    Reflective.

19    BY MR. AXELROD:

03:33   20    Q.   So all these are directed to the technology or how it

21    works?

22    A.   That's correct.

23    Q.   What is Exhibit 42?

24          THE COURT:  Are you offering 42?

03:33   25          MR. AXELROD:  Yes.

1          MR. SPROUL:  No objection.

2          THE COURT:  Received.

3     (Exhibit 43 admitted.)

4          THE WITNESS:  This is a report from our advertising

03:33  5   agency.  So we buy what we call out of home advertising.  So if

6     you see advertising on a billboard or on a bus or, you know, in

7     a mall, that's what we call out of home advertising.  So this

8     is a report from our advertising agency basically saying you

9     got what you paid for.

03:33  10  BY MR. AXELROD:

11    Q.   So this shows in the report for wherever the campaign

12    was -- in this area, it looks like Indianapolis and Boston and

13    the like, what ads were placed where?

14    A.   Yes, that's correct.

03:34  15  Q.   And was the messaging in all of those ads the same as

16    you've reviewed for the campaign generally?

17    A.   Yes, very consistent, again, focusing on showcasing the

18    inside of the jacket, the primary benefit being Omni-Heat

19    Reflective and the consumer benefits that provides.

03:34  20  Q.   What does Exhibit 31 --

21         MR. AXELROD:  Which I'll or along with 32 together if

22    that's --

23         THE COURT:  Any objection to 31 and 32?

24         MR. SPROUL:  No objection to 31, Your Honor.  And no

03:34  25  objection to 32.

1    THE COURT:  They are received.

2    (Exhibit 31 admitted.)

3    (Exhibit 32 admitted.)

4    MR. AXELROD:  Let's pull up Exhibit 32 first.

03:34    5    BY MR. AXELROD:

6    Q.   It's probably the easiest.  Mr. Trepanier, can you explain

7    how Exhibits 31 and 32 differ, if they do, from the earlier

8    channels of messaging that can be used?

9    A.   So these are -- this is what our PR team does.  They'll go

03:35    10    out and talk to different editors and reporters.  In this case

11    you're looking at two what we call "trade publications."  I

12    doubt anyone here reads Textile World or Sporting News.  You're

13    not really the intended reader of these things.  These are

14    intended to be read by people who are in the industry.  Either

03:35    15    they're either working in the industry, or they buy goods, so

16    it's intended to learn about products.  So what you're seeing

17    here is editors within the trade reporting on the launch of our

18    Omni-Heat Reflective.

19    Q.   And does Columbia work with these editors to deliver its

03:35    20    message to them?

21    A.   Yes.  At the beginning of the year when we're bringing in a

22    new technology to market, we go to editors like these to

23    explain what we're doing so that they can help get our message

24    to people who might be interested in buying the products,

03:36    25    putting them in stores.

1   Q.   So is this different from product reviews that some places

2   will do like a Consumer Reports or small specialty groups where

3   they are reporting on their evaluation of a product?

4   A.   Yes.   The intent of this is speaking to a much smaller

03:36   5   audience.   And this type of reporting happens sometimes a year

6   before a product comes out, and it's really intended to get the

7   industry excited.   The reviews you talk about are when a

8   product is actually on store shelves, and then people can

9   actually go buy it.

03:36   10   Q.   So hopefully this reflects the effectiveness of the message

11   and it's not coming from the reviewer.   It's coming from

12   Columbia?

13   A.   Yes.   It's a reflection of the fact that we are out there

14   conveying this message to editors.

03:36   15   Q.   And is there any different messaging in this from the

16   technology messaging we looked at earlier?

17   A.   No.   Again, very consistent message, our primary story

18   being Omni-Heat Reflective and the benefits of that technology.

19   Q.   How do you know any of this works to really convey the

03:37   20   technology message?

21   A.   Well, I think if you ever look at any one single piece of

22   data, it may or may not be wrong, so in marketing we try to

23   look at a lot of different things and reports and measurements,

24   and if those things all align, it's usually a good -- it tells

03:37   25   us that we're doing something right.   So we look at a number of

1    things.  When we launch a product, we look our media and

2    reviewers, kind of the Consumer Reports, the outdoors, are they

3    writing about our stories?  Are they saying -- are they saying

4    that the product works?  Are they recommending it to their

03:37    5    users?  We do large research studies where we look at thousands

6    of people and what their opinions are of the Columbia brand and

7    technology.

8        That's important because if we talk to just one person,

9    they may have a very specific view.  When you talk to thousands

03:37    10    of people, you get more accurate aggregate views of -- that

11    truly reflect how people's opinions are changing.

12        We conduct focus groups with third parties where we go to

13    very, very small groups of maybe five, six, max ten people, and

14    we say, "Let's go in depth.  What really motivated you to make

03:38    15    a purchase?  What do you think about this product?"  And those

16    are just some of the ways we measure effectiveness.

17    Q.    Would you turn to Exhibit 50?

18            MR. AXELROD:  Which I'll offer.

19            MR. SPROUL:  No objection.

03:38    20            THE COURT:  Received.

21        (Exhibit 50 admitted.)

22    BY MR. AXELROD:

23    Q.    What is exactly 50, and how does it relate to this review

24    process that you described?

03:38    25    A.    50 is a compilation of coverage that was secured very early

1   on in the launch process of Omni-Heat Reflective, so January of

2   2010 prior to my arrival.

3   Q.   So this predated your coming to Columbia?

4   A.   Yes, it did.

03:38   5   Q.   Did you -- when did you first see this exhibit?

6   A.   This was one of the first things I asked for when I came to

7   the company.  It's very common practice at Columbia and around

8   the industry to collect stories about what people are writing

9   to understand if your message is being received.  So the first

03:39   10  thing I wanted to know coming in to a new role is what's

11  already been said about this product?  Are people responding to

12  it?  Are they liking it?  Do we have an uphill battle, or is it

13  going to be easy sailing?

14  Q.   Would it be fair to describe this as sort of an internal

03:39   15  survey of what the media is reacting to after an advertising

16  message is being put out?

17  A.   Yes.  I mean this is an early read from the industry on --

18  does the industry think that this is a meaningful technology

19  and product launch.

03:39   20  Q.   Would you turn to Exhibit 73?

21          MR. AXELROD:   Which I offer.

22          MR. SPROUL:   No objection.

23          THE COURT:   Received.

24     (Exhibit 73 admitted.)

03:39   25  BY MR. AXELROD:

1    Q.    What is Exhibit 73?

2    A.    This is a marketing research study commissioned by a

3    third-party company called Leisure Trends Group which is now

4    part of a larger company called MPD.   They specialize in doing

03:40    5    these big surveys where they track the success of marketing

6    campaigns and brand performance.

7    Q.    When you say it was a big survey, do you know how big a

8    survey it was?

9    A.    I believe it's somewhere in the report, but I don't recall

03:40    10    the exact number.   But generally it's a very large sample size.

11    Statistically relevant.   You want to talk to enough people to

12    make sure it's not just an anomaly.

13    Q.    And who -- are there different groups that are surveyed

14    within the --

03:40    15    A.    Yes.   We go to -- we take surveys to multiple groups.

16    First we go to what's called "the general population," and that

17    could be anybody.   That could be anyone in the U.S., any age,

18    any demographic.   It's very important to know, you know, what

19    that general population thinks.   But then important for

03:41    20    Columbia is people who are, you know, invested in the outdoors

21    that buy a lot of outdoor gear, that spend a lot of time

22    outside.   We segment them and look at them separately and say,

23    "Okay.   Here's what the general population thinks.   What does

24    this generally niche people who spend a lot more on outdoor

03:41    25    gear -- what do they think about Columbia?"

1    Q.    Could you turn to page 908?

2            THE COURT:    I'm sorry?

3            MR. AXELROD:    908, the last three digits of the Bates

4    number.

03:41    5            THE COURT:    Thank you.

6    BY MR. AXELROD:

7    Q.    This page refers to -- well, the heading is "ad/promo

8    messaging GP."  Is GP the general population?

9    A.    Yes, general population.

03:41   10    Q.    And what's described here?

11    A.    What this is showing is what type of messages were when

12    someone -- we asked them what do they know or see about

13    Columbia, what did they hear about the brand, how does that

14    message change over time?  And so what you're seeing here in

03:42   15    the light blue is how the general population responded to

16    Columbia in 2009, and the dark blue is 2013, and what you'll

17    see there is a significant increase in some of the messages

18    that our general population received.  For instance, we went

19    from 23 percent to 54 percent for some of these words and

03:42   20    messages that are equated on the right meaning yes, they're now

21    associating Columbia with things like Omni, reflective, liner,

22    silver dots.  So, again, this is one signal that our message is

23    being received by the intended audience.

24            THE COURT:    Where are we?

03:42   25            MR. AXELROD:    910.

1     THE COURT:  That's part of the same exhibit, correct?

2     MR. AXELROD:  Yes.

3     THE COURT:  Thank you.

4  BY MR. AXELROD:

03:43  5  Q.  Mr. Trepanier, what is portrayed on page 910?

6  A.  What you see is another way of looking at the same type of

7  research data.  So by region we asked this group, "Have you

8  seen a Columbia ad?  Are you -- at any point in the last time

9  span have you seen a Columbia ad?"  And then "Are you aware of

03:43  10  Omni-Heat Reflective?"  So this is showing, you know, that a

11  good portion of the general population knew they'd seen a

12  Columbia advertisement and knew they'd seen an Omni-Heat

13  Reflective ad specifically.

14  Q.  Now, when you're saying "a good portion," these percentages

03:43  15  for the general population kind of run in the mid teens?

16  A.  Yes.  These are actually very sizeable numbers when you're

17  talking about all the people in America who could be in the

18  general population.  We're very satisfied with these types of

19  numbers.

03:44  20  Q.  Now, is there a second group that's also surveyed by

21  Leisure Group or MPD?

22  A.  Yes.  That group is called MAAP.  And really MAAP is the

23  super active outdoor people we talked about.  Again, people

24  who, compared to the general population, buy more outdoor gear,

03:44  25  spend more time outdoors.  For Columbia they're a more valuable

1  customer, so we definitely want to understand how they're

2  responding and if they're responding any differently.

3  Q.   Was this study in 2009 and in 2013 focused on Omni-Heat

4  Reflective?

03:44  5  A.   Yes.   It was focused on Omni-Heat Reflective and overall

6  brand health, but Omni-Heat Reflective was certainly one of the

7  key outcomes.   We wanted to understand was our work to message

8  this being effective.

9  Q.   And is Omni-Heat Reflective the only Columbia technology

03:44  10  that's separately evaluated in this report?

11  A.   Yes, I believe so.

12  Q.   And within the MAAP group, which I believe is Most Active

13  American People?

14  A.   Yes.

03:45  15  Q.   Something like that?

16  A.   I wasn't going to bore people with the acronym, but yes.

17  Q.   Could you turn to page 916.

18        MR. AXELROD:   Could we pull up 916?

19  BY MR. AXELROD:

03:45  20  Q.   And what did the survey show here with respect to the

21  perception of the message as between 2009 and 2013?

22  A.   Again, here, a lot of similar correlations between the

23  general population and the active audience.   I think what

24  you'll see here is even a larger divide between reception of

03:45  25  the old message and the new message, which means -- not

1    terribly surprising that this active outdoor audience is more

2    receptive than a general population audience to our marketing

3    messages.

4              MR. AXELROD:   And can we pull up page 918.

03:45    5    BY MR. AXELROD:

6    Q.   Does this reflect the survey information for the MAAP group

7    by region?

8    A.   Yes.   Again, same sort of regional look at have you seen a

9    Columbia ad, have you seen an Omni-Heat Reflective ad, and,

03:46   10    again, you see here the numbers are significantly higher than

11    general population.   Again, not surprising.   These people are

12    more likely to probably notice a Columbia ad, but they're also

13    probably reading publications like Backpacker, Outside magazine

14    that it's more likely that we'd run an advertisement.

03:46   15    Q.   In the heading there's "Ad/OHR."   What is OHR?

16    A.   OHR refers to Omni-Heat Reflective.   That's an internal

17    acronym we use to save time and space.

18    Q.   There's also a reference in the various regions to

19    "Omni-Heat aware."   What does that refer to?

03:46   20    A.   That means they are aware of the technology.   They've heard

21    it, they've seen it somewhere, and they -- you know, they have

22    some familiarity with the technology.

23    Q.   When the company refers to Omni-Heat, what can that refer

24    to?

03:47   25    A.   Technically, it could refer to a number of items, so

1    under -- we have an Omni-Heat category of technologies.  One of

2    them is under the heat reflective.  Another is Omni-Heat

3    insulation, so that is a proprietary insulation, the white

4    stuff if you were to cut your jacket and pull it out, and for a

03:47   5    short period of time we sold an electronically powered product

6    that was Omni-Heat Electric.  But for all intents and purposes

7    when you hear Omni-Heat Reflective at the company, people mean

8    Omni-Heat Reflective.  It's just become pervasive, and that's

9    what the company means when we say that.

03:47   10   Q.   Is the Omni-Heat insulation ever sold without or used

11   without Omni-Heat Reflective?

12   A.   I'm not sure, but it's unlikely.

13   Q.   Could you turn to Exhibits 86?

14        MR. AXELROD:  Which I'll offer.

03:48   15        THE COURT:  Any objection to 86?

16        MR. SPROUL:  No objection, Your Honor.

17        THE COURT:  Received.

18   (Exhibit 86 admitted.)

19   BY MR. AXELROD:

03:48   20   Q.   Is Exhibit 86 another way in which the company tests

21   whether and how its technology messaging has been received?

22   A.   Yes.  And how customers -- we think customers would receive

23   it.  If you think about the previous survey as these big

24   numbers, we're trying to get broad generalizations about how

03:48   25   people feel about something.  You can think about this as

1    talking to a few hundred people, going really in depth.  It's

2    not as statistically relevant, but it's often more interesting

3    and insightful because you get a lot more information.  So we

4    use these two things together.

03:48    5    Q.   How is the focus group conducted?  Is it conducted by

6    Columbia, or is it conducted by an independent consultant?

7    A.   It's conducted by an independent consultant, and that's

8    CLK Consulting, which is called out on this front page.

9    Q.   And was this study directed exclusively to Omni-Heat

03:49    10    Reflective?

11    A.   Yes.

12    Q.   Can you generally summarize what the conclusions of the

13    focus group were?

14    A.   In general I think there were probably three key takeaways.

03:49    15    One, I think there was consensus that this was unique and -- a

16    unique technology, that we had something that we should be

17    excited about.  There was a consensus that the benefit was

18    easily understood and valuable, this idea of staying warm, but

19    losing a sweat, and these were people who spend a lot of time

03:49    20    in the outdoors, so they can definitely understand you don't

21    want to overheat.  You want to stay warm, but you want to lose

22    the sweat.

23        And consistently I think a third thing was that it changed

24    their perspective of Columbia in general.  I think that was a

03:49    25    common refrain.  "Wow, I didn't expect this from Columbia.  You

1  guys are innovating, so like you've really contributed to the

2  larger perception of the outside with just the technology."

3          MR. AXELROD:  Can we pull up 971, please.

4  BY MR. AXELROD:

03:50  5  Q.  Does page 971 summarize the -- I'll call it the feedback

6  from the focus group during the course of this study?

7  A.  It does.  I think it -- really this reflects a lot of what

8  I just mentioned.  The idea that it's a credible technology;

9  that there's a clear benefit; that it has differentiated

03:50  10  benefits; that, you know, very active people in the outdoors

11  can relate with; and that, again, people -- another point is

12  people wanted to brainstorm with new applications, so when they

13  saw it in one style of product, they could easily understand

14  how this might be helpful in multiple products.

03:51  15          MR. AXELROD:  Could we pull up page 993.

16  BY MR. AXELROD:

17  Q.  What is page 993 addressing?

18  A.  Again this goes back to different feedback from this study.

19  One is that people -- they really like Omni-Heat Reflective,

03:51  20  but they also like it when it's in a stylish product.  That was

21  a key point of feedback.  Again, Omni-Heat Reflective, I think

22  people made interesting feedback here, was that it's credible.

23  It works.  You don't have to be so grandiose in your

24  explanation of the technology.  We get it.  We trust you.  And

03:51  25  I think, again, the outcomes for our ad campaigns is showing

1    off the style, talking about, you know, broader applications,

2    really being clear about the whole benefit, not just warmth,

3    but moisture regulation, and be confident of the technology

4    because the customers believe that.

03:52    5    Q.   Would you turn to Exhibit 45.

6        MR. AXELROD:   Which we'll offer.

7        THE COURT:   Any objection?

8        MR. SPROUL:   No, Your Honor.

9        THE COURT:   Received.

03:52    10   (Exhibit 45 admitted.)

11   BY MR. AXELROD:

12   Q.   What is Exhibit 45, Mr. Trepanier?

13   A.   Again, this is one more way we measure the effectiveness of

14   whether Omni-Heat Reflective is being well received by the

03:52    15   market.   In this case it's a field test, a study that we did

16   where we sent product out to social media influencers.   These

17   are people who write blogs or have Twitter accounts about the

18   outdoors.   It's not their full-time job generally.   It's just a

19   passion.   So we would send them product and ask for feedback

03:52    20   whether they thought it was a credible product and whether they

21   thought how we were explaining it was an appropriate way to

22   explain the technology.

23       MR. AXELROD:   Could we pull up page 719.

24   BY MR. AXELROD:

03:53    25   Q.   Is this an example of the independent feedback that you get

|  |  |  |
|--|--|--|
|  | 1 | from the participants for whom you've provided product? |
|  | 2 | A.   Yes.   So this is one example from an individual who took |
|  | 3 | the product out, obviously tested it with his dogs, back |
|  | 4 | country skiing, and then gave us feedback on how the product |
| 03:53 | 5 | performed and what they thought about Omni-Heat Reflective. |
|  | 6 | Q.   And who performs the study that's represented in |
|  | 7 | Exhibit 45? |
|  | 8 | A.   This was our advertising agency BSSP. |
|  | 9 | Q.   And do they select the participants? |
| 03:53 | 10 | A.   They do, yes. |
|  | 11 | Q.   Would you turn to Exhibits -- |
|  | 12 |           MR. AXELROD:   And I'll do them as a group.   66, 56, |
|  | 13 | 57, and 61, which we'll offer. |
|  | 14 |           MR. SPROUL:   One second, Your Honor. |
| 03:54 | 15 |           THE COURT:   Sure.   Take your time.   You said 66 and |
|  | 16 | 67? |
|  | 17 |           MR. AXELROD:   66, 56, 57, 61. |
|  | 18 |           THE COURT:   Thank you. |
|  | 19 |           MR. SPROUL:   No objections, Your Honor. |
| 03:54 | 20 |           THE COURT:   Received. |
|  | 21 |    (Exhibit 66 admitted.) |
|  | 22 |    (Exhibit 56 admitted.) |
|  | 23 |    (Exhibit 57 admitted.) |
|  | 24 |    (Exhibit 61 admitted.) |
| 03:54 | 25 |           MR. AXELROD:   Could we pull up Exhibit 66. |

BY MR. AXELROD:

Q.   Mr. Trepanier, what is Exhibit 66?

A.   This is an outdoors website called Outdoors Magic that has written a review on a Columbia Omni-Heat product.

03:54   Q.   Are these more like Consumer Reports?

A.   Exactly, so compared with some of the earlier news stories that you saw that were very focused on the industry, these are written by outdoor people generally for customers who are looking to buy a product and are looking for recommendations.

03:55   These are websites who specialize writing recommendations for products.

Q.   And were you here during Mr. Aldrich's opening when he showed an article being sent to Seirus in around January 2012 from their consultant that appended an article?

03:55   A.   Yes, I recall that from the opening comments.

Q.   Is Exhibit 66 that article?

A.   It appears to be, yes.

Q.   And what is Exhibit 56?

A.   Similarly this is another outdoor website that focuses on

03:55   reviewing product gear, Active Junky.  They're reviewing a pair of ski pants, and you can see in the first sentence that it's focused on Omni-Heat Thermal Reflective and its effectiveness.

Q.   And, again, these are independent reviews?

A.   Correct.

03:56   Q.   Not involving Columbia participation?

1    A.    Correct.    I mean often we will provide product for testing

2    purposes, but these are independent reviews, and they'll write

3    what they choose to write.

4    Q.    What is Exhibit 57?

03:56    5    A.    Similarly this is another website that's writing about new

6    product launches.    This is written in 2015, so, again, it's

7    reflective of the products that we were launching at Outdoor

8    Retailer, which is a large trade show in Salt Lake City.

9    Q.    Exhibit 61?

03:56    10    A.    This is a feature story.    When I say "feature," I mean a

11    longer story.    It's really about Columbia and our investment in

12    innovation.    This was written by an editor from Outside

13    magazine.

14    Q.    Is sales a reflection of whether a message is being

03:57    15    received?

16    A.    Yes.

17    Q.    And is sales a reflection of the acceptance of the

18    technology?

19    A.    Yes.

03:57    20        MR. SPROUL:    Objection.    Foundation, Your Honor.

21        THE COURT:    Overruled.

22    BY MR. AXELROD:

23    Q.    Would you look at Exhibit 249.    What is Exhibit 249?

24    A.    This is a spreadsheet outlining sales of Omni-Heat from

03:57    25    2010 to 2016.

1            MR. AXELROD:  I'll offer 249.

2            MR. SPROUL:  No objection.

3            THE COURT:  Received.

4        (Exhibit 249 admitted.)

03:57   5   BY MR. AXELROD:

6    Q.   Did you prepare Exhibit 249?

7    A.   I did not.

8    Q.   Who prepared 249?

9    A.   I understand this was prepared by someone in our accounting

03:57  10   department.

11   Q.   Is Jim Drozdowski one of those people?

12   A.   Yes, he would be the person.

13   Q.   And he will testify, I'll represent, to how this work was

14   created.

03:58  15       Can you summarize for the jury what it shows with respect

16   to the growth of Omni-Heat sales --

17   A.   Yes.

18   Q.   -- in the two- to three-year period after the launch?

19   A.   Yes, I would highlight a couple things here.  One is how

03:58  20   significant the -- how quickly the business grew.  So if you're

21   looking at the first year of a technology launch, that's a lot

22   of product for any new category, so it was obviously well

23   received.  Typical to most products when you launch them and

24   especially with technology, there's a bit of an adoption curve.

03:58  25   So people who buy new technology first, like the iPhone, are

1   usually early adopters.  Eventually as more people buy it, word

2   spreads.  You know, you reach a certain plateau, and then you

3   might see some incremental growth from there.  So what I see

4   here is very typical of what I would expect from a successful

03:59   5   product launch.

6   Q.   Let's walk the jury through the exhibit a little bit so

7   they can see how it's broken out.  What is the top level of

8   reported sales?

9   A.   That's absolute sales, so you can see 29 million in sales.

03:59   10   Q.   And which channel of distribution is that through?

11   A.   Yes.  So that's -- like I said, if you come down to total,

12   so that's through wholesale.  When we say "wholesale," that

13   means basically a reseller.  That means through places like

14   Dick's Sporting Goods and REI.  That means we're not selling it

03:59   15   directly.

16   Q.   So you're selling it to someone else who resells it or

17   distributes it to others?

18   A.   That's correct.

19          MR. AXELROD:   Can we back out and then drop down to

03:59   20   the --

21   BY MR. AXELROD:

22   Q.   What are these two groups of sales channels?

23   A.   When you see "Omni-Heat sales B&M," that means brick and

24   mortar, so that's a physical store that Columbia Sportswear

04:00   25   owns.  And then you see in the next category "Omni-Heat sales

1    E-commerce," so those are products we sell at our columbia.com

2    website.

3            MR. AXELROD:  Can we then back out?

4    BY MR. AXELROD:

04:00    5    Q.   So would I understand correctly, then, to get the total

6    Omni-Heat sales for any particular year through the three

7    channels we've described, wholesale, brick and mortar, and

8    E-commerce, you would add up for any given year the total sales

9    through each of those?

04:00    10   A.   That's correct, yes.

11   Q.   So roughly in the first year of launch, ballpark to me

12   looks like close to $45 million?

13   A.   Correct.

14   Q.   And by 2013, you're up to roughly 220, 230 in sales?

04:01    15   A.   Yes, I'd say that's a good approximation.

16   Q.   And thereafter it leveled off?

17   A.   Yes, we did see some leveling.

18   Q.   Now, in the course of your work, do you run into Seirus

19   Innovative?

04:01    20   A.   Occasionally, yes.

21   Q.   Have you ever seen in the regular course of your work any

22   of their advertising or marketing materials?

23   A.   No, I haven't.

24   Q.   Were you asked to look at some of those marketing

04:01    25   materials?

1    A.    Yes.    I was asked to look at them and form an opinion on

2    the messages they were trying to convey in their marketing

3    materials.

4    Q.    Would you turn to Exhibit 117?

04:01    5                MR. AXELROD:    Which we'll offer.

6                THE COURT:    Any objection to 117?

7                MR. SPROUL:    No, Your Honor, not to the exhibit.

8                THE COURT:    Received.

9    (Exhibit 117 admitted.)

04:01    10    BY MR. AXELROD:

11    Q.    What is Exhibit 117?

12    A.    This appears to be a hangtag that would be placed on a

13    Seirus product.

14    Q.    Now, earlier when you were talking about Exhibit 65, you

04:02    15    identified a number of hangtags from Columbia.    Is this the

16    same functional type of advertisement or message delivery

17    channel?

18    A.    Yes, I would say it has the same intent.

19    Q.    How do you evaluate this hangtag with respect to the

04:02    20    message that's being conveyed?

21    A.    Again, I go back to the same thing I mentioned before.    In

22    almost every marketing material, there's a primary message, and

23    then there are secondary messages.    So I look at what's the

24    most obvious thing here.    What I see most obvious is the

04:02    25    HeatWave message front and center, the fact that there is a

1  wave design within the word mark, the fact that there is

2  HeatWave technology actually featured on the product.  So if

3  you look at the top half of that tag, you have the wave which

4  is reminiscent of the technology.

04:03  5  And then I get into the secondary messages which are really

6  the nitty-gritty of the product benefits.  On the left I would

7  see a product and a technology diagram which explains

8  reflecting body heat while moisture escapes, and then I'll see

9  specific product benefits.  "Kinetic," I'm not quite sure what

04:03  10  that means.  "Reflective," I'm familiar with that message, and

11  the idea of returning 20 percent warmth.

12  Q.  Would you characterize this as a technology message, a

13  fashion message, or something in between?

14  A.  I think this is very clearly a technology message.  You

04:03  15  could put this on any number of products that had HeatWave and

16  it would be relevant.

17  Q.  Would you turn to Exhibit 1192 --

18           MR. AXELROD:  Which we'll offer.

19           MR. SPROUL:  I'm sorry.  I don't have that in my

04:04  20  binder, Your Honor.

21           THE COURT:  Mine goes to 1196 as well.  I don't have

22  1192.

23           MR. AXELROD:  Do you have 1193?

24           THE COURT:  No, it goes from 693 to 1196.

04:04  25           MR. SPROUL:  I have no objection to the document,

1    Your Honor, only foundation for the witness that works at

2    Columbia and not at Seirus.

3              THE COURT:  I haven't seen the document.  Do you have

4    it?

04:04   5              THE WITNESS:  I don't.  It's on the screen.

6              MR. AXELROD:  It's a Seirus catalog.

7              THE COURT:  Your objection is overruled.  1192 is

8    received.

9         (Exhibit 1192 admitted.)

04:04  10              THE COURT:  You may proceed.

11              MR. AXELROD:  Mr. Aldrich, I can just use it on the

12    screen.

13         Thank you, Your Honor.

14         Can we turn to 2920 and 2923.

04:06  15    BY MR. AXELROD:

16    Q.   Sorry.  I was waiting for both of them to come up.  We're

17    going to do them separately.

18         What is the principal message on the advertisement on 2920?

19    A.   Clearly HeatWave is the primary message.  Similarly you see

04:06  20    some secondary message here, "reflected heat," speaking to the

21    benefit, and then there are additional benefit statements

22    underneath the "HeatWave" word mark.

23              MR. AXELROD:  Can we pull up 2923.

24    BY MR. AXELROD:

04:06  25    Q.   What's the principal messaging for the advertising on 2923?

A.   Again, just looking at the predominance on the page, I would say this is another technology as the primary focus.  It takes up 75 percent of the page.  HeatWave, again very similar messaging to what we've seen in other pieces, the idea of reflected heat, and then getting the details on the benefit and the consumer benefit, 20 percent warmer, and this kinetic benefit, and then looking to the right, the same diagram you see in other marketing materials, the idea of heat being reflected, moisture escaping, and, again, you're seeing back kind of the wave reflected in the mark in the lower hand of that graphic as well.

Q.   So three-quarters of the page is devoted to what?

A.   HeatWave technology.

Q.   And what is the rest devoted to?

A.   The rest is looking at the glove and what I would call probably tertiary features.

        MR. AXELROD:  Could we blow up the glove.

        THE WITNESS:  Even within the glove name, "HeatWave" is called out, so again I would say that is -- clearly they're trying to reflect that technology even in the name of the glove, and then there are some additional features, leather, lining, zipper, et cetera.

BY MR. AXELROD:

Q.   And when you refer to tertiary features, is that what you're referring to?

1    A.   Yes.

2    Q.   Would leather be tertiary?

3    A.   Yes.   For some people that might be a valuable feature,

4    leather, but it doesn't appear that's their primary goal to

04:08  5    communicate the left glove being leather.   It appears their

6    primary message is HeatWave.

7              MR. AXELROD:   Could we turn to Exhibit 134 which we'll

8    offer.

9              MR. SPROUL:   No objection.

04:08  10             THE COURT:   Received.

11        (Exhibit 134 admitted.)

12   BY MR. AXELROD:

13   Q.   Mr. Trepanier, could you explain the primary and secondary

14   messaging in Exhibit 134?

04:09  15   A.   Yes.   The first thing I'm drawn to is the photography of

16   the product in this advertisement.   I say that because it's

17   shot in a unique manner that I'm familiar with, the glove being

18   open to showcase the interior of the product.   This is not how

19   we would typically shoot gloves.   There would be no real

04:09  20   benefit to shooting gloves in an advertisement like this unless

21   you were trying to tell a story about the interior of the

22   glove.   Obviously, HeatWave, the primary message in the header,

23   but also as a visual element in the background here.   I know

24   it's kind of hard to see on the screen, but the wave is

04:09  25   incorporated as a visual element.   So my opinion is they're

        1   trying to build some value and association between HeatWave and

        2   that design element.

        3   Q.   Now, there are a number of other technologies, if you will,

        4   referenced on this advertisement, are there not?

04:10   5   A.   Yes, and, again, I would call those secondary messages,

        6   features.   I'm not familiar with the specifics of most of these

        7   features.   Reflective features are clearly an idea I'm more

        8   familiar with than some of the others.

        9   Q.   And are they kind of given equal billing as secondary

04:10   10  features?

        11  A.   Yes, I think in terms of this main graphic, they are, yes.

        12  Q.   And would you turn to Exhibit 133 --

        13           MR. AXELROD:   Which I'll offer.

        14           MR. SPROUL:   No objection.

04:10   15           THE COURT:   Received.

        16       (Exhibit 133 admitted.)

        17  BY MR. AXELROD:

        18  Q.   What is Exhibit 133's message?

        19  A.   I think the key message here is HeatWave is a technology

04:10   20  idea and the idea that you should look for it when you see the

        21  silver lining.

        22  Q.   Why do you call it a technology message as opposed to a

        23  product message?

        24  A.   Because I don't think it's terribly clear here what product

04:11   25  they're speaking to.   If I look at this, they might be -- I

1    don't think they're talking about a hat, a jacket, or any of

2    the items features in this photography.  It's my opinion

3    they're talking about a technology and how to find that

4    technology when you're looking for it.

04:11    5              MR. AXELROD:  Could we pull up Exhibit 129.

6              MR. SPROUL:  No objection.

7              THE COURT:  Received.

8        (Exhibit 129 admitted.)

9    BY MR. AXELROD:

04:11    10    Q.    What's Exhibit 129?

11    A.    This appears to be a page out of a sales catalog, so these

12    are catalogs that are intended at trade buyers.

13    Q.    And, again, this is a Seirus advertisement or HeatWave

14    advertisement?

04:11    15    A.    Yes, it appears to be so, and, again, I would say this

16    appears to be a very technology-focused message.  If you look

17    at the left-hand side of the page, key message is HeatWave

18    technology.  You see the wave reflected in several places on

19    the left, and then the key benefits of HeatWave called out.  On

04:12    20    the right is how that technology is executed in a number of

21    products being gloves, beanies, hats, and socks.

22    Q.    Anything significant about how those products are

23    portrayed?

24    A.    Yeah.  I think the fact that they are turned in some cases

04:12    25    inside out or appear to be inside-out, it's a different way to

1    photograph, and it appears to be to emphasize the technology,

2    that HeatWave is pervasive in the products.

3            MR. AXELROD:   Could we pull up Exhibit 1196 which I

4    will offer.   And that may not be in the binder either,

04:13   5    Your Honor.   I apologize.

6            THE COURT:   It's in this.

7            MR. AXELROD:   Oh, good.

8            MR. SPROUL:   No objection.

9            THE COURT:   Received.

04:13   10    (Exhibit 1196 admitted.)

11            MR. AXELROD:   Exhibit 1196 is a Seirus catalog for

12    2013/2014.   It's their work wear/hunting catalog.

13        Could you -- could we pull up page 3308.

14    BY MR. AXELROD:

04:13   15    Q.   And, again, is the message similar to what you've described

16    in prior --

17    A.   Yes, very similar.   I mean clearly the HeatWave word mark,

18    similar graphic.   Something that's new here is how they've used

19    the HeatWave in this top band at the bar.   So, again, they're

04:14   20    using that as a design element, likely with the intent to

21    associate that design with HeatWave.

22    Q.   And is the -- is it fair to call it the figure logo in the

23    lower left half of the page a technology message?

24    A.   Yes, I would position this as a technology message

04:14   25    explaining how the technology works and what benefits it

1    conveys.

2    Q.   And what is --

3         MR. AXELROD:   Could we pull up page 3309?

4    BY MR. AXELROD:

04:14    5    Q.   And what is shown on page 3309 in terms of its messaging?

6    A.   It appears to be a continuation of the same section of the

7    catalog going back to the idea of how the product is

8    photographed.   Clearly they're showing, you know, a piece of

9    photography that's aimed at showing what's happening inside of

04:15    10    the glove with the call out of integrated reflective liner.

11    Q.   What is an integrated reflective lining to your

12    understanding, if you have any understanding?

13    A.   I mean I would understand it to be of one piece, not two

14    separate pieces.

04:15    15         MR. AXELROD:   Thank you.   I have no further questions.

16         THE COURT:   Cross-exam.

17         MR. SPROUL:   One issue, Your Honor, a technical

18    problem.   The screen is not coming up.

19         MR. MARCHESE:   Would it be okay to take a couple of

04:17    20    minute break so we can try to figure this out?

21         THE COURT:   Sure.   Why not.   I'll have the jury step

22    into your room, and we'll bring you out in just a minute.

23         (Recess.)

24         (Proceedings held in the presence of the jury panel.)

04:34    25         THE COURT:   Welcome back.   Have a seat, everybody.

1    We're waiting for one juror.  Everybody's here.

2        You have your technology going.  Have a seat.  Let's go.

3    You're up.

4        MR. SPROUL:  Thank you, Your Honor.

04:34    5                    CROSS EXAMINATION

6    BY MR. SPROUL:

7    Q.    Mr. Trepanier?

8    A.    Yes.

9    Q.    You testified extensively using this term, "technology"

04:34    10   over and over again, correct?

11   A.    Uh-huh.

12   Q.    What did you mean by that, technology?

13   A.    What I mean by technology is a -- I don't know what the

14   definition of technology is.  I guess I used it to mean an idea

04:35    15   that provides a benefit.

16   Q.    Specifically in your testimony, you were referring to the

17   technology, so I'm not asking for a general definition for

18   technology, but what was the technology that you were referring

19   to in your testimony?

04:35    20   A.    I think I referred to probably a couple technologies in my

21   testimony.  One was on the heat reflective as the technology,

22   and I believe I referenced HeatWave as the technology as well.

23        MR. SPROUL:  If I could have Exhibit 31 pulled up.

24   BY MR. SPROUL:

04:35    25   Q.    Which you testified to earlier.

1    Do you know an Eric Groff at Columbia?

2    A.    I do know an Eric Groff who was once at Columbia, yes.

3    Q.    And was the Eric Groff that was once at Columbia the senior

4    footwear product line manager at one time?

04:36    5    A.    That sounds accurate, yes.

6    Q.    Did you work with him?

7    A.    Not directly, but I did come across him from time to time,

8    yes.

9    Q.    And did he work with Omni-Heat products?

04:36    10    A.    I can't say with certainty, but it wouldn't surprise me.

11    We had Omni-Heat Reflective in footwear products.

12    Q.    If you could look at page 5 --

13        MR. SPROUL:    I'll ask it to be pulled up -- of

14    Exhibit 31.

04:36    15    BY MR. SPROUL:

16    Q.    In the middle paragraph, you see where it says, "Although

17    that's not the case in footwear as the company launched several

18    styles of boots and trail shoes where the dot is on both the

19    inside and outside of the products as in the new woman's Yama

04:36    20    OutDry Flash."    Do you see that?

21    A.    Yes.

22    Q.    You understand the dot referred to is Omni-Heat?

23    A.    Yes, I understand that.

24    Q.    Could you look at the next paragraph where it said, "Groff

04:36    25    said this feature doesn't serve any functional purpose.    'It

1    just looks cool,' he told S News with a laugh."  Do you see

2    that?

3    A.   I do see that, yes.

4          MR. SPROUL:  If you could pull up Exhibit 129, please,

04:37    5    Mr. Volper.

6    BY MR. SPROUL:

7    Q.   You testified to this at the end of your testimony.  When

8    was the first time you'd seen Exhibit 129?

9    A.   I don't recall the exact period, but it was with reviewing

04:37   10    material for the testimony here.

11    Q.   Your testimony with respect to 129 used the term "the

12    technology" when you --

13          MR. SPROUL:  I'm sorry, Your Honor.  We lost the

14    picture, and it's rather important here.

04:37   15    BY MR. SPROUL:

16    Q.   Your testimony with respect to 129 used the term "the

17    technology"?

18    A.   That's correct.

19    Q.   And you were specifically pointing to the socks, at least

04:37   20    in the first part of your testimony, and you said the sock was

21    turned inside-out in order to highlight the technology.  Isn't

22    that right?

23    A.   I said that was my take on how this was photographed, yes.

24    Q.   And by "the technology" with respect to Exhibit 129, what

04:38   25    were you referring to?

1  A.   HeatWave technology.

2  Q.   Is that the patented HeatWave technology?

3  A.   I don't know if it's patented.  I'm referring to the

4  technology that's referenced alongside the silver wavy

04:38  5  reflective stuff.  I assume is HeatWave.

6  Q.   You're not very familiar with Seirus products, are you?

7  A.   No, I'm not terribly familiar with Seirus.

8  Q.   Would it surprise you to know that that sock you referred

9  to as turned inside-out, in fact, is sold in that way with the

04:38  10  silver reflected -- reflecting material out?

11  A.   No, that would not surprise me at all.

12  Q.   And the same with the hat and the glove there on

13  Exhibit 129?

14  A.   No, that would not surprise me.

04:38  15  Q.   That it was sold in that manner.  Excuse me.  I'm sorry for

16  talking over you.

17      Do you understand that those products sold by Seirus with

18  HeatWave fabric, with the reflective silver material facing

19  outward, are not accused of infringement in this case?

04:39  20  A.   I'm not aware of the specifics of that, no.

21  Q.   Would that surprise you to learn that?

22  A.   I don't know if it would surprise me or not.  I don't have

23  an opinion on it.

24  Q.   Given your reference to these noninfringing products as the

04:39  25  technology, is it fair to say that your understanding of what

1    the technology is in your testimony goes well beyond what may

2    be accused of infringement in this case?

3    A.    I probably have more of a layman's understanding than some

4    people in this room.  When I say the technology, I refer to

04:39    5    HeatWave and the silver reflective waves.  That's my

6    understanding of the technology.

7    Q.    And it's not limited to technology or features that may, in

8    fact, be covered by the patent?

9    A.    I can't speak to that one way or the other.

04:39    10    Q.    You are the director PR and promotions for Columbia.  Is

11    that right?

12    A.    That was a previous role, yes.

13    Q.    What's your current role again?  I'm sorry?

14    A.    Director of global brand communications.

04:40    15    Q.    Global brand communications.  And are you in charge of

16    public relations in that role?

17    A.    Yes, part of that is PR.

18    Q.    Who do you report to?

19    A.    I currently report to the president of the brand.

04:40    20    Q.    Who is the president?

21    A.    Joe Boyle.

22    Q.    And in your role your job is to sell Columbia products.  Is

23    that right?

24    A.    Not that specific, no.  My job is to build the reputation

04:40    25    of the brand first and foremost, to protect that, and

|    |     |                                                                      |
|----|-----|----------------------------------------------------------------------|
|    | 1   | ultimately the outcome of that should be selling products.           |
|    | 2   | Q.   And your education is bachelor of arts in communications        |
|    | 3   | from the University of West Florida.  Is that right?                 |
|    | 4   | A.   That's accurate.                                                |
| 04:40 | 5 | Q.   You didn't take any engineering classes?                        |
|    | 6   | A.   No.                                                             |
|    | 7   | Q.   No classes in textile development?                              |
|    | 8   | A.   No.                                                             |
|    | 9   | Q.   And after graduation, you went to work for -- I think you       |
| 04:41 | 10 | said Wagner Engstrom as an account manager?                          |
|    | 11  | A.   That's accurate.                                                |
|    | 12  | Q.   And Wagner Engstrom is a PR firm.  Is that right?               |
|    | 13  | A.   Yes, it's a PR firm.                                            |
|    | 14  | Q.   Is that like Madmen?                                            |
| 04:41 | 15 | A.   No, I don't think it's nearly that exciting.  It's a lot of     |
|    | 16  | work supporting technology clients, specifically Microsoft.          |
|    | 17  | Q.   And, in fact, you worked primarily for Microsoft while you      |
|    | 18  | were at Wagner Engstrom?                                             |
|    | 19  | A.   Solely, yes.                                                    |
| 04:41 | 20 | Q.   Sometime around 2010, you then moved to Columbia as a           |
|    | 21  | public relations manager, right?                                     |
|    | 22  | A.   That's accurate.                                                |
|    | 23  | Q.   And you've over the years worked your way up to your            |
|    | 24  | current position?                                                    |
| 04:41 | 25 | A.   Correct.                                                        |

1    Q.   And all of the positions that you've held at Columbia have

2    been PR positions.   Isn't that right?

3    A.   PR has always been an element of those positions.   The idea

4    is I've added on additional responsibilities beyond PR.

04:41   5    Q.   Primary function and responsibilities have been focused on

6    PR-related issues at Columbia.   Isn't that fair?

7    A.   No, I would not say that.   I would say at some points in my

8    career my focus has been PR.   Other points of my career, my

9    focus has been on other categories of marketing.

04:42   10   Q.   Well, fair to say that you're not a designer or engineer at

11   Columbia.

12   A.   That's a fair statement.

13   Q.   And you work on promoting products or creating brand

14   awareness, protecting the brand, right?

04:42   15   A.   Correct.

16   Q.   Now, you are here, I suspect, as the face of Columbia.   Is

17   that right?

18   A.   I don't know if I'm the face of Columbia.   I'm here to talk

19   about the marketing we do for our products.

04:42   20   Q.   Well, you are the first witness to speak on behalf of

21   Columbia.   But you didn't talk about infringement.   Is that

22   right?

23   A.   No, that's not my expertise.

24   Q.   And you didn't talk about the invalidity issues in this

04:42   25   case?

1   A.    No.   I would never talk about anything like that.

2   Q.    And you didn't testify to damages?

3   A.    Correct.

4   Q.    Were you personally authorized -- involved in authorizing

04:43   5   this lawsuit against Seirus?

6   A.    No.

7   Q.    Now, you're not on the board of directors, correct?

8   A.    No.

9   Q.    You're not an executive officer as that term is used in the

04:43   10   10K statements or official documents?

11   A.    Correct.

12   Q.    In fact, you're not a director.  Is that true?

13   A.    I'm not a director in terms of its technical meaning from a

14   financial reporting standpoint, yes.

04:43   15   Q.    Columbia's other representative sitting here at the table

16   is Adam Kelly.  Is that right?

17   A.    That's correct, yes.

18   Q.    And Adam Kelly's position is associate general counsel?

19   A.    I don't know his exact title, but that sounds accurate.

04:43   20   Q.    He's not the general counsel, though.  He's not the top

21   lawyer at Columbia?

22   A.    I don't believe so.

23   Q.    You testified for almost an hour, give or take, but in that

24   testimony, you didn't testify about the patent claims, did you?

04:44   25   A.    No, I did not.

1    Q.    And you didn't testify about the prior art that is asserted

2    or relevant to the patent claims at issue in this case?

3    A.    No, I did not.

4    Q.    And you didn't analyze whether the Omni-Heat products

04:44    5    practiced the patents ensued either.  Your testimony is not

6    directed to that fact either, was it?

7    A.    No.

8    Q.    Approximately how many products are there that use

9    Omni-Heat fabric?

04:44    10    A.    I don't know the exact number, but I believe it's hundreds,

11    if not thousands.

12    Q.    And those hundreds or perhaps thousands of products are

13    spread over many categories of products.  Isn't that right?

14    A.    That's correct.

04:44    15    Q.    And did you analyze any specific category?  Did you look at

16    shoes, for instance?

17    A.    I'm not sure if I understand what you mean by "analyze."

18    Q.    Let me rephrase the question.  As part of your testimony, I

19    didn't hear you identify specific products that Columbia

04:45    20    alleges practiced the patents?

21    A.    No, and I wouldn't have referred to any specific products

22    in that context.  So no.

23    Q.    Now, in your role you don't know what it means for the

24    Omni-Heat to be a patented technology.  Isn't that fair?

04:45    25    A.    I have a general awareness of what a patent is, and as far

1    as the specifics of what makes something patented, I'm not an

2    expert on that.

3    Q.   My question was a little narrower than that.   You don't

4    know what it means for the Omni-Heat to be a patented

04:45   5    technology.   Isn't that right?

6    A.   I think I have an understanding of what it means to be a

7    patented technology at a general sense, maybe not to the level

8    of specificity as some other people in this room.

9    Q.   During your deposition, you were asked, "So when Columbia

04:46   10   refers to Omni-Heat as being a patented technology, what does

11   that encompass in your view?"

12       Your response:   "I'm not terribly familiar with the details

13   of patent application, you know, what makes something

14   patented."

04:46   15       So I'll ask you again.   In your role you don't know what it

16   means for the Omni-Heat to be a patented technology?

17   A.   Again, I'll repeat what I said before.   I have a broad

18   understanding of what a patent means, but not to the specific

19   level of other people in this room.

04:46   20   Q.   Columbia has a large marketing budget.   Would you agree?

21   A.   "Large" is relative.

22   Q.   Columbia's marketing budget for 2015 was approximately

23   $120 million globally.   Is that fair?

24   A.   I don't think that's an accurate representation.   Columbia

04:46   25   Sportswear Company, which is a separate entity from Columbia

1    the brand had a $120 million budget.

2    Q.    Fair enough.  And you made that distinction in your opening

3    testimony.  You said that budget includes Columbia's other

4    brands.  Is that right?

04:47    5    A.    That's accurate, yes.

6    Q.    And you classified these other brands as separate

7    companies.  Is that right?

8    A.    Correct.

9    Q.    These are all companies though that Columbia has bought

04:47    10    over the years.  Isn't that right?

11    A.    Again, I think there's a lot of confusion here when you say

12    "Columbia."  This is something we have confusion of internally.

13    There is a company called Columbia Sportswear Company.  And

14    then there's a brand called the Columbia Sportswear.  I work

04:47    15    for the brand Columbia Sportswear.  So we have this issue all

16    the time where we're talking about this larger company and

17    we're talking about the brand.  So when I'm talking about the

18    120 million, that is the larger company that has multiple

19    subdivisions, companies, brands, whatever you want to call it.

04:47    20    Q.    Those brands within the larger Columbia company are

21    Mountain Hardwear.  Is that right?

22    A.    Yes.

23    Q.    Piranha, Sorel.  Are there others?

24    A.    Those are the brands, yes.

04:48    25    Q.    And all three of those were purchased by Columbia.  Is that

1    right?

2    A.    Again, they were purchased by Columbia Sportswear Company,

3    yes.

4    Q.    And now Sorel sells shoes in addition to some other

04:48    5    products, but they're primarily a shoe brand.  Is that right?

6    A.    Yes, primarily a footwear brand.

7    Q.    And Sorel uses Omni-Heat in some of the Sorel shoes.  Isn't

8    that right?

9    A.    I'm not aware of that.

04:48    10    Q.    You'd be surprised to learn that.  Is that what you're

11    telling me?

12    A.    I wouldn't be surprised.  I'm not aware of it.

13    Q.    Can you tell me approximately how much Columbia -- what

14    percentage or what portion of that $120 million spent on

04:48    15    advertising globally for the larger Columbia corporation was

16    spent for the Columbia brand in 2015?

17    A.    I couldn't speak to that number specifically.

18    Q.    Approximately?

19    A.    I don't even -- it's -- this is a complicated question, but

04:49    20    that number breaks into multiple regions around the globe that

21    have direct ownership of that budget.  I have insight into the

22    North American budget.  I don't have, you know, as much insight

23    into how that money is being spent in markets around the world.

24    Q.    Based on your insight into the North American budget, what

04:49    25    is the amount that Columbia spent advertising for the Columbia

1    brand in the North America region?

2    A.    Yes, and I'm not trying to convolute the issue.  I'm trying

3    to give as clear an answer as possible.  So we do the

4    advertising -- like the advertising we showed here, the average

04:49    5    budget for our fall season is relatively $9 million that I

6    oversee in North America.

7    Q.    You oversee $9 million as part of the advertising budget

8    spent for the Columbia brand?

9    A.    Yeah, and that number fluctuates, and, again, there are

04:50    10    different things you can look at that is a marketing expense.

11    When I say that number, that specifically relates to some of

12    the advertising we reviewed in my testimony, things like print

13    advertising, television, out of home advertising.  There are a

14    range of other marketing expenses that make that number go up.

04:50    15    Again, that's building fixtures for product.  That is salaries.

16    What that total number is, I honestly don't know.

17    Q.    Are there other dollars spent in the North America region

18    on advertising apart from what you manage?

19    A.    Yes, there is.  There is our direct to consumer business.

04:50    20    They do -- they buy search ads with Google, for instance, and

21    then we have relationships, trade agreements with some of our

22    partners where there is a guaranteed percentage of their

23    purchases.  They get a credit for advertising more or less.

24    Q.    Can you tell me what the entire advertising budget is for

04:51    25    Columbia brand for North America?

A.   No, I couldn't tell you that.

Q.   Can you give me a ballpark?

A.   I wouldn't be comfortable.  I honestly don't know all of the different avenues and what that number adds up to.

04:51   Q.   Somewhere between 9 million and 120 million, that's what we know?

A.   Yes, somewhere in there.

Q.   Now, Omni-Heat was introduced right before you came to Columbia.  Isn't that right?

04:51   A.   Correct.

Q.   But when you started your job at Columbia, you familiarized yourself with the history of Omni-Heat and reviews and the like.  Is that correct?

A.   Yes, immediately upon arriving, I read as much as I could.

04:51   Q.   And is it fair to say that Omni-Heat was the largest marketing campaign in the company history?

A.   Yes, I would say that's probably an accurate representation.

Q.   And that Omni-Heat was the most comprehensive, integrated

04:51   global marketing campaign in the company history?

A.   Yes, I would say that's accurate.

Q.   What does "comprehensive integrated" refer to in that context?

A.   In my testimony I talked a lot about being consistent, and

04:52   we talked about how that message is delivered in multiple ways,

1    so making our message consistent in print, whether it's in a

2    print advertisement, a TV commercial, in social media, that's

3    generally what we mean by "comprehensive and integrated," is

4    trying to have a consistent message and multiple different ways

04:52    5    of delivering that message.

6    Q.   Just a message or a consistent story?  That's a term you

7    used quite often.

8    A.   Yes, yes.

9    Q.   Based on your testimony by all accounts, this Omni-Heat

04:52    10   marketing campaign has been successful.  Would you agree?

11   A.   Yes, I would agree.

12   Q.   And it has contributed largely to increased sales of

13   Omni-Heat products?

14   A.   I think it is a contributor, yes.

04:52    15   Q.   I want to ask a few questions about this idea that you

16   talked about at the beginning part of your testimony that

17   Omni-Heat is part of the marketing story.  You testified, I

18   believe, that Omni-Heat allows you to tell a different story

19   from your competitors.  Is that right?

04:53    20   A.   That's correct.

21   Q.   And why is it important again for you to differentiate from

22   your competitors?

23   A.   It's important for us to differentiate so that when people

24   go to a store and make a decision on what product they're going

04:53    25   to buy, they have something that sets Columbia and makes

1    Columbia unique as a point of differentiating a different

2    benefit.

3    Q.    And you believe that it's important for company

4    spokespeople to deliver a consistent story on Omni-Heat.  Is

04:53    5    that right?

6    A.    Yes.  And when I say "story," I really mean going back to

7    the fundamentals of why the product exists, and, you know,

8    who's it for, why did we build it, what does it do, and tell

9    that in a way that people can relate with, so yes, that's a

04:54    10    story.

11            MR. SPROUL:  Mr. Volper, could you please pull up

12    1103.

13        I don't believe this was introduced during the direct

14    examination, so I will offer it into evidence now.

04:54    15            THE COURT:  I'm sorry.  What number is this one?

16            MR. SPROUL:  1103.

17            THE COURT:  Any objection to 1103?  It is received.

18        (Exhibit 1103 admitted.)

19            THE WITNESS:  Yes, this is a document my team

04:54    20    prepares, consistently season -- year over year to explain our

21    new product launches and how we should communicate those when

22    speaking outside the company.

23    BY MR. SPROUL:

24    Q.    And this document, consistent with what you've testified to

04:55    25    earlier, assists with telling that consistent marketing story,

1  right?

2  A.   Yes, I think if -- you know, we want our stories to be

3  accurate and representative of the products.  So -- and

4  occasionally in a large company, people have different opinions

04:55  5  and different motives, so the idea here is to try to coalesce

6  around a single idea that's most accurate.

7  Q.   And it was important that people tell a consistent story

8  with respect to this marketing strategy that you had

9  implemented?

04:55  10  A.   Yes, it's important that we present an accurate story, yes.

11  Q.   Consistent story?

12  A.   Consistent story.

13  Q.   If you could look at page 1, you see the first bullet under

14  the "Key Messages" heading?

04:55  15  A.   Under "Key Messages"?

16  Q.   Yes.

17  A.   Yes, I think we've highlighted it.

18  Q.   We're pulling it up here.  There we go.

19     "For fall 2012" -- I'm reading from Exhibit 1103 -- "For

04:56  20  fall 2012, we're focused on maintaining our momentum with

21  Omni-Heat and multiplying our technologies to amplify the

22  customer benefit."

23     Part of your focus here, one of the key messages, was that

24  you were focused on multiplying your technologies to amplify

04:56  25  the customer benefit.  Is that right?

1    A.    That is one of several messages in that statement.

2    Q.    Fair enough.   What is being referred to here with reference

3    to your technologies -- or our technologies?

4    A.    Well, the first technology referenced is Omni-Heat as in

04:56  5    Omni-Heat Reflective, so it's continuing to communicate the

6    product benefits of that, and then communicate the product

7    benefits of additional technologies, I would say, as a

8    secondary message that have been combined with Omni-Heat

9    Reflective.

04:57  10    Q.    By "other technologies" you're referring to some of those

11    features that you talked about in your direct examination,

12    other branding components and so forth that --

13    A.    Yes.   I don't recall.   Maybe it's in this exact document,

14    but additional technologies that have been released after

04:57  15    Omni-Heat Reflective is my assumption.

16    Q.    And we'll go into those in a little more detail later, but

17    before we do that, let's look at some marketing efforts that

18    Columbia uses to gain this marketing story momentum that you

19    have around Omni-Heat.

04:57  20        Now, you do 360-degree marketing?

21    A.    That's correct.

22    Q.    What is 360-degree marketing for those of us who are not

23    marketers?

24    A.    It just basically means marketing in a lot of different

04:57  25    places.

1    Q.   And in addition to that, Columbia uses many channels to

2    market the Omni-Heat products.  Is that right?

3    A.   Yes, that's correct.

4    Q.   What's referred to -- what is meant by "a channel" in the

04:57    5    context of marketing?

6    A.   A channel is largely just a category, so, you know, print

7    advertising is a channel.  TV is a channel of communication, so

8    it's, roughly speaking, a category of communication.

9    Q.   And these communication categories or channels would

04:58    10    include various types of displays?

11    A.   Yes.

12    Q.   Billboards?

13    A.   Yes.

14    Q.   Advertisements on bus stations?

04:58    15    A.   Correct.

16    Q.   Radio advertising?

17    A.   Yes, all true.

18    Q.   Television advertisements?

19    A.   Yes.

04:58    20    Q.   Placement in social media?

21    A.   Correct.

22    Q.   And you employed all of these channels to market Omni-Heat.

23    Isn't that right?

24    A.   I wouldn't say every season or every year we employ all of

04:58    25    those channels.  Some years we have focus -- we focus on some

channels, and some years we focus on other channels. I would

have to speak to a specific campaign to understand, you know,

what channels we used in a specific year.

Q. Well, you marketed Omni-Heat using billboards. Is that

right?

A. That's correct, yes.

Q. And I would characterize it as fairly extensively. Would

you agree with that?

A. If I recall correctly, our billboard strategy was focused

on a number of what we call high-impact markets, so it wasn't a

national campaign. It was focused in on markets where we did

a -- generally more business than other areas.

Q. Okay. If you could turn to --

        MR. SPROUL: I asked Mr. Volper to pull up

Exhibit 1091.

BY MR. SPROUL:

Q. You testified to this earlier, I believe. I think it's

also Plaintiff's Exhibit 40, so it's been offered, and we can

pull up Exhibit 40 if that would be --

        THE COURT: It doesn't matter.

BY MR. SPROUL:

Q. Exhibit 1091 it is then. If you could look at

page -- first of all, if you could refresh us as to what this

document is.

A. Yes. This is a report from our advertising -- well, I'm

1  now looking at a different page here.  Do you want me to

2  comment on this page?

3  Q.   I'm sorry.  Let's start with the first page of

4  Exhibit 1091, and could you tell us what this is, please?

05:00  5  A.   This is a print advertisement for Omni-Heat Reflective.

6  Q.   And if you could --

7        MR. SPROUL:  If I could have Mr. Volper turn to page

8  34074, the internal Bates number.

9  BY MR. SPROUL:

05:00  10  Q.   I believe you testified to this page, but I may be

11  mistaken, but could you tell us, then, what's being shown in

12  Exhibit 1091 at 34074?

13  A.   Yes.  These are what we call "sheltered advertisements."

14  This is a bus shelter.  And these are ads that speak to

05:01  15  Omni-Heat Reflective as featured in boots, and I believe this

16  was placed in -- it appears to be Chicago, Illinois.

17  Q.   And similar types of display ads at bus stations were

18  purchased in Chicago.  Is that right?

19  A.   Yes.

05:01  20  Q.   Minneapolis, Boston, Cleveland, Denver, Indianapolis,

21  Milwaukee, Pittsburgh, Seattle?

22  A.   That sounds accurate.  I couldn't speak to the specific

23  year.  We generally fluctuate between, say, five and ten

24  markets each season where we spend more money than we would at

05:01  25  other markets.  And that's usually an element of that.

1    MR. SPROUL: If I could ask Mr. Volper to turn to

2    page 34070 and 71 of the same document.

3    BY MR. SPROUL:

4    Q.    Why don't you tell me what this page shows?

05:02    5    A.    This appears to be a summary page showing specifically

6    where we had an out of home advertisement, whether that be a

7    billboard or a transit ad or something similar.

8    Q.    And if you look at the next page ending in 71, those were

9    additional cities where you had similar billboards purchased?

05:02    10    A.    That's correct, yes.

11    Q.    Briefly, without belaboring the point, if we could look at

12    the number of units purchased in each city --

13    MR. SPROUL: If we go back to page 70, if you could

14    pull up Chicago, for instance.

05:03    15    BY MR. SPROUL:

16    Q.    What does this tell you about the number of units purchased

17    in Chicago, if anything?

18    A.    I'm reading that there were eight units, meaning eight

19    separate displays on the Magnificent Mile; 40 units in Suburban

05:03    20    Chicago, and 48 advertising units -- and I honestly don't know

21    what "light showing level" means in this instance, but a number

22    of executions in our advertisements.

23    Q.    So it looked like 90 units purchased in Chicago alone?

24    A.    Yes.

05:03    25    MR. SPROUL: And if you could zoom back out,

1    Mr. Volper, please.

2    BY MR. SPROUL:

3    Q.    For Minneapolis, Cleveland, Denver, Indianapolis,

4    Milwaukee, Pittsburgh, and Seattle, Columbia purchased at least

05:04    5    20 or more units in each of those cities?

6    A.    That appears to be accurate, yes.

7    Q.    So across the country, Columbia purchased hundreds of

8    billboard ads specifically focusing on the Omni-Heat product.

9    Isn't that right?

05:04    10    A.    I wouldn't say across the country.    We purchased ads in

11    these specific markets.

12    Q.    In cities -- specific cities across the country.

13    A.    Yes.

14         THE COURT:    I need to see counsel up here.

05:06    15         (The following proceedings were heard at the bench:)

16         THE COURT:    So we try to stop at 5:00.    I put your

17    timer on pause for now.    I'm guessing you still have at least a

18    half-hour or so.

19         MR. SPROUL:    20 minutes, no more than a half-hour.

05:06    20         THE COURT:    He's going to have rebuttal, and my

21    thought is we let them go for the evening and pick up tomorrow

22    morning unless you're telling me, "No, I'm just about done with

23    my next question," then I would --

24         MR. SPROUL:    I'm not that close to being done.

05:06    25         THE COURT:    I didn't think so.    We'll let them go,

1    we'll get back together at 9:00 tomorrow morning.

2        (Proceedings held in the presence of the jury panel.)

3        THE COURT:   Members of the jury, we're going to stop

4    for our evening recess at this time.   So that you know,

05:06  5    typically we're going to be working as kind of business days,

6    9:00 to 5:00, an hour or so, and about two breaks.   One in the

7    morning and one in the afternoon is generally how we're going

8    to be operating.   If we get to a place where I have a witness

9    who's almost finished, we might work a little bit later into

05:06 10    the evening, but generally we'll be stopping around 5:00.

11        With that I'm going to excuse you for the evening.   I don't

12    know if Bernadette has any go home instructions for you or not.

13    I'll leave that between you and her.

14        I will remind you not to talk about the case with anyone.

05:06 15    I know your family members are going to be curious about what

16    it is that you're working on, and just let them know that you

17    can't discuss the case until it's over, and then after it's

18    over, you can tell them whatever you want.   But until that

19    time, please don't discuss the case.

05:06 20        And with that have a pleasant evening.   I will see you --

21    if you could get here a little bit before 9:00, 8:30, 8:45, and

22    we'll try to get started right at 9:00.   Have a pleasant

23    evening.

24        (Proceedings held outside the presence of the jury panel.)

05:07 25        THE COURT:   I'll see you all tomorrow morning.   Have a

1    good evening.

2                            ---000---

3

4                    C-E-R-T-I-F-I-C-A-T-I-O-N

5

6        I certify that the foregoing is a correct transcript from

7    the record of proceedings in the above-entitled matter.

8

9        Dated September 18, 2017, at San Diego, California.

10

11

                    /s/ Dana Peabody
12                  Dana Peabody,
                    Registered Diplomate Reporter
13                  Certified Realtime Reporter

14

15

16

17

18

19

20

21

22

23

24

25

1                    United States District Court

2              For the Southern District of California

3

4                                    )
   Columbia Sportswear NORTH         )
5  AMERICA, INC., an Oregon          )    No. 17-cv-1781-HZ
   corporation,                      )
6                                    )    September 19, 2017
                                     )
7          Plaintiff,                )    San Diego, California
                                     )
           v.                        )
8                                    )
   SEIRUS INNOVATIVE ACCESSORIES,    )
9  INC, a Utah Corporation,          )
                                     )
10                                   )
           Defendant.                )
11

12

13

14                  Volume 2 - AM Session

15          Reporter's Transcript of Proceedings

16      BEFORE THE HONORABLE MARCO A. HERNANDEZ

17              United States District Judge

18

19

20

21

22

23  Court Reporter:         Dana Peabody, RDR, CRR
                            District Court Clerk's Office
24                          333 West Broadway, Suite 420
                            San Diego, California, 92101
25                          DanaPeabodyCSR@gmail.com

APPEARANCES:

For the Plaintiff:         SCHWABE, WILLIAMSON & WYATT, P.C.
                           NIKA F. ALDRICH, JR., ESQ.
                           DAVID W. AXELROD, ESQ.
                           BRENNA LEGAARD, ESQ.
                           1211 SW 5th Avenue, Suite 1900
                           Portland, Oregon 97204

For the Defendant:         FISH & RICHARDSON, P.C.
                           CHRISTOPHER S. MARCHESE, ESQ.
                           SETH M. SPROUL, ESQ.
                           12390 El Camino Real
                           San Diego, California 92130

For the Defendant:         MARKOWITZ HERBOLD, P.C.
                           RENEE ROTHAUGE, ESQ.
                           1211 SW Fifth Avenue, Suite 3000
                           Portland, Oregon 97204

1  Case:   Columbia v. Seirus
   Date:   September 19, 2017
2

3
                        INDEX OF WITNESSES
4
   FOR THE PLAINTIFF:
5                                    E X A M I N A T I O N
                                DIRECT   CROSS  REDIRECT  RECROSS
6
   Scott Trepanier
7    Mr. Sproul                            232
     Mr. Axelrod                                            248
8
   Michael "Woody" Blackford
9    Mr. Aldrich                     253
     Mr. Marchese                           294
10

11                      INDEX OF EXHIBITS

12 EXHIBIT                                        EVIDENCE

13 22                                                271

14 217                                               283

15 219                                               284

16 305                                               265

17 629                                               282

18 696                                               287

19 698                                               268

20 707                                               283

21 1027                                              346

22 1043                                              375

23 1045                                              355

24 1301                                              289

25 1403                                              319

1          San Diego, California, September 19, 2017

2                        *   *   *

3          THE CLERK:  Calling matter number 1 of the calendar,

4     17cv1781, Columbia Sportswear North America, Incorporated,

08:40  5     versus Seirus Innovative Accessories, Inc., jury trial day two.

6          THE COURT:  What do you have for me?

7          MR. AXELROD:  Good morning, Your Honor.  David

8     Axelrod.  I wanted to raise the issue of how we apprise the

9     jury of the Court's prior findings, particularly the design

08:40 10     patent infringement issue, and it comes up in this context:

11     There is agreement that a product as used by the consumer where

12     the HeatWave material is not in the innermost surface is

13     noninfringing of the utility patent but it still infringes the

14     design patent.  The statements being made in the court before

08:41 15     the jury are not distinguishing these issues.

16          So, for example, Mr. Sproul made the statement to

17     Mr. Trepanier that to the effect it was agreed that

18     outer-facing sock as was portrayed in one of the pictures is

19     not infringing.  If he was restricted to the utility patent,

08:41 20     that would be correct, but not for the design patent.  So our

21     rebuttal examination either involves us walking through

22     Exhibit 599, which is the Court's summary judgment opinion and

23     order to --

24          THE COURT:  Yeah, you're not doing that.

08:41 25          MR. AXELROD:  Okay.  Then we need an alternate way to

1  explain to the jury that the Court has determined that these

2  still infringe the design.

3          THE COURT:   Thank you.

4          MR. SPROUL:   The questions I thought, Your Honor, were

08:42   5  clear, that they were in the context of the technology that we

6  were talking about on cross-examination.   Design patent is not

7  technology-related; it's design-related.   I think I can clarify

8  and perhaps mitigate Mr. Axelrod's concerns with a single

9  question clarifying that he understands that the sock is not

08:42   10  accused of infringing the utility patents, and we're not

11  talking about the design patent.

12          THE COURT:   The issue he raises is a legitimate issue,

13  and I'm convinced that the jury was confused that any patent

14  had been infringed based on the way that the questions came

08:42   15  out.   Your point is a good one.   Ultimately we can resolve this

16  by way of a jury instruction at the end of the trial or some

17  other way, but you're not reading the summary judgment into the

18  record.   Not that it isn't great opinion, but it's just too

19  long, and it has too many things that are not relevant to this

08:43   20  issue.

21          MR. AXELROD:   I appreciate that concern, and that's

22  why I raised the issue, but I think waiting to the end for the

23  jury to understand the distinction is --

24          THE COURT:   You're going to be able to clarify this on

08:43   25  redirect.   I don't have any problem with that.

1    MR. AXELROD:  But that relates to the witness

2    testifying as to the Court's orders which --

3    THE COURT:  Well, you will have other witnesses who

4    will say, "These are two different patents, and while it may

08:43    5    not be infringing the utility patent, there is infringement

6    regarding the design patent."

7    MR. AXELROD:  Okay.  We'll see how it goes.

8    THE COURT:  We'll see how it goes.  You're a good

9    lawyer.  You're going to figure this out.  I know you are.  I

08:43    10    have faith in you.

11    Anything else?

12    MR. AXELROD:  That was it.

13    THE COURT:  Anything else?

14    MR. SPROUL:  No, Your Honor.

08:44    15    THE COURT:  All right.  Once we get a jury, we'll get

16    rolling here.  Thank you.

17    (Recess.)

18    THE CLERK:  Matter number 1 of the calendar, 17cv1781,

19    Columbia Sportswear North America, Incorporated, versus Seirus

08:57    20    Innovative Accessories, Incorporated, jury trial day two.

21    THE COURT:  You may proceed.

22    CROSS-EXAMINATION (resumed)

23    BY MR. SPROUL:

24    Q.   Good morning, Mr. Trepanier, Trepanier?

08:57    25    A.   All of the above are fine.

1  Q.   Trepanier.  I will try to do that correctly.  Excuse me if

2  I did it incorrectly before.

3       To start with, you didn't speak to your lawyers last night

4  about your testimony?

08:57  5  A.   Yes, I -- well, I didn't speak about the testimony

6  specifically, no.

7  Q.   A brief recap:  Your testimony yesterday established

8  Columbia's significant marketing efforts surrounding the

9  Omni-Heat product.  Is that fair?

08:58  10  A.   Yes, I spoke to the many ways we market the product, yes.

11  Q.   Would you agree that Mr. Woody Blackford is a part of the

12  marketing effort and campaign?

13  A.   We use him as a spokesperson, so, yes, he is involved in

14  the marketing.

08:58  15  Q.   Columbia is a large company with significant resources and

16  established marketing channels?

17  A.   Again, I think that's -- we're relatively large compared to

18  some other companies.  We're probably smaller than some

19  companies, yes.

08:58  20  Q.   And Columbia in part, based on its size, has what you would

21  consider established marketing channels.  Is that fair?

22  A.   Yes, I think it's fair to say we have established marketing

23  channels.

24  Q.   And you have established retail and wholesale channels as

08:58  25  well?

1    A.    Yes, we have established retail and wholesale channels.

2    Q.    And such established channels allows you to sell your

3    products.  Is that right?

4    A.    I don't -- I think the answer is a little bit more

08:59   5    complicated than a yes or no.  In our direct channels, channels

6    we own, we can sell whatever we choose.  Every year with our

7    wholesale channel, which is our largest channel, it's a

8    constant negotiation with those retailers as to what product

9    they're going to sell, so we can't just put whatever product we

08:59   10   want on the store at Dick's and REI.  That's a conversation

11   with those retailers.

12   Q.    But given your size and your place in the market and your

13   relationship with your wholesalers, you don't need to

14   participate in certain trade shows, for instance.  Is that

08:59   15   fair?

16   A.    Again, I think that's a complicated answer.  When you look

17   at the breadth of our business, there are some elements that

18   are more developed and some that are not.  We do take part in a

19   number of trade shows where we do need to be there for specific

08:59   20   retailers and specific product lines.

21   Q.    Do you attend the Snow Sports Industries America trade

22   show?

23   A.    I do not.

24   Q.    What about Columbia?  Does it have a presence there?

09:00   25   A.    I don't believe we've had a formal presence there for some

1    time.

2    Q.   And is that because you have relationships with vendors and

3    wholesalers such that you don't need to go to the Snow Sports

4    Industries America trade show in order to establish those

09:00   5    relationships?

6    A.   No, actually, I don't think that's accurate.   There's two

7    competing trade shows.   There's Outdoor Retailer and SIA.

8    There's a lot of crossover.   The same customers tend to go to

9    the same two trade shows, so we've made an investment in

09:00   10   Outdoor Retailer because we don't think it makes sense to go to

11   both shows, and increasingly SAI is more focused on hard goods,

12   skis, poles, things like that, and OR is specifically focused

13   on the business brand.

14   Q.   You've testified that the sales of Omni-Heat have boosted

09:00   15   Columbia.   Is that right?

16   A.   Yes.

17   Q.   And Omni-Heat was released to the public or commercially in

18   2010.   Is that correct?

19   A.   That's correct, in the fall of 2010.

09:01   20   Q.   Go back with me.   At that time the country was starting to

21   come out of a bad economic slump.   Is that fair?

22   A.   Yeah, I don't recall the exact time of the recession, but

23   it was within a couple years of that.

24   Q.   2007, 2008, 2009, does that ring a bell?

09:01   25   A.   Again, I don't remember the exact date, but, yes, there was

1    a recession in the 2000s.

2    Q.    Is it fair to say that ski gloves are discretionary

3    purchases?

4    A.    I don't know if I can answer that.  It probably depends on

09:01    5    what part of the country you live in.  If it's below zero,

6    probably not as discretionary as if you're living in San Diego.

7    Q.    But if you're buying the gloves in order to ski, that

8    would -- you'd consider that discretionary?

9    A.    Yes, if you're skiing, that's probably a discretionary

09:02    10    effort unless it's your job to work on a ski hill.

11    Q.    And discretionary to a layperson would mean that people buy

12    it when they have the money, and they do it for enjoyment?

13    A.    That's how I would define it, yes.

14    Q.    Such purchases decrease during bad times.  Is that fair?

09:02    15    A.    Yes, I think some sales increase and decrease depending on

16    the economy.

17    Q.    As the economy recovered after the slump, sales increased

18    in discretionary products such as ski gloves.  Is that fair?

19    A.    I think that's a broad generalization, but -- I can't speak

09:02    20    of the economic input on the ski glove industry specifically,

21    no.  I don't have an opinion on that.

22    Q.    Is it fair to say that the increase in Columbia sales with

23    the Omni-Heat technology coincided with the increased activity

24    in the economy overall 2010 onward?

09:02    25    A.    I'm not an economist.  To try to correlate sales of a

1    specific product line to macroeconomic trends, I mean I don't

2    have an educated opinion on how those two correlate.

3    Q.    Fair enough.    Thank you, Mr. Trepanier.

4         Columbia has other features and technologies that it uses

09:03    5    in its products.    Is that right?

6    A.    Yes, that's true.

7    Q.    It's not uncommon, in fact, for Columbia's products to

8    incorporate multiple technologies?

9    A.    That's also true, yes.

09:03    10         MR. SPROUL:    If I could ask Mr. Volper to pull up

11    Exhibit 289 -- which I believe you testified to yesterday --

12    and go to page 235.    I'm sorry, 689.    I wrote that down wrong.

13    We're going to do this the old-fashioned way, I guess.

14    BY MR. SPROUL:

09:04    15    Q.    Mr. Trepanier, I'm putting in front of you what has

16    previously been introduced as Exhibit 689.    And I'm identifying

17    page ending in Bates number 183.    Do you see that?

18    A.    Yes, I do.

19    Q.    Do you see those various brand icons on the page?

09:04    20    A.    Yes.

21    Q.    And those are Columbia's Omni brands.    Is that fair?

22    A.    I mean they are technologies.

23    Q.    Your technologies.    And in addition to Omni-Heat, there is

24    Omni-Freeze, Omni-Wick, Omni-Dry, Omni-Tech, Omni-Shield,

09:05    25    Omni-Shade, Omni-Grip.    Is that right?

1    A.   That's correct, yes.

2    Q.   Another of your technologies would be OutDry.  Is that

3    fair?

4    A.   OutDry is a technology, yes.

09:05   5    Q.   And that was a technology you purchased?

6    A.   That's correct.  We purchased OutDry as a company in 2012,

7    I believe.

8    Q.   That didn't come from Mr. Blackford's innovation lab.  Is

9    that fair?

09:05  10    A.   No, that was a purchased company.

11    Q.   And what about Omni-Heat Electric?  I don't see that on

12    there, but I think you mentioned that earlier.  It was short

13    lived?

14    A.   Yes, so, again, I think I mentioned when we referenced

09:05  15    Omni-Heat, there's several technologies under that portfolio.

16    Really internally when we say "Omni-Heat," we mean Omni-Heat

17    Reflective.  But yes, there was an Omni-Heat Electric that was

18    short-lived.

19    Q.   What was that?

09:06  20    A.   Battery-powered heat in footwear and jackets.

21    Q.   What happened to that technology?

22    A.   We didn't feel it was safe, so we pulled it from the

23    market.

24    Q.   Were there any specific instances where someone was hurt

09:06  25    because of the Omni-Heat Electric technology that you put into

1    your jackets?

2    A.    I don't remember the specifics.  I don't remember the

3    specifics of the recall.

4    Q.    Now, other than Omni-Heat, none of these Omni brands are

09:06    5    covered or relate to the utility patents at issue in this case.

6    Is that fair?

7    A.    I don't have background on the patents related here.  I

8    don't know.

9          MR. SPROUL:    Mr. Volper, could you pull up Exhibit 36,

09:06    10    please.  If you could turn to page ending in Bates number 330.

11    Actually -- yeah, 330 is fine.

12    BY MR. SPROUL:

13    Q.    Do you recognize this glove shown on page 330 of

14    Exhibit 36?

09:07    15    A.    Yes, I do.

16    Q.    And do you see on the right-hand side there's the men's

17    Zircon Ridge glove?

18    A.    Yes, I see that.

19    Q.    And underneath the picture of the glove is a column titled

09:07    20    "Features."  Do you see that?  It's very small print.

21    A.    I do, yes.

22    Q.    And the first feature is Omni-Heat which we're familiar

23    with?

24    A.    Uh-huh.

09:07    25    Q.    And under that are a number of additional features.  Is

1    that fair?

2    A.    Yes, that's accurate.

3    Q.    There are ten additional features in addition to Omni-Heat?

4    A.    Correct.

09:07    5    Q.    The first is OutDry waterproof, and then you've got

6    Pittard's goatskin leather palm, right?

7    A.    Yes.

8    Q.    Pittard's water-resistant digital sheepskin leather

9    overlay?

09:08    10    A.    Yes, that's what it says.

11    Q.    In addition to your OutDry, you've got two different

12    animals on this particular glove.  Is that right?

13    A.    That's what this says, yes.

14    Q.    And those are features that are not covered by the utility

09:08    15    patent.  Is that fair?

16    A.    Again, I don't -- I'm not an expert on patents.  I haven't

17    read the patent, so I don't know.

18    Q.    There's another point there, the 3-point precurve.  You had

19    talked about that yesterday.

09:08    20    A.    Yes, I did.

21        MR. SPROUL:  In fact, if I could ask Mr. Volper to go

22    up a page to Bates ending in 329.

23    BY MR. SPROUL:

24    Q.    3-point precurve was the featured technology in the fall of

09:09    25    2013 marketing document of Exhibit 36.  Is that fair?

1    A.    It is the primary message in this marketing material, yes.

2    Q.    And 3-point precurve is not part of the patents that are at

3    issue in this suit.  Is that right?

4    A.    I don't know.

09:09    5    Q.    Now, these features that we've talked about, in addition to

6    Omni-Heat, 3-point precurve, the goatskin, the sheepskin, the

7    Omni-Wick, the Omni-Tech, the Omni-Freeze, those features are

8    important to Columbia?

9    A.    Yes.   Our technologies are important and features are

09:09    10    important.

11    Q.    And people buy gloves based on some of these other

12    technologies.  Is that fair?

13    A.    Yes, I would assume people look for certain features, and

14    that's what influences their purchase.

09:09    15    Q.    That's why you include them and highlight them in the

16    product, in fact, right?

17    A.    Yes.

18    Q.    Now, you agree that it's a reach to say the consumers make

19    their purchasing decision based on whether a product contains

09:10    20    Omni-Heat.  Is that right?

21    A.    No, I don't think that's accurate.  I think a lot of the

22    features you referenced are similar in a lot of different

23    products.  I think Omni-Heat we felt was a different shade and

24    feature.

09:10    25    Q.    In your deposition, you were asked --

1          MR. SPROUL:    And I would ask Mr. Volper to pull up his

2   depo at page 105, starting line 23.    It continues on to page

3   106.

4   BY MR. SPROUL:

09:10   5   Q.    You were asked "The eighth bullet on Exhibit 10 reads

6   'Consumers make their purchasing decisions based on whether

7   products contain Omni-Heat Reflective technology.'    Do you see

8   that statement?"

9          Your answer:    "Yes.

09:10   10          "Do you agree with it?"

11          And you said, "I would agree that some consumers make their

12   purchasing decisions based on -- I think it may be kind of a

13   reach to say customers in general."

14          You agreed at the time that it was a reach to say customers

09:11   15   in general make purchasing decisions based on Omni-Heat

16   Reflective.

17   A.    Yeah.    I think what I meant was that when you look at

18   individual consumers, like one at a time, they may have

19   multiple motivations for buying a product.    And this goes back

09:11   20   to the research study I talked about yesterday.    When you look

21   at hundreds or thousands of consumers, you can start to see

22   trends that help us understand what are the most important

23   messages and features at a large scale.

24   Q.    But you agree that -- I'm sorry.    Apparently a graphic was

09:11   25   behind my question.    I'm going to reask or at least reread into

|       |    |                                                                          |
|-------|----|--------------------------------------------------------------------------|
|       | 1  | the record the -- your deposition testimony.                             |
|       | 2  | MR. AXELROD:  I'd object.                                                 |
|       | 3  | THE COURT:  Sustained.                                                    |
|       | 4  | MR. SPROUL:  Okay.  We'll move on.                                        |
| 09:12 | 5  | BY MR. SPROUL:                                                            |
|       | 6  | Q.  In addition to Omni-Heat, you agree that there are other             |
|       | 7  | factors that consumers consider when they buy gloves, for                |
|       | 8  | instance?                                                                 |
|       | 9  | A.  Yes.  Individual consumers might have individual features           |
| 09:12 | 10 | they're looking for.                                                      |
|       | 11 | Q.  These factors include color?                                         |
|       | 12 | A.  Yes.                                                                  |
|       | 13 | Q.  Sizing?                                                              |
|       | 14 | A.  Yes.                                                                  |
| 09:12 | 15 | Q.  Fit?                                                                  |
|       | 16 | A.  Yes.                                                                  |
|       | 17 | Q.  Quality?                                                             |
|       | 18 | A.  Yes.                                                                  |
|       | 19 | Q.  Brand name?  Some people buy gloves because they're                  |
| 09:12 | 20 | Columbia.  Isn't that right?                                             |
|       | 21 | A.  Yes.                                                                  |
|       | 22 | Q.  Some people by Seirus gloves because they're Seirus,                 |
|       | 23 | because of the brand name.  Isn't that fair?                            |
|       | 24 | A.  That's correct.                                                      |
| 09:12 | 25 | Q.  Other features include the design of the cuff on the glove?          |

1  A.   That is a feature of a glove, yes.

2  Q.   And that is a factor that consumers take into account when

3  purchasing gloves?

4  A.   Some consumers maybe.  Again, I think my job is to look at

09:13  5  what attracts consumers in aggregate at scale.

6  Q.   Mountain Hardwear is a Columbia brand.  I think you

7  testified to that yesterday.

8  A.   It's part of the Columbia family of brands, yes.

9  Q.   Mountain Hardwear sells high end, premium jackets?

09:13  10  A.   Yes, they do.

11  Q.   In addition to other clothing and accessories?

12  A.   That's correct.

13  Q.   And they're considered perhaps more premium than Columbia.

14  Is that fair?

09:13  15  A.   I would say some consumers may say that.

16  Q.   Mountain Hardwear doesn't use Omni-Heat at all in any of

17  its jackets, does it?

18  A.   I'm not aware of them using Omni-Heat Reflective in their

19  jackets.

09:13  20  Q.   Yet the quality of the Mountain Hardwear Jackets is

21  considered to be high?

22  A.   Yes, I would say it's considered high quality.

23  Q.   People stay plenty warm using Mountain Hardwear jackets

24  without Omni-Heat?

09:14  25  A.   Some people stay warm, sure.

1    Q.    Columbia, in fact, sells jackets without Omni-Heat as well,

2    don't they?

3    A.    Yes, we do sell jackets without Omni-Heat Reflective.

4    Q.    You don't consider Seirus a substantial competitor in the

09:14    5    U.S. to Columbia, do you?

6    A.    Substantial?  Can you give me a point of reference for

7    substantial?

8    Q.    Do you have a sense whether or not that's true based on

9    your understanding of substantial?

09:14    10    A.    I believe Seirus is a competitor.

11    Q.    Now, you were asked to name competitors in your deposition,

12    and you named five other companies prior to Seirus.  In fact,

13    you didn't name Seirus until you were prompted.  You named The

14    North Face, Marmot, Under Armour, Nike, Terex, all before

09:15    15    Seirus, right?

16    A.    Yes, that's accurate.

17    Q.    Columbia is far larger than Seirus.  Isn't that right?

18    A.    I don't know what Seirus' market size is.

19    Q.    You saw the slide yesterday that showed Seirus' revenues

09:15    20    from the accused products?

21    A.    Yes, I did.

22    Q.    Do you recall the number being around ███████ over the

23    entire period that we're considering here?

24    A.    I recall seeing that, but I don't know what our volume of

09:15    25    glove sales are, so I don't have a point of comparative

1    reference.

2    Q.    Well, that ████████ was -- that Seirus has sold in

3    revenue over the last four years is less than your marketing

4    budget for fall 2017.    Is that right?

09:15    5    A.    Yes.

6    Q.    Your marketing budget I think you testified to for fall of

7    2017 was $9 million?

8    A.    In the range of 9 million.

9    Q.    Do you understand that Seirus sells more gloves than

09:16    10    Columbia sells gloves?

11    A.    Again, I don't have a sense of relative sales figures for

12    gloves.

13    Q.    Sitting here you can't tell me whether Columbia sells more

14    or fewer gloves than Seirus?

09:16    15    A.    No, I can't say that.    I generally don't look at gloves on

16    a day-to-day basis.

17    Q.    Seirus doesn't compete with Columbia in other product

18    categories such as jackets, shoes, shirts?

19    A.    I don't know what other -- what the extent of Seirus

09:16    20    products are and what they've sold in the past.

21    Q.    What percentage of Columbia's revenue are gloves?

22    A.    I couldn't tell you.    I don't know.

23    Q.    Less than 1 percent?

24    A.    Is that a question?

09:16    25    Q.    Yes.

A.   I don't know.

Q.   Do you have any reason to believe it's more than 1 percent of Columbia's sales?

A.   I don't have any -- I don't have anything to help me form an opinion on that.  I don't track gloves as a portion of total sales.

Q.   You aren't aware of any instance where anyone has expressed confusion between a Columbia Omni-Heat product and a Seirus product.  Is that right?

A.   I don't have firsthand knowledge of that.

Q.   Yesterday you provided an analysis of Seirus marketing efforts including looking at their hangtags and some of their brochures.

A.   Yes, that's correct.

Q.   And you provided opinions of Seirus of the design of these particular marketing accessories, the hangtags and the brochures.

A.   Yes.

Q.   And before this trial, apart from efforts related to this trial, you hadn't analyzed those tags or brochures.  Is that fair?

A.   That's correct.

Q.   You looked at -- as part of your analysis, you looked at the colors and size of the font and the orientation of the hangtags?

1    A.    Yes.

2    Q.    And you had names that you ascribed to the name tags, the

3    positions on the name tag.  Is that right?  Primary, secondary,

4    I think you used those terms to describe Seirus hangtags?

09:18    5    A.    Yes.  I formed my opinion on what I thought the primary and

6    secondary messages were.

7    Q.    And you weren't involved, of course, in creating those

8    hangtags.

9    A.    No.  I can't fully understand the intent of the person who

09:18    10    designed them, but as someone who does that on a daily basis, I

11    think I have a fairly good opinion on how these things come

12    together.

13    Q.    Okay.  Well, I think you answered my question.

14                MR. SPROUL:  No further questions at this time,

09:18    15    Your Honor.

16                THE COURT:  Redirect?

17                MR. AXELROD:  May I approach the witness?

18                THE COURT:  You may.

19                       REDIRECT EXAMINATION

09:19    20    BY MR. AXELROD:

21    Q.    Mr. Trepanier, will a large marketing budget sell a bad

22    product or a product that doesn't work?

23    A.    My experience is that you can't put lipstick on a pig.  You

24    have to start with a good product.

09:19    25    Q.    Do you have any personal experience with an example of

1    that?

2    A.    I have.    Unfortunately, I have many experiences of

3    marketing not being effective when the product wasn't

4    successful.    I think one that jumps to mind is I talked about

09:19    5    working for Microsoft and marketing Bing.    The launch budget on

6    that was in excess of half a billion dollars, and today we

7    aren't saying, "Bing it."    We're saying, "Google it," so that's

8    a sign that you can't always throw money at a problem to solve

9    it.

09:20    10    Q.    I handed you some products.

11         MR. AXELROD:    Could we pull up Exhibit 129, please?

12    BY MR. AXELROD:

13    Q.    Yesterday Mr. Sproul asked you some questions about the

14    products on this page.    Do you recall that?

09:20    15    A.    Yes, I do.

16    Q.    And he asked you about the hat product.    Do you have the

17    skullcap up there, the HeatWave skull?

18    A.    Yes, this appears to be the same product.

19    Q.    Could you hold it up so the jury sees what you have?    Does

09:20    20    it have a style number of it?

21    A.    Yes.    O -- if I'm reading the correct number, 032814.

22    Q.    How about a 2209?

23    A.    Oh, sorry.    It's back here, 2209, yes.

24    Q.    And how is that product displayed to the consumer to be

09:21    25    worn?

|  |  |  |
|---|---|---|
|  | 1 | A.   Well, it's displayed with the black side facing out and the |
|  | 2 | reflective on the inside of the hat. |
|  | 3 | Q.   And is it also shown on the Seirus advertisement to be |
|  | 4 | marketed as reversible? |
| 09:21 | 5 | A.   It's marked as reversible in this catalog. |
|  | 6 | Q.   And if you reverse it, or you look inside, what do you see? |
|  | 7 | A.   I seat HeatWave reflective print. |
|  | 8 | Q.   Do you have two examples of sock products from Seirus? |
|  | 9 | A.   Yes.  Yes, I do. |
| 09:21 | 10 | Q.   And do you see the style number 2148? |
|  | 11 | A.   I do. |
|  | 12 | Q.   Now, I will ask you to assume there will be later evidence |
|  | 13 | to cover this point that this style number covers two different |
|  | 14 | product models. |
| 09:22 | 15 | A.   Okay. |
|  | 16 | Q.   And do you have two different product models showing that |
|  | 17 | same style number? |
|  | 18 | A.   Yes, I believe there's two different -- |
|  | 19 | Q.   They're a little hard to find.  You can find them on |
| 09:22 | 20 | Seirus' bar code. |
|  | 21 | A.   Okay.  Yes, 2184 and 2184. |
|  | 22 | Q.   How about 2148? |
|  | 23 | A.   2148. |
|  | 24 | Q.   And is one of them in the original plastic bag? |
| 09:22 | 25 | A.   Yes, this one here is in the plastic bag. |

1    Q.    Would you take it out of the plastic bag and hold it up as

2    it's to be displayed?

3          And is there HeatWave lining or the wavy line pattern in

4    any part of that product?

09:23    5    A.    I would say HeatWave lining is on the inside of the

6    product.

7    Q.    Okay.    Do you understand that that product is accused of

8    infringing the utility patent because the HeatWave lining is on

9    the innermost surface of the product as it's intended to be

09:23    10    used?

11          MR. SPROUL:    Objection.    Foundation.    He's already

12    testified he doesn't know about the patent.

13          THE COURT:    Your objection is overruled.    You can

14    answer the question.

09:23    15          THE WITNESS:    Yeah.    Again, I'm not terribly

16    comfortable speaking to the specifics of the patent.

17    BY MR. AXELROD:

18    Q.    Well, I wasn't asking you the specifics of the patent.    I

19    was asking you the specifics of Columbia's position in the suit

09:23    20    with respect to what is infringing and what is not.

21    A.    Yeah.    In the infringement, I don't understand the

22    specifics.

23    Q.    Fair enough.    Would you -- do you have --

24          MR. AXELROD:    Pull up the second glove model under

09:24    25    2148.

BY MR. AXELROD:

Q.    Now, is that shown for its intended use differently than the prior model of 2148?

A.    It appears they're putting the reflective on the outside of the -- of the sock.

Q.    Now, yesterday Mr. Sproul asked you a question about that in which he suggested there was no accusation of infringement with respect to this product.  Do you understand that to be incorrect?

A.    I do understand that there is a design patent related to the print.

Q.    And do you understand that all of the Seirus products that use the HeatWave fabric are accused of infringing the design patent?

A.    Yes, I understand that.

Q.    And are you aware that the Court has made that determination that, in fact, they do infringe?

A.    Yes, I do recall that from the opening statements.

        MR. AXELROD:   No further questions.

        THE COURT:   Do any of the jurors have a question for this witness?  If so, please raise your hand.  No questions. You may step down.

        Call your next witness.

1          MR. ALDRICH:  Your Honor, plaintiff calls Woody

2    Blackford.

3                   MICHAEL "WOODY" BLACKFORD,

4                   PLAINTIFF'S WITNESS, SWORN

09:25    5          THE CLERK:  Would you state and spell your full name

6    for the record.

7          THE WITNESS:  Blackford, B-l-a-c-k-f-o-r-d.  First

8    name Michael, M-i-c-h-a-e-l.

9          THE COURT:  You may inquire.

09:25   10                   DIRECT EXAMINATION

11   BY MR. ALDRICH:

12   Q.   My first question was going to be could you state your

13   name, please, but I guess we covered that.

14   A.   Yeah, my middle name is Edward.  We can add that in there.

09:26   15   Q.   Thank you.

16        And, Mr. Blackford, what is your position at Columbia

17   Sportswear?

18   A.   I am currently the vice president of design and innovation.

19   Q.   And how long have you been in that position?

09:26   20   A.   I've been in that position for about four years with that

21   title.

22   Q.   And what are your responsibilities as the vice president of

23   design and innovation?

24   A.   I'm responsible for coming up with a lot of our products

09:26   25   and overseeing the design of them as well as the innovation

1    platforms that we create to put in them as well as actually

2    personally being involved directly in both of those activities.

3    Q.    How many people work for you?

4    A.    It varies a little bit, but between 55 and 60 indirect

09:26    5    reports.

6    Q.    You said your title was vice president.  Is that correct?

7    A.    Yes, I'm a vice president.

8    Q.    Are you an officer of the company?

9    A.    I believe so.  Yes, I am.

09:27   10    Q.    And what kind of facilities do you have for your group at

11    Columbia Sportswear?

12    A.    Well, we have a few different spaces.  We have a space for

13    our design group for apparel design which is the apparel design

14    area, and then we have space for our footwear design area, and

09:27   15    then we have really my favorite place, the innovation lab.

16    Q.    And can you tell us about the innovation lab.  What's that?

17    A.    The innovation lab, which was talked about a little bit

18    earlier, it's a space about double the size of the courtroom

19    here, maybe a little bigger.  It shares the thing that has no

09:27   20    windows in it.  It's a little bit like that.  But inside we

21    have a lot of really fun toys to help us understand materials.

22    So we have a thermal chamber, which is a room that you can

23    basically create a storm inside so that you can have controlled

24    weather environment.  We have a lot of thermal imaging systems,

09:28   25    which is one of my favorites to work with because you can

1    really see what's happening with materials.  We have 3-D

2    printing and a lot of sophisticated equipment, but at the end

3    of the day, it allows us to have ideas and then test them.

4    Q.    When was the innovation lab built?

09:28    5    A.    The innovation lab that we're in now was completed in 2011

6    actually.  Before that we had similar spaces, but smaller with

7    not as many fun toys.

8    Q.    Do you go to any trade shows as part of your work?

9    A.    I do.  I go to the OutDoor Retailer show, which is a show

09:28    10    that's in Salt Lake City, and I've been going there for over 20

11    years, twice a year, so many times.  And then another big show

12    that we go to is called the ISPO show, which happens in Munich,

13    Germany, once a year, and I've been there maybe a dozen times.

14    Q.    Why do you go to trade shows?

09:29    15    A.    The main reason the company brings me to trade shows is to

16    explain our technologies to our retail customers that also

17    attend the shows.  So they want me there to explain how they're

18    different from what everyone else is doing and give them deeper

19    understanding.

09:29    20    Q.    Mr. Blackford, do you have a college education?

21    A.    I do have a college education.  Yes.

22    Q.    From where?

23    A.    From St. Francis Xavier University in Antigonish, Nova

24    Scotia, Canada.

09:29    25    Q.    And can you tell the jury where is Antigonish?

A.    Well, if you get out the map, it's about as far as you can

be from here on the East Coast and still be in North America.

It's in the Maritimes of Canada, getting up there into the

Atlantic Ocean.

09:30    Q.    Cold there?

A.    Definitely cold, yes.

Q.    What is your college degree in?

A.    My college degree is in business administration and

economics.

09:30    Q.    This has nothing to do with textiles?

A.    Not a thing.

Q.    Or science?

A.    Well, some people like to think of economics as a

pseudoscience where we did a lot of modeling.  I did take

09:30    calculus and whatnot, but it's not a science.

Q.    How did you develop an interest in science?

A.    Really, I think I have to credit it to my father.  He's an

M.I.T. graduate and has a Ph.D. in physics, and so I grew up in

this science household with an expectation that I would become

09:31    a scientist.  And my dad in my view was the smartest person I

knew, so I asked him a lot of questions, and I learned a lot

from him over time.  And as a kid, I used to play in his lab.

Q.    You said he had a lab?

A.    He had a lab.  He did applied physics, so frequently when I

09:31    was growing up from say the ages of 5 to 12 or so, he was

working on electron tunneling microscopes a lot.  So I would go

to his lab on the weekends, and he would go into his clean room

and work on his tunneling electron microscope, and leave me to

play with stuff outside the lab, and a lot of that was magnetic

filings and magnets.  I loved the magnetic field and sort of

learning how it worked.  The oscilloscope was one of my

favorite things to play with, and hook things up to it and see

what voltages were being generated by -- even your own body

actually generates some current, which is interesting.  Just

played around there a lot, and it was all kind of unchaperoned,

kind of learn as you go stuff, which I did make a few mistakes

that caused some concern.  But over time, you know, I started

to learn things, and I always had my dad to ask questions, and

so I felt like maybe there's where I picked it up.

Q.    Why did you not pursue a science degree in college?

A.    Well, the other thing that was happening in my life, as I

was growing up is I was very attracted to the outdoors, so I

liked going hiking, and I liked boating, and I liked being

outside.  And I was so attracted to it that at a very young

age -- I think today it would be called "child labor" -- I got

a job at an outdoor store kind of in the back room in Halifax,

Nova Scotia, where my dad was a professor, and, you know,

cutting up boxes, bringing in inventory, stuff like that, and I

really enjoyed that space.

Q.    What did you do after college?

A.   So basically -- well, let me finish that.  As I came up to

college, my dad was assuming that I was going to be in

sciences, and I didn't really have the heart to tell him that I

didn't want to go into science and I was thinking about this

outdoor industry.  And so I actually started in his department.

He signed me up for undergrad, you know, BSC, and after a

couple of months -- and I was still working at outdoor store

of -- really grappling with the thing.  I had to tell my father

that I didn't want to be in science and that I was going to go

and take a business degree.  And at that point he actually

financially said, "Okay.  Well, you're on your own.  You're

going to be paying for that" because he didn't consider it to

be worthy.  But that's the story of how I ended up in business

administration.

Q.   Okay.  So after college with the business degree, where did

you go next?

A.   So I moved from Nova Scotia, and you may not have heard of

it because it's a very small place populationwise, to Toronto,

Canada, where there was jobs and stuff, and I got a job at an

outdoor store.

Q.   And what was the outdoor store?

A.   That store was called The Trail Head in Toronto on Front

Street.

Q.   And where did you go after that?

A.   Well, what happened was working there, is I started to meet

the manufacturers.  They came in.  We were a fairly prominent

store in Canada, and I met the owner of a company called Sierra

Designs, and after meeting him several times and, you know,

showing him my interest in products, he hired me.

09:35  Q.    And when you left Sierra Designs, what was your title?

A.    I was the director of design as well as basically

manufacturing and sourcing, which was a strange combo, but

small company.

Q.    How did you end up rising to the level of being head of

09:35  products, head of design, for Sierra Designs?

A.    Well, a lot of it came from a design aptitude that I had.

I'd always liked to draw and stuff like that, and the minor

that I did take in college was art, and I was always drawing

pictures.  And I started drawing products to give to the owner

09:35  of the company, and he eventually decided to try one, and it

sold pretty well.  So I slowly was brought in to be in design

and kind of went from there.

Q.    Any particular successes you had at Sierra Designs?

A.    Yeah.  The first time I think I really made an invention

09:36  without really understanding that you could invent a fabric at

the time is what's now known in the industry as "soft shell."

And the way that that happened was my -- the owner of the

company asked me when I was on my way to the OR show, "Could

you make a fleece that doesn't collect dog hairs" because he

09:36  was annoyed with fleeces always collecting dog hairs.

1       So I said, "I think I can think about how to solve that."

2   So while I was at the show, it occurred to me that you could

3   now bond fabrics, and that was in the mid-90s.  Bonding wasn't

4   that common before with glues.  So what if we glued a woven

09:36   5   material to a fleece material and put it together.  We would

6   have a woven face, which means it's more like your shirt and

7   won't collect dog hair so easily, and then have the fleece in

8   back, and that became known as "soft shell."  And I developed

9   that, and I was definitely the first.

09:37   10      But the manufacturers and I, you know, agreed that they

11  could sell it to other people after a while because I just

12  didn't really realize we should try and protect that, and

13  neither did the owner of the company I was at the time.  So it

14  became actually a very big product in the industry that's sold

09:37   15  to this day with no named inventor.

16  Q.   And when did you join Columbia Sportswear?

17  A.   I joined Columbia Sportswear on September 12, 2005.

18  Q.   And you've been at Columbia ever since?

19  A.   I have.

09:37   20  Q.   When you started at Columbia, what was your position?

21  A.   When I started at Columbia, they didn't know me very well,

22  so I took a lower position from my old company and started as

23  an outerwear designer, senior outerwear designer.

24  Q.   And by 2008 what was your role?

09:37   25  A.   By 2008 -- in January of 2008, they decided to make me the

1    director of innovation, the first one that we had at the

2    company.

3    Q.    Now, prior to 2008, what types of materials did Columbia

4    use in its garments that it was designing?

09:38  5    A.    Well, mostly what we were doing is buying what I would call

6    ingredient brand technology.  So we were going to companies

7    like Gore-Tex or Polartec and buying fabrics from them to be

8    our technology, kind of like Lurex-type of thing, and that was

9    our process.  But the problem with it is that you never look

09:38  10   different.  You're not different from other brands, as we

11   talked about yesterday.

12   Q.    And was there a change in Columbia's position around 2008?

13   A.    Yes.  I had been doing some innovation before they actually

14   gave me the job, and actually I was remembering last night, I

09:39  15   got in a fair amount of trouble for that because I was creating

16   a lot of prototypes and not doing things efficiently.  And I

17   think our CEO, Tim Boyle, recognized that I would be better

18   suited to innovation-type work, but at the same time the

19   company was wanting to differentiate, wanting to make products

09:39  20   that weren't like everybody else's, and they felt like having

21   an innovation department that was focused on creating new ways

22   to keep people warm or dry or something like that, we would

23   have an opportunity to start to really move in that direction

24   and not be the same as everybody else.

09:39  25   Q.    And I believe you mentioned that there were four main

1    priorities in your -- when you started this innovation group.

2    A.    Yeah.    I mean at the highest level, our company's about

3    function and keeping people comfortable in any outdoor

4    environment, and then we made that -- you know, at the next

09:39    5    level, we said, "Let's try to create really original ideas and

6    be the best we can at keeping people warm, dry, cool, and

7    protected."

8    Q.    And in 2008 was there a particular product or idea you were

9    working on?

09:40    10    A.    Yes.    So at that point I was working on warm and how we

11    could be different and warm, and at the time, we had this idea

12    for a collection of ideas called Omni-Heat, and we made a

13    thermal insulation, and we made an electric product, and I was

14    looking for something more.

09:40    15    Q.    So what types of obstacles do you have in terms of making

16    people warmer?

17    A.    Well, and that's -- you know, it's brought me to more.    The

18    issue really is keeping somebody comfortable so they're not

19    feeling all hot and sweaty without adding bulk so that they're

09:40    20    not feeling weighted down, because if you're in a heavy

21    product, and you're -- you know, that's warm, just moving

22    around in it will make you sweaty.    So you need it to be as

23    light as possible yet providing the maximum warmth.

24    Q.    Did you have any particular objective in terms of

09:41    25    increasing the warmth?

A.    I did.    There's different ways you can think about it, but the industry has this measurement of insulation value called "CLO," C-L-O, and 1 CLO means the warmth of one British royal uniform.    That's how the term came up.    I was trying to reach 3 CLO in a very lightweight package, which hadn't been done in lightweight products, say under a hundred grams.    So my goal was to create a product over 3 CLO.

Q.    And at the time, were you aware of any other ways of increasing warmth other than just adding more insulation?

A.    Yeah.    I mean what was on my mind nagging at me is that, you know, you could use basically trapping air and all that stuff, but that really creates bulk.    But we have this space blanket out there, and it's been out there since NASA created it.    It's very effective at keeping someone warm.    It heats them up very quickly, but the darn thing is very uncomfortable to wear.    So that was really on my mind.    And the reason why a space blanket is --

MR. ALDRICH:    Can I approach?

MR. MARCHESE:    Can I object to the noise?

MR. ALDRICH:    Sorry about that.

THE WITNESS:    I think a lot of people object to the noise.

So the thing with this is -- the reason why it is effective is it's not -- because it's metal, actually, which is one of the things I think a lot of people misinterpret.    It's because

1    it's like a mirror.  So if you can hold something up and see

2    your reflection in it, it's like a mirror, and that's what

3    reflects stuff.  And I think a lot of the industry was getting

4    that confused with metal which -- really metal by itself is not

09:43    5    a mirror.  It's a conductor.  And if you think of a wire,

6    right, that usually wires are going to be made of metal because

7    they conduct electricity, but that makes them transfer things

8    like heat.

9        So what made this special is it was a mirrorlike surface,

09:43    10    but totally nonbreathable, very loud, no stretch.  You can't

11    wear it, and it's a sweat bag as we said yesterday.

12    BY MR. ALDRICH:

13    Q.   But it's fairly lightweight, right?

14    A.   Super lightweight, so you're getting just, you know, in a

09:43    15    few grams a lot of heat, you know, potential heat in terms of

16    what could be reflected.

17    Q.   For the benefit of everybody, I'll get that out of the way.

18        Did you ever consider the idea of using some sort of space

19    blanket in clothing?

09:44    20    A.   Yeah.  I was, as I said, thinking about that at around the

21    time I came up with an idea.

22        MR. ALDRICH:  If I could approach, Your Honor.  This

23    is Exhibit 305 which we'll offer.

24        THE COURT:  What is it?

09:44    25        MR. ALDRICH:  It's the patent.

1       THE COURT:   Any objection to 305?

2       MR. MARCHESE:   No objection, Your Honor.

3       THE COURT:   305 received.

4    (Exhibit 305 admitted.)

09:44   5       MR. MARCHESE:   Excuse me, Your Honor.

6    I don't have a book of your exhibits.

7       MR. ALDRICH:   Oh, I'm sorry.   I'll take care of that.

8    BY MR. ALDRICH:

9    Q.   Mr. Blackford, have you ever seen the document I put in

09:45   10   your hand before?

11   A.   To be honest, this is the first time I've got to actually

12   touch the original, but, yes, I've seen the written copy.

13   Q.   Okay.   And you're the -- this is the utility patent, right?

14   A.   If it's '270.   I'm just looking at the cover.   It doesn't

09:45   15   have numbers on it, but what's on my screen, yes.

16   Q.   Okay.   And you're the named inventor of this patent?

17   A.   I am.

18   Q.   And the patent's name you used -- you used the name Woody

19   Blackford.   Do you see that?

09:46   20   A.   Yeah.

21   Q.   Where did that name come from?

22   A.   Well, to not make a long story.   My name is Michael as I

23   told you, and when I was in -- actually, the first introduction

24   to school, kindergarten in a fairly small class, there were six

09:46   25   Michaels, so they started giving me -- I didn't get the Michael

1    award, so they started giving me other names which did not

2    start with Woody, but over time Woody came along, and I liked

3    it, so I stuck with it.

4    Q.   Do you remember when you came up with the invention that's

5    here in the utility patent?

6    A.   I do.

7    Q.   When was that?

8    A.   It was around the end of September or perhaps October 1st,

9    2008.

10   Q.   And where were you?

11   A.   I was in a meeting room -- I was actually kind of in the

12   process of training some fellow workers, Dean Rurak and

13   Lynnette Stiger, that were merchants.   They were people that

14   work on the architecture of our line, like how many styles we

15   have and whatnot.   And I was looking at, you know, the

16   disappointment which was an attempt at having the heat

17   reflection in a product.   So I was looking at a piece of

18   product that was 100 percent coated with a polyurethane and

19   aluminum in it and looking at its properties, and, first of

20   all, it was very uncomfortable.   It had very, very low

21   breathability results.

22        So that frustration was -- I was recounting that

23   frustration to my cohorts.   And then I wasn't sure that it was

24   even a reflector, and when I asked the supplier that was

25   showing me the fabric, you know, for the reflective results,

1    show me how reflective this is, they had none.  And it occurred

2    to me, you know, really what we need is the space blanket.  I

3    need to be able to hold this up.  I need to be able to see my

4    reflection in it, but I want the properties of all these high

09:48  5    tech fabrics we've developed that are stretchy and soft and

6    wicking and air breathable and moisture vapor, and why can't I

7    do that.

8        And I started thinking, well, what if I put little bits of

9    space blanket on there?  I should get a lot of that heat

09:48  10    reflection, but I can allow that base material to work and

11    still do what its job is.  So you notice when you held up

12    Omni-Heat yesterday, it's not noisy.  It's stretchy.  It has

13    all the properties of regular performance fabrics.

14    Q.    Did you believe at the time you had come up with a new

09:48  15    invention?

16    A.    I certainly had never seen anything like it, and I'm not

17    the sort of person to assume I have an invention not knowing

18    everything else about it, but it was top of mind to get it in

19    front of our team that works on patents.

09:49  20    Q.    And how long did it take your team to come up with a

21    marketable product from late September 2008?

22    A.    It took just about exactly two years.

23    Q.    And what was involved in the process of taking your idea

24    and over two years turning it into a marketable product?

09:49  25    A.    Well, a lot of things were involved.  The first thing was

1   to get some workable prototypes of the material and to find a

2   method to stick the equivalent of a space blanket on the

3   material, and then do a lot of testing because I actually

4   wanted to make sure that this was, in fact, a heat reflector

09:49   5   and also having the performance properties of the base

6   materials of the industry, and then a lot of field testing.  My

7   favorite test instrument is still a human, and if they tell me

8   it works, then that's what I'm really confirming that things

9   are in a good spot.

09:50   10          MR. ALDRICH:  I'd like to offer Exhibit 698.

11          THE COURT:  Any objection to 698?

12          MR. MARCHESE:  No objection, Your Honor.

13          THE COURT:  Received.

14      (Exhibit 698 admitted.)

09:50   15   BY MR. ALDRICH:

16   Q.   Mr. Blackford, what is Exhibit 698?

17   A.   This is the first presentation that I gave to the company

18   like as a whole about Omni-Heat.

19   Q.   And let's turn --

09:50   20   A.   Reflective, I should say.

21   Q.   I just said let's turn to page that ends in 577.

22   A.   Will the digital thing do that?

23   Q.   Yes, we'll get that up for you.

24       Can you explain what we see on the top of page 577?

09:50   25   A.   So here's some photographs of me in the thermal chamber

1   with what's called "a thermal manikin," or the industry has

2   nicknamed this particular kind of manikin Newton.  It's made by

3   Northwest Measurement Systems, and it's meant to simulate a

4   human body, particularly from the perspective of it struggling

09:51   5   to stay, say, cool in a hot place or warmer in a cold place,

6   and it has heaters in it, 28 heaters simulating the body trying

7   to stay warm in different zones, plus it can actually sweat.

8   So it's a simulation of a human.

9       And then we're in this chamber that is creating cold

09:51   10   temperatures, and that gives you this controlled environment to

11   study insulations and things like heat reflection and how they

12   affect products.

13   Q.   And is this Omni-Heat that you're testing in these

14   photographs?

09:51   15   A.   On the left-hand side, that Columbia jacket does have

16   Omni-Heat Reflective inside, yes.

17             MR. ALDRICH:   Let's go ahead and zoom in on the bottom

18   of the page.

19   BY MR. ALDRICH:

09:52   20   Q.   And I see here in the second row, it talked about

21   reflective dots.   Are these the test results?

22   A.   Yes.   So basically this is the test results, and, you know,

23   my goal is to get basically high warmth with light weight.   So

24   you can see that the weight of the garment is the lightest of

09:52   25   the three, and the other two garments are more industry

1    standard similar products, but I'm getting to that CLO value of

2    over 3 in the product, and that was what our goal was.

3    Q.   Let's turn to page ending in 573.   What is this chart?

4    A.   So it looks kind of crazy.   But what this is is the readout

09:52    5    that comes from the thermal manikin.   The thermal manikin is

6    hooked up to software called ThermDAC, and it generates

7    information to show you how things are working.   So the green

8    line basically is the thermal resistance, and the higher that

9    is, the more insulating a product is.

09:53    10    Q.   And so just summarizing the results of what you see here,

11    what does this show in general?

12    A.    Okay.   So first of all, the first section up until a little

13    past 4:40 on the bottom there is a repeating experiment of two

14    different products.   So the one that says "Fall '09" is a

09:53    15    product from the season fall '09.   The one that says "OAG" is

16    the same product with Omni-Heat Reflective.   And then the FO9,

17    if -- it seems like a typo, but I did that again, and then

18    you'll see that FO9 repeated a third time, and then the other

19    OH, which will be OHE.   So I'm just repeating back and forth,

09:54    20    and you can see by adding Omni-Heat Reflective, you know, we're

21    getting in the range of 20 percent in that particular test of

22    the core of the body, more insulation value.

23         And then the blue line, if you're wondering what that is,

24    it's just showing how hard the manikin is working, so how much

09:54    25    power it's drawing.   So obviously when it's more insulated, it

1    doesn't draw as much power, so the blue line drops.

2    Q.   And was this the basis of the marketing materials that we

3    saw that said 20 percent warmer?

4    A.   It was one of the data points that we used.

09:54    5         MR. ALDRICH:   Let me offer Exhibit 22 --

6         THE WITNESS:   Oh, just to go back to that for one

7    second.   Is that too hard?

8    BY MR. ALDRICH:

9    Q.   That might be hard.

09:54   10    A.   You'll notice there was other stuff to the right.   That was

11    another jacket, a windbreaker, and then we added on the heat.

12         MR. ALDRICH:   Thank you.   We'll go to Exhibit 22.

13         THE COURT:   Do you have any objection to 22?

14         MR. MARCHESE:   Sorry, Your Honor.   Just a minute,

09:55   15    please.   No objection.

16         THE COURT:   22 is received.

17    (Exhibit 22 admitted.)

18    BY MR. ALDRICH:

19    Q.   Mr. Blackford, what is Exhibit 22?

09:55   20    A.   Exhibit 22 is further examination in a lab, our lab, of the

21    heat-reflective properties, and what this is telling you about

22    that -- you couldn't really send out a fabric for

23    heat-reflective testing at this time and get an industry

24    standard test.   The industry doesn't really do them.   So we

09:55   25    were looking at ways to do it, and that's what this is.

Q.    And so looking at the upper left-hand corner, I see this

test setup.  Can you explain briefly what the test setup is?

A.    Yes.  So what we're doing here is -- the thing that looks

like a lamp is a heat source.  The little rectangle at the

09:56    bottom is a piece of Omni-Heat Reflective fabric with the dots

facing towards the heat source.  And then the rectangle-looking

thing that's at an angle where the red line is connecting to it

is a thermal imaging camera.  And then we've noted that the

distance of the heat source from the material is 9 inches.

09:56    10    Q.    And on the left side of this, it lists a bunch of fabrics.

What are these different fabrics?

A.    So basically we start with a base material which would be

that type of material as I was saying that we want to enhance,

so like a common stretchy, air permeable, performance fabric

09:56    15    from the industry.  And then we have what's called "full foil"

which would be covering that 100 percent with space blanket so

we get to see what happens there.  And then we have four more

different coverages of foil on that same base fabric.

Q.    And the column right to the right of that?

09:57    20    A.    The percent foil coverage?

Q.    Yeah.

A.    Yeah.  So that is telling you so base has 0 percent

coverage; full foil has 100 percent coverage; what we call in

this test "regular dot" was 40 percent coverage; a little

09:57    25    bigger dot was 48; and even bigger one with different spacing

1    was 50.   And then to get to 67 percent, we actually had to make

2    bigger dots with little ones in between, so two different dots.

3    Q.   And the column to the right of that?

4    A.   So to the right of that is the temperatures that we're

09:58   5    recording with the thermal imaging camera of heat being

6    reflected back to the lens of the camera.

7    Q.   And to the right of that?

8    A.   And then to the right of that, we're calculating with base

9    as the 0 line, meaning not a reflective material, in the idea

09:58   10   of the industry, just a common base material.   And then the

11   full foils, we're considering that 100 percent, and then we're

12   looking at the fraction of heat reflection we're getting in

13   between.   So at 40 percent coverage, the thermal imaging camera

14   in this test is reading 39 percent heat reflection, so fairly

09:58   15   similar to the coverage.

16   Q.   Did you prepare a slide today to show the test results

17   here?

18   A.   I did.

19        MR. ALDRICH:   Let's go ahead and call up PDX1.

09:58   20   BY MR. ALDRICH:

21   Q.   What does this slide show here?

22   A.   So basically this is the plot of all those different tests.

23   So it's the 0 percent base material all the way up to the 100

24   percent covered, and then data point in between.

09:59   25   Q.   What do you call this type of relationship that you're

1    seeing here on this chart?

2    A.    Well, you could call it a straight line.    Another meaning

3    for that is that it's basically linear, so as we are increasing

4    percentages of foil coverage, we are also, you know, getting

09:59    5    that same increase in heat reflection.    So basically if you put

6    50 percent coverage, you get 50 percent more heat reflection,

7    so it's a very direct correlation.

8    Q.    Now, did you do any other types of testing besides heat

9    reflection in your work on developing Omni-Heat?

09:59    10    A.    Of course.    So, as I said, we wanted to get is this space

11    blanket, but we also wanted to have the properties of a regular

12    performance material, so we then had to test Omni-Heat in its

13    various coverages for things like air permeability, moisture

14    vapor transmission, those were key ones.

10:00    15    Q.    So let's talk about air permeability and let's go

16    to -- well, let me ask this:    When you were going to test air

17    permeability, did you have any expectations of what you would

18    see in terms of testing air permeability in Omni-Heat fabric?

19    A.    We did.    So our -- in our mind, because if you think of a

10:00    20    textile as an open structure, when you really get down

21    microscopically and look at it, it's full of holes, it has good

22    air flow.    We expected that if we covered half of it, we would

23    block half of its ability to have air flow.    Kind of like if

24    you eat half your pizza, half of it's gone, it's not coming

10:00    25    back kind of thing.    So we thought, you know, if it's half

1  plugged up, it's half gone in terms of its, you know, heat

2  reflection.

3         MR. ALDRICH:   So can we pull up PDX2.

4         THE WITNESS:   Or I meant air permeability.   Sorry.

10:01  5  BY MR. ALDRICH:

6  Q.   What does this chart show?

7  A.   So this is what we all expected.   This is what I expected.

8  This is what other fabric experts that I was working with on my

9  team, we all expected to see, oh, we're going to just have this

10:01  10  straight line just like the heat reflection in terms of loss of

11  air flow through the fabric.

12  Q.   So as you increase the amount of reflective material on the

13  fabric, you get a proportional increase in heat reflection, but

14  you're expecting the opposite in terms of its breathability.

10:01  15  Is that right?

16  A.   That's right.

17  Q.   Okay.   And is that what you found?

18  A.   To our surprise, no.

19  Q.   Really?

10:01  20         MR. ALDRICH:   So let's go to the next slide then.

21  BY MR. ALDRICH:

22  Q.   What does this slide show?

23  A.   So with different coverages, similar to what we talked

24  about with heat reflection, we were seeing that the air

10:02  25  permeability was staying extremely high such that at 70 percent

1    coverage, we're still in the 90s when it comes to air

2    permeability, 90 percent.  So we were really maintaining almost

3    all the air permeability of that air flow, which is critical to

4    our comfort.  The reason why we're all wearing textile shirts

10:02    5    right now and not foil or something like that is it has that

6    air flow.  And so to our surprise you could have high coverage

7    and maintain that air flow.

8    Q.    And did you test water vapor permeability as well?

9    A.    We did.

10:02    10    MR. ALDRICH:  Can we switch to the next one?

11    MR. MARCHESE:  I don't have copies of these slides.  I

12    wasn't given those either.

13    MR. ALDRICH:  You were produced those.

14    MR. MARCHESE:  But I'm wondering if you have a hard

10:02    15    copy.

16    MR. ALDRICH:  I don't have a hard copy with me.  I'm

17    sorry.

18    BY MR. ALDRICH:

19    Q.    I'm sorry.  You can go on.  What's shown in this slide?

10:03    20    A.    Okay.  So this is the moisture vapor transfer result, and a

21    lot like the air perm, we're still maintaining a lot of the

22    ability of the fabric to transfer moisture.  That base material

23    can still transfer moisture with high coverage.  So, again, at

24    70 percent coverage, we're getting 80 percent of the moisture

10:03    25    vapor transmission where we would expect it at only 30 percent.

So a substantial amount of the base material's ability to
perform is maintained while you have this high coverage of
space blanket.

     MR. ALDRICH:  Let's go to the next slide.

BY MR. ALDRICH:

Q.  And what does this slide show?

A.  So this is just the whole collection.  So you've got the
green line which was the heat reflection and that straight
linear line, and then plotting on here, you know, the general
curves of what you're going to see with air permeability and
moisture vapor transmission.

Q.  And what did you end up concluding as a result of this
analysis work?

A.  Well, that we had something more special than we'd even
expected.  When I sat at the table that day and thought of
doing this, I didn't expect that we'd be able to maintain so
much comfort while having so much heat reflection.

Q.  And so what does this slide show?

A.  So this just shows you, you know, the range of 30 to 70
percent and how it would be an optimal range because the heat
reflection at 30 percent is quite low, so if you don't get
above that, you're not really getting much.  Obviously, you're
still getting a lot of the moisture vapor transmission, air
perm, but at about 70, you're starting to see much bigger
erosion in the air perm and moisture vapor transmission, so it

1   seems like where you'd want to cut it off.

2   Q.   Are you aware of anyone else that at the time was using

3   metal in clothing to try to increase warmth?

4   A.   Yeah.  I had seen metal a lot in clothing and -- and was

10:05  5   often frustrated by really how people misunderstood what that

6   meant.  As I said, metal is like a wire, and if you have little

7   wires running through a material, that doesn't make a mirror,

8   and what you really needed was the mirror.  You needed the

9   reflector.  And so most of the metal products either had total

10:05  10   coverage of not a very good reflector that didn't breathe at

11   all, or they had some way of trying to get metal bits into

12   things that didn't work like mirrors.

13   Q.   You heard reference during the opening presentation about a

14   Castelli jacket?

10:06  15   A.   Yes.

16   Q.   Did you ever see a Castelli jacket?

17   A.   I did.

18   Q.   What was the Castelli jacket?

19   A.   So the Castelli jacket is a bike jacket that was something

10:06  20   we wanted to submit to the patent office for them to consider.

21   And the way that it works is it is a full coverage, 100 percent

22   coverage of foil -- or actually not even a foil in that case,

23   so not a very good reflector.  It was more of a PU with bits in

24   it.  But let's say even if it was foil -- so at that 100

10:06  25   percent coverage, and it is attached to a base material in 100

1    percent coverage.

2        And then what they do is put holes in it which gives you,

3    yes, some air perms, but it exposes none of the base material,

4    and that means it can't do all the things you want it to do.

10:07    5    It still doesn't stretch like a space blanket.  It doesn't have

6    the moisture vapor transmission because there is no base

7    material to pick up your sweat.  So it's still actually ends up

8    performing like a sweat bag.

9        And if you look at the reviews of the product that, in

10:07   10    fact, is written in articles, that people hated how it felt

11    against their skin because it ended up still being more of, you

12    know, the same, which was a sweat bag.

13    Q.   And when you say they poked holes in it, they poked holes

14    through the foil, or they poked holes all the way through?

10:07   15    A.   All the way through everything.

16                MR. MARCHESE:  Objection, Your Honor.  Speculation.

17                THE COURT:  Overruled.

18                THE WITNESS:  Yeah, all the way through both layers,

19    so a layer of 100 percent coverage of foil and also the base

10:07   20    material, so clean-cut holes.

21    BY MR. ALDRICH:

22    Q.   Just to lay the foundation, did you ever see a Castelli

23    jacket?

24    A.   I did.

10:07   25    Q.   Did you ever try it on?

1    A.    I tried.

2    Q.    And?

3    A.    It was very small.  It was an Italian bike jacket.  So I'm

4    a big guy, so I got my arms in there and whatnot, but other

10:08    5    people that worked with me that could wear it, we tried it on,

6    and it definitely had that crinkly, sweaty, all wrong, not

7    going to be comfortable problem.

8    Q.    That's not your invention?

9    A.    No.

10:08    10    Q.    And you mentioned before that it took a couple of years to

11    fully develop Omni-Heat.  Is that right?

12    A.    Yes, it did.

13    Q.    And is there any kind of a review process at Columbia when

14    you have a product ready to go?

10:08    15    A.    Yeah.  I'm not authorized to just come up with something

16    and then go off to the races.  So I have to review it with our

17    executives, in particular our CEO, Tim Boyle, who we heard

18    about yesterday.  He's our president, actually.

19    Q.    And did you show Mr. Boyle your idea?

10:09    20    A.    I did along with a whole room of other people, so this was

21    kind of the first kind of really workable piece of material,

22    and I brought it into the boardroom, laid it on the table, and

23    the reaction was not good.

24    Q.    What do you mean "not good"?

10:09    25    A.    Well, I remember our CEO in particular, Tim, saying it was

1    the most garish thing he'd ever seen.  It looked like a disco

2    ball, and it would be an embarrassment to have it in a product.

3    Q.   Did you -- how did you feel about that?

4    A.   Well, as someone who invents things, I'm used to

10:09    5    resistance.  If someone's surprised or taken aback by something

6    I suggest, actually I start to think maybe I'm on to something

7    because if they haven't seen something like that before, it

8    gets you thinking, "Okay.  This is different."

9         And then I really focused on it functions.  This -- we've

10:10   10    tested it.  This works.  This could really change, you know,

11    how lightweight a product could be and be very warm.  So I

12    pushed hard to continue.

13    Q.   And were there any expectations set for Omni-Heat at its

14    launch after your meeting with the executives?

10:10   15    A.   Yeah.  So in alignment with the -- you know, the kind of

16    bad review, the company expected to sell very little, so they

17    allowed me to put it in a certain number of products and put

18    our forecast at very low numbers.

19    Q.   Do you remember what the numbers were?

10:10   20    A.   $3 million, maybe.

21    Q.   And did you manage to meet expectations?

22    A.   Yeah.  By the time we were into shipping for the season, we

23    had orders for $70 million, so it was over 20 times the

24    expectation which was surprising even to me.

10:11   25    Q.   Let me get a sample.  Is that an example of --

A.   Yeah.  So this is Omni-Heat Reflective, and you can see, A,
it's very quiet, nothing like the space blanket.  It's very
stretchy.

Q.   Is it stretchy in both directions?

10:11   A.   Yeah -- well, depending on the base material, if that's the
property of the base material.  And when it's against your
skin -- we've actually done blind tests because we think you
can feel it.  But if we do it, you actually can't even feel it
in terms of a texture, and it has those properties, you know.

10:11   When it's on that innermost surface, it's a great reflector
without the price of all the yucky stuff that comes with a
space blanket.

         MR. ALDRICH:  We can let the jury pass that around.

         THE COURT:  Do you want that marked as an exhibit?

10:12         MR. ALDRICH:  It is.

         THE COURT:  What number is it?  So if we're doing
things right, we don't hand things to the jury until they're
received.

         MR. ALDRICH:  I'm sorry.

10:12         THE COURT:  That's all right.

         MR. ALDRICH:  Is it okay if I introduce 629?

         MR. MARCHESE:  No objection.

         THE COURT:  Received.  You may hand it to the jury.

         (Exhibit 629 admitted.)

10:12         MR. ALDRICH:  Thank you, Your Honor.

1    BY MR. ALDRICH:

2    Q.   As long as we're doing show and tell, I have a couple other

3    examples you might talk about.

4              MR. ALDRICH:   This will be Exhibit 217.   Any objection

10:12    5    to 217?

6              MR. MARCHESE:   No objection.

7              THE COURT:   It is received.

8         (Exhibit 217 admitted.)

9              THE WITNESS:   So this is an Omni-Heat Reflective what

10:12   10    we call "base layer."   And what I love about this is, again, it

11    really talks to the lightweight package that's very warm.   So

12    you'll feel the weight of this garment is very light, but this

13    provides the warmth of much bulkier products.

14             MR. ALDRICH:   All right to pass it around?

10:13   15             THE COURT:   Yes.

16             MR. ALDRICH:   Thank you, Your Honor.

17        How about 707?

18             MR. MARCHESE:   Excuse me.   No objection.

19             THE COURT:   Received.

10:13   20        (Exhibit 707 admitted.)

21             THE WITNESS:   This is a pair of gloves, and we put

22    Omni-Heat Reflective in gloves and hats and footwear, which I

23    think Nika has there to give you an example, and obviously it's

24    in a glove, a pretty different thing.

10:13   25             MR. ALDRICH:   219.

1          MR. MARCHESE:  No objection, Your Honor.

2          THE COURT:  219 is received.

3      (Exhibit 219 admitted.)

4          THE WITNESS:  So in here we have a pair of Omni-Heat

10:13  5  Reflective winter boots which became quite popular.

6          MR. ALDRICH:  Can we call up Exhibit 31?

7      31 has already been admitted, Your Honor.

8      Let's go to page 5 here.

9  BY MR. ALDRICH:

10:14  10  Q.  We heard some testimony yesterday about the use of

11  Omni-Heat in shoes, Mr. Blackford.

12  A.  Right.

13  Q.  Did you use Omni-Heat in shoes?

14  A.  Clearly.  There's a pair.

10:14  15  Q.  And in shoes did you put Omni-Heat on the inside?

16  A.  That is where I wanted it to go, yes, always on the

17  innermost layer facing the body.

18  Q.  And why do you put it on the innermost layer?

19  A.  Well, because first to reflect heat, like I said with the

10:15  20  mirror, you have to be able to see your reflection.  Same

21  thing:  If there's something in the way of the mirror, the

22  mirror's not going to work very well, so you need to have the

23  mirror exposed.

24  Q.  Did Columbia ever put any Omni-Heat fabric on the outside?

10:15  25  A.  We did in my knowledge once.  And that was against my will,

1    and that was for a decorative idea which we didn't continue

2    with for very long.

3    Q.   Do you see the quote at the bottom of the screen here?

4    "Mr. Groff said this feature" -- well, let's read up a

10:15    5    paragraph.

6        It said, "Although that's not the case in footwear, as the

7    company launched several styles of boots and trail shoes where

8    the dot is both on the inside and outside of the products as

9    the new woman's Yama OutDry Flash."  Do you see that?

10:16    10    A.   Uh-huh.

11    Q.   And the quote below says, "Groff said this feature doesn't

12    serve any functional purpose.  It just looks cool."  Do you see

13    that?

14    A.   Yep.

10:16    15    Q.   What's your understanding of what's being referred to

16    there?

17    A.   Well, I think he's talking that they did put some

18    reflective on the outside for looks.

19    Q.   He's not referring to "it just looks cool" on the inside?

10:16    20    A.   No.

21            MR. MARCHESE:   Objection.   Speculation.

22            THE COURT:   Sustained.

23            MR. ALDRICH:   Thank you, Your Honor.

24    BY MR. ALDRICH:

10:16    25    Q.   When did Columbia first start to publicly launch Omni-Heat

1    Reflective?

2    A.   So the first time it was made public was at the Vancouver

3    Olympics in 2010, February 2010.

4    Q.   And were you part of that launch?

10:16   5    A.   I was.  I worked with the Canadian ski team to prepare

6    their competition outfits, and a key thing that we wanted to

7    integrate for them was Omni-Heat Reflective, and they tested

8    it, and they were keen on that, and we went ahead and did that.

9    Q.   And so what was the first product publicly known that used

10:17   10    Omni-Heat Reflective?

11    A.   The first one that I think was seen by the public was worn

12    by that moguls team on the first night of that Olympics in

13    2010.

14              MR. ALDRICH:  I'd like to offer Exhibit 696.

10:17   15              THE COURT:  Can you identify it for the Court, please.

16              MR. MARCHESE:  I'm not sure I've seen it before.

17              MR. ALDRICH:  Yes.  Maybe Mr. Blackford can identify

18    it.

19              THE COURT:  That would be great.

10:17   20              THE WITNESS:  This is the actual uniform that in this

21    case the moguls team wore, and we made an extra one.  You can

22    see it has signatures all over it.  Nika seems to have gotten

23    permission to get this out of our lobby where it's usually

24    under glass, but you can see --

10:18   25              THE COURT:  Well, that's okay.  Your job is just to

1    identify it.  You've identified it.

2        Now you can offer it.

3            MR. ALDRICH:  Offer 696.

4            THE COURT:  Any objection?

10:18   5            MR. MARCHESE:  No objection.

6            THE COURT:  It is received.

7        (Exhibit 696 admitted.)

8            THE COURT:  Now you can talk about it.  Ask your

9    question.

10:18   10            THE WITNESS:  Thank you.

11    BY MR. ALDRICH:

12    Q.  My question was what is it, and I think you've explained

13    it.

14    A.  It's, as I said, the Olympic uniform of the mogul skiers

10:18   15    from the 2010 Olympics where, in this jacket, Canada actually

16    won the first Gold Medal of the Olympics, but also the first

17    that they had ever won as a country on Canadian soil, so it

18    turned out to be a pretty big deal.

19    Q.  And were you there?

10:18   20    A.  I was there, and near me was the current and past Canadian

21    prime minister, so it was a big Canadian moment.

22    Q.  And you're Canadian?

23    A.  I am, born in Canada.

24    Q.  We looked at a few of the Omni-Heat products, and I think

10:19   25    you showed that the reflective parts of those Omni-Heat

1    products are on the inside of the jacket, like in the ski

2    jacket here.

3    A.    That's right.

4    Q.    And you said that there's a reason why you put it on the

10:19   5    inside.

6    A.    Yes.

7    Q.    Are you aware of approximately how many products Columbia

8    has sold with Omni-Heat Reflective technology?

9    A.    I've seen the list, and the number of different products is

10:19  10    in the thousands.

11    Q.    And where is Omni-Heat Reflective technology found in those

12    products?

13    A.    It's always on the inside of the product, facing the wearer

14    so that it can act as that reflective surface, heat-reflective

10:20  15    surface.

16    Q.    And that's the case in all several thousand products?

17    A.    That's the intention.  If we screwed one or two up, I'd

18    like to know about it.

19    Q.    Well, there was discussion yesterday of Exhibit 1031.  I

10:20  20    don't remember if this was submitted into evidence.

21            MR. MARCHESE:  It was not put into evidence to my

22    knowledge, Your Honor.

23            MR. ALDRICH:  Offer 1031.

24            MR. MARCHESE:  No objection.

10:20  25            THE COURT:  Received.

1        (Exhibit 1301 admitted.)

2    BY MR. ALDRICH:

3    Q.    Mr. Blackford, are you familiar with Exhibit 1031?

4    A.    Exhibit 1031?

10:21  5    Q.    The one in your hand.

6    A.    Oh, yes.

7    Q.    No, the one in your hand.

8    A.    Oh, this one.  I'm sorry.

9    Q.    Are you familiar with Exhibit 1031?

10:21  10    A.    I am, yes.

11    Q.    It's a Thermalux glove?

12    A.    Yes.

13    Q.    Is that your invention?

14    A.    Absolutely not, no.

10:21  15    Q.    Why is that not your invention?

16    A.    Well, as I talked about, to me this really represents the

17    wire type situation.  So you have metal yarns that are weaved

18    through the material, and if I hold my face up to it, I can see

19    no reflection.  So what you get out of that is conduction, and

10:21  20    it actually says on the hangtag here "heat-conducting fibers"

21    which means it moves heat from one place to another, but it

22    doesn't change its direction like a reflector.  So to me it's a

23    very different product.  Also, it has very different coverages

24    and stuff like that, but mostly it's conductive.

10:22  25        MR. MARCHESE:  If I may, just real quickly I think

1    that was Exhibit 1301, not 1031.

2                THE WITNESS:   1031 is on the --

3                MR. MARCHESE:   So it's 1031?

4                THE WITNESS:   That's what's I see, yes.

10:22    5                MR. MARCHESE:   Okay.   Thank you.   I just wanted to

6    make sure we got it clear on the record.

7    BY MR. ALDRICH:

8    Q.   You can set that down, Mr. Blackford.

9         Let's go back to Exhibit 305.

10:22    10    A.   That's not this.   Okay.

11    Q.   You -- for your Omni-Heat products currently, you use the

12    dot as we've seen, correct?

13    A.   Yes.

14    Q.   Have you considered using any other designs for Omni-Heat

10:23    15    products or reflective products at Columbia?

16    A.   Yes, we have.

17    Q.   And did you consider any of the designs that are shown in

18    your patent?

19    A.   We did.

10:23    20    Q.   Did you consider using Figure 3A at any point?

21    A.   Yes, we did.

22    Q.   And did you end up using Figure 3A for any of your

23    products?

24    A.   No, we didn't.

10:23    25    Q.   Why is that?

1    A.    The reason is, is that it turned out in manufacturing that

2    there was durability risks with certain shapes, and our

3    company's very concerned about durability, and I needed to

4    bring a product to market that would be able to last through a

10:23    5    lot of wear.    And it turned out that if you had straight lines

6    and pointy edges like this hexagon has, like pointy corners and

7    horizontal straight lines, in the use of the product and even

8    the manufacturing of the product, it was very at risk for

9    peeling and starting to come off and create kind of like the

10:24    10    corner of a stamp.    You know, if it was round, it's harder to

11    lift than if it has a sharp edge.    So basically our foil could

12    come off.

13    Q.    Did you look at Figure 3B at any point?

14    A.    Yes, I did.

10:24    15    Q.    And why did you not use Figure 3B?

16    A.    Exactly the same reason.    It's a triangle with sharp points

17    and presented that risk, the lift risk.

18    Q.    And how about Figure 3C?

19    A.    Same thing, squares, pointy, edges, and then those straight

10:24    20    horizontal edges as well.

21    Q.    And what about Figure 3E?

22    A.    That turned out to be the worst one.    Because of the way

23    that it's manufactured, particularly on rollers and with

24    pressure and lamination, straight horizontal lines across

10:25    25    created lots of problems.

1    Q.    And so does this explain one of the reasons you went with

2    the circle dot pattern?

3    A.    Yes.    The circle dot pattern is a round edge all the way

4    around, so it worked very well in terms of that durability

10:25    5    factor.

6    Q.    And did you ever consider using Figure 3D for any of your

7    products?

8    A.    We did.    That's the only other one we considered.

9    Q.    And why is that?

10:25    10    A.    And it's because it has continuous rounded edges as well,

11    so no straight lines, no sharp corners, and that made it

12    attractive.

13    Q.    And did you end up using Figure 3D?

14    A.    No, we didn't.

10:25    15    Q.    And why is that?

16    A.    Mostly because by the time we were considering bringing it

17    to market, we knew about the Seirus product, and we didn't want

18    to have an overlap in the marketplace and confuse consumers

19    because we feel that the patterns are important.

10:26    20    Q.    Mr. Blackford, I think you testified earlier that you do

21    not have a degree in science?

22    A.    I do not have a degree in science.

23    Q.    And you don't have a Ph.D.?

24    A.    I don't have a Ph.D.

10:26    25    Q.    Have you ever published a peer-reviewed paper for a

1   scientific journal?

2   A.   I've published no papers.

3   Q.   Are you a member of any technical organizations?

4   A.   Not that I signed up for.

10:26   5   Q.   What qualifies you to be an inventor?

6   A.   As I tell kids at schools -- I go as part of the STEM

7   period of the year at schools -- anybody can be an inventor,

8   and all you need to have is an idea, and then you have to bring

9   that idea to fruition.  You have to do the work to make that

10:26   10  idea a reality, and we're all free to do that.  There's no

11  rules against that.  It might be a little harder sometimes if

12  you don't have all the education, but you can figure it out.

13          MR. ALDRICH:  No further questions, Your Honor.

14          THE COURT:  Members of the jury, we'll be taking our

10:27   15  morning recess at this time.  We'll be in recess for 15

16  minutes.  You may escort yourselves into the jury room, and

17  I'll see you in about 15 minutes.

18      (Proceedings held outside the presence of the jury panel.)

19          THE COURT:  You can step down.  15 minutes.

10:27   20  (Recess.)

21      (Proceedings held outside the presence of the jury panel.)

22          THE COURT:  Did you have further questions?

23          MR. ALDRICH:  We're just going to correct the exhibit

24  number.

10:44   25          THE COURT:  Okay.

1     (Proceedings held in the presence of the jury panel.)

2          THE COURT:  Please be seated, everybody.

3     You may proceed.

4          MR. ALDRICH:  We're just going to correct on the

10:45  5  record, Your Honor.  We had it as Exhibit 1031.  In fact, it is

6     Exhibit 1301 is the Thermalux gloves.

7          THE COURT:  Okay.  Thank you for fixing that.

8     Cross-exam.

9          MR. MARCHESE:  Thank you, Your Honor.

10:45  10                CROSS-EXAMINATION

11    BY MR. MARCHESE:

12    Q.  Good morning, Mr. Blackford.

13    A.  Good morning.

14    Q.  How are you today?

10:45  15  A.  I am good.

16    Q.  Great.

17         I have a few questions for you about your testimony.  I'm

18    going to have somebody bring up a binder for you.  Mr. Goodrich

19    is going to hand you several binders.  I'm not sure we'll get

10:46  20  through everything this morning, but we'll have it before you.

21    A.  I am running out of desk space.

22         THE COURT:  Bernadette.

23    BY MR. MARCHESE:

24    Q.  Is it tight up there?

10:46  25        THE COURT:  Yes, he needs some space.

1        THE WITNESS:   Thank you.

2        MR. MARCHESE:   Thank you, Your Honor.

3    BY MR. MARCHESE:

4    Q.   Mr. Blackford, do you have on the table in front of you the

10:46    5    Thermalux glove that was marked 1301?

6    A.   I don't think I do.   Do I?   I saw it over there.

7        MR. MARCHESE:   Oh, you have it over there.   Thank you.

8    It got away from me.   Thank you.

9    BY MR. MARCHESE:

10:46    10   Q.   Sir, can I hand you this, please?

11   A.   Sure.

12   Q.   Okay.   Now, you said you've seen this before, correct?

13   A.   I have.

14   Q.   And the first time you saw that was when?

10:47    15   A.   Actually yesterday.

16   Q.   First time ever?

17   A.   Yeah.

18   Q.   So prior to your purported invention in the '270 patent,

19   you'd never seen the Thermalux glove, correct?

10:47    20   A.   Correct.

21   Q.   Now, Columbia has a marketing team, correct?

22   A.   Yes.

23   Q.   And you participate in the marketing for the company,

24   correct?

10:47    25   A.   Well, I'm not in the marketing department, no.

|        |    |                                                              |
|--------|----|--------------------------------------------------------------|
|        | 1  | Q.  But you're involved in marketing, aren't you?            |
|        | 2  | A.  I guess in the sense that I go to do presentations and   |
|        | 3  | things.                                                      |
|        | 4  | Q.  You talked about that in your direct?                    |
| 10:47  | 5  | A.  Yeah.                                                     |
|        | 6  | Q.  You go out to shows; you do presentations, correct?      |
|        | 7  | A.  Correct.                                                 |
|        | 8  | Q.  And as part of that, you're familiar with the Columbia   |
|        | 9  | product line, right?                                         |
| 10:47  | 10 | A.  Yes.                                                      |
|        | 11 | Q.  And you've got a whole series of Omni-Heat products?     |
|        | 12 | A.  Correct.                                                 |
|        | 13 | Q.  I think you said there were hundreds of them?            |
|        | 14 | A.  Thousands.                                                |
| 10:47  | 15 | Q.  Thousands of them.                                        |
|        | 16 |     And part of that collection of products includes things  |
|        | 17 | that begin with the term "therma," correct?                  |
|        | 18 | A.  Maybe in some cases.                                      |
|        | 19 | Q.  They do, right?  Is that a "yes"?                         |
| 10:48  | 20 | A.  I actually can't quite recall.                           |
|        | 21 | Q.  You don't know.  Okay.  We can come back to that.        |
|        | 22 |     So I wanted to --                                         |
|        | 23 | A.  I did recall.  I think we have one called Thermarator.    |
|        | 24 | Q.  Thermarator.  Okay.  And that is a product that came up in |
| 10:48  | 25 | 2010 or later, correct?                                      |

1  A.  That, I don't know, but it must have, yes, because I think

2  it has Omni-Heat, yeah.

3  Q.  Okay.  Thank you.  Omni-Heat, I think we heard testimony

4  that it began being marketed in 2010.  Correct?

10:48  5  A.  That's correct.

6  Q.  Okay.  And then, therefore, anything that was an Omni-Heat

7  product would have to be post 2010, correct? -- or 2010?

8  A.  Correct.

9  Q.  Okay.  So anything that would be an Omni-Heat therma

10:48  10  product would be 2010 or later?

11  A.  Correct.

12  Q.  And the Thermalux glove, I think you heard the opening

13  statement, and I think you'll hear evidence, was introduced in

14  the early '90s.  Correct?

10:49  15  A.  I did hear that, yes.

16  Q.  And you used the term "therma" on your own Omni-Heat

17  product, correct?

18  A.  Yes.  Thermarator.

19  Q.  Thermarator.  Right, you do.

10:49  20        MR. MARCHESE:  Can I approach, Your Honor?

21        THE COURT:  Sure.

22        MR. MARCHESE:  Thank you.

23  BY MR. MARCHESE:

24  Q.  I have to confess I haven't seen this before.  I'm going to

10:49  25  look at it in realtime with you and talk about it, if you

1    wouldn't mind.  Is that okay?

2    A.   Sure.

3    Q.   Great.

4         All right.  So this is a jacket I think you said was signed

10:49   5    by the Canadian ski team.  Correct?

6    A.   Correct.

7    Q.   And this jacket has -- it does have Omni-Heat lining in it,

8    correct?

9    A.   It does.

10:49  10    Q.   Okay.  And when you wear this coat, do you wear it without

11    anything in between?

12    A.   In certain circumstances, but mostly not, no.

13    Q.   Mostly not, right?  You would wear at least one layer,

14    maybe more, between your skin and this, correct?

10:50  15    A.   That's correct.

16    Q.   And I thought I heard you say in your testimony -- I wrote

17    it down -- that Omni-Heat has to be against the skin.  Correct?

18    A.   If I said that, no, it does not have to be against the

19    skin.  It needs to be facing towards the body.

10:50  20    Q.   So it can have layers in between, correct?

21    A.   It can.

22    Q.   Just like with the Castelli jacket, you would wear that

23    with layers in between, correct?

24    A.   Probably.

10:50  25    Q.   You don't know?

| | | |
|---|---|---|
| | 1 | A.   Well, I mean someone could wear it either way. |
| | 2 | Q.   Well, you had a Castelli jacket, correct? |
| | 3 | A.   Correct. |
| | 4 | Q.   And you looked at a Castelli jacket? |
| 10:50 | 5 | A.   I did. |
| | 6 | Q.   And you formed opinions about a Castelli jacket, right? |
| | 7 | A.   I did. |
| | 8 | Q.   You did.  And you don't have it here today, do you? |
| | 9 | A.   I don't personally, no. |
| 10:50 | 10 | Q.   No.  You still have it, right? |
| | 11 | A.   I think we have it in our archives. |
| | 12 | Q.   You didn't bring it to the trial, did you? |
| | 13 | A.   No, I did not. |
| | 14 | Q.   You didn't show it to the patent office, did you? |
| 10:51 | 15 | A.   That, I -- just like in the video, I worked with our patent |
| | 16 | attorneys and submitted everything that I knew, and they did |
| | 17 | the work they did, just like it shows in the video. |
| | 18 | Q.   Sir, you offered -- let me back up a minute. |
| | 19 |      To your knowledge, the Castelli jacket was not provided to |
| 10:51 | 20 | the patent office, correct? |
| | 21 | A.   I honestly don't know one way or the other. |
| | 22 | Q.   But you're the person who is -- let me look here.  Just a |
| | 23 | minute here. |
| | 24 |      You signed a declaration early on in this case, correct? |
| 10:51 | 25 | Concerning venue, right? |

1    A.    I signed a declaration, yes.

2    Q.    Concerning venue, court venue, correct?

3    A.    I don't specifically remember it being only about court

4    venue.

10:52    5    Q.    It was something about court venue, correct?

6    A.    Perhaps.  I'm not recalling.  You'd have to show me the

7    document.

8    Q.    I can refresh your recollection if I'll just ask you a

9    question, though.  In that declaration -- let me pull it out

10:52    10    here.  Let's just do that.  This is -- if you open your binder,

11    Exhibit 1403, please.

12    A.    Will it come up on the screen?

13    Q.    Sure.

14         MR. MARCHESE:  Can you pull it up on the screen?

10:52    15    Thank you.

16         THE WITNESS:  Which of the two binders is that in?

17    BY MR. MARCHESE:

18    Q.    If you'd prefer to look at it on the screen, you can do

19    that.

10:52    20    A.    It's more than one page, I thought.

21    Q.    Can you read it?

22    A.    Yep.

23    Q.    Great.  All right.  This says it's "The declaration of

24    Michael Woody Blackford in support of Columbia Sportswear

10:52    25    response to Seirus' motion to dismiss or alternatively transfer

venue to Southern District of California."  Do you see that?

A.    Okay, yeah.

Q.    Does this refresh your recollection?

A.    Yes.

10:53

      MR. MARCHESE:  Can you go to the last page of that
document, please.  And if you would blow up the -- the last
section, please.

BY MR. MARCHESE:

Q.    That's your signature, correct?

10:53

A.    That's my signature.

Q.    And your name is not actually -- your legal name is not
Woody Blackford, correct?

A.    That's correct.

Q.    It's Michael Blackford?

10:53

A.    Yep.

Q.    But on the '270 patent, you put Woody Blackford?

A.    That's what the patent attorney put, yes.

Q.    He didn't put your legal name on there, did he?

A.    He did not.

10:53

Q.    Here it says that you declare that the above statements are
true to the best of your knowledge and belief, and you
understand that you made it for use as evidence in court, and
it's subject to penalty for perjury, correct?

A.    I did.

10:53

Q.    And you stand by that today, right?

1  A.  I do.

2         MR. MARCHESE:  If you could go back up to page 1,

3  please -- actually page 2.  Apologies.  Can you blow up

4  paragraph 4.

10:54  5  BY MR. MARCHESE:

6  Q.  Here you said, "I am the sole inventor of U.S. Patent

7  Numbers 8,424,119 and 8,453,270, correct?

8  A.  Correct.

9  Q.  Okay.  And you're familiar with the '119 patent, right?

10:54  10  A.  Yes.

11  Q.  That patent's not in the case, is it?

12  A.  No.

13  Q.  Okay.  And it says here, "I am the primary and best source

14  of information regarding the conception and reduction of

10:54  15  practice of the inventions of these patents," correct?

16  A.  Correct.

17  Q.  Is that true?

18  A.  I think so, yes.

19  Q.  Was it true then?

10:55  20  A.  When I signed it?

21  Q.  Yes.

22  A.  Yes.

23  Q.  Is it true now?

24  A.  Yes.

10:55  25  Q.  It goes on to say, "And Columbia Sportswear's involvement

1    in the prosecution of the patent applications leading to issued

2    U.S. Patent Numbers," and it has the same two patents, correct?

3    A.    Correct.

4    Q.    Is that true?

10:55    5    A.    I believe so, yes.

6    Q.    It was then, correct?

7    A.    I understood it to be, yes.

8    Q.    And it still is, right?

9    A.    Yes.

10:55    10    Q.    So you are the -- you were and are the primary and best

11    source of information regarding Columbia Sportswear's

12    involvement in prosecution of the '270 patent, right?

13    A.    Well, in terms of the reduction of practice and the

14    inventions of the patents.

10:55    15    Q.    Sir, it says, "Columbia Sportswear's involvement in the

16    prosecution of the patent applications."  Is that unclear?

17    A.    That's not how I interpreted it.  I interpreted it to be I

18    am the primary and best source of information regarding the

19    conception and reduction of practice of the inventions of these

10:56    20    patents and would be involved in this trial in that regard.

21    Those how I understood it.  Maybe I misunderstood.

22    Q.    Well, it says what it says, and you signed it, correct?

23    A.    It says what it says, and I signed it.

24    Q.    And you signed it under oath, didn't you?

10:56    25    A.    I don't remember taking an oath, but I signed it.

|       |    |                                                                              |
|-------|----|------------------------------------------------------------------------------|
|       | 1  | Q.  It said "under penalty of perjury"?                                      |
|       | 2  | A.  Okay.                                                                    |
|       | 3  | Q.  You signed that, didn't you?                                            |
|       | 4  | A.  That's my signature.                                                    |
| 10:56 | 5  | Q.  And you stand by it today, correct?                                     |
|       | 6  | A.  That's my signature.                                                    |
|       | 7  | Q.  And so in the context of the prosecution -- let me back up.            |
|       | 8  |     You know what prosecution of the '270 patent means,                    |
|       | 9  | correct?                                                                    |
| 10:56 | 10 | A.  I believe that it means the process of obtaining a patent.             |
|       | 11 | Q.  You believe it, or you know that?                                       |
|       | 12 | A.  That's my understanding.                                                |
|       | 13 | Q.  So your understanding -- well, you've used the term                    |
|       | 14 | "prosecution" here, so you must have had an understanding at               |
| 10:56 | 15 | the time, correct?                                                          |
|       | 16 | A.  Well, this document, not unlike our patents, our attorneys            |
|       | 17 | wrote it.  I made sure that I had an understanding of it, but I            |
|       | 18 | didn't write those words.                                                   |
|       | 19 | Q.  You didn't write the words in this paragraph, did you?               |
| 10:57 | 20 | A.  No.                                                                     |
|       | 21 | Q.  Somebody else did for you?                                             |
|       | 22 | A.  That's right.                                                           |
|       | 23 | Q.  Lawyers did, right?                                                     |
|       | 24 | A.  Yeah.                                                                   |
| 10:57 | 25 | Q.  Lawyers wrote your patent, too, your '270 patent, correct?            |

1    A.    That's correct.

2    Q.    You didn't participate -- you didn't write the claims, did

3    you?

4    A.    No.   I did not write the type of language that the patent

10:57    5    examiner wants to see.

6    Q.    And you really don't know what the language means in this

7    context of the patent, do you, in the claims, right?

8    A.    Well, I explained in full detail to my patent attorney like

9    it shows us in the video yesterday my invention.   They put it

10:57    10    into the words that the patent examination office is used to

11    working with.

12    Q.    Sir, if you don't mind, I have limited time.   I have a

13    clock here, and you can certainly explain yourself on redirect,

14    but I'm asking you yes or no --

10:57    15    A.    Okay.

16    Q.    -- and if you can't answer yes or no, just say, "I cannot

17    do it," but I'd prefer if you didn't explain because you're

18    using my clock up.   Okay?

19    A.    Sorry.

10:58    20    Q.    Thank you.

21        What I want to know is -- and we can look at testimony on

22    this from your deposition if we need to.   My understanding was

23    in the -- you were asked about what the claims meant in your

24    patent, correct?

10:58    25    A.    I was asked what the claims meant in my patent by whom?

```
 1   Q.   When you were deposed.

 2   A.   Yes.

 3   Q.   You were deposed in the case?

 4   A.   Yes.

 5   Q.   And you testified under oath?

 6   A.   I did.

 7   Q.   Now, I did not take that deposition, right?

 8   A.   No, you didn't.

 9   Q.   It was another gentleman?

10   A.   It was.

11   Q.   And you answered questions to the best of your ability,

12   right?

13   A.   I did.

14   Q.   And you did them under oath?

15   A.   I did.

16   Q.   And you testified truthfully, correct?

17   A.   To the best of my ability.

18   Q.   And at that deposition, when asked about what the meanings

19   of claim terms were, you were unable to give meanings, correct?

20   A.   That's right.  I said I wasn't an expert.

21   Q.   And here today when I've asked you about prosecution, you

22   said you didn't write this, correct?

23   A.   That's correct.

24   Q.   Okay.  And so you're not 100 percent sure what prosecution

25   is.  Is that right?
```

1    A.    I have my understanding.    Others may disagree with it.

2    Q.    And your understanding is that's the back-and-forth between

3    the patent office, correct?

4    A.    Yeah.    It's the process of getting a patent.

10:59  5    Q.    In the process of getting the patent here, it says you're

6    the best and primary source of information for that, correct?

7    A.    Regarding the conception, reduction of practice.

8    Q.    Well, I think it says what it says, but let me ask you

9    this:    The Castelli jacket was submitted to the patent

10:59  10    office -- I'm sorry.    Excuse me.

11        The Castelli jacket, there were two website printouts that

12    were provided to the patent office, correct?

13    A.    I actually don't know what the patent attorneys provided,

14    but that's what I saw yesterday.

10:59  15    Q.    You saw those yesterday, right?    Do you have any reason to

16    believe that anything else was submitted?

17    A.    Could have been.    I haven't reviewed everything that was

18    submitted.

19    Q.    But you don't know, right?

10:59  20    A.    No, I don't.

21    Q.    Okay.    And you didn't check, did you?

22    A.    No, I didn't.

23    Q.    Didn't bother to go look and see was the Castelli jacket

24    submitted, did you?

11:00  25    A.    No.

1    Q.    Didn't bother to look at the file, the prosecution history,

2    to see if the Castelli jacket had been provided to the patent

3    office, did you?

4         MR. ALDRICH:    Your Honor, this seems to relate to the

11:00    5    topic of inequitable conduct which is not an issue in the case.

6         THE COURT:    Your objection is overruled.

7    BY MR. MARCHESE:

8    Q.    Sir, let me ask it again to make sure we're clear here.

9    Before you testified you never went back to the file with the

11:00    10    '270 patent to see what was submitted for the Castelli jacket,

11    correct?

12    A.    Correct.

13    Q.    Nevertheless, you stood up here today and you testified

14    about the qualities and properties of that jacket, right?

11:00    15    A.    I did.

16    Q.    You made representations about what it's like, didn't you?

17    A.    I did, yes.

18    Q.    You said the fabric is a lot like a space blanket, I

19    thought I heard you say.    Right?

11:00    20    A.    Yes, except for it wasn't 100 percent like a space blanket

21    because it had a lot less reflectance.    It wasn't like a

22    mirror.

23    Q.    But I can't see it, can I?

24    A.    You can't see it.

11:01    25    Q.    The jury can't see it?

1    A.   No, they can't see it.

2    Q.   They've got to take your word for it, don't they?

3    A.   Yes, they do.

4    Q.   And you've also told us that the Castelli jacket had a --

11:01   5    it did have a base layer to which the foil was attached,

6    correct?

7    A.   It did have a textile underneath.

8    Q.   It did.  Okay.  And you said there were holes poked all the

9    way through, right?

11:01   10   A.   Yes.

11   Q.   And we can't see that, can we?

12   A.   You can't see that here right now physically, no.

13   Q.   Right.  We can't.  Because we don't have it, right?

14   A.   Correct.

11:01   15   Q.   But you do?

16   A.   Columbia has it, yes.

17   Q.   Okay.  And you don't know whether the patent office ever

18   got to see it, do you?

19   A.   I am not aware, no.

11:01   20   Q.   Okay.  And were you the one -- let me ask you this:  I

21   recall reading in your deposition that you said that the

22   Castelli jacket was the big one, prior art, the big one, the

23   one that you remembered the most, right?

24   A.   Yeah.  I don't know if it was the big one for the patent

11:01   25   prosecutors, but, yes, I remembered it the most.

1    Q.   It was the big one for you.   Those were your words, right?

2    A.   If those are the words, yes.

3    Q.   All right.   They are.   I can show them to you.   Would you

4    agree with them here right now?

11:02    5    A.   Yes.

6    Q.   Okay.   Thank you.

7         And you said as well in your deposition that that was the

8    prior art that stuck out in your memory the most, correct?

9    A.   Yes.

11:02   10    Q.   And you got one of them, right?

11    A.   Yes, I did.

12    Q.   And you tested it for the coverage of the foil versus the

13    base layer, right?

14    A.   Yes.

11:02   15    Q.   Yeah.   And those tests were never presented to the patent

16    office, were they?

17    A.   I don't know.

18    Q.   You don't know because you didn't check, did you?

19    A.   I did not check.

11:02   20    Q.   No.   You did not.

21         But you were involved in the prosecution of the patent, the

22    '270 patent, weren't you?

23    A.   In the extent, as we saw in the video, I explained my

24    invention to our patent attorneys and met with them several

11:02   25    times as the patent went through its process.

1    Q.   But you had more involvement than that, didn't you?

2    A.   Maybe.  I don't -- I mean that's what I saw my activities

3    as.

4    Q.   As -- you said as preparing the patent application, right?

11:03  5    A.   No, as explaining to my patent attorneys what the invention

6    was.

7    Q.   But as time went on, the patent went through the process

8    with the patent office, right?  You have the back-and-forth

9    with the patent examiner, and the examiner says rejected.   All

11:03  10   that, that's the prosecution history, right?

11   A.   Yes.

12   Q.   And somewhere along the line you actually submitted another

13   declaration, didn't you?

14   A.   That's true.

11:03  15   Q.   You sure did.

16        And in it -- you put in that declaration a series of tests

17   that you'd been describing today with your counsel, correct?

18   A.   Correct.

19   Q.   And in that you said -- your words were that the 30 to 70

11:03  20   was the optimal range, right?

21   A.   Yes.

22   Q.   And in that declaration, you never mentioned the coverage

23   of the Castelli jacket, did you?

24   A.   I did not mention that it was 100 percent.

11:03  25   Q.   And you know what it is today, don't you?

1    A.    100 percent is the coverage.

2    Q.    You just said it had holes poked in it.

3    A.    Of all material that exists, it's 100 percent covered.

4    Q.    But you didn't give the patent office a chance to check

5    that out, did you?

6    A.    I know -- again, I don't know if our patent attorneys sent

7    a physical sample or not.

8    Q.    Well, let me take a look with you at your patent.  Just a

9    minute here.

10            MR. MARCHESE:  Can you pull up 1019?

11   BY MR. MARCHESE:

12   Q.    Is that your patent, the '270 patent?

13   A.    It looks like it, yes.

14            MR. MARCHESE:  And can you go to the last page,

15   please, Mr. Volper.  Just down to the bottom, please.  Keep

16   going.  There you go.  One more back.  Okay, great.  Can you

17   blow up claims 1 and 2 in the right-hand column?

18   BY MR. MARCHESE:

19   Q.    Now, sir, you've seen these before, right?

20   A.    Yes.

21   Q.    You've seen a version of them before the patent application

22   was filed, right?

23   A.    Yes.

24   Q.    And you read them during the course of the prosecution of

25   the patent, correct?

1    A.    I don't immediately recall, but I must have.

2    Q.    You must have, right?  Yes?

3    A.    Yes.

4    Q.    And you submitted a declaration midway through the

11:06    5    prosecution where you made some statements under oath, correct?

6    A.    Correct.

7    Q.    And you stated that 30 to 70 was the optimal range, right?

8    A.    Yes.

9    Q.    And in that process when you submit that declaration, you

11:06    10    never gave the Castelli jacket to the patent office, right?

11    A.    Correct.

12    Q.    Never gave the patent office an opportunity to make their

13    own judgment, did you?

14    A.    Not -- I personally didn't.  I don't know if our patent

11:06    15    attorneys did.

16    Q.    But you did not, did you?

17    A.    I did not.

18    Q.    You did not insist that it get submitted, did you?

19    A.    I did not think to insist, no.

11:06    20    Q.    You didn't even ask that it be submitted, did you?

21    A.    I did not.

22    Q.    Now, take a look at the claim.  When you were deposed about

23    this claim, you were asked about base material.  Do you

24    remember that?

11:06    25    A.    It was a long day, but I think I was maybe.  I have to see

1    the part of it.

2    Q.    You were asked, "Do you know what the base material means,

3    what the term 'base material' means?"  Do you remember that

4    question?

11:07    5    A.    Vaguely.

6    Q.    And would you agree with this, that you said, "I would have

7    described the invention to, and I did, to our patent attorneys,

8    and they chose the terminology that's in the patent," right?

9    A.    Uh-huh.    Yes.

11:07    10    Q.    "Yes"?

11    A.    Yes.

12    Q.    And you weren't able to offer your own definition of what

13    that means, right?

14    A.    To basically say what exactly the legal terminology was?  I

11:07    15    did not answer that.

16    Q.    Now, you were also asked about a Columbia glove at that

17    point, correct?  You had some Columbia gloves in front of you

18    during the deposition.

19    A.    Again, vaguely.

11:07    20    Q.    Do you remember that vaguely?

21    A.    Was it right after that other question?

22    Q.    Well, let's see.  I can show you the pages if you really

23    want to.  I just have some basic questions about it.

24    A.    You can ask me the basic questions.

11:08    25    Q.    Sure.    You were asked if you could identify a base material

| | 1 | in a Columbia glove.  Do you remember that? |
| | 2 | A.   I believe if you say that's what I did, that you're |
| | 3 | probably correct.  I don't exactly remember it, no. |
| | 4 | Q.   And you were unable to identify the base material in your |
| 11:08 | 5 | own words related to the patent documents, correct? |
| | 6 | A.   Can I hear what my own words were? |
| | 7 | Q.   You said, "In my own words not related to these patent |
| | 8 | documents, I can do that."  You could give it in your own |
| | 9 | words, but you couldn't give it in terms of the patent |
| 11:08 | 10 | document, correct? |
| | 11 | A.   Yeah.  I didn't want to -- I can explain it like I |
| | 12 | explained it to our patent attorneys is what I meant. |
| | 13 | Q.   But you couldn't take any position about what base material |
| | 14 | meant in this context of the claims, correct? |
| 11:08 | 15 | A.   I did not. |
| | 16 | Q.   You could not.  Is that correct? |
| | 17 | A.   I did not take that position, no. |
| | 18 | Q.   Because you did not want to? |
| | 19 | A.   I didn't want to speak for the patent attorney that wrote |
| 11:09 | 20 | the actual description. |
| | 21 | Q.   But that's your invention, right? |
| | 22 | A.   It is my invention that I described to the patent attorney. |
| | 23 | Q.   And there was another declaration, another thing you |
| | 24 | submitted under oath in the context of this patent application, |
| 11:09 | 25 | correct?  At the very beginning, right? |

|       |    |                                                                              |
|-------|----|------------------------------------------------------------------------------|
|       | 1  | A.    Yes.                                                                    |
|       | 2  | Q.    Under penalty of perjury, correct?                                      |
|       | 3  | A.    What thing are you referring to?                                        |
|       | 4  | Q.    Oath or declaration, do you remember that?                              |
| 11:09 | 5  | A.    You mean for the initial patent application?                            |
|       | 6  | Q.    Yes.                                                                    |
|       | 7  | A.    Yes.                                                                    |
|       | 8  | Q.    And you signed that, right?                                             |
|       | 9  | A.    Again, our patent attorney wrote it and I signed it.                    |
| 11:09 | 10 | Q.    The patient attorney wrote it, but you signed it?                       |
|       | 11 | A.    Yes.                                                                    |
|       | 12 | Q.    And you signed it under penalty of perjury, correct?                    |
|       | 13 | A.    Yes.                                                                    |
|       | 14 | Q.    And you claimed to have read and understood the patent,                 |
| 11:09 | 15 | right?                                                                        |
|       | 16 | A.    I had it explained to me so that I understood it, yes.                  |
|       | 17 | Q.    So -- but when you were asked at your deposition what base              |
|       | 18 | material was, you couldn't provide a definition in the context               |
|       | 19 | of the patent, correct?                                                       |
| 11:09 | 20 | A.    I did not.                                                              |
|       | 21 | Q.    And you were asked -- let me look at another example here.              |
|       | 22 | Do you see the words "discontinuous array of discrete                         |
|       | 23 | heat-directing elements"?                                                     |
|       | 24 | A.    Yes.                                                                    |
| 11:10 | 25 | Q.    Okay.  You were asked about those words in your deposition,             |

1  right?

2  A.  Yes.

3  Q.  You gave an answer to that, didn't you?

4      MR. ALDRICH:  Your Honor, the Court has actually

5  construed these terms.  I'm not sure if he's going to -- the

6  topic of claim construction, but the Court has issued an order

7  actually construing the meaning of these terms.

8      THE COURT:  Your objection is overruled.

9  You can go ahead and proceed.

10     MR. MARCHESE:  Thank you, Your Honor.

11  BY MR. MARCHESE:

12  Q.  You were asked about the meaning of the term -- or the

13  phrase, I should say, "discontinuous array of discrete

14  heat-directing elements," correct?

15  A.  Yes.

16  Q.  And you responded that you could not tell exactly what you

17  had described nine years ago to your patent attorneys, right?

18  A.  Yeah.  I mean it was a long time ago.

19  Q.  And you couldn't --

20  A.  The exact words because I felt like the exact wording was

21  important, and I could not recall.

22  Q.  Well, you had the words in front of you when you were in

23  your deposition, didn't you?

24  A.  That I provided to my patent attorney?

25  Q.  No.  When you were at the deposition, you were shown the

1    claim, right?

2    A.    I had the claim in front of me, yes.

3    Q.    Sure, and you could read those words, right?

4    A.    Yes.

11:11    5    Q.    And you would sign an oath when you filed the patent

6    application, right?

7    A.    Yes.

8    Q.    And in that oath, you'd said that you read and understood

9    the patent application, correct?

11:11    10    A.    That I read it and understood it.

11    Q.    And you said that under penalty of perjury, right?

12    A.    Yes.

13    Q.    And when you sat in your deposition when you were asked

14    what that meant, you couldn't give a meaning, correct?

11:11    15    A.    I did not want to say that I understood the patent

16    attorney's choice of words in a way that I was a patent

17    attorney.    I didn't want to represent myself as a patent

18    attorney.

19    Q.    You were just asked what do those words mean, right?

11:11    20    A.    Yeah.

21    Q.    And you couldn't give a meaning for those words in the

22    claim, right?

23    A.    No, because I felt like I was being asked in a way that

24    I --

11:12    25    Q.    Sir, if I really could -- I just want you to answer my

1    questions.  You can explain later.  Your counsel can ask you

2    questions, and you can do that.  If you would just -- like I

3    said, I'm under a clock, so I want to make sure I get my

4    questions answered.

11:12    5              MR. MARCHESE:  If you would highlight --

6              PANEL MEMBER:  Is there something we should be seeing

7    on the screen?  We haven't seen a screen.

8              THE COURT:  Thank you.  This exhibit hasn't been

9    received which is why they didn't get it.

11:12    10             MR. MARCHESE:  Oh, apologies.  I thought this was

11   already admitted.

12             THE COURT:  The patent hard copy has been received.

13   This one, if it's a separate exhibit --

14             MR. MARCHESE:  Apologies.  Any objection to the

11:12    15   patent?

16             MR. ALDRICH:  No, certainly not.

17             THE COURT:  It's received.  Go ahead and display it to

18   the jury, please.

19        (Exhibit 1403 admitted.)

11:13    20             MR. MARCHESE:  I thought it was already on because it

21   was received.  My apologies.  Well, now we can see it.  I

22   probably asked about 50 questions, and they never got to see

23   it.

24   BY MR. MARCHESE:

11:13    25   Q.   But in any event, now we can all see it, and now we can see

1    the words "base material."  Do you see those, sir?

2    A.   I see, "Discontinuous array, discrete heat-directing

3    elements, each independently coupled to the first side of the

4    base material."

11:13    5    Q.   Okay.  Base material.  I asked you questions about base

6    material, right?

7    A.   If you say that's what I was asked at deposition, I

8    probably was, yes.  I don't have it.

9    Q.   When I was asking you questions earlier in your

11:13    10    deposition -- or I'm sorry -- in your trial testimony here, I

11    was asking you about base material in the claim, right?

12    A.   Yes.

13    Q.   And your questions about that were with response to what

14    was in this claim that we're all now looking at, correct?

11:14    15    A.   Yes.

16    Q.   Okay.  And your answers that you gave about "discontinuous

17    array of discrete, heat-directing elements," those were also

18    from the claim, correct?

19    A.   From being asked about the claim, yes, I think.  It's hard

11:14    20    without seeing this, my deposition.

21    Q.   Well, your testimony is what it is.  I'm just trying to

22    figure out whether -- so the jury can understand what you were

23    looking at, what I was looking at, and, unfortunately, what

24    they weren't looking at is what we're all looking at now.

11:14    25    A.   Okay.

1    Q.    Is that correct?

2    A.    Yes.

3    Q.    Thank you.   All right.   And then if you go to the next

4    line, it says "independently coupled."   Do you see that?

11:14    5    A.    Yes.

6    Q.    And I think you said that in the Castelli jacket that the

7    base fabric was punched through, right?

8    A.    Yes.

9    Q.    And, therefore, there was, I think you said, 100 percent

11:14    10   coverage of the foil.   Right?

11   A.    Of the fabric, there's 100 percent coverage of fabric

12   that's there.

13   Q.    Okay.   But that -- again, the jacket, it didn't go to the

14   patent office.   The patent office didn't get a chance to judge

11:15    15   for itself, did it?

16   A.    I have no knowledge one way or the other.

17   Q.    You don't know.   Okay.

18         MR. MARCHESE:   Well, can you go -- if you, would

19   Mr. Volper, can you please come out of there and go back two

11:15    20   pages.   Okay.   If you would in the column 3, left-hand column

21   from line 4 to 13, that paragraph, please blow it up.

22   BY MR. MARCHESE:

23   Q.    Do you see the term "coupled" there in quotes?

24   A.    Yes.

11:15    25   Q.    That's from your patent, correct?

1    A.    That's from the '270 patent.

2    Q.    And this is a paragraph in the '270 patent, correct?

3    A.    Yes.

4    Q.    And it's a paragraph you read before the patent application

11:15    5    was filed, correct?

6    A.    Yes.

7    Q.    And you understood it, right?

8    A.    Yes.

9    Q.    And in it later, if you read down about four or five lines,

11:16    10    you can see it provides what I would consider to be a

11    definition of "coupled."   Do you see that?

12    A.    Yes.

13    Q.    Okay.   And there it says, "Coupled may mean that two or

14    more elements are in direct physical or electrical contact."

11:16    15    Do you see that?

16    A.    Uh-huh.

17    Q.    "Yes"?

18    A.    Yes.

19    Q.    If you say "uh-huh," I'm going to ask you to say yes.

11:16    20    A.    Yes.   Yes.

21    Q.    Thank you.

22         And if you nod your head or shake your head, I'll ask you

23    to give us a verbal response.

24    A.    Makes sense.

11:16    25    Q.    Okay.   Now, you read that sentence when you filed the

1    patent application, right?

2    A.    I reviewed it with my patent attorney.    Yes, I would have

3    read it.

4    Q.    You came to an understanding of it, right?

11:16    5    A.    I felt I understood it.

6    Q.    The next sentence, same thing, you read it; you felt you

7    understood it, correct?

8    A.    Yes.

9    Q.    Okay.    And here it says, "Coupled may also mean that two or

11:17    10    more elements are not in direct contact with each other, but

11    yet still cooperate or interact with each other."    Right?

12    A.    Yes.

13    Q.    Okay.    And so two or more elements, that could be three or

14    four, right?

11:17    15    A.    Yes.

16    Q.    So you could have the discrete -- I think it's called the

17    heat-directing elements.    They could be coupled to one or two

18    or three other elements, right?

19    A.    Heat-directing elements could be coupled to other elements?

11:17    20    Q.    That's what it says.    "Coupled may mean two or more

21    elements that are not in direct contact with each other."

22    A.    Okay.

23    Q.    Do you read that?

24    A.    Yes.

11:17    25    Q.    Does that make sense to you that coupled could mean

1    multiple elements are all coupled together in a way that they

2    don't have to be in direct contact?

3    A.    I didn't quite interpret it that way.  I thought it meant

4    multiple elements disconnected from each other sitting on the

11:18    5    base material.

6    Q.    Okay.  So it could be -- there could be -- coupled is

7    broad, right?  Would you agree with that?

8    A.    I don't have an opinion on the term "broad" for this,

9    but --

11:18    10    Q.    You don't know what the term "broad" means?

11    A.    Meaning it has a wide meaning?

12    Q.    Yeah.

13    A.    I don't have an opinion on that.

14    Q.    You don't have an opinion on whether this definition of

11:18    15    "coupled" has a wide meaning?

16    A.    No.

17    Q.    But you would agree with me that the words say what they

18    say, right?

19    A.    The words could be interpreted, so they do say something,

11:18    20    yes.

21    Q.    They say something that you read and understood, right?

22    A.    Yes.

23    Q.    Okay.  And they say that two or more elements coupled --

24    well, withdrawn.

11:18    25        Coupled may also mean that two or more elements are not in

1    direct contact with each other, right?

2    A.   Yes.

3         MR. MARCHESE:   Okay.   Now can we go back to the claim,

4    Mr. Volper.

11:19   5    BY MR. MARCHESE:

6    Q.   While he's pulling the claim up, the Castelli jacket, I've

7    seen pictures of it, and I don't have one.   I was unable to get

8    one, but I will tell you that it looked to me like it was a --

9    a lot like this jacket.   It had an outer shell and then an

11:19   10   inner liner, right?

11   A.   Yes.

12   Q.   That's what this is.   Would you agree?

13   A.   Yes.

14   Q.   Okay.   And on it, the Castelli jacket, there was a foil

11:19   15   layer, right?

16   A.   Yes.

17   Q.   Okay.   And that was pointing --

18   A.   Or something that looked like foil.

19   Q.   Well, you have it, so you must know that it looks like

11:19   20   foil, right?

21   A.   Yes.

22   Q.   And that Castelli jacket had the foil pointing towards the

23   user, the wearer?

24   A.   Yes.

11:20   25   Q.   And the wearer could wear a T-shirt in between or maybe

1    some sort of a performance shirt that wicks and keeps you cool

2    or dry, correct?

3    A.    That would be an option, yes.

4    Q.    And the same could be done with this?

11:20    5    A.    Yes.

6    Q.    And that's what it's intended for.  You're supposed to wear

7    a layer underneath, right?

8    A.    In most cases, yes.

9    Q.    Probably the Castelli jacket is the same thing, right?

11:20    10    A.    Yes.

11    Q.    You're out actively biking around, you'd have another layer

12    on underneath?

13    A.    Yes.

14    Q.    Okay, great.  So in the Castelli jacket, if I'm not

11:20    15    mistaken, if the holes were punched through, there would still

16    be another layer of fabric back behind it, right?

17    A.    The shell, the outer layer.

18    Q.    Yeah, the shell, right?

19    A.    Yes.

11:20    20    Q.    And they're not directly attached to each other.  They're

21    just like this.  They can be separated apart, correct?

22    A.    Yes.

23        MR. MARCHESE:  Let the record reflect I'm holding up

24    the -- this is -- I don't have the exhibit number handy in

11:21    25    front of me.  This is the Canadian ski jacket.

1          Counsel, do you remember the number?

2                MR. ALDRICH:   696.

3     BY MR. MARCHESE:

4     Q.    696 is the exhibit, and it has an inner Omni-Heat layer,

5     correct?

6     A.    Yes.

7     Q.    And that is not joined to the outer shell part, this

8     red-and-white exterior part, correct?

9     A.    Yes.

10    Q.    Okay.  And same with Castelli, right?

11    A.    Yes.

12    Q.    And the word "coupled" as we just heard, it means it could

13    either be directly connected, or it doesn't have to be directly

14    connected, correct?

15    A.    I did not interpret it in the layer sense.  I interpreted

16    it as from each other on one base material.

17    Q.    I mean the words said what they said.  We saw them in the

18    patent.  You would stand by those words today, wouldn't you?

19    A.    Yes, except for I'm not understanding them the same way.

20    Q.    You don't understand the words in there to mean what we

21    just read?

22    A.    My understanding is, I think, different than yours.

23    Q.    Well, I just read the words, so I'm just going by what the

24    words say.  We can go back and look at them.  Why don't we do

25    it?  I think it would be helpful because I think you're not

1    remembering.

2         Okay.  Coupled.  At the -- this is the patent.  And

3    column 3, definition of the word "coupled."  We've looked at it

4    before, right?

11:22    5    A.    Yeah.

6    Q.    And that second sentence that begins with "however," it

7    says, "Coupled may mean" -- "may also mean that two or more

8    elements are not in direct contact with each other," right?

9              MR. ALDRICH:  Your Honor, repetitious.

11:22    10              THE COURT:  Sustained.

11    BY MR. MARCHESE:

12    Q.    Sir, would you agree with me -- I'm again holding up this

13    ski jacket, Canadian ski jacket -- would you agree with me that

14    the liner, the Omni-Heat liner and the shell are not

11:23    15    necessarily in direct contact with each other?  They can be

16    separated?

17    A.    Yeah, they're two different layers.

18    Q.    Thank you.

19              MR. MARCHESE:  Can we go back to the claim.

11:23    20              THE COURT:  I'll pause your clock for a minute.

21              MR. MARCHESE:  Thank you.

22              THE COURT:  All right.  Go ahead.

23              MR. MARCHESE:  Thank you, Your Honor.

24              THE COURT:  Sure.

25

1    BY MR. MARCHESE:

2    Q.   If we go back to the second paragraph of the claim, you see

3    that word on the second line, "coupled." Do you see that?

4    A.   I lost track here.

11:23    5            MR. MARCHESE:   If you can highlight it, please,

6    Mr. Volper.

7    BY MR. MARCHESE:

8    Q.   There it is.  Here it says -- if we read before that word

9    and after that word, it says, "A discontinuous array of

11:24    10   discrete, heat-directing elements each independently coupled to

11   a first side of a base material." Do you see that?

12   A.   Uh-huh.

13   Q.   "Yes"?

14   A.   Yes.

11:24    15   Q.   They use the word "coupled," right?

16   A.   Yes.

17   Q.   Isn't it reasonable to conclude that you would read

18   "coupled" in the context of what it says in the patent earlier,

19   the definition?

11:24    20   A.   Yes.

21   Q.   And, therefore, the discrete, heat-directing elements, they

22   don't actually have to be directly attached to the base

23   material; they could actually be indirect, right?

24   A.   That's not my understanding.

11:24    25   Q.   Well, that's what we just walked through with the patent --

1    the jacket here.  The Canadian jacket, you agreed with me.

2    A.  Well, those two layers are separate.  I agreed, yes.

3    Q.  They're separate, and so according to the definition of

4    "coupled," they can be coupled?

11:25    5    A.  Is that a question?  Yes.  I think we're just -- I'm having

6    a different visual.

7    Q.  Well, you said yes.  Okay.  I thought I heard you say yes.

8    Was that your answer?

9    A.  Yes.

11:25    10    Q.  Okay.  Thank you.

11        And, similarly, Castelli, which has holes punched through

12    it, would have a base material, the outer shell, which would be

13    behind the holes punched, correct?

14    A.  The outer shell would be behind the holes punched.

11:25    15    Q.  And if I laid the holes punched on top of the outer

16    fabric -- I don't have it in front of me, so I can't,

17    unfortunately, do this demo with the jacket, but if I had the

18    outer shell in my left hand as the outer shell -- are you with

19    me?

11:25    20    A.  Yes.

21    Q.  And my right hand is the lining material, correct?

22    A.  Yes.

23    Q.  And my right hand, according to what you've told us, has

24    holes punched through it, right?

11:26    25    A.  Yes.

1  Q.    If I lay that lining material down on the shell, I'm going

2  to have a backing that has holes going through to it, correct?

3  A.    You're going to have holes, and then they're going to have

4  a backing, you know, where the hole is, yes.

11:26    5  Q.    Exactly.   Thank you.

6       And now, with that laid overlaid like that, what was the

7  percent coverage of the holes if you just -- I know you said it

8  was 100 percent.   But if you considered to lay that Castelli

9  liner with the holes punched through the foil, laid it down on

11:26    10  a piece of paper, what would be the ratio of the holes to the

11  full piece of sheet of paper?

12  A.    I did not measure that.

13  Q.    You didn't measure it, did you?  No.   Is that correct?

14  A.    That's correct.

11:26    15  Q.    Okay.   Even though you submitted a declaration in the

16  prosecution of the patent application where you said 30 to 70

17  was optimal, correct?

18  A.    Yes.

19  Q.    Even though you submitted that declaration, and you

11:27    20  testified to the patent office that this was something that was

21  optimal, and that you had tested it, and that you had come up

22  with this invention that should be patented, when you never

23  mentioned Castelli's coverage if you were to lay the foil down

24  with the dots on some backing material like paper, correct?

11:27    25  A.    Correct, and one thing I --

1    Q.   Well, wait a second.  You said "correct."  Thank you.

2         MR. MARCHESE:  Now, if you could blow out so I could

3    see claim 2 as well.  Yes, thank you.

4    BY MR. MARCHESE:

11:27  5    Q.   On line 2 it says "body gear" at the very end.  Do you see

6    that?

7    A.   Uh-huh.  Yes.

8    Q.   Okay.  And you were asked about the term "body gear" at

9    your deposition, correct?

11:28  10   A.   Probably, yes.

11   Q.   But you were unable to give a description of what that

12   terms means in the claim, correct?

13   A.   From the perspective of a legal attorney, yes.

14   Q.   You weren't able to give a -- do you want me to read your

11:28  15   testimony to you?

16   A.   Sure.

17   Q.   Okay.  The question was, "Do you know how the term 'body

18   gear' appears in your patent, how it came to be there?"

19        And you said, "It would come from my description of the

11:28  20   invention to the patent attorney that's choosing that

21   language."  Does that ring a bell?

22   A.   Yes.

23   Q.   So you didn't pick that word, did you?

24   A.   No.

11:28  25   Q.   And -- but at some point in time, you must have come to an

1   understanding of what it was, correct?

2   A.   Yes.

3   Q.   Okay.  And it means that it could be -- I think if we look

4   at the patent, we'll see it's very broad.  It could be a

11:28   5   jacket.  It could be basically any kind of apparel, correct?

6   A.   Yes.

7   Q.   So it could cover this Canadian jacket that we've been

8   looking at?

9   A.   Yes.

11:29   10   Q.   It could cover the Castelli jacket, correct?

11   A.   Yes, it's body gear.

12   Q.   Okay.  And this claim also mentions base material.  We've

13   seen that, right?

14        MR. MARCHESE:   Could you highlight that, please,

11:29   15   Mr. Volper?

16   BY MR. MARCHESE:

17   Q.   It says base material, right?

18   A.   Yes.

19   Q.   And there's a definition of base material in your patent,

11:29   20   correct?

21   A.   Yes.

22   Q.   And it's quite broad as well.  Wouldn't you agree?

23   A.   I think it's broad, yes.

24   Q.   Okay.  It's broad enough to cover -- why don't we just look

11:29   25   at it so we can see what it says.

1       MR. MARCHESE:  If you can go back to the page where we

2   were with "coupled," please, Mr. Volper.  Sorry.  It's a

3   different area.  Sorry.  Could you go back?  My eyes were not

4   what they once were.  Okay.  Can you blow up the paragraph at

11:30   5   the bottom?  Can you scroll down, please.  It begins on the

6   left-hand column, line 49 to 59.  I think this is actually body

7   wear here.  Apologies.

8   BY MR. MARCHESE:

9   Q.   Body gear, body wear, it's very broad, and we saw that,

11:30  10   jackets, pants, scarfs, shirts, hats, gloves?

11   A.   Yes.

12   Q.   It could cover Castelli, right?

13   A.   Yes.

14       MR. MARCHESE:  Okay.  Can you go back to the patents,

11:30  15   please.  Same page.  Thank you.  Sorry.  I'm going to tell you

16   where to go.  Okay.  If you could go to the right-hand column,

17   line -- just the very top, all the way down to line 19.

18   BY MR. MARCHESE:

19   Q.   So, Mr. Blackford, we're looking at column 4, I think it

11:31  20   was lines 1 to about 19.  Do you have that in front of you?

21   A.   I think so.  The numbers are cut off, but I'll go with

22   that.

23   Q.   Do you have any reason to believe that's incorrect?

24   A.   No.

11:31  25   Q.   All right.  Here it's talking about the base material,

1    correct?

2    A.    Yes.

3    Q.    Okay.    And starting with "suitable" about halfway down --

4    do you see that?

11:31    5    A.    Yes.

6    Q.    Okay.    That's talking about the base material, correct?

7    A.    Yes.

8    Q.    Okay.    So it could be -- the patent says, "May include

9    nylon, polyester, Rayon, cotton, Spandex, wool, silk, or a

11:31    10    blend thereof or any other material having a desired look,

11    feel, weight, thickness, weave, texture, or other design

12    property."    Do you see that?

13    A.    Yes.

14    Q.    Would you agree with that?

11:32    15    A.    Yes.

16    Q.    And that's what "base material" means in the context of

17    your patent, correct?

18    A.    Yes.

19    Q.    And so the base material could be polyester, Nylon, right?

11:32    20    A.    Yes.

21    Q.    Okay.    Or any other material having a desired look or feel?

22    A.    Yes.

23    Q.    Would you agree with me that the exterior of the Canadian

24    ski jacket is -- it's a material, right?

11:32    25    A.    Yes, but on the inside, that has a polyurethane coating.

1  Q.   Sir, but would you agree with me that this is a material?

2  A.   Yes, it's a material.

3  Q.   The same with the Castelli jacket, right?

4  A.   Yes, the exterior is a material.  The other side of it is

11:32  5  not a material.  It's a polymer.

6  Q.   Sir, I asked you whether the exterior was a material.

7  Would you agree?

8  A.   The exterior is a material, yes.

9  Q.   Thank you.  Thank you.  All right.  With that said, I want

11:32  10  to ask you some questions about this Canadian jacket.  Okay?

11  This is the Canadian team ski jacket again?

12  A.   Yes.

13  Q.   So we talked about it.  It has a liner, right, that's got

14  Omni-Heat, right?

11:33  15  A.   Yes.

16  Q.   Okay.  And that -- but there's other components to the

17  jacket, right?

18  A.   Yes.

19  Q.   It's got a waterproof, breathable component to it, right?

11:33  20  A.   Yeah, it's a polymer membrane.

21  Q.   Something like Gore-Tex, right?

22  A.   Something like it.  Some microporous polyurethane layer.

23  Q.   I think probably most people have heard of Gore-Tex.

24  That's a pretty famous material.  Would you agree?

11:33  25  A.   It is, but it's not exactly the same.

1    Q.    It's not exactly the same, but there's something like that

2    in here, right?

3    A.    It's a microporous film, yes.

4    Q.    And when a microporous material is in a product like a coat

11:33    5    or a glove, that could be a desirable feature to a consumer.

6    Wouldn't you agree?

7    A.    Yes.

8    Q.    And if a product has a leather component to it, maybe the

9    exterior is leather, or it's made of a different type of fabric

11:34    10    like a real durable Nylon or polyester, that might be desirable

11    to a consumer, correct?

12    A.    Yes.   Some consumers may have a preference for that.

13    Q.    Okay.   And some consumers may have a preference for having

14    no insulation inside of their jacket, right?

11:34    15    A.    Yes.

16    Q.    And they may have a preference for having no insulation in

17    their glove, correct?

18    A.    Yes.

19    Q.    And they actually might have a preference for a particular

11:34    20    kind of insulation.   Wouldn't you agree?

21    A.    Yes.

22    Q.    Maybe they like down, right?

23    A.    It's possible.

24    Q.    Maybe they like Thinsulate?

11:34    25    A.    Yes.

1    Q.    But they would have -- there are preferences.    People have

2    desires, preferences.    They make purchasing decisions based at

3    least at times on what the insulating material is, correct?

4    A.    Yes.

11:34    5    Q.    And consumers might at times make purchasing decisions

6    based on whether the -- in the glove or in the jacket whether

7    that waterproof breathable is Gore-Tex or some other brand,

8    right?

9    A.    Yes.

11:35    10    Q.    Okay.    Because some people know what Gore-Tex is, don't

11    they?

12    A.    Yes, and more people know the name.

13    Q.    They know the name, right?

14    A.    Yes.

11:35    15    Q.    And they buy because of the name, don't they?

16    A.    Yes.

17    Q.    And people know the Columbia name, too, right?

18    A.    Yes.

19    Q.    And they buy because they say, "Oh, this is Columbia.    It's

11:35    20    a brand I know.    It's a brand I like."    They might actually

21    have that kind of opinion, correct?

22    A.    Yes.

23    Q.    And that would influence their purchasing decision.

24    Wouldn't you agree?

11:35    25    A.    Yes.

1    Q.   And people also -- for Seirus, you've heard of Seirus

2    before, right?

3    A.   Yes.

4    Q.   And you actually have seen Seirus HeatWave products before,

11:35    5    correct?

6    A.   Yes.

7    Q.   And you were walking the floor at a show prior to the

8    lawsuit, and you saw a Seirus HeatWave, correct?

9    A.   I'm not sure if it was prior to the lawsuit.  It was

11:36    10    brought to my attention at a trade show, yes.

11    Q.   And you saw Seirus HeatWave products, correct?

12    A.   I can't recall if I went to see them, no.

13    Q.   You did at some time see a Seirus HeatWave?

14    A.   Yes.

11:36    15    Q.   And you're familiar with Seirus?

16    A.   I wasn't until then.

17    Q.   Okay.  But you've become familiar with them?

18    A.   Yes.

19    Q.   And you know they are a brand.  They sell a lot of gloves,

11:36    20    right?

21    A.   Yes.

22    Q.   It's a brand that's respected, correct?

23    A.   I would say yes.

24    Q.   Okay.  It's a brand that's well known, right?

11:36    25    A.   Pretty well known.



| | |
|---|---|
| 1 | Q.   And it's a brand that in the snow sports industry, it's one |
| 2 | of the top glove sellers.   Wouldn't you agree? |
| 3 | A.   I would have to see the stats on that, but it's a seller, |
| 4 | yes. |
| 11:36  5 | Q.   It's a seller, but it's one of the top sellers.   Wouldn't |
| 6 | you agree? |
| 7 | A.   Without seeing the data, I can't agree without knowing. |
| 8 | Q.   You don't know.   Okay.   Well, how about would you believe |
| 9 | it's in the top ten? |
| 11:36  10 | A.   I don't want to guess. |
| 11 | Q.   But you would agree with me that it's a well-known brand, |
| 12 | correct? |
| 13 | A.   Sure. |
| 14 | Q.   Sure.   And people -- |
| 11:37  15 | A.   Yes. |
| 16 | Q.   -- make purchasing decisions based on brand names all the |
| 17 | time, don't they? |
| 18 | A.   Yes. |
| 19 | Q.   They walk up to a rack in a store, and they see Seirus on |
| 11:37  20 | the rack, and that would probably -- that could potentially, I |
| 21 | should say, draw them in to making a purchasing decision, |
| 22 | right? |
| 23 | A.   Yes. |
| 24 | Q.   And the same for Columbia, right? |
| 11:37  25 | A.   Yeah. |

1    Q.    And the same for a brand called Patagonia?

2    A.    Yes.

3    Q.    Brand is important, isn't it?

4    A.    Brand is an important factor, yes.

11:37    5    Q.    It's an important factor in the purchasing decision,

6    agreed?

7    A.    Yes.

8    Q.    Okay.    Thank you.

9          And so when a consumer walks up and sees a brand they're

11:37    10    familiar with, that they know and that they trust, the

11    purchasing decision will at least in part be driven by that,

12    correct?

13    A.    Yes.

14    Q.    And if a person walks up to a rack and they know and they

11:37    15    really like Gore-Tex, and they want to buy a Gore-Tex product,

16    they will be driven in part to buy the product because it has

17    Gore-Tex, correct?

18    A.    Yes.

19    Q.    And if a customer walks up to a rack and sees a product

11:38    20    that has Thinsulate, and they really like Thinsulate, and

21    they've been buying it before, and it's worked great for them,

22    that will drive their decision, at least in part, correct?

23    A.    Yes.

24    Q.    And if a person really wants a leather glove, and they say,

11:38    25    "That's got leather.    That's a reason I'm going to buy the

1    product," correct?

2    A.    Yes.

3    Q.    And if a person walks up to a rack of gloves, and they see

4    that this particular glove has a cool color that they really

11:38    5    like, that could drive the purchasing decision, right?

6    A.    Yes.

7    Q.    And a person could walk up to a rack, and they could see a

8    glove hanging there that has a very long gauntlet to it.  Maybe

9    they're a snowboarder, and they like to ride snowboards, and

11:38    10    they want to have coverage up to nearly their elbow.   That

11    could drive the purchasing decision, correct?

12    A.    Yes.

13    Q.    They might want buckles, right? -- to strap down, cinch

14    down their glove, right?

11:38    15    A.    Yes.

16    Q.    And that could partially drive the decision to buy the

17    product, right?

18    A.    Yes.

19    Q.    And they might want a pocket on their glove that has a

11:38    20    zipper so they could put their credit card in there or a key or

21    something, right?

22    A.    Yes.

23    Q.    And that would in part drive the purchasing decision.

24    Wouldn't you agree?

11:39    25    A.    I would agree.

1   Q.    Yeah, and in part they may actually see a liner in the

2   glove, and the glove liner might actually influence their

3   decision, right?

4   A.    Yes.

11:39   5   Q.    It could, right?

6   A.    Yeah.

7   Q.    Okay.  And if that glove liner was made of black or silver,

8   maybe they want black or silver, but it would depend on the

9   person.  They might pick one or the other, right?

11:39   10   A.    They might.

11   Q.    Now, you testified earlier that you are a VP, I believe.

12   Is that right?

13   A.    Yes.

14   Q.    Okay.  And you are not a director of the company, correct?

11:39   15   A.    An officer?

16   Q.    You're not a director.

17   A.    Oh, a director?  Not on the board of directors, no.

18   Q.    And you are not a founder, correct?

19   A.    I am not a founder.

11:40   20   Q.    And you did not authorize the filing of this lawsuit, did

21   you?

22   A.    No, I didn't -- or, no, I don't think I did.

23   Q.    Well, either you did or didn't.

24   A.    No.

11:40   25   Q.    That was a "no," and I'm not sure it's going to be clear.

```
 1    A.   No, I didn't.

 2    Q.   You did not authorize the filing of the lawsuit, right?

 3    A.   No.

 4    Q.   Okay.  You were not involved -- well, withdrawn.

 5         Now, you've mentioned a gentleman named Tim Boyle, right?

 6    A.   Yes.

 7    Q.   CEO, correct?

 8    A.   Yes.

 9    Q.   He's not here, right?

10    A.   He's not.

11    Q.   Haven't seen him at any point in time?

12              MR. ALDRICH:  Objection.  Repetitive.

13              THE COURT:  Sustained.

14    BY MR. MARCHESE:

15    Q.   There are other -- are there any other Boyles on -- that

16    are executives at the company that are related to Mr. Boyle?

17    A.   Yeah, his mom, Gert; and his son, Joe; and his daughter,

18    Molly.

19    Q.   Okay.  Thank you.

20         Now, you mentioned that there's a nine-person team that you

21    head -- at least at one point in time a nine-person team in

22    this innovation lab.  Is that correct?

23    A.   Yes.

24    Q.   Okay.  And I think I saw a document in the opening

25    statement where it said that it was a million-dollar --
```

11:40 (line 5)
11:40 (line 10)
11:40 (line 15)
11:40 (line 20)
11:41 (line 25)

1    a million-dollar lab.  Is that right?

2    A.   That's what the article said, yeah.

3    Q.   And then we saw some statistics or some information about

4    spending on marketing, right?

11:41    5    A.   I did not see that.

6    Q.   Oh, you didn't.  Sorry.  That's right.  You weren't in here

7    when Mr. Trepanier testified.

8    A.   No.

9    Q.   Well, he testified that the marketing budget in North

11:41    10    America, I believe for the fall of 2017, would be $9 million.

11    Does that sound right?

12    A.   If that's what he said, I bet he knows.  Yes.

13    Q.   Okay.  Great.  And so that's about nine times as much as

14    a million-dollar lab, right?

11:41    15    A.   Yes.

16    Q.   Now, the information we also saw during the opening said

17    that the labs generated -- I think it was 200 patents, correct?

18    A.   Yes, that's what the information said.

19    Q.   And in this case, there's only one utility patent, right?

11:42    20    A.   In this case, yes.

21    Q.   And there's only one design patent, correct?

22    A.   Yes.

23    Q.   And so all those other 199 patents are not relevant to

24    whether there's infringement or validity or anything in this

11:42    25    case, correct?

|       |    |                                                                          |
|-------|----|--------------------------------------------------------------------------|
|       | 1  | A.   They're not in the case, correct.                                   |
|       | 2  | Q.   Not relevant, right?                                                |
|       | 3  | A.   I don't know.                                                       |
|       | 4  | Q.   Would you agree?                                                    |
| 11:42 | 5  | A.   I agree, yes.                                                       |
|       | 6  | Q.   Now, we saw you provide some testimony about what Mr. Eric          |
|       | 7  | Groff said -- actually let me back up a second.                          |
|       | 8  |         MR. MARCHESE:  Can you pull up Exhibit 1027.  Okay.              |
|       | 9  | And if you could --                                                     |
| 11:42 | 10 | BY MR. MARCHESE:                                                         |
|       | 11 | Q.   Let me just ask you this, Mr. Blackford:  Have you seen             |
|       | 12 | this document before?                                                    |
|       | 13 | A.   It's an article from Portland Monthly, yes.                         |
|       | 14 |         MR. MARCHESE:  I'm going to have to get it.  I don't             |
| 11:43 | 15 | know if it's admitted yet, so I'm going to have to make sure.            |
|       | 16 | BY MR. MARCHESE:                                                         |
|       | 17 | Q.   And you're familiar with it, sir?                                   |
|       | 18 | A.   I'm familiar with the article, yes.                                 |
|       | 19 |         MR. MARCHESE:  I'd like to ask for it to be admitted,            |
| 11:43 | 20 | Your Honor.                                                              |
|       | 21 |         THE COURT:  You're offering 1027.  Any objection?               |
|       | 22 |         MR. ALDRICH:  No objection, Your Honor.                          |
|       | 23 |         THE COURT:  It is received.                                      |
|       | 24 |     (Exhibit 1027 admitted.)                                            |
| 11:43 | 25 |         THE COURT:  You may show it to the jury.                         |

1          MR. MARCHESE:  Thank you, Your Honor.

2     BY MR. MARCHESE:

3     Q.   So this is a picture of you holding up something that says,

4     "It's dry," right?

11:43  5     A.   Yeah.  It's an air permeability demonstration unit.

6     Q.   For demonstrating -- that's not demonstrating Omni-Heat, is

7     it?

8     A.   No.

9     Q.   Some other product line that you guys have?

11:43  10    A.   Yes.

11    Q.   Omni-Dry.  Is that right?

12    A.   Omni-Dry and Omni-Tech.

13    Q.   And when you're selling your products, some of the products

14    have Omni-Heat and Omni-Dry, right?

11:43  15    A.   Yes.

16    Q.   Okay.  And those products -- wouldn't it be true that at

17    times when people are buying those products, they're driven to

18    make their purchasing decision because of Omni-Dry?

19    A.   Maybe, yes.

11:44  20    Q.   And maybe sometimes by Omni-Heat, right?

21    A.   Yes.

22    Q.   Maybe sometimes by both?

23    A.   Yes.

24    Q.   And maybe sometimes by other product features, right?

11:44  25    A.   Possibly, yes.

1  Q.   And in this document, Groff said that your idea is 10

2  percent.   Do you remember saying that?

3  A.   Well, the journalists write what they write, and I say what

4  I say, and it was an interview.   I don't exactly remember what

11:44  5  I said.

6           MR. MARCHESE:   Can you scroll down.   One more.   Right

7  in the middle, there's the all caps, Mr. Volper.   Can you blow

8  that up?

9  BY MR. MARCHESE:

11:44  10  Q.   This is a quote attributed to you, correct?

11  A.   It is attributed to me.

12  Q.   And were those your words?

13  A.   I think they were pretty close, yes.

14  Q.   Okay.   So the idea, according to you, is probably 10

11:45  15  percent, right?

16  A.   Meaning of the amount of work you have to do, yes.

17  Q.   And the rest is things like marketing and sales, building

18  out a product, things of that nature, correct?

19  A.   Yeah.   Well --

11:45  20  Q.   Great --

21  A.   -- for me development.

22  Q.   Well, I'm asking you.   You said yes to marketing and sales

23  and all that.

24  A.   I didn't mean to.

11:45  25           MR. ALDRICH:   Objection, Your Honor.   Repetitive.

1    THE COURT:  You're kind of talking over each other.

2  Go ahead and ask your question.

3    MR. MARCHESE:  Sure.  I just wanted to make sure that

4  the answer was what it was.

11:45    5    THE WITNESS:  Can you reask?

6  BY MR. MARCHESE:

7  Q.   Sure.  Did 90 percent include marketing and sales and

8  advertising?  It includes that, right?

9  A.   Not -- in my brain when I made that comment, that's not

11:45   10  what I was meaning, no.

11  Q.   You meant something different?

12  A.   Yes.

13  Q.   Okay.  And 90 percent I think you said may have been --

14  well, can you tell me what you said?

11:45   15  A.   It would be the testing, the research, the development, all

16  the work to file a patent, all those things.

17  Q.   Okay.  And so when you came up with your idea for what

18  became Omni-Heat, I think you talked about it before, and you

19  mentioned there were some other people there when you had the

11:46   20  idea.

21  A.   Yes, there were some other people in the room.

22  Q.   Lynette --

23  A.   Stiger.

24  Q.   Lynette Stiger, and how many other people were in the room?

11:46   25  A.   The two I remember because --

1    Q.   Just the number.  You can just give me the number.

2    A.   I'm remembering two.

3    Q.   Lynnette Stiger and who?

4    A.   Dean Rurak.

11:46    5    Q.   Mr. Rurak and Ms. Stiger?

6    A.   Lynnette Stiger.

7    Q.   Stiger.  Rurak and Stiger, they were there, correct?

8    A.   Yes.

9    Q.   And I think you've said in the documents that there were no

11:46    10   documents that were generated from that particular event,

11   correct?

12   A.   Correct.

13   Q.   And I -- I haven't seen Ms. Stiger or Mr. Rurak in the room

14   here.  Is that right?

11:47    15   A.   They're not in the room here, no.

16   Q.   And so after you had this event that you described where

17   this happened, they -- you continued to work on the idea,

18   right?

19   A.   Oh, yeah.  Yes.

11:47    20   Q.   You did.  And other people helped you, right?

21   A.   Yes.

22   Q.   But nobody else appears as an inventor on your patent,

23   correct, your '270 patent, correct?

24   A.   That's correct.

11:47    25        MR. MARCHESE:  Can you go back to the '270 patent,

1    please.

2    BY MR. MARCHESE:

3    Q.   And this is Exhibit 1019, your '270 patent.  Do you see it?

4    A.   Yes.

11:47  5         MR. MARCHESE:  Go to the part in the left-hand column

6    in the middle where it says "related U.S. application data."

7    Could you blow that up for us, please.

8    BY MR. MARCHESE:

9    Q.   Have you seen this before, this section of the patent,

11:48  10   Mr. Blackford?

11   A.   I would have glanced over it, yes.

12   Q.   Okay.  And in it there are a series of design patents

13   cited, correct?

14   A.   Yes.  I think they're design -- yes, they're all des, so

11:48  15   it's a design patents.

16   Q.   Those are design patents, right?

17   A.   Yes.

18   Q.   And there's a number of those patents that are not yours,

19   correct?

11:48  20   A.   Yes, I believe so.

21   Q.   A number of those patents are Mr. Snyder's, aren't they?

22   A.   Yes.

23   Q.   Mr. Snyder's the invention of the '093 patent, right?

24   A.   The design patent, yes.

11:48  25   Q.   And the '093 patent is at issue in this case, correct?

1    A.   Correct.

2    Q.   And some of these designs are showing your patent, correct?

3    A.   Yes.

4    Q.   The wave design that's in your patent, your '270 patent,

11:48  5   right?

6    A.   There is a wave design as a figure in there, yes.

7    Q.   That's not your design, correct?

8    A.   Correct.  I did not design that.

9    Q.   That came from Mr. Snyder, right?

11:49  10  A.   He has the design patent, yes.

11   Q.   Well, the design came from him, right?

12   A.   The illustration, the design, yes.

13   Q.   Thank you.

14        And some of these other design patents were also

11:49  15  Mr. Snyder's, right?

16   A.   That, I don't know.  I'd have to look at the --

17   Q.   Do you recall any of them being his inventions or not?

18   A.   I can't remember.

19   Q.   Let's do this:  Do you remember that there was a hexagon

11:49  20  shape that you talked about in your direct testimony?

21   A.   There was a figure of -- an example of a hexagon, yes.

22   Q.   I think you said the hexagons would peel off over wear and

23   tear?

24   A.   Yes.

11:49  25  Q.   And that's not your design, is it?

1    A.    That is an example of a potential pattern.

2    Q.    I just want to know if that was your pattern or your

3    design.

4    A.    I did not make that -- I didn't draw the drawing of the

11:50    5    illustration, no.

6    Q.    Was the hexagonal shape pattern design -- was that your

7    design or somebody else's?

8    A.    I did not design the little hexagonal example.

9    Q.    And then there was the straight lines that you said also

11:50    10    didn't work because they'd peel off, right?

11    A.    Yes.

12    Q.    And that was not your design either, was it?

13    A.    That example was not my design.

14    Q.    And then there were little triangles you said would peel

11:50    15    off, too, correct?

16    A.    Yes.

17    Q.    And that was not your design either, was it?

18    A.    No.

19    Q.    And I think you have this in front of you now,

11:51    20    Mr. Blackford.  Can you take a look at Exhibit 1045?  We

21    haven't published it to the jury.

22    A.    Yes.

23        THE COURT:  So the way it works is they have to offer

24    it into evidence, and until it's offered into evidence, you

11:51    25    don't get to see it.

|       |    |                                                                |
|-------|----|----------------------------------------------------------------|
|       | 1  | MR. MARCHESE:  Sorry about that.                               |
|       | 2  | THE COURT:  He's doing it right.                               |
|       | 3  | MR. MARCHESE:  Thank you, Your Honor.                          |
|       | 4  | BY MR. MARCHESE:                                               |
| 11:51 | 5  | Q.   Exhibit 1045, is it familiar to you?                      |
|       | 6  | A.   Yes.                                                       |
|       | 7  | Q.   And so you know -- we're happy to flip through it, if you |
|       | 8  | would like, but -- and we can do that for you, but I'll ask you |
|       | 9  | based on the first page if you know what it is.               |
| 11:51 | 10 | A.   It looks like it's the presentation I gave that I talked  |
|       | 11 | about before.                                                  |
|       | 12 | Q.   But I think this is a little bit different one.          |
|       | 13 | A.   Oh, I better flip through.                                |
|       | 14 | Q.   We'll have to flip down for you.                         |
| 11:51 | 15 | MR. MARCHESE:  Can you flip through, please.  Just            |
|       | 16 | page down.  Thank you, Mr. Volper.                            |
|       | 17 | THE WITNESS:  Okay.                                            |
|       | 18 | BY MR. MARCHESE:                                               |
|       | 19 | Q.   Does it look familiar?                                   |
| 11:51 | 20 | A.   Yeah.  There's the one that I talked about this morning. |
|       | 21 | Q.   Is this your work?                                        |
|       | 22 | A.   I built this presentation, yes.                          |
|       | 23 | MR. MARCHESE:  I'd like to offer it into evidence,           |
|       | 24 | Your Honor.                                                    |
| 11:52 | 25 | MR. ALDRICH:  No objection.                                   |

1    THE COURT:  It is received.

2    (Exhibit 1045 admitted.)

3    MR. MARCHESE:  If you could go to page 2, Mr. Volper,

4    please.  I'm looking about -- if you could blow up the part

11:52  5    that says "performance," the bullet points under there.  Thank

6    you.

7    BY MR. MARCHESE:

8    Q.  Here it says a number of bullet points.  Feel free to

9    review them, but I want to ask you about the second one.  Do

11:52  10   you see that?

11   A.  Yep.

12   Q.  It says, "The lining material boosts the CLO an educated

13   estimate of an additional 25 percent."  Do you see that?

14   A.  Uh-huh.  Yes.

11:52  15   Q.  An educated estimate of 25 percent, correct?

16   A.  Yes.

17   Q.  And that means you didn't send this -- well, let me ask you

18   this:  CLO is this heating factor you mentioned.  Is that

19   right?

11:52  20   A.  It is a thermal resistance measurement, yes.

21   Q.  1 CLO is a British wool army uniform?

22   A.  That's where the word came from.

23   Q.  But it's a unit of measure for a warmth factor.  Is that

24   right?

11:53  25   A.  Yes.

1  Q.   And here you're saying you had an educated estimate of an

2  additional 25 percent from using, I believe, Omni-Heat.   Is

3  that right?

4  A.   Yes.

11:53  5  Q.   Okay.   But ultimately you didn't use 20 percent, correct?

6  A.   I didn't use 20 percent?

7  Q.   You didn't use 25 percent?

8  A.   I didn't use it?

9  Q.   Yeah.   I think the advertising material you said says 20

11:53  10  percent.   Right?

11  A.   Yes, we had advertising material that said 20 percent.

12  Q.   And that 20 percent is the same value as what you're

13  talking about here at 25 percent, correct?

14  A.   Yes.

11:53  15  Q.   Okay.   And an educated estimate, that's not based on

16  sending the fabric or the product or the material out to a

17  third-party lab, is it?

18  A.   No.   It's -- and nobody could test it at the time because

19  of reflection testing not being an industry standard.

11:53  20  Q.   Nobody could test it.   Is that what you're saying?

21  A.   Not as a standardized test.

22  Q.   But you had a method for testing it, right?

23  A.   We had made educated estimates.

24  Q.   And you did that in-house?

11:54  25  A.   We did that in-house, yes.

1    Q.    And you did not send it out to a third-party lab, correct?

2    A.    For the heat reflective part, no, we didn't at that time.

3    Q.    For other parts you did, right?

4    A.    Yeah, for like the insulation.

11:54    5    Q.    You would send insulation out to be tested by a third-party

6    lab?

7    A.    Yeah.

8    Q.    To get data, right?

9    A.    Yeah.

11:54    10    Q.    Figure out how good it was working?

11    A.    Yeah.

12    Q.    Okay.  But that wasn't done for the lining, the Omni-Heat

13    lining, correct?

14    A.    The third-party testing you mean?

11:54    15    Q.    Yeah.  You didn't do third-party testing, right?

16    A.    Not at that time, no.

17    Q.    You just did an educated estimate, correct?

18    A.    Yes.

19    Q.    And later you revised it, right?

11:54    20    A.    Well, yeah, we made -- we stopped making that claim.

21    Q.    The material -- well, you stopped making the claim of 25

22    percent, right?

23    A.    And 20 percent.

24    Q.    You don't even make a claim of 20 percent anymore?

11:55    25    A.    No.

1    Q.    You make no claim of the warmth factor, correct?

2    A.    That's correct.

3    Q.    And you've withdrawn that claim because it's not accurate,

4    correct?

11:55    5    A.    Well, what happened was --

6    Q.    Well, wait.  Let me just ask you again.

7    A.    It's not accurate for every product.

8    Q.    Not accurate for every product?

9    A.    Every kind of product.

11:55    10    Q.    But the claim was made for every kind of product, correct?

11    A.    In the beginning we had very few kinds of products.

12    Q.    And for every kind of product, you made the same claim that

13    it would -- that it would provide a boost of an additional 25

14    percent of warmth, correct?

11:55    15    A.    In the first season for a limited amount of products, we

16    did that.  In the next season for gloves, we didn't want to

17    make that claim.

18    Q.    You had made gloves for the first season?

19    A.    I don't recall, but we may have.

11:56    20    Q.    And you made a claim of 25 percent boost, right?

21    A.    To who?

22    Q.    To the public.

23    A.    No.

24    Q.    Never made that claim outside?

11:56    25    A.    Of 25 percent, no.

1    Q.    But you had made a claim of 20 percent, right?

2    A.    We may have in that first season on gloves, and when they

3    started testing it, I was concerned about that for gloves

4    because your fingers are hard to insulate.

11:56    5    Q.    You've made a claim in your product literature of 20

6    percent warmth.   We saw it in the opening statement, didn't we?

7    A.    In the first season we did, yes.

8    Q.    For all the products, right?

9    A.    For everything we had in that season.

11:56    10    Q.    Including gloves?

11    A.    I can't recall.

12    Q.    If there were gloves, it would include gloves, right?

13    A.    If there was gloves, yes, it would have appeared to cover

14    gloves.

11:56    15    Q.    And you withdrew that statement since, correct?

16    A.    Yes.

17    Q.    Because it's not supportable, right, for all products?

18    A.    Right.   People's metabolisms and -- and particularly gloves

19    because the volume-to-surface ratio of finger is very low, so

11:57    20    it's hard to claim the same amount of heat reflectance.

21    There's a lot less heat coming out of a finger.

22    Q.    Well, so that was a lot of words to what -- I wanted was a

23    yes/no answer.   I just wanted to know that you withdrew -- you,

24    Columbia and your team, withdrew the 20 percent claim after

11:57    25    Omni-Heat was first issued, correct?

1    A.    Yeah.   I was in favor of not claiming that for everything,

2    correct.

3    Q.    You were -- you personally were not in favor of claiming a

4    25 percent boost of warmth for all Omni-Heat products, correct?

11:57    5    A.    Correct.

6    Q.    Nevertheless it was made, correct?

7    A.    A 20 percent was made in the first season, yes.

8    Q.    And then it was withdrawn, correct?

9    A.    Then we stopped using it, yes.

11:57   10    Q.    Because it wasn't 100 percent accurate, correct?

11    A.    That, and we couldn't test every single product.  It was

12    too hard.

13    Q.    So you couldn't know, correct?

14    A.    Yes.

11:57   15    Q.    And so now you don't make that claim, correct?

16    A.    Correct.

17    Q.    And you still don't to this day, correct?

18    A.    Correct, as far as I know.

19    Q.    Thank you.   Now, you had another product that you were

11:58   20    selling for a while that was an Omni type -- the Omni name

21    seems to permeate the products of Columbia.   Would you agree?

22    A.    Correct.

23    Q.    And you had a battery-powered set of products, Omni -- I

24    don't know the name.

11:58   25    A.    Omni-Heat Electric.

1  Q.   Omni-Heat Electric, and those were sold a while?

2  A.   Yes.

3  Q.   And it had a battery, and you would combine it with things

4  like insulation or lining or other kind of materials, and you'd

11:58  5  make a product with battery power, right?

6  A.   Yes.

7  Q.   And so when people bought that battery-powered product,

8  would you, yourself, consider that the main driving force in

9  purchasing that product was the battery-powered warmth of the

11:58  10  product?  Would you agree with that?

11  A.   In some cases that would be correct, yes.  Some consumers

12  would think that.

13  Q.   Well, how much were you charging on average for a

14  battery-powered jacket?

11:59  15  A.   They ranged from 350 to a very high price, $1200.

16  Q.   $1200.  So if a customer's buying a $1200 jacket, they're

17  buying it for the battery power, aren't they?

18        MR. ALDRICH:  Objection.  Calls for speculation.

19        THE COURT:  Sustained.

11:59  20  BY MR. MARCHESE:

21  Q.   To the best of your knowledge, sir -- you work for

22  Columbia, right?

23  A.   I do.

24  Q.   And you're involved -- you said you go out and do

11:59  25  marketing, right?



1  A.  I don't go do marketing.  No.  I do presentations.

2  Q.  You do presentations at trade shows?

3  A.  Yeah, I talk to our customers, and I present, but I don't

4  consider myself a marketing material.

11:59  5  Q.  That's okay.  Maybe the terminology wasn't entirely clear.

6  I just wanted to make clear you're going out on the road;

7  you're talking to customers; you're promoting your products,

8  right?

9  A.  Yes, yes.

11:59  10  Q.  And as part of that, you gain some knowledge about what

11  people want and what they buy and why they buy things, correct?

12  A.  Correct.

13  Q.  Okay.  So based on your experience and your knowledge, you

14  would agree with me, would you not, that when somebody's buying

12:00  15  a 12 or $1300 jacket with battery power in it, they want the

16  batteries, right?

17       MR. ALDRICH:  Objection, Your Honor.

18       THE COURT:  Sustained.  That means you don't answer

19  the question.  He's going to ask you another one.

12:00  20  BY MR. MARCHESE:

21  Q.  And, sir, what is your -- you've seen marketing studies

22  from the company, correct?

23  A.  Yes.

24  Q.  And you seen marketing studies on the battery-powered

12:00  25  product, correct?

1    A.   No.

2    Q.   You don't know anything about that?

3    A.   I don't think we did the study on that one.

4    Q.   In your view, is the driver for the purchasing decision the

12:00  5    battery power of the $1300 product?

6             MR. ALDRICH:   Same objection, Your Honor.

7             THE COURT:   Sustained.

8    BY MR. MARCHESE:

9    Q.   Sir, let me ask you this:   What happened with the

12:00 10   battery-powered product line?

11            MR. ALDRICH:   Objection.   Scope.

12            THE COURT:   Overruled.

13            THE WITNESS:   We determined that there was too much

14   safety risk with heating up an element and having a lithium ion

12:01 15   battery like a Samsung phone has inside a product, so we

16   decided to discontinue them.

17   BY MR. MARCHESE:

18   Q.   They were recalled, correct?

19   A.   Some were recalled; some were just discontinued.

12:01 20   Q.   And there were problems with them, correct?

21   A.   We had some problems, yes.

22   Q.   And was that one of your inventions?

23   A.   It was not an invention by me, no.   I don't recall it being

24   an invention at all in terms of a patent.

12:01 25   Q.   It didn't -- the battery-powered system from Columbia that

1   was recalled was not an invention, correct?

2   A.    No.

3   Q.    Was that a yes or a no?  I'm sorry.

4   A.    It was not an invention.

12:01   5   Q.    I said correct, and you said no.  I just wanted to make

6   sure.

7   A.    There was no patent.

8   Q.    Now, you've done measurements of the coverage area for --

9   for Omni-Heat, right?

12:01   10  A.    Yes.

11  Q.    You yourself?

12  A.    Yes.

13  Q.    And you've come up with a number of different coverage

14  areas, correct?

12:02   15  A.    We have created a number of different coverage areas -- a

16  number of different coverage areas, correct.

17  Q.    And you've measured, for example, 35 percent.  Does that

18  sound right?

19  A.    Yes, I would have measured 35 percent probably in one of my

12:02   20  measurements.

21  Q.    And you've measured lower than that, correct?

22  A.    Yes.

23  Q.    And higher than that, correct?

24  A.    Yes.

12:02   25  Q.    And you testified in your deposition about variants, right?

A.    Yes.

Q.    And so when you're making Omni-Heat fabric -- let me ask

you this:   Does Columbia manufacture Omni-Heat itself?

A.    No.   We have a third party do that.

12:02  Q.    A third-party fabric maker, correct?

A.    Well, there's several third parties.  We have the foil

supplier, the adhesive supplier, the textile supplier, and the

lamination partner.

Q.    And then the lamination partner puts them all together,

12:03  correct?

A.    Yes.

Q.    And the lamination partner takes the foil, they take the

textile, and they take the adhesive, and they make a roll of

fabric, correct?

12:03  A.    Yes.

Q.    And that company is where?

A.    We have several.  I think there's 12.

Q.    And they're all in Asia?

A.    At this moment, yeah, they're all in parts of Asia.

12:03  Q.    China?

A.    Yes.

Q.    Korea?

A.    I'm not sure if we're doing it in Korea right now.

Q.    Taiwan?

12:03  A.    Yes.

1  Q.   Okay.  And so these fabric makers, they actually make the

2  Omni-Heat material for you, correct?

3  A.   Yes.

4  Q.   And you buy Omni-Heat fabric from them, don't you?

12:03  5  A.   Yes -- I mean we specify it, we develop it, we engineer it,

6  and then they manufacture it, and we in turn pay for it.

7  Q.   So these 12 companies actually manufacture these rolls of

8  Omni-Heat fabric, right?

9  A.   And was about 12.  There may be more or less.

12:04  10  Q.   It may be more than 12.  Is that correct?

11  A.   Or less.  I can't -- I'm estimating.

12  Q.   Shall we say roughly 12?  Is that okay?

13  A.   Yeah.

14  Q.   The roughly 12 fabric makers, they manufacture the rolls of

12:04  15  Omni-Heat fabric for you using these various ingredients, the

16  foil, the adhesive, and the textile?

17  A.   Yes.

18  Q.   And then you receive -- you, Columbia, receive these rolls

19  of fabric, right?

12:04  20  A.   No.  We send them to, you know, a glove factory or garment

21  factory.

22  Q.   Okay.  And when those are -- well, let me ask you this:

23  That roll of fabric, that's going to be a manufactured product.

24  It's been made by machines, right?

12:04  25  A.   It has been made by machines into a roll, yes.

1    Q.   And it's like five yards wide?  How wide?

2    A.   Typically between 54 and 62 inches.

3    Q.   So about close to 4 or 5 feet wide, correct?

4    A.   Yeah.

12:05    5    Q.   And how many yards on a roll roughly typically?

6    A.   Typically 300 to 500.

7    Q.   And you pay money to these people -- Columbia pays money to

8    these fabric makers for these rolls, right?

9    A.   Yeah.

12:05   10    Q.   And once that's paid for, you receive this article in your

11   hand, correct?

12   A.   Well, the factory pays for it.  The garment factory, they

13   receive it.  We pay for the garment, the glove, or the shoe.

14   Q.   And so the -- you pay the factory that makes the shoe or

12:05   15   the glove or the jacket, correct?

16   A.   Yeah, and they buy the core of the material.

17   Q.   They buy the core of the material?

18   A.   On our behalf.

19   Q.   But Columbia effectively pays for that material?

12:05   20   A.   You could say so, yes.

21   Q.   And that material is a separate product that arrives at the

22   factory that actually puts it together into a glove or a jacket

23   or into a shoe, right?

24   A.   It arrives on a roll, yes.

12:05   25   Q.   And it's finished, right?  It's fabric.  It's done.

|  | 1 | There's no more manufacturing of that fabric, correct? |

1    There's no more manufacturing of that fabric, correct?

2    A.   Correct.

3    Q.   And then that company that makes the -- let's say it's a

4    glove, and they're going to make an insulated glove.

12:06    5         MR. MARCHESE:   May I approach, Your Honor?

6         THE COURT:   Sure.

7         MR. MARCHESE:   Thank you.   I think you have an

8    insulated Columbia glove up here.   This is Exhibit 707.

9    BY MR. MARCHESE:

12:06    10   Q.   You've seen this before?

11   A.   Yeah, I think I've seen it before.

12   Q.   I'm giving it back to you.

13        Tell us what is the part of that glove that is -- arrives

14   on that roll of fabric, if you would, please.

12:06    15   A.   It's the Omni-Heat lining.

16   Q.   The lining inside, correct?

17   A.   Along with everything else that comes on a roll.

18   Q.   What else comes on a roll?

19   A.   The outer fabric.

12:07    20   Q.   The fabric comes on the roll, right?

21   A.   Yeah.

22   Q.   And it's the Omni-Heat fabric lining on a roll, right?

23   A.   The Omni-Heat fabric lining comes on a roll, yes.

24   Q.   And that is taken by the glove maker, and they combine it

12:07    25   with other stuff, right?

1    A.    Yes.

2    Q.    They combine it with the insulation, right?

3    A.    Yes.

4    Q.    And they combine it sometimes with a waterproof breathable

12:07    5    like Gore-Tex or another type that Columbia uses?

6    A.    Potentially, yes.

7    Q.    And they combine it with an outer shell, correct?

8    A.    Yes.

9    Q.    And they could combine it with buckles or straps or zippers

12:07    10    and other things, correct?

11    A.    Yes.

12    Q.    Maybe a leather palm, right?

13    A.    Yes.

14    Q.    And all of those -- those are components that are added to

12:07    15    the lining material, correct?

16    A.    They're all components of the finished product, yes.

17    Q.    Okay.   And all those separate components are made into a

18    glove, correct?

19    A.    Correct.

12:07    20    Q.    And all those components exist before the glove is made,

21    correct?

22    A.    Correct.

23    Q.    And those are all manufactured, or at least the lining

24    we've heard is manufactured prior to being received by the

12:08    25    company that makes the glove, correct?

1   A.   Correct.

2   Q.   And part of the value of that glove, would you agree with

3   me or not, is the insulation?

4   A.   Part of the cost of the glove is the insulation.

12:08   5   Q.   Part of the value to the consumer is the insulation,

6   correct?

7   A.   Yes.

8   Q.   Part of the value to the consumer is the shell, correct?

9   A.   Yes.

12:08   10   Q.   Part of the value to the consumer is the waterproof,

11   breathable fabric, correct?

12   A.   Correct.

13   Q.   Part of the value to the consumer are the other features of

14   the glove, correct?

12:08   15   A.   Yes, they're all common features of gloves.

16   Q.   And all of those features contribute to the overall value

17   of the glove, including that the lining material is part of

18   that, right?

19   A.   Yeah, it's the one thing that's pretty different, but yes.

12:08   20   Q.   Everything -- well, when you're looking at that glove, you

21   tell me -- before you look inside of it, look at the outside.

22   Can you see the lining material?

23   A.   No.   The hangtag tells me that -- I can see a little bit,

24   but, no, not really.

12:09   25   Q.   Okay.   You can't.   You'd have to actually look inside of it

1    to see that?

2    A.   I would have to look inside.

3    Q.   Thank you.   Now, Columbia has incorporated the term

4    "Omni-Heat" in its lining material, right?

12:09   5    A.   Yes.

6              THE COURT:   How much longer do you have?

7              MR. MARCHESE:   I may have 15 minutes or so.

8              THE COURT:   Keep going.

9              MR. MARCHESE:   Okay.   I just wanted to -- permission

12:09   10   to recall this witness in our case in chief.

11             THE COURT:   Of course.

12             MR. MARCHESE:   Thank you.

13   BY MR. MARCHESE:

14   Q.   So I was asking about the logo design in the fabric.

12:10   15   You're familiar with that, right?

16   A.   For Omni-Heat?

17   Q.   Yes.

18   A.   Yes, we have a logo design on the Omni-Heat fabric.

19   Q.   You actually write the word "Omni-Heat" in there, correct?

12:10   20   A.   We do.

21   Q.   There's a reason for that, right?

22   A.   Yes.

23   Q.   You do that to tell the consumer public that it's a

24   Columbia product, right?

12:10   25   A.   Yes, along with the "patented" word as well, same thing.

1    Q.    Okay.  And so there's a reason for putting a logo on a

2    piece of fabric, right?

3    A.    Yes.

4    Q.    And it's to tell the public that this is Columbia's

12:10    5    product, right?

6    A.    Yes.

7    Q.    To let them know it's not Seirus' product, right?

8    A.    Well, to let them know it's Columbia's product.

9    Q.    Well, to differentiate yourself from Patagonia, to

12:10    10    differentiate yourself from Marmot, to differentiate yourself

11    from any number of competitors that Columbia would have,

12    correct?

13    A.    Yes.

14    Q.    And the same would be true for any other kind of

12:11    15    manufacturer who would put something like "Seirus" all over the

16    inside of their liner.  Wouldn't you agree?

17    A.    Yes.

18    Q.    And that company that puts -- you know, for example, puts

19    their logo all over their lining material is differentiating

12:11    20    themselves from others, correct?

21    A.    Yes.

22    Q.    And they're telling the consuming public that this is my

23    product and it's not someone else's.  Would you agree?

24    A.    Yes.

12:11    25    Q.    So I heard on your direct examination you talked about

1    something called soft shell.  Do you remember that?

2    A.    Yes.

3    Q.    Okay.  And soft shell was something you said that you

4    developed in the mid-'90s, right?

12:12    5    A.    Yeah, '96 or '97, something like that.

6    Q.    And I think you said it had to do with bonding fabrics

7    together.  Is that correct?

8    A.    Yes.

9    Q.    A type of laminating?

12:12    10    A.    Yes.

11    Q.    In the mid-90s when you came up with soft shell, laminating

12    fabrics was well known?

13    A.    It was well known for laminating membranes to fabrics, but

14    the idea of this particular combination was not well -- was not

12:12    15    known to me at all.

16    Q.    Would you agree with me that laminating in the mid-'90s of

17    fabrics together was known?

18    A.    I would say actually yes.  I mean -- yes.

19    Q.    Thank you.  Thank you.

12:13    20          And I thought I heard you mention the word Lurex.  Right?

21    A.    Yes.

22    Q.    You're familiar with that, right?

23    A.    I read it on this label here, yeah.

24    Q.    So you're looking at the Thermalux glove?

12:13    25    A.    Yes.

1    Q.   And that's Exhibit 1301?

2    A.   Yes.

3    Q.   And prior to seeing the Thermalux glove from Seirus, had

4    you ever heard of Lurex?

12:13  5    A.   Yes.

6    Q.   Okay.  And that's a foil material, correct?

7    A.   It's foil -- well, it's metal fiber material.

8    Q.   It's a type of foil.  Would you agree?

9    A.   I don't interpret it to be foil, no.

12:13  10   Q.   It's a metal fiber.  You would agree with that?

11   A.   Yes.

12   Q.   It was developed by NASA, correct?

13   A.   That, I don't know.  I don't know the history.

14   Q.   When did you first hear of Lurex?

12:13  15   A.   I'd seen it off and on in the industry over the years.  I

16   never really looked at it too-too closely, but I'd known of it.

17   Q.   You'd known of it since before Omni-Heat.  Is that correct?

18   A.   Probably, yes.

19   Q.   And you had seen products using Lurex, correct?

12:14  20   A.   Yes.

21   Q.   And yet you said before you'd never seen a Thermalux glove

22   prior to Omni.  Correct?

23   A.   Hadn't seen that glove, no.

24   Q.   You'd seen any other gloves -- withdrawn.

12:14  25        You had not seen any other gloves or any other type of

1   apparel with Lurex combined with another fabric.  Is that

2   correct?

3   A.   I don't recall.

4        MR. MARCHESE:   I might have a few more minutes.  I

12:14  5   don't know if you want to take a break.

6        THE COURT:   Keep going.

7        MR. MARCHESE:   Thank you.

8   BY MR. MARCHESE:

9   Q.   Let's talk about the Exhibit 1043, please.  Sir, this is a

12:15  10   declaration that we talked about earlier.

11        MR. MARCHESE:   This has not been published yet.  It's

12   not been put into evidence yet, Your Honor.

13        THE COURT:   Okay.

14        MR. MARCHESE:   I could just -- any objection to it?

12:15  15        MR. ALDRICH:   No objection.

16        THE COURT:   It's received.

17     (Exhibit 1043 admitted.)

18        MR. MARCHESE:   Thank you.

19   BY MR. MARCHESE:

12:15  20   Q.   Sir, take a look at it.  We can flip through it if you'd

21   like, but Exhibit 1043 appears to be a declaration from you.

22   Would you agree?

23   A.   Yes.

24   Q.   And this was submitted in the context of your patent

12:15  25   prosecution of the '270 patent, correct?

1    A.    It looks like it, yes.

2    Q.    And this -- in this particular declaration, it provides

3    some test data, correct?

4    A.    I can't recall.  I'd have to --

12:16    5    Q.    Can you go to the next page, please.  There's actually one

6    more down?

7    A.    Oh, yes.

8    Q.    Does this look familiar?

9    A.    Yes.

12:16    10    Q.    We saw this graph on your direct, correct?

11    A.    Yes.

12    Q.    Okay.  So this graph has in it three lines, green, blue,

13    and red, correct?

14    A.    Correct.

12:16    15    Q.    And just for reference for purposes of the record, this

16    is -- Columbia 18623 is the page this is coming from.

17         And this green line here, that stands for what?

18    A.    Heat reflection.

19    Q.    And for heat reflection, you made some assumptions,

12:16    20    correct?

21    A.    Yes -- I mean can you tell me what you mean by that?

22    Q.    Well, I think you assumed that the bottom left-hand .0 and

23    0, you didn't actually test that, did you?

24    A.    We considered that to be the base material, and for the

12:17    25    purposes of the testing, we called that the baseline, so zero.

| | | |
|---|---|---|
| | 1 | Q.   But you didn't test it, did you? |
| | 2 | A.   We did test the base material, yes. |
| | 3 | Q.   Well, let me ask you this:   You made an assumption here |
| | 4 | that the phenomenon that you're describing would behave |
| 12:17 | 5 | linearly.   Is that correct? |
| | 6 | A.   That was our guess, our hypothesis. |
| | 7 | Q.   It was a guess? |
| | 8 | A.   Well, in the -- this wasn't a guess here, but before we did |
| | 9 | the testing, it was our guess. |
| 12:17 | 10 | Q.   Your guess was that a system with foil and a backing |
| | 11 | material, a base material, would behave linearly, correct? |
| | 12 | A.   The heat reflection aspect, yes. |
| | 13 | Q.   Okay.   And that assumption that you made was not based on |
| | 14 | any scientific analysis, was it? |
| 12:18 | 15 | A.   The -- you mean after the testing or before? |
| | 16 | Q.   Well, you were asked at your deposition: |
| | 17 | "Question:   You're not basing that, referring to this |
| | 18 | linear behavior, on any scientific analysis that you performed |
| | 19 | independently?"   Do you remember that question? |
| 12:18 | 20 | A.   They performed independently. |
| | 21 | Q.   That's what they asked.   Do you remember that? |
| | 22 | A.   Okay.   I don't. |
| | 23 | Q.   Do you remember that question? |
| | 24 | A.   I don't specifically remember that one, no. |
| 12:18 | 25 | MR. MARCHESE:   Can you pull up Mr. Blackford's |

1    deposition, please.  Page 211.  And start at line 4, please,

2    down to line number 11.

3    BY MR. MARCHESE:

4    Q.  You were asked whether the line would decrease in a linear

5    fashion.  Do you remember that?

6    A.  I don't see the stuff before it.  It says it would decrease

7    in linear fashion, but I'm not sure what.

8    Q.  The assumption of linearity is for air permeability,

9    correct?

10   A.  No.

11   Q.  The assumption of linearity was for the water vapor and air

12   permeability.  Would you agree?

13   A.  No.  It was for heat reflection.

14   Q.  So you assumed heat reflection.  Is that correct?

15   A.  I'm getting lost on the term "assumed."

16   Q.  Well, it's a word that you were asked about.

17        MR. MARCHESE:  If you go up to page 209, please.  This

18   may be better.

19   BY MR. MARCHESE:

20   Q.  My apologies.  I'm trying to be as clear as I can.  This

21   was a --

22   A.  Oh, you mean expected.

23   Q.  Pardon?

24   A.  Do you mean expected by assumed.

25   Q.  You know, let me ask you, this was a slide that we looked

1    at on your direct, right?

2    A.    Yes.

3    Q.    And that expected line was something that you assumed,

4    correct?

12:20    5    A.    I don't -- I don't know if I get the word "assumed" here,

6    but I expected.   That is the word I would use.

7    Q.    But then you ended up -- you said you did some testing,

8    right?

9    A.    Yes.

12:20    10    Q.    And you got an actual line there, correct?

11    A.    Yes.

12    Q.    And in that actual line, you measured three data points?

13    A.    I measured five.

14    Q.    I see the three.   So you measured at a hundred and zero.

12:20    15    Is that correct?

16    A.    A hundred and zero and the three in the middle.

17    Q.    The three in the middle.   But you never measured below 40

18    percent, did you?

19    A.    No, I did not.

12:20    20    Q.    And the top one is 67 percent, correct?

21    A.    Correct, in this test.   I measured it, but not here in this

22    test.

23    Q.    In this test you never measured above 67, did you?

24    A.    No.

12:21    25    Q.    And in this test you never measured below 40, did you?

1    A.    No.

2    Q.    And you just assumed, then, that the behavior would be the

3    straight line between the bottom data point -- and I'll just

4    highlight it here if I can.  I'll put my finger on it.

12:21    5        The bottom data point on -- this is -- just a minute if you

6    would.  Boy, it's hard to read.

7        All I'm saying is this bottom point that's at 40, correct?

8    A.    Where your finger is is on the 30 line, but yeah.

9    Q.    The point is on 40?

12:21    10    A.    The point is on 40.

11    Q.    And beneath that there are no data points until you get to

12    zero?

13    A.    Correct.

14    Q.    So you didn't do any measurements beneath 40?

12:21    15    A.    No.  We expected them to fall between where the 40 line

16    fell and the 100 fell, somewhere in that range, which is very

17    close to each other.

18    Q.    And then for 67 is the upper data point, correct?

19    A.    Yes.

12:22    20    Q.    And you did not measure any points above 67 percent, did

21    you?

22    A.    Not in this test.

23    Q.    You did not.  Is that correct for this test?

24    A.    For this test, correct.

12:22    25    Q.    So you just drew a line that curved at almost a right

angle, correct?

A.   Well, the next data point connected to the next data point.

Q.   But you said in your declaration --

         MR. MARCHESE:   If you can go back to Exhibit 1043.

12:22   Let's see.   Next page, please.

BY MR. MARCHESE:

Q.   If you look at -- well, I guess let me ask you this:   You said previously in your testimony that you had considered the range 30 to 70 to be optimal, right?

12:23   A.   Yes.

Q.   And you submitted this declaration to support that claim, correct?

A.   Yes.

Q.   And yet you did not do any data points between 67 and 100, correct?

12:23   A.   In that test, correct.

Q.   And you did not do any testing beneath 40 percent, correct?

A.   No.   I just showed where the data would likely fall.

Q.   And so, nevertheless, you ended up saying that 30 to 70 was optimal, but this test you had not measured 70, 69, or 68, correct?

Q.   Correct.   I looked at where the line was going and saw where those -- that data fell.

Q.   And despite the fact that you said the range from 30 to 40 was optimal, you didn't measure it at 38 or 37 or 36 or any of

1    those, correct?

2    A.    Correct.

3                 MR. MARCHESE:    Thank you, Your Honor.    Nothing

4    further.

12:24    5                 THE COURT:    Thank you.

6        Members of the jury, we will be taking our mid-day recess

7    at this time.    It is about 12:25, so we will get back together

8    at 1:25.    Please be on time.    Enjoy your lunch.    Thank you.

9        (Proceedings held outside the presence of the jury panel.)

12:24    10                 THE COURT:    You may step down.    See you in an hour.

11                 MR. ALDRICH:    Your Honor, quick question:    We would

12    ask that 1302 be brought into the courtroom.    It's a physical

13    exhibit.

14                 THE COURT:    Do I have it?

12:24    15                 MR. ALDRICH:    We don't have it.    You don't have it.

16    They have it.

17                 THE COURT:    What is it?

18                 MR. ALDRICH:    It's the Castelli jacket they said isn't

19    here.

12:25    20                 MR. MARCHESE:    We don't have a Castelli jacket.

21                 MR. ALDRICH:    You have it as 1302.

22                 MR. MARCHESE:    It was a placeholder in case we could

23    get one, Your Honor.    We were never able to.

24                 THE COURT:    Okay.

12:25    25                 MR. MARCHESE:    Thank you, Your Honor.

1          THE COURT:   You're welcome.

2                         ---oOo---

3

4              C-E-R-T-I-F-I-C-A-T-I-O-N

5

6      I certify that the foregoing is a correct transcript from

7   the record of proceedings in the above-entitled matter.

8

9          Dated September 19, 2017, at San Diego, California.

10

11

                    /s/ Dana Peabody
12                  Dana Peabody,
                    Registered Diplomate Reporter
13                  Certified Realtime Reporter

14

15

16

17

18

19

20

21

22

23

24

25

384

1                UNITED STATES DISTRICT COURT

2               SOUTHERN DISTRICT OF CALIFORNIA

3

4  COLUMBIA SPORTSWEAR NORTH      )
   AMERICA, INC., AN OREGON       )
5  CORPORATION,                   )
                                  )
6              PLAINTIFF,         ) CASE NO. 17CV1781-HZ
                                  )
7  VS.                            ) SAN DIEGO, CALIFORNIA
                                  )
8  SEIRUS INNOVATIVE ACCESSORIES,) TUESDAY,
   INC., A UTAH CORPORATION,      ) SEPTEMBER 19, 2017
9                                 ) 1:28 P.M.
              DEFENDANT.          )
10 _____)

11

12

13         REPORTER'S TRANSCRIPT OF PROCEEDINGS

14                      JURY TRIAL

15              VOLUME 2 - PM SESSION

16                 PAGES 384 - 527

17      BEFORE THE HONORABLE MARCO A. HERNANDEZ
              UNITED STATES DISTRICT JUDGE

18

19

20

21

22 REPORTED BY:  CAMERON P. KIRCHER
                 CSR NO. 9427, RPR, CRR, RMR
23               333 W. BROADWAY, SUITE 420
                 SAN DIEGO, CALIFORNIA  92101
24               E-MAIL:  CPKIRCHER@GMAIL.COM

25

COMPUTER-AIDED TRANSCRIPTION

385

```
1    APPEARANCES:

2    FOR THE PLAINTIFF:    SCHWABE, WILLIAMSON & WYATT, P.C.
                           BY:  NIKA F. ALDRICH, JR., ESQ.
3                               DAVID W. AXELROD, ESQ.
                                BRENNA LEGAARD, ESQ.
4                          1211 SW 5TH AVENUE
                           SUITE 1900
5                          PORTLAND, OREGON  97204

6
     FOR THE DEFENDANT:    FISH & RICHARDSON, P.C.
7                          BY:  CHRISTOPHER S. MARCHESE, ESQ.
                                SETH M. SPROUL, ESQ.
8                          12390 EL CAMINO REAL
                           SAN DIEGO, CALIFORNIA  92130
9
                           MARKOWITZ HERBOLD, P.C.
10                         BY:  RENEE ROTHAUGE, ESQ.
                           1211 SW FIFTH AVENUE
11                         SUITE 3000
                           PORTLAND, OREGON  97204
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

386

# INDEX

EXAMINATION

<u>WITNESS NAME</u>                                                      <u>PAGE</u>

<u>ZACHARY SNYDER</u>

     DIRECT BY MS. LEGAARD.......................................... 396
     CROSS BY MR. SPROUL ........................................... 410

<u>JAMES DROZDOWSKI</u>

     DIRECT BY MS. LEGAARD.......................................... 431
     CROSS BY MR. SPROUL ........................................... 436

<u>MORGAN CHIN</u>

     DIRECT BY MR. AXELROD.......................................... 447
     CROSS BY MR. MARCHESE......................................... 505

387

1                                    **EXHIBITS**

2      <u>EXHIBIT</u>                                                    <u>PAGE</u>

3      EXHIBIT 1 ENTERED INTO EVIDENCE                           398
       EXHIBIT 107 ENTERED INTO EVIDENCE                         472
4      EXHIBIT 135.1 ENTERED INTO EVIDENCE                       481
       EXHIBIT 138 ENTERED INTO EVIDENCE                         481
5      EXHIBIT 220.3 ENTERED INTO EVIDENCE                       408
       EXHIBIT 222.1 ENTERED INTO EVIDENCE                       405
6      EXHIBIT 227 ENTERED INTO EVIDENCE                         433
       EXHIBIT 249 ENTERED INTO EVIDENCE                         434
7      EXHIBIT 332 ENTERED INTO EVIDENCE                         479
       EXHIBIT 387 ENTERED INTO EVIDENCE                         493
8      EXHIBIT 391 ENTERED INTO EVIDENCE                         500
       EXHIBIT 396 ENTERED INTO EVIDENCE                         490
9      EXHIBIT 436 ENTERED INTO EVIDENCE                         472
       EXHIBIT 427 ENTERED INTO EVIDENCE                         472
10     EXHIBIT 452 ENTERED INTO EVIDENCE                         493
       EXHIBIT 458 ENTERED INTO EVIDENCE                         493
11     EXHIBIT 460 ENTERED INTO EVIDENCE                         493
       EXHIBIT 475 ENTERED INTO EVIDENCE                         472
12     EXHIBIT 476 ENTERED INTO EVIDENCE                         472
       EXHIBIT 480 ENTERED INTO EVIDENCE                         490
13     EXHIBIT 491 ENTERED INTO EVIDENCE                         488
       EXHIBIT 501 ENTERED INTO EVIDENCE                         498
14     EXHIBIT 509 ENTERED INTO EVIDENCE                         498
       EXHIBIT 516 ENTERED INTO EVIDENCE                         499
15     EXHIBIT 526 ENTERED INTO EVIDENCE                         449
       EXHIBIT 528 ENTERED INTO EVIDENCE                         449
16     EXHIBIT 529 ENTERED INTO EVIDENCE                         449
       EXHIBIT 530 ENTERED INTO EVIDENCE                         449
17     EXHIBIT 531 ENTERED INTO EVIDENCE                         449
       EXHIBIT 532 ENTERED INTO EVIDENCE                         449
18     EXHIBIT 544 ENTERED INTO EVIDENCE                         449
       EXHIBIT 546 ENTERED INTO EVIDENCE                         485
19     EXHIBIT 551 ENTERED INTO EVIDENCE                         481
       EXHIBIT 722 ENTERED INTO EVIDENCE                         500
20     EXHIBIT 1028 ENTERED INTO EVIDENCE                        388
       EXHIBIT 1050 ENTERED INTO EVIDENCE                        420
21     EXHIBIT 1057 ENTERED INTO EVIDENCE                        424
       EXHIBIT 1058 ENTERED INTO EVIDENCE                        424
22     EXHIBIT 1059 ENTERED INTO EVIDENCE                        425
       EXHIBIT 1060 ENTERED INTO EVIDENCE                        426
23     EXHIBIT 1316 ENTERED INTO EVIDENCE                        391

24

25

388

1          SAN DIEGO, CALIFORNIA - TUESDAY, SEPTEMBER 19, 2017

2                              1:28 P.M.

3               THE CLERK:  JURORS ENTERING.

4               (JURY PRESENT, 1:29 P.M.)

5               THE COURT:  BE SEATED.

6                   REDIRECT EXAMINATION CONTINUED

7     BY MR. ALDRICH:

8     Q.   MR. BLACKFORD, DO YOU REMEMBER SOME QUESTIONS ABOUT THE

9     CASTELLI JACKET?

10    A.   YES.

11    Q.   AND DO YOU REMEMBER SOME QUESTIONS ABOUT WHETHER YOU

12    NOTIFIED THE PATENT OFFICE ABOUT THE CASTELLI JACKET WHEN YOU

13    WERE APPLYING FOR YOUR PATENT?

14    A.   YES.

15              MR. ALDRICH:  COULD WE PULL UP EXHIBIT 305.  AND CAN

16    WE ZOOM IN ON THE UPPER RIGHT-HAND SIDE.  IT SAYS "REFERENCES

17    CITED."  THAT'S PERFECT.

18    Q.   IS THAT YOUR UNDERSTANDING OF THE REFERENCES THAT WERE

19    CITED DURING THE PROSECUTION, THE PRIOR ART REFERENCES THAT

20    WERE CITED DURING THE PROSECUTION OF THE '270 PATENT?

21    A.   YES.

22    Q.   AND DOWN AT THE BOTTOM THERE IT SAYS "OTHER

23    PUBLICATIONS."  DO YOU SEE THAT?

24    A.   YES.

25    Q.   AND WHAT IS THE PUBLICATION THAT'S SHOWN THERE ON THE

389

1    FIRST PAGE?

2    A.    CASTELLI INSOLITO RADIATION JACKET.

3    Q.    SO DID YOU DISCLOSE THE CASTELLI RADIATION JACKET TO THE

4    EXAMINER DURING THE PROSECUTION OF YOUR PATENT?

5    A.    IT APPEARS, YES, THE PATENT ATTORNEY DID.

6            MR. ALDRICH:  CAN WE PULL UP --

7    Q.    AND WHAT IS THE WEBSITE THAT'S SHOWN HERE UNDER OTHER

8    PUBLICATIONS?

9    A.    WWW.FEEDTHEHABIT.COM.

10   Q.    FEEDTHEHABIT.COM?

11   A.    YEAH.

12           MR. ALDRICH:  OKAY.  CAN WE PULL UP EXHIBIT 1028.

13           YOUR HONOR, OFFER 1028.

14           THE COURT:  ANY OBJECTION TO 1028?

15           MR. MARCHESE:  NO, YOUR HONOR.

16           THE COURT:  IT IS RECEIVED.

17           (TRIAL EXHIBIT 1028 RECEIVED IN EVIDENCE.)

18   Q.    BY MR. ALDRICH:  MR. BLACKFORD, IS THAT THAT

19   FEEDTHEHABIT WEBSITE?

20   A.    YES.

21   Q.    AND IT'S ABOUT THE CASTELLI, THEY CALL IT RADIATION

22   JACKET.  DO YOU SEE THAT?

23   A.    YES.

24           MR. ALDRICH:  LET'S GO TO THE SECOND PAGE.  AND

25   LET'S GO DOWN ONE, TWO, THREE, FOUR, FIVE, SIX PARAGRAPHS.

390

1    PERFECT.

2    Q.   DO YOU SEE THAT PARAGRAPH THAT BEGINS WITH "TO PUT

3    RADIATION THEORY INTO PRACTICE"?

4    A.   YEAH.

5    Q.   CAN YOU -- CAN YOU READ THAT TO YOURSELF.

6    A.   OKAY.

7    Q.   IT SAYS, "CASTELLI FABRIC ENGINEERS SPENT COUNTLESS

8    HOURS TRANSFORMING AN ALUMINUM REFLECTIVE NASA-TYPE SPACE

9    BLANKET MATERIAL INTO A LAMINATE SUITABLE FOR APPAREL."

10        DO YOU SEE THAT?

11   A.   YES.

12   Q.   IS THAT YOUR UNDERSTANDING OF WHAT THE RADIATION JACKET

13   WAS?

14   A.   YES.

15   Q.   LET'S GO TO THE NEXT PAGE.  THE SECOND PARAGRAPH DOWN IT

16   SAYS "WARM," AND THERE IS A SENTENCE HERE THAT SAYS, "TO

17   PROTECT AGAINST THIS KIND OF HEAT LOSS, CASTELLI LAMINATED A

18   WOVEN SUBSTRATE TO A PERFORATED SPACE BLANKET FILM."

19        DO YOU SEE THAT?

20   A.   YES.

21   Q.   AND SO DID YOU DISCLOSE TO THE PATENT OFFICE CASTELLI'S

22   IDEA OF LAMINATING A SPACE BLANKET TO THE INSIDE OF A GARMENT

23   AND THEN PERFORATING IT?

24   A.   YES.

25   Q.   OKAY.  LET'S GO BACK TO -- ACTUALLY, LET ME GO BACK ONE

391

1    PAGE.  SORRY.  THE SECOND PAGE.  THAT'S WHERE YOU ARE.  THE

2    BOTTOM PARAGRAPH.

3         DO YOU SEE HERE IT SAYS THE RADIATION JACKET

4    FEATURES A REMOVABLE RADIATION LINER?

5    A.   YES.

6    Q.   WAS IT YOUR UNDERSTANDING THAT THE ALUMINUM FOIL WAS

7    COUPLED TO THE OUTER SHELL?

8    A.   NO.

9    Q.   WHY IS THAT?

10   A.   WELL, IT WAS ACTUALLY A REMOVABLE INSERT THAT SNAPPED

11   AND ZIPPED INTO THE PRODUCT.

12   Q.   ANY OTHER REASONS WHY YOU DIDN'T THINK THAT THE ALUMINUM

13   LINER --

14   A.   ALUMINUM WAS BONDED TO THE BASE FABRIC TOGETHER AND THEN

15   HOLES PUNCHED INTO IT, AND THAT'S WHERE IT WAS BONDED.  IT

16   HAD NOTHING TO DO WITH THE OUTER SHELL.

17   Q.   WAS THERE ANYTHING -- I GUESS THERE WAS A ZIPPER OR

18   SOMETHING THAT CONNECTED THE --

19   A.   YEAH.  IT WAS LIKE AN INTERCHANGE WHERE YOU COULD UNZIP

20   THE INNER LINING AND ZIP IT ALL TOGETHER, PLUS SOME SNAPS I

21   BELIEVE.

22   Q.   SO IT'S NOT LIKE THE LINER WAS LIKE PRESSED UP AGAINST

23   THE --

24   A.   NO, IT WAS AN INDEPENDENT ARTICLE.

25         MR. ALDRICH:  ALL RIGHT.  LET'S GO BACK TO

392

1    EXHIBIT 305.  IF WE COULD GO TO THE SECOND PAGE.  AND DOWN AT

2    THE BOTTOM IT SAYS OTHER PUBLICATIONS AGAIN.

3    Q.    AND WHAT IS THE FIRST ITEM HERE UNDER OTHER

4    PUBLICATIONS?

5    A.    WWW.CYCLINGWEEKLY, CASTELLI RADIATION JACKET.

6    Q.    IS THAT A SECOND ARTICLE YOU SUBMITTED TO THE PATENT

7    OFFICE REGARDING THE RADIATION JACKET?

8    A.    YES.

9    Q.    AND YOU DID THAT DURING THE PROSECUTION OF THE '270

10   PATENT?

11   A.    WE DID, YES.

12          MR. ALDRICH:  OKAY.  CAN WE PULL UP EXHIBIT 316.

13   I'M SORRY, 1316.

14          MR. MARCHESE:  THIS IS 316.

15          MR. ALDRICH:  MY MISTAKE.  1316.  AND I'LL PUT IT ON

16   THE ELMO.

17          MR. MARCHESE:  I CAN'T SEE IT.

18          MR. ALDRICH:  IT'S ONE OF YOUR EXHIBITS.

19          MR. MARCHESE:  NO OBJECTION.

20          THE COURT:  1316 IS RECEIVED.

21          (TRIAL EXHIBIT 1316 RECEIVED IN EVIDENCE.).

22   Q.    BY MR. ALDRICH:  SO THIS IS EXHIBIT 1316 THAT DEFENDANTS

23   WANTED TO INTRODUCE.  AND THIS IS -- IS THIS THAT CYCLING

24   WEEKLY ARTICLE THAT YOU TOLD THE PATENT OFFICE ABOUT?

25   A.    YES.

393

1    Q.   AND THIS SHOWS A PICTURE OF THAT RADIATION JACKET?

2    A.   YES, IT DOES.

3    Q.   AND YOU PROVIDED THIS TO THE PATENT OFFICE?

4    A.   WE DID.

5    Q.   AND THERE AT THE TOP OF THE SECOND PAGE -- I'M GOING TO

6    ZOOM IN A LITTLE BIT -- IT TALKS ABOUT THE VARIOUS PIECES OF

7    THIS JACKET THAT ZIP OFF.

8    A.   YES.

9    Q.   AND IT SAYS, "AS FOR THE SILVER RADIATION JACKET, I

10   FOUND IT DIDN'T RELEASE ENOUGH PERSPIRATION AND HATED THE WAY

11   IT FELT ON BARE SKIN."

12        DO YOU SEE THAT?

13   A.   I DO.

14   Q.   WAS THAT CONSISTENT WITH YOUR ANALYSIS OF THAT JACKET?

15   A.   IT WAS, YES.

16   Q.   DO YOU RECALL COUNSEL ASKING YOU A FEW QUESTIONS ABOUT

17   THE -- I'M SORRY.  LET ME GO BACK TO EXHIBIT 117.

18        DO YOU REMEMBER COUNSEL ASKING YOU ABOUT VARIOUS

19   THINGS THAT MIGHT AFFECT WHY CONSUMERS BUY PRODUCTS?

20   A.   YES.

21   Q.   DO YOU REMEMBER HIM ASKING YOU ABOUT WHETHER A BRAND

22   MIGHT --

23   A.   YES.

24   Q.   -- AFFECT PEOPLE'S DECISIONS?

25        AND EXHIBIT 117 HAS ALREADY BEEN INTRODUCED AND

394

1    ACCEPTED, I BELIEVE.

2          HOW LARGE IS THE SEIRUS BRAND HERE, BRAND NAME, IN

3    COMPARISON TO THE WORD "HEATWAVE"?

4    A.    MUCH SMALLER.

5    Q.    HOW LARGE IS THE WORD "SEIRUS" HERE IN COMPARISON TO THE

6    OVERALL SIZE OF THE HANG TAG?

7    A.    PRETTY SMALL PORTION.

8    Q.    HOW LARGE IS THE WORD "SEIRUS" HERE IN COMPARISON TO THE

9    BOTTOM GRAPHIC AND PORTION OF THE HANG TAG THAT RELATES TO

10   DIRECTING HEAT?

11   A.    A SMALL PORTION.

12   Q.    HOW LARGE IS THE WORD "SEIRUS" IN COMPARISON TO THE TOP

13   PORTION OF THE HANG TAG THAT SHOWS THE PATENTED D-093

14   INFRINGED PATENT DESIGN?

15          MR. MARCHESE:  OBJECTION.  THAT MISSTATES THE

16   EVIDENCE.

17          THE COURT:  REPHRASE YOUR QUESTION.

18   Q.    BY MR. ALDRICH:  HOW LARGE IS THE WORD "SEIRUS" HERE IN

19   RELATION TO THAT SILVERY WAVY DESIGN AT THE TOP PORTION OF

20   THE HANG TAG?

21   A.    SMALL.

22   Q.    DO YOU REMEMBER COUNSEL ASKING YOU SOME QUESTIONS ABOUT

23   YOUR TESTING DATA?

24   A.    YES.

25   Q.    APPROXIMATELY HOW MANY TESTS OF OMNI-HEAT FABRIC WOULD

1    YOU SAY YOU'VE DONE FOR REFLECTIVITY SAY IN THE PAST TEN

2    YEARS?

3    A.    IT'S HARD TO COUNT.  HUNDREDS.

4    Q.    HOW MANY TESTS HAVE YOU DONE ON AIR PERMEABILITY?

5    A.    HUNDREDS.

6    Q.    HOW ABOUT WATER VAPOR PERMEABILITY?

7    A.    SAME.

8    Q.    AND IS THERE ANY CONSISTENT THEME IN THOSE RESULTS?

9    A.    YEAH.  THEY ALIGN VERY WELL WITH WHAT I PUT IN THE

10   DECLARATION IN TERMS OF PERFORMANCE CHARACTERISTICS.

11   Q.    ANY DATA FALL OUTSIDE OF WHAT YOU TOLD THE PATENT OFFICE

12   ABOUT?

13   A.    NO.

14            MR. ALDRICH:  OKAY.  I HAVE NO FURTHER QUESTIONS,

15   YOUR HONOR.

16            THE COURT:  DOES THE JURY HAVE ANY QUESTION FOR THIS

17   PARTICULAR WITNESS?  IF SO, PLEASE RAISE YOUR HAND.

18            OKAY.  WRITE THE QUESTION DOWN ON A PIECE OF PAPER,

19   PLEASE.

20            COUNSEL APPROACH OVER HERE, PLEASE.

21        (THE FOLLOWING PROCEEDINGS WERE HELD AT SIDEBAR:)

22            THE COURT:  THERE IS THE QUESTION.

23            DO YOU HAVE ANY OBJECTION TO THE QUESTION?

24            MR. ALDRICH:  NO.  I HAVE NO OBJECTION.

25            THE COURT:  DO YOU HAVE ANY OBJECTION TO THE

1    QUESTION?

2          MR. MARCHESE:  NO.  NO OBJECTION.

3       (THE FOLLOWING PROCEEDINGS WERE HELD IN OPEN COURT:)

4          MR. ALDRICH:  SHOULD I STAY HERE?

5          THE COURT:  YOU CAN GO AHEAD AND HAVE A SEAT.

6          MR. ALDRICH:  THANK YOU.

7          THE COURT:  WHEN DETERMINING THE DESIGN PATTERN TO

8    BE USED IN THE OMNI-HEAT PRODUCT, MR. BLACKFORD SAID HE DID

9    NOT WANT TO USE THE WAVE PATTERN BECAUSE IT COULD BE CONFUSED

10   WITH SEIRUS' REFLECTIVE PRODUCT.  THIS IMPLIES SEIRUS PRODUCT

11   WAS IN EXISTENCE PRIOR TO THE COLUMBIA PRODUCT.

12         MR. BLACKFORD, IS THAT CORRECT?

13         THE WITNESS:  I WOULD SAY THAT DISCUSSION HAPPENED

14   AFTER WE LAUNCHED THE OMNI PRODUCT, SO WE HAD ALREADY

15   LAUNCHED IT, BUT WE WERE LOOKING AT NEW PATTERNS.  AND WE

16   BECAME AWARE OF SEIRUS WHILE WE WERE LOOKING AT NEW PATTERNS

17   SEVERAL YEARS AFTER WE LAUNCHED OMNI-HEAT.

18         THE COURT:  DO YOU HAVE ANY FOLLOW-UP QUESTIONS

19   BASED ON THAT?

20         MR. ALDRICH:  NO, YOUR HONOR.

21         THE COURT:  DO YOU HAVE ANY FOLLOW-UP QUESTIONS?

22         MR. MARCHESE:  NO, YOUR HONOR.

23         THE COURT:  YOU MAY STEP DOWN.

24         THE WITNESS:  THANK YOU.

25         THE COURT:  CALL YOUR NEXT WITNESS.

1          MS. LEGAARD:  COLUMBIA CALLS ZACH TAYLOR -- EXCUSE

2     ME, ZACH SNYDER.  ZACH SNYDER.

3          THE CLERK:  MR. SNYDER, IF YOU CAN STEP FORWARD,

4     PLEASE.

5          SIR, IF YOU'D RAISE YOUR RIGHT HAND.

6       ZACHARY SNYDER, HAVING BEEN DULY SWORN, TESTIFIED AS

7          FOLLOWS:

8          THE WITNESS:  I DO.

9          THE CLERK:  PLEASE BE SEATED, SIR.

10          PLEASE STATE YOUR FIRST AND LAST NAME FOR THE

11     RECORD, SPELLING YOUR LAST NAME.

12          THE WITNESS:  MY NAME IS ZACHARY SNYDER.  LAST NAME

13     IS SPELLED S-N-Y-D-E-R.

14          THE CLERK:  THANK YOU.

15          THE COURT:  YOU MAY INQUIRE.

16          MS. LEGAARD:  THANK YOU.

17                        DIRECT EXAMINATION

18     BY MS. LEGAARD:

19     Q.   MR. SNYDER, WHAT DO YOU DO FOR A LIVING?

20     A.   I'M A GRAPHIC DESIGNER THAT FOCUSES IN APPAREL.

21     Q.   SO WHAT KINDS OF THINGS DO YOU WORK ON AS A GRAPHIC

22     DESIGNER THAT FOCUSES ON APPAREL?

23     A.   I WORK ON T-SHIRTS, PRINTED PATTERNS; SO ESSENTIALLY

24     DECORATIVE ARTWORK THAT GOES ON THE SURFACES OF GARMENTS.

25     Q.   THANK YOU.

398

1          WHERE DO YOU CURRENTLY WORK?

2    A.    I WORK FOR A COMPANY CALLED ICEBREAKER.

3    Q.    WHAT IS ICEBREAKER?

4    A.    THEY ARE AN APPAREL COMPANY THAT PRIMARILY DOES

5    MERINO -- EXCUSE ME, MERINO WOOL PRODUCTS.  SO, YEAH.

6    Q.    OKAY.  DID YOU WORK AT COLUMBIA SPORTSWEAR AT SOME POINT

7    IN THE PAST?

8    A.    I DID.

9    Q.    OKAY.  WHEN DID YOU WORK THERE?

10   A.    I WORKED THERE FROM APPROXIMATELY 2002 UNTIL ABOUT

11   2012.

12   Q.    OKAY.  AND WHAT DID YOU DO THERE?

13   A.    WHEN I STARTED THERE, I WAS THEIR FIRST FULL-TIME PRINT

14   DESIGNER; SO I WORKED ON PATTERNS THAT GO -- THAT COVER AN

15   ENTIRE SURFACE OF THE GARMENT.  AND THEN OVER TIME, I BECAME

16   A DESIGN DIRECTOR AND SORT OF OVERSAW THE SORT OF CREATION OF

17   ALL GRAPHIC ITEMS; SO T-SHIRTS, BRANDING AND ALL-OVER

18   PRINTS.

19   Q.    CAN WE GET EXHIBIT 1, PLEASE.

20         SO MR. SNYDER, DO YOU RECOGNIZE THIS DOCUMENT?

21   A.    I DO.

22         MS. LEGAARD:  AND I'D LIKE TO GIVE YOU THE RIBBON

23   COPY AS A DEMONSTRATIVE.

24         MAY I APPROACH?

25         THE COURT:  YOU MAY.

COMPUTER-AIDED TRANSCRIPTION

399

1    Q.   BY MS. LEGAARD:  SO I'VE JUST HANDED YOU WHAT WE CALL

2    THE RIBBON COPY, WHICH IS AN ESPECIALLY FANCY ONE.

3          DO YOU RECOGNIZE EXHIBIT 1?

4    A.   I DO.

5    Q.   WHAT IS IT?

6    A.   I'M SORRY.  SAY THAT AGAIN.

7    Q.   WHAT IS EXHIBIT 1?

8    A.   OH, EXHIBIT 1.  THIS IS A PATTERN OR DESIGN THAT I

9    CREATED WITH OMNI-HEAT IN MIND.

10          MS. LEGAARD:  OKAY.  AND THEN CAN YOU ZOOM IN ON THE

11   LEFT TOP COLUMN, THE INVENTOR.

12          I DON'T THINK WE'VE ADMITTED THIS.  I'LL OFFER

13   EXHIBIT 1.

14          MR. SPROUL:  NO OBJECTION.

15          THE COURT:  RECEIVED.

16   (TRIAL EXHIBIT 1 RECEIVED IN EVIDENCE.)

17          MS. LEGAARD:  CAN YOU BLOW UP THE TOP LEFT COLUMN

18   THERE, THE INVENTOR.

19   Q.   ALL RIGHT.  DO YOU SEE WHERE IT SAYS "INVENTOR"?

20   A.   I DO.

21   Q.   IS THAT YOU?

22   A.   THAT IS ME.

23          MS. LEGAARD:  OKAY.  WE CAN PUT THAT AWAY FOR NOW.

24   Q.   SO DO YOU HAVE ANY FINANCIAL INTEREST IN THE OUTCOME OF

25   THIS LAWSUIT?

400

1    A.    I DON'T.

2    Q.    YOU DON'T WORK FOR COLUMBIA SPORTSWEAR ANYMORE;

3    CORRECT?

4    A.    NO.  NO, I DON'T.

5    Q.    DOES ICEBREAKER HAVE ANY RELATIONSHIP WITH COLUMBIA?

6    A.    NO, THERE IS NO RELATIONSHIP BETWEEN ICEBREAKER AND

7    COLUMBIA.

8    Q.    DOES ICEBREAKER HAVE ANY FINANCIAL INTEREST IN THE

9    OUTCOME OF THIS LAWSUIT?

10   A.    NO.  OTHER THAN KNOWING I WAS TAKING A COUPLE OF DAYS

11   OFF OF WORK, THEY DON'T KNOW ANYTHING ABOUT IT.  THEY ARE NOT

12   PARTICULARLY INTERESTED.

13   Q.    MR. SNYDER, WHERE DO YOU LIVE?

14   A.    I LIVE IN PORTLAND, OREGON.

15   Q.    SO TO YOUR KNOWLEDGE, COULD YOU HAVE BEEN COMPELLED TO

16   COME TESTIFY HERE BY THE COURT OR BY COLUMBIA?

17   A.    NO.

18   Q.    SO WHY DID YOU COME?

19   A.    I CAME BECAUSE I'M INTERESTED IN WHAT HAPPENS HERE,

20   ESPECIALLY FROM THE POINT OF ARTWORK CREATION.  SO FOR ME,

21   THE WHOLE POINT OF MY WORK AND HOW I MAKE A LIVING IS IN

22   CREATING ORIGINAL ARTWORK, YOU KNOW, WHAT I DESCRIBED BEFORE;

23   SO GRAPHICS FOR T-SHIRTS, ALL-OVER PATTERNS, THAT TYPE OF

24   THING.

25           AND SO FOR ME, IT'S INCREDIBLY IMPORTANT THAT THE

1    ORIGINALITY OF THOSE -- OF THAT WORK BE PROTECTED BECAUSE

2    THAT IS REALLY THE VALUE OF WHAT I DO.  IF THERE IS ANY

3    COMPROMISE TO THAT, THAT MEANS THAT THE WORK THAT I DO LOSES

4    VALUE AND IS NO LONGER IMPORTANT, WHICH IS ESPECIALLY

5    IMPORTANT FOR ME -- SORRY FOR AD-LIBBING.  BUT IN A TIME AND

6    AGE WHERE INFORMATION IS SO EASILY ACCESSIBLE, SO, YOU KNOW,

7    THE ABILITY TO SEE DESIGNS AND SEE WHAT'S ON THE WEB, THOSE

8    THINGS HAPPEN VERY IMMEDIATELY.

9    Q.   SO MR. SNYDER, BASED ON YOUR EXPERIENCE, WAS IT OKAY TO

10   COPY AT COLUMBIA SPORTSWEAR?

11   A.   NO, NO.  ABSOLUTELY NOT.

12   Q.   WHY NOT?

13   A.   WELL, A LITTLE BIT LIKE I WAS DESCRIBING BEFORE.  SO AT

14   COLUMBIA SPORTSWEAR, WE SPENT A TON OF TIME AND ENERGY MAKING

15   SURE THAT EVERYTHING THAT WAS CREATED WAS ORIGINAL AND NOT A

16   COPY AT ALL.  SO THERE IS -- WE EITHER CREATED ARTWORK

17   IN-HOUSE OURSELVES.  WE HIRED ILLUSTRATORS AND ARTISTS TO

18   CREATE ARTWORK, AND OFTEN BOUGHT ORIGINAL PRINTS; SO WE SPENT

19   A TON OF TIME DOING THAT.

20         WHY DID WE DO THAT?  BECAUSE AS A BRAND WITH A

21   STRONG POINT OF VIEW AND A VOICE, PART OF WHAT WE NEEDED TO

22   DO WAS MAKE SURE THAT WE WERE A LEADER IN CREATING THE

23   IDENTITY.

24         SO ESSENTIALLY A BRAND HAS A -- I'D SAY A

25   PERSONALITY.  IT KIND OF HAS A VOICE.  AND TO HAVE A STRONG

1    VOICE AND REALLY TO HAVE PEOPLE DESIRE YOUR BRAND OR TO SEEK

2    YOU OUT, YOU REALLY NEED TO BE ORIGINAL AND CREATE THINGS

3    FROM AN ORIGINAL POINT OF VIEW.  IF YOU WERE TO COPY

4    ANYTHING, YOU REALLY COMPROMISE THAT.

5        AND AT THE POINT WHERE YOU'RE COPYING THINGS, PEOPLE

6    AREN'T GOING TO SEE YOU AS CREDIBLE, AND THEY ARE NOT GOING

7    TO REALLY INVEST IN YOUR BRAND.  SO ESSENTIALLY IT WOULD BE A

8    LITTLE BIT LIKE A PERSON ASSUMING SOMEONE ELSE'S PERSONALITY.

9    Q.   IS IT OKAY TO COPY AT ICEBREAKER?

10   A.   ABSOLUTELY NOT.

11       MS. LEGAARD:  SO LET'S GO BACK TO EXHIBIT 1.  COULD

12   YOU BLOW UP THE DESIGN PORTION, THE GRAPHIC THERE.  THANK

13   YOU.

14   Q.   SO MR. SNYDER, IS THIS YOUR DESIGN?

15   A.   THAT IS.

16   Q.   WHY DID YOU INVENT THIS DESIGN?

17   A.   AT THE TIME WE WERE -- HAD STARTED WORKING WITH

18   OMNI-HEAT, WHICH WAS A REFLECTIVE PATTERNING.  I'M ASSUMING

19   EVERYBODY HERE KNOWS THAT.

20       WE HAD A DOT PATTERN FOR IT, AND WE WANTED TO

21   FURTHER EXPLORE WHAT THAT PATTERN COULD BE.  SO SOME OF THE

22   DIALOGUE WAS JUST TALKING THROUGH THE POSSIBILITIES OF WHAT

23   SUCH A PATTERN COULD LOOK LIKE IN THE FUTURE.  AND AT THE

24   TIME, IT'S IMPORTANT TO REMEMBER THAT WE DIDN'T KNOW MUCH

25   ABOUT WHERE OMNI-HEAT WAS GOING TO GO OR WHAT THE FUTURE

1    WOULD BE LIKE.  SO WHAT THAT PATTERN COULD -- WHAT THE

2    EXISTING PATTERN OR ANY PATTERN COULD LOOK LIKE IN WEEKS OR

3    MONTHS OR YEARS FROM THEN WAS REALLY UNKNOWN.

4         SO THAT WAS -- THAT WAS THE START OF DOING PATTERN

5    EXPLORES BASED AROUND THE NEED FOR OMNI-HEAT.

6    Q.   HAD COLUMBIA SPORTSWEAR ALREADY DECIDED TO RELEASE

7    OMNI-HEAT REFLECTIVE IN THAT DOT PATTERN?

8    A.   THAT'S CORRECT.  YES, IT HAD.

9    Q.   SO WHY WERE YOU ASKED TO DEVELOP ADDITIONAL DESIGNS?

10   A.   AGAIN, JUST LOOKING TO THE FUTURE AND TRYING TO THINK

11   ABOUT WHAT COULD -- WHAT COULD OMNI-HEAT BE IN THE FUTURE.

12        SO AT THE TIME, WE HAD A DOT PATTERN.  AN EXAMPLE OF

13   WHAT MIGHT HAVE HAPPENED -- AND, AGAIN, THESE WERE ALL

14   UNKNOWNS AT THE TIME -- IS THAT WE MAY HAVE DECIDED THAT THE

15   DOT PATTERN WASN'T COMMUNICATING IN THE WAY WE WANTED IT TO.

16   WE MIGHT HAVE ALSO THOUGHT THAT THE DOT PATTERN WAS VALUABLE

17   FOR WHAT IT DID, BUT WE MIGHT HAVE WANTED TO SEGMENT A

18   DIFFERENT CLASS OF PRODUCT, SO MAYBE A DIFFERENT -- LIKE AN

19   ENTRY-LEVEL PRODUCT RANGE, AND THEN MAYBE MORE EXPENSIVE

20   STUFF.  AND YOU WANTED A WAY TO COMMUNICATE THAT TO PEOPLE,

21   LIKE, HEY, THIS IS A LITTLE BIT DIFFERENT.

22        SO THAT WAS ALL, YOU KNOW, AROUND THIS EXPLORE OF

23   THE OMNI-HEAT PATTERN, TRYING TO FIGURE OUT WHAT THAT COULD

24   BE.

25   Q.   SO HOW DID YOU COME UP WITH THE WAVE PATTERN?

404

1    A.    THE WAVE PATTERN WAS A PRETTY INTERESTING ONE FOR ME.

2    ONE OF THE THINGS THAT YOU DO AS A DESIGNER IS -- GREAT WORK

3    OF THE DESIGNERS IS WHEN YOU CAN CREATE SOMETHING THAT'S VERY

4    INTUITIVE AND ALMOST UNKNOWN.

5          A FAVORITE EXAMPLE I HAVE IS OF A DOOR.  SO IF YOU

6    THINK ABOUT WHEN YOU'RE APPROACHING A DOOR THAT YOU WANT TO

7    OPEN, AND THERE IS JUST A FLAT PANEL THERE, THEN YOU KNOW

8    IMMEDIATELY THAT TO OPEN THAT DOOR YOU'RE GOING TO PUSH IT.

9    AND IF YOU SEE A HANDLE THERE TO PULL, AND YOU PULL IT AND

10   THE DOOR OPENS.  THAT'S GREAT DESIGN.  IT'S SOMETHING THAT

11   WORKS INTUITIVELY, THAT YOU DON'T HAVE TO THINK ABOUT.

12         SO FROM A PROBLEM-SOLVING POINT OF VIEW, ONE OF THE

13   THOUGHTS WAS AROUND -- ONE OF MY THOUGHTS WAS AROUND HOW DO

14   WE COMMUNICATE WARMTH AND HEAT?

15         SO EXPLORING THAT IN MY HEAD, TRYING TO THINK OF

16   WAYS TO REPRESENT HEAT AND WARMTH, I THOUGHT A BIT ABOUT -- I

17   GREW UP IN TUCSON, ARIZONA, WHERE IT GETS SUPER HOT IN THE

18   SUMMER, AND OFTEN WHEN YOU LOOK ON THE HORIZON, YOU CAN

19   LITERALLY SEE THOSE HEAT RIPPLES.  YOU KNOW, IT'S KIND OF A

20   SOURCE OF MIRAGES FROM THE HEAT RISING OFF THE GROUND.

21         SO THE THOUGHT I HAD WAS TO TRY TO REPRESENT THOSE

22   HEAT RIPPLES OR THAT DISTURBED AIR IN A GRAPHIC FORMAT.  AND

23   THAT WAS THE ORIGIN OF THE PATTERN THAT'S SHOWN ON THE

24   SCREEN.

25   Q.    SO WHAT'S THE FUNCTION OF THIS DESIGN ON A GLOVE OR AN

COMPUTER-AIDED TRANSCRIPTION

1    ITEM OF COLD-WEATHER GEAR?

2         MR. SPROUL:  OBJECTION.  FOUNDATION.

3         THE COURT:  OVERRULED.

4         THE WITNESS:  FROM A PURELY FUNCTIONAL POINT OF

5    VIEW, OF COURSE, IT'S TO REFLECT HEAT.  FROM A DESIGN POINT

6    OF VIEW, THE FUNCTION OF IT IS TO HELP COMMUNICATE THE

7    INTUITIVENESS OF THAT.

8         SO MY HOPE WOULD BE -- OR, AGAIN, THE SORT OF

9    PERFECT DESIGN SOLUTION WOULD BE THAT YOU SEE THAT AND IT

10   IMPLIES THAT THERE IS GOING TO BE WARMTH IN WHAT IT'S DOING.

11   Q.   BY MS. LEGAARD:  SO COLUMBIA COULD HAVE JUST TOLD ITS

12   CUSTOMERS IN WORDS ON TAGS, THESE GLOVES WILL KEEP YOU WARM.

13   WHY GO TO THE TROUBLE OF FIGURING OUT HOW TO DO IT THROUGH

14   DESIGN?

15   A.   WELL, I THINK COLUMBIA PROBABLY DOES CALL IT OUT IN

16   WORDS.  THE PROBLEM IS THAT I THINK ALL GLOVE MANUFACTURERS

17   ARE GOING TO SAY THE SAME THING; RIGHT.  LIKE ESSENTIALLY,

18   WHEN YOU'RE SELLING A WARM GLOVE, THAT'S A CLAIM THAT YOU'RE

19   GOING TO WANT TO MAKE.  AND TO PUT IT IN WORDS ON PACKAGING

20   AND IN MARKETING MATERIALS IS SOMETHING THAT EVERYBODY IS

21   GOING TO CLAIM.

22        THE HARDER PART TO DO IS TO MAKE IT A LITTLE BIT

23   MORE AUTHENTIC THAN JUST SOMETHING THAT'S WRITTEN ON A PIECE

24   OF PAPER.  SO THE VALUE OF BUILDING IN SOMETHING THAT SAYS

25   WARM INTO THE PRODUCT IS YOU MAKE A MUCH MORE INTUITIVE

406

1    CONNECTION FOR THE PEOPLE THAT ARE SHOPPING.

2              SO TO TAKE THE EXAMPLE YOU JUST ASKED ABOUT, IF I'M

3    LOOKING AT A WALL OF THINGS THAT ALL CLAIM TO BE HOT, AND I

4    CAN SEE SOMETHING THAT GIVES ME A LITTLE BIT OF A VISUAL CUE

5    THAT IT DOES SOMETHING, IT'S GOING TO MAKE ME THINK THAT IT'S

6    A LITTLE BIT MORE THOUGHT THROUGH AND MAKE A STRONGER, MORE

7    INTUITIVE CONNECTION.

8    Q.    THANK YOU.

9              MS. LEGAARD:  SO I'D LIKE TO SHOW YOU EXHIBIT 222.1.

10   OFFER THIS INTO EVIDENCE.

11             MR. SPROUL:  NO OBJECTION.

12             THE COURT:  IT'S RECEIVED.

13        (TRIAL EXHIBIT 222.1 RECEIVED IN EVIDENCE.)

14             MS. LEGAARD:  I'LL HAND YOU THESE.

15             THE WITNESS:  GOT IT.

16   Q.    BY MS. LEGAARD:  MR. SNYDER, CAN YOU LOOK AT THE LINING

17   OF THAT GLOVE.

18   A.    UH-HUH.  I'M LOOKING AT IT.

19   Q.    DO YOU RECOGNIZE THE DESIGN ON THE LINING?

20   A.    YES.  THE DESIGN OF THE LINING LOOKS VERY SIMILAR TO THE

21   ARTWORK THAT WE WERE TALKING ABOUT BEFORE.

22   Q.    SO FROM YOUR DESIGN PERSPECTIVE, WHAT'S THE VALUE OF THE

23   DESIGN IN THIS LINING?

24   A.    SO VERY SIMILAR TO -- WELL, EXACTLY LIKE WHAT I WAS

25   DESCRIBING BEFORE.  BUT ESSENTIALLY WHEN I SEE THIS, AND I

1    SEE THAT THERE IS AN INTENT TO COMMUNICATE WARMTH THROUGH THE

2    USE OF THIS WAVE, I THINK THAT'S PART OF THE VALUE.

3            SO THERE IS FUNCTIONAL BENEFIT THAT WE TALKED ABOUT,

4    AND THEN FROM A PURELY AESTHETIC POINT OF VIEW, THIS LOOKS TO

5    ME TO BE DOING WHAT I WAS TRYING TO SELL IT FOR WHEN I

6    CREATED THAT PATTERN, WE WERE TALKING ABOUT BEFORE, WHICH IS

7    TO DEMONSTRATE WARMTH.

8    Q.   AND FROM YOUR DESIGN PERSPECTIVE, DOES THAT DESIGN

9    DISTINGUISH THAT PRODUCT FROM OTHER SKI GLOVES?

10   A.   ABSOLUTELY.  I THINK THAT -- YOU KNOW, AGAIN, IF YOU

11   IMAGINE YOURSELF LOOKING AT GLOVES, AND ESPECIALLY A WALL OF

12   GLOVES, AND YOU'RE TRYING TO DECIDE WHAT'S OF INTEREST TO YOU

13   AND HOW ARE YOU GOING TO DECIDE WHAT TO PURCHASE, IT'S REALLY

14   TOUGH FROM A DESIGN POINT OF VIEW TO CREATE UNIQUENESS.

15           WHEN YOU THINK ABOUT WHAT CONSUMERS SHOP FOR, FOR

16   EXAMPLE, MOST GLOVES ARE BLACK.  I MEAN, IT'S JUST A GIVEN.

17   MOST GLOVES ARE EITHER GOING TO HAVE FIVE FINGERS OR BE A

18   MITTEN.  THERE IS NOT A LOT OF VARIETY YOU CAN DO AS A

19   DESIGNER.  SO WHEN YOU CAN FIND SOMETHING THAT HELPS MAKE A

20   GLOVE STAND OUT A LITTLE BIT, IT'S A REALLY BIG DEAL.

21           AND THE THING I THOUGHT ABOUT WHEN WORKING ON THE

22   WAVE PATTERN WAS THIS IMAGINED DIALOGUE.  SO IF SOMEONE ASKS

23   YOU, HEY, I'M LOOKING FOR A GLOVE.  DO YOU -- WHAT DO YOU

24   LIKE?  WHAT KEEPS YOU WARM?  AND IF YOU'RE ABLE TO SHOW

25   SOMETHING LIKE THIS, AND PEEK AT THAT PATTERN AND SAY, THIS

408

1    WORKS REALLY GOOD FOR ME, THERE IS THAT IMMEDIATE VISUAL

2    CONNECTION.  SOMETHING LIKE THIS IS SUCH A STRONG PATTERN AND

3    SO RECOGNIZABLE, IT'S ALMOST BIGGER THAN A BRAND OR A NAME.

4    YOU DON'T HAVE TO REMEMBER MUCH OTHER THAN THIS.

5            AND THE WAY THAT WE OFTEN REMEMBER THINGS IS

6    VISUALLY.  IT'S A STRONGER CONNECTION THAN SORT OF

7    REMEMBERING A WORD OR SOMETHING LIKE THAT.

8            MR. SPROUL:  OBJECTION.  YOUR HONOR, HE DOESN'T HAVE

9    FOUNDATION TO SPEAK ABOUT HOW PEOPLE REMEMBER THINGS.  THAT'S

10   A VERY TECHNICAL ANALYSIS.

11           THE COURT:  YOUR OBJECTION IS OVERRULED.

12           PLEASE PROCEED.

13           THE WITNESS:  SO, YOU KNOW, AGAIN, I'M JUST -- AS A

14   DESIGNER, JUST TALKING THROUGH THOSE THINGS THAT I THINK

15   ABOUT AND THOSE OPPORTUNITIES TO COMMUNICATE TO CONSUMERS,

16   AND, AGAIN, AT THIS POINT LOOKING FOR AN OPPORTUNITY TO MAKE

17   A STRONG CONNECTION AND SPEAK IN A WAY THAT'S DIFFERENT AND

18   RECOGNIZABLE.

19   Q.   BY MS. LEGAARD:  IN YOUR OPINION, AS A DESIGNER, DOES

20   THE HANG TAG HAVE ANYTHING TO DO WITH THAT?

21   A.   I THINK THE HANG TAG HELPS DRAW YOUR ATTENTION,

22   CERTAINLY.  IN A CASE WHERE WE'RE TALKING ABOUT A LINING,

23   THAT ISN'T ALWAYS IMMEDIATELY VISUALLY NOTICEABLE ON THE

24   OUTSIDE.  THE HANG TAG CERTAINLY IS GOING TO LET YOU KNOW

25   WHAT'S GOING ON IN THE INSIDE OF THE GLOVE.

409

1              MS. LEGAARD:  I'M GOING TO HAND YOU EXHIBIT 223 --

2       220.3.  I'D LIKE TO OFFER THIS.

3              MR. SPROUL:  NO OBJECTION.

4              THE COURT:  IT IS RECEIVED.

5         (TRIAL EXHIBIT 220.3 RECEIVED IN EVIDENCE.)

6       Q.   BY MS. LEGAARD:  SO BASICALLY THE SAME QUESTION ABOUT

7       THIS PRODUCT AS WELL.  FROM A DESIGN PERSPECTIVE, WHAT IS

8       THAT WAVE DESIGN DOING?

9       A.   AS WE TALKED ABOUT BEFORE, IT'S COMMUNICATING WARMTH.

10      Q.   WOULD YOU SAY THAT IT DISTINGUISHES THAT PRODUCT FROM

11      OTHER PRODUCTS?

12      A.   ABSOLUTELY.  I MEAN, I THINK THAT -- AS WE TALKED ABOUT

13      JUST A MINUTE AGO -- THE IDEA OF HAVING A RECOGNIZABLE

14      PATTERN AND SOMETHING THAT STANDS OUT IS REALLY NOTICEABLE

15      HERE BECAUSE IN THIS CASE, WE'RE NOT USING A HANG TAG TO LEAD

16      US INTO PICK UP THE INSIDE.  WE CAN ACTUALLY SEE IT ON THE

17      OUTSIDE.  SO IT MAKES IT HIGHLY RECOGNIZABLE.

18              MS. LEGAARD:  AND GOING BACK TO EXHIBIT 1, PLEASE.

19      AND COULD YOU TURN TO THE THIRD PAGE.

20      Q.   SO MR. SNYDER, DID YOU INVENT -- DID YOU INTEND THIS

21      DESIGN TO GO ON FABRIC?

22      A.   WELL, ULTIMATELY THE INTENT IS TO MAKE FUNCTIONAL

23      PRODUCT; RIGHT.  SO THE DESIGNS TO GO INTO -- YOU KNOW, LIKE

24      THIS VISUAL REPRESENTS INTO GLOVES, COATS, YOU KNOW, FOOTWEAR

25      PERHAPS, THINGS LIKE THAT.

410

1              DOES IT GO ONTO FABRIC?  THAT'S PART OF THE FUNCTION

2      OF THE GLOVE, BUT ULTIMATELY, YOU KNOW, AGAIN FROM THE DESIGN

3      CREATION POINT OF VIEW, WHAT I'M THINKING ABOUT IS THE END

4      USE.  HOW THE PERSON IS GOING TO WEAR IT OR INTERACT WITH IT,

5      THE PIECE.

6              SO WAS IT INTENDED TO GO ON FABRIC?  YES.  IS IT

7      DESIGNED SPECIFICALLY JUST FOR FABRIC?  NO.  THAT WASN'T THE

8      INTENT.  THE INTENT WAS TO HAVE IT BE IN PIECES LIKE WHAT'S

9      REPRESENTED HERE.

10     Q.   AND THEN WHAT DO YOU UNDERSTAND THE VALUE OF YOUR DESIGN

11     TO BE TO COLUMBIA SPORTSWEAR, GIVEN THAT THEY WENT TO MARKET

12     WITH DOTS AND AREN'T CURRENTLY USING OMNI-HEAT?

13     A.   I'M SORRY.  CAN YOU SAY THAT AGAIN?  THE VALUE OF THE

14     DESIGN.

15     Q.   WHAT'S THE VALUE OF THE DESIGN TO COLUMBIA AND THE FACT

16     THAT THEY WENT TO MARKET WITH DOTS, THAT THEY AREN'T

17     CURRENTLY USING IT WITH OMNI-HEAT?

18     A.   I THINK ULTIMATELY THE VALUE OF THE DESIGN IS IN THE

19     POTENTIAL USE.  SO OBVIOUSLY IF THEY ARE NOT USING IT TODAY,

20     IT DOESN'T HAVE IMMEDIATE VALUE BECAUSE IT'S NOT IN PLAY.

21     BUT THE VALUE IS IN THE POTENTIAL USE.

22              I TALKED A LITTLE BIT A FEW MINUTES AGO ABOUT THE

23     IDEA THAT IF COLUMBIA DISCOVERED EITHER THE DOT PATTERN

24     WASN'T WORKING THE WAY THEY WANTED IT TO, OR THEY WANTED TO

25     COMMUNICATE A DIFFERENT TIER PRODUCT OR PERHAPS FIND A DESIGN

411

1    THAT'S A LITTLE BIT MORE INTUITIVE, THOSE ARE ALL THINGS THAT

2    I FEEL THAT DESIGN COULD DO.

3           MS. LEGAARD:  THANK YOU, MR. SNYDER.  I HAVE NO

4    FURTHER QUESTIONS.

5           THE COURT:  CROSS-EXAMINE.

6                     CROSS-EXAMINATION

7    BY MR. SPROUL:

8    Q.   GOOD AFTERNOON, MR. SNYDER.

9    A.   GOOD AFTERNOON.

10   Q.   WE HAVEN'T MET BEFORE.  MY NAME IS SETH SPROUL.

11   APPRECIATE YOU COMING DOWN HERE.  I KNOW IT'S A LONG TRIP.

12          YOU TESTIFIED ABOUT THE VALUE OF YOUR WORK AT

13   COLUMBIA.

14   A.   UH-HUH.

15   Q.   AND YOU WORKED DIRECTLY FOR MR. BLACKFORD?

16   A.   ONLY -- NOT AT THE TIME OF THIS CREATION.  SO AT ONE

17   POINT IN MY TIME AT COLUMBIA, I DID WORK FOR MR. BLACKFORD.

18   BUT AT THE TIME WE WORKED AT THIS, I DID NOT DIRECTLY REPORT

19   TO HIM IN THE ORGANIZATION.

20   Q.   YOU WORKED UNDER HIS ORGANIZATION; IS THAT FAIR?

21   A.   IT WAS MORE LIKE AN ADJACENT ORGANIZATION, PART OF THE

22   ORGANIZATION.

23   Q.   YOU WORKED WITH HIM ON THE OMNI-HEAT PROJECT?

24   A.   YES.

25   Q.   AND MR. BLACKFORD FIRED YOU; ISN'T THAT RIGHT?

412

1    A.    YES, HE DID.  I WOULDN'T USE THE WORD "FIRE," THOUGH.

2    THE -- IT WAS ELIMINATION OF POSITION.  AND IT DIDN'T ONLY

3    APPLY TO ME.  IT APPLIED TO MY PEERS THAT WERE IN THE SAME

4    POSITION AS WELL.

5    Q.    HE ELIMINATED YOUR POSITION --

6    A.    UH-HUH.

7    Q.    I DON'T MEAN TO --

8    A.    NO.

9    Q.    -- PAINT THIS IN A NEGATIVE LIGHT.

10          THE COURT:  IT'S REALLY IMPORTANT THAT ONLY ONE

11   PERSON SPEAK AT A TIME.  OTHERWISE, YOU'LL DRIVE MY COURT

12   REPORTER CRAZY.

13          MR. SPROUL:  APOLOGIES.

14          THE WITNESS:  UNDERSTOOD.

15   Q.    BY MR. SPROUL:  HE ELIMINATED YOUR POSITION --

16   A.    UH-HUH.

17   Q.    -- IN NOVEMBER 2013; IS THAT RIGHT?

18   A.    THAT SOUNDS RIGHT.

19   Q.    THAT WAS A MONTH BEFORE COLUMBIA SUED SEIRUS ON YOUR

20   DESIGN PATENT; IS THAT RIGHT?

21   A.    THAT'S -- THAT MAY BE RIGHT.  I DON'T KNOW.

22   Q.    DID THEY CONSULT YOU PRIOR TO THE LAWSUIT?

23   A.    NO.

24   Q.    NOW, YOU ARE BEING COMPENSATED AT $50 AN HOUR BY

25   COLUMBIA; IS THAT RIGHT?

COMPUTER-AIDED TRANSCRIPTION

413

1    A.    THAT'S CORRECT.

2    Q.    AND ARE YOU BEING PAID FOR YOUR TIME WHILE YOU'RE IN

3    SAN DIEGO?

4    A.    I AM.

5    Q.    AND YOUR TIME TESTIFYING?

6    A.    THAT'S CORRECT.

7    Q.    AND COLUMBIA PAID FOR YOUR TRAVEL EXPENSES TO COME

8    DOWN?

9    A.    THEY DID.  THAT'S CORRECT.

10   Q.    AND WHEN YOU WERE FIRST CONTACTED BY COLUMBIA'S LAWYERS,

11   THEY WERE THE ONES WHO SUGGESTED COMPENSATION TO YOU.  YOU

12   DID NOT ASK FOR IT FROM COLUMBIA?

13   A.    THAT'S CORRECT.

14   Q.    APPROXIMATELY HOW MUCH TIME HAVE YOU SPENT ON THIS CASE

15   FOR WHICH YOU'VE BEEN COMPENSATED BY COLUMBIA?

16   A.    IT'S DIFFICULT TO SAY WITH ANY ACCURACY.  IT'S BEEN A

17   WHILE SINCE BEFORE THIS CASE THAT WE'VE TALKED.  BUT 10

18   HOURS, 20 HOURS.  IT'S NOT A TON OF TIME.

19   Q.    DID ANY OF THAT TIME INVOLVE ANALYZING SEIRUS HANG TAGS

20   OR SEIRUS GLOVES?

21   A.    NO.

22   Q.    YOU DID THAT FOR THE FIRST TIME HERE?

23   A.    THAT'S RIGHT.

24   Q.    YOU UNDERSTAND THAT DESIGN PATENTS COVER AND ARE

25   DIRECTED TO SOLELY ORNAMENTAL FEATURES; IS THAT RIGHT?

1    A.    HONESTLY, I DON'T KNOW A LOT ABOUT EXACTLY WHAT DESIGN

2    PATENTS COVER.  SO IN MY LAYMAN'S TERM, MY UNDERSTANDING IS

3    THAT A DESIGN PATENT IS FOR THE AESTHETIC DESIGN, YEAH, FOR

4    THE ARTWORK ITSELF.

5    Q.    IT'S NOT FOR THE FUNCTION?

6    A.    RIGHT.  SO, YEAH, IN MY UNDERSTANDING, A DESIGN PATENT

7    IS NOT FOR THE FUNCTION, BUT RATHER THE LOOK OF THE THING.

8    Q.    AND WHEN YOU REFERRED TO FUNCTIONALITY EARLIER IN YOUR

9    DIRECT TESTIMONY, YOU WEREN'T SPEAKING ABOUT YOUR DESIGN

10    SPECIFICALLY?

11    A.    IN -- IT'S A LITTLE BIT OF BOTH.  SO I WAS SPEAKING TO

12    THE -- IN SOME ASPECTS, YES, THAT THE DESIGN WOULD BE A PART

13    OF PROVIDING A TECHNICAL BENEFIT.  BUT WAS ALSO SPEAKING TO

14    THE FACT THAT OMNI-HEAT ITSELF PROVIDED -- PROVIDES A

15    TECHNICAL BENEFIT.

16          MR. SPROUL:  COULD YOU PULL UP EXHIBIT 1, PLEASE.

17    Q.    I BELIEVE YOU JUST TESTIFIED ABOUT EXHIBIT 1, WHICH IS

18    YOUR DESIGN PATENT.

19    A.    YES, THAT'S CORRECT.

20    Q.    YOU'RE THE SOLE INVENTOR ON THAT PATENT?

21    A.    YES.

22    Q.    MR. BLACKFORD IS NOT LISTED AS AN INVENTOR WITH YOU?

23    A.    I DON'T BELIEVE HE IS.

24    Q.    AND YOU HAVE PERSONAL KNOWLEDGE OF THE PROSECUTION OF

25    THIS EXHIBIT 1?

415

1    A.    I'M SORRY.  I DON'T QUITE UNDERSTAND WHAT THAT MEANS.

2    Q.    ARE YOU UNCLEAR ABOUT THE WORD "PROSECUTION"?

3    A.    I DON'T KNOW WHAT YOU MEAN BY PERSONAL KNOWLEDGE.  SO AM

4    I AWARE THAT THERE IS A COURT CASE?  OBVIOUSLY.  SO I'M NOT

5    QUITE SURE WHAT YOU MEAN BY THAT.

6    Q.    LET ME USE A DIFFERENT WORD:  PATENTING.  DO YOU HAVE

7    PERSONAL KNOWLEDGE ABOUT THE PROCESS BY WHICH THIS PATENT WAS

8    OBTAINED?

9    A.    NO, NOT IN ANY DETAIL.  I WAS ESSENTIALLY -- WE -- IN

10   CREATING THE PATTERN, WE TALKED ABOUT WANTING TO CREATE

11   DESIGN PATENTS, BUT I DON'T HAVE MUCH KNOWLEDGE ABOUT WHAT

12   THAT PROCESS ACTUALLY INVOLVES.

13   Q.    IN YOUR DEPOSITION -- I'M SORRY.  STRIKE THAT.

14         YOU SUBMITTED A DECLARATION EARLIER IN THIS CASE; IS

15   THAT RIGHT?

16   A.    A DECLARATION IS?

17   Q.    A SERIES OF STATEMENTS SIGNED BY YOU --

18   A.    UH-HUH.

19   Q.    -- UNDER PENALTY OF PERJURY.

20   A.    UH-HUH.  OKAY.

21   Q.    AND IN THAT DECLARATION, YOU STATED THAT YOU HAVE

22   PERSONAL KNOWLEDGE REGARDING THE INVENTION OF THE DESIGN --

23   A.    UH-HUH.

24   Q.    -- ITS PATENTING AND THE PRIOR ART THAT WAS EXAMINED

25   WHEN DEVELOPING THIS DESIGN; IS THAT RIGHT?

1    A.    THAT IS CORRECT.

2    Q.    SO I'LL ASK YOU AGAIN.  DO YOU HAVE PERSONAL KNOWLEDGE

3    ABOUT THE PATENTING OF THE '093 PATENT, EXHIBIT 1?

4    A.    AND I THINK THIS IS WHERE I'M GETTING A LITTLE CONFUSED

5    IN THE DIALOGUE.  SO I'M AWARE THAT IT WAS PATENTED, AND I

6    DID, YOU KNOW, SUBMIT MY NAME AND HELP COMPLETE SOME OF THE

7    PAPERWORK.

8          BUT IN TERMS OF EXACTLY WHAT THAT MEANS AND EXACTLY

9    HOW A PATENT FUNCTIONS FROM A LEGAL POINT OF VIEW, AND JUST

10   BEING CLEAR TO SAY THAT THAT'S A BIT BEYOND MY UNDERSTANDING.

11   Q.    UNDERSTOOD.  THANK YOU FOR THE CLARIFICATION.

12          IF YOU LOOK AT THE FIRST PAGE OF EXHIBIT 1, YOU SEE

13   THAT THE ASSIGNEE THERE ON THE THIRD LINE UNDERNEATH

14   HEAT-REFLECTIVE MATERIAL AND THEN THE NAME, THE THIRD LINE,

15   THAT'S COLUMBIA SPORTSWEAR NORTH AMERICA?

16   A.    THAT'S CORRECT, YES.

17   Q.    THAT MEANS THAT COLUMBIA SPORTSWEAR OWNS ALL THE RIGHTS

18   IN THIS PATENT?

19   A.    YES.

20   Q.    AND YOU ASSIGNED ALL YOUR RIGHTS AS PART OF YOUR

21   EMPLOYMENT WITH THEM; IS THAT RIGHT?

22   A.    THAT'S CORRECT.

23   Q.    SO COLUMBIA'S ABILITY TO USE YOUR PATENT IN LITIGATION

24   WAS UNAFFECTED BY THEM ELIMINATING YOUR POSITION, TO USE YOUR

25   WORDS?

417

1    A.   YES.  THAT'S MY UNDERSTANDING.

2    Q.   SO THEY WERE FREE TO ELIMINATE YOUR POSITION PRIOR TO

3    SUING.  THEY DIDN'T NEED TO ACTUALLY WAIT?

4    A.   RIGHT.  RIGHT.

5    Q.   YOU HAD GIVEN THEM YOUR VALUE AND WERE NO LONGER USEFUL

6    TO THEM AT THAT POINT; IS THAT FAIR?

7    A.   YEAH, THAT'S FAIR.

8    Q.   NOW, DO YOU UNDERSTAND HOW A DESIGN PATENT CLAIMS ITS

9    SUBJECT MATTER?

10   A.   NO.

11   Q.   IF YOU COULD LOOK AT THE RIGHT-HAND COLUMN OF EXHIBIT 1

12   UNDER THE WORD "CLAIM."  IT'S ON THE TOP RIGHT.  IT HAS A

13   NUMBER NEXT TO IT, 57.

14   A.   UH-HUH.  I SEE THAT.

15   Q.   DO YOU SEE THAT?

16   A.   YEP.

17   Q.   DO YOU SEE IT READS, "THE ORNAMENTAL DESIGN OF A

18   HEAT-REFLECTIVE MATERIAL, AS SHOWN AND DESCRIBED."

19   A.   UH-HUH.

20   Q.   DO YOU UNDERSTAND THAT'S THE CLAIM OF THIS PARTICULAR

21   PATENT?

22   A.   YES, I UNDERSTAND THAT.

23   Q.   AND IF WE LOOK AT FIGURE 2 -- IF WE CAN GO TO THE NEXT

24   PAGE, PLEASE -- FIGURE 2 IS A PICTURE OF YOUR DESIGN; IS THAT

25   FAIR?

418

1    A.    UH-HUH.  UH-HUH.

2    Q.    AND DO YOU UNDERSTAND THAT -- IF YOU CAN PULL THAT DOWN,

3    PLEASE.  LET'S GO BACK TO THE CLAIM.

4         THE CLAIM AGAIN READS, THE ORNAMENTAL DESIGN OF A

5    HEAT-REFLECTIVE MATERIAL.  AND THAT MATERIAL IS REFERRING TO

6    THE FABRIC ON WHICH THE DESIGN IS PLACED; IS THAT FAIR?

7    A.    WELL, FOR ME I GUESS THE WAY THAT I SEE IT IS THAT THE

8    DESIGN ITSELF SHOWS HOW THE HEAT-REFLECTIVE MATERIAL WOULD BE

9    USED.  AS FAR AS IT APPLIES TO HOW THAT'S APPLIED, I DON'T

10   THINK THAT THAT'S WHAT THIS IS CLAIMING.

11   Q.    I'M SORRY.  YOU DON'T THINK -- I DON'T UNDERSTAND YOUR

12   ANSWER.  COULD YOU PLEASE CLARIFY.

13   A.    YEAH.  SO AS I'M HEARING IT AND WE'RE TALKING THROUGH

14   IT, THIS SAYS THE ORNAMENTAL DESIGN, WHICH IS ESSENTIALLY

15   WHAT I WOULD CALL THE ILLUSTRATION OR THE DRAWING OF THE

16   ARTWORK ITSELF OF A HEAT-REFLECTIVE MATERIAL.  SO THAT MEANS

17   BASICALLY, YOU KNOW, THE ART ITSELF IS REPRESENTING WHAT THE

18   HEAT-REFLECTIVE MATERIAL IS, AS SHOWN AND DESCRIBED.

19   Q.    AND THE HEAT-REFLECTIVE MATERIAL HERE IS THE FABRIC; IS

20   THAT FAIR?

21   A.    NO.  NO, IT'S NOT THE FABRIC WE'RE TALKING ABOUT.  IT'S

22   THE ACTUAL HEAT-REFLECTIVE MATERIAL ITSELF.

23   Q.    IT'S MERELY THE SILVER IN THE CASE OF OMNI-HEAT; IS THAT

24   CORRECT?

25   A.    CORRECT.  CORRECT.  YES.

1    Q.    NOT EVEN THE FABRIC?

2    A.    I DON'T SEE IT AS THE FABRIC MYSELF.

3    Q.    WELL, IN OMNI-HEAT, THE SILVER IS APPLIED TO A FABRIC;

4    IS THAT FAIR?

5    A.    SURE.  I MEAN, YEAH, THE SILVER SEEMS TO BE APPLIED TO A

6    FABRIC.  BUT WHEN WE TALK ABOUT WHAT OMNI-HEAT IS --

7    Q.    I'M SORRY.  I THINK MY QUESTION WAS VERY NARROW.

8          SILVER IS APPLIED TO A FABRIC.  YOU AGREE WITH THAT?

9    A.    I AGREE THAT THE SILVER IS WHAT OMNI-HEAT IS.

10   Q.    OKAY.  AND THAT'S APPLIED TO A FABRIC?

11   A.    IT CAN BE APPLIED TO A FABRIC.  I DON'T KNOW THAT IT

12   COULDN'T BE APPLIED TO OTHER THINGS.

13   Q.    IT IS, IN FACT IN THE OMNI-HEAT EXAMPLES NEXT TO YOU,

14   FOR INSTANCE, APPLIED TO A FABRIC?

15   A.    YES.

16   Q.    IF I COULD DIRECT YOU TO THE LOWER RIGHT-HAND COLUMN ON

17   THE FRONT PAGE OF EXHIBIT 1.  DO YOU SEE THE LAST SENTENCE

18   THERE?  LET'S PULL THAT UP.

19          IT READS, "THE BROKEN LINES IN THE DRAWINGS DEPICT

20   ENVIRONMENTAL SUBJECT MATTER ONLY AND FORM NO PART OF THE

21   CLAIMED DESIGN."

22          DO YOU SEE THAT?

23   A.    I DO.

24   Q.    AND EARLIER YOU REFERENCED CERTAIN OF THE FIGURES IN

25   YOUR PATENT.  YOU UNDERSTAND THAT WHERE THE --

1          MR. SPROUL:  MR. VOLPERT, COULD YOU PLEASE PULL UP

2     FIGURE 5, FOR INSTANCE.  IT'S ON PAGE 3.

3     Q.   NOW, IN FIGURE 5 WE SEE THE INSIDE OF A BOOT BEARING THE

4     DESIGN; CORRECT?

5     A.   CORRECT.

6     Q.   AND THEN WE SEE THE OUTLINE OF A BOOT, BUT IT'S

7     DESIGNATED BY BROKEN LINES.  AND ACCORDING TO THAT DISCLAIMER

8     ON THE FRONT PAGE OF YOUR PATENT, THAT BOOT FORMS NO PART OF

9     THE CLAIMED DESIGN; ISN'T THAT RIGHT?

10    A.   TO MAKE SURE THAT I'M ANSWERING THE QUESTION THAT I

11    THINK I AM, THE BOOT SHOWS AN EXAMPLE OF HOW THAT PATTERN

12    COULD BE USED.

13    Q.   IT FORMS NO PART OF THE CLAIMED DESIGN; ISN'T THAT

14    RIGHT?

15    A.   THE BOOT ITSELF IS NOT A PART OF THE CLAIMED DESIGN.

16    Q.   OKAY.  AND YOU HAVE A LINKEDIN PAGE; IS THAT RIGHT?

17    A.   YEAH.

18    Q.   AND YOU UPDATE IT MAYBE ONCE A YEAR I BELIEVE YOU'VE

19    TESTIFIED TO?

20    A.   MAYBE.  IT'S PROBABLY BEEN A COUPLE YEARS SINCE I'VE

21    PAID ANY REAL ATTENTION TO IT.

22    Q.   WHAT'S THE PURPOSE OF A LINKEDIN PAGE?  WELL, STRIKE

23    THAT.

24          WHAT'S THE PURPOSE OF YOUR LINKEDIN PAGE?

25    A.   IN THEORY, THE INTENT IS TO PUT A PROFILE OUT THERE TO

421

1    SHOW PEOPLE, YOU KNOW, WHAT YOU'VE DONE PROFESSIONALLY.

2         MR. SPROUL:  MR. VOLPERT, COULD YOU PLEASE PULL UP

3    EXHIBIT 1050.

4    Q.   MR. SNYDER, COULD YOU IDENTIFY EXHIBIT 1050, PLEASE.

5    A.   THAT APPEARS TO BE MY LINKEDIN PAGE.

6    Q.   DO YOU NEED TO EXAMINE THE ENTIRE DOCUMENT?

7    A.   NO.  I'M SURE THAT IT IS.

8         MR. SPROUL:  YOUR HONOR, WE OFFER EXHIBIT 1050 INTO

9    THE RECORD.

10        MS. LEGAARD:  NO OBJECTION.

11        THE COURT:  IT'S RECEIVED.

12   (TRIAL EXHIBIT 1050 RECEIVED IN EVIDENCE.)

13   Q.   BY MR. SPROUL:  NOW, THIS WAS A COPY OF YOUR LINKEDIN

14   PAGE FROM SOMETIME IN 2016, PRODUCED EARLIER IN THIS CASE?

15   A.   OKAY.

16   Q.   AND YOU WERE SHOWN THIS DURING YOUR DEPOSITION, WHEN YOU

17   WERE DEPOSED EARLIER?

18   A.   I MAY HAVE BEEN.  I DON'T REMEMBER THAT, BUT IT'S

19   CERTAINLY POSSIBLE.

20   Q.   OKAY.  ONE PURPOSE OF THIS -- OF YOUR LINKEDIN PAGE IS

21   TO COMMUNICATE YOUR QUALIFICATIONS AND ACHIEVEMENTS THAT

22   YOU'VE ACQUIRED OVER THE YEARS?

23   A.   UH-HUH.  UH-HUH.

24        MR. SPROUL:  NOW, IF YOU COULD ZOOM OUT,

25   MR. VOLPERT, PLEASE.  SCROLL DOWN TO THE SECOND PAGE.

COMPUTER-AIDED TRANSCRIPTION

422

1    UNFORTUNATELY THE WAY THIS PRINTED, IT CUT OFF THE

2    TITLE THERE.  BUT AT THE VERY TOP, DO YOU UNDERSTAND THAT TO

3    BE DESCRIBING YOUR TIME -- I'M SORRY.  THAT'S NOT CUT OFF.  I

4    MISREAD IT.

5    IF YOU COULD GO UP ONE PAGE, PLEASE, MR. VOLPERT.

6    WE'LL START AT THE TOP.

7    Q.   DOWN AT THE BOTTOM OF THE PAGE, DO YOU SEE IT SAYS

8    "DESIGN DIRECTOR"?

9    A.   I DO.

10   Q.   UNDERNEATH THAT IT SAYS "COLUMBIA SPORTSWEAR"?

11   A.   YES.

12   Q.   THIS REPRESENTS YOUR TIME AT COLUMBIA SPORTSWEAR?

13   A.   IT DOES.

14   Q.   AND THAT CONTINUES ONTO THE SECOND PAGE?

15   A.   UH-HUH.

16   Q.   AND UNDER "COLUMBIA SPORTSWEAR," YOU HAVE TWO HEADINGS:

17   "RESPONSIBILITIES AND ACCOMPLISHMENTS."

18   A.   CORRECT.

19   Q.   AND UNDER NEITHER OF THOSE HEADINGS DO YOU FIND THE WORD

20   "OMNI-HEAT"; IS THAT FAIR?

21   A.   YEAH, THAT'S FAIR.

22   Q.   AND UNDER NEITHER ONE OF THOSE HEADINGS, EITHER

23   RESPONSIBILITIES OR ACCOMPLISHMENTS IS THERE ANY

24   IDENTIFICATION OF YOUR '093 PATENT?

25   A.   YEAH.

423

1     Q.   AND AT YOUR TIME AT COLUMBIA, YOU RECEIVED AT LEAST FIVE

2     SEPARATE PATENTS; ISN'T THAT RIGHT?

3     A.   THAT SOUNDS RIGHT, YES.

4     Q.   AND NONE OF THOSE WERE LISTED ON YOUR LINKEDIN PAGE; IS

5     THAT RIGHT?

6     A.   CORRECT.

7     Q.   I'D LIKE TO ASK YOU A FEW QUESTIONS ABOUT THE ACTUAL

8     WORK YOU DID COMING UP WITH YOUR DESIGNS THAT ULTIMATELY WENT

9     INTO EXHIBIT 1.

10    A.   OKAY.

11              MR. SPROUL:  IF YOU COULD PULL UP EXHIBIT 1004,

12    PLEASE, MR. VOLPERT.

13    Q.   COULD YOU IDENTIFY EXHIBIT 1004, MR. SNYDER?

14    A.   YES.  THIS IS ESSENTIALLY A SUMMARY OF THE DESIGN

15    EXPLORES THAT I DID WITH THE INTENT OF BASICALLY EXPLORING

16    POSSIBILITIES FOR THE OMNI-HEAT PATTERN.

17    Q.   AND WERE THESE DESIGNS TRANSLATED INTO PATENTS?

18    A.   I BELIEVE, IF MEMORY SERVES CORRECTLY, THE -- ALL BUT

19    THE TOP LEFT ONE WERE TRANSLATED INTO THE DESIGN PATENT.

20    Q.   AND WHAT IS THE TOP LEFT ONE?

21    A.   THE TOP LEFT ONE IS THE ORIGINAL OMNI-HEAT DOT

22    PATTERN.

23    Q.   IS THAT YOUR PATTERN?

24    A.   I WOULDN'T CALL IT MY PATTERN.  IT'S ESSENTIALLY -- THE

25    IDEA OF CREATING DOTS WAS BROUGHT TO ME.  I DID WORK WITH IT

424

1     AND HELPED TO GET THAT ARTWORK, WHAT I WOULD CALL READY FOR

2     PRODUCTION.

3     Q.   YOU WEREN'T THE ORIGINATOR OF THE DOTS --

4     A.   NO.

5     Q.   -- IS THAT YOUR TESTIMONY?

6     A.   THAT'S CORRECT.

7     Q.   BUT THE OTHER FIVE DESIGNS ARE YOUR ORIGINAL ARTWORK; IS

8     THAT FAIR?

9     A.   THAT IS CORRECT.

10    Q.   AND THE SECOND DESIGN GOING RIGHT IS A PATTERN OF

11    SQUARES?

12    A.   UH-HUH.

13    Q.   THE THIRD DESIGN GOING RIGHT IS STRAIGHT LINES?

14    A.   THAT'S CORRECT.

15    Q.   GO TO THE SECOND ROW.  FIRST PATTERN ARE REPEATING

16    TRIANGLES.  THE NEXT ONE ARE HEXAGONS I BELIEVE?

17    A.   THAT'S CORRECT.

18    Q.   AND THE FINAL ONE, THE WAVE PATTERN?

19    A.   THAT'S CORRECT.

20    Q.   OKAY.  AND YOU RECEIVED -- YOU FILED FOR AND RECEIVED

21    PATENTS ON ALL FIVE OF THOSE DESIGNS; IS THAT RIGHT?

22    A.   YES.  I BELIEVE SO.

23    Q.   AND I'D LIKE TO HAVE YOU IDENTIFY THEM QUICKLY.  WE

24    WON'T SPEND MUCH TIME ON IT.

25         MR. SPROUL:  BUT MR. VOLPERT, IF YOU COULD PULL UP

COMPUTER-AIDED TRANSCRIPTION

425

1    EXHIBIT 1057.

2    Q.    AND IS THIS YOUR DESIGN PATENT RELATED TO THE TRIANGLE

3    DESIGN?

4    A.    YES, IT IS.

5              MR. SPROUL:  I OFFER IT, YOUR HONOR.

6              MS. LEGAARD:  NO OBJECTION.

7              THE COURT:  RECEIVED.

8         (TRIAL EXHIBIT 1057 RECEIVED IN EVIDENCE.)

9              MR. SPROUL:  MR. VOLPERT, COULD YOU PULL UP

10   EXHIBIT 1058.

11   Q.    MR. SNYDER, IS THIS YOUR DESIGN PATENT RELATED TO THE

12   HEXAGON DESIGN?

13   A.    YES, IT IS.

14   Q.    AND I'M GOING TO READ THE NUMBER.  IT'S D400.  LET'S DO

15   THE WHOLE NUMBER.  I'M SORRY.  I HAVE IT WRITTEN DOWN

16   SHORTHAND.

17             THE FULL PATENT NUMBER IS D-653,400; IS THAT RIGHT?

18   A.    UH-HUH.

19   Q.    AND IF YOU COULD PULL UP 1057 AGAIN.

20             OH, I'M SORRY.  I NEED TO OFFER EXHIBIT 1058.

21             MS. LEGAARD:  NO OBJECTION.

22             THE COURT:  RECEIVED.

23        (TRIAL EXHIBIT 1058 RECEIVED IN EVIDENCE.)

24             MR. SPROUL:  IF YOU COULD PULL UP 1057, PLEASE.

25   I'LL READ THE FULL NUMBER INTO THE RECORD.

COMPUTER-AIDED TRANSCRIPTION

426

1    Q.    DESIGN D-651,352; IS THAT RIGHT?

2    A.    YES.

3    Q.    IF YOU COULD PULL UP EXHIBIT 1059.

4          AND THE DESIGN PATENT NUMBER HERE IS D-655,921?

5    A.    THAT'S CORRECT.

6    Q.    AND IS THIS YOUR SQUARE DESIGN?

7    A.    THAT IS CORRECT.

8          MR. SPROUL:  I OFFER IT, YOUR HONOR.

9          MS. LEGAARD:  NO OBJECTION.

10         THE COURT:  RECEIVED.

11   (TRIAL EXHIBIT 1059 RECEIVED IN EVIDENCE.)

12         MR. SPROUL:  IF YOU COULD PULL UP EXHIBIT 1060.

13   Q.    PATENT NUMBER HERE IS D-656,741; IS THAT RIGHT?

14   A.    THAT'S CORRECT.

15   Q.    AND IS THIS YOUR STRAIGHT-LINE DESIGN?

16   A.    THAT IS CORRECT.

17   Q.    SO WITH EXHIBIT 1, WE HAVE EXHIBITS 1057 THROUGH 1060,

18   AND THOSE ARE YOUR FIVE DESIGNS?

19   A.    YES.

20   Q.    NOW, THIS PATTERN HERE IS AN INTERESTING ONE BECAUSE IT

21   LOOKS RATHER SIMPLE.  AND I BELIEVE DURING YOUR DEPOSITION,

22   YOU DID NOT REFER TO THIS ONE AS A SOPHISTICATED GEOMETRIC

23   PATTERN; IS THAT FAIR?

24   A.    THAT'S FAIR.

25   Q.    IT IS A SIMPLE DESIGN?

427

1     A.    IT'S A FAIRLY SIMPLE DESIGN, YES.

2           THE COURT:  DO YOU WANT TO OFFER THAT?  THE JURY

3     HASN'T SEEN IT.

4           MR. SPROUL:  I APOLOGIZE, YOUR HONOR.  I'M GETTING

5     AHEAD OF MYSELF.  I OFFER IT INTO EVIDENCE.

6           MS. LEGAARD:  NO OBJECTION.

7           THE COURT:  IT'S RECEIVED.

8           (TRIAL EXHIBIT 1060 RECEIVED IN EVIDENCE.)

9     Q.    BY MR. SPROUL:  AND YOU WERE GRANTED A PATENT ON THE

10    STRAIGHT-LINE DESIGN?

11    A.    YES.

12    Q.    IF YOU COULD PULL UP EXHIBIT 1 AGAIN.

13          DO YOU SEE THE PATTERN DOWN AT THE BOTTOM OF THE

14    FIRST PAGE?

15    A.    I DO.

16    Q.    THAT'S THE WAVY DESIGN THAT'S THE SUBJECT OF THIS

17    PATENT?

18    A.    THAT'S RIGHT.

19    Q.    IS THAT DESIGN SOMETHING YOU CREATED?

20    A.    YES.

21    Q.    NOW, IT SEEMS LIKE AN OBVIOUS QUESTION, EXCEPT DURING

22    YOUR TESTIMONY, I BELIEVE THAT YOU -- EXCUSE ME.

23          DURING YOUR DEPOSITION, I BELIEVE THAT YOU SAID THAT

24    YOU DID NOT CREATE THESE PARTICULAR -- STRIKE THAT.  NEVER

25    MIND.  I'M GOING TO MOVE ON, YOUR HONOR.

COMPUTER-AIDED TRANSCRIPTION

428

1          MR. SPROUL:  COULD YOU PULL UP EXHIBIT 5, PLEASE.

2     COULD YOU PULL UP EXHIBIT 1019, PLEASE.

3     Q.   HAVE YOU SEEN EXHIBIT 1019 BEFORE?

4     A.   YOU KNOW, I MAY HAVE AROUND THE TIME OF THE DEPOSITION.

5     BUT IF I DID, I DON'T REMEMBER IT.

6     Q.   OKAY.  AND YOU SEE THAT THE INVENTOR LISTED ON THE FIRST

7     PAGE IS MR. WOODY BLACKFORD?

8     A.   I DO.  I SEE THAT.

9     Q.   AND THE APPLICANT IS COLUMBIA SPORTSWEAR, OR THE

10    ASSIGNEE --

11    A.   YEAH, I SEE THAT.

12    Q.   AND YOU ARE NOT LISTED AS AN INVENTOR ON THIS PATENT,

13    ARE YOU?

14    A.   THAT'S CORRECT.

15    Q.   FILED IN -- ON MAY 7TH, 2010 WHILE YOU WERE WORKING AT

16    COLUMBIA ON OMNI-HEAT?

17    A.   YEAH.

18    Q.   NOW, IF WE GO DOWN -- AND I KNOW MR. MARCHESE ASKED

19    MR. BLACKFORD ABOUT THIS, BUT WE'LL AGAIN SHOW IT TO THE JURY

20    VERY BRIEFLY, BECAUSE YOU HAVEN'T BEEN ASKED ABOUT IT.  BUT

21    COULD YOU HIGHLIGHT THE RELATED U.S. APPLICATIONS IN THE

22    FIRST COLUMN DOWN IN THE BOTTOM LEFT.

23          NOW, WE LOOKED AT A NUMBER OF YOUR PATENTS JUST NOW.

24    AND I'D LIKE TO IDENTIFY THEM.  THE '921 PATENT, WHICH IS THE

25    SECOND FULL PATENT DOWN.  THAT'S YOUR PATENT.  THAT'S THE

429

1    SQUARES; RIGHT?

2    A.    SURE.  I DON'T HAVE THE NUMBERS MEMORIZED BUT, YEAH, IT

3    LOOKS LIKE.

4    Q.    THE '741 PATENT IS THE LINES PATENT.  '352 IS THE

5    TRIANGLE PATENT.  '400 IS THE HEXAGON PATENT.  AND '093, THE

6    WAVE PATENT.

7          DOES THAT SOUND RIGHT?

8    A.    IT DOES SOUND RIGHT.

9    Q.    DID YOU KNOW THAT THESE WERE LISTED AS RELATED

10   APPLICATIONS IN PATENTS TO MR. BLACKFORD'S PATENT?

11   A.    NO, I DIDN'T KNOW THAT.

12   Q.    COULD YOU PULL UP FIGURE 3, PLEASE, OF THE -- OF

13   EXHIBIT 1019.

14         DO YOU SEE FIGURE 3 OF EXHIBIT 1019 IN FRONT OF YOU,

15   MR. SNYDER?

16   A.    I DO.

17   Q.    AND ARE ALL OF THOSE YOUR PICTURES?

18   A.    YES.  THOSE APPEAR TO BE THE DESIGNS THAT -- FROM THE

19   PATENTS THAT WE WERE JUST TALKING ABOUT.

20   Q.    THOSE ARE YOUR DESIGNS APPEARING IN MR. BLACKFORD'S

21   PATENT?

22   A.    IT LOOKS LIKE THAT, YES.

23   Q.    AND DID YOU KNOW THAT THOSE WERE PLACED IN

24   MR. BLACKFORD'S PATENT?

25   A.    NO, I DIDN'T KNOW THAT.

430

1    Q.   MR. BLACKFORD'S LAWYERS OR YOUR LAWYERS, WHOEVER YOU

2    WERE WORKING WITH, PUT THEM IN THERE?

3    A.   YEAH.  I DIDN'T PUT THEM IN THERE, SO WE CAN PRESUME

4    THAT THE LAWYERS DID.

5    Q.   NOW, IN YOUR DECLARATION THAT YOU SUBMITTED EARLIER IN

6    THIS CASE, YOU SAID THAT YOU WERE FAMILIAR WITH THE PRIOR

7    ART --

8    A.   THAT'S CORRECT.

9    Q.   -- AS A PART OF YOUR DESIGN PATENT?

10   A.   YES.  THE CIRCLE PATTERN, YES.

11           MR. SPROUL:  AND I WOULD ASK MR. VOLPERT TO PULL UP

12   EXHIBIT 1123.

13   Q.   HAVE YOU SEEN EXHIBIT 1123 BEFORE?

14   A.   NO.  I'M NOT FAMILIAR WITH THIS.

15           MR. SPROUL:  IF YOU COULD TURN, MR. VOLPERT, TO

16   FIGURES 3, 4, 5, 6, 7 AND 8.  THEY ARE ALL ON THE THIRD PAGE.

17           MS. LEGAARD:  YOUR HONOR, I'D OBJECT ON THE GROUNDS

18   OF FOUNDATION.

19           THE COURT:  HE HASN'T ASKED THE QUESTION YET.

20           MR. SPROUL:  WELL, YOUR HONOR, I WOULD LIKE TO SHOW

21   IT TO HIM.  IT'S GOING TO COME IN LATER THROUGH MR. BLOCK.

22   HE CAN SAY HE HASN'T SEEN IT.

23           THE COURT:  YOU HAVEN'T ASKED THE QUESTION.  I'M

24   STILL WAITING.

25   Q.   BY MR. SPROUL:  OKAY.  MR. SNYDER, YOU SAID YOU HADN'T

431

```
1    SEEN THIS DOCUMENT BEFORE.  HAVE YOU SEEN ANY OF FIGURES 3,

2    4, 5, 6, 7 OR 8?

3    A.   NO.  I HAVEN'T SEEN THESE BEFORE.

4              MR. SPROUL:  NO FURTHER QUESTIONS AT THIS TIME, YOUR

5    HONOR.

6              THE COURT:  REDIRECT?

7              MS. LEGAARD:  NONE.

8              THE COURT:  DO ANY OF THE JURORS HAVE ANY QUESTIONS

9    FOR THIS WITNESS?

10             YOU MAY STEP DOWN.

11             WOULD YOU LIKE THIS WITNESS TO BE EXCUSED?

12             MS. LEGAARD:  YES, PLEASE.

13             THE COURT:  ANY OBJECTION?

14             MR. MARCHESE:  NO, YOUR HONOR.  WE WILL NOT RE-CALL

15   HIM.

16             THE COURT:  YOU ARE EXCUSED BACK TO BUSINESS.

17             THE WITNESS:  THANK YOU.

18             THE COURT:  CALL YOUR NEXT WITNESS.

19             MS. LEGAARD:  WE CALL JAMES DROZDOWSKI.

20             THE COURT:  STEP FORWARD AND BE SWORN.

21             THE CLERK:  STEP RIGHT OVER HERE, PLEASE.

22             RAISE YOUR RIGHT HAND.

23         JAMES DROZDOWSKI, HAVING BEEN DULY SWORN, TESTIFIED AS

24         FOLLOWS:

25             THE WITNESS:  I DO.
```

432

1              THE CLERK:  PLEASE BE SEATED.

2              PLEASE STATE YOUR FIRST AND LAST NAME FOR THE

3    RECORD, SPELLING YOUR LAST NAME.

4              THE WITNESS:  IT'S JAMES DROZDOWSKI.  THAT IS

5    D-R-O-Z-D-O-W-S-K-I.

6              THE CLERK:  THANK YOU.

7              MS. LEGAARD:  YOUR HONOR, MAY I APPROACH WITH A

8    BINDER?

9              THE COURT:  YOU MAY.

10                        DIRECT EXAMINATION

11   BY MS. LEGAARD:

12   Q.   GOOD AFTERNOON, MR. DROZDOWSKI.

13   A.   GOOD AFTERNOON.

14   Q.   WHERE DO YOU WORK?

15   A.   I WORK FOR COLUMBIA SPORTSWEAR COMPANY.

16   Q.   AND WHAT IS YOUR POSITION?

17   A.   I AM THE GO TO MARKET FINANCE MANAGER.

18   Q.   SO CAN YOU GIVE ME AN EXAMPLE OF A PROBLEM THAT YOU

19   MIGHT WORK WITH -- WORK ON AS A GO TO MARKET FINANCE MANAGER.

20   A.   SURE.  WE ARE ALWAYS LOOKING TO GROW OUR SALES.  SO I

21   WOULD WORK WITH A CROSS-FUNCTIONAL TEAM THAT WOULD INCLUDE

22   MARKETING, THE SALES TEAM, PRODUCT TEAM, AND WE WOULD SIT

23   AROUND THE TABLE AND DISCUSS WAYS THAT WE THINK WE COULD GROW

24   SALES WITH A COMPANY LIKE DICK'S SPORTING GOODS.

25              EACH TEAM RELATES WHAT THEIR PROPOSITION WOULD BE.

433

1    MY PORTION IS TO MAKE SURE THAT THE RESULTS WOULD ALIGN WITH

2    WHAT OUR FINANCIAL GOALS ARE FOR THE COMPANY.

3    Q.   SO WHERE WOULD YOU GET THE FINANCIAL INFORMATION THAT

4    WOULD PERMIT YOU TO DO SOMETHING LIKE THAT?

5    A.   I WOULD BE GETTING THAT OUT OF OUR COLUMBIA FINANCIAL

6    ACCOUNTING SYSTEMS.

7    Q.   AND DO YOU PULL THAT INFORMATION OUT OF THE ACCOUNTING

8    SYSTEM YOURSELF?

9    A.   IN MOST CASES, I DO.  I DON'T HAVE ACCESS TO ALL THE

10   INFORMATION.  IF IT'S SOMETHING THAT I DON'T HAVE ACCESS TO,

11   THEN I WILL GO AND TALK TO A PEER WITHIN OUR GROUP WHO WOULD

12   HAVE ACCESS TO THAT DATA.

13   Q.   OKAY.  SO TURNING TO THE OMNI-HEAT REFLECTIVE PRODUCTS

14   WHICH ARE AT ISSUE HERE.  WERE YOU ASKED TO COLLECT

15   INFORMATION REGARDING COLUMBIA'S SALES AND PROFITS ON

16   OMNI-HEAT REFLECTIVE PRODUCTS?

17   A.   CORRECT.

18   Q.   HOW MANY OMNI-HEAT REFLECTIVE PRODUCTS DOES COLUMBIA

19   SELL?

20   A.   OH, WE SELL THOUSANDS.

21   Q.   SO I'M GOING TO SHOW YOU PLAINTIFF'S EXHIBIT 227, WHICH

22   I BELIEVE HAS ALREADY BEEN ADMITTED.  IT SHOULD BE IN YOUR

23   BINDER.

24   A.   GOT IT.

25   Q.   OKAY.

434

1          MS. LEGAARD:  OFFER 227.

2          MR. SPROUL:  I DON'T KNOW WHAT IT IS.  THERE IS A

3   LOT OF NUMBERS.  WE DON'T HAVE AN OBJECTION.

4          THE COURT:  YOU DON'T HAVE ANY OBJECTION?

5          MR. SPROUL:  NO.

6          THE COURT:  IT'S RECEIVED.

7      (TRIAL EXHIBIT 227 RECEIVED IN EVIDENCE.)

8   Q.  BY MS. LEGAARD:  OKAY.  CAN YOU IDENTIFY THIS DOCUMENT.

9   A.  YES, I CAN.  THIS IS A LISTING OF ALL OF THE PRODUCTS

10  THAT WERE IDENTIFIED IN THIS CASE UNDER WHAT WE WERE LOOKING

11  FOR AS FAR AS THE OBJECTIVES.

12  Q.  OKAY.  CAN YOU TELL ME HOW THIS LIST CAME TO BE.

13  A.  SURE.  WHAT HAD HAPPENED WAS THAT I WAS CONTACTED BY THE

14  LOCAL GROUP, AND WE REACHED OUT TO A PERSON IN THE PRODUCT

15  TEAM WHO HAS AN EXPERTISE IN KNOWING ALL THE PRODUCTS THAT

16  ARE OMNI-HEAT REFLECTIVE AND THAT ARE A PART OF THIS CASE.

17  Q.  OKAY.  HOW DO YOU KNOW THAT THIS LIST IS COMPLETE AND

18  ACCURATE?

19  A.  WELL, AGAIN, SHE IS AN EXPERT IN THIS AREA OF OPERATIONS

20  AROUND THE PRODUCTS.  I THEN WAS ABLE TO GET THESE NUMBERS

21  BACK.  I PROVIDED THEM TO MY EXPERT ON THE WHOLESALE SIDE,

22  WHO WENT THROUGH OUR ACCOUNTING SYSTEMS TO PULL SALES BY

23  THESE STYLE NUMBERS AND MATERIAL NUMBERS.  I ALSO REACHED OUT

24  TO OUR GENTLEMAN WHO IS AN EXPERT ON THE RETAIL SIDE TO GRAB

25  THESE NUMBERS AND SALES.

1           I ADDED THOSE UP TOGETHER, AND THEY WERE IN LINE

2      WITH WHAT WE EXPECTED AS FAR AS SALES AND SALES GROWTH THAT

3      WE EXPECTED FOR FALL '10 THROUGH 2014 AT THE TIME.  SO THEY

4      ALIGNED WITH WHAT THE EXPECTATIONS WERE.

5      Q.   GREAT.  THANK YOU.

6           MS. LEGAARD:  I'M GOING TO SHOW YOU PLAINTIFF'S

7      EXHIBIT 249.  I'D LIKE TO OFFER 249 IF IT'S NOT ALREADY IN.

8           MR. SPROUL:  I BELIEVE IT'S ALREADY IN.  NO

9      OBJECTION.

10          THE COURT:  RECEIVED.

11          (TRIAL EXHIBIT 249 RECEIVED IN EVIDENCE.)

12     Q.   BY MS. LEGAARD:  OKAY.  MR. DROZDOWSKI, COULD YOU

13     IDENTIFY THIS DOCUMENT.

14     A.   YES, I CAN.  THIS IS A SUMMARY THAT I PUT TOGETHER FOR

15     THIS CASE.

16     Q.   AND HOW DID YOU MAKE THIS SUMMARY?

17     A.   WHAT I DID IS I TALLIED UP THE OMNI-HEAT SALES THAT WERE

18     GIVEN TO ME BY THE GENTLEMAN WHO PROVIDED THOSE OUT OF THE

19     ACCOUNTING SYSTEM.  I THEN ALSO TOOK THE TOTALS FOR U.S.

20     WHOLESALE COLUMBIA OUT OF OUR ACCOUNTING SYSTEMS AND PUT

21     THESE INTO A SCHEDULE TO SHOW WHAT PERCENTAGE OMNI-HEAT WAS

22     AS A TOTAL OF U.S. WHOLESALE, AND THEN ALSO THEN CALCULATED

23     THE MARGINS AND MADE SURE THAT THEY WERE EXPECTED TO BE IN

24     LINE WITH WHAT WE HAD THOUGHT.

25          I DID THE SAME THING ON THE RETAIL SIDE.  I GATHERED

436

1    THE SCHEDULE FROM THE GENTLEMAN WHO PROVIDED THE RETAIL, AND

2    FROM THE ACCOUNTING SYSTEMS, AND THEN I PULLED THE TOTALS

3    FROM OUR ACCOUNTING SYSTEMS.

4    Q.    OKAY.  SO CAN YOU TELL ME HOW MUCH HAS COLUMBIA

5    SPORTSWEAR MADE IN REVENUE FROM THE SALE OF OMNI-HEAT

6    REFLECTIVE PRODUCTS IN THE U.S. DURING THE YEARS OF 2010 TO

7    2016?

8    A.    SURE.  IT'S AROUND 1.3 BILLION.  ON THE WHOLESALE SIDE,

9    IT'S OVER 700 MILLION DOLLARS; AND ON THE RETAIL SIDE, IT'S

10   THE OTHER 500 MILLION DOLLARS.

11   Q.    OKAY.  SO ON THIS DOCUMENT, THERE IS A LINE THAT SAYS

12   "INVOICED COST."

13   A.    UH-HUH.

14   Q.    WHAT DOES THAT MEAN?

15   A.    THAT'S THE COST OF US MAKING THE PRODUCT AND THEN

16   GETTING THE PRODUCT FROM OVERSEAS INTO OUR DISTRIBUTION

17   CENTER.

18   Q.    OKAY.  CAN YOU TELL ME ROUGHLY WHAT AMOUNTS ARE IN THAT

19   NUMBER, WHAT CATEGORIES OF COSTS ARE IN THAT NUMBER?

20   A.    IT'S WHAT WE CALL F.O.B.  SO IT'S WHAT IT COSTS TO MAKE

21   THE MATERIAL AND THEN THE FREIGHT COSTS TO HAVE IT SHIPPED

22   FROM OVERSEAS INTO THE UNITED STATES.  AND THEN THE COST OF

23   TYPICALLY GETTING IT TRUCKED FROM THE AREA THAT WE WOULD

24   RECEIVE IT INTO OUR D.C. IN PORTLAND, OREGON.

25   Q.    OKAY.  AND THEN THERE IS ALSO A LINE THAT SAYS

1    "OMNI-HEAT PRODUCT MARGIN PERCENT."

2         DO YOU SEE THAT?

3    A.   CORRECT.  THAT'S A TYPICAL FINANCIAL CALCULATION THAT WE

4    MAKE TO SEE WHAT OUR PRODUCT -- WHAT OUR PROFIT MARGIN IS ON

5    THAT SPECIFIC PRODUCT TYPE.

6         AND YOU CAN SEE, IT'S PRETTY MUCH IN LINE WITH WHAT

7    OUR WHOLESALE MARGINS ARE; AND THE SAME ON THE RETAIL SIDE.

8    Q.   SO WHAT DOES THE MARGIN FOR AN OMNI-HEAT PRODUCT TEND TO

9    BE?

10   A.   IT'S TYPICALLY BETWEEN 40 AND 50 ON THE WHOLESALE SIDE,

11   WHICH IS IN LINE WITH WHERE OUR TOTAL WHOLESALE MARGINS ARE.

12   AND FOR BRICK-AND-MORTAL RETAIL, IT'S A LITTLE BIT HIGHER

13   THAN THAT, BETWEEN 50 AND 60.  AND ON THE E-COMMERCE SIDE,

14   IT'S TYPICALLY BETWEEN 60 AND 70.

15        MS. LEGAARD:  OKAY.  THANK YOU.  I HAVE NO FURTHER

16   QUESTIONS.

17        THE COURT:  CROSS-EXAMINE.

18                    CROSS-EXAMINATION

19   BY MR. SPROUL:

20   Q.   IF YOU COULD PULL UP EXHIBIT 227.

21        DO YOU SEE EXHIBIT 227?  I DON'T HAVE IT ON MY

22   SCREEN, BUT AS LONG AS OTHER PEOPLE CAN SEE IT, THAT'S FINE.

23   A.   YES.

24   Q.   I'M SORRY?

25   A.   YES, I CAN SEE IT.

438

1    Q.    YOU CAN SEE IT?  OKAY.

2          EXHIBIT 227 YOU SAID IDENTIFIED ALL THE PRODUCTS

3    WITH OMNI-HEAT REFLECTIVE IN IT; IS THAT RIGHT?

4    A.    WE WENT OUT TO GATHER ALL OF THE -- ALL OF THE PRODUCT

5    TYPES IN THIS RELATED CASE, YES.

6    Q.    YOU DON'T KNOW, SITTING HERE RIGHT NOW, WHETHER

7    OMNI-HEAT REFLECTIVE IS APPLIED CONSISTENTLY ACROSS ALL THESE

8    PRODUCTS THOUGH, DO YOU?

9    A.    THAT IS NOT MY EXPERTISE, NO.

10   Q.    IN FACT, YOU HAVE VERY LITTLE KNOWLEDGE ABOUT THE

11   PRODUCTS THEMSELVES.  YOU'RE A FINANCE GUY?

12   A.    I KNOW -- CORRECT.

13   Q.    OKAY.

14   A.    BUT WE HAVE AN EXPERT THAT IDENTIFIED THOSE STYLES FOR

15   US.

16   Q.    OKAY.  YOU DIDN'T TALK ABOUT INFRINGEMENT IN YOUR

17   DIRECT?

18   A.    NO.

19   Q.    DIDN'T TALK ABOUT INVALIDITY?

20   A.    NO.

21   Q.    DIDN'T TALK ABOUT THE PATENTS?

22   A.    NO.

23   Q.    YOU WEREN'T INVOLVED IN AUTHORIZING THIS LAWSUIT; IS

24   THAT RIGHT?

25   A.    NO.

439

1    Q.   I'M GOING TO ASK YOU ABOUT EXHIBIT 249 THAT YOU JUST

2    TESTIFIED TO.

3         YOU TALKED ABOUT THIS INVOICED COST.  IF YOU CAN

4    BLOW THAT UP, MR. VOLPERT, ON THE TOP LEFT.

5         AND YOU SAID, I BELIEVE YOUR TESTIMONY WAS THAT

6    INVOICED COST IS THE COST TO MAKE THE PRODUCT AND TO SHIP IT

7    TO THE U.S.; IS THAT RIGHT?

8    A.   CORRECT.

9    Q.   AND YOU REFERRED TO THAT AS F.O.B.; IS THAT RIGHT?

10   A.   (NO AUDIBLE RESPONSE.)

11        THE COURT:  YOU HAVE TO ANSWER OUT LOUD, PLEASE.

12        THE WITNESS:  YES.

13   Q.   BY MR. SPROUL:  AND YOU AFFIRMED MY FIRST QUESTION, COST

14   TO MAKE, PLUS SHIPPING --

15        THE REPORTER:  WAIT, WAIT.

16        MR. SPROUL:  LET ME REDO DO THAT.  I APOLOGIZE.

17   Q.   INVOICED COST IS COST TO MAKE, PLUS SHIPPING TO THE

18   U.S.; IS THAT RIGHT?

19   A.   SHIPPING TO OUR DISTRIBUTION CENTER, CORRECT.

20   Q.   THAT DOESN'T INCLUDE COSTS SUCH AS SALARIES; CORRECT?

21   A.   CORRECT.

22   Q.   COMMISSIONS?

23   A.   CORRECT.

24   Q.   UTILITIES?

25   A.   CORRECT.

440

1    Q.    REAL ESTATE?

2    A.    CORRECT.

3    Q.    MARKETING?

4    A.    CORRECT.

5    Q.    ARE THERE ANY OTHER COSTS THAT AREN'T REFLECTED HERE IN

6    THE INVOICED COSTS THAT YOU CAN THINK OF BESIDES THOSE THAT

7    I'VE NAMED?

8    A.    THERE IS A VARIETY OF COSTS OF DOING BUSINESS, CORRECT,

9    THAT WE HAVEN'T DISCUSSED.

10   Q.    SO THIS -- STRIKE THAT.

11         DO YOU RECALL EARLIER IN THIS CASE THAT YOU WERE

12   DEPOSED?

13         (PHONE RINGING.)

14         THE COURT:  SOMEBODY HAS A PHONE RINGING.  OH, THERE

15   WE GO.

16         THANK YOU.  GO AHEAD.

17         MR. SPROUL:  I'M JUST GLAD THAT WASN'T ME.  IT'S

18   BEEN ME IN THE PAST.

19   Q.    MR. DROZDOWSKI, DO YOU RECALL YOU WERE DEPOSED EARLIER

20   IN THIS CASE?

21   A.    CORRECT.

22   Q.    AND YOU HAD A SPREADSHEET THAT YOU WERE ASKED ABOUT

23   DURING YOUR DEPOSITION.  PROBABLY MORE THAN ONE, BUT THERE

24   WAS ONE IN PARTICULAR.  AND THERE WAS AN ERROR IN THIS

25   PARTICULAR SPREADSHEET.

441

1              DO YOU RECALL THAT?

2     A.    I DON'T.

3              MR. SPROUL:  I WILL ASK MR. VOLPERT TO PULL UP YOUR

4     DEPOSITION AT PAGE 35, STARTING AT LINE 5.

5              THE WITNESS:  OH.

6     Q.    BY MR. SPROUL:  AND YOU WERE ASKED, DID YOU EVER HAVE TO

7     GO BACK TO MIKE AND ASK FOR ADDITIONAL INFORMATION?  YOUR

8     ANSWER WAS YES.

9              AND WHAT INFORMATION WAS THAT?  IT WAS CONCERNING

10    STYLE NUMBERS.

11             QUESTION:  CAN YOU BE MORE SPECIFIC?

12             ANSWER:  WE RECEIVED -- I RECEIVED UPDATES TO THE

13    STYLE COUNT LIST.  SO I HAD TO GO BACK TO MIKE TO ASK HIM TO

14    ALSO INCLUDE THOSE STYLES.

15             BY UPDATE, YOU MEAN ADDITIONAL STYLE NUMBERS?

16             ANSWER:  CORRECT.

17             QUESTION:  DO YOU RECALL, WERE ANY STYLE NUMBERS

18    DELETED FROM THE ORIGINAL INQUIRY?

19             ANSWER:  YES.

20             DO YOU RECALL THAT EXCHANGE?

21    A.    YES.

22    Q.    AND DO YOU RECALL THAT DOCUMENT, AT LEAST GENERALLY?

23    A.    CORRECT.  YES.

24    Q.    AND YOU RECALL THE ERROR AT THAT TIME IN THAT

25    DOCUMENT?

442

1    A.    YES.

2    Q.    COULD YOU EXPLAIN THAT.

3    A.    SO WHEN WE RECEIVED -- WHEN I RECEIVED THE FINANCIALS

4    BACK FROM MIKE ON THE WHOLESALE SIDE AND FROM JOE ON THE

5    RETAIL SIDE, I NOTICED SOMETHING THAT DID NOT MAKE SENSE TO

6    ME, AND THAT IS THAT WHILE OUR WHOLESALE SALES WERE GOING UP

7    AND OUR RETAIL SALES WERE GOING UP, THESE IDENTIFIED STYLES

8    SALES WERE GOING DOWN.  THAT DID NOT MAKE SENSE TO ME BECAUSE

9    WE SHOULD HAVE SEEN THEM ALL GOING UP.

10          SO THEN WE WENT BACK TO THE PRODUCT TEAM AND SAID, I

11    THINK YOU'RE MISSING SOME STYLES HERE.  THIS DOESN'T MAKE

12    SENSE TO ME.  AND, YES, THEY WENT BACK AND SAID, YOU ARE

13    CORRECT, WE ARE MISSING SOME STYLES.

14          AND WE HAD SOME ADDITIONAL STYLES THAT WERE

15    INCORRECT BEFORE.  SO WE WENT BACK AND MIKE RE-RAN THE

16    WHOLESALE NUMBERS AND JOE RE-RAN THE RETAIL NUMBERS.

17    Q.    SO YOU HAD A SPREADSHEET REPRESENTING SALES NUMBERS THAT

18    WAS INCORRECT; IS THAT RIGHT?

19    A.    CORRECT.

20    Q.    YOU NOTICED THE ERROR --

21    A.    CORRECT.

22    Q.    -- CREATED A NEW SPREADSHEET AND PROVIDED THAT TO

23    COUNSEL FOR THIS CASE; IS THAT RIGHT?

24    A.    CORRECT.

25    Q.    SOMETIMES MISTAKES HAPPEN WITH THESE SORTS OF

COMPUTER-AIDED TRANSCRIPTION

443

1    SPREADSHEETS; IS THAT FAIR?

2    A.    CORRECT.

3    Q.    COLUMBIA DOES NOT OWN OR OPERATE ITS OWN MANUFACTURING

4    FACILITIES; IS THAT RIGHT?

5    A.    CORRECT.

6    Q.    THEY ARE ALL IN ASIA; IS THAT CORRECT?

7    A.    NO.

8    Q.    MANY OF THEM ARE IN ASIA?

9    A.    CORRECT, MANY ARE IN ASIA.

10   Q.    YOU AGREE THAT ALL SALES OF ALL COLUMBIA PRODUCTS HAVE

11   GROWN FROM 2010 TO 2015?

12   A.    I'M SORRY.  CAN YOU RESTATE THAT AGAIN.

13   Q.    SALES FOR COLUMBIA PRODUCTS ACROSS ITS PRODUCT

14   CATEGORIES AND TECHNOLOGIES, INCLUDING PRODUCTS THAT DON'T

15   USE OMNI-HEAT, HAVE GROWN FROM 2010 TO 2015?

16   A.    I CAN'T SAY THAT ALL PRODUCTS HAVE GROWN.  I'M SURE WE

17   HAVE SOME PARTS OF OUR PRODUCT THAT HAVE NOT GROWN OR HAVE

18   GONE AWAY BECAUSE THEY HAVEN'T BEEN SUCCESSFUL.

19   Q.    MANY PRODUCTS THAT DON'T INCLUDE OMNI-HEAT, THOUGH, FOR

20   THOSE PRODUCTS, SALES HAVE GROWN, IS THAT FAIR, FROM 2010 TO

21   2015?

22   A.    OUR BASE OF SALES HAVE INCREASED FROM 2010 TO 2015,

23   CORRECT.

24   Q.    INCLUDING FOR SALES OF PRODUCTS WITHOUT OMNI-HEAT?

25   A.    CORRECT.

444

1          MR. SPROUL:  NO FURTHER QUESTIONS.

2          THE COURT:  REDIRECT?

3          MS. LEGAARD:  NONE.

4          THE COURT:  IS THERE ANY QUESTIONS FROM THE JURORS

5    FOR THIS WITNESS?  IF SO, PLEASE RAISE THEIR HAND.

6          YOU MAY STEP DOWN.

7          WOULD YOU LIKE THIS WITNESS TO BE EXCUSED?

8          MS. LEGAARD:  YES.

9          THE COURT:  ANY OBJECTION?

10          MR. MARCHESE:  NO OBJECTION.

11          THE COURT:  YOU ARE EXCUSED TO GO ABOUT YOUR

12    BUSINESS.

13          THE WITNESS:  THANK YOU.

14          THE COURT:  CALL YOUR NEXT WITNESS.

15          MR. AXELROD:  WE CALL MORGAN CHIN AS AN ADVERSE

16    WITNESS PURSUANT TO RULE 611.

17          MR. MARCHESE:  YOUR HONOR, MS. CHIN IS A MOTHER.

18    SHE'S RECENTLY BECAME A MOTHER WITH A TWO-MONTH-OLD, AND SHE

19    IS WITH HER INFANT DAUGHTER RIGHT NOW, WILL BE A FEW MINUTES.

20    SHE'S TENDING TO HER.  I DON'T KNOW IF IT'S SON OR

21    DAUGHTER.

22          THE COURT:  MORE INFORMATION THAN I NEED.

23          MR. MARCHESE:  UNDERSTOOD.

24          THE COURT:  LET'S ALLOW THE JURY TO STEP INTO THE

25    ROOM, AND THEN WHEN WE HAVE THE WITNESS READY, WE WILL GET

COMPUTER-AIDED TRANSCRIPTION

445

```
1    GOING.

2            (JURY ABSENT, 2:43 P.M.)

3            THE COURT:  DO YOU ANTICIPATE MS. CHIN BEING READY

4    IN THE NEXT FIVE MINUTES OR SO?

5            MR. MARCHESE:  I DON'T WANT TO PUT THIS ON THE

6    RECORD.

7            (OFF-THE-RECORD DISCUSSION HELD.)

8            THE COURT:  WHY DON'T WE TAKE OUR AFTERNOON RECESS.

9    WE'LL GO AHEAD AND BE IN RECESS UNTIL 3 O'CLOCK.  THAT GIVES

10   US 20 MINUTES.

11           MR. MARCHESE:  THAT SHOULD WORK.

12           THE COURT:  OKAY.  THANK YOU.

13           (RECESS, 2:44 P.M. TO 3:00 P.M.)

14           THE COURT:  BE SEATED.

15           MR. ALDRICH:  YOUR HONOR, WE HAVE A PROCEDURAL ISSUE

16   IF WE COULD.

17           THE COURT:  SURE.  WHAT'S UP?

18           MR. ALDRICH:  I'D APPRECIATE IF YOU'D BE KIND WITH

19   ME, BUT I'M STRUGGLING WITH SOMETHING I'VE NEVER FACED

20   BEFORE.

21           THE DEFENDANT IN THIS CASE HAS MOVED TO TRANSFER

22   THIS CASE TO THE DISTRICT OF SAN DIEGO, AND AS YOU KNOW, THE

23   COURT GRANTED THIS MOTION.  THIS COURT NO LONGER HAS SUBPOENA

24   POWER OVER MR. BLACKFORD, WHO HAS A FLIGHT SCHEDULED HOME

25   TOMORROW.  HE'S NOT SUBJECT TO SUBPOENA HERE.  THEY HAVEN'T
```

446

1    SERVED A SUBPOENA, AND THEY CAN'T SERVE A SUBPOENA HERE.

2              SO IF YOU'D EXPLAIN, FOR MY BENEFIT -- I THINK THEY

3    SAID THEY WANTED TO RESERVE THEIR RIGHT FOR HIM TO COME NEXT

4    WEEK, BUT UNDER WHAT AUTHORITY, I DON'T UNDERSTAND.

5              THE COURT:  OH, I CAN DO THAT.  I'M A FEDERAL JUDGE.

6    I CAN MAKE SURE HE REMAINS AVAILABLE.

7              DO YOU NEED HIM NEXT WEEK?

8              MR. MARCHESE:  WE DO, YOUR HONOR.

9              THE COURT:  CAN YOU TAKE HIM OUT OF ORDER?

10             MR. MARCHESE:  WE CAN.

11             THE COURT:  SO MAYBE WE CAN ACCOMMODATE HIS SCHEDULE

12   BY TAKING HIM OUT OF ORDER OR WORKING SOMETHING OUT.  I'LL

13   LEAVE IT UP TO YOU TO WORK SOMETHING OUT SO YOU CAN GET

14   MR. BLACKFORD ON HIS WAY.

15             SO YOU WANT MY AUTHORITY.  HE APPEARED IN THIS

16   COURTROOM.  NOW HE'S MINE.  HE'S NOT EXCUSED.  ONCE HE'S

17   APPEARED IN THIS COURTROOM, HE'S MINE.  HE'S STILL UNDER THE

18   POWER OF THIS COURT.  THAT'S MY AUTHORITY.

19             MR. ALDRICH:  THANK YOU, YOUR HONOR.  THAT'S ALL I

20   NEEDED.

21             THE COURT:  ALL RIGHT.

22             MR. ALDRICH:  AND WE'LL WORK IT OUT WITH THE OTHER

23   SIDE THIS EVENING.

24             THE COURT:  OKAY.  GOOD.

25             MR. MARCHESE:  YOUR HONOR, MAY I JUST -- SORRY.  ONE

COMPUTER-AIDED TRANSCRIPTION

447

1    QUICK HOUSEKEEPING THING, TOO.

2           THERE WAS ONE QUESTION THAT WAS ASKED OF

3    MR. BLACKFORD THAT HE ANSWERED, AND THEN I OBJECTED AT THE

4    SAME TIME AND YOU SUSTAINED IT.  CAN WE HAVE THAT STRICKEN,

5    THAT ANSWER?

6           THE COURT:  YOU WANT ME TO GO BACK AND STRIKE IT

7    NOW?  NO, I'M NOT GOING TO DO THAT.

8           MR. MARCHESE:  OKAY.  THANKS.

9           (JURY PRESENT, 3:03 P.M.)

10          THE COURT:  PLEASE BE SEATED.

11          CALL YOUR NEXT WITNESS.

12          MR. AXELROD:  AS STATED PREVIOUSLY, WE CALL MORGAN

13   CHIN.

14          THE COURT:  STEP FORWARD AND BE SWORN.

15          THE CLERK:  RIGHT OVER HERE, MA'AM.

16          PLEASE RAISE YOUR RIGHT HAND.

17      MORGAN CHIN, A WITNESS, HAVING BEEN DULY SWORN,

18       TESTIFIED AS FOLLOWS:

19          THE WITNESS:  I DO.

20          THE CLERK:  PLEASE BE SEATED.

21          PLEASE STATE YOUR FIRST AND LAST NAME FOR THE

22   RECORD, SPELLING YOUR LAST NAME.

23          THE WITNESS:  MORGAN CHIN, C-H-I-N.

24          THE CLERK:  THANK YOU.

25

448

1                        DIRECT EXAMINATION

2       BY MR. AXELROD:

3       Q.    MRS. CHIN, MY NAME IS DAVID AXELROD.  I REPRESENT

4       COLUMBIA SPORTSWEAR IN THIS CASE.

5                   WE'VE NEVER MET BEFORE, BUT I FEEL LIKE I KNOW YOU

6       FROM LOOKING AT A LOT OF YOUR E-MAIL CORRESPONDENCE.  WE'RE

7       GOING TO BE GOING THROUGH SOME OF THAT E-MAIL CORRESPONDENCE

8       TO FILL IN SOME OF THE CALENDAR THAT SEIRUS' COUNSEL

9       PRESENTED TO THE JURY.

10                  BEFORE WE DO THAT, I'D LIKE TO GET A LITTLE BIT OF

11      BACKGROUND.  IN 2012, WERE YOU EMPLOYED BY SEIRUS?

12      A.    YES.

13      Q.    AND YOUR NAME THEN WAS MORGAN HAAS, WAS IT NOT?

14      A.    CORRECT.

15      Q.    AND THAT'S H-A-A-S?

16      A.    YES.

17      Q.    SO WHEN I SEE E-MAIL CORRESPONDENCE IN THE NAME OF

18      MORGAN HAAS, THAT'S YOU?

19      A.    YES.

20      Q.    AND THEN SOMETIME AROUND 2012, YOU WERE MARRIED;

21      CORRECT?

22      A.    YES.

23      Q.    AND YOU BECAME, AS YOU ARE NOW, MORGAN CHIN; CORRECT?

24      A.    YES.

25      Q.    AND JUST RECENTLY, I UNDERSTAND YOU'VE JUST HAD A BABY

449

1    GIRL?

2    A.    I HAVE A GIRL, THREE YEARS AGO, AND THEN A BABY BOY FOUR

3    MONTHS AGO.

4    Q.    A BABY BOY.  CONGRATULATIONS.

5    A.    THANK YOU.

6    Q.    YOU'VE GOT A BALANCED HOUSEHOLD.

7              I'M GOING TO SHOW YOU A NUMBER OF EXHIBITS.  YOU

8    HAVE A BIG BOOK IN FRONT OF YOU THAT CONTAINS ALL OF THESE.

9    A.    OKAY.

10   Q.    OR IF WE CAN ADEQUATELY GET THEM IN FRONT OF THE SCREEN

11   FOR YOU, YOU WON'T HAVE TO WRESTLE WITH THE BOOK.

12             MR. AXELROD:  TO BEGIN, I'D LIKE TO OFFER CERTAIN

13   EXHIBITS:  543, 526, 544, 528 AND 529 THROUGH 31.

14             MR. MARCHESE:  NO OBJECTION, YOUR HONOR.

15             THE COURT:  THEY ARE RECEIVED.

16        (TRIAL EXHIBITS 526, 528, 529, 530, 531, 532 AND 544

17        RECEIVED IN EVIDENCE.)

18             MR. AXELROD:  COULD WE PULL UP --

19   Q.    BEFORE WE START.  HOW LONG HAVE YOU BEEN WITH SEIRUS?

20   A.    SINCE 2009.

21   Q.    SO ALMOST TEN YEARS?

22   A.    EIGHT YEARS, YEAH.

23   Q.    AND WHAT IS YOUR CURRENT POSITION?

24   A.    RAW MATERIALS BUYER.

25   Q.    IF YOU CAN PULL THAT IN A LITTLE CLOSER.  YOU'RE A

450

1    LITTLE SOFT.

2    A.   RAW MATERIALS BUYER.

3    Q.   AND WERE YOU ALSO THE RAW MATERIALS BUYER IN 2012?

4    A.   YES.

5    Q.   WHAT DOES THE RAW MATERIALS BUYER FOR SEIRUS DO?

6    A.   I'M IN CHARGE OF LOOKING AT OUR NEEDS AS FAR AS WHAT

7    MATERIAL IS NEEDED TO PURCHASE TO MAKE OUR FINISHED

8    PRODUCT.

9    Q.   AND WHERE DO MOST OF THOSE MATERIALS COME FROM?

10   A.   THE MATERIALS COME FROM A VARIETY OF DIFFERENT

11   SUPPLIERS.  ARE YOU ASKING WHICH LOCATION OR --

12   Q.   GEOGRAPHICALLY.

13   A.   MOST OF THE MATERIALS DO COME FROM OVERSEAS IN ASIAN

14   COUNTRIES.

15   Q.   AND ARE YOU THE PERSON RESPONSIBLE FOR SOURCING RAW

16   MATERIALS?

17   A.   YES.

18   Q.   ARE YOU ALSO THE PERSON RESPONSIBLE FOR SOURCING

19   FINISHED PRODUCT?

20   A.   NO, I AM NOT.

21   Q.   WHO HAS RESPONSIBILITY FOR SOURCING FINISHED PRODUCT?

22   A.   THAT WOULD BE OUR FINISHED GOODS BUYER AND THE VP OF

23   OPERATIONS.

24   Q.   MR. MURPHY?

25   A.   CORRECT.

COMPUTER-AIDED TRANSCRIPTION

1    Q.    AND THE FINISHED GOODS BUYER IS?

2    A.    OUR FINISHED GOODS BUYER IS RIO FERRERAS.

3    Q.    AND WHO WAS IT IN 2012?

4    A.    I DON'T RECALL IN 2012.  SORRY.

5          MR. AXELROD:  COULD YOU PULL UP EXHIBIT 543.  WE

6    HAVE A MONITOR ISSUE AGAIN, I GUESS.

7          THE COURT:  IT'S UP HERE.  STILL DON'T HAVE IT?

8          THE CLERK:  THAT'S THE EXHIBIT THAT YOU SEE RIGHT

9    THERE.

10   Q.    BY MR. AXELROD:  MS. CHIN, IS YOUR MONITOR WORKING?

11   A.    IT IS.  THANK YOU.

12         MR. AXELROD:  ARE WE OFF THE CLOCK?

13         THE COURT:  I'M SORRY.  THANK YOU.  I'LL ADD SOME

14   TIME TO YOU.

15         MR. AXELROD:  LIKE A SOCCER GAME.

16         DID THAT CHANGE ANYTHING?

17         JUROR NO. 7:  THEY HAVE A FUZZY ONE.

18         THE COURT:  SO THEY ARE NOT GOING TO HAVE THIS

19   EXHIBIT.  WHAT WE CAN DO IS KIND OF PRETEND LIKE WE ARE BACK

20   IN THE OLDEN DAYS, WHEN WE USED PAPER.  AND SO AFTER YOU HAVE

21   FINISHED EXAMINING THIS WITNESS ABOUT THIS EXHIBIT, YOU CAN

22   PUBLISH IT TO THE JURY.  AND WE WILL PASS IT AROUND TO THE

23   JURY.  EITHER THAT, OR WE CAN WAIT.  HOWEVER YOU WANT TO DO

24   IT.

25         IN THE MEANTIME, WE'RE GOING TO REBOOT THE SYSTEM

452

1    AND SEE IF THAT HELPS.

2            MR. AXELROD:  IS THAT MONITOR PORTABLE IN ANY WAY?

3            THE COURT:  I DON'T KNOW.

4            THE CLERK:  IT DOES NOT MOVE.

5            THE COURT:  DO YOU HAVE A SCREEN AT ALL?

6            JUROR NO. 8:  NO.  THE BLUE LIGHT IS NOW YELLOW.

7            THE COURT:  ALL RIGHT.

8            JUROR NO. 4:  YOUR HONOR, WOULD YOU LIKE US TO MOVE

9    OVER THERE?

10            THE COURT:  NO.  JUST HANG ON FOR A SECOND.  WE'RE

11   WAITING FOR EVERYTHING TO KIND OF REBOOT.

12            JUROR NO. 4:  WE'VE GOT IT.

13            THE COURT:  YOU GOT IT?  OKAY.

14   Q.   BY MR. AXELROD:  MRS. CHIN, DO YOU HAVE IN FRONT OF YOU

15   EXHIBIT 543?

16   A.   YES.

17   Q.   I'M GOING TO ASK YOU TO TURN, OR WE'LL TURN YOU TO

18   PAGE 2650 AT THE BOTTOM.

19            DO YOU RECOGNIZE THAT -- THIS IS AN E-MAIL THREAD,

20   IS IT NOT, THE EXHIBIT AS A WHOLE?

21   A.   YES.

22   Q.   AND IS IT A SERIES OF E-MAILS PRINCIPALLY BACK AND FORTH

23   BETWEEN YOU, ON BEHALF OF SEIRUS, AND A CORRESPONDENT NAMED

24   CHEN GING?

25   A.   YES.

453

1    Q.    AND IS -- HE OR SHE?

2    A.    I ACTUALLY HAVE NEVER MET IN PERSON, SO I DON'T KNOW FOR

3    SURE.

4    Q.    CHEN GING WORKS FOR A COMPANY CALLED JIANGSUSHENLI;

5    CORRECT?

6    A.    CORRECT.

7    Q.    AND COULD WE REFER TO THEM AS SHENLI, AND YOU'LL KNOW

8    WHO I'M TALKING ABOUT?

9    A.    YES.

10   Q.    AND THEY ARE A CHINESE MANUFACTURER OF FABRICS, ARE THEY

11   NOT?

12   A.    YES.

13   Q.    WERE THEY A SUPPLIER TO SEIRUS IN JANUARY OF 2012?

14   A.    JANUARY 2012?  I'M NOT SURE THAT WE HAD YET ORDERED

15   MATERIAL WITH THEM.  BUT WE HAD BEEN WORKING WITH THEM ON A

16   MATERIAL AT THAT TIME, YES.

17   Q.    HAD YOU BEEN WORKING WITH THEM ON A MATERIAL OTHER THAN

18   THE DISCUSSIONS CONCERNING OMNI-HEAT?

19   A.    CORRECT.

20   Q.    BUT YOU HAD NOT HAD ANY PURCHASES FROM THEM?

21   A.    I'M NOT POSITIVE IF WE HAD ORDERED THE FUZZ FABRIC YET

22   FROM THEM.

23   Q.    AND LET ME TURN YOU TO THE NEXT PAGE.  AND WE'LL CALL

24   OUT A SECTION OF YOUR E-MAIL THAT STARTS "VERY IMPORTANT."

25   A.    I'M SORRY.  WHICH PAGE ARE YOU ON?

COMPUTER-AIDED TRANSCRIPTION

1    Q.   THE SECOND PAGE OF THE FIRST E-MAIL.  LAST PAGE OF THE

2    EXHIBIT.

3            MR. MARCHESE:  EXCUSE ME.  DID YOU SAY 543?  IS THAT

4    RIGHT?

5            MR. AXELROD:  YES.  LAST PAGE.

6    Q.   WOULD YOU READ --

7    A.   I SEE IT ON THE SCREEN.  SORRY.  YES.

8    Q.   YOU'RE ABLE TO SEE IT AS WELL.

9            AND YOU WRITE TO SHENLI, DO YOU NOT, "WE ARE

10   INTERESTED IN THE COLUMBIA OMNI-HEAT MATERIAL AND UNDERSTAND

11   THAT WE ARE UNABLE TO USE THE SAME PRINT THAT COLUMBIA USES.

12   CAN YOU PLEASE ADVISE IF YOU HAVE OTHER EXISTING PRINTS THAT

13   ARE AVAILABLE THAT WE MAY USE WITHOUT PAYING A TOOLING CHARGE

14   FOR A CUSTOM DESIGN?  IF SO, PLEASE URGENTLY SEND ME A COUPLE

15   OF YARDS FOR SAMPLING."

16           DO YOU SEE THAT?

17   A.   YES.

18   Q.   THIS IS A JANUARY 31, 2012 E-MAIL, IS IT NOT?

19   A.   YES.

20   Q.   AND DOES IT FOLLOW A MEETING THAT YOU HAD WITH SHENLI AT

21   THE JANUARY 20 TO JANUARY 23 OUTDOOR RETAILER SHOW IN SALT

22   LAKE?

23   A.   YES, IT DOES.

24   Q.   WAS THAT THE FIRST TIME YOU HAD MET SHENLI?

25   A.   IT'S THE FIRST MEETING THAT I HAD ATTENDED, THE FIRST

455

1   MEETING IN PERSON, YES.

2   Q.   AND AT THE TIME -- BEFORE YOU ATTENDED THAT MEETING, DID

3   YOU KNOW THAT SHENLI WAS A SUPPLIER OF OMNI-HEAT MATERIAL TO

4   COLUMBIA?

5   A.   I DID NOT.

6   Q.   DID YOU LEARN THAT DURING THE CONVERSATION?

7   A.   AT THE MEETING AT OUTDOOR RETAILER, YES.

8   Q.   WAS ANYONE WITH YOU?

9   A.   AT THE MEETING?

10  Q.   YES.

11  A.   BOB MURPHY.

12  Q.   ANYONE ELSE FROM SEIRUS?

13  A.   NO.

14  Q.   SO YOU AND MR. MURPHY MET WITH SEIRUS (SIC).  HOW DID IT

15  COME UP THAT SHENLI TOLD YOU THAT THEY WERE MANUFACTURING

16  OMNI-HEAT MATERIAL FOR COLUMBIA?

17  A.   WHEN YOU WERE AT THESE MEETINGS AT THE SHOW, THEY WILL

18  SHOW YOU BINDERS FULL OF DIFFERENT MATERIALS TO SHOW WHAT

19  THEIR COMPANY IS ABLE TO OFFER.

20  Q.   AND DID THEY SHOW YOU OMNI-HEAT MATERIAL?

21  A.   THEY DID SHOW US A FOIL-PRINTED MATERIAL.

22  Q.   PARDON?

23  A.   THEY DID SHOW A MATERIAL WITH FOIL PRINTING ON IT,

24  YES.

25  Q.   DID YOU KNOW IT WAS OMNI-HEAT MATERIAL?

456

1    A.    I DON'T RECALL AT THAT POINT IF WE -- IF IT HAD SAID

2    LIKE OMNI-HEAT ON IT.

3    Q.    WHETHER IT SAID OMNI-HEAT ON IT OR NOT, WOULD YOU HAVE

4    RECOGNIZED IN JANUARY 2012 WHAT OMNI-HEAT REFLECTIVE MATERIAL

5    WAS?

6    A.    THE ONLY THING AT THIS POINT I KNEW FROM THIS MEETING IS

7    THAT THEY CALLED IT OMNI-HEAT.  I DIDN'T KNOW THAT IT WAS

8    COLUMBIA'S OMNI-HEAT AS YOU REFERENCED.

9    Q.    NOW, DID YOU SEEK SAMPLES FROM SHENLI AT THIS TIME?

10   A.    WE DID.

11   Q.    AND IN YOUR -- IN YOUR MESSAGE, YOU ASKED FOR A COUPLE

12   OF YARDS.  WHAT IS A COUPLE OF YARDS IN A MATERIAL REQUEST?

13   IS THAT A SIGNIFICANT AMOUNT?  WHAT CAN YOU DO WITH IT?

14   A.    WITH A COUPLE OF YARDS OF MATERIAL, WE COULD PROBABLY

15   MAKE LIKE THREE OR FOUR SAMPLES MAYBE.  MOSTLY BECAUSE WHEN

16   YOU'RE SAMPLING THE FIRST TIME, YOU'RE TRYING TO GET IT

17   RIGHT, SO IT REQUIRES A LITTLE BIT MORE MATERIAL THAN A

18   PRODUCTION LOT, SAY.

19   Q.    NOW, YOU ASKED THAT THEY URGENTLY SEND YOU SOME SAMPLES.

20   WHAT WAS THE URGENCY AT THAT TIME, IN JANUARY OF 2012?

21   A.    THE URGENCY HERE WOULD JUST BE THAT WE WANT TO BE ABLE

22   TO GET MATERIAL IN TIME TO BE ABLE TO SEND TO OUR FACTORIES

23   TO GET PRODUCT MADE FOR OUR APRIL STEERING MEETING.

24   Q.    NOW, THE APRIL STEERING MEETING HAS WHAT FUNCTION?

25   A.    THAT IS SO THAT -- THE MEETING IS -- THE PURPOSE OF THE

1    MEETING IS SO THAT WE CAN SHOW NEW AND DIFFERENT STYLES THAT

2    WE'RE INTERESTED IN POTENTIALLY ADDING TO OUR LINE THE

3    FOLLOWING YEAR.

4    Q.    IS THE APRIL STEERING COMMITTING AN IMPORTANT MEETING

5    WITHIN SEIRUS?

6    A.    YES.

7    Q.    DOES IT PRETTY MUCH SET THE TRACK OF WHERE SEIRUS IS

8    GOING FOR THAT YEAR?

9    A.    IT DOES, YES.

10    Q.    AND IS THERE A FOLLOW-ALONG MEETING A FEW MONTHS LATER

11    WHERE FINAL DECISIONS ARE MADE?

12    A.    YES.

13    Q.    AND IS THAT ALSO CALLED A STEERING COMMITTEE MEETING?

14    A.    YES, IT IS.

15    Q.    AND DO YOU RECALL THAT IN 2012, THE STEERING COMMITTEE

16    MEETING WAS IN EARLY APRIL, THE FIRST ONE?

17    A.    THE FIRST MEETING IS GENERALLY IN APRIL, YES.

18    Q.    AND DO YOU RECALL THAT THE SECOND MEETING WAS AT THE END

19    OF JULY?

20    A.    IT IS NORMALLY IN JULY AT SOME POINT.  I DON'T KNOW THE

21    EXACT BEGINNING OR END, BUT, YES, IN JULY.

22    Q.    AND IS IT THE SECOND MEETING WHERE THE IMPORTANT

23    SELECTION DECISIONS OR PRODUCT DECISIONS ARE MADE?

24    A.    THE JULY STEERING MEETING, WE'RE KIND OF ZEROING IN ON

25    WHAT IS MORE POTENTIALLY GOING TO MAKE IT INTO OUR LINE FOR

1    THE FOLLOWING YEAR.

2    Q.    AND WHEN YOU SAY THE FOLLOWING YEAR, FOR JULY 2012, YOU

3    WOULD HAVE BEEN TALKING THE FALL 2013 SEASON; IS THAT

4    CORRECT?

5    A.    CORRECT.

6    Q.    NOW, WHEN YOU MET WITH SHENLI AT OUTDOOR RETAILER, DID

7    THEY DESCRIBE FOR YOU -- THEY TOLD YOU YOU COULDN'T USE THE

8    OMNI-HEAT PATTERN, DIDN'T THEY?

9    A.    YES.

10   Q.    AND DID THEY TELL YOU THAT A DESIGN PATENT HAD BEEN

11   ISSUED ON THAT PATTERN?

12   A.    NO.

13   Q.    DID THEY TELL YOU ANYTHING ABOUT WHY YOU COULDN'T USE

14   THE COLUMBIA?

15   A.    NO.

16   Q.    WOULD YOU TURN TO EXHIBIT 526.

17          IS THE LAST PAGE OF EXHIBIT 526 THE EXPLANATION THAT

18   SHENLI GAVE YOU FOR WHY THEY WOULDN'T SEND YOU ANY SAMPLES?

19   A.    THE PAGE THAT'S ENDING ON 5251; RIGHT?

20   Q.    CORRECT.

21   A.    OH, THE ONE THAT'S UP HERE.

22          THEY ARE SAYING WE ONLY HAVE YARDS OF COLUMBIA

23   OMNI-HEAT, SO I'M SO SORRY, I CAN'T PROVIDE SUCH FABRICS FOR

24   YOU.

25   Q.    WHY DOES HAVING YARDS PREVENT THEM FROM PROVIDING YOU

459

1    SAMPLES?

2    A.    I ACTUALLY BELIEVE THAT THIS GOES BACK TO MY QUESTION

3    WHERE I ASKED THEM IF THEY HAD ANY OTHER EXISTING PRINTS THAT

4    ARE AVAILABLE THAT WE MAY USE.  AND SO SINCE -- SO I THINK

5    WHAT THEY ARE SAYING -- THE WAY I READ IT IS THEY ARE SAYING

6    HERE, LIKE, NO, WE ONLY HAVE YARDS OF THE COLUMBIA OMNI-HEAT;

7    SO I CAN'T SEND YOU SUCH FABRICS.  MEANING THEY CAN'T FOLLOW

8    MY REQUEST TO SEND SOMETHING DIFFERENT, IF POSSIBLE.  BECAUSE

9    I SAY PLEASE URGENTLY SEND ME A COUPLE OF YARDS, IF

10   POSSIBLE.

11   Q.    SO THEY ONLY HAD OMNI-HEAT MATERIAL --

12   A.    RIGHT.

13   Q.    -- WAS YOUR INTERPRETATION THAT HAD BEEN MADE FOR

14   COLUMBIA?

15   A.    YES.

16   Q.    OKAY.  WOULD YOU TURN TO EXHIBIT 544.  WOULD YOU GO TO

17   THE LAST PAGE.

18   A.    OKAY.

19   Q.    DO YOU SEE THAT?

20   A.    YES.

21   Q.    THE E-MAIL ON THE LAST PAGE IS SENT ON OR ABOUT

22   FEBRUARY 12 OF 2012, ROUGHLY TWO WEEKS LATER, FROM MR. MURPHY

23   TO YOU; CORRECT?

24   A.    YES.

25   Q.    AND WHAT IS MR. MURPHY ASKING?

460

1    A.    MORGAN, WHAT IS THE STATUS OF GETTING THE FOIL PRINT

2    LINING FROM THE GUY YOU FOUND.

3    Q.    AND DID YOU RESPOND TO HIM, AS SHOWN ON PAGE 655?

4    A.    YES, I DID.

5          DO YOU WANT ME TO READ IT?

6    Q.    NO.  WELL, DID YOU -- SURE.  WE'LL PULL IT UP AND

7    EVERYBODY CAN SEE IT.

8    A.    SORRY.

9    Q.    AND I'LL JUST ASK YOU:  DID YOU TELL MR. MURPHY THAT YOU

10   HAD RECEIVED ONLY SMALL SWATCHES OF OMNI-HEAT MATERIAL?

11   A.    YES.

12   Q.    BUT THEY WEREN'T ENOUGH TO CREATE ANY SAMPLES?

13   A.    CORRECT.

14   Q.    AND ARE THE SAMPLES THAT YOU'RE WANTING TO CREATE

15   COMPLETE GLOVES, OR SOME OTHER TYPE OF SAMPLE?

16   A.    I'M SORRY.  YES, THEY WOULD BE COMPLETE GLOVES.

17   Q.    OKAY.  AND WHAT DID MR. -- HOW DID MR. MURPHY RESPOND?

18   A.    HIS FOLLOW-UP WAS TWO WEEKS LATER.

19   Q.    OKAY.  LET ME ASK YOU BEFORE WE -- I GOT A LITTLE OUT OF

20   MY OWN ORDER.

21   A.    OKAY.

22   Q.    ON THE FEBRUARY 12 E-MAIL, HE ASKED YOU TO SET UP A

23   MEETING WITH SHENLI WHEN YOU TOLD HIM YOU HADN'T RECEIVED

24   SAMPLES; CORRECT?

25   A.    CORRECT.

COMPUTER-AIDED TRANSCRIPTION

461

1    Q.    AND ON THE FEBRUARY 14 E-MAIL, YOU TOLD HIM YOU WOULD

2    TRY TO DO THAT; CORRECT?

3    A.    YES.

4    Q.    AND DID YOU?

5    A.    YES.

6    Q.    AND DID YOU SET UP A MEETING ON FEBRUARY 28, 2012?

7    A.    FROM THIS E-MAIL IT SAYS, I WILL E-MAIL THEM TO SET UP A

8    MEETING ON THE 28TH.  SO I WOULD ASSUME SO, YES.

9    Q.    WOULD YOU LOOK ON THE FIRST PAGE OF EXHIBIT 544 WHERE

10   MR. MURPHY IS E-MAILING BACK TO YOU ON FEBRUARY 29.

11           AND DOES THAT REFRESH YOUR RECOLLECTION WHETHER HE

12   HAD THE MEETING ON OR ABOUT FEBRUARY 28?

13   A.    YES.  IT LOOKS LIKE HE DID HAVE THE MEETING.

14   Q.    AND DOES HE REPORT ON THE RESULTS OF THE MEETING?

15   A.    YES.  HE SAYS THAT JIN, WHO I'M ASSUMING IS -- WAS HIS

16   CONTACT THAT HE MET THERE, AGREED TO SEND FIVE YARDS.

17   Q.    WHEN YOU SAY "THERE," WE'RE REFERRING TO SHENLI?

18   A.    YES.  SORRY.

19   Q.    OKAY.  NOW, IS FIVE YARDS A SUBSTANTIAL AMOUNT OF

20   MATERIAL FOR SAMPLING?

21   A.    IT'S -- AGAIN, FOR SAMPLING, IT'S NOT GOING TO GO VERY

22   FAR, JUST BECAUSE WE NEED MORE TO MAKE A PRODUCT.  BUT IT

23   WOULD PROBABLY MAKE LIKE POTENTIALLY LIKE 10, 12 GLOVES

24   MAYBE.

25   Q.    OKAY.  SO YOU COULD MAKE A RELATIVELY BROAD

COMPUTER-AIDED TRANSCRIPTION

1    ASSORTMENT?

2    A.    WE COULD.  BUT IF I MAY, IN THESE TYPES OF MEETINGS, THE

3    REASON WHY WE WANT THAT EXTRA YARDAGE IS BECAUSE IT'S REALLY

4    RARE THAT WE GET THE PRODUCT MADE THE CORRECT WAY THE FIRST

5    TIME.  SO WE LIKE TO HAVE THAT EXTRA MATERIAL TO BE ABLE --

6    ONCE WE GET THE SAMPLE FROM OUR FACTORY TO SAY, YOU PUT THE

7    MATERIAL IN THE WRONG LOCATION OR WHATEVER, AND TRY TO GET

8    THE CORRECT SAMPLE IN TIME FOR OUR MEETING.

9    Q.    THERE IS A LEARNING CURVE THAT THE FACTORY GOES

10   THROUGH?

11   A.    YEAH.

12   Q.    SURE.

13   A.    YES.

14   Q.    SO WHAT DO YOU FIGURE YOU WOULD GET OUT OF FIVE YARDS?

15   FIVE GLOVES?  TEN GLOVES?  SOMEWHERE BETWEEN FIVE AND TEN

16   GLOVES TO USE AS EXAMPLES IN THE SALES MEETING?

17   A.    YES.  POTENTIALLY.

18   Q.    OKAY.  WOULD THAT BE YOUR BEST ESTIMATE?

19   A.    IT WOULD.

20   Q.    DID THE FIVE YARDS COME TO YOU?

21   A.    THIS FAR BACK, I COULDN'T SAY FOR CERTAIN.  BUT IN

22   GENERAL, THE MATERIAL DOES COME TO ME.

23   Q.    DO YOU HAVE ANY RECOLLECTION OF RECEIVING THE FIVE YARDS

24   OF OMNI-HEAT MATERIAL FROM SHENLI?

25   A.    I DON'T RECALL RECEIVING A FULL FIVE YARDS, BUT I DO

463

1    REMEMBER RECEIVING SOME MATERIAL.

2    Q.    AND WHEN YOU RECEIVED IT, DID IT HAVE A PATENT PENDING

3    NOTICE ON THE MATERIAL?

4    A.    IT DID.

5    Q.    AND DID IT HAVE OMNI-HEAT, THE OMNI-HEAT LOGO ON THE

6    MATERIAL?

7    A.    YES, IT DID.

8    Q.    SO YOU ACTUALLY SAW THE MATERIAL AND INSPECTED IT WHEN

9    IT CAME IN?

10   A.    YES.

11   Q.    DID YOU HAVE ANY ROLE IN THEN SENDING IT ON TO WHOEVER

12   WOULD TAKE THE NEXT STEP IN CREATING SAMPLES FOR THE

13   MEETING?

14   A.    YES.  I WOULD PASS THAT ON TO OUR SAMPLE COORDINATOR AT

15   THE TIME.

16   Q.    AND WOULD YOU LOOK AT EXHIBIT 528.  THIS IS A SERIES OF

17   E-MAIL COMMUNICATIONS BETWEEN YOU AND AMY AT SHENLI; IS THAT

18   CORRECT?

19   A.    CORRECT.

20   Q.    AND WHO IS SHENLI?

21   A.    THIS IS ONE OF OUR FACTORIES.

22   Q.    AND DO THEY MAKE GLOVES?

23   A.    YES.

24   Q.    DO THEY MAKE OTHER SEIRUS PRODUCTS?

25   A.    FOR A WHILE, THEY ALSO MADE HATS FOR US.

464

1          MR. AXELROD:  AND COULD YOU PULL UP EXHIBIT 529, 530

2     AND 531.

3     Q.   LET'S LOOK FIRST AT 531.  IS THIS A PICTURE THAT WAS

4     TAKEN BY SOMEONE AT SEIRUS OF THE MATERIAL RECEIVED FROM

5     SHENLI, OR DID IT COME WITH THE TRANSMITTAL OF THE OMNI-HEAT

6     MATERIAL?

7     A.   FROM LOOKING AT THIS PICTURE, I COULDN'T SAY WHERE IT

8     CAME FROM.

9     Q.   IS THAT WHAT THE MATERIAL LOOKED LIKE WHEN YOU INSPECTED

10    IT?

11    A.   YES.

12    Q.   AND IS THAT THE PATENT PENDING NOTICE THAT WAS ON IT?

13    A.   YES.

14    Q.   AND REFERRING YOU TO EXHIBIT 530, IS THAT THE OMNI-HEAT

15    LOGO THAT WAS ON THE COLUMBIA OMNI-HEAT MATERIAL?

16    A.   YES.

17    Q.   REFERRING YOU TO EXHIBIT 529.  COULD YOU TURN TO

18    PAGE 539.

19    A.   EXHIBIT 529 AND PAGE 539, DID YOU SAY?

20    Q.   NO.  OH, I SEE WHAT I DID.  I SCRAMBLED MY EXHIBITS, I'M

21    BEING TOLD.  THAT'S WHY I WAS PAUSING BEFORE.  I DUMPED THE

22    SHEET OFF.  LET ME BACK UP.  WE'LL GO BACK TO 528.

23          THIS IS THE ONE WHERE I ASKED YOU TO IDENTIFY

24    SHENLI.  WOULD YOU TURN TO THE LAST PAGE OF EXHIBIT 528,

25    WHICH IS -- THAT'S WHERE WE FIND PAGE 529.

COMPUTER-AIDED TRANSCRIPTION

465

1    A.    OKAY.

2    Q.    AND IS THIS A CONTINUATION, AS YOU CAN SEE FROM THE

3    PRIOR PAGE, OF AN E-MAIL FROM YOU TO AMY AT SHENLI?    STRIKE

4    THAT.    A CONTINUED -- EXCUSE ME.    REWIND.    I'LL START OVER.

5         IS THIS AN E-MAIL FROM AMY TO YOU AT SEIRUS, DATED

6    ON OR ABOUT MARCH 8, 2012, REFERRING TO INSTRUCTIONS THAT AMY

7    HAD RECEIVED FROM MR. MURPHY ABOUT WHAT TO DO WITH THE

8    COLUMBIA MATERIAL?

9    A.    THIS IS AN E-MAIL FROM AMY TO ME, AND IT IS ASKING FOR

10   INSTRUCTION THAT WAS GIVEN FROM BOB.

11   Q.    TO AMY, ABOUT WHAT SAMPLES TO MAKE?

12   A.    CORRECT.

13   Q.    AND ON THE E-MAIL -- PULL UP THE LAST PAGE FOR THE

14   JURY -- THERE IS A REFERENCE TO FOUR PRODUCT SAMPLES BY

15   BRAND, IS THERE NOT?

16   A.    YES.

17   Q.    AND THERE IS A COLUMBIA FLEECE GLOVE LISTED.    DO YOU SEE

18   THAT?

19   A.    I DO, YES.

20   Q.    AND A MOUNTAIN HARD WARE?

21   A.    YES.

22   Q.    NOW, ARE THESE SAMPLES THAT AMY AT SHENLI IS BEING ASKED

23   TO MAKE WITH THE MATERIAL THAT BOB IS PROVIDING OR THAT

24   SEIRUS IS PROVIDING?

25   A.    I'M SORRY.    JUST ONE MOMENT.

466

1          YES.  THIS IS SAYING TO SOURCE THE MATERIAL AND THEN

2     SEND TO US FOR SAMPLING.

3     Q.    NOW WE CAN GO TO 529.  AND I'VE GOT THE RIGHT EXHIBIT.

4          IS EXHIBIT 529 A SERIES OF COMMUNICATIONS INVOLVING

5     YOU, JONELLE OROZCO AT SEIRUS AND ALBERT CONCERNING THE

6     MANUFACTURE OF GLOVE SAMPLES?

7     A.    YES.

8     Q.    AND IN THIS CONTEXT, I'D LIKE YOU TO UNFORTUNATELY TURN

9     BACK TO EXHIBIT 544.  EXHIBIT 544 WAS THE E-MAIL FROM

10    MR. MURPHY TO YOU AT THE END OF FEBRUARY LETTING YOU KNOW

11    THAT HE HAD BEEN ABLE TO GET FIVE YARDS FROM SHENLI;

12    CORRECT?

13    A.    CORRECT.

14    Q.    AND HE GAVE YOU SOME INSTRUCTIONS FOR WHAT HE WANTED

15    DONE WITH THAT PRODUCT, DID HE NOT?

16    A.    YES.

17    Q.    AND IS THE FIRST INSTRUCTION TO, QUOTE, USE ONLY IN

18    CUFF, CLOSED QUOTE?

19    A.    CORRECT.

20    Q.    WHAT DOES THAT MEAN?

21    A.    THAT MEANS JUST TO USE THAT MATERIAL ONLY IN THE CUFF

22    PORTION OF THE GLOVE, SO NOT THE REST OF THE HAND AND ALL OF

23    THAT (INDICATING).

24    Q.    WHY WOULD HE TELL YOU TO DO THAT?

25    A.    I COULDN'T SAY FOR SURE WHY THAT WAS HIS INSTRUCTION.

467

1    Q.   BY USING IT ONLY IN THE CUFF, WOULD HE BE ABLE TO MAKE

2    MORE SAMPLES?

3    A.   THAT IS ONE THEORY.  I DON'T KNOW IF THAT'S WHY IN THIS

4    SITUATION.

5    Q.   WOULD USING IT IN THE CUFF ENABLE ONE TO DISPLAY IT TO A

6    POTENTIAL BUYER SO THEY WOULD SEE WHAT THE PRODUCT WOULD LOOK

7    LIKE ON THE SHELF WITHOUT HAVING TO USE ALL THE MATERIAL

8    NECESSARY TO MAKE A COMPLETE GLOVE?

9    A.   YES.

10   Q.   NOW, IT ALSO SAYS VENTED IN BODY LINING.  WHAT DOES THAT

11   REFER TO?

12   A.   THE VENTED PORTION I ACTUALLY THINK IS A TYPO.  AND I

13   BELIEVE THAT'S FOR VENTEX, WHICH IS ONE OF OUR OTHER MATERIAL

14   SUPPLIERS IN THE BODY LINING, WHICH IS THE MAJORITY OF THE

15   GLOVE.

16   Q.   AND THAT WOULD HAVE REFERRED TO THE VENTEX MEGA-HEAT

17   MATERIAL; CORRECT?

18   A.   I WOULD ASSUME SO, YES.

19   Q.   AND THAT -- AT THIS TIME, THAT VENTEX MATERIAL HAD NO

20   REFLECTIVITY, DID IT?

21   A.   LOOKING AT THE DATES, I'M NOT POSITIVE.

22   Q.   WE'LL COME BACK TO SOME DOCUMENTS THAT RELATE TO THAT

23   VERY SHORTLY.

24   A.   OKAY.

25   Q.   THE LAST INSTRUCTION THAT MR. MURPHY GAVE YOU WAS MAKE

468

1    SURE TO NOT SHOW OMNI LOGO.

2         WHAT DID YOU UNDERSTAND FROM THAT INSTRUCTION FROM

3    MR. MURPHY?

4    A.   SIMPLY TO NOT INCLUDE THE OMNI LOGO ON THE FINISHED

5    PRODUCT SAMPLE.

6    Q.   WHEN YOU'RE CREATING SAMPLES FOR THE STEERING

7    COMMITTEE -- WHO COMES TO THE FIRST STEERING COMMITTEE,

8    THIS -- WE CALL IT THE STEERING COMMITTEE, BUT IT'S REALLY A

9    STEERING MEETING; IS THAT MORE ACCURATE?

10   A.   RIGHT.  THERE ARE A HANDFUL OF PEOPLE THAT ARE INTERNAL

11   IN OUR COMPANY, AS WELL AS SOME OF OUR BUYERS THAT HELP US TO

12   MAKE THE DECISIONS ON WHAT SHOULD MOVE FORWARD.

13   Q.   SO YOU INVITE IN OUTSIDE BUYERS WHO MAY BE INTERESTED IN

14   YOUR PRODUCTS AND WHOSE OPINION YOU RESPECT?

15   A.   YES.

16   Q.   AND DO YOU UNDERSTAND THAT MR. MURPHY WAS WANTING TO

17   MAKE UP A NUMBER OF MOCK-UP GLOVES THAT WOULDN'T BE AS THE

18   GLOVES WOULD REALLY BE MADE, BUT WOULD SHOW AN OMNI-HEAT

19   REFLECTIVE MATERIAL IN THE CUFF PORTION TO SHOW BUYERS WHAT A

20   FINISHED GLOVE WOULD LOOK LIKE WITH THIS MATERIAL?

21   A.   MY UNDERSTANDING IS THAT, YES, HE WOULD LIKE TO SHOW THE

22   FOIL PRINTING OPTION.

23   Q.   AND THIS WAS THE FIRST FOIL PRINTING MATERIAL YOU HAD

24   EVER SEEN, ISN'T IT?

25   A.   NOT THE FIRST FOIL PRINTING MATERIAL I'VE EVER SEEN.

469

1   Q.   IS IT THE FIRST FOIL PRINTING MATERIAL YOU HAD HAD IN

2   ANY VOLUME?

3            MR. MARCHESE:  OBJECTION.  VAGUE.

4            THE COURT:  OVERRULED.  YOU CAN ANSWER THAT.

5            THE WITNESS:  OKAY.  CAN YOU REPEAT THE QUESTION?

6   I'M SORRY.

7   Q.   BY MR. AXELROD:  IS THIS THE FIRST FOIL PRINTING

8   MATERIAL YOU HAD EVER SEEN OTHER THAN IN A SWATCH?

9   A.   NO, IT WAS NOT.

10  Q.   WHEN DID YOU SEE FOIL PRINTING MATERIAL NEAR ABOUT THIS

11  TIME?

12  A.   WE HAVE BINDERS IN OUR OFFICES THAT WE HAVE FROM YEARS

13  BACK, AND I KNOW THAT WE HAVE SOME FROM LIKE 2004 FROM A

14  COMPANY; AND I'VE SEEN THEM AT THE SHOWS AS WELL.

15  Q.   AND DO YOU KNOW IF ANY OF THOSE WERE EVER PRODUCED IN

16  THIS LITIGATION?

17  A.   I COULDN'T SAY FOR SURE.

18  Q.   WOULD YOU TURN TO EXHIBIT 529.

19            WHAT IS EXHIBIT 529?

20  A.   THIS IS THE E-MAIL THAT WE REFERENCED EARLIER BETWEEN

21  JONELLE AND ALBERT.

22  Q.   AND ALBERT WAS GOING TO MAKE THE GLOVES OR PUT THE

23  MATERIAL IN THE CUFFS; IS THAT CORRECT?

24  A.   YES.

25  Q.   OKAY.  AND WOULD YOU TURN TO THE LAST PAGE OF THE

470

1    EXHIBIT, WHICH IS PART OF AN E-MAIL FROM JONELLE TO ALBERT ON

2    PAGE 542.

3         AND ARE THESE JONELLE'S INSTRUCTIONS TO ALBERT?

4    A.    YES.

5    Q.    WOULD I UNDERSTAND CORRECTLY THAT ONLY ONE QUARTER OF

6    THE FIVE YARDS WAS SENT TO THIS GLOVE MANUFACTURER?

7    A.    FROM THIS E-MAIL, YES, IT LOOKS LIKE A QUARTER OF THE

8    YARD WAS SENT.

9    Q.    NOW, WOULD THAT BE TYPICALLY AN AMOUNT THAT YOU WOULD

10   SEND TO A MANUFACTURER TO MAKE UP A GLOVE?

11   A.    IT IS POSSIBLE, YES.

12   Q.    ALL RIGHT.  NOW, WHAT HAPPENED TO THE OTHER FOUR AND

13   THREE QUARTERS YARDS?  DID THOSE GO TO OTHER MANUFACTURERS?

14   A.    SO THIS FAR BACK, I COULDN'T SAY FOR SURE.  BUT I WANT

15   TO REITERATE THAT I WASN'T POSITIVE THAT WE ACTUALLY RECEIVED

16   A FULL FIVE YARDS.

17   Q.    OKAY.  DID YOU RECEIVE MORE THAN A QUARTER YARD?

18   A.    I COULDN'T SAY FOR CERTAIN.

19   Q.    DO YOU HAVE ANY IDEA HOW MUCH YOU RECEIVED BETWEEN A

20   QUARTER AND FIVE YARDS?

21   A.    I DON'T KNOW.

22   Q.    OKAY.  IF A QUARTER YARD WOULD MAKE A GLOVE, AT LEAST IN

23   THE MOCK-UP THAT MR. MURPHY INSTRUCTED, YOU COULD HAVE MADE

24   20, CORRECT, IF THERE HAD BEEN FIVE YARDS?

25   A.    YES.

471

1    Q.    OKAY.  THE INSTRUCTIONS FROM JONELLE TO ALBERT SAY,

2    QUOTE, PLEASE MAKE SURE THAT THE, QUOTE, OMNI-HEAT, CLOSED

3    QUOTE, OR, QUOTE, PATENT PENDING, CLOSED QUOTE, WORDING SHOWS

4    UP ON THE SAMPLE YOU MAKE.  SEE ATTACHED PHOTOS FOR

5    REFERENCE.

6          AND THAT'S THE TWO PHOTOS OF THE MATERIAL THAT WE

7    SHOWED EARLIER; CORRECT?

8    A.    YES.

9    Q.    DO YOU KNOW WHETHER THIS INSTRUCTION WAS FOLLOWED OR

10   MR. MURPHY'S INSTRUCTION TO NOT SHOW THE OMNI-HEAT OR PATENT

11   PENDING NOTICES WAS FOLLOWED?

12   A.    I -- SORRY.  I ACTUALLY DON'T, BECAUSE WHEN THE FINISHED

13   PRODUCTS COME IN, THEY DON'T COME BACK TO ME.

14   Q.    DID YOU EVER SEE ANY OF THE FINISHED PRODUCT?

15   A.    I DON'T REMEMBER SEEING THIS ONE COME BACK.

16   Q.    DO YOU PARTICIPATE IN THE STEERING COMMITTEE?

17   A.    I DO NOT.

18   Q.    DO YOU STILL HAVE ANY OF THE OMNI-HEAT MATERIAL FROM

19   SHENLI FROM JANUARY OR FEBRUARY OF 2012?

20   A.    I WOULD BE SURPRISED IF WE DO STILL.

21   Q.    THAT TAKES US THROUGH MARCH; CORRECT?

22   A.    YES.

23   Q.    WERE YOU INVOLVED IN RETRIEVING DOCUMENTS FOR PRODUCTION

24   IN THIS LITIGATION?

25   A.    YES.

472

1    Q.    AND WHAT WAS YOUR ROLE?

2    A.    MOSTLY ACTUALLY I JUST HAD TO GIVE ACCESS TO MY COMPUTER

3    FOR PEOPLE TO PULL MY E-MAILS.

4    Q.    OKAY.  DID YOU EVER SEE ANY COMMUNICATION IN JANUARY,

5    FEBRUARY OR MARCH LEADING UP TO THIS STEERING COMMITTEE

6    MEETING OF ANY INVOLVEMENT OF ANY REFLECTIVE MATERIAL, OTHER

7    THAN THE FIVE YARDS OR HOWEVER MANY YARDS IT WAS THAT CAME

8    FROM SHENLI?

9    A.    COULD YOU REPEAT THAT ONE MORE TIME?  I'M SORRY.

10   Q.    IT'S A LONG ONE.  LET ME GO THROUGH IT AFTER WE GET

11   THROUGH THIS NEXT ROUND.

12   A.    OKAY.

13          MR. AXELROD:  I'M GOING TO OFFER EXHIBITS 436, 475,

14   476, 427 AND 107.

15          MR. MARCHESE:  COULD YOU GIVE ME A MINUTE, YOUR

16   HONOR?

17          THE COURT:  OF COURSE.

18          MR. MARCHESE:  THANK YOU.

19          NO OBJECTION.

20          THE COURT:  RECEIVED.

21       (TRIAL EXHIBITS 107, 427, 436, 475 AND 476 RECEIVED IN

22       EVIDENCE.)

23   Q.    BY MR. AXELROD:  WOULD YOU TURN FIRST TO EXHIBIT 436.

24          IS EXHIBIT 436 A CATALOG THAT YOU RECEIVED, OR

25   SEIRUS RECEIVED FROM VENTEX AT THE 2012 OUTDOOR RETAILER

473

1    MEETING?

2    A.   IT DOESN'T HAVE ANY DATE ON IT, BUT IT WOULD BE A GOOD

3    GUESS, YES.

4    Q.   AND DO YOU RECOGNIZE THE COMPANY CATALOG OR MARKETING

5    MATERIALS AS COMING FROM VENTEX AT THE TIME?

6    A.   YES.

7    Q.   AND WOULD YOU LOOK AT EXHIBIT 475, WHICH IS E-MAIL

8    CORRESPONDENCE BETWEEN YOU AND MR. MURPHY LATER IN MARCH,

9    MARCH 21ST OF 2012; IS THAT CORRECT?

10   A.   YES.

11   Q.   AND IN IT, ARE YOU TRANSMITTING A COUPLE OF VENTEX

12   CATALOGS THAT ARE SHOWN AS ATTACHMENTS?

13   A.   YES.

14   Q.   AND ARE EXHIBITS 476 AND 427 THOSE TWO ATTACHMENTS?  WHY

15   DON'T WE PUT UP 427 FIRST, THE SECOND GENERATION.

16   A.   SO WITHOUT SEEING MY ACTUAL E-MAIL AND BEING ABLE TO

17   CLICK ON THE ATTACHMENTS, I COULDN'T SAY 100 PERCENT CERTAIN.

18   BUT I WOULD SAY IT'S A GOOD ASSUMPTION, YES.

19   Q.   DO YOU RECALL RECEIVING OR SEEING IN OR ABOUT THE SPRING

20   OF 2012 EXHIBIT 427, WHICH IS THE FIRST OF THE VENTEX

21   MARKETING MATERIALS?

22   A.   DO I RECALL SEEING IT?

23   Q.   YES.  RECEIVING IT AND LOOKING AT IT.

24   A.   YES.

25   Q.   AND COULD YOU FLIP THROUGH IT NOW.

474

1    A.    YES.

2    Q.    DID YOU HAVE A CHANCE TO LOOK?

3    A.    YES.

4    Q.    DO YOU SEE ANY REFERENCE TO ANY REFLECTIVE MATERIAL?

5    A.    SO ALL I SEE ARE A BUNCH OF TESTS AND MARKETING.

6    NOTHING THAT SPECIFICALLY SAYS REFLECTIVE.  BUT I'M NOT AN

7    EXPERT ON THIS TYPE OF STUFF.

8    Q.    OKAY.  WOULD YOU LOOK AT EXHIBIT 476.

9          FOR HOW LONG HAD YOU BEEN THE MATERIALS BUYER AT

10    SEIRUS IN EARLY 2012?

11    A.    PROBABLY ABOUT A YEAR OR TWO, MAYBE.

12    Q.    OKAY.  SO AT THIS POINT, YOU'VE GOT FIVE YEARS', SIX

13    YEARS' EXPERIENCE OF SOURCING TEXTILE MATERIALS FROM ASIA?

14    A.    YES.

15    Q.    OKAY.  WOULD YOU LOOK AT EXHIBIT 476.  THAT'S THE ONE

16    THAT IS CAPTIONED "MEGA-HEAT SECOND GENERATION."

17    A.    YES.

18    Q.    AND AT THE TOP IT SAYS, "2012 F/W" -- IS THAT

19    FALL/WINTER?

20    A.    YES.

21    Q.    -- "NEW DEVELOPMENT."

22          WOULD THIS BE VENTEX MARKETING MATERIAL FOR THE,

23    WHAT WE WOULD SEE AS THE FALL 2012/WINTER 2013 SEASON?

24    A.    YES.

25    Q.    SO THIS IS PRETTY CURRENT AS OF SPRING OF 2012?

475

1    A.    YES, IT IS.

2    Q.    AND WOULD YOU FLIP THROUGH THAT AND TELL ME IF YOU CAN

3    IDENTIFY ANY REFERENCE TO ANY VENTEX REFLECTIVE HEAT

4    MATERIALS.

5    A.    I DON'T SEE IT SAYS ANYTHING ABOUT REFLECTIVE.

6    Q.    DO YOU HAVE EXHIBIT 107?

7    A.    YES.

8    Q.    WHAT IS EXHIBIT 107?

9    A.    I BELIEVE THIS WAS OUR POWERPOINT FOR THE APRIL STEERING

10   MEETING.

11   Q.    WOULD I UNDERSTAND CORRECTLY THAT THIS WOULD REPRESENT

12   THE PRESENTATION THAT WOULD BE MADE TO THE KEY IN-HOUSE

13   PEOPLE AND TO THE KEY OUTSIDE BUYERS OR PEOPLE OF

14   INFLUENCE -- WHATEVER THE CORRECT TERM IS?

15   A.    YES.

16   Q.    -- THAT ARE COMING IN FOR THE MEETING?

17   A.    YES.

18   Q.    IS THIS A MULTI-DAY MEETING?

19   A.    YES.

20   Q.    HOW LONG DOES IT USUALLY LAST?  TWO, THREE DAYS?

21   A.    EXACTLY.  YEAH, TWO, THREE DAYS.

22   Q.    AND AS YOU FLIP THROUGH THE POWERPOINT PRESENTATION FOR

23   THAT MEETING, DO YOU SEE ANYWHERE ANY REFERENCE TO A PRODUCT

24   HAVING A REFLECTIVE LINING OR ANY HEAT-REFLECTIVE MATERIAL,

25   PARTICULARLY ANY HEAT-REFLECTIVE MATERIAL THAT SIMULTANEOUSLY

COMPUTER-AIDED TRANSCRIPTION

476

1    ALLOWS BREATHING?

2    A.   IS IT OKAY IF I'M LOOKING PAGE BY PAGE?  SORRY.  IT'S

3    TAKING A LITTLE WHILE.

4    Q.   NO PROBLEM.

5    A.   OKAY.

6         SO I DON'T SEE ANYTHING IN THERE THAT SAYS HEAT

7    REFLECTIVE.

8    Q.   SO GOING INTO THE APRIL STEERING COMMITTEE PROGRAM,

9    SEIRUS HAD NO HEAT-REFLECTIVE PRODUCTS ON ITS AGENDA, DID

10   IT?

11   A.   THEY DON'T HAVE ANYTHING REFERENCED IN THIS POWERPOINT,

12   NO.

13   Q.   IN WHAT THEY ARE SHOWING TO THE KEY PEOPLE FOR THEIR

14   UPCOMING SEASON; CORRECT?

15   A.   NOTHING WRITTEN IN HERE, NO.

16   Q.   NOW, WE SAW THAT MATERIAL WENT OUT TO ALBERT TO HAVE AT

17   LEAST ONE GLOVE OR A MOCK-UP GLOVE MADE; CORRECT?

18   A.   CORRECT.

19   Q.   NOW, WHEN THAT GLOVE COMES BACK, IS THERE USUALLY

20   DOCUMENTATION OF THE TRANSFER OF THAT GLOVE?

21   A.   YES.

22   Q.   SO SOMEWHERE THERE SHOULD HAVE BEEN INVOICES OR

23   TRANSMITTAL DOCUMENTS OR OTHER RECORDS SHOWING WHEN THAT

24   GLOVE CAME BACK?

25   A.   THERE IS.  BUT IT COULD BE AS LITTLE AS -- IT COULD BE

477

1    REFERENCED AS LIKE ONE GLOVE.  IT WOULDN'T NECESSARILY SAY

2    THE SPECIFIC STYLE THAT CAME BACK.

3    Q.    OKAY.  AND I THINK YOU SAID YOU DON'T ATTEND THE

4    STEERING COMMITTEE MEETING?

5    A.    I DO NOT.

6    Q.    WERE YOU PROVIDED ANY INFORMATION ABOUT WHAT HAPPENED AT

7    THE STEERING COMMITTEE MEETING?

8    A.    WE GET PROVIDED -- I GET PROVIDED THE INFORMATION OF

9    WHICH STYLES DID WELL AT THE STEERING MEETING AFTER IT'S

10   OVER.

11   Q.    OKAY.  DO YOU GET THAT IN WRITING?

12   A.    SOMETIMES AND SOMETIMES VERBAL.

13   Q.    HAVE YOU EVER SEEN ANY WRITTEN REFERENCE TO WHAT

14   HAPPENED AT THE STEERING COMMITTEE MEETING IN APRIL OF

15   2012?

16   A.    I COULDN'T SAY FOR SURE THAT FAR BACK.  UNFORTUNATELY,

17   IT IS A LITTLE INCONSISTENT.  SOMETIMES WE DO GET A WHOLE

18   SPREADSHEET.  SOMETIMES IT'S JUST AN E-MAIL FROM BOB SAYING

19   THIS DID WELL.  GET SOME SAMPLE YARDAGE GOING.

20   Q.    HAVE YOU EVER SEEN ANY RECORDS OF THE TRANSMITTAL BACK

21   FROM WHOEVER AND HOWEVER MANY MANUFACTURERS WERE GIVEN THE

22   OMNI-HEAT MATERIAL TO MAKE MOCK-UPS WITH?

23   A.    CAN YOU REPEAT THAT ONE MORE TIME?  I'M SORRY.

24   Q.    SURE.  HAVE YOU EVER SEEN -- WE KNOW MATERIAL WAS SENT

25   TO ALBERT TO MAKE A GLOVE; RIGHT?

478

1    A.   RIGHT.

2    Q.   HAVE YOU EVER SEEN ANY DOCUMENTATION SHOWING THAT ALBERT

3    SENT A GLOVE BACK?

4    A.   NO, I HAVEN'T.

5    Q.   DID YOU EVER SEE ANY OF THE GLOVES THAT CAME INTO SEIRUS

6    THAT HAD BEEN MADE WITH THE OMNI-HEAT MATERIAL?

7    A.   I DON'T BELIEVE SO.

8    Q.   WE KIND OF ALL -- I'LL SUBMIT TO YOU THERE IS WHAT I

9    VIEW AS A GAP WINDOW BETWEEN APRIL AND JULY OF 2012, AND I'D

10   LIKE YOU TO HELP ME FIGURE OUT WHAT WENT ON DURING THAT

11   PERIOD.

12        WE KNOW THERE WAS A STEERING COMMITTEE MEETING;

13   CORRECT?

14   A.   YES.

15   Q.   NOW, WE KNOW ALBERT GOT, IN THE MIDDLE OF MARCH, SOME

16   OMNI-HEAT MATERIAL TO MAKE UP SAMPLE GLOVES OR OTHER PRODUCTS

17   TO BE USED IN THAT STEERING COMMITTEE MEETING; CORRECT?

18   A.   YES.

19   Q.   BUT WE DON'T KNOW WHAT CAME BACK?

20   A.   YES.

21   Q.   OR HOW MANY CAME BACK?

22   A.   RIGHT.

23   Q.   OR HOW THEY WERE USED?

24   A.   RIGHT.

25   Q.   OR WHO THEY WERE SHOWN TO?

1    A.    I DON'T KNOW.

2    Q.    OKAY.  AND YOU'VE NEVER SEEN ANY RECORDS OF THAT, HAVE

3    YOU?

4    A.    NO.  BUT THAT'S NOT MY JOB.

5    Q.    OKAY.  YOUR JOB IS TO ORDER MATERIALS WHEN YOU'RE TOLD

6    TO HELP THEM MAKE PRODUCTS?

7    A.    YES.

8    Q.    OKAY.  AND SO WE GO THROUGH -- WHAT OTHER EVENTS WOULD

9    HAVE HAD TO HAVE HAPPENED?  THE GLOVES -- FOR THE STEERING

10   PEOPLE TO MAKE THEIR DECISIONS?

11          THE GLOVES WOULD HAVE TO COME BACK, WOULD THEY

12   NOT?

13   A.    YES.

14   Q.    WOULD THE STEERING COMMITTEE TYPICALLY MAKE

15   RECOMMENDATIONS OR DECISIONS WITHOUT HAVING SEEN SAMPLES OF

16   THE PRODUCTS?

17          MR. MARCHESE:  OBJECTION.  CALLS FOR SPECULATION.

18          THE COURT:  OVERRULED.

19          THE WITNESS:  NO.

20   Q.    BY MR. AXELROD:  SO THERE WOULD BE SAMPLES FOR THEM TO

21   MAKE DECISIONS ON WHAT MODELS, WHAT STYLES, WHAT WAS SUPPOSED

22   TO BE IN THEM, WHAT THE STORY WAS; IS THAT FAIR?

23   A.    I WOULD ASSUME SO.

24   Q.    OKAY.  LET'S LEAP FORWARD THEN.  DO YOU RECALL WHEN THE

25   JULY STEERING COMMITTEE MEETING WAS?

480

1    A.   DO I RECALL WHEN IT WAS?

2    Q.   YES.

3    A.   I DON'T KNOW WHICH -- WHAT THE EXACT DATE WAS.  IT WAS

4    SOMETIME IN JULY.

5    Q.   OKAY.  WOULD YOU LOOK AT EXHIBIT -- THIS IS A

6    SPREADSHEET EXHIBIT, 332.

7         MR. AXELROD:  BEFORE YOU LOOK AT IT, I'LL OFFER

8    332.

9         MR. MARCHESE:  JUST A MINUTE.

10        NO OBJECTION, YOUR HONOR.

11        THE COURT:  RECEIVED.

12        (TRIAL EXHIBIT 332 RECEIVED IN EVIDENCE.)

13   Q.   BY MR. AXELROD:  MRS. CHIN, WHAT'S EXHIBIT 332?

14   A.   THIS IS A SPREADSHEET, AND IT LOOKS LIKE NOTES ON -- I'M

15   GUESSING FROM WHAT CAME OUT OF THE JULY STEERING MEETING.

16   Q.   AND DOES IT IDENTIFY A NUMBER OF PRODUCTS THAT ARE GOING

17   TO BE MADE WITH WHAT IS NOW CALLED HEATWAVE LINING?

18   A.   YES.

19   Q.   AND HOW MANY DIFFERENT GLOVE PRODUCTS DO YOU IDENTIFY ON

20   EXHIBIT 332 THAT WERE DESIGNATED FOR THE UPCOMING 2013/2014

21   SELLING SEASON THAT WERE TO BE MADE WITH WHAT IS CALLED

22   HEATWAVE MATERIAL?

23   A.   I THINK I CAN COUNT FIVE THINGS THAT ARE SAYING TO ADD

24   IT IN HERE.

25   Q.   WOULD THAT SUGGEST TO YOU THAT THERE WERE AT LEAST FIVE

481

1    GLOVES MADE FROM THE REFLECTIVE MATERIAL THAT WERE SHOWN TO

2    BUYERS AND OTHERS IN MAKING THESE DECISIONS?

3    A.   YES, THAT'S A SAFE ASSUMPTION.

4    Q.   AND THAT OCCURRED -- IS THE DATE OF THAT EXHIBIT

5    JULY 30, 2012?

6    A.   YES.

7    Q.   NOW, BETWEEN FEBRUARY -- TOO MUCH PAPER.  EXCUSE ME FOR

8    A SECOND.

9         MR. AXELROD:  I WOULD OFFER EXHIBIT 551, 135.1 AND

10   138.  OH, AND 546.

11        MR. MARCHESE:  ANOTHER ONE?

12        MR. AXELROD:  YEAH, 546.

13        MR. MARCHESE:  546.

14        NO OBJECTION, YOUR HONOR.

15        THE COURT:  RECEIVED.

16        (TRIAL EXHIBITS 135.1, 138 AND 551 RECEIVED IN

17        EVIDENCE.)

18   Q.   BY MR. AXELROD:  MRS. CHIN, WOULD YOU LOOK AT

19   EXHIBIT 551.

20   A.   YES.

21   Q.   IS THIS AN E-MAIL FROM YOU TO PRANALI JHALA?

22   A.   YES.

23   Q.   INQUIRING ABOUT, QUOTE, OMNI-HEAT PRICING?

24   A.   YES.

25   Q.   AND IT'S DATED JULY 18; CORRECT?

482

1    A.    CORRECT.

2    Q.    AND IS EXHIBIT 135.1 AN E-MAIL FROM JODY CARLSON TO A

3    HOST OF PEOPLE INSIDE SEIRUS THAT IS TRANSMITTING WHAT IS

4    REFERENCED AS AN IMAGE OF THE OMNI-HEAT HEADER?

5          DO YOU SEE THAT?

6    A.    I DO SEE THAT, YES.

7    Q.    AND DO YOU RECOGNIZE THE PRODUCT THAT'S ON THE BACK THAT

8    WAS SENT WITH THE E-MAIL?  IT'S PAGE 300 OF THE E-MAIL.

9    A.    CAN YOU EXPLAIN WHAT YOU MEAN BY DO I RECOGNIZE IT?

10   LIKE I HAVE SEEN IT, THE SYMBOL.

11   Q.    DO YOU RECOGNIZE WHAT IT IS?

12   A.    IT'S A GLOVE.

13   Q.    IT'S A COLUMBIA OMNI-HEAT GLOVE, IS IT NOT?

14   A.    YES.

15   Q.    AND HAVE YOU SEEN THAT GLOVE AT ABOUT THIS TIME IN

16   SEIRUS?

17   A.    NO, I DID NOT.  I'M ACTUALLY I DON'T EVEN THINK ON THIS

18   E-MAIL.  SO THIS IS THE FIRST TIME I'M SEEING IT.

19   Q.    WELL, MAYBE WE SHOULD IDENTIFY WHO THE PEOPLE ARE ON THE

20   E-MAIL BECAUSE IT WENT TO QUITE A FEW.

21   A.    OKAY.

22   Q.    WE KNOW WHO MIKE CAREY IS.

23   A.    OKAY.

24   Q.    WHO IS JOE EDWARDS?

25   A.    JOE EDWARDS IS ALSO -- WAS WITH OUR COMPANY.

483

1   Q.   AND WHAT WAS HIS ROLE AND POSITION?

2   A.   HE WAS -- HE WOULD HELP WITH LIKE OUR LEGAL

3   DEPARTMENT.

4   Q.   OKAY.  AND WENDY CAREY.  THAT'S MR. CAREY'S WIFE;

5   CORRECT?

6   A.   YES.  AND ALSO OUR C.F.O.

7   Q.   AND DAVID I.  IS HE IN SALES?

8   A.   CORRECT.

9   Q.   AND SEAN CAREY WAS IN WHAT DEPARTMENT?

10  A.   OUR CREATIVE DEPARTMENT.

11  Q.   SO HE WOULD HAVE BEEN WORKING UP GRAPHICS AND PROBABLY

12  WOULD HAVE BEEN INTERESTED IN THIS TRANSMITTAL; IS THAT

13  CORRECT?

14  A.   YES.

15  Q.   AND GREG CALISE?

16  A.   ALSO IN GRAPHICS.

17  Q.   OKAY.  AND ROBERT MURPHY IS YOUR HEAD OF PRODUCTION;

18  CORRECT?

19  A.   CORRECT.

20  Q.   AND TRACY BOEING?

21  A.   SHE WAS OUR GRAPHICS IN OUR PRODUCTION DEPARTMENT.

22  Q.   AND DANICA CAREY IS MR. CAREY'S DAUGHTER?

23  A.   YES.

24  Q.   AND HER ROLE AT SEIRUS IS?

25  A.   MARKETING.

484

1    Q.   OKAY.  SO THIS IS A PRETTY WIDE DISSEMINATION WITHIN

2    THIS SMALL COMPANY, IS IT NOT?

3    A.   IT IS A LOT OF PEOPLE IN THE E-MAIL, BUT IT'S NOT REALLY

4    THAT OUT OF THE ORDINARY.

5    Q.   WOULD YOU LOOK AT EXHIBIT 138.  THAT'S AN E-MAIL FROM

6    MR. CALISE TO MUCH OF THE SAME GROUP, IS IT NOT?

7    A.   YES.

8    Q.   ALSO AT THE END OF JULY 2013?

9    A.   YES.

10   Q.   2013.  STRIKE THAT.  WE'LL TABLE THAT ONE FOR LATER.

11        APART FROM LOOKING AT THE OMNI HEAD -- AT THE

12   OMNI-HEAT HEADER AND YOUR GOING OUT AND SEEKING PRICING FOR

13   OMNI-HEAT PRODUCTS, WHAT ELSE DO YOU RECALL THAT WAS GOING ON

14   THAT LED TO THE SUDDEN SELECTION OF EIGHT NEW HEATWAVE

15   LINE -- OR EIGHT MODELS OF GLOVES FOR THE UPCOMING SEASON?

16   A.   ARE WE GOING BACK REFERENCING THE SPREADSHEET WE JUST

17   SAW?

18   Q.   YES.

19   A.   I THOUGHT WE SAID FIVE AND NOW YOU JUST SAID EIGHT.

20   Q.   I'M SORRY.  LET ME REWIND.

21   A.   SORRY.  I JUST WANT TO MAKE SURE.

22   Q.   LATE IN THE AFTERNOON.

23        LET ME TELL YOU WHAT I'M TRYING TO ASK.

24   A.   OKAY.

25   Q.   WE SEE IN APRIL THE STEERING COMMITTEE IS COMING IN AND

485

1    HAS ITS SET OF PROJECTS, ITS POWERPOINT SLIDE, YOU KNOW,

2    PROJECTION, ET CETERA.  NO REFLECTIVE PRODUCTS.

3    A.    OKAY.

4    Q.    YOU'VE RECEIVED THE FIVE YARDS, OR HOWEVER MANY YARDS IT

5    WAS OF MATERIAL FROM SHENLI THAT IS BEING SENT OUT TO MAKE

6    SAMPLES.  AND THEN SUDDENLY WE LEAP FORWARD, DO WE NOT, TO

7    JULY, WHERE DECISIONS ARE BEING MADE TO ADD NEW PRODUCTS WITH

8    WHAT'S REFERRED TO AS HEATWAVE LINING; IS THAT CORRECT?

9    A.    CORRECT.

10   Q.    AND THERE APPEARS TO BE NO DOCUMENTATION IN THIS GAP OF

11   HOW THIS HAPPENED.  THE ONLY THING IN BETWEEN IS YOU'VE

12   BEEN -- YOU'RE GOING OUT TO GET PRICING; CORRECT?

13   A.    CORRECT.

14   Q.    AND PEOPLE ARE LOOKING AT THE COLUMBIA OMNI-HEAT HEADER

15   THAT ARE INVOLVED IN SALES AND MARKETING --

16   A.    CORRECT.

17   Q.    -- CORRECT?

18          WHO GAVE YOU INSTRUCTIONS TO GO GET OMNI-HEAT

19   PRICING, AND WHAT WERE YOU SEEKING PRICING FOR?

20   A.    FROM 551, I BELIEVE YOU SAID.  PRANALI IS THE ONE THAT

21   IS REQUESTING IMMEDIATE PRICING ON OMNI-HEAT.

22   Q.    OKAY.  AND WHAT IS PRANALI'S ROLE IN BRINGING PRODUCTS

23   TO MARKET FOR SEIRUS?

24   A.    AT THIS POINT, SHE WAS OUR SAMPLE COORDINATOR.

25   Q.    AND SO DOES SHE NEED PRICING FOR WHAT PURPOSE?

486

1    A.    SHE IS LOOKING FOR PRICING SO THAT WE'RE ABLE TO GET A

2    ROUGH IDEA OF HOW MUCH IT WOULD COST TO MAKE THE PRODUCT.

3         MR. AXELROD:  WOULD YOU LOOK AT EXHIBIT 546, WHICH

4    I'LL OFFER.

5         MR. MARCHESE:  JUST ONE MOMENT.

6         NO OBJECTION.

7         THE COURT:  RECEIVED.

8         (TRIAL EXHIBIT 546 RECEIVED IN EVIDENCE.)

9    Q.    BY MR. AXELROD:  COULD YOU LOOK AT EXHIBIT 546.  IT'S

10   ANOTHER ONE OF THESE EXHIBITS THAT IS A SERIES OF E-MAILS.

11   THE FIRST ONE IS AT THE END.

12        IS IT AN E-MAIL FROM YOU TO SHENLI ON AUGUST 1ST?

13   A.    YES, IT IS.

14   Q.    IS THAT WHO YOU WENT TO TO GET OMNI-HEAT PRICING?

15   A.    IT DOESN'T LOOK LIKE IN THIS E-MAIL I'M ASKING FOR

16   PRICING.

17   Q.    I UNDERSTAND.  BUT IS THIS WHO YOU WENT TO FIRST TO TRY

18   TO GET SOURCING FOR OMNI-HEAT MATERIAL FOR THE HEATWAVE

19   PROJECT?

20   A.    I DON'T BELIEVE -- WE WOULDN'T GO TO THEM TO GET PRICING

21   FOR THE HEATWAVE MATERIAL THAT WE'VE ALWAYS GOTTEN FROM

22   VENTEX.

23   Q.    WELL, YOU HADN'T GOTTEN ANY HEATWAVE MATERIAL FROM

24   VENTEX IN AUGUST OF 2012, HAD YOU?

25   A.    RIGHT.  BUT I DON'T BELIEVE THAT WE EVER REFERENCED

1    HEATWAVE WITH SHENLI EVER.

2    Q.    NO.    THERE IS NO REFERENCE IN EXHIBIT 546 TO HEATWAVE,

3    IS THERE?    THE ONLY REFERENCES ARE TO THE OMNI-HEAT PROGRAM;

4    CORRECT?    IF YOU LOOK ON THE FIRST PAGE AT THE BOTTOM.

5    A.    OKAY.    YES.    I SEE WHAT YOU'RE SAYING.    SORRY.    I JUST

6    WAS CONFUSED ON THE WORDING.

7    Q.    SO IT WOULD APPEAR -- TELL ME IF THIS IS INCORRECT --

8    THAT SOMEBODY ASKED YOU TO GO GET PRICING FOR OMNI-HEAT

9    MATERIAL, PRANALI DID, FOR PRODUCTS THAT SEIRUS WAS PLANNING

10   TO INTRODUCE IN THE UPCOMING SEASON?

11   A.    YES.

12   Q.    AND THEN YOU AGAIN WENT BACK, AND FOR THE FIRST TIME

13   SINCE MARCH, RECONTACTED SHENLI AND ASKED TO MEET WITH THEM;

14   CORRECT?

15   A.    CORRECT.

16   Q.    AND SHENLI ASKED YOU SOME QUESTIONS ABOUT THE MEETING.

17   THAT'S THE MIDDLE OF THIS E-MAIL THREAD.    LIKE WHERE IT WOULD

18   BE, AND SAID THEY WERE KIND OF BUSY?

19   A.    YES.

20   Q.    OKAY.    AND YOU WROTE BACK AND SAID -- IS YOUR RESPONSE

21   AT THE BOTTOM OF THE FIRST PAGE OF EXHIBIT 546?

22          ON AUGUST 2, DESCRIBING FOR THEM WHY YOU WERE

23   SEEKING TO TOUCH BASE?

24   A.    YES.

25   Q.    AND SHENLI RESPONDED THAT THEY WOULDN'T BE COMING TO THE

488

1    STATES AND THEREFORE COULDN'T MEET WITH YOU?

2    A.    CORRECT.  YES.

3    Q.    AND IT'S AT THAT POINT, IS IT NOT, THAT YOU TURNED TO

4    VENTEX TO SEE IF THEY WOULD BECOME A SUPPLIER FOR THIS

5    OMNI-HEAT MATERIAL; IS THAT CORRECT?

6    A.    I BELIEVE THAT WE HAD BEEN WORKING WITH THEM KIND OF AT

7    THE SAME TIME, LOOKING TO SEE WHICH OPTION WE WERE GOING TO

8    GO WITH.

9    Q.    WELL, YOU'D BEEN TALKING WITH VENTEX FOR SURE --

10    A.    YES.

11    Q.    -- CORRECT?

12    A.    UH-HUH.

13    Q.    YOU WERE INTERESTED IN THEIR MEGA-HEAT PRODUCT THAT IS A

14    BASE MATERIAL WITH CLAIMED BENEFITS --

15    A.    CORRECT.

16    Q.    -- CORRECT?

17          BUT YOU HAD NEVER HAD ANY DISCUSSION WITH THEM ABOUT

18    PUTTING REFLECTIVE MATERIAL ON IT UNTIL YOU ATTENDED THE

19    SUMMER OUTDOOR RETAILERS SHOW IN SALT LAKE CITY IN EARLY

20    AUGUST; ISN'T THAT CORRECT?

21    A.    THAT SOUNDS RIGHT, YES.

22    Q.    AND IF YOU'LL TURN TO EXHIBIT 491.  491 IS ONE OF THOSE,

23    I'LL CALL THEM ENCYCLOPEDIC EXHIBITS, BECAUSE AS PRODUCED BY

24    SEIRUS, IT CONTAINS A HOST OF E-MAIL CORRESPONDENCE BETWEEN

25    YOU AND VARIOUS VENTEX REPRESENTATIVES FROM JANUARY TO

489

1    SEPTEMBER OF 2012; IS THAT CORRECT?

2    A.   YES.

3           MR. AXELROD:  I'D OFFER 491.

4           THE COURT:  ANY OBJECTION TO 491?

5           MR. MARCHESE:  NO OBJECTION.

6           THE COURT:  RECEIVED.

7       (TRIAL EXHIBIT 491 RECEIVED IN EVIDENCE.)

8    Q.   BY MR. AXELROD:  MRS. CHIN, COULD YOU TURN TO THE PAGE

9    IN EXHIBIT 491 THAT HAS THE BATES NUMBER 659.

10   A.   YES.

11   Q.   IS THIS AN E-MAIL FROM YOU TO DAN MEYER DATED

12   AUGUST 6TH, 2012?

13   A.   YES, IT IS.

14   Q.   WHO IS DAN MEYER?

15   A.   DAN MEYER IS OUR CONTACT WITH VENTEX.

16   Q.   AND WHERE IS HE LOCATED?

17   A.   HE'S LOCATED IN THE UNITED STATES, SO LOCAL.

18   Q.   DO YOU KNOW WHETHER HE LIVES IN PORTLAND, OREGON?

19   A.   I'M NOT POSITIVE WHERE HE'S LOCATED.

20   Q.   WOULD YOU DESCRIBE HIM AS AN INDEPENDENT SALES REP IN

21   THE UNITED STATES FOR VENTEX?

22   A.   YES.

23   Q.   AND WAS HE WITH YOU AT OUTDOOR RETAILER IN THE -- AT THE

24   EARLY AUGUST 2012 TRADE SHOW?

25   A.   YES, IT SAYS HERE.

490

1          THE COURT:  CAN YOU KEEP YOUR VOICE UP HERE.

2          THE WITNESS:  SORRY.  YES.  IT SAYS IT WAS GREAT TO

3     SEE YOU AT O.R.  SO I WOULD ASSUME HE WAS AT THE MEETING,

4     YES.

5     Q.   BY MR. AXELROD:  OKAY.  WHO ELSE DID YOU MEET AT

6     VENTEX?

7     A.   GOING THIS FAR BACK, I WOULDN'T KNOW EVERYBODY.  BUT

8     DEFINITELY JOORI, WHO IS WITH VENTEX, AND I BELIEVE JASMINE

9     AS WELL.

10    Q.   JOORI IS THE PRINCIPAL CONTACT THAT YOU HAVE WITH

11    VENTEX; IS THAT FAIR?

12    A.   CORRECT.

13    Q.   AND JASMINE, JOORI'S ASSISTANT OR VICE VERSA?

14    A.   JASMINE WOULD BE THE ASSISTANT.

15    Q.   OKAY.  DO YOU RECALL HAVING DISCUSSIONS WITH VENTEX

16    ABOUT THEM BECOMING A SUPPLIER OF WHAT WAS THEN VENTEX'S

17    MATERIAL WITH ALUMINUM FOIL PRINTING AT THAT TRADE SHOW?

18    A.   YES.  I SEE THAT HERE.

19    Q.   IS YOUR AUGUST 6TH E-MAIL THE FIRST DOCUMENTATION OF ANY

20    KIND THAT YOU'RE AWARE OF BETWEEN SEIRUS AND VENTEX THAT

21    REFERS TO ALUMINUM FOIL PRINTING OR ANY ADDITIVE REFLECTIVE

22    PRINTING TO THEIR MEGA-HEAT PRODUCT?

23    A.   IT WOULD BE A SAFE ASSUMPTION, YES.

24          MR. AXELROD:  AND WOULD YOU LOOK AT EXHIBIT -- I'LL

25    OFFER EXHIBIT 480 AND 396.

491

1        MR. MARCHESE:  I'M SORRY.  WHICH TWO, PLEASE?

2        MR. AXELROD:  480 AND 396.

3        MR. MARCHESE:  DID YOU SAY 296?

4        MR. AXELROD:  396.

5        MR. MARCHESE:  THANK YOU.

6        THE COURT:  ANY OBJECTION TO 480?

7        MR. MARCHESE:  NO OBJECTION TO 480, YOUR HONOR.

8        THE COURT:  RECEIVED.

9    (TRIAL EXHIBIT 480 RECEIVED IN EVIDENCE.)

10       THE COURT:  396?

11       MR. MARCHESE:  NO OBJECTION.

12       THE COURT:  RECEIVED.

13    (TRIAL EXHIBIT 396 RECEIVED IN EVIDENCE.)

14  Q.  BY MR. AXELROD:  LOOKING AT EXHIBIT 480, IS THAT AN

15  E-MAIL FROM YOU TO MR. MURPHY?

16  A.  YES.

17  Q.  AND ARE YOU UPDATING MR. MURPHY ON YOUR ACCOMPLISHMENTS

18  FROM THE PRIOR FEW DAYS, OR WHATEVER?

19  A.  YES.

20  Q.  AND IS ONE OF THEM TO ORDER AND ARRANGE FOR THE DELIVERY

21  OF THE FIRST SAMPLE OF VENTEX ALUMINUM FOIL MATERIAL?

22  A.  YES.

23  Q.  AND WAS THAT -- WHAT DATE WAS THAT SCHEDULED FOR?

24  A.  AUGUST 24TH.

25  Q.  AND LOOKING AT EXHIBIT 396.  WHAT IS EXHIBIT 396?

1    A.    396 IS AN E-MAIL FROM ME -- OR CORRESPONDING WITH ME AND

2    THE CONTACT AT SHENLI.

3    Q.    OKAY.  NOW, IF YOU LOOK DOWN AT THE BOTTOM OF PAGE 396,

4    IS THIS AN AUGUST 11, 2012 E-MAIL?

5    A.    YES.

6    Q.    AND IN THE BOTTOM OF THAT E-MAIL, WHAT DO YOU ASK FROM

7    THE PEOPLE AT SHENLI?

8    A.    WE'RE INTERESTED IN INCLUDING THE ALUMINUM FOIL PRINTING

9    IN OUR LINE -- OMNI IN OUR LINE NEXT YEAR.  CAN YOU PLEASE

10   ADVISE ON THE FOLLOWING.  AND THEN I'M ASKING FOR A MOLD

11   CHARGE FOR OUR CUSTOM MOLD.

12              THE COURT:  KEEP YOUR VOICE UP, PLEASE.

13              THE WITNESS:  AND THE LEAD TIME, HOW LONG IT WOULD

14   TAKE TO GET THAT MADE.

15   Q.    BY MR. AXELROD:  WERE YOU STILL CONSIDERING SHENLI AS A

16   SUPPLIER OF WHAT IS STILL REFERRED TO AS AN OMNI-HEAT FOIL

17   PRINTING?

18   A.    IT LOOKS LIKE FROM THIS E-MAIL, YES.

19   Q.    OR WERE YOU JUST SEEKING A COMPETITIVE PRICE TO KNOW HOW

20   TO BETTER NEGOTIATE WITH VENTEX?

21   A.    IT'S PRETTY COMMON FOR US TO LOOK AT MULTIPLE DIFFERENT

22   SUPPLIERS ON THE SAME TYPE OF ITEM.

23   Q.    SO YOU NOW HAVE A SUPPLIER FOR A REFLECTIVE MATERIAL;

24   CORRECT?

25   A.    CORRECT.

1    Q.    AND MOVING INTO SEPTEMBER, WHAT HAS TO BE DEVELOPED TO

2    GET THAT SUPPLIER ARRANGEMENT FINALIZED?

3    A.    CAN YOU REPEAT THAT, PLEASE?

4    Q.    SURE.  LET ME SHOW YOU SOME EXHIBITS.  WELL, YOU'VE MADE

5    AN ARRANGEMENT WITH VENTEX TO SUPPLY REFLECTIVE HEAT

6    MATERIAL; CORRECT?

7    A.    YES.

8    Q.    YOU'RE GOING THROUGH SETTING THAT UP.  YOU'RE FINALIZING

9    PRICING NOW, ARE YOU NOT?

10   A.    YES.

11   Q.    YOU HAVE TO GET THEM A MOLD PATTERN FOR THE DESIGN

12   THAT'S BEEN IDENTIFIED?

13   A.    YES.

14   Q.    WHAT ELSE DO YOU NEED TO DO TO BE ABLE TO HAVE MATERIALS

15   SO YOU CAN START MAKING GLOVES?

16   A.    THAT'S PRETTY MUCH IT.

17         MR. AXELROD:  OKAY.  WOULD YOU LOOK AT

18   EXHIBIT 460 -- OR I'LL OFFER 460, 452 AND 387, AND 458.

19         MR. MARCHESE:  I'M TRYING TO KEEP UP WITH YOU.  CAN

20   YOU SAY THOSE AGAIN, PLEASE.

21         MR. AXELROD:  SURE.  460, 452, 387 AND 458.

22         MR. MARCHESE:  THANK YOU.  IT JUST TAKES A LITTLE

23   WHILE, YOUR HONOR.  APOLOGIES.  THERE IS A LOT OF DOCUMENTS

24   IN HERE.

25         NO OBJECTION TO 387.

494

1          THE COURT:  RECEIVED.

2     (TRIAL EXHIBIT 387 RECEIVED IN EVIDENCE.)

3          MR. MARCHESE:  NO OBJECTION TO 452.

4          THE COURT:  RECEIVED.

5     (TRIAL EXHIBIT 452 RECEIVED IN EVIDENCE.)

6          MR. MARCHESE:  NO OBJECTION TO 458.

7          THE COURT:  RECEIVED.

8     (TRIAL EXHIBIT 458 RECEIVED IN EVIDENCE.)

9          MR. MARCHESE:  NO OBJECTION TO 460.

10          THE COURT:  RECEIVED.

11     (TRIAL EXHIBIT 460 RECEIVED IN EVIDENCE.)

12     Q.   BY MR. AXELROD:  MRS. CHIN, WOULD YOU LOOK AT

13     EXHIBIT 460.  IS THIS AN E-MAIL FROM GREG CALISE TO YOU DATED

14     SEPTEMBER 4TH, 2012?

15     A.   YES.

16     Q.   AND ADDRESSED TO YOU IT SAYS, "MIKE IS GOOD WITH THIS

17     PATTERN."  DO YOU SEE THAT?

18     A.   YES.

19     Q.   WHO IS MIKE?

20     A.   MIKE IS THE OWNER OF THE COMPANY.

21     Q.   MR. CAREY?

22     A.   YES.

23     Q.   AND WOULD HE TYPICALLY BE INVOLVED IN SIGNING OFF ON ALL

24     OF THESE TYPES OF DECISIONS?

25     A.   YES.

495

1    Q.    AND I'M ASSUMING HE'S ON THE STEERING COMMITTEE.  IS

2    THAT A FAIR ASSUMPTION?

3    A.    ABSOLUTELY.

4    Q.    AND I'M ASSUMING NO NEW PRODUCTS WOULD EVER GET ADOPTED

5    OR APPROVED FOR THE SEIRUS LINE WITHOUT HIS APPROVAL?

6    A.    YES.

7    Q.    WOULD YOU LOOK AT EXHIBIT 452.  I'M GOING TO DRAW YOUR

8    ATTENTION TO THE E-MAIL IN THE MIDDLE OF THE FIRST PAGE.  YOU

9    ARE NOT AN ADDRESSEE OR AN AUTHOR OF THIS E-MAIL, BUT IT

10   RELATES TO THE SCREEN PRINT THAT WE SHOWED ON THE BACK OF

11   EXHIBIT -- BACK SIDE OF EXHIBIT 460, SECOND PAGE.

12          MR. MARCHESE:  OBJECTION TO THE CHARACTERIZATION OF

13   THE DOCUMENT, YOUR HONOR.

14          THE COURT:  GO AHEAD AND REPHRASE YOUR QUESTION.

15          MR. AXELROD:  I DIDN'T KNOW I CHARACTERIZED THE

16   DOCUMENT.  I'M SORRY.

17          MR. MARCHESE:  IT SEEMED TO ME YOU COMBINED 452 AND

18   460.  THAT'S WHAT I HEAR.

19          MR. AXELROD:  SORRY.  NO.  I THOUGHT -- 460 IS TWO

20   PAGES.

21          MR. MARCHESE:  RIGHT.  I THOUGHT YOU SAID YOU WERE

22   REFERRING TO 452 AND YOU WERE REFERRING TO 460.  YOU'RE

23   REFERRING TO THEM TOGETHER.

24          MR. AXELROD:  MY APOLOGIES.

25   Q.    REFERRING TO EXHIBIT 452.  IS IT A REQUEST TO ANALYZE

496

1    THE AMOUNT OF REFLECTIVITY, IT SAYS COMPARED TO OMNI-HEAT?

2    A.   YES.  I SEE THAT.

3    Q.   AND DOES THAT REFER TO THE DESIGN THAT MIKE HAD

4    APPROVED?

5    A.   AT THIS POINT, WE COULD HAVE CHANGED THE DESIGN; SO I

6    COULDN'T SAY FOR CERTAIN WHICH DESIGN HE'S REFERRING TO

7    HERE.

8    Q.   OKAY.  WELL, MR. CALISE'S E-MAIL TO YOU TRANSMITTING THE

9    DESIGN THAT MIKE IS GOOD WITH WAS ON SEPTEMBER 4 AT 4:50 IN

10   THE AFTERNOON.  AND EXHIBIT 452 WAS TRANSMITTED BETWEEN

11   MR. MURPHY AND MR. CAREY AT 5:11 AND HAD COME OUT EARLIER

12   THAT DAY AT 1 O'CLOCK FROM MR. CAREY; CORRECT?

13   A.   CORRECT.

14   Q.   SO WOULD YOU UNDERSTAND THAT THEY WERE AT THIS TIME

15   REFERRING TO THE DESIGN THAT WAS PROPOSED AS SHOWN IN

16   EXHIBIT 460?

17   A.   YES, THAT WOULD BE FAIR.

18   Q.   HAVE YOU EVER BEEN TASKED WITH MEASURING THE AMOUNT OF

19   REFLECTIVE COVERAGE ON A PRODUCT AT SEIRUS BEFORE?

20   A.   ME PERSONALLY, NO.

21   Q.   HAVE YOU EVER BEEN INVOLVED DIRECTLY OR INDIRECTLY IN

22   THAT TYPE OF AN ANALYSIS?

23   A.   I DON'T DO ANY OF THE ANALYZING.

24   Q.   WOULD YOU PULL UP EXHIBIT 458.  ACTUALLY, BEFORE WE GET

25   TO 458, LOOK AT EXHIBIT 387.  AND ON THE SECOND PAGE OF

497

1    EXHIBIT 387 IS AN E-MAIL FROM GREG CALISE.  THIS TIME YOU

2    WERE A RECIPIENT.

3         DO YOU RECALL RECEIVING THIS E-MAIL?

4    A.   YES.

5    Q.   DID YOU HAVE ANY INVOLVEMENT OTHER THAN RECEIVING THE

6    REPORTED OUTCOME, IN HOW THAT WAS DERIVED?

7    A.   NO.

8    Q.   AND THEN TURNING TO EXHIBIT 458.  ON THAT FRONT PAGE,

9    CENTER DOWN, IS THAT AN E-MAIL BACK TO YOU FROM TO

10   MR. CALISE, MR. MURPHY AND OTHERS AT SEIRUS SEEKING TO GET

11   THEIR ATTENTION FOR SOME INFORMATION WHEN THEY ARE QUITE

12   BUSY?

13   A.   YES.

14   Q.   WHAT'S THE RUSH AT THIS POINT?

15   A.   IT LOOKS LIKE -- OH, SORRY.  IT LOOKS LIKE THE RUSH IS

16   THAT WE'RE NOT ABLE TO CREATE A MOLD WITH A PATTERN WITHOUT

17   THIS INFORMATION.

18   Q.   OKAY.  IS IT FAIR TO SAY PEOPLE ARE IN -- WORKING HARD

19   AND IN A HURRY TO GET A LOT OF THINGS DONE SO THAT THESE

20   PRODUCTS ARE IN A POSITION TO BE SOLD IN THE UPCOMING YEAR?

21   A.   YES.

22   Q.   AND THE PRODUCTS WE'RE REFERRING TO IS THE NEW SERIES OF

23   HEATWAVE PRODUCTS THAT'S GOING TO BE INTRODUCED; CORRECT?

24   A.   YES.

25   Q.   SO YOU'RE WORKING ON THE SUPPLY SIDE FOR ONE PART OF IT;

1    CORRECT?

2    A.    YES.

3    Q.    AND OTHERS ARE WORKING ON DEVELOPING THE MARKETING

4    MATERIALS?

5    A.    YES.

6    Q.    WHAT IS YOUR DEADLINE FOR GETTING ORDERS IN TO MEET THAT

7    PERIOD?

8    A.    FOR THE MATERIAL?

9    Q.    YES.

10    A.    GENERALLY, I THINK WE WANT ALL OF OUR FINISHED SAMPLES

11    IN-HOUSE BY OCTOBER 1.  SO WE'RE DEFINITELY TRYING TO GET THE

12    MATERIALS AS QUICK AS POSSIBLE HERE.

13    Q.    NOW, WHEN YOU SAY YOUR FINISHED SAMPLES, SO THESE ARE

14    NOT PRODUCTION.  THIS IS TO GO OUT AND SELL TO THE TRADE?

15    A.    YES.

16    Q.    AND HOW MANY SAMPLES DO YOU USUALLY NEED TO SUPPLY THE

17    SALES FORCE FOR THAT PERIOD?

18    A.    THIS IS A ROUGH GUESS, BUT I BELIEVE IT'S ABOUT LIKE 40

19    OR 50 PAIRS OF GLOVES PER STYLE.  BUT THIS IS A GUESS.

20    Q.    SO FOR THE TEN HEATWAVE PRODUCTS OR SO, YOU WOULD NEED

21    ROUGHLY 500 YARDS?

22    A.    I'M SORRY.  I THINK I MISUNDERSTOOD YOUR QUESTION.  YOU

23    SAID 40 -- I THOUGHT YOU SAID HOW MANY GLOVES WOULD WE MAKE

24    NORMALLY.

25    Q.    RIGHT.

499

1    A.   SO LIKE 40 OR 50 FOR --

2    Q.   FOR EACH STYLE?

3    A.   RIGHT.

4    Q.   SO IF WE HAD EIGHT HEATWAVE GLOVES, YOU'D HAVE 400

5    GLOVES THAT YOU HAD TO MAKE FOR SAMPLES?

6    A.   YES.  ROUGHLY.

7    Q.   OKAY.  SO IS THE CYCLE THEN, YOU GET THESE SAMPLES IN,

8    SALESMEN GO OUT, HOPEFULLY GET ORDERS, AND THEN YOU CAN ORDER

9    FOR PRODUCTION?

10   A.   YES.

11          MR. AXELROD:  OKAY.  WOULD YOU TURN TO -- I'LL OFFER

12   EXHIBIT 516 AND 391 AND 509 AND 501.

13          MR. MARCHESE:  NO OBJECTION TO 516.

14          MR. AXELROD:  AND 722.

15          MR. MARCHESE:  NO OBJECTION TO 509.

16          THE COURT:  THOSE ARE RECEIVED.

17     (TRIAL EXHIBITS 509 AND 516 RECEIVED IN EVIDENCE.)

18          MR. MARCHESE:  NO OBJECTION TO -- DID YOU SAY 501?

19   NO OBJECTION TO 501.

20          THE COURT:  RECEIVED.

21       (TRIAL EXHIBIT 501 RECEIVED IN EVIDENCE.)

22          MR. MARCHESE:  391, LET ME LOOK AT THAT, PLEASE.

23          MR. AXELROD:  391.

24          MR. MARCHESE:  391, RIGHT.  THANK YOU.  NO OBJECTION

25   TO 391.

COMPUTER-AIDED TRANSCRIPTION

500

1          THE COURT:  AND 722?

2          MR. MARCHESE:  I DIDN'T HEAR THAT ONE.  722.

3          MR. AXELROD:  YES.

4          MR. MARCHESE:  THANK YOU.

5          NO OBJECTION TO 722.

6          THE COURT:  516, 391, 509, 501 AND 722 ARE

7    RECEIVED.

8          (TRIAL EXHIBITS 391 AND 722 RECEIVED IN EVIDENCE.)

9    Q.   BY MR. AXELROD:  MRS. CHIN, TURNING TO THE SECOND PAGE

10   OF EXHIBIT 516.

11          DURING THIS FALL OF 2012, WERE YOU PRETTY MUCH ABLE

12   TO MEET YOUR TARGET, GET YOUR SAMPLES AND GET THIS STUFF

13   SUPPLIED BY VENTEX AND MANUFACTURED INTO GLOVES?

14   A.   I BELIEVE SO, YES.

15   Q.   AND IS EXHIBIT 516 THE SERIES OF E-MAILS BETWEEN YOU AND

16   VENTEX, EITHER IN CHINA OR VENTEX THROUGH MR. MEYER REGARDING

17   THE PURCHASE AND SUPPLY ISSUES?

18   A.   YES.  THIS IS AN E-MAIL BETWEEN US.

19   Q.   AND THE E-MAIL I WANT YOU TO LOOK AT IS ON PAGE 120.

20   IT'S UP ON THE SCREEN IF THAT'S AN EASIER WAY TO GET TO IT.

21   IT MAY BE.

22          IS THIS YOUR E-MAIL TO JASMINE AT VENTEX IN KOREA

23   AND DAN MEYER, WHEREVER DAN MEYER LIVES?

24   A.   YES.

25   Q.   NOW, YOU'RE REPORTING THAT YOU'RE GETTING, QUOTE,

COMPUTER-AIDED TRANSCRIPTION

501

1    AMAZING RESPONSE ON OUR HEATWAVE GLOVE STYLES, CLOSED QUOTE.

2         DID THAT RESPONSE COME TO YOU?

3    A.   NOT SPECIFICALLY, BUT IT TRICKLES DOWN TO ME, YES.

4    Q.   OKAY.  WAS IT A BUZZ?  IT'S A SMALL COMPANY; RIGHT?  SO

5    EVERYBODY WOULD KNOW WHAT'S GOING ON, WOULD THEY NOT?

6    A.   I NORMALLY GET THE HEADS UP BECAUSE I'M GOING TO HAVE TO

7    ORDER MATERIAL FOR SOMETHING.

8    Q.   OKAY.  AND FROM THE TONE OF THE E-MAIL, IT SOUNDS LIKE

9    YOU'RE PRETTY EXCITED?

10   A.   YES.

11   Q.   AND WOULD THIS REPRESENT THE TIME WHEN YOU'RE GOING FROM

12   GETTING SAMPLES FOR SALESMEN TO GETTING READY TO START

13   PLACING PRODUCTION ORDERS?  AND WE'RE IN MARCH OF 2013.

14   A.   YES.

15   Q.   AND WOULD YOU LOOK AT EXHIBIT 391.  AND DOES THE FIRST

16   E-MAIL ON EXHIBIT 391 ACCURATELY REFLECT YOUR UNDERSTANDING

17   OF HOW THE HEATWAVE LAUNCH, IF YOU WILL, WAS PERCEIVED?

18   A.   YES.

19   Q.   AT THIS POINT IN TIME, MARCH OF 2013, HAVE YOU HAD ANY

20   DISCUSSIONS WITH VENTEX ABOUT PATENTS?

21   A.   I DON'T BELIEVE SO.

22   Q.   HAVE YOU HAD ANY DISCUSSION WITH ANYBODY ABOUT THE

23   PATENT PENDING LOGO THAT WAS ON THE OMNI-HEAT MATERIAL THAT

24   YOU RECEIVED FROM SHENLI BACK IN MARCH?

25   A.   I DON'T BELIEVE SO.

502

1    Q.    WHEN YOU SAW THAT PATENT PENDING NOTICE, DID YOU MAKE

2    ANY INQUIRY OF ANYBODY AT SEIRUS?

3    A.    NO.

4    Q.    WOULD YOU TURN TO EXHIBIT 509.  WHAT IS EXHIBIT 509?

5    A.    THIS IS AN E-MAIL BETWEEN ME AND VENTEX.

6    Q.    AND IS THE FIRST E-MAIL FROM JASMINE TO YOU?

7    A.    YES, IT IS.

8    Q.    OKAY.  APRIL 4 OF 2013?

9    A.    YES.

10   Q.    OKAY.  AND ARE THERE TWO ATTACHMENTS TO THAT E-MAIL?

11   A.    YES.

12   Q.    AND WHAT IS THE FIRST ATTACHMENT?

13   A.    US0000D657093S1P.

14   Q.    OKAY.  IS THAT THE DESIGN PATENT?

15   A.    OH, I'M SORRY.  I SEE LATER IN THE E-MAIL THAT SHE'S

16   SAYING THAT THIS IS -- I CAN'T SEE THAT SHE SAYS ANYTHING

17   ABOUT -- OH, A SPECIAL DESIGN.

18   Q.    I'M SORRY.  I'M CONFUSING YOU WITH MY OWN.  IT'S LATE IN

19   THE AFTERNOON.

20   A.    I'M SORRY.

21   Q.    LET'S FLIP OVER TO EXHIBIT 501.  AND I WILL WITHDRAW

22   509.

23           THE COURT:  YOU WANT TO REMOVE 509 FROM THE --

24           MR. AXELROD:  RECORD.

25           THE COURT:  -- EXHIBITS WHICH HAVE BEEN RECEIVED?

COMPUTER-AIDED TRANSCRIPTION

503

1          MR. AXELROD:  YES.

2          THE COURT:  ANY OBJECTION?

3          MR. MARCHESE:  WE'D LIKE TO KEEP IT, YOUR HONOR.

4          THE COURT:  ALL RIGHT.  IT'S IN.  THANK YOU.

5   Q.   BY MR. AXELROD:  OKAY.  SO THE JURY CAN FOLLOW, DO YOU

6   SEE EXHIBIT 509?

7          THE COURT:  YOU ARE NOW REFERRING HER TO 509?

8          MR. AXELROD:  YES.

9          THE COURT:  OKAY.

10          THE WITNESS:  OKAY.  YES.

11   Q.   BY MR. AXELROD:  IS THAT THE SAME E-MAIL THAT'S AT THE

12   BOTTOM OF -- OR THAT'S THE SECOND E-MAIL IN THE THREAD THAT

13   IS 501?

14   A.   YES.  YES.

15   Q.   SO YOU GOT AN E-MAIL FROM PEOPLE AT VENTEX ON APRIL 4,

16   AND THEN YOU TRANSMITTED THAT TO MR. MURPHY; CORRECT?

17   A.   CORRECT.

18   Q.   ALSO ON APRIL 4?

19   A.   CORRECT.

20   Q.   AND IN YOUR E-MAIL TO MR. MURPHY, WHICH IS EXHIBIT 501,

21   YOU INCLUDED THE ATTACHMENTS THAT YOU HAD RECEIVED FROM

22   VENTEX; CORRECT?

23   A.   YES.

24   Q.   WOULD YOU LOOK AT THE E-MAIL FROM VENTEX THAT STARTS AT

25   THE BOTTOM OF 501 AND IS ESSENTIALLY OVER ON THE SECOND PAGE.

1    A.   YES.

2    Q.   DID THE PEOPLE AT VENTEX ALSO COMMUNICATE DIRECTLY WITH

3    OTHERS AT SEIRUS?

4    A.   THEY WOULD CONTACT OTHERS, BUT I AM THE MAIN CONTACT AS

5    THE MATERIALS BUYER.

6    Q.   WHO ELSE WOULD THEY CONTACT IF SOMETHING CAME UP OR

7    ISSUES HAD TO BE --

8    A.   BOB.

9    Q.   MR. MURPHY?

10   A.   YES.

11   Q.   OKAY.  LOOKING AT THE SECOND PAGE, VENTEX WRITES, WE

12   FOUND A SIMILAR LITTLE WAVE PATTERN -- OR EXCUSE ME.  WE

13   FOUND A LITTLE SIMILAR WAVE PATTERN.

14        DO YOU SEE THAT?

15   A.   YES, I DO.

16   Q.   AND DID YOU UNDERSTAND THAT TO REFER TO THE FACT THAT

17   THEY WERE IDENTIFYING THE D-093 DESIGN PATENT THAT WAS

18   ATTACHED TO THIS E-MAIL?

19   A.   YES.

20   Q.   OKAY.  AND THEN THEY SAY DOWN BELOW, "FOR YOUR

21   INFORMATION, I ATTACHED THE ONE DOCS FOR HELPING THE

22   POTENTIAL ISSUE OF PATENT WITH COLUMBIA FOR THE FUTURE."  AND

23   THAT'S WHAT WE ALL NOW REFER TO AS THE FOTTINGER REFERENCE.

24        DO YOU SEE THAT?

25   A.   YES.

505

1    Q.    AND THAT WAS ATTACHED ALSO WITH THE E-MAIL FROM THE

2    KOREAN SUPPLIER VENTEX THAT YOU FORWARDED TO MR. MURPHY;

3    CORRECT?

4    A.    YES.

5    Q.    HAD YOU EVER DISCUSSED ANY PATENT ISSUES WITH VENTEX

6    PRIOR TO YOUR RECEIVING THIS E-MAIL?

7    A.    I DON'T BELIEVE SO.

8    Q.    THEY REFER TO THE COLUMBIA PATENT OR COLUMBIA'S PATENT.

9    HAD YOU EVER HAD A DISCUSSION WITH VENTEX PRIOR TO THIS

10   COMMUNICATION ABOUT COLUMBIA'S PATENTS?

11   A.    I DON'T BELIEVE SO, NO.

12   Q.    HAD ANYONE AT SEIRUS, TO YOUR KNOWLEDGE, SINCE RECEIVING

13   THE MATERIAL FROM -- EXCUSE ME, FROM SHENLI, THE OMNI-HEAT

14   MATERIAL WITH THE PATENT PENDING NOTICE, MADE ANY PATENT

15   SEARCH OR ANY PATENT INQUIRY TO DETERMINE WHAT PATENTS OR

16   PATENT APPLICATIONS OWNED BY COLUMBIA HAD BEEN PUBLISHED?

17   A.    I'M NOT INVOLVED IN THE SEARCHING OF THAT, SO I COULDN'T

18   SAY IF ANY SEARCHES HAVE BEEN DONE.

19   Q.    SO TO YOUR KNOWLEDGE --

20   A.    TO MY KNOWLEDGE, NO.

21              MR. AXELROD:  THANK YOU.  THAT'S ALL I HAVE.

22              THE COURT:  CROSS-EXAMINE.

23              MR. MARCHESE:  AND, YOUR HONOR, I'D LIKE TO RESERVE

24   THE RIGHT TO RE-CALL MS. CHIN.

25              THE COURT:  OKAY.

506

1          MR. MARCHESE:  THANK YOU.

2                    CROSS-EXAMINATION

3    BY MR. MARCHESE:

4    Q.   GOOD AFTERNOON, MS. CHIN.

5    A.   GOOD AFTERNOON.

6    Q.   NICE TO SEE YOU AGAIN.

7          SO MR. AXELROD ASKED YOU A SERIES OF QUESTIONS ABOUT

8    A LOT OF DIFFERENT DOCUMENTS.  AND I'M GOING TO TRY TO KEEP

9    THEM ORGANIZED HERE AS I WORK THROUGH IT.  AND I'LL PROBABLY

10   JUST GO IN THE SAME SEQUENCE THAT HE WENT IN IF THAT'S OKAY.

11   A.   OKAY.

12   Q.   GREAT.

13         SO IF YOU COULD GO BACK TO EXHIBIT 543.

14   A.   OKAY.

15   Q.   DO YOU HAVE IT?

16   A.   YES.

17   Q.   OKAY.  THANK YOU.

18         AND IN PARTICULAR, MR. AXELROD POINTED YOU TO I

19   THINK IT WAS THE LAST TWO PAGES OF THE E-MAIL, OF THIS SERIES

20   OF E-MAILS.

21         DO YOU REMEMBER THAT?

22   A.   YES.

23   Q.   AND IN THAT E-MAIL, HE WAS ASKING YOU QUESTIONS ON

24   PAGE -- IT'S THE BOTTOM RIGHT-HAND CORNER OF 652.  DO YOU

25   REMEMBER LOOKING AT THIS?

1    A.    YES.

2    Q.    AND ON THIS PARTICULAR E-MAIL, THERE IS A REFERENCE TO

3    SOMETHING CALLED "FUZZ MATERIAL."  DO YOU SEE THAT?

4    A.    YES.

5    Q.    CAN YOU TELL US WHAT FUZZ MATERIAL IS.

6    A.    FUZZ MATERIAL IS SIMPLY A FUZZY FLEECE MATERIAL THAT WE

7    USE IN OUR LINE.

8    Q.    WHY ARE YOU CALLING IT FUZZ MATERIAL WITH -- THIS IS

9    SHENLI YOU'RE COMMUNICATING WITH; IS THAT CORRECT?

10   A.    YES.

11   Q.    AND WHY ARE YOU CALLING IT FUZZ MATERIAL?

12   A.    THIS IS A WAY THAT IT WAS FIRST REFERENCED TO US FROM

13   SHENLI.  SO IT JUST KIND OF STUCK AS THE THING THAT WE WOULD

14   USE TO REFERENCE THIS MATERIAL AND KNOW WHAT WE'RE TALKING

15   ABOUT.

16   Q.    SO SHENLI IS A COMPANY IN CHINA; IS THAT CORRECT?

17   A.    YES.

18   Q.    AND COMMUNICATIONS WITH THEM, HOW WOULD YOU CHARACTERIZE

19   IT?  WAS IT EASY?  DIFFICULT?  YOU HAD TO BE CAREFUL WHAT YOU

20   SAID?  I MEAN, CAN YOU TELL US.

21   A.    A LOT OF OUR COMMUNICATION WITH PEOPLE OVERSEAS IS A

22   LITTLE BIT DIFFICULT JUST BECAUSE IT IS THEIR SECOND

23   LANGUAGE.  SO THIS IS WHY WE WOULD USE SOMETHING AS "FUZZ"

24   AND STICK WITH IT.

25           PROBABLY SOUNDS LIKE A SILLY WORD TO EVERYONE ELSE,

508

```
1    BUT IT'S SOMETHING THAT WE BOTH AGREED ON REPRESENTS THE
2    FABRIC, AND WE KNEW WE COULD USE TO EASILY REFERENCE A
3    CORRECT ITEM WITH THEM.
4    Q.   SO SHENLI AND SEIRUS, YOU IN THIS PARTICULAR INSTANCE,
5    COULD TALK TO EACH OTHER WITH TERMINOLOGY YOU BOTH
6    UNDERSTOOD?
7    A.   CORRECT.
8    Q.   AND THAT WOULD BE, IN THIS INSTANCE, "FUZZ"; CORRECT?
9    A.   CORRECT.
10   Q.   OKAY.  AND THEN IF YOU SKIP DOWN A LITTLE BIT LOWER IN
11   THE E-MAIL, YOU'LL SEE REFERENCES TO SL-66183, SL-69313,
12   HL-69440 AND SO ON.
13         DO YOU SEE THOSE?
14   A.   YES.
15   Q.   SO THESE LETTERS WITH DIGITS, WHAT WOULD YOU CALL
16   THOSE?
17   A.   THOSE WE WOULD CALL STYLE NUMBERS.
18   Q.   STYLE NUMBERS.
19         WHAT'S A STYLE NUMBER?
20   A.   THOSE ARE REFERENCING A DIFFERENT MATERIAL STYLE.
21   Q.   HOW DOES THAT DIFFER FROM REFERRING TO SOMETHING AS
22   FUZZ, FOR EXAMPLE?
23   A.   IT DOESN'T, OTHER THAN THIS IS A SERIES OF LETTERS AND
24   NUMBERS AND THE OTHER ONE IS A WORD.  IT'S JUST A REFERENCE,
25   AGAIN, OF WHAT MATERIAL WE'RE TRYING TO TALK TO THEM ABOUT.
```

509

1    Q.   WELL, WHY WOULD YOU CALL ONE FUZZ AND THE OTHER ONES YOU

2    WOULD REFER TO WITH A STYLE NUMBER?

3    A.   JUST BECAUSE THAT'S HOW IT WAS EITHER LABELED IN THEIR

4    BINDERS THAT THEY ARE SHOWING US OR THEY FIRST WOULD

5    REFERENCE IT WITH US.

6    Q.   SO SHENLI, IN THIS INSTANCE, DOESN'T HAVE A STYLE NUMBER

7    FOR FUZZ; IS THAT CORRECT?

8    A.   CORRECT.

9    Q.   AND I SEE REFERENCE IN HERE AS WELL TO SOMETHING CALLED

10   "AQUAPIL FLEECE."  DO YOU SEE THAT?

11   A.   YES.

12   Q.   IS THAT ANOTHER FABRIC YOU'RE FAMILIAR WITH?

13   A.   I DON'T KNOW WHAT THIS PARTICULAR ONE IS, BUT IT WOULD

14   BE ANOTHER FABRIC, YES.

15   Q.   AND IS THIS ANOTHER EXAMPLE OF A TERM THAT YOU WOULD USE

16   WITH SHENLI WHEN THERE WAS NO STYLE CODE?

17   A.   CORRECT.

18   Q.   AND THEN UP ABOVE, THERE IS LANGUAGE THAT SAYS "VERY

19   IMPORTANT, WE ARE INTERESTED IN THE COLUMBIA OMNI-HEAT

20   MATERIAL."

21        DO YOU SEE THAT?

22   A.   YES.

23   Q.   AND CAN YOU TELL US ABOUT WHY YOU'RE USING THE

24   TERMINOLOGY "COLUMBIA OMNI-HEAT MATERIAL"?

25   A.   AGAIN, JUST GO BACK TO LIKE THE FUZZ REFERENCE.  THIS IS

510

1    JUST THE FIRST WORD THAT THEY HAD USED TO REFERENCE THIS

2    SPECIFIC MATERIAL TYPE TO US.

3    Q.   SO "COLUMBIA OMNI-HEAT MATERIAL" IS A TERM THAT SHENLI

4    HAS FIRST USED WITH SEIRUS; IS THAT CORRECT?

5    A.   YES.

6    Q.   AND SO YOU USE IT BACK WITH THEM; IS THAT RIGHT?

7    A.   YES.

8    Q.   WHY?

9    A.   BECAUSE WE HAVE AN UNDERSTANDING OF WHEN WE SAY

10   "OMNI-HEAT," THIS IS THE MATERIAL THAT WE'RE REFERENCING,

11   THIS IS THE MATERIAL THAT WE'RE ASKING ABOUT.

12   Q.   SO IT'S A CONVENIENT FORM OF TERMINOLOGY TO ALLOW YOU TO

13   COMMUNICATE?

14   A.   YES.

15   Q.   SIMILAR WITH FUZZ?

16   A.   YES.

17   Q.   WAS THERE A STYLE NUMBER FOR COLUMBIA OMNI-HEAT WITH

18   SHENLI?

19   A.   NOT TO MY KNOWLEDGE.

20   Q.   WAS -- AND THIS COMMUNICATION IS IN -- IT LOOKS LIKE

21   FEBRUARY 1, 2012; IS THAT CORRECT?

22   A.   YES.

23   Q.   AND AS OF THIS TIME PERIOD, THE FEBRUARY 2012 TIME

24   PERIOD, THERE IS NO STYLE NUMBER FOR COLUMBIA OMNI-HEAT FROM

25   SHENLI?

COMPUTER-AIDED TRANSCRIPTION

511

1    A.    YES.

2    Q.    THERE IS OR IS NOT?

3    A.    THERE IS NOT.  SORRY.

4    Q.    NO PROBLEM.

5          SOMETIMES THE QUESTIONS SEEM LIKE THEY SHOULD BE

6    YESES, BUT THEY SHOULD BE NOES.  BUT ANYWAY, I'LL TRY TO

7    CLEAR THAT UP.

8          TO YOUR RECOLLECTION, WAS THERE ANY POINT IN TIME

9    WHEN YOU WERE COMMUNICATING WITH SHENLI WHERE COLUMBIA

10   OMNI-HEAT MATERIAL, AS THEY FIRST REFERRED TO IT, HAD A STYLE

11   NUMBER?

12   A.    NO, THERE WASN'T.

13   Q.    SO THE ENTIRETY OF YOUR COMMUNICATION WITH SHENLI

14   CONCERNING THIS PARTICULAR MATERIAL, YOU WOULD USE THE

15   TERMINOLOGY FIRST GOTTEN FROM THEM; IS THAT CORRECT?

16   A.    YES, IT IS.

17   Q.    SO LET ME JUST MOVE FORWARD A LITTLE BIT TO A DOCUMENT

18   THAT COUNSEL LOOKED AT A LITTLE LATER, AND I THOUGHT I WOULD

19   JUST USE IT NOW BECAUSE I THINK IT'S GOT THE SAME

20   TERMINOLOGY.

21         IT'S 546, PLEASE.  I HOPE THAT'S RIGHT.  I'VE GOT A

22   LOT OF DOCUMENTS SITTING HERE IN FRONT OF ME.  I'LL DO MY

23   BEST TO KEEP TRACK OF THEM.

24         IF YOU GO -- LOOK TO THE VERY BOTTOM OF 546 ON THE

25   FIRST PAGE.  THERE IS AN E-MAIL FROM YOU TO CHEN QING -- IS

512

1   THAT HOW YOU SAY IT?

2   A.   YOUR GUESS IS AS GOOD AS MINE.  BUT I SEE THAT NOW.

3   Q.   I'M TRYING TO BE PHONETIC.

4   A.   YEAH.

5   Q.   OKAY.  SO IT'S -- MRS. HUANG IS WHO YOU'RE WRITING TO;

6   IS THAT CORRECT?

7   A.   YES.

8   Q.   AND SHE IS WITH SHENLI; IS THAT RIGHT?

9   A.   CORRECT.

10  Q.   AND HERE THERE IS A REFERENCE TO SETTING UP THE, QUOTE,

11  OMNI-HEAT PROGRAM WITH YOU.  DO YOU SEE THAT?

12  A.   YES.

13  Q.   WHY ARE YOU USING THAT TERM "OMNI-HEAT" THERE?

14  A.   AGAIN, JUST BECAUSE THAT IS THE TERM THAT WE HAD SET

15  UPON THAT WE WOULD USE TO REFERENCE THIS MATERIAL.

16  Q.   AND IS IT CORRECT -- I THINK FROM YOUR EARLIER TESTIMONY

17  THAT YOU HAD -- ULTIMATELY SEIRUS WENT WITH VENTEX FOR

18  HEATWAVE?

19  A.   YES.

20  Q.   DID NOT USE SHENLI; CORRECT?

21  A.   CORRECT.

22  Q.   NEVER DID, IS THAT RIGHT, TO YOUR KNOWLEDGE?

23  A.   YES.

24  Q.   SO TO MAKE SURE WE'RE CLEAR HERE.  TO YOUR KNOWLEDGE,

25  SEIRUS NEVER USED THIS SHENLI FABRIC, FOIL PRINTED, WHATEVER

COMPUTER-AIDED TRANSCRIPTION

513

1    YOU WOULD CALL IT, FABRIC FOR THE HEATWAVE LINE; IS THAT

2    CORRECT?

3    A.    CORRECT.

4    Q.    COULD YOU TAKE US TO 544, PLEASE.

5              SO MS. CHIN, I HOPE I DON'T CALL YOU MS. HAAS AT

6    SOME POINT, BECAUSE I KEEP SEEING YOUR NAME AS MS. HAAS ON

7    HERE.

8              THIS IS AN E-MAIL THAT YOU LOOKED AT WITH COUNSEL

9    FROM COLUMBIA; IS THAT CORRECT?

10   A.    YES.

11   Q.    AND ABOUT HALFWAY DOWN THERE IS AN E-MAIL FROM

12   GLOBALBOBM.  THAT'S BOB MURPHY; IS THAT RIGHT?

13   A.    YES, IT IS.

14   Q.    TO YOU; CORRECT?

15   A.    YES.

16   Q.    AND THAT'S IN THE -- THAT'S ABOUT -- ON OR ABOUT

17   FEBRUARY 29, 2012; RIGHT?

18   A.    YES.

19   Q.    AND HERE IT SAYS -- I THINK YOU MADE THIS POINT IN YOUR

20   DIRECT EXAMINATION HERE, WHERE YOU SAID "VENTED" WAS A TYPO;

21   IS THAT CORRECT?

22   A.    I BELIEVE IT IS, YES.

23   Q.    AND IN YOUR BELIEF, THAT SHOULD BE "VENTEX"; IS THAT

24   CORRECT?

25   A.    CORRECT.

514

1    Q.    AND SO CAN YOU EXPLAIN FOR US, IF VENTEX IS IN THE BODY

2    LINING, WHAT DOES THAT MEAN IN THE CONTEXT OF THE LINING FOR

3    THE GLOVE?

4    A.    THE BODY LINING WOULD BE -- BASED ON THIS E-MAIL, IT

5    WOULD BE EVERYTHING OTHER THAN THE CUFF.  SO THE MAJORITY OF

6    THE GLOVE, THE WHOLE LIKE INNER OF THE PALM AND THAT, THE

7    BACK AND EVERYTHING.

8    Q.    THAT WOULD BE ALL VENTEX; IS THAT RIGHT?

9    A.    YES.

10   Q.    AND IT WOULD BE VENTEX MEGA-HEAT?

11   A.    YES.

12   Q.    AND CAN YOU TELL US, WAS VENTEX MEGA-HEAT A FABRIC THAT

13   SEIRUS WAS INTERESTED IN USING FOR THE HEATWAVE PRODUCT

14   LINE?

15   A.    YES.

16   Q.    AND WHEN DID THAT BEGIN TO OCCUR, TO YOUR KNOWLEDGE?

17   A.    WE FIRST SAW THAT MATERIAL AT THE OUTDOOR RETAILER SHOW

18   IN JANUARY 2012.

19   Q.    AND DID YOU PERSONALLY KNOW ABOUT MEGA-HEAT BEFORE

20   JANUARY 2012?

21   A.    NO.

22   Q.    OKAY.  BUT OTHERS AT SEIRUS MIGHT HAVE; IS THAT

23   CORRECT?

24   A.    POTENTIALLY, YES.

25   Q.    BUT I MEAN, YOU WOULDN'T KNOW IF ANYBODY ELSE AT SEIRUS

515

1    DID KNOW ABOUT IT; IS THAT RIGHT?

2    A.    NOT NECESSARILY.

3    Q.    OKAY.  DO YOU KNOW -- WELL, LET ME ASK YOU THIS:  WAS

4    THERE A POINT IN TIME, TO YOUR KNOWLEDGE, THAT SEIRUS LANDED

5    ON USING MEGA-HEAT FOR THE HEATWAVE LINE?

6    A.    PROBABLY DURING OUR STEERING MEETINGS.

7    Q.    RIGHT.  AND THEN AT SOME POINT IN TIME, YOU ACTUALLY --

8    YOU WERE INVOLVED IN PURCHASING MEGA-HEAT FROM VENTEX;

9    CORRECT?

10   A.    YES.

11   Q.    AND THERE WAS A PARTICULAR -- WELL, HAVE YOU HEARD THE

12   TERM "MEGA-HEAT RX"?

13   A.    YES.

14   Q.    WHAT DOES THAT MEET?

15   A.    THE X SYMBOLIZES THE FOIL-PATTERN PRINTING.

16   Q.    SO MEGA-HEAT IS A FABRIC FROM VENTEX.  THAT'S THE BASE

17   LAYER; IS THAT CORRECT?

18   A.    YES.

19   Q.    AND THEN WITH THE FOIL ON IT, THEY CALL IT MEGA-HEAT

20   RX?

21   A.    YES.

22   Q.    SO IT WAS MEGA-HEAT RX THAT SEIRUS WAS PURCHASING FOR

23   HEATWAVE?

24   A.    YES.

25   Q.    AND STILL IS?

516

1   A.   YES.

2   Q.   SO I THINK YOU PROBABLY ANSWERED THIS, BUT I WANT TO

3   MAKE SURE I'M CLEAR ON IT HERE.

4        DO YOU KNOW WHETHER OR NOT A SAMPLE OF A GLOVE WITH

5   SHENLI, THIS OMNI-HEAT MATERIAL THAT YOU WERE TALKING ABOUT

6   BEFORE, EVER CAME BACK TO SEIRUS?

7   A.   I NEVER SAW THE SAMPLE COME BACK, NO.

8   Q.   AND TELL ME ABOUT WHEN -- WHEN YOU -- IN YOUR EXPERIENCE

9   AT SEIRUS, YOU'RE INVOLVED IN GETTING THE FABRIC IN, AND YOU

10  HAVE SOME INVOLVEMENT IN GETTING SAMPLES OF GLOVES; IS THAT

11  CORRECT?

12  A.   MY INVOLVEMENT IS GETTING THE MATERIALS IN AND PROVIDING

13  IT TO OUR SAMPLE COORDINATOR, WHO WOULD SEND OUT WITH THE

14  INSTRUCTIONS TO GET THE PRODUCT MADE.

15  Q.   AND WHAT KIND OF THINGS HAPPEN, IN YOUR EXPERIENCE, WHEN

16  YOU SEND SAMPLES OUT TO MANUFACTURERS IN ASIA WHO WOULD MAKE

17  GLOVE SAMPLES FOR YOU?  FOR EXAMPLE, WHAT KIND OF THINGS

18  COULD HAPPEN?

19  A.   THEY COULD -- WE'RE NORMALLY ASKING FOR -- WE'RE NOT

20  NORMALLY ASKING FOR ONE SAMPLE.  WE'RE NORMALLY ASKING FOR

21  DIFFERENT SAMPLES AT A TIME.  AND IT'S PRETTY RARE THAT WE

22  GET EVERY SINGLE SAMPLE THAT WE'VE REQUESTED BACK, OR IF WE

23  DO, THAT THEY ARE ALL MADE HOW WE WANT THEM TO BE MADE.

24  Q.   WHY IS THAT?

25  A.   AGAIN, PROBABLY THE LANGUAGE BARRIER.  BUT ALSO A LOT OF

1    TIMES BECAUSE WE'RE RUSHING AND ASKING THEM TO GET US SAMPLES

2    IN TIME FOR OUR STEERING MEETINGS.

3    Q.   SO SOMETIMES YOU JUST DON'T GET BACK EVERYTHING YOU ASK

4    FOR; IS THAT CORRECT?

5    A.   YES.

6    Q.   I THINK YOU SAID -- WELL, I DON'T WANT TO PUT WORDS IN

7    YOUR MOUTH.  IS THAT COMMON?  TYPICAL?  CAN YOU GIVE US A

8    SENSE.

9    A.   IT'S PRETTY COMMON.

10   Q.   SO IT'S POSSIBLE HERE, WHEN WE'RE TALKING ABOUT THIS

11   SAMPLING I THINK WITH THE -- THIS OMNI-HEAT MATERIAL

12   SAMPLING, QUESTIONS THAT COUNSEL WAS ASKING YOU, THAT A

13   SAMPLE NEVER CAME BACK; IS THAT CORRECT?

14   A.   YES.

15   Q.   AND THAT WOULD NOT BE OUT OF THE ORDINARY; CORRECT?

16   A.   NO, IT WOULDN'T.

17   Q.   NOW, YOU WERE ASKED SOME QUESTIONS ABOUT A PIECE OF

18   FABRIC, AND THERE WERE PICTURES SHOWN OF IT THAT SAID

19   "OMNI-HEAT" AND "PATENT PENDING" ON IT.

20        DO YOU REMEMBER THAT?

21   A.   YES.

22   Q.   AND CAN YOU JUST GIVE US A SENSE OF WHAT YOUR

23   UNDERSTANDING IS, HAVING SEEN THIS PATENT PENDING, THE WORDS

24   ON THE FABRIC, WHAT YOUR UNDERSTANDING WITH THAT WOULD BE?

25   A.   IT JUST -- TO ME, SINCE IT SAID "PENDING" MEANS THAT

518

1    IT'S NOT FINAL, THAT MAYBE THERE IS A PATENT THAT HAD BEEN

2    CREATED -- OR WHAT'S THE RIGHT WORD?  SUBMITTED FOR IT, BUT

3    IT WASN'T FINAL.  SO IT DIDN'T REALLY STRIKE ME AS A BIG

4    DEAL.

5    Q.   AND WHAT KIND OF EXPERIENCE DO YOU HAVE IN TERMS OF, YOU

6    KNOW, SOCIAL MEDIA, TV, OR WHAT HAVE YOU THAT WOULD HELP YOU

7    UNDERSTAND WHAT PATENT PENDING MEANS TO YOU?

8    A.   SO EMBARRASSING, BUT I WATCH A LOT OF TV.  AND I KNOW

9    LIKE ON SHARK TANK -- I DON'T KNOW IF ANYBODY WATCHES THAT.

10   BUT A LOT OF TIMES THEY WILL SAY HOW IF THE PRESENTER SAYS

11   IT'S PATENT PENDING, THEN A LOT OF TIMES THE INVESTORS WILL

12   KIND OF LAUGH AND SAY PENDING DOESN'T MEAN ANYTHING, THAT

13   DOESN'T HAVE RELEVANCE IN WHAT THEY ARE TRYING TO SELL TO

14   THEM.

15   Q.   SO YOU'VE SEEN THIS ON THE SHARK TANK SHOW; IS THAT

16   RIGHT?

17   A.   YES.  SORRY.  I WATCH A LOT OF TV.

18   Q.   IT'S OKAY.  I'VE WATCHED IT, TOO.

19        CAN YOU PULL UP 551, PLEASE.  LET'S TAKE A LOOK AT

20   PROBABLY THE FIRST E-MAIL WHICH IS -- WELL, ACTUALLY IF YOU

21   WANT TO LOOK AT THE TOP E-MAIL, THAT'S FINE.  IT IS THE ONE

22   THAT IS FROM YOU TO PRANALI JHALA.

23        DO YOU SEE THAT?

24   A.   YES.

25   Q.   AND THIS IS DATED -- THIS IS -- NOW WE'RE IN JULY OF

519

1    2012; RIGHT?

2    A.    YES.

3    Q.    AND YOU ARE USING THE WORD OMNI -- WELL, ACTUALLY NOT

4    THAT WORD.  IT LOOKS LIKE YOU'VE GOT "OMI HEAT."

5          DO YOU SEE THAT?

6    A.    YES.

7    Q.    I TAKE IT, IS THAT A TYPO?

8    A.    YES.

9    Q.    OKAY.  SO AT THIS POINT IN TIME, YOU'RE USING THE TERM

10   "OMNI-HEAT" WHEN YOU'RE COMMUNICATING WITH MS. JHALA;

11   CORRECT?

12   A.    CORRECT.

13   Q.    WHY IS THAT?

14   A.    AGAIN, JUST BECAUSE IT WAS WHAT WE HAD SETTLED ON

15   CALLING IT AT THAT TIME, JUST BECAUSE WE HADN'T COME UP

16   WITH -- WE HADN'T ADDED IT TO OUR LINE YET, WHICH MEANS WE

17   HADN'T CREATED OUR PERSONAL STYLE NUMBER OF WHAT WE WOULD BE

18   ORDERING AND A DESCRIPTION OF WHAT IT WAS YET.

19   Q.    SO WOULD IT BE CORRECT TO SAY THAT THIS IS A TERM OF

20   CONVENIENCE FOR YOU AT THIS POINT?

21   A.    YES.

22   Q.    IT'S A WAY THAT YOU GUYS CAN COMMUNICATE WITH EACH OTHER

23   ABOUT SOMETHING.  IT'S TERMINOLOGY?

24   A.    WITH EACH OTHER.  AND THEN IF SHE EVER WAS STEPPING IN,

25   LIKE SAY I WAS OUT SICK OR WHATEVER, SHE WOULD BE ABLE TO

520

1    COMMUNICATE ALSO WITH THE MATERIAL VENDORS AND HAVE THAT SAME

2    KIND OF LANGUAGE WITH THEM.

3    Q.    SO SHENLI; IS THAT RIGHT?

4    A.    CORRECT.

5            MR. MARCHESE:   COULD YOU PULL UP 546.

6    Q.    NOW WE'RE IN THE AUGUST 2012 TIME FRAME IN THIS E-MAIL;

7    CORRECT?

8    A.    YES.

9    Q.    AND SO THIS IS AFTER THE STEERING COMMITTEE MEETING

10   WHICH HAPPENS IN JULY OF 2012; CORRECT?

11   A.    CORRECT.

12   Q.    BUT YOU'RE NOT AT THAT STEERING COMMITTEE MEETING IN

13   JULY OF 2012; RIGHT?

14   A.    NO, I'M NOT.

15   Q.    OKAY.  AND YOU DON'T NORMALLY GO TO STEERING COMMITTEE

16   MEETINGS, DO YOU?

17   A.    NO, I DON'T.

18   Q.    OKAY.  SO YOU DON'T KNOW FROM FIRSTHAND KNOWLEDGE WHAT

19   HAPPENED AT THE STEERING COMMITTEE MEETING IN JULY OF 2012?

20   A.    NO, I DON'T.

21   Q.    AND YOU DON'T KNOW SITTING HERE -- LET ME ASK YOU THIS.

22   WITHDRAWN.

23            TO YOUR KNOWLEDGE, WAS THE HEATWAVE NAME ARRIVED AT

24   IN JULY OF 2012 AT THE STEERING COMMITTEE MEETING?

25   A.    I DON'T KNOW AT THIS POINT.

521

1    Q.   SO HERE IN THIS E-MAIL, AT THE BOTTOM, AGAIN, YOU'RE

2    COMMUNICATING WITH MS. HUANG AND YOU'RE USING THE TERM

3    OMNI-HEAT IN QUOTES.

4         AND I THINK WE ACTUALLY LOOKED AT THIS BEFORE.  MY

5    APOLOGIES.  SO I'M GOING TO SKIP PAST THIS.  I FORGOT I

6    ACTUALLY USED THIS PREVIOUSLY.  SO WE CAN LET THIS ONE GO.

7         MR. AXELROD ASKED YOU SOME QUESTIONS ABOUT MEASURING

8    COVERAGE ON -- FOIL COVERAGE ON FABRICS.  DO YOU REMEMBER

9    THAT?

10   A.   YES.

11   Q.   AND I THOUGHT YOU SAID THAT -- WELL, REFRESH ME.  DO YOU

12   HAVE ANY KNOWLEDGE OF ANY MEASUREMENTS THAT HAVE BEEN MADE ON

13   HEATWAVE FABRIC OVER THE PAST FEW YEARS?

14   A.   YES.

15   Q.   AND DO YOU KNOW ANY OF THE NUMBERS, PERCENTAGE NUMBERS?

16   HAVE YOU SEEN ANY OF THOSE?

17   A.   I'VE SEEN A LOT OF DIFFERENT NUMBERS, YES.

18   Q.   AND HAVE YOU SEEN ANY ABOVE 70 PERCENT?

19   A.   YES.

20   Q.   OKAY.  AND HOW MANY TIMES HAVE YOU SEEN THAT?

21   A.   IT WOULD BE A GUESS, BUT --

22        MR. AXELROD:  OBJECTION.  CALLS FOR SPECULATION.

23        THE COURT:  SUSTAINED.

24   Q.   BY MR. MARCHESE:  YOU WOULDN'T WANT TO GUESS.  CAN YOU

25   GIVE US A ROUGH ESTIMATE?

1    A.   I COULDN'T SAY FOR CERTAIN.  ROUGH ESTIMATE --

2           MR. AXELROD:  OBJECTION.  SAME.  LACK OF PERSONAL

3    KNOWLEDGE.

4           THE COURT:  THE OBJECTION IS SUSTAINED.

5    Q.   BY MR. MARCHESE:  WAS IT MORE THAN TWICE?

6    A.   YES.

7    Q.   MORE THAN FIVE TIMES?

8    A.   POTENTIALLY, YES.

9    Q.   SO SOMEWHERE BETWEEN -- WELL, SOMEWHERE OVER TWO, BUT

10   MAYBE OVER FIVE; IS THAT CORRECT?

11   A.   YES.

12   Q.   THANK YOU.

13          CAN I HAVE EXHIBIT 301, PLEASE.

14          THE COURT:  IT'S EXACTLY 5 O'CLOCK.  YOU'RE TURNING

15   TO A NEW TOPIC.  THIS WOULD BE A GOOD TIME FOR US TO TAKE OUR

16   EVENING RECESS.

17          WE'LL BE IN RECESS UNTIL TOMORROW MORNING.  ONCE

18   AGAIN, GET HERE JUST A LITTLE BIT BEFORE 9 O'CLOCK, AND WE'LL

19   TRY TO START RIGHT AT 9 O'CLOCK, JUST LIKE WE DID THIS

20   MORNING.  A FEW MINUTES EARLY.  GREAT JOB.

21          I'LL SEE YOU TOMORROW.  HAVE A GOOD EVENING.

22          (JURY ABSENT, 5:03 P.M.)

23          THE COURT:  PLEASE BE SEATED.  THEY WILL BE EXITING

24   IN JUST A FEW MINUTES.  JUST HOLD YOUR PLACES UNTIL THEY ARE

25   OUT AGAIN.

523

1          YOU MAY STEP DOWN.

2          I'LL SEE YOU TOMORROW AT 9 O'CLOCK IN THE MORNING.

3          BEFORE YOU LEAVE, I WANT YOU TO WORK TOGETHER TO SEE

4    IF YOU CAN GET MR. BLACKFORD'S TESTIMONY SQUARED AWAY AND

5    WHAT THE TIMING IS GOING TO BE WITH THAT.

6          MR. ALDRICH:  YES.  THE PROCEDURAL QUESTION FROM ME

7    THIS MORNING ACTUALLY TOOK AN INTERESTING WRINKLE.

8          WE GOT A REQUEST THIS AFTERNOON TO HAVE MR. KELLY

9    APPEAR IN THEIR CASE-IN-CHIEF.  MR. KELLY IS NOT MAKING AN

10   APPEARANCE.  THEY DID NOT DISCLOSE HIM WHEN YOU ASKED WHO

11   THEIR WITNESSES WERE GOING TO BE.  HIS ONLY RELEVANT

12   TESTIMONY DURING THE DEPOSITIONS WAS ABOUT THE NIKE LICENSE

13   THAT'S BEEN EXCLUDED.

14         CAN YOU COMPEL MR. KELLY TO TESTIFY?

15         THE COURT:  CAN I COMPEL --

16         MR. ALDRICH:  I'M NOT SURE PROCEDURALLY.  CAN THEY

17   REQUIRE MR. KELLY TO TESTIFY?

18         THE COURT:  SO I UNDERSTAND.  I HAVE MR. BLACKFORD,

19   BECAUSE HE WAS IN MY COURTROOM AND HE TESTIFIED.

20         MR. ALDRICH:  I UNDERSTAND.

21         THE COURT:  AND IT'S LIKE A BLESSING.  SOME PEOPLE

22   DON'T LOOK AT IT THAT WAY, BUT THAT'S HOW I LOOK AT IT.

23         MR. ALDRICH:  VERY GOOD, YOUR HONOR.

24         THE COURT:  ONCE THE BLESSING IS ON HIM, HE'S

25   MINE.

524

1          MR. ALDRICH:  OKAY.

2          THE COURT:  NOW YOU'RE TALKING ABOUT SOMEONE WHO

3    DOESN'T HAVE MY BLESSING YET.

4          MR. ALDRICH:  OKAY.

5          THE COURT:  SO WHAT'S YOUR QUESTION?

6          MR. ALDRICH:  DOES MR. KELLY NEED TO TESTIFY?

7          THE COURT:  I DON'T KNOW THE ANSWER TO YOUR

8    QUESTION.  HE WAS -- IS HE SUBPOENAED TO BE HERE?

9          MR. ALDRICH:  HE'S NOT SUBPOENAED TO BE HERE, AND

10   THEY HAVE NO SUBPOENA POWER OVER HIM HERE.

11         MR. MARCHESE:  HE'S BEEN ON OUR WITNESS LIST FOR A

12   LONG TIME, YOUR HONOR.

13         THE COURT:  SO WHEN YOU -- WHEN I ASKED, TELL ME WHO

14   YOUR WITNESSES ARE, HE WAS NOT SOMEBODY YOU INCLUDED ON YOUR

15   LIST?

16         MR. MARCHESE:  I THINK WE DID.

17         MR. ALDRICH:  NO, YOUR HONOR.  THEY DID NOT.

18         MR. MARCHESE:  I BELIEVE HE'S BEEN ON OUR LIST

19   FOR -- I CAN GO BACK AND LOOK TO SEE WHEN IT WAS.  BUT MY

20   RECOLLECTION IS HE'S BEEN ON THE LIST FOR QUITE SOME TIME.

21         THE COURT:  I DON'T KNOW THE ANSWER TO THAT.  SO THE

22   ISSUE IS, IS HE SOMEBODY THAT'S GOING TO COME HERE ON HIS OWN

23   VOLITION?

24         MR. MARCHESE:  HE'S HERE.

25         THE COURT:  HE'S ALREADY HERE.

COMPUTER-AIDED TRANSCRIPTION

525

1              MR. ALDRICH:  THIS IS MR. KELLY.  HE'S IN-HOUSE

2     COUNSEL.  HE'S SITTING AT COUNSEL TABLE AS A CORPORATE

3     REPRESENTATIVE.  BUT HE IS NOT APPEARING BY SUBPOENA, AND I

4     DON'T THINK THEY HAVE ANY SUBPOENA POWER OVER HIM.

5              THE COURT:  I DON'T HAVE ANY POWER OVER HIM AT THIS

6     JUNCTURE, BECAUSE THE BLESSING HASN'T OCCURRED YET.

7              MR. ALDRICH:  I UNDERSTAND, YOUR HONOR.  THANK

8     YOU.

9              MR. MARCHESE:  I SUPPOSE WE CAN SERVE HIM WITH A

10    SUBPOENA TOMORROW.

11             THE COURT:  YOU CERTAINLY CAN.

12             MR. MARCHESE:  GREAT.

13             MR. ALDRICH:  TO BE CLEAR, THE COURT DOESN'T HAVE

14    ANY SUBPOENA POWER OVER HIM UNDER RULE 45.

15             THE COURT:  I DON'T KNOW WHAT THE ANSWER TO THAT IS.

16    IF THEY WANT TO SERVE A SUBPOENA OVER HIM, WE'LL TAKE UP THE

17    ISSUE WHETHER HE HAS TO APPEAR IN THE MATTER.  HE'S HERE.

18    HE'S PRESENT.  HE'S IN THIS JURISDICTION.  I DON'T KNOW

19    WHETHER THEY CAN SERVE A SUBPOENA ON HIM.

20             MR. ALDRICH:  THE RULES CHANGED A COUPLE YEARS AGO,

21    SO I THINK WE CAN PROBABLY DEAL WITH THAT THIS EVENING WITH

22    THEM, YOUR HONOR.

23             MR. MARCHESE:  WE CAN CERTAINLY TALK ABOUT THAT

24    OFFLINE.

25             ONE QUICK QUESTION, YOUR HONOR.  I DID NOTICE THAT

526

1    MR. BLACKFORD REMAINED IN THE COURTROOM WHILE FACT WITNESSES

2    WERE TESTIFYING.  AND I --

3         THE COURT:  THERE HAS BEEN A WHOLE -- NOBODY SAID TO

4    ME THERE IS A MOTION TO EXCLUDE WITNESSES.

5         MR. MARCHESE:  I DIDN'T -- WE DIDN'T DO THAT BEFORE.

6    I KNOW I WAS THINKING FOR FUTURE -- HE MAY NOT BE HERE FOR A

7    WHILE, BECAUSE I DON'T KNOW IF HE'S GOING HOME.  BUT I WAS

8    THINKING FOR FUTURE REFERENCE, WE'D LIKE TO EXCLUDE HIM.

9         THE COURT:  I THINK YOU'RE A LITTLE LATE FOR THAT

10   ONE, BECAUSE ALL YOUR WITNESSES HAVE BEEN SITTING BACK THERE

11   AND LISTENING TO TESTIMONY.

12        MR. MARCHESE:  THEY ARE ALL IN-HOUSE PEOPLE THAT ARE

13   NOT GOING TO TESTIFY.

14        MR. ALDRICH:  MR. CAREY WAS THERE LISTENING TO

15   MS. CHIN'S TESTIMONY AS WELL.

16        MR. MARCHESE:  HE'S A CORPORATE REP.  HE'S ALLOWED

17   TO DO THAT.

18        THE COURT:  HE WOULD BE ANYWAYS.

19        YOU'RE TOO LATE ON THAT.  IF THAT WAS A MOTION THAT

20   WAS MADE BEFORE THE TRIAL, I WOULD HAVE GRANTED IT AND WE

21   WOULDN'T BE HAVING THIS CONVERSATION.

22        ANYTHING ELSE?  ALL RIGHT.  WORK TOGETHER.  GET THAT

23   STUFF WORKED OUT.

24        MR. ALDRICH:  THANK YOU, YOUR HONOR.

25        THE COURT:  USE YOUR MANNERS.

527

1        MR. MARCHESE:  THANK YOU.

2        (PROCEEDINGS CONCLUDED AT 5:08 P.M.)

3              --OOO--

4        C E R T I F I C A T I O N

5        I HEREBY CERTIFY THAT I AM A DULY APPOINTED,
QUALIFIED AND ACTING OFFICIAL COURT REPORTER FOR THE UNITED
6   STATES DISTRICT COURT; THAT THE FOREGOING IS A TRUE AND
CORRECT TRANSCRIPT OF THE PROCEEDINGS HAD IN THE
7   AFOREMENTIONED CAUSE; THAT SAID TRANSCRIPT IS A TRUE AND
CORRECT TRANSCRIPTION OF MY STENOGRAPHIC NOTES; AND THAT THE
8   FORMAT USED HEREIN COMPLIES WITH THE RULES AND REQUIREMENTS
OF THE UNITED STATES JUDICIAL CONFERENCE.

9

        DATED:  SEPTEMBER 19, 2017, AT SAN DIEGO,
10  CALIFORNIA.

11                       S/CAMERON P. KIRCHER
                         CAMERON P. KIRCHER
12

13

14

15

16

17

18

19

20

21

22

23

24

25

COMPUTER-AIDED TRANSCRIPTION

1              United States District Court

2         For the Southern District of California

3

4                          )

    COLUMBIA SPORTSWEAR NORTH      )

5   AMERICA, INC., an Oregon       )   No. 17-cv-1781-HZ

    corporation,                 )

6                         )   September 20, 2017

          Plaintiff,        )

7                         )   San Diego, California

            v.              )

8                         )

    SEIRUS INNOVATIVE ACCESSORIES. )

9   INC., a Utah Corporation,     )

                        )

10                        )

          Defendant.        )

11

12

13

                 Volume 3 - AM Session

14

         Reporter's Transcript of Proceedings

15

       BEFORE THE HONORABLE MARCO A. HERNANDEZ

16

           United States District Judge

17

18

19

20

21

22

23  Court Reporter:          Dana Peabody, RDR, CRR

                     District Court Clerk's Office

24                 333 West Broadway, Suite 420

                     San Diego, California, 92101

25                 DanaPeabodyCSR@gmail.com

```
 1        APPEARANCES:

 2

 3    For the Plaintiff:        SCHWABE, WILLIAMSON & WYATT, P.C.
                                NIKA F. ALDRICH, JR., ESQ.
 4                              DAVID W. AXELROD, ESQ.
                                BRENNA LEGAARD, ESQ.
 5                              1211 SW 5th Avenue, Suite 1900
                                Portland, Oregon 97204
 6

 7    For the Defendant:        FISH & RICHARDSON, P.C.
                                CHRISTOPHER S. MARCHESE, ESQ.
 8                              SETH M. SPROUL, ESQ.
                                12390 El Camino Real
 9                              San Diego, California 92130

10

11    For the Defendant:        MARKOWITZ HERBOLD, P.C.
                                RENEE ROTHAUGE, ESQ.
12                              1211 SW Fifth Avenue, Suite 3000
                                Portland, Oregon 97204

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1   Case:   Columbia v. Seirus
     Date:   September 20, 2017
 2                        INDEX OF WITNESSES
     FOR THE PLAINTIFF:
 3                                    E X A M I N A T I O N
                              DIRECT   CROSS  REDIRECT  RECROSS
 4
     Morgan Chin
 5      Mr. Marchese                          539                554
        Mr. Axelrod                                   547
 6
     Michael Carey
 7      Mr. Aldrich                    559            641
        Mr. Marchese                         609
 8                        INDEX OF EXHIBITS

 9   EXHIBIT                                        EVIDENCE

10   121                                              591

11   125                                              589

12   128                                              576

13   135                                              588

14   137                                              653

15   212                                              586

16   221                                              537

17   225                                              537

18   225.3                                            537

19   225.4                                            537

20   481                                              552

21   489                                              652

22   523                                              548

23   702                                              590

24   705                                              570

25   736                                              577
```

San Diego, California, September 20, 2017

* * *

(Proceedings held outside the presence of the jury panel.)

THE COURT:    Somebody needs something.

MR. ALDRICH:    Your Honor, just with respect to Mr. Blackford, he canceled his flight this morning and has postponed it until this evening.    Mr. Blackford has meetings scheduled with international partners that are flying in for the next week to meet with him and his department.    As you know, he's an officer of the company, and they've invested millions of dollars and an outside consultant to help them.    He needs to be back tomorrow.    We offered him to be available as the very next witness this morning so that we could get through him and he could get on his flight.    They prefer a different sequence that I'm not sure would be reasonable to try to accommodate, so he's available, he's here, he's willing to testify next.

MR. MARCHESE:    So we had -- we're okay with out of order, as I mentioned yesterday, but Dr. Cole is their expert, their technical expert.    And our point to call him back in our case in chief was so that we could ask him questions about what Dr. Cole says in her testimony.    So she, as I understand it, isn't sequenced to go -- well, she may go late today, I don't know.    But in any event, we wanted to have it such that Mr. Blackford falls after her testimony, and he can come back

1    on Monday or Tuesday next week if that's more convenient, or we

2    could have him -- I think probably tomorrow would work.  We're

3    not saying he has to fall in a particular slot.  We just need

4    to have him sequenced after her.

08:38    5        THE COURT:  There's no requirement that he even be in

6    the courtroom while she testifies.

7        MR. MARCHESE:  Oh, I don't know that he needs to be in

8    the courtroom or not.  I just want to be able to ask him

9    questions about what Dr. Cole testifies to.

08:38   10        THE COURT:  I see.

11      Can you make him available by phone?

12        MR. ALDRICH:  To testify by phone?

13        THE COURT:  Yeah.

14        MR. BLACKFORD:  Tomorrow is a lot better for me than

08:38   15    next week.

16        MR. MARCHESE:  I think tomorrow -- tomorrow will be

17    fine.  I think Dr. Cole will be up and down, and we'll get

18    Mr. Blackford in.

19        THE COURT:  Tomorrow.

08:38   20        MR. ALDRICH:  So we'll just do it right after Cole.

21    If she goes on today, it may be later today.

22        MR. MARCHESE:  If she goes on today, we'll get him on

23    after that.

24        MR. ALDRICH:  At least he can get on by tomorrow

08:39   25    afternoon.

1                    MR. MARCHESE:  Sounds good.

2                    MR. ALDRICH:  That would be fine.

3                    THE COURT:  Glad to help.

4                    MR. ALDRICH:  Thank you, Your Honor.  It's amazing.

08:39     5    It's like when you call technical support, and as soon as they

6    pick up the phone, the computer works again.

7                    THE COURT:  It's a lot like that, but different.

8                    MR. MARCHESE:  A little different this time.  There's

9    nothing else that we had, Your Honor.

08:39    10                    MR. ALDRICH:  We had a separate question.  There are

11    still a couple of pending issues.  One of them is what the

12    Court is going to do about the question of the equitable

13    damages under section 289 and whether the Court's going to have

14    the jury decide that.

08:39    15                    THE COURT:  Yes.

16                    MR. ALDRICH:  The jury's going to decide that?

17                    THE COURT:  Yes.

18                    MR. ALDRICH:  We figured.  We just wanted

19    clarification.  Thank you, Your Honor.

08:39    20                    THE COURT:  Sure.

21                    MR. ALDRICH:  And then we had filed a motion last week

22    to preclude their experts from testifying, both under Daubert

23    and also because the expert opinions were disclosed literally

24    the day before trial.  They haven't responded to that motion

08:40    25    yet, but that motion is pending, Your Honor.

1    THE COURT:  On the experts, they're the same experts

2    that were disclosed a long time ago.  It's just that the

3    testimony has changed?

4    MR. ALDRICH:  They are the same experts.  They

08:40    5    produced, I think, like a new 67-page report on an issue, and

6    the damages expert -- there are new issues.  They're entirely

7    new issues.  A hundred-some pages of additional reports were

8    produced literally in the days before trial, and we think that

9    they're legally faulty and contradict the Supreme Court in

08:40    10    Samsung v. Apple.  But in addition to that, they rely on new

11    evidence that was just produced and are about a month late in

12    terms of responding to the disclosures as they were required by

13    the Court.

14    THE COURT:  Thank you.

08:40    15    MR. MARCHESE:  So I don't know how many pages.

16    Hundreds of pages were referred to, but the opinions are short.

17    They're brief.  They're rebutting expert opinions that their

18    experts submitted on the article of manufacture, so we have

19    two.  Well, I think one of them is not in dispute at all.

08:41    20    There was a supplemental -- both damages experts did

21    supplemental expert reports on updated numbers for the sales of

22    the accused products.  I don't think there's any objection to

23    our expert's supplemental or their expert's supplemental.  I

24    think we're fine on those.  Would you agree?

08:41    25    MR. AXELROD:  Yes.

1          MR. ALDRICH:  Just with respect to the updated

2     numbers, we don't object, Your Honor.

3          MR. MARCHESE:  And there are two other reports.  One

4     of them is from Dr. Block, the technical expert.  He is

08:41  5     offering opinions -- it's a -- how long is that opinion,

6     Mr. Sproul?  10, 15 pages?

7          MR. SPROUL:  It's a little longer than that, 30 pages,

8     25.  Half of it relates to a rebuttal issue that's no longer

9     evidence because Your Honor has ruled on the proper standard

08:41  10     for the article of manufacture, so the first half is all he'll

11     be relying on, but we provided that I think on the 11th.

12          MR. MARCHESE:  It was about a week and a half before

13     trial.  And then, you know, we had -- we had him cover both

14     standards, the one that was offered by Columbia and the one

08:42  15     that was eventually ruled upon, and then we had Ms. Distler

16     follow up his report.  She's the damages expert.  She just

17     tallies up the numbers that were provided by -- so let me back

18     up one more minute.

19          There was a supplemental deposition, fact deposition, taken

08:42  20     of Ms. Carey back on Friday.  The days are starting to run

21     together.  Back on Friday of last week, we agreed to do that.

22     We put her up to testify about these new -- the supplemental

23     update numbers that we talked about there's no dispute on, and

24     then she produced a bill of materials that she generated from

08:42  25     her accounting department which stated the costs of the various

1    components of the gloves that are accused in this case.

2    Ms. Distler took that information and put it into a report and

3    tallied up what the numbers would be, and it's -- I don't know

4    the number of pages, but it's not particularly long either,

08:43    5    Your Honor.   And half of it, by the way, too -- I'm sorry, but

6    half of it is the other standard that doesn't apply.

7                THE COURT:   So that part becomes irrelevant.

8                MR. MARCHESE:   Correct.

9                MR. ALDRICH:   Your Honor, we think the papers that

08:43    10    were submitted might be helpful to the Court in understanding

11    the timing issues and the legal issues involved here, but the

12    bottom line is this:   The legal standard that was proposed that

13    has been adopted by the Court was proposed in December 2016.

14    Seirus has known about that standard for nine months now.   And

08:43    15    they argued in December 2016 in a letter to Your Honor that we

16    needed to do some discovery, and they needed to supplement

17    discovery in order to deal with this issue.

18        And rather than produce the discovery that they thought was

19    going to be necessary on this issue, on the legal standard that

08:44    20    they proposed, they instead filed multiple motions to delay the

21    trial, and only after the Court ruled on all those did they

22    dump a bunch of expert reports on us the next day addressing

23    the issue that was going to be going to trial in a week.

24                THE COURT:   All right.   I'll take a look at the

08:44    25    paperwork.

1          MR. ALDRICH:  Thank you, Your Honor.

2          MR. MARCHESE:  Thank you, Your Honor.

3          THE COURT:  Anything else?

4          MR. ALDRICH:  Not from us, Your Honor.

08:44    5          MR. AXELROD:  We have one housekeeping.  There are

6     three exhibits that were used with Mr. Trepanier, Exhibit 221,

7     Exhibit 225.3, and Exhibit 225.4, and we would offer those

8     while we're on the record.  I understand there's no objection.

9          MR. MARCHESE:  I'm sorry.  I was --

08:44    10         THE COURT:  Do you have any objection to these?  221,

11    225, and -- 225.3 and .4?  You're welcome to take a look at

12    them.

13         MR. MARCHESE:  No objection.

14         THE COURT:  Okay.  Received.

08:45    15        (Exhibit 221, 225, 225.3, and 225.4 admitted.)

16         MR. ALDRICH:  Thank you, Your Honor.

17         THE COURT:  Do you have anything else?

18         MR. ALDRICH:  Not that I can think of.

19         THE COURT:  Are you going to finish today?

08:45    20        MR. ALDRICH:  No, Your Honor.

21         THE COURT:  All right.  I was just trying to figure

22    out how much time I have before I have to deal with this other

23    issue that you just raised.

24         MR. ALDRICH:  We have Dr. Cole, and then we have our

08:45    25    licensing expert, and then we have our damages expert.  I think

1  it's likely that we will rest -- oh, and sorry -- next we have

2  Mike Carey, so it's going to be Mike Carey, our infringement

3  expert, our licensing expert, and our damages expert.  I think

4  it's likely we will rest our case tomorrow.

08:45  5          THE COURT:  Okay.  Have you checked your time?

6          MR. ALDRICH:  4 hours 27 minutes, Your Honor.  No, we

7  haven't checked.

8          THE COURT:  We're within a minute of each other.

9  We've been keeping independent time.

08:45  10          MR. ALDRICH:  Where are you?

11          THE COURT:  I'm counting down from 20.

12          MR. ALDRICH:  So you're at 13:33ish?  Or 15:33ish?

13          LAW CLERK:  15:37.

14          THE COURT:  15:37 for the white team, because it's a

08:46  15  chess clock, and the black team.  The white team has how much?

16          LAW CLERK:  15:37.

17          THE COURT:  The black team?

18          LAW CLERK:  16:36.

19          THE COURT:  Okay.  That's where you are.

08:46  20          MR. ALDRICH:  Thank you, Your Honor.

21          THE COURT:  As soon as we get the jury racked up,

22  we'll be ready to roll.

23      (Proceedings held in the presence of the jury panel.)

24          THE COURT:  We need the witness.  Ms. Chin, you remain

08:58  25  under oath.

1    MR. MARCHESE:  Your Honor, can I take the ski jacket

2  down?

3    THE COURT:  Sure.  Actually we should take control

4  over that.  It's ours.

08:58  5    MR. MARCHESE:  I keep noticing it up there.  Thank

6  you.

7    CROSS-EXAMINATION (resumed)

8  BY MR. MARCHESE:

9  Q.  Good morning, Ms. Chin.

08:58  10  A.  Good morning.

11  Q.  One thing we need to do, by the way, is to try to speak up

12  a little bit, and if there's times when we can't hear you, I

13  may ask you to repeat a question.  Okay?

14  A.  Okay.

08:58  15  Q.  Great.  Thank you.

16    I first wanted to ask you about a company called Giant

17  Knitting.  Does that ring a bell to you?

18  A.  Yes.

19  Q.  Who's Giant Knitting?

08:59  20  A.  Giant Knitting is somebody we have sourced fabric with in

21  the past, prior to when I was even in my current position.

22  Q.  And so you're familiar with their fabrics.  Is that

23  correct?

24  A.  Yes.

08:59  25  Q.  And what kind of materials have you seen from Giant

1    Knitting?

2    A.    A pretty wide array.

3         MR. AXELROD:    This is a matter that I believe is

4    barred by the Court's ruling.

09:01    5         (The following proceedings were heard at the bench:)

6         MR. MARCHESE:    During the direct Ms. Chin mentioned

7    Giant Knitting in fabric samples, so I wanted to ask her little

8    bit more on that.    I think the issue Mr. Axelrod is referring

9    to is there is a binder of fabric samples from Giant Knitting

09:01   10    that we had put on our exhibit list, but Your Honor ruled in

11    the motion in limine that there could be no post discovery

12    documents brought into evidence is what I recall from the

13    hearing, so this is not -- we're not going to bring that binder

14    into evidence.    I just want to ask her some questions about

09:01   15    Giant Knitting.

16         MR. AXELROD:    This was never produced in discovery,

17    never identified to having any relevance to any validity

18    issues.    It's the going back and bringing in all kind of new

19    things that have never been part of the issues in the case.

09:01   20         THE COURT:    And she just mentioned Giant Knitting is a

21    supplier.

22         MR. AXELROD:    I didn't even catch that she

23    mentioned -- I -- I don't believe she mentioned Giant Knitting

24    in any of her responses to my questions.    None of my questions

09:01   25    were directed to Giant Knitting.    I don't know anything about

1    them.

2        (Proceedings held in the presence of the jury panel.)

3        THE COURT:   The objection is sustained.

4    BY MR. MARCHESE:

09:01  5    Q.   Well, another company that you know of is called Ventex,

6    correct?

7    A.   Correct.

8    Q.   And you've dealt with Ventex for quite some time while

9    you've been at Seirus.  Is that correct?

09:01  10   A.   Yes.

11   Q.   And there are two people that we've seen on emails from

12   Ventex pretty regularly, I think some of the ones that came

13   into evidence, and they were Jasmin and Joori.  Do you remember

14   those names?

09:01  15   A.   Yes.

16   Q.   And do you know those two individuals?

17   A.   I do.

18       MR. MARCHESE:   And would you please pull up,

19   Mr. Tisa -- by the way, we have Mr. Tisa now.  Mr. Volper is

09:01  20   not here today.  I'll be referring to Mr. Tisa.

21       It's 501, please.  Thank you.  Can you just blow up --

22   let's see.  Here, one right down here at the bottom, Mr. Tisa,

23   the last email on the bottom from Jasmin to Morgan and Joori.

24   BY MR. MARCHESE:

09:02  25   Q.   I was mentioning Joori.  That's a first name, correct?

1    A.    Correct.

2    Q.    And is this a woman or a man?

3    A.    A woman.

4    Q.    And her last name is Hwang, correct?

09:02    5    A.    Correct.

6    Q.    And you know her, right?

7    A.    I do.

8    Q.    Have you met her before?

9    A.    Yes.

09:02    10    Q.    Approximately how many times?

11    A.    10, 12 maybe.

12    Q.    In person?

13    A.    Correct.

14    Q.    Okay.  And then Jasmin is another person listed on here.

09:02    15    Do you know her?

16    A.    Yes.

17    Q.    And she works for Ventex?

18    A.    She does.

19    Q.    And so does Ms. Hwang?

09:02    20    A.    Yes.

21    Q.    And do you know what Jasmin's last name is?

22    A.    I'm not positive.

23    Q.    Okay.  And so can you tell us just your sense of their

24    professionalism and, you know, what you know about them in

09:03    25    working with them over the years?

1    A.   They're both very professional, get back -- they both get

2    back to me really quickly on answers that I need, always been

3    on time or early to the meetings that we've had at these shows,

4    and great response, very professional.

09:03    5              MR. MARCHESE:  Can you flip to the next page, please?

6    BY MR. MARCHESE:

7    Q.   This is an email --

8              MR. MARCHESE:  Actually apologies.  Can you go back to

9    page 1 of the exhibit?

09:03    10   BY MR. MARCHESE:

11   Q.   And here is Jasmin writing to you and Ms. Hwang, correct?

12   A.   I think she's -- yes, we are both on there, but directing

13   it to me.

14   Q.   Cc'ing Ms. Hwang?

09:04    15   A.   Correct.

16   Q.   That means she's copied on the email.  Is that your

17   understanding?

18   A.   Correct.

19   Q.   Can you tell us the relationship in terms of the hierarchy

09:04    20   in Ventex to your knowledge about Ms. Hwang and Jasmin?

21   A.   Jasmin is Joori, Ms. Hwang's, assistant.

22   Q.   And so here Jasmin is writing to you on April 4, 2013,

23   correct?

24   A.   Yes.

09:04    25   Q.   And she -- it starts off "Hi, Morgan.  I believe you

1    already considered the similarity with Columbia's Omni-Heat and

2    MegaHeat RX.  As we are regarding businesses in America, we are

3    checking patents."  Do you see that?

4    A.   Yes.

09:04   5    Q.   Do you remember reading that?

6    A.   I do.

7        MR. MARCHESE:  Okay.  And then the next page, if we

8    could please go there.

9    BY MR. MARCHESE:

09:04   10   Q.   She writes at the top, "We found a little similar wave

11   pattern."  Do you see that?

12   A.   Yes.

13   Q.   And do you remember counsel for Columbia asking you about

14   that yesterday?

09:05   15   A.   I do.

16   Q.   I don't recall -- maybe you do -- the next sentence being

17   asked about.  Do you?

18   A.   I'm not sure.

19   Q.   Okay.  I didn't remember it, but I'll read it into the

09:05   20   record.  "However, per our attorney, there will be no problem

21   as your design factor because of logo and irregular wave."  Do

22   you see that?

23   A.   Yes.

24   Q.   And did you read that?

09:05   25   A.   I did.

1  Q.   You read that back in April of 2013?

2  A.   Yes.

3  Q.   And the logo in your understanding is referring to what?

4  A.   Our Seirus name, our logo.

09:05  5  Q.   And where?

6  A.   Within the wave pattern.

7  Q.   And we saw that during the opening statement.   There was a

8  piece of fabric that was shown.   A Seirus logo was on it,

9  correct?

09:05  10  A.   Yes.

11  Q.   And is that the fabric that's typically used in these

12  gloves?

13  A.   Yes.

14  Q.   And that type of design.   Is that right?

09:06  15  A.   Correct.

16  Q.   And so the gloves that are in this case, these HeatWave

17  gloves have the Seirus logo in the wave pattern, correct?

18  A.   Yes.

19  Q.   And it's -- how often approximately would you say it's

09:06  20  repeating?

21  A.   Fairly often.   Maybe every 2 inches or so.

22  Q.   Okay.   Thank you.

23     So what was your reaction to them writing to you "Per our

24  attorney there will be no problem as your design factor because

09:06  25  of logo and irregular wave"?

1  A.   Mostly just that they were alerting us to something, but

2  that it wasn't a big deal and nothing to cause concern.

3  Q.   Thank you.

4        MR. MARCHESE:   Could you pull up Exhibit 528.   This

09:07  5  has been received.

6  BY MR. MARCHESE:

7  Q.   Do you remember seeing Exhibit 528 during your testimony

8  yesterday?

9  A.   Yes.

09:07  10  Q.   And this is an email from Amy at the very top --

11        MR. MARCHESE:   If we could blow that up, please.

12  BY MR. MARCHESE:

13  Q.   Amy at Shinhuei.   Do you see that?   And do you recognize

14  who Amy is?

09:07  15  A.   She's one of our contacts at a factory.

16  Q.   And this factory Shinhuei, are you familiar with it?

17  A.   Yes.

18  Q.   How?

19  A.   They have made gloves for us and hats for a while.

09:07  20  Q.   This is a different company from Shenli?

21  A.   Yes.

22  Q.   So Shinhuei is the company that takes the components and

23  makes them into gloves?

24  A.   Correct.

09:07  25  Q.   And Shenli was a fabric supplier, correct?

A.    Yes.

Q.    Okay.  I just wanted to make sure there was no confusion on this email because I think maybe the names are fairly similar, Shinhuei versus Shenli, but they are separate companies?

09:08    A.    Completely different, yes.

Q.    Thank you.

MR. MARCHESE:  And with that, Your Honor, I have no further questions.

THE COURT:  Redirect?

09:08    MR. AXELROD:  Thank you, Your Honor.

REDIRECT EXAMINATION

BY MR. AXELROD:

Q.    Mrs. Chin, do you have Exhibit 523?

A.    Yes.

09:09    Q.    Exhibit 523 is one of these long sets of email exchanges between you and people at Ventex, is it not?

A.    Yes.

Q.    And it runs from roughly January of 2012 to September?

A.    Yes.

09:09    Q.    Would you turn to page 569 at the bottom?

A.    Okay.

Q.    And would you look at the email at the bottom?  We'll pull it up on the screen.  Is this an email from you to Joori Hwang at Ventex?

09:10    A.    Yes, it is.

1    Q.   And in that email, you refer to the analyses that Seirus

2    has done of the amount of foil coverage on the material that

3    Ventex is providing, correct?

4    A.   Yes.

09:10    5         MR. AXELROD:   Your Honor, I'm advised that Exhibit 523

6    is not admitted yet.   I thought it was admitted yesterday.

7         THE COURT:   Any objection?

8         MR. MARCHESE:   If I could look at it real quickly.

9    No objection.

09:10    10        THE COURT:   Received.

11   (Exhibit 523 admitted.)

12   BY MR. AXELROD:

13   Q.   In this email dated September 6, you advise Joori of

14   Seirus' evaluation of the HeatWave material that Ventex is

09:11    15   providing, correct?

16   A.   Yes.

17   Q.   And you tell her that your review indicates that the

18   coverage is between 60 and 70 percent of the base material.  Is

19   that correct?

09:11    20   A.   Yes.

21   Q.   And that -- the mold that generated this material is the

22   same mold that Seirus uses today, correct? -- or that Ventex

23   uses to make the Seirus product?

24   A.   I couldn't confirm that.

09:11    25   Q.   As part of your responsibilities, have you ever paid Ventex

1    or acquired a different mold for the HeatWave product?

2    A.    Yes.

3    Q.    Pardon?

4    A.    Yes.

09:11    5    Q.    During the period between September and the end of the

6    selling season, February of 2017, have you purchased any

7    different mold from Ventex?

8    A.    I'm not positive.  I'd have to go back through my files.

9    Q.    Do you have any recollection of ordering a new mold?

09:12    10    A.    I'm not sure when the new molds were purchased.

11    Q.    Referring you to Exhibit 501 that counsel reviewed with

12    you, yesterday you talked about Shark Tank?

13    A.    Yes.

14    Q.    Do you recall that?

09:12    15    A.    Yes.

16    Q.    Does Seirus get its legal advice from Shark Tank?

17    A.    No.

18    Q.    Does Seirus get its legal advice from a Korean attorney for

19    its material supplier?

09:12    20            MR. MARCHESE:  Objection.  It's misleading.

21            THE COURT:  Overruled.

22            THE WITNESS:  No.

23    BY MR. AXELROD:

24    Q.    Who provides legal review within Seirus at this period of

09:12    25    time, 2013?

1    A.    At this time, it would be facilitated through Joe Edwards

2    who would speak with our outside legal.

3    Q.    Joe Edwards is one of the owners, a board member, and an

4    officer at that time, was he not?

09:13    5    A.    Correct.

6    Q.    And was that principally his area of responsibility at

7    Seirus?

8    A.    One of his responsibilities.

9    Q.    And you didn't talk to Joe Edwards directly about this

09:13    10    communication from Ventex, did you?

11    A.    No, I did not.

12    Q.    Were you advised by anyone at Seirus that in 2016 the Court

13    determined that the products made with the HeatWave fabric

14    infringed the D '093 design patent?

09:13    15    A.    I was not, no.

16    Q.    You were not told that fact?

17    A.    Specifically on the documents that you're referring to, no.

18    Q.    I'm asking whether you were told in your role as the

19    material supplier at Seirus by anyone at Seirus that in May of

09:14    20    2016 the Court determined that products made with the HeatWave

21    fabric infringed Columbia's D '093 design patent?

22    A.    I'm sorry.    Can you repeat the question.

23    Q.    Sure.    Were you told by anyone at Seirus that in the spring

24    of 2016 the Court in this case ruled that products made with

09:14    25    the HeatWave fabric with what is referred to as the wavy line

1    design infringed Columbia's D '093 design patent?

2    A.   I'm not sure the exact dates when any of that information

3    was brought to me.

4    Q.   Were you told in 2016?

09:14   5    A.   Again, I'm not sure on the exact dates.

6    Q.   Can you tell whether it was a year ago or a week ago?

7    A.   More than -- yeah, probably more than -- definitely more

8    than a week ago, so, yes, probably about a year ago.

9    Q.   Okay.  And were you also told that the Court ruled that

09:15   10   putting Seirus' logo on Columbia's design does not make it

11   noninfringing?

12   A.   No, I was not told that.

13   Q.   After you learned of this Court's rulings, did Seirus make

14   any changes at that time to its mold?

09:15   15   A.   Yes, we have.

16   Q.   Now, you assert changes have been made recently, I take it?

17   A.   We have made changes recently, yes.

18   Q.   And those were -- those are not even out yet, are they?

19   And they're not part of this case, so putting that aside, in

09:15   20   the year after the Court's ruling, so up through the 2016-2017

21   season, did Seirus make any changes to its mold design?

22            MR. MARCHESE:  Objection.  Foundation, Your Honor.

23            THE COURT:  You're actually outside the scope.  I will

24   allow you to cross-examine on this issue.  You may proceed.

09:16   25            THE WITNESS:  Yes.

BY MR. AXELROD:

Q.   What changes did you make in 2016?

A.   We've made a change to the pattern -- to the mold.

Q.   Were any products changed for the 2016-2017 selling season?

09:16   A.   I'm not on the products side.  I'm only on the material

side, so I can speak to the material, the pattern changing for

the material.

Q.   Would you look at Exhibit 481.

     MR. AXELROD:  And I'll offer Exhibit 481.

09:17   THE COURT:  Any objection to 481?

     MR. MARCHESE:  I thought this was received.

     MR. AXELROD:  Not yet.

     MR. MARCHESE:  No objection, Your Honor.

     THE COURT:  Received.

09:17   (Exhibit 481 admitted.)

BY MR. AXELROD:

Q.   Who's Tracy Boeing?

A.   She was in our production department doing design work for

us.

09:17   Q.   And as of August 13, had you're heard of the name HeatWave?

A.   I believe so, yes.

Q.   I think it was identified when you were given the results

of the steering committee meeting.  Isn't that correct?  When

you were told what new products would be made, there was a

09:17   reference to HeatWave?

1    A.    Yes.

2    Q.    Have you ever seen any document that had the word

3    "HeatWave" on it prior to that July 30 document?

4    A.    I'm not positive.

09:18    5    Q.    After that -- Ms. Boeing's position is what again?

6    A.    Graphic design for our production department.

7    Q.    And her role with new products would be what?

8    A.    Creating instructions for our factories to make the

9    product.

09:18    10    Q.    So telling the companies that are making the product what

11    it is they're dealing with?

12    A.    Yes.

13    Q.    Okay.  And she referred to the design that Seirus was

14    developing or considering in August of -- of 2012 as Omni-Heat

09:18    15    printing, didn't she?

16    A.    Yes.

17            MR. AXELROD:  I have no further questions.

18            THE COURT:  Do you have some recross?

19            MR. MARCHESE:  I do, Your Honor, but is there -- would

09:18    20    it be possible to have a sidebar briefly with Your Honor on an

21    issue?

22            THE COURT:  Sure.

23        (The following proceedings were heard at the bench:)

24            MR. MARCHESE:  I think -- there was a motion in limine

09:20    25    issue that we talked about where there was a new design which

1    is a like a triangular wave, and there was a motion to keep

2    that out of the case, and I think the door has been opened now

3    to show it.

4            THE COURT:  I agree.

09:20    5            MR. AXELROD:  I disagree.

6            THE COURT:  Go ahead.

7            MR. AXELROD:  Because the questions were directed to a

8    specific period of time.  This new design was disclosed to us

9    weeks ago only when they came up.  We have no information about

09:20    10   it.  It does not appear that any products have been made with

11   it as far as we can tell.  Even the old design is on the

12   website.

13           THE COURT:  Your question was more general.  It was

14   have they done anything about the change of the design.  She

09:20    15   answered yes and then you tried to frame it in a little

16   narrower part because she wasn't getting to where you wanted

17   her to.  But you didn't give her a framework in your

18   original -- when you originally asked your question.

19        You can ask that question.  You can recross on that issue.

09:20    20       (Proceedings held in the presence of the jury panel.)

21           MR. MARCHESE:  Thank you.

22                    RECROSS-EXAMINATION

23   BY MR. MARCHESE:

24   Q.  Ms. Chin, in your testimony just a minute ago, you said

09:20    25   there's been a change in the mold, correct?

1    A.    Correct.

2    Q.    And a change -- the current change you're familiar with is

3    kind of a -- I call it a sawtooth wave.  It looks like a series

4    of triangles.  Are you familiar with that?

09:20    5    A.    If it's been in the last four months, then I'm not familiar

6    with it yet because I've been out of the office on maternity

7    leave.

8    Q.    Oh, correct.  That's right.

9         You are familiar with a change that was made back in the

09:20    10   early -- I'd say -- I guess it would be spring 2016 time frame.

11   Is that right?

12   A.    Yes.

13   Q.    And that was a change made to the mold?

14   A.    Yes.

09:21    15   Q.    A change made to the design?

16   A.    Yes.

17   Q.    And you've seen that redesign, correct?

18         MR. AXELROD:  Your Honor, this is relating to -- can

19   we sidebar again briefly?

09:21    20        THE COURT:  Sure.

21        (The following proceedings were heard at the bench:)

22        MR. AXELROD:  This is another new issue for which no

23   discovery was ever provided, and no contention has ever been

24   made that there was a different design we're dealing with.

09:24    25        MR. MARCHESE:  That's not true.  So at the -- and I

1  was -- Mr. Carey is going to testify that right after the order

2  came out, they changed the design and offered to show it

3  to -- in the context of trying to figure out if we can get past

4  this point.

09:24    5          MR. AXELROD:   Now we're going to --

6          MR. MARCHESE:   There was a -- there was a refusal.

7  They wouldn't even look at the new design to tell us.

8          THE COURT:   But the issue is a discovery issue; and

9  that is, in response to any of their discovery, did you

09:24    10  disclose to them that, this design?

11         MR. MARCHESE:   My recollection is it's in the papers.

12  This has been briefed and addressed.   There's another --

13  there's two new designs.

14         THE COURT:   So I can't resolve this right here.   It

09:24    15  can't be done, so you can leave this topic alone.   You can

16  provide me what the discovery was, what you disclosed at that

17  time.   If it was disclosed, it's fair grounds.   If it was not

18  disclosed in the course of discovery, you stay away from it.

19         MR. MARCHESE:   Well, it wasn't in discovery because it

09:24    20  was after the close.

21         THE COURT:   It doesn't matter.   You still have a

22  continuing responsibility to disclose.   If they made a request

23  and you did not disclose, you're staying away from this topic,

24  if you responded and said, "Yes, there's a new design" in the

09:24    25  course of discovery, this is fertile ground.   You get to go

1    there.

2            MR. MARCHESE:  Let me ask you this:  So in this case

3    they're contending that after the summary judgment order came

4    in that there was no attempt to get around the patent.  But

09:24    5    there were two attempts in particular.  And both of those were

6    disclosed to them and discussed in the context of at least

7    settlement discussions.

8            THE COURT:  It has to be in the course of discovery.

9            MR. MARCHESE:  But it's -- Your Honor, I mean this is

09:24    10    serious charges.

11            THE COURT:  Absolutely.

12            MR. MARCHESE:  And to be able to respond to them and

13    show that we made every effort to comply is -- I think we have

14    to be able to do that.

09:24    15            THE COURT:  If you disclosed it in discovery, you're

16    welcome to it.

17        And I can't resolve this right now.  So step away from this

18    topic.  She's your witness.  She's going to be available.  You

19    call her back.

09:24    20            MR. MARCHESE:  I understand.

21        (Proceedings held in the presence of the jury panel.)

22    BY MR. MARCHESE:

23    Q.    So, Ms. Chin, just to make it clear here, there was a

24    redesign of the mold that happened, I think you said in spring

09:24    25    of 2016 approximately.

1    A.    Yes.

2    Q.    And do you -- that changed the look of the wavy design.    Is

3    that right?

4                MR. AXELROD:    Objection.

09:24    5            THE COURT:    Sustained.

6    BY MR. MARCHESE:

7    Q.    What kind of changes did that make to the design?

8                MR. AXELROD:    Objection.

9                THE COURT:    Sustained.    Move off of this topic.

09:24    10               MR. MARCHESE:    Understood.    Then I have no further

11    questions.

12               THE COURT:    Okay.    Do you have any other questions?

13               MR. AXELROD:    No, Your Honor.

14               THE COURT:    You may step down.    The parties want you

09:24    15    to remain available.    You can talk to either -- to your

16    counsel, and they'll let you know what you need to do.    I know

17    your a nursing mother and all of that.

18               THE WITNESS:    Okay.

19               THE COURT:    Call your next witness.

09:25    20               MR. ALDRICH:    Your Honor, plaintiff calls Mike Carey.

21                    <u>MICHAEL CAREY</u>,

22                    PLAINTIFF'S WITNESS, SWORN

23               THE CLERK:    Would you state and spell your full name

24    for the record.

09:25    25               THE WITNESS:    Michael Carey, C-a-r-e-y.

|       |    |                                                                      |
|-------|----|----------------------------------------------------------------------|
|       | 1  | THE CLERK:   Thank you.                                               |
|       | 2  | MR. ALDRICH:   Can you call up DDX110, please.                       |
|       | 3  | DIRECT EXAMINATION                                                    |
|       | 4  | BY MR. ALDRICH:                                                       |
| 09:26 | 5  | Q.   Mr. Carey, you were a referee in the NFL, weren't you?          |
|       | 6  | A.   Yes, sir.                                                        |
|       | 7  | Q.   You -- how long did you do that?                                 |
|       | 8  | A.   In the NFL I was there for 24 years.                            |
|       | 9  | Q.   And when did you stop being a referee?                          |
| 09:26 | 10 | A.   My last year was 2013.                                          |
|       | 11 | Q.   And that was something you did at the same time that you        |
|       | 12 | were working at Seirus?                                               |
|       | 13 | A.   Yes.                                                             |
|       | 14 | Q.   When did you start Seirus again?                                |
| 09:26 | 15 | A.   I founded the company in 1984.                                  |
|       | 16 | Q.   1984.                                                           |
|       | 17 | And so for a significant portion of that time, you were --          |
|       | 18 | at the same time on Sundays, sometimes Mondays, being a              |
|       | 19 | referee.   Is that right?                                            |
| 09:27 | 20 | A.   Most of the time on Sundays, once a year on Mondays.            |
|       | 21 | Q.   Once a year.                                                    |
|       | 22 | And I understand that you had the honor actually of being a          |
|       | 23 | referee in the Super Bowl --                                         |
|       | 24 | A.   Yes, I was.                                                     |
| 09:27 | 25 | Q.   -- is that right?                                               |

1        Was that a proud moment for you?

2    A.   Of course.

3    Q.   In football there are a bunch of rules to the game, aren't

4    there?

09:27    5    A.   Yes.

6    Q.   How big is the rule book?

7    A.   The rule books are about 120 pages.

8    Q.   And as the referee, you're the person responsible for

9    enforcing the rules, right?

09:27    10    A.   Correct.

11    Q.   And occasionally people break the rules, right?

12    A.   Occasionally, yes, they do.

13    Q.   And when they break the rules, you have to issue a penalty,

14    right?

09:27    15    A.   Yes.

16    Q.   You can't have an orderly game of football if people are

17    breaking the rules, correct?

18    A.   Correct.

19    Q.   You need everybody to follow the rules, right?

09:27    20    A.   Correct.

21    Q.   And my guess, over 23 years, you probably got to know a lot

22    of these football players, right?

23    A.   I know who they are, but on a personal basis, no.

24    Q.   Did you know many of them to be good people?

09:28    25         MR. MARCHESE:   Objection.   Relevance.

|   |   |
|---|---|
| 1 | THE COURT:  Sustained. |
| 2 | BY MR. ALDRICH: |
| 3 | Q.  But sometimes good people break the rules, right? |
| 4 | MR. MARCHESE:  Objection. |
| 09:28  5 | THE COURT:  Sustained. |
| 6 | BY MR. ALDRICH: |
| 7 | Q.  Regardless of who breaks the rules, your job is to enforce |
| 8 | the rules, right? |
| 9 | A.  Yes. |
| 09:28  10 | Q.  And if somebody breaks the rules, you have to issue a |
| 11 | penalty.  Is that right? |
| 12 | MR. MARCHESE:  Objection again, Your Honor.  This |
| 13 | sounds like he's talking about the NFL again. |
| 14 | THE COURT:  Sustained. |
| 09:28  15 | MR. ALDRICH:  Can we call up DDX104. |
| 16 | BY MR. ALDRICH: |
| 17 | Q.  Mr. Carey, this is your company, right? |
| 18 | A.  Yes, it is. |
| 19 | Q.  This is pretty much everybody at Seirus? |
| 09:28  20 | A.  I wouldn't profess that. |
| 21 | Q.  Most of the people? |
| 22 | A.  Yes. |
| 23 | Q.  It's a company photo? |
| 24 | A.  Correct. |
| 09:29  25 | Q.  And this is a company you founded with Mr. Edwards, right? |

1    A.    Yes.

2    Q.    And you guys were joint owners.  Is that right?

3    A.    Yes.

4    Q.    Throughout the entire history of Seirus, there have only

5    been two owners of the company, you and Mr. Edwards, right?

09:29

6    A.    Yes.

7    Q.    And approximately 50 percent owners.  Is that right?

8    A.    Approximately.

9    Q.    And always have been?

09:29    10    A.    Approximately.

11    Q.    Okay.  And what was the division of responsibilities

12    between you and Mr. Edwards?

13    A.    You have to give a time period.

14    Q.    Oh, okay.  Were you the head of sales?

09:29    15    A.    Yes.

16    Q.    Were you the head of marketing?

17    A.    No.

18    Q.    Who was the head of marketing?

19    A.    The head of marketing -- at what period are you talking?

09:29    20    Q.    Let's talk about 2013 to 2017.

21    A.    At that time Mr. Edwards was the head of marketing.

22    Q.    Okay.  And -- but with respect to the legal

23    responsibilities, that all fell on Mr. Edwards' shoulders?

24    A.    Correct.

09:30    25    Q.    And as head of sales -- well, maybe it's not in the sales

1    department.  But you would go to all the steering committee

2    meetings, right?

3    A.    That's not correct.

4    Q.    You went to most of the steering committee meetings?

09:30  5    A.    That's correct.

6    Q.    You did go to the steering committee meetings back in 2012,

7    correct?

8    A.    Yes.

9    Q.    We talked about a couple of steering committee meetings in

09:30  10    2012, Mr. Axelrod did, with Ms. Chin.  Is that correct?

11    A.    I remember her talking about one.  That's the only one I

12    remember him talking about.  Oh, yes.

13    Q.    There was one in April and another one --

14    A.    In July.

09:30  15    Q.    Okay.  And you were at both of those, correct?

16    A.    That's correct.

17    Q.    And there was a product development group as well?

18    A.    A product development group --

19    Q.    Committee?  No?

09:31  20    A.    No.  We don't have a group called the product development

21    group.

22    Q.    You also signed off on all hangtags for all products,

23    right?

24    A.    Correct.

09:31  25    Q.    And no product went to market without your approval,

1  correct?

2  A.  I couldn't say no products, but the idea is that I signed

3  off on it.

4  Q.  The HeatWave products all had your approval before they

09:31  5  went to market, right?

6  A.  Yes.

7  Q.  And you are today the CEO.  Is that right?

8  A.  Yes.

9  Q.  And also the president?

09:31  10  A.  Yes.

11  Q.  And so everything today rises up to your responsibility

12  ultimately, correct?

13  A.  Yes.

14  Q.  Are you also the chairman of the board?

09:31  15  A.  Yes, I am.

16  Q.  There are three directors of the company.  Is that right?

17  A.  Yes.

18  Q.  It's you, Ms. Carey, correct?

19  A.  Yes.

09:32  20  Q.  And Mr. Edwards?

21  A.  Yes.

22  Q.  You have a number of patents yourself, correct?

23  A.  Yes, that's true.

24  Q.  Do you know approximately how many?

09:32  25  A.  I'd be guessing.  Somewhere around nine or a dozen,

1    something like that.

2    Q.   And the company has a number of patents?

3    A.   That's correct.

4    Q.   About 20?

09:32    5    A.   That might be accurate.

6    Q.   And others that are still in the prosecution process.  Is

7    that right?

8    A.   Yes.

9    Q.   Around the world, right?

09:32    10    A.   Yes.

11    Q.   You have a number of patent attorneys that you hire to work

12    on your patents.  Is that right?

13    A.   We have one group that works on our patents.

14    Q.   It's a group in Utah, correct?

09:33    15    A.   That's not correct.

16    Q.   There used to be a group in Utah?

17    A.   Yes.

18    Q.   Okay.  And then you also use a group in California.  Is

19    that correct?

09:33    20    A.   That's correct.

21    Q.   That's a group called Procopio.  Is that right?

22    A.   Yes.

23    Q.   And then you also have some other experts on patents that

24    Seirus has used over time, correct?

09:33    25    A.   Pardon me?  Repeat that question, please.

1    Q.   Yeah, are you familiar with Troutman Sanders?

2    A.   Yes.

3    Q.   You guys have used Troutman Sanders for patent work in the

4    past?

09:33   5    A.   Not for prosecution.

6    Q.   Okay.   But for other patent-related work?

7    A.   That's correct, yes.

8    Q.   Any other law firms besides the one in Utah, the one in --

9    the one in California, and Troutman Sanders?

09:33   10   A.   No.

11   Q.   Do you have any outside experts that have helped with

12   patent work in the past besides attorneys?

13         MR. MARCHESE:   Objection, Your Honor, to the extent

14   this could possibly get into some privileged areas.

09:33   15         THE COURT:   No, that's a yes-or-no question.

16         THE WITNESS:   Yes.

17   BY MR. ALDRICH:

18   Q.   Besides Mr. Edwards, you have a legal department within the

19   company.   Is that right?

09:34   20   A.   At what time?

21   Q.   There's Mr. Denike that works there now as general counsel.

22   Is that right?

23   A.   That's correct, yes.

24   Q.   And then there's another gentleman by the name of Steve

09:34   25   Nelson that has also been a sort of a general counsel for the

1    company over the years?

2    A.    Outside general counsel.

3    Q.    An outside general counsel.  He's been working for Seirus

4    for how long?

09:34    5    A.    Since the early '80s.  That's my recollection.

6    Q.    The '80s?

7    A.    '80s, yes.

8    Q.    And so my understanding is that Seirus is pretty well

9    represented by people that are familiar with patent law.  Is

09:34    10    that right?

11    A.    Yes.

12    Q.    Does Seirus get its legal advice from television?

13    A.    No.

14    Q.    Does Seirus rely on the opinions of its foreign vendors

09:35    15    with respect to whether it infringes U.S. patents under U.S.

16    law?

17    A.    We would respect their position on whatever information

18    they give us if they're qualified legal personnel.

19    Q.    Did you understand them to be qualified legal personnel in

09:35    20    the United States?

21    A.    I'm not qualified to know about that.

22    Q.    You don't know?

23    A.    I don't know.

24    Q.    Did you understand them to have any U.S. legal training?

09:35    25    A.    I couldn't answer that.

1    Q.    Do you have any understanding of whether they understood

2    the scope of a U.S. design patent?

3    A.    To my knowledge, all patent jurisdictions follow the same

4    type of international expertise, and so I would assume one

09:36    5    would have knowledge of quite a few jurisdictions.

6    Q.    Seirus has applied for patents in Korea, correct?

7    A.    Yes.

8    Q.    And has had patents rejected in Korea, correct?

9    A.    I couldn't answer that.

09:36    10    Q.    Let me have you turn in your binder to Exhibit 697-1 or .1.

11    A.    What's the number again, please?

12    Q.    697.1.

13            MR. MARCHESE:    I'm sorry, Counsel --

14            MR. ALDRICH:    697.1.

09:36    15            MR. MARCHESE:    -- I don't have that.

16            MR. ALDRICH:    697?

17            THE WITNESS:    I have 697.

18            MR. MARCHESE:    Your Honor, may I please.  I don't have

19    697, and I'm not familiar with 697.1.  I don't have it.  I

09:37    20    don't know what it is right here right now, and I have

21    objection to 697.  I'm assuming that .1 is a variation of a

22    theme of that one.

23            THE COURT:    Are you offering 697?

24            MR. ALDRICH:    Nope.

25

1    BY MR. ALDRICH:

2    Q.    You don't have 697?

3    A.    I have 697, just not .1.  I can't find it.

4    Q.    Maybe you can look on the screen.

09:37  5    A.    Sure.  Great.

6    Q.    You'll see that this is a printout from the Korean

7    intellectual property rights information website.  Do you see

8    that?

9    A.    I'm not familiar with this document, so it's going to take

09:37  10    me a second to -- where does it say "Korea"?

11    Q.    Just right up at the top.

12    A.    Oh, it wasn't on that side.  Okay.  Yes.

13    Q.    And do you see the applicant is Seirus Innovative

14    Accessories, Inc.?

09:38  15    A.    Yes.

16    Q.    And do you see the legal status of the patent application

17    that's being referenced on this page?

18    A.    No, I do not.

19    Q.    Let's go down a little bit.  Right there in the middle of

09:38  20    the page.  Do you see the legal status?

21    A.    Yes, I do.

22         MR. MARCHESE:  Your Honor, I apologize.  I would like

23    to have an objection to the date on this document in terms of

24    it was -- this was produced after discovery.

09:38  25         THE COURT:  Well, I'm sustaining your objection on

1    other grounds.  He says he's not at all familiar with this

2    document.  Move on.

3             MR. ALDRICH:  We can come back to this later.

4    BY MR. ALDRICH:

09:38    5    Q.   But your testimony is that your understanding is that the

6    legal systems around the world for patents is basically the

7    same.  Is that right?

8    A.   I'm not a legal professional, but that's what my

9    understanding was, so that all the jurisdiction operate in the

09:39    10    same, that they're pretty similar.

11    Q.   And you're not aware of any times that Seirus has applied

12    for a patent in Korea and had it rejected while at the same

13    time continuing to prosecute the same application in the

14    United States?

09:39    15    A.   This is news to me today from you.

16    Q.   And you're not aware of any such situations where Seirus

17    has actually had patents granted around the world even though

18    it has had the same application rejected in Korea?

19    A.   No, I'm not.

09:39    20             MR. ALDRICH:  Let's go to Exhibit 705.  I move to

21    admit 705.

22             THE COURT:  Any objection to 705?

23             MR. MARCHESE:  No objection.

24             THE COURT:  Received.

09:40    25        (Exhibit 705 admitted.)

BY MR. ALDRICH:

Q.   Mr. Carey, I've put in front of you a HeatWave report that's been marked as Exhibit 705.  Do you see that?

A.   Yes, I do.

Q.   And is this a list of the HeatWave products?

A.   You have a list of HeatWave products.  This is the first I've seen of this report also.

Q.   Are there any products on here that are not HeatWave products?

A.   I couldn't tell you.  You have a blowup, and I can't see behind it, and I can't read those.  The type on this is too small for me to read, so I couldn't tell you.

Q.   Could you look in your binder then?

A.   Oh, sure.

Q.   Thank you.

A.   So they all seem to be HeatWave products.  There's one -- this is a financial spreadsheet, I assume, and one says "less Seirus silver products," so that's obviously not a product, but other than that, it looks like all are Seirus HeatWave products.

Q.   And, in fact, it says "HeatWave Report" at the top of the page, correct?

A.   Yes, it does.

Q.   Okay.  And on the majority of the HeatWave products, the reflective aluminum stripes are on the innermost surface of the

1    glove, correct?

2    A.    You said "Seirus products" and now you're saying "gloves."

3    Which ones do you mean?

4    Q.    I'm sorry.    On the majority of the HeatWave product line,

09:42    5    the products have the reflective components on the innermost

6    part of the product, correct?

7    A.    Different models, that's correct.

8    Q.    Okay.    And so I'd like you to help me isolate the

9    exceptions to the rule, and I notice that there are two of them

09:42    10    here in red on the spreadsheet that I assume were put there for

11    that purpose.

12    A.    Again, I'm not familiar with this document.    You have to

13    give me a second.

14    Q.    I will be patient, and we'll take our time.

09:43    15    A.    Thank you.

16          So the two that are listed that have the silver on the

17    outside, one is a sock, and one is a glove.    None of our hats

18    have HeatWave facing the skin, and so I can't tell you which

19    ones of those are yet, but anything that said "hat," HeatWave

09:43    20    is not the innermost surface, and it doesn't face the skin.

21    Q.    We saw a HeatWave skullcap.    I think that's been admitted

22    into evidence yesterday, correct?

23    A.    Yes.

24    Q.    And that was sold to have the reflective parts facing the

09:43    25    skin, correct?

1    A.    It's presented both ways.   That's a skullcap.   I said

2    hats --

3    Q.    I understand.

4    A.    -- which is a different product line.

09:43    5    Q.    Do you sell any HeatWave hats?

6    A.    Yes.

7    Q.    Okay.   This is the skullcap?

8    A.    That's correct.

9    Q.    Okay.   Are there any other products besides hats -- and

09:44    10    again you mentioned that there are these liners.   This is a

11    glove liner, correct?

12    A.    Yes.

13    Q.    And on the glove liner, it's sold two different ways,

14    right?

09:44    15    A.    Correct.

16    Q.    It's sold -- some of the products are sold with the

17    reflective part on the inside, correct?

18    A.    Yes.

19    Q.    And then some of the products are sold like this so that

09:44    20    the reflective part is on the outside of the liner, correct?

21    A.    Yes.

22    Q.    And the idea of a liner is somebody puts this on and wears

23    it inside a glove.   Is that right?

24    A.    It's designed to be worn both as a glove by itself or

09:44    25    inside another glove.

1    Q.    Okay.  And then you also have a couple of sock products,

2    right?

3    A.    That's true.

4    Q.    And on the socks, once again, you sell one version where

09:44    5    the reflective part is on the innermost surface, right?

6    A.    Yes.

7    Q.    And then you sell another one where the reflective part is

8    not on the innermost surface, correct?

9    A.    Yes.

09:45    10    Q.    Inside-out basically?

11    A.    No, just one iteration over the other.  Not inside-out.

12    Q.    Okay.  Thank you, Mr. Carey.

13        Are there any other products besides hats and the two liner

14    products, the sock and the glove liner, that Seirus sells where

09:45    15    the reflective part is not on the innermost surface?

16    A.    Sure.

17    Q.    What else?

18    A.    So we have a couple of head liners that do the same thing

19    and skull liners, as you just pointed out, that do the same

09:45    20    thing --

21    Q.    Let me stop.  So on the skull liner that we talked about,

22    again, this is how it is sold, correct?

23    A.    It's sold like that, and it's sold the other way as well

24    with that silver on the outside.  You just have one version.

09:45    25    Q.    But they're all sold as reversible, correct?

1  A.   The skull liner is sold as reversible.  The others are not.

2  Q.   You advertise to users that they can wear it either way,

3  right?

4  A.   Yeah, that's true.

09:46  5  Q.   So they could wear it -- you actually advertise that they

6  can wear it so that the reflective part is on the innermost

7  surface, correct?

8  A.   Yes.  We sell them both ways, so they're presented with the

9  silver out or black out.

09:46  10  Q.   I see.  So sometimes you sell them like this?

11  A.   Correct.

12  Q.   And sometimes you sell them like this?

13  A.   Yeah, depending on which way the client wants them.

14  Q.   But either way you sell them, the hangtag says

09:46  15  "reversible"?

16  A.   Yes, it does.

17  Q.   Okay.  Any other products that you sell besides -- the

18  exceptions you've carved out so far are the silver glove liner,

19  the silver sock, and skullcaps which you say are sold either

09:46  20  way.  Any other products?

21  A.   To be accurate I'd have to go through the catalog, if you

22  want me to pull that out, and say specifically which ones are

23  and which ones aren't.  But as I'm sitting here, I couldn't say

24  that I have a comprehensive list.

09:47  25  Q.   Well, just looking at the list you have in front of you on

1    Exhibit 705, can you identify any others?

2    A.   Do you have the time?  A catalog would be much faster.

3    Q.   Okay.  Let's go to Exhibit 128.  Is Exhibit 128 a document

4    you've seen before?

09:47    5    A.   Yes.

6    Q.   Exhibit 128 is Seirus' winter '15-'16 catalog, correct?

7    A.   That's correct.

8    Q.   And then if we can turn to page 9 -- yeah, let's turn to

9    page 9, toward the front of this catalog which is 100-some

09:47    10   pages --

11   A.   Yes.

12             MR. ALDRICH:  I'll move to admit Exhibit 128.

13             MR. MARCHESE:  No objection.

14             THE COURT:  Received.

09:48    15        (Exhibit 128 admitted.)

16   BY MR. ALDRICH:

17   Q.   So page 9 -- I'm sorry.

18             MR. ALDRICH:  Next page.  The other page 9.

19             THE WITNESS:  You can go back, though.  There is a

09:48    20   product there that HeatWave is not on the innermost surface

21   next to the skin, so if you go back to the HeatTouch section,

22   our electrically charged gloves.

23             MR. ALDRICH:  Okay.  Let's go back two pages.

24   BY MR. ALDRICH:

09:48    25   Q.   Can you explain -- this is the HeatTouch Torche product.

1   Is that right?

2   A.   Yes.

3   Q.   And your contention is the HeatTouch Torche product is sold

4   so that the reflective components are not on the innermost

09:48   5   surface.  Is that right?

6   A.   Yes.

7   Q.   Okay.  And the HeatTouch Torche product line is still sold

8   as a HeatWave product, right?

9   A.   It's sold as a HeatTouch product that has -- one of its

09:49   10   components is HeatWave.

11   Q.   HeatWave is advertised on the box as one of the features of

12   the product, correct?

13   A.   Yes.

14   Q.   Okay.  I have a pair that was provided to us two days ago

09:49   15   of the HeatTouch Torche gloves.  Do you recognize that?

16   A.   Yes.

17          MR. ALDRICH:  This is Exhibit 736.  Move to admit.

18          MR. MARCHESE:  No objection.

19          THE COURT:  Received.

09:49   20      (Exhibit 736 admitted.)

21   BY MR. ALDRICH:

22   Q.   Mr. Carey, can you open the box for the jury.  Let's show

23   those gloves to the jury, the ones you just put in your right

24   hand.  And where is the reflective component on those gloves?

09:49   25   A.   On these gloves it's on the -- the reflective is on the

1    back side of the glove, and the palm side is the nonreflective.

2    Q.    Okay.    Thank you.    You can put those away.

3         Are there any other products besides the HeatWave Touch

4    Torche gloves that you've just shown the jury?

09:50    5    A.    I haven't completely shown this glove.

6    Q.    Okay.    Well, I'll let your counsel do that.

7    A.    Okay.

8    Q.    Besides those gloves you just showed the jury and the few

9    products we talked about before, are there any other products

09:50    10   in the HeatWave line that don't have the reflective component

11   on the inside surface?

12   A.    Again, if we go through the catalog, I will designate which

13   ones.    I'd forgotten about the Torche.    I'm sure I've forgotten

14   about others also.

09:50    15   Q.    Okay.    Let's go to page ending in 161.    Now, this is the

16   beginning of the HeatWave section of the catalog, correct?

17   A.    That's not quite accurate.

18   Q.    This is the part of the catalog that talks about HeatWave,

19   correct?

09:50    20   A.    Yes.

21   Q.    And all of the HeatWave products fit within the HeatWave

22   product line, correct?

23   A.    Yes.

24   Q.    You have a product line that you call the HeatWave line,

09:51    25   right?

A.   Yes.

Q.   And these products, some of them have a number of features, correct?

A.   Correct.

09:51   Q.   Some of them have pockets on them, right?

A.   Are you talking about -- so the product line is much broader than gloves.  So you have gloves here that are the HeatWave gloves, and you have other accessories.

Q.   So these gloves have a variety of features?

09:51   A.   All of them have a variety.

Q.   Some of them have buckles?

A.   Yes.

Q.   You don't have a section of the catalog for products with buckles, right?

09:51   A.   No.

Q.   Some of them have zippers?

A.   Yes.

Q.   You don't have a section of the catalog for products with zippers?

09:51   A.   No.

Q.   Some of them have other features as well, right?

A.   Yes.

Q.   HeatWave is the primary product differentiator for the HeatWave line of products, right?

09:51   A.   That's not correct.

1   Q.   But you call these products the HeatWave products, right?

2   A.   Yes.

3   Q.   And these products all have that HeatWave fabric in them,

4   right?

09:52   5   A.   That's true.

6   Q.   And that's the fabric that has that wavy line pattern,

7   right?

8   A.   Yes.

9   Q.   In fact, that wavy line pattern is right in the middle of

09:52   10   that HeatWave logo up in the top left-hand corner of this page,

11   correct?

12   A.   That's not the pattern that we use in the glove, no.

13   Q.   But you have a wavy line pattern right there in the middle

14   of that HeatWave logo?

09:52   15   A.   Yes.

16   Q.   All right.  So starting here at page 161, are there any

17   products on here that do not have the HeatWave fabric on the

18   innermost surface?

19   A.   I'm still waiting for it to come up.  Sorry.

09:52   20   Q.   Oh, sorry.  This is the page.

21   A.   Oh, I'm sorry.  This page.

22   Q.   I'm sorry.  Maybe we could go back and correct.  This is

23   the beginning of the HeatWave section, correct?

24   A.   No, it's the glove section.

09:53   25   Q.   It's the beginning of the HeatWave glove section?

1    A.    That's correct.

2    Q.    Thank you for the clarification.

3          Any products on this page that don't have HeatWave fabric

4    on the innermost surface?

09:53    5    A.    No.

6    Q.    Let's go to the next page.    Same question.

7    A.    No.    All of the gloves in this year's catalog will have at

8    least a section of the glove with the silver facing the user.

9    Q.    Okay.    Let's go to the page ending in 165.    This is the

09:53    10    beginning of the HeatWave Plus section, correct?

11    A.    That's correct.

12    Q.    And the HeatWave Plus section was a variation that Seirus

13    made on the HeatWave gloves, right?

14    A.    Yes.

09:53    15    Q.    Okay.    And if we go to the next page, the difference

16    between the HeatWave gloves and the HeatWave Plus gloves is

17    that on the HeatWave Plus gloves, the silver is on the inside

18    surface only on the back side of the hand, correct?

19    A.    On some of the -- some of our gloves.

09:54    20    Q.    The HeatWave Plus?

21    A.    Yes.    So a HeatWave Plus has -- some of the gloves have the

22    reflective on the back of the hand, and some of them don't have

23    the reflective showing at all.

24    Q.    That's a new development, correct?

09:54    25    A.    Yes.

| | |
|---|---|
| 1 | Q.   Okay.   That's something that happened just in this newest |
| 2 | selling season.   Is that correct? |
| 3 | A.   Well, last year's selling season. |
| 4 | Q.   Through -- through the 2016-2017 selling season, Seirus' |
| 09:54   5 | HeatWave Plus product line still had reflective components on |
| 6 | the inside of the glove on the back of the hand, correct? |
| 7 | A.   Yes. |
| 8 | Q.   Okay.   And the change that has been made to introduce a new |
| 9 | product line that has -- it's a new variation to HeatWave Plus |
| 09:54   10 | where you decided to take the silver and turn it around on the |
| 11 | entire glove.   That's something you decided to do only for the |
| 12 | 2017-2018 selling season, correct? |
| 13 | A.   Yes, but it was introduced in '16.   So our seasons are -- |
| 14 | everything's produced a year in advance. |
| 09:55   15 | Q.   I see.   I see.   And here on page -- I guess it's page 14 of |
| 16 | the catalog, correct? |
| 17 | A.   Yes. |
| 18 | Q.   This is showing the HeatWave -- the HeatWave fabric there |
| 19 | on the back of the hand, correct? |
| 09:55   20 | A.   Yes. |
| 21 | Q.   And then on the palm of the hand, it's actually the same |
| 22 | fabric, right? |
| 23 | A.   Yes. |
| 24 | Q.   All you did was turn it around? |
| 09:55   25 | A.   Yes. |

1    Q.    But back in 2015-2016, you didn't do that, right?

2    A.    No.  I think in '15-'16 we had that also.  I have to look

3    at the catalog to make sure.  I think we've had this for a

4    couple years now.

09:55    5    Q.    Do you remember giving a deposition in this case?

6    A.    I remember giving a deposition.  I don't remember what the

7    dates were, and at this time, I just have to see the catalog to

8    know what the dates were.  That's all.

9    Q.    Do you have a catalog in front of you, the actual physical

09:56   10    catalog?  It's in the binder.

11    A.    Oh, sure.

12    Q.    Exhibit 128.

13    A.    If this is '15-'16, so '15-'16 starts -- this gets

14    introduced in 2014 because our selling season starts a year

09:56   15    before.  It's a little bit complicated.

16    Q.    Yeah, I understood.  I'd like to talk about what you were

17    selling.

18    A.    Sure.

19    Q.    And so in 2015-2016, what was sold to the public, the

09:56   20    HeatWave Plus line had reflective fabric on the inside of the

21    gloves on every one of the HeatWave Plus gloves, correct?

22    A.    Correct.

23    Q.    And the same in the 2016-2017 selling season, correct?

24    A.    Yes.

09:57   25    Q.    By 2016-2017 you had been in this litigation for a number

1    of years, correct?

2    A.    Yes.

3    Q.    You originally were served with papers in this lawsuit in

4    2013, correct?

09:57    5    A.    That's true.

6    Q.    And I'd like to look again at the page here on the catalog.

7    It might be difficult to see, but there's a wavy line design

8    pattern in the background of this image, correct?

9    A.    That's true.

09:57    10    Q.    It's the same wavy line design pattern that's on the inside

11    of the gloves, correct?

12    A.    That's true.

13    Q.    It's important for you to show the consumers that wave line

14    design pattern when you're talking about the HeatWave products,

09:58    15    correct?

16    A.    That's not accurate.

17    Q.    Okay.    Seirus also has -- advertises its HeatWave products

18    elsewhere besides in catalogs, correct?

19    A.    Yes.

09:58    20    Q.    You know what?    I meant to ask you, are there any other

21    products in the 2015-2016 season that you saw in that catalog

22    that did not have HeatWave fabric on the inside of the product

23    besides the ones we've talked about?

24    A.    Well, you didn't complete going through the catalog.

09:58    25    Q.    If you could -- do you want to take a quick flip?

A.   Sure.

Q.   Thanks.   But I think we already agree that for all of the

gloves -- all of the gloves that were HeatWave gloves in that

season had HeatWave fabric on the innermost surface, correct?

09:59   A.   That's not true.

Q.   Except for the HeatWave Torche?

A.   That's one.

Q.   Was there another one?

A.   Yeah, the HeatWave glove liner.

09:59   Q.   HeatWave glove liner that we already talked about.   Any

others?

A.   No.

Q.   Okay.   Thank you.   All right.   Let's leave it at that for

now then.   We can talk about other products later if we need

09:59   to.

A.   Sure.

Q.   All right.   So besides the catalog, Seirus advertises its

HeatWave products elsewhere, correct?

A.   Yes.

09:59   Q.   Seirus advertises its HeatWave products in trade shows,

correct?

A.   Correct.

Q.   And part of that advertising campaign was based on

Columbia's advertising campaign, correct?

09:59   A.   I beg your pardon?

1   Q.   Part of Seirus' advertising campaign for HeatWave after it

2   launched the HeatWave products was based on Columbia's

3   advertising --

4   A.   Absolutely not.

5   Q.   It wasn't?

6   A.   No.

7        MR. ALDRICH:   Let's call up Exhibit 212.

8   Move to admit.

9        MR. MARCHESE:   No objection.

10       THE COURT:   Received.

11   (Exhibit 212 admitted.)

12   BY MR. ALDRICH:

13   Q.   Mr. Carey, this is an email that was sent to you, correct?

14   A.   Can you blow it up first, please?

15   Q.   You bet.

16   A.   Thank you.   Yes, it was.

17   Q.   This is an email from David I?

18   A.   Yes, it is.

19   Q.   Who's David I?

20   A.   He was our national sales manager -- one of our national

21   sales managers back in that time.

22   Q.   And he sends you an email here, correct?

23   A.   Yes.

24   Q.   And it says --

25   A.   It's actually sent to Greg.   I'm just copied.

1    Q.    And the subject is "HeatWave pattern," correct?

2    A.    Yes.

3    Q.    And he says -- this is in response to the HeatWave pattern,

4    right?

10:01    5    A.    Yes.

6    Q.    And he says, "It's cool looking, but we need to come up

7    with a technical story behind what this pattern advantages

8    are."  Do you see that?

9    A.    Yes.

10:01    10    Q.    He says, "Columbia has built a campaign around their

11    Omni-Heat based on the circle pattern and now have introduced

12    Omni-Freeze with the same pattern for summer."  Do you see

13    that?

14    A.    Yes.

10:01    15    Q.    So people within Seirus were looking at Columbia with

16    respect to the advertising campaign that Columbia was using,

17    correct?

18    A.    Yes, I assume that's what Dave was doing.

19    Q.    Let's turn to Exhibit 135, which I think is already in

10:02    20    evidence.   This is an email we saw.

21            MR. ALDRICH:   If it's not in, I move to admit 135.

22            MR. MARCHESE:   Is this 135 or 135.1?

23            MR. ALDRICH:   I've got 135 which is a complete,

24    two-page document.

10:02    25            MR. MARCHESE:   No objection.

| | | |
|---|---|---|
| | 1 | THE COURT:  Received. |
| | 2 | (Exhibit 135 admitted.) |
| | 3 | BY MR. ALDRICH: |
| | 4 | Q.   This is an email that was sent to you as well, correct? |
| 10:02 | 5 | A.   Yes. |
| | 6 | Q.   As the first person on the list, right? |
| | 7 | A.   Yes. |
| | 8 | Q.   And also to Mr. Edwards, correct? |
| | 9 | A.   Yes. |
| 10:02 | 10 | Q.   And it contains an attachment, correct? |
| | 11 | A.   I assume so.  If you'd scroll down I'll be able to see it. |
| | 12 | Q.   It does say "attachment."  Do you see that? |
| | 13 | A.   Great. |
| | 14 | Q.   And the subject is "Omni-Heat header card," correct? |
| 10:03 | 15 | A.   Yes. |
| | 16 | Q.   And the text is "Here is an image of the Omni-Heat header." |
| | 17 | Do you see that? |
| | 18 | A.   Yes. |
| | 19 | Q.   And Mr. Carlson sent you -- |
| 10:03 | 20 | MR. ALDRICH:   Let's go to the next page. |
| | 21 | BY MR. ALDRICH: |
| | 22 | Q.   -- a photograph of a pair of Omni-Heat gloves, correct? |
| | 23 | A.   Yes. |
| | 24 | Q.   Showing that header card, correct? |
| 10:03 | 25 | A.   Yes -- actually they're mittens. |

1    Q.   Thank you.   And if we zoom in there on that circle showing

2    that hangtag, that hangs on the Columbia products, correct?

3    A.   Yes.

4    Q.   So, again, people at Seirus were looking to Columbia's

10:03    5    marketing campaign as Seirus was getting ready to launch its

6    own products, correct?

7    A.   Yes.

8    Q.   And Seirus ended up using a marketing campaign that focused

9    on the technology about how the product works, correct?

10:04    10    A.   On our HeatWave technology, yes.

11    Q.   Seirus used graphics to show how heat reflects back to the

12    user, correct?

13    A.   As we always do.

14    Q.   Seirus also markets its products on its website, correct?

10:04    15    A.   Yes.

16          MR. ALDRICH:   Let me turn to Exhibit 125.

17       Move to admit 125.

18          MR. MARCHESE:   Just one minute.   No objection.

19          THE COURT:   Received.

10:05    20       (Exhibit 125 admitted.)

21    BY MR. ALDRICH:

22    Q.   Exhibit 125 is a printout of Seirus' website, correct?

23    A.   Yes.

24    Q.   And under "Gloves" you have separate catalogs for HeatWave

10:05    25    Plus and HeatWave, correct?

1  A.   Yes.

2  Q.   Okay.  Again, you don't have sections for gloves with

3  buckles, right?

4  A.   No.

10:05  5  Q.   Gloves with zippers?

6  A.   No.

7       MR. ALDRICH:  Okay.  Let's move to Exhibit 702.  I'll

8  move to admit.

9       MR. MARCHESE:  No objection.

10:06  10      THE COURT:  Received.

11      (Exhibit 702 admitted.)

12  BY MR. ALDRICH:

13  Q.   And Exhibit 702 is what you get when you would click on the

14  HeatWave section of the website that we just looked at,

10:06  15  correct?

16  A.   Yes.

17  Q.   And right up at the top is that HeatWave logo.

18  A.   HeatWave kinetic heat return system, yes.

19  Q.   "Look for the silver lining and increase your body's heat,"

10:06  20  correct?

21  A.   Yes.

22  Q.   And the camera focused there on the inside of the glove

23  showing that silver lining, correct?

24  A.   It's focused on the gloves that show the lining.

10:06  25  Q.   And the inside of the gloves, right?

1    A.    And the exterior of the glove.

2    Q.    And down below there are a bunch of images of gloves,

3    correct?

4    A.    Yes.

10:06    5    Q.    None of those show the inside, right?

6    A.    Right.

7    Q.    Normally you don't photograph gloves from the inside?

8    A.    We've photographed gloves a lot of different directions.

9    Q.    Well, let's go ahead and look at the rest of this exhibit

10:07    10    then.    None of the gloves here are photographed showing what

11    the inside of the glove looks like?

12    A.    Correct.

13    Q.    But at the top of the page, you have this advertisement

14    that focuses on the inside of the glove, correct?

10:07    15    A.    Yes, it does show that.

16            MR. ALDRICH:    Okay.    And then Exhibit 121.    Move to

17    admit.

18            MR. MARCHESE:    No objection.

19            THE COURT:    Received.

10:07    20        (Exhibit 121 admitted.)

21    BY MR. ALDRICH:

22    Q.    This is what you would get on the website if you clicked on

23    the HeatWave Plus portion of the website that we looked at

24    earlier, correct?

10:08    25    A.    Yes.

1    Q.    Okay.   And at the top, again, that's a picture of the glove

2    showing the inside of the glove, right?

3    A.    Yes.

4    Q.    It says, "Feel the waves of heat," correct?

10:08    5    A.    Yes.

6    Q.    Okay.   And then this would have all the HeatWave Plus

7    products, correct?

8    A.    Yes.

9    Q.    Do you know if the website looks like this today?

10:08    10    A.    Yeah, I haven't seen it recently, but . . .

11    Q.    You're not aware that one week ago Seirus removed these

12    images from its website?

13    A.    Yes.

14    Q.    You are aware of that?

10:08    15    A.    Yes.   Well, I don't know when it happened, but it was -- we

16    were directed to do that a while ago.

17    Q.    Directed to do that?

18    A.    Yes, I --

19              MR. MARCHESE:   Objection.   I don't want to reveal any

10:08    20    privileged information, Your Honor.

21              THE COURT:   Sustained.

22    BY MR. ALDRICH:

23    Q.    If it came from counsel, we don't want to hear about it.

24        Approximately one week ago the website was changed so that

10:08    25    these images were removed, correct?

1   A.   I couldn't tell you when it was done.

2   Q.   But that was done after the judge ruled that we were going

3   to go to trial this week, correct?

4   A.   When it came down, I couldn't answer that.

10:09   5   Q.   You were up in Oregon a couple weeks ago, correct?

6   A.   Yes.

7   Q.   Then you were there when the judge ruled that we were going

8   to go ahead and go forward with trial here in San Diego this

9   week?

10:09   10   A.   Yes.

11   Q.   And the change to the website happened after that, right?

12   A.   I'm not sure.

13   Q.   Okay.  But earlier this year, this is what the website

14   would have looked like, correct?

10:09   15   A.   I'm not sure of that either.

16   Q.   But the HeatWave Plus logo at the top of the page and the

17   HeatWave logos at the top of the page, those have been on that

18   page for quite a while, correct?

19   A.   They were initially on the website.  When they came down, I

10:09   20   couldn't tell you.

21   Q.   Okay.  And I'm showing you Seirus' website today.  Do you

22   see that?

23   A.   I don't see the date.  This is live?

24   Q.   This is live.

10:10   25   A.   I see that.

| | |
|---|---|
| 1 | MR. ALDRICH:  Can we show this to the jury? |
| 2 | MR. MARCHESE:  No objection. |
| 3 | THE COURT:  Received. |
| 4 | You will have to print this out and we'll assign a number |
| 5 | to it, but now it will be shown as an exhibit that's not |
| 6 | been -- I guess because I don't have a document received into |
| 7 | evidence.  So it will be demonstrative. |
| 8 | MR. ALDRICH:  Thank you, Your Honor. |
| 9 | THE COURT:  You may look at it. |
| 10 | BY MR. ALDRICH: |
| 11 | Q.   So here at the top of the page, it still shows the HeatWave |
| 12 | glove with photographs of the inside, correct? |
| 13 | A.   Yes. |
| 14 | Q.   Okay. |
| 15 | MR. ALDRICH:  Can you just scroll down the page a |
| 16 | little bit. |
| 17 | BY MR. ALDRICH: |
| 18 | Q.   And this graphic here that talks about "look for the silver |
| 19 | lining," do you see that? |
| 20 | A.   Yes. |
| 21 | Q.   Okay.  And this is -- talks about reflecting heat back to |
| 22 | the user.  Do you see that? |
| 23 | A.   Yes, I do. |
| 24 | MR. ALDRICH:  Okay.  That's all right.  We can be done |
| 25 | with this exhibit.  Thank you. |

Timestamps in left margin: 10:10 (line 5), 10:10 (line 10), 10:11 (line 15), 10:11 (line 20), 10:11 (line 25)

1    BY MR. ALDRICH:

2    Q.    Mr. Carey, do you consider Columbia Sportswear to be one of

3    Seirus' competitors?

4    A.    We compete with them in certain areas.

10:11    5    Q.    At your deposition --

6                MR. ALDRICH:    Can we call up Mr. Carey's deposition?

7    Can we turn to page 44, lines 8 to 12.

8    BY MR. ALDRICH:

9    Q.    Do you remember being asked at your deposition, "Do you

10:12    10    consider Columbia Sportswear to be one of Seirus' competitors?"

11    A.    Yes.

12    Q.    And your answer was, "I know that they have made a

13    competing product, but other than that, I don't consider them

14    to be a competitor, no."  Do you remember that?

10:12    15    A.    Yes.

16    Q.    Okay.  And during the development of the HeatWave products,

17    Columbia -- Seirus was looking at Omni-Heat, correct?

18    A.    Could you repeat that?

19    Q.    During the development of the HeatWave products,

10:12    20    Columbia -- or Seirus was looking at Omni-Heat, correct?

21    A.    Yes.

22    Q.    And had obtained Omni-Heat product, correct?

23    A.    Yes.

24    Q.    And you knew about that at the time, correct?

10:13    25    A.    No, I did not.

1  Q.  When did you find out that Seirus had obtained Columbia

2  product in the process of developing its HeatWave products?

3  A.  After we were sued.

4  Q.  How long after you were sued?

10:13  5  A.  During the preparation when documents started to go around

6  that showed that we had Columbia materials from their supplier.

7  Q.  Do you remember saying at your deposition that you were not

8  aware that Seirus had obtained any Omni-Heat fabric or any

9  Omni-Heat products?

10:14  10  A.  I wasn't aware of that.

11  Q.  You weren't aware during your deposition?

12  A.  No, no.  You said during my deposition I said I wasn't

13  aware, and I said, yes, I wasn't aware at the time that the

14  fabric was brought that we had it.

10:14  15  Q.  The Omni-Heat fabric was, in fact, a focus of Seirus during

16  the development of its HeatWave product line, correct?

17  A.  I don't think that's an accurate statement.

18  Q.  It wasn't a focus?

19  A.  It wasn't a focus of Seirus.  The production department had

10:14  20  received some materials that I learned after the case had

21  started, but it was never in our developmental meetings.

22        MR. ALDRICH:  Can we turn to Mr. Carey's deposition,

23  page 101.

24  BY MR. ALDRICH:

10:15  25  Q.  And you gave a deposition in this case last year, correct?

1   A.   I believe that's when it was, yes.

2   Q.   And, again, the litigation started in 2013, correct?

3   A.   Yes.

4   Q.   So at this time, you'd been in litigation for about -- more

5   than two years, right?

6   A.   A long time.

7   Q.   A long time.  And in advance of your deposition, you

8   prepared for your deposition, correct?

9   A.   Yes, I did.

10  Q.   You looked at a lot of documents, right?

11  A.   More documents than I can imagine.

12  Q.   Did you speak with anybody in the company before your

13  deposition about the lawsuit?

14  A.   Of course.

15  Q.   Who did you speak to?  Did you speak to Mr. Edwards?

16  A.   Yes.

17  Q.   Mr. Murphy?

18  A.   Yes.

19  Q.   Did you speak to Ms. Chin?

20  A.   Yes.

21  Q.   You tried to become as knowledgeable as you could before

22  your deposition about --

23  A.   Yes, I did.

24  Q.   -- about what had happened during the development?

25  A.   That's correct.

1          MR. ALDRICH:  Okay.  Are we on page 101?  Can we look

2   at line 20 to 22.

3   BY MR. ALDRICH:

4   Q.   And I asked you at your deposition, "Has Seirus ever

10:16  5   obtained a sample of an Omni-Heat product?"  Do you see that?

6   A.   Yes, I do.

7   Q.   And do you see your answer, correct?

8   A.   Yes.

9   Q.   "Not to my knowledge," correct?

10:16  10   A.   Yes.

11   Q.   Correct?

12   A.   Yes.

13   Q.   That's the answer you gave last year in 2016, correct?

14   A.   Yes, I think that was correct.

10:16  15   Q.   Okay.  Thank you.

16          MR. ALDRICH:  Can we turn to Mr. Carey's deposition

17   testimony, page 98.

18   BY MR. ALDRICH:

19   Q.   Do you remember being asked about meetings at your

10:16  20   deposition?

21   A.   Yes, I do.

22   Q.   Such as steering committee meetings?

23   A.   Yes.

24          MR. ALDRICH:  And page 98, lines 15 to 19.

25

1  BY MR. ALDRICH:

2  Q.   And I asked you the question, "Would you be speculating

3  about whether Omni-Heat came up at that meeting," and this is

4  referring to one of the steering committee meetings, I believe.

5  Do you see your answer there?  You said, "No, I would have -- I

6  think I would have recalled if Omni-Heat was in there, but it

7  was not -- they weren't a focus of ours."  Do you see that?

8  A.   Yes.

9  Q.   But, in fact, Omni-Heat was a focus of Seirus', correct?

10  A.   No.

11  Q.   You saw all this -- you were here for Ms. Chin's testimony,

12  correct?

13  A.   Yes, I was.

14  Q.   You obtained copies of Omni-Heat fabric, right?

15  A.   The production department received it, yes.

16  Q.   And sent gloves -- sent fabric out to be manufactured and

17  mockup gloves for the steering committee to look at, right?

18  A.   I don't think that's accurate.  I'd never seen a glove with

19  Omni-Heat material in it, ever.

20  Q.   You didn't, but at the company, gloves were made -- mockup

21  gloves were made with the Omni-Heat fabric in them, right?

22  A.   Not -- I don't have that knowledge, no.

23  Q.   They were sent out to be made, correct?

24  A.   I don't have that -- from Mrs. Chin's testimony yesterday,

25  yes, I assume they were.

1  Q.    And Ms. Chin called it "the Omni-Heat program."  Do you

2  remember that?

3  A.    Yes.

4  Q.    And there's an email where she says, "We want to start an

10:18  5  Omni-Heat program with you," correct?

6  A.    I remember that email.

7  Q.    Do you remember emails that talked about creating our own

8  Omni version.  Do you remember that?

9  A.    I remember that.

10:18  10  Q.    Do you remember an email about what are we going to call

11  the Ventex material with Omni-Heat lining on it?  Do you

12  remember that -- or Omni-Heat printing on it?  Do you remember

13  that?

14  A.    I remember her email, yes.

10:18  15  Q.    Okay.  So there were a bunch of emails with Omni-Heat

16  headers were sent, right?  Omni-Heat hangtags were sent around?

17  A.    Omni-Heat hangtags different than production, yes.

18  Q.    Okay.  So the marketing department we know was looking at

19  Omni-Heat hangtags, right?

10:18  20  A.    They had Omni-Heat hangtags.

21  Q.    They were talking about developing an Omni-Heat story, or a

22  story for HeatWave that would have the technical advantages of

23  the Omni-Heat marketing campaign, right?

24  A.    That's not correct.

10:18  25  Q.    That's what the email showed, right?

1   A.   No, that's not what it showed.

2   Q.   Okay.  Well, it's an email that talked about developing a

3   technical story for HeatWave, correct?

4   A.   That's correct.

10:18   5   Q.   And referencing Omni-Heat, right?

6   A.   Yes.

7   Q.   And referencing the fact that Columbia had this technical

8   advertising campaign, right?

9   A.   Yes.

10:19   10   Q.   Okay.  And your testimony at your deposition was that

11   "Omni-Heat was not a focus of ours."  Is that correct?

12   A.   Yes.

13   Q.   That's the answer you gave at your deposition?

14   A.   That's correct.

10:19   15   Q.   Do you still believe that to be true today?

16   A.   Well, you said Omni-Heat fabric.  This is Omni-Heat as a

17   catalog.  When you first started talking, you said Omni-Heat

18   fabric, and I said no.

19   Q.   And that's the difference.

10:19   20   A.   That is a difference.  One is -- the production department

21   had materials that never made it to our steering committee.

22   The sales department, as they do with every product that we

23   make, compares our packaging with what somebody else does so we

24   can show the advantages of Seirus over our competitors.

10:19   25   Q.   But the Omni-Heat fabric was a focus of the development of

1   the HeatWave product line, correct?

2   A.   It was in the production department, not our developmental

3   process.

4   Q.   At your deposition you testified about some reasons why you

10:20   5   think the HeatWave fabric provided a -- an advantage for the

6   Omni-Heat product line.   Do you remember that?

7   A.   Not specifically.   I'd have to see.

8   Q.   Pardon?

9   A.   Not specifically.   I'd have to see the section you're

10:20   10   referring to.

11   Q.   Okay.   Are there any reasons why you think HeatWave

12   provides an innovative advance over Omni-Heat?

13   A.   I think we have an advantage over what they've -- what they

14   sell, yes.

10:21   15   Q.   Okay.   What are the reasons why you think that HeatWave

16   provides an advance over Omni-Heat?

17   A.   HeatWave is -- Omni-Heat is a simple reflective product

18   over a base material.   We started with a base material that had

19   unusual properties of not only wicking moisture away, but also

10:21   20   turning kinetic energy from the body and increasing its -- the

21   temperature inside.   So that's a market difference over the

22   competition.

23   Q.   I want to focus on the words "market difference."   That's a

24   marketing difference, right?

10:21   25   A.   Pardon me?

|  |  |
|---|---|
| 1 | Q.   That's a marketing difference? |
| 2 | A.   It's a measurable difference that we got from our vendor. |
| 3 | Q.   I see.   You don't know how that works, right? |
| 4 | A.   I don't know the science behind it, but I rely on our |
| 5 | vendors at their labs to give us the information that gives us |
| 6 | an advantage over our competitors. |
| 7 | Q.   Now, other than Dr. Cole, you're probably the only person |
| 8 | in the room with a science degree.   Is that right? |
| 9 | A.   I couldn't tell you that. |
| 10 | Q.   Do you have a science degree? |
| 11 | A.   Yes, I do. |
| 12 | Q.   Took a bunch of science classes in college? |
| 13 | A.   Yes, I did. |
| 14 | Q.   What's your degree in? |
| 15 | A.   Biology. |
| 16 | Q.   Biology.   Bachelor degree in biology? |
| 17 | A.   Yes. |
| 18 | Q.   You worked in the field for a while before you went into |
| 19 | snow sports, correct? |
| 20 | A.   A short period, yes. |
| 21 | Q.   And you don't know how this kinetic heat benefit actually |
| 22 | works, right? |
| 23 | A.   I don't know the science behind it because it's not my area |
| 24 | of expertise. |
| 25 | Q.   You never did any testing within Seirus to confirm what |

10: 21  5
10: 22  10
10: 22  15
10: 22  20
10: 22  25

1    your vendor said, right?

2    A.    We rely on our vendors for their information.

3    Q.    And your vendor's selling your fabric, right?

4    A.    Yes.

10:22    5    Q.    And you take what they say, and you put it on your own

6    marketing materials, and you say has a kinetic stage, right?

7    A.    Yes.

8    Q.    You don't confirm it, right?

9    A.    That's not correct.

10:23    10    Q.    How did you confirm that it actually provides this kinetic

11    benefit that Seirus touts in its marketing materials?

12    A.    Their labs do all the testing, and they sent us the data.

13            MR. ALDRICH:    Let me turn to Exhibit 117.

14    BY MR. ALDRICH:

10:23    15    Q.    This is the graphic on Seirus' hangtags, correct?

16    A.    Yes, it is.

17    Q.    And this talks about the kinetic stage that you were

18    talking about?

19    A.    Yes.

10:23    20    Q.    Now, it might be easier just for viewing sake -- well, let

21    me strike that.

22        This -- a variation of this graphic shows up on a variety

23    of Seirus' marketing materials, correct?

24    A.    Yes, it does.

10:23    25    Q.    Okay.    It shows up on -- we saw it on the website, right?

1    A.    I don't recall.

2    Q.    Okay.   We see it in catalogs, right?

3    A.    Yes.

4    Q.    Okay.   So I'm going to go back to the one on the website

10:24  5    because I think it's easier for everyone to see.   All right?

6    A.    Okay.   Sure.

7    Q.    So on this graphic, it shows warmth being reflected down by

8    those wavy line strips, right?

9    A.    Yes.

10:24  10   Q.    And moisture permeates through the base layer?

11   A.    That's correct.

12   Q.    And it refers to that as the reflective stage, right?

13   A.    Yes.

14   Q.    And then there's a discussion about a kinetic stage, right?

10:24  15   A.    Yes.

16   Q.    And it says that it "converts emitted energy into increased

17   heat," correct?

18   A.    That's correct.

19   Q.    Okay.   And that's the part that you can't explain, right?

10:25  20   A.    I think that explains it.   So that's the part that explains

21   it, but the science behind it, I couldn't tell you the chemical

22   makeup and whatever is in the fabric that makes that happen.

23   Q.    I see.   And then underneath that it shows an arrow, and it

24   says "amplified heat."   Do you see that?

10:25  25   A.    Yes.

1    Q.    Okay.   And so is that -- Seirus' position is that the

2    HeatWave fabric amplifies heat?

3    A.    That it increases the heat that would normally escape from

4    your body, yes.

10:25   5    Q.    I see.   So if something amplifies heat, it make it hotter,

6    right?

7    A.    Correct.

8    Q.    Okay.   And Seirus' position is that this kinetic stage

9    technology amplifies heat by making it hotter, right?

10:25   10    A.    Warmer, yes.

11    Q.    Warmer?

12    A.    Yes.

13    Q.    So let's say, for example, I made something out of this

14    fabric like a coffee cup.   All right.

10:26   15    A.    Okay.

16    Q.    And I put coffee in it.

17    A.    Yes.

18    Q.    Is the coffee going to get hotter?

19    A.    This is out of the realm of what we're talking about here.

10:26   20    Q.    No, no --

21    A.    It isn't designed for --

22    Q.    This is in the realm of the benefits that you explained was

23    the superior advance over Omni-Heat.   You said that it's this

24    kinetic stage property that amplifies heat that is the superior

10:26   25    advance over Omni-Heat, correct?

1    A.    I said "increases heat," and this says "amplifies" because

2    it -- just like in an insulated glove, the heat that escapes is

3    amplified over something that would normally escape.

4    Q.    It's amplified?

5    A.    Yes.

6    Q.    It's made hotter?

7    A.    It's warmer than it would have been without it.

8    Q.    And so, again, if I made something out of this fabric and

9    I -- I made a coffee cup and I poured hot coffee in there, is

10   it going to get hotter?

11   A.    That's not what this says.

12   Q.    It does say that it amplifies heat, right?

13   A.    Not from coffee.

14   Q.    I see.  So it doesn't actually amplify heat at all, does

15   it?

16   A.    Yes, it does.  It increases the heat that the user feels

17   over what he would not -- what he would feel if he did not have

18   that.

19   Q.    But you don't know the science behind how?

20   A.    No, I don't know the science behind how this electricity

21   works either.

22   Q.    Did you take classes in physics?

23   A.    Yes, I did.

24   Q.    Is this idea consistent with basic principles of physics

25   that you learned about in college?

1    A.    Sure.

2    Q.    The idea that you can convert emitted heat -- or emitted

3    energy into increased heat, it's consistent with principles of

4    physics you learned about in college?

10:28    5    A.    This is a marketing piece that shows --

6    Q.    That's all the answer I need.  Thank you.  I'm done.

7          THE COURT:  Members of the jury, we'll be taking our

8    morning recess at this time.  We'll be in recess for 15

9    minutes.

10:28    10         (Proceedings held outside the presence of the jury panel.)

11         THE COURT:  You may step down.  15 minutes.

12         (Recess.)

13         (Proceedings held outside the presence of the jury panel.)

14         THE COURT:  Regarding Exhibit 1192, what happened with

10:43    15    that exhibit is that the plaintiff introduced the exhibit which

16    actually is a defense exhibit.  Once an exhibit has been

17    offered and received by the Court, it belongs to the Court.

18    And so somehow you ended up with 1192.  You need to return that

19    to us.  We will make a copy for you and give it back to you,

10:43    20    but it's now mine.

21         MR. MARCHESE:  I had no idea how we ended up with it.

22         THE COURT:  We'll make a copy for you, and we'll make

23    sure you don't leave without that copy today.

24         MR. MARCHESE:  Can we discuss one issue?

10:44    25         THE COURT:  Sure.

1    MR. MARCHESE:  So we've been talking about the opening

2    the door on the new design, and the new design is on the live

3    web page that counsel just showed, and so may I show that to

4    the jury now?

10:44    5    MR. ALDRICH:  I -- where is it on the web page?

6    MR. MARCHESE:  If you go to the liner glove, you'll

7    see the new design.

8    MR. ALDRICH:  To the liner glove?

9    MR. MARCHESE:  Sure.  We just looked at it.  It's on

10:44    10   there.

11   THE COURT:  That's on the current web page?

12   MR. MARCHESE:  Correct, the same one that was just

13   shown.

14   MR. ALDRICH:  I'm not actually online anymore, so --

10:44    15   THE COURT:  If you showed part of the web page, you

16   get to show the rest of it.

17   MR. MARCHESE:  Thank you.

18   (Proceedings held in the presence of the jury panel.)

19   THE COURT:  Mr. Carey, have a seat.  You're still

10:46    20   under oath.  Please be seated.

21   Cross-exam.

22   MR. MARCHESE:  Thank you.

23   CROSS-EXAMINATION

24   BY MR. MARCHESE:

10:46    25   Q.  Good morning, Mr. Carey.

1    A.    Good morning.

2    Q.    So we will be calling you back in our case in chief later

3    in the trial, but for now I just wanted to follow up on

4    questions that counsel for Columbia asked.   Okay?

10:46    5    A.    Sure.   Yes.

6    Q.    So you were shown several documents during your testimony.

7    Do you recall that?

8    A.    Yes.

9    Q.    And I wrote them down as we went through them.   The first

10:46    10    one was a catalog, Exhibit 128.   And this was the winter

11    2015-2016 Seirus catalog, correct?

12    A.    Yes.

13    Q.    And Seirus, does it issue a winter -- let me ask you

14    this -- withdrawn.

10:47    15         Does Seirus issue a catalog in each year?

16    A.    Yes.

17    Q.    Approximately how many?

18    A.    How many years?

19    Q.    How many catalogs.

10:47    20    A.    I'd be guessing.   Somewhere around 500, 750.

21    Q.    Different catalogs?

22    A.    No.   Just one catalog, just how many copies -- I'm sorry.

23    Q.    No, my apologies.   I wanted to know how many different

24    versions of the catalog.

10:47    25    A.    Oh, just one version.

1   Q.   But that would be one version every year?

2   A.   Yes.

3   Q.   And each year you advertise -- Seirus advertises the

4   product line?

10:47   5   A.   Yeah, that's correct.

6   Q.   And some years products come on; some years they may be new

7   ones; some may drop off from the year before?

8   A.   Every year, yes.

9   Q.   And is that true for HeatWave?

10:47   10   A.   Sure.

11   Q.   So in 2014-'15, there may have been additional HeatWave

12   gloves that were in the catalog for that year that are not in

13   2015-2016?

14   A.   That's correct.

10:47   15   Q.   Is that the same for every year since HeatWave's been

16   introduced?

17   A.   That's true.

18   Q.   And during the examination by Columbia's counsel, you only

19   saw this one catalog, correct?

10:48   20   A.   Yes.

21        MR. MARCHESE:  Let's take a look at that catalog, if

22   we could, please.  Could you go to page 4, please.

23   BY MR. MARCHESE:

24   Q.   On this page I see a number of different -- I call them

10:48   25   logos or designs -- on the right-hand side of the page

1    vertically aligned in a column.  It begins with HeatTouch,

2    HeatWave, HeatWave Plus, et cetera.  Do you see those?

3    A.    Yes, I do.

4    Q.    Okay.  And can you tell us what each of those represents,

10:48    5    please?

6    A.    Those are different technologies that Seirus has developed

7    in its history, yes.

8    Q.    Are any of those currently used as of the 2015-2016 time

9    frame?

10:49    10    A.    Yes, these are all I think in the '15-'16 catalog, yes.

11    Q.    So all of these technologies were being used by Seirus in

12    2015-2016?

13    A.    Yes.

14    Q.    And there are other technologies that Seirus was using in

10:49    15    that time frame, correct?

16    A.    Yes, that's true.

17    Q.    Can you give us some examples of those, please?

18    A.    Well, like Gore-Tex, different exterior fabrics that were

19    used, that we employ in many of our products.  Different types

10:49    20    of insulations, different types of components that go into most

21    of our products, but these are the ones that we have been

22    instrumental in developing.

23    Q.    I see.  So the technologies called out on page 4 of Exhibit

24    Number -- I believe this was Exhibit Number 128 -- those are

10:50    25    technologies that over the years Seirus has been involved with

1    the development of?

2    A.    That's correct.    These were our trade names and developed

3    product line or products and technologies.

4    Q.    Okay.    So when we go to the first product line advertised

5    in this document, Exhibit 128 --

10:50

6              MR. MARCHESE:    Could we go to page 6?

7    BY MR. MARCHESE:

8    Q.    -- we see the HeatTouch products, right?

9    A.    Yes.

10   Q.    HeatTouch, can you tell us generally what those are?

10:50

11   A.    Well, they are rechargeable heated gloves that we took

12   about ten years in development to come up and perfect a glove

13   technology that you can use rechargeable batteries and create a

14   panel of heat delivery system so that you can have a very low

15   profile glove or a fully insulated glove that delivers heat all

10:50

16   throughout the day.

17   Q.    And do those products all include HeatWave or some, not

18   all?

19   A.    No.    The only one we have HeatWave in is the -- this

20   Torche.    We have about seven or so models of HeatTouch gloves.

10:51

21             MR. MARCHESE:    Can you go to page 7, please -- excuse

22   me -- page 8.

23   BY MR. MARCHESE:

24   Q.    And we're looking at page 8 of Exhibit 128, Mr. Carey.    Can

25   you tell us generally what's on here?

10:51

1    A.    So this is part of the collection of our electronically

2    heated gloves.   The Torche leads it off, and then Inferno which

3    is another HeatTouch glove.

4    Q.    And Inferno, is that a product that has HeatWave?

10:51    5    A.    No, it does not.

6    Q.    And -- but HeatTouch Torche does.   Is that correct?

7    A.    That's correct.

8    Q.    I want to ask you a few more questions about HeatTouch

9    Torche in a minute.

10:52    10         MR. MARCHESE:   But can you flip to the next page,

11   please.

12   BY MR. MARCHESE:

13   Q.    Page 9 of Exhibit 128 we're looking at here.   How many of

14   these have HeatWave?

10:52    15   A.    None of them.

16   Q.    So none of these HeatTouch gloves shown on page 9 have

17   HeatWave?

18   A.    That's correct.

19   Q.    And then if we go to the next page, 10, we see the HeatWave

10:52    20   section beginning.   Is that correct?

21   A.    Yes.

22   Q.    So the HeatTouch is the first item called out in this

23   catalog, right?

24   A.    That's correct.

10:52    25         MR. MARCHESE:   And so if you can go back to page --

1    actually you don't need to.

2    BY MR. MARCHESE:

3    Q.    I'll just ask you some questions about the HeatTouch

4    Torche.    We've talked about that in the case, right?

10:52    5    A.    Yes.

6    Q.    And I think you have a pair in front of you?

7    A.    That's correct.

8    Q.    And can you show us where -- how the HeatTouch Torche

9    system would work and where the batteries are and all that,

10:52    10    please?

11    A.    Yeah.    It's pretty cool.    So we started out with one of the

12    other technologies that we've developed.    It's a -- it's really

13    a really thin profile glove that warms as well as a big, hefty,

14    lofted glove.    I sell a lot of these to the military.

10:53    15    Q.    Do you call it the All Weather Glove?

16    A.    This is our All Weather Glove series.    And this is the

17    lightest weight of them all.    It's got a unique construction.

18    It's a trilaminate, and this is the lightest version of that.

19    And in that we created a pocket that you can put two batteries

10:53    20    in, and there's an electronically generated fusion panel, we

21    call it, that goes all the way across the back of the hand and

22    around to the fingers and delivers really nice warmth

23    throughout the day.

24        So this is the base layer.    It goes on, slips on.    It's

10:53    25    got great dexterity to it.    And then if it's very cold, you can

1    put this over glove on, and then you have an even heavier

2    insulated situation so that going to the very depths of -- very

3    low temperatures and stay very warm for a long time.  So I'm

4    very proud of this.

10:54    5    Q.   Is there a battery pack that you can show the ladies and

6    gentlemen?

7    A.   Sure.  So this comes with a series of two batteries.  I

8    always get a defective one.

9    Q.   I opened one up the other day, and the tape was hard to get

10:54   10   off.

11   A.   You can't steal these, that's for sure.

12        So inside for each glove, there's a very thin profile, very

13   lightweight rechargeable battery that powers the fusion panel

14   that we've put in.

10:54   15   Q.   And you put two of those batteries in each of the All

16   Weather gloves?

17   A.   Yes, one set, one pair in one glove and then another pair

18   in the other, wafer thin, very light, lasts a long time.

19   Q.   And is there a rechargeable cord, cable, that comes with

10:55   20   this setup so that the purchaser can recharge the batteries?

21   A.   Yes, that's true.  So it's typical, you know, charge it

22   like your phone or something like that.  So it plugs into the

23   wall, and then when you finish that day -- so these plug into

24   the wall; they plug into the batteries; they don't catch on

10:55   25   fire.  And you're ready to go for the next day.  It's a great

1    system.

2    Q.    What if I lost my charger?  Could I buy a new one?

3    A.    Sure.

4    Q.    What if I lost a battery?  Could I buy another?

10:55    5    A.    Yes.

6    Q.    So they're separately sold?

7    A.    Absolutely.

8    Q.    And can you show us where the HeatWave fabric is on this

9    system?

10:55    10    A.    On the outside component, there's a glove that has the

11    HeatWave material on the back of the hand and flipped over on

12    the palm of the hand.

13    Q.    So when you put that glove on over top of the battery liner

14    on the inside, is the HeatWave up against the skin of the user?

10:56    15    A.    No.

16    Q.    Is it -- what is it touching?

17    A.    The interior glove.

18    Q.    And what's your understanding of what kind of damages that

19    Columbia is asking for with respect to the HeatTouch Torche

10:56    20    system for the design patent?

21    A.    They want every penny of every dollar we make over the

22    whole system.

23    Q.    Including the batteries?

24    A.    Including the battery, the charger, the panel, the

10:56    25    insulation that goes inside, every -- every component.  They

1    want all of our money.

2    Q.    Does that HeatTouch Torche system have any waterproof,

3    breathable technology in it?

4    A.    Yes.    All of our insulated gloves have 100 percent

10:57    5    waterproof -- breathable waterproof liners.

6    Q.    And when was the All Weather Glove developed?

7    A.    Oh, back in the early '90s.

8    Q.    And so the All Weather Glove has been in existence long

9    before Columbia generated or created its Omni-Heat material.

10:57    10    Is that right?

11    A.    Oh, yes.

12    Q.    And the All Weather Glove, can you tell us a little bit

13    about its acceptance in the industry and how well it's

14    performed and all that?

10:57    15    A.    Sure.    This is a product we worked on for a long time.    So

16    we developed a trilaminate system that has fleece next to your

17    skin, and then in between, it's a waterproof, breathable

18    membrane that's sandwiched outside of a four-way-stretch nylon.

19    So for the very first time, we had waterproof, breathable

10:58    20    materials in a very, very thin lightweight glove, and we

21    introduced it -- it was '94 or something like that.    But we

22    worked on it for years.    So we brought it out in '93, so a year

23    in advance.

24        And it had instant success because of how warm it can be in

10:58    25    such a thin profile, so important such that it became, outside

1    of the issue glove for the military, their number one selling

2    glove that they've outfitted in their clothing stores.  So it

3    gave us instant recognition.  It really put us on the map as

4    far as glove makers are concerned.

10:58    5              MR. MARCHESE:  May I approach briefly?  I think if you

6    feel the glove while we're talking about it.

7    BY MR. MARCHESE:

8    Q.   Is the All Weather Glove currently in the Seirus product

9    line?

10:59   10    A.   Yes.

11    Q.   So has it been consistently in the product line?

12    A.   Yes, since its inception.

13    Q.   Tell us, how well does it do in terms of sales these days?

14    A.   You know, it's the cornerstone of our glove line, and so it

10:59   15    grows every year, even though every -- not every, but so many

16    companies try to emulate what we're doing, so there's now --

17    our All Weather Glove is really kind of the iconic piece, and

18    it's -- the whole industry sells about 2 million gloves a year,

19    and we're about, oh, 10 percent, 15 percent of that glove

10:59   20    market in that series alone.  So it's a very well-accepted

21    product.

22    Q.   And you said "in the industry."  What industry are you

23    referring to?

24    A.   I'm sorry.  The Snow Sports Industries of America.

10:59   25    Q.   You said that they're -- I think you said 2 million gloves

1    a year in that industry?

2    A.    Yeah, it generally depends on the weather.

3    Q.    So if it's a really snowy year, that might go up?

4    A.    Or down in a not so snowy year, yes.

11:00    5    Q.    So your -- the rise and fall of sales for your product

6    lines are actually tied, at least in some part, to weather?

7    A.    More to weather than the economy.  In fact, back in '08

8    when the economy was really in the dumps, it was a very good

9    snow year, so the snow sports industry is fairly recession

11:00    10    proof.  So in '08, '09 when everything was in the tank, our

11    sales were up as well as the industry, unlike what was

12    mentioned before.  But in a bad year, the snow has not fallen,

13    it hasn't gotten extremely cold, the snow sports industry

14    suffers.

11:00    15    Q.    So, again -- and what percentage approximately of the

16    overall sales does the All Weather Glove account for in the

17    industry?

18    A.    To the best of my knowledge, somewhere in the 10 to 20

19    percent range.

11:01    20    Q.    And that's the All Weather Glove, not including other

21    Seirus products?

22    A.    That's correct.

23    Q.    Are there gloves that Seirus makes with the -- kind of same

24    glove with and without HeatWave?

11:01    25    A.    Yes.  So we make the original All Weather Glove which is

1    the first one that we developed, and that one we put HeatWave

2    in also.

3    Q.   What's the difference in, roughly if you can do it, in

4    sales of the All Weather with the HeatWave versus the

11:01    5    non-HeatWave?

6    A.   The All Weather Glove without HeatWave sells about 200

7    times the number of gloves we sell with HeatWave.

8            MR. MARCHESE:   So if we could turn to page -- same

9    exhibit as we were on, 128, page 12 -- excuse me -- page 10.

11:02    10    BY MR. MARCHESE:

11    Q.   This is page 10 of Exhibit Number 128.   Can you tell me --

12    if you look in the upper right-hand corner, you see the

13    HeatWave Shred?

14    A.   Yes.

11:02    15    Q.   And those are pictures that you're providing in your

16    catalog to customers.   Is that correct?

17    A.   That's correct.

18    Q.   And can you see HeatWave fabric in there?

19    A.   No.   No.

11:02    20            MR. MARCHESE:   Thank you.   Can you go to page -- this

21    is page 11.   I apologize.   I'm getting confused.

22    BY MR. MARCHESE:

23    Q.   If you look in the lower right-hand corner, there's a 10

24    and an 11.   I'm trying to navigate the numbers.   I think I have

11:02    25    it right.

1    A.    I see.

2    Q.    This is page 11 of the exhibit.  I believe it's page 10 of

3    your catalog.  Can you tell us -- these are HeatWave gloves?

4    A.    Yes.

11:03    5    Q.    Can you see the HeatWave fabric on any of them?

6    A.    No.

7            MR. MARCHESE:  Can you go to the next page, please,

8    page 12 of the exhibit.

9    BY MR. MARCHESE:

11:03    10    Q.    These are HeatWave gloves?

11    A.    Yes.

12    Q.    Do you see the HeatWave fabric anywhere?

13    A.    No.

14    Q.    And there's also on here, I noticed there's a blue box on

11:03    15    the two on the left-hand side that say "Soundtouch."

16    A.    Yes.  That's a technology that allows the user to use a

17    touch tone -- a touch screen, so it takes a particular type of

18    energy to get to the screen to make it work, and these gloves

19    allow that to happen.

11:03    20    Q.    Maybe just make that a little clearer.  Are you saying that

21    if I want to use my iPhone, and I have a Soundtouch glove, I

22    can -- I don't have to take it off, and I can put my finger on

23    it?

24    A.    That's correct.

11:04    25    Q.    Is that something beneficial to customers to your

1    knowledge?

2    A.    Absolutely.  If you want to stay warm and not take your

3    glove off and use your phone and your iPad, it's imperative.

4    Q.    Beneficial to what kind of people?  What kind of consumers

11:04    5    do you market it to?

6    A.    Everybody.

7    Q.    Skiers?

8    A.    Skiers, anybody out in the cold, workers, again we sell a

9    lot to the military, people just walking their dog.

11:04    10    Q.    They want to be able to use their phone without taking

11    their glove off?

12    A.    That's correct.

13    Q.    Probably advantageous when you're on a ski lift.  I would

14    imagine you take it off, you drop your glove.  That's trouble.

11:04    15    A.    I would imagine.

16          MR. MARCHESE:  So can we go to page 13.

17    BY MR. MARCHESE:

18    Q.    And these are more HeatWave gloves?

19    A.    Yes.

11:04    20    Q.    Do any of those show the HeatWave fabric?

21    A.    No.

22          MR. MARCHESE:  Okay.  Can you go to the next page,

23    please, page 15 of Exhibit 128.

24    BY MR. MARCHESE:

11:05    25    Q.    And this is HeatWave Plus, correct?

1    A.    Yes.

2    Q.    And you spoke about that some, right?

3    A.    That's true.

4    Q.    And some HeatWave Plus gloves have the silver in part

11:05    5    against -- or on the inside of the glove?

6    A.    Correct.

7    Q.    And the other part is -- it looks like a black color on the

8    bottom -- I'm sorry.  I don't have -- I'm on the wrong page.

9        Before I go to that, I want to ask one more question here.

11:05    10    Neofleece, do you see that there on the bottom right of

11    page 14?

12    A.    Yes.

13    Q.    What is that?

14    A.    That's a fabric Seirus developed back in the early 1980s,

11:05    15    and so it's a bilaminate, so its -- we take neoprene, which is

16    a clothes insulation -- if you know anybody who surfs, it's wet

17    suit material.  It's insulation.  It reflects heat back to the

18    body.  It warms up whatever you have between your skin and

19    that.  And back then, it didn't have the creature comfort that

11:06    20    we wanted, so we took a fleece that would wick moisture away

21    from the body and keep it away so you can stay more

22    comfortable; we laminated that to neoprene, and that launched

23    another big area of our product line.

24    Q.    And so here we see on page 14 of Exhibit 128 Neofleece

11:06    25    being advertised as part of the HeatWave Plus line, correct?

1    A.    It's part of the technology, yes.

2    Q.    Okay.  And on to the next page, 15.  Here we see the inside

3    and the outside of a Seirus HeatWave Plus glove, correct?

4    A.    One of the models, yes.

11:06    5    Q.    One of the models, and that's got -- it looks like it has

6    some silver on the top in the inside and black on the bottom?

7    A.    That's correct.

8    Q.    Can you tell us a little bit more about what we have here,

9    what we're looking at?

11:06    10    A.    Again, you have a ski glove.  This one in particular -- I

11    don't know which model it is, but it has the typical things,

12    outer shell, different ways of clamping that down with cinches

13    or buckles, and then it has a gauntlet, this gauntlet pull tab

14    there.  And inside it's got our Neofleece insulation along with

11:07    15    other insulations that keep you much warmer than if you didn't

16    have it, and the Neofleece panel is on the back because that's

17    the part that gets exposed to the wind and the elements, and so

18    it gives you extra protection.  And then the liner is -- has a

19    waterproof, breathable liner inside of that, also, and then the

11:07    20    HeatWave material that's against your skin.

21    Q.    Let me ask you again in terms of damages, if you know, how

22    much does -- you know, the damages is Columbia seeking for a

23    product like this?

24    A.    Again, they're claiming every penny we make from every

11:07    25    component, every technology.  Some of those are our original

1    technologies.    They want every penny of it.

2    Q.    They want every penny you make off the leather outer?

3    A.    Yes.

4    Q.    Every penny you make off buckles and straps?

11:08    5    A.    Yes.

6    Q.    Every penny you make off the insulation?

7    A.    Yes.

8    Q.    Every penny you would make if it has Soundtouch?

9    A.    Yes.

11:08    10    Q.    Every penny from Neofleece?

11    A.    Yes.

12    Q.    And I think you said all your gloves are waterproof,

13    breathable?

14    A.    All of our lofted, insulated gloves are waterproof and

11:08    15    breathable.

16    Q.    And Columbia wants every penny off of that too?

17    A.    Yes.

18    Q.    Some of the HeatWave Plus gloves I think you testified have

19    no silver facing, correct?

11:08    20    A.    That's correct.

21    Q.    How long has that been the case?

22    A.    We brought it out last year, so in '16, 2016, we introduced

23    it, and it started to ship now.

24    Q.    And why would a consumer want to have the silver totally

11:09    25    away from them?

11:09  1    A.    Well, consumers want a variety.    Everything we buy, we

2    want -- everybody has a personal preference on what they like,

3    and so it's my belief that having the softest material against

4    your skin is a better feel and more desirable for some.    For

11:09  5    some it's not.

6    Q.    How about in terms of warmth?    When you flip the silver

7    away from the hand, what kind of experiences in warmth have you

8    noticed and determined?

9    A.    Well, the benefit of reflective is that it reflects both

11:09  10   ways, and so it works whether that silver faces you or faces

11   away because it has that reflective quality.    When you first

12   put on any one that has silver, you'll feel the warmth faster

13   because the silver lining is against your skin, but if you flip

14   it, you feel the comfort first, and then eventually you feel

11:10  15   the radiation that comes back from the silver lining.    But

16   it's -- they both reach about the same warmth comfort.    It's

17   just depending on what you like, if you like the soft, nice

18   cuddly feel, or do you like the fast reflective feel of the

19   warmth.

11:10  20   Q.    Now, if we go to page 18 of Exhibit 128 --

21   A.    Yes.

22   Q.    -- here we see Gore-Tex advertised.

23   A.    Yes.

24   Q.    What is Gore-Tex?

11:10  25   A.    So Gore-Tex was -- probably one of the biggest

1    revolutionary inventions in waterproof, breathable products in

2    the marketplace because you could make things waterproof before

3    that, but it got very clammy.  And so the Gore Corporation

4    developed a material that would let water vapor escape and not

11:11    5    allow water molecules to come in.  So it kept you drier and --

6    for both reasons, no water coming in and allowed more water to

7    escape, not all the water, but water vapor.

8        And so it got introduced in gloves called Gates gloves a

9    long time ago, and at the same time, they made it in jackets,

11:11    10    and it really is the fundamental way to stay dry.  And so there

11    are a number of companies that make a different type of

12    waterproof, breathable material too.

13    Q.    To your recollection and understanding, was Gore-Tex the

14    first material that would allow you to keep totally -- totally

11:11    15    dry, but allow vapors to escape?  Because I remember in the old

16    days when I used to camp with my friends, we would -- you'd

17    wear these ponchos made of plastic, and you'd have a rainstorm

18    inside your poncho and one going on outside.  Was Gore-Tex

19    different?

11:12    20    A.    Yeah.  So it allowed a lot of that moisture to escape.  It

21    breathes water vapor, not water, so once you get water on your

22    skin, it doesn't quite help.  But any vapor, it lets it out

23    through its system, so it was a revolutionary development.

24    Q.    And you've had Gore-Tex fabric in your gloves for how long?

11:12    25    A.    Oh, you'd have to ask Bob, but we got the license, I'm

1    guessing, about ten years ago.

2    Q.    And so when you're selling a Gore-Tex glove, is it your

3    understanding based on your experience with the company that

4    Gore-Tex is a factor in people's purchasing decision?

11:12    5    A.    It's a big factor.    Most people believe it's an insulation

6    because they advertise it as being warmer, but it is a

7    waterproof, breathable liner.

8    Q.    And do you put hangtags on your products that have

9    "Gore-Tex"?

11:12    10    A.    Sure.

11    Q.    You put that on there when you have a HeatWave product with

12    Gore-Tex?

13    A.    Sure.

14    Q.    So you're advertising the Gore-Tex functionality feature

11:13    15    brand?

16    A.    Sure.

17    Q.    And you're advertising the Seirus brand, too, correct?

18    A.    Absolutely.    Primarily.

19    Q.    So when I -- I think this was hard -- we can talk about

11:13    20    this a little more in your direct, but a real quick question

21    popped into my head.    When somebody walks into a sporting goods

22    store, a ski shop, snowboard shop, whatever it is that has

23    Seirus gloves, what are they going to see?    How are they

24    displayed to them?    Does it say "HeatWave" at the top totally,

11:13    25    or how is it done?

1  A.    Generally what you'll see is -- we've been fortunate enough

2  to where we're a pretty big supplier for snow sports, so you

3  walk in, and you'll see a little boutique display that has

4  "Seirus Cold Weather Center," and then you'll see a complete

11:13  5  line of all of our products, gloves on one side -- depends on

6  how many sides, and then however they're designed -- they're

7  called planograms -- we have face protection, hats, and

8  insulated gloves, All Weather Gloves, and so they all are

9  underneath the Seirus moniker.

11:14  10  Q.    What is the primary advertising or branding feature that

11  you see when you first walk up and see a Seirus section in the

12  store?

13  A.    Seirus cold weather center.

14  Q.    In your opinion, your experience, your background with the

11:14  15  company, is Seirus a well-known brand in the snow sports

16  industry?

17  A.    Absolutely.

18        MR. MARCHESE:   Can you go on to page 20, please.

19  BY MR. MARCHESE:

11:14  20  Q.    Here's another technology called Windstopper -- I'm on page

21  20 of Exhibit 128 for the record.   What is that?

22  A.    Windstopper is a windproof material that, again, Gore

23  Industries makes that they followed up with their Gore-Tex

24  waterproof, breathable.   This is designed as an outer material

11:14  25  to help wind from coming in the glove so you don't get

1    convection happening so much.

2    Q.   Is that a technology that you use with any HeatWave gloves?

3    A.   I don't think so.  I'd have to look and see, but I don't

4    think we do.

11:15    5         MR. MARCHESE:   And then there's the next page, please,

6    22.

7    BY MR. MARCHESE:

8    Q.   We see Xtreme All Weather.  Is that similar to the All

9    Weather Glove you were talking about before?

11:15    10   A.   Yes.   This was -- so if you're familiar with REI, they were

11   the first ones really to jump on the All Weather Glove because

12   there had been nothing on the market quite like it.

13   Q.   What is REI in case people don't know?

14   A.   I'm sorry.  It's a -- it is the premier outdoor industry

11:15    15   store.   It's -- they sell everything from outdoors to snow

16   sports to -- outdoor activities.   It is the premier store for

17   that.

18   Q.   Then what was their relationship with the All Weather?

19   A.   Well, they were one of the first to buy, the very first

11:15    20   year we brought it out, and we were excited about it, but they

21   had a preseason sale that -- a Labor Day sale that they have

22   every year, and our gloves just blew out the door.   They called

23   us up, and they took everything we had out of our warehouse and

24   bought them all.   And so when it got popular -- when the winter

11:16    25   hit, we had no more gloves because we'd already made -- you

1    can't make them in season, and it really helped the popularity

2    because they were calling, and we'd just say, "Sorry, REI just

3    bought them all," and so the demand for it went through the

4    roof.   And then the military jumped on it, and that just blew

11:16    5    it up.

6         But what they did not -- what they wanted was an -- All

7    Weather Glove was waterproof, breathable materials, but the

8    seams weren't sealed.  It's very hard to do that on a

9    form-fitting glove.  If you've seen the waterproof, breathable

11:16    10   liner, it's about the size of this monitor here, and it gets

11   squished into a glove.

12   Q.   Let me ask you this real quick -- I think it may not be

13   entirely clear.  Why does it matter that the seams aren't

14   sealed?

11:17    15   A.   Well, if you stick your hand in a bucket of water, it will

16   leak.  Now, the All Weather Glove, because of its properties,

17   it's really used a lot for paddling and skin diving, too,

18   because once you get water inside, it traps that water and

19   warms that water up too.  So it works in warm temperatures,

11:17    20   cold temperatures, underwater.  It's just an unbelievable

21   product.

22        But the seams weren't sealed, so if you were really an

23   outdoor -- and you're in the rain all the time, it could leak,

24   so REI challenged us to come up with a 100 percent waterproof,

11:17    25   breathable form-fit, which was a daunting task.  Because of

|      |     |                                                                  |
|------|-----|------------------------------------------------------------------|
|      | 1   | that big liner that goes into it, it gets squished in, and it's   |
|      | 2   | no longer a dexterous glove.  So it took us five or six years,    |
|      | 3   | but we finally developed the technology, so now we have an All    |
|      | 4   | Weather series that's 100 percent waterproof, breathable, seam    |
| 11:18| 5   | sealed, and it has just blown up as well.  It's one of our        |
|      | 6   | technologies.                                                     |
|      | 7   | Q.   Now, with the HeatWave, we've heard a lot of talk about      |
|      | 8   | this MegaHeat RX fabric, right?                                   |
|      | 9   | A.   Yes.                                                         |
| 11:18| 10  | Q.   And when you were first presented with that fabric, what     |
|      | 11  | was your reaction to it?                                          |
|      | 12  | A.   I thought it was a great idea.  So Bob brought it back --    |
|      | 13  | Q.   Bob is?                                                      |
|      | 14  | A.   I'm sorry.  Bob Murphy, our VP of operations who goes to     |
| 11:18| 15  | Asia and helps source a lot of the things that we bring to the    |
|      | 16  | table and put together to come up with new products.             |
|      | 17  |      And he had just come up back from one of our vendors who     |
|      | 18  | had developed the material that has this ability to take the      |
|      | 19  | energy that you give off and keep it back more than it would if   |
| 11:18| 20  | you didn't have it.  So it was exciting to us.                    |
|      | 21  | Q.   And we hear -- we heard some -- actually, I think I could    |
|      | 22  | probably find a diagram in the catalog that we're looking at,     |
|      | 23  | Exhibit 128.  Just bear with me for one minute here.  I'm not     |
|      | 24  | sure this one has it.  Oh, here we go.                            |
| 11:19| 25  |      MR. MARCHESE:   Page 2, please.  If you could blow up        |

1    the part that says "HeatWave."

2            THE WITNESS:   Pardon me?

3            MR. MARCHESE:   I'm sorry.   Not that part, but the

4    whole red portion there.   Great.   Thank you.

11:19   5    BY MR. MARCHESE:

6    Q.    And there's this statement -- I think counsel asked you a

7    lot of questions about returning 20 percent more warmth, and I

8    think there was some questions about amplification.   So in

9    terms of this 20 percent more warmth and the kinetic here which

11:19   10   says "amplifies temperature four to five degrees" in the yellow

11   on the left --

12   A.    Yes.

13   Q.    -- what was your reaction when you were presented with

14   MegaHeat, the fabric, from Ventex, in terms of its ability to

11:20   15   warm and be beneficial?

16   A.    I liked the idea, and so -- it's important, though, to

17   really realize what does that mean by "it amplifies," and so I

18   tasked our development to go and get the data that shows that.

19   I'm not a materials expert, so I couldn't tell you exactly how

11:20   20   it works or anything, just like I couldn't tell you how this

21   works, but I just wanted to make sure that we substantiate

22   everything we do.

23   Q.    And you got data from where?

24   A.    From Ventex labs.

11:20   25   Q.    And Ventex is a South Korean company?

1    A.    That's correct.

2    Q.    And it's a sizeable fabric maker.  Is that correct?

3    A.    Yes.  I don't deal with them.  Mr. Murphy does, but, yes,

4    they're a very, very trustworthy, big company.

11:20    5         MR. MARCHESE:  Can we have Exhibit 212, please.  Can

6    you blow up the topmost email, please.

7    BY MR. MARCHESE:

8    Q.    This is an exhibit that we saw in your previous

9    examination.  Do you remember that?

11:21    10    A.    Yes.

11    Q.    And this is from David I.  Is that right?

12    A.    Yes.

13    Q.    Is his last name really just one letter "I"?  I had to ask

14    that.

11:21    15    A.    He's Chinese, and, you know, just like Ellis Island people,

16    people changed their name.  It's a lot longer name, but it's

17    Americanized, so that's his actual last name.

18    Q.    So he would typically be referred to as David and last name

19    I?

11:21    20    A.    That's his legal name now, yes.

21    Q.    Thank you.  So it says here in the subject where David is

22    writing, David I is writing, "It's cool looking, but we need to

23    come up with a technical story behind what this pattern

24    advantages are."  Do you see that?

11:22    25    A.    Yes.

1  Q.   And then it goes on to talk about Columbia and its

2  Omni-Heat.   Do you see that?

3  A.   Yes.

4  Q.   I just wanted to ask you some questions about how you guys

11:22  5  operate, how the -- is it common for Seirus to look at

6  competitors' products?

7  A.   Absolutely.

8  Q.   Why?

9  A.   We're in a competitive market just like any other consumer

11:22  10  products company.   You better know what you're up against in

11  the marketplace, and so he was asking us to make sure we have

12  features and benefits that people can identify with and give us

13  a competitive edge.

14  Q.   Roughly how many companies are there making gloves in the

11:22  15  snow sports industry?

16  A.   Of high quality, good distribution, there are probably 25

17  or so in total.   There are quite a few more than that, but 25.

18  Q.   And how many of those competitors are you watching to see

19  what they do, to check out their new products, all that kind of

11:23  20  thing?

21  A.   Well, we don't spend a lot of time going through.   We do

22  most of our development by looking at problems and trying to

23  solve those problems.   Then when we do that, then we look at

24  what's outside the marketplace and say, "okay.   How do we

11:23  25  measure up?"   And then we broadcast what we do through our

1    point of purchase and our advertising to amplify what we do.

2    Q.    So it's not uncommon for you to look at advertisements from

3    a competitor?

4    A.    No.

11:23    5    Q.    And it's not uncommon for you to look at a competitor's

6    product?

7    A.    No, just like you would.

8    Q.    And do you have go to trade shows?

9    A.    Yes, I do.

11:23    10    Q.    Have you heard of SIA?

11    A.    Yes.

12    Q.    We've been talking about SIA a lot, right?

13    A.    Yes, Snow Industries of America.

14    Q.    And snow sports industries?

11:23    15    A.    That's correct.

16    Q.    Okay.  And then there's OutDoor Retailer?

17    A.    Yes.

18    Q.    And when you go to OutDoor Retailer, are competitors

19    displaying their gloves there?

11:23    20    A.    Sure.

21    Q.    And so is Seirus?

22    A.    Yes.

23    Q.    And do you walk around to see what the other people are

24    doing?

11:24    25    A.    Absolutely.

1    Q.    Is that common in your experience?

2    A.    Of course.

3    Q.    Isn't that what people do at trade shows?

4    A.    Sure.

11:24    5    Q.    And people are -- they're milling about to look and see

6    what their competitors are doing, all the new features?

7    A.    And whatever else is on the marketplace.

8              MR. MARCHESE:    Could I have Exhibit 125, please.

9    BY MR. MARCHESE:

11:24    10    Q.    So here's an exhibit that you were shown during your

11    examination by Columbia's counsel.    Do you recall that?

12    A.    Yes.

13    Q.    And in this particular instance -- excuse me here.

14          There's a lot of technologies called out here on this page,

11:25    15    right?

16    A.    Technologies, yes.

17    Q.    And a lot of different types of products that Seirus makes,

18    correct?

19    A.    Yes, that's true.

11:25    20    Q.    Okay.    And I see two of them say "HeatWave," right?

21    A.    Let me see.    Oh, yes.    Yes.

22    Q.    And the featured item at the bottom here, that's not a

23    HeatWave glove.    It's an Xtreme All Weather Glove?

24    A.    That's correct.

11:25    25    Q.    So can we -- there was a website that was shown -- actually

1    let me do this first before we do that.

2              MR. MARCHESE:  Can you go to Mr. Carey's deposition at

3    page 101, please.

4    BY MR. MARCHESE:

11:26   5    Q.   And there was a question on this page about --

6              MR. MARCHESE:  Is that 101?  Oh, here it is.  I think

7    it is line 20 to 22.  I didn't write down the line so I had to

8    find it.

9    BY MR. MARCHESE:

11:26   10   Q.   -- "has Seirus ever obtained a sample of an Omni-Heat

11   product?"  What did you understand that to mean?

12   A.   I felt it meant, you know, a glove, jacket, things like

13   that.

14   Q.   And what was the answer to that?

11:26   15   A.   "Not to my knowledge."

16   Q.   And this was back at the time of your deposition, right?

17   A.   Yes.

18   Q.   Was that true?  Your answer was correct?

19   A.   We had not had a product glove or anything like that, no.

11:26   20   Q.   Okay.  So your answer here was correct?

21   A.   That's true.

22             MR. MARCHESE:  All right.  Can we go to the live web

23   page, please.

24        So this is something you haven't had an opportunity to see

11:27   25   before, so I wanted to show you this.  We saw some -- an

1    example off the live web page during Mr. Carey's direct

2    examination, and we wanted to show another part of the web page

3    here which shows you the current HeatWave design.

4         Can you roll your mouse over that glove and show us what it

11:27    5    looks like.   Okay.   Thank you.

6    BY MR. MARCHESE:

7    Q.   Tell us, Mr. Carey, if you would, what we're looking at

8    here.

9    A.   It's the current HeatWave design that we have that is

11:27    10    called a sawtooth wave, basically.

11    Q.   Is that the wavy design that is in the patent, or is that

12    something later?

13    A.   No, it's not the one that's subject to this litigation.

14    Q.   Has Seirus presented this to Columbia?

11:28    15    A.   Yes.

16    Q.   And what was Columbia's response?

17    A.   Fine with it.

18    Q.   And for the current model year and for going forward and

19    since you got -- well, let me ask you this:

11:28    20         MR. ALDRICH:   Your Honor, I'd like to move to strike

21    real quick the settlement discussions between the parties.

22         THE COURT:   The objection is sustained.   Don't

23    consider that last response.

24    BY MR. MARCHESE:

11:28    25    Q.   Have you heard any accusations of infringement concerning

1   this new design?

2   A.   No.

3   Q.   And is that the -- the new pattern or the pattern you're

4   using for HeatWave --

11:28   5   A.   Yes.

6   Q.   -- going forward?

7   A.   Yes.

8   Q.   Thank you.

9        MR. MARCHESE:   I have nothing further, Your Honor.

11:28   10   Thank you, Mr. Carey.

11        MR. ALDRICH:   Can we keep that web page up, please.

12        THE COURT:   Redirect?

13                    REDIRECT EXAMINATION

14   BY MR. ALDRICH:

11:29   15   Q.   Mr. Carey, this web page currently says "out of stock,"

16   correct?

17   A.   That's correct.

18   Q.   Why is it out of stock?

19   A.   Because our shipments haven't come in as yet.

11:29   20   Q.   Is this a new product?

21   A.   No.   We've made this product for a long time.

22   Q.   With this design?

23   A.   The design is new.

24   Q.   You've sold this product?

11:29   25   A.   Yes.



1    Q.   Is there anybody out in the world that actually can have

2    one in their hands and wear it?

3    A.   Oh, you mean have we shipped it yet.  No.  Like I said, it

4    hasn't come in yet.

11:29    5    Q.   Brand-new product, right?

6    A.   Brand-new design, yes.

7         MR. MARCHESE:  Okay.  Can we put up the opening slide

8    89.  It's from opening statement.  Sorry.

9    BY MR. ALDRICH:

11:30    10   Q.   Mr. Carey, you're aware that in March of 2016 Seirus agreed

11   that the design patent in this case was valid and enforceable,

12   correct?

13   A.   Yes.

14   Q.   And you're aware that the Court entered an order ordering

11:30    15   and adjudging that the design patent in the case was

16   enforceable and valid, correct?

17   A.   Yes.

18        MR. ALDRICH:  Can we go to the opening slide 63.  This

19   is also from the opening presentation.

11:31    20   BY MR. ALDRICH:

21   Q.   And you're aware that on August 10th of last year, more

22   than a year ago, the Court ordered that Seirus's HeatWave

23   fabric infringes that D '093 patent, correct?

24   A.   The wave pattern, yes.

11:31    25   Q.   And you found out about that probably on August 10th, 2016,

1   correct?

2   A.   Near that date, yes, after that date, at some point.

3   Q.   And after Seirus found out that its HeatWave fabric line

4   was adjudged to be infringing the D '093 patent -- and, again,

11:31   5   this had been in litigation at that point for almost three

6   years, right?

7   A.   Yes.

8   Q.   Okay.   And after that happened, did Seirus withdraw any

9   product from the market?

11:31   10   A.   We immediately stopped making the design.

11   Q.   Did you stop shipping product to market?

12   A.   No, we did not.

13   Q.   You continued to ship infringing products to your

14   customers, correct?

11:32   15   A.   To the committed -- those that we had made commitments to

16   earlier, yes.

17   Q.   You continued to advertise it with that wave line design on

18   your website, correct?

19   A.   I haven't seen that website.   We redid everything that --

11:32   20   in my power to take that down.

21   Q.   If I were to tell you that I have historical versions of

22   the website from earlier this year showing you the wavy line

23   design as we looked at your website --

24   A.   Yes.

11:32   25   Q.   It wouldn't surprise you that earlier this year you were

1    still showing that glove with the -- showing the inside of the

2    glove with that wavy line design?

3    A.    I saw that, yes.

4    Q.    And you continued to keep that website up showing that wavy

11:33    5    line design after you were found to have infringed, correct?

6    A.    Yes.

7    Q.    And continued to do so until about a week ago, right?

8    A.    That's -- that's not my knowledge that it was a week ago.

9    Q.    It wouldn't surprise you, though?

11:33    10    A.    It was earlier than that in my opinion.

11    Q.    Did you cancel any orders with -- did you go back to any of

12    your customers that had purchase orders and said, "We can't do

13    it.  We have been found that this -- this product infringes a

14    patent, and we are prohibited by law from selling you any

11:33    15    product that infringes a patent"?  Did you go back to any

16    customers and say, "We can't do it anymore.  I have to cancel

17    your order.  I'm sorry"?

18    A.    Those orders were committed long ago.  There is no

19    substitute in our line, no substitute in your line, and these

11:33    20    are little, small, mom-and-pop stores for the most part that

21    without that product, they would be hurt, and, no, I would not

22    cut them off for that.  That's not reasonable.

23    Q.    I understand.  Is REI a mom-and-pop store?

24    A.    No, they're not.

11:34    25    Q.    Is amazon.com a mom-and-pop store?

|       |    |                                                                        |
|-------|----|------------------------------------------------------------------------|
|       | 1  | A.   No, it is not.                                                     |
|       | 2  | Q.   And you continued to sell it to REI, correct?                     |
|       | 3  | A.   We continued to sell to everybody we had original                 |
|       | 4  | commitments for.                                                        |
| 11:34 | 5  | Q.   And you continued to keep the product on amazon.com,              |
|       | 6  | correct?                                                                |
|       | 7  | A.   No.                                                                |
|       | 8  | Q.   You pulled it off amazon.com?                                      |
|       | 9  | A.   Yes.   We're -- the season doesn't start until now.   We're       |
| 11:34 | 10 | not shipping anything to amazon.com that has --                         |
|       | 11 | Q.   I might be unclear.   Starting in August 10, 2016, did you        |
|       | 12 | pull your infringing products off of amazon.com?                       |
|       | 13 | A.   I don't know.                                                      |
|       | 14 | Q.   But it wouldn't surprise you to find out that your products       |
| 11:34 | 15 | continued to be on amazon.com even though they were found to be        |
|       | 16 | infringing?                                                             |
|       | 17 | A.   That, I'm surprised, yes.                                          |
|       | 18 | Q.   You're surprised?                                                  |
|       | 19 | A.   Yes, I would have hoped we got -- we caught all of that.          |
| 11:34 | 20 | Q.   You would have hoped that?                                         |
|       | 21 | A.   Yes.                                                               |
|       | 22 | Q.   That would have been the reasonable thing to do, correct?         |
|       | 23 | A.   I would have hoped we would have done that, yes.                  |
|       | 24 | Q.   Do you remember some questions about Soundtouch?                  |
| 11:35 | 25 | A.   Yes.                                                               |

|    |    |
|----|----|
| 1  | Q.    Soundtouch is a technology that allows you to use your |
| 2  | glove on a smartphone, right? |
| 3  | A.    Yes, and other devices. |
| 4  | Q.    And other devices.  Does Seirus have a patent on that? |
| 5  | A.    No. |
| 6  | Q.    And why is that? |
| 7  | A.    Because it's been in the marketplace for quite some time. |
| 8  | Q.    It's kind of an industry standard? |
| 9  | A.    I wouldn't say that. |
| 10 | Q.    Just about every glove maker makes a glove that you can use |
| 11 | with a smartphone? |
| 12 | A.    I couldn't answer that question for you. |
| 13 | Q.    You're very familiar with the glove industry, right? |
| 14 | A.    Yes. |
| 15 | Q.    You know all your competitors? |
| 16 | A.    No, I don't know them all. |
| 17 | Q.    You go to trade shows? |
| 18 | A.    Yes, I do. |
| 19 | Q.    You walk the floor? |
| 20 | A.    Yes. |
| 21 | Q.    You look at competitor products? |
| 22 | A.    That's not my -- no, I don't do that. |
| 23 | Q.    But you don't know whether it's industry standard at this |
| 24 | point now that an iPhone has been out ten years that glove |
| 25 | manufacturers -- |

11:35  5

11:35  10

11:35  15

11:36  20

11:36  25

1  A.   Glove manufacturers definitely have it, but I don't know if

2  all of them do.

3  Q.   Okay.

4  A.   Not all of our gloves have them.  We sell more without it.

11:36  5  Q.   Okay.  You also talked about Neofleece, right?

6  A.   Neofleece, yes.

7  Q.   Do you have a patent on that?

8  A.   No.  It's -- laminating materials is not anything new, but

9  the way we did it was a new way of doing things.

11:36  10  Q.   Do you have an agreement with the manufacturer that makes

11  Neofleece?

12  A.   That makes Neo --

13  Q.   Who makes Neofleece for you?

14  A.   Anybody who we designate to make product for -- we

11:36  15  developed the laminating product, and we contract out other

16  manufacture -- other fabric manufacturers to make it for us, so

17  it's our development.

18  Q.   I understand.  But you have -- there's some manufacturers,

19  presumably in Asia, that actually do the manufacturing of the

11:37  20  Neofleece for you.  Is that right?

21  A.   Yes.

22  Q.   Okay.  Is that proprietary to Seirus?

23  A.   Neofleece is a proprietary name to Seirus, yes.

24  Q.   Okay.  And are any of those manufacturers allowed to sell

11:37  25  Neofleece to any other party?

1   A.   They cannot sell Neofleece to other parties.

2   Q.   Okay.  You have some sort of proprietary agreement with

3   them that that's a proprietary technology to Seirus, and

4   they're not allowed to sell Neofleece to anyone else, right?

11:37   5   A.   I think you're misrepresenting.

6   Q.   Correct me.

7   A.   So Neofleece is the proprietary name.  We don't own a

8   patent on laminating fleece to neoprene, and since we don't own

9   the patent, we can't stop them from making neoprene with fleece

11:38   10   on it.  Even if we did have a patent, we did it so long ago it

11   would have been expired.

12   Q.   Okay.  But that fabric is proprietary to you, correct?

13   A.   The Neofleece trade name about that fabric is proprietary.

14   Q.   It's just the trade name?

11:38   15   A.   That's correct.

16   Q.   The fabric itself anybody can buy?

17   A.   Correct.

18   Q.   I see.  Are there any fabrics that are proprietary to

19   Seirus?  Well, how about HeatWave?  Is HeatWave proprietary?

11:38   20   A.   We do not have a patent on HeatWave, but its trade name is

21   proprietary to Seirus.

22   Q.   What about that silver wavy line design with your logo in

23   it that Ventex had been making for three, four years?  Is that

24   proprietary to Seirus?

11:39   25   A.   Yes, anything with our name in it is proprietary to Seirus.

1   Q.   And Ventex is not allowed to sell that to anybody else?

2   A.   Not with our logo in it.

3   Q.   Not with what?

4   A.   Not with our logo in it.

11:39  5   Q.   Not with your logo?

6   A.   The pattern that we make, no, that pattern was ours.

7   Q.   That would breach the law for somebody to buy that HeatWave

8   fabric from Ventex without your permission, right?

9   A.   I don't know if it would break the law.  It's our product,

11:39  10  so --

11   Q.   It would breach --

12   A.   -- we don't allow people to sell our trade name to other

13   people.

14   Q.   It would breach your agreement that you have with Ventex to

11:39  15  have somebody else buy some HeatWave fabric from Ventex with

16   your name in it?

17   A.   To sell it in the marketplace, yes.

18   Q.   That wouldn't be okay, right?

19   A.   Correct.

11:39  20  Q.   There was also a discussion of Gore-Tex.  Do you remember

21   that?

22   A.   Yes.

23   Q.   Gore-Tex -- you put the Gore-Tex brand on your products

24   when you use --

11:40  25  A.   On the hangtags, yes.

1   Q.   But you're actually required to do that, right, by

2   Gore-Tex?

3   A.   I'm not sure.   We may be.

4   Q.   I mean if you buy Gore-Tex product, you're actually

11:40   5   required by your contract agreement with them to put the

6   Gore-Tex name on those products, right?

7   A.   I don't know exactly how that's supposed to be, but we're

8   supposed to advertise their name, but specifically -- because

9   we do it differently than everybody else, so I would assume

11:40   10   that there may be some kind of idea that's supposed to happen,

11   but the way we do it is completely different than most people

12   do it that I've seen.

13   Q.   Are there any other fabrics from Columbia that Seirus has

14   looked to besides Omni-Heat in terms of its development?

11:41   15   A.   We don't look at Columbia to help develop our products.

16        MR. ALDRICH:   Could we go to deposition page 136,

17   please, and before you publish, I just need to make sure I'm on

18   the right page.   I apologize.   Page 165 -- and it's okay to

19   publish -- lines 15 to 19.

11:42   20        THE COURT:   Do you want this published to the jury?

21        MR. ALDRICH:   Yes, please.

22        MR. MARCHESE:   I have no objection, Judge.

23   BY MR. ALDRICH:

24   Q.   Do you remember at your deposition being asked, "In

11:42   25   developing the HeatWave fabric, people at Seirus were looking

1    to Omni-Heat, correct?"

2    A.   I see that, yes.

3    Q.   And your answer was no?

4    A.   Yes.

11:42    5         MR. ALDRICH:   Can we go to Exhibit 489.

6    BY MR. ALDRICH:

7    Q.   This is an email at the bottom from Joe U.   Who's Joe U?

8    A.   Joe U -- oh, I see.   That's Joe Urzetta.   He was a sales

9    director at the time.

11:43    10   Q.   And this is an email to MWDD Carey.   Do you see that?

11   A.   Yes.

12   Q.   Is it safe to assume that's you?

13   A.   Yes.

14   Q.   And then right next to that is maskedjoe@seirus.com?

11:43    15   A.   Yes.

16   Q.   I assume that's Mr. Joe Edwards we talked about before?

17   A.   Yes.

18   Q.   Who's the legal department, was at the time?

19   A.   Yes.

11:43    20   Q.   And then next to that is Bob Murphy.   Do you see that?

21   A.   Yes.

22   Q.   Bob M, and then --

23        MR. ALDRICH:   Sorry.   Move to admit 489.

24        MR. MARCHESE:   No objection.

11:43    25        THE COURT:   Received.

1    (Exhibit 489 admitted.)

2         MR. ALDRICH:  Apologize to the jury.  I'll catch you

3    up real quick.

4    BY MR. ALDRICH:

11:43  5    Q.   Next to Bob Murphy we have Wendy Carey.  That's another

6    director?

7    A.   Yes.

8    Q.   Correct?

9    A.   Yes.

11:43  10   Q.   And this is -- this email is titled "Columbia and

11   Omni-Freeze."  Do you see that?

12   A.   Yes.

13   Q.   And Omni-Freeze, you understand that's a different -- a

14   different Columbia product, different Columbia technology?

11:44  15   A.   Yes.

16   Q.   That's not Omni-Heat, right?

17   A.   I assume not.

18   Q.   Okay.  And this is -- it looks like some sort of marketing

19   blurb on Columbia launching its new Omni-Freeze Zero campaign

11:44  20   in April 2013, correct?

21   A.   Yes.

22   Q.   It's actually coincidentally right around the same time

23   that you heard from Ventex about the design patent, right?

24   A.   The same time they sent the email.  I had not heard that.

11:44  25        MR. ALDRICH:  Okay.  Let's go to the top of the email

1    then.  Can you zoom in on the top.

2    BY MR. ALDRICH:

3    Q.   This is the response from you to Bob Murphy, correct?

4    A.   Yes.

11:44  5    Q.   And it says, "Bob, do we have a line on this fabric?"  Do

6    you see that?

7    A.   I see those words, yes.

8    Q.   That was your response?

9    A.   Yes.

11:44  10   Q.   Do you remember we talked about the heat -- the kinetic

11   heat amplifying heat system a little bit?

12   A.   Yes.

13   Q.   Do you recall that counsel asked you some follow-up

14   questions about that?

11:45  15   A.   Yes.

16        MR. ALDRICH:  Can we turn to Exhibit 137.

17        Move to admit.

18        MR. MARCHESE:  No objection.

19        THE COURT:  Received.

11:45  20        (Exhibit 137 admitted.)

21   BY MR. ALDRICH:

22   Q.   Exhibit 137 is a markup to Seirus' -- it looks like a draft

23   here.  Do you see that up at the top left corner?

24   A.   Yes.

11:45  25   Q.   It's in a markup to Seirus' winter 2013-2014 -- its

1    marketing materials.  Do you see that?

2    A.    Yes, it's a PR piece.

3    Q.    This is actually your markup?

4    A.    Pardon me?

11:46    5    Q.    This is your markup?

6            MR. MARCHESE:  I just have an objection.  I think this

7    is beyond the scope of the cross.

8            THE COURT:  No, your objection is overruled.

9        You can answer.

11:46    10            THE WITNESS:  Can you repeat the question?

11    BY MR. ALDRICH:

12    Q.    This is your markup to the materials?

13    A.    Oh.  So my highlights you mean?

14    Q.    Yes.

11:46    15    A.    You have to show me what you're talking about.  Some of

16    them may be mine; some of them may be somebody else's.  I'm not

17    sure.

18            MR. ALDRICH:  Then let's go down to the Seirus

19    HeatWave section.  It's about halfway down the page.  If we

11:46    20    could blow that up.  Above that.  That paragraph right there is

21    all we need.

22    BY MR. ALDRICH:

23    Q.    You see it says, "Seirus HeatWave brand-new 2013-2014."  Do

24    you see that at the top?

11:46    25    A.    Oh, yes.

1   Q.   Okay.   And under that it says, "Seirus' exclusive and

2   uniquely engineered HeatWave lining is the foundation of its

3   HeatWave kinetic heat return system."   Do you see that?

4   A.   Yes.

11:47   5   Q.   And that kinetic heat return system is the technology we

6   talked about before that you said was scientifically

7   substantiated, and I had some questions about that, correct?

8   A.   Yes.

9   Q.   Okay.   Let's keep reading.   It says, "This revolutionary

11:47   10  dual heating system employs Seirus' specially designed

11  reflective layer to retain 20 percent more warmth."   Do you see

12  that?

13  A.   Yes.

14  Q.   Do you know where Seirus got that 20 percent warmer number?

11:47   15  A.   I have knowledge about how it got collected, yes.

16  Q.   Indulge me.

17  A.   So as you can see further down, it talks about the four or

18  five degrees, and then they had a 20 percent up there, and

19  my -- this is my statement afterwards at the bottom, after the

11:47   20  MSRP --

21  Q.   Mr. Carey, all I'm asking you is for starters, Seirus has

22  been putting "20 percent warmer" on its products -- for the

23  HeatWave products for a while, and all I'm asking is where did

24  that 20 percent warmer number come from.

11:48   25  A.   From the data that Ventex sent to us.

1    Q.    That wasn't testing that Seirus did internally?

2    A.    No.

3    Q.    Seirus was relying on Ventex?

4    A.    That's correct.

11:48    5    Q.    Are you aware that Ventex offered to make Omni-Heat for

6    Columbia?

7    A.    No.

8    Q.    Okay.  So let's keep going.  You were following along as to

9    where I want to go.  There's this line that says -- it talks

11:48    10    about "up to four to five degrees."  It's currently highlighted

11    on the screen --

12                MR. ALDRICH:  And if we could not highlight for a

13    moment.

14    BY MR. ALDRICH:

11:48    15    Q.    The next line is actually highlighted in the text in this

16    marked-up copy, correct?

17    A.    Yes.

18    Q.    Okay.  And that line is, "By kinetically generating heat

19    from your body's movement, Seirus defines this phenomenon as

11:49    20    reflected heat amplified."  Do you see that?

21    A.    Yes.

22    Q.    And that is the -- that is the technology that we were

23    talking about earlier that Seirus advertises as the improvement

24    over Omni-Heat, correct?

11:49    25    A.    That's not correct.

1    Q.    It's not correct?

2    A.    No.

3    Q.    Okay.   Why is it not correct?

4    A.    This was prepared by our -- by a PR person, and what he

11:49    5    says kinetically -- the material isn't kinetically generating.

6    Your body generates the kinetic energy, and so I was correcting

7    that.  I want them to make sure that they had the right

8    terminology, and that's where I said, "Show data and facts to

9    support this."  Basically, "Go back to Ventex, get the right

11:49    10    data, let's make sure that we're saying something that's

11    substantiated."

12    Q.    So this is your markup here, "show data, facts that support

13    this, statement is not accurate by definition."  Is that right?

14    A.    Yes, two different areas.   Show data and facts supporting

11:50    15    the 20 percent, four and five degrees.  The fabric creating

16    kinetics, the fabric can't create kinetics, and that's what

17    that says.  It's just a misstatement, and so I asked them to

18    clean that up.  That's not an accurate statement.   Your body

19    creates kinetic energy.  Fabric doesn't do that.  It preserves

11:50    20    that energy in the form of heat and keeps it to your body.

21    That's how it increases the heat.

22        MR. ALDRICH:   Let's go back to Exhibit 128, and

23    page 3161.  Bottom right-hand corner.

24    BY MR. ALDRICH:

11:51    25    Q.    This says "kinetic stage."  Do you see that?

A.    Yes.

Q.    And then there's an arrow to the left over there.  It shows heat?

A.    Yes.

Q.    And then it shows amplified heat, right?

A.    Yes.

Q.    It's creating more heat, right?

A.    It means that it gives more heat into the glove from what it would have been without the product.

Q.    But it's not -- the glove is not kinetically generating more heat, right?

A.    No.  Your body creates the kinetic heat, and that kinetic energy is returned more than it would be without the product.

MR. ALDRICH:  I have no further questions, Your Honor.

THE COURT:  You may step down.

THE WITNESS:  Thank you.

THE COURT:  So we are at about ten minutes till noon. We'll take our mid-day recess at this time.  We will be in recess for an hour.  So ten minutes to 1:00.  And I will see you at that time.  Have a good lunch.

(Proceedings held outside the presence of the jury panel.)

THE COURT:  Please be seated.  They'll be walking through here in just a minute.  We can finish our conversation.

There was a conversation that we had regarding discovery and whether or not there had been disclosure of new fabric with

1    the new design on the part of Seirus to Columbia.  A little bit

2    of that is already in evidence based on the website which

3    showed new fabric.

4        What's not in evidence is when the new fabric was first

11:54  5    introduced, and when it wasn't.  I don't know where to look to

6    resolve your issue on that.  So you're going to have to provide

7    that information to me, or you're going to have to work it out

8    amongst yourselves.

9        MR. ALDRICH:  I may be the only person in the room

11:54 10    that knows the answer, as Fish was not on the team at that

11    time.  But it was something that was proposed during mediation,

12    and we did never, to my knowledge, receive any disclosure about

13    what the proposed redesign would be, but instead there was

14    discussion at mediation in November of last year about

11:54 15    various -- they were asking us to agree to various hypothetical

16    ideas in the abstract, but I don't think we ever saw a print.

17    I don't think we ever saw a design.  I don't think we were ever

18    given a sample or any actual product to -- or even like a

19    diagram of what it would actually look like.  And so -- and it

11:55 20    came out of mediation, so this is in the record now.  This is

21    the latest design that is in the record, but I don't think that

22    anything November 2016 era -- she was talking about April -- I

23    don't think any of that should be admissible.  We don't have

24    any discovery on any of it.

11:55 25        MR. MARCHESE:  Your Honor --

1          THE COURT:  Did you ask for discovery on that issue?

2          MR. ALDRICH:  We've asked for discovery on all of

3     their heat-reflecting products.  We asked interrogatories,

4     "Please identify all of your HeatWave fabrics."  They

5     identified two fabrics.  We tested those two fabrics,

6     absolutely.

7          MR. MARCHESE:  We can go back.  We were not on the

8     case back then, so, right, there is a deficit of information.

9     If we try to scramble and find things and go back through the

10    old records -- we could probably call the old counsel -- but we

11    can go back and check on that.

12         There was a -- my understanding is that there was another

13    fabric design that was -- I don't know if it was shipped or

14    not.  I can go back and look at it, but it -- if they're

15    opening the door about RE -- I'm sorry, about Amazon, I heard

16    that -- I'm happy to go back in the Wayback Machine and see

17    what was on Amazon at particular times, and I feel like the

18    door was opened for that, for us to show it if the redesign

19    shows up on there.

20         THE COURT:  That's fine.  I don't disagree with that.

21    I mean if they are referring to things in the past in their

22    case, that's a little bit different because why I let you show

23    the rest of the website, they brought it up in their case.

24    That's a little bit different than what they're saying is

25    throughout discovery.  They presumably have made a request for

1    you to provide them with this information about any reflective

2    fabric, and that would include the development of any fabric

3    since the time of this lawsuit, and if you didn't disclose

4    that, that's a problem.  Why don't you go ahead and kind of

11:56   5    scrounge around and see what you can find out.

6          MR. MARCHESE:  That's what I'm going to have to do.  I

7    appreciate that.  That's what we'll have to do.

8          THE COURT:  You have time to do that.  I don't think I

9    need to address this issue immediately as long as both sides

11:57   10    stay away from it.  My work is done until you bring more

11    information to me.

12          MR. ALDRICH:  Thank you, Your Honor.

13          MR. MARCHESE:  The only one thing I would ask is if we

14    can go back -- I think you've already answered this, but I want

11:57   15    to be clear -- look at the Amazon web pages to see when this

16    new design came out, because I think, as you said, the door's

17    open, we can show those to the jury.

18          THE COURT:  That's fine.  They had clearly a

19    conversation about Amazon and when things were taken off Amazon

11:57   20    and they weren't.  That door has been opened.  If you find out

21    when it happened, if it was sometime in the past, you're

22    certainly welcome to put that evidence in when you call

23    Mr. Carey as your witness or through some other source.

24          MR. MARCHESE:  Thank you, Your Honor.

11:57   25          MR. ALDRICH:  Are we entitled to discovery on that?

1    We haven't received any of that discovery.  We asked the

2    question because it's been on Amazon.  They continue to sell it

3    on Amazon, and now they're saying, "Well, we'd like to go in

4    this Wayback Machine.  We'd like to find all kinds of

11:58    5    historical relationships that we had with Amazon, et cetera."

6    We don't have any of that.

7        THE COURT:  Slow down.  If it's still on Amazon, then

8    they're not going to find anything that shows that it's not on

9    Amazon.

11:58    10        MR. ALDRICH:  I guess I'm just confused about what it

11    is that they're trying to do with this Amazon thing.  Are they

12    going to use something about Amazon to broach things that they

13    were supposed to produce during discovery, but never produced?

14        THE COURT:  Well, you just asked the question.  It's

11:58    15    still on Amazon.  Made the point.  It's still on Amazon.  Can

16    they now go to Amazon and say, "No, it's not"?

17        MR. ALDRICH:  Okay.  If that's all they want to do,

18    that's fine.

19        THE COURT:  And it was taken down months ago.

11:58    20        MR. ALDRICH:  If that's all they want to do, I don't

21    object to that.

22        MR. MARCHESE:  That's what we were talking about.

23        THE COURT:  All right.

24        MR. MARCHESE:  Thank you.

11:58    25        THE COURT:  We can go off the record now.

1      (Recess.)

2                          ---OOO---

3

4                C-E-R-T-I-F-I-C-A-T-I-O-N

5

6      I certify that the foregoing is a correct transcript from

7  the record of proceedings in the above-entitled matter.

8

9          Dated September 20, 2017, at San Diego, California.

10

11
                        /s/ Dana Peabody
12                      Dana Peabody,
                        Registered Diplomate Reporter
13                      Certified Realtime Reporter

14

15

16

17

18

19

20

21

22

23

24

25

664

1                UNITED STATES DISTRICT COURT

2               SOUTHERN DISTRICT OF CALIFORNIA

3

4   COLUMBIA SPORTSWEAR NORTH      )
    AMERICA, INC., AN OREGON       )
5   CORPORATION,                   )
                                   )
6              PLAINTIFF,          ) CASE NO. 17CV1781-HZ
                                   )
7   VS.                            ) SAN DIEGO, CALIFORNIA
                                   )
8   SEIRUS INNOVATIVE ACCESSORIES,) WEDNESDAY,
    INC., A UTAH CORPORATION,      ) SEPTEMBER 20, 2017
9                                  ) 12:55 P.M.
               DEFENDANT.          )
10  _____)

11

12

13            REPORTER'S TRANSCRIPT OF PROCEEDINGS

14                       JURY TRIAL

15                 VOLUME 3 - PM SESSION

16                   PAGES 664 - 831

17        BEFORE THE HONORABLE MARCO A. HERNANDEZ
               UNITED STATES DISTRICT JUDGE

18

19

20

21

22   REPORTED BY:  CAMERON P. KIRCHER
                   CSR NO. 9427, RPR, CRR, RMR
23                 333 W. BROADWAY, SUITE 420
                   SAN DIEGO, CALIFORNIA  92101
24                 E-MAIL:  CPKIRCHER@GMAIL.COM

25

COMPUTER-AIDED TRANSCRIPTION

665

1    APPEARANCES:

2    FOR THE PLAINTIFF:    SCHWABE, WILLIAMSON & WYATT, P.C.
                          BY:  NIKA F. ALDRICH, JR., ESQ.
3                              DAVID W. AXELROD, ESQ.
                               BRENNA LEGAARD, ESQ.
4                         1211 SW 5TH AVENUE
                          SUITE 1900
5                         PORTLAND, OREGON  97204

6
     FOR THE DEFENDANT:    FISH & RICHARDSON, P.C.
7                          BY:  CHRISTOPHER S. MARCHESE, ESQ.
                                SETH M. SPROUL, ESQ.
8                          12390 EL CAMINO REAL
                           SAN DIEGO, CALIFORNIA  92130
9
                           MARKOWITZ HERBOLD, P.C.
10                         BY:  RENEE ROTHAUGE, ESQ.
                           1211 SW FIFTH AVENUE
11                         SUITE 3000
                           PORTLAND, OREGON  97204
12

13

14

15

16

17

18

19

20

21

22

23

24

25

COMPUTER-AIDED TRANSCRIPTION

666

1                              **INDEX**

2        EXAMINATION

3        WITNESS NAME                                          PAGE

4        CHRISTINE COLE, PH.D.

5            DIRECT BY MS. LEGAARD...................................... 668
             CROSS BY MR. SPROUL ...................................... 707
6            RE-DIRECT BY MR. LEGAARD ................................. 804
             RE-CROSS BY MR. SPROUL................................... 805
7
        MATTHEW MERRIMAN
8
             DIRECT BY MR. ALDRICH..................................... 809
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

COMPUTER-AIDED TRANSCRIPTION

667

**EXHIBITS**

EXHIBIT                                                    PAGE

EXHIBIT 6 ENTERED INTO EVIDENCE                            728
EXHIBIT 87 ENTERED INTO EVIDENCE                           827
EXHIBIT 89 ENTERED INTO EVIDENCE                           816
EXHIBIT 145 ENTERED INTO EVIDENCE                          681
EXHIBIT 146 ENTERED INTO EVIDENCE                          681
EXHIBIT 147 ENTERED INTO EVIDENCE                          681
EXHIBIT 148 ENTERED INTO EVIDENCE                          681
EXHIBIT 149 ENTERED INTO EVIDENCE                          681
EXHIBIT 150 ENTERED INTO EVIDENCE                          681
EXHIBIT 151 ENTERED INTO EVIDENCE                          681
EXHIBIT 152 ENTERED INTO EVIDENCE                          681
EXHIBIT 153 ENTERED INTO EVIDENCE                          681
EXHIBIT 154 ENTERED INTO EVIDENCE                          681
EXHIBIT 155 ENTERED INTO EVIDENCE                          681
EXHIBIT 156 ENTERED INTO EVIDENCE                          681
EXHIBIT 161 ENTERED INTO EVIDENCE                          681
EXHIBIT 162 ENTERED INTO EVIDENCE                          681
EXHIBIT 163 ENTERED INTO EVIDENCE                          681
EXHIBIT 164 ENTERED INTO EVIDENCE                          681
EXHIBIT 165 ENTERED INTO EVIDENCE                          681
EXHIBIT 166 ENTERED INTO EVIDENCE                          681
EXHIBIT 167 ENTERED INTO EVIDENCE                          681
EXHIBIT 168 ENTERED INTO EVIDENCE                          681
EXHIBIT 196 ENTERED INTO EVIDENCE                          681
EXHIBIT 197 ENTERED INTO EVIDENCE                          681
EXHIBIT 198 ENTERED INTO EVIDENCE                          681
EXHIBIT 199 ENTERED INTO EVIDENCE                          681
EXHIBIT 200 ENTERED INTO EVIDENCE                          681
EXHIBIT 220 ENTERED INTO EVIDENCE                          716
EXHIBIT 220.2 ENTERED INTO EVIDENCE                        682
EXHIBIT 221.2 ENTERED INTO EVIDENCE                        703
EXHIBIT 225 ENTERED INTO EVIDENCE                          670
EXHIBIT 253 ENTERED INTO EVIDENCE                          812
EXHIBIT 700 ENTERED INTO EVIDENCE                          681
EXHIBIT 701 ENTERED INTO EVIDENCE                          681
EXHIBIT 1153 ENTERED INTO EVIDENCE                         731

COMPUTER-AIDED TRANSCRIPTION

668

1      SAN DIEGO, CALIFORNIA - WEDNESDAY, SEPTEMBER 20, 2017

2                          12:55 P.M.

3              (JURY PRESENT, 12:55 P.M.)

4              (RECESS, 12:55 P.M. TO 1:00 P.M.)

5              THE COURT:  CALL YOUR NEXT WITNESS.

6              MS. LEGAARD:  COLUMBIA CALLS DR. CHRISTINE COLE.

7              THE CLERK:  MA'AM, COULD YOU RAISE YOUR RIGHT HAND.

8         CHRISTINE COLE, PH.D., A WITNESS HAVING BEEN DULY SWORN,

9         TESTIFIED AS FOLLOWS:

10             THE WITNESS:  I DO.

11             THE CLERK:  GO AHEAD AND HAVE A SEAT.

12             THE WITNESS:  THANK YOU.

13             THE CLERK:  AND PLEASE STATE YOUR FIRST AND LAST

14     NAME FOR THE RECORD, SPELLING YOUR LAST NAME.

15             THE WITNESS:  CHRISTINE COLE, C-O-L-E.

16             THE COURT:  YOU MAY INQUIRE.

17             MS. LEGAARD:  MAY I APPROACH?

18             IT'S HEAVY.  THERE IS THIS ONE.

19             THE COURT:  ARE THERE TWO BINDERS FOR DR. COLE?

20             MS. LEGAARD:  YES.

21                      DIRECT EXAMINATION

22     BY MS. LEGAARD:

23     Q.   GOOD AFTERNOON, DR. COLE.

24     A.   THANK YOU.

25     Q.   SO TO BEGIN WITH, I WANT TO ASK A FEW GENERAL QUESTIONS

COMPUTER-AIDED TRANSCRIPTION

1    TO TRY TO GIVE THE JURY SOME CONTEXT FOR YOUR TESTIMONY,

2    BECAUSE WE HAVE HEARD FROM A LOT OF PEOPLE OVER THE PAST FEW

3    DAYS.

4            SO DR. COLE, ARE YOU WHAT'S CALLED AN EXPERT

5    WITNESS?

6    A.   YES, I HAVE BEEN ADMITTED AS AN EXPERT IN FEDERAL COURT

7    PREVIOUSLY.

8    Q.   AND SO DID COLUMBIA SPORTSWEAR HIRE YOU TO ASK YOU TO

9    TEST PRODUCTS AND PROVIDE EXPERT OPINION IN THIS CASE?

10   A.   YES.  COLUMBIA HIRED ME THROUGH AN EXPERT WITNESS FIRM

11   RUBIN/ANDERS.

12   Q.   OKAY.  AND SO ARE YOU GOING TO GIVE THE JURY AN EXPERT

13   OPINION ABOUT WHETHER OR NOT THE HEATWAVE PRODUCTS INFRINGE

14   THE '207 PATENT (SIC)?

15   A.   YES, I WILL.

16   Q.   OKAY.  ARE YOU GOING TO GIVE THE JURY AN OPINION ABOUT

17   WHETHER OR NOT THE HEATWAVE FABRICS INFRINGE THE DESIGN

18   PATENT?

19   A.   I DON'T NEED TO MAKE THAT DETERMINATION BECAUSE THE

20   COURT HAS ALREADY RULED THAT THE SEIRUS HEATWAVE FABRICS DO

21   INFRINGE THE '093 DESIGN PATENT.

22   Q.   OKAY.  AND SO WE HAVE, IN THIS CASE, PRODUCTS LIKE

23   EXHIBIT 220.2, WHICH I BELIEVE IS ALREADY IN EVIDENCE.

24            CAN YOU SEE THIS?

25   A.   YES, I CAN.

670

1    Q.    SO THE REFLECTIVE ELEMENTS FACE OUTWARD, ARE ON THE

2    OUTSIDE OF THIS PRODUCT; CORRECT?

3    A.    THAT'S CORRECT.

4    Q.    OKAY.  AND THEN THERE ARE PRODUCTS SUCH AS THIS ONE.

5    THIS IS EXHIBIT 225.

6            MS. LEGAARD:  I DON'T KNOW THAT IT'S BEEN OFFERED.

7    I'D LIKE TO OFFER IT.

8            MR. SPROUL:  NO OBJECTION.

9            THE COURT:  RECEIVED.

10    (TRIAL EXHIBIT 225 RECEIVED IN EVIDENCE.)

11    Q.    BY MS. LEGAARD:  SO IN THIS -- IN THIS PRODUCT YOU'VE

12    GOT REFLECTIVE ELEMENTS THAT FACE INWARD.  THEY ARE ON THE

13    INNERMOST SURFACE OF THE INNERMOST LINING; RIGHT?

14    A.    CORRECT.

15    Q.    SO WE'LL GET TO THIS IN A MINUTE.  BUT IS IT YOUR

16    UNDERSTANDING THAT COLUMBIA ACCUSES THIS PRODUCT, THESE SORTS

17    OF PRODUCTS WITH THE HEATWAVE FABRIC ON THE INSIDE, OF

18    INFRINGING THE '207 PATENT (SIC)?

19    A.    MY UNDERSTANDING IS THAT COLUMBIA HAS ACCUSED THE

20    PRODUCTS WITH THE REFLECTIVE LAYER FACING INWARDS, TOWARDS

21    THE BODY OF THE WEARER, OF INFRINGING ON THE UTILITY PATENT,

22    THE '270 PATENT.

23    Q.    OKAY.  DOES COLUMBIA ALSO ACCUSE, DO YOU KNOW, THIS

24    PRODUCT OF INFRINGING THE DESIGN PATENT?

25    A.    YES.

671

1    Q.    IS THAT BECAUSE IT HAS THE WAVY LINE PATTERN WE'VE BEEN

2    HEARING ABOUT?

3    A.    YES.  IT'S BECAUSE THAT PRODUCT, REGARDLESS OF WHICH WAY

4    THAT IT'S ACTUALLY WORN, CONTAINS THE DESIGN, WHICH HAS BEEN

5    RULED AS INFRINGING THE DESIGN PATENT.

6    Q.    OKAY.  AND DO YOU UNDERSTAND THAT COLUMBIA ACCUSES THIS

7    PRODUCT (INDICATING), WITH THE REFLECTIVE ELEMENTS FACING

8    OUTWARD, OF INFRINGING THE UTILITY PATENT?

9    A.    MY UNDERSTANDING IS COLUMBIA DOES NOT ACCUSE THE PRODUCT

10   AS YOU SHOW IT WITH THE REFLECTIVE ELEMENTS FACING AWAY FROM

11   THE BODY OF THE WEARER OF INFRINGING THE UTILITY, THE '270

12   PATENT.

13   Q.    OKAY.  DOES COLUMBIA ACCUSE THIS PRODUCT OF INFRINGING

14   THE DESIGN PATENT?

15   A.    YES, COLUMBIA DOES ACCUSE THAT PRODUCT OF INFRINGING ON

16   THE DESIGN PATENT.

17   Q.    BECAUSE IT HAS THE WAVY LINES?

18   A.    CORRECT.

19   Q.    OKAY.  THANK YOU.  HOPEFULLY THAT'S CLEAR.

20            SO DR. COLE, CAN YOU TELL ME WHAT COLLEGE DEGREES

21   YOU HAVE.

22   A.    YES.  I HAVE A BACHELOR OF SCIENCE IN CHEMISTRY FROM THE

23   UNIVERSITY OF NORTH CAROLINA AT CHAPEL HILL, AND I HAVE A

24   PH.D. IN PHYSICAL CHEMISTRY FROM M.I.T.

25   Q.    SO YOU HAVE A PH.D. IN PHYSICAL CHEMISTRY.  WHAT IS

672

1  PHYSICAL CHEMISTRY?

2  A.   PHYSICAL CHEMISTRY IS A PART OF THE GREATER FIELD OF

3  CHEMISTRY WHICH TYPICALLY INVOLVES WORKING WITH HEAT AND THE

4  INTERACTION OF HEAT WITH MATERIALS, MATTER.  IT ALSO PERTAINS

5  TO THE INTERACTION OF LIGHT WITH MATERIALS, SUCH AS THE FORM

6  WE CALL SPECTROSCOPY, LASERS FOR INSTANCE FALL IN THAT

7  CATEGORY.

8         REACTIONS, HOW MOLECULES COME TOGETHER AND REACT

9  WITH SURFACES, REACT TO EACH OTHER, DIFFERENT DYNAMICS.  IT'S

10  A HIGHLY MATHEMATICAL SIDE OF CHEMISTRY.  PHYSICAL CHEMISTS

11  DON'T TEND TO LIKE THE ORGANIC CHEMISTRY, CHICKEN-WIRE

12  STRUCTURES THAT I THINK MOST PEOPLE DON'T LIKE EITHER.

13  Q.   RESERVE JUDGMENT ON THAT.

14         SO WHAT IS IT THAT YOU STUDY?

15  A.   I STUDY IN PARTICULAR THESE DAYS RESEARCH PROJECTS.  AND

16  THE KIND OF RESEARCH THAT I DO IS ALL FUNDED BY OUTSIDE

17  SPONSORS; SO I HAVE TO SATISFY SPONSORS' REQUIREMENTS.

18         OUR PRIMARY FUNDERS ARE THE DEPARTMENT OF DEFENSE,

19  THE ARMY, THE NAVY, THE AIR FORCE, THE SPECIAL OPERATIONS

20  GUYS, AS WELL AS CLASSIFIED RESEARCH THAT UNFORTUNATELY I

21  CAN'T TALK ABOUT.

22  Q.   FAIR ENOUGH.

23         WOULD IT BE FAIR TO SAY THAT YOU STUDY TEXTILES?

24  A.   YES.  ALL OF THESE MATERIALS WHERE MY EXPERTISE BECOMES

25  INVOLVED IS THE FACT THAT THEY ARE FUNDAMENTALLY TEXTILE

673

1   MATERIALS; THAT IS, THEY CONTAIN TEXTILE FIBERS IN SOME

2   FORM.

3   Q.   SO BY "TEXTILES," WHAT WOULD BE A COMMON LAYMAN'S

4   UNDERSTANDING OF WHAT THE WORD "TEXTILE" MEANS?

5   A.   YARNS, FABRICS, KNIT FABRICS, WOVEN FABRICS, NON-WOVEN

6   FABRICS, BRAIDS, COATED MATERIALS, LAMINATED MATERIALS.

7            WHAT'S IN COMMON IN ALL OF THESE ARE THE SIZE OF THE

8   FIBERS THAT ARE IN THEM, SO THEY ARE NOT OPTICAL FIBERS, SUCH

9   AS WE USE FOR TELECOMMUNICATIONS.

10   Q.   OKAY.  WHAT WOULD THE DEPARTMENT OF DEFENSE NEED

11   RESEARCHED IN TEXTILES, JUST GENERALLY SPEAKING?

12   A.   WE WORK A LOT OF NEW PRODUCT DEVELOPMENT FOR THEM.  SO,

13   FOR INSTANCE, THE PEOPLE HERE IN SAN DIEGO MAY HAVE SEEN ON

14   TV ABOUT A PROJECT DEMONSTRATION LAST WEEK IN THE HARBOR AT

15   THE NAVY STATION, WHICH WAS CALLED CITADEL PROTECT.  THE IDEA

16   WAS COMING UP WITH BENIGN TECHNOLOGIES FOR BEING ABLE TO STOP

17   SMALL BOATS.  MY GROUP HAS PART OF THE MATERIALS DEVELOPMENT

18   SECTION FOR THAT.

19            OTHER THINGS THAT HAVE DEALT WITH CAMOUFLAGE FOR

20   UNIFORMS, GLOVES, GLOVE MANUFACTURE TECHNOLOGIES.  IT'S A

21   WHOLE HOST, TESTING THE DEVELOPMENT.

22   Q.   AND FOR HOW MANY YEARS HAVE YOU STUDIED TEXTILES?

23   A.   I'VE BEEN A FACULTY MEMBER IN MATERIAL SCIENCE AND

24   ENGINEERING AT CLEMSON UNIVERSITY FOR OVER 41 YEARS.

25   Q.   ARE YOU A MEMBER OF ANY PROFESSIONAL ORGANIZATIONS?

1    A.    YES, I AM.  I AM A MEMBER OF THE SOUTHERN TEXTILE

2    ASSOCIATION, WHICH IS A GROUP OF PREDOMINANTLY TEXTILE

3    MANUFACTURERS AND THEIR SUPPLIERS, NOT JUST LOCATED IN THE

4    SOUTHEAST.

5            I'M ALSO A MEMBER OF AATCC, WHICH IS AN

6    INTERNATIONAL ORGANIZATION WHICH DEALS WITH THE COLORATION AS

7    WELL AS THE FINISHING OF ALL KINDS OF TEXTILE PRODUCTS.

8            I'M ALSO A MEMBER OF THE SOUTHERN ASSOCIATION OF THE

9    INTERNATIONAL ASSOCIATION OF CLOTHING DESIGNERS AND

10   EXPERTS -- EXCUSE ME, EXECUTIVES.  THIS IS A GROUP THAT WORKS

11   WITH THE INTERLINING LINING FABRICS, THE KINDS OF FABRICS

12   WHICH ARE GIVING STRUCTURE TO ALL OF THE SUITS WHICH COUNSEL

13   IS WEARING TODAY.

14   Q.    HAVE YOU --

15   A.    AS WELL AS MILITARY GARMENTS, BY THE WAY.  THE DESIGNERS

16   WORK WITH EVERYTHING.

17   Q.    HAVE YOU PUBLISHED ANY ARTICLES IN THE FIELD OF

18   TEXTILES?

19   A.    YES.  I'VE PUBLISHED A NUMBER OF ARTICLES.  AS YOU CAN

20   IMAGINE, THE LEVEL OF MILITARY WORK THAT I DO, AS WELL AS THE

21   FACT THAT FOR THE LAST GOOD BIT OF TIME, I'VE DONE A LOT OF

22   CLASSIFIED WORK.  NONE OF THAT IS PUBLISHED.

23   Q.    AND THEN WHAT EXPERIENCE DO YOU HAVE WITH PATENTS?

24   A.    I'M THE HOLDER OF SEVEN PATENTS.  THESE INCLUDE TWO

25   PATENTS WHICH WERE GENERATED IN CONJUNCTION WITH WORK THAT WE

675

1    DID FOR NASA OUT HERE IN CALIFORNIA.  AND THEY PERTAIN TO THE

2    DEVELOPMENT OF NEW TECHNOLOGIES FOR GLOVES THAT ARE WORN BY

3    ASTRONAUTS WHEN THEY ARE OUTSIDE OF THE VEHICLES IN SPACE.

4         I ALSO HAVE SEVERAL PATENTS THAT PERTAIN TO THE

5    DEVELOPMENT OF CHEMICAL BIOLOGICAL PROTECTIVE MATERIALS, SUCH

6    AS ARE USED BY SOLDIERS AND EMERGENCY FIRST RESPONDERS.

7    Q.   THANK YOU.

8         HAVE YOU EVER DONE WORK FOR COLUMBIA SPORTSWEAR

9    BESIDES THIS ENGAGEMENT?

10   A.   NO.

11        MS. LEGAARD:  OKAY.  SO AS A PRELIMINARY

12   HOUSEKEEPING MATTER, I'D LIKE TO OFFER FOR EVIDENCE -- I'M

13   GOING TO SHOW IT ON THE SCREEN, BUT JUST FOR THE JURY'S LATER

14   REFERENCE, EXHIBIT 184.

15        MR. SPROUL:  OBJECTION, YOUR HONOR.  IT WAS LATE

16   PRODUCED AFTER THE CLOSE OF DISCOVERY, IS MY UNDERSTANDING.

17        MS. LEGAARD:  I THINK THESE ARE TEST RESULTS FROM

18   HER EXPERIMENTS.

19        MR. ALDRICH:  YOUR HONOR, THESE WERE AT HER

20   DEPOSITION.

21        MR. SPROUL:  THEY WERE PRODUCED -- THEY WEREN'T EVEN

22   PROVIDED TO COUNSEL.  THEY WERE INTRODUCED AT HER DEPOSITION

23   BY COUNSEL IN A DIRECT EXAMINATION APPARENTLY, BUT THEY

24   WEREN'T PREVIOUSLY PROVIDED.  AND THAT WAS OUTSIDE OF THE

25   DISCOVERY PERIOD.

1          THE COURT:  I NEED THE JURORS TO STEP INTO THE ROOM

2     FOR A MINUTE, PLEASE.

3          (JURY ABSENT, 1:11 P.M.)

4          THE COURT:  I'M SORRY.  SO YOU WERE AWARE OF THESE

5     AT DEPOSITION, BUT YOU NEVER HAD -- YOU NEVER WERE PRODUCED

6     COPIES OF THEM?

7          MR. SPROUL:  I WAS NOT AT THE DEPOSITION, YOUR

8     HONOR.  BUT MY UNDERSTANDING IS FROM THE RECORD THAT AT THE

9     END OF QUESTIONING BY SEIRUS COUNSEL OF DR. COLE, MR. ALDRICH

10    THEN PROCEEDED TO DIRECT DR. COLE IN AN EXAMINATION ON

11    EXHIBIT -- WHAT APPARENTLY IS EXHIBIT 184 AND DID NOT PROVIDE

12    A COPY TO COUNSEL AT THAT TIME, OTHER THAN THE COPY HE WAS

13    EXAMINING DR. COLE ON, AND WHICH HE HAD HIMSELF.  BUT IT WAS

14    NOT PREVIOUSLY PROVIDED PRIOR TO THE DEPOSITION.

15         MR. ALDRICH:  DR. COLE DID -- TOOK THESE PHOTOGRAPHS

16    AND DID THIS DATA AND TOOK IT TO THE DEPOSITION AND OPPOSING

17    COUNSEL DID HAVE COPIES OF IT AT THE DEPOSITION.  AND THEY

18    HAD THE OPPORTUNITY TO ASK QUESTIONS ABOUT THESE -- THIS

19    EXHIBIT AT HER DEPOSITION.

20         THIS IS -- I MEAN, I DON'T KNOW WHAT TO SAY BEYOND

21    THAT.  THIS WAS DURING DISCOVERY.  IT WAS DURING EXPERT

22    DISCOVERY.  AND THEY HAD THE OPPORTUNITY TO DEPOSE HER ABOUT

23    IT AT HER DEPOSITION.

24         THE COURT:  DID THEY HAVE -- SO DID YOU LEAVE THEM

25    WITH COPIES OF THIS EXHIBIT?

677

1          MR. ALDRICH:  YEAH.  I GAVE THEM COPIES OF IT AT THE

2     DEPOSITION.

3          MR. SPROUL:  THE RECORD AS I READ IT -- AND, AGAIN,

4     I WAS NOT THERE -- MR. MCGOWAN, COUNSEL FOR SEIRUS SAYS,

5     "MR. ALDRICH, DO YOU HAVE A COPY FOR ME" AT THE BEGINNING OF

6     THE EXAMINATION, AND HE SAYS NO.  AND SO HE THEN PROCEEDS TO

7     ASK A NUMBER OF QUESTIONS ABOUT EXHIBIT 184 AND THEN

8     MR. MCGOWAN ASKED A FEW QUESTIONS.

9          BUT I DON'T KNOW IF MR. ALDRICH PROVIDED HIM WITH

10    HIS COPY OR HOW THAT WAS PERFORMED.  BUT THE RECORD SEEMS

11    FAIRLY CLEAR TO ME, ON A FRESH READ, THAT MR. MCGOWAN WAS

12    NEVER PROVIDE A COPY.

13         I DON'T KNOW WHOSE COPY HE TOOK WITH HIM AFTER THE

14    DEPOSITION.  BUT THERE WAS NO REPORT.  THERE WAS JUST A BRIEF

15    EXAMINATION AT THE END OF HER DEPOSITION ON APPARENTLY WHAT

16    IS EXHIBIT 184.

17         MR. ALDRICH:  FRANKLY, I'D HAVE TO GO BACK TO THE

18    RECORD TO LOOK.  BUT THE EVIDENCE WAS ALL THERE AT THE

19    DEPOSITION, AND THEY WERE WELCOME TO ASK QUESTIONS ABOUT IT.

20    AND THEN THE COURT REPORTER TOOK AWAY THIS BINDER AND MARKED

21    THE BINDER THAT WAS THERE.

22         THE BOTTOM LINE IS IT WAS THERE; I BELIEVE THEY

23    ASKED QUESTIONS.  BUT THEY CERTAINLY HAD THE OPPORTUNITY TO

24    ASK QUESTIONS.  AND IT'S JUST SUPPLEMENTAL DATA, BECAUSE

25    DR. BLOCK SAID SHE DIDN'T TAKE ENOUGH SAMPLES, SO SHE TOOK A

678

1    BUNCH MORE SAMPLES AND SHOWED UP AT HER DEPOSITION, AND SAID

2    HERE, I TOOK A WHOLE BUNCH MORE PHOTOGRAPHS FOR YOU,

3    DR. BLOCK, AND I RAN THE DATA A BUNCH MORE TIMES BASED ON

4    YOUR OBJECTION DURING YOUR EXPERT REPORT.  AND HERE IS ALL

5    THE DATA.  AND SHE BROUGHT IT TO HER DEPOSITION.

6          MR. SPROUL:  IT'S 222 PAGES OF SPREADSHEETS,

7    PICTURES, VERY, VERY SMALL NUMBERS.  AGAIN, IT WASN'T

8    PROVIDED AT THE BEGINNING OF THE DEPO.  IT WAS PROVIDED AT

9    THE VERY END.  ANNOUNCED AT THE BEGINNING OF HIS DIRECT

10   EXAMINATION, WITHOUT A COPY BEING PROVIDED TO MR. MCGOWAN

11   DURING THAT EXAMINATION.

12         MR. MARCHESE:  IT'S THE TYPE OF THING THAT IT HAD TO

13   HAVE BEEN DONE BEFORE THE DEPOSITION STARTED, AND IT'S NOT

14   THE KIND OF THING THAT, YOU KNOW, YOU DO AFTER THE EXPERT FOR

15   ONE SIDE HAS COMPLETED HIS DEPOSITION, AND THEN YOU SAY, HERE

16   YOU GO, I'VE GOT 220 PAGES, TAKE YOUR BEST FIVE MINUTES WITH

17   IT IF YOU CAN, BUT I'M GOING TO ASK QUESTIONS ABOUT IT.

18         IT'S LITIGATION BY AMBUSH, AND IT DOESN'T SEEM

19   PROPER.  WE'VE HAD A LOT OF OBJECTIONS ABOUT LATE-PRODUCED

20   DISCOVERY.  WE'VE HAD IT PRECLUDED.  AND THIS SEEMS TO FALL

21   PERFECTLY WITHIN THE CATEGORY OF THE TYPE OF STUFF THAT

22   EASILY COULD HAVE BEEN AND SHOULD HAVE BEEN PRODUCED PRIOR TO

23   A DEPOSITION, FOR FAIR WARNING AND AN OPPORTUNITY TO PREPARE.

24         MR. ALDRICH:  YOUR HONOR, JUST FOR THE RECORD, I

25   BELIEVE THE DEPOSITION TOOK PLACE MORE THAN A YEAR AGO.

1          THE COURT:  I UNDERSTAND THAT.

2          I'M TRYING TO SEPARATE OUT AN EARLIER CONVERSATION

3     WE HAD WHERE YOU WERE OBJECTING TO EVIDENCE THAT THEY WERE

4     CONCERNED ABOUT, AND I DON'T REMEMBER WHETHER IT WAS RAISED

5     AT A DEPOSITION OR NOT, FROM WHAT HAS HAPPENED IN THIS

6     PARTICULAR INSTANCE.

7          IN THIS PARTICULAR INSTANCE, AS I UNDERSTAND IT, YOU

8     HAD A DEPOSITION, A PATENT DEPOSITION, ALL THESE EXHIBITS

9     WERE AVAILABLE.  AND YOU DON'T KNOW WHETHER YOU GAVE THEM A

10    COPY OF THE EXHIBITS AFTERWARDS OR NOT.  BUT THEY WERE --

11    THEN BECAME PART OF THE RECORD AT THAT TIME.

12         MR. ALDRICH:  YEAH.  I DON'T -- I HONESTLY CAN'T

13    REMEMBER.  WHAT MOST LIKELY HAPPENED IS THEY ASKED FOR A COPY

14    AFTER THE DEPOSITION, AND I SENT THEM EVERYTHING THAT WE HAD.

15    BUT BASED ON THEIR REPRESENTATION, THE COURT REPORTER TOOK

16    THE COPY THAT WAS AT THE DEPOSITION.

17         BUT, AGAIN, THIS TOOK PLACE IN 2015, AND WE'VE HAD

18    SUMMARY JUDGMENT MOTIONS, WE'VE HAD EVERYTHING ELSE.  THERE

19    HAS BEEN ZERO, ZERO OBJECTION TO THIS DOCUMENT OR TO THE

20    RESULTS IN THIS DOCUMENT FOR THE PAST 18 MONTHS OF THIS CASE

21    UNTIL TWO MINUTES AGO.

22         THE COURT:  ALL RIGHT.  AND I KNOW ON THE OTHER

23    ISSUE THAT YOU RAISED, OR THAT THEY WERE OBJECTING TO, I HAVE

24    RESERVED RULING.  WE WERE GOING TO DO SOME RESEARCH FOR ME.

25         MR. MARCHESE:  THIS WAS THE QUESTION ON THE AMAZON

680

1    PIECE?  WAS THAT --

2            THE COURT:  NO.  I THINK WE'VE KIND OF RESOLVED

3    THAT.  BUT IT WAS ON -- I THINK IT WAS ON THE QUESTION OF

4    WHEN FABRIC WAS FIRST DISCLOSED OR NOT.

5            MR. MARCHESE:  RIGHT.

6            THE COURT:  AND I THINK IT WAS ON THAT PARTICULAR

7    ISSUE, WHETHER THERE WAS SOME DISCOVERY ISSUES AROUND THAT.

8    AND YOU'RE STILL RESEARCHING THAT?

9            MR. MARCHESE:  CORRECT.  RIGHT.

10            THE COURT:  ALL RIGHT.

11            MR. MARCHESE:  WE'LL LOOK AT THAT TONIGHT.

12            MR. ALDRICH:  JUST FOR THE RECORD, YOUR HONOR.

13    THERE WERE TWO COPIES AT THE DEPOSITION.

14            MR. SPROUL:  TWO COPIES.

15            MR. ALDRICH:  I HAVE THE TRANSCRIPT RIGHT HERE.

16    THERE WERE TWO COPIES AT THE DEPOSITION.

17            MR. SPROUL:  ONE FOR DR. COLE, ONE FOR MR. ALDRICH.

18    THE RECORD IS CLEAR, MR. MCGOWAN SAYS, "DO YOU HAVE A COPY

19    FOR ME?"  AND MR. ALDRICH SAYS "NO, I'M SORRY" AND PROCEEDS

20    INTO HIS EXAMINATION.

21            MR. ALDRICH:  I SAID, "I'M SORRY.  I HAVE TWO

22    COPIES."  AND HE SAID, "IT'S ALL RIGHT."

23            THE COURT:  OKAY.  THANK YOU.  I'VE HEARD ENOUGH.

24            YOUR OBJECTION IS OVERRULED.  YOU MAY PROCEED.

25            BRING THE JURY BACK IN.

681

1              (JURY PRESENT, 1:17 P.M.)

2              THE COURT:  PLEASE BE SEATED.

3              YOU MAY PROCEED.

4              MS. LEGAARD:  SO I WOULD ALSO LIKE TO OFFER INTO

5    EVIDENCE, BUT NOT DISPLAY TO THE JURY AT THIS TIME,

6    EXHIBITS 145 THROUGH 156 -- THESE ARE PHOTOGRAPHS -- 161

7    THROUGH 168, 196, 197, 199, 200, 700 AND 701.

8              MR. MARCHESE:  CAN YOU DO THAT AGAIN.  I CAN'T WRITE

9    THAT FAST.

10             MS. LEGAARD:  YEAH.  SO 145 THROUGH 156, 161 THROUGH

11   168, 196, 197, 199, 200, 700 AND 701.

12             MR. MARCHESE:  THANK YOU.

13             WE DO NOT HAVE EXHIBIT 199 -- DID YOU SAY 197?

14             MS. LEGAARD:  HANG ON A SECOND.  I THINK IT'S 198.

15   I'M SORRY.

16             MR. MARCHESE:  SO 196, 198, 199?

17             MS. LEGAARD:  YES.

18             MR. SPROUL:  NO OBJECTIONS, YOUR HONOR.

19             THE COURT:  RECEIVED.

20          (TRIAL EXHIBITS 145-156, 161-168, 196, 197, 198, 199,

21          200, 700 AND 701 RECEIVED EVIDENCE.)

22             MS. LEGAARD:  WHILE WE'RE AT IT, I'VE BEEN WAVING

23   AROUND 220.2, AND I'VE JUST BEEN TOLD THAT'S NOT IN EVIDENCE.

24   WE'D LIKE TO OFFER THIS.

25             MR. SPROUL:  NO OBJECTION.

COMPUTER-AIDED TRANSCRIPTION

682

1          THE COURT:  RECEIVED.

2          (TRIAL EXHIBIT 220.2 RECEIVED IN EVIDENCE.)

3     Q.   BY MS. LEGAARD:  OKAY.  SO DR. COLE, HAVE YOU DEVELOPED

4     AN OPINION OF WHETHER SEIRUS INFRINGES CLAIM 2 OF THE '270

5     PATENT?

6     A.   YES, I HAVE BUILT AN OPINION.

7     Q.   AND WHAT IS THAT OPINION?

8     A.   IN MY OPINION, THE SEIRUS HEATWAVE PRODUCTS WITH THE

9     HEAT-REFLECTIVE ELEMENTS ON THE INNERMOST LAYER FACING

10    TOWARDS THE BODY DO INFRINGE ON CLAIM 2 OF THE '270 PATENT.

11    Q.   AND HOW ABOUT CLAIM 23 OF THE '270 PATENT?

12    A.   THE SEIRUS HEATWAVE PRODUCTS WITH THE INWARD-FACING

13    MATERIALS ALSO INFRINGE ON CLAIM 23 OF THE '270 PATENT.

14    Q.   SO WHICH HEATWAVE PRODUCTS DID YOU DETERMINE INFRINGE

15    THE PATENT?

16    A.   THESE ARE THE HEATWAVE PRODUCTS WHERE THE BASE LAYER IS

17    THE INNERMOST LAYER, THAT IS, THE LAYER CLOSEST TO THE

18    WEARER'S BODY AND WHERE THE HEAT-REFLECTING ELEMENTS FACE

19    TOWARDS THE BODY OF THE WEARER.

20    Q.   OKAY.  AND HOW ABOUT THE HEATWAVE-PLUS PRODUCTS?

21    A.   THE HEATWAVE-PLUS PRODUCTS THAT I'VE SEEN HAVE ONE PART

22    OF THE GLOVE WHERE THE REFLECTIVE ELEMENTS FACE TOWARDS THE

23    HAND, EVEN THOUGH THEY HAVE OTHER PARTS WHERE THE ELEMENTS DO

24    NOT FACE TOWARDS THE HAND.  BECAUSE ANY PART OF THE GLOVE HAS

25    THE HEATWAVE MATERIAL THAT FACES TOWARD THE HAND, THOSE

683

1    PRODUCTS ALSO INFRINGE.

2    Q.   OKAY.  ARE THERE ANY HEATWAVE PRODUCTS THAT YOU DID NOT

3    CONSIDER?

4    A.   I DID NOT CONSIDER THE MATERIALS WHERE -- THE PRODUCTS

5    WHERE IT WAS CLEAR FROM ADVERTISING LITERATURE THAT THOSE

6    PRODUCTS WERE DESIGNED TO BE WORN BY A PERSON WITH THE

7    HEAT-REFLECTIVE MATERIAL POINTING AWAY FROM THE WEARER'S

8    BODY.

9    Q.   OKAY.  AND IS 220.2 AN EXAMPLE OF THAT SORT OF PRODUCT

10   THAT YOU DID NOT CONSIDER?

11   A.   CORRECT.  THAT GLOVE IS AN EXAMPLE OF THE KIND OF

12   PRODUCT WHICH DOES NOT INFRINGE ON CLAIM 2 OR CLAIM 23.

13   Q.   OKAY.  ALL RIGHT.  DID YOU PREPARE SOME SLIDES THAT

14   ILLUSTRATE YOUR OPINIONS?

15   A.   YES, I DID.

16   Q.   I THINK I HAVE THEM HERE.

17        SO WHAT DO I MEAN WHEN I SAY "INFRINGE A PATENT

18   CLAIM"?

19   A.   IN ORDER FOR SOMEONE OR FOR A PRODUCT TO INFRINGE ON A

20   PATENT CLAIM, YOU HAVE TO BE ABLE TO FIND IN THE PRODUCT

21   EVERY ELEMENT WHICH EXISTS IN THAT PATENT CLAIM.  IT'S NOT

22   SUFFICIENT TO FIND ALL BUT ONE ELEMENT.

23        YOU ARE REQUIRED TO FIND EACH AND EVERY ELEMENT.  IF

24   THERE IS A SINGLE PIECE WHICH IS MISSING, THEN THAT PRODUCT

25   DOES NOT INFRINGE.

684

1    Q.    AND SO AS WE WALK THROUGH YOUR OPINIONS, ARE WE GOING TO

2    WALK THROUGH EVERY SINGLE SUBPART OF THIS CLAIM?

3    A.    YES.  WE'RE GOING TO HAVE TO WALK THROUGH EVERY BIT OF

4    THE LEGALESE WHICH SITS IN HERE.  AND I'LL TRY TO PUT IT INTO

5    MORE COMMON LANGUAGE, WHAT WE'RE LOOKING FOR IN THE CASE OF

6    SOME OF THESE PRODUCTS.

7    Q.    OKAY.  SO LET'S START WITH THE FIRST BIT OF LEGALESE:

8    "A HEAT MANAGEMENT MATERIAL ADAPTED FOR USE WITH BODY GEAR."

9         WHAT IS YOUR OPINION WITH RESPECT TO WHETHER THE --

10   THE SEIRUS PRODUCTS INFRINGE THIS PART OF THE CLAIM?

11   A.    IN MY OPINION, THE SEIRUS HEATWAVE PRODUCTS, AS WE'VE

12   PREVIOUSLY DESCRIBED THEM, DO INFRINGE ON THIS PART OF THE

13   PATENT CLAIM.

14        AND THE PROOF THAT WE HAVE, I HAVE TO LOOK AT BOTH

15   WHETHER THE HEATWAVE PRODUCTS CONTAIN A HEAT MANAGEMENT

16   MATERIAL, IN THIS CASE A FABRIC, WHETHER THIS FABRIC IS

17   SOMETHING THAT CAN BE USED WITH BODY GEAR.  BODY GEAR BEING

18   DEFINED WITHIN THE PATENT AS SOMETHING WHICH IS USED BY A

19   HUMAN BODY, SUCH AS AN ARTICLE OF CLOTHING.  IT MIGHT BE A

20   SLEEPING BAG.  IT COULD POSSIBLY EVEN BE A TENT.

21        SO THE TWO THINGS THAT I HAVE TO BE ABLE TO SHOW IN

22   THE HEATWAVE PRODUCTS THAT ARE ACCUSED, BOTH HEAT -- A HEAT

23   MANAGEMENT MATERIAL AND THAT THEY ARE ADAPTED TO BE ABLE TO

24   BE USED SOMEHOW ASSOCIATED WITH THE HUMAN BODY.

25   Q.    SO IS HEATWAVE FABRIC A HEAT MANAGEMENT MATERIAL?

685

1    A.   YES, IT IS.  IF YOU LOOK AT THE SEIRUS ADVERTISEMENTS,

2    ON THE RIGHT-HAND SIDE, YOU CAN SEE IN THE PICTURE THAT

3    PEOPLE HAVE SEEN BEFORE, IN THE LOWER RIGHT-HAND CORNER THAT

4    SEIRUS SHOWS THAT HEAT IS BEING REFLECTED BACK TOWARDS THE

5    WEARER'S BODY; SO IT'S CLEARLY DESIGNED -- HEATWAVE IS

6    CLEARLY DESIGNED TO MANAGE HEAT.

7            AND IT'S ALSO -- THESE ARE GLOVES.  WE NORMALLY

8    THINK OF GLOVES AS SOMETHING WHICH IS WORN BY A HUMAN BODY.

9    SO THIS IS BODY GEAR, AND IT'S HEAT MANAGEMENT MATERIAL WHICH

10   CAN BE USED WITH BODY GEAR, AND, IN FACT, IS USED WITH BODY

11   GEAR IN THIS CASE.

12   Q.   DID YOU DO ANY TESTING ON THE FABRIC TO DETERMINE IF IT

13   MANAGES HEAT?

14   A.   YES, I DID.  I TOOK -- WELL, THIS ALSO IS ANOTHER

15   REPRESENTATION OF SOME GLOVES, SEIRUS' GLOVES WHICH HAVE BEEN

16   SHOWN PREVIOUSLY.

17           IN THE TOP IS THE HEATWAVE GLOVE AND THE BOTTOM IS

18   THE HEATWAVE-PLUS GLOVE.  AND WHAT WE'RE TALKING ABOUT FOR

19   THE HEAT MANAGEMENT MATERIAL IS THAT SILVER MATERIAL WHICH IS

20   SHOWN ON THE INSIDE OF THE GLOVE.

21   Q.   THANK YOU.  HERE WE GO.

22           SO WHAT FABRICS DID YOU TEST TO DETERMINE IF THEY

23   WERE HEAT MANAGEMENT MATERIALS?

24   A.   THE FIRST TWO FABRICS THAT I WAS PROVIDED, THAT I

25   UNDERSTAND THAT SEIRUS PROVIDED THROUGH THE COURT, THESE ARE

686

1    FABRICS WHICH WERE SENT TO ME BY COLUMBIA'S COUNSEL.

2         I WAS PROVIDED WITH TWO FABRICS, ONE OF THEM IS THE

3    HEATWAVE FABRIC WITH THE WAVY, SILVER WAVY LINES ON IT THAT

4    WAS DESCRIBED AS A TWO-WAY STRETCH; THAT IS, IT ONLY REALLY

5    STRETCHES ALONG ONE DIRECTION IN THE FABRIC.  AND A SECOND

6    FABRIC, WHICH WAS DESCRIBED AS A FOUR-WAY STRETCH, THAT IS,

7    BOTH LENGTH-WISE AND WIDTH-WISE STRETCH WITHIN THE MATERIAL.

8         THE TESTING THAT WAS DONE, I SENT THESE FABRICS TO A

9    COMPANY IN ALABAMA, AZ TECHNOLOGY.  AZ TECHNOLOGY DEVELOPED

10   THIS PARTICULAR TEST FOR NASA.  IT'S USED EXTENSIVELY BY

11   NASA.  AZ ACTUALLY NOT ONLY DEVELOPED THE TEST, THEY

12   DEVELOPED THE INSTRUMENT WHICH IS USED FOR CERTIFICATION FOR

13   NASA.

14        AND THE TEST MEASURES THE THERMAL REFLECTANCE OF

15   HEAT BY THE TWO-WAY STRETCH AND THE FOUR-WAY STRETCH FABRICS

16   AT BODY TEMPERATURE, APPROXIMATELY.

17   Q.   AND WHAT DID YOU DETERMINE FROM THIS TEST?

18   A.   THIS TEST CLEARLY SHOWS THAT THE HEATWAVE FABRICS DO

19   REFLECT HEAT; THAT IS, THEY ARE HEAT MANAGEMENT MATERIALS.

20   Q.   OKAY.  AND SO WHAT WAS YOUR CONCLUSION WITH RESPECT TO

21   THE FIRST SUBPART OF THAT CLAIM?

22   A.   IN MY OPINION, THE SEIRUS -- THE ACCUSED SEIRUS HEATWAVE

23   PRODUCTS DO INFRINGE ON THIS FIRST CLAUSE OF CLAIM 1.

24   Q.   OKAY.  SO LET'S MOVE ON TO THE NEXT ONE.  "A BASE

25   MATERIAL HAVING A TRANSFER PROPERTY THAT IS ADAPTED TO ALLOW,

1    IMPEDE AND/OR RESTRICT PASSAGE OF A NATURAL ELEMENT THROUGH

2    THE BASE MATERIAL."

3            SO WHAT DID YOU DO TO EVALUATE INFRINGEMENT OF THIS

4    PARTICULAR SUBPART?

5    A.   THIS IS A SOMEWHAT AWKWARD WAY OF SAYING THE BASE

6    MATERIAL -- THAT IS THE FABRIC WITHOUT THE REFLECTIVE

7    ELEMENTS APPLIED TO IT -- HAS TO HAVE SOME PROPERTY, SOME

8    NATURAL PROPERTY.  IN THIS PARTICULAR CASE, I CHOSE THE

9    NATURAL PROPERTIES OF AIR FLOW AND THE MOVEMENT OF

10   MOISTURE.

11   Q.   SO WHAT DID YOU DO TO TEST AIR FLOW AND THE MOVEMENT OF

12   MOISTURE?

13   A.   I TOOK THE SEIRUS SUPPLIED FABRICS AND I SENT THEM TO A

14   RECOGNIZED TEXTILE TESTING LABORATORY, PRECISION TESTING.

15   AND PRECISION RAN TWO STANDARD TEXTILE TESTS.  THESE ARE

16   WIDELY USED BY THE INDUSTRY, PARTICULARLY FOR MILITARY FABRIC

17   TESTING.

18           ONE OF THE TESTS MEASURES THE AIR PERMEABILITY OF

19   THE MATERIAL MULTIPLE TIMES ON THE FABRIC.  THE OTHER TEST

20   MEASURES THE MOVEMENT OF MOISTURE VAPOR THROUGH THE FABRIC,

21   AGAIN MULTIPLE TIMES.

22           AND IN EACH CASE, I SUPPLIED PRECISION TESTING WITH

23   APPROXIMATELY ONE-HALF OF THE SEIRUS MATERIAL THAT HAD BEEN

24   PROVIDED TO ME.  THEY SELECTED THEIR OWN SAMPLES FOR

25   TESTING.

1    Q.    OKAY.  WHAT WERE THE RESULTS OF THESE TESTS?

2    A.    THE RESULTS OF THE MOVEMENT OF MOISTURE VAPOR IS SHOWN

3    ON THE RIGHT-HAND SIDE OF THIS PARTICULAR IMAGE.  AND, AGAIN,

4    WHAT YOU'RE LOOKING AT FOR THE BASE MATERIAL IS SHOWN IN

5    LINE 1 FOR THE TWO-WAY STRETCH AND IN LINE 3 FOR THE FOUR-WAY

6    STRETCH.

7             AND THE NUMBERS ON THE RIGHT-HAND SIDE INDICATE THAT

8    MOISTURE VAPOR DOES MOVE THROUGH BOTH BASE MATERIALS.

9             MS. LEGAARD:  CAN THE JURY SEE THE POWERPOINT

10   PRESENTATION?  I ASK THAT IT BE SHOWN TO THEM.

11            MR. SPROUL:  NO OBJECTION, YOUR HONOR.

12            MS. LEGAARD:  SORRY ABOUT THAT.

13   Q.    OKAY.  SO THE RESULTS OF THIS -- TO RECAP, THE RESULTS

14   OF THIS TEST WERE THAT THE BASE MATERIAL HAS A TRANSFER

15   PROPERTY?

16   A.    YES, THE BASE MATERIAL HAS A TRANSFER PROPERTY.  AND IN

17   PARTICULAR, THIS TRANSFER PROPERTY IS THE MOVEMENT OF

18   MOISTURE THROUGH THE BASE MATERIAL.

19   Q.    OKAY.

20   A.    I ALSO TESTED A SECOND NATURAL ELEMENT OR TRANSFER

21   PROPERTY OF THE BASE MATERIALS.  AND THIS IS THE MOVEMENT OF

22   AIR THROUGH THE FABRIC AT A VERY LOW PRESSURE DIFFERENTIAL,

23   SUCH AS ONE MIGHT EXPERIENCE IN WEARING CLOTHING.

24            AGAIN, THE TWO-WAY STRETCH BASE MATERIAL IS SHOWN

25   IN LINE 1; THE FOUR-WAY STRETCH BASE MATERIAL IS SHOWN IN

689

1    LINE 3.  AND IN BOTH CASES, THESE BASE MATERIALS ARE AIR

2    PERMEABLE.

3    Q.    OKAY.  DID YOU CONSIDER ANYTHING ELSE?

4    A.    YES.  AGAIN, LOOKING BACK AT SEIRUS' INFORMATION THAT I

5    BELIEVE WE SHOWED DURING THE PREVIOUS WITNESS' TESTIMONY,

6    SHOWS ON THEIR WEBSITE, ONE CAN SEE THAT MOISTURE IS SHOWN AS

7    MOVING THROUGH THE FABRIC AND THROUGH THE BASE MATERIAL.

8    Q.    OKAY.  SO WHAT IS YOUR CONCLUSION ABOUT THIS SUBPART OF

9    CLAIM 1 OF THE '207 PATENT (SIC)?

10   A.    IN MY OPINION, THE ACCUSED SEIRUS HEATWAVE PRODUCTS DO

11   INFRINGE ON THIS PORTION OF CLAIM 1.

12   Q.    OKAY.  SO NOW WE MOVE ON TO THE NEXT SUBPART.  "A

13   DISCONTINUOUS ARRAY OF DISCRETE HEAT-DIRECTING ELEMENTS, EACH

14   INDEPENDENTLY COUPLED TO A FIRST SIDE OF A BASE MATERIAL."

15         SO HOW DID YOU GO ABOUT EVALUATING THIS?

16   A.    THIS IS ONE OF THE AREAS WHERE PRIOR TO GETTING THIS FAR

17   WITHIN THIS PARTICULAR CASE, THE COURT RULED ON WHAT THE

18   DEFINITION OF THIS TERM WOULD BE.

19         AND THE EASIEST THING IS TO LOOK DOWN AT THE BOTTOM

20   RIGHT-HAND SECTION WHICH SAYS, FOR THE INDEPENDENT ELEMENTS,

21   DISCRETE HEAT-DIRECTING ELEMENTS, SOME OF THE BASE FABRIC IS

22   EXPOSED BETWEEN THE ADJACENT ELEMENTS.  SO WE'RE TOLD THAT

23   PART OF THE FABRIC IS COVERED BY THE ELEMENTS, BUT FOR PART

24   OF THE FABRIC, THE BASE FABRIC IS ALSO EXPOSED.

25   Q.    OKAY.  SO HOW DID YOU EVALUATE THAT?

690

1    A.    I TOOK A NUMBER OF PHOTOGRAPHS OF THE VARIOUS SEIRUS

2    FABRICS.    THERE ARE A TOTAL OF FIVE SEIRUS FABRICS THAT I WAS

3    PROVIDED WITH.

4         AND WHAT YOU SEE HERE ARE PHOTOGRAPHS AT DIFFERENT

5    LEVELS OF MAGNIFICATION WHICH I TOOK.    IN THE CASE OF THESE

6    FABRICS, THE HEAT-DIRECTING ELEMENTS ARE THE SILVER, WAVY

7    LINES.    THE BASE MATERIAL IS SHOWING THROUGH IN ALL OF THE

8    FABRICS, WHICH I EXAMINED A BLACK FABRIC.    SO YOU SEE BLACK

9    FABRIC SHOWING THROUGH BETWEEN ADJACENT SILVER WAVY LINES.

10   Q.    OKAY.    HOW DID YOU TAKE THESE PHOTOGRAPHS?

11   A.    THESE PHOTOGRAPHS I TOOK USING A PROFESSIONAL NIKON

12   CAMERA WITH NIKON ACCESSORIES TO GET THE CLEAREST PICTURES.

13   THERE ARE REFLECTIVE KIND OF FABRICS.    IT TAKES A LARGE

14   AMOUNT OF LIGHT ON THE FABRICS TO GET A UNIFORMLY ILLUMINATED

15   PICTURE, AS YOU SAW IN THE PREVIOUS SLIDE.

16        BUT THESE ARE ONES THAT I TOOK USING A CAMERA SET

17   UP, WHICH I HAVE ALSO USED ON SOME OF MY DEPARTMENT OF

18   DEFENSE PROJECTS.

19   Q.    OKAY.

20   A.    AND IN CASE, WHEN I TOOK A PHOTOGRAPH, I KEPT A RUNNING

21   LOG OF EXACTLY WHAT THE PHOTOGRAPHIC SET OF CONDITIONS WERE.

22   HOW THE CAMERA WAS SET UP, WHAT THE MAGNIFICATION IN THE LENS

23   WAS, ADDITIONAL MAGNIFYING LENSES THAT I HAD ON THE CAMERA,

24   WHETHER I HAD POLARIZING FILTERS, EXPOSURES, THE ILLUMINATION

25   AND ALL.

691

1        I WAS TRYING TO KEEP A COMPLETE SET OF NOTES SO THAT

2    IF ANYONE WANTED TO REPRODUCE MY WORK AT A LATER TIME, THEY

3    WOULD HAVE COMPLETE ACCESS TO HOW I HAD SET THESE MATERIALS

4    UP.

5    Q.   FAIR ENOUGH.

6        SO WHAT IS YOUR CONCLUSION ABOUT THIS PART OF THE

7    CLAIM?

8    A.   IN MY OPINION, THE ACCUSED SEIRUS HEATWAVE FABRICS DO

9    INFRINGE ON THIS ELEMENT OF CLAIM 1.

10   Q.   OKAY.  SO MOVING ON TO THE NEXT ELEMENT.  "THE

11   HEAT-DIRECTING ELEMENTS BEING POSITIONED TO DIRECT HEAT IN A

12   DESIRED DIRECTION."

13       HOW DID YOU GO ABOUT EVALUATING THIS PART OF THE

14   CLAIM?

15   A.   WE'VE ALREADY DETERMINED FROM PREVIOUS WORK IN EXAMINING

16   THIS CLAIM THAT THERE ARE HEAT-DIRECTING ELEMENTS.  THE

17   QUESTION IS, ARE THEY DIRECTING HEAT?

18       AGAIN, I HAD GUIDANCE FROM SEIRUS' MATERIALS, WHICH

19   SHOWED THAT FOR THEIR MATERIALS, THEY DO DIRECT HEAT BACK

20   TOWARDS THE WEARER.  BUT I ALSO DID ADDITIONAL WORK.

21   Q.   OKAY.  I THINK WE'LL GET TO YOUR ADDITIONAL WORK LATER.

22   A.   OKAY.

23   Q.   WHAT IS YOUR CONCLUSION ABOUT THIS PART OF THE CLAIM?

24   A.   IN MY OPINION, THE ACCUSED SEIRUS HEATWAVE FABRIC --

25   EXCUSE ME, HEATWAVE PRODUCTS DO INFRINGE ON THIS ELEMENT OF

1    CLAIM 1.

2    Q.   OKAY.  AND SO THE NEXT PART OF THE CLAIM IS "WHEREIN A

3    SURFACE AREA RATIO OF HEAT-DIRECTING ELEMENTS TO BASE

4    MATERIAL IS FROM ABOUT 7:3 TO ABOUT 3:7."

5         CAN YOU EXPLAIN A LITTLE BIT ABOUT WHAT THAT MEANS.

6    A.   IT MEANS BASICALLY THAT YOU'RE LOOKING TO SEE IF THE

7    SILVER ELEMENTS COVER ANYWHERE FROM ABOUT 30 PERCENT TO ABOUT

8    70 PERCENT OF THE AREA OF THE FABRIC.

9    Q.   OKAY.  SO WHAT KEY QUESTION DID YOU ANSWER HERE?

10   A.   LOOKING AT HOW MUCH OF THE FABRIC AREA IS COVERED BY THE

11   SILVER PART VERSUS HOW MUCH OF THE FABRIC AREA IS STILL

12   SHOWING THE BASE, WHICH IS A BLACK FABRIC IN THIS CASE.

13   Q.   IS THERE A STANDARD WAY TO DETERMINE THIS?

14   A.   THERE IS NO TEXTILE INDUSTRY STANDARD TEST FOR THIS.

15   Q.   SO COULD YOU HAVE SENT IT OUT TO SOME LAB AND HAD THEM

16   DO IT FOR YOU?

17   A.   NOT THE WAY THAT I SENT OUT THE PREVIOUS SAMPLES FOR

18   TESTING TO PRECISION TESTING IN A CERTIFIED LAB TO BE ABLE TO

19   DO THE MOISTURE OR AIR PERMEABILITY OR EVEN DOWN TO

20   AZ TECHNOLOGY TO BE ABLE TO DO THE AMOUNT OF HEAT

21   REFLECTED.

22   Q.   OKAY.  SO HOW DID YOU GO ABOUT EVALUATING THIS QUESTION

23   IF THERE IS NO STANDARD WAY TO DO IT?

24   A.   THE TESTING IS ACTUALLY STRAIGHTFORWARD.  IT'S SIMPLY A

25   MATTER OF STARTING WITH A GOOD PICTURE, WHICH IS VERY

693

1    UNIFORMLY ILLUMINATED, AND THEN ANALYZING THE DATA FROM THAT

2    PICTURE USING COMMERCIALLY AVAILABLE SOFTWARE.

3          I HAD THE ADVANTAGE OF KNOWING, FROM OVER 30 YEARS

4    AGO, THAT THE KIND OF SOFTWARE WHICH IS USED BY GRAPHIC

5    ARTISTS IS CAPABLE OF KNOWING WHAT COLOR EVERYTHING IN A

6    PICTURE ACTUALLY IS.  AND I'VE TAKEN ADVANTAGE OF THIS

7    PREVIOUSLY WHEN WE WERE DEVELOPING CAMOUFLAGE PATTERNS FOR

8    THE U.S. ARMY.

9          SO I KNEW THAT PHOTOSHOP, FOR INSTANCE, WIDELY USED

10   COMMERCIAL SOFTWARE, NOT ONLY KNEW FOR EVERY PICTURE THAT IT

11   WAS GIVEN HOW MANY LITTLE ELEMENTS WERE IN THE PICTURE, HOW

12   MANY PIXELS WERE ACTUALLY IN THE IMAGE, BUT THAT THE SOFTWARE

13   ALSO KNEW WHAT COLOR EVERY ONE OF THOSE PIXELS WAS AND WOULD

14   AUTOMATICALLY COUNT THEM.

15   Q.   SO WHAT ARE WE LOOKING AT HERE?

16   A.   WHAT WE'RE LOOKING AT IS ONE OF THE SEIRUS HEATWAVE

17   FABRICS WHICH IS POSITIONED, IT'S READY TO HAVE ITS PICTURE

18   TAKEN.

19         I NOTE THAT SOME OF THESE FABRICS AS THEY WERE SENT

20   TO ME HAD WRINKLES IN THEM.  I DIDN'T WANT THE WRINKLES

21   INCLUDED IN THE PICTURES, BECAUSE THAT WOULD POTENTIALLY

22   CONTAMINATE MY RESULTS.

23         SO I FLATTENED THE FABRICS OUT, NOT BY IRONING THEM,

24   BUT BY SIMPLY PUTTING A THIN PIECE OF OPTICAL GLASS ON TOP.

25   THE GLASS IS BEING HELD DOWN FLAT BY USING SEVERAL MAGNETS.

694

```
 1    THESE ARE SIMPLY RARE EARTH MAGNETS, HIGH HOLDING POWER TO BE
 2    ABLE TO KEEP THE GLASS FLAT ON THE FABRIC.
 3          SO THE FABRIC IS HELD FLAT.  AND I THINK THE NEXT
 4    IMAGE THAT YOU HAD SHOWS THE CAMERA ITSELF.  THIS IS MY NIKON
 5    CAMERA WITH ITS NIKON LENSES ON IT.  THE CAMERA IS SIMPLY
 6    POSITIONED ON A TRADITIONAL PHOTOGRAPHIC COPY STAND
 7    VERTICALLY SO THE FABRIC IS FLAT UNDERNEATH THE LEVEL OF THIS
 8    PARTICULAR CAMERA.
 9          ONE IMPORTANT FEATURE IS THAT THE FRONT PART OF THE
10    CAMERA IS ACTUALLY BELOW THE LEVEL OF THE L.E.D. LIGHTS THAT
11    I'M USING FOR ILLUMINATING IT.  WHAT THIS DOES IS IT
12    MINIMIZES THE SHADOWS WHICH ARE ACTUALLY BEING PROJECTED ONTO
13    THE SURFACE OF THE FABRIC AND IT SIMPLY JUST GIVES YOU A
14    BETTER QUALITY PICTURE.
15          THE CHECK FOR IF YOU HAVE A GOOD PICTURE IS YOU
16    SIMPLY LOOK AT IT AND SEE IF YOU HAVE BRIGHT SPOTS IN IT OR
17    DARK SPOTS IN IT OR IT LOOKS GOOD.
18    Q.   OKAY.
19    A.   SO WHAT YOU'RE LOOKING AT HERE IS KIND OF AN OVERALL
20    VIEW OF THE WHOLE SETUP.  ON THE LEFT-HAND SIDE, THERE IS --
21    IN THE DARK HOLE TOWARDS THE TOP IS THE ACTUAL NIKON CAMERA.
22    IT'S FACING DOWN, LOOKING AT ONE OF THE FABRICS AS I HAD
23    RECEIVED THEM.  THIS IS ACTUALLY WHAT REMAINS OF ONE OF THE
24    FABRICS AFTER I HAD TAKEN THE ROUGHLY OTHER HALF AND SENT OFF
25    FOR PREVIOUS TESTING.
```

1          SO I TOOK THE WHOLE FABRIC, TRIED TO FIND AN AREA

2     THAT DIDN'T HAVE A WRINKLE IN IT.  PUT THE GLASS ON TOP, HELD

3     THE FABRIC DOWN ON THE SURFACE OF THE TABLE UNDER NO TENSION,

4     AND THEN SIMPLY TOOK A PICTURE.  THE PICTURE WAS TRANSFERRED

5     ELECTRICALLY -- EXCUSE ME, ELECTRONICALLY OVER TO MY LAPTOP

6     ON THE RIGHT-HAND SIDE.

7          AND WHAT YOU'RE LOOKING AT IS THE MOST RECENT

8     PICTURE THAT I HAD TAKEN WITH THIS SETUP AS IT APPEARS WITHIN

9     THE COMMERCIAL PACKAGE PHOTOSHOP.

10    Q.   OKAY.  SO WHERE DID YOU GET THE FABRIC TO DO THIS

11    WITH?

12    A.   THE FABRIC WAS SENT TO ME BY COLUMBIA'S EXTERNAL

13    COUNSEL.  FOR THE FIVE FABRICS WHICH I RECEIVED, ALL OF THOSE

14    WERE GIVEN A SPECIFIC NUMBER, WHAT'S CALLED A BATES NUMBER ON

15    EACH FABRIC SAMPLE.  IN THE CASE OF THE LAST THREE FABRICS

16    THAT I WAS SENT, LITERALLY ALL I WAS SENT ON THE FABRIC WAS A

17    LABEL THAT HAD A SEIRUS BATES NUMBER ON IT.

18          IT'S JUST A WAY OF BEING ABLE TO KEEP TRACK OF EVERY

19    PAGE, EVERY PIECE OF INFORMATION IN A CASE.

20    Q.   SO DO YOU UNDERSTAND THAT THOSE FABRICS WERE GIVEN TO

21    COUNSEL BY SEIRUS AND THEN GIVEN BY COUNSEL TO YOU?

22    A.   I WAS TOLD BY COLUMBIA'S EXTERNAL COUNSEL THAT THESE

23    FABRICS HAD BEEN PROVIDED BY SEIRUS TO THEM AS REPRESENTATIVE

24    OF SEIRUS' PRODUCTION MATERIALS.

25    Q.   OKAY.  ALL RIGHT.  SO WHAT ARE WE LOOKING AT HERE?

1    A.    WE'RE LOOKING AGAIN AT THE -- THIS IS NOT THE COMPUTER

2    SCREEN.    THIS IS SIMPLY A SCREEN SHOT FROM THE COMPUTER

3    SCREEN.

4          YOU'RE LOOKING AT THE FULL PHOTOGRAPHIC IMAGE AS I

5    TOOK IT WITH THE NIKON CAMERA IN THE UPPER LEFT-HAND SIDE.

6    THIS SHOWS THE WAVY LINES.    IT ALSO INCLUDES THE SEIRUS LOGO.

7          ONE THING THAT YOU NOTICE, HOWEVER, IS THAT ALTHOUGH

8    THIS IS A LARGE PICTURE, YOU CAN'T SIMPLY TAKE THIS PICTURE

9    AND USE IT TO REPLICATE THE ENTIRE PIECE OF FABRIC.    WHAT WE

10   IN CHEMISTRY LEARNED A LONG TIME AGO WAS THE CONCEPT OF A

11   UNIT CELL.

12         A UNIT CELL IS SIMPLY A PART OF A PATTERN.    IF YOU

13   TAKE THAT PART OF THE PATTERN SHOWN INSIDE THE RED LINES, AND

14   YOU WOULD LIFT IT AND STAMP IT ALL OVER THE FABRIC CAREFULLY

15   MATCHING THE EDGES TOGETHER, YOU CAN REPRODUCE THE ENTIRE

16   PATTERN ON THE FABRIC.    SO THINK OF A UNIT CELL AS SIMPLY THE

17   SMALLEST REPEATING UNIT THAT IS MADE UP OF THIS PARTICULAR

18   PATTERN.

19   Q.    AND WHY WAS IT IMPORTANT TO DO -- TO FIND A UNIT CELL?

20   A.    BECAUSE OF THE SEIRUS LOGO.    IF THE SEIRUS LOGO HAD NOT

21   BEEN IN THE FABRIC, THAT IS, IF THE FABRIC HAD SIMPLY

22   CONSISTED OF A SERIES OF WAVY LINES, THEN WHAT I WOULD HAVE

23   DONE INSTEAD WAS SIMPLY DO A LARGE ENOUGH AREA OF WAVY LINES

24   TO WHERE I FELT CONFIDENT THAT I WAS GETTING A REPRESENTATIVE

25   VIEW OF THE FABRIC.

697

1            IN THIS PARTICULAR CASE, HOWEVER, THE SEIRUS LOGO

2      WAS QUITE PROMINENT, AND JUST LOOKING AT IT, ONE IS NOT

3      IMMEDIATELY SURE HOW MUCH OF THE AREA OF THE PATTERN IS

4      REPRESENTED BY THE LOGO ITSELF.

5            SO I WANTED TO MAKE SURE THAT I ACTUALLY TESTED WHAT

6      THIS PARTICULAR HEAT MANAGEMENT MATERIAL WAS AND NOT SIMPLY

7      SOME PART OF IT.

8      Q.   OKAY.

9      A.   SO IN EACH CASE, THE PHOTOGRAPHS AND THE RESULTS THAT

10     YOU SEE ARE FROM A UNIT CELL FOR THE PARTICULAR FABRIC STYLE,

11     AND I ALSO SHOW YOU WHICH PARTICULAR PHOTOGRAPH WAS USED FOR

12     MAKING THIS DETERMINATION.

13     Q.   OKAY.

14     A.   SO WHAT YOU SEE HERE IS THE UNIT CELL.  AND IF YOU

15     NOTICE, THE SCROLL BAR WHICH APPEARS JUST TO THE RIGHT OF THE

16     PHOTOGRAPH IS IN THE CENTER.  YOU AREN'T SEEING THE FULL UNIT

17     CELL.  YOU'D HAVE TO SCROLL UP A LITTLE BIT, SCROLL DOWN A

18     LITTLE BIT TO GET THE ENTIRE IMAGE IN.  PHOTOSHOP, HOWEVER,

19     KNOWS WHAT THE ENTIRE PHOTOGRAPH IS.

20            SO WORKING WITH THIS PARTICULAR UNIT CELL, ALL I DID

21     WAS GO INTO PHOTOSHOP AND SAY, TAKE A MEASUREMENT.  AND WHAT

22     YOU SEE, THE ONE LINE NEAR THE BOTTOM UNDERNEATH THE PHOTO

23     SAYS MEASUREMENT ONE.  SO FOR THIS PARTICULAR PHOTOGRAPH,

24     PHOTOSHOP HAS SIMPLY GONE IN, COUNTED EVERY PIXEL, AND FOR

25     EACH PIXEL KNOWS WHAT COLOR THAT PIXEL IS.  IT'S ACCUMULATED

1    ALL OF THAT INFORMATION AND IT'S ABOUT TO DUMP IT INTO A

2    SPREADSHEET FOR ME.

3    Q.    OKAY.    SO WHAT WERE THE RESULTS OF THIS ANALYSIS?

4    A.    THE RESULTS OF THE ANALYSIS ARE FOR EVERY MEASUREMENT

5    THAT I MADE ON EACH OF THE FIVE SEIRUS FABRICS, THE PERCENT

6    COVERAGE IS LESS THAN 70 PERCENT.    THE INDIVIDUAL NUMBERS

7    RANGE FROM A LOW OF 61.4 PERCENT TO A HIGH OF 69.2 PERCENT.

8            BUT EVERY INDIVIDUAL MEASUREMENT, AS WELL AS THE

9    AVERAGE OF ALL OF THE MEASUREMENTS FOR EACH FABRIC, FALLS

10   WITHIN THE RANGE OF 30 PERCENT TO 70 PERCENT.

11   Q.    OKAY.    AND THEN YOU'VE GOT A BINDER UP THERE SOMEWHERE

12   THAT'S EXHIBIT 184.

13   A.    YES.

14   Q.    CAN YOU IDENTIFY THAT AS THE RAW DATA FOR THIS

15   ANALYSIS?

16   A.    YES.    THE FIRST SHEET IS THE DATA TABLE THAT WE'RE

17   LOOKING AT HERE ON THE SCREEN RIGHT NOW.    AND YOU'RE LOOKING

18   AT WHAT I COMPILED OF THE PICTURES.    THE ACTUAL EXCEL

19   SPREADSHEETS APPEAR IN HERE.

20           THERE IS ONE WHERE THE SPREADSHEET RUNS ON FOREVER.

21   IF YOU LOOK AT IT, YOU REALIZE IT'S DUPLICATIVE.    I DIDN'T

22   USE THE DUPLICATE SECTIONS IN IT.

23           BUT THIS IS ACTUALLY ALL OF THE PHOTOGRAPHS AS THEY

24   WERE ANALYZED --

25   Q.    OKAY.

699

1    A.    -- AND SUMMARIZED HERE ON THE TABLE.

2    Q.    IS THERE ANYTHING ELSE YOU CONSIDERED IN DETERMINING

3    THAT THE COVERAGE OF THE SEIRUS FABRIC BY REFLECTIVE ELEMENTS

4    FELL WITHIN THAT CLAIMED RANGE?

5    A.    YES.   AT DR. BLOCK'S DEPOSITION, DR. BLOCK BEING THE

6    COMPARABLE EXPERT WHICH HAS BEEN EMPLOYED BY SEIRUS, HE

7    TESTIFIED AT HIS DEPOSITION THAT THE SURFACE COVERED BY THE

8    REFLECTIVE ELEMENTS LAYS SOMEWHERE BETWEEN 30 AND 70 PERCENT,

9    AS YOU SEE ON THE BOTTOM RIGHT-HAND SIDE OF THIS SLIDE.

10   Q.    OKAY.   SO WHAT IS YOUR CONCLUSION ABOUT THAT CLAIM

11   LIMITATION?

12   A.    IN MY OPINION, THE ACCUSED SEIRUS HEATWAVE FABRICS DO

13   INFRINGE THIS PARTICULAR ELEMENT OF CLAIM 1.

14   Q.    OKAY.   SO GO ON TO THE NEXT PART, "WHEREIN THE PLACEMENT

15   AND SPACING OF THE HEAT-DIRECTING ELEMENTS PERMITS THE BASE

16   MATERIAL TO RETAIN A PARTIAL PERFORMANCE OF THE TRANSFER

17   PROPERTY."

18         CAN YOU SUMMARIZE THAT IN A LANGUAGE THAT'S A LITTLE

19   EASIER TO UNDERSTAND.

20   A.    THIS IS THE SAME TESTING WHICH WAS DONE FOR THE SECOND

21   CLAUSE, TALKING ABOUT THE BASE MATERIAL BEFORE THE ELEMENTS

22   WERE ATTACHED.   THIS IS THE BASE MATERIAL AFTER THE ELEMENTS

23   HAD BEEN ATTACHED, THAT IS, THE HEATWAVE FABRICS THEMSELVES.

24         IN THIS CASE, AGAIN, IF WE LOOK AT SEIRUS'

25   ADVERTISING INFORMATION, IT CLEARLY CONVEYS THAT MOISTURE IS

700

1    BEING MOVED THROUGH THE BASE FABRIC, AS IT CONTAINS THE

2    HEAT-REFLECTING ELEMENTS.

3            BUT IN ADDITION, I SENT THESE -- I HAD THESE

4    MATERIALS TESTED BY PRECISION TESTING, THE CERTIFIED

5    THIRD-PARTY TESTING LABORATORY.  AGAIN, I KNOW THESE ARE FAR

6    TOO SMALL FOR ANYONE TO BE ABLE TO READ THEM, BUT YOU'RE

7    LOOKING BASICALLY AGAIN AT THE BASE MATERIAL TWO-WAY STRETCH,

8    THE BASE MATERIAL FOUR-WAY STRETCH THAT WE'VE ALREADY SEEN IN

9    LINES 1 AND 2.  AND THEN THE TWO-WAY STRETCH AND THE FOUR-WAY

10   STRETCH FABRICS AFTER THE REFLECTIVE ELEMENTS HAVE BEEN

11   APPLIED TO THEM.

12           SO WHAT YOU NOTICE IS THAT THE BASE MATERIAL DOES

13   HAVE HIGHER TRANSMISSION OF WATER VAPOR.  ONCE THE REFLECTIVE

14   ELEMENTS HAVE BEEN PLACED ON THE MATERIAL TO CREATE THE

15   HEATWAVE FABRIC, THE TRANSMISSION OF MOISTURE IS DECREASED.

16   HOWEVER, THE TRANSMISSION OF MOISTURE DOES STILL EXIST.

17   Q.   OKAY.

18   A.   THE OTHER TEST THAT WAS DONE WAS TO LOOK AT THE AIR

19   PERMEABILITY OF THESE SAME MATERIALS, ALSO BY PRECISION

20   TESTING.  AND ONCE AGAIN, WE SEE THE PROPERTY OF AIR

21   PERMEABILITY OF THE BASE MATERIALS IN LINES 1 AND 3, THE AIR

22   PERMEABILITY OF THE TWO-WAY STRETCH AND THE FOUR-WAY STRETCH

23   AFTER THE REFLECTIVE ELEMENTS HAVE BEEN APPLIED IN LINES 2

24   AND 4.

25           ONCE AGAIN, WE SEE THAT EVEN AFTER REFLECTIVE

701

1    ELEMENTS HAVE BEEN APPLIED TO THE FABRIC, WE DO STILL HAVE

2    PERMEABILITY OF AIR THROUGH THESE MATERIALS.

3    Q.    OKAY.  SO WHAT IS YOUR CONCLUSION ABOUT THAT CLAIM

4    LIMITATION?

5    A.    IN MY OPINION, THE ACCUSED SEIRUS HEATWAVE FABRICS DO

6    INFRINGE ON THIS PARTICULAR CLAIM ELEMENT.

7    Q.    OKAY.  SO WE'RE TALKING ABOUT CLAIM 2; CORRECT?  SO WE

8    WALKED THROUGH ALL THE LIMITATIONS OF CLAIM 1 AND NOW WE HAVE

9    TO MOVE ON TO THE FIRST PART OF CLAIM 2.

10          SO THAT SAYS, "THE HEAT MANAGEMENT MATERIAL OF

11   CLAIM 1, WHEREIN THE BASE MATERIAL COMPRISES AN INNERMOST

12   LAYER OF THE BODY GEAR HAVING AN INNERMOST SURFACE."

13          HOW DID YOU GO ABOUT ANALYZING THIS?

14   A.    CORRECT.  BECAUSE CLAIM 2 IS A DEPENDENT CLAIM, AND IT'S

15   DEPENDENT UPON CLAIM 1, IN ORDER TO INFRINGE ON CLAIM 2, THE

16   MATERIAL HAS TO INFRINGE ON EVERY ELEMENT OF CLAIM 1, BUT IN

17   ADDITION, EVERY ELEMENT OF CLAIM 2.

18          IN CLAIM 1, I'VE ALREADY ESTABLISHED THE -- THE

19   BASIS FOR MY OPINION THAT THE SEIRUS MATERIALS DO HAVE A HEAT

20   MANAGEMENT MATERIAL.  THEY DO HAVE A BASE MATERIAL.  SO I

21   HAVE TO ESTABLISH THAT THE BASE MATERIAL IS THE INNERMOST

22   LAYER OF BODY GEAR -- AGAIN, IN CLAIM 1, WE'VE ESTABLISHED

23   THAT IT'S BODY GEAR -- HAVING AN INNERMOST SURFACE.  SO THE

24   BASE MATERIAL HAS TO BE THE INNERMOST LAYER OF AN ITEM OF

25   BODY GEAR THAT HAS AN INNERMOST SURFACE.

702

1          I ESTABLISHED MY OPINION BY LOOKING AT PHOTOGRAPHS,

2     AS WELL AS BY LOOKING AT ACTUAL PRODUCT SAMPLES.  IF WE LOOK

3     AT SEIRUS' ADVERTISING MATERIAL, BOTH FOR THE HEATWAVE AND

4     THE HEATWAVE-PLUS GLOVES, WHAT WE SEE FROM THE PHOTOGRAPHS IS

5     THE SILVER MATERIAL, WHICH IS ON THE BASE MATERIAL, IS THE

6     INNERMOST LAYER; THAT IS, THE LAYER WHICH IS CLOSEST TO THE

7     SURFACE OF THE BODY OF THE WEARER.

8          THIS IS TRUE FOR BOTH THE HEATWAVE AND THE

9     HEATWAVE-PLUS GLOVE.

10    Q.   OKAY.  SO WHAT'S YOUR CONCLUSION ABOUT THAT SUBPART OF

11    THE CLAIM?

12    A.   IN MY OPINION, THE ACCUSED SEIRUS HEATWAVE PRODUCTS DO

13    INFRINGE ON THIS FIRST ELEMENT OF CLAIM 2.

14    Q.   OKAY.  AND THEN FINALLY, "WHEREIN THE HEAT-DIRECTING

15    ELEMENTS ARE POSITIONED ON THE INNERMOST SURFACE TO DIRECT

16    HEAT TOWARDS THE BODY OF A BODY GEAR USER."

17    A.   YES.  IN THIS CASE, NOT ONLY IS THE BASE MATERIAL THE

18    INNERMOST LAYER, BUT THE HEAT-DIRECTING ELEMENTS HAVE TO BE

19    DIRECTED TOWARDS THE WEARER'S BODY.

20         AND IF WE LOOK, FOR INSTANCE, AT SEIRUS' ADVERTISING

21    FOR A PRODUCT THEY CALL HEATWAVE SKULL, WE SEE THIS

22    REVERSIBLE CAP IS SHOWN BOTH BLACK TOWARDS THE OUTSIDE, AS

23    WELL AS SILVER TOWARDS THE OUTSIDE.

24         WHEN THE SILVER IS DIRECTED ON THE INSIDE, THEN THE

25    SILVER HEAT-DIRECTING ELEMENTS DO INFRINGE ON THIS ELEMENT OF

COMPUTER-AIDED TRANSCRIPTION

1   CLAIM 2.

2   Q.   I'VE GOT --

3   A.   WHEN THE SILVER IS ON THE OUTSIDE, HOWEVER, SUCH AS THE

4   SILVER SOCKS, WHICH I WAS -- SILVER GLOVE THAT I WAS ASKED

5   PREVIOUSLY IF IT INFRINGED ON THIS PARTICULAR CLAIM, THE

6   PRODUCT DOES NOT INFRINGE, BECAUSE THE ELEMENTS ARE NOT ON

7   THE CLOSEST SURFACE TO THE BODY.

8           MS. LEGAARD:  SO I'M GOING -- MAY I APPROACH, YOUR

9   HONOR?

10          THE COURT:  SURE.

11  Q.   BY MS. LEGAARD:  I WANT TO HAND YOU EXHIBIT 221.2, WHICH

12  I BELIEVE HAS BEEN ADMITTED INTO EVIDENCE.

13  A.   THANK YOU.

14  Q.   AND SO IF YOU LOOK AT THAT PRODUCT -- IT'S MARKED AS

15  IT'S SOLD IN A STORE -- DO YOU HAVE A COMMENT ON WHERE THE

16  HEAT-REFLECTIVE ELEMENTS ARE FACING?

17  A.   THE HEAT-REFLECTIVE ELEMENTS ARE FACING INWARD.  SO THE

18  CLEAR INTENTION IS THAT THIS PARTICULAR -- THIS PARTICULAR

19  ARTICLE OF CLOTHING IS DESIGNED TO BE WORN WITH THE

20  HEAT-DIRECTING ELEMENTS TOWARDS THE WEARER'S HEAD.

21          MS. LEGAARD:  OKAY.  AND I AM TOLD THAT 221.2 IS NOT

22  IN EVIDENCE.  I'D LIKE TO OFFER IT.

23          MR. SPROUL:  NO OBJECTION.

24          THE COURT:  RECEIVED.

25          (TRIAL EXHIBIT 221.2 RECEIVED IN EVIDENCE.)

1    Q.    BY MS. LEGAARD:   OKAY.   SO -- AND THEN -- SO LOOKING

2    BACK AT THE SCREEN, THE ADVERTISEMENT FROM SEIRUS, DO YOU

3    NOTICE THE WORDS "OUTER" AND "INNER"?

4    A.    YES.

5    Q.    WHAT DOES THAT SIGNIFY TO YOU?

6    A.    "OUTER" SUGGESTS THAT THIS IS THE PART OF THE CAP WHICH

7    SEIRUS INTENDS TO BE TO THE OUTSIDE OF THE WEARER'S BODY.

8    "INNER" SUGGESTS THAT THIS IS THE SIDE OF THE CAP WHICH IS

9    DESIGNED TO BE WORN TOWARDS THE WEARER'S BODY.

10            AND I'D LIKE TO NOTE, FROM MY APPAREL MANUFACTURING

11   BACKGROUND, THAT IF YOU LOOK CAREFULLY AT THE STITCHING, THE

12   SEAM WHICH JOINS THE SILVER TO THE BLACK MATERIAL, KIND OF A

13   CUFF ARRANGEMENT ON IT, ONE CAN SEE THAT THERE IS A SMALL

14   AMOUNT OF SILVER WHICH IS BELOW THE STITCHING.   THAT'S

15   NORMALLY A KIND OF FEATURE THAT ONE WOULD TRY TO CONCEAL IN A

16   GARMENT RATHER THAN ADVERTISE TO THE OUTSIDE.

17            SO THAT ALSO TELLS ME, NOT ONLY THE WORDING, BUT

18   ALSO THE CONSTRUCTION OF THE GARMENT, THAT THIS PRODUCT IS --

19   ALTHOUGH IT'S MARKETED AS REVERSIBLE, THE CLEAR INTENT IS

20   THAT THE WEARER IS LIKELY TO WEAR IT WITH SILVER SIDE TOWARDS

21   THE BODY.

22   Q.    THANK YOU.

23            WHAT ELSE DID YOU CONSIDER IN ANALYZING THIS

24   ELEMENT?

25   A.    I LOOKED AT SEIRUS' OWN ADVERTISING ABOUT REFLECTING,

1    THAT THE MATERIAL WAS GOING TO BE REFLECTING TOWARDS THE

2    WEARER'S BODY.

3    Q.    OKAY.  AND WHAT IS YOUR CONCLUSION ABOUT THE FINAL

4    SUBPART OF THIS WHOLE CLAIM 2 OF THE '270 PATENT?

5    A.    IN MY OPINION, THE ACCUSED SEIRUS HEATWAVE PRODUCTS DO

6    INFRINGE ON THIS LAST ELEMENT OF CLAIM 2.

7    Q.    OKAY.

8    A.    AND BECAUSE THE PRODUCTS, THE ACCUSED PRODUCTS INFRINGE

9    ON EACH AND EVERY ELEMENT OF CLAIM 2, AS WELL AS ON

10   INDEPENDENT CLAIM 1, THAT THE SEIRUS PRODUCTS DO INDEED

11   INFRINGE ON CLAIM 2 OF THE '270 PATENT.

12   Q.    OKAY.  THANK YOU.

13         HOW ABOUT CLAIM 23.

14   A.    CLAIM 23 IS VERY SIMILAR TO CLAIM 2, SO FORTUNATELY WE

15   DON'T HAVE TO WALK THROUGH EACH ONE OF THESE BECAUSE WE'VE

16   ALREADY WALKED THROUGH EVERYTHING EXCEPT FOR THE THIRD

17   SECTION.

18         IN CLAIM 2, THE HEAT-DIRECTING ELEMENTS ARE

19   DESCRIBED AS DISCRETE.  THEY ARE ALSO DESCRIBED AS EACH

20   ELEMENT IS INDEPENDENTLY COUPLED TO A FIRST SIDE.

21         IN CLAIM 23, THOSE RESTRICTIONS OF THE ELEMENTS

22   BEING DISCRETE AND THE RESTRICTION THAT EACH ELEMENT IS

23   INDEPENDENTLY COUPLED ARE REMOVED.  THAT IS, WE'VE STARTED

24   OFF WITH A VERY NARROW, VERY RESTRICTIVE DEFINITION, AND NOW

25   WE'RE ASKED TO HAVE A MORE EXPANSIVE KIND OF DEFINITION, ONE

706

1    THAT IS MORE INCLUSIVE.

2         BECAUSE THE ACCUSED PRODUCTS SATISFY, THAT IS, THEY

3    INFRINGE ON THE NARROWER DESCRIPTION, THEY ALSO INFRINGE ON

4    THE LESS RESTRICTIVE -- THE LESS RESTRICTED WAY OF SAYING THE

5    SAME THING.

6         SO IN MY EXPERT OPINION, THE ACCUSED HEATWAVE

7    PRODUCTS ALSO INFRINGE ON THIS LANGUAGE IN CLAIM 23, AND,

8    THEREFORE, THE ACCUSED PRODUCTS INFRINGE ON CLAIM 23 AS

9    WELL.

10   Q.   THANK YOU.  SO THE LAST THING I WANT TO TALK TO YOU

11   ABOUT.  IN YOUR OPINION, DOES HEATWAVE PROVIDE A SIGNIFICANT

12   IMPROVEMENT OVER THE PATENTED INVENTION?

13   A.   NO.

14   Q.   AND WHY NOT?

15   A.   WHAT WE'RE LOOKING AT HERE IS WHAT WAS PREVIOUSLY SHOWN,

16   THAT IS ONE OF SEIRUS' GRAPHICS, TO TRY TO DEMONSTRATE HOW

17   THEY FEEL THAT HEATWAVE TECHNOLOGY ACTUALLY FUNCTIONS.

18        I'D LIKE TO POINT OUT, THIS IS ADVERTISING.  THIS

19   ISN'T SCIENCE.

20   Q.   CAN THAT MATERIAL AMPLIFY HEAT OR INCREASE HEAT?

21   A.   NO.  I THINK THE EXAMPLE WHICH WAS GIVEN PREVIOUSLY IN

22   MR. CAREY'S TESTIMONY OF THE COFFEE CUP IS AN APPROPRIATE WAY

23   OF LOOKING AT HOW THIS TECHNOLOGY, IF IT WORKS THIS WAY,

24   WOULD BE A BENEFIT.

25   Q.   AND SO YOU HEARD MR. CAREY -- YOU WERE IN THE COURTROOM

1    WHEN MR. CAREY WAS TESTIFYING ABOUT THIS; CORRECT?

2    A.    YES.

3    Q.    AND YOU HEARD HIM DESCRIBE IT?

4    A.    YES.

5    Q.    IS IT FAIR TO SAY THAT THIS ESSENTIALLY AMOUNTS TO

6    INSULATION?

7    A.    I THINK THAT'S A REASONABLE WAY OF LOOKING AT THIS.

8    THAT YOU HAVE JUST ANOTHER LAYER OF INSULATION IN HERE.  YOU

9    DO NOT HAVE NEW TECHNOLOGY.

10   Q.    DOES COLUMBIA PUT OMNI-HEAT REFLECTIVE ELEMENTS ON

11   INSULATED FABRIC?

12   A.    I BELIEVE THAT THEY DO, IN TRYING TO PUT TOGETHER AN

13   ENTIRE PRODUCT.

14          MS. LEGAARD:  OKAY.  THANK YOU, DR. COLE.  I HAVE NO

15   FURTHER QUESTIONS.

16          THE COURT:  CROSS-EXAMINE.

17                      CROSS-EXAMINATION

18   BY MR. SPROUL:

19   Q.    GOOD AFTERNOON, DR. COLE.  THANK YOU FOR BEING HERE.

20   A.    THANK YOU.

21   Q.    I UNDERSTAND YOU'RE FROM SOUTH CAROLINA.  I HOPE YOU

22   WEREN'T IMPACTED BY THE RECENT STORMS.

23   A.    WE LOST POWER FOR A LITTLE OVER 24 HOURS.  THERE WERE

24   WELL OVER A HUNDRED THOUSAND PEOPLE IN OUR AREA, HOWEVER,

25   THAT LOST POWER.  BUT THANK YOU FOR YOUR CONCERN.  IT'S A

708

```
1    LONG RECOVERY PROCESS.

2    Q.   UNDERSTOOD.  THANK YOU FOR YOUR TIME.

3         YOU TESTIFIED AT THE END OF YOUR OPENING, OR YOUR

4    DIRECT TESTIMONY THERE, THAT CLAIM 2 IS NARROWER THAN

5    CLAIM 23; IS THAT RIGHT?

6    A.   THAT'S CORRECT.

7    Q.   AND THAT IF CLAIM 2 IS INFRINGED, CLAIM 23 IS

8    NECESSARILY INFRINGED AS WELL?

9    A.   CORRECT.  BECAUSE CLAIM 23 DOESN'T HAVE THE LIMITATIONS

10   THAT CLAIM 2 HAS.

11   Q.   BY EXTENSION, IF CLAIM 2 IS INVALID, CLAIM 23 IS ALSO

12   NECESSARILY INVALID FOR THE SAME REASONS?

13   A.   NO, NOT NECESSARILY.  BECAUSE THE DISTINCTION BETWEEN

14   CLAIM 2 AND CLAIM 23 IS DISCRETE ELEMENTS WHICH ARE

15   INDEPENDENTLY COUPLED.

16   Q.   RIGHT.

17   A.   ONE COULD HAVE NON-DISCRETE ELEMENTS WHICH ARE, ARE OR

18   ARE NOT INDEPENDENTLY COUPLED AND STILL SATISFY CLAIM 23 BUT

19   NOT SATISFY CLAIM 2, AND, THEREFORE, NOT INFRINGE ON CLAIM 2

20   BUT INFRINGE ON CLAIM 23.

21   Q.   YOU TESTIFIED THAT CLAIM 2 WAS NARROWER?

22   A.   IT'S MORE DEMANDING.

23   Q.   RIGHT.  AND IF YOU MEET THE MORE DEMANDING REQUIREMENT

24   OF CLAIM 2, YOU NECESSARILY MEET THE LESS DEMANDING

25   REQUIREMENTS OF CLAIM 23?  THAT WAS MY QUESTION.
```

709

1    A.    THAT'S CORRECT.   THAT'S CORRECT.

2    Q.    SO FOR INVALIDITY -- MAYBE I SAID IT WRONG.   IF CLAIM 2

3    IS INVALID, CLAIM 23 IS ALSO NECESSARILY INVALID OVER THE

4    SAME PIECE OF PRIOR ART?

5    A.    NO, NOT NECESSARILY.

6    Q.    WELL, WE'LL GET TO THAT LATER.   I THINK IT'S

7    INCONSISTENT WITH WHAT YOU JUST SAID, THAT 2 BEING NARROWER

8    AND 23 BEING BROADER, THAT THE BROADER CLAIM COULD STILL BE

9    VALID AND YET THE NARROWER COULD BE INVALID.   BUT THAT'S FOR

10   ANOTHER TIME.

11   A.    IT'S MY OPPORTUNITY TO DISCUSS THAT NEXT WEEK.

12   Q.    SORRY FOR SPEAKING OVER YOU.

13         YOUR TESTIMONY ABOUT THE -- I GUESS YOUR NORMAL WORK

14   WITH REGARD TO THE DEPARTMENT OF DEFENSE SOUNDED VERY

15   INTERESTING.   I WISH WE COULD ASK YOU MORE QUESTIONS ABOUT

16   THAT.   BUT WE'RE NOT HERE TO TALK ABOUT THAT TODAY, ARE WE?

17   A.    I HOPE NOT.

18   Q.    WE ARE, IN FACT, HERE TO TALK ABOUT COLUMBIA'S LAWSUIT

19   AGAINST SEIRUS AND NOT YOUR DEPARTMENT OF DEFENSE WORK, WHICH

20   I THANK YOU FOR.

21         YOU ARE A HIRED EXPERT IN THIS CASE, I THINK YOU

22   TESTIFIED TO?

23   A.    THAT'S CORRECT.

24   Q.    AND YOU WERE HIRED THROUGH A THIRD-PARTY EXPERT FIRM; IS

25   THAT RIGHT?

710

1    A.    THAT'S CORRECT.

2    Q.    SO YOU PUT YOUR NAME OUT TO THIS FIRM.  THEY THEN SHOP

3    YOU AROUND TO DIFFERENT LAW FIRMS OR COMPANIES WHO MIGHT BE

4    INVOLVED IN LITIGATION OR HAVE NEED OF AN EXPERT; IS THAT

5    RIGHT?

6    A.    THE THIRD PARTY APPROACHED ME A NUMBER OF YEARS AGO AND

7    ASKED IF I WOULD BE WILLING TO BE A TEXTILE EXPERT.  AND I

8    SENT THEM A C.V.

9          I HAVE WORKED WITH THEM PREVIOUSLY ON ONE PATENT

10   INFRINGEMENT CASE AS WELL.

11   Q.    HOW MANY PATENT CASES HAVE YOU DONE?  STRIKE THAT.

12         HOW MANY PATENT CASES HAVE YOU TESTIFIED IN OR BEEN

13   ENGAGED FOR?

14   A.    I GUESS THE TOTAL IS PROBABLY ABOUT FIVE.  IT'S ALL ON

15   THE FRONT PAGE OF MY C.V.  SO I DON'T DO VERY MANY.  WORKING

16   PATENT INFRINGEMENT, IT'S A VERY SMALL PART OF HOW I SPEND MY

17   TIME.

18   Q.    YOU TYPICALLY SPEND, OVER THE COURSE OF A YEAR, MAYBE 5

19   TO 10 PERCENT OF YOUR TIME DOING EXPERT WITNESS WORK; IS THAT

20   CORRECT?

21   A.    THAT'S WHAT I SAID AT MY DEPOSITION.  THAT'S CORRECT.

22   OBVIOUSLY THERE ARE WEEKS DURING THE YEAR, SUCH AS THIS WEEK

23   AND NEXT WEEK, THAT I'M ALMOST 100 PERCENT WORKING ON THIS.

24   BUT THE REST OF THE TIME, FOR INSTANCE, FOR THE LAST YEAR, I

25   THINK I WAS APPROACHED MAYBE A TOTAL OF LESS THAN A DAY.

711

1    Q.    UNDERSTOOD.

2          NOW, YOU ARE BEING COMPENSATED FOR YOUR TIME IN THIS

3    CASE AT THE RATE OF $325 PER HOUR; IS THAT RIGHT?

4    A.    THAT'S CORRECT.

5    Q.    AND FOR YOUR TIME THAT YOU SPEND UNDER OATH TESTIFYING,

6    YOU HAVE A 50 PERCENT PREMIUM; IS THAT RIGHT?

7    A.    THAT'S CORRECT.

8    Q.    SO THAT MEANS YOU MAKE APPROXIMATELY AN EXTRA $160 AN

9    HOUR TO SIT THERE AND TESTIFY IN FRONT OF THE JURY; IS THAT

10   RIGHT?

11   A.    THAT IS CORRECT.

12   Q.    I'M NOT SURE MY QUESTIONS ARE WORTH THAT, BUT PERHAPS

13   MS. LEGAARD'S ARE.

14          HOW MUCH IN TOTAL HAS COLUMBIA PAID YOU FOR YOUR

15   WORK IN THIS LITIGATION?

16   A.    I HAVE NO IDEA.

17   Q.    CAN YOU GIVE ME A BALLPARK?

18   A.    ALL I CAN TELL YOU IS THEY HAVE PAID EVERY INVOICE ON

19   TIME.

20   Q.    AND YOU'VE BEEN ENGAGED FOR HOW MANY YEARS IN THIS

21   CASE?

22   A.    I WAS ORIGINALLY APPROACHED AT THE TIME OF CLAIMS

23   CONSTRUCTION, WHICH I GUESS GOES BACK NOW CLOSE TO 24 MONTHS.

24   I'M NOT SURE OF THE DATES.  AT A FAIRLY MINOR LEVEL.  MORE

25   DEFINITIONS OF A COUPLE OF TERMS.

712

```
 1              MY EXTENSIVE WORK, HOWEVER, HAS BEEN THE TEST WORK,
 2    THE PREPARATION OF MY EXPERT REPORTS, AS WELL AS PREPARATION
 3    NOW FOR TRIAL AND THE DEPOSITION.  SO IT'S BEEN A VERY
 4    INTERMITTENT KIND OF PROCESS FORTUNATELY FOR MY OTHER
 5    PROJECTS.
 6    Q.   DO YOU KNOW IF YOU'VE BEEN PAID MORE THAN $50,000 FOR
 7    YOUR WORK IN THIS CASE?
 8    A.   I LITERALLY HAVE NO IDEA.
 9    Q.   WAS IT MORE THAN $500,000?
10    A.   OH, NO.  LESS THAN THAT.
11    Q.   MORE THAN $100,000?
12    A.   LESS THAN THAT.
13    Q.   SOMEWHERE BETWEEN 100 AND 50 THOUSAND DOLLARS?
14    A.   PERHAPS.  I MEAN, LITERALLY I WOULD HAVE TO GO BACK AND
15    CHECK MY BILLING RECORDS.  BECAUSE I DON'T KEEP TRACK OF
16    THAT.
17              THE PAYMENT TO ME ACTUALLY IS MADE TO A SMALL
18    BUSINESS OF WHICH I AM PRESIDENT.  AND THAT SMALL BUSINESS, I
19    USE THE MONEY THAT COMES IN TO FUND SOME SCHOLARSHIPS FOR
20    UNDERGRADUATE STUDENTS AT CLEMSON.  I FUNDED PART OF A
21    50TH-YEAR CELEBRATION FOR ONE OF THE PROFESSIONAL
22    ORGANIZATIONS.  I DONATED MONEY TO A FOUNDATION RUN BY A
23    PROMINENT TEXTILE MANUFACTURER WHO RECENTLY DIED.  I BOUGHT
24    EQUIPMENT WITH IT.  SO IT'S NOT THE SORT OF THING THAT I PAY
25    MYSELF A SALARY.
```

713

1    Q.   SO YOU'VE GIVEN AWAY ALL THE MONEY THAT YOU'VE MADE AS

2    PART OF YOUR WORK IN THIS CASE; IS THAT WHAT YOU'VE

3    TESTIFYING?

4    A.   NO, NOT ALL THE MONEY HAS BEEN GIVEN AWAY.  BUT IT SITS

5    WITHIN THE C-CORPORATION.  IT DOESN'T SIT ON MY PERSONAL

6    INCOME TAX RETURN.

7    Q.   FAIR ENOUGH.  WE WON'T TELL THE I.R.S.  THAT'S NOT WHAT

8    WE'RE CONCERNED WITH HERE.

9         BUT YOU CONTROL THAT C-CORPORATION?

10   A.   YES, I DO.

11   Q.   OKAY.  DO YOU BELIEVE HANG TAGS INFRINGE ANY OF THE

12   PATENTS IN THE SUIT?

13   A.   A HANG TAG CAN'T INFRINGE BECAUSE WHAT'S AT ISSUE IS A

14   HEAT MANAGEMENT MATERIAL ADAPTED FOR USE IN BODY GEAR, NOT A

15   HANG TAG.

16   Q.   SO THE HANG TAG IS NOT ACCUSED OF INFRINGING THE DESIGN

17   PATENT; CORRECT?

18   A.   THAT'S CORRECT.  WELL, OKAY.  I DON'T HAVE TO RULE ON

19   INFRINGEMENT OF THE DESIGN PATENT FOR ANY OF THESE PRODUCTS

20   WHATSOEVER, BECAUSE THE COURT HAS ALREADY RULED THAT THE

21   SEIRUS HEATWAVE FABRICS WITH THE PRODUCTS THAT INCORPORATE

22   FABRIC WITH THE WAVY DESIGN INFRINGE.

23   Q.   CORRECT.  THE FABRIC, THE PRODUCT, NOT THE DESIGN -- NOT

24   THE HANG TAG?

25   A.   CORRECT.  THE DESIGN PATENT PERTAINS TO A HEAT

714

1    MANAGEMENT MATERIAL.

2    Q.    OKAY.

3    A.    NOT TO A HANG TAG, NOT TO A CURTAIN, NOT TO A PATTERN ON

4    A CARPET.  AND IT HAS TO BE HEAT REFLECTIVE.

5    Q.    AND SIMILARLY, THE UTILITY PATENT, THE '270 PATENT AT

6    ISSUE IN THIS CASE, IS NOT DIRECTED TO AND DOES NOT COVER A

7    HANG TAG; IS THAT RIGHT?

8    A.    THAT'S CORRECT.  THE UTILITY PATENT IS ALSO DIRECTED TO

9    A HEAT MANAGEMENT MATERIAL, NOT TO A PAPER OR ANYTHING

10   ASSOCIATED, OTHER THAN THE HEAT MANAGEMENT MATERIAL AND THE

11   PRODUCTS IT INCORPORATED.

12   Q.    AND THE PICTURES OF WAVES IN ADVERTISING THAT ARE ON THE

13   HANG TAGS ARE NOT EVIDENCE THEMSELVES OF INFRINGEMENT; IS

14   THAT RIGHT?

15   A.    I THINK THEY ARE EVIDENCE OF HOW SEIRUS PERCEIVES THAT

16   ITS PRODUCT OPERATES.  AND THAT'S WHY I SHOWED THEM AS

17   EXAMPLES OF HOW SEIRUS FEELS THE HEATWAVE PRODUCT WORKS,

18   WHICH IS BACKED UP BY THE INDEPENDENT TESTING WHICH WAS DONE

19   AS WELL.

20   Q.    I NOTICED AT THE END OF YOUR TESTIMONY THERE, WHEN YOU

21   WERE ANALYZING THE STATEMENT IN SEIRUS' MARKETING MATERIAL

22   REGARDING THE KINETIC ENERGY CLAIM, YOU DISMISSED THAT

23   PARTICULAR PIECE OF ADVERTISING AS MARKETING.

24           DO YOU RECALL THAT?

25   A.    YES.

715

1    Q.    YOU SAID, THIS ISN'T SCIENCE.  THIS IS MARKETING?

2    A.    THAT'S CORRECT.  IT'S NOT SCIENCE.

3    Q.    THE ENTIRETY OF IT IS MARKETING; RIGHT?

4    A.    THE PORTION OF THAT PARTICULAR IMAGE WHICH REFERS TO THE

5    AMPLIFICATION OF HEAT AND THE KINETIC ENERGY IS NOT SCIENCE.

6    IT'S NOT SUPPORTED IN SCIENCE.

7    Q.    I WANT TO ASK YOU ABOUT YOUR INFRINGEMENT THEORIES.  AND

8    I THINK THE RECORD IS CLEAR, BUT I WANT TO MAKE SURE WE ARE

9    ALL ON THE SAME PAGE.

10          WHAT I HAVE HERE IS EXHIBIT 220 THAT I THINK HAS

11   ALREADY BEEN OFFERED AND ACCEPTED.  AND WE'RE NOT TALKING

12   ABOUT THE DESIGN PATENT, SO WE'RE ON THE SAME PAGE.  WHEN I

13   REFER TO THE PATENT ON INFRINGEMENT, WE ARE TALKING ABOUT THE

14   UTILITY PATENT, BECAUSE THAT'S THE ONLY ISSUE THE JURY NEEDS

15   TO DECIDE.

16          FAIR ENOUGH?

17   A.    UNDERSTOOD.

18   Q.    EXHIBIT 220 IS NOT ACCUSED OF INFRINGEMENT IN THIS CASE;

19   ISN'T THAT RIGHT?

20   A.    THAT'S CORRECT.

21   Q.    THE FABRIC USED IN THE PRODUCT IN EXHIBIT 220 IS THE

22   EXACT SAME FABRIC IN THE ACCUSED PRODUCTS; ISN'T THAT

23   RIGHT?

24   A.    I DON'T KNOW THAT INDEPENDENTLY.  BUT IF YOU'RE

25   REPRESENTING THAT IT IS THE SAME FABRIC, I WILL ACCEPT THAT

716

1    THEY ARE SIMILAR ENOUGH THAT WE CAN CONSIDER THEM FOR

2    DISCUSSION AS THE SAME FABRIC.

3    Q.   HOW IS IT THAT YOU DON'T KNOW THAT?

4    A.   WELL, I DON'T THINK I'VE EVER HAD MY HANDS ON THAT GLOVE

5    TO BE ABLE TO ANALYZE THE FABRIC WHICH IS IN THERE.

6         BUT IF YOU'RE WILLING TO REPRESENT TO ME THAT IT IS

7    THE SAME FABRIC AS ONE OF THE BATES-NUMBERED SEIRUS FABRICS

8    WHICH I TESTED, THEN I WILL ACCEPT THAT WITH THE COURT'S

9    APPROVAL.

10             MR. SPROUL:  MAY I APPROACH THE WITNESS, YOUR HONOR?

11             THE COURT:  SURE.

12             THE WITNESS:  THANK YOU.

13             MR. SPROUL:  YOUR HONOR, I OFFER EXHIBIT 220.

14   APPARENTLY IT WAS NOT OFFERED.

15             THE COURT:  ANY OBJECTION TO 220?

16             MS. LEGAARD:  NO.

17             THE COURT:  RECEIVED.

18        (TRIAL EXHIBIT 220 RECEIVED IN EVIDENCE.)

19             MR. SPROUL:  THERE IS NO EXHIBIT NUMBER ON THIS.

20   DID IT COME OFF?

21             MR. ALDRICH:  SETH, I BELIEVE IT'S EXHIBIT 696 IN

22   THE BOX THAT'S CURRENTLY IN THE WITNESS BOOTH RIGHT NOW.

23             MR. SPROUL:  UNDERSTOOD.  THERE WE GO.

24             THE WITNESS:  THE HEAT TOUCH.

25             MR. SPROUL:  I'M GOING TO HAND TO YOU -- I'VE HANDED

COMPUTER-AIDED TRANSCRIPTION

1    YOU EXHIBIT 220 AND EXHIBIT 696, WHICH I BELIEVE HAS BEEN

2    OFFERED.

3    Q.    AND YOU ARE ACCUSING EXHIBIT 696 OF INFRINGEMENT?

4    A.    CORRECT.

5    Q.    CAN YOU CONFIRM, CAN YOU COMPARE THE FABRICS IN 696 AND

6    220, PLEASE.

7    A.    WELL, UNDERSTAND THAT AN ANALYSIS WHICH INCLUDES A

8    DETAILED COMPARISON IS SOMETHING THAT I CAN'T DO SIMPLY

9    SITTING HERE.  SO I CAN VISUALLY LOOK AT THESE FABRICS.  I

10   CAN TOUCH THEM.  AND, YES, THEY APPEAR TO BE VERY SIMILAR TO

11   THE FIVE SEIRUS FABRICS THAT I DID EXAMINE.

12        AGAIN, THAT'S TO SAY, IF YOU'RE WILLING TO REPRESENT

13   TO ME THAT THIS IS THE SAME FABRIC, THAT IT HAS SIMILAR

14   PROPERTIES, I'M WILLING TO -- I'M WILLING TO ACCEPT THAT IN

15   MY RESPONSES TO YOUR FURTHER QUESTIONS.

16   Q.    DID YOU COMPARE THE FABRICS THAT YOU MEASURED TO EVERY

17   SEIRUS GLOVE?

18   A.    I COMPARED THEM AS FAR AS THE POSITIONING ON THE

19   HEAT-REFLECTIVE ELEMENTS, AS WELL AS THE POSITION ON THE BASE

20   LAYERS.

21   Q.    HOW MANY SEIRUS GLOVES DID YOU PHYSICALLY INSPECT AND

22   COMPARE TO THE FABRIC THAT YOU MEASURED?

23   A.    YOU WOULD HAVE TO LOOK BACK AT MY EXPERT REPORT ON THAT,

24   WHICH DELINEATES HOW MANY SEIRUS PRODUCTS THAT I ACTUALLY

25   CONSIDERED IN FORMING MY OPINION.

718

1    Q.    SITTING HERE NOW, CAN YOU TELL ME HOW MANY SEIRUS

2    PRODUCTS YOU ACTUALLY TOUCHED AND PHYSICALLY INSPECTED, SINCE

3    THAT APPARENTLY IS A DISTINCTION FOR YOU?

4    A.    WHEN I SHIPPED BACK ALL OF THE PRODUCTS TO SEIRUS'

5    EXTERNAL COUNSEL OVER A YEAR AGO, I REMEMBER SHIPPING ABOUT

6    SIX FULL BANKERS BOXES OF PRODUCTS.  SOME OF WHICH WERE

7    COLUMBIA'S, BUT MOST OF WHICH WERE SEIRUS'S.

8          HOW MANY OF THOSE WERE GLOVES VERSUS OTHER PRODUCTS,

9    I REALLY DON'T RECALL, BUT YOU'LL FIND IN MY OPENING EXPERT

10   REPORT A DELINEATION BY BATES NUMBER, EXHIBIT NUMBER, SOME

11   UNIQUE IDENTIFIER, EVERY ONE THAT I LOOKED AT.

12   Q.    SO YOUR PHYSICAL INSPECTION OF EXHIBITS -- EXCUSE ME.

13   STRIKE THAT.

14         YOUR PHYSICAL INSPECTION OF SEIRUS GLOVES AND THOSE

15   FOR WHICH YOU CAN OFFER AN OPINION ON ARE LIMITED TO THOSE

16   SPECIFIC GLOVES IDENTIFIED IN YOUR EXPERT REPORT; IS THAT

17   YOUR TESTIMONY?

18   A.    AS WELL AS THOSE SEIRUS --

19   Q.    I'M SORRY.  IS THAT YOUR TESTIMONY?  IT'S A "YES" OR

20   "NO" ANSWER, MA'AM.

21   A.    I'M SORRY.  I'M AN ACADEMIC.  WE DON'T GIVE YES OR NO

22   ANSWERS, BECAUSE WE'VE LEARNED THAT THERE ARE TOO MANY

23   DETAILS THAT END UP GETTING LEFT OUT IN YES OR NO ANSWERS.

24         SO WOULD YOU LIKE THE FULL ANSWER?

25   Q.    THAT QUESTION WAS CLEAR ENOUGH, BASED ON THE DISTINCTION

719

1    THAT YOU MADE WHEN I PRESENTED YOU WITH EXHIBIT 220 AND ASKED

2    YOU A RELATIVELY SIMPLE QUESTION, AFTER YOUR DETAILED

3    ANALYTICAL TESTIMONY THAT YOU GAVE EARLIER.  AND YOU REFUSED

4    TO ANSWER IT ON THE BASIS THAT YOU DIDN'T HAVE THAT PRODUCT

5    AND YOU HADN'T DONE A COMPARISON.

6         MY QUESTION TO YOU NOW IS:  ARE YOU LIMITING YOUR

7    TESTIMONY, YOUR CLAIM OF INFRINGEMENT TO THOSE PRODUCTS

8    SPECIFICALLY IDENTIFIED IN YOUR EXPERT REPORT AS THE ONES

9    THAT YOU OBSERVED AND PHYSICALLY INSPECTED?

10   A.   THE ADDITIONAL PIECE OF INFORMATION IS I WAS TOLD THAT

11   THE SEIRUS TWO-WAY FABRIC STRETCH AND THE FOUR-WAY FABRIC

12   STRETCH WERE THE ONLY HEATWAVE FABRICS WHICH SEIRUS HAD

13   INCORPORATED INTO THEIR BODY GEAR PRODUCTS.  IN PARTICULAR,

14   THAT THE FOUR-WAY STRETCH WAS PREDOMINANTLY THE HEATWAVE

15   FABRIC THAT WAS INCORPORATED.

16        IF YOU'RE REPRESENTING TO ME THAT THERE ARE OTHER

17   SEIRUS FABRICS WHICH I HAVE NOT BEEN PRIVY TO THAT HAVE BEEN

18   INCORPORATED IN PRODUCTS THAT DO NOT FALL WITHIN THESE FIVE

19   SEIRUS BATES-NUMBERED FABRICS THAT I'VE EXAMINED, THEN I

20   WOULD SAY I WOULD NEED TO EXAMINE THOSE ADDITIONAL FABRICS.

21   BUT THOSE ADDITIONAL FABRICS SHOULD HAVE BEEN MADE AVAILABLE

22   TO ME DURING THE DISCOVERY PROCESS.

23   Q.   THERE ARE NO ADDITIONAL FABRICS --

24   A.   IN WHICH CASE --

25   Q.   -- DR. COLE.

1    A.   -- IF THE FIVE FABRICS WHICH WERE FURNISHED THROUGH THE

2    DISCOVERY PROCESS TO ME DO REPRESENT THE ENTIRE UNIVERSE OF

3    HEATWAVE FABRICS WHICH SEIRUS HAS HAD INCORPORATED INTO ITS

4    PRODUCTS, THEN, YES, MY OPINION COVERS THOSE OTHER PRODUCTS;

5    EVEN THE ONES WHICH I HAVE NOT PHYSICALLY EXAMINED, AS LONG

6    AS I CAN SEE A PHOTOGRAPH OR HAVE A PHYSICAL LOOK TO MAKE

7    SURE THAT THE HEAT-REFLECTIVE ELEMENTS ARE ON THE INNERMOST

8    SURFACE.

9    Q.   I'M NOT REPRESENTING TO YOU THAT THE FABRICS YOU LOOKED

10   AT ARE INDICATIVE OF EVERY PRODUCT USED.  I'M ASKING YOU

11   ABOUT EXHIBIT 220 AND WHETHER OR NOT THAT LOOKS LIKE THE

12   FABRIC THAT YOU ANALYZED AND WHETHER YOU CAN SEE ANY

13   DIFFERENCES BETWEEN THAT FABRIC AND THE FABRICS THAT YOU

14   ACTUALLY MEASURED?

15   A.   THERE ARE -- THERE ARE NO OBVIOUS PHYSICAL DIFFERENCES

16   TO ME AS I SIT HERE BETWEEN THE FABRIC AS I SEE IT IN

17   EXHIBIT 220 AND THE FIVE FABRICS WHICH I EXAMINED AND

18   DETAILED.

19   Q.   OKAY.  I WILL REPRESENT TO YOU THAT EXHIBIT 220 IS

20   REPRESENTATIVE -- OR IS REPRESENTED BY THE FIVE FABRICS THAT

21   YOU MEASURED.

22   A.   THANK YOU.

23   Q.   IT'S YOUR TESTIMONY THAT EXHIBIT 220 DOES NOT INFRINGE

24   ANY OF THE TWO CLAIMS OF THE '270 PATENT?

25   A.   THAT'S CORRECT.  EXHIBIT 220 IS NOT AN ACCUSED PRODUCT

1    OF CLAIM -- EITHER CLAIM 2 OR CLAIM 23 OF THE '270 PATENT.

2              MR. SPROUL:  YOUR HONOR, MAY I APPROACH THE WITNESS?

3              THE COURT:  SURE.

4              MR. SPROUL:  I'D LIKE TO GRAB THAT EXHIBIT BACK FROM

5    YOU SO I CAN HOLD IT.

6              THE WITNESS:  SURE.

7              MR. SPROUL:  THANK YOU.

8    Q.   SO DR. COLE, EXHIBIT 220 IS A HEATWAVE LINER GLOVE; IS

9    THAT RIGHT?

10   A.   YES.

11   Q.   METALLIC ELEMENTS ARE FACING OUT?

12   A.   YES.

13   Q.   IT HAS ALL THE SAME WONDERFUL FEATURES AND BENEFITS OF

14   THE ACCUSED PRODUCTS; ISN'T THAT RIGHT?

15   A.   I HAVEN'T TESTED WHAT ITS HEAT REFLECTIVITY IS IN THAT

16   CONFIGURATION, BUT, YES, IF IT'S THE SAME FABRIC, THEN ONE

17   WOULD I THINK REASONABLY ASSUME THAT IT HAS THE SAME

18   PROPERTIES OF A BASE -- OF THE BASE MATERIAL.

19   Q.   AND YET IT DOESN'T -- IT DOES NOT INFRINGE.  THAT'S YOUR

20   OPINION?

21   A.   IT DOES NOT INFRINGE CLAIM 2, THAT'S CORRECT.  NOT IN

22   THAT CONFIGURATION.

23              MR. SPROUL:  I WOULD LIKE TO GRAB AN EXAMPLE OF A

24   FABRIC THAT'S ALREADY BEEN INTRODUCED.

25              COUNSEL, DO YOU HAVE THE OMNI-HEAT FABRIC?

722

1          THE COURT:  IT'S UP IN THE BOX NEXT TO THE JURY BOX.

2     Q.   BY MR. SPROUL:  DR. COLE, I'M HOLDING IN MY HAND WHAT'S

3     ALREADY BEEN INTRODUCED AS EXHIBIT 629.

4          DO YOU SEE THIS?

5     A.   YES, I DO.  DO YOU HAVE THE BATES NUMBER ON THAT SAMPLE?

6     CAN YOU READ ME THE LAST FOUR DIGITS, PLEASE.

7     Q.   I DO NOT SEE A BATES NUMBER ON THIS SAMPLE.  WOULD THE

8     BATES NUMBER RING A BELL, SIX RANDOM DIGITS?

9     A.   ACTUALLY, IT'S THE LAST FOUR I DO KNOW WELL.

10    Q.   THERE ARE SOME IDENTIFYING NUMBERS ON HERE.  A URI

11    NUMBER OR A PDM NUMBER, BUT I DON'T SEE A BATES NUMBER.

12    A.   OKAY.  THANK YOU.

13         MR. SPROUL:  COUNSEL, DO YOU KNOW IF THERE IS A

14    BATES NUMBER ASSOCIATED WITH THIS FABRIC?

15         THE WITNESS:  IF THERE IS A URI NUMBER ON IT, WHAT'S

16    THE LETTER?

17         MR. SPROUL:  J.

18         THE WITNESS:  OKAY.  THAT IS NOT ONE OF THE ORIGINAL

19    TWO FABRICS, THE TWO-WAY STRETCH AND THE FOUR-WAY STRETCH.

20    THIS IS ONE OF THE THREE FABRICS WHICH I WAS PROVIDED WITH

21    LATER.

22    Q.   BY MR. SPROUL:  THIS IS AN OMNI-HEAT, A COLUMBIA

23    OMNI-HEAT FABRIC.

24    A.   OH, IT'S OMNI-HEAT OR HEATWAVE?

25    Q.   THIS IS A COLUMBIA --

1    A.   I'M SORRY.  I CAN'T SEE IT FROM HERE.

2    Q.   I'M SORRY.  I WASN'T TRYING TO TRICK YOU.  I WAS GETTING

3    THERE.

4         BUT EXHIBIT 629 IS THE COLUMBIA OMNI-HEAT FABRIC.

5    A.   OH, OKAY.  THANK YOU.  THANK YOU FOR THE CLARIFICATION.

6    I WOULD NEED A MUCH CLOSER LOOK TO BE SURE.

7    Q.   SO WE'RE CLEAR, THIS FABRIC WOULD INFRINGE IN A DEVICE

8    OR A GLOVE, PIECE OF BODY GEAR, AS LONG AS IT'S FACING

9    TOWARDS THE SKIN IN THIS FASHION; IS THAT RIGHT?

10   A.   WELL, IT'S DIFFICULT FOR A PATENT HOLDER TO INFRINGE ON

11   ITS OWN PATENT.  SO IN THAT CASE, IT'S KIND OF IMPOSSIBLE FOR

12   COLUMBIA TO INFRINGE WITH THAT FABRIC ON ITS OWN PATENT.

13   Q.   YOU HAVE OFFERED AN OPINION THAT THE COLUMBIA OMNI-HEAT

14   FABRIC PRACTICES THE CLAIMS OF THE '270 PATENT, CLAIM 2 FOR

15   INSTANCE; ISN'T THAT RIGHT?

16   A.   CORRECT.

17   Q.   AND LET ME ASK IT IN THAT FASHION.  YOU'RE RIGHT.

18   COLUMBIA CERTAINLY DOESN'T INFRINGE ITS OWN PATENT.

19        BUT EXHIBIT 629 WOULD BE COVERED BY THE ELEMENTS OF

20   CLAIM 2 WHEN IT IS USED IN A PIECE OF BODY GEAR AND ORIENTED

21   IN THIS WAY TOWARDS A USER'S HAND; IS THAT RIGHT?

22   A.   IF -- IF THE REFLECTIVE ELEMENTS ON THAT PIECE OF FABRIC

23   ARE DIRECTED TOWARDS THE HAND OF THE WEARER, THEN THAT WOULD

24   BE INCLUDED IN CLAIM 2, THAT'S CORRECT.

25   Q.   IF IT'S ORIENTED REVERSED, SUCH THAT THE METALLIC

1    ELEMENTS ARE FACING OUT, IT DOES NOT INFRINGE; ISN'T THAT

2    RIGHT?

3    A.    DOES NOT INFRINGE ON CLAIM 2.  BUT, OF COURSE, AS YOU'RE

4    AWARE, THERE ARE MANY OTHER CLAIMS IN THE '270 PATENT THAN

5    SIMPLY CLAIM 2.

6    Q.    DR. COLE, THOSE CLAIMS ARE NOT AT ISSUE IN THIS CASE,

7    AND THE JURY IS NOT CONSIDERING THOSE CLAIMS.

8    A.    I UNDERSTAND.

9    Q.    ISN'T THAT RIGHT?

10   A.    I UNDERSTAND.  AND THAT'S WHY WE'RE NOT DISCUSSING THEM.

11   AND WE'RE NOT DISCUSSING PRODUCTS OTHER THAN THE ONES THAT

12   ARE ACCUSED OF INFRINGING SPECIFICALLY ON CLAIM 2 AND

13   CLAIM 23.

14   Q.    WELL, WE ARE DISCUSSING THOSE PRODUCTS, BECAUSE THEY ARE

15   RELEVANT TO THE BOUNDS, THE METES AND BOUNDS OF THE CLAIMS AT

16   ISSUE.  AND I'M ASKING YOU QUESTIONS ABOUT THEM.

17         AND I JUST WANT TO MAKE SURE THAT YOUR TESTIMONY IS

18   CLEAR, THAT ORIENTED IN THIS FASHION, WITH THE METALLIC

19   ELEMENTS FACING AWAY, EXHIBIT 629 WOULD NOT INFRINGE WHEN

20   PAIRED WITH A PIECE OF BODY GEAR?

21   A.    THAT'S CORRECT.  DOES NOT INFRINGE ON EITHER CLAIM 2 OR

22   CLAIM 23 OF THE '270 PATENT.

23   Q.    I'M GOING TO DO MY BEST TO FOLD THIS UP AND RETURN IT.

24   MY WIFE SAYS I DON'T KNOW HOW TO FOLD VERY WELL, AND I'M NOT

25   GOING TO BECOME BETTER IMMEDIATELY HERE TODAY.

725

1          I BELIEVE YOU'VE OFFERED TESTIMONY ABOUT A SEIRUS

2    SKULL CAP, SPECIFICALLY THE REVERSIBLE SKULL CAP?

3    A.    THAT'S CORRECT.

4    Q.    AND I HAVE HERE EXHIBIT 221.  I BELIEVE YOU WERE ASKED

5    ABOUT THIS --

6    A.    YES, I WAS.

7    Q.    -- IN YOUR OPENING.

8          AND YOU MADE A DISTINCTION BETWEEN WHETHER IT WAS

9    FACING OUT OR WHETHER IT WAS FACING IN; RIGHT?

10   A.    THAT'S CORRECT.

11   Q.    INFRINGING; CORRECT?

12   A.    YES.

13   Q.    NOT INFRINGING?

14   A.    CORRECT.

15   Q.    INFRINGING?

16   A.    CORRECT.

17   Q.    NOT INFRINGING?

18   A.    CORRECT.  NOT CLAIM 2 OR CLAIM 23.

19   Q.    THE ONLY CLAIMS WE CARE ABOUT; ISN'T THAT RIGHT?

20   A.    THAT'S CORRECT, IN THIS CASE.

21   Q.    NOW, THERE IS A REASON FOR THIS, ISN'T THERE?  AND THAT

22   IS BECAUSE THE CLAIMS HAVE A LIMITATION REQUIRING THAT THE

23   HEAT-REFLECTIVE MATERIAL BE ON THE INNERMOST SURFACE OF THE

24   BODY GEAR; ISN'T THAT RIGHT?

25   A.    CORRECT.

COMPUTER-AIDED TRANSCRIPTION

726

1    Q.    THE INNERMOST SURFACE OF THE INNER LAYER OF THE BODY

2    GEAR?

3    A.    THAT'S CORRECT.    THAT'S THE LIMITATION ON THE CLAIMS.

4    Q.    I'M SORRY.    THAT IS THE LIMITATION IN THE CLAIMS.

5            DO YOU UNDERSTAND WHERE THIS LIMITATION -- OR THE

6    PROVENANCE OF THIS LIMITATION?

7    A.    THIS IS AN INVENTION FROM MR. BLACKFORD.    I ASSUME AT

8    THE TIME THAT HE CAME UP WITH THE INVENTION, HE HAD AN IDEA

9    OF HOW THE PRODUCT WOULD BE USED.

10   Q.    IT'S A COMBINATION OF MR. BLACKFORD AND THE PATENT

11   OFFICE.    THERE IS A BACK-AND-FORTH, ISN'T THERE, DURING THE

12   PROSECUTION OF THE PATENT?

13   A.    TYPICALLY THERE IS.

14   Q.    AND THERE WAS, IN FACT, IN THIS CASE?

15   A.    CORRECT.

16   Q.    AND YOU ANALYZED THAT PROSECUTION HISTORY; ISN'T THAT

17   RIGHT?

18   A.    I HAVE LOOKED AT THE BACK-AND-FORTH PORTIONS OF IT.    I

19   HAVE, QUITE FRANKLY, NOT LOOKED AT A LOT OF THE KIND OF

20   BOILERPLATE DOCUMENTATION THAT WENT ALONG WITH IT.    BUT, YES,

21   THE DISCUSSION THAT WENT BACK AND FORTH BETWEEN THE EXAMINER

22   AND THE REPRESENTATIVE, THE LAW FIRM THAT REPRESENTED THE

23   INVENTOR.

24   Q.    FEEL FREE TO CHASTISE ME IF WE SPEND ANY TIME ON

25   BOILERPLATE, DOCTOR.

727

1            MR. SPROUL:  I WOULD ASK MR. TISA TO PULL UP

2      EXHIBIT 6, PLEASE.  AND PAGE 287.

3            THE WITNESS:  6?

4            MR. SPROUL:  EXHIBIT 6.

5            THE WITNESS:  I DON'T APPEAR TO HAVE ANYTHING THAT'S

6      NUMBERED SIX.

7      Q.   BY MR. SPROUL:  HOW ABOUT YOU LOOK ON THE SCREEN IN

8      FRONT OF YOU.  WOULD THAT BE OKAY?

9      A.   ONE MOMENT.

10     Q.   EXHIBIT 6 IS ADMITTED IN THIS CASE, AND IT IS THE

11     PROSECUTION HISTORY OF THE '270 PATENT.

12     A.   YES.  THIS APPEARS TO BE PART OF THE PROSECUTION

13     HISTORY.

14     Q.   AND YOU SEE CLAIM 2 THERE IN THE MIDDLE?

15     A.   YES.

16     Q.   AND YOU SEE THE WORDS THAT ARE UNDERLINED "HAVING AN

17     INNERMOST SURFACE," "ON THE INNERMOST SURFACE," TWO DIFFERENT

18     SPACES?

19     A.   YES.

20     Q.   AND THAT UNDERLINING YOU UNDERSTAND MEANS WERE ADDED IN

21     THIS PARTICULAR INTERACTION WITH THE PATENT OFFICE?

22     A.   YES.

23     Q.   AND THE RATIONALE FOR THIS IS PROVIDED A FEW PAGES

24     LATER.

25            MR. SPROUL:  IF YOU COULD TURN TO PAGE 295,

728

1    MR. TISA.

2         YOUR HONOR, I'VE JUST BEEN INFORMED THAT EXHIBIT 6

3    MAY NOT HAVE BEEN OFFERED ALREADY OR ADMITTED.  I OFFER IT.

4         THE COURT:  ANY OBJECTION?

5         MR. SPROUL:  IT'S THE PROSECUTION HISTORY OF THE

6    '270 PATENT.  IT'S YOUR EXHIBIT.

7         MS. LEGAARD:  I DON'T OBJECT TO ADMISSION OF THE

8    EXHIBIT.  I OBJECT TO QUESTIONING HER WITHOUT GIVING HER THE

9    DOCUMENT.

10        THE COURT:  ONE THING AT A TIME.

11        DO YOU HAVE AN OBJECTION TO NO. 6?

12        MS. LEGAARD:  NO.

13        THE COURT:  IT IS RECEIVED.

14        (TRIAL EXHIBIT 6 RECEIVED IN EVIDENCE.)

15        THE WITNESS:  CAN I GIVE YOU BACK THE SKULL CAP?

16        THE COURT:  I BELIEVE THAT BELONGS TO BERNADETTE

17   NOW.

18        THE CLERK:  I'LL TAKE THAT.

19   Q.   BY MR. SPROUL:  YOU HAVE EXHIBIT 6 IN FRONT OF YOU.

20   YOU'RE FREE TO LOOK AT PAGE 295 OF THE EXHIBIT ITSELF.

21   UNFORTUNATELY, IT'S NOT BEHIND ONE OF THE TABS.  IT'S IN

22   BETWEEN THE WHITE AND THE YELLOW TABS, IF YOU'D LIKE TO.  OR

23   YOU CAN LOOK AT THE SCREEN IN FRONT OF YOU.  IT'S GOING TO BE

24   THE SAME PAGE.

25   A.   PAGE 295?

729

1    Q.    PAGE 295.

2    A.    THANK YOU.

3    Q.    AND DID YOU ANALYZE THE PROSECUTION HISTORY AT ALL AS A

4    PART OF YOUR WORK IN THIS CASE, SPECIFICALLY -- STRIKE THAT.

5    I KNOW I'VE ASKED THAT ALREADY.

6          DID YOU ANALYZE THIS PARTICULAR INTERACTION

7    REPRESENTED HERE ON PAGES 294 THROUGH 299?

8    A.    I'M NOT SURE THAT I WOULD SAY ANALYZE.  I CERTAINLY HAVE

9    READ THIS.

10   Q.    OKAY.  AND YOU UNDERSTAND HERE THE -- THIS PARTICULAR

11   PORTION OF THE PROSECUTION HISTORY IS A RESPONSE FROM

12   MR. BLACKFORD'S ATTORNEYS TO THE PATENT OFFICE.

13         DO YOU UNDERSTAND THAT?

14   A.    YES.

15   Q.    AND MR. BLACKFORD'S ATTORNEYS ARE RESPONDING TO A

16   REJECTION FROM THE PATENT EXAMINER WHERE HE SAID, I'M NOT

17   ALLOWING YOUR CLAIMS AS CURRENTLY WRITTEN.

18         DO YOU UNDERSTAND THAT?

19   A.    CORRECT.  AS THE VIDEO THAT WAS SHOWN TO THE JURORS AT

20   THE VERY BEGINNING POINTS OUT, VERY FEW PATENTS ARE ACTUALLY

21   ISSUED THE FIRST TIME THROUGH.  THERE TENDS TO BE INTERACTION

22   BETWEEN THE INVENTOR, OR GENERALLY THE INVENTOR'S ATTORNEYS,

23   AND THE PTO EXAMINER, WHICH MAY TAKE PLACE OVER AN EXTENDED

24   PERIOD OF TIME.

25   Q.    THERE IS SOME GIVE-AND-TAKE BETWEEN THE INVENTOR AND THE

1    PTO; ISN'T THAT RIGHT?

2    A.    CORRECT.  I ACTUALLY PERSONALLY HAVE EXPERIENCED THIS AS

3    AN INVENTOR, WHERE WE WENT BACK AND FORTH OVER A PERIOD OF

4    ABOUT FOUR YEARS, INCLUDING AN APPEAL, A FINAL, FINAL

5    REJECTION; AND THEN TURNED AROUND AND REWROTE THE PATENT

6    CLAIMS AND IT SAILED THROUGH THE FIRST TIME.  SO I'M QUITE

7    AWARE OF HOW VOLUMINOUS THESE FILE WRAPPERS TEND TO BECOME.

8    Q.    AND OFTEN IT'S MORE GIVE FROM THE INVENTOR AND TAKE FROM

9    THE PTO, RIGHT, THE SCOPE IS NARROWER?

10   A.    I'M AN INVENTOR.  I CERTAINLY WOULD VIEW IT THAT WAY.

11          I THINK IT'S MORE PROPERLY THOUGHT OF AS A LEARNING

12   EXPERIENCE BOTH ON THE PART OF THE EXAMINER AS WELL AS ON THE

13   PART OF THE INVENTOR.  SO THE EXAMINER IS A KNOWLEDGEABLE

14   PERSON IN THE FIELD OF ART WHERE THIS INVENTION FALLS, BUT

15   THEY DON'T KNOW PERFECTLY THE MIND OF THE INVENTOR.

16          SO A LOT OF THIS IS -- BACK-AND-FORTH IS

17   CLARIFICATION AND, QUITE FRANKLY, THE PEOPLE WHO WOULD

18   PRACTICE THIS INVENTION SUBSEQUENT TO THE ISSUANCE OF THE

19   PATENT BENEFIT FROM THE INTERACTION BACK AND FORTH AND THE

20   SUBSEQUENT CLARIFICATION THAT TAKES PLACE.

21   Q.    CERTAINLY WE RELY ON IT IN LITIGATION SUCH AS THIS,

22   DON'T WE?

23   A.    CORRECT.  IT ALSO IS A NICE FORM OF INCOME, I SUSPECT,

24   FOR MANY PATENT ATTORNEYS.

25   Q.    FAIR ENOUGH.

731

1              THE SUBJECT OF THIS PARTICULAR INTERACTION BETWEEN

2     MR. BLACKFORD'S ATTORNEYS AND THE PATENT OFFICE WAS A

3     REFERENCE REFERRED TO AS LEVY.

4              HAVE YOU HEARD OF LEVY?

5     A.   YES.

6     Q.   DID YOU ANALYZE LEVY AS PART OF YOUR WORK IN THIS

7     CASE?

8     A.   I HAVE LOOKED AT LEVY.  SINCE LEVY WAS NOT CITED FOR

9     INFRINGEMENT BY -- EXCUSE ME, FOR INVALIDITY BY THE COURT, I

10    DID NOT SPEND MUCH TIME LOOKING AT THAT RECENTLY; SO MY

11    KNOWLEDGE GOES BACK QUITE A WAYS.

12             IF YOU'LL PROVIDE ME WITH A COPY OF LEVY, I WOULD BE

13    GLAD TO TAKE A CLOSER LOOK AT IT.

14             MR. SPROUL:  COULD YOU PULL UP EXHIBIT 1153, PLEASE,

15    MR. TISA.

16    Q.   THIS IS THE FRONT PAGE OF LEVY.  YOU'VE SEEN THIS?

17    A.   YES.

18             MR. SPROUL:  YOUR HONOR, I OFFER EXHIBIT 1153 INTO

19    EVIDENCE.

20             MS. LEGAARD:  NO OBJECTION.  IT'S NOT IN A BINDER.

21             THE COURT:  1153 IS RECEIVED.

22        (TRIAL EXHIBIT 1153 RECEIVED IN EVIDENCE.)

23             THE COURT:  I'M GOING TO PAUSE THE PROCEEDINGS FOR

24    JUST A MINUTE.

25             I WANT TO SEE COUNSEL OVER HERE, PLEASE.

732

1          (THE FOLLOWING PROCEEDINGS WERE HELD AT SIDEBAR:)

2          THE COURT:  SO THIS WAS AN INFRINGEMENT WITNESS, AND

3     IT SOUNDS LIKE YOU'RE MOVING INTO THE INVALIDITY PART.  YOU

4     WILL HAVE PLENTY OF TIME FOR INVALIDITY.

5          MR. SPROUL:  IT'S NOT INVALIDITY, YOUR HONOR.  IT'S

6     GOING TO BE RELATIVELY -- I THOUGHT IT WAS GOING TO BE

7     RELATIVELY QUICK.  IT'S JUST MEANT TO EXPLAIN THE METE AND

8     BOUNDS AND THE REASON FOR IT.  IT HAPPENS TO BE BECAUSE OF

9     PRIOR ART, BUT IT'S NOT AN INVALIDITY ISSUE; IN OTHER WORDS,

10    THE PATENT WAS NARROWED BECAUSE OF THE PRIOR ART.

11         THE COURT:  AS I UNDERSTAND, INFRINGEMENT IS GOING

12    TO PIVOT ON WHETHER OR NOT THERE WAS VIOLATION OF THE CLAIMS

13    AS THE'RE ULTIMATELY CONSTRUED BY THE COURT AND IN THE

14    PATENT.  SO I DON'T KNOW WHY WE'RE SPENDING TIME WITH WHAT

15    WE'RE SPENDING TIME WITH.

16         MR. SPROUL:  OKAY.  I WILL BE VERY BRIEF.  I'D LIKE

17    TO MAKE ONE POINT WITH RESPECT TO THE STATEMENT THAT'S ON THE

18    PAGE IN THE PROSECUTION HISTORY.

19         THE COURT:  THAT'S FINE.  AS LONG AS IT HAS TO DO

20    WITH INFRINGEMENT, I DON'T CARE.  IT SOUNDS TO ME LIKE WE'RE

21    HEADING INTO VALIDITY KIND OF CONVERSATIONS.

22         MR. SPROUL:  WE'VE VEERED THAT WAY.  IT'S NOT

23    INTENTIONAL.  WE'LL MOVE ON.

24         MR. ALDRICH:  YOUR HONOR, I UNDERSTAND THAT

25    PROSECUTION HISTORY HAS TWO RELEVANT PURPOSES IN A PATENT

1    INFRINGEMENT LITIGATION.  ONE OF THEM IS CLAIM CONSTRUCTION

2    AND ONE OF THEM IS THE METES AND BOUNDS OF PROSECUTION

3    HISTORY ESTOPPEL, WHICH IS NOT RELEVANT HERE BECAUSE THE

4    DOCTRINE OF EQUIVALENCE ISN'T RELEVANT.

5           SO I HAVE NO UNDERSTANDING OF WHAT THE RELEVANCE OF

6    THE PROSECUTION HISTORY IS IN A CASE WHERE DIRECT

7    INFRINGEMENT IS BEING ALLEGED, LITERAL INFRINGEMENT IS BEING

8    ALLEGED, AND THE COURT HAS ALREADY CONSTRUED THE CLAIM TERMS.

9           THE COURT:  THAT'S KIND OF MY POINT, BUT YOU SAID IT

10   BETTER THAN I DID.

11          MR. SPROUL:  I CAN EXPLAIN.

12          THE COURT:  GO AHEAD.

13          MR. SPROUL:  SO THERE IS A STATEMENT IN THE

14   PROSECUTION HISTORY WHERE --

15          THE COURT:  KEEP YOUR VOICE DOWN.

16          MR. SPROUL:  WHERE THE ATTORNEYS ARE RESPONDING IN

17   VIEW OF LEVY, AND THEY SAY, WELL, LEVY HAS INTERVENING FIBERS

18   BETWEEN THE REFLECTION AND THE USER'S BODY, AND THAT'S NOT

19   OUR INVENTION.  SO THERE IS A NARROWING OF THE CLAIM SCOPE.

20          AND I WANT TO UNDERSTAND -- IF THERE IS INTERVENING

21   FABRIC, I WANT TO CLARIFY THAT IF THERE IS INTERVENING FABRIC

22   BETWEEN THE HEAT-REFLECTING MATERIAL AND THE USER'S BODY,

23   THAT THAT'S NOT COVERED BY THE CLAIM.

24          THE REPORTER:  WAIT.

25          THE COURT:  LET ME MAKE THIS POINT ON THAT POINT.

734

1    THAT ISSUE HAS BEEN ESTABLISHED WITHOUT ANY DISPUTE.  SHE'S

2    ALREADY SAID THAT.  THEY HAVE SAID THAT.

3         MR. SPROUL:  WITH ALL DUE RESPECT, YOUR HONOR, THERE

4    IS ONE AREA OF CLARIFICATION, WHICH IS WHETHER OR NOT THAT

5    INTERVENING FIBER IS ATTACHED TO IT OR NOT.  IN OTHER WORDS,

6    IF YOU HAVE ANOTHER GLOVE UNDERNEATH, THEY STILL WANT TO SAY

7    THE GLOVE ACCUSES, WHERE THERE ARE TWO PIECES AND INTERVENING

8    FIBER.  THAT'S WHAT THIS IS DIRECTED TO.

9         THE COURT:  LIKE WITH THE LINERS?

10        MR. SPROUL:  RIGHT.

11        THE COURT:  AND THE ONE GLOVE?

12        MR. SPROUL:  EXACTLY.

13        THE COURT:  WHERE THEY HAVE THE LINER.  THAT'S THE

14   POINT YOU WANT TO MAKE.  OKAY.

15        MR. ALDRICH:  IF I COULD, YOUR HONOR.  WE SERVED

16   NONINFRINGEMENT CONTENTIONS IN THIS CASE, AND WE'VE RECEIVED

17   ANSWERS BACK THAT WERE NONANSWERS.  AND THIS IS A NEW THEORY

18   THAT HAS ONLY APPEARED IN THE LAST WEEK.

19        THERE WERE NONINFRINGEMENT CONTENTIONS RELATING TO

20   PRODUCTS -- FIRST OF ALL, PRODUCTS THEY NEVER PRODUCED IN THE

21   CASE; AND SECOND, PRODUCTS FOR WHICH THEY NEVER SERVED

22   NONCONTENTION -- NONINFRINGEMENT CONTENTIONS REGARDING WHY

23   THEY DIDN'T INFRINGE.

24        NOW, AS I SAID, THEY REFUSED TO ANSWER THEM IN THE

25   INTERROGATORY.  THEY SAID THEY WOULD SUPPLEMENT IT AFTER

COMPUTER-AIDED TRANSCRIPTION

1    CLAIM CONSTRUCTION.  THEY NEVER DID.  WE'RE WILLING TO LET

2    THE NONINFRINGEMENT POSITIONS IN DR. BLOCK'S REPORT BE

3    ADMISSIBLE, BECAUSE THEY AT LEAST DISCLOSED THAT DURING

4    DISCOVERY; BUT NEW THEORIES THAT HAVE EMERGED IN THE LAST

5    WEEK HAVE NO PLACE IN THIS CASE.

6        MR. SPROUL:  THIS IS NOT A NEW THEORY, AND WE GET TO

7    HOLD DR. COLE TO HER BURDEN HERE, YOUR HONOR.

8        THE COURT:  WELL, SO IN YOUR CONTENTIONS, WHEN YOU

9    WERE SAYING NONINFRINGING, DID YOU MEAN TO SAY, BY THE WAY,

10   WHEN THERE IS A LINER INVOLVED, THAT'S NOT INFRINGING BECAUSE

11   IT'S NOT UP AGAINST THE SKIN?

12       MR. SPROUL:  I WOULD NEED TO GO BACK AND CHECK.  I

13   CANNOT REPRESENT TO YOU HERE, YOUR HONOR, WHAT THE CONTENT OF

14   THOSE WERE.

15       MR. ALDRICH:  WE DON'T NEED TO CHECK.  THERE IS NO

16   ANSWER TO THAT INTERROGATORY.  THEY SAID THEY WOULD

17   SUPPLEMENT IT AFTER CLAIM CONSTRUCTION.  THEY NEVER DID.

18       SO ALL --

19       THE COURT:  WAIT.  ONE AT A TIME.  MY JOB IS TO

20   PROTECT HER, AND I WILL NOT LET YOU MESS WITH HER.

21       MR. ALDRICH:  SO THE ONLY NONINFRINGEMENT

22   CONTENTIONS THAT WE HAVE EVER BEEN PROVIDED IN THE CASE ARE

23   THE DEFENSE'S THAT WERE IDENTIFIED IN DR. BLOCK'S REPORT.

24   THAT IS IT.

25       THIS WHOLE THING ABOUT WE'VE GOT THIS GLOVE THAT HAS

1    TWO PARTS AND THE INNER PART SHOULD GO WITH THE OUTER PART,

2    THAT WHOLE THEORY, IT'S A NEW ONE THAT HAS BEEN WITHIN ONE

3    WEEK THAT THEY INTRODUCED THIS AS A NEW POSITION IN THE CASE

4    THAT WE HAD NEVER HEARD OF BEFORE.

5              MS. LEGAARD:  WE GOT THE PRODUCT A FEW DAYS AGO,

6    FRIDAY.

7              MR. ALDRICH:  THEY SHIPPED THE PRODUCT TO OUR HOTEL

8    ROOM TWO DAYS AGO.

9              THE COURT:  SLOW DOWN.

10             WERE YOU ACCUSING THIS PRODUCT OF INFRINGEMENT?

11             MR. ALDRICH:  WE ACCUSED EVERY PRODUCT OF

12   INFRINGING.  WE CARVED OUT THE ONES WHERE IT WAS OUTWARD

13   FACING.

14             NOW THEY GET UP AND THEY HAVE DR. -- MR. CAREY BEING

15   OBSTINATE ON THE STAND.  I DON'T KNOW WHICH ONES MIGHT HAVE

16   THE INNERMOST SURFACE --

17             MR. SPROUL:  THAT'S A MISCHARACTERIZATION.

18             MR. ALDRICH:  WE ASKED ABOUT NONINFRINGEMENT

19   CONTENTIONS, AND THEY REFUSED TO ANSWER.  AND THEN THEY SAID

20   THEY WOULD ANSWER AFTER CLAIM CONSTRUCTION.  CRICKETS.

21             THE COURT:  GO AHEAD.

22             MR. SPROUL:  WE'RE NOT CONTESTING THE VAST MAJORITY

23   OF GLOVES, TO THE EXTENT THEY HAVE MADE THEIR CASE FOR THEM.

24   BUT THERE ARE ONE OR TWO PRODUCTS HERE, ESPECIALLY THIS HEAT

25   TOUCH, WHERE IT FALLS OUTSIDE THE NORMAL SIMPLICITY THAT THEY

737

1    HAVE PRESENTED.

2            AND SO WE ARE SIMPLY TRYING TO LAY THIS FOUNDATION

3    WITH DR. COLE, TO UNDERSTAND EXACTLY HOW SHE IS GOING TO VIEW

4    THIS AND THE BASIS FOR HER TESTIMONY AND TO SHOW THAT IT'S

5    INCONSISTENT, THAT SHE CANNOT MAINTAIN THIS POSITION OF

6    INFRINGEMENT FOR AT LEAST THIS PRODUCT, BUT OTHER SIMILAR

7    PRODUCTS -- THERE AREN'T VERY MANY -- THAT THEY CAN'T

8    INFRINGE FOR THIS REASON.

9            THE COURT:  WHAT OTHER PRODUCTS ARE THERE?

10           MR. SPROUL:  I THINK WITH THE TWO DIFFERENT GLOVES,

11   THIS MAY BE THE ONLY ONE.  BUT THIS IS AN IMPORTANT ONE,

12   BECAUSE IT'S VERY EXPENSIVE.

13           MS. LEGAARD:  I DON'T THINK SHE'S EVER SEEN IT

14   BEFORE, EXCEPT SITTING IN COURT.

15           MR. SPROUL:  IT WAS ON THEIR EXHIBIT LIST.  THEY HAD

16   NEVER EXPRESSED A NEED TO INSPECT THE PHYSICAL PRODUCT.  THEY

17   ASKED FOR IT.  WE SENT IT OVER THAT DAY.

18           THE COURT:  OKAY.  THANK YOU.

19           MR. MARCHESE:  CAN I BE HEARD JUST BRIEFLY, YOUR

20   HONOR.

21           SO THEY HAVE KNOWN ABOUT THIS PRODUCT FOR A LONG

22   TIME.  IT'S BEEN ON THE MARKET FOR YEARS.  AND PLUS, THE

23   THEORY IS EFFECTIVELY THE SAME AS IF THE -- IF YOU HAVE AN

24   INTERVENING FABRIC WITH THE LINER, YOU HAVE AN INTERVENING

25   GLOVE.  IT'S THE SAME CONCEPT.  SO I MEAN, I THINK IT'S BEEN

738

1    COVERED BY THE CONTENTIONS, EVEN IF -- IN TERMS OF PRINCIPLE

2    OF NONINFRINGEMENT.

3          MR. ALDRICH:  THIS IS WHY WE HAVE DISCOVERY.  THIS

4    IS WHY WE SERVE CONTENTIONS.  THIS IS WHY WE ASK WHAT THEIR

5    THEORIES ARE IN THE CASE; SO THAT OUR EXPERTS CAN PREPARE AND

6    PROVIDE REPORTS AND PROVIDE TESTIMONY ABOUT WHAT THE ISSUES

7    ARE THAT ARE IN DISPUTE IN THE CASE.

8          WE SERVED NONINFRINGEMENT CONTENTIONS AND THEY --

9    THERE IS NO ANSWER TO THEM.

10          MR. MARCHESE:  WHAT ABOUT THE TEST REPORT?

11          MR. ALDRICH:  AGAIN, IF IT IS IN DR. BLOCK'S REPORT,

12   WHICH ALL THE OPINIONS IN HIS REPORT WEREN'T -- I MEAN, THE

13   NONINFRINGEMENT POSITION, THEY DIDN'T DISCLOSE DURING FACT

14   DISCOVERY; THAT'S OKAY.

15          WE'RE WILLING TO ALLOW THE NONINFRINGEMENT OPINIONS

16   THAT ARE IN HIS REPORT, BECAUSE WE WERE GIVEN FAIR NOTICE OF

17   THOSE DURING THE DISCOVERY PROCESS BEFORE SUMMARY JUDGMENT

18   MOTIONS WERE DUE, ET CETERA.  AND I'M FINE WITH THAT.  BUT

19   NEW THEORIES THAT ARE JUST COMING OUT IN THE LAST WEEK, WHAT

20   ARE WE SUPPOSED TO DO, AND THAT'S WHAT THIS IS.  IT'S LIKE

21   TRIAL BY SANDBAG.

22          THE COURT:  DID YOU SAY SOMETHING?

23          MR. MARCHESE:  I JUST -- YOU KNOW, I WAS GOING TO

24   SAY THERE WAS THE TEST REPORTS DISCLOSED RIGHT NEAR THE END

25   OF THE DEPO.  I THINK THE POINT IS --

739

1          THE COURT:  SAY AGAIN.

2          MR. MARCHESE:  THE TEST REPORTS THAT WE DEBATED

3     ABOUT BEFORE, I MEAN, THERE HAS BEEN -- IN ALL THESE CASES WE

4     ALWAYS HAVE THINGS COMING IN.

5          I THINK THE MOST IMPORTANT POINT IS THEY HAVE BEEN

6     ON NOTICE OF THIS GLOVE FOR A LONG, LONG TIME.  IT'S BEEN

7     AVAILABLE, PUBLICLY AVAILABLE.  IT'S BEEN ON THE INTERNET.

8     WHATEVER YOU WANT TO DO.  YOU CAN GO LOOK AT IT.  THERE IS

9     PHOTOS OF IT, TESTERS, PEOPLE, COMPANIES DOING REVIEWS OF IT.

10         BUT THE POINT, I THINK THE MOST CRUCIAL POINT HERE,

11    IT IS AN INTERVENING FABRIC LAYING BETWEEN THE --

12         THE COURT:  I UNDERSTAND THE ARGUMENT.  THE QUESTION

13    IS WHETHER OR NOT THEY ARE SOMEHOW PREJUDICED BECAUSE YOU

14    DIDN'T TELL THEM, BY THE WAY, WE ARE SAYING THAT THERE IS NO

15    INFRINGEMENT ON THE GLOVES WHERE THERE IS ACTUALLY A LINER

16    THAT IS INTERVENING BETWEEN THE ALLEGED PRODUCT THAT IS

17    INFRINGING AND THE PERSON'S HAND WHEN THERE IS A LINER.

18         I MEAN, I UNDERSTAND WHAT YOUR ARGUMENTS ARE.  I

19    THINK THE QUESTION IS WHETHER OR NOT YOU DISCLOSED.  AND BY

20    THE WAY, WE'RE TAKING THE POSITION OF NONINFRINGEMENT WHEN

21    THERE IS A LINER.

22         MR. SPROUL:  DR. BLOCK -- EXCUSE ME.  DR. COLE HAS

23    DONE THIS ANALYSIS.  I JUST THINK SHE'S OVERLOOKED THIS

24    POINT.  AND I THINK IT'S FAIR FOR US TO POINT OUT.

25         SHE'S -- WE JUST GOT ANOTHER 220 PAGES OF TESTING

740

1    SHE'S DONE.  SO I DON'T THINK IT'S RIGHT TO THE SAY THAT THIS

2    IS AMBUSH OR SANDBAGGING.  SHE SAID SHE ANALYZED THESE

3    GLOVES.  SHE KNEW THERE WERE TWO COMPONENTS.  AND I JUST

4    DON'T THINK SHE THOUGHT ABOUT THIS DISTINCTION, AND I THINK

5    IT'S FAIR FOR US TO BE ABLE TO POINT OUT THAT THIS IS

6    INCONSISTENT WITH HER OTHER THEORY.

7             THE COURT:  WOULD HAVE BEEN MUCH BETTER IF YOU WOULD

8    HAVE JUST SAID, HEY, WE AREN'T CONTESTING INFRINGEMENT

9    WHENEVER THERE IS A LINER INVOLVED, BECAUSE IT'S NOT AGAINST

10   THE SKIN.  SO SIMPLE.  BUT IT DIDN'T HAPPEN.

11            MR. MARCHESE:  WELL, I MEAN, IN ALL FAIRNESS, THIS

12   ALL LANDED IN OUR LAP IN THE PAST FOUR OR FIVE WEEKS SO WE'RE

13   TRYING.

14            THE COURT:  I KNOW.

15            MR. MARCHESE:  IT'S NOT THAT WE'RE TRYING TO CREATE

16   A NEW THEORY, YOUR HONOR.  NOT THIS LAW FIRM.  I DON'T WANT

17   YOU TO THINK THAT WE'RE TRYING TO PLAY FAST AND LOOSE.  WE'RE

18   TRYING TO DEFEND.

19            THE COURT:  I'M NOT HOLDING YOU TO WHAT YOU ARE

20   DOING.  I'M HOLDING WHAT YOUR PREDECESSOR DID OR DIDN'T DO.

21   AND THERE IS A REASON PROBABLY WHY THEY DIDN'T CONTINUE AS

22   COUNSEL IN THIS CASE, AND THAT'S NOT -- THAT'S NOT MY

23   BUSINESS.

24            MR. MARCHESE:  AND WE DON'T HAVE TO GET INTO THAT.

25            MR. ALDRICH:  THAT DOESN'T NEED TO BE ON THE

741

1    RECORD.

2              MR. MARCHESE:  I THINK THE POINT THAT I WANTED TO

3    MAKE IS THIS IS ACTUALLY REALLY A FAILURE OF PROOF, I THINK,

4    WHAT WE'RE LOOKING AT HERE.  IT IS THEIR BURDEN OF PROOF, AND

5    IF SHE DIDN'T PROVE THAT THAT FOIL IS AGAINST THE SKIN AND

6    SHE'S WILLING TO CONCEDE THAT WHEN IT'S FLIPPED AROUND, IT'S

7    NOT INFRINGING.  IT'S JUST A FAILURE TO PROVE THEIR BURDEN OF

8    PROOF, AND WE SHOULD BE ABLE TO CROSS HER ON THAT REGARDLESS,

9    EVEN IF WE CAN'T PUT DR. BLOCK UP ON IT.

10             THE COURT:  SO ULTIMATELY I NEED TO MAKE A CALL.  I

11   NEED TO GET BACK TO WORK.

12             YOUR QUESTION IS WEIGHING EVERYTHING THAT I HAVE TO

13   LOOK AT, IS -- ARE THE PLAINTIFFS UNDULY PREJUDICED AS A

14   RESULT OF THIS POSITION THAT IS BEING TAKEN BY THE PART OF

15   THE DEFENSE, INDICATING THAT WHEN THERE IS A LINER INVOLVED,

16   THAT THERE IS NONINFRINGEMENT.  AND THE ISSUE IS, BECAUSE THE

17   DEFENDANTS DID NOT TAKE OR ALERT THE PLAINTIFFS THAT THEY

18   WERE GOING TO BE TAKING THAT POSITION, ARE THEY UNDULY

19   PREJUDICED.

20             I FIND THAT THEY ARE NOT.  I'LL ALLOW YOUR

21   EXAMINATION TO PROCEED.

22             LET'S GET BACK TO WORK.

23             MR. SPROUL:  THANK YOU, YOUR HONOR.

24        (THE FOLLOWING PROCEEDINGS WERE HELD IN OPEN COURT:)

25   Q.   BY MR. SPROUL:  DR. COLE, I BELIEVE WE WERE LOOKING AT

COMPUTER-AIDED TRANSCRIPTION

742

1    EXHIBIT 1153, WHICH IS THE LEVY REFERENCE.  WE WON'T SPEND

2    MUCH TIME ON IT.  I'M PUTTING IT THERE FOR YOUR REFERENCE AND

3    SO THE JURY CAN SEE IT.  WE DON'T NEED TO GO INTO DETAIL ON

4    IT.

5              DO YOU SEE 1153?

6    A.   YES, I DO.

7              MR. SPROUL:  FOR MY BENEFIT, I'VE OFFERED IT.  I

8    BELIEVE IT WAS ADMITTED.  IS THAT RIGHT?

9              THE COURT:  IT WAS.

10             MS. LEGAARD:  YES.

11             MR. SPROUL:  THANK YOU.

12   Q.   SO THIS IS WHAT -- 1153 IS WHAT'S BEING DISCUSSED IN

13   THIS PORTION OF THE PROSECUTION HISTORY THAT WE'RE GOING TO

14   LOOK AT.  YOU AGREE?

15   A.   YES.  THIS IS THE '253 PATENT.

16   Q.   IF WE CAN GO BACK TO THE PROSECUTION HISTORY, PLEASE,

17   MR. TISA.

18             AND ON PAGE 254 -- EXCUSE ME, 294, THERE IN THE

19   SECOND TO LAST PARAGRAPH YOU SEE REFERENCE TO THE '253

20   PATENT.

21   A.   STARTING AT "CLAIM 1 IS AMENDED"?

22   Q.   IMMEDIATELY BEFORE THAT, THE APPLICANT SAYS, CLAIMS 1

23   THROUGH 7, 10, ET CETERA, WERE REJECTED UNDER 35 USC 102(B)

24   AS BEING ANTICIPATED BY U.S. 4,622,253, THE '253 PATENT.

25             THAT IS THE LEVY PATENT; IS THAT RIGHT?

743

1    A.    YES.  YES, THAT IS.

2            MR. ALDRICH:  YOUR HONOR, SORRY TO TAKE YOUR TIME.

3    CAN WE SPEAK AGAIN FOR A MINUTE, PLEASE?

4            THE COURT:  NO.  YOU NEED TO MOVE ON.

5            MR. SPROUL:  OKAY.

6    Q.    IF WE CAN GO TO PAGE 295, PLEASE.

7            IN RESPONSE TO ARGUMENTS MADE BY THE EXAMINER WITH

8    RESPECT TO THE LEVY PATENT, THE VERY BOTTOM OF THE PAGE THERE

9    ARE TWO COMPLETE SENTENCES.  THE APPLICANT SAYS, "THE

10   PRESENCE OF THE FIBERS BETWEEN THE REFLECTIVE SURFACE AND THE

11   BODY OF THE USER WILL NECESSARILY REDUCE THE EFFICACY OF THE

12   HEAT-REFLECTIVE PROPERTIES OF THE FABRIC."

13           DO YOU SEE THAT?

14   A.    YES.

15   Q.    AND THE NEXT SENTENCE SAYS, "BY CONTRAST, THE

16   HEAT-DIRECTING ELEMENTS OF THE PRESENT APPLICATION HAVE NO

17   INTERVENING FIBER LAYER TO INTERFERE WITH THE HEAT-DIRECTING

18   PROPERTIES OF THE HEAT-DIRECTING ELEMENTS."

19           DO YOU SEE THAT?

20   A.    YES.

21   Q.    YOU AGREE THAT WHERE THERE IS AN INTERVENING FIBER LAYER

22   BETWEEN THE METALLIC ELEMENTS AND THE BODY OF THE USER, THAT

23   THE CLAIMED INVENTION DOES NOT COVER THAT SCENARIO?

24   A.    COULD YOU REPEAT THAT, PLEASE.

25   Q.    DO YOU AGREE THAT WHERE THERE ARE INTERVENING -- STRIKE

744

1    THAT.

2              DO YOU AGREE THAT WHERE THERE IS AN INTERVENING

3    FIBER LAYER BETWEEN THE HEAT-DIRECTING METALLIC ELEMENTS AND

4    THE BODY OF THE USER, THAT THE CLAIM DOES NOT COVER THAT?

5              MS. LEGAARD:  OBJECTION.

6              THE WITNESS:  WHICH CLAIM ARE YOU TALKING ABOUT?

7              THE COURT:  OVERRULED.

8    Q.   BY MR. SPROUL:  CLAIM 2.

9    A.   CLAIM 2 IN THE '270 PATENT JUST TALKS ABOUT THE

10   HEAT-REFLECTING ELEMENTS BEING ON THE INNERMOST SURFACE OF

11   THE BASE MATERIAL, WHICH IS ALSO THE INNERMOST LAYER OF THE

12   BODY GEAR.  THERE IS NO DISCUSSION IN CLAIM 2 OF INTERVENING

13   FIBERS, OR FOR THAT MATTER, THE EFFICACY OF THE

14   HEAT-DIRECTING ELEMENTS.

15   Q.   THAT'S RIGHT.  THERE IS DISCUSSION HERE BY THE APPLICANT

16   TELLING THE PATENT OFFICE WHAT HIS CLAIM DOES NOT COVER?

17             MS. LEGAARD:  OBJECTION.  ARGUMENTATIVE.

18   Q.   BY MR. SPROUL:  ISN'T THAT RIGHT?

19             THE COURT:  SUSTAINED.

20             MR. SPROUL:  WITHDRAWN.

21   Q.   YOU AGREE THAT THE APPLICANT IS TELLING THE PATENT

22   OFFICE THAT THE INVENTION, WHICH IS SPECIFICALLY CLAIM 2 THAT

23   WE SAW AMENDED EARLIER, HAS NO INTERVENING FIBER LAYER TO

24   INTERFERE WITH THE HEAT-DIRECTING PROPERTIES OF THE

25   HEAT-DIRECTING ELEMENTS?

1    A.   THE LAST LINE HERE SAYS THE HEAT-DIRECTING ELEMENTS HAVE

2    NO INTERVENING FIBER LAYER TO INTERFERE.   THIS IS PART OF THE

3    DISCUSSION BACK AND FORTH BETWEEN THE ATTORNEY REPRESENTING

4    THE INVENTOR AND THE PTO EXAMINER.

5    Q.   THE INVENTION HAS NO INTERVENING FIBER LAYER BETWEEN THE

6    HEAT-DIRECTING ELEMENTS AND THE BODY OF THE USER; IS THAT

7    FAIR?

8    A.   THAT IS WHAT THE WORDS HERE ON THIS PAGE SAYS.

9    Q.   OKAY.   THANK YOU.

10        AND THAT IS CONSISTENT WITH YOUR DECISION IN THIS

11   CASE TO NOT ACCUSE, FOR INSTANCE, PRODUCTS WHERE THE

12   HEAT-DIRECTING ELEMENTS ARE FACING OUT?

13   A.   I DIDN'T MAKE THE DECISIONS AS TO WHICH PRODUCTS TO

14   ACCUSE OR NOT ACCUSE.

15   Q.   IT'S CONSISTENT WITH THAT DECISION, NONETHELESS?

16   A.   IT'S THE -- IT'S CONSISTENT WITH MY OPINION AS TO

17   SEIRUS' HEATWAVE PRODUCTS WHICH DO INFRINGE VERSUS THE ONES

18   THAT DO NOT APPEAR TO INFRINGE.

19   Q.   FAIR ENOUGH.

20   A.   I DIDN'T ACCUSE THE PRODUCTS.

21   Q.   IT'S CONSISTENT WITH YOUR OPINION?

22   A.   CORRECT.

23   Q.   YOUR UNIVERSE OF ACCUSED PRODUCTS, YOU REFER TO AS THE

24   INNERMOST SURFACE ACCUSED PRODUCTS; ISN'T THAT RIGHT?

25   A.   THAT'S CORRECT.

746

1    Q.   AND --

2    A.   CAN I PUT THIS AWAY?

3    Q.   YOU MAY.  MAY I -- PLEASE JUST SET THAT ON THE COUNTER

4    NEXT TO YOU.  THERE IS NO NEED FOR YOU TO KEEP THAT IN YOUR

5    LAP THE ENTIRE TIME.

6              THE WITNESS:  IS THIS ONE THAT WE CAN GIVE TO THE

7    BAILIFF?

8              MR. SPROUL:  YES.

9              THE WITNESS:  THANK YOU.

10   Q.   BY MR. SPROUL:  IN THE UNIVERSE OF ACCUSED PRODUCTS, YOU

11   INCLUDE WHAT ARE REFERRED TO OR WHAT YOU REFER TO AS THE

12   BIDIRECTIONAL-FACING HEATWAVE PRODUCTS; IS THAT RIGHT?

13   A.   NO, NOT BIDIRECTIONAL.

14   Q.   "BIDIRECTIONAL" IS A WORD YOU USED.  I DO NOT THINK

15   SEIRUS USES IT.  IT'S A WORD FROM YOUR REPORT; ISN'T THAT

16   RIGHT?

17   A.   AT THE TIME THAT I WROTE MY REPORT, THERE WERE MORE

18   CLAIMS THAT WERE IN PLAY BACK AND FORTH THAN WHAT WE'VE NOW

19   NARROWED DOWN TO CLAIM 2 AND CLAIM 23.

20   Q.   ARE YOU NO LONGER ACCUSING THE BIDIRECTIONAL PRODUCTS OF

21   INFRINGEMENT IN THIS CASE?

22   A.   THE PRODUCTS THAT ARE ACCUSED ARE THE ONES WHERE THE

23   HEAT-DIRECTING ELEMENTS ARE ON THE INNERMOST SURFACE OF THE

24   INNERMOST LAYER WHICH FACE TOWARDS THE WEARER.

25   Q.   "BIDIRECTIONAL PRODUCTS" IS YOUR TERM, DR. COLE.  I'M

COMPUTER-AIDED TRANSCRIPTION

1    JUST TRYING TO UNDERSTAND WHETHER OR NOT YOU'RE ACCUSING

2    THEM.

3    A.   YOU WOULD HAVE TO TELL ME THE PRODUCT SPECIFICALLY BY

4    NAME.  I WROTE THAT REPORT WELL OVER A YEAR AGO, AS YOU ARE

5    AWARE.

6            MR. SPROUL:  COULD YOU PULL UP PARAGRAPH 51, PLEASE,

7    OF DR. COLE'S INFRINGEMENT REPORT.

8            THE WITNESS:  DO I HAVE A HARD COPY?

9            MS. LEGAARD:  IF I MAY.  IT'S TAB 606 I THINK IN THE

10   BIG BINDER.

11           MR. SPROUL:  YOUR HONOR, I'M NOT GOING TO OFFER HER

12   REPORT, BUT I WOULD LIKE TO DISPLAY THE PARAGRAPH SO THAT THE

13   JURY CAN SEE WHAT WE'RE REFERRING TO.

14           THE COURT:  I'M SORRY.  I DIDN'T HEAR YOU.

15           MR. SPROUL:  I'M NOT INTENDING TO OFFER THE REPORT

16   AS EVIDENCE, BUT I WOULD LIKE TO DISPLAY THE PARAGRAPH SO

17   THAT THE JURY CAN SEE THE LANGUAGE.

18           THE COURT:  SURE.

19           MR. SPROUL:  PARAGRAPH 51 OF EXHIBIT 606.

20   Q.   PARAGRAPH 51 SAYS THAT "I UNDERSTAND THAT COLUMBIA

21   SPORTSWEAR ACCUSES ONLY THE INWARD-FACING HEATWAVE PRODUCTS

22   AND THE BIDIRECTIONAL FACING HEATWAVE PRODUCTS OF INFRINGING

23   THE ASSERTED CLAIMS OF THE '119 AND '270 PATENTS."

24           MY QUESTION TO YOU, DR. COLE, IS ARE YOU STILL

25   ACCUSING THE BIDIRECTIONAL HEATWAVE -- STRIKE THAT.

748

```
1              ARE YOU STILL ACCUSING THE BIDIRECTIONAL FACING
2     HEATWAVE PRODUCTS OF INFRINGING THE REMAINING TWO ASSERTED
3     CLAIMS?
4     A.   YES.
5     Q.   OKAY.  NOW, THERE IS AN EXHIBIT THAT HAS BEEN USED
6     PREVIOUSLY, AND IT'S THE SEIRUS HEAT TOUCH TORCHE GLOVE.
7              ARE YOU FAMILIAR WITH THAT?
8     A.   NO, I'M NOT.  I DON'T BELIEVE THAT THIS WAS PROVIDED TO
9     ME DURING MY EXAMINATION.
10    Q.   I'M GOING TO HAND IT TO YOU.  NOT A COMPLICATED
11    QUESTION.  I THINK YOU'VE -- IT'S ONE OF THE BIDIRECTIONAL
12    PRODUCTS THAT YOU'VE ACCUSED OF INFRINGEMENT.
13             SO IT IS COVERED BY YOUR OPINION, UNLESS YOU'D LIKE
14    TO STEP BACK FROM THAT AT THIS TIME?
15    A.   IF YOU WILL REPRESENT THAT IT'S A BIDIRECTIONAL PRODUCT
16    WHICH I GATHER WAS DEVELOPED BY SEIRUS AFTER THE TIME THAT
17    THIS REPORT WAS WRITTEN, I'D BE GLAD TO TAKE A LOOK AT IT.
18    Q.   IT'S BEEN IN EXISTENCE FOR YEARS.  I BELIEVE YOU'VE
19    ACCUSED IT OF INFRINGEMENT.  I'M GOING TO HAND IT TO YOU.  WE
20    DON'T NEED TO SQUABBLE NECESSARILY ABOUT WHETHER OR NOT
21    YOU'VE HAD IT PRIOR.
22    A.   THANK YOU.
23             MR. SPROUL:  THE BOX HOLDING THE GLOVES IS MARKED AS
24    EXHIBIT 736.  THE GLOVES HAVE COME OUT OF THE BOX.  I'M GOING
25    TO HAND YOU AT LEAST THE OUTER PART OF THE GLOVE.
```

749

1   Q.   FOR COMPLETENESS SAKE, I'M GOING TO HAND YOU THE

2   REMAINING PIECES FROM EXHIBIT 736.  THERE IS ONE INNER GLOVE

3   ON THE TABLE IN FRONT OF US.  THERE IS ANOTHER, BUT FOR OUR

4   PURPOSES HERE, WE DON'T NEED BOTH INNER GLOVES.

5             IF YOU COULD LOOK INSIDE THAT OUTER SHELL GLOVE THAT

6   YOU HAVE FROM EXHIBIT 736 AND CONFIRM FOR ME THAT THAT'S WHAT

7   YOU WOULD REFER TO AS A BIDIRECTIONAL PRODUCT.

8   A.   YES.

9   Q.   WHAT DO YOU MEAN BY BIDIRECTIONAL PRODUCT WITH RESPECT

10  TO THIS PRODUCT, EXHIBIT 736?

11  A.   IN PART OF THIS PRODUCT, THE HEAT-DIRECTING ELEMENTS ARE

12  DIRECTED TOWARDS THE WEARER'S BODY, AND PART OF THE PRODUCT,

13  THE HEAT-DIRECTING ELEMENTS APPEAR TO BE DIRECTED AWAY FROM

14  THE WEARER'S BODY.

15  Q.   SO IN THE TOP PART, YOU WOULD AGREE, THE PART THAT --

16  A.   THIS.

17  Q.   -- TOUCHES THE USER'S -- THE TOP OF THEIR HAND, THAT

18  PART HAS THE METALLIC FOIL FACING THE HAND; IS THAT

19  CORRECT?

20  A.   THAT'S CORRECT.

21  Q.   AND THE PALM SIDE HAS WHAT'S CALLED THE BRUSHED SIDE,

22  THE NONMETALLIC SIDE FACING THE USER'S HAND; ISN'T THAT

23  CORRECT?

24  A.   THAT'S CORRECT.

25  Q.   HAVE YOU ANALYZED THE PERCENTAGE OF METALLIC ELEMENT

750

1    FABRIC USED ON THE INNERMOST SURFACE OF THE GLOVE COMPARED TO

2    THE BRUSHED SURFACE?

3    A.   NO, I HAVE NOT.

4    Q.   DO YOU KNOW WHAT THAT PERCENTAGE IS?  DO YOU KNOW --

5    STRIKE THAT.

6         DO YOU KNOW WHAT THE RELATIVE PERCENTAGE IS BETWEEN

7    THE METALLIC SURFACE AND THE BRUSHED SURFACE ON THE INNERMOST

8    SURFACE OF EXHIBIT 736?

9    A.   OKAY.  I'M TRYING TO FIGURE OUT WHAT'S IN THE FINGERS.

10   IT APPEARS THAT THE BACK OF THE FINGERS IS THE METALLIC

11   SURFACE, BUT THE --

12   Q.   FEEL FREE TO PULL IT INSIDE OUT, IF YOU'D LIKE.

13   A.   IT'S A CHALLENGE BECAUSE THEY ARE NOT REALLY

14   SEPARABILE.

15   Q.   I REPRESENT TO YOU THAT, IN FACT, WHAT YOU INITIALLY

16   FELT IS ACCURATE, THAT ON THE FINGERS, THE TOP SIDE IS

17   COVERED, THE TWO SIDES ARE NOT AND THE BOTTOM ARE NOT.  IN

18   ADDITION, THE THUMB IS ALSO NOT COVERED WITH THE

19   HEAT-REFLECTING METALLIC ELEMENT.

20   A.   I WILL AGREE WITH THE THUMB.  THE THUMB DOES NOT HAVE

21   THE HEAT-REFLECTING ELEMENT TOWARDS THE BODY.  THE FINGERS, I

22   WOULD AGREE.  THE HEAT-DIRECTING ELEMENT APPEARS TO BE ONLY

23   ON THE BACK SIDE OF THE FINGERS, AND THE SIDE OF THE FINGERS

24   TOWARDS THE PALM IS THE BLACK FABRIC INSTEAD.

25   Q.   OKAY.  THANK YOU.  AND NOT THE THUMB?

751

1    A.   AND NOT THE THUMB AT ALL.

2    Q.   NOW, IN YOUR REBUTTAL REPORT -- STRIKE THAT.

3         YOU -- IN ADDITION TO AN INFRINGEMENT REPORT, YOU

4    AUTHORED AND ISSUED A REPORT RELATING TO THE VALIDITY OF THE

5    PATENTS; ISN'T THAT RIGHT?

6    A.   THAT'S CORRECT.

7         MS. LEGAARD:  OKAY.  BEYOND THE SCOPE.

8         THE COURT:  SUSTAINED.

9         MR. SPROUL:  YOUR HONOR, IT GOES DIRECTLY TO HER

10   ASSESSMENT OF INFRINGEMENT WITH RESPECT TO THIS PRODUCT.

11        THE COURT:  THE OBJECTION IS SUSTAINED.

12   Q.   BY MR. SPROUL:  YOU DID NOT TAKE INTO ACCOUNT WHEN YOU

13   PERFORMED YOUR INFRINGEMENT ANALYSIS, OF THE BIDIRECTIONAL

14   PRODUCTS, THE RELATIVE PERCENT COVERAGE OF THE METALLIC

15   ELEMENTS VERSUS THE BRUSHED FABRIC; ISN'T THAT RIGHT?

16   A.   THAT PERCENTAGE IS IRRELEVANT TO A DISCUSSION AS TO

17   WHETHER THE PRODUCT INFRINGES OR NOT.  IF ANY PART OF THE

18   PRODUCT INFRINGES, THE PRODUCT INFRINGES.

19        MR. SPROUL:  COULD YOU PULL UP CLAIM 2 OF THE '270

20   PATENT, PLEASE.  EXHIBIT 1019.  CLAIM 2, PLEASE, MR. TISA.

21   IT'S ON THE LAST PAGE, I BELIEVE.  IF YOU CAN ZOOM IN ON

22   CLAIM 2, JUST CLAIM 2.  JUST THE LANGUAGE OF CLAIM 2, PLEASE.

23   Q.   CLAIM 2 READS -- AND YOU ALREADY HAVE ANALYZED IT AND

24   DISCUSSED IT WITH THE JURY, BUT I'M GOING TO READ IT TO THEM

25   FOR ORIENTING US HERE.

752

```
 1              "THE HEAT MANAGEMENT MATERIAL OF CLAIM 1, WHEREIN
 2     THE BASE MATERIAL COMPRISES AN INNERMOST LAYER OF THE BODY
 3     GEAR HAVING AN INNERMOST SURFACE, AND WHEREIN THE
 4     HEAT-DIRECTING ELEMENTS ARE POSITIONED ON THE INNERMOST
 5     SURFACE TO DIRECT HEAT TOWARDS THE BODY OF A BODY GEAR USER."
 6              DO YOU SEE THAT?
 7     A.   YES.
 8     Q.   THE REFERENCE TO THE INNERMOST LAYER IS IN REFERENCE TO
 9     BODY GEAR, IN THIS CASE A GLOVE; ISN'T THAT RIGHT?
10     A.   YES.
11     Q.   AND YOUR ANALYSIS DID NOT TAKE INTO ACCOUNT THE ENTIRE
12     INNERMOST LAYER OF THE BODY GEAR; ISN'T THAT RIGHT?
13     A.   I'M NOT SURE IN WHAT CONTEXT YOU'RE DRAWING THAT
14     CONCLUSION.
15     Q.   YOU SAID YOU ONLY LOOKED AT THE PORTION OF THE INNERMOST
16     LAYER OF THE GLOVE THAT HAD THE METALLIC ELEMENTS ON IT.
17     A.   CORRECT.
18     Q.   THE RATIO OF SILVER METALLIC ELEMENTS TO BLACK BASE
19     FABRIC IS THE CRUX OF THE CLAIM HERE, ISN'T IT?
20              MR. ALDRICH:  OBJECTION, YOUR HONOR.
21              THE COURT:  YOUR OBJECTION --
22              MR. ALDRICH:  THIS IS ANOTHER NEW CONTENTION, I'M
23     AFRAID.
24              THE COURT:  ASK YOUR QUESTION AGAIN.
25     Q.   BY MR. SPROUL:  YOU DID NOT CONSIDER THE PERCENTAGE
```

753

1    COVERAGE OVER THE ENTIRE INNER SURFACE OF THE GLOVE, DID

2    YOU?

3              THE COURT:  YOUR OBJECTION IS OVERRULED.

4              YOU CAN ANSWER THAT QUESTION.

5              THE WITNESS:  CORRECT.  I DIDN'T.  BECAUSE CLAIM 2

6    ADDS -- REFERS TO THE HEAT MANAGEMENT MATERIAL AND IT TALKS

7    ABOUT THE BASE MATERIAL COMPRISING THE INNERMOST LAYER.

8    Q.   BY MR. SPROUL:  RIGHT.  AND IF --

9    A.   IT DOES NOT TALK ABOUT THE -- THE BASE MATERIAL RELATIVE

10   TO THE HEAT-DIRECTING ELEMENTS.  IT'S SIMPLY THE BASE

11   MATERIAL COMPRISES THE INNERMOST LAYER OF BODY GEAR HAVING AN

12   INNERMOST SURFACE.

13   Q.   RIGHT.  AND THE -- YOU DID NOT CONSIDER THE ENTIRE

14   INNERMOST SURFACE OF THE GLOVE WHEN CALCULATING YOUR

15   PERCENTAGE COVERAGE BY THE METALLIC ELEMENTS, DID YOU?

16   A.   I CONSIDERED THE HEAT MANAGEMENT MATERIAL AND WHAT

17   PERCENTAGE OF THE SURFACE WAS COVERED BY THE HEAT-DIRECTING

18   ELEMENTS, WHICH IS WHAT CLAIM 1 DIRECTS ME TO LOOK AT.

19   Q.   THE BRUSHED SIDE, WHERE THE HEAT-METALLIC ELEMENTS ARE

20   NOT FACING THE HAND, IS THE SAME MATERIAL JUST REVERSED;

21   ISN'T THAT RIGHT?

22             MR. ALDRICH:  OBJECTION, YOUR HONOR.

23             THE COURT:  YOUR OBJECTION IS SUSTAINED.

24   Q.   BY MR. SPROUL:  IF YOU WERE TO CONSIDER THE ENTIRE

25   SURFACE, THAT WOULD CHANGE YOUR CALCULATED PERCENTAGE; ISN'T

754

1    THAT RIGHT?

2         MR. ALDRICH:  OBJECTION, YOUR HONOR.

3         THE COURT:  SUSTAINED.

4         MR. SPROUL:  YOUR HONOR, I BELIEVE DR. BLOCK HAS

5    THIS IN HIS REPORT.  I BELIEVE HE TALKS ABOUT THE

6    BIDIRECTIONAL GLOVES IN MULTIPLE --

7         THE COURT:  WE'LL TAKE THIS UP LATER.

8         MOVE ON.

9         MR. SPROUL:  OKAY.  THANK YOU, YOUR HONOR.

10   Q.   DR. COLE, YOU TESTIFIED ABOUT THE 30 TO 70 PERCENT

11   COVERAGE IN YOUR OPENING DIRECT TESTIMONY; IS THAT RIGHT?

12   A.   THAT'S CORRECT.

13        MR. SPROUL:  AND IF YOU -- MR. TISA, IF YOU COULD

14   PULL OUT AND ZOOM IN ON THE MIDDLE ELEMENT THERE, WHERE IT

15   TALKS ABOUT 7:3 AND 3:7.

16        THE CLAIM LANGUAGE AT ISSUE HERE IS "WHEREIN A

17   SURFACE AREA RATIO OF HEAT-DIRECTING ELEMENTS OF BASE

18   MATERIAL IS ABOUT 7:3 TO ABOUT 3:7."

19        DO YOU SEE THAT?

20   A.   YES.

21   Q.   WHAT DO YOU UNDERSTAND THE "ABOUT" TO MEAN IN THIS

22   CONTEXT?

23   A.   "ABOUT" IS NOT A TERM THAT WENT THROUGH CLAIMS

24   CONSTRUCTION IN MY UNDERSTANDING.  SO TYPICALLY WHEN A TERM

25   DOES NOT GO THROUGH CLAIMS CONSTRUCTION, WE'RE DIRECTED TO

755

1    CONSIDER THEIR ORDINARY MEANING OF THE WORD.  IN SOME CASES,

2    WE MAY BE GIVEN A LITTLE BIT MORE INSIGHT TO THE MEANING OF A

3    TERM BY LOOKING AT THE SPECIFICATION, THAT IS, THE TEACHING

4    THAT'S BEEN PROVIDED BY THE INVENTOR.

5         I DO NOT FIND ANYTHING SPECIFICALLY IN THE

6    SPECIFICATION BY THE INVENTOR WHICH ADDRESSES WHAT WAS MEANT

7    BY "ABOUT," SO, THEREFORE, I HAVE TO FALL BACK ON IT'S THE

8    ORDINARY MEANING OF "ABOUT."

9         AND "ABOUT," CERTAINLY ANYTHING WHICH WOULD FALL

10   BETWEEN 30 PERCENT AND 70 PERCENT, THAT FALLS WITHIN THE

11   RANGE, WOULD BE WITHIN THE RANGE.  THE QUESTION IS, IF WE HAD

12   SOMETHING WHICH WAS SLIGHTLY LESS, SLIGHTLY MORE, HOW CLOSE

13   DOES THAT HAVE TO BE TO BE CAPTURED BY "ABOUT."

14        I THINK A REASONABLE WAY OF LOOKING AT IT WOULD BE

15   HOW WOULD YOU ROUND A NUMBER.  SO, FOR INSTANCE, IF YOU HAD

16   NOT 30 PERCENT, BUT 29.5 PERCENT.  ONE WOULD TYPICALLY EXPECT

17   THAT TO BE ROUNDED UP TO 30 PERCENT.  IF YOU HAD 29.1

18   PERCENT, PERHAPS YOU WOULD ROUND IT DOWN TO 29 PERCENT, IN

19   WHICH CASE, "ABOUT" MIGHT NOT CAPTURE IT.

20        AND A SIMILAR KIND OF ARGUMENT, WHEN YOU SET ON THE

21   HIGH END OF THE RANGE, THE 70 PERCENT RANGE AS WELL.

22   Q.   IS IT YOUR TESTIMONY THAT "ABOUT" THEN GOES TO 29 1/2

23   BUT DOES NOT EXTEND TO 29?

24   A.   YOU KNOW, I THINK THIS IS SOMETHING WE'RE PROBABLY GOING

25   TO ARGUE BACK AND FORTH AND SPLIT HAIRS ON FOREVER.  THE

756

1    TRUTH OF THE MATTER IS THAT IF YOU LOOK AT ALL OF THE TEST

2    WORK WHICH I DID, AS WELL AS THE INFORMATION THAT DR. BLOCK

3    DISCLOSED AT HIS DEPOSITION, ALL OF THE ACCUSED SEIRUS

4    HEATWAVE PRODUCTS FALL WITHIN THE 70 PERCENT, THE 30

5    PERCENT.

6    Q.   MY QUESTION WAS A LITTLE DIFFERENT.

7         IS IT YOUR TESTIMONY THAT "ABOUT" COVERS 29.5, BUT

8    IT DOESN'T COVER 29?

9    A.   I THINK IT'S REASONABLE THAT "ABOUT" WOULD BE CONSIDERED

10   THE 29.5.  THE REST OF THE NUMBER, WHETHER IT INCLUDES

11   ANYTHING LESS THAN THAT, I THINK THAT WE WOULD PROBABLY NEED

12   TO DISCUSS FURTHER.

13   Q.   IN OTHER WORDS, WE DON'T KNOW STANDING HERE RIGHT NOW;

14   IS THAT RIGHT?

15   A.   NO.  I THINK WE WOULD WANT TO DISCUSS IT FURTHER.

16   Q.   CAN YOU TELL ME --

17        MS. LEGAARD:  OBJECTION.  REPETITIVE.

18        THE COURT:  I'M SORRY?

19        MS. LEGAARD:  REPETITIVE.

20        MR. SPROUL:  SHE DIDN'T ANSWER THE QUESTION, YOUR

21   HONOR.

22        THE COURT:  CAN YOU ANSWER THE QUESTION?

23        GO AHEAD.

24        THE WITNESS:  MY FIRST BLUSH IS NO, I WON'T PUT 29

25   WITHIN THAT RANGE OF BEING COVERED BY "ABOUT."  AND PART OF

1    IT IS BECAUSE, QUITE FRANKLY, BASED ON MY TESTING, IT ISN'T

2    NECESSARY.

3    Q.    BY MR. SPROUL:  WELL, APART FROM THE TESTING, DO YOU

4    HAVE A FIRM AND DEFINITE UNDERSTANDING OF WHAT ABOUT 30

5    PERCENT MEANS?  STRIKE THAT.  ABOUT 3:7 MEANS?

6    A.    THAT CERTAINLY EVERYTHING THAT FALLS WITHIN THE 30

7    PERCENT TO 70 PERCENT IS WITHIN THE RANGE AS DEFINED WITHIN

8    CLAIM 2.  IT'S WHEN YOU GET ON THE OUTSIDE BORDERS OF THAT

9    RANGE, THE OUTSIDE OF IT, THAT I THINK THAT THERE IS A

10   LEGITIMATE DISCUSSION, WHICH SOMETIMES PEOPLE CALL ACADEMIC

11   DISCUSSIONS; SO I GUESS I'M A GOOD PERSON TO HAVE A

12   DISCUSSION WITH.

13   Q.    WHAT DO YOU MEAN BY "ACADEMIC DISCUSSION"?

14   A.    UNFORTUNATELY AS AN ACADEMIC, THEY TEND TO BE THINGS

15   WHICH ARE ABOUT SPLITTING HAIRS RATHER THAN TALKING ABOUT

16   USEFUL PRODUCTS, UNFORTUNATELY.

17   Q.    HOW DO YOU RELATE THAT ACADEMIC DISCUSSION TO MY

18   SPECIFIC QUESTION, WHICH IS HOW DO WE KNOW WHAT "ABOUT 30"

19   MEANS?  HOW DO WE KNOW WHAT "ABOUT 3:7" MEANS?

20         CAN YOU TELL ME FIRMLY AND WITH SOME DEFINITENESS

21   WHAT "ABOUT 3:7" MEANS?

22         MS. LEGAARD:  OBJECTION.  ASKED AND ANSWERED.

23         THE COURT:  OVERRULED.

24         THE WITNESS:  AS I INDICATED PREVIOUSLY, THAT WHEN

25   WE'RE NOT GIVEN FURTHER INFORMATION, EITHER BY THE COURT OR

758

1    THE INVENTOR ABOUT THE MEANING OF A TERM, WE'RE DIRECTED TO

2    USE ITS ORDINARY MEANING; AND IN THIS PARTICULAR CASE, I

3    THINK THAT A SIMPLE ROUNDING IS THE WAY THAT ORDINARILY WOULD

4    BE USED.

5             SO 29.5, TYPICALLY WE WOULD ROUND TO 30.  IT FALLS

6    WITHIN THE RANGE.  29, WE PROBABLY WOULDN'T ROUND IT TO 30,

7    UNLESS WE HAVE A VERY COARSE SCREEN THAT WE'RE PASSING THINGS

8    THROUGH.

9    Q.   SO SOMETIMES IT WOULD BE 29.5, BUT THERE MAY BE

10   SITUATIONS WHERE IT'S LESS THAN 29.5?

11   A.   IT MIGHT EXTEND DOWN A LITTLE BIT LOWER, CORRECT.

12   Q.   AND IF IT WERE JUST YOU AND I TALKING, I WOULDN'T SAY

13   THIS, BUT WE SHOULD TRY TO NOT SPEAK OVER EACH OTHER, SIMPLY

14   FOR THE COURT REPORTER'S BENEFIT.

15   A.   I APOLOGIZE.

16   Q.   IT'S ACTUALLY I THINK A NATURAL WAY THAT PEOPLE SPEAK,

17   BUT HERE IT'S DIFFICULT FOR HER.

18             WHAT ABOUT ON THE HIGH END, DO YOU BELIEVE 71 IS

19   ABOUT 7:3?

20   A.   AGAIN, IN THIS PARTICULAR SITUATION, I THINK IT'S AN

21   UNNECESSARY DISCUSSION, GIVEN THAT ALL THE PRODUCTS CLEARLY

22   FALL WITHIN THE RANGE.

23             DOES THE RANGE GET -- DOES IT GO OUTSIDE OF 70?

24   AGAIN, 70.4, TYPICALLY YOU WOULD ROUND THAT DOWN TO 70.  BY

25   THE TIME YOU GET TO 80, YOU PROBABLY WOULDN'T ROUND THAT DOWN

759

1    TO 70.

2    Q.   FALLS SOMEWHERE BETWEEN 70 AND 80; IS THAT FAIR?

3    A.   SOMEWHERE IN THERE.  AND CLOSER TO 70 WOULD BE THE LIMIT

4    FOR THE UPPER.

5    Q.   YOU CAN'T SAY WITH ANY MORE PARTICULARITY SITTING HERE

6    TODAY?

7    A.   QUITE FRANKLY, IT DOESN'T SEEM NECESSARY, GIVEN THE

8    PRODUCTS THAT HAVE BEEN ACCUSED.

9    Q.   WITH ALL DUE RESPECT, DR. COLE, IT'S NECESSARY BECAUSE

10   I'M ASKING YOU THE QUESTION.

11   A.   THANK YOU.

12   Q.   DID YOU ANSWER MY QUESTION?

13   A.   THEN, AGAIN, I WOULD SAY THAT THE UPPER END WOULD FALL

14   CLOSER TO 70, JUST AS THE DESCRIPTION THAT I GAVE YOU ON THE

15   LOWER END WITH 29.

16   Q.   BUT YOU CAN'T PROVIDE US ANY MORE SPECIFICITY THAN THAT?

17   YOU -- STRIKE THAT.

18   A.   ONCE WE ROUND TO -- ONCE WE DO A TYPICAL MATHEMATICAL

19   ROUNDING TO THE NUMBER, I WOULD SAY THINGS THAT ROUND, YES,

20   THEY FALL WITHIN THE RANGE.  THINGS THAT DON'T ORDINARILY

21   ROUND, THEY FALL OUTSIDE OF THE RANGE.

22   Q.   I APOLOGIZE FOR BELABORING THIS.  BUT YOU COULD ROUND 72

23   DOWN TO 70; ISN'T THAT RIGHT?

24   A.   YOU COULD.

25   Q.   YOU COULD ROUND 73 DOWN TO 70?

COMPUTER-AIDED TRANSCRIPTION

760

1    A.    CORRECT.

2    Q.    YOU COULD ROUND 74 DOWN TO 70?

3    A.    THAT'S CORRECT.

4    Q.    BUT WE DON'T KNOW; ISN'T THAT RIGHT?

5    A.    THE ONLY DIRECTION THAT WE ARE GIVEN BY THE PATENT IS

6    THE TERM "ABOUT."

7    Q.    THAT DOESN'T TELL US ENOUGH INFORMATION ABOUT WHERE THIS

8    CLAIM ENDS, DOES IT?

9            MS. LEGAARD:  YOUR HONOR.  OBJECTION.  THIS IS --

10            THE COURT:  OVERRULED.

11            THE WITNESS:  AS AN ACADEMIC WHO COMES FROM A

12    MATHEMATICAL SIDE, I WOULD HAVE PREFERRED IF THE CLAIM

13    LANGUAGE WAS MORE PRECISE.  BUT IT'S NOT.

14    Q.    BY MR. SPROUL:  IS THERE ANY REASON TO BELIEVE THAT

15    COLUMBIA HAS SURRENDERED ANY RANGE BELOW 30 PERCENT AND ABOVE

16    70 PERCENT?

17    A.    AS GIVEN BY THIS PARTICULAR CLAIM?

18    Q.    YES.

19    A.    I'M NOT AWARE OF -- I'M NOT AWARE THAT COLUMBIA CLAIMS

20    ANY MORE COVERAGE THAN WHAT YOU SEE BEFORE US IN THIS

21    PARTICULAR PATENT CLAIM.

22    Q.    YOU CAN'T GIVE ME A DEFINITIVE RANGE COVERED BY THIS

23    PARTICULAR PATENT CLAIM?

24    A.    AGAIN, THIS DIDN'T GO THROUGH CLAIM CONSTRUCTION, IS MY

25    UNDERSTANDING, SO WE DON'T HAVE GUIDANCE SITTING IN FRONT OF

761

1    US RIGHT NOW, ANYTHING OTHER THAN WHAT WE READ HERE, ABOUT

2    7:3 TO ABOUT 3:7.

3    Q.    THERE IS NOTHING IN THE PATENT THAT PROVIDES US ANY MORE

4    GUIDANCE, IS THERE?

5    A.    I DON'T RECALL THAT THERE IS ANYTHING THAT GIVES US ANY

6    MORE GUIDANCE.

7    Q.    WE DON'T KNOW WHETHER IT'S 25 TO 75, WHETHER IT'S 28 TO

8    72, WHETHER IT'S 29 TO 71, DO WE?

9    A.    AT THIS POINT, ALL WE KNOW IS "ABOUT."

10   Q.    THAT'S NOT ENOUGH, IS IT?

11   A.    AS I SAID, NOTHING THAT I HAVE TESTED OF THE ACCUSED

12   PRODUCTS PUTS THEM OUTSIDE OF THE 30 PERCENT TO 70 PERCENT.

13   Q.    YOU AGREE THAT THERE IS A LOT OF VARIOUS -- STRIKE THAT.

14          YOU AGREE THAT THERE IS VARIABILITY IN FABRICS

15   GENERALLY AS MANUFACTURED?

16   A.    YES, THERE IS VARIATION.

17   Q.    AND THERE IS, IN FACT, VARIATION IN THE SPECIFIC SEIRUS

18   FABRICS THAT YOU MEASURED AND OPINED ON IN THIS LITIGATION?

19   A.    YES.

20   Q.    WHY -- STRIKE THAT.

21          WHAT REASONS ARE THERE FOR THE VARIATION IN THE

22   VARIOUS FABRICS AS TO THE COVERAGE OF THE METALLIC

23   ELEMENTS?

24   A.    THERE IS POTENTIAL VARIATION IN THE BASE FABRIC ITSELF.

25   FIBERS ARE GENERALLY MADE WITH A PRETTY UNIFORM CROSS SECTION

1    THROUGHOUT THE LENGTH OF THEM.  THE TECHNIQUES USED FOR

2    CONSTRUCTING THESE FABRICS, YOU HAVE A LITTLE BIT OF

3    VARIATION IN THEM.  WHEN YOU TAKE THE FABRICS THROUGH

4    FINISHING, SOMETIMES THEY ARE STRETCHED A LITTLE BIT MORE

5    THAN OTHERS.

6            A MANUFACTURER TAKES THAT INTO ACCOUNT.  IF THERE IS

7    A LIMIT, SAY FOR THE AMOUNT OF DOWN THAT YOU'RE ADVERTISING

8    THAT YOU HAVE IN A DOWN JACKET, TO MAKE SURE THAT -- THAT

9    YOUR PRODUCT AS YOU TRY TO SELL IT TO CONSUMERS, THE

10   VARIATION HAS BEEN TAKEN INTO ACCOUNT.

11   Q.   AND THAT VARIATION CAN BE DUE TO, FOR INSTANCE, THE HEAT

12   THAT IS APPLIED DURING THE MANUFACTURING PROCESS OF THE

13   FABRIC?

14   A.   IT IS CERTAINLY TRUE, YES.

15   Q.   IT CAN BE DUE TO THE AGE OF THE DRUM, FOR INSTANCE, USED

16   TO EMBOSS THE FABRIC, IF IT'S MANUFACTURED IN THAT WAY?

17   A.   THIS IS CORRECT.

18   Q.   IT CAN BE DUE TO THE UNDERLYING BASE MATERIAL AND THE

19   VARIABILITY IN THAT FABRIC?

20   A.   YES.

21   Q.   THERE ARE NUMEROUS REASONS WHY YOU WOULD HAVE SOME

22   VARIATION IN THE CREATION AND MANUFACTURE OF THE FABRIC, SUCH

23   AS THE SEIRUS FABRIC, THAT YOU'VE OPINED ON TODAY?

24   A.   THIS IS CORRECT.  SO A MANUFACTURER NORMALLY EXERCISES

25   DUE-PROCESS CONTROL IN ORDER TO BOTH UNDERSTAND THE VARIABLES

763

1    AS WELL AS TO UNDERSTAND HOW TO KEEP THE RANGE OF THE

2    VARIABLES WITHIN HIS PROCESS LIMITS.

3    Q.   YOU LOOKED AT FABRIC SAMPLES IN THIS CASE; CORRECT?

4    A.   I LOOKED AT FABRIC SAMPLES THAT SEIRUS PROVIDED THROUGH

5    THE COURT TO ME.

6    Q.   DO YOU UNDERSTAND, OR IS THERE A DIFFERENCE IN YOUR MIND

7    BETWEEN FABRIC SAMPLES AND FABRIC SPECIMENS?

8    A.   I DON'T SEE THAT THERE IS A DIFFERENCE.

9    Q.   IT'S NOT A TERMINOLOGY OR PHRASE THAT YOU USE?

10   A.   SPECIMENS, NO.  SPECIMENS STRIKES ME AS MORE

11   BIOLOGICAL.

12   Q.   FAIR ENOUGH.

13        YOU DID NOT LOOK AT THE FABRIC -- STRIKE THAT.

14        YOU DID NOT REMOVE FABRIC FROM THE ACTUAL ACCUSED

15   GLOVES AND MEASURE THAT FABRIC, DID YOU?

16   A.   THAT'S CORRECT.  BECAUSE THE PATENT CLAIMS THAT I WAS

17   LOOKING AT DIRECT ME TO LOOK AT THE HEAT MANAGEMENT MATERIAL

18   AS ADAPTED FOR USE IN BODY GEAR, NOT AS REMOVED FROM BODY

19   GEAR.

20   Q.   YOU DID NOT CORRELATE THE SAMPLES THAT YOU USED TO

21   SPECIFIC PRODUCTS EITHER?

22   A.   I WAS TOLD WHICH FABRICS THAT SEIRUS USED.

23   Q.   YOU YOURSELF --

24   A.   I DID NOT INDEPENDENTLY VERIFY THAT ASSIGNMENT.

25   Q.   IN OTHER WORDS, YOU CAN'T TESTIFY -- STRIKE THAT.

764

```
 1              YOU DID NOT TESTIFY THAT SPECIFIC FABRICS THAT YOU
 2    MEASURED WENT INTO SPECIFIC SEIRUS GLOVE MODELS, DID YOU?
 3    A.   THAT'S CORRECT.  WHAT WAS REPRESENTED TO ME WAS THE
 4    FIRST TWO SEIRUS FABRICS THAT I WAS GIVEN, THE TWO-WAY
 5    STRETCH AND THE FOUR-WAY STRETCH AS WE'VE BEEN REFERRING TO
 6    THEM, THAT THE FOUR-WAY STRETCH WAS THE FABRIC THAT SEIRUS
 7    HAD REPRESENTED TO COUNSEL WAS USED IN ALL OF THE PRODUCTS.
 8              AND THEN LATER, I UNDERSTAND AT DIFFERENT
 9    DEPOSITIONS OF SEIRUS EMPLOYEES, THERE WAS SOME DISCUSSION AS
10    TO WHETHER THE TWO-WAY FABRIC HAD EVER BEEN USED, WITH SOME
11    SEIRUS EMPLOYEES SAYING IT HAD NEVER BEEN USED AND OTHER
12    SEIRUS SAYING, OH, NO, IT WAS USED IN THESE PARTICULAR
13    PRODUCTS.
14              SO THERE APPEARED TO BE SOME BACK-AND-FORTH
15    DISCUSSION AS TO WHAT WENT WHERE.
16    Q.   THE SPECIFIC FABRICS AT ISSUE HERE, THE SEIRUS FABRICS,
17    AND IN ADDITION, THE COLUMBIA OMNI-HEAT FABRICS WHICH YOU
18    ALSO MEASURED, MEASURING THE EXACT METALLIC COVERAGE IS
19    DIFFICULT; ISN'T THAT FAIR?
20    A.   MEASURING THE EXACT COVERAGE REQUIRES HAVING A GOOD,
21    SHARP PICTURE, WHICH IS WHY I TOOK MULTIPLE PICTURES.
22    Q.   YOU AGREE THAT STATISTICS ARE IMPORTANT FOR DRAWING
23    CONCLUSIONS BASED ON SCIENTIFIC MEASUREMENTS?
24    A.   IT'S NECESSARY TO UNDERSTAND THE VARIABILITY WITHIN THE
25    MATERIALS.
```

765

1    Q.    LAYPEOPLE OFTEN DON'T NEED TO RELY ON STATISTICS OR

2    INVOLVE THEM IN THEIR EVERYDAY COUNTING, FOR INSTANCE, IN

3    MEASUREMENTS?  AS AN EXAMPLE, WE CAN COUNT THE NUMBER OF

4    JURORS HERE IN THE JURY BOX WITH PRETTY GOOD ACCURACY AND

5    PRECISION; ISN'T THAT FAIR?

6    A.    CORRECT.  AND WE KNOW THAT THERE ARE EIGHT PEOPLE

7    SITTING OVER THERE, AND THEY ARE NOT SEVEN AND THEY ARE NOT

8    NINE.

9    Q.    BUT OTHER THINGS ARE MUCH MORE DIFFICULT TO MEASURE?

10   A.    NOT NECESSARILY MORE DIFFICULT TO MEASURE, BUT THERE MAY

11   BE SOME RANGE ASSOCIATED WITH THE MEASUREMENT.

12   Q.    WHAT DO YOU MEAN BY "RANGE"?  HOW WOULD YOU REFER TO

13   THAT?

14   A.    WELL, FOR INSTANCE, BODY WEIGHT.  IF YOU ASK WHAT

15   SOMEONE WEIGHS, DO YOU MEAN HOW MUCH THEY WEIGH IN THE

16   MORNING, HOW MUCH THEY WEIGH IN THE EVENING, HOW MUCH THEY

17   WEIGH TODAY VERSUS HOW MUCH THEY WEIGH TOMORROW.  SO THERE IS

18   SOME VARIATION THERE.  AND WE NORMALLY TAKE THAT VARIATION

19   INTO ACCOUNT WHEN WE TALK ABOUT HOW MUCH DO YOU WEIGH.

20          SO, FOR INSTANCE, I MIGHT SAY, WELL, YOU WEIGH 155

21   POUNDS.  I WOULDN'T SAY YOU WEIGH 155.134 POUNDS.  BECAUSE I

22   KNOW TEN MINUTES FROM NOW, YOU DON'T WEIGH THE 134, THE

23   NUMBER HAS CHANGED.

24   Q.    WOULD YOU REFER TO THAT RANGE AS A MARGIN OF ERROR?

25   A.    IT'S NOT QUITE CALLED THAT.  IT REALLY IS MORE

766

1    APPROPRIATELY REFERRED TO AS A RANGE.

2    Q.   DOES THE RANGE REPRESENT SOME EXPECTED ERROR OR

3    UNCERTAINTY IN THE MEASUREMENT?

4    A.   ONE WOULD EXPECT THAT THE MEASUREMENTS FALL WITHIN THAT

5    RANGE, A LARGE PORTION OF THE TIME.

6    Q.   WITHIN THE RANGE, BUT NOT THE EXACT MEASUREMENT?

7    A.   PERHAPS NOT THE MIDPOINT OF THE RANGE ALL THE TIME, OR

8    WHAT WE TYPICALLY CALL EITHER THE MEAN, THE AVERAGE OR

9    POSSIBLY THE MEDIAN VALUE.

10            MR. SPROUL:  MAY I APPROACH, YOUR HONOR, BRIEFLY?

11            THE COURT:  SURE.

12   Q.   BY MR. SPROUL:  I DON'T HAVE THE SEIRUS FABRIC HERE, BUT

13   I'M HOLDING IN FRONT OF YOU THE OMNI-HEAT FABRIC THAT WE

14   TALKED ABOUT EARLIER.

15            FROM A DISTANCE, IT LOOKS UNIFORM; ISN'T THAT FAIR?

16   A.   CORRECT.

17   Q.   AND, IN FACT, IT'S ACTUALLY MADE UP OF A LOT OF

18   DIFFERENT TINY LITTLE DOTS?

19   A.   CORRECT.

20   Q.   AND ONE HAS TO GET VERY CLOSE TO THESE DOTS IN ORDER TO

21   EVEN DISCERN THEM; ISN'T THAT FAIR?

22   A.   THIS IS CORRECT.

23   Q.   YOU CANNOT DISCERN THE DOTS SITTING WHERE YOU ARE?

24   A.   NO, I CAN SEE THE DOTS FROM HERE.

25   Q.   YOU CAN?

COMPUTER-AIDED TRANSCRIPTION

767

1    A.    I HAVE THE RIGHT GLASSES ON.

2    Q.    BUT YOU SITTING HERE ARE NOT ABLE TO TELL ME THE PERCENT

3    COVERAGE LOOKING AT THIS SWATH OF FABRIC; ISN'T THAT FAIR?

4    A.    THAT'S FAIR.  I CAN'T TELL YOU WHAT THE PERCENTAGE IS.

5    I SIMPLY HAVE A GENERAL IDEA OF WHAT THE PERCENT COVERAGE

6    IS.

7    Q.    IN ORDER TO DO THAT, YOU HAVE TO PERFORM A NUMBER OF

8    MEASUREMENTS, WHICH YOU TESTIFIED TO EARLIER?

9    A.    CORRECT.

10    Q.    AND WITH RESPECT TO THE OMNI-HEAT FABRIC AND THE

11    MEASUREMENTS YOU MADE, YOU LOOKED AT TWO DOTS; ISN'T THAT

12    RIGHT?

13    A.    NO, THAT'S NOT RIGHT.  THE UNIT CELLS, WHAT I WAS

14    LOOKING AT IN THE CASE OF BOTH THE SEIRUS FABRIC AND THE

15    COLUMBIA FABRICS WERE THE UNIT CELLS.  THAT IS, THAT SMALLEST

16    REPEATING DISTANCE THAT YOU CAN BASICALLY STAMP OUT THE

17    ENTIRE PATTERN.

18            AND IN THE CASE OF SEIRUS, IT'S A FAIRLY LARGE UNIT

19    CELL BECAUSE OF THE LOGO THAT ARE INCORPORATED IN IT.  IN THE

20    CASE OF COLUMBIA FABRICS, IT'S NOT.  IT'S FAIRLY SMALL.  AND

21    YOU TYPICALLY TAKE MULTIPLE MEASUREMENTS AND LOOK AT HOW

22    DIFFERENT IS ONE MEASUREMENT TO ANOTHER MEASUREMENT TO GIVE

23    YOU A SENSE OF WHETHER YOU HAVE TAKEN SUFFICIENT MEASUREMENTS

24    OR NOT.

25    Q.    YOUR UNIT CELL, AS YOU MEASURED THE COLUMBIA FABRIC, WAS

768

1    TWO DOTS; ISN'T THAT RIGHT?

2    A.   IT'S PARTS.  IT'S ONE COMPLETE DOT AND PARTS OF FOUR

3    OTHER DOTS.

4    Q.   THANK YOU.  I WASN'T TRYING TO INSINUATE ANYTHING ELSE.

5    I THOUGHT YOU REFERRED TO IT AS TWO DOTS.

6         IT'S ONE DOT PLUS PARTS OF OTHER DOTS?

7    A.   CORRECT.

8    Q.   TOGETHER THEY ADD UP TO TWO DOTS, PLUS THE RELATED

9    UNDERLYING BASE MATERIAL THAT SHOWS THROUGH IN THAT

10   PARTICULAR AREA?

11   A.   CORRECT.

12   Q.   AND AS WE'VE DISCUSSED, THERE IS SOME INHERENT

13   DIFFICULTY IN MEASURING THE RELATIONSHIP OR THE RATIO BETWEEN

14   THE SILVER DOT AND THE UNDERLYING BASE MATERIAL; RIGHT?

15   A.   THAT'S CORRECT.

16   Q.   AND WHEN YOU HAVE INHERENT UNCERTAINTY IN ITS SCIENTIFIC

17   MEASUREMENTS, SUCH AS THIS, THE CONCEPTS OF ACCURACY AND

18   PRECISION ARE IMPORTANT; ISN'T THAT RIGHT?

19   A.   THAT'S CORRECT.

20   Q.   ACCURACY IS FAIRLY UNDERSTOOD AS WHETHER OR NOT YOU'RE

21   RIGHT OR WRONG; IS THAT RIGHT?

22   A.   WHETHER YOUR MEASUREMENT CORRECTLY REFLECTS WHAT YOU'RE

23   ACTUALLY LOOKING AT.

24   Q.   AND PRECISION IS HOW CLOSE TOGETHER YOUR MEASUREMENTS

25   ARE?

769

1    A.    CORRECT.  TO GO BACK TO THE EXAMPLE OF YOUR BODY WEIGHT.

2    THE .34 ADDED ON TO THE END OF IT GIVES YOU A NUMBER OF

3    SIGNIFICANT FIGURES, AS WE SCIENTISTS REFER TO THEM, GIVES

4    YOU AN IDEA OF THE PRECISION WITH WHICH THE MEASUREMENT WAS

5    MADE.

6    Q.    ONE WAY TO UNDERSTAND THESE CONCEPTS OF ACCURACY AND

7    PRECISION IS THE ANALOGY OF THE SHARP SHOOTER.  HAVE YOU

8    HEARD THIS?

9    A.    NO, I HAVEN'T.

10   Q.    IF SOMEONE WERE TO SHOOT A GUN AT A TARGET, THEY COULD

11   SHOOT SIX BULLETS ALL TIGHTLY CLOSE TOGETHER.  THAT WOULD BE

12   VERY PRECISE; IS THAT FAIR?

13   A.    YES.

14   Q.    BUT IF THEY WERE NOWHERE NEAR THE CENTER OF THE TARGET,

15   THEY WOULDN'T BE VERY ACCURATE; IS THAT FAIR?

16   A.    IF YOUR OBJECTIVE WAS TO END UP WITH YOUR BULLETS IN THE

17   CENTER OF THE TARGET, THAT'S CORRECT.

18   Q.    OFTEN THE OBJECTIVE, I THINK?

19   A.    I DON'T SHOOT TARGETS.  BUT I WOULD AGREE.

20   Q.    ACCURACY IS HOW CLOSE YOU ARE TO THE CENTER.  PRECISION

21   IS HOW CLOSE TOGETHER YOUR MEASUREMENTS ARE?

22   A.    CORRECT.

23   Q.    YOU NEED BOTH CONCEPTS IN ORDER TO HAVE SOME CERTAINTY

24   ABOUT YOUR MEASUREMENTS?

25   A.    YOU WOULD LIKE TO HAVE BOTH CONCEPTS.

770

1    Q.    AND IN SCIENTIFIC MEASUREMENTS, THOSE TWO CONCEPTS ARE

2    REQUIRED IN ORDER TO HAVE SOME SORT OF CERTAINTY ABOUT WHAT

3    YOU ARE MEASURING AND MAKING AND DRAWING CONCLUSIONS ABOUT?

4    A.    WE NORMALLY GIVE A NUMBER AND THEN ALSO TALK MORE

5    CONVERSATIONALLY ABOUT WHAT THE NUMBER ACTUALLY MEANS.

6    Q.    TALK CONVERSATIONALLY  IS NOT THE BASIS, THOUGH, FOR

7    DRAWING SCIENTIFIC CONCLUSIONS?

8    A.    WHEN I SAY "TALK CONVERSATIONALLY," WE MEAN MODIFY IT.

9    SO YOU'RE TALKING ABOUT THE PRECISION OF MAKING A SINGLE

10   MEASUREMENT AND, THEREFORE, HOW ACCURATE THE GROUP OF

11   MEASUREMENTS END UP BEING.  THERE IS ALSO THE QUESTION OF HOW

12   GOOD IS YOUR SAMPLE.

13        SO IF YOU'RE GIVEN A SAMPLE WHICH ISN'T

14   REPRESENTATIVE OF WHAT YOU'RE EXPECTED TO MEASURE, IT DOESN'T

15   MAKE ANY DIFFERENCE HOW ACCURATE YOUR MEASUREMENT IS OR HOW

16   PRECISE YOUR MEASUREMENT IS.  IT'S STILL WORTHLESS.

17        SO IF YOU GIVE ME -- IF YOU, FOR INSTANCE, WERE TO

18   GIVE ME A SEIRUS FABRIC, AND IT'S NOT REPRESENTATIVE OF

19   SEIRUS FABRICS, I CAN MAKE EVERY MEASUREMENT THAT I WANT, AND

20   THE MEASUREMENTS REALLY AREN'T VERY GOOD.  THAT'S WHY SINCE

21   I'M NOT DRAWING MY OWN SAMPLES, I AM TOTALLY DEPENDENT ON

22   SEIRUS AND THROUGH THE COURT TO GIVE ME MATERIALS WHICH THEY

23   REPRESENT ARE REPRESENTATIVE.

24   Q.    YOU CONTROL FOR ACCURACY THROUGH METHODOLOGY IN ONE WAY;

25   IS THAT FAIR?

771

 1    A.    YOU CONTROL -- YOU CONTROL FOR ACCURACY BY HAVING A GOOD

 2    TEST METHOD TO BEGIN WITH, WHICH IS WHY YOU SAW OVER AND OVER

 3    I RELIED ON A STANDARDIZED TEST METHOD, PARTICULARLY THESE

 4    ONES WHICH ARE STANDARDIZED THROUGH A.S.T.M., THE AMERICAN

 5    SOCIETY FOR TESTING METHODS.  THAT HAS THOUSANDS OF TEST

 6    METHODS THAT ARE WIDELY ACCEPTED, NOT ONLY IN THE UNITED

 7    STATES, BUT ALSO AROUND THE WORLD.

 8         SO THESE ARE TEST METHODS THAT GIVE YOU A PROCESS

 9    FOR MAKING A TYPICAL MEASUREMENT, AND YOU CAN -- IF A

10    LABORATORY FOLLOWS THIS PARTICULAR METHOD, YOU'RE PRETTY MUCH

11    GUARANTEED THAT YOU'RE GOING TO GET AN ACCURATE RESULT.

12    Q.    ARE YOU FAMILIAR WITH THE TERM "STANDARD DEVIATION"?

13    A.    YES, I AM.

14    Q.    WHAT IS A STANDARD DEVIATION?

15    A.    THE STANDARD DEVIATION IS A MEASURE OF THE DISPERSION OF

16    RESULTS.

17    Q.    ARE YOU FAMILIAR WITH THE T-TEST?

18    A.    YES.

19    Q.    WHAT IS THE T-TEST?

20    A.    THE T-TEST IS BASICALLY USED TO COMPARE SAMPLES.

21    Q.    WHAT'S THE PURPOSE OF IT?

22    A.    TO ANSWER A QUESTION AS TO WHETHER TWO SAMPLES ARE

23    SIMILAR OR NOT TO WITHIN A PARTICULAR LEVEL OF PRECISION.

24    Q.    AND ARE THOSE CONCEPTS USEFUL WHEN MAKING SCIENTIFIC

25    MEASUREMENTS SUCH AS THE ONE -- SUCH AS THE ONES THAT

COMPUTER-AIDED TRANSCRIPTION

1    UNDERLIE YOUR CONCLUSIONS OF INFRINGEMENT HERE?

2    A.    YOU COULD APPLY A T-TEST TO THEM IF YOU WANTED TO.

3    Q.    YOU MADE A NUMBER OF MEASUREMENTS THAT YOU PUT INTO YOUR

4    ORIGINAL EXPERT REPORT; ISN'T THAT RIGHT?

5    A.    CORRECT.  AND THEY WERE PROVIDED AT MY DEPOSITION.

6    Q.    AND I'M REFERRING TO YOUR -- YOU MADE TWO SETS OF

7    MEASUREMENTS.  YOU DID TWO TESTS, ISN'T THAT RIGHT, ONE THAT

8    WENT INTO YOUR EXPERT REPORT, AND A SECOND SET THAT YOU

9    TESTIFIED TO TODAY THAT WAS DONE LATER; ISN'T THAT RIGHT?

10   A.    THE SECOND SET THAT WAS PROVIDED AT MY DEPOSITION,

11   YES.

12   Q.    OKAY.  AND THOSE TESTS WERE TESTS OF THE ACCUSED SEIRUS

13   FABRICS IN THIS CASE?

14   A.    AS WELL AS THE ADDITIONAL SEIRUS FABRICS THAT WERE

15   PROVIDED TO ME BUT WERE NOT PROVIDED INITIALLY.

16   Q.    AND BASED ON YOUR NUMBERS -- WELL, FIRST OF ALL, THIS

17   FIRST SET OF TESTS, YOU CAME OUT AROUND 68 PERCENT COVERAGE

18   OF THE METALLIC ELEMENTS IN PROPORTION TO THE UNDERLYING BASE

19   MATERIAL FOR THE SEIRUS FABRICS; IS THAT RIGHT?

20   A.    THAT'S CORRECT.  FOR THE TWO-WAY STRETCH AND THE

21   FOUR-WAY STRETCH, THAT'S ABOUT THE NUMBERS THAT I RECALL.

22   Q.    SEIRUS' EXPERT, DR. BLOCK, CRITICIZED YOUR TEST BECAUSE

23   YOU DIDN'T PROVIDE ANY STATISTICAL ANALYSIS; IS THAT FAIR?

24   A.    THAT IS IN HIS REPORT, YES.

25   Q.    HE SAID, IN FACT, YOU HAVE NOT SHOWN THAT COLUMBIA COULD

773

1    PROVE BY THE PREPONDERANCE OF THE EVIDENCE THAT THE HEATWAVE

2    FABRIC PRACTICES THE 30 TO 70 PERCENT OR 3:7 TO 7:3 SURFACE

3    AREA COVERAGE CLAIM LIMITATIONS?  THAT'S WHAT HE SAID.

4    YES?

5    A.   YOU'RE SAYING WHAT HE SAID.  IS THAT A QUESTION?

6    Q.   YES.  IS THAT WHAT HE SAID.  DO YOU RECALL HIM SAYING

7    THAT?

8    A.   IF YOU COULD PULL UP THAT PARTICULAR PAGE IN HIS

9    DEPOSITION, I WOULD BE GLAD TO VERIFY TO YOU THAT THAT'S

10   CORRECT.

11   Q.   WELL, HE CRITICIZED YOU, THAT YOU DIDN'T DETERMINE THE

12   STANDARD DEVIATION.  DO YOU RECALL THAT?

13   A.   YES, I DO.

14   Q.   YOU DIDN'T DETERMINE THE STANDARD DEVIATION, DID YOU, IN

15   YOUR TESTING?

16   A.   I DIDN'T PROVIDE THE STANDARD DEVIATION IN THAT REPORT,

17   THAT'S CORRECT.

18   Q.   HE SAID YOU DIDN'T DO A T-TEST?

19   A.   THAT'S CORRECT.  HE SAID THAT.

20   Q.   AND YOU DID NOT DO A T-TEST?

21   A.   THAT'S CORRECT.

22   Q.   AND IN RESPONSE, YOU PERFORMED A NEW SET OF TESTS; ISN'T

23   THAT RIGHT?

24   A.   I TOOK ADDITIONAL PHOTOGRAPHS AT THAT POINT.  QUITE

25   FRANKLY, IT SEEMED LIKE A POINT THAT WASN'T WORTH ARGUING

774

1    ABOUT.  I MEAN, I LOOKED AT THE SAMPLES ENOUGH.

2         KEEP IN MIND, THE SAMPLES THAT WERE PROVIDED TO ME

3    BY SEIRUS TYPICALLY WERE LESS THAN A YARD IN LENGTH.  THEY

4    WERE FAIRLY SMALL SAMPLES, WHERE IT WAS REPRESENTED THAT

5    THESE SAMPLES WERE REPRESENTATIVE OF SEIRUS' MATERIALS.  SO

6    SEIRUS HAD ALREADY MADE THE DETERMINATION IN THE SAMPLING

7    THAT THESE MATERIALS ARE WHAT YOU NEED TO BE LOOKING AT TO

8    MAKE THIS DETERMINATION.  NOT MY SAMPLING PLAN, WHICH IS ALSO

9    PART OF THIS KIND OF ANALYSIS.

10        JUST LIKE I MENTIONED ON DIRECT, THAT I TOOK HALF OF

11   THE SEIRUS MATERIALS AND SENT THEM DOWN TO AN INDEPENDENT

12   TESTING LAB.  I DIDN'T MAKE THEIR SAMPLES FOR THEM.  I LET

13   THEM PICK WHICH PARTS OF THE FABRIC THEY WANTED TO LOOK AT

14   BASED ON THE A.S.T.M. STANDARDS WHICH THEY NORMALLY CERTIFY

15   TO.

16        SEIRUS PROVIDES ME WITH A LIMITED AMOUNT OF FABRIC.

17   QUITE FRANKLY, IT'S NOT AS MUCH FABRIC AS ONE WOULD NORMALLY

18   WANT TO HAVE TO BE ABLE TO DO MOST OF THESE TESTS.  ONE

19   TYPICALLY WANTS A NUMBER OF YARDS OF FABRIC IN ORDER TO BE

20   ABLE TO MAKE THESE TESTS; BUT THIS IS WHAT I WAS PROVIDED

21   WITH THE BATES NUMBER ON IT.

22        WHETHER ARGUING THE POINT OF YOU DIDN'T DO ENOUGH

23   PHOTOGRAPHS, YOU DIDN'T ANALYZE ENOUGH, THE EASIEST THING TO

24   DO WAS JUST, HEY, TAKE MORE PICTURES AND PROVIDE THE

25   INFORMATION.

775

1          THE COURT:  WHY DON'T WE TAKE A RECESS AT THIS TIME.

2     WE'LL BE IN RECESS FOR ABOUT 15 MINUTES.

3          (JURY ABSENT, 3:31 P.M.)

4          (RECESS, 3:31 P.M. TO 3:46 P.M.)

5          THE COURT:  WHAT'S UP?

6          MR. SPROUL:  YES, YOUR HONOR.  YOU SUSTAINED AN

7     OBJECTION AT ONE POINT THERE, AND I WAS UNCLEAR THE BASIS FOR

8     THE OBJECTION.  I THOUGHT MY QUESTIONS WERE IN

9     NONCONTROVERSIAL TERRITORY, AND I WOULD ASK FOR CLARIFICATION

10    ON THAT POINT.

11         THE COURT:  SO YOU WERE, I BELIEVE, ASKING QUESTIONS

12    REGARDING THE PERCENTAGE OF THE FABRIC THAT WAS NONINFRINGING

13    AS COMPARED TO THE PERCENTAGE OF THE FABRIC THAT WAS

14    INFRINGING.  THEY STOOD UP AND OBJECTED, SAYING THEY DIDN'T

15    GET -- I FIGURE, THIS IS A NEW CONTENTION.  THEY NEVER RAISED

16    THAT AS A DEFENSE TO INFRINGEMENT.

17         MR. ALDRICH:  IT'S ACTUALLY A LITTLE BIT MORE THAN

18    THAT, YOUR HONOR.  IT VIOLATES CENTURIES' OLD BLACK LAW

19    JURISPRUDENCE ON THE MEANING OF THE WORD "COMPRISES."

20         SO WHEN IT SAYS THAT THE INNERMOST SURFACE COMPRISES

21    HEAT DIRECTING, YOU KNOW, HEAT-DIRECTING ELEMENTS OR

22    WHATEVER, THAT MEANS THAT IT HAS IT AND CAN ALSO HAVE OTHER

23    THINGS.  AND THEY ARE TRYING TO CREATE A NONINFRINGEMENT

24    POSITION THAT VIOLATES THAT TERM THAT THE PARTIES DIDN'T

25    CONSTRUE BECAUSE THEY DIDN'T DISCLOSE THIS AS A

776

1    NONINFRINGEMENT CONTENTION.

2              MR. SPROUL:  TWO POINTS, YOUR HONOR.  ONE, IT WAS

3    DISCLOSED.  DR. BLOCK SPECIFICALLY REFERS TO IT IN HIS

4    OPENING REPORT, PARAGRAPHS 83 AND 84.  HE SAYS THE

5    HEATWAVE-PLUS PRODUCTS, OR THE BIDIRECTIONAL PRODUCTS, TO USE

6    HER TERMINOLOGY --

7              THE REPORTER:  WAIT, WAIT.

8              MR. SPROUL:  I'M SORRY.

9              NOT ALL OF THE SO-CALLED HEAT-DIRECTING ELEMENTS ARE

10   LOCATED ON THE SAME SURFACE AND POSITION TO FACE THE USER.

11             HE GOES ON FOR ANOTHER PARAGRAPH AND A HALF.  IT'S

12   BEEN FULLY DISCLOSED.

13             AMGEN --

14             THE COURT:  YEAH.  BUT IT'S WRONG.  IT'S LEGALLY

15   WRONG.

16             MR. SPROUL:  WITH RESPECT, YOUR HONOR, THE POINT

17   HERE IS THAT SHE HAS TAKEN AN INCONSISTENT POSITION IN HER

18   INVALIDITY CASE VERSUS HER INFRINGEMENT CASE.  SHE GETS TO DO

19   ONE OR THE OTHER, BUT SHE DOESN'T GET TO HAVE TWO DIFFERENT

20   POSITIONS.

21             AND MY EXAMINATION WAS GOING TO BE FOCUSED ON ONE

22   REFERENCE WHERE SHE CONSIDERED MORE THAN THE COVERED MATERIAL

23   TO SHOW THAT SHE'S INCONSISTENT.

24             AND I THINK THAT'S SUPPORTED BY FEDERAL CIRCUIT

25   PRECEDENT AMGEN VS. -- I'LL GIVE YOU THE CITE BECAUSE I CAN'T

COMPUTER-AIDED TRANSCRIPTION

1    READ THE HANDWRITING.  IT'S 314 F.3RD, 1313, AT 1330, FED

2    CIRCUIT 2003.  QUOTE, "CLAIM TERMS MUST BE CONSTRUED THE SAME

3    WAY FOR THE PURPOSE OF DETERMINING INVALIDITY AND

4    INFRINGEMENT."

5            MY QUESTIONS WERE GOING TO BE FOCUSED ON ONE PRIOR

6    ART REFERENCE WHERE SHE DID SOMETHING INCONSISTENT WITH THE

7    WAY SHE DID HER INFRINGEMENT ANALYSIS.  AND I WOULD

8    RESPECTFULLY ASK YOUR HONOR TO ALLOW ME TO DO SO.

9            THE COURT:  SO THE PURPOSE IS NOT TO ARGUE TO THE

10   JURY THAT WHEN THEY ARE TRYING TO DETERMINE WHETHER THERE HAS

11   BEEN INFRINGEMENT OR NOT, THAT THE ISSUE OF INFRINGEMENT

12   DOESN'T PIVOT ON, FOR EXAMPLE, THE ENTIRE PRODUCT OR PIECES

13   OF THE PRODUCT THAT HAVE NOTHING TO DO WITH THE FABRIC THAT

14   IS AN ISSUE IN THIS PARTICULAR CASE.

15           YOU'RE NOT GOING TO BE MAKING THAT ARGUMENT TO THE

16   JURY; CORRECT?

17           MR. SPROUL:  I'M GOING TO BE ARGUING THAT IT'S

18   INCONSISTENT FOR HER TO LOOK AT ONLY THE PORTION THAT HAS THE

19   METALLIC ELEMENTS FACING THE USER AND TO IGNORE THE ENTIRE

20   SURFACE.

21           THE COURT:  DO YOU REMEMBER WHEN YOU WERE TELLING

22   WITNESSES THAT YOU GET FRUSTRATED WITH THEM BECAUSE THEY

23   DON'T ANSWER YOUR QUESTION?

24           MR. SPROUL:  YES.  FAIR ENOUGH, YOUR HONOR.  I'M

25   SORRY IF I DIDN'T ANSWER YOU.

1              COULD YOU STATE IT AGAIN.

2              THE COURT:  SURE.  YOU'RE NOT GOING TO BE ARGUING TO

3    THE JURY REGARDING WHETHER THERE HAS OR HAS NOT BEEN

4    INFRINGEMENT, THAT THEY GET TO CONSIDER PARTS OF THE PRODUCT

5    THAT AREN'T INFRINGING?

6              DO YOU UNDERSTAND WHAT I'M SAYING?  BECAUSE WE KNOW

7    THE FABRIC IS REALLY WHAT'S IN ISSUE IN THIS CASE, THE

8    HEATWAVE FABRIC.  AND SO YOU DON'T GET TO ARGUE, LOOK, WHEN

9    WE'RE LOOKING AT PERCENTAGE, FOR EXAMPLE, YOU GET TO CONSIDER

10   NOT JUST THE HEATWAVE PRODUCT, BUT OTHER FABRIC CONNECTED TO

11   THE HEATWAVE PRODUCT, BY WAY OF EXAMPLE.

12             MR. SPROUL:  WITH ALL DUE RESPECT, YOUR HONOR, THIS

13   CLAIM IS DIRECTED TO BODY GEAR; NOT TO THE FABRIC.  AND SO

14   THE GLOVE IS ACCUSED, NOT THE FABRIC.  AND IF WE ONLY WANT TO

15   TALK ABOUT THE FABRIC, IF THAT'S WHAT WE'RE GOING TO LITIGATE

16   HERE, THAT WOULD BE A DIFFERENT ISSUE.

17             BUT, IN FACT, IT IS THE BODY GEAR, IT IS THE GLOVE

18   THAT IS ACCUSED OF INFRINGEMENT, AND IT IS NOT MERELY THAT

19   PORTION OF THE FABRIC.  AND SO I THINK IT WOULD BE LEGALLY

20   INCORRECT TO BE LIMITED TO ONLY CONSIDER THAT PORTION OF THE

21   FABRIC WITH THE HEATWAVE METALLIC ELEMENTS FACING THE USER.

22             THE OTHER LINING FABRIC USED ON THE INNERMOST

23   SURFACE IS HEATWAVE MATERIAL FLIPPED INSIDE OUT.

24             THE COURT:  WE'VE ALREADY AGREED, THEY ARE NOT

25   ACCUSING THAT OF BEING IN VIOLATION OF ANY CLAIM.

1          MR. SPROUL:  WHERE IT IS IN ITS ENTIRETY.  AND MY

2     QUESTION -- OUR POSITION HERE IS THAT WHEN YOU ACTUALLY DO

3     THE CALCULATION OVER THE ENTIRE SURFACE OF THE INNER GLOVE,

4     WHICH IS WHAT YOU HAVE TO DO WHERE THE CLAIM IS DIRECTED TO

5     THE BODY GEAR, AND NOT MERELY TO THE FABRIC, THAT THAT

6     ANALYSIS IS GOING TO SHOW THAT THE PERCENTAGE COVERAGE IS

7     LESS THAN 30 PERCENT.

8          AND THIS IS REASONABLE AND ALLOWED BECAUSE IN PART

9     OF HER INVALIDITY ANALYSIS -- OR VALIDITY ANALYSIS, SHE DID

10    THIS EXACT SAME TEST.  SHE LOOKED AT THE HARBOR REFERENCE.

11    SHE CONSIDERED THE ENTIRE SURFACE, NOT JUST THE SURFACE THAT

12    WAS COVERED, BUT THE ENTIRE SURFACE AND SAID, I'M GOING TO

13    AVERAGE THE COVERAGE OVER THE ENTIRE SURFACE OF THE SHIRT.

14    AND TO BE CONSISTENT, WHICH SHE IS LEGALLY REQUIRED TO DO,

15    SHE MUST DO THE SAME ANALYSIS HERE.

16          AND SO I'M GOING TO ASK HER, SHE'S NOW -- I'VE NOW

17    PREVIEWED MY CROSS-EXAMINATION TO HER, BUT I THINK IT'S NOT

18    GOING TO BE A SURPRISE, THAT IF SHE DOES THAT HARBOR TEST, IF

19    SHE DOES THAT CALCULATION OVER THE ENTIRE SURFACE, THAT, IN

20    FACT, THE COVERAGE RATIO IS GOING TO BE UNDER THE 30 PERCENT

21    LIMIT AND WILL NOT BE FOUND TO INFRINGE.

22          THIS WILL APPLY ONLY TO THE BIDIRECTIONAL GLOVES,

23    DOES NOT APPLY TO THE GLOVES WHERE THE ENTIRE SURFACE IS

24    COVERED IN THE HEATWAVE MATERIAL.  AND I RESPECTFULLY ASK

25    THAT.  SORRY, YOUR HONOR.

780

1          MR. ALDRICH:  FIRST OF ALL, YOUR HONOR.  YOUR HONOR

2     ALREADY ADDRESSED HARBOR AND YOUR HONOR ALREADY HELD THAT

3     HARBOR HAS NO DISCLOSURE OF PERCENT COVERAGE, AND ANY

4     RELIANCE BY THEM ON THE FIGURES IN HARBOR, AS THE SOLE SOURCE

5     OF AUTHORITY ABOUT WHAT THE PERCENT COVERAGE IN HARBOR IS,

6     WAS LEGALLY IMPROPER.

7          SECOND, THEY HAVE WITHDRAWN HARBOR FROM THE CASE.

8     IT'S NO LONGER RELEVANT.

9          AND THIRD, THIS ALL COMES BACK DOWN TO THE

10    DEFINITION OF THE WORD "COMPRISES."  AND I THINK YOUR HONOR

11    GOT IT RIGHT WHEN YOU SAID THAT'S WRONG.  THEY ARE TRYING TO

12    MAKE A NONINFRINGEMENT POSITION HERE THAT IS LEGALLY WRONG.

13    AND WE CAN'T LET THAT GO TO THE JURY AS SOMETHING THAT THEY

14    ARE SUPPOSED TO TRY TO ANSWER.

15         MR. SPROUL:  YOUR HONOR, WE ARE NOT RELYING ON

16    HARBOR.  WE ARE RELYING ON DR. COLE'S ANALYSIS OF HARBOR,

17    WHICH WE ARE ALLOWED TO DO BECAUSE SHE IS REQUIRED TO BE

18    CONSISTENT WITH THE PRIOR ART AND INFRINGEMENT.

19         AND MR. ALDRICH'S POINT IS A GOOD ONE.  WE'RE NOT

20    ALLOWED TO CONTEST HARBOR.  WE'RE NOT ALLOWED TO RESURRECT IT

21    AND ARGUE INVALIDITY ON IT.  WE'VE LOST THAT.  IT'S GONE.  IN

22    PART BECAUSE OF HER TESTIMONY.

23         AND SO NOW WE GET TO RELY ON HER TESTIMONY.  WE ARE

24    ALLOWED TO INVESTIGATE THE REASON SHE DID IT AND ITS

25    APPLICATION TO INFRINGEMENT.  THERE HAS TO BE CONSISTENCY

781

1    BETWEEN HER INVALIDITY, HER VALIDITY ANALYSIS AND HER

2    INFRINGEMENT ANALYSIS.

3          AND THERE IS AN INCONSISTENCY, AND THOSE ARE

4    IRRECONCILABLE.  AND LEGALLY SHE'S NOT ALLOWED TO HAVE THAT

5    INCONSISTENCY, AND THAT INCONSISTENCY IS THE BASIS FOR A

6    NONINFRINGEMENT ARGUMENT HERE; NOT THAT PRIOR ART REFERENCE.

7    THE FACT THAT IT'S NOT PART OF INVALIDITY IS IRRELEVANT TO

8    THIS PARTICULAR DISCUSSION.

9          WE'RE NOT ARGUING INVALIDITY BASED ON HARBOR.  WE

10   ARE SIMPLY SHOWING AN INCONSISTENT APPROACH BY DR. COLE.

11         THE COURT:  MY QUESTION WAS WHETHER OR NOT YOU WERE

12   PLANNING ON ARGUING TO THE JURY THAT FIGURING OUT THE 30- TO

13   70-PERCENT RATIO, AND WHETHER OR NOT IT MET THOSE, THAT YOU

14   WERE GOING TO ARGUE TO THIS JURY THAT THEY TAKE INTO

15   CONSIDERATION BEYOND THE FABRIC ALL OF THE MATERIALS THAT

16   MAKE UP THE ACCUSED PRODUCT.

17         AND THE ANSWER TO YOU FROM ME IS YOU'RE NOT DOING

18   THAT.  I'M NOT LETTING YOU DO THAT.

19         MR. SPROUL:  WHEN YOU SAY ALL OF THE MATERIALS, TO

20   BE CLEAR, WE WERE GOING TO RELY ONLY ON THE INNER SURFACE.

21   AND IF YOU ARE SAYING WE'RE NOT ALLOWED TO DO THAT, THEN YOUR

22   HONOR, WE WILL NOT DO THAT.  WE MAINTAIN AN OBJECTION TO

23   THAT, AND WE'LL PROCEED ACCORDINGLY.

24         THE COURT:  THANK YOU.  DO YOU HAVE ANYTHING ELSE?

25         MR. ALDRICH:  THE ONE OTHER ISSUE I HAD, YOUR HONOR,

782

1    WAS I STILL DON'T UNDERSTAND WHAT THE RELEVANCE OF THE

2    PROSECUTION HISTORY IS IN THE CASE.

3            THE PROSECUTION HISTORY AGAIN IS ONLY RELEVANT TO

4    TWO ISSUES, AND THAT'S CLAIM CONSTRUCTION, WHICH IS THE

5    COURT'S PROVINCE, AND THE DOCTRINE OF EQUIVALENCE, WHICH

6    ISN'T ASSERTED HERE.  SO WHAT RELEVANCE DOES THE PROSECUTION

7    HISTORY HAVE TO THE JURY?

8            THE COURT:  I THINK IT MIGHT HAVE BEEN RELEVANT TO

9    THE LINE OF QUESTIONING THAT HE WAS INVESTIGATING IT FOR.  I

10   DON'T KNOW WHETHER HE'S STILL PLANNING ON GOING THERE OR

11   NOT.

12           MR. ALDRICH:  IT'S STILL AN ISSUE OF CLAIM

13   CONSTRUCTION.  AND I UNDERSTAND THAT THE COURT GRANTED THEM A

14   LITTLE BIT OF LEAVE TO EXPLORE THAT, BUT STILL, I THINK IT'S

15   LEGALLY IMPROPER, ACTUALLY, TO GIVE PROSECUTION HISTORY TO

16   THE JURY.

17           THERE IS NOTHING IN THERE THAT ANSWERS ANY QUESTIONS

18   FOR THEM.  THERE IS NOTHING IN THERE THAT'S PROBATIVE TO

19   ANYTHING THAT THEY ARE SUPPOSED TO ANSWER ON THE CASE.  IF

20   IT'S A QUESTION OF CLAIM CONSTRUCTION, THE COURT IS SUPPOSED

21   TO ANSWER IT.  IF IT'S AN ISSUE OF DOCTRINE OF EQUIVALENCE,

22   WE DON'T HAVE TO DEAL WITH IT.  SO IT'S NOT PROBATIVE.

23           MR. MARCHESE:  YOUR HONOR, JUST IN TERMS OF THE

24   PROSECUTION HISTORY, IT'S DEFINITELY RELEVANT TO DAMAGES,

25   BECAUSE WE'RE SUPPOSED TO LOOK AT THE INCREMENTAL VALUE OF

1    THE PATENTED INVENTION, EXCUSE ME, OVER THE PRIOR ART.  AND

2    THE BEST -- YOU KNOW, ONE SOURCE OF INFORMATION FOR THAT IS

3    TO LOOK AT THE PROSECUTION HISTORY TO SEE WHAT WAS GIVEN UP,

4    GIVEN UP, GIVEN UP, TO GET WHAT THEY GOT.

5         THAT GIVES YOU A SENSE WHICH IS INCREMENTALLY

6    DIFFERENT OVER WHAT EXISTED IN THE PRIOR ART.  THAT GOES TO

7    THE VALUATION OF THE INVENTION IN TERMS OF FIGURING OUT WHAT

8    A REASONABLE ROYALTY IS.  SO IT'S AT A MINIMUM HIGHLY

9    RELEVANT FOR THAT PARTICULAR ANALYSIS.  THEY ARE ASKING FOR A

10   REASONABLE ROYALTY.  WE SHOULD BE ABLE TO GET TO EXAMINE

11   THEIR WITNESSES AS TO THE INCREMENTAL ADVANCEMENT THAT THE

12   PATENT OFFICE SAID THEY MADE.

13        NOW, WE'RE NOT AGREEING THAT THAT INCREMENTAL

14   ADVANCE IS ANYTHING.  IT'S ZERO IN OUR VIEW, AND WE'VE SAID

15   THAT.  BUT THE PATENT OFFICE GAVE PUSH-BACK AND SAID, LEVY

16   HAS THIS, LEVY HAS THAT, LEVY HAS THAT.  THERE WERE

17   CONCESSIONS MADE ALONG THE WAY.

18        THOSE CONCESSIONS GO TO EXACTLY WHAT IS IN OR OUT OF

19   THE INVENTION.  AND WE HAVE TO FIGURE OUT WHAT THAT

20   INCREMENTAL DEVELOPMENT THEY GOT IS.  THEY GAVE UP BIG

21   CHUNKS, BIG SWATHS OF PROPERTY, AND THEY ENDED UP WITH 30 TO

22   70.

23        THE COURT:  THIS WITNESS ONLY TALKED ABOUT WHETHER

24   THERE WAS INFRINGEMENT OR NOT.  THAT'S A DIFFERENT -- THAT'S

25   WAY OUTSIDE THE SCOPE OF WHAT SHE WAS TESTIFYING TO.

784

1        IF YOU WANT TO BRING IN WITNESSES LATER ON AND TRY

2   TO CONVINCE ME THAT WE ARE LOOKING AT PROSECUTION HISTORY,

3   BECAUSE IT HAS SOMETHING TO DO WITH DAMAGES, I MIGHT LISTEN

4   TO YOU.  BUT RIGHT NOW, THIS IS A WITNESS WHO TALKED SOLELY

5   ABOUT INFRINGEMENT.  THAT WAS HER TOPIC.

6        AND I DON'T SEE HOW THE PROSECUTION HISTORY HAS

7   ANYTHING TO DO WITH WHAT IS ON THE TABLE REGARDING WHAT SHE

8   SPOKE ABOUT, WHICH WAS ONLY INFRINGEMENT.

9        MR. MARCHESE:  I WAS JUST RESPONDING -- I THOUGHT IT

10  WAS A BLANKET COMMENT BY MR. ALDRICH.  I WASN'T SPEAKING TO

11  THIS WITNESS IN PARTICULAR.  I WAS TALKING ABOUT JUST

12  GENERALLY THE RELEVANCE OF IT.

13       THE COURT:  AGAIN, WE MAY GET THERE.

14       MR. ALDRICH:  AND TO BE CLEAR, COUNSEL'S

15  REPRESENTATION IS NOT ENTIRELY ACCURATE.  EVERY SINGLE TIME

16  THAT THERE WAS A RESPONSE FROM THE PATENT OFFICE, IT SAYS, WE

17  RESPECTFULLY DISAGREE WITH THE EXAMINER.  HOWEVER, HERE ARE

18  SOME ADDITIONAL INFORMATION FOR THE EXAMINER.  SO THE IDEA

19  THAT THERE WERE CONCESSIONS IS FACTUALLY AND LEGALLY

20  INCORRECT.

21       BUT WE WOULD JUST MOVE TO HAVE 697 WITHDRAWN AND

22  ALSO TO HAVE, I BELIEVE IT WAS 1253, LEVY, WITHDRAWN.  THEY

23  ARE NOT RELEVANT TO ANY ISSUE IN THE CASE.  THEY ARE NOT

24  PROBATIVE, AND THEY SHOULDN'T BE BEFORE THE JURY, AT LEAST AT

25  THIS POINT.

785

1          MR. SPROUL:  YOUR HONOR, SHE TESTIFIED TO IT.  IT'S

2    PART OF THE RECORD.  IT'S PART OF THE PATENT HISTORY.

3          THE COURT:  YEAH.  HE PUT IT IN.  IT'S IN.  I'M NOT

4    TAKING IT AWAY.

5          MR. ALDRICH:  THANK YOU, YOUR HONOR.

6          MR. SPROUL:  THANK YOU, YOUR HONOR.

7          THE COURT:  DO YOU HAVE ANYTHING ELSE WE NEED TO

8    TALK ABOUT?

9          MR. SPROUL:  NO, YOUR HONOR.

10          THE COURT:  DID I GIVE YOU ENOUGH GUIDANCE?

11          MR. SPROUL:  I'M GOING TO FINISH UP WITH THE

12    STATISTICS HERE, AND WE'LL BE DONE.

13          MR. ALDRICH:  JUST ONE OTHER QUESTION.

14          I THOUGHT I HEARD A NEW INVALIDITY THEORY COME OUT

15    OVER THERE AS WELL, WHICH IS ANOTHER REASON I OBJECTED.  AND

16    YOUR HONOR OVERRULED ME.

17          BUT IT SOUNDED LIKE THEY WERE DRIVING AT AN ISSUE

18    ABOUT INDEFINITENESS ON THIS ISSUE OF ABOUT 30 TO ABOUT 70

19    PERCENT, AND WHETHER IT HAS A FIRM AND DEFINITE MEANING.

20    JUST WANT TO BE CLEAR THAT INDEFINITENESS WAS NEVER DISCLOSED

21    AS AN INVALIDITY THEORY, AND I KNOW THEY ARE NOT PLANNING ON

22    ASSERTING IT NOW.

23          MR. SPROUL:  YOUR HONOR, HER TESTIMONY IS WHAT IT

24    IS.  AND IT WAS PRETTY DARN CLEAR THAT SHE CAN'T PROVIDE A

25    SPECIFIC METE AND BOUND OF THE CLAIM.  SHE DOESN'T KNOW WHAT

786

1    IT MEANS.

2          AND WE AGREE, WE UNDERSTAND THAT INDEFINITENESS WAS

3    NOT PART OF -- WAS NOT AN ISSUE GOING INTO THIS TRIAL.  BUT

4    WE ARE GOING TO MOVE THE COURT, SUBJECT TO YOUR APPROVAL, OF

5    COURSE, TO ADD INDEFINITENESS AS A THEORY OF INVALIDITY,

6    BASED ON HER TESTIMONY IN THAT LAST SECTION.

7          THE COURT:  GOOD LUCK.

8          MR. SPROUL:  OKAY.

9          THE COURT:  THAT'S NOT LIKELY TO HAPPEN.

10         MR. ALDRICH:  THANK YOU, YOUR HONOR.  WE HAVE

11   NOTHING ELSE.

12         THE COURT:  OKAY.  BRING THE JURY BACK IN.

13         (JURY PRESENT, 4:00 P.M.)

14         THE COURT:  PLEASE BE SEATED.

15         YOU MAY PROCEED.

16   Q.   BY MR. SPROUL:  DR. COLE, GIVEN YOUR UNDERSTANDING OF

17   THE VARIABILITY IN THE MANUFACTURING PROCESS OF THE SEIRUS

18   FABRIC AND YOUR UNDERSTANDING OF THE UNCERTAINTY IN THE

19   MEASUREMENTS, DID YOU GO BACK TO COLUMBIA AND ASK IF THEY

20   COULD CONTROL FOR ANY OF THE POTENTIAL VARIABILITIES THAT

21   YOU'VE IDENTIFIED TO THE JURY?

22   A.   NO.  I WAS SIMPLY ASKED TO LOOK AT THE FABRICS THAT WERE

23   PRESENTED TO ME THROUGH THE COURT SYSTEM.

24   Q.   NOW, YOUR SECOND SET OF TESTS, YOUR SECOND SET OF TESTS

25   YOU TESTIFIED TO ARE CONTAINED HERE IN EXHIBIT 184; IS THAT

787

1   RIGHT?

2   A.   CAN I GET RID OF SOME OF THIS?

3   A.   CERTAINLY.

4        THE CLERK:  I'LL TAKE CARE OF IT.

5        THE WITNESS:  DO I NEED ALL THREE BINDERS?  ONE IS

6   MARKED TRIAL EXHIBIT BINDER.  ONE IS MARKED CROSS.  AND ONE

7   IS MARKED EXHIBIT 184.

8        MR. SPROUL:  IF YOU COULD HOLD ON TO THEM, THAT

9   WOULD BE GREAT.  IF THEY ARE SITTING ON YOUR LAP, WE CAN DO

10  SOMETHING THAT'S MORE COMFORTABLE.

11       THE WITNESS:  OKAY.

12  Q.   BY MR. SPROUL:  EXHIBIT 184 IS YOUR SECOND SET OF TESTS;

13  IS THAT CORRECT?

14  A.   IT APPEARS TO BE, YES.

15  Q.   IN FACT, YOU TESTIFIED ABOUT IT IN YOUR DIRECT

16  TESTIMONY, DID YOU NOT?

17  A.   I TESTIFIED ABOUT THE FIRST PAGE, PAGE 2 --

18  Q.   OKAY.

19  A.   -- WHICH SHOWS THE PERCENT COVERAGE.

20  Q.   222 PAGES OF TEST DATA, PICTURES AND ASSORTED THINGS IN

21  THERE?

22  A.   WELL, ONE OF THEM UNFORTUNATELY IS THE EXCEL SPREADSHEET

23  THAT SOME OF THE CELLS GOT REPLICATED IN.

24  Q.   OKAY.  THIS WAS --

25  A.   IT'S ACTUALLY SIMPLY ONE PICTURE AND THE EXCEL

1    SPREADSHEET THAT CORRESPONDS TO THAT PARTICULAR PHOTOGRAPH.

2    Q.    EXHIBIT 184 IS THE RESULTS OF YOUR SECOND SET OF TESTS

3    THAT YOU DID IN RESPONSE TO DR. BLOCK'S CRITICISM OF YOUR

4    INITIAL CONCLUSION THAT YOU PUT IN YOUR EXPERT REPORT?

5    A.    I THINK THAT'S A FAIR CHARACTERIZATION.

6    Q.    NOW, YOU DID NOT, FOR YOUR SECOND SET OF TESTS, SEND

7    THESE OUT TO A THIRD-PARTY TESTING ORGANIZATION, DID YOU?

8    A.    AS I TESTIFIED IN MY DIRECT, THERE IS NO

9    INDUSTRY-ACCEPTED STANDARD TEST FOR MAKING THIS KIND OF

10   MEASUREMENT OF COVERAGE AREA.  IT'S NOT A TEXTILE TEST.  SO

11   JUST LIKE I DID IN THE FIRST SET, I MADE ALL OF THESE

12   MEASUREMENTS MYSELF.  I TOOK THE PHOTOGRAPHS.  I LET

13   PHOTOSHOP DO THE ANALYSIS AND REPORTED THE RESULTS.

14   Q.    YOU COULD HAVE SENT THIS OUT TO A THIRD PARTY, THOUGH,

15   TO PERFORM THE SAME TESTS THAT YOU DID; ISN'T THAT RIGHT?

16   A.    I ACTUALLY INQUIRED ABOUT THAT AND WAS BASICALLY TOLD

17   THAT PEOPLE DIDN'T KNOW HOW TO TAKE THE PHOTOGRAPHS.

18   Q.    WHAT DO YOU MEAN BY "DIDN'T KNOW HOW TO TAKE THE

19   PHOTOGRAPHS"?

20   A.    THE CHALLENGE IN DOING THE COVERAGE ANALYSIS IS GETTING

21   A GOOD PICTURE TO BE ABLE TO ANALYZE IT.  AND THE REASON THE

22   PHOTOGRAPH IS A CHALLENGE IS THE FACT THAT THE

23   HEAT-REFLECTIVE ELEMENTS ARE SO REFLECTIVE OF VISIBLE

24   LIGHT.

25   Q.    HOW MANY THIRD-PARTY ORGANIZATIONS DID YOU APPROACH TO

789

1    ASSIST YOU WITH THESE SECOND SET OF TESTS?

2    A.   I TALKED TO A COUPLE OF DIFFERENT PEOPLE ABOUT IT,

3    PROFESSIONAL PHOTOGRAPHERS, WHETHER THEY WERE WILLING TO TAKE

4    THE PICTURES.  AND THE ANSWER WAS BASICALLY NO.

5    Q.   AND SO --

6    A.   I'M LOCATED IN A FAIRLY RURAL AREA IN SOUTH CAROLINA.  I

7    SEND SAMPLES OUT TO INDUSTRY-ACCEPTED THIRD-PARTY TESTING

8    LABS THAT ARE NOT LOCAL TO ME BECAUSE THEY ARE

9    INDUSTRY-ACCEPTED ONES.  BUT I'M NOT IN NEW YORK CITY, FOR

10   INSTANCE, WHERE THERE ARE A RATHER LARGE NUMBER OF FASHION

11   PHOTOGRAPHERS.

12        AND IN THIS PARTICULAR CASE, I FELT THAT IT WAS

13   IMPORTANT TO BE ABLE TO GET A GOOD, HIGH-QUALITY PHOTOGRAPH.

14   AND SINCE I WAS USING EQUIPMENT THAT I ALSO USE ON MY

15   DEPARTMENT OF DEFENSE PROJECTS, I THOUGHT THAT I WOULD TRY TO

16   TAKE THE PICTURES.

17        MR. SPROUL:  MR. TISA, COULD YOU PULL UP EXHIBIT

18   168, PLEASE.

19   Q.   IS EXHIBIT 168 ONE OF YOUR PICTURES THAT YOU TOOK WITH

20   YOUR NEW SETUP?

21   A.   YES, IT LOOKS LIKE.  I'M NOT SURE WHETHER IT'S A NEW

22   PICTURE OR WHETHER IT'S AN OLDER PICTURE.

23        CAN YOU TELL ME WHICH PHOTOGRAPH THIS IS.

24   Q.   IT WAS YOUR EXHIBIT, DR. COLE.  I'M JUST CURIOUS WHETHER

25   THIS WAS ONE OF YOUR NEW PICTURES OR ONE OF YOUR OLD

790

1    PICTURES.

2    A.    LOOKING AT IT, I DON'T KNOW WITHOUT TRACKING BACK

3    THROUGH AS TO WHAT EXHIBIT THIS ACTUALLY REFERS TO.

4    Q.    THIS PICTURE SEEMS TO BE MARKEDLY LOWER RESOLUTION THAN

5    SOME OF YOUR OTHER PICTURES.  DO YOU BELIEVE THAT TO BE

6    TRUE?

7    A.    I DON'T HAVE THE CROSS-REFERENCE THAT TELLS ME THE

8    COURT'S EXHIBIT NUMBERS VERSUS THE NUMBERS THAT I HAVE

9    ASSIGNED TO THESE THINGS.

10   Q.    LET ME ASK YOU ABOUT THIS PICTURE, REGARDLESS OF WHETHER

11   IT WAS YOUR FIRST SET OF TESTS OR SECOND SET OF TESTS.

12        THE CHALLENGE FOR YOU WAS TO MEASURE THE AMOUNT OF

13   SILVER VERSUS THE AMOUNT OF BLACK; IS THAT FAIR?

14   A.    THAT'S CORRECT.

15   Q.    IN FACT, WE SEE BLACK SPOTS THROUGHOUT THE SILVER; IS

16   THAT RIGHT?

17   A.    THAT'S CORRECT.

18   Q.    AND ANY LIGHT NOISE OR SILVER NOISE THAT MAY BE IN THE

19   BLACK PORTION WOULD CAUSE SOME ERROR IN YOUR MEASUREMENT; IS

20   THAT RIGHT?

21   A.    THESE ARE HIGHLY REFLECTIVE FABRICS, BUT THEY ARE PUT ON

22   TOP OF A TEXTILE MATERIAL WHERE THE YARNS HAVE A TENDENCY TO

23   POINT IN DIFFERENT DIRECTIONS.  THAT'S WHY ILLUMINATING THEM

24   AS WELL AS YOU CAN IS SO IMPORTANT.  BECAUSE THE MIRROR IS

25   REFLECTING LIGHT IN DIFFERENT DIRECTIONS, NOT ALL BACK

791

1    DIRECTLY AT THE CAMERA.

2            SO BASICALLY YOU'RE RIGHT.  WITH -- WHEN YOU LOOK AT

3    THESE MATERIALS, WHAT YOU TYPICALLY SEE IS THAT WITHIN THE

4    SILVER SECTION, IT'S OBVIOUSLY COVERED WITH THE FILM, I'LL

5    CALL IT THE PRINT IN SOME CASES.  BUT WITHIN THAT IMAGE, YOU

6    DEFINITELY SEE VARIATIONS IN WHAT IS SILVER.  WHERE SOME

7    APPEARS TO BE A LITTLE BIT DARKER GRAY.  SOME APPEARS TO BE A

8    LITTLE BIT LIGHTER.

9    Q.    AND WHAT'S THE REASON FOR THAT?

10   A.    IT HAS TO DO WITH THE FACT THAT THE LIGHT IS ACTUALLY

11   REFLECTING IN SLIGHTLY DIFFERENT DIRECTIONS.

12   Q.    IT'S DISPERSED IN DIFFERENT DIRECTIONS?

13   A.    DISPERSED IS A GOOD TERM FOR IT, YES.

14   Q.    DIFFUSED?

15   A.    NOT DIFFUSED.  IT REALLY IS DISPERSED.

16   Q.    OKAY.  SO AS PART OF YOUR TESTING IN THIS SECOND ROUND,

17   YOU WENT OUT AND BOUGHT SOME VERY EXPENSIVE CAMERA EQUIPMENT;

18   IS THAT RIGHT?

19   A.    I ALREADY OWNED IT.

20   Q.    YOU ALREADY OWNED IT?

21   A.    OKAY.  THE CAMERA EQUIPMENT, THE COPY STAND, THE LENSES,

22   I ALREADY OWNED.  WHAT I HAD TO DO WAS TO GO BUY WHAT ARE

23   CALLED MULTIPLIERS, WHICH GIVE YOU AN INCREASE IN THE

24   MAGNIFICATION THAT THE TELEPHOTO LENS GIVE YOU.  AND I WENT

25   OUT AND BOUGHT THE BEST THAT I COULD FIND IN THE WORLD.

792

1    Q.    COULD YOU PULL UP PDX-158, PLEASE.

2    A.    IS THAT EXHIBIT 158, OR WHAT IS IT?

3    Q.    IT IS YOUR DEMONSTRATIVE THAT YOU TESTIFIED TO IN YOUR

4    DIRECT TESTIMONY.  DO YOU SEE PDX-158 THERE IN FRONT OF

5    YOU?

6    A.    ACTUALLY, IT'S NOT.

7    Q.    I'M SORRY.  PDX-158 IS NOT WHAT YOU TESTIFIED TO?

8    A.    NO.  THIS IS ONE OF THE IMAGES THAT I BELIEVE COUNSEL

9    SENT TO YOU GUYS, BUT IT'S NOT ONE THAT WAS ACTUALLY USED IN

10   MY TESTIMONY TODAY.

11   Q.    OKAY.  LET ME ASK YOU ABOUT THIS PICTURE.  DO YOU SEE

12   THE HISTOGRAM IN THE TOP RIGHT?

13   A.    YES.

14   Q.    IS THAT WHAT THE HISTOGRAMS LOOK LIKE THAT YOU RECEIVED

15   FROM THE PICTURES YOU TOOK OF THE SEIRUS PRODUCTS?

16   A.    YES.

17   Q.    AND SO HOW WOULD YOU MEASURE --

18   A.    BY THE WAY, THIS ONE IS VERY GRAYED OUT.  IT'S VERY

19   DIFFICULT TO SEE.  IF YOU GO I THINK BACK ONE SLIDE --

20   Q.    PLEASE DO THAT.

21   A.    -- YOU'RE GOING TO SEE THE NON-GRAYED-OUT BACKGROUND.

22   Q.    THAT'S WHAT I'D LIKE.  THANK YOU FOR THAT CLARIFICATION.

23         THIS IS BETTER?

24   A.    YES.

25   Q.    SO IS THIS SLIDE ONE YOU USED?  I THINK THIS IS FROM --

793

1    A.   IT'S ACTUALLY NOT ONE THAT I USED.  IT IS -- OKAY.  IT'S

2    A PICTURE THAT I USED.  THIS IS NOT WHAT I ACTUALLY USED IN

3    DOING MY EXPERT REPORT, HOWEVER.

4         AND THE REASON YOU CAN TELL THAT IS IF YOU GO DOWN

5    NEAR THE BOTTOM EDGE UNDERNEATH THE PHOTO, YOU SEE

6    MEASUREMENT 1 AS A LABEL.  DATE AND TIME, 9/15/17.  THAT'S

7    WHEN THIS ANALYSIS WAS ACTUALLY DONE.

8         SO IT'S AN IMAGE THAT IS IN MY EXPERT REPORT, BUT

9    THIS DEMONSTRATIVE WAS SIMPLY DONE FOR THE MATTER OF MY

10   PRESENTATION EARLIER THIS AFTERNOON.

11   Q.   THIS DEMONSTRATIVE WAS DONE FOR YOUR PRESENTATION THIS

12   AFTERNOON?

13   A.   THAT'S CORRECT.  BECAUSE WE FELT THAT IT WOULD BE

14   CLEARER TO BE ABLE TO WALK PEOPLE THROUGH STEP-BY-STEP AS TO

15   WHAT WAS DONE.  SO THE IMAGE, THE PHOTOGRAPH THAT YOU SEE,

16   THE CROPPED UNIT CELL AND ALL, THOSE ARE EXACTLY WHAT IS

17   ACTUALLY IN MY EXPERT REPORT.

18        IT'S THIS PICTURE WITHIN PHOTOSHOP, WHICH IS DATING

19   BACK TO BEING PREPARED FOR HERE, RATHER THAN IT BEING IN MY

20   EXPERT REPORT.

21   Q.   IS THE HISTOGRAM SHOWN IN PDX-157 REPRESENTATIVE OF THE

22   HISTOGRAMS THAT YOU MEASURED IN COMING TO YOUR CONCLUSION OF

23   INFRINGEMENT BASED ON THESE SECOND SET OF TESTS?

24   A.   BASED ON THE COVERAGE AREA, THIS IS CORRECT.

25   Q.   NOW, LET ME UNDERSTAND.  YOU'VE SEEN THAT HISTOGRAM.

794

1    AND THE HISTOGRAM, FOR THE JURY, IS THE GRAPH IN THE TOP

2    RIGHT PICTURE, THE TWO LUMPS, THE MOUNTAIN THAT'S BLOWN UP

3    THERE.

4              IS THAT CORRECT?

5    A.    THAT'S CORRECT.

6    Q.    COULD YOU EXPLAIN WHAT A HISTOGRAM IS?

7    A.    OKAY.   WHAT PHOTOSHOP DOES IS FOR EVERY PIXEL IN THE

8    IMAGE, IT KNOWS WHAT COLOR THOSE PIXELS ARE.   AND IN THIS

9    PARTICULAR CASE, THE PIXELS ARE GIVEN IN GRAY SCALE.   IN THIS

10   PARTICULAR CASE, OKAY, PHOTOSHOP, AT ITS HIGHEST RESOLUTION,

11   DROPS THAT RANGE OF GRAY FROM BLACK TO PURE WHITE IN PIXEL

12   COUNT INTO A SERIES OF BINS.

13             THERE ARE 256 INDIVIDUAL BINS, WHERE THE BINS ON THE

14   LEFT-HAND SIDE REPRESENT THE BLACKEST BLACK.   THE BINS ON THE

15   RIGHT-HAND SIDE REPRESENT THE WHITEST WHITE.   AND THEN AS YOU

16   MOVE FROM LEFT TO RIGHT, YOU ARE CHANGING LITERALLY FROM

17   BLACK THROUGH SHADES OF GRAY UNTIL YOU GET TO WHITE.   AND

18   THAT'S WHAT IS REPRESENTED HERE ON THE HISTOGRAMS.

19   Q.    SO IN ORDER TO COUNT THE AMOUNT OF METALLIC COVERAGE,

20   FOR INSTANCE, YOU WOULD ADD UP THE AMOUNT OF AREA UNDER ONE

21   OF THESE CURVES; IS THAT RIGHT?

22   A.    I ADDED UP THE NUMBER OF PIXELS WHICH WERE NOT BLACK.

23   BECAUSE THE BACKGROUND FOR ALL OF THE HEATWAVE MATERIALS, THE

24   BASE FABRIC IS BLACK.   IT'S NOTHING OTHER THAN BLACK.   IT

25   DOESN'T HAVE ANY SILVER IN IT.   IT DOESN'T HAVE ANY WHITE IN

795

1    IT, SO TO SPEAK.

2           BUT AS YOU KNOW, BLACK IS NOT ALWAYS PRECISELY

3    BLACK.  THERE IS A LITTLE BIT OF A GRAY RANGE, EVEN WITHIN

4    WHAT WE THINK OF AS BLACK, AT THIS LEVEL OF RESOLUTION.  I

5    COULD HAVE TAKEN -- I COULD HAVE HAD PHOTOSHOP USE THE SAME

6    INFORMATION AND SAY, DON'T GIVE ME 256 BINS; GIVE ME 8, GIVE

7    ME 2, ANY MULTIPLE OF TWO.  PHOTOSHOP AUTOMATICALLY DOES THAT

8    FOR YOU.

9           BUT I FELT THAT IT WAS BETTER TO HAVE THE HIGHER

10   LEVEL OF RESOLUTION.  SO WHAT YOU'RE LOOKING AT, THE PEAK ON

11   THE LEFT-HAND SIDE, THAT'S BLACK; THAT'S THE BASE FABRIC.  AS

12   YOU MOVE OVER TO THE RIGHT-HAND SIDE, THAT'S WHITE.  WELL,

13   GRAYS.  THAT'S THE HEAT-REFLECTING ELEMENTS.

14          THE QUESTION IS, WHERE IS THE DIVIDING LINE BETWEEN

15   LEFT AND RIGHT?  SO WHAT I DID -- UNLESS YOU WANT TO ASK ME A

16   QUESTION ABOUT THIS, I CAN JUST TELL YOU.

17   Q.   WHAT DID YOU DO?

18   A.   WHAT DID I DO?  OKAY.  WHAT I DID WAS TO DETERMINE WHERE

19   IS THE BREAK BETWEEN WHAT'S BLACK AND WHAT'S WHITE.

20          SO I WENT IN AND SAID, OKAY, VISUALLY, IT LOOKS TO

21   ME HERE IS WHERE THE BREAK POINT IS.  PICK THE BIN.  THEN

22   WENT IN TO THE SPREADSHEET THAT HAS THE ACTUAL NUMBER OF

23   PIXELS, IF YOU WISH, THAT FELL INTO EACH ONE OF THESE 256

24   BINS AND ADDED THEM ALL UP.  SO I DIDN'T ASSIGN A PIXEL TO A

25   BIN.  ALL I SIMPLY DID WAS ADD THEM UP.

1           SO I HAVE THE NUMBER OF PIXELS, WHICH ARE ON THE

2      BLACK SIDE, DIVIDED BY THE TOTAL NUMBER OF PIXELS, WHICH IS

3      SIX MILLION SOMETHING.  THAT'S THE PERCENT OF THE BASE LAYER

4      THAT IS SHOWING THROUGH.  ONE MINUS THAT IS THE PERCENT OF

5      COVERAGE BY THE REFLECTIVE ELEMENTS.

6           NOW, THERE IS A QUESTION.  WHERE IS THE ACTUAL BREAK

7      IN HERE?  I MEAN, WE GO IN ALL THE TIME WITH OVERLAPPING

8      PEAKS TO TRY TO SEPARATE THEM OUT.  I WENT IN AND SAID, YOU

9      KNOW, I'M GOING TO SEE, LET'S SAY I DECIDED ON MY FIRST TIME

10     THROUGH THAT THE BREAK POINT WAS BIN NO. 76.  SO BLACK UP TO

11     76, REFLECTIVE ELEMENT FROM 77 ON.

12          I WENT IN AND SAID, WELL, MAYBE I MISSED THAT.

13     MAYBE IT REALLY WAS BIN 73 OR SOMEPLACE ELSE.  SO I WENT IN

14     AND PICKED THOSE, ADDED THEM UP AND LOOKED TO SEE IF THERE

15     WAS A SIGNIFICANT DIFFERENCE IN THE COVERAGE THAT I

16     CALCULATED WITH WHERE I CHOSE THE BREAK POINT BETWEEN

17     WHITE -- WELL, BETWEEN BLACK AND THE REFLECTIVE ELEMENTS.

18          AND AT EVERY CASE, I FOUND THE DIFFERENCE WAS

19     TRIVIAL IN IT, THAT WHERE I PUT THE DIVIDING LINE IN THERE

20     JUST REALLY DIDN'T HAVE A BIG EFFECT ON WHAT THE COVERAGE

21     THAT I CALCULATED WAS.

22          BUT THAT'S -- THIS GIVES YOU AN IDEA OF WHY YOU NEED

23     TO TAKE A GOOD PICTURE.  BECAUSE IF YOU DON'T TAKE A GOOD

24     PICTURE, WHAT YOU FIND IS THE HEAT-REFLECTING ELEMENTS, THAT

25     SILVER, IT'S REFLECTING EVERYWHERE, AND AS A RESULT, WHEN THE

797

1    LIGHT IS BEING REFLECTED THIS WAY AND THE CAMERA IS HERE,

2    THOSE PIXELS START LOOKING DARK, BECAUSE THEY ARE NOT

3    REFLECTING LIGHT BACK UP TOWARDS THE CAMERA.

4            AND YOU END UP WITH A SIGNIFICANT AMOUNT OF

5    CONTAMINATION OF WHAT YOU THINK IS THE BASE BY THE

6    HEAT-REFLECTING ELEMENTS.  SO YOU'VE GOT TO HAVE GOOD

7    CONTRAST WITHIN THE PICTURES FOR THEM TO BE RELEVANT.

8    Q.    CLARIFY FOR ME THE LUMP ON THE LEFT, THAT PEAK.  IS THAT

9    BLACK OR --

10   A.    THAT'S BLACK.

11   Q.    THAT'S BLACK?

12   A.    SO THE PIXELS RANGE FROM THE BLACKEST BLACK IS THE BIN

13   ON THE FURTHEST LEFT.  THE WHITEST WHITE IS THE BIN THE

14   FURTHEST ON THE RIGHT.  AND COUNTING THOSE, THERE IS A TOTAL

15   OF 256 UNIQUE BINS.

16   Q.    SO THERE IS SOME UNCERTAINTY AS TO WHERE BLACK ENDS AND

17   WHITE BEGINS; THAT'S YOUR TESTIMONY?

18   A.    THAT'S CORRECT.  AND THAT'S WHY I WENT IN WITH THE

19   SENSITIVITY ANALYSIS, TO BE ABLE TO FIGURE WHERE DO THINGS

20   BREAK AND HOW MUCH OF AN EFFECT ON THE CALCULATION IS MY

21   CHOICE OF WHERE I SAY THE BREAK IS.

22   Q.    NOW, IN YOUR SECOND SET OF TESTS -- IF YOU CAN PULL UP

23   PDX-159.

24            THIS WAS A SLIDE THAT YOU TESTIFIED TO EARLIER?

25   A.    YES, THIS IS.  AND BY THE WAY, THIS HAS ALL THE RESULTS

798

1    ON IT.  WHEN YOU SAY SECOND SET OF TESTS, THIS IS THE SET OF

2    TESTS.

3    Q.    THANK YOU.  AND YOU HAVE AVERAGE -- YOU HAVE FIVE

4    AVERAGE NUMBERS IN THE FAR RIGHT COLUMN; IS THAT RIGHT?

5    A.    CORRECT.  THERE WERE FIVE UNIQUE SEIRUS FABRICS THAT

6    WERE PROVIDED TO ME.

7    Q.    AND EACH OF THOSE AVERAGE NUMBERS CORRELATES TO A SINGLE

8    FABRIC THAT YOU TESTED MULTIPLE TIMES; IS THAT RIGHT?

9    A.    THAT'S CORRECT.

10    Q.    AND IF YOU LOOK AT THE NEXT COLUMN OVER TO THE LEFT, AND

11    IT'S ENTITLED "PERCENT COVERAGE."  THOSE ARE THE SPECIFIC

12    TESTS THAT YOU MADE ON EACH FABRIC, CORRECT, THAT LED TO THE

13    AVERAGE?

14    A.    RIGHT.  AND YOU HAVE WHICH PHOTO EACH SET OF NUMBERS

15    CAME FROM.  SO REMEMBER, EACH PHOTO REPRESENTS A UNIT CELL.

16    AND THIS IS WHAT PHOTOSHOP TOLD ME FOR THE PERCENT COVERAGE

17    FOR THAT PHOTO OF THE UNIT CELL WITH THAT FABRIC.

18         SO WHEN I TAKE MULTIPLE PHOTOS, I WILL TAKE THE

19    FABRIC UP, MOVE IT, PUT IT BACK DOWN AGAIN, AGAIN TRYING TO

20    AVOID AREAS THAT I CAN VISUALLY TELL ARE LIKELY TO BE

21    PROBLEMATIC OR WRINKLED, FOR INSTANCE.  I TRY TO STAY AWAY

22    FROM WRINKLES IN THERE.  PUT THE FABRIC BACK DOWN AGAIN, TAKE

23    ANOTHER PHOTO AND ANALYZE IT THE SAME WAY.  BUT IT IS THE

24    SAME FABRIC THAT SEIRUS HAD SENT.

25    Q.    YOUR LOWEST NUMBER IN THIS COLUMN YOU TESTIFIED TO IS

1    61.4; IS THAT RIGHT?

2    A.   CORRECT.

3    Q.   THAT MEANS THAT ONE OF YOUR MEASUREMENTS YOU MEASURED

4    THE COVERAGE OF THE SEIRUS MATERIAL AT 61.4?

5    A.   PERCENT, YES.

6    Q.   PERCENT.  AND YOUR HIGHEST MEASUREMENT WAS 69.2?

7    A.   PERCENT, THAT'S CORRECT.

8    Q.   EIGHT PERCENT DIFFERENCE BETWEEN THOSE TWO?

9    A.   SEVEN AND A HALF PERCENT, YES.

10   Q.   SEVEN AND A HALF PERCENT?

11   A.   CORRECT.

12   Q.   NOW, THIS IS INTERESTING, BECAUSE, IN FACT, THE SEIRUS

13   COVERAGE THAT YOU HAVE OPINED ON IS AT THE VERY HIGH END OF

14   THE CLAIMED RANGE; ISN'T THAT FAIR?

15   A.   YES, IT'S TOWARDS THE 70 PERCENT.

16   Q.   IT'S VERY CLOSE TO THE 70 PERCENT?

17   A.   CORRECT.

18   Q.   I BELIEVE YOUR AVERAGE OVERALL WAS 68 PERCENT; ISN'T

19   THAT RIGHT?

20   A.   I'M SORRY.  THE GRAPHIC IS OBSCURING MY VIEW OF WHAT'S

21   GOING ON.  THAT'S ALL RIGHT.  THIS DOESN'T HAVE IT.

22        WELL, IT LOOKS LIKE IT'S PROBABLY AROUND 66 PERCENT

23   OR SO, 66 1/2 PERCENT.

24   Q.   OF YOUR AVERAGES OVER THE FABRIC, THEY RANGE FROM

25   68 PERCENT TO 64.4 PERCENT; IS THAT FAIR?

1    A.    THAT'S CORRECT.

2    Q.    ALMOST 4 PERCENT DIFFERENCE BETWEEN YOUR HIGHEST AND

3    LOWEST VALUE IN YOUR AVERAGE RANGES?

4    A.    RIGHT.    RIGHT.    THESE ARE FOUR DIFFERENT FABRICS, WHICH

5    PRESUMABLY WERE MANUFACTURED ON DIFFERENT DATES.    WE KNOW AT

6    LEAST BETWEEN THE 42 AND THE 44, THE 42 IS A TWO-WAY STRETCH,

7    THE 44 IS THE FOUR-WAY STRETCH.    THEY HAVE DIFFERENT BASE

8    FABRIC.

9            I DON'T THINK ANYBODY EVER TOLD ME WHAT THE BASE

10    FABRIC IS FOR THE 47, 48 AND 49.    BUT YOU'VE GOT DIFFERENCE

11    IN BASE FABRICS, YOU'VE GOT DIFFERENCE IN TIME THEY WERE

12    MANUFACTURED PRESUMABLY.    YOU MAY HAVE DIFFERENCE IN WEAR ON

13    THE EQUIPMENT.    SO THIS IS PROBABLY REPRESENTATIVE OF THE

14    KIND OF RANGE AND VARIABILITY IN MANUFACTURING THAT WE WERE

15    EXPLORING EARLIER.

16    Q.    WE WERE TALKING EARLIER ABOUT WHETHER OR NOT YOU COULD

17    HAVE SENT THIS OUT TO A SEPARATE LAB OR PHOTOGRAPHER.    NOW,

18    YOUR TESTIMONY WAS THAT YOU COULDN'T LOCALLY BECAUSE YOU LIVE

19    IN A RURAL PART OF SOUTH CAROLINA.

20    A.    THAT'S CORRECT.    I DIDN'T FIND ANYBODY LOCALLY TO BE

21    ABLE TO DO THIS KIND OF WORK, WHERE THIS KIND OF WORK REALLY

22    IS TAKING THE PHOTOGRAPHS, AS I LEARNED HOW, HOW YOU HAD TO

23    TAKE THE PHOTOGRAPH.

24            THERE IS AN ADVANTAGE IF YOU'VE GOT A STANDARDIZED

25    TEST METHOD, BECAUSE EVERYBODY HAS AGREED AHEAD OF TIME WHAT

801

1    THE PROCEDURE IS TO BE ABLE TO DO THE TEST, WE AGREE WHAT THE

2    VARIABILITY IS IN THE TEST AND SO FORTH.  IT'S STANDARD, FOR

3    HEAVEN'S SAKES.  THAT'S WHY WE HAVE BIG STANDARDS

4    ORGANIZATIONS, BUT THERE IS NO STANDARD TEST FOR BEING ABLE

5    TO DO THIS.

6             SO I FELL BACK ON TRYING TO JUST TAKE AS GOOD A

7    PHOTOGRAPH AS I COULD AND THEN USE COMMERCIALLY AVAILABLE

8    SOFTWARE, LET IT RUN ON ITS OWN ANALYSIS, AND THEN EXPLAIN

9    HOW DID IT WORK AND WHERE I THOUGHT THE LIMITATIONS WERE.

10   Q.   SO YOU LOOKED LOCALLY IN YOUR RURAL SOUTH CAROLINA AREA

11   FOR SOMEONE WHO COULD DO THIS AND THEY COULDN'T DO IT?  YOU

12   COULD NOT FIND SOMEONE; RIGHT?

13   A.   THAT'S CORRECT.

14   Q.   YOU DIDN'T GO TO NEW YORK CITY?

15   A.   NO.  I ASKED MY DAUGHTER WHO WORKS WITH PHOTOGRAPHERS IN

16   NEW YORK CITY EVERY DAY.  SHE WASN'T COMING UP WITH ANYBODY

17   WHO COULD DO THIS.

18   Q.   YOU DIDN'T LOOK TO ATLANTA?

19   A.   NO.

20   Q.   CHAPEL HILL, THERE IS THREE UNIVERSITIES IN THAT AREA.

21   SOMEWHAT NEARBY IN NORTH CAROLINA?

22   A.   CORRECT.

23   Q.   INSTEAD, YOU DID THE TEST YOURSELF?

24   A.   THIS IS CORRECT.

25   Q.   YOU CREATED A 200-PAGE REPORT; CORRECT?

802

1    A.   I HAVEN'T COUNTED THE PAGES, BUT, YES.  THIS IS A

2    SIGNIFICANT AMOUNT OF WORK.

3    Q.   YOU ALREADY HAD IN MIND THE NUMBER AND THE RANGE THAT

4    YOU NEEDED TO REACH; ISN'T THAT RIGHT?

5    A.   I KNEW WHAT I WAS TRYING TO VERIFY, WHETHER OR NOT

6    INFRINGEMENT EXISTED.  BUT I'M A SCIENTIST.  I DON'T GO IN

7    SAYING, YOU KNOW, IF THE NUMBER IS NOT RIGHT, I'M GOING TO

8    THROW IT OUT.  I DON'T.  I HAVE TOO MUCH PERSONAL INTEGRITY

9    FOR THAT, AS WELL AS PROFESSIONAL ETHICS.

10   Q.   YOU DIDN'T DO A BLIND TEST?  YOU'RE NOT ABLE TO.  YOU

11   KNEW THE RANGE --

12   A.   CORRECT.

13   Q.   -- THAT YOU WANTED --

14   A.   I KNEW WHAT THE PRODUCT WAS.

15   Q.   YOU WERE PAID BY COLUMBIA?

16   A.   THROUGH RUBIN/ANDERS, YES.

17   Q.   GOAL-ORIENTED?

18   A.   MY FEE IN THIS CASE HAS NOTHING TO DO WITH THE OUTCOME

19   OF THIS CASE.

20   Q.   YOU WERE PAID BY COLUMBIA TO FIND INFRINGEMENT OF

21   SEIRUS?

22   A.   I WAS PAID BY COLUMBIA TO PROVIDE AN EXPERT REPORT.  I

23   HAVE IN THE PAST TOLD MY OWN CLIENTS, YOU DON'T HAVE A CASE,

24   AND HERE IS WHY YOU DON'T HAVE A CASE.  AND I'M GLAD TO SAY

25   THAT THEY FOLDED AT THAT PARTICULAR POINT.

803

```
 1              I DON'T TRY TO PAD A BILL.  I DON'T TRY TO MAKE MORE
 2    WORK FOR MYSELF SO MY BILL GETS BIGGER.  I'VE DONE OVER 75
 3    MILLION DOLLARS' WORTH OF GOVERNMENT CONTRACTS.  I'VE GONE
 4    THROUGH AUDITS BY EVERYBODY FROM ONE END TO THE OTHER, AND
 5    THEY HAVE ALWAYS COME OUT CLEAN.  AND THEY ARE GOING TO STAY
 6    THAT WAY.
 7    Q.   YOU DIDN'T --
 8    A.   I DON'T CARE ENOUGH ABOUT THIS PARTICULAR CASE TO EVER
 9    DO ANYTHING TO IMPUGN MY OWN INTEGRITY.
10    Q.   YOU DID NOT PERFORM A STANDARD DEVIATION, OR YOU DID NOT
11    DETERMINE THE STANDARD DEVIATION FOR YOUR MEASUREMENTS, DID
12    YOU?
13    A.   YOU COULD TAKE THE DATA RIGHT NOW AND DETERMINE THE
14    STANDARD DEVIATION.
15    Q.   YOU DID NOT DETERMINE THE STANDARD DEVIATION FOR YOUR
16    MEASUREMENTS, DID YOU?
17    A.   THAT'S CORRECT.
18    Q.   YOU DID NOT DO A T-TEST ON YOUR NEW MEASUREMENTS, DID
19    YOU?
20    A.   THAT'S CORRECT.
21    Q.   YOU CAN'T SAY WHETHER OR NOT YOUR AVERAGE MAY FALL
22    OUTSIDE OF THAT 30- TO 70-RANGE, BASED ON THE FACT THAT YOU
23    HAVEN'T DONE THE CORRECT STATISTICAL ANALYSIS, GIVEN THE
24    UNCERTAINTY IN THE UNDERLYING MEASUREMENTS?
25    A.   I CAN LOOK AT THE NUMBERS AND TELL YOU THAT THEY ARE NOT
```

804

1    GOING TO FALL OUTSIDE TO A VERY HIGH LEVEL OF PROBABILITY.

2              MR. SPROUL:  NO FURTHER QUESTIONS, YOUR HONOR.

3              THE COURT:  REDIRECT.

4              MS. LEGAARD:  I JUST HAVE A COUPLE OF THINGS.

5                     REDIRECT EXAMINATION

6    BY MS. LEGAARD:

7    Q.    DR. COLE, DID A SINGLE ONE OF YOUR TESTS INDICATE THAT

8    THE SEIRUS FABRIC FELL OUTSIDE THE 30- TO 70-RANGE?

9    A.    I NEVER -- IF WE'RE TALKING SPECIFICALLY ABOUT THE

10   PERCENT COVERAGE, I NEVER MEASURED A PERCENT COVERAGE THAT

11   WAS GREATER THAN 70 PERCENT.  NOT A SINGLE SAMPLE.

12   Q.    DID DR. BLOCK?

13   A.    DR. BLOCK AT HIS DEPOSITION, AS WE SHOWED ON MY DIRECT,

14   SAYS THE COVERAGE FALLS BETWEEN 30 AND 70 PERCENT.  SO I FEEL

15   LIKE THERE IS INDEPENDENT VERIFICATION.

16   Q.    THANK YOU.

17         I WANT TO ASK ONE LAST QUESTION ABOUT THE HEAT TOUCH

18   TORCHE GLOVE, WHICH IS THE BOX AT THE --

19   A.    WITHOUT GLOVES, OKAY.

20   Q.    RIGHT.  SO DR. COLE, IF SEIRUS HADN'T PUT HEATWAVE

21   FABRIC IN THAT GLOVE WITH THE HEAT-DIRECTING ELEMENTS

22   DIRECTED TOWARD THE USER, WOULD WE BE TALKING ABOUT IT AT

23   ALL?

24   A.    NO.  IF THE FABRIC HAD BEEN TURNED AROUND THE WAY IT'S

25   TURNED IN THE PALM IN SOME OF THE HEATWAVE-PLUS PRODUCTS,

COMPUTER-AIDED TRANSCRIPTION

805

1    THIS PRODUCT NEVER WOULD BE ACCUSED.

2            MS. LEGAARD:  THANK YOU.  THAT'S ALL I HAVE.

3            MR. SPROUL:  YOUR HONOR, MAY I ASK ONE QUESTION?

4            THE COURT:  SURE.

5            HANG ON JUST A SECOND.

6                        RECROSS-EXAMINATION

7    BY MR. SPROUL:

8    Q.   DR. COLE, DID YOU RECEIVE THE FABRIC THAT YOU TESTED

9    FROM COLUMBIA'S COUNSEL OR SEIRUS' COUNSEL?

10           MS. LEGAARD:  OBJECTION, YOUR HONOR.  THAT'S

11   MISLEADING.

12           THE COURT:  OVERRULED.

13           THE WITNESS:  IT CAME TO ME THROUGH COLUMBIA'S

14   COUNSEL.  I'VE NEVER HAD ANY INTERACTION WITH SEIRUS' COUNSEL

15   EXCEPT AT MY DEPOSITION.

16           MR. SPROUL:  WANTED TO CLARIFY THAT.  THANK YOU,

17   YOUR HONOR.

18           NO FURTHER QUESTIONS.

19           THE COURT:  ANYTHING ELSE?

20           MS. LEGAARD:  NO.

21           THE COURT:  YOU MAY STEP DOWN.

22           CALL YOUR NEXT WITNESS.

23           MR. ALDRICH:  YOUR HONOR, COUNSEL WANTED TO TAKE

24   MR. BLACKFORD OUT OF ORDER IN ITS INVALIDITY CASE AFTER

25   DR. COLE.

806

1              THE COURT:  ALL RIGHT.

2              THE WITNESS:  EXCUSE ME.

3              THE COURT:  JUST LEAVE THEM THERE.  THANK YOU.

4              MR. MARCHESE:  I DON'T HAVE HIS BINDERS IN FRONT OF

5      ME.  I THOUGHT WE WERE DOING HIM TOMORROW.

6              THE COURT:  OKAY.

7              MR. MARCHESE:  WE CAN DO -- I THINK MERRIMAN IS

8      NEXT.

9              MR. ALDRICH:  SORRY.  THEY SAID THAT THEY WERE GOING

10     TO TAKE HIM IMMEDIATELY AFTER COLE, AND HE'S PREPARED TO GO

11     IMMEDIATELY AFTER COLE.

12             MR. MARCHESE:  I DID NOT SAY THAT, YOUR HONOR.  I

13     SAID THAT WE WOULD TAKE HIM AFTER --

14             THE COURT:  HOW LONG WILL IT TAKE FOR YOU TO GET

15     READY TO DO THIS?

16             MR. MARCHESE:  I'M GOING TO HAVE TO TRY TO GET THE

17     PIECES AND PULL THEM TOGETHER.  I DON'T HAVE THEM HERE RIGHT

18     NOW.

19             THE COURT:  WILL YOU STEP INTO THE ROOM FOR A

20     MINUTE, PLEASE.

21             (JURY ABSENT, 4:27 P.M.)

22             THE COURT:  GO AHEAD AND GET READY AND SEE HOW LONG

23     IT TAKES.

24             MR. MARCHESE:  I DON'T KNOW IF ALL THE BINDERS ARE

25     HERE, YOUR HONOR.  I'LL HAVE TO LOOK.  BUT I'M NOT SURE THAT

807

1    THEY ARE.  WE WERE UNDER THE IMPRESSION HE WAS GOING

2    TOMORROW.

3              THE COURT:  SEE WHAT YOU CAN DO.

4              (BRIEF PAUSE IN PROCEEDINGS.)

5              HAVE A SEAT, EVERYBODY.

6              MR. MARCHESE:  YOUR HONOR, PART OF WHAT I WOULD LOVE

7    TO DO IS PUT SOME QUOTES IN FRONT OF MR. BLACKFORD.  I'M NOT

8    GOING TO HAVE THAT FROM DR. COLE.  IT JUST DOESN'T SEEM

9    FEASIBLE THAT I CAN PULL IT TOGETHER.

10             HE SAID HE CAN BE HERE TOMORROW.  IT SEEMS LIKE --

11             THE COURT:  IT'S OKAY.  ALL RIGHT.  I THINK HE DID

12   SAY THAT HE COULD BE HERE TOMORROW.  YOU HAD PLANNED ON HIM

13   BEING AFTER DR. COLE.  IF YOU'RE NOT READY TO GO, WE CAN DO

14   IT TOMORROW.  THAT'S ALL RIGHT.

15             MR. MARCHESE:  THANK YOU, YOUR HONOR.

16             THE COURT:  WE'RE NOT GOING TO MAKE YOU GO IF YOU'RE

17   NOT READY.

18             MR. MARCHESE:  THANK YOU, YOUR HONOR.

19             THE COURT:  DO YOU HAVE ANOTHER WITNESS AVAILABLE?

20             MR. ALDRICH:  WE COULD CALL MR. MERRIMAN.

21             THE COURT:  OKAY.  GET THE JURY BACK IN.

22             (JURY PRESENT, 4:31 P.M.)

23             THE COURT:  CALL YOUR NEXT WITNESS.

24             MR. ALDRICH:  YOUR HONOR, IF I CAN JUST HAVE A

25   MOMENT TO GRAB THE EASEL OUT OF THE JURY ROOM.

COMPUTER-AIDED TRANSCRIPTION

1          IS THERE A BEST PLACE, YOUR HONOR?

2          THE COURT:  HANG ON.

3          MR. ALDRICH:  PARDON?

4          THE CLERK:  ONE MOMENT.

5          MR. ALDRICH:  SORRY.

6          MR. MARCHESE:  WE CAN'T SEE IT, COUNSEL.

7          MR. ALDRICH:  I'LL SEE WHAT I CAN DO.

8          THE COURT:  YOU MIGHT HAVE TO MOVE.

9          MR. ALDRICH:  PARDON?

10         THE COURT:  I WAS TALKING TO MR. MARCHESE.

11         MR. MARCHESE:  ARE YOU GOING TO BE DRAWING ON IT THE

12  WHOLE TIME?

13         MR. ALDRICH:  NOT THE WHOLE TIME.

14         MR. MARCHESE:  OKAY.  MAYBE JUST LET US KNOW WHEN

15  YOU'RE GOING TO START AND STOP.

16         MR. ALDRICH:  I CAN LET YOU KNOW THAT.  BUT I ALSO

17  NEED TO HAVE THE WITNESS SEE IT.

18         MR. MARCHESE:  WE'RE GOING TO HAVE TO WALK ACROSS

19  THE ROOM.

20         MR. ALDRICH:  I UNDERSTAND.  I'LL PUT IT THIS WAY.

21  I WAS PLANNING ON USING THIS, BUT I COULD USE THE ELMO; I

22  HAVE A PRINTED PIECE OF PAPER WITH MY NOTES ON IT.

23         MR. MARCHESE:  WE CAN WALK ACROSS THE ROOM IF YOU

24  WANT.  IF IT'S 45 MINUTES OR AN HOUR STANDING ACROSS THE

25  ROOM, THAT MAY NOT MAKE SENSE.

1          THE COURT:  THAT'S FINE.  YOU CAN GO AHEAD AND MOVE

2     ACROSS.

3          THE JURY ASKED A QUESTION REGARDING EXHIBIT 295, AND

4     THEY WERE WONDERING WHETHER THAT WAS THE EXHIBIT THAT

5     REFERRED TO THE 1153 PATENT APPLICATION DATED NOVEMBER 1986.

6          I DON'T KNOW THE ANSWER TO YOUR QUESTION AND CANNOT

7     ANSWER YOUR QUESTION.  I CAN SAY THAT EXHIBIT 295 IS NOT

8     RELATED TO THE LEVY PATENT, SO I DON'T KNOW WHICH EXHIBIT

9     MIGHT BE.

10          ALL RIGHT.  WHERE IS THE WITNESS?

11          MR. ALDRICH:  PLAINTIFF CALLS MATTHEW MERRIMAN.

12     MATTHEW MERRIMAN, A WITNESS, HAVING BEEN DULY SWORN,

13          TESTIFIED AS FOLLOWS:

14          THE WITNESS:  I DO.

15          THE CLERK:  PLEASE BE SEATED.

16          STATE YOUR FIRST AND LAST NAME FOR THE RECORD,

17     SPELLING YOUR LAST NAME.

18          THE WITNESS:  MATT MERRIMAN, M-E-R-R-I-M-A-N.

19                    DIRECT EXAMINATION

20     BY MR. ALDRICH:

21     Q.   MR. MERRIMAN, THANKS FOR COMING.

22          WHERE DO YOU WORK?

23     A.   I WORK AT COLUMBIA SPORTSWEAR.

24     Q.   AND WHAT IS YOUR CURRENT JOB TITLE?

25     A.   I'M THE SENIOR DIRECTOR OF LICENSING.

810

1    Q.    HOW LONG HAVE YOU WORKED IN LICENSING FOR COLUMBIA

2    SPORTSWEAR?

3    A.    A LITTLE OVER SEVEN YEARS.

4    Q.    AND WHAT ARE YOUR RESPONSIBILITIES AS THE SENIOR

5    DIRECTOR OF LICENSING?

6    A.    THEY ARE VARIED.  BUT COLUMBIA MAKES A LOT OF PRODUCT.

7    WE MAKE JACKETS, SHIRTS; A LOT OF PRODUCT.  SOME OF THOSE WE

8    DON'T ACTUALLY MAKE OURSELVES, SO UNDERWEAR OR SOCKS, OR

9    THINGS LIKE THAT.

10          MY RESPONSIBILITIES ARE TO GO OUT AND FIND OTHER

11   COMPANIES TO MAKE THOSE PRODUCTS FOR US AND PUT OUR NAME ON

12   THOSE PRODUCTS.  THAT'S LARGELY WHAT I DO.

13   Q.    WHAT IS YOUR -- WELL, DID YOU GO TO COLLEGE?

14   A.    I DID.

15   Q.    WHERE DID YOU GO TO COLLEGE?

16   A.    I DID UNDERGRAD RIGHT HERE IN SAN DIEGO, U.C. SAN DIEGO.

17   AND THEN I WENT TO -- I GOT AN M.B.A. FROM THE UNIVERSITY OF

18   OREGON.  AND I ALSO GOT A LAW DEGREE FROM THE UNIVERSITY OF

19   OREGON.

20   Q.    SO YOU ARE AN ATTORNEY?

21   A.    I AM.

22   Q.    HOW LONG HAVE YOU BEEN NEGOTIATING LICENSES FOR

23   TEXTILES?

24   A.    SEVEN YEARS.

25   Q.    DO YOU CONSIDER YOURSELF AN EXPERT IN ANY FIELD?

1    A.    IN PRODUCT LICENSING.

2    Q.    AND WHAT QUALIFIES YOU TO BE AN EXPERT IN THE FIELD OF

3    LICENSING FOR TEXTILES?

4    A.    WELL, CERTAINLY THE LAW DEGREE AND THE M.B.A. HELPS IN

5    THAT.  BUT I'VE BEEN SOLELY DOING THAT RESPONSIBILITY FOR

6    COLUMBIA FOR SEVEN YEARS.  I'VE SPOKEN AT MANY, MANY INDUSTRY

7    EVENTS AND SEMINARS.  I'VE CONTINUED TO GET TRAINING IN

8    LICENSING OVER THE LAST SEVEN YEARS.

9    Q.    DO YOU HAVE AN ESTIMATE OF HOW MANY LICENSES OR

10   AGREEMENTS OR PARTNERSHIPS YOU CURRENTLY MANAGE FOR COLUMBIA

11   SPORTSWEAR?

12   A.    DOZENS.

13   Q.    DOES COLUMBIA SPORTSWEAR LICENSE ANY OF ITS PATENTS?

14   A.    WE DO.

15   Q.    AND WHY DO YOU LICENSE YOUR PATENTS?

16   A.    WELL, THERE IS SEVERAL REASONS.  OF COURSE, WE'RE A

17   PUBLIC COMPANY.  WE DO IT PARTLY FOR FINANCIAL GAIN.  THERE

18   IS ANOTHER BENEFIT, THOUGH, THAT'S BEYOND JUST THE FINANCIAL

19   PART, WHICH IS WE WANT TO CREATE THIS REPUTATION THAT

20   COLUMBIA IS AN INNOVATOR.

21          AND WE'VE COME UP WITH SOME GREAT TECHNOLOGIES AND

22   WE WANT PEOPLE TO KNOW THAT THEY ARE FROM COLUMBIA AND WE

23   INVENTED THEM AND THAT WE'RE AN INNOVATIVE COMPANY AND THAT

24   OUR PRODUCTS ARE GREAT AND THE CONSUMERS LIKE THEM.

25   Q.    AFTER OMNI-HEAT WAS LAUNCHED, DID YOU RECEIVE ANY

1    REQUESTS FOR PEOPLE WANTING TO LICENSE OMNI-HEAT

2    TECHNOLOGY?

3    A.    YEAH, I HAVE.

4    Q.    APPROXIMATELY HOW MANY REQUESTS DID YOU HAVE TO LICENSE

5    THIS TECHNOLOGY?

6    A.    I'D SAY IT'S APPROXIMATELY 20 OR SO OVER THE YEARS.

7    Q.    AND HAVE YOU GRANTED 20 LICENSES FOR OMNI-HEAT?

8    A.    NO.

9    Q.    WHY IS THAT?

10   A.    WE WANT TO BE VERY SELECTIVE OF WHO WE WORK WITH.  I

11   MEAN, SOME PRODUCT CATEGORIES DON'T MAKE SENSE.  AND THEN

12   OTHER COMPANIES, WE DON'T FEEL THAT ARE AT THE CALIBER THAT

13   WE WOULD WANT TO GIVE OUR ABSOLUTE PREMIER TECHNOLOGY TO.

14            MR. ALDRICH:  I'D LIKE TO MOVE TO ADMIT EXHIBIT 253.

15            MS. ROTHAUGE:  NO OBJECTION.

16            THE COURT:  IT'S RECEIVED.

17        (TRIAL EXHIBIT 253 RECEIVED IN EVIDENCE.)

18   Q.    BY MR. ALDRICH:  MR. MERRIMAN, WHAT IS EXHIBIT 253?

19   A.    I'M SORRY.  WHAT IS IT?

20   Q.    YES.  WHAT IS EXHIBIT 253?

21   A.    IT'S A POWERPOINT PRESENTATION THAT I CREATED.

22   Q.    IS THIS ABOUT YOUR LICENSING PROGRAM?

23   A.    YEAH.  IT'S A DOCUMENT THAT I USE GENERALLY WHEN TRYING

24   TO EXPLAIN LICENSING INTERNALLY TO DIFFERENT GROUPS OR TEAMS

25   THAT MIGHT NOT KNOW IT, OR EXTERNAL PARTIES.

813

1    Q.    LET ME HAVE YOU TURN TO THE NEXT PAGE.  WE CAN PUT IT ON

2    THE SCREEN FOR YOU.

3    A.    PERFECT.

4    Q.    WHAT IS SHOWN ON THIS PAGE?

5    A.    IT'S SORT OF THE GUIDING PHILOSOPHY THAT WE HAVE IN OUR

6    PROGRAM THAT, YOU KNOW, I WAS TRYING TO EXPLAIN HOW WE WOULD

7    DECIDE WHAT KIND OF LICENSE WE WOULD DO AND HOW WE WOULD

8    EVALUATE NEW OPPORTUNITIES.  AND SO THEY ARE GUIDING

9    PRINCIPLES.

10   Q.    AND WHO DRAFTED THESE GUIDING PRINCIPLES?

11   A.    I DID.  I DEVELOPED THEM.

12   Q.    OKAY.  THE FIRST GUIDING PRINCIPLE HERE SAYS, "ALL

13   LICENSING PARTNERSHIPS MUST BE PROFITABLE."

14         WHAT DOES THAT MEAN?

15   A.    COLUMBIA IS A PUBLIC COMPANY.  WE'RE IN THIS TO MAKE

16   MONEY.  AND THAT'S ONE COMPONENT.  IT'S NOT THE ONLY

17   COMPONENT.  BUT THAT'S ONE FACTOR THAT MOTIVATES US TO

18   LICENSE PRODUCT.

19   Q.    AND THEN THE SECOND GUIDING PRINCIPLE IS "ALL LICENSING

20   PARTNERSHIPS MUST BE BRAND ENHANCING."

21         WHAT DOES THAT MEAN?

22   A.    WELL, WE COULD LICENSE OMNI-HEAT OR ANY OF OUR OTHER

23   TECHNOLOGIES ON SOMETHING THAT WOULD BE -- LIKE A TOILET

24   PLUNGER, SOMETHING THAT WOULDN'T BE GREAT FOR THE BRAND, TO

25   HAVE THAT COLUMBIA BRAND ON IT.

814

1           BUT WE'RE LOOKING FOR HIGH-QUALITY PRODUCTS

2    CONTAINING OUR BEST TECHNOLOGIES AND SOMETHING THAT'S GOING

3    TO FURTHER ELEVATE THE COLUMBIA BRAND IN THE CONSUMERS' EYES.

4    Q.   AND THEN THE LAST BULLET IS THE "LICENSED PRODUCTS MUST

5    BE UNIQUELY COLUMBIA."

6           WHAT DOES THAT MEAN?

7    A.   THAT MEANS WE DON'T WANT TO -- FOR THE PRODUCTS THAT

8    WE'RE HAVING ANOTHER PARTNER MANUFACTURE FOR US, WE DON'T

9    WANT TO JUST HAVE BASIC COMMODITY PRODUCT OUT THERE.  SO

10   THERE IS SOME WAYS TO DIFFERENTIATE PRODUCT.  THE EASIEST

11   WAY, AND GENERALLY WHAT I TALK ABOUT WITH UNIQUELY COLUMBIA

12   IS BY INCORPORATING OUR VARIOUS PATENTED TECHNOLOGIES.

13          SO THAT WHEN SOMEONE SEES THAT PRODUCT AND THE

14   TECHNOLOGY, THEY KNOW IT'S FROM COLUMBIA BECAUSE THEY KNOW

15   THAT OUR TECHNOLOGIES ARE IN THAT ITEM.

16   Q.   LET'S GO TO THE NEXT PAGE.  THIS IS A CONTINUATION OF

17   YOUR LICENSEE GUIDING PRINCIPLES?

18   A.   IT IS.

19   Q.   OKAY.  CAN YOU EXPLAIN, JUST AT A GENERAL LEVEL, WHAT IS

20   SHOWN ON THIS PAGE.

21   A.   IT'S AT A VERY HIGH LEVEL, THE STEPS THAT IT TAKES TO GO

22   FROM A CONCEPT TO SALE AND DELIVERY OF A LICENSED PRODUCT.

23   Q.   OKAY.  SO LET'S START WAY OVER ON THE LEFT.  WHAT'S

24   SHOWN OVER HERE ON THE LEFT?

25   A.   SO THE FIRST STEP, AFTER WE HAVE A CONTRACT IN PLACE AND

1    WE HAVE AN AGREEMENT AND A PARTNER, IS TO DEVELOP A CONCEPT

2    AROUND A PRODUCT, WHICH IS DONE IN PART, BOTH WITH THE

3    LICENSEE AND COLUMBIA.  SO WE SIT DOWN TOGETHER AND SAY, HEY,

4    WOULDN'T IT BE GREAT IF WE DID SOCKS FOR COLUMBIA THAT WERE

5    SKIING AND HAD OMNI-HEAT IN THEM.

6    Q.   SO YOU'RE NOT JUST LICENSING OMNI-HEAT OUT TO OTHER

7    PEOPLE TO DO ON THEIR OWN; IS THAT RIGHT?

8    A.   NO.  WE HAVE A VERY SPECIFIC IDEA OF THE PRODUCTS THAT

9    ARE GOING TO GO TO MARKET, WHAT TECHNOLOGIES THEY WILL

10   CONTAIN, WHERE THEY ARE GOING TO BE SOLD, PRICE POINTS THAT

11   THEY ARE GOING TO BE AT.  ALL OF IT.

12   Q.   OKAY.  AND THEN WHAT'S THE SECOND STEP IN YOUR

13   PROCESS?

14   A.   SO I KIND OF MENTIONED EARLIER THAT WE'RE THE EXPERTS IN

15   JACKETS AND PANTS AND APPAREL.  THAT'S WHAT COLUMBIA DOES.

16   BUT ON CERTAIN THINGS -- THIS IS -- THE EXAMPLE SHOWS

17   EYEWEAR.  WE'RE NOT AN EXPERT IN MAKING SUNGLASSES OR

18   PRESCRIPTION GLASSES; SO WE RELY ON EXPERTS IN THE INDUSTRY.

19            SO AFTER HAVING THIS SORT OF CO-DEVELOPMENT

20   CONVERSATION, THE LICENSEE, WHO IS THE EXPERT IN THOSE

21   AREAS -- SO THE EXPERT WOULD GO THEN AND DESIGN THE GLASSES

22   AND THEN WE COME BACK TO US AND SAY, THIS IS WHAT WE WOULD

23   LIKE TO DO, THIS IS OUR VISION.

24   Q.   AND JUST OUT OF KINDNESS FOR THE COURT REPORTER, IF

25   YOU'D SLOW DOWN A LITTLE BIT.

816

1    A.   SORRY.

2    Q.   I SEE HER STRAINING OVER HERE.

3         OKAY.  THE THIRD STEP IN YOUR PROCESS HERE.  WHAT IS

4    THE THIRD STEP?

5    A.   THE THIRD STEP IS -- I JUST ALLUDED TO THAT.  THE

6    LICENSEES DESIGN THE PRODUCT, AND THEN THEY COME BACK TO US

7    AND SUBMIT TO MY TEAM A FORM THAT SHOWS THE DESIGN AND A LOT

8    OF OTHER ELEMENTS ON IT; PRICE POINT, PRODUCT NAME AND THINGS

9    LIKE THAT.  AND THEY ARE SAYING, THIS IS WHAT WE WOULD LIKE

10   TO DO.  CAN WE GO AHEAD WITH THIS.  AND IT'S WHAT WE CALL AN

11   APPROVAL FORM.

12   Q.   AND SO COLUMBIA APPROVES THE PRODUCT BEFORE IT GOES

13   OUT?

14   A.   WE APPROVE ALL ASPECTS OF THE PRODUCT:  THE DESIGN,

15   PACKAGING, DISTRIBUTION, EVERYTHING.

16   Q.   AND THEN THE FINAL STEP OF THE PROCESS, WHAT IS THAT?

17   A.   SO THIS IS -- THE LICENSEE ACTUALLY MAKES AND SELLS THE

18   PRODUCT AND THEN PAYS COLUMBIA ROYALTIES, SO THEY TAKE CARE

19   OF THE MANUFACTURING AND THE SALE OF THE PRODUCT.

20        MR. ALDRICH:  LET'S TURN TO EXHIBIT 89, WHICH I WILL

21   OFFER.

22        MS. ROTHAUGE:  NO OBJECTION.

23        THE COURT:  RECEIVED.

24   (TRIAL EXHIBIT 89 RECEIVED IN EVIDENCE.)

25   Q.   BY MR. ALDRICH:  MR. MERRIMAN, WHAT IS EXHIBIT 89?

COMPUTER-AIDED TRANSCRIPTION

817

1    A.    THIS IS ONE OF MY LICENSE AGREEMENTS.  AND THIS ONE IS

2    WITH A COMPANY CALLED OUTDOOR CUSTOM SPORTSWEAR.  BUT WE JUST

3    REFER TO THEM AS O.C.S.

4    Q.    AND WHAT DOES O.C.S. DO?

5    A.    O.C.S. LARGELY TAKES SHIRTS THAT WE'VE DESIGNED AND THEY

6    SELL THEM INTO THE COLLEGE BOOKSTORE CHANNEL WITH DECORATION

7    OF THE COLLEGE LOGO ON IT.  SO THEY MIGHT TAKE A COLUMBIA

8    SHIRT AND SELL IT TO SAN DIEGO STATE, SAN DIEGO STATE

9    BOOKSTORE, BUT BEFORE THEY DO THAT, THEY PUT THE SAN DIEGO

10   STATE LOGO ON IT.

11   Q.    AND SO WHAT IS -- WHAT IS THIS LICENSE GETTING FOR

12   COLUMBIA, BESIDES SOME REVENUE?

13   A.    I'M SORRY?

14   Q.    WHAT OTHER BENEFIT TO COLUMBIA IS THERE IN ENTERING INTO

15   A LICENSE WITH O.C.S.?

16   A.    WELL, WE GET THE REVENUE FROM THE SALES.  WE GET A

17   PERCENTAGE OF THEIR SALES.  BUT WE ALSO GET OUR BRAND AND OUR

18   TECHNOLOGIES THAT ARE IN THE PRODUCT THAT THEY SELL IN

19   CHANNELS THAT WE DON'T NECESSARILY SELL OURSELVES.

20          SO TAKING MY EXAMPLE EARLIER OF THE SAN DIEGO STATE

21   BOOKSTORE.  OUR -- THAT BOOKSTORE WOULDN'T CARRY PRODUCT THAT

22   DOESN'T HAVE THE SAN DIEGO STATE LOGO ON IT.  SO ALL OF A

23   SUDDEN, WE'RE BEING ABLE TO BROADEN THE REACH OF COLUMBIA BY

24   GETTING COLUMBIA PRODUCT IN THE CHANNEL THAT WE WOULDN'T SELL

25   OURSELVES.

818

1    Q.    IS O.C.S. A COMPETITOR OF COLUMBIA'S?

2    A.    NO.  THEY ARE A PARTNER.

3    Q.    LET ME HAVE YOU TURN TO SECTION 2.1 OF THE AGREEMENT.

4    JUST AT A HIGH LEVEL, WHAT IS SECTION 2.1?

5    A.    IT'S SORT OF THE KEY CLAUSE IN THE CONTRACT THAT GIVES

6    O.C.S. TO DO THE RIGHTS OF WHAT I JUST DESCRIBED, WHICH IS

7    SELL BLANK COLUMBIA GOODS THAT THEY THEN PUT DECORATIONS ON

8    AND SELL IT TO CERTAIN RETAILERS.

9    Q.    AND DOES THIS AGREEMENT ALLOW O.C.S. TO MAKE OR TO SELL

10   OMNI-HEAT PRODUCTS?

11   A.    IT DOES.

12         MR. ALDRICH:  LET'S GO TO SECTION 6.1.

13         AND MR. MARCHESE, I'M ABOUT TO START USING THE EASEL

14   IF YOU WANT TO MOVE OVER.

15         MR. MARCHESE:  OKAY.  GREAT.

16         MR. ALDRICH:  OR MS. ROTHAUGE.

17         SO 6.1 IS ON THE PAGE THAT ENDS IN 737.  GREAT.

18   THANK YOU.

19   Q.    WHAT IS SECTION 6.1?

20   A.    THIS IS THE CLAUSE THAT INDICATES WHAT THE ROYALTY RATE

21   IS, OR THE PERCENTAGE THAT O.C.S. WOULD PAY US ON SALES AS A

22   PERCENTAGE OF SALES.

23   Q.    AND WHAT IS THE ROYALTY RATE TODAY THAT O.C.S. PAYS

24   COLUMBIA FOR ITS USE OF OMNI-HEAT TECHNOLOGY?

25   A.    WELL, THIS CONTRACT HAS BEEN AMENDED SINCE THIS ORIGINAL

1    DATE.  BUT THE RATE VARIES BASED ON THE TYPE OF LOGO THAT

2    O.C.S. IS PUTTING ON THE GARMENT AND THE CHANNEL THAT THEY

3    ARE SELLING IT IN.  BUT THAT RANGE IS FROM 10 TO 15 PERCENT

4    OF THEIR SALES, WE TAKE FOR US.

5              MR. ALDRICH:  IT'S OLD SCHOOL.  I APOLOGIZE.

6    Q.   LET'S SEE.  SO IT'S 10 TO 15 PERCENT?

7    A.   THAT'S CORRECT.

8    Q.   ALL RIGHT.  IF I COULD HAVE YOU TURN TO CLAUSE 6.2(B).

9              WHAT IS CLAUSE 6.2(B)?

10   A.   IT'S WHAT WE CALL THE MINIMUM GUARANTY, OR M.R.G.

11   Q.   AND WHAT IS A MINIMUM GUARANTY?

12   A.   A MINIMUM GUARANTY IS THE THRESHOLD -- SO ROYALTY IS A

13   PERCENTAGE OF SALES THAT IS PAID TO COLUMBIA.  BUT IF THE

14   LICENSEE DIDN'T SELL ANYTHING, WE WANTED TO PROTECT

15   OURSELVES, SO WE HAVE A CLAUSE IN THERE THAT SAYS, IF YOU

16   DON'T HIT THIS MINIMUM THRESHOLD, YOU HAVE TO WRITE A CHECK

17   AT THE END OF THE YEAR.

18             SO IN YEAR FOUR, AS AN EXAMPLE HERE, THIS CLAUSE OR

19   IN THIS SECTION, THE MINIMUM GUARANTY IS A MILLION DOLLARS,

20   MEANING REGARDLESS OF HOW LITTLE PRODUCT O.C.S. SELLS, THEY

21   ARE GOING TO PAY COLUMBIA AT LEAST ONE MILLION DOLLARS IN

22   THAT YEAR.

23   Q.   NOW, CLAUSE 6.2 WITH THIS MINIMUM GUARANTY, IS THIS A

24   CLAUSE THAT PROVIDES A BENEFIT TO O.C.S. OR IS THIS A CLAUSE

25   THAT PROVIDES A BENEFIT TO COLUMBIA?

820

1    A.    IT'S ONLY A BENEFIT TO COLUMBIA.

2    Q.    OKAY.  CAN WE MOVE TO CLAUSE 8.5, THE BOTTOM OF THE NEXT

3    PAGE.

4          IT ACTUALLY GOES ON TO THE FOLLOWING PAGE, BUT

5    PERHAPS YOU COULD JUST TELL US WHAT CLAUSE 8.5 IS.

6    A.    8.5 SAYS THAT WHEN O.C.S. GOES OUT AND TRIES TO

7    ADVERTISE THESE PRODUCTS, THAT THEY HAVE TO FIRST GET

8    APPROVAL FROM US BEFORE THEY CAN PUT UP A BILLBOARD OR HAVE A

9    COMMERCIAL OR ANYTHING LIKE THAT, EVEN IN STORE SIGNAGE.

10   Q.    AND WHY IS IT IMPORTANT FOR COLUMBIA TO HAVE ADVERTISING

11   APPROVAL OVER O.C.S.'S MARKETING?

12   A.    SO THESE PRODUCTS THAT ARE IN -- KEEPING MY EXAMPLE, THE

13   SAN DIEGO STATE BOOKSTORE ONLY HAVE THE COLUMBIA LOGO ON IT.

14   THE CONSUMER WOULDN'T KNOW THAT O.C.S. MADE THIS AND NOT

15   COLUMBIA.  IT'S OUR BRAND THAT'S ON THE LINE.

16         AND SO IT'S VERY IMPORTANT TO US THAT ANY

17   ADVERTISING THAT IS DONE IS OF HIGH QUALITY AND IS ACCURATE

18   INFORMATION, BECAUSE THE CONSUMER THINKS THAT IT'S PRODUCT

19   THAT WE BUILT.

20   Q.    SO IS CLAUSE 8.5 A CLAUSE THAT PROVIDES A BENEFIT TO

21   O.C.S. OR A BENEFIT TO COLUMBIA?

22   A.    IT'S A BENEFIT TO COLUMBIA.

23   Q.    LET'S MOVE TO CLAUSE 9.3 ON THE NEXT PAGE.

24         WHAT IS CLAUSE 9.3?

25   A.    IT KIND OF GOES INTO THAT.  THIS IS THE CLAUSE THAT

821

1    REQUIRES SPECIFIC APPROVAL BY MY TEAM OF DRAWINGS AND THE

2    PROTOTYPES AND SAMPLES.  AND BECAUSE IT'S ALL THE DESIGNS

3    THAT WE TALKED ABOUT, THAT APPROVAL PROCESS FOR THE ACTUAL

4    PRODUCT HAS TO BE SIGNED OFF ON BY MY TEAM.

5    Q.   SO DOES THIS PROVIDE A LIST OF ALL OF THE DIFFERENT

6    ELEMENTS OF THE PRODUCT THAT YOU HAVE APPROVAL RIGHTS OVER

7    BEFORE THEY CAN SELL AN OMNI-HEAT PRODUCT?

8    A.   IT DOES.  WE HAVE TO SIGN OFF ON EVERY SINGLE ONE OF

9    THESE ELEMENTS.

10   Q.   SO I'M JUST READING.  IT SAYS "PROTOTYPES, SAMPLES,

11   DESIGNS, COLORS, MATERIALS, INTENDED MANUFACTURERS, PLANS

12   CONCERNING THE COMPOSITION OF ANY RELATED LINE, HANG TAGS,

13   LABELS AND PACKAGING MATERIALS."

14          IS THAT RIGHT?

15   A.   YES.  WE HAVE APPROVAL RIGHTS ON ALL OF THOSE

16   ELEMENTS.

17   Q.   ALL RIGHT.  AND PERHAPS I DON'T NEED TO ASK.  BUT DOES

18   THIS PROVIDE A BENEFIT TO COLUMBIA OR A BENEFIT TO O.C.S.?

19   A.   THESE ALSO ARE BENEFITS TO COLUMBIA.

20   Q.   LET ME MOVE TO CLAUSE 9.4.

21          WHAT IS CLAUSE 9.4?

22   A.   SO THIS IS FOR THE NEXT STEP.  AFTER WE'VE APPROVED THE

23   FORM SHOWING THE CAD'S, WHICH ARE THE COMPUTER DESIGNS ON

24   PAPER, WHAT THEY ARE GOING TO LOOK LIKE, WE ALSO REQUIRE THAT

25   WE GET PHYSICAL SAMPLES OF THE ACTUAL GARMENTS, AND WE HAVE

1    TO SIGN OFF ON THOSE BEFORE O.C.S. CAN SELL A PRODUCT.

2    Q.   AND THIS PRODUCT SAMPLES CLAUSE, IS THIS A BENEFIT TO

3    COLUMBIA OR A BENEFIT TO O.C.S.?

4    A.   IT'S A BENEFIT TO COLUMBIA.

5    Q.   LET'S GO TO CLAUSE 9.6.

6         WHAT IS CLAUSE 9.6?

7    A.   SO NOW AT THIS STAGE, WE'VE APPROVED THE SAMPLES,

8    PHYSICALLY SAID, THIS IS GREAT, IT MEETS OUR QUALITY.  IF

9    THERE IS ANY TECHNOLOGIES IN THEM, LIKE OMNI-HEAT, THEY LOOK

10   GOOD.  WE HAVE NOW APPROVED THE SAMPLE.

11        IT SAYS THAT O.C.S., THE APPROVAL IS ONLY TO THE

12   EXTENT THAT THE PRODUCT THAT'S PRODUCED MATCHES THE QUALITY

13   OF THOSE SAMPLES.  MEANING THAT O.C.S. CAN'T GET APPROVAL ON

14   A PHYSICAL SAMPLE AND THEN GO MAKE CHEAPER-QUALITY PRODUCT

15   AND SAY IT WAS APPROVED BECAUSE IT'S A DIFFERENT PRODUCT.

16   Q.   AND THIS CLAUSE, DOES THIS CLAUSE PROVIDE A BENEFIT TO

17   COLUMBIA OR A BENEFIT TO O.C.S.?

18   A.   AGAIN, THIS IS ANOTHER BENEFIT TO COLUMBIA.

19   Q.   LET'S GO TO CLAUSE 9.9.

20        WHAT IS CLAUSE 9.9?

21   A.   9.9 SAYS THAT WE'RE ALLOWED TO GO INTO ANY OF O.C.S.'S

22   FACTORIES, WHERE THEY ARE BUILDING THIS COLUMBIA PRODUCT

23   THAT'S GOT OUR LOGOS ON IT, AND WE CAN MAKE SURE THAT THEY

24   ARE USING HIGH-QUALITY FACTORIES, THAT THE TECHNOLOGIES ARE

25   BEING APPLIED THE RIGHT WAY, THAT ALL THE LAWS ARE BEING

823

1    FOLLOWED, ET CETERA.

2    Q.    AND CLAUSE 9.9, BENEFIT TO COLUMBIA OR O.C.S.?

3    A.    ANOTHER BENEFIT TO COLUMBIA.

4    Q.    CLAUSE 9.14, A COUPLE PAGES LATER.

5          WHAT IS CLAUSE 9.14?

6    A.    IT'S A CLAUSE THAT REQUIRES O.C.S. TO FOLLOW ALL LAWS AS

7    IT RELATES TO THE LABELING OF THE PRODUCTS, AND INCLUDING

8    PUTTING THE SPECIFIC PATENT NUMBERS OF THE PATENTS THAT WE

9    HAVE ON THE TECHNOLOGY OF THE PRODUCT, PUT THAT ON THE

10   PRODUCT.

11   Q.    IS CLAUSE 9.14 A BENEFIT TO COLUMBIA OR O.C.S.?

12   A.    ANOTHER BENEFIT TO COLUMBIA.

13   Q.    LET ME HAVE YOU GO TO CLAUSE 4.2(A), WHICH IS -- BACKING

14   UP A LITTLE BIT.

15         THE PAGE ENDS IN 735.  IF IT'S POSSIBLE TO -- LET'S

16   GO TO THE BOTTOM OF 735 FOR A SECOND.

17         WHAT IS CLAUSE 4.2?

18   A.    THIS IS THE CLAUSE THAT REQUIRES O.C.S. TO ONLY SELL

19   PRODUCT TO CUSTOMERS, YOU KNOW, DICK'S SPORTING GOODS, SAN

20   DIEGO STATE BOOKSTORE, THAT WE APPROVED IN ADVANCE.

21   Q.    AND LET'S TURN TO THE NEXT PAGE, CLAUSE 4.2(C).  I

22   NOTICE THAT THERE IS SOME BOLD LANGUAGE HERE IN 4.2(C).

23         DO YOU SEE THAT?

24   A.    I DO.

25   Q.    IT SAYS, "NOT ALL ACCOUNTS LISTED ON SCHEDULE 4.2(A)" --

COMPUTER-AIDED TRANSCRIPTION

824

1    4.2(A) IS A LIST OF CUSTOMERS THAT ARE APPROVED IN ADVANCE

2    FOR O.C.S. TO SELL PRODUCT TO?

3    A.    THAT'S CORRECT.

4    Q.    OKAY.  SO IT SAYS, "NOT ALL ACCOUNTS LISTED ON SCHEDULE

5    4.2(A) ARE APPROVED FOR SALES OF PRODUCTS CONTAINING

6    OMNI-HEAT REFLECTIVE TECHNOLOGY"?

7    A.    THAT'S CORRECT.

8    Q.    AND WHAT DOES THAT MEAN?

9    A.    WELL, THE REASON FOR THE CLAUSE IS WE DON'T WANT OUR

10   BEST TECHNOLOGY -- SO WE HAVE -- COLUMBIA HAS GOT A WHOLE

11   BUNCH OF TECHNOLOGIES.  OMNI-HEAT IS OUR TOP-TIER, MOST

12   PROFITABLE, HIGHEST, BEST TECHNOLOGY.  WE DON'T WANT THAT

13   TECHNOLOGY BEING SOLD AT ALL LEVELS OF DISTRIBUTION.  WE WANT

14   TO RESERVE IT FOR ONLY THE TOP -- WE TALK ABOUT R.E.I., FOR

15   TOP ACCOUNTS LIKE R.E.I.

16            THAT SAID, COLUMBIA SELLS A BROAD RANGE OF PRODUCTS

17   AT A WIDE RANGE OF DISTRIBUTION.  WE DON'T WANT TO SAY, YOU

18   CAN'T SELL TO OTHER CUSTOMERS, MAYBE A KOHL'S OR SOMEONE LIKE

19   THAT.  WE JUST DON'T WANT OMNI-HEAT IN THAT CHANNEL.

20            SO KOHL'S WOULD STILL BE AN APPROVED CUSTOMER; JUST

21   NOT APPROVED AS IT RELATED TO PRODUCT CONTAINING OMNI-HEAT.

22   Q.    AND I NOTICE THAT THIS CLAUSE IS IN BOLD.  WHY IS THIS

23   CLAUSE IN BOLD?

24   A.    BECAUSE IT IS OF UTMOST IMPORTANCE.

25   Q.    SO THIS -- BEING ABLE TO APPROVE EXACTLY WHICH CUSTOMERS

825

1    O.C.S. SELLS PRODUCT TO, IS THAT A BENEFIT TO COLUMBIA OR A

2    BENEFIT TO O.C.S.?

3    A.    IT'S A BENEFIT TO COLUMBIA.

4    Q.    LET'S GO BACK TO CLAUSE 1.6 ON PAGE 732.  I THINK THAT

5    YOU MIGHT HAVE TESTIFIED THAT THIS AGREEMENT ALLOWS O.C.S. TO

6    PURCHASE BLANKS; IS THAT CORRECT?

7    A.    YES.

8    Q.    OKAY.  AND THE DEFINITION OF BLANKS HERE IS SHOWN IN

9    SECTION 1.6; RIGHT?

10   A.    THAT'S CORRECT.

11   Q.    AND THE DEFINITION OF BLANKS IS THAT IT BEARS A COLUMBIA

12   MARK; IS THAT RIGHT?

13   A.    THAT'S CORRECT.  WE --

14   Q.    SO -- GO AHEAD, PLEASE.

15   A.    THE PRODUCT THAT -- WE CALL IT AS BLANK WITH O.C.S.

16   BECAUSE IT DIDN'T HAVE THOSE SCHOOL LOGOS ON IT INITIALLY.

17   BUT IT HAS THE COLUMBIA LOGO ON IT.  SO THAT'S WHAT WE REFER

18   TO AS BLANK.

19        THEY ARE BUILDING A PRODUCT WITH THE COLUMBIA LOGO,

20   AND THEN THEY WAIT AND GET AN ORDER FROM SAN DIEGO STATE, AND

21   THEY PUT THE SCHOOL LOGO ON IT.  BUT WE NEVER LET O.C.S. SELL

22   ANY PRODUCT THAT DOESN'T HAVE THE COLUMBIA LOGO ON IT.

23   Q.    SO THAT'S WHAT CLAUSE 1.6 IS SAYING, IS THAT ALL OF

24   THESE PRODUCTS HAVE TO BE COLUMBIA-BRANDED PRODUCTS; IS THAT

25   RIGHT?

1    A.    EVERY PRODUCT THAT O.C.S. HAS EVER SOLD HAS A COLUMBIA

2    LOGO ON IT.

3    Q.    SO THESE CLAUSES THAT WE JUST WENT THROUGH -- 9.9, 9.14,

4    1.6, 2.1, 9.4, 9.3, 8.5, ET CETERA -- ARE THESE CLAUSES THAT

5    O.C.S. WANTED IN THE CONTRACT OR ARE THESE CLAUSES THAT

6    COLUMBIA WANTED IN THE CONTRACT?

7    A.    THESE ARE ALL BENEFITS FOR US AND THINGS THAT COLUMBIA

8    INSISTED ON; NOT O.C.S.

9    Q.    IF O.C.S. WANTED TO ENTER INTO THIS CONTRACT BUT WANTED

10   ONE OF THESE CLAUSES, FOR EXAMPLE, TO NOT BE PART OF THE

11   CONTRACT, HOW WOULD YOU HAVE HANDLED THAT ON BEHALF OF

12   COLUMBIA?

13   A.    WE DON'T GENERALLY -- ACTUALLY, WE DON'T ALLOW

14   NEGOTIATIONS AS IT RELATES TO THESE CLAUSES.  IF FOR SOME

15   REASON THEY PUSHED AND SAID, IT'S REALLY IMPORTANT TO US THAT

16   WE CAN DO ADVERTISING WITHOUT YOUR APPROVAL, YOU HAVE NO

17   RIGHTS TO SAY THAT THEY CAN'T ADVERTISE IN A CERTAIN WAY, WE

18   WOULD HAVE TO BE COMPENSATED IN SOME OTHER MANNER TO PAY FOR

19   THAT LOSS OF A BENEFIT TO US.

20          SO THE EASIEST ONE THAT WE PROBABLY WOULD HAVE

21   TALKED ABOUT WOULD BE A HIGHER ROYALTY RATE.

22   Q.    WOULD SUCH AN AGREEMENT FIT INTO COLUMBIA'S LICENSING

23   GUIDING PRINCIPLES?

24   A.    IT WOULD CERTAINLY WEAKEN IT; RIGHT.  BECAUSE WE WANT TO

25   MAKE SURE THAT THE PRODUCTS ARE BRAND-ENHANCING, AND THERE IS

827

1    A POTENTIAL THAT BY NOT HAVING THESE THINGS IN IT, THE

2    FACTORY APPROVAL, ENSURING THAT IT'S A HIGH-QUALITY PRODUCT,

3    THAT WEAKENS THE ABILITY OF COLUMBIA TO PROTECT OUR BRAND AND

4    MAKE SURE THAT THOSE PRODUCTS ARE BRAND-ENHANCING.

5              MR. ALDRICH:  I WOULD LIKE TO OFFER INTO EVIDENCE

6    EXHIBITS 92, 91, 87, 88, 90.  THAT'S ALL.

7              MS. ROTHAUGE:  WHAT WAS AFTER 90?

8              MR. ALDRICH:  90 WAS THE LAST ONE, I BELIEVE.  SO

9    WE'RE BASICALLY SAYING 87 TO 92, I BELIEVE.

10             MS. ROTHAUGE:  NO OBJECTION.

11             THE COURT:  THEY ARE RECEIVED.

12        (TRIAL EXHIBITS 87, 88, 90, 91 AND 92 RECEIVED IN

13        EVIDENCE.)

14             MR. ALDRICH:  YOUR HONOR, I'VE GOT THREE MORE

15    LICENSE AGREEMENTS TO GO.  IF YOU'D LIKE TO STOP FOR THE

16    EVENING, IT MIGHT BE A GOOD RESTING POINT.

17             THE COURT:  OKAY.  MEMBERS OF THE JURY, WE'LL BE

18    TAKING OUR EVENING RECESS.  I'LL SEE YOU TOMORROW, SAME TIME,

19    A FEW MINUTES BEFORE 9 O'CLOCK.  WE'LL TRY TO GET STARTED

20    RIGHT AT 9:00.

21             HAVE A PLEASANT EVENING.  THANK YOU.

22             (JURY ABSENT, 5:04 P.M.)

23             THE COURT:  PLEASE BE SEATED AND GIVE THE JURY AN

24    OPPORTUNITY TO MAKE THEIR WAY OUT.

25             I WANT TO TALK ABOUT SCHEDULING.  YOU'RE GOING TO BE

COMPUTER-AIDED TRANSCRIPTION

828

```
 1     READY FOR TAKING A WITNESS OUT OF ORDER TOMORROW?

 2              MR. MARCHESE:  YES, YOUR HONOR.

 3              THE COURT:  OKAY.  AND I DON'T CARE HOW WE DO THAT.

 4     I DON'T KNOW IF YOUR WITNESS NEEDS TO GET ON HIS WAY IN THE

 5     MORNING, OR WHETHER YOU WANT TO INTERRUPT THE TESTIMONY.

 6     I'LL LEAVE IT UP TO YOU.  OR IF YOU WANT TO WAIT UNTIL AFTER

 7     THIS WITNESS, MR. MERRIMAN IS FINISHED.

 8              MR. ALDRICH:  I THINK WE'LL WAIT UNTIL MR. MERRIMAN

 9     IS FINISHED.

10              MR. MARCHESE:  THAT'S FINE, YOUR HONOR.

11              A QUESTION ABOUT OUR JMOL'S?

12              THE COURT:  YES.

13              MR. MARCHESE:  WHEN THEY REST, CAN WE DO THOSE

14     ORALLY?

15              THE COURT:  SURE.

16              MR. MARCHESE:  OKAY.

17              THE COURT:  IT MIGHT BE A LITTLE BIT EASIER FOR ME

18     TO FOLLOW IF YOU KIND OF GIVE ME AN OUTLINE OF WHERE YOU

19     THINK YOU'RE GOING TO BE HEADED WITH THOSE.

20              MR. MARCHESE:  OKAY.

21              THE COURT:  I DON'T WANT TO HOLD UP THE TRIAL IF YOU

22     GIVE ME A LIST OF 15 REASONS WHY I SHOULD GRANT JUDGMENT AS A

23     MATTER OF LAW AND EXPECT ME TO RULE FROM THE BENCH.

24     ESPECIALLY IN THIS AREA OF LAW, IT SEEMS TO GET KIND OF

25     COMPLICATED.
```

829

1          SO IF IT'S SOMETHING I'M GOING TO HAVE TO SPEND SOME

2     TIME WORKING WITH, I'M GOING TO SAY, I'M NOT RULING ON THIS

3     NOW, GO AHEAD AND START YOUR SIDE OF THE CASE AND THEN WE CAN

4     WAIT.

5          MR. MARCHESE:  UNDERSTOOD.

6          THE COURT:  SO I ALWAYS THOUGHT THAT LAWYERS TRIED

7     TO MAKE JUDGES' JOBS EASIER.  AND YOU'LL BE MAKING MY JOB

8     EASIER IF YOU CAN KIND OF GIVE ME A HEADS UP, AT LEAST AS TO

9     WHAT THE AREAS THAT YOU'RE LOOKING AT THAT YOU WANT ME TO

10    CONSIDER ARE.

11         MR. MARCHESE:  SHOULD WE FILE -- WE COULD FILE

12    TONIGHT A BRIEF PAPER THAT LAYS OUT THE AREAS WHERE WE THINK

13    WE'RE GOING TO MOVE WITH A BRIEF DESCRIPTION.

14         WOULD THAT HELP?

15         THE COURT:  THAT PROBABLY WILL HELP ME.

16         MR. MARCHESE:  GREAT.

17         THE COURT:  YEAH.  ANY INFORMATION THAT YOU CAN GIVE

18    ME AHEAD OF TIME WILL BE HELPFUL.  I DON'T WANT TO ORDER YOU

19    TO DO ANYTHING, BUT OBVIOUSLY IF YOU GIVE ME A HEADS UP AS TO

20    WHAT TO LOOK FOR, AND IF I HAVE A QUESTION ABOUT SOME OF THE

21    LEGAL AREAS, THEN I CAN UNLEASH MICHAEL TO GO FIND SOME CASES

22    TO HELP ME GET READY.

23         MR. MARCHESE:  UNDERSTOOD.  THANK YOU.

24         MR. ALDRICH:  THE JUROR'S QUESTION GAVE US A MOMENT

25    OF PAUSE.  THEY ARE FOCUSED ON THIS LEVY PATENT APPARENTLY,

830

1    WHICH IS NOT BEING USED AS PRIOR ART IN THE CASE, AND AS

2    WE'VE EXPLAINED, ISN'T REALLY EVEN RELEVANT OR PROBATIVE OF

3    ANY ISSUE IN THE CASE, GIVEN THAT THE PROSECUTION HISTORY

4    ISN'T.

5            CAN WE HAVE AN INSTRUCTION OR SOME WAY OF ACCOUNTING

6    FOR THAT FACT?

7            THE COURT:  RIGHT NOW MY INCLINATION IS NOT TO DO

8    ANYTHING.

9            MR. ALDRICH:  OKAY.

10           THE COURT:  I DON'T KNOW THAT -- I DON'T SEE IT IN

11   THE CASE ANYWHERE.  I DON'T KNOW IF IT'S MENTIONED IN THE

12   PATENT ITSELF AS PRIOR ART THAT WAS CONSIDERED OR NOT.  I

13   DON'T KNOW.  I DON'T RECALL THAT.

14           MR. SPROUL:  IT'S NOT GOING TO SHOW UP AS PART OF

15   OUR INVALIDITY CASE.  WE'RE NOT GOING TO REQUEST IT BE PUT IN

16   THE JURY VERDICT OR ARGUED AS INVALIDITY.

17           THE COURT:  ALL RIGHT.  SO I WANT YOU ALL HERE AT

18   8:30 TOMORROW MORNING, BECAUSE YOU'RE GOING TO HAVE STUFF

19   THAT YOU'RE GOING TO WANT ME TO THINK ABOUT BEGINNING BEFORE

20   WE GET STARTED, BECAUSE YOU ALWAYS DO.

21           SO WHY DON'T WE ALL PLAN ON GETTING HERE TOMORROW AT

22   8:30 IN THE MORNING, AND WE CAN TAKE UP ANY ISSUES PRIOR TO

23   THE TIME THAT THE JURY IS GOING TO BE HERE.

24           MR. ALDRICH:  I DON'T MEAN TO BE PEDANTIC, YOUR

25   HONOR, BUT I DON'T BELIEVE THAT MS. ROTHAUGE IS ACTUALLY

831

1    ADMITTED INTO THE COURT AT THIS POINT.

2          THE COURT:  OH.

3          MS. ROTHAUGE:  YOUR HONOR, I'M A CALIFORNIA LAWYER

4    AND I'M ADMITTED INTO THE SOUTHERN DISTRICT OF CALIFORNIA ON

5    MY OWN.

6          MR. ALDRICH:  THAT CERTAINLY EXPLAINS IT.  NEVER

7    MIND, YOUR HONOR.

8          MS. ROTHAUGE:  I MADE AN APPEARANCE, AND I AM

9    LEGALLY ALLOWED TO BE HERE.  THANK YOU.

10          THE COURT:  WELL, CONGRATULATIONS.  GOOD FOR YOU.

11          ALL RIGHT.  HAVE A GOOD NIGHT.

12          MR. MARCHESE:  THANK YOU, YOUR HONOR.

13          THE COURT:  YOU'RE WELCOME.  THANK YOU, ALL.

14          (PROCEEDINGS ADJOURNED AT 5:10 P.M.)

15                      --OOO--

16                C E R T I F I C A T I O N

17          I HEREBY CERTIFY THAT I AM A DULY APPOINTED,
     QUALIFIED AND ACTING OFFICIAL COURT REPORTER FOR THE UNITED
18    STATES DISTRICT COURT; THAT THE FOREGOING IS A TRUE AND
     CORRECT TRANSCRIPT OF THE PROCEEDINGS HAD IN THE
19    AFOREMENTIONED CAUSE; THAT SAID TRANSCRIPT IS A TRUE AND
     CORRECT TRANSCRIPTION OF MY STENOGRAPHIC NOTES; AND THAT THE
20    FORMAT USED HEREIN COMPLIES WITH THE RULES AND REQUIREMENTS
     OF THE UNITED STATES JUDICIAL CONFERENCE.

21
          DATED:  SEPTEMBER 20, 2017, AT SAN DIEGO,
22    CALIFORNIA.

23                          S/CAMERON P. KIRCHER
                          CAMERON P. KIRCHER
24

25

COMPUTER-AIDED TRANSCRIPTION

832

1                    UNITED STATES DISTRICT COURT

2                  SOUTHERN DISTRICT OF CALIFORNIA

3

4    COLUMBIA SPORTSWEAR NORTH        )
     AMERICA, INC., AN OREGON         )
5    CORPORATION,                     )
                                      )
6              PLAINTIFF,             ) CASE NO. 17CV1781-HZ
                                      )
7    VS.                              ) SAN DIEGO, CALIFORNIA
                                      )
8    SEIRUS INNOVATIVE ACCESSORIES,) THURSDAY,
     INC., A UTAH CORPORATION,        ) SEPTEMBER 21, 2017
9                                     ) 8:32 A.M.
               DEFENDANT.             )
10   _____)

11

12

13              REPORTER'S TRANSCRIPT OF PROCEEDINGS

14                          JURY TRIAL

15                    VOLUME 4 - AM SESSION

16                     PAGES 832 - 1009

17         BEFORE THE HONORABLE MARCO A. HERNANDEZ
                 UNITED STATES DISTRICT JUDGE

18

19

20

21

22   REPORTED BY:  CAMERON P. KIRCHER
                   CSR NO. 9427, RPR, CRR, RMR
23                 333 W. BROADWAY, SUITE 420
                   SAN DIEGO, CALIFORNIA  92101
24                 E-MAIL:  CPKIRCHER@GMAIL.COM

25

COMPUTER-AIDED TRANSCRIPTION

833

```
 1    APPEARANCES:

 2    FOR THE PLAINTIFF:    SCHWABE, WILLIAMSON & WYATT, P.C.
                            BY:  NIKA F. ALDRICH, JR., ESQ.
 3                              DAVID W. AXELROD, ESQ.
                               BRENNA LEGAARD, ESQ.
 4                          1211 SW 5TH AVENUE
                            SUITE 1900
 5                          PORTLAND, OREGON  97204

 6

 7    FOR THE DEFENDANT:    FISH & RICHARDSON, P.C.
                            BY:  CHRISTOPHER S. MARCHESE, ESQ.
 8                              SETH M. SPROUL, ESQ.
                            12390 EL CAMINO REAL
 9                          SAN DIEGO, CALIFORNIA  92130

10                          MARKOWITZ HERBOLD, P.C.
                            BY:  RENEE ROTHAUGE, ESQ.
11                          1211 SW FIFTH AVENUE
                            SUITE 3000
12                          PORTLAND, OREGON  97204

13

14

15

16

17

18

19

20

21

22

23

24

25
```

834

**EXAMINATION**

WITNESS NAME:                                                      PAGE:

MICHAEL MERRIMAN

    CROSS BY MS. ROTHAUGE........................................  880
    RE-DIRECT BY MR. ALDRICH ...................................  950

MICHAEL BLACKFORD

    DIRECT BY MR. MARCHESE .....................................  962

EXHIBITS

EXHIBIT                                                           PAGE

EXHIBIT 1403 ENTERED INTO EVIDENCE                                962
EXHIBIT 1407 ENTERED INTO EVIDENCE                                941

COMPUTER-AIDED TRANSCRIPTION

835

```
 1            SAN DIEGO, CALIFORNIA - THURSDAY, SEPTEMBER 21, 2017
 2                            8:32 A.M.
 3            (JURY ABSENT.)
 4            THE COURT:  GOOD MORNING.
 5            MR. MARCHESE:  GOOD MORNING.
 6            THE COURT:  SO I WANT TO FIRST TALK ABOUT SEIRUS'
 7    MOTION FOR RECONSIDERATION.  SOMETIMES I THINK WE'RE TALKING
 8    ABOUT DIFFERENT THINGS, AND I THINK THAT MAY HAVE HAPPENED IN
 9    THIS CASE, AND THAT MAY HAVE BEEN MY DIFFICULTY.
10            WHEN SEIRUS WAS ENGAGED IN A LINE OF QUESTIONING
11    WITH DR. COLE, MY CONCERN WAS THAT SEIRUS WAS GOING TO BE
12    ARGUING TO THE JURY THAT THE 30- TO 70-PERCENT RATIO WAS
13    SOMETHING OTHER THAN THE FABRIC THAT IS AT ISSUE IN THIS
14    CASE.  AND IT WAS MY SENSE THAT THAT IS INCONSISTENT WITH
15    CLAIM 2 AS IT WAS SET FORTH IN THE PATENT, AND THAT'S WHY I
16    SAID I'M NOT LETTING YOU DO THAT.
17            I DID NOT MEAN TO CONVEY TO SEIRUS THAT IF THERE
18    WERE INCONSISTENT STATEMENTS MADE ON THE PART OF DR. COLE,
19    THAT YOU WEREN'T ALLOWED TO IMPEACH HER BECAUSE THERE WERE
20    INCONSISTENT STATEMENTS IN HER REPORT OR IN HER TESTIMONY.
21            AND IF I CONVEYED OR WAS SHUTTING YOU DOWN ON THAT
22    ISSUE, I APOLOGIZE.  THAT WAS NOT MY INTENT.  IT WAS ONLY MY
23    INTENT TO MAKE SURE THAT WHEN YOU ARGUED TO THE JURY, WE
24    DIDN'T ARGUE SOMETHING THAT WAS INCONSISTENT WITH THE PATENT
25    ITSELF.
```

836

```
 1              DOES THAT MAKE SENSE?

 2              MR. SPROUL:  IT DOES, YOUR HONOR.  UNFORTUNATELY, I

 3    THINK AT THE TIME I WAS PRECLUDED FROM THEN PROCEEDING DOWN

 4    THAT PATH OF IMPEACHMENT ON THAT POINT OF INCONSISTENCY.

 5              THE COURT:  DR. COLE IS STILL AROUND.

 6              MR. SPROUL:  SHE IS.  AND I BELIEVE SHE'S GOING ON

 7    IN THE REBUTTAL CASE, SO IF YOUR HONOR ALLOWS --

 8              THE COURT:  YES, I WILL ALLOW YOU TO GO AHEAD AND

 9    QUESTION ON THOSE TOPICS SO THAT WE CAN CORRECT WHATEVER

10    MISCOMMUNICATION I GAVE TO YOU ON THAT ISSUE.

11              MR. SPROUL:  THANK YOU, YOUR HONOR.

12              MR. MARCHESE:  MAY I BE HEARD BRIEFLY ON THAT POINT

13    A LITTLE BIT FURTHER, YOUR HONOR?

14              THE COURT:  SURE.

15              MR. MARCHESE:  I THINK THAT THE THING ABOUT THE

16    FABRIC BEING THE ISSUE THAT YOU TALKED ABOUT AT THE VERY

17    BEGINNING OF THE DISCUSSION HERE WAS THAT -- THE WAY THAT I

18    UNDERSTAND COLUMBIA -- AND THEY CAN SAY OTHERWISE IF IT'S NOT

19    THE CASE.

20              THE WAY I UNDERSTAND THEM TO BE INTERPRETING CLAIM 2

21    IS THAT IT COVERS THE GLOVE, THE BODY GEAR; AND SO

22    CONSEQUENTLY, IT'S FABRIC AND BODY GEAR.  IT'S JUST NOT

23    FABRIC SITTING OUT ON A TABLE.

24              AND WE WANT TO MAKE SURE THAT THAT -- IF THAT'S

25    THEIR POSITION, IT'S UNDERSTOOD IN THE CASE.  IF IT'S THEIR
```

837

```
 1    POSITION THAT IT'S THE FABRIC, THEN THEIR DAMAGES CLAIM,

 2    WHICH IS GOING TO THE ENTIRE GLOVE, IS COMPROMISED BY THE WAY

 3    THEY HAVE BEEN ARGUING THIS CASE.

 4              AND I RECALL FROM --

 5              THE COURT:  THOSE ARE TWO DIFFERENT ISSUES AS I SEE

 6    THEM.  I THINK THAT, AS I READ THE CLAIM, THE FABRIC WAS WHAT

 7    WAS BEING PROTECTED; BUT THAT DOESN'T MEAN THAT IF YOU USE

 8    SOMETHING INSIDE A GLOVE, OR SOME OTHER COMPONENT, THAT AS

 9    REGARDS TO DAMAGES -- YOU ALL ARE GOING TO FIGHT ABOUT WHAT

10    THE ARTICLE OF MANUFACTURE IS REGARDING DAMAGES.

11              I'M NOT TELLING YOU AS MATTER OF LAW THAT THEY ARE

12    LIMITED TO THE VALUE OF THE FABRIC FOR PURPOSES OF DAMAGES.

13              MR. MARCHESE:  DIFFERENT ISSUE.  ARTICLE OF

14    MANUFACTURE IS FOR THE DESIGN PATENT.  FOR UTILITY PATENT,

15    THEY ARE CLAIMING THAT THE CLAIM COVERS THE WHOLE GLOVE, THE

16    FABRIC AND THE GLOVE.

17              I MADE THE ARGUMENT AT THE PRETRIAL CONFERENCE

18    REGARDING THE MOTION IN LIMINE ON DAMAGES, THAT THE CLAIM --

19    THEY MADE AN ARGUMENT REGARDING THE CLAIM -- IN THEIR

20    BRIEFING, THAT THE CLAIM COVERS THE WHOLE GLOVE WITH FABRIC

21    IN IT.  IF YOU LOOK BACK IN THE BRIEFING, I THINK YOU'LL SEE

22    IT.

23              AND MY POSITION WAS, AND I ARGUED THERE, IS THAT

24    EVEN THOUGH THE CLAIM ON ITS FACE SAYS IN CLAIM 2 -- NOT IN

25    CLAIM 1, IT ADDS THAT THE MATERIAL IS IN BODY GEAR, THAT -- I
```

838

1    MADE AN ARGUMENT REGARDING THIS ASTRAZENECA CASE, WHICH IS A

2    FEDERAL CIRCUIT CASE THAT CAME OUT IN 2015.  AND IT'S ABOUT

3    TRYING TO FIGURE OUT IF THERE IS A CLAIM THAT COVERS AN

4    ENTIRE PRODUCT, LIKE THE GLOVE.

5           IN THAT CASE, IT WAS A PHARMACEUTICAL PILL.  IF THE

6    NOVEL INGREDIENT OF THE CLAIM CAN ACTUALLY FORM THE BASIS TO

7    CAPTURE THE WHOLE PRODUCT -- IN THAT CASE, THEY SAID IT WAS,

8    IT WAS A PILL.  IT'S VERY DIFFERENT.

9           HERE, THEY HAVE BEEN ARGUING THAT IT'S THE WHOLE

10   GLOVE THAT'S COVERED.  AND ONE OF OUR POSITIONS THAT WE WANT

11   TO TRY TO ARGUE TO THE JURY WHEN WE CLOSE HERE, ABOUT WHAT

12   DR. COLE SAID IS, REMEMBER, SHE LAID A PIECE OF FABRIC DOWN

13   UNDER THE CAMERA AND TOOK PICTURES OF THAT.  AND SHE

14   TESTIFIED -- AS I RECALL ANYWAY -- THAT SHE NEVER ACTUALLY

15   TOOK A GLOVE AND PUT IT DOWN.

16          BUT THE CONTENTION IS, ACCORDING TO THE PLAINTIFF,

17   THAT IT'S A WHOLE GLOVE WITH FABRIC IN IT THAT INFRINGES

18   CLAIM 2.  AND AS A CONSEQUENCE, OUR ARGUMENT TO THE JURY IS

19   GOING TO BE HER TESTING WAS DEFICIENT BECAUSE SHE FAILED TO

20   LOOK AT THE GLOVE POST, YOU KNOW, MANUFACTURE OF THE FABRIC

21   INTO THE GLOVE.

22          YOU KNOW, IT'S GOING TO GO THROUGH CHANGES WHEN IT

23   GOES THROUGH THERE.  IT'S GOING TO POSSIBLY STRETCH.  IT WILL

24   BE CUT.  IT'S GOING TO BE MANUFACTURED.  AND SHE NEVER LAID A

25   GLOVE DOWN AND TESTED THAT.

839

1          THE COURT:  OKAY.  I THINK I UNDERSTAND YOUR POINT

2     NOW, IS THAT THE FABRIC MAY HAVE CHANGED THROUGH THE

3     MANUFACTURING PROCESS.

4          MR. MARCHESE:  IT IS ONE OF OUR POINTS.  AND I

5     THINK --

6          THE COURT:  I'M STILL NOT SURE HOW THAT FITS WITH

7     THE WHOLE GLOVE ISSUE.  THAT SOUNDS LIKE TWO DIFFERENT

8     THINGS.

9          MR. ALDRICH:  IT'S ALSO A NEW THEORY, YOUR HONOR.

10          MR. MARCHESE:  IT'S NOT A NEW THEORY.  WE'VE BEEN

11     CRITICIZING HER TESTING, DR. BLOCK HAS BEEN CRITICIZING HER

12     TESTING METHODOLOGY FROM DAY ONE.

13          I JUST WANT TO MAKE SURE THAT WE'RE NOT PRECLUDED

14     FROM ARGUING THAT POINT TO THE JURY, BECAUSE I BELIEVE THAT

15     IF YOU LOOK AT CLAIM 2, THE WAY THAT COLUMBIA HAS BEEN

16     ASSERTING IT AND INTERPRETING IT, THAT THEY ARE ARGUING THAT

17     IT IS FABRIC IN A GLOVE, THAT IS WHAT THAT CLAIM COVERS.  AND

18     CONSEQUENTLY, OUR POSITION IS GOING TO BE, IF YOU'RE GOING TO

19     SAY THERE IS INFRINGEMENT, AND YOU'RE GOING TO TEST IT, YOU

20     SHOULD TEST THE GLOVE.

21          THE COURT:  OKAY.  I'M SORRY.  THAT'S DIFFERENT THAN

22     WHAT I UNDERSTOOD THE POINT THAT YOU WERE TRYING TO MAKE

23     EARLIER.  I THOUGHT THE POINT YOU WERE TRYING TO MAKE EARLIER

24     IS THAT WHEN YOU'RE LOOKING AT 30 TO 70 PERCENT, YOU WEREN'T

25     LOOKING MERELY AT THE FABRIC ITSELF, BUT YOU WERE LOOKING AT

840

1    OTHER FABRICS THAT MAY HAVE BEEN ATTACHED TO THE HEATWAVE

2    FABRIC IN ORDER TO KIND OF CALCULATE WHETHER OR NOT IT WAS

3    MEETING THE 30- TO 70-PERCENT RANGE.

4         AND IF YOU WERE DOING THE LATTER, MY POINT WAS,

5    THAT'S NOT WHAT CLAIM 2 IS ABOUT.

6         MR. MARCHESE:  UNDERSTOOD.  DIFFERENT ISSUE.

7    IT'S -- THEY ARE KIND OF LIKE FINELY SLICING HERE BETWEEN

8    POINTS.  I KNOW WHAT YOU MEAN.  I'M TALKING ABOUT SOMETHING

9    DIFFERENT.

10        THE COURT:  OKAY.  AND I DON'T THINK I MISHEARD WHAT

11   WAS GOING ON BEFORE, AND THAT'S WHAT I WAS SAYING THAT YOU

12   CAN'T DO, BECAUSE THAT'S INCONSISTENT WITH THE CLAIM.

13        WHAT YOU'RE SAYING IS A DIFFERENT POINT THAT I

14   HAVEN'T HAD TIME TO ABSORB YET.

15        MR. MARCHESE:  OKAY.  THANK YOU.

16        THE COURT:  ALL RIGHT.

17        MR. ALDRICH:  YOUR HONOR, REGARDING THEIR MOTION FOR

18   RECONSIDERATION, WE ACTUALLY HAVEN'T EVEN HAD A CHANCE TO

19   READ IT YET.  AND IF IT WOULD BE OKAY BEFORE --

20        THE COURT:  YOU CAN GO AHEAD AND READ IT.  BUT EVEN

21   LAST NIGHT MY CLERK CAME TO ME AND SAID, I THINK YOU CONFUSED

22   EVERYBODY OUT THERE.

23        MR. ALDRICH:  OKAY.

24        THE COURT:  AND I DO THAT SOMETIMES.  SO BETWEEN

25   OURSELVES, I HAVE ALREADY HAD THIS CONVERSATION IN MY BRAIN,

COMPUTER-AIDED TRANSCRIPTION

1    THINKING THAT I HAD CONFUSED EVERYBODY AND I NEEDED TO FIX

2    IT.

3              MR. ALDRICH:  OKAY.  THAT'S FINE, YOUR HONOR.

4              WE HAD ANOTHER ISSUE.

5              THE COURT:  GO AHEAD.

6              MR. ALDRICH:  IN MAY OF 2015, WE SERVED OUR OPENING

7    ROUND OF DISCOVERY IN THIS CASE.  AND WE ASKED FOR TWO THINGS

8    IN PARTICULAR.  ONE OF THEM WAS WE ASKED FOR PRODUCT SAMPLES

9    OF ALL OF THEIR PRODUCTS THAT HAVE HEATWAVE FABRIC.  AND THE

10   OTHER THING WE ASKED FOR IS NONINFRINGEMENT CONTENTIONS FOR

11   WHY THEY SAY THEY DON'T INFRINGE.

12             AND THEY REFUSED TO ANSWER EITHER.  THEY REFUSED TO

13   EVER PUT IN NONINFRINGEMENT CONTENTIONS AND, THEY ALSO

14   REFUSED TO GIVE US ANY PRODUCT SAMPLES, OTHER THAN A

15   SMATTERING OF A FEW GLOVES.  AND WE HAD TO BUY OUR OWN OF A

16   FEW GLOVES ALONG THE WAY.

17             AND THEN IN THE LAST WEEK, WE'VE REALIZED THAT THEY

18   PLAN ON MAKING A CASE THAT WE HAVEN'T SATISFIED OUR BURDEN TO

19   PROVE INFRINGEMENT BECAUSE THEY HAVE NEW NONINFRINGEMENT

20   THEORIES CONCERNING WHICH PRODUCTS ACTUALLY HAVE THE HEATWAVE

21   FABRIC FACING INSIDE VERSUS WHICH PRODUCTS HAVE THE HEATWAVE

22   FABRIC FACING OUTSIDE.  NOW, WE DON'T HAVE ANY PRODUCTS TO

23   ANALYZE THOSE WITH.

24             AND SO WE TOLD THEM A FEW DAYS AGO, WE'D LIKE A

25   STIPULATION FROM YOU, JUST TELL US WHICH ONES ARE IN THE

842

1    INSIDE, WHICH ONES ARE ON THE OUTSIDE, AND THAT WAY WE CAN

2    JUST INTRODUCE IT TO THE COURT AND WE CAN RESOLVE THIS

3    WITHOUT HAVING TO BELABOR THE TRIAL, SLOGGING THROUGH

4    PRODUCTS.  AND THEY REFUSED TO GIVE US A STIPULATION.

5         WE SAID, YOU GUYS DRAFT THE STIPULATION, PUT IT IN

6    THE LANGUAGE YOU WANT.  IF YOU DON'T WANT INNERMOST SURFACE

7    TO BE ON THERE.  FINE.  TELL US WHICH PRODUCTS HAVE IT SKIN

8    FACING.  THAT'S FINE.

9         THEY REFUSED TO DO THAT.  THEY SAID, WE'LL PUT UP

10   MIKE CAREY.  BASICALLY YOU CAN CROSS-EXAMINE MIKE CAREY ON

11   OUR PRODUCTS.  SO WE GET MIKE CAREY ON THE STAND, AND THEY

12   BASICALLY TAUGHT HIM TO NOT ANSWER QUESTIONS AND TO FORGET

13   ALL OF THEIR PRODUCTS.  SO I SPENT 45 MINUTES WITH HIM

14   YESTERDAY GOING THROUGH A CATALOG AND HAVING HIM SAY,

15   ACTUALLY, I DON'T REMEMBER WHICH PRODUCTS.  AND WE GOT SOME

16   HATS, TOO.  BOY, I'M NOT GOING TO BE ABLE TO REMEMBER THAT.

17   WE'LL HAVE TO GO THROUGH ALL THOSE CATALOGS.

18        SO LAST NIGHT I WENT BACK TO THEM AGAIN AND I SAID,

19   I NEED -- IF YOU GUYS ARE GOING TO MAKE THIS CONTENTION, IF

20   YOU'RE GOING TO MAKE THIS CONTENTION THAT YOU HAVE PRODUCTS,

21   OTHER THAN THE ONES YOU'VE DISCLOSED DURING THE CASE, THE

22   SILVER GLOVE LINER AND THE SILVER SOCK.

23        IF YOU HAVE PRODUCTS WHERE YOU'RE GOING TO CONTEND

24   THAT WE HAVEN'T MET OUR BURDEN OF PROOF, BRING ALL THE

25   PRODUCTS TO COURT TOMORROW, AND I'D LIKE TO HAVE MIKE CAREY

843

1    BACK ON THE WITNESS STAND, AND I'D LIKE TO BE ABLE TO

2    CROSS-EXAMINE HIM ON YOUR TIME, BECAUSE YOU GUYS ARE NOT

3    COOPERATING, YOU'RE NOT GIVING US A STIPULATION.

4         AND THIS IS A NEW NONINFRINGEMENT CONTENTION WE'VE

5    NEVER HEARD ABOUT BEFORE, AND WE'LL WALK THROUGH ALL THE

6    PRODUCTS, AND WE'LL WASTE THE COURT'S TIME AND THE JURY'S

7    TIME WALKING THROUGH ALL THE PRODUCTS, BECAUSE WE DON'T HAVE

8    ANY OTHER WAY TO ESTABLISH THE RECORD BASED ON THIS NEW

9    NONINFRINGEMENT CONTENTION THAT SURFACES FOR THE FIRST TIME

10   TWO AND A HALF YEARS AFTER DISCOVERY AND AFTER THEY HAVE

11   REFUSED TO PRODUCE THE DISCOVERY.

12        AND SO WE'VE GOT A PROBLEM.  AND I'D LIKE THE COURT

13   TO EITHER ORDER THAT THE JURY IS TO FIND THAT ALL PRODUCTS

14   HAVE IT ON THE INSIDE SURFACE, BECAUSE THEY HAVE WAIVED THEIR

15   RIGHT TO SAY OTHERWISE; OR I'D LIKE SEIRUS TO BRING THEIR

16   PRODUCTS TO THE COURTROOM AND WE CAN GO THROUGH THEM ONE BY

17   ONE ON THEIR TIME AND NOT ON OUR CLOCK.  OR I THINK THE COURT

18   IS GOING TO HAVE TO FIND SOME OTHER SOLUTION IF THEY ARE

19   GOING TO BE BRINGING NEW NONINFRINGEMENT CONTENTIONS INTO THE

20   CASE AFTER WAIVING THEIR RIGHT TO DO SO THROUGHOUT DISCOVERY.

21        THE COURT:  SO I SAW THE SOCK AND I SAW THE GLOVE.

22   WHEN YOU'RE SAYING "NONINFRINGEMENT CONTENTIONS," YOU'RE

23   SAYING THAT THEY ARE CONTENDING THAT OTHER PRODUCTS DON'T

24   INFRINGE BECAUSE THE HEATWAVE PRODUCT, THE HEATWAVE FABRIC IS

25   FACING OUT?

844

1          MR. ALDRICH:  CORRECT.  AND WE'VE NEVER BEEN GIVEN

2    THESE PRODUCTS.  WE'VE NEVER BEEN GIVE PHOTOS OF THESE

3    PRODUCTS.  THEY HAVE NEVER BEEN IDENTIFIED.  AND THEY DID

4    IDENTIFY EXHIBIT 705 A FEW DAYS AGO.  IT'S A LIST OF THE

5    ENTIRE HEATWAVE LINE, AND IT HAS TWO RED LINES ON IT, AND

6    THOSE ARE FOR THE TWO PRODUCTS THAT THE PARTIES BOTH KNOW

7    HAVE ONLY OUTWARD-FACING REFLECTIVE PRODUCT.

8          BUT NOW THEY ARE MAKING THE CONTENTION THAT

9    REGARDLESS OF THIS EXHIBIT THAT WE GAVE YOU A WEEK AGO, THAT

10   SPECIFICALLY CALLS OUT THOSE TWO RED LINES THAT THE PARTIES

11   HAVE ALWAYS BEEN IN AGREEMENT ON, WE THINK SOME OTHER STUFF

12   ON THERE MIGHT NOT INFRINGE ALSO, AND WE'RE NOT GOING TO TELL

13   YOU WHICH ONES.

14         WE'RE GOING TO KEEP THAT A SECRET, AND YOU'RE GOING

15   TO HAVE TO PUT MIKE CAREY ON THE STAND AND YOU'RE GOING TO

16   HAVE TO GO ONE BY ONE, BUT HE'S GOING TO FORGET EVERY ONE OF

17   THOSE PRODUCTS.

18         THE COURT:  OKAY.  THAT WAS ONE OF YOURS.

19   WHAT WAS THE OTHER ONE?

20         MR. ALDRICH:  THAT WAS IT, I THINK.

21   OH, I THINK ANOTHER ISSUE ON INVALIDITY, BUT WE'RE

22   FAR FROM THERE YET, SO...

23         THE COURT:  OKAY.

24         MR. SPROUL:  AS I UNDERSTAND THIS, WHAT COUNSEL IS

25   COMPLAINING ABOUT IS THEIR FAILURE TO ESTABLISH THE PRODUCTS

845

1    AT ISSUE AND INFRINGEMENT OF THOSE PARTICULAR PRODUCTS.

2              ABOUT A WEEK AGO WE WERE ASKED FOR A STIPULATION FOR

3    REPRESENTATIVE PRODUCTS.  USUALLY THAT'S SOMETHING THAT IS

4    DONE, WORKED OUT DURING DISCOVERY BETWEEN THE PARTIES.  MY

5    UNDERSTANDING IS THERE WAS NO REQUEST FOR A STIPULATION

6    DURING DISCOVERY.  THERE WAS NO ATTEMPT TO WORK OUT A

7    REPRESENTATIVE PRODUCT.

8              IT'S THEIR BURDEN.  THEY ARE THE ONES WHO ARE

9    SUPPOSED TO PROVE INFRINGEMENT OF EACH INDIVIDUAL PRODUCT.

10   YOU ACCOMPLISH THAT BY WORKING OUT STIPULATIONS.  WE'RE UNDER

11   NO OBLIGATION TO DO THAT FOR THEM NOW, LIVE DURING TRIAL.

12   THEY ASKED FOR THE STIPULATION.  WE COULDN'T AGREE ON THE

13   LANGUAGE.

14             SO WE SAID -- THEIR THREAT WAS AT THE TIME LAST

15   WEEK, WE'RE GOING TO CALL MIKE CAREY, AND WE'RE GOING TO STEP

16   THROUGH EACH PRODUCT WITH HIM ONE BY ONE.  AND WE SAID, OKAY.

17   IT'S YOUR BURDEN.  DO WHAT YOU GOT TO DO.  AND THAT'S WHY

18   THEY CALLED MIKE CAREY IN THEIR CASE-IN-CHIEF AND PUT IN

19   FRONT OF HIM A LIST OF PRODUCTS.

20             IF THEY NOW FEEL THAT'S DEFICIENT, THEY HAVE

21   EXHAUSTED MR. CAREY IN THEIR CASE-IN-CHIEF.  THAT'S THEIR

22   PROBLEM.  THAT'S NOT OURS.  WE'RE UNDER NO OBLIGATION TO FIX

23   THEIR CASE FOR THEM.

24             THE COURT:  DO YOU KNOW WHETHER OR NOT THERE WAS A

25   PRIOR REQUEST FOR YOU TO PRODUCE ALL OF THE PRODUCTS THAT HAD

1    THE HEATWAVE FABRIC?

2          MR. SPROUL:  I'M NOT AWARE -- I HAVE NOT PERSONALLY

3    LOOKED AT THE REQUEST.  IF HE ASSERTS THERE IS --

4          MR. ALDRICH:  YOUR HONOR, I IDENTIFIED IT TO HIM

5    LAST NIGHT.  IT'S REQUEST FOR PRODUCTION NO. 2.  MAY 4, 2015,

6    TWO AND A HALF YEARS AGO.

7          MR. SPROUL:  HERE IS THE PROBLEM WITH THIS.  IF THEY

8    THOUGHT THAT WAS A PROBLEM, THEY SHOULD HAVE MOVED TO COMPEL.

9    IT'S COMMON.

10         MR. ALDRICH:  YOUR HONOR --

11         THE COURT:  WAIT A MINUTE.

12         MR. SPROUL:  IT IS COMMON, AND, IN FACT, ROUTINE

13   THAT PLAINTIFFS CANNOT -- OR PARTIES, IN FACT, CANNOT ISSUE A

14   DISCOVERY REQUEST AND THEN WAIT IN THE WEEDS WHEN IT HASN'T

15   BEEN ANSWERED, AND THEN SHOW UP AT TRIAL AND GET A PRECLUSION

16   BASED ON THAT.  IF THEY THOUGHT THERE WAS AN ISSUE THERE WITH

17   THE PRODUCT OR WITH THE IDENTIFICATION OF PRODUCTS, THEY

18   SHOULD HAVE MOVED TO COMPEL.

19         WE DIDN'T REALIZE THERE WAS AN ISSUE.  THE PRODUCTS

20   ARE FREELY AVAILABLE ON THE MARKET.  THEY HAVE ACCUSED THEM.

21   THEY HAVE ASKED FOR DAMAGES BASED ON THESE INDIVIDUAL

22   PRODUCTS.  THEY HAVE HAD NOTICE.  THIS IS NOT A SURPRISE TO

23   THEM, OR AT LEAST IT SHOULDN'T BE.

24         WHEN THEY HAVE ASKED FOR AN INDIVIDUAL PRODUCT IN

25   THE LAST WEEK OR SO, WE'VE IMMEDIATELY GIVEN IT TO THEM.  FOR

847

1    INSTANCE, THE HEAT TOUCH TORCHE THEY SAID, WE'VE NEVER SEEN

2    AN ACTUAL PHYSICAL EXAMPLE.  WE HAD IT MESSENGERED OVER THAT

3    VERY DAY.

4           BUT, AGAIN, IF THERE WAS A PROBLEM, THAT WAS THEIR

5    BURDEN TO ASK FOR IT AND MOVE THE COURT TO COMPEL PRODUCTION

6    OF THOSE ISSUES DURING DISCOVERY, NOT LAY THE BURDEN ON US AT

7    THIS LATE DATE.  IT'S NOT OUR BURDEN TO PROVE THIS ASPECT OF

8    THE CASE.

9           AND IT'S STRANGE, FRANKLY, TO HEAR MR. ALDRICH TELL

10   US THAT WE NEED TO BE PUNISHED TO MARCH THROUGH THE EVIDENCE

11   THAT THEY SHOULD HAVE ADDUCED IN THEIR CASE-IN-CHIEF, WHICH

12   THEY DIDN'T DO.

13          THE COURT:  THANK YOU.

14          MR. ALDRICH:  AGAIN, WE ALSO SERVED NONINFRINGEMENT

15   CONTENTIONS.  AND THE REASON WE DIDN'T MOVE TO COMPEL

16   PRODUCTION OF THE GLOVES IS BECAUSE THEY HAVE NO

17   NONINFRINGEMENT CONTENTIONS.  WE WEREN'T TOLD OF ANY THEORY

18   ON ANY BASIS EVER.  AND WHEN DR. BLOCK SERVED HIS

19   NONINFRINGEMENT REPORT, HE DIDN'T IDENTIFY THIS ISSUE,

20   EITHER.  SO, NO, WE DIDN'T NEED TO SEE EVERY ONE OF THE

21   PRODUCTS.  WE HAD NO REASON TO, BECAUSE THEY DIDN'T SAY ANY

22   OF THE PRODUCTS DIDN'T INFRINGE.

23          AND SO LAST NIGHT WE SAID, WE NEED -- IF YOU GUYS

24   ARE GOING TO MAKE THIS NEW THEORY THAT WE HAVE NEVER BEEN --

25   THAT HAS NEVER BEEN DISCLOSED TO US BEFORE, YOU GUYS HAD A

848

1    RULE 26(E) OBLIGATION TO TELL US ALL YOUR THEORIES.  AND THIS

2    NEW THEORY, NEVER DISCLOSED BEFORE, UNTIL A WEEK AGO, IF THIS

3    IS YOUR POSITION, WE NEED THE PRODUCT SAMPLES HERE IN THE

4    COURTHOUSE SO THAT WE CAN SHOW THE JURY THAT ALL OF THEM HAVE

5    HEAT-REFLECTIVE LINING ON THE INSIDE SURFACE.

6                    THE COURT:  WELL, ACTUALLY WHAT YOU WOULD NEED IS

7    THE ONES THAT DON'T.

8                    MR. ALDRICH:  YES.  SO I ASKED THEM, WHICH ONES DO

9    YOU CONTEND DON'T.  AND THAT'S ALL I NEED.  THAT'S TRUE.

10                   MR. MARCHESE:  YOUR HONOR, JUST TO ADD REAL QUICKLY.

11   I JUST KEEP HEARING A REFERRING BACK TO THE NONINFRINGEMENT

12   CONTENTIONS, BUT THIS IS ACTUALLY A DIFFERENT ISSUES.  THIS

13   IS ABOUT BURDENS OF PROOF.

14                   MY EXPERIENCE IN THESE CASES IS THAT WE HAVE -- I DO

15   CASES WITH HUNDREDS OF PRODUCTS ACCUSED IN THEM ALL THE TIME.

16   AND IN DISCOVERY, WE WORK TOGETHER TO COME UP WITH

17   REPRESENTATIVE PRODUCTS, AND THERE ARE STIPULATIONS THAT ARE

18   ARRIVED AT AND MOTIONS FILED WITH THE COURT IF WE CAN'T AGREE

19   ON REPRESENTATIVE PRODUCTS, AND THOSE ARE RESOLVED BY THE

20   COURT LONG IN ADVANCE OF TRIAL.

21                   IN THIS CASE, AS MR. SPROUL SAID, THE FIRST TIME

22   I'VE EVER HEARD OF THIS REQUEST WAS ON SATURDAY, TWO DAYS

23   BEFORE TRIAL STARTED.  WE HAD A MEET-AND-CONFER WITH THEM

24   TELEPHONICALLY AND THEY SAID, YOU NEED TO STIPULATE, YOU NEED

25   TO STIPULATE TO ALL PRODUCTS ARE THE SAME EXCEPT FOR THESE

1       TWO.

2              AND WE SAID, IT IS TOO LATE FOR US TO TRY TO FIGURE

3       ALL THAT OUT.  AND THEN THEY SENT A STIP OVER -- IS THAT

4       RIGHT, THE LANGUAGE.  IT'S THE LAST FEW MINUTES.  SO WE SAID,

5       IT'S YOUR BURDEN, YOU GUYS, TO PROVE -- AND THERE IS NO STIP,

6       THERE IS NO REPRESENTATIVE PRODUCT ISSUE.  IT'S NEVER BEEN

7       ADDRESSED IN THE CASE.  YOU GUYS SHOULD HAVE GOTTEN THAT DONE

8       LONG AGO.  YOU'VE ACCUSED I DON'T KNOW, 100 PRODUCTS.  YOU'VE

9       GOT TO FIGURE THAT OUT.

10             SO THEY SAID, THAT'S WHEN THE WHOLE POINT ABOUT

11      MR. CAREY CAME UP.  WE'RE GOING TO PUT HIM ON THE STAND AND

12      WE'RE GOING TO ASK HIM ABOUT THE GLOVES.  AND WE SAID, YOU

13      CAN DO THAT.

14             AND, YOU KNOW, I'M SORRY.  I DEFINITELY AM NOT

15      PLEASED TO HEAR SOME OF THE ASSERTIONS MADE BY MR. ALDRICH,

16      THAT WE SOMEHOW TRAINED HIM TO FORGET, I THINK HE SAID.

17      THAT'S ABSOLUTELY FALSE.  ABSOLUTELY.

18             AND SO IF THEY WANTED TO KNOW ALL THAT, THEY SHOULD

19      HAVE TAKEN A DEPOSITION ON IT, A 30(B)(6) DEPOSITION; THEY

20      COULD HAVE DONE THAT.  THEY COULD HAVE ASKED FOR A

21      REPRESENTATIVE PRODUCT STIPULATION; THEY COULD HAVE DONE.

22      THEY SHOWED UP TO COURT, AND WHAT I HEARD DR. COLE DO -- AND

23      WE CAN LOOK AT HER CLAIM CHARTS AGAIN.  I NEVER SAW A PRODUCT

24      EVER REFERENCED IN HER CLAIM CHART.  IT WAS JUST A MARCH

25      THROUGH MARKETING LITERATURE AND THEN SOME TESTING

 1    PHOTOGRAPHS THAT SHE TOOK.

 2           THERE IS NO SAYING, HERE IS THE PRODUCT THAT I'M

 3    LOOKING AT, THE ABC GLOVE.  GO THROUGH IT.  IT HAS ALL THESE

 4    ELEMENTS.  AND THEN SAY, ALL THESE OTHER PRODUCTS ARE EXACTLY

 5    THE SAME.  AND THEN EITHER MARCH THROUGH THEM OR SAY WHY SHE

 6    THINKS THEY ARE EXACTLY THE SAME.

 7           AND SO I THINK IT'S JUST A FAILURE OF PROOF, AND

 8    IT'S A FAILURE OF PROOF IN THIS CASE, YOUR HONOR, AND IT WAS

 9    THEIR BURDEN.  THEY ARE A HUGE COMPANY WITH HUGE RESOURCES.

10    THEY COULD HAVE EASILY WORKED ALL OF THIS OUT.  THEY COULD

11    HAVE BOUGHT THE GLOVES.  THEY ARE ON THE INTERNET.  THEY ARE

12    LIKE 40 BUCKS A POP.

13           AND I CAN GO BACK AND LOOK AT THE INTERROGATORY

14    RESPONSES AND SEE IF THERE WAS AN OBJECTION TO PUBLICLY

15    AVAILABLE INFORMATION.  THERE MAY HAVE BEEN.  THERE MAY HAVE

16    BEEN OBJECTIONS ABOUT PROVIDING SAMPLES, BECAUSE IT'S

17    EXPENSIVE.  YOU KNOW, THEY DON'T HAVE TO DO THAT.  SOMETIMES

18    THE PLAINTIFF HAS TO BUY THEIR OWN.  AND IN THIS CASE, WE CAN

19    GO BACK AND LOOK AT IT.  I'M SURE THERE WERE OBJECTIONS.

20    WE'LL CHECK THEM OUT.

21           BUT, YOU KNOW, IF THERE ARE OBJECTIONS AND THE

22    PLAINTIFF CAN'T WORK THEM OUT, THEY NEED TO MOVE TO COMPEL.

23    AND THEY DIDN'T DO IT.

24           THE COURT:  WELL, IT'S HARD -- I MEAN, THEIR

25    RESPONSE TO THAT IS, WE ASKED YOU WHICH PRODUCTS WERE

1    NONINFRINGING; AND THEY DIDN'T GET ANYTHING.  AND -- OR

2    DIDN'T GET MUCH ON THE ONE HAND.  AND I UNDERSTAND YOUR POINT

3    ON THE OTHER.

4            THIS IS WHAT HAPPENS WHEN LAWYERS DON'T GET ALONG.

5            MR. MARCHESE:  IN ALL FAIRNESS -- I'M SORRY.  GO

6    AHEAD.

7            THE COURT:  BECAUSE NORMALLY PEOPLE WOULD JUST TALK

8    TO EACH OTHER AND WE WOULD FIGURE OUT REALLY WHAT'S AT THE

9    BOTTOM OF THIS ISSUE.  AND THIS CASE IS NOT ABOUT -- THE CASE

10   SHOULDN'T PIVOT ON NONDISCLOSURE OF INFORMATION OR NOT

11   AGREEING TO CERTAIN STIPULATIONS.  REALLY, THERE SHOULD BE

12   VERY FEW SURPRISES WITH AS MUCH TIME, ENERGY AND MONEY AS HAS

13   BEEN SPENT IN THIS CASE TO DATE.

14           THE FACT THAT THEY ARE NOW CLAIMING THAT THERE

15   ARE -- THAT THESE ARE NEW NONINFRINGEMENT CONTENTIONS WHICH

16   SHOULD HAVE BEEN DISCLOSED, AGAIN, WITH NORMAL DISCOURSE, YOU

17   ALL WOULD HAVE FIGURED THIS OUT AND FIGURED OUT A WAY AROUND

18   IT A LONG TIME AGO.  BUT YOU DIDN'T.  AND SO YOU NOW ARE

19   ASKING ME TO RESOLVE YOUR PROBLEM.

20           MR. ALDRICH:  YEAH.  AND SO I WENT TO THEM LAST

21   NIGHT AND ASKED FOR SOME SOLUTIONS TO THE PROBLEM, INCLUDING

22   GOING BACK TO THE STIPULATION IDEA.  AND I ASKED FOR A PHONE

23   CALL LAST NIGHT.  I ASKED, CAN YOU CALL MY CELL PHONE SO WE

24   CAN TRY TO WORK THIS OUT.  AND AT ABOUT MIDNIGHT I GOT A

25   RESPONSE THAT SAID, NO, WE'RE GOING TO STAND ON OUR PAPERS.

1    AND AT 12:58, THEY FILED A JMOL ON THE ISSUE INSTEAD.

2             MR. MARCHESE:  THE JMOL IS DIFFERENT.

3             THE COURT:  IT'S TIME TO STOP THROWING ROCKS BACK

4    AND FORTH, BECAUSE THAT'S NOT HELPFUL TO ME AT THIS

5    PARTICULAR JUNCTURE.

6             YOU NEED TO GIVE THEM A LIST OF THOSE PRODUCTS WHICH

7    YOU ARE CLAIMING ARE NOT INFRINGING BECAUSE THEY ARE FACING

8    OUTWARD AS OPPOSED TO FACING INWARD.  GET THAT LIST FOR THEM.

9             MR. MARCHESE:  WE CAN DO THAT, YOUR HONOR.

10            THE COURT:  IF THE LIST -- ONCE THAT LIST IS

11   DISCLOSED, THEN I WANT YOU TO TALK TO ME.  IF IT'S NOT A HUGE

12   NUMBER OF PRODUCTS, THEN I WANT YOU TO PROVIDE THOSE.

13            MR. MARCHESE:  UNDERSTOOD.  BUT IT'S STILL A

14   SEPARATE ISSUE I THINK THAT WE HAVEN'T RESOLVED, AND THAT'S

15   WHAT OUR JMOL IS ABOUT, IS THAT DR. COLE DID NOT GO THROUGH

16   AN ANALYSIS OF A PRODUCT OR MAKE STATEMENTS ABOUT -- SO WE'RE

17   GOING TO FILE ON THAT.  I THINK THAT'S A DIFFERENT ISSUE.

18            AND THIS POINT ABOUT FACING IN OR FACING OUT IS

19   SEPARATE FROM WHAT I WAS TRYING TO SAY, THAT IT DOESN'T MEET

20   THE BURDEN OF PROOF.

21            THE COURT:  I UNDERSTAND THAT.  WE'LL SEE WHAT

22   HAPPENS WITH YOUR MOTION.  I'VE READ IT, WHAT YOU'VE PUT IN

23   YOUR PAPERWORK, AND I HAVEN'T CONSIDERED WHETHER OR NOT THERE

24   IS SUFFICIENT EVIDENCE FROM WHICH A JURY COULD CONCLUDE,

25   LOOKING AT THE EVIDENCE IN THE LIGHT MOST FAVORABLE TO THE

853

1    NON-MOVING PARTY, THAT THERE IS SUFFICIENT EVIDENCE TO MAKE A

2    FINDING IN FAVOR OF THE PLAINTIFF OR NOT.  I HAVEN'T GOTTEN

3    THERE YET.

4              MR. MARCHESE:  OKAY.  UNDERSTOOD.

5              THE COURT:  ALL RIGHT.  DO YOU NEED ANY FURTHER

6    CLARIFICATION OF WHAT MY EXPECTATIONS ARE REGARDING THE

7    NONINFRINGING PRODUCTS?

8              MR. ALDRICH:  WE ARE PLANNING ON RESTING LATER

9    TODAY, BUT I ASSUME THAT WE WILL LEAVE OUR CASE OPEN UNTIL

10   THIS ISSUE IS RESOLVED.

11             THE COURT:  SURE.

12             MR. ALDRICH:  THANK YOU, YOUR HONOR.

13             MR. MARCHESE:  WE ALSO PUT IN A JMOL ON

14   NONWILLFULNESS AND --

15             THE COURT:  I SAW THAT.

16             MR. MARCHESE:  AND I THINK -- I'M HAPPY TO ADDRESS

17   IT AT ANY POINT TODAY.

18             THE COURT:  OKAY.  WE'RE PRETTY MUCH THERE, BUT NOT

19   QUITE THERE YET.

20             MR. MARCHESE:  THANK YOU.

21             THE COURT:  WHEN WILL YOU BE ABLE TO GET A LIST OF

22   THE NONINFRINGING PRODUCTS BECAUSE THEY ARE OUTFACING?

23             MR. MARCHESE:  I'LL HAVE TO CHECK.  I DON'T KNOW OFF

24   THE TOP OF MY HEAD.

25             THE COURT:  OKAY.

COMPUTER-AIDED TRANSCRIPTION

854

1          MR. ALDRICH:  AS LONG AS WE HAVE A FEW MINUTES -- OR

2     WE COULD TAKE IT UP LATER.  WE'VE REVIEWED THE SLIDES THAT

3     THEY PLAN ON USING WITH DR. BLOCK, AND WE ARE GOING TO BE

4     FACING THE ISSUE THAT WE'VE BEEN CONCERNED ABOUT ALL ALONG,

5     WHICH IS DR. BLOCK GOING OFF THE PAGE.  AND WANTED TO KNOW

6     HOW THE COURT WANTS TO DEAL WITH THAT ISSUE, PARTICULARLY

7     WITH THE JURY PRESENT.

8          THE COURT:  I DON'T KNOW WHAT YOU'RE TALKING

9     ABOUT.

10         MR. ALDRICH:  WELL, IF DR. BLOCK TESTIFIES BEYOND

11    THE SCOPE OF HIS REPORT, YOUR HONOR HAS ALREADY SAID THAT HE

12    MAY NOT TESTIFY BEYOND THE SCOPE OF HIS REPORT.  AND IT

13    APPEARS FROM THE SLIDES THAT HAVE BEEN PRODUCED, FIRST OF

14    ALL, THAT THERE IS SOME OF THAT IN THERE.  AND WE'LL TRY TO

15    RESOLVE THAT IN ADVANCE.

16         THE OTHER ISSUE WE HAVE IS IT APPEARS THAT DR. BLOCK

17    MAY BE PREPARING TO TESTIFY IN CONTRADICTION TO THE COURT'S

18    ORDER ABOUT WHAT'S ALREADY DISCLOSED IN THE PRIOR ART FOR

19    WHICH THE COURT HAS GRANTED SUMMARY JUDGMENT.

20         THE COURT:  ALL RIGHT.  THAT'S NOT GOING TO HAPPEN.

21    WE'VE ALREADY TALKED ABOUT THAT.

22         MR. SPROUL:  I AGREE.  I JUST DISAGREE WITH HIS

23    CHARACTERIZATION OF DR. BLOCK'S SLIDES.  THAT'S NOT TRUE.

24    NEITHER ONE OF THOSE ACCUSATIONS I THINK ARE TRUE.

25         WE CREATED THESE SLIDES CERTAINLY TO COMPORT WITH

1    SUMMARY JUDGMENT, AND OUR CASE ISN'T TRYING TO GO BEYOND

2    THAT.  WE HAVE A VERY FOCUSED INVALIDITY CASE.  AND I HEAR

3    THE ACCUSATION.  I'M CURIOUS AS TO WHAT THE EXACT OBJECTIONS

4    ARE, BECAUSE I HAVEN'T HEARD THEM.

5              MR. ALDRICH:  WE'LL TRY TO WORK IT OUT, YOUR

6    HONOR.

7              THE COURT:  TALK.

8              MR. SPROUL:  I UNDERSTOOD THAT YOUR HONOR OVERRULED

9    THEIR ISSUE ON TRYING TO PRECLUDE US FROM USING PARTICULAR

10   PIECES OF PRIOR ART THAT RAISED THE ISSUE IN FOUR DIFFERENT

11   MOTIONS.  AND I UNDERSTOOD WHEN WE STARTED TRIAL THAT YOU

12   ACTUALLY DENIED THE PARTICULAR PRECLUSION ISSUE.

13             SO I THOUGHT THIS WAS RESOLVED WITH RESPECT TO AT

14   LEAST OUR OBVIOUSNESS COMBINATIONS, BUT WE CAN TAKE THAT UP

15   OFF-LINE AND BRING IT BACK TO YOU IF THERE IS AN ISSUE.

16             MR. ALDRICH:  THERE IS ONE OTHER RELATED ISSUE, YOUR

17   HONOR.  AT THE MOTION IN LIMINE, AT THE PRETRIAL CONFERENCE,

18   YOUR HONOR SAID THAT ANY FACTS THAT YOUR HONOR FOUND IN FAVOR

19   OF US, ON OUR MOTION FOR WHICH YOU GRANTED SUMMARY JUDGMENT

20   IN OUR FAVOR, THOSE FACTS ARE ESTABLISHED FOR THE CASE FOR

21   PURPOSES OF TRIAL.

22             THERE WERE FOUR MOTIONS IN SUMMARY JUDGMENT WE FILED

23   WHERE WE ARGUED THAT THESE PRODUCTS HAVE NO HEAT DIRECTION,

24   ANYTHING AT ALL, THAT THEY DIDN'T OPPOSE; AND YOUR HONOR

25   GRANTED OUR MOTION BASED ON THEIR NONOPPOSITION.

856

1           ARE THOSE FACTS -- CAN WE DEEM THOSE FACTS

2     ADMISSIBLE AT TRIAL, SINCE THEY WERE UNOPPOSED AT SUMMARY

3     JUDGMENT AND YOUR HONOR GRANTED THE MOTION BASED ON OUR -- ON

4     OUR MOTION?

5           THE COURT:  AND HOW IS IT THAT AS A PRACTICAL MATTER

6     THAT PLAYS OUT IN THE COURSE OF THIS TRIAL?

7           MR. ALDRICH:  SO, FOR EXAMPLE, THE HALLEY REFERENCE.

8     WE MOVED THAT HALLEY HAS NO HEAT-DIRECTING ELEMENTS.  THEY

9     DIDN'T OPPOSE.  AND YOUR HONOR GRANTED THE MOTION.  YOUR

10    HONOR DIDN'T MAKE ANY SPECIFIC FACTUAL FINDINGS OF ITS OWN

11    BECAUSE IT JUST GRANTED OUR MOTION THAT IT DOESN'T HAVE

12    HEAT-DIRECTING ELEMENTS.

13          BUT SINCE YOUR HONOR DIDN'T ACTUALLY MAKE A FACTUAL

14    FINDING, I'M AFRAID THAT THERE IS A LITTLE BIT OF AN

15    AMBIGUITY ABOUT WHETHER THAT FACT IS FOUND FOR PURPOSES OF

16    SUMMARY JUDGMENT AND IS A FACT THAT IS -- THAT NEEDS FURTHER

17    PROOF AT TRIAL.

18          THE COURT:  AND I -- HONESTLY, YOU'VE BOTH GIVEN ME

19    SO MUCH JOY IN PAPERWORK.  IF I HAVE RULED AND ISSUED A

20    JUDGMENT THAT HALLEY DOESN'T HEAT DIRECT, THEN THEY CANNOT.

21          MR. ALDRICH:  THANK YOU, YOUR HONOR.

22          MR. SPROUL:  YOUR HONOR, TO BE CLEAR.  WE'VE NEVER

23    ARGUED THAT SINCE WE JOINED THE CASE.  NONE OF OUR PAPERS

24    HAVE.  AND DR. BLOCK'S SLIDES DO NOT INDICATE THAT.  AND YET

25    MR. ALDRICH CONTINUES TO BRING THIS ISSUE UP.

1          WE ARE NOT ARGUING THAT ANY OF THESE SECONDARY

2     REFERENCES DISCLOSE HEAT-DIRECTING ELEMENTS WHERE YOUR HONOR

3     HAS SO RULED.

4          MR. ALDRICH:  PERFECT.

5          MR. SPROUL:  I DON'T KNOW WHAT THE ISSUE IS.

6          MR. ALDRICH:  THEN IT WON'T BE AN ISSUE, YOUR

7     HONOR.

8          THE COURT:  ALL RIGHT.  GLAD TO HEAR IT.

9          ALL RIGHT.  SO WE HAVE A BUNCH OF JURORS READY TO

10    ROLL.  I THINK -- I'M READY TO GO.  MICHAEL, YOU'RE READY TO

11    GO.  HE'S GOT THE CLOCK.

12          BRING THEM IN.

13          (JURY PRESENT, 9:02 A.M.)

14          THE COURT:  DO WE HAVE A WITNESS THAT WAS ON THE

15    STAND?

16          MR. ALDRICH:  YES.  MR. MERRIMAN IS STILL

17    TESTIFYING.

18          THE COURT:  GO AHEAD AND RE-TAKE THE STAND.

19          PLEASE BE SEATED.

20        MICHAEL MERRIMAN, HAVING PREVIOUSLY BEEN SWORN,

21        TESTIFIED AS FOLLOWS:

22          THE COURT:  YOU MAY PROCEED.

23               DIRECT EXAMINATION (CONTINUED)

24    BY MR. ALDRICH:

25    Q.  MR. MERRIMAN, JUST TO CATCH EVERYBODY UP TO WHERE WE

COMPUTER-AIDED TRANSCRIPTION

1    WERE YESTERDAY.  WE WERE TALKING ABOUT AN AGREEMENT THAT

2    COLUMBIA SPORTSWEAR HAS WITH O.C.S.

3             DO YOU REMEMBER THAT?

4    A.   I DO.

5    Q.   AND WE HAD BEEN DISCUSSING THE VARIOUS CLAUSES IN THAT

6    AGREEMENT THAT BENEFIT COLUMBIA IN THAT AGREEMENT.

7             DO YOU REMEMBER THAT?

8    A.   THAT'S CORRECT.

9    Q.   AND THAT WE HAD CREATED A LIST HERE OF SOME OF THE

10   CLAUSES IN THE AGREEMENT THAT ARE FOR COLUMBIA'S BENEFIT AND

11   PROVIDE VALUE TO COLUMBIA.

12            DO YOU REMEMBER THAT?

13   A.   I DO.

14   Q.   AND THE ACTUAL AGREEMENT THAT YOU HAVE WITH O.C.S. IS

15   ABOUT 40 PAGES.  DOES THAT SOUND FAIR?

16   A.   THAT SOUNDS RIGHT.

17   Q.   AND ARE THERE OTHER CLAUSES IN THAT AGREEMENT THAT ARE

18   ALSO FOR COLUMBIA'S BENEFIT?

19   A.   THE CONTRACT IS FAIRLY ONE-SIDED.  IT'S MOSTLY IN OUR

20   BENEFIT, YES.

21   Q.   OKAY.  NOW, DOES THE -- I THINK WE COVERED THAT THE

22   O.C.S. AGREEMENT COVERS THE OMNI-HEAT PRODUCTS.  DOES THE

23   O.C.S. AGREEMENT ALLOW O.C.S. TO USE COLUMBIA'S DESIGN

24   PATENTS THAT ARE ASSOCIATED WITH THE OMNI-HEAT TECHNOLOGY?

25   A.   IT DOES.

1    Q.    AND THAT WOULD INCLUDE THE DESIGN PATENT THAT'S AT ISSUE

2    IN THIS CASE?

3    A.    THAT'S CORRECT.

4    Q.    AND YOU'VE ENTERED INTO AN AMENDMENT TO THE O.C.S.

5    AGREEMENT; IS THAT RIGHT?

6    A.    WE HAVE.

7    Q.    AND THAT EXPANDS THE CHANNELS?

8    A.    YES.

9    Q.    OKAY.  AND DO YOU REMEMBER WHAT CHANNELS THAT AMENDMENT

10   APPLIES TO?

11   A.    VERY BROADLY.  IT ALLOWS O.C.S. TO SELL PRODUCT TO GOLF

12   CHANNELS.  SO THINK OF PEBBLE BEACH.  THEY CAN SELL SHIRTS

13   WITH THE PEBBLE BEACH LOGO ON IT AS WELL, IN ADDITION TO JUST

14   THE COLLEGE.

15   Q.    AND THE ROYALTY RATE FOR THAT AMENDMENT, WAS THAT THE

16   SAME ROYALTY RATE AS IN THE ORIGINAL AGREEMENT?

17   A.    YEAH.  I BELIEVE THERE WERE DIFFERENT CLASSIFICATIONS,

18   BUT IT WAS 10 TO 15 PERCENT.

19          MR. ALDRICH:  OKAY.  LET ME HAVE YOU TURN TO --

20   WELL, YOU DON'T HAVE TO TURN TO THE DOCUMENT, BUT WE'LL TALK

21   ABOUT EXHIBIT 91, WHICH HAS ALREADY BEEN ADMITTED.

22          IF YOU CAN ZOOM IN ON THE TOP, PLEASE.  MAYBE JUST

23   THE TOP PARAGRAPH.

24   Q.    MR. MERRIMAN, WHAT IS EXHIBIT 91?

25   A.    THIS IS ANOTHER ONE OF OUR LICENSING AGREEMENTS WITH A

860

1    COMPANY CALLED DELTA GALIL.  THE DIFFERENCE HERE IS THIS IS

2    FOR THE MANUFACTURE OF SOCKS.

3    Q.    SO WHO IS DELTA GALIL?

4    A.    THEY ARE ONE OF THE MAJOR PRODUCERS OF SOCKS AROUND THE

5    WORLD.  THEY HAVE -- THEY LICENSE CERTAIN BRANDS, INCLUDING

6    OURS.  THEY ALSO PRODUCE SOCKS FOR A LOT OF OTHER COMPANIES,

7    TOP COMPANIES:  NIKE, UNDER ARMOUR -- I MEAN, NOT UNDER

8    ARMOUR.  THEY DO UNDER ARMOUR AS WELL.  WILSON, A LOT OF

9    OTHERS.

10   Q.    AND WHY DID COLUMBIA WANT TO ENTER AN AGREEMENT WITH A

11   SOCK MANUFACTURER?

12   A.    SOCKS, I MEAN, YOU THINK ABOUT IT, IT'S PRETTY SIMILAR

13   TO SHIRTS, BUT THEY ARE ACTUALLY VERY DIFFERENT IN HOW THEY

14   ARE CONSTRUCTED.  IT'S NOT CUT AND SEWED.  IT'S A BUNCH OF

15   YARNS COMING TOGETHER.  AND IT'S DIFFERENT THAN WHAT WE DO,

16   OUR EXPERTISE INTERNALLY.  SO WE WANTED TO DO SOCKS.  IT WAS

17   IMPORTANT TO HAVE COLUMBIA-BRANDED SOCKS IN THE MARKET.

18        BUT WE WENT TO DELTA SPECIFICALLY BECAUSE THEY ARE

19   ONE OF THE TOP MANUFACTURERS WITH SOME REAL GREAT TECHNOLOGY,

20   DOING HIGH-END SOCKS, AND THEY WERE THE ONES OF ALL THE

21   COMPANIES THAT WE INTERVIEWED THAT REALLY, WE THOUGHT, HAD

22   THE CAPABILITIES TO PUT OMNI-HEAT AND FIGURE OUT HOW TO GET

23   THAT INTO SOCKS.

24   Q.    SO COLUMBIA DOESN'T MAKE SOCKS OF ITS OWN?

25   A.    WE DON'T.

861

1    Q.    OKAY.  AND SO THE SOCKS THAT DELTA GALIL SELLS, WHAT

2    BRAND NAME IS GOING ON THOSE SOCKS?

3    A.    YEAH.  SO TO BE CLEAR, WE DON'T MAKE -- OUR DESIGN

4    MERCHANDISING TEAM DOESN'T MAKE SOCKS.  DELTA MAKES COLUMBIA

5    SOCKS FOR US.  AND THEY BRANDED COLUMBIA.  THEY DON'T SAY

6    "DELTA" ON THE SOCKS.  THEY SAY "COLUMBIA."

7    Q.    AND WHERE ARE THOSE COLUMBIA-BRANDED SOCKS SOLD?

8    A.    ALMOST ALL THE STORES THAT CARRY THE SOCKS ARE THE

9    STORES THAT WOULD CARRY OUR SHIRTS AND JACKETS AND THINGS.

10   SO THEY WOULD BE IN THE SOCK DEPARTMENT AT DICK'S OR R.E.I.

11   OR KOHL'S.

12   Q.    WOULD THEY BE AT COLUMBIA'S OWN STORES?

13   A.    THEY WOULD.

14   Q.    OKAY.  IS DELTA GALIL A COMPETITOR OF COLUMBIA'S?

15   A.    NO.  MUCH LIKE O.C.S., THEY ARE ONE OF OUR PARTNERS, AND

16   THEY MAKE SOCKS.  WE MAKE SURE THEY DON'T SELL COMPETING

17   PRODUCTS.  THEY ARE SELLING SOCKS SPECIFICALLY FOR THE

18   OUTDOORS, SO COLUMBIA SOCKS.

19   Q.    AND DID -- DOES THIS LICENSE AGREEMENT ALLOW DELTA GALIL

20   TO MAKE OMNI-HEAT SOCKS?

21   A.    MY RECOLLECTION IS THIS ONE DIDN'T ORIGINALLY ALLOW THEM

22   TO MAKE OMNI-HEAT SOCKS.  WE WANTED TO BE SURE THAT THE

23   RELATIONSHIP WAS GOING WELL BEFORE WE AMENDED THE AGREEMENT

24   TO ALLOW THEM TO CREATE OMNI-HEAT SOCKS.

25   Q.    AND WHY DID YOU WANT TO WAIT BEFORE ALLOWING THEM TO

1    MAKE THOSE OMNI-HEAT SOCKS?

2    A.   WE KNEW THAT THE PROCESS OF PUTTING OMNI-HEAT ON THAT

3    TUBULAR YARN SOCK WOULD BE DIFFICULT AND REALLY WANTED TO

4    MAKE SURE THAT THEY WERE CREATING HIGH-QUALITY PRODUCT BEFORE

5    WE MOVED FORWARD AND HAD THEM START PLAYING AROUND WITH OUR

6    TOP TECHNOLOGY.

7    Q.   BUT I THINK YOU TESTIFIED THAT ONE OF THE REASONS YOU

8    WANTED DELTA GALIL WAS BECAUSE OF OMNI-HEAT.  DID I

9    UNDERSTAND THAT CORRECTLY?

10   A.   NO.  THAT'S CORRECT.  AND IN FACT, THIS WAS A DIRECTIVE

11   FROM OUR CEO.  HE REALLY WANTED TO HELP GET OMNI-HEAT OUT

12   THERE IN DIFFERENT PRODUCT CATEGORIES.  AND SO WHEN HE

13   ASKED -- WHEN WE TOLD HIM WE WERE GOING TO DO SOME SOCKS, HE

14   WANTED TO MAKE SURE THAT OMNI-HEAT SOCKS WERE PART OF THE

15   LINE.

16        MR. ALDRICH:  LET'S GO TO EXHIBIT 87.  AND IF WE

17   COULD ZOOM IN ON BULLET 2.

18   Q.   MR. MERRIMAN, WHAT IS EXHIBIT 87?

19   A.   87 IS THE AMENDMENT TO THAT ORIGINAL AGREEMENT.  SO THIS

20   IS THE DOCUMENT WE CREATED THAT NOW GIVES DELTA THE RIGHTS TO

21   PRODUCE OMNI-HEAT SOCKS.  AND YOU CAN SEE THAT IT WAS SIGNED

22   PERSONALLY ON OUR SIDE BY TIM BOYLE, OUR CEO, BECAUSE HE KEPT

23   PUSHING TO GET THIS ONE DONE.

24   Q.   AND SO THE -- TO LOOK AT THE AGREEMENT WITH DELTA GALIL,

25   YOU'D HAVE TO LOOK AT EXHIBIT 87 IN CONJUNCTION WITH

1    EXHIBIT 91; CORRECT?

2    A.    RIGHT.   91 IS THE BASE AGREEMENT.   87 IS THE PART THAT

3    ADDS ON OMNI-HEAT TO IT.

4    Q.    AND WITHOUT GOING THROUGH EACH INDIVIDUAL CLAUSE, DID

5    EXHIBIT 91 -- OR DID THE DELTA GALIL AGREEMENT IN GENERAL

6    HAVE THE SAME TERMS AND CONDITIONS?   EXCLUDE THE ROYALTY FOR

7    A MINUTE.

8    A.    YEAH.

9    Q.    BUT DID IT HAVE THE SAME TERMS AND CONDITIONS THAT WE

10   SEE HERE ON THE BOARD, IN TERMS OF THE BENEFITS TO

11   COLUMBIA?

12   A.    YES.   AS A GENERAL PRACTICE, ALL OF THOSE BENEFITS ARE

13   IN ALL OF OUR LICENSING AGREEMENTS, BECAUSE THEY ARE VERY

14   IMPORTANT FOR COLUMBIA TO RETAIN CONTROL OF PRODUCTS THAT

15   HAVE OUR BRAND ON THEM.

16   Q.    AND THE DELTA GALIL LICENSE AGREEMENT HAD A DIFFERENT

17   ROYALTY RATE; CORRECT?

18   A.    I BELIEVE SO.

19         MR. ALDRICH:   LET'S GO TO EXHIBIT 91.   AND THE PAGE

20   THAT ENDS IN 864.   AND IF YOU COULD ZOOM IN ON EXHIBIT 4 IN

21   THE MIDDLE OF THE PAGE.

22   Q.    SO WHAT WAS THE -- WHAT WAS THE ROYALTY RATE THAT DELTA

23   GALIL WAS GOING TO PAY?

24   A.    SO THIS WAS THE FIRST CONTRACT WE HAD WITH DELTA.   AND

25   IT HAD A STAIR-STEPPING ROYALTY RATE.   SO THE ROYALTY RATE

864

1    WAS TO INCREASE EVERY YEAR UNTIL WE GOT TO THAT 10-PERCENT

2    FIGURE.  AND SO IT STARTED OFF AT 7 PERCENT, BUT NOW THEY ARE

3    PAYING 10 PERCENT.

4    Q.    AND WHY WAS IT A GRADUATED OR A STAIR-STEP RATE THAT

5    WENT -- THAT STARTED AT 7 AND EVENTUALLY LANDED AT 10

6    PERCENT?

7    A.    WE KNOW THERE IS A LOT OF START-UP COSTS IN STARTING A

8    NEW BUSINESS, SO WE TRY TO GIVE AN INCENTIVE TO THE NEW

9    LICENSEE PARTNER TO GO OUT AND REALLY INVEST IN THE PRODUCT

10   AND MAKE A LITTLE MORE MONEY UPFRONT TO TRY TO RECOUP SOME OF

11   THEIR INITIAL COSTS.  BUT 10 PERCENT IS SORT OF THE STANDARD

12   RATE IN THE INDUSTRY FOR -- FOR OUR BRAND AND THIS TYPE OF

13   PRODUCT.

14   Q.    LET'S GO TO EXHIBIT 88.

15         MR. MERRIMAN, WHAT IS EXHIBIT 88?

16   A.    THIS IS WHAT I CALL AN INITIALIZATION SHEET.  SO WHEN I

17   HAVE A NEW CONTRACT WITH A NEW PARTNER, I'LL SEND THIS AROUND

18   TO THE LEGAL TEAM, TO OUR EXECUTIVE TEAM TO SIGN OFF.  IT'S A

19   SUMMARY OF A NEW AGREEMENT THAT COMES ALONG WITH THE ACTUAL

20   CONTRACT.  JUST BECAUSE THERE IS A LOT OF TERMS AND A LOT OF

21   BOILERPLATE IN THE AGREEMENTS.  BUT I WANT TO MAKE SURE THAT

22   I PROVIDE A SUMMARY OF THE KEY DETAILS OF ANY NEW CONTRACTS

23   SO THE EXECUTIVES CAN TAKE A LOOK AT IT.

24         AND THIS ONE HAS TO DO FOR -- THIS ONE IS SPECIFIC

25   TO A LICENSE AGREEMENT WITH A COMPANY CALLED LONDON LUXURY.

865

1    Q.    AND WHO IS LONDON LUXURY?

2    A.    LONDON LUXURY IS OUR LICENSEE IN THE HOME SPACE, SO BED

3    AND BATH PRODUCTS, SHEETS, THINGS LIKE THAT.

4    Q.    AND DOES THIS AGREEMENT COVER THE OMNI-HEAT PATENTS?

5    A.    IT DOES.

6    Q.    AND WHY ARE YOU LICENSING THE OMNI-HEAT PATENTS INTO THE

7    HOME SPACE?

8    A.    SO ONE OF THE THINGS THAT WE REALLY WANT TO DO WITH OUR

9    TECHNOLOGY, THIS ONE WAS REALLY ABOUT BROADENING THE REACH OF

10   OMNI-HEAT.

11          AND WE HAVE THIS TECHNOLOGY, IF YOU THINK ABOUT A

12   COMFORTER, RIGHT, IT'S A TEXTILE, AND THEN DOWN FILLING, KIND

13   OF LIKE A JACKET, AND WE WANTED THE CONSUMERS TO SAY, HEY,

14   THEY ASSOCIATE THE OMNI-HEAT ON A JACKET WITH KEEPING THEM

15   WARM, IT COULD DO THE SAME THING ON A COMFORTER; RIGHT.

16          AND SO WE REALLY WANTED TO CREATE THIS PERCEPTION

17   THAT OMNI-HEAT IS THE BEST TECHNOLOGY IN THE INDUSTRY TO KEEP

18   YOU WARM AND IT'S COLUMBIA-BRANDED.  SO, RIGHT, PEOPLE WOULD

19   COME TO THE ASSOCIATION THAT IF YOU WANT TO STAY WARM, BUY A

20   PRODUCT FROM COLUMBIA WITH OMNI-HEAT.

21   Q.    AND IS LONDON LUXURY A COMPETITOR OF COLUMBIA'S?

22   A.    NO.  THEY ARE A PARTNER.

23   Q.    COLUMBIA DOESN'T MAKE PRODUCTS LIKE BED SHEETS AND

24   PILLOWCASES AND COMFORTERS ITSELF?

25   A.    NOT OURSELVES.  WE DO IT ALL THROUGH LONDON LUXURY.

1           MR. ALDRICH:  AND SO FOLLOWING THIS PAGE -- WELL,

2    ACTUALLY, LET'S SCROLL DOWN TO THE VERY BOTTOM OF THIS PAGE.

3    CAN WE JUST ZOOM IN ON THE -- YEAH.  STARTING RIGHT THERE,

4    KEY TERMS.  THAT'S PERFECT.  THANK YOU.

5    Q.   SO IS THIS A SUMMARY OF THE ROYALTY RATE THAT LONDON

6    LUXURY WAS GOING TO PAY?

7    A.   THAT'S CORRECT.  IT HAS THE ROYALTY RATE, THE GUARANTEED

8    ROYALTIES IS WHAT WE TALKED ABOUT, IS THE M.R.G. WITH THE

9    O.C.S. CONTRACT, THE MINIMUM GUARANTY.

10   Q.   AND, ONCE AGAIN, I SEE IN THE DISTRIBUTION CHANNELS THAT

11   IT IS ONLY CHANNELS, SO THAT WOULD BE RETAILERS THAT ARE

12   APPROVED BY COLUMBIA; IS THAT RIGHT?

13   A.   RIGHT.  AND THEN, YOU KNOW, EACH CATEGORY SOMETIMES HAVE

14   PRODUCTS THAT -- SHEETS ARE SOLD SOMETIMES IN PLACES WHERE

15   THERE AREN'T JACKETS; SO WE HAVE ADDITIONAL CHANNELS.  BED,

16   BATH & BEYOND IS A GOOD EXAMPLE, WHERE THEY DON'T CARRY

17   APPAREL.  BUT LONDON LUXURY SPECIFICALLY ASKED FOR THAT, SO

18   WE PUT THAT IN THE AGREEMENT.

19   Q.   AND I SEE THE ROYALTY RATE HERE FOR THIS AGREEMENT IS 9

20   PERCENT?

21   A.   THAT'S CORRECT.

22   Q.   OKAY.  WHY IS IT LESS FOR LONDON LUXURY THAN FOR DELTA

23   GALIL AND O.C.S.?

24   A.   IN THE INDUSTRY, THERE IS DIFFERENT ROYALTY RATES THAT

25   ARE TYPICAL FOR DIFFERENT PRODUCT CATEGORIES, AND IT HAS

867

1    LARGELY TO DO WITH THE PROFIT MARGIN THAT THE COMPANY MAKING

2    THOSE PRODUCTS MAKE THEMSELVES.

3         CERTAIN CATEGORIES ARE HIGHER, WHAT WE CALL HIGHER

4    MARGIN, MEANING AFTER YOU SELL AN ITEM, OR THE COST THAT YOU

5    SELL IT FOR, YOU'VE GOT TO SUBTRACT THE COST THAT IT COSTS

6    YOU TO MAKE THOSE GOODS.  AND SOMETIMES THERE ARE HIGHER

7    MARGINS IN CERTAIN CATEGORIES THAN WITH OTHERS.  BEDDING,

8    THERE IS LESS MARGIN THAN THERE IS SAY WITH APPAREL OR WITH

9    ACCESSORIES.  THAT'S WHY -- SO LONDON LUXURY WAS GOING TO

10   MAKE LESS MONEY.

11        IF WE KEPT A REALLY HIGH ROYALTY RATE, IT WOULD

12   PRICE THESE ITEMS SO THAT A CONSUMER GOING INTO AN ACCOUNT

13   LIKE BED, BATH & BEYOND WOULD SAY, WELL -- IF COLUMBIA WAS

14   GETTING PAID A HUGE ROYALTY ON TOP OF -- IF THEY WERE

15   GETTING PAID -- IF THEY WERE GETTING PAID A HUGE ROYALTY, IT

16   MIGHT PRICE THOSE ITEMS AND MAKE IT TOO EXPENSIVE SO PEOPLE

17   WON'T WANT BUY THEM; SO WE HAD A LITTLE BIT OF A LOWER

18   ROYALTY RATE HERE.

19   Q.   WERE THERE ANY MANUFACTURING CHALLENGES THAT YOU WERE

20   AWARE OF IN TERMS OF MAKING COMFORTERS AND SHEETS AND WHATNOT

21   WITH OMNI-HEAT?

22   A.   WELL, ONE DIFFERENCE THERE IS WIDER WIDTHS.  SO TRYING

23   TO FIGURE OUT, YOU HAVE TO USE DIFFERENT ROLLERS, RIGHT, IF

24   YOU'RE TRYING TO MAKE SOMETHING FOR A KING SIZE BED THAN IF

25   YOU'RE MAKING A PILLOW OR A JACKET OR SOMETHING LIKE THAT.

1    Q.   DID THAT MANUFACTURING ISSUE PLAY A PART IN THE ROYALTY

2    RATE AT ALL?

3    A.   WELL, PARTLY.  AND THEN ALSO THE FACT THAT THERE IS HUGE

4    AMOUNT OF -- OMNI-HEAT IS PRETTY -- IT ADDS COST TO THE

5    MATERIAL.  AND IF YOU THINK ABOUT THE SIZE OF, YOU KNOW, A

6    COMFORTER, AND THE AMOUNT OF OMNI-HEAT THAT IT USES, IT'S

7    GOING TO MAKE IT PRETTY EXPENSIVE.

8         SO, AGAIN, WE HAD TO KEEP THE ROYALTY RATE A LITTLE

9    BIT LOWER SO THAT THESE PRODUCTS WOULD NOT BE TOO EXPENSIVE

10   COMPARED TO THE OTHER PILLOWS OR PRODUCTS OUT IN THE MARKET,

11   PILLOWS OR COMFORTERS.

12   Q.   AND AT THE BOTTOM OF THIS, THERE IS SOME LANGUAGE THAT

13   SAYS "PROMOTION COMMITMENT."  WHAT IS PROMOTION COMMITMENT?

14   A.   SO IN ALMOST ALL OF OUR CONTRACTS, IN ADDITION TO THOSE

15   BENEFITS, WE HAVE WHAT'S CALLED A MARKETING COMMITMENT OR

16   PROMOTIONAL COMMITMENT.  SO IT'S IN ADDITION TO THE ROYALTY

17   RATE.

18        SO HERE, LONDON LUXURY IS PAYING US 9 PERCENT OF

19   THEIR SALES IN TERMS OF A CHECK, YOU KNOW, CASH EVERY

20   QUARTER.  THE PROMOTIONAL COMMITMENT IS NOT PAID TO COLUMBIA,

21   BUT IT'S AN AMOUNT THAT THE LICENSEE, HERE LONDON LUXURY

22   HERE, IS SAYING, WE'LL SPEND AT LEAST AN ADDITIONAL ONE

23   PERCENT OF OUR SALES ON MARKETING.

24        BUT, AGAIN, THIS IS A FLOOR.  MOST OF OUR LICENSEES

25   END UP SPENDING THREE, FIVE, TO FIVE, MAYBE UPWARDS OF 10

869

1    PERCENT ON MARKETING THOSE GOODS.  IT'S JUST A BARE MINIMUM

2    THAT THEY HAVE TO SPEND.

3    Q.   SO THIS ONE PERCENT IS AN AGREEMENT THAT THEY ARE GOING

4    TO ADVERTISE COLUMBIA'S BRANDED PRODUCTS IN THE MARKET?

5    A.   YEAH, ADVERTISE BROADLY.  THEY WILL GO TO TRADE SHOWS.

6    THEY CAN DO WHAT WE CALL P.O.P., POINT OF PURCHASE.  YOU

7    KNOW, THE SIGNS ABOVE THE RACKS THAT SAY "COLUMBIA," A LOT OF

8    TIMES, THE BRANDS HAVE TO PAY FOR THAT.  SO THEY WILL DO

9    THINGS TO REALLY PROMOTE THESE PRODUCTS.

10           BUT EVERY TIME THEY DO THAT, IT HAS THE COLUMBIA

11   BRAND; RIGHT.  THEY ARE NOT SAYING "LONDON LUXURY."  THEY ARE

12   SAYING "COLUMBIA."

13   Q.   AND SO IS THAT ONE PERCENT PROMOTION COMMITMENT, IS THAT

14   A BENEFIT TO COLUMBIA OR IS THAT A BENEFIT TO LONDON

15   LUXURY?

16   A.   WELL, BECAUSE THOSE ARE OUR BRAND AND OUR TECHNOLOGIES

17   THAT THEY ARE PROMOTING, IT'S A BENEFIT TO COLUMBIA.

18   Q.   SO IF I COULD -- IF I HAD A BIGGER PIECE OF PAPER, THAT

19   WOULD GO ON THE BOTTOM OF THE LIST HERE AS ANOTHER BENEFIT TO

20   COLUMBIA?

21   A.   YEAH.  I WOULD SAY THAT'S -- ON 95 PERCENT OF OUR

22   AGREEMENTS, THERE IS A PROMOTIONAL COMMITMENT.

23   Q.   AND IF WE CAN GO TO -- BEHIND THIS LICENSING CONTRACT

24   INITIALIZATION SHEET.  IF WE GO TO THE NEXT PAGE, IS THIS THE

25   AGREEMENT ITSELF ATTACHED TO THAT?

870

1    A.    YES.  THAT'S THE ACTUAL LICENSING AGREEMENT.

2              MR. ALDRICH:  OKAY.  AS PART OF EXHIBIT 88.  IF WE

3    CAN GO TO THE PAGE THAT ENDS IN 688.  CAN WE ZOOM IN ON THE

4    PARAGRAPH AT THE TOP OF THE PAGE.

5    Q.    MR. MERRIMAN, IF YOU NEED A MOMENT TO READ THAT, THAT'S

6    FINE.  BUT MY QUESTION IS WHAT GENERALLY DOES CLAUSE 7.2 IN

7    THIS AGREEMENT COVER?

8    A.    IT MEANS THAT ANY OF THE STYLES THAT O.C.S. DESIGNED --

9    LONDON LUXURY DESIGNS BELONG TO COLUMBIA.  SO THEY CREATE IT,

10   THEY SELL IT; BUT ULTIMATELY THOSE DESIGNS ARE PROPERTY OF

11   COLUMBIA SPORTSWEAR.

12   Q.    AND SO IF THEY DESIGN A COMFORTER, WHO OWNS THE

13   DESIGN?

14   A.    COLUMBIA.

15   Q.    IS THAT A BENEFIT TO COLUMBIA OR IS THAT A BENEFIT TO

16   LONDON LUXURY?

17   A.    THAT'S ANOTHER BENEFIT TO COLUMBIA.

18   Q.    AND SO IF I HAD ROOM ON THIS PIECE OF PAPER, THE FACT

19   THAT ALL OF THE DESIGNS ARE THEN TRANSFERRED TO COLUMBIA'S

20   OWNERSHIP, THAT WOULD BE ANOTHER BENEFIT TO COLUMBIA?

21   A.    THAT'S CORRECT.

22   Q.    LET'S LOOK AT EXHIBIT 90.

23              DO YOU RECOGNIZE EXHIBIT 90?

24   A.    I DO.

25   Q.    WHAT IS EXHIBIT 90?

871

1    A.    THIS IS ANOTHER ONE OF THOSE INITIALIZATION SHEETS THAT

2    GOES OUT WITH A LICENSING AGREEMENT SUMMARIZING THAT

3    AGREEMENT.

4    Q.    AND IF WE ZOOM IN ON THE KEY TERMS AT THE BOTTOM.

5    A.    I'LL SAY THIS IS FOR ONE OF OUR LICENSEES CALLED

6    THE OUTDOOR RECREATION GROUP.  AND I JUST REFER TO THEM AS

7    "TORG."

8          TORG MAKES BACKPACKS, TENTS, SLEEPING BAGS,

9    HARD-GOOD ACCESSORIES FOR US.  WATER BLADDERS THAT WOULD GO

10   ON BACKPACKS TO HYDRATE, YOU KNOW, KIND OF LIKE A CAMEL BACK.

11   Q.    AND IS TORG A COMPETITOR OF COLUMBIA'S?

12   A.    NO.  THEY ARE OUR PARTNER.

13   Q.    AND WHY DID -- WELL, FIRST OF ALL, DOES THIS AGREEMENT

14   COVER OMNI-HEAT?

15   A.    IT DOES.

16   Q.    OKAY.  DOES IT COVER THE DESIGN PATENTS AS WELL?

17   A.    IT DOES.

18   Q.    AND WHY DID COLUMBIA ENTER AN AGREEMENT WITH TORG TO

19   ALLOW TORG TO MANUFACTURE OMNI-HEAT PRODUCTS?

20   A.    WELL, CERTAIN CATEGORIES IT WOULDN'T MAKE SENSE TO PUT

21   OMNI-HEAT.  IF YOU WERE CREATING A FORK FOR CAMPING, IT

22   DOESN'T MAKE SENSE.  BUT THE CATEGORIES WHERE IT DID MAKE

23   SENSE IS, WHERE WE WERE EXCITED ABOUT IT WAS SLEEPING BAGS TO

24   KEEP YOU WARM; RIGHT.  YOU PUT OMNI-HEAT ON THE INSIDE OF A

25   SLEEPING BAG.  AND THAT WAS OUR INTENT.

872

1    Q.    AND THERE IS A ROYALTY RATE IN THIS AGREEMENT?

2    A.    YEAH.  THERE IS ACTUALLY TWO.

3    Q.    AND WHAT'S THE ROYALTY RATE THAT'S GOING TO COVER

4    OMNI-HEAT IN SLEEPING BAGS?

5    A.    THAT WOULD BE 8 PERCENT.

6    Q.    AND WHY AGAIN DOES THIS CONTRACT HAVE A LOWER ROYALTY

7    RATE THAN THE DELTA GALIL AGREEMENT FOR SOCKS OR O.C.S.

8    AGREEMENT FOR JACKETS AND SHIRTS?

9    A.    HARD GOODS, TENTS ESPECIALLY, SLEEPING BAGS AS WELL HAVE

10   AMONG THE LOWEST MARGIN IN THE INDUSTRY, MEANING THE

11   COMPANIES THAT SELL THOSE PRODUCTS MAKE THE SMALLEST

12   PERCENTAGE OF PROFIT ON ANY INDIVIDUAL SALE.  AND THAT'S WHY

13   FOR TENTS AND SLEEPING BAGS, THERE IS A LOWER ROYALTY THAN

14   THERE WOULD BE FOR BACKPACKS OR OTHER CATEGORIES.

15   Q.    THE SAME CONSIDERATIONS THAT GO INTO COMFORTERS I

16   ASSUME?

17   A.    YEAH.  IF YOU THINK ABOUT HOW MUCH -- ON THE INSIDE OF

18   ONE OF THOSE SLEEPING BAGS, HOW MUCH OMNI-HEAT WOULD ACTUALLY

19   HAVE TO BE USED COMPARED TO SAY THE INSIDE OF A GLOVE OR HAT.

20   IT'S A PRETTY SUBSTANTIAL DIFFERENCE.

21   Q.    AND WITHOUT WALKING THROUGH EACH CLAUSE IN THE

22   AGREEMENT, THE BENEFITS TO COLUMBIA IN THIS AGREEMENT, ARE

23   THEY THE SAME AS THE BENEFITS TO COLUMBIA IN THE DELTA GALIL

24   AGREEMENT AND THE LONDON LUXURY AGREEMENT?

25   A.    THEY ARE.

873

1    Q.   IN FACT, IS IT THE SAME FORM AGREEMENT?

2    A.   YEAH.  WE START OFF WITH THE SAME BASE TEMPLATES.  WE'RE

3    NOT REDRAFTING THIS 40-PAGE DOCUMENT EVERY TIME.

4    Q.   AND THAT FORM AGREEMENT IS COLUMBIA'S FORM?

5    A.   IT'S COLUMBIA'S FORM, FAVORABLE TO US.

6    Q.   HAVE YOU OR YOUR DEPARTMENT EVER CONSIDERED LICENSING

7    OMNI-HEAT TO ANY COMPETITORS?

8    A.   NEVER.

9    Q.   AND WHY IS THAT?

10   A.   IT IS SO IMPORTANT FOR COLUMBIA FOR OMNI-HEAT TO BE

11   ASSOCIATED WITH COLUMBIA SPECIFICALLY, NOT AS GORTEX THAT'S

12   ON A WHOLE BUNCH OF DIFFERENT BRANDS.  WE WANT CONSUMERS TO

13   KNOW THAT COLUMBIA IS THE COMPANY THAT PUTS THE REFLECTIVE

14   MATERIAL ON THE INSIDE OF GARMENTS AND ACCESSORIES TO KEEP

15   YOU WARM.

16        AND LICENSING TO A COMPETITOR WOULD HAVE DILUTED

17   THAT AND WOULD HAVE NOT BEEN CONSISTENT WITH THOSE GUIDED

18   PRINCIPLES THAT I TALKED ABOUT YESTERDAY.

19   Q.   HAVE YOU OR YOUR DEPARTMENT EVER LICENSED OMNI-HEAT TO

20   BE USED WITHOUT COLUMBIA'S BRAND NAME?

21   A.   NEVER.

22   Q.   HAVE YOU OR YOUR DEPARTMENT EVER LICENSED OMNI-HEAT TO

23   BE LICENSED FOR PERIODS OF TIME SUCH AS SAY 17 YEARS?

24   A.   NO.  IN FACT, QUITE THE OPPOSITE.  MOST OF OUR LICENSING

25   AGREEMENTS ARE PRETTY SHORT, ESPECIALLY THESE THAT INVOLVE

874

```
1    OMNI-HEAT.  WE KEEP THEM -- THREE TO FOUR YEARS IS TYPICALLY
2    THE LENGTH OF PERIOD OF TIME THAT WE GIVE IN ANY AGREEMENT.
3    Q.   WOULD YOU HAVE LICENSED OMNI-HEAT TO SEIRUS IN 2013 IF
4    THEY HAD APPROACHED YOU?
5    A.   NO.
6    Q.   NOW, I'D LIKE YOU TO HYPOTHETICALLY ASSUME FOR A MOMENT
7    THAT SEIRUS ASKED TO HAVE A LICENSE TO PRACTICE OMNI-HEAT
8    BACK IN 2013.  OKAY?
9    A.   OKAY.
10   Q.   AND THEY WANTED A LICENSE THAT WAS GOING TO LAST FOR THE
11   REMAINING 17 YEARS OF LIFE THAT WAS ON THE PATENT.
12   A.   OKAY.
13   Q.   AND I'D LIKE YOU TO ALSO ASSUME FOR A MOMENT THAT SEIRUS
14   WAS NOT GOING TO SELL ANY OF ITS PRODUCTS BRANDED AS COLUMBIA
15   PRODUCTS.  IT WAS INSTEAD GOING TO SELL THOSE PRODUCTS
16   BRANDED AS SEIRUS PRODUCTS.
17   A.   OKAY.
18   Q.   I'D ALSO LIKE FOR YOU TO ASSUME FOR A MOMENT THAT
19   COLUMBIA WAS NO LONGER GOING TO HAVE THE OPPORTUNITY TO
20   CONTROL QUALITY OR ADVERTISING.  IT WAS NOT GOING TO HAVE ANY
21   APPROVAL RIGHTS AT ALL OVER HOW SEIRUS USED THE PRODUCT.
22   OKAY.
23   A.   UNDERSTOOD.
24   Q.   AND THAT SEIRUS INSTEAD WAS GOING TO SELL ITS PRODUCTS
25   BRANDED AS SEIRUS PRODUCTS AND THAT SEIRUS WAS PLANNING ON
```

875

1    USING THE PATENTS ON GLOVES.

2    A.   OKAY.

3    Q.   AND COMPETING AGAINST COLUMBIA IN THE SAME STORES WHERE

4    COLUMBIA SELLS OMNI-HEAT GLOVES.

5    A.   OKAY.

6    Q.   WHAT WOULD YOUR RESPONSE HAVE BEEN?

7    A.   I WOULD -- EXCUSE ME.  I WOULD HAVE BEEN SHOCKED BECAUSE

8    THAT JUST DOESN'T HAPPEN.  YOU DON'T GET CALLS FROM

9    COMPETITORS TO USE YOUR PRODUCT.  AND I WOULD HAVE BEEN A

10   LITTLE BIT CURIOUS, BUT I WOULDN'T REALLY HAVE KNOWN WHAT TO

11   SAY OTHER THAN NO.  BUT, YOU KNOW, I WOULD HAVE BEEN CURIOUS

12   TO KNOW WHAT THEY WERE THINKING OR WHY THEY WERE EVEN

13   REACHING OUT.

14        MR. ALDRICH:  CAN WE TURN TO EXHIBIT 253, THE VERY

15   LAST PAGE.  THIS HAS ALREADY BEEN ADMITTED.

16   Q.   THIS IS YOUR POWERPOINT PRESENTATION WE TALKED ABOUT

17   YESTERDAY?

18   A.   IT IS.

19   Q.   AND WHO'S SHOWN ON THE LEFT HERE -- ON THE RIGHT?

20   A.   THAT IS MRS. BOYLE.

21   Q.   THIS IS MRS. BOYLE, THE CHAIRMAN OF THE BOARD?

22   A.   SHE'S CHAIRMAN OF THE BOARD, MOTHER OF OUR CEO.  HER

23   PARENTS FOUNDED THE COMPANY.

24   Q.   IT SAYS AT THE TOP, "MOTHER RULES THE FIELD"?

25   A.   SHE GOES BY MA BOYLE SOMETIMES.

COMPUTER-AIDED TRANSCRIPTION

876

1    Q.    MA BOYLE?

2          THE REPORTER:  I'M SORRY?

3          THE WITNESS:  SHE GOES BY MA BOYLE.

4    Q.    BY MR. ALDRICH:  AGAIN, WE'RE TALKING ABOUT A SITUATION

5    WHERE SEIRUS WAS GOING TO ASK FOR A LICENSE THAT REMOVED ALL

6    OF THESE CLAUSES; RIGHT.

7    A.    OKAY.

8    Q.    NO FACTORY APPROVALS.  THEY ARE ALLOWED TO MODIFY THE

9    PRODUCT.  THEY ARE NOT GOING TO GIVE YOU PRODUCT SAMPLES.

10   YOU GET NO PRODUCT APPROVAL.  YOU GET NO ADVERTISING

11   APPROVAL.  YOU GET NO MINIMUM GUARANTEED.  OKAY.  THIS IS THE

12   LICENSE AGREEMENT THAT SEIRUS WANTS IN 2013.

13         AND YOUR ANSWER WOULD HAVE BEEN?

14   A.    NO.

15   Q.    I'D LIKE YOU TO ASSUME FOR A MOMENT THAT MA BOYLE CAME

16   TO YOU AND SAID, FOR WHATEVER REASON YOU DON'T UNDERSTAND,

17   SHE SAYS, LOOK, I WANT YOU TO STRIKE A DEAL WITH THESE

18   PEOPLE.  OKAY?

19   A.    OKAY.

20   Q.    I WANT YOU TO ENTER INTO A NEGOTIATION WITH SEIRUS, AND

21   I WANT YOU TO STRIKE A DEAL AND LET THEM HAVE AN AGREEMENT.

22   OKAY?

23   A.    OKAY.

24   Q.    HOW WOULD YOU HAVE APPROACHED THE PROCESS OF THE

25   NEGOTIATION AND TRYING TO FIGURE OUT WHAT YOUR OPENING OFFER

877

1    WOULD HAVE BEEN?

2    A.    WELL, FIRST, IF MA BOYLE TELLS YOU TO DO SOMETHING, YOU

3    DO IT.  SO IT WOULD HAVE BEEN, AGAIN, HIGHLY UNUSUAL FOR ME

4    TO DO THIS TYPE OF AGREEMENT, BUT WHERE I WOULD HAVE STARTED

5    IN THE NEGOTIATION PROCESS IS I WOULD HAVE HAD TO MAKE SOME

6    ASSUMPTIONS.

7         I WOULD HAVE WANTED TO TRY TO FIGURE OUT HOW MUCH

8    THAT THIS OTHER COMPANY, SEIRUS, WAS GOING TO MAKE ON THIS

9    PRODUCT.  AND THEN GENERALLY WHAT I WOULD HAVE DONE IS TRIED

10   TO GET MOST OF THAT PROFIT MYSELF, LEAVING ONLY A LITTLE BIT

11   FOR THEM.  THAT WAY, THEY GET SOME BENEFIT, BUT WE GET AS

12   MUCH BENEFIT AS POSSIBLE, BECAUSE WE'D BE GIVING UP A LOT OF

13   OTHER PROTECTIONS AND RIGHTS AND BENEFITS THAT WE HAVE IN OUR

14   OTHER AGREEMENTS.

15   Q.    AND SO WHAT ASSUMPTION WOULD YOU HAVE MADE, OR HOW WOULD

16   YOU HAVE COME TO AN ASSUMPTION ABOUT SEIRUS' PROFITS?

17   A.    WELL, AGAIN, WE TALKED ABOUT DIFFERENT CATEGORIES HAVE

18   DIFFERENT PROFITABILITY, AND I WOULD HAVE STARTED WITH THAT.

19   SO I WOULD SAY, OKAY, IF WE'RE TALKING GLOVES AND SKULL CAPS,

20   AND I WOULD TRY TO THINK, OKAY, THAT'S A MORE PROFITABLE

21   CATEGORY.  I WOULD HAVE LOOKED AT OUR OWN BUSINESS AND SEEN

22   HOW MUCH MONEY WE MAKE.

23        THOSE ARE -- WE MAKE GLOVES OURSELVES, COLUMBIA DOES

24   THAT; THEY ARE NOT LICENSED OUT.  SO WE DO HAVE MORE

25   INFORMATION.  I DON'T MANAGE THAT BUSINESS, BUT I KNOW

878

1    ROUGHLY THAT THEY ARE A HIGHER PROFITABILITY CATEGORY.

2    Q.    DO YOU HAVE A GENERAL SENSE OF THE PROFITABILITY OF YOUR

3    ACCESSORY LINES LIKE GLOVES AND HATS AND SOCKS?

4    A.    WELL, GENERALLY THE MARGINS ARE HIGHER.  SO THE MARGINS

5    FOR THOSE CATEGORIES WOULD HAVE BEEN IN THE BALLPARK OF 50 TO

6    55 PERCENT.  AND THAT'S WHAT I WOULD HAVE ASSUMED THAT SEIRUS

7    WAS MAKING AS WELL.

8    Q.    AND SO BASED ON THAT ASSUMPTION, AGAIN, YOU SAID YOU

9    WANTED TO LEAVE A LITTLE BIT OF MONEY FOR THEM; RIGHT?

10   A.    RIGHT.  MY INTENTION WOULD NOT BE TO TAKE EVERY PENNY

11   THAT THEY WERE MAKING, SINCE WE WOULD NEVER COME TO A DEAL IF

12   I TOOK EVERY PENNY.  BUT IF THEY MAKE A LITTLE BIT OF AN

13   AMOUNT OF MONEY, THEN THERE IS SOME BENEFIT TO THEM.

14   Q.    AND SO WHAT WOULD YOUR OPENING OFFER HAVE BEEN TO SEIRUS

15   IN THIS SITUATION?

16   A.    SO THEIR MARGIN WAS 50 TO 55 PERCENT, THAT DOESN'T

17   ACCOUNT FOR SOME OF THE OVERHEAD THAT WOULD BE ASSOCIATED.

18   SO THERE WOULD BE SOME ADDITIONAL COSTS THAT WOULDN'T BE

19   CAPTURED IN THAT 50 TO 55 PERCENT.

20         SO I WOULD HAVE STARTED AT IN THE BALLPARK OF

21   35-PERCENT ROYALTY RATE IS WHAT WOULD HAVE BEEN MY FIRST

22   OFFER.

23   Q.    YOUR OPENING OFFER WOULD HAVE BEEN 35 PERCENT?

24   A.    IT WOULD HAVE BEEN.

25   Q.    AND DO YOU HAVE AN IDEA, JUST BASED ON YOUR EXPERTISE IN

879

1    SEVEN YEARS OF NEGOTIATING LICENSES, WHERE THIS ULTIMATE

2    ROYALTY AGREEMENT WOULD HAVE COME OUT?

3    A.    WELL, THESE THINGS GENERALLY GO BACK AND FORTH.  MY GOAL

4    WOULD BE TO TRY TO STAY AS CLOSE TO 35 PERCENT AND GET AS

5    MUCH OF THAT FOR COLUMBIA AS POSSIBLE.  BUT I WOULD ASSUME

6    THAT WE WOULD HAVE LANDED BETWEEN 20 AND 30 PERCENT.

7    Q.    IS THERE A POINT AT WHICH IT'S NOT WORTH GOING TO

8    MANAGEMENT WITH A DEAL?

9    A.    YEAH.  I MEAN, ULTIMATELY I'M RESPONSIBLE FOR THIS

10   DEPARTMENT.  AND IF WE DO A BAD DEAL, IT'S ON ME.  AND YOU

11   HAVE TO REMEMBER, WE'RE GETTING 10 TO 15 PERCENT ON OUR OTHER

12   LICENSES FOR PRODUCTS THAT HAVE OUR BRAND ON IT, WE GET OTHER

13   BENEFITS FROM IT.

14         AND THEN THE OTHER THING THAT WE HAVE TO TAKE INTO

15   ACCOUNT IS NONE OF THESE PRODUCTS WITH OUR OTHER LICENSEES,

16   WITH DELTA OR TORG, THOSE DON'T COMPETE WITH COLUMBIA.  THEY

17   ARE COLUMBIA-BRANDED PRODUCTS.  THESE PRODUCTS WOULD COMPETE

18   WITH THE PRODUCTS THAT OUR TEAM IS TRYING TO SELL.  AND EVERY

19   GLOVE THAT THEY SELL WITH THE INFRINGING TECHNOLOGY ON IT IS

20   POTENTIALLY A LOST SALE FOR COLUMBIA.

21         SO NOT ONLY DO WE HAVE TO ACCOUNT FOR THE FACT THAT

22   WE'RE 10 TO 15 PERCENT IN OUR NORMAL -- OUR NORMAL LICENSE

23   AGREEMENTS ARE NONCOMPETITIVE.  WE WOULD ALSO HAVE TO ACCOUNT

24   FOR THE LOST SALES TO COLUMBIA OF COLUMBIA GLOVES THAT HAVE

25   OMNI-HEAT IN IT.  AND THAT'S WHY, FOR ME, THERE IS NO WAY

880

1    THAT I COULD GO LESS THAN 20 PERCENT.

2           I MEAN, I WOULDN'T EVEN BRING IT TO MANAGEMENT AND

3    TRY TO POSE IT AS A REASONABLE DEAL.  EVEN IF MA BOYLE IS

4    PRESSURING, I'D SAY, YOU CAN'T GO LESS THAN 20 PERCENT.

5    COLUMBIA WOULD BE LOSING MONEY ON THIS DEAL BECAUSE OF

6    POTENTIAL LOST SALES.

7    Q.   NOW, ARE YOU AWARE OF SOMETHING CALLED THE

8    GEORGIA-PACIFIC FACTORS?

9    A.   I AM.

10   Q.   OKAY.  AND GEORGIA-PACIFIC FACTORS ARE 15 FACTORS THAT

11   GO INTO DETERMINING A REASONABLE ROYALTY?

12   A.   THAT'S CORRECT.

13   Q.   AND IS YOUR UNDERSTANDING THAT YOU ARE TESTIFYING TODAY

14   ONLY ABOUT FACTOR NO. 15?

15   A.   THAT IS MY UNDERSTANDING.

16           MR. ALDRICH:  NO FURTHER QUESTIONS, YOUR HONOR.

17           THE COURT:  CROSS-EXAMINE.

18           DO YOU WANT THAT MOVED OUT OF THE WAY?

19           MS. ROTHAUGE:  I'M GOING TO USE IT.  THANK YOU, YOUR

20   HONOR, FOR ASKING, THOUGH.

21           THE COURT:  OKAY.

22                      CROSS-EXAMINATION

23   BY MS. ROTHAUGE:

24   Q.   GOOD MORNING, MR. MERRIMAN.

25   A.   GOOD MORNING.

1  Q.   I UNDERSTAND YOU'VE BEEN AT COLUMBIA FOR ABOUT SEVEN

2  YEARS; IS THAT RIGHT?

3  A.   THAT'S CORRECT.

4  Q.   AND ISN'T IT TRUE THAT DURING THAT SEVEN YEARS, YOU'VE

5  BEEN IN THE LICENSING DEPARTMENT?

6  A.   I HAVE.

7  Q.   AND ISN'T IT TRUE THAT THIS IS YOUR FIRST EVER FULL-TIME

8  JOB IN THE LICENSING AREA?

9  A.   IT IS.

10  Q.   AND YOU'VE BEEN DOING IT FOR SEVEN YEARS; RIGHT?

11  A.   I HAVE.

12  Q.   AND YOU HAVE HAD A PRETTY RAPID ASCENT UP THE CORPORATE

13  LADDER IN THE LICENSING DEPARTMENT, HAVEN'T YOU?

14  A.   I'VE BEEN FORTUNATE, YES.

15  Q.   YOU STARTED JUST AT THE KIND OF COMING ENTRY LEVEL.  YOU

16  WERE PRODUCT MANAGER, RIGHT, INITIALLY FOR A COUPLE YEARS?

17  A.   YEAH.  I MANAGED ALL OF OUR COLLEGIATE BUSINESS AND ALL

18  THE LICENSES ASSOCIATED WITH THAT.

19  Q.   AND THEN YOU WERE A DIRECTOR FOR A COUPLE YEARS AFTER

20  THAT; RIGHT?

21  A.   THAT'S CORRECT.

22  Q.   AND THEN MOST RECENTLY, I THINK ABOUT EIGHT MONTHS AGO,

23  YOU WERE PROMOTED TO SENIOR LICENSING DIRECTOR; RIGHT?

24  A.   THAT'S CORRECT.

25  Q.   OKAY.  SO YOU'RE THE GUY IN CHARGE OF LICENSING AT

1    COLUMBIA; IS THAT RIGHT?

2    A.   PRODUCT LICENSING, YEAH.  I MANAGE MOST LICENSES.

3    Q.   IS THERE ANYONE ELSE MORE EXPERIENCED THAN YOU AT

4    LICENSING AT COLUMBIA?

5    A.   AS IT RELATES TO PRODUCT LICENSING, NO.

6    Q.   SO YOU ARE THE MOST -- WITH YOUR SEVEN YEARS OF

7    EXPERIENCE, YOU'RE THE MOST EXPERIENCED PERSON AT COLUMBIA ON

8    LICENSING; RIGHT?

9    A.   THAT'S MY UNDERSTANDING.

10   Q.   SO COLUMBIA REALLY HAS NOT HAD A BIG LONG HISTORY OF

11   LICENSING, GIVEN THAT THEY HAVE ONLY REALLY HAD THIS

12   EXPERTISE FOR SEVEN YEARS WITH YOU; ISN'T THAT RIGHT?

13   A.   WELL, WE'VE BEEN LICENSING SINCE ABOUT 2000 I'D SAY IS

14   WHERE OUR LICENSING STARTED.

15   Q.   IS THAT BEFORE YOU WERE THERE?

16   A.   YES.

17   Q.   OH, IT WAS SOMEBODY ELSE WORKING ON THAT LICENSING

18   PROGRAM BEFORE?

19   A.   YES.

20   Q.   OH, SO THERE ARE OTHER PEOPLE WHO HAVE MORE INFORMATION

21   ABOUT THE HISTORY OF THE LICENSING AT COLUMBIA; IS THAT

22   RIGHT?

23   A.   WELL, ABOUT THE HISTORY?  I MEAN, THERE ARE PEOPLE THAT

24   WERE DOING IT THAT ARE STILL IN THE BUILDING THAT I WORK

25   WITH.  BUT I WOULD SAY THAT, YOU KNOW, WE'VE GROWN THE

883

1    DEPARTMENT MUCH LARGER THAN IT WAS AT THAT TIME.

2    Q.   I UNDERSTAND THAT.  I'M JUST TRYING TO GET A SENSE --

3    A.   YEAH.

4    Q.   -- OF IS THERE SOME HISTORICAL -- IS THERE SOMEBODY WHO

5    HAS A BROADER HISTORY OF LICENSING AT COLUMBIA.  CAN YOU

6    IDENTIFY THAT PERSON FOR US?

7    A.   NO, NOT AS IT RELATES TO PRODUCT LICENSING.

8    Q.   BUT THERE IS SOMEBODY -- SO FORGET I SAID PRODUCT

9    LICENSING.  ANSWER ME THE MORE GENERAL QUESTION, WHICH IS, IS

10   THERE SOMEBODY WHO HAS DONE MORE LICENSING DEALS OF ANY KIND

11   ON BEHALF OF COLUMBIA OTHER THAN YOU?

12   A.   NO.

13   Q.   OKAY.  IS THERE SOMEBODY MORE EXPERIENCED WHO HAS AN

14   UNDERSTANDING OF THE HISTORY OF COLUMBIA'S LICENSING

15   PRACTICES BEFORE YOU GOT THERE?

16   A.   THERE IS SOMEONE WHO WAS DOING IT BEFORE, BUT I WOULDN'T

17   SAY THEY KNOW THE HISTORY BETTER THAN I DO.

18   Q.   OKAY.  TELL ME WHO THAT IS.

19   A.   TOM.

20   Q.   I'M SORRY.  WHAT WAS HIS NAME?

21   A.   TOM MILLER.

22   Q.   TOM MILLER.  SO TOM MILLER WAS DOING LICENSES BEFORE YOU

23   GOT THERE?

24   A.   THAT'S CORRECT.

25   Q.   WAS THERE ANYONE ELSE?

COMPUTER-AIDED TRANSCRIPTION

884

1    A.   THERE WERE A COUPLE SHORT-TERM PEOPLE THAT HAD HELD THE

2    POSITION BETWEEN TOM MILLER AND MYSELF.

3    Q.   HOW LONG HAD TOM MILLER BEEN THERE?

4    A.   I'M NOT SURE EXACTLY.  HE'S BEEN WITH THE COMPANY FOR A

5    VERY LONG TIME.

6    Q.   DID YOU SAY A VERY LONG TIME?

7    A.   HE'S BEEN WITH THE COMPANY.  HE WAS IN LICENSING I THINK

8    SINCE SOMETIME IN THE 2000'S.

9    Q.   OKAY.  SO WAS HE IN ANOTHER POSITION BEFORE?

10   A.   I BELIEVE SO, BUT I'M NOT POSITIVE.

11   Q.   SO MR. MILLER HAD 17-PLUS YEARS OF EXPERIENCE AT

12   COLUMBIA, AND AT LEAST 17 OF THOSE YEARS HAD SOME INVOLVEMENT

13   WITH LICENSING; IS THAT RIGHT?

14   A.   I THINK HIS LICENSING TIME WAS PROBABLY FIVE OR SO YEARS

15   APPROXIMATELY.

16   Q.   PRIOR TO YOU GETTING THERE?

17   A.   YEAH.

18   Q.   LET'S TALK A LITTLE BIT ABOUT YOUR -- WHAT YOU DID

19   BEFORE YOU GOT TO COLUMBIA AND BEGAN YOUR LICENSING CAREER.

20        IT TURNS OUT I LOOKED AT YOUR LINKEDIN WEBPAGE.  SO

21   THIS IS YOUR RESUME YOU PUT OUT ONLINE FOR THE WORLD TO SEE;

22   RIGHT?

23   A.   YEAH.

24   Q.   AND IT LOOKS LIKE YOU'RE NO STRANGER TO LITIGATION OR

25   LAWSUITS; RIGHT?

885

1    A.   WELL, I WAS -- I PRACTICED FOR A VERY SHORT PERIOD OF

2    TIME.

3    Q.   WELL, YOU WORKED AT NIKE FOR A WHILE, DIDN'T YOU?

4    A.   I WAS AN EXTERN AT NIKE.  I MEAN, I WAS IN LAW SCHOOL,

5    AND I WAS IN THEIR LEGAL DEPARTMENT WHEN I WAS THERE.

6    Q.   AND YOU SAY THAT WHEN YOU WERE A LAW STUDENT AT NIKE,

7    THAT YOU ASSISTED WITH LITIGATION FOR VARIOUS INTERNAL NIKE

8    CLIENTS; IS THAT CORRECT?

9    A.   I DID LITIGATION PREP, YEAH.

10   Q.   YEAH.  SO YOU HELPED NIKE WITH ITS LAWSUITS; RIGHT?

11   A.   I HELPED NIKE DO SOME RESEARCH, YES.

12   Q.   OKAY.  SO YOU KNOW HOW TO -- YOU HELPED NIKE PREPARE FOR

13   LAWSUITS; IS THAT RIGHT?

14   A.   I DID RESEARCH FOR NIKE AS I WAS ASKED TO DO CERTAIN

15   RESEARCH PROJECTS.

16   Q.   YEAH.  AND IT ALSO SAID YOU DID MULTIPLE -- YOU WORKED

17   FOR MULTIPLE GROUPS, AND ONE OF THOSE GROUPS WAS THE

18   LITIGATION GROUP.

19        SO YOU EXTERNED FOR THE LITIGATION GROUP AT NIKE; IS

20   THAT RIGHT?

21   A.   YES.

22   Q.   AND THEN YOU WENT OUT TO FROHNMAYER DEATHERAGE; IS THAT

23   CORRECT?

24   A.   THAT'S CORRECT.

25   Q.   AND FOR THOSE OF US WHO AREN'T FAMILIAR WITH OREGON,

1    THAT'S ONE OF THE PREMIER TRIAL LAW FIRMS IN OREGON, ISN'T

2    IT?

3    A.   YOU CAN CLASSIFY THEM THAT WAY.  THEY ARE A SMALL-TOWN

4    LAW FIRM.

5    Q.   YEAH.  BUT ALL THEY DO IS LAWSUITS; RIGHT?

6    A.   THAT'S NOT ALL THEY DO, NO.

7    Q.   WELL, THEY HAVE A REPUTATION FOR HANDLING LAWSUITS;

8    RIGHT?

9    A.   SURE.  I WORKED ON WILLS AND FAMILY LAW STUFF AS WELL.

10   I MEAN, IT'S A SMALL-TOWN LAW FIRM.  IT DOES A LITTLE BIT OF

11   EVERYTHING.

12   Q.   I'M SORRY.  YOU'RE DENYING THAT FROHNMAYER DEATHERAGE

13   HAS A REPUTATION FOR BEING AN EXCELLENT TRIAL LAW FIRM IN

14   OREGON?

15   A.   NO.  LIKE MOST SMALL-TOWN LAW FIRMS, THEY DO A VERY

16   BROAD RANGE OF WORK.

17   Q.   OKAY.  I'LL ACCEPT YOUR UNDERSTANDING OF WHAT THAT FIRM

18   DOES.

19   A.   YEAH.

20   Q.   ONE OF THE THINGS YOU DID THERE, THOUGH, WAS YOU

21   PREPARED CIVIL LITIGATION CLIENTS FOR TRIAL?

22   A.   YES.

23   Q.   SO TELL ME ABOUT THAT.  SO THAT MEANS YOU HELPED PEOPLE

24   GET READY FOR TRIAL; RIGHT?

25   A.   NOT NECESSARILY PEOPLE.  I WOULDN'T CLASSIFY IT AS THAT.

887

1    THE MAJORITY OF WHAT WE DID WAS CASES INVOLVING AUTO

2    ACCIDENTS, AND I DID A LOT OF RESEARCH IN GOING THROUGH

3    MEDICAL RECORDS IS LARGELY HOW I SPENT MY TIME, JUST TRYING

4    TO FIND OUT IF THE CLAIMS WERE LEGITIMATE OR NOT.

5    Q.   SO WHEN YOU PREPARED LITIGATION CLIENTS FOR TRIAL, YOU

6    WEREN'T REALLY -- YOU SAY YOU WERE PREPARING THEM FOR TRIAL.

7    BUT IS THAT NOT TRUE, YOU ACTUALLY WERE ONLY KIND OF

8    ANALYZING CLAIMS FOR TRIAL?

9    A.   WELL, OUR CLIENTS WERE GENERALLY INSURANCE COMPANIES,

10   AND I WAS REVIEWING RECORDS AND CREATING SUMMARIES ON THOSE

11   RECORDS.

12   Q.   WELL, IT WOULD BE FAIR TO SAY THAT YOU'RE FAMILIAR WITH

13   THE LITIGATION PROCESS AND YOU'VE HAD EXPERIENCE WITH

14   LITIGATION; IS THAT RIGHT?

15   A.   I'LL TELL YOU THE LAST TIME I WAS IN A COURTROOM WAS IN

16   JURY DUTY IN THIS COURTROOM WHEN I WAS LIVING IN SAN DIEGO.

17   SO I WORKED AT THE LAW FIRM FOR A VERY SHORT PERIOD OF

18   TIME.

19   Q.   OKAY.  SO MY QUESTION WAS TOTALLY DIFFERENT.  MY

20   QUESTION WAS, SO YOU ARE FAMILIAR WITH THE LITIGATION

21   PROCESS, BASED UPON THESE JOBS THAT YOU HAD BEFORE GOING TO

22   COLUMBIA; RIGHT?

23   A.   I HAVE WORKED VERY LITTLE IN LITIGATION, BUT I HAVE DONE

24   SOME WORK INVOLVING LITIGATION.

25   Q.   SO AT SOME POINT YOU LEARNED THAT IN THIS CASE, COLUMBIA

888

1    NEEDED A LICENSING EXPERT SO THAT THEY COULD TESTIFY IN THIS

2    TRIAL.  DID YOU LEARN THAT AT SOME POINT?

3    A.    YEAH.

4    Q.    AND AT SOME POINT, YOU LEARNED THAT YOU WERE GOING TO BE

5    GIVING A DEPOSITION IN THIS CASE.  DO YOU RECALL THAT?

6    A.    I DO RECALL THAT.

7    Q.    HOW DID YOU LEARN THAT YOU HAD BEEN SELECTED TO PROVIDE

8    OR TO GIVE A DEPOSITION IN THIS CASE?

9          MR. ALDRICH:  YOUR HONOR, I'M AFRAID WE MAY BE

10   HEADED INTO PRIVILEGED TESTIMONY.

11         THE COURT:  YOUR OBJECTION IS OVERRULED.

12         YOU CAN ANSWER THAT QUESTION.

13         MS. ROTHAUGE:  THAT'S NOT MY INTENT.

14         THE WITNESS:  I WAS INFORMED BY ONE OF OUR INSIDE

15   ATTORNEYS THAT THERE WAS A LAWSUIT AND I MIGHT BE ASKED TO

16   PARTICIPATE IN SOME WAY.

17   Q.    BY MS. ROTHAUGE:  DID YOU HAVE TO CLEAR THAT -- WHEN YOU

18   WERE ASKED THAT, DID YOUR BOSS KNOW ABOUT THAT?

19   A.    I'M NOT SURE WHAT HE KNEW AT THE TIME, IF HE KNEW

20   BEFORE, IF HE BECAME AWARE OF IT LATER.

21   Q.    OKAY.  SO YOU DON'T KNOW WHETHER HE THOUGHT YOU WOULD BE

22   A GOOD PERSON TO GIVE TESTIMONY AND BE AN EXPERT IN THIS

23   CASE, DO YOU?

24   A.    NO.  I DON'T KNOW.

25   Q.    BUT NEVERTHELESS, YOU GAVE A DEPOSITION ON MAY 12 OF

1    2016; ISN'T THAT RIGHT?

2    A.   THAT SOUNDS CORRECT.

3    Q.   AND I'D LIKE TO ASK -- AND MAY 12 OF 2016, THAT WAS LAST

4    YEAR, LAST MAY.  THAT WAS THE FIRST TIME THAT YOU DISCLOSED

5    YOUR OPINION ABOUT WHAT THE PROPER ROYALTY RATE SHOULD BE IN

6    THIS CASE.

7              DO YOU AGREE WITH THAT?

8    A.   YES.

9    Q.   AND ON MAY 12 OF 2016, THAT'S WHEN YOU TESTIFIED UNDER

10   OATH THAT YOU THOUGHT THE RATE SHOULD BE 20 PERCENT; ISN'T

11   THAT RIGHT?

12   A.   I DON'T RECALL EXACTLY WHAT I SAID OR SAYING IT THAT

13   WAY.

14   Q.   DID YOU DISCLOSE IN YOUR DEPOSITION THAT YOU THOUGHT 20

15   PERCENT WOULD BE THE APPROPRIATE RATE?

16   A.   I BELIEVE I STATED THAT, AS I MENTIONED TO THE JURY

17   EARLIER, THAT WE WOULD LAND SOMEWHERE BETWEEN 20 AND 30

18   PERCENT IF WE WERE TO SETTLE ON A REASONABLE ROYALTY RATE.

19   Q.   LET'S LOOK AT THAT DEPOSITION, BECAUSE I DON'T THINK

20   THAT IS PRECISELY RIGHT.  CAN YOU PLEASE PULL UP 98, PAGE 98.

21   AND I WANT YOU TO LOOK AT THAT.

22   A.   OKAY.

23   Q.   JUST TAKE A LOOK AT IT.  READ IT TO YOURSELF AND SEE IF

24   THAT REFRESHES YOUR RECOLLECTION ABOUT MY QUESTION, WHICH

25   IS -- MAYBE IT'S THE PAGE BEFORE.  NO, IT'S THAT PAGE.

890

1    A.    SEE IT.

2    Q.    SO DOES THAT REFRESH YOUR RECOLLECTION THAT ON MAY 12,

3    2016, YOU TESTIFIED FOR THE FIRST TIME THAT THE RATE WAS 20

4    PERCENT?

5              MR. ALDRICH:   YOUR HONOR, CAN THE WITNESS HAVE A

6    COPY OF HIS DEPOSITION TRANSCRIPT?

7              THE COURT:   IT SHOULD BE UP ON THE SCREEN.

8              THE WITNESS:   I HAVE IT.

9              MR. ALDRICH:   THANK YOU.

10   Q.    BY MS. ROTHAUGE:   LET ME KNOW WHEN YOU'VE REFRESHED YOUR

11   RECOLLECTION.

12   A.    IT'S WHAT I JUST SAID.  I SAID WE WOULDN'T CONSIDER

13   SOMETHING LESS THAN THE 20-PERCENT RANGE.

14   Q.    OKAY.  NOW, LET'S TALK ABOUT WHAT YOU DID TO PREPARE FOR

15   THAT TESTIMONY AS AN EXPERT IN THIS CASE.

16         YOU MET FOR THE FIRST TIME ON THIS CASE WITH

17   ATTORNEYS THE DAY BEFORE; ISN'T THAT RIGHT?

18   A.    I BELIEVE THAT'S TRUE.

19   Q.    ALL RIGHT.  SO ON MAY 11, ISN'T IT TRUE THAT ON MAY 11,

20   IT WAS THE VERY FIRST TIME YOU HAD EVER EVEN HEARD ABOUT THIS

21   CASE; IS THAT RIGHT?

22   A.    I CAN'T SAY FOR CERTAIN IT WAS THAT DATE OR -- WELL,

23   THEY TOLD ME BEFORE THAT THERE WAS A LAWSUIT GOING ON BEFORE

24   THE DAY OF MY DEPOSITION.  BUT IT WASN'T MUCH BEFORE THAT.

25   Q.    BUT YOU DIDN'T KNOW ANYTHING ABOUT THE FACTS OF THE CASE

COMPUTER-AIDED TRANSCRIPTION

891

1    ON MAY 11, DID YOU?

2    A.    VERY LITTLE.

3    Q.    WHAT DID YOU KNOW BEFORE MAY 11 ABOUT THE FACTS OF THIS

4    CASE, MR. MERRIMAN?

5            MR. ALDRICH:    OBJECTION.    WE HAVE SOME PRIVILEGE

6    ISSUES.

7    Q.    BY MS. ROTHAUGE:    WERE YOU ACTING AS AN ATTORNEY PRIOR

8    TO MAY 11 IN THIS CASE?

9    A.    ON THIS CASE?

10   Q.    YEAH.

11   A.    NO.

12           MS. ROTHAUGE:    I'M JUST SIMPLY ASKING WHAT HE KNEW,

13   AND HE WASN'T ACTING AS AN ATTORNEY.

14           THE COURT:    THERE WAS CONVERSATIONS BETWEEN HIS

15   LAWYER AND HIM.

16           MS. ROTHAUGE:    LET ME MAKE THE RECORD VERY CLEAR.

17   Q.    DID YOU HAVE CONVERSATIONS WITH LAWYERS PRIOR TO

18   MAY 11TH ABOUT THIS LAWSUIT?

19   A.    I'M NOT SURE.

20   Q.    OKAY.    SO ON MAY 11, ISN'T IT TRUE, THAT'S THE FIRST

21   TIME THAT YOU SIT DOWN AND YOU LEARN ABOUT THE FACTS OF THIS

22   CASE; IS THAT RIGHT?

23   A.    I GOT A MORE IN-DEPTH UNDERSTANDING OF WHAT WAS GOING ON

24   SHORTLY PRIOR TO THE DEPOSITION.

25   Q.    IT WAS THE FIRST TIME YOU LEARNED THAT THIS WAS A PATENT

892

1    CASE; RIGHT?

2    A.    I'M NOT SURE IF I HAD HEARD THAT BEFORE OR NOT.

3    Q.    SO YOU JUST -- YOU DIDN'T KNOW BEFORE MAY 11 ONE WAY OR

4    THE OTHER; RIGHT?

5    A.    I CAN'T -- I CAN'T RECALL EXACTLY WHAT I KNEW BEFORE

6    THAT DATE.

7    Q.    WELL, LET'S TALK -- I KNOW THAT YOU SAID IN YOUR

8    DEPOSITION THAT YOU SPENT FOUR HOURS ON MAY 11TH LEARNING

9    ABOUT THE CASE FOR YOUR DEPOSITION ON MAY 12TH; ISN'T THAT

10   RIGHT?

11   A.    THAT SOUNDS RIGHT.

12   Q.    OKAY.  AND WHO DID YOU MEET WITH DURING THOSE FOUR HOURS

13   WHEN YOU WERE LEARNING ABOUT THE FACTS OF THIS CASE?

14   A.    OUR OUTSIDE COUNSEL AND OUR INSIDE COUNSEL.

15   Q.    OKAY.  SO COULD YOU PLEASE IDENTIFY THE INDIVIDUALS THAT

16   YOU MET WITH FOR FOUR HOURS ON MAY 11TH, THE DAY BEFORE YOUR

17   DEPOSITION.

18   A.    THEY ARE SITTING AT THE TABLE.

19   Q.    COULD YOU PLEASE IDENTIFY THEM FOR THE RECORD.

20   A.    NIKA AND ADAM.  I THINK -- ADAM KELLY, INSIDE COUNSEL.

21   Q.    OKAY.  SO MR. KELLY --

22   A.    YEAH.

23   Q.    -- WHO IS SITTING NEXT TO MR. ALDRICH?

24   A.    THAT'S CORRECT.

25   Q.    YOU MET WITH MR. KELLY AND MR. ALDRICH ON MAY 11TH TO

1    LEARN ABOUT THE FACTS OF THE CASE; CORRECT?

2    A.   TO GET A MORE IN-DEPTH UNDERSTANDING, YES.

3    Q.   AND ISN'T IT TRUE THAT ON MAY 11TH, WHILE MEETING WITH

4    THESE TWO INDIVIDUALS THAT YOU'VE IDENTIFIED, THAT'S WHEN YOU

5    LEARNED OR FORMED THE OPINION THAT 20 PERCENT WAS THE NUMBER

6    YOU WOULD TESTIFY TO THE NEXT DAY IN YOUR DEPOSITION?

7    A.   I WOULDN'T PHRASE IT THAT WAY.  I MEAN, THAT'S WHERE I

8    LEARNED THE FACTS OF THE CASE.  AND IT WAS NEVER PITCHED TO

9    ME LIKE, THIS IS WHAT YOU'RE GOING TO SAY.  THEY DIDN'T

10   INFORM ME WHAT MY OPINION WAS GOING TO BE.

11        IT WAS THEY WERE SIMPLY LAYING OUT WHAT THE CASE WAS

12   AND TELLING ME WHAT I WOULD BE ASKED AND LIKELY, YOU KNOW, AS

13   ANY DEPOSITION, YOU KNOW --

14        MR. ALDRICH:  I WOULD JUST ADVISE YOU NOT TO

15   DISCLOSE CONFIDENTIAL COMMUNICATIONS WITH COUNSEL.  THAT'S

16   PRIVILEGED INFORMATION.

17        MS. ROTHAUGE:  I'M NOT GOING TO ASK FOR PARTICULAR

18   SPECIFIC THINGS.

19   Q.   BUT YOU LEARNED INFORMATION FROM MR. KELLY AND

20   MR. ALDRICH, AND BASED UPON THE INFORMATION YOU LEARNED IN

21   THAT MEETING DURING THAT FOUR HOURS, YOU FORMED YOUR OPINION

22   THAT 20 PERCENT WAS THE APPROPRIATE RATE; IS THAT CORRECT?

23   A.   NO.  I WOULDN'T SAY IT THAT WAY.  BECAUSE THE FACTS OF

24   THIS CASE DON'T REALLY -- THE INFRINGEMENT IS SEPARATE FROM

25   WHAT THE APPROPRIATE ROYALTY RATE WOULD BE IF WE WERE GOING

894

1    TO LICENSE OMNI-HEAT TO A COMPETITOR.  I MEAN, THAT'S SORT OF

2    INDEPENDENT FROM MOST OF THE FACTS IN THIS CASE.

3    Q.    OKAY.  I WASN'T ASKING THAT.  I UNDERSTAND THAT NOW YOU

4    HAVE A PRETTY SOPHISTICATED UNDERSTANDING OF WHAT THE CASE IS

5    ABOUT.

6             BUT WHAT I'M ASKING YOU IS, ON THE DAY BEFORE YOUR

7    DEPOSITION, WHEN YOU MEET FOR THE FIRST TIME TO LEARN ABOUT

8    THE FACTS OF THE CASE, DID YOU GET ANY OTHER INFORMATION IN

9    THAT MEETING ABOUT THE PATENT OR THE FACTS OF THE CASE THAT

10   ALLOWED YOU TO FORM THE OPINION THAT 20 PERCENT WAS THE

11   APPROPRIATE RATE THAT YOU WOULD TESTIFY TO IN YOUR DEPOSITION

12   THE NEXT DAY?

13   A.    I DON'T RECALL.

14   Q.    DID YOU -- DID THEY BRING YOU ANY DOCUMENTS TO LOOK

15   AT?

16   A.    YES.

17   Q.    WHAT DOCUMENTS DID YOU LOOK AT?

18   A.    MOSTLY MY DOCUMENTS THAT WE'VE TALKED ABOUT HERE.  THE

19   CONTRACTS THAT I'VE WRITTEN, THAT INVOLVE OMNI-HEAT AND

20   SAYING THAT THEY WOULD LIKELY BE SUBJECT OF THIS CASE.

21   Q.    WHO WAS IT THAT -- SO THAT'S INTERESTING.

22             SOMEBODY BROUGHT YOU THE CONTRACTS TO THE MEETING ON

23   THE 11TH; IS THAT RIGHT?

24             MR. ALDRICH:  YOUR HONOR.

25             THE COURT:  IF THAT'S AN OBJECTION, IT'S OVERRULED.

895

1          YOU CAN ANSWER THAT QUESTION.

2          THE WITNESS:  THEY WERE AT THE MEETING, YES.

3     Q.   BY MS. ROTHAUGE:  WHO SELECTED THOSE DOCUMENTS FOR YOU

4     TO REVIEW THE DAY BEFORE YOUR DEPOSITION?

5     A.   I DON'T KNOW.

6     Q.   DID SOMEONE CARRY THEM INTO THE ROOM WITH YOU -- WITH

7     THEM?

8     A.   THEY WERE IN THE ROOM.

9     Q.   OKAY.  SO YOU DIDN'T -- SO YOU DIDN'T SELECT THOSE

10    DOCUMENTS; RIGHT?

11    A.   THAT'S CORRECT.

12    Q.   WHO WOULD HAVE HAD ACCESS TO THIS -- BECAUSE IT'S PRETTY

13    CONFIDENTIAL, THESE LICENSING AGREEMENTS; RIGHT?

14    A.   WELL, OF COURSE THEY ARE CONFIDENTIAL.  BUT I AM AN

15    ATTORNEY, BUT THAT DOESN'T MEAN I DON'T GET LEGAL REVIEW ON

16    MY LICENSING AGREEMENTS.  AND MR. KELLY, YOU CAN SEE ON A LOT

17    OF THOSE INITIALIZATION SHEETS, HE SIGNS OFF ON THOSE AND

18    HE'S READ THOSE AGREEMENTS AND HE'S AWARE OF THEM.

19    Q.   MY QUESTION WAS, WHO WOULD HAVE HAD ACCESS TO THE

20    LICENSING AGREEMENTS TO SELECT THE AGREEMENTS THAT YOU SHOULD

21    REVIEW ON THE DAY BEFORE YOUR DEPOSITION?  AND I THINK YOU'VE

22    ANSWERED THE QUESTION.

23          WAS MR. KELLY THE ONLY PERSON AT THAT MEETING WHO

24    WOULD HAVE HAD ACCESS TO YOUR LICENSING AGREEMENTS?

25    A.   PROBABLY.

896

```
 1    Q.   OKAY.  SO DID YOU --

 2    A.   I WOULD HAVE HAD ACCESS TO THEM, OBVIOUSLY.

 3    Q.   MR. KELLY WOULD HAVE AS WELL; RIGHT?

 4    A.   YEAH.

 5    Q.   IS THAT RIGHT?

 6    A.   YES, THAT'S CORRECT.

 7    Q.   SO DID YOU UNDERSTAND THAT IT WAS MR. KELLY WHO HAD

 8    SELECTED THOSE CONTRACTS FOR YOU?

 9    A.   I DIDN'T EVEN REALLY THINK ABOUT IT.

10    Q.   OKAY.  ANYWAY, SO YOU LOOK AT THE CONTRACTS THAT SOMEHOW

11    APPEARED THERE THE DAY BEFORE YOUR DEPOSITION.

12         DID YOU LOOK AT ANYTHING ELSE TO PREPARE YOUR

13    OPINION?

14    A.   I DON'T RECALL WHAT ELSE I LOOKED AT OR IF I LOOKED AT

15    ANYTHING ELSE.

16    Q.   ALL RIGHT.  LET'S GO TO -- AND THEN, OF COURSE, WE KNOW

17    YOU TESTIFIED TO 20 PERCENT ON MAY 12TH.  BUT THEN --

18    A.   20 TO 30 PERCENT.

19         MS. ROTHAUGE:  WELL, YOU LOOKED AT -- YOU KEEP

20    SAYING THAT.  BUT CAN I PUBLISH TO THE JURY PAGE 98.

21         THE COURT:  HANG ON A SECOND.

22         MS. ROTHAUGE:  LINES 3 THROUGH 13.

23    Q.   YOU SEE IT'S IN FRONT OF YOU RIGHT THERE AGAIN?

24    A.   YEAH.

25         THE COURT:  IT'S NOT IN FRONT OF THE JURY YET.  IF
```

897

1    YOU'RE USING THIS TO REFRESH HIS MEMORY, IT DOESN'T GO IN

2    FRONT OF THE JURY.

3            MS. ROTHAUGE:  I'M USING IT TO IMPEACH HIM.

4            THE COURT:  THEN YOU CAN GO AHEAD AND DISPLAY IT TO

5    THE JURY.

6            MS. ROTHAUGE:  PLEASE PUBLISH TO THE JURY THE

7    TESTIMONY THAT MR. MERRIMAN GAVE IN HIS DEPOSITION ON

8    MAY 12TH, 2016.

9        DOESN'T IT SAY:  "SO TO ME, I COULDN'T SEE COLUMBIA

10           CONSIDERING SOMETHING THAT WAS LESS THAN 20 PERCENT

11           RANGE ROYALTY RATE IF IT WAS BASED ON TOP LINE NET

12           SALES COMPARABLE TO THE WAY WE DO OUR LICENSING

13           AGREEMENTS.

14           "QUESTION:  THIS IS THE OPINION YOU HAVE FORMED

15           ABOUT THIS CASE IN THE LAST 24 HOURS?

16           "ANSWER:  WELL, YES.  BECAUSE I WAS NOT AWARE OF

17           THIS CASE PRIOR TO COMING IN YESTERDAY OR BEING SET UP

18           FOR THE DEPOSITION.  BUT I DIDN'T KNOW ANY OF THE FACTS

19           OF THE CASE PRIOR TO YESTERDAY."

20   Q.   SO ISN'T IT TRUE, THAT WHEN YOU WERE ASKED ABOUT THE

21   RATE, YOU SAID ONLY 20 PERCENT RANGE; ISN'T THAT RIGHT?

22   A.   I SAID THAT I WOULDN'T CONSIDER ANYTHING LESS THAN 20

23   PERCENT.

24   Q.   OKAY.

25   A.   IT DOESN'T MEAN THAT I WOULDN'T TAKE MORE.

898

1    Q.    OBVIOUSLY YOU'D TAKE MORE.

2    A.    IT DOESN'T MEAN THAT I WOULDN'T TRY TO GET MORE.

3    Q.    I UNDERSTAND.  I MEAN, YOU'RE A TOUGH NEGOTIATOR;

4    RIGHT?

5    A.    I TRY TO DO WHAT'S IN THE BEST INTEREST OF OUR

6    COMPANY.

7    Q.    AND THE BEST INTEREST OF COLUMBIA; RIGHT?

8    A.    YES.

9    Q.    OKAY.  SO LET'S TALK ABOUT WHEN THIS 30 PERCENT SHOWED

10   UP, THOUGH.

11          ISN'T IT TRUE THAT ON JUNE 30TH, YOU ISSUED AN

12   EXPERT REPORT?  THAT'S LIKE, WHAT, 42 DAYS LATER.  ISN'T THAT

13   TRUE, MR. MERRIMAN?

14   A.    I BELIEVE SO.

15   Q.    SO BETWEEN -- AND IN THAT REPORT, ISN'T IT TRUE THAT

16   THAT IS WHEN YOU SAY FOR THE FIRST TIME THAT YOU WOULD START

17   AT 35 PERCENT, CONSISTENT WITH WHAT YOU SAID TODAY, AND THAT

18   YOU WOULD SETTLE SOMEWHERE BETWEEN 20 AND 30 PERCENT;

19   RIGHT?

20   A.    SURE.  BUT I DON'T THINK THOSE THINGS ARE

21   INCONSISTENT.

22   Q.    RIGHT.  BUT AFTER MORE TIME, AFTER DOING -- WE'LL GET

23   INTO WHAT YOU DID IN THIS TIME PERIOD.

24          BUT AFTER -- YOU SETTLED ON A HIGHER NUMBER, DIDN'T

25   YOU?  I MEAN, YOU DISCLOSED 30 PERCENT IN YOUR REPORT ON

899

1    JUNE 30TH; ISN'T THAT CORRECT?

2    A.    THAT SOUNDS RIGHT.

3    Q.    NOW, IN THAT EXPERT -- SO NOW I WANT TO FIND OUT WHAT

4    YOU DID BETWEEN MAY 12TH, YOUR DEPOSITION, AND WHEN YOU --

5    YOU KNOW, 42 DAYS LATER WHEN YOU ISSUED THE 20- TO 30-PERCENT

6    REPORT.

7         WHAT WORK DID YOU DO TO ARRIVE AT THAT CONCLUSION IN

8    YOUR EXPERT REPORT?

9    A.    I MADE AN ANALYSIS SIMPLY -- LIKE I DO WITH THE REST OF

10   OUR AGREEMENTS.  WE HAVE TO SIT DOWN IN EACH CASE WHEN I SAY,

11   OKAY, TENTS SHOULD BE 8 PERCENT, WHICH IS LOWER THAN OUR

12   STANDARD RATE.  WHY WOULD THEY BE LOWER?  I KIND OF GO

13   THROUGH JUST SORT OF A PROCESS IN MY HEAD, OKAY, HERE IS WHAT

14   THE PROFITABILITY HERE, THEY ARE GOING TO MAKE LESS MONEY ON

15   IT.  THIS IS A FAIR RATE.

16        I SIMPLY -- THE FACTS WERE NEW TO ME.  YOU POINTED

17   THAT OUT.  I HAD TIME TO KIND OF DIGEST AND THINK ABOUT AT

18   WHAT POINT WOULD MAKE SENSE FOR COLUMBIA TO BREAK EVEN ON

19   THIS, OR WHAT WOULD BE A RATE THAT WE WOULD GET TO.  IT WAS

20   JUST SORT OF A REFLECTION ON WHAT I WOULD NEGOTIATE AS THE

21   EXPERT AT COLUMBIA.

22   Q.    WHAT DOCUMENTS DID YOU REVIEW DURING THAT TIME FRAME?

23   A.    I DON'T RECALL.

24   Q.    DID YOU -- SO ALL YOU REMEMBER ABOUT DOCUMENTS THAT YOU

25   HAD TO DO THIS GEORGIA-PACIFIC ANALYSIS WAS THAT YOU HAD

1    CONTRACTS THAT MR. KELLY HAD HAD ACCESS TO AND BROUGHT TO THE

2    MEETING AND -- IS THAT IT?  IS THAT ALL YOU HAD ACCESS TO

3    DURING THAT TIME FRAME WHEN YOU WERE PREPARING YOUR REPORT?

4    A.   I HAVE ACCESS TO THE DOZENS AND DOZENS AND DOZENS OF

5    AGREEMENTS THAT I'VE NEGOTIATED.  AND THE ONES -- WE GO

6    FORWARD WITH A VERY SMALL PERCENTAGE OF THE AGREEMENTS THAT

7    WE ACTUALLY NEGOTIATE OR ENTER INTO.

8              AND I WORK ON LICENSING AGREEMENTS AND NEGOTIATIONS

9    VIRTUALLY EVERY SINGLE DAY THAT I'M AT THE OFFICE.  SO I HAVE

10   A LONG-STANDING HISTORY OF KIND OF KNOWING WHAT WOULD BE THE

11   APPROPRIATE RATE.  AND I DRAW ON THAT.  I DON'T REVIEW

12   DOCUMENTS FOR DOING THOSE DEALS.  I GO TO MY EXPERTISE.  IT'S

13   WHAT I DO.

14             SO, NO, I DIDN'T REVIEW A LOT OF DOCUMENTS IN THIS

15   CASE, BUT I RELIED ON MY EXPERTISE.

16   Q.   WHAT DID YOU LEARN ABOUT SEIRUS DURING THAT 42 DAYS?

17   A.   I DIDN'T LEARN MUCH ABOUT SEIRUS, BECAUSE IT LARGELY IS

18   INDEPENDENT OF MY ANALYSIS OF WHAT WOULD BE THE REASONABLE

19   ROYALTY RATE.

20   Q.   WELL, DIDN'T YOU LEARN ABOUT THEIR MARKETING CHANNELS,

21   LIKE WHERE THEY SELL?

22   A.   I DON'T RECALL WHAT I LEARNED IN THAT PERIOD.  I WAS

23   GIVEN SOME INFORMATION ABOUT SEIRUS, I BELIEVE.  BUT --

24   Q.   WHO GAVE YOU THAT INFORMATION?

25   A.   I DON'T RECALL.

1    Q.    HOW MANY -- DID YOU -- NOW, YOUR EXPERT REPORT, DID YOU

2    WRITE THAT EXPERT REPORT THAT WAS ISSUED ON JUNE 30TH?

3    A.    I DID NOT DRAFT IT.

4    Q.    WHO PREPARED IT FOR YOU?

5    A.    I DON'T KNOW WHO DRAFTED THAT.

6    Q.    WAS IT PROVIDED -- WAS IT DRAFTED BY YOUR LAWYERS?

7    A.    POTENTIALLY IN PART.  I MEAN, I DEFINITELY HAD A LOT OF

8    SAY IN WHAT WAS GOING IN THE CONTENT OF IT, BUT THE INITIAL

9    WRITING, EVERY SINGLE WORD, WAS NOT.

10   Q.    OKAY.  SO LET'S TALK ABOUT THAT PROCESS.  SO YOU -- DID

11   YOU TALK TO -- SO YOU DIDN'T DRAFT IT.  IT WAS DRAFTED BY

12   SOMEONE YOU DON'T REMEMBER.  BUT YOU HAD A LOT OF INPUT INTO

13   IT.

14        AM I CAPTURING YOUR TESTIMONY CORRECTLY, SIR?

15   A.    SORT OF.  MOST OF THE AGREEMENTS THAT I WRITE, THE

16   AGREEMENTS THAT WE'VE BEEN GOING THROUGH, I DON'T DRAFT MOST

17   OF THE WORDS IN THOSE AGREEMENTS.  I DRAFT THE RELEVANT PARTS

18   THAT HAVE TO DO WITH ROYALTY RATES, THE GUARANTY.  AND MUCH

19   LIKE MY REPORT, I DIDN'T DRAFT ALL OF THE WORDS OF THAT

20   AGREEMENT, BUT ALL OF THE KEY TERMS WERE THINGS THAT CAME

21   FROM MY EXPERT OPINION.

22   Q.    OKAY.  WHO DRAFTED THE WORDS IN YOUR REPORT?

23   A.    I DON'T KNOW.

24   Q.    AND DO YOU KNOW WHETHER IT WAS DONE BY SOMEBODY AT

25   COLUMBIA?

1    A.   I DON'T KNOW.

2    Q.   YOU HAVE NO -- AND WHO DID YOU TALK TO ABOUT YOUR DRAFT

3    OF YOUR REPORT?

4    A.   MR. ALDRICH AND MR. KELLY.

5    Q.   OKAY.  DID MR. ALDRICH AND MR. KELLY HELP PREPARE THE

6    REPORT THAT YOU ISSUED ON JUNE 30TH?

7    A.   I DON'T KNOW THEIR SPECIFIC INVOLVEMENT IN PREPARING

8    THAT REPORT.

9    Q.   DID YOU HAVE CONVERSATIONS ON THE PHONE WITH THEM ABOUT

10   THIS REPORT?

11   A.   I BELIEVE SO.  I DON'T RECALL SPECIFICALLY.

12   Q.   YOU HAD SOME -- HOW MANY DO YOU THINK YOU HAD?

13   A.   I DON'T RECALL.

14   Q.   DID YOU TALK TO -- THERE IS THIS GUY YOU TOLD ME EARLIER

15   ABOUT WHO KNEW ABOUT LICENSING AT THE COMPANY.  TOM MILLER.

16   A.   I DID NOT INVOLVE TOM MILLER.

17   Q.   SO YOU DID NOT TALK TO TOM MILLER --

18   A.   NO.

19   Q.   -- ABOUT COLUMBIA'S -- LET ME FINISH MY QUESTION.

20        YOU DID NOT TALK TO TOM MILLER ABOUT COLUMBIA'S

21   HISTORY OF LICENSING OR GET ANY INPUT FROM HIM ON THIS TOPIC;

22   CORRECT?

23   A.   I DID NOT.

24   Q.   DID YOU TALK TO ANYONE AT COLUMBIA IN PREPARING YOUR

25   REPORT?

903

1    A.    NOT OTHER THAN MR. KELLY, I DON'T BELIEVE.

2    Q.    SO AS PART OF YOUR JOB FOR COLUMBIA, WASN'T IT ALSO PART

3    OF YOUR JOB TO TALK TO AN EXPERT ABOUT DAMAGES IN THIS

4    CASE?

5    A.    TO TALK -- I'M SORRY?

6    Q.    I'M SORRY.  THAT WAS A TERRIBLE QUESTION.  LET ME

7    REPHRASE THAT.

8    A.    OKAY.

9    Q.    DID YOU TALK TO A MS. MORONES?

10   A.    I DID.

11   Q.    WHO IS MS. MORONES?

12   A.    I BELIEVE SHE'S ANOTHER EXPERT IN DAMAGES.

13   Q.    WHOSE EXPERT?

14   A.    MS. MORONES.

15   Q.    AND WHO IS SHE AN EXPERT FOR?

16   A.    I BELIEVE SHE'S ONE OF OUR WITNESSES.

17   Q.    OKAY.  IS SHE HERE IN THE ROOM TODAY?

18   A.    YES, SHE IS.

19   Q.    OKAY.  SO YOU SPOKE WITH MS. MORONES.  DID YOU TALK TO

20   MS. MORONES DURING THIS TIME FRAME WHEN YOU WERE FORMING --

21   YOU KNOW, YOU AND MR. KELLY WERE FORMULATING YOUR ROYALTY

22   RATES?

23   A.    I SPOKE TO HER I BELIEVE ONE TIME.  AND I DON'T RECALL

24   EXACTLY WHEN THAT CONVERSATION OCCURRED.

25   Q.    SO WHAT DID YOU UNDERSTAND -- WELL, FIRST OF ALL, YOU

1    SPOKE WITH HER ONE TIME.  WAS THAT IN A MEETING OR WAS THAT

2    ON THE PHONE?

3    A.   IT WAS ON THE PHONE.

4    Q.   AND WHO -- DID YOU JUST CALL HER UP OUT OF THE BLUE, OR

5    DID SOMEBODY CALL YOU AND ASK YOU TO CALL?  HOW DID THAT CALL

6    HAPPEN?

7    A.   I WAS IN OUR ATTORNEY'S OFFICE, AND WE HAD A CONFERENCE

8    CALL.

9    Q.   WAIT.  SO WHAT ARE YOU TALKING ABOUT, ATTORNEY'S OFFICE.

10   SO YOU WERE NOT AT WORK?

11   A.   SORRY.  OUR GENERAL -- OUR ASSISTANT GENERAL COUNSEL,

12   MR. KELLY.  I WAS IN HIS OFFICE AT COLUMBIA.

13   Q.   OKAY.  SO YOU'RE IN MR. KELLY'S OFFICE, AND YOU BOTH

14   CALL MS. MORONES TOGETHER; IS THAT RIGHT?

15   A.   I DON'T RECALL WHO CALLED WHO, BUT WE WERE ON THE PHONE

16   TOGETHER, YES.

17   Q.   AND DID MR. KELLY TELL YOU WHY YOU WERE GOING TO BE

18   TALKING TO MS. MORONES?

19   A.   I DON'T RECALL.  I KNEW IT WAS RELATED TO THE CASE.

20   Q.   WHAT DID YOU TALK -- WHAT DID YOU, MR. KELLY AND

21   MS. MORONES TALK ABOUT?

22   A.   I REALLY HAVE NO RECOLLECTION OF THAT CALL, OTHER THAN

23   THAT IT OCCURRED.

24   Q.   YOU DON'T RECALL -- DO YOU RECALL WHAT QUESTIONS SHE

25   ASKED YOU?

905

1    A.    I DON'T.

2    Q.    AND YOU DON'T RECALL -- DO YOU RECALL WHAT THE TOPIC OF

3    CONVERSATION WAS?

4    A.    YEAH.  IT WAS RELATED TO THIS LAWSUIT.

5    Q.    WHAT ABOUT THIS LAWSUIT WAS IT RELATED TO?

6    A.    I DON'T RECALL THE SPECIFIC POINTS OF WHAT WE TALKED

7    ABOUT.  I REALLY DON'T.

8    Q.    DID IT HAVE ANYTHING TO DO WITH YOUR ROYALTY RATE?

9    A.    I'M SURE IT HAD TO DO WITH MY TESTIMONY, BUT I DON'T

10   RECALL THE SPECIFICS OF THE CONVERSATION.

11   Q.    SO WAS IT ABOUT YOUR TESTIMONY HERE TODAY, OR WAS IT

12   ABOUT YOUR TESTIMONY THAT YOU HAD GIVEN IN THE DEPOSITION ON

13   MAY 12TH?

14   A.    IT WOULDN'T HAVE BEEN ABOUT TODAY.  IT WOULD HAVE BEEN

15   ABOUT THE DEPOSITION OR THE REPORT, PERHAPS.  I DON'T RECALL

16   SPECIFICALLY.

17   Q.    BUT YOU DO RECALL GENERALLY THAT YOU HAD A CONVERSATION

18   IN MR. KELLY'S OFFICE WHERE YOU SPOKE WITH MS. MORONES ABOUT

19   WHAT YOU HAD COME UP WITH BETWEEN MAY 12 AND JUNE 30 FOR A

20   ROYALTY; IS THAT RIGHT?

21   A.    I CAN'T SAY SPECIFICALLY THAT THAT CAME UP, BUT I WOULD

22   ASSUME.  I DON'T RECALL THE CONVERSATION, OTHER THAN IT

23   OCCURRING AND IT BEING IN MR. KELLY'S OFFICE.

24   Q.    DO YOU REMEMBER ANY QUESTIONS THAT SHE HAD FOR YOU?

25   A.    I DON'T.

1    Q.   DID YOU EVER EXCHANGE ANY E-MAILS AFTER THE CALL?

2    A.   I DON'T RECALL.

3    Q.   DID YOU HAVE ANY CONVERSATIONS WITH HER AFTER THAT CALL,

4    ANY OTHER KIND OF COMMUNICATION, MAYBE THROUGH SOMEBODY?

5    MAYBE MR. KELLY REPORTED THAT YOU NEEDED TO GET SOME MORE

6    INFORMATION FOR HER OR SOMETHING LIKE THAT.

7    A.   I DON'T BELIEVE SO, BUT I DON'T RECALL.

8    Q.   SO THAT COULD HAVE HAPPENED?

9    A.   PERHAPS.  BUT I DON'T RECALL.

10   Q.   OKAY.  ALL RIGHT.  I'D LIKE TO TALK ABOUT THE -- LET'S

11   TURN TO THESE LICENSES THAT MR. KELLY SELECTED FOR YOU TO

12   LOOK AT TO COME UP WITH YOUR RATE.

13            I THINK THE FIRST ONE YOU TESTIFIED --

14            MR. ALDRICH:  OBJECTION, YOUR HONOR.  ARGUMENTATIVE

15   AND MISCHARACTERIZES.

16            THE COURT:  THE OBJECTION IS OVERRULED.

17   Q.   BY MS. ROTHAUGE:  I KNOW IT'S ALL CROSSED OUT.  BUT DO

18   YOU REMEMBER THIS DEAL?

19   A.   I DO.

20   Q.   AND CAN YOU REFRESH THE JURY'S RECOLLECTION, WHAT IS

21   THIS?  THIS WAS WITH WHOM?

22   A.   THIS WAS WITH -- ALMOST ALL OF OUR AGREEMENTS HAVE THESE

23   CLAUSES, BENEFITS OR ELEMENTS OF THE CONTRACT.

24   Q.   OH, YEAH.  THAT WAS A TERRIBLE QUESTION.  I APOLOGIZE.

25            THE DEAL THAT YOU -- THIS REPRESENTED A LICENSING

907

1    DEAL YOU DID FOR 10 TO 15 PERCENT.  THEY GOT THE RIGHT TO

2    MAKE YOUR COLUMBIA CLOTHES --

3    A.    THAT WAS O.C.S.

4    Q.    -- PUT COLLEGIATE STUFF ON IT.

5            WHO WAS IT?

6    A.    THAT WAS OUTDOOR CUSTOM SPORTSWEAR.

7    Q.    O.C. --

8    A.    O.C.S.

9    Q.    O.C.S.

10           SO O.C.S. HAS A DEAL WITH COLUMBIA WHERE THEY MAKE

11   COLUMBIA'S CLOTHES, RIGHT, FOR COLLEGES AND THE LIKE?

12   A.    THEY TAKE A PORTION OF OUR CLOTHES, YES, AND THEN

13   DECORATE THEM, ADD A SCHOOL LOGO AND SELL THEM INTO A

14   DIFFERENT CHANNEL.

15   Q.    NOW, AS A LICENSING EXPERT, YOU'VE HEARD OF CO-BRANDING

16   I ASSUME; RIGHT?

17   A.    YES.

18   Q.    AND CO-BRANDING, TELL THE JURY, WHAT IS CO-BRANDING?

19   A.    CO-BRANDING IS WHERE THERE IS TWO BRANDS ON AN

20   INDIVIDUAL ITEM, SO YOU MIGHT HAVE COLUMBIA AND ANOTHER

21   BRAND.

22   Q.    SO THIS O.C.S. DEAL, ISN'T THAT A CO-BRANDING DEAL?

23   A.    O.C.S. DEAL IS -- IT'S A DIFFERENT TYPE OF DEAL BECAUSE

24   IT -- IT DOESN'T NECESSARILY -- IT DOESN'T HAVE THE O.C.S.

25   BRAND ON IT.  I WOULD NOT CHARACTERIZE IT AS CO-BRANDING,

908

1    BECAUSE SOME OF THE PRODUCTS THAT WE'VE TALKED ABOUT HAVE THE

2    LOGOS OF SAN DIEGO STATE OR THE OTHER LOGOS ON THEM.  SOME OF

3    THE PRODUCTS THEY SELL DON'T HAVE ANY LOGOS ON THEM, OTHER

4    THAN COLUMBIA.  SO I COULDN'T CLASSIFY THAT AS CO-BRANDED

5    PRODUCT.  IT'S ONLY ONE BRAND.

6    Q.   OKAY.  THAT'S A HELPFUL CLARIFICATION.

7         SO IN SOME INSTANCES, THIS AGREEMENT ALLOWS FOR

8    CO-BRANDING; IN OTHER WORDS, ISN'T IT TRUE THAT IF SOMEONE

9    HAS A "COLUMBIA" SHIRT ON IT, IF YOU'RE GOING TO PUT ANOTHER

10   LOGO ON IT, IT'S CO-BRANDING.  YOU'VE GOT TO GET PERMISSION;

11   RIGHT?

12   A.   YOU HAVE TO GET PERMISSION, BUT IT'S NOT CO-BRANDING.

13   THEY ARE PUTTING THOSE LOGOS ON IT BASED ON THEIR CUSTOMERS'

14   SPECIFIC ASKS.  NO, I WOULDN'T CLASSIFY IT AS CO-BRANDING

15   PRODUCT.

16   Q.   WELL, MAYBE WE CAN AGREE ON THIS, BECAUSE I UNDERSTAND

17   YOU DON'T THINK IT'S CO-BRANDING.  BUT WITH THE UNDERSTANDING

18   THAT CO-BRANDING INVOLVES PUTTING TWO DISTINCT AND DIFFERENT

19   LOGOS ON ONE PIECE OF APPAREL, COULD YOU AGREE WITH ME THAT

20   IT'S CO-BRANDING IN SOME INSTANCES?

21   A.   NOT IN A TECHNICAL SENSE.  SOME OF THE PRODUCTS ARE DUAL

22   BRANDED, I WILL SAY THAT.

23   Q.   RIGHT, DUAL BRANDED.  OKAY.  SO DUAL BRANDED, WE CAN

24   AGREE ON THAT; RIGHT?

25   A.   OKAY.

COMPUTER-AIDED TRANSCRIPTION

909

1    Q.    SO YOU WOULD AGREE THAT THIS INVOLVES DUAL BRANDING.  SO

2    COLUMBIA ON ONE SIDE, SAN DIEGO OR AN OREGON DUCK ON THE

3    OTHER SIDE; RIGHT?

4    A.    FOR SOME OF THE PRODUCTS, BUT NOT ALL OF THE PRODUCTS.

5    Q.    BUT SOME OF THEM, THIS ALLOWS FOR CO-BRANDING;

6    CORRECT?

7    A.    THERE ARE TWO LOGOS ON SOME OF THE PRODUCTS, YES.

8    Q.    AND SO ISN'T IT TRUE THAT IF THERE WAS GOING TO BE A

9    LICENSE WITH SEIRUS, THERE WOULDN'T BE TWO LOGOS ON THE

10   GLOVES; RIGHT?

11   A.    NO.  COLUMBIA WOULDN'T GET THE BENEFIT OF HAVING THEIR

12   NAME ON THAT PRODUCT.

13   Q.    EXACTLY.  SO ANY DEAL LIKE THIS THAT HAD SOME KIND OF

14   DUAL BRANDING, THAT'S JUST NOT APPLICABLE TO THE SEIRUS

15   LICENSE, WHERE SEIRUS WOULD WANT TO BE THE ONLY BRAND ON ITS

16   OWN GLOVE; RIGHT?

17   A.    NO.  THE SEIRUS DEAL WOULD BE A MUCH WORSE DEAL FOR

18   COLUMBIA, BECAUSE WE WOULDN'T GET ANY OF THE RECOGNITION OF

19   OUR NAME ON THOSE PRODUCTS.  THEY WOULDN'T BE

20   COLUMBIA-BRANDED PRODUCTS.

21   Q.    I UNDERSTAND THAT.  I UNDERSTAND THAT YOU DON'T LIKE

22   THIS DEAL.  I THINK WE CAN AGREE ON THAT.  AND I CAN

23   UNDERSTAND THAT YOU DON'T THINK IT'S A GOOD DEAL.  BUT YOUR

24   EXPERT OPINION IS DIFFERENT.  OKAY.

25          SO I'M ASKING YOU A DIFFERENT QUESTION, WHICH IS, IN

910

1    THE HYPOTHETICAL NEGOTIATION, ISN'T IT TRUE THAT SEIRUS IS

2    NEGOTIATING SO THAT IT HAS ONLY ITS NAME ON THE GLOVE; RIGHT?

3    IT WON'T BE DUAL-BRANDED; RIGHT?

4    A.   IN THE HYPOTHETICAL AGREEMENT, YES, THAT'S WHAT WE'RE

5    TALKING ABOUT.

6    Q.   OKAY.  SO WE CAN AGREE THAT A DEAL THAT HAS DUAL

7    BRANDING IS NOT APPLICABLE TO THE SEIRUS DEAL; RIGHT?

8    A.   WE CAN AGREE -- WE CANNOT AGREE THAT -- WITH THAT.

9    BECAUSE THERE IS BENEFITS TO COLUMBIA.  AND AS SORT OF A

10   BENCHMARK TO SAY, WE'RE GETTING 10 TO 15 PERCENT, PLUS ALL

11   THOSE OTHER BENEFITS, IN THE SEIRUS DEAL, WE'RE NOT GETTING

12   ANY OF THOSE BENEFITS.

13        SO, OF COURSE, I WOULD USE MY LICENSING AGREEMENTS.

14   WE'RE ARGUING THE BENEFITS AS A BENCHMARK AND THEN WE WOULD

15   GO FROM THERE.

16   Q.   BUT YOU WOULD AGREE THAT THIS -- THIS DEAL, WITH THIS 10

17   TO 15 PERCENT INVOLVES A RELATIONSHIP WHERE SOMEONE ELSE IS

18   MAKING THE PRODUCT AND COLUMBIA IS PUTTING ITS NAME -- AND

19   THEY ARE PUTTING COLUMBIA'S NAME ON THE PRODUCT; RIGHT?

20   A.   THAT'S CORRECT.

21   Q.   AND IN SOME INSTANCES, THEY ARE PUTTING TWO LOGOS OR

22   BRANDS ON IT; RIGHT?

23   A.   WITH THAT ONE LICENSEE, YES.

24   Q.   OKAY.

25   A.   BUT MOST OF OUR AGREEMENTS DO NOT HAVE OTHER LOGOS ON

1    IT; JUST THE COLUMBIA LOGO.

2    Q.   RIGHT.  AND I'LL GET TO THOSE IN A MINUTE.

3    A.   OKAY.

4    Q.   I WAS JUST ASKING ABOUT THIS ONE DUAL-BRANDING DEAL.

5    AND I THINK WE NOW HAVE AN UNDERSTANDING THAT THIS WOULD NOT

6    BE THE DEAL THAT SEIRUS AND COLUMBIA WOULD BE NEGOTIATING;

7    ISN'T THAT CORRECT?

8    A.   IT WOULD BE A VARIATION OF THAT DEAL --

9    Q.   BUT IT --

10         THE REPORTER:  WAIT, WAIT.

11   Q.   BY MS. ROTHAUGE:  BUT IT WOULD NOT BE THIS DEAL WITH

12   DUAL-BRANDING OPTIONS; CORRECT?

13   A.   NO TWO DEALS ARE THE SAME.  EVERY DEAL IS DIFFERENT.

14   THERE IS DIFFERENT LEVELS OF TERMS AND THERE IS VARIATIONS.

15   SO IT WOULDN'T BE THAT EXACT DEAL.  JUST LIKE NO TWO DEALS

16   ARE EXACTLY THE SAME.

17   Q.   OKAY.  WELL, MR. MERRIMAN, YOU'RE THE LICENSING EXPERT

18   THAT COLUMBIA HAS PUT FORWARD HERE, AND YOU'VE BROUGHT TO

19   THIS JURY SOME EXAMPLES THAT YOU USED AS SORT OF COMPARABLES;

20   RIGHT?

21   A.   BECAUSE NO TWO DEALS ARE THE SAME, YOU'VE GOT TO LOOK AT

22   WHAT'S CLOSEST AND COMPARE IT AND SAY HOW IS THE DEAL -- HOW

23   IS IT DIFFERENT, HOW IS IT BETTER OR HOW IS IT WORSE.

24         AND I'D SAY WE GET 10 TO 15 PERCENT ON A DEAL WHERE

25   WE HAVE A LOT OF OTHER BENEFITS, AND IN THE DEAL THAT WE'RE

912

1    TALKING ABOUT WITH SEIRUS, WE'D HAVE A LOT OF NEGATIVES WITH

2    IT.  WE WOULDN'T BE ABLE TO CONTROL ADVERTISING.  WE WOULDN'T

3    BE ABLE TO CONTROL WHERE IT GOES.  WE WOULDN'T GET THE

4    BENEFIT OF COLUMBIA'S NAME GETTING OUT.

5              THE COURT:  MR. MERRIMAN, I WANT YOU TO TRY TO JUST

6    LISTEN TO HER QUESTION.  JUST ANSWER HER QUESTION IF YOU

7    WOULD, PLEASE.

8              GO AHEAD AND ASK YOUR QUESTION AGAIN.

9    Q.   BY MS. ROTHAUGE:  YOU BROUGHT TO THE JURY AT LEAST FOUR

10   CONTRACTS THAT WERE WHAT YOU THOUGHT WERE THE BEST COMPARABLE

11   DEALS FOR YOUR ANALYSIS; RIGHT?

12   A.   THEY ARE THE ONLY FOUR DEALS WE'VE DONE INVOLVING

13   OMNI-HEAT, YES.

14   Q.   OKAY.  AND I'M JUST ASKING AN APPLES-TO-APPLES AND

15   ORANGES-TO-ORANGES QUESTION.  YOU UNDERSTAND THAT.  I'M JUST

16   TRYING TO COMPARE A SEIRUS DEAL WITH THESE EXAMPLES YOU

17   BROUGHT HERE.

18             DO YOU UNDERSTAND THAT?

19   A.   I UNDERSTAND THAT'S WHAT YOU'RE TRYING TO DO, BUT I

20   WOULDN'T SAY IT'S APPLES TO APPLES.

21   Q.   RIGHT.  SO I THINK THAT'S MY POINT.  THIS IS NOT AN

22   APPLES-TO-APPLES DEAL; RIGHT?  THIS IS TOTALLY DIFFERENT THAN

23   WHAT YOU WOULD DO WITH SEIRUS; CORRECT?

24   A.   COLUMBIA'S NAME WOULD NOT BE ON THE PRODUCT, MA'AM.

25   Q.   MY QUESTION IS, THIS DEAL IS DIFFERENT THAN WHAT YOU

913

1    WOULD DO WITH SEIRUS; CORRECT?

2    A.    IN SOME WAYS, IT'S DIFFERENT.

3    Q.    OKAY.  SO WE CAN AT LEAST AGREE ON THAT.  BUT THIS ONE

4    IS NOT -- THIS IS NOT THE -- THIS IS NOT A PERFECT EXAMPLE

5    FOR COMPARISON, IS IT?

6    A.    THERE IS NO PERFECT EXAMPLE FOR COMPARISON.

7    Q.    AND THIS ONE CERTAINLY ISN'T, IS IT?

8    A.    IT'S AS CLOSE AS WE CAN GET.  IT'S A STARTING POINT FOR

9    THE TYPE OF DEAL.  IT'S THE BEST EXAMPLE OF THE DEALS THAT

10   COLUMBIA HAS DONE.

11   Q.    SO ONE OF THE BEST EXAMPLES YOU COULD FIND WAS A DEAL

12   WHERE SOMEBODY ELSE IS MAKING THE PRODUCT, PUTTING COLUMBIA'S

13   NAME ON IT, AND THEN ALSO SOMETIMES DUAL BRANDING.  THAT WAS

14   THE BEST COMPARISON YOU COULD GET FOR THIS JURY?

15   A.    COLUMBIA IS VERY EXCLUSIVE ABOUT OMNI.

16   Q.    MY QUESTION WAS REALLY SIMPLE.  THIS, WITH THOSE

17   ARRANGEMENTS, WAS THE BEST YOU COULD GET?

18   A.    WE HAVE ONLY LICENSED OMNI-HEAT TO FOUR LICENSEES IN THE

19   HISTORY OF THE INVENTION.

20   Q.    I UNDERSTAND.

21   A.    I BROUGHT --

22             THE REPORTER:  WAIT, WAIT.

23             THE WITNESS:  WE BROUGHT ALL FOUR OF THOSE EXAMPLES

24   BECAUSE THEY ARE THE ONLY TIMES.  AND WE'VE NEVER DONE IT

25   WITH A COMPETITOR, SO WE DON'T HAVE AN EXAMPLE OF WHAT WOULD

COMPUTER-AIDED TRANSCRIPTION

1    BE EXACTLY LIKE THE SEIRUS CASE.

2         BUT THESE ARE THE MOST REPRESENTATIVE CASE, BECAUSE

3    THEY ARE THE ONLY ONES THAT COLUMBIA HAS EVER DONE THAT

4    INVOLVE OMNI-HEAT.

5    Q.   BY MS. ROTHAUGE:  WELL, LET ME ASK IT A DIFFERENT WAY,

6    BECAUSE I DON'T WANT TO KEEP BELABORING THIS POINT.

7         WOULDN'T YOU AGREE THAT THIS DEAL THAT YOU DID IS

8    DIFFERENT THAN WHAT YOU WOULD DO WITH SEIRUS?

9    A.   IT'S DIFFERENT BECAUSE --

10   Q.   OKAY.  THAT ANSWERS MY QUESTION.  THANK YOU VERY MUCH.

11        ALL RIGHT.  LET'S MOVE TO DELTA GALIL.  YOU

12   TESTIFIED ABOUT DELTA, THE DELTA GALIL DEAL, I THINK.

13   A.   YEAH.

14   Q.   AND THAT WAS THE ONE WITH THE SOCKS?

15   A.   THAT'S CORRECT.

16   Q.   AND THIS IS AN INSTANCE WHERE THE SOCKS WOULD BE MADE BY

17   SOMEBODY ELSE, AND ALSO COLUMBIA'S TRADEMARKS AND ALL THAT

18   ARE PUT ON THOSE SOCKS FOR COLUMBIA; RIGHT?

19   A.   YES.

20   Q.   AND IT IS -- IT'S BASICALLY A BRANDED-PRODUCT DEAL;

21   RIGHT?

22   A.   YES.

23   Q.   HAVE YOU HEARD OF PRIVATE LABELING?  DO YOU KNOW WHAT

24   THAT IS?

25   A.   YES.

915

1    Q.   NOW, ISN'T PRIVATE LABELING WHERE YOU GIVE SOMEBODY --

2    WHERE YOU GO HIRE SOMEBODY TO MAKE STUFF, LIKE SOCKS, FOR

3    YOU, AND YOU HAVE THEM PUT YOUR LOGO ON IT?  IS THAT YOUR

4    UNDERSTANDING OF PRIVATE LABELING?

5    A.   WHEN IT'S INVOLVED WITH A RETAILER THAT'S DOING IT.  SO

6    IF YOU HAVE KIRKLAND SIGNATURE AT COSTCO, A LOT OF THAT

7    PRODUCT IS PRIVATE LABEL.  COSTCO WILL GO HAVE SOMEBODY MAKE

8    THAT PRODUCT FOR THEM.  BUT NOT FROM A BRAND.  IT'S LICENSED

9    PRODUCT AT THAT POINT.

10   Q.   YOU'RE TRYING TO TELL US COLUMBIA IS NOT A RETAILER.  I

11   THOUGHT I HEARD THEY HAVE THEIR OWN STORES.

12   A.   WE DO.

13   Q.   OKAY.  SO COLUMBIA IS A RETAILER; CORRECT?

14   A.   YEAH.  BUT THE DIFFERENCE HERE IS THAT IT'S NOT PRIVATE

15   LABEL.  PRIVATE LABEL IS FOR ONE ACCOUNT; RIGHT.  SO KIRKLAND

16   SIGNATURE IS ONLY SOLD AT COSTCO.  OUR LICENSEES THAT MAKE

17   THIS PRODUCT FOR US, THAT ARE COLUMBIA-BRANDED PRODUCT, THEY

18   SELL IT TO OUR RETAIL; I'LL AGREE WITH THAT.  BUT THEY ALSO

19   SELL IT TO R.E.I. AND DICK'S AND KOHL'S.  SO IT'S NOT PRIVATE

20   LABEL.  IT'S A LICENSING DEAL.

21   Q.   YEAH.  OKAY.  WELL, IN SOME INSTANCES WHEN IT'S RETAILED

22   AT COLUMBIA STORES, YOU'RE HAVING SOMEBODY ELSE MAKE THE

23   PRODUCT FOR YOU AND YOU'RE PUTTING YOUR BRAND ON IT.

24        THAT'S ESSENTIALLY -- WE CAN AGREE ON THAT; RIGHT?

25   A.   YEAH.  BUT IT -- IT'S LICENSED BECAUSE THEY ARE SELLING

1    IT AT WHOLESALE, JUST LIKE THEY SELL THE SAME PRODUCT TO

2    DICK'S OR THE OTHER COMPANIES THAT I MENTIONED.

3    Q.   BUT IN THIS INSTANCE, ISN'T IT TRUE, THAT SEIRUS WOULD

4    NOT BE PRIVATE LABELING OR MAKING A PRODUCT FOR COLUMBIA;

5    ISN'T THAT TRUE?

6    A.   THAT'S TRUE.  IT WOULDN'T HAVE THE COLUMBIA NAME ON

7    IT.

8    Q.   RIGHT.  BECAUSE IN THIS INSTANCE -- AND I THINK IT'S

9    IMPORTANT WE NOW MAYBE TALK ABOUT WHAT THE SCOPE OF THE

10   LICENSE IS THAT SEIRUS -- OR YOU ASSUMED SEIRUS WOULD WANT IN

11   YOUR ANALYSIS.

12          AND ISN'T IT TRUE THAT ALL SEIRUS WOULD BE LICENSING

13   IS THE ABILITY TO -- AND I'M REFERRING -- I'M USING FOR

14   DEMONSTRATIVE PURPOSES, EXHIBIT 1407.  ISN'T ALL THEY ARE

15   GOING TO BE LICENSING IS THE ABILITY TO PUT SOME FOIL

16   PRINTING ON ONE SIDE OF THE FABRIC SO THAT -- AND HAVE IT

17   PLACED, THAT GETS PLACED AGAINST A WEARER'S SKIN?

18   A.   THAT'S MY UNDERSTANDING.

19   Q.   OKAY.  SO IT'S A LIMITED TECHNICAL LICENSE; RIGHT?

20   A.   IT WOULD HAVE BEEN A -- THAT WAS MY UNDERSTANDING OF THE

21   HYPOTHETICAL, IS IT WAS A LICENSE TO PUT THE HEATWAVE

22   MATERIAL AS A LINING IN GLOVES OR HATS AND THINGS LIKE

23   THAT.

24   Q.   AND SO IT'S NOT ONE OF THESE BRANDED DEALS LIKE YOU'VE

25   BEEN DESCRIBING TO US, IS IT?

1      A.    IT'S DIFFERENT IN A NUMBER OF WAYS, SOME OF WHICH ARE

2      DETRIMENTAL TO COLUMBIA.

3      Q.    I'M NOT ASKING ABOUT DETRIMENTAL.  I'M UNDERSTANDING

4      THAT.  I'M TALKING ABOUT JUST THE TERMS.

5             IT IS A DIFFERENT ARRANGEMENT WHEN YOU ARE LICENSING

6      JUST THE ABILITY TO PUT SOME FOIL ON FABRIC VERSUS WHEN

7      YOU'RE MAKING SOCKS FOR COLUMBIA AND PUTTING COLUMBIA'S, YOU

8      KNOW, TRADEMARKS ON IT; RIGHT?

9      A.    AND IT'S ALSO DIFFERENT BECAUSE IT'S INVOLVING A

10     COMPETITOR AND NOT PARTNER.

11     Q.    I'LL GET TO THAT, SIR.  I PROMISE YOU I'LL GET TO THAT.

12     I'M ASKING JUST ABOUT THE TECHNOLOGY AND THE TERMS OF WHAT IS

13     BEING LICENSED.

14            OKAY.  CAN WE FOCUS ON THAT RIGHT NOW?

15     A.    I UNDERSTAND.

16     Q.    GOOD.  SO YOU UNDERSTAND THAT IT IS VERY DIFFERENT WHEN

17     YOU'RE TAKING A LICENSE, JUST TO PUT SOME FOIL ON THE FABRIC,

18     VERSUS WHEN YOU'RE TAKING A LICENSE TO MANUFACTURE SOMEBODY

19     ELSE'S PRODUCT FOR THEM AND PUT THEIR NAME ON IT.  WOULD YOU

20     AGREE, THAT'S DIFFERENT?

21     A.    IT'S DIFFERENT.

22     Q.    OKAY.  AND ALL THE DEALS YOU'VE SHOWN US HERE TODAY

23     INVOLVE A SITUATION WHERE SOMEBODY ELSE WAS GOING TO MAKE IT

24     AND PUT COLUMBIA'S NAME ON IT; RIGHT?

25     A.    ALL OF OUR PRODUCTS WOULD HAVE REQUIRED COLUMBIA TO BE

918

1    BRANDED ON THE PRODUCTS, YES.

2    Q.   YEAH.   THESE WERE ALL DEALS FOR BRANDED GOODS.   I THINK

3    THOSE WERE YOUR WORDS; RIGHT?

4    A.   THEY WERE, YES.

5    Q.   THEY ARE NOT NARROW, TECHNICAL DEALS; RIGHT?

6    A.   THEY WEREN'T LICENSES FOR JUST THE TECHNOLOGY.   THEY

7    INCLUDED OTHER ELEMENTS AS WELL.

8    Q.   THANK YOU.

9         I'D LIKE TO TALK NEXT ABOUT HOW YOU VALUE THE

10   TECHNOLOGY AT ISSUE IN THE LICENSE THAT WE'VE NOW AGREED UPON

11   THAT SEIRUS WOULD BE TAKING, AND THAT IS THE VALUE OF THE

12   OMNI-HEAT REFLECTIVE.   WELL, I WANT TO USE YOUR WORDS SO WE

13   DON'T HAVE ANY CONFUSION.

14        IF WE USE THE WORD "OMNI-HEAT REFLECTIVE

15   TECHNOLOGY," WILL YOU AND I HAVE AN UNDERSTANDING THAT I'M

16   REFERRING TO THE FOIL PRINTING ON FABRIC?

17   A.   YEAH.   WE CAN CALL THAT OMNI-HEAT.

18   Q.   OKAY.   NOW, I UNDERSTOOD FROM THE DELTA GALIL DEAL, THAT

19   ORIGINALLY THAT TECHNOLOGY, THE REFLECTIVE TECHNOLOGY WAS NOT

20   INCLUDED; RIGHT?

21   A.   IN THE FIRST DRAFT, THAT'S CORRECT.

22   Q.   WELL, IT WASN'T JUST THE FIRST DRAFT.   I THOUGHT YOU DID

23   A WHOLE DEAL WITH THEM?

24   A.   RIGHT.   THE FIRST AGREEMENT DIDN'T INCLUDE OMNI-HEAT.

25   Q.   AND WHAT WAS THE ROYALTY RATE ON THE FIRST AGREEMENT?

1    A.    THAT WAS STAIR-STEPPED UP TO 10 PERCENT.

2    Q.    AND WHEN YOU DID THE AMENDMENT WHERE YOU ADDED THE

3    REFLECTIVE TECHNOLOGY, YOU DIDN'T CHANGE THE ROYALTY RATE,

4    DID YOU?

5    A.    THAT IS CORRECT.  THE ROYALTY RATE DID NOT CHANGE.

6    Q.    I'D LIKE TO ASK YOU TO LOOK AT THE LONDON LUXURY DEAL.

7    IT'S EXHIBIT 88.  AND WE'RE GOING TO LOOK AT WHAT -- YOU

8    KNOW, THE LICENSE TECHNOLOGIES THAT ARE IN THESE AGREEMENTS

9    THAT YOU BROUGHT FOR US TO LOOK AT TODAY.  AND LET'S GO TO

10   PARAGRAPH 2.5.  THIS IS ALREADY IN EVIDENCE.

11         CAN WE HIGHLIGHT THAT.  MR. MERRIMAN, OKAY.  THIS

12   PARAGRAPH IS CALLED "LICENSED TECHNOLOGIES."

13         LET ME KNOW WHEN YOU'VE READ IT SO I CAN ASK YOU

14   QUESTIONS ABOUT IT.

15   A.    I HAVE.

16   Q.    NOW, THE LICENSED TECHNOLOGIES UNDER THIS DEAL WITH

17   LONDON LUXURY INCLUDE OMNI-HEAT REFLECTIVE, OMNI-FREEZE ZERO

18   AND OMNI-WICK EVAP.

19         DO YOU SEE THAT?

20   A.    I DO.

21   Q.    NOW, THOSE ARE THREE DIFFERENT TECHNOLOGIES; ISN'T THAT

22   RIGHT?

23   A.    THAT'S CORRECT.

24   Q.    AND IN THIS DEAL, ALL THREE ARE GETTING LICENSED TO

25   LONDON LUXURY TOGETHER; RIGHT?

1    A.    THAT'S CORRECT.

2    Q.    THEY ARE BEING BUNDLED TOGETHER; RIGHT?

3    A.    I WOULDN'T PHRASE IT -- BUT, YES, THEY HAVE RIGHTS TO DO

4    ALL THREE.

5    Q.    YOU WOULDN'T SAY THAT THEY ARE -- IT'S LIKE A

6    COMBINATION, YOU GET --

7    A.    IT WOULD JUST BE A WEIRD WAY OF SAYING IT.  THE LICENSE

8    GRANTED THE ABILITY FOR LONDON LUXURY TO PRODUCE PRODUCT

9    CONTAINING THESE THREE TECHNOLOGIES.

10    Q.    SO LET'S TALK ABOUT OMNI-FREEZE ZERO.  IS THAT A GOOD

11    TECHNOLOGY?

12    A.    YEAH.

13    Q.    IS THAT A VALUABLE TECHNOLOGY TO CUSTOMERS?

14    A.    SURE.

15    Q.    WHAT DOES IT DO?

16    A.    IT'S SORT OF ALMOST THE OPPOSITE OF OMNI-HEAT IN A WAY,

17    IN THAT IF YOU'RE SWEATING, IT HELPS YOU COOL DOWN.  THERE IS

18    A CHEMICAL REACTION -- AND I'M NOT THE SCIENTIST IN THE ROOM

19    OR THE INVENTOR.  BUT IT'S A COOLING TECHNOLOGY WHEN IT'S

20    HOT, TO KEEP THE WEARER COOL.

21    Q.    YOU ALSO HAVE OMNI-WICK EVAP?

22    A.    I DO.

23    Q.    AND WHAT IS THAT?

24    A.    IT'S A DIFFERENT TECHNOLOGY THAT HELPS THE EVAPORATION

25    PROCESS.

921

1    Q.    IS THAT ALSO A VALUABLE TECHNOLOGY THAT'S SOLD TO

2    CUSTOMERS?

3    A.    IT IS.

4    Q.    AND DO CUSTOMERS LIKE THESE TECHNOLOGIES, THESE

5    OMNI-WICK EVAP AND THE OMNI-FREEZE ZERO TECHNOLOGIES?

6    A.    THEY DO.

7    Q.    AND THEY ARE VALUABLE TO A LICENSEE?

8    A.    THEY ARE.

9    Q.    AND IN THIS INSTANCE, YOU HAVE COMBINED OMNI-HEAT

10   REFLECTIVE, OMNI-FREEZE ZERO, OMNI-WICK EVAP; RIGHT?

11   A.    THEY ARE ALL INCLUDED IN THE LICENSE, YES.

12   Q.    AND THERE IS NO BREAKDOWN AS TO HOW MUCH EACH ONE IS

13   WORTH FOR PURPOSES OF IDENTIFYING A ROYALTY RATE; ISN'T THAT

14   RIGHT?

15   A.    THAT'S CORRECT.

16   Q.    SO WHEN I USE THE WORD "BUNDLED TOGETHER," I MEANT, YOU

17   KNOW, YOU BASICALLY -- FOR ONE ROYALTY RATE, YOU GET ALL OF

18   THESE; RIGHT?

19   A.    YES.  THEY CAN INCORPORATE ALL THREE OR ONE OF THE

20   THREE, YES.

21   Q.    YOU CAN USE ALL THREE; RIGHT?

22   A.    YOU COULD.

23   Q.    AND WE CAN'T TELL HOW MUCH EACH ONE OF THESE IS VALUED

24   FOR PURPOSES OF COMING TO A ROYALTY RATE, CAN WE?

25   A.    WE KEEP THE ROYALTY RATE THE SAME, REGARDLESS OF THE

COMPUTER-AIDED TRANSCRIPTION

1    TECHNOLOGY, THAT'S CORRECT.

2    Q.    MY QUESTION IS A LITTLE DIFFERENT, MR. MERRIMAN.

3    A.    OKAY.

4    Q.    ISN'T IT TRUE, WE CAN'T FIGURE OUT FROM THIS, OR EVEN

5    ANYTHING YOU'VE TOLD US, WE CAN'T FIGURE OUT WHICH ONE OF

6    THESE TECHNOLOGIES IS APPORTIONED OR ATTRIBUTABLE TO THE

7    ROYALTY RATE, CAN WE?

8    A.    WE DON'T CHARGE ROYALTY RATE BASED ON SPECIFIC

9    TECHNOLOGY IN A PRODUCT.

10   Q.    YOU BUNDLE ALL THESE TECHNOLOGIES TOGETHER, AND IT'S

11   KIND OF LIKE, YOU KNOW, IT'S LIKE A TWO-FOR-ONE SALE; RIGHT?

12   IT'S LIKE A THREE-FOR-ONE SALE.   YOU GET THREE TECHNOLOGIES

13   FOR ONE PRICE; CORRECT?

14   A.    A LICENSE AGREEMENT IS -- IT'S A BUNDLE OF RIGHTS AND

15   RESPONSIBILITIES.   THE LICENSEE DOES A CERTAIN AMOUNT OF

16   THINGS.   WE GIVE A CERTAIN AMOUNT OF THINGS.

17         IN THIS AGREEMENT, PART OF THE RIGHTS THAT LONDON

18   LUXURY IS GETTING IS THE RIGHT TO USE OMNI-HEAT, OMNI-FREEZE

19   AND EVAP.

20   Q.    AND THEY ARE PAYING ONE PRICE; RIGHT?

21   A.    YES.   AS PART -- WE LOOK AT -- IT WOULD BE VERY HARD TO

22   LOOK AT EVERY PRODUCT AND SAY, OKAY, YOU'RE GOING TO HAVE A

23   DIFFERENT ROYALTY FOR THIS ONE BECAUSE IT'S GOT OMNI-HEAT,

24   AND THIS ONE HAS TWO TECHNOLOGIES, SO WE HAVE A DIFFERENT

25   ROYALTY RATE.

923

1          WE LOOK AT THE OVERALL BUSINESS AND WHAT WE EXPECT

2     THAT PORTFOLIO OF SALES AND PRODUCT TO BE, AND WE ASSIGN A

3     ROYALTY RATE, BECAUSE THAT -- IT WOULD BE A LOGISTICAL

4     NIGHTMARE TO TRY TO HAVE A DIFFERENT ROYALTY RATE FOR EVERY

5     SINGLE PRODUCT DEPENDING ON WHAT THE TECHNOLOGY IS.

6     Q.   VERY INTERESTING ANSWER.

7          SO WHAT I TAKE FROM THAT IS THAT IT WOULD BE VERY

8     HARD AND A LOGISTICAL NIGHTMARE FOR COLUMBIA TO HAVE TO

9     FIGURE OUT WHAT ITS INDIVIDUAL TECHNOLOGIES ARE WORTH FOR

10    PURPOSES OF ASSIGNING A ROYALTY RATE; IS THAT RIGHT?

11    A.   I'M SAYING TO COLLECT.  I'M SAYING IF WE HAD A DIFFERENT

12    ROYALTY RATE FOR THE 1500 PRODUCTS THAT I MANAGE, THAT WOULD

13    BE AN ACCOUNTING NIGHTMARE, TO TRY TO KEEP TRACK OF EVERY

14    SALE OF EVERYTHING THAT HAD A DIFFERENT ROYALTY RATE.  THAT'S

15    WHAT I WAS TRYING TO EXPLAIN.

16    Q.   THAT'S WHY -- SO IS THAT WHY NO ONE AT COLUMBIA HAS EVER

17    DONE THE WORK TO FIGURE OUT WHAT THIS OMNI-HEAT REFLECTIVE

18    VALUE IS ON ITS OWN?

19    A.   WE'VE NEVER HAD TO DO THE WORK.  IT DOESN'T -- IT'S NOT

20    SOMETHING THAT PROVIDES A BENEFIT FOR US TO DO IT THAT WAY.

21    WE ASSIGN A ROYALTY RATE TO WHAT THE FAIR RATE WOULD BE IN

22    THE INDUSTRY.

23    Q.   OKAY.  SO IT'S DIFFICULT, AND THE REALITY IS YOU JUST

24    DON'T HAVE IT, YOU DON'T HAVE THAT INFORMATION; RIGHT?

25    A.   WE DON'T LOOK AT LICENSING RATES -- OR ROYALTY RATES

924

1    THAT WAY.  IT'S JUST NOT HOW WE EVALUATE IT.

2    Q.   YOU LOOK AT LICENSING ROYALTY RATES KIND OF IN A BUNDLE

3    OF BOTH TECHNOLOGIES AND TRADEMARKS; ISN'T THAT RIGHT?

4    A.   WE LOOK AT THE FULL RIGHTS AND RESPONSIBILITIES THAT

5    EACH SIDE IS GETTING.  WE'RE GIVING SOME THINGS.  THE

6    LICENSEE IS DOING SOME THINGS.  THERE ARE BENEFITS TO

7    COLUMBIA.

8    Q.   OKAY.  MY QUESTION IS WAY SIMPLER THAN THAT.  I WAS JUST

9    SAYING, YOU BUNDLE THE TECHNOLOGIES WITH THINGS LIKE

10   TRADEMARKS.  ONE NUMBER; RIGHT?

11   A.   THERE IS ONE NUMBER.

12   Q.   OKAY.  SO LET'S DO IT THAT WAY.  CAN YOU PULL UP THE

13   TRADEMARK --

14            THE COURT:  MS. ROTHAUGE, SINCE YOU'RE MOVING TO A

15   NEW AREA, WHY DON'T WE TAKE OUR MORNING RECESS AT THIS TIME.

16            LADIES AND GENTLEMEN, WHY DON'T YOU GO AHEAD AND

17   STEP INTO YOUR ROOM.  WE'LL BE IN RECESS FOR ABOUT 15

18   MINUTES.

19            (JURY ABSENT, 10:30 A.M.)

20            THE COURT:  YOU CAN STEP DOWN.

21            15 MINUTES.

22            (RECESS, 10:30 A.M. TO 10:43 A.M.)

23            (JURY PRESENT, 10:43 A.M.)

24            THE COURT:  BE SEATED.

25            HOLD ON JUST A SECOND.  LET ME GET YOUR TIMER GOING.

925

1          YOU MAY PROCEED.

2     Q.    BY MS. ROTHAUGE:   MR. MERRIMAN, BEFORE THE BREAK, WE

3     WERE TALKING ABOUT EVERYTHING THAT YOU GET FOR THE ONE PRICE

4     THAT WE'VE SEEN IN THESE ROYALTY AGREEMENTS.

5          DO YOU REMEMBER THAT?

6     A.    YES.

7     Q.    AND YOU AGREED WITH ME THAT YOU GET THREE TECHNOLOGIES

8     WITH THE ONE PRICE, THE ROYALTY THAT YOU PAY UNDER THE

9     AGREEMENTS, THE BRANDING AGREEMENTS THAT YOU'VE SHOWN US

10    TODAY; RIGHT?

11    A.    YES.   IT'S THE SAME ROYALTY RATE FOR ALL THREE.

12    Q.    AND ISN'T IT TRUE THAT IN ADDITION TO THE TECHNOLOGIES,

13    YOU ALSO GET THE TRADEMARKS AS PART OF THE ROYALTY RATE THAT

14    YOU'RE PAYING; RIGHT?

15    A.    ALL THE PRODUCTS ARE COLUMBIA-BRANDED, IF THAT'S WHAT

16    YOU'RE REFERRING TO, YES.

17    Q.    OKAY.   WELL, LET'S LOOK AT EXHIBIT 88, THE LONDON LUXURY

18    AGREEMENT.   AND LET'S LOOK AT -- WELL, YOU DRAFTED THESE

19    AGREEMENTS.   YOU KNOW THERE IS A PAGE, A SCHEDULE THAT SHOWS

20    ALL THE MARKS THAT ARE AVAILABLE FOR USE WHEN YOU PAY THIS

21    ONE ROYALTY RATE; RIGHT?

22    A.    YES.

23    Q.    AND DOES SCHEDULE A, TITLED "PROPERTY" APPEAR TO BE A

24    SCHEDULE THAT SHOWS ALL THE TRADEMARKS THAT YOU GET TO USE

25    FOR THIS ONE ROYALTY RATE?

926

1    A.    THOSE WOULD BE THE LIST OF POTENTIAL TRADEMARKS THAT

2    COULD BE ON ANY GIVEN PRODUCT.    NOT NECESSARILY -- WE WOULD

3    WANT TO MAKE SURE IT FITS FOR THE RIGHT PRODUCT, BUT, YES,

4    POTENTIALLY THIS IS WHAT COULD BE ON A PRODUCT FOR THIS.    I'M

5    SORRY.    IS THIS LONDON LUXURY?

6    Q.    THIS IS LONDON LUXURY.

7            SO THESE ARE ALL THE TRADEMARKS THAT ARE AVAILABLE

8    FOR THE ONE ROYALTY RATE PRICE FOR THE BLANKETS AND THE

9    SLEEPING BAGS; RIGHT?

10   A.    POTENTIALLY.    BUT STILL, SUBJECT TO THE PRODUCT APPROVAL

11   PROCESS THAT WE WOULD HAVE.

12   Q.    I UNDERSTAND THAT.    I'M JUST ASKING PURELY ABOUT THE

13   INTELLECTUAL PROPERTY THAT'S BEING GRANTED FOR THESE ROYALTY

14   RATES THAT WE'RE TALKING ABOUT IN YOUR AGREEMENTS THAT YOU

15   SHOWED US HERE TODAY.

16           AND YOU WOULD AGREE THAT ALL OF THOSE AGREEMENTS

17   HAVE SCHEDULES LIKE THIS ONE WITH THE TRADEMARKS ON THEM;

18   RIGHT?

19   A.    YES.

20   Q.    AND NOT ONLY DO THEY GET TO USE THE TRADEMARKS, BUT THEY

21   GET TO USE THE DESIGNS AND THE PICTURES; RIGHT?

22   A.    YES.

23   Q.    HOW MANY TRADEMARKS ARE ON THIS SCHEDULE A THAT ARE

24   AVAILABLE FOR USE IF YOU PAY THIS ONE LOW ROYALTY RATE?

25   A.    I SEE 14 ON THIS SPECIFIC ONE.

1    Q.    SO YOU GET THREE TECHNOLOGIES AND 14 TRADEMARKS UNDER

2    THE ROYALTY AGREEMENTS, THE LONDON LUXURY ROYALTY AGREEMENTS;

3    IS THAT RIGHT?

4    A.    YES.

5    Q.    AND SO ALL OF THESE INTELLECTUAL PROPERTY RIGHTS ARE

6    BUNDLED TOGETHER FOR THE ONE ROYALTY PRICE UNDER THE

7    AGREEMENTS THAT YOU'VE TESTIFIED TO ABOUT HERE TODAY;

8    RIGHT?

9    A.    PART OF THE RIGHTS AND RESPONSIBILITIES, YES.

10   Q.    AND THERE IS NO WAY TO KNOW -- THERE IS NO ALLOCATION

11   FOR THE TRADEMARKS VERSUS THE TECHNOLOGIES; RIGHT?

12   A.    NO.  WE GENERALLY HAVE ONE FLAT ROYALTY RATE.  IN SOME

13   CASES TWO, DEPENDING ON THE TYPE OF PRODUCT.

14   Q.    SO IF WE WANTED TO KNOW HOW MUCH OF THE -- WELL, WHAT IS

15   THE ROYALTY RATE FOR LONDON LUXURY AGAIN?

16   A.    I DON'T RECALL EXACTLY.  I THINK THAT ONE WAS -- 9

17   PERCENT SOUNDS ABOUT RIGHT.

18   Q.    YEAH, THAT SOUNDS ABOUT RIGHT.  SO LET'S SAY -- I THINK

19   IT'S 9 PERCENT AND THEN 8 PERCENT FOR SLEEPING BAGS.

20         DOES THAT SOUND ABOUT RIGHT?

21   A.    SLEEPING BAGS WAS TORG.

22   Q.    TORG.  OKAY.  I GOT THEM MIXED UP.  OKAY.

23         SO LET'S -- FOR THE RECORD, LET'S JUST BE REALLY

24   CLEAR ON WHAT THE ROYALTY RATE IS FOR LONDON LUXURY.  AND IT

25   IS 9 PERCENT, AND 6 PERCENT FOR CLOSEOUTS.

928

1         DOES THAT SOUND RIGHT?

2    A.    THAT SOUNDS CORRECT.

3    Q.    SO FOR THE NINE -- WE DON'T KNOW HOW MUCH THE OMNI-HEAT

4    REFLECTIVE TECHNOLOGY IS, OR HOW MUCH OF IT CONTRIBUTES TO

5    THAT 9 PERCENT ROYALTY RATE, DO WE?

6    A.    I WOULDN'T SAY IT'S THAT WE DON'T KNOW.  WE DON'T BREAK

7    IT OUT THAT WAY.

8    Q.    AND YOU'VE OFFERED NO TESTIMONY TO HELP THE JURY

9    DETERMINE, YOU KNOW, OF THE 9 PERCENT, WELL, 1 PERCENT IS FOR

10   REFLECTIVE TECHNOLOGY AND 6 PERCENT IS FOR TRADEMARK.  YOU

11   DON'T HAVE ANY OPINION ON THAT, DO YOU?

12   A.    WE DON'T BREAK OUT OUR AGREEMENTS THAT WAY.  THERE IS,

13   AGAIN, A SET OF BENEFITS AND A SET OF RESPONSIBILITIES THAT

14   THEY GET AND IT GOES BACK AND FORTH.  AND WE HAVE ONE,

15   GENERALLY ONE ROYALTY RATE.

16   Q.    SO IS THE ANSWER TO MY QUESTION, NO, YOU'VE PROVIDED NO

17   OPINIONS TO HELP THE JURY DETERMINE OUT OF THE 9 PERCENT

18   ROYALTY RATE WHAT CAN BE ATTRIBUTED TO THE OMNI-HEAT

19   REFLECTIVE TECHNOLOGY?

20   A.    THAT'S NOT HOW WE LOOK AT THE AGREEMENT, SO I HAVEN'T

21   PROVIDED INFORMATION SPECIFICALLY TO DO IT THAT WAY BECAUSE

22   THAT'S NOT HOW WE WOULD DO IT.

23   Q.    UNDERSTOOD.  THANK YOU.

24         NOW, YOU ALSO DID -- I THINK YOU TESTIFIED THAT AS

25   PART OF YOUR ANALYSIS, YOU DID A GEORGIA-PACIFIC ANALYSIS; IS

1    THAT RIGHT?

2    A.    CORRECT.

3    Q.    AND A GEORGIA-PACIFIC ANALYSIS IS -- IT WAS YOUR

4    GEORGIA-PACIFIC ANALYSIS, WASN'T IT?

5    A.    THAT'S CORRECT.

6    Q.    YOU'VE NEVER DONE ONE BEFORE, HAVE YOU?

7    A.    I HAVEN'T HAD TO, NO.

8    Q.    AND YOU DID THAT GEORGIA-PACIFIC ANALYSIS BETWEEN MAY 12

9    OF 2016 AND JUNE 30TH OF 2016; ISN'T THAT RIGHT?

10   A.    I DIDN'T KNOW ABOUT THE CASE BEFOREHAND, SO IT WASN'T I

11   KNOW ON THE FRONT END.  I DON'T KNOW EXACTLY WHEN THAT -- IF

12   IT WAS BEFORE OR -- IT PROBABLY WOULD HAVE TO BE.  THAT WOULD

13   MAKE SENSE, I THINK.

14   Q.    RIGHT.  YOU DIDN'T DO A GEORGIA-PACIFIC BEFORE?

15   A.    DIDN'T DO IT BEFORE, NO.

16   Q.    BUT YOU ISSUED ONE ON JUNE 30TH?

17   A.    OKAY.

18   Q.    SO WE CAN AGREE THAT YOU DID YOUR ANALYSIS SOMETIME

19   BETWEEN MAY 12 AND JUNE 30TH; ISN'T THAT RIGHT?

20   A.    THAT SOUNDS RIGHT.

21   Q.    AND SINCE IT WAS YOUR FIRST GEORGIA-PACIFIC ANALYSIS

22   EVER, DID YOU GET SOME HELP FROM SOMEBODY?

23   A.    I WAS IDENTIFIED THE CASE AND TALKED TO OUR ATTORNEYS

24   ABOUT IT.  AND AS WAS INDICATED EARLIER, I WAS LOOKING AT ONE

25   SPECIFIC FACTOR OF THAT CASE.

930

1    Q.    LET ME BREAK THAT DOWN A LITTLE BIT.

2              SO SOMEONE PROVIDED YOU THE CASE, THE

3    GEORGIA-PACIFIC CASE SO YOU COULD READ IT AND KNOW WHAT THAT

4    EVEN MEANS?

5    A.    I HAD A CONVERSATION WITH OUR ATTORNEY.

6    Q.    WHAT ATTORNEY?

7    A.    MR. ALDRICH.

8    Q.    SO MR. ALDRICH HELPED YOU TO IDENTIFY THE CASE.  DID HE

9    TELL YOU WHAT THE CASE WAS?

10   A.    HE IDENTIFIED THE GEORGIA CASE.

11   Q.    DID HE GIVE IT TO YOU TO READ?

12   A.    I DON'T RECALL.

13   Q.    DID YOU JUST RELY ON WHAT HE TOLD YOU ABOUT THE

14   GEORGIA-PACIFIC CASE IN COMING TO YOUR OPINION?

15   A.    I DON'T RECALL OUR SPECIFIC CONVERSATION ABOUT IT.

16   Q.    BUT YOU DON'T REMEMBER READING THE CASE?

17   A.    I DON'T RECALL HOW MUCH I READ OF THAT CASE OR WHAT

18   PARTS OF THAT CASE I READ.

19   Q.    SO YOU -- OKAY.  SO I CAN'T TELL WHETHER YOU'RE SAYING

20   YOU YOU DID OR DIDN'T READ IT.

21   A.    I DIDN'T READ EVERY WORD OF THAT CASE.  I READ PARTS OF

22   THAT CASE.

23   Q.    OKAY.  YOU READ PARTS OF THE -- SO YOU DIDN'T READ THE

24   WHOLE CASE, WHICH IS VERY LENGTHY BECAUSE IT'S A COMPLICATED

25   TEST; RIGHT?

931

1    A.    WELL, I DIDN'T READ THE WHOLE CASE.

2    Q.    SO YOU ACTUALLY DON'T KNOW ABOUT THE GEORGIA-PACIFIC

3    TEST THEN; IS THAT WHAT YOU'RE SAYING?

4    A.    NO, THAT'S NOT WHAT I'M SAYING.

5    Q.    OKAY.  SO MY QUESTION WAS, SO YOU DIDN'T READ THE WHOLE

6    CASE, YOU DIDN'T READ THE WHOLE CASE BECAUSE IS IT A VERY

7    LENGTHY OPINION?

8    A.    I BELIEVE IT IS.

9    Q.    AND SO YOU DIDN'T HAVE TIME TO READ THE WHOLE CASE;

10   RIGHT?

11   A.    I WOULDN'T SAY THAT I DIDN'T HAVE TIME TO READ THE WHOLE

12   CASE.

13   Q.    YOU JUST CHOSE NOT TO READ THE WHOLE CASE?

14   A.    I FOCUSED ON WHAT I BELIEVED WAS THE RELEVANT PART OF

15   THAT CASE.

16   Q.    HOW DID YOU KNOW WHAT WAS THE RELEVANT PART OF THE CASE

17   IF YOU HADN'T READ THE WHOLE CASE?

18   A.    I'VE HAD CONVERSATIONS WITH OUR ATTORNEY AND IN-HOUSE

19   COUNSEL.

20   Q.    SO YOU KNEW WHAT PARTS OF THE CASE TO READ BECAUSE AN

21   IN-HOUSE LAWYER AND I GUESS AN OUT-HOUSE LAWYER TOLD YOU

22   WHICH PARTS TO READ; IS THAT RIGHT?

23   A.    YES.

24   Q.    OKAY.  AND WHO WERE THE TWO LAWYERS THAT TOLD YOU WHAT

25   PARTS OF THE CASE TO READ?

COMPUTER-AIDED TRANSCRIPTION

932

1    A.    MR. ALDRICH AND MR. KELLY.

2    Q.    RIGHT.  SO AFTER YOU -- SO YOU READ THE PARTS THAT THEY

3    TOLD YOU TO READ.  WHAT DID YOU DO NEXT?

4    A.    I'M NOT SURE OF THE SEQUENCE.

5         MR. ALDRICH:  YOUR HONOR, IT'S ACTUALLY OUTSIDE THE

6    SCOPE.  MR. MERRIMAN ONLY TESTIFIED ABOUT GEORGIA-PACIFIC

7    FACTOR 15 TODAY AS HE TESTIFIED.

8         THE COURT:  THE OBJECTION IS OVERRULED.

9         YOU CAN ANSWER THE QUESTION.

10        MR. ALDRICH:  OKAY.

11        THE WITNESS:  AS I ALLUDED TO EARLIER, I HAD TAKEN

12   THE FACTS THAT I HAD HEARD IN THE CASE, I COMPARED IT AGAINST

13   OUR OTHER LICENSING AGREEMENTS AND CAME UP WITH MY OPINION.

14   Q.    BY MS. ROTHAUGE:  YOU MENTIONED THAT ALSO YOU HAD SOME

15   CONVERSATIONS WITH YOUR ATTORNEYS ABOUT YOUR GEORGIA-PACIFIC

16   ANALYSIS TO HELP YOU; IS THAT RIGHT?

17   A.    I DON'T RECALL THE SPECIFIC CONVERSATIONS.  I DID HAVE

18   CONVERSATIONS AT SOME POINT ABOUT GEORGIA WITH MY

19   ATTORNEYS -- OR COLUMBIA ATTORNEYS.

20   Q.    AND YOU'RE LOOKING AT MR. ALDRICH.  DID YOU HAVE

21   CONVERSATIONS WITH MR. ALDRICH ABOUT YOUR GEORGIA-PACIFIC

22   ANALYSIS AS YOU WERE FORMING YOUR OPINIONS ABOUT IT?

23   A.    MR. ALDRICH AND MR. KELLY.

24   Q.    OKAY.  SO YOU TALKED TO BOTH OF THEM ABOUT YOUR -- THE

25   GEORGIA-PACIFIC TEST AND INFORMATION AS PART OF FORMING YOUR

933

1    OPINION; RIGHT?

2    A.    THAT'S CORRECT.

3    Q.    HOW MANY CONVERSATIONS DID YOU HAVE WITH MR. ALDRICH?

4    A.    MOST OF MY CONVERSATIONS THAT INVOLVED MR. ALDRICH,

5    MR. KELLY WAS PRESENT AS WELL.  AND I DON'T RECALL HOW MANY

6    CONVERSATIONS I HAD.

7    Q.    COULD IT HAVE BEEN, WHAT, 12 CONVERSATIONS?

8    A.    I DON'T RECALL.  SPECIFICALLY AS IT RELATES TO GEORGIA?

9    Q.    YES.

10    A.    ARE YOU TALKING ABOUT THIS SPECIFIC TIME PERIOD OR ARE

11    YOU TALKING --

12    Q.    YES.  I'M LIMITING MY QUESTIONS TO HOW MANY TIMES DID

13    YOU HAVE CONVERSATIONS WITH YOUR LAWYERS BETWEEN MAY 12 AND

14    JUNE 30TH ABOUT THE GEORGIA-PACIFIC FACTORS AND YOUR

15    ANALYSIS.

16    A.    I WOULD SAY IT WAS LESS THAN 12.

17    Q.    HOW LONG DID THE CONVERSATIONS GO ON?

18    A.    I DON'T RECALL.

19    Q.    WERE THEY IN PERSON OR BY PHONE?

20    A.    I DON'T RECALL.  I BELIEVE BOTH.

21    Q.    SO SOMETIMES YOU MET IN PERSON WITH MR. KELLY AND

22    MR. ALDRICH, AND SOMETIMES YOU JUST TALKED ON THE PHONE WITH

23    THE TWO OF THEM ABOUT THIS ANALYSIS; IS THAT CORRECT?

24    A.    THAT'S CORRECT.

25    Q.    NOW, DID ONE OF THE -- ONE OF THE THINGS THAT YOU NEED

934

1   TO CONSIDER, OR YOU'RE ALLOWED TO CONSIDER WHEN YOU'RE

2   LOOKING AT GEORGIA-PACIFIC IS HOW EASY IT WOULD BE TO DESIGN

3   AROUND THE PATENT, OR, IN OTHER WORDS, CHANGE YOUR PRODUCT SO

4   THAT IT DIDN'T INFRINGE ANYMORE.

5        ARE YOU FAMILIAR WITH THAT CONCEPT FROM YOUR

6   CONVERSATIONS WITH YOUR ATTORNEYS AND YOUR REVIEW OF PORTIONS

7   OF GEORGIA-PACIFIC?

8   A.   BRIEFLY, YES.  I'VE HEARD OF THAT.

9   Q.   AND SO IN ORDER TO DO THAT ANALYSIS, YOU'D HAVE TO HAVE

10  AN UNDERSTANDING OF THE PATENT; CORRECT?

11  A.   SOME UNDERSTANDING.

12  Q.   WHICH PATENTS DID YOU READ IN PREPARATION OF YOUR

13  OPINIONS?

14  A.   I HAVEN'T READ THE PATENTS FULLY.

15  Q.   WHAT DID YOU SAY?

16  A.   I HAVEN'T FULLY READ THE TEXT OF ALL OF OUR PATENTS.

17  Q.   OKAY.  SO YOU READ PORTIONS OF THE PATENTS; IS THAT

18  CORRECT?

19  A.   I'VE SEEN PORTIONS OF OUR PATENTS, YES.

20  Q.   WHERE HAVE YOU SEEN PORTIONS OF THE PATENTS?

21  A.   OUT OF CURIOSITY, EVEN I THINK -- I'VE READ THE

22  OMNI-HEAT PATENT PRIOR TO THIS CASE JUST OUT OF PERSONAL

23  CURIOSITY.

24  Q.   WELL, I WAS -- LET ME MAKE SURE I'M CLEAR.  I'M

25  WONDERING BETWEEN MAY 12 AND JUNE 30TH, DID YOU READ THE

1    PATENTS AT ALL?

2    A.    NO.

3    Q.    SO YOU HAD NOT READ THE PATENTS ON JUNE 30TH, 2016 WHEN

4    YOU ISSUED YOUR EXPERT REPORT; IS THAT CORRECT?

5    A.    I'VE READ THEM PRIOR TO THAT.  I READ THE OMNI-HEAT

6    PATENT PRIOR TO THAT.

7    Q.    OH.  I MISUNDERSTOOD THEN.

8              SO PRIOR TO MAY 12 OF 2016, YOU HAD READ THE

9    OMNI-HEAT PATENT?

10   A.    PART OF IT, YES.

11   Q.    PART OF IT.  AND WHAT PART DID YOU READ?

12   A.    I DON'T RECALL WHAT SPECIFIC PART I READ.

13   Q.    AND DO YOU REMEMBER HOW MUCH TIME PRIOR TO MAY 12 YOU

14   HAD READ THE PATENT?  LIKE WAS IT WEEKS?  WAS IT YEARS?  WAS

15   IT MONTHS?  HOW MUCH TIME?

16   A.    IT WAS MORE THAN A MONTH PRIOR.

17   Q.    SO 30 DAYS PRIOR TO MAY 12.  SO AROUND APRIL 12, MAYBE

18   AROUND THAT TIME FRAME, YOU LOOKED AT PART OF THE PATENT OUT

19   OF CURIOSITY?

20   A.    YEAH.  I'D SAY WITHIN A YEAR PROBABLY OF MAY.

21   Q.    AND WAS -- AND IN PREPARING YOUR OPINION, IS THE ONLY

22   INFORMATION YOU HAD ABOUT THE PATENTS IN THIS CASE COME FROM

23   THAT LOOKING AT THE PATENTS OUT OF CURIOSITY MONTHS OR YEARS

24   BEFORE?

25   A.    WELL, I HAD SPOKEN TO OUR ATTORNEYS ABOUT THE PATENTS.

1    Q.   OH, OKAY.  I SHOULD HAVE ASKED YOU ABOUT THAT.

2         SO BETWEEN MAY 12, 2016 AND JUNE 30TH OF 2016, DID

3    YOU HAVE CONVERSATIONS WITH YOUR ATTORNEYS ABOUT THE PATENTS?

4    A.   BRIEFLY.

5    Q.   AND THEY TOLD YOU ABOUT THE PATENTS?

6    A.   WE DISCUSSED THE PATENTS AT ISSUE IN THIS CASE.

7    Q.   SO EVERYTHING YOU KNOW, KNEW, YEAH, KNEW ABOUT THE

8    PATENTS WHEN YOU ISSUED YOUR REPORT ON JUNE 30TH, CAME FROM

9    CONVERSATIONS WITH ATTORNEYS; IS THAT RIGHT?

10   A.   LARGELY THAT.  AND THEN THE INFORMATION THAT I HAD ABOUT

11   OUR PATENTS FROM READING IT PRIOR TO MAY.

12   Q.   AND WHICH ATTORNEYS HAD PROVIDED INFORMATION TO YOU THAT

13   YOU RELIED UPON ABOUT THE PATENTS PRIOR TO ISSUING YOUR

14   REPORT ON JUNE 30TH?

15   A.   I'D BEEN WORKING WITH MR. ALDRICH AND MR. KELLY.

16   Q.   ALL RIGHT.  SO LET ME -- SO WE KNOW YOU KNOW SOMETHING

17   ABOUT THE PATENTS.  SO LET ME ASK SOME QUESTIONS ABOUT THAT

18   AND PROBE YOUR -- THE BASIS OF YOUR OPINIONS A LITTLE BIT.

19        SO ONE OF THE ISSUES, AS WE JUST AGREED UPON, IS HOW

20   EASILY YOU CAN DESIGN AROUND THE PATENT; RIGHT?

21   A.   SURE.

22   Q.   AND THEN I'M GOING TO NOW ASK SPECIFICALLY ABOUT THE

23   '270 PATENT FOR THESE NEXT SERIES OF QUESTIONS.  AND DO YOU

24   UNDERSTAND THE '270 PATENT TO BE THE UTILITY PATENT?

25        MR. ALDRICH:  YOUR HONOR, THIS ISN'T IN THE CONTENT

937

1    OF HIS EXPERT DISCLOSURE AT ALL, AND IT WASN'T ADDRESSED IN

2    HIS DIRECT TESTIMONY.

3            THE COURT:  ASK YOUR QUESTION AGAIN.

4            MS. ROTHAUGE:  I'M ASKING -- I'M TESTING WHAT

5    INFORMATION -- WHAT DESIGN-AROUND INFORMATION HE HAD THAT HE

6    EITHER CONSIDERED OR DIDN'T CONSIDER IN FORMING HIS

7    OPINION.

8            THE COURT:  YOUR OBJECTION IS OVERRULED.

9            YOU CAN ASK THE QUESTION.

10           THE WITNESS:  I'M SORRY.  CAN YOU ASK THE QUESTION

11   AGAIN.

12           MS. ROTHAUGE:  YEAH.  IT WAS ACTUALLY A BAD

13   QUESTION; SO I'LL ASK A BETTER QUESTION.

14   Q.   SO WE KNOW THAT YOU KNOW A LITTLE SOMETHING ABOUT THE

15   '270 PATENT FROM YOUR ATTORNEYS WHEN YOU ISSUED YOUR OPINION;

16   RIGHT?

17   A.   IT'S NOT SUPER CLEAR TO ME.  I DON'T HAVE A TON OF

18   DETAIL.  I WAS FOCUSED ON WHAT THE REASONABLE ROYALTY RATE

19   WOULD BE, OR THE ROYALTY AS IT RELATED TO LICENSING THESE

20   OUT.  I WASN'T DEALING A LOT IN THIS CASE AS IT SPECIFICALLY

21   RELATED TO THE PATENT ITSELF, JUST WHAT THE ROYALTY RATE

22   WOULD BE FOR THE PATENT.

23   Q.   ALL RIGHT.  WELL, I'M JUST TESTING HOW MUCH -- WHAT YOU

24   KNOW ABOUT DESIGN-AROUND.  BECAUSE OBVIOUSLY YOU KNOW IF A

25   COMPETITOR CAN EASILY DESIGN AROUND YOUR PATENT, ISN'T IT

1    TRUE THAT THAT WILL AFFECT THE NEGOTIATIONS?

2    A.    POTENTIALLY.

3    Q.    SO THAT'S WHAT I WANT TO FIND OUT IN THIS CASE.

4          SO IN THIS CASE, DO YOU UNDERSTAND THAT THE UTILITY

5    PATENT, IF THIS IS MY HAND IN A GLOVE, THAT IF THE FOIL SIDE

6    IS TOUCHING MY HAND, IT COULD POTENTIALLY INFRINGE?

7    A.    THAT'S MY UNDERSTANDING.

8    Q.    BUT IF I FLIP IT, IT DOESN'T ANYMORE; RIGHT?

9    A.    I UNDERSTAND THAT THAT CHANGES THE ANALYSIS AND LIKELY

10   WOULD NOT INFRINGE, IF IT WAS FACING AWAY FROM THE WEARER.

11   Q.    OKAY.  AND YOU UNDERSTAND THAT, YOU KNOW, IT'S PRETTY

12   EASY TO DESIGN AROUND A PATENT WHERE ALL YOU HAVE TO DO IS

13   LIKE FLIP THE MATERIAL OVER; RIGHT?

14   A.    YES.  IT'S EASY TO FLIP MATERIAL.  I THINK THERE WOULD

15   BE SOME QUESTION AS TO WHETHER THE BENEFIT WOULD BE THE SAME.

16   AGAIN, I'M NOT THE EXPERT ON THAT.  BUT JUST BY TURNING IT

17   AROUND --

18   Q.    LET'S ASSUME THAT THE BENEFIT IS THE SAME.  LET'S ASSUME

19   THE BENEFIT IS THE SAME.  THAT'S A FAIR CLARIFICATION.

20         MY QUESTION IS, ASSUME FOR THIS NEGOTIATION, THIS

21   HYPOTHETICAL NEGOTIATION THAT YOU'RE CONDUCTING ON BEHALF OF

22   MS. BOYLE, YOU GOT TO GET A DEAL, AND LET'S ASSUME THAT THE

23   FUNCTIONALITY IS THE SAME, PERFORMANCE IS THE SAME, BUT ALL

24   SEIRUS HAS TO DO IS FLIP THE FABRIC OVER TO GET AROUND THE

25   PATENT.

939

1          OKAY.  CAN WE ASSUME THAT?

2     A.   WE CAN ASSUME THAT.

3     Q.   AND THAT'S GOING TO AFFECT THE ROYALTY RATE THAT YOU CAN

4     GET FROM SEIRUS, ISN'T IT?

5     A.   IT'S LEAVING OUT -- EVEN IF THE PERFORMANCE IS EXACTLY

6     THE SAME --

7     Q.   I'M ASKING JUST ABOUT THIS ONE ISSUE.

8     A.   I KNOW.  I'M SAYING IF YOU FLIP IT AROUND, IT MAKES IT

9     NOT VISIBLE; RIGHT.  AND WE TALK A LOT ABOUT VISIBLE

10    TECHNOLOGIES AT COLUMBIA AND TRYING TO MAKE OUR TECHNOLOGIES

11    VISIBLE SO THE CONSUMERS SEE THE BENEFIT, PERCEIVE THE

12    BENEFIT AND UNDERSTAND IT, WHICH MAKES IT MORE SALABLE.

13    Q.   NOW WE'RE GOING ON A TANGENT.  I DON'T WANT TO GO DOWN

14    THAT TANGENT.

15          MR. ALDRICH:  YOUR HONOR --

16          THE REPORTER:  ONE AT A TIME.

17          THE COURT:  THANK YOU.  HAVE A SEAT.

18          ASK YOUR QUESTION.

19          MS. ROTHAUGE:  IT'S A MORE NARROW QUESTION I'M

20    ASKING.

21    Q.   IF SEIRUS SAID, WE DON'T CARE ABOUT THE REFLECTIVE, WE

22    WANT JUST THE PERFORMANCE.  WE'RE GOING TO FLIP IT.  WOULD

23    THAT AFFECT THE ROYALTY RATE -- WOULD THAT AFFECT THE

24    NEGOTIATIONS?

25    A.   IT'S HARD TO SAY.  IT'S A VERY DIFFERENT PRODUCT AT THAT

COMPUTER-AIDED TRANSCRIPTION

940

1    POINT BECAUSE --

2    Q.   IS IT FAIR TO SAY THEN THAT YOU DIDN'T CONSIDER THIS

3    ISSUE WHEN YOU WERE FORMING YOUR OPINION ON THE ROYALTY

4    RATE?

5    A.   IT'S NOT THAT IT WASN'T CONSIDERED.  IT'S THAT I VIEW

6    HAVING THE REFLECTIVITY SHOWING OUTWARD AS A BENEFIT THAT'S

7    WORTH SOMETHING.  THERE IS A LOT OF VALUE IN THAT.

8    Q.   SO YOU COMPLETELY DISREGARDED THE ABILITY OF SEIRUS TO

9    DESIGN AROUND IN FORMING YOUR OPINION; IS THAT CORRECT?

10   A.   NO.  BECAUSE I ALSO BELIEVE -- I BELIEVE IT'S A HUGE

11   PART OF THE BENEFIT.  IT'S NOT THAT IT'S DISREGARDED.

12   Q.   BUT I TOLD YOU TO ASSUME FOR MY QUESTION THAT SEIRUS IN

13   THE HYPOTHETICAL NEGOTIATION TELLS YOU, WE DON'T CARE, WE

14   WANT THE PERFORMANCE.  WE ARE GOING TO FLIP IT.

15   A.   OKAY.

16   Q.   OKAY.  AND, IN FACT, THEY HAVE DONE THAT ON SOME OF

17   THEIR GLOVES.  YOU KNOW THAT; RIGHT?  THEY HAVE FLIPPED THE

18   MATERIAL; RIGHT?

19   A.   I BECAME AWARE OF THAT YESTERDAY.

20   Q.   OKAY.  SO I WANT YOU TO ASSUME FOR THIS QUESTION THAT

21   THEY ARE GOING TO FLIP EVERYTHING.  OKAY.  AND WILL THAT --

22   MY QUESTION TO YOU NOW IS, WOULD THAT AFFECT NEGOTIATIONS?

23   YES OR NO.

24        MR. ALDRICH:  YOUR HONOR, THERE IS A LEGAL PROBLEM

25   WITH THIS LINE OF QUESTIONS.

COMPUTER-AIDED TRANSCRIPTION

1          THE COURT:  YOU KNOW, YOU GET REDIRECT.

2          MR. ALDRICH:  I CAN HANDLE IT THERE.  THAT'S FINE.

3          THE COURT:  ALL RIGHT.  GO AHEAD.

4     Q.   BY MS. ROTHAUGE:  DID YOU CONSIDER THAT?  YES OR NO.

5     A.   IT WASN'T A PRIMARY FACTOR THAT I WAS LOOKING AT.

6     Q.   THANK YOU.

7          MS. ROTHAUGE:  SO I DO WANT TO LOOK AT SOMETHING I

8     KNOW YOU DID CONSIDER.  AND LET'S LOOK AT YOUR EXPERT REPORT.

9     THIS IS EXHIBIT 1344.

10          ALSO, WHILE I'M THINKING ABOUT IT, MOVE TO OFFER

11     1407, WHICH IS THE MATERIAL I'VE BEEN FLIPPING OVER AS I

12     QUESTIONED MR. MERRIMAN.

13          THE COURT:  ANY OBJECTION TO 1407?  THAT'S THE

14     HEATWAVE FABRIC.

15          MR. ALDRICH:  SORRY.  NO, OF COURSE NOT.

16          THE COURT:  RECEIVED.

17          (TRIAL EXHIBIT 1407 RECEIVED IN EVIDENCE.)

18          MS. ROTHAUGE:  YEAH.  OKAY.  SO I'M NOT GOING TO

19     MOVE TO ADMIT THIS.  WE'RE GOING TO PULL UP ON THE SCREEN SO

20     YOU CAN REFRESH YOUR RECOLLECTION A PARAGRAPH OF YOUR EXPERT

21     REPORT.

22          I'M GOING TO ASK YOU TO LOOK AT PAGE 7.  AND I'M

23     GOING TO ASK YOU TO LOOK AT THE THIRD PARAGRAPH DOWN THAT

24     SAYS, MR. MERRIMAN WOULD HAVE ASSUMED.

25     Q.   DO YOU SEE THAT?  IT LISTS SOME OF YOUR ASSUMPTIONS.  DO

942

1    YOU SEE THAT?

2    A.    OKAY.

3    Q.    HAVE YOU HAD A CHANCE TO READ IT?

4    A.    NO.  I'LL READ IT REAL QUICK.

5    Q.    YEAH.  READ IT?

6    A.    OKAY.

7    Q.    SO YOU DID MAKE SOME ASSUMPTION.  THIS IS A REPORT THAT

8    SOMEONE DRAFTED FOR YOU, BUT YOU SIGNED OFF ON THIS; RIGHT?

9              MR. ALDRICH:  OBJECTION.  MISCHARACTERIZES.

10             THE COURT:  OVERRULED.  YOU CAN ANSWER THE

11   QUESTION.

12             THE WITNESS:  I -- TO BE CLEAR, I CAME UP WITH THE

13   CONTENTS.  SOMEONE WROTE THE LANGUAGE.  AND YEAH --

14   Q.    BY MS. ROTHAUGE:  THAT'S WHAT I MEANT TO ASK.

15   A.    YEAH.

16   Q.    OKAY.  AND SO THIS -- IT STATES SOME OF YOUR ASSUMPTIONS

17   FOR THE HYPOTHETICAL NEGOTIATION, DOESN'T IT?

18   A.    THAT'S FAIR.

19   Q.    AND THE -- IT SAYS HERE THAT YOU WOULD HAVE ASSUMED THAT

20   COLUMBIA WOULD HAVE BEEN IN THE STRONGER BARGAINING POSITION.

21             DO YOU SEE THAT?

22   A.    THAT'S CORRECT.

23   Q.    AND THEY WOULD HAVE BEEN BECAUSE SEIRUS WAS IN A

24   DIFFICULT POSITION, HAVING PRESUMABLY INVESTED HEAVILY IN

25   DEVELOPING AND MARKETING ITS HEATWAVE LINES OF GLOVES AND

943

1    OTHER PRODUCTS WHOSE SALES COULD BE ENJOINED.  RIGHT?

2    A.   YEP.

3    Q.   SO YOU ASSUMED FOR YOUR HYPOTHETICAL NEGOTIATION -- AND

4    THIS IS SOME FANCY LAWYER TALK, SO I WANT YOU TO EXPLAIN THIS

5    TO ME.

6         YOU WOULD HAVE ASSUMED THAT HEATWAVE WOULD HAVE BEEN

7    ENJOINED; RIGHT?  DO YOU SEE THAT?

8         DOES THAT MEAN THAT COLUMBIA WOULD HAVE COME INTO

9    COURT AND WOULD HAVE GOT AN INJUNCTION TO STOP -- TO SHUT

10   DOWN THE BUSINESS AND STOP THEM FROM SELLING THE HEATWAVE

11   GLOVE?  THAT'S WHAT THAT MEANS; RIGHT?

12   A.   WHAT I WAS GETTING AT -- I DIDN'T WRITE -- THAT WASN'T

13   LANGUAGE THAT I INITIALLY USED.  WHAT I WAS --

14   Q.   WELL, I'M ASKING IF YOU UNDERSTAND WHAT -- AM I RIGHT

15   ABOUT WHAT AN INJUNCTION MEANS, WHAT "ENJOINED" MEANS?

16   A.   YES.

17   Q.   COLUMBIA WOULD HAVE USED COURT PROCEEDINGS TO COME IN

18   AND SHUT DOWN THE SALES; RIGHT?

19   A.   POTENTIALLY, YES.

20   Q.   SO YOU ASSUMED THAT.  THAT'S WHAT COLUMBIA WOULD HAVE

21   DONE FIRST.

22        AND YOU FIGURED SEIRUS WOULD SUFFER BOTH ECONOMIC

23   AND REPUTATIONAL LOSSES IF IT COULD NOT BRING THOSE PRODUCTS

24   TO MARKET.  RIGHT?

25   A.   SURE.

1    Q.   SO YOU KNEW, COLUMBIA KNEW THAT YOU COULD PUT SEIRUS

2    BOTH AT ECONOMIC AND REPUTATIONAL INJURY BY -- IN THESE

3    NEGOTIATIONS; RIGHT?

4    A.   WHAT I WOULD SAY IS THAT THEY HAD ADVERTISED THIS

5    PRODUCT.  THEY WERE BRINGING IT TO MARKET.  AND IF IT NEVER

6    WAS ABLE TO COME TO MARKET, OR IT HAD TO GET PULLED FROM THE

7    MARKET, THAT'S NOT SOMETHING THAT IS GENERALLY FAVORED UPON.

8    IF YOU SAY YOU'RE DELIVERING AND COULDN'T DO IT.

9    Q.   I MEAN, THAT COULD BE THE END OF A SMALL FAMILY-OWNED

10   COMPANY, CAN'T IT, IF THEY ARE ENJOINED FROM BRINGING THEIR

11   PRODUCT TO MARKET THAT THEY HAD BEEN ADVERTISING; RIGHT?

12   A.   IF THOSE PRODUCTS ARE INDEED INFRINGING ON OTHER --

13           THE REPORTER:  WAIT.

14           SORRY.  YOU MIGHT WANT TO GO BACK.

15   Q.   BY MS. ROTHAUGE:  SO YOU UNDERSTOOD THAT SEIRUS WOULD

16   SUFFER BOTH ECONOMIC AND REPUTATIONAL LOSSES IF IT COULD NOT

17   BRING ITS PRODUCTS TO MARKET; RIGHT?

18   A.   THERE IS A DETRIMENT TO NOT BEING ABLE TO BRING YOUR

19   PRODUCTS TO MARKET AFTER THEY HAD BEEN ADVERTISED, YES.

20   Q.   AND YOU KNEW THAT SINCE SEIRUS WAS A SMALL, FAMILY-OWNED

21   COMPANY, NOT BEING ABLE TO BRING ITS PRODUCTS, THAT COULD BE

22   THE DEATH FOR A SMALL COMPANY; RIGHT?

23   A.   I DIDN'T KNOW THAT.  I DIDN'T REALLY KNOW WHO OWNED THE

24   COMPANY.

25   Q.   WELL, LET'S LOOK AT THE NEXT LINE.  IT SAYS, GLOVE SALES

1   ARE SEASONAL.  SO YOU KNOW WHAT "SEASONAL" MEANS; RIGHT?

2   A.   OF COURSE.

3   Q.   SO "SEASONAL" MEANS THAT YOU'VE GOT A -- YOU ONLY REALLY

4   SELL PRODUCT A LIMITED TIME OUT OF THE YEAR; RIGHT?

5   A.   WINTER GLOVES ARE SOLD IN THE WINTER, YES.

6   Q.   RIGHT.  SO THEY HAVE GOT TO MAKE THEIR MONEY TO SURVIVE

7   IN THE WINTER, BECAUSE THAT'S THE ONE TIME OF THE YEAR THAT

8   THEY CAN DO THAT; RIGHT?

9   A.   IF THEY ARE ONLY SELLING GLOVES, THAT WOULD BE THE

10  CASE.

11  Q.   OKAY.  SO SINCE THEY WERE SEASONAL, SEIRUS WOULD BE AT

12  RISK OF LOSING A SEASON'S WORTH OF SALES IF THEY COULD NOT

13  CONSUMMATE A TIMELY LICENSE.  THAT'S WHAT YOU CONCLUDE;

14  RIGHT?

15  A.   SURE.  THERE WOULD BE PRESSURE BECAUSE THEY WOULD HAVE

16  HAD PRODUCT AND MARKETING OUT THERE THAT THEY WOULD HAVE

17  WANTED TO GET THOSE PRODUCTS SOLD.

18  Q.   AND IF THEY MISSED THEIR SEASON, THEY WOULD HAVE NO

19  REVENUE FOR AN ENTIRE YEAR; RIGHT?

20  A.   WELL, THEY COULD OF COURSE SELL WINTER GLOVES THAT

21  WEREN'T INFRINGING OF ANY PATENTS, AND MY UNDERSTANDING IS

22  THAT THEY DO PRODUCE GLOVES THAT DON'T HAVE THE HEATWAVE; AND

23  THAT IS NOT SOMETHING THAT WOULD STOP.

24  Q.   THAT'S YOUR CURRENT UNDERSTANDING.  I'M ASKING ABOUT

25  YOUR UNDERSTANDING WHEN YOU DID THIS.

946

1           AND YOUR UNDERSTANDING, YOU SAID YOU DIDN'T

2    UNDERSTAND MUCH ABOUT SEIRUS BACK WHEN YOU WERE WRITING UP

3    YOUR OPINIONS HERE.

4    A.   I DIDN'T KNOW WHAT THEY PRODUCED PRIOR TO THAT MAY

5    DATE.

6    Q.   RIGHT.

7    A.   AND THEN I GOT A RANGE OF PRODUCTS AND WAS KIND OF TOLD

8    WHAT THEY PRODUCE AND SAW PARTS OF THE WEBSITE, AND I WAS

9    AWARE.  I WAS AWARE THAT THE HEATWAVE WAS NOT ON ALL OF THE

10   PRODUCTS, SO I KNEW THAT ONLY A PORTION OF THE PRODUCTS WERE

11   AT ISSUE IN THIS CASE.

12   Q.   WELL, AFTER YOU FORMED YOUR OPINION -- I UNDERSTAND

13   YOU'VE HAD CONVERSATIONS AND YOU'VE LEARNED A WHOLE LOT MORE.

14   BUT I'M TALKING ABOUT THE OPINION YOU FORMED THAT YOU CAME TO

15   TESTIFY HERE, THAT WAS FORMED ON JUNE 30TH.  SO I WANT TO

16   FIND OUT, I'M TALKING ABOUT THAT TIME FRAME.

17   A.   I KNEW THAT THEY PRODUCED SOME PRODUCTS THAT DID NOT

18   HAVE HEATWAVE PRIOR TO FORMING MY OPINION.

19   Q.   BUT YOU DIDN'T KNOW HOW MUCH?

20   A.   I STILL DON'T KNOW THE BREAKDOWN OF THEIR SALES OF HOW

21   MUCH PRODUCT IS INFRINGING.  I DON'T KNOW -- YOU KNOW, THAT'S

22   NOT WHAT I WAS ASKED TO TESTIFY ABOUT.  I WAS FOCUSED ON THE

23   PRODUCTS THAT HAVE OMNI-HEAT AND WHAT WOULD BE THE ROYALTY

24   RATE FOR THEIR PRODUCTS.

25   Q.   BUT WHAT YOU DO KNOW IS THAT IF YOU CAN SHUT THEM

1    DOWN -- IF THEY ARE THREATENED THAT THEY ARE GOING TO BE SHUT

2    DOWN FOR A SEASON, THAT'S GOING TO HAVE SERIOUS FINANCIAL AND

3    REPUTATIONAL IMPLICATIONS, ISN'T IT?

4    A.   I THINK "SHUT DOWN" IMPLIES THAT THE COMPANY WOULD BE

5    SHUT DOWN.  WHAT I'M REFERRING TO IS WE WOULD ONLY SHUT DOWN

6    THE PRODUCTS THAT WERE INFRINGING UPON COLUMBIA'S RIGHTS.

7    Q.   BUT AT THE TIME YOU FORMED THIS OPINION, YOU DIDN'T KNOW

8    THAT, DID YOU?  YOU DIDN'T KNOW WHAT SEIRUS --

9    A.   I KNEW THAT WE WOULD ONLY SEEK TO PROHIBIT SALES OF

10   PRODUCT THAT INFRINGED ON OUR TECHNOLOGY RIGHTS.  IT'S IN NO

11   INTEREST OF COLUMBIA TO PREVENT SEIRUS -- I MEAN, THAT'S NOT

12   OUR OBJECTIVE, IS NOT TO PREVENT SEIRUS FROM SELLING GLOVES.

13   IT'S TO PREVENT THEM FROM SELLING GLOVES THAT HAVE OUR

14   TECHNOLOGY IN THEM.

15   Q.   AND SO YOU -- AND YOU KNEW THAT IF YOU -- THAT YOU COULD

16   CREATE A STRONG BARGAINING POSITION BY GETTING AN INJUNCTION

17   CAUSING THEM TO MISS THE SEASON AND SUFFER FINANCIAL INJURY.

18   THAT'S WHAT YOU WERE THINKING IN TERMS OF YOUR FACTORS IN

19   THIS HYPOTHETICAL NEGOTIATION; RIGHT?

20   A.   I WANT TO MAKE CLEAR THAT, YES, WE WOULD BE USING

21   LEVERAGE, I WOULD USE LEVERAGE THAT I HAD TO PREVENT THE SALE

22   OF INFRINGING PRODUCT THAT DAMAGES COLUMBIA'S TECHNOLOGY AND

23   OUR RIGHTS.

24   Q.   AND WHAT WE'VE BEEN TALKING ABOUT IS THE LEVERAGE THAT

25   YOU WOULD HAVE USED; CORRECT?

948

1    A.    ONLY AS IT RELATES TO INFRINGING PRODUCT.

2    Q.    UNDERSTOOD.  AND YOU DIDN'T CONSIDER WHETHER OR NOT THE

3    PATENTS WERE VALID OR NOT, DID YOU?

4              MR. ALDRICH:  OBJECTION, YOUR HONOR.

5              THE COURT:  OVERRULED.

6              YOU CAN ANSWER THAT QUESTION.

7              MR. ALDRICH:  YOUR HONOR, IF I COULD ELABORATE.

8              THE COURT:  NO.  I MEAN, HE'S TALKING ABOUT HIS

9    OPINION AND WHAT HE USED TO FORMULATE HIS OPINION.  IT'S FAIR

10   GAME.

11             ANSWER THE QUESTION.

12             THE WITNESS:  I WAS ASSUMING, BASED ON THE LEGAL

13   ANALYSIS, THAT THE PATENTS WERE INFRINGING.  AND I WOULD

14   HAVE -- I MEAN, THAT WAS WHAT -- I DIDN'T GO IN AND MAKE THE

15   DETERMINATION MYSELF SPECIFICALLY AS A PATENT EXPERT.  I'M

16   THE LICENSING EXPERT.

17             MY --

18   Q.    BY MS. ROTHAUGE:  YOU RELIED UPON ATTORNEYS FOR THAT;

19   CORRECT?

20   A.    FOR THE PATENT WORK, YES.

21   Q.    YES.  AND SO YOU KNOW THOUGH -- ANSWER ME THIS:  IF YOU

22   HAD A COMPETITOR WHO CAME TO YOU AND SAID, WE WILL FIGHT YOU,

23   WE WILL FIGHT TO INVALIDATE YOUR PATENTS, WOULD THAT HAVE ANY

24   IMPACT ON THE NEGOTIATIONS?

25   A.    OF COURSE.

949

1    Q.    OKAY.  AND SO IF SEIRUS SAID TO YOU, WE HAVE A

2    GOOD-FAITH BASIS FOR BELIEVING THAT WE CAN INVALIDATE YOUR

3    PATENTS, THAT WOULD HAVE AFFECTED THE ROYALTY RATE, WOULDN'T

4    IT?

5    A.    SORRY.  CAN YOU REPEAT THAT ONE MORE TIME.

6    Q.    IF SEIRUS CAME TO YOU AND SAID, WE BELIEVE THESE ARE

7    INVALID PATENTS AND WE WILL DEFEND OURSELVES --

8    A.    IF THEY ARE INVALID?

9    Q.    YES.  WE WILL DEFEND OURSELVES, BY INVALIDATING,

10   ATTEMPTING TO INVALIDATE THEM, THAT WOULD IMPACT THE ROYALTY

11   RATE THAT YOU NEGOTIATED; CORRECT?

12   A.    IT WOULD DEPEND ON WHAT THE PATENT EXPERTS ON OUR TEAM

13   FELT.  IF THEY FELT CONFIDENT THAT --

14   Q.    ASSUME THEY DON'T.  ASSUME FOR THIS HYPOTHETICAL, BASED

15   ON YOUR EXPERIENCE AT COLUMBIA AND YOUR FORMATION OF THESE

16   OPINIONS, THAT SEIRUS IS GOING TO SAY THAT THERE ARE -- THERE

17   IS A QUESTION ABOUT THEIR VALIDITY.  WOULD THAT HAVE AFFECTED

18   THE ROYALTY RATE NEGOTIATIONS?

19   A.    SO IF OUR ATTORNEYS CAME TO US AND SAID THAT THEY WERE

20   GOING AFTER SEIRUS FOR PATENT INFRINGEMENT AND THAT SEIRUS

21   HAD A GREAT CASE AND THE PRODUCTS DIDN'T INFRINGE, OF COURSE

22   THAT WOULD IMPACT THE ROYALTY RATE.

23   Q.    AND MY QUESTION WAS SLIGHTLY DIFFERENT.  WHAT IF THEY

24   SAID TO YOU, WE'RE GOING AFTER THEM, BUT THEY HAVE GOT A

25   GREAT ARGUMENT THAT THE PATENTS ARE INVALID.  WOULD THAT HAVE

950

1    IMPACTED THE ROYALTY RATE?

2    A.   IF THEY HAD A GREAT ARGUMENT, IT WOULD HAVE BEEN A

3    FACTOR, BUT IT --

4         MS. ROTHAUGE:   THAT'S ALL I WANTED TO KNOW.   THANK

5    YOU.

6         THE WITNESS:   OKAY.

7         MS. ROTHAUGE:   I HAVE NO FURTHER QUESTIONS.

8         THE COURT:   REDIRECT.

9                   REDIRECT EXAMINATION

10   BY MR. ALDRICH:

11   Q.   MR. MERRIMAN, BACK TO DISCUSSING GEORGIA-PACIFIC.   YOU

12   UNDERSTAND THAT THAT CASE LAYS OUT A HYPOTHETICAL NEGOTIATION

13   BETWEEN THE LICENSEE AND THE LICENSOR?

14   A.   THAT IS HOW I UNDERSTOOD IT, YES.

15   Q.   AND YOU UNDERSTAND THAT IT PRESUMED THAT THE

16   HYPOTHETICAL NEGOTIATION TAKES PLACE ON THE EVE OF

17   INFRINGEMENT?

18   A.   YES.

19   Q.   AND DO YOU UNDERSTAND THAT YOU ARE DIRECTED TO ASSUME

20   THAT THE PATENT IS VALID AND INFRINGED?

21   A.   THAT IS HOW I UNDERSTOOD IT.

22   Q.   AND SO MS. ROTHAUGE'S QUESTIONS ABOUT WHETHER THERE

23   WOULD BE A POTENTIAL INVALIDITY DEFENSE WOULD HAVE WHAT

24   RELEVANCE TO YOU IN TERMS OF A GEORGIA-PACIFIC ANALYSIS?

25   A.   I'M SORRY.

1    Q.   YES.  SO THE QUESTIONS YOU JUST RECEIVED IN WHICH YOU

2    WERE TO PRESUME THAT THEY MIGHT HAVE AN INVALIDITY DEFENSE,

3    DO THOSE QUESTIONS HAVE ANY RELEVANCE TO A GEORGIA-PACIFIC

4    ANALYSIS, AS FAR AS YOU CAN TELL?

5    A.   NOT AS I UNDERSTAND IT.

6    Q.   YOU HAD SOME QUESTIONS ASKED TO YOU ABOUT DOCUMENTS THAT

7    YOU LOOKED AT IN PREPARING YOUR OPINION.

8         DO YOU REMEMBER THAT?

9    A.   YES.

10   Q.   AND YOU SAID SOME DOCUMENTS WERE SELECTED AND WERE

11   AVAILABLE FOR YOU IN PREPARING YOUR OPINION; CORRECT?

12   A.   THAT'S CORRECT.

13   Q.   AND I THINK YOU TESTIFIED THAT THE DOCUMENTS YOU LOOKED

14   AT IN PREPARING YOUR OPINION WERE THE LICENSE AGREEMENTS THAT

15   WE LOOKED THROUGH TODAY; CORRECT?

16   A.   THAT'S CORRECT.

17   Q.   IS THERE ANY REASON YOU CAN THINK OF THAT THOSE MIGHT

18   HAVE BEEN THE DOCUMENTS THAT WERE PREPARED FOR YOU TO HAVE

19   AVAILABLE TO YOU AS YOU PREPARED FOR YOUR DEPOSITION?

20   A.   BECAUSE THOSE WERE THE DOCUMENTS THAT I WAS RESPONSIBLE

21   FOR AND THE ONLY LINK TO REALLY WHY I WOULD BE HERE AS IT

22   RELATES TO OMNI-HEAT.  THOSE ARE THE FOUR AGREEMENTS WHERE WE

23   HAVE LET A PARTNER, ONE OF OUR LICENSEES, USE OMNI-HEAT.

24   Q.   YOU DON'T HAVE ANY OTHER LICENSING AGREEMENTS THAT HAVE

25   OMNI-HEAT?

```
1    A.    NO.  WE'VE BEEN APPROACHED MANY TIMES TO LICENSE

2    OMNI-HEAT.  WE HAVE ONLY SELECTED FOUR CATEGORIES AND FOUR

3    LICENSEES TO PUT OMNI-HEAT ON OUR PRODUCTS.

4    Q.    AND WHEN YOU WERE LOOKING AT LICENSING SOCKS, THE DELTA

5    GALIL, DID YOU HAVE OFFERS FROM ANYBODY ELSE TO MAKE SOCKS

6    FOR YOU?

7    A.    YEAH.  WE HAD MANY OFFERS.

8    Q.    YOU HAD MANY OFFERS?

9    A.    WE DID.

10   Q.    AND IN THE END, YOU SELECTED ONLY ONE?

11   A.    THAT'S CORRECT.

12            MR. ALDRICH:  LET'S GO TO EXHIBIT 88.  IF WE CAN GO

13   TO PAGE 678, SECTION 2.5.  IT'S ALREADY BEEN ADMITTED.

14            MS. ROTHAUGE:  NO OBJECTION.

15   Q.    BY MR. ALDRICH:  DO YOU REMEMBER HAVING SOME QUESTIONS

16   ABOUT THE FACT THAT THE LONDON LUXURY LICENSE INCLUDES THE

17   RIGHT TO MAKE BOTH OMNI-HEAT REFLECTIVE AND A COUPLE OF OTHER

18   TECHNOLOGIES THAT COLUMBIA SELLS?

19   A.    I RECALL THAT, YES.

20   Q.    AND THOSE OTHER TECHNOLOGIES ARE CALLED OMNI-FREEZE ZERO

21   AND OMNI-WICK EVAP?

22   A.    CORRECT.

23   Q.    DID THOSE THREE TECHNOLOGIES EVER GO TOGETHER IN ONE

24   PRODUCT?

25   A.    NOT THAT I UNDERSTAND.  I'M NOT AWARE OF ANY.
```

1   Q.   THE OMNI-HEAT REFLECTIVE, THAT COVERS PRODUCTS TO KEEP

2   YOU WARMER; RIGHT?

3   A.   YEAH.   GENERALLY IT WOULDN'T MAKE SENSE, BECAUSE THEY

4   ARE -- THE TECHNOLOGIES ARE DESIGNED FOR SPECIFIC TEMPERATURE

5   CONDITIONS.

6          SO OMNI-HEAT WOULD BE TO KEEP YOU WARM WHEN IT'S

7   COLD, AND OMNI-FREEZE WOULD BE TO KEEP YOU COLD WHEN IT'S

8   WARM.

9   Q.   SO IF LONDON LUXURY MAKES A COMFORTER THAT HAS OMNI-HEAT

10  REFLECTIVE, IT WOULD NOT ALSO HAVE OMNI-FREEZE ZERO?

11  A.   IT WOULD PROBABLY BE A HEAVYWEIGHT COMFORTER THAT WOULD

12  BE FOR USE IN COLD-WEATHER TIMES TO KEEP YOU WARM.

13  Q.   A PRODUCT THAT WOULD HAVE OMNI-HEAT REFLECTIVE IN IT AND

14  OMNI-FREEZE ZERO IN IT WOULDN'T MAKE ANY SENSE?

15  A.   I CAN'T THINK OF ANY WAYS WHY YOU WOULD WANT TO DO

16  THAT.

17  Q.   OKAY.   AND SO IF THEY SELL A PRODUCT WITH OMNI-HEAT

18  REFLECTIVE IN IT, WHAT ROYALTY RATE DO THEY PAY?

19  A.   IT'S THE SAME.   THIS ONE WAS 9 OR 10 PERCENT.

20  Q.   I THINK YOU SAID 9 PERCENT?

21  A.   NINE PERCENT.

22  Q.   OKAY.   AND THEY WOULDN'T MIX TECHNOLOGIES IN THAT ONE

23  PRODUCT HERE; RIGHT?

24  A.   THAT'S CORRECT.

25  Q.   DO YOU RECALL QUESTIONS ABOUT THE ROYALTY RATE?

1    A.    YES.

2    Q.    YOU STARTED TO ANSWER, AND I THINK YOU WERE CUT OFF.

3         DELTA GALIL MAKES SOME SOCKS THAT ARE

4    COLUMBIA-BRANDED THAT HAVE OMNI-HEAT IN THEM.

5    A.    THAT'S CORRECT.

6    Q.    OKAY.  AND DOES DELTA GALIL MAKE SOCKS THAT DO NOT HAVE

7    OMNI-HEAT IN THEM?

8    A.    THEY DO.

9    Q.    AND DO THOSE SOCKS SELL FOR THE SAME PRICE?

10   A.    THEY DON'T.

11   Q.    HOW DO YOU KNOW THAT?

12   A.    WELL, AS PART OF THAT PRODUCT APPROVAL FORM THAT WE

13   TALKED ABOUT YESTERDAY, THE LICENSEE, WHEN THEY ARE

14   SUBMITTING PRODUCTS FOR APPROVAL, GIVE US A GENERAL PRICE

15   POINT OF WHAT THE SOCKS WOULD SELL AT, AND THE FEATURES AND

16   BENEFITS OF EACH SOCK, INCLUDING WHAT TECHNOLOGIES WOULD BE

17   INCLUDED.

18   Q.    AND SO DO YOU HAVE AN UNDERSTANDING OF WHAT A BASIC PAIR

19   OF NON-OMNI-HEAT SOCKS SELLS FOR?

20   A.    WELL, THERE IS -- THERE IS MANY DIFFERENT TYPES OF

21   SOCKS.  BUT IF WE TALK -- LET'S TALK SKI SOCKS AS AN EXAMPLE,

22   BECAUSE YOU WOULDN'T PUT OMNI-HEAT, AGAIN, IN SOCKS THAT ARE

23   FOR WHEN IT'S WARM OUT.

24         BUT FOR SKI SOCKS, THE OMNI-HEAT SOCKS SELL FOR $35

25   A PAIR, FOR ONE PAIR.

1    Q.    THE OMNI-HEAT SOCKS, $35 A PAIR?

2    A.    THIRTY-FIVE FOR ONE PAIR.

3    Q.    WHAT ABOUT A PAIR OF SOCKS THAT DON'T HAVE OMNI-HEAT IN

4    THEM?

5    A.    WE SELL COMPARABLE SKI SOCKS WITHOUT OMNI-HEAT FOR ABOUT

6    HALF THAT PRICE, $15, $20; COUPLE DIFFERENT MODELS.

7    Q.    AND IS SO COLUMBIA GETTING THE SAME AMOUNT OF MONEY FOR

8    SOCKS THAT HAVE OMNI-HEAT IN THEM AND SOCKS THAT DON'T?

9    A.    NO.  I FEEL LIKE THAT WAS A LITTLE BIT OF A

10   MISCONFUSION.  WE HAVE THE SAME ROYALTY RATE FOR EVERY PAIR

11   OF SOCKS THAT WE SELL.  BUT THAT DOESN'T MEAN THAT WE DON'T

12   GET MORE MONEY FOR THE SOCKS THAT HAVE OMNI-HEAT.  IF WE'RE

13   GETTING, JUST USING ROUND NUMBERS, 10 PERCENT ROYALTY RATE ON

14   A $30 SOCK, THAT MEANS WE GET $3, RIGHT, FOR EVERY PAIR THAT

15   IS SOLD.

16        ON THE SOCK THAT IS $10, WITHOUT OMNI-HEAT, WE STILL

17   GET 10 PERCENT.  10 PERCENT OF $10 IS $1.  SAME ROYALTY RATE

18   FOR BOTH PRODUCTS, BUT COLUMBIA IS GETTING $3 FOR THE SOCK

19   WITH OMNI-HEAT, AS OPPOSED TO MUCH LESS THAN THAT FOR THE

20   SOCK WITHOUT OMNI-HEAT.

21   Q.    AND I THINK YOU TESTIFIED THAT WHEN YOU WERE WORKING

22   WITH DELTA GALIL, THE FOCUS OF THAT WAS ABOUT OMNI-HEAT; IS

23   THAT RIGHT?

24   A.    WE SPECIFICALLY SELECTED THEM FROM THE I'D SAY EIGHT OR

25   SO SERIOUS CONTENDERS BECAUSE OF THEIR CAPABILITY WITH

956

1    TECHNOLOGY AND SOME OF THE THINGS THEY HAVE DONE WITH OTHER

2    BRANDS THAT MADE US FEEL THAT THEY WERE MOST LIKELY TO BE

3    ABLE TO FIGURE OUT HOW TO PUT OMNI-HEAT ON THE SOCKS.

4    Q.   MS. ROTHAUGE ASKED YOU SOME QUESTIONS, AND YOU WERE

5    STARTING TO EXPLAIN THAT THE SEIRUS DEAL WOULD BE VERY

6    DIFFERENT FROM THESE AGREEMENTS THAT YOU HAVE WITH THESE FOUR

7    OTHER LICENSEES.  AND SHE CUT YOU OFF.  AND I JUST WANTED TO

8    GIVE YOU THE OPPORTUNITY TO FINISH YOUR ANSWER.

9         WHY WOULD THE DEAL, THE HYPOTHETICAL DEAL WITH

10   SEIRUS IN WHICH YOU PRESUME THAT THE PATENTS ARE VALID AND

11   YOU PRESUME THAT THEY INFRINGE, WHY WOULD THAT DEAL BE

12   DIFFERENT THAN --

13   A.   BECAUSE WE --

14   Q.   -- THAN THE DEALS THAT YOU NEGOTIATED WITH YOUR OTHER

15   LICENSEES?

16   A.   BECAUSE WE WOULD BE COMPETING WITH OURSELVES, MEANING

17   DELTA SELLS SOCKS THAT HAVE THE COLUMBIA BRAND ON IT.  WE

18   DON'T PRODUCE ANY SOCKS OURSELVES.  DELTA SELLS THE COLUMBIA

19   SOCKS.  SAME WOULD GO WITH TENTS OR SLEEPING BAGS, THINGS

20   LIKE THAT.

21        IN THIS CASE, IN THE DEAL WITH SEIRUS, WE WOULD

22   BE -- COLUMBIA PRODUCES GLOVES.  WE PRODUCE GLOVES WITH

23   OMNI-HEAT.  WE WOULD BE LICENSING A TECHNOLOGY TO ANOTHER

24   MANUFACTURER OF GLOVES THAT WOULD PUT THE SAME PATENT IN

25   THOSE GLOVES AND WOULD COMPETE AT A RETAILER.

1          IF YOU WENT INTO AN R.E.I. OR A DICK'S, YOU'D HAVE

2    GLOVES THERE THAT HAD SEIRUS GLOVES WITH THE HEATWAVE AND OUR

3    PATENT ON IT, AND YOU WOULD HAVE COLUMBIA GLOVES WITH

4    OMNI-HEAT.  SOME CONSUMERS WOULD BUY THE COLUMBIA GLOVES.

5    SOME WOULD PRESUMABLY BUY THE SEIRUS GLOVES.

6          AND IN THAT CASE, WE LOST THE SALE, THE POTENTIAL

7    SALE OF A GLOVE THAT HAD OMNI-HEAT BECAUSE A CONSUMER SAW

8    THAT BOTH GLOVES HAD THE SAME TECHNOLOGY, AND FOR SOME REASON

9    THEY PICKED THE SEIRUS GLOVE.

10          AND WE WOULD HAVE TO OFFSET THAT IN THE INCREASED

11   ROYALTY RATES, AND THAT'S WHY IT WOULD BE A HIGHER ROYALTY

12   THAN WHAT WE WOULD GIVE FOR A BRAND THAT PRODUCES SOCKS THAT

13   SELLS WITH OUR NAME, THAT COLUMBIA GETS THE BENEFIT OF HAVING

14   MORE BRANDED PRODUCT OUT THERE.

15   Q.   AND JUST ONE FINAL QUESTION.  THESE FOUR LICENSEES THAT

16   YOU HAVE.

17   A.   YES.

18   Q.   IF THEY SELL A PRODUCT THAT ONLY HAS OMNI-HEAT IN IT,

19   THAT'S THE ONLY TECHNOLOGY THAT IT HAS, I RECOGNIZE THEY ARE

20   REQUIRED TO PUT YOUR BRAND NAME ON IT; RIGHT?  BUT IF THAT'S

21   THE ONLY TECHNOLOGY THAT IT HAS, WHAT'S THE ROYALTY RATE THAT

22   THEY PAY FOR THAT?

23   A.   IT'S THE SAME ROYALTY RATE.

24          MR. ALDRICH:  I HAVE NO FURTHER QUESTIONS, YOUR

25   HONOR.

1          THE COURT:  THANK YOU.

2          DO THE JURORS HAVE ANY QUESTION FOR THIS WITNESS?

3     IF SO, PLEASE WRITE IT DOWN.

4          THE QUESTION IS AS FOLLOWS:  HAS COLUMBIA EVER

5     LICENSED ANY PATENTED TECHNOLOGY OTHER THAN OMNI-HEAT TO ANY

6     NON-PARTNERED ENTITY?  AND IF SO, WHAT WAS THE ROYALTY RATE?

7          THE WITNESS:  WE HAVE A SEPARATE BRAND THAT WE

8     ACQUIRED THAT HAS TECHNOLOGY THAT'S NOT COLUMBIA-BRANDED BUT

9     THAT SELLS SALES PRODUCT.  IT'S A TECHNOLOGY COMPANY.  IT'S

10    NOT SAYING A COLUMBIA BRAND.  WE HAVEN'T LICENSED OUT

11    OMNI-WICK OR ANY OF OUR OTHER TECHNOLOGIES SIMILAR TO

12    OMNI-HEAT TO ANY OTHER COMPETITORS OR ANY OTHER COMPANIES.

13         OCCASIONALLY WE DO ALLOW OUR OWN COMPANIES THAT WE

14    OWN TO USE CERTAIN TECHNOLOGIES IN AREAS THAT IT DOESN'T

15    COMPETE WITH COLUMBIA.  SO WE OWN A NUMBER OF BRANDS,

16    COLUMBIA DOES.  BUT WE DON'T LICENSE TECHNOLOGY TO

17    COMPETITORS AND DEFINITELY NOT ANY OF THE COLUMBIA-BRANDED

18    TECHNOLOGIES, INCLUDING OMNI-HEAT.

19         THE COURT:  DO YOU HAVE ANY FOLLOW-UP QUESTIONS

20    BASED ON THE RESPONSES?

21         MR. ALDRICH:  NO, YOUR HONOR.

22         THE COURT:  DO YOU HAVE ANY FOLLOW-UPS BASED ON THE

23    RESPONSES?

24         MS. ROTHAUGE:  NO, YOUR HONOR.  OH, EXCEPT OTHER

25    THAN WHAT WAS THE ROYALTY RATE?

959

1            THE WITNESS:  I WASN'T INVOLVED IN THAT DEAL.

2            THE COURT:  ANYTHING ELSE?

3            YOU MAY STEP DOWN.

4            DO YOU WANT THIS WITNESS TO BE EXCUSED?  DO YOU WANT

5    THIS WITNESS TO BE EXCUSED?

6            MR. ALDRICH:  I DO, YEAH.  SURE.

7            MR. MARCHESE:  YOUR HONOR, WE MAY WANT TO RE-CALL

8    HIM FOR ARTICLE OF MANUFACTURE.

9            THE COURT:  OKAY.  PLEASE REMAIN AVAILABLE.  YOU MAY

10   STEP DOWN.

11           CALL YOUR NEXT WITNESS.

12           MR. ALDRICH:  YOUR HONOR, SEIRUS WANTED TO CALL

13   WOODY BLACKFORD AS PART OF ITS CASE-IN-CHIEF OUT OF ORDER.

14   MR. BLACKFORD HAS MADE HIMSELF AVAILABLE AND IS ABLE TO

15   TESTIFY NOW AS PART OF THEIR INVALIDITY CASE.

16           MR. MARCHESE:  WE WILL CALL HIM NOW, YOUR HONOR.

17   JUST ONE LEGAL POINT I WANTED TO ADDRESS WITH YOUR HONOR VERY

18   BRIEFLY.

19           THE COURT:  OKAY.  MEMBERS OF THE JURY, WHEN SOMEONE

20   SAYS THERE IS A LEGAL POINT, THAT MEANS YOU HAVE TO GO INTO

21   YOUR ROOM.

22           (JURY ABSENT, 11:28 A.M.)

23           THE COURT:  PLEASE BE SEATED.

24           MR. MARCHESE:  YOUR HONOR, MR. BLACKFORD IS BEING

25   CALLED BEFORE THE PLAINTIFF RESTS, BUT WE WANTED TO MAKE SURE

960

1    IT'S CLEAR THAT ANYTHING HE SAYS, SINCE WE'RE CALLING HIM AS

2    OUR WITNESS HERE IN THEIR CASE, ANYTHING HE SAYS CAN'T FIX

3    ANY PROBLEMS WITH THEIR CASE IN TERMS OF INFRINGEMENT OR SO

4    ON FOR JMOL PURPOSES.

5            THE COURT:  UNDERSTOOD.

6            MR. MARCHESE:  THANK YOU.

7            THE COURT:  I THINK THAT'S RIGHT.

8            MR. ALDRICH:  YOUR HONOR, MR. MERRIMAN IS AVAILABLE

9    NOW IF THEY WANT TO CALL HIM OUT OF SEQUENCE ALSO.  IT WOULD

10   BE VERY INCONVENIENT FOR HIM TO HAVE TO STICK AROUND.  WE

11   HAVE NO IDEA WHAT THEY WANT TO DO.

12           THE COURT:  LET'S DO ONE WITNESS AT A TIME.

13           MR. ALDRICH:  HE IS THE ONE WITNESS WHO HAS BEEN

14   CALLED.

15           THE COURT:  I THOUGHT HE WAS CALLING

16   MR. BLACKFORD.

17           MR. ALDRICH:  WE JUST HAD MR. MERRIMAN.  THEY ARE

18   SAYING THEY HAVE MORE QUESTIONS FOR HIM ON ANOTHER ISSUE.

19   CAN WE JUST PUT HIM BACK ON THE STAND AND LET HIM ANSWER

20   THOSE QUESTIONS?

21           MR. MARCHESE:  WE HAVEN'T GOTTEN TO THE ARTICLE OF

22   MANUFACTURE PART OF THE CASE YET, SO WE HAVE THAT COMING UP

23   IN OUR CASE-IN-CHIEF.  AND THEN THEY'LL DO REBUTTAL AND ALL

24   THAT.  SO I JUST DON'T KNOW WHAT'S GOING TO COME OUT YET.  I

25   DON'T WANT TO RELEASE HIM.  THAT'S THE POINT.  WE MAY NOT

961

1    CALL HIM.

2         MR. ALDRICH:  THEY HAVE NEVER DISCLOSED HIM AS A

3    POTENTIAL WITNESS ON THIS ISSUE.  I HAVE NO IDEA WHAT THEY

4    ARE DRIVING AT, OTHER THAN INCONVENIENCING OUR WITNESSES.

5         IF THEY HAVE QUESTIONS, HE'S HERE.  I SAY WE GET IT

6    DONE WITH.

7         THE COURT:  LET'S TALK WITH MR. BLACKFORD FIRST.

8         MR. ALDRICH:  THANK YOU, YOUR HONOR.

9         YOUR HONOR, I'M SORRY.  I'M DEFENDING MR. BLACKFORD.

10   DO YOU MIND IF I HAVE A TWO-MINUTE BREAK?

11        THE COURT:  NO.

12        MR. ALDRICH:  THANK YOU, YOUR HONOR.

13        (RECESS, 11:30 A.M. TO 11:32 A.M.)

14        MR. ALDRICH:  THANK YOU, YOUR HONOR.

15        THE COURT:  YOU'RE WELCOME.

16        (JURY PRESENT, 11:33 A.M.)

17        THE COURT:  PLEASE BE SEATED.

18        YOU REMAIN UNDER OATH.

19        YOU MAY PROCEED.

20        MR. MARCHESE:  THANK YOU, YOUR HONOR.

21        SEIRUS CALLS MR. MICHAEL BLACKFORD.

22        MICHAEL BLACKFORD, HAVING BEEN PREVIOUSLY SWORN,

23        TESTIFIED AS FOLLOWS:

24

25

962

1                        DIRECT EXAMINATION

2      BY MR. MARCHESE:

3      Q.   AND MR. BLACKFORD, WELCOME BACK.  GOOD MORNING.

4      A.   THANK YOU.

5            MR. MARCHESE:  AND JUST FOR PURPOSES OF

6      HOUSEKEEPING, PRIOR, IN YOUR EARLIER TESTIMONY, WE TALKED

7      ABOUT EXHIBIT 1403.  AND THIS DOCUMENT WAS NOT PREVIOUSLY

8      ADMITTED.

9            I WOULD LIKE TO OFFER IT, YOUR HONOR.

10           MR. ALDRICH:  NO OBJECTION.

11           THE COURT:  RECEIVED.

12      (TRIAL EXHIBIT 1403 RECEIVED IN EVIDENCE.)

13           MR. MARCHESE:  THANK YOU.

14      Q.   AND JUST TO REFRESH, MR. BLACKFORD, THIS IS A

15      DECLARATION THAT YOU EXECUTED IN THE CONTEXT OF VENUE.

16           DO YOU REMEMBER TALKING ABOUT THAT BEFORE?

17      A.   YES.

18      Q.   AND THIS IS SOMETHING THAT YOU SIGNED UNDER OATH;

19      CORRECT?

20      A.   YES.

21           MR. MARCHESE:  OKAY.  AND IF YOU COULD GO TO

22      PAGE NO. 2, PLEASE.  IF YOU COULD BLOW UP PARAGRAPH 4.

23      Q.   AND MR. BLACKFORD, DO YOU RECALL LOOKING AT THIS

24      PARAGRAPH WHEN YOU TESTIFIED PREVIOUSLY?

25      A.   YES.

963

1    Q.    THANK YOU.

2          AND HERE IT SAYS THAT YOU ARE THE SOLE INVENTOR OF

3    TWO PARTICULAR PATENTS.  ONE OF THOSE IS THE '270 PATENT;

4    RIGHT?

5    A.    CORRECT.

6    Q.    AND YOU'RE THE BEST SOURCE OF INFORMATION REGARDING THE

7    CONCEPTION AND REDUCTION OF PRACTICE OF THOSE PATENTS;

8    RIGHT?

9    A.    AT COLUMBIA SPORTSWEAR, YES.

10   Q.    AND COLUMBIA SPORTSWEAR'S INVOLVEMENT IN THE PROSECUTION

11   OF PATENT APPLICATIONS LEADING TO THOSE PATENTS, INCLUDING

12   THE '270 PATENT; RIGHT?

13   A.    AT COLUMBIA SPORTSWEAR, YES.

14   Q.    AND THE '270 PATENT IS THE PATENT IN THIS LAWSUIT;

15   CORRECT?

16   A.    IT'S ONE OF THEM, YES.

17   Q.    AND THERE IS A DESIGN PATENT AS WELL; CORRECT?

18   A.    YES.

19   Q.    THAT'S NOT THE '119 PATENT; RIGHT?

20   A.    THAT'S CORRECT.

21   Q.    OKAY.  I'D LIKE YOU TO PICK UP EXHIBIT 6, WHICH IS IN

22   THE BINDER IN FRONT OF YOU.

23         MR. ALDRICH:  YOUR HONOR, OBJECTION.

24         THE COURT:  I'M SORRY.

25         MR. ALDRICH:  OBJECTION.

COMPUTER-AIDED TRANSCRIPTION

964

1              THE COURT:  TO EXHIBIT 6?

2              MR. ALDRICH:  YES.

3              MR. MARCHESE:  IT'S BEEN RECEIVED.

4              THE COURT:  I HAVEN'T SEEN A QUESTION OTHER THAN

5      LOOK AT EXHIBIT 6.

6              MR. ALDRICH:  OBJECTION.  6 IS THE PROSECUTION

7      HISTORY OF THE PATENT, YOUR HONOR.

8              THE COURT:  WHAT IS THE RELEVANCE OF 6?

9              MR. MARCHESE:  YOUR HONOR, WE'RE GOING TO USE THIS

10     FOR PURPOSES OF DAMAGES TO SHOW WHAT THE -- IN FRONT OF THE

11     PATENT OFFICE, WHAT THE PATENT OFFICE ALLOWED TO BE GRANTED

12     AT THE END OF THE DAY.

13             THE COURT:  LET'S MOVE ON TO ANOTHER TOPIC.  THAT

14     OBJECTION IS SUSTAINED.

15             MR. ALDRICH:  THANK YOU, YOUR HONOR.

16             MR. MARCHESE:  CAN WE RETURN TO THAT TO DISCUSS

17     LATER?

18             THE COURT:  YOU MAY.

19             MR. MARCHESE:  THANK YOU.

20     Q.   LET'S TAKE A LOOK AT SOME OF YOUR TESTIMONY THAT YOU

21     PREVIOUSLY GAVE IN THE CASE.

22     A.   OKAY.

23     Q.   AND YOU PREVIOUSLY TESTIFIED ABOUT HEAT CONDUCTING AND

24     HEAT REFLECTING.

25             DO YOU REMEMBER THAT?

COMPUTER-AIDED TRANSCRIPTION

1    A.    YOU'D HAVE TO DESCRIBE TO ME THE CONTEXT.    I THINK WE

2    DID DISCUSS IT, OR I SAID IT, BUT I CAN'T REMEMBER IN WHICH

3    CONTEXT.

4    Q.    AND IN PARTICULAR, YOU TESTIFIED THAT HEAT-CONDUCTING

5    FIBERS MEANS IT MOVES HEAT FROM ONE PLACE TO ANOTHER, BUT IT

6    DOESN'T CHANGE ITS DIRECTION LIKE A REFLECTOR.

7              DO YOU REMEMBER THAT?

8    A.    I THINK I WOULD HAVE SAID THAT, BUT WITHOUT THE EXACT

9    WORDS IN FRONT OF ME.    BUT, YES, I'M GOING TO AGREE WITH YOU.

10   I'M GOING TO SAY THAT WHAT YOU'RE REPRESENTING IS PROBABLY

11   WHAT I SAID.

12   Q.    WELL, WOULD YOU AGREE WITH IT SITTING HERE TODAY?

13   A.    THAT A WIRE WOULD MOVE HEAT GENERALLY IN ONE DIRECTION.

14   IF YOU START HEATING UP AT ONE END, IT'S GOING TO TRAVEL TO

15   THE OTHER END AND NOT CHANGE DIRECTION, UNLESS YOU BENT THE

16   WIRE OR SOMETHING LIKE THAT.    BUT EVEN THEN, IT'S TRAVELING

17   ALONG WHATEVER THE -- YOU KNOW, WIRE DIRECTION IS.

18   Q.    IN YOUR INVENTION, I BELIEVE YOU CHARACTERIZED IT AS A

19   REFLECTOR; RIGHT?

20   A.    YEAH.    IT'S LIKE A -- WELL, A PORTION -- WHEN I SAY

21   HEAT-DIRECTING ELEMENT, I'M THINKING OF SOMETHING LIKE A

22   MIRROR, IN THE CASE OF CLAIM 2, THAT WOULD BE ABLE TO CHANGE

23   THE DIRECTION OF HEAT, OR RADIATION, WHICH IS HEAT, WHEN IT

24   HITS THE SURFACE.

25   Q.    SIR, I'M JUST ASKING YOU YES AND NO QUESTIONS; SO IF YOU

1    CAN PLEASE TRY TO GIVE THOSE TO ME, PLEASE.

2    A.    I WILL TRY.  BUT I WANT TO GIVE THE WHOLE TRUTH, SO

3    SOMETIMES I NEED --

4    Q.    YOUR LAWYER WILL GET TO ASK YOU QUESTIONS.  SO IF YOU

5    CAN JUST PLEASE STICK TO THE TOPICS THAT I'M ASKING YOU

6    ABOUT.  WE NEED TO GET THROUGH THIS QUICKLY.

7    A.    I WILL TRY MY BEST.

8    Q.    THANK YOU.

9          AND SO YOU SAID, TO YOU, A REFLECTOR IS A VERY

10   DIFFERENT PRODUCT FROM A CONDUCTOR; CORRECT?

11   A.    DID I SAY PRODUCT?

12   Q.    YES.  YOU SAID THAT THE THERMALUX WAS A VERY DIFFERENT

13   PRODUCT.

14   A.    OH, OKAY.  SO I DIDN'T SAY THAT IT -- THAT'S DIFFERENT.

15   SO I SAID THE THERMALUX IS A VERY DIFFERENT PRODUCT FROM?

16   Q.    FROM A REFLECTOR.

17   A.    YEAH.  TO ME, IT DOES SEEM --

18   Q.    JUST PLEASE ANSWER THE QUESTIONS YES OR --

19          THE REPORTER:  WAIT.  WAS THAT A YES?

20          MR. ALDRICH:  YOUR HONOR --

21          THE WITNESS:  I SAID YES, IT WAS DIFFERENT FROM A

22   REFLECTOR.

23          MR. ALDRICH:  YOUR HONOR, I JUST WANT TO MAKE SURE

24   THE WITNESS HAS AN OPPORTUNITY TO ANSWER THE QUESTION.

25          THE COURT:  THANK YOU.

967

1          MR. MARCHESE:  YOU CAN EXPLAIN LATER IF YOU'D LIKE.

2     YOU SAID YES, AND THEN YOU TRIED TO ADD TO IT.

3     Q.   I JUST WANT YOU TO ANSWER IF YOU CAN --

4     A.   IF I CAN --

5     Q.   -- YES OR NO --

6          THE REPORTER:  ONE AT A TIME.

7          THE WITNESS:  IF I CAN'T SAY YES OR NO, I GUESS I

8     WON'T ANSWER THE QUESTION.

9     Q.   BY MR. MARCHESE:  YOU CAN SAY, I CAN'T ANSWER IT.

10    A.   YEAH.

11    Q.   OKAY.

12    A.   THAT'S AN OPTION.

13    Q.   THANK YOU.

14    A.   OKAY.

15    Q.   I DON'T WANT TO TALK ON TOP OF YOU --

16    A.   ME EITHER.

17    Q.   -- SO LET'S TRY TO KEEP IT --

18         THE REPORTER:  WAIT, WAIT.

19         THE WITNESS:  I WILL SLOW DOWN.

20         MR. MARCHESE:  OKAY.  IF YOU COULD PULL UP

21    EXHIBIT 1019, PLEASE.

22    Q.   THIS IS THE '270 PATENT; CORRECT?

23    A.   THAT'S THE FIRST PAGE, YES.

24    Q.   AND YOU'RE THE INVENTOR ON THAT PATENT; RIGHT?

25    A.   YES.

COMPUTER-AIDED TRANSCRIPTION

968

1    Q.   AND IT'S YOUR POSITION THAT THE OMNI-HEAT FABRIC IS A

2    REFLECTOR; CORRECT?

3    A.   WELL, YES.  THE OMNI-HEAT FOIL ELEMENTS, THE DISCRETE

4    INDEPENDENT ELEMENTS ARE REFLECTORS; NOT THE WHOLE

5    MATERIAL.

6    Q.   THE DOTS ARE REFLECTORS; CORRECT?

7    A.   THE INDEPENDENT ELEMENTS, WHICH COULD BE DOTS, IN THE

8    CASE OF THE UTILITY PATENT --

9    Q.   SIR, JUST YES OR NO WOULD BE FINE.

10   A.   THE DOTS ARE REFLECTORS, YES.

11   Q.   THANK YOU.

12        AND THEY ARE NOT CONDUCTORS; CORRECT?

13   A.   THEY ARE ALSO CONDUCTORS.

14   Q.   THEY ARE BOTH?

15   A.   YES.

16   Q.   THANK YOU.

17        AND YOUR PATENT SAYS THE SAME THING, DOESN'T IT?

18   A.   YOU'D HAVE TO SHOW ME IN WHICH AREA.  BUT THIS IS

19   COMMENTARY ON CONDUCTION AND REFLECTION.

20        MR. MARCHESE:  COULD YOU TURN, MR. TISA, TO

21   COLUMN 5, LINE 54, TO THE END OF THE COLUMN.  I'M SORRY.

22   PAGE 13 IN PDF.  COLUMN 5, LINE 54 TO THE END.

23        THE WITNESS:  IT'S A LITTLE BIT SMALL.  IS IT GOING

24   TO GET BLOWN UP?

25        MR. MARCHESE:  IT'S GOING TO GET BLOWN UP.  IT WILL.

969

```
1    Q.    THERE WE GO.  IS THAT BETTER?

2    A.    IT'S CUT OFF ON THE RIGHT.

3    Q.    WE WILL CAPTURE THE WHOLE THING.  I THINK IT'S

4    ACTUALLY -- THERE YOU GO.  NOT CUT OFF.  THERE YOU GO.

5          CAN YOU READ IT?

6    A.    I CAN READ IT.

7    Q.    ALL RIGHT.  AND IT SAYS THAT THE HEAT MANAGEMENT

8    MATERIAL ELEMENTS, RIGHT HERE IN ABOUT THE THIRD TO FOURTH

9    LINE, MAY BE FROM ABOUT 30 PERCENT TO ABOUT 70 PERCENT.

10   WE'VE SEEN THAT BEFORE; RIGHT?

11   A.    YES.

12   Q.    AND YOU HEARD TESTIMONY YESTERDAY FROM DR. COLE

13   CONCERNING THE TERM "ABOUT"; RIGHT?

14   A.    I DID, YES.

15   Q.    AND YOU AGREE WITH EVERYTHING SHE SAID; CORRECT?

16   A.    ON THE TERM "ABOUT"?

17   Q.    YES.

18   A.    I DIDN'T DISAGREE WITH ANYTHING SHE SAID.

19   Q.    YOU AGREE WITH EVERYTHING SHE SAID THEN; CORRECT?

20   A.    CLOSE.

21   Q.    CLOSE.  THERE IS A DIFFERENCE; RIGHT?  YOU DIDN'T AGREE

22   WITH EVERYTHING?

23   A.    I THINK IT WOULD -- WE WERE IN AGREEMENT.  JUST THE

24   NUANCES.  THERE IS SOME NUANCES ON MAYBE HOW I WOULD HAVE

25   SAID IT.
```

970

1    Q.    SO YOU'RE CLOSELY IN AGREEMENT WITH HER, BUT NOT EXACTLY

2    IN AGREEMENT WITH HER; RIGHT?

3    A.    YES.

4    Q.    AND THAT'S CONCERNING THE TERM "ABOUT"?

5    A.    YES.

6    Q.    AND THAT TERM APPEARS IN THE CLAIMS, DOESN'T IT?

7    A.    IT IS IN THE CLAIMS, YES.

8    Q.    AND IT'S CONCERNING THE RANGE 30 PERCENT TO 70 PERCENT;

9    RIGHT?

10   A.    YES.

11   Q.    AND SO YOU ARE IN AGREEMENT WITH HER JUST ABOUT, BUT NOT

12   ENTIRELY?

13   A.    I THINK IT WOULD PROBABLY BE A DIFFERENCE, SLIGHT

14   DIFFERENCE OF OPINION.  BUT I THINK ROUGHLY HOW SHE TALKED

15   ABOUT IT IS, YOU KNOW, ACCURATE.

16   Q.    NOW, YOU'RE THE INVENTOR OF THE PATENT; CORRECT?

17   A.    YES.

18   Q.    AND YOU WOULD CONSIDER YOURSELF TO BE A PERSON OF SKILL,

19   AN EXPERT IN THE FIELD OF PATENT, WOULD YOU?

20   A.    IN THE FIELD OF PATENT?

21   Q.    NO.  IN THE FIELD OF THIS PATENT, THE '270 PATENT.

22   A.    I'M CERTAINLY KNOWLEDGEABLE ABOUT THE INVENTION, YES.

23   Q.    AND YOU FEEL LIKE YOU'RE AN EXPERT ABOUT IT?

24   A.    I NEVER LIKE TO BRAG ABOUT THINGS.

25   Q.    SO YOU'RE NOT AN EXPERT ABOUT THE '270 PATENT?

971

```
 1     A.   IF YOU WANT TO CALL ME AN EXPERT, I'LL ACCEPT THAT
 2     REPRESENTATION.
 3     Q.   I DON'T WANT TO CALL YOU ANYTHING.  I JUST WANT TO ASK
 4     YOU WHAT YOU ARE.
 5     A.   I AM WOODY BLACKFORD, MAN WITH IDEAS.
 6     Q.   MAN WITH IDEAS, WHO IS NOT SURE IF HE'S AN EXPERT?
 7     A.   I DON'T HAVE AN EDUCATION, SO I INVENT THINGS.  I'M ABLE
 8     TO DO THAT.
 9     Q.   OKAY.  FINE.  I THINK YOUR ANSWER IS WHAT IT IS.
10          BUT YOU DID UNDERSTAND DR. COLE TO -- SHE SAID SHE
11     WAS AN EXPERT; RIGHT?
12     A.   YES.
13     Q.   AND DO YOU CONSIDER HER ONE?
14     A.   I THINK SO.  SHE'S QUITE IMPRESSIVE.
15     Q.   AND YOU HEARD HER TESTIMONY?
16     A.   I DID.
17     Q.   AND YOU HAVE CLOSE AGREEMENT, BUT NOT PRECISE AGREEMENT
18     WITH HER ABOUT THE TERM "ABOUT"; CORRECT?
19     A.   YES.
20     Q.   OKAY.  AND YOUR DISAGREEMENT IS WHAT?
21     A.   WELL, MY CLOSE AGREEMENT IS -- I WAS THINKING IN MY HEAD
22     AS THE INVENTOR OF WHAT I WAS TRYING TO COMMUNICATE TO THE
23     PATENT ATTORNEY THAT BECAME THE LANGUAGE, AND I GUESS THAT'S
24     WHAT I WAS REFLECTING UPON.
25     Q.   THE PATENT ATTORNEYS PICKED THE WORD "ABOUT"; CORRECT?
```

1    A.    YEAH.    THAT'S -- AS I SAID, I'M NOT AN EXPERT.    AND JUST

2    LIKE WE WATCHED IN THE VIDEO, YOU HIRE A PATENT ATTORNEY,

3    THEY WRITE THE LANGUAGE.

4    Q.    YOU DID NOT PICK THE WORD "ABOUT"; CORRECT?

5    A.    I DID NOT PICK THE WORD "ABOUT."

6    Q.    AND YOU DID NOT FORM AN OPINION WHEN THE PATENT WAS

7    FILED AS TO WHAT THAT MEANT; CORRECT?

8    A.    NO.    I THINK I DID.

9    Q.    YOU HAD AN OPINION ABOUT WHAT "ABOUT" MEANT?

10   A.    YES.

11   Q.    AND IT MEANT EXACTLY WHAT DR. COLE SAID; CORRECT?

12   A.    AS I SAID, CLOSE.

13   Q.    CLOSE, BUT NOT EXACTLY THE SAME?

14   A.    NO.    WOULD YOU LIKE TO ASK ME WHAT I --

15   Q.    I THINK I ALREADY DID.    I SAID WHAT AND YOU ANSWERED.

16   A.    OKAY.    I DIDN'T ANSWER WHAT I WAS THINKING IT WAS.

17   Q.    OH, WELL, TELL US WHAT YOU WERE THINKING.

18   A.    WELL, WHAT I WAS THINKING WE WERE MEANING, IS THAT

19   BETWEEN 30 AND 70 PERCENT WOULD CERTAINLY BE WITH -- THAT'S

20   THE RANGE THAT WE'RE CLAIMING.    AND ANYTHING THAT FELL WITHIN

21   30 AND 70 PERCENT WOULD BE AN INFRINGEMENT.

22          BUT I DIDN'T WANT TO SAY THAT -- LET'S SAY, YOU

23   KNOW, WITH MANUFACTURING VARIANCE, THAT IF SOMETHING FELL

24   SLIGHTLY OUTSIDE OF 30 PERCENT, LIKE BELOW IT, THAT THEY

25   WOULDN'T ALSO BE WHAT WE INTENDED TO HAVE COVERED.

973

1          SO LET'S SAY WE USE 5 PERCENT, WHICH WE TALKED ABOUT

2     YESTERDAY, SEIRUS HAVING ABOUT A 4 PERCENT VARIANCE.

3     5 PERCENT, YOU KNOW, 30 PERCENT COVERAGE WOULD BE, SAY, 28.5.

4     AND THEN AT THE HIGH END, 5 PERCENT OF 70 PERCENT WOULD BE

5     3.5, SO 73.5, SINCE IT'S A LARGER AREA.

6     Q.   OKAY.

7     A.   SO THAT'S WHAT I WAS THINKING.

8     Q.   SURE.  LET'S WRITE THAT DOWN THEN AND SEE WHAT YOU WERE

9     THINKING.

10    A.   OKAY.

11    Q.   SO YOU'RE TELLING US THAT YOU HAVE A CLOSE AGREEMENT

12    WITH DR. COLE, BUT NOT EXACT; CORRECT?

13    A.   YEAH.  THAT WE'RE BOTH THINKING THAT THERE IS A NUMBER

14    BELOW 30 AND ABOVE 70 IN A PRETTY TIGHT RANGE THAT --

15    Q.   SO LET ME TURN IT SO YOU CAN SEE.

16    A.   -- THAT IN THE ORDINARY MEANING OF THE TERM WOULD COVER

17    IT.

18    Q.   THE BOTTOM END YOU THINK WOULD BE 30; RIGHT?

19    A.   AT MINIMUM.

20    Q.   AND THE UPPER WOULD BE 70; RIGHT?

21    A.   AT MAXIMUM.

22    Q.   AND WE ASKED DR. COLE WHERE SHE THOUGHT IT WOULD END UP

23    ON THE OUTSIDE OF THE RANGE 30, BELOW 30, AND I NEVER HEARD

24    HER LAND ON A NUMBER, DID YOU?

25    A.   NO, I DIDN'T.

974

1    Q.    NO.  AND SHE DID NOT; CORRECT?

2    A.    WELL, IF I THOUGHT SHE LANDED ON A NUMBER, IT WOULD HAVE

3    BEEN THE ROUNDING, SO, YOU KNOW, THE 29.5.

4    Q.    SO 29.5.  YOU THINK THAT'S THE NUMBER.  IS THAT THE

5    BOTTOM END OF THE RANGE FOR "ABOUT"?

6    A.    I DON'T -- THAT'S WHERE WE'RE CLOSELY IN AGREEMENT BUT

7    NOT IN EXACT.  BECAUSE I THINK IT'S A 5 PERCENT VARIANCE,

8    WHICH WOULD BE 28.5.

9    Q.    SO YOU THINK IT'S 28.5?

10   A.    YEAH.

11   Q.    AND SHE SAID SHE THOUGHT IT MIGHT BE 29.5?

12   A.    BEING -- HER ROUNDING ERROR THOUGHT THAT SHE HAD, YES.

13   Q.    OKAY.  SO SHE HAD A ROUNDING ERROR THOUGHT WHERE SHE

14   SAID IT WAS 29.5; CORRECT?

15   A.    YES.

16   Q.    AND THEN YOU'RE SAYING YOU DISAGREE WITH HER ON THAT.

17   YOU THINK IT'S ACTUALLY 28.5 PERCENT; RIGHT?

18   A.    THAT WOULD BE MY THOUGHT THAT WAS IN MY MIND AS THE

19   INVENTOR.

20   Q.    AND ANYTHING LOWER THAN 28.5 PERCENT, YOU THINK IS

21   OUTSIDE YOUR CLAIM; CORRECT?

22   A.    YES.

23   Q.    OKAY.  AND THEN FOR ABOVE 70, I THINK THEN FOR HER

24   ROUNDING ERROR, SHE WOULD BE AT 70.5 PERCENT; CORRECT?

25   A.    THAT'S HOW I UNDERSTOOD IT, YES.

975

1    Q.    OKAY.  BUT YOU WOULD DISAGREE WITH THAT; CORRECT?

2    A.    YES.

3    Q.    YOU WOULD PUT -- YOU'D GO A LITTLE HIGHER, WOULDN'T

4    YOU?

5    A.    I GO WITH MANUFACTURING VARIANCE, BECAUSE THAT'S WHAT I

6    WAS INTENDING IN MY MIND; 5 PERCENT, WHICH MAKES IT 73.5.

7    Q.    YOU WENT TO 28.5 BELOW, BUT YOU'LL GO TO 73.5 ABOVE?

8    A.    BECAUSE IT'S 5 PERCENT OF A NUMBER.

9    Q.    I SEE.

10   A.    YEAH.

11   Q.    I SEE.  SO IT'S ALWAYS GOING TO BE 5 PERCENT IN YOUR

12   WORLD; RIGHT?

13   A.    WELL, AS WE AGREED WITH SEIRUS AND THEIR MANUFACTURING

14   VARIANCE, YOU CAN GET UP TO 5 PERCENT.

15   Q.    WE'LL SEE ABOUT THAT IN A LITTLE BIT, ABOUT SOME OF THE

16   VARIANCE THAT YOU HAD.

17   A.    OKAY.

18   Q.    NOW, ANYTHING ABOVE 73.5, IN YOUR VIEW AS THE INVENTOR,

19   IS OUTSIDE OF YOUR PATENT CLAIM; RIGHT?

20   A.    YES.

21   Q.    OKAY.  IN YOUR PATENT, NOWHERE DOES IT SAY 73.5;

22   CORRECT?

23   A.    NO.  IT SAYS ABOUT 70.

24   Q.    NOWHERE DOES IT SAY 5 PERCENT ABOVE, DOES IT?

25   A.    NO.  IT SAYS ABOUT 70.

COMPUTER-AIDED TRANSCRIPTION

1    Q.    NOWHERE DOES IT SAY BELOW 30, IT WOULD BE 28.5, DOES

2    IT?

3    A.    NO.  IT SAYS ABOUT 30.

4    Q.    AND NOWHERE DOES IT SAY THAT IT WOULD BE 5 PERCENT

5    BELOW; CORRECT?

6    A.    NO.  IT SAYS ABOUT 30.

7    Q.    YOU MADE THAT UP, DIDN'T YOU?

8    A.    I DID NOT MAKE THAT UP.  THAT WAS THE LANGUAGE THAT THE

9    PATENT ATTORNEY CHOSE TO USE, ASSUMING I GUESS PEOPLE WOULD

10   HAVE AN ORDINARY UNDERSTANDING OF THE MEANING OF THE WORD

11   "ABOUT."

12   Q.    NOW, IF YOU WANTED TO PUT SOME PRECISION ON THE TERM

13   "ABOUT," YOU COULD HAVE WRITTEN YOUR 5 PERCENT POINT INTO THE

14   PATENT APPLICATION, COULDN'T YOU?

15   A.    I SUPPOSE THAT WOULD HAVE BEEN AN OPTION OF THE PATENT

16   ATTORNEY.

17   Q.    BUT IT WOULD HAVE BEEN AN OPTION FOR YOU, TOO, BECAUSE

18   YOU READ AND UNDERSTOOD THE PATENT APPLICATION; CORRECT?

19   A.    I HAD IT EXPLAINED TO ME, AND I WAS SATISFIED WITH THE

20   WORD "ABOUT."

21   Q.    AND YOU DID NOT RAISE AN OBJECTION, YOU DIDN'T MAKE A

22   SINGLE POINT ABOUT NOT INCLUDING 5 PERCENT, DID YOU?

23   A.    NO.  I WAS THINKING "ABOUT" SHOULD COVER MANUFACTURING

24   VARIANCE, IF SOMEONE WAS UNDERSTANDING THIS TYPE OF

25   PRODUCT.

1    Q.   THE WORDS "MANUFACTURING VARIANCE" AREN'T IN THE PATENT

2    EITHER, ARE THEY, IN THE CONTEXT OF "ABOUT," ARE THEY?

3    A.   NO.

4    Q.   THEY ARE NOT.  NO, THEY ARE NOT.

5    A.   NO, THEY ARE NOT.

6    Q.   RIGHT.

7         AND SO BETWEEN YOUR TESTIMONY THE LAST TIME AND YOUR

8    TESTIMONY THIS TIME, YOU HAVE SPOKEN TO YOUR LAWYERS;

9    RIGHT?

10   A.   WHAT'S -- I HAVE SPOKEN TO MY LAWYERS?

11   Q.   YES.

12   A.   YEAH.

13   Q.   YOU'VE SPOKEN TO THEM ABOUT YOUR TESTIMONY, DIDN'T

14   YOU?

15   A.   I'M NOT SURE.  I MEAN, WE'VE HAD MEALS.  KEPT TALKING

16   ABOUT THE CASE IN GENERAL.

17   Q.   THE CASE IN GENERAL AND ABOUT YOUR TESTIMONY IN THE

18   CASE; CORRECT?

19   A.   I GUESS SO, YEAH.  I DON'T REALLY -- I'M NOT PINPOINTING

20   WHEN WE ACTUALLY STARTED TALKING ABOUT WHAT I SAID.

21   Q.   OKAY.  NOW, WHEN YOU GOT -- WHEN YOU TESTIFIED THE OTHER

22   DAY, I ASKED YOU A LOT OF QUESTIONS ABOUT YOUR UNDERSTANDING

23   OF VARIOUS TERMS IN THE PATENT CLAIMS; RIGHT?

24   A.   YOU DID.

25   Q.   AND YOU TESTIFIED THAT YOU DIDN'T HAVE AN UNDERSTANDING

978

1   OF BASE MATERIAL, I BELIEVE; RIGHT?

2   A.   I SAID THAT -- JUST LIKE WE WATCHED IN THE VIDEO, I

3   EXPLAINED MY INVENTION AT THE TIME TO THE PATENT ATTORNEYS,

4   AND THEY CHOSE THE LANGUAGE.  AND I DO FIND THE LANGUAGE TO

5   NOT BE HOW I WOULD ORDINARILY SPEAK.

6   Q.   AND YOU WOULDN'T ORDINARILY SPEAK IN TERMS OF "ABOUT A

7   RANGE"; RIGHT?

8   A.   WELL, "ABOUT" IS ONE OF THOSE TERMS --

9   Q.   SIR, I ASKED YOU YES OR NO.  YES OR NO.  YOU WOULD NOT

10  TYPICALLY SPEAK IN TERMS OF ABOUT A RANGE, WOULD YOU AGREE?

11  A.   I WOULD SAY I WOULD BE MORE LIKELY TO TALK ABOUT THAT

12  THAN A LOT OF THE OTHER KIND OF WEIRD WORDS THAT APPEAR IN

13  PATENTS.

14  Q.   I ASKED YOU A SIMPLE YES OR NO QUESTION.  DO YOU

15  TYPICALLY SPEAK IN TERMS OF RANGES BEING ABOUT A PARTICULAR

16  AMOUNT?

17          MR. ALDRICH:  OBJECTION.  REPETITIVE.

18          THE COURT:  OVERRULED.

19          THE WITNESS:  I THINK I HAVE, YES.

20  Q.   BY MR. MARCHESE:  DO YOU TYPICALLY DO THAT?

21  A.   I'D HAVE TO ANALYZE ALL MY RESPONSES.  I CAN'T ANSWER.

22  Q.   AND YOU WOULD -- I THINK YOU WOULD TELL US -- AM I

23  RIGHT -- THAT AT THE TIME YOU FILED THIS PATENT APPLICATION,

24  YOU HAD IN YOUR MIND A 5-PERCENT VARIANCE; IS THAT RIGHT?

25  A.   I HAD A MANUFACTURING VARIANCE IN MIND.

1    Q.    AND YOU DIDN'T PUT IT IN THE PATENT?

2    A.    IT'S NOT IN THE PATENT.

3    Q.    YOU DIDN'T BOTHER TO TELL THE PUBLIC WHO WOULD READ YOUR

4    PATENT AND TRY TO UNDERSTAND WHAT "ABOUT" MEANS THAT IT'S A

5    5-PERCENT VARIANCE, DID YOU?

6    A.    NO.

7    Q.    YOU DIDN'T GIVE SEIRUS ANY KIND OF AN ADVANCED WARNING,

8    ANY KIND OF SENSE ABOUT WHAT THE TERM "ABOUT" MEANS, THAT IT

9    WOULD BE A 5-PERCENT VARIANCE, DID YOU?

10   A.    I DID NOT GIVE SEIRUS ADVANCED WARNING.

11   Q.    YOU DIDN'T GIVE ANYBODY ADVANCED WARNING, DID YOU?

12   A.    NO.

13   Q.    THE FIRST TIME YOU'VE EVER DONE IT IS AS YOU SAT HERE

14   TODAY AND YOU SAID IT IN THIS COURT UNDER OATH; CORRECT?

15   A.    YES.  FIRST TIME I'VE BEEN ASKED ABOUT IT.

16   Q.    NOW, HERE -- I WANT TO COME BACK.  WE DETOURED INTO THE

17   WORLD OF "ABOUT" THERE FOR A MINUTE.

18   A.    WE DID.

19   Q.    I WANT TO COME BACK AND ASK YOU ABOUT THE REST OF THIS

20   PARAGRAPH ON THE SCREEN.

21   A.    OKAY.

22   Q.    IT SAYS, "THIS RANGE HAS BEEN SHOWN TO PROVIDE A GOOD

23   BALANCE OF HEAT MANAGEMENT PROPERTIES; E.G." -- MEANING FOR

24   EXAMPLE -- "REFLECTIVITY OR CONDUCTIVITY" --

25   A.    YES.

1    Q.    -- "WITH THE DESIRED PROPERTIES OF THE BASE FABRIC, FOR

2    EXAMPLE, BREATHABILITY OR WICKING, FOR INSTANCE" --

3    A.    UH-HUH.

4    Q.    -- RIGHT?

5    A.    YES.

6    Q.    AND IT TALKS ABOUT REFLECTIVITY OR CONDUCTIVITY;

7    RIGHT?

8    A.    YES.

9    Q.    SO THE HEAT MANAGEMENT PROPERTIES WITHIN THE CONTEXT OF

10   YOUR PATENT IS ONE OR BOTH; CORRECT?

11   A.    IT'S HEAT DIRECTING, YES.

12   Q.    AND THAT COULD BE REFLECTIVITY?

13   A.    IT COULD BE REFLECTIVITY AND CONDUCTIVITY AT THE SAME

14   TIME.

15   Q.    OR IT COULD BE ONLY REFLECTIVITY?

16   A.    OR IT COULD ONLY BE REFLECTIVITY.

17   Q.    OR IT COULD BE ONLY CONDUCTIVITY?

18   A.    I THINK IN THE BODY IT MIGHT SAY THAT IT CAN ONLY BE

19   CONDUCTIVITY.

20   Q.    AND THAT'S REFLECTED IN THE SCOPE OF THE CLAIMS THAT ARE

21   AT ISSUE IN THIS PARTICULAR CASE, CLAIMS 2 AND 23; RIGHT?

22   A.    IN CLAIMS 2 AND 23, I'M PERCEIVING HEAT DIRECTING TO BE

23   REFLECTION.

24   Q.    BUT, SIR, IT SAYS RIGHT HERE IT COULD BE REFLECTIVITY OR

25   CONDUCTIVITY, RIGHT?

1    A.    IN THE EXAMPLES IN THE BODY, YES; BUT NOT IN THOSE

2    CLAIMS.

3    Q.    YOUR CLAIMS ARE ONLY REFLECTIVITY; IS THAT RIGHT?

4    A.    CLAIM 2.

5    Q.    IT'S ONLY REFLECTIVITY?

6    A.    THAT'S HOW I'M UNDERSTANDING HEAT DIRECTING.

7    Q.    HAVE YOU EVER DESCRIBED OMNI-HEAT AS YING AND YANG?

8    A.    I THINK I MIGHT HAVE, YES.

9         MR. MARCHESE:    COULD YOU PULL UP EXHIBIT 32, PLEASE.

10   PAGE NO. 4.

11   Q.    SIR, THIS IS AN ARTICLE, EXHIBIT 32 -- AND I BELIEVE

12   IT'S BEEN RECEIVED.  AND IT IS FROM TEXTILE WORLD; RIGHT?

13   A.    YES.

14   Q.    AND YOU'VE SEEN THIS BEFORE; RIGHT?

15   A.    YES.

16   Q.    AND IF YOU WOULD PLEASE, MR. TISA, THERE IS A

17   PARAGRAPH -- HERE IT'S REFERRING TO SOMETHING CALLED -- YOU

18   CALL A YING-AND-YANG EFFECT; RIGHT?

19   A.    YES.

20   Q.    AND THOSE ARE YOUR WORDS; RIGHT?

21   A.    WELL, THAT'S WHAT THEY SAID.  I DON'T REALLY REMEMBER

22   WHAT I SAID TO THE PERSON.  BUT, YOU KNOW, WITH A JOURNALIST,

23   IT'S NOT EXACTLY YOUR WORDS.  THEY ARE NOT AS GOOD AS THE

24   COURT REPORTER.  BUT I'M NOT GOING TO DISAGREE WITH IT.

25   Q.    YOU'RE NOT.  YOU'VE DESCRIBED OMNI-HEAT AS HAVING A

982

1    YING-YANG EFFECT; RIGHT?

2    A.    I COULD GO WITH THAT, YES.

3    Q.    OKAY.   AND THEN IT SAYS, ABOVE THAT, I THINK EXPLAINING

4    WHAT YOU MEANT, THE ARTICLE STATES, THE FOIL DOTS -- THOSE

5    WOULD BE THE OMNI-HEAT DOTS ON THE FABRIC; RIGHT?

6    A.    YES.

7    Q.    REFLECT BODY HEAT BACK TO THE WEARER BUT ARE ALSO

8    CONDUCTIVE.

9          DO YOU SEE THAT?

10   A.    YES.   YES.

11   Q.    SO THE DOTS ON OMNI-HEAT FABRIC ARE BOTH CONDUCTIVE AND

12   REFLECTIVE; CORRECT?

13   A.    YES.   BECAUSE IF A METAL --

14   Q.    SIR.   YES OR NO?

15   A.    YES.

16   Q.    AND AS SUCH, IF CLAIM 2 IS LIMITED IN YOUR PATENT, YOUR

17   '270 PATENT TO ONLY REFLECTIVE, THEN OMNI-HEAT IS NOT COVERED

18   BY CLAIM 2; CORRECT?

19   A.    NO.

20   Q.    NO, THAT'S NOT CORRECT?

21   A.    NO.

22   Q.    SO CLAIM 2 COVERS REFLECTIVE AND CONDUCTIVE?

23   A.    NO.

24   Q.    CLAIM 2 COVERS OMNI-HEAT?

25   A.    YES.

983

1    Q.    AND SO YOUR BELIEF IS THAT CLAIM 2 CAN BE LIMITED TO

2    REFLECTIVE ONLY BY THE HEAT-DIRECTING ELEMENTS; RIGHT?

3    A.    YES.

4    Q.    BUT IT'S ALSO BROAD ENOUGH TO COVER SOMETHING THAT'S NOT

5    JUST REFLECTIVE, BUT ALSO CONDUCTIVE; CORRECT?

6    A.    NO.  I WOULD -- I THINK I NEED TO EXPLAIN.

7    Q.    WELL, SIR, I GUESS THE YING-AND-YANG EFFECT, IT SAYS IT

8    RIGHT HERE.  IF YOU START TO OVERHEAT, THE HUMIDITY MAKES THE

9    FOIL CONDUCTIVE AND DRAWS THE HEAT AWAY; RIGHT?

10   A.    YES.  BUT IT NEVER STOPS REFLECTING.

11   Q.    GOT IT.  SO IT'S BOTH.  IT'S REFLECTING AND

12   CONDUCTING?

13   A.    YEAH.  IT HAS THE CAPABILITY TO, YOU KNOW, BE A

14   REFLECTOR AND A CONDUCTOR.  BUT THE REFLECTION IS OVERRIDING

15   THE CONDUCTION, PARTICULARLY IN A LOW-HUMIDITY STATE.

16   Q.    THAT'S FINE.  I JUST -- I THINK WE WERE TALKING ACROSS

17   ONE ANOTHER.  THAT'S WHAT I'M TRYING TO GET AT.

18         OMNI-HEAT IS BOTH REFLECTIVE AND CONDUCTIVE THROUGH

19   THE DOTS; RIGHT?

20   A.    YES.

21   Q.    AND CLAIM 2 IN THE SAME KINDS OF CONDITIONS WOULD COVER

22   SOMETHING THAT'S REFLECTIVE AND CONDUCTIVE?

23   A.    NO.

24   Q.    SO CLAIM 2 THEN CAN'T COVER OMNI-HEAT?

25   A.    YES, IT CAN.

984

1    Q.    SIR, I THINK THAT THOSE TWO THINGS DON'T SOUND CORRECT.

2    MAYBE YOUR LAWYER CAN CLEAR IT UP WITH YOU, BUT I THINK WHAT

3    I HEAR YOU SAYING IS --

4    A.    IT'S A REFLECTOR.

5    Q.    IT'S JUST A REFLECTOR?

6    A.    NO, I'M NOT SAYING IT'S JUST A REFLECTOR.  BUT ITS

7    OVERRIDING PROPERTY IS THAT IT'S MUCH -- BECAUSE IT'S

8    MIRROR-LIKE PROPERTIES, THEY WELL EXCEED ITS CONDUCTING

9    PROPERTIES.  SO ITS NET EFFECT IS REFLECTOR.

10   Q.    OKAY.  GOT IT.  OKAY.  SO CLAIM 2 IS DESCRIBING A

11   PRODUCT WHOSE NET EFFECT IS A REFLECTOR; RIGHT?

12   A.    YEAH.  IT'S DESCRIBING A HEAT-DIRECTING ELEMENT.

13   Q.    LIKE A MIRROR; RIGHT?

14   A.    LIKE A MIRROR.

15   Q.    OKAY.  AND THAT HEAT-REFLECTING ELEMENT IS NET EFFECT

16   REFLECTIVE?

17   A.    YES.

18   Q.    BUT IF I TOOK THE OVERALL GROSS OPERATION OR FUNCTION OF

19   IT, THERE WOULD BE SOME REFLECTIVITY AND SOME CONDUCTIVITY;

20   RIGHT?

21   A.    YES.  IN SOME CASES IT COULD BE 100 PERCENT

22   REFLECTIVITY.

23   Q.    AND OTHER CASES IT MIGHT NOT?

24   A.    YEAH.  BUT IT COULD NEVER BE, YOU KNOW, ZERO PERCENT

25   REFLECTIVITY.  YOU'D ALWAYS BE REFLECTIVE.

1    Q.   UNDERSTOOD.  NOW I THINK WE'RE SPEAKING THE SAME

2    LANGUAGE.

3    A.   OKAY.

4    Q.   YOU'RE SAYING THAT CLAIM 2 COVERS A SCENARIO OF A

5    PRODUCT LIKE OMNI-HEAT WHERE IT'S ALWAYS REFLECTIVE, THERE'S

6    ALWAYS SOME REFLECTIVITY?

7    A.   THE OMNI-HEAT PRODUCT, YES.

8    Q.   AND --

9    A.   THE OMNI-HEAT HEAT PRODUCT ISN'T JUST THE PATENT.  THERE

10   IS OTHER THINGS YOU CAN DO TO MAKE A HEAT-DIRECTING

11   ELEMENT.

12   Q.   WELL, THAT WASN'T WHAT I WAS ASKING.  OMNI-HEAT IS AT

13   ISSUE IN THIS CASE; RIGHT?

14   A.   YES.

15   Q.   YEAH.  AND SO OMNI-HEAT --

16   A.   WELL, THE SEIRUS PRODUCT IS AT ISSUE.

17   Q.   YOU'RE RIGHT.  YOU'RE RIGHT.

18        SO OMNI-HEAT IS BOTH REFLECTIVE AND CONDUCTIVE?

19   A.   IT'S A NET REFLECTOR THAT HAS BECAUSE OF METAL CONTENTS

20   SOME CONDUCTIVITY.

21   Q.   IT'S A NET REFLECTOR WITH SOME CONDUCTIVITY?

22   A.   UH-HUH.

23   Q.   YES?

24   A.   YES.

25   Q.   AND CLAIM 2 IS THE SAME THING; RIGHT?

COMPUTER-AIDED TRANSCRIPTION

986

1    A.    NO.   CLAIM 2 IS TALKING ABOUT A HEAT-DIRECTING ELEMENT

2    THAT, YES, IS A NET REFLECTOR, OR A REFLECTOR.

3    Q.   IT'S A REFLECTOR, JUST LIKE OMNI-HEAT; RIGHT?

4            MR. ALDRICH:   OBJECTION.   REPETITIVE, ASKED AND

5    ANSWERED ABOUT FIVE TIMES.

6            THE WITNESS:   YEAH.   I THINK I DID ANSWER THAT

7    ONE.

8            THE COURT:   SUSTAINED.

9    Q.   BY MR. MARCHESE:   OKAY.   NOW, I THINK YOU TALKED ABOUT

10   REFLECTIVITY BEING LIKE A MIRROR EFFECT.   I KNOW I HEAR THAT,

11   AND WE TALKED ABOUT THAT JUST NOW.

12   A.   I SAID THAT IF SOMETHING ISN'T, YOU KNOW, MIRROR LIKE,

13   IT CAN'T BE A REFLECTOR.   SO METAL, WIRE, YOU KNOW, IF IT HAS

14   NO MIRROR-LIKE PROPERTIES, IS LIKELY TO HAVE VERY LITTLE

15   REFLECTANT, CERTAINLY NOT ABOVE SAY THE ORDINARY

16   STATE-OF-THE-ART BASE MATERIAL THAT WE'RE TALKING ABOUT.

17   Q.   WELL, I THINK I JUST HEARD YOU SAY THAT THE WIRE COULD

18   HAVE SOME REFLECTIVITY; RIGHT?

19   A.   YES.

20   Q.   AND -- NOW --

21   A.   BUT IT'S A NET CONDUCTOR, JUST LIKE THE NET REFLECTOR.

22   Q.   SIR, I HAD ANOTHER QUESTION FOR YOU.

23   A.   SORRY.

24   Q.   IT'S OKAY.   I KNOW.   YOU WANT TO EXPLAIN YOURSELF.

25   EVERYBODY DOES.   I GET IT.   YOU'LL GET A CHANCE.   I'M TRYING

987

1    TO KEEP IT QUICK AND TIGHT HERE ON THESE QUESTIONS, IF WE

2    COULD.

3            SO I WANTED TO ASK YOU ACTUALLY ABOUT THE

4    MIRROR-TYPE EFFECT ON THE INSIDE OF ONE OF THESE JACKETS.  IF

5    I HAD AN OMNI-HEAT JACKET AND I WOULD HOLD IT UP, YOU'RE

6    TELLING ME THE INSIDE OF THAT JACKET -- WHICH MINE DOESN'T

7    HAVE THAT; ACTUALLY MINE IS PEELING -- IT WOULD HAVE A

8    MIRROR-LIKE EFFECT; RIGHT?

9    A.   YEAH.  LIKE IF YOU TOOK A LASER AND YOU PUT IT ONTO THE

10   FABRIC LIKE, AND IT HIT ONE OF THE ELEMENTS, THE LASER BEAM

11   HAS A PRETTY CLEAN REFLECTION OFF OF THAT.

12   Q.   SO I THINK WHAT YOU SAID WAS BY THE SAME TOKEN, WHEN

13   YOU'RE USING IT IN A -- YOU KNOW, IN ACTIVE WEAR, THAT THE

14   HEAT OFF YOUR BODY WOULD REFLECT BACK; CORRECT?

15   A.   THE HEAT EMITTED FROM THE HEAT SOURCE, WHICH IS YOUR

16   BODY, IS GOING TO CHANGE DIRECTION, YEAH.

17   Q.   BUT IF I HAVE -- LET'S SAY I HAVE AN INTERVENING LAYER,

18   LIKE HERE I HAVE A SHIRT IN BETWEEN MY JACKET --

19   A.   YEAH.

20   Q.   -- AND INTERVENING LAYER --

21   A.   YEAH.

22   Q.   -- THEN THAT -- WHEN THE REFLECTION HAPPENS BACK FROM

23   THE OMNI-HEAT MATERIAL, IT'S GOING TO HIT MY SHIRT, NOT ME;

24   RIGHT?

25   A.   WELL, BASICALLY WHAT'S HAPPENING IS WITH THE SHIRT

988

1    THERE, YOU KNOW, THERE IS STILL HEAT COMING OUT OF THE SHIRT,

2    AND THEN THAT HEAT IS BEING REDIRECTED TOWARDS THE BODY.

3    AND, YES, THERE IS A SHIRT THERE, BUT IT'S STILL BEING

4    REDIRECTED TOWARDS THE BODY.

5    Q.   SO IT'S STILL, YOU BELIEVE, WITHIN THE SCOPE OF YOUR

6    PATENT; CORRECT?

7    A.   WHAT IS?  WHAT'S THE QUESTION?

8    Q.   IF I HAVE A JACKET ON -- SORRY I WASN'T CLEAR.

9         WHEN I HAVE A JACKET ON THAT HAS OMNI-HEAT INSIDE OF

10   IT AND I'M WEARING A SHIRT BETWEEN ME --

11   A.   YEAH.

12   Q.   -- AND THE OMNI-HEAT JACKET, THE PATENT, YOUR '270

13   PATENT, IN YOUR VIEW, STILL COVERS THAT; IS THAT CORRECT?

14   A.   YEAH.  BECAUSE WE'VE REDIRECTED THE HEAT TOWARDS THE

15   BODY.

16   Q.   UNDERSTOOD.  EVEN THOUGH THERE IS A LAYER IN BETWEEN;

17   RIGHT?

18   A.   IN THAT SCENARIO, YEAH.  IF THERE WAS A LAYER IN

19   BETWEEN, WE'RE STILL REDIRECTING THE HEAT TOWARDS THE BODY.

20   Q.   IF THERE ARE TEN LAYERS IN BETWEEN THE BODY AND THE

21   OMNI-HEAT DOTS, YOU'D STILL BE REFLECTING HEAT BACK TO THE

22   BODY; RIGHT?

23   A.   IT WOULD STILL BE REDIRECTING IT, YES.

24   Q.   AND SO YOU BELIEVE THAT WOULD BE WITHIN THE SCOPE OF

25   YOUR CLAIMS; CORRECT?

989

1    A.    WHATEVER THE OTHER PERSON WEARS HAS GOT NOTHING TO DO

2    WITH THE CLAIM, YES.

3            MR. MARCHESE:  YOUR HONOR, I'D LIKE TO HAVE

4    PERMISSION TO ASK A QUESTION ABOUT THE PROSECUTION HISTORY

5    RIGHT NOW, BECAUSE THERE IS A POINT EXACTLY ON THIS.

6            MR. ALDRICH:  YOUR HONOR HAS ALREADY PERFORMED CLAIM

7    CONSTRUCTION ON THE TERMS IN DISPUTE.

8            THE COURT:  IS THERE -- WHAT SPECIFIC QUESTION ARE

9    YOU ASKING ABOUT?

10           MR. MARCHESE:  THERE IS A PARAGRAPH IN THE

11   PROSECUTION TALKING ABOUT THIS VERY POINT, AND I WANT TO ASK

12   MR. BLACKFORD ABOUT IT.

13           THE COURT:  GO AHEAD AND POINT HIM TO THE PART OF

14   THE PROSECUTION HISTORY THAT YOU'RE INTERESTED IN.

15           MR. MARCHESE:  ABSOLUTELY.

16           CAN I HAVE EXHIBIT 6, PLEASE.  PAGE 295.  ACTUALLY,

17   CAN YOU GO TO 287 FIRST.

18           MR. ALDRICH:  DOES MR. BLACKFORD HAVE A COPY IN HIS

19   BINDER?

20           MR. MARCHESE:  HE DOES HAVE A BINDER.  YOU HAVE A

21   BINDER IF YOU WANT TO LOOK AT THAT.

22           THE WITNESS:  IS IT THIS ONE?

23           MR. MARCHESE:  IT SHOULD SAY ON IT EXHIBIT 6 ON THE

24   FRONT COVER.  DO YOU HAVE IT?

25           THE WITNESS:  SO EXHIBIT 6 IS THIS WHOLE THING.

990

1          MR. MARCHESE:  YEAH, IT'S LARGE.

2          THE COURT:  IT'S THIS ONE.

3          THE WITNESS:  SO IT'S THE WHOLE 800 PAGES.  OKAY.

4          MR. MARCHESE:  IT IS.  IT'S THE WHOLE BINDER.

5          THE WITNESS:  OKAY.  IT'S THE WHOLE BINDER.

6          MR. MARCHESE:  IT IS.  IT'S THE PROSECUTION OF THE

7    PATENT.

8          THE WITNESS:  ALL RIGHT.

9    Q.    BY MR. MARCHESE:  AND I'M GOING TO TAKE YOU TO PAGE --

10   IF YOU WANT TO FLIP IT TO PAGE -- THERE IS TWO PAGE NUMBERS

11   ON THE BOTTOM RIGHT.  THERE IS ONE, WHICH HAS A COL PREFIX

12   AND ONE WITH JUST A THREE-DIGIT NUMBER.

13   A.    OKAY.

14   Q.    ARE YOU WITH ME?

15   A.    I SEE COL607 ON THE COVER.

16   Q.    RIGHT.  SO IF YOU CAN GO TO COL893.

17   A.    I'M GETTING IT.

18   Q.    GOT IT?

19   A.    YES.

20   Q.    AND THERE IS SOME CLAIMS THERE; CORRECT?

21   A.    THERE IS AMENDMENTS TO CLAIMS, AND THAT'S WHAT IT SAYS.

22   THAT'S WHAT IS ON THE PAGE.

23   Q.    RIGHT.  AND YOU'VE SEEN AMENDMENTS TO CLAIMS BEFORE IN

24   YOUR HISTORY AS AN INVENTOR; CORRECT?

25   A.    NOT VERY OFTEN.  BECAUSE USUALLY, LIKE WE SAW IN THE

991

1    VIDEO, THE PATENT LAWYER IS HANDLING THESE AMENDMENTS; AND SO

2    I'M NOT LOOKING AT THEM UNLESS I'M REQUIRED TO SUPPLY A

3    DECLARATION OF SOMETHING.

4          MR. MARCHESE:  YOU KNOW, I THOUGHT EXHIBIT 6 HAD

5    BEEN RECEIVED.  I'D LIKE TO --

6          THE COURT:  IT HAS NOT.

7          MR. MARCHESE:  SURPRISING.  OKAY.  I DIDN'T REALIZE

8    THAT.  SORRY.

9          THE COURT:  I DON'T THINK THE PROSECUTION HISTORY

10   HAS BEEN RECEIVED.

11         MR. ALDRICH:  YOUR HONOR, EXHIBIT 6 WAS RECEIVED,

12   BUT WE OBJECTED AND ASKED THAT IT BE WITHDRAWN FOR THE

13   REASONS THAT WE DISCUSSED YESTERDAY.  IT HAS NO PROBATIVE

14   VALUE IN THE CASE.

15         THE COURT:  I NEED THE JURY TO STEP INTO YOUR ROOM.

16         (JURY ABSENT, 12:08 P.M.)

17         THE COURT:  PLEASE BE SEATED.

18         ALL RIGHT.  SO WHAT'S YOUR POINT?

19         MR. MARCHESE:  MY POINT IS THAT DR. COLE TESTIFIED

20   ON THIS VERY PARAGRAPH YESTERDAY AND SAID THAT THERE WAS A

21   SECTION OF THIS AMENDMENT WHERE SHE AGREED THAT THERE WAS A

22   SURRENDER EFFECTIVELY OF FABRICS IN BETWEEN THE HEAT

23   REFLECTORS IN THE BODY.

24         MR. ALDRICH:  YOUR HONOR, I HEARD NO SUCH

25   TESTIMONY.

COMPUTER-AIDED TRANSCRIPTION

992

```
 1              THE COURT:  I'M SORRY?

 2              MR. MARCHESE:  I THOUGHT I DID.  BUT IN EVENT,

 3    THAT'S WHAT I WANT TO ASK ABOUT.

 4              THE COURT:  SO WHAT PARAGRAPH -- CAN YOU HIGHLIGHT

 5    WHAT IT IS THAT YOU'RE ASKING?

 6              MR. MARCHESE:  PAGE 295.

 7              THE COURT:  I HAVE 225.

 8              MR. MARCHESE:  295.  I WAS JUST GOING TO SHOW HIM TO

 9    GET HIM ORIENTED.

10              THE COURT:  I HAVE ON DISPLAY 893 OR 287, DEPENDING

11    UPON WHICH WAY YOU'RE LOOKING AT IT.

12              MR. MARCHESE:  IT'S THE PARAGRAPH AT THE BOTTOM OF

13    295 WHICH WILL BE UP NOW.

14              THE COURT:  OKAY.  THANK YOU.

15              I'M SORRY.  THE POINT OF THAT IS WHAT?

16              MR. MARCHESE:  THE POINT IS TO ASK HIM WHETHER --

17    WHAT THAT MEANS IN THE CONTEXT OF AN INTERVENING LAYER.

18              THE COURT:  AND WHY DO I -- WHY SHOULD THE

19    TRIERS-OF-FACT CARE ABOUT THAT?

20              MR. MARCHESE:  WELL, IF AN INTERVENING LAYER IS IN

21    BETWEEN, THEN IT CAN'T -- IF I WEAR A LINER LIKE THE HEAT

22    TOUCH TORCHE IN BETWEEN, IT CAN'T INFRINGE.

23              I CAN JUST ASK HIM IF HE AGREES OR DISAGREES WITH

24    WHAT DR. COLE SAID ABOUT THIS, AND WE CAN MOVE ON FROM IT.

25              MR. ALDRICH:  YOUR HONOR --
```

1            THE COURT:  YEAH, I DON'T KNOW THAT THIS WITNESS

2    REALLY NEEDS TO TESTIFY ABOUT THAT.  BECAUSE THE CLAIMS ARE

3    WHAT THEY ARE.  THEY ARE WHAT I CONSTRUED.

4            WHETHER I'LL LET YOU MAKE THAT ARGUMENT OR NOT, I

5    DON'T KNOW ABOUT THAT.  IT'S AN INTERESTING ARGUMENT THAT I

6    HAVEN'T QUITE FIGURED OUT YET.  BUT I DON'T KNOW THAT HE

7    NEEDS TO TESTIFY TO THAT.

8            I MEAN, YOU HAVE THIS ISSUE ALREADY BEFORE THE

9    COURT, AND IT SEEMS TO ME IT'S ALMOST A LEGAL ISSUE AS

10   OPPOSED TO A FACT ISSUE.  HOW HE CONSTRUES THE CLAIMS AT THIS

11   POINT, I DON'T SEE THE RELEVANCE.

12           MR. MARCHESE:  WHAT THE INVENTOR BELIEVES WAS

13   SURRENDERED DURING PROSECUTION I THINK IS RELEVANT, YOUR

14   HONOR.

15           THE COURT:  WELL, WHEN WE ARE LOOKING AT CLAIMS,

16   AREN'T WE REALLY GOING TO BE LOOKING AT THE CLAIMS AS THEY

17   SIT IN THE PATENT, AND MY RULINGS DURING CLAIM CONSTRUCTION,

18   AND THAT WILL THEN DRIVE THE JURY'S DETERMINATION OF WHAT THE

19   CLAIMS SAY?

20           MR. MARCHESE:  RIGHT.  BUT THAT HAS TO BE DONE IN

21   THE CONTEXT OF A PERSON OF ORDINARY SKILL IN THE ART, WHICH

22   AN INVENTOR IS ALWAYS CONSIDERED TO BE A PERSON OF ORDINARY

23   AND USUALLY EXTRAORDINARY SKILL --

24           THE COURT:  I'M SORRY.

25           MR. MARCHESE:  -- ON ISSUES OF INFRINGEMENT, WHAT

1    THE PROSECUTION HISTORY MEANS, THINGS OF THAT NATURE.  AN

2    INVENTOR'S TESTIMONY CAN BE RELEVANT.

3            THE COURT:  WELL, I GET THAT.  BUT YOUR QUESTION IS,

4    DOES IT MATTER THAT THE LINER'S ON HERE ARE NOT, ON THE GLOVE

5    OR NOT.  AND I DON'T KNOW THAT THIS LINE OF QUESTIONING

6    ANSWERS THAT QUESTION.

7            MR. MARCHESE:  WELL, MY QUESTION IS ONLY TO SET UP

8    WHAT THIS MEANS, AND THAT IS WHAT WE'RE TRYING TO ASK

9    ABOUT.

10           THE COURT:  ALL RIGHT.

11           MR. ALDRICH:  IN OTHER WORDS, HE'S TRYING TO GO AT

12   THE QUESTION OF WHAT IS THE SCOPE OF THE CLAIMS, WHICH IS

13   SOMETHING WE HANDLED A YEAR AND A HALF AGO IN CLAIM

14   CONSTRUCTION.

15           BUT BEYOND THAT, IF I COULD ACTUALLY POINT YOUR

16   HONOR TO WHAT'S REALLY ON THE PAGE.  IT REPEATEDLY SAYS, AT

17   THE TOP OF PAGE 295, FIRST FULL PARAGRAPH, WE RESPECTFULLY

18   DISAGREE.  THEN IN THE NEXT PARAGRAPH, IT SAYS, FURTHERMORE,

19   THE '253 PATENT ALSO FAILS TO TEACH.

20           SO THIS IS A FULL PAGE OF ARGUMENT ABOUT WHY THE

21   EXAMINER IS WRONG.  IT IS NOT CONCEDING ANYTHING.  IT IS NOT

22   YIELDING ANYTHING.  IT'S IN NEGOTIATION WITH THE PATENT

23   OFFICE SAYING, MR. EXAMINER, YOU'RE INCORRECT, WE WILL MAKE

24   SOME AMENDMENTS TO THE CLAIMS TO TRY TO OVERCOME THIS.

25   THAT'S ACTUALLY WHAT IT SAYS ON THE PRIOR PAGE.  THE

995

1    REJECTION IS RESPECTFULLY TRAVERSED, IN LIGHT OF THE

2    AMENDMENTS TO THE CLAIMS AND THE REMARKS BELOW.

3          SO THERE IS NO YIELDING ANYTHING HERE, WHICH IS WHAT

4    HE REPRESENTED AT OPENING STATEMENT TO THE JURY, THIS

5    PROSECUTION HISTORY WAS ALL ABOUT.  IT WAS FALSE.

6          MR. MARCHESE:  YOUR HONOR, THAT'S A QUESTION OF FACT

7    THAT THEY CAN ARGUE.

8          MR. ALDRICH:  THAT IS NOT A QUESTION OF FACT, AND IT

9    SHOULD NOT BE ARGUED AND SHOULD BE CORRECTED.

10          MR. MARCHESE:  YOUR HONOR, WHAT WAS GIVEN UP DURING

11    THE PROSECUTION IS RELEVANT.  I'VE GOT A CASE THAT I CAN CITE

12    TO YOU, THE ASTRAZENECA CASE, THAT WILL TELL YOU YOU NEED TO

13    LOOK AT THE ELEMENTS OF THE CLAIM AND FIND OUT WHAT IS NOVEL

14    AND NOT NOVEL FOR DAMAGES PURPOSES AND DETERMINE WHETHER OR

15    NOT -- WHAT'S PURPORTEDLY NOVEL I SHOULD SAY.  BECAUSE WE'RE

16    SAYING IS NOVEL.  BUT WHAT IS PURPORTEDLY NOVEL IS RELEVANT

17    TO THE DAMAGES, A REASONABLE ROYALTY ASSESSMENT.

18          AND IN THIS CASE, THE JURY NEEDS TO UNDERSTAND HOW

19    WE GOT TO WHERE WE ARE IN THE CLAIM, WHAT IT TRULY IS THAT

20    THEY FINALLY -- THE EXAMINER SAID YOU CAN HAVE THIS.  THAT'S

21    ALL WE'RE TRYING TO GET AT ULTIMATELY WITH DAMAGES.  THAT'S

22    WHY I DID THAT IN THE OPENING.  THAT IS COMPLETELY RELEVANT.

23          THERE IS ONLY ONE WAY TO UNDERSTAND WHAT THE

24    EXAMINER SAID WAS OKAY, AND THAT'S BY LOOKING AT THE

25    PROSECUTION HISTORY.  AND SO THAT HAS TO COME IN FOR THAT

1    PURPOSE.  OTHERWISE, YOU KNOW, A PATENTEE CAN ARGUE, IF YOU

2    KEEP THAT FROM THE JURY, A PATENTEE CAN ARGUE OVER AND OVER

3    AGAIN THAT THIS WHOLE CLAIM WAS SOMETHING THAT WE CAME UP

4    WITH WAS NEW AND NOBODY KNEW ANYTHING ABOUT IT BEFORE,

5    SUBJECT ONLY TO WHAT AN EXPERT DOES WITH PRIOR ART THAT'S

6    OUTSIDE THE PROSECUTION.

7         BUT IN ORDER TO FIGURE OUT WHAT DAMAGES ARE REALLY

8    AND TRULY PROPER, BECAUSE YOU HAVE TO LOOK -- I MEAN, THE

9    FEDERAL CIRCUIT, AND THERE IS MANY CASES THAT SAY THIS, YOU

10   HAVE TO LOOK AT THE INCREMENTAL ADVANCE, THE FOOTPRINT OF THE

11   INVENTION IS WHAT JUDGE RADER HAS WRITTEN BEFORE.

12        AND THE FOOTPRINT OF THE INVENTION CAN BE UNDERSTOOD

13   IN A LOT OF DIFFERENT WAYS, ONE OF WHICH IS WHAT THE INVENTOR

14   AND THE APPLICANT DECIDED TO GIVE UP.  WHETHER THEY ARGUED

15   ABOUT IT IS ONE THING.

16        MR. ALDRICH:  THAT'S FALSE.

17        MR. MARCHESE:  BUT WHAT THEY ULTIMATELY GAVE UP,

18   YOUR HONOR, IS RELEVANT TO UNDERSTAND THE FOOTPRINT OF THE

19   INVENTION.

20        NOW, THAT CAN TURN INTO A DISPUTE OF FACT.  THE

21   OTHER SIDE CAN SAY NO, NO, NO, WE DIDN'T GIVE UP X, Y AND Z;

22   WE ONLY GAVE UP A, B AND C.  OR THEY CAN SAY WE GAVE UP

23   NOTHING.  BUT THE DEFENDANT SHOULD BE ABLE TO BE ENTITLED TO

24   PROVE WHAT THE FOOTPRINT IS.

25        AND IN THIS CASE, IF WE LOOK AT THE PROSECUTION

1    HISTORY, A STRONG ARGUMENT CAN BE MADE THAT THE FOOTPRINT IS

2    30 TO 70 AT MOST.

3          THE COURT:  YOU WERE GOING TO SAY SOMETHING.

4          MR. ALDRICH:  I MEAN, TO WHAT EXTENT DO YOU WANT ME

5    TO ARGUE AGAINST THAT?  IT'S JUST WRONG.

6          DURING -- I MEAN, I'VE NEVER HEARD OF A CASE LIKE

7    THIS BEFORE, AND I'VE NEVER HEARD OF THE IDEA THAT FOR A

8    DAMAGES PURPOSE, YOU CAN GO AND LOOK AT THE NEGOTIATIONS BACK

9    AND FORTH BETWEEN THE APPLICANT AND THE PATENT OFFICE,

10   PARTICULARLY WHERE THE APPLICANT SAYS OVER A FULL PAGE, NO,

11   WE DISAGREE, YOU DON'T HAVE IT RIGHT, THAT'S NOT WHAT IT'S

12   ABOUT, LEVY DOESN'T HAVE THAT, ET CETERA, ET CETERA.

13         AND TO THE EXTENT THAT THEY THOUGHT IT WOULD BE

14   RELEVANT SOMEHOW, CLAIM CONSTRUCTION.  THAT'S WHY WE DO THAT

15   PROCESS.  AND WE DID IT ON MAY 22ND, AFTER MONTHS OF

16   DISCOVERY.  AND IF THEY WANTED TO DEPOSE MR. BLACKFORD DURING

17   THAT TIME -- ACTUALLY, THEY DID DEPOSE MR. BLACKFORD DURING

18   THAT TIME.

19         MR. MARCHESE:  YOUR HONOR, THE JURY IS THE FINDER OF

20   FACT.

21         MR. ALDRICH:  THERE IS NO RELEVANCE.  THERE IS ZERO

22   RELEVANCE.  ONCE THE COURT HAS CONSTRUED THE CLAIM TERMS AND

23   ONCE -- IF THEY WANT TO SHOW WHAT'S IN THE PRIOR ART AND

24   THEREFORE WHAT THE SCOPE -- YOU KNOW, WHAT THIS PATENT SHOWS

25   OVER THE PRIOR ART, THEY CAN DO THAT; RIGHT.

998

1           THEY HAVE PRIOR ART IN THE RECORD THAT THEY ARE

2     PLANNING ON INTRODUCING.  IF THEY WANT TO INTRODUCE THAT

3     PRIOR ART AND SAY, HERE IS WHAT THE STATE OF THE ART WAS

4     BEFORE, AND THEN HERE IS WHAT THE PATENT COVERS, AND THAT

5     DIFFERENCE THERE IS WHAT THE VALUE OF THE PATENT IS, THEY CAN

6     DO THAT.

7           BUT THIS ISN'T RELEVANT TO THAT AT ALL, BECAUSE IT'S

8     A BACK-AND-FORTH IN WHICH WE'RE SAYING, NO, EXAMINER, YOU

9     HAVE IT WRONG.  IT'S NOT A PARTY ADMISSION.  IT'S HEARSAY.  I

10    MEAN, IT'S BIZARRE THAT THIS THEORY IS EVEN COMING OUT.  I'VE

11    NEVER HEARD OF SUCH A THING.

12          MR. MARCHESE:  "BIZARRE" IS AN INTERESTING WORD.

13    BUT THE FEDERAL CIRCUIT SAYS OVER AND OVER AGAIN, YOU HAVE TO

14    FIGURE OUT WHAT THE SCOPE OF THE INVENTION, WHAT WAS TRULY

15    INVENTED.  AND THERE ARE CASES, INCLUDING ASTRAZENECA, WHERE

16    THEY SAY YOU NEED TO FOCUS IN AND FIGURE OUT WHAT ELEMENT IN

17    THE CLAIM IS TRULY PURPORTEDLY NOVEL.

18          AND THAT NEEDS TO BE FACTORED IN BY THE JURY, BY THE

19    FINDER-OF-FACT IN DETERMINING WHAT A REASONABLE ROYALTY

20    SHOULD BE.

21          MR. ALDRICH:  AND DR. BLOCK HAS LOTS OF TESTIMONY ON

22    THAT.  HE'S GOING TO EXPLAIN WHAT THE STATE OF THE ART WAS.

23    HE'S GOING TO EXPLAIN WHAT FOTTINGER COVERED.  HE'S GOING TO

24    EXPLAIN, TO THE EXTENT THERE IS A DIFFERENCE BETWEEN

25    FOTTINGER AND THIS PATENT, WHAT THAT DIFFERENCE IS.  THAT'S

999

1    ALL READY TO COME INTO THE RECORD.

2              BUT NOT HERE.  NOT IN THIS WAY.

3              MR. MARCHESE:  YOUR HONOR, I HADN'T FINISHED.

4              THE COURT:  GO AHEAD.

5              MR. MARCHESE:  THANK YOU.

6              SO IN ORDER TO UNDERSTAND WHAT THE SCOPE OF THE

7    CLAIMS ARE, TRULY WHAT IS THE INVENTIVE ASPECT, PURPORTEDLY,

8    BECAUSE THE JURY HAS TO DO THAT, GEORGIA-PACIFIC ACCOUNTS FOR

9    THAT.

10             THE FEDERAL CIRCUIT HAS SAID IT OVER AND OVER AGAIN.

11   IT'S A PARAMOUNT CONSIDERATION BECAUSE THERE NEEDS TO BE

12   APPORTIONMENT.  THERE NEEDS TO BE DETERMINATIONS OF WHETHER

13   THE ENTIRE MARKET VALUE RULE WILL APPLY.  THEY NEED TO

14   UNDERSTAND WHAT THE VALUE OF THE INVENTION IS.

15             AND THERE ARE SOURCES OF INFORMATION FOR THAT,

16   INCLUDING THE PRIOR ART, OF WHICH LEVY IS ONE PIECE, WHICH

17   DEFINES THE STATE OF THE ART.  AND THEN THE APPLICANT'S

18   CONDUCT IN THE COURSE OF THE PROSECUTION HISTORY CERTAINLY IS

19   RELEVANT EVIDENCE OF WHAT THE FOOTPRINT IS.

20             BECAUSE THE APPLICANT IS FREE AT ANY JUNCTURE IN THE

21   PROSECUTION HISTORY TO SAY, I WILL NOT AMEND, I STAND ON MY

22   CLAIMS.  IF THEY DO THAT AND THEY GET THEIR CLAIMS ALLOWED,

23   THEY HAVE A BROADER PATENT.  IF THEY SURRENDER TERRITORY IN

24   RESPONSE TO A REJECTION, THEN THE SCOPE OF THEIR CLAIM HAS

25   NARROWED BY ITS VERY NATURE.

1000

1    AND THE JURY NEEDS TO KNOW THAT.  THEY NEED TO

2    UNDERSTAND WHAT IT IS IN THIS PATENT CLAIM THAT COLUMBIA

3    BELIEVES, OR AT LEAST CONCEDED TO HAVE BELIEVED THAT IT GOT

4    DURING PROSECUTION.  THERE IS ONLY ONE WAY TO GET THERE.

5    WE'VE GOT TO LOOK AT IT.

6    THE COURT:  I DON'T KNOW THAT THERE IS ONLY ONE WAY

7    TO GET THERE, BUT THERE IS PROBABLY MULTIPLE WAYS TO GET

8    THERE.  THE QUESTION IS WHETHER THIS IS A RELEVANT AND

9    ADMISSIBLE WAY FOR YOU TO GET THERE.

10    LET ME ASK YOU A QUESTION.  THE DEFENSE IS ARGUING

11    TO THE COURT THAT WHAT THEY ARE CALLING THE FOOTPRINT IS A

12    RELEVANT CONSIDERATION.  YOU SEEM TO BE CONCEDING THAT POINT,

13    BUT SUGGESTING THAT THEY CAN DO THAT BY LOOKING AT PRIOR ART

14    AND SAYING, THIS IS WHERE THE INVENTION -- THIS IS HOW THE

15    INVENTION DEVELOPED ALONG THE WAY.

16    AM I CORRECT IN SUMMARIZING WHAT YOU SAID?

17    MR. ALDRICH:  YOU DON'T ESTABLISH THE SCOPE --

18    AGAIN, YES, YOU CAN LOOK AT WHAT THE FOOTPRINT OF THE

19    INVENTION IS, AND THE FOOTPRINT OF THE INVENTION IS THE

20    DIFFERENCE BETWEEN THE PRIOR ART AND THE PATENTED

21    TECHNOLOGY.

22    THE COURT:  THAT IS RELEVANT FOR THE CONSIDERATION

23    FOR THE JURY IN DETERMINING WHAT DAMAGES SHOULD BE.  DO YOU

24    AGREE WITH THAT?

25    MR. ALDRICH:  YES.  I WOULD AGREE THAT THE

COMPUTER-AIDED TRANSCRIPTION

1001

1    DIFFERENCE BETWEEN THE PRIOR ART AND THE INVENTION IS

2    RELEVANT FOR DAMAGES PURPOSES.

3              THE COURT:  OKAY.  AND SO WHAT THEY ARE SUGGESTING

4    IS ONE OF THE WAYS YOU CAN LOOK AT IT IS BY LOOKING AT THE

5    PROSECUTION HISTORY IN ORDER TO LOOK AT WHAT THE FOOTPRINT

6    IS, AND THAT THAT'S A SOURCE OF INFORMATION THAT THE JURY CAN

7    CONSIDER.

8              MR. ALDRICH:  I WOULD DISAGREE WITH THAT AND I WOULD

9    ALSO SAY IT'S PREJUDICIAL.

10             THE COURT:  IT'S ALWAYS GOING TO BE PREJUDICIAL.

11   THEY DON'T EVEN INTRODUCE ANYTHING UNLESS IT'S PREJUDICIAL.

12   THAT'S THE WHOLE POINT.

13             MR. ALDRICH:  SO, AGAIN, WHAT'S BEING INVITED

14   HERE -- AND I'VE HEARD MR. MARCHESE SAY THIS ABOUT FIVE

15   TIMES, YOUR HONOR.  YOUR HONOR, IT'S ABOUT THE SCOPE OF THE

16   CLAIM.  EVERY TIME HE STARTS INTO A NEW CLAIM, YOUR HONOR,

17   IT'S ABOUT THE SCOPE OF THE CLAIMS.  THAT BY DEFINITION IS

18   CLAIM CONSTRUCTION.

19             THE COURT:  I DON'T DISAGREE WITH YOU ABOUT THAT.

20             MR. ALDRICH:  OKAY.

21             THE COURT:  BUT WHAT HE'S -- AND MAYBE HE'S USING

22   THE SCOPE OF THE CLAIMS IN A WAY, I DON'T KNOW.  BUT WHAT

23   HE'S SUGGESTING, AND IT HAS SOME -- MAKES SOME SENSE TO ME,

24   IS IN LOOKING AT HOW BIG THE FOOTPRINT IS, ONE OF THE THINGS

25   THAT WE CAN TAKE INTO CONSIDERATION IS WHAT HAPPENED DURING

COMPUTER-AIDED TRANSCRIPTION

1002

1    THE PROSECUTION OF THE CASE.

2         MR. ALDRICH:  NO.  WE CAN LOOK AT A PATENT AND WE

3    CAN LOOK AT WHAT WAS -- AT WHAT THE CLAIMS ARE NOW, AND WE

4    CAN SAY, WHAT'S THE DIFFERENCE BETWEEN THOSE.  THAT'S THE

5    SCOPE OF THE INVENTION.

6         THE COURT:  I'M SORRY.  SAY THAT AGAIN.  LOOK AT THE

7    PATENT AND LOOK AT WHERE THE CLAIMS ARE NOW?

8         MR. ALDRICH:  SO YOU CAN LOOK AT A PIECE OF PRIOR

9    ART, FOR EXAMPLE, AND THEN YOU CAN LOOK AT THE PATENT CLAIMS

10   THAT ARE PROPERLY CONSTRUED.  YOU CAN SAY, WHAT'S THE

11   DIFFERENCE BETWEEN THIS PIECE OF PRIOR ART AND THESE CLAIMS.

12   THAT'S AN APPROPRIATE THING TO DO.  AND THAT'S WHAT DR. BLOCK

13   HAS DONE OVER A HUNDRED AND SOME-ODD PAGES.

14        HE DIDN'T INCLUDE LEVY.  AND THAT'S WHAT THEY ARE

15   TRYING TO DO, IS THEY ARE TRYING TO BRING LEVY INTO THE CASE,

16   BECAUSE LEVY WAS USED IN THE PROSECUTION, AND DR. BLOCK NEVER

17   MENTIONED LEVY.  SO THEY ARE TRYING TO BRING PRIOR ART INTO

18   THE CASE UNDER THE AUSPICES OF DAMAGES -- NEW THEORY AGAIN.

19   THAT'S WHY WE'RE DOING THIS.

20        BUT THE BACK-AND-FORTH CORRESPONDENCE WITH THE

21   PATENT OFFICE HERE DOESN'T GIVE ANY CONTEXT BEYOND AN EXPERT

22   SAYING, HERE IS ONE PIECE OF PRIOR ART, HERE IS THE PATENT,

23   AND THEN DOING AN ANALYSIS OF WHAT THE DIFFERENCE IS BETWEEN

24   THEM.

25        NOW, I WOULD AGREE THAT THERE COULD BE SOMETHING, IF

1003

1    THERE WAS A CONCESSION MADE.  IF YOU SAID, YES, EXAMINER,

2    YOU'RE CORRECT, OR IF YOU SAID NOTHING AND SIMPLY AMENDED THE

3    CLAIMS, THEN THAT NARROWS THE SCOPE OF THE INVENTION.  I

4    WOULD AGREE WITH THAT.  BUT THAT'S NOT WHAT HAPPENED HERE.

5           REPEATEDLY, AND OVER PAGES, THE APPLICANT SAID,

6    EXAMINER, YOU'RE WRONG.  WE RESPECTFULLY DISAGREE WITH

7    RESPECT TO ALL OF THESE POSITIONS YOU'RE TAKING.  BUT WE'RE

8    GOING TO AMEND TO TRY TO GET THROUGH THIS AND TO WORK WITH

9    YOU ON IT.

10           THAT'S NOT A CONCESSION, AND THEREFORE IT DOESN'T

11   TEACH THE SCOPE OF THE CLAIMS AT ALL.  FOR CLAIM CONSTRUCTION

12   PURPOSES, FOR PROSECUTION HISTORY ESTOPPEL, FOR DAMAGES, IT

13   TEACHES NOTHING; BUT IT'S PART OF THAT BACK-AND-FORTH WITH

14   THE PATENT OFFICE.

15           AND THERE IS PLENTY OF CASE LAW THAT TALKS ABOUT THE

16   RELEVANCE OF PROSECUTION HISTORY IN A CASE.  AND WHERE YOU

17   HAVE THAT BACK -- WHERE THERE IS THIS BACK-AND-FORTH

18   CORRESPONDENCE, COURTS SAY IT'S NOT RELEVANT AT ALL TO

19   ANYTHING IN THE CASE.

20           MR. MARCHESE:  THAT'S JUST NOT CORRECT, YOUR HONOR.

21   I MEAN, THE REPRESENTATIONS ABOUT SURRENDER AND PROSECUTION

22   HISTORY AND ESTOPPEL, THIS IS WHERE YOU GET IT FROM; SO

23   THAT'S NOT CORRECT.

24           BUT IN TERMS OF DAMAGES, WHAT THE PATENTEE DECIDES

25   THEY WILL NOT FIGHT ON, THEY CAN SAY WE DISAGREE, WE

1004

1    DISAGREE.  BUT WHAT THEY ENDED UP ON, WHAT THEY ENDED UP

2    AMENDING TO FINALLY GET A CLAIM, TEACHES ONE WHO IS EXAMINING

3    THESE THINGS AND TRYING TO FIGURE OUT WHAT'S THE VALUATION OF

4    THE PATENT FOR PURPOSES OF LICENSING, WHAT IS IT THAT'S

5    REALLY DIFFERENT?

6         AND THEY CAN USE THAT INFORMATION TO UNDERSTAND WHAT

7    IT IS THAT THE PATENTEE GOT.  THIS IS A PUBLIC NOTICE

8    FUNCTION IS WHAT IS THIS IS SUPPOSED TO BE.  THE CASES SAY

9    THAT.  BLACK LETTER LAW.  THE PROSECUTION HISTORY IS TO PUT

10   THE PUBLIC ON NOTICE IN CONJUNCTION WITH THE PATENT AS TO

11   WHAT IT IS THAT THE PATENTEE GOT.

12        AND SO PUBLIC -- IF I'M IN A HYPOTHETICAL

13   NEGOTIATION IN THE GEORGIA-PACIFIC WORLD, AND I AM A

14   POTENTIAL LICENSEE, I'LL TELL YOU WHERE I'M GOING TO GO RIGHT

15   AWAY.  I'M GOING TO GO TO THIS PROSECUTION HISTORY AND TRY TO

16   FIGURE OUT WHAT THE SCOPE OF THE PATENT IS, SO THAT I CAN

17   UNDERSTAND, DESIGN AROUND, SO I CAN UNDERSTAND HOW DIFFICULT

18   IT WOULD BE TO REPRODUCE A DIFFERENT PRODUCT.  SO I CAN

19   FIGURE OUT HOW MUCH I WANT TO PAY, IF ANYTHING, FOR THE

20   INVENTION.

21        IT'S CRUCIAL.  YOU ASK ANY LICENSING ATTORNEY WHO

22   HAS DONE A LOT OF THIS WORK, YOU WILL GO TO THE PATENT, YOU

23   WILL LOOK AT THE CLAIMS AND YOU WILL LOOK AT THE PROSECUTION

24   HISTORY, AND YOU WILL MAKE A VALUE ASSESSMENT OF THE PATENT.

25        YOU'LL SAY --

1005

1    THE COURT:  WHAT ABOUT HIS POINT, THOUGH, WHERE HE

2    WAS SAYING THAT IT'S ONE THING WHERE THERE IS CONCESSIONS

3    THAT HAVE BEEN MADE, BUT IT'S QUITE A DIFFERENT THING WHERE

4    THEY ARE JUST KIND OF GOING BACK AND FORTH AND THERE IS

5    DISAGREEMENT ABOUT WHAT IT WAS.

6        WHAT'S THE VALUE OF THAT?

7        MR. MARCHESE:  THE VALUE IS TO SAY WHENEVER THEY

8    MAKE AN AMENDMENT, THEY HAVE TO LIVE BY THE AMENDMENT.  SO

9    IT'S A FORK IN THE ROAD.  THE REJECTION COMES IN, THE PATENT

10   OFFICE SAYS, YOU'VE GOT, YOU KNOW, OPTIONS.  YOU CAN STAND ON

11   YOUR CLAIMS AND ARGUE OR YOU CAN AMEND; OR YOU CAN WITHDRAW.

12   AND DEPENDING ON THE CONDUCT OF THE PATENT APPLICANT, THAT

13   DEFINES WHAT THE VALUE, WHAT THE OVERALL SCOPE OF THE PATENT

14   CLAIMS ARE.

15       BECAUSE I WOULD KNOW, IF I LOOKED AT THIS PATENT,

16   THAT THEY STOOD ON -- THAT THEY HAD TO AMEND THEIR CLAIMS TO

17   GET DISCONTINUOUS AND DISCRETE.  THEY HAD TO AMEND THEIR

18   CLAIMS TO GET INDEPENDENT.  THEY HAD TO AMEND THEIR CLAIMS TO

19   GET THIS ABOUT 30 TO 70.

20       NOW I KNOW THAT IF I MAKE ANY CHANGE THAT'S OUTSIDE

21   THE SCOPE OF THOSE THINGS, THERE IS NO EQUIVALENCE.  I DON'T

22   HAVE TO WORRY ABOUT -- YOU KNOW, I CAN DESIGN AROUND WITHOUT

23   FEAR OF EQUIVALENCE.  AND SO THAT GOES TO WHAT THE VALUE IS.

24       IT ALSO TELLS ME, IF YOU MAKE A CONCESSION ON

25   CERTAIN ELEMENTS OF THE CLAIM, THAT THAT IS DEFINING TO THE

1006

1    PERSON WHO IS POTENTIALLY GOING TO TAKE A LICENSE, TO FIGURE

2    OUT WHAT THE VALUE IS, THAT IS GOING TO HELP THEM UNDERSTAND

3    WHAT IT IS THAT'S TRULY, IF ANYTHING, NOVEL IN A PATENT.

4           AND SO THIS IS AS GOOD AN INDICATOR, IF NOT THE

5    BEST, FOR FIGURING OUT FOR PURPOSES OF LICENSING, THIS IS

6    PROBABLY ONE OF THE FIRST THINGS YOU'D LOOK AT.  GIVE ME THE

7    PATENT.  GIVE ME THE PROSECUTION HISTORY.  LET ME TRY TO

8    UNDERSTAND WHAT I'M GETTING.

9           MR. ALDRICH:  YOUR HONOR --

10          MR. MARCHESE:  AND IF I'M GOING TO TAKE A LICENSE, I

11   ALSO WANT TO UNDERSTAND WHAT OTHER LICENSEES MIGHT -- WHAT

12   BENEFITS THEY MIGHT GET.  HOW EASY IT IS FOR THEM TO DESIGN

13   AROUND A PATENT.  BECAUSE I DON'T WANT TO PAY MORE THAN MY

14   COMPETITORS DO TO HAVE THE SAME TECHNOLOGY.

15          SO ALL OF THIS SHOULD GO IN.  AND IF YOU LOOK AT

16   GEORGIA-PACIFIC, YOU'LL SEE SMACK DAB IN THE MIDDLE OF THE 15

17   FACTORS, THERE IS THE PATENT SCOPE.  AND IF YOU GO TO THE

18   CASE LAW FROM THE FEDERAL CIRCUIT, AND I'VE SAID IT OVER AND

19   OVER AND OVER AGAIN, YOU'VE GOT TO FIGURE OUT WHAT THE

20   FOOTPRINT IS, AND YOU HAVE TO APPORTION, YOU HAVE TO

21   APPORTION TO THE VALUE OF THE INVENTION.

22          IT'S CRUCIAL.  AND PART OF THAT IS APPORTIONING

23   CLAIM APPORTIONMENT.  AND ASTRAZENECA STANDS FOR THAT

24   PROPOSITION.

25          THE COURT:  ALL RIGHT.  THANK YOU.

1007

1    MR. ALDRICH:  YOUR HONOR, ONCE AGAIN, I HEARD HIM

2    SAY THE SCOPE OF THE PATENT.  SO, AGAIN, ONCE YOU HAVE CLAIM

3    CONSTRUCTION DONE, YOU DON'T NEED TO GO BACK TO THE

4    PROSECUTION HISTORY TO FIGURE OUT WHAT THE SCOPE OF THE

5    PATENT IS.

6        THE SCOPE OF THE PATENT IS WHAT THE COURT HAS

7    ORDERED THE SCOPE OF THE PATENT IS.  AND THEN YOU HAVE AN

8    EXPERT EXPLAIN THE DIFFERENCE BETWEEN THE SCOPE OF THE PATENT

9    AND THE PRIOR ART.  THAT'S WHAT DR. BLOCK IS GOING TO DO.

10       BUT DR. BLOCK IS NOT GOING TO TESTIFY ABOUT LEVY

11   BECAUSE HE DIDN'T PUT IT IN HIS REPORT.  BUT THEY ARE TRYING

12   TO BACKDOOR LEVY BY GETTING IT IN THROUGH PROSECUTION HISTORY

13   UNDER THE AUSPICES THAT IT RELATES TO DAMAGES.

14       MR. MARCHESE:  THAT'S NOT CORRECT, YOUR HONOR.

15   DR. BLOCK DOES DESCRIBE THE PROSECUTION HISTORY IN HIS EXPERT

16   REPORTS.

17       MR. ALDRICH:  AND THEY ALSO WANTED IT FOR CLAIM

18   CONSTRUCTION.

19       THE COURT:  WAIT.  DON'T DO THAT.

20       MR. ALDRICH:  I'M SORRY.  I THOUGHT I WAS STILL

21   SPEAKING.

22       THE COURT:  NO, NO.  HE WAS SPEAKING.

23       GO AHEAD.

24       MR. MARCHESE:  DR. BLOCK, HE DID DESCRIBE THE

25   PROSECUTION HISTORY, AND THE PROSECUTION HISTORY IS PART OF

COMPUTER-AIDED TRANSCRIPTION

1    HIS REPORT.  LEVY WAS THE REFERENCE, THE ONLY REFERENCE THAT

2    WAS DISCUSSED.

3         AND SO UNDERSTANDING WHAT HAPPENED IN THE

4    PROSECUTION HISTORY IS SOMETHING THAT OUR EXPERT HAS OPINED

5    UPON.  THEY HAD A CHANCE TO DEPOSE HIM ON IT.  IT'S RELEVANT

6    FOR THE CASE FOR US TO UNDERSTAND WHERE THE PRIOR ART

7    INTERSECTS.  AND WE'RE NOT ASSERTING THAT LEVY INVALIDATES,

8    AND WE WILL NOT ASSERT THAT.  IT WILL NOT BE ON THE VERDICT

9    FORM.

10        BUT WE ARE ASSERTING THAT FOTTINGER DOES.  AND TO

11   UNDERSTAND WHERE FOTTINGER LIES, WITH RESPECT TO WHAT THEY

12   DID AND DID NOT CONCEDE DURING PROSECUTION, IS RELEVANT.

13        THE COURT:  ALL RIGHT.  THANK YOU.  I'M SORRY.

14        THERE WAS SOMETHING ELSE THAT YOU WANTED TO SAY.

15        MR. ALDRICH:  AGAIN, I'M FLUMMOXED SO I APOLOGIZE.

16   I DIDN'T REALIZE I'D BE HAVING THIS ARGUMENT.

17        THE COURT: OKAY.  IT IS 12:30.  I'M GOING TO THINK

18   ABOUT THIS.  I'LL SEE YOU ALL IN 45 MINUTES.

19        MR. ALDRICH:  THANK YOU, YOUR HONOR.

20        THE COURT:  I'LL LET YOU KNOW WHAT I THINK.

21        MR. ALDRICH:  THANK YOU, YOUR HONOR.

22        MR. MARCHESE:  THANK YOU, YOUR HONOR.

23        THE COURT:  STAY PUT UNTIL THE JURY IS OUT.

24        MR. ALDRICH:  IT'S A CONTINUATION OF THOUGHT.

25        I DO HAVE THIS TROUBLING PROBLEM, THOUGH.  THE

1009

1    REPRESENTATIONS WERE MADE THAT CONCESSIONS WERE GIVEN OUT

2    DURING PROSECUTION HISTORY.  AND AS YOUR HONOR HAS JUST SEEN,

3    THAT'S EXACTLY WHAT DIDN'T HAPPEN.

4         AND THOSE REPRESENTATIONS WERE MADE DURING OPENING,

5    AND I NEED TO FIGURE OUT HOW WE'RE GOING TO CORRECT THE FACT

6    THAT REPRESENTATIONS WERE MADE TO THE JURY THAT ARE

7    MANIFESTLY FALSE.

8         THE COURT:  OKAY.

9         MR. ALDRICH:  THAT WAS ALL I WANTED TO SAY.  THANK

10   YOU.

11        THE COURT:  ALL RIGHT.  THANK YOU.

12        (RECESS, 12:30 P.M.)

13                   --O0O--

14            C E R T I F I C A T I O N

15        I HEREBY CERTIFY THAT I AM A DULY APPOINTED,
     QUALIFIED AND ACTING OFFICIAL COURT REPORTER FOR THE UNITED
16   STATES DISTRICT COURT; THAT THE FOREGOING IS A TRUE AND
     CORRECT TRANSCRIPT OF THE PROCEEDINGS HAD IN THE
17   AFOREMENTIONED CAUSE; THAT SAID TRANSCRIPT IS A TRUE AND
     CORRECT TRANSCRIPTION OF MY STENOGRAPHIC NOTES; AND THAT THE
18   FORMAT USED HEREIN COMPLIES WITH THE RULES AND REQUIREMENTS
     OF THE UNITED STATES JUDICIAL CONFERENCE.

19

20        DATED:  SEPTEMBER 21, 2017, AT SAN DIEGO,
     CALIFORNIA.

21                           S/CAMERON P. KIRCHER
                             CAMERON P. KIRCHER
22

23

24

25

1    United States District Court

2    For the Southern District of California

3

4                                    )
     COLUMBIA SPORTSWEAR NORTH        )
5    AMERICA, INC., an Oregon         )    No. 17-cv-1781-HZ
     corporation,                     )
6                                     )    September 21, 2017
             Plaintiff,               )
7                                     )    San Diego, California
             v.                       )
8                                     )
     SEIRUS INNOVATIVE ACCESSORIES,   )
9    INC., a Utah Corporation,        )
                                      )
10                                    )
             Defendant.               )
11

12

13                    Volume 4 - PM Session

14           Reporter's Transcript of Proceedings

15        BEFORE THE HONORABLE MARCO A. HERNANDEZ

16               United States District Judge

17

18

19

20

21

22

23   Court Reporter:        Dana Peabody, RDR, CRR
                            District Court Clerk's Office
24                          333 West Broadway, Suite 420
                            San Diego, California, 92101
25                          DanaPeabodyCSR@gmail.com

```
 1   APPEARANCES:

 2

 3   For the Plaintiff:      SCHWABE, WILLIAMSON & WYATT, P.C.
                             NIKA F. ALDRICH, JR., ESQ.
 4                           DAVID W. AXELROD, ESQ.
                             BRENNA LEGAARD, ESQ.
 5                           1211 SW 5th Avenue, Suite 1900
                             Portland, Oregon 97204
 6

 7   For the Defendant:      FISH & RICHARDSON, P.C.
                             CHRISTOPHER S. MARCHESE, ESQ.
 8                           SETH M. SPROUL, ESQ.
                             12390 El Camino Real
 9                           San Diego, California 92130

10

11   For the Defendant:      MARKOWITZ HERBOLD, P.C.
                             RENEE ROTHAUGE, ESQ.
                             1211 SW Fifth Avenue, Suite 3000
12                           Portland, Oregon 97204

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1    Case:  Columbia v. Seirus
     Date:  September 21, 2017
2

3                        INDEX OF WITNESSES

4
     FOR THE PLAINTIFF:
5                                        E X A M I N A T I O N
                                    DIRECT  CROSS REDIRECT RECROSS
6
     Serena Morones
7       Mr. Axelrod                       1127

8

9

10   FOR THE DEFENDANT:
                          E X A M I N A T I O N
11                                  DIRECT  CROSS REDIRECT RECROSS

12   Michael "Woody" Blackford
        Mr. Marchese              1017              1083
13      Mr. Aldrich                        1068               1109

14

15

16

17

18

19

20

21

22

23

24

25
```

1  Case:   Columbia v. Seirus
   Date:   September 21, 2017
2

3

4                    INDEX OF EXHIBITS

5  EXHIBIT                                          EVIDENCE

6  372                                               1127

7  398                                               1126

8  399                                               1126

9  400                                               1126

10 402                                               1126

11 1037                                              1042

12 1363                                              1126

13 1397                                              1050

14 1400                                              1064

15

16

17

18

19

20

21

22

23

24

25

San Diego, California, September 21, 2017

* * *

(Proceedings held outside the presence of the jury panel.)

THE COURT:   Please be seated.

So I reviewed the Georgia Pacific factors and understand that the issue of improvements on the state of the art are a relevant consideration on all parts, and for the jury in determining a reasonable royalty rate.  And the question, then, is whether or not prosecution history furthers that particular point or not.  And I lost where precisely the defense was pointing to in Exhibit Number 6 when I stepped off the bench, so I couldn't go back and find precisely what language they were using.

But I think in general the defense can use statements by Dr. Blackford or by Michael Blackford, by Woody Blackford, in the course of the prosecution history if they are relevant to that point and that is what the state of the art was prior to the invention.

The limitation on that, in my opinion, is whether or not the probative value of the portion of prosecution history which is intended to be offered is outweighed significantly by its prejudicial effect.

And it's that balancing part that I think the Court needs to look at in determining whether or not the defense can simply march down the prosecution history and look at everything that

1  was done during the course of that under the umbrella that this

2  is relevant to consideration of changes in the state of the

3  art.

4      I don't know how to do that in a vacuum.  And I think it

01:18   5  will depend upon the particular exhibit that you're looking at

6  and the question that you're asking for me to make that

7  determination.

8      But I can say in general simply the give-and-take between

9  the patent office and the lawyers for Columbia are not going to

01:19  10  meet that threshold, but if there are specific statements made

11  by Columbia or Mr. Blackford which tell us what the state of

12  the art was, then I will admit those.  And I can't give you

13  much more guidance than that because I don't know specifically

14  what it is that you're going to be looking at in the course of

01:19  15  the prosecution history.

16      MR. MARCHESE:  I think perhaps maybe what we will do

17  that would be a safe thing, there's a declaration that

18  Mr. Blackford submitted in the course of the prosecution, that

19  I could show him that and examine him on that.

01:19  20      THE COURT:  Okay.

21      MR. MARCHESE:  Okay.

22      MR. ALDRICH:  We have no objection to

23  cross-examination on the declaration that he submitted.

24      THE COURT:  Okay.

01:19  25      MR. MARCHESE:  But I'd still like to have Dr. Block

1   have some testimony as to what happened in the prosecution

2   because we think it's relevant to -- still to damages, and he

3   could walk through it.

4            THE COURT:  Again, it's hard for me -- if you're

01:20   5   looking at specific portions of this, it would be helpful for

6   me to know what they are.  Honestly, I don't have time to read

7   all of this, and so if you have the specific areas that you

8   want me to consider as fertile ground for your examination, I'm

9   willing to do that.  I'll put in the work, but I can't just say

01:20   10   march on, and I can't give you any more guidance than I've

11   already given you.

12            MR. MARCHESE:  Understood.  Dr. Block won't testify

13   today so we could put together a submission to Your Honor with

14   the particular parts of the prosecution.  It's only a few pages

01:20   15   we would want him to talk about.

16            THE COURT:  Okay.

17            MR. MARCHESE:  And they're in my demonstratives that I

18   did in the opening, so we could even have him just walk through

19   those.

01:20   20            THE COURT:  Okay.  Well, I'm happy to take a look at

21   it with that lens.

22            MR. ALDRICH:  Also, Your Honor, Mr. Blackford already

23   testified about that declaration for them, and he's already

24   testified about the infringement issues, and I heard them

01:20   25   saying that part of the reason for probing here was they wanted

1   to probe about infringement issues concerning the HeatTouch

2   Torche glove.  When they asked to call Mr. Blackford back, they

3   said it would be in relation to invalidity, so we have some

4   objection to some of the testimony as well.  It seems like

01:21   5   double-dipping.

6          THE COURT:  I understood this was about invalidity as

7   well.

8          MR. ALDRICH:  And not damages.

9          MR. MARCHESE:  And damages as well.

01:21   10          MR. ALDRICH:  They never said damages.

11          MR. MARCHESE:  And nonwillfulness.

12          MR. ALDRICH:  That's new.

13          THE COURT:  We need to get rolling.  Get the jury back

14   in.  You can go ahead and proceed.

01:22   15       (Proceedings held in the presence of the jury panel.)

16          THE COURT:  Please be seated.

17          MR. ALDRICH:  May I approach?

18          THE COURT:  Sure.

19          MR. MARCHESE:  May I proceed?  Thank you, Your Honor.

01:23   20                DIRECT EXAMINATION (resumed)

21   BY MR. MARCHESE:

22   Q.   Mr. Blackford, could you pick back up that thick exhibit,

23   number 6 again, please?  The binder, the big book.

24   A.   This one?

01:24   25   Q.   I don't know.  I can't see it.  It says number 6 on the

1  cover.  Do you see that?

2  A.  Oh, yeah.

3  Q.  I think it does anyway.

4  A.  Yeah.

01:24   5  Q.  You have it?

6  A.  I've got it.

7  Q.  Great.  Could you turn to page COL810, please.

8  A.  810.  Yes, I'm there.

9      MR. ALDRICH:  Your Honor, there's already been

01:24  10  testimony by Mr. Blackford on this exhibit.  It was admitted as

11  1039, I believe.

12      THE COURT:  Okay.

13      MR. MARCHESE:  Can I proceed with Exhibit 6?

14      THE COURT:  You may.

01:24  15      MR. MARCHESE:  Exhibit 6 was received before?  Is it

16  in evidence?

17      THE COURT:  It's in evidence.

18      MR. MARCHESE:  Thank you.

19      Can you pull up, Mr. Tisa, page 204.

01:25  20  BY MR. MARCHESE:

21  Q.  This is a declaration that says it's by Woody Blackford.

22  Do you see that?

23  A.  Yes.

24  Q.  And is this a declaration that you executed or signed in

01:25  25  the course of the prosecution of the '270 patent?

1    A.    That's my understanding, yes.

2    Q.    And if you go to -- if you go through that a little further

3    to page COL815, that's page 209 of the exhibit?

4    A.    Yes.

01:25    5    Q.    Is that your signature?

6    A.    Yes, it is.

7    Q.    Okay.   And you signed that in September of 2012?

8    A.    It looks like the day, yes.

9    Q.    Okay, great.   Thank you.

01:25    10    And can you look at -- of the previous page, COL814.

11    A.    Yep.   Yes.

12    Q.    Okay.   Thank you.   And paragraph 14.   Why don't you just

13    read that to yourself, and let me know when you're done.

14        MR. ALDRICH:   Your Honor, this is repetitive.

01:26    15        THE COURT:   Your objection is overruled.   Go ahead.

16    BY MR. MARCHESE:

17    Q.    Paragraph 14.

18    A.    I'm reading it.   I'm making sure I'm understanding.   Yes.

19    Q.    You read it.

01:26    20    And here the declaration states, "A fabric having a

21    percentage of surface area coverage of heat-directing elements

22    of between about 30 percent and about 70 percent allows for

23    optimal heat direction with a minimal effect on air

24    permeability and MVTR and is, therefore, unexpectedly superior

01:27    25    to fabrics having a percentage of surface area coverage outside

1    this range."   Do you see that?

2    A.   Yes.

3    Q.   And you put that in your declaration, right?

4    A.   Yes.

01:27    5    Q.   And that was done in order to address a rejection that the

6    patent office had made, correct?

7    A.   My understanding would be it was -- my patent lawyer asked

8    me to make this declaration in assistance with his dialogue

9    with the patent office.

01:27    10    Q.   Did you understand that it was in response to a rejection

11    by the patent office?

12    A.   I think I was told, like, it would help if we gave some

13    clarity on some of the properties, and that's what this

14    declaration was about.

01:27    15    Q.   Okay.   Thank you.

16         And so this declaration was talking about this 30 to 70

17    percent range that we've discussed in the -- prior in your

18    testimony?

19    A.   That's one of the things it's discussing, yes.

01:27    20    Q.   And if you go back to page 204, which is COL810.

21    A.   Yes.

22    Q.   And the paragraphs on that page -- the first one just

23    states that you're over 21 and gives your address, right?

24    A.   Yes.

01:28    25    Q.   And the second one talks about your work in the industry,

1    correct?

2    A.    Yes, it does.

3    Q.    And then the third paragraph gives your title at the time,

4    correct?

01:28    5    A.    Yes.

6    Q.    And the fourth paragraph says you're an inventor, correct?

7    A.    Yes.

8    Q.    And then the fifth paragraph says, "Key properties to

9    consider in an optimal heat-reflective material for use in body

01:28    10    wear are heat reflection, air permeability, and moisture vapor

11    transmission rate," right?

12    A.    Yes.

13    Q.    That abbreviated MVTR?

14    A.    Yes.

01:28    15    Q.    Is it okay if we use MVTR?

16    A.    Sure.

17    Q.    Okay, great.    The next paragraph, paragraph 6 on

18    page COL811 states that "the invention disclosed and claimed,"

19    and then it gives a patent application number.    Do you

01:29    20    understand that to be the patent application that led to the

21    '270 patent?

22    A.    I would assume it is.    The number doesn't seem to match.

23    776306.    That's the application number.

24    Q.    It's the application number.

01:29    25    A.    Yeah.    If you represent that that is for the 207, I would

1    agree, and I think when I signed it, that's what I thought I

2    was doing.

3    Q.    You said "207."  Did you mean '270 patent?

4    A.    Yeah.  Is that what we're talking about, '270?

01:29    5    Q.    The '270 patent, right?

6    A.    The one that I've been shown a bunch of times here, yeah.

7    Q.    Is that the patent that you're the inventor on?

8    A.    Yes.

9    Q.    Okay.  So this declaration was submitted in conjunction

01:29    10    with getting that '270 patent, correct?

11    A.    Yes.

12    Q.    And then you say in paragraph 7, "Prior to U.S. patent

13    application" -- the same application number we just saw, so no

14    difference there?

01:29    15    A.    Yes.

16    Q.    -- "one of skill in the art would have expected that

17    heat-directing material surface coverage area of a base

18    material is increased, air permeability and MVTR would decrease

19    in a linear fashion," right?

01:30    20    A.    Yes.

21    Q.    Okay.  And then it goes on to say in the next paragraph,

22    paragraph 8, that some laboratory testing was done, correct?

23    A.    Yes.

24    Q.    And you performed that?

01:30    25    A.    I only performed the laboratory testing for the heat

1  reflection because there was -- we were not aware of any

2  industry standard test that would allow us to use a third

3  party.  The other stuff was third party to my knowledge.

4  Q.  So you did the heat management -- I'm sorry.  Can you tell

01:30  5  me which tests you did in-house?

6  A.  The heat-reflection aspect, we did that in-house.  The

7  moisture vapor transmission was done with Intertek, and the air

8  permeability, I believe we conducted at an outside lab run by a

9  guy named Rick Pekala who's a Ph.D., and he did the -- and his

01:31  10  lab at a company called Entek, the air permeability testing.

11  Q.  So air permeability was done by a third party?

12  A.  Yes.

13  Q.  And then heat reflection was done in-house?

14  A.  Only because we didn't see any other way to -- we would

01:31  15  prefer, you know, to have a third party there, but it just

16  didn't seem available.

17  Q.  Understood.

18      And then what was the third one you said was done by a

19  third party?

01:31  20  A.  The air permeability was done by Entek.

21  Q.  Entek, but then you mentioned another one.  I'm sorry I

22  didn't get it down.

23  A.  That was Intertek.  It sounds similar.

24  Q.  And they did which test?

01:31  25  A.  They did the MVTR.

1  Q.   Thank you.

2  A.   That's my recollection.

3  Q.   Okay.   Appreciate that.

4       So in paragraph 8, continuing on, that there was

01:32   5  "laboratory testing on pattern heat management materials

6  disclosed and claimed in that patent application revealed that

7  this assumption is incorrect."  Do you see that?

8  A.   Which -- yeah, I see it.  I'm not sure which assumption

9  we're talking about.

01:32  10  Q.   I was going to ask you which one that was.

11  A.   I think it's probably the -- well, let's see.  I have to

12  read number 7 again.  I think it's that "one of the skill in

13  the art would have expected that as the heat-directing material

14  surface coverage of base materials increased, air permeability

01:32  15  would decrease in a linear fashion."  So that's the assumption

16  that is incorrect.

17  Q.   Okay.   Thank you.

18       So the assumption referred to in paragraph 8 is -- can you

19  go back to Paragraph 7 -- is what's stated in paragraph 7 of

01:33  20  the declaration, correct?

21  A.   Yes.

22  Q.   And then in paragraph 9, you go on, I think, to talk about

23  what you found in the testing.  Is that correct?

24  A.   Let me read it here.  Yes.

01:33  25  Q.   And you were talking about here, if we were to go

1    to -- well, we won't go there yet, but let's keep this up.    As

2    shown below in Figure 1, there's a figure on the next page,

3    right?

4    A.    I guess so.    207?    Page 207?

01:33    5    Q.    Page 206, I think.

6    A.    206.

7    Q.    Yes.    Thank you.    We'll look at it in a minute.

8        You were saying a relatively high surface coverage area of

9    heat-reflective elements.    Is that the same as the dots in

01:34    10    Omni-Heat?

11    A.    It would be, yeah, whatever -- I mean obviously the utility

12    of the patent isn't about a pattern, but it would be whatever

13    elements you were using in whatever shape they were.

14    Q.    And they could be dots?

01:34    15    A.    They could be.

16    Q.    They could be -- I think we saw hexagonals in the patent

17    application?

18    A.    Uh-huh.    Yes.

19    Q.    Okay.    And I think you mentioned here that that --

01:34    20    approximately 70 percent is a figure that you were working

21    with, correct?

22    A.    Yes.

23    Q.    And then you said -- you called that a relatively high

24    surface coverage area.    Is that fair?

01:34    25    A.    That's what I said, yes.

1    Q.    And then you said that that may be used before the

2    percentage loss in air permeability and MVTR becomes

3    substantial, right?

4    A.    Yes.

01:34    5    Q.    So you're talking about surface coverage area of

6    heat-reflective elements, right?

7    A.    That's one of the things I'm talking about.

8    Q.    But it's one of the things, right?

9    A.    Yes.

01:35    10    Q.    Okay.    And you did measurements to determine the coverage

11    area.    Is that correct?

12    A.    Yes, we did.

13    Q.    Did them in-house?

14    A.    That, I think we did.    I think -- yeah, we used an Olympus

01:35    15    optical, slash -- it's an optical microscope with a digital

16    software that receives the output.    That's my recollection.

17    Q.    Okay.    Thank you.

18    A.    We may have third-partied that, but I think we were doing

19    it in-house.

01:35    20    Q.    Now, you've done surface coverage area measurements for

21    Omni-Heat-type fabric in the past at Columbia.    Is that right?

22    A.    That's right.

23    Q.    And have you done that in-house only, or has it been out-

24    house and in-house, or can you tell us a little bit about that?

01:36    25    A.    Well, we certainly spent a lot of time kind of learning a

1  good way to do that, but I think we've done both out of

2  house -- we've definitely done both out of house and in-house.

3  Q.  You said you spent a lot of time learning how to do it.  Is

4  that right?

01:36  5  A.  Well, yeah, figuring out a way because, again, as Dr. Cole

6  said yesterday, there was no industry standard, surprisingly,

7  for that sort of thing.

8  Q.  Why did you say "surprisingly"?

9  A.  Well, you kind of would have thought that measuring surface

01:36  10  coverage would have had an ASTM, American Standard Testing

11  Method, but it didn't.

12  Q.  There was nothing you found?

13  A.  Nothing, no.

14  Q.  Okay.  And you said you spent a lot of time developing your

01:36  15  own in-house method.  Am I right?

16  A.  I said I spent a lot of time figuring out how to do it.

17  Q.  Do you still have -- let me ask you this:  Have you had

18  multiple different versions of an in-house method that you've

19  used over the years?

01:37  20  A.  I can't really remember what we, you know -- what our

21  versions were before we settled on the version we started

22  using, and it turned out while there was no standard, we had

23  this use of equipment that was capable of doing it, and then

24  when we sent it out to third parties, companies like Exponent

01:37  25  and whatnot, they would come up with their system, and since

1   they were all, you know, doctorates and stuff, I figured they

2   knew what they were doing, and I looked into their methods, and

3   they were pretty much what we were doing.

4   Q.   The version that you settled on, do you remember when that

01:37   5   happened?

6   A.   The version that I settled on --

7   Q.   I think you said -- I wrote a note down here.  It said that

8   you settled on a version in-house at some point.  Does that

9   sound right?

01:37   10   A.   We settled on a test approach for measuring surface

11   coverage in-house at some point, yes.

12   Q.   Okay.  And on that settled version, do you still use it

13   today?

14   A.   Yes, I think we do.

01:38   15   Q.   Have you used it -- since you settled on this approach,

16   have you consistently used that to measure surface coverage

17   area?

18   A.   I think in-house, yes -- to the best of my knowledge I

19   would add.  Sometimes people are running tests, not me.  They

01:38   20   may be running something else.

21   Q.   To best of your knowledge, this same approach has been

22   used?

23   A.   Yes.

24   Q.   Do you remember approximately when you developed that

01:38   25   approach, that settled approach that you've used in-house?

1    A.    You know, I can't really pinpoint the date, but it must

2    have been, you know, early on, 2008 even, 2009.    I really can't

3    remember.

4    Q.    Okay.    Well, you probably learned this in your deposition.

01:38    5    Lawyers love to bracket things.    Can you tell me, do you

6    believe it was before 2010?    Would that be safe?

7    A.    I believe it would be, yes.

8    Q.    Okay.    Thank you.

9        And that settled approach that you used in-house to measure

01:39    10    surface coverage area, did you discuss that with Dr. Cole?

11    A.    No.

12    Q.    To your knowledge, did anybody from Columbia discuss it

13    with Dr. Cole?

14    A.    I bet they did.    I'm thinking that people did, but I have

01:39    15    no knowledge of that, so that would be a guess, and I shouldn't

16    speculate, so I will not do that.

17    Q.    Okay.    Thank you.

18        And then you mentioned a company call Exponent, right?

19    A.    Yeah.

01:39    20    Q.    And Exponent is an outside company?

21    A.    Yes.

22    Q.    That Columbia uses to make measurements?

23    A.    Yeah.    Sometimes we have these unusual properties that

24    we've come up with something that the industry has not

01:39    25    established a test for.    They're the sort of company you could

1    reach out with, and they will establish a scientific method

2    that's, you know, rigorous, and we could then use, and they

3    often run the tests for you as well.

4    Q.    And I think you said you've used Exponent to do surface

01:40    5    coverage area measurements?

6    A.    Yes.

7    Q.    For Omni-Heat?

8    A.    Not -- well, for embodiments of the patent, yes.  I mean

9    Omni-Heat is not the patent, as you know.  It's an embodiment,

01:40    10    but for embodiments of the patent, and even measuring things

11    outside the patent, you know, yes.

12    Q.    Well, my question probably wasn't very good.  I guess I was

13    just trying to say for the Omni-Heat-type fabric, have you used

14    Exponent to do surface coverage area measurements?

01:40    15    A.    I can't specifically say if it was for, like, an actual

16    Omni-Heat product, but -- I'm sorry.  I'd be speculating so I

17    can't answer.

18    Q.    So would any type of Omni-Heat, like developmental

19    Omni-Heat fabric or any kind of fabric that you were thinking

01:41    20    about making -- I mean I guess foil coverage on a base layer of

21    fabric -- broadly speaking, have you --

22    A.    Yes.  They have measured foil coverage on base material for

23    us.

24    Q.    And when did you start using Exponent to do that?

01:41    25    A.    I don't know.  I can't recall when the first time was.  I

1  know you want to bracket it.

2  Q.  I do.  I apologize.  I'll have to do it again.  How about

3  before 2012?

4  A.  Yes.

01:41  5  Q.  Do you still use Exponent to do scientific measurements for

6  you?

7  A.  Yes.

8  Q.  Do you still use them to do scientific measurements of foil

9  coverage area?

01:41  10  A.  Well, still meaning like in the future, or still like today

11  or --

12  Q.  Maybe that's not a great question.

13  So you started using Exponent to do foil coverage

14  measuring, I think you said before 2012?

01:42  15  A.  Yes.

16  Q.  And what I'm wondering is did you continue to use Exponent

17  for that same type of work up to about the present?

18  A.  Yeah.  I mean if I needed them to do a test, I would still

19  reach out with them at the present time, but not necessarily on

01:42  20  surface coverage, you know.  It could be other things.

21  Q.  Understood.

22  Are there other companies besides Exponent that Columbia

23  uses to do foil surface coverage measurements?

24  A.  Well, I think some of our vendors, but either ones that

01:42  25  supply us foil or vendors that do the lamination, they've run

1  some tests, is my recollection, but, again, I'm getting I think

2  into the zone of fuzzy memory, so --

3  Q.  You don't need to speculate.  I don't want you do that.

4  A.  Okay, no speculation.

01:42  5  Q.  If you can remember things --

6  A.  I wouldn't be surprised to find out that we've had other

7  people measure it such as a vendor or the foil supplier.  Let's

8  put it that way.

9  Q.  Who's the foil supplier?

01:43  10  MR. ALDRICH:  Objection, Your Honor.  I've been

11  meaning to request to seal the courtroom if we're getting into

12  highly confidential information including the identification of

13  a proprietary supplier of components for Columbia's product.

14  MR. MARCHESE:  I don't need to know the name,

01:43  15  Your Honor.  It's not that important.

16  THE WITNESS:  They're really good.

17  BY MR. MARCHESE:

18  Q.  Okay.  Great.

19  So this really good vendor of foil --

01:43  20  A.  Yeah.

21  Q.  Is it your memory, your recollection, that they've done

22  foil coverage measurements for you?

23  A.  Again, I don't -- I wouldn't be surprised to find out.  I

24  know they do a lot of foil coverage measurements of their own

01:43  25  as a leading foil supplier -- the leading foil supplier in the

1    world.

2    Q.   And then I think you mentioned there may be other vendors

3    who do foil coverage surface area measurements for you, or is

4    that --

01:44    5    A.   I said I would not be surprised to find out if others have

6    done that for us.

7    Q.   Okay.  So let me make sure I have this correct then.

8    Exponent you know for sure they've done foil measurement --

9    coverage area measurements for you.

01:44    10   A.   Yes.

11   Q.   And I think you said you believe, but you're not 100

12   percent sure, that this vendor who we won't name also does

13   that, correct?

14   A.   I know for a fact they do measurements.  I wouldn't be

01:44    15   surprised to find out if they did measurements for us, but I

16   would be speculating, so I better stop doing that.

17   Q.   Does this vendor -- you said they do measurements for

18   others, right?

19   A.   Well, they have foil that they use for other things, like

01:44    20   on money, for example.  Like, you know, when you look at your

21   money and it has like a little special foil-like security thing

22   on there?

23   Q.   Right.

24   A.   They're a company that does that, so they have to be super

01:44    25   precise when they're making money and putting foil down, so I

1   know they do pretty accurate measurements.

2   Q.   Will they do pretty accurate measurements of foil coverage

3   for Omni-Heat if they were going to do that?

4   A.   If they did it, yeah, they would be pretty accurate.

01:45   5   Q.   How about Exponent?  Accurate?

6   A.   Oh, yeah.

7   Q.   Why do you say that?

8   A.   Well, if you look up Exponent as a company, it's basically

9   made up of very experienced scientists, and they have a

01:45   10   division that focuses on materials.

11   Q.   Can you find them on the Internet?

12   A.   Yeah, exponent.com.

13   Q.   Would there be indications on there that they do laboratory

14   testing of fabrics and so on?

01:45   15   A.   Yeah.  I don't know if it would say specifically like

16   "surface coverage area of heat-reflective products," but they

17   would talk about their fabric division.

18   Q.   If one were experienced in the fabric industry, one could

19   infer from reading their Exponent website that they could get

01:46   20   foil coverage testing.  Is that fair?

21          MR. ALDRICH:   Speculation.

22          THE COURT:   Sustained.

23   BY MR. MARCHESE:

24   Q.   That's fine.

01:46   25          Is -- where is Exponent located?

1    A.    They have offices, I think, in China, in many parts of the

2    U.S., I think Menlo Park.

3    Q.    That's California.  Is that right?

4    A.    I think.  I don't actually know.  I'm a Canadian, remember?

01:46    5    I'm learning the geography, but I know I sent things to Menlo

6    Park.

7    Q.    It is in California.

8    A.    And then they have one in I think Atlanta, Georgia, Boston,

9    but you'd have to look up their addresses.  I know they have

01:46    10    several offices.

11    Q.    Okay.  Thank you.

12        So if we go on to the next page, please, 206, COL812, here

13    we have a graph.  Do you see that?

14    A.    Yes.

01:46    15    Q.    And it's a plot of three different curves.  Is that

16    correct?

17            MR. ALDRICH:   Your Honor --

18            THE WITNESS:   Yes.

19            MR. ALDRICH:   -- again, this is repetitive of

01:47    20    testimony he was asked about two days ago.

21            THE COURT:   That's true.

22            MR. MARCHESE:   I don't have -- I just really quickly

23    wanted to go through it.

24            THE COURT:   Are you making a different point than one

01:47    25    you made before?

1        MR. MARCHESE:  I don't think we made this point in the

2   declaration.  There were slides -- there were demonstrative

3   slides, and I think it's -- that was my recollection.

4        MR. ALDRICH:  Your Honor, they pulled out the

01:47   5   declaration and asked questions about it.

6        THE COURT:  The objection is sustained.

7        MR. ALDRICH:  Thank you, Your Honor.

8        MR. MARCHESE:  Okay.

9   BY MR. MARCHESE:

01:47  10   Q.  And then this is -- let me just ask you this:  This is a

11   graph that you generated.  Is that correct?

12   A.  Yes.

13   Q.  Okay.  Can you turn to the next page, please.  And then

14   paragraph 10 talks about Table 1 below.  Is that the table

01:47  15   that's called out -- it looks like it's got two columns,

16   "Reflective Coverage" and "Air Permeability Degradation."  Do

17   you see that?

18        MR. ALDRICH:  Your Honor, same objection.

19        MR. MARCHESE:  I don't think I asked about this table.

01:48  20        THE COURT:  But you had an opportunity to.  I mean

21   this was raised by them.  You had cross-examination, and this

22   wasn't -- this isn't a new area.  You're covering old area.

23        MR. MARCHESE:  Understood.

24        THE COURT:  If you have new area, you're certainly

01:48  25   welcome to it.

BY MR. MARCHESE:

Q.   So all I want to know is, is this talking about surface coverage area?

          MR. ALDRICH:   Same objection.

01:48          THE COURT:   Overruled.

     You can answer that question.

          THE WITNESS:   It's talking about air permeability degradation and reflective, you know, coverage.   It's talking about our test instrument that was used at Entek.

01:48 BY MR. MARCHESE:

Q.   And it's a -- reflective coverage area is the foil to the base lawyer.   Is that correct?

A.   Yeah, it's the percentage coverage of foil to base layer.

Q.   Okay.   And then paragraph 11.   This table is also in part
01:49 talking about foil to base layer coverage area?

A.   Yes.

Q.   Okay.

A.   It has foil coverage.   It has moisture vapor transmission. It says who did the testing.

01:49 Q.   Great.   Thank you.

          MR. MARCHESE:   On to the next page, please, COL814, paragraph 12.

BY MR. MARCHESE:

Q.   The table here in paragraph 12 is also in part talking
01:49 about the foil to base layer coverage area, correct?

1  A.   I mean it lists a bunch of fabrics with coverages, and then

2  it has the heat reflection.  It shows the test instrument.

3  Q.   Okay.  Thank you.

4       And then we get to paragraph 13, the next one.  It says --

01:50  5  and I think we looked at this before -- "One of skill in the

6  art could not have predicted heat reflection."  You've seen

7  that, right?

8            MR. ALDRICH:  The statement that -- we've looked at

9  this before, Your Honor.  Objection.

01:50  10           THE COURT:  Overruled.  Go ahead.

11           THE WITNESS:  Yeah, we talked about that before.

12  BY MR. MARCHESE:

13  Q.   Okay.  And this is referring to surface coverage area foil

14  to base layer again, correct?  In part at least?

01:50  15  A.   Well, I think we should read it maybe just to make sure.

16  Q.   Sure.  I was just trying to -- I didn't want to spend a lot

17  of time on it, but go ahead, take your time.

18  A.   You want me to read it?

19  Q.   Sure.

01:50  20  A.   "One of the skill in the art could not have predicted that

21  heat reflection would have increase in a linear fashion while

22  air permeability and moisture vapor transmission would change

23  in a nonlinear fashion with increasing surface coverage area of

24  heat-directing elements."

01:50  25  Q.   So that's saying -- can you tell us what that says in your

1    words?

2    A.    It's saying that myself, as we talked about in my testimony

3    earlier in the week, as well as fellow experts that I work

4    with, that we all sort of looked at it and thought -- you know,

01:51    5    as well as other people -- that if we plug up half the thing --

6    as I said, if I eat half my pizza, you know, it's gone.  So we

7    expected a linear reaction in terms of the degradation of those

8    key properties, air permeability and moisture vapor

9    transmission.

01:51    10    Q.    So in other words, as you adjust the amount of surface

11    coverage area, these properties change, but not linearly,

12    right?

13                MR. ALDRICH:  Your Honor, same objection.

14                THE COURT:  Sustained.

01:51    15    BY MR. MARCHESE:

16    Q.    And then paragraph 14 where -- you already looked at that,

17    so I don't think we need to do that one again.

18        So -- all right, sir, are there any other paragraphs that

19    you wrote besides the statement at the very end of the

01:51    20    declaration, which is on COL815, in here concerning the

21    invention?

22    A.    Was there any other -- can you repeat the question?

23    Q.    Yeah.  We walked through the -- we walked through it

24    beginning to end, and I wanted to ask --

01:51    25    A.    Oh, is that the whole thing?

1  Q.  I think so.  You can go to the next page.  It has a

2  declaration on the next page.

3  A.  If you represent that that's the whole thing, that's the

4  whole thing.

01:52  5  Q.  That's all I see, but feel free to flip through it and

6  double-check.

7  A.  Did we go through 12?

8  Q.  Yes, we looked at 12 and 13, and we had previously looked

9  at 14.

01:52  10  A.  I don't think we looked at the table 3, like description

11  and stuff like that below each thing.  I mean are you asking me

12  have we reviewed the whole document?

13  Q.  I'm asking if we asked about every paragraph in the

14  document.

01:52  15  A.  I'd say no.

16  Q.  We didn't ask about every paragraph?

17  A.  No.

18  Q.  Okay.  Which paragraph did I miss?

19  A.  You didn't talk about some of the descriptions like

01:52  20  under -- there's like a paragraph underneath the graph, for

21  example.

22  Q.  Okay.  Fine.  That paragraph underneath the graph is

23  talking about the graph, correct?

24  A.  Yeah.

01:52  25  Q.  And then in paragraph 10, the paragraph below the table, is

1    talking about the table in that same paragraph, right?

2    A.    Yes.

3    Q.    And then in paragraph 11, the paragraph below table 2 is

4    talking about table 2?

01:53    5    A.    Yes.

6    Q.    And then for paragraph 12, the paragraph below table 3 is

7    talking about table 3?

8    A.    Yes.

9    Q.    Thanks.   I just wanted to make sure I didn't miss any

01:53    10    paragraphs in the declaration as we walked through it.   Is that

11    fair?

12    A.    Okay.   Sure.

13    Q.    Okay.   Thank you.

14        And, Mr. Blackford, you've got Exhibit 1037 in front of you

01:53    15    right now?

16    A.    Yes.

17    Q.    Is this an email that --

18    A.    Is that in this other binder?

19    Q.    It is actually.   Yes, I think so.   I can get that too.

01:54    20    A.    Small type.

21    Q.    It's really small type.

22    A.    I didn't bring my really good glasses.

23    Q.    Let me just ask you some preliminary questions about it.

24    Can you see it better now?

01:54    25    A.    Yes.

1    Q.   And it's not received yet, and I haven't offered it yet,

2    but I just want to ask you quickly, is the topmost email an

3    email that you wrote to Mr. Mark Sandquist?

4    A.   October 17, 2008, Mark Sandquist, yes.

01:54    5    Q.   That's your email that you wrote?

6    A.   It looks like it's from me and then from him and, you know,

7    back and forth.

8    Q.   Is it correct to say that this -- and feel free to -- if

9    you want to look at it in the binder where you can see the

01:55    10    whole thing, it's a one-pager.

11    A.   Uh-huh.

12    Q.   Is it correct that it is an email chain back and forth

13    between you and Mr. Sandquist?

14    A.   Yes.

01:55    15           MR. MARCHESE:   Your Honor, I'd like to offer it.

16           MR. ALDRICH:   No objection.

17           THE COURT:   1037 is received.

18       (Exhibit 1037 admitted.)

19    BY MR. MARCHESE:

01:55    20    Q.   Mr. Blackford, could you -- I'm going to take you down

21    there because I don't think you can read it very well on the

22    page.

23           MR. MARCHESE:   So I'd like to go to the paragraph

24    numbered 8 at the very bottom.

01:55    25           THE WITNESS:   Okay.

1          MR. MARCHESE:  Can you blow that up, please?

2   BY MR. MARCHESE:

3   Q.   Can you see that?

4   A.   Yep.

01:55  5   Q.   And it says "costing competitiveness acid test."  Do you

6   see that?

7   A.   Yeah.   Kind of strange lingo, isn't it?

8   Q.   So "competitiveness," that's referring to Columbia's

9   interactions or other competitors in the market.  Is that

01:56  10   correct?

11   A.   Well, it's referring to costing competitive meaning like

12   if -- how -- how efficient are we at building something is what

13   it's talking about.

14   Q.   And so "competitiveness" is referring to how efficient and

01:56  15   how your costing compares to another company?

16   A.   Right.   So you could -- this acid test means like how

17   efficient we are, let's test ourselves.

18   Q.   Against somebody else?

19   A.   Yeah.

01:56  20   Q.   Okay.   And in this case, the somebody else was The North

21   Face?

22   A.   In this case what we did is we ran a blind test, so if we

23   give a product to our manufacturing groups, that's a Columbia

24   product, they know a lot of information about it.   They know

01:56  25   the target, they know the cost that we already have, the

1  margins, and all that.  And so what we decided to do, which was

2  an idea that I had, is what if we made a theoretical product,

3  kind of like we were talking about this morning, and -- you

4  know, that idea of theoretical negotiation.

01:57  5  Q.    I think it's hypothetical negotiation.

6  A.    Well, theoretical product, and we knew something about it,

7  like we knew what its price was in the marketplace.  Then if we

8  had the factories make this theoretical product and we saw

9  where the costs came out, we would know compared to our

01:57  10  competitor what our profitability would be, but we never made

11  the product --

12  Q.    Let me ask you this real quick.

13  A.    Yeah.

14  Q.    There's, I'm sure, more story to it, but I want to make

01:57  15  sure it's clear.  It says "TNF."

16  A.    That's The North Face.

17  Q.    Okay.  Thanks.  I thought it was.  I've seen it

18  abbreviated, but I wanted to make sure you would agree.

19  A.    Yeah.

01:58  20  Q.    And here it says, "We asked eight technical factories to

21  cost two jackets Of the North Face?

22  A.    Yes.

23  Q.    Eight technical factories, are those companies in Asia that

24  make products for Columbia?

01:58  25  A.    Yes.

1  Q.    And so you actually had eight separate factories cost out

2  two different North Face jackets for Columbia?

3  A.    Yeah, but they didn't know they were North Face jackets,

4  and we never made the products.  We just did the cost.

01:58  5  Q.    You didn't -- the factories did not know those were North

6  Face jackets, correct?

7  A.    Well, they weren't actually North Face jackets.  They were

8  drawings that had similar features.

9  Q.    Features of The North Face jackets?

01:58  10  A.    Yeah, like chest pocket, two hand pockets, similar amount

11  of fabric consumption, all that kind of stuff, but they

12  weren't, you know -- they weren't products we ever made.  This

13  was just a test.

14  Q.    So it was cloaked as a Columbia style, right?

01:58  15  A.    Yeah, so that they would look at it like a Columbia style

16  and build it as if it was a Columbia style rather than thinking

17  that they're, you know -- if they knew The North Face price,

18  they'd be like, "Oh, I know what they're doing.  They're trying

19  to figure out if North Face gets a better price than Columbia."

01:59  20  Q.    So you were trying to figure out whether or not these

21  technical factories could build for Columbia a coat just like

22  two North Face jackets.  Is that fair?

23  A.    Yeah, with similar features and all that, see if they would

24  give us what we think is a good deal.

01:59  25  Q.    But you wouldn't tell the factory that it was a North Face

1    style, right?

2    A.   No, because it wasn't.  It was a drawing that had similar

3    features.

4    Q.   But it says here it was "cloaked as a Columbia style"?

01:59   5    A.   Yeah.  I mean that was my terminology in there which meant

6    we're going to present it to them like it's a regular Columbia

7    style, but we know the feature set that we're putting in is

8    exactly the same as this North Face jacket in terms of it

9    having the same number of pockets, same number of zippers, that

01:59  10    kind of thing.

11    Q.   And it says that you wanted to get an acid test on how

12    profitable you would be -- "we would be."  Is that Columbia

13    would be?

14    A.   Yeah.

02:00  15    Q.   "If we were making their product," and "their" is North

16    Face?

17    A.   Well, as I stated, it's these products that have the same

18    feature sets with our own drawings.  We never sent them North

19    Face jackets or anything like that.  We just looked at a

02:00  20    similar product, drew it up ourselves, and used that to get a

21    cost analysis done just to see where we'd land because it had

22    the same kind of features, the same kind of fabric, things like

23    that.

24    Q.   But this is the kind of thing you've done on other

02:00  25    occasions, right?

1    A.    Actually, that's the only time I ever did that because the

2    manufacturing team didn't like it because it revealed that we

3    could be a little more competitive, so they told me to stop

4    doing it, so I did.

02:00  5    Q.    They told you to stop doing that?

6    A.    Yeah.    They're a lot more powerful than I am, so . . .

7    Q.    Other people at Columbia have done that?

8    A.    I don't think so.

9    Q.    You don't know of anybody else?

02:01  10    A.    No.    I was the one hair brain that had an idea like that,

11    and we tried it once, and hair brain, shut down.

12    Q.    And this says that "The North Face is running these styles

13    on low margin scenario."    That means they weren't making a lot

14    of money off of them, right?

02:01  15    A.    I said we could argue that.    I didn't say they were.    We

16    didn't know.    We don't know their margins.

17    Q.    And one of the two has been in their line for five years

18    and sells at relatively high volumes, right?

19    A.    Yeah.

02:01  20    Q.    That's a successful jacket, right?

21    A.    Yeah.

22    Q.    And so you were trying to figure out what it would cost for

23    you to make a jacket with the same features?

24    A.    Like it really had nothing to do with -- if you're getting

02:01  25    at, like, was I trying to copy it, no.    What we were trying to

1    do was just test ourselves.

2    Q.    Using a style from The North Face, right?

3    A.    Using a drawing that, you know, and a design that we did up

4    ourselves that had the same feature set.

02:02    5    Q.    Can you go up to Paragraph 7, please.

6    A.    Paragraph 7?

7    Q.    Yeah, I'm going to have it blown up for you so that we can

8    all see it better.

9            MR. MARCHESE:    It's above actually.    Not the

02:02    10   signature.    Right above.

11   BY MR. MARCHESE:

12   Q.    And take your time.    You can read through it, if you'd

13   like.

14   A.    Okay.

02:02    15   Q.    I just have a couple questions about it.

16   A.    Yep.

17   Q.    You read it?

18   A.    Yeah, I read it.

19   Q.    And it's talking about a costing language here.    Do you see

02:02    20   that?

21   A.    Yep.

22   Q.    And this is relating to communications that Columbia would

23   be having with outerwear factories.    Is that correct?

24   A.    Yes.

02:03    25   Q.    And those factories are in Asia?

1    A.    Yes.    Well, they -- the factories -- we work with factories

2    in I think about 30 countries, so they can be South America;

3    they can be other places.

4    Q.    But these are --

02:03    5    A.    Central America.

6    Q.    These are factories in foreign countries.    Is that correct?

7    A.    Yeah.    Yeah, they're not in the United States.

8    Q.    And you're looking to come up with a costing language for

9    that, right?

02:03    10    A.    Yeah.

11    Q.    The way you could talk to them, correct?

12    A.    Yeah, and you see that word "Sam" there?

13    Q.    I didn't ask you about that.

14    A.    Oh, sorry.

02:03    15    Q.    No problem.    And then it says "a costing language that both

16    CSC" -- that would be Columbia Sportswear Company?

17    A.    Yes.

18    Q.    That's your company?

19    A.    Yep, Columbia Sportswear is the company where I work.

02:03    20    Q.    -- "and the factory would understand," right?

21    A.    Yeah.    We were trying to get to a way -- because basically

22    what happens is --

23    Q.    It's okay.    That's all I wanted to know.

24    A.    We're getting in a language -- yes.

02:04    25    Q.    Okay.    Thank you.

1    MR. MARCHESE:  It appears like 1397 has been received.

2  I don't see it on the screen.  It's not been received.  I'd

3  like to offer it, Your Honor.

4    MR. ALDRICH:  What was the document again?

02:04   5    MR. MARCHESE:  1397.

6    MR. ALDRICH:  Yep.  That's fine.

7    MR. MARCHESE:  Thank you.

8    THE COURT:  It's received.

9  (Exhibit 1397 admitted.)

02:05   10  BY MR. MARCHESE:

11  Q.  And the second email down is from you, correct?

12  A.  The second email down.  Is there more than one email?

13  Q.  It's a whole string of them here, and it's maybe a little

14  bit hard to follow.  Do you see that one?

02:05   15  A.  I'm on the email.

16  Q.  Okay.  And this is from April 2009, correct?

17  A.  Yes, it is.

18  Q.  Is this during the development process of Omni-Heat?

19  A.  Well, it's during the period, yes.

02:05   20  Q.  And Omni-Heat was released to the public as a product in

21  what year?

22  A.  October 10, 2010, for sale.

23  Q.  So this is about a year and a half before?

24  A.  Yeah.

02:05   25  Q.  Okay.  And the subject line is "dots hot," right?

1    A.    Yep.    That I think came from somebody else.    I don't

2    think -- it says it's R-E, and so that's not the whole email,

3    so there's been previous dialogue also.

4    Q.    Right.    We can look at a little bit more of it, but you

02:06    5    have it in your binder.    Feel free to flip around if you want

6    to.

7         So what I want to ask you is the next one down.    It's from

8    Scott Elser, I believe.    Scott Elser is writing to Tim who is

9    Tim Boyle.    Is that right?

02:06    10   A.    I don't see Tim Boyle's thing there, but I think it is Tim

11   Boyle.

12   Q.    He's actually down below.

13   A.    Yeah, I see it down here.    Tim Boyle.

14   Q.    That's the same Tim Boyle we've been talking about?

02:06    15   A.    Yeah, he's Gert's son.

16   Q.    He's CEO?

17   A.    CEO.

18   Q.    If you go to the email above -- I was trying to get the

19   people -- all the players here.    Okay.    So now that we know who

02:07    20   Tim is, is it your understanding that Scott Elser is writing to

21   Tim Boyle?

22   A.    It looks like it.

23   Q.    And he's writing about a percent of foil coverage, correct?

24   A.    That, and it says something about that four years of

02:07    25   mechanical engineering finally put to use, something like that.

1    Q.    Right, but I mean this is talking about percentage of foil

2    coverages in this email, correct?

3    A.    I think it is, yes.

4    Q.    Okay.  And there beneath the text of the email, which you

02:07    5    were just referring to --

6    A.    Yeah.

7    Q.    -- Scott puts down three percentages, right?

8    A.    Yes.

9    Q.    Okay.  And the original art is 29 percent?

02:08    10    A.    Yeah.

11    Q.    Right?

12    A.    Yeah.

13    Q.    And there's a second version 21.3, right?

14    A.    Yeah.

02:08    15    Q.    And a third version 14.8?

16    A.    Yes.

17    Q.    And so two of those numbers are beneath the 28.5 that you

18    talked about?

19    A.    Yeah.  You want to know why?

02:08    20    Q.    So -- well, it's the truth.  Isn't that correct?

21    A.    It is true, but it was against my will, and I can tell you

22    why we never did it and all that.

23    Q.    Well, let's see how you responded.

24    A.    How I responded?

02:08    25    Q.    Yes.  Can you go back to the email right above.  So is this

| | |
|---|---|
| 1 | your response right above from you to Scott Elser and Zach |
| 2 | Snyder? |
| 3 | A.  "Interesting.  Thanks." |
| 4 | Q.  That's the one, correct?  Yeah? |
| 02:08  5 | A.  It looks like I have -- yep, responded with "Interesting. |
| 6 | Thanks." |
| 7 | Q.  Okay.  And you responded to Scott Elser, right? |
| 8 | A.  Yes. |
| 9 | Q.  And Zach Snyder? |
| 02:09  10 | A.  It appears to be.  I see Scott.  I only see his name -- |
| 11 | MR. ALDRICH:  Your Honor, object.  Misrepresentation |
| 12 | of the document. |
| 13 | THE COURT:  I'm sorry? |
| 14 | MR. ALDRICH:  He's misrepresenting the document. |
| 02:09  15 | THE COURT:  You can fix that in -- |
| 16 | MR. ALDRICH:  That's fine.  Thank you, Your Honor. |
| 17 | BY MR. MARCHESE: |
| 18 | Q.  I don't mean to misrepresent it.  I'm just trying to get a |
| 19 | sense of what's going on here. |
| 02:09  20 | A.  I could explain it to you. |
| 21 | Q.  I'm just asking, are you writing this email? |
| 22 | A.  Am I writing -- it's a thread.  I'm part of it.  In this |
| 23 | case I've written "Interesting.  Thanks" to at least Scott |
| 24 | Elser, but perhaps Zach Snyder as well. |
| 02:09  25 | Q.  And Zach Snyder is the inventor who testified in the case |

1  concerning the '093 patent?

2  A.    Yes.

3  Q.    Okay.  Thank you.

4        And let me just ask you this:  There's nothing here that I

02:09  5  can see where you're objecting to any of the three numbers that

6  were below, right?

7  A.    There is in the email, if we looked at the rest of it, but

8  not with the "interesting thanks."

9  Q.    We can go up above and see what the next response is.  Do

02:10  10  you want to look at that?

11  A.    Can we do it?  We should look at the whole thing because

12  there's enough in the prior thing, I can -- I'd have to get to

13  the part -- maybe I can do it with the book.

14  Q.    Sure.  You've got the book in front of you.  But while

02:10  15  you're looking at it, just to make it clear, there were three

16  numbers in there, right?

17  A.    My book doesn't seem to have the whole thread.  It only has

18  one page.

19  Q.    Well, there's only one page in the exhibit.  This is how it

02:10  20  was produced to us.

21  A.    Well, it's not the whole thing.

22  Q.    That's what I've got.

23  A.    Okay.

24  Q.    Okay.  Thank you.

02:10  25        And you can look at it and tell me if there's any bit of

1    it -- take a look at that email.  It's a one-pager, right?

2    A.   I did look at this email.  It was shown to me, and it had a

3    lot more pages.

4    Q.   Well, this is 1397.  This is what I've got.

02:10    5    A.   Okay.

6    Q.   Thank you.

7        So let's talk a little bit about variance, okay?

8    A.   Okay.

9    Q.   The appearance of the dots in each of the Columbia products

02:11    10   may not be identical to one other, correct?

11   A.   The appearance?

12   Q.   The appearance of the dots in each Columbia product may not

13   be identical to one another.  Is that correct?

14   A.   Yeah.  I mean that would be up to the viewer.  I mean

02:11    15   everyone views things with different perspectives, and so the

16   appearance to one viewer, to another viewer, different lighting

17   conditions could be variable.

18   Q.   And even if unnoticeable to most people, there's a variance

19   among Omni-Heat fabrics and dots.  Is that right?

02:12    20   A.   Yes.

21   Q.   And so you have variance.  Is that correct?

22   A.   Manufacturing variance and intended variance both occur.

23   Q.   "Intended" means you actually meant for the dots to be

24   bigger or smaller, right?

02:12    25   A.   Yes.

1    Q.    And "manufacturing" means it happens because the

2    manufacturing is inconsistent?

3    A.    Yes.

4    Q.    And you could have variance in the size of the dots, right?

02:12    5    A.    Yes.

6    Q.    You could have variance in the spacing of the dots,

7    correct?

8    A.    Yes.

9    Q.    You could have variance in the material that you use?

02:12    10    A.    You mean the foils or the base material?

11    Q.    Either one.

12    A.    We could, but you -- what are you getting at in terms of

13    what that would mean, if anything?

14    Q.    I'm asking you whether there can be variance in the

02:12    15    materials that are used.

16    A.    Of course.  Yeah, I mean it could be lots of things, fleece

17    or . . .

18    Q.    You could use vacuum metallized aluminum, right?

19    A.    Directly deposited you mean to the material?

02:13    20    Q.    Well, those are words that you used in your deposition?

21    A.    Yeah, I mean the foil itself can be vacuum metallized.

22    Q.    It could be vacuum metallized chrome?

23    A.    Yeah, I mean these things are -- they call it vapor

24    deposition of a metal.

02:13    25    Q.    And you've used copper, haven't you?

1    A.    Uh-huh.    Yes.

2    Q.    And you've used gold?

3    A.    Once for a very small piece of fabric.

4    Q.    It was expensive, right?

02:13  5    A.    Yeah.

6    Q.    And you can vary the application of the dots, right, I

7    think in terms of the different type of foils that you could

8    use?

9    A.    Yes.

02:13  10   Q.    And you could have variance in the actual fabric in terms

11   of the coverage because of the different metals that you use,

12   right?

13   A.    A variance due to the metals?  Yes.

14   Q.    And each dot doesn't have the same amount of reflectivity,

02:14  15   correct?

16   A.    Each dot does not have the same amount of reflectivity.  If

17   they're all from one metal or from different metals or --

18   Q.    If they're from the same metal, would they all have the

19   same reflectivity?

02:14  20   A.    Well, are we talking about with equal -- like an equal dot?

21   Two dots are created equal?

22   Q.    Talking about across the fabric, they're not all equal,

23   right?

24   A.    Not all the dots are equal, so therefore they're -- you

02:14  25   know, total reflectants per dot could vary due to the variance

1    in the dot size, but the reflection, you know, capacity would

2    be linear as we have talked about.

3    Q.    Sure.   But it varies depending on the dot size, right?

4    A.    Yeah.

02:14    5    Q.    And the rollers that are used to create the fabrics, if you

6    change those, you could have variance in your fabrics of the

7    coverage, right?

8    A.    Well, rollers is not exactly accurate, but the preparation

9    for the depositing of the adhesive before you bring a foil in

02:15    10    for lamination, yes.

11    Q.    Well, in your deposition you were asked what would cause

12    Columbia to vary the size of the dot, and you said, "Usually

13    it's a manufacturing outcome where, depending on the materials

14    involved and the rollers and even things like humidity and

02:15    15    temperature of the adhesive at the time of application, we can

16    get variance."

17    A.    All those things combined, yes, I just didn't want to

18    isolate it to rollers.

19    Q.    Rollers matter?

02:15    20    A.    Yeah.

21    Q.    Older rollers may give you variance?

22    A.    Yeah, I mean if you were running a lot of yardage, like we

23    find maybe after a million yards, it's time to change out the

24    roller because you're going to start to get degradation.

02:15    25    Q.    You're going to get degradation and variance of the foil

1    coverage?

2    A.    Yes.

3    Q.    And when you switch into a new set of rollers, you could

4    have variance as well, right?

02:16    5    A.    If things weren't executed -- yeah, this whole

6    manufacturing variance thing that we discussed.

7    Q.    And that can depend on humidity, right?

8    A.    Yeah, humidity is a factor when it comes to the adhesive

9    aspect.

02:16    10    Q.    So all of these things -- actually one more thing.

11    Temperature can matter, right?

12    A.    Yep.

13    Q.    Different factory might matter, right?

14    A.    Temperature affects viscosity of the adhesive.  Of course a

02:16    15    different factory may not be exactly the same as the next.

16    Q.    So all of these things that we've just mentioned can create

17    variance of the foil coverage on the fabrics, right?

18    A.    Yeah, we've got variance.

19    Q.    And consequently you've had measurements, I think you said

02:16    20    in an article, of 35 percent, right?

21    A.    Yes.

22    Q.    And I saw from Dr. Cole she got 37 percent.  Is that right?

23    A.    Yes.

24    Q.    She got 33.8 percent?

02:17    25    A.    Yes.

1    Q.    She got 35.8 percent?

2    A.    Yes.

3    Q.    32.4 percent?

4    A.    Yes.

02:17    5    Q.    Plus or minus can you say 5 percent?

6    A.    5 percent, yeah.

7    Q.    So her range was 30 -- I said 32.4 to 37.  Is that right?

8    A.    Yes.

9    Q.    Plus or minus 5 percent takes us to 20 something -- 27.2 is

02:17    10    the lowest if you do plus or minus 5 percent from 32?  No?

11    A.    Huh-uh.  No.  I mean if you think about 5 percent from 30,

12    it's 28.5, so there's no way that you can get to a lower number

13    from 32.

14    Q.    I see what you're saying.

02:17    15    A.    It's not plus or minus at all.  It's plus.

16    Q.    Okay.  Gotcha.  Understood.

17          But all those things, they all add up to create variance

18    across the different fabrics that you'll have with the foil

19    coverage, right?

02:18    20    A.    Yes.

21    Q.    Now, you -- in your deposition you testified about going

22    and looking at -- I think it was Seirus products.  Is that

23    correct?

24    A.    I don't remember going and looking at Seirus products in my

02:18    25    testimony, no.

1    Q.   You analyzed Seirus products in connection with the case,

2    right?

3    A.   No.

4    Q.   You didn't do that?

02:18    5    A.   No.

6    Q.   Okay.  Let's take a look.

7    A.   If I did, I don't recall.

8         MR. MARCHESE:  It's -- I think it's 1403.  Down to the

9    second page.

02:19    10    BY MR. MARCHESE:

11    Q.   If you look at paragraph 6 of Exhibit 1403, Mr. Blackford.

12    A.   Yes.

13    Q.   Do you see that?

14    A.   Oh, yeah.  "I have participated in or supervised the

02:19    15    identification and testing of the Seirus HeatWave products for

16    infringement."

17    Q.   Does that refresh your memory?

18    A.   I guess so.

19    Q.   So you did do that?

02:19    20    A.   I guess I did.

21    Q.   And you tested --

22    A.   My brain is not working on that one.

23    Q.   I'm sorry.  What?

24    A.   Blank on the memory.

02:19    25    Q.   Did you test for foil coverage?

1    A.   I have no memory of it, but you might be able to show that

2    I did, so --

3    Q.   You just don't recall.  Is that right?

4    A.   No.

02:19   5    Q.   Okay.  So you can't say whether you did or whether you

6    didn't?

7    A.   Yeah.  Blank.

8    Q.   That's fine.  I just want to know if you remembered and

9    that was it.

02:20  10    A.   Don't remember.

11    Q.   Okay.  And so you did supervise identification and testing

12    of Seirus HeatWave products.  That is true, correct?

13    A.   Supervise, again, I'm drawing a blank on how that would

14    have looked.  But if I said I did it, I must have, but memory

02:20  15    blank.

16    Q.   Have you -- you've done testing of other companies'

17    products, correct?

18    A.   Testing of other companies' products, yes.

19    Q.   Okay.  And you've tested competitors' products?

02:20  20    A.   Yes.

21    Q.   And you've tested products from -- can you give us three

22    examples of companies.

23    A.   Like I think I've tested the Merrell Moab Gore-Tex shoe.

24    I've tested The North Face Denali jacket.  I think I've, you

02:21  25    know, tested a product from inov-8 say, for example, which is a

1  running shoe.

2  Q.  And you did that to compare them to Columbia products,

3  correct?

4  A.  We call it benchmarking, to see what their properties are

02:21  5  so that when we look at our own properties, we have a framework

6  from which to compare.

7  Q.  So you can compare your products to another company's

8  products, right?

9  A.  Yeah, for benchmarking purposes.  I mean we want to be the

02:21  10  best, and we want to, you know, know how other people are

11  doing, and it starts with knowing how they're doing.

12  Q.  And so you want to know how Merrell is doing on its shoe to

13  compare your own shoe to theirs?

14  A.  Yeah.

02:21  15  Q.  To say why you're better or different?

16  A.  Or start working on getting better if we're not.

17  Q.  Got it.  And you mentioned inov-8, right?

18  A.  Yeah.

19  Q.  You would do the same kind of thing there.  You would do

02:21  20  testing of their product to see where you compare to see

21  whether you're better or different, or how you might get better

22  or different?

23  A.  Yes.

24  Q.  And you've done that with other products as well, correct?

02:21  25  A.  Yes.

1          MR. MARCHESE:  Could you pull up Exhibit 1400,

2    please -- actually I'm not going to use that.

3          THE WITNESS:  What's that?

4    BY MR. MARCHESE:

02:22    5    Q.  I'll ask you really quick one question about it.  If you go

6    to Exhibit 1400 --

7          MR. MARCHESE:  Any objection?

8          MR. ALDRICH:  No objection.

9          THE COURT:  Received.

02:22   10    (Exhibit 1400 admitted.)

11    BY MR. MARCHESE:

12    Q.  In this one, it's a very long string, and I just wanted to

13    point you to one in particular.  It's at the bottom of page 1,

14    COL84320, from Scott Elser to Tim Boyle and Woody Blackford

02:22   15    dated April 2009.  Are you there?

16    A.  Yeah.

17    Q.  And he says down here, "Hi, all.  I just wanted to clarify

18    that this percent coverage that I came up with was strictly

19    mathematical, but was not done using the industry standard

02:23   20    method."  Do you see that?

21    A.  Yep.

22    Q.  So Mr. Elser is talking here about percent coverage of

23    foil.  Is that right?

24          MR. ALDRICH:  Objection.  Calls for speculation.

25

1   BY MR. MARCHESE:

2   Q.   To your knowledge, sir?

3   A.   Yeah.   It looks like.   Okay.   Hold on.

4            MR. ALDRICH:   There's an objection, Your Honor.

02:23   5        THE COURT:   I'm sorry.

6            MR. ALDRICH:   I had an objection.   Calls for

7   speculation.

8            THE COURT:   He rephrased the question.   Let him answer

9   the question.   Your objection is overruled.

02:23   10       THE WITNESS:   Let me read it.   Because it is a long

11  thread, I'm just trying to get my bearings on what we're

12  talking about here.

13  BY MR. MARCHESE:

14  Q.   Sure.   I just wanted to ask you about this one particular

02:23   15  industry standard method reference.

16  A.   Yep.

17  Q.   Do you see that?

18  A.   Yep, I see --

19  Q.   And that's referring to foil coverage, correct?

02:24   20  A.   Yep.

21  Q.   And Mr. Elser is saying that there's an industry standard

22  method, correct?

23  A.   He is, but -- and I think it's talked about later in the

24  email.

02:24   25  Q.   I'm sorry.   What?

1    A.    He's kind of making things up.   He doesn't know what he's

2    doing.

3    Q.    Mr. Elser doesn't know what he's doing?

4    A.    Yeah, and he says that himself later in the email.

02:24   5    Q.    And he says in the next sentence, "The numbers of 50 to 55

6    percent coverage supplied by our vendor and verified by our own

7    MR uses industry standard methods."   Do you see that?

8    A.    That's the language he's using.

9    Q.    And what does "MR" stand for?

02:24   10   A.    Materials research.

11   Q.    And so materials research is your own internal

12   organization?

13   A.    Yeah.

14   Q.    And he's referencing industry standard methods again,

02:24   15   right?

16   A.    Well, Scott is thinking that there is industry standard

17   methods, yes, and he's talking about artwork, not actually foil

18   coverage.

19   Q.    He says "coverage," right?

02:24   20   A.    Yeah, but he's looking at -- he's a graphic designer, and

21   he's looking at artwork, not foil coverage.

22   Q.    He says "percent coverage," doesn't he?

23   A.    He does.

24   Q.    And he wrote this, right?   You did not write this?

02:25   25   A.    I didn't write it, no.

1   Q.   All right.   And he says in the next sentence, "That's what

2   we should be going by."   Do you see that?

3   A.   That's what he says.

4   Q.   That's what he said, right.   And you received that email,

02:25   5   correct?

6   A.   I did.

7   Q.   And if you look up the string, there's nowhere that I can

8   see going up the email where you say that there's no industry

9   standard method.   Correct?

02:25   10   A.   I think I was being polite.   Yeah, no, I don't think I got

11   right in there and said, "Hey, you don't know what you're

12   talking about."

13   Q.   You didn't correct him, did you?

14   A.   No.

02:25   15       MR. MARCHESE:   Nothing further.

16       THE COURT:   Cross-exam.

17       MR. ALDRICH:   I'm just wondering if we could -- after

18   today if we could mark these pages as exhibit numbers.

19       THE COURT:   We can talk about that later.

02:26   20       MR. ALDRICH:   Okay.   Thanks.

21       MR. MARCHESE:   Can I drag it out?

22       THE COURT:   Yes.

23       MR. MARCHESE:   Thank you, Your Honor.

24

25

|   | |
|---|---|
| 1 | CROSS-EXAMINATION |
| 2 | BY MR. ALDRICH: |
| 3 | Q.   Mr. Blackford, do you remember counsel asking you some |
| 4 | questions about Exhibit 1397? |
| 5 | A.   Probably.  Let me look at 1397.  Yes, I do. |
| 6 | Q.   Do you remember you said that -- |
| 7 | A.   It's fuzzy on the screen here for some reason.  It's |
| 8 | blurred out.  Okay.  I can read that. |
| 9 | Q.   Do you remember you said that this was not the complete |
| 10 | thread? |
| 11 | A.   Yes. |
| 12 | Q.   Okay.  Can you turn to the next tab that counsel provided |
| 13 | for you in your binder and chose not to ask you about? |
| 14 | A.   Yeah. |
| 15 | Q.   Is this more of a thread? |
| 16 | A.   It's more of it, yes. |
| 17 | Q.   Okay.  And then Exhibit 1400? |
| 18 | A.   That appears to be even more of it. |
| 19 | Q.   Okay.  And I think you were trying to explain what the |
| 20 | thread was all about, so let's go to 1400. |
| 21 | A.   Yeah, okay. |
| 22 | Q.   I'm just going to allow you the opportunity to -- |
| 23 | A.   To do some discussion. |
| 24 | Q.   To do some discussion.  But you're going to have to go |
| 25 | slowly so that Debby can get the relevant portions on the |

02:26 (line 5)
02:27 (line 10)
02:27 (line 15)
02:27 (line 20)
02:27 (line 25)

1    screen so the jury can see it while you're explaining the

2    various emails in the thread.   So if you could tell us --

3    A.    If you go to the third page in the middle from Scott Elser.

4    Q.    Is this 322?

02:28    5    A.    Yeah, 322.

6    Q.    Okay.   And you want to go to the middle?

7    A.    Yeah, the middle where it starts with the word "actually."

8    Q.    Okay.

9    A.    It says, "Actually, no, I got a D in thermodynamics, which

02:28   10    is exactly why I'm happily working for you as a graphic

11    designer today."   So that is basically where Scott said, "Yeah,

12    you're right.   I don't know what I'm talking about," but I

13    didn't have to tell him that.   He kind of figured it out.   Tim

14    Boyle figured it out.

02:28   15        So then let's go down to where we were talking about the

16    percentage coverages.

17    Q.    Is this at the bottom of that same page?

18    A.    Yes.

19    Q.    Is the email to Tim Boyle from Scott?

02:28   20    A.    Yeah.   So we're talking about this percentage.   So what

21    happened here -- I'm just trying to find from Tim here, but

22    basically remember how I told you when I put the foil on the

23    table that Tim Boyle's reaction was that it was garish and the

24    most embarrassing thing that he'd ever seen?   He did not want

02:29   25    to sell it.

02:29

Well, at this point, you know, we're in April 9, 2009, so we're well from coming out with it, and he's still pushing on me in his subtle ways to not -- to maybe somehow make it invisible so that you couldn't see anything, and I end up saying back to him politely in many different ways, some which aren't even in the email, "No, it wouldn't work if we did that. That's not what we're going to do." And I'm actually in the email, I think, at some point pushing for 50 percent coverage, like if you go to where Tim Boyle says, "My battery died long ago" --

02:29

Q. Hold on. Let's catch up on the page there. Can you give me the numbers at the bottom of the page you're looking at.

A. So page 84321.

Q. Okay. And where on the page are you looking?

02:30

A. Backwards from Woody Blackford under Tim Boyle.

Q. Is this the portion of the email you're talking about?

A. Yes. I say, "My battery is about to die," and he makes a joke, "My battery died long ago." That's his sense of humor. But, anyhow, what I'm talking about here is actually I'm partly

02:30

correcting Scott's math, but as you can see, I'm also saying I would prefer 50 percent, and I'm trying to keep Tim in this range and also the same time politely sort of point out that Scott's math, he wasn't doing it right.

Q. Okay.

02:31

A. So basically the whole email is Tim Boyle, you know, doing

1    his thing where he's like, "Can we not make it look so ugly,"

2    and me pushing back, as well as Scott Elser in the middle

3    trying to be helpful, but not knowing what he's doing.

4    Q.   Thank you.

5         Let's go to Exhibit 1037.  Do you remember counsel asking

6    you some questions about this acid test you did?

7    A.   Yes.

8    Q.   And just to give you a chance to explain, because I think

9    counsel cut you off, what was the purpose of this test you were

10   trying to do?

11   A.   So basically -- I want to be very clear, this is nothing to

12   do with copying because I was kind of getting the signal that

13   maybe I'm a copier.  Really what it was about was trying to

14   figure out the efficiency of our manufacturing.  I think it's

15   pretty legit to want to do that.  As I said, I only got to do

16   it once, and they didn't let me do it again.  But we were just

17   trying to figure out a way, hey, what if we built this jacket,

18   what would it cost us to build it.  It turned out our costs

19   were pretty high, you know, knowing what The North Face price

20   was, and that we weren't very efficient, and so we were trying

21   to learn.

22        And so it was basically -- a lot of things I do is a

23   learning thing.  I'm not in manufacturing or anything like

24   that, and I was trying to help the company learn, but we never

25   made the product.  We never even, in fact, copied the product.

|  |  |  |
|--|--|--|
| | 1 | We made our own drawings with a similar feature set, but I |
| | 2 | think everyone gets that.  I explained that already. |
| | 3 | Q.   And that's why the bullet point there down at the bottom is |
| | 4 | called "costing competitiveness acid test"? |
| 02:32 | 5 | A.   Yeah.  I mean it's my weird language, but, yes, that's what |
| | 6 | I'm saying. |
| | 7 | MR. ALDRICH:  Let's go up to the header at the top of |
| | 8 | the email, the very top of the page. |
| | 9 | BY MR. ALDRICH: |
| 02:33 | 10 | Q.   I think this is the only place we actually see what the |
| | 11 | subject matter of the email is, and do you see the date there? |
| | 12 | A.   Yes. |
| | 13 | Q.   October 17, 2008, right? |
| | 14 | A.   Yeah. |
| 02:33 | 15 | Q.   And this is an update from a trip that you had? |
| | 16 | A.   Yes. |
| | 17 | MR. ALDRICH:  Okay.  Can we go down to halfway down |
| | 18 | the page. |
| | 19 | BY MR. ALDRICH: |
| 02:33 | 20 | Q.   There's a bullet point 1? |
| | 21 | A.   Yeah. |
| | 22 | Q.   So this is the biggest -- this is the top bullet point from |
| | 23 | your trip, right? |
| | 24 | A.   Yeah. |
| 02:33 | 25 | Q.   And what is bullet point 1 about? |

A.    Well, it's about me working on -- we already had the name Omni-Heat, so this is two weeks after I've had my invention idea for the patent that we're talking about, patent '270, and -- but we already have this Omni-Heat name because we had an insulation as well as the electric products we talked about. And here I'm basically telling them that I've established a new option -- it's a little bit cut off for me.  Can you just make it a little wider.

Q.    Oh, actually that is the way it appears on the page. Sorry.

A.    And I'm saying we've established an interesting point of difference, but, you know, basically radiate heat back at the user, and I'm kind of loosely telling them that I've had an idea.

Q.    Let me go back to the Exhibit Number 6.  Do you have --

A.    Oh, yeah, the big long -- this one.

Q.    Yeah.  What's your understanding of what Exhibit 6 is?

A.    It is the over -- I guess it's like 1341 pages of back-and-forth between the patent attorney that worked on my invention with the examiner's office.

Q.    This is the back-and-forth correspondence after which the patent office gave you a patent?

A.    Yes.

Q.    Did you and your attorneys disclose any prior art to the examiner during that process?

1 A.   Yeah, and it's all in here, I think, and it was over a

2 hundred items of prior art that we made sure they were aware

3 of.

4 Q.   Let me have you turn to page -- down at the bottom, you see

02:36  5 the number COL?

6 A.   Yep.

7       MR. ALDRICH:  Turn to COL713.  And up to the top of

8 the page, it says -- go ahead.  Maybe the first third of the

9 page.

02:36  10      THE WITNESS:  I'm getting there.

11 BY MR. ALDRICH:

12 Q.   You see there it says "date mailed"?

13 A.   Yes.

14 Q.   And so this is a document that was mailed from the patent

02:36  15 office on November 30, 2012?

16 A.   Actually I'm looking at the filing date.

17 Q.   Over on the right-hand side of the screen.

18 A.   Date due.  Oh, yes, date mailed.

19 Q.   And what is the name of this document?

02:37  20 A.   "Notice of allowance."

21 Q.   So that's the date that the examiner told you that you had

22 a patent?

23 A.   Yes.

24 Q.   November 30, 2012.

02:37  25      MR. ALDRICH:  Let's go to page 706.

|  | 1 | THE WITNESS:  Yes. |
|---|---|---|
|  | 2 | BY MR. ALDRICH: |
|  | 3 | Q.   And this is an issue notification? |
|  | 4 | A.   Correct. |
| 02:37 | 5 | Q.   And do you see up there at the top it says "issue date"? |
|  | 6 | A.   Yes. |
|  | 7 | Q.   And so this tells you that your patent is going to issue as |
|  | 8 | a new patent on January 29, 2013? |
|  | 9 | A.   Yes, it does. |
| 02:38 | 10 | Q.   And down at the bottom of the page we can see the date? |
|  | 11 | A.   Yes. |
|  | 12 | Q.   And so as of January 2013, you had a patent on the way.  Is |
|  | 13 | that right? |
|  | 14 | A.   That's what this says. |
| 02:38 | 15 | MR. ALDRICH:  Let's go forward to page 631. |
|  | 16 | BY MR. ALDRICH: |
|  | 17 | Q.   Let me ask you this question:  After the patent office told |
|  | 18 | you, "We're going to give you a patent" -- after maybe 750 |
|  | 19 | pages -- |
| 02:38 | 20 | A.   Yeah. |
|  | 21 | Q.   -- the patent office said, "We're going to give you a |
|  | 22 | patent," did you stop giving additional prior art to the patent |
|  | 23 | office? |
|  | 24 | A.   I don't think we did, no. |
| 02:39 | 25 | MR. ALDRICH:  Okay.  And so page 631. |

1       THE WITNESS:   Yes.

2  BY MR. ALDRICH:

3  Q.   This is an information disclosure statement that you

4  provided to the patent office?

02:39  5  A.   Yes.

6  Q.   And which -- which piece of prior art did you disclose here

7  on the bottom of 631?

8  A.   I can't quite read it.   It looks like it was Fottinger.

9  And Walter, et al.

02:39  10  Q.   Have you heard the name Fottinger this week?

11  A.   Yes.

12  Q.   This is the piece of prior art that Seirus is alleging

13  renders your patent invalid, right?

14  A.   Yes.

02:39  15  Q.   Okay.   So you disclosed Fottinger to the examiner after the

16  examiner had already said you can have the patent.   Is that

17  right?

18  A.   Yes.

19  Q.   And up at the top of this document, what was the date of

02:40  20  that?

21  A.   Is it the filing date?

22  Q.   The top receipt date.

23  A.   Receipt date February 27, 2013.

24       MR. ALDRICH:   Okay.   So let's go to the one page

02:40  25  earlier.   630.

1            THE WITNESS:   Okay.

2   BY MR. ALDRICH:

3   Q.   And the top of the page, what is this?

4   A.   Supplemental notice of allowability.

02:40   5   Q.   What's your understanding of what that is?

6   A.   It's approved still, still approved.

7   Q.   Okay.   And do you see under bullet point 1, it says, "This

8   communication is responsive to"?

9   A.   Yes.

02:41   10  Q.   And it references the information disclosure statement that

11  was submitted on February 27, 2013?

12  A.   That's what it looks like, yes.

13  Q.   Okay.   And then in bullet point 3, it says what?

14  A.   "The allowed claims are 1 through 7, 9 through 19, and 21

02:41   15  through 31."

16  Q.   So the examiner allowed your claims after receiving your

17  disclosure of Fottinger.   Is that right?

18  A.   Yes.

19            MR. ALDRICH:   Okay.   And then let's go down to the

02:41   20  very bottom.

21  BY MR. ALDRICH:

22  Q.   It says "attachments."

23  A.   Yes.

24  Q.   And just to be clear, the examiner attached to the

02:41   25  supplemental notice of allowability a copy of the document that

1  we just looked at, that information disclosure statement,

2  correct?

3  A.   It looks like it, yes.

4  Q.   And at this point do you have any understanding of how many

02:41  5  pieces of prior art the examiner looked at over the 733 pages

6  of back-and-forth correspondence with the patent office?

7  A.   Over a hundred.

8  Q.   How do you know that?

9  A.   I looked at it and actually tried to count them up and

02:42  10  noticed where there's little stars -- there's little stars on

11  over 30 of them which means he's looked at it a little closer

12  than everything else.  And in this particular case, this is the

13  only thing he looked at because it was the only thing we sent

14  because we'd already kind of had the notice of allowance.

02:42  15       MR. ALDRICH:  And if we go back one page to 629, the

16  date that this was mailed.

17  BY MR. ALDRICH:

18  Q.   Do you see the date that this document was mailed?

19  A.   Yeah, mail date March 13, 2013.

02:43  20  Q.   Approximately how long after you sent and notified the

21  examiner about Fottinger?

22  A.   It looks like about three weeks.

23  Q.   Have you looked at Fottinger?

24  A.   Yes.

02:43  25  Q.   How voluminous is the Fottinger patent?

1    A.    It's a two-page application.

2    Q.    So the examiner had a two-page application for three weeks?

3    A.    Yes.

4    Q.    And at the end of that process, he said?

02:43    5    A.    That your patent is still valid.

6          MR. ALDRICH:    And if we go back one page further.

7    BY MR. ALDRICH:

8    Q.    This is the new issue notification telling you that your

9    patent has been approved?

02:43    10    A.    Yes.

11          MR. ALDRICH:    I have no further questions, Your Honor.

12          THE COURT:    Redirect?

13          MR. MARCHESE:    Your Honor, I feel like counsel has

14    just opened the door on the prosecution histories.

02:44    15          THE COURT:    Members of the jury, why don't you step

16    into your room, and we'll take our afternoon recess at this

17    time.

18        (Proceedings held outside the presence of the jury panel.)

19          THE COURT:    Have a seat.

02:44    20    I wasn't intending on saying you couldn't talk about,

21    necessarily, the prosecution histories before, anyways.    I was

22    trying to give you some parameters about my understanding.    Do

23    you know what it is you want to cover?

24          MR. MARCHESE:    Well, one thing I'd like to cover for

02:44    25    sure is that the only IDS, information disclosure statement,

1  that counsel referred to was the one with Fottinger, but there

2  are others after the issue notification came in.

3          THE COURT:  Okay.

4          MR. MARCHESE:  Or the allowance, excuse me.  There was

02:45  5  about -- I don't have them counted in front of me -- probably

6  10 or 11 pieces of prior art that came in.  That would be one.

7          THE COURT:  Okay.

8          MR. MARCHESE:  I feel like this examination on what

9  happened with Fottinger has now opened the door to the IPRs.

02:45  10  Counsel has made -- tried to create an inference that the

11  examiner has done his or her duty and has looked at Fottinger

12  very carefully.  He had three weeks.  Mr. Blackford said it was

13  a two-page application, and we all know that the patent office

14  has gone back and taken a second look, and it's not as signed,

02:45  15  sealed, and delivered as counsel would have the jury believe.

16          THE COURT:  Okay.  How many other -- so I know that

17  you want to talk about around ten other prior arts.  I know you

18  want to talk about Fottinger and other IDRs which --

19          MR. MARCHESE:  IDS, information disclosure statement,

02:46  20  that's what that document was that counsel showed.

21          THE COURT:  Okay.

22          MR. MARCHESE:  It's a way that an applicant can submit

23  prior art to the patent office.

24          THE COURT:  Okay.  What else?

02:46  25          MR. MARCHESE:  And I thought -- I don't know if I'll

1    do this or not, but I thought it would be fair for me to just

2    show the amendments that were made by Columbia to get the

3    patent allowed.  And I hope that last piece doesn't take very

4    long, and I'm not trying to get into the details of what was

02:46    5    argued and all that.  All I wanted to establish was that the

6    examiner rejected the claims, and they got amended -- the

7    examiner rejected the claims, and they got amended.  That's it.

8            THE COURT:  Okay.  I think you're justified and

9    allowed to do that.

02:46    10           MR. MARCHESE:  Thank you, Your Honor.

11           MR. ALDRICH:  So, again, the amendment -- that's the

12    issue that we talked about three times is the amendments, and

13    we're going to do that now?

14           THE COURT:  You went into a place where I was hoping

02:47    15    you didn't and would not go.

16           MR. ALDRICH:  So -- as long as I can -- I mean because

17    he's going outside the scope of my cross at that point, so do I

18    get recross on that?

19           THE COURT:  Sure.

02:47    20           MR. ALDRICH:  Okay.  So what are the three topics he's

21    allowed to explore?

22           THE COURT:  He's going to talk about some -- you

23    talked about Fottinger.  He's going to talk about some prior

24    art and IDS.

02:47    25           MR. MARCHESE:  Correct.

1       THE COURT:  And some amendments.

2       MR. MARCHESE:  The IPR as well, Your Honor.

3       MR. ALDRICH:  That's a different topic, Your Honor.

4       THE COURT:  What's the IPR?

02:47    5       MR. MARCHESE:  It's the interparty's review, and this

6    was a subject of a motion in limine which Your Honor did grant

7    in favor of Columbia.  This is the reexamination that's going

8    on of the patent, and what I said was counsel's examination of

9    Mr. Blackford made it seem like the examiner -- well, the

02:47   10    examiner received an IDS.  Mr. Blackford said there was a star

11    next to it.  They got some testimony about it, and they said it

12    was three weeks.  It was a two-page document, and so that's

13    enough time for the examiner to figure out that Fottinger is

14    not a problem.

02:48   15       But now we know from the IPRs that Fottinger, the very

16    reference that they were referring to, was submitted, and the

17    patent office found that there was a questionable patentability

18    and is now reexamining and doing an IPR on this patent on these

19    claims.

02:48   20       THE COURT:  Why would he have any information about

21    that?

22       THE WITNESS:  I don't.

23       MR. MARCHESE:  I don't know if he does.  I'd like to

24    ask somebody.

02:48   25       THE COURT:  Let's keep that one aside.  We don't have

1       to cross that bridge yet.

2              MR. MARCHESE:  Well, I'd like to do it with somebody

3       because I feel the door has been opened now.

4              THE COURT:  Well, let me think about that.

02:48   5      MR. MARCHESE:  Okay.

6              THE COURT:  Your other areas I have approved.

7              MR. MARCHESE:  Thank you.

8              THE COURT:  All right.  Let's take our afternoon

9       recess.  I need a cup of coffee.

02:48   10     (Recess.)

11          (Proceedings held outside the presence of the jury panel.)

12             THE COURT:  Have a seat.

13          (Proceedings held in the presence of the jury panel.)

14             THE COURT:  Please be seated.

03:06   15     Redirect.

16                      REDIRECT EXAMINATION

17      BY MR. MARCHESE:

18      Q.   Mr. Blackford, could you pick up Exhibit 6 again, please.

19      A.   Okay.

03:06   20  Q.   Thank you.  Do you have it?

21      A.   I have it.

22      Q.   Okay, great.

23      A.   Oh, page 419.

24      Q.   419.  You're welcome to look at it in the binder or on the

03:07   25  screen, either way.

1   A.   Okay.  Hold on a second.  Okay.  Just so you know, I

2 haven't looked through this -- every page of this, so I'll do

3 my best to help.

4   Q.   Sure.  Do your best.

03:07  5      I know that you'd said in that one declaration that you

6 were -- you had looked at it before.  Is that correct?

7   A.   Yeah, I've looked at it, but, you know, it's 1300 pages.

8   Q.   Understood, and I'm not going to show you nearly every

9 page.  Mercifully, we'll only do a few.

03:07  10   A.   Okay.

11   Q.   Can you tell me to your knowledge, are those the original

12 claims of the patent application?

13   A.   Without knowing where we are in this body of work, it's

14 hard for me -- I can't answer.

03:08  15   Q.   Well, if I represent to you those are the original claims,

16 would you have any reason to disagree with it?

17   A.   No.  I think you're probably being --

18   Q.   I'm sorry.  What?

19   A.   I have no way of knowing.  I have no way of knowing.

03:08  20   Q.   You have no way of knowing?

21   A.   No.

22   Q.   And you've reviewed this before?

23   A.   Like I said, we just jumped into page 1025, and I don't

24 know where we are in the process of the prosecution.

03:08  25         MR. MARCHESE:  Well, let's take a look at 406, please.

|       |    |                                                              |
|-------|----|--------------------------------------------------------------|
|       | 1  | THE WITNESS:   Okay.                                         |
|       | 2  | BY MR. MARCHESE:                                             |
|       | 3  | Q.   Do you see that?                                        |
|       | 4  | A.   Yes.                                                    |
| 03:08 | 5  | Q.   And would you agree with me that page 406 is the original |
|       | 6  | cover sheet of the patent application?                       |
|       | 7  | A.   It's a cover sheet.  I'm not sure that it's the original. |
|       | 8  | Q.   You're not sure it's the original?                      |
|       | 9  | A.   I'm not sure it's the very first thing we sent or -- I'm |
| 03:09 | 10 | not.                                                         |
|       | 11 | Q.   Okay.  Well, why don't you take a look and see the      |
|       | 12 | transmission date, May 7, 2010, right?                       |
|       | 13 | A.   Yes.   That is clear.                                   |
|       | 14 | MR. MARCHESE:   Can you blow up 1019, please.                |
| 03:09 | 15 | THE WITNESS:   Okay.                                         |
|       | 16 | BY MR. MARCHESE:                                             |
|       | 17 | Q.   And if you look at the -- on the left-hand column where it |
|       | 18 | says "filed May 7, 2010" -- are you with me?                 |
|       | 19 | A.   Yes.                                                    |
| 03:09 | 20 | Q.   Okay.  Now, would you agree with me that the application |
|       | 21 | that we saw in Exhibit 6 which said "transmission date May 7, |
|       | 22 | 2010," is the filing, the original application file for the  |
|       | 23 | '270 patent?                                                 |
|       | 24 | A.   Those are the same dates.                               |
| 03:09 | 25 | Q.   Same dates, but you are not going to agree with that.  Is |

1  that correct?

2  A.   No.  I agree they're the same dates.  I'm not familiar

3  enough with this body of work to know that for absolute sure

4  this is the first thing they sent, but it is the same date,

03:09  5  so --

6  Q.   Is it reasonable for you to conclude that what we were

7  looking at on page 406 is the original patent application for

8  the '270 patent?

9  A.   I don't want to speculate.

03:10  10  Q.   So you just don't know, right?

11  A.   I just don't know.

12          MR. MARCHESE:   Okay.  So let's take a look down at

13  page number 307, right?

14  BY MR. MARCHESE:

03:10  15  Q.   Are you with me?

16  A.   The COL307?

17  Q.   No, the page of the exhibit, COL913.

18  A.   COL913.

19  Q.   It's on the screen if you want to look at it.

03:10  20  A.   Yes.

21  Q.   You see that?

22  A.   Yes, I see it.

23  Q.   And earlier in your testimony with counsel for Columbia,

24  you were looking at papers from the patent office, and you

03:10  25  seemed to recognize those, didn't you?

1  A.   As I was walked through them, I -- and pointed out various

2  dates and whatnot, I was able to follow through, yes.

3  Q.   Okay.  And the date on this particular document is -- says

4  it's responsive to communication filed on May 7, 2010, right?

03:11  5  A.   That's what I see, yes.

6  Q.   And that's the same date as we saw for the patent

7  application being filed for the '270 patent, right?

8  A.   That's the same date that we saw twice before, yes.

9         MR. MARCHESE:  Can you go to page 306.

03:11  10  BY MR. MARCHESE:

11  Q.   Mr. Blackford, this is the page before the one we were just

12  looking at?

13  A.   Yes.

14  Q.   From the U.S. Patent and Trademark Office?

03:11  15  A.   Yes.

16  Q.   This is from the examiner, correct?

17  A.   It's from the office.

18  Q.   See the examiner's name listed there in the upper

19  right-hand corner?  It says "Robert Muromoto."

03:11  20  A.   Yes, examiner.

21  Q.   Would you agree with me this came from the examiner from

22  the patent office?

23  A.   It certainly seems like it did, yes.

24  Q.   And the mailing date there February 3, 2012?  Upper

03:12  25  right-hand corner, it's blown up in front of you.

1    A.    Upper right-hand corner?

2    Q.    I'm sorry.  Lower right-hand corner.  My apologies.

3    A.    There it is, yes, mail date.

4    Q.    So February 3, 2012, the examiner is responding to a

03:12    5    communication from May 7, 2010, correct?

6    A.    That's what -- I think so.  It looks like it's the mail

7    date and the filing date, and I don't see where it says it's a

8    response, but --

9              MR. MARCHESE:  Well, if you go to the next page, 307.

03:12    10              THE WITNESS:  Yes.  Oh, yeah, office action and

11    summary?

12    BY MR. MARCHESE:

13    Q.    Right, and there near the top box, number 1 --

14    A.    Yes.

03:12    15    Q.    -- status, it says, "Responsive to communication filed on

16    May 7, 2010."  Do you see that?

17    A.    Yes.  Yes.  Yes.

18    Q.    Okay.  So this is what's called an office action, right?

19    A.    Office action summary.

03:12    20    Q.    From the patent office?

21    A.    From the patent office.

22    Q.    From the examiner at the patent office?

23    A.    From the examiner.

24              MR. MARCHESE:  Okay.  And if you go down a little bit,

03:13    25    please, Mr. Tisa, to the section that says "disposition of

1    claims."

2    BY MR. MARCHESE:

3    Q.    Do you see that, Mr. Blackford?

4    A.    Yes.

03:13    5    Q.    Same page, this is 307 of the exhibit, the boxes 5 is --

6    has an "X" in it.  It says, "Claims 1 through 25 are pending in

7    the application."  Do you see that?

8    A.    Yes.

9    Q.    And then it says box 7, that's checked, right?

03:13    10    A.    Yes.

11    Q.    And claims 1 through 25 are rejected, correct?

12    A.    That's what it says, yes.

13    Q.    Okay.  Now, if you could bear with me and move -- actually

14    closer towards the front of the binder --

03:13    15    A.    Okay.

16    Q.    -- we're going backwards.  From what you would normally

17    think, we're actually going towards the front, but we're going

18    later in time.  It's kind of strangely reversed

19    chronological --

03:13    20    A.    How you read a Japanese comic book.

21    Q.    There you go.  Like a Japanese comic book.

22         MR. MARCHESE:  If you would, please, page 286.

23         THE WITNESS:  Columbia page 286?

24    BY MR. MARCHESE:

03:14    25    Q.    No, sorry -- I'm going to use the numbers, the three-digit

1   numbers.

2   A.   Okay.

3   Q.   Right.  COL892, page 286 of the exhibit.  Are you there?

4   A.   I'm getting there, yes.

03:14   5   Q.   Okay.  And this is an amendment, correct?

6   A.   It says "amendment."

7   Q.   And it's coming from -- to your understanding from

8   Columbia, right?

9   A.   Amendment.  From Columbia?  In the United States Patent --

03:14   10   Q.   I can show you a signature if you'd like to see it.  Would

11   that help?

12   A.   It's hard to tell the way it's written if it's from

13   Columbia or from the United States Patent and Trademark Office.

14   Q.   Understood.

03:14   15       MR. MARCHESE:   Go to page COL905 which is page 299 of

16   the exhibit.

17       THE WITNESS:   Yes.

18   BY MR. MARCHESE:

19   Q.   Are you there?

03:15   20   A.   Yes.

21   Q.   Okay.  And there's a signature there, correct?

22   A.   I see a typed name of Steven J. Prewitt.

23   Q.   Okay.  And Steven J. Prewitt is from a law firm called

24   Schwabe, Williamson & Wyatt, right?

03:15   25   A.   I think that's where he's from.  I know Steven.

1  Q.   Same law firm sitting here today, right?

2  A.   I think so.  He's a -- he's the guy I talk to about

3  inventions.

4  Q.   Got it.  So Steven Prewitt signs this document we're

03:15   5  looking at called "an amendment," correct?

6  A.   It's not really a signature, but, yeah, there's his name

7  written there -- typed in.

8  Q.   Typed in with a --

9  A.   Slashes.

03:15  10  Q.   Actually in the patent office, you're allowed to do this

11  called "an electronic signature."  You understand?

12  A.   Sounds good.

13  Q.   Great.  Okay.  Now, if you can go back to page 287, right

14  behind the first page, it's that amendment.

03:16  15  A.   Yes.

16  Q.   Do you see what is done there on claim 1 and claim 2?

17  A.   I see some underlined words, and I'm not sure I see what's

18  done there.

19  Q.   Well, let's say this to you:  You've been -- you've had

03:16  20  patents -- you've been involved in the acquisition of patents

21  for Columbia, correct?

22  A.   I've invented things and then told the patent attorney, and

23  they've -- about the stuff, yes.

24  Q.   And you've seen where responses to the patent office occur,

03:16  25  when they add words, they underline.  Is that your

1  recollection?

2  A.   Say that again.

3  Q.   Yeah.   When words are added to a claim, they're underlined.

4  A.   I -- no one's ever told me that, but if -- I mean I guess

03:16  5  that's the way it works.

6  Q.   That's the way it works.   These underlined words are new

7  words.

8  A.   Okay.

9  Q.   And then in the bracket words are words that were deleted.

03:16  10  Okay?

11  A.   Oh, okay.

12  Q.   Okay.   So would you agree with me that in response to the

13  examiner's office action which we got -- we saw from February

14  of 2012, amendments were made of the claims, right?

03:17  15  A.   That's -- yeah, amendments or clarifications, I guess.

16  Q.   And Columbia did not stand on the original language of the

17  claims.   They added words, right?

18  A.   Yeah, I guess they made it more clear by adding some words

19  and taking some words out.

03:17  20  Q.   And they took some words out and added some in, right?

21  A.   Well, if the underlining and crossing out -- if that's done

22  by us -- done by us?

23  Q.   It is.   It's your document.   It was signed by Mr. Prewitt.

24  A.   That seems to be what's going on here, yes.

03:17  25  Q.   So their underlining is new language;  the bracketing is

1    old, right?

2    A.   I really don't know.   So you're telling me, and I'm --

3         MR. ALDRICH:   Objection, Your Honor.   Lack of personal

4    knowledge.

03:17   5         THE COURT:   Sustained.

6    BY MR. MARCHESE:

7    Q.   All right, sir, but you don't see where -- it is true from

8    what you're reading here that there are underlinings and

9    bracketing, right?

03:18  10    A.   I see underlining, and I see cross-throughs, and I see some

11    brackets.

12    Q.   Okay.   Great.   And then let's go on, let's move forward in

13    time, which we go towards the front like a Japanese comic book.

14    A.   Okay.

03:18  15    Q.   Which I've never seen one before.

16    A.   Oh, you haven't?   Even the magazines, everything.

17    Q.   All right.

18    A.   Yep.

19    Q.   Looking forward to seeing one.

03:18  20         So if you would, please, sir, to page 266 of -- which is

21    Columbia 872.

22    A.   Yes.

23    Q.   Okay.   And in that particular document, if you look at it,

24    it is from the patent office, right?

03:18  25    A.   This appears -- they all seem to say the same thing at the

1    top.  This one has the logo.  It looks like it's from the

2    office.

3    Q.   From the patent office, right?

4    A.   Yeah, it states "Department of Commerce, United States

03:19    5    Patent and Trademark Office," yes.

6    Q.   And from the examiner again, Mr. Robert Muromoto, correct?

7    A.   Examiner, yes, Robert H. Muromoto, Jr.

8    Q.   And the mailing date is June 29, 2012, right?

9    A.   June 29, 2012.

03:19    10    Q.   Okay.  To the next page, please, which is going now in the

11    direction we would normally go, not in Japan, COL873, page 267.

12    That's the second page of the office action, correct?

13    A.   I don't know if it's the second page, but it's another

14    page, and it says "office action summary."

03:19    15    Q.   Right, and the status here that we look at says "responsive

16    to a communication filed on April 30, 2012," right?

17    A.   Yes.

18    Q.   And that was the date of the amendment we saw, correct?

19    A.   Yes.

03:19    20    Q.   And --

21    A.   No, isn't it -- oh, that was the mail date was the 29th and

22    then -- wow, and that's the next day, I guess.

23         MR. MARCHESE:  If we could go back to the amendment we

24    looked at.

25

BY MR. MARCHESE:

Q.   The date that Mr. Prewitt signed it?

A.   Oh, okay.

Q.   April 30, 2012.   Do you see that on page Columbia 905?

03:20    A.   Yes.

Q.   Okay.   Thank you.

MR. MARCHESE:   So if you go down now to the part that says "disposision of claims boxes 5 through 9."

THE WITNESS:   Yes.

03:20    BY MR. MARCHESE:

Q.   Box 5 is checked, right?

A.   Yes.

Q.   And it says claims 1 through 31 are pending?

A.   Yes, it does.

03:20    Q.   So we have more now.   We had 25 before, and now we have 31, right?

A.   Okay.

Q.   Is that a "yes"?

A.   I see 1 to 31, and I saw 1 to 25 before.

03:20    Q.   So we see a different number this time around?

A.   Yes.

Q.   Okay.   This time the same check box in 7, all of them are rejected, 1 through 31, right?

A.   Yes.

03:20    Q.   Okay.   Thank you.

1    Now, in response -- we get another amendment.

2        MR. MARCHESE:   Can we go to page 187.

3        THE WITNESS:   187.

4    BY MR. MARCHESE:

03:21    5    Q.   Before we go there, let me make sure it's clear so we can

6    get the date reference.

7        MR. MARCHESE:   Could you go back to page 266.

8        THE WITNESS:   Okay.

9    BY MR. MARCHESE:

03:21    10   Q.   266, the mailing date is June 29, 2012, right?

11   A.   June 29, 2012.

12   Q.   Okay.   Now, again in your Japanese comic book, move forward

13   to page COL793 which is page 187 of the exhibit.

14   A.   Yes.

03:21    15   Q.   Okay.   And here we see a response to final office action.

16   Do you see that?

17   A.   Yes.   I'm reading it.

18   Q.   And it says it's responding to the office action mailed

19   June 29, 2012, right?

03:22    20   A.   In response to office action mailed June 29, 2012, yes.

21   Q.   It's the same one we saw before just now, right?

22   A.   Yes.   I'm getting a little confused, but yes.

23   Q.   Okay.   Thank you.   Now, on to the next page.

24       MR. MARCHESE:   If you could blow up claims 1 and 2

03:22    25   with the title above.

1           THE WITNESS:  Okay.

2    BY MR. MARCHESE:

3    Q.   And here we see more amendments of the claims, right?

4    A.   I see some underlining.

03:22   5    Q.   And it says at the top "amendments to the claims," doesn't

6    it?

7    A.   Oh, yes.  Yes.

8    Q.   Okay.  And it says at the beginning of claim 1 -- see the

9    little parenthetical?  It says "currently amended"?

03:22   10   A.   Okay.

11   Q.   And the only difference I can see the underlining from the

12   prior claim.  Is that your understanding?

13   A.   Yes, it's the only thing I see underlined.

14   Q.   Okay.  Thank you.

03:23   15        So subsequent to that, your counsel took you to -- I think

16   it was the notice of allowability which is page COL779 which is

17   page 173.  Actually go to 171, please.  COL777.

18   A.   Okay.

19   Q.   Are you there?

03:23   20   A.   Yep.

21   Q.   Okay.  This is from the patent office, right?

22   A.   United States Patent and Trademark Office, yes, I'm getting

23   familiar with that.

24   Q.   Okay.  And this is a -- the mail -- this is mailed on

03:23   25   October 5, 2012, right?

1    A.    These things are hard to read.    Filing date -- there.    They

2    should put a box around that.

3    Q.    We've got it highlighted.    Does that help?

4    A.    Yep.

03:23    5    Q.    Is that the right date?

6    A.    October 5, 2012.

7    Q.    Okay.    Great.    And then if you go to -- two pages -- to, I

8    guess, further back in in a normal type of book reading you

9    would do, advance two pages to COL779, 173 is the --

03:24    10    A.    Yes.

11    Q.    And these -- this here it says "notice of allowability,"

12    right?

13    A.    Yes.

14    Q.    And you looked at that before when you were examined by

03:24    15    your own attorney, correct?

16    A.    It's looking very similar to other pages, but yes.

17    Q.    Okay.    So here you've got the patent office saying, "We've

18    gone through one round of amendments, two rounds of amendments,

19    and then" --

03:24    20    A.    A third.

21    Q.    A notice of allowability?

22    A.    Is that the third round?

23    Q.    Well, so the original claims go in.    We saw those, but you

24    didn't know if that was the original claim set, right?    Is that

03:24    25    correct?

1          MR. ALDRICH:  Objection.  Lack of foundation.  Lack of

2  personal knowledge.

3          THE COURT:  Overruled.

4          THE WITNESS:  I did not know if that was the original,

03:24  5  so --

6  BY MR. MARCHESE:

7  Q.  But you did see an office action right after that where all

8  claims were rejected, correct?

9  A.  Yes, I did.

03:25  10  Q.  And then after that, we saw an amendment, right?

11  A.  Yes.

12  Q.  And then after that we saw another office action where all

13  claims were rejected, correct?

14  A.  Yes, and a different number.

03:25  15  Q.  Different number, we had 31 this time instead of 25, right?

16  A.  Yeah.

17  Q.  And then we end up in the second response.  There's another

18  amendment made, right?

19  A.  Yes.

03:25  20  Q.  And the words that were underlined there was the language

21  that said -- I think it's important that we look at this.  The

22  words that were added in that second amendment --

23  A.  Where is that?

24  Q.  Page COL794, 188, Exhibit 6.

03:25  25  A.  Well, there's -- okay.

1  Q.   The underlined words added there --

2       MR. MARCHESE:   If we look at claim 1 blown up.

3  A.   Yeah.

4  Q.   -- says we're in a surface area ratio of heat-directing

03:25  5  elements to base material is from about 7:3 to about 3:7.

6  Right?

7  A.   Yeah.

8  Q.   That's the only underlining you see, correct?

9  A.   I don't know if there was anything that may have happened.

03:26  10  Q.   But that's the only underlining you see, correct?

11  A.   Yes.

12       MR. MARCHESE:   Can you pull up claim 2, please.

13  BY MR. MARCHESE:

14  Q.   No underlining there, right?

03:26  15  A.   No.

16  Q.   Okay.   Thank you.

17       So the notice of allowability is the one we were looking at

18  on page COL779, right?

19  A.   Yes.

03:26  20  Q.   So the notice of allowability, if you go back a couple

21  pages, we saw was dated October 5, 2012, right?

22  A.   The notice of allowability for which one?

23  Q.   Two pages back from where you were, October 5, 2012.

24  A.   Yes.

03:27  25  Q.   And then I'm going to go forward in time here.   Can you see

1    that?

2    A.   I can see it, yes.

3    Q.   Okay.  Great.

4         After that we get what's called "an information disclosure

03:27    5    statement."

6              MR. MARCHESE:   If you go to page COL718 or page 112 of

7    the exhibit.

8              THE WITNESS:   Yep.

9    BY MR. MARCHESE:

03:27    10    Q.   Do you see that?

11    A.   I see it.

12    Q.   Okay.  And the date on that is October -- I'm sorry --

13    November 21, 2012, in the very upper-left corner.

14    A.   Yes.

03:28    15    Q.   November 21, 2012, we get an information disclosure

16    statement, right?

17    A.   Yes.

18    Q.   And in that there are --

19              MR. MARCHESE:   And if you take the blowout off of

03:28    20    that, please, and we'll just count them down.

21    BY MR. MARCHESE:

22    Q.   There are U.S. patents disclosed.  I see eight of them on

23    this page, right?

24    A.   Yeah, there's eight.

03:28    25              MR. MARCHESE:   And if we go onto the next page,

1       please.

2              THE WITNESS:   And those are patents?

3       BY MR. MARCHESE:

4       Q.   That's what it says.

03:28   5   A.   Where does it say that?

6              MR. MARCHESE:   Can you go back to the prior page.

7              THE WITNESS:   Oh, yeah, patent number, yes.

8       BY MR. MARCHESE:

9       Q.   It's U.S. patents, right, eight of them?

03:28   10  A.   Yes.

11             MR. MARCHESE:   And on to the next page, please.

12      BY MR. MARCHESE:

13      Q.   Another five there, number 9, 10, 11, 12, 13?

14      A.   Yes.

03:28   15  Q.   Okay.   And then beneath that, U.S. patent application

16      publications.   Do you see that?

17      A.   Yes.

18      Q.   And there's three of those?

19      A.   Yes.

03:28   20  Q.   So 13 U.S. patents?

21      A.   So.

22      Q.   Three U.S. applications?

23      A.   So we disclose -- we sent these?

24      Q.   That's the information disclosure statement from your

03:29   25  counsel.   Okay?

1    A.    Okay.

2    Q.    And then if you can look down to the next page, please.

3    Foreign patent documents, Mr. McKinney, there's one of those,

4    right?

03:29    5    A.    Yes.

6    Q.    Okay.    So about -- one foreign document.

7        Now, about six weeks after the patent's been examined, it's

8    all done, Columbia sends in 13 U.S. patents, three U.S.

9    applications, and one foreign application, right?

03:29    10    A.    Yes, it looks like that's what we did.

11    Q.    Yep.    Okay.    And then if we go forward to page Columbia

12    637, page 31, upper left-hand corner, receipt date February 22,

13    2013.    Are you with me?

14    A.    I'm getting there.

03:30    15    Q.    Okay.

16    A.    Yep.

17    Q.    Okay.    There we see a foreign patent document for Worley

18    submitted, right?

19    A.    Patent number, foreign patent James Brice Worley.

03:30    20    Q.    Worley comes in.    Now we're about three months after the

21    patent has been examined, right?

22    A.    We are at -- I see filing date.    Is that the filing date?

23    The 10th of --

24    Q.    This is the date that the notice of allowance came,

03:30    25    October 5, 2012, right?

1    A.   I'm getting a little lost on where that date is written in

2    here.

3    Q.   Well, it's in your testimony today, but that will stand.

4         It is true that there's an information disclosure statement

03:31    5    on February 22, 2013, that includes Worley, right?

6    A.   These darned dates are hard to see on the page.

7    Q.   The very upper left-hand corner where it says receipt

8    date --

9    A.   Oh, up there.

03:31    10    Q.   Got it?

11    A.   Yep.

12    Q.   The receipt date with Worley is February 22, 2013?

13    A.   That's Worley.

14    Q.   Okay.  Thank you.

03:31    15         And then last if we go a couple three pages forward to page

16    Columbia 631, page 25 of the exhibit, tell me if you're there.

17    A.   Uh-huh.

18    Q.   Do you see it?

19    A.   Yes.

03:31    20    Q.   Okay.  And that's dated February 27, 2013, receipt date,

21    upper left-hand corner, right?

22    A.   Yeah, I see that.

23    Q.   You agree with that?  Is that what it says?

24    A.   I can't disagree with it.

03:32    25    Q.   Okay.  Great.

1    MR. MARCHESE:  And then if we go down to the bottom of

2    that page, please, foreign patent documents box.

3    THE WITNESS:  I see that, yes.

4    BY MR. MARCHESE:

03:32   5    Q.  What do we see there?

6    A.  Fottinger, Walter, foreign document 2073613.

7    Q.  And that's 227, so that's February 27, 2013, right?

8    A.  Yes.

9    Q.  And that's Fottinger, right?

03:32  10    A.  That's Fottinger.

11    Q.  So after the notice of allowance in this case, after the

12    amendments had been made, and the examiner says, "I'm done," we

13    get 13 U.S. patent -- I'm sorry -- 13 U.S. patents, three U.S.

14    patent applications, one foreign reference?

03:32  15    A.  Yeah.

16    Q.  In November of 2012, right?

17    A.  Yeah.

18    Q.  Then Worley, a foreign reference in February of 2013,

19    right?

03:33  20    A.  Uh-huh.

21    Q.  And then last, buried at the very end, we get Fottinger,

22    February 27, 2013, correct?

23    A.  Isn't there more notices of allowance somewhere in there?

24    Q.  I'm just asking you, is this what happens after this date?

03:33  25    That's all I want to know.  Would you agree that --

1    A.    It's not the only thing that happens after that date.

2    Q.    There are other things that happen.  I just want to know if

3    you would agree with me that after October 5, 2012, all this

4    extra prior art is disclosed.

03:33    5            MR. ALDRICH:  Objection.  Repetitive.

6            THE COURT:  Overruled.

7            THE WITNESS:  It looks like we sent all this prior

8    art, and we just went through it, yes.

9    BY MR. MARCHESE:

03:33    10   Q.    Thank you.  So I remember you saying something about a star

11   being next to --

12   A.    Yeah.

13   Q.    -- a reference --

14   A.    Right over the actual patent.  All the prior art is listed

03:33    15   on there somewhere, and there's stars by some of them, and I

16   inquired as to what the stars were about, and I was told it

17   means that maybe they were looked at.

18   Q.    Told by counsel, right?

19   A.    Yeah.

03:34    20   Q.    Okay.  Columbia counsel?

21   A.    I can't remember.

22   Q.    Somebody who represents Columbia?

23   A.    I think I was in a room full of counsel and said, "What do

24   these stars mean?"

03:34    25   Q.    Got it, and somebody told you that means that it was

1    considered, right?

2    A.   Yeah, that maybe they looked at it a little closer or

3    something like that.  I really probably don't know what it

4    means.

03:34   5    Q.   I'm sorry.  I thought you were done.  Apologies.  What did

6    you say?

7    A.   My interpretation of what the star meant from what I was

8    told is that they maybe looked at it a little closer, but I'm

9    not sure.

03:34   10   Q.   Okay.  Thanks.

11           MR. MARCHESE:  And if you blow up the foreign patent

12   document Fottinger.

13   BY MR. MARCHESE:

14   Q.   Do you see the left-hand columns, says "examiner initial,"

03:35   15   right?

16   A.   Yeah, it seems blank.

17   Q.   With a star it's blank, right?

18   A.   Okay.  Yeah.

19   Q.   The examiner did not initial Fottinger, did he?

03:35   20   A.   I don't know if that's what that means, but there's nothing

21   in the box.  Would he do that if he just looked at one?

22           THE COURT:  Yeah, you don't get to ask questions.

23           THE WITNESS:  Sorry about that.  I apologize.

24           MR. MARCHESE:  May I move this, Your Honor?

03:35   25           THE COURT:  Sure.

|  |  |
|---|---|
| 1 | MR. MARCHESE:  Thank you. |
| 2 | BY MR. MARCHESE: |
| 3 | Q.  Mr. Blackford, we talked about Scott Elser, right? |
| 4 | A.  We talked about Scott Elser, yes. |
| 03:35  5 | Q.  And you criticized his work, correct? |
| 6 | A.  He criticized his own work.  I criticized it here a little |
| 7 | bit in the sense that he admitted in the email that he didn't |
| 8 | really know what he was doing when it came to surface coverage |
| 9 | of artwork on his screen. |
| 03:36  10 | Q.  He was working for you, right? |
| 11 | A.  At that point I can't recall.  He might have been. |
| 12 | Q.  He did at some point? |
| 13 | A.  I'm not sure what the overlap was because I took on -- I |
| 14 | took design back on in 2012, so if that was before 2012, which |
| 03:36  15 | it was, no, he did not work for me. |
| 16 | Q.  And he's no longer with the company, right? |
| 17 | A.  That's correct. |
| 18 | Q.  And he was let go, correct? |
| 19 | A.  He might have been.  He does still work for the company |
| 03:36  20 | part-time. |
| 21 | Q.  I was just looking on his web page, and it doesn't list |
| 22 | Columbia as anything part-time, but if he is, then that's -- |
| 23 | A.  We'll use him like as a contract. |
| 24 | Q.  Oh, you still use him then? |
| 03:36  25 | A.  Yeah. |

1   Q.   And even though you weren't very favorable about what he

2   said in his email, you still use him?

3   A.   He's a good guy, a great graphic designer, just not good at

4   math.

03:37   5   Q.   Okay.  Fair enough.  But he knows what an independent test

6   standard is, right?

7   A.   No.

8   Q.   He doesn't?

9   A.   He's not good at that.  He's a great illustrator.

03:37   10   Q.   He's a great illustrator?

11   A.   Yeah.

12   Q.   You would agree with me that he's great at what he does in

13   illustrations, correct?

14   A.   Yeah, he's great at making drawings.

03:37   15   Q.   And he's great at -- so great that you guys have brought

16   him back, and he's still working with you, right?

17   A.   Yeah.

18   Q.   Part-time basis?

19   A.   Yeah.

03:37   20        MR. MARCHESE:  Thanks.  Nothing further, Your Honor.

21        THE COURT:  Recross.

22                    RECROSS-EXAMINATION

23   BY MR. ALDRICH:

24   Q.   Mr. Blackford, counsel asked you some questions about

03:38   25   Exhibit 6.  That's the tone?

1  A.    Yes.

2  Q.    6.   I have to ask you to get it back out again.   You were

3  explaining that there were some other things that happened

4  during this period of time after the original notice of

03:38  5  allowance, correct?

6  A.   I think we reviewed that earlier in my testimony, yes.

7  Q.   Okay.   And I think you were explaining before that even

8  though you had a notice of allowance and an issue notification,

9  when you guys became aware of additional prior art, you

03:38  10  continued to submit that to the patent office.   Is that right?

11  A.   Yes.

12  Q.   And you said that there were some documents in the exchange

13  with the patent office in here that counsel didn't show to the

14  jury, right?

03:39  15  A.   I think potentially.

16  Q.   Let's look at --

17  A.   If I'm understanding it correctly.

18  Q.   Let's look at Bates stamp 678.

19  A.   678.   I'm there.

03:39  20  Q.   Okay.   So this is another email -- or not an email, but a

21  correspondence from the patent office, right?

22  A.   I'm becoming familiar with that's the one that's from the

23  office, yes.

24  Q.   Okay.   And you see the mail date there, January 25, 2013?

03:39  25  A.   Yeah.   Yep, January 25th.

1    Q.    Okay.  Let's go to the next page.  What is this document?

2    A.    Supplemental notice of allowability.

3    Q.    So on January 25, 2013, after you submitted these 13 U.S.

4    patents, three applications, and one foreign application, here,

03:40    5    1-25-13.  Is that right?  Sorry.  1-25-13 on the prior page, we

6    had --

7    A.    Yes, on the prior page.

8    Q.    We had another notice of allowability, right?

9    A.    On the other page?

03:41   10    Q.    That's on 679.

11    A.    I'm just trying to see if that's the same date.  It's -- I

12    see we're --

13    Q.    If it would be helpful, you might look in the binder.  That

14    way you can flip the pages.

03:41   15    A.    Yes, notice of allowability, it says, "This communication

16    is responsive to January 18, 2013, request."  I don't see any

17    other dates on it.

18    Q.    The date from the page before?

19    A.    Is the date.

03:41   20    Q.    Pardon?

21    A.    Is the date from the page before the date?

22    Q.    Yeah.

23    A.    Okay.

24    Q.    That's the cover page from the patent office?

03:41   25    A.    I'll get it.

1   Q.   So on January 25, 2013, there's another notice of

2   allowability that covers all of this additional prior art that

3   you've put in, right?

4   A.   That seems to be what it's covering, yes.

03:42   5   Q.   Okay.   And then let's go to Bates stamp 635.   Are you

6   there?

7   A.   Uh-huh.

8   Q.   This is another correspondence from the patent office?

9   A.   Yeah.

03:42   10   Q.   Dated March 1, 2013?

11   A.   Yes.

12   Q.   And if you could go to the next page, you see this is

13   another notice of allowability?

14   A.   Yes.

03:43   15   Q.   And you see that this responds to the information

16   disclosure statement from February 22, 2013, right?

17   A.   Yes.

18   Q.   So here, February 22, the examiners looked at Worley,

19   right?   You went through this with opposing counsel,

03:43   20   Mr. Marchese, right?

21   A.   Yeah, I see it on 637.   It says Worley, James Worley.

22   Q.   Okay.   And so here on March 1, 2013, you have this

23   additional notice of allowability, right?

24   A.   Yes.

03:43   25   Q.   And then we can go to the one we've been talking about

1    before, which is page 631.

2    A.    631.

3    Q.    Or actually -- let's go to 629.

4    A.    629.

03:44    5    Q.    Date on this one?

6    A.    January -- March 13, 2013.

7    Q.    March 13.  And that's another notice of allowability,

8    right?

9    A.    Yes.

03:44    10    Q.    And this one is the one that corresponds to Fottinger,

11    right?

12    A.    Yes.

13    Q.    In fact, the patent office basically allowed your patent

14    four times, right?

03:44    15    A.    Yes.

16    Q.    I'm running out of space here.

17        NOA, notice of allowability.  Now, do you recall counsel

18    asking you some questions about what happened earlier in the

19    prosecution during the amendment process?

03:45    20    A.    Yes.

21    Q.    Okay.  I'd like to go to page 679 which you already looked

22    at.  Sorry.  That's the wrong page.

23    A.    Okay.

24    Q.    I promise I wrote it down.  Bates stamp 893.

03:45    25    A.    Columbia 893?

1    Q.    Yes, Columbia 893.

2    A.    Yes.

3    Q.    Do you remember counsel asking you some questions about

4    some language that was added to these amendments?

03:46    5    A.    Yes.

6    Q.    Or to these claims, I guess it was?

7    A.    Yes.

8    Q.    Do you remember counsel making some representations about

9    the fact that the notion that Columbia sort of seeded ground,

03:46    10    if you will, on its fence posts?

11    A.    Yes.

12    Q.    May not have been the language that counsel used, but

13    something to that effect, right?

14    A.    I remember that from the opening.

03:46    15    Q.    Let's go forward to page 900.    900 are the remarks that

16    accompanied the amendments to the claims to the patent office.

17    A.    Okay.

18    Q.    Okay.    And do you see there that there's discussion of a --

19    toward the bottom under, where you are now, rejection of

03:47    20    claims.

21    A.    Yes.

22    Q.    Do you see the examiner had rejected the claims based on

23    U.S. patent 4,622,253?    Do you see that?

24    A.    Yes.

03:47    25            MR. MARCHESE:    Okay.    Move to admit Exhibit 1153.

1    It's in.  Sorry.

2    BY MR. ALDRICH:

3    Q.  And this is the patent that the examiner used to reject the

4    claims.  This is a patent to Levy.  Have you seen Levy before?

03:48    5    A.  I did review Levy, yes.

6         MR. ALDRICH:  If we could go to the next page of Levy.

7         THE WITNESS:  Yeah.

8    BY MR. ALDRICH:

9    Q.  Do you have an understanding of what Levy's invention is

03:48    10    about?

11    A.  Yeah, I think I do.

12    Q.  What is Levy's invention about?

13    A.  Well, it's kind of like a carpet, the way I look at it, but

14    basically you do have a foil layer, 100 percent coverage, and

03:48    15    then you have a layer of plastic, and then you have a layer of

16    batting, which is like, you know, wadding, insulation, and then

17    they're basically poking holes through the whole thing at the

18    same time, shoving yarns through it all.

19    Q.  Is that your invention?

03:49    20    A.  No, it doesn't seem -- I mean no.  It's not like it.

21    Q.  Why is that not your invention?

22    A.  Well, in my view there's no base material.  There's no

23    independent elements, you know, discrete elements, and then

24    you've obscured the entire reflective layer with a bunch of

03:49    25    fiber.

1    Q.    Maybe we could -- so just looking at the figure here --

2    A.    Yeah.

3    Q.    -- just Item 50 on top, do you have an understanding what

4    50 is?

03:49    5    A.    Yeah, I think that's the reflective layer, but I think if

6    you go to Figure 1 --

7    Q.    We'll go there in just a moment.  I just want to make sure

8    the jury follows.

9    A.    Okay.

03:49    10    Q.    So 50 is the foil?

11    A.    Yes.

12    Q.    Okay.  And 40 is?

13    A.    Plastic.

14    Q.    A layer of plastic?

03:49    15    A.    Yeah.

16    Q.    And layer 30?

17    A.    Is like batting which is like a bunch of cotton or

18    something like that.

19    Q.    And then what is 70?

03:50    20    A.    It's an apparatus that you punch holes through everything

21    with.  It's the same way you make a carpet.  You know how those

22    little fibers are coming out of the carpet.

23            MR. ALDRICH:  And then can we go to Figure 1.

24            THE WITNESS:  So Figure 1 here, that looks like a

03:50    25    carpet.

BY MR. ALDRICH:

Q.    Okay.  You didn't invent carpets?

A.    No.

Q.    Okay.  And so looking at Figure 1, you see Item 50 there?

03:50   A.    Yes.

Q.    And Item 40, that's the plastic?

A.    Yes.

Q.    And Item 60 is?

A.    That's the carpeting fibers.

03:50   Q.    Okay.  And so does this product have separate foil elements that are discrete?

A.    No, it has one continuous sheet.

Q.    Okay.  And so the examiner, though, thought that this patent was relevant to your invention and rejected your claims
03:51   based on Levy, right?

A.    That's my understanding of what some communication was about, yes.

        MR. ALDRICH:  Okay.  Well, let's go back to Exhibit 6 -- actually, is it possible to leave this figure on the
03:51   screen and also go to Exhibit 6?  Let's do that.  Page 900. And let's go right after that reference to Levy.  Let's just do the zoom in on that paragraph there at the bottom.

BY MR. ALDRICH:

Q.    And do you see the sentence, the second sentence there says, "This rejection is respectfully traversed in light of the
03:52

1  amendments to the claims and the remarks below"?  Do you see

2  that?

3  A.   Yeah.   What's "traversed?"   I can't ask a question.   I see

4  that.

03:52  5            MR. ALDRICH:   Okay.   And so let's go to the next page.

6            THE WITNESS:   Yep.   Okay.

7            MR. ALDRICH:   And can we zoom in on the first full

8  paragraph on that page.

9  BY MR. ALDRICH:

03:53  10  Q.   And, Mr. Blackford, can you read into the record what your

11  attorney wrote back to the examiner regarding Levy?

12  A.   "The '253 patent is cited for teaching an array of

13  separated foil elements.   We respectfully disagree with this

14  characterization of the '253 patent.   The cited reference fails

03:53  15  to teach or suggest a discontinuous array of discrete

16  heat-directing elements, each independently coupled to the

17  first side of a base material or independently coupling each of

18  the discontinuous array of heat-directing elements to a first

19  side of a base material."

03:53  20  Q.   So -- so far do you agree with what your attorney said?

21  A.   Yeah, I do because I'm perceiving that to mean like there's

22  a solid sheet of foil in the carpet.

23  Q.   Okay.   And then continue on -- and the '253 patent, that's

24  referring to Levy, right?

03:54  25  A.   Yes.

1    Q.   Okay.  So continue on.  It says "rather."

2    A.   "Rather, the '253 patent teaches a continuous laminated

3    reflective sheet that is perforated with fiber wadding.  Thus,

4    the laminate sheet provides a continuous perforated surface

03:54    5    rather than a discontinuous array of discrete heat-directing

6    elements.  This distinction is important because it is the

7    uncovered spaces between the heat-directing elements that allow

8    the base material to retain its desired properties."  And then

9    it says, "See paragraphs 27, 28."

03:54    10    Q.   And so in your understanding here, is your attorney

11    conceding anything about Levy?  Is your attorney agreeing with

12    the examiner about anything that the examiner has said about

13    Levy?

14    A.   It seems like he's pushing back.

03:55    15            MR. MARCHESE:   Objection.

16            THE COURT:   Sustained.

17    BY MR. ALDRICH:

18    Q.   What's your understanding of what your attorney is saying

19    to the examiner here?

03:55    20    A.   He's saying that it isn't a discontinuous array of discrete

21    heat-directing elements.  It's a solid sheet.  That's how I

22    read it.

23    Q.   Do you understand that he's agreeing or disagreeing with

24    the examiner's representation of what Levy is?

03:55    25    A.   Based on the word "we respectfully disagree," I'd say it's

1    a disagreement.

2            MR. ALDRICH:   Let's go on to the next paragraph.

3    BY MR. ALDRICH:

4    Q.   And here it says, "Furthermore, Levy also fails to teach a

03:55    5    heat-management material wherein each of the discontinuous

6    heat-directing elements is independently coupled to a first

7    side of a base material."  Do you see that?

8    A.   Yes.

9    Q.   Is your understanding that your attorney's agreeing with

03:55    10    the examiner about how Levy applies or disagreeing?

11    A.   Seems to be further disagreement.

12    Q.   Let's go to the other office action response that we looked

13    at which is --

14            MR. ALDRICH:   Let's go to page 195 -- sorry --

03:56    15    page 801.

16    BY MR. ALDRICH:

17    Q.   195 in your binder.

18    A.   Columbia 801?

19    Q.   Columbia 801.  Are you there?

03:56    20    A.   Yes.

21    Q.   This is the second time that you guys are responding to the

22    examiner regarding Levy, correct?

23    A.   Again, I'm not sure the sequence, but it does look like

24    a response.

03:57    25            MR. ALDRICH:   And let's go to the next page, 802.  And

1    let's go to the first few lines at the top of the page.

2    BY MR. ALDRICH:

3    Q.    Here it says, "Levy is cited for teaching an array of

4    separated foil elements."  Do you see that?

03:57    5    A.    Yes.

6    Q.    And based on your review of Levy, does it show an array of

7    separated foil elements?

8    A.    It does not.

9    Q.    Okay.   And so your attorney writes back and says -- can you

03:57    10    read what your attorney says?

11    A.    "We respectfully disagree with this characterization of the

12    '253 patent.   The cited reference fails to teach or suggest a

13    discontinuous array of discrete heat-directing elements

14    independently coupling each of a discontinuous array of

03:58    15    heat-directing elements to a first side of a base material or a

16    discontinuous array of uniformly sized heat-reflective

17    elements.   Rather" --

18    Q.    Is your attorney --

19          MR. MARCHESE:   Your Honor, briefly, there was some

03:58    20    words that -- claim numbers were not read there into the

21    record.

22          THE COURT:   The jury has this in front of them.   Your

23    objection is overruled.

24    BY MR. ALDRICH:

03:58    25    Q.    So, Mr. Blackford, is your attorney here agreeing or

1    disagreeing with the examiner?

2    A.   Seems like it's -- because it says "respectfully disagree,"

3    disagree.

4    Q.   And, in fact, this time it underlined things?

03:58  5    Mr. Examiner?

6    A.   Yeah.

7    Q.   Right?

8    A.   Yeah.

9    Q.   Same language again, but this time I'm underlining it for

03:59  10   emphasis, right?

11   A.   Okay.

12   Q.   And does this section of the document where your attorney

13   disagrees with the examiner, does it continue on for the

14   remainder of the page?

03:59  15   A.   That's page 802.  I see "furthermore."  It seems to keep

16   going, yes.

17        MR. ALDRICH:   Okay.   Can we call up opening statement

18   page 131.

19        MR. MARCHESE:   Your Honor, reading the opening

03:59  20   statement into the record, I'm going to object to that.

21        THE COURT:   Go ahead.

22        MR. MARCHESE:   I believe counsel's about to read part

23   of the opening statement into the record.

24        MR. ALDRICH:   I'm just going to ask a few questions

03:59  25   about whether the statements made in opening were correct or

1    not.

2              THE COURT:  Well, you can ask about whether the acts

3    alleged or stated in opening statement are correct, but the

4    reference to the opening statement itself at this juncture, no.

04:00    5              MR. ALDRICH:  Okay.

6    BY MR. ALDRICH:

7    Q.  Do you remember during opening statement Mr. Marchese made

8    some references and representations to the jury about --

9              MR. MARCHESE:  Objection, Your Honor.

04:00    10             THE COURT:  Sustained.  Rephrase the question.

11   BY MR. ALDRICH:

12   Q.  Do you remember that there were some statements made during

13   opening statement --

14             MR. MARCHESE:  Objection, Your Honor, it's the same.

04:00    15             THE COURT:  Sustained.

16             MR. ALDRICH:  Your Honor, I'm unclear about what

17   you're permitting me to do.

18             THE COURT:  If you want to ask about anything that

19   were facts, don't refer to it as opening statement.  Just ask a

04:00    20   question.

21             MR. ALDRICH:  Okay.

22   BY MR. ALDRICH:

23   Q.  Did Columbia push back?

24   A.  To the patent office?

04:00    25   Q.  To the examiner.

A.   It appears to have because there's lots of "respectfully

disagreement."

Q.   Did the -- did Columbia say to the examiner essentially

you're wrong?

A.   Respectfully, yes.

Q.   Did the -- did Columbia say to the examiner you're

absolutely wrong?

        MR. MARCHESE:  Objection.  That's --

        THE COURT:  Overruled.

        THE WITNESS:  I mean it was pretty clear language that

they respectfully disagreed and that they couldn't agree with

the patent examiner.

BY MR. ALDRICH:

Q.   Did Columbia say, "Our original language is great"?

A.   No.

Q.   Did Columbia -- I think that's probably enough.

        MR. ALDRICH:  I have no further questions, Your Honor.

Thank you.

        THE COURT:  Anything else?

        MR. MARCHESE:  Nothing further, Your Honor.

        THE COURT:  You may step down.

    May this witness be excused?

        MR. MARCHESE:  Yes, Your Honor.

        THE COURT:  Any objection?

        MR. ALDRICH:  No objection, Your Honor.

1        THE COURT:  You are excused.

2        THE WITNESS:  Thank you.

3        THE COURT:  You're welcome.

4    Your next witness.

04:02    5        MR. ALDRICH:  We are offering Matthew Merriman again.

6    They said they wanted to call him in their invalidity case.

7    He's here and available.  He has other obligations, so if

8    they'd like to take him, we are making him available.

9        MR. MARCHESE:  Your Honor, I think we will not take

04:02   10    Mr. Merriman in our case in chief.

11        THE COURT:  Okay.  Then he's excused.  Any objection?

12        MR. ALDRICH:  No objection, Your Honor.

13        THE COURT:  No objection.

14        MR. MARCHESE:  No objection, Your Honor.

04:02   15        THE COURT:  He's excused.

16        MR. ALDRICH:  Never mind.  Sorry.

17        THE COURT:  Next witness.

18        MR. AXELROD:  We call Serena Morones.

19                    SERENA MORONES,

04:02   20            PLAINTIFF'S WITNESS, SWORN

21        THE CLERK:  Would you state and spell your full name

22    for the record.

23        THE WITNESS:  Serena Morones, M-o-r-o-n-e-s.

24        THE CLERK:  Thank you.

04:03   25        MR. MARCHESE:  May I just move the easel again?

| | |
|---|---|
| 1 | THE COURT:  Of course. |
| 2 | MR. AXELROD:  Counsel, in connection with her |
| 3 | testimony, I would offer Exhibits 372, 398, 399, 400, 402 -- I |
| 4 | guess 705 is already in -- and 1363. |
| 04:04  5 | MR. MARCHESE:  I did not get all of them. |
| 6 | MR. AXELROD:  372, 398, 399, 400, 402, 1363. |
| 7 | MR. MARCHESE:  Just one moment. |
| 8 | No objection except 372 doesn't have any Bates numbers on |
| 9 | it. |
| 04:05  10 | THE COURT:  Are you familiar with that document, |
| 11 | counsel?  Are you familiar with that document? |
| 12 | MR. MARCHESE:  I haven't seen it before, Your Honor. |
| 13 | THE COURT:  Okay. |
| 14 | MR. MARCHESE:  I'm just wondering where it came from. |
| 04:05  15 | It says "Seirus" on the top of it, but I just am not familiar |
| 16 | with it. |
| 17 | THE COURT:  Do you have a copy with the Bates numbers |
| 18 | on it so that he can reference where it came from?  In the |
| 19 | meantime 398, 399, 400, 402, 1363 are received. |
| 04:05  20 | (Exhibit 398, 399, 400, 402, and 1363 admitted.) |
| 21 | THE COURT:  If you want to skip over 372 and circle |
| 22 | back around, you may. |
| 23 | MR. AXELROD:  I believe it's Seirus 20661. |
| 24 | MR. MARCHESE:  Was it an electronic file produced? |
| 04:06  25 | MR. AXELROD:  No.  I believe it might be an Excel. |

1       That's why it's loses the Bates number.

2                   MR. MARCHESE:   So it was produced?

3                   MR. AXELROD:   Yes.

4                   THE COURT:   372 is received.

04:06   5       (Exhibit 372 admitted.)

6                   MR. ALDRICH:   It's in Ms. Morones --

7                   MR. MARCHESE:   No objection, Your Honor.

8                        DIRECT EXAMINATION

9       BY MR. AXELROD:

04:06   10      Q.   What's your profession?

11      A.   I am a Certified Public Accountant, and I specialize in

12      forensic accounting and calculating damages in litigation as

13      well as business valuation.

14      Q.   Would you describe for the jury your educational background

04:06   15      and any certifications that you've received that are relevant

16      to your testimony today.

17      A.   I have a bachelor's degree in accounting from the

18      University of Oregon, a master's degree in taxation from

19      Portland State University.   I also have professional

04:07   20      credentials that come along with these specialties.   The CPA is

21      the first one that I mentioned.   In addition I am a certified

22      fraud examiner.

23          I also have two credentials in business valuation.   One is

24      called accredited senior appraiser through the American Society

04:07   25      of Appraisers, and the other is called accredited in business

1    valuation through the American Institute of CPAs.

2    Q.    What is Morones Analytics?

3    A.    Morones Analytics is a firm that I own in Portland that has

4    six professional staff and two administrative staff that all of

04:07    5    us together specialize in these same areas.   We work together

6    as a team on our projects.

7    Q.    Can you describe for us generally the type of work that

8    Morones Analytics does and who you work for?

9    A.    Yes.   The type of work we do ranges from on -- on kind of

04:08    10    one end of the range business valuations where we're

11    determining the value of a business.   More relevant to this

12    case, we do a lot of financial analysis in the dispute context

13    where we're calculating damages for different types of claims,

14    or often we will also do forensic accounting investigations.

04:08    15    So if there's some kind of allegation of wrongdoing, we will

16    investigate the accounting documents in a case and kind of

17    figure out where the money went or whether the allegations can

18    be proven or not with evidence in the case.

19         So the term "forensic" in my understanding means evidence

04:08    20    for court.   So forensic accounting is investigating accounting

21    data and bringing it to court and presenting evidence in trial.

22    Q.    Do you often work on litigated cases?

23    A.    Yes, very often.

24    Q.    How many different cases that have been in litigation have

04:09    25    you participated in as an expert witness?

1  A.   Well, not all cases go to trial, so I have been

2  specializing in this field for 21 years, and over the course of

3  those 21 years, something more than 500 to a thousand

4  litigation cases, and cases that have, for me personally that

04:09  5  I've testified in, probably about a hundred.

6  Q.   In connection with the litigation work, are you working for

7  the attorneys for one or the other sides?

8  A.   Most of the time.  Sometimes I'm court appointed, so I'm

9  working as an independent on behalf of the court, but most of

04:09  10  the time a law firm will call my firm and ask if we would be

11  available to work on a case.

12  Q.   And in connection -- and in that respect, have you worked

13  on prior cases with members of my firm?

14  A.   Yes, I have.

04:10  15  Q.   And have you also worked on cases against members of my

16  firm?

17  A.   I have.

18  Q.   And similarly have you worked on cases on behalf of some of

19  the defendants' lawyers such as Mrs. Rothauge's firm in

04:10  20  Portland?

21  A.   Yes.  Her firm is in Portland, and I have worked for and

22  against her firm.  The other attorneys I have not worked for

23  before.

24  Q.   Can you describe for us the process that an outside expert

04:10  25  goes through when they get involved in the case with respect to

1    who you communicate, how you conduct your investigation, and

2    what your communication channels are, if you will?

3    A.    Okay.    Generally the process is once -- once I've agreed to

4    take a case, if I think it's appropriate for my expertise, then

04:11    5    I do an engagement letter with the firm that sets out kind of

6    the financial agreements and some of the other terms, and then

7    I start a back-and-forth process of communication with the

8    primary attorney-client that I'm assigned to to try to gather

9    information so that I can start to learn about the case.

04:11    10    There's usually several conversations that help me -- get me up

11    to speed on what the case is about.

12        Then I usually receive a tremendous amount of documents

13    that my staff and I have to spend time reading and studying to

14    learn about the case and get up to speed.    Those documents come

04:11    15    from the law firm that has engaged me because it's my

16    understanding that the law firms maintain custody of all the

17    documents in a case, and there's a process where both sides

18    will exchange documents so that there's one global set of

19    documents at -- available to everyone on the case.    So I have

04:11    20    access to those documents through the law firm.    I don't have

21    any direct access or opportunity to go straight to the parties

22    in the case to obtain those documents.    I can do my own

23    research, independent research, regarding -- we do market

24    research and financial research and things like that.

04:12    25    Q.    Accessing publicly available documents and the like?

1    A.    Yes.

2    Q.    If you want to meet with or interview people, how is that

3    handled?

4    A.    I can request meetings with the clients that are working

04:12  5    for -- working with the attorneys who hired me.  If I want to

6    interview a party on the other side of the case, the way that

7    works is I have to write deposition questions and work through

8    this deposition process.  I'm not allowed to just call up the

9    other side and ask them questions.

04:12  10    Q.    Is this generally the milieu and the channels that an

11    expert has to go through in most engagements?

12    A.    Yes.    That's the typical.    I would expect any of the

13    experts working in this process would go through a similar kind

14    of protocol for how we get information.

04:13  15    Q.    Were you retained to work for Columbia Sportswear in this

16    case?

17    A.    I was retained to -- by the Schwabe firm to render

18    opinions, to answer certain questions for Columbia Sportswear,

19    yes.

04:13  20    Q.    Had you ever done any work for Columbia Sportswear before?

21    A.    No.

22    Q.    How are you compensated for your work?

23    A.    My firm is compensated on an hourly rate basis for all of

24    the time we spend from beginning to end in this case.

04:13  25    Q.    Have you done all the work in the case?

1    A.    No.   I have a team of people that will assist and play

2    different roles depending on what the work is.   So I would say

3    there's probably three or four members of my firm who have

4    worked on this case.

04:13    5    Q.    And for how long has the firm been working on the case?

6    A.    My engagement letter is dated February 2016, so it's been

7    about 18 months.

8    Q.    And what has Morones Analytics charged to date for the

9    services that it's rendered?

04:14    10    A.    I looked at our billings prior to traveling here, and we

11    had charged about $95,000 for our work to date, which is pretty

12    consistent with what my original fee estimate was.

13    Q.    And has that work involved rendering reports on some of the

14    issues in the case?

04:14    15    A.    Yes.

16    Q.    And you gave a deposition roughly a year ago in the case?

17    A.    Last summer.

18    Q.    And have you also reviewed Seirus' expert reports?

19    A.    Yes, I have.

04:14    20    Q.    For your commentary and criticism?

21    A.    Yes.

22    Q.    What were you asked to look at in this case?   What issues

23    were you asked to answer?

24    A.    I was asked to give damage opinions because this case

04:14    25    involves, I understand, patent infringement claims and that the

1    claims would be subject to damages for Columbia.  And so two

2    categories of damage opinion I was asked to give.  The first is

3    a damage opinion related to the design patent claim, which

4    throughout the course of the case -- I understand there was a

04:15    5    ruling of infringement in the beginning that didn't exist, but

6    throughout the course that ruling was made, and that opinion

7    involves quantifying profits that Seirus earned on the sale of

8    all of the HeatWave products because I understand all of the

9    HeatWave products are subject to the design patent.

04:15    10         The second part of my assignment was to develop an opinion

11    about a reasonable royalty to apply under the utility patents,

12    and I understand that, there's only one utility patent

13    remaining, but to determine what would be a reasonable royalty

14    and apply that to the sales of the product that relate to the

04:16    15    utility patents.

16    Q.   We're going to use a word in connection with the

17    determination of profits on the -- for infringement of the

18    design patent called "disgorgement."  Are you familiar with

19    that term?

04:16    20    A.   Yes, I am.

21    Q.   And what does disgorgement mean?

22    A.   Disgorgement means to take away, and so in the case like

23    this with Columbia and Seirus, it would be a scenario where --

24    now, I'm going to say this in my own words, so there might be

04:16    25    legally more correct ways to say this, but my understanding is

1    that Columbia would be able to take away the profit that Seirus

2    earns using Columbia's patents, so it means to reach out and

3    take it back.

4    Q.    And is that a remedy that you understand applies solely to

04:16    5    the design patent infringement?

6    A.    In this case, yes, I understand that that calculation

7    applies to the sale of products that were subject to the design

8    patent.

9    Q.    And let me ask you if you can explain to the jury what your

04:17    10    conclusions were as to those two issues looking at slide number

11    2.

12    A.    Yes.   So my conclusion regarding the amount of profit

13    earned by Seirus relating to the design patent is $3.4 million.

14         MR. AXELROD:   Your Honor, we have a series of

04:17    15    demonstratives.   I don't believe there's any objection to them.

16    We'd like to display them to the jury through the witness'

17    testimony.

18         THE COURT:   You may.

19         THE WITNESS:   So that's the first bullet point on the

04:17    20    slide showing my opinions.   And then my conclusion regarding a

21    reasonable royalty rate to apply to the sale of products

22    subject to the utility patent is a range of 20 to 10 percent.

23    BY MR. AXELROD:

24    Q.    What was your source of information about sales of the

04:18    25    HeatWave products?

1    A.    My source of information was a series of documents that

2    Seirus provided that listed out each of the HeatWave products

3    by product number and description and showed the quantity of

4    sales, the dollar of sales, profits earned on those sales.

04:18    5    Q.    Did you receive one such production sometime in 2016?

6    A.    We received several productions of that -- versions of that

7    same document over the course of the case.

8            MR. AXELROD:    Could we pull up Exhibit 705.

9    BY MR. AXELROD:

04:18    10    Q.    Have you seen Exhibit 705 before?

11    A.    Yes.    I believe this is the most recent production of this

12    report that Seirus created for our purposes of this case.

13    Q.    Can you explain to the jury how Exhibit 705 is set up,

14    how's it structured?

04:19    15    A.    This exhibit is created by Seirus, I understand, and

16    reports sales of products that contain the HeatWave fabric.

17    There may be some history on how those were identified, but my

18    understanding is that these are the products, all of which are

19    subject to at least the design patent.    And the spreadsheet on

04:19    20    the far left column shows the product code, the product number.

21    The next column shows the product name, and within the product

22    name, you can determine some of the attributes of the product.

23    And then the next column shows the units sold.

24            This particular report has a three-column section.    There's

04:20    25    two on this page, that show what fiscal year the data is

1    reported for.   So this first yellow section is showing data for

2    fiscal year 2012-2013 that ends September 30, 2013.   So there

3    are a few sales that happened in the 2012-2013 fiscal year.

4    Q.   So that shows for the first month, really it's just what

04:20   5    happened in September of --

6    A.   Yes.   I understood based on, I believe, discussions between

7    counsel -- the counsel for the various parties that there were

8    some sales in just September of 2013.

9        And then the next pink section shows all sales for fiscal

04:20   10   ending 9-30-2014.   And these three columns represent all of the

11   data provided to us about HeatWave sales particularly, units

12   sold, total dollars for sales, and total dollars of profit.

13   Q.   And the language comes from Seirus?

14   A.   Yes.

04:21   15   Q.   Now, if you went to the -- to the next page, would you have

16   the same structure, but for different fiscal years?

17   A.   Yes.   Each of these reports show the entire collection of

18   HeatWave products on one page, which is -- they fit on one

19   page.   Thankfully, it's not a voluminous set of products.   And

04:21   20   so the next page shows the '14-'15 fiscal year, and then also

21   the '15-'16 fiscal year, and I believe the final page shows the

22   '16-'17 partial period that we have available.

23   Q.   Now, in the upper left-hand part of the highlighted

24   section, there's some language that says "Excludes

04:22   25   international shipped direct from Asia."   Do you know who

1  prepared that?

2  A.   I don't know who wrote those words.  I understand, though,

3  that the entire report is prepared by Seirus.

4  Q.   And do you know what was intended to be excluded by that

04:22   5  reference?

6  A.   I understand that the intent is to exclude international

7  sales because the sales subject to the infringement claims need

8  to be U.S. sales.

9  Q.   And do you understand this document was prepared by Seirus

04:22   10  to just address the claims that are -- the product sales and

11  profits that are subject to claims in this litigation?

12  A.   Yes.

13       MR. AXELROD:   Could we go back to the first page of

14  the exhibit.

04:23   15  BY MR. AXELROD:

16  Q.   Now, down in the middle of the page, there's a highlighted

17  section.

18       MR. AXELROD:   Can we pull that up.

19  BY MR. AXELROD:

04:23   20  Q.   Apart from the yellow highlighting, is there a couple

21  entries that are shown in red?

22  A.   Yes.

23  Q.   And were those shown on the document produced by Seirus?

24  A.   Yes.

04:23   25  Q.   Are you familiar with those two product groups?

1    A.   Yes, generally, I am aware that there are some product

2    groups that are not alleged to infringe the utility patent.   I

3    understand they do infringe the design patent, but not the

4    utility patent.   And those would be products that have the

04:23    5    fabric facing away from the body, not towards the body, and

6    Seirus identified which products those would be in their data,

7    and those are the products that both experts, both me and the

8    Seirus expert, have removed from calculations relating to the

9    utility patent.   I think the largest category are the glove

04:24   10    liner where the fabric faces outward.

11             MR. AXELROD:   May I approach the witness?

12    BY MR. AXELROD:

13    Q.   I'm going to hand you what has been marked and admitted as

14    Exhibits 220.3 and 225.3, and ask you can you identify those

04:24   15    with the product codes on Exhibit 705 that are highlighted in

16    red?

17    A.   So 2116.   Yes, I see on the label on the back, this

18    product, this glove, or this liner says "2116" on the label.

19    And let's see.   2148 is on the sticker label, so yes.

04:25   20    Q.   And does category -- do both of those categories come in

21    two versions?   In other words, for style number 2116, is there

22    a version in which the metallic elements are on the exterior

23    and a version on which they're on the interior?

24    A.   Yes.   Right above the red 2116, there's a glove 2116 that

04:25   25    says "HeatWave glove liner black," and according to this data

1   from Seirus, that product would be subject to the infringement

2   claim for the utility patent, I understand, because the fabric

3   faces inward.

4   Q.   I don't know if we have a black liner, but let me hand you

04:25  5   what's been marked as Exhibit 225.4.   And is that a black sock

6   version of style 2148?

7   A.   Yes.   This sticker says "2148" which would be the black

8   sock.   And I would assume that -- that the fabric is facing

9   inward.

04:26  10                 MR. AXELROD:   Could we turn to slide 3.

11   BY MR. AXELROD:

12   Q.   How did you approach the disgorgement analysis for

13   infringement of the design patent?   And I'll refer sometimes to

14   the statutory section under which it comes -- just to keep

04:26  15   things clear, it's section 289 of the Patent Act.

16   A.   Well, the first step in a calculation of damage is to

17   assume -- for me it's usually to assume liability.   In this

18   particular design patent analysis, I understand that that

19   ruling has been made, so step 1 is there's infringement.

04:27  20        Step 2 is to identify the products that would be subject to

21   the infringement.   I understand that all the products on the

22   list that I was provided are subject to that infringement

23   claim.

24        I understand that there has been a -- I would call it a

04:27  25   topic, for lack of a better legal word, that's come up

throughout this case of a question of what is the appropriate

article of manufacture.  Are we talking about the entire

product when we're looking at sales and profits for

disgorgement, or are we talking about some subset of the

04:27    product in terms of identifying the article of manufacture.

Q.    For purposes of your testimony and opinion in this stage of

the litigation, the plaintiff's case, were you asked to make

any assumptions about what the relevant article of manufacture

is?

04:28    A.    Yes.  I was asked to assume that the relevant article of

manufacture is the entire product sold to the customer which

would be a glove, a liner, a hat, not some other smaller kind

of definition of that product.

Q.    Referring you to slide 3, which I think is up in front of

04:28    the jury, what is your starting point?

A.    The starting point for disgorgement analysis is to

determine sales, and so this slide summarizes the total sales

of HeatWave products as listed on those reports that Seirus

provided.  If you were to add up all of the total sales numbers

04:28    for all those fiscal years, they're summarized here on this

slide.  So the starting point is how much was sold, and I

understand that a case like this, that the plaintiff's burden

of proof in a disgorgement is merely just what is the sales

amount, and so over the time period that we have a data

04:29    available, the total sales of HeatWave products add up to

1   7, 324, 435.

2   Q.  To get to a profit disgorgement figure, what is the next

3   set of steps that you go through?

4   A.  The next set of steps would be to identify what costs

5   are -- I call them in an accounting word "direct variable

6   costs."  Direct variable costs are costs that if you have an

7   additional sale, then you have to incur additional cost to get

8   that sale.  The most obvious type of cost is the material cost.

9   In order to sell a glove, you have to incur the cost of the

10   product, the physical cost of the glove.  I understand in this

11   case that Seirus pays an outside company to manufacture the

12   gloves, so you've got to buy those gloves and incur that cost

13   in order to sell them.

14      In addition to the cost of the product, there would be

15   likely be additional direct variable costs that Seirus must

16   incur in order to sell the product, and I would be -- if I were

17   doing this analysis in entirety, I would be looking for those

18   direct variable costs.

19   Q.  What does slide 4 portray?

20   A.  Slide 4 shows -- the first line is the same, HeatWave

21   sales.  The next line shows HeatWave gross profit.  And what

22   I've done for that is to add up the call among those Seirus

23   reports that said "total profit."  I have an understanding of

24   what that -- what has been deducted in order to get that.  I

25   understand that it's that outside manufacturing cost that

1  Seirus incurred in order to have the products manufactured.

2  Q.   Would it typically also include freight to ship it from

3  the --

4  A.   Yes.

04:31   5  Q.   -- factory in China or wherever it is --

6  A.   Yes.

7  Q.   -- overseas?

8  A.   All the costs to get the product into the Seirus location

9  and to be -- to make it available for sale, those would be

04:31   10  direct variable costs that I would want to deduct, so I did.

11  Q.   So you agree those should be deducted?

12  A.   Yes.

13  Q.   And are there other direct variable costs that you've been

14  able to identify from Seirus' records that you agree should be

04:31   15  deducted?

16  A.   Yes.   We also identified commission expense as a category.

17  To me that would be obviously variable because most commission

18  arrangements are tied to sales.   The more you sell, you owe

19  something to salespeople, so we saw that category on the

04:32   20  financial statement.   We saw that it was a very consistent

21  percentage of sales and went ahead and deducted that from the

22  sales also.

23  Q.   What types of Seirus records are you looking at to identify

24  whether there are direct variable costs associated with the

04:32   25  HeatWave sales or not?

A.    Seirus provided us with their financial statements, pretty detailed level of information on income and expenses for the company as a whole, so I was able to look at their financial statements and see cost categories on those financial statements.

MR. AXELROD:    Could we pull up Exhibit 1363.

BY MR. AXELROD:

Q.    Do you have 1363 in front of you?

A.    Yes.

Q.    And can you identify -- Ms. Morones, I'm going to direct you to a couple of pages in the financial statement and ask you are these examples of the kind of data that you are looking for in the financial statement to investigate whether there are additional variable costs associated with the manufacture and sale of the HeatWave product?

A.    Yes.   This section that you've enlarged shows cost of goods sold, which would -- I would assume would be a direct variable cost.   It's going to contain primarily material cost with some other items, and so, yes.   However, because we are just talking about HeatWave products, in this case the cost of goods sold numbers, we had to take it right off of that sheet that summarized HeatWave where it just said sales and total profits because this overall financial statement does not designate cost of goods sold just for HeatWave products.   It's total companywide cost of goods sold.

1    Q.   In doing your analysis, were you able to identify any other

2    direct variable cost with sufficient supporting evidence that

3    you felt they should be deducted from the total HeatWave sales

4    and to recognize direct variable cost to arrive at a

5    disgorgement profit?

6    A.   I was not.  I stopped the analysis at commission expense

7    because for two reasons:   One, because in a patent infringement

8    case, the burden of proof or evidence is on the defendant.   So

9    I understood it was the defendant expert's role to identify the

10   additional variable costs.   Also, in the course of litigation,

11   we asked for production -- asking for production means asking

12   for documents or information -- that would demonstrate that

13   certain cost categories are variable, and we didn't receive any

14   specific documentation that supported any additional costs

15   being variable.   So, also, in Ms. Carey's deposition she was

16   not --

17   Q.   Ms. Distler?

18   A.   No.   Ms. Carey's deposition.   She was asked about which

19   cost categories were variable, and that deposition was very

20   unclear about how to identify the additional cost categories.

21   So I did not conduct any further analysis of variable costs for

22   those reasons, lack of information, and it's not my assignment

23   to carry it all the way to a net profit level.   It's the

24   defendant's expert assignment.

25   Q.   So is it your understanding -- you understand that Seirus

1  does contend that there are other direct variable costs that

2  should be addressed?

3  A.  Yes.

4  Q.  And you understand that's part of their proof in their

04:37  5  case?

6  A.  Yes.

7  Q.  And then you will come back after that and address whatever

8  it is that gets presented?

9  A.  Yes.

04:37  10  Q.  Your understanding of the process we're going through?

11  A.  Yes.

12  Q.  What does Exhibit 5 show?

13  A.  Exhibit 5 shows the results of the analysis of starting

14  with HeatWave sales, subtracting the direct costs that were

04:37  15  summarized on the HeatWave report, also subtracting the

16  █████████ commissions to arrive at what I've called "marginal

17  profit on sales" of █████████.

18  Q.  And subject to actual proof of additional direct variable

19  expenses, would this be the disgorgement figure?

04:38  20  A.  Yes, this would be my opinion of the disgorgement of --

21  awaiting additional evidence of additional variable cost.

22  Q.  What was the other subject that you were asked to address?

23  A.  I was asked to develop an opinion of what would be a

24  reasonable royalty rate and also apply that calculation

04:38  25  relating to the utility patent claim.

1    Q.   I think I may have skipped over -- we started talking at

2    the outset how you approached the cases and how you get

3    information.   Did you conduct any interviews in connection with

4    your preparation of your opinions?

04:38    5    A.   Yes.   As part of analyzing reasonable royalty analysis, we

6    wanted to talk to Columbia executives and understand, you know,

7    their marketing practices.   We wanted to understand Omni-Heat

8    and the whole story of Omni-Heat, and so, yes, I interviewed

9    several Columbia individuals.

04:39    10    Q.   Who did you interview?

11    A.   We interviewed Adam Kelly, the inhouse counsel.   We

12    interviewed Scott Trepanier.   We interviewed Woody Blackford,

13    who's been on the stand for quite a while today.   We

14    interviewed Matt Merriman, and I believe we interviewed

04:39    15    Dr. Cole who previously testified.   I believe that might be

16    all.

17    Q.   When you say "we," you and others at Morones Analytics?

18    A.   Yes.   I had one primary assistant, her name is Jennifer

19    Murphy.   So we would try to do the interviews together.   There

04:39    20    might have been one or two that I was by myself, but we

21    typically try to do them together.

22    Q.   What are Ms. Murphy's credentials, qualifications?

23    A.   Her credentials are very similar to mine.   She has many

24    years of experience, and she's a CPA.   She has several forensic

04:39    25    accounting credentials.   She's a fabulous financial analyst in

1    this whole field.

2    Q.    Now, when we turn to the reasonable royalty, are we dealing

3    with a different set of products?

4    A.    Yes.    The reasonable royalty analysis is looking at the

5    utility patent claim of infringement, and there are a couple

6    differences with that analysis regarding the products that I

7    understand.    We understand that the infringement date is a

8    little bit later, so we have excluded the one month of

9    September 2013 from our data because I understand the

10    infringement date is December 2013.

11        And also the utility patent claim does not include these

12    products, and so we have subtracted out the products that are

13    not alleged to have infringed.    So the dollar amount of the

14    sales related to the utility patent were slightly less -- about

15    ███████ dollars less -- ███████ something -- less than the

16    design patent claim of ███████.

17    Q.    When you say ███████ less?

18    A.    A million less.    There's ███████, yeah, as opposed to

19    ███████.

20    Q.    I put back up Exhibit 705.

21            MR. AXELROD:    And could we highlight the center.

22    BY MR. AXELROD:

23    Q.    We talked briefly a little bit ago about style numbers 2116

24    in the silver style, and 2148 also in the silver style?

25    A.    Yes.

1    Q.    These are -- the style numbers are the product codes for

2    those products that Seirus excludes from the design patent?

3    A.    Yes.

4    Q.    Or excuse me --

04:42    5    A.    No, the utility patent.

6    Q.    The utility patent.

7    A.    Yes.

8    Q.    And if you go through the set of data that Seirus provided,

9    are you essentially adding up those two excluded categories?

04:42    10    A.    Yes.

11    Q.    The 2116 silver and 2148 silver?

12    A.    Yes, subtract them out, yes, the silver products as well as

13    the first yellow set of data which represents September 2013

14    for all products.

04:42    15    Q.    We've heard a little bit about the Georgia Pacific test and

16    the hypothetical negotiation.  Can you describe for the jury

17    what it is.

18    A.    The Georgia Pacific factors or test, Georgia Pacific

19    relates to a case, a very old case -- I think it's from the

04:42    20    '70s -- that set out guidelines for determining what might be a

21    reasonable compensation to pay a patent owner when a patent is

22    infringed.  And it's based on the idea of developing a royalty

23    rate to multiply times some sales number to compensate the

24    patent owner.

04:43    25        And the Court in the Georgia Pacific case set out 15

1    factors that should be considerations or questions to ask when

2    an expert or parties are trying to determine what will be a

3    reasonable royalty.   The 15 factors are summarized in a lot of

4    articles, a lot of books, and quotes in a lot of other cases as

04:43    5    well.

6         And they are also what I've used to develop my opinion of a

7    reasonable royalty, and this slide shows a listing of the

8    factors and a short description I've given of each one.   These

9    are my descriptions.   The actual factors have paragraphs of

04:43    10    multi-sentences of description of what they really are, what

11    are the questions, what are the considerations, and we will

12    show some of those, but these are the listings of the 15

13    factors.

14    Q.   When you say you're going to talk about some of those, are

04:44    15    you going to talk about those that you feel apply to this case?

16    A.   I'm going to talk about the most important ones that I feel

17    apply.   I did talk about some in my report that I'm not going

18    to talk about in my direct in order to try to condense the

19    presentation.

04:44    20    Q.   Are there some key premises that the Georgia Pacific

21    negotiation is supposed to follow?

22    A.   Yes.   My understanding is that the kind of key premise is

23    hypothetical -- that's super important -- hypothetical meaning

24    this never happened.   So we're trying to construct what could

04:44    25    have happened with certain assumptions.

1        And also I understand a key premise is eve of infringement.

2    The timing is just moments before infringement, meaning not a

3    year before, not two years before, but with the knowledge of

4    the situation, circumstances, facts that are in place on the

04:45    5    eve of infringement.

6    Q.    Now, the '270 patent issued in June of 2013.    When did you

7    place the time just before infringement would exist?

8    A.    Just mid-year 2013.    I personally didn't see a lot of

9    factors that are super time sensitive within that time period,

04:45    10    so June 2013.

11    Q.    Does the Georgia Pacific test require that the parties make

12    any assumptions about whether or not there was infringement of

13    the patent in their negotiation?

14    A.    Well, from my own understanding, the whole purpose of the

04:45    15    analysis is assuming infringement.    Otherwise, there's no

16    damage.    Damages are -- in a case like this, damages are zero

17    if there's no infringement, so my understanding of the whole

18    premise of Georgia Pacific, the eve of infringement, meaning

19    there is infringement.    And so if you back up to the eve of

04:46    20    infringement, then what do the parties know?    What did they

21    believe?    And because it's the eve of infringement, it assumes

22    infringement did happen.

23    Q.    Or there will be infringing --

24    A.    Yes.

04:46    25    Q.    -- past the eve?

A.    Yes.

Q.    Are there assumptions made as to the validity of the
patent?

A.    I would assume yes, because otherwise infringement --
infringement doesn't exist, so that's part of the infringement
assumption.

Q.    How, did you address the -- or approach the Georgia Pacific
factors in this case?

A.    Well, originally I went through each one and asked
questions of the Columbia clients, read documents.  For
purposes of presenting here today, to simplify this process
because it can be very long and tedious, I've summarized them
into themes, and I'm going to talk about them in terms of
themes instead of each one individually.  And so this slide
shows the four themes that I've created to group these
together.

The first theme I call "Columbia licensed position," and
that means what has been Columbia's history of licensing,
what's their posture toward licensing their Omni-Heat patient.
It's kind of some of the stuff that Matt Merriman talked about.
What are the relationships between the parties.  So what would
be the position of Columbia toward Seirus in the negotiation.

The second theme is -- I call it "patent use and commercial
success."  How did both parties use the patents and how did --
and what was the result?  What were the sales?  What was the

1    commercial success result?

2        The third theme is the entire market value rule.  I've

3    called it that.  This theme gets at whether or not I -- we

4    should be looking at a smaller subset of the product, or

04:48  5    whether we will apply the entire market value rule, which I

6    assume I will explain more about what that means.

7        And then the last theme is kind of a wrap-up.  It's -- and

8    it corresponds to factor number 15 what would be the result of

9    a hypothetical negotiation between the parties.  It really ties

04:48  10    together all of these factors and answers the question of,

11    okay, where do we end up after all of this consideration?

12    Q.   Shall we look at our first Georgia Pacific factor?

13    A.   Sure.  So the first theme that I talked about, the Columbia

14    license position, corresponds to the first factor, and this is

04:48  15    the text of the factor:  "The royalties received by the patent

16    owner for the licensing of the patent in suit proving or

17    tending to prove an established royalty."

18        So it's asking does -- has Columbia received royalties for

19    this patent in the past?  And the answer is yes.  We heard -- I

04:49  20    was here in the courtroom to hear the testimony about the

21    Columbia patents and regarding Omni-Heat.  And so I looked at

22    those, talked to the Columbia representatives about them, and

23    noted that Columbia had received royalties for the patent in a

24    range.  I think the next slide shows the range, lists the four

04:49  25    licenses, and the range of royalties between 7 and 15 percent.

1    And keeping in mind that this summary doesn't include those

2    minimum guarantees and some of the other financial terms, but

3    in terms of a royalty rate or a percent, Columbia has received

4    in the 7 to 15 percent range for the licenses that included

04:50    5    Omni-Heat.

6    Q.    Now, you note a couple of items on your slide.   What do

7    those refer to?

8    A.    These bullet points below were important considerations to

9    me in looking at these licenses.   The first, that was that all

04:50    10    of these licenses were with noncompetitive companies.

11    Mr. Merriman called them "partners" as kind of his term.   I

12    just look at those as those are companies that are in a

13    relationship to assist Columbia, not compete with Columbia.

14    And I believe that that -- that ties into another factor that

04:50    15    we'll talk about, but that's an important consideration in

16    understanding the rate of these licenses.

17        The second I've called "promotional burdens."   The

18    promotional burdens are obligations that the licensees have to

19    serve Columbia's best interest by the way that they -- by the

04:51    20    way that they position the branding or the technology, by the

21    way they market.   Columbia has complete control over what

22    channels the products are, what retail channels, what retail

23    stores they're sold into, and so they're obligations that are

24    in these licensing agreements that the licensees have to

04:51    25    fulfill in order to be in this relationship.

1  Q.   You were present for Mr. Merriman's testimony both on

2  direct and cross-examination?

3  A.   Yes.

4  Q.   And did you -- were you present when they walked -- he and

04:51  5  counsel walked through the various -- we'll call them

6  promotional burdens or obligations and responsibilities that

7  the licensee under the Columbia licenses that permit other

8  people to use Omni-Heat Reflective, how do you address those in

9  evaluating their impact on a reasonable royalty that might be

04:52  10  negotiated in a hypothetical negotiation?

11  A.   Well, I think you have to -- in this factor, you're

12  evaluating what's -- what exists.   What's preexisting.   We have

13  these four licenses.   They exist.   But we have to understand

14  what goes along with them and then compare that to the

04:52  15  hypothetical negotiation and look to see would that come along

16  with a hypothetical negotiation.

17       Well, I understand the hypothetical negotiation scenario to

18  be that Seirus would use the patent design -- we're not talking

19  about design in this, but this is what they did.   They've been

04:52  20  using the design, and they would use the functionality, the

21  utility, in their gloves and put their logo on it, and so none

22  of these promotional burdens would exist in the hypothetical

23  scenario.   And so to me that means that these royalty rates are

24  lower than what the hypothetical royalty rate would be because

04:53  25  Seirus is not serving Columbia's best interests.   Seirus is not

1    serving all of these different categories of obligations, so in

2    order to compensate for that, the royalty needs to be higher.

3    Q.    So in the hypothetical negotiation, do I understand

4    correctly the license that Seirus would get would be a license

04:53  5    to the '270 patent?

6    A.    Yes.

7    Q.    Or certainly at least the claims would -- would apply, and

8    then Seirus would then be free to make, sell, or import

9    products under that patent without any other restrictions?

04:53  10    A.    Yes, that's the way I understand the hypothetical

11    negotiation framework is to look at what actually happened as

12    a -- as how -- as what would be the assumptions in the

13    hypothetical negotiation.  Seirus would have not put Columbia

14    logo on it.  Seirus would have promoted it however they wanted

04:54  15    to promote it; and so, therefore, Columbia would be in the

16    position to not be served in the way that they demand in their

17    license and would need additional compensation for that

18    scenario.

19    Q.    There were some questions of Mr. Merriman about bundles of

04:54  20    rights or people who were wanting to characterize it as bundles

21    of rights to be divvied up among the rate.  Is that how a --

22    these four licenses work?

23    A.    Well, no.  As Mr. Merriman testified that Columbia doesn't

24    view the different patents or trademarks inside of the license

04:55  25    as separate assets to be separately valued.  I think -- I

1    shouldn't say I think.

2        I know Mr. Merriman said on one of the phone calls that

3    anyone who wants to license Columbia, 10 percent is the

4    starting point no matter what it is.   Whether it's just -- you

04:55    5    know, that's just the starting point, so it doesn't matter

6    what's included inside in their -- the way that they license

7    themselves.

8    Q.    Can any of these licensees shown on slide 11, Delta Galil,

9    The Outdoor Recreation Group, London Luxury, or OCS, sell any

04:55    10    Omni-Heat product without paying the applicable royalty and

11    assuming the promotional burdens that go with the license?

12    A.    No.   That would be a breach of contract if they did that.

13    Q.    What's the next Georgia Pacific factor in this group?

14    A.    The next factor that I want to discuss is factor number 4,

04:56    15    "The license or established policy and marketing program to

16    maintain its patent monopoly by not licensing others to use the

17    invention, or by granting licenses under special conditions

18    designed to preserve that monopoly."

19    Q.    Can you translate that into --

04:56    20    A.    Yes.   This just refers to what Columbia's position is with

21    respect to the Omni-Heat patent, and that is as Mr. Merriman

22    testified.   I don't need to repeat all of it, but that they had

23    only licensed four licenses that they felt fit the criteria of

24    their licensing principles, and which is reflected in this

04:56    25    excerpt from their internal licensing document that

1    Mr. Merriman drafted, that the license for Omni-Heat -- and
2    their other licenses need to be profitable, brand-enhancing,
3    and uniquely Columbia.  And that to me fits that factor very
4    well, that Columbia very carefully protects its trademarks, its
04:57  5    patents, and doesn't allow any competitors access to it except
6    for unique circumstances that benefit Columbia.
7    Q.   So factor 4 is essentially what is the attitude of the
8    patent holder in this case with respect to whether he wants to
9    license or whether he wants to preserve his monopoly?
04:57  10   A.   Yes.  And one thing I forgot to mention about these factors
11   is each of these factors goes to royalty rate, and so if the
12   answer is yes, they preserve a monopoly, that would indicate a
13   higher royalty rate.  If no, they didn't, if they opened it up
14   to everyone, and it was all unrestricted licenses, that would
04:57  15   indicate a lower royalty rate.  So for each of these factors
16   you have to ask the questions, evaluate the information; and
17   the expert and the parties, the hypothetical negotiators, will
18   determine does that mean that I need to go up, or does that
19   mean that I need to go down.
04:58  20   Q.   And is that actually what the jury function will be under
21   the instructions?
22   A.   Yes, that will be your assignment at the end of this trial.
23   Q.   What's the fifth factor?
24   A.   The fifth factor that fits into this first theme is the
04:58  25   commercial relationship between the licenser and the licensee

1    such as whether they are competitors in the same territory, in

2    the same line of business, or whether they are inventor and

3    promoter.

4    Q.    And what do we have here?

5    A.    We have competitors, and that was something evidenced in

6    several different places, but Mr. Carey in his deposition

7    acknowledged, said at this time, Seirus and Columbia shared a

8    competitive space in snow sports.

9         The question:   "But did Seirus consider Columbia to be one

10   of its competitors?"

11        The answer:   "Yes."

12   Q.    So how does that factor into where you would think the

13   royalty rate would go, or what the patent holder and infringer

14   would agree to?

15   A.    If we can go to the prior slide with the text of the

16   factor, the answer is it would increase the royalty rate, and

17   the reason is because in this factor, it's contrasting a

18   competitor relationship with an inventor-promoter relationship.

19   An inventor-promoter relationship is one where the inventor

20   doesn't have any ability to market and distribute its products,

21   so it will find another company and promoter, and that promoter

22   will help maximize the value of the patent through its ability

23   to promote and sell and manufacture.

24        We don't have an inventor-promoter relationship here.   We

25   have a competitor relationship, so that means that in the

1   hypothetical negotiation, Columbia would view Seirus as a

2   threat and a harm to them and would want more compensation in

3   order to license the patent.

4   Q.   Could you describe what's shown in slide 16?

05:00   5   A.   Slide 16 -- and by the way, I don't see the slide numbers

6   on mine.   This next --

7   Q.   It's a factor 5 relationship?

8   A.   Right.

9   Q.   Exhibit 472 for the record -- 372.

05:00   10   A.   Yes.   It is an excerpt from an internal Seirus document

11   that shows a summary of a Seirus discussion with one of their

12   customers, and down in the -- well, it says "topic."   It was

13   actually a spreadsheet that was kind of a log of customer

14   comments and communications, and the topic was the HeatWave

05:00   15   glove, and the discussion says what this customer says, "Good

16   technology story with a dual technology story.   She likes that

17   our technology one-ups Columbia's.   She wants to know if we

18   are" -- and by the way, the A-R-R-E was in the original.

19   That's not my typo.   "We are going to provide her staff with

05:01   20   product to use so they'll be able to support and sell the

21   product."

22   Q.   And is this an example of Seirus salespeople going in and

23   selling HeatWave directly against Columbia products?

24   A.   Well, it was the customer saying that they liked that it

05:01   25   one-upped Columbia, so the customer is acknowledging that it's

1  a competitive relationship.  So I mean Seirus is acknowledging

2  it, too, through the discussion with the customer.

3  Q.   Now, is that all the factors that you grouped in your first

4  category that basically focuses on the licenses already

05:01  5  existing and the character of the relationship?

6  A.   Yes.

7  Q.   What was the second -- the next theme among the group

8  factors that you are going to evaluate?

9  A.   The next theme I believe is the -- is how the parties used

05:02  10  the patent, and what was the resulting sales and commercial

11  success of the patent.  So --

12  Q.   Factor 8?

13  A.   Yes.

14       THE COURT:  Since we're moving to a new section, it is

05:02  15  exactly 5:00.  Why don't we take our recess for the evening.

16       Members of the jury, we'll be in recess till tomorrow

17  morning.  Same time.  Same place.  Have a good evening, and I

18  will see you then.

19       (Proceedings held outside the presence of the jury panel.)

05:03  20       THE COURT:  You may step down.

21       Is this your last witness?

22       MR. AXELROD:  Yes.

23       THE COURT:  Okay.  You'll be resting tomorrow in the

24  middle of the morning maybe?

05:04  25       MR. AXELROD:  Subject to resolution of the product

1    issue.

2            THE COURT:  I'm sorry?

3            MR. AXELROD:  Well, I understand they're giving us a

4    list and bringing in the products that they contend --

05:04    5            THE COURT:  Oh, thank you.  I just needed a reminder

6    what you were talking about.  It's been a long day.  Yes,

7    subject to that, and then he'll be resting.  Okay.

8            MR. MARCHESE:  One thing, Your Honor.

9            MR. SPROUL:  We have a motion for reconsideration,

05:04    10   Your Honor, three pages on the product issue to preserve our

11   objection to this and to give you some framework for our

12   position vis-a-vis the burdens here with respect to who needs

13   to identify products and what Columbia should have done during

14   discovery and are now trying to force us to do.

05:05    15           THE COURT:  Okay.

16           MR. SPROUL:  May I hand it to you, or would you like

17   us to file?

18           THE COURT:  You can leave it with Bernadette.  She'll

19   give it to me.  Thank you.

05:05    20           MR. SPROUL:  Thank you, Your Honor.

21           THE COURT:  See you tomorrow morning.

22                           ---000---

23

24

25

1    C-E-R-T-I-F-I-C-A-T-I-O-N

2

3        I certify that the foregoing is a correct transcript from

4    the record of proceedings in the above-entitled matter.

5

6        Dated September 21, 2017, at San Diego, California.

7

8
                         /s/ Dana Peabody
9                        Dana Peabody,
                         Registered Diplomate Reporter
10                       Certified Realtime Reporter

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1       United States District Court

2       For the Southern District of California

3

4                                          )
        COLUMBIA SPORTSWEAR NORTH          )
5       AMERICA, INC., an Oregon           )    No. 17-cv-1781-HZ
        corporation,                       )
6                                          )    September 22, 2017
                                           )
7            Plaintiff,                     )    San Diego, California
                                           )
                  v.                       )
8                                          )
        SEIRUS INNOVATIVE ACCESSORIES.     )
9       INC., a Utah Corporation,          )
                                           )
10                                         )
             Defendant.                    )
11

12

13                      Volume 5 - AM Session

14           Reporter's Transcript of Proceedings

15        BEFORE THE HONORABLE MARCO A. HERNANDEZ

16              United States District Judge

17

18

19

20

21

22

23  Court Reporter:         Dana Peabody, RDR, CRR
                            District Court Clerk's Office
24                          333 West Broadway, Suite 420
                            San Diego, California, 92101
25                          DanaPeabodyCSR@gmail.com

```
 1        APPEARANCES:

 2

 3        For the Plaintiff:        SCHWABE, WILLIAMSON & WYATT, P.C.
                                    NIKA F. ALDRICH, JR., ESQ.
 4                                  DAVID W. AXELROD, ESQ.
                                    BRENNA LEGAARD, ESQ.
 5                                  1211 SW 5th Avenue, Suite 1900
                                    Portland, Oregon 97204
 6

 7        For the Defendant:        FISH & RICHARDSON, P.C.
                                    CHRISTOPHER S. MARCHESE, ESQ.
 8                                  SETH M. SPROUL, ESQ.
                                    12390 El Camino Real
 9                                  San Diego, California 92130

10

11        For the Defendant:        MARKOWITZ HERBOLD, P.C.
                                    RENEE ROTHAUGE, ESQ.
                                    1211 SW Fifth Avenue, Suite 3000
12                                  Portland, Oregon 97204

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1  Case:  Columbia v. Seirus
   Date:  September 22, 2017
2

3
                         INDEX OF WITNESSES
4
   FOR THE PLAINTIFF:
5                                      E X A M I N A T I O N
                                 DIRECT   CROSS REDIRECT RECROSS
6
   Serena Morones
7    Mr. Axelrod                    1186              1287
     Mr. Marchese                        1205
8

9                         INDEX OF EXHIBITS

10 EXHIBIT                                      EVIDENCE

11 94                                              1289

12 703                                             1289

13 737                                             1288

14 1433                                            1290

15

16

17

18

19

20

21

22

23

24

25

1    San Diego, California, September 22, 2017

2    *  *  *

3    (Proceedings held outside the presence of the jury panel.)

4        THE COURT:   Please be seated.

08:34  5    I wanted to take up a couple of things that were on my

6    list, and I'm sure you may have things on your list as well.

7        Working our way backwards, the motion for reconsideration

8    regarding Columbia's burden to prove infringement, I don't look

9    at it as a shifting of the burden of proof.  I look at it as a

08:34  10   discovery issue.  The discovery issue is are they entitled to

11   know which products have the shiny thing on the outside.  They

12   are.  And that's all I'm asking you to disclose.

13       MR. SPROUL:   Okay, Your Honor.  We appreciate that.

14       THE COURT:   All right.  So this motion is denied.

08:34  15       MR. ALDRICH:   Thank you, Your Honor.

16       THE COURT:   Then Columbia filed a motion regarding

17   experts Distler and Block.  It's a discovery beef as I see it,

18   again.  I've started to read through the motion, and I've read

19   your response.  I'm not -- let me stop for a second.  Are you

08:35  20   planning on calling any of those witnesses today?

21       MR. SPROUL:   Dr. Block will likely go up today,

22   Your Honor, and briefly talk about the subject matter of

23   article of manufacture today.

24       THE COURT:   Okay.  So it seems to me that the motion

08:35  25   actually has a legal issue, at least not so much in regards to

1  Dr. Block, but as regards Distler, a legal issue wrapped up in
2  that, and that is if the jury determines that the article of
3  manufacture is something less than the whole, how then -- what
4  do they do with that?  What's the next step that they're going
08:35  5  to do with that?  And I think that is a law question, not a
6  fact question in part.  And that is what is the measure that is
7  going to be damages for the component?  How do you look at it?
8  How do you decide it?  And, honestly, I am wrestling with that
9  answer right now because I think it will affect the jury
08:36  10  instructions and how I tell the jury to do their job at the end
11  of the trial.
12      One way to look at it is to say that I want the jury to
13  figure out what the total value of the glove would be; figure
14  out how much of that total value the component would add or
08:36  15  added to that.  And when I say value, I'm talking about
16  profits, total profits.  How much of that total profit is
17  attributable to the component, and then that becomes the
18  measure of damages.
19      That is different than what I think the defense is trying
08:37  20  to do, and I don't even know what the plaintiffs are trying to
21  do on that measure of damages, but I don't know what the answer
22  to that is, but I think I'm going to have to instruct the jury
23  to use that type of a methodology, or alternatively kind of
24  what the -- I think the defense is suggesting where you look
08:37  25  through each cost and is it attributable to making that

1    component as opposed to the entire glove and deduct that out of

2    the value of the product.  I, as you can tell because I'm

3    having such a hard time articulating it, that I'm wrestling

4    with what the right answer to this is, but I do believe it

08:37    5    involves a law question, not just a fact question.

6         MR. MARCHESE:  I think that -- it seems to me from

7    reading the case -- the paucity of case law on the issue and

8    the articles that have been written about this issue, is that I

9    think you could -- it would depend on the facts and

08:38    10    circumstances -- could depend on the facts and circumstances

11    about how it's done.

12         Some cases like the iPhone, the Apple Samsung case, the

13    design is kind of bound up in the product, and then it's not

14    separately sellable.  You're not going to take that iPhone case

08:38    15    out and sell it to somebody.  But I think -- and that might be,

16    I think, more akin to the scenario you describe the first

17    instance.

18         I think in our instance here -- I think we've got evidence

19    in on in this -- there's a separate roll of fabric that comes

08:38    20    off the line from company -- fabric maker A.  That has actually

21    got a value.  It's got a dollar associated with it, and then

22    that is provided to another manufacturer who then puts it into

23    a glove.  I think Columbia does the same thing as Seirus does

24    in that regard.  So in this instance, it feels to me like it is

08:38    25    a different factual scenario because there is a separate

1  article.  You could sell it to Columbia; you could sell it to

2  Seirus; you could sell it to Athleta.  It could go wherever.

3  It's a roll of fabric, and I think that's different from the

4  iPhone case.

08:39  5       THE COURT:  Yeah, I'm not prepared to rule on this

6  issue.  You can tell that I'm struggling with what the answer

7  to this is.  And maybe you all can -- I don't know if you've

8  directly addressed the point that I'm raising which is what do

9  I tell the jury to do at the end in figuring out if the article

08:39  10  of manufacture is something less than the entirety.

11       MR. MARCHESE:  Right.

12       THE COURT:  Then how do you figure out what the

13  damages are?

14       MR. MARCHESE:  Well, we -- to that end, Your Honor,

08:39  15  we'd actually just before you came in the room we -- we're

16  going to discuss jury instructions tomorrow morning.  Maybe we

17  can make some headway in that regard and reach an agreement and

18  kind of, you know, give you some sharp disputes to deal with in

19  that in terms of the jury instructions.

08:39  20       THE COURT:  Yeah, I mean if you want to send me some

21  briefing on that point, how do I instruct the jury regarding

22  how to assign damages if the article of manufacture is

23  something less than the entire piece.

24       MR. MARCHESE:  Okay.  We can work on that.

08:40  25       THE COURT:  That's how I'd frame the question.

1          MR. ALDRICH:  We still have the issue that Dr. Block

2    is going to testify today that the glove is made of several

3    components.  One of those components is labor.  One of those

4    components is shipping costs.  One of those components is

08:40  5    know-how.  These are all components where in Apple v. Samsung,

6    the Supreme Court was very clear that a component is a thing

7    made by man.  So those are not legally components, and he

8    should not be able to tell the jury something that is legally

9    wrong.

08:40  10         Now, the larger question about how to apportion is

11    something that's going to come up with Ms. Distler, and she's

12    not going to testify today, so we have the weekend to wrangle

13    with that sort of legal issue before Your Honor rules about

14    whether she can testify about this issue.  But I don't think

08:41  15    that Dr. Block should be permitted to testify today that labor

16    and know-how and shipping and freight and all of these other

17    expenses, taxes, that all these other expenses that go into the

18    final product of a glove are components because it's legally

19    unsupportable.  It's just wrong.

08:41  20         THE COURT:  Okay.  That's what I'm wrestling with.

21         MR. SPROUL:  Maybe I can clarify things.  So

22    Dr. Block's going to limit his testimony on the components of

23    physical pieces.  It's a misrepresentation or a mistake on

24    Mr. Aldrich's part that he's going to talk about costs.

08:41  25    That's -- the financial part is Ms. Distler.  It is not

1   Dr. Block.  He's going to talk about what the different

2   components are, and his testimony will be limited to the

3   physical components.

4            THE COURT:  Okay.  That solves that then.  His

08:41   5   testimony will be limited to the physical components.

6            MR. ALDRICH:  Okay.  Perfect.  Thank you, Your Honor.

7            MR. MARCHESE:  Solved one.

8            THE COURT:  There was something else I wanted to talk

9   to you about, but I don't remember what it was off the top of

08:42   10   my head.

11           MR. AXELROD:  Can I bring up kind of an overall

12   scheduling issue?

13           THE COURT:  Certainly.

14           MR. AXELROD:  From the exchanges between the parties,

08:42   15   they're planning to get through Dr. Block today, maybe, finish

16   up on Monday.  We would do our rebuttal.  I'm assuming our

17   rebuttal will extend into Tuesday.  It seemed to me that the

18   afternoon of Tuesday might be a good jury instruction session

19   with the Court and openings -- or closings on Wednesday, when

08:42   20   everybody's fresh, and go to the jury.  That's kind of a

21   recommendation that I'm seeing coming out of the general

22   exchanges of what we anticipate.  I don't know if that fits

23   with the Court's --

24           THE COURT:  Finishing early?  Of course it fits with

08:42   25   my schedule.  I'm scheduled to go to Hawaii the following week,

1    and I was -- you all had me nervous.

2         MR. MARCHESE:  Question:  Do we get a bit of rebuttal

3    to their rebuttal on article of manufacture because that's --

4    according to the rulings of the Court, it's our burden to come

08: 43    5    forward with burden of production on the article of manufacture

6    and the profits.

7         THE COURT:  Probably not.  Let's see how it unfolds.

8    I wasn't planning on giving you rebuttal to their rebuttal.

9         MR. MARCHESE:  We would -- and I don't know if we

08: 43    10    would need it, but I just wanted to know what we should

11    anticipate in our case in chief on that point.  It seems like

12    we should cover the bases as completely as we can, and if

13    there's anything left over, I would just ask the Court to at

14    least give us the -- if it appears that we need to respond to

08: 43    15    something, to give us an opportunity to do that.

16         THE COURT:  I'll keep an open mind about your

17    suggestion.

18         MR. MARCHESE:  Thank you.

19         THE COURT:  I want to hear how it unfolds.  We'll

08: 44    20    decide.  It may be that you just have a couple questions that

21    you need to wrap up.  I'm probably going to be okay with that,

22    but let's see.

23         MR. MARCHESE:  I would think it would be very tight.

24    Less than an hour or something like that.

08: 44    25         THE COURT:  To me very tight is five minutes.

1        MR. MARCHESE:  Lawyers like to talk.

2        THE COURT:  Okay.  Let's see.  What else?  Were there

3   any other motions that were out there?  Again, the wave of

4   filings has overtaken me, and I can't even keep up with all of

08:44    5   them.  I know that a lot of them are just exhibit lists, but I

6   don't know if there's anything else that I need to decide other

7   than the issue that I already raised regarding the experts.

8        MR. SPROUL:  Your Honor, perhaps we could address

9   Dr. Block's testimony in advance and address one particular

08:44   10   objection -- or number of objections that fall under one

11   umbrella with respect to his testimony that we've talked to you

12   about multiple times I thought was resolved.  Apparently it's

13   not.  And that is with respect to his testimony regarding

14   obviousness.

08:45   15        I understand Columbia objects to any testimony at all, any

16   opinion on obviousness, and as I told you in the pretrial

17   conference or the pretrial-pretrial conference, he's going to

18   limit his obviousness analysis to Fottinger plus Worley,

19   Halley, Vaughn, and Blauer, and those four references he would

08:45   20   rely on only for the teaching of a particular coverage

21   percentage, 30 to 70, 50 percent, et cetera.

22        Columbia has objected that Dr. Block hasn't fully exposed

23   his opinion in his report, and he's therefore precluded, and

24   I'd like to address that prior to the time that he goes up on

08:45   25   the stand because I think that Your Honor will see that, in

1    fact, he did fully disclose those opinions, maybe not into

2    words, "Fottinger plus Vaughn," that counsel would like to see,

3    but that's not what's required, and if I may read into the

4    record what he said.  It's very brief, but I think it

08:46    5    should --

6              THE COURT:  I think you're right on that point,

7    actually.  If you want to keep talking and try to convince me

8    otherwise, you're welcome to do so, but let me hear from them

9    first, because I think you're right.

08:46    10              MR. SPROUL:  Thank you, Your Honor.

11              MR. ALDRICH:  It might be helpful if I pull up a

12    portion of Dr. Block's report.

13              THE COURT:  Why is it -- I mean again what I recall

14    reading was they are not using the other references for heat

08:46    15    direction.  They're only using them for the 30 to 70 percent.

16              MR. ALDRICH:  Right.

17              THE COURT:  And I think Dr. Block almost with every

18    reference said it didn't meet 30 to 70 percent.

19              MR. ALDRICH:  Okay.  So just a moment.  We'll pull up

08:46    20    the report so we can look at it.  Does Your Honor have it here?

21         Can we go to page 4.  And can we zoom in on the bottom

22    portion of the page.

23              MR. SPROUL:  Perhaps we could short-circuit this.

24              MR. ALDRICH:  I'd like to make my point.

08:47    25              THE COURT:  Hang on a second.  I like short circuit.

08:47
1    MR. SPROUL:  We are not relying on the disclosure in
2  appendix 11, and so this is additional disclosure that
3  certainly can't be held against us, but the disclosure we're
4  relying on is in the body of his report, two paragraphs, and I
5  think once Your Honor sees it, it will be clear that he has
6  disclosed this opinion on which he's going to testify.

08:47
7    MR. ALDRICH:  Your Honor, what he does in his main
8  report is he says, "You could mix anything with anything else."
9  And then in this -- in appendix 11, he provides the detailed
10  analysis for this.  In the detailed analysis he provides each
11  piece of prior art, and he identifies the secondary reference
12  to which he's going to rely.  And so here he's got Fottinger,
13  and at the bottom you see the list of references he's going to
14  rely on with Fottinger.  And -- and it's Vaughn, Halley,

08:48
15  Blauer.
16    Now, first of all, they want to introduce a combination of
17  Fottinger with Worley, and you'll see that Worley is not
18  mentioned here anywhere, so this is new opinion that's not in
19  his report.  He provides detailed analysis with respect to

08:48
20  these, but never in his report does he put Fottinger with
21  Worley, and Dr. Block wants to testify about that combination
22  today.  So that's issue number one.
23    But if we can move beyond that -- let's go to the next
24  paragraph, and, again, he says here -- you know, the point is

08:48
25  each of these provides heat-directing elements with a 30 to 70

1  percent coverage ratio.

2      So if we could zoom in on the next paragraph.

3      Here is the motivation to combine.  "All of the

4  aforementioned references are analogous art because they are

08:48   5  directed to and can be applied to the similar problem of

6  providing heat management to a base material."  That's the

7  motivation to combine.  But Your Honor has since ruled that

8  none of them are.  None of them have heat-directing elements.

9  None of them are heat management materials.

08:49  10      And so what he's going to testify about today, if he's

11  going to testify about an obviousness combination of any of

12  these is inherently going to go beyond the scope of his report

13  because his report -- the motivation to combine was -- like the

14  foundation of it is that they are analogous art because they

08:49  15  all relate to the idea of providing heat-directing elements.

16      And that continues in the last part of the same sentence,

17  and it continues on to the next page, page 5, first paragraph,

18  "Upon review of Fottinger" -- sorry.  First full paragraph.

19      "Upon review of Fottinger, a person of ordinary skill in

08:50  20  the art would have recognized that the elements applied to the

21  base material could provide heat management."  But Your Honor

22  has since ruled that that's not the case.  None of those pieces

23  of prior art can provide heat management.

24      If you skip a sentence, it talks about "Such a modification

08:50  25  is nothing more than using a known technique providing heat

1    direction with a known device for improvement."  But Your Honor

2    has since held that none of them provide heat direction.

3    And if you go on to the next paragraph, same problem.  He

4    relies -- he says -- as part of the motivation to combine, he

08:50    5    says that "They perform in a similar manner and still provide

6    the performance desired by the teachings of Fottinger; i.e.

7    heat direction."  And again Your Honor said they don't have

8    heat direction.

9    So the problem is Dr. Block, in providing his opinion that

08:50   10    you could combine Fottinger with anything, has said the reason

11    you would do that is because they all relate to heat direction,

12    and, indeed, throughout his report he tried to make this

13    argument that waterproof shells are related to heat direction,

14    and Your Honor granted our motions that none of that is

08:51   15    correct.  And so he cannot testify today about any motivation

16    to combine that doesn't -- that isn't undermined entirely by

17    the Court's grant of our summary judgment motions to the

18    contrary.

19    THE COURT:  Does Fottinger teach heat direction?

08:51   20    MR. ALDRICH:  Fottinger teaches the idea of heat

21    direction.

22    THE COURT:  I understood that they were going to use

23    Fottinger for heat direction and the others for 30 to 70

24    percent.

08:51   25    MR. ALDRICH:  I understand, but they have to identify

1    motivation to combine, a reason why somebody of ordinary skill

2    in the art would have done that, and what Dr. Block has

3    testified in his report is that the only reason you would do

4    that is because they all relate to the topic of heat direction.

08:51    5    They no longer have that because Your Honor has ruled that they

6    don't.  So they no longer have any motivation to combine to put

7    before the jury.

8            MR. SPROUL:  If I may address that because this is the

9    crux of the issue, and he's wrong, and I can show you.  There's

08:52    10   two examples, and the motivation to combine is unrelated to

11   heat management.  It's directed to the benefit of coverage and

12   changing the coverage.  More coverage, less air flow; less

13   coverage, more air flow, that applies regardless of heat

14   direction.  Heat direction doesn't have anything to do with air

08:52    15   flow.

16        Paragraph 1382, page 275, if I could ask counsel's --

17            THE COURT:  Tech.

18            MR. SPROUL:  Tech -- thank you -- to pull up paragraph

19   1382.

08:52    20           MR. ALDRICH:  What's the exhibit number?

21            MR. SPROUL:  It's his expert report, and I don't have

22   his exhibit number.

23            MR. ALDRICH:  All I have pulled up is his appendix.

24            MR. SPROUL:  Let me read it because it's simple

08:52    25   enough.  "Indeed upon review of Rand '875 or any of the

1  references as a primary reference."  So Dr. Block provided

2  detailed analysis for ten separate references, every element.

3  Your Honor ruled that some of those elements weren't met.

4  Fine, those elements -- but he's referring back to his copious

08:53  5  detailed analysis of every one of these references.  He says,

6  "A person of ordinary skill in the art would have recognized

7  that the elements applied to the base material could provide

8  heat management by, for example, heat direction.  Thus a person

9  of ordinary skill in the art would have been motivated to look

08:53  10  to the teachings of the secondary references to identify a

11  desirable range of percentage coverage thereby providing this

12  capability.  A person of ordinary skill in the art would have

13  readily recognized the wide-ranging benefits, advantages, and

14  predictable results provided by such a combination.  The heat

08:53  15  management of Fottinger as one of the primary references plus

16  any of the other two references as they relate to the desirable

17  range of coverage."  That's the motivation to combine.

18     Paragraph 1388.  "In view of this confirmation and the

19  admitted prior art in the asserted patent, it appears that the

08:54  20  only arguably novel aspect of the asserted patents is the 30 to

21  70 percent surface area coverage limitation, but as already

22  discussed herein, such coverage for the purposes of retaining

23  the base fabric's transfer properties; e.g., breathability,

24  moisture wicking, et cetera, was already disclosed by several

08:54  25  references including, for example, not limiting, Vaughn and

1       Halley that expressed a disclosed 30 to 70 percent ratio, and

2       several other references that disclose coverage ratios within

3       the claimed range."

4           Again, these coverage ratios are all clearly laid out

08:54   5       earlier in his report.  For instance, if we go to the Worley

6       section, which is 10 to 15 to 20 pages worth of disclosure, he

7       says, "Worley, for example, discloses that according to some

8       embodiments, the coating will cover from about 50 to about 90

9       percent."  The coverage ratios are disclosed expressly in the

08:55   10      earlier portion of his report, and later on he says you take

11      those coverage disclosures and you combine them with any of the

12      other references because, in fact, these are all mungeable

13      together, and so I think he's fully disclosed that he has a

14      basis to testify, Your Honor.

08:55   15          THE COURT:  I agree.

16          MR. ALDRICH:  What about combination of Fottinger with

17      Worley?  That was not disclosed in the section that I -- in

18      appendix 11.

19          THE COURT:  I'll tell you the names all kind of get

08:55   20      muddled in my head.

21          MR. SPROUL:  We're not relying on that portion of the

22      appendix as the basis for our disclosure.  It's this earlier

23      portion in his report where he says, "Here's the disclosure of

24      Worley.  Here's the disclosure of Fottinger," and then later on

08:55   25      he says, "Look, all these disclose some coverage limitation,

1   and those provide certain benefits, and you would combine those

2   benefits of different coverage limitations with any of the

3   other primary references."

4       The purpose here is notice.  They knew what we were saying

08:56   5   Worley discloses.  They knew that we were --

6           THE COURT:  It's in the report.

7           MR. SPROUL:  Yes, Your Honor.

8           THE COURT:  If it's in the report, they get to use it.

9           MR. ALDRICH:  I mean that sentence started with "if,"

08:56   10  and I don't think it's in the report, but okay.

11          THE COURT:  They're telling me that it is.

12          MR. ALDRICH:  I understand.  That's their job.

13          THE COURT:  I can't -- I don't have the report in

14  front of me.

08:56   15          MR. ALDRICH:  Okay.  There are a few other slides that

16  we mentioned yesterday we had concerns that Dr. Block might go

17  off the page, and indeed they have some additional slides that

18  have some further opinions that are not contained in his

19  report.  They are -- and I'll read this for their benefit --

08:56   20  528, 531 to 32, 538 to 39, and 557.  And I don't know if they

21  want to call those up, but one of them, Dr. Block was opining

22  about how mesh works.  The word "mesh" doesn't even show up in

23  his report.  One of them is relying on some portions of Halley

24  for the performance of percent coverage.

08:57   25          MR. SPROUL:  We've withdrawn the Halley -- I'm

1    sorry -- not for the percent coverage, but we've withdrawn the

2    Halley reference with respect to its criticism of Blackford's

3    declaration.

4            MR. ALDRICH:   Okay.   So that resolved two of them.   So

08:57  5    the -- there was an opinion about mesh in there.

6            MR. SPROUL:   So the mesh issue, Halley, as they

7    testified to yesterday, I believe is a two-page document.

8            MR. ALDRICH:   Fottinger is.

9            MR. SPROUL:   Excuse me.   Fottinger is a two-page prior

08:57  10   art reference.   It discloses one embodiment.   It discloses a

11   test.   The parties argued extensively about what this test

12   meant.   Dr. Cole has an extensive rebuttal on the test.   Notice

13   that Dr. Block did not put the word "mesh."   In setting up the

14   test Fottinger, in his articulation what he did, describes

08:58  15   the base.   25 mesh, it's an industry standard term.

16   Dr. Block's simply has a screen with the language from the

17   patent and a picture illustrating what that is.

18           THE COURT:   If it's in Fottinger, your objection is

19   overruled.

08:58  20           MR. SPROUL:   Thank you, Your Honor.

21           MR. ALDRICH:   If it's in Fottinger at all.

22           THE COURT:   It's prior art that was already discussed

23   as I understand.

24           MR. ALDRICH:   But Dr. Block is going to give new

08:58  25   opinions today about how this particular embodiment works based

08:58

1  on an opinion he's providing about different types of mesh and
2  how -- how adhesives would go through different types of mesh.
3  There are like six different types of mesh standards.  He
4  didn't provide any analysis about -- he didn't -- the word
5  "mesh" doesn't even show up in his report, notwithstanding the
6  section of the report that he's going to testify on.  That
7  doesn't show up in his report either.  This is entirely new
8  testimony.  He's going to provide new opinions that we've had
9  no discovery on, no disclosure on, and I mean there's just

08:59

10  nothing in the report.  He doesn't even mention the test that
11  was performed by Fottinger.  Like the last two paragraphs of
12  Fottinger is a test, he doesn't even mention that test as the
13  basis for any of his opinions in his report.

14       MR. SPROUL:  That's not true.  He actually does refer

08:59

15  to the test, and he says Fottinger describes this test, and
16  then he goes on to talk about the results of the test which is
17  Fottinger takes a picture with the thermal camera showing one
18  side is warmer than the other.  Dr. Cole rebutted that, or at
19  least attempted to, by saying, "It's not from reflection.  It's

08:59

20  from conduction."
21       Again, Fottinger is a singular reference, singular
22  embodiment; it's fully disclosed, analyzed.  They've had
23  notice.

24       MR. ALDRICH:  I don't know how to tell Your Honor

08:59

25  otherwise in any more emphatic terms, but the reality is that

1  this is a new opinion that simply was never disclosed, and he

2  did not mention these opinions before, and I'd be happy to

3  provide the slide to you, and they could identify the portions

4  of the report that they think cover that, and maybe over lunch

09:00  5  Your Honor could have a look and see if he can find this in

6  there, but it's just not there.

7          THE COURT:  Will you be able to do that if they can --

8  can you point me to the report?

9          MR. SPROUL:  Certainly, and we do not assert that he

09:00  10  used the word "mesh."  He did refer to the test.  And he talked

11  about it, so if you would like the discussion, we'll provide it

12  to Your Honor.

13          THE COURT:  And I don't know when you're planning on

14  calling Dr. Block.

09:00  15          MR. SPROUL:  I expect 2:30ish, 3:00.

16          MR. ALDRICH:  It will definitely be after lunch.  I

17  don't have the slide numbers here, but we talked about --

18      Seth, do you have the slides handy?

19          MR. SPROUL:  Which slide are you referring to?

09:00  20          MR. ALDRICH:  I had 528 as one of them.  This is the

21  other section is -- Dr. Block's providing opinions about

22  Columbia's fabrics here, but Dr. Block never studied Columbia's

23  fabrics and never provided an opinion about it.

24          MR. SPROUL:  Your Honor, Dr. Cole in rebuttal to

09:01  25  Dr. Block's invalidity report, measured the Omni-Heat coverage

1    ratios.  These are from her report, directly from her report.

2    He's not saying he did the analysis.  He's saying she did, and

3    he's saying this is where they fall.  We're not contesting

4    those.

09:01    5         MR. ALDRICH:  There's another problem about relevance

6    and probative value whether there's an overlap -- whether the

7    Columbia fabrics fit in the overlap range between Fottinger and

8    the '270 patent is irrelevant.

9         MR. SPROUL:  It seems highly relevant to me,

09:01   10    Your Honor, because there's arguing the Fottinger range doesn't

11    anticipate the Blackford range when, in fact, the Omni-Heat

12    fabrics fall directly in the Fottinger range.

13         THE COURT:  To the extent there's an objection to this

14    slide, which is I think at the bottom of what we're talking

09:02   15    about, the objection is overruled.  That slide can be

16    received -- or used.

17         MR. SPROUL:  Thank you, Your Honor.

18         MR. ALDRICH:  Just to make sure we cover them all.

19    531?  Or what was 531?

09:02   20         MR. SPROUL:  Halley, those two slides were withdrawn.

21         MR. ALDRICH:  Okay.  And then 538 and 539.

22         MR. SPROUL:  Give me a clue of what those were.

23         MR. ALDRICH:  I wish I knew.  I just wrote down the

24    numbers, but it's probably a couple prior to this.

09:02   25         THE COURT:  It's 9:00.  We're going to stop and get

1    the jury in here.  You all can work over the lunch hour and try

2    to figure out what we're going to do.

3              MR. ALDRICH:  Thank you, Your Honor.

4              THE COURT:  Thank you.

09:05    5         (Proceedings held in the presence of the jury panel.)

6              THE CLERK:  Calling matter number 17cv1781, Columbia

7    Sportswear North America, Incorporated, versus Seirus

8    Innovative Accessories, jury trial day five.

9              THE COURT:  You may proceed.

09:05    10             MR. AXELROD:  Thank you, Your Honor.

11                  DIRECT EXAMINATION (resumed)

12    BY MR. AXELROD:

13    Q.    Good morning, Ms. Morones.

14    A.    Good morning.

09:05    15    Q.    Yesterday when we broke for the day, we had gone through

16    the first group theme of your Georgia Pacific factors.  Do you

17    recall that?

18    A.    Yes.

19    Q.    And then that was the group that relates to relationship

09:05    20    and character of the patentee's attitudes toward his patent and

21    licensing, and the relationship with the parties, whether

22    they're competitors or not and the like?

23    A.    Yes.

24    Q.    What is the second group of Georgia Pacific factors that

09:06    25    you've collected for discussion?

1    A.    The second theme that I grouped factors into was how both

2    parties used the patent, and what was the resulting sales and

3    commercial success of the patent.

4    Q.    And I'm going to pull up for you slide 17, which is Georgia

09:06    5    Pacific factor number 8.  Is that one of this group?

6    A.    Yes, and factor number 8 says, "The established

7    profitability of the product made under the patent, its

8    commercial success, and its current popularity."

9    Q.    And what materials did you look to to decide the character

09:06    10    of this factor in these particular negotiations?

11    A.    I looked to the sales and profits from the products that

12    included the patent from both Columbia Sportswear and Seirus.

13    Q.    What does slide 16 show -- excuse me -- 18?

14    A.    The slide shows the -- a chart of Columbia's sales of

09:07    15    products that include Omni-Heat Reflective, and the left axis

16    shows the dollar amounts in millions, and so you can see that

17    Columbia began to sell in 2010, I believe October, and

18    experienced very rapid increases in sales of products that

19    include Omni-Heat.

09:07    20        I've pointed out the assumed infringement date of mid-2013,

21    because that would be the time period of hypothetical

22    negotiation in terms of looking at what has been the commercial

23    success for Columbia up to the time of hypothetical

24    negotiation.  I'm also showing the sales of products after the

09:08    25    hypothetical negotiation date.

1  Q.   In the hypothetical negotiation, is the accused infringer

2  granted or expected to have or assumed to have knowledge of the

3  patentee's sales?

4  A.   Yes.   That's my understanding of how the negotiation works,

09:08  5  that each party has full knowledge of the facts in existence at

6  the time, so I'm assuming that Seirus would have seen Omni-Heat

7  in the market and seen its commercial success and been aware of

8  that.

9  Q.   And would have been aware of the ramp-up of sales that's

09:08  10  depicted?

11  A.   Yes.

12  Q.   And is that the reason why the infringement date is shown

13  here?

14  A.   Yes, because it's pointing out what is the time period,

09:08  15  what's the perspective of the parties at that date.   It's

16  looking back and seeing the impact of Omni-Heat within Columbia

17  between 2010 and mid-2013.

18  Q.   What does slide 19 depict?

19  A.   This slide is showing the percent of Omni-Heat sales within

09:09  20  Columbia out of total Columbia sales, and, by the way, these

21  are U.S. sales and also just Columbia Sportswear, not all of

22  their other companies.   And so you can see with this slide that

23  the dark green bar shows the ratio of products that include

24  Omni-Heat compared to total in terms of what are revenues for

09:09  25  Omni-Heat products compared to total revenues.   So the ratio

1  has increased by 2013 to slightly below 30 percent, and that to

2  me, in my view that's a pretty significant permeation of

3  Omni-Heat with respect to total Columbia sales, keeping in mind

4  that Columbia sells products other than cold weather.  They

09:10   5  also sell warm weather.

6       They -- I understand that they only put Omni-Heat in their

7  more premium products, so they have a lot of products which are

8  positioned at a lower cost point, so a 30 percent penetration

9  of Omni-Heat for their total sales is pretty significant.

09:10   10  Q.  I notice that on all these slides, you go up and through

11  year 2016.

12  A.  Yes.

13  Q.  Did you also have partial data for later periods both -- on

14  Exhibit 705 for Seirus and for Columbia?

09:10   15  A.  Yes.  I received data through, I believe, February 2017,

16  and I don't include the -- that data on these slides because

17  I'm showing full years.  It would be -- it wouldn't be a

18  comparable bar to show a partial period.

19            MR. AXELROD:  Could we look at slide 20.

09:11   20            THE WITNESS:  This slide is showing the dollar amounts

21  generated by Omni-Heat sales for Columbia.  So the top line

22  says "Omni-Heat" and then "total sales."  Those dollar amounts

23  are in millions, so for 2010, the partial year of 2010, that's

24  44.4 million, and all the way over to the right through end of

09:11   25  year 2016, and then the total, the total would be billions, so

1   Columbia has sold 1.3 billion of products that include

2   Omni-Heat through the end of 2016.  I believe the number

3   through 2017 is around 1.5 billion.

4       And then I'm also showing the cost, the cost of goods sold,

09:11   5   and the gross profit margin earned by Columbia on these

6   Omni-Heat products.  And the total over to the right is the

7   average of all periods, the 53 percent, and then I'm also

8   showing year by year what was the gross margin on Omni-Heat

9   products.

09:12   10      Then below that section, I have included data for all

11  Columbia products in the U.S. that do not include Omni-Heat as

12  a comparison to look at the total sales and also to look at a

13  comparison of gross margin between the collection of Omni-Heat

14  and the collection of non-Omni-Heat products.

09:12   15  BY MR. AXELROD:

16  Q.   What was the difference in gross margin between Omni-Heat

17  and non-Omni-Heat in the period going into the hypothetical

18  negotiation?

19  A.   The very bottom of the slide shows the average difference

09:12   20  between 2010 and 2012, the full fiscal period before the

21  negotiation.  The Omni-Heat products had a higher gross margin

22  on average of 7.3 percent.  For all of the data, all of the

23  periods on the chart, the average higher gross margin for

24  Omni-Heat products was 3.5 percent.

09:13   25  Q.   So the Omni-Heat products were more profitable as a

1    percentage of the sales price?

2    A.   Yes.

3    Q.   And do they also sell at a premium price?

4    A.   Yes, I understand that they do.  Just from looking if

09:13  5    you -- like the example we saw yesterday of the Omni-Heat sock

6    at $35 compared to the non-Omni-Heat sock at 15 to $20.

7              MR. AXELROD:  Let's turn to slide 21.

8    BY MR. AXELROD:

9    Q.   And the next *Georgia Pacific* in this group, what is factor

09:13  10   11?

11   A.   Factor 11 is looking at what did the infringer do with the

12   patent, and what was the result.  So it's a similar look at

13   Seirus' sales and profitability.

14   Q.   And slide 22?

09:14  15   A.   This slide shows a chart of the sales of Seirus products

16   that included their HeatWave fabric, and for fiscal 2014

17   through 2016, and these numbers are as stated, so the first bar

18   is ▮▮▮▮▮▮, the second ▮▮▮▮▮▮▮▮, the third ▮▮▮▮▮▮▮.

19   Q.   Now, these sales took place after the patent had issued,

09:14  20   correct?

21   A.   Yes.

22   Q.   So this would not have been data that Seirus had going in

23   to the hypothetical negotiation, or are they assumed to know

24   that?

09:14  25   A.   Well, every company would have some kind of expectation,

1    but they wouldn't have a crystal ball, so these sales have

2    occurred after the time of hypothetical negotiation.

3    Q.    And what does slide 23 depict?

4    A.    This slide is showing the dollar amount of total

5    companywide Seirus sales as well as information about HeatWave,

6    but we'll start with the total companywide Seirus sales for the

7    2014 fiscal year is ████████.    And, again, the Seirus numbers

8    are as stated, whereas the Columbia numbers I showed them in

9    millions, so these are just as stated.

10          And so Seirus has total sales in the ████████ range, and

11    then -- and I'm showing what has been the company's overall

12    company sales growth between 2014 and 2015.    Overall Seirus

13    sales grew by ████████.    Between 2015 and 2016, overall sales

14    declined ████████.

15          Then I'm also showing the sales from products that include

16    the HeatWave, and you can see that the first year ████████;

17    second year, 2015, ████████;  third year about ████████, and

18    the -- the line that says "net product sales" right under

19    "HeatWave," that is all HeatWave products that would be subject

20    to the design patent.

21          Remember we have two sets of numbers for HeatWave product.

22    We have the full set that relates to the design patent, and we

23    have the smaller set that relates to the utility patent.    So I

24    removed and subtracted out the sales related to the alleged --

25    the noninfringing for the utility patent to arrive at the

1  infringing utility patent sales numbers of ███████ for 2014,

2  ███████████ for 2015, ████████████ for 2016.

3  Q.   And does the line right below that show the rate at which

4  the HeatWave sales have been growing?

09:17  5  A.   Yes.   I calculated the sales growth for the HeatWave

6  products that are subject to the utility patent, and then I'm

7  also showing what percent those sales are compared to total

8  Seirus sales.   So you can see that it began in 2014 at about █

9  percent of total sales and has increased in 2016 to █ percent

09:17  10  of total sales.   █ percent is still pretty significant

11  compared to Columbia's █ percent.   I mean just in the time

12  period that these products have been available, █ percent to

13  me is still a significant use of the patent.

14  Q.   Would I understand correctly, then, that, for example, if

09:17  15  Seirus had elected to not infringe by selling the HeatWave

16  products, this would not have affected between 90 and 97

17  percent of their other products?

18  A.   If I understand your question correctly, that there are

19  over 98 percent of their products that have nothing to do with

09:18  20  HeatWave.

21  Q.   Correct.

22  A.   So those would be unaffected by any dispute or negotiation

23  regarding HeatWave.

24  Q.   So that takes us through the commercial success and use of

09:18  25  the invention by both parties.   What's the next group?

A.    The next theme is -- I've called "the entire market value

rule," and it looks at whether or not the profits earned from

the sale of products should somehow be apportioned to the

patent, or whether the analysis should be based on the sale of

09:19  the entire product.

Q.    And what is your understanding of how the entire market

value rule is applied?

A.    My understanding of the entire market value rule is that if

the patented invention drives the sale of the product, drives

09:19  the market demand and sale of the product, then the entire

market value rule applies, and that means that royalties should

be applied to the sale of the whole product; in this case the

sale of a whole glove as opposed to some subset or part of the

glove.

09:19  Q.    Were you asked to give any opinion or conduct any research

into what drives consumer demand for these products?

A.    I was not.

Q.    What were you asked to assume?

A.    I was asked to assume the entire market value rule does

09:19  apply; that in Columbia's case, the Omni-Heat technology drives

the sale of the Omni-Heat products, the jackets and products

that contain it, as well as in Seirus' case that the HeatWave

product drives the sale of the gloves and the other products

containing it.

09:20  Q.    And with that -- is that assumption the basis on which you

1    use gross sales as the licensing measure?

2    A.    Yes.    So I have not apportioned the sale of HeatWave

3    products to any smaller subset.    I've applied my conclusion of

4    reasonable royalties to the total sales of all products that

09:20    5    contain the utility patent.

6    Q.    In the various Columbia licenses where they've licensed

7    Omni-Heat Reflective to third parties -- I believe there's four

8    of them -- is the royalty base in those patents in each case

9    also the gross sales along the heat-reflective products?

09:21    10    A.    I actually believe they're net sales, but it is net sales

11    of the entire product as opposed to any smaller subset that

12    were measured.

13    Q.    You're correct.    Could you explain for the jury the

14    difference between gross sales and net sales.

09:21    15    A.    Gross sales represents just what the total sales of a

16    product are prior to any consideration of returns or discounts.

17    So in a financial statement world, in income statements you see

18    a top line number called "gross sales," and then you see some

19    deductions from it to arrive at net sales.    And it's my

09:21    20    understanding that, for example, if a customer were to return a

21    product to Columbia, they would not have to pay a royalty on

22    that product, so it would take into account any returns or

23    discounts.

24    Q.    And are those -- are you using net sales figures in the

09:21    25    various charts that you displayed to the jury where we saw

1    total HeatWave sales?

2    A.    I'm using the sales reported by Seirus as sales of HeatWave

3    products which I understand have taken into account returns and

4    some discounts -- some categories of returns and discounts

5    which I understand would be on the same basis that the Columbia

6    would measure net sales for royalty purposes.

7    Q.    They're both using net sales?

8    A.    Yes.    And there's a difference between net sales in the

9    context of a royalty calculation and financial statement net

10    sales.

11          MR. AXELROD:    Can we go to slide 26.

12    BY MR. AXELROD:

13    Q.    Did you also do an alternate analysis if it was determined

14    that the entire market value rule was inapplicable?

15    A.    Yes.    So in the case that -- I'm not sure if it's the jury

16    or the Court who will decide that question -- that the entire

17    market value rule doesn't apply, then there's a question about

18    how to -- how to determine what royalty rate or what sales

19    level to use to calculate reasonable royalties.    And so what I

20    did was I looked at the Columbia data, because at the time of

21    hypothetical negotiation, this would be the source of

22    information available to the parties, to look to what is the

23    impact of the Omni-Heat patent and how much profit is driven by

24    Omni-Heat just by itself.

25          So what I did is I compared the Omni-Heat margin to the

1    non-Omni-Heat margin.  In my expert report, I concluded that

2    there is a 5 percent additional margin for the Omni-Heat sales

3    compared to the non-Omni-Heat sales.  And that was my

4    recommendation for a royalty rate to apply if the entire market

09:24    5    value rule does not apply.

6    Q.    In just looking at the differential between the Omni-Heat

7    margin and non-Omni-Heat margin, in other words, you make a

8    higher percentage of a higher-priced product, does that

9    consider the fact that the Omni-Heat products sell for a higher

09:24    10    price?

11    A.    No, it doesn't look at that issue of quantifying how much

12    more top line sales revenue you get, only what is the

13    incremental profit margin Columbia has been able to receive for

14    the products that include Omni-Heat compared to not include

09:24    15    Omni-Heat.

16    Q.    Does that factor consider that Omni-Heat Reflective sales

17    are for Columbia, and apparently for Seirus, additional sales?

18    In other words, they're not sales that are taking away from

19    other products that they sell, but they're new sales?

09:25    20    A.    No, it doesn't take that into account either.  And I want

21    to -- the reason why in my expert report I concluded 5 percent

22    is because I had a different time period of data in my expert

23    report that ended mid-2016.

24    Q.    And with the additional data, do you come to roughly the

09:25    25    same conclusion?

1    A.    Well, it -- with the additional time period, using the

2    whole time period, the number drops to 3.5 percent, but the

3    hypothetical negotiation period is 2013, so I was being

4    conservative using data after 2013.   So, yes, I would still say

09:25    5    that 5 percent is a reasonable conclusion.

6    Q.    What is Georgia Pacific factor number 15?

7    A.    Factor 15 is the factor that ties it all together and looks

8    at what would be the considerations in the process and result

9    of a hypothetical negotiation.   This is a factor that

09:26    10    Mr. Merriman talked about -- testified about, and so I have

11    also stepped through the process of what I think that would

12    look like and what are the most important considerations in a

13    hypothetical negotiation.

14              MR. AXELROD:   Could we have slide 28.

09:26    15    BY MR. AXELROD:

16    Q.    Would you walk the jury through how you would see the

17    hypothetical negotiation playing out in the context of these

18    various factors.

19    A.    Yes.   So the first issue I think is important is that both

09:26    20    companies have a similar gross margin.   I think that's because

21    both companies are in the outdoor apparel space, and so we're

22    looking at a gross margin of 53 to 54 percent.   Both parties

23    would know that that's what they're earning on the sale of

24    products.

09:27    25          The second important factor to me is that both companies

marketed the technology as a leading technology, meaning when I say "leading," I mean prominent.  They're trying to drive demand with marketing claims and also the way they named the product.  So in Seirus' case, they named the gloves HeatWave gloves.  Their hangtags have pictures that show the way the product works.  Omni-Heat, similar marketing, was very prominently using the Omni-Heat technology to drive demand.  So both companies kind of took a posture that way in their marketing.

The next important factor is that Columbia protects its patent monopoly.  We heard Matt Merriman talk about that, and I confirmed that with just reviewing the licensing agreements and their marketing information, that Columbia would not be expected to just open up their technology and make it available to anyone.

The next important factor is -- it's my understanding from discussions with Matt Merriman that Columbia would want to start the negotiation at a very aggressive position, all or nearly all of their gross margin, because they would expect a company like Seirus to take away their sales and to be a competitor, and they would expect to lose sales to them.  So as a negotiating posture they would -- Mr. Merriman told me, "I would start with the entire gross margin.  That's where I would start.  That's maybe not where I would end, but that would be what I would want."

1    The next factor is that Columbia has substantial

2 negotiating power, and that factor to me means that Columbia is

3 the patent owner and already has shown tremendous commercial

4 success of the patent, so that means that they're -- they --

09:29    5 they're the one that guards the patent and has the right to

6 license it or not license it.

7    The next factor is that I believe Seirus would be highly

8 motivated to negotiate on the eve of infringement because in

9 reviewing the Seirus documents and the communications, Seirus

09:29    10 had been working on the HeatWave product for a period of time.

11 It was at least a year.  It might have been -- I believe it's

12 two years.  They had placed orders for the product earlier in

13 the year.  Their customers were excited about the product, and

14 so with the hypothetical negotiation set the eve -- on the eve

09:29    15 of infringement, they would be in a position to very much need

16 to reach a deal in order to not lose sales and lose face with

17 their customers and lose the investment that they had made.

18    And then I also believe that Seirus would be logically

19 willing to concede a substantial portion of their gross margin

09:30    20 because they would be able to see the impact that Columbia

21 enjoyed from Omni-Heat.  So they would be looking at Omni-Heat

22 and thinking this is a tremendously popular valuable

23 technology, and, therefore, they should -- they would be

24 logically expected to be willing to pay for that, to be willing

09:30    25 to give up substantial portion of their margin because they

1    would expect company growth and brand growth from the patent.

2        So in my construction of the hypothetical negotiation, I

3    concluded that a reasonably significant portion of both

4    companies' gross margin would be 40 percent.  To me that's

09:31    5    conservative.  I could have said 75 percent or 50 percent, but

6    to me 40 percent of the gross margin is significant for both

7    sides of the negotiation which equals 21 percent.  And so just

8    on this hypothetical negotiation factor alone, I concluded that

9    21 percent would be reasonable.

09:31    10    Q.    And that would be 21 percent of the net sales of products

11    covered by the patent?

12    A.    Yes.

13    Q.    What does slide 29 depict?

14    A.    Slide -- this slide shows all of the factors again, and

09:31    15    I -- to remind you, I haven't discussed them all.  I've

16    discussed more in my report.

17        But it just shows a graphic representation of the ones that

18    I considered in my opinion about the impact to the royalty

19    rate.  Also what's key about this summary is that I see the

09:32    20    plaintiff -- Columbia licensing factor number 1 as setting a

21    floor, and that is something that's both logical to me, and

22    also I've read in various publications about a hypothetical

23    negotiation under Georgia Pacific that when the patent owner

24    has licenses for the product that it should set a floor for

09:32    25    what the hypothetical negotiation would look like.

1    Q.    And what is the floor that you derive from the Columbia

2    licenses?

3    A.    If we could go to the next slide, I would show you that.

4          I used a 10 percent floor for the Columbia licenses.    The

09:32    5    ones that I reviewed showed a range of about 18 to -- 8 to 15

6    or 17 percent, but I understood from talking to Matt Merriman

7    that he starts at 10.    He may go down a little bit for certain

8    products such as the sleeping bags, but the negotiation starts

9    at 10, and there are considerations that take it up, and

09:33    10    considerations that take it down, but 10 percent is the kind of

11    basic Columbia licensing rate from which he begins to

12    negotiate.    And so I see that as the floor on which all of

13    these Georgia Pacific factors build.

14    Q.    Seirus argues that those licenses should be chopped up and

09:33    15    parts of the rate assigned to different components, and I think

16    they give Omni-Heat 1 or 2 percent.    Do you think that's a

17    correct analysis of those licenses that you used to set the

18    floor?

19    A.    I don't because this is just a real common-sense analysis

09:34    20    for me, that if Seirus had approached Columbia and said, "We

21    like your technology.    We want to use it," and in other words,

22    if they'd asked permission, they would have paid at least 10

23    percent in my mind, in my view in listening to the testimony

24    and reviewing the documents.    It doesn't make sense to me that

09:34    25    if Seirus instead infringes and uses it however they want and

1    without the Columbia brand that they would get to pay less.

2    That just rationally does not make sense.  In fact, the

3    opposite.  If they don't use it with the Columbia brand, and

4    they don't use it in a way that Columbia's licensing program

09:34    5    would require, the opposite would happen.  They would have to

6    pay some higher amount in order to be able to use it in that

7    way.

8                   MR. AXELROD:  Go back to slide 29.

9    BY MR. AXELROD:

09:35    10    Q.    In slide 29 you put a bunch of arrows next to different

11    factors.  Can you tell us -- tell the jury what those arrows

12    represent and what they increase relative to.

13    A.    Yes.  So I talked yesterday about how the Georgia Pacific

14    factors are questions or considerations to evaluate and decide

09:35    15    whether those questions would increase or decrease a royalty

16    rate, and it's not a scientific process.  It's not like each

17    one gets a 1 percent or a half a percent.  It's a subjective

18    process that you will all have to do yourselves in some way.

19           And -- but what I do is I look for a floor or a base rate

09:35    20    to start from and say from this level, I'm going to -- and

21    that's how a negotiation works.  You know, there's kind of a

22    starting point, from this level, a certain level, and then

23    these considerations would cause me to increase my rate or

24    decrease my rate.

09:36    25           So what I've done is I've used the Columbia licenses as a

1　floor, and I believe that these other factors that we've talked

2　about, most all of them would indicate an increase to a

3　reasonable royalty rate, and so that's why my opinion of what

4　is a reasonable royalty rate is something more than 10 percent.

09:36　5　My conclusion is a range of 10 to 20 percent, but I believe

6　that something significantly more than 10 percent is reasonable

7　for this case.

8　　　　　　MR. AXELROD:　Could we pull up slide 31.

9　BY MR. AXELROD:

09:36　10　Q.　Can you walk the jury back through your ultimate

11　conclusions.

12　A.　So to sum up all of my testimony, this slide goes back to

13　the design patent which has -- as I understand has already been

14　determined to have been infringed, and shows my calculation of

09:37　15　disgorgement profit which is the damage remedy for the design

16　patent.　This has nothing to do with the royalty analysis.

17　This is the other patent, and the appropriate measure of

18　damages for the design patent is that disgorgement of Seirus

19　profit.　And my calculation of that disgorgement amount is

09:37　20　3,427,904.

21　　　　　　MR. AXELROD:　Can we go to the reasonable royalty

22　slide.

23　　　　　　THE WITNESS:　And for the utility patent, the

24　appropriate measure of damage is the application of a

09:37　25　reasonable royalty to the sales of product containing the

1  patent, and in this slide I'm showing my calculation.  I start

2  with total Seirus HeatWave sales, and then I subtract three

3  lines that take out dollars that are not related to the utility

4  patent.  There's a one-month period of time prior to

09:38  5  infringement, and then there are two products that I'm

6  subtracting because they're not alleged to have infringed the

7  utility patent.

8  So the total HeatWave sales subject to the utility patent

9  adds up to ▮▮▮▮▮▮▮▮, and then I've applied a 10 percent

09:38  10  rate and then a 20 percent rate to show the dollar amount of

11  reasonable royalty damages assuming the 10 percent floor or the

12  20 percent hypothetical negotiation conclusion.

13  BY MR. AXELROD:

14  Q.   And if the parties ended up at what you believe would be

09:39  15  the outcome of their hypothetical negotiation, would the

16  royalty damages for infringement of the utility patent be the

17  ▮▮▮▮▮▮▮▮ figure?

18  A.   Yes, the 20 percent rate would calculate to ▮▮▮▮▮▮▮.

19          MR. AXELROD:   Thank you.  I have nothing further.

09:39  20          THE COURT:   Cross-exam.

21                    CROSS-EXAMINATION

22  BY MR. MARCHESE:

23  Q.   Good afternoon, Ms. Morones -- good morning.  I'm sorry.

24  I'm Chris Marchese.  I'm counsel for Seirus.  We have not met

09:40  25  before, correct?

1    A.    Well, it's nice to meet you.

2    Q.    Thank you.   Nice to meet you as well.

3          I just had a couple of preliminary questions.   I wanted to

4    make sure I understood your opinions in the case.

09:40   5          You offered an opinion of reasonable royalty on the '270

6    utility patent.   Is that correct?

7    A.    Yes.

8    Q.    And you offered an opinion of disgorgement on the design

9    patent, correct?

09:40   10   A.    Yes.

11   Q.    And I did not hear you offer an opinion of reasonable

12   royalty on the design patent.   Is that correct?

13   A.    That's correct.

14   Q.    Now, you have been an expert on damages before, correct?

09:40   15   A.    Yes.

16   Q.    And I think -- I recall from your opening testimony

17   yesterday -- it's been a while, but I think you said it was

18   approximately a thousand cases?

19   A.    I said between 500 and a thousand somewhere.   It's a rough

09:40   20   estimate.

21   Q.    Okay.   And you were deposed in the case, correct?

22   A.    Yes.

23   Q.    And you were asked about the number of cases you'd been an

24   expert in.   Is that right?

09:40   25   A.    Yes.

1    MR. MARCHESE:  Can we pull up Ms. Morones' deposition

2  at page 5, lines 2 through 4.

3    Your Honor, I'd like to publish it if I could, please.

4    MR. AXELROD:  No objection.

5    THE COURT:  You may.

6  BY MR. MARCHESE:

7  Q.   Is this a question you recall being asked in your

8  deposition?

9  A.   Yes.

10 Q.   Is your answer accurate?

11 A.   It's consistent with what I said, between 500 and a

12 thousand.

13 Q.   So -- but is this correct that it's over 800 times, or is

14 it less than 800?

15 A.   I don't -- I -- I don't know.  In both answers I'm

16 estimating because I've never counted.  I'm just taking my

17 number of years and the number of engagements that my firm

18 does.

19 Q.   Okay.  But I mean it seems to me a big difference between

20 500 and 800.  Will you stand by the answer that you gave in

21 your deposition?

22 A.   Well, it's an estimate, so, yes.  I mean I think that's a

23 reasonable estimate.

24 Q.   Okay.  So the 500 that you said, the 500, 800 really should

25 be 800 to a thousand.  Is that correct?

1    A.   I -- I mean I can't tell you exactly how many times.   This

2    is an estimate.   What I gave in testimony is also an estimate.

3    I've been doing this for 21, 22 years.

4    Q.   Okay.   Thank you.

09:42  5        And I think you said in your deposition that you were

6    engaged by plaintiff and defendant equally, and you don't keep

7    track.   Is that correct.

8    A.   I don't remember exactly what I said, but it's my belief

9    that I'm engaged equally, and I don't -- I don't have a sense

09:42  10   one way or the other that I'm on one side or the other more

11   often.

12   Q.   So it's approximately 50 percent plaintiff, approximately

13   50 percent defendant, right?

14   A.   That's my sense, but, as I said, I have never measured it.

09:42  15   Q.   You said in your deposition you don't keep track.   Is that

16   correct?

17   A.   I don't remember what I said in my deposition precisely,

18   but I know that I don't keep track or measure how many cases I

19   do for plaintiff or defense.

09:43  20   Q.   It's true of those 5 to a thousand -- 500 to a thousand or

21   800 to a thousand cases that you have never worked for my firm,

22   correct?

23   A.   That's correct.

24   Q.   And this is a patent infringement case, correct?

09:43  25   A.   Yes.

1  Q.   It involves the '270 utility patent, correct?

2  A.   Yes.

3  Q.   And the design patent, correct?

4  A.   Yes.

09:43  5  Q.   And you have -- I think you have said before that out of

6  the range of cases that you've given us, whether it's 5 to a

7  thousand or 800 to a thousand -- let's just -- can we say 800?

8  A.   That's okay.

9  Q.   It will be easier to say that.  Out of the 800

09:43  10  approximately cases you've done, four of them at the time you

11  were deposed were patent cases, correct?

12  A.   Yes, four previous to this, so this would be my fifth, yes.

13  Q.   This is your fifth patent case.  Okay.

14       And I think only one -- actually two now, one prior case

09:44  15  and this case you've quantified damages for a plaintiff in a

16  patent case, correct?

17  A.   I'm -- well, I quantified damages in each one.  I

18  don't -- I'd have to think about whether the plaintiff or

19  defense because I don't remember.  I don't keep track, so I

09:44  20  don't know.

21  Q.   Okay.  I apologize.  I think I wasn't very precise.  I

22  meant to say reasonable royalty damages for a patent, you've

23  done that how many times?

24  A.   I can remember at least three.  The two prior ones I don't

09:44  25  remember.

1    Q.    Three including this one?

2    A.    Yes.

3    Q.    One of the cases that you did for -- one of the patent

4    cases that you listed prior, one of the four, was a -- an

09:45    5    attorney malpractice case, correct?

6    A.    Yes.

7    Q.    And that was not a reasonable royalty complication, right?

8    A.    Correct.

9    Q.    And another case that you did prior to this one relating to

09:45    10    patents was actually a breach of license agreement, correct?

11    A.    Yes.

12    Q.    And in that case, you did not do a Georgia Pacific

13    reasonable royalty damages, correct?

14    A.    That's correct.    That was a lost profits calculation.

09:45    15    Q.    And you're not doing lost profits here, correct?

16    A.    I am not.

17    Q.    And of the prior cases we're talking about, one of them was

18    a patent infringement case, right?

19    A.    Yes.

09:45    20    Q.    And in that one, you did a Georgia Pacific reasonable

21    royalty damages computation or not?

22    A.    Yes.

23    Q.    This is your -- I'm counting two.    Is there another one I'm

24    missing?

09:45    25    A.    As I said, the -- actually the attorney malpractice case, I



1   may have misspoken.  I believe I did a reasonable royalty

2   damages analysis of that as well as a lost profits analysis.

3   And then the first one is the one I don't recall.  It's just

4   too long ago.

09:46   5   Q.   You believe you did a reasonable royalty damages analysis

6   in the attorney malpractice case, but you're not sure?

7   A.   Yes.

8   Q.   Are you sure or not sure?

9   A.   I believe I did.  I mean I can remember, yes, I did.

09:46   10   Q.   You did?

11   A.   I can remember developing a royalty, yes.

12   Q.   You're sure of that?

13   A.   Yes.

14   Q.   Okay.  Thank you.

09:46   15       So I want to ask a little bit about your résumé, or CV as

16   it's sometimes called.

17       You have one of those, right?

18   A.   Yes.

19   Q.   And tell us what a CV is, if you would, please.

09:46   20   A.   A CV is a -- like a résumé, curriculum vitae, the Latin

21   word.  It's a summary of education, experience, a variety of --

22   just things about me that are -- the professional information.

23   Q.   And in this particular case, you did submit -- actually you

24   did three reports, right?

09:47   25   A.   Yes.

1    Q.    One was your main report and two supplements.  Is that

2    correct?

3    A.    Yes.

4    Q.    And in your main report, you attached your CV, right?

09:47  5    A.    Yes.

6    Q.    And so I've looked at your CV, and I saw -- it does list

7    publications.  Is that right?

8    A.    Yes.

9    Q.    And the publications that are listed there are -- there's

09:47  10    nothing on patents that I could see.  Is that fair?

11    A.    That's fair.  I have not published on patents.

12    Q.    And you've never published on the Georgia Pacific analysis,

13    correct?

14    A.    That's correct.

09:47  15    Q.    I think you said you read some papers on it, right?

16    A.    Yes.

17    Q.    Have you read books on it?

18    A.    Yes.

19    Q.    And -- but you haven't written a book, right?

09:47  20    A.    I have not written a book.

21    Q.    You haven't written a book on Georgia Pacific?

22    A.    I have not.

23    Q.    Haven't written a book on patent damages?

24    A.    I have not.

09:47  25    Q.    Haven't written an article on Georgia Pacific?

A.    I have not.

Q.    Haven't written an article on patent damages, correct?

A.    Correct.

Q.    And have you been -- you know what blogging is, right,

09:48    where you go on the Internet and you write about subject matter

that you may be knowledgeable about or have expertise in?  Do

you know what I'm talking about?

A.    Yes.

Q.    Have you done any blogging with respect to patent damages?

09:48    A.    I have not.

Q.    Or Georgia Pacific?

A.    No.

Q.    But you have written on other topics, right?

A.    Yes.

09:48    Q.    You've written on financial resolution of partnership

dispute?

A.    Yes.

Q.    And you've written about something called "What It's

Worth"?

09:48    A.    Uh-huh.   Yes.

Q.    Yes?  And that's about valuation?

A.    Valuation, yes.

Q.    Business valuation, right?

A.    Yes.

09:48    Q.    And you've written "Buzz abounds on markets for trading

1    start-up shares," right?

2    A.    Yes.

3    Q.    That doesn't relate to patents, right?

4    A.    It doesn't.

09:48    5    Q.    And you wrote an article about supporting lost sales in a

6    lost profits case, right?

7    A.    Yes.

8    Q.    That was not a patent article?

9    A.    That was not.

09:48    10    Q.    Did not involve reasonable royalties, right?

11    A.    It did not.

12    Q.    And you wrote an article about "Exclusive autograph deals,

13    what value to the athlete and their fans."  You wrote that?

14    A.    Yes.

09:49    15    Q.    And that's not a patent article?

16    A.    That's correct.

17    Q.    And that doesn't have anything to do with reasonable

18    royalties, correct?

19    A.    Correct.

09:49    20    Q.    Or disgorgement of profits in a patent case?

21    A.    Correct.

22    Q.    And then another article was called "Athlete signature

23    lines, maximizing endorsement value for professional athlete."

24    You wrote that?

09:49    25    A.    Yes.

| | | |
|---|---|---|
| | 1 | Q.  Not patents? |
| | 2 | A.  No. |
| | 3 | Q.  Not reasonable royalty? |
| | 4 | A.  No. |
| 09:49 | 5 | Q.  And the last one I see on your CV, it says -- it's a bullet |
| | 6 | point, and it says "Presenter for education courses on |
| | 7 | valuation and damage analysis," right? |
| | 8 | A.  Yes. |
| | 9 | Q.  And that's not been patent-related or has it? |
| 09:49 | 10 | A.  I've done so many.  I don't believe so. |
| | 11 | Q.  And have you ever been a speaker at a symposium or a |
| | 12 | seminar specific to patent damages? |
| | 13 | A.  I have not. |
| | 14 | Q.  And I'm looking at your professional credentials and |
| 09:50 | 15 | education.  Those are on your CV too? |
| | 16 | A.  I'm sorry? |
| | 17 | Q.  Your professional credentials and education, that's on your |
| | 18 | CV, right? |
| | 19 | A.  Yes. |
| 09:50 | 20 | Q.  And you're a CPA? |
| | 21 | A.  Yes. |
| | 22 | Q.  And you have a number of other accreditations and |
| | 23 | credentials listed here.  I don't see any related to patent |
| | 24 | licensing.  Are there any that I'm not aware of? |
| 09:50 | 25 | A.  I did for a period of time have a patent licensing |

1  credential.  I didn't keep it up, though, because I didn't -- I

2  didn't believe it was enough of a heavyweight credential

3  compared to my others, so I didn't continue it.

4  Q.   So the patent licensing credential was not a heavyweight

09:50  5  credential, right?

6  A.   The one that is available, I didn't believe it was rigorous

7  enough to promote as a credential.

8  Q.   And you're not a member of the Licensing Executive Society?

9  A.   I am not.

09:50  10  Q.   Okay.  You know about that, right?

11  A.   Yes.

12  Q.   And that is probably the premier society for people

13  involved in intellectual property licensing.  Would you agree?

14  A.   I don't know how to rate it.  I'm just aware of it.

09:51  15  Q.   You're aware of it.

16  A.   Yes.

17  Q.   Have you gone to meetings for the Licensing Executive

18  Society?

19  A.   I have not.

09:51  20  Q.   And have you read conference papers and things from the

21  LES, Licensing Executive Society?

22  A.   I may have.  I've read a lot about patents, and I'm aware

23  that the organization exists and members have published

24  information and articles.

09:51  25  Q.   Would you agree with me that writing publications is a way

1   of establishing yourself as knowledgeable in a particular

2   field?

3   A.   Yes.

4   Q.   And you've done that, right?

09:51   5   A.   Yes.

6   Q.   But you haven't done anything on patents, correct?

7   A.   I have not.

8   Q.   You do not have a degree in economics?

9   A.   I do not.

09:52   10   Q.   You don't have a bachelor degree in economics?

11   A.   No.  I have a bachelor degree in accounting.

12   Q.   No master's degree in economics?

13   A.   I do not.

14   Q.   No certifications in economics?

09:52   15   A.   No.

16   Q.   You haven't written any -- have you written articles on

17   economics?

18   A.   Some of my articles may have contained economic concepts,

19   but I'm not -- if you're asking if I'm an economist, I'm not.

09:52   20   I'm an accountant.

21   Q.   Thank you.  Would you agree with me that supply and demand

22   are driving demand for a particular product?  That is an

23   economic concept, correct?

24   A.   It is a -- it is an economics and marketing concept, both

09:52   25   together.

1    Q.    And you don't have a marketing degree, right?

2    A.    I do not.

3    Q.    And you've offered opinions in this case about whether

4    HeatWave or Omni-Heat drives demand for a particular product,

09:53    5    correct?

6    A.    I have -- in my report I said that I understand that it

7    does, and that I've been instructed to assume the entire market

8    value rule, but I did not offer expert opinion that Omni-Heat

9    or HeatWave drives demand.

09:53    10    Q.    And that's because you're not an economist, correct?

11    A.    Correct.

12    Q.    And who told you to make that assumption?

13    A.    Counsel for Columbia.

14    Q.    Who's that in particular, please?

09:53    15    A.    Well, at the time -- let's see -- it would have been

16    Mr. Aldrich.

17    Q.    Anybody else?

18    A.    At the time of my report, Mr. Eads, who is not here today.

19    Those two were the ones I was working with.

09:53    20    Q.    And Mr. Eads is with Mr. Aldrich's law firm, correct?

21    A.    Yes.

22    Q.    So those two gentlemen told you to assume that the entire

23    market value rule applies, right?

24    A.    Yes, and that would be -- every time I testify there are

09:53    25    certain assumptions that I am instructed to make because

1       they're outside of my area of expertise and that someone else

2       will testify to support those assumptions.

3       Q.   Did you talk to anybody at Columbia or at the law firm

4       about why that assumption was valid?

09:54   5       A.   Yes.

6       Q.   And tell us who you talked to about that.

7       A.   I talked to Mr. Scott Trepanier as well as Mr. Kelly, the

8       Columbia counsel.

9       Q.   Mr. Kelly is here at the table --

09:54   10      A.   Yes.

11      Q.   -- correct?

12      A.   Yes.

13      Q.   Okay.  He's not an economist, is he?

14      A.   I don't know if he is.  He's at least an attorney.

09:54   15      Q.   He's an attorney, but you don't know if he's an economist?

16      A.   Correct.

17      Q.   And Mr. Trepanier, he's not an economist?

18      A.   He is a marketing executive, and I would expect him to be

19      extremely knowledgeable about the impact of Omni-Heat to

09:54   20      Columbia.

21      Q.   You'd expect, but do you know that?

22      A.   I -- I mean he's both very knowledgeable, provided a lot of

23      information, a lot of substantiation about the role of

24      Omni-Heat within Columbia.

09:55   25      Q.   Now, you don't know one way or another whether

1    Mr. Trepanier is a trained economist?

2    A.   I don't.

3    Q.   And you would agree with me that supply and demand, the

4    most basic concept of it, is something taught in economics

09:55   5    classes, correct?

6    A.   I have some.

7    Q.   Feel free to take a drink if you need it.  Don't worry.

8    Let me know when you're ready to go.

9    A.   Do you want to repeat your question?

09:55   10   Q.   Do you know -- let me ask you this:  Supply and demand is

11   an economics concept, correct?

12   A.   Yes.

13   Q.   And driving demand requires knowledge of economics.

14   Wouldn't you agree?

09:56   15   A.   Well, possibly.  I mean I believe that companies like

16   Columbia, Nike, others that sell a lot of products, I believe

17   that their top marketing executives understand the demand of

18   their products very well.  They have to.  The degree to which

19   they've studied economics, I don't know.  They're marketing

09:56   20   executives, so I don't know that that premise is entirely true.

21   Q.   Well, let me ask you this:  So you're talking to

22   Columbia -- I think you said Mr. Trepanier -- about entire

23   market value rule, driving demand, right?

24   A.   Yes.

09:56   25   Q.   And you talked to Mr. Kelly, right?

          1    A.    Yes.

          2    Q.    And they --

          3    A.    And Mr. Merriman.  I didn't finish all of that listing.

          4    Q.    Mr. Merriman, right?

09:56      5    A.    Yes.

          6    Q.    Anybody else?

          7    A.    The counsel for Columbia.

          8    Q.    Outside lawyers, right?

          9    A.    Yes.

09:56     10    Q.    Mr. Aldrich?

         11    A.    Yes, and with -- conversations with them, it was with

         12    respect to what documents exist, what information does Columbia

         13    have available to describe Omni-Heat and its role within the

         14    company.

09:57     15    Q.    But they didn't explain to you the analysis, the factual

         16    basis, the economics behind why they were asking you to assume

         17    that the entire market value rule or the driving demand, saying

         18    HeatWave drives demand or Omni-Heat drives demand, they didn't

         19    give that to you, did they?

09:57     20    A.    Well, they explained to me the premise that Omni-Heat needs

         21    to drive demand and explained that Columbia believes very

         22    strongly that it does because of its role within the company

         23    and its history, and that it's not -- that it would not be my

         24    assignment to opine on that or prove that, but they explained

09:57     25    why they believe it.

1  Q.   I think what you said there was an important point that I

2  haven't gotten to yet.   They were talking to you about

3  Omni-Heat, right?

4  A.   We talked about both, but --

09:57  5  Q.   "Both" being what?

6  A.   Both Omni-Heat and HeatWave.   Because I understood from

7  looking at my -- just doing my own looking and reviewing

8  documents, what the -- what HeatWave was.   I saw the marketing.

9  I saw the positioning.   So they talked about HeatWave being

09:58  10  marketed as a driver also, but primarily, yes, we were talking

11  about Omni-Heat and what its role had been with Columbia.

12  Q.   Okay.   And Mr. Trepanier, he's not a marketing person at

13  Seirus, right?

14  A.   Correct.

09:58  15  Q.   He's not an expert on marketing any Seirus products at all,

16  is he?

17  A.   I don't know.

18  Q.   He's never worked for the company before, has he?

19  A.   That doesn't mean he wouldn't understand a lot about what

09:58  20  another company does, but he certainly doesn't work for the

21  company.

22  Q.   And to your knowledge, he never has, right?

23  A.   No.

24  Q.   Okay.   I mean to your knowledge, he never has would be yes?

09:58  25  A.   I wouldn't expect him -- I don't know.   He would have

1    mentioned it.

2    Q.    He would have.    Thank you.

3    A.    By now, yes.

4    Q.    And Mr. Kelly, he's not a Seirus employee and never has

09:58    5    been to your knowledge?

6    A.    I don't know, but I wouldn't expect so.

7    Q.    So you wouldn't think he's an expert on marketing or

8    economics or driving demand of Seirus products, right?

9    A.    Well, as I said, an executive in a company like Columbia

09:59    10    would know a lot about what other companies are doing or about

11    marketing issues, but obviously he's not an executive of

12    Seirus.

13    Q.    He's not even -- he's a lawyer.    He's not even a marketing

14    guy at Columbia, right?

09:59    15    A.    Well, as we know, a lot of lawyers have other areas of

16    expertise.    You guys do dual things all the time, so I don't

17    know.

18    Q.    You don't know?

19    A.    Right.

09:59    20    Q.    Okay.    And you mentioned Mr. Merriman, right?

21    A.    Yes.

22    Q.    And he's never worked for Seirus, right?    To your

23    knowledge?

24    A.    Correct.

09:59    25    Q.    Okay.    And he is a -- not a person who's worked directly



1    with the marketing and the economics and all that of Seirus

2    products or HeatWave, correct?

3    A.    Correct.

4    Q.    And the forth person you mentioned that you talked to is

10:00    5    Mr. Aldrich.  Do I have that right?

6    A.    Mr. Aldrich, Mr. Eads.

7    Q.    They were outside lawyers with Schwabe, right?

8    A.    Yes.

9    Q.    They are not experts.  They haven't worked for Seirus.

10:00    10    They haven't done -- they haven't worked for the company to

11    understand the economics and the driving demand for Seirus

12    products.  Would you agree with that?

13    A.    Yes, that's correct.

14    Q.    And so you've made this assumption about the entire market

10:00    15    value rule based on these conversations with the five people,

16    right?

17    A.    Yes -- well, I was instructed to make the assumption.  My

18    understanding about it is based on the discussions with the

19    five people.

10:00    20    Q.    Okay.  The entire market value in this case is a big deal.

21    Would you agree?

22    A.    Yes.

23    Q.    And the reason is because the law of patent damages says if

24    you can prove that the patented feature -- I think these are

10:00    25    your words -- drives demand -- the patent feature drives demand

1    for the entire product, then you may take a royalty on the base

2    of the entire product.  Do you agree with that?

3    A.    Yes.

4    Q.    But if you can't prove it -- if you can't prove it, then

10:01   5    you must apportion or divide down the base to find the piece

6    where the patented feature is, and you can take a royalty on

7    that, correct?

8    A.    Correct.

9    Q.    So if I had a glove with four pieces, one of which is a

10:01  10    patented feature, and I cannot prove that that one patented

11    feature drives demand for the entire glove, I can only get a

12    royalty on the one component, correct?

13    A.    I understand that apportionment applies.  Whether it's that

14    one component or not, that it's an apportionment analysis.

10:01  15    Q.    Now, in this particular case, you were asked about

16    apportionment at your deposition, right?

17    A.    Probably, yes.

18    Q.    And in your opinion, you did not -- I'm sorry.

19        In your report you did not offer an opinion about

10:01  20    apportioning the base, the cost of the overall glove down to

21    the patented feature, the liner of the glove, the HeatWave, did

22    you?

23    A.    I did not.

24    Q.    And that's an economic -- would you agree with me that's

10:02  25    kind of an economics analysis, apportionment?



1   A.   It can be an accounting analysis, an economics analysis.

2   It's a quantitative analysis.

3   Q.   Okay.  And you're an accountant?

4   A.   Yes.

10:02   5   Q.   And you did not do an apportionment analysis with respect

6   to these gloves to come down and figure out what the

7   proportional value or apportioned value of the HeatWave was to

8   the entire glove, did you?

9   A.   In terms of what you described in the question before, the

10:02   10   cost, looking at the cost of the liner with respect -- or the

11   fabric with respect to the whole glove or some other way of

12   comparison, no, I did not.

13   Q.   Okay.  And you didn't try to figure out what the

14   contributing value in a particular glove was from the

10:02   15   insulation, did you?

16   A.   I did not.

17   Q.   And you did not consider whether Gore-Tex contributes value

18   to a particular glove, did you?

19   A.   I did not because I assumed the entire market value rule

10:03   20   applies, so I did not conduct that.

21   Q.   You did not?

22   A.   Correct.

23   Q.   And you did not try to figure out what the value of, say, a

24   leather outer glove would be, did you?

10:03   25   A.   I did not.

1    Q.    And you didn't try to figure out what the value would be

2    contributed to the gloves by the Seirus brand name, did you?

3    A.    No.

4    Q.    And you never went into a store to see how Seirus products

10:03    5    are displayed, did you?

6    A.    I did not.

7    Q.    And you never looked to see whether there would be racks of

8    Seirus gloves with "Seirus" at the very top, did you?

9    A.    I did not go into a store.  I looked at their website,

10:03    10    their marketing on their website.

11    Q.    And when you offered your report, you'd never even held a

12    Seirus glove in your hand, had you?

13    A.    That's correct.

14    Q.    You'd never taken one and pulled it apart to see what the

10:03    15    liner looked like relative to the rest of the glove, correct?

16    A.    Right, and that's because it wasn't my assignment to do

17    that.  There are plenty of experts and witnesses who are

18    addressing the physical properties of the gloves.  It wouldn't

19    be my assignment to do that.

10:04    20    Q.    Would you agree with me that when you offered your report,

21    Seirus gloves were available publicly?  I mean you could have

22    bought them?

23    A.    Yes.  I saw them online.  I saw them at REI.  I saw where

24    they were marketed, yes.

10:04    25    Q.    And, to your knowledge, the lawyers for Columbia had

1    samples of Seirus gloves, didn't they?

2    A.   They probably did.

3    Q.   Do you know whether they did or not?

4    A.   I mean I met with them.   They may have had them there.   I

10:04    5    just don't remember.

6    Q.   Did you ask them to look at them?

7    A.   No.

8    Q.   Were you interested in what they were like?

9    A.   It wasn't -- I mean I could see them online.   It wasn't

10:04   10    necessary for my analysis to evaluate and inspect the property

11    because I understand that other experts would be doing that.

12    So I could have out of my curiosity, would have been fine.   In

13    fact, I did before trial because I was asked that in my

14    deposition, but it's a matter of curiosity for me, not a part

10:04   15    of my assignment.

16    Q.   When you wrote a report and you opined that Seirus owes

17    millions of dollars to Columbia, you were not curious to see

18    what a Seirus glove would look like?

19    A.   I could see on the website exactly what they looked like.

10:05   20    They have a very nice website and are very clear about what

21    their products are.

22    Q.   Did you think whether it would have value to you in your

23    analysis to figure out what the various components of the glove

24    are and what maybe they would contribute to the overall value

10:05   25    of the glove?

1  A.   Not based on my assignment which is to assume the entire

2  market value rule applies.  If I had been asked to apportion, I

3  may have proceeded further to investigate those issues.

4  Q.   If you had been asked to apportion -- you mean by the

10:05   5  lawyers.  Is that right?

6  A.   Yes.

7  Q.   Okay.  And if you'd had been asked to apportion, that means

8  you could have, being a CPA -- you said it's kind of a

9  quantitative analysis -- you could have figured out what the --

10:05   10  you know, the fractional value of the HeatWave was to an

11  overall glove, correct?

12  A.   Well, I mean I can certainly count things in a variety of

13  ways.  I'm not sure what you mean by "value" in that case.

14  Q.   Let me ask you this --

10:06   15       MR. MARCHESE:  May I approach?

16       THE COURT:  Sure.

17  BY MR. MARCHESE:

18  Q.   I don't know if you've been here earlier in the trial, but

19  we've been looking at this glove quite a bit.

10:06   20  A.   Is this the infamous battery glove?

21  Q.   I don't know if it's infamous.

22  A.   It's infamous to me.  I'll tell you why.

23  Q.   You've seen it, right?

24  A.   I've seen it online.  I have not actually -- it's pretty

10:06   25  expensive, so I wouldn't want to have bought this one.

1  Q.  Never held one in your hand?

2  A.  I have not held one in my hand.

3  Q.  Okay.  Why don't you open it up.

4  A.  Okay.

10:07  5  Q.  Can you show it to the jury, please?  The different pieces.

6  That's an outer glove, right?  Inner glove.  And then there's a

7  couple battery packs in there and a charger, right?

8  A.  Yeah, a box with some technology in it.

9  Q.  It's got technology in it?

10:07  10  A.  Yeah.

11  Q.  That's got value, doesn't it?

12  A.  It may, but what I think is -- why I call these gloves

13  infamous is that Seirus sold hardly any of them.  The sales for

14  these gloves are just very insignificant, so I'm not sure why

10:07  15  they're such a big issue in this trial because they're very

16  expensive, and the sales dollars are just immaterial to me.

17  Q.  Immaterial to you?

18  A.  Yeah.

19  Q.  You think they're immaterial to Seirus?

10:07  20  A.  I don't know.  I would think that Seirus is probably

21  disappointed by their performance.

22  Q.  You're speculating, or do you know that?

23  A.  Well, just from the numbers.  We can look at the numbers of

24  the sales are very -- less than 1 percent of all their sales of

10:08  25  gloves.

1    Q.    In units or in dollars?

2    A.    In dollars.

3    Q.    Okay.  But despite the fact that you find that to be an

4    infamous glove, your opinion is that Columbia should get every

10:08  5    penny of profit from that glove, correct?

6    A.    If the entire market value rule applies, which means that

7    the Omni-Heat or the HeatWave feature -- and remember these

8    products are primarily named HeatWave, and that's how they're

9    marketed -- if that drives demand, then the entire market value

10:08  10    rule applies and the royalty applies to the whole thing.

11    Q.    Now, if you had been asked to offer opinions on the entire

12    market value rule, you think you could have done it?

13    A.    I do.

14    Q.    You think you could have offered an opinion on it, right?

10:08  15    A.    I mean I may have wanted to use the assistance of other

16    experts.  I mean if you're asking me on my own, I think -- I

17    always do things in collaboration with others being an

18    accountant.  But I do believe it -- from the perspective of a

19    consumer in the Pacific Northwest, I believe it.  So I believe

10:09  20    it's provable.  I wasn't asked to do it, but I believe it's

21    provable because I've been around Omni-Heat for years, and I've

22    seen what it's done in the market.  So I know just from my own

23    experience.  I've bought products because of Omni-Heat.  So,

24    yes, I think it could be proven.

10:09  25    Q.    Okay.  That was a long answer to a pretty simple question.

|       |    |                                                                          |
|-------|----|--------------------------------------------------------------------------|
|       | 1  | If you had been asked to do it, in other words, to compute               |
|       | 2  | the -- to figure out whether the entire market value rule                |
|       | 3  | applies, whether HeatWave drives demand for the entire glove,            |
|       | 4  | whether it be a battery-powered glove or an insulated glove,             |
| 10:09 | 5  | you could have done that?                                                |

6    A.    I believe it's provable within my accounting expertise.    I

7    would have to draw on the expertise of others to do that.

8    Q.    An economist?

9    A.    I would probably prefer a marketing executive than an

10:10   10    economist, or an economist who specializes in marketing.    Some

11    have specialties in that way.

12    Q.    Now, you've looked at the inside of that glove now, right?

13    A.    I have not.

14    Q.    If you can just look at the -- where do you see HeatWave?

10:10   15    A.    It's right here.

16    Q.    Can you hold that up?  It's right there.  It's on half of

17    the inside, right?

18    A.    It appears to be on this side, yes.

19    Q.    And it's not on the other glove at all, right?

10:10   20    A.    You mean on this?

21    Q.    The inner glove, right.

22    A.    It does not appear to be on that one.

23    Q.    Not on the batteries either, is it?

24    A.    I would not expect it to be on the battery.

10:10   25    Q.    Okay.  But you were asked to assume that the HeatWave

1  drives demand in and of itself for that entire glove, correct?

2  A.   Well, the way I understand the entire market value rule, I

3  mean, is that it's looking at both Omni-Heat and HeatWave, and

4  so -- and it's a question of the entire -- the entire use of

10:11  5  the patent, not just does it -- does it drive demand for this

6  particular glove, but not demand for that particular glove?

7  I'm looking at it as a whole.

8  Q.   Oh, you're doing a holistic approach to the entire market

9  value rule?

10:11  10  A.   In the way that I understand it, but as I've testified, I'm

11  not acting as an expert on whether it applies or not.

12  Q.   Well, let's ask you this:  So when you applied the entire

13  market value rule, you did it holistically, correct?

14  A.   I don't know what you mean by "holistically."

10:11  15  Q.   You said no matter what the glove is, whether it's a liner

16  glove, whether it's an insulated glove, whether it's a

17  battery-powered glove, the entire market value rule applies to

18  HeatWave.   It drives demand for the entire glove, correct?

19  A.   I would think that that's how one would need to do that;

10:12  20  otherwise, we would be trying every single product.   But as I

21  said, I have not conducted the analysis, so it's just based on

22  my just answering your questions based on my logical

23  understanding.

24  Q.   But you've never done an entire market value rule analysis

10:12  25  in your entire career, have you?

1  A.    That's correct.

2  Q.    You didn't do it here?

3  A.    That's correct.

4  Q.    But you said you think you might have been able to do it,

10:12  5  right?

6  A.    I think it's doable.  I mean I wouldn't want to do it on my

7  own.  I would want to use the expertise of others, but I think

8  it's doable.  I believe that it's true in this case.

9  Q.    Now, you've articulated what you believe that rule is in

10:12  10  your testimony before, correct?

11  A.    Yes, I'm sure I did in my deposition.

12  Q.    You said that the patent -- it would apply if the patented

13  feature drives demand for the entire product.  Is that a

14  fair --

10:12  15  A.    That's my understanding, yes.

16  Q.    And so patented feature is -- is the base, the bottom of

17  the inquiry.  Figure out what the patented feature is first,

18  right?

19  A.    I would assume that that would be required.

10:13  20  Q.    And then find out whether that feature drives demand for

21  the overall product, correct?

22  A.    Correct.

23  Q.    Or the product is composed of multiple features, right?

24  A.    Yes.

10:13  25  Q.    Okay.  And now, when you offered your report, that was back

1    about a year plus ago.  Is that right?

2    A.   Yes.

3    Q.   Okay.  And in your report you reached a final opinion about

4    damages, at least as of that time, correct?

10:13    5    A.   Yes.

6    Q.   And at that point in time, you said you had reviewed the

7    patents.  Is that right?

8    A.   I had read them -- skimmed them, yes.

9    Q.   Skimmed them.  But you only spent about 30 minutes to an

10:13    10    hour total reviewing the patents at the point when you issued

11    your report, correct?

12    A.   Correct.

13    Q.   And you would admit you didn't read them carefully, did

14    you?

10:14    15    A.   That's correct.  That wouldn't be part of my assignment to

16    read them in depth because there are plenty of experts who will

17    explain and analyze the patents.

18    Q.   So as the damages expert who's offering opinions about

19    millions of dollars on particular patents, where you finalize,

10:14    20    formulated your opinions, you're offering opinions about

21    reasonable royalty with respect to a utility patent,

22    disgorgement with respect to a design patent, 30 minutes to an

23    hour on the patents would be good enough?

24    A.   Well, you're assuming that's all I know about the patents.

10:14    25    I also had a conversation with Mr. Blackford to understand

1  them.  Dr. Cole explained them -- explained the functionality

2  to me.  The Columbia executives also did.  So I wouldn't expect

3  that I would be able to as an accountant read the patent and

4  understand them completely.  So I had conversations with others

10:14    5  to understand -- to be able to understand what Omni-Heat does

6  and what -- what's the difference between the design patent and

7  the utility patent.

8  Q.    This is your slide, correct, Mrs. Morones?

9  A.    Yes.

10:15    10  Q.    And this is the Georgia Pacific factors for the '270

11  patent?

12  A.    Yes.

13  Q.    You did not apply these factors to the design patent,

14  right?

10:15    15  A.    That's correct.  It's a topic of discussion relative to

16  utility patent.

17  Q.    Okay.  So these Georgia Pacific factors are applied only to

18  the '270 patent?

19  A.    Yes.

10:15    20  Q.    And in it there are a number of factors that I see that you

21  highlighted in -- I guess it's orange -- for entire market

22  value rule, right?

23  A.    Yes.

24  Q.    Number 9, advantages of the invention, right?

10:15    25  A.    Yes.

1    Q.    And you felt like when you offered your opinion that you

2    understood the advantages of the invention, the '270 patent?

3    A.    Yes.    I wrote about that in my report, yes.

4    Q.    You wrote about that.    Well, that's in paragraph 10 of your

10:16    5    report, right?

6    A.    I -- you can show me the report.

7    Q.    I can show you that in a minute, but I just want to ask you

8    this:    That part that describes what the patents cover, that

9    was written by Ms. Murphy, right?

10:16    10    A.    I don't remember.

11            MR. MARCHESE:    Can you pull up the deposition at 33,

12    lines 9 through 23.

13        Permission to publish, Your Honor?

14            MR. AXELROD:    My understanding this is --

10:16    15            MR. MARCHESE:    I think this is for the impeachment.

16            THE COURT:    I'm sorry.    I didn't hear what you said.

17            MR. AXELROD:    The witness said she didn't recall, and

18    he wanted to use the deposition.    Now he's saying for

19    impeachment, but she hasn't said anything.

10:16    20            MR. MARCHESE:    Okay.    We'll -- we won't publish.

21    BY MR. MARCHESE:

22    Q.    And I can just show it to you and see if it refreshes your

23    recollection.

24    A.    Okay.

10:16    25    Q.    Thank you.    Just one minute.    We'll pull it up.    Okay.

1    In here you and I and counsel are looking at it, but it

2  says:

3    "Question:   Let's go to paragraph 10 of your report."

4         MR. AXELROD:   Objection, Your Honor.

10:17  5         THE COURT:   Sustained.   You're using it to refresh her

6  memory.   The jury doesn't get to hear that.   She gets to read

7  it for herself and indicate whether or not it refreshes her

8  memory.

9  BY MR. MARCHESE:

10:17  10  Q.   Does it refresh your memory as to paragraph 10 of your

11  report, who wrote it?

12  A.   Yes, it does.

13  Q.   Okay.   And Ms. Murphy was the one who wrote the description

14  of the Columbia patents.   Is that correct?

10:17  15  A.   Yes.   There was a table in my report that lists the patents

16  and lists some information about them, yes.

17  Q.   You did not write that?

18  A.   That's correct.   Ms. Murphy is my -- I would call number 1

19  associate who works with me on my cases.

10:17  20  Q.   The claims of the '270 patent recite a 30 to 70 percent

21  coverage area.   Do you know about that?

22  A.   Yes, I've heard a lot about that.

23  Q.   Since you came to the trial?

24  A.   Yes, and before I understood that that was part of the

10:18  25  patent claim.

1  Q.  But when you wrote your report, you didn't know how 30 to

2  70 percent was measured, did you?

3  A.  No.

4  Q.  And --

10:18   5  A.  I mean I have a general understanding of what that means.

6  That's the coverage of the reflective material on the fabric,

7  the percentage of coverage.

8  Q.  As of the point you wrote your report and gave your

9  deposition, you did not know how the 30 to 70 percent was

10:18  10  measured, correct?

11  A.  That's probably true.  I don't remember being asked that

12  question, but if I think back to what I knew at the time of my

13  report or even now, I am not -- haven't undertaken an analysis

14  of how to measure like some of the other experts have testified

10:18  15  about.

16      MR. MARCHESE:  Can I have the deposition at 35, 7 to

17  8, please.

18    Permission to publish this for impeachment.

19      MR. AXELROD:  What is it?

10:19  20      MR. MARCHESE:  Page 35, line 7 to 8.

21      MR. AXELROD:  No objection.

22      THE COURT:  You may publish it.

23      MR. AXELROD:  Do the whole thing.

24  BY MR. MARCHESE:

10:19  25  Q.  At your deposition you were asked, "How is that 30 to 70

1  percent measured?"  Your answer:  "I don't know."  Correct?

2  A.  Yes.

3  Q.  Is that the correct answer?

4  A.  It's -- yes, it's correct.  As an expert?  I've heard

10:19  5  people talk about it in the trial, but I wouldn't know how to

6  scientifically measure the coverage.

7  Q.  And you don't know if a product with a 30 percent coverage

8  is more desirable than one with a 70 percent coverage, correct?

9  A.  I have heard discussion about the result of a higher

10:20  10  coverage or a lower coverage and what -- what could higher -- I

11  have some understanding of that.

12  Q.  As of the time you wrote your report, you did not know

13  whether a product with 30 percent coverage would be more

14  desirable than one with a 70 percent coverage, correct?

10:20  15  A.  That might be true as of that time because I don't -- I've

16  learned a lot over the course of even during this trial.

17  Q.  Well, you said "might be true."  Is it true as of that time

18  or not?

19  A.  If it's in my deposition, then that would be what I knew at

10:20  20  that time.

21  Q.  Okay.  That's what you said.  Do you have any reason to

22  want to correct that now?

23  A.  No.

24  Q.  So in your report when you talked about the entire market

10:20  25  value rule, you showed a picture of a Seirus hangtag.  Do you

1      remember that?

2      A.    Yes, the liner hangtag.

3      Q.    The liner hangtag, right?

4      A.    Yes.

10:21    5    Q.    You did not show a picture of a hangtag for a Gore-Tex

6      glove?

7      A.    No.  I showed a picture of a liner hangtag.

8      Q.    You did not show a picture of a liner for a glove with

9      Soundtouch, did you?

10:21   10    A.    I did not.

11      Q.    You did not show a hangtag for a glove that has Windstopper

12      fabric, did you?

13      A.    I showed a liner hangtag.

14      Q.    Just the liner?

10:21   15    A.    Just the liner, yes.

16      Q.    And the liner doesn't have any insulation, right?

17      A.    I don't believe so.  I believe it's nearly all HeatWave

18      fabric.

19      Q.    So you showed the one that was -- you showed a hangtag in

10:21   20    your report when you said that you were assuming the entire

21      market value rule applied for a liner, right?

22      A.    Well, no, I showed it because the hangtag illustrates how

23      HeatWave works, and that's an illustration of Seirus marketing

24      for HeatWave.

10:22   25    Q.    But make sure we're clear here.  In your report when you

1  put the hangtag in there, it was only for a liner, right?

2  A.   Yes.   I didn't put multiple hangtags in.   I put in one for

3  a liner because it illustrated -- clearly illustrated Seirus'

4  view of how HeatWave works.

10:22  5  Q.   You did not put in a hangtag for an insulated glove, right?

6  A.   I did not.

7  Q.   You had a conversation I think you said with Mr. Blackford.

8  A.   Yes.

9  Q.   Prior to issuing your report?

10:22  10  A.   Yes.

11  Q.   And in that conversation, he told you that the coverage of

12  the dots on the Columbia Omni-Heat product is something like 30

13  to 40 percent, correct?

14  A.   I believe that's correct.

10:23  15  Q.   You've looked at several license agreements in the case,

16  correct?

17  A.   Yes.

18  Q.   And I want to ask you if you would agree with me on this

19  point:   Do you understand that it's very different when you're

10:23  20  taking a license just to put some foil on the fabric versus

21  when you're taking a license to manufacture somebody else's

22  product for them and put their name on it?   Do you agree with

23  that?

24  A.   Well, the use -- the two uses you've described are

10:23  25  different.

1  Q.   They're different, right?

2  A.   Yes.

3  Q.   And a license to those two different uses are different

4  licenses, agreed?

10:24    5  A.   Just logically they would be different; they're not the

6  same.

7  Q.   And all the deals that you've used in your report and that

8  you've talked about in your testimony here involve a situation

9  where somebody else was going to make a product, and Columbia

10:24   10  was going to put its name on it, right?

11  A.   I'm not sure if the -- yeah, for the most part.  The one

12  with the blanks is a little bit different, but yes.

13  Q.   So the answer is yes?

14  A.   Yes.

10:24   15  Q.   And all of the deals that you looked at, the four license

16  agreements you looked at, were for branded goods.  Would you

17  agree with me?

18  A.   Yes.

19  Q.   And branded goods are where the licensee is making a

10:25   20  product and putting Columbia's name on it, correct?

21  A.   Yes, with the exception of that outdoor custom sportswear.

22  It already has -- they don't -- they're putting somebody else's

23  name on it.

24  Q.   They're putting, like, a university's name on it.

10:25   25  A.   Right.

1     Q.    And they're putting Columbia.

2     A.    Well, Columbia is already on it.    They're buying Columbia

3     product and putting another -- yeah, a university or a golf

4     club on it.

10:25    5     Q.    Okay.    And you would agree with me that in the hypothetical

6     license that you've talked about for the Georgia Pacific

7     analysis for the '270 patent, Seirus wouldn't be getting any

8     Columbia products under that, would they?

9     A.    They would not want the Columbia products.    I would assume

10:25    10    that they would want to sell their own products.

11    Q.    And that's because Seirus has its own brand and its own

12    fame and all that, correct?

13    A.    Well, Seirus has their own brand, their own company.

14    They're in the business to sell their own product.

10:25    15    Q.    And so they wouldn't even want to get a Columbia branded

16    glove, for example, and then sell it like OCS did, right?

17    A.    I would not -- I mean I don't know.    I wouldn't expect them

18    to want to promote a competitor.

19    Q.    So the answer is no?

10:26    20    A.    Well, I don't know for sure.    I haven't seen them answer

21    that question, but I would not expect that from them.

22    Q.    Okay.    Thank you.

23          None of the agreements that you looked at, none of the

24    deals that you looked at, I think -- let me make sure we're

10:26    25    clear.    OCS is one, right?

|   |   |
|---|---|
| 1 | A.    Yes. |
| 2 | Q.    Torg, T-o-r-g? |
| 3 | A.    Yes. |
| 4 | Q.    That's another one? |
| 10:26   5 | A.    Yes. |
| 6 | Q.    And then there was one with Delta Galil, right? |
| 7 | A.    Yes. |
| 8 | Q.    And then there was a fourth one with -- I'm trying to |
| 9 | remember -- London Luxury, right? |
| 10:26   10 | A.    Yes. |
| 11 | Q.    Of those four deals, none of those were narrow, technical |
| 12 | deals on a particular patent license, were they? |
| 13 | A.    No, because that's not what Columbia does.   Those deals |
| 14 | were representative of Columbia's licensing program. |
| 10:27   15 | Q.    And they weren't just for technology, right? |
| 16 | A.    No. |
| 17 | Q.    There was other stuff that the licensee was getting in |
| 18 | addition to the technology, right? |
| 19 | A.    Yes, because Columbia wouldn't license just their |
| 10:27   20 | technology.   The way that they license is by offering their -- |
| 21 | their brand, their technology, all of it together, and |
| 22 | requiring a lot of services to be provided by these companies |
| 23 | that sell these other products. |
| 24 | Q.    I think we need to be really clear here in the case because |
| 10:27   25 | I don't want your testimony to muddy the water here about this |

1  point.  In the hypothetical negotiation under Georgia Pacific

2  which you did for the '270 patent -- you did that, right?

3  A.    Yes.

4  Q.    The license agreement would be just for the patent,

10:27  5  correct? -- just the '270 patent, right?

6  A.    Yes, but the way I see that being just for the patent, so I

7  agree with you that it's for the patent.

8  Q.    Well, if you agree, let me ask you the next question.    The

9  next question is that it's just for the patent, right?

10:28  10  Correct?

11  A.    The patent is being licensed, yes.

12  Q.    Nonexclusive license, right?

13  A.    Yes.

14  Q.    That means Columbia has the right to go license the patent

10:28  15  to anybody they want besides Seirus, right?

16  A.    If I understand nonexclusive, yes.

17  Q.    Do you understand?

18  A.    Well, meaning that Seirus isn't the only one who can use

19  it.

10:28  20  Q.    So you would agree with me there?

21  A.    Yes.

22  Q.    Okay.  And it doesn't include the right to get

23  Columbia-branded goods, right?

24  A.    Or the obligation to promote Columbia.

10:28  25  Q.    That wasn't what I asked.    The hypothetical license does



1   not give Seirus the right to get Columbia-branded goods,

2   correct?

3   A.   That's correct.

4   Q.   Okay.   And the hypothetical license does not give Seirus

10:28   5   the right to get any trademarks from Columbia, correct?

6   A.   That's correct.

7   Q.   And the hypothetical license doesn't give Seirus the right

8   to get any logos or designs from Columbia, right?

9   A.   That's correct.

10:29   10   Q.   And the hypothetical license doesn't give Seirus the right

11   to call theirs Omni-Heat, right?

12   A.   That's correct.

13   Q.   Or to call it OutDry?

14   A.   Yes.

10:29   15   Q.   Or any of the Omni names, right?

16   A.   Correct.

17   Q.   Okay.   And it doesn't give Seirus the right to get trade

18   secrets or know-how from Columbia, correct?

19   A.   Yes, that's correct.

10:29   20   Q.   And it doesn't give Seirus access to trade channels or

21   customers of Columbia, correct?

22   A.   Correct.

23   Q.   And it doesn't give Seirus the right to any other patent

24   besides the '270 patent, right?

10:29   25   A.   That's correct.

1  Q.   Okay.   Thank you.

2       So with that said, I want to take a look at these license

3  agreements so we can see what they say.

4            THE COURT:   Why don't we -- you're moving to a new

10:29   5  topic.   Why don't we take our morning recess.

6       Members of the jury, we'll be in recess for about 15

7  minutes.

8       (Recess.)

9       (Proceedings held in the presence of the jury panel.)

10:46  10            THE COURT:   Please be seated.

11      You may proceed.

12            MR. MARCHESE:   Thank you, Your Honor.

13  BY MR. MARCHESE:

14  Q.   And, Ms. Morones, before we took the break, we were going

10:46  15  to talk about license agreements.   Do you recall that?

16  A.   Yes.

17  Q.   And so as promised, we will look at a couple of them.

18  First I'd like to talk about Delta Galil.   You know that one,

19  right?

10:46  20  A.   Yes.

21  Q.   And that license included a right to use Columbia property

22  including names, symbols, designs, logos, artwork, copyrights,

23  trademarks, and trade dress, right?

24  A.   Yes.

10:47  25  Q.   And patents too, correct?

1    A.    Yes.

2              MR. MARCHESE:   If we go to number 88, please.

3         And I don't know if that's -- has that been received?  I

4    offer it if not.

10:47    5              THE COURT:   It's been received.

6              MR. MARCHESE:   I'm sorry.  I didn't see it.  Thank

7    you.

8              THE COURT:   No problem.

9    BY MR. MARCHESE:

10:47    10    Q.    Do you see it Ms. Morones?

11    A.    Yes.

12    Q.    Am I saying your name correctly?

13    A.    Yes.

14    Q.    Mine gets butchered all the time.

10:47    15         So London Luxury is an agreement which we already -- I'm

16    sorry -- I was talking about Delta Galil, wasn't I?  Apologies.

17              MR. MARCHESE:   Can we have Exhibit 91 instead, please?

18    BY MR. MARCHESE:

19    Q.    Do you see that up there, Ms. Morones?

10:48    20    A.    I don't think that one's in my binder, but it's okay.

21    You're showing me on the screen.

22    Q.    Sure.  And if you need the entire copy, let us know.

23    A.    Okay.

24    Q.    The Delta Galil agreement is something you're familiar

10:48    25    with?

1  A.  Yes.

2  Q.  And when the original license was provided by Columbia, it

3  included no patents at all, right?

4  A.  That might be true.  I do remember it did not include

10:48  5  Omni-Heat the first time around.

6  Q.  It did not include Omni-Heat patents, correct?

7  A.  Correct.

8  Q.  Did not include the '270 patent, right?

9  A.  I would assume that's included, yes.

10:48  10  Q.  You assume or that's correct?

11  A.  I'd have to assume.  I believe that you're correct.

12      MR. MARCHESE:  And if we look at Exhibit Number 87,

13  please.

14  BY MR. MARCHESE:

10:48  15  Q.  Exhibit Number 87 is an amendment to the Delta Galil

16  agreement, right?

17  A.  Yes.

18  Q.  And in that amendment to the Delta Galil agreement, there

19  is paragraph 2.  Do you see that?

10:49  20  A.  Yes.

21  Q.  And in the amendment, "Columbia grants licensee" -- which

22  is Delta Galil, right?

23  A.  Yes.

24  Q.  -- "a nonexclusive license under Columbia's patents and

10:49  25  trade secrets related to," and then it goes on for quite some

1    time, "licensed articles incorporating Columbia's Omni-Heat

2    Reflective technology," right?

3    A.    Yes.

4    Q.    In this amendment --

10:49    5        MR. MARCHESE:    If we can see the whole page again,

6    please.

7    BY MR. MARCHESE:

8    Q.    This amendment was -- at the very top, very first

9    paragraph, it says March 18, 2013, right?

10:50    10    A.    Yes.

11    Q.    And is it your -- and would you agree with me that Delta

12    Galil amendment happened after the original agreement?  Right?

13    A.    Yes.

14    Q.    And so in the original agreement, the Omni-Heat patents and

10:50    15    trade secrets were not provided to Delta Galil, correct?

16    A.    Correct.

17    Q.    And when they -- they were then added by a subsequent

18    amendment?

19    A.    Yes.

10:50    20    Q.    And that amendment did not increase the rate at all for the

21    Delta Galil license, correct?

22    A.    That's correct.

23        MR. MARCHESE:    Can you go back to Exhibit 91, please,

24    the license agreement.  If you could go to schedule D, which is

10:51    25    on page -- I don't have the page number on the exhibit in front

1    of me.  It's the bottom -- let's see.  It's like 36.

2    Schedule D.

3    BY MR. MARCHESE:

4    Q.   Do you see that, Ms. Morones?

10:51    5    A.   Yes.

6    Q.   So this license agreement gave Delta Galil access to

7    approved manufacturers for Columbia, correct?

8    A.   Yes.

9    Q.   And the hypothetical license you've been talking about,

10:51   10    that would not provide that benefit to Seirus, correct?

11    A.   I would assume not.

12    Q.   And the -- you said "assume not."  Is that correct or not?

13    A.   Well, hypothetical requires an assumption, so --

14    Q.   But --

10:51   15    A.   Since it's hypothetical.

16    Q.   Well, but the hypothetical license in Georgia Pacific is

17    very specific.  Wouldn't you agree with me?

18    A.   I'm not sure what you mean by "specific."  That's a very

19    vague --

10:51   20    Q.   Did --

21    A.   -- term.

22    Q.   You read the Georgia Pacific case?

23    A.   Yes.

24    Q.   Cover to cover?

10:52   25    A.   Oh, I -- yes, likely.  It's been years that I have been



1   using the Georgia Pacific case, and I know I've read it several

2   times.

3   Q.   It's a famous case, right?

4   A.   Yes.

10:52  5   Q.   From the 1970s.

6   A.   Yes.

7   Q.   And it really set up the test for determining what a

8   reasonable royalty would be in patent cases, right?

9   A.   Yes, it's one of the most referenced cases in -- regarding

10:52  10   patent damages, yes.

11   Q.   And it's cited regularly by the Court of Appeals and the

12   Supreme Court.   Would you agree?

13   A.   Yes.

14   Q.   Okay.   And in the Georgia Pacific case, they explicitly --

10:52  15   that calls out a very specific type of hypothetical license.

16   Would you agree with me?

17   A.   I'm not sure what you mean by "a specific type of

18   hypothetical license."

19   Q.   Are you aware of exactly what the license will be under

10:52  20   Georgia Pacific or not?

21   A.   I just don't -- you're using such vague -- I don't

22   understand your question.

23   Q.   My question is, can you tell us what exactly is the license

24   that Seirus would get from Columbia under the Georgia Pacific

10:53  25   reasonable royalty analysis?

| | |
|---|---|
| 1 | A.   Well, I can describe what I understand would be the |
| 2 | attributes of the license.  It would be a license for the |
| 3 | utility patent.  It would be -- it would be under the facts and |
| 4 | circumstances of the parties' relationship, in other words, as |
| 10:53   5 | a competitive relationship, so -- |
| 6 | Q.   I want to clarify.  I don't want to know the -- more of the |
| 7 | atmospherics of it.  I was curious what the terms would be. |
| 8 | Would it be nonexclusive? |
| 9 | A.   It would need to be nonexclusive because Columbia uses the |
| 10:53   10 | patent, so it couldn't be exclusive. |
| 11 | Q.   Okay.  And it would be for the '270 patent, right? |
| 12 | A.   Yes. |
| 13 | Q.   No other patents? |
| 14 | A.   Correct. |
| 10:54   15 | Q.   And it would be -- it would not include trademarks? |
| 16 | A.   I assume so, yes. |
| 17 | Q.   It wouldn't include trade dress or designs or anything like |
| 18 | that? |
| 19 | A.   Correct. |
| 10:54   20 | Q.   It wouldn't include trade secrets? |
| 21 | A.   Correct. |
| 22 | Q.   And it wouldn't include logos? |
| 23 | A.   Correct. |
| 24 | Q.   Artwork? |
| 10:54   25 | A.   Correct. |

1    Q.    Access to approved manufacturers?

2    A.    Yes.    The way I see that, what it includes and what it

3    doesn't include is I look to what actually happened, how did

4    Seirus use it.

10:54    5    Q.    Well, I'm just asking you what it has and doesn't have

6    because I'm trying to get -- understand the difference between

7    the hypothetical license, which is the one you're saying that

8    Seirus would get for -- I think it was 1. -- whatever.    It's

9    your 10 or 20 percent license -- and what these licenses are

10:54    10    like that you say are comparable.    That's what I want to

11    understand.    Okay?

12    A.    I didn't say the licenses were comparable.    I didn't

13    testify to that.

14    Q.    So the Delta Galil license agreement in your view is not

10:55    15    comparable to the hypothetical license in this case, correct?

16    A.    Yes.    Absolutely, it's not comparable.

17    Q.    Okay.    And the OCS agreement is not comparable to the

18    hypothetical license in this case, correct?

19    A.    Yes.    There are many differences between these Columbia

10:55    20    licenses and the hypothetical license.

21    Q.    And the Torg agreement is not comparable to the

22    hypothetical license agreement in this case, correct?

23    A.    Yes.    And when you say "comparable," I'm assuming you mean

24    what's included and what's not included in terms of the terms.

10:55    25    There are licenses for the technology, and so in that sense,

1    they are licenses for the property at issue, but in terms of

2    the terms and expectations, they're very different.

3    Q.    They're not comparable, correct?

4    A.    Correct.    But I'm concerned that you're construing that in

10:55    5    a -- like in a sense of looking at market licenses and saying

6    that they should be disregarded.    I don't think that that's the

7    way the Georgia Pacific factors work at all in terms of they

8    should be disregarded because they have more features in them.

9    Q.    I just wanted to see if you would tell me that you think

10:56    10    they're comparable or not.    That's all I want to know.

11    A.    They are very different.

12    Q.    All four?

13    A.    Yes.

14    Q.    And I listed three of them.    I did not do London Luxury.

10:56    15    Is that not comparable in your view?

16    A.    It's very different.

17    Q.    Not comparable?

18    A.    They're not identical.

19    Q.    That's not my question.

10:56    20    A.    Well, "comparable" is a big word in my world, so I don't

21    know if we want to argue about what comparable means.    But

22    comparable means very similar, and of course I don't think

23    anyone has suggested that they're very similar.    That's why --

24    that's why adjustments need to be made to the royalty rate from

10:57    25    the starting point of the Columbia licenses because of the

1    differences.

2    Q.   Under your definition of "comparability," you would agree

3    with me, then, that Delta Galil and the other three agreements

4    are not comparable, right?

10:57    5         MR. AXELROD:  Objection.  Asked and answered.

6         THE COURT:  Overruled.

7    You can answer the question.

8         THE WITNESS:  Yes, I would agree.

9    BY MR. MARCHESE:

10:58   10    Q.   There was a particular slide, PDX214.  Do you remember this

11    one?

12    A.   Yes.

13    Q.   And this particular slide gives the Georgia Pacific

14    factors, right?

10:58   15    A.   Yes.

16    Q.   And number 1 is plaintiff licenses, right?

17    A.   Yes.

18    Q.   And here you say that "The plaintiff licenses set the

19    floor," right?

10:58   20    A.   Yes.

21    Q.   And in your case you used the four noncomparable agreements

22    to set the floor, right?

23    A.   I used the four Columbia licenses that include Omni-Heat,

24    yes, to set the floor.

10:58   25    Q.   Which you agreed with me are not comparable?

A.   They're very different, and that's why I believe that the
rate needs to be adjusted upward from the floor to account for
the differences.

Q.   Now, you've read publications about Georgia Pacific, right?

A.   Yes.

Q.   And you've -- I think you said you had not gone to any
seminars to see people talk about patent damages.  Is that
correct?

A.   That's not what you asked me.

Q.   Well, did you?  Have you done that?

A.   Yes.

Q.   And in those articles you've read and the experts you've
watched talking about how you do Georgia Pacific -- and I mean
experts in the law and economics and all that talk about how
you this, when you set the floor using a plaintiff license,
have you ever heard anybody tell you that the license needs to
be comparable?

A.   Not specifically.  I have read that the most important
consideration for setting the floor is looking to what the
patent owner has licensed the technology for.

Q.   And to find a comparable license to do that with, correct?

A.   I have not specifically heard a speaker say that.  In my
understanding of Georgia Pacific, the strongest consideration
is what does the patent owner license it for as far as that
analysis of licenses.


1  Q.   Have you read any of the cases from the court of appeals

2  concerning setting the floor using plaintiff's licenses?

3  A.   I don't recall any specific discussion about that.

4  Q.   And you don't recall seeing anything about comparability of

11:00  5  license agreements in the opinions of the courts.  Is that

6  correct?

7  A.   Not that I can recall sitting here right now.

8  Q.   Now, in these license agreements, there were a number of

9  different technologies licensed, right?

11:00  10  A.   Yes.

11  Q.   There was -- well, I remember seeing Omni-Heat, right?

12  A.   Yes.

13  Q.   And is it Omni-Dry?  Is that another one?

14  A.   Yes.

11:00  15  Q.   And which other ones?

16  A.   Omni-Freeze.

17  Q.   Any others?

18  A.   Not that I can remember.  I'd have to look at them.

19  Q.   And I kind of remember your testimony earlier.  I wrote

11:00  20  this down, and I wasn't sure if those were your word or not,

21  but "chop up the licenses."  Does that sound like words you

22  used?

23  A.   I might have said that, yes.

24  Q.   And so what I want to know is, did you make any effort in

11:01  25  this case to chop up the license agreements to figure out what

1    each value was contributed to the license agreements, say, by

2    Omni-Dry versus Omni-Heat versus Omni cold -- I think you

3    called it --

4    A.    Freeze.

11:01    5    Q.    Omni-Freeze.    Did you chop them up?

6    A.    I did not.

7    Q.    And in the hypothetical license that Seirus is going to

8    get, it's not going to get any patents, know-how, trademarks,

9    trade dress, anything technology-related to Omni-Freeze, will

11:01    10    it?

11    A.    I would assume not.

12    Q.    And in the hypothetical license, Seirus is not going to get

13    any trademarks, trade dress, artwork, trade secrets, patents,

14    or anything related to Omni-Dry, correct?

11:01    15    A.    Correct.

16            MR. MARCHESE:    Could you pull up PDX204.

17    BY MR. MARCHESE:

18    Q.    Ms. Morones, do you remember this slide?

19    A.    Yes.

11:02    20    Q.    It looks to me like the Omni-Heat sales are going down.

21    A.    This slide shows relative to total, so as a percent of

22    total sales, yes, the percentage is going down.

23    Q.    And that's because Columbia is introducing new products?

24    A.    Yes, that's what Mr. Drozdowski -- I had to think of his

11:02    25    name -- indicated, that they're -- Columbia is trying to

1    diversify into other product categories.

2    Q.    Buying companies and increasing its sales?

3    A.    Well, yes.  I mean they are buying companies.  I don't

4    know -- I'd have to look at my schedules to see what the total

11:02    5    sales are, but he said that they're offering a different type

6    of variety of products.

7    Q.    And they've bought Piranha.  Is that one of them?

8    A.    Yes -- I'm not familiar with that one, but probably.

9    Q.    And they've bought Mountain Hardwear?

11:03    10    A.    Yes.

11    Q.    And they've bought OutDry?

12    A.    Yes.

13    Q.    And you're familiar with OutDry?

14    A.    Yes.

11:03    15    Q.    And OutDry has patents, right?

16    A.    Yes.

17    Q.    And OutDry licenses those patents, correct?

18    A.    I believe so.  I don't know that I know which entity

19    licenses --

11:03    20    Q.    Mr. Merriman mentioned that OutDry has patented licenses,

21    right?

22    A.    Yes.

23    Q.    And he didn't know the rates, right?

24    A.    He did not.

11:03    25    Q.    And you don't know them either, right?

A.   I do not.

            MR. MARCHESE:   Exhibit 1083, I offer.

            MR. AXELROD:   No objection if she can identify it.

            THE COURT:   So that means you need to display it to
11:05   the witness, please.

BY MR. MARCHESE:

Q.   Do you see that it's up, Ms. Morones?  Do you see

Exhibit 1083?

A.   Yes.

11:05   Q.   And can you tell us what it is, please?

A.   It appears to be a printout from outdry.com because at the

footer it says www.outdry.com.

Q.   Is this a document that you're familiar with?

A.   I don't specifically recall.  Have I seen it?  I may have.

11:05   Q.   Are you familiar with any of the licensees that OutDry has?

A.   Just in terms of the company names, I'm familiar with

Browning.  Columbia is listed as one.  The others I'm not

familiar with.

Q.   And you said OutDry was acquired.  It's owned by Columbia,

11:06   right?

A.   Yes, it was purchased by Columbia.

Q.   In what year?

A.   I don't remember.

Q.   And you do know that Columbia -- I'm sorry -- that -- now

11:06   you've looked at this list that OutDry has partners, right?

A.    Well, the footer of the document, what's printed on the

bottom, has the website forward slash, E-N-G, underscore,

partners.

Q.    So OutDry has a number of partners, right?

11:06    A.    I don't -- I mean it's what their website says, yes.

Q.    The website says that they have partners, right?

A.    Yes.

Q.    And did you look at any license agreements, assuming they

exist, between OutDry and any of its partners?

11:07    A.    I did not.

Q.    For patents?

A.    I did not.

Q.    You didn't look for any license agreements between OutDry

and, say, Castelli.  Is that right?

11:07    A.    I did not.

Q.    And you didn't look at any license agreements between

OutDry and Browning, a company you said you're familiar with?

A.    No, and the reason is that I was in talking to --

Mr. Trepanier, I believe, told me that these arrangements

11:07    existed at the time of acquisition, and they're very different

from Columbia's licensing strategy and position.

Q.    They're not comparable, right?

A.    Well, they're different -- they're not Columbia licensed --

Columbia brand programs.  They're entirely different, existing

11:07    at the time of acquisition, and that OutDry company has

1    continued those relationships.  And that's different than

2    Columbia's -- under the factor number 1, what is the patent

3    owner's history of licensing, it's a different organization

4    entirely.

11:08    5    Q.   Different organization.  Okay.  And did you ask for access

6    to the OutDry license agreements?

7    A.   I don't believe so.

8    Q.   And did anybody give you the OutDry license agreements?

9    A.   I don't think so.

11:08    10    Q.   So you're unaware of whether those are nonexclusive, bare,

11    kind of just a patent license agreement as opposed to an

12    agreement like the four we've looked at which have trade dress

13    and trademarks and trade secrets and all of that, right?

14    A.   I don't know.

11:08    15    Q.   So you just don't know?

16    A.   I don't know.

17          MR. MARCHESE:   Can you go back to PDX204.

18    BY MR. MARCHESE:

19    Q.   So this is the slide we were looking at before,

11:08    20    Ms. Morones, and I wanted to ask you, to your knowledge is the

21    reason that the sales went down at least in part due to other

22    companies doing foil printing like Omni-Heat?

23    A.   I don't know.

24    Q.   Did you ask?

11:08    25    A.   I don't think I did.

1   Q.   And in considering whether the sales have decreased as a

2   result of new product lines or other foil printing or any other

3   factors, did you consider whether design-arounds might exist to

4   the patent?

11:09   5   A.   In consideration -- the reason for the decline in sales,

6   no; as part of my Georgia Pacific analysis, yes.   I'm aware

7   that that's a -- that that's a consideration.

8   Q.   Design-arounds are a consideration you have to take into

9   account in figuring out how valuable a patent license is,

11:09   10   right?

11   A.   Yes.

12   Q.   And in this case, I think you -- maybe you've been in

13   court.   You've probably seen people --

14          MR. MARCHESE:   I'm going to grab it, if I may.

11:09   15          THE COURT:   Sure.

16          MR. MARCHESE:   Thank you.

17   BY MR. MARCHESE:

18   Q.   -- holding up the Omni-Heat fabric and saying that if you

19   put it towards your skin that Columbia would consider that to

11:10   20   be an infringement of its patent.   Is that right?

21   A.   Yes.

22   Q.   And if you turned it away from your skin like that --

23   A.   Yes, I understand that difference.

24   Q.   -- that would -- Columbia would contend that does not

11:10   25   infringe, right?

1    A.    Yes.

2    Q.    Did you consider that design-around concept in your

3    reasonable royalty analysis?

4    A.    I did not because I understand those are excluded from the

11:10    5    sales that I'm applying a royalty to, so the --

6    Q.    I think you answered my question.  I think you said you did

7    not.

8    A.    Well, I didn't have to additionally consider that because I

9    understood those products to be out already.  The products that

11:10    10    are designed that way, in the Seirus data are already removed

11    from the analysis.

12    Q.    But so you did not consider whether the value of the

13    license should go up or down depending how easy or hard it

14    would be for Seirus to just turn the fabric around, right, on

11:10    15    the products that do have the foil facing in?

16    A.    I did not.

17        MR. MARCHESE:    Can I have slide number PDX213.

18    BY MR. MARCHESE:

19    Q.    This was your summary of the hypothetical negotiation,

11:11    20    right?

21    A.    Yes.

22    Q.    And in this document, you have seven different -- seven

23    bullet points, right?

24    A.    Yes.

11:11    25    Q.    And one of those bullet point I wrote down was the third


1  one, "Columbia protects its patent monopoly."  You said you got

2  the information for that from Mr. Merriman, right?

3  A.   Yes.

4  Q.   You did not do an independent analysis of that, correct?

11:11  5  A.   That's correct.  I'm not sure what I would have done to

6  confirm additional licenses by Columbia, though, but in terms

7  of knowing in the public realm what Columbia's licenses are, I

8  have to ask Columbia for that information.

9  Q.   The fourth bullet says, "Columbia would start negotiations

11:12  10  at a rate equal to total gross margin."  Do you see that?

11  A.   Yes.

12  Q.   And you said Columbia would be, quote, "very aggressive."

13  Do you remember saying that?

14  A.   Yes.

11:12  15  Q.   And you said that Mr. Merriman told you that, right?

16  A.   Yes.

17  Q.   And you said that Mr. Merriman said that Columbia would

18  expect to lose sales, right?

19  A.   Yes.

11:12  20  Q.   And that, therefore, that Columbia should get its entire --

21  the entire gross margin from Seirus, correct?

22  A.   I said that he would want to start the negotiation there.

23  Q.   But he wouldn't end there, right?

24  A.   Well, no, I mean in my conversation with him, that's what

11:12  25  he said where he would start.

1   Q.   And you got the information for the fourth bullet point

2   from Mr. Merriman, correct?

3   A.   Yes.

4   Q.   You did not do your own independent analysis, right?

11:12   5   A.   In terms of that assumption, that is from Mr. Merriman.

6   That's how he would -- that would be his posture in a

7   hypothetical negotiation.

8   Q.   And then the fifth bullet point, "Columbia has substantial

9   negotiating power," that came from Mr. Merriman as well, right?

11:13   10   A.   No.   That's my own conclusion because of Columbia being a

11   patent owner and having experienced substantial commercial

12   success.

13   Q.   Well, tell me, which are the other bullets on here besides

14   3 and 4 did you get your information from Mr. Merriman for?

11:13   15   A.   Let me think about your question.   Which of the bullet

16   points -- would you mind repeating?

17   Q.   Yeah.   Sorry.   So bullet 3 was the one that says "Columbia

18   protects its patent monopoly," right?

19   A.   Yes.

11:13   20   Q.   And that came from Mr. Merriman?

21   A.   Well, there are documents that substantiate that, too, the

22   internal marketing documents that talk about the program, the

23   licensing program.

24   Q.   Let me just try to shortcut because I think that will help

11:13   25   for everybody here.   I think we already talked about bullets 3

1  and 4, right?

2  A.  Yes.

3  Q.  And so of the other five bullets on the page, which of

4  these did you get information from Mr. Merriman for?

11:14  5  A.  Mr. Merriman contributed -- no, actually that was

6  Mr. Trepanier -- number 2 in terms of my understanding of how

7  Columbia markets the technology.  However, there are a lot of

8  documents that substantiate Columbia's marketing.  And that

9  would be the only other one.

11:14  10  Q.  So bullet number 2, you got information from Mr. Trepanier,

11  right?

12  A.  Yes.

13  Q.  And you did not get anything from Mr. Merriman for that,

14  correct?

11:14  15  A.  I wouldn't say that.  With Mr. Merriman we talked about a

16  lot of things, and I would -- Mr. Merriman definitely talked

17  about the importance of Omni-Heat and how that would factor

18  into the negotiation.

19  Q.  Let me go back through some of the testimony in your case

11:15  20  at your deposition.  Okay?  So we talked earlier about your

21  expert report, right?

22  A.  Yes.

23  Q.  And you had this -- the main report that you issued

24  about -- I'd say a year and two or three months ago, you were

11:15  25  deposed on it, right?

1    A.    Yes.

2    Q.    And you opined on -- in that particular report on the '270

3    patent, right?

4    A.    Yes.

11:15    5    Q.    And on the design patent?

6    A.    Yes.

7    Q.    And you did a reasonable royalty Georgia Pacific -- you

8    stepped through the Georgia Pacific factors for the '270

9    patent?

11:15    10    A.    Yes.

11    Q.    And in the context of preparing your report, you spoke to a

12    number of employees for Columbia, which you've already

13    identified, right?

14    A.    Yes.

11:16    15    Q.    Lawyers -- well, I think lawyers both inside and outside of

16    Columbia, right?

17    A.    Yes.

18    Q.    And then Mr. Trepanier, Mr. Merriman.  I think you

19    mentioned that you spoke to Dr. Cole?

11:16    20    A.    Yes.

21    Q.    And Mr. --

22    A.    Blackford.

23    Q.    Am I missing anybody?

24    A.    I don't believe so -- oh, Mr. Drozdowski, the financial

11:16    25    representative for Columbia.

1  Q.  And he testified in court earlier, right?

2  A.  I was not here, so . . .

3  Q.  He did.

4      Were you here for Mr. Trepanier's testimony?

11:16    5  A.  I was not.

6  Q.  Were you here for Mr. Blackford's first round of testimony?

7  A.  No.

8  Q.  How about his second one?

9  A.  Yes.

11:16    10  Q.  Did you hear Dr. Cole testify?

11  A.  Yes.

12  Q.  So let me just ask you a few questions about the Delta

13  Galil license first which we've talked about a little bit.

14      You have said -- let me just ask you a question, and you

11:17    15  tell me if you think it's correct or not.  Okay?  The fact that

16  the Delta Galil license was amended and the -- to add the

17  Omni-Heat patents and the royalty rate wasn't changed at all --

18  are you with me so far?

19  A.  Yes.

11:17    20  Q.  That tends to show there is no independent value assigned

21  to the Omni-Heat rights, correct?

22  A.  The agreement doesn't assign the value, but that's not how

23  I understand Columbia views its value.

24  Q.  So your understanding is Columbia views the amendment to

11:17    25  the agreement to Delta Galil, even though it didn't add any

1   percentage points in terms of what had to be paid, and

2   Omni-Heat patents and all kind of other technologies were

3   transferred, that your opinion is nevertheless Omni-Heat had

4   independent value to Delta Galil?

11:18  5   A.  Yes.  What Mr. Merriman explained is that when you go from

6   that $15 sock to the $30 sock that the increase in wholesale

7   price times the royalty rate provides additional income to

8   Columbia.

9   Q.  And that came from Mr. Merriman, right?

11:18  10   A.  Yes.

11   Q.  You did not do your own independent analysis of that,

12   correct?

13   A.  Well, I can see -- anyone can look and see the socks online

14   and see that there's a significant difference in the retail

11:18  15   price.

16   Q.  You were asked at your deposition about whether you did

17   some sort of a market analysis or some sort of determination

18   for -- in the context of the entire market value rule for

19   products that had Omni-Heat versus those that did not --

11:18  20   A.  Yes.

21   Q.  -- remember?

22   A.  Yes.

23   Q.  And you said there weren't enough to do that, right?

24   A.  Yes.

11:19  25   Q.  And that's because the only one was a sock, right?

1  A.  No.  I think there were -- there might have been a jacket.

2  There were -- we were given six or seven products that Columbia

3  believed could be -- were similar, and we eliminated some of

4  those because -- I don't remember what the issues were, but

11:19  5  there were problems with the data, and we felt that we couldn't

6  use them.  So we got down to just something like two or three

7  products that we felt were similar enough with and without

8  Omni-Heat, and I felt like that was too few products given all

9  of the vast amount of sales, so I didn't feel comfortable

11:19  10  drawing a conclusion just on that basis.

11  Q.  So you didn't do any kind of a market analysis to figure

12  out what the difference would be in terms of demand and whether

13  or not the Omni-Heat was driving demand for any Columbia

14  product with and without Omni-Heat, right?

11:19  15  A.  Well, that's kind of a different question than what we were

16  just talking about, so I did not do an analysis of demand.

17  Q.  So here's a question:  From just looking at products on the

18  website, and I'm talking about Seirus products or Omni-Heat, I

19  want to know how did you quantify just looking at products on

11:20  20  the website to include in your analysis here to backup or

21  corroborate what Mr. Merriman told you about the Delta Galil

22  license in terms of the no added royalty rate?

23  A.  I didn't do that with respect to Seirus because he was

24  talking about the way Columbia sees that.  And so I can see

11:20  25  that with respect to the sock example.  And I didn't continue

1    it beyond just looking at a couple products because Columbia

2    had difficulty finding comparable products with and without

3    Omni-Heat.

4    Q.    So I think the answer is you just did not do that analysis?

11:21  5    A.    Did not do that with respect to Seirus.

6    Q.    And, in fact, for the Delta Galil agreement, you do not

7    even know how many patents comprise the Omni-Heat Reflective

8    technology licensed to Delta Galil, correct?

9    A.    Sitting here, no, I don't.  It might be in the agreement,

11:21  10    if you want to show it to me.

11    Q.    And did you ever ask for that information?

12    A.    I have the copy of the agreement.

13    Q.    Did you ever ask how many patents were comprised of the

14    Omni-Heat Reflective technology in the license?

11:21  15    A.    I don't believe so.

16    Q.    You said in your report that Columbia had received a number

17    of offers to license Omni-Heat Reflective technology and

18    declined them because they did not support Columbia's strict

19    criteria to reserve [sic] the value of its brand of

11:22  20    technologies, right?

21    A.    Yes.

22    Q.    And you were never provided any documents to show what

23    Columbia's strict licensing criteria is, correct?

24    A.    The one I can recall is the internal document created by

11:22  25    Mr. Merriman that talks about the licensing principles.  That's

1    been displayed.

2         MR. MARCHESE:  Can I have the deposition at page 86,

3    lines 20 to 22.

4         Permission to publish for impeachment.

11:22    5         MR. AXELROD:   86?

6         MR. MARCHESE:  86, 20 to 22.

7         MR. AXELROD:   I think you need to include the prior

8    question and answer.

9         MR. MARCHESE:  That's fine.

11:23    10        THE COURT:  Do you have any objection?

11        MR. AXELROD:   No.  Not with --

12        THE COURT:  You may proceed.

13        MR. MARCHESE:  Thank you, Your Honor.

14    BY MR. MARCHESE:

11:23    15    Q.  So you were asked by Mr. Eads -- he took your deposition,

16    right? -- I'm sorry, not Mr. Eads.  He defended your

17    deposition, correct?

18    A.  Correct.

19    Q.  I did not take it.  Another lawyer took it, correct?

11:23    20    A.  Correct.

21    Q.  And you were asked:

22        "Question:  Is the Columbia strict criteria that you

23    identified, the strict criteria to preserve the value of its

24    brand and technologies, did you see if that was memorialized in

11:23    25    writing?"

1    Do you remember that question?

2  A.   I don't remember it, but I'm reading it here.

3  Q.   And your answer was, "I don't recall it being specifically

4  memorialized in terms of the licensing practice other than the

11:24  5  general statements that Columbia makes about their effort to be

6  an innovative company and to be known as that, but, no, I

7  didn't see a specific policy."  Did you say that?

8  A.   Yes.

9  Q.   Those were your words?

11:24  10  A.   Yes.   However, the document I'm referring to is in my

11  report.

12  Q.   I have another question because this is the one I wanted to

13  read, and I read earlier what Mr. Axelrod wanted me to read.

14     "So you weren't provided with any documents that show that

11:24  15  strict criteria?

16     "Answer:   No."

17     Is that your testimony?

18  A.   That's what I said in my deposition.   I may have not

19  remembered the one document that I showed in my report that has

11:24  20  those principles that were discussed in Matt Merriman's

21  deposition because I did have that by the time of my

22  deposition.

23  Q.   But you just said "no"?

24  A.   I know, but, you know, depositions go on all day, and

11:24  25  sometimes I forget.   Sometimes I may -- I might be thinking of

1    something a little bit different, but it is in my report.

2    Q.    But you did say "no"?

3    A.    I said "no," yes.

4    Q.    And you didn't change that testimony later when you -- let

5    me ask you this:   After the deposition you got the transcript,

6    right?

7    A.    Yes.

8    Q.    And you had an opportunity to review it, didn't you?

9    A.    Yes.

10   Q.    And you never changed that answer, did you?

11   A.    I did not.

12   Q.    You did not make any calculation and understand --

13   actually, withdrawn.   Let me ask this differently.

14        You did not make any calculation of what the price premium

15   for Omni-Heat is versus non-Omni-Heat products, correct?

16   A.    Correct.

17   Q.    And Columbia did not provide you with that claimed price

18   premium, right?

19   A.    That's correct.

20   Q.    And so here, again, if there was such a claim, you did not

21   independently quantify or determine that, correct?

22   A.    That's correct.

23   Q.    And you relied on Columbia's view of how they believe they

24   are compensated, correct?

25   A.    That makes absolute logical sense to me, but Columbia did

|      |    |                                                              |
|------|----|--------------------------------------------------------------|
|      | 1  | explain to me that perspective on how they believe they're   |
|      | 2  | compensated.                                                 |
|      | 3  | Q.   In paragraph 49 of your report, you wrote that you      |
|      | 4  | understood from discussions with Mr. Merriman that "While    |
| 11:26| 5  | license agreements for noncompeting products do not          |
|      | 6  | specifically attribute a portion of the royalty to Omni-Heat,|
|      | 7  | Columbia receives compensation for the Omni-Heat Reflective  |
|      | 8  | patents."  Do you remember writing that?                     |
|      | 9  | A.   Yes.                                                    |
| 11:26| 10 | Q.   And you were asked about that in your deposition, and that |
|      | 11 | was paragraph 49 of your report.  Do you agree?              |
|      | 12 | A.   I don't know.  You'd have to show me my report.         |
|      | 13 | Q.   I can show it to you.  Let me just ask you this:  In terms |
|      | 14 | of the compensation that I just talked about for Columbia    |
| 11:27| 15 | receiving compensation for Omni-Heat, is it true that you did |
|      | 16 | not quantify that?                                           |
|      | 17 | A.   That's correct.                                         |
|      | 18 | Q.   And Columbia only described to you their view of how they |
|      | 19 | believe they are compensated, right?                        |
| 11:27| 20 | A.   Yes.                                                    |
|      | 21 | Q.   And, in fact, you did not quantify any of the items that |
|      | 22 | you identify in paragraph 49 of your report, correct?        |
|      | 23 | A.   You would have to show me paragraph 49.                 |
|      | 24 |      MR. MARCHESE:  Can you pull up paragraph 49.            |
| 11:27| 25 | And I'm not going to offer this, Your Honor.  I'm just       |

1    going to ask questions about it.

2    BY MR. MARCHESE:

3    Q.    Do you see paragraph 49?

4    A.    Yes.   I'm reading it.

11:27    5    Q.    Let me know when you're done.

6    A.    Yes.

7    Q.    Okay.   And paragraph 49 talks about Columbia receiving

8    compensation in these license agreements for Omni-Heat

9    Reflective patents, right?

11:28    10    A.    Yes.

11    Q.    And then you talk about an "incremental royalty received on

12    the wholesale price premium generated by the inclusion of

13    Omni-Heat Reflective into a product," correct?

14    A.    Yes.

11:28    15    Q.    Compared to products that do not include Omni-Heat

16    Reflective, right?

17    A.    Yes.

18    Q.    And so in terms of the items in paragraph 49, specifically

19    compensation, incremental royalty, price premium, you did not

11:28    20    quantify those, correct?

21    A.    I did quantify them in terms of understanding them to be

22    true in terms of looking at the retail prices of these

23    products, in the example of the socks, the $35 sock and the 15

24    to $20 sock, to see that there is a price differential.   So in

11:28    25    terms of quantifying that concept, yes.   I didn't gather up all

1    of the data for all of the products to quantify it in that way.

2    Q.   You said something a little different in your deposition.

3         MR. MARCHESE:   Can I have page 88, lines 20 to 23.

4    Permission to publish for impeachment.

11:29   5         MR. AXELROD:   Which line?

6         MR. MARCHESE:   20 to 23.

7         MR. AXELROD:   I think you need to go up to 10.   And I

8    have no objection.

9         MR. MARCHESE:   Up to which one?

11:29   10        MR. AXELROD:   Line 10.

11        MR. MARCHESE:   I think it's self-contained in the one

12   question I have.

13        THE COURT:   Your objection is overruled.   You can

14   address that on redirect.

11:29   15   You can publish that.

16        MR. MARCHESE:   Thank you, Your Honor.

17   BY MR. MARCHESE:

18   Q.   Ms. Morones, you were asked:

19        "Question:   And so any of the items that you identify in

11:30   20   49," and this is referring to paragraph 49, "specifically

21   compensation, incremental royalty, a price premium, those are

22   not quantified, correct?

23        "Answer:   Correct."

24        Is that your testimony then?

11:30   25   A.   That was my testimony.

|  | 1 | Q. And you had an opportunity to review your deposition? |
|---|---|---|
|  | 2 | A. Yes. |
|  | 3 | Q. After you were deposed, right? |
|  | 4 | A. Yes. |
| 11:30 | 5 | Q. And you did not change that answer, correct? |
|  | 6 | A. That's correct. |
|  | 7 | Q. You offered some testimony about disgorgement of profits, |
|  | 8 | right? |
|  | 9 | A. Yes. |
| 11:30 | 10 | Q. And that was for the design patent, right? |
|  | 11 | A. Yes. |
|  | 12 | Q. We're now out of the world of the '270 patent, okay? |
|  | 13 | A. Yes. |
|  | 14 | Q. And is it your understanding that the analysis that you did |
| 11:31 | 15 | for the design patent was a different type of analysis? |
|  | 16 | A. Yes. |
|  | 17 | Q. It was not a Georgia Pacific analysis, right? |
|  | 18 | A. That's correct. |
|  | 19 | Q. And all you presented today was, I think, kind of a |
| 11:31 | 20 | high-level view of your views on the design patent.  Right? |
|  | 21 | A. What do you mean by my view on -- |
|  | 22 | Q. That was a bad question.  Let me ask it again. |
|  | 23 | You looked at the total.  I think you called it gross |
|  | 24 | revenue for Seirus accused products.  Is that right? |
| 11:31 | 25 | A. Total revenue, total sales. |

1    Q.    And then you subtracted out costs, and you came out with

2    what you called "the total profits" --

3    A.    Marginal profit.

4    Q.    Marginal profit.  And you took out which costs?

11:31    5    A.    I took out the costs summarized on the Seirus documents

6    that summarized the HeatWave sales and profits, so there are

7    costs removed on that document.  So I took those out.  I also

8    took out commissions.

9    Q.    Took out commissions, and you took out some other costs,

11:32    10    but there's a number of other costs that go into making a

11    product and selling a product.  Would you agree?

12    A.    There could be, yes.

13    Q.    You did not take out advertising costs, did you?

14    A.    I did not.

11:32    15    Q.    And you did not take out costs relating to marketing in

16    particular, did you?

17    A.    I did not.

18    Q.    And you did not take out costs related to research and

19    development for the gloves, did you?

11:32    20    A.    Correct.

21    Q.    And you did not take out cost related to the process for

22    developing relationships and -- with customers and end

23    distribution, right?

24    A.    That's correct.

11:32    25    Q.    And you didn't take out the cost to ship the products from

1  Seirus' factory in Poway, California, here, out to its own

2  customers, right?

3  A.    Correct.

4  Q.    And there's a dispute over that, right?

11:32  5  A.    Well, there's a dispute, yes, about nearly everything in

6  this case.

7  Q.    There's a dispute over those costs, right?

8  A.    Well, yes.  Yes.

9  Q.    And your position is none of those cost should be taken out

11:33  10  and that Columbia should get these marginal profits that you

11  talked about, right?

12  A.    That's not entirely correct.  That's not what I testified

13  to.

14  Q.    Your position, I think you said, is that Columbia should

11:33  15  get the marginal profits from the design patent, right?

16  A.    That's not exactly what I said either.  Would you like to

17  know what my --

18  Q.    Just correct what I had wrong.  Maybe I misunderstood what

19  you said.

11:33  20  A.    Okay.  My position is that Seirus has the burden of proof

21  of proving what profits -- what costs are directly associated

22  with revenues.  Columbia has the burden of proof of

23  demonstrating sales only.  And so I've presented the sales.  I

24  presented two cost categories that I'm confident should be

11:33  25  deducted.  They're obvious to me.

1  Q.   And these other costs that I just went through, you did not

2  deduct?

3  A.   I did not deduct those.   Some of those other --

4        THE COURT:   Wait.   You interrupted her.   Let her

11:34  5  finish.

6        THE WITNESS:   I did not deduct those.   There are some

7  categories that if it were my burden of proof, I may have

8  deducted; others that I wouldn't have deducted.   So I

9  understand this process to include your expert presents the

11:34  10  evidence, and then I have an opportunity to give rebuttal.

11  BY MR. MARCHESE:

12  Q.   Exactly what I was trying to get at.   Just so everybody

13  knows where this is going to go, you did your calculation for

14  the design patent, and you took out a couple of components of

11:34  15  costs, right?

16  A.   Yes.

17  Q.   And then Seirus' expert will come next.   That's

18  Ms. Distler, right?

19  A.   Yes.

11:34  20  Q.   Have you met her before?

21  A.   I have not.

22  Q.   Okay.   So she'll testify in probably tomorrow -- I'm

23  sorry -- on Monday, about some extra costs that she will say

24  should come out, right?

11:34  25  A.   Yes.

1    Q.    And then you will be probably heard from again to give your

2    views on that, right?

3    A.    Yes.

4    Q.    Okay.  I just wanted to make sure everybody knows it's not

11:34    5    the end of the story here with the question of cost.  That's

6    all I was trying to get at.

7    A.    And I believe I made that clear in my direct.

8    Q.    I think you did, too, and I wanted to make it clear here

9    too.

11:35    10    The only thing I wanted to ask you is also with respect to

11    design patent damages, you said that -- did you call it "the

12    gross revenue" or the -- what was the name you gave it?

13    A.    The total sales is what is on the document that Seirus

14    provided to me.

11:35    15    Q.    Right, so the total revenue.  So your design patent damages

16    opinion is that the damages for the design patent should be

17    based on the total revenue from each and every glove in the

18    case?

19    A.    The total revenue as reported on that document -- and I

11:35    20    understand from Ms. Carey's deposition that that has some

21    deductions from it, some returns, some discounts.  That's the

22    number that I've applied the -- that's the starting point of

23    that analysis.  I almost said "royalty."  I'm sorry.  But it's

24    the starting point of that analysis.

11:36    25    Q.    I just want to make one other point clear here before we

1    end today, our discussion here, is that also with respect to

2    the total revenue, I think that you called it, there is a

3    dispute as to whether or not the revenue should properly be

4    just the fabric, the HeatWave fabric, or whether in your

11:36    5    position, it should be the glove, right?

6    A.    I understand -- I don't know.    I understand that there's a

7    dispute about the article of manufacture.    I don't understand

8    what your position is on that.

9    Q.    Okay.    But your position is that the article of manufacture

11:36    10    for design patent damages is the whole glove, right?

11    A.    I have assumed the article of manufacture is the entire

12    product sold to the consumer.

13    Q.    So that would be --

14    A.    Or sold to wholesaler.    Sorry.

11:36    15    Q.    No problem.

16          That would be the whole insulated glove?

17    A.    Yes.    It would be the whole item number and reported sales

18    that go along with that item number.

19    Q.    And that would be -- if it was the battery-powered glove

11:37    20    you looked at, it would be the whole glove, right?

21    A.    Yes.

22    Q.    And you're not sure what the position will be from Seirus

23    in terms of what the proper article of manufacture is.    Is that

24    correct?

11:37    25    A.    That's correct.

1       MR. MARCHESE:   Thank you.   Nothing further,

2   Your Honor.

3       THE COURT:   Redirect?

4                   REDIRECT EXAMINATION

11:37   5   BY MR. AXELROD:

6   Q.   Ms. Morones --

7       MR. AXELROD:   Could we pull up slide 15.

8   BY MR. AXELROD:

9   Q.   There was a little wrestling match about the documentation,

11:37   10   whether you had any documentation from Columbia about their

11   licensing practices, and you were referring to a document

12   report.   Is that shown on slide 13?

13   A.   Yes, it is, and I did have this, and it's in my report.   It

14   was also in my presentation.

11:38   15       THE COURT:   Counsel, would you mind making sure that

16   your microphone is pointed toward you to make sure that

17   everybody can hear you, particularly our court reporter.

18       MR. AXELROD:   My apologies.   This was very short, so I

19   didn't go to the lectern.

11:38   20   BY MR. AXELROD:

21   Q.   Is that document in evidence as Exhibit 94?

22   A.   Yes.

23       MR. AXELROD:   Thank you.   I have no other questions.

24       THE COURT:   Does the jury have any questions for this

11:38   25   witness?   In so, please raise your hand.

1      You may step down.

2              THE WITNESS:  Thank you.

3              THE COURT:  You need to remain available.

4      The plaintiff will call the next witness.

11:38  5              MR. ALDRICH:  Your Honor, we have a few documents to

6      move to admit, and then subject to the Court's order this

7      morning, we will be resting our case now.  So we'd like to move

8      to admit Exhibit 737.  It's the printout we showed the other

9      day from the website -- from Seirus' current website.

11:39  10             MR. MARCHESE:  I don't have it in front of me.  Can I

11     see it?

12             MR. ALDRICH:  I think you had yours as 1433.

13             MR. MARCHESE:  We did.  If we could just admit them

14     both.

11:39  15             MR. ALDRICH:  Fine.

16             MR. MARCHESE:  No objection.

17             THE COURT:  Received.

18         (Exhibit 737 admitted.)

19             MR. MARCHESE:  737.  Do you have any objection on

11:39  20     1433?

21             MR. ALDRICH:  No, no objection.

22             THE COURT:  Let's do theirs first.

23             MR. ALDRICH:  Also I wanted to move to admit

24     Exhibit 703.  It's the space blanket that's crumpled up in the

11:39  25     corner.

1        MR. MARCHESE:  No objection.

2        THE COURT:  Received.

3     (Exhibit 703 admitted.)

4        MR. ALDRICH:  And we had one other.

11:39  5        MR. AXELROD:  I was just advised that Exhibit 94

6  hasn't been offered and admitted.  That's the Columbia

7  licensing policies that Mr. Trepanier went through.

8        MR. MARCHESE:  No objection to that.

9        THE COURT:  Received.

11:40  10    (Exhibit 94 admitted.)

11       MR. ALDRICH:  We had one other one we wanted to get

12  admitted.  Exhibit 731.

13       THE COURT:  Which is?

14       MR. ALDRICH:  Let me speak to counsel real quick.

11:40  15       MR. MARCHESE:  I object to that, Your Honor.

16  Currently it didn't come in through a witness.

17       THE COURT:  I don't know what it is.  Can you identify

18  it for the Court, please.

19       MR. ALDRICH:  Yes, Exhibit 731 is a letter sent from

11:40  20  counsel to counsel advising --

21       THE COURT:  That's all I needed to know.  I don't have

22  any foundation for that particular exhibit at this juncture.

23  The objection is sustained.  You can take it up later.

24       MR. ALDRICH:  Okay.

11:40  25       THE COURT:  Anything else as regards to exhibits?

|       |    |                                                                    |
|-------|----|--------------------------------------------------------------------|
|       | 1  | MR. MARCHESE:  Well, 1433.                                          |
|       | 2  | THE COURT:  We're on their side of the case.                       |
|       | 3  | MR. MARCHESE:  Apologies.                                           |
|       | 4  | MR. ALDRICH:  No, Your Honor.                                       |
| 11:41 | 5  | THE COURT:  All right.  And so the only other thing is              |

the issue that we talked about this morning that we need to

talk about before you rest.

|       | 8  | MR. ALDRICH:  Correct.                                              |
|       | 9  | THE COURT:  Okay.  And you have some exhibits that you              |
| 11:41 | 10 | want offered -- to offer at this time.                             |

want offered -- to offer at this time.

|       | 11 | MR. MARCHESE:  Yes, Your Honor.  1433.                              |
|       | 12 | THE COURT:  And as I understand it, there's no                      |

objection to 1433.

|       | 14 | MR. ALDRICH:  No.                                                   |
| 11:41 | 15 | THE COURT:  Received.                                               |
|       | 16 | (Exhibit 1433 admitted.)                                           |
|       | 17 | MR. MARCHESE:  Thank you.                                           |
|       | 18 | THE COURT:  Anything else?                                          |
|       | 19 | MR. MARCHESE:  No, Your Honor.                                      |
| 11:41 | 20 | THE COURT:  All right.  Members of the jury, I'm going              |

to give you an early lunch.  The lawyers and I have some work

to do before we get started this afternoon.  It's -- let's call

it -- how about in an hour.  So we're at 20 to 12:00, so at 20

to 1:00, I will see you.  Enjoy your lunch.  See you then.

| 11:41 | 25 | (Proceedings held outside the presence of the jury panel.)         |

1    THE COURT:  Please be seated.

2    Left over from this morning is the list of products that

3    have a shiny side on the outside.  Is that it?

4    MR. ALDRICH:  Yes.  I mean it's not on the outside,

11:43  5    but not on the inside, facing the inside.

6    THE COURT:  Not facing.

7    MR. ALDRICH:  Exclusively facing outside.

8    MR. SPROUL:  Your Honor, we maintain our objection of

9    course, but subject to your ordering us to do this, we put

11:43  10   together a provisional list last night.  There was an error

11   when we typed it up.  It should be here in 15 minutes or so.

12   THE COURT:  And once we have the list, what is your

13   intent to do with it?

14   MR. ALDRICH:  I would need the products so that I

11:43  15   could cross-examine their witness with it, with the products,

16   and just get the products into evidence.  I mean if they don't

17   infringe, they don't infringe, and then we're done.  But to the

18   extent there's a dispute about it, we'd -- I need to look at

19   the products and then potentially cross-examine a witness about

11:44  20   it.  But my guess here -- Mr. Sproul could correct me -- is we

21   probably are talking about fewer than five products.

22   THE COURT:  Do you know?

23   MR. SPROUL:  I don't know the exact number.  My -- can

24   I ask the client very quickly?

11:44  25   THE COURT:  Of course.  Take your time.

1       MR. SPROUL:  I understand it's more than five, 15ish,

2  maybe more.

3       And here's one problem with having the components here --

4  or the products here is some of them are older products, and we

11:44   5  don't have -- we certainly didn't have them all sitting here.

6  So not every product that's going to be highlighted is

7  available for cross-examination, but again that --

8       THE COURT:  We can do what we can do, so you give them

9  the list.  That's all I've asked you to do.

11:44  10       MR. SPROUL:  Thank you, Your Honor.

11       THE COURT:  You will have completed your task.

12       And then you want an opportunity to talk to Mr. Carey about

13  those products?

14       MR. ALDRICH:  Yes.  I'd prefer to have the products

11:45  15  and Your Honor said that they should bring the products, or

16  they should provide the products, but I'd like the --

17       THE COURT:  No.  What I said was give you a list.  I

18  didn't say bring the products, as I recall.  I don't remember

19  telling them to bring the products.

11:45  20       MR. ALDRICH:  Your Honor did say that actually, but I

21  won't quibble with Your Honor.

22       THE COURT:  Good.  Because I changed my mind.

23       MR. ALDRICH:  I'm learning, Your Honor.

24       But in any event, I would need to be able to cross-examine

11:45  25  him on it, and so to the extent they have any documentation or

1   anything that can support their position on this, we would need

2   it so that we could cross-examine Mr. Carey, and I understand

3   he's going next.  I mean I could take him later out of sequence

4   as well, but I understand he's going next on the witness stand.

11:45   5       MR. SPROUL:  This goes to part of the problem,

6   Your Honor, which is this is -- the trial should be focused on

7   particular products at issue.  It is a discovery issue, and it

8   wasn't resolved during discovery, and so we will do what we

9   can.  We'll give him the list.  Some products we'll have.  Some

11:46   10  products we won't, but certainly it would be unfair for us to

11  be deemed to have waived any argument with respect to those

12  products.

13      THE COURT:  I'm not saying that that's going to

14  happen.

11:46   15      MR. SPROUL:  I understand, Your Honor.  Thank you.

16      THE COURT:  Like I said, I've tried to fix the

17  discovery issue by having you provide the list.  I didn't

18  realize there would be an issue about this.  I thought that

19  they would provide the list, and you would say, "Oh, okay.

11:46   20  There's these five products," and everybody would move on.

21      MR. ALDRICH:  I'm still a little in the dark about

22  which products, but we have this document 705 they produced to

23  us last week that has a list called "HeatWave products," and it

24  has a list of all the products and all the sales numbers and

11:46   25  everything.  And I mean if all the products on that list have

1  it on the innermost surface except for the two that are in red,

2  then I think we're okay because those are the only products

3  that we've been dealing with in this case.

4          THE COURT:  So maybe you just need to compare.

11:46  5          MR. ALDRICH:  That's fine.

6          THE COURT:  And then have a conversation about it, and

7  kind of narrow the issues for the Court.

8          MR. ALDRICH:  Thank you, Your Honor.

9          THE COURT:  So with that, that caveat, are you ready

11:47  10  to rest?

11          MR. ALDRICH:  Yes, Your Honor.  We also had this

12  Exhibit 731 and I mischaracterized 731.  It's the letter from

13  our counsel to Mr. Carey attaching the complaint and the

14  lawsuit and advising him of the utility patents.  It's shown on

11:47  15  the screen here.

16          THE COURT:  Unfortunately, my screen stopped working.

17  And the purpose for this that it's -- it's a date.

18          MR. ALDRICH:  Just establishing the date that they

19  were informed of the utility patent.

11:47  20          THE COURT:  Got it.

21          MR. MARCHESE:  We object to that, Your Honor.  That's

22  got no foundation, and to the extent it would come in through a

23  witness, it just hasn't done that.

24          THE COURT:  All right.  Mr. Carey's going to take the

11:47  25  stand?  So the objection is sustained.

|       |    |                                                                    |
|-------|----|--------------------------------------------------------------------|
|       | 1  | MR. ALDRICH:   Thank you.                                           |
|       | 2  | MR. MARCHESE:   Your Honor.                                         |
|       | 3  | THE COURT:   Hang on.  Other than that now, are you                 |
|       | 4  | ready to rest?                                                      |
| 11:47 | 5  | MR. ALDRICH:   Other than those two issues, we are                  |
|       | 6  | ready to rest, Your Honor.                                          |
|       | 7  | MR. MARCHESE:   So we have an issue concerning JMOLs.               |
|       | 8  | I think it's very important for purposes of Mr. Carey's             |
|       | 9  | testimony.   And we --                                             |
| 11:48 | 10 | THE COURT:   Are you resting?                                       |
|       | 11 | MR. ALDRICH:   Sorry.   Subject to those two exceptions,            |
|       | 12 | Your Honor, we're resting, yes.                                     |
|       | 13 | THE COURT:   Okay.   Now --                                        |
|       | 14 | MR. MARCHESE:   Which two exceptions?                               |
| 11:48 | 15 | MR. ALDRICH:   The document we just looked at and the               |
|       | 16 | list of products and resolving that issue.                         |
|       | 17 | MR. MARCHESE:   Oh, I didn't hear the rest on the -- I              |
|       | 18 | mean the document -- I think they just didn't get that in, so      |
|       | 19 | they can't -- I mean our position is --                            |
| 11:48 | 20 | THE COURT:   But, see, what happens then is they're not            |
|       | 21 | going to rest.   They're going to call your client back so they    |
|       | 22 | can introduce one document.   Right?                               |
|       | 23 | MR. MARCHESE:   They will try, I suppose, Your Honor.               |
|       | 24 | THE COURT:   Well, you will object.   I'll overrule it.            |
| 11:48 | 25 | Your client will take the stand, and we'll introduce one           |

1    document.

2         MR. MARCHESE:  Okay.

3         THE COURT:  And then the other thing is just subject

4    to the list, I don't think the list is going to -- the

11:48  5    individual products, as long as you're not moving for judgment

6    because of these two products or these three products haven't

7    yet been proven, we'll put that issue aside, and you can make

8    your JMOL motion on all the other stuff.

9         MR. MARCHESE:  Well, the two JMOL issues are really

11:49  10   important for Mr. Carey's position.  First is we -- there's no

11   evidence in the record concerning reasonable royalty for the

12   design patent, and the 289 remedy, the disgorgement remedy, has

13   no willfulness component to it.  So our issue is there should

14   be JMOL on willfulness with respect to the design patent and

11:49  15   that takes off the table all this question and answer that

16   counsel wants to get concerning what happened after the summary

17   judgment order was issued.  We did brief this to, Your Honor,

18   briefly briefed it.

19        THE COURT:  So one is on the reasonable royalty

11:50  20   regarding the design patent?

21        MR. MARCHESE:  Correct, and there was -- right.  There

22   was no evidence of that.  And so it's our position that that's

23   out of the case, should be JMOL'd out, if it even existed

24   before.

11:50  25        THE COURT:  And no evidence of willfulness.

1    MR. MARCHESE:  The reason why no willfulness should be

2  allowed on the design patent is because their only remedy that

3  they've offered evidence on is the 289 disgorgement, and there

4  is no willfulness remedy with respect to that disgorgement

11:50    5  statute.

6    THE COURT:  So willfulness is only relevant to

7  reasonable royalties?

8    MR. MARCHESE:  Correct.

9    THE COURT:  Not to disgorgement.

11:50   10    MR. MARCHESE:  Correct.

11    THE COURT:  All as regards the design patent.

12    MR. MARCHESE:  Correct.

13    THE COURT:  All right.

14    MR. MARCHESE:  One more thing on willfulness.  For the

11:51   15  '270 patent, the patent did not issue until June of 1993 --

16    THE COURT:  No.

17    MR. MARCHESE:  I'm sorry.  2013.  Counsel was poking

18  me in the arm saying I was a decade off.  So that's a function

19  of getting older, decades seem to collapse a little bit.

11:51   20    So 2013 it came out, and then the notice letter that

21  Columbia's counsel wants to get in, the one we were just

22  talking about, is dated the same day they filed the lawsuit in

23  this particular case, December 4, 2013; it's about six months.

24  And we -- two things to bear in mind here.  So there's only --

11:51   25  so at the pretrial conference, and this is in our brief,

1    Your Honor, Mr. Aldrich said, "We are not seeking willfulness

2    for any actions that occurred after the date of the design

3    patent was filed," and that letter was sent in December of

4    2013.  So that's all off the table.  I'm talking about the

11:52  5    utility patent.  And the months prior -- so the patent issues

6    six months before that.  There's no evidence in the record

7    of -- and there -- about Seirus knowing about the patent, the

8    '270 patent, prior to that date in December.  And the case law

9    that we cited in our brief states that you can't have willful

11:52  10    infringement without notice of the patent.

11         THE COURT:  Before what date in December?

12         MR. MARCHESE:  December 4th, 2013, is the date that

13    the letter came.

14         THE COURT:  So evidence of the fabric with "patent

11:53  15    pending" on it isn't evidence of the patent?

16         MR. MARCHESE:  Not -- it is not, Your Honor, because

17    the patent did not exist then.  That all happened in 2012.  The

18    patent did not issue until June of 2013.

19         THE COURT:  And what about all the letters that went

11:53  20    back and forth, conversations between -- I forget the witness'

21    name -- Ms. Chin?

22         MR. MARCHESE:  Ms. Chin.

23         THE COURT:  And conversations about the patent,

24    concerns about the patent?

11:53  25         MR. MARCHESE:  Not about the patent, it was only the

1    design patent.  The timeline is -- and it's kind of

2    confusing --

3            THE COURT:  Well, I don't remember it saying "design

4    patent."  I just remember them saying concerns about the

5    patent.

6            MR. MARCHESE:  They sent a letter from the supplier

7    Ventex in April of 2013.  They attached the design patent.  The

8    utility patent did not exist at that time.  '270 was not

9    issued.  Two months later the utility patent issues in June of

10   2013.  And then six months go by up till December 4th of 2013

11   when the letter that Mr. Aldrich wants to get introduced

12   through Mr. Carey arrives, and it does have the '270 patent in

13   it.  It doesn't say -- it says, "We don't even know if there's

14   infringement yet," so there's no accusation of infringement at

15   that point.  But in any event, for that entire six-month period

16   between the date it issues and the letter arrives, Seirus has

17   never heard of that patent.  There's no evidence of that fact.

18   And consequently as a matter of law, there can be no

19   willfulness during that period.

20           THE COURT:  Thank you.

21           MR. ALDRICH:  A couple things, Your Honor.  There is

22   evidence in the record of the value of the reasonable royalty

23   for the design patent because Mr. Merriman testified that he

24   would have licensed the design patent together with the utility

25   patents.  He testified that all four of the licenses that are

11:55

1  in the record cover both the utility patent and the design

2  patent.  So there's certainly sufficient evidence in the record

3  of what the reasonable royalty for the design patent would have

4  been, at least in conjunction with the utility patent at that

5  hypothetical negotiation.

6      Second, if you're ready.

7          THE COURT:  Go ahead.

8          MR. ALDRICH:  Willfulness on the design patent is also

9  relevant to our section 285 claim for damages which is

10  exceptional case doctrine and attorney's fees.

11          MR. SPROUL:  That's a matter for the Court.

12          MR. ALDRICH:  It is a matter for the Court,

13  Your Honor, but the willfulness question is a question for the

14  jury.  The determination of whether to award attorney's fees

15  based on the jury's determination is a question for the Court.

16  For that matter, section 284, enhanced damages, is also a

17  question for the Court.  The jury is only asked whether there

18  was willfulness or not, and then Your Honor has the privilege

19  of deciding whether to, or not, treble the damages as a result

20  of the jury's finding.

21          THE COURT:  Okay.

22          MR. ALDRICH:  And with respect to the utility patent,

23  the letter was sent in December 2013.  At that time the utility

24  patent was not asserted in the case.  So they were put on

25  notice in December 2013.  The utility patent was added to that

11:56

1    case several months later, and then this action was filed

2    January 2015.  So we've not been claiming a willfulness -- I

3    mean Your Honor denied our motion on that, and so we -- we will

4    be asserting willfulness for actions that have taken place

5    since then because we were denied our motion to keep that out.

6    But since January of 2015 when this action was filed, and my

7    understanding is that they asked to keep out -- or sorry -- we

8    asked to keep out evidence that took place prior on the basis

9    that we would not be asking for relief going forward.  That was

11:57   10   denied.  And so we are asserting willfulness for the entire

11   period of time since the beginning.

12            THE COURT:  So you're asserting willfulness in the

13   '270 patent beginning when?

14            MR. ALDRICH:  Well, they were given -- they -- we have

11:57   15   evidence in the record as of this letter.  There's evidence in

16   the record that they became aware of that patent in December

17   2013.  The actions that took place prior to that do contribute

18   to the willfulness analysis, but we have to prove that they had

19   knowledge of the patent, and that letter is evidence of the

11:58   20   knowledge of the patent.

21            THE COURT:  And so since -- again, your dates that you

22   are asserting that there's evidence of willfulness begins in

23   December of 2013 as regards the utility patent?

24            MR. ALDRICH:  Correct.

11:58   25            THE COURT:  And stretches until current?

1    MR. ALDRICH:  Correct.

2    THE COURT:  And I know they cited to me a statement

3  that was made regarding you not pursuing willfulness damages,

4  and I remember the statement.  I remember a brief part of the

11:58    5  conversation, but I do not remember the context of that.

6    MR. ALDRICH:  The context was that we had asked to

7  keep out knowledge that they acquired of their defenses that

8  they acquired after the lawsuit started -- or actually I think

9  it was after the Washington lawsuit started, but it wasn't even

11:59    10  clear when they acquired that knowledge.  We had asked to keep

11  that out.  That motion was denied.  We said at that time that

12  we would not pursue willfulness based on later events.

13    And the law is pretty clear that, you know, legal defenses

14  that your lawyers come up with for you in the course of

11:59    15  litigation isn't enough to get you out of willful conduct.  But

16  that motion was denied, so they are -- they have been putting

17  in evidence, and they're going to be putting in evidence of

18  what happened after 2013, 2014, and their state of mind about

19  information they learned from lawyers, and so we are asserting

11:59    20  willfulness ab initio.

21    THE COURT:  Thank you.

22    MR. ALDRICH:  I can rest on that.  Sorry.

23    THE COURT:  Okay.  Thank you.

24    MR. MARCHESE:  May I respond?

11:59    25    THE COURT:  Sure.

1       MR. MARCHESE:    Thank you.

2           So we won't put in evidence post 2013 about the Korean

3       decision or any of that if we don't have to because we think

4       willfulness is gone.    And I'm reading Mr. Aldrich's quote from

12:00   5   the pretrial conference, and he says, "We assume that once they

6       retain counsel that they've been relying in good faith on all

7       the briefing that they've submitted in the case.    The acts that

8       give rise to willfulness in this case were copying that took

9       place prior to in 2012 and 2013."

12:00   10          So after the date that Seirus gets sued and hires another

11      law firm, and the representation here is that they've been

12      relying in good faith on all the briefing they've submitted and

13      all that in the case, the statement is that the willfulness

14      that they're relying on was something that happened before that

12:00   15  date, before December 4, 2013.    It's in our briefing.    I think

16      it's clear, and I -- I don't think that counsel should be able

17      to make a representation like that and then pull it back and

18      say it was conditional.

19          I don't think it was conditional.    I heard it.    I wrote it

12:01   20  down, I mean in my notes, and said, "All we need to do is

21      overcome any allegations of willfulness for that '270 patent

22      for the six months existed before that date" because you

23      can't -- can't be willful -- there can be no willful

24      infringement prior to June of 2013 because there's no patent

12:01   25  that exists at that point.

1            THE COURT:  Okay.

2            MR. MARCHESE:  And I will submit the record is

3    absolutely absent of any evidence that Seirus knew of that

4    patent, '270 patent, before December 4, 2013.

12:01    5            THE COURT:  Okay.

6            MR. ALDRICH:  A couple follow-up points.  This action

7    was started January 2015.  And so they had been on notice of --

8    I mean, again, this action was filed January 2015.  They were

9    put on notice of the '270 patent in December of 2013.  The

12:01   10   patent wasn't added to the suit until several months later.

11   That was point one.

12            Point two, as Your Honor noted, they were aware that it was

13   patent pending.  I think we've heard evidence in the record

14   that they know how to conduct patent searches, and that they

12:02   15   were put on notice of the Fottinger reference, and that they

16   were put on notice by their Korean supplier of patents and made

17   aware of that in April of 2013, nine months prior.  And so I

18   think, as I said, the actions that give rise to willfulness

19   here took place prior to 2013, but their continued sales after

12:02   20   2013 are willful sales.

21            THE COURT:  I don't -- my issue isn't so much with

22   whether or not there's evidence of willfulness or not.  My

23   issue is whether or not your statement that you weren't going

24   to be pursuing willfulness damages somehow precludes that issue

12:02   25   from being brought to the jury.  It's -- that's what I think

1      I'm wrestling with.  And, again, I don't remember the context

2      of the statement.  I remember the statement.  I just don't

3      remember exactly what it was we were talking about.  If you

4      were to ask me blindly what was it we were talking about, I

12:03   5      would have guessed that it had something to do with me denying

6      bifurcation, but I honestly don't remember what the context

7      was.

8                    MR. MARCHESE:  It registered obviously with us, and,

9      you know, we took note of that.  And there's a case that we

12:03   10     cited from the federal circuit that says, "To willfully

11     infringe a patent, the patent must exist."  So you can't be

12     preexistence, and one must have knowledge of it.

13                   THE COURT:  Again, I don't have -- there's evidence

14     that after the patent issued and that there was notice to

12:03   15     Mr. Carey that there was continuing violation of the patent in

16     the light most favorable to the plaintiff.  That's not my

17     issue.  My issue is whether or not Mr. Aldrich's statement

18     precludes them from presenting or arguing that to the jury.

19     That's it.

12:03   20        But if I was just to go on the evidence, is there evidence

21     of willfulness?  Yes, there is, in the light most favorable to

22     the plaintiffs.  But did his statement stop that?  Has that

23     statement that he made in pretrial conference foreclosed him

24     from going forward.  Again, that's what I need to decide.

12:04   25                   MR. MARCHESE:  And that's our argument.  That's

1    exactly what we're arguing.

2         THE COURT:   Okay.   I understand.   Anything else?

3         MR. MARCHESE:   No, Your Honor.

4         THE COURT:   Let's take a break.   I will -- on the

12:04   5    issue of willfulness, because I think I'm going to need to go

6    back to the transcript and kind of look at the transcript in

7    its entirety, and not the whole of the transcript, but just

8    that section of it in context in order to reach a conclusion

9    regarding the willfulness issue.

12:04   10        As regards to the reasonable royalty issue and whether

11   there's evidence of reasonable royalty as to the design patent,

12   in looking at the evidence in the light most favorable to the

13   nonmoving party, which is the position that I must take at this

14   juncture, the motion for a judgment as a matter of law is

12:05   15   denied.   There is sufficient evidence to proceed as to that

16   issue.

17        So that takes care of the willfulness in putting it aside

18   for now, it takes care of reasonable royalty on the design

19   patent.   And I'm sorry, you've got another -- was there another

12:05   20   issue that you raised, or were those the two?

21        MR. SPROUL:   We also have a pending -- one of the two

22   motions that we moved on for JMOL related to the infringement,

23   so we have our basically three sub parts to the -- to our

24   noninfringement.

12:05   25        THE COURT:   Okay.   Now's the time.

1    MR. SPROUL:  All right.  Your Honor, just to make sure

2  I covered my bases, first of all, there's no evidence in which

3  a jury could find that the HeatWave products infringe because

4  Dr. Cole did not tie the fabric she tested to individual

12:06    5  products, and her testing is insufficient to find coverage

6  limitations were met.

7    Second, Columbia's failed to meet its burden to show that

8  the HeatTouch Torche infringes any of the claims of the '270

9  patent.  The evidence shows that any accused products,

12:06   10  including an intervening fiber between the user and the

11  heat-directing elements, do not infringe the claims.  HeatTouch

12  Torche contains an inner glove with no HeatWave fabric in it

13  facing either away or toward the user.  So the HeatTouch Torche

14  cannot infringe because it does not have heat-reflecting

12:06   15  material on the innermost surface as required by claim 23.

16    And the third basis on noninfringement would be that --

17  well, I've already covered that.  They can't satisfy their

18  burden on the 7 to 3, 3 to 7 coverage limitation.

19    THE COURT:  Thank you.

12:07   20    MR. ALDRICH:  Dr. Cole said that she was given samples

21  through Seirus that were representative of the fabric.  She

22  tested the fabric samples.  I am confused about what the

23  argument is that she didn't test sufficient samples of fabric.

24  They provided the fabric samples, and she tested them all, so I

12:07   25  think sufficient evidence is in the record on that point.  If

1    there are any questions I'd be happy to answer them.

2         With regards to the HeatTouch Torche glove, I think the

3    relevant question is whether this is a piece of body gear.  If

4    this is a piece of body gear, there's sufficient evidence in

12:08    5    the record that it has it on the innermost surface, and I

6    recognize that they have another glove that goes with it that

7    can be put inside of it, but the question is, this comes out of

8    the box; is this a piece of body gear and does it have it on

9    the innermost surface?  I think there's sufficient evidence in

12:08    10    the record of that.

11         THE COURT:  Thank you.  Anything else?

12         MR. SPROUL:  One more on noninfringement, Your Honor,

13    and that is --

14         THE COURT:  Wait.  Is there anything else on the

12:08    15    points that you've already raised?  I want new points.

16         MR. SPROUL:  I apologize, Your Honor.  No.

17         THE COURT:  Okay.  As regards to the HeatWave products

18    infringing and whether or not there was sufficient evidence in

19    the light most favorable to the plaintiffs for a reasonable

12:08    20    jury to conclude by preponderance of the evidence that there

21    has been infringement, there is, both on the issue of whether

22    or not the fabric was similar or same fabric and on the issue

23    of the 30 to 70 and 70 to 30 percent.

24         As regards Heat Torche glove, and the question is because

12:09    25    of the design of an intervening glove which can be worn with

1    the outer glove, is there sufficient evidence from which a

2    reasonable trier of fact could conclude by preponderance of the

3    evidence while looking at the evidence in light most favorable

4    to the plaintiff that the HeatTouch Torche infringes, I find

12:09    5    there is sufficient evidence.   The motion on those two issues

6    is denied.

7        Next.

8            MR. SPROUL:   One further noninfringement issue,

9    Your Honor, and subject to, I think, an ongoing issue, we would

12:09    10    move for judgment as a matter of law that the bidirectional

11    gloves don't infringe because only a portion of the innermost

12    surface is covered, and substantial evidence can support that

13    because Dr. Cole did not determine the overall coverage

14    percentage.   She focused only on that material with the fabric.

12:09    15            THE COURT:   Okay.   I think that's a conversation we've

16    already had, whether I am even going to let you make that

17    argument to the jury.   So is there anything you want to say on

18    that.

19            MR. ALDRICH:   Do I need to?

12:10    20            THE COURT:   It's your nickel.

21            MR. ALDRICH:   No, Your Honor.   I'm fine.

22            THE COURT:   All right.   The motion for judgment as a

23    matter of law as regards what you describe as the bidirectional

24    gloves is denied.   I believe the inquiry focuses on whether or

12:10    25    not the 3 to 70 -- 30 to 70 percent and 70 to 30 percent

1      applies to the fabric in the infringing portion of the glove,

2      not to the bidirectional or other pieces of the product.   For

3      those reasons your motion is denied.

4              MR. SPROUL:   Thank you, Your Honor.

12:10  5              THE COURT:   Anything else?

6              MR. MARCHESE:   I have a couple damages points.

7      Apologies.   We have -- we would like to move to for judgment as

8      a matter of law concerning the reasonable royalty opinion

9      offered by Ms. Morones, and to the extent it's supported by

12:10  10     others, for the '270 patent, because her testimony concerning

11     the entire -- well, there was no evidence of the entire market

12     value rule being satisfied.   As that standard is stated in the

13     case law, you have to demonstrate that the patented feature --

14     the actual claimed feature drives demand for the entire

12:11  15     product.

16         I think it became clear that they did not do that for the

17     Seirus products.   They did not, which is what you have to do it

18     for, not for Omni-Heat.   You have to do it for the products

19     that you're claiming are infringing, and they did not do it on

12:11  20     a product-by-product basis.   They did not break it down by

21     HeatTouch or HeatWave or liners or socks or hats.   It was a

22     holistic approach as I mentioned to her on the cross.   And it

23     is -- it fails under the Laserdynamics.   And then there's

24     numerous cases we cited in our -- I think I argued at length in

12:11  25     the motion in limine on this very same point, that this fails

1    as a matter of law.

2           THE COURT:   Thank you.

3           MR. MARCHESE:   Secondly, the comparable license issue,

4    I think that those are not clearly licenses.   There are

12:12    5    admissions to that effect, and consequently you can't build a

6    reasonable royalty case as a matter of law under a

7    noncomparable license used as your starting point, as she --

8    Ms. Morones -- testified that was her starting point under

9    Georgia Pacific factor 1.   And as a matter of law under the

12:12   10   federal circuit precedent, that is improper and cannot be done

11   and cannot be sustained or supported.

12          Third the -- the case law, Unilock case, Laserdynamics, and

13   others have held that the cat's out of the bag when you hold up

14   the total revenues to the jury when there's no support for the

12:12   15   entire market value rule, which is clearly the case here.   And

16   they were showing our total revenues.   We saw a profit and loss

17   statement go up.   They were showing total revenues on every

18   product that Seirus makes.   Completely improper.

19          She can't even show the total revenues on the accused

12:13   20   HeatWave products.   There was not evidence of the entire market

21   value, and you certainly by extension can't show the total

22   values for the entire company.   You know, that's clearly an

23   improper procedure and attempt on their part to paint Seirus

24   as, you know, having a lot of money to pay in terms of damages.

12:13   25   They showed ██████████ a year, as I recall.

1    But in any event, all of that violates the case law

2  concerning entire market value and apportionment.

3    And then last we move on damages on the grounds of a

4  failure to apportion.  The case law is clear when there's no

12:13    5  entire market value satisfied, which is not here, that the

6  plaintiff has the burden.  They carry the burden to apportion,

7  and they can't apportion the rate.  The case law says the rate

8  cannot be apportioned.

9    And I think what you heard from Ms. Morones was that

12:14   10  she -- she did the 10 percent rate and then divided it in half

11  using some data from Omni-Heat, not data from Seirus, and took

12  10 percent, divided it in half, came up with five, but then she

13  testified that they reran the numbered a little bit more, and

14  it was only 3.5, and then she rounded it up to 5.  That's

12:14   15  clearly an improper apportionment.  The case law is clear.  You

16  can see the Lucent case.  Laserdynamics has it.  The statements

17  are that you cannot apportion the rate.  You have to apportion

18  the base, which she did not do.  She took five -- she took the

19  10 percent, 10 to 20 percent.  She divided it in half, which

12:14   20  she admitted even was a failure really to -- on two grounds.

21  She did it with Omni-Heat.  It was 3.5, not 5, and then they

22  applied that apportioned rate to the entire base.  So it's just

23  a violation of the principles of damages in patent cases.

24    THE COURT:  Thank you.

12:15   25    MR. AXELROD:  Do you want us to go through the --

1    THE COURT:  Sure.

2    MR. AXELROD:  With respect to the last issue, there

3  was no testimony about dividing anything in half.  What

4  Ms. Morones did was conduct a separate analysis that was

12:15    5  limited to the specific contribution of HeatWave, the HeatWave

6  technology, to increasing the margins, and she used that as a

7  surrogate for apportioning to the specific technology, which is

8  the issue of apportionment in the first place.  And there's

9  nothing about apportionment that requires it to be done on a

12:15   10  quasi component-by-component basis.

11    So it has nothing to do with dividing a rate in half or

12  anything else.  She took the value for the increased margin,

13  gave a very conservative number to it for the benefit of

14  Seirus, and went with that as her alternative apportionment.

12:15   15    We briefed the entire market value issue rule extensively

16  in the motions in limine, and we directed the Court to the

17  cases that applied here when you're dealing with relatively

18  simple components, and an issue that a -- or relatively simple

19  products, and where a significant component of the product is

12:16   20  marketed heavily as the reason that consumers should purchase

21  that product.  We've presented substantial evidence both from

22  Columbia's marketing program and from Seirus' marketing program

23  that Seirus is effectively mimicking of Columbia's technology

24  marketing program is strong evidence of the fact that the

12:16   25  claimed invention does satisfy the entire market value rule and

1    motivates demand.  It appears throughout all of Seirus'

2    advertising in the same way that it appears throughout all of

3    Columbia's advertising and marketing to the consumer.  They

4    market the technology.  That's the reason to buy this glove.

5    It's not a fashion glove.  It's not otherwise a performance

6    glove.

7    Seirus' sales skyrocketed as Ms. Morones' charts show.

8    Columbia's sales skyrocketed.  That's strong evidence that it

9    is that technology that is driving that commercial demand and

10   generating that commercial success.

11   Laserdynamics, Unilock, all these technology cases where

12   somebody tried to provide or present evidence or measure the

13   value of a reasonable royalty on an entire operating system

14   when someone contributes a few lines of software or contributed

15   a minor component to an overall computer system really has no

16   application to a case where, you know, some of these products,

17   90 percent of the product is all HeatWave fabric.  There's no

18   case law that says this has to be proved on a

19   product-by-product basis where the defendant or the infringer's

20   line is an entire set of products that is marketed on one

21   overriding banner, and that banner presents the reason for all

22   of these products to be purchased by the consumer.

23   So we think we've presented a very strong case through the

24   testimony of Mr. Trepanier, through the testimony of the

25   experts that have described what the benefits of the invention

1  are, and how it's applied, and that's a jury question from our

2  perspective.

3          THE COURT:  Do you want to talk about comparable

4  licenses?

12:18  5          MR. AXELROD:  We're playing semantics.  Ms. Morones

6  kept saying, "They are different."  You have to make

7  adjustments to make them comparable, and that is what she did

8  in her analysis.  These are the only license, and, therefore,

9  the best examples of what Omni-Heat Reflective is licensed for

12:19  10  when it is licensed.  She went through in her analysis and

11  explained in detail the differences between the licenses that

12  they now want to brand as noncomparable, and the Georgia

13  Pacific license, to explain the adjustments that we have to

14  make to make them apply directly.

12:19  15      So in the abstract, yes, they are different.  If you want

16  to say a difference makes it noncomparable, noncomparable in

17  this context as Ms. Morones testified is really kind of a legal

18  conclusion.  These licenses are not noncomparable in the sense

19  that they're not directly relevant to the reasonable royalty in

12:19  20  this case.

21          THE COURT:  Thank you.  Anything else?

22          MR. MARCHESE:  The comparable license agreements, it's

23  become crystal clear just how incomparable they are.  They had,

24  you know, trade secrets, trade dress, trademarks, right, access

12:19  25  to manufacturers, all these kind of things that came along with

it, and the hypothetical license is nothing more than a
nonexclusive, bare patent license.  You don't get any of that
other stuff.  And the cases are pretty clear, and it's pretty
strict about something you can use as a starting point.  If
you're going to say the starting point for the royalty rate is
X license, it better be pretty close.  And in this instance
these couldn't be farther away from the type of license
agreements you see that get accepted by the federal circuit.

These are branding agreements.  They're -- they're
transferring basically the entire Columbia brand name to
somebody and saying, "You can sell it."  And that, I think,
everybody would agree in this particular industry is a huge
value.  If I could put "Columbia" on my product -- this is one
of the biggest brands in outdoor sports clothing -- then I get
a great value out of it.

I'm not going to get any of that in this hypothetical
license.  Seirus just gets one thing.  They get the right to do
this 30 to 70 foil printing on the inside of the glove, and
that is a wildly different animal from what we've seen in these
four license agreements that form the very foundation of the
royalty analysis.  It's absolutely improper.  And it's -- this
is the kind of thing that's never accepted by the court of
appeals, and I believe that what they've put on here in this
case, was -- and I understand why they did it.  They wanted to
get a high rate.  But I believe it's wholly improper, and this

1   is not the way you build a case for what a royalty is on a bare

2   patent -- nonexclusive, bare patent license on one single

3   patent versus a huge -- those things are -- those are full

4   rights to all Columbia patents.  They're all these

12:21  5   technologies.  They're branding.  They're trade secrets, trade

6   dress, access to -- I mean it's a giant -- it's a business

7   deal.  And Seirus will get none of those benefits.  They get

8   none of that.

9       And so Columbia tried to counteract that by showing the

12:21  10   things that those licensees would get, but Seirus would get

11   none of that.  That makes it even less comparable, and so what

12   you have is a business deal.  You're enabling people to be

13   Columbia, basically to put the brand on it, to use their blanks

14   in one instance, to build a company and a product line around

12:22  15   Columbia's famous name, all their technology, all of Omni-Heat,

16   Omni-Dry, Omni-Freeze, all of these things.  It couldn't be

17   farther away from the type of patent license that Seirus would

18   get.

19       THE COURT:  Thank you.  The issue of damages regarding

12:22  20   a reasonable royalty rate with the '270 patent, the defense has

21   moved for judgment as a matter of law and pointed to a number

22   of different issues that they feel were ill considered by

23   Ms. Morones, the expert for plaintiffs, including market

24   demand, comparable licenses, total revenue on all products,

12:23  25   which calls into question the entire market value and the

1    failure to -- or the failure to appropriately apportion.

2         Again, I am required to look at the evidence in the light

3    most favorable to be the plaintiffs, and while there was a

4    separate analysis in how the HeatWave increased the value; that

12:23  5    is, the margins to the part of our -- or on the part of the

6    defendants as a result of the technology, I feel that that was

7    an appropriate analysis and acceptable analysis and do not

8    grant a motion on that basis.

9         As regards the application of the EMV and whether or not

12:24  10   consumers are driven to buy the product, again, Ms. Morones and

11   others have testified as to why people are buying this product

12   based on the way that it is marketed.

13        As regards the licenses, there are, in fact, no identical

14   licenses that are issued by Columbia.  They simply don't exist.

12:24  15   And so they have to use what they can, and in their

16   hypothetical, they looked at licenses that were issued on the

17   technology, and from there Ms. Morones and others formulated

18   their opinions about, well, what the hypothetical negotiations

19   would result in.  And in looking at the licenses, again, they

12:24  20   use the only licenses that were available, and while there are

21   differences between what actual licenses would be issued and

22   what the hypothetical license would look like, that goes to the

23   weight of the opinion, not to its admissibility, and it does

24   not mean that that opinion is not valuable.  It is an opinion

12:25  25   that the jury can take into consideration.

1    It will be up to the defense, using their witnesses and

2  experts, to convince the jury that that opinion should not be

3  given the weight that plaintiff deems it should, but it is not

4  a reason for me to grant a motion on -- as a matter of law at

12:25    5  this particular juncture because, as I look at the evidence in

6  the light most favorable to the nonmoving party, the plaintiffs

7  have satisfied their burden of proving reasonable royalty

8  damages as to the '270 patent.   The motion is denied.

9    Anything else?

12:25  10    MR. MARCHESE:  I think we've done it, Your Honor.

11    THE COURT:  Okay.  I think your record is complete.

12    MR. AXELROD:  I know you told the jury to be back in

13  15 minutes.

14    THE COURT:  Do you want more time than that?  Is that

12:26  15  what you're suggesting?

16    MR. MARCHESE:  We were going to ask for the same

17  thing.

18    MR. AXELROD:  It would be lovely to get a bite to eat

19  one of these days.

12:26  20    THE COURT:  How about 35 minutes?  Will that give you

21  enough time?

22    MR. AXELROD:  We'll make it work.

23    THE COURT:  Do you need more than that?  How about 45

24  minutes?

25    (Recess.)

1               ---OOO---

2

3           C-E-R-T-I-F-I-C-A-T-I-O-N

4

5    I certify that the foregoing is a correct transcript from

6 the record of proceedings in the above-entitled matter.

7

8      Dated September 22, 2017, at San Diego, California.

9

10

       /s/ Dana Peabody
11        Dana Peabody,
       Registered Diplomate Reporter
12        Certified Realtime Reporter

13

14

15

16

17

18

19

20

21

22

23

24

25

1321

1    UNITED STATES DISTRICT COURT

2    SOUTHERN DISTRICT OF CALIFORNIA

3

4    COLUMBIA SPORTSWEAR NORTH        )
     AMERICA, INC., AN OREGON         )
5    CORPORATION,                     )
                                      )
6              PLAINTIFF,             ) CASE NO. 17CV1781-HZ
                                      )
7    VS.                              ) SAN DIEGO, CALIFORNIA
                                      )
8    SEIRUS INNOVATIVE ACCESSORIES,)   FRIDAY,
     INC., A UTAH CORPORATION,        ) SEPTEMBER 22, 2017
9                                     ) 1:10 P.M.
               DEFENDANT.             )
10   _____)

11

12

13            REPORTER'S TRANSCRIPT OF PROCEEDINGS

14                       JURY TRIAL

15               VOLUME 5 - PM SESSION

16                 PAGES 1321 - 1480

17   BEFORE THE HONORABLE MARCO A. HERNANDEZ
             UNITED STATES DISTRICT JUDGE

18

19

20

21

22   REPORTED BY:  CAMERON P. KIRCHER
                   CSR NO. 9427, RPR, CRR, RMR
23                 333 W. BROADWAY, SUITE 420
                   SAN DIEGO, CALIFORNIA  92101
24                 E-MAIL:  CPKIRCHER@GMAIL.COM

25

COMPUTER-AIDED TRANSCRIPTION

1322

```
 1   APPEARANCES:

 2   FOR THE PLAINTIFF:   SCHWABE, WILLIAMSON & WYATT, P.C.
                          BY:  NIKA F. ALDRICH, JR., ESQ.
 3                             DAVID W. AXELROD, ESQ.
                               BRENNA LEGAARD, ESQ.
 4                        1211 SW 5TH AVENUE
                          SUITE 1900
 5                        PORTLAND, OREGON  97204

 6
     FOR THE DEFENDANT:   FISH & RICHARDSON, P.C.
 7                        BY:  CHRISTOPHER S. MARCHESE, ESQ.
                               SETH M. SPROUL, ESQ.
 8                        12390 EL CAMINO REAL
                          SAN DIEGO, CALIFORNIA  92130
 9
                          MARKOWITZ HERBOLD, P.C.
10                        BY:  RENEE ROTHAUGE, ESQ.
                          1211 SW FIFTH AVENUE
11                        SUITE 3000
                          PORTLAND, OREGON  97204
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1323

1   <u>**INDEX**</u>

2   <u>EXAMINATION</u>

3   <u>WITNESS NAME</u>                                                    <u>PAGE</u>

4   <u>MICHAEL CAREY</u>

5      DIRECT BY MR. MARCHESE.................................... 1326
       CROSS BY MR. ALDRICH..................................... 1405
6      CROSS BY MR. MARCHESE.................................... 1447

7   <u>ROBERT MURPHY</u>

8      DIRECT BY MS. ROTHAUGE.................................... 1450

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

COMPUTER-AIDED TRANSCRIPTION

1324

1                              **EXHIBITS**

2      EXHIBIT                                              PAGE

3      EXHIBIT 114 ENTERED INTO EVIDENCE                    1419
       EXHIBIT 119 ENTERED INTO EVIDENCE                    1412
4      EXHIBIT 184 ENTERED INTO EVIDENCE                    1474
       EXHIBIT 202 ENTERED INTO EVIDENCE                    1341
5      EXHIBIT 203 ENTERED INTO EVIDENCE                    1342
       EXHIBIT 204 ENTERED INTO EVIDENCE                    1345
6      EXHIBIT 205 ENTERED INTO EVIDENCE                    1352
       EXHIBIT 206 ENTERED INTO EVIDENCE                    1350
7      EXHIBIT 209 ENTERED INTO EVIDENCE                    1364
       EXHIBIT 210 ENTERED INTO EVIDENCE                    1370
8      EXHIBIT 211 ENTERED INTO EVIDENCE                    1371
       EXHIBIT 499 ENTERED INTO EVIDENCE                    1375
9      EXHIBIT 505 ENTERED INTO EVIDENCE                    1416
       EXHIBIT 1404.1 ENTERED INTO EVIDENCE                 1465
10     EXHIBIT 1404.2 ENTERED INTO EVIDENCE                 1465
       EXHIBIT 1404.3 ENTERED INTO EVIDENCE                 1465
11     EXHIBIT 1404.4 ENTERED INTO EVIDENCE                 1465
       EXHIBIT 1404.5 ENTERED INTO EVIDENCE                 1465
12     EXHIBIT 1404.6 ENTERED INTO EVIDENCE                 1465
       EXHIBIT 1404.7 ENTERED INTO EVIDENCE                 1465
13     EXHIBIT 1404.8 ENTERED INTO EVIDENCE                 1465
       EXHIBIT 1404.9 ENTERED INTO EVIDENCE                 1465
14     EXHIBIT 1404.10 ENTERED INTO EVIDENCE                1465
       EXHIBIT 1404.11 ENTERED INTO EVIDENCE                1465
15     EXHIBIT 1404.12 ENTERED INTO EVIDENCE                1465
       EXHIBIT 1404.13 ENTERED INTO EVIDENCE                1465
16     EXHIBIT 1404.14 ENTERED INTO EVIDENCE                1465
       EXHIBIT 1404.15 ENTERED INTO EVIDENCE                1465
17     EXHIBIT 1404.16 ENTERED INTO EVIDENCE                1465
       EXHIBIT 1404.17 ENTERED INTO EVIDENCE                1465
18     EXHIBIT 1404.18 ENTERED INTO EVIDENCE                1465
       EXHIBIT 1404.19 ENTERED INTO EVIDENCE                1465
19     EXHIBIT 1404.20 ENTERED INTO EVIDENCE                1465

20

21

22

23

24

25

1325

1        SAN DIEGO, CALIFORNIA - FRIDAY, SEPTEMBER 22, 2017

2                            1:10 P.M.

3            THE COURT:  DID WE HAVE A WITNESS ON?

4            MR. MARCHESE:  NO, WE DID NOT.

5            MR. ALDRICH:  YOUR HONOR, DID YOU WANT TO TAKE UP

6    THE ISSUE OF WILLFULNESS BEFORE MR. CAREY TOOK THE STAND?

7    THAT PRETRIAL CONFERENCE --

8            THE COURT:  I HAVEN'T HAD A CHANCE TO GO BACK AND

9    LOOK AT THE TRANSCRIPT IN ORDER TO DO THAT, AND I'M GOING TO

10   HAVE TO DO THAT.

11           MR. ALDRICH:  OKAY.

12           THE COURT:  SO CAN YOU STAY AWAY FROM THAT AREA AT

13   THIS JUNCTURE.

14           MR. MARCHESE:  IT IS -- I SUPPOSE I COULD, YEAH.  IT

15   IS A PART --

16           THE COURT:  IT WILL BE A LITTLE BIT BROKEN UP, BUT

17   WE'LL JUST HAVE TO ADJUST A LITTLE BIT.

18           MR. MARCHESE:  OKAY.  AND THAT IS WITH RESPECT TO

19   THE REPRESENTATION MADE ABOUT THE '270 PATENT AND THE TIMING?

20           THE COURT:  CORRECT.  I THINK SO.  IF WE CAN JUST

21   AVOID THAT, AND THEN I CAN FIGURE OUT WHAT TO DO.  IT REALLY

22   IS -- IT HAS LESS TO DO WITH THE EVIDENCE THAN

23   REPRESENTATIONS THAT WERE MADE BY COUNSEL.

24           MR. MARCHESE:  SO IF -- IF I SKIP OVER PARTS THAT WE

25   WERE GOING TO DO WITH MR. CAREY, CAN I --

1326

1    THE COURT:  YOU CAN CALL HIM BACK.  YEAH, YOU CAN

2    CALL HIM BACK.

3    MR. MARCHESE:  THANK YOU.

4    (JURY PRESENT, 1:12 P.M.)

5    THE COURT:  WELCOME BACK.  PLEASE BE SEATED.

6    MEMBERS OF THE JURY, THE PLAINTIFF HAS RESTED, AND

7    WE ARE NOW TO THE DEFENSE SIDE OF THE CASE.

8    CALL YOUR WITNESS.

9    MR. MARCHESE:  SEIRUS CALLS MIKE CAREY.

10   THE COURT:  GO AHEAD AND RE-TAKE THE STAND.

11   YOU REMAIN UNDER OATH.

12   THE WITNESS:  OF COURSE.

13   MICHAEL CAREY, HAVING PREVIOUSLY BEEN DULY SWORN,

14   TESTIFIED AS FOLLOWS:

15   MR. MARCHESE:  MAY I PROCEED, YOUR HONOR?

16   THE COURT:  YOU MAY.

17   MR. MARCHESE:  THANK YOU.

18                    DIRECT EXAMINATION

19   BY MR. MARCHESE:

20   Q.   SO I THINK WE'RE IN THE AFTERNOON NOW.  MR. CAREY, GOOD

21   AFTERNOON TO YOU.

22   A.   GOOD AFTERNOON.

23   Q.   COULD YOU PLEASE REINTRODUCE YOURSELF TO THE JURY.

24   A.   I AM MICHAEL CAREY.

25   Q.   AND TELL US A LITTLE BIT ABOUT YOUR -- IF YOU COULD,

COMPUTER-AIDED TRANSCRIPTION

1327

```
1    REMIND US OF YOUR ROLE IN THE COMPANY.

2    A.   PARDON ME?

3    Q.   YOUR ROLE AT THE COMPANY AT SEIRUS.

4    A.   I'M THE CEO AND PRESIDENT OF SEIRUS INNOVATIONS.

5    Q.   AND AGAIN, REMINDER.  HOW LONG HAVE YOU BEEN THERE?

6    A.   SINCE ITS INCEPTION IN 1984.

7    Q.   AND IF YOU COULD, JUST IN A NUTSHELL, SORT OF GIVE US A

8    SUMMARY OF WHAT SEIRUS, THE COMPANY, IS AS FAR AS YOU BELIEVE

9    IT TO BE.

10   A.   NUTSHELL.  WELL, SEIRUS IS A COMPANY THAT'S COMPRISED OF

11   GREAT PEOPLE.  I MEAN, COMPANIES ARE ALWAYS A REFLECTION OF

12   THEIR PEOPLE.  WE HAVE AN INCREDIBLE BEVY OF PEOPLE WHO WANT

13   TO CONTRIBUTE.  AND THEY HAVE HELPED FORM A CULTURE OF DOING

14   GOOD THINGS AND BEING CREATIVE AND CRITICAL THINKERS AND

15   DEVELOPING GREAT CONSUMER PRODUCTS BASED ON INNOVATIONS,

16   BASED ON BEING FIRST IN THE MARKET, BEING PIONEERS IN WHAT WE

17   DO.  AND SO IT'S MORE THAN JUST THE BRICK AND MORTAR.  IT'S

18   REALLY THE HEART AND SOUL OF SEIRUS IS ITS PEOPLE.

19        AND WHAT WE DO IS A REFLECTION OF THAT.  WE WANTED

20   TO CREATE, MY WIFE AND I AND THOSE WHO HAVE JOINED OUR

21   COMPANY, IT'S THAT RELIANCE ON EACH OTHER, THE PEOPLE THAT

22   REALLY MAKES SEIRUS WHAT IT IS.  AND IT'S HARD TO PUT THAT IN

23   A NUTSHELL.

24        BUT WE WANTED TO GIVE PEOPLE AN OPPORTUNITY TO JOIN

25   AN ORGANIZATION THAT IS DEDICATED ON DOING GREAT THINGS AND
```

COMPUTER-AIDED TRANSCRIPTION

1328

1    ACKNOWLEDGING THAT EVERYTHING FROM THE FIRST PERSON WHO COMES

2    IN THE DOOR TO THE LAST PERSON WHO LEAVES, THEY ARE

3    COMPLETELY RESPONSIBLE FOR WHAT WE DO.  EVERY SINGLE PERSON.

4           AND WE'VE BEEN SO BLESSED.  I COULDN'T TELL YOU HOW

5    LUCKY I AM TO BE PART OF THIS ORGANIZATION.

6    Q.    THANK YOU, MR. CAREY.

7           I WANT TO TALK A LITTLE BIT MORE ABOUT SEIRUS AND

8    THE HISTORY AND HOW YOU BUILT IT UP AND ALL THAT IN A FEW

9    MINUTES.  BUT BEFORE THAT, CAN WE TALK -- I'D LIKE TO ASK YOU

10   ABOUT YOUR UPBRINGING.

11          I UNDERSTAND YOU'RE FROM SAN DIEGO; RIGHT?

12   A.    YES.  I WAS BORN HERE IN SAN DIEGO, MERCY HOSPITAL, AND

13   GREW UP ABOUT TWO MILES DOWN THE ROAD.

14   Q.    AND SO DID YOU, WHILE YOU WERE HERE IN TOWN, DID YOU

15   GO -- I TAKE IT YOU WENT TO SCHOOL HERE AND YOU -- YOU KNOW,

16   YOU HAD SOME FAMILY HERE OBVIOUSLY AS WELL.

17          CAN YOU TELL US ABOUT YOUR FAMILY LIFE IN SAN DIEGO

18   WHILE YOU WERE HERE.

19   A.    YES.  SO I GREW UP HERE.  MY DAD AND MOM WERE -- SERVED

20   IN THE WAR, JUST LIKE A LOT OF PEOPLE WHO GOT HERE.  ONCE

21   THEY MOVED HERE AFTER THE WAR, THEY HAD US.  I WENT TO HIGH

22   SCHOOL HERE AND WAS A PRODUCT OF THE BOYS AND GIRLS CLUB OF

23   SAN DIEGO.  AND THAT'S BEEN AN IMPORTANT THING IN MY LIFE,

24   TOO.

25   Q.    WHAT DID YOUR MOM AND DAD DO?

1329

1    A.   MY DAD WAS A PHYSICIAN.  MY MOM WAS A NURSE.  HER DAD

2    WAS A PHYSICIAN.  AND YOU KNOW, I CAN'T TELL YOU HOW

3    IMPORTANT THEY HAVE BEEN IN MY LIFE.

4    Q.   WHAT KIND OF VALUES DID THEY INSTILL IN YOU AS A

5    CHILD?

6    A.   WELL, THE MOST IMPORTANT THINGS THAT WE ALL LEARN IN

7    LIFE IS THAT WHATEVER YOU DO, BE THE BEST YOU CAN BE AT

8    WHATEVER YOU DO.  BE ALWAYS TRUTHFUL AND HONEST.

9         I WAS REALLY BLESSED TO BE IN AN ATMOSPHERE THAT HAD

10   JUST UNCONDITIONAL LOVE.  STRONG DISCIPLINE, AND THAT'S

11   IMPORTANT, TOO.  BUT JUST THAT ENVIRONMENT OF BEING NURTURED

12   AND HAVING REALLY STRONG ETHICS AND TRUST AND HONESTY AND ALL

13   OF THAT.  AND THAT'S -- THAT DIDN'T ONLY JUST EXTEND TO MY

14   PARENTS, BUT ALL OF THEIR FRIENDS.

15        AS A MATTER OF FACT, THAT GENTLEMAN WHO ADORNS THE

16   WALL BEHIND YOU, JUDGE EARL GILLIAM, WAS ONE OF MY DAD'S BEST

17   FRIENDS AND HE AND OTHERS HAD A PROFOUND INFLUENCE ON MY LIFE

18   GROWING UP.

19   Q.   SO WHEN YOU WERE A YOUNG PERSON, TEENAGER AND SO,

20   GROWING UP IN SAN DIEGO, YOU WERE INVOLVED IN SPORTS; IS THAT

21   RIGHT?

22   A.   YEAH.

23   Q.   AND WHAT SPORT WAS YOUR FAVORITE ONE?

24   A.   THE ONE I WAS PLAYING AT THE TIME.  BUT I WAS FORTUNATE

25   TO EXCEL IN FOOTBALL, SO I LIKE -- I LIKED THAT QUITE A

1330

1   BIT.

2   Q.   SO AFTER YOU FINISHED HIGH SCHOOL, YOU WENT TO

3   COLLEGE?

4   A.   YEAH.  I WENT TO -- I GOT RECRUITED TO THE UNIVERSITY OF

5   SANTA CLARA IN NORTHERN CALIFORNIA, TO PLAY FOOTBALL FOR

6   THEM, WHERE I WAS A BIOLOGY MAJOR AND FELL IN LOVE WITH

7   ORGANIC CHEMISTRY, WHICH I'M AFRAID DR. COLE WASN'T REALLY A

8   FAN OF ORGANIC CHEMISTRY, BUT IT'S SO VITAL TO LIFE.

9          WITHOUT THAT COVALENT HYDROGEN BOND, NOBODY WOULD BE

10  HERE.  AND I FELL IN LOVE WITH SCIENCE.  WENT TO GRADUATE

11  SCHOOL IN MICROBIOLOGY AND GOT AN HONORARY DOCTORATE FROM

12  SANTA CLARA AND BEEN VERY LUCKY.

13  Q.   SO WHEN YOU WERE AT SANTA CLARA, DID YOU PLAY FOOTBALL?

14  I THINK YOU SAID YOU DID; RIGHT?

15  A.   YEAH.

16  Q.   THE WHOLE TIME THROUGH?

17  A.   YES.

18  Q.   AND THEN AFTER YOU GRADUATED, WHERE DID YOU GO?

19  A.   AFTER I GRADUATED, I CAME DOWN TO SAN DIEGO AND WENT TO

20  GRADUATE SCHOOL AT SAN DIEGO STATE UNIVERSITY.

21  Q.   AND YOU WERE -- I THINK YOU WERE PURSUING MICROBIOLOGY;

22  IS THAT RIGHT?

23  A.   YES.

24  Q.   MASTER'S DEGREE?

25  A.   MASTER DEGREE IN MICRO, YES.

1331

1    Q.    DID YOU GET THAT?

2    A.    NO.  I DIDN'T WRITE MY THESIS.  WENT ALL THE WAY THROUGH

3    IT AND DIDN'T WRITE MY THESIS.

4    Q.    WHY NOT?

5    A.    WELL, WENDY AND I WERE DEVELOPING A COMPANY.

6    Q.    WENDY --

7    A.    I'M SORRY.

8    Q.    MS. CAREY?

9    A.    MY WIFE.  WE'VE BEEN WORKING TOGETHER ALL OUR LIVES.

10   AND, YOU KNOW, I'M SO LUCKY TO BE ABLE TO WORK WITH SOMEBODY

11   YOU LOVE, FROM START TO FINISH.  IT'S BEEN BEAUTIFUL.

12          BUT WE GOT INVOLVED IN BUSINESS, AND SO IT JUST PUT

13   ME -- I LOVE PEOPLE.  I'M A SCIENTIST, TOO.  BUT BEING ABLE

14   TO BE IN THE BUSINESS COMMUNITY, YOU JUST GET MORE

15   INTERACTION.  I JUST FELL IN LOVE WITH THE BUSINESS PART OF

16   IT.

17   Q.    SO DID YOU -- YOU GOT INVOLVED WITH THE BUSINESS OR A

18   COMPANY AND YOU -- AND YOU DEPARTED FROM YOUR MASTER'S DEGREE

19   STUDIES; IS THAT RIGHT?

20   A.    YES.

21   Q.    AND WAS THAT INVOLVED WITH WHAT KIND OF -- WHAT TYPE OF

22   INDUSTRY WERE YOU IN?

23   A.    WELL, WENDY AND I AND A COUPLE FRIENDS THAT I PLAYED

24   FOOTBALL WITH, WE STARTED A COMPANY TO PROMOTE SCHOOL SPORTS

25   IN SAN DIEGO.  SO WE PUBLISHED A HIGH SCHOOL SPORTS MAGAZINE,

1332

1    AND WE PUBLISHED -- THERE ARE SCHEDULES AROUND THE CITY SO

2    EVERYBODY KNEW WHAT TIME THE GAMES WERE AND THINGS LIKE THAT.

3    WE JUST WANTED TO GIVE BACK TO THE COMMUNITY, BASICALLY.

4    Q.    AND WE HEARD A FEW DIFFERENT TIMES HERE SINCE THE TRIAL

5    STARTED THAT YOU BECAME A REFEREE IN THE NFL; CORRECT?

6    A.    YES.

7    Q.    AND HOW DID THAT BEGIN FOR YOU?

8    A.    WELL, I PLAYED ALL THE WAY THROUGH COLLEGE.  AND GROWING

9    UP, YOU LEARN SO MUCH FROM THE GAME OF FOOTBALL, AND ANY TEAM

10   SPORT, HOW TO REALLY GIVE YOURSELF TO THE TEAM, HOW TO

11   SACRIFICE ALL THOSE THINGS.  AND I WANTED AN OPPORTUNITY TO

12   GIVE THOSE SAME THINGS I LEARNED FROM THAT GAME BACK TO THE

13   KIDS WHO WERE GROWING UP.

14         AND I WANTED TO HAVE A FAMILY AND A BUSINESS, AND SO

15   COACHING WAS OUT OF THE QUESTION, BECAUSE THAT'S 24/7.  BUT A

16   FRIEND OF MINE TALKED ME INTO BECOMING A REFEREE.

17   Q.    AND WHERE DID YOU START WITH THAT?

18   A.    WELL, EVERYBODY STARTS WITH LITTLE POP WARNER KIDS.  SO

19   IT WAS REALLY A LOT OF FUN.  I MEAN, KEEP THE PARENTS OUT OF

20   IT, IT'S MORE FUN.  BUT THE KIDS HAD A GREAT TIME.

21         AND I WAS LUCKY ENOUGH TO RISE THROUGH THE RANKS AND

22   GOT INTO DIVISION I FOOTBALL.  AND FROM THERE, WENT TO THE

23   NFL.

24   Q.    SO HOW DID YOU END UP GETTING INTO THE NFL?  WHAT WAS

25   THE PROCESS TO MAKE THAT HAPPEN?

1333

1    A.    WELL, IF YOU MAKE IT TO DIVISION I, YOU KNOW, LIKE

2    SAN DIEGO STATE, USC, THINGS LIKE THAT, THAT'S WHERE THE NFL

3    SCOUTS OFFICIALS, JUST LIKE THEY SCOUT HIGH SCHOOL PLAYERS.

4         AND IF YOU'RE LUCKY ENOUGH TO GET SELECTED, WHAT

5    THEY DO IS THEY THEN SEND -- THEY HAVE A TEAM OF SECURITY

6    AGENTS -- THAT ARE ALL EX-FBI AGENTS, AND SO THEY DO -- THEY

7    COME AND INTERVIEW YOU.  THEY DO A COMPLETE BACKGROUND CHECK

8    TO MAKE SURE YOU'RE SQUEAKY CLEAN, TRUSTWORTHY.  THEY

9    INTERVIEW ALL YOUR NEIGHBORS.  I DIDN'T KNOW THAT AT THE

10   TIME.  THEY INTERVIEW ALL YOUR BUSINESS ASSOCIATES, THOSE WHO

11   LIKE YOU AND THOSE WHO DON'T.

12        AND THEN IF YOU PASS THAT, THEN YOU GO IN AND YOU

13   TAKE A PSYCHOLOGICAL PROFILE TEST TO MAKE SURE THAT, YOU

14   KNOW, YOU'RE STABLE ENOUGH TO DO IT.  AND THEN AFTER THAT,

15   THE LEAGUE ITSELF COMES AND BRINGS YOU IN AND THEY INTERVIEW

16   YOU AND MAKE SURE THAT THEY THINK THAT YOU'RE OF A STATURE

17   THAT THEY WOULD LIKE TO HAVE IN THEIR GAME.

18   Q.    AND THEY DID ACCEPT YOU?

19   A.    YES.  I WAS LUCKY.

20   Q.    SO HOW MANY YEARS DID YOU END UP DOING THAT?

21   A.    I WAS IN THE NFL FOR 24 YEARS.

22   Q.    AND YOU STEPPED UP THROUGH THE RANKS IN THE NFL REFEREE

23   OR OFFICIATING WORLD; RIGHT?

24   A.    YEAH.  SO IF YOU'RE NOT FAMILIAR WITH FOOTBALL, THERE IS

25   SEVEN OFFICIALS ON THE FIELD.  AND THERE IS THREE THAT ARE

1334

1    VERY DEEP, THAT IT'S A RUNNING GAME AND A PASSING GAME.  AND

2    THE DEEP PEOPLE ARE THE ONES WHO RULE ON CATCH/NO CATCH,

3    TOUCHDOWNS.  AND THAT'S THE POSITION I HAD WHEN I WAS IN

4    DIVISION I, AND SO THEY BROUGHT ME AS A DEEP OFFICIAL.

5    Q.   AND THEN ULTIMATELY YOU WORKED YOUR WAY UP TO WHAT?

6    A.   THEN IF YOU ARE ONE OF THEIR TOP PERFORMERS ON THEIR

7    TESTING -- THE RULES ARE VERY COMPLICATED, NOT ONLY ON WHAT

8    THE RULES ARE, BUT WHAT THE INTERPRETATION OF THOSE RULES ARE

9    AND HOW THEY ARE APPLIED IN THE MECHANICS, AND THEY THINK

10   THAT YOU ARE OF LEADERSHIP QUALITY AND HAVE A STRONG ENOUGH

11   PRESENCE THAT THE COACHES ARE GOING TO ACCEPT YOU AND THE

12   PLAYERS ARE GOING TO ACCEPT YOU, THEN THEY INVITE YOU TO TRY

13   OUT AS A REFEREE.

14   Q.   A REFEREE IS WHAT, THE TOP PERSON?

15   A.   OH, YES.  EXCUSE ME.  THE REFEREE IS THE ONE IN CONTROL

16   OF THE GAME, SO HE'S THE ONE THAT MAKES SURE THAT THE GAME IS

17   PLAYED FAIRLY.  AND SO THE LEAGUE IS REALLY, REALLY CONSCIOUS

18   OF MAKING SURE THAT THE GAME IS AS FAIR TO ONE SIDE AS IT IS

19   TO THE OTHER, BECAUSE EACH SIDE THINKS THAT THE REFEREE IS

20   FOR THE OTHER TEAM; RIGHT.

21        AND SO THEY WANT TO MAKE SURE THAT YOU'RE ABLE TO

22   PROJECT AND PERFORM IN A WAY THAT IS COMPLETELY FAIR AND

23   COMPLETELY UNBIASED IN THE WAY THAT YOU PERFORM IN THE

24   GAME.

25   Q.   AND DID YOU ULTIMATELY ACHIEVE THE HIGHEST GOAL IN THE

COMPUTER-AIDED TRANSCRIPTION

1335

1    NFL AS A REFEREE?

2    A.    YES.

3    Q.    AND THAT WAS WHAT?

4    A.    I GOT TO WORK A SUPER BOWL BACK IN 2008.

5    Q.    AND THE NFL IS A BIT OF A FAMILY AFFAIR FOR YOU;

6    RIGHT?

7    A.    YES.  SO MY BROTHER ALSO, WHICH IS RARE, IS AN NFL -- HE

8    WAS AN NFL OFFICIAL TOO, AND BECAME A REFEREE ALSO.  BUT THAT

9    ALSO HAS TO DO WITH SAN DIEGO'S ASSOCIATION, THE ONES WHO

10   HAVE HELPED DEVELOP REFEREES AND OFFICIALS.  THEY DO AN

11   INCREDIBLE JOB OF REALLY GETTING YOU READY TO PERFORM VERY

12   WELL IN A VERY HIGH-INTENSE, VERY HIGHLY CHARGED ATMOSPHERE.

13   AND SO I STAND ON THE SHOULDERS OF A LOT OF PEOPLE.

14   Q.    AND CAN YOU TELL US, WHAT WAS THE CONNECTION, TO THE

15   EXTENT THERE IS ONE, BETWEEN WHAT YOUR PREPARATIONS OF YOUR

16   FAMILY LIFE OR UPBRINGING AND ALL THAT, PREPARED YOU TO BE AN

17   NFL REFEREE AND ULTIMATELY TO RUN YOUR OWN COMPANIES AS

18   WELL?

19          MR. ALDRICH:  YOUR HONOR, PROBATIVE VALUE.

20          THE COURT:  SUSTAINED.

21   Q.    BY MR. MARCHESE:  NOW, I'M GOING TO SWITCH GEARS AND ASK

22   YOU A QUESTION ABOUT SEIRUS.  WHAT I'D LIKE TO ASK YOU IS

23   WHAT IS SEIRUS' POLICY IN TERMS OF INTELLECTUAL PROPERTY?

24   A.    WELL, IT'S A FUNDAMENTAL OF WHAT WE DO.  SO PRIMARILY TO

25   BE CRITICAL ENOUGH THINKERS TO COME UP WITH GREAT

COMPUTER-AIDED TRANSCRIPTION

1336

1    INTELLECTUAL PROPERTIES AND TO RESPECT INTELLECTUAL

2    PROPERTIES, NOT ONLY OURS, BUT ANYBODY ELSE'S.

3    Q.    AND HAS SEIRUS EVER BEEN ACCUSED OF INFRINGING SOMEBODY

4    ELSE'S PATENTS, BESIDES BY COLUMBIA?

5    A.    NO.  NEVER.

6    Q.    DOES SEIRUS TAKE ANY KINDS OF STEPS BEFORE IT INTRODUCES

7    A PRODUCT TO CLEAR IT?

8    A.    YES.  SO WE'RE REALLY A PRODUCT DEVELOPMENT COMPANY, AND

9    SO WE HAVE STAGES OF DEVELOPMENT.  AND BEFORE WE'RE READY TO

10   BRING A NEW PRODUCT TO THE MARKET, IT GETS -- THERE ARE

11   SIGNS-OFFS BY THE EXECUTIVE WHICH IS MYSELF, THE SALES

12   DEPARTMENT, THE CREATIVE DEPARTMENT, THAT MAKES SURE

13   EVERYTHING IS RIGHT; AND THEN OUR LEGAL DEPARTMENT AS WELL.

14   Q.    AND WHAT -- DO YOU HAVE SOME SORT OF SIGN-OFF?  MAYBE

15   YOU SAID THAT AND I MISSED IT.  DID YOU HAVE SIGN-OFF AS

16   WELL?

17   A.    YES.  I'M CONSIDERED THE EXECUTIVE.

18   Q.    SO YOU ARE -- THE LAST PERSON TO CHECK THE BOX ON A

19   PRODUCT IS YOU?

20   A.    THAT'S CORRECT.

21   Q.    ALL RIGHT.  WELL, LET'S REWIND A LITTLE BIT AND TALK

22   ABOUT HOW SEIRUS CAME TO BE.  SEIRUS, I THINK WE'VE HEARD

23   THIS THROUGH A LOT OF THE TESTIMONY, BUT I'LL ASK IT JUST TO

24   MAKE SURE EVERYBODY IS CLEAR.

25          SEIRUS IS FOCUSED ON SOMETHING CALLED THE SNOW

1337

1   SPORTS INDUSTRY; IS THAT RIGHT?

2   A.   YES.

3   Q.   WHAT IS THAT?

4   A.   SO SNOW SPORTS INDUSTRY ARE ALL THOSE EXPERIENCES THAT

5   YOU DO IN COLD WEATHER, PREDOMINANTLY SKIING AND

6   SNOWBOARDING, BUT ANYTHING THAT HAS TO DO WITH ENTERTAINMENT

7   ON THE SNOW IN COLD WEATHER.

8   Q.   WHAT ARE SOME EXAMPLES OF OTHER THINGS BESIDES SKIING

9   AND SNOWBOARDING THAT YOU GUYS SELL PRODUCTS TO?

10  A.   SLEDDING.  BUT, YOU KNOW, WORKING IN THE COLD, WE

11  CREATED A WORK DIVISION TO THE MILITARY; THEY ARE IN THE COLD

12  QUITE A BIT.  WE SELL QUITE A BIT OF GOODS TO THEM AS WELL.

13  BUT YOU NAME IT.  YOU KNOW, FROM WATCHING A FOOTBALL GAME IN

14  THE COLD.

15  Q.   AND SO HOW DID YOU PERSONALLY GET INVOLVED IN THE SNOW

16  SPORTS INDUSTRY?  I MEAN, YOU'RE GROWING UP IN SAN DIEGO, YOU

17  GO OFF TO SCHOOL IN SANTA CLARA.  YOU'RE A CALIFORNIA BOY.

18  YOU COME BACK TO SAN DIEGO, AND ALL OF A SUDDEN YOU'RE IN THE

19  SNOW SPORTS INDUSTRY.

20         HOW DOES THAT HAPPEN?

21  A.   WELL, ACTUALLY I OWE THAT TO MY WIFE, WENDY.  SHE AND I

22  MET IN COLLEGE.  AND I WENT TO SANTA CLARA.  A LOT OF MY

23  FRIENDS THAT I PLAYED FOOTBALL WITH, THEY WERE FROM NORTHERN

24  CALIFORNIA, TOO, WHICH IS CLOSE TO THE SIERRA MOUNTAINS.

25  THEY SKIED.

1338

```
 1            AND PLAYING FOOTBALL, IF YOU'RE ON A RIDE, YOU CAN'T
 2    SKI.  AND SO AFTER MY SENIOR YEAR --
 3    Q.   YOU SAID.  YOU'RE ON A "RIDE," YOU MEAN SCHOLARSHIP?
 4    A.   YES.  I'M SORRY.
 5    Q.   I JUST WANT TO BE CLEAR.
 6    A.   YOU CAN'T SKI.  SO I MET WENDY AT COLLEGE, AND SHE MOVED
 7    UP TO THE MOUNTAINS.  THEY LET HER DO HER SENIOR WORK IN THE
 8    MOUNTAINS.  I DON'T KNOW HOW THAT HAPPENED.  AND SO I GOT
 9    INTRODUCED TO SKIING THERE.  AND HATED IT.  THE FIRST TIME,
10    HATED IT.  AND THEN -- BUT I STUCK WITH IT AND LEARNED IT AND
11    REALLY FELL IN LOVE WITH IT.  AND THAT'S HOW I ENDED UP
12    INVENTING MY FIRST PRODUCT.
13    Q.   SO YOU INVENTED A PRODUCT FOR SNOW SPORTS?
14    A.   YES.
15    Q.   WHAT WAS THAT CALLED?
16    A.   IT WAS CALLED CAT TRACKS.
17    Q.   AND WE'VE JUST PUT UP SLIDE DDX-202 UP THERE, MR. CAREY.
18            DO YOU SEE THAT?
19    A.   YEAH.
20    Q.   THIS IS CAT TRACKS; RIGHT?
21    A.   OH, YEAH.
22    Q.   CAN YOU EXPLAIN TO US JUST BRIEFLY -- YOU DON'T NEED TO
23    GO INTO DETAIL -- WHAT IT IS.
24    A.   IT'S A WALKER FOR SKI BOOTS, THE RELATIONSHIP BETWEEN
25    THE SKI BOOT AND THE SKI BINDING.  SO IT REALLY SOLVED A BIG
```

COMPUTER-AIDED TRANSCRIPTION

1    ISSUE OF LOWER LEG INJURIES FROM THE COMPATIBILITY OF BOOTS

2    AND BINDINGS.  AND I GOT LUCKY.

3    Q.    AND YOU GOT A PATENT ON IT; RIGHT?

4    A.    YES.

5    Q.    AND HOW DID IT DO IN TERMS OF SALES --

6    A.    IT DID VERY WELL.

7    Q.    -- IN THE INDUSTRY?

8    A.    IT LAUNCHED -- IT LAUNCHED OUR COMPANY.  IT HELPED

9    LAUNCH OUR COMPANY.  DURING THOSE YEARS, SKIING WAS REALLY

10   ONLY HARD GOODS.  SO HARD GOODS WERE SKIS AND BOOTS AND POLES

11   AND CLOTHING, JACKETS, PANTS.  AND THEIR ONLY -- THERE WAS

12   ONLY, YOU KNOW, SKI GOGGLES AND GLOVES THAT WERE IN THE

13   MARKETPLACE.

14          AND AT THAT TIME, 95 PERCENT OF THE SALES CAME FROM

15   HARD GOODS, AND SOFT GOODS AND ACCESSORIES WERE ONLY ABOUT 5

16   PERCENT OF THE SALES.  THIS IS ONE OF THE PRODUCTS THAT

17   HELPED KIND OF CHANGE THAT, THAT THE STORES REALIZED THAT

18   THERE WAS A MARKET IN WHAT WE CALL ESSENTIALS, NOT THE

19   EQUIPMENT, BUT THINGS THAT REALLY ARE IMPORTANT TO ENJOY THE

20   SPORT.

21          AND SO FROM OUR INCEPTION, WHICH WAS 5 PERCENT OF

22   THE MARKET, TO NOW, ACCESSORIES ARE LIKE 33 PERCENT OF THE

23   MARKET AND A BIG PERCENTAGE OF THEIR PROFITABILITY.  SO THIS

24   CATEGORY HAS BEEN -- HAS BEEN GOOD.  AND THIS IS ONE OF THE

25   HALLMARKS OF THAT INDUSTRY.

1340

1    Q.    SO GLOVES ARE ACCESSORIES; IS THAT RIGHT?

2    A.    THAT'S CORRECT.

3    Q.    HATS?

4    A.    YES.

5    Q.    OKAY.  YOU'RE TALKING ABOUT SOMETHING DIFFERENT FROM

6    SKIS AND BOOTS AND BINDINGS?

7    A.    CORRECT.

8    Q.    OKAY.  NEXT SLIDE, PLEASE.

9          SO TELL US IF YOU WOULD, HOW DID CAT TRACKS LEAD TO

10   SEIRUS?

11   A.    WELL, SO WE WERE -- I STARTED -- DURING THAT TIME, I

12   TRAVELED THE WHOLE COUNTRY.  FIRST OF ALL, WENDY AND I --

13   WENDY CAREY, WE TOOK THIS PRODUCT TO ALL THE DISTRIBUTORS

14   AROUND THE COUNTRY -- THERE ARE ONLY LIKE FOUR OR FIVE OF

15   THOSE; THAT'S HOW THE INDUSTRY WORKED AT THAT TIME -- WITH

16   OUR OLDEST DAUGHTER DRISANA IN MY BACKPACK AND GOT

17   DISTRIBUTION.

18         WE SHOWED ALL FIVE DISTRIBUTORS AND THEY ALL WANTED

19   TO DO IT.  AND WE WERE LUCKY ENOUGH TO PICK THE ONE THAT WE

20   WANTED.  AND SO AFTER THAT, I WENT AROUND THE COUNTRY AND

21   WOULD GIVE CLINICS, WHAT THEY CALL, SO YOU TEACH PEOPLE WHAT

22   THIS PRODUCT DOES AND WHY IT'S IMPORTANT TO USE.

23         AND DURING THAT TIME, I MET MY PARTNER, JOE EDWARDS,

24   WHO HAD A PATENT OF A NEOPRENE FACE MASK.  AND WE BECAME

25   FRIENDS.  AND THEN IT'S COINCIDENTALLY.  I TOLD HIM, HEY, I'M

1341

1    WORKING ON THIS GLOVE.  AND HE SAID, YOU KNOW, I'M WORKING ON

2    THE SAME THING.  WHY DON'T WE DO IT TOGETHER.

3                MET ONE OF THE FOUNDING FATHERS OF THE GLOVE

4    INDUSTRY AND THE SNOW SPORTS INDUSTRY, WHO HAD JUST MOVED

5    FROM THE EAST COAST, GLOVERSVILLE, NEW YORK -- IF YOU

6    BELIEVE THAT.  BECAUSE THAT'S WHERE -- ALL SKI GLOVES WERE

7    MADE IN GLOVERSVILLE WAY BACK IN THE '40S AND '50S AND '60S.

8    AND IT DIDN'T MOVE TO ASIA UNTIL RIGHT AFTER THAT.  AND HE

9    WAS ONE OF THOSE PEOPLE WHO FIRST WAS ABLE TO FIND FACTORIES

10   IN ASIA.

11               SO HE TOOK BOTH OF US UNDER HIS WING, TAUGHT US THE

12   GLOVE MARKET AND GLOVE PRODUCTION FROM THE GROUND UP.  I

13   MEAN, WE GOT A PH.D. IN GLOVE MAKING THROUGH MR. WEISS.

14               MR. MARCHESE:  I REALIZE NOW THAT I DID NOT PUBLISH

15   DDX-202.

16               ANY OBJECTION TO THAT?

17               MR. ALDRICH:  YES.

18               MR. MARCHESE:  OBJECTION?

19               MR. ALDRICH:  YES.  OBJECTION.

20               THE COURT:  WHICH ONE WAS 202?

21               MR. MARCHESE:  IT WAS THE CAT TRACKS SLIDE.

22               THE COURT:  YOUR OBJECTION IS OVERRULED.  IT IS

23   RECEIVED.

24          (TRIAL EXHIBIT 202 RECEIVED IN EVIDENCE.)

25               MR. MARCHESE:  THANK YOU.

COMPUTER-AIDED TRANSCRIPTION

1342

```
1     IF WE COULD JUST GO BACK TO -- THERE IT IS, 202.

2  Q.   AND YOU'VE ALREADY TALKED ABOUT IT JUST BRIEFLY.  IS

3  THIS THE CAT TRACKS INVENTION THAT YOU GOT?

4  A.   YES, IT IS.

5  Q.   AND THAT LED TO SEIRUS?

6  A.   CORRECT.

7     MR. MARCHESE:  OKAY.  CAN WE HAVE DDX-203 AGAIN,

8  PLEASE.  AND I'D LIKE TO OFFER THAT, YOUR HONOR.

9     THE COURT:  ANY OBJECTION TO 203?

10     MR. ALDRICH:  NO.

11     THE COURT:  RECEIVED.

12  (TRIAL EXHIBIT 203 RECEIVED IN EVIDENCE.

13  Q.   BY MR. MARCHESE:  SO MR. CAREY, WE HAVE A SLIDE UP HERE

14  ABOUT SEIRUS INNOVATION.  CAN YOU TELL US A LITTLE BIT ABOUT

15  WHAT WE'RE LOOKING AT.

16  A.   YEAH.  SO YOU'LL SEE, THE TOP LEFT PICTURE IS A GROUP OF

17  US SKIING ON THE MOUNTAINS, AND THAT'S ASSORTED PICTURES OF

18  OUR PRODUCT.

19  Q.   THOSE CLOTHES LOOK LIKE IT'S NOT A CURRENT PHOTO?

20  A.   YEAH.  NEONS WERE BIG IN THE '70S.  FASHION TRENDS

21  CHANGE.

22  Q.   AND THEN TELL US, CAN YOU EXPLAIN WHAT'S GOING ON WITH

23  THE BULLET POINTS ON THE SLIDE, PLEASE.

24  A.   YEAH.  WE'RE FAMILY OPERATED.  AND IT'S REALLY EXTENDED

25  FAMILY.  I WAS MENTIONING BEFORE, YOU KNOW, GETTING THAT
```

1    PATENT WAS REALLY KIND OF HARD TO EXPLAIN.  WHEN YOU BRING

2    SOMETHING INTO EXISTENCE THAT HADN'T BEEN DONE BEFORE, AND

3    IMMEDIATELY THE PATENT OFFICE GIVES YOU A PATENT, IT'S REALLY

4    SOMETHING ELSE.  NEXT TO GETTING MARRIED TO WENDY AND THE

5    BIRTH OF MY TWO DAUGHTERS THAT I GOT TO SEE, THAT REALLY WAS

6    SOMETHING SPECIAL.  EVEN COMPARED TO THE SUPER BOWL THAT WAS

7    SPECIAL.

8            AND SO WE HAD THREE COMPANIES REALLY.  SO WE HAD

9    WINTER MOUNTAIN COMPANY, WHICH WAS CAT TRACKS AND ANOTHER

10   PRODUCT WE HAD.  AND JOE HAD A COMPANY IN SALT LAKE CITY THAT

11   MADE THE MASK.  AND WE RAN SEIRUS IN SAN DIEGO, DID ALL THE

12   SHIPPING AND ALL OF THAT.  AND SO IT WAS WENDY AND MYSELF,

13   AND WE STARTED IN OUR GARAGE.  I MEAN, IT WAS SOMETHING ELSE.

14   Q.   AND THE COMPANY HAS, WHAT, 300-PLUS PRODUCTS TODAY?

15   A.   YEAH.  SO FROM THOSE FIRST FEW PRODUCTS, WE HAVE BEEN

16   FORTUNATE ENOUGH TO DEVELOP PRODUCTS EVERY YEAR.  AND THE

17   MORE PEOPLE WE BRING ON TO HELP US RUN THE BUSINESS,

18   EVERYBODY CONTRIBUTES, AND EVERY YEAR WE PROBABLY BRING OUT

19   ANOTHER 30 PRODUCTS EVERY YEAR.

20           BUT WE JUST -- WE KEEP IT AT 300 PRODUCTS BECAUSE

21   THAT'S THE MOST -- THAT'S THE MOST PRODUCTS THAT WE CAN

22   REALLY MANAGE AT OUR SIZE.

23   Q.   AND SO WHAT'S HAPPENED TO THE COMPANY IN TERMS OF

24   FACILITIES OVER THE YEARS?

25   A.   WELL, WE MOVED FROM OUR GARAGE, WHERE IT WAS WENDY,

1344

1    MYSELF, OUR KIDS AND BOB MURPHY, WHO WAS OUR FIRST EMPLOYEE.

2    WE HAD BROUGHT TWO PEOPLE IN AT THE SAME TIME FROM SAN DIEGO

3    STATE, BECAUSE I LIVED RIGHT CLOSE TO THERE.  AND WE JUST

4    EXCHANGED HATS.  IF WE HAD TO PACK ONE DAY, WE WERE PACKING.

5    IF WE HAD TO DO INVOICING, WE'D DO THAT.  ANOTHER DAY YOU'RE

6    JUST DOING ALL THESE THINGS.

7              AND AT THE TIME, WE HAD NO IDEA IT WAS GOING TO GROW

8    INTO WHAT IT WAS.  IT WAS JUST THE PASSION FOR WORKING

9    TOGETHER, BUILDING SOMETHING BIG, YOU KNOW.

10   Q.   AND YOU'VE SINCE GOTTEN YOUR OWN FACILITIES; IS THAT

11   CORRECT?

12   A.   YES.  SO WE -- WE'RE LUCKY WE -- AS WE GREW, WE INVESTED

13   EVERY DIME.  SO WENDY AND I STARTING THIS BUSINESS, WE ALWAYS

14   HAD NIGHTTIME JOBS, BECAUSE WE POURED EVERY PENNY BACK INTO

15   THE COMPANY.

16             AND THE FIRST THING WE DID WAS WE GOT OFFICES UP IN

17   MIRAMAR AREA.  AND THEN ABOUT FIVE YEARS LATER, WE WERE ABLE

18   TO BUY A BUILDING THERE.  AND WE OUTGREW THAT.  AND THEN WE

19   WERE ABLE TO BUY A PLOT OF LAND UP IN POWAY AND BUILD A

20   FACILITY UP THERE WHERE WE ARE NOW HOUSED.

21             MR. MARCHESE:  AND CAN YOU GO ON TO 204, PLEASE.

22             PERMISSION TO PUBLISH?

23             THE COURT:  DO YOU HAVE ANY OBJECTION TO 204?

24             MR. AXELROD:  OH, SORRY.

25             NO, YOUR HONOR.

1345

1    THE COURT:  IT'S RECEIVED.

2    (TRIAL EXHIBIT 204 RECEIVED IN EVIDENCE.)

3    Q.   BY MR. MARCHESE:  MR. CAREY, DDX-204 IS UP.  WHAT ARE WE

4    LOOKING AT HERE?

5    A.   SO YOU'RE LOOKING AT A LIST OF PATENTS THAT SEIRUS IS

6    PROUD TO HAVE.

7    Q.   AND YOU'RE AN INVENTOR ON A NUMBER OF PATENTS; RIGHT?

8    A.   YES, I AM.

9    Q.   A NUMBER OF THESE YOU'RE THE INVENTOR ON?

10   A.   YES.  ONCE YOU DO IT, YOU WANT TO TRY TO DO IT AGAIN.

11   AND WE'VE BEEN LUCKY TO BE ABLE TO HAVE A NUMBER OF

12   PATENTS.

13   Q.   SO THE COMPANY -- SO THE NAME OF THE COMPANY IS

14   TYPICALLY SAID TO BE SEIRUS INNOVATION; RIGHT?

15   A.   YES.  THAT'S OUR CULTURE.

16   Q.   WHY DO YOU GUYS CALL IT THAT?

17   A.   BECAUSE WE STRIVE TO BE, AND FORTUNATELY ENOUGH, WE'VE

18   BEEN ABLE TO PERFORM AT A PIONEERING LEVEL.  WE'RE FIRST TO

19   MARKET WITH MOST OF THE THINGS THAT WE DO.  WE'VE JUST BEEN

20   REALLY BLESSED TO BE INNOVATIVE IN SO MANY AREAS IN THE SNOW

21   SPORTS INDUSTRY.

22        AND IT'S BASICALLY BECAUSE OF THE DIVERSITY WE HAVE

23   IN OUR BUSINESS.  YOU KNOW, WE HAVE DIFFERENT THINKERS.

24   WE'RE 50 PERCENT WOMEN; 50 PERCENT MEN.  WE'RE -- THE WHOLE

25   IDEA ABOUT COLLABORATION IS GETTING DIFFERENT THOUGHTS

1346

```
 1   TOGETHER.  AND THEN IT'S JUST BEEN KIND OF A SPRING WELL OF

 2   IDEAS.

 3           NOT JUST PRODUCTS.  THE WAY WE RUN OUR BUSINESS IS

 4   DIFFERENT THAN ANYBODY ELSE.  WE HAVE PEOPLE WHO COME INTO

 5   OUR CULTURE, IT'S -- EVERYBODY SAYS IT'S COMPLETELY DIFFERENT

 6   THAN WHAT THEY HAVE SEEN ANYWHERE ELSE.

 7   Q.   AND YOU MENTIONED A WHILE BACK WHEN I WAS ASKING YOU

 8   QUESTIONS, I ASKED YOU ABOUT SNOW SPORTS.  DO YOU REMEMBER

 9   THAT?

10   A.   YES.

11   Q.   IS THERE A TRADE ASSOCIATION FOR YOUR INDUSTRY?

12   A.   YES.  IT'S CALLED SNOW SPORTS INDUSTRIES OF AMERICA.

13   IT'S WHERE ALL OF THE PEOPLE WHO MAKE PRODUCTS FOR SNOW

14   SPORTS GET TOGETHER, SO THEN THEY HAVE A BIG TRADE SHOW.  NOW

15   IT'S IN DENVER.

16           THAT EVERYBODY WHO PURCHASES -- OR THE IDEA IS

17   EVERYBODY WHO PURCHASES, DEALERS, PEOPLE WHO SELL RETAIL COME

18   AND THEY SHOP THE WEARS THERE.  AND IT'S ALSO A BIG CULTURAL

19   COMMUNITY GATHERING, TOO, SO IT HELPS THE SPIRIT OF THE

20   INDUSTRY, TOO, WHICH IS REALLY A PASSIONATE INDUSTRY.

21   Q.   SO WHAT INVOLVEMENT WOULD YOU HAVE WITH THE S.I.A.?  I'M

22   SORRY.  S.I.A. IS SNOW SPORTS INDUSTRIES OF AMERICA; IS THAT

23   CORRECT?

24   A.   YES.  SO IT'S A TRADE ASSOCIATION.  AND SO, FIRST OF

25   ALL, YOU HAVE TO BE A MEMBER IN ORDER TO SHOW YOUR WARES.
```

1347

1    BUT 90 PERCENT OF THE PEOPLE THAT SHOW IN THE AREA ARE

2    MEMBERS, AND THEY SHOW AT THE TRADE SHOW THERE.

3            AND I GOT INVITED TO BE ON THEIR -- TO RUN FOR THEIR

4    BOARD OF DIRECTORS 15 YEARS AGO OR SOMETHING LIKE THAT.  AND

5    I GOT ELECTED.

6    Q.   CAN YOU GIVE US THE NAMES, SOME EXAMPLES OF SOME OF THE

7    BIGGER COMPANIES IN S.I.A. THAT PEOPLE MIGHT KNOW?

8    A.   WELL, IF YOU'RE NOT IN THE SNOW SPORTS ARENA, BUT K2

9    SPORTS; AND SOME OF THESE ARE SUBSIDIARIES OF BIG COMPANIES,

10   TOO.  ROSSIGNOL, OBERMEYER SPORTS, ALL THE BIG CLOTHING

11   MANUFACTURERS.

12   Q.   HOW MANY COMPANIES ARE MEMBERS OF THE TRADE ASSOCIATION,

13   APPROXIMATELY?

14   A.   OH, I THINK THERE IS ABOUT 300.

15   Q.   AND SO YOU BECAME A MEMBER OF THE BOARD OF DIRECTORS FOR

16   S.I.A.

17   A.   YES.

18   Q.   DID YOU GO ANYWHERE ELSE AFTER THAT WITH YOUR

19   INVOLVEMENT WITH S.I.A.?

20   A.   YES.  THEN ONCE I GOT ONTO THE BOARD, WHICH IS MAINLY

21   MADE UP OF OWNERS OR VICE PRESIDENTS OF COMPANIES; SO THERE

22   IS -- THE BOARD IS ABOUT 22 PEOPLE.  AND THEN THEY ELECT WHAT

23   THEY CALL THEIR EXECUTIVE COMMITTEE, THOSE WHO THEY WANT TO

24   HELP STEER THE INDUSTRY.

25           AND THEN WHEN YOU GET ON THE EXECUTIVE COMMITTEE,

1348

1    THEN THAT'S WHEN YOU'RE ELIGIBLE TO BE THE CHAIRMAN OF THE

2    BOARD, WHICH REALLY IS THE PERSON WHO DIRECTS WITH THE

3    PRESIDENT AND STAFF, THE TRADE ASSOCIATION.

4    Q.   AND DID YOU GET ELECTED TO BE CHAIRMAN OF THE BOARD?

5    A.   YES, I DID.

6    Q.   HOW MANY YEARS DID YOU SERVE IN THAT CAPACITY?

7    A.   FOUR YEARS.

8    Q.   FROM WHAT YEAR, BEGINNING TO END?

9    A.   HMM.  I THINK IT WAS -- I THINK I WAS EMERITUS IN '13,

10   AND THEN FOUR YEARS PRIOR.

11   Q.   SO WHAT KIND OF PAY DID YOU RECEIVE TO DO THIS WORK WITH

12   S.I.A.?

13   A.   NOT A LOT.

14   Q.   NOTHING?

15   A.   NO, IT'S PRO BONO.  YOU HAVE TO BE DEDICATED TO GIVE

16   YOURSELF TO THE INDUSTRY.  SO, NO, THERE IS NO COMPENSATION.

17   I MEAN, EXCEPT FOR THE GRATITUDE OF HELP TO BUILD THE

18   INDUSTRY INTO WHAT IT IS.

19   Q.   AND SO THAT WAS IN SOME SENSE, YOU KNOW, A WORK OF SOME

20   CHARITABLE NATURE.  HAVE YOU DONE ANY STRICTLY TRULY

21   CHARITABLE WORK IN YOUR CAREER?

22   A.   OH, YEAH.  SO I MENTIONED BEFORE THAT I WAS A PRODUCT OF

23   THE BOYS AND GIRLS CLUB OF SAN DIEGO.  AND SO THAT HAS ALWAYS

24   BEEN IMPORTANT FOR ME TO TRY TO GIVE BACK TO THE COMMUNITY.

25        AND SO I'VE BEEN -- I'VE BEEN ON THEIR BOARD OF

1349

```
1   DIRECTORS FOR OVER 20 YEARS.  I GOT INVITED TO BE ON THE

2   BOARD OF REGENTS AT SANTA CLARA, WHICH IS KIND OF A GOVERNING

3   BOARD.  AND THEN --

4   Q.  IS THAT THE UNIVERSITY --

5   A.  UNIVERSITY OF SANTA CLARITA.

6           MR. ALDRICH:  OBJECTION, YOUR HONOR.

7           THE COURT:  SUSTAINED.

8   Q.  BY MR. MARCHESE:  ALL RIGHT.  SO HOW MANY EMPLOYEES DOES

9   SEIRUS HAVE?

10  A.  WE HAVE -- WE'RE A SEASONAL BUSINESS, SO YEAR-ROUND WE

11  HAVE ABOUT 60.  AND THEN WHEN THE HEIGHT OF THE SEASON COMES

12  AND WHEN WE'RE SHIPPING A LOT, IT'S ABOUT 80 TO 100,

13  SOMETHING LIKE THAT.

14  Q.  AND ARE ALL THOSE PEOPLE LOCAL TO SAN DIEGO?

15  A.  EVERY ONE OF THEM, YES.

16  Q.  AND HAS SEIRUS EVER DEVELOPED ANY HEAT-REFLECTIVE

17  TECHNOLOGIES?

18  A.  OH, SURE.  YES.

19  Q.  OKAY.  AND CAN YOU TELL US JUST GENERALLY WHAT THOSE

20  ARE.

21  A.  WELL, BASICALLY ANY INSULATOR IS A REFLECTOR.  BUT IF

22  YOU'RE TALKING ABOUT HIGHER GRADES OF REFLECTIVITY, YES.  AND

23  WE'VE MADE BACK IN THE EARLY '90S A FOIL --

24          MR. ALDRICH:  OBJECTION, YOUR HONOR.

25          THE COURT:  OVERRULED.
```

COMPUTER-AIDED TRANSCRIPTION

1350

1    THE WITNESS:  FOIL COUPLED WITH A PRODUCT CALLED

2    THERMEX, WHICH WAS A DUPONT PRODUCT THAT WICKED MOISTURE AWAY

3    AND HELPED KEEP YOU DRY.  AND WE PUT ALUMINUM FOIL, LUREX IT

4    WAS CALLED, ONE OF THOSE SPACE-AGE PRODUCTS THAT CAME OUT OF

5    NASA, TO THAT.  AND PUT IT IN A GLOVE AND STARTED SELLING

6    IT.

7    Q.    BY MR. MARCHESE:  WHAT WAS THE NAME OF THAT GLOVE?

8    A.    IT'S CALLED THERMALUX.

9    MR. MARCHESE:  AND I'VE JUST PULLED UP DDX-206.  I'D

10   LIKE TO OFFER THAT.

11   THE COURT:  ANY OBJECTION?

12   MR. ALDRICH:  IT'S A DEMONSTRATIVE; RIGHT?

13   THE COURT:  IT WON'T BE DEMONSTRATIVE IF IT'S

14   OFFERED.

15   MR. ALDRICH:  NO OBJECTION, YOUR HONOR.  I'M

16   SORRY.

17   THE COURT:  IT'S RECEIVED.

18   (TRIAL EXHIBIT 206 RECEIVED IN EVIDENCE.)

19   Q.    BY MR. MARCHESE:  MR. CAREY, IS THIS A THERMALUX GLOVE?

20   A.    THAT'S ONE OF THE VERSIONS, YES.

21   Q.    AND HAVE WE SEEN THAT BEFORE IN THIS CASE?

22   A.    YES.

23   MR. MARCHESE:  AND IF I MAY APPROACH, YOUR HONOR?

24   THE COURT:  SURE.

25   MR. MARCHESE:  I HAVE EXHIBIT 1301 HERE.

COMPUTER-AIDED TRANSCRIPTION

1351

1   Q.   MR. CAREY, IS THIS A THERMALUX GLOVE?

2   A.   YES, IT IS.

3   Q.   WHEN DID YOU FIRST COME UP WITH THE THERMALUX GLOVE?

4   A.   BACK IN THE EARLY '90S, AROUND '91.

5   Q.   AND THERMALUX GLOVE IS -- I THINK YOU SAID YOU HAVE A

6   FIBER COUPLED WITH -- TWO MATERIALS COUPLED TOGETHER; IS THAT

7   RIGHT?

8   A.   YES.  THE ALUMINUM LUREX METALLIC, COUPLED WITH THERMEX

9   TOGETHER, AND SO IT MAKES A NICE, REFLECTIVE, BREATHABLE,

10   WICKABLE PRODUCT.

11   Q.   AND DID YOU GET A PATENT ON THERMALUX?

12   A.   NO.

13   Q.   WHY NOT?

14   A.   BECAUSE IT WAS COMMON TECHNOLOGY TO BIND THINGS

15   TOGETHER.  IT HAD BEEN IN THE MARKETPLACE BEFORE.  PUTTING --

16   COUPLING ONE ELEMENT TO ANOTHER ELEMENT WAS -- SEEMED OBVIOUS

17   TO US.

18   Q.   HAVE YOU HEARD OF A CONCEPT CALLED LAMINATING?

19   A.   ABSOLUTELY.  SURE.

20   Q.   WHEN DID YOU FIRST HEAR ABOUT LAMINATING?

21   A.   OH, YOU KNOW, PROBABLY IN COLLEGE, YOU KNOW.  BUT WE --

22   WE LAMINATED -- WE WERE ONE OF THE FIRST TO LAMINATE.  WE

23   WERE THE FIRST TO LAMINATE FLEECE TO NEOPRENE.  WE CALLED IT

24   NEO-FLEECE.  AND THIS WAS BACK IN THE MID '80S.  AND SO

25   THAT'S A VERY COMMON WAY TO PRODUCE PRODUCT, PRODUCE FABRICS

1352

1    ALSO.

2         MR. MARCHESE:  I'VE JUST PULLED UP DDX-205.  I'D

3    ACTUALLY LIKE TO OFFER THAT, YOUR HONOR.

4         MR. ALDRICH:  NO OBJECTION.

5         THE COURT:  RECEIVED.

6    (TRIAL EXHIBIT 205 RECEIVED IN EVIDENCE.)

7    Q.   BY MR. MARCHESE:  MR. CAREY, THIS IS A SLIDE THAT

8    SHOWS -- IT'S ENTITLED "SEIRUS PRODUCTS" AND IT HAS A FEW

9    DIFFERENT GRAPHICS ON IT.

10        DO ANY OF THESE RELATE TO LAMINATING?

11   A.   YES.  SO THE PRODUCT ON YOUR LEFT IS A -- ANOTHER ONE OF

12   OUR PATENTED PRODUCTS.  IT HAS A NEO-FLEECE MASK, WHERE

13   IT'S -- THE PORTION AROUND YOUR FACE IS NEO-FLEECE, WHICH IS

14   A FLEECE BONDED TO NEOPRENE.  AND NEOPRENE WAS THE BEST GOING

15   SOFT INSULATION, AND SO IT WAS EXCEPTIONALLY GOOD ABOUT

16   KEEPING -- STOPPING YOUR CHEEKS, NOSE AND CHIN FROM GETTING

17   FROSTBITE, WHICH IS A BIG PROBLEM IN THE SNOW SPORTS,

18   OBVIOUSLY.

19        AND THE PRODUCT ON THE FAR RIGHT IS A HOODED VERSION

20   OF THAT SAME KIND OF CONCEPT.

21   Q.   AND WHAT ABOUT THE MIDDLE.  I SEE THE WORD "NEO-FLEECE."

22   WHAT IS THAT?

23   A.   SO THAT IS ONE OF OUR MARKETING PIECES, YOU KNOW, SINCE

24   THE EARLY '80S.  THAT SHOWED -- THAT DEPICTED TO THE CONSUMER

25   HOW THIS WORKED.

1    YOU CAN SEE NOW NEOPRENE OF ITSELF IS REALLY AN OPEN

2    CELL -- A CLOSED-CELL FOAM THAT GETS CUT THINLY.  AND IF

3    YOU'VE HAD WETSUITS, THEY PUT NYLON ON IT.  BUT NYLON IS NOT

4    VERY CREATURE COMFORTABLE SO WE LAMINATED FLEECE TO THE

5    BOTTOM OF IT AND HAD IT, THE NYLON, ON THE OUTSIDE.

6    SO CLOSED-CELL INSULATION IS IMPERMEABLE TO WATER

7    AND WIND, BUT IT DOESN'T BREATHE.  SO IN AN APPLICATION LIKE

8    A FACE MASK, WHERE YOU DON'T PERSPIRE SO MUCH, IT'S NOT A BIG

9    ISSUE.  SO THIS DEPICTS THAT THE WATER AND WIND DOESN'T

10   PENETRATE AND THE WARMTH STAYS INSIDE.  SO YOU'RE MUCH WARMER

11   THAN YOU WOULD BE WITHOUT IT.

12   Q.   AND JUST ROUGHLY, WHAT'S THE VINTAGE OF THIS

13   ILLUSTRATION REGARDING NEO-FLEECE?

14   A.   I COULDN'T TELL YOU, BUT WE'VE HAD IT SINCE THE EARLY

15   '80S.

16   Q.   YOU'VE HAD THIS ILLUSTRATION SINCE THE EARLY '80S?

17   A.   ABSOLUTELY, YEAH.

18   Q.   AND IN THE BOTTOM RIGHT, THERE IS SOMETHING CALLED

19   WEATHERSHIELD TRI-LAMINATE?

20   A.   YEAH.  I THINK WE TALKED ABOUT THAT EARLIER.  SO WE --

21   WE JUST LIKED CREATING NEW FABRICS.  AND SO WE WANTED TO TAKE

22   A STEP UP FROM NEOPRENE, BECAUSE THE PROBLEM WITH THAT, IT

23   DIDN'T BREATHE.  SO ONCE YOU TAKE IT OFF THE FACE AND USE IT

24   IN OTHER AREAS, IT CAN BE A LITTLE STIFLING.

25   SO WE GOT FLEECE AND THEN WE PUT A WATERPROOF,

1354

1    BREATHABLE MEMBRANE IN BETWEEN AND THEN LAMINATED NYLON ON

2    THE OUTSIDE OF THAT.  SO THEN YOU REALLY HAD A REALLY NEW WAY

3    OF BEING ABLE TO STAY DRY AND WARM, AND THAT'S WHAT

4    ULTIMATELY BECAME OUR ALL-WEATHER GLOVE SERIES.  IT'S JUST

5    BEEN SUCCESSFUL FOR US.

6    Q.   AND THEN SO THIS ILLUSTRATION AS WELL, FOR WEATHERSHIELD

7    TRI-LAMINATE, WHAT'S THE VINTAGE FOR THAT ONE, PLEASE.

8    A.   SO WE FIRST STARTED DOING ALL-WEATHER GLOVES I THINK IN

9    1996 OR SO.

10   Q.   HOW LONG HAS THIS ILLUSTRATION BEEN AROUND THEN?

11   A.   SO SINCE THEN.  THAT'S WHAT WE USED TO HELP SHOW PEOPLE

12   WHAT THE MATERIAL DID.

13   Q.   SO IS IT FAIR TO SAY THAT, SIMILAR TO WHAT WE'VE SEEN

14   FOR HEATWAVE, THAT SEIRUS HAS BEEN ILLUSTRATING THE

15   REFLECTION OF HEAT OR WARMTH IN ITS PRODUCT LITERATURE FOR

16   DECADES?

17   A.   CORRECT.

18   Q.   SO MR. CAREY, CAN YOU LOOK AT THE THERMALUX GLOVE ONE

19   MORE TIME, PLEASE.

20   A.   SURE.

21   Q.   CAN YOU TELL US, MORE SPECIFICALLY, HOW IS THAT MADE

22   WITH RESPECT TO THE GOLD FOIL AND THE REST OF THE PRODUCT.

23   A.   HOW IS IT MADE WITH RESPECT --

24   Q.   HOW DO YOU PUT THEM TOGETHER?  HOW DO YOU GET THE TWO

25   MATERIALS TO COMBINE?

1355

1    A.    YEAH.  SO THIS IS A KNITTED MATERIAL.  SO YOU TAKE THE

2    SAME NUMBER OF FIBERS OF THERMEX, AND YOU WEAVE THEM TOGETHER

3    INDEPENDENTLY; SO EACH ONE OF THESE THREADS IS ITS OWN THREAD

4    THAT GOES THROUGH, AND THEN THERMEX GOES THROUGH IN THIS

5    PARTICULAR ONE.

6              THE ORIGINAL ONES, IT WAS -- THEY WERE BOTH

7    INDEPENDENT, BUT MOST OF THE LUREX, WHICH WAS NEXT TO THE

8    SKIN, WHICH WAS NOT VERY COMFORTABLE.  THEN WE LEARNED ABOUT

9    PLATING, WHICH IS THE ABILITY TO WEAVE IT SO IT STAYS CLOSER

10   TO THE SURFACE.  AND WITH THAT, THAT ALLOWS US TO FLIP IT

11   INSIDE OUT AND HAVE IT, THE SOFTEST THINGS NEXT TO YOUR

12   SKIN.

13   Q.    SO STEP BACK IN TIME FOR US, IF YOU WOULD, BACK TO THE

14   EARLY '90S WHEN YOU'RE FIRST PUTTING THE THERMALUX PRODUCTS

15   ON THE MARKET.

16             WHERE IS THE LUREX FIBERS, THOSE GOLD FIBERS, WHERE

17   WOULD IT APPEAR?  WOULD IT BE OUTSIDE?  INSIDE?  BOTH?

18   A.    IT WOULD BE BOTH.  SO YOU HAVE EQUAL AMOUNT NEXT TO YOUR

19   SKIN AND THEN EQUAL AMOUNT ON THE SURFACE.

20   Q.    AND THEN I THINK YOU SAID AT SOME POINT IN TIME YOU

21   STARTED TO USE PLATING?

22   A.    YEAH.  THAT'S THE PROCESS WHERE THEY ARE ABLE TO WEAVE

23   IT ON THE UPPER LEVEL.  AND SO THE INSIDE LEVEL IS -- YOU

24   STILL HAVE LUREX THAT KIND OF GETS TO YOUR SKIN, BUT NOWHERE

25   NEAR LIKE IT DID WHEN IT WAS ALMOST ALL NEXT TO YOUR SKIN.

1356

1    Q.    WHEN DID YOU START USING PLATING?

2    A.    I THINK THAT WAS RIGHT AROUND '94, '95.

3    Q.    NOW, IS THERE A POINT IN TIME WHERE YOU CHANGED THE

4    COLOR OF THE LUREX THREADS IN THE GLOVE?

5    A.    YES.  IT USED TO BE SILVER, AND WE CHANGED IT TO GOLD,

6    OH, PROBABLY IN '94.  IT GOT VERY POPULAR, BUT THEN WE -- SO

7    THAT SILVER, THAT BLACK SILVER, PEOPLE STARTED CALLING IT THE

8    "MICHAEL JACKSON GLOVE."  AND SO IT JUST -- IT HELPED IN THE

9    BEGINNING, BUT THEN IT JUST BECAME KIND OF A FUNNY WAY OF

10   LOOKING AT IT.  SO WE TRIED THE GOLD AND WE RAN THEM

11   SIDE-BY-SIDE AND THE GOLD DID BETTER.

12   Q.    AND THERE IS ANOTHER PRODUCT WE'VE BEEN HEARING A LOT

13   ABOUT IN THE CASE, AND I KNOW YOU SHOWED IT IN YOUR ORIGINAL

14   TESTIMONY.  THAT'S THE HEAT TOUCH BATTERY-POWERED GLOVE?

15   A.    YES.  THE INFAMOUS ONE.

16   Q.    PARDON ME?

17   A.    THE INFAMOUS ONE.

18   Q.    THE INFAMOUS HEAT TOUCH GLOVE.

19         CAN YOU TELL US HOW, IF AT ALL, DOES THE HEAT TOUCH

20   GLOVE KIND OF INTERCONNECT OR INTERRELATE TO HEATWAVE.

21   A.    WELL, IT'S KIND OF A PATHWAY STORY.  SO WE DID WELL WITH

22   THIS PRODUCT AND WE STARTED --

23   Q.    YOU MEAN THERMALUX?

24   A.    THERMALUX, EXCUSE ME.  YES.

25         AND SO, YOU KNOW, WE'RE ALWAYS TRYING TO INCREASE

1357

1    THE DEVELOPMENT OF WHATEVER WE DO THAT'S SUCCESSFUL.  AND SO

2    WE HAD BEEN LOOKING AT OTHER WAYS OF GETTING FOIL TO THINGS.

3    WE SAW -- WE HAD A LOT OF FABRICS BROUGHT TO US FOR

4    LAMINATING.  WE HAD ONE THAT WAS ALL FOIL THAT WE TRIED IN A

5    FACE MASK THAT DIDN'T WORK SO WELL.

6           AND THEN AS WE GOT GOING FURTHER ALONG, ALL OF OUR

7    ATTENTION AFTER OUR ALL-WEATHER GLOVE SERIES WAS SO POPULAR,

8    WE WANTED TO COME UP WITH AN ELECTRONICALLY HEATED SYSTEM.

9    SO WE FIRST STARTED TO DO IT WITH LUREX; THAT DIDN'T WORK AS

10   WELL AS WE WANTED IT TO.

11          WE HAD -- WE HAD A NUMBER OF PARTNERS WITH POLAR

12   TECH AND OTHER HIGH-TECH DEVELOPERS OF ELECTRONICS, AND JUST

13   KEPT TRYING TO WORK ON THAT.  AND EVENTUALLY WE CAME UP WITH

14   THAT SYSTEM THAT WE EXPLAINED LAST WEEK, OR EARLIER THIS

15   WEEK, ON HOW TO DO IT AND DO IT WELL.

16          AND AS THAT GOT POPULAR, WE WANTED TO COME OUT WITH

17   SOMETHING THAT WAS MORE AFFORDABLE THAN THE $400 GLOVES TO

18   THOSE WHO COULDN'T AFFORD THAT, THAT WOULD DO SOMETHING THAT

19   THEY LIKED.

20   Q.   AND DO YOU SEE ANY KIND OF A COMPLEMENTARY RELATIONSHIP

21   BETWEEN HEAT TOUCH AND HEATWAVE?

22   A.   YES.  SO WE CALLED IT SISTER PRODUCTS.  YOU KNOW, THE

23   NAMES ARE VERY SIMILAR.  SO WE WANTED TO TRADE OFF THE

24   SUCCESS OF HEAT TOUCH AND THAT ASPIRATIONAL PIECE, AND SO THE

25   NAME "HEATWAVE" KIND OF MAKES YOU THINK LIKE, ALL RIGHT, I

1358

1    CAN'T HAVE HEAT TOUCH, BUT I CAN HAVE HEATWAVE.  SO IT WAS A

2    NATURAL COMBINATION OF THOSE TWO PRODUCTS TOGETHER.

3    Q.   AND SO -- WHAT WAS THE FIRST -- YOU KNOW, APPROXIMATELY

4    THE FIRST YEAR OR MONTH AND YEAR, IF YOU CAN EVEN GET THAT

5    CLOSE, AS TO WHEN YOU BEGAN MARKETING HEAT TOUCH UNDER THAT

6    NAME?

7    A.   2011.  SO -- 2011.

8    Q.   OKAY.  AND THEN HEATWAVE CAME ALONG ABOUT, WHAT, A YEAR,

9    YEAR PLUS LATER?

10   A.   THE NEXT YEAR, 2012, YES.

11   Q.   OKAY.  AND IF YOU CAN RECALL FOR US WHAT YOU REMEMBER

12   ABOUT IT.  WHAT WAS THE GENESIS OF THE HEATWAVE PRODUCT?

13   A.   WELL, WE HAVE A DEVELOPMENTAL COMMITTEE.  SO WE'RE A

14   COLLABORATIVE COMPANY, NO MATTER HOW WE -- WHETHER WE'RE

15   LEARNING HOW TO DISTRIBUTE THE PRODUCT OR DO ANYTHING THAT WE

16   DO, WE DO IT COLLABORATIVELY AND WE HAVE A COMMITTEE THAT

17   REALLY FOCUSES ON DEVELOPING PRODUCTS.

18        IT INCLUDES THE INSIDE STAFF, AND DURING CERTAIN

19   PARTS OF THE YEAR, WE BRING IN TRUSTED RETAILERS AND TRUSTED

20   REPS.  SO WE DISTRIBUTE THROUGH INDEPENDENT REPS.  AND WE

21   JUST TRY TO FIND PROBLEMS AND FIND A WAY TO SOLVE THOSE

22   PROBLEMS.

23        AND AT ONE OF THOSE MEETINGS -- THERE ARE MULTIPLE

24   THINGS THAT WE'RE EXAMINING AT THE SAME TIME.  AND AT ONE OF

25   THOSE MEETINGS, THIS MEGA-HEAT PRODUCT THAT BOB MURPHY FOUND

1359

1   WAS BROUGHT INTO THE MEETING.

2   Q.   YOU SAID THE MEGA-HEAT PRODUCT.  CAN YOU TELL US WHAT

3   THAT IS.  I KNOW WE'VE HEARD A LOT ABOUT IT.  BUT I WANTED

4   YOU TO PUT IT IN YOUR WORDS.

5   A.   SO ALL THE BASE LAYERS, THINGS THAT STAY CLOSE TO YOUR

6   SKIN, THEY ARE CONSTANTLY BEING DEVELOPED.  THERE ARE A

7   NUMBER OF FLEECES, SO I JUST WAS SIMPLIFYING IT BY SAYING THE

8   KIND OF FLEECE WE HAD ON OUR ALL-WEATHER GLOVES.

9        BUT EVERY YEAR WE'RE TRYING TO FIND WHAT'S THE

10  NEWEST TECHNOLOGY, AND PEOPLE ARE PITCHING THAT TO US ALL THE

11  TIME.  AND ONE OF OUR VENDORS PITCHED MEGA-HEAT, WHICH TOOK

12  THE ENERGY THAT WAS GETTING OFF FROM KINETIC JUST ACTION,

13  YOUR MOVEMENT, AND IT WAS ABLE TO CHEMICALLY SAVE MORE OF

14  THAT BACK TO YOUR SKIN.

15       SO HE WAS EXCITED ABOUT IT AND WANTED TO HAVE THAT

16  IN OUR LINE.  SO THAT'S REALLY WHEN IT KIND OF STARTED.

17  Q.   AND SO YOU GUYS EVENTUALLY -- DID YOU HAVE SOME DESIRE

18  TO USE MEGA-HEAT; IS THAT RIGHT?

19  A.   YES.

20  Q.   BY "YOU GUYS" I MEAN SEIRUS?

21  A.   YES.

22  Q.   AND WHAT DID YOU WANT TO DO WITH IT?

23  A.   WE WANTED TO PUT IT IN ANY PLACE THAT WE CAN, ESPECIALLY

24  IN GLOVES THAT WOULD HELP US DELIVER MORE WARMTH TO THE

25  CONSUMERS.

1360

1    Q.   AND DID YOU HAVE A CONCEPT AT SOME POINT AT THE COMPANY

2    TO ADD TO MEGA-HEAT?

3    A.   YES.   IT WAS DECIDED TO BOND REFLECTIVE FOIL, KIND OF

4    LIKE WE HAVE WITH LUREX TO IT, SO THAT IT GAVE MORE TO THE --

5    JUST THE SIMPLE NEW TECHNOLOGY THAT WAS -- SO YOU PUT TWO

6    THINGS TOGETHER.   WE DID A LOT OF THINGS AT THE TIME THAT

7    WERE TWO THINGS IN ONE.   AND SO THIS FELL RIGHT INTO THE

8    CONCEPT AND JUST A LITTLE BIT MORE DEVELOPMENTAL.

9         SO IT HELPED ELEVATE THE IDEA OF WHERE THE MORE WE

10   CAN GET THE HEAT TOUCH, THE BETTER.

11   Q.   SO YOU COMBINED THE FOIL WITH MEGA-HEAT.   IS THAT SOME

12   SORT OF LAMINATING PROCESS?

13   A.   YEAH.   IN THIS CASE, IT'S LAMINATED, BECAUSE THIS WAS

14   TIGHTLY WOVEN, SO YOU WOULDN'T MOVE IT INSIDE LIKE YOU DID

15   WITH A KNITTED PIECE.   IT'S MORE LIKE A VERY SOLID PIECE OF

16   FABRIC, IF YOU SAY SOLID.   JUST NOT -- NOT AS VISIBLY POROUS

17   AS A KNITTED ONE IS GOING TO BE.

18   Q.   AND SO IF WE LOOK BACK AT DDX-205 UP ON THE SCREEN HERE.

19   I THINK YOU MENTIONED BEFORE THAT SOME OF THESE AT LEAST ARE

20   EXAMPLES OF LAMINATING?

21   A.   OH, YES.   SO -- I THOUGHT YOU WERE GOING TO CHANGE.   SO

22   BOTH OF THESE PRODUCTS HAVE LAMINATED FEATURES TO THEM.   THE

23   FACE PIECES, BOTH OF THESE ON THE LEFT AND THE RIGHT, HAVE A

24   LAMINATED NEO-FLEECE PIECE.

25   Q.   AND THEN THE WEATHERSHIELD TRI-LAMINATE, IS THAT ALSO --

1361

1    THE NAME SUGGESTS IT.  I TAKE IT THAT'S LAMINATED?

2    A.   IT'S A LAMINATION.  BUT IT'S NOT SHOWN ON THE PRODUCT ON

3    THIS PAGE.

4    Q.   SO THE MEGA-HEAT PLUS THE FOIL WOULD BE ANOTHER EXAMPLE

5    OF LAMINATING TWO MATERIALS?

6    A.   CORRECT.  YEAH.  JUST ANOTHER WAY OF LAMINATING, YES.

7    Q.   AND SO AT SOME POINT IN TIME, DID YOU CONSIDER FILING A

8    PATENT APPLICATION TO TRY TO PROTECT THE FOIL LAMINATED ONTO

9    MEGA-HEAT?

10   A.   NO.

11   Q.   WHY NOT?

12   A.   IT JUST SEEMED OBVIOUS TO US.  WE HAD ALREADY BEEN DOING

13   IT WITH THERMALUX.  IT IS JUST ANOTHER TECHNIQUE OF COUPLING

14   THE MATERIALS TOGETHER.  AND WE HAD BEEN LAMINATING BEFORE.

15   SO IT SEEMED OBVIOUS TO US.

16   Q.   AND THEN YOU WERE TALKING EARLIER ABOUT THE KIND OF

17   COMPLEMENTARY RELATIONSHIP, THE FOLLOW-ON FOR HEAT TOUCH TO

18   HEATWAVE.  HOW DID YOU DEVELOP THE NAME HEATWAVE?

19   A.   WELL, THAT HAPPENED IN OUR JULY STEERING MEETING OF

20   2012.  SO MR. MURPHY HAD ALREADY DONE HIS THING, AND WE

21   DECIDED THAT WE WERE GOING TO EXAMINE BRINGING THAT PRODUCT

22   INTO THE LINE.

23        AND SO WE HAD ONE OF THE COLLABORATIVE MEETINGS.  IT

24   WASN'T A FULL STEERING MEETING.  BUT AFTER EVERY STEERING

25   COLLABORATION, THEN THE IN-HOUSE STAFF THAT'S ON THAT

1362

1    COMMITTEE, WE GET TOGETHER AND WE KIND OF START SELECTING OUT

2    THOSE THINGS WE'RE GOING TO KEEP AND THOSE THINGS WE'RE NOT.

3    AND THAT'S WHEN WE PRETTY MUCH START LIKE THE MARKETING OF

4    OUR -- OF HOW WE'RE GOING TO DO IT.  AND WE GET SOME INPUT

5    FROM THE DEALERS AND REPS.  BUT WHEN IT COMES TO DOING THE

6    HEAVY LIFTING, THAT'S WHEN THAT'S DONE.

7            AND IN THAT MEETING, SOMEBODY WAS TALKING ABOUT,

8    BECAUSE WE HAD TWO WAYS OF DELIVERING HEAT, THAT IT WAS YOU

9    GET WAVES OF HEAT.  AND THEN SOMEBODY SAID, HEATWAVE.  AND

10   IMMEDIATELY EVERYBODY SAID, YEAH, HEATWAVE, HEAT TOUCH.  IT'S

11   GOING TO RING TRUE TO ANYBODY WHEN WE BRING IT OUT TO THE

12   DEALERS.  AND SO IT'S AUTOMATIC.

13           MR. MARCHESE:  WELL, I'VE GOT A TIME LINE I WANTED

14   TO SHOW YOU HERE IN A MINUTE.  BUT BEFORE I DO, AND I KNOW

15   EVERYBODY LOVES TIME LINES.  I'D LIKE TO GO TO DDX-208,

16   PLEASE.

17           PERMISSION TO PUBLISH?

18           MR. ALDRICH:  RELEVANCE.

19           THE COURT:  HELP ME OUT.

20           MR. MARCHESE:  YOUR HONOR, I DON'T NEED TO PUBLISH.

21   I CAN JUST ASK HIM QUESTIONS ABOUT IT.  I JUST DIDN'T KNOW IF

22   IT WOULD BE OBJECTIONABLE.

23   Q.   OKAY.  LET ME ASK YOU ABOUT DDX-208, MR. CAREY.  CAN YOU

24   JUST TELL US GENERALLY WHAT THIS PARTICULAR SLIDE IS TELLING

25   YOU AND EXPLAIN TO EVERYBODY IN THE ROOM AND THE JURY WHAT

1363

1    YOU'RE SEEING HERE.

2    A.   WELL, DURING OUR HISTORY, WE'VE BEEN FORTUNATE TO

3    HAVE -- BE GIVEN HIGH ACCOLADES FOR THE THINGS THAT WE'VE

4    DEVELOPED.  AND ON THE LEFT, IF YOU DON'T SEE IT, THERE IS

5    THE LIST OF SOME OF THE PUBLICATIONS AND PEOPLE WHO EVALUATE

6    PRODUCT.

7         SO SKI MAGAZINE, WHICH IS A PUBLICATION THAT CATERS

8    TO THE SNOW SPORTS INDUSTRY.  THEY HAVE A SECTION THAT

9    EVALUATES THE NEW PRODUCTS AND PRODUCTS THAT ARE ON THE

10   MARKET.  C-NET, I THINK EVERYBODY KNOWS ABOUT THAT.  OUTSIDE

11   MAGAZINE, AN OUTDOOR INDUSTRY PUBLICATION.  FREESKIER IS

12   ANOTHER YOUTH MAGAZINE.  AND ALL OF THOSE, WE HAD BEEN GIVEN

13   ACCOLADES THROUGHOUT OUR HISTORY.

14        AND THOSE ON THE RIGHT ARE SOME OF THOSE THAT WE'VE

15   BEEN GIVEN.  BEST GLOVE OF 2016 BY SKI MAGAZINE.

16        MR. ALDRICH:  OBJECTION.

17        THE COURT:  SUSTAINED.

18   Q.   BY MR. MARCHESE:  AND SO THE COMPANY HAS WON AWARDS FOR

19   ITS GLOVES; CORRECT?

20        MR. ALDRICH:  OBJECTION.

21        THE COURT:  SUSTAINED.

22        MR. MARCHESE:  NOW, LET ME GO ON TO THE TIME LINE

23   THEN, IF WE COULD.  DDX-209.  AND I'D LIKE TO OFFER THIS.

24        MR. ALDRICH:  JUST A MINUTE.

25        NO OBJECTION, YOUR HONOR.

1364

```
1        THE COURT:  RECEIVED.

2        (TRIAL EXHIBIT 209 RECEIVED IN EVIDENCE.)

3   Q.   BY MR. MARCHESE:  MR. CAREY, I THINK YOU PROBABLY SAW

4   THIS TIME LINE IN THE OPENING STATEMENT.

5   A.   YES.

6   Q.   AND TELL US, WHAT'S ON THE FAR LEFT?  WHAT DO WE SEE

7   THERE?

8   A.   THAT'S A THERMALUX GLOVE.  IT REPRESENTS ITS INCEPTION

9   BACK IN THE EARLY '90S.

10  Q.   AND THAT'S THE SAME THERMALUX GLOVE YOU'VE BEEN TALKING

11  ABOUT PREVIOUSLY?

12  A.   THIS ONE RIGHT HERE, YES.

13  Q.   GREAT.  THANK YOU.

14        AND SO THEN IT LOOKS LIKE WE FAST-FORWARD ABOUT 20

15  YEARS TO DECEMBER 2011, STEERING COMMITTEE MEETING.  DO YOU

16  SEE THAT?

17  A.   YES.

18  Q.   AND YOU'VE BEEN TALKING ABOUT I THINK THE STEERING --

19  YOU'VE BEEN USING THIS TERMINOLOGY --

20  A.   STEERING COMMITTEE.  IT'S OUR DEVELOPMENT, PRODUCT

21  DEVELOPMENT COMMITTEE.

22  Q.   HOW OFTEN DOES THAT MEET?

23  A.   IT MEETS BASICALLY THREE TIMES A YEAR AS A WHOLE

24  GROUP.

25  Q.   AND WE SEE THE STEERING COMMITTEE ABBREVIATED "SC" HERE;
```

1365

1    IS THAT RIGHT?

2    A.    YES.

3    Q.    AND SO IT LOOKS LIKE THERE ARE THREE STEERING COMMITTEE

4    MEETINGS ON THIS TIME LINE?

5    A.    THAT'S CORRECT.    FORMAL.

6    Q.    I'M SORRY?

7    A.    FORMAL.

8    Q.    I'M SORRY?

9    A.    FORMAL.    THESE ARE THE FORMAL MEETINGS THAT WE HAVE,

10   YES.

11   Q.    SO THERE WAS ONE ON THE TIME LINE DDX-209 FOR DECEMBER

12   OF 2011?

13   A.    YES.

14   Q.    AND THEN APRIL 2012?

15   A.    YES.

16   Q.    AND THEN JULY 2012; RIGHT?

17   A.    YES.

18   Q.    AND SO COULD YOU LET US KNOW, WERE YOU AT THE

19   DECEMBER 2007 STEERING COMMITTEE MEETING?

20   A.    NO, I WAS NOT.

21   Q.    AND WHY NOT?

22   A.    I REFEREE FOOTBALL GAMES, AND THAT WAS ON A SUNDAY.

23   Q.    BUT YOU WERE THERE FOR THE APRIL 12TH MEETING; IS THAT

24   RIGHT?

25   A.    YES.

1366

1   Q.   AND WERE YOU AT THAT POINT IN TIME, WITH SEIRUS,

2   DEVELOPING HEATWAVE?

3   A.   YES.

4   Q.   AND THEN LET'S FAST-FORWARD THEN TO JULY 2012.  THERE IS

5   A LITTLE MORE DETAIL HERE.  IT SAYS "HEATWAVE NAME AND DESIGN

6   CONCEIVED."

7        DO YOU SEE THAT?

8   A.   YES.

9   Q.   AND YOU PREVIOUSLY TOLD US ABOUT THE HEATWAVE NAME IN

10  YOUR TESTIMONY.  DID THAT DEVELOPMENT OF THAT NAME HAPPEN IN

11  JULY OF 2012?

12  A.   YES.

13  Q.   AND IT HAPPENED IN THE WAY YOU JUST DESCRIBED?

14  A.   CORRECT.

15  Q.   AND THEN IT MENTIONS HERE THAT THE DESIGN WAS ALSO

16  CONCEIVED.  CAN YOU EXPLAIN THAT TO US, HOW THAT HAPPENED.

17  A.   SURE.  I'D BE HAPPY TO.  BUT FIRST I'D LIKE TO MENTION

18  THAT MR. SNYDER HAD A DESCRIPTION OF HOW HE CAME UP WITH HIS

19  PATTERN DESIGN, AND I WANT TO MAKE IT CLEAR THAT WE'RE NOT

20  ACCUSED OF COPYING HERE.

21        SO I HAD A DEPOSITION ON THIS BEFORE MR. SNYDER'S.

22  I HAD NEVER HEARD MR. SNYDER'S STORY BEFORE.  HIS

23  DEPOSITION -- WHERE I ENUMERATED THIS STORY BEFORE, AND HIS

24  DEPOSITION WAS AFTER MINE, SO I HAD NO WAY THAT I KNEW ABOUT

25  HIS STORY BEFORE.  SO I DON'T WANT TO BE ACCUSED OF COPYING

1    MR. SNYDER.

2    Q.   SO YOU'VE GIVEN US THIS PREAMBLE.  WHY?

3    A.   WELL, BECAUSE DURING THAT MEETING, AS SOON AS SOMEBODY

4    SAID HEATWAVE, WHAT CAME TO ME WAS, YOU KNOW, WE ALL LIVE IN

5    CALIFORNIA.  WHEN YOU SEE ANY HORIZON, THE ROAD OR THE SAND

6    OR DOWN IN THE DESERT, THOSE RIPPLES THAT KIND OF BLUR YOUR

7    VISION, JUST KIND OF WAVES OF HEAT.

8            SO IT JUST WAS SO CLEAR TO ME THAT WE HAD TO DEVELOP

9    THAT INTO WHAT THE LOGO WAS GOING TO LOOK LIKE.  AND WE DID.

10   AND IT BECAME WHAT IT IS TODAY.

11   Q.   AND SO THE DESIGN THAT WE SEE INSIDE -- LET ME JUST GRAB

12   THE FABRIC.  THIS IS EXHIBIT 220.  IT'S ALREADY BEEN

13   RECEIVED.

14           IS THIS THE WAVE PATTERN THAT YOU WERE JUST TALKING

15   ABOUT?

16   A.   YES, IT IS.

17   Q.   AND THAT WAVE PATTERN WAS CONCEIVED AT THE JULY 2012

18   STEERING COMMITTEE MEETING?

19   A.   THAT'S WHEN IT INITIATED, YES.

20   Q.   AND YOU WERE INVOLVED IN THAT?

21   A.   YES.

22   Q.   THAT CONCEPTION?

23   A.   YES.

24   Q.   AND SO TELL US THEN, WHAT HAPPENED AFTER THE STEERING

25   COMMITTEE MEETING IN TERMS OF DEVELOPING AND BRINGING THE

1368

1    PRODUCT TO FRUITION AND THE DESIGN.

2    A.   WELL, THE DESIGN -- SO I TASKED THE CREATIVE DEPARTMENT

3    TO COME UP WITH AN EMBODIMENT OF WHAT THAT'S GOING TO LOOK

4    LIKE.  AND THEY DID.  AND PRETTY QUICKLY CAME UP WITH WHAT WE

5    CURRENTLY SEE NOW AS OUR HEATWAVE DESIGN.

6    Q.   AND YOUR CREATIVE DEPARTMENT, CAN YOU TELL US BRIEFLY

7    WHAT THEIR ROLE WAS.

8    A.   YEAH.  SO WE HAVE A CREATIVE DEPARTMENT THAT HAS -- HAS

9    OUR CREATIVE DIRECTOR AND WE CREATE EVERYTHING WE DO

10   IN-HOUSE.  SO WE -- WE USED TO MANUFACTURE OUR GOODS, BUT AS

11   WE GOT BIGGER, WE WERE CUTTING; SO WE COULDN'T HANDLE THE

12   CAPACITY MORE, SO WE START -- EVERYTHING WE BUILT WAS BUILT

13   OUT OF HOUSE.

14        BUT EVERY CONCEPT THAT WE DO IS DEVELOPED IN-HOUSE.

15   AND HOW WE DISPLAY IT, WHETHER IT'S IN THE PACKAGING OR THE

16   POINT OF PURCHASE THAT THE STORES USE, OR ADVERTISING, WE

17   DON'T HIRE OUTSIDE ADVERTISERS, OR ANYTHING LIKE THAT.  WE DO

18   IT ALL IN-HOUSE.  AND THEY ARE IN CHARGE OF MAKING THAT ALL

19   HAPPEN.

20   Q.   AND ULTIMATELY YOU ARRIVED AT THE FINAL DESIGN;

21   CORRECT?

22   A.   YES.

23   Q.   AND CAN YOU HOLD THE DESIGN UP ONE MORE TIME AND JUST

24   EXPLAIN TO US WHAT THE COMPONENTS ARE OF IT.

25   A.   YES.  SO -- DO YOU HAVE A SHEET?  IT MIGHT BE EVEN

1369

1    EASIER.

2    Q.   I'M SORRY.  THE FABRIC SHEET?

3    A.   YEAH, THE HEATWAVE SHEET.  I THINK THERE IS ONE THERE.

4         MR. MARCHESE:  I DON'T SEE IT UP HERE.  I DON'T KNOW

5    IF THAT'S BEEN RECEIVED.

6         MR. ALDRICH:  CHRIS, IS IT OVER THERE?

7         MR. MARCHESE:  IS IT UP THERE?

8         HOPE WE DIDN'T LOSE IT.

9         MR. ALDRICH:  I DIDN'T TAKE IT.

10        MR. MARCHESE:  THIS IS EXHIBIT 1407.  I UNDERSTAND

11   IT'S BEEN RECEIVED.

12        MR. ALDRICH:  NO OBJECTION IF IT HASN'T.

13        MR. MARCHESE:  HERE YOU ARE, MR. CAREY.

14        THE WITNESS:  SO THE DESIGN WAS A SERIES OF THOSE

15   WAVES, AND THEN WE PUT THESE BLACK RECTANGLES THROUGHOUT.

16   AND THEN WE PLOPPED OUR LOGO INSIDE THAT PATTERN.  SO YOU GET

17   A VERY DISTINCT LOOK OF THAT WAVE WITH OUR SEIRUS INSIDE THAT

18   BLACK RECTANGLE THROUGHOUT THE WHOLE FABRIC.  SO THAT IS OUR

19   PATTERN.

20        MR. MARCHESE:  WOULD YOU LIKE TO SEE IT.

21   Q.   SO WAS THE DESIGN WITH THE RECTANGLE AND THE LOGO

22   ALREADY DEVELOPED?  I SEE THAT GREEN ARROW HERE, IT SAYS

23   DEVELOPMENT BY NOVEMBER OF 2012.

24   A.   YES.  WELL, THERE IS ALWAYS CONSTANT DEVELOPMENT, BUT,

25   YOU KNOW, AS YOU SEE IT NOW, THAT'S WHEN THAT HAD BEEN

1370

1    COMPLETED.

2    Q.   AND WHAT HAPPENS IN NOVEMBER 2012 WITH HEATWAVE AT

3    SEIRUS?

4    A.   WELL, WITH HEATWAVE, AS WELL AS WITH ALL OF OUR

5    PRODUCTS, THIS IS THE BEGINNING OF OUR -- WHAT WE CALL OUR

6    SELLING SEASON, THE OPEN TO BUY.  BECAUSE YOU HAVE TO HAVE

7    EVERYTHING A YEAR IN ADVANCE BEFORE IT GETS TO MARKET.

8         SO GENERALLY IN NOVEMBER IS WHEN WE GO VISIT SOME OF

9    THE LARGER RETAILERS AND SHOW THEM WHAT WE'RE GOING TO BRING

10   OUT NEXT YEAR AND RECONFIRM WHAT THEY HAVE DONE THE YEAR

11   BEFORE.  AND WE GO THROUGH THAT PROCESS WITH THEM.  AND THAT

12   STARTS IN NOVEMBER, SOMETIMES OCTOBER.  BUT NOT UNTIL WE HAVE

13   SOMETHING TO SHOW THEM, AND THAT'S USUALLY BY THE 1ST OF

14   NOVEMBER.

15   Q.   AND THEN THERE IS ANOTHER ITEM ON THE TIME LINE OF

16   JANUARY 2013.  CAN YOU TELL US WHAT THAT IS, PLEASE.

17   A.   YES.  SO THAT'S WHEN THERE ARE TWO NATIONAL TRADE SHOWS

18   THAT HANDLE WINTER OUTDOOR ACTIVITIES.  ONE IS THE OUTDOOR

19   RETAILER THAT'S IN SALT LAKE CITY IN EARLY JANUARY, AND THEN

20   S.I.A., SNOW SPORTS INDUSTRY OF AMERICA, THAT'S THEIR BIG

21   SHOW, OUR BIG SHOW, GENERALLY AT THE END OF JANUARY.

22        MR. MARCHESE:  DDX-210.  I'D LIKE TO OFFER THAT.

23        MR. ALDRICH:  YOUR HONOR, THE ONLY OBJECTION IS THAT

24   IT WASN'T PRODUCED DURING DISCOVERY.

25        THE COURT:  YOUR OBJECTION IS OVERRULED.

1371

1    (TRIAL EXHIBIT 210 RECEIVED IN EVIDENCE.)

2    Q.    BY MR. MARCHESE:    AND DDX-210, MR. CAREY, IS ENTITLED

3    "JANUARY 2013 TRADE SHOW."

4        WHAT IS BEING DEPICTED HERE?

5    A.    SO TO GIVE EVERYBODY A SENSE, THIS IS THE CONVENTION

6    CENTER IN DENVER, COLORADO, WHERE EVERYBODY SETS UP THEIR

7    BOOTHS.    AND THIS IS SEIRUS' BOOTH THERE, WHICH IS BASICALLY

8    40 FEET BY 100 FEET; AND WE HAVE A NUMBER OF DISPLAY SECTIONS

9    FOR -- BASICALLY CUSTOMERS COME THROUGH, MAINLY MA-AND-PA'S

10   AND EXAMINE OUR LINE IN ITS ENTIRETY.

11       AND YOU CAN SEE OUR HEADER IN THE MIDDLE, OUR

12   RECEPTION.    ON THE ONE SIDE IS OUR HEAT TOUCH DISPLAY, ON THE

13   LEFT, AND OUR HEATWAVE DISPLAY ON THE CORNER OF THE RIGHT.

14   AND ALL OF OUR PRODUCTS, INCLUDING THOSE, ARE DISPLAYED

15   THROUGHOUT.    EACH ONE OF THOSE SELLING STATIONS HAS EVERY ONE

16   OF OUR PRODUCTS SO OUR REP CAN SHOW IT READILY TO A CUSTOMER.

17   WE HAVE 12 STATIONS THAT ARE BUSY PRETTY MUCH ALL DAY LONG.

18   Q.    AND IS THERE -- THE BLOW-OUT OF THE, LOOKS LIKE A

19   PEDESTAL THERE.

20   A.    OH, YEAH.

21   Q.    CAN YOU TELL US WHAT THAT IS.

22   A.    SO THAT ON THE FAR RIGHT IS AN ENLARGEMENT OF THE

23   PEDESTAL THAT'S ON THE RIGHT OF THE BOOTH.    AND THAT, YOU CAN

24   SEE, IT HAS HEATWAVE IN IT; SO IT'S WHERE WE DISPLAY OUR

25   MARQUEE PRODUCTS.    AND THERE IS HEATWAVE WITH A COUPLE OF

COMPUTER-AIDED TRANSCRIPTION

1372

1    GLOVES AND THE FABRIC UNDERNEATH.  AND ON THE OPPOSITE CORNER
2    IS OUR HEAT TOUCH DISPLAY THAT SHOWED THAT PRODUCT.  THAT
3    INTRODUCED VERY WELL AND WAS A KEY DRIVER FOR SEIRUS'
4    ADVANCED TECHNOLOGY.
5            AND CONTRARY TO WHAT THE DAMAGES EXPERT SAID, THAT
6    IS A VERY IMPORTANT PART OF OUR LINE.  AND THAT ONE PRODUCT,
7    EVEN THOUGH LESS THAN ONE PERCENT, THAT ONE PRODUCT, OUR
8    WHOLE HEATWAVE LINE, ITS FIRST YEAR WAS ONLY THREE PERCENT.
9    SO I BEG TO DIFFER WITH HER.  IT'S A VERY IMPORTANT PART OF
10   OUR CULTURE.
11   Q.   SO THIS IS THE S.I.A. TRADE SHOW; RIGHT?
12   A.   YES, IT IS.  RIGHT.
13   Q.   AND YOU'RE SHOWING HEATWAVE IN JANUARY OF 2013?
14   A.   CORRECT.
15   Q.   CAN YOU GO BACK TO DDX-209, PLEASE.
16           SO BACK TO THE STEERING COMMITTEE IN JULY OF 2012.
17   AT THAT POINT IN TIME, TO YOUR KNOWLEDGE, WHAT PATTERN IS
18   COLUMBIA USING IN ITS PRODUCTS FOR OMNI-HEAT?
19   A.   THEY HAD A DOT PATTERN.
20   Q.   NOT WAVES; RIGHT?
21   A.   NO.
22   Q.   AND AT THAT POINT IN TIME, AND ALL THE WAY UP UNTIL
23   JANUARY OF 2013, WHAT KNOWLEDGE, IF ANY, DID YOU HAVE OF
24   COLUMBIA'S PATENTS?
25   A.   THEN, WE DIDN'T KNOW THEY HAD A PATENT.

1373

1  　　　　　MR. MARCHESE:  DDX-211.  I'D LIKE TO OFFER THAT,

2  YOUR HONOR.

3  　　　　　MR. ALDRICH:  NO OBJECTION.

4  　　　　　THE COURT:  RECEIVED.

5  　　　(TRIAL EXHIBIT 211 RECEIVED IN EVIDENCE.)

6  Q.　BY MR. MARCHESE:  MR. CAREY, I THINK WE'RE ALL LOOKING

7  NOW AT DDX --

8  A.　LET ME CORRECT THAT.  I THINK NOVEMBER '12.

9  Q.　I'M SORRY.  WHAT?

10  A.　OKAY.  I DIDN'T KNOW THEY HAD HAD A PATENT AT THAT

11  POINT, LET'S PUT IT THAT WAY.

12  Q.　RIGHT.  SO LET ME -- THIS TIME LINE IS ENTITLED "SEIRUS

13  HEATWAVE DEVELOPMENT"; RIGHT?

14  A.　CORRECT.

15  Q.　AND THE NEXT ITEM AFTER JANUARY 2013, HEATWAVE AT THE

16  TRADE SHOW, IS APRIL 2013; IS THAT RIGHT?

17  A.　CORRECT.

18  Q.　AND AT THAT POINT IN TIME, WAS IT YOUR UNDERSTANDING

19  THAT VENTEX SENT AN E-MAIL TO SEIRUS WHERE IT ATTACHED THE

20  COLUMBIA DESIGN PATENT AT ISSUE IN THIS CASE?

21  A.　IN APRIL, YES.  APRIL OF '13, THAT'S RIGHT.  I GOT MY

22  YEARS MIXED UP.

23  　　　　　MR. ALDRICH:  YOUR HONOR, I JUST WANT TO NOTE THAT I

24  BELIEVE THIS SLIDE OPENS THE DOOR.

25  　　　　　THE COURT:  OKAY.

1374

1    MR. ALDRICH:  THANK YOU.

2  Q.   BY MR. MARCHESE:  AT THAT POINT IN TIME -- WELL, TO YOUR

3  KNOWLEDGE, HAD SEIRUS LEARNED OF ANY OF THE COLUMBIA PATENTS

4  PRIOR TO APRIL OF 2013?

5  A.   NO.

6  Q.   AND THEN IS IT YOUR UNDERSTANDING THAT THE '270 PATENT

7  ISSUED IN JUNE OF 2013, AS WE SEE AT THE BOTTOM?

8  A.   YES.

9  Q.   AND THEN ARE YOU AWARE THAT COLUMBIA SUED SEIRUS IN

10 DECEMBER OF 2013?

11 A.   YES.

12 Q.   AND SO PRIOR TO THAT LAWSUIT, WERE YOU AWARE OF THE '270

13 PATENT?

14 A.   NO.

15 Q.   AND SO WHEN WE GET TO THE TOP OF THE TIME LINE IN

16 DECEMBER OF 2013, WHAT HAPPENED THERE WITH RESPECT TO

17 VENTEX?

18 A.   WE WERE INFORMED THAT THEY WERE INVALIDATING COLUMBIA'S

19 PATENT ON OMNI-HEAT IN SOUTH KOREA.

20 Q.   AND DO YOU KNOW WHAT PRIOR ART REFERENCE THAT WAS BASED

21 ON?

22 A.   YES.  ON FOTTINGER.

23    MR. MARCHESE:  HAS THIS ALREADY BEEN RECEIVED?  I

24 THINK IT HAS BEEN.  WELL, I WOULD OFFER 499.

25    THE COURT:  ANY OBJECTION TO 499?

1375

1     MR. ALDRICH:  NO.  NO, YOUR HONOR.

2     THE COURT:  RECEIVED.

3     (TRIAL EXHIBIT 499 RECEIVED IN EVIDENCE.)

4  Q.   BY MR. MARCHESE:  MR. CAREY, EXHIBIT 499 HAS NOW BEEN

5  PUBLISHED.  AND CAN YOU TAKE A LOOK AT IT, PLEASE.  AND JUST

6  GENERALLY TELL US WHAT THIS IS.

7  A.   WELL, THIS IS COMMUNICATION BETWEEN JOORI HWANG, WHO WAS

8  OUR REPRESENTATIVE AT VENTEX, BOB MURPHY AND MY PARTNER JOE

9  EDWARDS, TALKING ABOUT THAT VERY ISSUE, THAT THEY WERE IN THE

10 PROCESS OF INVALIDATING COLUMBIA'S PATENTS IN SOUTH KOREA.

11 Q.   AND SO YOU RECEIVED THIS E-MAIL; IS THAT CORRECT?

12 A.   YES, I DID.

13 Q.   AND THAT WAS ON DECEMBER 11TH, 2013?

14 A.   CORRECT.

15 Q.   AND THAT WAS JUST DAYS AFTER -- AFTER SEIRUS WAS SUED

16 FOR PATENT INFRINGEMENT; CORRECT?

17 A.   CORRECT.

18     MR. MARCHESE:  SO, MR. CAREY, WE FAST-FORWARD A FEW

19 YEARS LATER AND THERE IS A POINT IN TIME -- ACTUALLY, YOUR

20 HONOR, MAY I HAVE A SIDEBAR VERY BRIEFLY?

21     THE COURT:  SURE.

22     (THE FOLLOWING PROCEEDINGS WERE HELD AT SIDEBAR:)

23     MR. MARCHESE:  I WAS GOING TO TALK ABOUT WHAT

24 HAPPENED AFTER THE SUMMARY JUDGMENT MOTION, AND I RECALL NOW

25 THAT YOU WERE RESERVING.  I THINK -- DID YOU RULE AGAINST US

COMPUTER-AIDED TRANSCRIPTION

1    ON THAT?  I THINK YOU DID, RIGHT, ON THE JMOL; RIGHT?

2            THE COURT:  SO THERE WAS THE ISSUE ON WILLFULNESS

3    THAT WAS LEFT OPEN, WHETHER OR NOT FOR A CERTAIN PERIOD OF

4    TIME MR. ALDRICH'S STATEMENTS HAD FORECLOSED THEM FROM

5    SEEKING DAMAGES FOR WILLFULNESS AT THE PRETRIAL CONFERENCE.

6    I'M LOOKING AT THOSE STATEMENTS RIGHT NOW.

7            WHAT IT LOOKS LIKE MR. ALDRICH SAID WAS FROM THE

8    TIME THAT THE LAWSUIT WAS FILED, UNTIL THE TIME -- I THINK IT

9    WAS IN DECEMBER, WHEN THEY LEARNED ABOUT THE KOREAN PATENT,

10   HE DIDN'T MAKE ANY STATEMENTS ABOUT THAT, BUT HE SAID AFTER

11   THAT, THAT THEY WEREN'T SEEKING DAMAGES FOR WILLFULNESS.

12           MR. ALDRICH:  THAT WAS DECEMBER 2015.

13           THE COURT:  CORRECT.  CORRECT.

14           MR. MARCHESE:  OKAY.  SO IS IT -- SO IS ALL THIS

15   KOREAN STUFF --

16           THE COURT:  SO WHAT I HAD SAID AT THE HALFTIME WAS

17   THAT I BELIEVE THERE WAS EVIDENCE OF WILLFULNESS, BUT IT

18   WOULD BE LIMITED BY ANY LIMITATION THAT MR. ALDRICH HAD MADE

19   AT THE TIME OF THE PRETRIAL CONFERENCE.

20           IF I COULD CONFIRM WHAT YOU HAD WRITTEN IN YOUR

21   MOTION --

22           MR. SPROUL:  MAY I MAKE A COMMENT ON THAT, YOUR

23   HONOR?

24           I THINK IF YOU LOOK AT HIS STATEMENT, WHAT HE SAYS

25   EXACTLY IS NOT -- HE SAYS BOTH FROM THE TIME THE LAWSUIT IS

1    FILED.  HE ALSO SAYS, MORE IMPORTANTLY, FROM THE TIME COUNSEL

2    WAS ENGAGED; BECAUSE THAT'S THE BASIS FOR THE NONWILLFULNESS.

3          THE COURT:  HE SAYS BOTH THINGS, AND I THINK THOSE

4    TWO THINGS ARE KIND OF INCONSISTENT WITH EACH OTHER.  I WOULD

5    LIKE -- I'M GOING TO GIVE THEM THE BENEFIT OF THAT STATEMENT.

6          SO IF IT'S AMBIGUOUS, IF THAT STATEMENT IS AMBIGUOUS

7    AS TO KIND OF WHAT WAS GOING ON, I KNOW IT'S NOT ENTIRELY

8    CLEAR TO ME, BECAUSE I'M READING IT RIGHT NOW.  BUT IT LOOKS

9    TO ME LIKE WHAT THEY SAID WAS FROM THE PERIOD OF TIME AFTER

10   THE KOREAN KNOWLEDGE; BEYOND THAT, THEY SAID HE'S -- THEY

11   HAVE LAWYERS AND WE'RE NOT LOOKING FOR WILLFULNESS AFTER

12   THAT.

13         MR. MARCHESE:  WELL, I JUST WANT TO KNOW WHETHER I

14   SHOULD EXPLORE PAST THIS DECEMBER TIME FRAME.

15         THE COURT:  WELL, I'M ALMOST DONE READING THIS

16   SECTION.  WHY DON'T WE TAKE OUR RECESS NOW AND LET ME FINISH

17   READING THIS SECTION AND LET ME TELL YOU WHAT THE PARAMETERS

18   ARE.

19         MR. MARCHESE:  THANK YOU, YOUR HONOR.

20         MR. ALDRICH:  THANK YOU, YOUR HONOR.

21      (THE FOLLOWING PROCEEDINGS WERE HELD IN OPEN COURT:)

22         THE COURT:  MEMBERS OF THE JURY, I NEED TO TALK TO

23   THE LAWYERS ABOUT A LEGAL ISSUE.

24         THIS WILL BE OUR AFTERNOON RECESS.  OKAY.

25         (JURY ABSENT 2:24 P.M.)

1378

1        THE COURT:  YOU MAY STEP DOWN.

2        SO MY COPY OF THE TRANSCRIPT SAYS -- THIS IS

3   MR. ALDRICH SPEAKING.  YOUR HONOR, SORRY.  THE EARLIEST

4   DOCUMENT THAT THEY HAVE BEEN ABLE TO IDENTIFY THAT WOULD

5   SUBSTANTIATE KNOWLEDGE OF THE KOREAN PROCEEDING ON THEIR

6   EVIDENCE LIST IS DATED DECEMBER 2015, TWO YEARS AFTER THE

7   SUIT WAS FILED.

8        QUESTION BY ME.  ARE YOU SEEKING DAMAGES AFTER THAT

9   DATE?

10       MR. ALDRICH:  WE'RE NOT.  WE'RE NOT ALLEGING THAT

11  THERE WAS ANY WILLFULNESS AFTER THAT DATE, YOUR HONOR.  BUT

12  WE ASSUME THAT ONCE THEY RETAINED COUNSEL, THAT THEY ARE --

13  THAT THEY HAD BEEN RELYING IN GOOD FAITH ON ALL OF THE

14  BRIEFING THAT THEY HAVE SUBMITTED IN THE CASE.

15       AND THE ACTS THAT GIVE RISE TO WILLFULNESS IN THIS

16  CASE WERE THE COPYING THAT TOOK PLACE PRIOR TO, IN 2012 AND

17  2013.  SO THE FACT THAT THEY SUBMITTED SOME BRIEFS THAT RELY

18  IN GOOD FAITH ON THEIR BRIEFS OR OTHER THINGS THAT HAVE COME

19  TO LIGHT IN 2015 OR 2016 OR LAST MONTH, IS IRRELEVANT TO THE

20  WILLFULNESS CLAIM THAT WE ARE MAKING IN THIS CASE.

21       OTHERWISE, YOU KNOW, THE PARTIES WOULD BE ABLE TO

22  INTRODUCE ALL THE BRIEFING THAT'S BEEN SUBMITTED INTO THE

23  CASE AND ALL THE THEORIES THAT THEY DEVELOPED THROUGH

24  LITIGATION COUNSEL.  AND THE SUPREME COURT HAS SAID THAT'S

25  CORRECT.

1379

1    AND THEN I GO ON, AFTER THE '105 CASE, AND WE HAVE

2    SOME FURTHER DISCUSSION.  I THINK THE PORTIONS THAT I READ

3    ARE THE PERTINENT PARTS OF THE STATEMENTS WHICH WERE MADE

4    DURING THE COURSE OF THE PRETRIAL CONFERENCE.  IT'S CLEAR TO

5    ME THAT WHAT MR. ALDRICH WAS TRYING TO KEEP OUT IS WORK THAT

6    WAS DONE ON THE PART OF THE LAWYERS AFTER THE LAWSUIT WAS

7    FILED IN ORDER TO CLAIM THAT THERE WASN'T WILLFULNESS DURING

8    THE TIME PRIOR TO THAT.

9    AND THAT THAT'S THE PART WHERE HE WAS SAYING THAT

10   WOULD BE INAPPROPRIATE BASED ON THE RULINGS.  IN OTHER WORDS,

11   YOU CAN'T FIX WHAT DID YOU IN THE PAST BASED ON WHAT YOUR

12   LAWYERS ARE TELLING YOU IN THE PRESENT.

13   HOWEVER, IT'S CLEAR THAT THERE WAS A BRIGHT LINE

14   THAT WAS DRAWN WHEN I ASKED THE QUESTION, ARE YOU SEEKING

15   DAMAGES AFTER DECEMBER 2015, AND HE SAID NO, WE'RE NOT.  AND

16   IT'S ALSO CLEAR THAT WHEN HE WAS TALKING ABOUT WHAT -- IN

17   RESPONSE, WHAT IS IT THAT YOU'RE DOING, AND HE WAS TALKING

18   ABOUT THE ACTS THAT GAVE RISE TO WILLFULNESS IN THIS CASE,

19   WERE THE COPYING THAT TOOK PLACE PRIOR TO, IN 2012 AND 2013.

20   I'M GOING TO LIMIT, THEREFORE, THE CONVERSATION TO

21   WILLFULNESS THAT TOOK PLACE IN 2012 AND IN 2013.  AS I

22   UNDERSTAND IT, THE PATENT DIDN'T ISSUE UNTIL JUNE OF 2013.  I

23   DON'T KNOW THAT THERE WAS ANY EVIDENCE OF WILLFULNESS AFTER

24   THAT TIME OR PRIOR TO THAT TIME BECAUSE THE PATENT DIDN'T

25   ISSUE UNTIL JUNE OF 2013.

1380

1     SO THEN WE'RE LEFT WITH, WELL, WHAT THEN IS LEFT FOR

2   THE COURT TO CONSIDER ON THE ISSUE OF WILLFULNESS.  AND I

3   DON'T KNOW THAT THERE IS ANYTHING BECAUSE I DON'T KNOW THAT

4   THERE WAS ANYTHING IN 2012 OR 2013.

5     MR. ALDRICH, IS THERE ANYTHING ELSE YOU WANT ME TO

6   CONSIDER?  I'M TRYING TO THINK OF WHAT EVIDENCE OF

7   WILLFULNESS THAT WOULD HAVE EXISTED PRIOR TO --

8     MR. ALDRICH:  I MEAN, PART OF THE PROBLEM HERE, YOUR

9   HONOR, IS THAT THEY HAVE NOW OPENED THE DOOR.  IF THEY ARE

10  GOING TO CONTEND THAT THERE IS NO WILLFULNESS, THE THERMALUX

11  HAS NO PROBATIVE VALUE IN THE CASE.

12     THE E-MAILS THAT THEY JUST SHOWED, THE FACT THAT

13  THEY LEARNED ABOUT THE KOREAN PROCEEDING, WHICH WE FILED A

14  MOTION IN LIMINE ON TO PRECLUDE, AND WAS ONLY ALLOWED BECAUSE

15  IT'S RELEVANT TO WILLFULNESS, THAT WASN'T RELEVANT.

16     SO THEY HAVE NOW OPENED THE DOOR TO WILLFULNESS FOR

17  THE REST OF THE CASE, BECAUSE HAVING BEEN DENIED OUR MOTION

18  IN LIMINE, AND HAVING BEEN TOLD THAT THE ONLY -- AND US

19  HAVING BEEN TOLD THAT THE ONLY BASIS FOR BRINGING IN THE FACT

20  THAT THE KOREAN COURT INVALIDATED THE CLAIMS, THE ONLY

21  PROBATIVE VALUE OF THAT IN THE CASE, AND THE ONLY PROBATIVE

22  VALUE OF THE THERMALUX GLOVE WAS WITH RESPECT TO WILLFULNESS.

23     THEY CAN'T ON THE ONE HAND BRING IN ALL THAT

24  EVIDENCE AND PARADE IT BEFORE THE JURY LIKE THEY JUST DID,

25  AND THEN AT THE SAME TIME SAY, YOUR WILLFULNESS CASE SHOULD

COMPUTER-AIDED TRANSCRIPTION

1381

1    NOT BE HERE ANYMORE.  SO THEY HAVE OPENED THE DOOR.  THE JURY

2    HAS HEARD THE EVIDENCE OF THE DEFENSE OF WILLFULNESS.  SO I

3    DON'T -- I DON'T SEE HOW WE CAN NOW SAY THAT WE CAN'T GO

4    AHEAD AND PUT ON THAT CASE.

5            WHAT I WAS TRYING TO SAY BACK THEN IS WE'RE WILLING

6    TO DISCLAIM THAT THERE WAS ANY WILLFUL CONDUCT WITH RESPECT

7    TO THE UTILITY PATENT AFTER DECEMBER OF 2015.  THAT RENDERS

8    THEIR KNOWLEDGE OF THE KOREAN PROCEEDING AS OF THAT DATE

9    IRRELEVANT.

10           THAT'S WHAT I WAS TRYING TO COMMUNICATE.  WHETHER I

11   DID IT ARTICULATELY OR NOT AT THE PRETRIAL CONFERENCE OR NOT,

12   I'M NOT SURE.  WHAT I WAS TRYING TO SAY IS, THEY CAN'T RELY

13   ON THEIR OPINIONS OF COUNSEL; RIGHT.  AND THEY HAVE WAIVED,

14   THAT IS WHAT I WAS SAYING; RIGHT.

15           I MEAN, THEY DIDN'T -- THEY SAID THEY WEREN'T

16   RELYING ON ANY OPINIONS OF COUNSEL.  BUT IN ADDITION TO THAT,

17   YOU KNOW, WE'RE WILLING TO DISCLAIM WHETHER THERE WERE ANY

18   WILLFUL ACTS AFTER DECEMBER 2015, WHICH IS THE FIRST DATE

19   THAT THEY HAVE ANY EVIDENCE IN THE RECORD OF THIS KOREAN

20   PROCEEDING.

21           IF THEY ARE SAYING AS OF THAT DATE, WE HAD A

22   GOOD-FAITH BASIS, BECAUSE WE LEARNED ABOUT THIS KOREAN

23   PROCEEDING, IF THAT'S THEIR POSITION, THEN I WAS SAYING,

24   FINE, I WILL DISCLAIM THAT THERE WAS ANY WILLFUL CONDUCT ON

25   THE UTILITY PATENT AFTER THAT DATE.

1382

```
 1        AND THAT'S WHAT I WAS TRYING TO ARTICULATE TO THE
 2   COURT.  AND, AGAIN, I APOLOGIZE IF I MIXED IT UP.  BUT I
 3   THINK THEY HAVE COMPLETELY OPENED THE DOOR, NOW PARADING
 4   BEFORE THE JURY THE EXACT EVIDENCE THAT WE MOVED TO EXCLUDE
 5   FROM THE CASE ON THE BASIS THAT WE DID.  AND THEIR DEFENSE
 6   WAS, IT ONLY HAS RELEVANCE TO WILLFULNESS.
 7        SO THE JURY HAS NOW HEARD THAT A KOREAN COURT HAS
 8   INVALIDATED THIS PATENT OR A VERSION, DERIVATION OF IT.  THEY
 9   HAVE HEARD THAT THEY HAVE INVALIDATED THAT VERSION OF THE
10   PATENT, AND THE ONLY RELEVANCE TO THAT, THEY SAID WAS BECAUSE
11   WE RELIED ON THAT IN GOOD FAITH MOVING FORWARD.
12        MR. MARCHESE:  YOUR HONOR, IT'S A MATTER OF LAW HERE
13   THAT THERE CAN'T BE WILLFULNESS, BECAUSE THE PATENT -- THERE
14   CAN'T BE WILLFULNESS BEFORE THE PATENT ISSUES.  THE FEDERAL
15   CIRCUIT SAYS THAT.
16        THE COURT:  I UNDERSTAND THAT.  I ASKED YOU TO STAY
17   AWAY FROM WILLFULNESS UNTIL I HAD THIS PART OF IT DECIDED.
18        MR. MARCHESE:  WELL, I JUST -- YOU KNOW, I WASN'T
19   UNDER THE IMPRESSION THAT YOU WERE STILL HOLDING UP THIS
20   QUESTION OF THIS PERIOD, BECAUSE IT'S ONLY SIX MONTHS OF TIME
21   THAT WE'RE TALKING ABOUT.
22        BECAUSE MR. ALDRICH HAD SAID THAT ANYTHING AFTER
23   THEY BROUGHT LAWYERS ON, IT SAYS RIGHT HERE, WE ASSUME ONCE
24   THEY RETAIN COUNSEL, THEY HAVE BEEN RELYING IN GOOD FAITH ON
25   ALL THE BRIEFING.  WE RETAINED COUNSEL IN DECEMBER OF 2013.
```

1383

```
 1          SO I JUST LED RIGHT UP TO THAT POINT.  THAT WAS IT.

 2          MR. ALDRICH:  NO, YOUR HONOR.

 3          MR. MARCHESE:  NOTHING MORE.

 4          MR. ALDRICH:  HE PUT IN DECEMBER 2013, THAT THEY

 5    LEARNED ABOUT THE INVALIDATION OF THE FOREIGN COUNTERPART

 6    PATENT IN KOREA.  THAT'S WHAT HE PUT ON THE SCREEN JUST NOW.

 7    AND THAT'S WHY I STOOD UP AND SAID, I THINK THE DOOR IS

 8    OPEN.

 9          THE COURT:  BUT I THINK WE'RE TALKING ABOUT TWO

10    DIFFERENT THINGS.  ONE IS WHETHER OR NOT WHEN THEY MOVED FOR

11    JUDGMENT OF ACQUITTAL -- NOT JUDGMENT OF ACQUITTAL, MOTION

12    FOR JUDGMENT AS A MATTER OF LAW, HALFTIME, WHETHER OR NOT WE

13    WERE GOING TO -- OR I WAS GOING TO RULE THAT AS A MATTER OF

14    LAW, WILLFULNESS AS REGARDS TO THE UTILITY PATENT WAS OFF THE

15    TABLE.  AND I NEEDED TO GO BACK AND REVIEW THE RECORD TO

16    FIGURE OUT WHAT YOU STATED IN LIGHT OF THAT STATEMENT, TO

17    KIND OF DECIDE WHETHER OR NOT WILLFULNESS WAS OFF THE TABLE.

18          THEN WHAT HAPPENED IS I SAID, STAY AWAY FROM

19    WILLFULNESS, BECAUSE I HAVEN'T HAD AN OPPORTUNITY TO FIGURE

20    THIS ALL OUT YET.  AND WILLFULNESS CAME KIND OF MARCHING IN,

21    NOTWITHSTANDING MY REQUEST THAT YOU STAY AWAY FROM THAT UNTIL

22    I HAD AN OPPORTUNITY TO RESOLVE THE WILLFULNESS ISSUE.

23          MR. MARCHESE:  BUT THERE STILL CAN'T BE WILLFULNESS

24    AS A MATTER OF LAW, BECAUSE THERE IS NO EVIDENCE IN THE

25    RECORD FROM THE POINT OF ISSUANCE OF THE PATENT UNTIL THE
```

1384

1    COUNSEL WAS HIRED.

2         THE COURT:  STOP.  WHY WERE YOU THEN ASKING ABOUT

3    ALL THIS OTHER STUFF?  BECAUSE I THINK MR. ALDRICH IS

4    CORRECT, THEN IT BECOMES IRRELEVANT.

5         MR. MARCHESE:  I WAS GETTING UP TO THE POINT WHERE

6    THE LAWSUIT IS FILED, WHICH IS EXACTLY -- I NEED TO PROVE

7    THAT WE HAD NO NOTICE OF THE PATENT AT THAT POINT, WHICH I

8    DID.

9         THE COURT:  BUT IF THERE IS NO ISSUE OF WILLFULNESS,

10   WHY ARE WE TALKING ABOUT THE KOREAN PATENT?

11        MR. MARCHESE:  WE CAN INSTRUCT THAT AWAY.  I MEAN,

12   THAT'S ALL RIGHT.  BUT THAT'S SOMETHING -- IT'S JUST -- AS A

13   MATTER OF LAW, THERE IS A SIX-MONTH PERIOD THAT'S OPEN HERE.

14   ONCE WE HIRED COUNSEL -- AND WE CAN BRIEF THIS UP FOR YOUR

15   HONOR.  THERE IS THE WBIP CASE --

16        THE COURT:  I'M NOT DISAGREEING WITH YOU.  I'M

17   ACTUALLY AGREEING WITH WHAT YOU SAID.  MY TROUBLE IS THAT YOU

18   MARCHED IN EVIDENCE THAT I ASKED YOU TO STAY AWAY FROM

19   BECAUSE ITS ONLY RELEVANCE IS TO WILLFULNESS, AND YOU MARCHED

20   IT IN BEFORE THE JURY.

21        AND YOUR RESPONSE TO ME NOW IS, JUDGE, THE WAY WE

22   FIX THAT IS WITH AN INSTRUCTION.  AND I'M SORRY.  YOU DID

23   SOMETHING I ASKED YOU NOT TO DO.

24        MR. MARCHESE:  OKAY.  WELL, I WAS TRYING TO GET UP

25   TO THE POINT OF FILING THE SUIT, WHICH I DID.  AND THAT WAS

1385

1    IT.  I DID NOT GO BEYOND.  MY INTENT WAS NOT TO CONTINUE TO

2    GO BEYOND IT.

3         THE COURT:  BUT BEFORE WE HAD SAID, AND THE ONLY

4    POINT OF THE KOREAN LAWSUIT WAS ON THE ISSUE OF WILLFULNESS.

5    IF WILLFULNESS IS OFF THE TABLE, THIS HAS NO RELEVANCE, NONE.

6    AND THAT IS THE ONLY REASON I LET YOU BRING THAT EVIDENCE

7    INTO -- BEFORE THIS JURY IN THE FIRST PLACE.  AT PRETRIAL I

8    HAD SAID THAT.

9         MR. MARCHESE:  WELL, I STILL THINK -- I MEAN, WE'D

10   LIKE TO BRIEF THIS OUT, YOUR HONOR.  THERE CANNOT BE

11   WILLFULNESS HERE.

12        THE COURT:  I DON'T DISAGREE WITH YOU.  I'M ON YOUR

13   SIDE ON THIS.  THAT'S NOT THE PROBLEM.  THE PROBLEM IS YOU

14   HAVE NOW BROUGHT EVIDENCE THAT IS IRRELEVANT TO THE ISSUES

15   BEFORE THE COURT, BECAUSE WILLFULNESS IS GONE.

16        MR. MARCHESE:  UNDERSTOOD.  BUT WE CAN -- IT SHOULD

17   NOT BE ON THE VERDICT FORM, YOUR HONOR.

18        THE COURT:  AGAIN, I'M NOT DISAGREEING WITH YOU.

19        MR. MARCHESE:  OKAY.

20        THE COURT:  I HAVE A PROBLEM, AND THAT'S THAT THE

21   JURY HAS NOW HEARD EVIDENCE, WHICH IS HIGHLY PREJUDICIAL,

22   THAT'S IRRELEVANT TO THE CASE.

23        MR. MARCHESE:  THE POINT -- SO THEY HAVE SAID, AND

24   THEY WILL CONTINUE TO PUT THE EVIDENCE IN WHICH THEY HAVE.

25   THERE IS ALL KINDS OF EVIDENCE IN THIS CASE WHICH WOULD BE

1    PREJUDICIAL.  THERE IS THE PATENT PENDING.  THERE IS ALL

2    THESE OTHER ISSUES THAT HAVE BEEN COMING IN FOR DAYS NOW.

3          AND THAT ALL -- YOUR HONOR HAS SAID THAT THEY CAN GO

4    FORWARD ON REASONABLE ROYALTY ON THE DESIGN PATENT.  THAT

5    MEANS THAT THEY CAN -- AS I UNDERSTAND THE LAW, THEY CAN SEEK

6    WILLFUL INFRINGEMENT ON THE DESIGN.  THEY CAN'T SEEK WILLFUL

7    INFRINGEMENT ON THE UTILITY PATENT.

8          THE COURT:  AGAIN, I DON'T THINK I DISAGREE WITH

9    YOU.

10          MR. MARCHESE:  SO MY POINT IS THAT ALL THE EVIDENCE

11   THAT'S COME IN BEFORE ABOUT "PATENT PENDING" AND ALL THIS

12   KIND OF THINGS HAS BEEN HIGHLY PREJUDICIAL TO SEIRUS FOR DAYS

13   NOW.  AND IT'S NOT RELEVANT TO THE '270 PATENT.  IT'S ALL

14   COME IN, AND WE'VE HAD TO DEAL WITH IT.

15          MR. ALDRICH:  YOUR HONOR, IF I MAY --

16          THE COURT:  THE DIFFERENCE IS THAT SOMETIMES AS THE

17   EVIDENCE IS COMING IN, WE MAY NOT KNOW UNTIL HALFTIME THAT

18   IT'S IRRELEVANT.  ONCE I KIND OF RESERVED RULING ON THAT

19   PARTICULAR ISSUE, AND ASKED YOU TO STAY AWAY FROM IT BECAUSE

20   I HADN'T QUITE RESOLVED IT, HADN'T HAD AN OPPORTUNITY FIND

21   THE DOCUMENT, AND UNTIL MY RULING ACTUALLY, THAT'S WHY I

22   ASKED YOU TO STAY AWAY FROM IT WAS BECAUSE I DIDN'T KNOW HOW

23   I WAS GOING TO COME DOWN ON THAT PARTICULAR ISSUE.

24          ONCE I CAME DOWN IN YOUR FAVOR, THAT BECAME

25   IRRELEVANT, WHICH IS WHY I ASKED YOU TO STAY AWAY FROM IT.

1387

1     MR. MARCHESE:  I UNDERSTAND IT'S IRRELEVANT.  AND I

2  UNDERSTAND THAT IT'S -- IT WAS DEFINITELY STATED ON THE

3  RECORD, AND THAT HAPPENED.  AND MY POINT IS THAT THAT WAS

4  DONE IN ORDER TO GET US RIGHT TO THE POINT WHERE THE LAWSUIT

5  WAS FILED.

6     THE COURT:  OKAY.

7     MR. MARCHESE:  AND WILLFULNESS -- AND I THINK IT

8  SOUNDS LIKE WE'RE IN AGREEMENT.  IT'S NOT RELEVANT TO THE

9  '270 PATENT, BECAUSE OF THE TINY TIME PERIOD.  THERE WAS NO

10 NOTICE OF THE PATENT.  AND AS A MATTER OF LAW, THERE CAN'T BE

11 WILLFULNESS.

12    THE COURT:  AGAIN, I'M ON YOUR SIDE ON THAT.

13    MR. MARCHESE:  OKAY.

14    THE COURT:  ON THAT LEGAL POINT, I AM ON YOUR SIDE.

15    MR. MARCHESE:  NO, I GET IT.  THEY ARE GOING TO WANT

16 TO TRY TO ATTACK THE KOREAN FINDING AND ALL THAT.  AND I'M

17 SURE THEY HAVE WANTED TO DO THAT ALL ALONG.  AND THAT -- YOU

18 KNOW, I THINK THAT THAT'S OPEN TO THAT POINT.

19    THE COURT:  WHAT WOULD YOU LIKE ME TO DO?

20    MR. ALDRICH:  WHAT WOULD I LIKE YOU TO DO?

21    THE COURT:  YES.

22    MR. ALDRICH:  I THINK WILLFULNESS IS BACK IN THE

23 CASE.  THEY OPENED THE DOOR TO IT.  IT'S BACK IN THIS CASE,

24 AND WE'RE GOING TO GO THROUGH ALL THE WILLFULNESS STUFF AND

25 IT SHOULD BE ON THE VERDICT FORM.

1388

1    THAT'S THE ONLY SANCTION I CAN THINK THAT'S

2  APPROPRIATE FOR VIOLATING YOUR HONOR'S ORDER AND PUTTING IN

3  HIGHLY PREJUDICIAL MATERIAL THAT HAS NO RELEVANCE OTHERWISE.

4  SAME WITH THE THERMALUX GLOVE.

5    MR. MARCHESE:  THE THERMALUX GLOVE HAS BEEN IN

6  EVIDENCE FROM LONG AGO.  IT CAME IN AS A PART OF THE WHOLE

7  PATENT PENDING PIECE THAT WE'VE BEEN DEALING WITH.

8    MR. ALDRICH:  BUT IT WASN'T ASSERTED AS PRIOR ART.

9  THE ONLY RELEVANCE TO THAT GLOVE IS THEIR GOOD-FAITH BELIEF

10  THAT BECAUSE THEY LAUNCHED THAT GLOVE -- THE OMNI-HEAT FABRIC

11  ITSELF IS NOT SUBSTANTIALLY DIFFERENT, AND THEY COULD RELY ON

12  THE FACT THAT IT LOOKED ABOUT THE SAME IS WHAT THEY ARE

13  SAYING.  THAT'S THE ONLY RELEVANCE OF THAT GLOVE.

14    THE COURT:  THE THERMALUX GLOVE IS GOING IN, IT CAME

15  IN IN YOUR CASE.

16    MR. ALDRICH:  YEAH.  WE BROUGHT IT IN, YEAH.

17    MR. MARCHESE:  THAT'S A RED HERRING.  THE ISSUE, AS

18  I SEE IT, IS THAT THEY -- THAT THERE CAN BE -- WELL, WE'VE

19  TALKED ABOUT THIS ALREADY, '270 PATENT WITH WILLFULNESS.  I

20  THINK THEY HAVE PRESERVED THEIR RIGHT TO CHALLENGE

21  WILLFULNESS.

22    AND I STILL -- I MEAN, WE'VE GOT A JMOL MOTION ON

23  THE DESIGN PATENT.  WE DON'T BELIEVE THEY SHOULD BE ABLE TO

24  GO FORWARD ON REASONABLE ROYALTY WITH DESIGN, WHICH WOULD

25  KNOCK OUT, IN OUR VIEW, WILLFUL INFRINGEMENT FOR THAT PATENT.

1389

1    I KNOW MR. ALDRICH MADE AN ARGUMENT ABOUT ENHANCED DAMAGES,

2    AND I THINK THE 284 AND 285 DAMAGES AND SAID WILLFULNESS IS

3    RELEVANT TO THOSE.

4            AND I DON'T DISAGREE WITH HIM.  IT CAN BE IF IT'S

5    PROPERLY IN THIS CASE.  BUT IN THIS PARTICULAR CASE, THE

6    DESIGN PATENT, THERE WAS NO, TRULY NO CASE OF REASONABLE

7    ROYALTY BROUGHT FORWARD AND OUR VIEW REMAINS THE SAME.  IT

8    SHOULD BE OUT.  YOUR HONOR DENIED THAT MOTION.

9            AND THEN WE HAVE THIS ONE LAST ISSUE CONCERNING THE

10   '270 PATENT.  AND YOU KNOW, AS I'VE SAID BEFORE, I THINK IT'S

11   A MATTER OF LAW, IT CAN'T BE WILLFUL.

12           THE COURT:  WELL, THE ONLY REASON I RULED IN YOUR

13   FAVOR WAS BECAUSE OF MR. ALDRICH'S STATEMENT AT THE PRETRIAL

14   CONFERENCE, NOT BECAUSE THERE WAS SOME OTHER PROBLEM WITH

15   WILLFULNESS.

16           MR. MARCHESE:  THE PROBLEM WITH WILLFULNESS IS THAT

17   ONCE YOU HAVE -- A COUNSEL COMES IN AND BEGINS DEFENDING YOU

18   IN THE CASE, TO CONTEND THERE IS WILLFUL INFRINGEMENT AFTER

19   THAT POINT, HOW DO YOU DO THAT?

20           YOU HAVE HIRED A LAWYER.  THEY HAVE COME IN.  THERE

21   IS NO DISPUTE THAT THE LAW FIRM WAS HIRED IN DECEMBER.  THEY

22   CAME IN.  THEY BEGIN DEFENDING.  THEY'RE FILING, THEY ARE

23   GOING BACK AND FORTH WITH PAPERWORK AND THINGS OF THAT

24   NATURE, AND THERE IS JUST NO WILLFULNESS AFTER THAT POINT.

25   YOU'RE DEFENDING YOURSELF IN GOOD FAITH.  YOU'RE ANSWERING

1390

1    THE COMPLAINT.  YOU'RE DOING ALL THE THINGS YOU'RE SUPPOSED

2    TO DO.

3         AND THAT'S NOT WILLFUL INFRINGEMENT.  ABSOLUTELY

4    NOT.  THAT CAN'T BE.  BUT ANYTHING BEFORE THAT, LEADING UP TO

5    THE TIME WHEN THE PATENT ISSUED, WHICH IS SIX MONTHS EARLIER,

6    THERE IS NO NOTICE OF THE PATENT; SO THERE CAN'T BE WILLFUL

7    INFRINGEMENT AS A MATTER OF LAW, NO MATTER WHAT HAPPENED IN

8    KOREA.

9         THE COURT:  SO IF A LAWYER SAYS IT'S A VALID PATENT,

10    YOU SHOULD STOP PRODUCING IT, AND AN INDIVIDUAL CONTINUES TO

11    PRODUCE, NOTWITHSTANDING HIS LAWYER'S ADVICE, THAT'S NOT

12    WILLFUL?

13         MR. MARCHESE:  IT'S NOT WILLFUL.  ONCE YOU HIRE A

14    LAW FIRM TO PROTECT -- YOU'RE IN LITIGATION, YOU HIRE THEM,

15    THEY COME IN, YOU BEGIN DEFENDING THE CASE, AND YOU GO

16    FORWARD AND, YOU KNOW, YOU FILE ALL THE PAPERS YOU FILE, YOU

17    END UP IN TRIAL HERE, I DON'T SEE HOW THAT CAN BE WILLFUL

18    INFRINGEMENT.

19         THE COURT:  WHAT IF THE LAWYER IS ADVISING THE

20    CLIENT NOT TO DO SOMETHING AND THE CLIENT DOES IT ANYWAYS.

21         MR. MARCHESE:  I DON'T THINK THERE IS ANY EVIDENCE

22    OF THAT IN THIS CASE.

23         THE COURT:  THAT'S NOT MY QUESTION.  MY QUESTION IS:

24    WHAT IF SOMEBODY SIMPLY IGNORES THE REQUEST OF THEIR LAWYER?

25         MR. MARCHESE:  IGNORE, THAT DIDN'T HAPPEN HERE.

1391

1    THIS CASE WAS DEFENDED.

2         THE COURT:  THAT'S NOT MY QUESTION.  SO IT'S

3    POSSIBLE THAT WILLFULNESS COULD EXIST.  I'M NOT SAYING THAT

4    THAT EVIDENCE SUGGESTS -- THAT THAT'S WHAT THE EVIDENCE

5    SUGGESTS, BUT IT'S CERTAINLY POSSIBLE.

6         MR. MARCHESE:  YOU'RE SAYING IF A LAWYER WAS TO TELL

7    THE -- HIS OR HER CLIENT TO CONTINUE DOING WHAT THEY HAVE

8    BEEN DOING --

9         THE COURT:  OR TO STOP DOING WHAT THEY ARE DOING,

10   AND THE CLIENT DID IT ANYWAYS.

11        MR. MARCHESE:  I SUPPOSE, IN THAT INSTANCE, I COULD

12   IMAGINE YOU COULD MAKE A CASE FOR IT, IF YOU WAIVED YOUR

13   ATTORNEY/CLIENT PRIVILEGE AND ALL THAT.  BUT THAT DIDN'T

14   HAPPEN HERE.

15        MR. ALDRICH:  YOUR HONOR, I THINK IT COULD ALSO BE

16   WILLFUL INFRINGEMENT IF THE COURT TELLS YOU THAT YOU'RE

17   INFRINGING AND YOU CONTINUE DOING IT.

18        MR. MARCHESE:  BUT THAT'S A DIFFERENT ISSUE.  THAT'S

19   THE OTHER PATENT.

20        MR. ALDRICH:  THAT'S THE DESIGN PATENT.  I THINK

21   THAT ISSUE IS STILL ALIVE.  WE'RE TALKING ABOUT THE UTILITY

22   PATENT.

23        AND IF I CAN MAKE ONE OTHER POINT OF CLARIFICATION,

24   I'M SORRY.  THE KOREAN PATENT ISSUE, THE NOTIFICATION ABOUT

25   THE KOREAN PATENT, ALL OF THAT, IT ONLY RELATES TO THE

1392

1    UTILITY PATENT.  IT HAS NO RELATION TO THE DESIGN PATENT AT

2    ALL.

3           THE COURT:  I AGREE WITH YOU ABOUT THAT.

4    WILLFULNESS ON THE DESIGN PATENT IS STILL ALIVE.  WE'RE ONLY

5    TALKING ABOUT THE UTILITY PATENT.

6           MR. ALDRICH:  THAT'S RIGHT.

7           MR. MARCHESE:  RIGHT.  AGREED.  DESIGN PATENT, I'M

8    NOT TALKING ABOUT RIGHT NOW.  I'M TALKING ABOUT THE '270

9    PATENT.  AND THERE IS A PERIOD OF ONLY SIX MONTHS THAT I

10   THINK IS RELEVANT HERE.

11          YOU HAVE A DEFENSE THAT'S MOUNTED, A DEFENSE

12   THAT'S CLEARLY IN GOOD FAITH.  WE ENDED UP IN TRIAL ON THE

13   PATENT.

14          THE COURT:  RIGHT.

15          MR. MARCHESE:  AND WE HAVE -- WE DON'T HAVE THE

16   INSTANCE WHERE THE CLIENT SAID, KEEP DOING WHAT -- I'M SORRY,

17   THE LAWYER TOLD THEIR CLIENT, KEEP DOING WHAT YOU'RE DOING,

18   AND THE CLIENT VIOLATING.  WHAT THEY DID WAS THEY DEFENDED

19   THE CASE THROUGH THE WHOLE PERIOD OF THE CASE.  WE ENDED UP

20   WITH A TRIABLE CASE.

21          THE COURT:  AGAIN, I APPRECIATE THAT THERE ISN'T ANY

22   EVIDENCE TO SUGGEST THAT THE HYPOTHETICAL THAT I GAVE YOU

23   EXISTS.  ALL I'M SAYING IS WHEN SOMEONE SAYS THAT CAN NEVER

24   HAPPEN, I'M THINKING, NAH, NEVERS ARE NEVER REALLY A GOOD

25   THING TO PUT IN FRONT OF A JUDGE, BECAUSE WE'LL ALWAYS THINK

COMPUTER-AIDED TRANSCRIPTION

1    OF SOME WEIRD EXAMPLE THAT ACTUALLY CAN HAPPEN.

2            MR. MARCHESE:  FAIR ENOUGH.

3            THE COURT:  I THINK THAT THE EVIDENCE REGARDING THE

4    KOREAN PATENT IS IRRELEVANT TO THE ISSUE OF WILLFULNESS ON

5    THE '270 PATENT.  BUT I AM NOT PERSUADED THAT THE SOLUTION TO

6    THAT IS SAY, NOW WE'RE PUTTING WILLFULNESS BACK ON THE TABLE

7    AS REGARDS TO THE '270 PATENT.

8            I THINK A CURATIVE INSTRUCTION WHICH TELLS THE JURY

9    THAT THE EVIDENCE REGARDING THE KOREAN PATENT IS IRRELEVANT,

10   AND THEY ARE NOT TO CONSIDER IT IN ANY WAY DURING THEIR

11   DELIBERATIONS IS HOW WE WILL CURE THIS PROBLEM.  AND THEN

12   WE'LL MOVE ON AND NOT ADDRESS ANY MORE WILLFULNESS ISSUES AS

13   REGARDS TO THE '270 PATENT.

14           MR. MARCHESE:  THANK YOU, YOUR HONOR.

15           WITH REGARD TO THE DESIGN PATENT.

16           THE COURT:  HANG ON A SECOND.  HANG ON A SECOND.

17           AND I KNOW THAT THAT'S NOT THE SOLUTION THAT YOU

18   WERE LOOKING FOR, MR. ALDRICH.  BUT I WILL HAVE YOU DRAFT THE

19   INSTRUCTION IN A WAY FOR THE COURT AND MAKE A SUGGESTION.

20   I'M NOT SAYING I'LL GIVE YOUR INSTRUCTION.  BUT I'LL

21   CERTAINLY CONSIDER GIVING THAT INSTRUCTION THAT DOES

22   PRECISELY THAT, OR I CAN JUST TRY TO SAY WHAT I JUST SAID TO

23   THE JURY RIGHT NOW ABOUT THE KOREAN PATENT.

24           MR. ALDRICH:  I THINK WE ACTUALLY SUBMITTED A

25   PROPOSED INSTRUCTION ON THE ISSUE ALREADY.

1    THE COURT:  IF YOU HAVE, AND YOU WANT TO GIVE IT TO

2  ME, I CAN GIVE IT TO THEM NOW; OR I CAN WAIT UNTIL THE END.

3  I DON'T KNOW WHAT YOU WOULD PREFER.

4    MR. ALDRICH:  I DON'T KNOW THAT WE ACTUALLY HAVE A

5  COPY HERE.

6    THE COURT:  THAT ADDRESSES SPECIFICALLY THE KOREAN

7  PATENT?

8    MR. ALDRICH:  YES.  IT'S A VERY SPECIFIC ONE.

9    MR. AXELROD:  I BELIEVE IT WAS SUBMITTED WITH THE

10  PROPOSED PRELIMINARY INSTRUCTIONS.

11    MR. ALDRICH:  I THINK IT WAS 25(B) EVEN, BUT I'LL GO

12  GET IT.

13    MS. LEGAARD:  I'LL GET IT.

14    THE COURT:  ALL RIGHT.  I DRAFTED AN INSTRUCTION.

15  I'LL READ IT TO YOU.  IF YOU'RE SATISFIED WITH IT, I WILL

16  READ IT TO THE JURY AS SOON AS THEY RETURN.

17    IT SAYS AS FOLLOWS:  YOU HAVE HEARD EVIDENCE

18  REGARDING THE '270 PATENT IN A KOREAN COURT.  THAT EVIDENCE

19  WAS SUBMITTED TO YOU REGARDING THE ISSUE OF WILLFUL VIOLATION

20  OF THE '270 PATENT.  PLEASE DISREGARD ANY EVIDENCE OF THE

21  KOREAN COURT'S FINDING.

22    MR. AXELROD:  I THINK THE INSTRUCTION TO THE JURY

23  NEEDS TO BE MORE DIRECT IN TERMS OF INSTRUCTING THEM THAT

24  ANYTHING THAT HAPPENS IN KOREA, WHICH OPERATES UNDER

25  DIFFERENT LAW, DIFFERENT SYSTEMS, DIFFERENT PATTERNS, CAN

1   HAVE NO APPLICATION ON THE CONSIDERATION OF THE VALIDITY OR

2   INFRINGEMENT OF THE U.S. PATENT.

3        THE COURT:  WHY?

4        MR. AXELROD:  BECAUSE OTHERWISE, I THINK THAT IT

5   WILL HAVE CARRYOVER EFFECT.  JUST TELLING THEM TO DISREGARD

6   SOMETHING, WITHOUT GIVING SOME CONTEXT AND REASON FOR WHY

7   IT'S IRRELEVANT, WON'T STICK.

8        THAT'S MY FEAR.

9        MR. ALDRICH:  I ALSO --

10       THE COURT:  I MEAN, I'M TRYING TO GET TO THE -- BACK

11  TO THE TRIAL.  IF YOU WANT ME TO CONSIDER GIVING A SEPARATE

12  INSTRUCTION REGARDING THE KOREAN COURT AT THE END OF THE

13  CASE, I WILL CERTAINLY CONSIDER GIVING A BROADER INSTRUCTION

14  LATER.  BUT I JUST NEED TO GIVE THEM SOMETHING TO GET THIS

15  OUT OF THEIR MIND RIGHT NOW, AND THEN THEY CAN MOVE FORWARD

16  ON THE REST OF THE CASE.

17       MR. ALDRICH:  YOUR HONOR, I JUST HAVE TO TELL YOU, I

18  CONTINUE TO BE TROUBLED BY THE FACT THAT YOU GAVE A SPECIFIC

19  INSTRUCTION TO COUNSEL.  THEY DISREGARDED YOUR INSTRUCTION, I

20  WOULD OFFER DELIBERATELY, BY PUTTING UP A SLIDE THAT PUT THE

21  POISON PILL FOR THE CASE IN, THAT WE HAD STRENUOUSLY OBJECTED

22  TO BE OUT.

23       AND I -- AGAIN, THIS PATENT WAS NOT ASSERTED IN THE

24  CASE UNTIL APRIL OF 2014.  THIS SUIT WAS NOT FILED UNTIL

25  JANUARY OF 2015.  I THINK WILLFUL INFRINGEMENT OF THE UTILITY

1396

1    PATENT IS STILL IN THE CASE, BECAUSE IT WASN'T -- THIS SUIT

2    WASN'T FILED UNTIL JANUARY 2015.  BUT I DO THINK THAT THE

3    CURATIVE INSTRUCTION IS APPROPRIATE.  BUT I THINK WILLFULNESS

4    HAS TO BE IN THE CASE.

5            THE COURT:  WHAT PERIOD OF TIME DO YOU THINK

6    WILLFULNESS IS STILL IN PLAY?  I MEAN, TAKING INTO

7    CONSIDERATION WHAT YOU SAID AT THE PRETRIAL CONFERENCE.

8            MR. ALDRICH:  YEAH.  THROUGH -- I MEAN, WE DIDN'T

9    ASSERT THE PATENT UNTIL APRIL 2013.

10           THE COURT:  OKAY.  AND YOU SAID THAT THEN YOU WERE

11   ONLY LOOKING FOR WILLFULNESS IN 2012 AND 2013.  SO WHAT DO I

12   DO?

13           MR. ALDRICH:  WELL, I KNOW THAT'S WHAT YOU SAID I

14   SAID, BUT THAT'S NOT OBVIOUSLY WHAT I WAS -- WHAT I WAS

15   INTENDING TO ARTICULATE.  THAT WAS NOT ASSERTED IN THIS CASE

16   UNTIL APRIL OF 2014.  AND THIS SUIT WASN'T FILED UNTIL THE

17   FOLLOWING YEAR.

18           THE COURT:  OKAY.  SO YOU DIDN'T MEAN WHAT YOU SAID?

19           MR. ALDRICH:  WELL, I GUESS I SAID WHAT I SAID.  I

20   TRUST THE COURT REPORTERS -- THANK YOU.  BUT, AGAIN, I'LL

21   JUST PUT BACK ON THE RECORD, I DO BELIEVE THAT WHAT THEY DID

22   WAS A DIRECT VIOLATION.  I THINK IT WAS DELIBERATE, AND I

23   THINK THERE WAS A REASON FOR DOING IT.  AND I THINK THEY HAVE

24   NOW SABOTAGED THE TRIAL BY DOING SO.  AND I THINK THAT

25   WILLFULNESS SHOULD BE BACK IN THE CASE.

1397

1    THE COURT:  OKAY.  TRIALS ARE TOUGH.  AND PEOPLE

2    MAKE MISTAKES.  AND I DO NOT BELIEVE THAT THE MISTAKE -- THE

3    ERROR THAT WAS COMMITTED IN THIS INSTANCE WAS AN INTENTIONAL

4    ERROR ON THE PART OF COUNSEL.

5         IF I HAD BELIEVED THAT, THE CONSEQUENCES AND THE

6    TONE OF MY CONVERSATION WITH SOMEONE WHO VIOLATED MY DIRECT

7    ORDER WOULD HAVE AN ENTIRELY DIFFERENT FLAVOR AND FEEL.  IF I

8    THOUGHT THAT HE INTENTIONALLY DID SOMETHING THAT I TOLD HIM

9    NOT TO DO, HE WOULD BE FACING SANCTIONS FAR BEYOND ANYTHING

10   THAT OCCURRED IN THIS PARTICULAR COURT.

11        I'M SATISFIED THAT'S NOT GOING TO HAPPEN IN THIS

12   CASE.  AND HE WILL BE VERY CAREFUL AS HE MOVES FORWARD TO

13   MAKE SURE THAT HE FOLLOWS EVERYTHING I SAY TO THE LETTER.

14        UNDERSTOOD.

15        MR. ALDRICH:  YES.  THANK YOU, YOUR HONOR.

16   APPRECIATE IT.

17        THE COURT:  LET'S GET THE JURY BACK IN.

18        MS. ROTHAUGE:  ACTUALLY, YOUR HONOR, IN LIGHT OF

19   THAT, BECAUSE WE WILL BE GOING FROM MR. CAREY TO MY WITNESS,

20   I WANT TO RAISE THIS -- BECAUSE THIS IS AN ISSUE.  I WANT TO

21   RAISE -- PLAINTIFF'S EXHIBIT 494 IS A DOCUMENT I PLAN TO USE

22   WITH MY WITNESS.  AND I DON'T -- I THINK IT'S ADMITTED.

23        MR. MARCHESE:  494 JUST CAME IN WITH MR. CAREY.

24        MS. ROTHAUGE:  SO THE PROBLEM IS IT HAS SOME

25   REFERENCE TO THE ISSUES THAT WE'VE JUST BEEN TALKING ABOUT.

1398

1    AND SO I WANT SOME CLARITY ON WHAT QUESTIONS WOULD BE

2    APPROPRIATE TO ASK ABOUT IT.

3            I SIMPLY WANTED TO HAVE MY WITNESS ACKNOWLEDGE THAT

4    HE RECEIVED IT AND HE FORWARDED IT ON TO MR. EDWARDS.  THAT'S

5    WHAT I WAS GOING TO USE IT FOR.

6            MR. MARCHESE:  I DON'T THINK IT'S RELEVANT ANYMORE

7    IF WILLFULNESS -- SO I THINK IT'S NOT.  WE CAN WITHDRAW THAT

8    EXHIBIT.

9            MS. ROTHAUGE:  THAT'S WHAT I WANT TO MAKE SURE OF.

10            MR. ALDRICH:  YOUR HONOR, COULD YOU READ THE

11    CURATIVE INSTRUCTION BACK.

12            THE COURT:  SURE.  YOU HAVE HEARD EVIDENCE REGARDING

13    THE '270 PATENT IN A KOREAN COURT.

14            MR. ALDRICH:  THERE NEEDS TO BE A CORRECTION THERE,

15    YOUR HONOR.  IT WASN'T THE '270 PATENT.  IT WAS A DIFFERENT

16    PATENT.  IT'S A PATENT UNDER KOREAN LAW.

17            THE COURT:  I'M SORRY.  THANK YOU.

18            MR. ALDRICH:  THAT ALSO COVERS THE OMNI-HEAT

19    PRODUCTS --

20            THE COURT:  THANK YOU.

21            MR. ALDRICH:  -- IN KOREA.

22            THE COURT:  SO IT RELATES, BUT IT'S A DIFFERENT

23    PATENT.  IT WAS BEFORE THE KOREAN COURT.  IS THAT EVEN THE

24    RIGHT --

25            MR. ALDRICH:  IT WAS BEFORE THE KOREAN PATENT

1    OFFICE.  AND IT WAS ALSO BEFORE THE KOREAN COURT, BUT I'M NOT

2    SURE WHAT THE TRANSCRIPT SAYS AT THIS POINT ABOUT IT.

3            THE COURT:  SO YOU'VE HEARD EVIDENCE THAT A PATENT

4    UNDER KOREAN LAW WAS BEFORE THE KOREAN PATENT OFFICE.  THAT

5    EVIDENCE WAS SUBMITTED TO YOU REGARDING THE ISSUE OF WILLFUL

6    VIOLATION OF THE '270 PATENT.  PLEASE DISREGARD ANY EVIDENCE

7    OF THE KOREAN -- SHOULD I SAY PATENT OFFICE'S FINDINGS?

8            WITH THAT, LET US PROCEED WITH THE TRIAL.

9            MR. ALDRICH:  THANK YOU, YOUR HONOR.

10           THE COURT:  ALL RIGHT.

11           MR. MARCHESE:  YOUR HONOR, JUST VERY QUICKLY.

12           WE'VE GOT -- THE RESOLUTION OF THE JMOL ON THE

13   DESIGN PATENT WAS FINAL.  BECAUSE I HAVE A MODULE WITH

14   MR. CAREY THAT I WILL DO ON DESIGN PATENT WILLFULNESS, AND I

15   WANT TO MAKE SURE THAT I DON'T RUN AFOUL OF THE PRIOR

16   RULINGS.

17           SO JUST FOR CLARIFICATION, WE DID THE JMOL AND SAID

18   THERE WOULD BE NO -- THERE COULD BE NO WILLFULNESS FOR THE

19   DESIGN PATENT.  AND I THINK YOU SAID, YOUR RULING WAS THAT

20   THAT WAS NOT GRANTED.

21           THE COURT:  CORRECT.

22           MR. MARCHESE:  OKAY.  THANK YOU.

23           THE COURT:  WILLFULNESS IN THE DESIGN PATENT IS

24   STILL A LIVE ISSUE.

25           MR. MARCHESE:  UNDERSTOOD.

1400

1    THE COURT:  ANYTHING ELSE?  ALL RIGHT.

2    (JURY PRESENT, 3:00 P.M.)

3    THE COURT:  BE SEATED.

4    MEMBERS OF THE JURY, YOU HEARD EVIDENCE REGARDING A

5    PATENT UNDER KOREAN LAW THAT WAS BEFORE THE KOREAN PATENT

6    OFFICE.  THAT EVIDENCE WAS SUBMITTED TO YOU REGARDING THE

7    ISSUE OF WILLFUL VIOLATION OF THE '270 PATENT.  IT WAS

8    SUBMITTED IN ERROR.

9    PLEASE DISREGARD ANY EVIDENCE OF THE KOREAN PATENT

10   OFFICE'S FINDINGS AND STRIKE IT.  YOU SHOULD NOT CONSIDER IT.

11   YOU MAY PROCEED.

12   Q.   BY MR. MARCHESE:  MR. CAREY, I WANTED TO CONTINUE ON

13   WITH THE -- ON IN TIME TO THE 2016 TIME FRAME.  OKAY?

14   A.   OKAY.

15   Q.   AND IN OR ABOUT AUGUST 2016, DID YOU BECOME AWARE OF THE

16   FACT, AS WE'VE HEARD IN EVIDENCE IN THIS COURT, THAT THE

17   COURT FOUND THAT SEIRUS INFRINGES THE DESIGN PATENT?

18   A.   YES, I DID.

19   Q.   AND DO YOU RECALL WHEN THAT WAS?

20   A.   SOMETIME MID-AUGUST.

21   Q.   AND CAN YOU TELL US WHAT YOU DID YOURSELF, AND THE

22   COMPANY, IN RESPONSE TO WHAT YOU FOUND OUT ABOUT THIS DESIGN

23   PATENT INFRINGEMENT?

24   A.   WE IMMEDIATELY STOPPED MAKING ANY MORE FABRIC WITH THAT

25   ON IT.

1401

1    Q.    WHAT DO YOU MEAN, "WITH THAT ON IT"?

2    A.    WITH THE DESIGN THAT WAS CONSIDERED INFRINGING.

3    Q.    THE WAVY DESIGN?

4    A.    THE WAVE DESIGN WITH OUR LOGO ON IT.

5    Q.    UNDERSTOOD.  AND DID YOU DO SOMETHING ELSE?  WHEN YOU

6    STOPPED PRODUCTION, YOU SAID OF THE FABRIC WITH THE WAVE

7    DESIGN, WHAT ELSE DID YOU DO WITH THAT?

8    A.    WE IMMEDIATELY STARTED CREATING A NEW DESIGN.

9    Q.    AND YOU SAID YOU IMMEDIATELY BEGAN CREATING ONE.  HOW

10   DID THAT GO?

11   A.    GOOD.  YOU KNOW, THAT PROCESS TAKES A WHILE BECAUSE YOU

12   COME UP WITH A DESIGN, YOU HAVE TO SHIP IT OFF, GET IT PUT

13   INTO A DRUM AND THEN START HAVING THAT APPLIED TO THE

14   FABRIC.

15   Q.    AND DID YOU ALSO -- DID YOU HAVE ANY GLOVES WITH THE

16   WAVE DESIGN ON HAND, OR THAT YOU -- WERE IN INVENTORY OR

17   ANYTHING LIKE THAT IN AUGUST OF 2016?

18   A.    YES.  YES.  SO REMEMBER, WE -- THIS IS AUGUST OF 2016.

19   ALL OF THE PRODUCT THAT WE START SHIPPING BASICALLY IN

20   SEPTEMBER THROUGH THAT NEXT SEASON WAS MADE A YEAR IN

21   ADVANCE; SO IT WAS ALL IN A WAREHOUSE OR ON THE WATER.  AND

22   WE HAD COMMITMENTS FROM OUR VENDORS FOR THAT PRODUCT.

23   Q.    AND WHEN YOU SAY "COMMITMENTS," WHAT KIND OF PEOPLE OR

24   COMPANIES ARE YOU COMMITTED TO?

25   A.    WELL, ANYBODY WHO BUYS IT.  AND SO THE INDUSTRY IS MADE

COMPUTER-AIDED TRANSCRIPTION

1402

1    UP BASICALLY OF TWO REALLY DIFFERENT TYPES OF RETAILERS.

2    IT'S THE CHAIN STORES, LIKE R.E.I., DICK'S, TSA, WHEN THEY

3    WERE IN BUSINESS, AND SPORTS CHALET.

4         AND COMPANIES LIKE THOSE ARE MULTI-CHAIN, AND THE

5    MAJORITY OF THE INDUSTRY IS RUN BY, YOU KNOW, THE LITTLE MA

6    AND PA'S.  YOU KNOW, THEY HAVE GOT ONE OR TWO STORES.  AND

7    THOSE PEOPLE OWN STORES ALL OVER OF THE COUNTRY.  SO WE HAVE

8    A BUYING CYCLE THAT STARTS IN NOVEMBER AND RUNS THROUGH

9    BASICALLY MARCH OF THE YEAR EARLIER.  AND THEY PLACED THEIR

10   ORDERS AND THEY RELY ON US TO MAKE SURE THAT THEY GET THEIR

11   GOODS.

12   Q.   AND I THINK YOU USED THE WORD "COMMITMENTS," DIDN'T

13   YOU?

14   A.   YES.  AND THEN, YOU KNOW, IT'S A COMMITMENT FOR US TO

15   DELIVER OUR WARES TO THEM, WHICH WE ARE VERY -- IT'S VERY

16   IMPORTANT FOR US, LIKE EVERYBODY ELSE, TO HONOR YOUR

17   COMMITMENTS.  ONE OF THOSE FOUNDATIONS OF WHAT WE LEARN IN

18   AMERICA IS THAT YOU MAKE A COMMITMENT TO SOMEBODY, YOU CARRY

19   THROUGH WITH IT.

20   Q.   AND DID YOU AT SOME POINT IN TIME -- DID YOU FULFILL THE

21   COMMITMENTS OF THE COMPANY WITH RESPECT TO THE WAVE DESIGN?

22   A.   YES, I DID.

23   Q.   WAS THERE ANYTHING LEFT OVER?

24   A.   YES.  AND SO WHAT WAS LEFT OVER WAS ABOUT 50,000 PAIR OF

25   GLOVES AND LINERS.  AND WE HAVE CORDONED THEM OFF AND CAN'T

1403

```
 1    USE THEM.

 2    Q.   AND WHAT WILL YOU DO WITH THEM?

 3    A.   WE'RE GOING TO EAT THEM.  HOPEFULLY WE CAN MAYBE GIVE

 4    THEM AWAY TO CHARITY OR SOMETHING.  I'VE NEVER BEEN IN THIS

 5    POSITION BEFORE, SO I DON'T KNOW WHAT WE'RE GOING TO DO.  BUT

 6    WE'RE NOT -- WE CANNOT SELL THEM AT THIS POINT.

 7              MR. MARCHESE:  AND I THINK THIS IS 1433.  I BELIEVE

 8    THIS HAS BEEN RECEIVED.

 9              THE COURT:  ANY OBJECTION TO 1433?  I'M NOT SURE

10    WHETHER IT'S BEEN RECEIVED OR NOT.  WE'VE CERTAINLY SEEN

11    THIS.

12              MR. AXELROD:  NO, YOUR HONOR.

13              THE COURT:  IF IT HADN'T BEEN RECEIVED, I THINK IT

14    IS NOW.

15              IT'S BEEN RECEIVED ALREADY.

16              MR. MARCHESE:  THANK YOU, YOUR HONOR.

17    Q.   EXHIBIT 1433, MR. CAREY, CAN YOU TELL US WHAT WE'RE

18    LOOKING AT HERE.

19    A.   THAT IS THE NEW PATTERN OF THE -- OUR SOFT-TOOTH WAVE

20    DESIGN ON OUR HEATWAVE PRODUCTS.

21    Q.   CAN I HAVE PAGE 2 OF THE EXHIBIT, PLEASE.

22              AND DOES THAT SHOW IT MORE CLOSELY?

23    A.   YES.

24    Q.   AND WHAT'S YOUR UNDERSTANDING OF COLUMBIA'S REACTION TO

25    THAT?
```

1404

```
1    A.    THAT THEY -- THEY AGREE THAT THIS ISN'T CLOSE TO WHAT

2    THEY ARE DOING.

3              MR. AXELROD:  OBJECTION.  NO PERSONAL KNOWLEDGE.

4    MOVE TO STRIKE.

5              THE COURT:  THE OBJECTION IS OVERRULED.  THIS

6    ACTUALLY HAS ALREADY BEEN ANSWERED IN PART OF YOUR CASE.

7              YOU MAY PROCEED.

8              MR. ALDRICH:  JUST ALSO CONCERNED ABOUT RULE 408,

9    YOUR HONOR.

10             THE COURT:  OKAY.  THANK YOU.

11   Q.    BY MR. MARCHESE:  SO JUST A COUPLE MORE QUESTIONS, OR A

12   FEW MORE QUESTIONS ACTUALLY, MR. CAREY.

13             WHAT IS YOUR UNDERSTANDING ABOUT WHAT THE DAMAGES

14   ARE THAT COLUMBIA IS SEEKING IN THIS CASE FOR YOUR PRODUCTS

15   THAT YOU'VE BEEN SELLING WITH HEATWAVE?

16   A.    I THINK WE TALKED EARLIER, THEY WANT TO TAKE EVERY PENNY

17   OF WHAT WE MAKE ON EVERYTHING THAT HAS ANY PART OF THIS

18   DESIGN AWAY FROM US.

19   Q.    AND IS THAT INCLUDING, YOU KNOW, THE BATTERY-POWERED

20   GLOVE?

21   A.    EVERYTHING, ANYTHING.  WHETHER IT'S A SQUARE INCH OR A

22   WHOLE PRODUCT.

23   Q.    AND WE HEARD SOME TESTIMONY FROM MR. MERRIMAN.  WERE YOU

24   HERE FOR THAT?

25   A.    YES, I WAS.
```

COMPUTER-AIDED TRANSCRIPTION

1405

1   Q.   HE'S A COLUMBIA EMPLOYEE, TO YOUR UNDERSTANDING?

2   A.   THAT'S CORRECT.

3   Q.   AND HE MENTIONED THAT -- THERE WAS A DOCUMENT THAT GOT

4   SHOWED DURING HIS TESTIMONY WHEN MS. ROTHAUGE CROSS-EXAMINED

5   HIM, AND IT STATED THAT SEIRUS WAS IN A DIFFICULT POSITION

6   AND HAD HEAVILY INVESTED AND WOULD SUFFER ECONOMIC AND

7   REPUTATIONAL LOSSES AND TALKED ABOUT HOW GLOVE -- GLOVE SALES

8   ARE SEASONAL.

9        DID YOU SEE THAT TESTIMONY IN THAT DOCUMENT?

10  A.   YES, I DID.

11  Q.   AND WHAT WAS YOUR REACTION TO THAT?

12  A.   MY REACTION WAS PRETTY VISCERAL, THAT THEY WOULD

13  ACTUALLY PRINT AND SAY THAT THEIR INTENTION, THEIR GOAL WAS

14  TO HARM THE REPUTATION AND THE COMPANY, ANOTHER COMPANY.  I

15  JUST WAS FLABBERGASTED.  I'VE NEVER HEARD THAT BEFORE.

16  Q.   AND SO I KNOW YOU'VE HEARD A LOT OF EVIDENCE IN THE CASE

17  ABOUT STATEMENTS ABOUT COPYING AND SO ON.

18        DID SEIRUS COPY COLUMBIA?

19  A.   ABSOLUTELY NOT.

20        MR. MARCHESE:  THANK YOU.  NOTHING FURTHER, YOUR

21  HONOR.

22        THE COURT:  CROSS-EXAMINE.

23                    CROSS-EXAMINATION

24  BY MR. ALDRICH:

25  Q.   GOOD AFTERNOON, MR. CAREY.

COMPUTER-AIDED TRANSCRIPTION

1406

1    A.    GOOD AFTERNOON.

2    Q.    YOU MENTIONED THAT I THINK YOUR COLLEGE DEGREE WAS IN

3    BIOLOGY; IS THAT RIGHT?

4    A.    YES.

5    Q.    YOU DIDN'T TAKE CLASSES IN DESIGN, LIKE FABRIC DESIGN,

6    PRODUCT DESIGN?

7    A.    NO.

8    Q.    THAT'S SOMETHING THAT YOU LEARNED LATER AFTER YOUR

9    COLLEGE CAREER WAS OVER; CORRECT?

10   A.    YES.

11   Q.    AND YET, YOU MANAGED TO OBTAIN SEVERAL PATENTS IN THE

12   AREA OF CLOTHING; RIGHT?

13   A.    YES.

14   Q.    YOU'RE NOT A MEMBER OF ANY TRADE ORGANIZATIONS THAT

15   RELATE TO THE DESIGN OF CLOTHING; RIGHT?

16   A.    NO.

17   Q.    AND YOU'VE NEVER PUBLISHED ANY PAPERS RELATING TO

18   CLOTHING DESIGN?

19   A.    NO.

20   Q.    WHEN YOU HIRE PEOPLE AT SEIRUS, WHAT LEVEL OF SKILL DO

21   YOU HAVE AS YOUR SORT OF MINIMUM REQUIREMENT FOR PEOPLE THAT

22   ARE GOING TO WORK ON DESIGNING DIFFERENT TYPES OF CLOTHING?

23   A.    IT DEPENDS ON WHAT YOU'RE ASKING SPECIFICALLY, WHAT

24   POSITION THEY ARE IN.

25   Q.    WHAT LEVEL OF EXPERIENCE DO PEOPLE AT SEIRUS HAVE WITH

1    RESPECT TO CLOTHING AND ACCESSORIES?

2    A.    AGAIN, IT DEPENDS ON WHO YOU'RE TALKING ABOUT

3    SPECIFICALLY.

4    Q.    DO YOU HAVE ANY GENERAL KNOWLEDGE?

5    A.    PARDON ME?

6    Q.    DO YOU HAVE ANY GENERAL KNOWLEDGE ABOUT WHAT EXPERIENCE

7    LEVEL YOUR EMPLOYEES HAVE WHO DESIGN CLOTHING?

8    A.    YES.   SOME HAVE VERY HIGH LEVELS.

9    Q.    AND SOME HAVE?

10   A.    I'M NOT THE ONE WHO HIRES THEM, SO I WOULD NOT WANT TO

11   OPINE ON THAT.

12   Q.    OKAY.   YOU DON'T RECALL THAT AT YOUR DEPOSITION I ASKED

13   YOU ACTUALLY THE EXACT SAME QUESTION -- BECAUSE I'M ACTUALLY

14   READING FROM THE TRANSCRIPT HERE -- AND YOUR ANSWER IS SOME

15   HAVE ZERO.

16          DO YOU REMEMBER THAT?

17   A.    NO, I DIDN'T REMEMBER THAT.

18   Q.    OKAY.   YOUR ANSWER WAS SOME HAVE ZERO.   SOME HAVE BEEN

19   FORMALLY TRAINED AND SOME ARE IN TRAINING.

20          DOES THAT SOUND LIKE -- DO YOU AGREE WITH THAT?

21   A.    SURE.

22   Q.    WHY DOES SEIRUS HIRE PEOPLE THAT HAVE ZERO EXPERIENCE IN

23   CLOTHING DESIGN AND ACCESSORIES?

24   A.    SAME REASON YOU HIRE ANYBODY.   YOU WANT TO GIVE THEM AN

25   OPPORTUNITY TO EXCEL.

1408

1    Q.    SOME PEOPLE HAVE INFORMATION THAT IS VALUABLE,

2    INDEPENDENT OF THEIR EDUCATIONAL BACKGROUND; CORRECT?

3    A.    I WOULD AGREE WITH THAT.

4    Q.    MR. BLACKFORD IS ONE OF THOSE PEOPLE, ISN'T HE?

5    A.    I COULDN'T ANSWER THAT QUESTION FOR YOU.

6    Q.    WELL, YOU HEARD HIS EDUCATIONAL BACKGROUND; RIGHT?

7    A.    PARDON ME?

8    Q.    YOU HEARD HIS EDUCATIONAL BACKGROUND?

9    A.    I DON'T RECALL WHAT IT IS.

10   Q.    OKAY.  I THINK HE SAID A BACHELOR'S DEGREE IN BUSINESS,

11   SOMETHING LIKE THAT.  BUT HE'S ONE OF THOSE PEOPLE THAT HAS

12   EXPERIENCE IN CLOTHING DESIGN THAT'S VALUABLE, INDEPENDENT OF

13   HIS EDUCATIONAL BACKGROUND; RIGHT?

14   A.    I COULDN'T -- I COULDN'T GIVE YOU AN OPINION ON THAT.

15   Q.    OKAY.  NOW, YOU HAD TALKED ABOUT THE THERMALUX GLOVE;

16   RIGHT?

17   A.    YES.

18   Q.    AND NOW, TELL ME, DURING THE DISCOVERY PERIOD IN THIS

19   CASE, THAT PERIOD LASTED A COUPLE YEARS; RIGHT?

20   A.    I'M NOT AN ATTORNEY.  I CAN'T TELL YOU WHAT THAT PERIOD

21   WAS.

22   Q.    BUT THERE WAS A PERIOD OF TIME OF WHEN YOU GOT SERVED,

23   AND MAYBE A YEAR AND A HALF AGO, WHEN YOU GUYS WRANGLED UP

24   ALL THE DOCUMENTS YOU COULD, AND ALL THE EVIDENCE YOU COULD

25   THAT YOU WERE GOING TO USE IN THIS CASE; CORRECT?

1409

1    A.    AGAIN, I COULDN'T TELL YOU THE PERIOD, BUT WE DID THAT

2    PROCESS.

3    Q.    YOU DID THAT THOROUGHLY AND EXTENSIVELY; RIGHT?

4    A.    TO THE BEST OF OUR ABILITIES, YES.

5    Q.    WOULD IT SURPRISE YOU TO LEARN THAT YOU PRODUCED ROUGHLY

6    65,000 PAGES' WORTH OF DOCUMENTS?

7    A.    YEAH, THAT WOULD SURPRISE ME.

8    Q.    THAT WOULD SURPRISE YOU?

9    A.    WELL, I MEAN, I DIDN'T KNOW THAT MANY DOCUMENTS, YEAH,

10   THAT SURPRISES ME.  THAT'S A LOT OF PAPER.

11   Q.    YEAH.  IT'S SOMEWHERE BETWEEN 60 AND 65 THOUSAND PAGES

12   WORTH OF DOCUMENTS THAT SEIRUS TURNED OVER TO OPPOSING

13   COUNSEL AS PART OF THE DISCOVERY PROCESS IN THE CASE.

14   A.    OKAY.

15   Q.    AND ARE YOU AWARE THAT ACTUALLY SOME OF THE ATTORNEYS

16   HAD TO GO BACK LOOKING AT OLD BOXES OF STUFF, DUSTED OFF ON

17   SHELVES LOOKING FOR OLD RECORDS?

18   A.    I WASN'T AWARE.

19   Q.    YOU WEREN'T AWARE OF THAT?

20   A.    I'M NOT SURPRISED.  I MEAN, DISCOVERY IS DISCOVERY.

21   Q.    DID YOU GUYS HAVE LIKE A STORAGE AREA WHERE YOU KEEP OLD

22   RECORDS AND DOCUMENTS?

23   A.    YES.

24   Q.    WHAT IS THAT STORAGE AREA?  IS IT --

25   A.    I COULDN'T TELL YOU.

COMPUTER-AIDED TRANSCRIPTION

1410

1    Q.    OKAY.  BUT YOU HAVE SOME ARCHIVES, RIGHT, WHERE YOU KEEP

2    ALL KINDS OF OLD DOCUMENTS?

3    A.    IN MANY SPOTS I'M SURE.

4    Q.    OKAY.  AND ATTORNEYS WENT LOOKING BACK THROUGH AS MANY

5    OLD DOCUMENTS AS THEY COULD TO TRY TO FIND ANYTHING THAT YOU

6    GUYS COULD PRODUCE THAT WOULD SUPPORT YOUR CASE; RIGHT?

7    A.    I DON'T HAVE KNOWLEDGE OF THAT, BUT I WOULD HOPE THEY

8    DID.

9    Q.    YOU WOULD CERTAINLY HOPE THAT YOUR ATTORNEYS DID

10   EVERYTHING THEY COULD; RIGHT?

11   A.    YEAH.

12   Q.    AND YOU HAD BEEN TESTIFYING HERE, IF I UNDERSTAND

13   CORRECTLY, ABOUT THE THERMALUX GLOVE; RIGHT?

14   A.    YES.

15   Q.    AND YOU HAD SAID THERE WAS A VERSION OF IT THAT YOU SOLD

16   THAT WAS I THINK INSIDE OUT; IS THAT RIGHT?

17   A.    NO.  THAT'S NOT WHAT I SAID.

18   Q.    CAN YOU EXPLAIN.  BECAUSE I MISSED IT.

19   A.    YEAH.  SO IN THE EARLY VERSIONS, THAT WAS -- THE LUREX

20   WAS LACED THROUGH WITH THE THERMEX, AND SO THERE WAS AS MUCH

21   AGAINST YOUR SKIN AS THERE WAS NOT AGAINST YOUR SKIN.

22   Q.    AND THEN THE LATER VERSION, WHAT HAPPENED TO THE LATER

23   VERSION THAT WE SEE UP THERE AT YOUR TABLE NOW?

24   A.    YEAH.  THEN WE LEARNED OF A PROCESS CALLED PLATING, I

25   THINK IT'S CALLED, WHERE THEY COULD KEEP ONE FIBER CLOSER TO

1411

1    THE SURFACE AND ANOTHER FIBER MORE AWAY FROM THE SURFACE.

2    Q.   AND THE OLDER VERSION THAT YOU'RE TALKING ABOUT, DID YOU

3    EVER SELL THAT?

4    A.   YES.

5    Q.   WHEN DID YOU SELL THAT?

6    A.   '91 THROUGH -- I'M GOING TO GUESS, I DON'T KNOW,

7    PROBABLY -- UNTIL WE BROUGHT OUT THIS VERSION HERE, WHICH I

8    THINK WAS '94, OR SOMETHING LIKE THAT.  I'M NOT SURE.

9    Q.   WOULD IT SURPRISE YOU TO LEARN THAT NOT A SINGLE PIECE

10   OF EVIDENCE WAS PRODUCED REGARDING THAT OLDER VERSION OF THE

11   GLOVE?

12   A.   NO.  IT WOULDN'T SURPRISE ME.

13   Q.   WHY IS THAT?

14   A.   WE STOPPED SELLING IT IN '93.  THAT'S A LONG TIME AGO.

15   Q.   BUT YOU KNOW YOU GUYS TURNED OVER CATALOGS DATING BACK A

16   LONG WAYS IN THIS CASE; RIGHT?

17   A.   CATALOGS, YES.  BUT YOU SAID PRODUCT.

18   Q.   I'M SORRY.  THERE IS ZERO EVIDENCE OF THAT OLDER

19   THERMALUX GLOVE YOU'RE TALKING ABOUT THAT WAS EVER PRODUCED

20   IN THIS CASE.  ARE YOU AWARE OF THAT?

21   A.   NO.  I WOULD BE SURPRISED AT THAT.

22   Q.   PARDON?

23   A.   I WOULD BE SURPRISED THAT YOU DIDN'T SEE A SILVER

24   THERMALUX GLOVE IN OUR 1991 CATALOG.

25        MR. ALDRICH:  OKAY.  CAN WE PULL UP DDX-119.

COMPUTER-AIDED TRANSCRIPTION

1412

1    ANY OBJECTION?

2    MR. MARCHESE:  NO OBJECTION.

3    THE COURT:  RECEIVED.

4    (TRIAL EXHIBIT 119 RECEIVED IN EVIDENCE.)

5    Q.   BY MR. ALDRICH:  DO YOU REMEMBER SEEING THIS SHOWN TO

6    THE JURY DURING OPENING STATEMENTS?

7    A.   SURE.

8    Q.   DO YOU THINK THAT'S A FAIR CHARACTERIZATION OF HOW THE

9    TWO PRODUCTS LOOK?

10   A.   I KNOW IT'S A FAIR REPRESENTATION OF OUR PRODUCT, YES.

11   Q.   LET ME GO AHEAD AND HAND YOU THE --

12   MR. ALDRICH:  MAY I APPROACH, YOUR HONOR?

13   THE COURT:  YES.

14   Q.   BY MR. ALDRICH:  YOU THINK THAT PHOTOGRAPH IS A FAIR

15   REPRESENTATION OF THE DIFFERENCES BETWEEN THE PRODUCTS?

16   A.   SURE.

17   Q.   ALL RIGHT.

18   MR. ALDRICH:  MAY I HAND THEM OFF TO THE JURY, YOUR

19   HONOR?

20   THE COURT:  YES.

21   Q.   BY MR. ALDRICH:  NOW, SEIRUS BECAME AWARE OF THE DESIGN

22   PATENT IN APRIL 2013; CORRECT?

23   A.   SEIRUS WAS SENT AN E-MAIL THAT HAD THAT DESIGN PATENT

24   ATTACHED TO IT.

25   Q.   AND SEIRUS DIDN'T DO ANY ANALYSIS WITH RESPECT TO THE

1413

1    DESIGN PATENT OR THE HEATWAVE PRODUCTS BETWEEN APRIL AND

2    DECEMBER 2013; CORRECT?

3    A.   CORRECT.

4    Q.   WHY IS THAT?

5    A.   WE DIDN'T KNOW ABOUT IT.

6    Q.   YOU DIDN'T KNOW ABOUT WHAT?

7    A.   THEIR DESIGN PATENT.

8    Q.   WELL, YOU LEARNED ABOUT THE DESIGN PATENT IN APRIL OF

9    2013; CORRECT?

10   A.   THERE WAS AN E-MAIL SENT, BUT I HAVE NO KNOWLEDGE OF THE

11   DESIGN PATENT IN APRIL OF '13.

12        MR. ALDRICH:  OKAY.  LET'S -- I'D LIKE TO INTRODUCE

13   EXHIBIT 731.  LET ME MAKE SURE I HAVE THAT RIGHT.  YES, 731,

14   PLEASE.

15        MR. MARCHESE:  OBJECTION.  RELEVANCE, YOUR HONOR.

16   AND PREJUDICIAL.

17        THE COURT:  HANG ON A SECOND.  HE'S JUST OFFERING

18   THIS RIGHT NOW FOR IDENTIFICATION PURPOSES.  THE WITNESS CAN

19   TAKE A LOOK AT IT.

20        THE WITNESS:  OKAY.

21   Q.   BY MR. ALDRICH:  THIS IS A LETTER THAT YOU WERE SENT,

22   MR. CAREY?

23   A.   YES.

24   Q.   AND THE LETTER IS DATED DECEMBER 4, 2013?

25   A.   YES.

COMPUTER-AIDED TRANSCRIPTION

1414

1    Q.    AND THIS IS THE DATE THAT YOU WERE SERVED PAPERS

2    REGARDING THE ALLEGATIONS OF INFRINGEMENT OF THE DESIGN

3    PATENT IN THIS CASE; IS THAT CORRECT?

4    A.    YES.

5    Q.    AND IT'S ALSO THE DATE THAT YOU WERE NOTIFIED BY

6    COLUMBIA ABOUT THE UTILITY PATENT IN THE CASE; CORRECT?

7    A.    MULTIPLE UTILITY PATENTS.

8    Q.    OKAY.  AND YOUR TESTIMONY IS THAT BEFORE THIS DATE,

9    NOBODY HAD ANY IDEA ABOUT -- NOBODY AT COLUMBIA -- AT SEIRUS

10   HAD ANY IDEA ABOUT THE UTILITY PATENT; RIGHT?

11   A.    THAT'S NOT WHAT I SAID.

12   Q.    OH, YOU DID HAVE AN IDEA ABOUT THE UTILITY PATENT?

13   A.    I SAID I DIDN'T HAVE AN IDEA.  I SAID WE RECEIVED AN

14   E-MAIL THAT HAD THE UTILITY -- THE UTILITY, NO.  I'M SORRY.

15   I THOUGHT YOU MEANT DESIGN PATENT.

16   Q.    I SEE.  SO LET'S BE CLEAR.  ABOUT THE DESIGN PATENT, YOU

17   KNEW ABOUT THE DESIGN PATENT -- SOMEBODY AT SEIRUS KNEW ABOUT

18   THE DESIGN PATENT BACK IN APRIL; CORRECT?

19   A.    SOMEBODY AT SEIRUS HAD RECEIVED AN E-MAIL THAT HAD THE

20   DESIGN PATENT ATTACHED TO IT, YES.

21   Q.    AND THIS IS DECEMBER 4, 2013; CORRECT?

22   A.    CORRECT.

23   Q.    AND MY QUESTION WAS, WAS ANY ANALYSIS DONE WITH RESPECT

24   TO THE DESIGN PATENT AND THE HEATWAVE PRODUCTS PRIOR TO BEING

25   SERVED ON DECEMBER 4, 2013?

1   A.   IN RELATION TO THE PATENTS YOU'RE ASKING ME?

2   Q.   I'M TALKING ABOUT -- I CAN ASK IT AGAIN TO TRY TO BE

3   CLEAR.  ALL I'M ASKING ABOUT IS DESIGN PATENT.

4   A.   CORRECT.

5   Q.   OKAY.  AND MY QUESTION IS, WAS ANY ANALYSIS DONE BY

6   SEIRUS WITH RESPECT TO THE DESIGN PATENT AND THE HEATWAVE

7   PRODUCTS PRIOR TO DECEMBER 4, 2013?

8   A.   NO.

9   Q.   AND WHY IS THAT?

10  A.   NUMBER ONE, NOBODY IN THE EXECUTIVE LEVEL KNEW ABOUT THE

11  DESIGN PATENT.

12          MR. ALDRICH:  I'D LIKE TO INTRODUCE EXHIBIT 505.

13          THE COURT:  YOU HAVE OFFERED 731, I BELIEVE, AND I

14  HAD NOT RULED ON IT.  YOU HAVE NOW LAID A FOUNDATION FOR IT.

15  I'M RESERVING RULING ON 731.  IT MAY BE THAT PORTIONS OF IT

16  ARE ADMISSIBLE AND PORTIONS OF IT ARE NOT.

17          I UNDERSTAND THAT RELEVANCE HAS TO DO WITH THE DATE

18  MORE THAN THE SUBSTANCE.

19          MR. ALDRICH:  CORRECT, YOUR HONOR.

20          THE COURT:  OKAY.  SO THERE MAY BE A WAY THAT YOU

21  CAN REDACT PIECES OF IT THAT ARE NOT RELEVANT TO THAT

22  ISSUE.

23          MR. ALDRICH:  THAT'S FINE, YOUR HONOR.

24          THE COURT:  OKAY.

25          MR. ALDRICH:  ANY OBJECTION TO 505?

1416

1    MR. MARCHESE:  NO OBJECTION, YOUR HONOR.

2    THE COURT:  RECEIVED.

3    (TRIAL EXHIBIT 505 RECEIVED IN EVIDENCE.)

4    MR. ALDRICH:  IF WE CAN TURN TO THE SECOND PAGE.

5  Q.   DO YOU REMEMBER SEEING THIS DOCUMENT, THIS E-MAIL

6  SPECIFICALLY SHOWN TO MS. CHIN WHEN SHE TESTIFIED A COUPLE OF

7  DAYS AGO, MR. CAREY?

8  A.   LET ME READ THIS.

9    MR. MARCHESE:  COUNSEL, DO YOU HAVE A BINDER WITH

10 THE EXHIBITS IN IT?

11   THE WITNESS:  YES, I RECALL THIS.

12 Q.   BY MR. ALDRICH:  THIS IS AN E-MAIL --

13   MR. MARCHESE:  COUNSEL, DO YOU HAVE A BINDER WITH

14 THE EXHIBITS IN THEM?

15   MR. ALDRICH:  NO, I DON'T.

16   MR. MARCHESE:  DO YOU HAVE ONE --

17 Q.   BY MR. ALDRICH:  THIS IS AN E-MAIL THAT WAS SHOWN OR

18 SENT FROM VENTEX TO MORGAN CHIN ON APRIL 4, 2013; CORRECT?

19 A.   YES.  THE ONE THAT SAYS "MEGA-HEAT RX PATENT"?

20 Q.   THAT'S CORRECT.  APRIL 4TH, 2013.

21       AND YOU'LL RECALL THAT IT ATTACHED A COPY OF THE

22 DESIGN PATENT; CORRECT?

23 A.   YES.

24 Q.   AND DO YOU RECALL WHAT HAPPENED AFTER MS. CHIN RECEIVED

25 THAT E-MAIL?

1417

1    A.    YES.

2    Q.    SHE FORWARDED THAT E-MAIL TO MR. MURPHY; CORRECT?

3    A.    YES.

4    Q.    MR. MURPHY IS VICE PRESIDENT; IS THAT CORRECT?

5    A.    YES.

6    Q.    IF I RECALL CORRECTLY, MR. MURPHY IS EMPLOYEE NO. 2; IS

7    THAT RIGHT?

8    A.    YES.

9    Q.    HE'S BEEN WITH THE COMPANY SINCE 1984?

10   A.    YES.

11   Q.    HE'S AN EXECUTIVE WITH THE COMPANY?

12   A.    YES.

13   Q.    YOUR TESTIMONY A FEW MINUTES AGO WAS THAT NONE OF THE

14   EXECUTIVES KNEW ABOUT THE DESIGN PATENT; CORRECT?

15   A.    CORRECT.

16   Q.    BUT MR. MURPHY DID KNOW ABOUT THE DESIGN PATENT;

17   CORRECT?

18   A.    HE HAD RECEIVED THAT E-MAIL.

19   Q.    AND?

20   A.    GENERALLY WHEN WE TALK ABOUT EXECUTIVE, EXCUSE ME, WE

21   TALK ABOUT WENDY, JOE AND MYSELF.  I MEAN, VP IS CONSIDERED

22   EXECUTIVE.  WE JUST DON'T TALK ABOUT IT IN THOSE TERMS.

23   Q.    I SEE.  YOU SAID JOE.  THAT'S JOE EDWARDS; IS THAT

24   RIGHT?

25   A.    THAT'S CORRECT.

COMPUTER-AIDED TRANSCRIPTION

1418

1    Q.    HE'S AN EXECUTIVE?

2    A.    CORRECT.

3    Q.    AND ARE YOU AWARE THAT MR. MURPHY FORWARDED A COPY OF

4    THAT E-MAIL TO MR. EDWARDS?

5    A.    YES, I AM.

6    Q.    AND SO MR. EDWARDS DID HAVE A COPY OF THE DESIGN PATENT,

7    DIDN'T HE?

8    A.    YES, HE DID.

9    Q.    BUT YOUR TESTIMONY WAS THAT NO ANALYSIS WAS DONE BECAUSE

10   NONE OF THE EXECUTIVES HAD A COPY OF THE DESIGN PATENT; ISN'T

11   THAT WHAT YOU JUST SAID?

12   A.    NO.  I SAID NOBODY KNEW ABOUT IT.

13   Q.    NOBODY KNEW ABOUT THE DESIGN PATENT?

14   A.    CORRECT.

15   Q.    MR. MURPHY HAD RECEIVED A COPY AND MR. EDWARDS HAD

16   RECEIVED A COPY, BUT NOBODY KNEW ABOUT IT.  THAT'S YOUR

17   TESTIMONY?

18   A.    THAT NEITHER ONE OF THEM OPENED IT.  THE ONLY ONE WHO

19   OPENED IT --

20   Q.    HOW DO YOU KNOW THAT?

21   A.    BECAUSE I TALKED TO THEM.

22   Q.    WE CAN LET THEM TESTIFY.  WE'LL LET MR. EDWARDS AND

23   MR. MURPHY TESTIFY ABOUT THAT.

24   A.    OKAY.

25            MR. ALDRICH:  CAN WE PULL UP EXHIBIT 114, PLEASE.

COMPUTER-AIDED TRANSCRIPTION

1419

1    OFFER 114.

2    MR. MARCHESE:  NO OBJECTION.

3    THE COURT:  RECEIVED.

4    (TRIAL EXHIBIT 114 RECEIVED IN EVIDENCE.)

5    Q.   BY MR. ALDRICH:  MR. CAREY, HAVE YOU SEEN EXHIBIT 114

6    BEFORE?

7    A.   LET ME REVIEW IT.

8    Q.   OH, SURE.  YEAH.

9    A.   OKAY.  COULD YOU ENLARGE IT SO I CAN SEE THE WHOLE

10   THING, PLEASE.

11   CAN YOU CONTINUE TO SCROLL DOWN, PLEASE.  AND

12   FURTHER.  THANK YOU.

13   I VAGUELY REMEMBER THIS, BUT I CAN'T SPEAK TO IT

14   SPECIFICALLY.

15   Q.   THIS IS AN E-MAIL THAT YOU GOT FROM YOUR PUBLIC

16   RELATIONS, E-MAIL OR MEMO OR SOMETHING LIKE THAT, THAT YOU

17   GOT FROM YOUR PUBLIC RELATIONS PERSON; IS THAT CORRECT?

18   A.   OKAY.

19   Q.   JANUARY 4TH, 2012.  MR. BRYCE, BRYCE & ASSOCIATES?

20   A.   CORRECT.

21   Q.   THAT'S YOUR PR FIRM; CORRECT?

22   A.   CORRECT.

23   Q.   AND HE SENT THIS TO YOU IN 2012; CORRECT?

24   A.   I DON'T SEE -- I DON'T SEE THAT I DID GET IT.  BUT IF

25   THAT'S WHAT HAPPENED.  COULD YOU SHOW ME THE DELIVERY

1420

1    NOTICE.

2    Q.   YOU DON'T REMEMBER TESTIFYING AT YOUR DEPOSITION THAT

3    YOU RECEIVED A COPY OF THIS IN 2012?

4    A.   I DON'T RECALL THIS.

5    Q.   OKAY.  CAN WE GO TO THE SECOND PAGE OF THE DOCUMENT.

6    AND THERE IS A SECTION HERE ABOUT COLUMBIA.

7         DO YOU SEE THAT?

8    A.   YES.  I DO RECALL THIS PART.

9    Q.   JANUARY 6TH, 2012, ATTACHING OR TELLING YOU ABOUT

10   COLUMBIA OMNI-HEAT BASE LAYER; CORRECT?

11   A.   CORRECT.

12   Q.   HAD YOU HEARD OF OMNI-HEAT AT THAT POINT?

13   A.   I SUPPOSE I DID.

14   Q.   HOW DO YOU KNOW YOU HEARD ABOUT OMNI-HEAT BEFORE THEN?

15   A.   I'M IN THE INDUSTRY, AND I'VE HEARD ABOUT IT BEFORE.

16   Q.   AND SO YOU ARE AWARE THAT OMNI-HEAT WAS A REFLECTIVE

17   FABRIC ON THE INSIDE OF CLOTHING ON A BASE MATERIAL; IS THAT

18   RIGHT?

19   A.   NO.  I JUST KNEW THAT IT HAD SHINY STUFF ON IT.

20   Q.   OKAY.  YOU'VE -- LET'S GO TO 705.

21        YOU'VE SEEN THIS DOCUMENT?  WE TALKED ABOUT IT THE

22   OTHER DAY.

23   A.   YES.

24   Q.   AND WE WERE TALKING ABOUT THE HEAT TOUCH TORCHE GLOVE.

25   DO YOU REMEMBER THAT?

1421

1    A.    YES.

2    Q.    AND CAN WE GO TO THE SECOND PAGE.  SO THE HEAT TOUCH

3    TORCHE GLOVE WAS LAUNCHED IN THE -- CAN WE ZOOM IN ON THE TOP

4    OF THE PAGE SO I CAN SEE THE DATES.  IT'S ITEM -- IT'S LIKE

5    THE SIXTH OR SEVENTH ITEM DOWN ON THE LIST.

6          DO YOU SEE THAT?

7    A.    YES.

8    Q.    IT'S ITEM 1087?

9    A.    YES.

10   Q.    AND SO THAT WAS LAUNCHED DURING THE 2015/2016 FISCAL

11   YEAR?

12   A.    YES.

13   Q.    AND DURING THAT YEAR, YOU SOLD A TOTAL OF ███ OF THOSE

14   GLOVES?

15   A.    YES.

16   Q.    AND TWO ABOVE THAT IS THE HEATWAVE ZENITH GLOVE.  DO YOU

17   SEE THAT?

18   A.    YES.

19   Q.    YOU SOLD ███ OF THOSE GLOVES?

20   A.    YES.

21   Q.    CAN WE GO TO -- SCROLL DOWN THE PAGE.  THAT YEAR YOU

22   SOLD A TOTAL OF ███ GLOVES?

23   A.    THOSE ARE TOTAL GLOVES.

24   Q.    WELL, TOTAL OF THE PRODUCTS THAT YOUR COUNSEL HAS

25   IDENTIFIED FOR US AS BEING THE HEATWAVE LINE OF PRODUCTS.

1422

1    A.    THOSE AREN'T ALL GLOVES.

2    Q.    OKAY.

3    A.    THEY ARE OTHER THINGS BESIDES GLOVES ON THERE.

4    Q.    OKAY.  SO YOU SOLD A TOTAL OF ████████ HEATWAVE PRODUCTS;

5    CORRECT?

6    A.    CORRECT.

7    Q.    BUT THAT YEAR YOU SOLD A TOTAL OF ████ HEATWAVE TOUCH

8    TORCHE GLOVES; IS THAT RIGHT?

9    A.    YES.

10   Q.    AND YOU SOLD A TOTAL OF, IT LOOKS LIKE, ████████ ████████

11   ████████ ████████ DOLLARS' WORTH OF HEATWAVE PRODUCTS THAT

12   YEAR?

13   A.    YES.

14   Q.    IS THAT CORRECT?

15   A.    YES.

16   Q.    CAN WE GO BACK UP TO THE HEATWAVE TOUCH TORCHE.  YOU

17   SOLD A TOTAL OF ███████ WORTH OF THE HEATWAVE TOUCH TORCHE

18   GLOVES?

19   A.    YES.

20   Q.    OKAY.  COULD WE GO TO THE FOLLOWING YEAR.

21         AND THIS IS THE 2016/2017 YEAR?

22   A.    YES.

23   Q.    DO YOU SEE THAT?  THAT YEAR, YOU SOLD A TOTAL OF ███ OF

24   THOSE HEAT TOUCH TORCHE GLOVES?

25   A.    YES.

1423

1   Q.   FOR A TOTAL OF ████?

2   A.   YES.

3   Q.   COULD WE GO DOWN TO THE BOTTOM OF THE PAGE.  THAT'S

4   ACTUALLY BEFORE YOU SCROLL -- SORRY.

5           SO THAT'S A TOTAL OF ABOUT ████ IN --

6   A.   YES.

7   Q.   -- HEAT TOUCH TORCHE GLOVES SINCE ITS INCEPTION; IS THAT

8   RIGHT?

9   A.   YES.

10  Q.   AND NONE OF THE OTHER HEAT TORCHE GLOVES -- I THINK YOU

11  MENTIONED THAT YOU HAVE SOME OTHER GLOVES THAT ALSO HAVE

12  THESE BATTERY PACKS; IS THAT RIGHT?

13  A.   YES.

14  Q.   AND NONE OF THOSE HAVE HEATWAVE IN THEM; RIGHT?

15  A.   CORRECT.

16  Q.   SO THIS IS THE ONLY ONE THAT'S RELEVANT TO THE ISSUE.

17  IT'S THE ONLY ONE THAT HAS, YOU KNOW, THIS COMPLEX TECHNOLOGY

18  YOU'RE TALKING ABOUT, WITH A BATTERY PACK IN IT.  THE REST OF

19  THE GLOVES THAT HAVE BEEN ACCUSED IN THIS CASE ARE MORE

20  SIMPLE SKI GLOVES; CORRECT?

21  A.   NO.

22  Q.   OH, SORRY.  SKI GLOVES, HATS, SOCKS, BEANIES, ET CETERA;

23  CORRECT?

24  A.   YES.  BUT NOT SIMPLE GLOVES.

25  Q.   OKAY.  MUCH MORE SIMPLE THAN THE HEAT TOUCH TORCHE

1424

1   GLOVE; CORRECT?

2   A.   I WOULD NOT AGREE WITH THAT.

3   Q.   OKAY.  THAT'S FINE.  I'LL LET YOU GO WITH THAT.

4        BUT TOTAL FOR THE HEAT TOUCH TORCHE GLOVES, WE'RE

5   TALKING ABOUT ███████; CORRECT?

6   A.   YES.

7   Q.   OKAY.  AND IF WE SCROLL DOWN TO THE BOTTOM OF THIS PAGE,

8   TOTAL OF ████  ████████ DOLLARS IN HEATWAVE SALES FOR THE

9   2016/2017 SEASON?

10  A.   YES.

11  Q.   AND A GRAND TOTAL OF ████████ HEATWAVE PRODUCTS;

12  CORRECT?

13  A.   YES.

14  Q.   WE WERE -- DO YOU REMEMBER DURING YOUR DEPOSITION, WE

15  HAD TALKED ABOUT WHAT IT WOULD TAKE TO NOT INFRINGE THE

16  UTILITY PATENT IN THIS CASE?

17  A.   I DON'T RECALL.

18  Q.   YOU DON'T REMEMBER HAVING A CONVERSATION ABOUT THAT WHEN

19  WE TALKED ABOUT A YEAR AND A HALF AGO AT YOUR DEPOSITION?

20  A.   YEAR AND A HALF AGO, NO.  SORRY.

21  Q.   THAT'S FINE.

22  A.   MY MEMORY IS GOOD, BUT NOT THAT GOOD.

23  Q.   CAN WE PULL UP MR. CAREY'S DEPOSITION.  PAGE 210.

24       ANY OBJECTION TO PUBLISHING TO THE JURY?

25       MR. MARCHESE:  UNLESS IT'S FOR IMPEACHMENT, YES.

1425

1    Q.    BY MR. ALDRICH:    OKAY.    I ASKED YOU -- DO YOU SEE AT THE

2    TOP OF THE PAGE THERE --

3    A.    YES.

4    Q.    -- I ASKED YOU, ARE YOU AWARE THAT THE CLAIMS OF THE

5    PATENTS IN SUIT -- THE UTILITY PATENTS IN SUIT ALL REQUIRE

6    THAT THE REFLECTIVE SURFACE BE ON THE INNERMOST SURFACE OF

7    THE PIECE OF CLOTHING?

8              MR. MARCHESE:    OBJECTION.    THIS IS THE SAME ISSUE,

9    YOUR HONOR, AS BEFORE; READING THE TESTIMONY.

10   Q.    BY MR. ALDRICH:    DO YOU SEE THAT?

11             THE COURT:    I'M NOT QUITE SURE I UNDERSTAND YOUR

12   OBJECTION.

13             MR. MARCHESE:    EARLIER I HAD NOT PUBLISHED SOME

14   DEPOSITION TESTIMONY TO THE JURY, AND THERE WAS AN OBJECTION

15   TO READING THE Q & A FROM IT.    AND THAT OBJECTION WAS

16   SUSTAINED.

17             THE COURT:    I DON'T REMEMBER THE CONTEXT OF THAT.

18   IF YOU'RE ASKING -- I KNOW THERE WAS AN ISSUE ABOUT YOU

19   REFRESHING SOMEBODY'S MEMORY.

20             MR. MARCHESE:    THAT WAS THE ISSUE, CORRECT, YOUR

21   HONOR.

22             THE COURT:    I DON'T KNOW THAT'S WHAT HE IS DOING

23   HERE, IS REFRESHING SOMEBODY'S MEMORY OR IMPEACHING HIM.    I

24   DON'T KNOW.    BUT THE ANALYSIS IS DIFFERENT, DEPENDING UPON

25   WHAT I THINK HE'S DOING.

1426

1    MR. MARCHESE:  UNDERSTOOD.

2    Q.    BY MR. ALDRICH:  DO YOU REMEMBER I HAD ASKED YOU THAT

3    QUESTION, MR. CAREY?

4    A.    NO, I DON'T.

5    Q.    OKAY.  LET'S GO TO THE NEXT PAGE, 211.

6    A.    OKAY.

7    Q.    SO DOES THIS REFRESH YOUR RECOLLECTION THAT I TOLD YOU

8    THAT THE UTILITY PATENTS IN THIS CASE, THE ASSERTED CLAIMS

9    ALL REQUIRE THAT THE REFLECTIVE SURFACE BE ON THE INNERMOST

10   SURFACE OF THE GARMENT?

11           DO YOU REMEMBER THAT?

12   A.    NO.  BUT I SEE WHAT YOU WROTE AND WHAT I SAID.

13           CAN I GO BACK TO THE TOP AGAIN?

14   Q.    YOU WANT TO GO BACK TO THE PREVIOUS PAGE?

15   A.    YEAH, TO YOUR QUESTION.

16   Q.    OKAY.  I APOLOGIZE TO THE JURY.  IT'S ALL DONE IN SECRET

17   HERE.

18           THE COURT:  MEMBERS OF THE JURY, WHY DON'T WE -- YOU

19   HAD A BREAK, BUT WE HAVE NOT; SO WE NEED ONE.

20           LET'S TAKE TEN MINUTES SO THAT WE CAN STRETCH OUR

21   LEGS.

22           WE'LL SEE YOU IN TEN MINUTES.  AND I WILL GIVE

23   MR. CAREY AN OPPORTUNITY TO READ THE TRANSCRIPT.

24           (RECESS, 3:40 P.M. TO 3:52 P.M.)

25           THE COURT:  GOOD AFTERNOON.  SO WRITE THIS DOWN.

1427

1    EXHIBIT 184, LOOKS LIKE, HAS NOT YET BEEN RECEIVED

2    BY THE COURT.  I DON'T EVEN KNOW WHAT IT IS.  BUT BEFORE WE

3    LEAVE TODAY, WE'LL GET IT TAKEN CARE OF.

4    MR. ALDRICH:  I KNOW WHAT IT IS.

5    THE COURT:  OKAY.  GO AHEAD AND GET THE JURY IN.

6    (JURY PRESENT, 3:52 P.M.)

7    THE COURT:  BE SEATED.

8    THERE IS A QUESTION FROM THE JURY REGARDING THE

9    KOREAN PATENT, WHY IT WAS NOT OFFERED, AND THE U.S. PATENT'S

10   INVALIDITY.

11   IT IS SIMPLY IRRELEVANT TO THIS CASE.  YOU ARE NOT

12   TO CONSIDER IT AT ALL.  THANK YOU.

13   YOU MAY PROCEED.

14   Q.   BY MR. ALDRICH:  MR. CAREY, YOU WERE READING PAGE 210,

15   WHEN WE TOOK A BREAK, OF YOUR DEPOSITION TRANSCRIPT.  AND IF

16   I COULD ASK YOU TO READ PAGE 210 AND 211.

17   A.   (WITNESS REVIEWS DOCUMENT.)

18   I'M FINISHED WITH -10.  OKAY.

19   Q.   DO YOU REMEMBER THIS IS ABOUT A YEAR AND A HALF AGO THAT

20   YOU AND I HAD THIS CONVERSATION; CORRECT?

21   A.   CORRECT.

22   Q.   AND IN ESSENCE, I TOLD YOU THAT SEIRUS WAS ONLY BEING

23   ACCUSED WITH RESPECT TO ITS HEATWAVE PRODUCTS OF INFRINGING

24   THE UTILITY PATENT WHERE THE SHINY SIDE OF THE FABRIC WAS

25   FACING THE USER IN SOME PART OF THE PRODUCT; CORRECT?

1428

```
 1    A.   I THINK THAT'S WHAT THAT SAYS, YES.

 2    Q.   THAT'S ESSENTIALLY WHAT I TOLD YOU; RIGHT?

 3    A.   YES.  IN THIS, YES.

 4    Q.   OKAY.  AND DID SEIRUS THEN IMMEDIATELY CHANGE ITS DESIGN

 5    SO THAT IT WAS ONLY PRODUCING PRODUCTS THAT HAD THE SHINY

 6    SIDE FACING OUT?

 7    A.   NO.

 8    Q.   WHY IS THAT?

 9    A.   BECAUSE WE DIDN'T THINK THAT THIS PATENT WAS VALID.

10    Q.   IN FACT, THERE IS A BENEFIT TO HAVING THE SHINY SIDE

11    FACING IN, ISN'T THERE?

12    A.   WHAT DO YOU MEAN BY "IN"?

13    Q.   FACING TOWARD THE USER.

14    A.   FACING TOWARD THE USER?

15    Q.   YEAH.

16    A.   FOR SOME PEOPLE.

17    Q.   IS THERE A BENEFIT TO HAVING IT FACING AWAY FROM THE

18    USER?

19    A.   FOR SOME PEOPLE.

20    Q.   IS THERE A BENEFIT TO HAVING IT FACING AWAY FROM THE

21    USER IN THE ENTIRE GLOVE SO THAT YOU CAN'T SEE THE FABRIC,

22    YOU CAN'T SEE THE REFLECTIVE SIDE AT ALL?

23    A.   YES.  FOR SOME PEOPLE.

24    Q.   BUT YOU HAVEN'T ACTUALLY SOLD ANY PRODUCTS LIKE THAT;

25    CORRECT?
```

1429

1    A.    THAT'S NOT CORRECT.

2    Q.    WHEN DID YOU START SELLING THOSE PRODUCTS?

3    A.    WELL, WE HAD THEM IN THE LINE VERY EARLY ON; I COULDN'T

4    TELL YOU.  AND MORE AND MORE AS THE YEARS HAVE GONE BY.

5    Q.    YOU HAVEN'T -- YOU DIDN'T SEND US ANY OF THOSE PRODUCTS

6    DURING DISCOVERY, DID YOU?

7    A.    I DON'T KNOW WHAT WE SENT YOU.

8    Q.    OKAY.  WITH RESPECT TO THE GLOVES, DO YOU HAVE ANY

9    GLOVES THAT HAVE THE SHINY SIDES SUCH THAT IT -- AND I'M NOT

10   TALKING ABOUT THE SILVER GLOVE LINER.  WE'VE ALREADY TALKED

11   ABOUT THAT; CORRECT?

12   A.    YES.

13   Q.    OTHER THAN THE SILVER GLOVE LINER, DO YOU HAVE ANY

14   GLOVES WHERE THE SHINY SIDE ONLY FACES AWAY FROM THE USER?

15   A.    YES.

16   Q.    WHEN DID YOU START SELLING THOSE?

17   A.    IN THIS CURRENT SEASON COMING UP.

18   Q.    WHEN YOU SAY "THIS CURRENT SEASON," YOU'RE TALKING

19   2017/2018?

20   A.    CORRECT.

21   Q.    DOES ANY USER OUT THERE ACTUALLY HAVE ONE YET?

22   A.    I DON'T KNOW.

23   Q.    OKAY.  SO IT'S ENTIRELY POSSIBLE THEY ARE NOT EVEN FOR

24   SALE YET; IS THAT RIGHT?

25   A.    NO.  THEY ARE FOR SALE.  WHAT DO YOU MEAN BY "SALE"?  OF

COMPUTER-AIDED TRANSCRIPTION

1430

1    COURSE THEY ARE FOR SALE.

2    Q.    YOU STARTED TO SHIP THEM TO THE STORES?

3    A.    I COULDN'T -- I WOULDN'T KNOW EXACTLY IF WE HAVE OR

4    NOT.

5    Q.    YOU DON'T KNOW WHETHER YOU'VE SHIPPED THOSE GLOVES TO

6    STORES OR NOT; RIGHT?

7    A.    CORRECT.

8    Q.    OKAY.  SO YOU DON'T -- YOU DON'T KNOW IF ANYBODY IN THE

9    WORLD, OTHER THAN SEIRUS, HAS ACTUALLY SEEN ONE OF THESE NEW

10   GLOVES THAT YOU HAVE THAT HAS THE SHINY SIDE ONLY FACING AWAY

11   FROM THE USER?

12   A.    THAT'S NOT CORRECT.

13   Q.    OKAY.  JUST CLARIFY THEN.

14   A.    WELL, BECAUSE OUR SELLING SEASON STARTS IN NOVEMBER.

15   Q.    OKAY.

16   A.    AND SO WE HAVE SAMPLES THAT WE MAKE UP, SO THAT WE

17   GET -- WE GIVE THE BUYERS, WE GIVE TO STORE PERSONNEL WHO

18   WANT THEM TO KNOW ABOUT THE PRODUCT.  IT'S -- THEY ARE

19   PROMOTIONAL PRODUCTS THAT WE GIVE AWAY.  THOSE GLOVES ARE OUT

20   IN THE MARKETPLACE.

21   Q.    OKAY.  BUT NO END USERS; CORRECT?

22   A.    WE HAVE COMMITMENTS, BUT WE MAY OR MAY NOT HAVE SHIPPED

23   THEM YET.  I DON'T KNOW.

24   Q.    OKAY.  SO THIS SUIT HAD BEEN GOING ON FOR ABOUT THREE

25   YEARS AT THAT POINT; IS THAT CORRECT?

COMPUTER-AIDED TRANSCRIPTION

1431

1    A.    A LONG TIME.

2    Q.    IN FACT, IT'S BEEN GOING ON ALMOST FOUR YEARS?

3    A.    A LOT LONGER THAN I WOULD LIKE.

4    Q.    ALMOST FOUR YEARS SINCE DECEMBER OF 2013 WHEN YOU WERE

5    FIRST SERVED PAPERS IN THE LAWSUIT AND --

6    A.    THAT'S TRUE.

7    Q.    OKAY.  AND IT'S BEEN FOUR AND A HALF YEARS SINCE YOU

8    WERE MADE AWARE OF THE DESIGN PATENT; CORRECT?  "YOU" BEING

9    SEIRUS.

10   A.    IT WAS SENT TO SEIRUS, CORRECT.

11   Q.    OKAY.  AND FOR FOUR YEARS, YOU CONTINUED TO SELL YOUR

12   PRODUCTS WITH THE REFLECTIVE SIDE VISIBLE TO THE USER ON THE

13   GLOVES; CORRECT?

14        MR. MARCHESE:  OBJECTION.  RELEVANCE, YOUR HONOR.

15        THE COURT:  OVERRULED.

16        THE WITNESS:  YES.  VISIBLE TO THE USER, YES.  LIKE

17   I SAID, THERE IS -- THE GLOVE LINERS ARE ALWAYS LIKE THAT.

18   Q.    BY MR. ALDRICH:  RIGHT.  RIGHT.  THE GLOVE LINERS?

19   A.    YEAH.

20   Q.    THE USER CAN SEE THE TECHNOLOGY; RIGHT?  SO EVEN IF YOU

21   HAVE THE REFLECTIVE SIDE FACING AWAY FROM THE USER, THE USER

22   CAN SEE THE TECHNOLOGY; RIGHT?

23   A.    ONLY IF THEY GO UP AND TURN IT INSIDE OUT AND TRY TO

24   FIND IT.

25   Q.    NO.  ON THE SILVER GLOVE LINERS.  YOU HAVE SILVER GLOVE

COMPUTER-AIDED TRANSCRIPTION

1432

1    LINERS; RIGHT?

2    A.    CORRECT.

3    Q.    AND YOU HAVE BLACK GLOVE LINERS; RIGHT?

4    A.    CORRECT.

5    Q.    AND ON THE SILVER GLOVE LINERS, YOU HAVE THE SILVER SIDE

6    FACING AWAY, AND THE USERS CAN SEE, THEY CAN VISUALLY SEE THE

7    TECHNOLOGY; CORRECT?

8    A.    THEY CAN SEE THE SILVER, YES.

9    Q.    YEAH.  AND ON THE BLACK GLOVE LINERS, THEY CAN SEE THE

10   TECHNOLOGY IF THEY LOOK ON THE INSIDE; RIGHT?

11   A.    THEY CAN SEE THE TECHNOLOGY IN THE BLACK.  THE BLACK

12   SURFACE IS JUST AS TECHNICAL AS THE SILVER SURFACE.

13   Q.    RIGHT.  AND THE -- THE SAME WITH THE SOCK; RIGHT?  YOU

14   SELL A SILVER SOCK AND THEN YOU SELL A BLACK SOCK; CORRECT?

15   A.    YES.

16   Q.    AND ON THE SILVER SOCK, AGAIN, IT'S FACING AWAY FROM THE

17   USER; CORRECT?

18   A.    CORRECT.

19   Q.    SO THE SILVER SIDE IS FACING AWAY FROM THE USER;

20   CORRECT?

21   A.    THAT'S CORRECT.

22   Q.    AND THE USER CAN SEE THAT TECHNOLOGY; CORRECT?

23   A.    THEY CAN SEE THE SILVER.

24   Q.    OKAY.  NOW, ON THE HEATWAVE GLOVES, HEATWAVE GLOVES, IF

25   YOU TAKE THAT FABRIC AND YOU TURN IT AROUND THROUGHOUT THE

1433

```
1    ENTIRE INSIDE OF THE GLOVE, YOU FLIP IT AROUND, WHICH --

2    THAT'S WHAT YOU'RE DOING ON THE HEATWAVE PLUS PRODUCT, BUT

3    ONLY ON HALF OF THE GLOVE; RIGHT?

4    A.    THAT'S NOT QUITE ACCURATE.

5    Q.    WELL, ON THE MOST RECENT PRODUCTS THAT HAVEN'T ACTUALLY

6    SHIPPED TO ANY USERS, YET.  I KNOW ON THE NEW HEATWAVE PLUS

7    PRODUCTS, YOU'RE DOING THAT ON BOTH SIDES; RIGHT?

8    A.    DIDN'T SAY THEY HADN'T BEEN SHIPPED ALL THE YEARS.

9    Q.    OKAY.  BUT EXCLUDING THE BRAND-NEW PRODUCTS THAT YOU

10   JUST LAUNCHED FOUR YEARS LATER, ALL OF THE OTHER

11   HEATWAVE-PLUS PRODUCTS, YOU HAVE THE SILVER SIDE FACING AWAY

12   ON HALF OF THE PRODUCTS, ON THE PALM SIDE, RIGHT, YOU FLIPPED

13   THAT FABRIC AROUND SO THE SILVER SIDE FACES AWAY; CORRECT?

14   A.    BUT IT'S ACTUALLY 60 PERCENT, BUT...

15   Q.    OKAY.  BUT ON THE TOP SIDE OF THE GLOVE, YOU HAVE THAT

16   SILVER SIDE STILL FACING THE USER; RIGHT?

17   A.    CORRECT.

18   Q.    SO THE USER CAN SEE THE SILVER; CORRECT?

19   A.    IF THEY OPEN UP THE GLOVE AND LOOK AT IT, YES.

20   Q.    WELL, THE HANG TAG SAYS "LOOK INSIDE"; RIGHT?

21   A.    YES.

22   Q.    YOU'RE TELLING THE USER TO LOOK INSIDE; RIGHT?

23   A.    YES.

24         MR. ALDRICH:  I MEAN, I CAN JUST SHOW THAT TO THE

25   JURY.  WE CAN PUT IT UP HERE ON THE ELMO.
```

COMPUTER-AIDED TRANSCRIPTION

1434

```
 1            ACTUALLY, CAN YOU CALL UP EXHIBIT 117.  CAN WE ZOOM
 2     IN ON THE TOP THERE.
 3     Q.    SO JUST FOR THE JURORS' BENEFIT, IT SAYS "LOOK INSIDE"
 4     AND IT HANGS RIGHT UP THERE ON THE TOP, RIGHT WHERE THE
 5     CONSUMER WOULD LOOK INSIDE AND SEE THE SILVER; RIGHT?
 6     A.    YES.
 7     Q.    NOW, IF YOU TOOK THE GLOVE LINER OR THE LINER FABRIC AND
 8     YOU FLIPPED IT AROUND THROUGH THE WHOLE INSIDE OF THE GLOVE,
 9     THE USER WOULDN'T SEE THE SILVER ANYMORE, WOULD THEY?
10     A.    NO, YOU WOULDN'T.
11     Q.    THEY WOULDN'T SEE THE REFLECTIVE TECHNOLOGY INSIDE THE
12     GLOVE ANYMORE, WOULD THEY?
13     A.    THEY WOULD NOT SEE THE SILVER, NO.  THEY WOULD NOT.
14     Q.    AND FOR FOUR YEARS AFTER YOU WERE SUED IN THIS CASE, YOU
15     CONTINUED TO SELL PRODUCT THAT SAID "LOOK INSIDE" AND SHOWED
16     THE SILVER ON THE INSIDE; RIGHT?
17     A.    EVEN THE ONES THAT HAVE BLACK SAY "LOOK INSIDE."  LOOK
18     INSIDE, IF I CAN GET YOU TO LOOK INSIDE MY GLOVE, YOU'RE MORE
19     THAN LIKELY GOING TO BUY IT.  SILVER, BLACK, PURPLE, GREEN.
20     Q.    WELL, EXCEPT THAT THE BLACK GLOVES ALSO HAVE SOME SILVER
21     SHOWING; RIGHT?
22     A.    NO.
23     Q.    THE HEATWAVE GLOVES THAT HAVE THE BLACK, THE
24     HEATWAVE-PLUS GLOVES; RIGHT?
25     A.    NO.  THE HEATWAVE GLOVES WERE AS YOU SUGGESTED ALL BLACK
```

1435

1    INSIDE.  TO MY KNOWLEDGE, THERE IS NO SILVER THAT IS

2    SHOWING.

3    Q.    WAIT A SECOND.  HEATWAVE GLOVES THAT ARE ALL BLACK

4    INSIDE.  THERE IS NO USER THAT HAS ONE; RIGHT?

5    A.    THAT'S NOT TRUE.

6    Q.    HEATWAVE -- I THOUGHT WE'VE BEEN THROUGH THIS ABOUT FOUR

7    TIMES NOW.

8          THERE ARE NO HEATWAVE GLOVES THAT YOU KNOW OF THAT

9    ARE SOLD TO USERS YET?

10   A.    THAT'S NOT WHAT I SAID.  YOU SAID THERE IS NO USERS WITH

11   THEM OUT THERE, AND I SAID WE HAVE GIVEN PLENTY AWAY TO

12   USERS.

13   Q.    OH, I SEE.  YOU DON'T KNOW ANY END USERS HAVE PURCHASED

14   ONE.  THAT'S THE DISTINCTION YOU'RE MAKING?

15   A.    I DON'T KNOW EITHER WAY.  YES, THEY ARE OUT THERE.

16   Q.    OKAY.  BUT IF YOU HAD, A YEAR AND A HALF AGO, WHEN I

17   ADVISED YOU THAT THIS LAWSUIT, THE UTILITY PATENT CLAIMS

18   RELATED TO PUTTING THE REFLECTIVE SIDE TOWARD THE USER, A

19   YEAR AND A HALF AGO I TOLD YOU THAT, YOU DIDN'T MAKE ANY

20   CHANGES AT THAT TIME TO MAKE SURE THAT THE REFLECTIVE SIDE

21   ONLY FACED AWAY FROM THE USER; CORRECT?

22   A.    REPEAT THAT.

23   Q.    YOU DIDN'T MAKE ANY CHANGES AT THAT TIME TO MAKE SURE

24   THAT THE REFLECTIVE SIDE FACED AWAY FROM THE USER; CORRECT?

25   A.    SINCE THEN, WE HAVE DONE THAT.

1436

1    Q.    AGAIN, THAT'S JUST STARTING TO SELL; CORRECT?

2    A.    I'M ANSWERING YOUR QUESTION.  WE HAVE DONE THAT.

3    Q.    OKAY.  I'LL TAKE YOUR ANSWER.

4          YOU SELL THROUGH AMAZON?

5    A.    WE DO NOT HAVE AN ACTIVE -- WE DON'T SELL OUR PRODUCTS

6    FROM SEIRUS ACTIVELY ON AMAZON, NO, WE DO NOT.

7    Q.    DO YOU KNOW WHO DOES?

8    A.    PARDON ME?

9    Q.    DO YOU KNOW WHO DOES?

10   A.    ANYBODY WHO BUYS PRODUCT FROM US HAS THE ABILITY TO SELL

11   THROUGH AMAZON.

12   Q.    DO YOU REMEMBER THE OTHER DAY -- WE HAD TALKED THE OTHER

13   DAY ABOUT HOW YOU HAD RECEIVED NOTICE OF THE DESIGN PATENT,

14   OR SEIRUS HAD, RATHER, RECEIVED NOTICE OF THE DESIGN PATENT

15   IN APRIL OF 2013; CORRECT?

16   A.    CORRECT.

17   Q.    AND I THINK IT'S ON THE SCREEN HERE NOW.

18         DO YOU SEE THAT?

19   A.    YES.

20   Q.    AND IT SAYS, HOWEVER, "PER OUR ATTORNEY, THERE WILL BE

21   NO PROBLEM IN YOUR DESIGN FACTOR BECAUSE OF LOGO AND

22   IRREGULAR WAVE."

23         DO YOU SEE THAT?

24   A.    NO.  CAN YOU ENLARGE THAT?

25   Q.    OH, YOU CAN'T SEE THAT.  OKAY.  WE'LL ZOOM IN.

1437

1    MR. MARCHESE:  WHICH EXHIBIT ARE WE LOOKING AT?

2    MR. ALDRICH:  THIS IS 505, WHICH I THINK HAS BEEN

3    ADMITTED.  WAS 505 ADMITTED?

4    MR. MARCHESE:  I THINK WE ALREADY HAVE RECEIVED

5    IT.

6    Q.  BY MR. ALDRICH:  OKAY.  IN THE MIDDLE OF THE PAGE THERE.

7    A.  YES.

8    Q.  AND YOU HAD EXPLAINED THAT YOUR UNDERSTANDING WAS THAT

9    PATENT LAWS ARE BASICALLY THE SAME AROUND THE WORLD; RIGHT?

10    A.  THAT'S MY UNDERSTANDING.

11    Q.  AND WE HAD TALKED ALSO ABOUT THE PATENT ATTORNEYS THAT

12    SEIRUS HAS RETAINED IN THE PAST.

13    DO YOU REMEMBER THAT?

14    A.  YES.

15    Q.  WE TALKED ABOUT THE LAW FIRM THAT YOU USED FOR

16    PROSECUTION WORK IN UTAH?

17    A.  YES.

18    Q.  OKAY.  WE TALKED ABOUT PROCOPIO THAT YOU USED IN

19    CALIFORNIA?

20    A.  CORRECT.

21    Q.  IS THERE ALSO A FIRM IN ARIZONA THAT DOES SOME PATENT

22    WORK FOR YOU?

23    A.  ARIZONA?

24    Q.  YEAH.

25    A.  NOT THAT I RECALL.

COMPUTER-AIDED TRANSCRIPTION

1438

1    Q.    YOU DON'T REMEMBER THAT?

2    A.    ARIZONA, I DON'T RECALL THAT.

3    Q.    TROUTMAN SANDERS.  WE TALKED ABOUT TROUTMAN SANDERS?

4    A.    OH, I DIDN'T KNOW THEY WERE IN ARIZONA.

5    Q.    NO, NO, NO.  SEPARATE.  SORRY.  DIDN'T MEAN TO CONFUSE

6    YOU.

7          WE TALKED ABOUT TROUTMAN SANDERS; CORRECT?

8    A.    YES.

9    Q.    THEY HAVE DONE SOME PATENT WORK FOR YOU OVER THE

10   YEARS?

11   A.    YES.

12   Q.    WE ALSO TALKED ABOUT SOME INDEPENDENT EXPERTS THAT YOU

13   HAVE HAD OVER THE YEARS THAT HAVE HELPED YOU WITH SOME PATENT

14   ISSUES; IS THAT CORRECT?

15   A.    YES.

16   Q.    BUT IT DAWNED ON ME, THERE IS SOME OTHER -- THERE IS

17   SOME OTHER PATENT FIRMS THAT YOU'VE ALSO WORKED WITH OVER THE

18   YEARS.

19          HAVE YOU HEARD OF A FIRM CALLED HAYES SOLOWAY?  DOES

20   THAT SOUND FAMILIAR?

21   A.    DOESN'T SOUND FAMILIAR.

22   Q.    HOW ABOUT EUROPEAN PATENT FIRMS, HAVE YOU EVER USED A

23   EUROPEAN PATENT FIRM?

24   A.    ONLY IF -- IF WE HAVE, IT WOULD HAVE BEEN THROUGH OUR

25   ATTORNEYS.  I HAVE NOT HIRED, TO MY KNOWLEDGE, A EUROPEAN

1439

1   PATENT FIRM.

2   Q.   HOW ABOUT A CHINESE PATENT FIRM?

3   A.   I COULDN'T TELL YOU.

4   Q.   HOW ABOUT A KOREAN PATENT FIRM?

5   A.   COULDN'T TELL YOU.

6   Q.   CANADIAN PATENT FIRM?

7   A.   COULDN'T TELL YOU.

8   Q.   RUSSIAN PATENT FIRM?

9   A.   I DON'T KNOW.

10  Q.   WOULD IT SURPRISE YOU TO LEARN THAT SEIRUS HAS RETAINED

11  LAWYERS AROUND THE WORLD, INCLUDING IN EUROPE, CHINA, KOREA,

12  CANADA, RUSSIA, TO REPRESENT IT IN ITS PATENT WORK?

13          MR. MARCHESE:  OBJECTION, YOUR HONOR.  SPECULATION.

14  LACK OF FOUNDATION.

15          THE COURT:  OVERRULED.  YOU CAN ANSWER THE QUESTION.

16          ACTUALLY, WHETHER IT SURPRISES HIM ACTUALLY IS NOT

17  REALLY A RELEVANT QUESTION.  I'LL SUSTAIN THE OBJECTION ON

18  DIFFERENT GROUNDS.

19          MR. MARCHESE:  THANK YOU, YOUR HONOR.

20          THE COURT:  YOU CAN REPHRASE YOUR QUESTION.

21          MR. ALDRICH:  MAY I APPROACH, YOUR HONOR?

22          THE COURT:  SURE.

23  Q.   BY MR. ALDRICH:  MR. CAREY, I'VE PUT IN YOUR HANDS ONE

24  OF YOUR OWN PATENTS.

25          DO YOU SEE THAT?

1440

1    A.    YES, I DO.

2    Q.    THIS IS A PATENT YOU HAVE FOR PROTECTIVE MASK WITH

3    SCARF?

4    A.    YES.

5    Q.    DO YOU REMEMBER THIS PATENT?

6    A.    YES, I DO.

7    Q.    THIS WAS A PRETTY SIGNIFICANT PATENT FOR SEIRUS;

8    CORRECT?

9    A.    YES, IT IS.

10   Q.    OKAY.

11   A.    OR WAS.

12   Q.    IT WAS.  AND YOU'RE NAMED AS AN INVENTOR ON IT?

13   A.    YES.

14   Q.    AND ALSO YOUR PARTNER, JOE EDWARDS; CORRECT?

15   A.    CORRECT.

16   Q.    AND THIS IS A PATENT THAT YOU APPLIED FOR IN 1992.  DO

17   YOU SEE THAT ON THE UPPER LEFT?

18   A.    UPPER LEFT.  YES.  YES, GOT IT.

19   Q.    JUST UNDER THE NAMES?

20   A.    YEAH.

21   Q.    DO YOU SEE THAT?

22   A.    UH-HUH.

23   Q.    AND YOU RECEIVED THIS PATENT IN 1993; CORRECT?

24   A.    YES.

25   Q.    DO YOU SEE THE DATE OF THE -- THE DATE THAT YOU APPLIED

COMPUTER-AIDED TRANSCRIPTION

1441

```
1    FOR THE PATENT WAS JANUARY 27, 1992?

2    A.   IF YOU CAN DIRECT ME, THAT WOULD HELP.

3    Q.   IT'S IN THE UPPER LEFT.  IT SAYS "FILED."

4    A.   OH, THE SAME DATE.  YEAH, SURE.

5            MR. MARCHESE:  I DON'T KNOW THAT THESE WERE PRODUCED

6    IN DISCOVERY, YOUR HONOR.  I HAVEN'T SEEN THEM BEFORE IN THE

7    DISCOVERY.

8            THE COURT:  I DON'T KNOW.

9            MR. MARCHESE:  I DON'T BELIEVE THEY WERE.  THERE IS

10   NO PRODUCTION NUMBER ON THEM.

11           MR. ALDRICH:  I'M NOT ADMITTING THEM.  I'M JUST

12   ASKING HIM TO REFRESH HIS RECOLLECTION, AND ACTUALLY TO

13   IMPEACH HIM ON TESTIMONY HE PROVIDED TWO DAYS AGO.

14   Q.   I'VE PUT IN YOUR HANDS AN INTERNATIONAL PATENT

15   APPLICATION.  DO YOU SEE THAT?

16   A.   YES.

17   Q.   AND THIS IS YOUR PATENT APPLICATION.  DO YOU SEE THAT?

18   A.   YES.

19   Q.   UPPER LEFT-HAND CORNER IT SAYS, "INVENTORS:  MICHAEL

20   CAREY AND JOSEPH EDWARDS."  DO YOU SEE THAT?

21   A.   YES.

22   Q.   AND DO YOU SEE THE -- IT SAYS UP IN THE UPPER LEFT,

23   "PRIORITY DATA."  DO YOU SEE THAT?

24   A.   PRIORITY DATA?  OH, YES, GOT IT.

25   Q.   UPPER LEFT CORNER.
```

1442

1    DO YOU SEE A NUMBER THERE, 826,083?

2    A.   YES.

3    Q.   AND IF WE CAN GO BACK TO YOUR U.S. PATENT.  DO YOU SEE

4    THE APPLICATION NUMBER?

5    A.   YES.

6    Q.   IN THE UPPER LEFT-HAND CORNER IT SAYS, "826,083."  DO

7    YOU SEE THAT?

8    A.   YES.

9    Q.   AND, AGAIN, THE FILING DATE ON THE U.S. PATENT,

10   JANUARY 27, 1992?

11   A.   YES.

12   Q.   DO YOU SEE THAT?

13   A.   UH-HUH.

14   Q.   AND ON THE EUROPEAN PATENT APPLICATION, PRIORITY DATED

15   JANUARY 27, 1992?

16   A.   OKAY.

17   Q.   DO YOU SEE THAT?

18   A.   YES.

19   Q.   AND THE EUROPEAN PATENT, THIS IS A PATENT YOU APPLIED

20   FOR IN THE UPPER RIGHT-HAND CORNER:  CANADA, JAPAN, EUROPE,

21   BELGIUM, CHINA, DENMARK, SPAIN, FRANCE, GREAT BRITAIN,

22   GERMANY, IRELAND, ITALY, LUXEMBURG, NETHERLANDS, SWEDEN AND A

23   COUPLE I DON'T RECOGNIZE.

24        DO YOU SEE THAT?

25   A.   YEAH.

1443

1    Q.   SO THIS IS A PATENT APPLICATION YOU PUT IN IN EUROPE?

2    A.   CORRECT.

3    Q.   IT'S THE SAME PATENT APPLICATION THAT YOU HAVE IN THE

4    U.S., CORRECT, THE RELATED PATENTS?

5    A.   RELATED PATENTS, YES.

6    Q.   RELATED PATENTS.  AND IN THE U.S., YOU WERE GRANTED A

7    PATENT; CORRECT?

8    A.   YES.

9    Q.   AND IN EUROPE?

10   A.   I DON'T KNOW.

11   Q.   YOU DON'T KNOW?

12   A.   NO.  I DON'T RECALL.

13   Q.   I'VE PUT IN YOUR HANDS AN EXTRACT FROM THE REGISTER OF

14   EUROPEAN PATENTS.

15   A.   OKAY.

16   Q.   IF I CAN HAVE YOU TURN TO THE SECOND PAGE AT THE TOP.

17        DO YOU SEE THAT IN 1994, YOU REQUESTED AN

18   EXAMINATION OF THE PATENT?

19   A.   YES.

20   Q.   BY 1996, YOU STILL DID NOT HAVE A PATENT?  DO YOU SEE

21   THAT?

22   A.   NO.  I THINK YOU HAVE TO -- OH, THAT IT WAS WITHDRAWN.

23   I SEE THAT.

24   Q.   YOU ACTUALLY WITHDREW THE PATENT APPLICATION IN EUROPE

25   AFTER FOUR YEARS; CORRECT?  MAYBE IT WAS THREE YEARS.

COMPUTER-AIDED TRANSCRIPTION

1444

1    A.    ACCORDING TO THIS DOCUMENT, YES.

2    Q.    AND IN THE UNITED STATES, YOU APPLIED FOR A PATENT IN

3    JANUARY 1992, AND YOU RECEIVED A PATENT IN JUNE 1993;

4    CORRECT?

5    A.    YES.

6    Q.    IT TOOK YOU 18 MONTHS TO GET A PATENT IN THE UNITED

7    STATES; CORRECT?

8    A.    APPROXIMATELY, YES.

9    Q.    IN FOUR YEARS, YOU DID NOT GET A PATENT IN EUROPE;

10   CORRECT?

11   A.    YES.

12   Q.    YOU KNEW THAT THE LAWS FOR PATENTS WERE DIFFERENT IN THE

13   UNITED STATES AND OVERSEAS; CORRECT?

14   A.    NO.

15   Q.    MR. CAREY, YOU WERE NOT ABLE TO GET A PATENT IN EUROPE

16   AFTER FOUR YEARS OF APPLYING FOR THE PATENT IN EUROPE, AND IN

17   18 MONTHS, IT SAILED THROUGH IN THE UNITED STATES; CORRECT?

18   AND ARE YOU TELLING ME THAT YOU BELIEVED THAT THE PATENT LAWS

19   AROUND THE WORLD ARE UNIVERSAL AND ARE THE SAME AND THAT WAS

20   YOUR GOOD-FAITH BELIEF?

21   A.    I SAID GENERALLY MY OPINION IS THAT THEY ARE -- THEY

22   OPERATE THE SAME WAY.  BUT ONE EXAMINER TO THE NEXT, WHO

23   KNOWS WHAT THEY DO.

24   Q.    YOUR BELIEF IS THAT, IN GENERAL, PATENT LAWS OPERATE THE

25   SAME WAY AROUND THE WORLD, EVEN THOUGH YOU COULD NOT GET A

1445

1    PATENT IN FOUR YEARS IN EUROPE FOR WHAT YOU SAILED THROUGH IN

2    18 MONTHS IN THE UNITED STATES; IS THAT YOUR TESTIMONY?

3    A.   MY TESTIMONY IS THAT FOR SOME REASON THIS WAS WITHDRAWN.

4    AND I DON'T KNOW WHY.

5    Q.   AFTER YOU ASKED IN 1994 FOR AN EXAMINATION OF IT;

6    CORRECT?

7    A.   I'M NOT AN ATTORNEY.  I DON'T KNOW WHAT HAPPENED IN THIS

8    PROSECUTION.

9    Q.   BUT YOU CAN SEE HERE THAT IN AUGUST OF 1996, THERE WAS A

10   DISPATCH OF A COMMUNICATION REGARDING THE EXAMINING -- FROM

11   THE EXAMINING DIVISION; CORRECT?  SO THE EXAMINING DIVISION

12   SENT A COMMUNICATION IN AUGUST OF 1996; CORRECT?

13          MR. MARCHESE:  OBJECTION, YOUR HONOR.  FOUNDATION.

14   SPECULATION.

15          THE COURT:  THE OBJECTION IS OVERRULED.

16          THE WITNESS:  YEAH.  I DON'T KNOW WHAT -- I AM NOT A

17   PATENT EXPERT.  I COULDN'T TELL YOU WHAT THIS PROCESS WAS

18   THERE; OR HERE FOR THAT MATTER.

19   Q.   BY MR. ALDRICH:  AND THAT'S WHY YOU RELY ON REAL PATENT

20   EXPERTS FOR YOUR ANALYSIS; CORRECT?  YOU DON'T RELY ON KOREAN

21   ATTORNEYS TELLING YOU YOU CAN PUT YOUR LOGO ON SOMEONE'S ELSE

22   DESIGN; CORRECT?

23   A.   NO, THAT'S NOT WHAT I'M SAYING.  I RELY ON ATTORNEYS TO

24   GIVE INFORMATION, AND I THINK RESPECTABLE ATTORNEYS DESERVE

25   RESPECT, WHEREVER THEIR JURISDICTION IS.

COMPUTER-AIDED TRANSCRIPTION

1446

1   Q.   WHAT DID YOU DO AFTER THE DESIGN PATENT WAS RECEIVED BY

2   YOUR FIRM, BY YOUR COMPANY IN APRIL 2013, TO MAKE SURE YOU

3   DIDN'T INFRINGE IT?

4   A.   I DIDN'T KNOW -- I DIDN'T RECEIVE THAT INFORMATION.

5   Q.   THAT WOULD BE LEFT TO MR. EDWARDS; CORRECT?

6   A.   CORRECT.

7   Q.   BY THE TIME OF YOUR DEPOSITION, MR. EDWARDS WAS NO

8   LONGER IN CHARGE OF THE LEGAL DEPARTMENT; CORRECT?

9   A.   I DON'T RECALL THE DATES.  WHAT WAS THE DATE OF MY

10  DEPOSITION?

11  Q.   ABOUT A YEAR AND A HALF AGO.

12  A.   I DON'T KNOW WHAT DATE HE CEASED TO DO THAT.

13  Q.   I'LL REPRESENT TO YOU THAT AT THE TIME OF YOUR

14  DEPOSITION, YOU WERE NO LONGER USING MR. EDWARDS FOR LEGAL

15  WORK.

16  A.   OKAY.

17  Q.   DOES THAT SOUND LIKE IT COULD BE RIGHT?

18         MR. MARCHESE:  NEVER MIND.  NO OBJECTION.

19         THE WITNESS:  COULD BE RIGHT.

20  Q.   BY MR. ALDRICH:  OKAY.  AND SO ALL DECISIONS THAT ARE

21  MADE ABOUT WHETHER TO GO FORWARD OR WHETHER TO GO -- WHETHER

22  OR NOT TO GO FORWARD WITH A PROJECT, THOSE DECISIONS ARE ALL

23  MADE BY YOU NOW; CORRECT?

24  A.   NOT COMPLETELY.

25  Q.   YOU'RE THE HEAD, YOU'RE THE TOP; RIGHT?

1447

1    A.   YES.

2         MR. ALDRICH:  I HAVE NO FURTHER QUESTIONS, YOUR

3    HONOR.

4         THE COURT:  REDIRECT.

5                   REDIRECT EXAMINATION

6    BY MR. MARCHESE:

7    Q.   HELLO, MR. CAREY.

8    A.   HELLO.

9    Q.   I WOULD LIKE TO PUT ON THE ELMO HERE -- I'M NOT GOING TO

10   TRY TO HAVE THIS RECEIVED, YOUR HONOR.  I JUST WANTED TO PUT

11   THIS UP ON THE SCREEN FOR THE JURY.  THANK YOU.  I'M SORRY.

12   THIS IS 1416.

13        MR. CAREY, THIS IS A HEATWAVE HANG TAG; RIGHT?

14   A.   YES.

15   Q.   AND THAT HEATWAVE HANG TAG SAYS, "THE ONLY THING WARMER

16   IS ELECTRIC."  DO YOU SEE THAT?

17   A.   YES, I DO.

18   Q.   WHAT IS THAT ALLUDING TO?

19   A.   OUR HEAT TOUCH GLOVES.  SO, REMEMBER, I TALKED ABOUT THE

20   ASPIRATIONAL PART AND THEN THE AFFORDABLE PART FOR AS MANY

21   PEOPLE AS WE CAN.  THE IDEA IS TO TIE THOSE TWO TOGETHER.

22   Q.   SO TO TIE HEAT TOUCH TO HEATWAVE?

23   A.   CORRECT.

24   Q.   THANK YOU.

25        AND I THINK THERE WAS SOME QUESTIONS ABOUT THE SALES

COMPUTER-AIDED TRANSCRIPTION

1448

1    UNITS FOR THE HEAT TOUCH GLOVE.  DO YOU REMEMBER THAT?

2    A.   YEAH.

3    Q.   AND SO THERE WERE A NUMBER OF DIFFERENT HEAT TOUCH

4    PRODUCTS; CORRECT?

5    A.   THAT'S CORRECT.

6    Q.   ONLY ONE IS THE HEAT TOUCH TORCHE; RIGHT?

7    A.   YES.

8    Q.   AND THAT'S THE ONE WITH THE HEATWAVE LINER; RIGHT?

9    A.   YEAH.  AND EVEN THAT GLOVE, IF EVERY ONE OF MY GLOVES

10   SOLD ████ WORTH OF UNITS, I'D BE VERY HAPPY.

11   Q.   BUT THESE OTHER HEAT TOUCH GLOVES, THEY SELL MORE;

12   CORRECT?

13   A.   SURE, YEAH.  THE LINERS SELL MORE.

14   Q.   SO THERE WERE A LOT OF QUESTIONS THAT WERE ASKED THERE

15   AT THE END ABOUT THE WAVE, WITH THE WAVE DESIGN.  DO YOU

16   REMEMBER THOSE?

17   A.   OH, YES.

18        MR. MARCHESE:  I KEEP LOSING TRACK OF THE FABRIC.

19        MAY I APPROACH, YOUR HONOR?

20   Q.   THIS IS EXHIBIT 1408, 1407, MR. CAREY.

21   A.   YES.

22   Q.   WAS THERE ANYTHING PARTICULAR ABOUT THAT PARTICULAR

23   FABRIC DESIGN THAT MADE -- THAT YOU CONSIDERED WITH RESPECT

24   TO THE DESIGN PATENT IN THIS CASE THAT MADE YOU -- IN TERMS

25   OF THE ALLEGED INFRINGEMENT THAT WAS GOING ON EARLY IN THE

1449

1    CASE?

2    A.   YES.   IT'S A PRETTY COOL DESIGN, AND WE'RE VERY PROUD OF

3    THIS.   AND IT'S DONE COMPLETELY IN-HOUSE.   AND IT HAS -- OUR

4    DESIGN INCLUDES THAT RECTANGULAR BOX, BUT MORE IMPORTANTLY,

5    INSIDE THAT BOX, OUR LOGO TELLS EVERYBODY, THIS IS SEIRUS.

6    AND WE WANT THEM TO HAVE THAT, INCREASE THE VALUE OF OUR

7    BRAND.   AND AS YOU SEE, IT'S DONE THAT PRETTY WELL.

8    Q.   AND WHAT WAS YOUR IMPRESSION WITH RESPECT TO THE

9    EXISTENCE OF THE REPEATING BOX AND THE REPEATING LOGO

10   CONCERNING THE COLUMBIA DESIGN PATENT?

11   A.   WELL, THEY JUST HAVE THE SIMPLE WAVE THROUGH IT.   AND

12   OUR PATTERN IS INTRICATELY INTEGRATED WITH OUR LOGO.   IT'S

13   ALMOST AS DOMINANT AS THE WAVES ARE.   AND THAT'S FOR A

14   REASON.   SO THAT PATTERN IS UNIQUELY US.

15            AND AS WE KNOW, COLUMBIA DOESN'T EVEN USE THE WAVE

16   PATTERN.   NEVER HAS.

17            MR. MARCHESE:   I HAVE NOTHING FURTHER, YOUR HONOR.

18            THE COURT:   DO THE JURORS HAVE ANY QUESTIONS FOR

19   THIS WITNESS?   IF SO, PLEASE RAISE YOUR HAND.

20            YOU MAY STEP DOWN.

21            THE WITNESS:   THANK YOU.

22            THE COURT:   CALL YOUR NEXT WITNESS.

23            MS. ROTHAUGE:   SEIRUS CALLS MR. ROBERT MURPHY.

24            THE COURT:   STEP FORWARD AND BE SWORN.

25            MS. ROTHAUGE:   YES.   YOUR HONOR, WE WILL HAVE A

COMPUTER-AIDED TRANSCRIPTION

1450

```
1    DEMONSTRATIVE, SO I WOULD LIKE TO HAVE PERMISSION TO HAVE A

2    COUPLE OF PEOPLE MOVE THE TABLE OUT SO THE JURORS CAN SEE OUR

3    DEMONSTRATIVE.

4              THE COURT:  YES, MA'AM.

5              THE CLERK:  RAISE YOUR RIGHT HAND.

6         ROBERT MURPHY, A WITNESS, HAVING BEEN DULY SWORN,

7         TESTIFIED AS FOLLOWS:

8              THE WITNESS:  I DO.

9              THE CLERK:  PLEASE BE SEATED.

10             SIR, PLEASE STATE YOUR FIRST AND LAST NAME FOR THE

11   RECORD, SPELLING YOUR LAST NAME.

12             THE WITNESS:  ROBERT MURPHY, M-U-R-P-H-Y.

13                      DIRECT EXAMINATION

14   BY MS. ROTHAUGE:

15   Q.   MR. MURPHY, WHERE DO YOU LIVE?

16   A.   SAN DIEGO.

17   Q.   HOW LONG HAVE YOU LIVED IN SAN DIEGO?

18   A.   34, 33, 34 YEARS.

19   Q.   WHERE DID YOU GO TO SCHOOL?

20   A.   I WENT TO SCHOOL AT SAN DIEGO STATE.

21   Q.   DID YOU GET A JOB AFTER GOING TO SCHOOL AT SAN DIEGO

22   STATE?

23   A.   I ACTUALLY GOT A JOB DURING GOING TO SAN DIEGO STATE

24   ANSWERING A JOB -- AN AD ON THE JOB BOARD AT SAN DIEGO STATE

25   FOR A JOB WITH MIKE AND WENDY AT THEIR HOUSE.
```

1451

1    Q.    WHAT WERE YOU STUDYING WHILE YOU WERE AT SAN DIEGO

2    STATE?

3    A.    FIRST STARTED INFO SYSTEMS AND THEN SWITCHED TO

4    MARKETING.

5    Q.    SO YOU SAID THAT YOU ANSWERED AN AD FOR A JOB WITH WENDY

6    AND MIKE CAREY.  WHAT KIND OF JOB WAS IT?

7    A.    IT WAS -- YOU KNOW, I WAS GOING TO SCHOOL, AND SO I

8    NEEDED SOMETHING PART-TIME TO KIND OF PAY THE CAR INSURANCE,

9    CALL IT BEER-MONEY JOB.

10              AND THERE WAS A JOB TO ASSEMBLE AND SHIP SKI

11   ACCESSORIES AT SOMEBODY'S HOUSE LIKE RIGHT ACROSS THE STREET

12   FROM SAN DIEGO STATE.

13   Q.    SO OBVIOUSLY YOU APPLIED FOR THE JOB AND GOT THE JOB?

14   A.    APPLIED, THERE WAS -- ACTUALLY, I APPLIED.  I CALLED

15   MIKE -- OR I CALLED THE HOUSE AND TALKED TO MIKE.  AND THEY

16   HAD HIRED A COUPLE OF GUYS ALREADY.  AND HE SAID, WELL, I

17   THINK, YOU KNOW, WE'VE GOT ENOUGH PEOPLE ALREADY.

18              AND WE JUST TALKED FOR LIKE AN HOUR OR SO, AND HE

19   SAID, YOU KNOW, WHY DON'T YOU COME OVER TOMORROW AFTER SCHOOL

20   AND LET'S TALK SOME MORE AND SEE IF MAYBE I CAN FIT ONE MORE

21   GUY IN.  AND SO I WAS TECHNICALLY THE THIRD PERSON EMPLOYED,

22   BUT AFTER A COUPLE OF WEEKS, THE OTHER TWO GUYS KIND OF FADED

23   AWAY AND FILTERED OUT, AND I JUST STUCK WITH IT.

24   Q.    HOW MANY YEARS HAVE YOU BEEN AT SEIRUS?

25   A.    33 YEARS THIS PAST SEPTEMBER.

1452

1    Q.   SO CAN YOU DESCRIBE THE VARIOUS JOBS THAT YOU'VE HAD AT

2    SEIRUS OVER THAT TIME.

3    A.   WELL, THE FIRST ONE, WHEN IT WAS JUST THE THREE OF US,

4    WAS EVERYTHING FROM CUSTOMER SERVICE TO TAKING THE ORDER,

5    PACKING THE ORDER, SHIPPING THE ORDER, TYPING IT OUT, TYPING

6    AN INVOICE, PUT IT IN THE MAIL.  AND THEN THE OTHER HALF WAS

7    BABY-SITTING THE KIDS IN THE GARAGE.

8    Q.   WELL, YOU MOVED UP -- TO THE EXTENT THERE WAS A

9    CORPORATE LADDER, DID YOU MOVE UP AT SOME POINT?

10   A.   YES.  AS WE GREW AND ADDED MORE PEOPLE TO THE COMPANY,

11   SO I TOOK ON THE ROLE OF WAREHOUSE MANAGER EVENTUALLY,

12   WHEN -- AS MIKE INDICATED, WE MOVED TO A SMALL BUILDING IN

13   THE MIRAMAR AREA.

14        AND RAN A WAREHOUSE WITH FOUR OR FIVE GUYS FOR A

15   WHILE.  AND THEN EVENTUALLY AS THE PRODUCT GREW, HELPING

16   COORDINATE THE PRODUCTION WITH OUR FACTORIES.  AND THEN

17   BECAME PRODUCTION MANAGER, OPERATIONS MANAGER AND THEN

18   EVENTUALLY VP OF OPERATIONS.

19   Q.   SO HOW LONG HAVE YOU BEEN ON LET'S SAY THE PRODUCTION

20   SIDE OF SEIRUS?

21   A.   PROBABLY -- REALLY THE MAJORITY OF IT.  SINCE -- LET'S

22   SEE.  I WAS 24.  SO PROBABLY ABOUT 30 YEARS NOW.

23   Q.   DO YOU KNOW HOW TO BUILD A SEIRUS GLOVE?

24   A.   I DO.

25   Q.   OKAY.  THERE IS AN ARTICLE OF MANUFACTURE ISSUE IN THIS

1453

1    CASE, AND SO I'D LIKE TO ASK YOU ABOUT HOW YOU MANUFACTURE A

2    SEIRUS HEATWAVE GLOVE.

3    A.    SURE.

4    Q.    WILL YOU BE ABLE TO DO THAT FOR US?

5    A.    ABSOLUTELY.  SURE.

6    Q.    I'M GOING TO ASK YOU TO SPEAK A LITTLE SLOWER, BECAUSE

7    I'M HAVING A HARD TIME HEARING YOU.

8          CAN YOU PLEASE DESCRIBE FOR ME WHAT ARE THE BASIC

9    COMPONENTS OF BUILDING A SEIRUS HEATWAVE GLOVE.

10   A.    THERE IS A LOT OF INDIVIDUAL COMPONENTS THAT GO INTO A

11   GLOVE.  KIND OF THE BASIC, GENERAL COMPONENTS ARE THERE IS AN

12   OUTER SHELL THAT WOULD HAVE A LOT OF ACCOUTREMENTS TO IT.

13   ZIPPERS, POCKETS, CINCHES, DIFFERENT FUNCTIONAL ACCESSORIES

14   THAT GO ON IT.

15         THERE IS AN INNER LINING OR LINER, AND THEN THERE IS

16   AN INSULATIVE LAYER, AND THERE IS A WATERPROOF LAYER.  SO IN

17   OUR CASE, AND IN MOST OF OUR GLOVES, THERE IS A WATERPROOF

18   MEMBRANE EMBODIED IN THE GLOVE.

19   Q.    YES.  CAN YOU MOVE A LITTLE CLOSER.  YOU'RE DOING BETTER

20   AT SPEAKING SLOWLY.  BUT JUST SPEAK UP A LITTLE NOW.

21   A.    THANK YOU.

22   Q.    I'M NOW GOING TO ASK YOU WHERE THE DIFFERENT COMPONENTS

23   YOU'VE JUST DESCRIBED ARE MANUFACTURED.

24         SO LET'S START WITH THE OUTER SHELL.  WHERE IS THAT

25   MADE?

COMPUTER-AIDED TRANSCRIPTION

1454

1    A.    RIGHT NOW, PREDOMINANTLY IN CHINA.

2    Q.    AND IN -- WHERE ARE THE FACTORIES?

3    A.    VARIOUS FACTORIES.  WE HAVE SOME FACTORIES THAT ARE IN

4    THE SOUTHERN PART OF CHINA.  WE HAVE SOME FACTORIES THAT ARE

5    UP IN THE NORTHERN PART OF CHINA.

6    Q.    YOU MENTIONED A WATERPROOF MEMBRANE.  WHERE IS THAT

7    MADE?

8    A.    THAT IS MADE, SOME FROM TAIWAN AND THEN SOME FROM THE

9    U.S.A. WITH -- I'D HEARD TESTIMONY ABOUT THE GORTEX BRAND

10   THAT WE HAVE A LICENSE TO.  GORTEX MAKES THEIR MEMBRANES, OR

11   THEIR INSERTS HERE IN THE UNITED STATES.

12   Q.    AND FINALLY, WHAT ABOUT THE LINER.  WHERE IS THE LINER

13   MADE?

14   A.    THE LINER, A VARIETY OF PLACES.  SO THE HEATWAVE LINER

15   IN PARTICULAR COMES FROM KOREA, SOUTH KOREA.  WE HAVE LINING

16   THAT COMES FROM THE UNITED STATES, SOME LINING THAT COMES

17   FROM CHINA.  SOME OF THE FACTORIES SUPPLY THEIR OWN.

18   Q.    NOW, SPECIFICALLY IN THE LINER, WE'VE BEEN HERE TALKING

19   ABOUT THE FABRIC THAT'S IN THE LINER.  IS THE FABRIC

20   MANUFACTURED SOMEPLACE?

21   A.    THE FABRIC IN THE LINER IS KNIT IN SOUTH KOREA, AND THE

22   FOIL PRINTING IS ALSO DONE IN SOUTH KOREA.

23   Q.    NOW, BECAUSE YOU SAID "KOREA," I JUST WANT TO MAKE IT

24   VERY CLEAR.  THERE IS TWO KOREAS; RIGHT?

25   A.    RIGHT.

COMPUTER-AIDED TRANSCRIPTION

1455

1    Q.    THERE IS ONE IN THE NEWS A LOT, NORTH KOREA?

2    A.    CORRECT.

3    Q.    AND THE FABRIC IS MADE IN SOUTH KOREA; RIGHT?

4    A.    CORRECT.

5    Q.    OKAY.  SO TELL ME ABOUT THE FACTORIES WHERE THIS SEIRUS

6    FABRIC IS MADE.

7    A.    THE --

8    Q.    THE LINER FABRIC IS MADE.

9    A.    THE LINER FABRIC IS MADE JUST ABOUT THREE HOURS OUTSIDE

10   OF SEOUL.  AND THEN THE PRINTING IS DONE -- IT'S KNIT THERE.

11   THERE IS A DYEING AND A FINISH FACILITY IN THAT SAME REGION.

12   AND THEN THE PRINTING IS DONE ABOUT AN HOUR-AND-A-HALF DRIVE

13   AWAY OUTSIDE OF THE SEOUL AREA.

14   Q.    NOW, THE MATERIAL IS -- IT'S MADE OF SOMETHING CALLED

15   MEGA-HEAT?  WE'VE HEARD ABOUT; RIGHT?

16   A.    CORRECT.

17   Q.    SO TELL ME, WHAT IS MEGA-HEAT.

18   A.    MEGA-HEAT WAS A UNIQUE MATERIAL THAT WE HAD TALKED WITH

19   A SUPPLIER ABOUT THAT IS CUT -- MIKE KIND OF MENTIONED

20   PLATING, WHERE THERE IS ONE FIBER THAT'S DIRECTED ON TOP AND

21   ONE FIBER THAT'S DIRECTED ON THE BOTTOM.

22         SO IN THIS CASE, THERE IS A NYLON AND A POLYESTER

23   LAYER THAT ARE PLATED TOGETHER.  AND THERE IS A CHEMICAL

24   TREATMENT IN BETWEEN THOSE LAYERS THAT WHEN PERSPIRATION OR

25   VAPOR, MOISTURE VAPOR PASSES THROUGH THE FIBERS, THERE IS A

1456

1    KINETIC REACTION, AND IT HEATS UP THE SURFACE TEMPERATURE A

2    LITTLE BIT.

3    Q.   AND THEN THERE IS SOMETHING ELSE.  THERE IS THE FABRIC

4    THAT YOU JUST DESCRIBED, THE MEGA-HEAT.

5    A.   CORRECT.

6    Q.   THERE IS ALSO A FOIL PRINTING ON IT?

7    A.   THEN THERE IS A MYLAR LAYER, A FOIL MYLAR LAYER THAT'S

8    LAID DOWN, THAT'S PRINTED ON THE OUTSIDE OF THAT, SIMILAR TO

9    THE MYLAR THAT'S USED IN THE THERMALUX.

10   Q.   CAN YOU DESCRIBE HOW THAT HAPPENS, HOW THAT MEGA-HEAT

11   MATERIAL IS MARRIED TO THE FOIL.

12   A.   THERE IS A -- THE FABRIC AND -- THERE IS A SHEET OF

13   FILM, FOIL FILM, FOIL MYLAR THAT'S CONTINUOUS, THAT IS LAID

14   DOWN ON TOP OF THE FABRIC WITH GLUE ADHESIVE, AND THERE IS A

15   ROLLER THAT ROLLS OVER THAT WITH HEAT AND PRESSURE.  AND THAT

16   ROLLER IS INSCRIBED WITH OUR PATTERN ON IT, OUR LOGO AND OUR

17   PATTERN.

18        AND THAT ROLLER GOES OVER IT, PUTS THAT HEAT AND

19   PRESSURE ON THE FABRIC, AND THE POSITIVE PARTS OF THAT STAY

20   ON AND STICK ONTO THE FABRIC, THE NEGATIVE PARTS COME OFF.

21   Q.   THAT FABRIC IS MADE BY WHAT COMPANY?

22   A.   VENTEX.

23   Q.   DOES VENTEX SELL THIS MEGA-HEAT WITH THE FOIL PRINTING

24   THAT WE'VE JUST DESCRIBED TO ANYONE OTHER THAN SEIRUS?

25   A.   THEY SELL A VARIETY OF FABRICS WITH FOIL PRINT TO OTHER

COMPUTER-AIDED TRANSCRIPTION

1457

1    PEOPLE.

2    Q.    LIKE WHO?

3    A.    HARLEY-DAVIDSON.  IN THE FACTORY THAT WORKS WITH

4    HARLEY-DAVIDSON, THEY SUPPLY THEM FOR THEIR JACKETS.

5    ATHLETICA, WHICH IS A WOMEN'S APPAREL LINE FOR LIKE YOGA AND

6    WOMEN'S EXERCISE.

7              MR. AXELROD:  YOUR HONOR, I'M GOING TO OBJECT.

8    THERE IS NO FOUNDATION THAT THIS WITNESS HAS PERSONAL

9    KNOWLEDGE OF THEIR CONTRACTS OR ANY OTHER RELATIONS WITH

10   THESE THIRD PARTIES.

11             THE COURT:  THE OBJECTION IS SUSTAINED.

12             IF YOU CAN ESTABLISH A FOUNDATION.

13   Q.    BY MS. ROTHAUGE:  DO YOU HAVE -- YOU HAVE CONTACT,

14   PRETTY REGULAR CONTACT WITH VENTEX; IS THAT RIGHT?

15   A.    I DO, YES.

16   Q.    AND YOU'VE NEGOTIATED CONTRACTS WITH THEM?

17   A.    CORRECT.

18   Q.    AND SO YOU'VE NEGOTIATED THE RIGHT TO EXCLUSIVELY USE

19   THE MEGA-HEAT RX FABRIC IN SOME AREAS?

20   A.    CORRECT.

21   Q.    FOR SOME PRODUCTS; CORRECT?

22   A.    CORRECT.

23   Q.    AND YOU KNOW THAT IN OTHER AREAS, THAT MEGA-HEAT RX

24   FABRIC CAN BE USED BY OTHERS.  YOU KNOW THAT; RIGHT?

25   A.    CORRECT.

1458

1    Q.    AND HAVE YOU BEEN TOLD DURING THESE NEGOTIATIONS WHO THE

2    OTHERS ARE THAT WILL BE ABLE TO USE THE MEGA-HEAT RX

3    FABRIC?

4              MR. AXELROD:  SAME OBJECTION.

5              THE COURT:  SUSTAINED.

6    Q.    BY MS. ROTHAUGE:  HAVE YOU HAD THE OPPORTUNITY TO LOOK

7    AT PRODUCTS THAT CONTAIN THE MEGA-HEAT RX FABRIC OUT IN THE

8    MARKET, AS YOU'RE AT TRADE SHOWS OR THE LIKE?

9    A.    YES, OF COURSE.

10   Q.    AND HAVE YOU SEEN THAT FABRIC, MEGA-HEAT FABRIC USED

11   WITH ANY OTHER PRODUCTS OTHER THAN SEIRUS PRODUCTS?

12   A.    THE MEGA-HEAT --

13             MR. AXELROD:  SAME OBJECTION, YOUR HONOR.

14             THE COURT:  OVERRULED.

15             THE WITNESS:  NO.

16   Q.    BY MS. ROTHAUGE:  HAVE YOU SEEN -- LET ME REPHRASE THAT

17   QUESTION.  YOU MIGHT NOT HAVE HEARD ME.

18             HAVE YOU SEEN THE MEGA-HEAT RX FABRIC USED BY OTHER

19   COMPANIES ON OTHER PRODUCTS?

20   A.    MEGA-HEAT RX, NO.

21   Q.    HAVE YOU EVER -- OKAY.  HAVE YOU EVER SEEN A

22   HARLEY-DAVIDSON JACKET THAT HAD FOIL PRINTING ON A MEGA-HEAT

23   FABRIC?

24   A.    YES, I HAVE.

25   Q.    OKAY.  AND HAVE YOU EVER SEEN ANY YOGA WEAR THAT HAS THE

COMPUTER-AIDED TRANSCRIPTION

1459

1   MEGA-HEAT FABRIC WITH THE FOIL LINING ON IT?

2   A.   NO, I HAVE NOT.

3   Q.   HAVE YOU HEARD ABOUT IT?

4   A.   YES.

5   Q.   OKAY.  ALL RIGHT.

6        MS. ROTHAUGE:  NOW, YOUR HONOR, I'D LIKE TO ASK

7   MR. MURPHY TO DEMONSTRATE THE DIFFERENT COMPONENTS THAT HAVE

8   BEEN IDENTIFIED AS EXHIBIT 1404.1 THROUGH I BELIEVE 19.  SO

9   THAT HE CAN IDENTIFY THOSE COMPONENTS AND IDENTIFY HOW THEY

10  ARE PUT TOGETHER.

11       THE COURT:  YOU WANT HIM TO BE ABLE TO STEP DOWN TO

12  THE TABLE?

13       MS. ROTHAUGE:  YES, YOUR HONOR.

14       THE COURT:  YOU MAY STEP DOWN.

15       THE WITNESS:  THANK YOU.

16       THE COURT:  PLEASE KEEP YOUR VOICE UP, BECAUSE

17  YOU'RE GOING TO BE AWAY FROM A MICROPHONE.

18       THE WITNESS:  OKAY.

19  Q.   BY MS. ROTHAUGE:  DID I ASK YOU TO DECONSTRUCT A

20  HEATWAVE GLOVE SO THAT YOU COULD DEMONSTRATE TO THE JURY THE

21  DIFFERENT COMPONENTS OF THE GLOVE?

22  A.   YES, YOU DID.  I BELIEVE THIS IS OUR --

23       THE REPORTER:  I'M SORRY.

24       THE WITNESS:  I BELIEVE THIS IS OUR DAYS HEATWAVE

25  PLUS GLOVE THAT WAS DECONSTRUCTED.

COMPUTER-AIDED TRANSCRIPTION

1460

1    THE COURT:  IF THE JURORS IN THE BACK NEED TO STAND

2    UP, FEEL FREE TO DO SO.

3    Q.    BY MS. ROTHAUGE:  ALL RIGHT.  I'D LIKE YOU TO START --

4    WELL, I ASKED YOU TO PLACE ALL OF THESE COMPONENTS ON THIS

5    TABLE SO YOU COULD DESCRIBE HOW TO BUILD THIS GLOVE; RIGHT?

6    A.    SO, YES.

7    Q.    SO EXPLAIN HOW YOU'VE ARRANGED IT SO THAT THE JURY CAN

8    UNDERSTAND HOW YOU'RE GOING TO BUILD THIS GLOVE.

9    A.    SO KIND AS I DESCRIBED EARLIER, WE HAVE AN OUTER SHELL

10   AS ONE OF THE MAIN COMPONENTS OF THAT GLOVE.  AND THE INNER

11   LINING INSULATIVE LAYERS.  AND SO THOSE TWO, THOSE KIND OF

12   MARRY UP TO MAKE THE GLOVE.

13        SO WE START WITH, YOU KNOW, BASE LAYER FABRIC.  WE

14   START WITH IN THIS CASE, IT'S A SOFT SHELL FABRIC.

15        MS. ROTHAUGE:  LET THE RECORD REFLECT THAT THE

16   WITNESS IS REFERRING TO 1404.4.

17        THE WITNESS:  THESE WOULD BE THE FABRICS, INCLUDING

18   THE PALM MATERIALS AND STUFF WOULD BE DIE CUT INTO THE PROPER

19   SHAPE FOR THE GLOVE.

20        ANYTHING -- DO YOU NEED EXHIBITS THERE?

21   Q.    BY MS. ROTHAUGE:  EXPLAIN WHAT YOU WERE REFERRING TO

22   THERE.

23   A.    OKAY.  SORRY.  1404.11 AND 1404.2 ARE TWO OF THE BACK

24   PANELS, WE WOULD CALL IT.  SO THESE WOULD BE DIE CUT IN THE

25   SHAPE FOR THAT PARTICULAR DESIGN.  STITCHING WOULD BE ADDED.

1461

1    IN THIS CASE, STITCHING AND A LITTLE BIT OF CORDING IN THERE

2    TO GIVE IT A LITTLE ACCENT STITCH ON THE BACK OF THE

3    KNUCKLES.

4    Q.    OKAY.   WHAT'S NEXT?

5    A.    IN THIS PARTICULAR GLOVE, IT HAS A POCKET ON THE BACK,

6    SO A WATERPROOF ZIPPER.   THIS ONE IS 1404.10.   IT HAS A

7    WATERPROOF ZIPPER THAT GIVES YOU ACCESS TO A POCKET IN THE

8    BACK OF THE GLOVE, SO IF YOU WANTED TO PUT ONE OF THOSE

9    AIR-ACTIVATED HEAT PACKS IN THERE, YOU CAN HEAT UP THE GLOVES

10   THAT WAY.   IF YOU WANT TO PUT A LITTLE MONEY IN THERE, YOUR

11   KEYS, SOMETHING TO CARRY AROUND.

12   Q.    WHAT'S NEXT?

13   A.    SO 1404.13 WOULD BE A CINCH, IT WOULD BE ADDED -- THIS

14   USUALLY WOULD BIND OR CINCH UP THE WRIST AREA OF THE GLOVE.

15          AND THEN 1404.14 WOULD BE WHAT WE CALL THE BUNGEE

16   CORD.   THAT WOULD BE USED TO CINCH UP THE GAUNTLET OF THE

17   GLOVES.   AND THERE IS OTHER SMALLER ACCESSORIES THAT ARE

18   ADDED.

19          THIS WOULD BE -- THIS ONE HERE IS 1404.16.   THIS

20   WOULD BE A BUCKLE THAT WOULD BE ADDED TO THE SIDE OF THE

21   GLOVE SO YOU CAN PUT THE TWO GLOVES TOGETHER WHEN YOU'RE DONE

22   SKIING FOR THE DAY.   YOU KEEP THE GLOVES TOGETHER.   YOU DON'T

23   LOSE ONE OF THEM.

24          AND THEN 1404.17 WOULD JUST REPRESENT LABELS THAT WE

25   WOULD PUT, BRAND IDENTIFICATION LABELS, IN THIS CASE, A

1462

1   WATERPROOF, BREATHABLE THAT INDICATES THIS GLOVE IS

2   WATERPROOF.

3   Q.   WHAT IS THIS ITEM?  THIS IS -- WHAT IS 1404.1?

4   A.   1404.1 IS THE PARTIALLY CONSTRUCTED PALM PORTION.  SO

5   JUST KIND OF TO GIVE YOU A LOOK AT, THIS WOULD BE THE PALM,

6   IN THIS CASE, A POLYURETHANE PALM.  AGAIN, THAT SOFT SHELL

7   FABRIC IN THE CUFF.

8            THESE ARE WHAT WE WOULD CALL THE SIDEWALLS OF THE

9   GLOVES.  THAT GIVES THE GLOVE A THREE-DIMENSIONAL SHAPE.  AND

10  THESE ARE WHAT WE CALL THE FOURCHETTES OF THE GLOVE.  SO,

11  AGAIN, GIVING THAT THREE-DIMENSIONAL BOX FINGER SHAPE.

12           CHEAPER GLOVES ARE JUST PINCHED OFF AND SEWN AT THE

13  ENDS.  MAYBE THAT SIDEWALL IS STRAIGHT.  SO ON A HIGH-QUALITY

14  GLOVE, YOU CAN SEE THE CURVE THAT'S IN THAT SIDEWALL.  THAT

15  MAKES A VERY COMFORTABLE FORM FIT LIKE YOUR HAND SITS WHEN

16  IT'S RELAXED.

17  Q.   SO NOW CAN YOU TAKE -- PUT THESE TOGETHER FOR US SO THAT

18  WE CAN SEE HOW THAT WORKS?

19  A.   SO THE OUTER SHELL WOULD GET ASSEMBLED.  THIS WOULD BE

20  ALL DONE INSIDE OUT AS YOU CAN IMAGINE, BECAUSE YOU'VE GOT

21  ALL THE SEAMS ON THE INSIDE OF THE GLOVE.

22           SO THIS WOULD ALL GET ASSEMBLED LIKE THIS.  THE

23  BUNGEE CORD AT THE BOTTOM, THE BUCKLES AND THE LABELS ON THE

24  SIDE.  AND YOU'D END UP WITH THAT.  SO THAT WOULD BE A HALF

25  PAIR OF GLOVES, JUST THE SHELL.

1463

1    Q.    AND WHAT IS THAT?

2    A.    THIS IS A HALF PAIR OF GLOVES, JUST THE SHELL OF THE

3    HALF PAIR.  OH, I'M SORRY.  THE EXHIBIT NUMBER.

4    Q.    THERE ISN'T ONE.  LET'S CALL THIS 1404.20.

5          MS. ROTHAUGE:  PERMISSION TO SHARE 1404.20 WITH THE

6    JURORS AND LET THEM SEE THE SHELL?

7          THE WITNESS:  OKAY.

8          THE COURT:  WAIT A MINUTE.  1404.20 IS BEING

9    OFFERED.  ANY OBJECTION?

10          MR. AXELROD:  NO, YOUR HONOR.

11          THE COURT:  IT IS RECEIVED.  YOU MAY PUBLISH IT TO

12    THE JURY.

13          (TRIAL EXHIBIT 1404.20 RECEIVED IN EVIDENCE.)

14          THE WITNESS:  SO THIS WOULD BE DONE AT ONE OF OUR

15    PRIMARY FACTORIES.  THE FACTORIES THAT HAVE A HIGH QUALITY OF

16    SEWING CAPABILITY.

17          THEN OTHER LAYERS OF THE GLOVES ARE DONE AT A

18    SECONDARY FACTORY, EITHER A SUBCONTRACTOR OF THEIRS OR

19    ANOTHER FACTORY THAT THEY EMPLOY TO DO THE LINING LAYER.

20    Q.    BY MS. ROTHAUGE:  SO ARE WE NOW GOING TO BUILD THE

21    LINING SIDE OF THE GLOVE?

22    A.    CORRECT.  CORRECT.

23    Q.    CAN WE START WITH WHAT ARE THE BASIC PIECES OR MATERIALS

24    THAT YOU USED.  CAN YOU IDENTIFY THOSE BY NUMBER.

25    A.    SO THIS WOULD BE, IN THIS CASE, THE HEATWAVE GLOVE.

1464

1    THIS WOULD BE THE LINING FOR A HEATWAVE GLOVE,

2    EXHIBIT 1404.6.

3              AND, AGAIN, THIS MATERIAL WOULD BE DIE CUT INTO THE

4    VARIOUS SHAPES TO CREATE THE LINING THAT GOES IN.  SO IN THIS

5    CASE, THIS IS, YOU KNOW, A MUCH SIMPLER SEWING.  IT'S WHAT WE

6    CALL A GUN CUT, WHERE THE SEAM COMES ACROSS THE BOTTOM OF THE

7    TWO FINGERS.  THERE IS NO SIDEWALL.  THERE IS NO FOURCHETTES.

8    YOU DON'T WANT TO FEEL TOO MANY SEAMS IN THE VERY LINING OF

9    THE GLOVE.

10             SO THAT WOULD GET SEWN INDEPENDENTLY.  YOU HAVE THE

11   INSULATION, 1404.5.  THAT INSULATION AGAIN COULD COME FROM

12   UNITED STATES, CHINA, DEPENDING ON WHAT GLOVE MODEL, WHAT

13   PRICE LEVEL WE'RE AT.

14             THAT INSULATION WOULD GET COMBINED WITH THE LINING

15   TO MAKE THAT (INDICATING).  SO THAT'S THE LINING WITH THE

16   INSULATION COMBINED.

17   Q.   WHEN YOU SAY "THAT," WHAT IS THAT?

18   A.   THIS IS 1404.8.

19             MS. ROTHAUGE:  MOVE FOR ADMISSION OF 1404.8, YOUR

20   HONOR.

21             THE COURT:  ANY OBJECTION?

22             MR. AXELROD:  ARE YOU NOT GOING TO OFFER IT ALL, ALL

23   OF THE COMPONENTS?

24             MS. ROTHAUGE:  SHOULD I JUST PRE-OFFER THEM ALL?

25             OKAY.  I MOVE TO OFFER 1404.1 THROUGH 1404.20.

1465

1    THE COURT:  ANY OBJECTION?

2    MR. AXELROD:  NO, YOUR HONOR.

3    THE COURT:  RECEIVED.

4    (TRIAL EXHIBITS 1404.1 THROUGH 1404.20 RECEIVED IN

5    EVIDENCE.)

6    MS. ROTHAUGE:  DO YOU WANT TO GO AHEAD AND PASS THAT

7    TO THE JURY.

8    THE WITNESS:  OKAY.

9    Q.   BY MS. ROTHAUGE:  OKAY.  SO WE'VE BUILT THE SHELL HERE.

10   WE NOW HAVE ALSO -- YOU'VE BUILT -- YOU'VE EXPLAINED YOU'VE

11   BUILT THE LINER.

12   A.   THE LINING AND INSULATION LAYER.

13   Q.   AND THE INSULATION LAYER?

14   A.   CORRECT.

15   Q.   SO WHAT HAPPENS NEXT?

16   A.   SO THE KEY COMPONENT IN ANY OUTDOOR SPORTS, ESPECIALLY

17   SKI GLOVE, IS THAT WATERPROOF MEMBRANE.  AND IT'S KIND OF

18   FUNNY.  EVERYBODY AT OUR OFFICE KIND OF THINKS IT'S FUNNY.

19   YOU DON'T ENVISION THIS WHEN YOU LOOK AT A SKI GLOVE.

20        BUT THAT'S ACTUALLY A MEMBRANE THAT WOULD GO INTO A

21   GLOVE.  AND IT'S EXTRA LARGE LIKE THAT, BECAUSE THIS

22   TWO-LAYER MEMBRANE HAS TO FIT OVER A THREE-DIMENSIONAL

23   PRODUCT AND NOT BIND UP YOUR HAND, STILL FEEL COMFORTABLE

24   WHEN YOU GRIP SOMETHING OR YOU'RE DOING AN OUTDOOR SPORT.

25        SO THAT WATERPROOF LINER IS PUT OVER THE LAYER

COMPUTER-AIDED TRANSCRIPTION

1466

```
1    THERE, THE INSULATOR, THE LINING LAYER THAT YOU HAVE THERE.

2    Q.   WHAT IS THE EXHIBIT NUMBER ON THAT?

3    A.   THAT ONE IS 1404.3.

4    Q.   SO WHAT HAPPENS -- YEAH, EXPLAIN HOW -- WHAT'S GOING TO

5    HAPPEN AFTER WE'VE GOT THE INSULATIVE LAYER LINER AND THE

6    MEMBRANE.  WHAT HAPPENS?

7    A.   SO THAT NOW GETS COMBINED ONTO -- SOMETIMES ONTO A MOLD

8    OR SOMETIMES JUST BY HAND.  THIS IS 1404.9.  AND THAT'S THE

9    COMBINED WATERPROOF MEMBRANE LAYER WITH THE LINING AND THE

10   LINER.

11   Q.   NOW, I NOTICE THERE WAS A LITTLE BIT OF TAPE, KIND OF

12   ACROSS OF THAT?

13   A.   THERE IS.

14   Q.   WHY IS THAT?

15   A.   SO WHEN YOU -- WHEN THEY PUT THAT INTO THE OUTER SHELL,

16   THAT'S BEING PASSED AROUND NOW, THERE NEEDS -- YOU DON'T --

17   WHEN YOU PULL YOUR HAND OUT OF THE GLOVE, YOU DON'T WANT TO

18   PULL OUT THE LINING IN THE LAYER OF THE GLOVE.

19        SO THEY WILL PUT A LITTLE BIT OF GLUE ON THAT

20   INSULATIVE LAYER AND GET THAT TO GLUE INTO THE WATERPROOF

21   INSERT, AND THEN YOU CAN SEE A LITTLE BIT OF TAPE THERE.

22   THEY WILL LOOSELY TACK IN THAT LAYER INTO THE OUTER SHELL SO

23   THAT IT DOESN'T COME OUT ACCIDENTALLY WHEN YOU'RE ON THE

24   SLOPES.

25   Q.   BUT SINCE IT'S -- BUT LET'S TALK ABOUT THAT.  SO YOU
```

1467

```
1   TACK THOSE SIDES, BUT YOU DON'T SEW THEM?

2   A.   CORRECT.

3   Q.   NOW, WHY AREN'T YOU SEWING THE LONG FINGERS TO SEW THE

4   MEMBRANE AND LINER IN?

5   A.   WELL, IF YOU WERE TO SEW THE WHOLE THING IN -- I DON'T

6   KNOW THAT IT CAN BE DONE THAT EASY.  IF YOU SEW THE WHOLE

7   THING IN, IT WOULD BIND DOWN AND IT WOULD BIND UP THE GLOVE,

8   AND WHEN YOU FLEXED THE GLOVE OR BENT YOUR HAND, IT WOULDN'T

9   BE COMFORTABLE.

10        SO WITH GORTEX -- GORTEX ACTUALLY, WE TACK IN AT THE

11  TIPS.  THAT'S THE WAY THEY DESIGNED THEIR LINER.  WITH OUR

12  LINERS, WE DO SOME TACKING AT THE TIPS AND THEN WE DO SOME

13  TACKING AT THE SIDES.

14        SO ON A GLOVE LIKE THIS, THAT HAS A ROLLED FINGER,

15  THOSE ARE TYPICALLY TACKED IN THE SIDES AWAY FROM THE TIP.

16  Q.   AND SO THE LINER CAN BE PULLED OUT?

17  A.   CORRECT.  CORRECT.  IT'S -- THE GORTEX INTERNATIONAL

18  TEST IS FIVE POUNDS OF PRESSURE.  SO WE FOLLOW THAT SAME

19  STANDARD WITH OUR FACTORIES.  IT HAS TO WITHSTAND ABOUT FIVE

20  POUNDS OF PRESSURE TO PULL IT OUT.

21  Q.   SO IS THERE NOW A FINAL STEP.  TELL US ABOUT THE FINAL

22  STEP.

23  A.   SO THEN ONCE THOSE TWO ARE COMBINED, THE OUTER SHELL IS

24  PULLED OVER THAT FINAL LAYER, AND THEN IT IS BOUND AT THE

25  BOTTOM WITH THAT BUNGEE CORD WE TALKED ABOUT.  SO THAT SEALS
```

1468

1    UP, SO YOU CAN SEAL UP THE GLOVE SO THERE IS NO SNOW THAT

2    GETS INTO THE INSIDE OF THE HAND.

3            MS. ROTHAUGE:  ALL RIGHT.  I THINK THE ONLY OTHER

4    THING -- LET'S HAND OUT THESE, TOO, SO THE JURY CAN FEEL FREE

5    TO SEE ANY OF THE THESE.  THE COMPONENTS I'M A LITTLE WORRIED

6    ABOUT.

7            THE WITNESS:  THIS ONE HAS A LITTLE WAX PAPER ON

8    IT.

9            THE COURT:  ONE OF THE THINGS THAT DOESN'T HAPPEN IS

10   YOU DON'T HAVE CONVERSATIONS WITH THE JURY.

11           THE WITNESS:  OH, OKAY.

12           SO THE WATERPROOF MEMBRANE HAS WAX PAPER ON IT JUST

13   FOR STABILITY.

14           MS. ROTHAUGE:  ALL RIGHT.  I'LL ASK YOU TO SIT BACK

15   DOWN.

16           THE WITNESS:  OKAY.

17   Q.   BY MS. ROTHAUGE:  I HAVE HERE EXHIBIT 1404.6, WHICH IS A

18   SWATH OF THE MEGA-HEAT FABRIC WITH THE FOIL PRINTING.

19   A.   OKAY.

20   Q.   HAVE YOU HEARD ABOUT THE TERM "MANUFACTURING

21   VARIANCE"?

22   A.   YES.

23   Q.   IS THERE A VARIANCE, MANUFACTURING VARIANCE WITH THIS

24   TYPE OF FABRIC, WITH THE SEIRUS LINING?

25   A.   WITH EVERY TYPE OF FABRIC THERE IS, INCLUDING THE

1469

1    MEGA-HEAT FABRIC.

2    Q.    CAN YOU -- AND WHAT CAUSES THE MEGA-HEAT RX FABRIC

3    THAT'S USED FOR THIS LINING TO HAVE MANUFACTURING VARIANCE?

4    A.    IN THIS CASE, OUR EXPERIENCE HAS BEEN WITH THE BASE --

5    THE BASE LAYER, THE BASE KNITTING LAYER CAN HAVE A VARIANCE

6    IN THE DYE LOT; CERTAINLY THE COLOR CAN BE DIFFERENT SHADES

7    OF BLACK.

8         WE'VE HAD EXPERIENCE WITH THE BRUSHING OR THE

9    FINISHING BEING EITHER TOO LIGHT OR TOO THICK.  AND WE'VE HAD

10   SOME VARIATION WITH THE STRETCH OF THE FABRIC.  IN SOME

11   ITERATIONS, ONCE WE CUT THOSE LITTLE FOURCHETTE PIECES, THE

12   FABRIC HAS CURLED UP ON US.

13        WE'VE ALSO HAD VARIANCE WITH THE FOIL TYPE.

14   SOMETIMES THE FOIL WILL COME OUT A LITTLE BIT THICK, A LITTLE

15   BIT TOO -- YOU KNOW, THE THICKNESS CAN AFFECT THE PRINT

16   RANGE.  A LITTLE BIT TOO SILVER, A LITTLE BIT TOO PEWTER

17   COLOR.

18   Q.    AND SO DOES THIS FABRIC COME IN LOTS?

19   A.    YES.  IT COMES IN LOTS OF 500 YARDS.

20   Q.    OKAY.  SO 500 YARD -- ARE THEY ROLLS?

21   A.    THE ROLLS ARE SMALLER.  BUT THE LOTS THAT THE FACTORY

22   CONTROLS ARE IN 500-YARD LOTS.

23   Q.    AND HOW MANY LOTS HAVE BEEN USED FOR MANUFACTURING

24   HEATWAVE GLOVES, THE ONES AT ISSUE IN THIS CASE?

25   A.    OVER 150 I WOULD SAY.

1470

1    MS. ROTHAUGE:  I HAVE NO FURTHER QUESTIONS.  OH, I

2    MIGHT HAVE ONE FURTHER QUESTION.

3    MR. AXELROD:  YOUR HONOR --

4    MS. ROTHAUGE:  I DO HAVE ONE MORE QUESTION.

5    Q.   ARE YOU AWARE THAT -- ARE YOU FAMILIAR WITH THE GLOVES

6    THAT ARE BEING MANUFACTURED -- THAT YOU'RE MANUFACTURING THAT

7    HAVE -- THEY HAVE SOME -- WHERE THEY ARE BRUSHED, WHERE THE

8    FOIL FACES AWAY FROM THE USER AND SOME WHERE THE FOIL

9    FACES -- IS UP AGAINST THE WEARER?

10   A.   YES.  OF COURSE.

11   Q.   AND WHAT ARE THE NAMES OF THOSE GLOVES?

12   A.   IT'S PART OF OUR HEATWAVE-PLUS COLLECTION.

13   Q.   OKAY.  AND WHAT IS THE RATIO OF FOIL PRINT FACING THE

14   SKIN VERSUS THE BRUSHED SIDE FACING THE SKIN ON THOSE

15   PRODUCTS?

16   A.   THE BRUSH SIDE IS APPROXIMATELY 60 PERCENT OF THE

17   COVERAGE.  THE FOIL BEING ABOUT 40 PERCENT.

18   MS. ROTHAUGE:  ALL RIGHT.  I THINK I NOW HAVE NO

19   FURTHER QUESTIONS.

20   THE COURT:  ALL RIGHT.

21   YOU WERE GOING TO SAY SOMETHING.

22   MR. AXELROD:  I HAVE PROBABLY MORE THAN A HALF AN

23   HOUR.  AND GIVEN THE LATE HOUR, I'D LIKE TO DO IT FIRST THING

24   MONDAY.

25   THE COURT:  OKAY.  IT'S TEN MINUTES TO 5 O'CLOCK.

COMPUTER-AIDED TRANSCRIPTION

1  WE'LL TAKE AN EARLY RECESS FOR THE DAY.  IT'S FRIDAY.  I WILL

2  SEE YOU ON MONDAY MORNING.  SAME TIME.

3        PLEASE REMEMBER THE PRECAUTIONARY INSTRUCTION

4  DIRECTING YOU NOT TO DISCUSS THE CASE.  LEAVE YOUR MATERIALS

5  WHEREVER BERNADETTE TELLS YOU TO.  AND HAVE A GREAT WEEKEND.

6        I'LL SEE YOU MONDAY, SAME TIME, SAME PLACE.

7        THANK YOU SO MUCH.

8        (JURY ABSENT, 4:52 P.M.)

9        THE COURT:  PLEASE BE SEATED.  YOU MAY STEP DOWN.

10        AS SOON AS THE JURY LEAVES, WE'LL DISCUSS OUR

11  HOMEWORK ASSIGNMENTS.

12        SO I AM WORKING ON JURY INSTRUCTIONS RIGHT NOW.

13  WE'RE ABOUT THREE-QUARTERS OF THE WAY THROUGH OUR PROPOSED

14  INSTRUCTIONS.  I WILL PLAN ON BEING ABLE TO HAVE A

15  CONVERSATION WITH YOU ABOUT THOSE TUESDAY.

16        AS I RECALL FROM THIS MORNING, THE PLAN WAS THAT ALL

17  OF THE EVIDENCE WOULD BE DONE ON TUESDAY; IS THAT CORRECT?

18        MR. MARCHESE:  I BELIEVE THAT'S CORRECT, YOUR

19  HONOR.

20        THE COURT:  AND THE BEST GUESS WAS TUESDAY BY NOON

21  IT WILL BE DONE, OR TUESDAY EARLY AFTERNOON.  WHAT DO YOU ALL

22  THINK?

23        MR. ALDRICH:  I THINK WE GOT PROBABLY PUSHED BACK A

24  LITTLE BIT TODAY.  I THINK THE GOAL WAS TO GET THROUGH BLOCK

25  TODAY, AND WE DID NOT GET THROUGH MURPHY TODAY.  SO I THINK

1472

1    IT WILL PROBABLY BE LATER THAN NOON ON TUESDAY, I GUESS.

2              MR. MARCHESE:  I THINK WE MIGHT MAKE IT BY THEN.  IT

3    WILL BE CLOSE.

4              THE COURT:  OKAY.  ALL RIGHT.  IF WE HAVE A COUPLE

5    OF HOURS IN THE AFTERNOON, WE'LL START TAKING UP

6    INSTRUCTIONS.  THERE IS A LOT OF INSTRUCTIONS IN THESE CASES.

7              IN ANY EVENT, AND ONE OF THE THINGS WE MAY WANT TO

8    THINK ABOUT -- AND I'LL LEAVE IT TO YOU.  SO I'M GOING TO

9    GIVE COPIES OF WHATEVER JURY INSTRUCTIONS WE SETTLE ON TO THE

10   JURORS.  THEY WILL EACH HAVE THEIR OWN COPY OF THE

11   INSTRUCTIONS.

12             IN SOME CASES, THERE ARE AS MANY AS 60 INSTRUCTIONS.

13   ME READING 60 INSTRUCTIONS OVER THE COURSE OF TWO HOURS OR

14   MORE TO THE JURY DOES NOT REALLY SIT WELL WITH ME.  I'D

15   RATHER NOT DO THAT.  EVEN IF IT'S 30 INSTRUCTIONS, WE'RE

16   TALKING ABOUT WELL OVER AN HOUR OF READING.

17             ONE OF THE WAYS WE CAN AT LEAST SHORTEN SOME OF THE

18   INSTRUCTIONS WOULD BE NOT TO REPEAT SOME OF THE INSTRUCTIONS

19   AT THE BEGINNING.  I'LL GIVE THEM COPIES OF THOSE

20   INSTRUCTIONS.  I SIMPLY WON'T RE-READ THE INSTRUCTIONS

21   REGARDING, FOR EXAMPLE, WITNESSES OR WHAT IS EVIDENCE, DIRECT

22   AND CIRCUMSTANTIAL EVIDENCE.

23             JUST -- NOT BECAUSE I DON'T THINK THEY ARE

24   IMPORTANT, BUT BECAUSE I DON'T WANT TO SPEND TWO HOURS

25   READING WHEN I CAN GET IT DONE IN A LITTLE OVER AN HOUR.  AND

1473

1    I THINK AN HOUR OF READING IS REALLY TOUGH FOR JURORS

2    ANYWAYS.

3            IF YOU HAVE ANY OTHER SUGGESTIONS ABOUT HOW WE MIGHT

4    SHORTEN THE INSTRUCTIONS, I'D BE HAPPY TO HEAR FROM YOU ABOUT

5    HOW TO DO THAT.

6            YOUR HOMEWORK ASSIGNMENT HAS TO DO WITH THE ISSUE

7    OF -- THAT I RAISED EARLIER TODAY AT HALFTIME, WHICH IS HOW

8    WE'RE GOING TO FIGURE OUT OR INSTRUCT THE JURY THAT IF THEY

9    DECIDE THAT THE ARTICLE OF MANUFACTURE IS SOMETHING LESS THAN

10   THE WHOLE GLOVE, HOW DO THEY THEN FIGURE OUT WHAT DAMAGES

11   SHOULD BE REGARDING SOMETHING LESS THAN THE FULL GLOVE AS THE

12   ARTICLE OF MANUFACTURE AND HOW TO COMPUTE THAT.

13           AND, AGAIN, I THINK THAT THERE IS A FACTUAL MATTER

14   THAT IS INVOLVED IN THAT, THAT THERE MAY ALSO JUST BE AS A

15   MATTER OF LAW, THIS IS HOW YOU REACH THOSE CALCULATIONS.  I

16   ASKED YOU FOR BRIEFING ON THAT.  IF YOU COULD GET THAT TO ME

17   BEFORE WE GET TO THE END OF THIS -- AND I'M TALKING TO YOU

18   ABOUT INSTRUCTIONS -- THAT WOULD BE HELPFUL.  I'M THINKING

19   THAT IF IT'S A MATTER OF LAW, I'M GOING TO HAVE TO INSTRUCT

20   THEM ON THIS ISSUE.

21           I DON'T KNOW -- WE HAVE EXHIBIT NO. 184 THAT WE NEED

22   TO GET RESOLVED BEFORE YOU LEAVE.  MAKE SURE THAT BERNADETTE

23   HAS ALL OF THE EXHIBITS, THAT YOU DON'T HAVE SOME MISTAKENLY

24   IN YOUR PILE OF THINGS AS REGARDS TO EXHIBITS THAT HAVE BEEN

25   RECEIVED, AND THAT YOU'RE LEAVING COURT WITH EXHIBITS THAT

1474

1    HAVE ALREADY BEEN INTRODUCED.  SO GET THE EXHIBIT THING

2    SQUARED AWAY WITH BERNADETTE BEFORE YOU TAKE OFF.

3         I THINK THOSE ARE ALL THE THINGS ON MY PLATE AS

4    REGARDS HOMEWORK ASSIGNMENT.  YOU HAVE EXHIBIT 184.

5         MR. ALDRICH:  THIS IS 184.  THIS WAS DR. COLE'S TEST

6    RESULTS FROM THE 30- TO 70-PERCENT COVERAGE MEASUREMENT.

7         THE COURT:  I DON'T REMEMBER WHETHER IT WAS OFFERED

8    OR NOT.  ARE YOU OFFERING 184?

9         MR. ALDRICH:  IT WAS -- CAN I HAVE HER EXPLAIN.

10   SHE'S ACTUALLY SITTING HERE LOOKING AT IT.

11        MS. BURK:  YOUR HONOR, THIS WAS THE EXHIBIT WHERE

12   THERE WAS A DISCUSSION ABOUT BEING AT THE DEPOSITION, AND

13   WHETHER IT WAS THERE OR WASN'T THERE.

14        AND THEN MR. ALDRICH READ FROM THE TRANSCRIPT WHERE

15   THERE WAS TWO COPIES.  AND THEN AT THE END IN THE TRANSCRIPT,

16   YOU SAY I'VE HEARD ENOUGH.  THE OBJECTION IS OVERRULED.  YOU

17   MAY PROCEED.

18        MR. ALDRICH:  BUT I DON'T THINK YOU EVER RECEIVED

19   IT.  BUT THE OBJECTION TO NOT HAVE IT ADMITTED WAS OVERRULED.

20        THE COURT:  I JUST DIDN'T SAY THE MAGIC WORD.

21        MR. ALDRICH:  THAT'S CORRECT.

22        THE COURT:  RECEIVED.

23        (TRIAL EXHIBIT 184 RECEIVED IN EVIDENCE.)

24        MR. ALDRICH:  AND I DON'T -- I DON'T BELIEVE THAT

25   ANY OF IT WAS ACTUALLY SHOWN ON THE SCREEN.  BUT IT WAS STILL

COMPUTER-AIDED TRANSCRIPTION

1475

1   OFFERED AND --

2           THE COURT:  NEEDS TO BE RULED ON.

3           MR. SPROUL:  AS MUCH AS I'D LIKE TO RE-LITIGATE,

4   YOUR HONOR, I THINK IT WAS RULED ON.

5           THE COURT:  OKAY.  SO RECEIVED.  MAGIC WORDS DONE.

6           MR. ALDRICH:  THANK YOU, YOUR HONOR.

7           THE COURT:  ALL RIGHT.  FROM PLAINTIFF'S

8   PERSPECTIVE, ARE THERE ANY OTHER HOMEWORK ASSIGNMENTS THAT WE

9   NEED TO BE THINKING ABOUT?

10          MR. ALDRICH:  I HAVE A COUPLE OF ISSUES.

11          NO. 1, THEY HAD SHOWN AN E-MAIL THAT TOOK PLACE IN

12  DECEMBER 2013.  I DIDN'T WRITE DOWN THE EXHIBIT NUMBER.  BUT

13  IT HAD TO DO WITH A KOREA ISSUE.  I BELIEVE IT WAS ADMITTED,

14  AND THAT SHOULD BE WITHDRAWN.

15          MR. MARCHESE:  I THINK WE AGREED THAT IT WOULD BE

16  WITHDRAWN.  I THOUGHT WE ALREADY DECIDED THAT, 499.

17          THE COURT:  ALL RIGHT.  499 IS WITHDRAWN.

18          MR. ALDRICH:  THANK YOU.

19          THE COURT:  THANK YOU.

20          MR. ALDRICH:  SECOND ISSUE.  WE HAVE ONE LINGERING

21  DISPUTE WITH RESPECT TO DR. BLOCK'S SLIDES HE'S PLANNING ON

22  PRESENTING.

23          THE COURT:  OH, OKAY.  THIS IS A CONTINUATION OF OUR

24  DISCUSSION AT HALFTIME.

25          MR. ALDRICH:  WE GOT IT DOWN -- I THINK IT WAS THIS

1476

1    MORNING.  BUT WE GOT THE DISPUTE DOWN TO THERE IS A SINGLE

2    SLIDE.  WE BELIEVE HE'S GOING BEYOND THE SCOPE OF HIS REPORT.

3    THEY SAY HE'S NOT.

4            IF IT WOULD BE HELPFUL, WE COULD PROVIDE THE SLIDE.

5    WE CAN WRITE IT UP, SEND IT TO YOU OVER THE WEEKEND WHAT THE

6    ISSUE IS.  BUT I THINK DR. BLOCK IS GOING TO TESTIFY ON

7    MONDAY; SO IT WOULD BE HELPFUL TO GET RESOLUTION ON THAT.

8            THE COURT:  IT INVOLVES ONE SLIDE?

9            MR. ALDRICH:  IT'S A SINGLE SLIDE.

10           THE COURT:  OKAY.

11           MR. ALDRICH:  IS THERE A WAY WE CAN --

12           THE COURT:  IF YOU CAN JUST FORWARD ME THE SLIDE,

13   FORWARD ME YOUR TWO OR THREE PAGES, DON'T GIVE ME MORE THAN

14   THAT ABOUT WHERE IT IS IN THE REPORT.  FORWARD ME YOUR

15   ARGUMENTS ABOUT WHY IT'S NOT IN THE REPORT, EVEN THOUGH THEY

16   SAY IT IS.

17           MR. ALDRICH:  THANK YOU.

18           THE COURT:  AND I WILL LET YOU KNOW WHAT I THINK ON

19   MONDAY.

20           MR. ALDRICH:  AND THEN FINALLY, THIS DOVETAILS ON

21   THE ISSUE ABOUT ARTICLE OF MANUFACTURE.  BUT WE DO HAVE THE

22   LINGERING DAUBERT MOTION ON THAT QUESTION, ABOUT WHETHER

23   THEIR EXPERTS CAN OPINE ON THE ISSUE.

24           THERE WERE TWO -- TWO ISSUES THERE.  ONE OF THEM WAS

25   A DISCOVERY AND TIMELINESS ISSUE, AND THEN THE OTHER ONE

1477

1    WAS -- WE ARE ARGUING THAT BECAUSE THEY DID NOT APPLY THE LAW

2    CORRECTLY, ON APPORTIONMENT, BECAUSE THE DAMAGES EXPERT HAS

3    INCLUDED LABOR COSTS, FOR EXAMPLE, AND OTHER SIMILAR COSTS,

4    THAT HER METHODOLOGY IS NOT RELIABLE AND NOT ADMISSIBLE.

5              THE COURT:  I FORGOT ABOUT THAT BEING PART OF MY

6    HOMEWORK ASSIGNMENT.  I HAVE READ YOUR BRIEFING FROM BOTH

7    SIDES THAT YOU PROVIDED ON THAT ISSUE, BUT I HAVE NOT

8    DECIDED.  BUT I WILL HAVE AN ANSWER FOR YOU ON MONDAY

9    MORNING.

10             AND THAT WAS -- YOUR DAUBERT OBJECTIONS WERE BOTH

11   FOR DR. BLOCK AND FOR THE OTHER PERSON WHOSE NAME ESCAPES ME.

12             MR. AXELROD:  CAREY DISTLER.

13             MR. ALDRICH:  THEY REPRESENTED TO THE COURT TODAY

14   THAT DR. BLOCK WILL NOT BE OPINING IN THE WAY THAT WE FOUND

15   TO BE OFFENSIVE.

16             THE COURT:  RIGHT.

17             MR. ALDRICH:  SO IT RELATES I THINK AT THIS POINT

18   EXCLUSIVELY WITH MS. DISTLER WITH RESPECT TO THE DAUBERT

19   ISSUES.  THE DISCOVERY ISSUES APPLY I THINK TO BOTH.

20             THE COURT:  OKAY.  AND I'M SORRY.  SO THERE IS

21   STILL -- BESIDES THE SLIDE THAT WE'RE TALKING ABOUT WITH

22   DR. BLOCK, THERE IS STILL SOME DISCOVERY ISSUES WITH

23   DR. BLOCK?

24             MR. ALDRICH:  WELL, THE SLIDE RELATES TO

25   INVALIDITY.

COMPUTER-AIDED TRANSCRIPTION

1    THE COURT:  OKAY.

2    MR. ALDRICH:  BUT THEN SEPARATELY -- AND I'M GOING

3    TO TRY NOT TO ARGUE, BECAUSE I DON'T WANT TO WASTE A LOT OF

4    OUR TIME BACK-AND-FORTH ARGUMENT.  BUT ESSENTIALLY WHAT THE

5    ISSUE IS IS THEY PRODUCED REPORTS REGARDING THIS ARTICLE OF

6    MANUFACTURE ISSUE LATE.

7    THE COURT:  WELL, LET ME SEE IF I CAN INTERRUPT YOU

8    FOR A MINUTE.

9    AS REGARDS DR. BLOCK, ARE THE ISSUES THAT YOU FILED

10   YOUR MOTION, YOUR DAUBERT MOTION AND I THINK IT WAS A

11   DISCOVERY MOTION, ARE THEY -- DID YOU ALREADY RAISE THE

12   ISSUES?  THOSE ARE THE SAME ISSUES THAT ARE ALREADY IN

13   SUBMISSIONS THAT YOU'VE ALREADY GIVEN TO THE COURT?

14   MR. ALDRICH:  YES.  THE ISSUES ARE ALL SUBMITTED TO

15   THE COURT THERE.

16   THE COURT:  OKAY.

17   MR. ALDRICH:  THE ONE SLIDE DISPUTE IS AN INVALIDITY

18   SLIDE AND IS UNRELATED.

19   THE COURT:  OKAY.  ALL RIGHT.  SO I -- LIKE I SAID,

20   I HAVE READ EVERYTHING IN THERE.  I JUST HAVEN'T DECIDED WHAT

21   TO DO WITH IT YET.

22   I THINK I READ IT LAST NIGHT AND FINISHED IT THIS

23   MORNING.  SO I HAVE AN UNDERSTANDING WHAT YOUR ARGUMENTS ARE

24   AND WHAT THE ISSUES ARE.  I JUST HAVEN'T GOTTEN TO THE WHAT

25   ARE YOU GOING TO DO ABOUT IT.  I THINK THAT IN READING IT,

1479

```
 1    I'M ALSO CLUED IN ON THAT WE WERE GOING TO HAVE THIS PROBLEM

 2    THAT I GAVE YOU YOUR HOMEWORK ASSIGNMENTS ABOUT REGARDING

 3    WHAT WE'RE GOING TO DO WITH THE ART.

 4              I MEAN, THAT'S THE GENESIS OF MY QUESTION IS WHAT

 5    ARE WE GOING TO DO WITH THIS ARTICLE OF MANUFACTURE IF THE

 6    JURY DECIDES THAT THE ARTICLE OF MANUFACTURE IS SOMETHING

 7    LESS.  THEN WHAT DO THEY DO AS FAR AS DAMAGES OR ANYTHING

 8    ELSE THAT THEY ARE GOING TO DO?  THAT STILL REMAINS AN OPEN

 9    QUESTION TO ME.

10              BUT ANYWAYS, THE GENESIS OF ME TALKING ABOUT THAT IS

11    READING YOUR --

12              MR. ALDRICH:  I HAD FIGURED THAT'S WHAT TRIGGERED

13    IT, BUT I STILL WANTED TO REMIND YOU --

14              THE COURT:  THAT WE STILL NEED AN ANSWER.

15              MR. ALDRICH:  THAT'S CORRECT.

16              THE COURT:  ANYTHING ELSE FROM YOUR SIDE?

17              MR. MARCHESE:  NO, YOUR HONOR.

18              THE COURT:  WELL, HAVE A SWELL WEEKEND, EVERYONE.

19              MR. ALDRICH:  THANK YOU, YOUR HONOR.

20              THE COURT:  SEE YOU NEXT WEEK.

21              MR. MARCHESE:  THANK YOU.

22              THE COURT:  WE'LL CHECK IN AT 8:30 WITH EACH

23    OTHER.

24              MR. MARCHESE:  8:30  OKAY.

25              (PROCEEDINGS ADJOURNED AT 5:05 P.M.)
```

COMPUTER-AIDED TRANSCRIPTION

1480

--oOo--

C E R T I F I C A T I O N

1        I HEREBY CERTIFY THAT I AM A DULY APPOINTED,

2    QUALIFIED AND ACTING OFFICIAL COURT REPORTER FOR THE UNITED

3    STATES DISTRICT COURT; THAT THE FOREGOING IS A TRUE AND
     CORRECT TRANSCRIPT OF THE PROCEEDINGS HAD IN THE

4    AFOREMENTIONED CAUSE; THAT SAID TRANSCRIPT IS A TRUE AND
     CORRECT TRANSCRIPTION OF MY STENOGRAPHIC NOTES; AND THAT THE

5    FORMAT USED HEREIN COMPLIES WITH THE RULES AND REQUIREMENTS
     OF THE UNITED STATES JUDICIAL CONFERENCE.

6

7        DATED:  SEPTEMBER 22, 2017, AT SAN DIEGO,
     CALIFORNIA.

8

9                               S/CAMERON P. KIRCHER
                                CAMERON P. KIRCHER

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

COMPUTER-AIDED TRANSCRIPTION

1481

1        UNITED STATES DISTRICT COURT

2       SOUTHERN DISTRICT OF CALIFORNIA

3

4    COLUMBIA SPORTSWEAR NORTH        )
     AMERICA, INC., AN OREGON         )
5    CORPORATION,                     )
                                      )
6              PLAINTIFF,             ) CASE NO. 17CV1781-HZ
                                      )
7    VS.                              ) SAN DIEGO, CALIFORNIA
                                      )
8    SEIRUS INNOVATIVE ACCESSORIES,) MONDAY,
     INC., A UTAH CORPORATION,        ) SEPTEMBER 25, 2017
9                                     ) 8:33 A.M.
               DEFENDANT.             )
10   _____)

11

12

13        REPORTER'S TRANSCRIPT OF PROCEEDINGS

14              JURY TRIAL

15         VOLUME 6 - AM SESSION

16          PAGES 1481 - 1615

17    BEFORE THE HONORABLE MARCO A. HERNANDEZ
         UNITED STATES DISTRICT JUDGE

18

19

20

21

22   REPORTED BY:  CAMERON P. KIRCHER
                   CSR NO. 9427, RPR, CRR, RMR
23                 333 W. BROADWAY, SUITE 420
                   SAN DIEGO, CALIFORNIA  92101
24                 E-MAIL:  CPKIRCHER@GMAIL.COM

25

COMPUTER-AIDED TRANSCRIPTION

1482

1    APPEARANCES:

2    FOR THE PLAINTIFF:    SCHWABE, WILLIAMSON & WYATT, P.C.
                          BY:   NIKA F. ALDRICH, JR., ESQ.
3                               DAVID W. AXELROD, ESQ.
                                BRENNA LEGAARD, ESQ.
4                         1211 SW 5TH AVENUE
                          SUITE 1900
5                         PORTLAND, OREGON  97204

6
     FOR THE DEFENDANT:    FISH & RICHARDSON, P.C.
7                          BY:   CHRISTOPHER S. MARCHESE, ESQ.
                                 SETH M. SPROUL, ESQ.
8                          12390 EL CAMINO REAL
                           SAN DIEGO, CALIFORNIA  92130
9
                           MARKOWITZ HERBOLD, P.C.
10                         BY:   RENEE ROTHAUGE, ESQ.
                           1211 SW FIFTH AVENUE
11                         SUITE 3000
                           PORTLAND, OREGON  97204
12

13

14

15

16

17

18

19

20

21

22

23

24

25

COMPUTER-AIDED TRANSCRIPTION

1483

# INDEX

EXAMINATION

WITNESS NAME                                                          PAGE

ROBERT MURPHY

    CROSS BY MR. AXELROD ........................................ 1515
    RE-DIRECT BY MS. ROTHAUGE ................................. 1543

IRA BLOCK, PH.D.

    DIRECT BY MR. SPROUL ...................................... 1546
    CROSS BY MR. ALDRICH ...................................... 1580

# EXHIBITS

EXHIBIT                                                              PAGE

EXHIBIT 220.1 ENTERED INTO EVIDENCE                                   1543
EXHIBIT 221.1 ENTERED INTO EVIDENCE                                   1543
EXHIBIT 223.2 ENTERED INTO EVIDENCE                                   1533
EXHIBIT 252.2 ENTERED INTO EVIDENCE                                   1543
EXHIBIT 435 ENTERED INTO EVIDENCE                                     1539
EXHIBIT 443 ENTERED INTO EVIDENCE                                     1538
EXHIBIT 739 ENTERED INTO EVIDENCE                                     1599
EXHIBIT 1040 ENTERED INTO EVIDENCE                                    1555
EXHIBIT 1116 ENTERED INTO EVIDENCE                                    1573
EXHIBIT 1123 ENTERED INTO EVIDENCE                                    1573
EXHIBIT 1125 ENTERED INTO EVIDENCE                                    1573
EXHIBIT 1126 ENTERED INTO EVIDENCE                                    1573
EXHIBIT 1156 ENTERED INTO EVIDENCE                                    1573
EXHIBIT 1158 ENTERED INTO EVIDENCE                                    1573
EXHIBIT 1227.13 ENTERED INTO EVIDENCE                                 1529
EXHIBIT 1227.15 ENTERED INTO EVIDENCE                                 1517
EXHIBIT 1227.20 ENTERED INTO EVIDENCE                                 1517
EXHIBIT 1227.69 ENTERED INTO EVIDENCE                                 1529
EXHIBIT 1227.164 ENTERED INTO EVIDENCE                               1532
EXHIBIT 1227.84 ENTERED INTO EVIDENCE                                1534

COMPUTER-AIDED TRANSCRIPTION

1484

1    SAN DIEGO, CALIFORNIA - MONDAY, SEPTEMBER 25, 2017

2                    8:33 A.M.

3        (JURY ABSENT.)

4        THE COURT:  PLEASE BE SEATED.  GOOD MORNING.

5        MR. MARCHESE:  GOOD MORNING.

6        MR. AXELROD:  GOOD MORNING, YOUR HONOR.

7        THE COURT:  WELCOME BACK.  GOOD TO BE ALIVE.

8        SO WE HAVE SOME THINGS TO TALK ABOUT.  LET'S SEE.

9    LET'S FIRST TALK ABOUT COLUMBIA'S CONCERN ABOUT DR. BLOCK AND

10   DISTLER.  AND COLUMBIA HAS FILED MOTIONS TO EXCLUDE, I DON'T

11   KNOW IF IT'S ALL THE SUPPLEMENTAL REPORT, BUT IT WAS A

12   PORTION OF THE SUPPLEMENTAL REPORT REGARDING BOTH OF THOSE

13   INDIVIDUALS.

14       AND WITH DR. BLOCK, THE OBJECTION WAS THAT

15   INFORMATION IN THE SUPPLEMENTAL REPORT WAS AFTER MY DEADLINE

16   FOR PROVIDING SUPPLEMENTAL REPORTS.  AND WITH DISTLER, THE

17   PROBLEM IS A LITTLE MORE COMPLICATED, BECAUSE THAT REPORT WAS

18   EVEN LATER, AND IT INCLUDED AND WAS BASED ON -- INFORMATION

19   WAS BASED ON DATA THAT COLUMBIA HAD SOUGHT TO RECEIVE THAT

20   HAD BEEN DENIED DURING THE COURSE OF DISCOVERY.  AND THERE IS

21   AN ARGUMENT THAT THE PERSPECTIVE REGARDING THE ARTICLE OF

22   MANUFACTURE IS CONTRARY TO THE LAW.

23       SEIRUS RESPONDS BY SAYING, FIRST OF ALL, THE COURT

24   HADN'T YET TOLD US PRECISELY WHAT THE RULING WOULD BE

25   REGARDING ARTICLE OF MANUFACTURE, SO WHILE LATE, WE HAVE GOOD

1485

1    REASONS FOR BEING LATE.

2         SECONDLY, AS REGARDS DISTLER, THE INFORMATION THAT

3    COLUMBIA IS COMPLAINING ABOUT THAT THEY DIDN'T RECEIVE IN

4    DISCOVERY ACTUALLY WAS DISCLOSED THROUGH THE DEPOSITION OF A

5    FINANCIAL EXPERT; SO THEY HAVE IT AND HAVE HAD IT.

6         AND THEN, THIRD, AS REGARDS THE LEGAL ISSUE WITH THE

7    ARTICLE OF MANUFACTURE, THAT'S A MATTER OF OPINION I GUESS AS

8    REGARDS AS TO WHETHER OR NOT IT IS OR IS NOT INCONSISTENT

9    WITH THE STATE OF THE LAW.  THAT'S MY SUMMARY.

10        SO LET ME HEAR FROM -- IT'S YOUR MOTION TO EXCLUDE,

11   BUT TELL ME WHAT ELSE I'M MISSING.

12        MR. AXELROD:  I THINK YOU HAVE THE ISSUES DOWN

13   PRETTY WELL.  IT'S VERY CLEAR THAT THEY DIDN'T FILE IT IN A

14   TIMELY FASHION.  AND IN THE MONTH LEADING UP TO THAT, WE KEPT

15   SAYING, THEY HAVE MISSED THE DEADLINE.  WE NEED TO KNOW.  AND

16   THEY DELIBERATELY BLEW IT OFF FOR SIX MONTHS, PROVIDING US

17   THIS STUFF JUST BEFORE TRIAL.

18        AND I THINK THE SANCTION IN RULE 26(E) IS VERY

19   CLEAR.  IT HAS TO BE EXCLUDED, AND THAT'S THE END OF THE

20   MATTER RIGHT THERE.

21        THE COURT:  WELL, THERE IS TWO CONSIDERATIONS,

22   RIGHT, WHETHER THERE WAS REASONABLE JUSTIFICATION FOR THE

23   TARDINESS AND THEN, SECONDLY, WHETHER OR NOT IT'S HARMLESS OR

24   NOT.  I MEAN, TO GET PAST BOTH OF THOSE KIND OF JUMPS.

25        MR. AXELROD:  THERE IS NO JUSTIFICATION FOR THE

1486

1    DELAY.  WE GOT OURS IN ON A TIMELY FASHION.

2         THE COURT:  YEAH.

3         MR. AXELROD:  OURS WERE FILED ON AUGUST 1.  NOBODY

4    KNEW WHAT THE -- EVERYBODY KNEW WHAT THE TWO ALTERNATIVE

5    TESTS WERE.  NOBODY KNEW WHERE THE BURDENS WERE GOING TO

6    FLOW.  SO YOU SUBMIT YOUR REPORTS AS THEY ULTIMATELY DID,

7    LOOKING AT BOTH OPTIONS.

8         THE COURT:  TALK TO ME ABOUT THE -- WHAT IT WAS

9    SPECIFICALLY IN DR. BLOCK'S REPORT THAT IS NEWS TO YOU THAT

10   YOU DIDN'T ANTICIPATE AND ARE NOT ABLE TO MEET; IN OTHER

11   WORDS, THE HARMFUL PART OF THIS.

12        MR. AXELROD:  DR. BLOCK IS GIVING OPINIONS IN WHICH

13   HE ASSERTS THAT THINGS LIKE MANUFACTURER'S KNOW-HOW,

14   MANUFACTURER'S LABOR --

15        THE COURT:  DR. BLOCK IS GIVING THAT OPINION?

16        MR. AXELROD:  YES.  HE IDENTIFIES THESE AS

17   COMPONENTS, AND, THEREFORE, ARE SEPARATE ARTICLES OF

18   MANUFACTURE IN HIS ANALYSIS OF HOW THESE PRODUCTS SHOULD BE

19   VIEWED.

20        THE COURT:  OKAY.  AND IS THE PROBLEM THE SAME WITH

21   DR. DISTLER REGARDING THE ACTUAL INFORMATION THAT YOU'RE

22   GETTING OUT OF THAT?

23        MR. AXELROD:  WELL, WITH MS. DISTLER, THERE IS TWO

24   PARTS OF IT.  ONE, SHE INCLUDES LABOR THROUGH THE GUISE OF

25   APPLYING THIS COST FACTOR FROM THE CONTRACT MANUFACTURER, WHO

COMPUTER-AIDED TRANSCRIPTION

1487

1    GIVES OUT A PRICE PER GLOVE, IF YOU WILL.  AND THEY HAVE USED

2    THAT SORT OF BLACK-BOX NUMBER, WHICH WE DON'T KNOW WHAT'S

3    BEHIND IT.

4         THAT'S WHERE THE DISCOVERY ISSUE WAS.  WE ASKED FOR

5    INFORMATION ABOUT THEIR CONTRACT MANUFACTURER'S COSTS AND

6    ALLOCATIONS, AND THEY REFUSED TO PROVIDE IT.

7         SO ALL WE HAVE IS THIS ONE BLACK BOX TO WHICH SHE

8    ATTACHES A COUPLE FABRIC COSTS, MS. DISTLER, IN MAKING HER

9    ANALYSIS, AND THEREBY ALLOCATES LABOR AS A SEPARATE

10   COMPONENT, BECAUSE ALL THIS MANUFACTURING, LABOR COSTS, SHE

11   TREATS AS UNRELATED TO THE KEY COMPONENT IN THE CASE, WHICH

12   IS THE HEATWAVE FABRIC AND WHATEVER THAT IS MANUFACTURED

13   INTO.

14        THE COURT:  SO -- AND YOU'RE TELLING ME THAT YOU

15   DON'T HAVE ANY WAY OF MEETING THAT NEW INFORMATION?

16        MR. AXELROD:  WE HAVE -- WE DON'T KNOW WHAT'S BEHIND

17   THE BLACK BOX, OR WHAT'S IN THAT BLACK-BOX COMPONENT.

18        THE COURT:  ALL RIGHT.

19        MR. AXELROD:  IT'S JUST A NUMBER.  WE KNOW THERE IS

20   LABOR.  WE KNOW THE MANUFACTURER HAS TO HAVE HIS PROFIT AND

21   SO FORTH.

22        THE COURT:  AND THEY SAID THAT THEY HAD GIVEN YOU

23   WHAT YOU'RE CALLING THE "BLACK-BOX INFORMATION" DURING THE

24   COURSE OF A POST PRETRIAL CONFERENCE I BELIEVE DEPOSITION OF

25   SOMEBODY THAT THEY CALLED THE FINANCIAL EXPERT.

1488

1    MR. AXELROD:  THEY MADE MRS. CAREY AVAILABLE FOR A

2    DEPOSITION THAT WAS DIRECTED TO EXTRATERRITORIAL SALES

3    EXCLUSIONS AND THE NEW FINANCIAL NUMBERS THAT SHE PROVIDED.

4        IN THE COURSE OF THAT, WE HAD JUST GOTTEN DR. --

5    MS. DISTLER'S ATTACHMENT THAT CONTAINS THE BLACK-BOX NUMBER.

6    MRS. CAREY DID NOT KNOW WHAT WAS BEHIND THE BLACK-BOX NUMBER,

7    OTHER THAN THAT IT COMES FROM THEIR CONTRACT MANUFACTURER.

8    SO THAT REALLY DOESN'T FILL ANY OF THE GAPS FOR US AND WE

9    HAVE NO DOCUMENTATION FOR IT.

10        THE COURT:  AND YOU STILL DON'T HAVE ANY

11    DOCUMENTATION FOR IT?

12        MR. AXELROD:  CORRECT.  WE DON'T KNOW WHAT IS IN

13    THAT COMPONENT.

14        THE COURT:  AS REGARDS DR. BLOCK, I ALWAYS, UNTIL

15    TODAY, UNDERSTOOD THAT DR. BLOCK WAS AN EXPERT REGARDING

16    SCIENCE; NOT AN ARTICLE OF MANUFACTURE.  AND THE ISSUE THAT

17    YOU'RE HAVING WITH DR. BLOCK SEEMS TO GO TO THE ARTICLE OF

18    MANUFACTURE, WHAT IS THE ARTICLE OF MANUFACTURE.

19        AM I RIGHT ABOUT THAT?

20        MR. AXELROD:  CORRECT.  IT'S JUST THE REPORT THAT

21    WAS FILED FOR THE FIRST TIME, I THINK ON THE 7TH, JUST BEFORE

22    THE PRETRIAL CONFERENCE.  AND MS. DISTLER'S CAME AFTER THE

23    PRETRIAL CONFERENCE.

24        THE COURT:  ALL RIGHT.  LET ME HEAR FROM SEIRUS.

25        MR. SPROUL:  WELL, YOUR HONOR, WITH REGARD TO THE

1489

```
1   TIMING, OUR UNDERSTANDING -- AND, OF COURSE, WE CAME IN

2   RATHER LATE TO THE CASE.  OUR UNDERSTANDING WAS THAT THIS WAS

3   AN ISSUE PENDING BEFORE YOUR HONOR, AND THE PARTIES WERE NOT

4   GOING TO DO ANYTHING PRIOR TO A RULING FROM YOUR HONOR.  THAT

5   WAS OUR UNDERSTANDING AT THE TIME WE TOOK OVER.

6            THE COURT:  THAT'S A MISTAKEN UNDERSTANDING.

7            MR. SPROUL:  FAIR ENOUGH, YOUR HONOR.

8            WE THEN PROVIDED OUR OPENING -- THE SUPPLEMENTAL

9   REPORT FOR DR. BLOCK I BELIEVE IN EARLY SEPTEMBER.  AND IT

10  RELATES TO THE RELATIVELY SIMPLE ISSUE OF WHAT THE ARTICLE OF

11  MANUFACTURE IS.  THEY SAY IT'S A GLOVE.  DR. BLOCK,

12  CONSISTENT WITH THE TESTIMONY WE'VE SEEN HERE, SAYS IT'S, IN

13  FACT, A COMPONENT OF THE GLOVE, CONSISTENT WITH WHAT SEIRUS

14  HAD ARGUED EARLIER IN THE CASE.

15           THE COURT:  AGAIN, I THOUGHT DR. BLOCK'S EXPERTISE

16  WAS KIND OF IN THE SCIENCE BEHIND ALL THIS; NOT WHAT'S THE

17  ARTICLE OF MANUFACTURE.

18           MR. SPROUL:  IT IS.  BOTH PARTIES HAVE USED THEIR

19  TECHNICAL EXPERT TO OPINE ON WHAT THE ARTICLE OF MANUFACTURE

20  IS.  DR. COLE IS GOING TO OFFER REBUTTAL TESTIMONY THAT THE

21  ARTICLE OF MANUFACTURE IS THE ENTIRE GLOVE.  AND SO PART AND

22  PARCEL TO THIS CASE, BOTH TECHNICAL EXPERTS HAVE BEEN

23  EMPLOYED IN THE SERVICE OF EXPLAINING THE ARTICLE OF

24  MANUFACTURE TO THE JURY.  WHETHER OR NOT IT ACTUALLY NEEDS

25  EXPERT OPINION IS MAYBE A TOPIC FOR ANOTHER DAY, BUT BOTH
```

1490

1    PARTIES HAVE DONE IT.  CERTAINLY OURS WAS A LITTLE BIT LATER.

2            BUT TO YOUR QUESTION, TO COUNSEL, IT WASN'T A

3    SURPRISE.  IT WAS CONSISTENT WITH WHAT SEIRUS HAD ARGUED

4    EARLIER IN THE CASE, THAT, IN FACT, THE FABRIC AND NOT THE

5    ENTIRE GLOVE WAS THE ARTICLE OF MANUFACTURE.

6            WITH REGARD TO THE SPECIFIC COMPLAINTS THAT

7    MR. AXELROD RAISED THAT DR. BLOCK RELIES ON LABOR OR

8    KNOW-HOW, HE DID IN HIS REPORT, AND I THINK IT'S PROPER TO DO

9    SO; THOSE CAN BE COMPONENTS OR THINGS THAT ADD UP TO THE

10   ENTIRE GLOVE.  HE'S NOT GOING TO TESTIFY TO THAT TODAY, AS I

11   EXPLAINED EARLIER LAST WEEK.

12           DR. BLOCK WILL LIMIT HIS TESTIMONY THAT THE ARTICLE

13   OF MANUFACTURE IS THE FABRIC, AND THE GLOVE IS MADE UP OF A

14   NUMBER OF PHYSICAL COMPONENTS, AND THAT YOU SHOULD SEPARATE

15   OUT THOSE SEPARATE COMPONENTS.  KNOW-HOW AND LABOR,

16   MANUFACTURING, WHATEVER THE WORDS WERE THAT MR. AXELROD USED

17   IN HIS COMPLAINT ARE NOT A PART OF DR. BLOCK'S TESTIMONY.

18           THE COURT:  TALK TO ME ABOUT DISTLER.

19           MR. SPROUL:  MY UNDERSTANDING IS THAT THEY COMPLAIN

20   THAT SHE HAS DEDUCTED CERTAIN COSTS, SUCH AS LABOR COSTS AND

21   SO FORTH, UNDER THE THEORY THAT THE SAMSUNG V. APPLE DECISION

22   FROM THE SUPREME COURT PRECLUDES THAT.

23           THE DECISION, OF COURSE, IS THREE PAGES LONG AND

24   DOES NOT DISCUSS LABOR COSTS OR REALLY ANY ASPECT OF THE

25   DAMAGES ANALYSIS REQUIRED TO FIGURE OUT A PROFIT DISGORGEMENT

COMPUTER-AIDED TRANSCRIPTION

1491

1   DETERMINATION, EXCEPT TO SAY, YOU NEED TO FIGURE OUT THE

2   PROPER ARTICLE OF MANUFACTURE, AND THAT IT CAN BE A COMPONENT

3   AND NOT MERELY THE WHOLE PRODUCT.  IT'S REALLY A VERY

4   SUCCINCT OPINION, AS YOUR HONOR KNOWS.

5         THEIR COMPLAINT WITH MS. DISTLER'S REPORT ISN'T

6   SUPPORTED THEN BY THE SAMSUNG V. APPLE OPINION BECAUSE IT

7   SIMPLY IS SILENT ON WHETHER OR NOT YOU CAN SUBTRACT THOSE

8   KIND OF COSTS.  SO HER ANALYSIS I THINK IS REALLY A

9   RUN-OF-THE-MILL PROFIT ANALYSIS.  AND THE DISPUTE IS WHAT

10  COSTS ARE ACCEPTABLE TO BE DEDUCTED?  THEIR EXPERTS SAY FEWER

11  COSTS; WE SAY MORE COSTS.  SOMETHING CROSS-EXAMINATION CAN

12  BRING OUT.

13        ONE NOTE.  WE HAVE NOT DEPOSED EITHER OF THEIR

14  EXPERTS ON THEIR SUPPLEMENTAL REPORTS.  THEY HAVEN'T DEPOSED

15  OURS.  GIVEN THE SIMPLICITY OF THE ISSUES, WE DON'T THINK

16  IT'S NECESSARY, AND THE TIMELINESS IS NOT PREJUDICIAL IN THIS

17  INSTANCE.

18        THE COURT:  THE PROBLEM WITH MS. DISTLER IS THEY ARE

19  TELLING ME THAT THEY DON'T HAVE THE BACKGROUND DATA WHICH

20  THEY HAD REQUESTED THAT HELPS FORMULATE MS. DISTLER'S

21  OPINIONS REGARDING THE PEOPLE THAT WERE PROVIDING THE LABOR

22  TO SEIRUS.

23        MR. SPROUL:  MR. MARCHESE WILL ANSWER THIS ONE, YOUR

24  HONOR.

25        MR. MARCHESE:  SO, YOUR HONOR, THERE WAS SOME

1492

1    DISCUSSION ABOUT MS. CAREY'S DEPOSITION, WHICH OCCURRED ON

2    FRIDAY PRIOR, NOT THIS PAST FRIDAY, BUT A FRIDAY BEFORE.  AND

3    THERE WAS -- PRIOR TO HER DEPOSITION, THERE WAS A DISCLOSURE

4    OF BILLS OF MATERIALS FOR THE GLOVES, VERY DETAILED

5    BREAKDOWNS OF ALL THE DIFFERENT ELEMENTS THAT GO INTO THE

6    GLOVES.  AND SO THAT WAS PRODUCED.  THEY HAD THAT PRIOR TO

7    THE DEPOSITION.  THEY CAME IN, ASKED MS. CAREY QUESTIONS

8    ABOUT THAT.

9           MS. DISTLER'S REPORT, IN TERMS OF THE FABRIC

10   COSTING, IS DERIVED FROM THE BILLS OF MATERIALS THAT

11   MS. CAREY PULLED FROM THEIR S.A.P. DATABASE.  SO THIS IS DATA

12   THAT THEY KEEP IN THE ORDINARY COURSE OF BUSINESS.  IT WAS

13   PULLED.  THERE WERE SPREADSHEETS.  THEY WERE PRODUCED.  THEY

14   ASKED QUESTIONS OF MS. CAREY AT HER DEPOSITION ABOUT THESE

15   THINGS.  SHE WILL TESTIFY ABOUT THEM WHEN SHE TAKES THE STAND

16   HERE PROBABLY TODAY.

17          THE COURT:  SO EVERYTHING THAT MS. DISTLER IS USING

18   TO FORMULATE HER OPINION IS INCLUDED IN THOSE REPORTS?  THERE

19   IS NOTHING ELSE?

20          MR. MARCHESE:  NOT THAT I'M AWARE OF, YOUR HONOR.

21          THE COURT:  AND THOSE WERE GIVEN TO COUNSEL DURING

22   THE COURSE OF MS. CAREY'S DEPOSITION, WHICH WAS A COUPLE OF

23   WEEKS AGO?

24          MR. MARCHESE:  CORRECT.  THEY WERE GIVEN TO COLUMBIA

25   PRIOR TO THE DEPOSITION.  AND THEN THEY CAME AND DEPOSED HER

1493

1    ON A SUPPLEMENTAL, AN UPDATE OF THE NUMBERS UP THROUGH

2    FEBRUARY 28TH; SO IT WAS ANOTHER YEAR OF SALES DATA WAS

3    PROVIDED.

4          AND THEN THE OTHER TOPIC WAS THE BILLS OF MATERIALS,

5    AND MR. AXELROD, AS I UNDERSTAND IT, ASKED QUESTIONS ABOUT

6    THEM, SO HE HAD A FAIR OPPORTUNITY TO GET WHAT HE NEEDED TO

7    GET FROM THEM.

8          AND MS. CAREY WAS PRODUCED AS A 30(B)(6) WITNESS ON

9    THIS TOPIC AS WELL.  SHE IS THE C.F.O. AND WAS INVOLVED

10   PERSONALLY IN THE PULL OF THE DATA.

11         THE COURT:  OKAY.  IS THERE ANYTHING ELSE YOU WANT

12   TO TELL ME?

13         MR. MARCHESE:  I THINK THAT'S IT, YOUR HONOR.

14         THE COURT:  ALL RIGHT.  THANK YOU.

15         MR. AXELROD, THEY ARE TELLING ME THAT EVERYTHING

16   THAT MS. DISTLER IS RELYING UPON WAS PROVIDED TO YOU DURING

17   THE COURSE OF MS. CAREY'S DEPOSITION, THAT THERE IS NOTHING

18   ELSE THAT SHE RELIED ON IN REACHING HER OPINIONS.

19         GIVEN THAT INFORMATION, ARE YOU STILL TELLING ME

20   THAT YOU ARE NOT ABLE TO MEET THIS SUPPLEMENTAL REPORT?

21         MR. AXELROD:  WE STILL HAVE A BLACK-BOX NUMBER.

22   MS. DISTLER RELIED ON A BLACK-BOX NUMBER AND ALLOCATES

23   EVERYTHING IN THAT BLACK BOX TO OTHER COMPONENTS WITHOUT

24   KNOWING WHAT IT REPRESENTS OR NOT.

25         WHAT WE GOT WAS A SERIES FOR VARIOUS PRODUCTS OF A

COMPUTER-AIDED TRANSCRIPTION

1494

1    LISTING, AND IT WILL SHOW MANUFACTURER'S NUMBER, THE BIG

2    NUMBER; THAT'S THE BLACK-BOX NUMBER.  THEN IT WILL SHOW A

3    FABRIC COST.  AND IF THERE IS THE SECOND FABRIC COST, IT WILL

4    SHOW THAT.

5             SO MS. DISTLER JUST ASSUMED IN HER PROCESS THAT SHE

6    WOULD ALLOCATE EVERYTHING AWAY FROM THE HEATWAVE FABRIC, AS

7    SHE STYLES IT.  AND WE DON'T KNOW WHAT IS IN THAT BLACK BOX

8    THAT WOULD SHOW THAT THAT'S INAPPROPRIATE, BECAUSE WE THINK

9    MOST OF IT IS LABOR.

10            SO, FOR EXAMPLE, WHERE SHE ENDS UP WITH IS A PRODUCT

11   THAT IS MADE 100 PERCENT FROM HEATWAVE MATERIAL BECAUSE OF

12   THIS BLACK-BOX NUMBER, SHE ALLOCATES ONLY ONE-THIRD OF THE

13   PROFIT TO THE HEATWAVE MATERIAL, AND THE OTHER TWO-THIRDS

14   GOES TO MANUFACTURER'S LABOR, OR SOMETHING WE KNOW NOT WHAT.

15            THE COURT:  SO WHAT HAPPENED IS THEY GAVE HER A

16   NUMBER, SHE DOESN'T KNOW WHAT'S BEHIND THAT NUMBER, AND

17   NEITHER DO YOU?

18            MR. AXELROD:  I DON'T KNOW WHAT SHE KNOWS ABOUT

19   WHAT'S BEHIND THE NUMBER.  BUT I HAVEN'T HAD A CHANCE TO

20   EXAMINE HER, AND SHE DOESN'T SAY IN HER REPORT.

21            THE COURT:  I'M SORRY.  IN HER REPORT, IT JUST SAYS

22   THAT NUMBER.  OKAY.

23            MR. MARCHESE:  YOUR HONOR, I'M LOOKING AT THE BILL

24   OF MATERIALS RIGHT HERE RIGHT NOW, AND THERE IS A LINE ITEM

25   FOR VENTEX.  IT HAS TO DO WITH THE HEATWAVE FABRIC.  AND SO,

1    AS I UNDERSTAND IT, THAT NUMBER WAS USED AS A -- AS A NUMBER

2    TO FIND OUT WHAT THE COST OF THE FABRIC WAS TO PURCHASE FROM

3    VENTEX.

4              AND THEN WHAT MS. DISTLER DID WAS KIND OF AN

5    APPORTIONMENT.  SHE USED THAT VALUE AND COMPARED IT TO THE

6    COST OF AN ENTIRE GLOVE.  AND THEN SHE WAS ABLE TO DETERMINE

7    WHAT THE APPORTIONED VALUE OF THE FABRIC WAS, VIS-A-VIS, AN

8    ENTIRE GLOVE.  AND THEN SHE RAN HER NUMBERS OFF THAT.

9              THE COURT:  I UNDERSTAND THAT.  BUT WHAT THEY ARE

10   SAYING IS THEY DON'T KNOW WHAT, KIND OF LIKE THE LINE-ITEM

11   BREAKDOWN IS FOR LABOR, AND I DON'T KNOW WHAT ELSE WAS

12   INCLUDED IN MS. DISTLER'S COMPUTATIONS.

13             MR. MARCHESE:  THERE IS LINE ITEM CALLED

14   "MANUFACTURING" ON HERE, AND THAT WAS PROVIDED TO THEM IN

15   DISCOVERY.  AND THEN THEY HAD AN OPPORTUNITY TO ASK MS. CAREY

16   QUESTIONS ABOUT THAT, BECAUSE THAT'S FROM HER OWN

17   SPREADSHEET.

18             THE COURT:  ARE THERE OTHER NUMBERS BESIDES THAT?

19             MR. AXELROD:  NO.  THAT'S THE KEY ONE.  THAT'S THE

20   BIG ONE.

21             THE COURT:  IT JUST SAYS "MANUFACTURING," BUT YOU

22   DON'T KNOW WHAT THAT MEANS?

23             MR. AXELROD:  EXACTLY.  AND MRS. CAREY DIDN'T KNOW

24   EITHER.

25             THE COURT:  THEY ARE ENTITLED TO KNOW WHAT'S BEHIND

1496

1    ALL OF THE NUMBERS.

2              MR. MARCHESE:  WELL, THEY HAD AN THE OPPORTUNITY TO

3    ASK MS. CAREY ABOUT IT.

4              THE COURT:  THEY DID.  AND SHE SHE SAID SHE DIDN'T

5    KNOW.

6              MR. MARCHESE:  WELL, THEN THIS COULD HAVE BEEN

7    SOMETHING THAT WAS BROUGHT UP, I WOULD IMAGINE, THROUGH MORE

8    DISCOVERY THEN, IF THEY WANTED TO.

9              BUT THIS IS -- I MEAN, THE KEY TO THE OPINION THAT

10   MS. DISTLER IS OFFERING IS THE VENTEX FABRIC NUMBER.  THAT'S

11   THE COST TO BUY THE ROLL OF FABRIC.  I MEAN, THAT'S WHAT

12   MATTERS FOR PURPOSES OF DETERMINING WHAT THE COST -- SO

13   MS. DISTLER'S OPINION -- SHE SAYS THE ARTICLE OF MANUFACTURE

14   IS THE FABRIC.  AND WE HAVE THE FABRIC NUMBER, WE HAVE THE

15   VENTEX NUMBER, WHAT WAS PAID FOR THE FABRIC.

16             AND ONCE YOU TAKE THAT NUMBER, YOU CAN FIGURE OUT

17   WHAT THE PROPORTIONAL AMOUNT IS TO THE OVERALL GLOVE.  YOU

18   CAN FIGURE OUT HOW MUCH OF THE VALUE OF THE GLOVE COMES FROM

19   THAT VENTEX FABRIC.

20             THE COURT:  SO WHEN SHE'S CALCULATING -- DOING HER

21   CALCULATIONS, SHE'S ONLY RELYING ON THE VALUE OF THE FABRIC

22   TO DETERMINE WHAT -- NOT TO DETERMINE WHAT THE ARTICLE OF

23   MANUFACTURE WOULD BE, BUT IT IS TO DETERMINE WHAT PROFITS

24   WOULD BE.

25             MR. MARCHESE:  I'M JUST LOOKING AT HER SLIDES RIGHT

1497

1    NOW.

2              THE COURT:  FOR A DISGORGEMENT ANALYSIS.

3              MR. MARCHESE:  RIGHT.  THE DISGORGEMENT ANALYSIS,

4    SHE CONCLUDES, BASED ON WHAT SHE'S HEARD FROM DR. BLOCK, IS

5    THAT THE APPROPRIATE ARTICLE OF MANUFACTURE, AND BASED ON

6    WHAT SHE'S HEARD IN TESTIMONY IN THE TRIAL, IS THE FABRIC.

7              AND THEN SHE SAYS THAT THE COST FROM VENTEX IS "X"

8    DOLLARS.  HERE, IN THIS EXAMPLE IT'S ███.  SHE ADDS DUTY AND

9    FREIGHT BECAUSE IT NEEDS TO BE SHIPPED FROM VENTEX TO THE

10   GLOVE MAKER.  AND SHE COMES UP WITH A TOTAL COST FOR THE

11   HEATWAVE FABRIC BASED ON THE VENTEX NUMBER, WHICH IS A LINE

12   ITEM.

13             AND THEN SHE TAKES THE TOTAL COST OF THE GLOVE, IN

14   THIS CASE, IT WAS ████  FOR THE TOTAL COST OF THE GLOVE,

15   ████  FOR THE HEATWAVE FABRIC.  SHE DIVIDES THE NUMBERS AND

16   COMES UP WITH 17.2 PERCENT OF THE COST OF THE GLOVE IS THE

17   FABRIC.

18             AND THEN SHE TAKES THE A.S.P. OF THE GLOVE, SO

19   WHAT -- THE NEXT STEP IS TO SAY, HERE IS HOW MUCH IT COSTS TO

20   MAKE IT.  HERE IS HOW MUCH THEY GET FOR IT WHEN THEY SELL IT

21   TO WHOEVER THE CUSTOMER IS.  AND TAKES THE FRACTIONAL VALUE

22   OF THAT, SO IN THIS CASE, IT'S 17 PERCENT OF ███.  SHE COMES

23   UP WITH A VALUE OF THE FABRIC AS TO THE OVERALL COST AT

24   ███.

25             AND THEN SHE SUBTRACTS OFF THE COSTS, WHICH

COMPUTER-AIDED TRANSCRIPTION

1498

1    MS. MORONES SAYS, THERE ARE THREE OR FOUR CATEGORIES OF COSTS

2    SHE CAN TAKE OFF.  MS. DISTLER SAYS THOSE THREE OR FOUR SHE

3    AGREES, PLUS A FEW MORE, AND SHE ARRIVES AT HER FINAL NUMBER.

4            SO AS I SEE IT, THIS MANUFACTURING BLACK BOX, FROM

5    WHAT I'M LOOKING AT HERE, AND MY UNDERSTANDING OF THE

6    PROCESS, IS A RED HERRING.

7            THE COURT:  WELL, LAWYERS LOVE THAT WORD.

8            SO WHAT THEY ARE SAYING FOR THE MANUFACTURING COSTS

9    IS THE COST OF THEIR DISTRIBUTOR TO THE COST OF THE FABRIC

10   ITSELF.  IF YOU KNOW WHAT THE COST OF THE FABRIC ITSELF IS,

11   TELL ME WHY YOU NEED TO KNOW WHAT'S BEHIND THAT COST IF THEY

12   ARE NOT MAKING ANY FURTHER DEDUCTIONS OFF OF THAT?

13           MR. AXELROD:  BECAUSE THE SUPREME COURT TEST SAYS

14   THAT YOU LOOK TO WHAT THE ARTICLES OF MANUFACTURE ARE.  AND

15   IN DETERMINING AN ALLOCATION OF PROFITS TO DIFFERENT ARTICLES

16   OF MANUFACTURE, IF THERE IS SUCH A THING, YOU NEED TO KNOW

17   WHAT WENT INTO MAKING THAT ARTICLE OF MANUFACTURE AND HOW IT

18   RELATES TO THE OTHER COMPONENT COSTS IN THE GLOVE.

19           THE COURT:  SO YOU WOULD SAY IT'S IMPORTANT FOR

20   COLUMBIA TO KNOW HOW OR WHAT THE BREAKDOWN IS FOR VENTEX TO

21   PROVIDE THE FABRIC TO SEIRUS?

22           MR. AXELROD:  VENTEX DOESN'T PROVIDE THE FABRIC TO

23   SEIRUS.  VENTEX SHIPS IT TO THE CONTRACT MANUFACTURER.

24           THE COURT:  OKAY.

25           MR. AXELROD:  AS ONE OF A COUPLE OF FABRIC INPUTS

1499

1    THAT THE CONTRACT MANUFACTURER TYPICALLY GETS, OR IN THE CASE

2    OF SOME PRODUCTS, IT'S THE ONLY FABRIC.

3         THEN THE CONTRACT MANUFACTURER MAKES THE NEXT STAGE

4    OF THE PRODUCT, WHICH IS EITHER A FINISHED PRODUCT MADE

5    WHOLLY FROM THAT HEATWAVE FABRIC, OR IT'S A GLOVE THAT HAS

6    HEATWAVE FABRIC IN IT THAT HAS BEEN REMADE INTO ADDITIONAL

7    ARTICLES OF MANUFACTURE, OR COMPONENTS TO USE THEIR ANALYSIS,

8    AND GIVEN A VALUE IN MS. DISTLER'S REPORT THAT SHE WHOLLY

9    EXCLUDES FROM THE HEATWAVE FABRIC ITSELF.

10        SO WITHOUT KNOWING WHAT'S IN THE MANUFACTURER'S

11   BLACK BOX, YOU DON'T KNOW HOW MUCH OF THAT MANUFACTURER'S

12   BLACK-BOX FIGURE SHOULD BE ATTRIBUTABLE TO THE HEATWAVE AND

13   OTHER FABRICS IN THE PROCESS, FOR THOSE ARE THE TRUE

14   ARTICLES.

15        THE COURT:  BUT DO YOU KNOW WHAT -- BASED ON WHAT

16   INFORMATION YOU HAVE, WHAT SEIRUS PAYS FOR THE FABRIC, WHAT

17   SEIRUS PAYS TO MANUFACTURE EACH OF THE COMPONENTS OF THE

18   GLOVE USING, AGAIN, THEIR LANGUAGE?

19        MR. AXELROD:  WE KNOW WHAT THEY PAID VENTEX FOR THE

20   MATERIAL.  DEPENDING ON THE PRODUCT, WE WILL HAVE SOME OTHER

21   MATERIAL COSTS THAT ARE INPUTS.  AND THEN THERE IS THE BIG

22   COST, WHICH IS THE MANUFACTURER PUTTING IT ALL TOGETHER,

23   ADDING A FEW WHAT LOOK TO BE MISCELLANEOUS ITEMS, LIKE A

24   CINCH OR A STRAP OR WHATNOT, AND DELIVERING THAT NEW PRODUCT

25   TO SEIRUS IN THE UNITED STATES.

1    THE COURT:  SO I'M STILL NOT SURE WHAT OTHER

2  INFORMATION YOU NEED.  I AGREE THAT YOU VEHEMENTLY DISAGREE

3  WITH WHAT THE ARTICLE OF MANUFACTURE IS.

4    MR. AXELROD:  YES.

5    THE COURT:  BUT IF THEY ARE TELLING YOU THE ARTICLE

6  OF MANUFACTURE IS THE FABRIC, AND THIS IS WHAT WE PAID FOR

7  THE GLOVE TOGETHER, INCLUDING INSTALLATION OF THE FABRIC AND

8  FOR THE FABRIC ITSELF, WHAT OTHER INFORMATION IS THERE THAT

9  YOU NEED?

10    MR. AXELROD:  WE NEED TO KNOW WHAT THE LABOR, PROFIT

11  AND NONARTICLE COMPONENTS OF THE MANUFACTURING COSTS ARE IN

12  ORDER TO DETERMINE WHETHER THERE IS A FAIR ALLOCATION BEING

13  MADE, APART FROM THE FACT THAT THERE IS NO CONSIDERATION

14  WHATSOEVER --

15    THE COURT:  AND YOU DON'T HAVE THAT INFORMATION?

16    MR. AXELROD:  WE DON'T HAVE THAT INFORMATION.

17    THE COURT:  LABOR.  WHAT ELSE?

18    MR. AXELROD:  LABOR, MANUFACTURER'S PROFIT OR OTHER

19  CHARGES AND FEES.  WE DON'T KNOW WHAT THE BLACK-BOX NUMBER

20  IS.  IF WE WANTED TO STIPULATE THAT IT'S ALL LABOR, FINE.

21    THE COURT:  YOU WENT TOO FAST FOR ME.  LABOR,

22  MANUFACTURER --

23    MR. AXELROD:  THERE COULD BE PROFIT.  THERE COULD

24  BE -- YOU KNOW, WE DON'T KNOW HOW THEY STRUCTURED THEIR COST

25  BREAKDOWN AS BETWEEN SEIRUS AND THE MANUFACTURER, OR WHAT THE

COMPUTER-AIDED TRANSCRIPTION

1501

1    MANUFACTURER HAS IN THERE OR IS CHARGING FOR.  AND IT MAY

2    JUST BE A FLAT FEE AND NO ONE KNOWS AND IT INCLUDES ALL THE

3    CONCEIVABLE INPUTS THAT THE MANUFACTURER MAY PROVIDE.

4         THE COURT:  BUT IF SEIRUS IS ABLE TO TELL YOU THAT

5    THIS IS WHAT WE'RE PAYING OUR MANUFACTURER, REGARDLESS OF

6    WHAT IT IS FOR LABOR COSTS AND EVERYTHING ELSE, THAT THIS IS

7    WHAT WE PAY THEM FOR A PARTICULAR PIECE OF FABRIC OR PUTTING

8    IT ALL TOGETHER, AND YOU HAVE THAT INFORMATION, AND THEN

9    THEREFORE WERE ABLE TO CALCULATE THE -- WHAT AGAIN THEIR --

10   WHAT THE PROFIT IS FROM THE ARTICLE OF MANUFACTURE USING

11   WHATEVER NUMBERS THEY ARE, I STILL AM NOT GRASPING WHAT OTHER

12   INFORMATION YOU USE.

13        YOU HAVE ALL THE INFORMATION THAT SEIRUS USES IN

14   ORDER TO FIGURE OUT WHAT THEIR PROFIT IS, IF IT'S FOR THE

15   ENTIRE GLOVE, FOR THE ENTIRE GLOVE; IF IT'S FOR A PIECE OF

16   IT, THEN FOR A PIECE OF IT.

17        IT SEEMS TO ME I'M MISSING SOMETHING HERE.

18        MR. AXELROD:  WE WOULD LIKE TO KNOW WHAT THE

19   MANUFACTURER'S BREAKDOWN OF COSTS OR CHARGES IS SO THAT WE

20   CAN DETERMINE WHETHER A PORTION OF THOSE CHARGES, AS WE

21   BELIEVE, SHOULD BE ALLOCATED TO THE HEATWAVE FABRIC.

22        MR. MARCHESE:  SO I'M --

23        MR. AXELROD:  THEY ARE TRYING --

24        MR. MARCHESE:  EXCUSE ME REAL QUICK.  I DON'T

25   UNDERSTAND WHY THEY NEED TO KNOW THAT BECAUSE -- WELL,

1502

1    TWOFOLD.  NO. 1, IT'S THE FABRIC THAT WE'RE SAYING IS THE

2    ARTICLE OF MANUFACTURE.

3            AND YOU'VE HEARD THE TESTIMONY THAT THAT FABRIC IS

4    COMPLETE WHEN IT COMES FROM VENTEX.  IT'S DONE.  IT'S A ROLL.

5    AND THEN IT'S CUT AND SEWN INTO THE GLOVE.  SO THE ARTICLE OF

6    MANUFACTURE IS THE FABRIC ON A ROLL.  WE KNOW WHAT THE COST

7    OF THAT IS.  WHAT SEIRUS PAYS FOR IT, THAT'S A LINE ITEM.

8    AND SO NOW ALL WE NEED TO DO IS SUBTRACT OFF COSTS FROM THAT

9    WHICH WE HAVE FROM DATA THAT WE'VE PROVIDED.

10           THE OTHER MANUFACTURING COSTS, IF ANYTHING, AS I

11   UNDERSTAND WHAT MR. AXELROD IS SAYING, MIGHT ACTUALLY REDUCE

12   THAT SOME.  BUT WE DON'T HAVE -- WE'RE NOT FACTORING ANY

13   FURTHER REDUCTIONS IN.  WE'RE JUST USING THE COST DATA THAT

14   WE HAVE TO COME UP WITH A CONSERVATIVE NUMBER AS TO WHAT THE

15   OVERALL PROFITABILITY OF THE GLOVE IS BASED ON THE FABRIC.

16           AND THAT IS ALL DONE VIA COMPUTATIONS, PURE MATH,

17   STARTING FROM A NUMBER, A SPECIFIC DOLLARS-AND-CENTS NUMBER

18   THAT WE'RE GIVING THEM THAT IS RECORDED, MAINTAINED IN THE

19   ORDINARY COURSE AND WAS PRODUCED TO THEM.

20           THE COURT:  IS THERE ANYTHING ELSE YOU WANT TO TELL

21   ME?

22           MR. AXELROD:  NO.

23           THE COURT:  THANK YOU.

24           SO THE ANALYSIS BEGINS WITH FIGURING OUT WHETHER OR

25   NOT SEIRUS WAS LATE DISCLOSING ITS SUPPLEMENTAL REPORTS TO

1503

```
1   COLUMBIA.  IT WAS.

2            AND THEN THE NEXT QUESTION IS WHETHER THEY SHOULD BE

3   PROHIBITED FROM TESTIFYING ABOUT INFORMATION THAT WAS

4   DISCLOSED LATE.  AND THERE ARE TWO ISSUES, SUBISSUES THAT

5   NEED TO BE DECIDED.  THE FIRST ONE IS WHETHER OR NOT THE

6   DISCLOSURE WAS SUBSTANTIALLY JUSTIFIED.  I FIND IT WAS NOT

7   SUBSTANTIALLY JUSTIFIED AND SHOULD HAVE BEEN DISCLOSED

8   EARLIER.

9            AND SECONDLY, WHETHER THE DISCLOSURE WAS HARMLESS.

10  AND THAT, MY ANALYSIS TAKES ME TO WHETHER OR NOT COLUMBIA CAN

11  MEET THE INFORMATION THAT'S PROVIDED BY SEIRUS, EVEN THOUGH

12  THE DISCLOSURE WAS LATE, OR WHETHER OR NOT THEY ARE

13  PREJUDICED BY HAVING THIS LATE DISCLOSURE.

14            I FIND THAT THEY ARE NOT PREJUDICED AND CAN MEET THE

15  INFORMATION THAT SEIRUS HAS PROVIDED TO THEM.  AND THAT

16  SHOULD TAKE CARE OF DR. DISTLER'S REPORT.

17            WITH REGARDS -- I SAY DR. DISTLER.  MS. DISTLER.

18            MR. MARCHESE:  IT'S "MS."

19            THE COURT:  MS. DISTLER'S -- I APOLOGIZE.

20  MS. DISTLER'S REPORT.

21            AS REGARDS DR. BLOCK AND HIS ANALYSIS REGARDING THE

22  ARTICLE OF MANUFACTURE, AGAIN, MY TROUBLE WITH DR. BLOCK IS,

23  WELL, HIS EXPERTISE REACHES TO THE FABRIC AND THE WAY IT'S

24  DESIGNED AND THE SCIENCE BEHIND IT.  AND I'M NOT SURE THAT

25  HIS EXPERTISE SHOULD BE USED IN DETERMINING WHAT THE ARTICLE
```

COMPUTER-AIDED TRANSCRIPTION

1504

1  OF MANUFACTURE IS.

2          AND BECAUSE SOME OTHER EXPERT RAISED THAT ISSUE, I

3  DON'T KNOW HOW I FEEL ABOUT THAT.  THERE IS NO OBJECTION AND

4  IN IT CAME.  THEY ARE NOT OBJECTING ON THAT ISSUE EITHER,

5  HOWEVER.  THEY ARE OBJECTING SIMPLY BECAUSE DR. BLOCK WAS

6  LATE IN PROVIDING SOME INFORMATION.

7          COLUMBIA CONTENDS THAT SEIRUS IS PRODUCING THE

8  REPORT BY DR. BLOCK THAT OPINES FOR THE FIRST TIME THE

9  ARTICLE OF MANUFACTURE ANALYSIS.  ON THAT ISSUE, FOR REASONS

10  THAT COLUMBIA IS RAISING, AND THAT IS THAT THE REPORT WAS

11  LATE, ONCE AGAIN, IT WAS NOT SUBSTANTIALLY JUSTIFIED, AND THE

12  ISSUE IS WHETHER OR NOT THAT IS HARMLESS OR NOT.

13          IN THIS CASE, IT'S A LITTLE BIT DIFFERENT BECAUSE,

14  AGAIN, HE'S PROVIDING AN EXPERTISE REGARDING WHAT THE ARTICLE

15  OF MANUFACTURE IS FOR THE FIRST TIME.  IT WAS LATE.  NOT

16  EXCUSED.  I AM SUSTAINING THE OBJECTION REGARDING THAT ISSUE

17  WITH DR. BLOCK.  DR. BLOCK WILL NOT BE OPINING ON THE

18  SUPPLEMENTAL REPORT.

19          THERE WAS, IN ADDITION, THIS WEEKEND, OTHER THINGS

20  YOU GAVE ME TO THINK ABOUT.  ONE OF THEM HAD TO DO WITH A

21  SLIDE THAT DR. BLOCK WAS PROVIDING REGARDING THE SIZE OF THE

22  MESH AND WHETHER OR NOT HE COULD TALK ABOUT FOTTINGER'S, NOT

23  ONLY REFLECTIVE CAPACITY, BUT RATHER WHETHER IT SOMEHOW FIT

24  WITHIN THE 30- TO 70-PERCENT RANGE.

25          AND COLUMBIA -- I'VE READ YOUR MATERIALS, BUT I JUST

COMPUTER-AIDED TRANSCRIPTION

1505

1    READ THEM THIS MORNING, SO I HAVE NOT STUDIED THEM -- IS

2    SAYING, AS I GET IT, THAT DR. BLOCK NEVER OPINED REGARDING

3    THE PRECISE DIMENSIONS OF THE MESH, WHICH WOULD AFFECT THE

4    CALCULATION ABOUT THE COVERAGE.

5            I THINK I SAID THAT CORRECTLY.

6            MR. ALDRICH:  THAT'S FAIR.  I CAN HELP IF THAT WOULD

7    BE BENEFICIAL.

8            THE COURT:  SURE.

9            MR. ALDRICH:  SO FOTTINGER EXPLAINS IN HIS PATENT

10   APPLICATION THE IDEA OF USING A 5- TO 40-PERCENT COVERAGE.

11   THAT'S NOT DISPUTED.

12           AND AT THE END OF HIS APPLICATION, HE PROVIDES SOME

13   DETAILS OF AN EXPERIMENT THAT HE TRIED.  AND THAT EXPERIMENT,

14   HE PUT DOWN SOME MESH AND THEN APPLIED HIS MAGIC BINDER

15   SOLUTION WITH ALUMINUM IN IT OVER THE MESH TO CREATE A SAMPLE

16   FABRIC.

17           NOW, THERE IS DISPUTE IN THIS CASE ABOUT -- HE GOES

18   ON TO EXPLAIN WHAT THE RESULTS OF THAT TEST SHOWED.  AND

19   DR. COLE HAS DONE AN ANALYSIS OF WHAT THE RESULTS SHOWED.

20   BUT THERE IS NO EVIDENCE AND NO OPINIONS HAVE BEEN OFFERED IN

21   THIS CASE ABOUT WHAT THE PERCENT COVERAGE WAS IN THAT

22   EXPERIMENT, LAYING THE MESH DOWN AND PUTTING THIS GOOP OVER

23   THE TOP OF IT ON THIS FABRIC.

24           AND THE TERM "MESH," "25 MESH" HAS A MYRIAD OF

25   MEANINGS, DEPENDING ON WHICH SCALE OF MESH YOU USE.  YOU'D

1506

1    HAVE TO ALSO FIGURE OUT THE VISCOSITY OF THE BINDER THAT GOES

2    THROUGH THE MESH AND HOW IT'S GOING TO DRY.

3           SO AN EXPERT WOULD HAVE TO OPINE ABOUT -- AS A

4    RESULT OF THIS PROCESS, OF SMEARING THIS VISCOUS FLUID OVER

5    THIS MESH SCREEN THAT'S GOING TO GO OVER A PIECE OF FABRIC,

6    AN EXPERT WOULD HAVE TO GIVE AN OPINION ABOUT WHAT THE

7    PERCENT COVERAGE OF THE RESULT OF THAT WOULD BE.  AND NEITHER

8    EXPERT IS DOING THAT.  THE EXPERTS ARE RELYING INSTEAD ON

9    THAT 5- TO 40-PERCENT NUMBER THAT FOTTINGER EXPLAINED EARLIER

10   IN HIS APPLICATION.

11          SO THIS IS THE FIRST TIME THAT DR. BLOCK IS ACTUALLY

12   GIVING AN OPINION ON WHAT THIS EXPERIMENT WOULD LIKE LOOK.

13   AND HE'S GOT A SLIDE THAT SAYS, YEAH, YOU'D HAVE THESE

14   PERFECT CIRCULAR DOTS LEFT OVER IF YOU HAD A 25 MESH.

15   ESSENTIALLY THERE WOULD BE NO SPREADING OF THE GOOP AS IT

16   DRIES.  HE DOESN'T GIVE ANY ANALYSIS.  HE'S JUST SHOWING THE

17   JURY A VISUAL OF WHAT HE THINKS THE RESULT WOULD LOOK LIKE.

18          AND HE'S GOT THEM LIKE MIRRORS, TOO.  SO THERE IS NO

19   EVIDENCE THAT THIS RUBBERY GOOP IS GOING TO LOOK LIKE A

20   MIRROR.  SO IT'S PREJUDICIAL AND INACCURATE IN THAT WAY AS

21   WELL.

22          BUT, AGAIN, THIS IS NEW OPINION TESTIMONY THAT'S

23   NEVER BEEN PROVIDED IN TERMS OF IF YOU ACTUALLY TOOK THIS

24   EXPERIMENTAL GOOP, RUBBERY STUFF AND SPREAD IT ON A SCREEN

25   OVER SOME FABRIC, WHAT WOULD THE RESULT ACTUALLY LOOK LIKE?

1507

1    AND WOULD IT BE 5- TO 40-PERCENT COVERAGE?  THERE IS NO

2    EVIDENCE IN THE RECORD OF THAT, SO THIS IS AN ENTIRELY NEW

3    OPINION AND THAT'S THE BASIS OF OUR OBJECTION.

4         THE COURT:  OKAY.  THANK YOU.

5         MR. SPROUL:  AS YOU CAN TELL FROM OUR BRIEFING, THE

6    WORDS "25 MESH" DO NOT APPEAR IN DR. BLOCK'S REPORT.

7    NEVERTHELESS, FOTTINGER IS A VERY BRIEF AND SUCCINCT

8    REFERENCE, AS YOUR HONOR HAS ALREADY NOTED, AND THE PARTIES

9    HAVE FULLY VETTED IT.

10        AND THE DISPUTE DURING DISCOVERY, AND BETWEEN THE

11   EXPERTS AND IN THE REPORTS WAS THE EFFECT OF DR. FOTTINGER'S

12   TEST.  THIS IS SIMPLY FOUNDATIONAL.  THERE IS NO DISPUTE THAT

13   HE DID THE TEST.  AND THE SPECIFIC DISPUTE, AS YOU'VE SEEN,

14   RELATES TO REALLY TWO LINES IN FOTTINGER'S APPLICATION WHERE

15   HE SAYS, PRINTING WAS EFFECTED USING A 25-MESH PRINTING FILM,

16   WHOLE THETA 0.5 MILLIMETER.  THICKNESS IS 0.22 MILLIMETER.

17        STRAIGHTFORWARD.  NEVER CONTESTED.  IT'S SIMPLY

18   FOUNDATIONAL TO WHAT THE PARTIES REALLY DISPUTE, WHICH IS

19   WHETHER OR NOT THIS REFLECTED HEAT.

20        AND SO --

21        THE COURT:  SO YOU'RE NOT ARGUING TO THE JURY THAT

22   THE EXPERIMENT TEACHES 40-PERCENT COVERAGE OR A PARTICULAR

23   PERCENTAGE OF COVERAGE?

24        MR. SPROUL:  WELL, CERTAINLY DR. BLOCK CAN DO THE

25   MATH, OR ANYBODY CAN DO THE MATH BASED ON THIS DESCRIPTION OF

1508

1    WHAT A 25 MESH PASTE WOULD LAY DOWN.  IT'S CONSISTENT WITH

2    WHAT FOTTINGER SAYS ELSEWHERE.  HE SAYS, MY COVERAGE IS 5 TO

3    40 PERCENT.  THIS DOES NOT FALL OUTSIDE OF THAT RANGE BASED

4    ON THE MATH THAT A HIGH SCHOOLER COULD DO ONCE YOU HAVE THE

5    MEASUREMENTS.

6            AND SO OUR UNDERSTANDING WAS THAT THIS WASN'T

7    DISPUTED.  THIS WAS A RELATIVELY STRAIGHTFORWARD ISSUE

8    BECAUSE THE COVERAGE WAS ALREADY ESTABLISHED ELSEWHERE IN

9    FOTTINGER'S REPORT, AND THE ISSUE WAS WHETHER OR NOT IT

10   REFLECTED.  AND DR. COLE SAYS SHE CONSIDERED FOTTINGER'S

11   EXPERIMENT, AND SHE THINKS THAT IT DOESN'T DISCLOSE AT LEAST

12   ONLY HEAT-DIRECTING ELEMENTS.  IT SIMPLY CONDUCTS.

13           SO OUR UNDERSTANDING WAS THAT THIS WAS REALLY A

14   NONISSUE, AND THAT THEY ARE RAISING IT NOW SIMPLY TO UNDERCUT

15   DR. BLOCK'S LATER TESTIMONY ON HOW AND WHY FOTTINGER WOULD

16   ACTUALLY WORK.  BUT THIS WASN'T IN DISPUTE.  THE WORDS WERE

17   THERE FOR THEM.  DR. BLOCK HAD IT.

18           IT'S JUST THE PARTIES, AS FAR AS I UNDERSTAND IT,

19   DIDN'T UNDERSTAND THIS TO BE THE DISPUTE.  AND CERTAINLY

20   PERHAPS THERE ARE OTHER MESHES.  DR. BLOCK WILL TESTIFY THAT

21   ONE OF ORDINARY SKILL UNDERSTOOD EXACTLY WHAT THIS 25 MESH

22   WAS, REGARDLESS OF THE FACT THAT THERE MAY BE OTHER

23   STANDARDS.  AND THERE IS A VERY SIMPLE REASON WHY.

24           BUT WE BELIEVE THIS WAS FULLY DISCLOSED.  DR. COLE

25   HAD TWO PAGES ON IT IN HER EXPERT REPORT.  SO WE SUBMIT THAT

COMPUTER-AIDED TRANSCRIPTION

1509

1    YOUR HONOR SHOULD ALLOW IT.

2                THE COURT:  THANK YOU.

3                MR. ALDRICH:  SO THESE TWO SENTENCES THAT THEY SAY

4    PLAIN ORDINARY MATH, BASED ON WHAT?  I MEAN, WHAT DOES 25

5    MESH MEAN?

6                THAT'S SOMETHING THAT AN EXPERT HAS TO GIVE AN

7    OPINION ON, BECAUSE THERE ARE FIVE DIFFERENT STANDARDS FOR

8    MEASURING MESH.  AND THEY ARE DIFFERENT IN EUROPE VERSUS THE

9    UNITED STATES.  AND THIS IS A GERMAN PATENT APPLICATION THAT

10   WAS FILED IN GREAT BRITTAIN.

11               SO WHICH MESH WOULD HAVE BEEN UNDERSTOOD BY A PERSON

12   OF ORDINARY SKILL IN THE ART, AND WHAT THOSE MEASUREMENTS

13   WOULD HAVE MEANT, THETA .5 MM.  I HAVE NO IDEA WHAT THAT

14   MEANS.  THAT'S SOMETHING THAT'S QUINTESSENTIALLY AN EXPERT

15   OPINION.

16               AND THESE TWO LINES OF TEXT THAT THEY ARE SAYING

17   THAT ARE IN FOTTINGER.  THEY ARE IN FOTTINGER.  BUT

18   THROUGHOUT THIS CASE, THEY SHOW UP IN NO EXPERT REPORT.  THEY

19   SHOW UP IN NO DEPOSITION.  THEY ARE NOT SOMETHING THAT EITHER

20   PARTY HAS RELIED ON IN THIS CASE IN TERMS OF FIGURING OUT

21   WHAT FOTTINGER'S DISCLOSURE ACTUALLY MEANS.  INSTEAD, THE

22   PARTIES HAVE RELIED ON THE 5 TO 40 PERCENT.  BOTH EXPERTS

23   HAVE OPINED ON THAT.

24               THE COURT:  THANK YOU.  YOUR OBJECTION IS OVERRULED.

25   THE SLIDE WILL BE ALLOWED.  I BELIEVE IT GOES TO THE WEIGHT,

1510

1    NOT THE ADMISSIBILITY OF THE EVIDENCE AND IT IS, THEREFORE,

2    ALLOWED.

3            MR. SPROUL:  THANK YOU, YOUR HONOR.

4            THE COURT:  IS THERE ANYTHING ELSE WE NEED TO TALK

5    ABOUT THIS MORNING BEFORE WE GET STARTED?  I KNOW YOU BOTH

6    SENT ME SOME INFORMATION REGARDING THE HOMEWORK ASSIGNMENT

7    THAT I GAVE YOU.  I HAVE NOT HAD AN THE OPPORTUNITY TO READ

8    THAT YET.

9            MR. SPROUL:  AN ADDITIONAL ISSUE, YOUR HONOR, THAT

10   HAS NOT BEEN RAISED TO THE COURT BEFORE, AND I DIDN'T GET A

11   CHANCE TO SPEAK TO MR. ALDRICH IN ADVANCE.

12           THEY HAVE AN EXHIBIT THAT THEY WANT TO USE WITH

13   DR. BLOCK IN CROSS RELATING TO TESTING.  DR. BLOCK IS NOT

14   GOING TO OFFER ANY TESTIMONY ON THE INFRINGEMENT, AND WE

15   BELIEVE SUCH AN EXHIBIT AND SUCH CROSS-EXAMINATION WOULD BE

16   OUTSIDE THE SCOPE.

17           SO RATHER THAN DO THIS LIVE, WE WOULD LIKE TO RAISE

18   THIS ISSUE IN ADVANCE AND SEEK A RULING FROM YOUR HONOR THAT

19   THEY WOULD BE LIMITED TO THE SCOPE OF DR. BLOCK'S DIRECT

20   TESTIMONY.

21           THE COURT:  YES.  THEY ARE CLEARLY LIMITED TO THE

22   SCOPE OF DR. BLOCK'S EXPERT TESTIMONY, UNLESS THEY ARE

23   OFFERING SOME INFORMATION THAT GOES TO IMPEACHMENT.  BUT IF

24   YOU'RE NOT OFFERING DR. BLOCK FOR PURPOSES OF --

25           MR. SPROUL:  NONINFRINGEMENT.

1511

1    THE COURT:  -- NONINFRINGEMENT, THEN THEY SHOULD BE

2  WORKING ON THE OTHER ISSUE, WHICH IS WHETHER OR NOT THE

3  PATENT IS VALID.

4    MR. SPROUL:  THANK YOU, YOUR HONOR.

5    MR. MARCHESE:  VERY BRIEFLY.

6    MR. ALDRICH:  YOUR HONOR, BRIEFLY ON THAT.

7    THE COURT:  SURE.

8    MR. ALDRICH:  IF IT GOES TO CREDIBILITY, I ASSUME WE

9  CAN RAISE IT?

10    THE COURT:  YES.

11    MR. ALDRICH:  THANK YOU.

12    THE COURT:  BUT TREAD CAREFULLY.

13    MR. ALDRICH:  I WILL.  I'LL TREAD CAREFULLY, YOUR

14  HONOR.

15    THE COURT:  AND IF THERE IS AN ISSUE THAT YOU WANT

16  TO RAISE THAT IS OUTSIDE THE SCOPE OF THEIR EXAMINATION, AND

17  YOU THINK IT GOES TO CREDIBILITY, BUT IT TALKS ABOUT

18  INFRINGEMENT, TELL ME, I HAVE AN ISSUE AND A MATTER FOR THE

19  COURT THAT WE NEED TO TALK ABOUT, I'LL SEND THE JURY OUT AND

20  WE'LL FIGURE IT OUT, WHETHER YOU'RE IN OR OUTSIDE THE SCOPE

21  OF WHAT I WOULD ALLOW.

22    MR. ALDRICH:  DO YOU WANT TO TALK ABOUT IT NOW?

23  HE'S GOING UP NEXT.

24    THE COURT:  I UNDERSTAND THAT.  BUT I DON'T KNOW

25  WHAT THEY ARE GOING TO OFFER, AND THEN WHY YOU THINK THAT YOU

COMPUTER-AIDED TRANSCRIPTION

1512

1    HAVE A RIGHT TO IMPEACH HIM WITH WHATEVER YOU THINK YOU'RE

2    IMPEACHING HIM WITH.

3            I WOULD RATHER LISTEN TO THE TESTIMONY.  THEN YOU

4    CAN SAY, HE JUST SAID THIS, JUDGE, AND THIS IS WHAT I WANT TO

5    IMPEACH HIM WITH.  IT'S A LITTLE OUTSIDE THE REALM OF

6    VALIDITY THAT ACTUALLY CROSSES INTO INFRINGEMENT A LITTLE

7    BIT, BUT I THINK IT'S STILL VALID.  AND YOU'LL GET TO TELL ME

8    WHY.  JUST TAKE A BREAK BEFORE WE DO THAT.

9            MR. ALDRICH:  OKAY.  THANK YOU, YOUR HONOR.

10           MR. MARCHESE:  VERY BRIEFLY, YOUR HONOR.  SORRY

11   ABOUT THAT.

12           THIS IS JUST A HOUSEKEEPING THING.  THERE HAS BEEN

13   PROFIT-AND-LOSS STATEMENTS FROM SEIRUS THAT HAVE BEEN

14   INTRODUCED INTO EVIDENCE.  AND I THINK THERE WILL BE MORE.

15   AND I'D LIKE THE OPPORTUNITY TO SEAL THOSE AND JUST TO ALERT

16   YOU TO THAT FACT.  WE'LL BE FILING A MOTION TO SEAL UP THOSE.

17   IT'S A PRIVATE COMPANY.

18           THE COURT:  I UNDERSTAND.

19           MR. MARCHESE:  OKAY.  THANK YOU.

20           THE COURT:  I DON'T HAVE A PROBLEM WITH THAT.

21           MR. ALDRICH:  THERE WAS ONE OTHER BRIEF WE FILED

22   LAST NIGHT, WHICH IS AN OPPOSITION TO THEIR MOTION FOR

23   JUDGMENT AS A MATTER OF LAW REGARDING WILLFULNESS, YOUR

24   HONOR.

25           THE COURT:  DIDN'T WE ALREADY RULE ON THIS ISSUE?

1513

```
1          MR. ALDRICH:  I DON'T THINK YOUR HONOR ACTUALLY
2    RULED ON IT.
3          THE COURT:  ON WILLFULNESS?
4          MR. ALDRICH:  ON WILLFULNESS ON THE '270 PATENT,
5    YOUR HONOR, CORRECT.  THERE IS SUFFICIENT EVIDENCE IN THE
6    RECORD THAT THERE WAS WILLFUL BLINDNESS.  AND WILLFUL
7    BLINDNESS IS WILLFULNESS, YOUR HONOR, UNDER GLOBAL TECH,
8    SUPREME COURT DECISION FROM 2011.
9          AND SO WE RECOGNIZE THAT YOUR HONOR SAID THAT THERE
10   IS NO WILLFULNESS AFTER THE DATE OF FILING OF SUIT,
11   DECEMBER 4TH, 2013, BUT THERE IS SUFFICIENT EVIDENCE IN THE
12   RECORD OF WILLFULNESS BETWEEN -- IN THE MONTHS PRECEDING THAT
13   UNDER THE DOCTRINE OF WILLFUL BLINDNESS.
14         SO WE JUST WANTED TO MAKE SURE THAT THEIR MOTION FOR
15   JUDGMENT AS A MATTER OF LAW REGARDING WILLFULNESS PRIOR TO
16   DECEMBER 4TH, 2013 IS DENIED.  WE SUBMITTED A BRIEF, ABOUT
17   EIGHT PAGES LAST NIGHT ON THAT, YOUR HONOR.
18         THE COURT:  DO YOU KNOW WHAT HE'S TALKING ABOUT?
19         MR. MARCHESE:  THIS IS FRESH TO ME, BUT I DO KNOW
20   THE CASE THAT HE'S REFERRING TO FROM THE SUPREME COURT IS AN
21   INDUCEMENT CASE FOR INDUCED INFRINGEMENT, WHERE THE SUPREME
22   COURT SAID THAT WILLFUL BLINDNESS COULD BE RELEVANT TO THAT.
23   BUT IT'S NOT A WILLFULNESS CASE.
24         THE COURT:  SO WHAT WE TALKED ABOUT WAS KIND OF
25   SETTING SOME PARAMETERS REGARDING SOME DATES BASED ON
```

1514

1    MR. ALDRICH'S STATEMENT DURING THE COURSE OF THE PRETRIAL

2    CONFERENCE.

3              AND I THINK WHAT MR. ALDRICH IS SAYING, EVEN THOUGH

4    YOU DID THAT, JUDGE, THERE WAS STILL A LITTLE WINDOW IN THERE

5    THAT EXISTS REGARDING WILLFULNESS.  I BELIEVE IT WAS A

6    NINE-MONTH WINDOW, PLUS OR MINUS.  I DON'T THINK THAT YOU

7    DISAGREED WITH THAT, BUT IF YOU NEED SOME TIME TO THINK ABOUT

8    THAT, I'LL GIVE YOU SOME TIME TO THINK ABOUT THAT.

9              MR. MARCHESE:  RIGHT.  SO WE WERE UNDER THE

10   IMPRESSION THAT JMOL WAS GRANTED ON THE WILLFUL INFRINGEMENT

11   ISSUE FOR THE '270 PATENT.  AND I -- IF FOR WHATEVER REASON,

12   IF I'M MISTAKEN ABOUT THAT, THEN OBVIOUSLY I AM.  BUT THAT

13   WAS OUR UNDERSTANDING.

14             AND SO WE WOULD -- IF THAT --

15             THE COURT:  TAKE A LOOK AT IT.  WE DON'T NEED TO

16   DECIDE THIS RIGHT NOW.  TAKE A LOOK AT IT.  I NOW REMEMBER

17   THAT THERE WAS THIS LITTLE WINDOW IN THERE.  I DIDN'T HEAR

18   ANY ARGUMENT REGARDING THE LITTLE WINDOW AT THE TIME.  TAKE A

19   LOOK AT IT, AND I'LL FIGURE OUT WHAT WE DID.

20             I THINK THAT I JUST GRANTED -- I THINK YOU'RE RIGHT.

21   I THINK I JUST GRANTED YOUR MOTION FOR JUDGMENT AS A MATTER

22   OF LAW AND DID NOT KIND OF CONSIDER THE LITTLE WINDOW THAT

23   WAS LEFT, THAT EIGHT-MONTH WINDOW OR WHATEVER IT IS, APRIL TO

24   DECEMBER I THINK.

25             MR. MARCHESE:  APRIL TO DECEMBER.

1515

1    MR. ALDRICH:  MY RECOLLECTION IS YOU SAID MANY

2  TIMES, I'M AGREEING WITH YOU, I'M AGREEING WITH YOU, I'M

3  AGREEING WITH YOU, BUT WE NEVER ACTUALLY GOT TO A DECISION ON

4  THE JMOL, WHICH LEFT THIS WINDOW OPEN.  AND I JUST WANT TO

5  MAKE SURE THAT THE -- THAT OUR OPPOSITION REGARDING THAT

6  WINDOW IS OPEN.  THAT WAS ALL, YOUR HONOR.

7    THE COURT:  TAKE A LOOK AT THE TRANSCRIPT, SEE WHAT

8  IT SAYS, GIVE ME A RESPONSE AND THEN WE'LL DECIDE.

9    MR. ALDRICH:  THANK YOU, YOUR HONOR.

10    MR. MARCHESE:  SURE THING.  THANK YOU.

11    THE COURT:  ALL RIGHT.

12    MR. MURPHY WAS ON THE STAND.  MR. MURPHY.

13    THE WITNESS:  YES, SIR.

14    (JURY PRESENT, 9:18 A.M.)

15    THE COURT:  PLEASE BE SEATED.

16    MR. MURPHY, YOU REMAIN UNDER OATH.

17  ROBERT MURPHY, HAVING PREVIOUSLY BEEN SWORN, TESTIFIED

18    AS FOLLOWS:

19    THE COURT:  YOU MAY PROCEED.

20    MR. AXELROD:  THANK YOU, YOUR HONOR.

21    CROSS-EXAMINATION

22  BY MR. AXELROD:

23  Q.   GOOD MORNING, MR. MURPHY.

24  A.   GOOD MORNING, SIR.

25    MR. AXELROD:  I'M GOING TO HAND YOU A FEW EXAMPLES

COMPUTER-AIDED TRANSCRIPTION

1516

1    OF SEIRUS PRODUCTS.

2              MAY I APPROACH, YOUR HONOR?

3              THE COURT:  YOU MAY.

4    Q.   BY MR. AXELROD:  AND FOR THE RECORD, I'M FIRST HANDING

5    YOU WHAT'S BEEN MARKED AS EXHIBIT 225.3, THE SILVER SOCK, AND

6    225.2, THE BLACK SOCK, WHICH I BELIEVE HAS STYLE NO. 8137.

7              DID I IDENTIFY THOSE CORRECTLY?

8    A.   CORRECT.

9    Q.   ARE EACH OF THOSE PRODUCTS MADE BY HAND OR MACHINE?

10   A.   BY MACHINE.

11   Q.   OKAY.  SO CAN WE CALL THEM ARTICLE OF MANUFACTURE, FOR

12   OUR DISCUSSION?

13   A.   I'M NOT SURE OF THE DEFINITION OF --

14   Q.   YOU DON'T KNOW WHAT THAT IS?

15   A.   NO.  I'M SORRY.

16   Q.   ARE THESE ARTICLES OF MANUFACTURE MADE ENTIRELY, APART

17   FROM THE PACKAGING THAT'S ADDED ON, FROM HEATWAVE FABRIC?

18             MS. ROTHAUGE:  OBJECTION.  SPECULATION.  HE

19   TESTIFIED HE DIDN'T KNOW THAT TERM.

20             THE COURT:  OVERRULED.  YOU CAN ANSWER THE

21   QUESTION.

22             THE WITNESS:  ASIDE FROM THE THREAD AND THE LOGO

23   THAT'S APPLIED, YES.

24   Q.   BY MR. AXELROD:  YES.

25             YOU KNOW WHETHER THEY ARE TOTALLY MADE FROM HEATWAVE

COMPUTER-AIDED TRANSCRIPTION

1517

1    FABRIC, DO YOU NOT?

2    A.   YES.   ASIDE FROM THE THREAD AND THE LOGO.

3    Q.   YES.

4    A.   THE REST IS HEATWAVE FABRIC.

5    Q.   AND WHEN YOU'RE REFERRING TO THE THREAD, THAT'S WHATEVER

6    THREAD WAS USED TO STITCH THE HEATWAVE FABRIC INTO THE SHAPE

7    OF THE SOCK?

8    A.   CORRECT.

9    Q.   AND DOES SEIRUS PROVIDE ITS CONTRACT MANUFACTURER WITH

10   INSTRUCTIONS ON HOW TO ASSEMBLE OR PROCESS THE HEATWAVE

11   FABRIC TO MAKE THE SOCK FOR SEIRUS?

12   A.   YES.

13           MR. AXELROD:   COULD WE PULL UP EXHIBIT 1227.20 AND

14   1227.15.   AND I WOULD OFFER BOTH EXHIBITS.

15           MS. ROTHAUGE:   COUNSEL, WHAT GLOVE IS THAT?

16           MR. AXELROD:   1227.20 AND 1227.15.   I BELIEVE THEY

17   ARE BOTH PRODUCTION REQUESTS -- PRODUCTION INSTRUCTIONS FOR

18   STYLE 8137.

19           MS. ROTHAUGE:   NO OBJECTION TO 1227.15.

20           THE COURT:   RECEIVED.

21       (TRIAL EXHIBIT 1227.15 RECEIVED IN EVIDENCE.)

22           MS. ROTHAUGE:   AND NO OBJECTION TO 1227.20.

23           THE COURT:   RECEIVED.

24       (TRIAL EXHIBIT 1227.20 RECEIVED IN EVIDENCE.)

25           MR. AXELROD:   HOUSEKEEPING.

1518

1    Q.    MR. MURPHY, IS EXHIBIT 1227.15 A PRODUCTION REQUEST THAT

2    COMES FROM SEIRUS FOR THE HEATWAVE SOCK STYLE 2148?

3    A.    THAT IS CORRECT.

4    Q.    AND IS 27 -- 1227.20 A CORRESPONDING DOCUMENT FOR THE

5    HEATWAVE SOCK THAT IS STYLE NO. 8137?

6    A.    CORRECT.

7    Q.    AND ARE THESE THE INSTRUCTIONS THAT SEIRUS GIVES TO THE

8    MANUFACTURER SO THE MANUFACTURER KNOWS WHAT AND HOW TO MAKE

9    PRODUCTS FROM THE HEATWAVE FABRIC?

10   A.    YES, THAT'S CORRECT.

11   Q.    NOW, DOES SEIRUS RECEIVE THIS ARTICLE FOR THE FIRST TIME

12   WHEN IT'S SHIPPED TO THE UNITED STATES?

13   A.    THE ARTICLE IS FIRST -- FROM THIS INSTRUCTION A SAMPLE,

14   APPROVAL SAMPLE IS CREATED, SO THAT WOULD BE THE FIRST

15   RECEIPT THAT WE GET, IS THE APPROVAL OF THE PRODUCT OR A

16   PRODUCT APPROVAL.

17   Q.    DOES THAT COME TO YOU AS A FINISHED PRODUCT?

18   A.    YES.  WITHOUT PACKAGING.

19   Q.    SO THIS IS PART OF YOUR SETUP PROCESS WITH THE

20   MANUFACTURER; IS THAT FAIR?

21   A.    THAT'S CORRECT.

22   Q.    EVERY TIME YOU PLACE AN ORDER AFTER YOU'VE GIVEN

23   APPROVAL FOR WHAT THE MANUFACTURER HAS DONE, THE MANUFACTURER

24   DOESN'T SEND YOU TEST SAMPLES, DOES HE OR DOES IT?

25   A.    NOT EVERY TIME.

COMPUTER-AIDED TRANSCRIPTION

1519

1    Q.    AND ARE ALL OF THESE MANUFACTURERS IN CHINA?

2    A.    NO.  NOT NECESSARILY.

3    Q.    WHAT OTHER COUNTRIES ARE THE CONTRACT MANUFACTURERS IN

4    THAT WOULD BE DEALING WITH HEATWAVE FABRIC?

5    A.    TAIWAN.

6    Q.    ALL RIGHT.  AND DO I UNDERSTAND CORRECTLY THAT THESE

7    PRODUCTS ARE MADE WITH HEATWAVE FABRIC ONLY BECAUSE SEIRUS

8    TOLD THE MANUFACTURER TO DO SO?

9    A.    YES.

10   Q.    AND YOU MENTIONED THE FACT THAT YOU HAVE AN EXCLUSIVE

11   AGREEMENT WITH VENTEX; CORRECT?

12   A.    CORRECT.

13   Q.    SO THAT HEATWAVE FABRIC CAN'T BE USED FOR SOCKS OR HATS

14   OR ANY OTHER PRODUCTS WITHOUT SEIRUS' PERMISSION; CORRECT?

15   A.    HEATWAVE FABRIC CAN'T BE USED WITH -- IN ANY OTHER

16   PRODUCTS.  IT'S SEIRUS' PROPRIETARY FABRIC.

17   Q.    CORRECT.  SO IT CAN'T SHOW UP IN BEDDING OR AUTOMOBILE

18   FABRIC OR ANYTHING.  IT'S TOTALLY CONTROLLED BY SEIRUS; IS

19   THAT CORRECT?

20   A.    HEATWAVE FABRIC, YES, THAT'S CORRECT.

21   Q.    OKAY.  NOW, IN THE COURSE OF THE MANUFACTURING PROCESS,

22   SEIRUS NEVER TOUCHES OR RECEIVES HEATWAVE FABRIC ITSELF, DOES

23   IT?

24   A.    SOMETIMES, YES.

25   Q.    WHEN WOULD IT?  DOES IT CURRENTLY?

1520

```
 1    A.    SEIRUS HAS A VARIETY OF WAREHOUSES.  ALL OF THE FABRIC

 2    IS ORDERED THROUGH THE SUPPLIER, SENT TO OUR WAREHOUSE; AND

 3    THEN IT'S EVENTUALLY DIVIDED OUT OF OUR WAREHOUSE TO THE

 4    FACTORIES.

 5    Q.    SO ARE YOU SAYING THAT THE HEATWAVE FABRIC COMES TO THE

 6    UNITED STATES AS FABRIC?

 7    A.    NO.  WE HAVE -- WE HAVE WAREHOUSES IN SHANGHAI AND HONG

 8    KONG.

 9    Q.    OKAY.  SO VENTEX DELIVERS THE FABRIC TO A SEIRUS

10    WAREHOUSE IN HONG KONG OR SHANGHAI?

11    A.    THEY DELIVER TO OUR FORWARDER AT THE FORWARDER IN

12    KOREA.

13    Q.    SO THEY DELIVER IT TO A COMPANY THAT WILL THEN RECEIVE

14    IT AND MOVE IT ON?

15    A.    CORRECT.

16    Q.    SO SEIRUS DOESN'T REALLY TAKE IT DURING THE

17    MANUFACTURING PROCESS, DOES IT?

18    A.    SEIRUS TAKES POSSESSION OF IT WHEN IT'S HANDED OVER,

19    TENDERED TO OUR FORWARDER.

20    Q.    OKAY.  IS THAT A TECHNICAL POSSESSION; IN OTHER WORDS,

21    VENTEX RELEASES IT, AND THEN IT GOES TO THE FORWARDER AND THE

22    FORWARDER SENDS IT TO THE FACTORY?

23    A.    THAT IS A LEGAL -- WHAT IS IT?  THERE IS A LEGAL

24    SHIPPING TERM WHERE THE PROPERTY IS TENDERED TO US.  WE TAKE

25    POSSESSION OF IT LEGALLY ONCE IT'S THE TURNED OVER TO OUR
```

COMPUTER-AIDED TRANSCRIPTION

1521

1    FORWARDER.

2    Q.    OKAY.  BUT REALLY THE FORWARDER IS AN INTERMEDIARY WHO

3    IS JUST MOVING THE PRODUCT FROM VENTEX TO THE CONTRACT

4    MANUFACTURER; CORRECT?

5    A.    THE FORWARDER IS A SHIPPER, CORRECT.  BUT IT'S LEGALLY

6    IN OUR POSSESSION, VALUE-WISE.

7    Q.    DOES SEIRUS PAY VENTEX FOR THE MATERIAL, OR DOES THE

8    CONTRACT MANUFACTURER PAY VENTEX?

9    A.    SEIRUS PAYS VENTEX.

10   Q.    OKAY.  SO THEN THE MATERIAL IS SENT TO THE CONTRACT

11   MANUFACTURER; CORRECT?

12   A.    FROM WHERE, PLEASE?

13   Q.    FROM VENTEX THROUGH THE FORWARDER TO THE CONTRACT

14   MANUFACTURER?

15   A.    NO.  IT'S SENT FROM THE FORWARDER TO OUR WAREHOUSE, ONE

16   OF OUR TWO WAREHOUSES IN ASIA.

17   Q.    OKAY.  AND HOW DOES IT GO FROM THE WAREHOUSES TO THE

18   CONTRACT MANUFACTURER?

19   A.    ONCE A MANUFACTURING ORDER IS PLACED TO THE FACTORY, OUR

20   TEAM WILL FIGURE OUT WHO NEEDS WHAT MATERIAL AND THEY WILL

21   DIVIDE THE MATERIAL UP AND SEND IT FOR THE PRODUCTION

22   ORDER.

23   Q.    SO THEY THEN CUT UP -- DO THEY PROCESS THE MATERIAL, OR

24   ARE THEY ONLY SENDING ENOUGH MATERIAL TO THE MANUFACTURER TO

25   MAKE WHATEVER ORDER IS PENDING?

1522

1    A.    THEY SEND IT BASED ON THE ORDER THAT'S PENDING.

2    Q.    AND THEN THE MANUFACTURER TAKES THAT MATERIAL AND

3    PERHAPS OTHER MATERIALS, DEPENDING ON THE PRODUCT WE'RE

4    TALKING ABOUT, CORRECT, AND FURTHER PROCESSES THE HEATWAVE

5    FABRIC, DOESN'T IT?

6    A.    CORRECT.

7    Q.    AND IT MAY MAKE FINISHED PRODUCTS TOTALLY FROM THE

8    HEATWAVE FABRIC, AS THE EXAMPLES OF THE SOCKS YOU HAVE?

9    A.    CORRECT.

10   Q.    AND IT MAY MAKE OTHER PRODUCTS IN WHICH IT FIRST

11   TRANSFORMS THE HEATWAVE FABRIC INTO AN INTERMEDIATE PRODUCT;

12   CORRECT?

13   A.    FOR INSTANCE?

14   Q.    A LINER.

15   A.    YES.

16   Q.    AND SO IT MAKES A LINER OUT OF THAT HEATWAVE FABRIC AND

17   THEN THAT LINER MAY BE COMBINED WITH OTHER COMPONENTS AND

18   MATERIALS BY THE CONTRACT MANUFACTURER INTO A FINISHED GLOVE;

19   CORRECT?

20   A.    EITHER THAT -- EITHER THE CONTRACTOR OR A SUBCONTRACTOR

21   OF THEIRS WOULD PRODUCE THE LINER AND THEN RETURN THAT BACK

22   TO THEIR FACTORY.

23   Q.    WHEN YOU SAY "RETURN THAT BACK," BACK TO THE CONTRACT

24   MANUFACTURER?

25   A.    CORRECT.

1523

1    Q.    AND THE CONTRACT MANUFACTURER CONTROLS THOSE SUBCONTRACT

2    RELATIONSHIPS, DOES IT NOT?

3    A.    CORRECT.

4    Q.    BUT NONE OF THEM WILL DO ANYTHING WITHOUT SEIRUS'

5    DIRECTION; ISN'T THAT RIGHT?

6    A.    CORRECT.

7    Q.    IN OTHER WORDS, THROUGHOUT THIS PROCESS, EVEN THOUGH ALL

8    THESE OTHER PEOPLE ARE WORKING WITH THE HEATWAVE AND OTHER

9    FABRICS TO MAKE DIFFERENT PRODUCTS, SEIRUS IS IN CONTROL;

10   CORRECT?

11   A.    CORRECT.

12   Q.    NOW, WHEN THE HEATWAVE FABRIC IS IN A PRODUCT, IT'S THAT

13   FABRIC THAT MAKES THAT PRODUCT A HEATWAVE PRODUCT, ISN'T

14   IT?

15   A.    YES.

16   Q.    YOU CAN'T REALLY HAVE ANYTHING THAT SEIRUS WOULD

17   DESIGNATE AS A HEATWAVE PRODUCT, WHETHER IT'S A HAT OR A SOCK

18   OR A GLOVE, WITHOUT HAVING THAT HEATWAVE FABRIC BEING AN

19   INTEGRAL PART OF THE PRODUCT; CORRECT?

20   A.    CORRECT.

21   Q.    THEN AFTER THE MANUFACTURER GETS THESE -- THE PROCESS,

22   THE LINER MADE OUT OF THE HEATWAVE FABRIC, AND GETS OTHER

23   MATERIALS, THAT MANUFACTURER CUTS AND ASSEMBLES THE PIECES

24   WITH THE MANUFACTURER'S LABOR; CORRECT?

25   A.    LIKE I SAID, EITHER THAT MANUFACTURER OR A SUBCONTRACTOR

1524

1    OF THEIRS WOULD CUT AND ASSEMBLE.

2    Q.   SO ONE OR ANOTHER OF THE CHINESE OR TAIWANESE

3    MANUFACTURERS WILL DO ALL OF THE PROCESSING AND ALL OF THE

4    ASSEMBLING OF THE VARIOUS COMPONENTS AND PROVIDE WHATEVER

5    LABOR IS REQUIRED; CORRECT?

6    A.   CORRECT.

7    Q.   WHATEVER KNOW-HOW IS REQUIRED TO MAKE THE GLOVE?

8    A.   IN CONJUNCTION WITH OUR KNOW-HOW, CORRECT.

9    Q.   YOUR KNOW-HOW IN THE FORM OF THE INSTRUCTIONS;

10   CORRECT?

11   A.   INSTRUCTIONS AND APPROVAL OF THE PHYSICAL PRODUCT.

12   Q.   OKAY.  AND THEIR KNOW-HOW IN HOW TO ACTUALLY MAKE THE

13   PRODUCT COME TOGETHER?

14   A.   CORRECT.

15   Q.   AND WHATEVER THEIR CAPITAL REQUIREMENTS ARE?

16   A.   PLEASE.  AN EXAMPLE.

17   Q.   THE MANUFACTURER IS GOING TO HAVE CAPITAL INVESTMENT IN

18   EQUIPMENT AND THE LIKE TO MAKE THESE PRODUCTS, IS IT NOT?

19   A.   IN SOME CASES, WE WOULD PROVIDE SOME OF THAT

20   EQUIPMENT.

21   Q.   WHEN DO YOU PROVIDE EQUIPMENT TO THE CONTRACT

22   MANUFACTURERS?

23   A.   IF THERE WAS A SPECIAL MACHINE REQUIRED THAT WAS JUST

24   FOR OUR PRODUCT, THEN WE MIGHT INVEST IN A MACHINE FOR THEM

25   TO USE FOR US.

1525

1    Q.    HAVE YOU DONE THAT WITH RESPECT TO HEATWAVE PRODUCTS?

2    A.    I WOULD HAVE TO CHECK, BUT I KNOW THAT WE'VE DONE THAT

3    WITH SOCKS.

4    Q.    AND WHAT WAS THE SPECIAL EQUIPMENT THAT YOU PROVIDED

5    YOUR CONTRACT MANUFACTURER TO MAKE SOCKS?

6    A.    AN OFF-THE-ARM ZIGZAG MACHINE, AS REFERENCED IN THIS

7    TECHNICAL INSTRUCTION.

8    Q.    AND THAT'S SO THAT THEY CAN MAKE THE ENTIRE PRODUCT WITH

9    HEATWAVE FABRIC?

10   A.    SO THAT THEY CAN MAKE SOCKS WITH A SPECIAL TYPE OF

11   SEAM.

12   Q.    AND THEN THE MANUFACTURER APPLIES THE HANG TAGS, DOES HE

13   NOT, AND ALL OF THE PACKAGING?

14   A.    THEY DO APPLY IT, YES.

15   Q.    AND IN THE UNITED STATES, RATHER THAN IN CHINA AND IN

16   KOREA, COLUMBIA'S PATENTED WAVY LINE DESIGN APPEARS ONLY ON

17   FINISHED AND COMPLETE ARTICLES OF MANUFACTURE THAT ARE SOLD

18   TO CONSUMERS; ISN'T THAT CORRECT?

19              MS. ROTHAUGE:  OBJECTION.  COMPOUND.

20              THE COURT:  YOU CAN REPHRASE YOUR QUESTION.

21              MR. AXELROD:  SURE.

22   Q.    IN THE UNITED STATES, WHEN THESE PRODUCTS ARE IN THE

23   UNITED STATES, COLUMBIA'S PATENTED WAVY LINE DESIGN APPEARS

24   ONLY ON FINISHED AND COMPLETE ARTICLES OF MANUFACTURE THAT

25   ARE SOLD TO THE CONSUMER, OR INTENDED FOR SALE TO THE

COMPUTER-AIDED TRANSCRIPTION

1526

1    CONSUMER; ISN'T THAT CORRECT?

2    A.    CAN YOU REPHRASE THAT ONE MORE TIME?  I'M SORRY.

3    Q.    SURE.  WHEN THIS PRODUCT COMES TO THE UNITED STATES, ANY

4    OF THESE HEATWAVE MATERIALS, IT COMES TO SEIRUS AS FINISHED

5    PRODUCTS; CORRECT?

6    A.    YES.

7    Q.    AND THEY ALREADY HAVE THE PACKAGING ON IN ACCORDANCE

8    WITH SEIRUS' INSTRUCTIONS; IS THAT CORRECT?

9    A.    YES.

10    Q.    AND THERE IS NOTHING TO BE DONE FURTHER OTHER THAN TO

11    SHIP THEM TO PROSPECTIVE CUSTOMERS; IS THAT FAIR?

12    A.    SOME PRICE, SOME PREPPING, PRICE STICKERING AND

13    PREPARATION FOR THE CUSTOMERS.

14    Q.    SO YOU MAY PUT ON AN ADDITIONAL STICKER THAT SAYS

15    "MANUFACTURER'S RETAIL PRICE" OR --

16    A.    CORRECT.

17    Q.    BUT OTHER THAN PERHAPS PUTTING A PRICING STICKER ON IT,

18    THERE IS NO FURTHER PROCESSING, THERE IS NO FURTHER HANDLING,

19    IT'S READY TO BE SOLD TO THE CONSUMER; CORRECT?

20    A.    IN SOME CASES, THERE IS SOME ASSEMBLY.

21    Q.    WHAT'S AN EXAMPLE OF WHERE YOU THINK THERE IS FURTHER

22    ASSEMBLY AFTER THE PRODUCT COMES FROM THE CONTRACT

23    MANUFACTURER?

24    A.    IN THE TORCHE GLOVE, THAT WOULD HAVE TO GET PACKAGED.

25    THE TWO GLOVES WOULD BE COMBINED HERE AND PACKAGED IN THE

1527

1    UNITED STATES.

2    Q.   SO THE -- WE'LL COME BACK TO THE TORCHE IN A LITTLE BIT.

3    THAT'S THE THREE ONE -- THREE GLOVES IN ONE PRODUCT?

4    A.   IT'S THE TWO GLOVES, THE HEATED INNER GLOVE AND THE OVER

5    SHELL.  THOSE ARE MADE AT TWO DIFFERENT FACTORIES.  SO THOSE

6    HAVE TO GET COMBINED HERE AND PACKAGED IN THE UNITED

7    STATES.

8    Q.   OKAY.  AND SEIRUS IDENTIFIES THAT AS THE

9    THREE-GLOVES-IN-ONE PRODUCT?

10   A.   IF THAT'S WHAT THE PACKAGING SAYS.

11   Q.   OKAY.  WE'LL COME BACK TO THAT IN A LITTLE BIT.  YOU

12   WOULDN'T DISAGREE WITH THAT CHARACTERIZATION, I WOULD TAKE

13   IT?

14   A.   I'M NOT IN THE MARKETING DEPARTMENT.  YOU KNOW, I MAKE

15   THE PRODUCT.

16   Q.   OKAY.  SO APART FROM THE ASSEMBLY THAT HAS TO BE DONE TO

17   PUT THE THREE GLOVES INTO ONE BOX FOR THE TORCHE, WITH

18   RESPECT TO ALL OF THE OTHER HEATWAVE PRODUCTS, THEY ONLY COME

19   TO THE UNITED STATES AS FINISHED PRODUCTS; CORRECT?

20   A.   CORRECT.

21   Q.   MR. MURPHY, I'M GOING TO HAND YOU TWO MORE PRODUCTS.

22   THEY ARE FOR THE RECORD EXHIBIT 220.1, WHICH IS STYLE NO.

23   8134, AND 220.3, WHICH IS STYLE NO. 2116.

24   A.   DO YOU WANT THOSE BACK?

25   Q.   SURE.

1528

1    WHAT ARE THESE PRODUCTS?

2    A.    I'M SORRY.  SAY THAT AGAIN.

3    Q.    WHAT ARE THESE PRODUCTS?

4    A.    THIS IS THE HEATWAVE GLOVE LINER.

5    Q.    AND ONE IS A GLOVE LINER THAT SHOWS THE HEATWAVE, THE

6    FOIL ON THE HEATWAVE FABRIC ON THE EXTERIOR; CORRECT?

7    A.    CORRECT.

8    Q.    AND THE OTHER IS ONE IN WHICH THE HEATWAVE FOIL IS ON

9    THE INTERIOR; IS THAT CORRECT?

10    A.    CORRECT.

11    Q.    NOW, THE LINERS, CONSIDERING BOTH FOIL ON THE INSIDE AND

12    FOIL ON THE OUTSIDE TOGETHER, ARE SEIRUS' LARGEST SELLING

13    HEATWAVE PRODUCT, ARE THEY NOT?

14    A.    I DON'T KNOW IF I CAN SPEAK TO THAT, BUT MAYBE.

15    Q.    WHEN I LOOK TO SEIRUS' SALES RECORDS THAT THEY PRODUCED,

16    THEY COME UNDER A COUPLE OF DIFFERENT STYLES, 8134 WE YOU

17    HAVE IN FRONT OF US, AND 2116.  AND I COME UP WITH ROUGHLY

18    ███ ███████ DOLLARS OF HEATWAVE PRODUCTS THAT WERE SOLD UNDER

19    THESE TWO STYLES.

20    IS THAT CONSISTENT WITH YOUR UNDERSTANDING?

21    A.    I DON'T KNOW THE SALES NUMBERS BY HEART.

22    MR. AXELROD:  OKAY.  COULD WE PULL UP

23    EXHIBIT 227.13.

24    WHAT IS EXHIBIT 227.13, MR. MURPHY?  AND I WOULD

25    OFFER 223.13.

COMPUTER-AIDED TRANSCRIPTION

1529

1    THE COURT:  ARE YOU SAYING 227?  IT'S ACTUALLY

2  1227.13.

3    MR. AXELROD:  I'M SORRY.

4    THE COURT:  IT MATTERS TO US.

5    MR. AXELROD:  YES.

6    MS. ROTHAUGE:  NO OBJECTION, YOUR HONOR.

7    THE COURT:  IT'S RECEIVED.

8    (TRIAL EXHIBIT 1227.13 RECEIVED IN EVIDENCE.)

9    MR. AXELROD:  ALL OF THESE 227'S, FOR THE RECORD,

10  ARE 1227 POINT SOMETHING.

11  Q.   MR. MURPHY, WHAT IS 1227.13?

12  A.   THIS IS THE PRODUCTION REQUEST DOCUMENT FOR THE HEATWAVE

13  GLOVE LINER IN HWS.

14    MR. AXELROD:  AND I'M GOING TO PULL UP FOR YOU

15  1227.69.  WHAT IS 1227.69, WHICH I OFFER.

16    THE WITNESS:  THIS IS --

17    THE COURT:  WELL, WAIT A SECOND.

18    MS. ROTHAUGE:  1227.69; IS THAT RIGHT?

19    MR. AXELROD:  YES.

20    MS. ROTHAUGE:  NO OBJECTION.

21    THE COURT:  RECEIVED.  YOU CAN ASK YOUR QUESTION

22  AGAIN.

23    (TRIAL EXHIBIT 1227.69 RECEIVED IN EVIDENCE.)

24    MR. AXELROD:  THANK YOU.

25  Q.   MR. MURPHY, WHAT IS EXHIBIT 1227.69?

COMPUTER-AIDED TRANSCRIPTION

1530

1   A.   THIS IS THE PRODUCTION REQUEST FOR THE HEATWAVE GLOVE

2   LINER.

3   Q.   FOR THE OTHER MODEL, THE 2116?

4   A.   CORRECT.

5   Q.   AS OPPOSED TO THE 8134?

6   A.   CORRECT.

7   Q.   AND THE DIFFERENCE BETWEEN THESE TWO IS BLACK IS ON THE

8   INSIDE OR BLACK ON THE OUTSIDE -- OR SILVER IS ON THE

9   OUTSIDE?

10  A.   NO.   THE DIFFERENCE IS ONE HAS A DIFFERENT HEADER CARD

11  THAN THE OTHER.

12  Q.   NOW, THERE IS ANOTHER 2116 STYLE THAT'S BLACK, THAT HAS

13  THE FOIL ON THE INSIDE; CORRECT?

14  A.   THERE IS A COLOR WAY IN THAT 2116 PRODUCT.   THAT IS A

15  COLOR WAY OF THE 2116 PRODUCT CODE.

16  Q.   WHAT DO YOU MEAN BY "A COLOR WAY"?

17  A.   ONE COLOR WOULD BE BLACK.   ONE COLOR WOULD BE SILVER.

18  Q.   OKAY.   AND THEY ARE BOTH WITHIN THE 2116 STYLE NUMBER?

19  A.   THAT'S CORRECT.

20  Q.   WHEREAS, THE 8134 IS A DIFFERENT STYLE NUMBER,

21  ESSENTIALLY THE SAME PRODUCT?

22  A.   DIFFERENT HEADER WITH A DIFFERENT HEADER CARD.

23  Q.   WITH A DIFFERENT HEADER CARD.   SO IT GETS A DIFFERENT

24  STYLE NUMBER IF IT HAS A DIFFERENT HEADER CARD?

25  A.   CORRECT.

COMPUTER-AIDED TRANSCRIPTION

1531

1    Q.    AND ARE THE TWO HEADER CARDS ATTACHED TO BOTH OF THOSE

2    EXHIBITS, SUCH THAT YOU CAN SEE WHAT THE DIFFERENCE IS?

3    A.    YES.

4    Q.    AND, AGAIN, WHEN THAT -- THAT COMES TO SEIRUS WITH THE

5    HEADER CARD ON IT?

6    A.    SOMETIMES.

7    Q.    NOW, FOR EACH OF THE GLOVE LINERS, THEY ARE MADE 100

8    PERCENT FROM HEATWAVE FABRIC, ARE THEY NOT?

9    A.    YES.  CORRECT.

10          MR. AXELROD:  LET ME SHOW YOU TWO OTHER EXHIBITS.

11   FOR THE RECORD, 221.1, WHICH IS A HEATWAVE SKULL LINER, STYLE

12   NO. 2209, AND 221.2, WHICH IS A HEATWAVE SKULL LINER, STYLE

13   8138.

14   Q.    DID I DESCRIBE THOSE CORRECTLY, MR. MURPHY?

15   A.    CORRECT.

16   Q.    MAYBE I LEARNED SOMETHING FROM OUR LAST EXCHANGE.  IS

17   THE DIFFERENCE BETWEEN THESE TWO PRODUCTS ONLY ONE COMES WITH

18   A DIFFERENT HEADER?

19   A.    CORRECT.

20   Q.    AND DO YOU KNOW WHAT THE RELATIVE SALES OF THE SKULL

21   CAPS IS?

22   A.    I DO NOT.

23          MR. AXELROD:  COULD WE PULL UP EXHIBIT 1227.164.

24   AND I WOULD OFFER .164.

25          MS. ROTHAUGE:  NO OBJECTION.

COMPUTER-AIDED TRANSCRIPTION

1532

1    THE COURT:  RECEIVED.

2    (TRIAL EXHIBIT 1227.164 RECEIVED IN EVIDENCE.)

3    Q.    BY MR. AXELROD:  WHAT IS EXHIBIT 1227.164, MR. MURPHY?

4    A.    IT IS A PRODUCTION REQUEST FOR THE HEATWAVE SKULL LINER

5    2209.

6    Q.    AND I'M GOING TO PULL OUT FOR YOU AND THE JURY THE PART

7    THAT APPEARS AT THE TOP.

8         DO YOU SEE THE FIRST HEADING WHERE IT SAYS "HAT"?

9    A.    YES.

10   Q.    AND DO YOU SEE IN THE INSTRUCTIONS WHERE IT SAYS

11   SILVER -- LOOKS LIKE "SILVER/FOIL SIDE WILL BE INSIDE HAT

12   TOUCHING SKIN."

13        DO YOU SEE THAT?

14   A.    YES.

15   Q.    IS THAT SEIRUS' INSTRUCTION TO THE MANUFACTURER FOR THIS

16   PRODUCT?

17   A.    YES.

18   Q.    AND, AGAIN, THE SKULL CAP PRODUCTS ARE MADE 100 PERCENT

19   FROM HEATWAVE FABRIC, ARE THEY NOT?

20   A.    ASIDE FROM THE LABELS AND STITCHING --

21   Q.    YES.

22   A.    -- CORRECT.

23        MR. AXELROD:  LET ME HAND YOU WHAT I'VE MARKED AS A

24   NEW EXHIBIT 223.2, WHICH FOR THE RECORD IS A HEATWAVE ZENITH

25   MITT, STYLE NO. 8161.

1533

1    MS. ROTHAUGE:  NO OBJECTION.

2    THE COURT:  IT IS RECEIVED.

3    MR. AXELROD:  I GUESS I'LL OFFER IT.

4    (TRIAL EXHIBIT 223.2 RECEIVED IN EVIDENCE.)

5    Q.   BY MR. AXELROD:  MR. MURPHY, ARE YOU FAMILIAR WITH THE

6    ZENITH MITT?

7    A.   YES, SIR.

8    Q.   THE ZENITH MITT AND THE ZENITH GLOVE ARE PROBABLY

9    SEIRUS' LARGEST SELLING GLOVE; IS THAT CORRECT?

10   A.   AGAIN, I CAN'T SPEAK TO THE SALES.

11   Q.   DO YOU KNOW, DO YOU GET A SENSE FROM THE PRODUCTION

12   ORDERS THAT YOU SEE PLACED?

13   A.   NOT REALLY.  I MEAN, WE HAVE A LOT OF PRODUCTS.

14   Q.   OKAY.  AND IS THAT GLOVE SOMETHING THAT'S MADE BY HAND

15   OR BY MACHINE?

16   A.   BY MACHINE.

17   Q.   WERE YOU HESITATING BECAUSE THERE IS A LITTLE HAND AND A

18   LOT OF MACHINE?

19   A.   BECAUSE THE MACHINES REQUIRE SOMEBODY WITH HANDS TO

20   OPERATE THEM, SO...

21   Q.   OKAY.  BUT EITHER WAY, IT IS A THING THAT IS MADE BY

22   EITHER HAND OR MACHINE?

23   A.   CORRECT.

24   Q.   NOW, DO THE INSTRUCTIONS FOR MAKING THIS GLOVE FOLLOW

25   GENERALLY THE PATTERN OF THE INSTRUCTIONS THAT WE REVIEWED

1534

1    FOR THE LINER, THE SKULL CAP AND THE SOCKS?

2    A.    GENERALLY, YES.

3         MR. AXELROD:  COULD WE PULL UP EXHIBIT 1227.84,

4    WHICH WE'LL OFFER.

5         MS. ROTHAUGE:  NO OBJECTION.

6         THE COURT:  RECEIVED.

7    (TRIAL EXHIBIT 1227.84 RECEIVED IN EVIDENCE.)

8    Q.    BY MR. AXELROD:  IS EXHIBIT 1227.84 SEIRUS' INSTRUCTIONS

9    FOR THE HEATWAVE ZENITH MITT THAT IS STYLE NO. 1031?

10   A.    THAT IS CORRECT.

11   Q.    AND DOES THE MODEL THAT YOU HAVE IN FRONT OF YOU, WHICH

12   I BELIEVE HAS A SLIGHTLY DIFFERENT STYLE NUMBER, 8161, DOES

13   THAT DIFFER ONLY BECAUSE THAT IS SEIRUS' WAY OF CODING THAT

14   IT WANTS A DIFFERENT HANG TAG ADVERTISEMENT ON THE OUTSIDE OF

15   THE PRODUCT?

16   A.    IN THIS CASE, YES.

17   Q.    CAN YOU TAKE OUT THE HEATWAVE LINER AND HAND IT TO ME.

18   A.    JUST THE HEATWAVE PART?

19   Q.    YEAH.  TAKE OUT THE HEATWAVE LINER FROM THE GLOVE.  CAN

20   YOU SEPARATE THEM?

21   A.    WITH A SEAM RIPPER, I CAN OPEN UP THE BOTTOM SEAM AND

22   REMOVE THIS COMPLETELY.

23   Q.    SO YOU WOULD HAVE TO TAKE THE GLOVE APART?

24   A.    YOU DO NEED TO DETACH THE BOTTOM CUFF SEAM HERE AND THEN

25   THE LINER IS INTACT.

COMPUTER-AIDED TRANSCRIPTION

1535

1    Q.   OKAY.  AND WHEN YOU SAY "DETACH IT," YOU HAVE TO CUT IT

2    BECAUSE IT'S SEWN TOGETHER?

3    A.   IT IS TACKED TOGETHER AT THE BOTTOM, YES.

4    Q.   AND ALL OF THE VARIOUS PIECES THAT GO TO MAKE UP THE

5    GLOVE ARE EITHER TACKED OR SEWN OR PLACED TOGETHER AS PART OF

6    THE MANUFACTURING PROCESS, ARE THEY NOT?

7    A.   CORRECT.

8    Q.   NOW, YOU MENTIONED THE HEATWAVE TORCHE.  LET ME HAND YOU

9    WHAT'S BEEN MARKED AS EXHIBIT 736.

10           IS THAT THE HEATWAVE TORCH THAT YOU WERE REFERRING

11   TO?

12   A.   YES, SIR.

13   Q.   NOW, SEIRUS ADVERTISES IT ON THE FRONT OF THE BOX AS A

14   COMPONENT SYSTEM.  DO YOU SEE THAT?

15   A.   YES, SIR.

16   Q.   AND IT ALSO ADVERTISES IT AS A THREE-IN-ONE-GLOVE, OR

17   THREE GLOVES IN ONE?  EXCUSE ME.

18   A.   YES.

19   Q.   WHAT ARE THE THREE COMPONENTS THAT SEIRUS IDENTIFIES IN

20   THAT PRODUCT?

21   A.   I DON'T KNOW THAT THEY IDENTIFY IT HERE.  BUT IN THE

22   FRONT IT JUST IDENTIFIES TWO.

23   Q.   OKAY.  AND THE TWO IN THERE ARE THE --

24   A.   ARE THE HEATED INNER LINER GLOVE.

25   Q.   YES.

COMPUTER-AIDED TRANSCRIPTION

1536

1    A.    AND THE OUTER SHELL.

2    Q.    SO THE -- COULD YOU TAKE IT -- PULL THEM OUT OF THE BOX.

3          SO IN THIS COMPONENT SYSTEM, YOU HAVE A HEATWAVE

4    GLOVE, DO YOU NOT?

5    A.    YES, SIR.

6    Q.    WOULD YOU SHOW THAT TO THE JURY.  AND IT HAS THE

7    HEATWAVE LINER ON THE INSIDE?

8    A.    YES, SIR.

9    Q.    AND THEN YOU ALSO HAVE A SEPARATE LINER UNRELATED TO

10   THIS GLOVE, A SEPARATE LINER GLOVE?

11   A.    THE HEATED GLOVE.

12   Q.    OKAY.  AND THAT CAN BE USED SEPARATELY?

13   A.    CORRECT.

14   Q.    OKAY.  SO THAT IS A SECOND GLOVE.  AND THEN THESE TWO

15   COMPONENTS CAN BE COMBINED WITH THE BATTERY PACK INTO THE

16   TOTAL SYSTEM, WHICH WOULD BE YOUR THIRD GLOVE, WOULD IT

17   NOT?

18   A.    THESE COULD BE WORN ALONE, WITH THE SHELL (INDICATING).

19   THIS CAN BE WORN WITH OR WITHOUT THE BATTERIES

20   (INDICATING).

21   Q.    OKAY.  SO THAT GIVES YOU THREE COMBINATIONS, DOES IT

22   NOT?

23   A.    CORRECT.

24   Q.    SO IS THAT THE THREE GLOVES IN ONE?

25   A.    FROM MY VIEW, THIS IS A DRESS GLOVE OR A HEATED GLOVE.

1537

1  THIS IS AN OVER GLOVE THAT'S OVERSIZED TO GO OVER THIS

2  GLOVE.

3  Q.   OKAY.  SO TWO DIFFERENT GLOVES?

4  A.   TWO DIFFERENT GLOVES.  TWO DIFFERENT WAYS TO WEAR THIS

5  GLOVE, EITHER WITH OR WITHOUT THE BATTERIES.  AND THEN AN

6  OVER SHELL.

7  Q.   OKAY.  AND YOU DON'T VIEW THE OVER SHELL AS A SEPARATE

8  GLOVE?

9  A.   PERSONALLY I WOULDN'T WEAR THIS ALONE BECAUSE IT'S SIZED

10  TO GO OVER THIS.  SO IT'S A HALF --

11  Q.   SO IT MIGHT BE A LITTLE BIT BIG?

12  A.   IT'S MEANT TO BE A HALF SIZE BIGGER.

13  Q.   BUT OTHERWISE IT'S A PURELY -- TOTALLY FUNCTIONAL

14  GLOVE?

15  A.   OF COURSE.

16  Q.   OKAY.  AND SO THESE DIFFERENT COMPONENTS CAN BE MIXED

17  AND MATCHED, DEPENDING ON THE USER'S NEEDS AT THE MOMENT;

18  CORRECT?

19  A.   COULD BE, SIR.

20  Q.   AND THAT'S WHAT MAKES UP THE COMPONENT SYSTEM?

21  A.   THAT'S WHAT MAKES UP A COMPONENT SYSTEM.

22  Q.   SO CAN YOU AND I AGREE THAT THE TORCHE PRODUCT IS A

23  MULTI-COMPONENT PRODUCT?

24  A.   YES.

25          MR. AXELROD:  COULD WE PULL UP EXHIBIT 443.

COMPUTER-AIDED TRANSCRIPTION

1538

1    Q.    YESTERDAY YOU TALKED ABOUT THE CONTRACT THAT YOU HAD

2    WITH VENTEX.  DO YOU RECALL THAT?

3    A.    YESTERDAY, NO.

4    Q.    DO YOU RECALL -- OH, SORRY.  GOT ME.

5          FRIDAY DO YOU RECALL TALKING ABOUT YOUR CONTRACT

6    WITH VENTEX?

7    A.    YES.

8          MR. AXELROD:  AND I WOULD OFFER EXHIBIT 443.

9          MS. ROTHAUGE:  NO OBJECTIONS.

10         THE COURT:  RECEIVED.

11         (TRIAL EXHIBIT 443 RECEIVED IN EVIDENCE.)

12   Q.    BY MR. AXELROD:  IS EXHIBIT 443 A COPY OF SEIRUS' FORM

13   OF FOREIGN MANUFACTURING AGREEMENT THAT VENTEX SIGNED?

14   A.    IT'S A COPY OF OUR VENDOR AGREEMENT.

15   Q.    OKAY.  HOW IS THAT DIFFERENT THAN MY DESCRIPTION?  IS

16   THIS NOT LIMITED TO FOREIGN CONTRACT MANUFACTURERS?

17   A.    CORRECT.

18   Q.    SO EVERYONE WHO DEALS WITH SEIRUS, YOU HAVE SIGN THIS

19   CONTRACT?

20   A.    CORRECT.

21   Q.    OKAY.  AND IS EXHIBIT 435 -- WHICH WE'LL PULL UP AND I

22   WILL OFFER.

23         WHAT IS EXHIBIT 435?

24   A.    THIS IS THE SIGNATURE PAGE OF THAT VENDOR AGREEMENT.

25         MR. AXELROD:  AND COULD WE PULL UP EXHIBIT 505.

1539

1    OH, DID I OFFER 435?  IF NOT, I INTENDED TO.

2    MS. ROTHAUGE:  I HAVE NO OBJECTION.

3    MR. AXELROD:  THANK YOU.

4    THE COURT:  RECEIVED.

5    (TRIAL EXHIBIT 435 RECEIVED IN EVIDENCE.)

6  Q.  BY MR. AXELROD:  LET'S GO BACK TO 435.  I DIDN'T REALIZE

7  THE JURY DOESN'T GET TO SEE IT.

8    AND THAT'S VENTEX' SIGNATURE PAGE ON THAT CONTRACT

9  FOR THE YEAR -- WELL, SIGNED MARCH 2013?

10  A.  YES.

11  Q.  AND DO YOU HAVE THEM RE-SIGN EACH YEAR?

12  A.  YES.

13  Q.  OKAY.  AND CAN WE PULL UP EXHIBIT 505.  I BELIEVE 505 IS

14  ADMITTED.

15    DO YOU RECOGNIZE EXHIBIT 505?

16  A.  AN E-MAIL FROM MORGAN TO ME, YES.

17  Q.  DO YOU RECOGNIZE IT?

18  A.  YES.  YES.

19  Q.  OKAY.  THIS IS E-MAIL CORRESPONDENCE BETWEEN YOU AND

20  MORGAN CHIN?

21  A.  CORRECT.

22  Q.  AND DO YOU RECALL THE E-MAIL CORRESPONDENCE STARTED WITH

23  YOUR REQUEST TO MS. CHIN TO LET YOU KNOW WHETHER VENTEX -- I

24  THINK YOU REFER TO THEM AS "THESE GUYS," CLOSED QUOTE, SIGNED

25  YOUR CONTRACT AGREEMENT?

COMPUTER-AIDED TRANSCRIPTION

1540

```
 1    A.    CORRECT.

 2    Q.    AND IS EXHIBIT 443, THE VENDOR FORM AGREEMENT, THE

 3    CONTRACT THAT YOU WERE REFERRING TO THERE?

 4    A.    IT IS.

 5    Q.    NOW, DOES SEIRUS CONSIDER ITS MANUFACTURING RELATIONSHIP

 6    WITH VENTEX CONFIDENTIAL?

 7    A.    YES.

 8    Q.    AND DOES SEIRUS EXPECT THAT VENTEX, LIKE SEIRUS' OTHER

 9    FOREIGN CONTRACT MANUFACTURERS, WILL KEEP THEIR INFORMATION

10    REGARDING SEIRUS' PRODUCTS, MATERIALS AND BUSINESS

11    CONFIDENTIAL FROM OTHER COMPETITORS?

12    A.    YES.

13    Q.    AND YOU WOULD CONSIDER IT A BREACH OF YOUR AGREEMENT

14    WITH VENTEX IF VENTEX PROVIDED OTHER PARTIES WITH SEIRUS'

15    HEATWAVE FABRIC, WOULD YOU NOT?

16    A.    WITH SEIRUS' HEATWAVE FABRIC?

17    Q.    YES.

18    A.    I DON'T KNOW THAT THERE IS A SPECIFIC BREACH IN THE

19    AGREEMENT FOR THAT, BUT IT WOULD BE -- IT WOULD CERTAINLY

20    DISAPPOINT US.

21    Q.    YOU WOULDN'T CONSIDER THAT A BREACH OF YOUR AGREEMENT

22    WITH SEIRUS, THAT ONE YOU HAVE EXCLUSIVITY FOR THAT FABRIC?

23    A.    I DON'T KNOW IN THIS CONTRACT IF THERE IS A SPECIFIC

24    CLAUSE THAT THAT WOULD BREACH, BUT IT WOULD -- YOU KNOW, IT

25    WOULD DISAPPOINT US THAT THEY WOULD DO THAT.
```

1541

1    Q.    WELL, IT'S YOUR EXPECTATION IN YOUR RELATIONSHIP WITH

2    THE CONTRACT MANUFACTURER THAT THEY WILL KEEP ALL OF THE

3    INFORMATION CONCERNING SEIRUS' BUSINESS CONFIDENTIAL BETWEEN

4    THE MANUFACTURER AND SEIRUS; CORRECT?

5    A.    THAT IS THE EXPECTATION, YES.

6    Q.    AND THEY WON'T PROVIDE YOUR PROPRIETARY OR CLAIMED

7    FABRICS OR OTHER PRODUCTS TO THIRD PARTIES OR COMPETITORS;

8    CORRECT?

9    A.    CORRECT.

10    Q.    NOW, THE VENDOR AGREEMENT THAT YOU HAVE REQUIRES YOUR

11    VENDOR TO INDEMNIFY AND HOLD SEIRUS HARMLESS FROM ANY CLAIMS

12    THAT ARISE OUT OF YOUR USE OF THE VENDOR'S MATERIALS THAT

13    MIGHT BREACH ANY STATE OR FEDERAL LAW; IS THAT CORRECT?

14    A.    CORRECT.

15    Q.    AND IS THAT THE REASON IN EXHIBIT 505 YOU WERE

16    REQUESTING MS. CHIN TO PULL AND IDENTIFY FOR YOU WHETHER

17    VENTEX HAD SIGNED THE AGREEMENT?

18    A.    NO, NOT NECESSARILY.  JUST AT THAT TIME PERIOD THAT'S A

19    FOLLOW-UP TO OUR ANNUAL SIGNING OF THE AGREEMENTS.

20    Q.    WELL, THIS FOLLOWED IMMEDIATELY UPON PRIOR E-MAIL

21    CORRESPONDENCE BETWEEN YOU AND MS. CHIN, WHICH IDENTIFIED ONE

22    ISSUED COLUMBIA PATENT, THE DESIGN PATENT IN THIS CASE, AND

23    REFERS TO ISSUES RELATING TO THE UTILITY PATENT, OR A

24    COLUMBIA PATENT, WAS IT?

25    A.    CORRECT, YES.

COMPUTER-AIDED TRANSCRIPTION

1542

1    Q.    AND THAT'S WHY -- THAT'S WHAT -- WHY YOU REQUESTED OR

2    MADE THE REQUEST TO MS. CHIN TO CONFIRM THAT THESE PEOPLE HAD

3    SIGNED YOUR VENDOR AGREEMENT?

4    A.    AT THIS TIME, THIS WAS A NEW VENDOR, SO THIS WOULD HAVE

5    BEEN THEIR -- YOU KNOW, I WOULD HAVE BEEN LOOKING TO MAKE

6    SURE THAT THEY HAD SIGNED THAT AGREEMENT.  I CAN'T SAY THAT

7    IT WAS IN RELATIONSHIP TO, BUT IT CERTAINLY WAS PART OF THAT

8    E-MAIL CHAIN.

9    Q.    WELL, YOU HAD BEEN PURCHASING PRODUCT, PARTICULARLY,

10   SPECIFICALLY THE HEATWAVE FABRICS, SINCE THE FALL OF 2012,

11   HAD YOU NOT?

12   A.    CORRECT.

13   Q.    SO IT WASN'T YOUR FIRST DEALINGS WITH VENTEX?

14   A.    NO.  BUT IT WAS OUR FIRST, YOU KNOW, PRODUCTION YEAR

15   WITH THEM.  MOST OF OUR SUPPLIERS WE HAD LONG RELATIONSHIPS

16   WITH.

17   Q.    OKAY.  SO YOU WERE INQUIRING OF VENTEX -- OF MS. CHIN

18   ABOUT WHETHER VENTEX HAD SIGNED THE VENDOR AGREEMENT THAT HAS

19   THIS INDEMNIFICATION PROVISION?

20   A.    YES.  CORRECT.

21   Q.    OKAY.  AT THE IMMEDIATE TIME THAT VENTEX HAD, FOR THE

22   FIRST TIME, OR PREVIOUSLY, IDENTIFIED COLUMBIA PATENT ISSUES

23   TO YOU; CORRECT?

24   A.    IT IS ON THAT E-MAIL CHAIN, YES.

25   Q.    IS VENTEX ASSISTING SEIRUS' DEFENSE OF THIS

COMPUTER-AIDED TRANSCRIPTION

1543

1    LITIGATION?

2    A.    NOT THAT I'M AWARE OF.

3              MR. AXELROD:  OKAY.  NO FURTHER QUESTIONS.

4              THE COURT:  REDIRECT.

5              MR. AXELROD:  OH, MORE HOUSEKEEPING, YOUR HONOR.

6         THERE IS UNCERTAINTY AS TO WHETHER 220.1 HAS BEEN

7    ADMITTED.  225.2, THE SOCK, AND 221.1  IF THEY HAVE NOT, I

8    WOULD OFFER THEM.

9              MS. ROTHAUGE:  WE HAVE NO OBJECTIONS.

10             THE COURT:  THEY ARE RECEIVED.

11        (TRIAL EXHIBITS 252.2, 220.1 AND 221.1 RECEIVED IN

12        EVIDENCE.)

13             MS. ROTHAUGE:  JUST TWO FOLLOW-UP POINTS WITH YOU,

14    MR. MURPHY.

15                     REDIRECT EXAMINATION

16    BY MS. ROTHAUGE:

17    Q.    HEATWAVE FABRIC IS OUT IN THE PUBLIC, ISN'T IT?

18    A.    CORRECT.

19    Q.    SO ANYBODY COULD GET ACCESS TO THE ACTUAL FABRIC, IF

20    THEY WANTED; RIGHT?

21    A.    CORRECT.

22    Q.    AND IF SOMEONE WANTED A SAMPLE OF HEATWAVE FABRIC, THEY

23    COULD GO TO A STORE AND THEY COULD CUT OUT A LITTLE PIECE

24    FROM THE LINER AND HAVE IT; RIGHT?

25    A.    THAT IS CORRECT.

1544

1    Q.   I'D LIKE TO ASK YOU ABOUT WHAT COUNSEL ASKED YOU ABOUT,

2    EXHIBIT 1227.8, AND IT WAS THE PRODUCTION REQUEST FOR THE

3    HEATWAVE ZENITH MITT.  OH, .84.  AND I'M GOING TO ASK YOU TO

4    LOOK SPECIFICALLY AT THE MATERIAL NOTE, WHICH WE WILL EXPAND,

5    ENLARGE FOR YOU.

6         CAN YOU PLEASE TELL US WHAT THE MATERIAL NOTE IS.

7    A.   THE MATERIAL NOTE CLARIFIES THAT ALL OF THE OTHER

8    FABRICS THAT ARE SUPPLIED IN THAT PRODUCT ARE SUPPLIED BY THE

9    FACTORY, EXCEPT FOR THE THINGS LISTED.  SO IN THIS CASE, THE

10   HEATWAVE LINING AND THE Y.T. INSERT; THOSE ARE SUPPLIED BY

11   SEIRUS.

12   Q.   WHEN IT SAYS "HEATWAVE LINING V.T. WITH REFLECTIVE

13   PRINTING," IS THAT REFERRING TO THE VENTEX REFLECTIVE PRINTED

14   MATERIAL THAT SEIRUS HAS PURCHASED AND STORES AT ITS

15   WAREHOUSES?

16   A.   IT IS.

17   Q.   AND WHY IS IT THAT SEIRUS BUYS THE MATERIAL FROM VENTEX

18   AHEAD OF PRODUCTION AND STORES IT IN THE WAREHOUSE?

19   A.   THE MATERIALS ARE A LOT OF TIMES ON A LONG LEAD TIME,

20   AND SO THE ONLY WAY FOR US -- WITH THE MYRIAD OF PRODUCTS WE

21   MAKE, THE ONLY WAY FOR US TO PLAN ACCURATELY IS TO BUY THE

22   MATERIAL AHEAD OF TIME, HAVE IT IN THE WAREHOUSE SO THAT IT'S

23   READY FOR A PRODUCTION ORDER.  WHEN THE PRODUCTION ORDERS

24   COME IN, WE HAND THAT OFF TO THE FACTORY.  WE CAN SEND OUR

25   SUPPLY ITEMS IN OUT OF THE PRESTORED MATERIAL.

1545

1    Q.    DOES IT HAVE ANYTHING TO DO ALSO WITH THE SIZE OF YOUR

2    COMPANY?

3    A.    YES.    YOU KNOW, IT'S DIFFICULT FOR OUR -- YOU KNOW, A

4    SMALLER COMPANY TO PRE-PLAN.    WE'VE GOT TO MAKE SURE THAT THE

5    MATERIALS ARE THERE, READY AND WAITING.    SO WE CAN'T JUST

6    PLACE, YOU KNOW, PRODUCTION ORDERS A YEAR IN ADVANCE AND HOPE

7    THAT'S THE DIRECTION THAT THE MATERIAL IS NEEDED.    SO WE HAVE

8    TO BE AS READY AS WE CAN WITH ALL OF OUR SUPPLY ITEMS TOO

9    WHEN THE PRODUCTION ORDERS START TO COME IN.

10              MS. ROTHAUGE:    I HAVE NO FURTHER QUESTIONS.

11              THE COURT:    DO ANY OF THE JURORS HAVE ANY QUESTION

12   FOR THIS WITNESS?    IF SO, PLEASE RAISE THEIR HAND.

13              YOU MAY STEP DOWN.

14              THE WITNESS:    THANK YOU.

15              MR. ALDRICH:    YOUR HONOR, WE WOULD LIKE TO CALL

16   MR. MURPHY BACK IN OUR REBUTTAL CASE.

17              THE COURT:    PLEASE REMAIN AVAILABLE.

18              CALL YOUR NEXT WITNESS.

19              MR. SPROUL:    YOUR HONOR, SEIRUS CALLS DR. IRA

20   BLOCK.

21              THE COURT:    PLEASE STEP FORWARD AND BE SWORN.

22              THE CLERK:    SIR, IF YOU'D RAISE YOUR RIGHT HAND.

23              IRA BLOCK, PH.D., A WITNESS, HAVING BEEN DULY SWORN,

24        TESTIFIED AS FOLLOWS:

25              THE WITNESS:    I DO.

1546

1    THE CLERK:  PLEASE BE SEATED.

2    SIR, PLEASE STATE YOUR FIRST AND LAST NAME FOR THE

3    RECORD, SPELLING YOUR LAST NAME.

4    THE WITNESS:  IRA, I-R-A.  BLOCK, B-L-O-C-K.

5    THE COURT:  YOU MAY INQUIRE.

6    MR. SPROUL:  THANK YOU, YOUR HONOR.

7    DIRECT EXAMINATION

8    BY MR. SPROUL:

9    Q.  DR. BLOCK, WHERE DO YOU LIVE?

10   A.  I LIVE IN MADISON, GEORGIA.

11   Q.  WHAT IS YOUR CURRENT OCCUPATION?

12   A.  I'M SORRY?

13   Q.  WHAT IS YOUR CURRENT OCCUPATION?

14   A.  MY CURRENT OCCUPATION.  I AM RETIRED.

15   Q.  COULD YOU PROVIDE A BRIEF SUMMARY OF YOUR EDUCATION.

16   A.  BRIEF SUMMARY OF MY EDUCATION.  A BACHELOR OF CHEMICAL

17   ENGINEERING IN 1963 FROM THE UNIVERSITY OF MARYLAND.  I

18   FOLLOWED THAT UP WITH A PH.D. IN NUCLEAR ENGINEERING A FEW

19   YEARS LATER.

20   THE REASON I WAS IN THE NUCLEAR ENGINEERING PROGRAM

21   WAS THAT I WAS INTERESTED IN RADIATION CHEMISTRY EFFECTS ON

22   PLASTICS, AND THAT WAS THE ONLY PLACE I COULD DO IT.

23   Q.  AND DR. BLOCK, HAVE YOU BEEN ENGAGED BY SEIRUS TO OFFER

24   AN OPINION IN THIS CASE?

25   A.  I'M SORRY.  AGAIN, PLEASE.  COULD YOU SPEAK DIRECTLY

COMPUTER-AIDED TRANSCRIPTION

1    INTO THE MICROPHONE.

2    Q.    I'M SORRY.  HAVE YOU BEEN ENGAGED BY SEIRUS TO OFFER AN

3    OPINION IN THIS CASE?

4    A.    YES, I HAVE.

5    Q.    AND HAVE YOU PREPARED SLIDES TO ASSIST IN YOUR

6    TESTIMONY?

7    A.    YES, I HAVE.

8            MR. SPROUL:  YOUR HONOR, WE REQUEST PUBLISHING OF

9    DR. BLOCK'S SLIDES.

10            THE COURT:  SURE.

11            MR. SPROUL:  IF YOU COULD PULL UP DDX-502.  THANK

12    YOU.

13    Q.    DR. BLOCK, COULD YOU PROVIDE A SUMMARY OF YOUR

14    PROFESSIONAL WORK EXPERIENCE AFTER YOU RECEIVED YOUR PH.D. IN

15    NUCLEAR ENGINEERING.

16    A.    YES.  I WAS EMPLOYED BY THE DEPARTMENT OF TEXTILES AND

17    CONSUMER ECONOMICS AT THE UNIVERSITY OF MARYLAND.  FOR ABOUT

18    35 YEARS, I WORKED IN THE FIELDS OF TEXTILES, FIBERS, FABRICS

19    AND POLYMERS.

20            I HAVE OVER 40 YEARS OF EXPERIENCE IN TEACHING AND

21    RESEARCH, AND I'VE OFFERED APPROXIMATELY 60 PAPERS WHICH

22    WOULD BE OF USE IN THIS AREA.  AND I'VE CO-AUTHORED A

23    TEXTBOOK ON TEXTILES.

24    Q.    DR. BLOCK, YOU TESTIFIED THAT YOU'RE RETIRED.  HAVE YOU

25    DONE ANYTHING TO MAINTAIN YOUR TECHNICAL KNOWLEDGE SINCE YOU

1548

1    RETIRED?

2    A.   I KEEP -- TRY TO KEEP UP WITH THE FIELD THROUGH REVIEW

3    OF THE LITERATURE, LOOKING OUT TO SEE WHAT OTHER PEOPLE ARE

4    DOING, KEEPING IN TOUCH WITH VARIOUS UNIVERSITIES.

5    Q.   AND HAVE YOU BEEN ENGAGED AS AN EXPERT IN OTHER

6    LITIGATIONS?

7    A.   YES, I HAVE.

8    Q.   APPROXIMATELY HOW MANY?

9    A.   PERHAPS A HUNDRED TIMES.

10   Q.   AND OVER WHAT SPAN OF TIME?

11   A.   OH, 40-SOME YEARS.  NEARLY 50 YEARS NOW.

12   Q.   DR. BLOCK, I KNOW YOU SAID YOU LIVED IN GEORGIA AND

13   DR. COLE, IF YOU RECALL, LIVES IN SOUTH CAROLINA.  IS IT A

14   COINCIDENCE THAT THE TWO OF YOU ARE ON THE EAST COAST AND

15   THIS CASE IS PENDING ON THE WEST COAST?

16   A.   NO, IT'S NOT -- NOT A COINCIDENCE REALLY.  THAT'S WHERE

17   MOST OF THE WORK IN TEXTILES IS DONE, ON THE EAST COAST.

18   Q.   DR. BLOCK, HAVE YOU -- ARE YOU FAMILIAR WITH THE '270

19   PATENT IN THIS CASE?

20   A.   YES, I AM.

21   Q.   AND HAVE YOU DEVELOPED AN OPINION AS TO THE VALIDITY OF

22   THE '270 PATENT?

23   A.   YES, I HAVE.

24   Q.   AND COULD YOU PROVIDE -- IF YOU LOOK AT DDX-505 -- A

25   SUMMARY OF YOUR OPINIONS.

COMPUTER-AIDED TRANSCRIPTION

1549

1    A.   505 --

2         MR. SPROUL:  YOUR HONOR, WE CAN TAKE DOWN 505, GIVEN

3    THAT THE SECOND BULLET WAS SUBJECT OF DISCUSSION EARLIER THIS

4    MORNING.

5         THE COURT:  OKAY.

6    Q.   BY MR. SPROUL:  IF YOU CAN PROVIDE, DR. BLOCK, A SUMMARY

7    OF YOUR OPINION RELATING TO INVALIDITY IN THIS CASE.

8    A.   YES, I CAN.  I HAVE TWO OPINIONS.  ONE IS THAT CLAIMS 2

9    AND 23 OF THE '270 PATENT ARE INVALID.  THEY ARE JUST WRONG.

10         NO. 2 I DON'T THINK I'M SUPPOSED TO TALK ABOUT.

11   Q.   WILL YOU JUST STOP RIGHT THERE.  WE'RE ONLY GOING TO

12   TALK ABOUT THE INVALIDITY.

13   A.   THAT PART, YES.

14   Q.   DR. BLOCK, WHAT DOES THE '270 PATENT SAY ABOUT THE STATE

15   OF THE ART OF THE TECHNOLOGY AT THE TIME THAT IT WAS FILED?

16   A.    IN EXHIBIT 1019, COLUMN 1, LINES 30 TO 48, MR. BLACKFORD

17   TOLD US THAT HE BELIEVED THAT HEAT-REFLECTIVE MATERIAL, SUCH

18   AS ALUMINUM, TAKE THE FORM OF A SOLID UNITARY FILM ON A

19   FABRIC.  THAT WHEN YOU DO THIS, THESE LININGS DO NOT TRANSFER

20   MOISTURE, VAPOR OR ALLOW THE PASSAGE OF AIR THROUGH THE

21   FABRIC.

22         AND THAT THEN THESE COATED MATERIALS IMPAIR THE

23   ABILITY OF THE MATERIAL TO STRETCH, DRAPE OR HANG AT A

24   DESIRED WAY.  ALL OF THIS TOGETHER CONTRIBUTED TO A RATHER

25   UNCOMFORTABLE FABRIC.

1550

1    Q.   DO YOU AGREE WITH THE CHARACTERIZATION IN THE '270

2    PATENT ABOUT THE STATE OF THE ART AT THE TIME THAT IT WAS

3    FILED IN 2009?

4    A.   I WOULD SAY THAT THE STATE OF THE ART AT THE TIME THIS

5    WAS FILED WAS -- IT WAS TEN YEARS OUT OF DATE.  THINGS HAD

6    PROGRESSED SOMEWHAT BEYOND THAT.

7    Q.   AND DR. BLOCK, HAVE YOU ANALYZED THE DISCLOSURE OF THE

8    '270 PATENT?

9    A.   YES, I HAVE.

10   Q.   AND COULD YOU PROVIDE A SUMMARY OF THE TEACHING OF THE

11   '270 PATENT.

12   A.   WELL, AS SHOWN IN EXHIBIT 1019, LINES 3 -- SORRY.

13   COLUMN 3, LINES 27 TO 32, AND COLUMN 4, LINES 44 TO 51, THE

14   PATENT TELLS US THAT IT BELIEVES THAT A MATERIAL FOR BODY

15   GEAR IS DISCLOSED.  THAT IS A MATERIAL, LIKE CLOTH, A TEXTILE

16   OF SOME SORT.  BODY GEAR BEING OUTDOOR WEAR.

17        IT USES A PATTERN OF HEAT MANAGEMENT MATERIAL

18   ELEMENTS, THAT IS, HEAT-DIRECTING ELEMENTS OF SOME SORT,

19   COUPLED TO A BASE FABRIC.  THAT'S THE ORIGINAL CLOTH.  AND IS

20   SUPPOSEDLY GOING TO DIRECT HEAT TOWARD OR AWAY FROM THE BODY.

21        IT ALSO TELLS US THAT THESE HEAT-MANAGEMENT ELEMENTS

22   MAY BE ALUMINIUM BASED.  THEY MAY BE COPPER BASED.  THEY MAY

23   ALSO BE NONMETALLIC.  AND OF MAJOR IMPORTANCE HERE I THINK,

24   IS IT ALSO SAYS THEY MAY USE METALLIC PLASTIC.

25   Q.   THANK YOU, DR. BLOCK.

1551

1    HAVE YOU ANALYZED THE CLAIMS THAT ARE ASSERTED IN

2    THIS CASE?

3    A.   YES, I HAVE.

4    Q.   AND UNDERSTANDING THE JURY HAS HEARD TESTIMONY ON THE

5    CLAIMS ALREADY, BUT ALSO UNDERSTANDING WE'VE BEEN GONE FOR

6    THE WEEKEND.  COULD YOU BRING US BACK TO REALITY AND GIVE US

7    A BRIEF EXPLANATION OF WHAT CLAIM 2 COVERS.

8    A.   AS SHOWN IN EXHIBIT 1019, WHICH IS THE PATENT, JUST A

9    QUICK SUMMARY.  THE PATENT IS CLAIMING A HEAT MANAGEMENT

10   MATERIAL, THAT IS A CLOTH, THAT IS GOING TO MANAGE HEAT, THAT

11   IN SOME WAY IS GOING TO DIRECT HEAT FORWARD OR BACKWARD.

12       THAT THIS HEAT MANAGEMENT MATERIAL COMPRISES --

13   "COMPRISE" MEANS EMBRACES, ENCLOSES -- A BASE MATERIAL,

14   THAT'S A CLOTH.  THIS CLOTH WILL HAVE PROPERTIES, THAT'S

15   TRUE.

16       IT WILL ALSO HAVE A DISCONTINUOUS ARRAY.

17   DISCONTINUOUS, THAT IS, THE ARRAY IS NOT HERE; THE ARRAY IS

18   HERE (INDICATING).  A DISCONTINUOUS ARRAY OF DISCRETE

19   HEAT-DIRECTING ELEMENTS.  THAT IS, WITHIN THIS OPEN ARRAY,

20   EACH OF THE INDIVIDUAL ELEMENTS IS ALSO SEPARATED FROM ALL

21   THE OTHER ELEMENTS.

22       AND THAT THE HEAT-DIRECTING ELEMENTS WILL BE

23   POSITIONED FOR THE PURPOSE OF DIRECTING HEAT IN THE DESIRED

24   DIRECTION, WHICH YOU WOULD EXPECT.

25       IT ALSO SAYS THAT THERE WILL BE A SURFACE AREA RATIO

1552

1    OF HEAT-DIRECTING ELEMENTS TO BASE MATERIAL.  SO WE HAVE A

2    CLOTH.  ON THAT CLOTH, WE'RE GOING TO PUT ELEMENTS OF SOME

3    SORT.  THESE ELEMENTS WILL BE EITHER 70 PERCENT, ALL THE WAY

4    DOWN TO 30 PERCENT COVERAGE OF THE AREA.  AND THEN THE

5    PLACEMENT AND SPACING OF THE HEAT-DIRECTING ELEMENTS PERMITS

6    THE BASE MATERIAL TO OBTAIN PARTIAL PERFORMANCE, WHICH IS

7    BASICALLY OBVIOUS.

8            AND THEN IN 2, THE CLAIM IS THAT THE HEAT-DIRECTING

9    ELEMENTS ARE POSITIONED ON THE INNERMOST SURFACE TO DIRECT

10   HEAT TOWARD THE BODY OF THE WEARER.

11           SO THAT'S THE SUMMATION.

12   Q.   THANK YOU, DR. BLOCK.

13           DID YOU ALSO CONSIDER CLAIM 23?

14   A.   YES, I DID.

15   Q.   AND HOW DOES CLAIM 2 RELATE TO CLAIM 23?

16   A.   CLAIMS 2 AND 23 ARE NEARLY IDENTICAL, EXCEPT FOR SOME

17   SMALL WORDS, WHICH ARE IMPORTANT.  23 IS THE ENTIRE GLOBAL

18   IDEA OF WHAT WE'RE TALKING ABOUT.  CLAIM 2 LIMITS THAT TO

19   SOME EXTENT.

20           IT SAYS, A DISCONTINUOUS ARRAY OF DISCRETE

21   HEAT-DIRECTING ELEMENTS, NOT JUST A DISCONTINUOUS ARRAY.  AND

22   IT ALSO SAYS THAT EACH IS INDEPENDENTLY COUPLED, INSTEAD OF

23   JUST COUPLED.

24           SO WHAT WE HAVE IS THE PARTICULAR AND THE GENERAL

25   (INDICATING).  AND THE POINT HERE IS THAT I DON'T HAVE TO GO

1553

```
1    THROUGH 2 AND 23.  IF I CAN SHOW YOU THAT CLAIM 2 IS INVALID,
2    THEN THAT MEANS CLAIM 23 IS ALSO INVALID.
3    Q.   NOW, DR. BLOCK, YOU UNDERSTAND THAT THERE IS THIS
4    CONCEPT IN PATENT LAW -- AND RELEVANT TO YOUR ANALYSIS --
5    OF ONE OF -- EXCUSE ME -- THE LEVEL OF ONE OF ORDINARY
6    SKILL?
7    A.   YES.  I AM.
8    Q.   AND GENERALLY, WHY ARE WE CONCERNED WITH THE LEVEL OF
9    ONE OF ORDINARY SKILL?
10   A.   IT IS MY UNDERSTANDING THAT IN THE VALUATION OF THESE
11   PATENTS, WHEN I'M EVALUATING, FOR EXAMPLE, OBVIOUSNESS OF THE
12   PATENT, I SHOULD DO THIS FROM THE VIEWPOINT OF A PERSON OF
13   ORDINARY SKILL IN THE ART.  NOT A GENIUS, NOT A LAYMAN, BUT
14   SOMEBODY WHO HAS SOME EXPERIENCE, KNOWS WHAT'S GOING ON, BUT
15   ISN'T CONVERSANT WITH ABSOLUTELY EVERYTHING.
16   Q.   AND DID YOU DEVELOP AN OPINION ABOUT THE LEVEL OF
17   ORDINARY SKILL FOR THE '270 PATENT?
18   A.   YES, I DID.  I BELIEVE THAT A PERSON OF ORDINARY SKILL
19   IN THIS PARTICULAR ART WOULD HOLD A MASTER'S DEGREE IN
20   TEXTILE ENGINEERING OR TEXTILE SCIENCE, OR ITS EQUIVALENT; OR
21   HAVE AT LEAST THREE OR MORE YEARS' EXPERIENCE IN THE FIELD
22   ITSELF.
23        AND THE REASON FOR THIS IS THAT PERSON HAS TO
24   UNDERSTAND CHEMICAL, PHYSICAL, MECHANICAL AND HEAT MANAGEMENT
25   PROPERTIES IN ORDER TO FULLY UNDERSTAND WHAT'S GOING ON
```

1554

1    HERE.

2    Q.    DR. BLOCK, HAVE YOU DEVELOPED AN OPINION AS TO WHETHER

3    THE ASSERTED CLAIMS OF THE '270 PATENT ARE ANTICIPATED --

4    A.    YES, I HAVE.

5    Q.    -- BY ANY PARTICULAR PRIOR ART REFERENCE?

6    A.    YES, I HAVE.

7    Q.    AND COULD YOU PROVIDE A BRIEF SUMMARY OF WHAT YOU

8    UNDERSTAND "ANTICIPATION" TO MEAN.

9    A.    I UNDERSTAND THAT A PATENT CLAIM IS INVALID UNDER

10   35 U.S. CODE 102(B) AS ANTICIPATED IF THE INVENTION WAS

11   PATENTED OR PUBLISHED ANYWHERE, WAS IN PUBLIC USE, WAS ON

12   SALE.  THAT IS, IF ORDINARY PEOPLE WALKING ALONG THE STREET

13   HAD SEEN THIS, THEN YOU COULD SAY, IT'S ANTICIPATED.

14          FURTHERMORE, ANTICIPATION REQUIRES ONLY THAT A

15   SINGLE PRIOR ART REFERENCE DISCLOSE ALL THE CLAIMS.

16   Q.    IF YOU COULD TURN TO -- PULL UP SLIDE 514, PLEASE.

17          DR. BLOCK, HAVE YOU DEVELOPED AN OPINION AS TO

18   WHETHER ANY REFERENCE ANTICIPATES THE ASSERTED CLAIMS IN THE

19   '270 PATENT?

20   A.    YES, I HAVE.  AND THAT IS AN APPLICATION FOR A MATERIAL

21   THAT WAS FILED BY FOTTINGER IN OCTOBER OF 1981, ABOUT 30

22   YEARS BEFORE MR. BLACKFORD FILED WHAT HE THOUGHT HE HAD

23   INVENTED.

24   Q.    IF YOU COULD PULL UP SLIDE 515, PLEASE.

25          DR. BLOCK, DID YOU ANALYZE THE DATE OF INVENTION AND

1555

1    THE CRITICAL DATE FOR THE '270 PATENT?

2    A.   YES, I DID.  FROM EXHIBIT 1019, WE SEE THAT THE CLAIM

3    PRIOR DATE HERE IS 2009.  AND THAT THERE IS A CRITICAL DATE

4    OF MAY 7, 2008.

5    Q.   AND WHAT DOES THAT CRITICAL DATE MEAN WITH RESPECT TO

6    PRIOR ART IN THIS CASE?

7    A.   THAT CRITICAL DATE MEANS ANYTHING THAT WAS DONE BEFORE

8    MAY OF 2008 IS PRIOR ART AND IT CAN'T BE CONTESTED.

9    Q.   AND DID YOU CONSIDER WHETHER FOTTINGER WAS PRIOR ART TO

10   THE '270 PATENT?

11   A.   YES, I DID.  AND I CONCLUDED THAT IT WAS.

12   Q.   AND COULD YOU PROVIDE A BRIEF SUMMARY OF WHAT THE

13   FOTTINGER REFERENCE IS.

14   A.   FROM EXHIBIT 1040, WE HAVE A UNITED KINGDOM PATENT

15   APPLICATION, GB 2,073,613.  AND THE APPLICATION WAS PUBLISHED

16   21 OCTOBER, 1981.  THUS, IT DEFINITELY PRECEDES THE 2008

17   CRITICAL DATE.  THIS IS DEFINITELY PRIOR ART.

18        MR. SPROUL:  YOUR HONOR, WE OFFER EXHIBIT 1040 INTO

19   EVIDENCE.

20        MR. ALDRICH:  NO OBJECTION.

21        THE COURT:  RECEIVED.

22        (TRIAL EXHIBIT 1040 RECEIVED IN EVIDENCE.)

23   Q.   BY MR. SPROUL:  DR. BLOCK, DID YOU DEVELOP AN OPINION AS

24   TO WHETHER FOTTINGER DISCLOSES EVERY ELEMENT OF THE PREAMBLE

25   OF CLAIM 1?

COMPUTER-AIDED TRANSCRIPTION

1556

1    A.    YES, I DID.

2    Q.    AND WHAT DID YOU CONCLUDE?

3    A.    FOTTINGER TEACHES US THAT HIS INVENTION RELATES TO

4    TEXTILE SHEETS; THAT IS, CLOTH.  THAT THIS CLOTH CAN BE

5    NONWOVEN, WOVEN OR KNIT.  HE SPECIFICALLY TELLS US NONWOVEN,

6    WOVEN OR KNIT CLOTH.

7          HE ALSO TELLS US THAT THIS MATERIAL WILL CARRY A

8    CONTINUOUS COATING -- I'M SORRY, A DISCONTINUOUS COATING;

9    THAT IS DOTS, OF A BINDER AND METAL POWDER.

10          THOSE ARE HIS HEAT-DIRECTING ELEMENTS.  THE PRODUCTS

11   ARE VERY SUITABLE FOR USE IN CLOTHING.  THEY CAN BE AS

12   LINING, THEY CAN BE INTERLINING, OR THEY CAN BE OUTER SHELL.

13          SO HERE IS A LINING.  THERE IS AN INTERLINING ON THE

14   INSIDE OF MY COLLAR.  THAT HELPS STIFFEN IT AND KEEP IT IN

15   PLACE.  AND THEN, OF COURSE, THERE IS THE OUTER LAYER, WHICH

16   IS WHAT YOU SEE, UNLESS I OPEN MY JACKET.

17          AND HE GOES ON TO TELL US THAT THE COATED FACE WILL

18   BE ON THE INSIDE OF THE FABRIC.  SO HE'S TELLING US HE HAS A

19   HEAT-MANAGEMENT MATERIAL, ADAPTED FOR USE WITH BODY GEAR.

20   Q.    AND DR. BLOCK, DID YOU DEVELOP AN OPINION AS TO WHETHER

21   FOTTINGER DISCLOSES ELEMENT 1(A)?

22   A.    YES, I DID.

23   Q.    AND WHAT IS YOUR OPINION?

24   A.    OKAY.  AS WE LOOK AT EXHIBIT 1040, COLUMN 1, LINES 23 TO

25   32, COLUMN 1, LINES 61, THROUGH COLUMN 2, LINE 4, FOTTINGER

1557

1    TELLS US THAT THE HEAT-RETENTION PROPERTIES IN TEXTILE SHEET

2    AND ALSO ITS RESISTANCE TO THE PASSAGE OF MOISTURE; THAT IS,

3    HE HAS A BASE MATERIAL, THE BASE MATERIAL HAS A PROPERTY.

4    PASSAGE OF MOISTURE THROUGH THAT BASE MATERIAL.

5           AND THAT AT A GIVEN TEMPERATURE, THE PROPERTIES OF

6    HEAT RETENTION AND MOISTURE RELEASE ARE BALANCED.  THEN I

7    THINK WE WANT TO KEEP IN MIND FOTTINGER IS TELLING US WE NEED

8    A BALANCE.

9           AND HE ALSO GOES ON TO SAY, BY ENSURING THAT THE

10   INDIVIDUAL COATED AREAS ARE MUTUALLY SEPARATED, THE

11   POROSITY/BREATHING AND DRAPING PROPERTIES OF THIS FABRIC WILL

12   NOT BE SUBSTANTIALLY IMPAIRED, AND THAT THIS DESIRABLE EFFECT

13   SHOWS UP IN WOVEN, NONWOVEN AND KNIT FABRICS.

14   Q.   DID YOU DEVELOP AN OPINION AS TO WHETHER FOTTINGER

15   DISCLOSES ELEMENT 1(B)?

16   A.   YES, I DID.

17   Q.   WHAT IS THAT OPINION?

18   A.   THAT IT DOES.

19          AND IF WE LOOK AT EXHIBIT 1040, COLUMN 1, LINES 54

20   TO 57, COLUMN 1, LINES 61 TO 65, COLUMN 3, LINES 7 TO 10, HE

21   TELLS US HE HAS A DISCONTINUOUS COATING, COMPRISING A BINDER

22   AND A METAL POWDER, THAT IS, A DISCONTINUOUS ARRAY OF

23   DISCRETE HEAT-DIRECTING ELEMENTS, THAT THE INDIVIDUAL COATED

24   AREAS ARE SEPARATE, AND THAT A TEXTILE SHEET OF THE INVENTION

25   MAY BE PRODUCED IN A PARTICULAR WAY.

1558

1     SO HE'S COVERED ALL THE POINTS OF 1(B).

2     Q.   DR. BLOCK, HAVE YOU DEVELOPED AN OPINION AS TO WHETHER

3     FOTTINGER DISCLOSES ELEMENT 1(C)?

4     A.   YES, I HAVE.

5     Q.   WHAT IS THAT OPINION?

6     A.   YES, IT DOES.

7          AS WE FIND IN EXHIBIT 1040, COLUMN 4, LINES 68 TO

8     76, AND COLUMN 3, LINES 48 TO 52, HE NOTES THAT HUMAN SKIN

9     HAS DIFFERENT TEMPERATURES, DEPENDING ON WHERE YOU'RE

10    LOOKING, AND THAT THE DIFFERENT DEGREES OF HEAT RADIATING

11    FROM THESE ZONES IS REFLECTED BY A SHEET OF HIS INVENTION.

12         HE GOES ON TO SAY THAT THESE MAY BE USED AS OUTER

13    FABRICS, IN WHICH CASE THE COATED FACE WILL BE ON THE INSIDE.

14    SO HE'S TELLING US THAT THERE ARE HEAT-DIRECTING ELEMENTS,

15    THESE HEAT DIRECTING ELEMENTS ARE POSITIONED TO DIRECT HEAT

16    IN A DESIRED DIRECTION.

17    Q.   DR. BLOCK, DID YOU DEVELOP AN OPINION AS TO WHETHER

18    FOTTINGER DISCLOSES ELEMENT 1(D)?

19    A.   YES, I DID.

20    Q.   AND WHAT IS THAT OPINION?

21    A.   HE DOES.  AS WE FIND FROM EXHIBIT 1040, COLUMN 1, LINES

22    54 TO 60, FOTTINGER TEACHES A DISCONTINUOUS COATING MADE UP

23    OF A BINDER AND METAL POWDER.  THAT'S THE METAL PLASTIC THAT

24    BLACKFORD SPOKE ABOUT.  AND COMPRISES INDIVIDUAL AREAS OF A

25    CERTAIN SIZE, AND THAT IT COVERS FROM 5 TO 40 PERCENT OF THE

1559

1   SURFACE OF THE FABRIC.

2   Q.   DID YOU DEVELOP AN OPINION AS TO WHETHER FOTTINGER

3   DISCLOSES ELEMENT 1(E)?

4   A.   YES, I DID.

5   Q.   AND WHAT IS THAT OPINION?

6   A.   AND THAT OPINION IS THAT, YES, IT DOES.

7          AND AGAIN, I REFER TO EXHIBIT 1040.  THIS TIME

8   COLUMN 1, LINES 61 TO 65.  BY ENSURING THAT THE INDIVIDUAL

9   COATED AREAS ARE MUTUALLY SEPARATED, THE POROSITY/BREATHING

10  AND DRAPING PROPERTIES OF THE FABRIC WILL NOT BE

11  SUBSTANTIALLY IMPAIRED.

12         AND 1(E) SAYS THAT THE PLACEMENT AND SPACING OF THE

13  HEAT-DIRECTING ELEMENTS PERMITS THE BASE MATERIAL TO RETAIN

14  AT LEAST PARTIAL PERFORMANCE OF ITS PROPERTIES.

15  Q.   THIS WORD "POROSITY" IS USED HERE.  WHAT IS -- WHAT DOES

16  "POROSITY" MEAN?

17  A.   IN LAY TERMS, WHEN WE SAY THE POROSITY OF A FABRIC,

18  BASICALLY IT DOESN'T HAVE HOLES IN IT.  CAN YOU BLOW THROUGH

19  IT?  IF IT'S PERFECTLY SOLID, NO, YOU CAN'T.  IF IT'S

20  COMPLETELY OPEN, IT'S EASY TO DO.

21  Q.   AND DR. BLOCK, DID YOU DEVELOP AN OPINION AS TO WHETHER

22  OR NOT FOTTINGER DISCLOSED THE ELEMENTS OF CLAIM 2?

23  A.   YES, I DID.

24  Q.   WHAT ARE THOSE OPINIONS?

25  A.   HE DOES.

COMPUTER-AIDED TRANSCRIPTION

1560

1    AS SEEN IN EXHIBIT 1040 AT COLUMN 3, LINES 48 TO 52,

2    THE PRODUCTS' INVENTION ARE SUITABLE FOR USES AS INTERLINING,

3    FOR LININGS AND FOR OUTER LAYERS.  AND THE COATED FACE WILL

4    BE ON THE INSIDE OF THE ARTICLE.

5    A PERSON OF ORDINARY SKILL IN THE ART HAS TO

6    CONCLUDE THAT FOTTINGER UNDERSTANDS THAT HE WANTS HIS

7    HEAT-DIRECTING ELEMENTS TO BE FACING TOWARD THE BODY.

8    Q.   DR. BLOCK, DO YOU UNDERSTAND THAT DR. COLE HAS

9    CHALLENGED YOUR OPINION IN THIS CASE, THAT THE '270 PATENT

10   DISCLOSES HEAT-DIRECTING ELEMENTS?

11   A.   YES, I AM AWARE OF THAT.

12   Q.   AND HAVE YOU CONSIDERED WHAT THE '270 PATENT TEACHES TO

13   BE, OR WHAT COULD BE HEAT-DIRECTING ELEMENTS?

14   A.   THE '270 PATENT SPECIFICALLY TELLS US THAT AS FAR AS

15   MR. BLACKFORD WAS CONCERNED AT THAT TIME, THE HEAT-DIRECTING

16   ELEMENTS COULD BE NONMETALS, AND THEY COULD ALSO BE A THING

17   CALLED METALLIC PLASTIC.  THAT'S WHAT FOTTINGER HAS ALREADY

18   INVENTED.

19   Q.   AND DO YOU UNDERSTAND THAT FOTTINGER DISCLOSED A

20   SPECIFIC EXAMPLE OF HIS INVENTION?

21   A.   YES, I DID.  SHALL I DESCRIBE IT?

22   Q.   PLEASE.  WILL YOU PLEASE DESCRIBE IT.

23   A.   FOTTINGER STATES IN HIS PAPER, EXHIBIT 1040, COLUMN 2,

24   103 TO 105; FAIRLY SHORT.  FOTTINGER TELLS US THAT HE DID

25   SOMETHING.  AND WHAT DID HE DO?  HE MADE A PIECE OF CLOTH IN

1561

1    HIS LABORATORY.  IT WAS A NONWOVEN CLOTH.  AND YOU'LL SEE

2    FROM MY PICTURE, THAT LITTLE STUFF IN THE MIDDLE IS A

3    NONWOVEN FABRIC.

4           HE THEN, USING A 25 MESH PRINTING SCREEN, HE APPLIED

5    TO THAT CLOTH, BY A PASTE.  THAT PASTE CONTAINED HIS

6    MATERIAL, ALUMINUM POWDER HELD IN A BINDER.  THIS SORT OF

7    TECHNIQUE HAS BEEN KNOWN FOR A THOUSAND YEARS.  IT'S STILL

8    BEING USED.  IT'S CALLED SCREEN PRINTING.

9           THIS IS WHAT IT LOOKED LIKE WHEN HE WAS DONE.  HIS

10   25 MESH WITH HALF-MILLIMETER SPOTS.  AND THAT GIVES US 36

11   PERCENT COVERAGE, WHICH IS IN THE RANGE OF 5 TO 40, JUST THE

12   WAY FOTTINGER SAID IT WOULD BE.

13   Q.   WHAT DOES ONE OF ORDINARY SKILL -- STRIKE THAT.

14          WOULD ONE OF ORDINARY SKILL UNDERSTAND WHAT IS MEANT

15   BY "25 MESH PRINTING FILM," AS STATED THERE?

16   A.   YES.  QUITE EASILY.  YOU JUST GO -- WELL, 30 YEARS AGO,

17   I WOULD HAVE OPENED UP THE CATALOG TO SEE WHAT A "25 MESH"

18   IS.  BY 2009, MR. BLACKFORD COULD HAVE JUST GONE ONLINE AND

19   LOOKED UP 25 MESH.  AND IT WOULD HAVE GIVEN HIM VARIOUS

20   COMPANIES THAT MAKE VARIOUS SCREENS.

21          NOW, MR. FOTTINGER TELLS US HE USED A 25 MESH

22   PRINTING SCREEN, WITH A HOLE OF A HALF MILLIMETER IN

23   DIAMETER.  AND THAT HE WAS ABLE TO CREATE A FABRIC THAT HAD A

24   DISCONTINUOUS ARRAY OF DOTS, THAT COVERED BETWEEN 5 AND 40

25   PERCENT.  THE HALF-MILLIMETER MATERIAL WOULD, OF COURSE, BE

1562

1    UP NEAR THE 40-PERCENT RANGE; THE .22-MILLIMETER MATERIAL

2    WOULD BE DOWN TOWARD THE 5-PERCENT RANGE.

3         NOW, THE QUESTION OF, WELL, HOW DO WE KNOW WHAT A 25

4    MESH SCREEN IS IS EASILY SATISFIED BY ANY PERSON WHO JUST

5    CONSIDERS THE COVERAGE.  40 PERCENT IS A FUNCTION OF THE SIZE

6    OF THE HOLES -- BIG HOLES, FEWER OF THEM; SMALL HOLES, MORE

7    OF THEM.  AND THE SPACING OF THE HOLES.  LARGE HOLES, FAR

8    APART; SMALL HOLES, CLOSE TOGETHER.  SO YOU HAVE THREE THINGS

9    INTERACTING:  THE COVERAGE, THE SIZE OF THE HOLE AND THE

10   SPACING OF THE HOLE.

11        MR. BLACKFORD HAS TOLD US THAT IF IT'S LESS THAN 30

12   PERCENT, THESE DOTS DON'T WORK.  BLACKFORD TELLS US THAT HIS

13   DOTS GO UP TO 40 PERCENT.  SO HIS COVERAGE HAS TO BE IN THE

14   30- TO 40-PERCENT REGION.  HE'S NOT GOING TO CREATE WITH THIS

15   EXPERIMENT SOMETHING THAT DOESN'T WORK, NOT FOR THE PURPOSE

16   OF THIS PATENT ANYWAY.

17        SO USING THOSE THREE NUMBERS, WE HAVE THE COVERAGE

18   IS BETWEEN 30 AND 40 PERCENT.  WE HAVE THE SIZE OF THE HOLE

19   WAS A HALF A MILLIMETER.  THAT MEANS THAT A 25 MESH SCREEN IS

20   APPROXIMATELY 25 SPOTS SPACED ABOUT ONE MILLIMETER APART.

21   AND WHETHER IT'S BEING SOLD TO YOU BY A GERMAN FIRM OR A

22   RUSSIAN FIRM OR A BRITISH FIRM OR AN AMERICAN FIRM, IT'S

23   GOING TO BE THE SAME SIZE MESH.

24   Q.   THANK YOU, DR. BLOCK.

25        COULD YOU PULL UP SLIDE 528, PLEASE.

1563

1    NOW, DR. BLOCK, YOU UNDERSTAND THAT DR. COLE AGAIN

2    CHALLENGES WHETHER OR NOT FOTTINGER TEACHES THE CLAIMED

3    RATIO.

4    A.   YES, I AM AWARE OF THAT.

5    Q.   AND WHAT IS YOUR OPINION IN RESPONSE TO DR. COLE'S

6    CHALLENGE?

7    A.   FOTTINGER IS -- FOTTINGER TEACHES US FROM 5 TO 40.  IT'S

8    MY UNDERSTANDING THAT IF YOU HAVE A PORTION OF A RANGE, YOU

9    HAVE DISCLOSED THE ENTIRE RANGE.  BLACKFORD IS CLAIMING 30

10   PERCENT TO 70 PERCENT.  THIS SLIDE SHOWS US THAT THERE IS AN

11   OVERLAP IN THE 30- TO 40-PERCENT REGION.

12       DR. COLE TOOK CLOTH FROM COLUMBIA AND SHE MEASURED

13   FOUR SAMPLES OF CLOTH, AND THOSE ARE THE FOUR NUMBERS YOU SEE

14   BELOW YOU.  32, 34, 36 AND THEN SHE SAYS COLUMBIA TOLD HER

15   THAT THEY GOT 37.  OKAY.  FINE.

16       AND I BELIEVE THAT FOTTINGER, IF YOU JUST USE YOUR

17   POINTER FOR ME, PLEASE, FOTTINGER, WITH HIS 36, PLACES

18   HIMSELF DIRECTLY IN THE MIDDLE OF MR. BLACKFORD'S CLAIMED

19   INVENTION.

20       THANK YOU.

21   Q.   THANK YOU, DR. BLOCK.

22       WHAT ARE YOU SHOWING ON SLIDE DDX-529?

23   A.   THIS IS A SUMMATION.  I'M NOT GOING TO READ THE WHOLE

24   THING TO YOU.  THE WHOLE POINT IS THAT WE HAD TO LOOK AT

25   THESE VARIOUS ITEMS.  WE DID LOOK AT THOSE VARIOUS ITEMS.  WE

1564

1    CHECKED OFF EACH OF THE BOXES.

2    Q.    YOU UNDERSTAND THAT THERE IS SOME DISCUSSION ABOUT THE

3    CRITICALITY OF THE 30- TO 70-PERCENT RANGE, THIS 3:7 AND 7:3

4    RATIO?

5    A.    YES, I UNDERSTAND THAT.

6    Q.    AND HAVE YOU ANALYZED THAT ISSUE?

7    A.    YES, I HAVE.

8    Q.    AND CAN YOU PROVIDE A SUMMARY OF YOUR OPINIONS ON THE

9    CRITICALITY OF THAT 30- TO 70-PERCENT RANGE?

10    A.    YEAH.  THE 30- TO 70-PERCENT RANGE IS NOT CRITICAL.

11    MR. BLACKFORD MIGHT HAVE THOUGHT IT WAS, BUT IT IS NOT.

12        FIRST OFF, IF YOU CONSIDER WHAT THIS RANGE IS,

13    EVERYTHING GOES FROM ZERO TO A HUNDRED.  50 PERCENT IS THE

14    MIDDLE.  PLUS OR MINOR 20 IS 30 TO 70.  SO HE'S SIMPLY TAKING

15    THE HEART OUT OF THE CAKE; THAT'S ALL.

16        THE SECOND THING IS IF IT WERE CRITICAL, IF IT WERE

17    REALLY IMPORTANT, THE PATENT WOULD NOT SAY "ABOUT 30

18    PERCENT."  IT WOULD SAY "30 PERCENT," OR EVEN "30.0 PERCENT

19    TO 70 PERCENT."  SO THAT A PERSON OF SKILL WOULD READ WHAT IT

20    SAID AND WOULD SAY, OKAY, I UNDERSTAND.  IT'S FROM HERE TO

21    HERE (INDICATING).  NOT HERE, NOT HERE, BUT HERE TO HERE

22    (INDICATING) IS VERY IMPORTANT.

23        THE THIRD POINT, IN CONTRADICTION TO MR. BLACKFORD,

24    WHO THOUGHT THAT THE BASE FABRIC TRANSFER PROPERTY WOULD

25    CHANGE LINEARLY, IT'S BEEN SHOWN THAT IT DOES NOT.  THE

1565

```
1    TRANSFER OF MOISTURE THROUGH THE FABRIC, THE TRANSFER OF AIR
2    THROUGH THE FABRIC IS NOT PROPORTIONAL.  AND IT'S BEEN KNOWN
3    TO NOT BE PROPORTIONAL.
4              MR. SPROUL:  COULD YOU PULL UP SLIDE 532, PLEASE.
5    Q.   DR. BLOCK, YOU RECALL MR. BLACKFORD -- WERE YOU IN THE
6    COURTROOM WHEN MR. BLACKFORD TESTIFIED EARLIER IN THIS
7    CASE?
8    A.   YES, I WAS.
9    Q.   AND DO YOU RECALL HIS TESTIMONY REGARDING HIS
10   EXPECTATION ABOUT THE LINEARITY OF THE PERMEABILITY OF THE
11   FABRIC?
12   A.   YES, I DID.
13   Q.   AND DO YOU HAVE AN OPINION ABOUT THAT EXPECTATION?
14   A.   YES, I DO.  WHAT YOU'RE SEEING ON YOUR SCREEN IN DDX-532
15   IS WHAT MR. BLACKFORD SAYS HE EXPECTED.
16             AND WHAT HE'S SHOWING IS THE GREEN LINE, WHICH IS
17   HEAT REFLECTION, RISES FROM THE LOWER LEFT TO THE UPPER RIGHT
18   LINEARLY, STRAIGHT LINE.  HE SAID, THEREFORE, I CONCLUDE THAT
19   THE OTHER PROPERTY, AIR PERMEABILITY OR MOISTURE TRANSPORT
20   SHOULD DECREASE IN THE SAME MANNER FROM UPPER LEFT TO LOWER
21   RIGHT.
22   Q.   DID YOU HEAR -- EXCUSE ME.
23             DID YOU HEAR MR. BLACKFORD SAY THAT HE CONSULTED ANY
24   SCIENTIFIC LITERATURE TO DETERMINE WHAT ONE OF ORDINARY SKILL
25   WOULD HAVE EXPECTED THE PERMEABILITY TO BE IN FABRIC?
```

1566

1    A.    NO, I DID NOT HEAR HIM SAY THAT.

2    Q.    AND IF HE HAD CONSULTED SCIENTIFIC LITERATURE AT THE

3    TIME, WHAT WOULD HE HAVE FOUND?

4    A.    HE WOULD HAVE FOUND -- I BELIEVE IT'S ON THE NEXT

5    SLIDE.

6          HE WOULD HAVE FOUND A PAPER -- AND IT TOOK ME LESS

7    THAN AN HOUR TO FIND THIS PAPER -- BY ONE PROFESSOR OGULATA.

8    THOSE ARE THE BLUE DIAMONDS THAT YOU SEE.  AND IT'S

9    EXHIBIT 1156, PUBLISHED IN 2006.

10         SHOWING THAT AIR PERMEABILITY DOES NOT FALL LINEARLY

11   THE WAY MR. BLACKFORD SAYS HE THOUGHT IT WOULD.  IT IS A

12   CURVED LINE.  IT IS NONLINEAR.

13         OKAY.  THAT'S THEORETICAL, YOU SAY.  WELL, AT ABOUT

14   THE SAME TIME, MR. LAWRENCE, EXHIBIT 1158, AND A CONSORTIUM

15   OF UNIVERSITIES -- HE DIDN'T DO THIS HIMSELF.  THERE WERE

16   ABOUT FIVE UNIVERSITIES INVOLVED IN THIS -- WERE DOING THE

17   EXPERIMENTAL WORK ON SIMILAR FABRICS.  AND THEY FOUND THE RED

18   DOTS.

19         AND THE WORK OF OGULATA PREDICTS THE WORK OF

20   LAWRENCE TO A VERY HIGH DEGREE.  SO YOU -- IF YOU WERE A

21   PERSON OF ORDINARY SKILL, YOU WOULD LOOK AT THE WORK OF

22   OGULATA, YOU WOULD LOOK AT THE BLACKFORD EXPECTATIONS, AND

23   YOU WOULD SAY BLACKFORD IS WRONG.  THIS HAS ALREADY BEEN

24   DONE.  THERE IS NOTHING NEW HERE.

25   Q.    TO BE CLEAR, WHEN WERE THE OGULATA AND LAWRENCE PAPERS

1567

1    PUBLISHED?

2    A.    2006.

3    Q.    SO THAT WAS BEFORE MR. BLACKFORD'S ASSESSMENT OF WHAT HE

4    THOUGHT ONE OF ORDINARY SKILL IN THE ART WOULD THINK?

5    A.    THAT IS CORRECT.  I BELIEVE THAT THEY WOULD ALSO QUALIFY

6    AS PRIOR ART BECAUSE THEY ARE PRIOR TO THE 2008 DATE.

7    Q.    THANK YOU, DR. BLOCK.

8          DID YOU ALSO DEVELOP OPINIONS IN THIS CASE AS TO THE

9    OBVIOUSNESS OF THE '270 PATENT AND THE ASSERTED CLAIMS?

10   A.    YES, I DID.

11   Q.    AND DOES SLIDE DDX-534 PROVIDE A SUMMARY OF YOUR

12   HIGH-LEVEL UNDERSTANDING OF WHAT THE OBVIOUSNESS

13   DETERMINATION IS?

14   A.    YES.  IT IS MY UNDERSTANDING THAT A PATENT CANNOT BE

15   GRANTED FOR SUBJECT MATTER THAT WOULD HAVE BEEN OBVIOUS; THAT

16   IS, AT THE TIME OF THE ALLEGED INVENTION, YOU WOULD LOOK AT

17   IT AND SAY, OH, THAT'S OBVIOUS.

18         ONE SHOULD EVALUATE OBVIOUSNESS OVER THE PRIOR ART

19   FROM THE VIEWPOINT OF A PERSON OF ORDINARY SKILL IN THE ART,

20   NOT A LAYMAN, NOT A GENIUS.

21         THE COURT:  WE'LL TAKE A RECESS AT THIS JUNCTURE.

22   THIS WILL BE OUR MID-MORNING RECESS.  PLEASE ESCORT

23   YOURSELVES INTO THE ROOM, AND WE'LL BE IN RECESS FOR ABOUT 15

24   MINUTES.

25         THE WITNESS:  THANK YOU.

COMPUTER-AIDED TRANSCRIPTION

1568

1    (JURY ABSENT, 10:35 A.M.)

2    THE COURT:  PLEASE BE SEATED.

3    MR. ALDRICH:  WHEN WE WERE DOING CLEANUP OF TASKS

4    THIS MORNING, THERE WERE A COUPLE OF MATTERS THAT I HAD

5    FORGOT --

6    THE COURT:  I KNOW.  YOU WANT TO GO LOOK AT THE

7    WAREHOUSE, OR SOMETHING LIKE THAT.

8    MR. ALDRICH:  THAT'S ONE.

9    THE COURT:  WHAT WAS THE OTHER ONE?

10    MR. ALDRICH:  WE'RE MAKING PROGRESS ON THE

11    IDENTIFICATION OF PRODUCTS, AND WE'RE DOWN TO EIGHT PRODUCTS

12    THAT WE HAVE NO DISCLOSURES ON THAT THEY ARE CLAIMING DON'T

13    INFRINGE.

14    WE'VE ASKED THEM TO BRING THOSE EIGHT HATS TO THE

15    COURTROOM, SO THAT WE CAN LOOK AT THEM, OR AT LEAST

16    SUFFICIENT DOCUMENTATION.  JUST WANT TO MAKE SURE WE'RE GOING

17    TO PROCEED ON THAT.

18    MR. SPROUL:  OKAY.  WE BROUGHT FIVE OF THE EIGHT OR

19    FIVE OF THE SEVEN.  AND THERE WAS AN ADDITIONAL SOCK.  I

20    THOUGHT -- ANYWAYS, I THINK WE HAVE ALL BUT TWO OF THEM HERE

21    IN THE COURTROOM.  I DIDN'T GET A CHANCE TO TALK TO

22    MR. ALDRICH PRIOR TO STARTING.

23    MR. ALDRICH:  THE FINAL ONE IS WE'D LIKE TO CALL

24    DR. BLOCK BACK IN OUR REBUTTAL CASE.  DR. BLOCK HAS GIVEN

25    SOME OPINIONS ABOUT WHETHER SEIRUS' PRODUCTS PRACTICE THE

1569

1    PATENTS.  THAT'S RELEVANT TO THE COMMERCIAL SUCCESS OF THE

2    PATENTS-IN-SUIT, WHICH IS RELEVANT TO INVALIDITY.

3         THE COURT:  OKAY.

4         MR. SPROUL:  WE STRONGLY OBJECT, YOUR HONOR.  HE

5    IS -- THEY HAD THEIR CHANCE.  THEY ARE DOING THIS FOR

6    INFRINGEMENT, AND THIS IS NOT FOR COMMERCIAL SUCCESS, AND

7    IT'S NOT PART OF ANYBODY'S COMMERCIAL SUCCESS OPINION.

8         DR. BLOCK HAS NOT OFFERED AN OPINION, AND HE WILL

9    NOT OFFER AN OPINION ON INFRINGEMENT IN THIS CASE, AND THAT'S

10   WHY THEY WANT TO BRING THIS IN ON REBUTTAL.  AND WE THINK

11   IT'S HIGHLY INAPPROPRIATE.

12        THEY HAD THEIR CHANCE TO MAKE THEIR CASE ON

13   INFRINGEMENT.  THEIR EXPERT IS UNREBUTTED WITH EXPERT

14   TESTIMONY, AND WE THINK IT'S UNFAIR FOR THEM TO NOW CALL

15   DR. BLOCK IN THEIR REBUTTAL CASE TO DO WHAT THEY SHOULD HAVE

16   DONE IN THEIR CASE-IN-CHIEF.

17        THEY PLAYED AND THEY SHOWED MR. BLOCK'S DEPOSITION

18   TESTIMONY IN THEIR CASE-IN-CHIEF.  THEY CHOSE NOT TO CALL

19   HIM.  AND IT'S IMPROPER FOR THEM TO NOW TRY AND CLEAN UP AND

20   INTRODUCE THINGS THAT ARE OUTSIDE THE SCOPE OF HIS DIRECT

21   TESTIMONY AND HIS REBUTTAL TESTIMONY.

22        THE COURT:  WELL, LET'S WAIT TO HEAR ALL OF THE

23   TESTIMONY, AND THEN I'LL MAKE A DECISION.

24        MR. SPROUL:  OKAY.  THANK YOU, YOUR HONOR.

25        THE COURT:  YOU MAY STEP DOWN.

COMPUTER-AIDED TRANSCRIPTION

1570

1        THE WITNESS:  THANK YOU.

2        (RECESS, 10:37 A.M. TO 10:51 A.M.)

3        THE COURT:  PLEASE BE SEATED.

4        YOUR QUESTION REGARDING CLARIFYING WHAT EXACTLY THE

5    JURY HAS TO DECIDE UPON.  I WILL GIVE YOU MORE INSTRUCTIONS

6    THAN YOU'RE GOING TO WANT TO LISTEN TO AT THE END OF THE

7    TRIAL.  I WILL TELL YOU PRECISELY WHAT IT IS THAT YOU NEED TO

8    DECIDE AND HOW TO GO ABOUT IT.

9        YOU MAY PROCEED.

10        MR. SPROUL:  THANK YOU, YOUR HONOR.

11        IF WE COULD GO BACK TO SLIDE 533, PLEASE, VERY

12    BRIEFLY.

13    Q.   YOU WERE DISCUSSING, DR. BLOCK, OGULATA AND LAWRENCE,

14    THOSE TWO REFERENCES.

15        YOU'RE NOT RELYING ON THOSE TWO REFERENCES AS PRIOR

16    ART THAT INVALIDATE THE PATENT, THE ASSERTED CLAIMS IN THIS

17    CASE, ARE YOU?

18    A.   DO YOU MEAN SOLELY RELYING UPON?

19    Q.   YOU'RE NOT RELYING ON OGULATA OR LAWRENCE TO SHOW

20    INVALIDITY IN THIS CASE; ISN'T THAT RIGHT?

21    A.   NO.  OGULATA AND LAWRENCE SPEAK ONLY TO MR. BLACKFORD'S

22    BELIEF THAT THE LOSS IN AIR PERMEABILITY WOULD BE LINEAR WITH

23    RESPECT TO THE PLACEMENT OF HEAT-DIRECTING ELEMENTS ON THE

24    SURFACE OF THE FABRIC.

25    Q.   THANK YOU, DR. BLOCK.

COMPUTER-AIDED TRANSCRIPTION

1571

```
1    IF YOU COULD PULL UP SLIDE 535, PLEASE.

2    HAVE YOU DEVELOPED AN OPINION AS TO WHETHER THE

3    ASSERTED CLAIMS, 2 AND 23 OF THE '270 PATENT, WERE OBVIOUS AT

4    THE TIME OF THE INVENTION OF THE '270 PATENT?

5    A.   YES, I HAVE.

6    Q.   AND COULD YOU TELL US WHAT THAT OPINION IS.

7    A.   THEY WERE DEFINITELY OBVIOUS AT THE TIME.

8    Q.   AND WHAT ARE YOU SHOWING IN SLIDE 535?

9    A.   THIS IS A TIME LINE STARTING WITH FOTTINGER IN 1981,

10   PROCEEDING TO BLACKFORD IN 2010.  AND WHAT WE SEE IS

11   FOTTINGER ORIGINALLY ANTICIPATES AND RENDERS OBVIOUS IN 1981.

12   BUT HE'S NOT THE ONLY PERSON.  I THINK IF YOU'RE

13   GOING TO BE SURE ABOUT THIS, I THINK A PERSON OF ORDINARY

14   SKILL IN THE ART WOULD SAY, WELL, I'VE GOT FOTTINGER.  IS

15   THERE MORE?

16   AND THE MORE IS WE HAVE A BLAUER PATENT IN '95.

17   BLAUER SAID 50 PERCENT.  THAT MEANS HE'S FOUND A SPOT RIGHT

18   IN BLACKFORD'S RANGE.  IT'S ALREADY PRIOR ART.

19   WE HAVE VAUGHN, 30 TO 70 PERCENT; THE EXACT SAME

20   RANGE.  WE HAVE HALLEY, 30 TO 70 PERCENT; THE EXACT SAME

21   RANGE.  WE HAVE WORLEY, 50 TO 80 PERCENT; EVEN BEYOND THAT

22   RANGE.

23   SO THAT BY THE TIME WE GOT TO THE APPLICATION -- THE

24   '270 APPLICATION, IT HAS ALREADY BEEN WELL-ESTABLISHED THAT

25   YOU CAN PLACE ELEMENTS ON THE SURFACE OF THE FABRIC AND IT
```

COMPUTER-AIDED TRANSCRIPTION

1572

1    DOESN'T MATTER IF THESE ARE HEAT-DIRECTING ELEMENTS.  AS LONG

2    AS YOU'RE PLACING ELEMENTS ON THE SURFACE OF THE FABRIC, IT

3    CAN BE IN THE RANGE OF 5 TO 80 PERCENT, AND IT'S BEEN SHOWN

4    IN THE PATENT LITERATURE THAT IT WORKS.

5             SO THAT BLACKFORD'S 30/70 RANGE HAS BEEN WELL KNOWN

6    FOR YEARS.  IT'S OBVIOUS.

7    Q.   DR. BLOCK, WHAT ARE YOU SHOWING IN SLIDE 536?

8    A.   IN THE DESIRABLE COVERAGE RANGE, THIS IS WHAT YOU WANT

9    TO CONSIDER.  I HAVE HEAT MANAGEMENT.  I WANT TO KEEP YOU

10   WARM.  AT THE SAME TIME, I WANT IT TO BE BREATHABLE.  AIR

11   PERMEABILITY, MOISTURE VAPOR TRANSPORT.  AT THE SAME TIME, I

12   WANT IT TO HANG RIGHT, SO IT WILL BE COMFORTABLE.  AT THE

13   SAME TIME, I WANT IT TO FEEL WELL.

14            FOTTINGER, ALONG WITH THE SECONDARY REFERENCES THAT

15   I'VE GIVEN YOU, ALL ADDRESS THIS QUESTION, EITHER DIRECTLY OR

16   INDIRECTLY.  BREATHABILITY, THE DRAPE AND THE HAND, ARE ALL

17   COVERED BY THIS RANGE OF ARTISTS, ANYWAY PRACTITIONERS.

18            MR. SPROUL:  YOUR HONOR, I OFFER EXHIBITS 1126,

19   1116, 1125, AND 1123, WHICH ARE THE WORLEY, HALLEY, VAUGHN

20   AND BLAUER PATENTS INTO EVIDENCE.

21            THE COURT:  I HAVE 1126, 1116, 1123.  AND I'M

22   MISSING ONE.

23            MR. SPROUL:  1125.

24            THE COURT:  THANK YOU.

25            ANY OBJECTION?

1573

1    MR. ALDRICH:  I HAVE 1116, 1125, 1126.  AND --

2    MR. SPROUL:  1123.

3    MR. ALDRICH:  NO OBJECTION, YOUR HONOR.

4    THE COURT:  THEY ARE RECEIVED.

5    (TRIAL EXHIBITS 1116, 1123, 1125 AND 1126 RECEIVED IN

6    EVIDENCE.)

7    MR. SPROUL:  HOUSEKEEPING.  I'D ALSO LIKE TO OFFER

8    1156 AND 1158, OGULATA AND LAWRENCE.

9    THE COURT:  I THINK OUR COURT REPORTER DIDN'T HEAR

10   WHAT YOU SAID ANY BETTER THAN I DID.

11   MR. SPROUL:  I'D LIKE TO ALSO OFFER 1156, THE

12   OGULATA REFERENCE DISCUSSED AND TESTIFIED TO BY MR. --

13   DR. BLOCK EARLIER, AND EXHIBIT 1158, THE LAWRENCE

14   REFERENCE.

15   MR. ALDRICH:  NO OBJECTION.

16   THE COURT:  THEY ARE RECEIVED.

17   (TRIAL EXHIBITS 1156 AND 1158 RECEIVED IN EVIDENCE.)

18   Q.   BY MR. SPROUL:  DR. BLOCK, DID YOU CONSIDER THE WORLEY

19   REFERENCE SHOWN ON SLIDE DDX-537, EXHIBIT 1126, AS PART OF

20   YOUR OBVIOUSNESS ANALYSIS?

21   A.   YES, I DID.

22   Q.   AND WHAT DID YOU CONCLUDE BASED ON YOUR CONSIDERATION OF

23   WORLEY?

24   A.   WORLEY IS A U.S. PATENT.  IT IS DEFINITELY PRIOR ART.

25   SHALL I CONTINUE?

1574

1    Q.    PLEASE.

2    A.    WORLEY IS A U.S. PATENT.  IT IS DEFINITELY PRIOR ART.

3    IT WAS GRANTED IN 2006, SO IT WAS EARLIER THAN THE CRITICAL

4    DATE.

5    Q.    AND DID YOU ANALYZE WORLEY?

6    A.    YES, I DID.

7    Q.    AND WHAT DID YOU CONCLUDE ABOUT WORLEY'S DISCLOSURE AS

8    IT RELATES TO THE OBVIOUSNESS OF CLAIMS 2 AND 23?

9    A.    I CONCLUDED THAT WORLEY DOES RENDER THE BLACKFORD PATENT

10   OBVIOUS.

11   Q.    AND WHY IS THAT?

12   A.    OKAY.  IN 1(D), THE BLACKFORD PATENT SAYS A SURFACE

13   RATIO OF HEAT-DIRECTING ELEMENTS IN THE 70 TO 30 RANGE.

14   WORLEY SAYS FROM ABOUT 50 TO 80 PERCENT.  THAT'S THE RANGE

15   THAT MR. BLACKFORD IS TALKING ABOUT.

16         HE ALSO GOES ON TO TELL US THE COATING MAY COVER A

17   LARGER PERCENTAGE OF THE SURFACE IF IT'S HEAT REFLECTION OR

18   ANY OTHER SORT OF REGULATING PROPERTIES.  ON THE OTHER HAND,

19   AND I THINK THIS IS A GOOD TEACHING, WHEN OTHER PROPERTIES OF

20   THE COATED ARTICLE -- FLEXIBILITY, SOFTNESS, AIR

21   PERMEABILITY, WATER VAPOR -- ARE CONTROLLING CONSIDERATIONS,

22   GO THE OTHER WAY.

23         SO WORLEY IS TEACHING US NOT JUST HIS RANGE, BUT

24   HE'S ALSO TEACHING US A BALANCE BETWEEN VARIOUS PROPERTIES.

25   DON'T STICK TO JUST ONE NUMBER, BUT SOMETIMES YOU GO THIS

1575

1    WAY; SOMETIMES YOU GO THAT WAY.

2    Q.    HOW DOES THE COVERAGE OF ELEMENTS RELATE TO THAT

3    BALANCE, DR. BLOCK?

4    A.    WELL, IF YOU PUT MORE ELEMENTS ON THE SURFACE, YOU'RE

5    GOING TO GET AN ENHANCEMENT IN YOUR HEAT REFLECTION, YOU'RE

6    GOING TO BECOME STIFFER, YOU'RE GOING TO HAVE LESS MOISTURE

7    PERMEABILITY, YOU'RE GOING TO HAVE A ROUGHER, COARSER

8    HANDLE.

9    Q.    AND IF YOU HAVE FEWER ELEMENTS ON YOUR FABRIC?

10   A.    IF YOU GO THE OTHER WAY, YOU MIGHT HAVE LESS HEAT

11   REFLECTION, BUT YOU WILL HAVE BETTER BREATHABILITY, GREATER

12   AIR PERMEABILITY, BETTER MOISTURE VAPOR TRANSPORT.

13   Q.    AND DID YOU CONSIDER THE HALLEY REFERENCE AS PART OF

14   YOUR OBVIOUSNESS ANALYSIS?

15   A.    YES, I DID.

16   Q.    AND WHAT DID YOU CONCLUDE?

17   A.    I CONCLUDED THAT HALLEY ALSO RENDERED THE BLACKFORD

18   PATENT OBVIOUS.  AS WE SEE IN EXHIBIT 1116, WHICH IS THE

19   U.S. PATENT -- I'M SORRY, U.S. APPLICATION 20020197924, DATED

20   DECEMBER 26TH OF 2002.  HALLEY IS DEFINITELY PRIOR ART.

21   Q.    AND DID YOU CONSIDER HOW OR WHETHER HALLEY WOULD INFORM

22   THE TEACHING OF FOTTINGER?

23   A.    YES, I DID.

24   Q.    AND WHAT DID YOU CONCLUDE?

25   A.    THAT IS SHOWN IN THE NEXT SLIDE.  AND HALLEY TELLS US

1576

1    THAT THE PERCENT COVERAGE OF THE SURFACE, LIKE POLYMERIC

2    DOTS, IS PARTICULARLY IMPORTANT, 30 TO 70 PERCENT RANGE.

3    GENERALLY NOT NECESSARY, YOU COULD BE LESS, YOU COULD BE

4    MORE, DEPENDING ON YOUR BASE MATERIAL AND WHAT IT IS YOU WISH

5    TO ACCOMPLISH.

6         AGAIN, WE HAVE A REFERENCE THAT RENDERS BLACKFORD

7    OBVIOUS AND ALSO TEACHES US THE BALANCE BETWEEN THESE VARIOUS

8    IDEAS.

9    Q.   AND, AGAIN, WHY WOULD ONE OF ORDINARY SKILL HAVE

10   COMBINED HALLEY WITH FOTTINGER?

11   A.   WELL, FOTTINGER RENDERS OBVIOUS, AND ALSO ANTICIPATES

12   BLACKFORD.  HALLEY IS BACKING UP, SUPPORTING FOTTINGER.

13   Q.   IN WHAT WAY?

14   A.   WELL, HE'S GIVING US THE 30- TO 70-PERCENT RANGE FOR

15   ELEMENTS.  THAT'S A MAJOR PORTION OF IT.

16   Q.   AND DID YOU CONSIDER THE VAUGHN REFERENCE AS PART OF

17   YOUR OBVIOUSNESS ANALYSIS IN THIS CASE?

18   A.   YES, I DID.

19   Q.   AND WHAT DID YOU CONCLUDE?

20   A.   I CONCLUDED THAT VAUGHN WAS ALSO PRIOR ART THAT RENDERED

21   BLACKFORD OBVIOUS.  AND THAT'S SHOWN IN EXHIBIT 1125, WHICH

22   IS A U.K. PATENT APPLICATION, GB-2350073.  AND THAT HAS A

23   DATE OF PUBLICATION OF 2000.  AGAIN, PRIOR ART.

24   Q.   AND HOW WOULD THE VAUGHN PATENT APPLICATION INFORM THE

25   TEACHING OF FOTTINGER?

1577

1    A.    WELL, FIRST, VAUGHN DEFINITELY SAYS A PATTERN OF DOTS.

2    AND SECOND, VAUGHN SAYS THE PERCENTAGE COVERAGE BY THE

3    PATTERN COULD BE AS WIDE AS 20 TO 80, BUT PREFERABLY 30 TO

4    70.

5    Q.    AND DID YOU HAVE AN OPINION AS TO WHY ONE OF ORDINARY

6    SKILL WOULD COMBINE VAUGHN WITH FOTTINGER?

7    A.    AGAIN, YOU HAVE FOTTINGER WITH ANTICIPATION AND

8    OBVIOUSNESS.  AND NOW YOU ADD TO THAT VAUGHN WITH THE

9    DEFINITE 30 TO 70, RENDERING BLACKFORD OBVIOUS.

10   Q.    AND DID YOU CONSIDER THE BLAUER REFERENCE, EXHIBIT 1123,

11   AS PART OF YOUR OBVIOUSNESS ANALYSIS?

12   A.    YES, I DID.

13   Q.    AND WHAT DID YOU CONCLUDE?

14   A.    BLAUER IS A U.S. PATENT, NO. 5626949.  IT HAS A PATENT

15   DATE OF 1997.  IT IS DEFINITELY PRIOR ART.

16   Q.    AND HOW DOES BLAUER, EXHIBIT 1123, INFORM THE

17   OBVIOUSNESS ANALYSIS FOR ONE OF ORDINARY SKILL?

18   A.    THAT WE'LL SEE ON THE NEXT SLIDE OF WHAT BLAUER HAS

19   DONE.

20          BLAUER HAS 50 PERCENT AS HIS SPOT.  BUT ALSO, IF YOU

21   TAKE A LOOK AT THE BLAUER PATENT, HE LISTS SOME EXAMPLES OF

22   WHAT HIS MATERIAL WOULD LOOK LIKE.  AND WE LOOK AT THE '270

23   PATENT, AND WE SEE EXAMPLES OF WHAT THEIR MATERIAL MIGHT LOOK

24   LIKE.

25          AND THERE IS A VERY CLOSE COINCIDENTAL ARRANGEMENT,

1578

1    FIGURE 4 OF BLAUER, FIGURE 3A --

2         MR. ALDRICH:  OBJECTION, YOUR HONOR.  MR. --

3    DR. BLOCK IS CONTRADICTING THE COURT'S PRIOR DECISIONS.

4         MR. SPROUL:  I'M --

5         THE COURT:  HANG ON A SECOND.

6         HE SHOULD BE DISCUSSING PERCENTAGES.

7         MR. SPROUL:  OKAY.

8         THE COURT:  THE OBJECTION IS SUSTAINED.

9    Q.  BY MR. SPROUL:  DR. BLOCK, IF YOU CAN LIMIT YOUR

10   TESTIMONY TO PERCENTAGES AS SHOWN IN THE FIGURES IN BLAUER ON

11   THE LEFT AND THE '270 PATENT ON THE RIGHT.

12        HOW DOES BLAUER INFORM YOUR OBVIOUSNESS ANALYSIS OR

13   HOW DOES -- EXCUSE ME.

14        HOW DOES BLAUER INFORM ONE OF ORDINARY SKILL AS TO

15   THE OBVIOUSNESS, CONSIDERING BLAUER AND FOTTINGER?

16   A.  OKAY.  WE START WITH FIGURE 4.  THAT IS AN ARRANGEMENT

17   OF HEXAGONS, WHICH SHOW APPROXIMATELY 50 PERCENT OF THE

18   SURFACE IS COVERED.

19        AND IF WE LOOK AT FIGURE 3A IN THE '270 PATENT --

20        MR. ALDRICH:  YOUR HONOR, OBJECTION AGAIN.  YOUR

21   HONOR HAS ALREADY ADDRESSED THE FIGURES CAN'T SHOW PERCENT

22   COVERAGES AND DR. BLOCK HASN'T GIVEN AN OPINION IN THIS CASE.

23        DO I HAVE --

24        THE COURT:  YOUR OBJECTION IS SUSTAINED.

25        MR. SPROUL:  WE CAN MOVE ON.

1579

1    Q.    DR. BLOCK, YOU TESTIFIED THAT BLAUER DISCLOSED A

2    50-PERCENT COVERAGE; IS THAT RIGHT?

3    A.    THAT IS CORRECT.

4    Q.    AND HOW DOES THAT 50-PERCENT COVERAGE OF BLAUER INFORM

5    YOUR UNDERSTANDING OR YOUR OPINION OF OBVIOUSNESS IN VIEW OF

6    FOTTINGER?

7    A.    ONCE AGAIN, FOTTINGER SAYS ANTICIPATED AND RENDERED

8    OBVIOUS.  BLAUER SAYS, YES, DEFINITELY RENDERED OBVIOUS.

9    Q.    AND DR. BLOCK, COULD YOU PROVIDE A SUMMARY OF YOUR

10   OBVIOUSNESS OPINIONS.

11   A.    YES, I DO.

12         IF YOU COMBINE FOTTINGER WITH THE SECONDARY, WITH

13   THE SECOND REFERENCES THAT I'VE GIVEN YOU, FOTTINGER FROM 5

14   TO 40 PERCENT, BLAUER, 50 PERCENT, A LITTLE BIT FURTHER.

15   VAUGHN, 30 TO 70 PERCENT.  HALLEY 30 TO 70 PERCENT.  WORLEY,

16   50 TO 80 PERCENT.

17         THE MOTIVATION TO COMBINE TELLS US THAT THE COVERAGE

18   IMPACTS THE PERMEABILITY AND MOISTURE VAPOR TRANSFER.  THOSE

19   ARE THE TWO MOST IMPORTANT THINGS THAT MR. BLACKFORD HAD

20   DISCUSSED.  AND THESE PEOPLE HAVE GOTTEN THERE LONG BEFORE HE

21   DID.

22   Q.    IS IT YOUR OPINION, DR. BLOCK, THAT FOTTINGER PLUS ANY

23   ONE OF THESE FOUR REFERENCES RENDERS OBVIOUS CLAIMS 2 AND 23

24   OF THE '270 PATENT?

25   A.    YES.

1580

1    MR. SPROUL:  NO FURTHER QUESTIONS, YOUR HONOR.

2    THE COURT:  CROSS-EXAMINE.

3    CROSS-EXAMINATION

4    BY MR. ALDRICH:

5    Q.   GOOD MORNING, DR. BLOCK.

6    A.   GOOD MORNING, SIR.

7    Q.   YOU RETIRED FROM TEACHING, WAS IT ABOUT 18 YEARS AGO; IS

8    THAT RIGHT?

9    A.   ABOUT THAT TIME, YES.

10   Q.   AND SINCE THAT TIME, YOUR RESUME SAYS THAT YOU'RE A

11   CONSULTING SCIENTIST.  DOES THAT SOUND RIGHT?

12   A.   YEAH.  THAT SOUNDS CORRECT, YES.

13   Q.   YOU'VE BEEN WORKING IN THE FIELD OF SCIENCE FOR LONGER

14   THAN I'VE BEEN ALIVE.

15   A.   I DON'T KNOW.  HOW OLD ARE YOU?

16   Q.   YOU HAD YOUR BACHELOR'S DEGREE MUCH BEFORE I WAS BORN.

17   A.   OH, GOOD.  OKAY.

18   Q.   AND YOU'VE BEEN WORKING IN THE FIELD OF SCIENCE THEN FOR

19   SEVERAL DECADES; IS THAT RIGHT?

20   A.   THAT'S CORRECT.

21   Q.   AND YOU SAID THAT I THINK SINCE YOU RETIRED FROM

22   TEACHING, YOU HAVE PRIMARILY BEEN HIRED AS AN EXPERT WITNESS

23   IN CASES LIKE THIS; IS THAT RIGHT?

24   A.   THAT HAS NOT BEEN MY -- THE PRIMARY TIME IN WHICH I

25   LIVED MY LIFE, NO.

1581

1    Q.    BUT SINCE YOU RETIRED, THIS IS A SIGNIFICANT PORTION OF

2    YOUR INCOME, IS WORKING AS AN EXPERT WITNESS ON CASES LIKE

3    THIS; CORRECT?

4    A.    PLEASE DEFINE "SIGNIFICANT."

5    Q.    YOU'VE BEEN AN EXPERT WITNESS IN ABOUT 100 CASES;

6    CORRECT?

7    A.    THAT'S TRUE.

8    Q.    BUT ONLY ONE OTHER PATENT CASE; CORRECT?

9    A.    I THINK THERE WERE TWO.  ONE WAS THE JORDACHE CASE.

10   Q.    JORDACHE?

11   A.    JORDACHE MANUFACTURES CLOTHING.

12   Q.    JEANS?

13   A.    YES, AMONG OTHER THINGS.  AND THEN THERE WAS A SECOND

14   CASE IN VIRGINIA.  I CAN'T REMEMBER THE NAME OF THE FIRMS

15   THAT WERE INVOLVED IN THAT.  SO THERE WERE TWO OTHERS.

16   Q.    OKAY.  SO THIS IS -- IN THE DECADES THAT YOU'VE BEEN

17   DOING THIS, THIS IS YOUR THIRD CASE RELATING TO PATENTS; IS

18   THAT RIGHT?

19   A.    THAT IS CORRECT.

20   Q.    MANY OF YOUR OTHER CASES HAVE RELATED TO INJURIES,

21   PERSONAL INJURIES; IS THAT RIGHT?

22   A.    PERSONAL INJURY CAUSED BY TEXTILE MATERIALS.

23   Q.    OKAY.  AND I THINK YOU SAID YOU HAD A DEGREE IN CHEMICAL

24   ENGINEERING FROM 1963; IS THAT RIGHT?

25   A.    APPROXIMATELY, YES.

1582

1   Q.   AND YOU STARTED WORKING AS AN ASSOCIATE PROFESSOR IN

2   1978?

3   A.   WELL, BEFORE I WAS AN ASSOCIATE PROFESSOR, I WAS AN

4   ASSISTANT PROFESSOR.

5   Q.   OKAY.  BUT THEN YOU'VE BEEN WORKING -- YOU WORKED AS A

6   PROFESSOR FOR DECADES; IS THAT RIGHT?

7   A.   YES.  ABOUT 40-SOME YEARS.

8   Q.   AND THEN STARTING IN 1992, YOU TRANSITIONED INTO WORKING

9   PURELY AS A SCIENTIST, AT LEAST ACCORDING TO YOUR RESUME;

10  RIGHT?

11  A.   THAT IS CORRECT.

12  Q.   OKAY.  AND AS A SCIENTIST, YOU PUBLISHED OVER 60 PAPERS;

13  IS THAT RIGHT?

14  A.   THAT IS CORRECT.

15  Q.   AS A SCIENTIST, YOU WORKED ON A NUMBER OF RESEARCH

16  MATTERS; RIGHT?

17  A.   THAT IS CORRECT.

18  Q.   DID YOU DO ANY RESEARCH MATTERS INVOLVING EXTERNAL

19  FUNDING?

20  A.   YOU MEAN, DID I RESEARCH EXTERNAL FUNDING?

21  Q.   NO.  DID YOU HAVE -- DID YOU DO ANY RESEARCH PROJECTS

22  WHERE THIRD PARTIES WERE PAYING FOR YOUR FUNDING, WHERE YOU

23  GOT GRANT MONEY TO DO RESEARCH?

24  A.   YES, I DID.

25  Q.   OKAY.  AND WHEN YOU DO RESEARCH AS A SCIENTIST, IT'S

COMPUTER-AIDED TRANSCRIPTION

1583

1    IMPORTANT TO BE THOROUGH; CORRECT?

2    A.    THAT IS CORRECT.

3    Q.    AND DETAILED; RIGHT?

4    A.    THAT IS CORRECT.

5    Q.    AND MOST IMPORTANTLY, WHEN YOU'RE A SCIENTIST, IT'S

6    IMPORTANT TO NOT BE BIASED; CORRECT?

7    A.    I WOULDN'T SAY THAT THAT IS THE MOST IMPORTANT, BUT THAT

8    IS IMPORTANT, YES.

9    Q.    WELL, WHEN WE'RE DEALING WITH SCIENCE, ULTIMATELY WE'RE

10   LOOKING FOR TRUTH; ISN'T THAT RIGHT?

11   A.    THAT IS CORRECT.

12   Q.    WE'RE LOOKING FOR OBJECTIVE TRUTH; RIGHT?

13   A.    THAT IS CORRECT.

14   Q.    WE DON'T WANT TO BE SWAYED ONE WAY OR THE OTHER BY

15   WHETHER THE SCIENTIST HAS A SUBJECTIVE BELIEF IN HIS RESULTS;

16   RIGHT?

17   A.    DEPENDS ON WHAT IT IS WE'RE LOOKING AT.

18   Q.    BUT FOR THE SCIENCE THAT YOU DID, WHAT'S CRITICAL IS, AT

19   LEAST IN THE SEARCH FOR TRUTH, IF THERE IS A BIAS, WE WANT TO

20   KNOW ABOUT IT; RIGHT?

21   A.    THAT IS CORRECT.

22   Q.    AND BIAS IS WHAT HAPPENS WHEN A PERSON IS UNDULY

23   INFLUENCED FROM SOME SOURCE; RIGHT?

24   A.    IF YOU'D LIKE TO DEFINE IT THAT WAY, YES.

25   Q.    DO YOU OBJECT THAT BIAS HAS TO DO WITH WHEN YOU ARE

1584

1    INFLUENCED?

2    A.    THERE HAS GOT TO BE MORE TO THAT SENTENCE.    YOU CAN'T

3    JUST STOP THERE.

4    Q.    OKAY.    HOW WOULD YOU DEFINE BIAS AS IT RELATES TO THE

5    SCIENTIFIC INQUIRY?

6    A.    A BIAS HAS ITS PLAIN AND ORDINARY MEANING.    YOU LEAN

7    THAT WAY.

8    Q.    YOU LEAN THAT WAY.    OKAY.    AND, AGAIN, IN -- WHEN WE'RE

9    DEALING WITH THE FIELD OF SCIENCE, WE WANT TO TRY TO AVOID

10    BIAS; RIGHT?

11    A.    NOT ALWAYS.

12    Q.    OKAY.    BUT IT'S IMPORTANT THAT PEOPLE IN THE END CAN

13    TRUST YOUR RESULTS; RIGHT?

14    A.    OH, ABSOLUTELY.

15    Q.    AND WHEN YOU WORK AS A SCIENTIST, THERE ARE A NUMBER OF

16    WAYS THAT WE WORK TO ENSURE THAT THE SEARCH FOR TRUTH IS PURE

17    AND THAT IT'S NOT INFLUENCED BY ANY BIAS BY THE SCIENTIST

18    HIMSELF; CORRECT?

19    A.    WE TRY TO, YES.

20    Q.    SO ONE WAY WE DO THAT IS LIKE THROUGH DOUBLE-BLIND

21    TESTING; IS THAT RIGHT?

22    A.    DEPENDS ON WHAT IT IS YOU'RE DOING.

23    Q.    BUT YOU UNDERSTAND THE TERM "DOUBLE-BLIND TESTING";

24    CORRECT?

25    A.    YES, I DO.

1585

1    Q.    AND DOUBLE-BLIND TESTING IS A WAY THAT WE TRY TO AVOID

2    BIAS ENTERING INTO THE SCIENTIST'S WORK; RIGHT?

3    A.    THAT IS CORRECT.

4    Q.    ANOTHER WAY THAT WE TRY TO AVOID BIAS IS BY RANDOMIZING

5    SAMPLES; RIGHT?

6    A.    THAT IS CORRECT.

7    Q.    AND WHERE YOU CAN'T COMPLETELY ELIMINATE BIAS BY THE

8    SCIENTIST, YOU AT LEAST TRY TO CONTROL FOR IT; RIGHT?

9    A.    I'M NOT EXACTLY CERTAIN WHAT YOU'RE AFTER HERE.

10   Q.    WELL, THERE ARE SOME AREAS WHERE YOU CAN'T COMPLETELY

11   ELIMINATE BIAS BY THE SCIENTIST; RIGHT?

12   A.    I CAN'T THINK OF ANY AT THE MOMENT.

13   Q.    OKAY.  BUT YOU AT LEAST WOULD, AS A SCIENTIST, TRY TO

14   MAKE SURE THAT THE PEOPLE THAT ARE READING YOUR WORK, YOU

15   WANT TO ACCOUNT FOR THE BIAS.  YOU WANT TO LET THEM KNOW THAT

16   THERE IS A POTENTIAL CONFLICT OF INTEREST OR A BIAS; RIGHT?

17   A.    IN THE WORK THAT I HAVE PUBLISHED OVER 50 YEARS, I HAVE

18   NEVER FOUND IT NECESSARY TO TELL PEOPLE THAT I AM BIASED IN

19   THE WORK THAT I HAVE DONE HERE.  I WRITE WHAT IT IS I DID,

20   WHAT IT IS I FOUND, WHAT IT IS I CONCLUDED, AND I LET MY

21   PEERS EVALUATE MY WORK.

22   Q.    OKAY.  AND ONE -- ONE CRITICAL WAY OF LETTING PEOPLE

23   KNOW THAT A SCIENTIST IS NOT BIASED, IS BY ENSURING THAT ALL

24   RESULTS FROM A STUDY ARE INCLUDED IN THE FINAL WORK PRODUCT;

25   CORRECT?

1586

1   A.    NO.  YOU ARE ALLOWED TO SCRATCH OUT.  AS I WAS TAUGHT IN

2   HIGH SCHOOL, YOU KEEP YOUR NOTEBOOK.  YOU WRITE DOWN YOUR

3   DATA.  YOU WRITE DOWN YOUR RESULTS.  IF YOU HAVE OUTLIERS,

4   YOU ARE ALLOWED TO SCRATCH THROUGH, AS LONG AS YOU LET PEOPLE

5   KNOW THERE WERE OUTLIERS AND YOU HAVE SCRATCHED THEM.

6   Q.    OKAY.  SO YOU'RE AT LEAST LETTING YOUR READERS KNOW THAT

7   THERE IS SOME DATA OUT THERE THAT YOU CHOSE NOT TO CONSIDER,

8   BUT YOU EXPLAIN WHY YOU CHOSE NOT TO CONSIDER IT; IS THAT

9   RIGHT?

10  A.    IN GENERAL, THAT IS CORRECT.

11  Q.    IF A SCIENTIST SELECTIVELY CHOOSES WHICH RESULTS TO

12  PUBLISH IN THE STUDY, AND DOESN'T TELL THE READER, JUST

13  CHOOSES NOT TO PUT SOME OF THE RESULTS IN, BASED ON THE

14  SCIENTIST'S OWN SUBJECTIVE VIEW, IT'S NO LONGER OBJECTIVE, IS

15  IT?

16        MR. SPROUL:  OBJECTION.  RELEVANCE.  PERHAPS WE

17  COULD HAVE OUR DISCUSSION NOW.

18        THE COURT:  OVERRULED.  GO AHEAD.

19        THE WITNESS:  CAN YOU GIVE ME AN EXAMPLE OF SOMEBODY

20  DOING SOMETHING LIKE THAT?

21        MR. ALDRICH:  WE'LL GET THERE.

22        MR. SPROUL:  YOUR HONOR, I BELIEVE THIS WAS THE

23  ISSUE WE DISCUSSED OFF THE RECORD, OR EARLIER THIS MORNING.

24        THE COURT:  SO MR. ALDRICH, I HAVE NOT GOTTEN TO THE

25  FINALITY REGARDING WHETHER OR NOT I WILL ALLOW YOU TO MOVE

1587

1    BEYOND THE SCOPE IN THE DIRECT EXAMINATION, AND I ASSUME THAT

2    YOU ARE STILL WITHIN THAT.

3              MR. ALDRICH:  I AM.

4              THE COURT:  YOUR OBJECTION IS OVERRULED.

5              MR. SPROUL:  THANK YOU, YOUR HONOR.

6              THE WITNESS:  WOULD YOU REPEAT YOUR LAST QUESTION,

7    PLEASE.

8    Q.   BY MR. ALDRICH:  IF A SCIENTIST SELECTIVELY CHOOSES

9    WHICH RESULTS TO PUBLISH IN A STUDY, IT'S NO LONGER AN

10   OBJECTIVE STUDY; CORRECT?

11   A.   YOU HAVE TO GIVE ME AN EXAMPLE.  BECAUSE WHEN YOU SAY

12   CHOOSES NOT TO PUBLISH, I COULD HAVE DONE SOMETHING WHERE THE

13   RESULTS WERE INCONCLUSIVE, UNDECIPHERABLE.  I COULD HAVE DONE

14   SOMETHING WHERE THE RESULTS WERE CONTRARY TO WHAT OTHER

15   PEOPLE WOULD HAVE THOUGHT, AND SO I HOLD BACK UNTIL I FIND

16   WHAT I DID WRONG.  I COULD PUBLISH A STUDY -- OR I COULD DO A

17   STUDY IN WHICH I JUST DON'T HAVE ENOUGH DATA OR THE DATA ARE

18   NOT SUFFICIENTLY ACCURATE OR SUFFICIENTLY PRECISE FOR ME TO

19   SAY I WANT TO PUBLISH THIS.

20             SO THERE ARE -- IF YOU COULD GIVE ME AN EXAMPLE OF

21   WHAT YOU MEAN BY SOMEBODY WITHHOLDING DATA, AND THEREBY

22   SHOWING BIAS, I COULD EXPLAIN TO YOU MORE READILY WHY I WOULD

23   SAY YES OR NO.

24   Q.   WELL, LET'S JUST TALK GENERALLY ABOUT THE FIELD OF

25   SCIENCE IN GENERAL.

1588

1    AGAIN, YOU JUST EXPLAINED A NUMBER OF REASONS WHY A

2    SCIENTIST MIGHT NOT INCLUDE SOME RESULTS, BUT I THINK YOU

3    ALSO EXPLAINED THAT THE SCIENTIST WOULD BE DUTY-BOUND

4    ESSENTIALLY TO AT LEAST DISCLOSE THAT THERE IS SOME RESULTS

5    THAT THEY CHOSE NOT TO CONSIDER IN THEIR FINAL FINDINGS;

6    CORRECT?

7    A.    I DON'T THINK THAT IS WHAT I JUST TOLD YOU.  I SAID THAT

8    I MIGHT NOT PUBLISH BECAUSE I DID, DAH, DAH, DAH, DAH, WHICH

9    MEANS I DID NOT PUBLISH.

10    IF I CHOOSE TO PUBLISH AND DO NOT REPORT ALL OF MY

11    DATA, THEN IT IS APPROPRIATE FOR ME TO TELL MY READERS WHY IT

12    IS I DID NOT INCLUDE THOSE DATA IN WHAT I PUBLISHED.

13    Q.    THANK YOU.

14    AND YOU'VE PROBABLY HEARD SOME RECENT NEWS STORIES

15    ABOUT PEOPLE WHO WERE DOING SCIENCE, BUT DID NOT PROVIDE THE

16    READER WITH ALL OF THE DATA FROM THEIR EXPERIMENTS;

17    CORRECT?

18    MR. SPROUL:  OBJECTION.  VAGUE.

19    THE COURT:  SUSTAINED.

20    Q.    BY MR. ALDRICH:  HAVE YOU HEARD OF THE TERM "ACADEMIC

21    FRAUD"?

22    A.    I'VE NEVER MET AN ACADEMIC FRAUD.  I'M SORRY.

23    Q.    OKAY.  YOU HAVEN'T HEARD OF THE TERM "ACADEMIC FRAUD"?

24    A.    I HAVE HEARD OF PEOPLE BEING ACCUSED OF FRAUDULENTLY

25    CLAIMING THINGS.  THEY ARE VERY FEW, VERY FAR BETWEEN, AND

1589

1    THEY CAN GENERALLY BE TRACED TO LARGE AMOUNTS OF MONEY

2    INFLUENCING THEM.

3    Q.    HAVE YOU HEARD OF SCIENTIFIC FRAUD?

4    A.    SAME ANSWER.

5    Q.    OKAY.  AND THAT -- THOSE TERMS APPLY IN SITUATIONS WHERE

6    SOMEBODY DOES A STUDY, BUT DOESN'T ACTUALLY PUBLISH ALL OF

7    THE RESULTS OF THEIR STUDY; CORRECT?

8    A.    YOU'RE GOING TO HAVE TO GIVE ME A CONCRETE EXAMPLE.

9    Q.    YOU WERE HERE IN COURT LAST WEEK WHEN DR. COLE

10   TESTIFIED; CORRECT?

11   A.    YES, I WAS.

12   Q.    AND YOU HEARD MR. SPROUL ACCUSE HER OF BIAS; RIGHT?

13   A.    I DON'T RECALL.

14   Q.    DID YOU HEAR MR. SPROUL QUESTION HER INTEGRITY?

15   A.    I DON'T RECALL.

16   Q.    YOU'RE CURRENTLY PAID BY SEIRUS ABOUT $350 AN HOUR FOR

17   YOUR TIME; IS THAT CORRECT?

18   A.    THAT IS IN KEEPING WITH WHAT EVERYONE ELSE IN MY FIELD

19   CHARGES.

20   Q.    ABOUT $350 AN HOUR?

21   A.    YES.

22   Q.    DO YOU HAVE ANY IDEA HOW MUCH MONEY YOU'VE BILLED TO

23   SEIRUS THROUGH THE COURSE OF THIS MATTER?

24   A.    NO, I DO NOT.

25   Q.    IN THIS CASE, YOU'RE HIRED AS A SCIENTIST; RIGHT?

1590

1     A.    NO.  I WAS HIRED AS AN EXPERT WITNESS TO GIVE MY

2     UNBIASED AND DISINTERESTED OPINION ABOUT THE SUBJECT

3     MATTER.

4     Q.    AND THAT'S IMPORTANT, RIGHT, THAT YOU WERE SUPPOSED TO

5     GIVE UNBIASED OPINIONS; IS THAT RIGHT?

6     A.    AND DISINTERESTED AS WELL.

7     Q.    BECAUSE IF YOU'RE BIASED, THERE IS A REAL QUESTION THAT

8     GOES TO HOW MUCH SOMEBODY SHOULD TRUST YOUR ANALYSIS; IS THAT

9     RIGHT?

10    A.    YOU WOULD HAVE TO EXPLAIN TO ME AGAIN CONCRETELY WHERE

11    THAT MIGHT BE IMPORTANT.

12    Q.    DR. BLOCK, YOU PROVIDED WRITTEN REPORTS IN THIS CASE;

13    CORRECT?

14    A.    THAT IS CORRECT.

15          MR. SPROUL:  YOUR HONOR --

16    Q.    BY MR. ALDRICH:  YOU PROVIDED A NUMBER OF --

17          THE COURT:  HANG ON A SECOND.

18          MR. SPROUL:  I'M GOING TO RENEW MY OBJECTION.  I

19    THINK HE'S ENCROACHING ON THE ISSUE WE DISCUSSED EARLIER.  A

20    STANDING OBJECTION.  THIS IS ALSO REPETITIOUS, IRRELEVANT AND

21    IT'S -- I SEE NO RELATION TO THE SCOPE OF THE DIRECT

22    EXAMINATION, WHICH WAS --

23          THE COURT:  YOUR OBJECTION IS OVERRULED.

24          GO AHEAD.

25    Q.    BY MR. ALDRICH:  YOU PROVIDED A NUMBER OF REPORTS IN

1591

1    THIS CASE; CORRECT?  OH, DR. BLOCK.

2    A.   YES.

3    Q.   OKAY.  AND FOR SEVERAL OF YOUR REPORTS, YOU ALSO

4    PROVIDED A NUMBER OF APPENDICES; RIGHT?

5    A.   YES.

6    Q.   AND EXHIBITS?

7    A.   YES.

8    Q.   AND I ACTUALLY HAVE THE TOTAL CONTENTS OF YOUR REPORT

9    OVER HERE.  I'LL BRING THEM OUT JUST TO SHOW.

10           MR. SPROUL:  I'M SORRY.  WHICH REPORT IS THIS?

11           MR. ALDRICH:  IT'S THE THREE REPORTS IN TOTAL.  BUT

12   I'M NOT --

13           MR. SPROUL:  OBJECTION, YOUR HONOR --

14           MR. ALDRICH:  I'M NOT SUBMITTING THEM.

15           MR. SPROUL:  -- TO THE REPORT.  OUTSIDE OF THE

16   SCOPE.

17           THE COURT:  HE'S NOT OFFERING THOSE AS EXHIBITS.

18   HE'S STILL OKAY.

19   Q.   BY MR. ALDRICH:  DOES THAT LOOK LIKE THE SUM TOTAL OF

20   THE REPORTS YOU PRODUCED IN THIS CASE, DR. BLOCK?

21   A.   I DON'T KNOW.  I CAN'T READ THE TITLES.

22   Q.   YOU WOULD HAVE TO ACTUALLY REVIEW ALL 1800 PAGES HERE TO

23   CONFIRM; IS THAT CORRECT?

24   A.   I'D BE HAPPY IF I COULD JUST READ THE TITLES.  FOR ALL I

25   KNOW, THIS IS A DICK NIXON OPERATION IN WHICH THERE ARE

COMPUTER-AIDED TRANSCRIPTION

1592

```
1    THOUSANDS OF NOTEBOOKS WITH NOTHING IN THEM.

2    Q.   OKAY.

3    A.   IF YOU WOULD SHOW ME WHAT IT SAYS, I COULD TELL YOU YES

4    OR NO.

5    Q.   SURE.  NO PROBLEM.

6    A.   COLUMBIA SPORTSWEAR NORTH AMERICA VERSUS SEIRUS.

7              THE COURT:  YOU DON'T NEED TO READ THEM.

8              THE WITNESS:  YES.  THIS SEEMS TO BE WORK THAT I

9    DID.

10   Q.   BY MR. ALDRICH:  OKAY.  DO YOU HAVE ANY REASON TO DOUBT

11   THAT THESE FOUR NOTEBOOKS CONTAIN THE OPINIONS THAT YOU

12   PROVIDED DURING THIS CASE?

13   A.   YOU'VE ONLY SHOWN ME THE FIRST ONE.

14   Q.   DO YOU WANT TO SEE THE OTHERS?

15   A.   YOU'VE GOT TO SHOW ME ALL OF THEM.

16   Q.   THAT'S FINE.  NO PROBLEM.

17   A.   THANK YOU.

18             THE WITNESS:  WELL, THIS ONE CONTAINS THAT IS LEGAL

19   AND BACK AND FORTH, WHICH I DID NOT WRITE.

20   Q.   BY MR. ALDRICH:  THIS WAS ATTACHED AS EXHIBITS TO YOUR

21   REPORT, THOUGH, WASN'T IT?

22   A.   WITHOUT GOING THROUGH EACH AND EVERY PAGE HERE, I CAN

23   ONLY SAY THE JURY WILL HAVE TO TAKE YOUR WORD FOR IT.

24   Q.   OKAY.  DO YOU WANT TO LOOK AT THE OTHERS?

25   A.   YES, SIR.  YES.  THESE ARE EXHIBITS.  AND FINALLY,
```

COMPUTER-AIDED TRANSCRIPTION

1593

1    VOLUME 4.

2            YES, THOSE FOUR VOLUMES DO CONTAIN THE MATERIAL THAT

3    I PROVIDED.

4    Q.   ABOUT 1800 PAGES; ISN'T THAT RIGHT?

5    A.   I DON'T KNOW.  I DIDN'T COUNT THEM.

6    Q.   BUT, DR. BLOCK, THERE IS ONE OPINION YOU DID NOT PUT IN

7    YOUR REPORT; ISN'T THAT CORRECT?

8    A.   AND THAT IS?

9    Q.   IS THERE?

10   A.   THERE ARE PROBABLY THOUSANDS OF OPINIONS THAT ARE NOT IN

11   MY REPORT.  YOU HAVE TO BE MORE EXACT.

12   Q.   RELEVANT TO THIS CASE.

13   A.   RELEVANT TO THIS CASE?

14   Q.   RELEVANT TO THIS CASE, IS THERE AN OPINION YOU DID NOT

15   PUT IN YOUR REPORT?

16           MR. SPROUL:  OBJECTION.  SCOPE.

17           THE COURT:  OVERRULED.  YOU CAN ANSWER THE

18   QUESTION.

19           THE WITNESS:  THANK YOU.

20           AGAIN, RELEVANT TO THIS CASE, I'LL GO FROM THOUSANDS

21   TO DOZENS.  PLEASE BE SPECIFIC.

22   Q.   BY MR. ALDRICH:  IT'S ABOUT TEN PAGES LEFT OUT OF YOUR

23   REPORT, DR. BLOCK.

24           MR. SPROUL:  OBJECTION, YOUR HONOR.

25           THE COURT:  HANG ON A SECOND.

1      MR. SPROUL:  THIS IS WHAT WE TALKED ABOUT EARLIER.

2      THE COURT:  MEMBERS OF THE JURY, I NEED YOU TO STEP

3  INTO THE ROOM, PLEASE.

4      (JURY ABSENT, 11:30 A.M.)

5      THE COURT:  PLEASE BE SEATED.

6      I DON'T KNOW WHAT THOSE TEN PAGES ARE.

7      MR. ALDRICH:  THOSE TEN PAGES ARE HIS INFRINGEMENT

8  ANALYSIS, THAT SEIRUS INFRINGES THE COLUMBIA PATENTS.  HE

9  DIDN'T PRODUCE IT DURING DISCOVERY.  WE FOUND OUT ABOUT IT AT

10  DEPOSITION.  AND THEN WE GOT THESE FOLLOW-UP PHOTOGRAPHS AND

11  HIS ANALYSIS WITH HIS CHART IN THE BACK SAYING THAT ALL THE

12  PRODUCTS FELL BETWEEN 62 AND 65 PERCENT COVERAGE.

13      MR. SPROUL:  IT'S NOT RELEVANT TO VALIDITY HERE,

14  YOUR HONOR.  WE DIDN'T OFFER HIM FOR INFRINGEMENT.  HE DID

15  NOT OFFER AN OPINION.  THEY HAD THEIR EXPERT GO UNREBUTTED.

16  THIS IS OUTSIDE THE SCOPE.

17      THE COURT:  SO I NEED TO KNOW MORE ABOUT THE

18  DOCUMENTS THEMSELVES.

19      MR. ALDRICH:  WOULD YOU LIKE A COPY?

20      THE COURT:  THAT WOULD BE FABULOUS.

21      MR. SPROUL:  YOUR HONOR, ONE THING I'LL NOTE IS

22  COUNSEL OBVIOUSLY HAS HAD THESE SINCE THE DEPOSITION, OR AT

23  LEAST SHORTLY AFTER THE DEPOSITION.  THEY PLACED THEM ON THE

24  EXHIBIT LIST ON THURSDAY NIGHT STRATEGICALLY.  THEY WERE NOT

25  PREVIOUSLY MARKED.  AND, SUBSEQUENTLY, WE DID NOT OFFER

1    DR. BLOCK ON INFRINGEMENT.

2         MR. ALDRICH:  WE'RE OFFERING THEM AS IMPEACHMENT

3    EXHIBITS, BECAUSE AT THE TIME YOU HAD SAID HE WAS GOING TO

4    TESTIFY ABOUT INFRINGEMENT.  NOW THEY ARE BEING OFFERED FOR

5    PURPOSES OF CREDIBILITY AND FOR PURPOSES OF LINKING THE

6    COMMERCIAL SUCCESS OF THE PATENTS TO SEIRUS' PRACTICING OF

7    THE PATENTS, BECAUSE DR. BLOCK HAS PROVIDED AN OPINION THAT

8    SEIRUS PRACTICES THE PATENTS.

9         MR. SPROUL:  THIS IS GRATUITOUS EVIDENCE, AND

10   WITHOUT THIS, THEY ALREADY HAVE EVIDENCE THAT THEY BELIEVE

11   ESTABLISHES COMMERCIAL SUCCESS.  THEY HAVE DR. COLE'S TESTING

12   THAT SHE HAS TESTIFIED TO IN THIS CASE.  THEY HAVE THEIR

13   ADDITIONAL MARKETING, ET CETERA, ET CETERA.  AND THIS IS

14   UNNECESSARY TO THEIR CASE.

15        THEY COULD HAVE CALLED HIM IN THEIR CASE-IN-CHIEF.

16   THEY COULD HAVE OFFERED THIS AFFIRMATIVELY AND THEY CHOSE NOT

17   TO.  THIS IS NOT RELEVANT TO THE ISSUE OF COMMERCIAL SUCCESS,

18   AND CERTAINLY IT'S NOT PROPERLY ADMITTED HERE, GIVEN THAT

19   THEY HAVE ALREADY PUT FORWARD THEIR AFFIRMATIVE EVIDENCE.

20        THE COURT:  THANK YOU.

21        MR. SPROUL:  THIS DOES NOT GO TO HIS OPINION OF

22   VALIDITY.

23        THE COURT:  WELL, IF DR. BLOCK WAS INCOMPLETE IN

24   THIS WAY, IN ISSUING HIS REPORT, AND THEY LATER FOUND OUT

25   THAT HE DID NOT ISSUE A COMPLETE REPORT AND WITHHELD

1596

1    EVIDENCE, THAT GOES TO HIS -- THE BIAS, INTEREST AND MOTIVES

2    OF THE WITNESS.  IT IS ADMISSIBLE FOR THAT PURPOSE.

3         MR. SPROUL:  SO, YOUR HONOR, HE PROVIDES THIS.  HE

4    PROVIDED TESTIMONY ABOUT THIS IN HIS DEPOSITION.  PRIOR

5    COUNSEL HAD NOT OFFERED IT AS PART OF HIS REPORT.  I'M NOT

6    SURE IT EVEN EXISTED AT THE TIME OF HIS REPORT.  I DON'T KNOW

7    THE TIMING FOR THIS PARTICULAR DOCUMENT.

8         THE COURT:  THAT'S AN ISSUE FOR REDIRECT.  BUT IF

9    YOU HAVE A WITNESS WHO, ESPECIALLY AN EXPERT WITNESS WHO

10   WITHHELD RELEVANT DOCUMENTS FROM A REPORT, AND FROM THE

11   CROSS-EXAMINATION PERSPECTIVE, THAT GOES TO THE BIAS, MOTIVE

12   AND INTEREST OF THE WITNESS, THEY ARE ENTIRELY ALLOWED TO

13   BRING THAT POINT FORWARD.

14        YOUR JOB ON REDIRECT IS TO EXPLAIN.  BUT CAN THEY

15   BRING THAT FORWARD IN ORDER TO SHOW THAT THIS WITNESS HAS A

16   BIAS, MOTIVE OR INTEREST, ABSOLUTELY.

17        MR. SPROUL:  THE PROBLEM HERE, THOUGH, YOUR HONOR,

18   IS THAT HE HASN'T OFFERED ANY TESTIMONY ON INFRINGEMENT.  AND

19   SO THIS WILL COME OUT SORT OF OUT OF THE BLUE AND WILL BE

20   DISJUNCTIVE WITH WHAT HIS DIRECT TESTIMONY WAS.  AND I THINK

21   THE JURY CAN BE CONFUSED BECAUSE IT'S NOT INCONSISTENT WITH

22   ANYTHING HE SAID.

23        THE COURT:  I AGREE.  AND, AGAIN, WHAT THE REMEDY

24   IS, ONE, YOU CAN EXPLAIN THAT, THAT IT'S NOT INCONSISTENT

25   WITH HIS PRIOR TESTIMONY; AND, TWO, I CAN INSTRUCT THE JURY

COMPUTER-AIDED TRANSCRIPTION

1    THAT IT'S NOT BEING OFFERED FOR PURPOSES OF WHETHER OR NOT

2    THERE WAS INFRINGEMENT, BUT ONLY AS IT GOES TO THE BIAS,

3    MOTIVES OR INTEREST OF THE WITNESS, AND THEY SHOULDN'T USE IT

4    IN ORDER TO DETERMINE WHETHER OR NOT THERE WAS INFRINGEMENT

5    OR WASN'T INFRINGEMENT, OR WHETHER THERE IS OR ISN'T

6    INVALIDITY.

7            BUT IT CERTAINLY GOES TO WHETHER OR NOT THERE WAS

8    FULL DISCLOSURE ON THE PART OF THE WITNESS WHEN THERE IS NOW

9    EVIDENCE THAT THIS WITNESS WITHHELD RELEVANT TESTIMONY AT THE

10   TIME THAT HE ISSUED HIS REPORT, AND IT WAS NOT ISSUED AT THAT

11   TIME.

12           MR. SPROUL:  SO I DO NOT UNDERSTAND -- I DON'T KNOW

13   THE TIMING OF THIS.  I DON'T KNOW WHEN IT WAS CREATED,

14   WHETHER OR NOT HE HAD IT AT THE TIME OF HIS REPORT.  BUT IN

15   THE CONTEXT OF AN EXPERT REPORT, IT'S NOT A MATTER OF

16   WITHHOLDING EVIDENCE.  HIS CRITICISM WAS VERY FOCUSED OF

17   TESTING METHODOLOGIES PERFORMED BY DR. COLE.  THIS IS NOT

18   INCONSISTENT WITH HIS CRITICISM OF DR. COLE.

19           SO IN THAT REGARD, HE DID NOT RELY ON HIS OWN

20   TESTING OR OTHER TESTING THAT SHOWED DIFFERENT NUMBERS.  HE

21   SIMPLY DIDN'T OFFER AN OPINION ON IT.  THAT'S NOT WHAT WE

22   WOULD TYPICALLY THINK OF AS HAVING WITHHELD EVIDENCE IN A

23   CASE SUCH AS THIS.

24           THE COURT:  THAT WOULD BE A MATTER FOR YOU TO

25   DISCUSS AND DESCRIBE IN REDIRECT EXAMINATION, WHERE YOU'RE

1598

1    ALLOWED TO EXPLAIN WHAT PRECISELY HAPPENED.  BUT AS I SEE IT,

2    THE WAY THAT THIS IS COMING OUT, IS THAT THERE WAS SOME

3    EVIDENCE OF NONINFRINGEMENT, AT LEAST ON THE BASIS -- EXCUSE

4    ME -- OF INFRINGEMENT ON THE BASIS OF HIS STUDY.  HE GETS TO

5    EXPLAIN IT HOWEVER HE WANTS TO, AND I THINK HE'LL BE GIVEN

6    THAT OPPORTUNITY IN REDIRECT.

7         BUT THE ISSUE AS TO WHETHER OR NOT IT'S COMING IN,

8    WHETHER IT'S ADMISSIBLE, IT IS FOR THE ISSUE OF BIAS, MOTIVE

9    OR INTEREST OF THE WITNESS.  YOUR OBJECTION IS OVERRULED.

10   THE JURY WILL BE BROUGHT IN.

11        MR. SPROUL:  THANK YOU, YOUR HONOR.

12        YOUR HONOR, WE ASK FOR THE LIMITING INSTRUCTION THAT

13   YOU OFFERED.

14        THE COURT:  OKAY.

15        (JURY PRESENT, 11:36 A.M.)

16        THE COURT:  PLEASE BE SEATED.

17        MEMBERS OF THE JURY, YOU'RE ABOUT TO HEAR A

18   CONVERSATION ABOUT PLAINTIFF'S EXHIBIT NO. 739, WHICH WILL BE

19   RECEIVED INTO EVIDENCE.  THE PURPOSE OF THIS EXHIBIT IS FOR

20   YOU TO DETERMINE THE BIAS, MOTIVES OR INTEREST OF THE WITNESS

21   AND FOR NO OTHER PURPOSE.

22        YOU MAY PROCEED.

23   Q.   BY MR. ALDRICH:  DR. BLOCK, WE WERE TALKING ABOUT TEN

24   PAGES THAT YOU DID NOT INCLUDE IN YOUR REPORT.

25        DO YOU REMEMBER THAT?

1599

1    A.    THAT IS CORRECT.

2    Q.    OKAY.  CAN WE PUT EXHIBIT 739 ON THE SCREEN, PLEASE.

3          DR. BLOCK, THIS IS --

4          THE CLERK:  IT WASN'T RECEIVED.

5          MR. ALDRICH:  SORRY.  OFFERED.

6          THE COURT:  RECEIVED.

7    (TRIAL EXHIBIT 739 RECEIVED IN EVIDENCE.)

8    Q.    BY MR. ALDRICH:  DR. BLOCK, THESE PAGES CONTAIN YOUR OWN

9    ANALYSIS OF SEIRUS' PRODUCTS; CORRECT?

10   A.    I DON'T KNOW WHAT YOU MEAN BY "ANALYSIS."

11   Q.    YOU TOOK PHOTOGRAPHS, DETAILED, HIGH-LEVEL PHOTOGRAPHS

12   OF SEIRUS' PRODUCTS; CORRECT?

13   A.    A, THEY ARE NOT DETAILED.  B, THEY ARE NOT HIGH LEVEL.

14   C, THEY ARE NOT PRODUCTS.

15   Q.    SO YOUR PHOTOGRAPHS AREN'T RELIABLE; IS THAT WHAT YOU'RE

16   SAYING?

17   A.    THAT'S WHY THEY WERE NOT -- NO, THAT'S NOT WHAT I'M

18   SAYING.

19   Q.    DR. BLOCK --

20   A.    PLEASE.  I'M TRYING TO REMEMBER WHAT YOU SAID.

21         THE COURT:  WAIT A MINUTE.

22         THE WITNESS:  I BELIEVE YOU SAID SOMETHING ABOUT MY

23   REPORT.  WOULD YOU PLEASE REPEAT WHAT IT WAS MR. ALDRICH

24   ASKED ME.

25         THE COURT:  NO.  YOU DON'T GET TO ASK THE REPORTER

1   TO READ.  YOU CAN --

2            THE WITNESS:  WOULD YOU PLEASE REPEAT.  I'M SORRY.

3   Q.   BY MR. ALDRICH:  YOU HAVE ABOUT TEN PAGES OF PHOTOGRAPHS

4   HERE THAT YOU TOOK OF SEIRUS' PRODUCTS WHERE YOU CALCULATED

5   THE TOTAL SURFACE AREA ON EACH OF THESE PHOTOGRAPHS OF

6   SEIRUS' HEATWAVE FABRIC; CORRECT?

7   A.   AGAIN, NOT PRODUCTS IN THE PLURAL.

8   Q.   THERE WERE FOUR GLOVES YOU ANALYZED; CORRECT?

9   A.   FOUR GLOVES; I DON'T RECALL THAT.

10  Q.   LET'S TURN TO THE LAST PAGE OF THE EXHIBIT.  THIS

11  CONTAINS THE SUMMARY OF YOUR ANALYSIS; CORRECT?

12  A.   YOU ARE CORRECT.  FOUR GLOVES.  I'LL CHANGE THAT, YES,

13  THESE ARE PRODUCTS.

14  Q.   AND YOU TOOK PHOTOGRAPHS, THREE PHOTOGRAPHS EACH OF FOUR

15  DIFFERENT GLOVES; CORRECT?

16  A.   THAT IS CORRECT.

17  Q.   AND YOU CALCULATED THE PERCENT COVERAGE OF THE ALUMINIUM

18  FOIL ON THE SURFACE AREA OF EACH OF THESE FOUR PRODUCTS;

19  CORRECT?

20  A.   THAT IS CORRECT.

21  Q.   AND YOU CALCULATED THAT THAT COVERAGE AREA WAS SOMEWHERE

22  BETWEEN 63 AND 69 PERCENT COVERAGE; CORRECT?

23  A.   WELL, I'VE GOT ONE NUMBER THAT'S DOWN AT 6.29 AND ONE

24  NUMBER THAT'S UP BY 66 -- 696.

25  Q.   AND ALL OF YOUR CALCULATIONS WERE BETWEEN 30 AND 70

1601

1    PERCENT; IS THAT CORRECT?

2    A.   YOU'VE BEEN TAKING LESSONS FROM DR. COLE, I SEE.  SHE

3    ALSO KNOWS NOTHING ABOUT STATISTICS.

4    Q.   WELL, FORTUNATELY YOU PROVIDED THE STATISTICAL ANALYSIS

5    HERE, DID YOU NOT?

6    A.   I DID NOT.  THAT'S WHY I'M SAYING IT --

7    Q.   OH, BUT OVER ON THE RIGHT, YOU DID A STANDARD DEVIATION

8    ANALYSIS; CORRECT?

9    A.   I DID NOT.  I REPORTED A STANDARD DEVIATION.  IT'S NOT

10   AN ANALYSIS.

11   Q.   I SEE.  YOU CALCULATED THE MEAN; CORRECT?  64.83 WAS THE

12   AVERAGE RESULT OF THE PHOTOGRAPHS THAT YOU TOOK?

13   A.   THAT IS CORRECT.

14   Q.   AND THEN YOU STOPPED; RIGHT?

15   A.   NO.  I ALSO GAVE YOU THE STANDARD DEVIATION.

16   Q.   OKAY.  BUT THEN YOU STOPPED DOING THE WORK, RIGHT,

17   BECAUSE YOU DIDN'T LIKE THE RESULTS; RIGHT?

18   A.   THAT IS CORRECT.

19   Q.   BECAUSE SEIRUS' LAWYERS TOLD YOU TO STOP DOING THE

20   ANALYSIS; RIGHT?

21   A.   THAT IS INCORRECT.

22   Q.   WHO TOLD YOU TO STOP DOING THE ANALYSIS?

23   A.   NO ONE.

24   Q.   YOU JUST DECIDED ON YOUR OWN, THIS DOESN'T LOOK LIKE

25   RESULTS I WANT TO FIND; IS THAT RIGHT?

COMPUTER-AIDED TRANSCRIPTION

1602

1    A.    THAT IS NOT AT ALL CORRECT.

2    Q.    WHY DID YOU STOP DOING THE ANALYSIS?

3    A.    BECAUSE I CONCLUDED THAT -- PARTICULARLY AFTER READING

4    DR. COLE'S REPORT, I CONCLUDED THAT EVERYTHING THAT I HAD

5    SAID ABOUT HER TECHNIQUE, HER METHODOLOGY AND HER CONCLUSIONS

6    WAS EXACTLY WHAT I WOULD -- YOU WOULD HAVE SAID TO ME IF THE

7    ROLES WERE REVERSED.  IT IS NOT GOOD WORK.  IT ALSO -- ALSO

8    IT WAS NOT DONE PRIOR TO THE WRITING OF MY REPORT.

9    Q.    DR. BLOCK, THE QUESTION I ASKED YOU WAS WHY DID YOU STOP

10   TAKING PHOTOGRAPHS.

11   A.    BECAUSE AS I JUST SAID, IF THE ROLES WERE REVERSED, YOU

12   WOULD CRITICIZE ME ON THIS WORK IN EXACTLY THE SAME WAY I

13   CRITICIZED DR. COLE ON HER TECHNIQUE, HER METHODOLOGY AND HER

14   CONCLUSIONS.  THIS IS NOT GOOD WORK.  IT IS NOT THE SORT OF

15   THING I WOULD PUBLISH.

16         YOU DON'T HAVE TO AGREE WITH ME.

17   Q.    BASED ON THE WORK THAT YOU DID?

18   A.    THIS WORK.

19   Q.    BASED ON THIS WORK THAT YOU DID --

20   A.    YES.

21   Q.    -- SEIRUS' GLOVES ALL INFRINGE THE '270 PATENT;

22   CORRECT?

23   A.    THAT IS NOT --

24         MR. SPROUL:  OBJECTION, YOUR HONOR.

25         THE COURT:  SUSTAINED.

1603

1    Q.   BY MR. ALDRICH:  BASED ON THIS WORK THAT YOU DID, THE

2    SEIRUS GLOVES HAVE 30- TO 70-PERCENT COVERAGE OF THE ALUMINUM

3    FOIL ON THE BASE FABRIC; CORRECT?

4              MR. SPROUL:  OBJECTION -- WITHDRAWN.

5              THE WITNESS:  I'M SORRY.  DID YOU OBJECT?

6              THE COURT:  GO AHEAD.

7              THE WITNESS:  DO I ANSWER?

8              THE COURT:  YES, PLEASE.

9              THE WITNESS:  BASED ON THE NUMBERS THAT YOU SEE

10   HERE, ACCORDING TO THE MANNER IN WHICH I DID THE ANALYSIS, I

11   FOUND A CERTAIN SET OF NUMBERS WITH A CERTAIN MEAN.  I ALSO

12   FOUND THAT THE WORK WAS SLOPPY, THAT THE WORK DID NOT

13   ACTUALLY POINT TO A PROPER ANSWER.

14             AND IF YOU'D LIKE TO ASK ME WHY I CONCLUDED THAT, I

15   WILL BE PLEASED TO ANSWER YOU.

16   Q.   BY MR. ALDRICH:  YOU CRITICIZED DR. COLE'S OPINION;

17   CORRECT?

18   A.   THAT IS CORRECT.

19   Q.   DR. COLE DID MORE TESTS THAN YOU DID, TOOK MORE

20   PHOTOGRAPHS; CORRECT?

21   A.   I DON'T KNOW.  HOW MANY PHOTOGRAPHS DID SHE TAKE?

22   Q.   I THINK SHE SHOWED THE JURY THAT SHE TOOK ABOUT 25

23   PHOTOGRAPHS.  DOES THAT SOUND RIGHT?  YOU WERE HERE, I

24   BELIEVE.

25   A.   I DIDN'T COUNT THE NUMBER OF HER PHOTOGRAPHS.

COMPUTER-AIDED TRANSCRIPTION

1   Q.   AND SHE USED A FULL UNIT CELL IN HER ANALYSIS, AND YOU

2   DID NOT; CORRECT?

3   A.   THAT IS ALSO CORRECT, YES.

4   Q.   YOU TESTED FOUR GLOVES; CORRECT?

5   A.   I TOOK PHOTOGRAPHS OF PORTIONS OF FOUR GLOVES, YES.

6   Q.   WHO GAVE YOU THE GLOVES?

7   A.   I BOUGHT THEM.

8   Q.   OKAY.  AND THEY WERE SEIRUS GLOVES; RIGHT?

9   A.   YES, THEY WERE.

10   Q.   AND DR. COLE DID A PIXEL-BY-PIXEL ANALYSIS; RIGHT?  SHE

11   HAD PHOTOSHOP CALCULATE EXACTLY HOW MANY PIXELS WERE IN THE

12   PHOTOGRAPH, AND THEN USED THAT AS A BASIS TO DETERMINE HOW

13   MANY PIXELS WERE LIGHT VERSUS HOW MANY PIXELS WERE DARK IN

14   ORDER TO DO HER CALCULATION.

15        DO YOU REMEMBER THAT?

16   A.   AND YOU HAVE JUST COME UP WITH ONE REASON WHY I DECIDED

17   THAT THIS WAS NOT APPROPRIATE WORK TO PUBLISH.

18   Q.   OKAY.

19   A.   THAT'S A REASON.

20   Q.   OKAY.  AND YOU DIDN'T DISCLOSE ANYWHERE IN YOUR REPORTS

21   THAT YOU WERE WITHHOLDING DATA FOR ANY PARTICULAR REASON;

22   CORRECT?

23        MR. SPROUL:  OBJECTION.  FOUNDATION.

24        THE WITNESS:  I HAD NOT DONE --

25        THE COURT:  YOUR OBJECTION -- REPHRASE YOUR

1605

1    QUESTION.

2            THE OBJECTION IS SUSTAINED.

3    Q.    BY MR. ALDRICH:  YES.  YOU HAD EXPLAINED EARLIER THAT IF

4    YOU EVER WITHHOLD REPORTS AS A SIGN -- WITHHOLD DATA AS A

5    SCIENTIST, THAT YOU AT LEAST DISCLOSE THE FACT THAT YOU'VE

6    WITHHELD DATA FOR SOME REASON; CORRECT?

7    A.    THAT IS NOT CORRECT.

8    Q.    THAT'S NOT WHAT YOU TESTIFIED TO --

9    A.    I SAID TO YOU THAT IF I WAS GOING TO PUBLISH AND I LEFT

10   DATA OUT OF WHAT I PUBLISHED, THAT I WOULD INFORM MY READERS

11   OF THAT.  I DID NOT SAY THAT I COULDN'T AS A PROPER SCIENTIST

12   NOT PUBLISH.

13   Q.    I'M GOING TO HAND YOU DR. COLE'S EXHIBIT 184.

14           HAVE YOU SEEN THIS BEFORE?

15   A.    184.  I HAVE SEEN THE SUMMARY OF PERCENT COVERAGE,

16   AUGUST 22, 2016.

17   Q.    AND THIS CONTAINS ABOUT 250 PAGES OF DR. COLE'S

18   ANALYSIS, SPREADSHEETS, PHOTOGRAPHS?

19   A.    I DON'T SEE ANY SPREADSHEETS.  THAT'S A HISTOGRAM.

20   Q.    THAT'S A HISTOGRAM PROVIDED AS A SPREADSHEET; CORRECT?

21   A.    THAT IS NOT A SPREADSHEET.

22   Q.    OKAY.  SO YOU'VE GOT ABOUT 250 PAGES THEN OF HISTOGRAMS

23   AND PHOTOGRAPHS?

24   A.    THAT'S TRUE, YEAH.

25   Q.    AND THE RESULTS OF DR. COLE'S ANALYSIS?

1606

1    A.    YES.  AND SHE DID THAT AFTER I CRITICIZED HER WORK.

2    Q.    AND YOU'VE HAD THIS ANALYSIS BY DR. COLE FOR ABOUT A

3    YEAR; CORRECT?

4    A.    I DID NOT HAVE THAT FOR ABOUT A YEAR AT THE TIME I WROTE

5    MY REPORT.

6    Q.    NO.  BUT AS OF TODAY.  AS OF TODAY, YOU'VE HAD THIS FOR

7    ABOUT A YEAR; RIGHT?

8    A.    YES.  IT'S FROM AUGUST OF 2016, YES.

9    Q.    OKAY.  DID YOU FIND A SINGLE MISTAKE?

10   A.    YES.  I CRITICIZED THE ENTIRE WORK AS BEING WRONG.  IT'S

11   NO DANG GOOD.  IT'S LOTS AND LOTS OF PAGES OF JUNK.  AND THAT

12   IS WHY I DECIDED TO WITHHOLD -- NOT PUBLISH.

13   Q.    WITHHOLD?

14   A.    NOT PUBLISH.

15   Q.    CONCEAL?

16   A.    OH, THAT IS A TERRIBLE WORD.

17   Q.    IT SOUNDS BAD FOR A SCIENTIST; RIGHT?

18         MR. SPROUL:  OBJECTION.

19         THE COURT:  WAIT.  YOU ARE TALKING OVER EACH OTHER.

20   PLEASE STOP.

21         YOU MAY ASK A QUESTION.

22         MR. ALDRICH:  MY APOLOGIES, YOUR HONOR.

23         THE WITNESS:  MAY I FINISH MY ANSWER?

24   Q.    BY MR. ALDRICH.  SURE.

25   A.    AS I SAID, NOT PUBLISH, NOT DISCLOSE.  FIRST, THIS WAS

1607

1    DONE AFTER I WROTE MY REPORT.

2    Q.   WHICH REPORT?

3    A.   THE FIRST REPORT THAT YOU REFERRED TO ON INVALIDITY.

4    Q.   YES.  BUT THE SECOND REPORT WAS ON NONINFRINGEMENT, WAS

5    IT NOT?

6    A.   I AM NOT TESTIFYING TO NONINFRINGEMENT.  AND THERE IS A

7    REASON WHY.  THE WORK THAT I HAVE HERE IN THESE TEN PAGES IS

8    JUST AS BAD AS THE WORK THAT DR. COLE PRODUCED.  AND I WASN'T

9    GOING TO GET UP THERE AND SAY WHICH ONE OF US IS THE WORST

10   SCIENTIST.  IT'S JUST NOT GOOD, WHAT I DID HERE.  IN FACT, I

11   WOULD SAY IT'S WORSE THAN WHAT DR. COLE DID.

12   Q.   THANK YOU, DR. BLOCK.

13        ON PAGE 7 OF YOUR INVALIDITY REPORT --

14   A.   YES.

15   Q.   DO YOU HAVE THAT REPORT IN FRONT OF YOU?

16   A.   INVALIDITY.  I THINK BY THE TIME I FIND IT, IT WOULD BE

17   A LOT EASIER IF YOU JUST BROUGHT IT UP TO ME AND SAID HERE,

18   THIS IS WHAT I'M TALKING ABOUT.

19        MR. SPROUL:  I DON'T BELIEVE WE PROVIDED DR. BLOCK'S

20   INVALIDITY REPORT.

21        THE WITNESS:  I DON'T HAVE MY REPORT.

22        MR. ALDRICH:  DON'T HAVE YOUR REPORT.  THANK YOU.

23        THE COURT:  OKAY.

24   Q.   BY MR. ALDRICH:  YOU UNDERSTAND, HOWEVER, DR. BLOCK,

25   THAT IN ORDER FOR A CLAIM TO BE INVALID AS ANTICIPATED BY THE

1608

1    PRIOR ART, EVERY ELEMENT OF THAT CLAIM MUST BE FOUND, EVERY

2    ELEMENT MUST BE FOUND IN A SINGLE PRIOR ART REFERENCE;

3    RIGHT?

4    A.    THAT IS CORRECT, YES.

5    Q.    THAT'S YOUR UNDERSTANDING OF THE LAW?

6    A.    THAT'S MY UNDERSTANDING OF THE LAW.

7    Q.    AND YOUR UNDERSTANDING IS THAT SEIRUS BEARS THE BURDEN

8    OF PROVING THAT BY CLEAR AND CONVINCING EVIDENCE; IS THAT

9    RIGHT?

10   A.    THAT IS MY UNDERSTANDING.

11   Q.    AND THE REASON FOR THAT HIGHER BURDEN IS BECAUSE THE

12   PATENT OFFICE HAS ALREADY DETERMINED THAT THE PATENT IS

13   VALID; CORRECT?

14   A.    I DON'T KNOW WHY THE LAW SAYS WHAT IT SAYS.

15   Q.    AND THERE WERE -- IN YOUR REPORT, YOU OPINED ABOUT A

16   NUMBER OF PATENTS LIKE YOU DO TODAY; CORRECT?

17   A.    THAT IS CORRECT.

18   Q.    AND ONE OF THOSE WAS FOTTINGER; CORRECT?

19   A.    THAT IS CORRECT.

20   Q.    YOU WROTE EXTENSIVELY ABOUT FOTTINGER; CORRECT?

21   A.    DEFINE "EXTENSIVELY."

22   Q.    SIGNIFICANT PORTION OF YOUR REPORT WAS DEVOTED TO YOUR

23   ANALYSIS OF FOTTINGER; CORRECT?

24   A.    PLEASE DEFINE "SIGNIFICANT PORTION."

25   Q.    DO YOU HAVE AN UNDERSTANDING OF WHAT "SIGNIFICANTLY"

1609

1    MEANS?

2    A.    YES, I DO.

3    Q.    OKAY.  WAS IT --

4    A.    I WOULD LIKE YOU TO TELL ME WHAT YOU THINK A SIGNIFICANT

5    PORTION IS.

6    Q.    I WOULD JUST LIKE TO USE YOUR OWN DEFINITION OF

7    SIGNIFICANT AS YOU USE IT IN EVERYDAY PARLANCE AND TO TELL ME

8    WHETHER YOU DID A SIGNIFICANT ANALYSIS REGARDING FOTTINGER?

9    A.    I DID A VERY SIGNIFICANT ANALYSIS REGARDING FOTTINGER.

10   IT IS NOT NECESSARILY VERY LONG.  IT DID NOT NECESSARILY MAKE

11   UP A MAJOR PORTION OF MY REPORT.  BUT THE ANALYSIS, AS

12   SUCCINCT AS IT MIGHT HAVE BEEN, WAS VERY GOOD.

13   Q.    OKAY.  CAN WE PULL UP PAGE 148 OF DR. BLOCK'S

14   DEPOSITION.

15         DO YOU REMEMBER GIVING A DEPOSITION IN THIS CASE?

16   A.    I MUST ADMIT THAT MY MEMORY OF THE DEPOSITION IS VERY

17   LIMITED.

18   Q.    THAT'S FINE.  YOU REMEMBER AT LEAST GIVING A DEPOSITION,

19   THOUGH; RIGHT?

20   A.    I REMEMBER THAT THERE WAS A DEPOSITION.

21   Q.    OKAY.  AND YOU AND I MET IN ATLANTA, GEORGIA; RIGHT?

22   A.    THAT'S CORRECT.

23   Q.    AND IT WAS AT THE OFFICES OF ONE OF SEIRUS' LAWYER'S

24   FIRMS?

25   A.    IT WAS AT -- YES, THE LAWYER'S OFFICES.

1610

1   Q.   OKAY.  AND AT THAT DEPOSITION, I ASKED YOU A NUMBER OF

2   QUESTIONS AND YOU GAVE YOUR ANSWERS; CORRECT?

3   A.   YES.  YES.

4   Q.   AND YOU TESTIFIED UNDER OATH; CORRECT?

5   A.   THAT IS CORRECT.

6   Q.   AND YOU TESTIFIED TRUTHFULLY; CORRECT?

7   A.   TO THE BEST OF MY ABILITY, YES.

8            MR. ALDRICH:  I SEEM TO HAVE THE WRONG PAGE.  GIVE

9   ME JUST A MINUTE.  SORRY.

10            OH, I'M SORRY.  CAN WE GO TO PAGE 143 OF THE

11   DEPOSITION.  CAN WE PUBLISH, YOUR HONOR?

12            THE COURT:  NOT YET.

13            WHAT IS IT THAT YOU'RE ASKING?

14            MR. ALDRICH:  WELL, I CAN JUST ASK THE QUESTION FOR

15   STARTERS.

16            THE COURT:  THERE WE GO.

17            MR. ALDRICH:  THANK YOU.

18   Q.   DO YOU REMEMBER AT YOUR DEPOSITION I ASKED YOU THE

19   FOLLOWING QUESTION, MR. BLACKFORD.

20   A.   I'M MR. BLOCK.  WOODY IS THE OTHER GUY.

21   Q.   YOU'RE BLOCK.  RIGHT, YOU'RE DR. BLOCK.  ALL RIGHT.

22   A.   DR. BLOCK.

23   Q.   I ASKED YOU WHICH OF THESE PATENTS DO YOU THINK IS THE

24   CLOSEST TO MR. BLACKFORD'S INVENTION.  DO YOU SEE THAT?

25   A.   I RECALL THAT, YES.  I SEE IT RIGHT THERE.

1611

1   Q.   AND YOUR ANSWER AT THE BOTTOM SAYS, I DON'T THINK ANY

2   ONE LISTS ALL OF THE REQUIREMENTS OF BLACKFORD'S PATENTS.

3        DO YOU SEE THAT?

4   A.   YES, I DO.

5   Q.   AND THAT WAS YOUR TESTIMONY THEN UNDER OATH; CORRECT?

6   A.   YES, IT WAS.

7   Q.   THAT MEANS THAT NOT A SINGLE ONE OF THE PATENTS,

8   INCLUDING BLACKFORD -- I'M SORRY, INCLUDING FOTTINGER, THAT

9   YOU INCLUDED IN YOUR REPORT, NOT A SINGLE ONE INCLUDED ALL OF

10  THE REQUIREMENTS OF BLACKFORD'S PATENTS; CORRECT?

11  A.   AT THAT TIME, THAT WAS A CORRECT STATEMENT, BECAUSE AT

12  THAT TIME, WE WERE DISCUSSING THE '119 PATENT AND THE '270

13  PATENT; AND EACH OF THEM HAS SOMETHING LIKE 25 CLAIMS.

14       IT WAS NOT UNTIL VERY RECENTLY, LONG AFTER THIS

15  DEPOSITION, THAT THE COURT DECIDED YOU WOULD LIMIT OUR WORK

16  TO FOTTINGER, AND WE HAVE THE FOUR SECONDARY SOURCES AS WELL.

17  Q.   OKAY.  SO YOUR TESTIMONY --

18  A.   SO AT THAT TIME --

19  Q.   SORRY.

20  A.   -- THIS IS FINE.  THIS IS A PROPER ANSWER.

21  Q.   OKAY.  SO YOUR TESTIMONY AT THAT TIME WAS NONE OF THE

22  PATENTS DISCLOSED ALL OF THE LIMITATIONS OF THE CLAIMS

23  BECAUSE THERE WAS ALSO ANOTHER PATENT THAT WAS IN DISPUTE AT

24  THAT TIME; IS THAT CORRECT?

25  A.   NOT ALL THE PATENTS LIST ALL OF THE REQUIREMENTS OF

1612

1   BLACKFORD'S PATENTS.  THERE ARE 25 CLAIMS TO EACH OF THOSE

2   TWO PATENTS.

3   Q.   ALL RIGHT.  LET'S GO TO PAGE 148 THEN.

4        SO NOW I'M SHOWING YOU PAGE 145 OF YOUR DEPOSITION.

5        DO YOU SEE THAT?

6   A.   YES, I DO.

7   Q.   AND HERE WE'RE TALKING MORE SPECIFICALLY ABOUT THE '270

8   PATENT; CORRECT?

9   A.   CLAIM 20 -- CLAIM 23 OF THE '270 PATENT.

10  Q.   RIGHT.  WE'RE TALKING SPECIFICALLY ABOUT ONE OF THE

11  CLAIMS THAT IS STILL IN DISPUTE TODAY; CORRECT?

12  A.   THAT IS CORRECT, THE 23 CLAIM.

13  Q.   CLAIM 23.  AND I ASKED THE QUESTION, SO MY QUESTION IS,

14  DO ANY OF THE PRIOR ART PATENTS COVER ALL OF THE LIMITATIONS

15  OF CLAIM 23 OF THE '270 PATENT.

16       DO YOU SEE THAT?

17  A.   IF YOU WILL TAKE AWAY THAT VERY LARGE GRAPHIC SO I CAN

18  SEE THE ENTIRE PAGE, I'D APPRECIATE IT.

19  Q.   SURE.  LET'S JUST BACK IT OUT.

20       YOUR HONOR, CAN WE PUBLISH THIS FOR IMPEACHMENT?

21       THE COURT:  HANG ON A SECOND.  GO AHEAD AND TAKE A

22  LOOK AT IT.

23       THE WITNESS:  YOU ASKED --

24       THE COURT:  WAIT.  JUST TAKE A LOOK AT IT, PLEASE.

25       THE WITNESS:  OKAY.  YES.  THANK YOU.

COMPUTER-AIDED TRANSCRIPTION

1    THE COURT:  YOU WANT THAT PUBLISHED FOR IMPEACHMENT

2    PURPOSES?

3    MR. ALDRICH:  IT'S OKAY, YOUR HONOR.

4    Q.   AGAIN, I ASKED YOU THE QUESTION:  DO ANY OF THE TEN

5    PRIOR ART PATENTS COVER ALL OF THE LIMITATIONS OF CLAIM 23 OF

6    THE '270 PATENT; CORRECT?

7    A.   YES, YOU DID.

8    Q.   AND YOUR ANSWER WAS "NO"; ISN'T THAT RIGHT?

9    A.   YES.  AND THEN YOU ASKED ME, WHY DO YOU SAY NO.  AND I

10   SAID TO YOU, IT'S THE 7:3 TO 3:7 RATIO.  NOT ALL OF THEM SAY

11   7:3 TO 3:7 RATIO.

12   Q.   BUT YOUR OPINION AT THE TIME WAS THAT NOT A SINGLE PRIOR

13   ART REFERENCE, NOT A SINGLE PIECE OF PRIOR ART COVERED ALL OF

14   THE LIMITATIONS OF CLAIM 23; ISN'T THAT RIGHT?

15   A.   THAT IS BECAUSE I WAS CONFUSED AS TO THE MEANING OF

16   RANGE.  I THOUGHT AT THAT TIME THAT IF THE PATENT DIDN'T

17   SPECIFICALLY SAY 3:7 TO 7:3, THEN IT DID NOT COVER THE CLAIM

18   OF -- OF ABOUT 7:3 TO 3:7.

19   I WAS IN ERROR AT THAT TIME, AND I APOLOGIZE IF I

20   LED YOU ASTRAY.

21   Q.   AND SO AFTER DRAFTING 1500 PAGES OF EXPERT REPORT AND

22   WORKING FOR $350 AN HOUR FOR AN UNTOLD PERIOD OF TIME IN

23   PREPARATION FOR YOUR WORK, YOU WERE CONFUSED ABOUT WHAT LEGAL

24   STANDARD YOU WERE SUPPOSED TO APPLY TO THIS CASE?

25   A.   THE PRELIMINARIES TO THAT QUESTION ARE IRRELEVANT.  YES,

1614

1    I WAS CONFUSED ABOUT THE LEGAL STANDARD TO BE APPLIED TO THIS

2    CASE AT THAT TIME.  AND AS I SAY, I HAVE A VERY VAGUE

3    RECOLLECTION OF THAT DAY.

4    Q.   AND YOU UNDERSTAND THAT IF NO SINGLE PIECE OF PRIOR ART

5    CONTAINS EVERYTHING IN THE CLAIM, THEN THERE IS NO

6    ANTICIPATION; CORRECT?

7    A.   THAT IS MY -- PLEASE REPEAT THAT.

8    Q.   YOU UNDERSTAND THAT IF NO SINGLE PIECE OF PRIOR ART

9    CONTAINS EVERYTHING IN THE CLAIM, THEN THERE IS NO

10   ANTICIPATION; CORRECT?

11   A.   THAT IS CORRECT.  THAT IS MY UNDERSTANDING.

12   Q.   NOW, AFTER YOU SAID AT YOUR DEPOSITION THAT NO SINGLE

13   PIECE OF PRIOR ART ANTICIPATES CLAIM 23, DID SEIRUS OR ITS

14   LAWYERS TALK TO YOU ABOUT THAT TESTIMONY?

15   A.   ACTUALLY, NO, THEY DID NOT.

16   Q.   BUT YOU'VE CHANGED YOUR OPINION AS YOU COME TO COURT

17   TODAY; IS THAT RIGHT?

18   A.   I'VE LEARNED SOMETHING, YES.

19   Q.   LET'S TALK ABOUT FOTTINGER.

20        MR. ALDRICH:  YOUR HONOR --

21        THE COURT:  YES.

22        MR. ALDRICH:  I CAN PROCEED WITH FOTTINGER.

23        THE COURT:  IF YOU'RE TURNING TO A NEW TOPIC, THIS

24   WOULD BE A GOOD TIME TO TAKE OUR MIDDAY RECESS.  LET'S BE IN

25   RECESS FOR ONE HOUR.

COMPUTER-AIDED TRANSCRIPTION

1615

1    I'LL SEE YOU BACK AT ABOUT 1 O'CLOCK.

2    (JURY ABSENT, 12:01 P.M.)

3    THE COURT:  WE WILL RECONVENE IN ONE HOUR.

4    (RECESS, 12:01 P.M.)

5    --OOO--

6    C E R T I F I C A T I O N

7    I HEREBY CERTIFY THAT I AM A DULY APPOINTED,
QUALIFIED AND ACTING OFFICIAL COURT REPORTER FOR THE UNITED
8    STATES DISTRICT COURT; THAT THE FOREGOING IS A TRUE AND
CORRECT TRANSCRIPT OF THE PROCEEDINGS HAD IN THE
9    AFOREMENTIONED CAUSE; THAT SAID TRANSCRIPT IS A TRUE AND
CORRECT TRANSCRIPTION OF MY STENOGRAPHIC NOTES; AND THAT THE
10   FORMAT USED HEREIN COMPLIES WITH THE RULES AND REQUIREMENTS
OF THE UNITED STATES JUDICIAL CONFERENCE.

11

12   DATED:  SEPTEMBER 25, 2017, AT SAN DIEGO,
CALIFORNIA.

13                                    S/CAMERON P. KIRCHER
                                     CAMERON P. KIRCHER
14

15

16

17

18

19

20

21

22

23

24

25

COMPUTER-AIDED TRANSCRIPTION

1        United States District Court

2     For the Southern District of California

3

4                                    )
   COLUMBIA SPORTSWEAR NORTH          )
5  AMERICA, INC., an Oregon           )    No. 17-cv-1781-HZ
   corporation,                       )
6                                     )    September 25, 2017
                                      )
7         Plaintiff,                  )    San Diego, California
                                      )
8         v.                          )
                                      )
   SEIRUS INNOVATIVE ACCESSORIES.     )
9  INC., a Utah Corporation,          )
                                      )
10                                    )
          Defendant.                  )
11

12

13                  Volume 6 - PM Session

14          Reporter's Transcript of Proceedings

15        BEFORE THE HONORABLE MARCO A. HERNANDEZ

16             United States District Judge

17

18

19

20

21

22

23  Court Reporter:        Dana Peabody, RDR, CRR
                           District Court Clerk's Office
24                         333 West Broadway, Suite 420
                           San Diego, California, 92101
25                         DanaPeabodyCSR@gmail.com

APPEARANCES:

For the Plaintiff:          SCHWABE, WILLIAMSON & WYATT, P.C.
                            NIKA F. ALDRICH, JR., ESQ.
                            DAVID W. AXELROD, ESQ.
                            BRENNA LEGAARD, ESQ.
                            1211 SW 5th Avenue, Suite 1900
                            Portland, Oregon 97204

For the Defendant:          FISH & RICHARDSON, P.C.
                            CHRISTOPHER S. MARCHESE, ESQ.
                            SETH M. SPROUL, ESQ.
                            GARRETT SAKIMAE, ESQ.
                            12390 El Camino Real
                            San Diego, California 92130

For the Defendant:          MARKOWITZ HERBOLD, P.C.
                            RENEE ROTHAUGE, ESQ.
                            1211 SW Fifth Avenue, Suite 3000
                            Portland, Oregon 97204

```
 1  Case:   Columbia v. Seirus
    Date:   September 25, 2017
 2

 3                        INDEX OF WITNESSES

 4
    FOR THE DEFENDANT:
 5                          E X A M I N A T I O N
                              DIRECT   CROSS  REDIRECT RECROSS
 6
    Ira Block, Ph.D.
 7    Mr. Aldrich                        1619
      Mr. Sproul                                          1678
 8
    Wendy Carey
 9    Mr. Sakimae                 1699              1745
      Mr. Axelrod                        1728
10
    Carrie Distler
11    Mr. Marchese                1748

12                        INDEX OF EXHIBITS

13  EXHIBIT                                       EVIDENCE

14  Page 8 of Block's Report                          1649

15  1364                                              1699

16  1368                                              1699

17  1369                                              1699

18  1372                                              1699

19  1418                                              1725

20  1423                                              1725

21  1435                                              1725

22  1436                                              1725

23

24

25
```

|       |    |                                                                        |
|-------|----|------------------------------------------------------------------------|
|       | 1  | San Diego, California, September 25, 2017                               |
|       | 2  | * * *                                                                  |
|       | 3  | (Proceedings held in the presence of the jury panel.)                  |
|       | 4  | THE COURT:  Please be seated.  You may proceed.                        |
| 01:03 | 5  | MR. ALDRICH:  Thank you, Your Honor.                                   |
|       | 6  | CROSS-EXAMINATION                                                      |
|       | 7  | BY MR. ALDRICH:                                                        |
|       | 8  | Q.  Dr. Block, I'd like to talk for a little bit about                 |
|       | 9  | Fottinger.  All right.  You're familiar with Fottinger?                |
| 01:03 | 10 | A.  We've spoken, but I'm not all that close to him.                   |
|       | 11 | Q.  Okay.  And you recognize, again, that in order to prove            |
|       | 12 | anticipation, Seirus has to prove by clear and convincing              |
|       | 13 | evidence that Fottinger contains every single part of claims 2         |
|       | 14 | and 23, right?                                                         |
| 01:03 | 15 | A.  That is my understanding.                                          |
|       | 16 | Q.  Okay.  And one part of the asserted claims requires that           |
|       | 17 | the heat-directing elements have to be on the innermost surface        |
|       | 18 | of the garment, correct?                                               |
|       | 19 | A.  That is correct.                                                   |
| 01:04 | 20 | MR. ALDRICH:  Okay.  And so if we could call up               |
|       | 21 | slide -- defendant's slide 523.                                        |
|       | 22 | Can we publish?                                                        |
|       | 23 | THE COURT:  This has already been received?                   |
|       | 24 | MR. ALDRICH:  Correct.                                        |
| 01:04 | 25 | THE COURT:  Yes.                                              |

1   BY MR. ALDRICH:

2   Q.   And this was the basis for your opinion that Fottinger

3   discloses being on the innermost surface, correct?

4   A.   That is correct.

01:04   5   Q.   Okay.   And just to go back to what Fottinger's all about,

6   Fottinger takes a bunch of chemicals and creates what's called

7   "a binder," correct?

8   A.   He called it a binder, that is correct.

9   Q.   Okay.   And the binder is basically a form of glue, right?

01:05   10   A.   That is not correct.

11   Q.   Oh, what is a binder?

12   A.   That is one of the definitions of binder.

13   Q.   Okay.

14   A.   That is, you can bind something to something else with the

01:05   15   way you've glued.   You can also bind something inside a

16   capsule.   You can also bind someone with a rope.   So in essence

17   what Fottinger is using the word "binder" here as, he is taking

18   his aluminum powder, and he is binding it in a vehicle that

19   will allow him to put his elements on the surface of a fabric.

01:05   20   Q.   And that's what I wanted to get at for starters.   First of

21   all, Fottinger is not dealing with like a highly reflective

22   foil like Mr. Blackford was referring to, correct?

23   A.   He is not dealing with a foil.   I don't know why you say

24   it's not highly reflective.

01:05   25   Q.   Well, it's aluminum powder, right?

1     A.    That is correct.

2     Q.    And it's actually only about 8 percent aluminum powder as

3     it's mixed together, correct?

4     A.    His formula is about 8 percent aluminum powder; however,

01:06    5     after all the volatiles have dried off or been given off, there

6     is a larger amount, so I don't know why you say it's not a

7     highly reflective surface.

8     Q.    In fact, it actually has more rubber in his formulation

9     than aluminum powder, right?

01:06    10    A.    If you will show me Fottinger and allow me to look at his

11    example, I will tell you if there's more rubber there than

12    anything else.

13          MR. ALDRICH:    Can we call up Exhibit 1140.    And could

14    we go to page -- sorry.    It's not the 1140 I thought we were

01:07    15    looking at.    How about 503?    This is the same Fottinger.    It's

16    just our marking number.

17          MR. SPROUL:    I think 1040 was the --

18          MR. ALDRICH:    Let's go to 1040.    As long as that's the

19    version in the record, that's fine.

01:07    20        And if we could go to page -- the third page, 634, and zoom

21    in on the section there.

22    BY MR. ALDRICH:

23    Q.    This is the formulation --

24    A.    Excuse me.    Up.    Starting with the word example.

01:07    25    Q.    Oh, okay.    All right.    And you see here he's got his

1    formulation, correct?

2    A.   This is his formulation for his fabric and also for his

3    printing paste.

4    Q.   Okay.  And the printing paste is -- at least in the

01:08   5    mixture, it's a total of about 1200 parts, correct?

6    A.   That is correct.

7    Q.   And the aluminum powder is 100 parts, correct?

8    A.   That is also correct.

9    Q.   And then there's the substance called polybutadiene,

01:08  10    correct?

11    A.   That is correct.

12    Q.   And that's rubber, right?

13    A.   It is a kind of rubber, yes, it is.

14    Q.   And there's more rubber in his printing paste than there is

01:08  15    aluminum powder, correct?

16    A.   That was not the question you asked me.

17    Q.   That's the question I'm asking now, though.

18    A.   You asked me a question --

19          THE COURT:  Wait a minute.  He's asking you a question

01:08  20    now.  Just answer the question.

21          THE WITNESS:  But I didn't get to answer his first

22    question.

23          THE COURT:  Don't argue with the judge.

24          THE WITNESS:  I'm not arguing, sir.

01:09  25          THE COURT:  I told you to answer his question.

1    THE WITNESS:  Yes, sir.

2    THE COURT:  Ask your question again.

3  BY MR. ALDRICH:

4  Q.   There's more rubber than aluminum powder in his mixture,

5  correct?

6  A.   One is 100 parts, one's 150 parts.  Yes, that is correct.

7  Q.   Okay.  So what Fottinger really has is this rubbery binder

8  with some aluminum powder mixed in, correct?

9  A.   Again, you're making assumption because you don't know what

10  rubber means.

11  Q.   Okay.  But your testimony is, if I understand correctly,

12  that this solution is going to be highly reflective.  Is that

13  right?

14  A.   I did not say that.  You said it.

15  Q.   That's fine.

16  A.   Excuse me, please.  You said it was not highly reflective

17  because it's just a bunch of rubber with a little bit of powder

18  in it.  I said, "You can't say that."

19    You then said, "Let us look at it."

20    I said, "All right.  We'll look at it."

21    You then said, "There is 150 parts of polybutadiene and 100

22  parts of powder."

23    I said, "Yes, that is true.  That does not mean that this

24  is a rubbery substance that is not highly reflective."

25  Q.   The aluminum powder is the only part of this substance that

1  can actually reflect heat, correct?

2  A.   Oh, no.   That is very, very wrong.

3  Q.   I see.   So the rubber can reflect heat.   Is that right?

4  A.   Excuse me.   When you say "rubber," you mean the

01:10  5  polybutadiene?

6  Q.   Yes.

7  A.   Yes, of course it can.

8  Q.   I see.   In your opinion, though, everything in the world

9  reflects heat, correct?

01:10  10  A.   That is not my opinion.   That's Planck's law.   If you wish

11  to overthrow Planck's law, go ahead.

12  Q.   I see.   Okay.

13       MR. ALDRICH:   Let's go back to defendant's

14  demonstrative Exhibit 523.

01:11  15  BY MR. ALDRICH:

16  Q.   And Exhibit 523, this was your opinion that the use of

17  their heat-directing elements, they are drops of this rubbery

18  binder with aluminum powder mixed in, but this was the basis of

19  your opinion that it is on the innermost surface of the

01:11  20  garment, correct?

21  A.   May I just ask that you remove the word "rubbery" from your

22  question?

23  Q.   Sure.   The polybutadiene-based mixture.

24  A.   It is not a polybutadiene-based mixture.   Could you just

01:11  25  say it's a mixture containing aluminum powder?

1  Q.    Okay.   The binder mixture.

2  A.    Fine.

3  Q.    Okay.   And this was the basis of your opinion that it is on

4  the innermost surface of the garment, correct?

01:12  5  A.    Fottinger specifically states the coated face will be on

6  the inside of the article.

7  Q.    I wanted to look at that clause a little more carefully,

8  though.   First it talks about -- it says, "The products of the

9  invention are very suitable for use as interlinings and as

01:12  10  lining fabrics."  Do you see that?

11  A.    Yes, I do.

12  Q.    Okay.   And you testified earlier that an interlining was

13  the type of stiffening fabric that is on the inside of my

14  lapel, correct?

01:12  15  A.    That is correct.

16  Q.    Okay.   So the fact that it's on interlining fabrics is

17  irrelevant to whether or not it could be on the innermost

18  surface of the garment, correct?  The interlining would never

19  be the innermost surface of the garment, right?

01:13  20  A.    That is correct.   An interlining will not be the innermost

21  surface.

22  Q.    Okay.   And then the second part of this says that it could

23  be on lining fabrics, right?

24  A.    That is also correct.

01:13  25  Q.    And lining fabrics can be oriented either toward the user

1    or away from the user, right?

2    A.   Yes, I said that, yes.

3    Q.   And there's nothing here that tells you how it is supposed

4    to be oriented, only that it is supposed to go on the lining

01:13    5    fabric, correct?

6    A.   Am I speaking as a PHOSITA, or am I just to answer your

7    question in the most narrow way possible?

8    Q.   You're just supposed to answer that the fact that it

9    discloses a lining fabric doesn't tell you which way that

01:13    10    lining fabric is supposed to be oriented, right?

11    A.   If we limit ourselves to that one particular phrase, you

12    are correct.

13    Q.   Okay.  And then there's a third clause that you relied on

14    which is the second sentence on the screen here, correct?

01:14    15    A.   Well, there are only two clauses in that.  I think you mean

16    "the coated face will."  Is that --

17    Q.   I miscounted.  Okay.

18         So the first we covered was the interlinings.  We said that

19    that's irrelevant.  We talked about linings.  And with respect

01:14    20    to linings, that does not show by clear and convincing evidence

21    that it is on the innermost surface of the garment, correct?

22    A.   For the moment and for the argument, I will agree with you.

23    Q.   Okay.  So then we go to the third clause, and the third

24    clause says they may be also used as outer fabrics for the

01:14    25    article of clothing, correct?

1    A.    That is correct.

2    Q.    And the outer fabric is the piece of fabric that's on the

3    outside of my jacket, correct?

4    A.    That is also correct.

01:14    5    Q.    And so if you put the binder with aluminum powder mixed

6    into it, if you put that on the outer fabric, it's not on

7    the -- it's not on the innermost surface of the garment, right?

8    A.    You are making an assumption that is not warranted.

9    Q.    Dr. Block, there's nothing here in this last clause that

01:15    10    says that the binder powder goes on the inside of the garment,

11    right?  It only says it goes on the inside of the outer fabric,

12    right?

13    A.    And you then went ahead and said that the coated -- that if

14    you have an outer fabric for articles of clothing that that

01:15    15    outer fabric must necessarily have a liner.  And I say you're

16    making an unwarranted assumption.

17    Q.    Well, Dr. Block, you wouldn't call it an outer fabric

18    unless there's another piece of fabric, right?

19    A.    That is not true.

01:15    20    Q.    Okay.  But this line does not show by clear and convincing

21    evidence that the aluminum powder binder, substance, goo, goes

22    on the inside of the garment, correct?

23    A.    I'm afraid you've used a term of art that I'd like you to

24    define, please.  What is "goo"?

01:16    25    Q.    Well, it's a binder, right?  It's this goopy binder, and

|  |  |  |
|---|---|---|
|  | 1 | I'm just saying that that binder, there's nothing in this |
|  | 2 | phrase -- there's nothing in this phrase that says what |
|  | 3 | Mr. Blackford came up with, which is that it goes on the inside |
|  | 4 | of the garment, right? |
| 01:16 | 5 | A.    Once again, to the extent that you wish me to limit myself |
|  | 6 | to just this one sentence and not to go beyond that and tell |
|  | 7 | you what a person of ordinary skill in the art would conclude |
|  | 8 | from this, I have to agree with you. |
|  | 9 | Q.    Thank you. |
| 01:17 | 10 | MR. ALDRICH:    Let me go to defendant's demonstrative |
|  | 11 | Exhibit 525. |
|  | 12 | BY MR. ALDRICH: |
|  | 13 | Q.    This was a diagram you created, correct? |
|  | 14 | A.    Yes, that is. |
| 01:17 | 15 | Q.    Okay.    And I notice that you made the dots here look very |
|  | 16 | metallic, right? |
|  | 17 | A.    No. |
|  | 18 | Q.    No? |
|  | 19 | A.    No. |
| 01:17 | 20 | Q.    Very reflective? |
|  | 21 | A.    No. |
|  | 22 | Q.    What -- |
|  | 23 | A.    It's a photograph of mother of pearl taken from an oyster |
|  | 24 | shell. |
| 01:17 | 25 | Q.    I see.    So it's meant to be shown as -- well, first of all, |

1    the patent doesn't talk about mother of pearl, right?

2    A.   You didn't ask me about the patent.  You asked me about the

3    picture.

4    Q.   Yeah, but Fottinger -- Fottinger isn't about mother of

01:18    5    pearl, right?

6    A.   I don't get the connection.

7    Q.   The connection is that --

8    A.   Fottinger does not mention mother of pearl.

9    Q.   Okay.  So this is not an accurate representation at all of

01:18    10    what Mr. Fottinger's print pattern would look like, correct?

11    A.   That is not correct.  Of course it's an accurate

12    representation.

13    Q.   It would look like mother of pearl?

14    A.   No, sir.  It would look like four half-millimeter dots of

01:18    15    something on a nonwoven fabric made of something, and whether I

16    use mother of pearl or aluminum foil or gold to represent the

17    heat-directing elements is utterly irrelevant.  And, by the

18    way, you accused me earlier of using reflective spots.

19            THE COURT:  Wait a minute.  You're way beyond the

01:19    20    scope of the question now.

21            THE WITNESS:  Oh, I'm sorry.

22            THE COURT:  Thank you.

23            THE WITNESS:  I take that back.  You did not accuse

24    me.

25

1  BY MR. ALDRICH:

2  Q.   Now, Dr. Block, you testified actually quite at length

3  about the way that you came up with the diagram here and the

4  fact that this would be a very accurate representation of what

01:19  5  Mr. Fottinger's fabric would look like, correct?

6  A.   Define "very accurate."

7  Q.   Is this a very accurate representation of what

8  Mr. Fottinger's fabric would look like?

9  A.   It is no less accurate than the patent's claim of about

01:19  10  30:70 to about 70:30.

11  Q.   Okay.  But the dimensions that you show on the screen here,

12  this is an accurate representation of what that printing paste

13  would look like after it goes through the mesh, correct?

14  A.   Would you please repeat that?  I don't think I understood

01:20  15  what you said.

16  Q.   Yeah.  You testified that there'd be a mesh called "a 25

17  mesh," correct?

18  A.   That is correct.

19  Q.   And then you would -- you said it was like a

01:20  20  thousand-year-old process, right?  That you would use --

21  A.   Yes.

22  Q.   And you would take this printing paste, and you would put

23  it over the mesh, and then pull the mesh back, and you'd be

24  left with a bunch of dots is what you said, correct?

01:20  25  A.   That is correct.

1   Q.   Okay.  And you said that what's shown on the screen here is

2   an accurate representation of what would be left over after

3   that process is complete based on Mr. Fottinger's work,

4   correct?

01:20  5   A.   Once again, when we say "accurate," I'm going to say it's

6   as accurate as the patent at issue with its about 70.

7   Q.   Dr. Block, is your work here accurate or not?

8   A.   It's as accurate as the patent's claim.

9   Q.   So it could be --

01:20  10   A.   It's --

11   Q.   So it could be erroneous.

12   A.   Excuse me?

13   Q.   It could be wrong.  Is that what you're saying?

14   A.   Are you saying the patents are wrong?

01:21  15   Q.   No.  I'm asking you if your analytical work that is shown

16   on this slide that you created -- I'm asking if it is accurate

17   or not.

18   A.   And I'm asking you to define "accurate," and you wouldn't,

19   so I say it is no less accurate than the claim in the patent.

01:21  20   Q.   The results of Mr. Fottinger's work would have these dots

21   that are .5 millimeters.  Is that right?

22   A.   That is correct.

23   Q.   And there would be -- they'd be spaced about 1 millimeter

24   apart.  Is that correct?

01:21  25   A.   That is correct.

1    Q.    And I believe you testified that that's 36 percent

2    coverage, correct?

3    A.    That will be 36 percent, yes.

4    Q.    And that was the result -- that 36 percent coverage, that

01:22    5    was the result of the analytical work that you did in looking

6    at Fottinger, looking at the experiment he ran, and calculating

7    the results of how that experiment would have come out on

8    fabric looking back on it 30 years later, correct?

9    A.    I have to take issue with your term "experiment."

01:22    10    Fottinger was not experimenting.  He was teaching --

11    Q.    I see.

12    A.    -- by example.

13    Q.    Okay.  So he created an example, correct?

14    A.    Yes, he did.

01:22    15    Q.    Okay.  And you analyzed his example, right?

16    A.    What do you mean by "analyzed"?

17    Q.    Well, you analyzed the description that he gave of his

18    example, right?

19    A.    May I put that in my own words?

01:22    20    Q.    Sure.

21    A.    Okay.  Fottinger gave an example.  I took what he said, 25

22    mesh, half-millimeter dots, range 5 to 40, and I said, "This is

23    what it would look like."

24    Q.    And that's your opinion you're offering today?

01:23    25    A.    That that's what it would look like, yes, it is.

1   Q.   Okay.  Thank you.  Do you remember Dr. Cole talking about

2   the concept of a unit cell?

3   A.   Yes, I do.

4   Q.   And do you remember a unit cell is the portion that can be

01:23  5   repeated sort of indefinitely to create a pattern?

6   A.   That is what unit cell means in textiles, yes.

7   Q.   And this fabric also has a unit cell, correct?

8   A.   That is correct.

9   Q.   And the unit cell -- I mean if this pattern is repeated,

01:24  10  we're going to see -- where's my line?  I'll tell you what:

11  I'll put it on the board.

12       So Fottinger has his example, has this -- this is

13  essentially what your diagram shows, correct?  I apologize for

14  my bad artwork, but in essence -- I'm getting close, aren't I?

01:24  15  A.   That is what I showed, yes.

16  Q.   And actually if you extended this and you showed more of

17  the fabric, you'd have another dot over here, right?

18  A.   I didn't say this was a unit cell.

19  Q.   I understand that.  I want to figure out what the unit cell

01:25  20  is.

21  A.   I'm sorry.  You asked me about a unit cell.

22  Q.   I understand.  Okay.  But if I continued this out, you

23  would have -- you would have this kind of a pattern all over

24  the fabric, right?  Continued, right?

01:25  25  A.   No, not if you repeated that.  If you repeated what's shown

1    in your red line, you will not get what your blue line shows.

2    Q.    I understand, but you showed four dots, and I'm just trying

3    to show how kind of those four dots would continue based on

4    this screen printing methodology you talked about.

01:25    5    A.    But you're incorrect.

6    Q.    I'm incorrect?

7    A.    You are incorrect, yes.

8    Q.    I'd have -- these two dots would be 1 millimeter apart,

9    correct?

01:25    10    A.    Yes.

11    Q.    And these blue dots would be 1 millimeter apart?

12    A.    If that is what you'd like to show, that is okay with me.

13    If what you would like to show is we'll take that stuff that's

14    inside the red lines, and then we will move your blue dot over

01:26    15    so that it is a millimeter away from the leftmost red dot, yes,

16    that is fine, but that's not a unit cell.

17    Q.    Okay.  I understand.  But all of the dots are going to be

18    1 millimeter apart, correct?

19    A.    They will all be 1 millimeter apart.

01:26    20    Q.    That's all I wanted to get to, and I apologize if I was

21    unclear.

22         Now, the unit cell in this case, if you draw a tangent line

23    there and a tangent line there and a tangent line here and a

24    tangent line here, the unit cell is this area right here,

01:26    25    correct?

1    A.    No.

2    Q.    That's not a unit cell?

3    A.    No.

4    Q.    That is not a repeatable section that would repeat

5    throughout?

6    A.    No.  It's repeatable, but it is not the unit cell of what

7    you're trying to reproduce.

8    Q.    I understand.  But this is a discrete cell that has a

9    section that could be repeated to create the entire fabric,

10   correct?

11   A.    No.

12   Q.    No?

13   A.    No, you don't understand what a unit cell is.  That's what

14   I'm trying to get at for you.  You are not producing the unit

15   cell.  You are trying to take this drawing that I've given you,

16   and I know what you're aiming at.  You're going to say there's

17   only one-half millimeter dot, and there's a lot more area, but

18   that is not correct.  And that is not a unit cell.  And if you

19   wish, I can come up and show the jury what a unit cell would

20   look like.

21   Q.    Well, just to get this straight, you said that all the dots

22   would be 1 millimeter apart, correct?

23   A.    Yes, I did.

24   Q.    Okay.  And you said all the dots are half-millimeter,

25   correct?

1   A.   That's correct.

2   Q.   And that means that there's a half-millimeter space between

3   the dots, correct?

4   A.   No.   The dots are spaced 1 millimeter apart.

01:28   5   Q.   Center to center, correct?

6   A.   I'm sorry.   Center to center.

7   Q.   Center to center which means there's a half-millimeter

8   space between the dots, correct?

9   A.   Yes.   There is a half-millimeter space between the dots.

01:28   10   Q.   Vertically and horizontally, correct?

11   A.   I'm sorry?

12   Q.   Vertically and horizontally, correct?

13   A.   Correct.

14   Q.   So that means the unit cell is 1 millimeter?

01:28   15   A.   That does not mean the unit cell is what you want to say it

16   is.

17   Q.   We'll tackle that in a bit.

18   A.   Good.

19   Q.   But, in fact, this circle is about 18 percent coverage of

01:28   20   this box, is it not?

21   A.   What's I keep saying.   That is not the unit cell, and you

22   can fiddle with pictures all you would like, but it is not the

23   unit cell to what Dr. Fottinger wanted to make.

24   Q.   Because, Dr. Block, am I correct that four circles would

01:29   25   fit in that box, right?   And four circles means that your one

1    circle is only one-quarter of that area, correct?  And in

2    fact --

3    A.    Excuse me.   Do I get to answer?

4    Q.    No.

01:29    5        THE COURT:   Let him answer that question.

6    BY MR. ALDRICH:

7    Q.    Go ahead.

8    A.    I do get to answer your question.   That you have now taken

9    a half and a half and a half and a half and a half, and you

01:29    10   have said, "Look what I have come up with."   And this is very

11   reminiscent of Mr. Blackford saying he invented something.   You

12   don't know what you're talking about.

13   Q.    Dr. Block, I've just divided this space into quarters.   Do

14   you see that?

01:29    15   A.    I see what you're doing.

16   Q.    Okay.   And each quarter is only 25 percent of the box that

17   I've created, correct?

18   A.    Sir, you can hash and --

19   Q.    Dr. Block, it's a yes-or-no question.

01:30    20   A.    -- chop that any way you'd like.   You're wrong.

21   Q.    Okay.   It was a yes-or-no question.   That -- this circle

22   only takes up one-quarter of the 1 millimeter square box that I

23   drew, correct?

24   A.    Let's see.   You have one half and one half and one half,

01:30    25   one and a half millimeters.   So you have gone one half, one,

1  and then you've come down one, and now you're going to say,

2  "Aha, this circle is one-fourth of what I've drawn."

3  Q.   And one-fourth is 25 percent, isn't it, Dr. Block?

4  A.   Of what you've drawn, yes.

01:30   5  Q.   And, in fact, Dr. Block, in fact, the circle doesn't even

6  take up all 25 percent, correct?

7  A.   How can it not -- well, yes, you're correct.

8  Q.   And in fact --

9         MR. SPROUL:  Objection.

01:30  10         THE COURT:  He answered the question.  Go ahead and

11  ask your next question.

12     I will give you opportunity on redirect.

13  BY MR. ALDRICH:

14  Q.   If you go back to 10th grade math, and you figure out the

01:31  15  area of the circle, the area of the circle is about 63 percent

16  of the square that it is in, correct?  So the area of the

17  circle is about 63 percent of this square that runs on the

18  tangents of that circle, correct?

19  A.   No, it's about 76 percent.

01:31  20  Q.   76 percent.  Okay.  So it's about three-quarters?

21  A.   Yes.

22  Q.   Okay.  So if the -- if the square is only 25 percent and

23  the circle is only 75 percent of that square, then that means

24  that this circle is significantly less, or three-quarters of 25

01:31  25  percent.  So we're talking about 18 percent -- the circle is

1   about 18 percent of this 1 millimeter square, correct?

2   A.   Well, you know, if you put in another two blue circles, you

3   could get that first upper left-hand round circle to be even

4   less than that, but you would still be wrong.  It is not the

01:32  5   unit square.

6   Q.   And Mr. Fottinger said that, in fact, it's preferable to be

7   within the 10 to 20 percent range, correct?

8   A.   Sir?

9   Q.   Fottinger said in his patent -- he talked about a 5 to 40

01:32  10   percent range, correct?

11   A.   That's correct.

12   Q.   But he actually said it's preferable to be in the 10 to 20

13   percent range, correct?

14   A.   Would you show me precisely where he said that?

01:32  15   Q.   Sure.

16         MR. ALDRICH:  Can we call up Exhibit 1040.  Second

17   page.  Line 105.

18         THE WITNESS:  Line 95 in a product of the invention?

19   BY MR. ALDRICH:

01:33  20   Q.   We'll blow it up for you here.  Just a moment, Dr. Block.

21   We'll try to make it easy.

22      You see it says "preferably" --

23   A.   Excuse me.  It's very nice that you want to turn that into

24   a square -- would you please give me the entire statement by

01:33  25   Fottinger instead of just the part you want to talk about.

1  Q.   I believe your attorney's handed you a binder of exhibits.

2  Did they hand you a binder of exhibits?

3  A.   I believe they did, yes.

4  Q.   So it might be easier if you look in the binder at

01:33    5  Exhibit 1040.

6  A.   Actually it would be a lot easier if you got rid of this

7  thing that's sitting in front of Fottinger, and we looked at

8  what Fottinger said instead of what you want him to say.

9  Q.   Okay.  I'm --

01:33   10        THE COURT:  Excuse me.  I want the jury to step into

11  your room.

12        (Proceedings held outside the presence of the jury panel.)

13        THE COURT:  Please be seated.

14  Dr. Block.

01:34   15        THE WITNESS:  Sir.

16        THE COURT:  It is imperative that you just allow

17  counsel to ask his question and that you answer his question.

18  The way this works is they will get an opportunity on what's

19  called redirect to fill in all those holes that you are worried

01:34   20  about in -- and --

21        THE WITNESS:  I'm sorry, Your Honor.

22        THE COURT:  -- and try to complete your answers.

23        THE WITNESS:  I'm sorry, Your Honor.

24        THE COURT:  So please just answer his question, and

01:34   25  we'll get through this process much more quickly and much more

1  smoothly, and trust that the lawyers on the other side are

2  listening and will let you explain everything that they think

3  you need to explain.

4      It makes my job extraordinarily difficult when we're having

01:35  5  this bantering back and forth. I can't control what's going

6  on, and I don't like it. That's why I became a judge. I like

7  control. And you're making me lose control, and I don't like

8  that at all.

9          THE WITNESS: I'm very sorry, sir. I fully

01:35  10  understand.

11          THE COURT: All right. Thank you.

12      (Proceedings held in the presence of the jury panel.)

13          THE COURT: Please be seated.

14  BY MR. ALDRICH:

01:35  15  Q.  Dr. Block, Mr. Fottinger says that preferably you would

16  limit his use of this binder to between 10 and 20 percent,

17  correct?

18  A.  At line 105, Fottinger makes that statement, yes.

19  Q.  Thank you.

01:36  20      Now, Fottinger did an experiment -- you called it "an

21  example" as I recall. Is that right?

22  A.  That's correct.

23  Q.  Okay. And one of the things that Fottinger did with his

24  example is he put his binder material in a coat, right?

01:36  25  A.  Just so we're all clear, he made the material. On that

1    material he put a pattern of spots made of his binder and of

2    powder.  He then took that piece of material, and he made that

3    the inside of the jacket.

4            MR. ALDRICH:  And maybe we could call up 1040.  Go to

01:37  5    the next page and zoom in on lines 106 to the bottom.

6    BY MR. ALDRICH:

7    Q.   So what he did is he took his binder, and he coated half of

8    the inside of the coat -- well, we don't know which side of the

9    coat, but half?

01:38  10   A.   That's not correct.

11   Q.   Where in this coat did he put the binder?

12   A.   He says on line 106 "The coated nonwoven fabric was sewn

13   into the right-hand half of the chest portion."  He did not

14   place his dots on the jacket.

01:38  15   Q.   The nonwoven fabric was placed somewhere in the right-hand

16   portion of the jacket, correct?

17   A.   That is correct.

18   Q.   And then on the left-hand portion of the jacket, he put the

19   binder, but without the aluminum, right?

01:38  20   A.   Once again, you're misrepresenting what he did.  He made up

21   a piece of cloth that had the spots, but did not have the

22   aluminum powder inside those spots.

23   Q.   And that's a control, correct?

24   A.   That is what he used as a control.  That's correct.

01:39  25   Q.   And this is to figure out whether his experiment or his

1    example reflected any heat, correct?

2    A.    Well, he wasn't doing it to figure it out.    He already knew

3    it would figure out.    It's an example.

4    Q.    Okay.    And so, once again, this side has his invention, if

01:39   5    you will?

6    A.    That is correct.

7    Q.    And this side has the invention minus the aluminum?

8    A.    That is also correct.

9    Q.    Okay.    And then he put somebody wearing the jacket in a --

01:39   10   some sort of test chamber.    Is that right?

11   A.    Well, he sat them down in a cold room.

12   Q.    Cold room for 20 minutes?

13   A.    Uh-huh.

14   Q.    And after 20 minutes, he took a photograph using a thermal

01:39   15   imaging camera, correct?

16   A.    That is correct.

17   Q.    And a thermal imaging camera is something that figures out

18   the temperature of the outside of the garment, correct?

19   A.    The camera takes the temperature of the surface that it

01:40   20   sees, yes.

21   Q.    Okay.    And after 20 minutes, the right side was warmer than

22   the left side, correct?

23   A.    That is also correct.

24   Q.    1.7 degrees warmer?

01:40   25   A.    About 1.5 degrees, 2 degrees centigrade.

1   Q.   Centigrade, so 3 --

2   A.   2 to 3 degrees Fahrenheit.

3   Q.   So the right side where the experiment was was warmer on

4   the outside of the jacket, right?

01:40   5   A.   That is correct.

6   Q.   Now, if Mr. Fottinger's experiment or example worked by

7   reflecting heat back to the user, the outside of the jacket

8   would have been colder than the outside of the other side,

9   correct?

01:41   10   A.   No.   Utterly, no.

11   Q.   Except that that's inconsistent with what you said at your

12   deposition, right?

13   A.   That is not what I said.

14   Q.   Okay.   Because if the material worked by reflection, it

01:41   15   would be reflecting some of that heat back to the user,

16   correct?

17   A.   That is correct.

18   Q.   If it conducts heat, it would conduct that heat potentially

19   to the outside of the jacket, correct?

01:41   20   A.   That is correct.

21   Q.   And so there's nothing in Fottinger that confirms that his

22   example worked by reflecting heat at all, correct?

23   A.   No, that's not correct because he's got his control.

24   Q.   The control over here, right?

01:41   25   A.   (Nodding head.)

1   Q.   This side was colder -- or sorry.

2       This side was hotter on the outside than the control side,

3 right?

4   A.   That's exactly what you would expect.

01:42   5   Q.   That's what you would expect if what?

6   A.   Exactly what you would have expected from Fottinger's

7 invention, and I will be happy to explain to the jury why that

8 is so.

9   Q.   Well, let's go to your deposition, lines -- page 245.

01:43  10       MR. ALDRICH:  Can we publish this to the jury for

11 impeachment?

12       THE COURT:  Sure.

13 BY MR. ALDRICH:

14   Q.   245, line 21.  I asked you the question:  "Is there

01:43  15 anything in Mr. Fottinger's experiment that confirms that there

16 was reflection?"

17       And your answer:  "No."

18       Do you see that?

19   A.   My answer was, "No, period.  Continue.  He does not confirm

01:43  20 that there was reflection.  It could have been a combination of

21 conduction and reflection."

22   Q.   We can continue, right?  "Or it could have just been an

23 artifact of the device that he used," right?

24   A.   That is also something that it could have been, yes.

01:43  25   Q.   Okay.  And then I asked you a follow-up question.  Do you

1    see that?  "But Mr. Fottinger's experiment does not support the

2    idea that his invention worked because it reflected heat,

3    correct?"

4    A.   And my answer was, "It does not work specifically because

01:44    5    it reflected heat."

6    Q.   "No.  He truly cannot make that statement."  Do you see

7    that?

8    A.   Yes, I do.

9    Q.   And what you're saying is that Fottinger cannot make the

01:44    10    statement that his invention worked because it reflected heat,

11    correct?

12    A.   No.  He cannot make the statement that it does not -- it

13    does not work specifically because it reflected heat, and I'll

14    be happy to explain that if you let me.

01:44    15    Q.   Okay.  But the jury is going to have to find by clear and

16    convincing evidence that Fottinger reflected heat, correct?

17    A.   That is correct, yes.

18    Q.   And Fottinger's own experiment you're saying can't confirm

19    that fact, right?

01:45    20    A.   I did not say that.

21    Q.   Suffice it to say there are a couple of areas where there's

22    some questions about what Fottinger anticipates?

23    A.   That is correct, yes.

24    Q.   Consistent with what you said at your deposition, correct,

01:45    25    that there are some areas where there's no single piece of

1    prior art that shows everything that's in claim 23, correct?

2    A.   As I explained earlier, I was confused about what was meant

3    by "everything."  I was wrong that because it did not say 70:30

4    that it didn't disclose prior art.  Fottinger does disclose

01:46    5    prior art.  He discloses it by his claim of 5 to 40.  It is a

6    disclosure.  It is anticipation, and it is obviousness.

7    Q.   Okay.  Now, so if a piece of prior art doesn't anticipate,

8    then we move on to this question about obviousness, right?

9    A.   Yes.

01:46    10    Q.   And with respect to obviousness, the question ultimately

11    is, did the patent -- or was the invention -- would it have

12    been obvious to a person of ordinary skill in the art at the

13    time of the invention to come up with this invention, correct?

14    A.   Would it have been obvious for a person of skill in the art

01:46    15    to have come up with Fottinger?

16    Q.   No.  The ultimate question that we're trying to answer here

17    is, would it have been obvious to a person of ordinary skill in

18    the art at the time of Mr. Blackford's invention in 2008, would

19    it have been obvious to come up with Mr. Blackford's invention?

01:47    20    Do you understand that to be kind of the ultimate question

21    here?

22    A.   I understand.

23    Q.   Okay.

24    A.   My understanding of your question is would it have been

01:47    25    obvious for a person of ordinary skill in the art to have come

1  up with Blackford's invention, and I don't think that that is

2  what is meant by "obvious." To me obvious would be

3  Mr. Blackford would show somebody his invention, and that

4  person would say, "Yeah, that's obvious. There's nothing new

01:47   5  there."

6  Q.  And that's the basis of your opinion?

7  A.  That is definitely the basis of my opinion.

8  Q.  Okay. Now, in trying to figure out whether an invention is

9  obvious, there are some risks, and there's some dangers that

01:48   10  the courts have found with doing this analysis, right?

11  A.  Yes.

12  Q.  And one of the risks, one of the problems is people are

13  prone to what's called "hindsight bias"?

14  A.  That's correct.

01:48   15  Q.  And hindsight bias is the idea that now that we know what

16  the invention was --

17  A.  Uh-huh.

18  Q.  -- right? It's very easy ten years later for us to look

19  back and say, "Oh, yeah, that would have been obvious then."

01:48   20  A.  Yep.

21  Q.  And we all have a natural bias to do that, right?

22  A.  You're making an assumption by an awful lot of people. How

23  about if you say, "Do you have" -- "you have sometimes done

24  that," I'd say yes.

01:48   25  Q.  I'm not asking about you specifically.

1      A.    I'll say yes.   It's been known.

2      Q.    But this is the concern that we have in the law is that

3      looking back ten years later, the natural inclination of people

4      is to say, "Yeah, that would have been obvious back then"

01:49    5      because it's easy to look at the invention as sort of the

6      roadmap or the blueprint for the ultimate solution, correct?

7      A.    That is correct.

8      Q.    Okay.   And because of that, we as the -- we in the law and

9      experts and the jury are supposed to consider some additional

01:49   10      evidence that might be helpful in terms of framing whether the

11      invention was obvious or not, correct?

12      A.    Yes, there are requirements.

13      Q.    Okay.

14            MR. ALDRICH:   Can we put up page 8 from Dr. Block's

01:50   15      expert report.

16         Your Honor, I'd like to publish just page 8 from his

17      report.

18            THE COURT:   I need to see it up here before it's

19      published.

01:50   20            MR. ALDRICH:   No problem.

21            THE COURT:   Is there any objection to page 8?

22            MR. SPROUL:   No objection.

23            THE COURT:   It is received and you may publish.

24         (Exhibit Page 8 of Block's Report admitted.)

01:50   25            MR. ALDRICH:   Can we go down to everything below that,

1    just starting at D, actually.  Thank you.

2    BY MR. ALDRICH:

3    Q.   And you listed in your report the additional evidence that

4    can be useful looking back ten years later in terms of

5    establishing whether an invention might have been obvious or

6    not, correct?

7    A.   Yes, I did take this into account.

8    Q.   Okay.  And so first of all, you talked about commercial

9    success, right?  You say you understand --

10   A.   That's one of the things to be considered.

11   Q.   Let me just finish.

12   A.   I'm sorry.

13   Q.   You understand that whether the invention became

14   commercially successful is a useful piece of evidence in terms

15   of understanding whether it was obvious or not, correct?

16   A.   That is correct.

17   Q.   And the reason for that is people have been struggling with

18   a topic for 30 years or 60 years, and then suddenly somebody

19   invents something, and it's like there's a pot of gold waiting

20   for them.  There's a presumption that maybe it wasn't obvious

21   after all because if that pot of gold was really waiting there

22   for the first person to do it, well, then somebody probably

23   would have done it beforehand, right?  That's the reason the

24   commercial success is relevant, right?

25   A.   That is a reason why one might consider commercial success,

1    but commercial success does not prove nonobviousness.

2    Q.   Very good.   And so then another piece of real-world

3    evidence we're supposed to consider is whether there was a

4    long-felt need for the invention, right?

01:52   5    A.   That is also correct.

6    Q.   And a third piece of evidence that we're supposed to

7    consider is whether other people had failed in the past,

8    correct?

9    A.   That is correct.

01:52   10   Q.   And another piece of evidence we're supposed to consider is

11   whether people copied the invention, correct?

12   A.   That is correct.

13   Q.   Because if people copied the invention, that might be

14   evidence that, in fact, this was a real invention that had

01:52   15   value and other people are clamoring to use it after not having

16   had this available previously, correct?

17   A.   That is a possibility.

18   Q.   And another thing we're supposed to look at is whether

19   there were any unexpected or surprising results, correct?

01:52   20   A.   That is correct.

21   Q.   And we're also supposed to look at whether there was praise

22   of the invention after the inventor came up with the idea,

23   right?

24   A.   That is correct.

01:52   25   Q.   And we're also supposed to look at whether any licenses

1    were taken, right?

2    A.    Yes.

3    Q.    Because if somebody -- if after somebody comes up with an

4    invention, everybody wants to take a license for it, that can

01:53    5    also be evidence that the patent or the idea was not obvious,

6    right?

7    A.    That could be, yes.

8    Q.    Also whether there was surprise by experts in the field and

9    those of art, right?

01:53    10    A.    That is true.

11    Q.    Okay.  And there's a -- you have a tenth -- ninth factor

12    there, right, about whether the patent proceeded contrary to

13    accepted wisdom in the art, right?

14    A.    That is also true.

01:53    15    Q.    And these are all factors that the jury is going to have to

16    assess in terms of figuring out whether the patented invention

17    was obvious or not, right?

18    A.    That is correct.

19    Q.    And, Dr. Block, in your 1500 pages of report, you didn't

01:53    20    talk about any of this.

21    A.    To the extent that they were relevant, I would have told

22    you about it in the report.  If you would like me to tell you

23    why they are not relevant, I'd be happy to do so.

24    Q.    You knew -- this is a page from your report.  This is --

01:54    25    this is a page where you laid out what you understood you were

1    supposed to do, correct?

2    A.   That is correct.

3    Q.   Okay.  But in your report, you didn't mention any of this,

4    right?

01:54    5    A.   That is correct.

6    Q.   Okay.

7    A.   As I say, it wasn't relevant.

8    Q.   Now, you understand, though, that Columbia has achieved

9    substantial commercial success for Omni-Heat, correct?

01:54    10    A.   Yes, I have, and I congratulate them for it.

11    Q.   Do you know if Fottinger ever sold a yard of his fabric?

12    A.   I have no idea.

13    Q.   Do you know if Castelli was successful in selling any of

14    his jackets?

01:55    15    A.   To the best of my knowledge, they did sell their jackets at

16    a very high price.

17    Q.   To your understanding, people have been trying to work with

18    reflective materials or at least putting metals and powders in

19    jackets and other pieces of garments for over 60 years,

01:55    20    correct?

21    A.   Yes, that is correct.

22    Q.   Going back to commercial success, you understand that

23    Seirus has also been commercially successful with HeatWave,

24    correct?

01:55    25    A.   I did see some testimony that they were making money with

1    it.  I don't know how successful.

2    Q.   And Seirus practices the invention, correct?

3    A.   When you say "practices the invention," you mean

4    specifically the '207 patent?

01:56  5    Q.   Yes, Seirus practices the '270 patent?

6    A.   I'm sorry.  The '270 patent.

7    Q.   They practice claims 2 and 23 of the '270 patent, correct?

8              MR. SPROUL:   Objection.

9              THE COURT:   Overruled.

01:56  10             THE WITNESS:   They have a product that can be compared

11   to the '270 patent, and if the '270 patent proves to be valid,

12   then one could say that they are practicing the '270 patent.

13   BY MR. ALDRICH:

14   Q.   And they practice every limitation of the '270 patent,

01:56  15   claims 2 and 23, correct?

16   A.   Again, if it turns out to be a valid patent, the answer is

17   yes.

18   Q.   Were you here when Mr. Merriman testified that Columbia

19   received perhaps 20 requests for licenses after Omni-Heat was

01:57  20   launched?

21   A.   I recall a number in that vicinity, yes.

22   Q.   And that they had selected four entities to take licenses

23   on Omni-Heat?

24   A.   I recall him saying something to that effect, yes.

01:57  25   Q.   Were you here when Mr. Trepanier testified about the praise



| | |
|---|---|
| 1 | and the industry congratulations and the positive reviews for |
| 2 | Omni-Heat after it was launched? |
| 3 | A.   Am I allowed to make a comment on that, or you just want a |
| 4 | yes or no? |
| 01:57   5 | Q.   I'm just wondering if you were here when he testified about |
| 6 | that? |
| 7 | A.   I was here when he said that, yes. |
| 8 | Q.   Okay.  Now, when you were drafting your report, 1500 pages, |
| 9 | you didn't have any of this evidence, correct? |
| 01:58   10 | A.   You mean the amount of money that was being made?  Is that |
| 11 | what you mean by "this evidence"? |
| 12 | Q.   You didn't have any of the evidence concerning the nine |
| 13 | factors that you included in your report that you understood |
| 14 | you were supposed to consider? |
| 01:58   15 | A.   That's not true. |
| 16 | Q.   Well, you wrote in your report a list of all of the |
| 17 | documents and all of the evidence that you relied upon in |
| 18 | forming your opinions, correct? |
| 19 | A.   That is correct. |
| 01:58   20 | Q.   And none of this evidence was listed on that single piece |
| 21 | of paper, correct? |
| 22 | A.   It was not relevant. |
| 23 | Q.   So you didn't consider it.  Is that right? |
| 24 | A.   That is not true. |
| 01:58   25 | Q.   You did consider it? |

1   A.   Well, there's a very good statement by Secretary of State

2   Dean Rusk in which he wrote to a particularly obnoxious

3   ambassador, "To the extent that your views have any meaning at

4   all, they have been considered and rejected." And that is

01:59   5   exactly what I did there. I went through this list, and I

6   looked to see commercial success? Apparently. That's why

7   Seirus is being sued.

8       A long-felt need? Not necessarily so.

9       Failed attempts by others? Not necessarily so.

01:59   10      Copying by others? Not necessarily so.

11      Unexpected results? Definitely not.

12   Q.   Dr. Block --

13   A.   You're cutting me off in the middle of my answer.

14   Q.   Dr. Block.

01:59   15   A.   You are cutting me off in the middle of my answer, sir.

16   Q.   Did you or did you not consider all of the evidence we just

17   discussed?

18   A.   I could not have considered all of the evidence that we

19   just discussed because much of it had not been disclosed at the

02:00   20   time I wrote my report.

21   Q.   We will get there --

22   A.   However --

23      THE COURT: Wait. Wait. Stop interrupting each other

24   and talking over each other.

02:00   25      Go ahead, Dr. Block. Your were answering.

1        THE WITNESS:  However, it was not relevant.

2    BY MR. ALDRICH:

3    Q.   Dr. Block, this is a list that you produced of documents

4    and things that you considered.

02:00   5    A.   That is correct.

6    Q.   There are 27 items on this list, correct?

7    A.   There are.

8    Q.   Pardon?

9    A.   There are, yes.

02:00  10    Q.   Okay.  You considered 27 documents in total in deciding

11    whether or not these patents were valid, correct?

12    A.   That is correct.

13    Q.   And ten of those were the pieces of prior art that you

14    originally opined on, correct?  You've dropped five of those,

02:01  15    but ten of those are the pieces of prior art?

16    A.   It might be even more, yes.

17    Q.   And then some of them have to do with this issue about

18    whether 30 to 70 percent was a surprising result like

19    Mr. Blackford testified.  Is that right?

02:01  20    A.   That's correct.

21    Q.   But in the two of them, two of the things you looked at

22    were actually the patents and the prosecution histories of the

23    patents, correct?

24    A.   You mean the '207 and the '119 -- '270 and '119?

02:01  25    Q.   That's correct?

1    A.   Well, that's the only two patents there are to consider.

2    Q.   27 documents you looked at.  You did not look at or

3    consider any evidence of whether the products were commercially

4    successful, correct?

02:02    5    A.   As I said, I considered it, and I found it irrelevant.

6    Q.   Mr. Block, at the top of this document --

7              MR. ALDRICH:  Can we publish, please?

8              THE COURT:  Yes.  Do you want this marked as an

9    exhibit?

02:02    10             MR. ALDRICH:  No.

11   BY MR. ALDRICH:

12   Q.   This document is called "Documents and Things Considered."

13   Correct?

14   A.   Yes.

02:02    15   Q.   And it contained every document and thing you considered,

16   correct?

17   A.   To the extent -- the best of my ability, that contained

18   every document and thing considered, yes.

19   Q.   And you did not include on this list any evidence of

02:02    20   commercial success?

21   A.   It was not available.  It was a secret held by Columbia.

22   Q.   You didn't ask for it, did you?

23   A.   It was not up to me to ask for it.  I am an expert in

24   textiles.

02:02    25   Q.   Dr. Block, did you ask the attorneys for the deposition

1   transcripts that had taken place in the case?

2   A.   I did not.

3   Q.   Did you ask the attorneys that were working with you for

4   the documents that had been produced regarding each party's

5   sales of the products?

6   A.   I was unaware that there had been any documents produced.

7   Q.   Those attorneys didn't give that to you, did they?

8   A.   They did not, no.

9   Q.   Did you ask for any of the licenses that were at issue in

10  the case?

11  A.   I was unaware that there were any.

12  Q.   And those attorneys didn't give that information to you,

13  correct?

14  A.   That is correct.

15  Q.   Okay.  Did you ask for any evidence regarding the nine

16  factors that you put in your report that you said you knew you

17  had to consider before drawing your conclusion?

18  A.   Did I ask for any evidence as to specifically this, this,

19  this, and this?

20  Q.   Correct.

21  A.   The answer is yes.

22  Q.   Which?

23  A.   If you will give me the list of things that I was supposed

24  to consider, I will finish answering your previous question.

25  Q.   Which documents that are relevant to the issue on this list

1   did you ask for?

2   A.   I didn't say I asked for.  I said considered, and I will

3   tell you why they are irrelevant and why I didn't have to ask

4   for them.

02:04   5   Q.   But they're not on your list, are they?

6   A.   Excuse me.   Number 9, whether the patentee proceeded

7   contrary to accepted wisdom?  Answer no.   Irrelevant.

8       Expressions of surprise by experts and those skilled in the

9   art.   Columbia has presented evidence that Mr. Blackford said,

02:04   10   "Oh, I found something," went into his lab, and said to his

11   subordinates, "Hey, guys, isn't this neat?"

12       And his subordinates said, "Yeah, Boss, that's real neat."

13   He took that to other experts, quote, at Columbia, and he said

14   "Hey, guys, look what I've invented," and the response was,

02:05   15   "That looks awful chintzy."

16       The next thing, the taking of licenses under the patent by

17   others --

18   Q.   Dr. Block?

19   A.   Excuse me.   I'm answering your question.

02:05   20       THE COURT:   Actually, you're beyond the scope of the

21   question.   He'll ask you another one.

22   BY MR. ALDRICH:

23   Q.   You just testified about evidence that you didn't have in

24   your possession when you issued your report, correct?

02:05   25   A.   I testified about some evidence not in my possession.

1    Q.    And so you rendered your opinion in this case without

2    having all of the evidence that you knew you were supposed to

3    have in your possession.

4    A.    Not true.  May I continue?

02:06    5    Q.    Let's go on to talk about --

6    A.    I didn't think so.

7    Q.    -- Ogulata and Lawrence.  You testified about two

8    publications that you said showed nonlinear results of moisture

9    vapor transmission in 2006.  Do you remember that?

02:06    10    A.    Yes, I do.

11    Q.    And those two publications were Lawrence and Ogulata,

12    right?

13    A.    That is correct.

14          MR. ALDRICH:  Can we put that up on the screen real

02:06    15    quick.

16          THE WITNESS:  That is not the correct slide.

17    BY MR. ALDRICH:

18    Q.    Well, unfortunately, that's all I've got because that's

19    what was produced to us, but the data is basically what you

02:06    20    testified to.  Is that correct?

21    A.    What you're looking at -- excuse me.  That's not what I

22    testified --

23          MR. SPROUL:  Objection, Your Honor.  This is not the

24    slide that was used in his demonstrative that he testified to

02:07    25    earlier.  This was an initial exchange.

1          THE COURT:  Okay.  Your objection is overruled.  He

2    can look at the slide and see if he can respond.

3        Ask a question.

4    BY MR. ALDRICH:

02:07   5    Q.   So in essence, though, what you were talking about was that

6    these two research papers, Ogulata and Lawrence, showed

7    nonlinear results for moisture vapor transmission, correct?

8    A.   That is correct.  Exhibits 1156 and 1158 individually show

9    nonlinear behavior.

02:07   10   Q.   Okay.  And actually Ogulata was a paper that didn't study

11   any real fabric, right?

12   A.   Ogulata's paper is theoretical.  That's correct.

13   Q.   He comes up with a model of -- sort of a hypothetical model

14   of how fabric is going to behave, right?

02:08   15   A.   When you say "hypothetical model," you make that sound as

16   if somehow it was sleazy or shouldn't have been.

17   Q.   No, I'm not passing any judgment on Mr. -- Dr. Ogulata's

18   work.  He came up with a mathematical model about how fabrics

19   are going to behave, correct?

02:08   20   A.   That is correct.

21   Q.   Okay.  And, in fact, what he did was he was studying the

22   width of the yarn in the fabric, right?

23   A.   Not entirely.

24   Q.   Well, what he was looking at was --

02:08   25          THE COURT:  And maybe you can move that out of the

1    way.    Thank you.

2    BY MR. ALDRICH:

3    Q.    Dr. Ogulata was looking at how fabric would change in terms

4    of moisture vapor permeability -- I apologize for my --

02:09    5    A.    We'll assume it's interlaced.

6    Q.    -- terrible diagram, but in essence woven fabrics are made

7    from yarns that go one direction and yarns that go the other

8    direction, correct?

9    A.    In general that's the way they're done.

02:09    10    Q.    And they're woven together?

11    A.    They're interlaced.

12    Q.    And Ogulata was studying woven fabrics, right?

13    A.    That is correct.

14    Q.    And what he was studying was, as I make the yarns thicker

02:09    15    or thinner, thereby reducing the size of these little holes,

16    how does that affect moisture vapor transmission, correct?

17    A.    Just to make it a little bit more complete than what you've

18    posited, what Dr. Ogulata did was he took a variety of yarns of

19    different sizes and different twist, because each of these are

02:10    20    different.    You can make a thin, very tightly twisted yarn.

21    You can make a fat, loosely twisted yarn.    And he then

22    considered if I use loosely twisted yarns far apart and close

23    together, if I use tightly twisted yarns far apart and close

24    together, if I use tightly twisted and loosely twisted yarns

02:10    25    back and forth, and then if I spent a long amount of time at my

1    computer, I will come up with what I believe is a good model

2    for the behavior of air going through a cloth.

3    Q.    And so that's what he was doing.   He was analyzing as I

4    adjust the size and the shape and the tightness of the yarns,

02:11    5    how much moisture vapor goes through, correct?

6    A.    Air permeability in this case.

7    Q.    Air permeability.   But one thing he did not do was he did

8    not -- he did not cover up a portion of the fabric, did he?

9    A.    That is correct, and it in no way obviates his work.

02:11    10    Q.    Sure.   He didn't look at reflective materials at all,

11    right?

12    A.    That is correct, and it in no way obviates his work.

13    Q.    I'm not trying to question Dr. Ogulata's work.   I trust

14    Dr. Ogulata's a scientist that did good, reliable work.   What

02:11    15    I'm questioning is how relevant it is to Mr. Blackford's

16    experiment because this is in essence what Mr. Blackford

17    tested, correct?

18    A.    That's a compound question.   Let me answer in parts.

19    Dr. Ogulata's work is perfectly valid with and without the

02:12    20    spots sitting on top.

21    Second, Mr. Blackford worked with woven cloth and only with

22    woven cloth in presenting his results.   So Ogulata is

23    predicting what would happen with Mr. Blackford.

24    Q.    You also gave an opinion about Lawrence, right?

02:12    25    A.    That is correct.

1   Q.   And Lawrence is about nonwoven fabrics, right?

2   A.   That is not correct.  It's about woven fabrics.

3   Q.   Primarily Lawrence is about nonwoven fabrics?

4   A.   If I may look at Lawrence?

02:12  5   Q.   Sure.  I think it's probably in the binder counsel gave

6   you.  I think it's Exhibit 1158.

7   A.   And what specifically is that?  Could you tell me?  Will it

8   be in my exhibits binder?

9   Q.   I believe it's in the binder that counsel gave you in

02:13  10   advance of your testimony on direct.

11   A.   It's patents, patents, patents.  Patents.  Patents.

12   Exhibit.

13   Q.   Well, you know what --

14   A.   Could you just tell me what it is you're asking?

02:13  15   Q.   It's not really relevant to -- I don't think it's relevant

16   to whether it's woven or nonwoven.  The reality is that

17   Lawrence did not discuss the effects of placing anything on top

18   of the fabric, correct?

19   A.   Exactly what I told you about Ogulata.  It does not in any

02:14  20   way mean that his work is not valid with respect to the patent.

21   Q.   Lawrence also has no reference to the idea of heat

22   reflectivity, correct?

23   A.   He was not measuring heat reflectivity.  That is correct.

24   Q.   There's nothing in Lawrence's paper or Ogulata's paper that

02:14  25   addresses any relationship between heat reflectivity and air

1   permeability, correct?

2   A.   That is correct.

3   Q.   Lawrence and Ogulata also don't address any relationship

4   between adding heat-reflective elements to fabric and the

02:14   5   moisture vapor transmission rate of the fabric, correct?

6   A.   That is the sort of question a person who doesn't

7   understand what's going on would ask me.   You are correct in

8   that.

9   Q.   Now, there were four other pieces of prior art that we --

02:15   10   that you discussed in your direct testimony, correct?

11   A.   That is correct.

12   Q.   And those, to summarize, are Halley, Blauer, Worley, and

13   Vaughn, right?

14   A.   Correct.

02:15   15   Q.   And each of the four of those has some number in that range

16   of 30 to 70 percent.   That's what you were testifying about,

17   correct?

18   A.   Each of them has a number that fits in between that range,

19   yes.

02:15   20   Q.   But none of them has anything to do with heat direction,

21   correct?

22   A.   That is what Judge Hernandez has ruled, and so, yes, that

23   is true.

24   Q.   So they all have 30 to 70 percent coverage of something on

02:16   25   a fabric, but it has nothing to do with heat direction.   Is

1  that right?

2  A.  No.  But that's not why I am citing them.  I'm citing them

3  for obviousness, not anticipation.

4  Q.  For example, Halley is about putting plastic dots on the

02:16  5  inside of a jacket so that when you put it on, you don't have

6  as much abrasion, right?

7  A.  That is correct.

8  Q.  And the same with Vaughn, right?  That's about putting

9  plastic dots on the inside of like a rain jacket so that when I

02:16  10  put it on, it doesn't wear off the lining, right?

11  A.  That's correct.

12  Q.  And Blauer is -- you showed some images from Blauer, right?

13  A.  Yes.

14  Q.  And Blauer is also about rain shells, right?

02:17  15  A.  You make that sound as if it were totally irrelevant.  Yes.

16  Q.  And it's about putting plastic on the inside of the rain

17  shell to add structural rigidity to the rain shell, right?

18  A.  That is part of what happens.

19  Q.  But it's just plastic, right?

02:17  20  A.  Oh, dear.  What do you mean "just plastic"?

21  Q.  There's no metal in it, right?

22  A.  There doesn't have to be metal in it.

23  Q.  They're not reflective at all, right?

24  A.  That is -- excuse me.

02:17  25  THE WITNESS:  Your Honor, I've got a problem answering

1   this part.

2   BY MR. ALDRICH:

3   Q.   The judge has ruled --

4   A.   That's why I'm asking His Honor.

02:17  5   Q.   I'll rephrase the question then.

6     The judge has ruled that the plastic on the inside of

7   Blauer's jacket has nothing to do with heat direction, right?

8   A.   If that's what His Honor has ruled, then that is correct.

9   Q.   And Worley's invention also had nothing to do with heat

02:18  10  direction, correct?

11  A.   If that's what His Honor has ruled, that is correct.

12  Q.   In fact, Worley actually came up earlier.  Do you remember

13  that?

14  A.   Came up earlier what?

02:18  15  Q.   Came up last week.

16  A.   In what context?  I didn't see him here.  That's why I'm

17  asking you in what context.

18  Q.   I understand.  Do you remember when Mr. Blackford was

19  testifying about the prosecution history of the patent?

02:18  20  A.   Yes.

21  Q.   And do you remember when Mr. Blackford testified that he

22  disclosed Fottinger to the patent office and three weeks later

23  the patent office looked at it and said, "You've got a valid

24  patent"?  Do you remember that testimony?

02:18  25  A.   That might be what he thought.

1    Q.    Okay.

2    A.    But may I consult '119 and '270 before I give you an

3    answer?

4    Q.    I'm just asking if you remember Mr. Blackford testifying

02:19    5    about that when he testified last week.

6    A.    Mr. Blackford said something to that effect.

7    Q.    And do you remember Mr. Blackford testified that five days

8    before he sent Fottinger to the patent office, he also sent a

9    copy of Worley to the patent office?  Do you see that there?

02:19    10    A.    That is what he claimed.

11    Q.    And the patent office with Fottinger and Worley in their

12    hand at the same time issued separate notices of allowability

13    over both Worley and Fottinger a few weeks apart from each

14    other, correct?

02:19    15    A.    That is what he believed.

16    Q.    And you are suggesting that the jury should find by clear

17    and convincing evidence that the examiner got it all wrong.  Is

18    that right?

19    A.    No.  Of course not.  May I continue with your Worley,

02:20    20    Fottinger, and all the other claims supposedly made to the

21    patent office?

22    Q.    I only have a couple more questions.

23    A.    I take that is a no.

24    Q.    Dr. Block, at the time of Mr. Blackford's invention,

02:20    25    Mr. Blackford was looking at a problem.   Do you remember

1  Mr. Blackford testifying he was looking at a particular

2  problem?

3  A.    Yes, I do.

4  Q.    Okay.   And the problem he was working on was some clothes

02:21  5  were bulky and heavy, didn't breathe well, didn't have good air

6  and moisture permeability.   Do you remember that?

7  A.    Yes, I do.

8  Q.    Those were real problems that people faced back in -- ten

9  years ago, right?

02:21  10  A.    That is approximately right, yes.

11  Q.    Clothing designers were struggling with how to make

12  clothing less bulky, less heavy, so that it breathed better,

13  had good air and moisture permeability, right?

14  A.    I don't know to what extent they were struggling.   They

02:21  15  were looking at ways of making clothing that was more

16  comfortable, warmer, and so forth.

17  Q.    And Mr. Blackford's invention addressed some of those

18  problems, didn't he?

19  A.    As I said in my deposition, he thought he was, and I also

02:22  20  said at the time it might have been.

21        MR. ALDRICH:   Can we pull up page 76 from Dr. Block's

22  deposition, please.

23        And I'd like to publish for impeachment purposes,

24  Your Honor.   We're going to do 76, 77.   We're getting there.

02:22  25        Bottom of 76, top of 77, through 77.

1       MR. SPROUL:  I'm sorry, Your Honor.  I'm unclear what

2   he's being impeached on here.  It seems like there's an

3   inconsistency that is being challenged.

4       THE COURT:  I'm working through that myself.

02:23    5   BY MR. ALDRICH:

6   Q.  And --

7       THE COURT:  Your objection is overruled.

8       You may publish this to the jury.

9   BY MR. ALDRICH:

02:23   10   Q.  The bottom of page 76, Dr. Block, do you see I asked you

11   the question, "Outerwear at the time tended to be bulky.  Some

12   of it was bulky and heavy.  Some of it was -- did not breathe

13   well, did not have good air and moisture permeability.  Some of

14   it was expensive.  These were certain problems we would have

02:23   15   been faced there"?

16   A.  Yes.

17   Q.  And your answer was -- oh, sorry.  That was your answer?

18   A.  That was my answer.  I agreed with you.

19   Q.  You agreed with me?

02:24   20   A.  Some people had a problem.  You made it seem as if everyone

21   was struggling, but not.  Some people had a problem.

22   Q.  Okay.  And then my next question on 77 --

23       MR. ALDRICH:  And let's put up 77 and 78, please.

24   BY MR. ALDRICH:

02:24   25   Q.  And my next question, "And Mr. Blackford's solution

1    addressed some of those problems, correct?"

2        And your answer?

3    A.   Once again --

4    Q.   "If we're referring to the two patents, that was a yes.   We

02:24    5    are referring to those two patents.   Mr. Blackford thought he

6    had a solution that he also thought was unique, that he also

7    thought was not obvious."   Do you see that?

8    A.   Yes, I do, and, once again --

9    Q.   Let's go down to the next question --

02:25    10    A.   Once again, you are covering up my answer.   There is more

11    to what I said than what you want to show the jury.

12    Q.   And let's go down to the next question and the next answer:

13    "But Mr. Blackford's design of Omni-Heat fabric did solve some

14    of the problems that you identified, correct?"

02:25    15        And your answer:   "It is possible that Mr. Blackford's

16    invention was a step toward a more comfortable body gear.   It

17    at least addressed the question.   Whether it solved the

18    problem, I think has not been determined."   Do you see that?

19    A.   Thank you for giving my full answer.

02:25    20    Q.   And do you agree with that statement today?

21    A.   That it could have been a step forward?   Whether it solved

22    the problem has not been determined?   I'll give him the benefit

23    of being a nice guy about it and not just say he was absolutely

24    wrong, yes.

02:26    25        MR. ALDRICH:   No further questions, Your Honor.

1    THE COURT:  All right.  Members of the jury, we'll be

2  taking our midday recess a little early this afternoon.  Please

3  step into your room.

4    (Recess.)

02:43  5    (Proceedings held outside the presence of the jury panel.)

6    THE COURT:  Please be seated.

7    MR. MARCHESE:  If I may?

8    THE COURT:  You may.

9    MR. MARCHESE:  There is an issue that maybe you had

02:43  10  noticed while we were in the midst of that cross-examination.

11    THE COURT:  Oh, I think I noticed.

12    MR. MARCHESE:  And we feel like that the door has been

13  opened to the IPR.

14    THE COURT:  I think so -- I don't know about that.

02:44  15  But keep going.

16    MR. MARCHESE:  Well, so what I understood from the

17  questions that were asked, there's an inference that I'm sure

18  will be argued, but it can certainly be drawn from the evidence

19  that came in that what the examiner did with Fottinger was the

02:44  20  last word.  Done.  He signed off on it.  He decided that that

21  was not a reference that would invalidate the claims, and the

22  patent passed through, sailed off into the sunset, and that is

23  it.  The patent office has issued its final word, and that's

24  absolutely -- we all know that's not the truth, number one.

02:44  25    And, number two, we spent a lot of time with Mr. Aldrich

1  arguing over and over again that the prosecution history is not

2  relevant, and here we have the very thing that they tried to

3  keep out, now they're trying to use as a sword.  And that's

4  absolutely inappropriate to not be able to come in and tell the

02:44   5  jury that the patent office has taken a second look and has

6  decided that there's a serious question of patentability over

7  the very same reference that they've now tried to assert has

8  been checked off, signed off on by the patent office.

9       And it's a matter at this point in time of the jury being

02:45   10  able to weigh the evidence.  They need to hear the whole story,

11  and they've only gotten a piece of it, and they've gotten the

12  piece that's favorable to Columbia.

13           THE COURT:  Thank you.  What do you all want to tell

14  me?

02:45   15           MR. ALDRICH:  Pardon?

16           THE COURT:  Is there anything you want to tell me

17  about the IPR?

18           MR. ALDRICH:  So first of all, the IPR, Your Honor, is

19  not complete.  It has a significantly lower burden of proof,

02:45   20  and so to tell the jury that an incomplete process in which the

21  patent trial and appeal board has said that there is a chance

22  that it is invalid over Fottinger and other prior art not of

23  record here is irrelevant to what they are supposed to be

24  deciding.  They are supposed to be deciding on a clear and

02:45   25  convincing evidence standard whether the art that's been put in

1    front of them renders the patent invalid.

2         THE COURT:  Okay.

3         MR. ALDRICH:  The motion in limine papers are fairly

4    detailed on that topic, and I don't think there's been a case

02:46    5    in which IPR proceedings have been allowed to be in front of a

6    jury that's supposed to be deciding a question of validity

7    based on clear and convincing evidence, and we put a bunch of

8    cases in our brief about that.

9         THE COURT:  Okay.  Thanks.

02:46    10        MR. MARCHESE:  I don't think you'll see cases where

11   the door's been opened like this, Your Honor.  It's a different

12   factual scenario.  You know, the patent office has said, "We

13   conclude that the information presented, Fottinger, establishes

14   a reasonable likelihood that the petitioner will prevail in

02:46    15   showing unpatentability of the claims at issue," and so I

16   just -- we were abiding by Your Honor's decision in the motion

17   in limine, and we haven't brought it in, and we had intended to

18   obviously honor that ruling.

19        But at this point in time, you know, when counsel opens the

02:47    20   door like he just did with the -- you know, the technical

21   expert in this case and tries to suggest to the jury through a

22   pretty strong cross-examination about what is in the

23   prosecution history, what the examiner did with Fottinger, and

24   that the examiner checked it off, and that's the end of the

02:47    25   story, well, it's not.  The story has continued, and this

1    patent has been deemed vulnerable, and we think the jury should

2    get to hear that now.

3         THE COURT:  Yeah.  I thought you were talking about a

4    different door that had been opened, not that one.

02:47  5         MR. MARCHESE:  Well, in addition, Your Honor,

6    certainly the door has been opened to the Korean proceedings as

7    well as the Japanese proceedings, and Fottinger was at issue in

8    South Korea.  The South Korean patent office rejected the

9    corresponding patent over Fottinger, and that's clear, that

02:48  10   door has been opened as well.

11      And we have to be able to combat these assertions that the

12   patent office has checked off Fottinger and believes that

13   that's the end of the story.  That could certainly be the

14   inference that they would draw, and that's clearly not the

02:48  15   whole story in this case.

16         THE COURT:  All right.  Thank you.  Anything else?

17         MR. SPROUL:  Your Honor, one question on a similar

18   issue which is those questions directed to whether or not those

19   secondary references disclosed heat-directing elements.

02:48  20   Dr. Block constrained his answers to your order.

21         THE COURT:  That's the door I thought you were talking

22   about.

23         MR. SPROUL:  Exactly, Your Honor.

24         THE COURT:  That door has been opened.  I think he

02:48  25   gets to explain his answers regarding why he stopped at the

1    heat-directing elements and his disagreement with me regarding

2    those heat-directing elements.  That's the door I thought you

3    were going to open.  There's no doubt that he gets to explain

4    his answers on those issues.

02:48    5           MR. SPROUL:  Thank you, Your Honor.

6           MR. MARCHESE:  Can we rebrief this IPR issue because

7    it's a really serious issue for us because the implication has

8    been made through this cross-examination by taking those IDSs

9    or arguing about those IDSs with Dr. Block, and, you know, the

02:49   10   jury's left with the impression that that's the end of the

11   story, and it's certainly not.

12           THE COURT:  Yeah, I just don't know -- this is kind of

13   a 403 problem for me.  I don't know what the right answer on --

14   as to, you know, one, has the door been opened; and, two, how

02:49   15   probative is it that there's this IPR that's going on for

16   purposes of this trial, and whether or not that -- how

17   probative that is to any issue that the jury needs to decide.

18   I'm not sure that you've got yourself there, but I'll let you

19   brief it, and I'll read whatever you send me.

02:49   20           MR. MARCHESE:  What about the South Korean

21   prosecution?

22           THE COURT:  Same thing:  I'm not sure that you've

23   gotten there on that issue as well.

24           MR. ALDRICH:  I don't know how I opened the door to

02:49   25   South Korea -- South Korean law, South Korean patents.  We

1    haven't seen what the patent claims are, and we can't because

2    they're in South Korean.  I have no idea how anything here

3    relates to Korean law.

4            THE COURT:  I'll read whatever you want to send me.

02:50    5            MR. MARCHESE:  Thank you, Your Honor.

6            THE COURT:  You can respond to whatever they send me.

7            MR. ALDRICH:  Thank you, Your Honor.

8            THE COURT:  Did you understand what I just said?

9            THE WITNESS:  Sure.  Thank you.

02:50   10    (Proceedings held in the presence of the jury panel.)

11            THE COURT:  Welcome back.  Please be seated.

12    Redirect.

13            MR. SPROUL:  Thank you, Your Honor.

14                    REDIRECT EXAMINATION

02:50   15    BY MR. SPROUL:

16    Q.   Dr. Block, if we could start at the beginning of some of

17    the answers that you gave on cross-examination.

18         You testified or you mentioned Planck's law.

19    A.   Uh-huh.

02:51   20    Q.   What do you mean by Planck's law?

21    A.   First of all, Dr. Planck, Professor Dr. Planck, was one of

22    the early founders of what we now call "modern physics," and in

23    his work, he was able to show that if you have a theoretical

24    body, what he called a "black body," and he said, "This

02:51   25    theoretical black body has certain characteristics.  It doesn't

1    exist on earth.  But if we take this as our model, then I can

2    show the following sorts of things."

3        And the following sort of thing that he showed is that

4    given the temperature of this black body, he can show you what

02:52    5    the heat curve looks like starting way out here with the sun,

6    very, very high temperatures, very high energy, and all the way

7    down at this tail end over here there is the body temperature

8    of the human being.  And there's the little blip down there

9    just like Planck said there would be.  It's been measured.

02:52   10        So Planck's law, when we relate it to real objects in the

11   real world, we have to say, "Well, here's Planck's model.  We

12   have to adjust it slightly to take into account real things."

13   And what Planck tells us is -- and that's why it's a law --

14   everything emits heat of some sort to some extent, some much

02:52   15   better than others.  Everything reflects heat to some extent,

16   some much better than others.

17   Q.   And how does Planck's law tie into your opinion that

18   Fottinger discloses heat-directing elements?

19   A.   Well, as I wrote in my report at the time before the judge

02:53   20   made his ruling, if we look at Planck's law, everything to some

21   extent emits heat.  Everything to some extent reflects heat.

22   And if you could take a look at my report, I go through item by

23   item by item with every single one of the references that I

24   had, and I say, "These elements do actually reflect heat, not

02:53   25   very well perhaps" -- but could you bring up the '119, please,

1    the claims?

2    Q.   How about the '270?

3    A.   Or the '270.  You're right.  How about if we bring up the

4    '270?

02:54    5    Q.   Well, let me ask.

6    A.   It finishes my answer.

7         MR. SPROUL:   Okay.  Could you please pull up -- in

8    fact, we have a slide on this.  I believe it's 508.

9         THE WITNESS:   Thank you.

02:54    10   BY MR. SPROUL:

11   Q.   An easier way to do it.

12        Dr. Block, how does Planck's law affect your opinion that

13   Fottinger discloses heat-directing elements with respect to

14   claim 2 of the '270 patent?

02:54    15   A.   One, item 3, a discontinuous array of discrete

16   heat-directing elements:   It does not say these have to be good

17   heat-directing elements, only that they be heat-directing

18   elements.  That, of course, is a major problem with this

19   patent.  There are no requirements of numbers.  So in its own

02:55    20   claim, it doesn't say that you have to be a good reflector of

21   heat.

22   Q.   Thank you, Dr. Block.

23        You were asked whether the secondary references that you

24   rely on for obviousness such as Worley, Halley, Blauer, and

02:55    25   Vaughn, whether they disclose heat-directing elements.  Do you

1    recall that?

2    A.   Yes, I do.

3    Q.   And your answer was that you were constrained by a prior

4    order in this court.  Is that correct?

02:55    5    A.   That is correct.

6    Q.   And you are now able to testify to your full opinion as to

7    whether or not those references disclose heat-directing

8    elements.  Could you please tell the jury your understanding of

9    whether those references, one or more of them disclose

02:55    10    heat-directing elements?

11            MR. ALDRICH:  Objection, Your Honor.

12            THE COURT:  I'm sorry.  I was watching a juror choke.

13            PANEL MEMBER:  I'm good.  All good.

14            THE COURT:  I'm sorry.

02:56    15            MR. ALDRICH:  Objection.

16            THE COURT:  Can you rephrase the question?  I missed

17    it because I was concerned about one of my jurors.

18            MR. SPROUL:  If you could pull up slide 537.

19    BY MR. SPROUL:

02:56    20    Q.   Do you recall talking -- testifying about the Worley

21    reference in the obviousness discussion?

22    A.   Yes, I do.

23    Q.   And do you recall being asked by counsel questions relating

24    to Worley and whether or not it disclosed heat-directing

02:56    25    elements?

1    A.    That is correct.

2    Q.    And you were constrained under your -- by your

3    understanding of a prior order of this court.   Is that correct?

4    A.    That is correct.

02:56  5              MR. SPROUL:   May we publish this?   These are slides

6    that he's already testified to.

7              THE COURT:   Sure.

8    BY MR. SPROUL:

9    Q.    What is your opinion as to whether or not Worley discloses

02:56 10    heat-directing elements?

11              MR. ALDRICH:   Objection, Your Honor.

12              THE COURT:   Your objection is overruled.   He can

13    explain this answer.

14              MR. ALDRICH:   Okay.

02:57 15              THE COURT:   We're having that technical thing where

16    some of them are working, and some of them weren't.   Still not

17    up -- it's not here.   It's looped me before.   Leave me out.

18        Do you have black screens there?

19              MR. MARCHESE:   We can use the ELMO.

02:58 20    BY MR. SPROUL:

21    Q.    For purposes of this question, we're simply going to be

22    showing a picture of the patent anyways, which probably isn't

23    that scintillating to the jury.

24        If you could provide your opinion as to whether or not

02:58 25    Worley discloses heat-directing elements.

1 A.   As I said in my initial report, yes, it does.

2 Q.   And why do you say that?

3 A.   As I explained, if we look at Planck's law, everything

4 emits or reflects heat to some extent.  The patent doesn't

02:58    5 require that it be a good reflector, only that it reflects.

6 Q.   Now, your opinion was that Fottinger teaches heat

7 direction?

8 A.   That is correct.

9 Q.   And you were relying in your initial opinion on the fact

02:59    10 that the secondary references, Worley, Halley, Vaughn, and

11 Blauer, teach coverage ratios.  Is that right?

12 A.   I think my ears just went out.  Could you repeat that in a

13 loud voice?

14 Q.   Certainly.

02:59    15        MR. SPROUL:  I'm not going to blow anybody out if I

16 project here?

17        THE COURT:  It doesn't look like it.

18        MR. SPROUL:  Okay.

19 BY MR. SPROUL:

02:59    20 Q.   It was your opinion, Dr. Blauer, that the secondary

21 references, Worley, Halley, Vaughn -- strike that.  I think I

22 called you Dr. Blauer.

23 A.   Yes, you did.  We all understood.

24 Q.   Dr. Block, it was your opinion that the secondary

03:00    25 references, Halley, Worley, Vaughn, and Blauer, teach coverage

1  ratios.  Isn't that right?

2  A.  That was my opinion initially today.

3  Q.  And your opinion today is -- well, strike that.

4      If those secondary references don't teach heat reflection,

03:00  5  is it your opinion that they could be combined with Fottinger?

6  A.  That is correct, yes.

7  Q.  And if they teach heat reflection, is that an additional

8  reason why one might combine any one of those references with

9  Fottinger?

03:00  10  A.  One could, but one would not have to.

11  Q.  And why is that?

12  A.  That's because they all would both anticipate and render

13  obvious the '270 patent.

14      MR. ALDRICH:  Move to strike, Your Honor.

03:00  15      THE COURT:  Your objection is overruled.  Again, this

16  is just so he can explain his earlier answers to counsel's

17  questions in cross-examination.

18  BY MR. SPROUL:

19  Q.  And if we look at the Halley reference, is it your opinion

03:01  20  that Halley disclosed heat-directing elements as well?

21  A.  That is correct.

22  Q.  And if we consider the Vaughn reference?

23  A.  Correct.

24  Q.  And the Blauer reference?

03:01  25  A.  Correct.

1    Q.    Correct as in they disclose heat-directing elements?

2    A.    They all disclose heat-directing elements.

3    Q.    And do you recall being questioned about the orientation

4    of -- with respect to Fottinger and his discussion of linings

03:01    5    and interlinings and surfaces?  Do you recall that discussion?

6    A.    Yes, I do recall that.

7    Q.    And do you recall -- strike that.

8         Could I have you look at the exhibit in your -- I'm

9    assuming we don't have a screen.  Is that right?  Do you have a

03:02    10    copy of your presentation in front of you, Dr. Block?

11    A.    A copy of my presentation, this morning's presentation with

12    all the slides?

13            MR. SPROUL:    Apparently we are back up, so if I could

14    ask Mr. Tisa to pull up slide 517.

03:02    15    BY MR. SPROUL:

16    Q.    I direct you to the bottom quote on slide 517 which is

17    column 3, lines 48 to 52.  And could you explain what

18    Mr. Fottinger is describing -- how one of ordinary skill would

19    understand what Fottinger is describing with respect to the use

03:03    20    of his discontinuous coatings on the textile fabric in a piece

21    of clothing.

22    A.    Both or just the bottom until --

23    Q.    Just the bottom, please.

24    A.    Okay.  A person of ordinary skill in the art would read

03:03    25    what Fottinger has written here that we have interlinings,

1    linings, and outer fabrics.  They may be also used as outer

2    fabrics for articles of clothing, in which case the coated face

3    will be on the inside of the article.  That is, he is not

4    telling us to put the dots on the outside facing away from the

03:03    5    body.  There is no question that a person of ordinary skill

6    would recognize Fottinger means facing inward.  Whether it is

7    the outer shell, whether it is the interlining, or whether it

8    is the lining, he wants them facing inward.

9    Q.    Is it your testimony today that Fottinger discloses every

03:04    10    element in claims 2 and 23?

11    A.    That is correct.

12    Q.    And is it your testimony today that Fottinger's experiment

13    teaches heat reflection?

14    A.    It's not an experiment; it's an example.

03:04    15    Q.    Is it your testimony today that Fottinger's example teaches

16    heat reflection?

17    A.    Yes.

18    Q.    And you recall counsel's use of his jacket where he asked

19    you about the right side and the left side of Fottinger's

03:04    20    example and his thermal image that he took?

21    A.    Yes, I do.

22    Q.    And do you recall that he explained that the Fottinger test

23    showed the right side with the textile, the alleged

24    heat-directing elements, was warmer than the left side.  Do you

03:05    25    recall that?

1  A.   That is correct.  Yes, I do.

2  Q.   And is it your testimony that that shows heat direction

3  towards the body of the user by those textile elements?

4  A.   It is showing just the opposite of what he claimed.  Yes,

03:05  5  it is showing heat reflection.

6  Q.   Of what who claimed?

7  A.   It is showing heat reflection back to the body of the

8  wearer.  And would you care for me to give the jury a

9  demonstration?  It will take about a minute for me to give them

03:05  10  a drawing.

11  Q.   Certainly -- well, actually I don't think we need to.  I

12  think we can address this --

13  A.   Fine.

14  Q.   -- in a slightly shorter segment, which is why does that

03:05  15  picture showing the right side warmer show, according to you,

16  that Fottinger's example reflected heat back to the user?

17  A.   If you prefer I wave my hands around, that's okay.

18       Fottinger has a jacket.  He adds a layer of something to

19  that jacket.  That layer has heat-reflective elements arranged

03:06  20  in a dot pattern.  The heat-reflective elements are the dots

21  that contain the aluminum powder.  On the other side, he has

22  the same fabric with spots, but they do not contain the

23  aluminum powder.  They just contain the plastic, or goo as

24  Mr. Aldrich would say.  We put these things on.  We sit and we

03:06  25  wait, and if he had a better camera -- today his experiment

would be we'll sit and we'll watch and you can see this side

warm up.  Why?

Not because it's losing heat.  If it's losing heat, what

you're saying is Fottinger puts on this garment on this young

man, and he slowly freezes to death because all the heat's

being conducted out of his body.  No.  What is happening is the

heat-reflective elements in this invention are sending warmth

back to his body.  He's getting warmer.  His warmer body sends

heat forward.

And some of it's reflected.  And, yes, some of it is

conducted because he only has 40 percent coverage.  So there

must be conduction along with reflection.  So bounce back, warm

up, bounce forward, bounce back, warm up, back, forth, back,

forth, we reach a point at which the temperature of the

heat-reflective elements has gotten to a point where they no

longer get any warmer.  The body is no longer getting any

warmer.  It's called "equilibrium."  For every heat photon that

comes from the body toward the heat-reflecting element, another

photon goes out to the outside.

So this part is, yes, warmer.  It's expected to be warmer,

and this part over here stays cooler.  Now, we could do

something about that if we wanted.  We could change our style

of garment and so forth and so on.  But the point is that what

Fottinger showed us way back then, 30-some years ago, 40 years

ago now, that he could raise the body temperature by using

1    these heat-reflective elements in this manner.

2    Q.   You were asked with regard to this particular example some

3    questions in your deposition which counsel asked you about

4    earlier.  Do you recall that?

03:08   5    A.   I'm sorry.  What was I asked?

6    Q.   Well, do you recall your answer -- your answer in your

7    deposition that counsel asked you about where you said

8    Fottinger does not work specifically because it reflected heat?

9    Do you recall that?

03:09   10    A.   Yes, I recall that, and that is correct.

11         MR. SPROUL:  And if we could pull this up, this was

12    already published by Mr. Aldrich.

13         THE WITNESS:  Does not work specifically because it

14    reflected heat.

03:09   15    BY MR. SPROUL:

16    Q.   And what do you mean by that answer?  What were you saying

17    when you responded in that way?

18    A.   Only 40 percent of Fottinger's fabric is heat-reflecting

19    elements.  There has to be conduction through the garment.  And

03:09   20    that's why I said "specifically because it reflected heat."  It

21    works, but not solely because it's reflecting heat.  It is

22    losing heat by conduction.

23    Q.   I want to ask you a few questions about obviousness which

24    you testified to with Mr. Aldrich.

03:09   25         Is it your opinion that one of ordinary skill would have

1    found the invention obvious without having seen the '270

2    patent -- let me ask a slightly different question.

3        Did you use hindsight to form your opinion that the

4    invention was obvious.

03:10    5    A.    Okay.    That way I don't have to go around the horn.

6    Q.    Yeah.

7    A.    If I may tell you -- tell me if I'm getting off the

8    subject.    The first time I was asked to have anything to do

9    with this, I went up to visit the offices of the former

03:10    10    counsel.    I spoke with one of the attorneys there, and he said,

11    "I'd like you to take a look at this," and he showed me the

12    Blackford declaration.

13                MR. ALDRICH:    Your Honor --

14                THE WITNESS:    And I said --

03:10    15                MR. ALDRICH:    Objection.

16                THE COURT:    Hang on a second.

17                MR. ALDRICH:    Objection.    We have not been provided

18    the privileged communications.    In fact, we asked and were

19    rejected, and he's about to go into attorney-client

03:10    20    communications.

21                MR. SPROUL:    We'd like to not waive so certainly --

22                THE COURT:    Do you want to redirect your witness?

23                MR. SPROUL:    I'll rephrase my question.

24                MR. ALDRICH:    Thank you, Your Honor.

03:10    25                MR. SPROUL:    Thank you.

1    BY MR. SPROUL:

2    Q.   Dr. Block, let me ask you a little more focused question

3    about your opinion today as you sit here with the jury.   Did

4    you use hindsight to form your opinion that the invention was

03:11    5    obvious?

6    A.   The very first time I saw the Blackford declaration, I

7    looked at it and said, "That's wrong."

8    Q.   Do you know what I mean when I say "hindsight" or counsel

9    asked you?

03:11    10    A.   That was the first time I ever saw it.   That can't be

11    hindsight.

12    Q.   I understand.   Do you believe -- is it your opinion that

13    one of ordinary skill would find -- would have found the

14    inventions in claim 2 and claim 23 of the '270 patent obvious

03:11    15    in view of Fottinger and those four secondary references that

16    you've testified --

17    A.   That the '270 patent would have been obvious in view of

18    Fottinger?   Is that what you're asking me?

19    Q.   Fottinger and --

03:12    20    A.   And the other.

21    Q.   -- secondary references.

22    A.   A person of ordinary skill looks at the patent and would

23    that person recognize the patent as being obvious?   Yes.   The

24    answer to that is yes.

03:12    25    Q.   And certainly you can't develop an opinion of obviousness

1    in the abstract with no patent.  You were simply -- is it true

2    that you were using the claims of the patent as the start of

3    your analysis?

4    A.   I would have to, yes.

03:12    5    Q.   Now, you were asked about secondary considerations as they

6    relate to your opinion of obviousness.  You understand that

7    secondary considerations are irrelevant to anticipation?

8    A.   That is correct.  They can only go to obviousness.

9    Q.   And is it your opinion that any of those factors -- well,

03:13   10   strike that.

11        And do you understand that secondary factors cannot

12   overcome a clear finding of obviousness?

13   A.   Cannot overcome a clear finding?  That seems obvious to me.

14   Q.   Okay.  That -- is it your understanding --

03:13   15        MR. ALDRICH:  Objection, Your Honor.  It's not the

16   legal standard.

17        THE COURT:  Well, you should not lead your witness in

18   any event.  Rephrase your question.

19   BY MR. SPROUL:

03:13   20   Q.   You testified that you didn't consider the secondary

21   factors to be relevant to your consideration of obviousness.

22   Is that right?

23   A.   I did not consider the secondary fact -- the other like

24   Worley and Vaughn, et cetera?

03:13   25   Q.   No.  I'm sorry.  You recall your testimony regarding the --

1   I used the wrong term -- the objective indicia of

2   nonobviousness, that list of nine different items that he put

3   in front of you?

4   A.  Yes, I do recall that.  Would you mind bringing it up and

5   letting me see it again just to refresh my memory?

6   Q.  Do you recall your questions --

7   A.  Yes, okay.  These are the nine questions.

8   Q.  And you have been in court listening to testimony since the

9   beginning.  Is that right?

10   A.  I'm sorry.  I didn't --

11   Q.  You have been in court listening to the testimony of the

12   various witnesses including the Columbia witnesses since the

13   beginning.  Is that right?

14   A.  Except for when I fell asleep, yeah, I have been listening,

15   yes.

16   Q.  Have you heard any testimony that changes your opinion

17   about whether or not claims 2 or 23 were obvious to one of

18   ordinary skill in the art --

19   A.  No, I have not.

20   Q.  -- at the time of the patent?

21   A.  No, I have not.

22   Q.  You were asked a few questions about the Lawrence and

23   Ogulata papers and references.  Do you recall that?

24   A.  Yes, I do.

25   Q.  Is it your testimony that Ogulata and Lawrence are relevant

1   to Mr. Blackford's declaration and his expected performance of

2   fabric with respect to permeability?

3   A.   Yes, very.

4   Q.   And why are Lawrence and Ogulata relevant to

03:15   5   Mr. Blackford's stated expectation of permeability?

6   A.   Just to summarize, Ogulata did a very, very complete and

7   very handsome theoretical study of what happens when you

8   make -- when you weave a fabric.  And he showed how you could

9   expect air permeability to change depending on what it is you

03:16   10   got.  I mean he didn't have just the one graph.  I had to do a

11   lot of stuff.  Anyway, he came up with that.

12       Lawrence and the universities that he worked with did

13   studies, physical studies, experimental work, on those -- on

14   similar fabrics, not Ogulata's fabrics, but on similar fabrics,

03:16   15   and when the results were published, one could see, you could

16   either look at it as Ogulata predicts Lawrence, or you can look

17   at it as Lawrence tells us that Ogulata's correct.

18       But in either event, what we're looking at is the air

19   permeability of a woven cloth which is the same sort of stuff

03:16   20   that Mr. Blackford used to assert his invention is not linear.

21   It is not what Mr. Blackford said it would be.

22   Q.   How do the results taught by Lawrence and Ogulata relate to

23   the results that Mr. Blackford showed from his test in his

24   declaration?

03:17   25   A.   Okay.  The first, and I think most important part,

1    irrespective of whether spots on top or no spots on top, the

2    behavior is nonlinear.  It is not Mr. Blackford's straight line

3    like this.  It's a curve that goes like that.  And no matter

4    how many dots, spots, or anything else you put on the surface

03:17  5    of that fabric, it is still going to be a curved line.  It will

6    change its shape a bit.  You'll have to say, "Well, Ogulata

7    didn't get this exactly right."  That's true.  But it is still

8    a curved line, not the straight line that Mr. Blackford said

9    everyone would expect.

03:17  10   Q.   Counsel for Columbia asked you a number of questions about

11   the interaction of heat-directing elements with air flow and

12   water vapor through a fabric.  Do you recall that?

13   A.   Yes, I do.

14   Q.   And does the fact that a -- an element placed on a fabric

03:18  15   reflects heat or doesn't reflect heat, does that impact

16   permeability in any way?

17   A.   No, it does not.

18   Q.   Why not?

19   A.   Because all we're talking about is are you covering up the

03:18  20   pores in the fabric through which the air or moisture is

21   flowing.  So here we have air flow.  If we close that off, it

22   changes.  Whether we close it off with another thread or

23   whether we close it off by putting a dot of plastic on top of

24   it is irrelevant.  It closed off; therefore, the passage has to

03:18  25   change.  It will still be nonlinear.

1    Q.    You were asked some questions about your testing that you

2    performed that was introduced at your deposition.    Do you

3    recall that?

4    A.    A little louder, please.

03:19    5    Q.    You were asked some questions about tests that you made on

6    Seirus gloves?

7    A.    Yes, I was.

8    Q.    And you were asked questions about that at your deposition,

9    weren't you?

03:19    10    A.    Yes, I was.

11    Q.    And you answered those questions?

12    A.    Yes, I did.

13    Q.    Now, you've read Dr. Cole's report?

14    A.    Yes, I have.

03:19    15    Q.    Her report specifically relating to infringement in this

16    case?

17    A.    Yes.

18    Q.    And do you have an opinion about her methodology and the

19    testing that she performed in that report?

03:19    20    A.    Please repeat.

21    Q.    Do you have an opinion about Dr. Cole's testing and her

22    methodology, and her methodology that she used in her report?

23    A.    Yes, I do.

24    Q.    And what is your opinion?

03:19    25    A.    Her methodology was flawed, and in my report I go through a

1    fairly long discussion about it, and initially she had

2    presented some information regarding fabrics, and I pointed out

3    that the procedures that she used were weak.  The

4    presentations -- the presentations that -- yes, it is

03:20    5    definitely working.  Thank you.

6        The presentation was not quite correct, and her conclusions

7    were faulty because she had not done certain statistical

8    analyses that were appropriate.

9        So that was basically my initial, and then Dr. Cole went

03:20   10    back and did a lot more measurements.  And after I looked at

11    those, I essentially said, "There are parts of what she did the

12    second time that are still open to the same criticisms that I

13    made the first time.  She still has not got a firm foundation

14    for her conclusions.

03:21   15    Q.   And you were asked whether the Seirus products included

16    every element.  Do you recall that?

17    A.   Whether the Seirus -- if it's a valid patent, yes.

18    Q.   And did your answer take into account your criticism of

19    Dr. Cole's testing and the criticism that you leveled against

03:21   20    your own testing?

21    A.   To the extent that I cannot prove and I don't think

22    Dr. Cole has proved that coverage area in Seirus gloves falls

23    within the 30:70 range, you are correct.

24        I shouldn't have made that statement.  She has not proved

03:22   25    it.  I cannot prove it.

1           MR. SPROUL:   No further questions at this time,

2      Your Honor.

3           THE COURT:   Do any of the jurors have any questions

4      for this witness?  If so please, raise their hand.

03:22   5      You may step down.

6           THE WITNESS:   Thank you, sir.

7           THE COURT:   Are you going to be using the easel?

8           MR. MARCHESE:   I don't believe so, Your Honor.

9           THE COURT:   We'll move it out of the way for you.   You

03:22   10     can call your next witness.

11          MR. MARCHESE:   Your Honor, Seirus calls Ms. Wendy

12     Carey, and my colleague Garrett Sakimae will take the direct

13     testimony.

14          THE COURT:   Please step forward.

03:23   15                    WENDY CAREY,

16                 DEFENDANT'S WITNESS, SWORN

17          THE CLERK:   Would you state and spell your full name

18     for the record.

19          THE WITNESS:   Wendy Carey, C-a-r-e-y.

03:23   20          THE COURT:   You may inquire.

21          MR. SAKIMAE:   Your Honor, defendants offer

22     Exhibits 1364, 1368, 1369, and 1372.

23          MR. AXELROD:   Is that the same as 705?

24          MR. SAKIMAE:   I don't think it was offered into

03:24   25     evidence.

1    MR. AXELROD:  No objection.

2    THE COURT:  They are received.

3    (Exhibits 1364, 1368, 1369, and 1372 admitted.)

4    DIRECT EXAMINATION

03:24  5  BY MR. SAKIMAE:

6  Q.  Good afternoon.

7  A.  Good afternoon.

8  Q.  Ms. Carey, would you please introduce yourself to the jury.

9  A.  Yes.  I'm Wendy Carey.

03:24  10  Q.  And who do you work for, Ms. Carey?

11  A.  I work for Seirus Innovation.

12  Q.  What is your current position at Seirus?

13  A.  My current position is CFO and executive vice president.

14  Q.  How long have you been the CFO?

03:24  15  A.  Since the beginning of Seirus time.

16  Q.  And what is a CFO?

17  A.  A CFO is the chief financial officer.

18  Q.  And where you from, Ms. Carey?

19  A.  I am from a little town in L.A., what used to be the rural

03:25  20  district of L.A. in San Gabriel Valley.  La Puente is the name

21  of the town.

22  Q.  Where are you currently from?

23  A.  San Diego.

24  Q.  How did you end up in San Diego?

03:25  25  A.  I met my husband, Mike Carey, in college, Santa Clara

1  University, and after a brief time in the mountains post

2  college, I ended up in San Diego.

3  Q.   You mentioned Santa Clara University.   Would you please

4  give a brief overview of your education.

03:25   5  A.   Yes.   I have a bachelor of arts from Santa Clara

6  University.   My major was general humanities which enabled me

7  to take a broad range of courses in science and accounting and

8  history, language.

9  Q.   You do not have a degree in accounting?

03:25   10  A.   I do not have a degree in accounting.

11  Q.   So how does someone without a finance or accounting degree

12  become and stay the CFO of a company for over 30 years?

13  A.   Good question.   So I've always had an interest in numbers,

14  so that part when we started incubating different businesses,

03:26   15  it was kind of natural for those responsibilities to fall to

16  me.   But then as the business grew, of course, the demands and

17  requirements of the position also grew, so I was very fortunate

18  to have the mentoring of many people:   Some really good bankers

19  who were very helpful and informative; a CPA who has been very

03:26   20  helpful and informative.   I've availed myself of different

21  classes to understand things and also used the mentoring of

22  different peers within the industries.

23  Q.   What did you do post college?

24  A.   Post college I worked in restaurants and various other

03:26   25  small things, but restaurants were the way that we actually

1    paid the bills while we were incubating different businesses

2    including Seirus.

3    Q.    Do you serve on any boards?

4    A.    I do.   I am very honored to serve on the board for our

03:27    5    trade organization, Snow Sports Industries of America.   I am --

6    the board has -- I think Mike mentioned at one point it was

7    about 22 members.   We have whittled it down to a much more

8    manageable group of about 15.   I am also very honored to be a

9    part of the six-man or five-man-one-woman executive committee

03:27    10    which does more of the fine detail organization for the -- our

11    group.

12        And then also for -- I'm on the board of directors for SOS

13    Outreach, which is a youth outreach organization that seeks

14    to -- or does identify at-risk kids that are junior high and

03:27    15    high school.   They're identified primarily through the school

16    system as kids who are not likely to finish junior high or high

17    school, and through a very well-developed program, helps mentor

18    them, building character, using -- getting on the mountain as

19    an attraction, but builds a whole series of programs that helps

03:28    20    them.   Many of them actually get to college and graduate.   So

21    it's been a very effective, great experience.

22    Q.    And I find this to be an interesting question, but why is

23    there a cold weather gear company based in San Diego?

24    A.    A lot of people ask that question because most people

03:28    25    expect that cold weather companies would be in the cold

weather.  But as I mentioned, meeting Mike in Northern

California -- and, of course, the first thing he always wanted

to do was get back to San Diego.  He's not a cold weather

person, but fortunately he fell in love with skiing, but never

03:28  fell in love with the cold.  So who better to help you keep

yourself warm than someone who does not like to be cold, and we

are definitely not going to be away from San Diego for a whole

lot of time.

Q.   When did you and Mr. Carey get into the cold weather

03:28  business?

A.   So we were skiing in Tahoe, and Mike -- I don't remember if

I bought him these boots for Christmas or how he got them, but

anyway he has a brand-new pair of boots.  He is -- after the

first day of skiing, he's looking at the bottom of his boots

03:29  and realizes that there's a lot of wear.  He did some

investigation and found out that there was -- this is actually

an issue in the industry because the fit between a boot and

binding is very precise.  So there had been a Swiss study that

said within five days, the minimal amount of walking that you

03:29  would do from your car to the lift and back was enough to knock

it out of the standard.  And, in fact, there were a lot of

suits in the industry where people were either having a lot of

vibration in their binding and prereleasing and getting hurt,

or clamping down their bindings so tight that they were not

03:29  releasing and getting hurt.

1    And so when he addressed this issue, the industry actually

2 was really excited, and, in fact, a lot of the boot and most of

3 the boot and binding manufacturers at the time said, "Will you

4 please put our name on your packaging because it will help us

03:29   5 educate the consumer about the need to protect the bottom of

6 their boot."

7 Q.   Let's talk briefly about your history with Seirus.

8    Your first job with Seirus was CFO?

9 A.   Yeah.  We weren't really into titles back then, but I had

03:30  10 the financial responsibilities.

11 Q.   And what were those financial responsibilities when Seirus

12 first began?

13 A.   At that time it was accounting, so invoicing and paying the

14 bills and helping to process the orders and actually a little

03:30  15 bit of production.  This was precomputers, so everything was

16 out on spreadsheets and trying to figure what the schedule

17 should be to meet our order commitments.

18 Q.   What are your responsibilities as the CFO today 30 years

19 later?

03:30  20 A.   30 years later it's a little more focused, so it still

21 oversees the accounting department, human resources, the IT

22 department, and then backup in other areas.

23 Q.   Since you oversee accounting, are you the person most

24 knowledgeable about the size of Seirus and employees generally?

03:30  25 A.   Yes.

1  Q.   How many employees does Seirus currently have?

2  A.   We have 61 full-time, regular employees, and then we hire

3  seasonally another 10 to 20.

4  Q.   You mentioned seasonally.  Why is that?

03:31  5  A.   As a seasonal business, we obviously get very busy at a

6  certain time of the year, so the primary part of our shipping

7  would be from September through, hopefully if it's a good long

8  season, February, and in order to help process orders through

9  the warehouse, we need to bring in more people.

03:31  10  Q.   What's the turnover like at Seirus?

11  A.   Oh, it's very low.  Our average tenure is about ten years,

12  and even with our seasonal employees, we are very lucky that

13  many -- I would say probably about 30-plus percent of those

14  people have been there for multiple years.

03:31  15  Q.   Ms. Carey, did you help to prepare demonstratives to help

16  aid your testimony today?

17  A.   I did.

18       MR. SAKIMAE:  Okay.  Mr. Tisa, would you please bring

19  up DDX610.  I believe counsel has an objection to this slide.

03:32  20       MR. AXELROD:  If she can lay a foundation.

21       MR. SAKIMAE:  Okay.

22  BY MR. SAKIMAE:

23  Q.   Ms. Carey, what do we see here?

24  A.   This is a cycle -- a graph that helps describe the cycle

03:32  25  for any one season.  So as you can see here, it goes from July

1  through another July into February, so I think that's, you

2  know, 14 or 16 months that it takes from the time that a -- our

3  product line, which is the products that we are actually going

4  to present for sale for a particular season get decided, until

03:32  5  they finish shipping that year plus into the February of the

6  following year.

7  Q.  And you are familiar with the cycle?

8  A.  Very familiar.

9  Q.  This happens year after year?

03:32  10  A.  Yes.

11      MR. SAKIMAE:  Your Honor, I would offer DDX106 and

12  publish it to the jury.

13      THE COURT:  These are demonstrative exhibits.  If you

14  want to show them to the jury, you may publish this exhibit.

03:33  15  BY MR. SAKIMAE:

16  Q.  If you cue in detail start with July.

17  A.  Yes.  So I believe there was mention before that we have a

18  steering meeting in July, and at that July meeting is -- or

19  shortly thereafter is when we actually decide what the line is

03:33  20  going to be.  And then the period from July through November,

21  we are preparing all our sales samples and getting ready to

22  actually take them to our potential buyers.

23  Q.  And what do you mean by "a line"?

24  A.  Oh, whatever product is going to be -- whatever products

03:33  25  are going to be in our line for that coming year.  Every year

1  we relook at what all the products are in our line and decide

2  which ones we should keep making, which new ones we should

3  introduce, and which ones maybe should be discontinued.

4  Q.   And what happens next?

03:34  5  A.   Then next by November, we are -- sometimes a little bit

6  before, but basically the bulk of our presentations to our

7  customers start in November, and that's when we -- that period

8  from November through March, we are going out and getting all

9  our sales commitments from our dealers.

03:34  10  Q.   And in March?

11  A.   And then in March -- by the end of March, hopefully we've

12  got all our sales commitments in, and we are putting in the

13  bulk of our product orders to our contract factories who are

14  building product for us.   Some of it happens before that, but,

03:34  15  again, the bulk of that period is getting all our production

16  built and into our warehouse.

17  Q.   Okay.   And from July to February it says "shipping cycle."

18  A.   Yes.

19  Q.   What happens then?

03:34  20  A.   That is -- so I think it's been mentioned that part of our

21  line is a hunting work wear line, and hunting, I believe, in

22  preparation for their fall hunting season, they like to take

23  their goods in July.   Most of the ski stuff doesn't start

24  shipping until a little bit later, but basically from July to

03:35  25  February is when we're doing the vast majority of the shipping

1    and invoicing that we will do for the year.

2    Q.    Thank you.

3        And are you familiar with the costs of the general

4    production of the products during this cycle?

03:35    5    A.    Yes.

6    Q.    Thank you.

7        MR. SAKIMAE:    Mr. Tisa, would you please pull up

8    demonstrative 604.

9    BY MR. SAKIMAE:

03:35    10    Q.    Ms. Carey, what are gross-to-net-sales adjustments?

11    A.    So this is a section that talks about our revenues and what

12    your gross revenue number ends up being, and so it is -- sales

13    revenue is the line that indicates all our invoicing, and then

14    once we invoice something, there are certain discounts or

03:35    15    allowances that customers will take in the process of paying

16    their invoices.    There are also sales returns.    So some things

17    that are invoiced actually get returned to us for credit, so

18    that comes out of that section.    And then there's sales freight

19    which is actually an add to revenue and then some other

03:36    20    miscellaneous adjustments.

21    Q.    And could you generally summarize what is on this slide?

22    A.    Yes.    So this is the section that would refer in our

23    financial statements to the -- a number that comes up with our

24    gross revenue.

03:36    25        MR. SAKIMAE:    Mr. Tisa, if you'd please pull up the

1  next demonstrative, 605.

2  BY MR. SAKIMAE:

3  Q.   Ms. Carey, what is this?

4  A.   This is the cost of sales, so, again, on our financial

03:36  5  statement, we have a section that tells you what the cost of

6  all those revenues that we generated in the last section are.

7  So there's direct material which indicates what the actual cost

8  of each product is according to our standard that we have

9  decided -- figured out in the beginning of the year.   And then

03:36  10  there's freight in and out for the materials and components and

11  finished goods that we -- that it takes to get materials to

12  where they need to be and then back to us and in our warehouse

13  as finished product, and some other miscellaneous cost that are

14  directly associated to those products.

03:37  15        MR. SAKIMAE:   If you could pull up 608, Mr. Tisa.

16  BY MR. SAKIMAE:

17  Q.   What are marketing expenses?

18  A.   That's an overarching term for those things that are

19  related to advertising and promotions and the sales, supplies,

03:37  20  and everything that it takes to actually advertise and promote

21  the sale of something so that we actually end up with a sale.

22  Q.   So what costs are included in Seirus' advertising?

23  A.   So that would be primarily print and media, so online

24  advertising, print advertising, like magazines and those types

03:37  25  of things.

1    Q.    Do you only highlight HeatWave in your advertising?

2    A.    No.    HeatWave is definitely one of the marketing lines that

3    we advertise.    We also advertise other product lines that we

4    have, and we do brand advertising, just advertising the Seirus

03:38    5    name also.

6    Q.    And what is business promotion?

7    A.    Business promotions is again promoting through spending the

8    products.    So maybe we do Seirus banners or product line

9    banners or displays or different types of ways to inform and

03:38    10    promote our product.

11    Q.    And business promotion refers costs?

12    A.    Yeah, these are all cost categories.

13    Q.    How are commissions related to HeatWave?

14    A.    If we weren't paying our reps their commission, they

03:38    15    probably wouldn't be out selling for us.

16    Q.    What are sales analytics and how does that relate to

17    HeatWave?

18    A.    Sales analytics is actually paying an outside group to help

19    with analyzing inventory flows through especially key customers

03:39    20    which helps optimize our customer sales and, therefore, our

21    sales by making sure they've got the right product on the

22    shelves at the right time.    Especially in the ski industry

23    where that winter season is so short and is also right around

24    Christmastime, being able to have product and the right amount

03:39    25    of product on your shelves at that time, and we've all heard

1   about how retailers count on Christmas, so if they don't have

2   the product there when they need it, it hurts their chances of

3   being profitable.

4   Q.   And here you have "sales meetings."  What is that?

03:39   5   A.   We have an annual sales meeting for both hunting and snow

6   sports divisions, and it's where we bring the reps to us to

7   help explain all of the products.  And, you know, we have very

8   many multi-component products, so understanding how they work

9   and what the features and benefits are is really important, so

03:40   10   it's a very important gathering for us.

11   Q.   And what is "product giveaway"?

12   A.   Product giveaway are -- we -- actually there's -- I could

13   sit and tell you the product all day, but if you get to put it

14   on, and if you get to go out and wear it on the mountain or

03:40   15   shoveling your driveway or whatever you're doing, you have a

16   much better conviction level about how well the product works

17   and are much more likely to buy it.

18   Q.   Okay.  And "sales supplies and awards," what had are those?

19   A.   Sales supplies are the miscellaneous support materials, so

03:40   20   catalogs and sales sheets, pricing sheets.

21   Q.   And lastly what are "travel and entertainment sales"?

22   A.   That's the section that requires the expenses for our sales

23   managers to go out and meet with accounts and explain products

24   and programs to them.

03:40   25          MR. SAKIMAE:   Mr. Tisa, would you pull up

1    demonstrative 606, please.

2    BY MR. SAKIMAE:

3    Q.   Ms. Carey, could you please summarize what we see here?

4    A.   Yes.   So this is the salaries and wages and expenses

03:41    5    associated with some of our departments in our company.   These

6    are not all of them, but these are the ones that are

7    specifically subject to being more or less kind of depending on

8    our sales volume.

9    Q.   Okay.   And how are sales salaries related to HeatWave?

03:41    10    A.   Because this is the sales manager, so, again, with the

11    volume of sales and volume of work that has to be done to

12    support those sales, we need more sales managers to be active

13    in the field.

14    Q.   Okay.   And how are customer service salaries related to

03:41    15    HeatWave?

16    A.   Same thing:   We need -- the more sales we have, the larger

17    customer service department we need.   Same with production and

18    purchasing which does all of our purchasing and production

19    scheduling for our product line, et cetera.

03:41    20    Q.   And what about fulfillment?

21    A.   Fulfillment definitely, that is the department that picks

22    and packs and ships out the orders, so the more orders they've

23    got to fulfill, the bigger that number is.

24    Q.   And how are assembly and quality control salaries related

03:42    25    to HeatWave?

1      A.    Assembly and quality control is -- that's the department

2      that would help with when -- receiving the product again and

3      checking it because, again, because we have so many

4      multi-component products, it's really important that we check

03:42   5      those.

6            I think you heard Mr. Murphy talk about making sure that

7      the fingers are tacked in the glove and such.  So they actually

8      put a certain percentage of the gloves on and then pull their

9      hand out, check to make sure that the fitting is right and

03:42  10      everything, but that the liners don't pull out.  They look at

11      other things, make sure that there's no flaws in the sewing.

12      We just want to make sure that our standards are completely

13      high for all the product that we have.

14            And then assembly, if there's any post production assembly

03:43  15      that needs to be done, like sometimes, for instance, with the

16      HeatWave, those headers and hangtags got printed late so they

17      had to put the headers on the product once it got to our

18      warehouse, or stickering or whatever else needs to be done.

19      Q.    Regarding assembly and controls salaries -- or assembly and

03:43  20      quality control, is there anything special that you have to do

21      for certain sellers?

22      A.    Sure.  Yes, some of our customers require, for instance,

23      poly bagging or stickering or something else done specifically

24      for them.

03:43  25      Q.    What's an example of a special customer you would have to

1    deal with?

2    A.    Oh, like Amazon, they are one of our customers who -- they

3    buy product from us in large quantities, and so we have to -- I

4    think they require poly bagging.

03:43    5    Q.    Moving on, how are art and design salaries related to

6    HeatWave?

7    A.    Again, this is the department that would help with the

8    design and fabrication of products and materials, so the more

9    our sales volume, the more of that department is needed.

03:44    10    Q.    And I think we just talked quite a bit about salaries.

11    What are the salaries and benefits like at Seirus?

12    A.    They're actually really good.   We are a -- as I mentioned,

13    a family business -- or I think as other people have mentioned

14    we are a family business, and the health and welfare of our

03:44    15    employees is very important.   So we have top-notch health and

16    dental programs paid 100 percent by us.   We just -- well, we

17    have the experience, and we're very fortunate that our

18    employees stay with us a long time.   An average tenure of ten

19    years, I think is significant.   So we do all kind of programs

03:44    20    like gym memberships and teams and stuff.

21        But we also, for instance, have a profit sharing program

22    that is absolutely on top of their salary.   We contribute part

23    of the profits from Seirus to them, and even in years when we

24    haven't been able to do salary increases because maybe it's

03:45    25    been a really poor winter, and we just haven't had the sales to

1    be as profitable as we would like, we make an effort to always

2    fund that program for them, and, in fact, last year I think

3    what we contributed to our employees was about twice what our

4    net profits ended up being.

03:45    5    Q.    And, briefly, how are health and dental insurance and

6    personnel taxes related to HeatWave sales?

7    A.    Well, as it's directly related to these wages, then it's

8    directly related to the number of personnel that we need to

9    handle the volume for.

03:45    10    Q.    Ms. Carey, what type of a seller is Amazon relative to

11    Seirus?

12    A.    So there are several ways that product can show up on

13    Amazon.  One is that they can actually be a customer for you

14    and place an order like any other online or even

03:46    15    brick-and-mortar account would, and then other people can

16    actually -- our customers could use them as what's called "a

17    marketplace."  If you have the experience of going on Amazon

18    to, like, buy a book and you'll see there's like three

19    different sources you could have for buying that book because

03:46    20    you're actually buying it from maybe -- from some little

21    possibly Ma and Pa store or even a bigger store that decides

22    they want to use Amazon as their online vendor.  So it's -- we

23    do not put -- we have our own online direct consumer site, so

24    we do not use Amazon for that.  They're simply a larger bulk

03:46    25    product customer for us.

1  Q.   At Seirus out in Poway, have you ever had to assemble

2  products?

3  A.   Personally?  Oh, yeah.  It used to be the fire drill

4  sometimes, but now that the processes in the warehouse are much

03:47  5  more sophisticated, and it's -- you know, when we first moved

6  to that warehouse, I knew where all the product was.  Now, I

7  walk out, and the first thing the guys in the warehouse say is,

8  "Can we help you?" because they don't want me messing up their

9  process.

03:47  10          MR. SAKIMAE:   Mr. Tisa, would you pull up 607.

11  BY MR. SAKIMAE:

12  Q.   What do we see here, Ms. Carey?

13  A.   These are variable -- what we call variable and general and

14  administrative costs like bad debt collections and dispute.  So

03:47  15  sometimes, unfortunately, some of our customers go out of

16  business, or for one reason or another are unable to pay us or

17  dispute something, that, you know, we kind of lose the argument

18  on, and so these expenses are here as well as -- warehouse

19  supplies should be like cardboard boxes and tape and labels and

03:47  20  things that it takes to actually pack up an order and get it

21  shipped out.

22  Q.   This isn't Seirus' bad debt?

23  A.   No, no.

24          MR. SAKIMAE:   Mr. Tisa, if you'd next blow up 609,

03:48  25  please.

1    BY MR. SAKIMAE:

2    Q.   And to wrap up, Ms. Carey, what do we see here?

3    A.   This is product development and samples, so this is the

4    place where we'd record expenses in the process of designing

03:48    5    something.  So we might need several versions before we confirm

6    that, yep, that's the version we want; this is how it's

7    supposed to look; this is how it's supposed to work, and

8    there's a cost associated with that.

9        And then finance or interest is we do not build inventory

03:48    10    every year ourself, so we borrow money and have to pay interest

11    on it.

12    Q.   In your opinion are each of the costs that we just walked

13    through necessary for the sale of HeatWave products?

14            MR. AXELROD:   Objection, Your Honor.

03:48    15            THE WITNESS:   Absolutely.

16            MR. AXELROD:   The witness is not competent and hadn't

17    established any kind of standard for her to give any such

18    opinion.

19            THE COURT:   Your objection is overruled.

03:48    20            THE WITNESS:   Yes.  After 30 years of doing business

21    and doing financial projections and monitoring the ups and

22    downs of the company and different accounts, I can see which

23    accounts are related directly to sales volume, and all of these

24    definitely are.

03:49    25    BY MR. SAKIMAE:

1    Q.    Would you consider these costs to be variable costs?

2    A.    Yes, they are variable with the success of the product

3    line.

4    Q.    Are each of these costs tracked by specific product lines?

03:49    5    A.    No, they are not.

6    Q.    Would it be possible to track each of these costs specific

7    to HeatWave, for example?

8    A.    As somebody once said, anything is possible if you want to

9    throw enough money and resources at it.  When you decide to

03:49    10    spend money on something, there's an analysis that you do, ROI,

11    return on investment.  So would it make sense, or is there a

12    need to track each of these by a particular product or product

13    line?  No, it wouldn't bear any fruit.

14    Q.    And as the CFO of Seirus, what is the gross profit margin

03:50    15    Seirus targets for its products generally?

16    A.    ██ percent.

17    Q.    Ms. Carey, you have a binder in front of you?

18    A.    I do.

19    Q.    If you'd please turn in the binder to Defendant's

03:50    20    Exhibit 1372 which I believe is already in evidence.

21    A.    Yes.

22    Q.    What is this document?

23    A.    So this is what we call our "pricing BOMs," the bill of

24    materials.  This every season that -- in preparation of the

03:50    25    season we go through, and the production department does a

1    version of this that shows all of the lines that will be

2    involved in any one product, and then I put it into my

3    spreadsheet which helps verify the cost of that item and the

4    standard cost of that item.  And then it also goes to another

03:50    5    spreadsheet that helps us decide what the wholesale and retail

6    price is that we're going to establish for each product.

7    THE COURT:  This exhibit has not been received into

8    evidence.

9    MR. SAKIMAE:  I think I offered it at the beginning of

03:51    10    the testimony.

11    MR. AXELROD:  We have no objection.

12    THE COURT:  It will be received.

13    MR. SAKIMAE:  I apologize, Your Honor.

14    THE COURT:  You may have, and my trusty Bernadette may

03:51    15    have not caught it.  You may proceed.

16    MR. SAKIMAE:  Okay.

17    BY MR. SAKIMAE:

18    Q.   Ms. Carey, does this document -- at the top it says '13 to

19    '14.  Does this document reflect all the years through 2017?

03:51    20    A.   Yes.  I believe there's a sheet in here for each year.

21    Q.   Okay.  And, Ms. Carey, at the top left of this document it

22    says "group/model."  What is that?

23    A.   That just indicates that the model name is going to be in

24    that column.

03:51    25    Q.   Okay.  And to the right "usage."  What is that?

1    A.    Usage is the amount of, for instance, yard of material that

2    we're going to use, or in the case of duty, the duty rate that

3    we are going to pay on a product.

4    Q.    And to the right, "unit dollar sign," what is that?

03:52    5    A.    That tells me the per yard price of a material, or in the

6    case of duty on how much of the value of the product we have to

7    pay duty.

8    Q.    And to the right again, "extension"?

9    A.    Extension is each of those lines extended out.  So for the

03:52    10    first line, the manufacture charges us for his labor and the

11    various other componentry that he provides that -- that

12    particular price, and then the liner, which is the waterproof,

13    breathable liner that we put in, its extension.

14            MR. SAKIMAE:    Mr. Tisa, can you please pull up -- blow

03:52    15    out the second line item here that says HeatWave Accel glove,

16    please.

17    BY MR. SAKIMAE:

18    Q.    What is a HeatWave Accel glove?

19    A.    It one of the models of one of our HeatWave gloves.

03:53    20    Q.    What is "1252"?

21    A.    That is the four digit product code that we assigned to

22    that model.

23    Q.    Next could you please explain what's on the row

24    "manufacture"?

03:53    25    A.    Yes.    So that is the manufacturer, which is factory number

1  14 which is the number we assign, is charging us $4.60 for the

2  labor and items that they are providing for this product.

3  Q.   Okay.   And the next -- well, "█████████████," what is

4  that?

03:53  5  A.   That's a waterproof, breathable liner that we are procuring

6  for this product and sending to the factory.

7  Q.   Continuing in that row, what is "██████████"?

8  A.   That is the item number that we assign to that particular

9  liner.

03:53  10  Q.   And continuing on, what is ".70"?

11  A.   That is the cost of that liner to us.

12  Q.   And the next, "Ventex," what is that?

13  A.   Ventex, so that is the source for the reflective material

14  that we use in our HeatWave products, and the ████████ number is

03:54  15  the item number that we assign.   The █████ is the amount of

16  yardage that we use in that product.   That product costs us

17  █████ a yard, which does not include the freight that it takes

18  to get it to us, and the extension of that █████ times █████ is

19  █████.

03:54  20  Q.   And I guess quickly what are the other five catalogs that

21  we see here?

22  A.   The other five catalogs are headers, bungie, these various

23  items that the factory doesn't supply that we actually supply

24  for them, and their associated costs.

03:54  25  Q.   And what is "a screamer"?

1  A.   A screamer is a small hangtag that goes in addition to the

2  larger header that is on the product.

3  Q.   Okay.  And I might have missed it.  What's "a bungie"?

4  A.   The bungie in the case of this product is a piece of bungie

03:55  5  that goes around the header to keep it on the glove.

6  Q.   And lastly, the last row, total, what does total represent?

7  A.   Total is the sum total of all the lines that we see above

8  there, ███ down to the freight, ███████.

9  Q.   How does the number ███ relate to the HeatWave Accel

03:55  10  glove?

11  A.   So that is what they -- what we call the standard cost of

12  that item will be that is -- and as you can see, this is off

13  the '13-'14 pricing program.  That 11-27-12 date that we see

14  off to the right means that that's the last date that we

03:55  15  received some updated information about that product.  We --

16  most of our pricing we get much, much earlier, but maybe there

17  was an adjustment like we found out that the usage of the

18  reflective material was ███ instead of ██, or something

19  changed to make this.  So at that date we established that this

03:56  20  is a price that we expect to pay for this product, and that

21  allows us to set our wholesale and retail pricing for it.  And

22  then there's adjustments later on in the financial statements

23  that allow for if there's some variance between that

24  expectation and reality.

03:56  25  Q.   Okay.  And rather than walk through this entire document,

1  would your general descriptions related to the HeatWave Accel

2  glove apply throughout the document for the other products?

3  A.   Yes.

4  Q.   Would you next turn to Defendant's Exhibit 1364, which I

03:56   5  believe was already offered.

6  A.   Yes.

7  Q.   What is this document --

8       MR. SAKIMAE:  Can you please blow up the top third.

9  BY MR. SAKIMAE:

03:56   10  Q.   What is this document?

11  A.   So this is a HeatWave sales report based on fiscal years.

12  Q.   Okay.  And what fiscal years is this report based on?

13  A.   This goes from 9-1-13, which was the very beginning of

14  HeatWave sales, through February 28, 2017.

03:57   15  Q.   And the first yellow box in the middle, "'12/'13 fiscal

16  year," what does that represent?

17  A.   That is the period of -- those are the -- underneath those

18  boxes are the sales that would have happened within that fiscal

19  year.  Since September was the first month that we shipped

03:57   20  product, then we only see one month of this year.

21  Q.   Okay.  And below that, what is the "product code"?

22  A.   The product code is again the four-digit number that we

23  assign to each product.

24  Q.   And "product name"?

03:57   25  A.   Product name is the name we assign to the product.

```
        1   Q.   And what are "units sold"?

        2   A.   Units sold are the net number of units that we sold for

        3   that product, so it's what we invoice minus whatever returns

        4   might have happened.

03:57   5   Q.   And to the right "total sales," what is that?

        6   A.   Total sales is the total dollar sales associated with those

        7   units.

        8   Q.   And lastly to the right of that, what does "total profit"

        9   represent?

03:58  10   A.   That's the gross profit for those sales, so it's the gross

       11   cost of goods subtracted from the total invoicing.

       12   Q.   And does total profit here reflect variances or other small

       13   miscellaneous cost?

       14   A.   No, it's just the gross profit.

03:58  15   Q.   Ms. Carey, if you'd flip -- continue flipping through this

       16   document, there's a pink box, green box, blue box, and another

       17   gray box.  What do those represent?

       18   A.   Those are each separate fiscal years.

       19   Q.   Okay.  And your answer related to the '12/'13 fiscal year

03:58  20   would apply the same?

       21   A.   Absolutely.

       22   Q.   And lastly in the top left corner there's a yellow box that

       23   says "excludes international shipped direct from Asia."  What

       24   does that mean?

03:58  25   A.   That means that this report does not include any HeatWave
```

1    product that was shipped direct from our offshore manufacturing

2    facility to an offshore customer.  I understood that it wasn't

3    to include any international sales.

4    Q.   And, Ms. Carey, is this exhibit an updated spreadsheet

03:59   5    produced in this case?

6    A.   Yes, actually for a couple reasons:  One to the -- my

7    statement right before, I originally understood that it

8    shouldn't include any international sales, so I subtracted all

9    sales that ended up with an international customer.  And then

03:59   10   it was told to me that, no, it could only exclude sales that

11   never touched the U.S., so I had to add some sales back in, and

12   in the process of that, we also discovered that there had been

13   a typo in the original report.  I think the original report

14   said -- at the heading said 9-1-15 to 2-28-17 when in fact the

03:59   15   data in that report covered 9-1-13 to 2 --

16   Q.   Was the data in that original report entirely accurate?

17   A.   It was entirely accurate except for my misunderstanding

18   about what should be included and excluded.

19   Q.   Okay.  And is the data in this report entirely accurate to

04:00   20   your knowledge?

21   A.   Yes.

22   Q.   And you would rely on all of this data in the ordinary

23   course of your business?

24   A.   Yes.

04:00   25          MR. SAKIMAE:  Mr. Tisa, if you'd please pull up

1    demonstrative 602.

2         And, Your Honor, I would offer Exhibits 1418, 1423, 1435,

3    and 1436 which are variations of the All Weather Glove.

4         THE COURT:   Can you show it to the other side so they

04:00   5    can see it.

6              MR. AXELROD:   These are product samples?

7              MR. SAKIMAE:   Yes.

8         THE COURT:   Any objection?

9              MR. AXELROD:   No, Your Honor.

04:01  10         THE COURT:   They are received.

11         (Exhibit 1418, 1423, 1435, and 1436 admitted.)

12              MR. SAKIMAE:   May I approach?

13         THE COURT:   You may.

14   BY MR. SAKIMAE:

04:01  15   Q.   Ms. Carey, looking at demonstrative 602, what do we see

16   here?

17   A.   602 is a report that compares the two of the cases in which

18   we have an exact same glove that is available both as HeatWave

19   and non-HeatWave.

04:01  20   Q.   And what do you mean by that?

21   A.   So, for instance, these samples that you showed me, we have

22   gloves that are, except for the fact that they -- if you just

23   look at the glove from the outside without getting into any of

24   the interior of the glove, they would look -- and without

04:02  25   looking at the header of the glove, they would look exactly the

1    same.

2    Q.    And what is the one difference?

3    A.    The one difference is that on the inside one has HeatWave

4    and one does not.

04:02    5    Q.    Okay.  And the demonstrative on the screen, it says

6    "seasonal year 2015, 2016," and then there's a row below that.

7    Could you explain what that is?

8    A.    Yes.  So these are the two samples.  You see a product code

9    1422, which is a HeatWave version of the original All Weather

04:02    10    Glove, and then 1425 is the All Weather Glove original without

11    HeatWave, and these are their associated sales from the same

12    period.

13    Q.    Okay.  And what does -- you see the column "units."  What

14    does that tell you?

04:02    15    A.    Those are the number of units that we sold in that seasonal

16    year.

17    Q.    And how did in 2015-2016 the sale of the HeatWave original

18    All Weather Glove compare with the All Weather Glove original?

19    A.    Well, as you can see, we sold a whole lot more of the

04:03    20    non-HeatWave versions.  We have ███████ compared to ██ pairs

21    of the HeatWave version.

22    Q.    Okay.  And below that product code 1176 and 1172, what do

23    you see there?

24    A.    Yes.  This is again another -- this is a Soundtouch All

04:03    25    Weather Glove which we have a version without HeatWave and then

1  we added HeatWave to it thinking that if we took a couple of

2  our more popular gloves and added HeatWave that it would do

3  even better.  That isn't quite what happened.

4  Q.  And why did you choose these two sets of gloves to compare?

04:03  5  A.  Well, these -- this is one of the cases where when you look

6  at the glove, there is no difference from the outside.  I mean

7  they're exactly the same glove with the exception of one having

8  HeatWave on the inside and the other not.  Most of the rest of

9  our line is different, and these even almost have the same

04:03  10  name, so outside of the inside of the glove, they're virtually

11  the same.

12  Q.  And given the information you just talked about on

13  demonstrative 602, as chief financial officer of Seirus, what

14  does that tell you?

04:04  15  A.  It tells me we're not selling nearly as many HeatWave

16  gloves as we are other gloves.

17  Q.  And lastly, Ms. Carey, were you here during opening?

18  A.  I was.

19  Q.  And you were here at various points throughout the trial as

04:04  20  well?

21  A.  Yes.

22  Q.  Seirus is your company?

23  A.  Yes.

24  Q.  You founded it?

04:04  25  A.  Yes.

|       |    |                                                                              |
|-------|----|------------------------------------------------------------------------------|
|       | 1  | Q.   Were you there the day the complaint showed up?                          |
|       | 2  | A.   I was.                                                                   |
|       | 3  | Q.   Okay.   Have you lived this case for the past two and a half             |
|       | 4  | years?                                                                        |
| 04:04 | 5  | A.   Yes.                                                                     |
|       | 6  | Q.   And you're aware of Columbia's lawyers allegations in this               |
|       | 7  | case that Seirus is a copyist?                                                |
|       | 8  | A.   Absolutely.                                                              |
|       | 9  | Q.   How does all that make you feel?                                         |
| 04:04 | 10 | MR. AXELROD:   Objection.                                                     |
|       | 11 | THE COURT:   Sustained.                                                       |
|       | 12 | BY MR. SAKIMAE:                                                               |
|       | 13 | Q.   What do you think about the allegations of copying in this               |
|       | 14 | case?                                                                         |
| 04:04 | 15 | A.   I was raised in a --                                                     |
|       | 16 | MR. AXELROD:   Objection.                                                     |
|       | 17 | THE COURT:   Sustained.                                                       |
|       | 18 | MR. SAKIMAE:   No further questions, Your Honor.                              |
|       | 19 | THE COURT:   Cross-exam.                                                      |
| 04:05 | 20 | MR. AXELROD:   Thank you, Your Honor.                                         |
|       | 21 | CROSS-EXAMINATION                                                             |
|       | 22 | BY MR. AXELROD:                                                               |
|       | 23 | Q.   Mrs. Carey, Seirus has employed an expert witness named                  |
|       | 24 | Carrie Distler, has it not?                                                   |
| 04:05 | 25 | A.   Yes.                                                                     |



|  | 1 | Q.    And Mrs. Distler was retained to testify among other things |
|  | 2 | as to which of Seirus' costs were properly deductible for |
|  | 3 | purposes of calculating disgorgement.  Is that correct? |
|  | 4 | A.    Yes. |
| 04:05 | 5 | Q.    And you've worked with Ms. Distler a fair amount, have you |
|  | 6 | not? |
|  | 7 | A.    I have answered some questions that were given to me, yes. |
|  | 8 | Q.    You've had conversations with her.  Have you met with her? |
|  | 9 | A.    Solely here.   Yeah, I -- we had conversations previously, |
| 04:06 | 10 | yes, with our attorneys. |
|  | 11 | Q.    And you understand that in the summer of 2016, Mrs. Distler |
|  | 12 | issued a report on which costs she found deductible or arguably |
|  | 13 | deductible for reasons that she relied on as arguably variable. |
|  | 14 | Do you recall that report? |
| 04:06 | 15 | A.    I don't recall actually seeing her report.  I'm vaguely |
|  | 16 | aware of, you know, what she did. |
|  | 17 | Q.    She relates -- |
|  | 18 | A.    And didn't necessarily agree with my views. |
|  | 19 | Q.    She relates in her deposition a conversation that she had |
| 04:06 | 20 | with you -- |
|  | 21 | A.    Okay. |
|  | 22 | Q.    -- in which you identified a whole host of costs that you |
|  | 23 | wanted to have deductible as part of the disgorgement analysis |
|  | 24 | and with which Mrs. Distler disagreed.  Are you aware of her |
| 04:06 | 25 | review in that respect? |

1  A.   In that respect, yes.

2  Q.   So you know that she disagreed with a lot of the

3  requests -- or a lot of the expenses that you identified here

4  today in which you sought to have deducted?

5  A.   I don't know that I would quantify it as a lot.  There were

6  some that she disagreed with.

7  Q.   My question to you is, are you disagreeing with

8  Mrs. Distler's report and the position that she took on what

9  may be an appropriate variable deductible expense, or are you

10  affirming her report?

11  A.   I -- as -- since she is the expert that we've hired, and

12  she's the one who's knowledgeable in this area, I defer to her

13  judgment.

14  Q.   So if she concludes that expenses that you wanted to deduct

15  were not adequately justified or adequately variable, you're

16  not here giving contrary testimony.  Is that correct?

17  A.   I defer to her judgment.

18  Q.   Now, the numerous demonstrative exhibits that you went

19  through that listed all kind of expenses, these are basically

20  the expenses that are tracked generally without product line on

21  your financial statements, correct?

22  A.   Correct.  They're not tracked per product line.

23  Q.   And I believe -- tell me if I'm wrong -- that you told the

24  jury in your testimony that one of your directly variable

25  expenses to sales is sales expense.  Is that correct?

1    A.    Sales expenses, yes.

2    Q.    And do you base that upon Seirus' financial statements?

3    A.    Yes, on -- well, and history of understanding the ebb and

4    flow of expenses versus sales.

04:08    5    Q.    For your testimony today, did you go back through Seirus'

6    financial statements and track sales to actual products

7    revenues?

8    A.    Did I go back through the financial statements?

9    Q.    Yes.    Did you look to see whether, in fact, sales -- sales

04:09    10    expense as you testified correlates with product revenues?

11    A.    Generally I did.    Not in great detail.    I mean I know

12    historically it does.

13    Q.    This is one I should practice before I do it.

14            MR. AXELROD:    This is an unrehearsed performance.

04:10    15    BY MR. AXELROD:

16    Q.    So to test your recollection, I'd like to go through and

17    see what the correlation is.    So I -- if we set up a series of

18    columns for the years, first year would be year ending

19    September 2013?

04:10    20    A.    The first year for -- that we had any HeatWave product on

21    the market, yes.

22    Q.    Okay.    HeatWave came the very last month?

23    A.    The very last month.

24    Q.    So your sales of HeatWave product in fiscal year ending

04:10    25    2013 were like what?    A ███████ percent of your sales?

```
        1    A.   I didn't look at it as a percent.

        2    Q.   ██████  versus  ██████?

        3    A.   Okay.

        4    Q.   So pretty -- not too effective, right?

04:11   5    A.   Uh-huh.

        6    Q.   And then 2014, sales increased for Seirus dramatically,

        7    didn't they?  I can see I'm going to run out of room.

        8         So we've got revenues, right?

        9    A.   Yes.

04:11  10    Q.   And in 2013 the revenues were roughly ██████, right?

       11    A.   I think that's about right.

       12    Q.   And in 2014 they jumped, didn't they?

       13    A.   I believe they did.

       14    Q.   ██████ and change?

04:11  15    A.   Okay.

       16    Q.   Is that consistent with your recollection?

       17    A.   You know, I'd feel better looking at something, but, you

       18    know, close enough.

       19    Q.   You have it in front of you, do you not?

04:11  20    A.   The financial statements?  I don't.

       21    Q.   Yes.   Aren't they -- I believe they're in your book.

       22    They're in the record under many different exhibit numbers,

       23    unfortunately.   There's a fair amount of duplication.   I think

       24    in your book --

04:12  25    A.   I found them.
```

1    Q.    Did you?

2    A.    Yes.  I found one, anyway.

3    Q.    So in 2014 I read ████████████, and I apologize for my

4    spelling.  Did you find the 2014?

04:13    5    A.    It may be here.  Yes.

6    Q.    So is ████████████ the correct revenue number for 2014?

7    A.    Yes.

8    Q.    And 2015 is the correct revenue ████████████?

9    A.    I think that was our biggest year ever.  It seems like a

04:13    10    distant memory.  Yes.

11    Q.    And then in 2016?

12    A.    Not .5, though.

13    Q.    Not .5?

14    A.    No.

04:13    15    Q.    What do you show?

16    A.    ████.

17    Q.    ████.  We'll just call it ██ even.  Is that good?

18    A.    Sure.

19    Q.    And in 2016 I have ██ -- or excuse me -- ████████.  I'd call

04:14    20    that ████, if that's good with you.

21    A.    ████.

22    Q.    Then let's go to the sales expense, make sure we're talking

23    the same thing.  Could you look at the -- I've got them under

24    different exhibit numbers, so let me correlate to you.  Are you

04:14    25    on Exhibit 1368?

1    A.    Now I am.

2          MR. AXELROD:   Can we pull up -- I'll pull up this

3    corresponding document as 398, and turn to page 12.   Maybe

4    that's a quicker way to get through this.

04:15    5          THE WITNESS:   Which page?  I'm sorry.   By the way,

6    your sales numbers for that year are wrong.

7    BY MR. AXELROD:

8    Q.    Pardon?

9    A.    Your sales number for that year is wrong.

04:15   10    Q.    For which year?

11    A.    For 2013.   It should be about ███.

12    Q.    Oh, I see.   You're looking at -- okay.   Are you okay with

13    ███ for ballpark?

14    A.    Sure.

04:15   15    Q.    Okay.   Mrs. Carey, I'm going to pull up Exhibit 398 which

16    is already in evidence, which is the same document that you're

17    looking at, and we're going to go to page 12 of that exhibit

18    which is the 2013 financial statement.   And does that show

19    salaries, sales?

04:16   20    A.    Yes, it does.

21    Q.    And is that the sales expense that you told the jury

22    increases as sales increase?

23    A.    Yes.

24    Q.    Okay.   So when your sales were ████████ in 2013 -- I'm a

04:16   25    terrible handwriter.

1     That's sales salaries.  What were your sales salaries when

2  your sales were ██ or ███████?

3  A.    ██████.

4  Q.    ████.  Now, go to the 2014 fiscal year, and I'll use

04:17  5  Exhibit 399.  And this one is on page 11, and it's easier to

6  find down toward the bottom.  And we'll pull that up.

7     And what is the number for the sales salaries?  When your

8  revenues went up 50 percent, what did sales expense do?

9  A.    That actually went down, 592, and there are a couple of

04:18  10  factors that affected that one.  I think that was the year that

11  we went a significant period of time without a sales manager

12  when we were in the process of looking for one.  And then the

13  other thing is that sometimes bonuses from a previous year

14  actually get reported in the next seasonal year.

04:18  15  Q.    So we can't really rely on the financial statement for

16  accuracy?

17  A.    If you look at the --

18         THE COURT:  Wait, please.  You're talking over each

19  other.

04:18  20     Ask your question again.

21  BY MR. AXELROD:

22  Q.    So we can't really rely on the financial statements to

23  conduct this cost analysis.  Is that what you're telling me?

24  A.    If you looked at any one or two isolated years, you might

04:18  25  see more variances than you would expect, but if you looked at

1  it over a longer period of time, you would see that the trend

2  is intact.

3  Q.   We're going to go through the HeatWave years.  Is that

4  fair?

04:19    5  A.   Pardon me?

6  Q.   We're going to go through the HeatWave years.

7  A.   The HeatWave years.

8  Q.   Is that appropriate?  That's what's at issue in this case,

9  isn't it?

04:19   10  A.   Sure.

11  Q.   Okay.  Let's look at the next fiscal year which I have as

12  Exhibit 400 and the sales expenses on page 16 of this financial

13  statement up at the top.  And what was the sales expense in

14  that year when sales again increased to the most ever?

04:19   15  A.   ██████.

16  Q.   Okay.  And then I pull up 1363.  And turning to page 15 of

17  the financial statement, it's kind of in the middle.  And sales

18  expense in that year was what, Mrs. Carey?

19  A.   I'm sorry.  What page?

04:20   20       MR. AXELROD:  May I approach?

21       THE COURT:  You may.

22       THE WITNESS:  Oh, I found it.  ██████.

23  BY MR. AXELROD:

24  Q.   Would you agree with me that there's no direct or variable

04:21   25  correlation between the level of sales and the amount of sales

1  expense?

2  A.    I would have to agree with you that it certainly looks like

3  that on that, but I know that did we not -- if we were not to

4  have a sales force, we would not have sales, and that is

04:21  5  absolutely necessary to the sales of product to have a sales

6  manager, of course, and that without sales, we wouldn't need

7  one.

8  Q.    You mentioned customer service.  In the 2012-2013 fiscal

9  year, do you recall how many people you had in customer

04:21  10  service?

11  A.    Not off the top of my head, no.

12  Q.    Do you remember who they were?

13  A.    Not off the top of my head.

14  Q.    In 2013 do you remember how many people Seirus employed for

04:21  15  quality assurance?

16  A.    No, I don't.  The other thing that affects the sales

17  numbers is who the particular people in the department are, so

18  some of our sales management comes at a higher price than

19  others.

04:22  20  Q.    You also had finance expense on your list that you showed

21  the jury?

22  A.    Definitely.

23  Q.    And under interest, Seirus' biggest expense is a

24  shareholder loan.  Is that correct?

04:22  25  A.    Yes.



1  Q.    So this is an expense where Seirus is paying the owners

2  which are you, your husband, and Joe Edwards?

3  A.    I'm not an owner, no.

4  Q.    You're not an owner.  They would be paying Mr. Carey and

04:22  5  Mr. Edwards interest on a loan that they made to help finance

6  the company?

7  A.    Whichever of them had loans to the company, yes.

8  Q.    Is there one loan ongoing, or do they make loans

9  periodically through the course of the year?

04:23  10  A.    It can happen either way.  There is one loan for one

11  partner that is predominant right now.

12  Q.    Have those -- have there always been these loans?

13  A.    No, not always.

14  Q.    Do you recall when they started?

04:23  15  A.    No, I don't recall exactly when.

16  Q.    Well, they were in existence and already there financing

17  the company in 2013 before HeatWave arrived, correct?

18  A.    Yes, yes.

19  Q.    And in 2013 what was the expense that Seirus paid to the

04:23  20  shareholders on those loans as part of their providing capital

21  to the company?

22  A.    I don't remember.

23  Q.    Would you look at the --

24  A.    Sure.  Which of these reports was it?

04:24  25  Q.    Well, I'll pull up 398 again which is the 2013 year.

1    A.    I found it.

2    Q.    And I come up with ▮▮▮▮ as what was paid in interest on

3    the loan used to --

4    A.    Yes.

04:24    5    Q.    -- help finance Seirus when sales were ▮▮▮▮?

6    A.    Yes.   Now, remember, one thing that will be very difficult

7    on that is the fiscal year in which an expense happens compared

8    to the period over which we are building inventory.   So we're

9    building inventory one year for the next year's sales.

04:24    10    Q.    Do you know if the shareholder loans were given to build

11    inventory?

12    A.    Pardon me?

13    Q.    Do you know if those shareholder loans were made in 2013 to

14    build inventory, or are they part of the base capital of the

04:25    15    company?

16    A.    I'm not quite sure how to separate those because the base

17    capital of the company is used in part to build inventory.   We

18    also have a bank loan of credit -- line of credit that we use

19    to help build inventory.

04:25    20    Q.    In 2014 what was the amount that was paid on the

21    shareholder loan?

22    A.    In 2014?

23    Q.    Yes.   And we can pull up Exhibit 399 which is the 2014

24    financial statement.   And I refer you to page 23.

04:25    25    A.    It would help -- you have stickers?

1  THE COURT:  Would it help you to have stickers?

2  BY MR. AXELROD:

3  Q.  Is it ███████  that was paid to the shareholders?

4  A.  What page?

04:26  5  Q.  Page 23 of the 2014 financial statement.

6  A.  It was ████  plus ███████ to the bank.

7  Q.  Right, but I was just focusing for consistency to this on

8  the shareholder loan.  The bank loan is for flooring inventory?

9  A.  Pardon me?

04:26  10  Q.  Is the bank loan for flooring inventory?

11  A.  Yes.

12  Q.  And the shareholder loan is kind of a basic capital

13  contribution for the company, is it not?

14  A.  Which is in part used for building inventory.

04:26  15  Q.  It could be used for lots of things.

16  A.  Including building inventory, sure.

17  Q.  Okay.  So when sales increased by 50 percent, the

18  shareholder loan actually went down?

19  A.  Again, probably most of that money that was spent in 2013

04:27  20  was to build inventory for 2014.

21  Q.  Are you guessing?

22  A.  No.  I know that's -- I mean you saw the graph of the cycle

23  of when we decide product and when we build product and when we

24  ship product, and so we're building product in the fiscal year

04:27  25  before the sales actually happen.

1    Q.    But you have that cycle in every year, don't you?

2    A.    Yeah, exactly.

3    Q.    So you were building product in 2013, were you not?

4    A.    For 2014, yes.

04:27    5    Q.    And when sales in that year were ███████, your

6    shareholder loan requirements were ██████?

7    A.    No.  The -- you would have to look at the loan requirements

8    the year before for the sales that occurred in that year.

9    Q.    Okay.  So when the sales go up in 2015 to the most ever,

04:27    10    the shareholder loan goes down?

11    A.    Which, again, one of the reasons for that is if we had

12    built a lot of inventory in 2013 and then the year wasn't as

13    good as we thought it would be, we would have a lot of

14    inventory already going into the next year.

04:28    15        So that's why I say you really have to -- to be entirely

16    fair and honest about this, you need to look at a multiple-year

17    trend, and it would go the same thing with salaries and all

18    those expenses because the sales staff is out selling product

19    one year for the next fiscal year.  So to look at any one

04:28    20    isolated year is not really giving a true and fair

21    representation of how these expenses can be related.

22    Q.    So, again, you're saying that the data that's in the

23    financial statements can't be used reliably to identify these

24    costs and their relationship to sales?

04:28    25    A.    In an isolated year, no.  You'd have to look at a trend

1  over a few years, which is -- it's fortunate that we have

2  several years of sales that we're looking at where, if you take

3  them in total, I think you'll find out.

4  Q.  And we're going through each year.

04:29   5  A.  Apparently.

6  Q.  So let's look at Exhibit 400, and that's the 2015

7  statement, and the interest expense for that year is on page 28

8  at the bottom.  And it, again, goes down.  I have ███.  Do you

9  want to confirm that?

04:29   10  A.  Again, you're only looking at that one.  You're not looking

11  at the line of credit.  But, yeah, the shareholder interest

12  rate did go down.

13  Q.  That's the big component of the finance category you showed

14  the jury, was it not?  It's much bigger than the bank loan,

04:30   15  isn't it?

16  A.  Oh, yeah.

17  Q.  And let's look at -- I'll pull up 1363.  Yes, page 2.  And

18  now sales are going down, and that shareholder loan is going

19  up, isn't it?

04:30   20  A.  Yeah.  I believe if you look at the projections for 2017,

21  you would understand why that happens because, again, we were,

22  since we'd had that big year in 2015, very low on inventory, so

23  we needed to build a lot more for the following year.

24  Q.  Let's look at one more.  Advertising.

04:30   25  A.  Sure.

1    Q.   What do you show as the company's advertising expense for

2    fiscal year ending 2013?  And that's Exhibit 398.   At page 19.

3    A.   So advertising was ████████.

4    Q.   When do you make those advertising purchases relative to

04:31   5    your cycle?  At the front end?

6    A.   The -- most of the advertising happens in --  you know, it

7    varies year to year.  September, December, January, and then,

8    of course, there's -- some of the aspects to this are co-op

9    advertising, so those are claims that our accounts make to us

04:32   10   at generally the end of the season, sometimes don't get paid

11   until into the next season.

12   Q.   Okay.  Would you turn to the 2014 fiscal year.  Page 18 --

13   it's Exhibit 399.   And the advertising expense was ████████,

14   correct?

04:32   15   A.   What page did you say?

16   Q.   18.   Two-thirds of the way down.

17   A.   We're in '15?

18   Q.   '14.   Excuse me.  '14.   Maybe I misspoke.

19   A.   Oh.

04:33   20   Q.   '15 is next, though, if you've got it.

21   A.   Yeah, ████.

22   Q.   And then 2015 which is Exhibit 400, I show ████████.   Do you

23   show the same?

24   A.   Yes.

04:33   25   Q.   So that looks like a significant decision or change was

1    made in the program without regard to the changes in sales.  Is

2    that fair?

3    A.   No, I don't think that's -- no.  The thing that you didn't

4    want to have happen looks like it happened there.

04:34   5    Q.   Which is what?

6    A.   ████████ to ████████, ████████ to ████████, ████████ to

7    ████████.

8    Q.   Yes.  They're independent of the level of sales, are they

9    not?

04:34   10   A.   They go up with the sales volume.

11   Q.   Well, they go up with program purchasing decisions, don't

12   they?

13   A.   Program purchasing decisions?

14   Q.   In other words, the company decides it's going to allocate

04:34   15   more towards advertising, which is what it did between 2014 and

16   2015.  Isn't that correct?

17   A.   Yes.  So sales grew, our advertising budget grew.

18   Q.   And in Exhibit 1363, the advertising expense stayed at

19   roughly the same level?  I have████  Do you have the same

04:35   20   number?

21   A.   Yes.

22   Q.   So that's what the actual correlation shows, does it not,

23   this increasing sales level and these expenses that often go

24   down while sales are increasing, and, likewise, in the

04:35   25   advertising mode show a change in Seirus' program rather than a

1    change in sales?

2    A.   I see a change in sales and a change in program.

3    Q.   Yes, but they are often inversely correlated on your own

4    data, aren't they?

04:35    5    A.   But not with advertising.

6              MR. AXELROD:   I have no further questions.

7              THE COURT:   Redirect?

8              MR. SAKIMAE:   Just briefly.

9                        REDIRECT EXAMINATION

04:36    10   BY MR. SAKIMAE:

11   Q.   Ms. Carey, are these -- is this the total for HeatWave

12   sales ███████████?

13   A.   No, that's --

14   Q.   What does this number represent?

04:36    15   A.   A distinction I doubt he would let me make, but when -- the

16   more -- the more complex or the more components that a product

17   has, the more advertising money we will spend on it.  So the

18   technology like All Weather we definitely have spent more money

19   on advertising.  So when we feel the need to -- or the ability

04:36    20   to spend more marketing dollars or more sales efforts or build

21   more inventory for something in order to support future growth,

22   we definitely do that, and there's definitely a direct

23   correlation.

24   Q.   Just briefly, in 2013 it says revenues ██████████.   Was

04:37    25   that your profit?

1    A.    No, not at all.  Are you kidding?

2    Q.    And that doesn't represent the profit of HeatWave sales?

3    A.    No.  That is -- as Mr. Axelrod adeptly pointed out,

4    HeatWave sales were a very small portion of that.

04:37    5    Q.    Okay.  About roughly how small of a portion?

6    A.    I think they were about ███████ or something like that.

7    Q.    How about for -- let's skip ahead to 2016.  Is ██████████████

8    profits or revenues?

9    A.    That's revenues.  That is the gross number.  Then

04:37    10    everything else comes after that:  salaries, wages, interest,

11    advertising, insurance.

12    Q.    And this is --

13    A.    Rent.

14    Q.    -- for all products in your line?

04:37    15    A.    That's all the sum total of our all products, yes.

16    Q.    Not just HeatWave?

17    A.    Not just HeatWave.

18    Q.    And just briefly, you mentioned the term "multiple-year

19    trend approach."  Why is a multiple-year trend appropriate when

04:38    20    discussing this data?

21    A.    On all kind of levels, it's the first thing that comes to

22    mind is if you look at the stock market and you tried to say in

23    any one year is the stock market a good investment, we all know

24    that it might lose significant value in one year, but you

04:38    25    always look at things over a longer period trend, which is why

1    I say I don't know this information by looking at one isolated

2    year.  I know it after looking at 30 years of experience on how

3    these costs support or don't support sales.  And whereas I

4    can't change the rent on our building, we can make adjustments

04:39    5    in these other areas for not needing to support sales directly.

6    Q.    And, Ms. Carey, earlier you testified that 55 percent gross

7    profit was what you shoot for.  Was that before you deduct all

8    of the costs identified?

9    A.    Yes.  Yeah, that's our gross profits, so that's just the

04:39    10    pure cost of building a product taken -- the gross profits is

11    just what it cost to build that product, not to sell it or

12    support it or any of these other costs.

13    Q.    Okay.  And lastly there's discussion about interest that

14    are paid to owners of the company.  Could you explain what that

04:39    15    is?

16    A.    Yes.  So the owners have -- we are an S corp., so we put

17    back -- the vast majority of the profits go back into the

18    company to provide operating capital and inventory-building

19    capital to the company so that the company can thrive.

04:40    20            MR. SAKIMAE:  No further questions.

21            THE COURT:  Do any of the jurors have any questions

22    for this witness?  If so please raise their hand.

23        You may step down.

24            THE WITNESS:  Thank you.

04:40    25            THE COURT:  Call your next witness.

1    MR. MARCHESE:  Seirus calls Ms. Carrie Distler.

2    THE COURT:  Step forward and be sworn.

3                    <u>CARRIE DISTLER,</u>

4              DEFENDANT'S WITNESS, SWORN

04:40    5    THE CLERK:  Would you state and spell your full name

6    for the record.

7    THE WITNESS:  Carrie Distler, D-i-s-t-l-e-r.

8                 DIRECT EXAMINATION

9    BY MR. MARCHESE:

04:41    10    Q.   Good afternoon, Ms. Distler.  Can you please introduce

11    yourself to the jury and tell them where you work.

12    A.   Hi.  I'm Carrie Distler.  I work for FTI Consulting.

13    Q.   And what is FTI Consulting?

14    A.   FTI is a multidisciplinary financial advisory services

04:41    15    firm.  We are publicly traded on the New York Stock Exchange,

16    and we have over 4,000 employees globally where we provide

17    consulting services to clients, economic, financial,

18    accounting, communications, and other product lines as well.

19    Q.   And how many offices does FTI have around the world?

04:42    20    A.   Over 25.

21    Q.   And how long have you been with the company?

22    A.   It will be 14 years in February.

23    Q.   And so why are you here today to testify?

24    A.   I'm here to testify today regarding damages payable to

04:42    25    Columbia with respect to the design patent and damages that

1  would be payable to Columbia should the utility patent, the

2  '270 patent, be found valid and infringed.

3  Q.   And do you have an opinion, then, for the design patent?

4  A.   Yes.

04:42  5  Q.   What is that?

6  A.   In my opinion the level of profit that should be disgorged

7  related to the HeatWave fabric is just over $500,000.

8  Q.   And how about the utility patent?  What's your opinion

9  there?

04:42  10  A.   For the utility patent, the reasonable royalty that would

11  be appropriate to pay to Columbia should the '270 patent be

12  found valid and infringed is approximately $119,000.

13  Q.   And thank you for that.  Can you tell us, what did you do

14  before you were employed by FTI, I think you said about 14

04:43  15  years ago.

16  A.   I worked for a small economic consulting firm in Boulder,

17  Colorado, for about three and a half years.

18  Q.   So it sounds like, FTI and this prior firm in Boulder,

19  Colorado, you'd been consulting for about 17 years?

04:43  20  A.   Yes.

21  Q.   And prior to that, what did you do?

22  A.   I was in school, I was studying in college.

23  Q.   And then could you briefly tell us what were your degrees

24  in post high school.

04:43  25  A.   Sure.  I have a bachelor in economics, magna cum laude, and

1    a master's in economics from The University of Missouri.

2    Q.    And have you in the course of your studies or your

3    consulting career -- have you taken courses in accounting?

4    A.    Yes.    I've taken some continuing education courses from the

04:43    5    Northwestern University in Chicago.

6    Q.    And how many of those courses have you taken?

7    A.    I took three.

8    Q.    In what period of time approximately?

9    A.    It was '08 to 2010, in that period.    They were quarter-long

04:44    10    courses that I took on some on accounting issues.

11    Q.    Great.    Thanks.

12        So you said you were an economist, and you said you have a

13    bachelor's degree and a master's degree, right?

14    A.    Yes.

04:44    15    Q.    And I think probably most people know generally what, you

16    know, economics means and what the economy is and all of that,

17    but what does an economist do?

18    A.    At a high level, economists analyze economic issues using

19    data, information, and tools from other disciplines like

04:44    20    finance, statistics, accounting, evaluation, some marketing,

21    and as an economist you're trained in areas such as, you know,

22    competition, industry and market analysis, supply and demand,

23    pricing, and profit maximization, forecasting future trends,

24    areas like that.

04:45    25    Q.    And so why is being an economist, if it is, relevant or

1    important for determining patent damages?

2    A.    Being an economist and determining patent damages kind of

3    go hand in hand.    When you're assessing the damages related to

4    a patent, you're looking at multiple aspects.    You're looking

04:45    5    at, you know, things like competition, what the market looks

6    like.    You're looking at supply, manufacturing costs.    You're

7    looking at what consumers are purchasing.    You're examining

8    pricing, how prices are set, profits that are generated, and

9    kind of expectations in the market.

04:45    10    Q.    Let's go back to FTI.    That's your current employer,

11    correct?

12    A.    Yes.

13    Q.    Are you an economist there?

14    A.    Yes.    My job title is senior managing director, but, yes,

04:45    15    I'm a consulting economist.

16    Q.    What do you do as senior managing director at FTI?

17    A.    So senior managing director is our partner level.    We're

18    publicly traded, so you're not called a partner, but as a

19    senior managing director, I primarily have two

04:46    20    responsibilities.    One is client service, and then the other is

21    developing, managing, and recruiting others in the firm.

22    Q.    And do you have any leadership positions at FTI?

23    A.    Yes.

24    Q.    Can you tell us what they are, please.

04:46    25    A.    I sit on our global steering committee for our women's

1   initiative, which is focused on retaining and promoting women

2   to more senior positions in the firm.  And then I also sit on

3   the leadership team of our national intellectual property

4   practice.

04:46   5   Q.   Intellectual property, I think the term has come up in the

6   context of this case I think probably a bunch of times, but

7   it's not a term that's commonly known by people as to what

8   exactly that means.  Can you give us a definition as to your

9   understanding of intellectual property?

04:47   10   A.   So, sure.  Intellectual property is -- it's a form of an

11   asset that we call an intangible asset.  It's not an asset that

12   you can necessarily touch and feel.  It's not a physical plant

13   where you're manufacturing or a piece of equipment.  It's

14   focused more on an idea that you're wanting to protect.  So it

04:47   15   could be a patent.  It could be a trademark, copyright, trade

16   secret, trade dress, something along those lines.

17   Q.   Thank you.  So you mentioned that you're involved with the

18   leadership team for FTI's intellectual property group.  Is that

19   right?

04:47   20   A.   Yes.

21   Q.   Can you just give us a sense of what the intellectual

22   property practice is like at the company?

23   A.   Sure.  So I'm going to call it "IP" for intellectual

24   property, but our IP group, it's -- we're a group of probably

04:47   25   35 people or so across the country where we specialize in

1    intellectual property issues.  On the leadership team, one

2    of -- some of my responsibilities include growing a practice,

3    growing the people, and also knowledge management.

4    Q.   And so as in your role at FTI as an economist working with

04:48    5    the intellectual property practice group, do you have a

6    specialty?

7    A.   I --

8    Q.   Special type of intellectual property that you work on?

9    A.   The vast majority of work that I do is in the patent space,

04:48    10    patent damages or patent valuation, although I've worked in the

11    other areas as well of IP.

12    Q.   How did you get into being involved with patents?

13    A.   I joined FTI like I said almost 14 years ago, and I was

14    interested -- always been interested in technology and

04:48    15    innovation.  I think it's really fun and interesting, and it's

16    fascinating to see what's going on in companies and how

17    companies are growing and building based on their IP.  So from

18    that I've been able to turn a career into doing IP consulting.

19    Q.   And can you give us a sense of what you do in your

04:48    20    practice -- in your career to kind of stay up-to-date on patent

21    issues?

22    A.   Well, sure.  Patent damages are kind of a special breed of

23    commercial damages.  The courts have provided a lot of

24    significant guidance in how patent damages should be

04:49    25    determined.  So as a practitioner that's specializing in this

space, it's so important for me to stay up-to-date on what's

happening from a case law perspective related to patent damages

so that I understand the lay of the land, and I'm managing

those expectations around what experts should be doing.

Q.   And do you read cases, patent damages cases, as part of

your work?

A.   Well, sure.  I mean I subscribe to a couple of news

services that focus mostly on patent -- on patent issues,

things that are going on.  So you'll get a daily or weekly feed

of a summary of things that are happening in the patent space.

If some of those seem interesting, I'll read the cases just to

stay up to speed, especially if it's related to damage or -- to

damages or specific issues within damages that the courts are

pretty active in.

       And then as a practice, our IP group will also do, you

know, quarterly or monthly calls just to catch up on IP trends

and discuss any particular cases that we think are of

particular interest that we want to make sure that we're aware

of.

Q.   And so as part of your work at FTI and even before, have

you reviewed patents?

A.   In doing patent damages or valuations, I'll have looked at

patents, yes.

Q.   Over the course of your career here as an economist and

working with patent damages, how many patents do you think

1    you've looked at?

2    A.   Over 14 years at FTI, I'm going to guess at least a

3    hundred.  I don't know.  I haven't counted, but I would assume

4    something along those lines.

04:50    5    Q.   So I'd like to ask you a couple questions about

6    professional organizations that you belong to that might relate

7    to patents.  Are there any that you can name?

8    A.   Yes.  I belong to the Licensing Executive Society, and then

9    I'm also involved in a group in Chicago called Chicago Women in

04:51   10    IP.

11           MR. MARCHESE:  And, Mr. Tisa, could we have DDX704.

12        Permission to publish the demonstratives that we shared

13    with you, Counsel.

14           MR. AXELROD:  I'm fine with the demonstrative.

04:51   15           THE COURT:  You can display them.

16           MR. MARCHESE:  Thank you.  Actually can you go back to

17    705, please -- oops.  Actually one back.  703.  My apologies.

18    BY MR. MARCHESE:

19    Q.   Ms. Distler, DDX703 is now up on the screen in front of

04:51   20    you, and I think everybody can see it.  I think you've

21    mentioned a couple of these.  Can you -- I thought it would be

22    helpful to have people's eyes on them when you went through it.

23    So can you just tell us what does this slide represent?

24    A.   It identifies the two associations that I just mentioned,

04:52   25    and then it also identifies that the past three years -- the

1    last three years in a row I've been identified as the leading

2    patent expert by the Intellectual Asset Management.  It's a

3    global trade association.

4    Q.    Do you speak on patent damages issues as part of your work?

04:52    5    A.    Yes, I do.

6    Q.    Can you tell us a little bit about that, please.

7    A.    Sure.  I have spoken at least seven times -- I have another

8    one coming up in a couple weeks -- where I'll discuss generally

9    what's happening and along the patent case law types of topics.

04:52   10    Again, with the notion of educating the group that we are

11    presenting to whether it's in-house counsels or outside

12    attorneys, but, again, with the focus on staying up-to-date on

13    patent damages issues.

14    Q.    So we've heard some terms in this case that I think are

04:53   15    going to come up in your testimony, but they were a subject of

16    Ms. Morones, who was the Columbia damages expert previously.

17    And so I'll just bring them up now.  "Entire market value

18    rule," is that something you're familiar with?

19    A.    Yes.

04:53   20    Q.    What's your experience with that?

21    A.    Well, in doing patent damages, in generally every patent

22    damages case, you're going to do that related to a reasonable

23    royalty.  You're going to have to do an analysis of the entire

24    market value rule which effectively means you're going to take

04:53   25    a look at the product that's accused of infringing, and you're

1    going to determine, if it's a multiple-component product, what

2    are the -- what's the primary or what's the -- what is the

3    driver of demand of that product.  And if it isn't the patented

4    feature, then you need to apportion or separate the patented

04:54    5    contribution versus the nonpatented contribution.

6    Q.    Have you spoken on these topics before?

7    A.    Yes.   A couple of years ago in one of the slides -- in one

8    of the presentations, I was speaking on a panel about current

9    issues, and it was discussing some recent developments -- and

04:54    10    we call it "EMVR" -- in the EMVR space.

11    Q.    That's an abbreviation for entire market value rule?

12    A.    Yes.

13    Q.    Maybe we can try to use that.  A little easier to say.

14         Have you offered opinions as an expert in the past on the

04:54    15    entire market value rule.

16    A.    Yes.

17    Q.    In the context of patent damages?

18    A.    Yes, in the context of patent damages and specifically

19    around a reasonable royalty, yes.

04:54    20    Q.    And so -- this is a slide called "Patent Damages

21    Experience."  Can you tell us what we're looking at here and

22    give us a sense of what this slide is providing in terms of

23    information?

24    A.    Sure.   So over the 14 years I've been at FTI, when I've

04:55    25    been doing IP work, I've worked on at least 50 patent matters

1    where we've been calculating damages.  I've -- as we mentioned,

2    there are numerous speaking engagements that I have endeavored

3    to talk about patent damages about.  Like I said, I subscribe

4    to patent law news services, and then I also review patent

5    cases that relate to damages on this part of my daily or -- as

6    part of my work -- the tasks that I do at work.

7    Q.    Now, of the 50 patent matters you have on your slide,

8    DDX704, how many of those times have you been retained as the

9    patent damages expert?

10    A.    I have issued nine reports to date where I'm the expert

11    testifying about patent damages matters.

12    Q.    And if you can give us a sense of what types of companies

13    you've worked for in the past as a patent damages expert?

14    A.    Sure.  I've worked for both small and large companies, and

15    the smaller, like Seirus, and I've also worked for large

16    companies like a Microsoft and Dell, and then I -- earlier this

17    year, I was working on a case for the University of California,

18    the regents.

19    Q.    And in the nine -- I think you said was it nine times

20    you've given reports?

21    A.    Yeah.  I have issued a written expert report on patent

22    damages.

23    Q.    How many times has the party that you've been working with

24    had it -- made a claim for patent damages?

25    A.    In five of those nine instances, I'm working for the party

1    that's seeking damages.

2    Q.    And the other ones, it's the defense?

3    A.    Correct, or the party that's -- yeah, not seeking damages.

4    Q.    And how many of those times have you made computations

04:56  5    related to reasonable royalty damages?

6    A.    It would have been in every one of those.

7    Q.    And in the other times, I think there are 41 or so matters

8    you would have been involved with, were you -- what was your

9    role with those matters?

04:57  10    A.    In those I was assisting one of my more senior colleagues

11    in the preparation of expert reports and opinions related to

12    damages.

13    Q.    And have you had any experience in your work on patent

14    matters with the apparel industry?

04:57  15    A.    I have.  I've worked on a project that related to maternity

16    clothing, a patent that related to maternity clothing.  It was

17    a utility patent, not a design patent.  And then from an

18    accessory side, I have worked on a matter that involved

19    baseball hat accessories.  I didn't issue a report in that one,

04:57  20    but I helped with -- we were working on the report when it

21    settled.  And then also one on sunglass retainers, and when

22    those sunglass retainers were also sold in large retail outlets

23    like a Dick's Sporting Goods, and they were also sold in the

24    small mom and pop shops.

04:57  25    Q.    So here on the slide that's showing right now, it mentions

1    the 50 patent matters.   When you say "matters," is that

2    litigation?

3    A.    Yeah, those would be litigation matters I'm identifying,

4    yes.

04:58    5    Q.    Okay.   Court cases?

6    A.    Correct.

7    Q.    And then do you do intellectual or patent work that's not

8    related to litigation or court matters?

9    A.    Yes.   The vast majority of the work that I do is in the

04:58    10    litigation setting, but I also help companies with valuing or

11    licensing technology as well.

12    Q.    And how many licensing matters have you been involved with

13    over the years would you estimate?

14    A.    I don't know as I sit here.   I would approximate probably

04:58    15    at least 15.   On the last -- and this year I've worked on a

16    couple of projects.   I've led a couple projects related to

17    licensing or acquiring technology.   One was an entity that

18    represents the large -- or the auto manufacturers across the

19    globe and looking into licensing and technology related to

04:59    20    preventing drunk driving.   And the other one was a large

21    insurance company that was looking at a patent portfolio, so a

22    group of patents that they were looking to buy related to

23    telematic.   So I'll assist in valuing or trying to price

24    patents or patent portfolios outside of the litigation context.

04:59    25    Q.    Great.   So here we are in a trial.   You're in a courtroom.

1    You're testifying in front of a jury.  Have you done it before?

2    A.  I have not.  This is my first time testifying in front of a

3    jury.

4    Q.  And so at this point in time, I'd like to shift gears into

04:59    5    your opinions.

6         MR. MARCHESE:  Your Honor, we're approaching the 5:00

7    hour.  I'm happy to continue, but I just wanted to flag that.

8         THE COURT:  It seems like a good time to stop.  We now

9    know all about your background so we can go to the opinions

05:00    10    beginning tomorrow morning.  That sounds like a good idea to

11    me.

12        Members of the jury, we'll take our evening recess at this

13    time.  Have a good evening.  I'll see you tomorrow.  Same time.

14        (Proceedings held outside the presence of the jury panel.)

05:00    15        THE COURT:  You can step down.

16        Please be seated.  Let's talk about our homework

17    assignments.

18        We are getting -- I'm going to be visiting with my clerk

19    and going over the proposed jury instructions.  If you'll leave

05:01    20    your emails with Bernadette this evening, I will send you, if I

21    finish, the proposed jury instructions this evening so you'll

22    have them by tomorrow morning to take a look at.

23        Secondly, I know that there is a motion out there on the

24    part of Columbia asking the Court to order Seirus the

05:02    25    opportunity to give somebody from Columbia, some investigator

1    or somebody like that, to go look at or for 50,000 gloves that

2    were mentioned in Mr. Carey's testimony.  I don't remember

3    specifically what the testimony was, but there was something

4    about 50,000 gloves that were taken off of the marketplace and

05:02    5    are stored somewhere with the possibility of them not really

6    knowing what to do with them, but maybe they were going to

7    donate them to charity or something along those lines, and

8    Columbia wants to go look for them and Seirus was closed over

9    the weekend.  I don't know whether you've worked something out

05:02    10    about that or not.

11         So I know we need to deal with that issue, and I don't

12    remember if there was anything else that we needed to deal with

13    as far as motions that have been left on my table kind of like

14    gifts over the weekend that I haven't yet had an opportunity to

05:03    15    open.  Was there anything else from Columbia?

16              MR. ALDRICH:  I think just the opposition to the JMOL

17    brief.

18              THE COURT:  Oh, that's right.  That's right, the JMOL

19    thing.  Okay.

05:03    20              MR. MARCHESE:  I don't know that anybody on our team

21    has had an opportunity to look at that, but we can do that this

22    evening.

23              THE COURT:  Okay.  Was there anything else from your

24    perspective of things that have been left on the table that I

05:03    25    haven't yet resolved?

1        MR. MARCHESE:  Not -- Mr. Sproul may have something

2    that I've forgotten about.  The two things I have on my list

3    here, my sticky note, is as I mentioned earlier, we're going to

4    ask to seal those profit and loss statements, I think that bill

05:03   5    of materials as well, and probably some testimony around those.

6        THE COURT:  Right.  So here's the deal around that:  I

7    don't have any trouble ordering that certain exhibits or

8    certain portions of testimony be sealed until somebody asks me

9    to unseal them because this is a public process and a public

05:04  10   proceeding, and I always have a great deal of question as to

11   how extensive my authority is.  But to the extent that you want

12   them sealed kind of as a preliminary matter until somebody asks

13   me to unseal it, I'm okay with that.

14       MR. MARCHESE:  It won't be a whole lot.  It's going to

05:04  15   be -- we'll identify page and line numbers and then exhibit

16   numbers.

17       THE COURT:  I'm assuming that Columbia doesn't have

18   any problem with that fact.  You may have some issues that you

19   may want sealed as well given the sensitivity.

05:04  20       MR. AXELROD:  No, Your Honor.

21       THE COURT:  Okay.  Next.

22       MR. MARCHESE:  And I think we're going to file a paper

23   on the IPR issue that we mentioned earlier, the door being

24   opened, and we'll put a brief paper in on that tonight.

05:04  25       THE COURT:  I like brief.  Is that it?

1    MR. ALDRICH:  Just minor housekeeping on our side, one

2 small issue.

3    THE COURT:  Hang on just a second.  They're whispering

4 over there.

05:05   5    MR. SPROUL:  One issue this morning when we -- when

6 you addressed the -- Dr. Block's testimony relating to article

7 of manufacture, we were precluded in part because of timing,

8 but I also understood Your Honor to be saying that you thought

9 it was inappropriate for a technical expert to be offering

05:05   10 expert opinion on article of manufacture.  And I was wondering

11 whether that would apply to Dr. Cole's testimony as well who

12 also offered some opinion on the article of manufacture.

13    In particular we filed an MIL directed to a portion of her

14 article of manufacture testimony, specifically relating to

05:05   15 the -- her ability to talk about marketing with respect to what

16 drives demand for the article of manufacture.  And we argued in

17 that MIL that it was inappropriate, and Your Honor denied it,

18 perhaps as a preliminary matter.

19    But we would raise it again, and in the broader context

05:06   20 that perhaps she shouldn't be allowed to offer any opinion on

21 article of manufacture outside of her expertise.

22    THE COURT:  So it was my understanding that Dr. Block

23 was going to identify the main article of manufacture saying

24 that this is what it was.

05:06   25    MR. SPROUL:  That's correct, Your Honor.

1    THE COURT:  And I can't articulate now, but that seems

2  different than what Dr. Cole had testified to as regards kind

3  of the marketing things and all those other issues.

4    MR. SPROUL:  Dr. Cole, I understand, is doing the

05:06    5  exact same thing.  She's going to identify the article of

6  manufacture.   As Dr. Block did, she's going to apply the test,

7  the DOJ test that Your Honor adopted, and identify what she

8  believes to be the proper article of manufacture under 289.

9    THE COURT:  They're in a little different position

05:06   10  because they were identifying the article of manufacture as to

11  the whole glove, and that's just -- that's kind of like in

12  hindsight, but the default position is the whole glove, and

13  it's your burden to prove and convince the jury that it's

14  something less than that.

05:07   15    MR. SPROUL:  That's true, Your Honor, but it's the

16  exact same analysis.  She just comes to a different conclusion.

17    THE COURT:  Again, they operate under assumption that

18  the article of manufacture is the whole glove almost.  So I

19  don't know that there's any -- I don't know that I heard

05:07   20  anything that says you should identify -- well, maybe I'm wrong

21  about that.  Let me think about that.  You might have something

22  there.

23    MR. SPROUL:  May I clarify, Your Honor, one quick

24  point?

05:07   25    THE COURT:  Yes.

1    MR. SPROUL:  Dr. Cole is going to offer this testimony

2    tomorrow, so she has not yet offered it, and it's going to be

3    in rebuttal to us because it is our burden to show the article

4    of manufacture, and so rather -- her testimony is, in fact,

05:07    5    going to be focused on this very specific issue of what the

6    article of manufacture is under section 289.

7    THE COURT:  I remember the motion in limine, and I

8    remember thinking you were wrong at the time, but maybe you're

9    right.

05:07    10    MR. SPROUL:  Understood, Your Honor.  Thank you.

11    MR. ALDRICH:  Your Honor, we are willing to go back to

12    Dr. Cole's testimony -- prepared testimony in her report, and

13    just ensure that she's not drawing the ultimate conclusion on

14    any issue, but is instead merely providing expert opinion that

05:08    15    may support whatever our position is that we will argue at

16    closing.  So we'll go back and review her testimony and make

17    sure that we're staying within the bounds of providing expert

18    opinion and not answering the ultimate question.

19    THE COURT:  Again, it seems to me that what the

05:08    20    article of manufacture is is ultimately going to be for the

21    jury to decide what it is, and I don't know that anybody's

22    science expert has any better expertise than I do, for that

23    matter, in determining what the article of manufacture is.  And

24    that's really why I was having trouble with Dr. Block, and

05:08    25    similarly you're raising the issue with regards to Dr. Cole.  I

 1   think your point is well-taken.

 2         MR. ALDRICH:   We'll go back and look and make sure,

 3   Your Honor.

 4         THE COURT:   All right.   I don't know where that leaves

05:09   5   us.   Interesting conversation we can have tomorrow morning.

 6      All right.   Anything else we need to talk about from

 7   plaintiff's perspective?

 8         MR. ALDRICH:   Very minor.   Move to withdraw

 9   Exhibit 696 from the jury, Your Honor.   Exhibit 696 is the

05:09   10   Canadian ski jacket.

11         THE COURT:   Do you care about the Canadian ski jacket?

12         MR. MARCHESE:   Well, I might actually.   Let me think

13   about that.

14         THE COURT:   I was wondering about that, whether you

05:09   15   really wanted the jury handling a signed Canadian ski jacket in

16   the jury room.

17         MR. ALDRICH:   And I don't want you holding on to it

18   for three years.   They'd like to put it back in the lobby of

19   the company.

05:09   20         MR. MARCHESE:   I made a lot of points about it when I

21   was cross-examining Mr. Blackford.   I don't know if they'd want

22   to look at it.

23         THE COURT:   Maybe what we can do is we will make it

24   available to them without sending it back, and if they ask a

05:09   25   question and would like to see it, we will then bring it back

1    for them to take a look at, and perhaps what you can do in the

2    meantime is take a -- multiple photographs of it that can act

3    as a substitute for the appellate period so that we don't have

4    to hang on to it for three years.

05:10    5            MR. MARCHESE:  Okay.

6            MR. ALDRICH:  That would be fine with us.

7            THE COURT:  Is that acceptable to you?

8            MR. MARCHESE:  Fine.

9            THE COURT:  Okay.  That's what we'll do.  Remind

05:10   10    Bernadette when we get there that that's what our agreement is,

11    and I will leave it up to the plaintiffs to provide an

12    alternative media for that particular exhibit.

13        Anything else from defense perspective?

14            MR. MARCHESE:  I think that's it, Your Honor.

05:10   15            THE COURT:  Well, everybody have a great night.

16            MR. MARCHESE:  Thank you, Your Honor.

17            MR. ALDRICH:  Thank you, Your Honor.

18            THE COURT:  See you tomorrow.

19                        ---oOo---

20

21

22

23

24

25

1                    C-E-R-T-I-F-I-C-A-T-I-O-N

2

3       I certify that the foregoing is a correct transcript from

4   the record of proceedings in the above-entitled matter.

5

6         Dated September 25, 2017, at San Diego, California.

7

8

9                /s/ Dana Peabody
             Dana Peabody,
10               Registered Diplomate Reporter
             Certified Realtime Reporter

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    United States District Court

2    For the Southern District of California

3

4                                    )
     COLUMBIA SPORTSWEAR NORTH        )
5    AMERICA, INC., an Oregon        )    No. 17-cv-1781-HZ
     corporation,                    )
6                                    )    September 26, 2017
          Plaintiff,                 )
7                                    )    San Diego, California
              v.                     )
8                                    )
     SEIRUS INNOVATIVE ACCESSORIES.  )
9    INC., a Utah Corporation,       )
                                     )
10                                   )
          Defendant.                 )
11

12

13

14                    Volume 7 - AM Session

15          Reporter's Transcript of Proceedings

16       BEFORE THE HONORABLE MARCO A. HERNANDEZ

17             United States District Judge

18

19

20

21

22

23   Court Reporter:         Dana Peabody, RDR, CRR
                             District Court Clerk's Office
24                           333 West Broadway, Suite 420
                             San Diego, California, 92101
25                           DanaPeabodyCSR@gmail.com

APPEARANCES:

For the Plaintiff:          SCHWABE, WILLIAMSON & WYATT, P.C.
                            NIKA F. ALDRICH, JR., ESQ.
                            DAVID W. AXELROD, ESQ.
                            BRENNA LEGAARD, ESQ.
                            1211 SW 5th Avenue, Suite 1900
                            Portland, Oregon 97204

For the Defendant:          FISH & RICHARDSON, P.C.
                            CHRISTOPHER S. MARCHESE, ESQ.
                            SETH M. SPROUL, ESQ.
                            12390 El Camino Real
                            San Diego, California 92130

For the Defendant:          MARKOWITZ HERBOLD, P.C.
                            RENEE ROTHAUGE, ESQ.
                            1211 SW Fifth Avenue, Suite 3000
                            Portland, Oregon 97204

1   Case:   Columbia v. Seirus
    Date:   September 26, 2017
2

3

4
                              INDEX OF WITNESSES
5
    FOR THE DEFENDANT:
6                                 E X A M I N A T I O N
                                  DIRECT   CROSS  REDIRECT  RECROSS
7
    Carrie Distler
8     Mr. Marchese                1779                1879      1892
      Mr. Axelrod                          1833                 1891,
9                                                               1895

10

11                            INDEX OF EXHIBITS

12  EXHIBIT                                      EVIDENCE

13  1437                                           1884

14

15

16

17

18

19

20

21

22

23

24

25

1          San Diego, California, September 26, 2017

2                              *   *   *

3      (Proceedings held outside the presence of the jury panel.)

4          THE COURT:  Be seated.

08:34  5      I don't know what I have for you based on our conversation

6  from last night because I think some of the information is just

7  getting to me now.

8          Regarding Columbia's motion opposing I guess the judgment

9  for -- judgment as a matter of law on the issue of willfulness

08:35 10  and '270 patent, I want to go back and look at what I said at

11  halftime, what I said.  I think you had raised an objection to

12  the introduction of some -- it might have been the Korean

13  patent during Mr. Carey's testimony, and I had a conversation

14  with Mr. Marchese that was intense about whether or not he had

08:35 15  done something that I had asked him not to do.  I need to go

16  back and read that portion of the record as well and just see

17  what I represented to the parties at the time.  I thought I had

18  made a ruling, but you're suggesting I did not, so let me look

19  at that and see what I did.

08:35 20          MR. ALDRICH:  And to the extent Your Honor made a

21  ruling, we'd just move for reconsideration.

22          THE COURT:  Okay.

23          MR. MARCHESE:  Your Honor, we filed a reply brief,

24  two- or three-pager, last night on that point.

08:36 25          THE COURT:  I read that.  So I've read all of the

1    briefing.  I want to dig a little bit deeper into a place where

2    neither of you went, and that's what did I say.

3         Did you file a response to the warehouse search question?

4              MR. MARCHESE:  I do not recall right now.  Mr. Sproul

08:36    5    is maybe more up to speed on that.

6              MR. SPROUL:  We did not, Your Honor.

7              THE COURT:  Were you planning on filing anything on

8    that?

9              MR. SPROUL:  We were not.  We thought we could address

08:36    10    it.

11              THE COURT:  Now?

12              MR. SPROUL:  Here.

13              THE COURT:  Okay.  Well, this would be a good time.

14    What do you want to tell me?

08:36    15              MR. SPROUL:  So it seems to us that it's an ancillary

16    issue to the issues that the jury needs to decide, that if, in

17    fact, there's a verdict rendered, this is an accounting issue,

18    and what I told Mr. Aldrich was we agree in principle to an

19    inspection.  This is not a -- the case where there's a

08:36    20    warehouse with a pile of sequestered products.  The products

21    have been sequestered through the SIP system.  They've been

22    taken out of the system and are not able to be shipped

23    electronically.  They're spread over multiple warehouses, so

24    finding them physically is actually quite an endeavor, not

08:37    25    something we could do this morning or yesterday or this

1 weekend.  So it's not that we're opposed to letting them

2 inspect those under the right circumstances.  It just didn't

3 seem to make sense to do it today.

4 THE COURT:  I don't know what that does with the

08:37 5 question of $50,000 worth -- 50,000 gloves worth of inventory

6 and damages which is a legitimate question that they are

7 raising.

8 MR. SPROUL:  Because those haven't been sold,

9 Your Honor, they shouldn't be a part of the calculation that

08:37 10 the jury's determining today, but, as I said, after a verdict,

11 we would certainly be willing to account for those in some way

12 consistent with whatever the Court decides today.

13 THE COURT:  Well, thank you.  I know that you actually

14 wanted them for a different purpose.

08:38 15 MR. ALDRICH:  We did want them for a different

16 purpose, but if those gloves were imported into the

17 United States, they are still infringing, and those are

18 infringing acts as well, so they're still relevant for purposes

19 of accounting.  But indeed we wanted to actually see if there

08:38 20 are, in fact, 50,000 gloves, as Mr. Carey testified, a rather

21 remarkable proposition.

22 THE COURT:  All right.  So the point of going and

23 looking at a warehouse is pointless because there's no way --

24 and I anticipated that what they were going to say, "It's not

08:38 25 here at our warehouse in San Diego."  It's going to be

08:38

1    scattered or somewhere else, and you're never going to be able

2    to find them anywhere.  So the motion currently before the

3    Court is whether I'm going to let you or order them to let you

4    go and look at their warehouse here and see if you can find

5    50,000 gloves.  I'm not letting you do that.  That's the issue

6    I'm deciding at this point.

7              MR. ALDRICH:  Thank you, Your Honor.

8              THE COURT:  Next you had -- there was a motion

9    regarding sealing certain portions of the trial.  I don't think

10   there's any objection to that, so we'll just need to identify

11   which portions need to be sealed so you can protect your

12   clients.

13             MR. MARCHESE:  We're working on that now to identify

14   all the passages in the transcript.

15             THE COURT:  Okay.  And then finally, at least from

16   last night's list, there was the issue of the Korean patent,

17   the IPR.  I just got that in -- stuff this morning.  I'm sure

18   that you just got it this morning as well.  You might have not

19   even seen it yet.

20             MR. ALDRICH:  It actually got filed at exactly 8:30.

21             THE COURT:  Okay.  I think I've already read it.

22             MR. ALDRICH:  If I could --

23             THE COURT:  So, anyways, I'll give you time to respond

24   to it.  The likelihood of me allowing that is not great, but if

25   you want to take a look at it and respond, I'll give you an

1    opportunity.

2            MR. ALDRICH:  We'll get a paper on file this morning.

3            THE COURT:  That was my list of things that I needed

4    to be working on.  Is there anything else we need to talk about

08:40    5    before we get the jury in place and moving?  Oh, jury

6    instructions.  We did send you jury instructions this morning.

7    They are draft instructions.  Take them as such.  So take a

8    look at them and be ready to talk about them probably -- I

9    don't know about this afternoon, but maybe tomorrow.  I don't

08:40    10    know how far we'll get today.

11            MR. ALDRICH:  Just a quick point about closings,

12    Your Honor.  I'm not sure what the schedule's looking like.  It

13    sounds like the parties might actually finish the case today.

14    Columbia has some people that would like to come down and see

08:40    15    the closing argument, so just requesting that we not start

16    before 10:00 tomorrow morning.  The flights land at 9:05.  I

17    think we're probably going to be dealing with jury instructions

18    anyway, but so that they can get their flight schedule and get

19    down here, I wanted to request that we not start before 10:00.

08:41    20            THE COURT:  We'll start when we're ready to start.  I

21    don't know when that will be.

22            MR. ALDRICH:  Okay.  Thank you.

23            MR. MARCHESE:  A couple other points, Your Honor, that

24    I think were still open -- one of them was open from yesterday.

08:41    25    It was the article of manufacture for Dr. Cole.

         1          MR. ALDRICH:  We are -- she's not going to testify

         2   about that today.

         3          MR. MARCHESE:  Okay.  And then last night, we received

         4   an entire new report from Ms. Morones on article of manufacture

08:41    5   in the form of 15 or so slides, and we hadn't seen it before.

         6   We are -- we can certainly address it if needed, but wanted to

         7   bring this to the Court's attention as something we've never

         8   seen before.

         9          THE COURT:  They're demonstrative exhibits for --

08:41   10          MR. AXELROD:  Correct.  It's a responsive report to

        11   what Ms. Distler has submitted.

        12          THE COURT:  I assume that that's what it was based on

        13   what they saying that it's the entire glove.  Your side says,

        14   "Not so fast.  It's much less than that."

08:41   15          MR. MARCHESE:  Right.

        16          THE COURT:  And their side's going to say, "Well, if

        17   it's much less than that, this is what it means."

        18          MR. AXELROD:  Exactly.

        19          THE COURT:  It's likely going to be okay.

08:42   20          MR. MARCHESE:  All right.  I just wanted to note for

        21   the Court and note our objection.

        22          THE COURT:  Sure.

        23          MR. SPROUL:  One further issue, Your Honor.  Last

        24   night we filed a motion for a renewed -- a renewed motion for

08:42   25   judgment as a matter of law on the reasonable royalty for the

 1   design patent.

 2        THE COURT:  I read it last night.  I'm not ready to

 3   rule on it.  They haven't had an opportunity to respond.

 4        MR. SPROUL:  Thank you.

08:42  5        THE COURT:  That's kind of like a reconsideration of

 6   what I've already done, right?  We're kind of rehashing old

 7   ground.  You're trying to convince the judge you got it wrong

 8   the first time; you need to look at it again.  We can look at

 9   that at the close of all the evidence.

08:42 10       Anything else?  All right.  We're making progress.  I'm

11   going to go finish my cup of coffee, and we'll get started at

12   9:00.  Thank you.

13        MR. MARCHESE:  Thank you, Your Honor.

14        MR. ALDRICH:  Thank you, Your Honor.

08:43 15    (Recess.)

16    (Proceedings held in the presence of the jury panel.)

17        THE CLERK:  Ms. Distler, if you could please take a

18   seat at the witness stand.

19        THE COURT:  You remain under oath.

08:59 20    You may proceed.

21        MR. MARCHESE:  Thank you, Your Honor.

22              DIRECT EXAMINATION (resumed)

23   BY MR. MARCHESE:

24   Q.   Good morning, Ms. Distler.

08:59 25   A.   Good morning.

08:59

1  Q.   We left off yesterday talking about your background and

2  qualifications.

3       Right now I'd like you to give us a summary, a brief

4  summary, of your opinions and specifically here right now, what

5  were you asked to do in this case.

6  A.   Yes.   In this matter I was asked to provide damages

7  opinions related to the infringement of the design patent, and

8  should the utility patent be found valid and infringed, I was

9  asked to offer a damage opinion in that regard too.

09:00   10  Q.   Did you do this?

11  A.   Yes.

12  Q.   And do you have an opinion on damages as a result of the

13  design patent issues in this case?

14  A.   Yes.

09:00   15       MR. MARCHESE:   Okay.   Could we have slide number 705,

16  Mr. Tisa.   Thank you.

17  BY MR. MARCHESE:

18  Q.   Ms. Distler, can you tell the jury what we're looking at on

19  the slide?

09:00   20  A.   Yes.   This is a summary of my opinion on the design patent

21  damages where the article of manufacture is the HeatWave

22  fabric.   The total profit that should be disgorged from Seirus

23  would be $500,817.

24  Q.   And if the utility patent, the '270 patent, is found to be

09:01   25  not invalid and infringed, do you have an opinion on damages

1  for the '270 patent?

2  A.  Yes.

3  MR. MARCHESE:  Slide number 706, please.

4  BY MR. MARCHESE:

09:01  5  Q.  Ms. Distler, does slide 706 summarize your damages opinion

6  concerning the '270 patent?

7  A.  Yes.

8  Q.  Can you please explain?

9  A.  In my opinion the appropriate reasonable royalty should the

09:01  10  utility patent be found valid and infringed is $119,263.

11  Q.  It looks like you've broken that down by different

12  categories of products.  Can you explain that?

13  A.  Yes.  I broke the royalty out by the different product

14  types sold by Seirus, so for gloves and mitts, the reasonable

09:01  15  royalty would be $104,787.  For glove liners it would be

16  $8,503.  For hats, it would be $4,158.  And for socks, it would

17  be $1,815.

18  Q.  Thank you.  Now, we saw a number for the design patent on a

19  prior slide, and here we see a number for the '270 patent.  Are

09:02  20  those numbers additive in this case?  Would you add them

21  together for damages?

22  A.  It's my understanding that you would not.

23  Q.  Okay.  Let's talk about your methodology.  What kind of

24  process did you go through to arrive at your opinions, and more

09:02  25  generally, how do you go about doing analyses of damages in

these types of matters?

A.    In general my process is that I would request documents and information from counsel that have been produced as part of the litigation.    I will conduct interviews with individuals from the company and also have discussions with the attorneys to better understand the facts and circumstances and issues.    And then I will analyze and synthesize all that information to arrive at my damages opinion.

Q.    In this case what kind of materials did you review?

A.    Specific to this matter, I reviewed documents that were produced by both Columbia and Seirus.    This included financial information about their products and their companies in their entirety.    I also reviewed marketing information that was produced by both parties.    This included catalogs, advertisements, hangtags, other items that are used to market the products.

      I also reviewed depositions that were provided by both Columbia and Seirus witnesses, and I also reviewed expert reports and depositions that were part of this matter, and I did some of my own research via publicly available resources, whether it's the company's websites or competitors' websites or any reports.

Q.    Was there anything that you asked for that you did not receive for your analysis?

A.    No.

1   Q.   And did you speak with people to formulate your opinions?

2   A.   Yes.

3   Q.   Can you tell us who?

4   A.   Yes.  I spoke with from Seirus, Ms. Carey and Mr. Murphy,

09:04   5   and then I also spoke with Dr. Block.

6   Q.   Why did you speak to Ms. Carey?

7   A.   Ms. Carey is the CFO of Seirus, so she's the best source of

8   information about the financial statements and other financial

9   information about the company.

09:04   10   Q.   Well, so, if she is the CFO and she knows about the numbers

11   and all that from the company, is that something you should

12   already know, or is that something you needed to get from her?

13   A.   You can look at a piece of paper that indicates a profit

14   and loss statement, but if you can talk to someone that

09:04   15   understands what the various line items mean, that's

16   informative.  At the same time, too, I was able to understand

17   from Ms. Carey how Seirus goes about pricing its products, how

18   its costs are determined in terms of the actual manufacturing

19   of the product, and then the sales cycle that Seirus has.

09:05   20   Q.   And you also spoke to Mr. Murphy, right?

21   A.   Yes.

22   Q.   Why?

23   A.   Mr. Murphy manages a lot of the manufacturing procurement

24   of products, as we've heard throughout the trial.  So I spoke

09:05   25   with him to understand how Seirus receives its products,

1    specifically the HeatWave products as well as the HeatWave

2    fabric that's part of the HeatWave products, and then I also

3    discussed with him alternatives for heat-reflective materials

4    that might be available to Seirus.

09:05    5    Q.    And so you also mentioned speaking with Dr. Block, right?

6    A.    Yes.

7    Q.    And why did you do that?

8    A.    I reviewed Dr. Block's expert reports, but it was also -- I

9    wanted to speak with him to understand better what was covered

09:06    10    by the patents at issue.

11    Q.    And did you yourself look at the patents in this case?

12    A.    Yes.

13    Q.    And did you write a section of your report where you laid

14    out your understanding of what the patents cover?

09:06    15    A.    Yes.    In every expert report, I identify what my

16    understanding is that the patents cover, the design patent and

17    the '270 patent in this instance, and I did the same here in

18    this matter as well.

19    Q.    Is that work you did yourself?

09:06    20    A.    Yes.    I generally write that section myself just so I

21    understand what the patents cover as I'm doing my analysis.

22    Q.    And to your understanding, we have design patent damages in

23    the case, right?

24    A.    Yes.

09:06    25    Q.    And then there's also utility patent damages, correct?

1       A.    Yes.

2       Q.    And that's for the '270 patent?

3       A.    Yes.

4       Q.    And do you believe that they are different, these types of

09:06   5    damages, design versus utility, or '270?

6       A.    Yes, they are.

7       Q.    Okay.  Well, in that case I think, if it's okay with you,

8       and I think this is the way you'd like to do it, let's break it

9       up, and I think we're going to start with design patent

09:07   10   damages.

11              MR. MARCHESE:    And can we go to slide number 708,

12      please.

13      BY MR. MARCHESE:

14      Q.    All right.  Do you have an understanding, Ms. Distler, of

09:07   15   what the design patent covers in this case?

16      A.    Yes.  The design patent covers the wavy design that appears

17      on the HeatWave fabric.

18      Q.    And what's your understanding of what the remedy is for

19      design patent infringement in this particular case?

09:07   20   A.    For design patent infringement, the patent holder can

21      disgorge the profits from the infringer that are related to the

22      article of manufacture.

23      Q.    And how do you calculate the profits from an article of

24      manufacture?

09:07   25   A.    Well, first you need to identify what that article of

1  manufacture is, and then from there, you need to identify the

2  profits that you would attribute to that article of

3  manufacture.

4          MR. MARCHESE:  Can we have DDX709, please.

09:08  5  BY MR. MARCHESE:

6  Q.   What is the article of manufacture in this case that you

7  used?

8  A.   In my analysis I used the HeatWave fabric as the article of

9  manufacture.

09:08  10  Q.   And does that seem reasonable to you?

11  A.   Yes.

12  Q.   Okay.  Can you explain why?

13  A.   Sure.  Last week we saw Mr. Murphy testify and present the

14  various components that go into creating an end product that's

09:08  15  sold as a HeatWave product.  There were multiple components,

16  and one of those components that's combined into the entire

17  product is the HeatWave fabric.

18          Secondly, yesterday Mr. Murphy testified about how Seirus

19  attains and uses the HeatWave fabric.  If you recall,

09:08  20  Mr. Murphy indicated that Seirus purchases it directly from

21  Ventex.  Ventex manufactures it on a roll, so HeatWave fabric

22  is on a roll of fabric that is then shipped to Asia where

23  Seirus will take possession of it, and Seirus will store it in

24  its warehouses in Shanghai and Hong Kong, and then as orders

09:09  25  are necessary, they will take those rolls -- Seirus will take

1    those rolls of HeatWave fabric and disperse the amount of

2    fabric that's necessary to fulfill the sales orders at its

3    various contract manufacturers.

4    Q.    Now, were you here for any part of Mr. Blackford's

09:09    5    testimony?

6    A.    Yes.

7    Q.    Okay.    And --

8    A.    Or I read the transcripts.

9    Q.    So you've either read the transcript, or you actually

09:09    10    watched his testimony live?

11    A.    Correct.

12    Q.    Is there anything that he said that supports your

13    conclusion or your use of the article of manufacture for the

14    design patent?

09:09    15    A.    Mr. Blackford testified that Columbia also receives its

16    Omni-Heat Reflective fabric -- it also is sold in a roll

17    similar to the HeatWave fabric for Seirus, and here's a slide

18    that presents some of Mr. Blackford's testimony regarding there

19    are many components that go into a glove and that those

09:10    20    components exist before the glove is made, so these parts come

21    together to create the entire product.

22    Q.    And so once you've identified the article of manufacture, I

23    think you said there's a second step.    Can you tell us what

24    that is?

09:10    25    A.    Yes.    So after we identify the article of manufacture we're

|       |    |                                                                        |
|-------|----|------------------------------------------------------------------------|
|       | 1  | going to analyze, we then need to assess the profits that              |
|       | 2  | should be attributed to that article of manufacture.                   |
|       | 3  | Q.   And so you used the article of manufacture would be the           |
|       | 4  | HeatWave fabric.  That's what you said, right?                         |
| 09:10 | 5  | A.   Yes, my analysis is premised on the HeatWave fabric being         |
|       | 6  | the article of manufacture.                                            |
|       | 7  | Q.   So how did you estimate the revenue for HeatWave fabric?          |
|       | 8  | A.   Ms. Carey testified yesterday about the bills of material.        |
|       | 9  | Those are spreadsheets that Ms. Carey summarizes the various           |
| 09:11 | 10 | cost components that go into creating the finished end product         |
|       | 11 | that Seirus receives.  It identifies the costs of those               |
|       | 12 | components, and I used that information to assess what portion         |
|       | 13 | of the revenue and then profits I would attribute to the              |
|       | 14 | HeatWave fabric.                                                       |
| 09:11 | 15 | Q.   And did you prepare an example of your analysis that you          |
|       | 16 | could share with the jury?                                            |
|       | 17 | A.   Yes.  I prepared an illustrative example for us to take a         |
|       | 18 | look at today to make my methodology more clear.                      |
|       | 19 | Q.   Thank you.                                                        |
| 09:11 | 20 | We're looking at DDX711, Ms. Distler.  Can you explain what            |
|       | 21 | we see here.                                                           |
|       | 22 | A.   Yes.  So the example product we're going to use is the           |
|       | 23 | HeatWave Accel glove.  You can see that on the left side for          |
|       | 24 | the 2015-2016 season.  If you look at the bill of material for        |
| 09:11 | 25 | this particular glove, you will see that the cost of the Ventex       |

1  fabric is ████.  This is calculated based on the cost of the

2  roll and the amount of yards that go into that particular

3  product.  And onto that amount, I include duty and I include

4  freight.  Duty is a U.S. import tax that the government

09:12  5  assesses.

6      And then freight, given that the HeatWave fabric will be

7  part of the end product, some of the freight should also be

8  attributed to the HeatWave fabric.  In this instance I used

9  half the freight.  There isn't necessarily a straightforward

09:12  10  way as you look at the bill of material to understand what the

11  weight contribution are of all of the components, but I took 50

12  percent of that for -- as a conservative estimate of how much

13  freight at the high end would be necessary.

14  Q.  And so you've determined the cost, it looks like here, of

09:12  15  the HeatWave fabric, and that was using the bill of materials.

16  Is that right?

17  A.  Correct.  All of this is using the bill of material.

18  Q.  Is that sometimes called a B-O-M or a BOM?

19  A.  Some people call it a BOM or B-O-M.  I'll probably call it

09:13  20  a B-O-M just to have less words.

21  Q.  Okay.  So now that you've determined the cost of the fabric

22  as we see in DDX711, what's the next step?

23  A.  So we're going to then turn the cost of the HeatWave fabric

24  solely into a percentage of the total cost of the product -- so

09:13  25  if we go to the next slide.  So on the BOM, it identifies the

1    total cost of the glove is ███. So the percentage of

2    HeatWave fabric cost as a percentage of the total cost for --

3    in this instance is 17.2 percent.

4            MR. MARCHESE: And just for the record, that's DDX712

09:13    5    they're just looking at.

6        Can we go to DDX713, please.

7    BY MR. MARCHESE:

8    Q.   Can you explain to the jury what we're looking at here?

9    A.   Yes. So now we need to understand -- we need to assess

09:13    10   what the revenue is that we should attribute to that HeatWave

11   fabric, so I used the percentage of cost, the 17.2 percent, and

12   I looked to see what the average sales price was of the

13   HeatWave Accel glove in its entirety in this period, and it was

14   ███. So I used the 17.2 percent times the ███ total

09:14    15   sales price to get to the amount of revenue that I attribute to

16   the HeatWave fabric here which is ███ per unit.

17   Q.   So just to make clear, average sales price, is that the

18   price that Seirus sells the glove for, or is that the retail

19   price?

09:14    20   A.   It's Seirus' wholesale price. Seirus will sell -- that's

21   the price Seirus sells to the retailer, and the retailer will

22   mark it up as he sells it to the final consumer.

23   Q.   Why would you use the Seirus average sales price in this

24   computation?

09:14    25   A.   Well, in this particular instance, when Seirus sets its

1    prices, it takes a look at what the cost is that they've

2    received from their manufacturer.  And then Seirus puts a

3    markup on that to determine the price they're going to charge

4    the wholesaler.  So they look at an entire cost bucket there.

09:15    5    They don't attribute any particular higher portion of profit to

6    the HeatWave fabric, so they usually target -- as Ms. Carey

7    said, ▮ percent is the margin and the markup of the cost of

8    the product, and that was consistent with my review of Seirus'

9    actual data, and so I -- that's one reason why using the

09:15    10    percentage of cost is appropriate.

11        Secondly, the issue here relates to a design patent damages

12    where it's the wavy design that's on the heated fabric -- or

13    it's on the HeatWave fabric.  So the design is not related to

14    function here since it's a design patent.  It's how it looks,

09:15    15    so I've also not attributed any extra profit to the HeatWave

16    fabric as opposed to the rest of the product.

17    Q.    So we're looking at here on DDX713.    ▮, is that the

18    fraction of the revenue that's attributable only to the

19    HeatWave fabric?

09:16    20    A.    Yes.  That's what I've calculated there.

21    Q.    Okay.  So what's the next step?

22    A.    So after you know the revenue, then you have to assess what

23    cost should be applied against that revenue to get to the

24    profit that should be disgorged.

09:16    25    Q.    And how did you do that?

A.    The next slide --

                MR. MARCHESE:    DDX717.

                THE WITNESS:    -- identifies the costs that I have

considered as necessary to make and sell the end product that

09:16    would result in generating the revenues and the profits that

would be apportioned then to the HeatWave fabric.

BY MR. MARCHESE:

Q.    And where did you get these numbers from?

A.    So these are line items that come from Seirus' financial

09:16    statements.    Ms. Carey testified yesterday to what these

various cost components include, and these are one -- these

are -- there are many line items on Seirus' profit and loss

statement, and these are the ones that I selected that I felt

were directly or indirectly necessary to make and sell the

09:17    product.

        You're considering items here beyond just purchasing the

product from the manufacturer.    You're also looking at salaries

and wages of particular departments whose functions are

necessary to make that sale:    assembly, quality control,

09:17    fulfillment.    You're looking at the marketing efforts that go

into selling Seirus' products.

        I also consider bad debt collections and dispute as that's

generally a cost of doing business.    They're going to have some

accounts that do not -- that you may not be able to recover

09:17    fully.    So in my opinion, these are costs that are necessary

1  for Seirus to generate profits on that end product so that they

2  could be disgorged.

3  Q.   So in your experience and in your opinion here, is it

4  necessary that costs vary one to one with sales of products in

09:18  5  order for them to be deducted?

6  A.   For profit disgorgement calculation, that's not necessary.

7  There may be costs that don't change, but they are still

8  functionally important and relevant and necessary to make that

9  sale.   For example, like I talked about the fulfillment

09:18  10  employees, a portion of their time is spent receiving product

11  from the manufacturer and then distributing that to the retail

12  customers at the end of the day.

13  Q.   And since you issued -- well, let me ask you this:   You

14  issued a report in this case, I think you had mentioned?

09:18  15  A.   I did in September, a few weeks -- a couple of weeks ago

16  approximately.

17  Q.   On the article of manufacture and all these computations,

18  is that right?

19  A.   Yes.

09:18  20  Q.   And have you made any changes to your reports since then?

21  A.   Yes.   I've updated this calculation for two items.

22  Q.   And what are those two items?

23  A.   The first item in the salaries and wages line item.   I was

24  using the denominator of net sales instead of gross sales which

09:19  25  is -- I used gross sales for everything else for the first

1  three columns, the negative 6.92 percent, the negative 6.89

2  percent, the negative 7.82 percent. So I updated those to use

3  the denominator of the gross sales and that changed my

4  calculation by approximately ███████.

09:19   5      And then the second change that I made was --

6  Q.  Before you go on, let me interrupt you real quick. The

7  1,485 --

8  A.  35.

9  Q.  $35, was that -- did you increase your number or decrease

09:19  10  your number?

11  A.  It increased by ███████, approximately ███████.

12  Q.  Thank you. You were about to talk about a second area?

13  A.  The second change I made since my report was removing the

14  sales returns line item that's underneath gross sales

09:20  15  adjustments.

16  Q.  Why did you do that?

17  A.  I wasn't certain. It was -- I mistakenly thought that some

18  of those returns had not already been factored into the

19  HeatWave sales that Ms. Carey identified, but from her second

09:20  20  deposition, she cleared that up, and they were included there,

21  so I removed them from my analysis as a deduction.

22  Q.  And then what did that do in terms of your overall

23  computation?

24  A.  That increased the profit damage figure by a little over

09:20  25  $23,000.



1    Q.    Okay.    Thank you.    So let's go back to your example.

2                MR. MARCHESE:    Can we have slide 715.

3    BY MR. MARCHESE:

4    Q.    How did you apply the profit margin that you determined to

09:20    5    come up with a -- you know, the final number that we see on

6    DDX715?

7    A.    Sure.    So we left off at revenue attributable to the

8    HeatWave fabric of ███.    I applied the profit margin that I

9    calculated in this slide we just looked at for that year, 35.9

09:21    10    percent.    So that results in ███ of profit from the sale of a

11    HeatWave Accel glove that should be attributed to the HeatWave

12    fabric.    So you would take that -- effectively you would take

13    that 101 times the number of units that were sold, and that

14    would give you the profits to disgorge for this particular

09:21    15    product.

16    Q.    So in the profit margin you have here at ███ percent, did

17    you include all of Seirus' costs that it uses to get to an

18    operating margin or just some of them?

19    A.    Not all of them, no.

09:21    20    Q.    Okay.

21    A.    Seirus' operating margin is really more like ███

22    percent, and this is clearly much higher than that.

23    Q.    And did Ms. Carey indicate at any point that there might be

24    additional costs that could be deducted?

09:21    25    A.    Ms. Carey and I walked through the entire profit and loss

1   statement, and as the CEO, there are costs that she views are

2   relevant for making all the products, right?  They're making

3   products at the end of the day.  I didn't necessarily include

4   all of those.  And I wouldn't since I'm performing a damages

09:22   5   analysis and a damages assessment.  So it was my job, my role

6   as the expert, to determine which costs would be appropriate to

7   include.

8   Q.    And did you do that?

9   A.    Yes.

09:22   10   Q.    And so we see this example for the HeatWave Accel glove,

11   number 1252, for the 2015-2016 season, right?

12   A.    Yes.

13   Q.    Did you do a similar -- or I should say did you do the same

14   analysis for other products that are at issue in this case?

09:22   15   A.    Yes.  So for the products that are accused of infringing

16   the '270 patent, I looked at the bills of material for each of

17   those products for each of the seasons and then performed the

18   same analysis.

19   Q.    And how about for the design patent?  You said the '270

09:22   20   patent.

21   A.    Oh, sorry, for the design patent.  My apologies.  The '270

22   is the utility side.  The design patent, correct.  Sorry.

23   Q.    Just so we're clear, the analysis on slide DDX715, that's

24   for the design patent, correct?

09:23   25   A.    Yes, this is the design patent.

1    Q.    Okay.    And so this is for the HeatWave Accel glove?

2    A.    That's for the HeatWave Accel glove, yes.

3    Q.    Just to make sure we're clear, you used the same analyses

4    for design patent damages for each and every product that is at

09:23    5    issue in the case?

6    A.    For each and every product that has the wavy design on the

7    HeatWave fabric, yes.

8    Q.    So when the HeatWave fabric is the appropriate article of

9    manufacture, which is what you've used here, what is your final

09:23    10    opinion on damages then?

11    A.    I think the next slide summarizes that.

12    Q.    So we're looking at DDX716.    Does this provide a summary of

13    your opinions concerning design patent damages?

14    A.    Yes, $500,817 is the amount of profit to disgorge for an

09:23    15    article of manufacture identified as the HeatWave fabric.

16    Q.    And we already saw these other numbers earlier in your

17    presentation, correct?

18    A.    Yes.    We started with the summary slide.

19    Q.    So we don't need to read them all here now.

09:24    20    Let me ask you some questions.    Were you here for

21    Ms. Morones' testimony?

22    A.    Yes.

23    Q.    And she's the damages expert for Columbia, correct?

24    A.    Yes.

09:24    25    Q.    And you're aware that she provided opinions on the design

1  patent in this case?

2  A.  Yes.

3  Q.  And do you agree with her opinions of damages for the

4  design patent?

09:24  5  A.  No, we disagree.

6  Q.  And can you explain why you disagree?

7  A.  Yes.  Ms. Morones starts her damages -- her damages

8  analysis for the design patent with an article of manufacture

9  of the entire glove.  For the reasons that we talked about at

09:24  10  the beginning, there are multiple components how Seirus handles

11  the HeatWave fabric in the manufacturing of its products.  I

12  think that's inappropriate.  I think it should really focus on

13  the wavy design on the HeatWave fabric that's covered by the

14  design patent when you are considering the article of

09:25  15  manufacture.

16  Q.  As opposed to the entire glove?

17  A.  Yes.

18  Q.  And I'm not sure -- I think you mentioned this:  Did you

19  say that there were some additional costs that you took out in

09:25  20  your computation of disgorgement of profits that Ms. Morones

21  did not?

22  A.  Yes.  Ms. Morones removed a couple of costs to start, and

23  she identified -- she stated that she would be identifying

24  additional costs to also include in her calculations of

09:25  25  deductions.  She submitted information last evening where she

1   deducts additional costs, so her profit margin is -- was 46.8

2   percent.  Now, I believe it's 41.6 percent, if my memory serves

3   me right.

4   Q.   So she in the end -- it sounds like since her original

09:25   5   testimony that we heard a day or so ago up until something you

6   saw last night that her deductions have changed.  Is that

7   right?

8   A.   Yes.   She's added additional costs.

9   Q.   And she went -- I think you said from the other day her

09:26   10   profit margin was 46.8 percent?

11   A.   Yes, I believe so.

12   Q.   And now she's down to 41.6 percent?

13   A.   Yes.

14   Q.   And are there still additional cost items that you believe

09:26   15   should come out that would lower the 41.6 percent to a lower

16   number?

17   A.   Yes.   Ms. Morones included some of the costs that I

18   identified and also included in other payroll taxes, but did

19   not include all the costs that I had deemed were necessary to

09:26   20   make and sell the product.

21   Q.   And your profit margin can you remind us is -- is

22   approximately what?

23   A.   On the HeatWave fabric, I believe it's 36.5 percent.

24          MR. MARCHESE:   Can we go back to slide 715.

25

1    BY MR. MARCHESE:

2    Q.    Is it 35.9?

3    A.    No, go back one more slide, please.

4    Q.    Okay.   Sorry.

09:27    5    A.    It's 35.9 percent for that particular fiscal year, but

6    overall over the entire period, it's 36.5 percent.

7    Q.    I see.   Got it.   Okay.   So the 36.5 is an average across

8    all the years?

9    A.    Yes.

09:27   10    Q.    Thank you.   So my understanding, then, is that you reviewed

11    some kind of an alternative or a different analysis by

12    Ms. Morones last night.   Is that correct?

13    A.    Yes.   There -- in the documents that I reviewed, there was

14    another analysis for a different article of manufacture.

09:28   15    Q.    And what's your opinion about the particular article of

16    manufacture used in that new opinion that you said you reviewed

17    last night?

18    A.    There wasn't much text to it, so I don't know as I sit here

19    the underlying bases for how the various components were

09:28   20    included, but it looks like it's trying to isolate what the

21    fabric components may have been that went into creating an end

22    product.

23    Q.    It's not just the vendor -- the Ventex HeatWave fabric?   Is

24    there something more that you saw?

09:28   25    A.    From my understanding of reviewing it, it looks like

1    Ms. Morones is taking the Ventex HeatWave fabric as a

2    percentage of other fabric costs that she identifies or is able

3    to identify from the bills of material.

4    Q.    So she had other fabric costs involved as well as the

09:28    5    HeatWave fabric at least in some cases?

6    A.    Well, she only analyzes fabric costs as opposed to the

7    other cost components and labor and other items that go into

8    making the end product that's then shipped to Seirus.

9    Q.    Okay.  Thank you.  Let's switch gears now and start talking

09:29    10    about the '270 patent.

11        MR. MARCHESE:  And if we could, Mr. Tisa, could you

12    pull up slide number 720.

13    BY MR. MARCHESE:

14    Q.    Ms. Distler, can you explain to us is this a summary of how

09:29    15    damages were computed by you for the '270 patent?

16    A.    Yes.  The remedy in a utility patent damages case, here the

17    one that's focused on the '270 patent, the remedy is a

18    reasonable royalty, and the reasonable royalty is a function of

19    two items:  A royalty base and a royalty rate that you multiply

09:29    20    by one another to get the reasonable royalty.

21    Q.    Do you have an example in mind that you could provide that

22    is -- kind of illustrates how this computation works?

23    A.    Sure.  As an -- a real life example:  If you're renting an

24    apartment, you are paying a monthly royalty or a monthly rent

09:30    25    for the use of someone's asset, their condo or their home or

1    whatever it may be.

2    Q.    So then what is the royalty base?

3    A.    The royalty base is generally the revenue that's related to

4    the sale of the patented technology or the number of units of

09:30    5    the patent technology that are sold.

6    Q.    So the number of dollars that are associated with the

7    particular item?

8    A.    Either the number of dollars or the number of units

9    depending on the base of a particular situation.

09:30    10    Q.    What is the royalty rate?

11    A.    The royalty rate is the rate that you would apply to those

12    dollars or units that would reflect the value of the patent.

13    Q.    So in this case and others that you've worked on, is there

14    some particular guidance or principles or rules that you follow

09:30    15    in computing a reasonable royalty?

16    A.    Yes.    There is a landmark case called the Georgia Pacific

17    case that -- where the courts have laid out a series of factors

18    that a licensee, Seirus, and a licensor, Columbia in this

19    instance, would consider as part of a negotiation for rights to

09:31    20    use the patent at issue here, the '270 patent.

21    Q.    And we've heard a lot of testimony about this Georgia

22    Pacific case.    Have you read it?

23    A.    Yes.

24    Q.    The whole thing?

09:31    25    A.    Yes.

1          MR. MARCHESE:  Okay.  And then let's have 721, please.

2     BY MR. MARCHESE:

3     Q.   So DDX721 is titled "Reasonable Royalty Georgia Pacific

4     Factors."  What are we looking at here?

09:31  5     A.   So this is an abbreviated list of the factors that the

6     court has determined may be relevant to consider when

7     performing a hypothetical negotiation.  So factors 1 through 14

8     are generally fact or data, information gathering factors, and

9     you will take the information from those first 14 factors, and

09:32  10    then in factor 15, you imagine that this hypothetical

11    negotiation is happening between the parties.  They're sitting

12    across the table from one another.  Both parties know all

13    information that was disclosed in factors 1 through 14, and

14    then they're negotiating for the payment that should be made to

09:32  15    use the patent.

16    Q.   Are any assumptions made in connection with factor 15?

17    A.   Yes, there are specific assumptions that correspond to a

18    hypothetical negotiation.

19    Q.   And what are those?

09:32  20    A.   One, the patents are assumed to be valid, in force, and

21    infringed.  That's why we're sitting here today.  I have to

22    make that assumption in order to calculate damages.

23         The second is that it is a willing licensor and a willing

24    licensee.  Both parties are going to sit down at the table, and

09:32  25    they're going to negotiate with each other.  And the third is

1  that a deal must be reached.  The two parties must come to a

2  conclusion.

3  Q.  So Ms. Distler, we're looking at DDX722.  Does this

4  summarize your opinion of the reasonable royalty patent damages

09:33   5  for the '270 patent?

6  A.  Yes.

7  Q.  And we've seen this one before, right?

8  A.  Yes.

9  Q.  And can you just briefly let us know what your opinion and

09:33   10  your conclusion was.

11  A.  In my opinion if the '270 patent is found valid and

12  infringed, the reasonable royalty for rights to use that patent

13  would be $119,263.

14  Q.  And so what was the royalty base that you used to get to

09:33   15  this particular number?

16  A.  The royalty base that I used reflects the contribution that

17  the patented feature provides to the overall product sales.  So

18  effectively I've apportioned or separated the entire value of

19  the end product to reflect the contribution of including

09:34   20  HeatWave fabric within it.

21  Q.  And what royalty rate did you use?

22  A.  I used a 10 percent royalty rate applied to that base.

23  Q.  So is your base -- the base that you used larger or smaller

24  than what Ms. Morones used?

09:34   25  A.  It's smaller.

1  Q.   And the 10 percent -- I think I recall Ms. Morones having

2  several different rates that she offered.   Is that correct?

3  A.   Yes.

4  Q.   And what were those?

09:34  5  A.   5 percent, 10 percent, and 20 percent.

6  Q.   So you -- you've used 10 percent here?

7  A.   Yes, I've used 10 percent based on my factor 1 analysis.

8  Q.   Okay.   So now let's talk about the base a little bit.   Go

9  deeper on the royalty base and how you got there.   You said --

09:34  10  I think I heard you say that you tried to apportion -- you may

11  have used the word "isolate," but you did an apportionment

12  analysis.   Is that correct?

13  A.   Yes.

14  Q.   And, you know, how did you -- I guess you're doing that,

09:34  15  but I know we've heard a lot about the entire market value

16  rule.   Did you use the entire market value rule or consider it

17  in this case?

18  A.   In every matter where you're performing a reasonable

19  royalty damages opinion, the analyst is going to consider the

09:35  20  entire market value rule, so, yes, I considered it in this

21  instance.

22  Q.   People may be sick of hearing about it.   Can you tell us

23  what -- again, what the entire market value rule is?

24  A.   Effectively the entire market value rule states that if

09:35  25  you're going to take a royalty on the entire value of the

1    product, the patented feature must be established as the driver

2    of demand for that entire product.  It's not sufficient that it

3    is just a contributor of many factors that go into influencing

4    a purchase.  It needs to be the driver.  Otherwise, you need to

09:35    5    apportion for those nonpatented elements, those other

6    contributors that are not related to the patented feature that

7    are still adding value or a factor that a consumer -- a

8    consumer considers.

9    Q.    And do you recall Ms. Morones provided testimony about the

09:36    10    entire market value rule?

11    A.    Yes.

12    Q.    And what did she say about it?

13    A.    Ms. Morones assumed that the entire market value rule

14    should be invoked.

09:36    15    Q.    And in this case, were you told to assume that the entire

16    market value rule applies or does not apply?

17    A.    No.

18    Q.    And so what did you do instead?

19    A.    I looked at the evidence that I gathered through my Georgia

09:36    20    Pacific analysis reviewing the 14 factors to understand what

21    the patented feature is and how it contributes to the products

22    in an effort to isolate that contribution to compensate the

23    patent holder, Columbia in this instance, in a manner that

24    reflects that contribution.

09:36    25    Q.    And what qualifies you to make that kind of determination

1   about the entire market value rule?

2   A.   As a practitioner that specializes in patent damages, this

3   is a requirement in my mind that every analyst should do as

4   they are considering the reasonable royalty that would be

09:37   5   appropriate.

6   Q.   And in your opinion that you're offering, is the patented

7   feature here at issue, the '270 patent, is it the driver of

8   sales for the gloves at issue?

9   A.   No.

09:37   10   Q.   Okay.  And from your analysis and your conversations with

11   other people and then hearing testimony in this case, what is

12   the patented feature?

13   A.   The patented feature is the application of heat-reflective

14   materials to a base fabric in a ratio of 30 percent to 70

09:37   15   percent, or about 30 percent to 70 percent, where the

16   heat-reflective materials are interfacing to the wearer.

17   Q.   And so from your review, you're sitting here through most

18   of this trial, and you've read a lot of papers and reports and

19   so on with respect to the case, what kind of evidence has

09:38   20   Columbia offered in an effort to try to demonstrate that the

21   patented feature is the driver of demand for the overall

22   HeatWave glove products and socks and so on?

23        MR. AXELROD:   Objection to the witness' comment on

24   witnesses' testimony.

09:38   25        THE COURT:   Sustained.

1    BY MR. MARCHESE:

2    Q.   What kind of evidence did you see offered by Columbia in

3    this case concerning what -- evidence concerning entire market

4    value rule or driving demand?

09:38    5              MR. AXELROD:   Same objection.

6              THE COURT:   Rephrase your question.

7    BY MR. MARCHESE:

8    Q.   Is there evidence that you saw in this case that would lead

9    you to conclude that the patented feature is the driver for the

09:38   10   entire product?

11             MR. AXELROD:   Same objection.

12             THE COURT:   The objection's overruled.

13        You can answer that question.

14             THE WITNESS:   What was the question again?

09:38   15   BY MR. MARCHESE:

16   Q.   Sorry.   Hopefully I can rephrase it exactly the same.   Is

17   there evidence that you saw in the case that would lead you to

18   conclude that the patented feature drives demand for these

19   gloves?

09:39   20   A.   I have not seen evidence in that regard.

21   Q.   And did you see any testimony concerning the types of items

22   that could contribute to consumers' purchasing decision, for

23   example, with an insulated glove -- I'll hold one up here

24   really quickly to show what I mean.   This example is

09:39   25   Exhibit 222.1.   It's been received previously.   I'll just refer

1    to that as "an insulated glove."

2        What kinds of features that contribute, from your analysis

3    and what you've seen in the case, contribute to a consumer's

4    purchasing decision with respect to this glove?

09:39   5        MR. AXELROD:  Your Honor, I have an objection.  The

6    witness is not qualified.

7        THE COURT:  Hang on a second.  I need the jury to step

8    into your room, please.

9        (Proceedings held outside the presence of the jury panel.)

09:40  10        THE COURT:  Mr. Axelrod.

11        MR. AXELROD:  The proposed testimony is outside the

12   scope of the witness' reports.  She's never given an opinion on

13   the entire market value rule.  Her report, submitted in 2016

14   and never changed, simply provides that she assumes that it's

09:40  15   not applicable in this case based on what other people have

16   told her and therefore goes forward on that basis.  She's not

17   qualified and has nothing in her report to support any kind of

18   consumer demand analysis and has made no study on that in that

19   respect.  If she wants to say that, you know, all she can

09:41  20   really say is, "I did not apply the entire market value rule"

21   which is all she says in her report.

22        MR. MARCHESE:  I disagree with that, Your Honor.

23   We've already heard that she did the analysis.  She's an

24   economist.  She looked at materials, marketing materials --

09:41  25        THE COURT:  Yeah.  Let's focus on the other part of

1    the question, though, and that is was all of that analysis

2    included in her report.

3              MR. MARCHESE:   She did an analysis of the entire

4    market value rule in her report.

09:41   5              THE COURT:   And that was included in her report and as

6    to why it did not apply?

7              MR. MARCHESE:   Why it does not apply, yes.

8              THE COURT:   So in her report, there is a portion of it

9    which discusses the entire market value rule and why it does

09:41  10    not apply?

11              MR. MARCHESE:   Yeah, and I'll have to pull it.  I can

12    point you to it.

13              THE COURT:   So it looks like -- sounds like there's a

14    disagreement about what is in the report.

09:41  15              MR. AXELROD:   Correct.

16              THE COURT:   Can you show me where it is?

17              MR. MARCHESE:   Sure.

18              THE COURT:   It sounds like your witness has located it

19    for you.  Maybe you can step up and share it with Mr. Axelrod.

09:42  20              MR. AXELROD:   Which paragraph numbers do you want me

21    to look to?

22              MR. MARCHESE:   Do you have it open?

23              THE WITNESS:   Yes, so I started -- the header

24    "Ms. Morones fails to satisfy the entire market value rule,"

09:42  25    paragraph 57.  And that goes through multiple pages to page 32,

1   paragraph 66.

2          MR. AXELROD:  This is coming in on Ms. Morones'

3   report?  This does not provide any analysis or opinion based on

4   any supposed independent review of marketing materials.  This

09:43   5   is simply saying, "I disagree with Ms. Morones' testimony."

6          THE COURT:  Well, if she does and she explains why,

7   she's going to be entitled to testify as to why, what she

8   disagrees with and why.

9          MR. AXELROD:  Yes, if it's the same as in her report,

09:43   10   but what she's being asked to testify to is a separate

11   analysis.

12          MR. MARCHESE:  I can cap it to what's in her report,

13   Your Honor.

14          THE COURT:  Okay.  Thank you.  Go ahead and get the

09:43   15   jury.

16       Do you understand the limitation?

17          THE WITNESS:  Yes.

18          THE COURT:  Thank you.

19       (Proceedings held in the presence of the jury panel.)

09:44   20          THE COURT:  Please be seated.

21       You may proceed.

22          MR. MARCHESE:  Thank you, Your Honor.

23   BY MR. MARCHESE:

24   Q.   Ms. Morones -- excuse me.

09:44   25       Ms. Distler, in your expert report, did you offer an

1  opinion on why the entire market value rule does not apply?

2  A.    Yes.

3  Q.    Can you explain how you reached your conclusion that it

4  does not?

5  A.    Yes.   So in Ms. Morones' report, she includes various

6  marketing materials, for example, a Seirus catalog, the Seirus

7  website, and pictures of hangtags to -- in an attempt to

8  establish that the patented feature is the driver of the sale

9  of the entire product such that you could use the entire value

10  of the product as the royalty base.

11      As I explained in my report, this is an insufficient

12  analysis to effectively link that the patented feature here,

13  the heat-reflective material applied in the ratio facing the

14  inner body, is the driver of the sale of the product.   In all

15  of those different materials, there are other multiple

16  components, technologies, or features that are also highlighted

17  that are also contributing to a consumer's decision to purchase

18  a product, not to mention branding and marketing and the

19  contribution that those attributes provide for the sale of a

20  product.

21      So as a result -- in addition I also performed independent

22  analyses to quantify the inclusion of different technologies to

23  understand what value drivers are part of the accused products

24  that are not covered by the patented feature.   So as a result

25  of that, to draw the conclusion that the driver of why a

1  customer is purchasing a HeatWave accused product is the

2  patented feature is not supported.

3  Q.  Okay.  Ms. Distler, we've pulled up slide number 730,

4  DDX730, and here is a slide titled "Impact of Adding Soundtouch

09:46   5  to HeatWave Gloves."  Do you see that?

6  A.  Yes.

7  Q.  What is Soundtouch?

8  A.  Soundtouch is a feature that's added usually to the index

9  finger and the thumb of the glove such that you can interact

09:47  10  with the touch screen of your phone without having to take your

11  hand out of the glove.

12  Q.  So if you're on a ski lift, for example, and you want to

13  send a text or make a phone call, you can touch your phone

14  without taking your gloves off?

09:47  15  A.  Yes.

16  Q.  And what are we looking at here, then, on DDX730?

17  A.  So in an effort to demonstrate that there are other

18  technologies or other features that are contributing value or

19  are features that, therefore, consumers are willing to pay more

09:47  20  for, I isolated what Soundtouch contributes in terms of the

21  sales price to HeatWave -- the same HeatWave product where one

22  version has the Soundtouch and one doesn't.

23      So if we look at the first example here, it's a HeatWave

24  Zenith glove; there's no Soundtouch included.  And then there's

09:47  25  a Soundtouch HeatWave Zenith glove, so you've added that

1  additional feature of Soundtouch.  So everything's the same

2  except for the inclusion of that additional technology or

3  feature.  When you include Soundtouch, the average sales price

4  of the entire product increases by ████.

09:48    5      Now, that Soundtouch is clearly not related to the patented

6  feature.  It's not related to the heat-reflective materials in

7  a ratio of 30 percent to 70 percent facing inner to the wearer.

8  So by not factoring in these nonpatented components or elements

9  or features that contribute to a consumer's decision to

09:48   10  purchase a particular glove, you're violating the entire market

11  value rule.  And at the same time you're effectively

12  overcompensating the patent holder for the contribution of the

13  technology embodied in the patented feature.

14      And you'll see for all of these four instances that's the

09:48   15  case.  The increase in the sales price is anywhere from ████

16  to ████ just from adding the Soundtouch feature alone.

17  Q.  Do you have another example?

18  A.  Yes.

19      MR. MARCHESE:  Could we have 731, please.

09:49   20  BY MR. MARCHESE:

21  Q.  And this is the Seirus HeatTouch Torche glove.  Have you

22  seen this one before?

23  A.  Yes.

24  Q.  How does the entire market value rule apply here in terms

09:49   25  of the features that -- the '270 patented feature?

1    A.   As I discuss in my report, this product, it really

2    illustrates the issue with not controlling for patented versus

3    nonpatented contributors to the sale of a product.   This is a

4    product, right?   It's the one that is the rechargeable battery

09:49    5    that you can do on-demand heat.   It -- Seirus sells it at a

6    wholesale price of approximately ███ per unit.   The consumer

7    plays multiples of that, you know, upwards of $300 potentially

8    for this glove.

9        This version of this glove includes the HeatWave fabric

09:50    10    within it on the inside of the glove.   By taking a royalty on

11    the entire product here for that HeatWave fabric, effectively

12    you're saying that the reason the consumer purchased this glove

13    was because of the inclusion of the HeatWave fabric.   Now, that

14    doesn't make sense.   It doesn't make common sense, right?

09:50    15    Someone's paying that much for this glove because they want the

16    functionality of the on-demand heat that's provided by the

17    rechargeable battery.

18        So this is -- those are two examples that I talk about in

19    my report in addition to the other features that are

09:50    20    highlighted in the marketing documents that Ms. Morones

21    includes in her report to identify what's included within the

22    Seirus products.   In those marketing documents in my report, I

23    highlight there's outer shells.   There's insulation.   There's

24    waterproof, breathability, wickability, functionality.   There's

09:51    25    the inclusion of MegaHeat, and when it doesn't have the 30 to

1    70 percent ratio or it's facing away from the body, it's not

2    related to the patented feature at that point.

3        I talk about there are cinches, there are buckles.  There

4    are multiple -- there's zippers, there's vents, there's

09:51  5    pockets, there are all these different features that a consumer

6    is looking to when they are considering their purchase in

7    addition to the Seirus brand.

8        So in my opinion, to say that it is because of the patented

9    feature, this 30 percent to 70 percent ratio applied to a

09:51  10    heat -- of heat-reflective materials applied to a base fabric

11    and then facing inner to the wearer, it's unsupported and

12    unreliable.  You really need to think about isolating the value

13    that the patented feature contributes to that end product when

14    you are conducting a reasonable royalty analysis.

09:52  15    Q.    Thank you, Ms. Distler.  So let's talk a little bit about

16    the sales of HeatWave versus non-HeatWave gloves, so those with

17    HeatWave versus those without.  Did you look at that?

18    A.    Yes.

19    Q.    And what can you tell us about what you found?

09:52  20    A.    What I found was that there are significantly greater sales

21    of non-HeatWave gloves than there are HeatWave gloves.  So that

22    establishes that for products without the HeatWave

23    functionality, there's also factors that are driving the demand

24    of those sales, right, so, again, contributing to the idea that

09:52  25    there are multiple things that a consumer is choosing or

|         |    |                                                                        |
|---------|----|------------------------------------------------------------------------|
|         | 1  | looking to when he or she is making their purchase decision.           |
|         | 2  | It isn't one particular factor.   And it's not been established        |
|         | 3  | that it is the patented feature that is resulting in the sale          |
|         | 4  | of that end product.                                                   |
| 09:52   | 5  | Q.   And so why is the entire market value rule important in           |
|         | 6  | this particular case?                                                  |
|         | 7  | A.   Not only in this particular case is it important, but in          |
|         | 8  | all cases to effectively isolate the contribution of the              |
|         | 9  | patent, to compensate the patent holder should the utility            |
| 09:53   | 10 | patent be found valid and infringed in a manner that's                |
|         | 11 | appropriate.                                                          |
|         | 12 | Q.   So you came up with a different damages base from the            |
|         | 13 | entire glove.   Is that correct?                                      |
|         | 14 | A.   That's correct.                                                  |
| 09:53   | 15 | Q.   And how did you do that?                                         |
|         | 16 | A.   So I asked Ms. Carey and Mr. Murphy if they could identify       |
|         | 17 | a glove that Seirus sells that is exactly the same as the             |
|         | 18 | HeatWave glove but for the inclusion of the HeatWave fabric.          |
|         | 19 | Ms. Carey yesterday pointed to these two different pairs of           |
| 09:53   | 20 | gloves.                                                              |
|         | 21 | Q.   So we've pulled up DDX732.   Does this relate to the issue      |
|         | 22 | that you were just describing?                                       |
|         | 23 | A.   Yes.                                                            |
|         | 24 | Q.   Can you explain?                                                |
| 09:53   | 25 | A.   Yes.   So the two gloves that Ms. Carey -- she was holding       |

1    yesterday, so one was an All Weather original glove.  You'll

2    see that in the top half of the slide on the second line.  So

3    that is the glove that does not contain the HeatWave fabric.

4    And then there is a version of that glove that's sold,

09:54    5    everything's the same other than you have a HeatWave liner on

6    the inside.  So you have the patented feature, the

7    heat-reflective materials applied in a ratio of 30 to 70

8    percent that's inner-facing to the wearer in that particular

9    product.

09:54    10    So what I've done here is I've isolated -- you know, I'm

11    controlling for all other aspects.  You know, what other

12    materials are going into the glove, what other -- if consumers

13    like the All Weather Glove product itself, it has its own

14    features and properties that consumers like, I'm controlling

09:54    15    for it having the Seirus brand.  It's a strong brand within the

16    glove space.  I'm controlling for that because these are both

17    Seirus gloves.

18    So you can look to these -- this comparison and the

19    difference in sales price you can attribute, then, to the

09:55    20    inclusion of the patented feature within that glove.  So in

21    this instance, there's a 22.5 percent increase in the price

22    over the non-HeatWave version, and in the analysis on the

23    bottom half of the slide, again, it's an All Weather Glove, but

24    this time I've added Soundtouch, and I've compared that to a

09:55    25    HeatWave All Weather Glove that has Soundtouch, and, again, the

1  increase in the sales price from the non-HeatWave glove is

2  about 22.3 percent in this instance.

3  Q.    And so how can you use this information to avoid having a

4  royalty that is taken against the entire value of a glove?

5  A.    And so this information you can use to, you know -- here

6  I've isolated what the increases in sales prices that Seirus

7  generates from selling a product that contains the patented

8  feature.    So you can use this to apportion your royalty base to

9  reflect only the contribution of the patented feature, and you

10 can base your royalty -- your reasonable royalty on that

11 amount.

12 Q.    So we're looking at another slide, DDX733.    Ms. Distler,

13 what have you done here?

14 A.    So here I am performing the apportionment of the royalty

15 base.    There is approximately ████████████ of sales in total

16 that Seirus has made of nonsilver HeatWave products.    So these

17 are products where the heat-reflective material is facing the

18 wearer.    And the increases that we saw in the last slide, the

19 22.5 percent, you take the reciprocal of that, so here I'm

20 starting with the amount of HeatWave sales.    So what do I need

21 to decrease by to reflect that contribution?    It's 18 percent.

22 And that reduces the royalty base to $1.19 million.    And this

23 isolates the increase that Seirus realizes, an economic

24 contribution on the sales price basis from including the

25 patented feature.

1    Q.    Okay.    Great.    So does that summarize your royalty base

2    analysis?

3    A.    Yes.

4    Q.    Okay.    Great.    Let's talk about the rate.    How did you go

09:57    5    about arriving at the 10 percent rate that you told us about

6    earlier?

7    A.    So I turned back to the other Georgia Pacific factors.    I

8    performed this analysis in factor 13 of my report, but I looked

9    to the other factors to help me determine the royalty rate that

09:57    10    I should then apply to this royalty base.

11    Q.    Did you look at every factor or all of the 15 that we

12    looked at?

13    A.    You consider all of the factors, but some factors may be

14    more relevant than others for any particular hypothetical

09:57    15    negotiation.

16            MR. MARCHESE:    Could we have slide 734.

17    BY MR. MARCHESE:

18    Q.    Okay.    So DDX734 looks -- it's titled "Georgia Pacific

19    Factors."    It's got three columns, licensing, technical, and

09:58    20    economic.    Why do you divide the factors into these three

21    columns?

22    A.    Just for presentation purposes.    We didn't have to sit

23    through me going through 14 factors and then factor 15 as well.

24            MR. MARCHESE:    Okay.    Let's step to DDX735, please.

25

BY MR. MARCHESE:

Q.   And this looks to be some bullet points related to the licensing column.  Is that correct?

A.   Yes.

Q.   Can you explain what you've done here?

A.   Yes.  So as you looked at the factors that I've included in the licensing bucket, 1, 2, 3, 4, 7, these are the more relevant information that you take away from those.  So first in a hypothetical negotiation, the licensor and licensee are only negotiating rights for the patent at issue, so in this instance the '270 patent.  You're not negotiating for any brands, any other patents, or anything else.  It's the construct of the hypothetical negotiation; the requirement is you're looking at the utility patent only.

Q.   Okay.  And were there other considerations that you considered in terms of licensing?

A.   Yes.  Columbia produced agreements that included the Omni-Heat Reflective brands, patents, and other Columbia information that were talked about or testified to here in the -- in this courtroom.  I also had an analysis of those in my report, in my factor 1 analysis.

      So Columbia produced these agreements, and as we heard, they include the ability of the licensee to use the Columbia brand.  These are really branding agreements if you step back away from these.  So the licensee wants to be able to use

1    Columbia's brands and marks and technologies which are all very

2    valuable, right?  The Columbia brand, we've demonstrated here

3    that it is a significant value.  So the licensee wants to be

4    able to put that on items that it sells in an effort to

5    hopefully contribute to those sales of the product.  And in

6    doing that, it makes sense that the entire product that would

7    be licensed or that would be subject to the royalty is the

8    entire product base because you're using that brand to promote

9    your product within the space and attract consumers to

10   hopefully want to purchase your product.

11       That's not the case here on the hypothetical negotiation.

12   Right.  We're just looking at the utility patent.  Seirus isn't

13   going to want to use Columbia's brand, right?  They also have

14   their own very strong brand.  In one of Columbia's agreements,

15   it enables the licensee to actually purchase Columbia products

16   from Columbia's manufacturers and suppliers.  Well, Seirus

17   already has those, so they won't need to do that either.

18       So when you look at these agreements without making a

19   significant adjustment to them to remove all of these other

20   items that are not subject to the hypothetical negotiation, but

21   are critical to the negotiation of those agreements with these

22   licensees and the purpose that these agreements were for, it's

23   necessary, if you're going to rely on them especially as a

24   starting point for the negotiations as Ms. Morones did.

25   Q.   So which agreements did you look at?

A.    There were four agreements.    There was the OCS agreement,
the TORQ agreement, the Delta Galil agreement, and London
Luxury if we recall.

Q.    Are those the same four that Mr. Merriman testified about?

A.    Yes.

Q.    And were all of those branding agreements?

A.    Yes.

Q.    Okay.    So I think at this point why don't we move on to the
technical column.    And we're looking at DDX737.    What are you
saying here, Ms. Distler?

A.    So what were the takeaways from the technical factors that
I evaluated?    First, what is the patented feature?    You can
think of it as the invented aspect, you know, what have we
heard.    It's the heat-reflective material that faces the skin
of the wearer at a ratio of 30 percent -- or about 30 percent
to about 70 percent.    So that's what the patented feature is.
That's what we're looking to value here.

     The base fabric that the heat-reflective materials are
applied to in the ratio that we discussed, it also has its own
desirable properties, MegaHeat as I discussed in my report,
MegaHeat is advertised by Ventex as a breathable, wickable -- a
draping product that's desirable on its website.    So it's
highlighting those features without the inclusion of any
heat-reflective material upon them.    So MegaHeat itself has
properties that contribute, you know, to whether or not a

1    product is preferred.  And MegaHeat's also used by Descente and

2    another company in the outdoor apparel space too.

3    Q.    So MegaHeat, just to refresh everyone, that is the base

4    layer that Seirus uses in HeatWave?

10:03    5    A.    Yes, that's what the heat-reflective material is applied

6    to, the MegaHeat fabric.

7    Q.    And the last bullet you have under "technical" is

8    "acceptable alternatives to the '270 patent."  What did you

9    mean by that?

10:03    10    A.    Yes.  So in a hypothetical negotiation in the technical

11    factors, one of the considerations is what is the licensee's

12    next best alternative.  So if Seirus didn't take a license, is

13    there something they could do that they would be able to still

14    enjoy benefits that are similar, but maybe not exactly the same

10:03    15    as the patented feature.  And then would those be acceptable to

16    consumers, and would they be available and whether or not they

17    were implementable.

18    So in this instance, I was informed that there are two

19    design-arounds which we've also heard here in this courtroom.

10:04    20    One is you can change the ratio of the amount of

21    heat-reflective material applied on the interfacing side of the

22    base fabric to less than about 30 percent or more than about 70

23    percent.  Also, you can reverse the fabric and have the

24    heat-reflective material on the other side of the fabric as

10:04    25    opposed to against the wearer.

1    Q.    And did you consider these design-arounds or alternatives

2    you talked about with respect to your damages analysis?

3    A.    Yes.    You would consider that as part of the hypothetical

4    negotiation and the different factors that the parties would

10:04    5    weigh as they are reaching a reasonable royalty.

6    Q.    Did Ms. Morones in her report and opinions consider either

7    of the alternatives that you just identified?

8    A.    Not that was identified.

9    Q.    And the last column is "Economic," and now we see DDX738.

10:05    10    There are four bullet points there.    The first one says,

11    "HeatWave products compete with Columbia's cold weather

12    accessories only."    What did you mean by that, and how is that

13    relevant?

14    A.    So Seirus, as we know, sells gloves, glove liners, socks,

10:05    15    and hats, and those are going to be the products that would

16    compete with whatever Omni-Heat Reflective product that

17    Columbia is making.    We don't know what portion of Columbia's

18    Omni-Heat Reflective sales actually relate to those items where

19    Seirus would be also providing gloves with the heat-reflective

10:05    20    material that's been accused of infringement here.    At the same

21    time, Ms. Morones includes in her hypothetical negotiation --

22    you know, one of the things she considers is that a sale of a

23    Seirus product results in a lost sale to Columbia.    There

24    hasn't been any evidence in this matter produced or analyzed

10:06    25    that suggests that the HeatWave gloves are direct substitute

1    for the Omni-Heat gloves or Omni-Heat socks versus HeatWave

2    socks.  I mean there are many -- there are many companies that

3    are offering products in this space.  So to assume that when

4    Seirus makes a sale of a HeatWave product that would

10:06    5    automatically negate a sale of a Columbia product, it just

6    isn't supported, or if there is evidence for that, it wasn't

7    documented or analyzed in a way to assess really what level of

8    competition, if any, you can see between the two parties.

9        Yes, I acknowledge they both are in the cold weather

10:06   10    accessory space.  Don't get me wrong, but you can't really

11    quantify the level of competition that you see between the

12    parties with the information that's been produced.

13    Q.   And then the next two bullet points are Columbia's

14    Omni-Heat sales at 1.6 billion, and then Seirus' accused

10:07   15    HeatWave sales at ███████.  Why did you include that?

16    A.   As part of the factors, you look at the sales and profits

17    that are generated by products that are covered or alleged to

18    be covered by the patent in suit.  So Columbia, we saw that

19    they generated 1.6 billion in Omni-Heat sales.  We also know

10:07   20    that a lot of those sales are for jackets or -- at least we've

21    seen that there are a lot of the sales are for jackets or other

22    types of products than just gloves, socks, and glove liners and

23    hats.  They use it across a much broader product line than what

24    Seirus offers.  Seirus' accused HeatWave sales are ███████,

10:07   25    so it's significantly smaller as compared to other products

1    that Columbia sells.  And both of the companies generate

2    margins, you know, gross margin on in a 50 percent type of

3    range.

4        But, you know, as we talked about in the first part of my

5    slide about the royalty base, there are significant nonpatented

6    elements that are also contributing to the end products and

7    contributing to the sale and the profits that are realized.  So

8    we really need to isolate down and focus on the value of the

9    patented technology.

10   Q.   So you've walked through all the factors now.  We've seen

11   the licensing, technical, the economic factors.  Can you

12   summarize your findings based on your analysis of all these

13   Georgia Pacific factors?

14   A.   Sure.  First, obviously we have to isolate for what the

15   contribution is of the patent, the patented feature and the

16   sale of the product.  Once we do that, I look to the licensing

17   factors.  The rates, you know, range in general from 7 percent

18   to 10 percent tiering up over time.  I took a royalty rate of

19   10 percent, and -- in light of the high end of those rates that

20   were included within the agreements, and since I'm applying

21   that 10 percent to an apportioned royalty base, that reflects

22   the contribution of the patented feature.  That's an adjustment

23   that's appropriate, and then I can use those agreements in my

24   analysis.  And then I also consider that there are alternatives

25   that were available to the '270 patent that we talked about

1    that could be employed as well.

2    Q.    Do you have a slide that summarizes your opinions

3    concerning the reasonable royalty damages for the '270 patent?

4    A.    Yes.    I think it's the next slide.

10:09    5    Q.    And now we're looking at DDX739.    Ms. Distler, I take it

6    this summarizes your findings?

7    A.    Yes.    So we left off on this slide with the royalty base of

8    1.19 million and the upper -- in the upper right-hand side of

9    the slide.    So we take that royalty base times a royalty rate

10:09    10    of 10 percent, and that gets to a reasonable royalty of

11    $119,263 which is my damages opinion here with respect to the

12    utility patent should it be found valid and infringed.

13    Q.    And do you think the reasonable royalty you've arrived at

14    here is conservative or what?

10:10    15    A.    I think it's a reasonable royalty.    You know, I've

16    demonstrated with you all why there are many contributors to

17    the sale of the product and how they add value to a product,

18    and I've endeavored to isolate what that contribution is of the

19    patented feature.    At the same time, too, you can -- you also

10:10    20    have to consider that there are design-arounds that are

21    available that would also impact the rates.    So I feel that

22    this is a reasonable royalty that would adequately compensate

23    Columbia for infringement of the utility patent should it be

24    found.

10:10    25    Q.    Thank you.    So you've spoken about having reviewed

1  Ms. Morones' opinions in this case, correct?

2  A.    Yes.

3  Q.    And do you have a slide summarized as some of the issues

4  that you have versus what she has in terms of your analysis and

5  her analysis?

6  A.    Yes.

7           MR. MARCHESE:    Could we have DDX740, please.

8  BY MR. MARCHESE:

9  Q.    Ms. Distler, what are we looking at here in DDX740?

10  A.    This is just a table comparing my analysis with Ms. Morones

11  and how they differ.    The total royalty that she opines is

12  anywhere from a 5 percent to a 20 percent rate applied to the

13  entire product sales price, whereas I'm using a 10 percent rate

14  applied to the apportioned royalty base as we discussed.

15  Q.    And so tell us about this first row under "Total Royalty."

16  It says "isolated value of the patented feature."    I think

17  you've already addressed it in great --

18  A.    Exhaustively.

19  Q.    You have.    Briefly, could you summarize why you have a

20  check and you have an "X" for Ms. Morones?

21  A.    Yes.    As I talked about, I've demonstrated what the

22  patented feature contributes to the HeatWave sales, and I base

23  my analysis on that.    Ms. Morones has assumed that the entire

24  market value rule holds and has not attempted to perform any,

25  you know, isolation of what the contribution of the '270 patent

1  is to the sale of the Omni-Heat Reflective products in her

2  analysis.

3  Q.   The next row says "independent analysis."  You have an "X"

4  for Ms. Morones and a check for you.   Why?

10:12  5  A.   There are certain statements that Ms. Morones includes in

6  her hypothetical negotiation that lack independent support or

7  analysis.   I talked about one of those, the idea that every

8  sale of a Seirus results in a lost sale to Columbia.   That

9  hasn't been established.   We don't have data or information to

10:12  10  be able to make such a statement.   There are other -- there are

11  other statements as well that she includes in her hypothetical

12  negotiation.

13  Q.   Well, how about the entire market value rule?  Did she

14  assume that applies?

10:13  15  A.   Yes, Ms. Morones assumed that that applies.

16  Q.   And what did you do?

17  A.   I did not assume that that applies.   I considered through

18  review of materials and conducting my own analysis of what

19  various contributors are to the value of an entire product.

10:13  20  Q.   And the third row says "considered alternatives."   You

21  touched on that a lot briefly.   If you would, please, what's

22  the difference here?

23  A.   So in my analysis, I considered if there were

24  design-arounds or not that were available for Seirus to employ;

10:13  25  again, change in ratio from 30 to 70 percent or turning the

1    HeatWave fabric away from the body.  Ms. Morones did not

2    include those.  This is a -- I would call it a critical defense

3    between our analyses in that she's assuming that Seirus must

4    take a license at whatever rate that Columbia prefers or

10:13    5    desires as opposed to considering that there were other

6    alternatives that could be employed that would cost Seirus less

7    than taking a royalty at a higher rate on the entire product.

8    Q.    And then the last row here is the "accounted for different

9    product types."  What did you mean by that?

10:14    10    A.    So Ms. Morones' 5 percent royalty rate, she indicates that

11    that is to reflect apportionment for the nonpatented elements.

12    That would be the rate that you would apply to the entire

13    product rather than the 10 percent or 20 percent.  But she

14    arrives at that by comparing all Columbia products that do not

10:14    15    have Omni-Heat Reflective with Columbia products that do have

16    Omni-Heat Reflective.  So those are two very broad comparisons.

17    There are multiple products that Columbia sells that they may

18    not sell in a version of Omni-Heat.

19        And, secondly, you're not isolating for really that

10:14    20    differential between Omni-Heat Reflective and non-Omni-Heat

21    Reflective.  If you recall, I really focused in on trying to

22    find a product that was similar but for the inclusion of the

23    patented feature.  Here you are just taking all Columbia sales

24    that don't have HeatWave and Columbia sales that do have

10:15    25    HeatWave, and you're comparing those together when they're not

1    really apples and oranges.

2    Q.   And so what's the overall -- we're looking at DDX740 still

3    with the Xs and the checks.   What's your overall conclusion

4    based on what you've summarized here?

10:15    5    A.   In my opinion Ms. Morones' damages opinion and royalty that

6    she opines to with respect to the '270 patent is unreliable and

7    overstates what the value is of the patented feature.

8    Q.   Okay.   Well, let's just refresh that on your conclusions.

9         MR. MARCHESE:   Could I have DDX741.

10:15    10    BY MR. MARCHESE:

11    Q.   And does this slide summarize your opinion concerning the

12    design patent damages in the case?

13    A.   Yes.   This is a summary of the profits that I opined should

14    be disgorged for infringement of the design patent when the

10:16    15    HeatWave fabric is the article of manufacture.

16    Q.   And that turns out to be $500,817?

17    A.   Yes.

18         MR. MARCHESE:   Okay.   Can we have DDX743.

19    BY MR. MARCHESE:

10:16    20    Q.   And this one is titled "Summary of Utility Patent Damages,"

21    and the total here is $119,263, correct?

22    A.   Yes.

23    Q.   And I see it seems like a little bit different information

24    on this one.   Can you explain what you have here?

10:16    25    A.   Yes.   I sorted the products that are accused of infringing

1    the '270 patent based on whether or not they were inner-facing,

2    bidirectional products.  So for the inner-facing HeatWave

3    products, the reasonable royalty that I opined to would be

4    $105,190.  For the HeatWave Plus products that are

10:17  5    bidirectional, it would be $12,257.  For the bidirectional

6    socks, it would be $1,815.  And those total to $119,263 in a

7    reasonable royalty.

8    Q.  And that's using the 10 percent rate you explained before,

9    correct?

10:17  10   A.  Correct.

11        MR. MARCHESE:  Thank you very much, Ms. Distler.  I

12   have nothing further.

13        THE COURT:  Cross-exam.

14        MR. AXELROD:  Thank you, Your Honor.

10:17  15        CROSS-EXAMINATION

16   BY MR. AXELROD:

17   Q.  Good morning, Ms. Distler.

18   A.  Good morning.

19   Q.  FTI is a large company.  Is that correct?

10:18  20   A.  Yes.

21   Q.  How many people are senior managing directors at FTI?

22   A.  I think it's generally about 400 across the globe.

23   Q.  Or around the world?

24   A.  Yes.

10:18  25   Q.  And how many people at FTI worked with you to provide you

1  information that you incorporated in your opinions?

2  A.   I had people assisting me in the preparation of my report,

3  yes.   I would estimate two, and then probably another two that

4  assisted with quality control.   Somewhere probably four to six,

5  I'm going to guess.

6  Q.   Did any of those people go out and interview any of the

7  people at Seirus?

8  A.   No.   I had telephone conversations with the individuals at

9  Seirus.

10  Q.   So when you got information from people at Seirus, it was

11  just by phone.   Is that correct?

12  A.   Correct.

13  Q.   And was that also true of the attorneys, or did you

14  actually go and meet with the attorneys?

15  A.   It was all via telephone.

16  Q.   How do you charge Seirus for your services?

17  A.   The hourly rate is $350 for all professionals that are

18  working on the project.

19  Q.   So that includes you?

20  A.   Yes.

21  Q.   Does it also include your assistants?

22  A.   Yes.

23  Q.   So everybody's at a flat $350 rate?

24  A.   Yes.

25  Q.   Does it include your clerical staff?   In other words, does

1    your secretary who's typing up your report bill at $350 an hour

2    as well?

3    A.    Our support staff in the form of executive assistants are

4    not client billable.

10:20    5    Q.    So they don't bill?

6    A.    And they don't generally participate much in any way in

7    preparation of a report other than, you know, printing

8    documents and things like that.

9    Q.    But the other three or four people that assisted you, they

10:20    10    are on the billing team?

11    A.    Yes.    They are client service professionals, yes.

12    Q.    And how much has FTI billed Seirus to date for your

13    services?

14    A.    I think just under $90,000 to date.

10:21    15    Q.    Now, when you gave your deposition, it was more than that,

16    was it not?

17    A.    I don't know.    I looked at the invoices that were

18    submitted -- or in the -- well, the payments that we've

19    received, and it was 90,000.    If I billed more than that,

10:21    20    then --

21    Q.    I'm not asking you how much you've been paid so far.    I was

22    asking how much you've billed Seirus for your services and work

23    on this case.

24    A.    I don't know.

10:21    25    Q.    You didn't look before giving your testimony today?

A.   Well, I looked at the -- a ledger of outstanding invoices versus payments received.

Q.   And what did the outstanding invoices show you?  Is that where the 90,000 figure was?

10:21   A.   Yes, that's where I saw it from.

Q.   So 90,000 is what's outstanding.  Is that correct?

A.   No, that's what has been paid.

Q.   And so how much has been billed?  That's the number you don't know?

10:22   A.   I don't know.

Q.   Now, how many different conversations did you have with people at Seirus before you wrote your first report?

A.   I would estimate one conversation with Mr. Murphy before I issued my report, and with Ms. Carey probably three -- in the
10:22   range of three I would -- if I recall.

Q.   And were all of your conversations with Ms. Carey concerning specific cost items?

A.   Not all of them.

Q.   What other subjects did you review with Ms. Carey?

10:22   A.   We talked about Seirus' sales cycle, how they set prices, how -- the cost of manufacturing the product, what information she receives from that.  There were some bills of material that were produced before my first report that we talked about in that regard, and I also asked her to get me information on, as
10:23   I discussed, the HeatWave versus non-HeatWave gloves.

1   Q.   And that's the one where you came up with one product,

2   their All Weather Glove?

3   A.   There were two products.

4   Q.   They were all All Weather gloves, were they not?

10:23   5   A.   Yes, one that included an additional feature.

6   Q.   Yes.   The Soundtouch?

7   A.   Yes.

8   Q.   But essentially their All Weather Glove, which is a

9   specialty glove that I believe they said they sell a lot to the

10:23   10   military or for military applications.   Do you know if that's

11   correct?

12   A.   It's one of Seirus' best selling gloves.

13   Q.   And do you know who the target audience is?

14   A.   I don't know the target audience, but I know I have one.

10:24   15   Q.   They gave you one?

16   A.   Oh, no.   I bought it years ago before this case ever

17   started.

18   Q.   How long did your conversation with Mr. Murphy take before

19   you filed your report?

10:24   20   A.   I don't recall specifically, but I would estimate 30 to 45

21   minutes.

22   Q.   So that's everyone you talked to at Seirus before preparing

23   your first report?

24   A.   That's all I recall, yes.

10:24   25   Q.   Then you prepared a later report that put forth some of

1    your calculations regarding this article of manufacture issue.

2    Do you understand that?

3    A.    And I did another report before that report, too, to

4    supplement for a new sales data that was produced.

10:24    5    Q.    Right, where Seirus directed some information that they had

6    published that was incorrect?

7    A.    I don't know if it was a Seirus correction or a law firm

8    correction.  I don't know.  I just know that the header was

9    changed on the spreadsheet, and different sales were removed

10:25    10    or -- were added back into that spreadsheet.

11    Q.    The header was changed to cover an entirely different time

12    period for the same data, correct?

13    A.    Yes.  My understanding is that the header that was

14    identified in that document didn't reflect the sales within

10:25    15    that period.

16    Q.    Who did you talk to at Seirus in connection with those two

17    reports?

18    A.    Ms. Carey and Mr. Murphy again.

19    Q.    And did you talk with Mr. Murphy just about your article of

10:25    20    manufacture report?

21    A.    Yes.  There's a paragraph in my report where I identify

22    what I spoke with Mr. Murphy about in my article of manufacture

23    report.

24    Q.    And how long did your conversation with Mr. Murphy take?

10:25    25    A.    No more than a half-hour.

1  Q.   Now, during the course of your work on this case, can you

2  give me a list of the various attorneys that you have

3  interfaced with to obtain information or assignments for your

4  work?

10:26  5  A.   I wouldn't say I received assignments for my work, but the

6  attorneys that I spoke with that I requested information from,

7  I would include two attorneys from the prior law firm.

8  Q.   That's the international firm of Troutman Sanders?

9  A.   Yes.   And then --

10:26  10  Q.   Who were those attorneys that you worked with?

11  A.   Paul McGowan and Anup Shah.

12  Q.   Okay.   And what other attorneys have you worked with either

13  in the preparation of your report, the editing of your report,

14  or in considering what tasks the attorneys are asking you to

10:27  15  do, or what issues they're asking you to opine on?

16  A.   Which report are you referencing of the three?

17  Q.   All of your reports, but the one report where you simply

18  updated figures was pretty -- not too controversial.   Is that

19  fair?

10:27  20  A.   Sure.

21  Q.   So we're talking a report that you did in 2016 on your

22  reasonable royalty analysis and your disgorgement analysis,

23  correct?

24  A.   The -- for the 2016 report.

10:27  25  Q.   Yes.   That was disgorgement and reasonable royalty, was it

1   not?

2   A.   Yes.   Those two attorneys that I identified from Troutman.

3   Q.   And you haven't talked with anyone else about your

4   reasonable royalty analysis in preparation for your testimony

10:27   5   here?

6   A.   So since that time, I have had discussions with counsel

7   from Fish & Richardson.

8   Q.   And which counsel have you worked with there on your

9   testimony?

10:28   10   A.   On -- well, I don't know what you mean by on my testimony,

11   but I've worked with the attorneys Chris Marchese,

12   Tucker -- I'm going to slaughter his name -- Terhufen, and

13   Garrett Sakimae.

14   Q.   Now, over the course of the work that you performed on the

10:28   15   case, how much of your time -- how many hours for you or your

16   client service assistants have been spent working with the

17   attorneys or communicating with the attorneys?

18   A.   I would call them client service professionals as they all

19   have college degrees and training, so I wouldn't call them

10:28   20   assistants first.   Secondly, I don't know as I sit here the

21   number of hours.   I don't know.

22   Q.   More than a hundred?

23   A.   Definitely.

24   Q.   More than 300?   Possibly?

10:29   25   A.   I don't know.   I don't want to give a wrong estimate.

1    Q.   Now, as a testifying expert, you have to take certain

2    assumptions into account, do you not?

3    A.   There are assumptions that go into analyses, yes.

4    Q.   And you rely on other people for information that you put

10:29    5    in your reports.  Is that correct?

6    A.   Well, I request information through counsel that was

7    produced in the matter, and then I will also, you know, rely on

8    information from a company as I have in this regard.  So, yes,

9    I will rely on others.

10:29    10    Q.   And in your reports, you've identified a number of those

11    sources and a number of the subjects on which you've relied on

12    from other people, do you not?

13    A.   I think so, yes.

14    Q.   With respect to your reasonable royalty analysis --

10:30    15         MR. AXELROD:  Could we pull up Ms. Distler's

16    deposition.

17         THE COURT:  This is a good time for us to -- you're

18    turning to a new topic now.  Why don't we take our morning

19    recess at this time.  We'll be in recess for 15 minutes.  You

10:30    20    can go ahead and step into your room.

21         (Proceedings held outside the presence of the jury panel.)

22         THE COURT:  Take 15.

23         (Recess.)

24         (Proceedings held in the presence of the jury panel.)

10:46    25         THE COURT:  Please be seated.

1        You may proceed.

2    BY MR. AXELROD:

3    Q.   Ms. Distler, before we broke, we were talking about some of

4    the assumptions that go into your opinions, and I think I had

10:46   5    asked you whether or not you have to rely on certain

6    information that comes from third parties.  Do you recall that?

7    A.   Yes, we had that discussion.

8    Q.   And, in fact, do you do that?  Do you rely on information

9    in the preparation of your report that comes from third

10:47   10   parties?

11   A.   I may.

12   Q.   And in your report, you identified in a number of respects

13   those cases in which you relied on certain assumptions or

14   premises attributed to third parties, correct?

10:47   15   A.   I assume so.  I don't know as I sit here.  I assume I did

16   in my report.

17   Q.   Did you read your report in preparation for your testimony

18   today?

19   A.   Yes.

10:47   20   Q.   In your report you rely very heavily on input from

21   Dr. Block, do you not?

22   A.   Yes, I cite to Dr. Block as a technical expert, correct.

23   Q.   How many times do you think?  A hundred?

24   A.   It could be.

10:48   25   Q.   200?

1    A.    I don't know as I sit here.

2    Q.    And in your later report, you rely very heavily on

3    Dr. Block, do you not?

4    A.    For the article of manufacture report?

10:48    5    Q.    Yes.

6    A.    Yes.    I -- in that report I cite to Dr. Block as well, yes.

7    Q.    And that was your source of using the HeatWave fabric as

8    the article of manufacture, correct?

9    A.    Yes, and I was asked to assume it for today's presentation.

10:48    10    Q.    Thank you.    Turning back to your reasonable royalty

11    analysis, you identified as, quote, fundamental, closed quote,

12    to your analysis your conclusion about what the patented

13    feature is that's associated with the Omni-Heat Reflective

14    technology.    Is that correct?

10:49    15    A.    I -- I defined what the patented feature is, yes.

16    Q.    And you say, "My understanding of what the patented feature

17    is" -- excuse me -- is fundamental to your opinions on

18    reasonable royalty.    Is that correct?

19    A.    Well, yes, you have to understand what the patented feature

10:49    20    is.    Yes.

21    Q.    Okay.

22         MR. AXELROD:    Could the witness be shown -- I offer

23    this for impeachment from her deposition, page 156, lines 9 to

24    11.

10:49    25         THE COURT:    That should not be shown to the jury yet,

1    please.

2         MR. MARCHESE:  It doesn't appear to be impeachment to

3    me, Your Honor.

4         THE COURT:  Your objection is sustained.

10:49  5   BY MR. AXELROD:

6    Q.   In your direct testimony, Ms. Distler, you told the jury

7    that you conducted your own independent analysis of the patent,

8    did you not?

9    A.   I conducted -- I reviewed the patent, but I rely on any

10:50  10  technical interpretation from the technical expert.

11   Q.   My question is more narrow.  In your testimony this

12   morning, you told the jury you conducted your own independent

13   analysis of the patent claim to determine what the patented

14   technology was, didn't you?

10:50  15  A.   If I said that, I wasn't trying to imply that I was myself

16   opining on what the patented feature is.  As I state in my

17   deposition, I identify what the patented feature is.

18   Q.   You relied on Dr. Block for that description, did you not?

19   A.   Yes, I did, in my report, yes.

10:50  20  Q.   And today you're relying on Dr. Block for your

21   understanding of the patented technology, are you not?

22   A.   Yes.  It's consistent with what I've heard here in

23   testimony too.

24   Q.   When you were preparing for your report, did anyone

10:50  25  instruct you to downplay your reliance on Dr. Block's input to

1    all of your opinions?

2    A.    Not that I'm aware of.

3    Q.    Okay.

4    A.    I mean I would have spoken with the attorneys as well about

10:51  5    the patented feature, but I don't know if anyone told me to

6    downplay per se my reliance on Dr. Block.  He's in my report.

7    I rely on him.

8    Q.    Now, do you have your report in front of you?

9    A.    I do -- I think.

10:51  10         MR. AXELROD:    Could you pull up slide 20 from our

11    opening.

12         MR. MARCHESE:    That's fine.

13    BY MR. AXELROD:

14    Q.    Do you have your report?

10:51  15    A.    Yes.

16    Q.    We're going to go through a few paragraphs, and you might

17    turn to your paragraph 111.

18    A.    Yes.

19    Q.    Now, in your report, in your analysis, you exclude certain

10:52  20    attributes of the invention as being part of the patented

21    technology, do you not?

22    A.    Could you repeat that question?  Sorry.  I was reading.

23    Q.    Do you have claim 2 in front of you on the screen?

24    A.    I do.

10:52  25    Q.    And you understand that this is one of the patent claims

1    from the '270 patent?

2    A.    Yes.

3    Q.    And it has a series of different elements that work in

4    combination, correct?

10:52    5    A.    Yes.

6    Q.    Now, in your report you identify a number of features of

7    the patent that you assume or state are not covered by the

8    patented technology, correct?

9    A.    Yes, when used outside of certain -- for example, that are

10:53    10    used outside the ratio of about 30 to 70 percent and other --

11    and inner-facing, yes.

12    Q.    So the first one that you identify in paragraph 11 is you

13    say the base material is not covered.  Is that correct?

14    A.    It's not covered when it isn't used with a ratio of 30

10:53    15    percent to 70 percent.

16    Q.    And you also --

17    A.    At least it's not the inventive aspect of the patent as I

18    talk about in my report and also in my deposition.

19    Q.    And you also conclude that the reflective element of the

10:53    20    patent is not covered by the patented technology.  Isn't that

21    correct?

22    A.    When it is not within a surface area ratio of

23    heat-directing elements to base material as about 7 to 3 or

24    about 3 to 7, then yes.

10:54    25    Q.    And this is part of your apportionment analysis, is it not?

1    First you were trying to identify what's not covered by the

2    patent?

3    A.    Yes.    In my apportionment analysis, I consider a glove with

4    and without inclusion of the HeatWave fabric, yes.

10:54    5    Q.    I'm referring you to the patent claim --

6    A.    Yes.

7    Q.    -- as to what's covered by the patent.

8    A.    Yes.

9    Q.    And you also excluded the element of heat-directing

10:54    10    elements which is part of the functionality of the heat

11    reflection, correct?

12    A.    I would disagree that I did not include that in my analysis

13    of apportionment.

14    Q.    Well, in paragraph 11 you state that "I further understand

10:54    15    that the utility patent does not cover the base fabric and its

16    properties or the heat-reflective materials that are applied to

17    the base fabric, but is limited to the benefits generated from

18    using a 30 to 70 percent balance of heat-reflective materials.

19    The base fabric is compared to using a coverage ratio outside

10:55    20    this range."

21        MR. MARCHESE:    Your Honor, if I may, I don't have an

22    objection.    I just keep hearing "paragraph 11," and it's

23    actually 111.

24        MR. AXELROD:    I'm sorry.

10:55    25        THE WITNESS:    I was looking for the paragraph too.    11

1    or 111?

2    BY MR. AXELROD:

3    Q.    My apologies.    Rewind.    Go to paragraph 111.

4    A.    To 111?

10:55    5    Q.    Yes.

6    A.    Okay.    Okay.    I've read the paragraph.

7    Q.    That's the paragraph that I quoted from, correctly?

8    A.    Where did you start citing from again?

9    Q.    Paragraph 11, "I further understand that the utility patent

10:56    10    does not cover the base fabric," et cetera.

11    A.    Yes, I see that sentence.

12    Q.    And did I quote it correctly when I read to it the jury?

13    A.    The sentence is, "I further understand that the utility

14    patents do not cover the base fabric and its properties or the

10:56    15    heat-reflective materials that are applied to the base fabric,

16    but it's limited to the benefits generated from using a 30

17    percent to 70 percent balance of heat-reflective material to

18    the base fabric as compared to using a coverage ratio outside

19    this range."

10:57    20    Q.    So you are focused on the element of claim 2 that just

21    provides the ratio, correct?

22    A.    Yes.    It's my understanding that's the patented feature,

23    the inventive aspect of the patent.

24    Q.    That's what Dr. Block told you, didn't he?

10:57    25    A.    Yes, I believe so, yes.

1  Q.  And that's what you're relying on for that part of your

2  apportionment analysis that seeks to narrow the invention down

3  to a subpart of claim 2.  Isn't that correct?

4  A.  Well, I think there's another element here that we should

10:57  5  consider.

6  Q.  Okay.  Can you answer that yes or no, and then you can --

7  A.  What was the question?

8  Q.  You rely upon Dr. Block for that part of your testimony

9  where you seek to narrow the, quote, patented technology to the

10:58  10  benefit coming from the defined ratio to the exclusion of the

11  other elements of the patent claim?

12  A.  In general it's my understanding that there is infringement

13  when that is occurring, so I focus my analysis on the

14  contribution of the patent to understand the economic

10:58  15  contribution in that regard.

16  Q.  So in that analysis, you excluded or considered not covered

17  the base material and the reflective functionality, but focused

18  instead on the 30 to 70 ratio?

19  A.  No.  In the comparison I'm doing, I'm including the base

10:58  20  fabric.  In the differential I calculated includes -- includes

21  the base fabric, the heat-reflective materials, and the 30

22  percent to 70 percent ratio, and I'm comparing with and without

23  that HeatWave fabric.

24  Q.  Did you ever see a commercial product that had all of the

10:59  25  elements of claim 2, but was outside the ratio?

1    A.    I don't know.  I don't -- I'm not aware.

2    Q.    You understand, do you not, that the patent claim covers

3    and is directed to the combination of all of these elements?

4    A.    Yes, and I'm also aware of the VirnetX decision that also

10:59    5    doesn't just limit it to the smallest patent practicing unit,

6    but also asks for apportionment based on, you know, looking at

7    what the contribution of the patented feature is.

8    Q.    That's what we're going to try to figure out.

9          The patent claim covers all of these elements used in

10:59    10    combination, does it not?

11    A.    Yes.

12    Q.    And did you ever see a commercial product that had a base

13    material with a discrete array -- or excuse me -- a

14    discontinuous array of discrete heat-directing elements

11:00    15    positioned on the base material where the coverage ratio was

16    outside the claimed limitation?

17    A.    Not that I recall.

18    Q.    Okay.  So you have no objective evidence that such a

19    product would even work, do you?

11:00    20    A.    No.  I rely on Dr. Block and my discussions with

21    Mr. Murphy.

22    Q.    Did you review or identify any products that were made with

23    all of the elements of claim 2, this combination of things that

24    provides the heat management and heat reflective benefits where

11:00    25    the coverage ratio was more than 70 percent?

1    A.    Can you ask that one more time?  It was long.

2    Q.    Did you view any product, particularly any commercial

3    product, that was made with all the elements of claim 2 where

4    the coverage ratio was more than 70 percent?

11:01    5    A.    I'm not aware of any.

6    Q.    Did anyone talk to you about what the disadvantages of such

7    a product are?

8    A.    I asked Dr. Block if you did change the coverage ratio,

9    would there be an expectation of much difference in the

11:01    10    functionality of the product, and he indicated no.

11    Q.    And you relied on that as a basis for your apportionment

12    analysis, did you not?

13    A.    Well, I relied on that statement with respect to whether or

14    not a design-around outside of that range would be appropriate.

11:01    15    Q.    And that's a critical part of your analysis, isn't it?

16    A.    Yes.  I think the ability to design-around -- options to

17    design-around are important.

18    Q.    So in determining whether there was a design-around that

19    was commercially practicable, you relied entirely on Dr. Block?

11:02    20    A.    Well, yes, and I would rely on the technical expert when it

21    comes to the design-around.

22    Q.    And you didn't rely upon any objective evidence from any

23    testing or commercial use or consumer review.  Is that correct?

24    A.    No, I did not.

11:02    25    Q.    And would the same be true for the purported design-around

1   to go at the other end of the range?

2   A.  No, I did not.

3   Q.  The other design-around you referred to was flipping the

4   fabric.  Is that correct?

11:03  5   A.  Yes, reversing the fabric.

6   Q.  And you testified to the jury that that would have no

7   adverse impact on the performance of the fabric.

8   A.  That's my understanding.

9   Q.  That's your understanding.  Who gave you that

11:03  10   understanding?

11   A.  Mr. Carey talked some about it in his deposition, and then

12   also speaking with Dr. Block.

13   Q.  So it came from Dr. Block, and then you read Mr. Carey's

14   deposition, and that was your interpretation?

11:03  15   A.  Yes.

16   Q.  Did you seek to identify any objective evidence to support

17   that premise, or did you just rely on what they told you?

18   A.  I -- yes, I relied on their information they provided to

19   me, and I'm also aware that there are products that encompass

11:03  20   the HeatWave fabric where they have been reversed in some

21   instances, and Mr. Carey testified there -- I believe it was

22   Mr. Carey; I could be wrong if I check my report -- that

23   consumers may -- some consumers prefer that as opposed to

24   having the metallic against their skin.

11:04  25   Q.  And did you look at -- I'm sure you did.  You looked at the



|        |    |                                                                           |
|--------|----|---------------------------------------------------------------------------|
|        | 1  | HeatWave product sales both outward facing and inward facing,             |
|        | 2  | correct?                                                                  |
|        | 3  | A.   Yes.                                                                 |
|        | 4  | Q.   And what percentage of the products that Seirus has chosen           |
| 11:04  | 5  | to make and market are actually inward facing and designed such           |
|        | 6  | that the metallic surface is on the skin?                                 |
|        | 7  | A.   It's a small portion.                                                |
|        | 8  | Q.   You want to check again?                                             |
|        | 9  | A.   I thought you said --                                                |
| 11:04  | 10 | Q.   Inward facing.                                                       |
|        | 11 | A.   Oh, inward facing.  Inward facing is the majority.                   |
|        | 12 | Q.   It's more than the majority, isn't it?  It's about 85                |
|        | 13 | percent?                                                                  |
|        | 14 | A.   Sure, if that's what my report says, yes.  I don't know             |
| 11:04  | 15 | sitting here that it's 85 percent.                                        |
|        | 16 | Q.   Do you have a ballpark recollection of what the                      |
|        | 17 | outward-facing product gross sales are?                                   |
|        | 18 | A.   I was going to assume -- oh, the outward facing?                     |
|        | 19 | Q.   Yes.                                                                 |
| 11:05  | 20 | A.   I was -- I can look.                                                 |
|        | 21 | Q.   Sure.  It's about ███████ inward facing to roughly                   |
|        | 22 | ███████ outward facing, is it not?                                       |
|        | 23 | A.   I'm just looking through the exhibits.  Yes, those                   |
|        | 24 | percentages sound right, yes.                                             |
| 11:06  | 25 | Q.   Now, you said you read Mr. Carey's deposition.  Is that              |

1  correct?

2  A.  Yes, prior to my first report.

3  Q.  And do you recall reading in that deposition where

4  Mr. Aldrich told Mr. Carey that you can avoid infringement if

11:06  5  you flip the material around so that it is outward facing and

6  no longer against the consumer's skin.  Do you recall that part

7  of the deposition?

8  A.  I don't recall precisely the exact words, but I recall that

9  passage.

11:06  10  Q.  And Seirus has never changed its product design, has it?

11  A.  I understand from testimony here there are some products

12  next year that are coming out, but, no, it hasn't changed its

13  design.

14  Q.  So they're working on something for after this trial?  Is

11:07  15  that --

16  A.  Well, I thought -- well, no, here sitting in the trial, I

17  heard testimony that there were some products that are -- maybe

18  the HeatWave Pluses are reversed, but, yeah, Seirus continues

19  on.

11:07  20  Q.  So the plus -- do you understand what the HeatWave Plus

21  product is?

22  A.  Yes.  One side is -- has the reflective facing and one side

23  doesn't.

24  Q.  And do you know why they changed the reflective side out?

11:07  25  A.  Specifically as I sit here, I don't want to speculate, but

1    I thought it had to do with comfort, but I could be wrong.

2    Q.    And when you're referring to comfort, people were getting

3    sweaty palms because the Seirus product is at the very high end

4    of the patented range, is it not?

5    A.    I don't know if it was sweaty palms, or if it was just a

6    desire to have the plush fabric against the palm, whatever the

7    deposition testimony states.

8    Q.    So you didn't make any further investigation to determine

9    whether or not that would have an impact on your assumption

10   that anything over 70 percent would be a perfect, noninfringing

11   alternative?

12   A.    No.    Dr. Block indicated that the -- adding additional

13   would not necessarily make that product no longer acceptable in

14   terms of consumer usage.

15   Q.    And did Dr. Block tell you on what he based that opinion?

16   A.    I assume his knowledge and experience.    I don't know if I

17   asked him that specific question, though.

18   Q.    Okay.    So that was -- he said it, so it was good enough for

19   you?

20   A.    He's the technical expert that I rely upon for the patent

21   suits, so . . .

22   Q.    Now, when testifying experts have to rely on things that

23   they don't personally know or can't personally confirm, that's

24   part of what your job is, is it not?

25   A.    I would --

1    Q.   That's a terrible question.  Let me rewind that one.

2         As part of your work, you have to rely on inputs from other

3    people, correct?

4    A.   Sure.  Generally, yes.

11:09    5    Q.   And you don't know whether they're right or wrong based on

6    your own personal experience or your own investigation,

7    correct?

8    A.   At times.

9    Q.   And these input from Dr. Block are in that category, are

11:09   10    they not?

11    A.   Well, I would say with respect to Dr. Block, again, I'm not

12    a technical expert, so I would rely on him for that purpose.

13    Q.   Exactly.  And that's one of the things that you have to do

14    when you're a testifying expert, correct?

11:09   15    A.   Yes.

16    Q.   And if those inputs are wrong, then your opinion's wrong in

17    that respect, isn't it?

18    A.   It could be.

19    Q.   And if those inputs are critical, or as you identified

11:10   20    fundamental to your opinion, then the opinion goes down with

21    it, does it not?

22    A.   It could depending on the disagreement.

23    Q.   Now, I think you confirmed a minute ago that critical to

24    your apportionment analysis in your Georgia Pacific analysis

11:10   25    was this notion that Seirus could switch to a commercially

1    equivalent noninfringing alternative very easily, correct?

2    A.    Yes.    Those are available -- those were available is my

3    understanding, yes.

4    Q.    And when you say "my understanding is, I don't know that,

11:10    5    but I was told that," correct?

6    A.    Yes, I am relying on a tech -- the technical expert for

7    that.

8    Q.    Look at Paragraph 114 of your report.  I think I got it

9    right, 114.

11:11    10    And in formulating your opinions, Mr. Murphy made

11    representations to you, did he not, as to how easily Seirus

12    could make these changes if it wanted to.  Is that correct?

13    A.    Yes.

14    Q.    And Mr. Murphy told you that they could make the changeover

11:11    15    to a noninfringing alternative with ten man hours of effort.

16    Is that correct?

17    A.    Yes, in terms of design and engineering, yes.

18    Q.    And it would cost less than a thousand dollars.  That's

19    what he told you, correct?

11:11    20    A.    Yes, it would be a minimal and nominal cost, yes.

21    Q.    And so you factored into your determination of what a

22    reasonable royalty would be the view that they could be out

23    there with a commercially acceptable product after spending ten

24    hours of work and $1,000 at any time they wanted to, correct?

11:11    25    A.    No.    This is indicating what would have to change per se.

1  It would take some time to, you know, potentially implement

2  this, but, you know, in a hypothetical negotiation, there's

3  something called "a holdup effect" that -- you know, that's

4  relied upon, but in the hypothetical negotiation, you know, the

11:12  5  construct is a willing licensor and willing licensee.  So, you

6  know, the holdup effect shouldn't be used as a way to put a

7  licensee over a barrel per se.  That's from -- that's what the

8  holdup effect is.

9  Q.    Well, let's talk about the holdup effect in this case.

11:12  10  That's your terminology for it.  Is that a term of art in your

11  licensing damages analysis?

12  A.    There are papers written on holdup effect along those

13  lines, yes.

14  Q.    And does that refer to the fact that when the -- it focuses

11:12  15  on what's the infringer's position at the time of the

16  hypothetical negotiation, correct?

17  A.    Yes.

18  Q.    Now, in this case in the hypothetical negotiation, our

19  negotiation takes place in approximately May of 2013?

11:13  20  A.    Yeah, near the date of the issuance of the patent, yes.

21  Q.    Okay.  Is that the date that you used?

22  A.    Yes.  That would be the date of first infringement, yes,

23  when the patent issues.

24  Q.    And at that time, Seirus has already gone into production,

11:13  25  have they not, for all of their HeatWave orders for the

1    upcoming 2013-2014 year?

2    A.    Yes.

3    Q.    Is that correct?

4    A.    Uh-huh.

11:13    5    Q.    And they brought on a whole line of HeatWave products for

6    that year, have they not, the first year?

7    A.    Yes, they have products that they're selling, yes.

8    Q.    And so going into the negotiation when they know the patent

9    is valid and it's infringed, they are significantly

11:14    10    incentivized, are they not, to get a license?

11    A.    Yes, up to a certain point, yes.

12    Q.    And your point was ten man hours and a thousand dollars of

13    expenditure to come up with the noninfringing alternative?

14    A.    Now, that's reflecting, like I said, the engineering and

11:14    15    design time that would go into it.

16    Q.    What more is there other than the engineering and design

17    and sending those instructions off to the factory?

18    A.    Well, that would encompass that time, but the products

19    would have to be made, sure.

11:14    20    Q.    Did you conduct any investigation to determine how quickly

21    a manufacturer would make the change?

22    A.    I did not quantify that.

23    Q.    Did you ever ask anyone at Seirus, "If it's so simple to

24    switch over to something that would work just as well, why

11:15    25    haven't you done that?"

1    A.    I think we're sitting here today because of the litigation

2    about whether or not there's infringement, so I don't know

3    their motivations about why they have or have not changed the

4    product.    I just -- I'm looking at it in a hypothetical

11:15    5    negotiation what were the options that were available to them.

6    Q.    So you didn't ask that question?

7    A.    No, I did not ask that question.

8    Q.    Now, when you -- did you look for any practical or

9    marketing-related issues that might have led Seirus to not seek

11:16    10    to make the changes you've described?

11    A.    I don't know what you're asking me.

12    Q.    That's another bad question.

13         Let's back up.    You testified you looked at a bunch of

14    Seirus marketing materials, correct?

11:16    15    A.    I looked at catalogs, hangtags, their website.

16    Q.    Okay.    And --

17    A.    And examples.

18    Q.    -- throughout those -- those are Seirus' principal

19    marketing materials, are they not, the hangtags and the

11:16    20    catalogs?

21    A.    I believe so, yes.

22    Q.    And when you look through those hangtags and catalog

23    materials, a strong theme of the marketing message is to look

24    inside the glove, is it not?

11:16    25    A.    That's one of the messages, yes.

1    Q.    And to look for the silver lining.

2    A.    Yes.

3    Q.    Correct?

4          Now, did you inquire whether that was so important to

11:17    5    Seirus that they would want to continue infringing rather than

6    simply avoid that characteristic and flip the material

7    inside-out?

8    A.    I considered that, yes, in my analysis when I quantify the

9    contribution of the patented technology, yes.

11:17    10    Q.    How did that factor into your analysis of the adequacy of a

11    noninfringing alternative?

12    A.    One more time?

13    Q.    How did that factor into your analysis of the alleged

14    noninfringing alternative of flipping the material around so

11:17    15    it's no longer visible to anyone?

16    A.    I included that as part of my analysis.

17    Q.    How did you include that?

18    A.    Because it's an option that could have been explored by

19    Seirus to have used when they were market -- when they were

11:17    20    going to -- if they wanted to implement that alternative.    I

21    considered that.

22    Q.    If they implement that alternative, then the technology is

23    no longer visible to someone looking at the product.    Isn't

24    that true?

11:18    25    A.    Well, yes, but it's not exactly -- it's not visible right

1    now unless you do look inside of it, to a consumer's

2    perspective -- unless it's an outer facing one.  I mean the tag

3    may say "look inside," yes.

4    Q.    You don't believe that it's visible to someone who would be

5    looking at a glove to purchase?

6    A.    Yes.  If you walked up and you opened the glove up, yes.

7    Q.    And if you're looking at the glove in the catalog, it's

8    visible because that's how they film the glove for purposes of

9    the catalog, isn't it?

10    A.    Yes, they may.  Yes.

11    Q.    So would you agree that Seirus' conduct indicates that the

12    visibility of the technology is important to their marketing

13    program?

14    A.    Well, they're marketing a product.  Are they marketing the

15    patented feature?  I think there's a difference there.

16    Q.    Is it your testimony that they are not marketing the

17    HeatWave fabric and the HeatWave technology?

18    A.    No.  They are marketing that, but I'm making the

19    distinction between marketing the HeatWave product versus

20    marketing the patented technology, the patented feature.  I

21    mean --

22    Q.    I pulled up claim 2 again.

23          THE COURT:  Uh-huh.

24    BY MR. AXELROD:

25    Q.    Now, the HeatWave fabric has every element that is on this

1      claim, doesn't it?

2      A.   Well, that --

3              MR. MARCHESE:   Objection, Your Honor.   Outside the

4      scope.

11:19  5              THE COURT:   Overruled.

6              THE WITNESS:   Well, yes, for the products that are

7      accused of infringing the '270, but for the products that are

8      outer facing, they do not infringe claim 2 is my understanding,

9      so they're not included within the base.   So Seirus is

11:20  10     marketing HeatWave where some of the products may be covered

11     by -- or may be alleged to infringe the '270, and some of those

12     products aren't.   So that would suggest they're marketing the

13     product HeatWave, not necessarily the patented feature.

14     BY MR. AXELROD:

11:20  15     Q.   And when you look at the materials, whether it's outward

16     facing or not, they tout the performance of the reflective

17     technology, do they not?

18     A.   Yes, that's one of the items that they identify.

19     Q.   And all of these elements -- let's just talk about the

11:20  20     inward facing that are subject to the infringement.   All of the

21     elements of claim 2 are part of that HeatWave material that's

22     incorporated and shown in every one of those accused products,

23     is it not?

24     A.   Can you ask that one more time?   I was just reading the --

11:20  25     Q.   Okay.   Every one of the inner-facing Seirus products

1  contains each of the elements of claim 2 in that HeatWave

2  fabric, does it not?

3  A.   Yes, the products that are accused of infringing the '270,

4  yes.

11:21  5  Q.   And that's the technology that they're marketing as the

6  reason to purchase the product, isn't it?

7  A.   Again, I would say they're marketing the product HeatWave

8  where some of those products are accused of infringing the '270

9  patent and some are not.

11:21  10  Q.   Let's switch over to your article of manufacture comments.

11  Now, in your article of manufacture opinion, to recap where we

12  were, I believe you agree that you were simply told to treat

13  the HeatWave fabric as an article of manufacture, correct?

14  A.   Yes.   I base that analysis on a -- the HeatWave fabric, I

11:22  15  was asked to assume that, yes.

16  Q.   And had you ever heard the term "article of manufacture"

17  before your work on this case?

18  A.   I knew that it existed in general because of the Supreme

19  Court case that was ongoing.

11:22  20  Q.   And in your report, you identify a few more additional

21  assumptions or positions that you take for your article of

22  manufacture analysis, correct?

23  A.   Would you like to point me to those just so that I'm on the

24  same page?

11:22  25  Q.   Sure.   Do you have the -- I believe it's the September 12

1  report, pages 4 and 6.

2  A.  Yes, I'm here.

3  Q.  It's go down to page 6.

4  A.  Okay.

11:23  5  Q.  Now, one of your premises for your methodology is that

6  there is no evidence, quote, "that indicates that the HeatWave

7  fabric should be credited with generating a higher portion of

8  profits than other components."  Is that one of your premises?

9  A.  Yes, and I base that on my discussion of what's contained

11:23  10  in that paragraph.

11  Q.  And then you also say that another premise is that, quote,

12  the inclusion of the HeatWave fabric over other components

13  drives the sale of the accused products, and you say there is

14  no evidence to support such a notion, correct?

11:24  15  A.  Yes.

16  Q.  And so that was another premise of your article of

17  manufacture methodology, correct?

18  A.  Yes, based on my analysis, as I discuss in my footnote

19  there, from the Distler rebuttal report.

11:24  20  Q.  And then you add a new premise, do you not, further down on

21  page 7, where you say, quote, The functionality of the HeatWave

22  fabric is separate from the ornamental design covered by the D

23  '093 patent, closed quote.  Do you see that?

24  A.  You're on page 7?  Sorry.  Paragraph 16 or 15?

11:24  25  Q.  15, end of 15.

1    A.    Yes.

2    Q.    Now, what is an article of manufacture?

3    A.    I don't have an expert opinion on what the article of

4    manufacture is.  I've calculated damages subject to an article

11:25    5    of manufacture being the HeatWave fabric.

6    Q.    Okay.  But do you know what an article of manufacture is in

7    the broad sense, generically?

8    A.    Generically?

9    Q.    Yes.

11:25    10    A.    Without providing any legal context?

11    Q.    Yes.

12    A.    I mean I would expect that an article of manufacture would

13    be a -- it could be a product, and like HeatWave fabric in this

14    instance, that is manufactured and used as an input into

11:25    15    another end product -- into another finished good.  Again, I'm

16    not providing any legal opinion in that regard.

17    Q.    Assume for our discussion that an article of manufacture is

18    a thing made by a hand or machine.

19    A.    Okay.

11:26    20    Q.    The HeatWave fabric is a thing, is it not?

21    A.    Yes.  It exists, yes.

22    Q.    And that thing has specific functionality, does it not?

23    A.    Yes.

24    Q.    It provides the heat reflection back to the user's body,

11:26    25    and it provides wickability, and it provides comfort, and it

1  provides proper draping of the person's -- proper fit or

2  whatever, does it not?

3  A.   That's my understanding.

4  Q.   But when you did your analysis, you excluded all of those

11:26  5  benefits and attributes, didn't you?

6  A.   Well, for the design patent, it's my understanding that

7  it's the way the -- the design patent is the way something

8  looks, its ornamental design, and that's what this analysis is

9  focused on.

11:27  10  Q.   So your analysis is --

11  A.   In this report.

12  Q.   Your analysis in your testimony today, apart from your

13  report, is seeking to attribute something just to the design

14  element and not to the article itself.  Is that correct?

11:27  15  A.   In my analysis for the design patent, the infringement as I

16  understand is the wavy design that's attached to the HeatWave

17  fabric.

18  Q.   Go back to my question.  My question was specific.  For

19  your article of manufacture analysis, this method that you came

11:27  20  up with -- and you created this method, did you not?

21  A.   Yes.  I looked at the bill of materials, and I determined

22  the cost of the HeatWave fabric that's a portion of that, yes.

23  Q.   Are you the person that came up with the idea of "I will

24  just use a pure cost ratio analysis, and that will be the way I

11:28  25  allocate profits back to the importance of whatever article I'm

1    looking at"?

2    A.    Yes, based on the -- based on the testimony I gave earlier

3    about why in this instance that assumption is appropriate.

4    Q.    And that's because you find that there is no functional

11:28    5    benefit to the use of the HeatWave fabric beyond any other

6    component, correct?

7    A.    Well, the design patent relates to the ornamental design or

8    the way something looks.  So for that assum -- for that

9    statement, as you can see I'm relying on Dr. Block as a

11:28    10    technical expert in that regard to make that distinction.  But

11    I also talk about that the fact that when Seirus is determining

12    its pricing for its products, it's basing it on the bills of

13    material and the costs so that they aren't attributing

14    themselves any higher portion of profit to the HeatWave fabric

11:29    15    as compared to other components.

16    Q.    Well, they don't track profits to any particular component

17    of the good, do they?

18    A.    No, and most companies would not.

19    Q.    Of course not.

11:29    20    A.    We're constructing an analysis here to get down to an

21    article of manufacture for one of the components that's accused

22    of infringing by having the wavy design on the HeatWave fabric

23    that goes into the end product.

24    Q.    So the fact that they apply a uniform ▇ percent

11:29    25    approximately gross margin figure to set their pricing and they

1  do that for all of their products doesn't say anything about

2  whether a particular component is key to the marketability of a

3  product, does it?

4  A.  Correct.  It's in support of that, and also the other -- as

5  I testified and I referred to in this paragraph in my rebuttal

6  report where I discuss that there are multiple contributors to

7  this sale of a product.

8  Q.  Let's go back to my question a minute ago, if we could,

9  because I think we've gotten sidetracked.  In your report you

10  specifically call out your view that the functionality of

11  HeatWave fabric is separate from the ornamental design covered

12  by the D '093 patent, correct?  That's one of your premises?

13  A.  Yes, I state that in my report.

14  Q.  And I am asking you, did you, therefore, when you did your

15  article of manufacture analysis exclude in that analysis the

16  functionality of the article that you were looking at?

17  A.  Well, the way I've done the calculation, it's separating

18  the functionality of the HeatWave fabric from the design as

19  I've captured the HeatWave fabric cost.  The functionality

20  would still be in the calculation that I'm doing.

21  Q.  How does the functionality or the importance of that

22  functionality relate to the cost?

23  A.  It's the cost of the fabric.

24  Q.  I understand it's the cost of the fabric, but that cost is

25  not adjusted in any way for what the actual performance

1    benefits of that fabric are, is it?

2    A.    Oh, they purchased the fabric from Ventex, and that's the

3    price that they pay for it.

4    Q.    And that's the price that you used for your analysis, but

11:31    5    it doesn't have anything to do, does it, with the functionality

6    of that fabric?  It's simply what it costs to make it?

7    A.    Yes.   It's what it costs to make it, yes.

8    Q.    And the design that is placed on that article doesn't have

9    anything to do with the cost either, does it?

11:32    10    A.    It may or may not.  It's the cost to purchase the fabric,

11    the component that is accused here of having the design that's

12    infringing the design patent.   That was my focus.

13    Q.    Yes.   You focused on just whatever the cost was to make it

14    without regard to the functionality of the article itself and

11:32    15    what functionality that contributes to the article, correct?

16    A.    Right.   That's a component that goes into the overall

17    product that's made by Seirus, yes.

18    Q.    The material is a component.

19    A.    Yes.

11:32    20    Q.    But the functionality of that material is not a component

21    that went into your analysis, was it?

22    A.    Not explicitly.

23    Q.    Or implicitly.

24    A.    Well, to the extent that the cost of the fabric as they're

11:32    25    putting the product together, and then I take a portion of that

1    to get to the revenue and the profits that would then be

2    attributable, then it is part of my analysis.

3    Q.   How is the functionality part of your analysis separate

4    from whatever cost it was to make the article?

11:33   5    A.   Because it's the HeatWave fabric that you're purchasing.

6    That's the lowest cost that I can get to to understand what the

7    price to purchase the article of manufacture is, if it's the

8    HeatWave fabric.

9    Q.   And did someone direct you to look for the lowest cost you

11:33   10   could find?

11   A.   No.  I didn't mean that the lowest cost I could find.   What

12   I'm saying is that's the lowest -- that represents the price of

13   purchasing that roll before it ends up into the manufacturing

14   process with other components.

11:33   15   Q.   That's kind of when it leaves Korea, but before it's gotten

16   to China.

17   A.   Yes.

18   Q.   Now, did you make any adjustment in the -- your analysis of

19   the profits attributable to that article for the use of the

11:34   20   design?

21   A.   In my analysis I -- based on the costs of the HeatWave

22   fabric, I have allocated the revenue and then taken profits

23   from that.  So it's all, again, based on the HeatWave fabric.

24   Q.   But the particular design doesn't play any roll or -- is

11:34   25   not a factor in your allocation, is it?

1       A.    To the extent that design is on the fabric, yes.

2       Q.    How is that a factor?  If you're only looking at cost,

3       whatever it costs to make it, it doesn't matter what design was

4       implemented, does it?

11:34   5       A.    This is the design that was implemented that's accused of

6       infringement, so that's what I'm capturing.

7       Q.    But you're not capturing any value for that design, are

8       you?

9       A.    Yes, I am capturing value for that design to the extent

11:34   10      that I'm taking the revenues and apportioning -- and assigning

11      a portion -- attributing a portion of those to the HeatWave

12      fabric.

13      Q.    But you're not attributing those based on the value of the

14      design.  You're attributing it just on the cost of manufacture

11:35   15      of the article, correct?

16      A.    That embodies that wavy design, yes.

17      Q.    Now, when you -- would you agree with me that a good test

18      of a methodology for evaluating damages is how it applies in

19      particular cases?

11:35   20      A.    I don't know as I sit here what -- what's your question

21      again?

22      Q.    You came up with a methodology, did you not, by which you

23      want to try to allocate back to a component or a part or a

24      thing that you were asked to assume, certain profits, correct?

11:36   25      A.    Yes.

|       |    |                                                              |
|-------|----|--------------------------------------------------------------|
|       | 1  | Q.   And would you agree that a good litmus for the          |
|       | 2  | reasonableness of that methodology is how it applies in the  |
|       | 3  | particular instance.                                         |
|       | 4  | A.   Sure.                                                   |
| 11:36 | 5  | Q.   I'm going to hand you a number of different HeatWave --  |
|       | 6  |         MR. AXELROD:   May I approach?                        |
|       | 7  |         THE COURT:   Of course.   You're already there.      |
|       | 8  | BY MR. AXELROD:                                              |
|       | 9  | Q.   -- a number of different Seirus HeatWave products.      |
| 11:36 | 10 | A.   Yes.                                                    |
|       | 11 | Q.   Can you pick -- pick one up?                            |
|       | 12 | A.   Yes.                                                    |
|       | 13 | Q.   Which one did you select?                               |
|       | 14 | A.   I picked up what looks to be a sock.                    |
| 11:36 | 15 | Q.   Hold it to up the jury so that they can see.            |
|       | 16 |     How much of that sock is HeatWave material?  And for the |
|       | 17 | record, could you read in the exhibit number for the particular |
|       | 18 | product.                                                     |
|       | 19 |         THE COURT:   The exhibit number is the one on the    |
| 11:37 | 20 | sticker.                                                     |
|       | 21 |         THE WITNESS:   It looks like it's 225.4.             |
|       | 22 | BY MR. AXELROD:                                              |
|       | 23 | Q.   Okay.   Have you seen this product before?             |
|       | 24 | A.   Just here at trial.                                     |
| 11:37 | 25 | Q.   So you submitted your opinions in this case before you'd |

1  seen the product?

2  A.  Before I'd seen every product, yes.

3       THE COURT:  Did you want to reask your question again.

4  I think it got lost.

11:37  5  BY MR. AXELROD:

6  Q.  What percentage of that product is made up of HeatWave

7  fabric?

8  A.  Of the total material?

9  Q.  Yes.

11:37  10  A.  Probably a large portion.

11  Q.  Probably close to 100 percent, is it not?

12  A.  It could be.  I don't know exactly if there's other

13  threading or anything along the lines along the cuff or other

14  areas, but yes.

11:38  15  Q.  Were you here when Mr. Murphy testified with respect to

16  that product?

17  A.  Yes.

18  Q.  And did you hear him testify that it was virtually all

19  HeatWave fabric other than maybe some thread or labels where

11:38  20  they tell you how to wash it?

21  A.  That's what I was referencing, yes.

22  Q.  So here's an article that is 100 percent for purposes of

23  our discussion HeatWave fabric?

24  A.  Yes.

11:38  25  Q.  And how much of the profits from the sale of that article

1    did you allocate to the HeatWave fabric?

2    A.   Not 100 percent.

3    Q.   Not even -- barely a third, isn't that correct?

4    A.   That could be the case.  I could look at my schedule.  It

11:38    5    wouldn't surprise me, yes.

6    Q.   Do you have your schedule in front of you?

7    A.   Yes, just one second here.  I'm just looking for the

8    product number.

9    Q.   Are you on schedule 8.1?

11:39    10    A.   Yes.

11    Q.   It's kind of in the middle.

12    A.   Yes, over all the periods.  42 percent.

13    Q.   So less than half?

14    A.   Yes.

11:40    15    Q.   What component in that product did you allocate the rest of

16    the profit to?

17    A.   Well, Seirus doesn't earn a profit on just the HeatWave

18    fabric.  It has to go into a product, correct?  That is the

19    article of manufacture that gets into the component.   That

11:40    20    component goes into making the product.   So in order to make

21    the sock, there are other inputs that go into creating the end

22    product that would generate the revenue and the profits from

23    the inclusion of the HeatWave fabric.

24    Q.   What other component in that product did you allocate more

11:40    25    than half the profit to?

1    A.    The remaining cost in the bill of material.

2    Q.    So that would be labor paid to the manufacturer to sew it

3    up into the product for Seirus' specifications?

4    A.    Yes, that would be a component.

11:40  5    Q.    And in your view, that's the dominant component to which

6    you have allocated profits?

7    A.    Well, yes.  The -- again, the article of manufacture that

8    goes into the HeatWave fabric is a roll.  It's a roll of liner.

9    So that HeatWave fabric in that -- in that component is then

11:41  10    supplied to go into the finished product that ends up

11    generating profits.  But the -- yes, so I'm relying on -- I'm

12    using my analysis based on the HeatWave fabric.  The cost of

13    that as the -- the cost of that is a percentage of the total

14    cost to make the glove, given that there's not additional

11:41  15    profit that I can identify that should be attributed as a

16    higher portion than any other profits that go into the end

17    product that sold at the end of the day.

18    Q.    You would agree with me, would you not, that there is no

19    other component in that product that Seirus markets in the

11:41  20    United States other than HeatWave fabric?

21    A.    Generally, yes, based on Mr. Murphy's testimony, yes.

22    Q.    And you allocated it less than half the profit to that?

23    A.    Yes --

24    Q.    To that article?

11:42  25    A.    Yes.

|       |    |                                                                          |
|-------|----|--------------------------------------------------------------------------|
|       | 1  | Q.   Okay.   Do you have a HeatWave liner up there?                       |
|       | 2  | A.   Yes.                                                                 |
|       | 3  | Q.   Let's do an outward facing one.   Kind of under the left             |
|       | 4  | part of the stack, I think I see it.                                      |
| 11:42 | 5  | A.   Yes.                                                                 |
|       | 6  | Q.   What exhibit number is on that?                                      |
|       | 7  | A.   220.2.                                                               |
|       | 8  | Q.   Okay.   And, again, that's 100 percent HeatWave fabric, is           |
|       | 9  | it not?                                                                   |
| 11:42 | 10 | A.   Yes.                                                                 |
|       | 11 | Q.   And what percentage of profit did you allocate to the               |
|       | 12 | material in that case?                                                    |
|       | 13 | A.   Well, I assume it's 100 percent based on Mr. Murphy's               |
|       | 14 | testimony yesterday.                                                      |
| 11:42 | 15 | Q.   Do you have any reason to doubt it?                                  |
|       | 16 | A.   No, I don't.   I didn't want to say that I knew that as my          |
|       | 17 | own assumption.                                                           |
|       | 18 | For all years 37.3 percent.                                              |
|       | 19 | Q.   So almost two-thirds of the profit you allocate to this             |
| 11:43 | 20 | labor component that the contract manufacturer adds that you             |
|       | 21 | call a component or article?                                             |
|       | 22 | A.   Yes.                                                                 |
|       | 23 | Q.   And is that labor a thing?                                          |
|       | 24 | A.   It is an input into making the -- into making a product,            |
| 11:43 | 25 | yes, I would say it is a resource and asset, yeah.   I mean it's         |

1  not a physical thing per se, but yes.

2  Q.   And that perspective with respect to the allocation of

3  labor is something that you ran all the way through this

4  process to come up with the opinions that you gave the jury,

5  correct?

6  A.   If you mean I used the portion of the HeatWave fabric cost

7  over the total cost to manufacturing the product, yes.

8  Q.   And the way it applies with these products that are 100

9  percent HeatWave is the same way the methodology applies to all

10 the other products.  Is that correct?

11 A.   Yes.

12 Q.   One more example.  Are you familiar with the infamous

13 Torche?

14 A.   Yes.  You all call it "infamous."

15 Q.   Now, that product on the outside packaging prominently

16 messages a couple of different technologies, doesn't it?

17 A.   Yes.

18 Q.   And there's some on the back side too.

19 A.   Yes.

20 Q.   I think there's three.  There's the -- or actually two.

21 There's the battery component with its insert, and then there's

22 the HeatWave technology, correct?

23 A.   Yes, and then they mention Neofleece as well.

24 Q.   And when you open up the box and you pull out the glove,

25 the HeatWave fabric is relatively prominent, is it not?

1    A.    Are you wanting me to open it?

2    Q.    Sure.

3    A.    Yes.    It's on this product on the inside.

4    Q.    And how much of the allocable profit from that did you

11:45    5    allocate back to the HeatWave technology?

6    A.    1.5 percent over the total sales.

7            MR. AXELROD:    Thank you, Ms. Distler.

8        That's all I have, Your Honor.

9            THE COURT:    Redirect.

11:46    10                    REDIRECT EXAMINATION

11    BY MR. MARCHESE:

12    Q.    Okay, Ms. Distler.    I don't have a whole lot to ask you,

13    but you were just talking about the HeatWave sock.    I think

14    that was one of the things that you were looking at.

11:47    15    A.    Yes.

16    Q.    I believe that was Exhibit -- you tell me.    I think you

17    have it in front of you.    I forgot to write the exhibit number

18    in my notes.

19    A.    I don't have it in front of me.

11:47    20    Q.    Oh, was it taken away?

21            MR. MARCHESE:    May I approach?

22            THE COURT:    Of course.

23    BY MR. MARCHESE:

24    Q.    I think this was it.    Were the other ones taken away too?

11:47    25    A.    Yes, I only have the Torche.

 1    Q.    Okay.  I think these will do for now.

 2    A.    Got it.

 3    Q.    So, Ms. Distler, if -- there was a bill of materials you've

 4    been referring to in your testimony, Exhibit 1372?

11:47    5    A.    Yes.

 6    Q.    And on it there was -- one of the entries is the HeatWave

 7    sock, correct?

 8    A.    Yes.

 9    Q.    Okay.  And on that there's -- there's labor cost, right?

11:48   10    A.    Yes.

11    Q.    And there is the cost for the fabric, the HeatWave fabric.

12    If you'd like, I'll wait till you catch up to me.  It's on page

13    17 of the bill of materials.

14          MR. MARCHESE:  Just for -- my notes don't indicate.

11:48   15    Has 1372 been received?  I believe it came in through

16    Ms. Carey.

17          THE CLERK:  Yes.

18          MR. MARCHESE:  Thank you.

19          THE WITNESS:  Yes.

11:48   20          MR. MARCHESE:  Can I please publish that.

21          THE WITNESS:  The 2015-2016 bill of materials period,

22    yes.

23    BY MR. MARCHESE:

24    Q.    Okay.  And there's the -- we're all now looking at it.

11:49   25    You've got labor costs listed, right?

A.    Yes.

Q.    And the HeatWave poly Spandex black, I take it that's the
HeatWave fabric.  Is that right?

A.    Yes.

11:49    Q.    And then there's duty?

A.    Yes.

Q.    And then there's freight, right?

A.    Yes.

Q.    And those are all costs?

11:49    A.    Those are all costs to make that product, yes.

Q.    And the only one that I see on there that is HeatWave
fabric is the one that's the HeatWave poly Spandex black line
item?

A.    Yes.

11:49    Q.    And so when you receive -- there's a roll of fabric -- I
think we heard Mr. Murphy testify a roll of fabric will be
received by Seirus, right?

A.    Yes.

Q.    And then there's work that has to go into it before you end
11:49    up with the sock.  Would you agree?

A.    Yes.

Q.    So it has to be cut, right?

A.    I would assume there's cutting, yes.

Q.    You heard Mr. Murphy testify?

11:49    A.    Right.  It's -- yes, it's just a -- it's the roll of -- and



1  the portion of the roll of the HeatWave fabric that gets sent

2  to the manufacturer.

3  Q.   And then there's the freight that we see here, so it

4  actually gets shipped to where it needs to go.

11:50   5  A.   Yes.

6  Q.   And then tell us again what the duty was.

7  A.   That is an import tax assessed by the U.S. Government.

8  Q.   To get it into the United States?

9  A.   Yes.

11:50   10  Q.   And then the cut sock has to be sewn, using, I would

11  imagine, some technical sewing techniques.   Does that sound

12  right?

13  A.   Yes, that's my understanding.

14  Q.   And then there has to be some packaging associated with it?

11:50   15  A.   Yes.

16  Q.   And everything except for the HeatWave sock are things you

17  excluded from the article of manufacture.   Is that correct?

18  A.   One more time?   Sorry.

19  Q.   Yeah.   You excluded the labor cost, right?   You did not

11:50   20  include that as part of the cost of the article of manufacture

21  for your analysis?

22  A.   Yes, because I'm taking a portion of the cost, and then I

23  take the portion of the cost that corresponds to the HeatWave

24  fabric that then I apply the percentages for revenue and

11:51   25  profits too.

1    Q.    Thank you.   Actually, could you hold up the HeatWave glove

2    liner you had.   And that's got the silver facing out, right?

3    A.    Yes.

4    Q.    And what's it look like inside?

11:51    5    A.    It's black.

6    Q.    That's black.   So that's -- if we're going back now to

7    shift gears quickly to the '270 patent, the utility patent,

8    that is, in your opinion, in the report that Mr. Axelrod took

9    you through, had -- part of it was an alternative design where

11:51    10    the HeatWave fabric was facing away, correct?

11    A.    Correct.

12    Q.    Is that an example of one of those?

13    A.    Yes.

14    Q.    And that's been implemented, sole marketed by Seirus?

11:51    15    A.    Yes.

16    Q.    Can you tell us how long that's been going on?

17    A.    I believe from the beginning, but let me crosscheck.   Yes,

18    in the first year of sales.

19    Q.    In the first years of sales, Seirus had the silver fabric

11:52    20    facing away?

21    A.    Yes.

22    Q.    Okay.   So that would be one of the alternatives you

23    considered as a potential design-around type product?

24    A.    Absolutely, and the silver has sold significantly more than

11:52    25    the black.



1    Q.   Can you give us a sense of what the numbers are of HeatWave

2    with the silver pointing inward in the liner versus the

3    HeatWave with the silver facing out?

4    A.   So if you look at it from a units perspective, it's almost

11:52   5    ███████ units of the silver and --

6    Q.   Facing out or facing in?

7    A.   The silver facing out, and then it's just over ███████ units

8    where the silver is facing in.

9    Q.   So ████████████████ units of the design-around that you

11:53  10    referred to in your report?

11    A.   Yes.

12            MR. MARCHESE:   May I approach again, Your Honor?

13            THE COURT:   Sure.

14            MR. MARCHESE:   I don't know if this one has been

11:53  15    received.   HeatWave Accel.

16            MR. AXELROD:   No objection.

17            THE COURT:   1437 is received.

18       (Exhibit 1437 admitted.)

19    BY MR. MARCHESE:

11:53  20    Q.   Ms. Distler, that is a HeatWave Accel glove.   Is that

21    correct?

22    A.   Yes.   This is the glove that I used as my example in the

23    design patent profit disgorgement.

24    Q.   And in the bill of materials, Exhibit 1372 that you've been

11:53  25    looking at, is the HeatWave Accel glove called out in there?   I

1   see -- on page 16 of the bill of materials, I do see that.

2   A.   Yes, it's on the first page, uh-huh.

3   Q.   Oh, it's on the first page?

4   A.   Well, there's one version of it from 2013-2014.

11:54   5   Q.   Okay. I'll look at page 1 with you then. There's an

6   entry, and we'll all see it here in a minute, that says

7   "HeatWave Accel glove," correct?

8   A.   Yes.

9   Q.   And so is that the example that you went through in your

11:54   10   slides on your direct testimony? Was that the one you were

11   referring to?

12   A.   It's similar, just a different year, but yes.

13   Q.   What are the cost components here that are called out?

14   A.   There's the manufacture line item that's going to include

11:54   15   labor and then any other items that the manufacturer may

16   supply. There's the liner Youngtech, Ventex, the header card,

17   bungie, screamer, duty, and freight.

18   Q.   And so which line item is the HeatWave fabric?

19   A.   It's the Ventex line.

11:54   20   Q.   And you accounted for that in determining what the

21   proportional cost of the article of manufacture is for that

22   particular HeatWave Accel glove, correct?

23   A.   Correct. The percentage I arrive at is the $1.33.5 with

24   duty and with freight only as the portion of the allocation.

11:55   25   Q.   And you took a portion of the duty and the freight? Was it

```
 1   50 percent?  Do you have that right --
 2   A.   50 percent of the freight, but the duty, it is a
 3   percentage -- here you can see it's 20 percent.
 4   Q.   Let's turn to the '270 patent again.  I thought I heard
 5   Mr. Axelrod say -- and tell me if this sounds correct -- that
 6   there were ████████ units of the outward-facing type of
 7   HeatWave fabric sold?  Did I hear him correctly?
 8            MR. AXELROD:   Incorrect.
 9            MR. MARCHESE:   Was it ████████?
10            THE COURT:   So actually you shouldn't be questioning
11   other counsel.   You should be questioning the witnesses.
12            MR. MARCHESE:   Apologies, Your Honor.  I couldn't hear
13   him.
14   BY MR. MARCHESE:
15   Q.   Is it your understanding that the silver facing away, that
16   the sales are ████████ approximately?
17   A.   I'm looking at the silver product sales.
18   Q.   And where are you looking right now?
19   A.   I'm looking in schedule 4.
20   Q.   From which document?
21   A.   Of the -- of Exhibit 1431.
22   Q.   And that's one of your reports, correct?
23   A.   Yes.
24   Q.   Okay.  You said you're looking at which schedule?
25   A.   I'm looking at schedule 4.
```

11:55 (line 5)
11:56 (line 10)
11:56 (line 15)
11:56 (line 20)
11:56 (line 25)

1    Q.    And does that tell you the number of sales in terms of

2    dollars of the outward-facing HeatWave products?

3    A.    Yes, there's a line item for the total sales for the period

4    of silver.

11:57    5    Q.    And does that agree with the ███████████ that Mr. Axelrod

6    said?

7    A.    No.

8    Q.    What do you have there?

9    A.    I have ███████.

11:57    10    Q.    And are there also -- so that's the outward-facing liner.

11    Is that correct?

12    A.    Yes, and socks.

13    Q.    Okay.  And then there may be other products that have the

14    silver facing away from the skin, but maybe you don't see it as

11:57    15    totally outward facing.  Is that correct?

16    A.    Yes.  Those are bidirectionals.

17    Q.    And how many dollars worth of those do you see?

18    A.    For bidirectionals, it's ███████.

19    Q.    So in your report that you were looking at earlier, do you

11:57    20    remember looking at -- there was some discussion back and forth

21    with Mr. Axelrod about the design-around or alternatives that

22    you'd identified.  Do you remember those?

23    A.    Yes.

24    Q.    And he was pointing you towards -- I'm sorry -- paragraph

11:58    25    111, and I think he may have even asked you about paragraph

1     112.   Do you recall that?

2     A.    Yes.

3     Q.    So if we could go there, in those paragraphs he was

4     referring to Dr. Block over and over again.  Do you remember

11:58   5     that?

6     A.    Yes.

7     Q.    But the next paragraph says that you had a discussion with

8     Mr. Murphy concerning alternatives, right?

9     A.    Yes.

11:58   10    Q.    Can you tell us about that, about your discussions with

11    Mr. Murphy.  What did he share with you?

12    A.    Are you referencing paragraph 113?

13    Q.    I am.

14    A.    "From my discussions with Dr. Block and Mr. Murphy, I

11:58   15    understand that implementing these alternatives would not have

16    reduced in any meaningful way the performance of HeatWave such

17    that these alternatives would be commercially acceptable."

18    Q.    I actually -- sorry.  That probably wasn't a very good

19    question.  I didn't want you to read it.  I wanted you to tell

11:59   20    me about -- what kind of conversations did you have with

21    Mr. Murphy?

22    A.    Yes, with Mr. Murphy, given that he is intimately involved

23    with the manufacturing and procurement of Seirus' products, it

24    was -- he was knowledgeable with the heat-reflective material

11:59   25    and its implementation and then whether or not there would be

1    changes with respect to performance of the product.  And then,

2    again, the discussion that I had with Mr. Axelrod around the

3    costs that would be incurred to make such a change happen.

4    Q.    And so you used these discussions with Mr. Murphy in part

11:59    5    to reach your conclusions that there would be design-around

6    available to Seirus, correct?

7    A.    Yes, from a technical perspective I would rely on

8    Dr. Block, but then in terms of evaluating whether or not it's

9    acceptable or available, I also spoke with Mr. Murphy.

12:00    10    Q.    And did Mr. Murphy tell you that Seirus had been selling

11    for a number of years and was continuing to sell the silver

12    outliners, for example?

13    A.    Yes.

14    Q.    And did he tell you about other products where the silver

12:00    15    was facing away from the skin?

16    A.    There are also the socks, and there are some hats that are

17    skull liners that do the same.

18    Q.    Now, Mr. Axelrod asked you, I think, questions -- I can't

19    remember if he used "crucial" or "critical" or -- he used some

12:00    20    words that he supplied to you when he asked you questions about

21    them concerning acceptable alternatives.  Do you remember that?

22    A.    Yes.

23    Q.    Here we see DDX738.  Right?

24    A.    Yes.

12:00    25    Q.    And in that is a summary of the licensing, technical, and

1    economic Georgia Pacific factors that you considered?

2    A.   Yes.

3    Q.   And how many of those factors are the acceptable

4    alternatives?

12:01  5    A.   It's just one.

6    Q.   Out of how many?

7    A.   Out of all of the factors.

8    Q.   Did you consider all of the factors?

9    A.   Yeah, I considered those that were relevant, but gathered

12:01  10   data according to all, yes.

11   Q.   Is any one determinative?

12   A.   I'm sorry?

13   Q.   Is any one of them determinative?

14   A.   No.   You're looking at everything in combination.

12:01  15   Specifically what the value that the patented feature

16   contributes is a significant consideration.

17   Q.   So in arriving at your 10 percent rate, you considered all

18   of these factors, correct?

19   A.   Yes.

12:01  20   Q.   And your 10 percent rate, as I understand it, it's --

21          MR. AXELROD:   Outside the scope of the cross.

22          THE COURT:   Overruled.

23   BY MR. MARCHESE:

24   Q.   As I understand it, your 10 percent actually is an

12:01  25   agreement with one of the three rates that Ms. Morones offered,

1  correct?

2  A.  It is.

3  Q.  So just briefly, one last thing I wanted to ask you about,

4  there were some questions put to you about whether fabric could

5  be made with the foil on the MegaHeat where you would be over

6  70 percent.  Do you remember that?

7  A.  Yes.

8  Q.  And is it possible?  I mean does it seem possible to you

9  that you could make it 71 or 72 or 73?  Doesn't that seem

10  conceivable?

11  A.  I don't have any reason to believe that it wouldn't be

12  possible.

13       MR. MARCHESE:  Thank you.  That's all I have,

14  Your Honor.

15       THE COURT:  Does the jury have any questions for this

16  witness?  If so, please raise your hand.

17     You may step down.

18       MR. AXELROD:  May I ask one question?

19       THE COURT:  Sure.

20                    RECROSS-EXAMINATION

21  BY MR. AXELROD:

22  Q.  If you add up the volume of HeatWave products that are 100

23  percent, or for all practical purposes 100 percent HeatWave

24  fabric, what is your sales volume?

25  A.  Total sales of glove liners are ████████████ and total

1    sales of socks are ███████.

2    Q.   And hats?

3    A.   ███████.

4    Q.   Is that awfully close or a little more than ████████?

12:03  5    A.   It's more than ███████.

6              MR. AXELROD:   Thank you.

7              THE COURT:   Anything else?

8              MR. MARCHESE:   Sorry to do this, but very briefly.

9    The tennis match.

12:03  10              REDIRECT EXAMINATION

11    BY MR. MARCHESE:

12    Q.   Could you pick up the glove liner, Ms. Distler, the one

13    with the silver facing out?

14    A.   Yes.

12:04  15    Q.   And there is a cuff on that that's black, right?

16    A.   Yes.

17    Q.   Is that HeatWave fabric or just some sort of other fabric?

18    Can you tell?

19              MR. AXELROD:   We're outside the cross.

12:04  20              THE COURT:   I don't know that we are.

21              MR. AXELROD:   Okay.

22              THE COURT:   Your objection is overruled.

23         You can answer that question.

24              THE WITNESS:   It does not appear to be the same

12:04  25    material.

1    BY MR. MARCHESE:

2    Q.    And then, again, just going to this question that

3    Mr. Axelrod asked, for the products where -- you know, like the

4    liner or the sock where Mr. Axelrod has been saying 100

12:04    5    percent, 100 percent, the portion I heard you talk about was, I

6    think, 42 percent for one of those products was your cost

7    apportionment.

8    A.    Yes.

9    Q.    And then for the HeatWave Accel glove that you provided

12:05    10    testimony on, what was the percentage of article of manufacture

11    for that?

12    A.    That was 17.2 percent.

13    Q.    So there's a big difference between an insulated-type glove

14    and one of these liners?

12:05    15    A.    Yes.  You're taking a larger percentage of the revenue and

16    profit and attributing it to the HeatWave fabric where there's

17    more HeatWave fabric contained within that product.

18            MR. MARCHESE:  Nothing further, Your Honor.

19            THE COURT:  You may step down.

12:05    20            MR. AXELROD:  I think it's fair for us to pull up

21    Exhibit --

22            THE COURT:  No, wait a minute.  You do not get to make

23    speeches about what's fair.

24            MR. AXELROD:  Sorry.  My apologies.

12:05    25            THE COURT:  Have the jury step out, please.

1    (Proceedings held outside the presence of the jury panel.)

2        THE COURT:   Please be seated.

3    I don't know how this happened, but the point of

4  Mr. Axelrod's questions was that jurors could have thought that

12:06   5  he might have been misleading them regarding the ███████,

6  and he wanted to make sure that there was no misunderstanding

7  about that.   That's why he asked for additional

8  cross-examination to that point.

9    I didn't know what the point of the wrist component of the

12:06  10  fabric was.   I didn't know if it was related to that or not,

11  but I let it go, and then you asked some other questions that

12  were related to Mr. Axelrod's questions and that had to do with

13  a construction of the socks and liners, et cetera.

14    Now, Mr. Axelrod what else is there that we need to

12:06  15  clarify?

16        MR. AXELROD:   The bill of materials demonstrates that

17  the cuff is made out of HeatWave fabric as Mr. Murphy

18  testified.

19        THE COURT:   Is that in evidence?

12:07  20        MR. AXELROD:   Yes.

21        THE COURT:   So why do you need any further

22  examination?

23        MR. AXELROD:   To point it out to the witness who just

24  testified to the contrary.

12:07  25        THE COURT:   You mean an exhibit doesn't do that for

1    you?

2            MR. AXELROD:  In the terms of the proximity of the

3    jury's perception, I don't believe that it does.

4            THE COURT:  All right.  I will let you ask that

12:07    5    question.  One question.  Because last time you said one

6    question, and it wasn't one question.  Understood?

7            MR. MARCHESE:  I will not follow up.

8            MR. AXELROD:  1229.69.

9            THE COURT:  Okay.  Bring them out.

12:07    10        (Proceedings held in the presence of the jury panel.)

11            THE COURT:  Please be seated.  Mr. Marchese, step

12    aside and let him ask him one question.

13                        RECROSS-EXAMINATION

14    BY MR. AXELROD:

12:08    15    Q.  Ms. Distler, you have in front of you what has been marked

16    as Exhibit 1227.69, which is a Seirus production request for

17    the HeatWave glove liner, and do you see partway down, there is

18    a description of the material to be used to make the cuff of

19    that glove liner?  And do I correctly read that it is "VT" for

12:08    20    Ventex "with reflective printing double layer folded at hem

21    brushed side out."  Is that correct?

22    A.  My screen is blank.

23    Q.  Oh, sorry.

24    A.  Yes.

12:09    25            MR. AXELROD:  Thank you.

1    THE COURT:  Members of the jury, this is -- we're

2  going to be taking our midday recess at this time.  We'll be in

3  recess for an hour.  Five minutes after the hour, I will see

4  you again.  Remember the instructions.  We'll see you then.

12:09    5  Have a good lunch.

6    (Proceedings held outside the presence of the jury panel.)

7    THE COURT:  You may step down.  Please be seated.  Are

8  there any further witnesses for the defense?

9    MR. MARCHESE:  Your Honor, we just would like to -- we

12:10   10  would have nobody except that we have still the outstanding

11  issue of willful infringement whether that's going to be in or

12  out for the '270 patent.  If it is in, then we would like to

13  get some evidence from Mr. Carey concerning the Korean

14  prosecution.

12:10   15    THE COURT:  Other than that you're done?

16    MR. MARCHESE:  Other than that we are done.

17    THE COURT:  Okay.  Did you file a response already on

18  that issue?  I don't remember.

19    MR. MARCHESE:  I think we did.  We did, Your Honor.

12:11   20    THE COURT:  All right.  I'll take a look at it.

21  Again, based on what you've told me and represented to me, I

22  think I have indicated to you that I wasn't persuaded.  I'll

23  take a look at what you've sent me and have that determination

24  for you when we're done at the end of the lunch hour.

12:11   25    And then if you are done, then we're back to your side.

1    How many witnesses do you anticipate calling?

2            MR. ALDRICH:  We have -- I think it is five witnesses,

3    Your Honor.

4            THE COURT:  For rebuttal?

12:11   5            MR. ALDRICH:  Correct.

6            THE COURT:  Well, we're not going to finish today.

7            MR. ALDRICH:  I don't think so.  That went longer this

8    morning than we were anticipating, yes.

9        We have JMOL motions, Your Honor.

12:11  10            THE COURT:  Okay.

11            MR. ALDRICH:  Would you like to hear them now or --

12            THE COURT:  No.  Let me figure out what we're going to

13    do on the other side, and then we'll take your motions.  You

14    can tell me what you're going to be moving against however.

12:12  15    Give me a heads-up.

16            MR. ALDRICH:  We're going to move for judgment as a

17    matter of law with respect to anticipation.  There was no

18    evidence that Fottinger shows heat-reflecting elements on the

19    innermost surface of the garment.  We'll be moving for judgment

12:12  20    as a matter of law on no anticipation because Fottinger teaches

21    away from 30 to 70 percent coverage range.  We'll be moving

22    judgment as a matter of law no anticipation; Dr. Block

23    testified that the elements were the aluminum particles.  They

24    are not independently coupled.  They are rather mixed in with a

12:12  25    rubber binder and then affixed to the garment.

1   Concomitant with our motions with respect to anticipation
2   and also obviousness, there are several limitations -- I just
3   missed it -- that are not satisfied in Fottinger as a matter of
4   law, and they don't have any evidence to fill the gap between
12:13  5   those limitations and obviousness.  The only limitation they're
6   relying on for obviousness is 30 to 70 percent coverage.  So
7   the fact that it's not on the innermost surface, the fact that
8   the heat-directing elements are not independently coupled, for
9   example, they have no evidence to fill the gap on those; and,
12:13  10  therefore, judgment as a matter of law with respect to
11  obviousness should be granted.
12   We'll also move for judgment as a matter of law because
13  Mr. -- or Dr. Block used the incorrect legal standard for
14  obviousness and testified as to his own legal standard which is
12:13  15  prone to hindsight.  We'll also move for judgment as a matter
16  of law because Dr. Block provided no motivation to combine
17  analysis as is required.
18   And we will move for judgment as a matter of law that
19  Seirus infringes.  I don't think any reasonable juror at this
12:14  20  point could conclude otherwise.  They've now had two experts
21  testify that Seirus' product satisfy all the limitations of the
22  claims.
23   And, finally, we'll move for judgment as a matter of law
24  that the products that are made exclusively from HeatWave
12:14  25  fabric, that being the socks, skullcaps, glove liners, are all

1 single-component products under Samsung v. Apple.  They are not

2 multi-component products because they're made 100 percent from

3 the infringing fabric, and, therefore, the apportionment

4 analysis does not apply under Samsung v. Apple.

12:15  5          THE COURT:  Oh, you've given me a lot of work to do.

6 Socks, skullcaps, and glove liners.  Thank you.  Okay.  The

7 likelihood of me being able to rule from the bench on all of

8 these issues is nonexistent, so which means that after you

9 rest, you can go ahead and raise these issues and rearticulate

12:15 10 them if you feel the need to, or add any others that you

11 haven't felt the need to.

12     I'll give you an opportunity to respond.  It may be

13 worthwhile for you just to respond in writing if you like or

14 not.  I don't care.  However you want to do it.  Make your

12:15 15 arguments and allow you to -- and that way I'll make sure that

16 I cover them all.

17          MR. ALDRICH:  Would it help if I handed up a piece of

18 paper?

19          THE COURT:  I don't know.  What's on it?

12:16 20          MR. ALDRICH:  It's our briefing on these topics.

21          THE COURT:  Oh, okay.  That's fine.  Have you served

22 it on the other side already?

23          MR. ALDRICH:  I'll hand it right now.

24          THE COURT:  Okay.  Which means that I'm not going to

12:16 25 be able to rule prior to the time you continue with the

1    evidence in the case.

2         MR. ALDRICH:  It seems to me, Your Honor, that there's

3    one question that if Your Honor ruled in our favor on, then it

4    would eliminate invalidity in the case; and, two, remove

12:16    5    several of the witnesses, which is simply the issue of whether

6    the Fottinger reference discloses being on the innermost

7    surface.  If it's not on the innermost surface, there's no

8    anticipation, and, again, they have no evidence that there

9    would be a motivation to combine.  They have no evidence of any

12:16    10    piece of prior art fills the gap for that.  So if as a matter

11    of law there is no anticipation because Fottinger doesn't

12    disclose putting it on the innermost surface, the patent is not

13    invalid, and we just cut our day short.

14         THE COURT:  Okay.  Thank you.  That's probably not

12:17    15    going to happen.

16         MR. ALDRICH:  Okay.

17         THE COURT:  Let's have our lunch.

18    (Recess.)

19                          ---oOo---

20

21

22

23

24

25

1    C-E-R-T-I-F-I-C-A-T-I-O-N

2

3    I certify that the foregoing is a correct transcript from

4    the record of proceedings in the above-entitled matter.

5

6    Dated September 26, 2017, at San Diego, California.

7

8                              /s/ Dana Peabody
9                              Dana Peabody,
                               Registered Diplomate Reporter
10                             Certified Realtime Reporter

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1902

1        UNITED STATES DISTRICT COURT

2        SOUTHERN DISTRICT OF CALIFORNIA

3

4   COLUMBIA SPORTSWEAR NORTH        )
    AMERICA, INC., AN OREGON         )
5   CORPORATION,                     )
                                     )
6               PLAINTIFF,           ) CASE NO. 17CV1781-HZ
                                     )
7   VS.                              ) SAN DIEGO, CALIFORNIA
                                     )
8   SEIRUS INNOVATIVE ACCESSORIES,)  TUESDAY,
    INC., A UTAH CORPORATION,        ) SEPTEMBER 26, 2017
9                                    ) 1:13 P.M.
                DEFENDANT.           )
10  _____ )

11

12

13        REPORTER'S TRANSCRIPT OF PROCEEDINGS

14                   JURY TRIAL

15             VOLUME 7 - PM SESSION

16              PAGES 1902 - 2072

17   BEFORE THE HONORABLE MARCO A. HERNANDEZ
          UNITED STATES DISTRICT JUDGE

18

19

20

21

22   REPORTED BY:  CAMERON P. KIRCHER
                   CSR NO. 9427, RPR, CRR, RMR
23                 333 W. BROADWAY, SUITE 420
                   SAN DIEGO, CALIFORNIA  92101
24                 E-MAIL:  CPKIRCHER@GMAIL.COM

25

COMPUTER-AIDED TRANSCRIPTION

1903

```
 1    APPEARANCES:

 2    FOR THE PLAINTIFF:     SCHWABE, WILLIAMSON & WYATT, P.C.
                             BY:  NIKA F. ALDRICH, JR., ESQ.
 3                                DAVID W. AXELROD, ESQ.
                                  BRENNA LEGAARD, ESQ.
 4                           1211 SW 5TH AVENUE
                             SUITE 1900
 5                           PORTLAND, OREGON  97204

 6
      FOR THE DEFENDANT:     FISH & RICHARDSON, P.C.
 7                           BY:  CHRISTOPHER S. MARCHESE, ESQ.
                                  SETH M. SPROUL, ESQ.
 8                           12390 EL CAMINO REAL
                             SAN DIEGO, CALIFORNIA  92130
 9
                             MARKOWITZ HERBOLD, P.C.
10                           BY:  RENEE ROTHAUGE, ESQ.
                             1211 SW FIFTH AVENUE
11                           SUITE 3000
                             PORTLAND, OREGON  97204
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

COMPUTER-AIDED TRANSCRIPTION

1904

1

# **INDEX**

2

<u>EXAMINATION</u>

3

<u>WITNESS NAME</u>                                                           <u>PAGE</u>

4

<u>DEBRA CRISS</u>

5

    DIRECT BY MS. LEGAARD....................................... 1920
    CROSS BY MS. ROTHAUGE...................................... 1934
6
    RE-DIRECT BY MS. LEGAARD .................................. 1954

7

<u>CHRISTINE COLE, PH.D.</u>

8

    DIRECT BY MR. ALDRICH...................................... 1959
    CROSS BY MR. SPROUL ...................................... 1995
9
    RE-DIRECT BY MR. ALDRICH ................................. 2037

10

<u>ROBERT MURPHY</u>

11

    DIRECT BY MR. AXELROD...................................... 2038

12

13

14

15

# **EXHIBITS**

16

<u>EXHIBIT</u>                                                              <u>PAGE</u>

17

EXHIBIT 1438 ENTERED INTO EVIDENCE                             2032
EXHIBIT 745 ENTERED INTO EVIDENCE                              2072

18

19

20

21

22

23

24

25

COMPUTER-AIDED TRANSCRIPTION

1905

1           SAN DIEGO, CALIFORNIA - TUESDAY, SEPTEMBER 26, 2017

2                           1:13 P.M.

3           (JURY ABSENT.)

4           THE COURT:  PLEASE BE SEATED.

5           SO PRIOR TO THE DEFENSE RESTING, I WANTED TO TAKE UP

6     THE ISSUE OF WHETHER OR NOT I WOULD ALLOW FURTHER EVIDENCE OF

7     THE I.P.R. MOTION THAT WAS FILED BY THE DEFENSE.

8           THE ARGUMENT BEING THAT THE PLAINTIFF, BY ELICITING

9     THE TESTIMONY FROM DR. BLOCK REGARDING PROSECUTION HISTORY,

10    HAD OPENED THE DOOR TO THE I.P.R. TESTIMONY, AND THAT THE

11    JURY WAS LEFT WITH AN IMPRESSION THAT AFTER CONSIDERATION OF

12    THE I -- EXCUSE ME, THE PROSECUTION HISTORY, THAT THAT WAS

13    IT, THAT THERE WAS NOTHING LEFT.

14          COLUMBIA RESPONDED BY SAYING THAT IT WAS MERELY

15    FILLING IN THE FURTHER INFORMATION REGARDING THE PROSECUTION

16    HISTORY THAT HAD BEGUN WITH THE DEFENSE EXAMINATION OF -- I

17    DON'T REMEMBER IF IT WAS DR. BLOCK OR SOME OTHER WITNESS.  I

18    DON'T RECALL WHICH ONE IT WAS.

19          I READ THE THE BRIEFING FROM BOTH SIDES AND CONCLUDE

20    THAT THE EVIDENCE OF THE I.P.R. SHOULD NOT BE ALLOWED IN,

21    THAT MY PRIOR RULING STANDS IN THIS CASE.  EVIDENCE OF THE

22    I.P.R. WOULD I THINK BE MISLEADING TO THE JURY IN SOME

23    RESPECTS, BECAUSE WE DON'T KNOW WHAT IS BEHIND THE I.P.R.'S

24    DECISION, AND THAT ITS PROBATIVE VALUE IS SUBSTANTIALLY

25    OUTWEIGHED BY ITS PREJUDICIAL EFFECT AND THAT THE JURY MAY

COMPUTER-AIDED TRANSCRIPTION

1906

1    PAY MORE ATTENTION TO A PENDING MATTER THAN IS DESERVED.

2            FOR THOSE REASONS, MY RULING STANDS.  EVIDENCE OF

3    THE I.P.R. WILL NOT BE COMING IN.

4            WITH THAT, IS THE DEFENSE READY TO REST?

5            MR. MARCHESE:  WE STILL HAVE THE OUTSTANDING ISSUE

6    OF THE WILLFUL INFRINGEMENT QUESTION AND WHETHER WE WOULD

7    WANT TO RE-CALL MR. CAREY TO ADDRESS THE SOUTH KOREAN -- YOU

8    KNOW, EVIDENCE THAT WE HAD PREVIOUSLY STOPPED PRESENTING AND

9    INSTRUCTING THE JURY ON.

10           THE COURT:  OKAY.

11           MR. ALDRICH:  YOUR HONOR, THE KOREAN INVALIDITY

12   PROCEEDING CONCLUDED AFTER THE LAWSUIT IN THIS CASE WAS

13   FILED.  YOUR HONOR HAS RULED THAT WE HAVE DISCLAIMED

14   WILLFULNESS AFTER THE DATE THAT THIS LAWSUIT WAS FILED, AND,

15   THEREFORE, WHAT HAPPENED IN KOREA HAS NO PROBATIVE VALUE

16   EITHER, UNLESS THEY ARE GOING TO CLAIM THAT THEY HAD

17   KNOWLEDGE OF THE PATENT PRIOR TO DECEMBER 4TH NOW, WHICH THEY

18   HAVE BEEN WALKING AWAY FROM, SUCH THAT THEY RELIED IN GOOD

19   FAITH ON SOMETHING THAT WAS HAPPENING IN KOREA ON A FOREIGN

20   COUNTERPART PATENT.

21           THIS STRIKES US AS DIRECTLY AT ODDS WITH THE CASE

22   THAT THEY HAVE BEEN PRESENTING SO FAR, AND WE HAVE NO

23   EVIDENCE OF THAT.  WE ALSO HAVE QUESTIONS ABOUT MR. CAREY'S

24   FOUNDATION TO BE ABLE TO TESTIFY ABOUT THIS, SINCE HE CLAIMED

25   IGNORANCE, AS I RECALL, OTHER THAN RELYING ON COMMUNICATIONS

1    WITH BOB MURPHY AND JOE EDWARDS.

2           SO WE'RE AT A COMPLETE LOSS OF HOW THEY TRY TO GET

3    THIS KOREAN PROCEEDING IN, ESPECIALLY BECAUSE NOTHING HAD

4    CONCLUDED BY THE TIME THAT THIS LAWSUIT WAS FILED; THAT THE

5    MOST THEY COULD SEEM TO TESTIFY ABOUT IS WE WERE AWARE THAT

6    THERE WAS A PROCEEDING.  BUT IN ORDER TO TESTIFY TO THAT,

7    THEY OPEN THE DOOR TO THE NOTION THAT THEY ACTUALLY DID HAVE

8    KNOWLEDGE OF THE PATENT.

9           THE COURT:  RESPONSE.

10          MR. MARCHESE:  I THINK THIS KIND OF POINTS OUT THE

11   PROBLEM WE HAVE WITH ALLOWING WILLFULNESS IN THIS CASE AT ALL

12   FOR THE '270 PATENT.  IT'S LIKE THE CHICKEN AND EGG PROBLEM

13   HERE.  WE DIDN'T KNOW ABOUT THE PATENT UNTIL WE GOT SUED;

14   THEREFORE, WE CAN'T DEFEND ON ANYTHING THAT HAPPENED AFTER WE

15   GOT SUED; BUT THEY CAN ACTUALLY CLAIM WILLFULNESS ON THINGS

16   THAT HAPPENED BEFORE WE KNEW ABOUT THE PATENT.

17          AND SO I THINK IT JUST SOLIDIFIES THE ARGUMENT AND

18   MAKES IT CLEAR THAT THERE SHOULD BE NO WILLFUL INFRINGEMENT

19   CASE WHATSOEVER FOR THE '270 PATENT BECAUSE WE DIDN'T KNOW

20   ABOUT IT.  AND HOW CAN YOU BE WILLFUL WHEN YOU HAVE NO IDEA

21   ABOUT THE PATENT.

22          MR. ALDRICH:  AND IF THAT'S THEIR POSITION, YOUR

23   HONOR, THAT THEY DIDN'T KNOW ANYTHING ABOUT IT, THEN WHAT

24   RELEVANCE DOES THAT KOREAN PROCEEDING HAVE?

25          MR. MARCHESE:  WELL, IT HAS -- IF IT DOES, IF

1908

```
1    WILLFULNESS IS ALLOWED TO BE PRESENTED TO THE JURY FOR THE
2    '270 PATENT, THE CASE LAW THAT WE CITED TO YOUR HONOR IN
3    THE MOTIONS IN LIMINE PROCEEDING, THERE IS -- THE
4    BIC V. WINDSURFING INTERNATIONAL CASE, WHERE THE FEDERAL
5    CIRCUIT HELD IN CONNECTION WITH WILLFULNESS, THAT EVENTS THAT
6    TAKE PLACE SUBSEQUENT TO AN ALLEGATION OF WILLFULNESS THAT
7    STRENGTHEN YOUR CONVICTION THAT YOU ARE FREE AND CLEAR OF THE
8    PATENT, WHETHER IT BE BY NONINFRINGEMENT OR WILLFULNESS --
9    I'M SORRY, OR INVALIDITY, ARE RELEVANT.
10           AND THIS WOULD BE AN INSTANCE OF WHERE WE LEARNED
11   ABOUT THE PATENT ON DECEMBER 4TH, 2013.  WE HAD THE THERMALUX
12   IN OUR HANDS, WHEN WE PUT IN EVIDENCE ON THAT, AND THERE IS
13   TESTIMONY ON THAT POINT.  AND WE, THEREAFTER, ABOUT TWO WEEKS
14   LATER, LEARNED THAT THE KOREAN COURT OR TRIBUNAL HAD
15   INVALIDATED THE COUNTERPART PATENT BASED ON FOTTINGER.  SO
16   THOSE ARE -- IT'S A STRENGTHENING OF THE CONVICTION OF
17   EXACTLY WHAT THEY THOUGHT AS OF THE TIME THEY LEARNED ABOUT
18   THE PATENT.
19           SO I THINK IT'S -- IF WE'RE GOING TO HAVE A
20   WILLFULNESS CASE IN, WE SHOULD BE ABLE TO PUT THAT IN.  ALL
21   FACTS AND CIRCUMSTANCES CAN COUNT FOR WILLFULNESS.  WHAT IS
22   YOUR STATE OF MIND.  IF YOUR STATE OF MIND IS, I FEEL PRETTY
23   GOOD ABOUT INVALIDITY, BECAUSE NOT ONLY DO I HAVE MY OWN
24   PRODUCT THAT I MADE 20 YEARS BEFORE, BUT I'VE ALSO GOT SOUTH
25   KOREA SAYING FOTTINGER IS REALLY GOOD.
```

1909

1    AND THAT GOES TO THE STATE OF THE MIND OF THE

2    EXECUTIVES OF THE COMPANY AND CAN CERTAINLY BE A DEFENSE TO

3    WILLFULNESS.  THAT'S WHAT WILLFULNESS IS ALL ABOUT.  THIS

4    HAPPENS IN VERY SORT SUCCESSION AFTER THE LETTER ARRIVES ON

5    DECEMBER 4TH.  AND MR. CAREY CAN TESTIFY TO THIS.

6    OUR POINT AND OUR POSITION IS, THERE SHOULD BE NO

7    CASE FOR WILLFUL INFRINGEMENT.  THERE IS NO PATENT UNTIL

8    JUNE.  NO NOTICE UNTIL DECEMBER 4TH.  YOU KNOW, THERE IS NO

9    EVIDENCE TO -- IN THIS CASE THAT IS ACCEPTABLE FOR PURPOSES

10   OF WILLFUL INFRINGEMENT.

11   THE COURT:  THANK YOU.

12   MR. ALDRICH:  I MEAN, STATE OF MIND OF WHAT?  FIRST

13   OF ALL, THE STATE OF MIND INQUIRY ENDS ON DECEMBER 4, BECAUSE

14   THAT'S THE DATE YOUR HONOR SAID WE DON'T HAVE A WILLFULNESS

15   BASED UPON MY PRIOR REPRESENTATION; SO ANYTHING THAT HAPPENED

16   AFTER DECEMBER 4 IS IRRELEVANT.

17   SO WHAT WE'RE TALKING ABOUT IS WHAT HAPPENED PRIOR

18   TO THEN.  AND, AGAIN, THEY HAVE ZERO EVIDENCE THAT THEY KNEW

19   ABOUT THE PATENT.  THAT'S THE POSITION THAT THEY HAVE TAKEN.

20   THAT'S WHAT THEY HAVE PUT FORWARD.  WE DIDN'T KNOW ABOUT IT.

21   IF THEY DIDN'T KNOW ABOUT IT, THEN HOW ARE THEY RELYING IN

22   GOOD FAITH ON THE KOREAN PROCEEDING WITH A DEFENSE TO

23   ANYTHING.

24   THEY -- IN ORDER TO GET THAT KOREAN PROCEEDING IN,

25   THEY ARE GOING TO HAVE TO ADMIT THAT THEY KNEW ABOUT THE U.S.

COMPUTER-AIDED TRANSCRIPTION

1910

1    UTILITY PATENT, OR HAD AT LEAST HAD A REASONABLE BELIEF THAT

2    THERE WAS ONE.  THEY ARE GOING TO HAVE TO PUT SOMETHING IN TO

3    MAKE IT RELEVANT THAT THEY KNEW ABOUT A KOREAN PROCEEDING.

4    OTHERWISE, IT'S TOTALLY IRRELEVANT TO THEIR STATE OF MIND.

5         THE COURT:  AND BASED ON MY RULINGS, YOUR

6    UNDERSTANDING THAT THE ISSUE OF WILLFULNESS IS ONLY GOING TO

7    BE RELEVANT FROM THE DATE OF THE ISSUE OF THE PATENT UNTIL

8    DECEMBER --

9         MR. ALDRICH:  THE RELEVANT -- THE PERIOD IS FROM THE

10   ISSUANCE OF THE PATENT FORWARD.  THEIR ACTS PRIOR TO THAT DO

11   CONTRIBUTE TO THEIR WILLFUL CONDUCT.  BUT INDEED, THE WINDOW

12   IN WHICH WILLFULNESS COULD OCCUR -- I MEAN, I THINK THERE

13   ACTUALLY IS SOME CASE LAW IT CAN GO A LITTLE BIT FURTHER THAN

14   THAT IF YOU HAVE NOTICE THAT THERE ARE ALLOWED CLAIMS.

15        AND WE HAVE EVIDENCE IN THE RECORD THAT THE CLAIMS

16   HAD BEEN ALLOWED AS OF MARCH.  AND SO IT'S POSSIBLE IT COULD

17   GO BACK FURTHER.  AND I'D HAVE TO LOOK UP THE CASE LAW ON

18   THAT.  BUT CERTAINLY IT ENDS BY DECEMBER 4, 2013.

19        AND THE WINDOW IS A PRECEDING AMOUNT OF TIME,

20   WHETHER IT GOES TO JUNE, BACK TO APRIL, WHEN THEY GOT THIS

21   LETTER FROM KOREA, OR BACK TO MARCH, I'M NOT SURE OF THE

22   ANSWER ON THAT.  I DON'T WANT TO MISREPRESENT THE STATE OF

23   THE CASE LAW ON THAT RIGHT NOW.

24        MR. MARCHESE:  SO THIS IS CRUCIALLY IMPORTANT HERE

25   FROM EXACTLY WHAT MR. ALDRICH SAID PROVES THE POINT.  HOW CAN

1911

1    YOU BE WILLFUL WHEN YOU HAVE NO IDEA ABOUT THE PATENT?  YOU

2    CAN'T.

3                 AND SO -- AND THEN THE STATE INDUSTRY CASE SAYS --

4    IT'S A FEDERAL CIRCUIT CASE, AND WE'VE CITED IT, QUOTED IT.

5    IT SAYS, THERE CAN BE NO WILLFUL INFRINGEMENT WHEN THERE IS

6    NO PATENT.  IN THIS CASE, THERE WAS NO PATENT PRIOR TO JUNE

7    OF 2013.  SO WHATEVER HAPPENED BEFORE THEN IS NOT RELEVANT.

8                 WHEN YOU GET TO THIS PERIOD, THERE IS NO EVIDENCE IN

9    THE RECORD THAT WE EVER HAD NOTICE OF THE PATENT OR ANY KIND

10   OF ACTS THAT OCCURRED DURING THAT PERIOD THAT WOULD BE

11   RELEVANT IN ANY EVENT.

12                SO WHAT WE HAVE HERE IS A PERIOD WHERE THE PATENT

13   EXISTS FOR SIX MONTHS, WHERE WE DON'T KNOW ABOUT IT.  SO HOW

14   CAN WE BE WILLFUL, RECKLESS, BE ACTING LIKE A PIRATE, WHEN WE

15   DON'T EVEN KNOW THAT THIS PATENT IS OUT THERE.  IT MAKES ZERO

16   LOGICAL SENSE.

17                SO WHAT WE END UP WITH IS WE ARRIVE AT DECEMBER 4TH

18   OF 2013, AND WE'VE SWORN OFF WILLFULNESS BY THE PLAINTIFF

19   AFTER THAT POINT; SO WILLFULNESS FOR THE '270 PATENT SHOULD

20   BE OUT OF THIS CASE.

21                BUT FOR WHATEVER REASON, YOU KNOW, IF THE COURT

22   DECIDES -- OBVIOUSLY THAT'S OUT OF OUR CONTROL.  IF THE COURT

23   DECIDES IT'S IN, WE HAVE TO BE ABLE TO DEFEND AGAINST IT.

24   BECAUSE THEY ARE SAYING, WELL, THERE MAY HAVE BEEN SOME

25   EVENTS THAT HAPPENED BACK IN 2012 THAT MIGHT HAVE GIVEN YOU

COMPUTER-AIDED TRANSCRIPTION

1912

1    SOME SORT OF A SIGNAL OR ALERT THAT THERE WOULD BE A PATENT

2    SOME DAY.

3         AND IF THAT'S GOING TO BE ACCEPTED AS THE BASIS FOR

4    WILLFUL INFRINGEMENT, THEN THE MOMENT WE LEARN ABOUT THE

5    PATENT FOR THE VERY FIRST TIME, AND YOU CAN ACTUALLY SEE THE

6    CLAIMS, KNOW WHAT THEY LOOK LIKE, WHEN WE LEARN TWO WEEKS

7    LATER THAT THE VERY SAME PATENT, THE KOREAN VERSION HAS BEEN

8    INVALIDATED, THAT GOES TO THE STATE OF MIND OF THE EXECUTIVES

9    OF THE COMPANY.  AND THAT IS A RELEVANT DEFENSE.

10        THE COURT:  THAT WOULD HAVE BEEN AFTER DECEMBER

11   OF --

12        MR. MARCHESE:  TWO WEEKS AFTER.  SO HE'S SWORN OFF

13   WILLFULNESS BEFORE DECEMBER.  WE HAVEN'T SWORN --

14        MR. ALDRICH:  AFTER --

15        MR. MARCHESE:  CAN I FINISH?

16        MR. ALDRICH:  SORRY.

17        THE COURT:  GO AHEAD.

18        MR. MARCHESE:  YEAH.  THEY HAVE SWORN OFF ANY

19   CONDUCT OR ACTS BY SEIRUS POST-DECEMBER 4TH, 2013 THAT COULD

20   CREATE WILLFULNESS.  WE DIDN'T SWEAR OFF ACTS AFTER THAT THAT

21   COULD SHOW NON-WILLFULNESS.  SO EVEN IF THEY ARE GOING TO SAY

22   THAT THEY CAN'T PROVE WILLFULNESS AFTER THAT DATE, STILL

23   SEIRUS HAS MADE NO REPRESENTATIONS THAT IT SHOULDN'T BE ABLE

24   TO DISPROVE, SHOW IT WAS NONWILFUL BY WHATEVER FACTORS AND

25   EVIDENCE THAT WE CAN PULL TOGETHER HERE TO DEFEND AGAINST

1    THIS.

2         THIS IS A SERIOUS, VERY SERIOUS ALLEGATION THAT

3    COULD LEAD TO ENHANCED DAMAGES, AND SO WE SHOULD BE ABLE TO

4    DEFEND IT AS VIGOROUSLY AS POSSIBLE.

5         MR. ALDRICH:  I BELIEVE I JUST HEARD HIM SAY, EVEN

6    THOUGH WILLFULNESS IS OUT OF THE CASE AFTER DECEMBER 4TH, WE

7    SHOULD BE ABLE TO PUT IN ALL OF OUR EVIDENCE CONCERNING ALL

8    OF OUR GOOD-FAITH ACTS AFTER DECEMBER 4TH.

9         THE COURT:  YEAH.  HE SAID THAT.

10        MR. ALDRICH:  OKAY.

11        MR. MARCHESE:  I DID SAY THAT.  IF IT'S IN.  IF IT'S

12   IN.  IF IT'S NOT IN, WE WON'T PUT IT IN.

13        MR. ALDRICH:  THE WILLFUL ACTS HERE, YOUR HONOR, ARE

14   BURYING YOUR HEAD IN THE SAND WHEN YOU'RE ADVISED.  FIRST OF

15   ALL, THEY HAVE GOT PHOTOGRAPHS THAT SHOW IT'S PATENT PENDING.

16   THEY ARE A SOPHISTICATED PARTY.  THEY HAVE GOT 20 PATENTS OF

17   THEIR OWN, INCLUDING PATENTS AROUND THE WORLD.  THEY HAVE

18   IN-HOUSE LEGAL COUNSEL, THEY HAVE EXTERNAL LEGAL COUNSEL, AND

19   THEY HAVE FOUR OR FIVE LAW FIRMS THAT ARE REPRESENTING THEM

20   ON PATENT MATTERS.

21        AND WHEN THEY GET AN ALARMING E-MAIL FROM KOREA THAT

22   SAYS, HEY, PARAGRAPH 1, THERE IS THIS DESIGN PATENT WE WANT

23   YOU TO KNOW ABOUT, AND PARAGRAPH 2, THERE IS THIS FOTTINGER

24   REFERENCE DEALING WITH TECHNOLOGY ISSUES.  WE KNOW YOU'RE

25   HAVING POTENTIAL -- FOR FUTURE OMNI-HEAT PATENT CONCERNS YOU

1914

1    HAVE, YOU KNOW, WE WANT YOU TO BE AWARE OF THIS FOTTINGER

2    REFERENCE.

3         AND THE REACTION TO THAT IS THAT MS. CHIN FORWARDED

4    THAT TO MR. MURPHY.  MR. MURPHY FORWARDED IT TO MR. EDWARDS.

5    AND MR. MURPHY WROTE BACK TO MS. CHIN AND SAID, HAVE THEY

6    SIGNED THE INDEMNIFICATION AGREEMENT, TO MAKE SURE WE'RE

7    COVERED IN CASE WE GET SUED.  THAT IS WILLFUL BLINDNESS.

8         THE COURT:  WHEN WAS THAT E-MAIL CHAIN?  I DON'T

9    REMEMBER THE DATE.

10        MR. ALDRICH:  THAT WAS APRIL 4, I BELIEVE, 2013.

11        THE COURT:  PRIOR TO THE ISSUANCE OF THE PATENT?

12        MR. ALDRICH:  TWO MONTHS.  AND BY THAT POINT,

13   MR. BLACKFORD TESTIFIED THAT FOUR NOTICES OF ALLOWANCE HAD

14   BEEN GRANTED.  THE '093 PATENT THAT THEY RECEIVED IS IN THE

15   SAME FAMILY AS THE '270 PATENT, AND ANY PATENT SEARCH PULLING

16   UP THE '093 PATENT IS GOING TO FIND THIS PENDING APPLICATION

17   WITH FOUR NOTICES OF ALLOWANCE ON IT FOR THE '270 PATENT.

18        THEY HAVE SENT THE E-MAIL TO MR. EDWARDS, WHO ISN'T

19   HERE TO TESTIFY.  AND BASED ON THAT THEY DECIDED, LET'S PUT

20   OUR HEAD IN THE SAND AND PLOW FORWARD FULL STEAM AHEAD.

21   LET'S GET THIS PRODUCT SHIPPED TO CUSTOMERS.  THAT IS THE

22   TEXTBOOK DEFINITION OF WILLFUL BLINDNESS, ESPECIALLY FOR A

23   SOPHISTICATED PATENT PARTY.

24        THAT'S EXACTLY WHAT GLOBAL TECH --

25        MR. MARCHESE:  GLOBAL TECH IS NOT A WILLFUL

1915

1    INFRINGEMENT CASE.

2            THE COURT:  ON THE ISSUE I NEED TO DECIDE RIGHT NOW,

3    AND THAT IS WHETHER OR NOT THE KOREAN PATENT INFORMATION IS

4    COMING INTO THIS CASE, THAT WOULD HAVE OCCURRED AFTER THE

5    WINDOW THAT I'M GOING TO ALLOW THEM FOR WILLFULNESS

6    ANYWAYS.

7            MR. MARCHESE:  FOR THEM.  FOR THEIR POSITIVE

8    ASSERTION OF WILLFULNESS, NOT FOR A DEFENSE TO WILLFULNESS.

9            THE COURT:  WELL, THE DEFENSE TO WILLFULNESS WOULD

10   HAVE HAD TO HAVE OCCURRED IN THAT SAME WINDOW.

11           MR. MARCHESE:  THAT'S NOT WHAT THE FEDERAL CIRCUIT

12   HAS SAID.

13           THE COURT:  THAT'S WHAT I'M SAYING.

14           MR. MARCHESE:  WELL, YOU KNOW, I WOULD RECOMMEND

15   READING THE BIC -- THE BIC/WINDSURFING INTERNATIONAL CASE.

16   WE CITE IT IN OUR BRIEFING.

17           THE COURT:  I'LL TAKE A LOOK AT IT.  BUT FOR

18   PURPOSES OF WHAT WE NEED TO DECIDE RIGHT NOW, THE ONLY

19   POSSIBLE WINDOW IS FROM JUNE RIGHT NOW, MAYBE GOES BACK UNTIL

20   APRIL, BECAUSE BASED ON SOME THINGS THEY SAID, UNTIL

21   DECEMBER, WHEN THEY SENT THE NOTICE.  THERE IS NO WILLFULNESS

22   AFTER THAT THAT'S BEING ALLEGED.

23           MR. MARCHESE:  THAT'S -- THEY SWORE IT OFF, RIGHT.

24           THE COURT:  CORRECT.

25           MR. MARCHESE:  BUT IT DIDN'T -- THAT REPRESENTATION

COMPUTER-AIDED TRANSCRIPTION

1916

1    BY COUNSEL, WE NEVER MADE THAT REPRESENTATION.  WE NEVER SAID

2    THAT WE -- OH, DON'T WORRY, WE DON'T DEFEND AGAINST

3    WILLFULNESS AFTER WE LEARN OF THE PATENT FOR THE FIRST TIME

4    EVER.

5         WE ARE ALLOWED TO DEFEND BASED ON ALL THE FACTS AND

6    CIRCUMSTANCES TO SHOW THAT WE WERE NONWILLFUL.  AND WHATEVER

7    IT HAPPENS TO BE, WHETHER IT WAS DURING OR AFTER THIS

8    CRITICAL PERIOD, THAT IS NOT RELEVANT FOR THIS PARTICULAR

9    INQUIRY.  WHAT WE NEED TO BE ABLE TO DO IS BE ABLE TO DEFEND.

10        THE COURT:  YEAH, BUT, AGAIN, IF THEY ARE SAYING

11   THERE WAS NO WILLFULNESS AFTER A CERTAIN DATE, AND I INSTRUCT

12   THE JURY, THE ONLY ISSUE IS WHETHER THERE IS ANY WILLFULNESS

13   THAT OCCURRED IN THIS WINDOW OR NOT.  AND YOU MUST BRING YOUR

14   ANSWER TO THIS QUESTION AS IN THIS WINDOW.

15        MR. MARCHESE:  YOU'RE TYING A HAND BEHIND MY BACK

16   THEN IF YOU DO THAT.  BECAUSE I CAN'T SHOW THAT THERE WAS

17   ADDITIONAL INFORMATION THAT WE LEARNED THAT ACTUALLY

18   CONFIRMED ANY BELIEF.

19        THE FIRST BELIEF WE COULD HAVE EVER FORMED WOULD

20   HAVE BEEN ON DECEMBER 4TH OF 2013, THE FIRST TIME THERE IS

21   ANY EVIDENCE WE HAVE A PATENT.  SO WHAT WE DID, WHAT HAPPENED

22   TO US RIGHT THEREAFTER IS HIGHLY RELEVANT TO UNDERSTANDING

23   WHETHER WE HAD ANY KIND OF -- YOU KNOW, WILLFUL BEHAVIOR

24   WHATSOEVER.  IT JUST --

25        THE COURT:  RIGHT.  AGAIN, THE QUESTION IS WHETHER

1917

1    I'M ALLOWING -- AND YOU HAVE TO CONVINCE ME TO ALLOW EVIDENCE

2    OF THE KOREAN PATENT IN AT THIS JUNCTURE ON THE ISSUE OF

3    WILLFULNESS.  YOU HAVE NOT.  IT'S NOT COMING IN.

4            MR. MARCHESE:  SO WE -- YOUR HONOR HAD RULED IN OUR

5    FAVOR ON THE MOTION IN LIMINE PREVIOUSLY, AND WE MADE THE

6    SAME ARGUMENT.

7            THE COURT:  I'M NOT SAYING THAT YOU WERE WRONG ABOUT

8    THAT.  WHAT I TOLD YOU BEFORE IS I NEEDED TO GO BACK AND LOOK

9    AT THE TRANSCRIPT.  I'VE GOT THE TRANSCRIPT AND I JUST

10   HAVEN'T GONE BACK TO SEE WHAT I SAID.

11           I BELIEVE I LEFT EVERYBODY WITH THE IMPRESSION THAT

12   WILLFULNESS WAS COMPLETELY OFF THE TABLE WITH REGARDS TO THE

13   '270 PATENT.  BUT I'LL GO BACK AND LOOK AT MY -- THE

14   LANGUAGE.

15           MR. MARCHESE:  I WOULD SUBMIT THAT IT IS, AND AS A

16   MATTER OF LAW, IT SHOULD BE OFF THE TABLE.

17           THE COURT:  DIFFERENT QUESTION.

18           MR. MARCHESE:  OKAY.  WELL, WE WOULD ASK THE COURT

19   IF, DEPENDING ON WHAT HAPPENS WITH THE RULING ON THIS, THAT

20   WE WOULD -- LOOKS LIKE WE'RE GOING TO SPILL OVER INTO

21   TOMORROW, THAT WE COULD CALL MR. CAREY TO TESTIFY TO THESE

22   POINTS.

23           THE COURT:  IF I CHANGE MY MIND ABOUT THAT ISSUE.

24           MR. MARCHESE:  ARE YOU LEANING TOWARDS GRANTING THE

25   JMOL OR NOT GRANTING THE JMOL?  I'M NOT SURE I'M CLEAR.

1918

1       THE COURT:  WELL, I NEED TO GO BACK.  IF I'VE

2  ALREADY SAID THAT YOU WERE ENTITLED TO A JMOL ON THE ISSUE OF

3  WILLFULNESS BASED ON -- AGAIN, I THINK I MADE IT CLEAR, IT

4  WASN'T BECAUSE THERE WAS A LACK OF EVIDENCE.  IT WAS BASED ON

5  STATEMENTS MADE BY MR. ALDRICH AT THE PRETRIAL CONFERENCE

6  THAT THAT ENDED UP CLOSING THE WINDOW TO WILLFULNESS; THEN

7  I'M GOING TO STAND BY MY RULING, AND THERE WON'T BE ANY

8  FURTHER ARGUMENT OR DISCUSSION ABOUT WILLFULNESS AS REGARDS

9  TO THE '270 PATENT.

10       BUT I DON'T OFF THE TOP OF MY HEAD FEEL COMFORTABLE

11  MAKING THAT STATEMENT WITHOUT HAVING AN OPPORTUNITY TO REVIEW

12  THE LANGUAGE THAT I USED AT THE HALFTIME MOTIONS AND THEN IN

13  OUR DISCUSSION SHORTLY THEREAFTER.

14       MR. MARCHESE:  UNDERSTOOD.

15       THE COURT:  OKAY.

16       MR. ALDRICH:  WE HAD ONE OTHER ISSUE, YOUR HONOR.

17  WE'D LIKE TO MOVE TO STRIKE THE TESTIMONY OF MS. DISTLER WITH

18  RESPECT TO THE ARTICLE OF MANUFACTURE ALLOCATION.

19       WHAT YOUR HONOR HEARD IS THAT SHE ALLOCATED

20  MULTICOMPONENT PRODUCTS TO MULTIPLE COMPONENTS, BUT SHE

21  INCLUDED, AS THOSE COMPONENTS, LABOR.  THE SUPREME COURT HAS

22  SAID THAT LABOR IS NOT A COMPONENT.

23       THE COMPONENTS, ACCORDING TO THE SUPREME COURT, ARE

24  THINGS MADE BY MAN OR MACHINE.  SO LABOR, FREIGHT, DUTY, THE

25  VARIETY OF EXPENSES THAT SHE TESTIFIED TO THAT SHE INCLUDED

1919

1    AS COMPONENTS IN THE GLOVE ARE AS A MATTER OF LAW NOT

2    COMPONENTS, WHICH RENDERS HER OPINION ON ARTICLE OF

3    MANUFACTURE UNSUPPORTABLE AND CONTRARY TO SUPREME COURT

4    OPINION AND INADMISSIBLE.

5            THE COURT:  I HAVE TO THINK ABOUT THAT ONE.  I DON'T

6    KNOW THAT I AGREE WITH YOU ON THAT LEGAL ISSUE, THAT LABOR IS

7    NOT SOMETHING THAT YOU CAN DEDUCT FROM THE VALUE OR -- I

8    GUESS FROM THE VALUE OF AN ARTICLE OF MANUFACTURE.

9            MR. ALDRICH:  RIGHT.  SO WHERE WE ENDED UP WAS ON

10   SOMETHING THAT IS 100 PERCENT, 100 PERCENT HEATWAVE FABRIC,

11   SHE SAYS THAT SHE'S ALLOCATING ONLY 35 PERCENT OF THE PROFIT

12   OF THAT ITEM, OR SOMETIMES 41 PERCENT OF THE PROFIT OF THAT

13   ITEM, TO THE COMPONENT THAT MAKES UP 100 PERCENT OF THE ITEM.

14           AND THAT ANALYSIS SHE SAID IS CONSISTENT WITH THE

15   ANALYSIS SHE DID FOR THE REST OF THE PRODUCTS.  SO IT'S -- I

16   MEAN, IT'S INCONCEIVABLE THAT WHEN YOU SELL AN ITEM THAT IS A

17   100-PERCENT INFRINGING PRODUCT, THAT YOU CAN ALLOCATE IT AND

18   SAY THAT THE PROFIT ISN'T 100 PERCENT; THAT IT'S 35 PERCENT.

19           AND IF THAT'S THE MATH THAT SHE DID THROUGHOUT HER

20   ANALYSIS AS APPLIED TO THE REST OF THE PRODUCTS, THEN THE

21   ANALYSIS IS LEGALLY FLAWED AND SHOULDN'T BE ADMISSIBLE TO THE

22   JURY.

23           THE COURT:  ALL RIGHT.  AGAIN, THAT TESTIMONY HAS

24   ALREADY BEEN RECEIVED.  YOUR MOTION TO STRIKE IS DENIED.  I

25   BELIEVE IT GOES TO THE WEIGHT, NOT THE ADMISSIBILITY.  AND

1920

1    YOU CAN ARGUE DURING CLOSING ARGUMENTS WHY THE ANALYSIS IS

2    FLAWED AND SHOULD NOT BE RELIED UPON.

3           MR. ALDRICH:  OKAY.  THANK YOU, YOUR HONOR.

4           THE COURT:  YOU'RE RESTING?

5           MR. MARCHESE:  SUBJECT TO OUR BRINGING MR. CAREY

6    BACK, YES, YOUR HONOR.

7           THE COURT:  ALL RIGHT.

8           (JURY PRESENT, 1:32 P.M.)

9           THE COURT:  WELCOME BACK.  SORRY FOR THE DELAY.

10          PLEASE BE SEATED.

11          THE DEFENSE HAS RESTED.

12          REBUTTAL FOR THE PLAINTIFF.

13          MS. LEGAARD:  COLUMBIA CALLS DEBRA CRISS.

14          THE CLERK:  PLEASE RAISE YOUR RIGHT HAND.

15        DEBRA CRISS, A WITNESS HAVING BEEN DULY SWORN, TESTIFIED

16      AS FOLLOWS:

17          THE WITNESS:  I DO.

18          THE CLERK:  PLEASE BE SEATED.

19          PLEASE STATE YOUR FIRST AND LAST NAME FOR THE

20    RECORD, SPELLING YOUR LAST NAME.

21          THE WITNESS:  DEBRA CRISS, C-R-I-S-S.

22          THE COURT:  YOU MAY PROCEED.

23                    DIRECT EXAMINATION

24    BY MS. LEGAARD:

25    Q.   GOOD AFTERNOON, MS. CRISS.

1921

1    A.    HI.

2    Q.    WHERE DO YOU WORK?

3    A.    I WORK AT COLUMBIA SPORTSWEAR.

4    Q.    AND WHAT IS YOUR TITLE?

5    A.    I'M THE DESIGN DIRECTOR FOR APPAREL, EQUIPMENT AND

6    ACCESSORIES.

7    Q.    AND WHAT DO YOU DO AS A DIRECTOR OF DESIGN OR APPAREL,

8    EQUIPMENT AND ACCESSORIES?

9    A.    THAT'S A LONG TITLE.  I LEAD A TEAM OF 38, I THINK IT'S

10   38 RIGHT NOW, WITH FOUR DIRECT REPORTS AND FOUR TEAMS.  AND

11   WE BUILD, DESIGN AND WORK WITH MERCHANDISING AND DEVELOPMENT

12   TEAMS TO BUILD THE MAJORITY OF THE PRODUCTS THAT COLUMBIA

13   PRODUCES.  SO WE DESIGN AND WE WORK WITH THE DEVELOPMENT TEAM

14   TO BRING THAT TO MARKET AS WELL.

15   Q.    AND WHAT ARE YOU HERE TO TELL THE JURY ABOUT?

16   A.    I'M HERE TO TALK ABOUT THE DESIGN AND DEVELOPMENT

17   PROCESSES THAT GO INTO BUILDING APPAREL, SPECIFICALLY

18   GLOVES.

19   Q.    SO CAN YOU TELL ME ABOUT YOUR EDUCATION.

20   A.    YEAH.  I WENT TO THE FASHION INSTITUTE OF DESIGN AND

21   MERCHANDISING IN SAN FRANCISCO, AND I GOT A DEGREE IN FASHION

22   DESIGN.  AND I SPECIALIZED IN OUTERWEAR WHILE I WAS IN

23   SCHOOL, PERFORMANCE OUTERWEAR TO BE SPECIFIC.

24   Q.    SO WHY PERFORMANCE OUTERWEAR?

25   A.    I ENJOY THE COMPLEXITY OF IT.  I LIKE SOLVING A PROBLEM

1922

1    AND TRYING TO MAKE PEOPLE MORE COMFORTABLE WHILE DOING THE

2    THINGS THEY ENJOY DOING.

3    Q.    SO WHEN DID YOU START WORKING IN THE OUTDOOR INDUSTRY?

4    A.    I ACTUALLY STARTED WHILE I WAS STILL IN SCHOOL.  I

5    WORKED FULL TIME THROUGH SCHOOL, AND ABOUT HALFWAY THROUGH, I

6    GOT A JOB AT A COMPANY CALLED MARMOT AS AN ASSISTANT

7    DESIGNER.  WAS VERY FORTUNATE TO BE ABLE TO FIND A JOB DURING

8    SCHOOL.

9    Q.    WHAT IS MARMOT?

10   A.    MARMOT IS AN OUTDOOR COMPANY.  AND AT THE TIME, THEY

11   WERE ALSO A MOUNTAINEERING BRAND, SO THEY WOULD BUILD STUFF

12   FOR ICE CLIMBERS, FOR REALLY KIND OF EXTREME ATHLETE-TYPE

13   PEOPLE.  AND NOW THEY CONTINUE TO BUILD SOME OF THAT, BUT

14   THEIR MAIN FOCUS IS GENERAL END-USER OUTDOOR GEAR.

15   Q.    HOW LONG DID YOU WORK AT MARMOT?

16   A.    JUST ABOUT TWO YEARS I BELIEVE.  IT WAS A WHILE AGO.

17   Q.    ALL RIGHT.  AND WHAT DID YOU DO THERE?

18   A.    I WAS THE ASSISTANT DESIGNER FOR THE FIRST -- ABOUT THE

19   FIRST HALF, AND I DID SOME DESIGN WORK.  I ALSO DID SOME

20   PRODUCT DEVELOPMENT WORK, WHICH MEANS I WOULD HELP THE

21   DESIGNER IN COMMUNICATING WHAT THEY WANT TO THE FACTORY.

22           AND I DID SOME MATERIALS RESEARCH, WHICH MEANS I

23   WOULD KIND OF DIG THROUGH ALL THE FABRICS THAT VENDORS WOULD

24   SEND TO US AND CHOOSE WHAT WE'RE GOING TO USE IN A PRODUCT.

25   AND I ALSO DID SOME TRENDS DEVELOPMENT.

COMPUTER-AIDED TRANSCRIPTION

1    Q.    OKAY.  AND WHERE DID YOU GO AFTER YOU LEFT MARMOT?

2    A.    WELL, VERY BRIEFLY I WORKED IN A VERY SMALL COMPANY THAT

3    I HELPED MY FRIEND START, SO THAT WAS ONLY ABOUT SIX OR EIGHT

4    MONTHS.  BUT AFTER THAT, I WENT TO A COMPANY CALLED SPYDER.

5    Q.    WHAT IS SPYDER?

6    A.    SPYDER IS -- THEY ARE A HIGH-END SKI WEAR BRAND.  YOU

7    MAY HAVE SEEN THEM ON ATHLETES IN DOWNHILL SKI COMPETITIONS;

8    SO THEY MAKE SKI SUITS FOR ATHLETES.  THEY ALSO MAKE JACKETS,

9    PANTS AND GLOVES.

10   Q.    AND WHAT DID YOU DO FOR SPYDER?

11   A.    I STARTED THERE AS A PRODUCT DEVELOPER.  SO I WENT IN

12   AND DID PRODUCT DEVELOPMENT FOR JACKETS, PANTS, GLOVES, AS

13   WELL AS SOME KIDS' STUFF.

14         AND A PRODUCT DEVELOPER IS -- LIKE I SAID, THEY ARE

15   KIND OF THE ENGINEER, THEY ARE THE ENGINEERING PART OF

16   PRODUCT CREATION.  AND SO THEY WILL TAKE THE DESIGN AND THE

17   VARIOUS SPECS OF THE DESIGN WHEN WE GET THEM AND EXPAND ON

18   THAT.  THEY WILL BUILD WHAT'S CALLED THE BILL OF MATERIALS.

19   THEY WILL BUILD A TECH PACK THAT HAS A LOT OF TECHNICAL

20   SKETCHES IN IT, THAT JUST TELLS THE FACTORY HOW TO CONSTRUCT

21   WHAT WE'RE TRYING TO BUILD.

22   Q.    AND HOW LONG WERE YOU AT SPYDER?

23   A.    JUST ABOUT FIVE YEARS, A LITTLE LESS.

24   Q.    AND WHERE DID YOU GO NEXT?

25   A.    LANDS END.

1924

1    Q.    AND WHAT DID YOU DO FOR LANDS END?

2    A.    I WAS A DESIGNER.  I WAS ALSO A DESIGNER AT SPYDER AFTER

3    I WAS A PRODUCT DEVELOPER.  SO THAT I DIDN'T GET THROUGH,

4    BUT...

5    Q.    AND THEN AFTER LANDS END, WHERE DID YOU GO?

6    A.    I WENT TO COLUMBIA.

7    Q.    AND WHAT DID YOU DO FOR COLUMBIA, OR WHAT HAVE YOU DONE

8    FOR COLUMBIA?

9    A.    I STARTED OUT AS A SENIOR DESIGNER, SO I WENT IN THE

10   DOOR AS A SENIOR DESIGNER, AND I WORKED ON, AGAIN, JACKETS,

11   PANTS, GLOVES.  AND MOST OF THAT VERY -- THE

12   HIGHER-PERFORMANCE-LEVEL PRODUCTS.  SO WATERPROOF,

13   BREATHABLE, INSULATED; AND ESPECIALLY SKI PRODUCT, SO COLD

14   WEATHER.  AND SO I WAS ONE OF THE MAIN DESIGNERS FOR THAT

15   TYPE OF PRODUCT.

16         AFTER THAT, I WAS PROMOTED TO LEAD DESIGNER FOR

17   OUTERWEAR, SO I ALSO HAD A SMALL TEAM.  SO I HAD A TEAM OF

18   ABOUT FOUR PEOPLE WHO DID ESSENTIALLY THE SAME THING.  SO I

19   WOULD KIND OF OVERSEE THEM AND HELP MENTOR THEM ON DOING THE

20   EXACT SAME JOB.

21         AND THEN A COUPLE OF YEARS LATER, A YEAR, COUPLE

22   YEARS LATER, I WAS PROMOTED TO DESIGN DIRECTOR.

23   Q.    SO HOW BIG IS YOUR TEAM NOW?

24   A.    CLOSE TO 40.  I DO A LITTLE BIT LESS DESIGN THESE

25   DAYS.

1925

1    Q.    DO YOU STILL DO DESIGN?

2    A.    I DO.  I DO.  NOWHERE NEAR AS MUCH AS I USED TO.  IT

3    DEPENDS ON THE SEASON.  SOMETIMES I WILL HANDLE MORE THAN

4    USUAL.  THIS LAST SEASON I HANDLED MORE THAN I NORMALLY DO.

5    USUALLY I'LL JUMP IN IF THERE IS SOMETHING THAT NEEDS MORE

6    BABY-SITTING, IF THERE IS SOMETHING THAT'S CONFIDENTIAL OR

7    THE TECHNOLOGY IS DIFFICULT TO WORK WITH.

8    Q.    OKAY.  SO OVER THE YEARS, HAVE YOU BEEN INVOLVED IN THE

9    CREATION OF A LOT OF GLOVES?

10   A.    UH-HUH.  I WOULD SAY SO.

11   Q.    FOR HOW MANY DIFFERENT COMPANIES?

12   A.    ALL FOUR OF THEM BUILT GLOVES.

13   Q.    SO BASED ON THAT EXPERIENCE, IS THE WAY THAT COLUMBIA

14   DESIGNS AND BUILDS GLOVES BASICALLY THE SAME AS THE WAY OTHER

15   COMPANIES DO IT?

16   A.    YEAH.  ESSENTIALLY.

17   Q.    SO COULD YOU GIVE US AN OVERVIEW OF HOW COLUMBIA BRINGS

18   A NEW PRODUCT, LIKE A GLOVE, TO MARKET.

19   A.    SURE.  IN A VERY KIND OF BROAD SENSE.  THE PROCESS

20   STARTS WITH WHAT'S CALLED A MERCHANDISER.  AND THE

21   MERCHANDISER, THEIR MAIN JOB IS TO EVALUATE THE MARKET,

22   UNDERSTAND WHAT IS OUT ON THE MARKET, WHAT'S MISSING FROM THE

23   MARKET AND WHAT OTHER COMPETITORS ARE BUILDING.

24          AND THEY WILL IDENTIFY A HOLE IN THE MARKET OR A

25   NEED.  AND THAT COULD BE SOMETHING THAT NO ONE IS MAKING,

1926

1   SOMETHING THAT WE ARE NOT MAKING AS A BRAND OR A PROBLEM THAT

2   HAS NOT YET BEEN SOLVED BY -- FOR THE CONSUMER.

3        THEN THEY WILL BUILD WHAT'S CALLED A BRIEF THAT WILL

4   EXPLAIN ALL OF THAT INFORMATION.  IT WILL EXPLAIN WHAT

5   TECHNOLOGIES WE MIGHT WANT TO INCLUDE, WHAT TYPES OF FEATURES

6   WE WANT.  AND THEY WILL PUT THIS INTO A BRIEF, AND THAT'S

7   WHERE THE DESIGNER GETS BROUGHT IN.

8        THE DESIGNER GETS THAT BRIEF, TAKES ALL THAT

9   INFORMATION, DOES THEIR OWN MARKET RESEARCH TO VALIDATE

10  WHAT'S BEEN TOLD TO THEM, AND THEN WE'LL BUILD THE AESTHETIC.

11  AND DEPENDING ON THE COMPLEXITY OF THE PRODUCT, WE'LL ALSO

12  KIND OF BUILD IN WHAT THE PRODUCT SHOULD DO AND HOW IT SHOULD

13  DO IT.

14       AT THAT POINT, WE'LL START TO BRING IN THE PRODUCT

15  DEVELOPMENT TEAM, AND THE PRODUCT DEVELOPMENT TEAM JUST GOES

16  ANOTHER STEP BEYOND THAT, AND TAKES THE INFORMATION GIVEN TO

17  THEM BY THE DESIGNER, BUILDS IT OUT MORE, ADDS MORE

18  INFORMATION, ADDS MORE DETAIL, BUILDS THE BILL OF MATERIALS,

19  AND THEN BEGINS THE CONVERSATION WITH THE FACTORY.

20       THE FACTORY THEN TAKES ALL THAT INFORMATION, BUILDS

21  OUT A PATTERN, BUILDS OUT A PRODUCT, AND A FEW WEEKS LATER,

22  WE GET A SAMPLE BACK.  THE ENTIRE TEAM -- MERCHANDISER,

23  DESIGN, PRODUCT DEVELOPMENT -- WILL ALL EVALUATE, MAKE SURE

24  IT'S CORRECT, MAKE SURE IT'S DOING WHAT WE WANT IT TO DO,

25  MAKE SURE IT FITS.

1927

1    AND THEN THAT PROCESS WILL BE REPEATED AS MANY TIMES

2    AS IT NEEDS TO BE UNTIL THE PRODUCT IS READY.  AND THEN

3    HOPEFULLY IT GETS ADOPTED AND HOPEFULLY WE SELL A BUNCH OF

4    IT.

5    Q.   ALL RIGHT.  SO WERE YOU HERE IN THE COURTROOM EARLIER

6    WHEN MS. DISTLER TESTIFIED?

7    A.   YES, I WAS.

8    Q.   DID YOU HEAR HER TESTIFY THAT COLUMBIA RECEIVES FABRIC

9    IN A ROLL?

10   A.   I DID.  THAT COLUMBIA RECEIVES?  SORRY.

11   Q.   YEAH.

12   A.   YEAH, I DID HEAR THAT.

13   Q.   IS THAT ACCURATE?

14   A.   NOT THAT I'M AWARE OF, NO.

15   Q.   SO DOES COLUMBIA BUY FABRIC?

16   A.   NO, NOT THAT I'M AWARE OF.

17   Q.   SO WHO BUYS THE FABRIC?

18   A.   THE FACTORY WILL.

19   Q.   WHAT DOES COLUMBIA BUY?

20   A.   WE PURCHASE THE FINISHED GOODS.  SO THE FACTORY IS

21   CALLED THE FINISHED GOODS VENDOR, AND WE PURCHASE FINISHED

22   GOODS FROM THEM.

23   Q.   DOES COLUMBIA SELL FABRIC?

24   A.   NO, NOT THAT I'M AWARE OF.

25   Q.   TO THE BEST OF YOUR KNOWLEDGE, DOES SEIRUS SELL

COMPUTER-AIDED TRANSCRIPTION

1    FABRIC?

2    A.    NOT THAT I'M AWARE OF.

3    Q.    OKAY.  HAD YOU HEARD OF SEIRUS BEFORE YOU WERE ASKED TO

4    TESTIFY AT THIS TRIAL?

5    A.    YES.

6    Q.    HAVE YOU ENCOUNTERED THEM IN THE INDUSTRY THROUGH THE

7    YEARS?

8    A.    YEAH.  HERE AND THERE.

9    Q.    HAVE YOU INSPECTED ANY SEIRUS PRODUCTS?

10    A.    A FEW.

11    Q.    OKAY.  AND THEN AS THE HEAD OF DESIGN AT COLUMBIA, DO

12    YOU PARTICIPATE IN THE DECISION TO PUT OMNI-HEAT REFLECTIVE

13    LINING IN A GLOVE?

14    A.    YES, I DO.

15              MS. LEGAARD:  MAY I APPROACH, YOUR HONOR?

16              THE COURT:  SURE.

17    Q.    BY MS. LEGAARD:  I'M GOING TO HAND YOU WHAT'S ALREADY

18    BEEN RECEIVED, EXHIBIT 707.

19              SO IS THAT A COLUMBIA SKI GLOVE WITH OMNI-HEAT

20    LINING?

21    A.    YES, IT IS.

22    Q.    SO WHY DOES COLUMBIA SPORTSWEAR USE OMNI-HEAT REFLECTIVE

23    AS A GLOVE LINER IN A PRODUCT LIKE THAT?

24    A.    WELL, FIRST OF ALL, IT WORKS VERY WELL TO HELP INCREASE

25    THE WARMTH OF THE GARMENT.  IT'S UNIQUE TO COLUMBIA.  IT'S

1929

```
1    SOMETHING THAT WE CAN OFFER THAT GENERALLY OTHER BRANDS
2    CAN'T.  AND IT'S VISIBLE.  WE'RE -- ONE OF OUR KIND OF
3    MANTRAS IS VISIBLY DISRUPTIVE TECHNOLOGY, AND THAT'S WHAT WE
4    CONSIDER THIS TO BE.
5    Q.   BY "VISIBLE," DO YOU MEAN IT'S VISIBLE TO PURCHASERS?
6    A.   YEAH.  ABSOLUTELY.
7    Q.   SO SWITCHING GEARS A LITTLE BIT.
8         TWO DAYS AGO, OR I GUESS THE DAY BEFORE YESTERDAY,
9    YOU WERE DEPOSED; RIGHT?
10   A.   YES.
11   Q.   AND SO A LAWYER FOR SEIRUS -- DID A LAWYER FOR SEIRUS
12   ASK YOU SOME QUESTIONS?
13   A.   YES.
14   Q.   AND DID THAT LAWYER ASK YOU ABOUT THE WORD "SINGLE
15   COMPONENT" AND "MULTICOMPONENT"?
16   A.   YEAH.
17   Q.   DID YOU KNOW WHAT HE MEANT?
18   A.   NOT ESPECIALLY, NO.  NOT IN A LEGAL TERM.  THAT DIDN'T
19   MAKE ANY SENSE.
20   Q.   DID HE TELL YOU WHAT HE MEANT?
21   A.   NO.
22   Q.   OKAY.
23   A.   I DON'T BELIEVE.
24        MS. LEGAARD:  MAY I APPROACH, YOUR HONOR?
25        THE COURT:  SURE.
```

COMPUTER-AIDED TRANSCRIPTION

1930

1    Q.    BY MS. LEGAARD:   NOW, I'M GOING TO HAND YOU EXHIBIT 736.

2          DO YOU SEE THE WORD "COMPONENT" ON THAT BOX?

3    A.    YES, I DO.

4    Q.    OKAY.  DO YOU WANT TO OPEN THE BOX AND TAKE THE PRODUCT

5    OUT.

6    A.    I THINK THAT'S EVERYTHING.  OKAY.

7    Q.    CAN YOU JUST BRIEFLY DESCRIBE THAT PRODUCT.

8    A.    YEAH.  THIS IS WHAT WE REFER TO AS A COMPONENT GLOVE,

9    WHICH MEANS IT'S GOT TWO PIECES.  THERE IS AN INNER LINER AND

10   THEN THERE IS AN EXTERIOR SHELL.  THEY CAN BE WORN

11   INDEPENDENTLY AND THEY CAN BE WORN TOGETHER.

12   Q.    AND SO WHAT DO YOU UNDERSTAND THE WORD "COMPONENT" ON

13   THE BOX TO BE REFERRING TO?

14   A.    JUST THAT, THAT IT'S A MULTIPLE-PIECE GLOVE, THAT IT HAS

15   AN INNER LINER AND AN EXTERIOR SHELL.

16   Q.    OKAY.  DOES THE USE OF THE WORD "COMPONENT" TO DESCRIBE

17   EACH OF THOSE FOUR GLOVES MAKE SENSE TO YOU?

18   A.    YEAH.  YES.

19   Q.    SO NOW I'M GOING TO HAND YOU EXHIBIT 222.1 AND EXHIBIT

20   220.2.

21          SO LOOKING AT 220.1, THAT SKI GLOVE?

22   A.    THE SKI GLOVE.  OKAY.

23   Q.    YEAH.  WOULD YOU CALL THE BUCKLE ON THAT GLOVE A

24   COMPONENT?

25   A.    NO.  NO.

1    Q.    WHAT WOULD YOU CALL IT?

2    A.    WELL, CURRENTLY I WOULD CALL IT A TRIM.  BUT BEFORE

3    ASSEMBLING IT, WE WOULD CALL IT RAW MATERIAL.

4    Q.    WHY WOULDN'T YOU CALL IT A COMPONENT?

5    A.    WELL, AS I JUST DESCRIBED, IN THE APPAREL INDUSTRY, A

6    COMPONENT IS AN ARTICLE OF CLOTHING THAT COMES WITH MULTIPLE

7    PIECES THAT ARE SEPARATABLE.

8    Q.    OKAY.  SO CAN YOU LOOK AT 220.3.

9    A.    UH-HUH.

10    Q.    ALL RIGHT.  WOULD YOU CALL THE THREAD THAT'S USED TO

11    MAKE THAT GLOVE A COMPONENT OF THE GLOVE?

12    A.    NO.

13    Q.    WHY NOT?

14    A.    BECAUSE YOU DON'T HAVE A GLOVE IF YOU TAKE THE THREAD

15    OUT.

16    Q.    FAIR ENOUGH.

17          SO AS I UNDERSTAND THIS TERM FROM YOUR EXPERIENCE IN

18    THE APPAREL INDUSTRY, WOULD YOU CALL THAT SILVER GLOVE A

19    MULTICOMPONENT PRODUCT?

20    A.    OH, NO.  HUH-UH.

21    Q.    WHY NOT?

22    A.    BECAUSE THERE IS ONE COMPONENT.

23    Q.    AND SO LOOKING AT THE SKI GLOVE, 222.1 --

24    A.    YES.

25    Q.    -- SAME QUESTION.  WOULD YOU CALL THAT A MULTICOMPONENT

1932

1    PRODUCT?

2    A.    NO.

3    Q.    SO SHIFTING GEARS SLIGHTLY.  GOING TO THE BACK TO THAT

4    LINER GLOVE.

5    A.    UH-HUH.

6    Q.    THE -- I'M SORRY.  THE SILVER GLOVE.

7    A.    LOT OF GLOVES.

8    Q.    HOW VISUALLY PROMINENT WOULD YOU SAY THE PATTERN IS, THE

9    DESIGN IS ON THAT GLOVE?

10    A.    IT'S THE GLOVE.  IT'S THE WHOLE GLOVE.

11    Q.    AND LOOKING AT THE SKI GLOVE --

12    A.    UH-HUH.

13    Q.    -- HOW PROMINENT WOULD YOU SAY THE DESIGN IS VISUALLY ON

14    THAT GLOVE?

15    A.    IT'S STILL PRETTY PROMINENT.  IT'S A BLACK GLOVE, SILVER

16    FLASH SO -- AND THEN I MEAN, EVEN THE HANG TAG ALSO CALLS

17    YOUR ATTENTION TO IT, SO...

18    Q.    SO DO YOU THINK THAT WOULD BE PROMINENT -- DO YOU THINK

19    THAT WOULD BE VISIBLE TO A CONSUMER SHOPPING FOR GLOVES?

20    A.    SURE.  IF YOU GO INTO LIKE AN R.E.I. OR SOMETHING, THERE

21    IS THE WALL OF GLOVES, THE WALL OF BLACK GLOVES.  MOST GLOVES

22    COME IN BLACK.  MOST DON'T COME IN A LOT OF COLORS.

23           AND PART OF THE REASON WHY COLUMBIA USES A SILVER

24    LINING IS THAT IT -- YOU CAN SEE IT IN THAT WALL OF BLACK

25    GLOVES.  AND SO I STILL THINK THAT THIS IS RATHER PROMINENT.

1933

1   Q.   ARE THERE OTHER FEATURES ON THAT GLOVE, LIKE DIFFERENT

2   MATERIALS?

3   A.   OH, SURE.   YEAH.

4   Q.   ARE THEY VISUALLY DISTINCTIVE?

5   A.   VISUALLY, NO.   THEY ARE ALL BLACK.

6   Q.   OKAY.   SO IN YOUR EXPERIENCE, IS THE LINING OF THAT KIND

7   OF SKI GLOVE DISTINCT FROM THE REST OF THE GLOVE?

8   A.   NO.   NO.   NO.   IT'S PART OF THE GLOVE.

9   Q.   OKAY.   CAN THE LINER BE SEPARATED FROM THE GLOVE?

10  A.   NOT WITHOUT JUST -- NOT WITHOUT PARTLY DESTROYING THE

11  GLOVE.

12  Q.   OKAY.   IN YOUR EXPERIENCE, DO CONSUMERS REPLACE THE

13  LINING IN A GLOVE LIKE THAT?

14  A.   I'VE NEVER HEARD OF IT, NO.   NO.   IT'S -- IT'S NOT

15  REALLY MEANT TO BE REPLACED.   IF IT WERE MEANT TO BE

16  REPLACED, I THINK THEY WOULD MAKE IT REMOVABLE.

17       IF YOU THINK ABOUT YOUR CAR, AND IF THE HEADLIGHT

18  WERE TO GO OUT, THERE IS A COMPARTMENT IN YOUR CAR, YOU OPEN

19  THE COMPARTMENT, YOU TAKE THE OLD HEADLIGHT OUT, YOU PUT THE

20  NEW HEADLIGHT IN, YOU CLOSE THE COMPARTMENT AND YOUR CAR IS

21  IN THE SAME SHAPE IT WAS BEFORE.

22       WITH SOMETHING LIKE THIS, IT WOULDN'T BE THE SAME.

23  YOU WOULD HAVE TO CUT THE LINING OUT AND THE GLOVE WOULD NO

24  LONGER BE IN THE SAME SHAPE THAT IT IS.

25  Q.   SO CAN ANY PART OF THAT GLOVE BE REMOVED WITHOUT THE USE

1934

1    OF SCISSORS?

2    A.    I DON'T -- NO, HUH-UH.

3    Q.    EVEN THE BUCKLES, WOULD YOU HAVE TO CUT THEM OFF?

4    A.    YES, YOU WOULD.

5    Q.    OKAY.  SO I HAVE A LAST SET OF QUESTIONS.

6          AT COLUMBIA SPORTSWEAR, IS IT OKAY TO COPY

7    COMPETITOR PRODUCTS?

8    A.    NO.  NO.  NO.  ABSOLUTELY NOT.  IT'S NOT ONLY

9    INAPPROPRIATE FROM A CORPORATE LEVEL, IT'S A PERSONAL POLICY

10   I HAVE WITH MY TEAM AND WITH THE PEOPLE THAT I HIRE.  IT'S

11   NOT.  IT'S NOT ACCEPTABLE.  IT'S NOT WHY WE DO WHAT WE DO.

12   Q.    WAS IT OKAY TO COPY AT SPYDER?

13   A.    NO.

14   Q.    WAS IT OKAY TO COPY AT MARMOT?

15   A.    NO.  LIKE I SAID, IT'S ALSO PERSONAL POLICY.  SO I DO MY

16   BEST TO AVOID WORKING FOR THOSE KINDS OF COMPANIES.

17          MS. LEGAARD:  THANK YOU.  I HAVE NO FURTHER

18   QUESTIONS.

19          THE COURT:  CROSS-EXAMINE.

20                      CROSS-EXAMINATION

21   BY MS. ROTHAUGE:

22   Q.    GOOD AFTERNOON.

23   A.    GOOD AFTERNOON.

24   Q.    HOW LONG HAVE YOU BEEN AT COLUMBIA?

25   A.    JUST ABOUT SEVEN YEARS, SIX AND A HALF, SEVEN YEARS.

COMPUTER-AIDED TRANSCRIPTION

1935

1    Q.    DURING THAT TIME, YOU'VE BEEN INVOLVED WITH COLUMBIA'S

2    NEW TECHNOLOGIES; IS THAT RIGHT?

3    A.    THAT'S CORRECT.

4    Q.    SO YOU ARE FAMILIAR WITH OUTDRY?

5    A.    I AM.

6    Q.    WHAT IS OUTDRY?

7    A.    OUTDRY OR OUTDRY EXTREME?

8    Q.    EITHER.

9    A.    OUTDRY EXTREME I'M FAMILIAR WITH.

10          OUTDRY EXTREME IS AN EXTERNAL MEMBRANE.  SO A NORMAL

11   WATERPROOF FABRIC HAS A MEMBRANE ON THE BACK SIDE OF IT.

12   WITH OUTDRY EXTREME, THAT MEMBRANE HAS BEEN MOVED TO THE

13   OUTSIDE OF THE FABRIC, SO THAT YOU DON'T EXPERIENCE WHAT'S

14   CALLED WET-OUT ON THE OUTSIDE OF YOUR FABRIC.  YOU DON'T HAVE

15   TO HAVE WHAT'S CALLED A DWR, WHICH IS ANOTHER COATING THAT

16   GOES ON THE OUTSIDE OF THE FABRIC.  AND YOU JUST GET BETTER

17   WATERPROOFNESS AND GENERALLY BETTER BREATHABILITY AS WELL.

18   Q.    AND SO YOU'VE WORKED WITH OUTDRY EXTREME AS WELL AS

19   OMNI-HEAT WHILE YOU'VE BEEN AT COLUMBIA; CORRECT?

20   A.    I HAVE, YES.

21   Q.    SO YOU'VE OFFERED SOME LAY OPINION TESTIMONY HERE TODAY,

22   SO I'D LIKE TO EXPLORE HOW YOU GOT TO THOSE OPINIONS.

23   A.    SURE.

24   Q.    SO LET'S BEGIN WITH -- YOU SAID THAT YOU HAVE INSPECTED

25   SOME SEIRUS GLOVES.  DID I HEAR THAT RIGHT?

1936

1   A.   YES.

2   Q.   AND WHEN WAS THE FIRST TIME THAT YOU INSPECTED SEIRUS

3   GLOVES IN CONNECTION WITH GIVING TESTIMONY HERE TODAY?

4   A.   IT WAS ABOUT TWO WEEKS AGO.   SOMEWHERE IN THERE.

5   Q.   WOULD THAT --

6   A.   ABOUT A WEEK AND A HALF AGO, TWO WEEKS AGO, I THINK.

7   Q.   SEPTEMBER 11TH, DOES THAT SOUND CORRECT?

8   A.   IN THAT NEIGHBORHOOD, YEAH.

9   Q.   SO ON SEPTEMBER 11TH, YOU INSPECTED FOR THE FIRST TIME

10  SEIRUS GLOVES FOR THIS CASE; RIGHT?

11  A.   CORRECT.

12  Q.   HOW DID YOU SELECT THE GLOVES?

13  A.   I HAD -- THEY WERE ALREADY AVAILABLE IN THE OFFICE.

14  Q.   THEY WERE ALREADY AVAILABLE --

15  A.   CORRECT.

16  Q.   -- FOR YOU?

17  A.   YES.

18  Q.   WHERE DID YOU HAVE A MEETING TO LOOK AT THEM?

19  A.   I DIDN'T HAVE A MEETING TO LOOK AT THE GLOVES.   I HAD A

20  MEETING TO DISCUSS WHY I WAS GOING TO BE HERE, AND THE GLOVES

21  WERE THERE.

22  Q.   SO WHERE WAS THIS MEETING?

23  A.   IT WAS AT THE COLUMBIA OFFICE.

24  Q.   SO YOU WERE AT WORK, AND YOU WENT TO A MEETING AND THERE

25  WERE GLOVES FOR YOU TO LOOK AT AT THAT MEETING?

1937

1    A.   CORRECT.  THEY WERE MOSTLY COLUMBIA GLOVES THAT WE WERE

2    LOOKING AT, AND THEN THERE WAS A SEIRUS GLOVE THERE AS

3    WELL.

4    Q.   SO YOU SAW ONE SEIRUS GLOVE DURING THAT MEETING?

5    A.   YEAH.  I THINK THERE WAS ONE SEIRUS GLOVE.

6    Q.   AND WHO ELSE WAS AT THIS MEETING?

7    A.   UM, THAT WAS BRENNA LEGAARD, MS. LEGAARD.  WHO WAS THE

8    MAIN PERSON I WAS WORKING WITH IN THE ROOM?

9    Q.   NO.  I'M JUST -- SO --

10        THE REPORTER:  WAIT.   START OVER.

11   Q.   BY MS. ROTHAUGE:  WHO WAS AT THE MEETING WHERE YOU

12   INSPECTED THE GLOVE ON SEPTEMBER 11TH?

13   A.   I WAS WORKING WITH BRENNA LEGAARD.  AND IN THE ROOM AS

14   WELL, WAS ADAM KELLY, JOHN MOTLEY, AND I BELIEVE

15   MR. ALDRICH.

16   Q.   SO THEY WERE ALL ATTORNEYS?

17   A.   I THINK.  YEAH, I GUESS SO.

18   Q.   AND THE ATTORNEYS HAD BROUGHT A GLOVE FOR YOU TO

19   INSPECT?

20   A.   THERE WAS A PILE OF GLOVES ON THE TABLE.

21   Q.   AND THEY BROUGHT -- SO THE ATTORNEYS SELECTED FOR YOU A

22   SEIRUS GLOVE TO INSPECT?

23   A.   THEY DIDN'T SELECT A GLOVE FOR ME, NO.

24   Q.   WELL, YOU SAID THAT WAS THE FIRST TIME YOU SAW A GLOVE,

25   SO I'M JUST TRYING --

COMPUTER-AIDED TRANSCRIPTION

1938

1   A.   THAT'S CORRECT.  THEY WERE ALL IN THE MEETING.  THEY

2   WERE IN THE ROOM.  AND WE WERE TALKING ABOUT GLOVES.  SO I

3   PICKED UP A COLUMBIA GLOVE, I PICKED UP A SEIRUS GLOVE AS

4   WELL, BECAUSE I HAD NEVER -- I HAD NEVER ACTUALLY SEEN THE

5   HEATWAVE IN PERSON, SO...

6   Q.   THIS WAS THE FIRST TIME YOU HAD EVER SEEN A SEIRUS GLOVE

7   AT THIS MEETING TWO WEEKS AGO?

8   A.   NO.  IT WASN'T THE FIRST TIME I HAD EVER SEEN A SEIRUS

9   GLOVE.  IT WAS THE FIRST TIME I HAD SEEN HEATWAVE IN

10  PERSON.

11  Q.   SO IT WAS -- THE FIRST TIME YOU HAD EVER SEEN A HEATWAVE

12  SEIRUS GLOVE WAS TWO WEEKS AGO?

13  A.   CORRECT.

14  Q.   WERE YOU GIVEN INFORMATION ABOUT THE DEVELOPMENT PROCESS

15  AT SEIRUS DURING THIS MEETING?

16  A.   NO.

17  Q.   WERE YOU GIVEN ANY OF THE PRODUCTION SPECIFICATIONS THAT

18  YOU'VE BEEN SEEING IN TRIAL HERE TODAY, DURING THAT

19  MEETING?

20  A.   NO.

21  Q.   WERE YOU GIVEN ANYTHING OTHER THAN THIS ONE GLOVE DURING

22  THIS MEETING ON SEPTEMBER 11TH?

23  A.   NO.

24  Q.   DID YOU EVER ASK TO SEE ANY OF THE DESIGN OR DEVELOPMENT

25  INFORMATION FOR SEIRUS BETWEEN THE SEPTEMBER 11TH MEETING AND

1    TODAY?

2    A.    NO.

3    Q.    YOU SAID THAT -- SO YOU DON'T REALLY KNOW ANYTHING ABOUT

4    HOW SEIRUS DEVELOPS AND DESIGNS THEIR HEATWAVE GLOVES; IS

5    THAT RIGHT?

6    A.    NO.  I'M HERE SPEAKING IN GENERALITIES ABOUT MY

7    EXPERIENCE WITH GLOVES.

8    Q.    MY QUESTION WAS DIFFERENT.  YOU DON'T KNOW ANYTHING

9    ABOUT HOW SEIRUS DESIGNS AND DEVELOPS ITS HEATWAVE GLOVES, DO

10   YOU?

11   A.    THAT'S CORRECT.

12   Q.    IN FACT, MR. MURPHY, YOU WOULD DEFER TO MR. MURPHY,

13   BECAUSE HE WOULD HAVE MORE INFORMATION ABOUT THAT; IS THAT

14   RIGHT?

15   A.    I SUPPOSE.

16   Q.    WELL, YOU HEARD HIM TESTIFY YESTERDAY.  DID YOU HEAR HIM

17   TESTIFY YESTERDAY?

18   A.    I DID, YEAH.

19   Q.    AND YOU UNDERSTAND HE'S IN CHARGE OF MAKING THE HEATWAVE

20   GLOVES AT SEIRUS?

21   A.    I DO, YEAH.

22   Q.    SO YOU WOULD DEFER TO HIS KNOWLEDGE ABOUT HOW THOSE

23   GLOVES ARE MADE; RIGHT?

24   A.    ABOUT A SPECIFIC COMPANY, YES, I WOULD REFER TO THE

25   PERSON WHO WORKS THERE.

1940

1    Q.    YOU'RE HERE TELLING US ABOUT GENERALIZED KNOWLEDGE BASED

2    ON YOUR PAST EXPERIENCE; IS THAT RIGHT?

3    A.    CORRECT.  IN FOUR DIFFERENT COMPANIES, YEAH.

4    Q.    AND LET'S TALK ABOUT THOSE FOUR DIFFERENT COMPANIES,

5    BECAUSE THOSE ARE ALL LIKE BILLION-DOLLAR COMPANIES; RIGHT?

6    A.    I DON'T KNOW FOR CERTAIN IF SPYDER OR MARMOT ARE

7    BILLION-DOLLAR COMPANIES.  THEY MIGHT NOT.  I'M NOT SURE.

8    THE OTHER TWO, YES.

9    Q.    WELL, THEY ARE OWNED BY APEX, WHICH I THINK IS A

10   12-BILLION-DOLLAR COMPANY.  DOES THAT SOUND FAMILIAR?

11   A.    I SUPPOSE APEX IS, YEAH.  I DON'T KNOW.

12   Q.    SO YOU'VE GOT A LOT OF EXPERIENCE WITH REALLY BIG,

13   BILLION-DOLLAR COMPANIES; RIGHT?

14   A.    SURE.  YES.

15   Q.    BUT YOU DON'T HAVE ANY EXPERIENCE WITH SEIRUS; RIGHT?

16   A.    WITH SEIRUS, NO, I DON'T.

17   Q.    NOW, IT IS TRUE, COUNSEL BROUGHT UP THAT WE HAD OUR

18   FIRST CHANCE TO ASK YOU ABOUT WHAT YOUR TESTIMONY WOULD BE

19   TWO DAYS AGO.

20   A.    UH-HUH.

21   Q.    DO YOU REMEMBER THAT?

22   A.    YES.

23   Q.    AND I WOULD LIKE TO PULL UP PAGE 66, LINE 25, THROUGH

24   67, LINE 10.  I'M GOING TO HAVE YOU REVIEW THAT.  I'M GOING

25   TO ASK YOU IF THOSE WERE YOUR -- IF THOSE WERE THE QUESTIONS

1941

1    AND THE ANSWERS THAT YOU GAVE UNDER OATH.

2    A.    OKAY.  I'M SORRY.  WHICH LINES WERE THEY?

3    Q.    COULD YOU JUST READ THEM TO YOURSELF.

4    A.    OH, OKAY.

5    Q.    IT'S RIGHT THERE, PULLED UP THERE, LINES 25 THROUGH 10.

6    A.    OKAY.

7              MS. LEGAARD:  EXCUSE ME, YOUR HONOR.  CAN I GIVE HER

8    A PAPER COPY OF THE DEPOSITION?

9              THE COURT:  SHE HAS IT UP ON THE SCREEN.

10             MS. ROTHAUGE:  IT'S UP ON THE SCREEN.

11   Q.    DO YOU SEE THAT?

12   A.    OKAY.  I'VE READ IT.

13   Q.    AND SO YOU WERE ASKED THE FOLLOWING QUESTION:

14             "YOU'RE NOT FAMILIAR WITH THE ISSUE, 'ARTICLE OF

15   MANUFACTURER,' THAT WE'RE THROWING AROUND?

16             "ANSWER:  NO.  I MEAN, I'VE HEARD THE TERM, BUT

17   THAT'S ABOUT AS FAR AS IT GOES."

18             THAT WAS THE QUESTION AND THAT WAS THE ANSWER;

19   RIGHT.

20   A.    YES.

21   Q.    YOU WERE THEN ASKED:  "ARE YOU FAMILIAR WITH THE TERM

22   'MULTICOMPONENT PRODUCTS'?"

23             YOUR ANSWER:  "AGAIN, I'VE HEARD OF IT, BUT I DON'T

24   KNOW WHAT ANYBODY MEANS BY IT."

25   A.    CORRECT.

1  Q.   WAS THAT YOUR ANSWER ON SUNDAY?

2  A.   THAT WAS MY ANSWER, YES.

3  Q.   AND SO THE QUESTION THEN IS, "SINGLE-COMPONENT

4       PRODUCTS?

5            "ANSWER:  I'VE HEARD IT, BUT I COULDN'T TELL YOU

6       WHAT ANYBODY MEANS BY IT."

7            WAS THAT THE ANSWER THAT YOU ALSO GAVE ON SUNDAY

8  WHEN YOU WERE ASKED IF YOU KNEW WHAT A MULTICOMPONENT PRODUCT

9  VERSUS A SINGLE COMPONENT PRODUCT WAS?

10 A.   YES.

11 Q.   AND SO TODAY YOU -- SOMETHING HAPPENED BETWEEN SUNDAY

12 AND TODAY, WOULD YOU AGREE?  BECAUSE YOU'VE NOW JUST TOLD THE

13 JURY, YOU'VE BEEN TALKING TO THE JURY ABOUT YOUR KNOWLEDGE

14 ABOUT COMPONENTS; RIGHT?

15 A.   COMPONENT, OUR PRODUCTS, YES.  THE DIFFERENCE BETWEEN

16 THAT OR THE LEGAL TERMINOLOGY OF MULTICOMPONENT PRODUCT AND

17 SINGLE COMPONENT PRODUCT, THAT'S WHERE I REALLY DIDN'T

18 KNOW.

19 Q.   SO SINGLE COMPONENT IS CONFUSING, THAT'S THE TERM THAT'S

20 CONFUSING TO YOU?

21 A.   YEAH.  I SUPPOSE SO, FROM IN A ROOM FULL OF LAWYERS, IT

22 KIND OF IS.

23 Q.   WELL, A ROOM -- OKAY.  WELL, YOU WERE -- YOU WERE THERE

24 WITH MS. LEGAARD.

25 A.   UH-HUH.

1943

1    Q.    DID YOU FEEL ANY PRESSURE AT ALL?

2    A.    NO, I'M NOT SAYING I FELT ANY PRESSURE.  BUT I DON'T

3    KNOW WHAT THAT MEANS AS A LEGAL TERM.

4    Q.    ALL RIGHT.  BUT YOU WERE ASKED A VERY GENERAL QUESTION,

5    AND YOU TOLD THE TRUTH --

6    A.    YES.

7    Q.    -- RIGHT?

8    A.    AND SO TWO DAYS AGO, YOU DIDN'T UNDERSTAND A SINGLE

9    COMPONENT VERSUS MULTIPLE COMPONENTS; RIGHT?

10   A.    CORRECT.

11   Q.    WELL, I'D LIKE TO ASK YOU A LITTLE BIT ABOUT WHAT YOU DO

12   UNDERSTAND ABOUT GLOVES.  AND I UNDERSTOOD THAT YOU -- YOU

13   HAVE SOME EXPERIENCE WITH BUILDING PACKS, YOU CALL THEM;

14   RIGHT?

15   A.    TECH PACKS.

16   Q.    TECH PACKS?

17   A.    UH-HUH.

18   Q.    OKAY.  AND BASICALLY TECH PACKS ARE THE PARTS THAT GO

19   TOGETHER TO BUILD THE GLOVE; RIGHT?

20   A.    THE BILL OF MATERIALS ARE THE PARTS.  THE TECH PACK IS

21   THE EXPLANATION OF HOW TO BUILD IT.

22   Q.    OKAY.  SO YOU HAVE AN UNDERSTANDING THAT THERE ARE PARTS

23   THAT GO INTO A GLOVE.  THERE IS MULTIPLE PARTS?

24   A.    YEAH.  THERE IS RAW MATERIALS THAT GO INTO IT, YES.

25   Q.    LET ME MAKE SURE I UNDERSTAND IT.  I ASKED IF THERE WERE

1944

```
1    MULTIPLE PARTS.  WHEN I SAY THE WORDS "MULTIPLE PARTS," DO

2    YOU UNDERSTAND I MEAN MULTIPLE PARTS, MORE THAN ONE?

3    A.    UH-HUH.  YES.

4    Q.    SO WOULD YOU AGREE WITH ME THAT THERE ARE MULTIPLE PARTS

5    THAT GO INTO A GLOVE, LIKE THE ONE YOU HAVE IN FRONT OF YOU,

6    THE EXCEL GLOVE?

7    A.    YES.

8    Q.    SO WOULD YOU AGREE WITH ME, FOR EXAMPLE, THAT THERE IS

9    WHAT WE'VE MARKED AS EXHIBIT 1404.7, A LINER --

10   A.    UH-HUH.

11   Q.    -- AND YOU SEE THAT THIS LINER IS MADE OF FABRIC;

12   RIGHT?

13   A.    YES.  IT IS, YEAH.

14   Q.    AND I WANTED TO ASK YOU A LITTLE BIT ABOUT THIS FABRIC.

15   THIS IS BASICALLY A FABRIC WITH AN ALUMINUM PRINTING ON IT,

16   ISN'T IT?

17   A.    I DON'T KNOW IF IT'S -- I ASSUME IT'S A PRINT, YES.

18   Q.    WELL, WHAT DO YOU CALL THAT IN YOUR BUSINESS?

19   A.    IT COULD BE -- I ACTUALLY DON'T KNOW THE NAME OF THE

20   PROCESS, BUT THE REMOVAL, IF IT'S A FOIL PATTERN, THERE IS A

21   REMOVAL PROCESS.  IT'S NOT A PRINT.  I COULDN'T TELL YOU THE

22   EXACT NAME OF THAT PROCESS.

23   Q.    SO MAYBE WE COULD CALL THIS A FOIL PRINTED FABRIC?

24   A.    SURE.

25   Q.    ALL RIGHT.  SO YOU -- AND SO YOU DO HAVE SOME
```

1945

1    UNDERSTANDING ABOUT HOW A FOIL PRINTED FABRIC IS MADE,

2    THOUGH; RIGHT?

3    A.    A GENERAL UNDERSTANDING, YES.

4    Q.    AND I THINK WE TALKED ABOUT THIS ON SUNDAY.  I THINK YOU

5    TOLD ME THERE IS A MILL?

6    A.    YES.

7    Q.    SO THERE IS A SPECIAL MILL THAT DOES NOTHING BUT CREATE

8    THE BASE FABRIC; RIGHT?  IS THAT RIGHT?

9    A.    YES.

10   Q.    AND THEN THERE IS ANOTHER MILL NEAR THAT MILL WHERE THEY

11   GO AND THEY PAINT THE FOIL, YOU KNOW, THEY PUT THE FOIL, THE

12   ALUMINUM FOILING ON TOP; RIGHT?

13   A.    SOMETIMES.  WHAT I SAID IS SOMETIMES THERE IS A MILL

14   THAT ONLY DOES THE BASE FABRIC, AND THEN THERE IS ANOTHER

15   MILL THAT DOES THE FOIL.  SOME MILLS DO BOTH.

16   Q.    AND IN THE CASE OF VENTEX -- DO YOU KNOW VENTEX?

17   A.    I KNOW OF VENTEX.

18   Q.    I MEAN, THEY HAVE -- DO YOU UNDERSTAND THAT THEY HAVE

19   ONE MILL THAT CREATES THE FABRIC AND ANOTHER WHERE THEY PUT

20   ON THE FOIL PRINTING?

21   A.    I DO NOW.

22   Q.    ALL RIGHT.  AND SO YOU KNOW THAT THERE IS A PRODUCT THAT

23   VENTEX PRODUCES --

24   A.    YES.

25   Q.    -- RIGHT?

1946

1    AND THERE IS ROLLS WITH THIS FABRIC, WITH THE FOIL

2    PRINTING ON IT; RIGHT?

3    A.    I UNDERSTAND THAT, YES.

4    Q.    AND DID YOU ALSO UNDERSTAND FROM MR. MURPHY AND FROM

5    MS. CAREY'S TESTIMONY, THAT SEIRUS BUYS THAT PRODUCT FROM

6    THOSE MILLS AT VENTEX?

7    A.    THAT IS WHAT I HEARD FROM MR. MURPHY, YEAH.

8    Q.    OKAY.  AND THAT WAS THE FIRST TIME YOU HEARD THAT;

9    RIGHT?

10   A.    CORRECT.

11   Q.    AND THAT'S DIFFERENT FROM YOUR UNDERSTANDING, BECAUSE I

12   THINK I UNDERSTOOD YOU TO SAY THAT TYPICALLY WITH COLUMBIA

13   AND OTHER BILLION-DOLLAR COMPANIES, THEY MAKE THE FACTORIES

14   GO BUY IT?

15   A.    THAT'S CORRECT.

16   Q.    RIGHT.  BUT IN SEIRUS' CASE, SINCE THEY ARE A SMALL

17   COMPANY AND A SEASONAL NICHE COMPANY, THEY HAVE TO GO BUY IT

18   THEMSELVES; RIGHT?

19   A.    THAT'S MY UNDERSTANDING NOW, YES.

20   Q.    OKAY.  AND THEN THEY PUT IT IN A WAREHOUSE; RIGHT?

21   A.    UH-HUH.

22        THE REPORTER:  "YES"?

23        THE WITNESS:  YES.

24   Q.    BY MS. ROTHAUGE:  AND THEN THAT PRODUCT IS THEN SENT TO

25   OTHER FACTORIES WHERE IT'S CUT AND TURNED INTO GLOVES; RIGHT?

1947

1    MS. LEGAARD:  OBJECTION.  SHE HASN'T TESTIFIED TO

2    ANY PERSONAL KNOWLEDGE ABOUT HOW SEIRUS DOES ANY OF THIS

3    STUFF.

4    THE COURT:  YOUR OBJECTION IS SUSTAINED.

5    Q.   BY MS. ROTHAUGE:  DO YOU HAVE ANY UNDERSTANDING ABOUT

6    WHAT HAPPENS WITH FABRIC ONCE IT GETS TO A FACTORY,

7    SPECIFICALLY FABRIC LIKE WHAT I HAVE SHOWN YOU HERE WITH

8    1404.7?

9    A.   GENERALLY, YES.

10   Q.   DOES IT GET -- WHAT HAPPENS TO IT?

11   A.   GENERALLY IT'S STORED, IF NECESSARY.  OTHERWISE, IT'S --

12   DEPENDING ON WHAT ELSE IS HAPPENING WITH THE PRODUCT

13   DEVELOPMENT PROCESS, IT GETS ROLLED OUT, CUT OUT, AND THE

14   PATTERN -- OR PATTERN LAID ON TOP AND THEN CUT OUT AND MADE

15   INTO A PRODUCT.

16   Q.   SO THAT PRODUCT THEN GETS PUT INTO THE FINISHED PRODUCT;

17   IS THAT RIGHT?

18   A.   SAY THAT AGAIN.

19   Q.   THE FABRIC THEN GETS PUT INTO THE FINISHED PRODUCT?

20   A.   YEAH.  THEY ALL GET PUT TOGETHER AND THEN BECOME THE

21   FINISHED PRODUCT.

22   Q.   SO I WANT TO TALK ABOUT THE OTHER PART.  SO WE AGREE

23   THERE IS A LINER, RIGHT, IN THE HEATWAVE GLOVES?

24   A.   THERE IS, YES.

25   Q.   AND THEN WOULD YOU AGREE WITH ME THAT IN ADDITION TO THE

1948

1    LINER, WHAT HAPPENS NEXT -- AND I'M GOING TO HOLD UP

2    1404.8 -- IS THAT THERE IS INSULATION SEWED AROUND THE

3    LINER?

4         MS. LEGAARD:  YOUR HONOR, OBJECTION.  SHE HASN'T

5    TESTIFIED TO ANY PERSONAL KNOWLEDGE OF ANY OF THIS, AND SHE

6    WASN'T IN COURT WHEN MR. MURPHY DID THIS DEMONSTRATION.

7         THE COURT:  ARE YOU TALKING ABOUT GENERALLY OR

8    TALKING ABOUT SEIRUS?

9         MS. ROTHAUGE:  I'M TALKING ABOUT GENERALLY.

10        THE COURT:  YOUR OBJECTION IS OVERRULED.

11        YOU CAN ANSWER THE QUESTION.

12   Q.   BY MS. ROTHAUGE:  DO YOU UNDERSTAND THAT AFTER THE LINER

13   IS MADE, THAT THERE IS -- WITH THESE TYPES OF GLOVES, THERE

14   IS AN INSULATION SEWN ONTO THEM?

15   A.   WELL, MY UNDERSTANDING GENERALLY IS A LITTLE DIFFERENT.

16   THAT THEY ARE CUT, THE PIECES FOR THE LINER ARE CUT, SOME OF

17   THEM ARE SEWN TOGETHER.  THE PIECES FOR THE OTHER PART OF THE

18   HAND, A FEW OF THEM ARE SEWN TOGETHER, AND THEN THE

19   INSULATION IS SEWN TO THAT.  AND THEN SORT OF TWO LAYERS ARE

20   PARTIALLY SEWN TOGETHER.

21   Q.   IF I SHOW YOU EXHIBIT 1404 --

22        MS. ROTHAUGE:  PERMISSION TO APPROACH?

23        THE COURT:  SURE.

24        MS. ROTHAUGE:  1404.8.

25   Q.   DO YOU RECOGNIZE 1404.8 TO BE SOMETHING LIKE WHAT YOU'VE

COMPUTER-AIDED TRANSCRIPTION

1949

1    JUST BEEN DESCRIBING IN TERMS OF THE NEXT STEP IN THE

2    MANUFACTURING PROCESS?

3    A.    FOR THE MOST PART.  THE STAY STITCH AT THE TOP IS NOT

4    USUAL.  BUT OTHER THAN THAT, IT'S CLOSE TO THE INTERIOR OF A

5    GLOVE, YES.

6    Q.    OKAY.  AND THEN DO YOU KNOW THAT IF YOU WANT TO MAKE IT

7    WATERPROOF, DO YOU HAVE AN UNDERSTANDING THAT YOU NEED

8    SOMETHING THAT'S CALLED A MEMBRANE, OR A LINER?

9    A.    OR A BLADDER, YEAH.

10   Q.    OKAY.  SO THIS IS EXHIBIT 1404.3, IS THIS SOMETHING THAT

11   YOU RECOGNIZE?

12   A.    YES.

13   Q.    DID YOU LEARN IN THE COURSE OF THIS TRIAL THAT SEIRUS

14   PURCHASES THESE SEPARATELY?

15   A.    YES.  MOST COMPANIES DO.

16   Q.    AND SEIRUS BUYS THEM FROM A COMPANY IN TAIWAN.  DOES

17   THAT --

18   A.    I DON'T KNOW IF I HEARD THAT, BUT I BELIEVE IT.

19   Q.    SO THIS IS -- IF YOU WANT TO MAKE THE GLOVE WATERPROOF,

20   DO YOU NEED TO HAVE THIS BLADDER OR MEMBRANE?

21   A.    THERE IS A COUPLE OTHER WAYS TO DO IT, BUT IT'S PROBABLY

22   THE MORE EFFICIENT WAY TO DO IT.

23   Q.    SO THIS IS ANOTHER PART OF THE GLOVE?

24   A.    IT'S A WATERPROOFING BLADDER, YEAH.  YEAH.

25   Q.    AND WOULD YOU SAY THIS IS AN IMPORTANT PART OF A

1950

1    GLOVE?

2    A.    UH-HUH.  IF YOU WANT A WATERPROOF GLOVE, YEAH.

3    Q.    AND THEN --

4    A.    AND YOU DON'T WANT TO SEAM SEAL IT, BUT...

5    Q.    AND THEN FINALLY WE GET TO THE SHELL.  YOU'RE FAMILIAR

6    WITH THE TERM "SHELL"?

7    A.    I AM, YES.

8    Q.    AND THE SHELL -- DO YOU HAVE AN UNDERSTANDING ABOUT HOW

9    SHELLS ARE MADE?

10    A.    UH-HUH.

11    Q.    WHAT'S YOUR GENERAL UNDERSTANDING?

12    A.    NOT DISSIMILAR FROM THE WAY THE LINING IS SEWN TOGETHER.

13    YOU SEW PARTS OF THE LINING, PORTIONS OF THE LINING TOGETHER,

14    AND THEN -- THEN YOU LEAVE CERTAIN PORTIONS UNSEWN SO THAT

15    YOU CAN PUT THE LINING IN.  AND SO PUT THE LINING INTO THE

16    FINGERS, AND THEN YOU FINISH MAKING THE GLOVE BY SEWING UP

17    THE END OF THE GLOVE.  AND DEPENDS ON HOW THEY DECIDE TO TACK

18    THE WATERPROOFING INTO THE GLOVE.  IT'S DIFFERENT;

19    OCCASIONALLY VERY DIFFERENT.

20    Q.    WOULD YOU AGREE THAT AS A DESIGNER, DO YOU SPEND SOME

21    TIME MAKING SURE YOU HAVE A GREAT DESIGN ON YOUR SHELL?

22    A.    OF COURSE, YEAH.

23    Q.    AS A DESIGNER, IS DESIGNING THE SHELL AN IMPORTANT PART

24    OF DESIGNING THE GLOVE?

25    A.    YEAH.  BUT WE DON'T REALLY THINK ABOUT DESIGNING A

COMPUTER-AIDED TRANSCRIPTION

1951

1    GARMENT AS IN JUST WHAT'S ON THE OUTSIDE.

2    Q.    I'M ASKING, IF IT'S UP AGAINST THE WALL, IS THERE -- AND

3    THERE IS A WALL, I THINK YOU SAID A WALL OF BLACK GLOVES, DO

4    YOU TRY TO DO ANYTHING ON THE GLOVE TO MAKE IT STAND OUT?

5    A.    SOMETIMES.

6    Q.    WHAT DO YOU DO?

7    A.    THERE MIGHT BE A DESIGN -- QUITE FRANKLY, ON GLOVES, YOU

8    DON'T REALLY DO VERY MUCH TO THE OUTSIDE OF IT, BECAUSE IT

9    CAN BE IRRITATING TO THE HAND, OR IT CAN ACTUALLY AFFECT

10   DEXTERITY IN THE GLOVE AS WELL.

11   Q.    IS THAT THE KIND OF PROBLEM YOU'VE SEEN HAPPENING WHEN

12   YOU WORKED AT COLUMBIA WITH THEIR GLOVES?

13   A.    ANY COMPANY.  THE FIRST PROTOTYPE, YOU GET IT BACK, YOU

14   DON'T HAVE GREAT DEXTERITY AS FAR AS WHERE THE LINES GO, AND

15   YOU FIX WHAT'S HAPPENING INSIDE THE LINER.

16          A LOT OF THE TIMES THE WAY THE INTERIOR LINING IS

17   BUILT, DOESN'T WORK OUT VERY WELL WITH -- WHAT'S HAPPENING ON

18   THE INSIDE WITH WHAT'S WORKING ON THE OUTSIDE.  SO YOU HAVE

19   TO JUST KEEP ADJUSTING.

20   Q.    WELL, THERE ARE TWO SEPARATE THINGS.  YOU RAISED AN

21   IMPORTANT POINT.

22          THE LINER AND THIS SHELL ARE TWO SEPARATE THINGS,

23   AREN'T THEY?

24   A.    WELL, YEAH, BUT THEY HAVE TO WORK TOGETHER, WHICH IS THE

25   POINT.  THEY HAVE TO BE INSERTED AND YOU HAVE TO MAKE SURE

1952

1    THAT EVERYTHING IS ACTUALLY MOVING TOGETHER.

2    Q.   OH, I UNDERSTAND THAT.  BUT YOU WOULD AGREE, THEY ARE

3    TWO DIFFERENT PARTS?

4    A.   I SUPPOSE, YEAH.

5    Q.   AND, OF COURSE, WITH THE COLUMBIA SAMPLES YOU'VE BEEN

6    TALKING ABOUT, THEY HAVE HAD PROBLEMS WHEN THEY TRY AND PUT

7    THEM TOGETHER, BUT EVENTUALLY, YOU GET A PRODUCT THAT LOOKS

8    LIKE THIS, RIGHT, ON THE OUTSIDE?

9    A.   ON THE OUTSIDE, YES.  FROM HERE, YEAH.

10   Q.   AND DO YOU SEE THE SILVER LINING?

11   A.   NOT FROM HERE, NO.

12   Q.   OKAY.  SO ARE THERE SPECIAL -- OTHER SPECIAL FEATURES --

13   I THINK YOU TALKED ABOUT BUCKLES --

14   A.   YEAH.

15   Q.   -- AT SOME POINT?

16        NOW, BUCKLES ARE ANOTHER PART OF A GLOVE, AND THEY

17   SHOW UP ON THE SHELVES; RIGHT?

18   A.   THEY DO.

19   Q.   AND I HEARD YOU CALL THEM RAW MATERIALS?

20   A.   PRIOR TO ASSEMBLY, YEAH, WE CALL THEM RAW MATERIALS.

21   Q.   THAT'S WHAT COLUMBIA CALLS THEM; RIGHT?

22   A.   THAT'S WHAT COLUMBIA CALLS THEM.  THAT'S WHAT LANDS END

23   CALLS THEM.  THAT'S WHAT SPYDER CALLS THEM.

24   Q.   WOULD YOU BE SURPRISED THAT SEIRUS, THEY CALL THEM

25   BUCKLES, FINISHED BUCKLES?

1953

1    A.   THAT'S FINE.

2    Q.   THEY CALL THEM FINISHED GOODS?

3    A.   OKAY.

4    Q.   AND DO YOU KNOW --

5    A.   THEY CALL THOSE FINISHED GOODS.

6    Q.   NO, FINISHED COMPONENTS.

7    A.   OH, OKAY.

8    Q.   FINISHED COMPONENTS?

9    A.   IF THAT'S WHAT THEY CALL THEM.  I CAN'T TESTIFY TO THAT,

10   SO.

11   Q.   AND IT'S BECAUSE THE RAW MATERIALS TO MAKE THE BUCKLE

12   ARE -- HAVE ALREADY BEEN PROCESSED TO MAKE THE BUCKLE.  YOU

13   UNDERSTAND THAT A BUCKLE IS MADE OF PLASTIC AND IT HAS TO BE

14   MOLDED; RIGHT?

15   A.   YES.  I UNDERSTAND THAT IS A RAW MATERIAL TO THE GLOVE,

16   THOUGH.

17   Q.   IT'S A RAW MATERIAL TO THE BUCKLE, AND THEN YOU GET A

18   BUCKLE; RIGHT?

19   A.   THE BUCKLE IS RAW MATERIAL TO THE GLOVE IS WHAT I

20   MEAN.

21   Q.   WELL, THE RAW MATERIAL -- I'M GOING BACK ONE STEP.

22   A.   OKAY.

23   Q.   THERE IS RAW MATERIAL THAT GOES INTO THE BUCKLE, TO MAKE

24   THE BUCKLE; RIGHT?

25   A.   I DO UNDERSTAND THAT, YEAH.

1954

1    Q.    AND THAT GETS PROCESSED; RIGHT?

2    A.    I WOULD ASSUME.  I DON'T KNOW ANYTHING ABOUT THAT

3    KIND -- THAT PROCESS.

4    Q.    WELL, AND THEN EVENTUALLY THAT'S A PART THAT GETS

5    INCLUDED ON THE SHELL?

6    A.    IF THAT'S HOW SEIRUS REFERS TO IT, THEN, AGAIN, I DON'T

7    KNOW MUCH ABOUT THEIR NOMENCLATURE.

8            MS. ROTHAUGE:  I DON'T HAVE ANYTHING ELSE.

9            THE WITNESS:  THANK YOU.

10           MS. LEGAARD:  WOULD YOU LEAVE THOSE, COUNSEL.

11           I JUST HAVE A COUPLE THINGS.

12                    REDIRECT EXAMINATION

13   BY MS. LEGAARD:

14   Q.    SO FIRST OF ALL, HOW BIG WAS MARMOT WHEN YOU STARTED?

15   A.    I'LL BE HONEST.  BACK THEN, I DIDN'T PAY ATTENTION TO

16   NUMBERS.  BUT IT WAS -- I THINK THE OFFICE HELD ABOUT 35 OR

17   40 PEOPLE.  AND THERE WAS AN OFFICE SOMEWHERE ELSE, BUT I

18   DON'T REMEMBER EXACTLY HOW MANY PEOPLE WERE THERE.

19   Q.    WOULD YOU DESCRIBE IT AS MAJOR BRAND WHEN YOU WERE

20   THERE?

21   A.    NO.  IT WAS MAJOR TO ATHLETES AND MOUNTAIN CLIMBERS OR

22   ICE CLIMBERS, WHICH IS NOT A VERY BIG POPULATION.

23   Q.    ALL RIGHT.  FAIR ENOUGH.

24           SO LET'S LOOK AT SOME OF THESE PARTS THAT COUNSEL

25   WALKED THROUGH WITH YOU.  SO SHE HELD UP THIS PART -- AND IF

COMPUTER-AIDED TRANSCRIPTION

1955

1    I MAY APPROACH, YOUR HONOR, I'M GOING TO HAND THIS TO YOU.

2              THE COURT:  SURE.

3              THE WITNESS:  THANK YOU.

4    Q.   BY MS. LEGAARD:  NOW, IS THAT THE SORT OF LINER YOU

5    WOULD EXPECT -- LET ME PUT IT ANOTHER WAY.

6              IF YOU WERE TO TAKE A PIECE -- PAIR OF SCISSORS AND

7    CUT APART THAT SEIRUS GLOVE, 221.1, WHATEVER IT IS, WOULD YOU

8    EXPECT TO FIND SOMETHING THAT LOOKED LIKE THAT INSIDE OF

9    IT?

10   A.   NOT PRECISELY, NO.

11   Q.   AND SO LET ME HAND YOU 1404.8.

12   A.   OKAY.

13   Q.   WOULD YOU EXPECT TO FIND SOMETHING THAT LOOKED LIKE THAT

14   INSIDE THAT GLOVE IF YOU CUT IT OPEN?

15   A.   EVENTUALLY.  THERE IS STILL SOME MORE DIGGING THAT WOULD

16   HAVE TO HAPPEN TO GET TO THIS.

17   Q.   AND SO WHAT WOULD IT TAKE TO REMOVE THE INSULATION FROM

18   THAT LINER INSIDE A GLOVE?

19   A.   WELL, WHILE IT'S STILL INSIDE THE GLOVE?

20   Q.   WELL, IF YOU TOOK IT OUT.

21   A.   EVEN RIGHT NOW.

22   Q.   WOULD YOU HAVE TO TAKE THE SEAMS APART TO GET THAT

23   INSULATION OFF?

24   A.   YEAH, THE INSULATION, DEPENDING ON THE INSULATION,

25   LIKELY WOULDN'T MAKE IT THROUGH THAT, EITHER.  IT WOULD TEAR

1956

1    PRETTY FAST ALONG THE SEAMS.

2    Q.    SO YOU'D HAVE TO DESTROY THE INSULATION?

3    A.    ABSOLUTELY, YEAH.  YEAH.

4    Q.    AND FROM -- I'M GOING TO TRY TO ASK THIS IN A

5    REASONABLE, CLEAR WAY, SO FORGIVE ME IF I FLOUNDER A BIT.

6         BUT DURING THE MANUFACTURING PROCESS -- WHAT I'M

7    TRYING TO ASK YOU IS, DOES THE FACT THAT YOU WOULD HAVE TO

8    DESTROY THAT INSULATION TO GET OFF THAT LINER, A PRODUCT OF

9    THE MANUFACTURING PROCESS?

10   A.    I'M SORRY.  CAN YOU REPEAT THAT?

11   Q.    IF THE FACT THAT YOU'D HAVE TO DESTROY THAT INSULATION

12   TO GET OFF THE LINER, LIKE A -- IS THAT A PRODUCT OF THE

13   MANUFACTURING -- IS THAT BECAUSE OF HOW IT'S MADE, THE

14   SEQUENCE OF STEPS IN THE MANUFACTURING PROCESS?

15   A.    IT'S HOW IT'S MADE AND WHAT IT IS.  IT'S NOT INTENDED TO

16   BE PUT IN, PULLED BACK OUT, PUT IN, PULLED BACK OUT.  IT'S

17   TOO DELICATE FOR THAT.  IT'S HOW IT'S MADE AND WHAT IT

18   ACTUALLY IS.

19   Q.    WHEN A GLOVE IS MADE, WHEN THE LINER IS EFFECTIVELY SEWN

20   TOGETHER, IS IT SEWN TO THE INSULATION AT THAT POINT?

21   A.    SAY AGAIN.

22   Q.    WHEN A SKI GLOVE LIKE THAT INSULATED GLOVE IS MADE, WHEN

23   A LINER IS SEWN, IS THE INSULATION SEWN TO IT AT THE SAME

24   TIME, IN YOUR EXPERIENCE?

25   A.    GENERALLY, YES.  SOME PORTIONS OF THE LINING MAY BE SEWN

1957

1    TO OTHER PORTIONS OF THE LINING FIRST.

2           BUT AS IT LOOKS LIKE ONLY THE FOURCHETTES HAVE

3    POTENTIALLY BEEN SEWN FIRST.  SO THEN THE INSULATION HAS BEEN

4    SEWN WITH THE LINING TO OTHER PARTS OF THE LINING.

5    Q.   SO --

6    A.   DOES THAT MAKE SENSE?

7    Q.   I THINK SO.  SO THAT PARTIALLY FINISHED LINING THAT I

8    JUST HANDED YOU BEFORE, WOULD THAT -- WITHOUT THE INSULATION

9    ON IT, THAT EXIST INSIDE OF A SKI GLOVE, OR WOULD IT BE

10   ENCASED IN INSULATION?

11   A.   NOT IN A SKI GLOVE.  YOU WOULDN'T -- IN AN INSULATED

12   GLOVE?

13   Q.   YEAH.

14   A.   IT WOULDN'T BE IN THERE LIKE THIS, NO.

15   Q.   OKAY.  AND NOW I'M GOING TO HAND YOU 1404.20.

16   A.   THAT'S WHY I COULDN'T SEE THE LINING.

17   Q.   SO COUNSEL ASKED YOU IF YOU COULD SEE THE LINING, DIDN'T

18   SHE?

19          SO COUNSEL HELD THAT -- DID COUNSEL HOLD THAT UP AND

20   ASK YOU IF YOU COULD SEE THE LINING?

21   A.   YES.

22   Q.   AND WHY COULDN'T YOU SEE THE LINING?

23   A.   THERE IS NO LINING.

24          MS. LEGAARD:  THANK YOU VERY MUCH.  THAT'S ALL I

25   HAVE.

COMPUTER-AIDED TRANSCRIPTION

1958

1        THE COURT:  DO YOU HAVE ANY QUESTIONS FOR THIS

2   WITNESS?  IF SO, PLEASE RAISE YOUR HAND.

3        YOU MAY STEP DOWN.

4        THE WITNESS:  THANK YOU.

5        THE COURT:  DO YOU WANT THIS WITNESS TO BE EXCUSED?

6        MS. LEGAARD:  YES.

7        THE COURT:  ANY OBJECTION?

8        MS. ROTHAUGE:  NO OBJECTION.

9        THE COURT:  YOU ARE EXCUSED TO GO ABOUT YOUR

10  BUSINESS.

11        CALL YOUR NEXT WITNESS.

12        MR. ALDRICH:  PLAINTIFF CALLS DR. CHRISTINE COLE.

13        THE COURT:  PLEASE RE-TAKE THE STAND.

14        YOU WERE PREVIOUSLY PLACED UNDER OATH AND HAVE NOT

15  BEEN EXCUSED.  YOU REMAIN UNDER OATH.

16        GO AHEAD AND HAVE A SEAT.

17        THE WITNESS:  THANK YOU.

18     CHRISTINE COLE, PH.D., HAVING BEEN PREVIOUSLY SWORN,

19        TESTIFIED AS FOLLOWS:

20        THE COURT:  YOU MAY PROCEED.

21        THE WITNESS:  MOMENT, PLEASE.  I NEED TO GET MY

22  OTHER PAIR OF GLASSES.

23        THE COURT:  SURE.

24        THE WITNESS:  THANK YOU.

25        MR. ALDRICH:  IS THAT OKAY FOR YOU GUYS?

COMPUTER-AIDED TRANSCRIPTION

1959

1    MR. MARCHESE:  FINE.

2    MR. ALDRICH:  DR. COLE HAS SOME SLIDES.  JUST

3 PERMISSION TO PUBLISH THE SLIDES?

4    THE COURT:  SURE.

5    MR. SPROUL:  ASSUMING THEY WERE WHAT WAS DISCLOSED,

6 NO OBJECTION.

7    THE COURT:  OKAY.

8                    DIRECT EXAMINATION

9 BY MR. ALDRICH:

10 Q.  DR. COLE, WELCOME BACK.  JUST TO TAKE A MOMENT TO GET

11 EVERYBODY ORIENTED.

12    YOU HAVE ALREADY PROVIDED AN OPINION THAT SEIRUS

13 INFRINGES THE UTILITY PATENT; CORRECT?

14 A.  YES.

15 Q.  OKAY.  AND JUDGE HERNANDEZ HAS RULED THAT SEIRUS

16 INFRINGES THE DESIGN PATENT; CORRECT?

17 A.  THAT'S MY UNDERSTANDING.

18 Q.  AND WITH RESPECT TO VALIDITY, YOU UNDERSTAND THAT SEIRUS

19 HAS ALREADY AGREED THAT THE DESIGN PATENT IS VALID;

20 CORRECT?

21 A.  THAT'S MY UNDERSTANDING.

22 Q.  AND SEIRUS IS CONTENDING THAT THE UTILITY PATENT IS

23 INVALID; CORRECT?

24 A.  THAT'S ALSO MY UNDERSTANDING.

25 Q.  OKAY.  AND DR. BLOCK GAVE HIS OPINION YESTERDAY ABOUT

1960

1    WHY THE UTILITY PATENT IS INVALID.

2    A.    YES.  I HEARD HIS TESTIMONY.

3    Q.    AND SO YOU WILL NOW BE PROVIDING YOUR OPINIONS

4    CONCERNING WHETHER THE UTILITY PATENT IS VALID; RIGHT?

5    A.    CORRECT.

6    Q.    AND WHAT IS YOUR ULTIMATE OPINION?

7    A.    IN MY OPINION, THE UTILITY PATENT, THE '270 PATENT IS

8    VALID.

9    Q.    NOW, WE'VE HEARD THE TERM "ANTICIPATE" AND WE'VE HEARD

10   THE TERM "OBVIOUSNESS."

11          DO YOU HAVE AN UNDERSTANDING OF WHAT IT MEANS FOR A

12   PIECE OF PRIOR ART TO ANTICIPATE A PATENT?

13   A.    YES, I DO.

14   Q.    OKAY.  AND IF YOU COULD WALK US THROUGH YOUR

15   UNDERSTANDING OF THE REQUIREMENTS FOR A PIECE OF PRIOR ART TO

16   ANTICIPATE A PATENT.

17   A.    WELL, TECHNICALLY IT'S DESCRIBED AS ALL THE LIMITATIONS

18   THAT ARE IN THE PATENT CLAIMS MUST BE PRESENT IN A SINGLE

19   PIECE OF PRIOR ART; THAT IS, THE SAME CLAIM ELEMENTS THAT I

20   WALKED US THROUGH LOOKING AT INFRINGEMENT, I HAVE TO WALK

21   BACK THROUGH AND BE ABLE TO FIND IN A SINGLE PIECE OF PRIOR

22   ART.  I'M NOT ALLOWED TO TAKE MULTIPLE PIECES OF PRIOR ART

23   FOR THE TEST OF ANTICIPATION.

24   Q.    OKAY.  AND IS THERE ANOTHER LEGAL TEST FOR ANTICIPATION

25   THAT YOU USED IN DOING YOUR ANALYSIS?

1961

1    A.    YES.    ONE OF ORDINARY SKILL IN THE ART MUST BE ABLE TO

2    PRACTICE THE PATENT WITHOUT HAVING TO DO UNDUE

3    EXPERIMENTATION.

4    Q.    OKAY.    AND WHAT IS THE THIRD COMPONENT THAT YOU

5    UNDERSTAND IS NECESSARY TO HAVE A FINDING OF ANTICIPATION?

6    A.    THAT THE CLAIMS HAVE TO BE SHOWN BY CLEAR -- WELL, THE

7    CLAIMS ARE NOT VALID BY CLEAR AND CONVINCING EVIDENCE.

8    Q.    THANK YOU.

9          NOW, DID MR. BLACKFORD IN HIS PATENT GIVE ANY IDEA

10   OF WHAT HE CONSIDERED TO BE A HEAT-DIRECTING ELEMENT?

11   A.    YES.    MR. BLACKFORD, THE INVENTOR, DID.    HE ACTUALLY

12   GIVES IT IN A COUPLE OF PLACES.    ONE IS IN THE DESCRIPTION

13   THAT YOU SEE NOW CURRENTLY, HEAT-REFLECTIVE MATERIALS, SUCH

14   AS ALUMINUM AND MYLAR TYPICALLY TAKE THE FORM OF A UNITARY

15   SOLID FILM.

16   Q.    OKAY.    AND DID HE?

17   A.    SO HE CLEARLY INTENDS FOR HIS HEAT-DIRECTING MATERIALS,

18   HIS HEAT-DIRECTING ELEMENTS, AS WE TALK ABOUT THEM, TO BE IN

19   FILM FORM.

20   Q.    AND DID HE PROVIDE ANY FURTHER DESCRIPTION LATER IN THE

21   PATENT OF THE TYPE OF HEAT-DIRECTING ELEMENTS THAT HE WAS

22   REFERRING TO?

23   A.    YES.    HE IS MORE SPECIFIC, AS WE SEE IN THE LOWER

24   PARAGRAPH HERE, WHERE HE CALLS OUT ALUMINUM-BASED MATERIALS

25   AS PARTICULARLY SUITED FOR REFLECTIVITY.    HE GOES ON TO

1962

1   MENTION COPPER-BASED MATERIALS FOR CONDUCTIVITY OR OTHER

2   METALS OR METAL ALLOYS.  AND THEN HE GOES ON TO TALK ABOUT

3   THE FACT THAT WE CAN HAVE NONMETALLIC MATERIALS, SUCH AS A

4   METALLIC PLASTIC OR MYLAR, PROVIDED IT HAS A REFLECTIVE

5   PROPERTY.

6   Q.   AND WHAT IS METALLIC PLASTIC?

7   A.   METALLIC PLASTIC IS BASICALLY A FILM THAT HAS METAL

8   APPLIED TO IT.

9   Q.   IS THERE A COMMON CONSUMER PRODUCT THAT THE JURY MIGHT

10  KNOW ABOUT THAT THEY MIGHT ASSOCIATE WITH METALLIC PLASTIC?

11  A.   HELIUM-FILLED BALLOONS, SUCH AS WE USE AT PARTIES.

12  Q.   OKAY.  AND WHAT ABOUT THIS, EXHIBIT 703.  WHAT IS

13  THIS?

14  A.   THE NASA-DEVELOPED SPACE BLANKET IS A GOOD EXAMPLE OF A

15  METALIZED FILM, SUCH AS MR. BLACKFORD TALKS ABOUT IN THIS

16  SECTION.

17  Q.   AND THESE EXAMPLES THAT MR. BLACKFORD GAVE -- WELL, DID

18  YOU HEAR MR. BLACKFORD TALK ABOUT HAVING A MIRROR-LIKE

19  SURFACE?

20  A.   YES.

21  Q.   AND THE PRODUCTS THAT HE'S IDENTIFIED HERE, ARE THESE

22  ALL PRODUCTS THAT WOULD HAVE A MIRROR-LIKE SURFACE?

23  A.   YES, THEY ARE.

24  Q.   IS THAT SOMETHING THAT SOMEBODY OF ORDINARY SKILL IN THE

25  ART WOULD UNDERSTAND FROM READING MR. BLACKFORD'S PATENT?

1963

1    A.    YES.   SOMEONE WITH ORDINARY SKILL IN THE ART CERTAINLY

2    WOULD RECOGNIZE THE TERM "METALLIC PLASTIC" OR "MYLAR" OR AN

3    "ALUMINUM FOIL."

4    Q.    OKAY.   NOW, DR. BLOCK REFERRED TO THE FOTTINGER PATENT;

5    CORRECT?

6    A.    CORRECT.   THE FOTTINGER PATENT APPLICATION.

7    Q.    AND GENERALLY SPEAKING, WHAT IS -- WHAT IS

8    MR. FOTTINGER'S INVENTION ABOUT?

9    A.    FOTTINGER CLAIMS TO HAVE INVENTED PUTTING DOTS THAT

10   CONSIST OF BINDER AND AN ALUMINUM POWDER ONTO ONE SURFACE OF

11   A FABRIC, AND THEN CLAIMED SOME THERMAL PROPERTIES ASSOCIATED

12   WITH HIS INVENTION, WHEN HE INCORPORATES IT INTO A GARMENT.

13   Q.    DOES HE GIVE AN EXAMPLE IN HIS PATENT ABOUT WHAT THE

14   FORMULATION OF THE BINDER WOULD BE?

15   A.    FOTTINGER GIVES A SINGLE EXAMPLE.   SO THIS IS THE ONLY

16   INFORMATION WE HAVE TO GET A BETTER IDEA OF WHAT FOTTINGER

17   SPECIFICALLY IS THINKING ABOUT.   AND THE TOP PART OF THE

18   SECTION DESCRIBES THE FABRIC THAT HIS BINDER COMPOSITION IS

19   GOING TO BE APPLIED TO.

20         SO HIS BINDER COMPOSITION STARTS WITH THE ALUMINUM

21   POWDER AND THEN FINISHED WITH THE TOTAL NUMBER OF PARTS AT

22   THE BOTTOM.   AND THERE ARE A NUMBER OF DIFFERENT INGREDIENTS

23   IN HIS BINDER COMPOSITION.

24   Q.    I WAS GOING TO ASK YOU ABOUT THOSE INGREDIENTS.   THE

25   FIRST INGREDIENT THERE SAYS "AL POWDER."   DO YOU SEE THAT?

1964

1   A.   YES, I DO.

2   Q.   AND IT SAYS "100" NEXT TO THAT.  WHAT DOES THAT MEAN?

3   A.   THIS IS A TYPICAL WAY IN THE INDUSTRY OF DESCRIBING A

4   COMPOSITION.  IT'S PARTS BY WEIGHT.  SO OUT OF THE TOTAL, 100

5   PARTS CONSIST OF THIS ALUMINUM POWDER WITH THAT PART OF THE

6   SURFACE.

7   Q.   AND AT THE VERY BOTTOM, I SEE THE NUMBER 1194.2.

8        DO YOU SEE THAT?

9   A.   YES.

10  Q.   IS THAT THE TOTAL NUMBER OF PARTS?

11  A.   YES.  THAT'S THE TOTAL WEIGHT.

12  Q.   OKAY.  AND SO WHAT PERCENT BY WEIGHT OF THIS BINDER

13  COMPOSITION IS THE ALUMINUM POWDER?

14  A.   THE ALUMINUM POWDER IS 100 PARTS OUT OF 1194.2 PARTS.

15  ABOUT 8 PERCENT ALUMINUM POWDER BY WEIGHT.

16  Q.   OKAY.  NOW, THE NEXT INGREDIENT HERE IS SOMETHING

17  CALLED -- AND THERE ARE LOTS OF SYLLABLES HERE SO I APOLOGIZE

18  IF I'M BUTCHERING THIS.  IT SAYS SOMETHING LIKE POLYACRYLATE

19  DISPERSION.

20        DO YOU SEE THAT?

21  A.   YES.

22  Q.   WHAT IS POLYACRYLATE DISPERSION?

23  A.   THIS IS PART OF THE GLUE, IF YOU WISH, IN THE BINDER

24  COMPOSITION.  IT'S SIMPLY -- IT'S PART OF THE SYSTEM TO BE

25  ABLE TO GLUE THE ALUMINUM POWDER ONTO THE FABRIC.

1    Q.    IS THERE A SUBSTANCE THAT THE JURY MIGHT BE FAMILIAR

2    WITH THAT WOULD BE POLYACRYLATE?

3    A.    WALL PAINT.

4    Q.    WALL PAINT?

5    A.    WALL PAINT.  IT'S -- THE SAME CHEMICAL COMPANIES THAT

6    MAKE THE POLYACRYLATE PORTIONS FOR WALL PAINT MAKE A SMALL

7    AMOUNT OF THAT THAT'S ACTUALLY USED IN TEXTILE

8    APPLICATIONS.

9    Q.    OKAY.  THIRD INGREDIENT ON HERE I THINK IS

10   POLYBUTADIENE; IS THAT RIGHT?

11   A.    YES.  POLYBUTADIENE IS SIMILAR TO THE POLYACRYLATE.

12   IT'S A DIFFERENT UNDERLYING CHEMISTRY.  WE THINK OF THE

13   POLYBUTADIENES AS REALLY RUBBERS.

14   Q.    ARE THERE ANY OTHER THINGS ON HERE THAT ARE LIKE

15   RUBBERS?

16   A.    NOT LIKE RUBBER.

17   Q.    OKAY.  SO WE HAVE BASICALLY 150 PARTS RUBBER, 150 PARTS

18   SOMETHING THAT'S IN WALL PAINT; IS THAT RIGHT?

19   A.    CORRECT.  IT'S FLEXIBLE.

20   Q.    AND THEN THERE IS SOME OTHER LESSER INGREDIENTS?

21   A.    YES.  THE OTHER INGREDIENTS ARE FOR THINGS SUCH AS

22   CONTROLLING HOW ACID THE MATERIAL IS, HOW THE REACTION GOES.

23   WE HAVE A MELAMINE RESIN, WHICH IS GOING TO CROSS-LINK ALL OF

24   THIS TOGETHER, SO THAT THE ALUMINUM PARTICLES ACTUALLY WERE

25   HELD WITHIN THIS BINDER COMPOSITION AND THEY DON'T

1    FALL OUT.

2    Q.    NOW, YOU WERE HERE YESTERDAY AND YOU HEARD DR. BLOCK

3    TESTIFY; CORRECT?

4    A.    YES, I DID.

5    Q.    AND IN DR. BLOCK'S TESTIMONY, WHAT DOES HE REFER TO AS

6    THE HEAT-DIRECTING ELEMENTS IN FOTTINGER?

7    A.    WE HAVE UP ON THE SCREEN DR. BLOCK'S DIRECT TESTIMONY

8    HERE, WHERE HE COMMENTS THAT FOTTINGER IS TAKING HIS ALUMINUM

9    POWDER AND HE'S PUTTING IT IN A VEHICLE THAT ALLOWS HIM TO

10   PUT HIS ELEMENTS ON THE SURFACE OF THE FABRIC.

11   Q.    SO THE ELEMENTS THAT DR. BLOCK IS REFERRING TO ARE THE

12   MICROSCOPIC BITS OF ALUMINUM POWDER?

13   A.    YES.

14   Q.    SO LOOKING AT THE CLAIMS THEN, THERE IS A LIMITATION

15   SHOWN ON THE SCREEN.  IT SAYS, "A DISCONTINUOUS ARRAY OF

16   DISCRETE HEAT-DIRECTING ELEMENTS, EACH INDIVIDUALLY COUPLED

17   TO A FIRST SIDE OF THE BASE MATERIAL."

18            DO YOU SEE THAT?

19   A.    YES, I DO.

20   Q.    AND ARE THE ALUMINUM -- LIKE THE MICROSCOPIC GRANULES OF

21   ALUMINUM POWDER, ARE THOSE EACH INDEPENDENTLY COUPLED TO THE

22   BASE MATERIAL?

23   A.    NO, THEY ARE NOT.  NOT BY THE DEFINITION WHICH WE HAVE

24   BEEN PREVIOUSLY PROVIDED BY THE COURT.

25   Q.    LET'S GO ON TO THE LAST LIMITATION.  IT SAYS, "WHEREIN

1967

1    THE HEAT-DIRECTING ELEMENTS ARE POSITIONED ON THE INNERMOST

2    SURFACE."

3            DO YOU SEE THAT?

4    A.   YES, I DO.

5    Q.   AND I'M GOING TO PUT ON THE SCREEN THE SLIDE THAT

6    DR. BLOCK USED DURING HIS ANALYSIS.  IN FOTTINGER, IS THERE

7    ANY DISCLOSURE THAT THIS RUBBERY SUBSTANCE WOULD BE ON THE

8    INNERMOST SURFACE OF THE CLOTHING?

9    A.   NO.

10   Q.   WELL, PERHAPS YOU COULD EXPLAIN.  THE QUOTE THAT'S SHOWN

11   ON THE SCREEN, FIRST OF ALL, TALKS ABOUT MR. FOTTINGER'S

12   INVENTION BEING USEFUL FOR INTERLININGS.

13           DO YOU SEE THAT?

14   A.   CORRECT.  MR. FOTTINGER'S INVENTION, HE IDENTIFIES THREE

15   POSSIBLE WAYS THAT IT COULD BE USED BY A PRACTITIONER.  THE

16   FIRST OF WHICH IS AN INTERLINING.  INTERLINING IS A VERY OLD

17   TERM USED IN THE GARMENT MANUFACTURING INDUSTRY.

18           AND INTERLINING, AS DR. BLOCK POINTED OUT YESTERDAY,

19   ARE MATERIALS THAT GO INSIDE A GARMENT; THAT IS, THEY ARE NOT

20   SEWN -- NOT SEEN FROM THE OUTSIDE OR FROM THE INSIDE, AND

21   THEY ARE THE THINGS THAT STIFFEN ONE'S LAPEL, THEY GIVE SHAPE

22   TO A GARMENT.  BUT THEY ARE INNER.  THEY ARE NOT INNERMOST.

23   Q.   OKAY.  AND SO THEN IT ALSO MENTIONS USING THIS RUBBERY

24   SUBSTANCE ON LINING FABRIC.  DO YOU SEE THAT?

25   A.   YES, I DO.

1968

1    Q.    IS THERE ANY DISCLOSURE HERE THAT THE RUBBERY SUBSTANCE

2    WOULD GO ON THE INNERMOST SURFACE OF THE LINING FABRIC?

3    A.    FOTTINGER DOES NOT PROVIDE US WITH ANY DIRECTION AS TO

4    WHICH SIDE OF THE FABRIC THE LINING FABRIC MIGHT BE SUITABLE

5    FOR HAVING HIS MATERIAL.

6    Q.    WOULD SOMEBODY OF ORDINARY SKILL IN THE ART READING

7    FOTTINGER DESIGNING CLOTHES BE INCLINED TO PUT A RUBBERY

8    COATING ON THE INNERMOST SURFACE OF A GARMENT?

9    A.    SOMEONE OF ORDINARY SKILL IN THE ART WOULD GENERALLY

10   WANT TO AVOID PUTTING A RUBBER MATERIAL DIRECTLY NEXT TO

11   SOMEONE'S SKIN.  YOU WOULD BE CONCERNED THAT PEOPLE WOULDN'T

12   FIND THE GARMENT, THE TOUCH AND FEEL OF THE INSIDE OF THE

13   GARMENT, WOULD BE PLEASING.

14          IN ADDITION, A RUBBERY KIND OF MATERIAL GENERALLY

15   GIVES US A LOT OF RESISTANCE TO BEING ABLE TO MOVE THAT

16   GARMENT OVER OTHER GARMENTS.  SO YOU MIGHT HAVE DIFFICULTY

17   GETTING YOUR ARMS INTO SLEEVES OR SLIDING THINGS AROUND.

18   Q.    SO MOVING ON TO THE NEXT SENTENCE.  IT SAYS THAT

19   "MR. FOTTINGER'S INVENTION CAN ALSO BE USED AS OUTER FABRICS

20   FOR ARTICLES OF CLOTHING."

21          DO YOU SEE THAT?

22   A.    YES, I DO.

23   Q.    AND "IN WHICH CASE, THE COATED FABRIC WOULD BE ON THE

24   INSIDE OF THE ARTICLE."

25          AS A PERSON OF ORDINARY SKILL IN THE ART -- WELL,

1969

1    YOU HAVE MORE THAN ORDINARY SKILL IN THE ART, BUT A PERSON OF

2    ORDINARY SKILL IN THE ART READING THIS, WHAT WOULD THEY

3    UNDERSTAND THAT CLAUSE TO MEAN?

4    A.    WELL, THAT LITERALLY WE CAN TAKE THE OUTER FABRICS,

5    WE'VE HEARD THESE ALSO REFERRED TO AS SHELL FABRICS IN THE

6    PERFORMANCE GARMENT INDUSTRY.  SO THIS IS WHAT YOU SEE AS WE

7    ALL SIT HERE AND LOOK AT WHAT EVERYBODY ELSE IS WEARING IN

8    THE COURTROOM.  THAT'S AN OUTER FABRIC.

9         BUT AN OUTER FABRIC ALSO IMPLIES THAT THERE IS AN

10   INNER FABRIC.  SO IT DOESN'T -- THIS SECTION DOESN'T TELL YOU

11   THAT FOTTINGER INTENDS FOR HIS INVENTION TO BE A NEXT-TO-SKIN

12   LAYER.

13   Q.    AND SO DO YOU HAVE AN OPINION ABOUT WHETHER FOTTINGER

14   DISCLOSES THE IDEA OF HAVING HEAT-DIRECTING ELEMENTS

15   POSITIONED ON THE INNERMOST SURFACE OF THE GARMENT?

16   A.    IN MY OPINION, FOTTINGER DOES NOT DISCLOSE THIS

17   ELEMENT.

18   Q.    NOW, NEXT LIMITATION SAYS, "WHEREIN A SURFACE AREA RATIO

19   OF HEAT-DIRECTING ELEMENTS TO BASE MATERIAL IS FROM ABOUT" --

20   THIS IS THE 30- TO 70-PERCENT RANGE; RIGHT?

21   A.    CORRECT.

22   Q.    OKAY.  AND WHAT DOES FOTTINGER SAY ABOUT THE COVERAGE

23   THAT HE'S IMPLYING ON HIS FABRIC?

24   A.    FOTTINGER TEACHES US TO USE HIS INVENTION AT A LOW

25   LEVEL, AND HE SPECIFICALLY POINTS OUT UP IN THIS UPPER

1970

1    SECTION ABOUT THE TRANSFER OF MOISTURE, THAT IF WE PUT TOO

2    MUCH OF OUR HYDROPHOBIC BINDER, HIS INVENTION ONTO THE

3    FABRIC, THAT THE TRANSFER OF MOISTURE MAY BE IMPAIRED.

4            SO HE SPECIFICALLY TALKS ABOUT HAVING BETWEEN 60 TO

5    95 PERCENT OF THE SURFACE AREA OF THE COATED FACE OF THE

6    FABRIC IS UNCOATED.  AND NOT ONLY --

7    Q.   LET ME JUST STOP YOU THERE.  YOU SAID 60 TO 95 PERCENT

8    UNCOATED.

9            JUST TO MAKE SURE WE DON'T CONFUSE THE JURY.  60 TO

10   95 PERCENT UNCOATED IS WHAT PERCENTAGE COATED?

11   A.   5 TO 40 PERCENT MAXIMUM.

12   Q.   SO IT'S THE SAME NUMBER THAT HE TALKED ABOUT EARLIER IN

13   THE PATENT?

14   A.   CORRECT.

15   Q.   OKAY.  I'LL LET YOU CONTINUE YOUR ANSWER.  YOU WERE

16   EXPLAINING WHAT FOTTINGER TEACHES WITH RESPECT TO HOW MUCH

17   COATING YOU SHOULD HAVE.

18   A.   WELL, FOTTINGER IS LIKE MANY INVENTORS, THEY HAVE A WIDE

19   RANGE, BUT THEY TELL US, IF YOU REALLY WANT TO PRACTICE THIS,

20   YOU NEED TO NARROW DOWN WHAT YOU'RE DOING.

21           AND IN FOTTINGER'S CASE, HE GIVES US MORE DIRECTION,

22   PREFERABLY THAT THE INDIVIDUAL AREAS COVER FROM 10 TO 20

23   PERCENT OF THE SURFACE AREA.

24   Q.   THANK YOU.

25           BUT TO BE CLEAR, WHAT EXACTLY IS IT THAT

COMPUTER-AIDED TRANSCRIPTION

1971

1    MR. FOTTINGER IS COVERING WITHIN THESE RANGES?

2    A.   HIS BINDER COMPOSITION, WHICH CONTAINS THE ROUGHLY 8

3    PERCENT ALUMINUM PARTICLES.

4    Q.   SO DO WE HAVE ANY IDEA WHAT THE PERCENT COVERAGE IS OF

5    ALUMINUM PARTICLES ON THE SURFACE OF THE FABRIC?

6    A.   WELL, IF YOU HAVE A MAXIMUM OF 40 PERCENT COVERAGE, BUT

7    ONLY 8 PERCENT OF THE 40 PERCENT IS ACTUAL ALUMINUM POWDER,

8    THAT'S CONSIDERABLY LESS THAN 5 PERCENT COVERAGE OF THE

9    FABRIC BY THE ALUMINUM POWDER.

10   Q.   DO YOU REMEMBER MR. BLACKFORD TESTIFIED ABOUT HIS

11   INVENTION AND HOW HE THOUGHT THAT THE IDEAL RANGE WAS BETWEEN

12   30 AND 70 PERCENT?

13   A.   YES.

14   Q.   IS THERE ANYTHING IN FOTTINGER THAT SUGGESTS YOU COULD

15   GO UP TO 70 PERCENT COVERAGE AND STILL GET MOISTURE VAPOR

16   PERMEABILITY AND AIR PERMEABILITY?

17   A.   NO.   FOTTINGER SPECIFICALLY TEACHES A PRACTITIONER TO

18   STAY DOWN ON THE LOWER LIMIT BECAUSE OF HIS CITED IMPAIRMENT

19   OF THE MOISTURE MOVEMENT THROUGH THE FABRIC.

20   Q.   SO IN YOUR OPINION, DOES FOTTINGER TEACH THE IDEA OF 30-

21   TO 70-PERCENT COVERAGE OF HEAT-REFLECTING ELEMENTS ON A BASE

22   MATERIAL?

23   A.   NO.

24   Q.   FOTTINGER -- WELL, CLAIM 2 ALSO REQUIRES THAT THERE BE

25   HEAT-DIRECTING ELEMENTS THAT ARE POSITIONED TO DIRECT HEAT IN

1972

1  A DESIRED DIRECTION, WHICH IS TOWARDS THE BODY OF A BODY GEAR

2  USER.

3          DO YOU SEE THAT?

4  A.   YES, I DO.

5  Q.   AND DID YOU LOOK AT WHETHER FOTTINGER DISCLOSES THIS

6  IDEA TO A PERSON OF ORDINARY SKILL IN THE ART?

7  A.   YES, I DID.  FOTTINGER FOLLOWS UP WITH HIS ONE EXAMPLE

8  THAT HE GIVES OF HIS FABRIC SUBSTRATE OF THE BINDER

9  COMPOSITION, WITH THE ALUMINUM POWDER THAT HE PUTS ONTO HIS

10  FABRIC SUBSTRATE.  HE GOES FURTHER AND HE ACTUALLY SEWS THIS

11  FABRIC INTO THE BODY, THE TORSO PORTION OF A JACKET.

12  Q.   ALL RIGHT.  SO LET'S WALK THROUGH THIS CAREFULLY.  WE

13  TALKED ABOUT IT A LITTLE BIT YESTERDAY WITH DR. BLOCK.

14          WHAT TYPE OF FABRIC DID HE USE FOR THIS PARTICULAR

15  EXPERIMENT?

16  A.   HE USES A NONWOVEN FABRIC, WHICH HAS BEEN PRINTED ON ONE

17  SIDE WITH HIS BINDER COMPOSITION THAT CONTAINS THE ALUMINUM.

18  THE WAY HE DESCRIBES IT, IT APPEARS THAT WHAT HE'S TALKING

19  ABOUT IS -- WE WOULD CALL AN INTERLINING MATERIAL.

20  Q.   IS THAT WHAT IS SHOWN HERE ON THE SCREEN?

21  A.   YES.  HE DESCRIBES FURTHER DOWN THAT IT'S AN INTERLINING

22  FABRIC, ACCORDING TO HIS INVENTION.

23  Q.   OKAY.  AND SO HE CREATED A TEST FOR HIS FABRIC TO SEE IF

24  IT WORKED; IS THAT RIGHT?

25  A.   THAT'S CORRECT.

1   Q.   OKAY.  AND CAN YOU EXPLAIN TO THE JURY HOW THIS TEST

2   WORKED.  WHAT DID HE DO?

3   A.   FOTTINGER TOOK A JACKET, AND INTO THE RIGHT-HAND HALF,

4   HE SHOWS HIS INVENTION.

5   Q.   ALL RIGHT.  SO THIS RIGHT-HAND HALF -- WE'RE GOING TO

6   USE THE CANADIAN JACKET TODAY, RATHER THAN MY JACKET.  OKAY.

7        THE RIGHT-HAND HALF IS WHERE HE PUT HIS INVENTION?

8   A.   CORRECT.

9   Q.   OKAY.  AND THEN CONTINUE.

10  A.   AND ON THE LEFT-HAND HALF --

11  Q.   (INDICATING.)

12  A.   -- HE PUTS HIS INVENTION MINUS THE ALUMINUM POWDER.  SO

13  THE TWO SIDES ARE IDENTICAL TO EACH OTHER, EXCEPT THE

14  RIGHT-HAND SIDE HAS THE ALUMINUM AND THE LEFT HAND DOES NOT

15  HAVE THE ALUMINUM.

16  Q.   OKAY.  AND THEN AFTER HE CREATED THIS MOCK-UP JACKET

17  WITH AN INTERLINING FABRIC, WHAT DID HE DO?

18  A.   HE PUTS THE JACKET ON A PERSON, SETS THE PERSON INTO A

19  ROOM THAT'S APPROXIMATELY THE TEMPERATURE OF THE ROOM WE'RE

20  ALL SITTING IN, AND HAS THE PERSON SIT IN THE -- SIT IN THE

21  ROOM WEARING THE JACKET FOR TEN MINUTES.

22        AT THE END OF TEN MINUTES, HE USES A CAMERA THAT CAN

23  MEASURE THE SURFACE TEMPERATURE OF THAT JACKET.  AND HE --

24  THE CAMERA TAKES AN IMAGE OF THE JACKET.

25  Q.   SO HE'S TAKING A MEASUREMENT OF THE TEMPERATURE OF THE

1974

1    OUTSIDE OF THE JACKET; IS THAT RIGHT?

2    A.    CORRECT.

3    Q.    OKAY.  AND HERE ON THE SCREEN, HE PROVIDES THE SUMMARY

4    OF HIS TEST; IS THAT RIGHT?

5    A.    YES.

6    Q.    AND WHAT DID HE SAY WAS THE RESULT OF HIS EXPERIMENT?

7    A.    FOTTINGER TELLS US THAT THE SIDE OF THE JACKET WHICH

8    CONTAINED HIS INVENTION WITH THE ALUMINUM POWDER IN IT WAS

9    1.5 TO 2 DEGREES CELSIUS ABOVE THAT OF THE OPPOSITE SIDE;

10   THAT IS, THE OUTSIDE OF THE JACKET THAT CONTAINED HIS

11   INVENTION WAS HOTTER THAN THE SIDE OF THE JACKET THAT DID NOT

12   CONTAIN HIS INVENTION.

13            AND THEN, AS A DOUBLE-CHECK, FOTTINGER SWITCHES THE

14   TWO SIDES OF THE JACKET, SO HE STARTS WITH HIS INVENTION ON

15   THE RIGHT SIDE AND HIS CONTROL ON THE LEFT, HE DOES A SECOND

16   EXPERIMENT WHERE HE PUTS HIS INVENTION ON THE LEFT SIDE OF

17   THE JACKET AND WITH HIS CONTROL ON THE RIGHT.

18            AND FINDS IN BOTH CASES THAT THE OUTER SURFACE OF

19   THE SIDE OF THE JACKET THAT CONTAINS HIS INVENTION IS WARMER

20   THAN THE SIDE OF THE JACKET THAT DOES NOT CONTAIN HIS

21   INVENTION.

22   Q.    AND AT THE BOTTOM OF THE SCREEN IN THE YELLOW, HE HAS

23   THE FINAL CONCLUSION OF HIS WORK; RIGHT?

24   A.    YES.

25   Q.    AND WHAT DOES HE SAY?

1975

1    A.   WELL, THE BOTTOM LINE HERE IS "CONSEQUENTLY, FOR THE

2    SAME RESISTANCE TO THE PASSAGE OF MOISTURE, A SUBSTANTIALLY

3    IMPROVED HEAT-INSULATING EFFECT WAS OBTAINED."

4    Q.   OKAY.  AND WE SAW THESE SLIDES EARLIER IN THE WEEK.

5    THIS IS YOUR MOCK-UP OF A JACKET?

6    A.   CORRECT.

7    Q.   AND THE RIGHT CHEST PORTION HAD THE ALUMINUM POWDER IN

8    IT?

9    A.   HAS HIS INVENTION WITH THE ALUMINUM POWDER.

10   Q.   AND THE LEFT PORTION DID NOT HAVE THE ALUMINUM POWDER;

11   RIGHT?

12   A.   CORRECT.  HAS EVERYTHING THAT THE RIGHT-HAND SIDE HAS,

13   EXCEPT NO ALUMINUM.

14   Q.   AND WHICH DIRECTION DID THE HEAT MOVE IN HIS JACKET, IF

15   THE OUTSIDE OF THE JACKET WAS WARMER?

16   A.   IT MOVED FROM INSIDE THE JACKET TO THE OUTER SURFACE OF

17   THE JACKET.

18   Q.   DOES THAT PROVE THAT THERE WAS REFLECTION GOING ON?

19   A.   NO.  IT SUGGESTS THAT THERE IS CONDUCTION.

20   Q.   IS THERE ANY EVIDENCE HERE THAT THERE WAS ANY

21   REFLECTION?

22   A.   HIS EXAMPLE DOESN'T HAVE ANY EVIDENCE OF REFLECTION.

23   Q.   WOULD A PERSON OF ORDINARY SKILL IN THE ART READING THIS

24   PATENT, BUILDING THIS, WOULD THEY END UP MAKING A PRODUCT

25   THAT WAS A HEAT-REFLECTOR, LIKE WHAT MR. BLACKFORD DESCRIBED

1976

1   IN HIS PATENT?

2   A.   NO.

3   Q.   COLUMBIA'S PATENTS INSTEAD REQUIRE THAT THE

4   HEAT-DIRECTING ELEMENTS REFLECT HEAT TOWARDS THE BODY; IS

5   THAT RIGHT?

6   A.   CORRECT.  IN THIS PARTICULAR GRAPHIC, THE BODY IS DOWN

7   AT THE LOW LEVEL, AND THE OUTSIDE IS UP AT THE TOP OF THE

8   PICTURE.  SO THE RED LINES, WHICH ARE TYPICALLY USED BY

9   GRAPHIC ARTIST TO SHOW HEAT ARE CLEARLY SHOWING HEAT COMES UP

10  FROM THE BODY, GETS REFLECTED OFF OF THE HEAT-DIRECTING

11  ELEMENTS AND THEN IS DIRECTED BACK TOWARDS THE BODY.

12  Q.   NOW, YOUR OPINION, ARE YOU AWARE OF ANYBODY ELSE WHO

13  AGREED WITH YOUR OPINION THAT THE JACKET DID NOT CONFIRM THAT

14  IT REFLECTED HEAT?

15  A.   I BELIEVE IF YOU LOOK AT SOME OF DR. BLOCK'S EARLIER

16  TESTIMONY --

17       MR. SPROUL:  OBJECTION.

18       THE WITNESS:  THAT WAS FROM HIS DEPOSITION LAST

19  YEAR.

20       THE COURT:  HANG ON JUST A SECOND.  I'M SORRY.

21       MR. SPROUL:  THE WAY I UNDERSTOOD THE QUESTION --

22  MAYBE IT WAS A DIFFERENT QUESTION THAT SHE'S ANSWERING.  I

23  UNDERSTOOD HIM TO BE ASKING, IS THERE ANYBODY ELSE OUT THERE

24  WHO DISAGREES ON FOTTINGER; NOT LIMITED TO MR. BLOCK.

25       THE COURT:  YOUR OBJECTION IS OVERRULED.  SHE IS

1977

1   RESPONDING TOWARDS DR. BLOCK.  THAT'S OKAY.

2           GO AHEAD.  I'M SORRY.

3           THE WITNESS:  DR. BLOCK'S DEPOSITION LAST YEAR, YOU

4   CAN SEE ON THE SCREEN WHAT HE SAID.  THAT MR. FOTTINGER'S

5   EXPERIMENT -- THE QUESTION WAS, "MR. FOTTINGER'S EXPERIMENT

6   DOES NOT SUPPORT THE IDEA THAT HIS INVENTION WORKED BECAUSE

7   IT REFLECTED HEAT."

8           AND DR. BLOCK RESPONDED, "DOES NOT WORK SPECIFICALLY

9   BECAUSE IT REFLECTED HEAT.  NO.  HE -- HE TRULY CANNOT MAKE

10  THAT STATEMENT."

11  Q.   BY MR. ALDRICH:  AND SO IN YOUR OPINION, DOES FOTTINGER

12  ENABLE A PERSON OF ORDINARY SKILL IN THE ART TO MAKE A

13  GARMENT THAT HAS HEAT-DIRECTING ELEMENTS THAT ARE POSITIONED

14  TO DIRECT HEAT IN A DESIRED DIRECTION BACK TOWARDS THE BODY

15  OF A BODY GEAR USER?

16  A.   IN MY OPINION, FOTTINGER DOES NOT.

17          MR. SPROUL:  MR. ALDRICH.

18          MR. ALDRICH:  YES.

19          MR. SPROUL:  YOUR HONOR, COULD WE MOVE THAT JACKET A

20  FOOT BACKWARDS.

21          MR. ALDRICH:  NO PROBLEM.

22          MR. SPROUL:  THANK YOU.

23  Q.   BY MR. ALDRICH:  AND SO IN YOUR OPINION, DOES FOTTINGER

24  ANTICIPATE THE UTILITY PATENT, CLAIM 2?

25  A.   NO.  AS WE -- AS I SAID AT THE BEGINNING OF THIS

1978

1    RECITATION, FOR ANTICIPATION, EACH AND EVERY ELEMENT IN THE

2    PATENT CLAIM HAS TO BE SUPPORTED WITHIN A SINGLE DOCUMENT.

3    AND WHAT WE HAVE HERE IS FOUR DIFFERENT AREAS WITHIN THIS ONE

4    PATENT CLAIM THAT I CAN'T FIND THE SUPPORT FOR THEM WITHIN

5    FOTTINGER.

6    Q.    LET'S TALK ABOUT CLAIM 23 REALLY QUICKLY.  DO YOU HAVE

7    AN OPINION ABOUT WHETHER CLAIM 23 ANTICIPATES -- SORRY,

8    WHETHER FOTTINGER ANTICIPATES CLAIM 23 OF THE PATENT?

9    A.    FOTTINGER DOES NOT ANTICIPATE CLAIM 23.  AS WE DISCUSSED

10   EARLIER, CLAIM 2 AND CLAIM 23 ARE EXTREMELY SIMILAR.  IT'S

11   ONLY UP IN THIS THIRD CLAUSE THAT THERE IS ANY DIFFERENCE IN

12   THE WORDING AT ALL, WITH DISCRETE AND INDIVIDUALLY COUPLED.

13   BUT THE SAME DISCUSSION HOLDS HERE.

14   Q.    OKAY.  NOW, IF FOTTINGER DOESN'T ANTICIPATE, YOU

15   UNDERSTAND THAT DR. BLOCK AND SEIRUS HAVE TAKEN THE POSITION

16   THAT THE PATENT WOULD AT LEAST BE RENDERED OBVIOUS OVER A

17   COMBINATION OF PUTTING FOTTINGER TOGETHER WITH ONE OF FOUR

18   OTHER PATENTS; CORRECT?

19   A.    CORRECT.

20   Q.    OKAY.

21   A.    IF YOU CAN'T FIND ALL OF THE CLAUSES IN A SINGLE

22   DOCUMENT, YOU ARE PERMITTED TO GO BACK AND SEE IF I COMBINED

23   THINGS THAT APPEAR TO GO TOGETHER, CAN I FILL IN THE HOLES IN

24   THE PARTICULAR PATENT ELEMENTS WHICH WERE MISSING IN THE

25   PRIMARY REFERENCE, IN THIS CASE IDENTIFIED AS FOTTINGER.

1979

1    Q.    AND DR. BLOCK OPINED THAT A PERSON OF ORDINARY SKILL IN

2    THE ART COULD COMBINE FOTTINGER WITH ONE OF THESE FOUR

3    REFERENCES TO FILL IN THE GAP OF FOTTINGER NOT HAVING 30- TO

4    70-PERCENT COVERAGE; RIGHT?

5    A.    YES.

6    Q.    OKAY.  DO YOU HAVE AN OPINION ABOUT WHETHER ANY OF THESE

7    FOUR REFERENCES HAVE HEAT-DIRECTING ELEMENTS IN A 30- TO

8    70-PERCENT COVERAGE ON A BASE MATERIAL?

9    A.    I DO HAVE AN OPINION, AND MY OPINION IS NONE OF THEM DO.

10   NONE OF THESE HAVE HEAT-DIRECTING ELEMENTS IN THEM.  AND I

11   BELIEVE THE COURT HAS ALREADY ISSUED AN OPINION ABOUT THAT.

12           MR. SPROUL:  OBJECTION.

13           THE COURT:  SUSTAINED.

14           MR. SPROUL:  I ASK THE TEXT BE REMOVED FROM THE

15   SLIDE.

16           THE COURT:  GO AHEAD AND TAKE IT DOWN.

17           MR. SPROUL:  YOUR HONOR, COULD WE HAVE A LIMITING

18   INSTRUCTION ON THIS.

19           THE COURT:  DON'T CONSIDER WHAT I DIDN'T.  REACH

20   YOUR DECISION UNLESS I INSTRUCT YOU OTHERWISE.

21   Q.    BY MR. ALDRICH:  LET'S TALK ABOUT HALLEY FOR A MOMENT.

22           WHAT IS -- ARE YOU FAMILIAR WITH THE HALLEY PATENT?

23   A.    YES.

24   Q.    WHAT IS THE HALLEY PATENT ABOUT?

25   A.    HALLEY IS ABOUT TRYING TO IMPROVE THE ABRASION

1980

1    RESISTANCE OF A MEMBRANE MATERIAL THAT MOST OF US CASUALLY

2    KNOW AS GORTEX.

3    Q.   AND WHAT DID HALLEY COME UP WITH THAT HE PATENTED IN HIS

4    PATENT?

5    A.   HALLEY CAME UP WITH THE IDEA OF PRINTING DOTS ON ONE

6    SIDE OF THE MEMBRANE, AND THESE DOTS WOULD BUILD UP THE

7    ABRASION RESISTANCE OF THE MEMBRANE SO THAT YOU DIDN'T HAVE

8    TO PUT AN EXTRA LINING FABRIC BETWEEN THE MEMBRANE AND THE

9    BODY.

10   Q.   WERE THOSE DOTS -- WHAT WERE THOSE DOTS MADE OF?

11   A.   THEY ARE MADE OF BINDERS.  THEY ARE MADE OF PLASTIC

12   BASICALLY.

13   Q.   DO THEY HAVE ANY METAL IN THEM?

14   A.   NO.

15   Q.   THEY ARE NOT METALLIC PLASTIC?

16   A.   NO.

17   Q.   THEY ARE NOT FOIL?

18   A.   NO.

19   Q.   YOU'RE FAMILIAR WITH THE VAUGHN REFERENCE?

20   A.   YES.

21   Q.   AND WHAT IS THE VAUGHN REFERENCE?

22   A.   THE VAUGHN REFERENCE IS A U.K. PATENT APPLICATION, WHICH

23   YOU CAN THINK OF AS BUILDING ON THE SAME IDEA AS HALLEY; THAT

24   IS, THIS IS ALSO A PTFE MEMBRANE, A GORTEX KIND OF MATERIAL,

25   ALSO TRYING TO ADDRESS THE IDEA OF GETTING IMPROVED ABRASION

COMPUTER-AIDED TRANSCRIPTION

1981

1    RESISTANCE BY EITHER COATING A BINDER ONTO IT OR BY PRINTING

2    DOTS ONTO IT.

3              IN THIS PARTICULAR CASE, WHAT VAUGHN HAS DONE IS ADD

4    A SMALL AMOUNT OF CARBON POWDER TO HIS BINDER COMPOSITION.

5    IT'S A SIMILAR COMPOSITION THAT HE USES IN PRINTING THE DOTS.

6    BUT HE POINTS OUT THAT YOU COULD PRINT IT -- YOU COULD COAT

7    IT CONTINUOUSLY, THAT IS, YOU COULD COVER 100 PERCENT OF THE

8    AREA, OR IF YOU WANT TO, YOU CAN PRINT THE DOTS ON TOP OF THE

9    AREA THAT HE'S ALREADY COATED.  BUT THE IDEA IS TARGETED

10   TOWARDS IMPROVING ABRASION RESISTANCE AGAIN.

11   Q.   SO HE'S GOT A COATING THAT'S 100 PERCENT COVERAGE; IS

12   THAT RIGHT?

13   A.   THAT'S ONE OF THE REPRESENTATIONS THAT VAUGHN MAKES.

14   Q.   AND THEN HE PUTS SOME DOTS ON TOP OF THE COATING?

15   A.   YES.

16   Q.   AND WHAT'S THE DIFFERENCE BETWEEN DOTS AND THE

17   COATING?

18   A.   THEY ARE VERY SIMILAR.  BOTH OF THEM CONTAIN CARBON

19   PARTICLES, VERY FINE CARBON PARTICLES.  AND HE EXPRESSES

20   SURPRISE THAT HE CAN ACTUALLY GET IMPROVED ABRASION

21   RESISTANCE AT -- I THINK AT ABOUT 1.5 PERCENT CARBON; SO IT'S

22   A VERY LOW CARBON LOADING IN HIS BINDER COMPOSITION.

23   Q.   DID VAUGHN MENTION ANYTHING ABOUT ALUMINUM FOIL?

24   A.   NO.

25   Q.   DID HE MENTION ANYTHING ABOUT MYLAR?

1982

1    A.    NO.

2    Q.    DID HE MENTION ANYTHING ABOUT METALLIC PLASTIC?

3    A.    NO.

4    Q.    DID YOU READ THE BLAUER PATENT?

5    A.    YES.

6    Q.    WHAT IS BLAUER ABOUT?

7    A.    BLAUER IDENTIFIES A PROBLEM WITH RAINCOAT FABRICS.  SO

8    THESE ARE SHELL FABRICS, AND HE RECOGNIZES THAT HE NEEDS TO

9    INCREASE THE TENSILE STRENGTH, BUT PARTICULARLY HE NEEDS TO

10   INCREASE THE DIMENSIONAL STABILITY.  THESE KIND OF FABRICS,

11   FREQUENTLY IF YOU PULL ON THEM, SLIDE IN SIDEWAY DIRECTIONS

12   VERY EASILY IN MANUFACTURING.

13        SO BLAUER HAS INVENTED A WAY OF PRINTING DOTS ON ONE

14   SIDE OF THE FABRIC, AND BY PUTTING THE DOTS IN, HE'S

15   ESSENTIALLY GLUING PIECES OF THE FABRIC STRUCTURE, THE WOVEN

16   FABRIC STRUCTURE TOGETHER, AND THEREBY IMPROVES THE

17   DIMENSIONAL STABILITY.

18   Q.    SO WHAT ARE THE DOTS MADE OF?

19   A.    THEY ARE PLASTIC.

20   Q.    ARE THEY METALLIC PLASTIC?

21   A.    NO.

22   Q.    IS THERE ANY FOIL?

23   A.    NO.

24   Q.    ARE YOU FAMILIAR WITH THE WORLEY PATENT?

25   A.    YES.

1983

1    Q.    AND WHAT IS WORLEY'S INVENTION ABOUT?

2    A.    WORLEY IS ANOTHER OUTGROWTH FROM NASA-INVENTED

3    TECHNOLOGY, IS MY UNDERSTANDING.    WORLEY IS PROBABLY BEST

4    THOUGHT OF AS PUTTING A HIGH-TECH INSULATED MATERIAL ONTO A

5    FABRIC.

6    Q.    DOES WORLEY MENTION FOILS?

7    A.    NO.

8    Q.    DOES HE MENTION METALLIC PLASTIC?

9    A.    NO.

10   Q.    DOES HE MENTION MYLAR?

11   A.    NO.

12   Q.    DOES HE MENTION ANYTHING THAT REFLECTS HEAT?

13   A.    NO.

14   Q.    DOES HE MENTION ANYTHING THAT DIRECTS HEAT IN A DESIRED

15   DIRECTION?

16   A.    NO.

17   Q.    SO LET'S ASSUME FOR A MOMENT, THOUGH, THAT SEIRUS CAN

18   SHOW THAT IF YOU COMBINE FOTTINGER WITH ONE OF THESE FOUR

19   REFERENCES, THAT YOU CAN FILL THE GAP, IF YOU WILL, OF

20   HEAT-DIRECTING ELEMENTS AT A 30- TO 70-PERCENT COVERAGE

21   RATIO.

22           DOES THAT MEET THE STANDARD FOR OBVIOUSNESS AS FAR

23   AS YOU'RE AWARE?

24   A.    NO.    EVEN IF YOU COULD FILL IN THE CLAUSE THAT YOU'VE

25   HIGHLIGHTED IN YELLOW, YOU STILL HAVE THE OTHER THREE CLAUSES

COMPUTER-AIDED TRANSCRIPTION

1984

1    WHICH ARE NOT FILLED IN BY EITHER FOTTINGER OR ANY OF THE

2    OTHER FOUR REFERENCES.  EVEN IF YOU COMBINE ALL FIVE PATENTS

3    AND PATENT APPLICATIONS, YOU JUST DON'T FILL IN THOSE

4    HOLES.

5    Q.   NOW, YOU'RE AWARE THAT WHEN YOU DO AN OBVIOUSNESS

6    ANALYSIS, THERE IS A RISK THAT -- THERE IS THIS RISK OF

7    HINDSIGHT; RIGHT?

8    A.   YES, I'M AWARE OF IT.

9    Q.   OKAY.  AND THAT'S A PROBLEM, WHERE -- THAT WE CONTEND

10   WITH, WHEN WE LOOK BACK TEN YEARS LATER ON, SOMETHING THAT

11   HAPPENED A LONG TIME AGO; RIGHT?

12   A.   CORRECT.

13   Q.   OKAY.  LIKE TODAY, PEOPLE MIGHT LOOK AT POST-IT NOTES

14   AND SAY POST-IT NOTES, THAT'S OBVIOUS.  JUST PUT SOME STICKY

15   STUFF ON A PIECE OF PAPER AND ANYBODY COULD HAVE COME UP WITH

16   THAT; RIGHT?

17   A.   CORRECT.

18   Q.   BUT, IN FACT, YOU KNOW THE HISTORY BEHIND POST-IT NOTES;

19   RIGHT?

20   A.   YES.

21   Q.   AND WAS THAT A PATENTABLE INVENTION, AS FAR AS YOU'RE

22   AWARE?

23   A.   AS FAR AS I'M AWARE, IT'S A PATENTABLE INVENTION.  I

24   DON'T KNOW IF A PATENT WAS ACTUALLY ISSUED, HOWEVER.

25   Q.   OKAY.  AND SO WE ARE SUPPOSED TO TAKE INTO REGARD SOME

1985

1    EVIDENCE IN RENDERING OUR CONCLUSION ABOUT WHETHER A PATENT

2    WAS OBVIOUS; RIGHT?

3    A.   CORRECT.

4    Q.   OKAY.  AND I HAVE ON THE SCREEN SOME OF THE REAL-WORLD

5    EVIDENCE THAT IS SUPPOSED TO BE CONSIDERED IN THE ANALYSIS.

6         DID YOU CONSIDER THESE FACTORS WHEN YOU RENDERED

7    YOUR OPINION IN THIS CASE?

8    A.   YES, I DID.

9    Q.   OKAY.  LET'S TALK ABOUT THE FIRST ONE, COMMERCIAL

10   SUCCESS.  THAT'S SOMETHING THAT YOU LOOKED AT?

11   A.   YES, I DID.

12   Q.   ARE COLUMBIA'S PRODUCTS COMMERCIALLY SUCCESSFUL?

13   A.   YES.  AT TRIAL, WE'VE HEARD NUMBERS OF OVER A BILLION

14   DOLLARS' WORTH OF COLUMBIA PRODUCTS CONTAINING THEIR

15   OMNI-HEAT REFLECTIVE FABRICS BEING SOLD.

16   Q.   AND DID YOU HEAR MR. BLOCK -- OR I'M SORRY,

17   MR. BLACKFORD TESTIFY THAT COLUMBIA DESIGNS ITS OMNI-HEAT

18   FABRIC TO PRACTICE IN THE 35-, 37-PERCENT COVERAGE RANGE?

19   A.   YES.  MR. BLACKFORD AT, I BELIEVE IT WAS HIS DEPOSITION

20   A LITTLE OVER A YEAR AGO, TOLD EVERYONE THAT COLUMBIA

21   DESIGNED THIS PARTICULAR PRODUCT FOR A 37-PERCENT AREA

22   COVERAGE; THAT IS, THE METALLIC DOTS THAT YOU SEE HERE ON

23   THIS JACKET LINING COVER 37 PERCENT OF THE LINING FABRIC, THE

24   SO-CALLED BASE FABRIC.

25   Q.   DID YOU TEST THE WATER VAPOR PERMEABILITY AND MOISTURE

1986

1   VAPOR PERMEABILITY ON COLUMBIA'S OMNI-HEAT PRODUCTS TO SEE IF

2   THEY PRACTICE THOSE PARTICULAR LIMITATIONS OF THE PATENT?

3   A.   YES, I DID.   IN A MANNER SIMILAR TO WHAT I HAD DONE

4   PREVIOUSLY.   I SENT LARGE PIECES OF THESE FABRICS OUT TO THE

5   PRECISION TESTING, WHICH IS A CERTIFIED THIRD-PARTY TESTING

6   LAB, WHERE THEY RAN TWO INDUSTRY STANDARD TESTS, ONE FOR

7   WATER VAPOR PERMEABILITY AND THE SECOND ONE FOR AIR

8   PERMEABILITY TESTING.

9   Q.   AND DID YOU --

10  A.   I ALSO SENT OUT, IN ADDITION TO THE REFLECTORIZED

11  MATERIAL, I SENT OUT THE BASE FABRICS THAT CORRESPONDED TO

12  THOSE REFLECTORIZED MATERIALS.

13  Q.   AND DID YOU DRAW A CONCLUSION ABOUT WHETHER COLUMBIA

14  PRACTICES MR. BLACKFORD'S PATENTS?

15  A.   YES.   THE BASE MATERIAL DOES RETAIN AT LEAST SOME OF ITS

16  MOISTURE PERMEATION, AS WELL AS AIR PERMEABILITY AFTER THE

17  FOIL HAS BEEN APPLIED TO IT.

18  Q.   AND YOU ALREADY RENDERED AN OPINION THAT SEIRUS ALSO

19  PRACTICES THE INVENTION; CORRECT?

20  A.   CORRECT.   CLAIMS 2 AND CLAIM 23.

21  Q.   OKAY.   AND YOU'VE ALSO HEARD TESTIMONY FROM DR. BLOCK

22  AND MS. DISTLER THAT SEIRUS PRACTICES CLAIMS 2 AND 23;

23  CORRECT?

24  A.   CORRECT.

25  Q.   OKAY.   AND ARE YOU -- WERE YOU HERE AT TRIAL TO HEAR OR

1987

1    ARE YOU AWARE OF SEIRUS' SALES FROM PRACTICING THE CLAIMS OF

2    THE PATENT?

3    A.    YES.

4    Q.    OKAY.  AND DID YOU CONSIDER THEIR COMMERCIAL SUCCESS IN

5    EVALUATING WHETHER THE PATENTS WERE OBVIOUS OR NOT?

6    A.    YES.  I THINK THIS VOLUME OF SALES CERTAINLY SHOWS THAT

7    THE PRODUCT HAS BEEN COMMERCIALLY SUCCESSFUL.

8    Q.    AND DID YOU DO ANY ANALYSIS IN TERMS OF WHETHER THE

9    COMMERCIAL SUCCESS THAT COLUMBIA AND SEIRUS ENJOYED WAS

10   RELATED TO THE FACT THAT THEY WERE PRACTICING MR. BLACKFORD'S

11   INVENTION?

12          MR. SPROUL:  OBJECTION.  FOUNDATION.  OUTSIDE THE

13   SCOPE OF HER EXPERTISE.

14          THE COURT:  OVERRULED.  SHE CAN ANSWER THE

15   QUESTION.

16          THE WITNESS:  IF YOU LOOK AT THE TWO HANG TAGS, THE

17   ONE ON THE LEFT FOR THE COLUMBIA OMNI-HEAT PRODUCT AND THE

18   ONE ON THE RIGHT FOR THE SEIRUS HEATWAVE PRODUCT, IF YOU LOOK

19   AT THEM IN -- DO WE HAVE SOME UP HERE?

20   Q.    BY MR. ALDRICH:  DR. COLE, IF YOU'LL LET ME KNOW WHAT

21   YOU'RE LOOKING FOR, I CAN PROBABLY HELP PROVIDE IT.

22   A.    WELL, THIS IS ONE OF SEIRUS' PRODUCTS.  THIS IS -- THIS

23   ONE WAS IDENTIFIED AS EXHIBIT 22.1 (SIC), ONE OF THE GLOVES.

24          AND IF YOU LOOK AT THE LABELING ON THE GLOVE, ON THE

25   SIDE THAT WOULD NORMALLY HANG ON A WALL, FOR INSTANCE,

1988

1    TOWARDS A POTENTIAL PURCHASER, THE LABEL COVERS APPROXIMATELY

2    HALF OF THE FACE OF THE GLOVE.  AND PROMINENTLY DISPLAYED ON

3    THIS LABEL, AS WE'VE SEEN A NUMBER OF TIMES BEFORE, THE

4    BOTTOM HALF HAS A GRAPHIC THAT SHOWS HOW HEATWAVE FUNCTIONS.

5    THE TOP SHOWS THE HEATWAVE DESIGN, THE PRINT, IF YOU WISH.

6    ACROSS THE CENTER, THERE WAS AN ENLARGED PRINT, HEATWAVE.

7            SO THERE IS NOTHING REALLY ON HERE THAT'S NOT

8    HEATWAVE, EXCEPT FOR THE SMALL PRINT WHICH IS SEIRUS' NAME

9    AND THE SIZE OF THE GLOVE.  SO ABOUT, I DON'T KNOW, 95

10   PERCENT OF THE SURFACE OF THIS TAG APPEARS TO BE ADVERTISING

11   HEATWAVE.

12   Q.   DID YOU LOOK AT OTHER MARKETING MATERIALS IN TERMS OF

13   DETERMINING WHETHER THE COMMERCIAL SUCCESS OF THE PRODUCT IS

14   RELATED TO THE FACT THAT THE COMPANY IS PRACTICING THE

15   PATENTED TECHNOLOGY?

16   A.   YES.  WHAT YOU'RE SEEING ON THIS SLIDE SHOWS THE

17   GRAPHICS, WHICH ON THE LEFT IS THE ONE THAT COLUMBIA USES FOR

18   OMNI-HEAT; ON THE RIGHT, THE ONE THAT SEIRUS USES FOR

19   HEATWAVE.  BOTH OF THESE GRAPHICS, AS I JUST SHOWED ON THE

20   LARGE TAGS, SHOW HOW THE CLAIMED PRODUCT TECHNOLOGY ACTUALLY

21   WORKS.

22           YOU FURTHER SEE THIS FOR BOTH, THE TOP HERE IS

23   COLUMBIA'S DOTS, THE ONES THAT THEY ARE USING RIGHT NOW FOR

24   OMNI-HEAT.  DOWN ON THE BOTTOM FOR HEATWAVE.  SOME TIME AGO I

25   WENT ON AMAZON AND ACTUALLY BOUGHT A SEIRUS PRODUCT, AND I

1989

1    WAS CONFRONTED -- I WAS SHOWN A PICTURE OF A SEIRUS PRODUCT

2    THAT LOOKED VERY SIMILAR TO THE KIND OF PICTURE THAT WE SEE

3    HERE DOWN ON THE BOTTOM LEFT; THAT IS, THE PRODUCT SHOWED UP

4    ON MY COMPUTER SCREEN CLEARLY DRAWING MY ATTENTION TO THE

5    INSIDE, AS WELL AS TALKING ABOUT HEATWAVE, THAT THIS WAS

6    SOMETHING THAT I AS A CONSUMER SHOULD LOOK FOR, AND THEREFORE

7    USE IT AS ONE OF MY PURCHASE DECISION CRITERIA.

8            FOR THE MOST PART, BY FAR THE MOST IMPORTANT

9    PURCHASE CRITERIA THAT I WAS BEING GIVEN.

10   Q.   SO YOU LOOKED THEN AT THE COMMERCIAL SUCCESS OF BOTH

11   COLUMBIA AND SEIRUS IN YOUR ANALYSIS BEFORE YOU CONCLUDED

12   WHETHER THE PATENT WAS OBVIOUS OR NOT; IS THAT RIGHT?

13   A.   CORRECT.

14   Q.   OKAY.  DID YOU LOOK AT WHETHER THERE HAD BEEN A

15   LONG-FELT BUT UNSOLVED NEED?

16   A.   YES.  AS I MENTIONED LAST WEEK, I'VE BEEN IN THIS

17   INDUSTRY FOR OVER 41 YEARS, ACTUALLY GREW UP WITH IT, SO I'VE

18   BEEN IN THE TEXTILE AND THE APPAREL INDUSTRY FOR ALMOST ALL

19   OF MY LIFE.

20           AND I'VE GONE TO MANY U.S. AND INTERNATIONAL

21   CONFERENCES OVER THOSE YEARS, WHERE WE ALWAYS TALK ABOUT THE

22   PROBLEM OF HOW DO WE HAVE MOISTURE PERMEABILITY,

23   AIR-PERMEABLE KINDS OF FABRICS, WHICH ARE ALSO WARM FABRICS,

24   WITHOUT MAKING MATERIALS WHICH ARE EXCESSIVELY BULKY.  SO

25   THIS HAS BEEN SOMETHING THAT IT'S BEEN WORKED ON IN THE U.S.

1990

1    TEXTILE INDUSTRY FOR OVER 60 YEARS.

2    Q.    AND DO YOU HAVE AN UNDERSTANDING OF HOW LONG AGO IT WAS

3    THAT THE SPACE BLANKET WAS INVENTED?

4    A.    I BELIEVE NASA INVENTED THAT PARTICULAR PRODUCT IN THE

5    EARLY '60S.

6    Q.    LET'S GO ON TO THE THIRD FACTOR.

7          DID YOU LOOK AT WHETHER ANY OTHERS HAD TRIED TO

8    ACCOMPLISH WHAT MR. BLACKFORD ACCOMPLISHED BUT WERE

9    UNSUCCESSFUL?

10   A.    YES, I DID.

11   Q.    AND I THINK YOU PROVIDED A SLIDE WITH AN EXAMPLE?

12   A.    RIGHT.  ONE OF THESE PRODUCTS IS WHAT WE HAVE PREVIOUSLY

13   REFERRED TO AS THE CASTELLI JACKET.  CASTELLI IS A COMPANY

14   THAT SELLS CLOTHING, VERY HIGH-END, TO BICYCLE RACERS AND

15   AMATEURS.  AND CASTELLI MARKETED WHAT THEY CALLED THE SILVER

16   RADIATION JACKET.

17         THIS PARTICULAR LINER IS A FILM-LIKE PRODUCT SIMILAR

18   TO THE SPACE BLANKET, EXCEPT IT HAS HOLES PUNCHED IN IT,

19   PRESUMABLY TO GIVE BETTER MOISTURE AND AIR PERMEATION THROUGH

20   THE FABRIC.

21         BUT EVEN WITH HOLES PUNCHED IN IT, WE SEE HERE WHERE

22   ONE OF THEIR PURCHASERS DIDN'T LIKE IT.  IT DIDN'T RELEASE

23   ENOUGH PERSPIRATION, HATED THE WAY IT FELT ON BARE SKIN.

24   Q.    ARE YOU AWARE OF ANY OTHER EXAMPLES, WHERE SOMEBODY HAS

25   TRIED TO SOLVE THE PROBLEM, BUT WAS UNSUCCESSFUL?

1991

```
 1    A.    THE FOTTINGER EXAMPLE THAT WE'VE JUST BEEN TALKING ABOUT

 2    IS ANOTHER EXAMPLE OF A FAILURE.

 3          THE COURT:  WHY DON'T WE STOP RIGHT NOW FOR OUR

 4    AFTERNOON RECESS AT THIS TIME.

 5          MR. ALDRICH:  SURE.  THANK YOU, YOUR HONOR.

 6          THE COURT:  I NOTICE SOME OF THE JURORS ARE YAWNING

 7    THERE, SO LET'S TAKE OUR BREAK.  15, YOU WANT ABOUT 15

 8    MINUTES.

 9          (JURY ABSENT, 3:03 P.M.)

10          THE COURT:  WE'LL TAKE 15.

11          (RECESS, 3:03 P.M. TO 3:19 P.M.)

12          THE COURT:  PLEASE BE SEATED.

13          YOU MAY PROCEED.

14    Q.    BY MR. ALDRICH:  DR. COLE, WE WERE TALKING ABOUT WHETHER

15    OTHERS HAD FAILED IN THEIR ATTEMPTS.

16          DID YOU -- DID YOU GET A SAMPLE OF FOTTINGER'S

17    FABRIC?

18    A.    NO.

19    Q.    DID YOU TRY?

20    A.    NO.

21    Q.    DID YOU MAKE ANY EFFORT TO CONTACT -- DO YOU KNOW WHAT

22    COMPANY FOTTINGER WORKED FOR?

23    A.    FOTTINGER WORKED FOR A EUROPEAN COMPANY CALLED

24    FREUDENBERG.  FREUDENBERG IS ONE OF THE LARGEST MANUFACTURERS

25    OF NONWOVEN FABRICS IN THE WORLD.  AND I CONTACTED SOMEONE I
```

COMPUTER-AIDED TRANSCRIPTION

1992

1    KNEW AT FREUDENBERG THROUGH MY PROFESSIONAL ASSOCIATIONS.

2    THIS PARTICULAR INDIVIDUAL HAD WORKED AT FREUDENBERG DURING

3    THE TIME THAT THIS INVENTION, THIS APPLICATION WAS FILED.  HE

4    ALSO SOLD THESE KIND OF PRODUCTS THAT FOTTINGER CLAIMS IN HIS

5    INVENTION.

6         SO I ASKED HIM IF HE HAD EVER SEEN THIS MATERIAL, IF

7    HE COULD REMEMBER IT, AND HE SAID NO.  HE CHECKED WITH SOME

8    OF HIS OTHER PEOPLE AT FREUDENBERG, AND THEY HAD NO

9    RECOLLECTION OF THIS EVER BEING A COMMERCIAL PRODUCT, EITHER.

10   Q.   DID YOU LOOK AT WHETHER THERE HAD BEEN ANY INDUSTRY

11   PRAISE FOR THE INVENTION AFTER THE LAUNCH OF THE OMNI-HEAT

12   PRODUCTS?

13   A.   YES.

14   Q.   AND DID YOU SPEAK WITH ANYBODY AT COLUMBIA ABOUT THAT?

15   A.   YES.  I SPOKE WITH MR. SCOTT TREPANIER, I BELIEVE IS HOW

16   IT'S PRONOUNCED.

17   Q.   YOUR GUESS IS AS GOOD AS ANY OF OURS AT THIS POINT.

18   A.   PRIOR TO THIS TRIAL, I SPOKE WITH MR. TREPANIER,

19   CHAPERONED BY COUNSEL AS USUAL.  AND AT THAT POINT,

20   MR. TREPANIER DESCRIBED SOME OF THE FEEDBACK THAT THEY HAD

21   GOTTEN FROM INDIVIDUALS, FROM PRINT ARTICLES AND SO FORTH,

22   AND HE ALSO SPOKE SIMILARLY ABOUT THESE MATERIALS EARLY IN

23   THIS TRIAL LAST WEEK.

24   Q.   DID YOU LOOK AT WHETHER THERE WAS ANY SKEPTICISM FROM

25   OTHERS ABOUT WHETHER MR. BLACKFORD'S INVENTION WOULD BE

1  SUCCESSFUL?

2  A.   YES.

3  Q.   AND WHAT EXAMPLE OF SKEPTICISM ARE YOU AWARE OF?

4  A.   WELL, WE'VE BEEN TALKING ABOUT FOTTINGER.  AND THIS IS

5  AN -- THIS IS THE EXAMPLE WE LOOKED AT PREVIOUSLY IN

6  FOTTINGER, WHERE FOTTINGER BASICALLY SAYS THAT IF YOU'RE

7  TRYING TO MAINTAIN A LOW RESISTANCE TO THE TRANSFER OF

8  MOISTURE, THAT IS, A VERY HIGH MOISTURE VAPOR PERMEABILITY

9  THROUGH THE MATERIAL, YOU DON'T WANT TO COVER VERY MUCH OF

10  THE FABRIC.

11         AND IN PARTICULAR, HE CALLS OUT KEEPING 60 TO 95

12  PERCENT OF THE SURFACE AREA OF HIS INVENTION UNCOATED; THAT

13  IS, HAVING A COVERAGE OF 5 TO 40 PERCENT MAXIMUM.  AND IN

14  ADDITION, AS WE SAW BEFORE, HE PREFERS COVERING SOMEWHERE

15  BETWEEN 10 AND 20 PERCENT.

16  Q.   WE WERE TALKING ABOUT INDUSTRY PRAISE.  DO YOU REMEMBER

17  MR. BLACKFORD TESTIFYING ABOUT THE LAUNCH OF THE OMNI-HEAT

18  PRODUCTS?

19  A.   YES.

20  Q.   AND WHAT DO YOU REMEMBER ABOUT MR. BLACKFORD'S TESTIMONY

21  ABOUT THE INITIAL LAUNCH OF THE OMNI-HEAT PRODUCTS?

22  A.   AS I RECALL, IT HAD BEEN A VERY LARGE ROLLOUT AND WAS

23  EXTREMELY WELL RECEIVED, COLUMBIA FELT.

24  Q.   OKAY.  AND DID YOU TAKE INTO REGARD ANY EVIDENCE OF

25  OFFERS FOR LICENSING THAT COLUMBIA RECEIVED AFTER IT LAUNCHED

1994

1    THE OMNI-HEAT PRODUCTS?

2    A.    YES, I DID.    PRIOR TO TRIAL, I ENDED UP AGAIN SPEAKING

3    WITH, OR ACTUALLY LISTENING TO MR. MERRIMAN, AGAIN ESCORTED,

4    CHAPERONED, AS I DESCRIBE IT BY COUNSEL, TALKING ABOUT

5    COLUMBIA'S LICENSING STRATEGY AS WELL AS LICENSES THAT THEY

6    HAD EXECUTED, WHICH INVOLVED THE OMNI-HEAT TECHNOLOGY.

7          WHAT MR. MERRIMAN TOLD ME AT THAT TIME WAS VERY

8    SIMILAR TO WHAT WE HEARD LAST WEEK; THAT IS, THAT COLUMBIA

9    HAD RECEIVED ABOUT 20 REQUESTS FOR POSSIBLE LICENSING OF

10   OMNI-HEAT.    THEY HAD ACTUALLY EXECUTED FOUR LICENSES.

11   Q.    AND FINALLY, DID YOU LOOK AT WHETHER THERE WAS ANY

12   EVIDENCE THAT AFTER COLUMBIA LAUNCHED THE OMNI-HEAT PRODUCTS,

13   ANYBODY HAD COPIED THAT INVENTION?

14   A.    YES.    AS WE'VE SEEN PREVIOUSLY, THESE ARE, AGAIN, SEIRUS

15   E-MAILS AND PHOTOGRAPHS, WHICH SHOW THE OMNI-HEAT MATERIAL AS

16   RECEIVED, AS WELL AS IT WAS RECEIVED WITH THE PATENT PENDING.

17   IT'S NOT JUST STAMPED IN THERE.    THAT'S PART OF THE FOIL

18   WHICH HAS BEEN -- I REFER TO IT AS A LAMINATION PROCESS,

19   LAMINATED INTO THE FABRIC.

20   Q.    OKAY.    AND SO DID YOU KEEP ALL OF THESE FACTORS IN MIND

21   AS YOU WERE DOING YOUR OBVIOUSNESS ANALYSIS?

22   A.    YES.

23   Q.    AND WAS WOODY'S IDEA OBVIOUS, WOULD IT HAVE BEEN OBVIOUS

24   TO A PERSON OF ORDINARY SKILL IN THE ART BACK IN 2008 TO HAVE

25   COME UP WITH THE IDEA THAT WOODY BLACKFORD CAME UP WITH?

1995

1    A.   IN MY OPINION, MR. BLACKFORD'S IDEA WAS NOT OBVIOUS,

2    SHOWN BOTH BY LOOKING AT THE UNSATISFIED PATENT CLAIM

3    ELEMENTS, AS WELL AS BY LOOKING AT THE MORE -- I THINK OF

4    THEM MORE AS EVERYDAY EVIDENCE THAT NO ONE ELSE DID IT.

5         I MEAN, TO ME, IT WAS OBVIOUS, IT WAS CLEARLY

6    IDENTIFIED AS A NEED WITHIN THE INDUSTRY OVER 60 YEARS AGO.

7    SO THERE WAS OVER 60 YEARS WHERE SOME OF THE TOP MINDS IN THE

8    INDUSTRY, PEOPLE WHO ARE NOT ONLY OF ORDINARY SKILL IN THE

9    ART, BUT THE EXPERTS, HAD TO BE ABLE TO INVENT THIS.

10   Q.   AND SO DO YOU HAVE A FINAL OPINION ABOUT WHETHER THE

11   CLAIMS 2 AND 23 OF THE UTILITY PATENT ARE VALID?

12   A.   IN MY OPINION, THE UTILITY PATENT IS A VALID PATENT;

13   THAT IS, AS YOU SPECIFY CLAIMS 2 AND CLAIM 23 OF THE '270

14   PATENT.

15             MR. ALDRICH:  NO FURTHER QUESTIONS, YOUR HONOR.

16             THE COURT:  CROSS-EXAMINE.

17             MR. SPROUL:  MAY I PROCEED, YOUR HONOR?

18             THE COURT:  YOU MAY.

19             MR. SPROUL:  THANK YOU.

20                       CROSS-EXAMINATION

21   BY MR. SPROUL:

22   Q.   GOOD AFTERNOON, DR. COLE.

23   A.   GOOD AFTERNOON.

24   Q.   YOU AGREE THAT MR. BLACKFORD DID NOT INVENT HEAT

25   REFLECTIVITY IN FABRICS?

1996

1    A.    THAT'S CORRECT.  THE NASA SPACE BLANKET, FOR INSTANCE,

2    AS HE DESCRIBES IN HIS PATENT APPLICATION, EXISTED BEFORE HIS

3    INVENTION WAS THOUGHT OF.

4    Q.    MR. BLACKFORD DID NOT INVENT COVERING 30 TO 70 PERCENT

5    OF A BASE LAYER FABRIC WITH ELEMENTS?

6    A.    WE'RE NOT DESCRIBING WHAT THE NATURE OF THOSE ELEMENTS

7    ARE?

8    Q.    THAT'S RIGHT.

9    A.    OKAY.  NO.  COVERING ANYWHERE FROM 1 TO 100 PERCENT OF

10   THE FABRIC IS IDENTIFIED IN WORLEY, FOR INSTANCE.

11   Q.    AND MR. BLACKFORD DOESN'T PURPORT TO HAVE INVENTED THE

12   PRINTING PROCESS BY WHICH THE FOIL IS COUPLED TO THE FABRIC

13   EITHER, DOES HE?

14   A.    NO.  JUST TO BE SPECIFIC, IT'S NOT TECHNICALLY KNOWN IN

15   THE INDUSTRY AS PRINTING.  IT'S A LAMINATING PROCESS.  THE

16   FOIL TECHNICALLY IS NOT PRINTED.

17   Q.    UNDERSTOOD.  I HAD "LAMINATED" AND I DECIDED TO USE

18   "PRINTED."

19          MR. BLACKFORD DOESN'T PURPORT TO HAVE INVENTED THE

20   PROCESS BY WHICH THE FOIL IS LAMINATED TO THE FABRIC?

21   A.    NO, HE DOES NOT.

22   Q.    AND MR. BLACKFORD DOES NOT -- IS NOT THE INVENTOR OF THE

23   BASE LAYER FABRIC RECITED IN HIS CLAIMS, IS HE?

24   A.    NO, HE'S NOT.

25   Q.    AND, IN FACT, HIS PATENTS -- EXCUSE ME, HIS PATENT, THE

1997

1    '270 PATENT, MAKES NO MENTION OF THE MACHINES USED BY THE

2    MANUFACTURERS TO MAKE THE FABRIC, SUCH AS OMNI-HEAT?

3    A.    NO, THERE IS NO MENTION OF EQUIPMENT.

4    Q.    AND THESE -- THIS EQUIPMENT EXISTED BEFORE

5    MR. BLACKFORD'S INVENTION?

6    A.    YES.

7    Q.    IN FACT, MR. BLACKFORD'S '270 PATENT MAKES NO MENTION OF

8    ANYTHING ABOUT THE MANUFACTURING PROCESS; ISN'T THAT FAIR?

9    A.    NOT OF THE FOIL ONTO THE FABRIC, THAT'S CORRECT.  I

10    BELIEVE THERE IS A METHOD PATENT IN THERE WHICH IS NOT IN

11    PLAY IN THIS PARTICULAR TRIAL.

12    Q.    THE '270 PATENT MAKES NO MENTION OF THE MANUFACTURING

13    PROCESS, DOES IT?

14    A.    CORRECT.

15    Q.    YOU AGREE THAT THE FOTTINGER REFERENCE IS PRIOR ART IN

16    THIS CASE?

17    A.    YES.

18    Q.    AND YOU JUST -- YOU DO NOT DISPUTE THAT FOTTINGER

19    TEACHES AT LEAST SOME OF THE CLAIMS OF THE '270 PATENT; ISN'T

20    THAT RIGHT?

21    A.    THAT'S CORRECT.

22    Q.    COULD YOU PULL UP --

23    A.    WELL, PARTS OF CLAIM 2 AND PARTS OF CLAIM 23.

24    Q.    COULD YOU PULL UP PDX324.  MAYBE I DIDN'T SAY THAT

25    CORRECTLY.

COMPUTER-AIDED TRANSCRIPTION

1998

1    MR. SPROUL:  COULD WE PUBLISH PDX 324.  I BELIEVE IT

2    WAS SHOWN IN HER PRESENTATION?

3    MR. ALDRICH:  NO OBJECTION.

4    Q.  BY MR. SPROUL:  YOU DON'T CHALLENGE THAT FOTTINGER

5    DISCLOSES THE PREAMBLE OF CLAIM 1, FOR INSTANCE?

6    A.  NO, I DON'T CHALLENGE IT.

7    Q.  AND YOU DON'T CHALLENGE THAT FOTTINGER DISCLOSES THE

8    SECOND ELEMENT, STARTING WITH A BASE MATERIAL?

9    A.  NO, I DON'T CHALLENGE IT.

10   Q.  AND YOU DON'T CHALLENGE THAT FOTTINGER DISCLOSES THE

11   ELEMENT RECITING THE WHEREIN, THE PLACEMENT AND SPACING OF

12   THE HEAT-DIRECTING ELEMENTS?  YOU DON'T CHALLENGE THAT

13   ELEMENT EITHER, DO YOU?

14   A.  I DON'T CHALLENGE THE PLACEMENT AND THE SPACING.  I DO

15   CHALLENGE HIS CHARACTERIZATION THAT THEY ARE HEAT-DIRECTING

16   ELEMENTS.

17   Q.  FAIR ENOUGH.

18   A.  BUT THE REST OF THAT CLAUSE WHERE THE BASE MATERIAL

19   RETAINS PARTIAL PERFORMANCE OF THE TRANSFER PROPERTY, I DON'T

20   CHALLENGE THAT, THAT FOTTINGER SHOWS THAT.

21   Q.  NOW, YOU DISPUTE THE SURFACE AREA RATIO.  YOU DISPUTE

22   THAT FOTTINGER DISCLOSES THE SURFACE AREA RATIO OF 7:3 AND

23   3:7, THE 30- TO 70-PERCENT RANGE; IS THAT FAIR?

24   A.  FOTTINGER DISCLOSES A SURFACE AREA COVERAGE OF 5 TO 40

25   PERCENT.

1    Q.    AND DO YOU AGREE THAT THERE IS A 10-PERCENT OVERLAP

2    BETWEEN THE FOTTINGER DISCLOSURE AND THE CLAIMED RANGE?

3    A.    AS A GENERAL COVERAGE.  I DO DISPUTE WHAT IS BEING

4    COVERED, BECAUSE THIS PATENT CLAIM CALLS FOR THE

5    HEAT-DIRECTING ELEMENTS IN A 30- TO 70-RATIO, NOT A SIMPLE

6    COVERAGE OF 30 TO 70 PERCENT.

7    Q.    YOU UNDERSTAND THAT FOTTINGER -- STRIKE THAT.

8          YOU UNDERSTAND THAT MR. -- DR. BLOCK AND SEIRUS

9    MAINTAIN THAT IT IS THE ENTIRE DOT AND NOT MERELY THE

10   ALUMINUM THAT REFLECTS HEAT?  DID YOU HEAR DR. BLOCK TESTIFY

11   TO THAT YESTERDAY?

12   A.    YES, I DID.  AND PART OF MY DIRECT, WE PULLED BACK UP

13   PART OF WHAT DR. BLOCK TESTIFIED TO, THE EXACT WORDING THAT

14   HE GAVE.

15   Q.    AND I UNDERSTAND YOU DISAGREE.  YOU'RE POINTING ONLY TO

16   THE ALUMINUM ELEMENTS.  BUT YOU UNDERSTAND THAT DR. BLOCK IS

17   ASSERTING THAT IT'S THE ENTIRE DOT.  I THINK THAT'S THE WORD

18   YOU USED EARLIER IN YOUR TESTIMONY.

19   A.    MY UNDERSTANDING -- OKAY.  ALUMINUM CLEARLY IS A

20   MATERIAL THAT'S CAPABLE OF INTERACTING WITH HEAT.  THE BINDER

21   MATERIAL, THE REST OF THE BINDER COMPOSITION HAS NO MORE

22   ABILITY TO INTERACT WITH HEAT THAN THE BASE MATERIAL DOES.

23   Q.    INTERACT WITH HEAT, CONDUCT HEAT, FOR INSTANCE?

24   A.    IT POSSIBLY CAN CONDUCT HEAT.  BUT IT GOES BACK TO

25   UNFORTUNATELY WHAT TENDS TO GET TITLED AN ACADEMIC ARGUMENT,

2000

1    WHICH IS WHERE I GATHER THAT HE WAS GOING AT ONE POINT

2    YESTERDAY AFTERNOON WITH PLANCK'S LAW, THAT EVERYTHING IS A

3    BODY RADIATOR.  ABSOLUTELY.  THAT'S TRUE.  IT'S A MINUSCULE

4    AMOUNT.

5          IF WE LOOK AT THE AMOUNT OF HEAT REFLECTION, FOR

6    INSTANCE, THAT A HUMAN BODY CAN GIVE, IT'S AN EXTREMELY LOW

7    LEVEL, EVEN RELATIVE TO THESE BASE MATERIALS.  AND THE

8    MATERIAL IN FOTTINGER'S BINDER COMPOSITION, ASIDE FROM THE

9    ALUMINUM, HAS A SIMILAR KIND OF INTERACTION WITH HEAT AS THE

10   BASE MATERIAL DOES.

11   Q.   YOU AGREE, THOUGH, THAT FOTTINGER, HIS TEACHING

12   CERTAINLY SUGGEST THAT HE THINKS THAT HIS INVENTION CAN

13   REFLECT HEAT.  YOU WOULD AGREE WITH THAT?

14   A.   FOTTINGER MAKES A MENTION OF HEAT REFLECTION.  BUT IF

15   YOU LOOK DOWN AT THE BOTTOM OF THE ONLY EXAMPLE THAT HE GIVES

16   US, HE MENTIONS A HEAT INSULATION MATERIAL.  HE DOESN'T

17   MENTION REFLECTION THERE.

18   Q.   YOU DIDN'T ANSWER MY QUESTION, WITH ALL DUE RESPECT,

19   DR. COLE.

20         YOU AGREE THAT FOTTINGER'S TEACHINGS CERTAINLY

21   SUGGEST THAT HE THINKS HIS INVENTION CAN BE USED TO REFLECT

22   HEAT?

23   A.   HE MENTIONS THE POSSIBILITY OF HEAT REFLECTION, BUT HE

24   MENTIONS IT IN PASSING.  AS I SAID, THE ONLY EXAMPLE THAT HE

25   GIVES TO A PERSON OF ORDINARY SKILL IN THE ART, HIS RATHER

2001

1    LENGTHY EXAMPLE, HOW HE PUTS HIS FABRIC TOGETHER, HOW HE

2    MANUFACTURES HIS FABRIC, HE SAYS IT'S CONDUCTED.

3              MR. SPROUL:  YES, YOUR HONOR.

4              THE COURT:  SO PLEASE TRY TO ANSWER THE QUESTION

5    THAT'S BEING ASKED.  IF THERE IS FURTHER EXPLANATION THAT IS

6    NEEDED, THAT'S WHAT THAT SIDE OF THE ROOM IS FOR.

7              THE WITNESS:  THANK YOU.

8              MR. SPROUL:  THANK YOU, DOCTOR.

9    Q.   I'LL ASK YOU A THIRD TIME.  YOU AGREE THAT FOTTINGER'S

10   TEACHING CERTAINLY SUGGESTS THAT HE THINKS HIS INVENTION CAN

11   BE USED TO REFLECT HEAT?

12   A.   COULD YOU PULL UP THE WORDING IN FOTTINGER?

13             MR. SPROUL:  ACTUALLY, WHY DON'T WE DO THIS.  LET'S

14   PULL UP YOUR DEPOSITION, SINCE I THINK I'VE ASK IT ENOUGH TO

15   BE ABLE TO IMPEACH HER WITH IT, YOUR HONOR.

16             PAGE 168, LINES 5 THROUGH 10.

17             MAY I PUBLISH?  I WAS READING HER ANSWER VERBATIM.

18             THE COURT:  JUST LET ME LOOK AT IT, PLEASE.

19             MR. SPROUL:  UNDERSTOOD.

20             THE COURT:  YES, YOU MAY PUBLISH IT TO THE JURY.

21             MR. SPROUL:  THANK YOU.  THE QUESTION ASKED IN YOUR

22   DEPOSITION WAS:

23             "BUT YOU WOULD AGREE, THIS WOULD -- THIS WOULD TEACH

24        A PERSON OF SKILL OR A PRACTITIONER, AS YOU PHRASED IT

25        EARLIER, ABOUT THE USE OF REFLECTING RADIATED HEAT IN

COMPUTER-AIDED TRANSCRIPTION

2002

1       APPAREL.

2            "ANSWER:  FOTTINGER'S TEACHINGS CERTAINLY SUGGEST

3       THAT HE THINKS HIS INVENTION CAN BE USED TO REFLECT

4       HEAT."

5   Q.   THAT WAS YOUR TESTIMONY, WAS IT NOT?

6   A.   YES, IT WAS.  I AGREE.

7   Q.   YOU AGREE?

8   A.   THAT -- I AGREE WITH MYSELF I GUESS.

9   Q.   THAT'S ALL I WAS ASKING YOU.  I WAS USING YOUR WORDS,

10  AND IT TOOK US A LONG TIME TO GET THERE.

11  A.   YES.  YES.

12  Q.   THANK YOU, DR. COLE.

13           IF YOU CAN PULL UP EXHIBIT 1040, WHICH IS THE

14  FOTTINGER REFERENCE, COLUMN 4, LINE 68 TO 76.  AND I'M GOING

15  TO ASK YOU SPECIFICALLY ABOUT THE WORD "REFLECTED" IN

16  FOTTINGER.

17           YOU AGREE THAT FOTTINGER ACTUALLY USES THE WORD

18  "REFLECTED," DOES HE NOT?  AGAIN, COLUMN 4, LINE 68 TO 76.

19  IN THE MIDDLE THERE, I THINK IT'S THE THIRD SENTENCE, HE

20  SAYS, "THE DIFFERENT DEGREES OF RADIATED HEAT," THAT'S THE

21  HEAT FROM THE HUMAN BODY, "FROM THESE ZONES IS REFLECTED BY A

22  SHEET OF THE INVENTION, AND THIS ALLOWS THE MAINTENANCE OF

23  THE EXISTING TEMPERATURE DIFFERENCES."

24           YOU AGREE HE SAYS THAT?

25  A.   YES.  THIS IS PART OF FOTTINGER'S PATENT APPLICATION.

1    Q.    THAT'S WHAT HE SAYS?

2    A.    YES.

3    Q.    HEAT FROM THE USER'S BODY IS REFLECTED BY A SHEET OF HIS

4    INVENTION?

5    A.    YES.

6    Q.    NOW, YOU CHALLENGE THE EXAMPLE PROVIDED BY MR. FOTTINGER

7    IN HIS PATENT APPLICATION, AND SPECIFICALLY, WHETHER OR NOT

8    IT TEACHES HEAT REFLECTION VERSUS CONDUCTION OR SOMETHING

9    ELSE; IS THAT FAIR?

10   A.    THAT'S CORRECT.

11   Q.    AND YOU, TO RECAP, SAY THAT BECAUSE THE SIDE OF THE

12   JACKET USING A PIECE OF FABRIC FROM HIS EXAMPLE IS WARMER,

13   THAT THAT SHOWS CONDUCTION, NOT HEAT REFLECTION; IS THAT

14   FAIR?

15   A.    THAT'S CORRECT.

16   Q.    NOW, YOU AGREE THAT THE OMNI-HEAT JACKET CAN BOTH

17   CONDUCT AND REFLECT HEAT FROM A USER'S BODY?

18   A.    IT'S POSSIBLE IT CONDUCTS, YES.  IT CERTAINLY

19   REFLECTS.

20   Q.    YOU HEARD MR. BLACKFORD TESTIFY TO THAT EFFECT?

21   A.    I BELIEVE SO.  I ACTUALLY DID -- HAD TESTING DONE ON THE

22   MATERIAL FOR THE HEAT REFLECTION.  AND THERE WAS A -- AN

23   APPRECIABLE INCREASE IN HEAT REFLECTION FROM THE

24   HEAT-REFLECTIVE MATERIAL VERSUS THE BASE MATERIAL THAT IT'S

25   ATTACHED TO.

2004

1    Q.   WELL, I'D LIKE TO ASK YOU A LITTLE BIT ABOUT

2    MR. BLACKFORD'S TESTIMONY BECAUSE HE SAID THAT THERE WAS

3    CONDUCTION AND REFLECTION IN THE OMNI-HEAT FABRICS.

4         DO YOU RECALL?

5    A.   I'M NOT SURE I WAS HERE FOR THAT PART OF HIS TESTIMONY.

6    IF YOU COULD PULL IT UP.

7         BUT I WOULD CAUTION IN TALKING ABOUT MR. BLACKFORD

8    AND HOW HIS INVENTION ACTUALLY WORKS, MR. BLACKFORD IS A VERY

9    HUMBLE INDIVIDUAL WHO POINTS OUT REPEATEDLY THAT HE'S NOT A

10   SCIENTIST.  HE'S JUST AN INVENTOR.

11   Q.   CAN WE RELY ON WHAT HE SAID IN COURT?

12   A.   WE CAN RELY ON THE FACT THAT HE BELIEVES WHAT HE SAID,

13   BUT HE ALSO ALWAYS PUTS IN THE CAVEAT THAT HE'S NOT A

14   SCIENTIST.

15   Q.   SO HE MAY NOT KNOW WHAT HE'S TALKING ABOUT WITH RESPECT

16   TO THE SCIENCE BEHIND HIS ALLEGED INVENTION?

17   A.   I WOULD CRITICIZE THE USE OF "ALLEGED."  IT'S AN

18   INVENTION.  WHETHER YOU BELIEVE THAT A PATENT IS VALID OR NOT

19   HAS NOTHING TO DO WITH AN INVENTION HAVING BEEN CREATED.  BUT

20   IN MY EXPERIENCE, MY LIMITED EXPERIENCE WORKING WITH PATENT

21   INFRINGEMENT CASES, IF HE IS THE INVENTOR, DOESN'T UNDERSTAND

22   ALL OF THE SCIENCE BEHIND HIS INVENTION, IT WOULDN'T BE THE

23   FIRST TIME THAT I'VE RUN ACROSS IT.

24   Q.   SO ARE YOU DISAGREEING WITH MR. BLACKFORD'S TESTIMONY

25   REGARDING THE CONDUCTIVITY AND REFLECTIVITY OF HIS OMNI-HEAT

2005

1    FABRIC?

2    A.   I HAVEN'T SEEN HIS TESTIMONY UP ON THE SCREEN YET.

3    COULD YOU SHOW IT TO ME, PLEASE.

4    Q.   YES.  I WOULD BE MORE THAN WILLING TO DO THAT.

5         COULD YOU PULL UP TESTIMONY FROM DAY 4, LINES --

6    EXCUSE ME, PAGE 981, STARTING AT LINE 25.  HE WAS BEING ASKED

7    ABOUT AN ARTICLE IN WHICH HE WAS QUOTED, WHERE HE WAS

8    REFERRING TO THE CONDUCTIVITY AND THE REFLECTIVITY OF HIS

9    OMNI-HEAT FABRIC AS A YING-AND-YANG EFFECT.

10        DO YOU RECALL THAT?

11   A.   I WASN'T HERE WHEN THAT TESTIMONY WAS GIVEN.

12   Q.   DID YOU READ HIS TESTIMONY?

13   A.   NO, I HAVEN'T READ HIS TESTIMONY.

14   Q.   YOU SEE IT STARTING AT LINE 25 IN THE PRIOR PAGE, THE

15   QUESTION IS:  "YOU'VE DESCRIBED OMNI-HEAT AS HAVING A

16   YING/YANG EFFECT; RIGHT?"

17        HE SAYS, "YES, I COULD GO WITH THAT."

18        AND THEN IF WE GO DOWN TO -- I'M SORRY.  WE'LL

19   FINISH THE Q. & A.

20        "OKAY."  AND THEN IT SAYS ABOVE THAT, "I THINK

21        EXPLAINING WHAT YOU MEANT, THE ARTICLE STATES, THE FOIL

22        DOTS -- THOSE WOULD BE THE OMNI-HEAT DOTS ON THE FABRIC;

23        RIGHT?

24        "ANSWER:  YES.

25        "THEY REFLECT BODY HEAT BACK TO THE WEARER, BUT ARE

2006

```
 1          ALSO CONDUCTIVE.  DO YOU SEE THAT?"

 2              ANSWER BY MR. BLACKFORD.  "YES.  YES."

 3              "QUESTION:  SO THE DOTS ON OMNI-HEAT FABRIC ARE BOTH

 4          CONDUCTIVE AND REFLECTIVE; CORRECT?

 5              "ANSWER:  YES.  BECAUSE IF A METAL --

 6              "QUESTION:  SIR.  YES OR NO.

 7              "ANSWER:  YES."

 8  Q.   HE'S FAIRLY CLEAR ABOUT THAT, ABOUT THE CONDUCTIVITY OF

 9  HIS OWN OMNI-HEAT FABRIC, IS HE NOT?

10          MR. ALDRICH:  YOUR HONOR, THE WITNESS WASN'T HERE

11  THAT DAY.  CAN SHE HAVE THE COMPLETE TESTIMONY TO REVIEW,

12  OTHER THAN JUST THE PORTION ON THE SCREEN.

13          THE COURT:  SHE CAN GO AHEAD AND RESPOND TO THE

14  QUESTION THAT IS IN FRONT OF HER.

15          MR. ALDRICH:  OKAY.

16          THE WITNESS:  I SEE MR. BLACKFORD'S RESPONSE.  BUT

17  IT APPEARS TO BE IN RESPONSE TO A QUESTION THAT HE WAS ASKED

18  ABOUT AN ARTICLE, THAT HE'S RESPONDING TO WHAT WAS WRITTEN IN

19  THE ARTICLE.

20          CAN YOU SHARE WITH ME WHAT THE ARTICLE WAS.

21          MR. SPROUL:  CERTAINLY.  EXHIBIT -- COULD YOU PULL

22  UP EXHIBIT 32, PLEASE.

23          COULD WE HAVE THIS PUBLISHED, PLEASE.  IT'S ALREADY

24  BEEN ADMITTED.

25          THE COURT:  SURE.
```

2007

1        MR. SPROUL:  THANK YOU.  AND THE PARAGRAPH STARTING

2   THE FOIL DOTS, PLEASE.

3   Q.   IF YOU CAN READ THAT PARAGRAPH.

4   A.   COULD I SEE THE WHOLE ARTICLE, PLEASE?

5   Q.   YOU MAY.

6   A.   THANK YOU.

7        THE COURT:  HAVE YOU FINISHED?

8        THE WITNESS:  YES, I HAVE.

9        THE COURT:  GO AHEAD AND ASK YOUR QUESTION.

10  Q.   BY MR. SPROUL:  DR. COLE, DO YOU SEE WHERE HE -- WHERE

11  MR. BLACKFORD REFERS TO THE CONDUCTIVITY AND REFLECTIVITY OF

12  THE OMNI-HEAT FABRIC AS THE YING/YANG EFFECT?

13  A.   YES.

14  Q.   ARE YOU SAYING THAT MR. BLACKFORD IS WRONG?

15  A.   THAT'S HIS OPINION.

16  Q.   ARE YOU SAYING HE'S WRONG?

17  A.   WELL, IT'S WELL-KNOWN THAT METALS IN FOIL FORM ARE

18  CONDUCTIVE.  IT'S ALSO CERTAINLY KNOWN THAT METALS IN FOIL

19  FORM CAN BE REFLECTIVE.

20  Q.   IN FACT, ALUMINUM HAS A VERY HIGH THERMAL CONDUCTIVITY;

21  IS THAT FAIR?

22  A.   THAT'S CORRECT.  IT ALSO HAS A VERY HIGH ELECTRICAL

23  CONDUCTIVITY, WHICH IS WHY WE USED IT FOR YEARS AS ALUMINUM

24  WIRING.

25  Q.   AND THE BINDER WITH ALUMINUM POWDER IN IT, DESCRIBED BY

COMPUTER-AIDED TRANSCRIPTION

2008

1    FOTTINGER, HAS A MUCH LOWER THERMAL CONDUCTIVITY; ISN'T THAT

2    FAIR?

3    A.   THE ALUMINUM -- EXCUSE ME.  COULD YOU REPEAT IT?

4    Q.   THE BINDER WITH THE ALUMINUM POWDER DISCLOSED IN

5    FOTTINGER HAS A MUCH LOWER THERMAL CONDUCTIVITY, DOESN'T

6    IT?

7    A.   A MUCH LOWER THERMAL CONDUCTIVITY THAN WHAT?

8    Q.   THAN ALUMINUM.

9    A.   THAN PURE ALUMINUM?

10   Q.   THAN THE ALUMINUM USED IN THE OMNI-HEAT FABRIC.

11   A.   OH, THE ALUMINUM FOIL?

12   Q.   YES.

13   A.   CAN YOU BE PRECISE ABOUT WHICH FORM OF ALUMINUM YOU'RE

14   TALKING ABOUT.  ARE YOU TALKING POWDER FORM VERSUS FILM FORM

15   OR -- WHAT AM I BEING ASKED TO COMPARE?

16   Q.   THE ALUMINUM AS USED IN THE OMNI-HEAT FABRIC, WHAT FORM

17   IS THAT ALUMINUM IN?

18   A.   IT'S A FOIL.  IN THE OMNI-HEAT INDIVIDUAL DOTS, IT'S IN

19   FOIL FORM.

20   Q.   THE THERMAL CONDUCTIVITY OF ALUMINUM IN FOIL FORM IS

21   VERY HIGH, ISN'T IT?

22   A.   YOU WOULD EXPECT IT TO BE, YES.

23   Q.   IT IS; IS THAT TRUE?

24   A.   IT IS.  BUT, AGAIN, IT'S GOING -- HOW MUCH CONDUCTIVITY

25   YOU GET DEPENDS ON THE THICKNESS OF THE FOIL AS WELL.

2009

1    Q.   MY QUESTION IS RELATIVELY SIMPLE:   THE ALUMINUM FOIL

2    USED IN THE OMNI-HEAT, THE THERMAL CONDUCTIVITY OF THAT IS

3    HIGHER THAN THE THERMAL CONDUCTIVITY OF THE BINDER PLUS

4    ALUMINUM POWDER DESCRIBED IN FOTTINGER?

5    A.   I WOULD EXPECT THAT'S TRUE.   IT'S A LITTLE DIFFICULT TO

6    DRAW A COMPLETE COMPARISON BECAUSE MY UNDERSTANDING IS THE

7    ALUMINUM FOIL WHICH IS USED IN THESE HEAT-REFLECTIVE PRODUCTS

8    IS ONLY ON THE ORDER OF ABOUT ONE MICRON IN THICKNESS.

9         ON THE OTHER HAND, THE ALUMINUM PARTICLES WHICH

10   FOTTINGER USES ARE ABOUT 25 MICRONS.   SO THE ALUMINUM

11   PARTICLES THAT FOTTINGER USES HAVE ROUGHLY 25 TIMES THE

12   THICKNESS, AND YOU'D EXPECT IT TO BE, ON THE THICKNESS

13   COMPONENT, A BETTER HEAT CONDUCTOR THAN FILM IS.

14        HOWEVER, THE PARTICLES ARE IN A BINDER, A PLASTIC,

15   WHICH DOESN'T HAVE VERY GOOD THERMAL CONDUCTIVITY.   SO IT'S A

16   LITTLE BIT -- I MEAN, WE TALKED ABOUT YING/YANG.   IT'S A

17   LITTLE BIT OF A TRADE-OFF IN THERE.   IT'S ONE OF THE THINGS

18   YOU'D LIKE TO PROVE BY EXPERIMENTATION.

19   Q.   SITTING HERE NOW, CAN YOU TELL US WHETHER YOU BELIEVE --

20   WHETHER IT'S YOUR OPINION THAT THE THERMAL CONDUCTIVITY OF

21   THE DOTS, THE BINDER PLUS THE ALUMINUM POWDER, DESCRIBED BY

22   FOTTINGER IS HIGHER OR LOWER THAN THE THERMAL CONDUCTIVITY OF

23   THE ALUMINUM FOIL USED IN OMNI-HEAT?

24   A.   AND MY CANDID ANSWER IS QUITE FRANKLY, I DON'T KNOW.

25   Q.   OKAY.

2010

1    A.    I WOULD WANT TO MEASURE IT TO BE SURE OF AN ANSWER.

2    Q.    WOULD YOU EXPECT THE CONDUCTIVITY, THE THERMAL

3    CONDUCTIVITY OF THE OMNI-HEAT HEAT ALUMINUM FOIL TO BE HIGHER

4    WITHOUT MEASURING IT THAN THE ALUMINUM POWDER PLUS BINDER

5    DESCRIBED IN FOTTINGER?

6    A.    AGAIN, I SIMPLY DON'T KNOW BECAUSE THE ALUMINUM, ALL

7    THESE ALUMINIZED FILMS ARE NOT JUST ALUMINUM.  THEY ALSO HAVE

8    MULTIPLE LAYERS OF PLASTIC.  I BELIEVE IT'S POLYCARBONATE

9    WHICH ARE IN THERE, TO BE ABLE TO PROTECT THE ALUMINUM FOIL.

10   THAT'S GOING TO DECREASE THE THERMAL CONDUCTIVITY OF THE DOTS

11   IN A SIMILAR MANNER TO THE WAY THAT FOTTINGER'S BINDER WOULD

12   DECREASE THE THERMAL CONDUCTIVITY OF JUST THE BARE ALUMINUM

13   POWDER.

14        BOTH INVENTIONS HAVE SOMETHING WHICH DECREASES THE

15   THERMAL CONDUCTIVITY.

16   Q.    AND YOU DON'T KNOW WHAT THE THERMAL CONDUCTIVITY OF THE

17   ALUMINUM POWDER PLUS BINDER USED IN FOTTINGER IS?

18   A.    NO.  I DON'T KNOW.

19   Q.    CAN WE CALL THAT THE "FOTTINGER DOT" FOR SHORT, SO I

20   DON'T HAVE TO SAY ALUMINUM POWDER PLUS BINDER EVERY TIME.  I

21   BELIEVE "DOT" WAS A WORD YOU USED ON YOUR DIRECT?

22   A.    THAT'S FINE WITH ME.  I THINK WE'LL BOTH UNDERSTAND WHAT

23   WE'RE TALKING ABOUT.

24   Q.    THANK YOU, DR. COLE.

25        NOW, YOU CHALLENGE WHETHER FOTTINGER DISCLOSES AN

2011

1    INDEPENDENTLY COUPLED DISCRETE HEAT-DIRECTING ELEMENT; IS

2    THAT FAIR?

3    A.    YES.

4    Q.    AND YOU DO THAT ON THE BASIS THAT THE ALUMINUM PARTICLES

5    ARE DISBURSED IN A SINGLE BOUND DOT AND THEREFORE NOT

6    INDEPENDENTLY COUPLED; IS THAT WHAT I HEARD YOU TESTIFY TO?

7    A.    THAT'S CORRECT.  THE COURT'S DEFINITION IS THE

8    HEAT-DIRECTING ELEMENTS ARE INDIVIDUALLY COUPLED MEANS THAT

9    SOME OF THE BASE FABRIC HAS TO BE VISIBLE BETWEEN THE

10   HEAT-CONDUCTING ELEMENTS.

11   Q.    YOU AGREE, THOUGH, THAT THE FOTTINGER DOTS ARE

12   INDEPENDENTLY COUPLED?

13   A.    AS AN ASSEMBLY OF DOTS, YES, THEY ARE INDIVIDUALLY

14   COUPLED.

15   Q.    AND YOU AGREE THAT THE FOTTINGER DOTS ARE WHAT

16   MR. FOTTINGER DISCLOSES AS HAVING A COVERAGE RANGE OF 5 TO 40

17   PERCENT?

18   A.    CORRECT.  IT'S THE DOTS.  IT'S NOT THE ALUMINUM IN THE

19   DOTS.

20   Q.    NOW, YOU AGREE THAT CLAIM 1 OF THE '270 PATENT -- IF YOU

21   COULD PULL THAT UP, PLEASE -- DOES NOT REQUIRE ANY PARTICULAR

22   AMOUNT OF HEAT DIRECTION?

23        THE COURT:  I THINK YOU NEED TO ASK YOUR QUESTION

24   AGAIN.

25        THE WITNESS:  CLAIM 1 IS NOT PULLED UP ON MY

COMPUTER-AIDED TRANSCRIPTION

2012

1    SCREEN.

2    Q.    BY MR. SPROUL:    AND, AGAIN, JUST FOR THE JURY'S SAKE,

3    CLAIM 1 IS ONE PART OF CLAIM 2; CORRECT?    CLAIM 2 IS THE

4    ADDITIONAL ELEMENTS, PLUS THE ELEMENTS OF CLAIM 1?

5    A.    CORRECT.

6    Q.    AND CLAIM 1 DOES NOT REQUIRE ANY PARTICULAR AMOUNT OF

7    HEAT DIRECTION; ISN'T THAT RIGHT?

8    A.    THAT'S CORRECT.

9    Q.    AND YOU AGREE THAT THE CLAIMS, CLAIM 2 AND 23, ASSERTED

10   IN THIS CASE, DO NOT SPECIFICALLY GIVE YOU AN UPPER OR LOWER

11   LIMIT TECHNICALLY, AND THAT ANYTHING MEETS IT WITH RESPECT TO

12   HEAT DIRECTION?

13   A.    I THINK THAT YOU'RE BORDERING ON WHAT TENDS TO BE

14   CONSIDERED ACADEMIC ARGUMENTS.    BY THE WAY, I CAN TELL YOU AS

15   A LONGTIME ACADEMIC, WE DON'T NORMALLY INDULGE IN ACADEMIC

16   ARGUMENTS.    WE HAVE FAR MORE PRODUCTIVE THINGS TO DO WITH OUR

17   TIME.    SO SOMEHOW WE GOT TAGGED WITH THAT ACADEMIC WORTHLESS

18   KIND OF ARGUMENT.

19         I THINK WHEN YOU VIEW CLAIM 1 THROUGH THE EYES OF A

20   PERSON OF ORDINARY SKILL IN THE ART, WHICH IS THE WAY YOU'RE

21   DIRECTED IF YOU'RE TALKING ABOUT VALIDITY HERE, YOU HAVE TO

22   THINK ABOUT THE PERSON OF ORDINARY SKILL IN THE ART WHO I

23   BELIEVE WE DEFINED AS HAVING AT LEAST THREE YEARS OF

24   EXPERIENCE IN THE INDUSTRY.    SOMEONE WHO HAS BEEN IN THE

25   INDUSTRY IS NOT INTERESTED IN ACADEMIC ARGUMENTS.    THEY ARE

2013

1    INTERESTED IN BEING ABLE TO SEE IF THEY CAN MAKE A PRODUCT

2    THAT THEY COULD SELL OR THAT THEIR EMPLOYER COULD SELL.

3         SO THEY WOULD DRAW AT A MINIMUM THAT WHATEVER WE DO,

4    THAT WE SPEND MONEY TO BE ABLE TO DO EXTRA, HAS TO DO BETTER

5    THAN THE BASE MATERIAL.  SO THE FLOOR IS KIND OF ESTABLISHED

6    BY WHAT DOES THE BASE MATERIAL DO AS FAR AS MOISTURE

7    PERMEABILITY, AIR PERMEABILITY, ANY OF THOSE PROPERTIES, BUT

8    ALSO FOR HEAT DIRECTION.

9         BUT OTHERWISE, AS DR. BLOCK POINTED OUT WITH

10   PLANCK'S LAW, EVERYTHING IS A REFLECTOR, EVERYTHING IS AN

11   ABSORBER.  IT JUST RANGES FROM HERE TO THERE (INDICATING),

12   AND IT'S THE SAME WAY WITH HEAT REFLECTION HERE.  IT'S

13   CERTAINLY TRUE.  EVERYTHING REFLECTS HEAT.

14   Q.  YOU AGREE THAT THE CLAIM DOESN'T DISCUSS THIS FLOOR YOU

15   TALK ABOUT, DOES IT?

16   A.   THAT'S CORRECT.  THE FLOOR -- THERE IS VERY LITTLE

17   QUANTIFIED IN THESE PATENT CLAIMS OF ANY KIND.

18   Q.  AND YOU AGREE THAT THE CLAIMS CONTROL, THEY DEFINE THE

19   INVENTION; ISN'T THAT RIGHT?

20   A.   WELL, THE CLAIMS ARE BY DEFINITION WHAT IS CLAIMED,

21   WHICH HAS TO FIND A FOUNDATION IN THE TEACHING OF

22   SPECIFICATION PART OF A PATENT.

23        BUT FOR INVALIDITY KINDS OF ARGUMENTS, IT HAS TO BE

24   INTERPRETED IN THE VIEW OF SOMEONE OF ORDINARY SKILL IN THE

25   ART.

COMPUTER-AIDED TRANSCRIPTION

1    Q.    YOU AGREE THAT THE CLAIM DOESN'T SPECIFICALLY GIVE YOU

2    AN UPPER LIMIT OR A LOWER LIMIT, AND THAT, TECHNICALLY,

3    ANYTHING MEETS IT?

4    A.    THE "TECHNICALLY," IN A HAIR-SPLITTING ARGUMENT, YOU ARE

5    CORRECT.

6    Q.    WELL, HAIR-SPLITTING.  YOU TALKED ABOUT THIS MIRROR-LIKE

7    SURFACE AS BEING COVERED BY THE CLAIM LANGUAGE.  DO YOU

8    RECALL THAT?

9    A.    NO.  I TALKED ABOUT IT AS THAT IS WHAT MR. BLACKFORD'S

10   INVENTION WAS.

11   Q.    WELL, YOU AGREE THAT THE CLAIM DOESN'T RECITE THIS

12   MIRROR-LIKE SURFACE?

13   A.    THAT'S CORRECT.

14   Q.    YOU AGREE --

15   A.    THE TERM "MIRROR" DOES NOT APPEAR IN THE CLAIM

16   LANGUAGE.

17   Q.    THE TERM "MYLAR" DOES NOT APPEAR IN THE CLAIM LANGUAGE

18   EITHER, DOES IT?

19   A.    NO.  IT APPEARS IN THE TEACHING, AS DOES THE

20   REFLECTIVITY PORTION OF THE PATENT.

21   Q.    THE TERM "MYLAR" DOES NOT APPEAR IN THE CLAIM

22   LANGUAGE?

23   A.    THAT'S CORRECT.  IT'S NOT IN THE CLAIM LANGUAGE.

24   Q.    THE TERM "ALUMINUM" DOES NOT APPEAR IN THE CLAIM

25   LANGUAGE?

2015

1    A.   NO.

2              MR. SPROUL:  NOW, IF I MAY APPROACH, YOUR HONOR?

3              THE COURT:  SURE.

4              MR. SPROUL:  I DON'T RECALL THE EXHIBIT NUMBER.  I

5    GUESS IT'S RIGHT HERE.  I CAN REFER TO IT.

6    Q.   EXHIBIT 703.  WHAT DO YOU CALL THIS?

7    A.   IT'S KNOWN CASUALLY AS A SPACE BLANKET.

8    Q.   IS IT MYLAR?

9    A.   MY UNDERSTANDING IS THAT -- OKAY.  THERE IS CONFUSION AS

10   TO WHAT MYLAR IS.  MYLAR IS ACTUALLY A TRADEMARKED PRODUCT.

11   IT REFERS TO A SPECIAL PLASTIC FILM.  HOWEVER, COMMONLY WE

12   THINK OF THAT FILM AFTER IT HAS BEEN METALIZED, AS YOU SEE IT

13   IN THE SPACE BLANKET.

14   Q.   SO --

15   A.   SO WE TALK ABOUT MYLAR BALLOONS, THE BALLOONS THAT HOLD

16   HELIUM IN, WHEN, AGAIN, TECHNICALLY MYLAR REFERS TO THE

17   POLYMER SUBSTRATE; NOT THE METALIZED FILM.  I UNDERSTAND IT'S

18   A CROSSOVER WHERE THINGS AREN'T QUITE PRECISE.

19   Q.   WELL, I'M CONFUSED BY THE LACK OF PRECISION.  IS MYLAR

20   REFLECTIVE OR NOT?

21   A.   AS WE NORMALLY THINK OF IT, YES, WE THINK OF IT AS IN

22   THE REFLECTIVE PRODUCT.

23   Q.   MYLAR IS REFLECTIVE?

24   A.   YES.

25   Q.   AND MYLAR IS A PLASTIC SUBSTRATE; IS THAT WHAT YOU

2016

1    SAID?

2    A.    IT'S ON A PLASTIC SUBSTRATE, YES.

3    Q.    AND IN THAT, EXHIBIT 703, THAT HAS AN EXTRA LAYER OF

4    METAL APPLIED TO IT; IS THAT RIGHT?

5    A.    THAT'S MY UNDERSTANDING OF HOW IT'S MADE.

6    Q.    GOING BACK TO MR. FOTTINGER'S TEST AND YOUR CRITICISM OF

7    HIS EXAMPLE.  YOU CLAIM THAT IT IS SOLELY CONDUCTION THAT

8    ACCOUNTS FOR THE GREATER AMOUNT OF HEAT THAT WAS MEASURED ON

9    THE SURFACE OF THE RIGHT SIDE OF THE JACKET WHEN THAT BORE

10   THE LINING OF THE INVENTION; IS THAT FAIR?

11   A.    I CHARACTERIZE IT AS CONDUCTION.  THE HEAT CLEARLY COMES

12   THROUGH HIS INVENTION AND OUT TO THE OUTER SURFACE OF THE

13   JACKET.

14          THERE ARE ONLY THREE MECHANISMS THAT WE NORMALLY

15   TALK ABOUT ABOUT FOR HOW HEAT MOVES AROUND.  CONVECTION

16   INVOLVES A MASS TRANSFER, WHERE YOU ACTUALLY HAVE FLOW OF

17   AIR, FOR INSTANCE.  WITH A JACKET THAT'S CLOSED UP,

18   CONVECTION DOESN'T SEEM LIKE A VERY HIGH PROBABLE MECHANISM

19   TO ME.

20   Q.    AND DO YOU BELIEVE THE ELEMENTS ADDED BY MR. FOTTINGER,

21   HIS FOTTINGER DOTS, INCREASE THE CONDUCTION OVER THE

22   BASE-LAYER CONDUCTIVE LEVEL?

23   A.    ACTUALLY, IT'S NOT THE DOTS, BECAUSE YOU MAY RECALL IN

24   FOTTINGER'S EXPERIMENT, HE PUTS ON THE OTHER SIDE OF THE

25   CHEST, THE EXACT SAME MATERIAL AS HIS INVENTION.  THE ONLY

2017

1    DIFFERENCE IS THE OTHER SIDE DOESN'T HAVE THE ALUMINUM IN IT.

2    SO HE'S SPECIFICALLY TESTING THE IMPACT OF PUTTING THE

3    ALUMINUM INTO THE DOTS.  IT'S NOT JUST MAKING THE DOTS.  IT'S

4    ADDING THE ALUMINUM TO THE DOTS.

5    Q.   NOW, ONE REASON WHY MR. FOTTINGER WAS ABLE TO MEASURE A

6    HIGHER TEMPERATURE ON THE SIDE USING HIS INVENTION IS

7    BECAUSE, IN FACT, THAT MADE THE WEARER WARMER ON THAT SIDE;

8    ISN'T THAT FAIR?

9    A.   FOTTINGER ONLY MEASURES THE SURFACE TEMPERATURE OF THE

10   JACKET.  FOTTINGER DOESN'T MEASURE THE BODY TEMPERATURE OF

11   THE WEARER OF THE JACKET.  SO THE ONLY INFORMATION FOTTINGER

12   GIVES US IS THE TEMPERATURE OF THE SURFACE OF THE JACKET.

13   Q.   YOU AGREE, IT'S A FAIRLY FUNDAMENTAL PRECEPT OF SCIENCE,

14   THAT HEAT MOVES FROM HOTTER TO COLDER OBJECTS; ISN'T THAT

15   RIGHT?

16   A.   THAT'S CORRECT.

17   Q.   SO IS IT ONE EXPLANATION FOR THE REASON THAT THE OUTER

18   PORTION OF FOTTINGER'S JACKET WAS MEASURED AS HAVING A HIGHER

19   TEMPERATURE IS BECAUSE THE UNDERLYING BODY HEAT OF THE WEARER

20   WAS WARMER; ISN'T THAT FAIR?

21   A.   NOT NECESSARILY.  BECAUSE THE SIDE THAT DOESN'T -- THAT

22   CONTAINS FOTTINGER'S INVENTION WITHOUT THE ALUMINUM POWDER

23   MAY BE ACTING AS A BETTER INSULATOR FOR THE HEAT OF THAT SIDE

24   OF THE BODY, BECAUSE IT DOESN'T HAVE THE MECHANISM OF

25   CONDUCTION BY THE ALUMINUM POWDER BEING INCLUDED IN THE

2018

1    DOTS.

2    Q.   YOU DON'T KNOW THIS.  THIS IS YOUR THEORY FOR ONE REASON

3    WHY THE TEMPERATURES MAY HAVE BEEN MEASURED AS THEY WERE?

4    A.   WE -- WHAT WE KNOW FROM FOTTINGER'S EXPERIMENT IS THE

5    OUTER SIDE OF THE JACKET THAT CONTAINS HIS INVENTION IS

6    HOTTER.

7    Q.   AND ONE REASON FOR THAT, BASED ON THIS FOUNDATIONAL

8    PRECEPT OF SCIENCE, THAT HEAT FLOWS FROM THE HOTTER TO THE

9    COLDER, IS THAT THE USER IS WARMER ON THE SIDE WITH HIS

10   INVENTION; ISN'T THAT RIGHT?

11   A.   I DON'T BELIEVE THOSE STATEMENTS FOLLOW FROM EACH OTHER.

12   BECAUSE THE WEARER CAN BE HOTTER -- CAN BE HOT ON BOTH SIDES.

13   HEAT IS TRYING TO FLOW OUT BOTH SIDES.  BOTH THE SIDE THAT

14   HAS HIS FULL INVENTION AS WELL AS THE OTHER SIDE.

15          SO IF I HAVE LESS OF AN INSULATING EFFECT ON THE

16   SIDE THAT HAS ALUMINUM POWDER ON IT, BOTH SIDES UNDERNEATH ON

17   THE BODY CAN BE EXACTLY THE SAME TEMPERATURE.  IT'S JUST I

18   HAVE BETTER INSULATION ON ONE SIDE VERSUS THE OTHER SIDE,

19   AND, THEREFORE, THE SURFACE TEMPERATURE OF THE JACKET IS

20   HOTTER ON THE SIDE THAT HAS LESS INSULATION.

21   Q.   DR. COLE, YOU CRITICIZED, OR AT LEAST YOU OFFERED

22   TESTIMONY ON MULTIPLE PIECES OF PRIOR ART THAT DR. BLOCK

23   TESTIFIED RENDERED THE PATENTS OBVIOUS.

24          DO YOU RECALL THAT?

25   A.   YES, I DO.

2019

1    Q.   NOW, I WANT TO ASK YOU ABOUT THESE REFERENCES VERY

2    BRIEFLY IN TURN.  IF YOU CAN PULL UP THE HALLEY REFERENCE.

3         NOW, YOU TESTIFIED THAT BASED ON THE NAME AND SEEING

4    ONLY THE FACE OF THE PATENT WHEN YOU WERE ASKED BY COUNSEL

5    EARLIER, SO I'M GOING TO LIMIT IT TO THAT AND NOT GO INTO

6    DETAIL.  BUT PLEASE LET ME KNOW IF YOU NEED ANY ADDITIONAL

7    INFORMATION.

8         YOU AGREE THAT HALLEY DISCLOSES A SURFACE COVERAGE

9    AREA OF DOTS FROM 30 TO 70 PERCENT?

10   A.   I THINK THAT'S CORRECT.  IT CERTAINLY IS SURFACE-AREA

11   COVERAGE OF DOTS.

12   Q.   AND YOU AGREE THAT HALLEY REFERS TO GOOD BREATHABILITY

13   IN WATER VAPOR TRANSMISSION?

14   A.   THAT'S CORRECT.

15   Q.   AND YOU AGREE THAT HALLEY STATES THAT THE BENEFIT OF A

16   WATER VAPOR PERMEABLE MATERIAL IS PERSPIRATION FROM THE

17   WEARER'S BODY IS ALLOWED TO ESCAPE FROM WITHIN THE GARMENT?

18   A.   YES.

19   Q.   YOU AGREE THAT HALLEY IS CONCERNED WITH THE PERMEABILITY

20   OF THE FABRIC?

21   A.   CORRECT.

22   Q.   AND THAT IS ONE OF THE REASONS FOR HIS RANGE OF 30 TO 70

23   PERCENT?

24   A.   HE DOESN'T WANT TO IMPAIR THE WATER VAPOR PERMEABILITY

25   OR ANY OTHER VALUED CHARACTERISTIC OF HIS MATERIAL SIMPLY BY

2020

```
 1    PUTTING HIS ABRASION-RESISTING DOTS ON TOP OF IT.

 2    Q.   AND YOU AGREE THAT HIS CONCERN FOR THE PERMEABILITY OF

 3    THE FABRIC IS THE BASIS FOR HIS DISCLOSED RANGE OF 30 TO 70

 4    PERCENT?

 5    A.   I WOULD AGREE.  BASICALLY IN THE INDUSTRY, WE KNOW THAT

 6    IT'S A TRADE-OFF.  ON ONE END, YOU GET COMPLETE PRESERVATION

 7    OF YOUR BASE MATERIAL PRODUCT.  ON THE OTHER END, YOU

 8    COMPLETELY LOSE ONE OF THOSE, WHETHER IT'S MOISTURE

 9    PERMEABILITY, AIR PERMEABILITY.

10         AND NOW YOU'RE TRYING TO GET ANOTHER PROPERTY

11    LAYERED ON TOP OF THIS, THERMAL INSULATION, FOR INSTANCE,

12    AND, AGAIN, IT'S A CONTINUUM.  YOU'VE GOT TO FIND, TOO LOW

13    AND YOU DON'T GET ENOUGH OF THE PROPERTY YOU'RE TRYING TO

14    DESIGN IN; TOO HIGH, AND YOU SACRIFICE THE BASE MATERIAL

15    PROPERTIES THAT YOU KNOW YOU ACTUALLY HAVE TO HAVE.

16    Q.   AND THAT TRADE-OFF WAS UNDERSTOOD BEFORE MR. BLACKFORD

17    FILED FOR HIS PATENT, WASN'T IT?

18    A.   ABSOLUTELY.  WE'VE KNOWN THAT THERE IS A CONTINUUM OUT

19    THERE FOR DECADES.  THIS IS WHAT I WAS GOING TO TEXTILE

20    CONFERENCES ABOUT IN THE EARLY '70S, HOW DO WE GET -- HOW DO

21    WE GET OUR CAKE AND EAT IT, TOO.  HOW DO WE MANAGE TO

22    PRESERVE THE PROPERTIES THAT WE WANT TO HAVE AT A HIGH ENOUGH

23    LEVEL WITHOUT SACRIFICING OUR INVENTION THAT WE THINK THAT WE

24    HAVE.

25    Q.   IT'S BEEN A CONCERN, AND AN UNDERSTANDING, A
```

2021

1    CONSIDERATION IN YOUR INDUSTRY SINCE AT LEAST THE 1970'S?

2    A.   AT LEAST THE 1970'S.  AND, QUITE FRANKLY, I SUSPECT IF

3    YOU GO BACK IN THE OLD LITERATURE, YOU'LL FIND THAT IT'S BEEN

4    AROUND FOR A LOT LONGER THAN THAT.

5    Q.   PEOPLE UNDERSTOOD THAT THE MORE YOU COVER UP THE FABRIC,

6    THE LESS PERMEABILITY IT HAS; ISN'T THAT RIGHT?

7    A.   CORRECT.

8    Q.   AND THE LESS YOU COVER IT UP, THE MORE PERMEABILITY IT

9    HAS?

10   A.   CORRECT.  THE MORE YOU'RE BACK TO THE PROPERTIES THAT

11   YOU STARTED WITH.

12   Q.   AND, IN FACT, THAT'S WHAT THE WORLEY REFERENCE TEACHES

13   US SPECIFICALLY, ISN'T IT?

14   A.   RIGHT.  WORLEY BASICALLY PUTS ON TOP OF HIS FABRIC, AS I

15   SAID, IT'S A HIGH-TECH -- IT'S A HIGH-TECH THERMAL INSULATION

16   BASICALLY WHAT WORLEY HAS.  AND HE TELLS YOU, YOU CAN COVER

17   BETWEEN 1 AND 100 PERCENT.  YOU KNOW, DOESN'T TELL ME IF I'M

18   TRYING TO FIGURE OUT HOW TO DESIGN A PRODUCT MUCH OF

19   ANYTHING, AS TO WHERE TO STOP ALONG THAT LINE FROM 1 TO 100

20   PERCENT, EXCEPT, AGAIN, LOW IS GOOD FOR CERTAIN THINGS AND

21   HIGH IS GOOD FOR OTHER THINGS.  AND THEY DON'T EXACTLY TRADE

22   OFF.  I'VE GOT TO FIGURE OUT WHERE I WANT TO BE ALONG THAT

23   LINE.

24   Q.   AND HE ALSO DISCLOSES 50 TO 80 PERCENT, DOESN'T HE?

25   A.   RIGHT.  HE DISCLOSES 1 TO 100 PERCENT.  50 TO 80 FALLS

COMPUTER-AIDED TRANSCRIPTION

2022

1    WITHIN THAT RANGE.

2    Q.    HE SPECIFICALLY SAYS THAT IF YOU'RE CONCERNED WITH

3    THERMAL REGULATING PROPERTIES OF THE HEATING ELEMENTS OR OF

4    THE ELEMENTS --

5    A.    THEY ARE NOT HEATING ELEMENTS, BUT OF THE ELEMENTS OF

6    HIS -- IT'S A PHASE CHANGE MATERIAL THAT HE HAS.

7    Q.    HE CALLS THEM ELEMENTS WITH THERMAL REGULATING

8    PROPERTIES?

9    A.    RIGHT.  THEY ARE HIGH-TECH INSULATION.

10   Q.    AND IF YOUR CONSIDERATION IS THE THERMAL REGULATING

11   PROPERTIES, THE MORE THERMAL REGULATION YOU WANT, IF THAT'S

12   YOUR CONTROLLING CONSIDERATION, THEN YOU WANT A LARGER

13   PERCENTAGE OF COVERAGE.  THAT'S WHAT HE TEACHES; RIGHT?

14   A.    RIGHT.  I MEAN, IT MAKES SENSE THAT IF YOUR -- IF YOUR

15   PRIMARY OBJECTIVE IS TO OPTIMIZE THE THERMAL REGULATION

16   THROUGH WHATEVER YOU'VE INVENTED, YOU WANT TO BE ON THE HIGH

17   END OF THE RANGE FOR THERMAL REGULATION.

18   Q.    AND HE ALSO TEACHES THAT IF YOU'RE CONCERNED WITH OTHER

19   PROPERTIES OF THE MATERIAL OR OF THE FABRIC, I.E.,

20   FLEXIBILITY, SOFTNESS, AIR PERMEABILITY OR WATER VAPOR

21   TRANSPORT, THEN THE COATING MAY COVER A SMALLER PERCENTAGE?

22   A.    CORRECT.

23   Q.    SO IF YOU WANT MORE AIR PERMEABILITY AND TRANSPORT OF

24   WATER VAPOR, YOU PUT LESS OF THESE ELEMENTS ON YOUR FABRIC?

25   A.    CORRECT.  YOU DO AS LITTLE AS POSSIBLE TO DISTURB THE

COMPUTER-AIDED TRANSCRIPTION

2023

1    UNDERLYING PERFORMANCE CHARACTERISTICS OF YOUR BASE

2    MATERIAL.

3    Q.   YOU AGREE THAT VAUGHN DISCLOSES A 30- TO 70-PERCENT

4    COVERAGE RANGE?

5    A.   RIGHT.  VAUGHN ALSO -- THE ABRASION-RESISTING DOTS IN

6    ONE PART DISCLOSES THE CONTINUOUS COATING.  WELL, A

7    CONTINUOUS COATING IS 100 PERCENT COVERAGE.

8         HE ALSO TALKS ABOUT, YOU CAN ADD DOTS ON TOP OF IT,

9    AND HE DOES GIVE US SOME GUIDANCE AS TO WHAT KIND OF COVERAGE

10   HE SUGGESTS THAT THE DOTS WOULD BE BEST FOR BEING ABLE TO

11   GIVE YOU ABRASION RESISTANCE.

12   Q.   YOU AGREE THAT HE SPECIFICALLY TEACHES A 30- TO

13   70-PERCENT COATING RANGE?

14   A.   I THINK THAT'S CORRECT.

15   Q.   NOW, YOU UNDERSTAND -- YOU TESTIFIED ABOUT THESE

16   SECONDARY CONSIDERATIONS.

17   A.   WHAT ARE YOU DEFINING AS SECONDARY CONSIDERATION?

18   Q.   COULD YOU PULL UP PDX-328.  I THINK THE TITLE OF YOUR

19   SLIDE IS "REAL WORLD-EVIDENCE," BUT WE'LL HAVE THE LIST HERE

20   IN A SECOND.

21        DO YOU RECALL YOUR TESTIMONY ON THESE FACTORS THAT

22   YOU TESTIFIED ABOUT?

23   A.   YES.

24   Q.   AND YOU UNDERSTAND THAT THESE ARE CONSIDERED ONLY FOR

25   OBVIOUSNESS AND NOT FOR ANTICIPATION?

2024

1    A.    THAT'S CORRECT.

2    Q.    AND, IN FACT, THE LAW IS QUITE CLEAR THAT SECONDARY

3    CONSIDERATIONS SUCH AS THIS CANNOT OVERCOME A STRONG --

4              MR. ALDRICH:  OBJECTION, YOUR HONOR.

5    Q.    BY MR. SPROUL:  -- CASE OF OBVIOUSNESS?

6              MR. ALDRICH:  MISCHARACTERIZING THE LAW.

7              THE COURT:  YOUR OBJECTION IS OVERRULED.

8              MR. SPROUL:  THANK YOU, YOUR HONOR.

9              THE COURT:  YOU CAN ANSWER THE QUESTION.

10   Q.    BY MR. SPROUL:  YOU UNDERSTAND THAT THE LAW IS SECONDARY

11   CONSIDERATIONS CANNOT OVERCOME A CLEAR CASE OF OBVIOUSNESS?

12   A.    I UNDERSTAND THAT THESE, AS YOU TERM THEM, SECONDARY

13   CONSIDERATIONS ARE IMPORTANT FACTORS THAT I HAVE TO

14   CONSIDER.

15   Q.    THEY ARE TO BE USED WHEN THE QUESTION OF OBVIOUSNESS IS

16   A CLOSE ONE, AND THEY MAY TIP THE SCALE?

17             MR. ALDRICH:  YOUR HONOR, CAN WE HAVE A SIDEBAR?

18             THE COURT:  NO.  SHE GETS TO TESTIFY ABOUT WHAT HER

19   UNDERSTANDING OF THE LAW IS, AND YOU CAN FIX IT LATER.

20             MR. ALDRICH:  OKAY.

21             THE WITNESS:  MY UNDERSTANDING IS I NEED TO CONSIDER

22   BOTH OBVIOUSNESS IN THE SENSE OF LOOKING AT THE PRIOR ART,

23   WHICH GENERALLY FOCUSES ON PATENTS AND PATENT APPLICATIONS,

24   BUT THAT'S NOT SUFFICIENT.  I CAN'T JUST CONSIDER THAT

25   INFORMATION.  I ALSO NEED TO BE CONSIDERING THESE SEVEN

2025

1    FACTORS AS WELL.

2            AS TO WHICH ONE OVERCOMES, WHICH ONE IS GIVEN MORE

3    WEIGHT BY THE LAW THAN THE OTHER, I DON'T KNOW.  ALL I KNOW

4    IS AS AN EXPERT, I HAVE TO PRESENT YOU WITH ALL OF THESE.

5            MR. SPROUL:  FAIR ENOUGH.

6    Q.   YOU DON'T KNOW WHAT WEIGHT THEY SHOULD BE GIVEN.  YOU'RE

7    SIMPLY PROVIDING THAT TO THE JURY?

8    A.   THAT'S CORRECT.

9    Q.   AND NOW, YOU UNDERSTAND THAT THESE SHOULD ONLY BE GIVEN

10   WEIGHT IF THERE IS A DIRECT CONNECTION, A NEXUS BETWEEN THE

11   SPECIFIED SECONDARY CONSIDERATION OR FACTOR AND THE CLAIMED

12   INVENTION?

13   A.   I UNDERSTAND THAT THERE HAS TO BE A NEXUS.

14   Q.   AND THAT NEXUS IS RIGOROUS, IT MUST BE A DIRECT

15   CONNECTION BETWEEN THE CLAIMED INVENTION AND THE SPECIFIED

16   FACTOR THAT YOU RELY ON?

17   A.   YES.

18   Q.   NOW, LET'S LOOK AT YOUR FIRST FACTOR HERE, COMMERCIAL

19   SUCCESS.  YOU RELY ON THE SUCCESS OF THE OMNI-HEAT PRODUCTS,

20   THE LARGE NUMBER OF SALES, AS EVIDENCE OF COMMERCIAL SUCCESS;

21   ISN'T THAT RIGHT?

22   A.   THAT'S PART OF IT.  I ALSO RELY ON THE COMMERCIAL

23   SUCCESS OF THE SEIRUS PRODUCTS.

24   Q.   HAVE YOU HEARD TESTIMONY IN COURT THAT GO TO THE FACT

25   THAT THERE MAY BE OTHER FACTORS THAT ACCOUNT FOR THAT

2026

1    SUCCESS?

2    A.   I'VE HEARD IT NIBBLED AROUND THE EDGES, THAT THERE ARE

3    OTHER REQUIREMENTS; THAT THE GLOVES, FOR INSTANCE, HAVE TO

4    SATISFY OTHER THAN SIMPLY KEEPING YOUR HANDS WARM.  THEY

5    HAVEN'T BEEN DELINEATED, WHAT THOSE OTHER FACTORS ARE.

6    Q.   WELL, YOU UNDERSTAND THAT MARKETING AND ADVERTISING IS A

7    SEPARATE FACTOR FROM THE PATENTED INVENTION WHEN CONSIDERING

8    COMMERCIAL SUCCESS?

9    A.   I UNDERSTAND THAT MARKETING IS GENERALLY USED TO DRIVE

10   SALES.

11   Q.   AND THAT MARKETING --

12   A.   AND IN THAT SENSE, MARKETING HAS TO BE CONSIDERED, WHAT

13   WAS THE INTENT OF THE PERSON WHO OFFERED THE PRODUCT FOR

14   SALE.  IN OTHER WORDS, WHAT DID THEY FEEL WERE THE

15   CHARACTERISTICS OF THE PRODUCT WHICH WOULD MAKE A POTENTIAL

16   CONSUMER BUY THAT PRODUCT.

17   Q.   IT'S YOUR TESTIMONY THAT COMMERCIAL SUCCESS IS

18   APPLICABLE WHEN THE ADVERTISER OR THE PATENT OWNER INTENDS TO

19   MARKET THEIR TECHNOLOGY, INTENT IS RELEVANT IN THAT FACTOR?

20   A.   I THINK INTENT IS IMPORTANT IN THIS FACTOR.  IF WE LOOK,

21   FOR INSTANCE, AT THE GLOVES, THE GLOVES ARE BLACK.  I MEAN,

22   IT'S BEEN SAID OVER AND OVER AGAIN.  GLOVES ARE BLACK.

23   OBVIOUSLY THE OUTSIDE OF THE APPEARANCE OF THE GLOVES IN THIS

24   PARTICULAR CASE IS NOT WHAT SEEMS TO BE STRONGLY MOTIVATING

25   PEOPLE TO BUY THEM.  THERE IS SOME OTHER FACTOR.

1          THE FACTOR IN THIS PARTICULAR CASE, IT APPEARS THAT

2     BOTH SEIRUS AND COLUMBIA CLEARLY FEEL THAT THEIR

3     HEAT-REFLECTIVE TECHNOLOGIES ARE WHAT IS THE MOST IMPORTANT

4     CHARACTERISTICS TO A POTENTIAL PURCHASER.

5     Q.   I THINK THAT WAS BEYOND WHAT I WAS ASKING, BUT LET ME

6     REFOCUS THAT QUESTION.

7          COLUMBIA SPENT A LARGE AMOUNT OF MONEY MARKETING

8     OMNI-HEAT, DIDN'T THEY?

9     A.   I DON'T KNOW WHAT THE NUMBER IS, BUT I'LL ACCEPT THAT.

10    Q.   AND MARKETING CAN BE A REASON FOR COMMERCIAL SUCCESS,

11    CAN IT NOT?

12    A.   ONE WOULD CERTAINLY HOPE THAT YOU SPEND -- IF YOU SPEND

13    MONEY ON MARKETING, THAT YOU DO SEE INCREASED SALES.

14    Q.   WERE YOU HERE DURING MR. TREPANIER'S TESTIMONY?

15    A.   YES, I WAS.

16    Q.   DO YOU RECALL THAT HE TESTIFIED THAT OMNI-HEAT WAS THE

17    LARGEST MARKETING CAMPAIGN IN THE COMPANY HISTORY?

18    A.   YES, I DID HEAR THAT.

19    Q.   DO YOU RECALL THAT HE SAID IT WAS THE MOST

20    COMPREHENSIVE, INTEGRATED GLOBAL MARKETING CAMPAIGN IN THE

21    COMPANY HISTORY?

22    A.   YES.

23    Q.   AND DO YOU UNDERSTAND THAT MARKETING CAN BE A SEPARATE

24    FACTOR DRIVING THE COMMERCIAL SUCCESS APART FROM THE PATENTED

25    INVENTION?

2028

1    A.    BUT THE MARKETING --

2    Q.    YES OR NO, DR. COLE.  DO YOU UNDERSTAND THAT THE

3    MARKETING CAN BE A SEPARATE FACTOR DRIVING THE COMMERCIAL

4    SUCCESS, APART FROM THE PATENTED INVENTION?

5    A.    IT'S PART OF WHAT DRIVES THE COMMERCIAL SUCCESS.

6    Q.    DR. COLE, DID YOU -- STRIKE THAT.  I'M GOING OUT OF

7    ORDER HERE.

8             IF YOU COULD PULL UP SLIDE PDX-336.  HOW ABOUT 335.

9    MY NUMBERING IS A LITTLE DIFFERENT -- THERE WE GO.

10            YOU TESTIFIED THAT YOU BOUGHT A PAIR OF SEIRUS

11   GLOVES?

12   A.    ACTUALLY, I THINK IT WAS ONE OF THE SOCKS.

13   Q.    SOCKS?

14   A.    YES.

15   Q.    DO YOU WEAR THEM?

16   A.    NO.  I PROVIDED THEM TO COUNSEL.

17   Q.    SILVER OUT OR SILVER IN?

18   A.    THEY WERE SILVER IN, AS I RECALL.

19   Q.    AND YOU BOUGHT THEM FROM AMAZON?

20   A.    I BOUGHT THEM THROUGH AMAZON, YES.

21   Q.    YOU UNDERSTAND AMAZON IS A THIRD-PARTY SELLER.  IT'S NOT

22   SEIRUS?

23   A.    I UNDERSTAND THAT SEIRUS DOESN'T DIRECTLY MARKET ON

24   AMAZON.

25             MR. SPROUL:  OKAY.  IF YOU COULD PULL UP SLIDE

COMPUTER-AIDED TRANSCRIPTION

2029

1    PDX-338.

2    Q.    NOW, YOU RECALL TESTIFYING ABOUT THE CASTELLI JACKET?

3    A.    YES.

4    Q.    AND YOU SPECIFICALLY REFERENCED THE CASTELLI JACKET AS

5    EVIDENCE OF A FAILURE BY OTHERS IN THE --

6    A.    THAT'S CORRECT.

7    Q.    -- IN THIS HEAT-REFLECTIVE AREA.

8              AND YOUR EVIDENCE FOR THAT IS THIS SOLE REVIEW FROM

9    CYCLINGWEEKLY.COM BACK IN THE 2010 TIME FRAME -- 2009; IS

10   THAT RIGHT?

11   A.    I BELIEVE THAT'S CORRECT.  IT'S ALL -- AND OBVIOUSLY,

12   YOU KNOW, WE'RE TRYING TO SUMMARIZE THINGS FOR THE JURY.

13   THIS IS AN EXAMPLE --

14   Q.    DR. COLE --

15             THE COURT:  YOU NEED JUST TO ANSWER THE QUESTION.

16   YOU'VE ALREADY DONE SO.  HE'S GOING TO ASK YOU ANOTHER

17   QUESTION.

18             THE WITNESS:  OKAY.  THANK YOU.

19   Q.    BY MR. SPROUL:  TO EVIDENCE FAILURE OF OTHERS, YOU RELY

20   ON THIS ONE SENTENCE SHOWN IN PDX-338 FROM EXHIBIT 1316, "AS

21   FOR THE SILVER RADIATION JACKET, I FOUND IT DIDN'T RELEASE

22   ENOUGH PERSPIRATION AND HATED THE WAY IT FELT ON BARE SKIN."

23             IS THAT RIGHT?

24   A.    THIS IS ONE THAT I RELIED ON, YES.

25   Q.    THAT'S THE ONLY ONE YOU RELIED ON FOR THIS CASTELLI

2030

1    JACKET?

2    A.   THAT'S ACTUALLY NOT TRUE.

3    Q.   WELL --

4    A.   THAT'S WHAT YOU HEARD ABOUT ON MY DIRECT TESTIMONY,

5    WHICH, OF COURSE, IS A SUMMARY OF MY OPINIONS.  AS YOU'RE

6    AWARE, THERE ARE THOUSANDS OF PAGES THAT ALL OF US AS EXPERTS

7    HAVE PRODUCED ALONG HERE.

8    Q.   DR. COLE, YOU ARE NOT PROVIDING YOUR EXPERT REPORT TO

9    THE JURY.  IT'S YOUR TESTIMONY.  THAT'S WHAT THEY HAVE TO

10   RELY ON.

11   A.   CORRECT.  THIS JACKET IS NO LONGER AVAILABLE FOR SALE.

12   Q.   DR. COLE, DO YOU SEE THE NEXT SENTENCE, AFTER THE ONE

13   YOU UNDERLINED?

14   A.   "OTHERS THOUGHT IT FINE."

15   Q.   "OTHERS THOUGHT IT FINE."  THAT WOULD SEEM TO COUNTERACT

16   THE PRIOR SENTENCE, WOULDN'T IT?

17   A.   IT SUGGESTS THAT PEOPLE HAVE DIFFERENT OPINIONS.  FOR

18   SOMETHING TO NOT BE A COMMERCIAL SUCCESS DOESN'T MEAN THAT IT

19   HAS TO BE 100-PERCENT FAILURE.  AGAIN, IT'S A GRADUATION.

20   YES, THANK YOU.

21   Q.   I SIMPLY WANTED TO POINT OUT THAT ONE REVIEWER DIDN'T

22   LIKE IT, AND IN THE SAME PARAGRAPH, NOT HIGHLIGHTED BY YOU,

23   OTHERS DID?

24   A.   CORRECT.

25   Q.   NOW, I THINK YOU TESTIFIED THAT YOU WERE NOT ABLE TO

2031

1    PHYSICALLY ANALYZE THE CASTELLI JACKET; IS THAT RIGHT?

2    A.   THAT'S CORRECT.  THE ONLY ACCESS I'VE HAD TO THE

3    CASTELLI JACKET HAS BEEN THROUGH PHOTOGRAPHS.

4    Q.   AND DID YOU EVER ASK MR. BLACKFORD WHETHER HE HAD A

5    CASTELLI JACKET?

6    A.   YES, I HAVE.

7    Q.   AND WHAT DID HE TELL YOU?

8    A.   CAN I SAY WHAT'S BEEN GOING ON --

9             THE COURT:  PLEASE ANSWER THE QUESTION.

10            THE WITNESS:  WELL, I'M -- MY UNDERSTANDING IS THAT

11   COLUMBIA HAS HAD A CASTELLI JACKET, AND THAT THEY HAVE DONE A

12   SEARCH THROUGH THEIR ATTIC, SO TO SPEAK, AND HAVE NOT BEEN

13   ABLE TO COME UP WITH IT.

14   Q.   BY MR. SPROUL:  THAT WASN'T MY QUESTION.  THOUGH, THANK

15   YOU FOR TELLING ME THAT.

16            DID YOU TALK TO MR. BLACKFORD, APART FROM THE

17   REQUEST SPECIFICALLY MADE IN THIS LITIGATION FOR THE CASTELLI

18   JACKET AFTER HIS TESTIMONY?  PRIOR TO THIS TRIAL, HAD YOU

19   ASKED MR. BLACKFORD FOR THE CASTELLI JACKET?

20   A.   I DON'T BELIEVE SO.  I REMEMBER DISCUSSING THE CASTELLI

21   JACKET WITH HIM, BUT I DON'T RECALL WHETHER I SPECIFICALLY

22   ASKED TO PUT MY HANDS ON THE CASTELLI JACKET.

23   Q.   CERTAINLY HE NEVER GAVE IT TO YOU?

24   A.   I'VE NEVER RECEIVED IT.

25            MR. SPROUL:  IF YOU COULD PULL UP EXHIBIT 1438,

2032

1    PLEASE.

2    Q.    HAVE YOU SEEN THIS PICTURE BEFORE?

3    A.    YES.

4         MR. SPROUL:  I'M ASSUMING IT'S IN EVIDENCE, BUT IF

5    NOT, I OFFER IT, YOUR HONOR.

6         MR. ALDRICH:  NO OBJECTION.

7         THE COURT:  RECEIVED.

8         (TRIAL EXHIBIT 1438 RECEIVED IN EVIDENCE.)

9    Q.    BY MR. SPROUL:  WHAT IS EXHIBIT 1438?

10   A.    1438 IS A PHOTOGRAPH OF THE INTERIOR, IT APPEARS, OF THE

11   CASTELLI JACKET.

12   Q.    WHERE DID THIS PICTURE COME FROM?

13   A.    THIS PHOTOGRAPH WAS PROVIDED TO ME BY COUNSEL.  I THINK

14   IF YOU LOOK AT, I BELIEVE IT'S IN ONE OF MY REPORTS, MY FIRST

15   REPORT.  AND IT SHOWS WHERE THE PHOTOGRAPH CAME FROM.

16   Q.    THIS PICTURE WAS INCLUDED BY YOU IN YOUR OPENING REPORT

17   THAT YOU DISCLOSED EARLIER IN THIS CASE; IS THAT RIGHT?

18   A.    RIGHT.  WHERE I WAS DISCLOSING BACKGROUND INFORMATION.

19   Q.    AND THE PICTURE SHOWS THE HOLES POKED IN THE REFLECTIVE

20   LINING?

21   A.    YES.  IT SHOWS THE PERFORATED LINING.

22   Q.    NOW, CAN YOU TELL FROM THIS PICTURE WHETHER OR NOT THERE

23   IS A BACKING ON THAT REFLECTIVE LINING?

24   A.    NO.  YOU CANNOT TELL FROM THIS PARTICULAR PHOTO WHETHER

25   THERE WAS A BACKING OR NOT.

2033

1    Q.   ARE YOU AWARE OF ANY BETTER PHOTOS OF THE CASTELLI

2    JACKET THAT WOULD SHOW YOU THAT?

3    A.   I DON'T KNOW.  IF YOU HAVE A PHOTO ON THE OTHER SIDE.

4    HOWEVER, LET ME POINT OUT THAT THE DESCRIPTION ELSEWHERE OF

5    THIS PARTICULAR MATERIAL CERTAINLY SUGGESTS THAT THERE IS NOT

6    A BACKING ON IT, BECAUSE IT'S DESCRIBED AS EXTREMELY THIN.

7    AND IF THERE WERE FABRIC BEHIND IT, THAT DESCRIPTION SEEMS TO

8    BE LESS LIKELY TO BE PUT ON THIS MATERIAL.

9    Q.   I WANT TO GO BACK AND TALK ABOUT FOTTINGER'S DOT VERY

10   BRIEFLY, BECAUSE WE'RE GETTING TOWARDS THE END HERE.

11         WHAT WAS THE SIZE OF THE ALUMINUM POWDER PARTICLES

12   THAT HE USED IN HIS MIXTURE, DO YOU RECALL?

13   A.   HE DESCRIBES THEM AS 25 MICRONS IN DIAMETER.

14   Q.   CAN YOU TELL THE JURY WHAT A MICRON IS.

15   A.   A MICRON IS A MILLIONTH OF A METER.  TO GIVE YOU A

16   BETTER COMPARISON TO THINGS THAT YOU'RE MORE FAMILIAR WITH,

17   THE POLYESTER FIBERS THAT ARE IN WHAT'S DESCRIBED AS A

18   MICROFIBER FABRIC ARE TEN MICRONS IN DIAMETER.

19         SO FOTTINGER'S ALUMINUM PARTICLES ARE ABOUT TWO AND

20   A HALF TIMES THE DIAMETER OF A POLYESTER MICROFIBER OR ABOUT

21   TWICE THE DIAMETER OF A NORMAL POLYESTER FIBER, SUCH AS YOU

22   MIGHT FIND IN A COTTON/POLYESTER BLEND FABRIC FOR SHIRTING,

23   JUST TO KIND OF GIVE YOU A SCALE.

24   Q.   THAT'S REALLY SMALL; IS THAT FAIR?  REALLY SMALL.  YOU

25   WOULDN'T SEE IT WITH YOUR NAKED EYE, EVEN IF YOU HAD REALLY

2034

1    GOOD EYES?

2    A.    YOU CAN SEE A SINGLE POLYESTER MICROFIBER WITH YOUR

3    NAKED EYE.  I HAVE NO REASON TO -- LOOK, I WORK WITH VERY

4    FINE POWDERS EVERY SINGLE DAY.  I WOULD EXPECT TO BE ABLE TO

5    SEE A 25 MICRON POWDER WITH MY EYE.

6    Q.    OKAY.  AND WHAT WOULD IT BE LOOK LIKE?

7    A.    GRAY.

8    Q.    I'M SORRY?

9    A.    IT LOOKS GRAY.

10   Q.    TINY; RIGHT?  VERY, VERY, VERY TINY?

11   A.    AGAIN, TINY IS RELATIVE TO SOMETHING ELSE.

12   Q.    PRACTICALLY THE SMALLEST THING YOU COULD SEE OPTICALLY

13   WITH YOUR EYE WITHOUT A MICROSCOPE; ISN'T THAT FAIR?

14   A.    I CAN SEE INDIVIDUAL POLYESTER FIBERS, WHICH ARE LESS --

15   HALF THE DIAMETER OF FOTTINGER'S ALUMINUM POWDERS.

16   Q.    25 MICRONS, IS THAT LARGER OR SMALLER THAN KOOL-AID

17   MIX?

18   A.    I DON'T HAVE A CLUE WHAT SIZE KOOL-AID MIX IS.

19   Q.    I'M NOT SURE, EITHER.  I'M JUST CURIOUS WHETHER YOU

20   COULD GIVE US A COMPARISON.

21         YOU AGREE, THOUGH, THAT THE SIZE OF THE ALUMINUM

22   POWDER IS SO SMALL, THAT WHEN MIXED INTO THIS MIXTURE, IT

23   ACTUALLY DIFFUSES; IS THAT RIGHT?

24   A.    NO.  I DON'T AGREE.  THERE IS NOTHING IN FOTTINGER'S

25   COMPOSITION WHICH ACTS AS A WETTING AGENT FOR THE SURFACE OF

2035

1    THAT ALUMINUM.  SO I SUSPECT -- I DON'T KNOW.  I SUSPECT THAT

2    IF YOU TAKE ALUMINUM POWDER AND YOU MIX IT INTO THE REST OF

3    FOTTINGER'S BINDER COMPOSITION, YOU GET LITTLE LUMPS OR

4    AGGLOMERATES OF ALUMINUM POWDER, AND YOU DON'T GET THE

5    PARTICLES WELL SEPARATED FROM EACH OTHER.

6    Q.    OKAY.  YOU DON'T THINK IT WOULD DISSOLVE?

7    A.    NO.  THERE IS NOTHING IN THERE TO MAKE IT DISSOLVE.

8    ALUMINUM DOESN'T HAVE ANY CHEMISTRY ON ITS SURFACE TO MAKE IT

9    DISSOLVE IN AN ORGANIC COMPOSITION.

10   Q.    WHAT ABOUT STIRRING IT UP, WOULD THAT MIX IT UP AND

11   EVENLY DISTRIBUTE IT THROUGHOUT THE BINDER?

12   A.    IT WOULD HELP.  BUT, NO, IT'S NOT ENOUGH TO UNIFORMLY

13   DISBURSE IT.

14   Q.    YOU THINK THAT'S WHAT FOTTINGER INTENDED WAS TO

15   UNIFORMLY DISBURSE IT THROUGHOUT HIS DOTS?

16   A.    FOTTINGER DOESN'T GIVE US ANY GUIDANCE ABOUT THAT, ABOUT

17   HOW HE THINKS THAT THE ALUMINUM MIGHT BE DISBURSED THROUGHOUT

18   THE REST OF THE HIS BINDER COMPOSITION.

19   Q.    OKAY.

20   A.    ALL HE DOES IS TALK ABOUT HAVING TO CONTROL THE

21   VISCOSITY SO THAT THE MORE DENSE PARTICLES, SUCH AS COPPER,

22   DON'T SETTLE OUT TOO QUICKLY.

23   Q.    DR. COLE, YOU TESTIFIED EARLIER THAT MR. BLACKFORD

24   DIDN'T INVENT THE PROCESS BY WHICH ALUMINUM FOIL WAS

25   LAMINATED TO FABRIC; RIGHT?

COMPUTER-AIDED TRANSCRIPTION

2036

1    A.    THAT'S CORRECT.

2    Q.    HE DIDN'T INVENT HEAT REFLECTIVITY?

3    A.    NO.

4    Q.    HE DIDN'T INVENT THE IDEA OF 30- TO 70-PERCENT

5    COVERAGE?

6    A.    NO.

7    Q.    AND, IN FACT, IT WAS A CONCERN GOING BACK TO AT LEAST

8    THE 1970'S, THAT THAT WAS A NICE RANGE, BECAUSE YOU WERE

9    CONCERNED ABOUT COVERING TOO MUCH UP OR NOT ENOUGH IN ORDER

10   TO NOT IMPACT THE --

11   A.    SOMEWHERE AROUND THE MIDDLE IS WHERE YOU PROBABLY WANTED

12   TO BE.

13   Q.    AND YOUR TESTIMONY IS THAT HIS INVENTION, DESPITE THE

14   FACT THAT HE DIDN'T INVENT THESE PARTICULAR FEATURES, WOULD

15   NOT HAVE BEEN OBVIOUS TO SOMEONE OF ORDINARY SKILL IN 2009?

16   A.    THAT IS MY TESTIMONY.  IT'S NOT OBVIOUS TO SOMEONE OF

17   ORDINARY SKILL IN THE ART.

18   Q.    WOULD IT HAVE BEEN OBVIOUS TO YOU?

19   A.    NO.  IT WASN'T.  I WISH -- YOU KNOW, QUITE FRANKLY, AS

20   AN INVENTOR, I WISH I INVENTED IT AND MADE A BILLION DOLLARS

21   AS WELL.

22              MR. SPROUL:  FAIR ENOUGH.  THANK YOU.

23              NO MORE QUESTIONS.

24              THE COURT:  REDIRECT.

25

COMPUTER-AIDED TRANSCRIPTION

2037

<u>REDIRECT EXAMINATION</u>

BY MR. ALDRICH:

Q.    DR. COLE, DO YOU REMEMBER A COUPLE OF QUESTIONS ABOUT

THE EXTENT TO WHICH YOU WERE SUPPOSED TO CONSIDER THE

REAL-WORLD EVIDENCE IN YOUR OBVIOUSNESS ANALYSIS?

A.    YES.

Q.    AND IS IT YOUR UNDERSTANDING THAT THE LAW IS THAT

EVIDENCE, SOMETIMES CALLED SECONDARY CONSIDERATION OR

OBJECTIVE INDICIA, AS YOU PUT ON YOUR SLIDE, REAL-WORLD

EVIDENCE, MUST ALWAYS BE CONSIDERED EN ROUTE TO A

DETERMINATION OF OBVIOUSNESS?

A.    THAT'S MY UNDERSTANDING.

Q.    AND IS IT ALSO YOUR UNDERSTANDING THAT THE COURTS HAVE

HELD THAT EVIDENCE, THE REAL-WORLD EVIDENCE, MAY OFTEN BE THE

MOST PROBATIVE AND COGENT EVIDENCE IN THE RECORD; IS THAT

YOUR UNDERSTANDING?

A.    I'VE HEARD THAT.  YES.

        MR. ALDRICH:  NO FURTHER QUESTIONS, YOUR HONOR.

        THE COURT:  DO ANY OF THE JURORS HAVE ANY QUESTIONS

FOR THIS WITNESS?

    (THE FOLLOWING PROCEEDINGS WERE HELD AT SIDEBAR:)

        MR. SPROUL:  WE'RE OKAY WITH THOSE QUESTIONS.

        MR. ALDRICH:  THE FIRST QUESTION SEEMS TO BE FROM --

        THE COURT:  IF YOU OBJECT, I'M NOT GOING TO ASK THE

FIRST QUESTION.  IT'S OUTSIDE THE SCOPE OF THE TESTIMONY.

2038

1          MR. ALDRICH:  I OBJECT TO THE FIRST.

2          THE COURT:  DO YOU HAVE AN OBJECTION TO THE SECOND?

3          MR. ALDRICH:  I HAVE NO OBJECTION.

4          THE COURT:  ANY OBJECTION TO THE SECOND QUESTION?

5          MR. MARCHESE:  IS IT, IS IT 20 PERCENT CLAIMED BY

6    THEM OR BY --

7          THE COURT:  SO THIS IS A JUROR ASKING THE

8    QUESTION.

9          MR. MARCHESE:  I KNOW.

10         THE COURT:  I HAVE NO IDEA.

11         MR. MARCHESE:  NO OBJECTION.

12      (THE FOLLOWING PROCEEDINGS WERE HELD IN OPEN COURT:)

13         THE COURT:  THE QUESTION IS:  DO YOU AGREE WITH THE

14   20 PERCENT -- THIS IS IN QUOTES, QUOTE, 20 PERCENT WARMER,

15   END QUOTE, CLAIM?  DID YOU TEST IT?

16         THE WITNESS:  NO.  I DID NOT TEST THE 20-PERCENT

17   WARMER.  THE TESTING THAT I DID LOOKED AT THE AMOUNT OF HEAT

18   THAT WAS REFLECTED BY BOTH THE SEIRUS AND THE COLUMBIA

19   FABRICS, RELATIVE TO THE REFLECTION OF THEIR BASE LAYER

20   MATERIALS.  AND BOTH MATERIALS DO REFLECT SIGNIFICANTLY MORE

21   THAN THEIR BASE MATERIALS DO.

22         THE COURT:  THANK YOU.  DO YOU HAVE ANY FOLLOW-UP

23   QUESTIONS?

24         MR. ALDRICH:  NO, YOUR HONOR.

25         THE COURT:  DO YOU HAVE ANY FOLLOW-UP QUESTIONS?

COMPUTER-AIDED TRANSCRIPTION

2039

1            MR. SPROUL:  NO, YOUR HONOR.

2            THE COURT:  YOU MAY STEP DOWN.

3            MR. ALDRICH:  YOUR HONOR, MAY THE WITNESS BE

4     EXCUSED?

5            THE COURT:  ANY OBJECTION?

6            MR. SPROUL:  NO, YOUR HONOR.

7            THE COURT:  YOU ARE EXCUSED.  THANK YOU.

8            THE WITNESS:  THANK YOU.

9            THE COURT:  CALL YOUR NEXT WITNESS.

10           MR. AXELROD:  COLUMBIA CALLS ROBERT MURPHY.

11           THE COURT:  PLEASE RE-TAKE THE STAND.  YOU REMAIN

12    UNDER OATH.  HAVE A SEAT.

13        ROBERT MURPHY, HAVING BEEN PREVIOUSLY DULY SWORN,

14        TESTIFIED AS FOLLOWS:

15           THE COURT:  YOU MAY INQUIRE.

16           MR. AXELROD:  THANK YOU, YOUR HONOR.

17                    DIRECT EXAMINATION

18    BY MR. AXELROD:

19    Q.   MR. MURPHY, I'M GOING TO PULL UP A SLIDE THAT SEIRUS

20    USED IN ITS OPENING, WHICH IS DDX-114.  AND I'D LIKE TO ASK

21    YOU SOME QUESTIONS ABOUT IT AND PUT A LITTLE MORE DATA IN

22    PLACE.

23           MS. ROTHAUGE:  YOUR HONOR, I'LL OBJECT TO THIS LINE

24    OF QUESTIONING AS BEING BEYOND THE SCOPE OF REBUTTAL.  THIS

25    WAS SOMETHING THAT HE HAD THE OPPORTUNITY TO CROSS-EXAMINE

2040

1      MR. MURPHY ON BEFORE.

2              THE COURT:  I'M NOT SURE WHERE IT IS THAT YOU'RE

3      GOING WITH THIS LINE OF QUESTIONING.

4              MR. AXELROD:  WE ARE GOING INTO THE COPYING ISSUES,

5      WHICH IS PART OF OUR REBUTTAL OF THEIR OBVIOUSNESS CASE.

6              THE COURT:  OKAY.

7              MS. ROTHAUGE:  I THINK THIS GOES INTO OTHER AREAS

8      THAT WE'VE HAD SIDEBARS ABOUT, YOUR HONOR.  WE WOULD MAINTAIN

9      OUR OBJECTION AT THIS TIME TO THAT.

10             THE COURT:  YOUR OBJECTION IS OVERRULED.

11     Q.   BY MR. AXELROD:  MR. MURPHY, DO YOU HAVE YOUR BINDER

12     WITH YOU?

13     A.   I DO.

14     Q.   COULD YOU LOOK AT EXHIBIT 423, PAGE 61.

15     A.   TAB 423, SIR?

16     Q.   PARDON ME?

17     A.   TAB 423?

18     Q.   YES.

19     A.   I DON'T HAVE THAT.  I HAVE 396 TO 427.

20             MS. ROTHAUGE:  DO YOU HAVE A BINDER FOR HIM?

21             MR. AXELROD:  YES, I DID.

22             MS. ROTHAUGE:  AND FOR ME.

23             MR. SPROUL:  CAN WE GET A BINDER?

24             MR. ALDRICH:  MAY I APPROACH?

25             OH, I'M SORRY.  523 IS WHAT I MEANT TO SAY.  I'M

COMPUTER-AIDED TRANSCRIPTION

2041

1    SORRY.

2          APPARENTLY I HAVE A LITTLE TROUBLE ARTICULATING THE

3    EXHIBIT NUMBERS.  MY APOLOGIES TO EVERYONE.

4    Q.    AND THEN IF YOU LOOK AT PAGE 61 IN THE MIDDLE, YOU WILL

5    SEE AN E-MAIL FROM MORGAN HAAS THEN, NOW MORGAN CHIN, TO DAN

6    MEYER?

7    A.    I'M SORRY.  SAY THAT ONE MORE TIME.  WHAT PAGE?  I FOUND

8    THE TAB.

9    Q.    61 IN THE LOWER RIGHT-HAND CORNER.  NOT THE SEIRUS BATES

10   NUMBER, BUT THERE IS A NUMERAL 61 ON THIS EXHIBIT.

11   A.    I GOT IT.

12   Q.    IS THIS AN AUGUST 6TH, 2012 E-MAIL FROM MORGAN HAAS, NOW

13   MORGAN CHIN, TO DAN MEYER, WHO IS THE U.S. REPRESENTATIVE FOR

14   VENTEX?

15   A.    THAT IS CORRECT.

16   Q.    ARE YOU FAMILIAR WITH THIS E-MAIL?

17   A.    NOT DISTINCTLY.  THIS IS MORGAN'S E-MAIL.  I'M NOT ON

18   IT, BUT GO AHEAD.

19   Q.    THIS WAS THE FIRST TIME THAT THERE IS ANY E-MAIL OR ANY

20   PHONE RECORD OR ANY OTHER KIND OF DOCUMENTATION OF ANY

21   COMMUNICATION BETWEEN SEIRUS AND VENTEX THAT RELATES OR

22   REFERS TO A MEGA-HEAT PRODUCT WITH ALUMINUM FOIL PRINTING, IS

23   IT NOT?

24   A.    I CAN'T SPEAK TO THAT, SIR.

25   Q.    DO YOU RECALL YOUR DEPOSITION TESTIMONY?

COMPUTER-AIDED TRANSCRIPTION

2042

1    A.   NOT NECESSARILY IN REGARDS TO THIS, NO.

2         MR. AXELROD:  COULD WE PULL UP MR. MURPHY'S

3    DEPOSITION AT PAGE 243, LINES 5 TO 9.

4    Q.   MR. MURPHY, SHOWING YOU YOUR DEPOSITION TESTIMONY ON

5    MAY 6TH OF 2016.  DOES THIS REFRESH YOUR RECOLLECTION WHETHER

6    THE AUGUST TIME FRAME WAS THE FIRST TIME THAT YOU COULD

7    IDENTIFY ANY DOCUMENTATION COMMUNICATING WITH VENTEX ABOUT A

8    VENTEX FABRIC WITH ALUMINUM FOIL PRINTING?

9    A.   IN REFERENCE TO DOCUMENTS THAT WERE SHOWN AT THE

10   DEPOSITION, I WOULD SAY THAT'S PROBABLY TRUE.

11   Q.   HAVE YOU EVER SEEN ANY OTHER DOCUMENT THAT SHOWS AN

12   EARLIER POINT IN TIME?

13   A.   WELL, THIS E-MAIL CHAIN GOES BACK TO JUNE 4TH, JUST IN

14   THE CHAIN IN THIS BINDER.

15   Q.   DO YOU WANT TO LOOK AND SEE IF YOU CAN FIND ANOTHER ONE?

16   A.   THROUGH THE BINDER?  I'M SAYING THAT E-MAIL CHAIN HERE

17   GOES BACK THROUGH JUNE 4TH, REFERENCING THE SAME STYLE

18   NUMBER.

19        MR. AXELROD:  MAY I SHOW THE JURY HIS QUESTION AND

20   ANSWER?

21        THE COURT:  NO.  DO YOU HAVE ANOTHER QUESTION?

22   Q.   BY MR. AXELROD:  MR. MURPHY, THERE WAS NOTHING IN YOUR

23   DEPOSITION THAT LIMITED YOUR ANSWER OR THE QUESTION TO THINGS

24   BEING SHOWN TO YOU AT THE DEPOSITION, WAS IT?

25   A.   IT'S -- LIMITED?  SAY AGAIN, PLEASE.

2043

1    Q.   THERE WAS NOTHING IN YOUR DEPOSITION THAT LIMITED THE

2    QUESTION OR YOUR ANSWER TO DOCUMENTS BEING SHOWN TO YOU AT

3    THE DEPOSITION, WAS THERE?

4    A.   NO.  I THINK THE QUESTION SPEAKS FOR ITSELF.  IT'S

5    ASKING IF THE DOCUMENT SHOWN WAS THE AUGUST 6TH TIME FRAME.

6    Q.   NO.  THAT IS NOT WHAT THE QUESTION SAYS.  LET ME READ IT

7    TO YOU.

8    A.   OKAY.

9    Q.   THE QUESTION READS:  "IS THE AUGUST 6 TIME FRAME THE

10        FIRST TIME THAT YOU CAN IDENTIFY ANY DOCUMENTATION

11        COMMUNICATING WITH VENTEX ABOUT A VENTEX FABRIC WITH

12        ALUMINUM FOIL PRINTING?"

13             AND YOUR ANSWER WAS, "AROUND THAT TIME FRAME, I

14   BELIEVE."

15             THAT WAS YOUR ANSWER THEN, AND IT WAS TRUE, WASN'T

16   IT?

17   A.   AS FAR AS THE DOCUMENTS THAT WERE PRESENTED AT THE

18   DEPOSITION, YES, THAT WAS TRUE.

19   Q.   HAVE YOU EVER SEEN ANY PRIOR DOCUMENTS?

20   A.   NOT THAT I CAN RECALL AT THIS TIME.

21             MR. AXELROD:  NOW, IF THAT'S THE FIRST TIME -- LET'S

22   GO BACK TO OUR DDX-114.  I'M GOING TO TRY -- I'M GOING TO PUT

23   IN A MARKER FOR I'LL CALL IT 8/6.  AND WE'LL KNOW THAT THAT'S

24   THE EARLIEST COMMUNICATION THAT SEIRUS CAN IDENTIFY WITH

25   VENTEX TALKING ABOUT A REFLECTIVE FABRIC.

COMPUTER-AIDED TRANSCRIPTION

2044

1    Q.   NOW, IN THIS CALENDAR, YOU HAVE A COUPLE OF STEERING

2    COMMITTEE MEETINGS, DO YOU NOT?

3    A.   CORRECT.

4    Q.   AND THE FIRST ONE IS IN JULY -- EXCUSE ME, THE FIRST ONE

5    IS IN APRIL OF 2012?

6    A.   THE FIRST ONE IN 2012 IS IN APRIL, CORRECT.

7            MR. AXELROD:   OKAY.   SO I'LL TRY TO PUT THAT IN

8    THERE.   AND I'LL USE "SC" FOR STEERING COMMITTEE.

9    Q.   NOW, IN YOUR BINDER, CAN YOU LOOK AT EXHIBIT 107.

10   A.    IS IT IN THE FIRST BINDER OR THE SECOND BINDER?  I GOT

11   IT.

12   Q.   THEY SHOULD BOTH BE THE SAME.   I DON'T WANT TO GET TOO

13   CROWDED.   LET ME TAKE ONE FROM YOU.   I THINK THE PROBLEM WAS

14   I COULDN'T TELL 423 FROM 523 IN THE QUESTION.   I THINK THE

15   BINDERS ARE THE SAME.

16           MR. MARCHESE:   IS THAT AN EXTRA ONE?

17           MR. AXELROD:   SURE.

18           MR. MARCHESE:   THANKS.

19   Q.   BY MR. AXELROD:  WHAT'S EXHIBIT 107?

20   A.   CORRECT.   YES, SIR.

21   Q.   WHAT IS EXHIBIT 107?

22   A.   OH, THIS?  THIS IS A PRESENTATION, A POWERPOINT

23   PRESENTATION COPY FOR OUR APRIL STEERING COMMITTEE MEETING.

24   Q.   IN 2012?

25   A.   CORRECT, 2012.

2045

1    Q.   AND THIS IS THE POWERPOINT PRESENTATION THAT'S USED TO

2    GIVE TO BOTH SEIRUS' KEY PEOPLE INSIDE AS WELL AS A SELECTIVE

3    GROUP OF POTENTIAL BUYERS OR ACTUAL BUYERS, PEOPLE THEY

4    RESPECT IN THE INDUSTRY?

5    A.   CORRECT.  CORRECT.

6    Q.   IN EXHIBIT 107, IS THERE ANY REFERENCE TO ANY PRODUCT

7    WITH ALUMINUM FOIL REFLECTIVITY?

8    A.   NO, THERE IS NOT.

9    Q.   THEN WOULD YOU LOOK AT EXHIBIT 436.  SKIP 436.  LET'S GO

10   TO 475.

11   A.   YES, SIR.

12   Q.   IS THIS A MARCH 21, 2012 E-MAIL FROM MORGAN HAAS TO

13   YOU?

14   A.   YES.

15   Q.   AND IT ATTACHES, DOES IT NOT, TWO VENTEX MARKETING

16   BROCHURES; IS THAT CORRECT?

17   A.   YES.  IT REFERS TO AN ATTACHMENT AT THE TOP.

18   Q.   AND ON THE E-MAIL, YOU CAN SEE THERE ARE TWO ATTACHMENTS

19   SHOWN; CORRECT?

20   A.   CORRECT.

21   Q.   DID YOU ASK HER TO PULL THESE MATERIALS FOR YOU?

22   A.   IT APPEARS SO.

23   Q.   AND WOULD YOU TURN TO EXHIBIT 427.  DID YOU ASK HER TO

24   PULL THESE BROCHURES SO THAT YOU COULD USE THEM AT THE

25   STEERING COMMITTEE MEETING?  THE APRIL STEERING COMMITTEE

2046

1    MEETING.  EXCUSE ME.

2    A.    I DON'T BELIEVE SO.

3    Q.    AND WHY DO YOU NOT BELIEVE SO?

4    A.    THE TITLE OF THE ATTACHMENT IS MEGA-HEAT POWER, WHICH IS

5    A TECHNOLOGY FROM VENTEX THAT WE DID NOT USE.

6    Q.    WELL, BUT THE BROCHURES ARE MUCH BROADER THAN THAT, ARE

7    THEY NOT?

8    A.    YES.  IT'S BROADER THAN I BELIEVE WHAT WE WERE LOOKING

9    AT.

10   Q.    AND NOTHING IN THE BROCHURE, WHICH IS EXHIBIT 427,

11   REFERS TO ANY ALUMINUM FOIL OR OTHER METALLIC REFLECTIVE

12   MATERIAL, DOES IT?

13   A.    NOT THAT I CAN SEE.  I JUST KNOW THIS ISN'T A MARKETING

14   MATERIAL THAT WE USED.

15   Q.    AND WOULD YOU LOOK AT EXHIBIT 476.

16   A.    YES, SIR.

17   Q.    AND IS THERE -- IS THIS THE SECOND OF THE VENTEX

18   BROCHURES THAT REFERS TO THEIR 2012 FALL/WINTER NEW

19   DEVELOPMENT LINE?

20   A.    YES, SIR.

21   Q.    AND THERE IS NOTHING IN THERE ABOUT HEAT-REFLECTIVE

22   MATERIAL, IS THERE?

23   A.    JUST, AGAIN, I KNOW THAT THIS IS NOT SOMETHING THAT WE

24   USED.  THE MEGA-HEAT POWER SERIES, IS NOT SOMETHING WE WERE

25   DEBATING.

2047

1    Q.    CAN WE GO BACK TO OUR CHRONOLOGY.  LOST MY -- ALL MY

2    WORK.  PUT IN STEERING COMMITTEE.

3           NOW, THERE WAS ANOTHER STEERING COMMITTEE MEETING IN

4    JULY; CORRECT?

5    A.    CORRECT.

6    Q.    END OF JULY?

7    A.    I DON'T RECALL THE EXACT DAYS, BUT IT VARIES BETWEEN MID

8    TO END.

9    Q.    NOW, HAVE YOU EVER SEEN ANY RECORD OF ANY OF THE

10   PROCEEDINGS OF THAT STEERING COMMITTEE?

11   A.    I'M SURE I HAVE AT SOME POINT.

12   Q.    HAS SEIRUS PRODUCED ANY RECORD IN THIS LITIGATION OF THE

13   STEERING COMMITTEE MEETING ITSELF?

14   A.    I HAVE NO IDEA WHAT WE'VE PRODUCED, SIR.

15   Q.    HAVE YOU EVER SEEN ANY IN CONNECTION WITH YOUR WORK

16   HERE?

17   A.    NOT THAT I CAN RECALL.

18   Q.    WOULD YOU LOOK AT EXHIBIT 332.

19          DO YOU HAVE EXHIBIT 332?

20   A.    I DO.  IT SAYS "NATIVE FILE, THUMB DRIVE."

21   Q.    332?

22   A.    332.

23   Q.    YES.

24   A.    NOT 532?  YES.  YEAH, 332.

25   Q.    YOU'RE CATCHING IT FROM ME.

2048

1    A.   NO.  332.  THAT'S THIS.

2         DO YOU WANT TO GIVE ME THE OTHER BINDER BACK?

3    Q.   THIS IS AN EXCEL SPREADSHEET THAT SHOWS DECISIONS MADE

4    AT THE STEERING COMMITTEE MEETING IN JULY, DOES IT NOT?

5    A.   I BELIEVE IT SHOWS A SUMMARY OF WHAT THE GLOVE LINE

6    PROPOSAL WOULD BE LEAVING THAT STEERING MEETING.

7    Q.   AND IT SHOWS FOR THE VERY FIRST TIME A REFERENCE TO

8    SOMETHING CALLED HEATWAVE, DOES IT NOT?

9    A.   I SEE FOIL PRINT.

10   Q.   DO YOU SEE REFERENCE IN THE PRODUCT DESCRIPTIONS TO

11   ADDING HEATWAVE TO VARIOUS PRODUCTS?

12   A.   YES, SIR.

13   Q.   AND THERE IS FIVE DIFFERENT PRODUCTS THAT ARE TO BE MADE

14   WITH HEATWAVE MATERIAL; CORRECT?

15   A.   YES, SIR.

16   Q.   AND DID YOU PARTICIPATE IN THAT STEERING COMMITTEE

17   MEETING?

18   A.   I DID.

19   Q.   AND AS I UNDERSTAND IT, WHEN THE DECISION IS MADE TO ADD

20   A PRODUCT OR A NEW PRODUCT TO THE SEIRUS LINE, THEY ARE

21   ALWAYS MADE BY THE OWNERS AND YOURSELF?

22   A.   IT'S A COMMUNAL EFFORT.  I MEAN, IT CERTAINLY HAS THE --

23   THE OWNERS HAVE THE FINAL SAY IN WHAT GETS ADDED TO THE LINE,

24   BUT THAT STEERING COMMITTEE IS A COMMUNAL EFFORT OF THE

25   PEOPLE INVOLVED.

COMPUTER-AIDED TRANSCRIPTION

2049

1    Q.    SO YOU BELIEVE THAT THE DECISION WAS MADE IN THAT LAST

2    WEEK IN JULY TO ADD THESE PRODUCTS TO THE LINE WITH WHAT WAS

3    NOW REFERRED TO FOR THE FIRST TIME AS HEATWAVE MATERIAL?

4    A.    I DON'T KNOW THAT THIS WAS THE FINAL DECISION FACTOR

5    DOCUMENT.  I JUST KNOW THAT THIS IS -- YOU KNOW, THIS IS A

6    SUMMARY OF WHAT IT LOOKS LIKE THE LINE -- THE GLOVE LINE WAS

7    GOING TO BECOME.

8    Q.    AS OF THE JULY STEERING COMMITTEE MEETING?

9    A.    AS OF 7/30/2012.  SO I'M NOT SURE IF THAT'S THE DATE OF

10   THE MEETING.  THAT'S THE DATE OF THE DOCUMENT.

11   Q.    IS THAT ROUGHLY THE TIME YOU'D DO YOUR STEERING

12   COMMITTEE?

13   A.    USUALLY RIGHT BEFORE THAT.

14   Q.    OKAY.  NOW, LEADING UP TO THIS JULY PERIOD, THERE ARE NO

15   DOCUMENTS, ARE THERE NOT, THAT REFER TO ANY FOIL -- OR EXCUSE

16   ME, ANY ALUMINUM FOIL OR REFLECTIVE MATERIAL IN SEIRUS'

17   POSSESSION OTHER THAN THE OMNI-HEAT FABRIC THAT YOU OBTAINED;

18   CORRECT?

19   A.    I CAN'T SPEAK TO THAT.  I DON'T KNOW IF -- YOU'RE SAYING

20   ANY DOCUMENT.  I DON'T KNOW THAT FOR A FACT, SIR.

21   Q.    SO YOU DON'T KNOW WHETHER THERE IS ANY EVIDENCE IN THIS

22   PERIOD PRIOR TO THE JULY STEERING COMMITTEE MEETING OF ANY

23   DOCUMENTATION SHOWING THAT SEIRUS DID ANY WORK, EVALUATION OR

24   CONSIDERATION OF ANY SPECIFIC HEAT-REFLECTIVE MATERIAL?

25   A.    I DON'T KNOW IF THERE IS DOCUMENTS FOR THAT.

2050

1    Q.   YOU'RE NOT AWARE OF ANY THAT WE -- THAT HAVE NOT BEEN

2    PRODUCED, I TAKE IT?

3    A.   I'M NOT AWARE OF ANYTHING.  WHAT'S BEEN PRODUCED, WHAT'S

4    NOT BEEN PRODUCED.

5    Q.   AND I'LL REPRESENT TO YOU THAT NONE HAVE BEEN PRODUCED.

6    A.   I WILL TAKE YOUR WORD FOR THAT.

7    Q.   NOW, THERE WAS SOME ACTIVITY DURING THIS PERIOD THAT HAS

8    BEEN DESCRIBED AS DEVELOPMENT, WAS THERE NOT?

9    A.   ACTIVITY AS FAR AS?

10   Q.   DEVELOPING WHAT'S SUPPOSEDLY BECAME OR WHAT DID BECOME

11   HEATWAVE.

12   A.   CERTAINLY.

13   Q.   AND THAT ACTIVITY INVOLVED YOU, DID IT NOT?

14   A.   YES, IT DID.

15   Q.   AND IN FEBRUARY YOU WENT AND VISITED COLUMBIA'S

16   MANUFACTURER, SHENLI OR JIANGSUSHENLI IN CHINA?

17   A.   I DID VISIT SHENLI, CORRECT.

18        THE COURT:  CAN YOU GIVE ME A YEAR FOR THAT

19   QUESTION, PLEASE.

20        MR. AXELROD:  2012.  FEBRUARY OF 2012.

21        THE COURT:  THANK YOU.

22   Q.   BY MR. AXELROD:  AND JUST SO WE'RE ON THE SAME TIME

23   FRAME, WOULD YOU TURN TO EXHIBIT 544.  AND I'LL JUST LEAVE

24   THE CHRONOLOGY ON.  544 IS IN EVIDENCE.

25   Q.   NOW, PRIOR TO VISITING SHENLI IN FEBRUARY, YOU HAD ASKED

COMPUTER-AIDED TRANSCRIPTION

2051

1    MS. HAAS, MS. CHIN -- LET ME REFER TO HER AS MS. CHIN SINCE

2    THAT'S HER CURRENT NAME, EVEN THOUGH SHE APPEARS AS MORGAN

3    HAAS IN THESE E-MAILS.

4         YOU HAD ASK HER TO GET AHOLD OF SHENLI AND GET YOU

5    SOME EXAMPLES OF OMNI-HEAT REFLECTIVE MATERIAL, HAD YOU NOT?

6    A.   THAT'S NOT CORRECT, SIR.

7    Q.   WHAT DID YOU ASK HER TO GET FOR YOU?

8    A.   I ASKED HER TO MEET PRIOR WITH SHENLI, WHO IS A SUPPLIER

9    OF SEIRUS.  AND SHE HAD BEEN APPROACHED BY THEM, THAT THEY DO

10   FOIL PRINTING.

11   Q.   WELL, YOU AND SHE MET WITH SHENLI AT THE OUTDOOR

12   RETAILER SHOW IN JANUARY IN SALT LAKE CITY, DID YOU NOT?

13   A.   ABOUT CURRENT BUSINESS.

14   Q.   AND YOU DISCUSSED OMNI-HEAT FABRIC AT THAT MEETING,

15   DIDN'T YOU?

16   A.   I DON'T RECALL DISCUSSING OMNI-HEAT WITH THEM AT THAT

17   POINT, BUT I HAD -- WE HAD CURRENT BUSINESS WITH ANOTHER

18   PRODUCT LINE WITH THEM.

19   Q.   OKAY.  AND IF MS. CHIN DOES RECALL DISCUSSING OMNI-HEAT

20   FABRIC, YOU WOULDN'T DISPUTE THAT, I TAKE IT?

21   A.   I WOULDN'T DISPUTE THAT SHE DISCUSSED A FOIL PRINT

22   SUPPLIER THAT SHE HAD FOUND AT THE OUTDOOR RETAILER SHOW.

23   Q.   OKAY.  NOW, SHE DIDN'T GO TO CHINA TO TRY TO GET THESE

24   SAMPLES, DID SHE?

25   A.   NO, SHE DID NOT.

2052

1    Q.    SHE WAS JUST E-MAILING FROM POWAY; CORRECT?

2    A.    CORRECT.   CORRECT.

3    Q.    AND SHE WAS UNSUCCESSFUL?

4    A.    AT GETTING THE SAMPLES?

5    Q.    YES.

6    A.    NO.  I BELIEVE SHE EVENTUALLY GOT A SAMPLE.

7    Q.    THEN DO YOU RECALL HER TELLING YOU THAT SHE WAS UNABLE

8    TO GET SAMPLES FROM SHENLI, AND YOU ASKING HER TO SET UP A

9    MEETING WITH YOU ON FEBRUARY 28?

10   A.    I RECALL HER ASKING TO SET UP A MEETING FOR ME IN

11   FEBRUARY AT SOME POINT, YES.

12   Q.    I THINK WE TRANSPOSED.   ME QUESTION WAS, DO YOU RECALL

13   YOU ASKING HER TO SET UP A MEETING FOR YOU?

14   A.    YES.

15   Q.    AND YOU MET WITH SHENLI ON FEBRUARY 28TH?

16   A.    APPROXIMATELY, YES.

17   Q.    SO THAT'S -- I HAVE TERRIBLE WRITING, BUT THAT'S

18   SUPPOSED TO BE "SHENLI" JUST TO KEEP OUR ORGANIZED.

19   A.    CHINESE CHARACTERS.

20   Q.    YES.  AND AT THE MEETING, SHENLI SHOWED YOU THE FABRIC

21   THAT THEY WERE GOING TO SEND YOU, DIDN'T THEY?

22   A.    I RECALL THEY SHOWED ME SOME FOIL PRINT FABRIC.  I DON'T

23   RECALL IF IT WAS THE FABRIC THEY ENDED UP SENDING.

24   Q.    OKAY.  NOW, THE FABRIC THAT THEY ULTIMATELY SENT TO YOU

25   IS REFLECTED IN EXHIBITS 529 THROUGH 531, IS IT NOT?  AND

COMPUTER-AIDED TRANSCRIPTION

2053

1    UNFORTUNATELY I THINK YOUR BINDER DOESN'T HAVE 531, OR 530;

2    SO WE'LL PULL THOSE UP.

3         MR. AXELROD:  WE'RE HAVING BINDER CONFUSION.

4    Q.   YOU DO HAVE 529 IN YOUR BINDER; RIGHT?

5    A.   I DO HAVE 529, CORRECT.

6    Q.   AND THAT'S A SERIES OF E-MAILS BETWEEN SEIRUS EMPLOYEES

7    AND THE MANUFACTURER OF SOME OF YOUR GLOVES; CORRECT?

8    A.   YES.  I BELIEVE SO.

9    Q.   AND IT INVOLVES SENDING A QUARTER OF A YARD OF WHAT WAS

10   REFERRED TO AS REFLECTIVE LINING TO THAT GLOVE MANUFACTURER

11   FOR MAKING SOME SAMPLES.  DO YOU RECALL THAT?

12   A.   YES.  CORRECT.

13   Q.   AND WITH THAT E-MAIL TO THE GLOVE MANUFACTURER WERE SOME

14   PICTURES.  LET ME PULL THOSE UP FOR YOU.  THEY WERE EXHIBITS

15   530 AND 531.

16        HAVE YOU SEEN THESE PICTURES BEFORE?

17   A.   I HAVE.

18   Q.   AND THAT'S THE MATERIAL THAT SHENLI SHOWED YOU, IS IT

19   NOT?

20   A.   I DON'T RECALL FOR CERTAIN, BUT I'M GOING TO ASSUME

21   SO.

22   Q.   PARDON?

23   A.   I DON'T RECALL FOR CERTAIN, BUT I WOULD ASSUME SO.

24   Q.   NOW, IF YOU TURN BACK TO EXHIBIT 544.

25   A.   YES.

2054

1    Q.    IS THAT AN E-MAIL THAT YOU SENT TO MORGAN HAAS, LOWER

2    HALF OF THE PAGE?

3    A.    YES.

4    Q.    AFTER YOUR MEETING WITH SHENLI?

5    A.    YES.

6    Q.    AND IN THAT E-MAIL YOU SAY, "MAKE SURE TO NOT SHOW OMNI

7    LOGO."  DO YOU SEE THAT?

8    A.    CORRECT.

9    Q.    AND THAT REFERRED TO THE OMNI-HEAT LOGO THAT WAS ON THE

10   MATERIAL THAT SHENLI HAD SHOWED YOU AND THAT YOU ASKED THEM

11   TO PROVIDE YOU FIVE YARDS OF; CORRECT?

12   A.    CORRECT.

13   Q.    NOW, I NOTE THAT YOU DID NOT TELL YOUR STAFF, OR YOU DID

14   NOT TELL MS. HAAS AT SEIRUS TO HAVE THEM REMOVE THE "PATENT

15   PENDING" NOTICE FROM THAT MATERIAL; CORRECT?

16   A.    IT DOESN'T APPEAR SO.  I MAY NOT HAVE SEEN IT AT THE

17   TIME.  I'M NOT SURE.

18   Q.    AND WAS THAT A DELIBERATE DECISION ON YOUR PART?

19   A.    TO NOT -- TO NOT SHOW THE LOGOS?

20   Q.    TO TELL THEM TO REMOVE THE OMNI-HEAT LOGO BUT TO -- BUT

21   NOT TELLING THEM TO REMOVE THE PATENT PENDING?

22   A.    NO.  I WOULD HAVE -- IF I HAD SEEN THE PATENT PENDING, I

23   WOULD HAVE TOLD THEM TO REMOVE BOTH.

24   Q.    YOU WERE HAVING THIS MATERIAL SENT OUT TO HAVE GLOVES

25   MADE FOR THE STEERING COMMITTEE MEETING; CORRECT?

2055

1    A.    NO.  OBVIOUSLY NOT, BECAUSE IT WASN'T IN THE

2    PRESENTATION THAT YOU JUST REFERRED TO.

3    Q.    YOU'VE GOT TWO STEERING COMMITTING MEETINGS COMING UP,

4    DON'T YOU?

5    A.    WE DO HAVE TWO STEERING MEETINGS SCHEDULED, SURE.

6    Q.    AND YOU WERE HAVING THIS OMNI-HEAT MATERIAL SENT OUT TO

7    HAVE GLOVES MADE AND SAMPLES TO SHOW PEOPLE; CORRECT?

8    A.    THAT IS NOT CORRECT.

9    Q.    WHAT WERE YOU SENDING IT OUT -- WHY WERE YOU SENDING

10   OMNI-HEAT MATERIAL OUT TO HAVE SAMPLES MADE IN THE TIME FRAME

11   OF YOUR UPCOMING STEERING COMMITTEE MEETINGS?

12   A.    BECAUSE WE WERE LOOKING AS AN R & D PROJECT, NOT

13   NECESSARILY FOR STEERING MEETING, WE WERE LOOKING FOR A FOIL

14   PRINT SUPPLIER.  MS. HAAS HAD FOUND A COUPLE OF SUPPLIERS AT

15   THE O.R. SHOW, AND SHENLI BEING A CURRENT SUPPLIER WAS -- WE

16   WERE LOOKING AT THEM AND LOOKING AT THEIR CAPABILITY OF DOING

17   FOIL PRINTING.

18   Q.    SO ROUGHLY SOMETIME IN MARCH, SHENLI GIVES YOU FIVE

19   YARDS OF OMNI-HEAT; CORRECT?

20   A.    CORRECT.

21   Q.    AND YOU SEND IT OFF TO THE GLOVE MANUFACTURER TO HAVE

22   MOCK-UPS MADE; CORRECT?

23   A.    WE HAD ONE PAIR OF MOCK-UPS MADE.

24   Q.    WHERE IS THAT PAIR?

25   A.    DESTROYED.  GONE.

2056

1   Q.   AND THEN THE OTHER ITEM IN THE DEVELOPMENT CHRONOLOGY IS

2   IN APRIL OF 2012.  THAT'S WHEN THE D-093 PATENT ISSUES;

3   CORRECT?

4   A.   I CAN'T SPEAK EXCLUSIVELY TO THE ISSUE DATE.

5   Q.   NOW, I WANT TO GO THROUGH -- I'LL TRY TO GO THROUGH ALL

6   THE DOCUMENTS WE'RE AWARE OF ABOUT THE DEVELOPMENT LEADING UP

7   TO HEATWAVE PER THE SLIDE THAT WAS SHOWN.  SO THE NEXT

8   DOCUMENT I HAVE IS EXHIBIT 135.1.

9        AND THIS TAKES PLACE IN JULY, END OF JULY, JULY 27,

10  2012, SPECIFICALLY.  I'LL JUST CALL THAT 135.1.

11       DO YOU RECALL THIS DOCUMENT, WHICH IS AN E-MAIL FROM

12  MR. CARLSON TO MANY PEOPLE AT SEIRUS?

13  A.   YES.

14  Q.   AND IT IS CIRCULATING THE -- SOME OMNI-HEAT MARKETING

15  LITERATURE; CORRECT?

16  A.   IT'S A PHOTO OF AN OMNI-HEAT HEADER CARD.

17  Q.   OKAY.  AND THE HEADER CARD IS FOR OMNI-HEAT REFLECTIVE;

18  CORRECT?

19       MS. ROTHAUGE:  COUNSEL, WELL, I HAVE AN OBJECTION TO

20  THE QUESTION.  IT APPEARS THAT THERE IS A NEW PICTURE THAT'S

21  BEEN SLIPPED INTO 135.1  I WANTED TO MAKE SURE THE WITNESS IS

22  NOT CONFUSED ABOUT WHAT HE'S SEEING.

23       THE COURT:  YOU CAN CHECK HIS BINDER TO MAKE SURE

24  YOU'RE LOOKING AT THE SAME THINGS.

25       MR. AXELROD:  I THINK WE ARE.  135.1 HAS ALWAYS HAD

COMPUTER-AIDED TRANSCRIPTION

2057

1    THIS.  IT HAD THIS WHEN IT WAS OFFERED.

2           MS. ROTHAUGE:  AND ARE YOU REPRESENTING IT'S PART OF

3    THE ORIGINAL E-MAIL?

4           MR. AXELROD:  NO.  IT'S NOT PART OF THE ORIGINAL

5    E-MAIL.  IT'S A CLEAR SHOWING OF THE HEADER CARD THAT WAS IN

6    THE ORIGINAL E-MAIL.

7           MS. ROTHAUGE:  THAT IS TAKEN AFTER?

8           MR. AXELROD:  YES.

9           MS. ROTHAUGE:  FOR TRIAL PREP?

10          THE WITNESS:  MR. AXELROD, AM I LOOKING AT 135, JUST

11   ALONE 135 OR 135.1?

12   Q.   BY MR. AXELROD:  135.1 HAS THE ADDITION OF A CLEAR

13   SHOWING OF THE HEADER CARD THAT'S ATTACHED AS 135.  YOU CAN

14   LOOK AT 135.

15   A.   OKAY.

16   Q.   EITHER ONE.  135.1 SIMPLY SHOWS IN CLEAR -- A GOOD

17   PICTURE OF THE HEADER CARD THAT'S IN --

18   A.   GOT IT.

19   Q.   -- THE ORIGINAL 135.  AND THIS IS THE OMNI-HEAT HEADER

20   CARD BEING CIRCULATED BY MR. CARLSON TO MIKE CAREY, TO

21   YOURSELF, TO MR. EDWARDS, ALL THE KEY PEOPLE AT SEIRUS;

22   CORRECT?

23   A.   SURE.  YES.

24   Q.   AND WOULD YOU LOOK AT EXHIBIT 546.

25          AND THIS IS AFTER OUR JULY -- EXHIBIT 546 IS

2058

1    CORRESPONDENCE BETWEEN MORGAN HAAS AND SHENLI AGAIN ASKING IF

2    THEY WOULD MEET AT THE SUMMER OUTDOOR RETAILER SHOW TO

3    DISCUSS WHAT MS. HAAS REFERS TO AS SEIRUS' OMNI-HEAT PROGRAM;

4    CORRECT?

5    A.    THAT'S WHAT SHENLI REFERS TO THE PROGRAM AS.

6    Q.    WELL, IF YOU LOOK DOWN AT THE E-MAIL ON THE BOTTOM OF

7    THE FIRST PAGE OF 546, THAT'S MORGAN HAAS TO SHENLI, IS IT

8    NOT?

9    A.    IT IS.

10   Q.    HI, MS. HWANG.  DO YOU SEE THAT?

11   A.    I DO, YES.

12   Q.    IT SAYS, WE WOULD LIKE TO DISCUSS SETTING UP THE, QUOTE,

13   OMNI-HEAT, CLOSED QUOTE, PROGRAM WITH YOU?

14   A.    YES.  SHE HAS THAT IN QUOTES BECAUSE THAT IS THE NAME

15   THAT THE VENDOR CALLED THE PROGRAM.

16   Q.    SO THAT'S WHAT YOU GUYS DECIDED TO CALL YOUR PROGRAM?

17   A.    THAT IS WHAT THEY REFERRED TO IT AS UNTIL A DEFINING

18   NAME OR STYLE NUMBER WAS PRODUCED.

19   Q.    OKAY.  THESE ARE ALL OF THE DOCUMENTS THAT I'VE BEEN

20   ABLE TO IDENTIFY THROUGHOUT THE COURSE OF THIS LITIGATION

21   THAT REFER TO WHATEVER DEVELOPMENT WAS GOING ON LEADING UP TO

22   THE TIME THE PRODUCTS WERE ACTUALLY SELECTED AND COMMITTED.

23          TO YOUR KNOWLEDGE, HAVE I LEFT OUT ANY DOCUMENT?

24   A.    I KNOW THERE IS PRICING FROM SHENLI AND OTHER FOIL

25   SOURCES THAT ARE ALL BEING OBTAINED AT THE SAME TIME.

2059

1    Q.    AND THAT WAS IN AUGUST, WAS IT NOT?

2    A.    NO.  THAT WAS FROM -- THROUGHOUT THAT WHOLE FIRST HALF

3    OF 2012 AT SOME POINT.

4    Q.    CAN YOU BRING SOME OF THESE DOCUMENTS IN?

5    A.    I CAN'T DO THAT.  I MEAN, I DON'T KNOW THAT -- I KNOW WE

6    WERE OBTAINING PRICING AT THAT TIME.  THE DECISION WAS IN THE

7    END NOT TO GO WITH SHENLI FOR THE FOIL PRINTING, BUT TO GO

8    WITH ANOTHER VENDOR.

9    Q.    THERE IS A SERIES OF CORRESPONDENCE IN AUGUST IN WHICH

10   YOU'RE TRYING TO OBTAIN PRICING.  DO YOU RECALL SEEING

11   THAT?

12          IF YOU HAVE SOME DOCUMENTS PRIOR TO THE JULY

13   STEERING COMMITTEE MEETING WHERE YOU'RE SOLICITING, WOULD YOU

14   PLEASE BRING THEM IN TOMORROW, SO YOU CAN ADD THEM TO THE

15   RECORD?

16   A.    I THINK YOU SEE FROM MORGAN, THE PRIOR E-MAIL CHAIN, THE

17   FIRST E-MAIL YOU SHOWED ME THAT SHE HAS CORRESPONDED WITH

18   VENTEX FROM JUNE 4TH WITH THAT SAME STYLE NUMBER ON THE

19   E-MAILS.

20   Q.    NONE OF THAT REFERS TO ANY PRODUCT WITH REFLECTIVE

21   PRINTING, DOES IT?  THAT'S WHAT WE JUST WENT THROUGH WITH

22   YOUR AUGUST ACKNOWLEDGEMENT THAT THAT WAS THE FIRST TIME

23   THERE IS ANY DOCUMENTATION REFERRING TO REFLECTIVE?

24   A.    BUT ON THAT SAME E-MAIL CHAIN, THAT SAME STYLE NUMBER

25   GOES BACK THROUGH THAT DOCUMENT TO JUNE 4TH, AS I POINTED OUT

2060

1    EARLIER.

2    Q.   YES.   REFERRING TO MEGA-HEAT WITHOUT REFLECTIVE

3    PRINTING; CORRECT?

4    A.   BUT THE SAME STYLE NUMBER, CORRECT.

5    Q.   WELL THEY PUT AN "RX" ON IT ONCE THEY WENT TO THE

6    REFLECTIVE PRINTING COMMITMENT, WHICH THEY DID IN AUGUST;

7    CORRECT?

8    A.   I DON'T KNOW THE EXACT DATE THEY PUT THE RX.

9    Q.   OKAY.   NOW, APART FROM THIS, WHICH BRINGS US THROUGH THE

10   FIRST COMMITMENT TO HEATWAVE IN THE ADDITIONAL PRODUCT LINE,

11   THERE WAS ALSO A SECOND DEVELOPMENT ASPECT, WAS THERE NOT?

12   A.   I'M NOT SURE WHAT YOU'RE REFERRING TO.

13   Q.   I'M NOT TRYING TO BE TRICKY.   I'M JUST TRYING TO LOOK

14   FOR MY OTHER NUMBER.

15        WOULD YOU LOOK AT EXHIBIT 501.   WRONG ONE.   SORRY.

16   EXHIBIT 460.

17        AND IS EXHIBIT 460 AN E-MAIL FROM GREG CALISE TO

18   MORGAN HAAS AND TO YOU REGARDING THE HEATWAVE SCREEN

19   DESIGN?

20   A.   YES.   THERE IS A HEATWAVE SCREEN DESIGN ON THERE.

21   Q.   HAVE YOU EVER SEEN ANY OTHER HEATWAVE PATTERNS PROPOSED

22   OR PREPARED AT ANY TIME BY SEIRUS DURING 2012?

23   A.   I BELIEVE SO, YES.

24   Q.   HAVE YOU EVER SEEN ANY DOCUMENTATION OF SUCH?

25   A.   I KNOW THAT THERE WAS OTHER PATTERN DEVELOPMENT.   I KNOW

2061

1    THIS IS NOT THE FINAL PATTERN, SO I'M ASSUMING THAT THERE IS

2    OTHER DOCUMENTATION.

3    Q.    AND THE FINAL PATTERN THAT YOU MAY BE REFERRING -- THE

4    SECOND PAGE SHOWS THE DESIGN DRAWING THAT SUPPOSEDLY, QUOTE,

5    MIKE IS GOOD WITH THIS PATTERN, CLOSED QUOTE?

6    A.    AT THAT TIME, YES.

7    Q.    ARE THE OTHER VARIATIONS, JUST VARIATIONS ON THIS

8    THEME?

9    A.    I DON'T KNOW.  I CAN'T TELL YOU THE DETAILS.  I JUST

10   KNOW THAT THE LOGO PLACEMENT WITHIN THIS WAVE IS NOT WHAT WE

11   CURRENTLY HAVE BEEN SHOWING HERE, SO THIS IS NOT A FINAL

12   VERSION.

13   Q.    APART FROM THE LOGO PLACEMENT OR THE SIZE OF THE LOGO IN

14   THE WAVY LINE DESIGN, DID YOU EVER SEE ANY PROPOSED PATTERN

15   FOR THE VENTEX MOLD, OTHER THAN THE WAVY LINE DESIGN?

16   A.    I RECALL THERE BEING WAVES MORE LIKE AN OCEAN WAVE, YOU

17   KNOW, KIND OF A CURL.  AND THEN VARIATIONS OF THIS AS WELL,

18   TOO.

19   Q.    WHEN YOU SAY "VARIATIONS OF THIS," VARIATIONS OF WHAT'S

20   SHOWN IN EXHIBIT 460?

21   A.    YES.

22   Q.    HAVE YOU EVER SEEN ANY DOCUMENTATION OF THIS OTHER

23   DESIGN THAT YOU REFER TO?

24   A.    I DON'T RECALL.  I JUST KNOW THAT WAS PART OF THE

25   PROPOSALS THAT WE WOULD BE GETTING.

COMPUTER-AIDED TRANSCRIPTION

2062

1    Q.   WAS THAT PROPOSED FOR THE MOLD THAT VENTEX WAS GOING TO

2    USE TO MAKE REFLECTIVE PRINTING?

3    A.   ULTIMATELY, YES, THAT'S WHAT IT WOULD TURN INTO IS TURN

4    INTO THE MOLD.

5    Q.   AND HAVE YOU EVER SEEN ANY DOCUMENTATION IN CONNECTION

6    WITH THIS LITIGATION THAT EVIDENCES THIS OTHER DESIGN?

7    A.   I COULDN'T TELL YOU EVERYTHING THAT'S IN THIS LITIGATION

8    NOW.

9    Q.   OKAY.  OTHER THAN THAT SURFING WAVE, IS THAT A FAIR

10   DESCRIPTION OF WHAT YOU'RE ARTICULATING?

11   A.   SURE, SURE.

12   Q.   IS THE ONLY DESIGN THAT EVER APPEARED DURING THIS PERIOD

13   THE DESIGN, THE SAME AS OR SIMILAR TO WHAT'S SHOWN ON

14   EXHIBIT 460?

15   A.   I COULDN'T SAY CONCLUSIVELY.  I'M NOT INHERENT IN THAT

16   CHAIN.  I'M THE ONE THAT KIND OF GETS IT AT THE BACK END AND

17   MAKES SURE THAT MORGAN IS PASSING IT ALONG TO THE PRINTER,

18   SO...

19   Q.   NOW, YOU'RE FAMILIAR WITH PATENTS, ARE YOU NOT?

20   A.   A LITTLE BIT.

21   Q.   HOW MANY PATENTS DO YOU HAVE ISSUED TO YOU AS AN

22   INVENTOR?

23   A.   I WOULD -- I WOULD GUESS TWO OR THREE.

24   Q.   OKAY.  AND HOW MANY DIFFERENT PATENT APPLICATIONS HAVE

25   YOU SUBMITTED OVER THE YEARS?

2063

1    A.    MAYBE SIX.

2    Q.    OKAY.  AND SOME OF THOSE APPLICATIONS HAVE BEEN FILED IN

3    AS MANY AS SEVEN OR EIGHT COUNTRIES, HAVE THEY NOT?

4    A.    YOU KNOW, I WOULD DEFER TO A LOT OF THAT WAS HANDLED BY

5    OUR PATENT ATTORNEYS.  BUT I KNOW THAT WE -- THAT SOME OF MY

6    PATENTS HAVE BEEN REQUESTED OR APPLIED FOR OUT OF THE

7    COUNTRY, YES.

8    Q.    SOME HAVE BEEN APPLIED FOR IN EUROPE AND RUSSIA AND

9    CANADA, ELSEWHERE AS WELL?

10   A.    I COULDN'T SPEAK TO THE EXACT COUNTRIES, BUT I KNOW

11   OUTSIDE THE U.S., SURE.

12   Q.    OKAY.  AND DO YOU CONDUCT ANY SEARCHES TO MONITOR HOW

13   YOUR PATENTS ARE PROGRESSING?

14   A.    ME PERSONALLY?

15   Q.    YES.

16   A.    NO.

17   Q.    ARE YOU AT ALL FAMILIAR WITH THE PAIR SYSTEM?

18   A.    NO, NOT AT ALL.

19   Q.    DO YOU KNOW WHAT THE PAIR SYSTEM IS?

20   A.    I DON'T.

21   Q.    OKAY.  IT'S A PUBLIC FEDERAL GOVERNMENT PROGRAM THAT

22   ALLOWS PEOPLE TO ACCESS PATENT PROSECUTIONS BEFORE THE PATENT

23   OFFICE, AFTER PUBLICATION -- AFTER APPLICATIONS ARE

24   PUBLISHED.

25   A.    OKAY.

COMPUTER-AIDED TRANSCRIPTION

2064

1    Q.    YOU HAVE NO FAMILIARITY WITH THAT?

2    A.    NOT AT ALL, NO.

3    Q.    YOU'RE AWARE THAT PATENTS ARE PUBLISHED AFTER A PERIOD

4    OF TIME FOLLOWING SUBMISSION OF THE APPLICATION?

5    A.    NOT NECESSARILY.

6    Q.    WELL, YOU KNOW A NUMBER OF YOURS HAVE BEEN PUBLISHED

7    WHILE STILL IN APPLICATION FORM, DO YOU NOT?

8    A.    NO, I DON'T KNOW THAT.

9    Q.    OKAY.  HAVE YOU EVER CONDUCTED A SEARCH TO LOOK FOR A

10   PATENT?

11   A.    NOT THAT I CAN RECALL.  YOU KNOW, I ISSUE ALL MY PATENTS

12   TO SEIRUS.  I ASSIGN ALL THE PATENTS WHEN THEY GO TO

13   APPLICATION STAGE TO SEIRUS.  SO IT'S KIND OF OUT OF MY HANDS

14   AT THAT POINT.

15   Q.    WOULD YOU LOOK AT EXHIBIT 501.  DO YOU RECALL RECEIVING

16   EXHIBIT 501?

17   A.    I RECALL SEEING THIS DOCUMENT, YES.

18   Q.    DO YOU EVER CONDUCT SEARCHES ON GOOGLE?

19   A.    ON GOOGLE, SURE.

20   Q.    YES.  OKAY.  IS EXHIBIT 501 AN E-MAIL THAT WAS SENT TO

21   YOU FROM MORGAN HAAS THROUGH VENTEX THAT ATTACHES THE D-093

22   PATENT THAT COVERS THE WAVY LINE DESIGN?

23   A.    YES.

24   Q.    DOES THAT REFRESH YOUR RECOLLECTION THAT THAT PATENT

25   ISSUED PUBLICLY ON APRIL 3, 2012?

COMPUTER-AIDED TRANSCRIPTION

2065

1    A.    THAT'S WHAT THE DOCUMENT SAYS, YES.

2    Q.    WHEN YOU RECEIVED THIS E-MAIL, DID YOU LOOK AT THE

3    ATTACHMENTS?

4    A.    I DID NOT.

5    Q.    WHAT DID YOU DO WITH IT?

6    A.    I FORWARDED THIS TO MR. EDWARDS, WHO HEADS UP OUR

7    COORDINATION WITH THE LEGAL TEAM.

8    Q.    OKAY.  AND MR. EDWARDS IS ANOTHER 50 PERCENT OWNER OF

9    THE COMPANY?

10   A.    I DON'T KNOW HIS PERCENTAGE.  BUT HE'S ANOTHER PARTNER

11   IN THE COMPANY, AND HE'S MY BOSS.

12   Q.    OKAY.  WHO ARE THE TWO OWNERS?

13   A.    TO MY KNOWLEDGE, MIKE CAREY AND JOE EDWARDS.

14   Q.    OKAY.  AND MR. EDWARDS WAS RESPONSIBLE FOR HANDLING

15   PATENT MATTERS?

16            MS. ROTHAUGE:  OBJECTION, YOUR HONOR.  THIS GOES

17   WELL BEYOND THE SCOPE.  HE SAID HE WAS OFFERING SOME COPYING

18   EVIDENCE THAT GOES TO COMMERCIAL SUCCESS.

19            THE COURT:  I THINK THAT OBJECTION IS SUSTAINED.

20   I'M NOT TYING THAT ONE TOGETHER.

21            MR. AXELROD:  AND I THINK I AM DONE.  THANK YOU.

22            THE COURT:  THANK YOU.

23            MEMBERS OF THE JURY, IT'S A LITTLE AFTER 5:00.

24   WE'LL BE TAKING OUR EVENING RECESS AT THIS TIME.  WE'LL BE IN

25   RECESS UNTIL THE SAME TIME TOMORROW MORNING.

COMPUTER-AIDED TRANSCRIPTION

2066

1          THANK YOU VERY MUCH.  HAVE A GOOD EVENING.

2          (JURY ABSENT, 5:14 P.M.)

3          THE COURT:  PLEASE BE SEATED.  YOU MAY STEP DOWN.

4          THE WITNESS:  THANK YOU.

5          THE COURT:  SO TOMORROW, EVEN BY THE CLOCK, YOU WILL

6    RUN OUT OF TIME.  YOU HAVE 2 HOURS AND 19 MINUTES.  YOU HAVE

7    1 HOUR AND 45 MINUTES LEFT, ACCORDING TO MY CLOCK.  SO I

8    DON'T CARE WHAT YOU ALL SAY ABOUT WHEN WE'RE GOING TO FINISH,

9    WE'RE FINISHING WITH THE EVIDENCE TOMORROW BECAUSE YOU'RE

10   GOING TO RUN OUT OF TIME.

11          MR. MARCHESE, YOU HAD MENTIONED TO ME -- AND I

12   APOLOGIZE.  I CUT YOU OFF THIS MORNING -- ABOUT A CASE THAT

13   YOU THOUGHT I SHOULD CONSIDER RELATED TO THE ISSUE OF THE

14   KOREAN PATENT, AND I DIDN'T NOTE DOWN THE CASE THAT YOU WERE

15   TELLING ME.

16          CAN YOU REFRESH MY MEMORY.

17          MR. MARCHESE:  IT'S CALLED BIC, BIC LEISURE VS.

18   WINDSURFING INTERNATIONAL.  IT'S AT -- I DON'T KNOW THE PAGE

19   CITE.  I KNOW IT'S 1 FED. 3RD, AND I WANT TO SAY MAYBE IT'S

20   1301.

21          THE COURT:  DO YOU HAVE A YEAR?

22          MR. MARCHESE:  IT WOULD BE -- IT'S IN OUR MOTION IN

23   LIMINE.

24          THE COURT:  WE'LL FIND IT.  THANK YOU.  I WILL TAKE

25   A LOOK AT THAT CASE.

COMPUTER-AIDED TRANSCRIPTION

2067

1          WAS THERE ANOTHER CASE?  I THOUGHT THERE WAS TWO

2     CASES.

3          MR. MARCHESE:  THAT'S THE FEDERAL CIRCUIT.  THE

4     OTHER ONE THAT WE WERE TALKING ABOUT WAS -- THAT'S THE ONE

5     THAT TALKS ABOUT THE SOUTH KOREAN FOLLOW-ALONG.

6          THERE WAS THE ONE FOR WILLFUL INFRINGEMENT, WHICH

7     WAS THE STATE INDUSTRY VS. MOR-FLO CASE.

8          THE COURT:  SAY AGAIN.

9          MR. MARCHESE:  STATE INDUSTRY V. MOR-FLO, M-O-R

10    HYPHEN F-L-O.

11         THE COURT:  OKAY.

12         MR. MARCHESE:  AND THAT'S A 1985 FEDERAL CIRCUIT

13    OPINION.

14         THE COURT:  OKAY.  ALL RIGHT.  THANK YOU.

15         I WILL -- AS REGARDS TO THINGS THAT WE NEED TO TAKE

16    CARE OF, I THINK MOST OF THE THINGS WE NEED TO TAKE CARE OF

17    ARE ON MY SIDE OF THE BENCH RIGHT NOW; NOT ON YOUR SIDES OF

18    THE BENCH.

19         I DON'T KNOW -- I'M TRYING TO REMEMBER EVERYTHING

20    THAT WE NEED TO DECIDE.  I KNOW WE NEED TO FINALLY PUT SOME

21    CLOSURE ON THE ISSUE OF WILLFULNESS AND WHETHER THERE IS A

22    WINDOW THAT WAS LEFT OPEN OR NOT.  AND SO I WILL TAKE A LOOK

23    AT THAT.  I STILL HAVEN'T FINISHED GOING THROUGH MY

24    TRANSCRIPT CAREFULLY.  I READ IT.  AND I KNOW THAT I DID A

25    BAD JOB IN MAKING A RULING THAT WAS CLEAR TO EVERYBODY.

2068

1    OTHER THAN THAT, I HAVE TO KIND OF GO THROUGH AND SEE WHAT I

2    ACTUALLY DID AND FIGURE IT OUT FOR MYSELF.

3         AND THAT -- TO THAT, I OWE YOU ALL AN APOLOGY.  I

4    WAS NOT CLEAR IN THAT RULING.  SO I WILL TAKE CARE OF THAT.

5    AND THEN WE WILL FIGURE OUT WHAT WE'RE DOING REGARDING

6    WILLFULNESS AND WHETHER OR NOT THERE IS ANY OTHER EVIDENCE

7    THAT I WILL OR WILL NOT TAKE ON THAT ISSUE.

8         MR. AXELROD:  JUST SO YOUR HONOR KNOWS, I DON'T KNOW

9    HOW MUCH TIME THEY WILL HAVE WITH MR. MURPHY.  BUT AFTER

10   THAT, WE'LL CALL SERENA MORONES BACK FOR THE REBUTTAL, AND

11   THEN WE'RE DONE.

12        THE COURT:  OKAY.

13        MR. AXELROD:  SO I WOULD EXPECT WE WOULD -- 10:30,

14   11:00.  SO I'M NOT SURE.  I GUESS I'M ASKING YOU WHAT YOUR

15   HONOR'S DRUTHERS WOULD BE AT THAT POINT.

16        THE COURT:  SO I THINK WHAT I WOULD LIKE TO DO -- SO

17   I'VE SENT YOU ALL OF THE JURY INSTRUCTIONS.  IF WE FINISH

18   AROUND 10:30, WHAT I WILL DO IS PROBABLY SEND THE JURY OUT.

19   WE'RE NOT GOING TO FINISH AT 10:30.

20        MR. AXELROD:  OKAY.  WE FINISH AT NOON.

21        THE COURT:  I'M THINKING WE'RE MORE LIKELY TO FINISH

22   AT NOON.

23        LET ME TURN THE QUESTION AROUND A LITTLE BIT.  HOW

24   MUCH TIME DO YOU ANTICIPATE TAKING FOR CLOSING ARGUMENT?

25        MR. ALDRICH:  HOUR AND A HALF MAYBE.

COMPUTER-AIDED TRANSCRIPTION

2069

1          THE COURT:  SO IF I GIVE YOU EACH -- YOU TWO HOURS,

2    THAT WOULD BE PLENTY OF TIME, IF I LIMIT YOU TO TWO HOURS?

3          MR. ALDRICH:  SURE.

4          THE COURT:  THAT'S FOR YOUR OPENING AND REBUTTAL.

5          MR. ALDRICH:  SURE.

6          THE COURT:  HOW ABOUT YOU, CAN YOU DO IT IN TWO

7    HOURS?

8          MR. MARCHESE:  YES, YOUR HONOR.  DO WE GET REBUTTAL

9    TO THEIR REBUTTAL, OR IS IT ONE, ONE, ONE.  ALL RIGHT.

10          THE COURT:  GOOD TRY.

11          MR. MARCHESE:  I'LL PLAN ACCORDINGLY.

12          MR. ALDRICH:  JUST FOR CLARIFICATION, YOUR HONOR.

13    WHAT IS MY REBUTTAL COVERING?  AM I JUST RESPONDING TO WHAT

14    THEY HAVE THE BURDEN ON, OR AM I --

15          THE COURT:  OH, I SEE.  THAT'S A GOOD QUESTION.  I

16    NEVER THOUGHT ABOUT THAT.  SO COVER ALL YOUR POINTS IN

17    OPENING, INCLUDING WHAT YOU ANTICIPATE THEIR DEFENSE THAT

18    STILL EXISTS MIGHT BE.  AND THEN YOU WILL REBUT WHATEVER THEY

19    HAVE TO SAY AS WELL.  SO COVER EVERYTHING.

20          MR. ALDRICH:  THANK YOU, YOUR HONOR.

21          MR. MARCHESE:  THE ISSUE I GUESS IS THAT WE HAVE THE

22    BURDEN ON THE ARTICLE OF MANUFACTURE, SO IT FEELS LIKE WE

23    SHOULD GET A REBUTTAL FOR A FEW MINUTES ON THAT POINT.  AND I

24    GUESS ON THE VALIDITY AS WELL.

25          THE COURT:  NO.  YOU WILL HAVE ONE SHOT.

2070

1          MR. MARCHESE:  ALL IN ONE SHOT.

2          THE COURT:  DO IT ALL IN ONE SHOT.  ALL RIGHT.  SO

3    ANTICIPATE.

4          ACTUALLY, I TOLD THEM THAT THEY HAD TO DO EVERYTHING

5    AND ANTICIPATE WHAT YOU WERE GOING TO SAY.  SO THEY'RE

6    ACTUALLY DOING THE ANTICIPATING.  THAT'S A BAD WORD IN THIS

7    CONTEXT.

8          MR. MARCHESE:  IT'S NOT A --

9          THE COURT:  IT'S A BAD WORD.

10         MR. ALDRICH:  THAT WAS AN OBVIOUS JOKE, YOUR HONOR.

11         THE COURT:  YOU GUYS HAVE BEEN DOING THIS TOO LONG.

12         MR. AXELROD:  CAN I INTERJECT ONE THOUGHT?  I THINK

13   WORKING OUT THE INSTRUCTIONS MAY TAKE US A LITTLE LONGER THAN

14   WE FEAR.

15         THE COURT:  YEAH.  SO WE MAY END UP SENDING THEM

16   HOME AT NOON, WORKING THROUGH THE INSTRUCTIONS IN THE

17   AFTERNOON AND THEN DOING CLOSINGS THE FOLLOWING DAY.  AND

18   INSTRUCTING THE FOLLOWING DAY.

19         SO -- AND THAT'S WHY I'M THINKING TWO HOURS AT MOST.

20   THAT MEANS, TWO, TWO AND THEN THE INSTRUCTIONS ARE PROBABLY

21   AN HOUR AT LEAST OF READING TO THEM.  IT MAY BE MORE THAN

22   THAT.  I DON'T KNOW WHAT IT'S -- HOW LONG IT'S GOING TO TAKE.

23   BUT I'M ANTICIPATING AT LEAST AN HOUR OF READING TO THEM.

24   PROBABLY AN HOUR AND A HALF.

25         MR. MARCHESE:  I'M HOPEFUL AT LEAST FOR ME THAT I'M

2071

1    NOT GOING TO GO TWO HOURS ON CLOSING.

2              THE COURT:  YEAH.  SO -- JUST BECAUSE I GIVE YOU

3    TWO, DOESN'T MEAN YOU NEED TO USE TWO.

4              MR. ALDRICH:  I ALSO AM HOPEFUL THAT HE DOESN'T GO

5    TWO HOURS.

6              THE COURT:  ALL RIGHT.  ANYTHING ELSE THAT WE NEED

7    TO TALK ABOUT?

8              AGAIN, I KNOW THAT THERE IS A LOT OF THINGS THAT ARE

9    STILL ON THE TABLE THAT ARE REALLY ON MY SIDE OF THE FENCE

10   THAT I NEED TO GET RESOLVED.

11             FROM THE PLAINTIFF'S PERSPECTIVE?

12             MR. ALDRICH:  I THINK WE HAVE A STIPULATION, YOUR

13   HONOR, FROM THEM CONCERNING THE PRODUCTS THAT HAVE

14   INWARD-FACING REFLECTIVE FOIL.  SO WE JUST NEED TO GET IT IN

15   THE RECORD.  I DON'T --

16             THE COURT:  OH, THAT WAS --

17             MR. MARCHESE:  MR. SPROUL.

18             THE COURT:  THAT LIST, AND YOU HAD FIVE PRODUCTS,

19   AND GOT THEM DOWN TO THREE PRODUCTS, AND DOWN I THINK TO TWO

20   PRODUCTS.

21             MR. ALDRICH:  THE LIST ACTUALLY IS TITLED "PRODUCTS

22   WHERE FOIL SIDE TOUCHES THE SKIN," AND THEN THERE IS A LIST

23   OF A DOZEN OR SO PRODUCTS THAT SAYS "PRODUCTS WHERE FOIL SIDE

24   DOES NOT TOUCH THE SKIN."

25             ONE OF THOSE IS DISPUTED.  THE REST OF THEM ARE NOT.

2072

1    SO WE JUST NEED TO GET THIS IN FRONT OF THE JURY, SO TO THE

2    EXTENT THAT THERE IS A DISPUTE --

3              MR. SPROUL:  WE'VE STIPULATED TO IT, SO WE'LL --

4              THE COURT:  DO YOU HAVE A NUMBER FOR IT?

5              MR. ALDRICH:  EXHIBIT 745.

6              THE COURT:  IT IS RECEIVED.

7         (TRIAL EXHIBIT 745 RECEIVED IN EVIDENCE.)

8              MR. ALDRICH:  THANK YOU.

9              THERE ARE NO OTHER ISSUES FROM OUR SIDE.

10             THE COURT:  ALL RIGHT.  NO OTHERS FROM MY SIDE.

11             MICHAEL, AM I FORGETTING ANYTHING?

12             LAW CLERK:  NOT THAT I CAN THINK OF AT THE MOMENT.

13             THE COURT:  OKAY.  YOU ALL HAVE A PLEASANT EVENING.

14             MR. MARCHESE:  THANK YOU, YOUR HONOR.

15             MR. ALDRICH:  THANK YOU, YOUR HONOR.

16             THE COURT:  I WILL SEE YOU TOMORROW.

17             (RECESS, 5:23 P.M.)

18                    C E R T I F I C A T I O N

19             I HEREBY CERTIFY THAT I AM A DULY APPOINTED,
     QUALIFIED AND ACTING OFFICIAL COURT REPORTER FOR THE UNITED
20   STATES DISTRICT COURT; THAT THE FOREGOING IS A TRUE AND
     CORRECT TRANSCRIPT OF THE PROCEEDINGS HAD IN THE
21   AFOREMENTIONED CAUSE; THAT SAID TRANSCRIPT IS A TRUE AND
     CORRECT TRANSCRIPTION OF MY STENOGRAPHIC NOTES; AND THAT THE
22   FORMAT USED HEREIN COMPLIES WITH THE RULES AND REQUIREMENTS
     OF THE UNITED STATES JUDICIAL CONFERENCE.
23             DATED:  SEPTEMBER 26, 2017, AT SAN DIEGO,
     CALIFORNIA.
24                             S/CAMERON P. KIRCHER
                               CAMERON P. KIRCHER
25

COMPUTER-AIDED TRANSCRIPTION

1                    United States District Court

2              For the Southern District of California

3

4                                    )
    COLUMBIA SPORTSWEAR NORTH        )
5   AMERICA, INC., an Oregon         )   No. 17-cv-1781-HZ
    corporation,                     )
6                                    )   September 27, 2017
             Plaintiff,              )
7                                    )   San Diego, California
                 v.                  )
8                                    )
    SEIRUS INNOVATIVE ACCESSORIES.   )
9   INC., a Utah Corporation,        )
                                     )
10                                   )
             Defendant.              )
11

12

13

14                    Volume 8 - AM Session

15              Reporter's Transcript of Proceedings

16         BEFORE THE HONORABLE MARCO A. HERNANDEZ

17                 United States District Judge

18

19

20

21

22

23  Court Reporter:          Dana Peabody, RDR, CRR
                             District Court Clerk's Office
24                           333 West Broadway, Suite 420
                             San Diego, California, 92101
25                           DanaPeabodyCSR@gmail.com

APPEARANCES:

For the Plaintiff:          SCHWABE, WILLIAMSON & WYATT, P.C.
                            NIKA F. ALDRICH, JR., ESQ.
                            DAVID W. AXELROD, ESQ.
                            BRENNA LEGAARD, ESQ.
                            1211 SW 5th Avenue, Suite 1900
                            Portland, Oregon 97204


For the Defendant:          FISH & RICHARDSON, P.C.
                            CHRISTOPHER S. MARCHESE, ESQ.
                            SETH M. SPROUL, ESQ.
                            12390 El Camino Real
                            San Diego, California 92130


For the Defendant:          MARKOWITZ HERBOLD, P.C.
                            RENEE ROTHAUGE, ESQ.
                            1211 SW Fifth Avenue, Suite 3000
                            Portland, Oregon 97204

```
1   Case:   Columbia v. Seirus
    Date:   September 27, 2017
2

3
                        INDEX OF WITNESSES
4
    FOR THE PLAINTIFF:
5                                        E X A M I N A T I O N
                                    DIRECT   CROSS REDIRECT RECROSS
6
    Robert Murphy
7     Ms. Rothauge                         2089
      Mr. Axelrod                                          2103
8
    Serena Morones
9     Mr. Axelrod                   2104              2177
      Mr. Marchese                        2127
10

11
                        INDEX OF EXHIBITS
12
    EXHIBIT                                       EVIDENCE
13
    1349                                            2151
14
    1440                                            2149
15
    1441                                            2153
16
    1442                                            2148
17

18

19

20

21

22

23

24

25
```

1          San Diego, California, September 27, 2017

2                        *   *   *

3          (Proceedings held outside the presence of the jury panel.)

4          THE COURT:  Good morning.  Be seated.

08:39    5      We have, I think, three issues that I had left for myself,

6      and there's a fourth one that's popped up that we maybe should

7      visit about.

8          The one that popped up is there's been a request for the

9      transcripts by an outside law firm, probably interested in the

08:40   10   development of this area of law, I would assume.  You filed --

11   the defense filed a motion this morning trying to seal all of

12   the transcript and exhibits.

13         MR. SPROUL:  May I clarify.  We understood that we

14   were only to file a notice, and that later we would provide

08:40   15   detailed -- we did not mean to indicate that we wanted to seal

16   the entire transcript.  We had very specific portions.  I

17   thought that was identified as well, but certainly that's not

18   our intent to seal the entire record, Your Honor.

19         THE COURT:  Okay.  I just saw the entry on the CM/ECF

08:40   20   so I don't know what the extent of it is.  I can delay the

21   disclosure of the transcript for a while.  Exhibits are

22   different.  Exhibits I think are a little bit easier to manage,

23   but the transcript is a public record, I think creates legal

24   issues for the Court, and the fact that the public should have

08:41   25   access and open and free access to public proceedings, that's a

1    little more challenging to me.  So don't just tell me what you

2    want sealed that's important, but tell me why you think I have

3    the authority to tell people in the public domain that they

4    cannot have access to a public proceeding.

08:41  5          MR. MARCHESE:  We can -- we are working on that right

6    now and coming up with page and line numbers for the

7    transcripts.  I think we have all the exhibits already.  That

8    was easy, but we will -- I think we can submit that tonight and

9    provide the rationale.  It's financial.  That was the whole

08:41  10    thing.  It's a private company with financial information.

11          THE COURT:  Yeah, the reasons for it you don't have to

12    convince me about.  I understand the reasons.  It's what my

13    authority is to stop somebody getting information that is

14    placed into the public record.  That's more my issue than what

08:41  15    your reasons are.

16          MR. MARCHESE:  Understood, and we will provide

17    the -- the proper motion with the specific areas that we'd like

18    to have sealed.

19          THE COURT:  The next thing that I want to turn to is

08:42  20    the issue of willfulness which we had been tossing around the

21    courtroom now for numerous days.  And, again, I reviewed the

22    transcript and our conversation, much of it, my conversation

23    with the parties several days ago, and tried to discern where I

24    had left everybody at the end of my conversation.  And, again,

08:42  25    I apologize for my lack of clarity on deciding the defense's

1    motion for judgment as a matter of law on the issue of

2    willfulness.

3         It's not often that you get to hear federal judges

4    apologize to you, but this is one.

08:42  5         So what happened is the defense moved for judgment as a

6    matter of law as to the issue of willfulness and pointed out to

7    the Court that there were statements made at the pretrial

8    conference that the plaintiffs were -- I'll use the word

9    "cabining" the framework for the issue of willfulness, and as I

08:43  10   looked at it, I think I had said that there was evidence of

11   willfulness, but I needed to kind of look back to the pretrial

12   conference and find out if there was cabining, what it looked

13   like.

14        And we had a conversation -- while I was trying to

08:43  15   figure all that out, we had some evidence come in and that, I

16   think, got me off track, and I'd never gotten back to the fact

17   that I needed to make a clear ruling on the issue of

18   willfulness.

19        So I looked at the transcript at the time and learned that

08:44  20   my interpretation of what Mr. Aldrich had said was that they

21   were not seeking to argue or prove willfulness prior to what I

22   took to be the issuance of the patent in 2013, and that it

23   would be cabined on the back side by notice regarding

24   infringement in -- I think it was December of '13.

08:44  25        So what I didn't clearly state, but I am clearly stating

1    now, is willfulness will be cabined to -- I will take

2    Mr. Aldrich at his representation and say there will be no

3    argument that there was any willfulness that existed prior to

4    the issuance of the patent in 2013 or post December of 2013.

08:45    5        And that means that the jury will be told in determining

6    whether there was willfulness or not that it will be just in

7    whether there was any willfulness that existed in that --

8    within those two dates that I just gave you.

9        The defense asked me to consider two cases in response to

08:45    10    this issue.  One -- I read both cases, and the reason they

11    asked me to look at them was for the proposition that the

12    Korean courts or Korean whatever agency it was that decided

13    that the '270 patent was invalid was relevant evidence as to

14    the issue of willfulness.  And at the beginning of the trial,

08:46    15    not knowing that there was going to be a motion about

16    willfulness and what Mr. Aldrich had said, I concluded that

17    that was a relevant piece of evidence.  However, the learning

18    of the invalidation of the patent falls outside of the

19    framework which I have just provided.

08:46    20        So then I went, as asked by the defense, and looked at the

21    cases to see if there was some rationale as to why evidence of

22    what the Korean court or whatever it was invalidating would be

23    relevant to the time period that is now relevant on the issue

24    of willfulness before this Court.

08:47    25        And while I agree with the defense that if -- that there

1    are times when such findings by a foreign jurisdiction are

2    relevant in this case, they are not because the time frame is

3    cabined within June to December of 2013.

4        So the judgment as a matter of law on the issue of

08:47    5    willfulness is granted except as I have indicated within the

6    dates that I've indicated.  Any questions on that issue?

7        MR. ALDRICH:  Just to clarify, Your Honor, the date

8    was December 4, 2013, when the notice of suit was served.

9        THE COURT:  Okay.

08:48    10       MR. ALDRICH:  Thank you, Your Honor.

11       THE COURT:  That was in the closing date?

12       MR. ALDRICH:  Correct.

13       THE COURT:  Thank you.

14       MR. MARCHESE:  May I be heard, Your Honor?

08:48    15       THE COURT:  Of course.

16       MR. MARCHESE:  Two things at least that I'm thinking

17    of right now, maybe I'll think of a third.  There was

18    Exhibit 499 which we had submitted into evidence.  I think it

19    was withdrawn back out.  It is an email from November 2013 time

08:48    20    frame from Ventex to Seirus in which they talk about they're in

21    the process of working to invalidate the patent and -- in South

22    Korea, and we think that's relevant.  So we'd like to

23    ask -- and that was brought in to evidence through Mr. Carey.

24    I don't think we need to recall him, but if we could have that

08:48    25    be in the record, Your Honor, as it was introduced and then

1  withdrawn, I'd like to have it received again and his testimony

2  around that be accepted.

3  MR. ALDRICH: It's December 11, 2013. It's not

4  November.

08:49  5  MR. MARCHESE: No, the email chain goes back in time

6  into November, Your Honor.

7  THE COURT: Okay. Can you give me the number of that

8  exhibit?

9  MR. MARCHESE: 499.

08:49  10  THE COURT: Thank you.

11  MR. MARCHESE: And, secondly, I think because of

12  that -- and again I don't think we need to have Mr. Carey come

13  back because we could have his testimony that he already gave

14  on South Korea just be reinstructed that you can now

08:49  15  consider --

16  THE COURT: Wait. The issue of South Korea

17  invalidation occurred after December.

18  MR. MARCHESE: Understood. I know that. That's true,

19  and I don't dispute that, but what I'm saying is this: You

08:49  20  have the evidence of Exhibit 499, which trails back into

21  November time frame, clearly within the window, and then you

22  have about, I don't know, two weeks after the case is filed --

23  I'm sorry. The notice is provided on December 4, 2013. You

24  have Mr. Carey who testified to this learning about the

08:50  25  invalidation. If you look -- I think if you look at that BIC

1    Windsurfing case, you'll see that that Court says that

2    subsequent acts that strengthen the conviction, those are acts

3    that are evidence of nonwillfulness.  In this case we have in

4    the period of the Exhibit 499 being received with the

08:50    5    statements about we are in the process of invalidating, can you

6    help us out:  And then three weeks later, after this notice

7    occurs, we have invalidation.  That falls squarely within BIC.

8        THE COURT:  You and I are going to disagree about

9    that.

08:50    10        MR. MARCHESE:  I just wanted to make my point.

11        THE COURT:  You did.

12        MR. MARCHESE:  We object to the exclusion of that

13    evidence.  It's highly relevant.

14        THE COURT:  We just disagree about that perspective.

08:50    15    And, unfortunately, I'm sitting here and you're standing there.

16        MR. MARCHESE:  Understood, but I have to make my

17    record.

18        THE COURT:  You did.  All right.

19        499 on the other hand, any response to 499?

08:51    20        MR. ALDRICH:  So 499 is an email trail that I guess

21    starts in November and continues to -- after the relevant time

22    period and discusses the Korean proceeding in December.  If the

23    top portion of it is redacted as not probative and all that's

24    discussed is the November proceeding, it seems like Mr. Murphy

08:51    25    could testify about it because Mr. Carey was not copied on that

1    chain.  So that would be something that Mr. Murphy would

2    testify about.  I could check with my client, but I don't think

3    we'd have an objection to it being limited to the emails that

4    took place in November.

08:51    5          THE COURT:  Okay.  Thank you.

6          MR. ALDRICH:  From the witness who has personal

7    knowledge.

8          THE COURT:  I understand.  So again that's consistent

9    with my other comment to defense right now.  499, as long as it

08:51    10   is not including conversations that then extend and start

11   talking about that Korean patent in December.  I don't know if

12   there's any other conversation unrelated to the Korean patent

13   that the plaintiffs care about or not.

14         MR. MARCHESE:  It does not talk about the invalidity.

08:52    15   It actually ends before that happens, so I don't think it needs

16   to be redacted, and I think we can just have it received, and

17   we can both argue about what it means.

18         THE COURT:  I don't know what 499 looks like, so maybe

19   you can give me a copy of it, and I can make a more informed

08:52    20   decision.

21         MR. MARCHESE:  We can bring it up, Your Honor.

22         THE COURT:  I know I have it somewhere in this library

23   that you've left me, but it might be difficult for me to grab

24   it myself.

08:52    25         MR. MARCHESE:  We have it up on the screen now.

|   |   |
|---|---|
| 1 | THE COURT:  Is that the whole thing? |
| 2 | MR. MARCHESE:  Yeah, it's four pages long, but here's |
| 3 | the topmost email.  This is latest in time at the top. |
| 4 | THE COURT:  Oh, okay.  Can I see the page before, |
| 5 | please? |
| 6 | MR. AXELROD:  It's almost easier to start from the |
| 7 | beginning of the thread. |
| 8 | THE COURT:  May I see the page before, please?  So I |
| 9 | don't -- this exhibit once -- it starts on December 5th. |
| 10 | Anything after December 5th I'm not receiving into evidence. |
| 11 | It should be excluded from this exhibit, so if you want to |
| 12 | re-mark it and enter it beginning on December 5th and working |
| 13 | backwards in time, that is acceptable.  Working forward from |
| 14 | December 5th, it is not acceptable to me. |
| 15 | MR. MARCHESE:  So anything above the -- well, the rest |
| 16 | of it below is earlier in time. |
| 17 | THE COURT:  Correct. |
| 18 | MR. MARCHESE:  You're saying anything above the |
| 19 | December 5th email? |
| 20 | THE COURT:  Correct. |
| 21 | MR. ALDRICH:  Anything including the December 5th |
| 22 | email and above, correct? |
| 23 | MR. MARCHESE:  I think one of the -- I think the 5th |
| 24 | would actually fall in -- |
| 25 | THE COURT:  Is that when the letter -- |

08:53 (line 5)
08:54 (line 10)
08:55 (line 15)
08:55 (line 20)
08:55 (line 25)

1          MR. ALDRICH:   The letter was sent via email on

2    December 4.

3          MR. MARCHESE:   I thought it said via FedEx, I believe.

4    We can look at it.

08:55   5          THE COURT:   Do you see what's on December the 5th?

6    I'm not quite sure why that presents any particular problems.

7          MR. ALDRICH:   I think it's pretty clear that Bob

8    Murphy is writing on December 5th, after receiving notice of

9    suit, and writing back to them asking for help from their legal

08:56   10   team, having just been served.

11         THE COURT:   Yeah, again, I don't know -- that seems

12   pretty obvious that that would have happened.

13         MR. ALDRICH:   Right.

14         THE COURT:   I don't know that that's creating anything

08:56   15   about -- it's not particularly relevant, but it's not

16   particularly damaging either, at least -- am I missing

17   something?

18         MR. ALDRICH:   It just seems to me that it's outside

19   the time frame.

08:56   20         MR. MARCHESE:   The letter is FedEx I think,

21   Your Honor, so it would have been received on the 5th.

22         THE COURT:   Again, it's not particularly relevant

23   somebody gets notice that there's a problem and call your

24   lawyers.  I'm not sure that it weighs one way or the other.

08:56   25   You can do it from December the 5th.  I don't see it as harmful

1    to the plaintiffs like the other stuff.  The other stuff

2    clearly is a different category.  I don't see that it plays for

3    willfulness one way or the other.  It's neutral as far as I'm

4    concerned.  Anything else?

08:56    5    MR. ALDRICH:  So do we have clear direction from the

6    Court that there should be not be any evidence concerning what

7    happened after December 4, and there should be no questions

8    that would invoke that either I assume.  Correct?

9    THE COURT:  On the issue of willfulness.

08:57    10    MR. MARCHESE:  I would just -- because the 5th, I

11    think, is relevant because it was -- the notice was sent via

12    FedEx, so I think we should be able to argue about it to that

13    point.

14    THE COURT:  I'm sorry.  I'm not quite sure what point

08:57    15    you're going to be arguing about.

16    MR. MARCHESE:  The letter, the notice letter that was

17    triggered -- that triggered Mr. Aldrich's comments that we

18    talked about from the pretrial conference, that letter was sent

19    via FedEx on the 4th, so it wouldn't have been received until

08:57    20    the 5th.

21    THE COURT:  Okay.  We're talking about one day now.

22    MR. ALDRICH:  It's not the day that concerns me.  I

23    just want to make sure there's a clear instruction that there

24    shall be no questions asked that we're going to have to object

08:57    25    to that are going to invoke something that happened at a later

1    time frame.

2              THE COURT:  On the issue of willfulness?

3              MR. ALDRICH:  Correct.

4              MR. MARCHESE:  That's the ruling that I heard, so we

08:58  5    will abide by the ruling.

6              THE COURT:  Okay.  Anything else?

7              MR. ALDRICH:  On that issue?

8              THE COURT:  Of course there's more on other issues,

9    but on that issue.

08:58  10    Let's see.  The other one that was on my plate was what I

11    will call a motion for reconsideration that Seirus filed

12    regarding royalty -- reasonable royalty as to the design

13    patent.  That motion for reconsideration is denied.

14              Again, I believe there is sufficient evidence from

08:58  15    which a reasonable trier of fact could conclude by a

16    preponderance of the evidence that the plaintiffs are entitled

17    to reasonable royalty by looking at all the evidence that was

18    received, including the comments and testimony of Mr. Merriman

19    along with other factors that were discussed more on the

08:59  20    utility patent, but in my opinion equally applicable as to the

21    design patent.  The motion is denied.

22         And then are Columbia's motions for judgment as a matter of

23    law.  I read those last night.  I just received Seirus'

24    responses.  I don't know when they were filed, but I just got

08:59  25    them this morning.  I haven't gone through all the analysis.  I

1    can tell you that they're going to be denied having not even

2    read Seirus' responses yet, but I can't -- I don't want to

3    articulate those -- the reasons therefor until I have a chance

4    to read the responses.

08:59    5        MR. ALDRICH:  I just didn't hear Your Honor.  Did you

6    say that they will be denied?

7        THE COURT:  They'll be denied.

8        MR. ALDRICH:  And does that include our motion with

9    respect to the products that are made exclusively from HeatWave

08:59    10   fabric?

11       THE COURT:  Yes.

12       MR. ALDRICH:  Thank you, Your Honor.

13       THE COURT:  I believe those are all going to be

14   questions that would be up to the jury to decide.

09:00    15   Is there anything else from plaintiff's perspective that I

16   need to address?

17       MR. AXELROD:  No, Your Honor.

18       THE COURT:  Defense?

19       MR. MARCHESE:  Nothing except just to -- a question.

09:00    20   When do we expect to be discussing the jury instructions?

21       THE COURT:  If we finish this morning, we'll start

22   whenever we finish, and if not, then this afternoon.  My plan

23   is to send the jury home as soon as we're done with testimony

24   this morning and then work on jury instructions until I can't

09:00    25   take it anymore and then begin with closing arguments tomorrow.

1      MR. MARCHESE:  Thank you.

2      THE COURT:  All right.  I'll step off the bench and

3 get the jury in place and get back to work.

4      (Recess.)

5      (Proceedings held in the presence of the jury panel.)

6      THE COURT:  We have a witness.  There he is.

7 Mr. Murphy, please take the stand, and you remain under oath.

8      Members of the jury, before I forget, I want to talk to you

9 a little bit about scheduling.  What I anticipate happening

10 today is that we will finish with the testimony.  I anticipate

11 that that may happen late this morning or right around the noon

12 hour, and what my plan is is to send you home after that, and

13 then the lawyers and I will continue doing what we need to do

14 to get you ready for closing arguments which will occur

15 tomorrow morning; and then I suspect that I will be instructing

16 you either late tomorrow morning, maybe into the noon hour, or

17 after the noon hour, I'll instruct you and you'll begin your

18 deliberations tomorrow after noon.  So that's where we are as

19 far as the schedule goes.

20      With that you may inquire.

21                CROSS-EXAMINATION (resumed)

22 BY MS. ROTHAUGE:

23 Q.  Good morning, Mr. Murphy.

24 A.  Good morning.

25 Q.  How much of your time is spent in Asia visiting factories

1    and working with vendors?

2    A.    Approximately four months a year.

3    Q.    You were asked about the design process yesterday, so I'm

4    going to turn to that issue.    How many years have you been

09:06    5    involved with the designing of products at Seirus?

6    A.    30.

7    Q.    And you were involved in the design process for the

8    HeatWave products, right?

9    A.    Correct.

09:06    10    Q.    Was there anything different in how the HeatWave product

11    was designed compared to all the other products that have been

12    designed by Seirus over the years?

13    A.    No.

14    Q.    At any time during that process did you instruct anyone

09:06    15    that they should be copying Columbia's Omni-Heat fabric?

16    A.    Absolutely not.

17    Q.    Did you observe or hear Morgan Chin indicate that she was

18    going to be copying the Omni-Heat fabric?

19    A.    No.

09:07    20    Q.    Well, let's go to what did happen with the development

21    process, and I'd like to have you look and have you pull up for

22    the jury what has already been admitted as DDX209.    And do you

23    see 209?

24    A.    Yes, I do.

09:07    25    Q.    Let's start with the first date that is on there and is

1    highly visible, and that is December 11th.  It indicates

2    there's a steering committee.

3    A.   Correct.

4    Q.   Were you -- did you attend that December -- yeah, December

09:07    5    steering committee in 2011?

6    A.   I did.

7    Q.   Can you describe what happened in that meeting with respect

8    to the product that would eventually become the HeatWave

9    product?

09:07   10   A.   The December meeting is kind of our first -- this ski

11   division, it's our first culmination of what that product line

12   is going to become for 2012.  So we -- since it involves some

13   outside members and inside members, we kind of review what the

14   2011 line has developed into so the committee gets to see their

09:08   15   finished -- the fruition of their products from 2011 series and

16   then rolled into kind of just an open forum about what ideas

17   are there moving forward.  And we had been -- a lot of that

18   involves us bringing material swatches or just ideas,

19   out-of-the-box ideas.

09:08   20         And so in going through materials, one of the

21   materials that we had been discussing with this company Ventex

22   was their MegaHeat fabric which was a temperature-changing

23   fabric.  It was very unique in the market.  And we discussed

24   shell fabrics, other lining fabrics, a variety of things, but

09:08   25   in going through that, that committee -- the committee was very

1    interested in that fabric and trying to figure out what more we

2    could do with it.  You know, where's it going to go?  Is it

3    glove linings?  Is it hat linings?  Is it a liner on its own,

4    since that's a big category for us.

09:09    5          And in that meeting there was just kind of this, you

6    know, debate about putting something thermal on it, kind of

7    like Thermalux.  We'd had some development back in the early

8    2000s with a retainium-reflective coating that we were putting

9    on, and so the concept, or kind of the "aha moment" was during

09:09    10   that moment where they wanted to add a reflective coating or

11   printing to the product.  So we're left with that task out of

12   the meeting of, you know, enhancing the MegaHeat-based fabric.

13   Q.   You talk about having worked with reflectives and that sort

14   of thing.  When you were in the meeting and someone had the

09:09    15   idea that maybe we add some reflection or some foil to the

16   MegaHeat fabric, was that -- was the concept of foil printing

17   on fabric new to you?

18   A.   No, not at all.

19   Q.   Had you seen foil printing done in the industry before?

09:10    20   A.   Absolutely, by many vendors.

21   Q.   Had you been offered samples of fabric with foil printing

22   and other reflectives at shows over the years?

23   A.   We had been offered samples, and we had samples.  We had

24   dialogue with reflective printing people from the 2005 mask

09:10    25   developments to 2008.  We were working with a company that was

1    making foot soles with reflective coating and were discussing

2    with them the same thing for our products.

3    Q.   So after you have -- after the December meeting, what's the

4    next step with regard to creating -- you know, finding some

09:10    5    kind of foil application for that MegaHeat fabric?  What did

6    you do next?

7    A.   We're fortunate enough with the trade shows that other

8    people have testified about that we have two -- at the time we

9    had two shows in January into February that are a ski industry

09:11    10    show and what's called the OutDoor Retailer show.   OutDoor

11    Retailer is kind of the hardcore outdoor crowd, ice climbing,

12    mountaineering, and we're fortunate in our industry that that

13    show hosts a very large sourcing event, and so they have

14    ballrooms filled with vendors from all over the world that come

09:11    15    in, including the United States, and show their wares.

16         And so one of the reason that Morgan Chin, our raw

17    material buyer, attends that show is that we're able to meet

18    with not only current vendors that we do business with, but

19    we're able to source new materials at that show.   So the task

09:11    20    was that Morgan and I would go to those shows and look for new

21    ideas.   One of the tasks coming up from 2011 was to look for a

22    reflective printer.

23    Q.   At some point did you check up to see how Ms. Chin, then

24    Ms. Haas, was doing on this task of finding a foil printer?

09:12    25    A.   Yes.   She had found a couple of people at the show that had

1    samples and that showed her samples at the show, and that I

2    sent an email -- we had a conversation at the show over lunch

3    or dinner that she had found somebody, and I sent an email to

4    her, maybe I think within a week or two, as I was scheduling my

09:12    5    February Asia trip to follow up, "What about that foil printing

6    guy you found at the OR show."

7           MS. ROTHAUGE:  I'd like to pull up Exhibit 544 which

8    has been offered in evidence and show you specifically page --

9           MR. AXELROD:  504.

09:12    10          MS. ROTHAUGE:  544.  If we can enlarge the Sunday,

11   February 12, 2012, email, please.

12   BY MS. ROTHAUGE:

13   Q.    Is this the email that you are referring to?

14   A.    Correct.

09:13    15   Q.    And I notice the subject line says "Foil printing lining."

16   A.    Correct.  We -- the vendor that she had found was doing

17   foil print lining.  They had samples at the show, and so we

18   were interested to discuss with him the idea of us sending the

19   MegaHeat-based fabric to him to do the printing.

09:13    20   Q.    Now, over the course of this chain of emails, did she

21   respond that she was working on this project?

22   A.    Yes, yes.

23   Q.    And were you satisfied that she was being diligent in her

24   efforts to find a foil printer?

09:13    25   A.    As she always is, yes.

1   Q.   All right.   Let's go to the first page of 544 while we're

2   on this chain because I believe you were asked about this

3   before.   And let's enlarge your February 29, 2012, email to

4   her.   And this -- it says, "Yes, Jin agreed to send five yards

09:14   5   use in cuff only."   It says, "Vented in body lining."   Was

6   vented what you meant to say there?

7   A.   Ventex was what I meant to say there.   The Ventex MegaHeat

8   fabric in the body, correct.

9   Q.   It goes on to say, "Make sure not to show the Omni logo."

09:14   10   So first of all, can you explain what instructions you are

11   giving to Ms. Haas?

12   A.   Well, we wanted to -- again, we're looking for a service

13   provider, somebody that can take our fabric and do foil

14   printing.   The first objective is to see whether that fabric is

09:14   15   functional for us, and so we're asking them if there is sample

16   material available that we can make a one-off proto and

17   feel -- how does that feel?   Is it flexible?   Does it feel good

18   against your skin?

19          And so my instruction to Morgan was that they'd agreed

09:15   20   to send some yardage they had in stock and to use it only in

21   the cuff and to use the Ventex fabric in the body of the glove.

22   Q.   When you instructed her make sure not to show Omni logo,

23   did you believe that was an appropriate instruction to give

24   her?

09:15   25   A.   Absolutely.   We would never want to show another company's

1    logo in anything that we make, whether we're showing that

2    product or whether it's just an internal thing.  It's not

3    appropriate to show another's logo.

4    Q.    Did you eventually receive -- you called it "a proto."

09:15    5    Does that mean prototype?

6    A.    Correct.   Yes.

7    Q.    Did you eventually receive a prototype that was consistent

8    with the instructions that you had given Ms. Haas a --

9    A.    As I recall, yes.

09:15    10    Q.    I think you were asked -- do you remember roughly when you

11    got that prototype?

12    A.    You know, usually samples are within two weeks to 30 days.

13    It depends.   Some factories -- depending on how busy they

14    are -- they have a separate sample room rather than the

09:16    15    production room.   Some companies turn samples around in a week.

16    Sometimes it takes a few weeks, but certainly within 30 days,

17    we would have had it.   Probably a couple weeks.

18    Q.    After you saw the prototype, I think you said yesterday it

19    was destroyed?

09:16    20    A.    Yes, prototypes never -- you know, just a prototype for a

21    look-see would not be something we show.   To my recollection it

22    was the fabric that we received, and at least the way it was

23    made up was not comfortable.   It wasn't -- it was kind of cheap

24    feeling, and it just wasn't something that we wanted to pursue

09:16    25    with them.

1    Q.    I'd like to go back to the timeline so we can place when

2    you were looking -- when you got the prototype with respect to

3    the next steering committee because I know you were asked about

4    that yesterday.  So we're back at 209, and you see that there

09:17    5    was -- you've testified already that there was an April

6    steering committee meeting?

7    A.    Correct.

8    Q.    Did you show that prototype at that steering committee?

9    A.    No.  As we referenced yesterday, in the steering meeting

09:17    10    PowerPoint, there's nothing in that PowerPoint or the agenda

11    that shows that we were showing reflective -- anything

12    reflective.

13    Q.    And why didn't you talk about the fact that you were

14    working on this R&D project?

09:17    15    A.    The steering committee, it's a semipublic meeting in that

16    we have -- it involves our internal staff, executive

17    management, sales management, as well as buyers from key

18    accounts.  So, you know, there could be a buyer from a mountain

19    store to a national buyer that are mixed in there as well as

09:17    20    three to four sales reps, and as confidential as people promise

21    to be in those meetings, you know, leaks happen.  So anything

22    that's a development that, you know, we see being a new

23    proprietary invention of Seirus, we don't show until it's

24    absolutely ready and that we're ready to kind of launch the

09:18    25    line, and sometimes we don't -- we don't show it until it's in

1    the catalog.

2    Q.   As of April 2012, were you in a position to tell anybody

3    about it?  That was a bad question.

4         Where were you in the R&D process as of April 2012

09:18    5    when you had that meeting?

6    A.   In April to my recollection we had not finalized a supply

7    line and costing yet, that we were still working on the actual

8    ability to do it on the MegaHeat fabric and what that cost was

9    going to become.  As I said, originally we were looking to do

09:18    10    it -- send it to another vendor and have it -- have the foil

11    put on, and it just -- we had to get that all worked out and

12    costed.

13    Q.   I now would like to ask you about another email string that

14    you were asked about yesterday, and it was the -- it was that

09:19    15    big, long exhibit, the five -- I believe it's 523, and I don't

16    know if you have the notebook.  Do you have that notebook?

17    A.   I don't.

18         MS. ROTHAUGE:  Permission to give him my copy.

19         THE COURT:  Sure.

09:20    20    BY MS. ROTHAUGE:

21    Q.   Are you looking at the very last page of that chain?

22    A.   The very --

23    Q.   The very beginning of the chain or the last page?

24    A.   Exactly.

09:20    25         MR. AXELROD:  Do you want to give the page reference?

1          MS. ROTHAUGE:    Page 79.

2          THE WITNESS:    Yes.

3     BY MS. ROTHAUGE:

4     Q.    And do you see the date when that string begins is

09:20  5     January 28, 2012?

6     A.    I believe it actually begins the 27th.

7     Q.    You're correct.    So Friday, January 27, 2012, is when that

8     string begins?

9     A.    Correct.

09:20  10    Q.    And the string goes all the way to -- now come forward to

11    the very last slash first page?

12    A.    Correct.

13    Q.    And what is the date there?

14    A.    9-20-2012.

09:21  15    Q.    So this string reflects work between January and September.

16    Is that right?

17    A.    Correct.

18    Q.    And is this -- does the string of emails reflect the work

19    that was being done by Seirus on the -- basically the MegaHeat

09:21  20    HeatWave project?

21    A.    Correct.

22    Q.    I'd like to ask you what was -- what else was going on

23    during that time frame because I think you were asked about

24    sort of -- there was some implication that -- I don't know --

09:21  25    maybe you weren't doing enough on the liner project yesterday.

1    So I want to get a sense from January until September of 2012,

2    does Seirus develop -- was it developing other products during

3    that time frame?

4    A.   Certainly, yes.

09:21    5    Q.   Were you developing -- was Seirus developing products other

6    than gloves?

7    A.   Certainly, yes.

8    Q.   Were you sourcing and costing other projects other than the

9    HeatWave project?

09:22    10    A.   Absolutely.

11    Q.   And were you sourcing and costing other components of what

12    would ultimately be the HeatWave glove?

13    A.   Absolutely.

14    Q.   All right.  Finally, I'd like you to look at Exhibit 504

09:22    15    which has been admitted and we will pull up.  I have just one

16    question.

17        You were asked yesterday about the vendor agreement

18    with Ventex.

19    A.   Yes.

09:22    20    Q.   And you indicated --

21        MR. AXELROD:  Objection.  Outside the scope.  That was

22    not part of yesterday's examination.

23        MS. ROTHAUGE:  I believe it was.

24        THE COURT:  I don't recall.  The objection is

09:22    25    overruled.  Go ahead.

1  BY MS. ROTHAUGE:

2  Q.   Can you take a look at the -- it begins Thursday, April 4,

3  2013, and you have a note -- a question to Ms. Chin, "Have

4  these guys signed our vendor agreements?"

09:23  5  A.   Yes.

6  Q.   First of all, explain why you would be asking Ms. Chin

7  about vendor agreements.

8  A.   It is the responsibility of the applicable buyer to have a

9  vendor agreement signed, so they're the ones that -- as a new

09:23  10  or existing vendor, every year they would have to sign a

11  revised agreement as we update it, and so each buyer's

12  respectively responsible to have their vendor sign a vendor

13  agreement.

14  Q.   And so why were you checking with Ms. Chin to see if there

09:23  15  was a vendor agreement with Ventex?

16  A.   Ventex was -- even though we'd been doing development with

17  Ventex, Ventex was a relatively new vendor.  A lot of vendors

18  stall and don't sign those on time.  They're hoping maybe we

19  forget about it and it just goes away.  And so in this time

09:23  20  frame -- this is April.  You know, the proceeding year, we'd

21  been developing with them and started the line, and so I'm

22  making sure that we had a vendor agreement on file.

23  Q.   Well, because there had been an email -- the prior email

24  had been sent, did you -- how come you remembered to ask this

09:24  25  question of Ms. Chin on this date?

1    A.   I had forwarded their -- the prior email or the email in

2    that chain was a legal document, so I had forwarded that on to

3    Joe Edwards who coordinated the legal department, and then,

4    making sure that my department's keeping up with our

09:24    5    responsibilities, was asking do we have a vendor agreement on

6    file with this company.

7             MS. ROTHAUGE:  I have no further questions.

8             THE COURT:  Redirect?

9             MR. AXELROD:  Very briefly.

09:24    10            MS. ROTHAUGE:  Actually, I do have one more.  I

11   apologize.  I just saw my Post-it.

12            THE COURT:  No problem.  Go ahead.

13   BY MS. ROTHAUGE:

14   Q.   You recall testifying yesterday about a cuff where there

09:24    15   was no HeatWave fabric visible.  Do you remember that

16   testimony?

17   A.   I don't, but can you refresh my memory?

18   Q.   I think you were shown a sock, and the cuff -- you were

19   asked about the cuff, and you said there was some HeatWave

09:25    20   fabric in that cuff.

21   A.   On a -- on the glove, I believe.

22            MR. AXELROD:  Objection.  That was the prior --

23            THE COURT:  It was not this witness.

24            MS. ROTHAUGE:  Oh, okay.

09:25    25            THE COURT:  Anything else?

| | |
|---|---|
| 1 | MS. ROTHAUGE:  No.  That's it.  Thanks. |
| 2 | REDIRECT EXAMINATION |
| 3 | BY MR. AXELROD: |
| 4 | Q.  One question, Mr. Murphy.  You have Exhibit 523 in front of |
| 5 | you? |
| 6 | A.  I do, yes. |
| 7 | Q.  And the way this exhibit is printed, there is an attachment |
| 8 | to one of the emails that shows up on the very last page, |
| 9 | correct? |
| 10 | A.  Yes, sir. |
| 11 | Q.  That's the picture of the wavy line fabric? |
| 12 | A.  Correct. |
| 13 | Q.  And that is an attachment to the email that appears on the |
| 14 | very first page dated September 20, 2012.  Is that correct? |
| 15 | A.  That appears correct, sir. |
| 16 | MR. AXELROD:  Thank you.  That's all I have. |
| 17 | THE COURT:  Do any of the jurors have questions for |
| 18 | this witness?  If so please raise your hand. |
| 19 | You may step down.  I don't know what your plans are |
| 20 | for Mr. Murphy.  Do you want this witness excused? |
| 21 | MR. AXELROD:  Yes, he can be excused. |
| 22 | THE COURT:  Any objection? |
| 23 | MS. ROTHAUGE:  No objection. |
| 24 | THE COURT:  You are excused. |
| 25 | Call your next witness. |

09:25
09:25
09:25
09:26
09:26

1          MR. AXELROD:  We call Serena Morones.

2          THE COURT:  You remain under oath.  Please take the

3    stand.

4                        DIRECT EXAMINATION

09:26    5    BY MR. AXELROD:

6    Q.   Ms. Morones, what did we ask you to do with respect to your

7    rebuttal testimony today?  What issues did we ask you to

8    address?

9    A.   You asked me to give a final opinion about my analysis of

09:27    10   marginal profit applicable for the design patent damages and

11   the disgorgement analysis in terms of what costs are

12   appropriately deductible.  You also asked me to provide some

13   opinion analysis of Ms. Distler's presentation of the article

14   of manufacture cost allocation.

09:27    15        And then the third issue to address is I understand

16   that the parties have stipulated to remove some product from

17   the utility patent alleged infringement where I'm applying a

18   reasonable royalty, so I have updated the conclusion of

19   reasonable royalty to exclude those additional items that the

09:27    20   parties have agreed to remove.

21   Q.   Was there also one adjustment that was made to both

22   categories to eliminate one product from the scope?

23   A.   Yes.  I understand that Columbia has decided to eliminate

24   the HeatTouch Torche from both categories of alleged

09:28    25   infringement.

1    Q.    And did you make that adjustment in the updated figures?

2    A.    Yes.

3    Q.    Let's turn to --

4            MR. AXELROD:    Could we pull up your slides?  Is there

09:28   5    any objection?

6            MR. MARCHESE:    No objection.

7            MR. AXELROD:    Thank you.

8    BY MR. AXELROD:

9    Q.    And to update the jury on the -- sort of the ping-pong

09:28  10    method that's used, when you first testified, you identified

11    Seirus' revenues from the infringing HeatWave products, those

12    that infringed on design patent?

13    A.    Yes.

14    Q.    And certain direct costs that you deducted?

09:28  15    A.    Yes.

16    Q.    Then were you present when Ms. Distler gave her

17    presentation of those additional expenses that she believed

18    should be deducted to get down to Seirus' incremental profit?

19    A.    Yes.

09:29  20    Q.    And are you now addressing those additional expenses to

21    give your opinion on whether they should be included or not?

22    A.    Yes, I am.

23            MR. AXELROD:    So could we show the first slide.

24    BY MR. AXELROD:

09:29  25    Q.    What does slide 187 show?

1    A.   This shows a summary of my opinions, and the first is that

2    it is my opinion that the supported marginal profit on the

3    HeatWave sales is at least 41.6 percent.

4    Q.   Now, that's -- what was your base number that was just the

09:29    5    direct cost subtracted from the revenues previously?

6    A.   I believe it was 47 percent.   I'd have to go back and look.

7    Q.   Okay.

8    A.   So I've reduced my original number for costs that I believe

9    were adequately supported and then application of that margin

09:30    10    to the entire base of HeatWave sales subject to the design

11    patent minus the HeatTouch Torche, which was a small

12    adjustment, would be equal to 3,018,174.

13          MR. AXELROD:   Could we pull up the next slide, please?

14    BY MR. AXELROD:

09:30    15    Q.   I've put in front of you slide 188.   What is slide 188?

16    What does it show?

17    A.   This slide is a replication of Ms. Distler's schedule 3.1

18    in her -- in her last expert report before trial.   And

19    schedule 3.4 in her report is where she lists out the costs

09:30    20    that she deducted from revenues to arrive at her opinion of

21    marginal profit assuming all HeatWave sales are considered.

22    And so we've replicated her schedule 3.1 and made a couple of

23    corrections to it because between her final report and her

24    trial testimony, she made a couple of corrections of errors

09:31    25    within the analysis, and she testified that she had made a

1    couple of corrections.

2         So we made those corrections as well to arrive at an

3    adjusted incremental profit margin of 34.8 after making those

4    corrections before I consider which ones I agree with or

09:31    5    disagree with.

6    Q.    Just so we're all on the same page, you start with the

7    total revenues?

8    A.    Yes.

9    Q.    Which is now adjusted to take out the HeatTouch Torche?

09:31    10    A.    Yes.

11    Q.    And then you took off cost of goods sold, correct?

12    A.    Yes.

13    Q.    And Ms. Distler took off the same cost of goods sold?

14    A.    Yes.

09:31    15    Q.    Because that came from Seirus?

16    A.    Yes.

17    Q.    And then you took off sales commissions?

18    A.    Yes.

19    Q.    And I'm assuming Ms. Distler also took off those same sales

09:32    20    commissions?

21    A.    Yes.

22    Q.    And those are commissions that are paid directly.  If I

23    sell product X, I get a reward?

24    A.    Yes, it's my understanding from Ms. Carey.

09:32    25    Q.    Directly coupled with the sale of whatever good generated

1    the commission?

2    A.    Yes.

3    Q.    And then -- so I'm assuming you and Ms. Distler get to the

4    same -- I'll call that "a gross margin less sales expense

09:32    5    figure"?

6    A.    We agree at that level, yes.

7    Q.    And then the rest is determining what -- I'll call them

8    "overhead" or "quasi fixed costs" should be deducted and which

9    should not?

09:32    10    A.    I would call them "other costs."

11    Q.    Okay.    And then page 188 is showing all of the additional

12    costs that Ms. Distler deducted?

13    A.    Yes, that's correct.

14          MR. AXELROD:    Let's go to slide 189, please.

09:32    15    BY MR. AXELROD:

16    Q.    Now, what is slide 189?

17    A.    This slide is also a replication of one of Ms. Distler's

18    schedules.    This is where she identifies which categories of

19    salaries that she believes should be deducted from the

09:33    20    revenues, and the categories with the Xs next to them are the

21    ones that she designated that she believed were appropriately

22    deductible.

23    Q.    The others she believed or testified were not appropriately

24    deductible?

09:33    25    A.    Yes.    The totals of the X'd items are the costs that roll

1    up to her summary schedule that we just looked at.  And so this

2    was kind of my starting point for agreeing or disagreeing with

3    her selections.

4              MR. AXELROD:   Okay.  If we go back to 188.

09:33    5    BY MR. AXELROD:

6    Q.   In her deductible costs, she has an entry for salaries and

7    wages, correct?

8    A.   Yes.

9              MR. AXELROD:   Could we pull that?

09:34    10             THE WITNESS:   The second line under "expenses" says

11   "salaries and wages," yes.

12   BY MR. AXELROD:

13   Q.   And do I understand correctly that it roughly was 7-plus

14   percent overall --

09:34    15   A.   Yes.

16   Q.   -- that she attributed to that category?

17   A.   Yes.

18             MR. AXELROD:   And then if we go to slide 189.

19   BY MR. AXELROD:

09:34    20   Q.   Is this a breakout that shows how she got to that figure?

21   In other words, what specific salary expenses that she

22   deducted?

23   A.   Yes, that's correct.

24   Q.   Then can we go to Exhibit -- before we leave that, which of

09:34    25   these specific salary expenses that she deducted do you

1    disagree with?

2    A.    I disagree with the line -- well, two items on this list,

3    the line item salaries, sales, the very first one, and I also

4    disagreed with her treatment of payroll taxes, the very last

09:34    5    line.    She excluded it.    She forgot, I believe, to include that

6    cost as part of salaries, and so I believe it should be

7    included, and I believe sales salary should be excluded.

8    Q.    Okay.    Let me make sure I understand.    You dispute the --

9    that sales salary should be included?

09:35    10    A.    Yes.

11    Q.    You don't dispute the other salary items that she allocated

12    should be deducted?

13    A.    That's correct, yes.

14    Q.    And you caught a mistake or an omission that she made in

09:35    15    further deducting the associated payroll taxes that go with

16    those salary expenses that you agree can be deducted?

17    A.    Yes.

18    Q.    And so when you adjust for the payroll tax, does that

19    increase the amount deducted or reduce the amount deducted?

09:35    20    A.    When I adjust for payroll taxes, it increases the amount

21    deducted which, in short, is in Seirus' favor to do that.

22    Q.    Okay.    So it was probably just an oversight on

23    Ms. Distler's report?

24    A.    Yes, I believe so.

09:36    25        MR. MARCHESE:    Objection, Your Honor.    Speculation.

|   |   |
|---|---|
| | 1 |
| | 2 |
| | 3 |
| | 4 |
| 09:36 | 5 |
| | 6 |
| | 7 |
| | 8 |
| | 9 |
| 09:36 | 10 |
| | 11 |
| | 12 |
| | 13 |
| | 14 |
| 09:36 | 15 |
| | 16 |
| | 17 |
| | 18 |
| | 19 |
| 09:37 | 20 |
| | 21 |
| | 22 |
| | 23 |
| | 24 |
| 09:37 | 25 |

1    MR. AXELROD:  I withdraw the question.

2    THE COURT:  Sustained.

3    MR. AXELROD:  Can we go to the next slide?

4  BY MR. AXELROD:

5  Q.  Now looking at slide 190, what does slide 190 show?

6  A.  This slide shows my adjustments to Ms. Distler's analysis.

7  So first I have adjusted salaries and wages by removing the

8  sales salary expense, and I don't know -- I'd like to explain

9  why I removed it -- and then the other categories of cost that

10  I believe are not appropriately supported as being direct

11  variable costs associated with HeatWave sales.

12  Q.  Would you explain to the jury the test or standard you

13  apply to determine whether a cost should be deducted for

14  purposes of the disgorgement analysis?

15  A.  I believe that the correct standard is what I call -- I

16  said this in my direct testimony -- direct and variable, and

17  it's a precise definition that helps me to prove definitively

18  that the cost is required in order to generate the sale.  And

19  so direct, just so we all understand, direct in my mind means

20  it somehow touches or interacts with the sale.  Materials would

21  be the best, most obvious, example.  You can't make the sale

22  unless you provide the glove to the customer.  The commission

23  was another good example.  There's going to be a commission

24  paid on every sale of HeatWave product.

25        And when I -- a metaphor that I might use for direct

is that I'm sitting -- I'm directly sitting in this chair.  I'm

like interacting with this chair.  I'm indirectly sitting in a

courthouse, and I'm more indirectly sitting in San Diego.  And

so when I'm looking at costs that would be appropriate to

09:38    deduct in a disgorgement analysis, I'm looking at those costs

that are directly necessary in order to achieve that additional

amount of sales that included the infringing product.

Q.   Is another way to view it that if the expense or cost would

have been incurred regardless of the HeatWave sales at issue,

09:38    then it's not deductible?

A.   Yes.  And that's getting at the terminology of variable

versus fixed.  So I said that a cost needs to be direct and

variable.  And the variable portion means that if sales

increase on the marginal level, I have an additional $100 of

09:38    sales, that there are going to be some costs that have to

increase in order to achieve that.  Those are variable.  Now,

also if the sales decrease, certain costs will necessarily

decrease because you no longer have that sale.

Other costs remain fixed regardless of the additional

09:39    $100, and fixed costs might be warehouse rent or an executive

salary or even in this case, I believe sales salaries.  In most

businesses that I analyze, sales salaries are typically fixed.

It's that commission that's the variable portion of it.  So

when a cost remains the same regardless of the incremental

09:39    HeatWave sales, then those are the costs that should be

1  disregarded.

2  Q.   Would you explain how that applies to the category of sales

3  salaries?

4  A.   Yes.   As Ms. -- I believe it was Ms. Distler's testimony as

09:39  5  opposed to Ms. Carey's testimony -- we saw that the sales

6  salaries during much of this time actually declined with

7  respect to -- while sales were increasing, so that's not an

8  example of a cost that is necessary on an incremental level to

9  achieve that additional sale.   So that's primarily why.   And

09:40  10  I've already included any commission portion of sales employee

11  expenses, the variable portion, so that's why I have disagreed

12  with that category.

13  Q.   And you disagree with the deduction for the bad debt

14  collections, dispute line item?

09:40  15  A.   Yes.   To me bad debt collection, dispute is an overall cost

16  of doing business.   It relates more to the financial condition

17  of a customer, not specifically to a particular sale of a

18  product.   If a customer goes bankrupt, they may have a variety

19  of products that they are selling, may or may not include

09:40  20  HeatWave.   I see that as just a general cost of doing business,

21  not a direct variable cost.

22  Q.   And did you disallow the advertising deduction?

23  A.   Yes.

24  Q.   Can you explain why?

09:41  25  A.   Advertising is an interesting category because it can

include a lot of different things.  And it is my understanding
of the way that a patent case works that the infringer has the
burden of proof to show that the cost is directly necessary and
associated.  But in my experience analyzing these cases,
advertising is largely predetermined, and significant portions
of it don't vary based on what product is being sold.  For
example, the cost of a website is going to be relatively the
same overall expense regardless of what actual products are on
the website; or the cost of a catalog, a catalog is going to be
a certain breadth and depth of catalog, and it will include
different products, but the overall cost may not change based
on whether it's a HeatWave product or a different type of
product being featured.

     There are some kinds of advertising costs that may be
directly associated with a product, but Seirus didn't provide
any information or any evidence to be able to separate out what
that would be, and it's their burden of proof to show that
evidence, and so for that reason I've deducted advertising.

Q.  When you look at the advertising expenditures as shown on
Seirus' financial statement, how does it change -- does it
change relative to sales and, if so, what is the relationship?

A.  If I remember right, there's -- between the 2013-2014 year,
there's a significant jump in advertising, a higher increase
than the sales increase, and then it stays more relatively
level.  So the change in advertising doesn't vary in the same

1    direction -- well, it does in the same direction, but not in a

2    consistent way with sales.

3    Q.    Did that jump in advertising coincide with an increase in

4    sales, or had an increase in sales occurred without changes in

09:43    5    advertising?

6    A.    Well, in one year it did, but in other years it didn't, so

7    there was kind of both going on.

8    Q.    Business promotion was another expense that you feel should

9    be disallowed?

09:43    10    A.    Yes.    So for business promotion, meetings sales, travel and

11    entertainment sales, my rationale for each of those is the same

12    as advertising; that I don't believe Seirus has proved that

13    those categories would be any different with or without

14    HeatWave, and in my opinion they need to show that, and they

09:43    15    need to be directly linked to the generation of additional sale

16    of HeatWave.

17         Sales analytics is a little bit different.    There's

18    only -- if we -- could we go back to the summary schedule

19    before I removed the numbers, the summary, schedule 3.1.

09:44    20         MR. AXELROD:    Slide 187 -- 188.

21         THE WITNESS:    Sales analytics has a -- has a first

22    time expense in 2015 and then a bit of a smaller expense in --

23    BY MR. AXELROD:

24    Q.    Oops.    Sorry.    I was trying to clear the mark, and I biffed

09:44    25    it.    Thank you.    My apologies.

1    A.    It didn't exist at all.    2014 has a higher expense in 2015,

2    so it's similar to the other marketing categories.    It's kind

3    of a cost of doing business.    It sounded like it was an outside

4    vendor that's doing overall analytics, not specifically tied to

09:45    5    whether or not an additional sale of HeatWave product is made.

6    Q.    Or to the group of HeatWave sales as a group?

7    A.    Yes, yes.

8    Q.    And the last item is interest.    What was that and why do

9    you feel that should be disallowed?

09:45    10    A.    The interest cost from my review of the financial statement

11    represents two types of loans that the company has.    One, the

12    largest category, are loans from shareholders, and a smaller

13    category includes bank loan.    And the category of loans to

14    shareholders was substantially larger than the bank loan, and I

09:46    15    disagree with its inclusion because it's also an indirect cost,

16    a general cost, of doing business; and in my work as a damage

17    expert -- I've been doing this for over 20 years -- I have not

18    seen an expert deduct interest in a calculation of either lost

19    profits, disgorgement profits, for the primary reason that it

09:46    20    can't be directly tied to a particular product on an

21    incremental basis.

22        I don't believe that Seirus presented sufficient

23    evidence that this interest -- total interest amount -- and

24    she's included all of the interest including the loans from the

09:46    25    shareholders -- is directly connected to the sale of HeatWave

product.  Remember that -- in the highest year of our time

period here, the HeatWave products represent about 10 percent

of Seirus' sales, and so there just wasn't enough of a -- what

I call "nexus," a connection, between this interest expense,

09:47  which I understand existed prior to the introduction of

HeatWave, these loans, to the sale of HeatWave products, so I

disagree with it.  I have never included an interest expense

deduction in a disgorgement analysis like this.

Q.   When you say it "existed prior," was the interest expense

09:47  before -- in the period prior to when they first developed

HeatWave roughly the same as the interest expense continuing

through the HeatWave sales period?

A.   I don't specifically remember.  I'd have to look back at

the numbers.

09:47       So the result of the -- of my -- of taking out the

items I disagree with and correcting the items that I believe

should have been deducted results in my opinion of the

supported marginal profit of 41.6 percent.

Q.   And you've applied that to the sales of HeatWave products

09:48  covered by the design patent infringement, and is that how you

get your disgorgement profit?

A.   Yes, I believe the next slide shows the application.  After

this -- this slide shows also the addition of payroll tax at

the bottom, but I think I've said enough about that.

09:48  Q.   That you added back in?

1    A.    Yes.

2    Q.    Is this the slide you were referring to that shows the

3    calculation?

4    A.    Yes.    And so the top line, the HeatWave sales, it's the

09:48    5    total sale of HeatWave -- of products that include HeatWave

6    excluding the HeatTouch Torche, which is about ███████ of

7    sales, and application of my opinion of the marginal profit of

8    ██████ percent to arrive at ████████████.

9    Q.    Were you present when Ms. Distler testified?

09:49    10    A.    Yes.

11    Q.    And did you read her report in which she provided a

12    cost-based allocation by which she purports to attribute profit

13    to HeatWave fabric?

14    A.    Yes.    I believe I received that the day or two days before

09:49    15    trial started, yes.

16    Q.    Do you have an opinion on whether the -- a cost-based

17    methodology such as she employed is appropriate -- is an

18    appropriate method to attribute profits earned from the sale of

19    the finished goods in the United States to a particular piece

09:50    20    of the product?

21    A.    I don't believe what she did appropriately represents an

22    allocation of sales -- and I'll talk about it more -- to any

23    particular part of these products.

24    Q.    Why do you feel it's not appropriate?

09:50    25    A.    Because the -- what she did is she created a fraction, and

1  the numerator of the fraction -- I would love to be able to use

2  a Seirus glove to talk about this, but the numerator of the

3  fraction is the cost -- her determination of the cost of the

4  Ventex fabric as it is shipped from the manufacturer, Ventex,

09:50  5  to the company that makes the gloves.  That's the numerator.

6  And so it's -- just imagine the bolt of fabric is the

7  numerator, and the denominator represents all of the costs to

8  make the glove.  So --

9  Q.  I didn't mean to interrupt.

09:51  10       MR. AXELROD:  Can I approach the witness?

11       THE COURT:  Sure.

12  BY MR. AXELROD:

13  Q.  Let me hand you what's been marked as Exhibit 222.1 which

14  is the Zenith glove.

09:51  15  A.  Okay.

16  Q.  That will help your illustration.

17       MR. MARCHESE:  Did you take it from the table?

18       MR. AXELROD:  Yes.

19       MR. MARCHESE:  Thank you.

09:51  20       THE WITNESS:  And so the numerator represents not --

21  not what I'm touching, the lining, because the lining has had

22  processes done to it, labor, sewing, you know, a lot of

23  processes to get it into the glove.  The numerator represents

24  the cost of the fabric before anything is done to it at all.

09:52  25  And then the denominator represents all of the cost of the

1    glove including labor, including tax and duty, including the

2    cost of these hangtags and the cords that hold the hangtags

3    together.  And in my opinion that isn't a logical comparison --

4    a logical way to apportion sales because the sales can't be

09:52   5    made of this product until it's a finished product.

6          The bolt of fabric is useless to the end customer,

7    so -- I mean backing up a little bit, the question I understand

8    that she is trying to answer -- she assumed that the article of

9    manufacture is the HeatWave fabric because she was instructed

09:52  10    to assume that, and experts are instructed to assume things all

11    the time because we can't be experts in everything.  So she was

12    asked to assume that the HeatWave fabric is the article of

13    manufacture, and then she set out to create some kind of ratio

14    or allocation of total sales to the HeatWave fabric.

09:53  15          But by only including the bolt of fabric as the

16    numerator, that doesn't give any consideration for how did the

17    fabric get in the glove?  What does it do in the glove?  What

18    did it cost to get it in the glove?  What does the consumer

19    think?  How does the consumer desire or value this relative to

09:53  20    the buckle or relative to the advertisement?  And so I just

21    think it's an irrational, illogical comparison.

22    BY MR. AXELROD:

23    Q.   Does it allocate profits to such factors as import duty?

24    A.   Yes.  The result of that kind of fraction is attributing --

09:54  25    is taking all sales for this glove and attributing profit to

1    everything that's not the fabric which is -- just by the

2    function of having all of that in the denominator.  So she

3    would be attributing profit to import, determining profit to

4    the tag, to -- just to everything, and attributing profit to

09:54    5    the labor separately because the labor isn't a denominator, and

6    I just don't think that's rational.

7    Q.   What generates the profits that are being attributed back?

8    What is sold that generates those profits that we're seeking to

9    evaluate?

09:54    10   A.   It's the product that generates the profit.  The consumer

11   is buying this, and so measuring -- attributing profit to a

12   bolt of fabric is too far upstream from this for it to make

13   sense.

14   Q.   In your opinion, did it lead to rational results in

09:55    15   specific applications, this method?

16   A.   No.  You can see in some of the resulting ratios that the

17   conclusions don't make sense.  It's especially obvious for the

18   products like the liners and hats that I understand are all

19   HeatWave fabric.  They don't have other fabrics in them.  She

09:55    20   testified that her range of allocated revenues for that product

21   was in the 35 to 39 -- 35 to 40 percent range, and that's not

22   rational to me.  I don't know how a majority of the sale of a

23   liner could be attributed to something else other than

24   HeatWave.

09:55    25   Q.   Could we look at the -- before we get there, were you also

1  asked to update and make some adjustments to your reasonable

2  royalty calculation?

3  A.   Yes.

4  Q.   And what were you asked to do in that respect?

09:56  5  A.   I was asked to remove a few more products that I understand

6  the parties have stipulated to remove, whether -- what they

7  stipulated about, I don't know, but I was instructed to remove

8  these from the utility patent damage calculation, and so this

9  update shows the additional products.

09:56  10        I have also included the original ones that were

11  already removed.   The categories of liners where the fabric is

12  facing outward, they were originally removed, and I had

13  originally removed September 2013 sales, so that there's just a

14  few categories of hats that are additionally removed.   And then

09:57  15  I've also removed the HeatTouch Torche because Columbia counsel

16  asked me to.   And then a couple of the items -- three I have

17  put in "unknown" because we don't have data produced from

18  Seirus to tell us how much the sales were of that style and

19  that color combination.

09:57  20  Q.   So we don't know if there's any sales made for those

21  categories?

22  A.   Right.

23  Q.   Because they don't show up on the spreadsheet that Seirus

24  provided?

09:57  25  A.   That's correct.

Q.    In all of their HeatWave sales?

A.    Yes.

Q.    Now, I caught a little mistake.    DDX705 is the source of the information, it says.    That's the set of spreadsheets that Seirus produced of all the HeatWave products?

A.    I don't recall what the exhibit numbers are, but the source of information is the -- that exhibit that shows all the fiscal years, involved different products and their sales.

MR. AXELROD:    For the record, that exhibit is 745 which is the parties' stipulation on certain additional products being excluded and other products --

THE WITNESS:    Oh, okay.    I misunderstood your question.    Okay.

BY MR. AXELROD:

Q.    If we go back to compare what your initial opinion was before these adjustments, because you said previously you had already excluded many of these products, do you recall what the figure was at the bottom line before application of the percentages?

A.    Well, it's -- you know that I have removed 179,000, so I'd have to do that math.    The prior conclusion of sales was 179,000 higher, so the impact of removing the additional stipulated items is to reduce the sales base by 179.

Q.    And then you apply the same royalty rate that you testified to previously?

1  A.    Yes.

2  Q.    And are these the only changes that you made to your

3  reasonable royalty analysis?

4  A.    Yes.

09:59  5        MR. AXELROD:  Thank you.  I have -- oh, I have -- can

6  we have a --Your Honor, we have an issue we probably should

7  discuss before the witness gets off.

8        THE COURT:  Okay.  Can I have you step into your room.

9        (Proceedings held outside the presence of the jury panel.)

09:59  10       MR. AXELROD:  The witness purchased some gloves from

11  Amazon in the last couple of days and had them sent to the

12  hotel, and we wanted to have her identify them and have them

13  admitted.

14       THE COURT:  To what point?

10:00  15       MR. AXELROD:  To the point of what current products

16  look like.

17       THE COURT:  And that rebuts the evidence placed by the

18  defense in what way?

19       MR. AXELROD:  It shows that they haven't withdrawn the

10:00  20  products from the market.

21       THE COURT:  Okay.

22       MR. MARCHESE:  Your Honor, we obviously object to

23  that.  We've had -- I can't count the number of times we've had

24  arguments about the products and items and documents produced

10:00  25  after the close of discovery and not being relevant.  We

1    haven't -- you know, this was a door that they opened up

2    originally asking about Amazon.  We put in -- there was some

3    evidence that was -- questions that were asked about it, but

4    now we have somebody going out and buying gloves off Amazon two

10:00    5    days before the close of trial, and now they want to get them

6    into evidence.  I mean for that reason it seems wholly

7    inappropriate.

8            And, secondly I don't see why Ms. Morones' testimony

9    concerning what she buys off Amazon is probative of anything.

10:01    10    It's clearly prejudicial.  There's no need for this to come in.

11    It's certainly not relevant to anything that's going on so far.

12            THE COURT:  As I recall there was testimony, and I

13    can't remember which way it went, indicating that the gloves

14    were no longer --

10:01    15            MR. MARCHESE:  That's not what the testimony was.  The

16    testimony is it's being sold on Amazon.  That came out clearly,

17    that it was being sold via third-party resellers on Amazon and

18    not via -- by Seirus, and this is going to be cumulative of

19    anything of a third-party reseller of Amazon having gloves on

10:01    20    the --

21            THE COURT:  Okay.  Thank you.  Anything else?

22            MR. AXELROD:  No.

23            THE COURT:  The objection is sustained.  Go ahead.

24    Let's take a --

10:01    25            MR. MARCHESE:  May I bring up one thing before the --

1    sorry -- before we start with Ms. Morones because I don't want

2    to get derailed in the middle of the cross-examination.   On

3    Sunday night, Ms. Morones offered a different opinion than what

4    she's offering today.   We -- let me back up.

5    She was supposed to testify -- the days are starting

6    to blend, but it would have been Monday or Tuesday that she

7    would have gone on.   Prior to her testimony, we got a different

8    set of slides from Ms. Morones which we objected to.   I don't

9    know if Your Honor recalls, but we objected and said it was a

10    new opinion and it was something that we thought was

11    inappropriate.   That was overruled.

12    And so she was going to testify on a different opinion

13    than what she provided today in terms of the design patent

14    damages, and she said today that she thinks that Ms. Distler's

15    methodology was -- I think I heard "not appropriate" and "not

16    rational."   But her opinion that she offered just the other day

17    which says "Serena Morones Opinions" on it, which we received,

18    is actually consistent with what Ms. Distler did, and I would

19    like to cross-examine her on that, and I wanted to make

20    sure -- I think they're going to object, probably it's beyond

21    the scope, but I don't think it is.

22    THE COURT:   Okay.

23    MR. AXELROD:   As Your Honor anticipated, we were

24    trying to work with Ms. Distler's methodology to see if it

25    could be made rational.   We ultimately conclude it couldn't.

1    So she is not offering any opinions on any kind of alternate

2    basis, but simply critiques the methodology itself.  So in

3    essence what she has done is withdrawn an opinion.

4              Now they want to bring it back in.  We will then go

10:03    5    back all through it and explain why it doesn't apply and what's

6    wrong with it, and it's clearly outside the scope of the

7    opinions that she's given in court.

8              MR. MARCHESE:  It's not outside the scope.

9              THE COURT:  If she's given inconsistent opinions,

10:03   10   while there may be an explanation for them, they're entitled to

11   cross-examine her on that.

12             Let's take our morning recess.  We'll be in recess for

13   ten minutes.

14        (Recess.)

10:20   15        (Proceedings held in the presence of the jury panel.)

16             THE COURT:  Please be seated.

17        You may proceed.

18             MR. MARCHESE:  Thank you, Your Honor.

19                       CROSS-EXAMINATION

10:21   20   BY MR. MARCHESE:

21   Q.   Good morning, Ms. Morones.

22   A.   Good morning.

23   Q.   So you've just offered opinions on design patent

24   disgorgement remedy, correct?

10:21   25   A.   Yes.



1    Q.    And I remember we talked the other day -- I don't remember

2    the day exactly.  I think it was Thursday.  Does that sound

3    right?

4    A.    Wednesday, I believe.

10:21    5    Q.    Wednesday it was.  Okay.  Great.  And on Wednesday you

6    talked about your background with patents.  Remember that?

7    A.    Yes.

8    Q.    And I don't remember you ever mentioning being involved

9    with a design patent case.  Is that correct?

10:21    10    A.    That may be correct, yes.  I don't know that you asked me

11    that, but that's correct.

12    Q.    It is correct that you've never been involved in a design

13    patent case, correct?

14    A.    I believe so, yes.

10:21    15    Q.    You believe, or is that correct?

16    A.    I believe so.

17    Q.    You're not sure?

18    A.    I don't remember the specific details of the legal

19    allegations of each case.

10:21    20    Q.    So you're unsure of whether you've ever been involved in a

21    design patent case?

22    A.    I believe that I have not.

23    Q.    Okay.  And I'm sure I wasn't entirely clear.  You are

24    involved in a design patent case here, right?

10:22    25    A.    Yes.

1   Q.   So prior to this case, have you ever been involved in a

2   design patent case?

3   A.   I believe that I have not.

4   Q.   And is the same answer true with respect to design patent

10:22  5   disgorgement?  You believe you have never been involved in a

6   case involving design patent disgorgement?

7   A.   That would follow from my previous answer, yes.

8   Q.   So you'd give the same answer?

9   A.   Yes.

10:22  10   Q.   Now, in this particular case, you have offered an opinion

11   on design patent disgorgement back on Wednesday of last week,

12   right?

13   A.   Actually, it was Friday.  Sorry.  The weeks have been long.

14   Yes.

10:22  15   Q.   I won't disagree with you there.

16      On Friday of last week.

17   A.   Yes.

18   Q.   Okay.  Great.  Can I call that "the Friday opinion"?

19   A.   You're welcome to call that "the Friday opinion," if you'd

10:22  20   like.

21   Q.   Okay.  Thank you.  And then today you offered another

22   opinion on design patent disgorgement, correct?

23   A.   Yes.

24   Q.   And can I call that "the Wednesday opinion"?

10:23  25   A.   Is today Wednesday?

```
 1   Q.   It is Wednesday.   That, I do know.
 2   A.   Yes, you're welcome to do that.
 3   Q.   Okay.   Thank you.
 4        Now, when you -- well, you've been an expert in a lot of
 5   cases, right.
 6   A.   Yes.
 7   Q.   I think it was something in the order of 800-plus cases.
 8   A.   Yes.
 9   Q.   And in those cases, you offer opinions, correct?
10   A.   Yes.
11   Q.   You offer damages opinions, right?
12   A.   Yes.
13   Q.   That's your -- that's what you do is damages opinions,
14   right?
15   A.   It's one of the things I do, yes.
16   Q.   Of the 800-plus cases you've done, it's primarily damages.
17   Is that right?
18   A.   Oh, I don't know that that's the case.   I do valuation.   I
19   do other cases where there are remedies that aren't exactly
20   called "damages."   There are a variety of things.   I do
21   forensic accounting too.
22   Q.   But you do a lot of cases where you offer opinions on
23   damages?
24   A.   That's correct.
25   Q.   And it's important when you offer opinions in a case to
```

10:23   5
10:23   10
10:23   15
10:23   20
10:24   25

1   express what -- everything you know about that opinion, right?

2   A.   And it depends on the case.   It depends on the type of the

3   case.   In this case I was very clear that the defendant had the

4   burden of proof and that it wasn't my assignment to identify

10:24   5   appropriately deductible costs.   So you were certainly welcome

6   to ask me what I thought was appropriately deductible, but it

7   wasn't my job on Friday to present everything that I thought

8   was appropriately deductible.

9   Q.   Let me ask you this:   If you offer an opinion in a case and

10:24  10   you've previously offered an inconsistent position or opinion,

11   isn't it important to let a jury know about that?

12   A.   And I believe I did.   I believe I let them know a preview I

13   would be coming back and testifying about what I thought was

14   reasonably supported by Ms. Distler.

10:25  15   Q.   My question was much narrower than that.   Isn't it

16   important when you offer an opinion on damages or some other

17   issue in a case, if you offered previously an inconsistent

18   position, it would be important to let a jury know about that,

19   correct?

10:25  20   A.   I don't -- I mean it -- just so depends on what it is and

21   why it's inconsistent.   It might be outside the scope of the

22   question at issue, so I -- you might want to narrow the

23   question down.

24   Q.   So if you have an inconsistent position previously,

10:25  25   sometimes it might be okay to withhold it, and other times it

1    would be okay to let the jury know, correct?

2    A.    It just really depends on the question because additional

3    information may come up.  You know, I'm just kind of -- I mean

4    I think generally we avoid taking inconsistent positions on

5    exactly the same issue, but it rarely happens that we just

6    reverse course and just change our mind arbitrarily.  So I'm

7    having a hard time understanding the scenario you're

8    presenting.

9    Q.    You just said it's rare that you take a different or

10   inconsistent position on an issue, correct?

11   A.    Yes.

12   Q.    But in that rare circumstance, would you agree with me or

13   not -- you can say yes or no; I don't think you need to explain

14   because it's simple.  In the rare instance where you take an

15   inconsistent position on an issue, is it important, yes or no,

16   to tell the jury about that?

17   A.    If it's relevant to this case and the questions in this

18   case, yes, I would agree.

19   Q.    It would be important to tell the jury, right?

20   A.    I mean -- yeah, I believe so.

21   Q.    Okay.  And I think there was another piece of your answer

22   that you gave before where you'd also said that -- I may not

23   get your words correct, but I believe the import of the word

24   was that in some circumstances, I think you said you may not

25   need to tell a jury about an inconsistent position.  Is that

1  right?

2  A.   Yes.   If it's not truly inconsistent, because what I think

3  you're going to do is you're going to try to make something

4  look inconsistent when it's not.   So if an opinion changes and

10:27   5  it's not an inconsistent position because of additional

6  information or a reason why the opinion needs to be different,

7  it's not just simply inconsistent.

8  Q.   Ms. Morones, if you wouldn't mind, I have a limited amount

9  of time left on the clock.   Okay?

10:27   10  A.   Well, the questions you asked me --

11       THE COURT:   Just a minute.   Listen to the question and

12  answer the question, and then, again, there's lawyers on both

13  sides, and if there's further explanation, the other side will

14  make sure that that comes out.

10:27   15  BY MR. MARCHESE:

16  Q.   So let me give you a scenario:   If you offer an opinion on

17  an issue, let's say on day one.   Okay?   Are you with me?

18  A.   Yes.

19  Q.   And then you offer a different opinion on the same issue on

10:28   20  day two.   Okay?

21  A.   Yes.

22  Q.   And then you offer yet a different position on an issue on

23  day three, isn't it important to tell the jury about the

24  position you took on day two?

10:28   25  A.   Yes, I agree.



1  Q.   Now, you said that Ms. Distler's opinion about the fabric,

2  the HeatWave fabric, for disgorgement of profits, and I'll use

3  your word, was not appropriate, correct?

4  A.   Yes.

10:28  5  Q.   And you said that Ms. Distler's opinion on the HeatWave

6  fabric was not rational, correct?

7  A.   Yes.

8  Q.   And tell us what "rational" means to you.

9  A.   The result doesn't make common sense.

10:28  10  Q.   So her theory that you could actually apportion down and

11  figure out what the fabric was, the HeatWave fabric, from the

12  HeatWave gloves was -- didn't make any sense, right?

13  A.   In my opinion, yes.

14  Q.   And you would say that the opinion concerning taking a

10:29  15  particular fabric and apportioning it based on an overall

16  glove, that is not rational, right?

17  A.   Yes.   The fabric just by itself without added labor and

18  cost to get it in there divided by the entire product and all

19  the labor that went into the entire product, yes.

10:29  20  Q.   So when you offer an opinion and you put on that opinion

21  "Serena Morones opinions," you stand by those, don't you?

22  A.   Well, yes, with full explanation and -- yes.

23  Q.   That was a "yes," right?

24  A.   Yes.

10:30  25  Q.   Okay.   And when you offer something that says "Serena

1    Morones opinions," that is something that -- if it changes over

2    time, that's something the jury should know about because you

3    just told me if your opinion on day one to day two to day three

4    changes, then day two should be revealed to the jury, correct?

10:30   5    A.   That's correct.

6          MR. MARCHESE:   Can I have PBX186 from the other day?

7    BY MR. MARCHESE:

8    Q.   I received slides from your lawyers on Sunday night, and

9    they are labeled with exactly the same numbers as what you

10:30  10    presented today, give or take a couple because I think there

11    are some additional slides in the one we're going to look at

12    that were not provided in this one you had today.   Does that

13    ring a bell?

14    A.   Yes, except it was Monday night.

10:30  15    Q.   It was Monday night.   The days are blending.

16          And do you remember doing a slide deck on Monday

17    night?

18    A.   Yes.

19    Q.   And that slide deck is not the same as the one you

10:31  20    presented today, correct?

21    A.   It's -- yes, it's more extensive.

22    Q.   It's not the same, correct?

23    A.   Correct.

24    Q.   And you did not present anything -- take that back.

10:31  25          There's a piece of that, at least, a piece of that,

1   that you presented on Monday night that wasn't in your direct

2   testimony today, correct?

3   A.   Yes.

4   Q.   Okay.  And we're going to go through it and look at it, and

5   I want to show it to the jury.

6            MR. MARCHESE:  If you can turn to PDX187.

7   BY MR. MARCHESE:

8   Q.   Now, is it fair for me to say with respect to -- the Monday

9   night slide deck that we're looking at right now, can I call

10  that "the Monday opinion"?

11  A.   Well, that wasn't an opinion expressed in court, so I just

12  want to make that clear.  That was a slide deck we prepared and

13  that I was considering presenting that we shared with you, so

14  it wasn't a publicly in court presented opinion.

15  Q.   It was not publicly presented in court, correct?

16  A.   Correct.

17  Q.   Not until now, right?

18  A.   Correct.

19  Q.   Okay.  Can I call it "the Monday opinion"?

20  A.   Sure.

21  Q.   Okay.  So we have a Friday opinion, a Monday opinion, and a

22  Wednesday opinion, right?

23  A.   Yes.

24  Q.   Each one different, correct?

25  A.   Each one includes different things.

1    Q.    But nobody got to see the entire Monday opinion until just

2    now, right?

3    A.    Yes, I agree.  I chose not to present this section of --

4    the opinion.  I believed that it would be confusing to the

5    jury.

6    Q.    And on that PDX187 -- this is from Monday -- it says

7    "Serena Morones Opinions," correct?

8    A.    Yes.

9    Q.    And you stand by those, don't you?

10   A.    Yes, and given the full explanation, which I hope you're

11   going to let me do, I will stand by what I presented.

12            MR. MARCHESE:  Can we publish these to the jury,

13   Your Honor?

14            THE COURT:  Sure.

15   BY MR. MARCHESE:

16   Q.    We're looking at the Monday opinion --

17            MR. MARCHESE:  Actually can you back up one slide,

18   PDX186?

19            THE COURT:  We're having a technical problem.  Hang on

20   just a second.  I've paused your time.

21            MR. MARCHESE:  Thank you.

22            THE COURT:  So we need to reboot the system.  That

23   takes about ten minutes.  You can keep going on other topics,

24   or we can wait.

25            MR. MARCHESE:  How about if I put it on the ELMO?

1       Will that work?

2               THE CLERK:  No.

3               MR. MARCHESE:  I would like to show it and continue.

4               THE COURT:  So we can sit and look at each other, or

10:34  5       you can take a break.

6               PANEL MEMBER:  Our screens are working here.  These

7       are working.

8               THE COURT:  I don't care about everybody else.  I care

9       about you.  As long as yours are working, and I think -- are

10:34  10      the lawyers working?  Let's roll.  We're good.

11              MR. MARCHESE:  Great.  May I proceed?

12              THE COURT:  You may.

13              MR. MARCHESE:  Thank you.

14          Go back to 187, please.

10:34  15      BY MR. MARCHESE:

16      Q.   And so we were talking about this before, Ms. Morones.

17      This is -- I'll represent to you these are the slides that we

18      received on Monday night from you.  Okay?

19      A.   Okay.

10:34  20      Q.   And the Monday opinion, right?

21      A.   Yes.

22      Q.   And it says on the top of that slide PBX187 "Serena Morones

23      Opinions," right?

24      A.   Yes.

10:35  25      Q.   And if I go through them -- and I'm happy to walk through

1    them with you one by one, if you'd like to see every single one

2    of them, and we'll look at some for sure, but I will represent

3    to you that every single one of them says "Serena Morones

4    Opinions" on it.  Every single slide that you presented on

10:35    5    Monday night has that same type.

6    A.   I accept that.

7    Q.   Is that something you can recall having seen on these

8    slides?

9    A.   Yes.

10:35    10    Q.   And you saw them -- you saw these slides before they were

11    presented to my team, the Seirus team, correct?

12    A.   Yes.  I made them.

13    Q.   You made them?

14    A.   Yes.

10:35    15    Q.   And each one of them says "Serena Morones Opinions,"

16    correct?

17            MR. AXELROD:   Asked and answered.

18            THE COURT:   Sustained.

19    BY MR. MARCHESE:

10:35    20    Q.   And you stand by each and every one of the opinions in

21    here, right?

22    A.   As fully explained to the jury, meaning I got to present

23    it -- present the information, explain what it means, and with

24    that opportunity, I stand by them, yes.

10:35    25    Q.   Thank you.  Thank you.  Okay.

1        MR. MARCHESE:   Can we go to PDX194.

2   BY MR. MARCHESE:

3   Q.   Now, PDX194, that was in your Monday opinion, right?

4   A.   Yes.

10:36   5   Q.   And it was not presented today, correct?

6   A.   Yes.

7   Q.   And in it you provide an example of product costing,

8   correct?

9   A.   Yes.

10:36  10   Q.   And in the opinion that you were going to offer, I assume,

11  based on these slides, you took several of the items on this

12  particular list, and you included them as part of your

13  computation, right?

14  A.   Yes.

10:36  15   Q.   Okay.   And is it correct to say that this is an excerpt

16  from the bill of materials, or BOM, that was produced

17  previously by Seirus in this case?

18  A.   Yes.

19  Q.   On which Ms. Distler relied?

10:36  20   A.   Yes.

21  Q.   Okay.   And that is Exhibit Number -- just a minute.   I

22  don't have the exhibit in front of me right now, but I will get

23  it in a minute.

24       You took an example from the bill of materials that Seirus

10:37  25   produced and generated this slide, correct?

1    A.    Yes.

2    Q.    And this is for the HeatWave Accel glove, right?

3    A.    Yes.

4    Q.    And that was an example that Ms. Distler provided in her

10:37  5    direct testimony, correct?

6    A.    I don't recall that, but she may have.

7    Q.    She may have.   Okay.

8          And in this particular example that you're doing, you're

9    providing -- you've got highlights I can see on three items.

10:37  10   Right?

11   A.    Yes.

12   Q.    One of them is liner Youngtech, right?

13   A.    Yes.

14   Q.    Do you know what that is?

10:37  15   A.    Yes.

16   Q.    That's that waterproof, breathable liner fabric, right?

17   A.    Right.

18   Q.    Does not contain HeatWave at all, right?

19   A.    That's correct, and -- yes, only the Ventex line in this

10:37  20   example includes HeatWave.

21   Q.    The Ventex line includes HeatWave, right?

22   A.    Yes.

23   Q.    Okay.   And the conductive fabric, that's not HeatWave,

24   right?

10:37  25   A.    That's correct.

1  Q.   And that is a Soundtouch --

2  A.   Right.

3  Q.   -- piece, right?

4  A.   Yes.

10:37  5  Q.   Okay.  The exhibit for the BOM is 1372 for the record.  You

6  looked at Exhibit 1372, the bill of materials?

7  A.   Yes.

8  Q.   And so in this example, what you do is you take those three

9  line items, liner Youngtech, Ventex, and conductive fabric,

10:38  10  only one of which is the HeatWave.

11  A.   Yes.

12  Q.   And you add them all together, correct?

13  A.   Yes.

14  Q.   Okay.  And you come up with a total cost at the bottom of

10:38  15  ████████████████████, correct?

16  A.   Yes.

17  Q.   And then you compute that the percentage of that to the

18  overall cost of the product is 43.3 percent, right?

19  A.   The overall cost of the sum of the three, so Ventex is 43

10:38  20  percent of the sum of the three specified fabrics in this bill

21  of material.

22  Q.   If I add up, ████████, ████, and ██████████, I get ██████,

23  right?

24  A.   Yes.

10:38  25  Q.   And then you computed -- you took the total cost of the

1    product, and you did a -- you did some sort of a fractional

2    percentage, right?

3    A.    Yes.    The calculation at the bottom, Ventex as a percent of

4    the specified fabric cost is 43 percent.

10:39    5    Q.    Okay.    So you added up the three fabrics and got , and

6    then you made that the -- I'm going to use your math term --

7    the denominator.

8    A.    Yes.

9    Q.    Takes me back.    The denominator, right?

10:39    10    A.    Yes.

11    Q.    And then you used ███ as the numerator, right?

12    A.    Yes.

13    Q.    And you divided ███ by ███, and you got 43.3 percent,

14    right?

10:39    15    A.    Yes.

16    Q.    And then you took the 43.3 percent, you multiplied it by

17    the sales of the HeatWave Accel, and you got an apportioned

18    value that you came up with for disgorgement, correct?

19    A.    Yes.

10:39    20    Q.    And you did that for every single product, right?

21    A.    Yes.

22    Q.    Okay.    And at the end of the day, you got a number, right?

23    A.    Yes, of course.

24         MR. MARCHESE:    Can we see PDX196.

25

BY MR. MARCHESE:

Q.    This is a slide that we received in the Monday opinion, correct?

A.    Yes.

Q.    And this is a slide we did not see today, correct?

A.    Correct.

Q.    And in that you have two different -- it looks like two different options or alternatives for disgorgement, correct?

A.    Yes.   The original -- the assumption that -- Columbia's assumption that the article manufactured is the product sold to the consumer, and an assumption that the article of manufacture is the HeatWave product, but using the allocation method that I would have presented to the jury if I had done this.

Q.    The one you presented to the jury today is the one based on finished product sold in U.S., correct?

A.    Yes, because that is the assumption I've been asked to make with respect to article of manufacture.

Q.    Okay.   You were asked to make that assumption by the lawyers for --

A.    As well as Ms. Distler was asked to make the assumption by the lawyers that the article of manufacture is the fabric.

Q.    Ma'am, I really do -- I'm on a clock, and I just want to get the answer.

This is an assumption you were asked to make by the lawyers, correct?

|     |     |
| --- | --- |
| 1 | A.    Yes. |
| 2 | Q.    And which lawyers? |
| 3 | A.    The Columbia counsel. |
| 4 | Q.    The outside?  The inside?  Who was it? |
| 10:40    5 | A.    The outside counsel. |
| 6 | Q.    Okay.  And can you identify them? |
| 7 | A.    Yes.  Mr. Axelrod and Mr. Aldrich. |
| 8 | Q.    Okay.  HeatWave fabric, I think you said in green here, |
| 9 | which is a different number, much lower, right? |
| 10:41   10 | A.    Yes, in this slide, yes. |
| 11 | Q.    On PDX196 the HeatWave fabric computation is ███████ |
| 12 | and some change, right? |
| 13 | A.    Yes. |
| 14 | Q.    And you were asked to assume that particular scenario as |
| 10:41   15 | well, correct? |
| 16 | A.    Which particular scenario? |
| 17 | Q.    The HeatWave fabric scenario. |
| 18 | A.    Well, I understand that -- no, I wasn't asked to assume.  I |
| 19 | have that alternate calculation because I understand that's |
| 10:41   20 | Seirus' position. |
| 21 | Q.    So you think this is the same as Seirus' position? |
| 22 | A.    Yes, just that HeatWave fabric is the article of |
| 23 | manufacture. |
| 24 | Q.    Okay.  And when you did -- so you used -- you have an |
| 10:41   25 | opinion here based on the Seirus position, correct? |

1    A.    Yes, based on the assumption the HeatWave fabric is the

2    article of manufacture, but using a different method to

3    allocate cost.

4    Q.    And so today when we heard your testimony, we did not get

10:42    5    to hear anything about this HeatWave fabric scenario that you

6    have on PDX196, correct?

7    A.    That's correct.

8    Q.    And the jury did not get to hear that you had a number that

9    was nearly $1.1 million less than what you offered today,

10:42    10    correct?

11    A.    Well, that's a different -- whole different framework.    It

12    depends on what your assumption is about the article of

13    manufacture.    But, yes, I didn't present this today.

14    Q.    Thank you.

10:42    15        MR. MARCHESE:    And then let's go back to PDX198 -- I'm

16    sorry -- 195.

17    BY MR. MARCHESE:

18    Q.    Here you give a different example, right?

19    A.    Yes.

10:42    20    Q.    Okay.    But, again, you're basing your example on HeatWave

21    fabric, right?

22    A.    All of these have HeatWave fabric, so yes.

23    Q.    You're highlighting the HeatWave fabric, right?

24    A.    The highlighted line is the HeatWave fabric, yes, the

10:43    25    yellow line in each of the bill of materials.

1    Q.   And under your scenario here, what we're looking at here is

2    you're saying that it constitutes 100 percent of the fabric,

3    and, therefore, you come up with 100 percent multiplier, right?

4    A.   100 percent of the specified fabric on the bill of

10:43    5    materials that I can see based on the data provided by Seirus.

6    There's one line of fabric on this bill of material.   There's

7    no other specified fabric.   And so, yes, because my methodology

8    was to -- the numerator is the Ventex line or the HeatWave

9    line.   The denominator is all of the specified fabric on the

10:43   10    bill of material.

11    Q.   I'm sure you can provide more on your direct.   I just kind

12    of wanted to focus in.   So I keep saying that, but I really do

13    have limited time.

14         So isn't it true here, though, that on example 2, you've

10:43   15    highlighted the HeatWave fabric cost, correct?

16    A.   Yes.

17    Q.   And then you -- there are all these other costs, labor,

18    duty, and freight?

19    A.   Yes.

10:44   20    Q.   And all told, those add up to ▆▆▆▆, right?

21    A.   Yes.

22    Q.   All you took was ▆▆▆▆▆.   You excluded all the other

23    items?

24    A.   Yes.   It's much as the same with every one I did.   I

10:44   25    disregarded the other items in the ratio analysis.

1    Q.    Okay.   Let's take a look at a few examples that you did.

2              MR. MARCHESE:   Can we go to Exhibit 1442.

3              If this hasn't been offered, I'd offer 1442.

4              MR. AXELROD:   No objection.

10:44    5              THE COURT:   It is received.

6         (Exhibit 1442 admitted.)

7    BY MR. MARCHESE:

8    Q.    Can you see that?  Can you see 1442?  Thank you.

9              1442 is an exhibit that I believe came from one of

10:45    10    your reports.   Correct?

11    A.    That came -- we provided this on Monday night with the

12    other -- with the slides.

13    Q.    Okay.   And that was -- this is part of the Monday opinion,

14    right?

10:45    15    A.    Yes.

16    Q.    And we did not see that today, correct?

17    A.    Correct.

18    Q.    Okay.   In the Monday opinion --

19              MR. MARCHESE:   Exhibit 1442, can we go to page 12.

10:45    20    And here -- I'm sorry.   Schedule D, page -- is that right?

21    I've got it.   Okay.

22    BY MR. MARCHESE:

23    Q.    There are three different gloves called out here, right?

24    A.    Yes.

10:45    25    Q.    Okay.   And we've got -- the middle one is the Workman

1    Dakota, right?

2    A.    Yes.

3            MR. MARCHESE:    Okay.    And I would like to offer

4    Exhibit 1440.

10:46    5            MR. AXELROD:    No objection.

6            THE COURT:    Received.

7        (Exhibit 1440 admitted.)

8            MR. MARCHESE:    May I approach?

9            THE COURT:    Sure.

10:46    10    BY MR. MARCHESE:

11    Q.    Have you seen this glove before?

12    A.    I have not.

13    Q.    Does it say "Workman Dakota" on it?

14    A.    Yes.

10:46    15    Q.    And can you hold it up, show it to the jury, please?    Can

16    you pull back the hangtag so they can see what it looks like?

17    Can you find any HeatWave fabric in that?

18    A.    Yes, I see some reflective fabric.

19    Q.    Can you hold it up and show it to the jury, please, where

10:46    20    you see it?    It's inside, right?

21    A.    Yes.

22    Q.    Kind of after you go through the cuff part with the Velcro,

23    it's in there?

24    A.    Yes, below the cuff.

10:47    25    Q.    Okay.    And in your analysis in Exhibit 1442, page 12 for

1    the Workman Dakota, you use the reflective printing line item

2    Ventex.  That's the only one you include in your computation

3    for the cost items, correct?

4    A.    Yes.

10:47    5    Q.    And because of that, you conclude that there should be

6    disgorgement of 100 percent of the profits for that particular

7    glove, correct?

8    A.    Yes.

9    Q.    And you didn't consider whether it had -- can you hold it

10:47    10    up again?  It's got some palm material on it, doesn't it?  Some

11    sort of material on the palm, kind of a -- the palm?

12    A.    Well, it's just got a big cuff -- oh, you mean this pattern

13    here?

14    Q.    Yeah, it has that, right?

10:47    15    A.    Yes.

16    Q.    That's part of the materials, correct?

17    A.    Well, according to visual inspection, but not according to

18    the data.

19    Q.    Let me ask you this:  It has protective pads on it, right?

10:48    20    A.    I don't know.  It may.  It seems to have some padding.

21    Q.    And it has cuff material, right?

22    A.    Yes, it has cuff material, and none of that is specified in

23    the bill of material.

24          MR. MARCHESE:  Your Honor, permission to pass it to

10:48    25    the jury.

1      THE COURT:  Sure.

2          MR. MARCHESE:  Tricky to get out of there.

3  BY MR. MARCHESE:

4  Q.  So for this glove, your conclusion using your analysis that

10:48  5  wasn't presented until now from Monday is that the -- that

6  Seirus should pay 100 percent of the profits for that glove to

7  Columbia?

8  A.  Yes.

9  Q.  And let's take a look at -- same schedule, I think same

10:48  10  page.  There's a product on there called the Workman Gripper

11  glove, I believe.  Do you see that one?

12  A.  Yes.

13  Q.  Okay.

14          MR. MARCHESE:  I'd like to offer Exhibit 144 -- I'm

10:49  15  sorry -- 1349 into evidence.

16          MR. AXELROD:  No objection.

17          THE COURT:  Received.

18      (Exhibit 1349 admitted.)

19          MR. MARCHESE:  Permission to approach?

10:49  20          THE COURT:  Sure.

21  BY MR. MARCHESE:

22  Q.  Have you seen this glove before?

23  A.  I have not.

24  Q.  But you did consider it in your Monday opinion, right?

10:49  25  A.  Yes.  I worked with the data on the bill of materials to

1    include it in my opinion.

2    Q.    Okay.    And that's item 8182 on -- in Exhibit 1442, correct?

3    A.    Yes.

4    Q.    And that's what you have in your hand, right?

10:49    5    A.    Yes.

6    Q.    Okay.    And for that particular glove, you similarly looked

7    only at Ventex -- reflective printing line item, correct?

8    A.    Yes, because that's the only material product specified on

9    the bill of materials.

10:50    10    Q.    Can you look inside of it and tell us if you can find the

11    HeatWave fabric?

12    A.    Similar to the other Dakota glove.

13    Q.    It's only on one-half?

14    A.    Yes.

10:50    15    Q.    Okay.    Thank you.

16            MR. MARCHESE:    Permission to pass that, Your Honor.

17            THE COURT:    Sure.

18    BY MR. MARCHESE:

19    Q.    Ms. Morones, for the Workman Gripper glove, the one that's

10:50    20    orange that's being passed around to the jury, you say that

21    Seirus should disgorge 100 percent of its profit from that

22    particular glove, correct?

23    A.    Yes.

24    Q.    And one more example that I'd like to show here.

10:50    25            MR. MARCHESE:    This is the glove called MS Behave,

1    Exhibit Number 1441.  I'd like to offer it.

2              MR. AXELROD:  No objection.

3              THE COURT:  Received.

4         (Exhibit 1441 admitted.)

10:51  5              MR. MARCHESE:  Thank you.

6    BY MR. MARCHESE:

7    Q.   The MS Behave glove is on Exhibit 1442 at Exhibit B, page 3

8    of 4, and here we see that the MS Behave is the middle item on

9    the schedule.  Do you see that?

10:51  10   A.   Yes.

11   Q.   And it's item -- in green with one yellow highlight under

12   it, correct?

13   A.   Correct.

14             MR. MARCHESE:  And permission to approach?

10:51  15             THE COURT:  Sure.

16   BY MR. MARCHESE:

17   Q.   Have you seen this glove before?

18   A.   Yes.

19   Q.   And that glove has insulation?

10:51  20   A.   Yes, it appears so.

21   Q.   It has a shell?

22   A.   Yes.

23   Q.   It has material in the palm, and it's -- right?

24   A.   Yes.

10:51  25   Q.   It's got a cuff?

1    A.    Yes.

2    Q.    And for that particular product, once again, you concluded

3    that 100 percent of the profits should be disgorged to

4    Columbia, correct?

10:52    5    A.    Yes, because there's -- none of that other information is

6    provided or specified.

7    Q.    And so if you look at -- well, let me look at Exhibit 1442

8    of your spreadsheet.  I believe this is received previously.

9              MR. MARCHESE:  I think it's in the same one you're in

10:52    10   right now.  It's Schedule A.  Okay.  There we are.  Apologies.

11   BY MR. MARCHESE:

12   Q.    This is from the Monday opinion, right?

13   A.    Yes.

14   Q.    And if we blow up the -- if you can find it on there.  My

10:53    15   eyes are struggling to get to the MS Behave --

16   A.    It's not -- right now --

17   Q.    1242.  It's on there, right?

18   A.    Yeah, 1240 is the glove.  1242 is the mitt.

19   Q.    1240 is the glove, and for that item 1240, the total sales

10:53    20   are ▇▇▇▇▇▇, right?

21   A.    Yes.

22   Q.    And it's your opinion that 100 percent of the profits from

23   that particular MS Behave glove at ▇▇▇▇▇▇, 100 percent should

24   go to Columbia.

10:53    25   A.    Yes.

1    Q.    And you have that 100 percent opinion from Monday, and you

2    had that 100 percent opinion on last Friday, and you had that

3    100 percent opinion today for the MS Behave, right?

4    A.    Yes.    That's the same, and looking at the -- assuming that

10:54    5    the 100 percent of the product is the article of manufacture.

6    Q.    And -- but that's not the same for --

7           MR. MARCHESE:    Back to PDX194.

8    BY MR. MARCHESE:

9    Q.    So we'll look at it in a minute.    PDX194 is the HeatWave

10:54    10   Accel glove, the example you provided in your Monday opinion?

11   A.    Yes.

12   Q.    The HeatWave Accel glove here on the Monday opinion, you

13   said that you should first take 43.3 percent of the overall

14   sales of that product and then do a disgorgement from that

10:55    15   point, correct?

16   A.    That's the result of -- yes, this methodology of Ventex in

17   the numerator, the other specified fabrics in the denominator.

18   Q.    But in the Friday opinion you gave, you said it should be

19   100 percent, correct?

10:55    20   A.    Well, that's -- that's under the assumption that the

21   article of manufacture is the entire glove.    It's clear that

22   those are different assumptions.    What is the article of

23   manufacture?    It's not my opinion to give what is the article

24   of manufacture.    So the difference --

10:55    25   Q.    Is that a yes or no?

A.    The difference between Friday and Monday is this analysis

is looking at an alternate way to measure the HeatWave fabric

as an article of manufacture.

Q.    Was that a yes or a no?

A.    Well, it's -- they're intentionally different because

they're talking about different things.

Q.    Let me ask one more time.   Real easy.   Your opinion on

Friday was that for the HeatWave Accel, Seirus should disgorge

100 percent of its profits, correct?

A.    Assuming the article of manufacture -- yes, assuming the

article of manufacture is the entire product.

Q.    The Monday opinion, which you didn't present but we're

looking at now, your opinion was that first you should take the

HeatWave Accel sales, apportion them down by 43 percent, and

then disgorge from that number, correct?

A.    No.   My opinion is not that the apportionment is necessary.

My opinion is that assuming the article of manufacture is the

HeatWave fabric, which that's not my opinion to make, it's an

assumption, an alternate way to make the allocation is what is

reflected in this spreadsheet.   So those are not inconsistent

opinions because they contain different assumptions about the

article of manufacture.

Q.    An alternate, different number that you provided in the

Monday opinion, which we hadn't seen until now, is that you

should take 43.3 percent of total sales of the Accel glove and

1      then do profits from there, correct?

2      A.    You're mischaracterizing my opinion.  I don't agree with

3      that statement.

4      Q.    You said 43.3 percent, right?

10:57   5      A.    The "should" part, I am not opining on whether there should

6      be an allocation at all.

7      Q.    Got it.  Here in PDX194 you provide an allocation, correct?

8      A.    Yes.

9      Q.    43.3 percent, right?

10:57  10      A.    Yes.

11      Q.    And then you took the total sales of the HeatWave Accel and

12      you multiplied that by 43.3 percent, right?

13      A.    Yes.

14      Q.    And then you did a disgorgement from that point, correct?

10:57  15      A.    Yes.

16      Q.    Thank you.  And you did that for a number of different

17      gloves, didn't you?

18      A.    All of the products listed, I created that ratio of Ventex

19      in the numerator, all specified fabrics in the denominator.

10:57  20      Q.    And you did that for all the gloves, and then you came up

21      with a final number, right?

22      A.    Yes.

23      Q.    And if we go back to PDX196 from the Monday opinion, that

24      number was $1.974 million, right?

10:58  25      A.    Yes.

1   Q.   Now, you said in your testimony that -- I think you said

2   something like sales can't -- I have it written down here --

3   "sales can't be made until something's finished?"

4   A.   Until something's -- excuse me?  I didn't hear the last --

5   Q.   Sales cannot be made until something is finished, does that

6   sound right?

7   A.   I may have said that.  That was probably my discussion of

8   the sale has to be of a finished product.

9   Q.   You would agree with me that rolls of HeatWave fabric are

10   purchased by Seirus, correct?

11   A.   That's testimony I've heard here.

12   Q.   And you don't have any reason to disagree with it, do you?

13   A.   I don't.

14   Q.   So that testimony was given.  It said that Seirus buys

15   finished rolls of HeatWave fabric from Ventex, correct?

16   A.   I've heard that, yes.

17   Q.   Takes it into possession at a -- I think it was a warehouse

18   or a facility in Asia, right?

19   A.   Yes.

20   Q.   And then ships it off to a manufacturer to build it into a

21   glove, correct?

22   A.   That's what I've heard, yes.

23   Q.   Okay.  Thanks.

24   And you also heard testimony that other companies purchase

25   HeatWave fabric, right?

1   A.   I don't remember hearing that testimony.

2   Q.   Were you here for the testimony by Mr. Murphy about

3   Harley-Davidson?

4   A.   I was not here for that testimony only, the -- yesterday's

10:59   5   testimony.

6   Q.   So you're hearing it for the first time, then?

7   A.   Yes.

8   Q.   So it's true, then, in the Seirus scenario, what you do

9   know about that Seirus is buying the fabric from Ventex, right?

11:00   10   A.   Yes.

11   Q.   And it's a finished roll of fabric that's saleable, that

12   can be purchased by Seirus, correct?

13   A.   That's what I understand, yes.

14   Q.   And then that's assembled and made into a glove, and

11:00   15   ultimately the glove can be sold to a consumer, right?

16   A.   Correct.

17   Q.   All right.  I'd like to switch gears a little bit and talk

18   about some of the deductions that you made in your opinion.

19   What I'd like to do is look at PDX188 for the Monday opinion,

11:00   20   same one we're looking at.  You've seen this slide before,

21   right?

22   A.   Yes.

23   Q.   Has it changed from Monday to today?

24   A.   No.

11:00   25   Q.   So the opinion you offer on PDX188 on today's testimony is

1    the same as what you had on Monday, correct?

2    A.    Yes.

3    Q.    Okay.    And originally when you testified on Friday, in your

4    Friday opinion you said that the profit margin should be 46.9

11:01    5    percent, correct?

6    A.    I didn't say that.

7    Q.    Well, I'm looking at PDX188 at the top, and it says

8    "Ms. Morones' marginal HeatWave profit 46.9 percent," correct?

9    A.    That's what that says, but I was very clear about the

11:01    10    process of the burden of proof being on the defendant to

11    support the costs in addition to the -- to that and that I

12    would come back and offer a final opinion.

13    Q.    Right, but I just want to know on Friday when you

14    testified, the number that you provided for the HeatWave profit

11:01    15    margin that you were using to compute your profit --

16    disgorgement of profits, the number, you used 46.9 percent,

17    right?

18    A.    Yes.

19    Q.    But today you used a different number, correct?

11:02    20    A.    Yes.

21    Q.    Today you used 41.6 percent, right?

22    A.    Yes.

23    Q.    And you agree in part with some of the -- some of the costs

24    that Ms. Distler subtracted to arrive at her 34.8 number we see

11:02    25    at the bottom of PDX188, correct?

1    A.    Yes.

2    Q.    But on Friday you did not, right?

3    A.    No, that's not what I testified to.  I didn't say that I

4    disagreed with all of her costs.  I said I disagree with some

11:02    5    and agree with others.

6    Q.    But you would agree with me that on Friday you offered a

7    number of 46.9 percent, right?

8    A.    Yes.

9    Q.    And since then -- when you testified today, you've decided

11:02    10    to agree with some of the cost deductions that Ms. Distler

11    made, right?

12    A.    I presented which ones I agree with and which ones I

13    disagreed with.

14    Q.    Okay.  So some you agree with that she made, and some you

11:02    15    disagree with, right?

16    A.    Yes.

17            MR. MARCHESE:  So let's take a look at PDX191.

18    BY MR. MARCHESE:

19    Q.    And again we're looking at the Monday opinion.  Did slide

11:03    20    PDX191 change between Monday and today?

21    A.    No.

22    Q.    So in PDX191, you would agree with Ms. Distler that five

23    out of the six categories of salaries that she identified are

24    deductible?

11:03    25    A.    Four out of them I agree with.  The salaries art/design I

```
 1   just believed it was insignificant, so I didn't comment on it
 2   or dispute it.
 3   Q.    So you agreed with Ms. Distler about five of the six
 4   salaries, which I'll state for the record:  customer service,
 5   production purchase, warehouse management, fulfillment --
 6   excuse me.  Let me say it again.  Withdrawn.
 7         You agreed with Ms. Distler on customer service,
 8   production/purchase, fulfillment, assembly QC, and art/design,
 9   correct?
10   A.    Yes, but as I just said, the art design was small enough, I
11   just felt it was insignificant.
12   Q.    So insignificant, but you included it, right?
13   A.    Yes.
14   Q.    Thank you.  And you disagreed with her on salaries for
15   sales, right?
16   A.    Yes.
17   Q.    But you also added allocated taxes for payroll, right?
18   A.    Right.
19   Q.    So that allocated taxes for payroll, that cuts across the
20   whole company.  Is that right?
21   A.    I'm not sure what you mean.  My calculation applies it to
22   only the selected line items.
23   Q.    Got it.  But you didn't -- you didn't subtract out salaries
24   for sales when you applied it to all the line items, right?
25   A.    To calculate the ratio, the ratio was calculated as taxes
```

11:03 (line 5)
11:04 (line 10)
11:04 (line 15)
11:04 (line 20)
11:04 (line 25)

1    divided by the compensation and then applied to the selected

2    line items.

3    Q.   So you -- but I see the -- at the bottom --

4         MR. MARCHESE:   Can you blow up --

11:05  5    BY MR. MARCHESE:

6    Q.   The bottom of PDX191 shows -- it says "X total of selected

7    line items," right?

8    A.   Yes.

9    Q.   When we look up above on the ones that you agreed with and

11:05  10   disagreed with for Ms. Distler, you disagreed on sales, right?

11   A.   Yes.

12   Q.   So you subtracted out the sales, and so that X would have

13   excluded sales, right?

14   A.   Yes.

11:05  15   Q.   Thank you.   And then you took the allocated taxes, payroll

16   based on the ones you've selected?

17   A.   Yes.

18   Q.   Okay.   So you -- sales salaries relate to the sale of

19   product, correct?

11:05  20   A.   Well, the job of a salesperson is to sell the company's

21   product, yes.

22   Q.   And one of those products that they sell is a HeatWave

23   glove, right?

24   A.   Yes.

11:05  25   Q.   And so these people that are working to sell gloves --

1    withdrawn.

2        You said that you subtracted commissions, right?

3    A.    Yes.

4    Q.    And those commissions go to salespeople, right?

11:06  5    A.    I would assume so.  Typically that's where they go.

6    Q.    And so the salespeople are paid on commissions plus salary,

7    right?

8    A.    Typically that's true.  Some companies are 100 percent,

9    but --

11:06  10   Q.    I see sales salary right here.  Would you agree with me

11   that Seirus does that?

12   A.    Yes, but Ms. Carey testified that these were sales

13   managers.

14   Q.    A sales manager is responsible for the sale of a product,

11:06  15   right?

16   A.    Yes.

17   Q.    And the sales managers have salespeople that work under

18   them, correct?

19   A.    Usually, yes.

11:06  20   Q.    And sales managers and salespeople who work under them get

21   commissions at Seirus, correct?

22   A.    They typically do.  I have not heard testimony that the

23   managers get a commission in addition to the salespeople.

24   Q.    But regardless of that, you have deducted the salaries for

11:06  25   those managers even though they are overseeing and responsible

1    for sales of product, right?

2    A.   Yes.

3    Q.   Including HeatWave products, right?

4    A.   Yes.

11:07    5         MR. MARCHESE:   So can we go to PDX190.

6    BY MR. MARCHESE:

7    Q.   And you have -- here you've got sales salaries and wages

8    adjusted, right?

9    A.   Yes.

11:07    10   Q.   And that adjustment accounts for you taking the sales

11   manager -- the salaries for sales out, right?

12   A.   And adding payroll taxes back in.

13   Q.   And adding payroll taxes in, and you get 5.82 percent

14   reduction, right?

11:07    15   A.   Yes, in the final year, yes.

16        MR. MARCHESE:   Okay.  If we go back to 191.

17   BY MR. MARCHESE:

18   Q.   In 191, then, if I add all that up, I should end up with

19   the ones that you X'd and the allocated taxes for payroll -- I

11:07    20   should get 5.82, right?

21   A.   Yes.

22        MR. MARCHESE:   And then I go over to page 190, slide

23   190 -- PDX190.

24   BY MR. MARCHESE:

11:08    25   Q.   And the 5.82 appears there, right?

|       |    |                                                           |
|-------|----|-----------------------------------------------------------|
|       | 1  | A.    Yes.                                                 |
|       | 2  | Q.    And what you don't take out, though, is a number of items |
|       | 3  | listed here, bad debt, advertising, business promotion,   |
|       | 4  | et cetera, right?                                         |
| 11:08 | 5  | A.    What do you mean by what I don't take out?          |
|       | 6  | Q.    You zeroed them out, right?                         |
|       | 7  | A.    Yes.    Sometimes your questions are unclear about whether I |
|       | 8  | took out what Ms. Distler did or whether I subtracted it, so -- |
|       | 9  | Q.    Understood.                                         |
| 11:08 | 10 | A.    -- trying to be clear.                              |
|       | 11 | Q.    I'll be clear.    The items bad debt, advertising, business |
|       | 12 | promotion, sales analytics, meeting sales, travel,       |
|       | 13 | entertainment and sales and interest are all items that  |
|       | 14 | Ms. Distler deducted, correct?                            |
| 11:08 | 15 | A.    Correct.                                            |
|       | 16 | Q.    And they're all items that you disagree with?      |
|       | 17 | A.    Yes.                                                |
|       | 18 | Q.    They should not be deducted in your opinion, right? |
|       | 19 | A.    Yes.                                                |
| 11:08 | 20 | Q.    Okay.    Let's talk about sales analytics.    You know what |
|       | 21 | that is, right?                                           |
|       | 22 | A.    Generally, yes.                                     |
|       | 23 | Q.    Okay.    Sales analytics have to do with -- it's a group that |
|       | 24 | tracks sales of products at retail stores, right?        |
| 11:09 | 25 | A.    It can be different things.    It's typically an outside |

1  consultant or a firm that will run analytics on the sale of

2  different products, and it's kind of like market research.

3  Q.    Market research, and they're looking into figure out

4  whether inventory is high or low, right?

11:09    5  A.    Different companies do different things, so Ms. Carey has

6  provided just a little bit of description of what this is.

7  Q.    It's common for sales analytic companies to help track

8  marketing and sales of products, right?

9  A.    Yes.

11:09   10  Q.    And those companies then would help track whether inventory

11  of different products went up or down so you could know how

12  well your sales were going, right?

13  A.    It depends, I mean, on what the company's being asked to

14  do, but I don't know that inventory tracking is a -- is an

11:09   15  automatic, you know, part of sales analytics, and she didn't

16  provide that visibility on what's being -- other than it's just

17  general tracking and analysis of sales.

18  Q.    Tracking and analysis of sales which can be used to figure

19  out what your inventory is like, right?

11:10   20  A.    It could be.

21  Q.    It could be used to figure out whether you're running out

22  of HeatWave gloves at a particular retail outlet or not, right?

23  A.    It could be, but in my opinion, it's no different than any

24  other information system in the company, and these are not --

11:10   25  those are the kind of indirect cost that we don't deduct.

1  Q.   You don't deduct them, but you would agree with me that a

2  sales analytics firm will track sales data, right?

3  A.   Yes.

4  Q.   And that can be used to figure out where your levels are in

11:10  5  particular retail stores, and you can send more or try to get

6  some back.  You can track that right and use that?

7  A.   I don't know that we know that to that degree of

8  specificity what you just asked me.  I have not heard that in

9  any testimony or any deposition that that's what's going on.

11:10  10  Q.   And it's true, though, with sales analytics that data is in

11  part tracking what sales figures are like for a company, right?

12  A.   Yes.

13  Q.   And some of the sales that Seirus makes are HeatWave,

14  right?

11:11  15  A.   Yes.

16  Q.   Business promotions, you know what that is, right?

17  A.   Generally, yes.

18  Q.   Things like, you know, catalogs, hangtags, marketing, you

19  go to a trade show, you market your product, things like that,

11:11  20  right?

21  A.   Yes.

22  Q.   Okay.  And one of the things that Seirus sells are HeatWave

23  gloves, right?

24  A.   Yes.

11:11  25  Q.   And those are in the catalogs, right?

```
      1   A.   Yes.

      2   Q.   And they're shown at the trade shows, right?

      3   A.   Yes.

      4   Q.   But you chose not to deduct that, correct?

11:11 5   A.   No, because there's no evidence to what degree any of that

      6   is -- would be additionally incurred because HeatWave --

      7   because of the HeatWave sales.  If there's no evidence that it

      8   would be any different regardless of whether it's HeatWave or

      9   something else, then I wouldn't deduct it.

11:11 10  Q.   But I can see here business promotion, it's all zeros.

     11   A.   Yes.

     12   Q.   You did not deduct it, correct?

     13   A.   That's correct.

     14   Q.   Okay.   Meetings sales, do you see that one?

11:12 15  A.   Yes.

     16   Q.   Okay.   And what you do -- you've heard testimony about how

     17   Seirus has steering committee meetings and they have sales reps

     18   and all these kinds of things, right?

     19   A.   Yes.

11:12 20  Q.   Okay.   And in order to train people on new products, you

     21   need to teach them about the new product lines.   Would you

     22   agree?

     23   A.   I would assume so.   That sounds reasonable.

     24   Q.   And sales representatives need to know about the new

11:12 25  products that are coming out, right?
```

1    A.    I'm sure they did, yes.

2    Q.    And they need to know about existing products, right?

3    A.    Yes.

4    Q.    Okay.  And so the products that Seirus makes include

11:12    5    HeatWave gloves, right?

6    A.    Yes.

7    Q.    But you -- again for meetings and so on, you chose not to

8    deduct that, correct?

9    A.    That's correct.  I think that those two categories,

11:12    10    meetings and travel and entertainment, is the same, that those

11    to me are more general expenses of the company that would

12    likely be the same with or without HeatWave in -- added into

13    the sales of the company.

14    Q.    But you would agree with me that the meeting sales, travel

11:13    15    entertainment expenses do involve HeatWave, right?

16    A.    They likely do.  HeatWave is a small portion of the

17    company's sales, but there's probably some mention of them.

18    Q.    But Ms. Distler and you, when you're looking at these

19    numbers, these deductions here, these are not -- we're not

11:13    20    taking out every single travel and entertainment sales expense

21    for the whole company, right?

22    A.    In calculating the ratio, you're looking at the total

23    travel and entertainment for the whole company.

24    Q.    And when you're subtracting it out here -- when Ms. Distler

11:13    25    is doing it, she's doing it in proportion to the amount of

1    HeatWave sales that are being made.  She's not saying every

2    single travel and entertainment expense the company has

3    incurred comes out?

4    A.   Neither expert has done that or represented that that's

11:13    5    what we're doing.

6    Q.   Okay.  Thank you.

7         Bad debt collections and dispute, you know what that is,

8    right?

9    A.   Yes.

11:13    10   Q.   And I think Ms. Carey talked about it wasn't Seirus' bad

11   debt.  It would be, for example, like a customer, they may go

12   out of business and they can't pay for the gloves they got,

13   right?

14   A.   Yes.

11:14    15   Q.   And so this is an expense that occurs when you have product

16   that you're out -- you put them out to a shop.  The shop tells

17   you either "I can't pay" or "I'm bankrupt" or something of that

18   nature.  Is that fair?

19   A.   Yes.  It's the amount that a customer owes you that they

11:14    20   end up not paying.

21   Q.   And customers will owe you, if you're a company like

22   Seirus, for gloves, right?

23   A.   For the products that you sell, yes.

24   Q.   And those include gloves, right?

11:14    25   A.   Yes.

1    Q.   And socks.

2    A.   Yes.

3    Q.   And hats.

4    A.   Yes.

11:14    5    Q.   HeatWave, too, right?

6    A.   Yes.

7    Q.   And so you would agree --

8    A.   But there's -- but there's no information that says that

9    any of that bad debt related to HeatWave.

11:14    10    Q.   So you took it out entirely, right?

11    A.   Yes.   And also it's not -- as I said, it's not directly

12    correlated to HeatWave sales.   It happens -- bad debt happens

13    on occasion when a customer struggles and ends up not paying,

14    but there's no direct association or information that would tie

11:15    15    it to specifically HeatWave.   It's like any general cost of

16    doing business.

17    Q.   But let's say I have three products that I sell to, you

18    know, the Alpine shop, okay, and those three products are

19    HeatWave, and they're All Weather without HeatWave, and they

11:15    20    are the Thermalux, okay?   We've seen all of those, right?

21    A.   I don't know about the others, but continue with your --

22    Q.   I sell all of them to the Alpine shop, okay?

23    A.   Okay.

24    Q.   And the Alpine shop gets, you know, $10,000 worth of each

11:15    25    one.   Are you with me?

1   A.   Yes.

2   Q.   The Alpine shop goes out of business and does not pay

3   Seirus for those gloves.

4   A.   Okay.

11:15   5   Q.   Isn't it fair to take off as a cost of doing business a

6   fraction of bad debt for your products to smooth it across all

7   your product line to figure out what the cost is of selling

8   that product because bad debt is a cost of doing business,

9   right?

11:16   10   A.   Well, under that logic, it would be fair to take out

11   everything, but we don't take out everything.  We're looking

12   for what is directly associated with the sale of the product on

13   an incremental basis, so some -- bad debt may happen in one

14   year, not the next year, so it can't be tied directly to a

11:16   15   HeatWave product.

16   Q.   But you told me the bad debt related to customers -- you

17   heard this in testimony, customers who can't pay their bills

18   for product that they received, right?

19   A.   Yes.

11:16   20   Q.   Interest, that's another item that you decided not to

21   deduct, correct?

22   A.   Correct.

23   Q.   And we heard testimony from Ms. Carey on that, right?

24   A.   Yes.

11:16   25   Q.   And she said that the interest was used at least in part

1    for working capital, right?

2    A.   Yes.

3    Q.   And she said also that a use of working capital is to build

4    inventory, right?

11:16    5    A.   Yes.

6    Q.   And inventory is gloves, correct, for Seirus?

7    A.   Yes.

8    Q.   And socks?

9    A.   Yes.

11:17    10    Q.   And hats?

11    A.   Yes.

12    Q.   And some of those are HeatWave, right?

13    A.   Yes.

14    Q.   I was checking to see if there's anything else I want to

11:17    15    ask you.   Oh, there was one more thing.

16             MR. MARCHESE:   Can you pull up Exhibit 1?

17    BY MR. MARCHESE:

18    Q.   This is the design patent at issue in the case, right?

19    A.   Yes.

11:17    20    Q.   And the design patent is the '093 patent, right?

21    A.   Yes.

22    Q.   And you studied this patent as part of your work, correct?

23    A.   Yes.

24    Q.   And you looked at the claim, correct?

11:17    25    A.   I've read the patent, yes, briefly.

|  |  |
|---|---|
| 1 | MR. AXELROD:  Objection.  This is going outside the |
| 2 | scope. |
| 3 | MR. MARCHESE:  This goes to the question of the fabric |
| 4 | that she was looking at to figure out what the claim covers. |
| 5 | THE COURT:  Get to that, please. |
| 6 | MR. MARCHESE:  Yes. |
| 7 | If you could blow up the claim. |
| 8 | BY MR. MARCHESE: |
| 9 | Q.   Would you agree with me that the claim is an ornamental |
| 10 | design of a heat-reflective material? |
| 11 | THE COURT:  Your objection is overruled. |
| 12 | Go ahead.  You can answer the question. |
| 13 | THE WITNESS:  Thank you.  Yes, that's what the claim |
| 14 | says. |
| 15 | BY MR. MARCHESE: |
| 16 | Q.   And the ornamental design of the heat-reflective material |
| 17 | in this particular case is the HeatWave wave on the inner liner |
| 18 | fabric of the Accel glove, for example, right? |
| 19 | A.   Yes, that's what I understand. |
| 20 | Q.   Okay.  So that's what's claimed, right? |
| 21 | A.   Yes. |
| 22 | MR. MARCHESE:  Okay.  If you could go to the bottom of |
| 23 | that column, please.  And blow up the very part above. |
| 24 | BY MR. MARCHESE: |
| 25 | Q.   It says "1 claim."  Do you remember reading that |

11:18 (lines 5, 10, 15, 20, 25)

1    Ms. Morones?

2    A.    I do not.

3    Q.    This language is in the '093 patent, right?

4    A.    Yes.

11:19    5    Q.    And it says, "The broken lines in the drawings depict

6    environmental subject matter only and form no part of the

7    claimed design."  Right?

8    A.    That's what it says, yes.

9    Q.    Okay.  And do you see figures -- figure 7 and figure 8?

11:19    10    A.    Yes.

11    Q.    And do you see the dashed lines there?

12    A.    Yes.

13    Q.    And so that means those -- the dashed part is not part of

14    the claim design, correct?

11:19    15    A.    I don't know.  I'm not an expert on interpreting patent

16    claims.

17    Q.    Sorry.  You would agree with me that the words said -- that

18    we looked at before -- that the dashed lines form no part of

19    the claim design, correct?

11:20    20    A.    You'll have to show me the previous.  It said something

21    along those lines, but --

22    Q.    We'll go back up.  "The broken lines in the drawings depict

23    environmental subject matter only and form no part of the

24    claimed design."  Correct?

11:20    25    A.    That's what it says.

|     |     |
| --- | --- |
| 1 | MR. MARCHESE:  Thank you.  Nothing further. |
| 2 | THE COURT:  Redirect? |
| 3 | REDIRECT EXAMINATION |
| 4 | BY MR. AXELROD: |
11:20 | 5 | Q.  Ms. Morones, do you have -- is Exhibit 1 in front of you? |
| 6 | A.  Yes. |
| 7 | MR. AXELROD:  Can we go to the drawings that depict |
| 8 | the use of the design. |
| 9 | BY MR. AXELROD: |
11:21 | 10 | Q.  Does figure 5, 6, 7, and 8 show how the design is used in |
| 11 | actual articles? |
| 12 | A.  It appears so, yes. |
| 13 | Q.  And do you see any of those that are articles that Seirus |
| 14 | uses the design with? |
11:21 | 15 | A.  I see what looks like a glove. |
| 16 | Q.  Thank you.  Ms. Morones, you were asked a number of |
| 17 | questions about the opinion that you'd -- it will take me a |
| 18 | little bit to get it -- that you chose not to present to the |
| 19 | jury.  Was this the conclusion that you came from from this -- |
11:22 | 20 | I'll refer to it as "the interim analysis"? |
| 21 | A.  Yes. |
| 22 | Q.  What were you seeking to do with that interim analysis in |
| 23 | comparison with Ms. Distler's use of a cost-based allocation? |
| 24 | A.  I was looking for a method to correct what I believed were |
11:22 | 25 | the irrational parts of her numerator and denominator using the |

1    bill of material data, which is the only data we have to use

2    for any kind of cost analysis.  So I was proposing a -- a

3    different ratio that would properly account for the value of

4    labor and the other materials that are incidental.  They're

11:23  5    included in that manufacturing line.  We can talk about that in

6    more detail about how my ratio accomplished -- by what I felt

7    was a more rational approach to what Ms. Distler was trying to

8    do.

9        It's not my opinion that it should be done.  That's an

11:23  10   assumption for the jury to actually make, but I was trying to

11   correct her cost allocation to something that I believed was

12   more logical and rational.

13   Q.   And in the course of that, were you eliminating certain

14   costs such as import duties or hang cards and the like to which

11:23  15   Ms. Distler was attributing profit from the sale of the

16   finished goods?

17   A.   Yes.   The result of my formula, which is Ventex in the

18   numerator and other specified fabrics in the denominator, what

19   that does is it takes those costs of labor, hangtags, duty, and

11:23  20   tax out of the equation and calculates a cost ratio only based

21   on what the specified fabrics were in the bill of materials,

22   Ventex divided by the total of specified fabrics.

23       So the result is I'm not allocating profit to the

24   hangtags, I'm not allocating profit to -- well, back up a

11:24  25   little bit.  The result of my ratio is to take all of the

1    remaining cost and spread them equally to the specified fabric

2    components, so it's only the specified fabric components that

3    are driving the allocation.

4    Q.    And as part of that analysis, did you go back and look and

11:24    5    see how it applied to certain specific products?

6    A.    Yes.    What I liked about the analysis is that to me, the

7    rate -- the resulting ratios were more rational.    There are

8    some exceptions that I saw, and the exceptions were based on

9    the limitations in the data.    So some of the ones that

11:25    10    Mr. Marchese pointed out to me were a result of the fact that I

11    didn't have data for -- I think the jury had those other

12    gloves -- data for that, those specified components or fabrics.

13         But for the most part I felt like the resulting ratios

14    were more rational because the products that had 100 percent

11:25    15    HeatWave received 100 percent allocation because HeatWave was

16    the numerator and the denominator.    The HeatTouch Torche, my

17    resulting ratio was around 2 percent, and so that method

18    correctly identified that there were these other really

19    expensive specified components.

11:25    20    Q.    Did you also find that it had still irrational application?

21    A.    Yes.    I was frustrated with it.    I -- I wanted to present

22    an alternative that you could -- the jury could consider, but I

23    was also frustrated because the data is extremely limited, and

24    I don't like that.    The data has inconsistencies in it.    Well,

11:26    25    there's two issues, two main issues.    One is that the

1   manufacturing line on that bill of materials -- I don't know if

2   you want to look at one, but there's one line that says

3   "manufacturing."  And Ms. Distler testified that that line was

4   labor or primarily labor.  But I believe it includes materials,

11:26   5   too, because the shells of these gloves are not separately

6   specified.  So I had a lump -- one line manufacturing that was

7   a lump of -- I don't know what's in it.

8        And then in some of the other products, there were

9   times when the waterproof liner was specified and had a dollar

11:27   10   amount, and other times when the waterproof liner said

11   "included."  So I was frustrated with the data.

12        But I was more frustrated with Ms. Distler's

13   methodology of looking at the upstream bolt of fabric divided

14   by -- the entire glove and all the labor that went in to make

11:27   15   it a glove.  So I was offering what I felt was the most

16   reasonable alternative given the data I have to work with, and

17   then ultimately decided that I didn't -- it might be more

18   confusing to offer that with all the limitations in the data

19   which is why I didn't present it.

11:27   20   Q.   Did you come to an opinion as to whether a cost-based

21   analysis really has any application to the real issue in the

22   case which is how do you appropriately attribute or allocate

23   profits from the sale of a finished good to some part of that

24   product?

11:28   25   A.   Well, yes, after working with it and trying to come up with

1    something that I felt was more rational, I mean it was obvious

2    to me that the cost-base analysis doesn't give any value --

3    doesn't answer the question of how valuable is the HeatWave

4    feature to the -- to the consumer and to generating the

11:28    5    revenue.  It was purely just what does HeatWave cost compared

6    to some other costs, and that's the limitation of that

7    approach.  And so that was another reason why I -- I don't know

8    that what I was -- may have presented would have been any more

9    helpful because it still doesn't answer the question of what's

11:28    10    the value of this feature, what's the desirability of this

11    feature in terms of allocating the revenue from this glove to

12    be this feature.

13    Q.    Thank you.

14          THE COURT:  Do any of the jurors have any questions

11:29    15    for this witness?  If so please raise your hand.

16          You may step down.  Would you like this witness to be

17    excused?

18          MR. AXELROD:  Yes.

19          THE COURT:  Any objection?

11:29    20          MR. MARCHESE:  No objection.

21          THE COURT:  You are excused.  You can go about your

22    business.

23          Call your next witness.

24          MR. AXELROD:  We rest.

11:29    25          THE COURT:  Members of the jury, I need you to step

1    into your room just to make sure there isn't any other tidbits

2    that we need to pick up before I let you go for the day.

3        (Proceedings held outside the presence of the jury panel.)

4        THE COURT:  Please be seated.

11:30    5    I just want to make sure that you've double-checked all the

6    exhibits that have been offered including those that have been

7    offered haven't been received and ruled on before I let the

8    jury go and tell them that everything's in.

9        MR. ALDRICH:  I'm being told that there are a few

11:30    10   questions about exhibits.

11       THE COURT:  So let's get that squared away.  What --

12   do you have specific numbers?

13       MR. ALDRICH:  We still have to take photographs of the

14   jacket, for example.

11:30    15       THE COURT:  Okay.  We can get that part taken care of.

16       MR. ALDRICH:  There was the letter from counsel on

17   December 4, 2013, advising -- attaching the complaint in the

18   lawsuit and advising of the existence of the '270 patent.  We

19   can submit a redacted version of that.

11:31    20       THE COURT:  Oh, because there were things in there

21   that were not relevant to the case.

22       MR. ALDRICH:  That's correct.

23       THE COURT:  So you haven't gotten that exhibit

24   completed?

11:31    25       MR. ALDRICH:  That's correct.

1         MR. MARCHESE:  You mean in terms of the '119 patent?

2    Is that what you're saying?

3         MR. ALDRICH:  I have to look at it to see if there's

4    anything else, but we can work with counsel.

11:31   5         MR. MARCHESE:  I think there's a lot of exhibits that

6    have the '119 patent and the license, so on and so forth.

7         MR. AXELROD:  Why not just do a stipulation that

8    notice was given?

9         MR. MARCHESE:  I wouldn't be willing to do that.

11:31  10         THE COURT:  That's fine.  Just look at the exhibit

11    during the break, and then let's -- I just want to make sure

12    that we have everything that needs to go back to the jury in.

13    Is that it from your side?

14         MR. ALDRICH:  There was -- there were a bunch of

11:32  15    defendant's demonstrative exhibits where there was -- it was

16    offered and received, but we just wanted to clarify the

17    demonstrative exhibits such as the slides that were presented

18    by the experts are not being sent to the jury room but are

19    instead purely for demonstrative purposes.

11:32  20         THE COURT:  Correct.  Demonstrative exhibits don't go

21    back to the jury.

22         MR. ALDRICH:  Okay.

23         MR. MARCHESE:  There were several that were offered

24    and received, though, so that would be the --

11:32  25         THE COURT:  That were separate from the -- that became

1    part of the record?

2              MR. MARCHESE:  Correct.

3              THE COURT:  Okay.  So let's clarify which ones those

4    are.  We'll take that up in a minute.

11:32    5          MR. ALDRICH:  I didn't understand the demonstrative

6    exhibits were being offered and received for purposes of

7    sending into the jury room.  I thought they were being received

8    for purposes of publishing to the jury during the presentation.

9              THE COURT:  I think generally you are correct.

11:32   10          MR. ALDRICH:  Okay.

11              THE COURT:  I think there was a couple that they

12    identified as wanting to go back to the jury.

13              MR. ALDRICH:  Okay.  Well, I'd be happy to take that

14    up.  I think that's all we have on our side, Your Honor.

11:33   15          THE COURT:  Okay.  Can you identify for me -- and if

16    you can't at this moment -- that's okay; we'll get to it

17    eventually -- what demonstrative exhibits you are expecting to

18    go back to the jury?  They're going to work on photographs of

19    the Canadian ski team jacket as we have described.  You're

11:33   20    going to work together regarding a letter that contained

21    information that is not relevant to these proceedings.  Any

22    further because of references to '119?  There may be other

23    things that are not part of this case.  And then I think those

24    were all the things on plaintiff's list as regards exhibits.

11:33   25          MR. MARCHESE:  I have the demonstrative exhibit

1    numbers here that I can read into the record.

2              THE COURT:  Okay.

3              MR. MARCHESE:  DDX203 through 206, so it would be 203,

4    204, 205, 206.  And then DDX210, DDX211, and DDX119.

5              MR. ALDRICH:  Yes, we would object to all of those.

6    Those are -- one of them was actually withdrawn, and the rest

7    of them are purely demonstrative, and some of them contain

8    information that was never produced during discovery, so we

9    didn't object to them being shown to the jury for purposes of

10   opening statement, but they are not evidence.

11             MR. MARCHESE:  Your Honor, there's -- if there was one

12   that was withdrawn, that's obviously not a problem, but the

13   other ones, we offered them into evidence and there was no

14   objection at the time, so we believe they are evidence now.

15             THE COURT:  Let me check with Bernadette.

16             Do you have them separately as exhibits?

17             THE CLERK:  I have them as exhibits received to go

18   into the jury room.

19             THE COURT:  We received them as exhibits to go into

20   the jury room.

21             MR. MARCHESE:  And then there is the Exhibit 499 which

22   was the letter we talked about at the last break which was the

23   one that began in November, and then we had decided to cut it

24   off on December 5th.

25             THE COURT:  Yes.

1          MR. MARCHESE:  So we would need to, I would imagine,

2    put a redacted version of that one in front of the jury.

3          THE COURT:  Okay.

4          MR. MARCHESE:  And we would request an instruction to

11:35    5    the jury about -- that they shouldn't read anything into the

6    redaction.  I don't want them to think that Seirus is hiding

7    something from them in the upper part of the email.

8          THE COURT:  Is there a way just to make it so that

9    part gets cut off so they can't even realize that there's a

11:35    10    redaction?

11          MR. MARCHESE:  Can we work with you on that?

12          MR. ALDRICH:  We're happy to work with you on that.

13          MR. MARCHESE:  Great.  We'll do that then, Your Honor.

14      And that is all I have.

11:35    15          THE COURT:  Okay.

16          MR. ALDRICH:  So I just have to go back to the opening

17    slides for a minute if we could, if it's possible to put them

18    on the screen.

19          THE COURT:  These were slides that were during opening

11:36    20    or --

21          MR. ALDRICH:  Yes.

22          THE COURT:  Were they also brought in during the

23    course of the trial?

24          MR. MARCHESE:  They were brought in through a witness,

11:36    25    Mr. Carey.

1    MR. ALDRICH:  First of all, 210, we objected to that

2    one, and I believe the -- I believe the Court sustained our

3    objection that he could not testify to this information at all.

4    And then if we go back to the other slides that they're asking

11:36    5    to go to the jury room, I -- again, we were not objecting to

6    them being shown, but we did not understand that these were

7    being offered as evidence.

8            THE COURT:  That's 203 through 206?

9            MR. ALDRICH:  We'll go back to 203.  This is 203.

11:36    10    This is 204.  205.  206.  210.

11           THE COURT:  That's the same as --

12           MR. ALDRICH:  211.  And then 119.  This is an

13    unauthenticated set of photographs that, again, we didn't

14    object to them putting this in their opening slides, but

11:37    15    they're unauthenticated photographs, and there's no basis to

16    allow a jury to have this back there.  They have the products.

17           MR. MARCHESE:  Your Honor, we offered them, and they

18    were not objected to.  The record is very clear on that.

19           THE COURT:  On the -- I thought I actually sustained

11:37    20    an objection on one of them, but Bernadette looks like she's

21    said that those were all received.

22           MR. MARCHESE:  I think it was 210 is what I'm being

23    told that was objected to and not received.

24           THE COURT:  That was my -- you know, at least on one

11:38    25    of them, when I look back, I think I sustained the objection.

 1          MR. MARCHESE:  I think you're right.  I agree.

 2          THE COURT:  210?

 3          MR. MARCHESE:  210.

 4          THE COURT:  Can I see it, please?

11:38    5          MR. MARCHESE:  Can you show 210?

 6          THE COURT:  That's the one I recall.

 7          MR. MARCHESE:  We would withdraw that one.  I recall

 8   it being objected to, too, but if it was not, we would withdraw

 9   that.

11:38   10          THE COURT:  I think there was an objection, and I

11   believe I sustained the objection.  If the others were offered

12   and received, they are offered and received.

13          MR. ALDRICH:  I believe we actually asked at the time

14   are these being received for purposes of just showing to the

11:38   15   jury, and the Court clarified to us at the time that that was

16   the purpose of it, and that's what they were being received

17   for, so that was our understanding.

18          THE COURT:  Bernadette, do you have a different record

19   of that?  For these set of exhibits?  You just show --

11:39   20          THE CLERK:  They were offered and received.

21          THE COURT:  You can -- we have a court reporter here.

22   Maybe we can go back to the transcript, and you can find that

23   for me.

24          MR. ALDRICH:  Yeah, I mean if --

11:39   25          THE COURT:  If that's what I said, then that's what

1    I'll do, but sitting here right at this moment, a lot has

2    happened over the last few days.

3            MR. ALDRICH:  Could we also offer additional slides

4    that were shown before the jury to be received, then, if this

11:39    5    is the understanding that there is about what it means when you

6    offer a demonstrative exhibit?

7            THE COURT:  No.  Again, what I understood is that they

8    weren't offering all of their demonstrative exhibits for

9    purposes of being received, but that there was a set that they

11:39   10    were.  But go back and look at the transcript, and, again, I

11    can't recall specifically.

12            MR. ALDRICH:  I mean I'm also looking at one, Exhibit

13    202 is a photograph of Mr. Carey in a referee uniform.

14            MR. MARCHESE:  We did not offer that one, Your Honor.

11:39   15            PLAINTIFF'S VIDEO TECH:  It's shown as received.

16            THE COURT:  Is 220 on our list, Bernadette?

17            THE CLERK:  DDX202 is showing this.

18            THE COURT:  Is it shown as being offered and received

19    on our list?

11:40   20            THE CLERK:  It doesn't show his picture.

21            THE COURT:  It's a different exhibit.  Actually, that

22    I think was 203 on the --

23            MR. MARCHESE:  I think that's 203.

24            THE CLERK:  If they changed the numbers, I wouldn't

11:40   25    know.

1     THE COURT:   That's a whole different problem.

2     MR. ALDRICH:   We weren't given --

3     MR. MARCHESE:   The problem is they're showing a

4  version.   I don't know what version they're showing.   We can

11:40  5  get the one that went up in front of the jury because we have

6  our version we showed.

7     MR. ALDRICH:   This is what you gave us.   I mean --

8     MR. SPROUL:   We gave you multiple copies.

9     THE COURT:   What's 203?

11:41  10     MR. MARCHESE:   So it is the -- is that 202 or 203?

11     THE COURT:   So the numbers are messed up.

12     MR. MARCHESE:   I think the numbers are correct in

13  Bernadette's binder.   I think that's what we show.

14     THE COURT:   Okay.

11:41  15     THE CLERK:   I wouldn't know the images.

16     THE COURT:   Okay.   So getting back to a way earlier

17  point, the photograph of the NFL officiating is not in.

18     MR. ALDRICH:   Okay.   Thank you.

19     THE COURT:   203, that would have been -- I don't know

11:41  20  what number that one was, but 203 to 206 are what Bernadette

21  shows in 211 and 119.   Those are the only ones that are in as

22  far as Bernadette's record.

23     MR. ALDRICH:   Okay.

24     THE COURT:   You can go back and look at the transcript

11:42  25  and see what I said, and if I made it clear that these are just

1    being received for purposes of demonstrative exhibits, then I

2    will stand by what I said earlier.

3              MR. ALDRICH:  Okay.  Thank you.  We'll have a look.

4              THE COURT:  All right.

11:42   5              MR. MARCHESE:  There's one other housekeeping issue,

6    Your Honor, which was at the end of the case here, we had

7    Ms. Morones subtract out some products as no longer being

8    accused by Columbia, and Ms. Distler's numbers include those.

9    Is there a way we can get a correction of her numbers for the

11:42   10   jury?

11             THE COURT:  Why don't you see if you can work that

12   out.

13             MR. ALDRICH:  Sure.

14             THE COURT:  That's a math problem.  See if you can

11:42   15   work it out.  The jury really wants to go, I think, and we're

16   still holding them up, so I just wanted to make sure that all

17   the evidence has been received and they're free to go.

18             Everybody agrees?  They're nodding their heads yes.

19             Go ahead and bring the jury out.  They can grab their

11:43   20   things.

21        (Proceedings held in the presence of the jury.)

22             THE COURT:  Members of the jury, please be seated.

23             You have heard all the evidence that you're going to

24   hear in this case.  As I told you yesterday, I was going to

11:43   25   send you home after that happened, so I'm sending you home.

The lawyers and I will be working this afternoon to make sure that the instructions are ready for you tomorrow morning. Please get here at the same normal time tomorrow morning, maybe a little bit before 9:00. We'll try to get started right at 9:00.

My expectation is when you walk out and sit down tomorrow morning, there might be a brief instruction, but more likely you'll just hear the beginning of the closing arguments in this case. I hope to have those completed early or late in the morning and then have you instructed by early to mid-afternoon when you will begin your deliberations tomorrow.

Once I give you the case to deliberate, how you run your lives is entirely up to you. So if you decide, for example, that you want to work late tomorrow afternoon, you can work late on deliberating tomorrow afternoon. If you decide, rather, you'd rather work for a little while tomorrow afternoon and then go home and begin the next day, Thursday -- Friday and work Friday instead, that will be entirely up to you. You can work as little or as long as you want until -- you get to deliberate until you have completed your deliberations and rendered whatever verdicts you want to render.

We will provide meals for you once you begin your deliberations, so you won't have to worry about that portion of the -- what it is that you need to do. We'll take care of that part of it for you.

1          So with that, please -- again I'm going to remind you

2    of the cautionary instruction directing you not to talk about

3    the case with anyone, do any research on your own trying to

4    find out about things about this case or the people involved in

11:45  5    this case.

6          Have a pleasant afternoon.  I will see you tomorrow

7    morning.  Thank you.

8          (Proceedings held outside the presence of the jury panel.)

9          THE COURT:  Please be seated.

11:46  10    My plan this afternoon is let the jury get away from us,

11    then we'll take our afternoon or midday recess.  Let's be in

12    recess for about an hour, so we'll get back at a quarter till,

13    and then I want to start talking about jury instructions and

14    start hammering the jury instructions out.

11:46  15          MR. SPROUL:  We intend to move for JMOL at some point,

16    Your Honor.  We can do it after lunch, but just to be clear, we

17    don't want to miss out on the opportunity now if now's the time

18    to --

19          THE COURT:  Okay.  I'll give you that opportunity, and

11:46  20    now will be about that opportunity, but before I lose my train

21    of thought, the court reporter asked me whether or not we

22    wanted our conversations regarding jury instructions to be

23    reported.

24          My recommendation is that you all get to sit down

11:47  25    instead of stand up each time you speak to me and we treat it

1    as though it is a work session, and because of that, it becomes

2    a little bit informal, and we're just kind of talking back and

3    forth, and it becomes very difficult for the court reporter to

4    capture everything.  What I would recommend is that we excuse

11:47    5    her from trying to report all of that with the understanding

6    that whatever objections you have, I will give you an

7    opportunity before we do closing arguments to put all of your

8    objections on the record and make whatever comments you want to

9    make regarding the instructions.

11:47    10    But just for the sake of saving my court reporter, if

11    we can agree to that process, then that's what we'll do.  If

12    not I'll just make her suffer.

13    So beginning with plaintiff, are you okay with that

14    informal kind of work session?

11:48    15    MR. AXELROD:  Yes, Your Honor.

16    MR. MARCHESE:  Yes, Your Honor.

17    THE COURT:  Okay.  So let's get your JMOLs on the

18    record, and we'll get to our break.

19    MR. SPROUL:  We move for judgment as a matter of law

11:48    20    that the asserted claims of the '270 patent, claims 2 and 23,

21    are anticipated by Fottinger.  The evidence shows that

22    Fottinger disclosed every limitation of claims 2 and 23, in

23    particular the heat-directing elements, the 30 to 70 percent

24    coverage range, and the innermost surface limitations submitted

11:48    25    by Columbia.

1          In addition we move for judgment as a matter of law on

2    the issue of obviousness.  There was sufficient evidence of --

3    there was evidence to show that Fottinger plus any one of

4    Halley, Worley, Vaughn, and Blauer together with the

11:49  5    understanding of one of ordinary skill in the art would render

6    the claims 2 and 23 obvious.

7          In addition there was sufficient evidence of a

8    motivation to combine.  The experts agree that concern for the

9    effect of the fabric by coverage was widely understood, and

11:49  10   Dr. Cole testified that 30 to 70 percent range was well known

11   in the industry of patents.

12          In addition we move for judgment as a matter of law

13   that the secondary considerations should not be considered.

14   There's an insufficient nexus between the patented invention

11:49  15   and each of the specific elements of the secondary

16   considerations.  In addition to that, secondary considerations

17   are inappropriate where obviousness is clear.  They cannot

18   overcome a strong obviousness case as was presented here.

19          In addition we move for judgment as a matter of law

11:50  20   that there's no infringement.  For starters we rely on the

21   evidence opposing their JMOL on this issue.  There was

22   insufficient evidence to show that the gloves -- Seirus gloves

23   as opposed to the fabric have the coverage in the required

24   range of 30 to 70 percent.  There's insufficient evidence that

11:50  25   the Seirus fabric itself had the coverage in the claimed range.

1    And regarding bidirectional gloves, there's insufficient

2    evidence that such gloves have innermost surface with coverage

3    that satisfies the claimed range.

4         In addition we move for judgment as a matter of law on

11:50    5    the issue of damages.  We renew our motions that we made

6    earlier in the case, and we move for judgment as a matter of

7    law that the article of manufacture is the HeatWave fabric from

8    Ventex and not the products, and that there is no evidence to

9    support damages on the design patent because there was no

11:51    10    separate determination of the article of manufacture for each

11    product by Columbia.

12         And we renew our judgment -- our motions for judgment

13    as a matter of law on the issue of willfulness for both the

14    '270 patent and the design patent.

11:51    15         THE COURT:  Thank you.  All of those are going to be

16    denied.  I love it when both sides are moving for judgment as a

17    matter of law on precisely the same issues.

18         MR. ALDRICH:  It makes it easy.

19         THE COURT:  It kind of means that this really is for

11:51    20    the jury to figure out.  And for the reasons that I will deny

21    their motions, I'm going to deny your motions because I have to

22    look at the evidence in the light most favorable to the

23    nonmoving party.  You're just not going to get there for the

24    same reasons that they're arguing the opposite and vice versa.

11:51    25         MR. ALDRICH:  I think technically we are required to

1    renew our motions for judgment as a matter of law now that the

2    evidence has closed, so I'm simply renewing the motions we've

3    already filed.

4              MR. AXELROD:    And I'm moving to reconvene at 1:00 if

11:52    5    that works for Your Honor.

6              THE COURT:    Oh, sure.    You want an extra ten minutes?

7              MR. AXELROD:    Yeah.

8              THE COURT:    That's fine.

9              MR. AXELROD:    No objection?

11:52    10              MR. SPROUL:    No objection.    In case I missed something

11    that we'd already moved on, we renew all of the motions.

12              THE COURT:    I can't tell you how much fun this is.

13              Again, all the motions are going to be denied.    I'll

14    try to see if I can articulate some better language other than

11:52    15    just because of what they said and just because of what they

16    said.

17              Sure.    We can get to -- in fact, we have all

18    afternoon, so if you want -- if you want to take a break for a

19    couple hours because it will give you more time to think about

11:52    20    instructions, I'm good with that.    We can -- we have all

21    afternoon.    As long as we are done by the time we walk out of

22    here today with instructions that I can give to the jury

23    tomorrow morning beginning right at 9:00, if there's some

24    preliminaries that I need to give them.    Other than that, let's

11:53    25    get started, 9:00 with opening statements tomorrow, and if

1    that's what our schedule is, if you want to get back at 2:00

2    this afternoon, I'm good with that.

3            MR. AXELROD:  I think that would be more effective.

4    We'd be more organized on our side.  I don't know if the

11:53    5    defendants are chomping at the bit.

6            MR. MARCHESE:  We would prefer to get done a little

7    earlier, but that's fine.  We can come back at 2:00.

8            THE COURT:  Why don't we come back at 2:00.  Is there

9    anything else from the parties' perspective that I need to

11:53    10    resolve?  I know we have some exhibit things that need to get

11    taken care of.  I need to get some better language on the

12    JMOLs, but other than that, is there anything that I need?

13            MR. ALDRICH:  If I sit here long enough, I'll come up

14    with something.

11:53    15            THE COURT:  Okay.  So let's not sit here.

16            How about from your perspective?

17            MR. MARCHESE:  Nothing, Your Honor.

18            THE COURT:  Let's have a break then.  See you this

19    afternoon.

20        (Recess.)

21                            ---oOo---

22

23

24

25

1

2

3

4

5                          C-E-R-T-I-F-I-C-A-T-I-O-N

6

7          I certify that the foregoing is a correct transcript

8    from the record of proceedings in the above-entitled matter.

9

10          Dated September 27, 2017, at San Diego, California.

11

12                          /s/ Dana Peabody
13                          Dana Peabody,
                            Registered Diplomate Reporter
14                          Certified Realtime Reporter

15

16

17

18

19

20

21

22

23

24

25

1          United States District Court

2      For the Southern District of California

3

4                                    )
   COLUMBIA SPORTSWEAR NORTH         )
5  AMERICA, INC., an Oregon          )   No. 17-cv-1781-HZ
   corporation,                      )
6                                    )   September 28, 2017
            Plaintiff,               )
7                                    )   San Diego, California
            v.                       )
8                                    )
   SEIRUS INNOVATIVE ACCESSORIES.    )
9  INC., a Utah Corporation,         )
                                     )
10                                   )
            Defendant.               )
11

12

13              Volume 9 - AM Session

14       Reporter's Transcript of Proceedings

15     BEFORE THE HONORABLE MARCO A. HERNANDEZ

16            United States District Judge

17

18

19

20

21

22

23  Court Reporter:        Dana Peabody, RDR, CRR
                           District Court Clerk's Office
24                         333 West Broadway, Suite 420
                           San Diego, California, 92101
25                         DanaPeabodyCSR@gmail.com

2201

APPEARANCES:

For the Plaintiff:        SCHWABE, WILLIAMSON & WYATT, P.C.
                          NIKA F. ALDRICH, JR., ESQ.
                          DAVID W. AXELROD, ESQ.
                          BRENNA LEGAARD, ESQ.
                          1211 SW 5th Avenue, Suite 1900
                          Portland, Oregon 97204


For the Defendant:        FISH & RICHARDSON, P.C.
                          CHRISTOPHER S. MARCHESE, ESQ.
                          SETH M. SPROUL, ESQ.
                          12390 El Camino Real
                          San Diego, California 92130


For the Defendant:        MARKOWITZ HERBOLD, P.C.
                          RENEE ROTHAUGE, ESQ.
                          1211 SW Fifth Avenue, Suite 3000
                          Portland, Oregon 97204

San Diego, California, September 28, 2017

*   *   *

(Proceedings held outside the presence of the jury panel.)

THE COURT:   Please be seated.

Let's finish up with some of the instruction issues that we were talking about before.  Columbia asked for an instruction regarding willfulness and an instruction that provided information about willful blindness, and said that if there's willful blindness, there's willfulness.  I have looked at the cases and the arguments that both sides have submitted.  And I thought quite a lot about it, and I don't think the instruction as it is written captures what willful blindness gets at.

And, secondly, I don't think as it is written that it's appropriate for this particular case, in particular the language regarding this objective belief on the part of Seirus and this objective belief that it was highly probable that Columbia had obtained a patent.  I don't know what evidence there was that anybody at Seirus subjectively believed that there was a high probability that Columbia had obtained a patent, so there was plenty of objective evidence that Columbia had obtained a patent, but nobody testified that Columbia had a patent.  For those reasons I am declining to give the willful blindness instruction.

Next Columbia had asked for an instruction regarding the motivation to combine and to add language in there regarding

1    motivation to combine.  Again, I looked at everything that was

2    submitted and thought about it, and the issue was whether or

3    not it is required that there should be a showing on the part

4    of Seirus that there was motivation to combine as part of the

08:23    5    obviousness inquiry, and I disagree with Columbia on that

6    issue.  I believe it is a consideration and one of the things

7    the jury must look at, but is not required as I have understood

8    the case law to date.  So their request for a requirement of

9    motivation to combine is denied.

08:23    10    And then I just this morning at 6:00 or 7:00 got another

11    requested instruction from Columbia.  It had to do with the

12    overlapping issue where I had pointed out to Columbia yesterday

13    that I was dissatisfied with the instruction because it was

14    pointing to specific percentages and evidence that was

08:24    15    inappropriate to be part of an instruction.  They went back to

16    their rooms and tried to come up with an instruction that was

17    more neutral in that it didn't give or reflect actual facts

18    that might be an issue in the case as part of an instruction.

19    I believe the instructions as they sit adequately address

08:24    20    this issue.  The request to add that additional instruction is

21    denied.

22    Columbia was going to think about their foreign

23    patentability instruction and whether they actually wanted me

24    to highlight for the jury, once again, through an instruction

08:25    25    the fact that there was a foreign patent issue.  I don't know

1    what you thought about and whether you wanted to address that

2    issue or not.

3    MR. AXELROD:  What we have thought about is that we

4    would heed Your Honor's admonition with the reservation that if

08:25    5    things are raised in closing argument that we think warrant the

6    instruction, we reserve the right to ask the Court to give it.

7    THE COURT:  Nobody is going to be talking about what

8    happened in a foreign jurisdiction during closing argument.

9    I think that's everything that was on the list.  Was there

08:26   10    something else that I'm forgetting?  I'm kind of just going off

11    the top of my head.

12    Mike, were there any other instructions?  I talked about

13    willful blindness, the overlapping, the foreign motivation to

14    combine.

08:26   15    MR. SPROUL:  If I may, Your Honor.

16    THE COURT:  Yes, please.

17    MR. SPROUL:  There's the one issue which I think we've

18    agreed on, that additional proposed sentence for the willful

19    instruction relating to the date that Your Honor has

08:26   20    instructed -- or that has cabined willfulness to.

21    THE COURT:  Did you send something out to them about

22    that?

23    LAW CLERK:  It's in there, but it hasn't been sent

24    around.

08:26   25    THE COURT:  We were wrestling with the dates last

1    night, and we decided June 4th to December 4th.

2            MR. SPROUL:  Yes, we had proposed a sentence; counsel

3    proposed a slight modification.  We agreed to that

4    modification, so I think that sentence was agreed to with

08:27    5    respect to the date.

6            THE COURT:  If you sent something to me about that, I

7    have not yet seen it.

8            MR. SPROUL:  We sent it last night.  We can --

9            THE COURT:  Did you send it to my email?

08:27    10            MR. SPROUL:  Yes, we did.

11            THE COURT:  Just check with Michael, both of you.  We

12    have a couple minutes.  Check with Michael and make sure that

13    we're okay on that instruction.  Did you get all of the

14    other -- are we okay on -- do you have like a final version of

08:27    15    the instructions?

16            LAW CLERK:  Yes.

17            THE COURT:  Okay.  Are there any other instruction

18    issues that we needed to talk about?

19            Let me tell you one other thing that I did that's going to

08:27    20    mess you all up.  There is an instruction, I believe it was

21    number 10.  I'm not sure.  It's a general instruction, and it

22    tells the jury how to go about their deliberations, picking

23    their presiding juror, how to communicate with the Court that

24    you have a verdict, all of those kinds of things.  I think in

08:28    25    the -- our numbering system it came in the middle like at

1    number 10.  That will be the last instruction that I will give.

2    So all the other numbers are going to get adjusted accordingly

3    because of that, but we'll give you a final copy of the

4    instructions in the correct order.  Just be aware if you've

08:28    5    already prepared.  And I apologize but that really should be

6    the last instruction that I give.  So your numbers may be off

7    is all I'm suggesting.  I don't know how you prepared your

8    slides.

9            MR. AXELROD:  So the past number 8 goes to the end and

08:28    10    everything else --

11            THE COURT:  Was it number 8 that did that?

12            MR. AXELROD:  "Upon returning to the jury room"?

13            THE COURT:  Yes, "select one of your members to act

14    as."

08:28    15            MR. AXELROD:  Yes.  Number 9 gets into summary of

16    contentions.

17            THE COURT:  Yes.  It would be that one.  That one will

18    go to the end.  Again, it just tells them how to conduct

19    themselves, and it's always the last instruction.  I just

08:28    20    didn't move it while I was reviewing.

21        Is there anything else from the plaintiff's perspective

22    regarding -- I'll give you an opportunity to put your

23    objections on the record, but regarding kind of the things that

24    we left on the table last night that I needed to take care of?

08:29    25    If there is you have to remind me because I don't remember.

1    MR. AXELROD:  We had one tweak that was left out that

2  is on old number 14, reasonable royalty, new number 13.  It's

3  in the paragraph we were talking about heavily yesterday about

4  EMVR and all this presumption exception.  In the second

08:29    5  sentence, the Court shifts its identification from what the

6  patent covers to, quote, the patented feature, and we think the

7  Court should refer to both the same way, either what the

8  patented -- what the patent covers or the patented invention,

9  but --

08:30   10    THE COURT:  The language should be the same?

11    MR. AXELROD:  Yes, in both sentences.

12    THE COURT:  And I apologize, but I actually did not

13  bring out my stack of instructions with me, so let me just turn

14  to the defense.  Do you know what he's talking about?

08:30   15    MR. SPROUL:  I think I see it.  It's on the second

16  page, number 14?

17    MR. AXELROD:  Yes.

18    MR. SPROUL:  That.

19    MR. AXELROD:  "If the patent covers."

08:30   20    THE COURT:  Does it make it clear?

21    MR. SPROUL:  It seems fine subject to our other

22  objections, I don't -- do you propose changing one or the other

23  in particular?

24    MR. AXELROD:  Well, we could either change both to the

08:30   25  "claimed invention" or say in both what the patent covers.

```
 1              MR. SPROUL:  I don't feel strongly about it,
 2    Your Honor.
 3              THE COURT:  What language do you want?
 4              MR. AXELROD:  The claimed invention.
 5              THE COURT:  Michael, can you fix that?
 6              LAW CLERK:  The claimed invention, which sentence?
 7              MR. AXELROD:  "If the claimed invention covers" in the
 8    first sentence, and then down below, "however, if Columbia
 9    proves that the claimed invention creates."
10              MR. SPROUL:  Subject to our other objections.
11              THE COURT:  We'll give you a chance to put all your
12    objections on the record.  Do you have it?
13              LAW CLERK:  Yes.
14              THE COURT:  I think you can print the instructions.
15    Let's give them an opportunity to put their objections on.
16         Go ahead.  We'll begin with Columbia.  Make your list out
17    and make your arguments.
18              MR. AXELROD:  Columbia excepts from the Court's
19    failure to instruct the jury on each of Columbia's requested
20    jury instructions that was not given, including the requested
21    instructions on willful blindness and the Court's findings as
22    requested in Columbia's motion to instruct that specific
23    findings set forth in Columbia's proposed order are
24    established.
25         Columbia excepts from the Court's decision with respect to
```

new numbered instruction number 10 concerning the article of
manufacture for failure to give the examples cited in Apple v.
Samsung or Samsung v. Apple, whichever way we want to refer to
it, the dinner plate in the modern oven.

08:32    With respect to the renumbered Instruction Number 15,
Columbia excepts from the Court's failure to include the
instruction that, quote, "A plain and ordinary meaning of a
claimed phrase can be limited to certain devices with
device-defining characteristics such as purpose and principal
08:33    use excluding structures that occasionally are in minor ways
produce the same results."  That's from the Asetek case, and we
also except from the Court's failure to include the radio
illustration from Asetek.

Columbia excepts newly numbered -- from newly numbered
08:33    instruction 21 for failure to instruct the jury on how
overlapping ranges are to be considered in anticipation and to
instruct the jury under the standards set forth in the Atofina
case.

And finally with respect to newly numbered instruction
08:33    number 21, Columbia excepts from the Court's failure to
instruct the jury on the specific prior art combinations that
Seirus is limited to in this case, and from the failure to
instruct with respect to motivation to combine as a necessary
finding before prior art references can be combined, and the
08:34    failure to instruct that evidence of a motivation must be

1    proved by clear and convincing evidence.

2        Finally, in that instruction Columbia excepts from the

3    inclusions of examples of hypothetical motivations to combine

4    for which there is not substantial evidence in the record.

08:34    5        THE COURT:  Did you raise that one yesterday, that

6    last one?

7            MR. AXELROD:  Pardon?

8            THE COURT:  Did you raise that last one yesterday?

9            MR. AXELROD:  No.

08:34    10           THE COURT:  That's a new one.

11           MR. AXELROD:  That is a new one.

12           THE COURT:  You should have raised that one yesterday

13    instead of springing that on me this morning.  All right.

14        What do you got?

08:34    15           MR. SPROUL:  Your Honor, we object to instructions --

16    newly numbered instructions 9 and -- we'll start with number 9,

17    which is the measure of damages -- in general to the inclusion

18    of the reasonable royalty for design patent.

19        We object to newly numbered instruction number 10 because

08:35    20    of the reference to single-component and multi-component

21    determination.  And since we haven't seen the final language to

22    the reference at the very end of the instruction to Seirus

23    misappropriation rather than to the patented design.

24           THE COURT:  Oh, okay.  I know which one you're talking

08:35    25    about.

1          MR. SPROUL:  To jury instruction number 12, we object

2     to the inclusion of the reasonable royalty for the design

3     patent.

4          Instruction number 13, we object to the inclusion of the

08:35   5     reasonable royalty for the design patent, and we further object

6     because the instruction fails to properly state the law on the

7     burdens on apportionment in the EMVR, and we object to the

8     inclusion of EMVR throughout the instructions including

9     instruction number 13.

08:35  10          Instruction number 14, we object because of the inclusion

11     of reasonable royalty for the design patent.  We also object

12     because it includes willfulness for the utility patent which is

13     unsupported by the evidence and because we were improperly

14     prohibited from arguing against willfulness or relying on

08:36  15     evidence outside of the limited time period that Your Honor has

16     cabined the willfulness determination to.

17          With regard to instruction number 20, no objection at this

18     time.  Instruction number 21, no objection at this time.

19          22, I believe we removed the language related to lost

08:36  20     profits, but we objected to the inclusion of language related

21     to lost profits, and we haven't seen the final, so we would

22     maintain that.

23          THE COURT:  Which one was that?

24          MR. SPROUL:  I believe the parties agreed.  So newly

08:37  25     numbered 22, there was language in two paragraphs relating to

1    what was essentially a lost profits determination.  I thought

2    we agreed to take those out.

3            THE COURT:  Michael, did you get that one?

4            LAW CLERK:  22?

08:37    5            THE COURT:  Was that -- what's the instruction about?

6            MR. SPROUL:  Utility damages burden and we had a --

7    each party objected to language that related to a lost profits

8    type analysis, and I believe the agreement was to bring those

9    out.  I just haven't seen the instruction.

08:37   10            THE COURT:  Oh, okay.  If both parties agree, it

11   should be out.  So double-check it when you get it.  Closing

12   arguments may be going on.  Just check and make sure that I --

13   if you agreed and I said I'm taking it out, it should be out.

14            MR. SPROUL:  Okay.  Understood.

08:37   15      Instruction number 23, we again object to the inclusion of

16   reasonable royalty because we don't think the evidence supports

17   it.

18            THE COURT:  All right.  Thank you.

19            MR. AXELROD:  I would have to say we did not except

08:38   20   things that we thought were agreed to and changed acceptably

21   yesterday, so we just have that caveat.  I don't think that

22   should be a problem.

23            THE COURT:  Okay.  I wanted to give you an opportunity

24   to make your exceptions for the record because we were working

08:38   25   in a work setting yesterday off the record.

|      |    |                                                        |
|------|----|--------------------------------------------------------|
|      | 1  | All right.  So plaintiff is ready for closing?         |
|      | 2  | MR. ALDRICH:  As ready as I'll be, Your Honor.         |
|      | 3  | THE COURT:  And the defense is ready for closings?     |
|      | 4  | MR. MARCHESE:  Ready.  Can we take a quick break       |
| 08:38| 5  | before we start?                                       |

         1    All right.  So plaintiff is ready for closing?

         2         MR. ALDRICH:  As ready as I'll be, Your Honor.

         3         THE COURT:  And the defense is ready for closings?

         4         MR. MARCHESE:  Ready.  Can we take a quick break

08:38    5    before we start?

         6         THE COURT:  Of course.  Oh, the exhibit thing.  I

         7    looked at the transcript.

         8         MR. ALDRICH:  I did too.  I misunderstood what

         9    Your Honor was saying, but I am incorrect, and indeed I

08:38   10    conceded that they could come into evidence, so such is life.

        11         THE COURT:  Okay.

        12         MR. ALDRICH:  Rookie error.

        13         THE COURT:  Oh, 499.  Did you see their amended 499?

        14         MR. ALDRICH:  No objection, Your Honor.

08:39   15         THE COURT:  Okay.  Are all of the exhibits, then,

        16    Bernadette-certified?

        17         THE CLERK:  Yes.

        18         THE COURT:  Okay.  We got the photograph taken care of

        19    of the coat?

08:39   20         MR. ALDRICH:  Did Angela send you photographs of the

        21    coat?

        22         THE CLERK:  I got no photographs.

        23         MR. ALDRICH:  You don't have the photographs yet?

        24    We'll get the photographs.  They were taken.

08:39   25         THE COURT:  Okay.

1              MR. MARCHESE:  The verdict form.

2              THE COURT:  Thank you.  The verdict form.  Michael,

3      what did I decide last night?  I went back and forth.  I think

4      I decided I'm going to use Columbia's verdict form.  Did we

08:39   5      make some adjustments?

6              LAW CLERK:  I think that we used our own.

7              THE COURT:  Send them ours.  Take a look at it.  I'm

8      not wedded strongly about the verdict form, by the way.

9              MR. MARCHESE:  I was just thinking we might want to

08:40  10      show some parts of it to the jury.

11              THE COURT:  Oh, sure, no problem.  We'll get it to you

12      in a minute.

13              MR. MARCHESE:  Okay.

14              MR. SPROUL:  One other issue.  Redacted Exhibit 731, I

08:40  15      don't think we've seen that.

16              MR. ALDRICH:  Remind me.

17              MR. SPROUL:  That's the notice letter from December

18      4th.

19              MR. ALDRICH:  You know, I think it's established in

08:40  20      the record through examination of Mr. Carey that he received

21      notice of the '270 patent just in the transcript, and I was

22      willing to let that admission go as it is reflected in the

23      transcript.

24              THE COURT:  So are you withdrawing the exhibit?

08:40  25              MR. ALDRICH:  Well --

1        THE COURT:  It hasn't been offered and received?  Let

2   me ask.

3        THE CLERK:  No.

4        THE COURT:  It was never offered, so it's not in.

08:40    5        MR. MARCHESE:  It's not in.  Okay.  That's fine.  It's

6   fine.

7        THE COURT:  That's should resolve your problem then.

8        MR. MARCHESE:  Yes.

9        THE COURT:  And I know if I sit here long enough

08:41   10   you'll keep popping up and thinking.  All right.  We'll get you

11   the verdict form.  Take a look at it.

12        (Recess.)

13        (Proceedings held outside the presence of the jury panel.)

14        MR. AXELROD:  Two points:  We are going to have

08:52   15   objections to the proposed verdict form's failure to

16   sufficiently detail the questions that the jury has to go

17   through in order to preserve appellate review.  But apart from

18   that, the Court's proposed instruction has one article for

19   reasonable royalty for design patent infringement and another

08:53   20   question for reasonable royalty for infringement of the utility

21   patent.

22        In our instructions, if you look at questions 9 and 10,

23   when we come to the utility patent because it's directly

24   overlapping with the design patent, we ask the jury to provide

08:53   25   a reasonable royalty for both combined, and that way that

1      they're making one reasonable royalty determination for both

2      patents if they find that the utility patent is infringed.  The

3      way the Court has it with two separate determinations, we fear

4      the jury will be confused as to whether those are additive,

08:53   5      overlapping, how they should be dealt with.  Our position in

6      the case has been that if there is a -- if there is a

7      hypothetical license, it is covering both patents at once.

8                    THE COURT:  Okay.  I don't have strong feelings about

9      the verdict form.  Go ahead.

08:54  10                    MR. SPROUL:  The reasonable royalty determinations for

11      each patent need to be separated as you have them on the

12      verdict form.  We think it's proper this way because there are

13      different determinations the jury is going to make for each

14      patent.  Combining them together doesn't tell us what the jury

08:54  15      does with that particular reasonable royalty, and we believe

16      the law is clear that the two numbers are going to be

17      exclusive.  They get to choose one or the other and not add

18      them together, and combining them together, as they proposed,

19      would be incorrect.

08:54  20                    THE COURT:  Are you okay with it the way it is?

21                    MR. SPROUL:  We are okay.  We don't object.

22                    MR. MARCHESE:  I want to add one more thing, and that

23      is a determination of value of the design patent is very

24      different from a utility patent.  Those Georgia Pacific factors

08:54  25      apply very differently.

1            THE COURT:   Okay.   We'll use the verdict form as it

2    is.   All right.   Anything else?

3            MR. ALDRICH:   Oh, there was one other issue.   Sorry.

4            THE COURT:   That's okay.

08:55    5            MR. ALDRICH:   On the HeatTouch Torche glove, we are

6    alleging infringement.   We are not asking for any damages for

7    it, but to the extent the jury finds that it infringes, we'd

8    like that included with any injunctive relief we may seek, and

9    so while I believe there's a stipulation about all of the

08:55   10    products that the parties agree are on the interfacing surface,

11    there is still a lingering dispute about the HeatTouch Torche

12    and whether it satisfies the claims apart and aside from the

13    other dispute.   We had a separate line item on the jury verdict

14    form to ask about that specific product for that reason.

08:55   15            THE COURT:   I didn't remember seeing a specific line

16    item on your form.   I might have just missed it.   I didn't see

17    it.

18        Do you have a problem with putting a separate line item on

19    the Heat Torche glove?

08:55   20            MR. SPROUL:   We do.   We think that actually it should

21    have all the products, but since they're pulling out one to

22    allow them to make their case on it is improper.

23            MR. ALDRICH:   It was questions 3 and 4 -- it's

24    questions 1 and 2, we had, was "Has Columbia proven by a

08:56   25    preponderance of the evidence that Seirus infringed claim 2 by

1    importing or selling the accused HeatWave utility products,"

2    and then questions 3 and 4 was "Does the HeatTouch Torche glove

3    infringe claim 2," and 4 was "Does it infringe claim 23?"

4              THE COURT:   Did you have a problem with their

08:56    5    requested verdict form?

6              MR. AXELROD:   That divides it up into two separate

7    inquiries.

8              THE COURT:   Well, I don't even remember what theirs

9    looked like.   I remember there was a lot of questions, but did

08:56   10    you have a problem with the way they did their verdict form?   I

11    don't have strong feelings about this.   If you're okay with

12    theirs, we can use theirs.

13              MR. SPROUL:   Our proposal was to include all the

14    products, but that needed to be determined prior to this point,

08:57   15    so we haven't settled on that.   So I think the way Your Honor

16    has it now is the best, but adding in just the HeatTouch

17    Torche, I think, is confusing, and --

18              THE COURT:   It has a --

19              MR. SPROUL:   There are other products that have other

08:57   20    issues with them, so this isn't the sole issue that the jury

21    needs to determine which is what it looks like from their

22    proposal.

23              MR. MARCHESE:   Has an extra layer of complication.

24    Sorry, Your Honor.

08:57   25              THE COURT:   So, Mr. Axelrod, it sounds like because

1   they haven't figured out a schedule with all the different

2   products in it that we would need to supply to the jury,

3   they're not happy with their own verdict form at this point.

4   Am I saying that correctly?

08:58    5           MR. SPROUL:  We prefer the way Your Honor has it

6   currently because I think it needed to be all the products

7   broken down so they can determine product by product.

8           THE COURT:  Right.  Okay.  So then we're back to what

9   do I do about the HeatTouch Torche glove.  Do you have a copy

08:58   10   of the verdict form with you?

11           LAW CLERK:  The Court's.  It's in chambers.

12           THE COURT:  Can you get me one?

13           LAW CLERK:  Yes.

14           THE COURT:  While he's doing that, Mr. Axelrod, can

08:59   15   you give me a copy of your proposed verdict form?  I didn't

16   come out here for this, so I didn't bring anything with me.

17           MR. SPROUL:  Your Honor, we would ask for a separate

18   item identifying the article of manufacture prior to the

19   identification of the damages.

09:02   20           THE COURT:  I'm not going to make any more changes.

21   It's 9:00.  The jury is coming in.  I'm going to go with the

22   verdict form as I've drafted it.  This is yours.  And I'll get

23   my robe on, and bring the jury in.

24       (Proceedings held in the presence of the jury panel.)

09:05   25           THE COURT:  Closing argument.

1          MR. ALDRICH:  Hi.  I feel like we know each other

2     except I don't know you at all.

3          Once again, before I start, I just want to thank you.  I

4     know it's been a long week and a half, and, as I said before, I

09:06   5     know you had far better things to do with your time, but we

6     appreciate your contribution to Columbia and Seirus helping to

7     resolve our dispute.

8          When I start a case, I often think that there's a theme to

9     the case, and this one to me is like any other case.  There's a

09:06  10     theme that I saw as I have been working on the case for the

11     past couple of years, and it's that innovation is hard work.

12          You got to hear from Woody Blackford on the second day of

13     the trial, and he talked about the hard work.  You heard that

14     Columbia ten years ago invested a million dollars in an

09:07  15     innovation lab in order to do the hard work.  You heard that

16     the results of that hard work is that they were able to get

17     about 200 patents over ten years, and they've continued to grow

18     their innovation lab to come up with new products for the

19     benefit of you.

09:07  20          You also heard Woody talk about what goes into that

21     process, the testing, the experimentation, the hours in the

22     lab, the instruments that I would never understand.  You heard

23     him talk about spending two years studying and working with

24     outside analysts and inside people and testing different

09:08  25     fabrics and different fabric structures and testing how the

heat reflects versus how it -- how the moisture passes through

or how the air passes through a piece of clothing or a piece of

fabric.  And you heard at the end of that, he had a surprising

revelation, something that nobody had realized before, nobody

09:08  5  had apparently even done the test before, which is to figure

out if I plug up a bunch of the fabric with something that's

not permeable at all -- no moisture is going to pass through a

space blanket; no air is going to pass through a space blanket.

But if I plug up the fabric with sections of a space blanket,

09:08  10  how much does it still breathe?

And he found this very surprising result which was it

actually breathes much better than you would expect.  You plug

up half of it, you're still going to get 80 percent performance

out of it.  If you plug up more of it, you're still going to

09:09  15  get performance out of it.  You're going to get a

disproportionate level of performance out of that piece of

fabric than you would expect.  And Woody realized that there's

this ideal sort of window that gives the benefits of the

reflectivity while also giving you the benefits of the

09:09  20  underlying base fabric.

And you heard that that was a two-year process.  He came up

with the idea in 2008, September 2008.  They publicly launched

it at the Olympic Games with this in January 2010, but it

actually went to market I think they said later that year,

09:09  25  September that year.  So we're talking two years is the

1    development timeline.

2        It's also hard work because when you come up with something

3    new, you are pushing against the tidewinds.  You're pushing

4    against what other people have preconceived.  You're pushing

09:10    5    against what's commonly done, and you have to come up with new

6    solutions and new ways to approach it.  You heard Woody say

7    that he put it on the table in front of his boss, the

8    executives at the company, and the CEO, and they essentially

9    laughed at him and said, "It looks like a disco ball.  We'll

09:10    10    never sell it.  We're going to allocate $3 million for sales of

11    this product in the first year," and they sold 70 million.

12        They had to overnight freight -- or I don't know if it was

13    overnight, but they had to expedite freight, millions more

14    yards, get that stuff into the factories.  We need to make 20

09:11    15    times as much of this in the first year of what we're

16    anticipating.

17        You also heard that there was hard work in terms of coming

18    up with an advertising message.  How are you going to sell

19    something that doesn't look any better?  How are you going to

09:11    20    sell a piece of clothing that isn't about how you're going to

21    appear?  And you heard Columbia started an advertising

22    campaign, revolutionary in its time, to focus on what the

23    inside of the garment looks like.  You can't see the outside of

24    the garment there at all.  But it's all about keeping you

09:11    25    warmer.  It's about selling technology to the consumer.

1    And you heard Mr. Trepanier up here for the better part of

2    a day explaining to you how difficult it was to come up with an

3    advertising campaign that was going to sell a product that was

4    technology for the inside of your clothes.

09:12    5    Innovation is hard work, and Woody said it best in this

6    article that they published.  The idea itself is probably only

7    10 percent.  The rest is in the details and the execution.

8    It's the two years spent after the flash of genius, after that

9    moment sitting in a conference room table looking at a bunch of

09:12    10    fabrics.  And he said it again in the last question that he

11    answered:  "What qualifies you to be an inventor?"  And he

12    said, "You have to do the work."

13    And as a result of all that work, after two years Woody got

14    from the United States Government a patent to compensate him

09:12    15    and to compensate Columbia for the effort of innovating

16    something new and beneficial for society.

17    And here's the other half of the theme:  Copying is easy.

18    Once the work's been done, it doesn't take very long to copy it

19    and launch a competing product to market.  And Seirus launched

09:13    20    its Omni-Heat program by taking Columbia's fabric from

21    Columbia's vendors, getting samples of it, and copying it and

22    launching their own product to directly compete with Columbia.

23    You heard that, that they recognized that they're directly

24    competing with Columbia.  And so they had this Omni-Heat

09:13    25    program to sell a competing product against Columbia's patent

09:14

1    pending product, and they knew it was patent pending.  It says

2    it right there, and they had the photographs, and they sent

3    those photographs to their vendors and said, "Hey, we want to

4    really draw attention to the fact that this Omni-Heat product

5    is patent pending."  And for the better part of a year, the

6    emails that you see at Seirus are all about Omni-Heat.  And

7    they say, "Well, Seirus" -- sorry, not Seirus, but Shen Li,

8    "They're the ones that used the term first.  We didn't use the

9    term first.  We just used that as nomenclature because we're

09:14   10   communicating with our vendor, and there's a communication

11   breakdown."

12       Well, there's a reason why they were calling it Omni-Heat.

13   It's because they asked them for a sample of Omni-Heat.  That's

14   the easiest way to talk about Omni-Heat if, in fact, that's

09:14   15   what you asked them to provide for you, and that's what

16   happened here.

17       And just the same once the work has been done to figure out

18   how to launch a product, how to commercialize it, how to sell

19   it to the market, copying becomes easy there too.  They got a

09:15   20   copy of Columbia's hangtag that showed our graphic about how

21   you would -- how you would demonstrate to the consumer -- how

22   you would demonstrate to the consumer what it is that they're

23   buying, and then Seirus launched their own advertising campaign

24   that looks remarkably like Columbia's.

09:15   25       That's because copying is easy.  Look for the silver

1    lining.  Look for the silver dot.  Columbia advertised 20

2    percent warmer.  Columbia advertised that after years of

3    testing and concluding that it was 20 percent warmer, and at

4    some point, Columbia realized that may not be completely

09:15    5    accurate for every product, and they stopped saying it.  But

6    Seirus said 20 percent warmer on their products and did zero

7    testing at all.  They said they relied on their manufacturer

8    for their testing.  I don't think you saw that -- I don't think

9    you saw those test results here.

09:16    10    And on and on, the message that Columbia spent trying to

11    create for its proprietary product, you see the same message

12    come through in Seirus' advertising.  The silver dot.  The

13    silver lining.  And so Seirus showed you this timeline of their

14    development.  They say they came up with the HeatWave name and

09:16    15    the design was conceived in July of 2012, and by November of

16    2012, they were selling.  Right there.

17    So I think this theme is -- I think this theme is

18    appropriate for the case:  Innovation is hard work, but copying

19    somebody else's work is easy.

09:17    20    Now, against that framework you're going to be asked to

21    answer four questions, and they are right here.  You're going

22    to be asked to answer the question about whether Seirus

23    infringes, whether the patent is valid, how much money should

24    be paid, and whether Seirus acted willfully in its conduct.

09:17    25    So we'll start with infringement.  You're going to be asked

09:17

1    to establish whether there was infringement by a preponderance

2    of the evidence.  And what that means is is it more likely or

3    not that Seirus infringed these patents.  This patent shows the

4    '270 patent.  It's just the utility patent because the design

5    patent has already been resolved.  So you're going to be asked

6    is it more likely or not that Seirus infringed.

7         And you're going to have in your binder or in your exhibits

8    a document that the parties agreed to put in the record, but

9    wasn't shown to you during the trial, which is a list of all of

09:18    10   the Seirus products where the foil side touches the skin.  And

11   we're going to ask you to find that, indeed, all of those

12   products infringe Columbia's utility patent because we walked

13   through the claims -- you guys are bored with the claims.

14        We've walked through these claims like six times now in

09:18    15   this case, and Dr. Cole walked through every one with you and

16   showed you how every single claim limitation is met by those

17   products that Seirus sells where the aluminum side touches the

18   skin.

19        As far as I can tell, there's only one portion of the claim

09:19    20   that's even in dispute, and that is this idea about whether the

21   reflective surface covers 30 to 70 percent of the inside of the

22   fabric -- or of the fabric that is used on the inside of the

23   gloves.  That's the only one that I have heard disputed at all

24   in this case.

09:19    25        And, again, Dr. Cole testified at length about the test

that she did which was -- I think she testified it's the same
way she would study department of defense materials, the same
way she would study fabrics in her academic life.  It's the
same camera equipment that she uses for department of defense
work.  It's the same analysis that she would use.  It's the
best analysis that she could come up with to figure out how
the -- what the surface area is that's reflected.  And she did
something like 25 different photographs on a whole bunch of
different types of fabric, and the results -- you have the
results.  If you want to examine, you're going to be left with
Exhibit 184, which is about 250 pages worth of histograms, and
the math is all in there, and you can figure it out for
yourself if you want to.

        But I would offer you probably don't have to because nobody
contested that the results are accurate.  They didn't have an
expert come up here and say that "I looked at her math, and the
math is wrong."  They didn't have an expert come up here and
say, "I did the work, and, in fact, it's not 30 to 70 percent,
I analyzed it, and I found that it's 75 percent."  They didn't
put a single document in the record that said it's more than 70
percent or less than 30 percent.  They put in zero evidence
other than challenge Ms. Cole -- Dr. Cole.  There's not a
single piece of evidence in the record that their fabric falls
outside the claimed range.

        And there's probably a reason for that.  There's probably a

1    reason that not a single piece of evidence is put in the

2    record.  I mean they had -- I think we saw toward the end of

3    the trial the actual CAD drawing that they came up with.

4    Somebody could have measured that at Seirus and calculated it

09:21    5    based on that.  Some expert -- if they were outside of 70

6    percent, after four years of litigation, you can be sure

7    somebody would have come in here in court and said, "It's more

8    than 70 percent," but nobody said that.

9        In fact, Seirus doesn't actually deny that their fabric

09:21    10    falls within the range of 30 to 70 percent.  In fact, they

11    admit it.  Dr. Block was asked, "And Seirus practices every

12    limitation of the '270 patent, claims 2 and 23, correct?"  And

13    his answer "yes."  Ms. Distler was asked, "Okay.  Every one of

14    the interfacing Seirus products contains each of the elements

09:22    15    of claim 2 in the HeatWave fabric, does it not?"  Her answer,

16    "Yes."

17        Not only do they not have any evidence to rebut, but their

18    two experts, the two paid experts that they have, both agreed

19    that Seirus fabric falls within the range of 30 to 70 percent,

09:22    20    and, in fact, they both said that every single limitation of

21    the claims is met for those products that face inward.  As far

22    as I can tell, Seirus admits that it infringes claim 2.  And

23    there is a little bit of a debate about certain products that

24    don't have the entire inside surface covered, but only part of

09:22    25    the inside surface, but the claims read, and the Court will

1    instruct, that if any of the inside surface of the glove has

2    fabric that reads on the claims -- that is the same as what's

3    said in the claim -- if any portion of the inside of the glove

4    has that, that means that the glove infringes.  They can put

09:23    5    extra fabric on the palm side, but if you look at what the

6    claims say, it talks about the fabric.  The fabric has to have

7    30 to 70 percent coverage, and if that fabric is used on the

8    inside surface, then those products infringe claims 2 and 23.

9        So they have this line of products called the HeatWave

09:23    10    Plus.  You can see there on the bottom of the screen that

11    HeatWave Plus.  Indeed the bottom, the palm side, doesn't have

12    HeatWave fabric, but that is not an excuse for infringement.

13    And the Court will -- in the jury instructions has some

14    explanation of why that's the case.

09:23    15        So that's chapter 1.  That's the first question you'll have

16    to answer is does Seirus infringe.

17        We'll go on to question 2.  Is the patent valid?  And I

18    don't know if you were all able to follow it, but we walked

19    through with Mr. Blackford the better part of an afternoon

09:24    20    the -- it's called "the prosecution history," the story of how

21    this patent came to be.  And in May of 2010, after they

22    realized that they had potentially a patentable invention here,

23    they filed a patent application.  And about almost two years

24    later, the patent office rejected that and said, "No, this

09:24    25    patent by Levy seems to say the same thing."

1    Mr. Blackford showed you Levy, showed you that Levy was

2  actually about something that looked like carpets, and it had a

3  sheet of reflective foil, and then stuff was poked through the

4  reflective foil, but it certainly was nothing like

09:25  5  Mr. Blackford invented.  So there was a back-and-forth

6  correspondence with the patent office, and you were told at

7  opening statement -- you were told that Columbia told the

8  examiner, "You're right.  We concede," and brought that fence

9  in.

09:25  10    But as you heard through Mr. Blackford, that's not what

11  happened at all.  Every time the examiner wrote and said, "I

12  don't think this is a valid patent," Columbia wrote back and

13  said, "We respectfully disagree," and argued back for a page

14  and said, "That's not correct.  You're -- Mr. Examiner, you

09:25  15  don't understand what this patent is really about."  There was

16  a back-and-forth correspondence that took place for a couple of

17  years here.  And it happened again, the second office action,

18  again rejected over Levy.  And, again, we respectfully

19  disagree.

09:25  20    And so on October 5, 2012, after there was enough

21  back-and-forth, give-and-take, explanation with the patent

22  office, the patent office said, "You've got a patent.  You're

23  right.  That's a patentable invention."  And after that Woody

24  didn't stop.  He didn't say great.  He continued to find out

09:26  25  that there was more prior art out there, and he continued to

09:26

1  send that to the patent office.  He sent 17 new prior art

2  disclosures on November 21st.  Again, he has been told he has a

3  patent, but he has a duty of candor to the patent office, and

4  he gives the patent everything he has.  The patent office says,

5  that's "Okay.  It's still a patentable invention," and they say

6  the patent's going to issue.  And still Woody doesn't stop.  He

7  identifies three more prior art in January of 2013, and the

8  patent office again says, "You can have a patent."

9  And then on February 22nd, he sends another information

09:27

10  disclosure statement to the patent office and identifies the

11  Worley patent.  And then he identifies the Fottinger patent.

12  And the patent office looked at both of those and said, "Yeah,

13  you have a patentable invention.  That is a valid patent."

14  Your fence posts are where they are.  You've got a fence.

09:27

15  You've got your property, and nobody's allowed to go across

16  your fence and go onto your property.

17  We talked earlier about how copying is easy.  Here's

18  another thing that's easy:  After somebody has a patent, it's

19  easy to go back looking through the annals of art and every

09:27

20  piece of fabric out there and try to cobble together some sort

21  of reason why it would have been obvious.  It's easy to go back

22  and look at all of that in hindsight.  But we're supposed to

23  look at this in the mindset of the inventor at the time that

24  the invention took place in 2008, supposed to look at what he

09:28

25  had available to him, what a person of ordinary skill in the

art would have had available to him at the time.  It's a very
difficult thing to do.  Again, we look back today, and we think
that Post-It note is a pretty obvious invention.  There's a lot
of evidence out there that it wasn't.  So, anyway, it's very
easy to attack somebody's patent after it's been issued by the
patent office and say, "Oh, no, there's more stuff out there.
There's more prior art.  Look, you could patch them together
any number of ways.  Easy."  Innovation is hard.

So the first question you're going to be asked is, is the
patent anticipated?  Was it anticipated?  That means did
something else come before it that did exactly what Woody's
patent claimed?  And, again, for anticipation, that means that
all limitations have to be present.  This word "limitations" I
recognize is lawyer talk.  But it means each of those line
items in that claim, each of those, you have to be able to find
each of those in a single piece of prior art.

And the only piece of prior art that they are asserting
anticipates in this case is Fottinger.  We spent a lot of time
with Mr. Fottinger in court the other day, figuratively.  But
there could be no missing elements.  Every single limitation
has to be there.  And not only that, but Fottinger would have
to teach you how to make what Woody made.  It would have to
teach a person of ordinary skill in the art how to make Woody's
invention.  It's not enough to just write a patent and say, "My
patent would cover X, Y, and Z.  I have a patent for a rocket

ship to the moon."  You actually have to -- the patent has to

enable a person of ordinary skill in the art how to do what

Woody did.

        And, finally, it has to be by clear and convincing

evidence.  Now, for infringement it's a preponderance of the

evidence.  That means more likely than not, but to prove a

patent invalid, it has to be by clear and convincing evidence.

That's a higher standard.  It's a higher threshold, and the

reason is that there's a presumption that the patent office did

their job.  And to take nothing away from you all, the jury in

order to -- in order to find a patent invalid is going to have

to reach a higher threshold of clear and convincing evidence in

order to find that a patent is invalid.  And so you are going

to have to be able to say by clear and convincing evidence that

everything in Fottinger -- or that everything in

Mr. Blackford's patent can be found in Fottinger.  If you

have -- if you do not have clear and convincing evidence on any

single limitation, the patent is not anticipated by Fottinger.

        Now, Mr. Blackford made it clear to the public what it was

that he invented.  He was dealing with highly reflective

materials like aluminum foil.  He explains in the background,

"Currently heat-reflective materials such as aluminum and Mylar

typically take the form of a unitary solid film."  He went on

to say that he's talking about "aluminum-based materials

particularly suited for reflectivity."  And he's talking about

1    metallic, plastic, and Mylar, specific examples that he gives,

2    and you heard that Fottinger is nothing like that.  Fottinger

3    is -- actually has more rubber in it, about three times more

4    rubber than it does aluminum.  And this aluminum is like little

09:32    5    bits of powder that are mixed in with this rubbery binder and

6    then put onto a piece of fabric in some sort of arrangement.

7        But rubber doesn't reflect heat, and, in fact, there's no

8    evidence that this concoction that he came up with, mixing

9    little bits of aluminum powder in there, actually reflects heat

09:32    10    at all.  And Dr. Block was clear during his testimony that he

11    thought that the heat-reflecting elements were the little bits

12    of aluminum powder.  Those are the things that reflect the

13    heat.  The rubber doesn't reflect heat.  It's the little bits

14    of aluminum powder.

09:32    15        And so with that, we go through the claims.  We have this

16    one here.  A discontinuous array of discrete heat-directing

17    elements, each independently coupled, and the Court has

18    provided some clarification of what this means.  What it means

19    is that you have to be able to have base fabric between

09:33    20    adjacent pieces of heat-directing elements.  This is where it

21    gets very difficult to think of Fottinger in the light of what

22    Mr. Blackford's patent is all about, right?  It's very clear

23    from Mr. Blackford's patent what he's talking about, which is

24    I've got these heat-directing elements, and there's space

09:33    25    between them where the base fabric can show through so that the

1    product can breathe.  Now, if you try to wrap your head around

2    how that's going to apply when it's rubber with aluminum powder

3    mixed in, they're not independently coupled to the base fabric.

4    The aluminum powder is mixed into this binder and like hundreds

09:33    5    or thousands of pieces of heat-directing elements are glued on

6    together, so that doesn't work.

7        There's no base fabric appearing between the individual

8    pieces of aluminum powder.  That doesn't work.  You have to

9    sort of shift your mind in a very bizarre way to start thinking

09:34    10    about aluminum powder as heat-directing elements in a way that

11    somebody of ordinary skill in the art in 2008 reading this

12    patent, they would know what was meant, and it's not Fottinger.

13    It's not rubber with aluminum powder in it.

14        So there's a missing element.  That, you don't find

09:34    15    anywhere in Fottinger.  You also don't find that his rubber

16    with aluminum was on the innermost surface.  Again, this was

17    Dr. Block's slide that he presented, and this was the only

18    evidence that was shown about where Fottinger is placed, and,

19    again, it's placed -- can be placed one of three places.  It's

09:34    20    placed on the interlining of a jacket.  That's in the lapel.

21    Well, that's not on the innermost surface of the jacket.  Or

22    it's placed on a lining, but it doesn't say which way the

23    lining is oriented.  And you heard Dr. Cole say that a person

24    of ordinary skill in the art reading Fottinger would know that

09:35    25    you're not going to put rubber on the inside of your garments.

1    It's going to -- it's not going to fit.  It's not going to wear

2    well or drape properly.  It's going to rub against your other

3    clothes.

4        But setting that aside for a moment, you'd have to find by

09:35  5    clear and convincing evidence that simply disclosing the idea

6    of putting it on a lining means that it goes on the inside of

7    the lining and not on the backside of the lining.  There's no

8    clear and convincing evidence of that.  And that may be why the

9    patent office looked at this and said, "This patent doesn't

09:35  10   anticipate at all."

11       Or the third place he talked about putting it is on the

12   outer fabric such that his rubbery binder with aluminum powder

13   would be on the inside of the article.  That's -- that's the

14   space in here, right?  That's the inside of the article.

09:36  15   That's not on the innermost surface either.  So there's no

16   evidence in the record anywhere that Fottinger teaches the idea

17   of putting his solution on the inside like Mr. Blackford

18   invented.  So that's another missing element.

19       Then we have the 30 to 70 percent coverage issue.  We have

09:36  20   a couple issues to deal with there.  First of all, if you have

21   only 8 percent aluminum powder mixed into rubber that's the

22   other 96 percent -- 92 percent, the -- there's no evidence in

23   the record at all of how much of the surface area is covered by

24   that aluminum powder.  And, again, Dr. Block says that the

09:37  25   heat-reflecting elements of the aluminum powder, so you have to

1    do this sort of mind twist again to try to figure out to get

2    Woody's patent to read in the same way as Fottinger.  And it

3    starts to make no sense if you try to calculate what 30 to 70

4    percent coverage would look like and how that would apply to

5    Fottinger's invention with aluminum powder.

6        But setting that aside for a moment, Fottinger teaches the

7    following:  Fottinger explains that water vapor permeability is

8    an issue, and if you put too much on, you're going to block

9    that water vapor permeability, and he says this desirable

10   property may be impaired, and he says this disadvantage can be

11   avoided if you limit it to 5 to 40 percent coverage.  But he

12   goes on, he says preferably keep it even lower, 10 to 20

13   percent coverage.

14       Now, you as a juror are going to have to find -- to find

15   anticipation by Fottinger.  You're going to have to find that

16   there is clear and convincing evidence here that Fottinger came

17   up with the idea of using up to 70 percent coverage.  There's

18   an overlapping range between -- I mean, again, setting

19   ourselves out of the mindset of the aluminum powder for a

20   minute, there's an overlapping range there between 5 and 40 and

21   30 to 70.  But anticipation requires that it actually teach

22   each element, and Mr. Blackford was the first person to realize

23   that you could go up to 30 to 70 percent coverage and get

24   optimal performance, and Mr. Fottinger is telling you keep it

25   low.  So that's another missing element.

09:39

1    And then we have this other problem with Fottinger, and to

2  summarize it, I think it's easiest said that it didn't work.  I

3  mean it didn't work.  Right?  He tested his concoction on a

4  jacket.  You heard Dr. Cole and you heard Dr. Block testify

5  about it.  He tested it by putting his invention on half and

6  just putting the rubber on the other half and then letting

7  somebody wear it.  And what he found in the end was that the

8  heat passed right through it.  Actually, the heat passed

9  through it more on the side that had the aluminum than on the

10  side that didn't have the aluminum.  And he checked his

11  invention.  He check it by actually flipping the jacket and did

12  a second jacket.  Same results.

13    So his invention didn't -- there's no evidence that his

14  invention reflected heat at all, and, again, in order to have

15  clear and convincing evidence that Fottinger anticipated, that

16  it came first, and that it taught the invention, it would have

17  to disclose how to make a jacket where heat is reflected, where

18  it's directed back to the body of the body gear user because

19  that's what the patent says:  directs heat towards the body.

20  And Fottinger doesn't teach you how to use that.  He uses the

21  word "reflective" one time in his patent and suggests that

22  might be how it works.

23    But what he found out through the experiment, what Dr. Cole

24  figured out actually, is that's not how it works at all.  In

25  fact, it doesn't work.  It actually lets more heat escape

through the side that has aluminum in it than the side that

doesn't.  And maybe that's why Fottinger never commercialized

his product, as you heard.  Because it didn't work.

But Dr. Block testified that indeed -- at his deposition he

said, and he confirmed that he said it at his deposition, that,

indeed, there's nothing in Fottinger that confirms that it

reflects any heat.  So there's that missing limitation also.

So here we have the one piece of prior art in the record

where you're being asked whether it anticipates, and there

are -- there are issues about half of it.  Eight limitations,

and there are four of them that are drawn into serious

question, and maybe that's again why after receiving this

two-page document, the examiner looked at it, and after three

weeks said, "This patent is a good patent."  Woody's patent is

a good patent.

And the same applies for claim 23.  Same issues.  So,

again, it's easy to look back later and say, "Oh, it was

obvious."  And Dr. Block said in essence that's the test that

he did.  He looked at it, and he said he understood that the

test he was supposed to do was to look at it and say, "Oh, that

was obvious."  But that's not the test at all.  The proper test

is to figure out what -- whether it would have been obvious to

a person of ordinary skill in the art at the time of the

invention by combining references, by combining pieces of prior

art to fill in the gaps of what the first one is missing.  And

it's not enough just to go out there and cherry-pick, oh, there's 30 to 70 percents over here and there's a little bit of some inside surface over here.  You can't do that.  You have to find that there would be a reason why somebody of ordinary skill in the art would have thought to do that, and we -- there's a big problem here with that already.

Fottinger is saying keep it low, less than 40 percent coverage.  In fact, preferably 10 to 20 percent coverage.  And they say well, a person of ordinary skill in the art reading that would have said, "Oh, yeah.  Let's go get some 30 to 70 percents off the shelf, find some patents out there that mentions the word "30 to 70 percent."  Sometime in the past 30 years, there's got to be some patents that have 30 to 70 percent something."

But why would a person in 2008 sitting there looking at Fottinger -- why would they have thought I think I'll try 30 to 70 percent coverage instead?  I mean why would they have done that when Fottinger expressly teaches them you'll lose permeability, keep it down to 5 to 40 percent.  There's no reason why somebody would have done that.  They're going to have to prove that to you by clear and convincing evidence, but there's no evidence in the record anywhere that there would have been a reason to try to combine things that don't have any heat direction with something that is meant to address heat.

So they cherry-picked four pieces of prior art off the

1    shelf.

2        Halley has to do with putting dots of plastic on the inside

3    of a membrane, like a -- I think it's like a rain shell -- so

4    that when you put it over your clothes, the dots of plastic

09:44    5    prevent it from catching and snagging, and they're very smooth

6    dots of plastic so they can slip right over your clothes, and

7    not tear the membrane, the very fragile membrane that's

8    supposed to be waterproof, I think is what it is.   That has

9    nothing to do with heat.   That has nothing to do with heat

09:44    10    reflection, heat direction.   That has nothing to do with heat

11    at all.

12        In fact, you'll have Halley back there.   It's Exhibit 1116,

13    and you can spend three days reading it.   The word "heat"

14    doesn't even appear in that patent.   The word doesn't even show

09:44    15    up.   The patent has nothing to do with heat.   Why would

16    somebody looking at Fottinger say, "Oh, it's a patent about

17    heat reflection" -- I mean it's not -- it doesn't really work

18    as heat reflection, but it's a patent about heat.   "Let me look

19    at some anti-abrasion dots."   It makes no earthly sense.

09:45    20        The same issue with the Vaughn patent.   Vaughn is like an

21    elaboration on Halley.   Vaughn said, "Add a little bit of

22    carbon in there.   It helps even more."   Again, it doesn't have

23    anything to do with heat.   Blauer is about rain shells and

24    putting plastic on the inside of rain shells so that it

09:45    25    improves the structural integrity of the other plastics,

1    putting plastic on plastic.  The word "heat" never arrives in

2    that patent either.  And Worley is a patent about heat

3    absorption.  It doesn't have anything to do with heat

4    direction, and the judge has already ruled that.

09:45    5    None of these patents have anything to do with heat

6    reflection.  Why would somebody take a patent like Fottinger

7    that says it's about heat and keep the coverage area low?  Why

8    would they disregard Fottinger and say, "Oh, you know what?

9    Let me go to the shelf and see if I can find some other

09:46   10    patents."  There's no reason why somebody would have done that.

11    But even if you step back from that, there's a bigger

12    problem, and that is that that only fixes potentially one

13    problem in Fottinger.  Fottinger is about 30 to 70 -- sorry --

14    the patent is about 30 to 70 coverage, but a whole lot of other

09:46   15    stuff, too, and the rest of these things, you could combine 30

16    to 70 percent, pull some 30 to 70 percents off the shelf and

17    mix them in with Fottinger, but it doesn't fix the rest of the

18    problems.

19    And so at the end of the day, you still have missing

09:46   20    elements.  You still have missing limitations, and the patent

21    can't be obvious.

22    Now, you're going to be asked -- you're going to be told

23    that before you draw your conclusion in any event, you're

24    supposed to look at more than just what the patents say.

09:47   25    You're supposed to look at the real-world evidence.  Sometimes

1    it's called "objective indicia of nonobviousness."  I tried to

2    turn that into English.  What that means is things that

3    happened in the real world.  Because as I said, it's super easy

4    to go cherry-pick some things off the shelf.  You are supposed

09:47  5    to avoid that hindsight.  You're supposed to try to avoid

6    looking back today saying, "Oh, it would have been obvious."

7    And the way you do that is by thinking about what actually

8    happened in the real world that might help teach you whether or

9    not the patent really was obvious to a person of ordinary skill

09:47  10    in the art.  And there are eight factors, and we can go through

11    them, and Dr. Cole went through them, and Dr. Block did not.

12        Number 1, is commercial success.  After the patent was

13    commercialized, did it become commercially successful?  And I

14    think the evidence there is overwhelming.  You heard evidence

09:48  15    from, I think, Mr. Drozdowski; you heard evidence from

16    Mr. Trepanier.  $1.3 billion worth of sales of Omni-Heat in the

17    past eight years since it launched.

18        It's not just Columbia's commercial success, though.

19    Seirus copied the patent, and they became commercially

09:48  20    successful as well.  As soon as they launched Omni-Heat, sales

21    of that product escalated year over year.

22        And it's not because of advertising.  It's not because of

23    some other thing.  I mean it is successful because it practices

24    the technology.  Right?  Both companies are advertising these

09:48  25    products.  You've got them all right here, right?  Both

products are advertising these products, prominently about the
technology.  HeatWave.  That's what they call it, HeatWave.
And they all show right at the top of it exactly what you're
supposed to be looking at.  They all say, "Look inside," or
some of them say, "Check it out" with a little arrow, and they
are selling this.  They're selling it to the consumers based on
the technology that is in there, based on Woody's invention.
They're not selling it because it looks better.  They're
selling it consistently because it's going to make you warmer.
In fact, if you look at Seirus' own hangtag, the word
"HeatWave" is about four times the size of their own logo.

        So both companies advertise this product -- this technology
as the driving force of what they were selling.  So the
products were commercially successful.  That is clear evidence.
If there had been -- if people knew that there was a pot of
gold waiting for the first person to come up with the idea that
Woody came up with, it would have been come up with long ago.
30 years ago Fottinger was trying to come up with some way of
having a little bit of heat reflection in some fabric.  If it
was so obvious -- there was $1.3 billion waiting for the
inventor -- this would have happened long ago.

        But you saw that Castelli suffered.  Castelli couldn't
figure it out, right?  The space blanket was invented in 1964,
and nobody figured out how to do what Woody did since 1964.
Fottinger couldn't figure it out.  1980 he invented something

1    where the heat passed right through it.  In fact, it seemed to

2    escalate the heat passing through.

3        You're also asked to look at whether others failed in their

4    attempts, and you saw somebody bought that Castelli jacket.

09:50    5    That was sold just shortly before Woody's invention.  I think

6    this review came out right around the same time that Woody came

7    up with his idea, and said, "Basically it's like wearing a

8    sweat bag."  So other people tried.  Fottinger tried, and his

9    invention didn't work.

09:51    10        You're also supposed to look at how the industry reacted.

11    How did the industry react?  You heard Mr. Trepanier up here

12    for a while.  He was talking about all the articles and the

13    reviews, but there's one review that I think is even more

14    compelling, at least to me, as I was looking at it.  The

09:51    15    Canadian Olympic team picked Omni-Heat to be in their uniforms

16    in the 2010 Olympics.  I mean if that's not industry praise, if

17    that's not the industry looking and saying "wow," I don't know

18    what is.

19        You're also supposed to look at whether anybody was

09:52    20    skeptical of what Woody came up with.  Woody came up with the

21    idea of 30 to 70 percent coverage range, and Fottinger says

22    don't do that.  Fottinger is skeptical.  Fottinger says this

23    desirable property may be impaired unless you limit yourself to

24    less than 40 percent coverage, preferably 10 to 20 percent.

09:52    25    But Woody's invention is going up to 70 percent.

1    You're also supposed to look, kind of like whether the

2    product was commercially successful, did anybody offer to

3    license it?  And you heard from Mr. Merriman that he's received

4    probably 20 offers from people to license Omni-Heat since it

09:52   5    was launched.  And they have struck licensing deals with four

6    companies, and all of those companies have to sell it as

7    Columbia products.  All four of them.  And they entered into

8    those deals specifically because they wanted to spread the

9    Columbia brand to products that they don't make, to socks, to

09:53   10   bedding, to sleeping bags, and tents.  So they were -- they

11   finally entered into some licensing agreements, but as a way of

12   expanding Columbia's portfolio, not as a way of competing

13   against itself.

14       So there's substantial evidence of licensing.  20 offers

09:53   15   for licenses, four different companies entered into licenses,

16   and you heard that the licensing rate was up in the 10 to 15

17   percent range.

18       And then the last consideration is whether anybody copied

19   it, and I think that's satisfied in spades, but that's left for

09:53   20   you to decide.

21       You're supposed to consider all of this evidence in order

22   to make sure you don't look back today and say, "Ah" --

23   Dr. Block said, "Ah, that was obvious.  I would have" -- held

24   up and said, "Yeah, that was obvious."  That's not the way you

09:54   25   should do the analysis.  The Court has instructed -- it will be

1    in the instructions you'll receive today.  He'll read it to

2    you.   You are supposed to consider all of this evidence in

3    coming up to your assessment.

4        And I think you'll find, and we asked you to find, that the

09:54   5    patent was properly allowed by the patent office and that it is

6    valid.   That's question 2.

7        Question 3.   Damages -- I'm thirsty.

8        So damages come in two different forms in this case.   First

9    there's a reasonable royalty, and, second, there's this issue

09:54   10   about Seirus' profits because of the design patent.   And on the

11   reasonable royalty, we are asking you to decide that the

12   patents would have been licensed together just like all of the

13   other licenses that Seirus -- or that Columbia entered into.

14   It licensed Omni-Heat, the Omni-Heat collection as a whole.

09:55   15   Said, "You can practice the utility patents and the design

16   patents that are associated with Omni-Heat."   There would be a

17   single amount that is applicable.

18       And the jury verdict form may be a little confusing on this

19   issue, so we would just ask that you make it clear what your

09:55   20   intention is as a jury in filling out the form.   But we think

21   that there should be one royalty amount that covers both

22   patents.   I would just ask that you write that right into the

23   jury form that that's what you decided and to put what that

24   amount would be in total.

09:55   25       So the reasonable royalty, here's what you're asked to

1    decide -- this is what the statute says.  This is the law.

2    "The Court shall award the claimant damages adequate to

3    compensate for the infringement, but in no event less than a

4    reasonable royalty for the use made of the invention by the

5    infringer."  And what that means is that you're supposed to

6    step back in time and think about how a hypothetical

7    negotiation for a license would have occurred on the eve of the

8    infringement, so back in 2013.  If Seirus and Columbia had sat

9    down at a table together, what deal would they have struck?

10   And there's a couple of pieces that you have to answer in

11   order to calculate this reasonable royalty.  You have to

12   calculate -- this is what the reasonable royalty is supposed to

13   be:  It's supposed to be the royalty base times the royalty

14   rate, and the answer is the royalty amount.  That's the number

15   that you're going to put on the form.

16   Let's start with the royalty base.  So the royalty base is

17   the sale of all the gloves and the liners and the hats and the

18   socks.  That's the royalty base.  That's what Seirus would want

19   to license.  That's what Columbia would license is all of the

20   ability to sell products that compete with Columbia.

21   You heard some discussion about the entire market value

22   rule.  And the entire market value rule says that if the

23   patented feature creates the basis for customer demand or

24   substantially creates the value of the component parts, the

25   base revenue would be the value of the whole product.  So that

means if the use of the HeatWave invention -- sorry -- if the
use of Woody's invention is what drives consumers to buy these
products, then the royalty base is the entire glove.  It's the
entire hat.  It's the entire sock.  It's the entire product
line.

There's a great example of it that Seirus sent us a slide
for, but ended up not using, which is this example of the
satellite radio patent.  Imagine a patent for a satellite radio
that's going to go in a Lamborghini.  Do people buy the
Lamborghini because of the satellite radio?  No.  People buy
the Lamborghini because it's a Lamborghini, right?  They're not
buying it because it's a satellite radio -- because it has a
satellite radio.  So in a situation like that, it would be
inappropriate to figure out what the royalty would be on the
sale of the cars as a whole.  You should be figuring out what
the royalty would be for the use of the satellite radio.

Or you wouldn't start with, well, Lamborghini's sold, you
know, $100 million worth of cars last year, and so we should
calculate the royalty based on $100 million worth of sales.
People aren't buying Lamborghinis for the satellite radios.
It's a component, if you will, a piece of the car, that does
not actually drive the consumer demand.  That's not why people
buy it.  It doesn't drive consumer demand for this car.

But that's not this case.  This case isn't about satellite
radios and Lamborghinis.  This case is about HeatWave fabric

09:59

09:59

10:00

10:00

10:01

1    which is splattered across all of their advertising materials.

2    It's on their website.  It's on every one of the gloves, on all

3    the hangtags.  Sometimes they make it super visible -- every

4    one of the hangtags.  They even stitch on the socks -- they

5    stitch a little bit curling out so you can make sure to see it.

6    What's that shiny stuff there?  Even on the HeatTouch Torche

7    glove that is a $400 glove, battery packs and everything, it's

8    a third of the -- a third of the back of the box is about

9    HeatWave.  The website, you saw the website.  You saw their

10   advertising materials.  You saw the fact that in virtually

11   every single product on the list, the name of the product is

12   HeatWave.

13        It's not -- it's not, you know, our gloves with buckles.

14   They don't put them in a catalog sorted out by, you know,

15   gloves with zippers versus gloves with Velcro or gloves that

16   are waterproof.  "Here's our waterproof line."  No.  There's

17   the HeatWave line of products.  The HeatWave line of products

18   is associated with the HeatWave name and the HeatWave fabric on

19   the inside.  They are driving demand for this product through

20   the use of the patented technology.  And so the royalty base in

21   that case is the total revenues that they have earned from

22   selling all of the gloves where -- and other products that

23   infringe the utility patent.

24        Now, this number, ███████████, that's their total

25   revenues.  That does not include the products where it's facing

1    away.  That's not included in that number because these don't

2    infringe the utility patent.  These gloves infringe the design

3    patent, but they don't infringe the utility patent.  And we're

4    not accusing them of that.  So that ███████ number, that

10:01  5    is their total revenue for sales of products that infringe the

6    utility patent, except we didn't include the HeatTouch Torche.

7        You heard a lot of talk in the past couple weeks about

8    "every last penny we've sold on this $500 glove."  It's only

9    1 percent of their sales, and to avoid any confusion or

10:01  10   complication, we -- ██████, we just wrote that off.  And so

11   that's not included in this number either.   ███████ is

12   their total revenues for the remainder of their products.

13       Now, from there you figure out what the royalty rate would

14   have been.  Right?  To figure out the royalty rate starting

10:02  15   point, what did Columbia license it to other people for?  And

16   what you heard in the record is kind of in that 10 to 15

17   percent range, but that's to Columbia's best friends.  They're

18   licensing at 10 to 15 percent for people that are going to help

19   promote Columbia's brand name and help promote Columbia's

10:02  20   technology, and they're going to -- these companies are going

21   to pay money to advertise for Columbia on top of the amount

22   that they're paying on a royalty rate.  They're going to put

23   Columbia's name on the products.

24       I mean you heard Mr. Merriman go through this very lengthy

10:02  25   list of everything that Columbia would get from these companies

1    in exchange for being allowed to practice Omni-Heat.  10 to 15

2    percent.  Is there any way on earth that Columbia would license

3    its Omni-Heat technology, its pride and joy, its first major

4    innovation coming out of its million dollar innovation lab --

10:03    5    is there any chance on earth that they would have licensed it

6    to a direct competitor to sell products that directly compete

7    against Columbia's gloves on the same shelf for 10 percent?

8        Every sale of this takes a sale away from this.  And

9    Columbia on this, they're going to make -- I forgot what the

10:03    10    numbers were, 40 percent profit, 50 percent, I don't remember.

11    But, anyway, right, Columbia is going to make profit selling

12    this.  But if they let a competitor sell that product, they

13    only make 10 percent?  There's no way Columbia would enter into

14    a license like that.

10:03    15        Now, you heard -- you heard some testimony that, well,

16    Seirus could have simply turned the fabric around.  Just turn

17    it around so it faces the other direction.  And so Seirus

18    wouldn't have been willing to pay a 10 percent royalty if all

19    they had to do was turn the fabric around.  So why didn't they?

10:04    20    Four years.  Four years we've been at this.  And if all they

21    had to do was turn the fabric around, why didn't they do it?  I

22    mean they did it on products where you can see it.  They did it

23    on socks and on gloves where we can still see the technology

24    because it's made from a single piece of fabric.  But in four

10:04    25    years, they wanted the consumer to see what was going on on the

1    inside of the glove.  There's no way that they would have said,

2    "Oh, that's all right.  We'll just turn the fabric around so

3    that nobody can see that technology that we're using competes

4    with Columbia."  That's the whole purpose.  If they turn that

10:05   5    fabric around so that it's all black, suddenly they're just

6    like every other glove on the market, and they can put a

7    hangtag on it that says HeatWave, but nobody is going to know

8    what that means or why.

9        They needed to have that reflective stuff showing in order

10:05   10   to be able to market these gloves as being unique and different

11   on the marketplace.  The concept that they could have just

12   turned the fabric around is inconceivable.  If it was

13   conceivable, why not?  Why are we here?  Four years ago this

14   would have been all over if it was that easy to do.  You heard

10:06   15   testimony that it would have taken no more than $1,000 and ten

16   hours' time for somebody to just come up with a new print

17   pattern and put it up at 75 percent coverage.  Ten hours and

18   $1,000, and they could have used a noninfringing design and

19   gone up to 75 percent coverage.

10:06   20       Why not?  Why didn't they do it?  We learn on the eve of

21   trial "Okay.  We're starting to launch some new products that

22   will do that."  On the eve of trial.  It's four years.  They

23   want you to believe that this patent is worthless, that they

24   wouldn't have licensed it for anything.  I think Ms. Distler

10:06   25   says about $125,000, that's all the royalties that Seirus would

10:07   1   have been willing to pay.  But Ms. Distler's own firm has
      2   billed more than $125,000 for her work in this case.  She said,
      3   I think, up to 300 hours they've spent so far on trying to come
      4   up with a number that's $125,000.  If it was that easy, we
      5   wouldn't be here.  There's a bench of attorneys over here.
      6   They want you to believe that this patent is only worth
      7   $125,000.

      8       I don't think it's that easy to design around because if
      9   you design around it by turning the fabric inside out or going
10:07  10   above 75 percent coverage, nobody's going to buy it, and that's
     11   why it was so important.  That's why it was so important, and
     12   they're willing to spend untold amounts of money on lawyers
     13   over four years to argue that they should only have to pay
     14   $125,000.  It's too important.

10:08  15       Mr. Merriman testified.  He wouldn't have gone below 20
     16   percent.  He would have expected the deal to have landed
     17   somewhere between 20 and 30 percent.  But there's no way that
     18   he would have gone to management for less than 20 percent.  It
     19   wouldn't even be worth it to license to a competitor.

10:08  20       You heard Ms. Morones testify.  She thinks that the
     21   reasonable royalty would have been about 21 percent.  So if you
     22   start here, here is the reasonable royalty.  Here's the gross
     23   revenues.  Seirus has gross profits about 54 percent.  30
     24   percent, that would be ████████████.

10:09  25       You'll be asked to write on the verdict form how much you

1    think the reasonable royalty would be.  30 percent royalty,

2    ██████████.  20 percent royalty would be ██████████.  If

3    you find it would be a 10 percent royalty, which that's what

4    Columbia licenses to their best friends for is 10 percent.

10:09    5    That would be ██████.  And, again, we would suggest that the

6    patents would be licensed together, and if you agree with that,

7    if that's how you as a jury assess what the royalty would be,

8    we would just ask that you make it clear on the verdict form so

9    the parties know what you were thinking, but a single royalty

10:09    10    amount that covers both patents in the amount of 20, 30

11    percent.

12        All right.  You're going to be separately asked to

13    determine what Seirus' profits were because there's going to be

14    some decision-making after you are all gone back to your

10:10    15    families about which form of damages Columbia's entitled to

16    here.  And as we talked about during opening, design patent

17    damages use a different -- you can use a different way of

18    collecting damages which is called "disgorgement of profits."

19    And that's because we talked about the fence.  The fence for a

10:10    20    design patent is pretty small.  Right?  It covers a pretty

21    small piece of territory, and it's very specific.  Here it's

22    heat-reflective materials for use in garments that has that

23    specific wavy line pattern.

24        And so you're going to be asked to calculate Seirus'

10:10    25    profits, and just put that number on the form, what were their

1    profits from selling the infringing products?  Okay.  Here is

2    the statute.  Here's the law you're going to be asked to

3    follow:  "Whoever sells or exposes for sale any article of

4    manufacture" -- there's that word;  there's the buzz word you've

10:11    5    been hearing about for the last two weeks and probably had no

6    idea why it matters because it hasn't been very well explained

7    to date -- but "Whoever sells or exposes for sell any article

8    of manufacture to which such design or colorable limitation has

9    been applied shall be liable to the owner to the extent of his

10:11    10    total profit."

11    Whoever sells or exposes for sell any article of

12    manufacture shall be liable to the extent of his total profit.

13    So here's a question:  What is it that Seirus sells?  Seirus

14    doesn't sell fabric.  They are going to want you to believe

10:11    15    that all that Columbia's entitled to are the profits that they

16    make on selling fabric, but Seirus doesn't sell fabric.  Seirus

17    imports into the United States gloves and sells those gloves to

18    consumers.  That's the article of manufacture to which the

19    design is applied.  That is the product that they are selling

10:12    20    or offering for sale into the United States.  The article of

21    manufacture that they are selling is gloves.

22    Seirus' profits on the gloves and all of the products that

23    have the HeatWave fabric in them is ██████████.  Now, this

24    number is a little bit higher than what we talked about with

10:12    25    the reasonable royalty, and the reason is, again, these

1    products.   They've sold about ███████████ worth of their

2    products made from -- exclusively from HeatWave fabric, right?

3    These products infringe the design patent, but they don't

4    infringe the utility patent, so when we're talking about the

10:13    5    reasonable royalty, we were only talking about those products.

6    But for the design patent, we're talking about all of the

7    products that have the HeatWave fabric in them, so that's

8    ███████████.   That is their gross revenue.   They have about a

9    ███ percent gross margin.

10:13    10    And then you heard some debating between the experts about

11    how much of that is variable costs that are attributable to the

12    sales and manufacture and whatnot of that HeatWave gloves and

13    other products, and total profit is 41 percent.   That's what

14    Ms. Morones calculated.   You heard that she -- heard what

10:14    15    Ms. Distler said, and she adjusted, and there was some things

16    she agreed with and some things she didn't agree with, but she

17    came up with -- I think it was 41.6 percent.   The total profits

18    then is ███████████.   That is Seirus' profits from the article

19    of manufacture that they sell.

10:14    20    Now, it was like an eternity listening to testimony on

21    spreadsheets -- at least to me it was.   I had a hard time

22    staying awake, and I know it was all very small type on the

23    screen, and a lot of us -- accounting terms that -- I never

24    took accounting, and so these numbers were racing over my head,

10:14    25    and these figures were racing over my head.   And I don't know

1    how you all can figure it out.  I've been immersed in this case

2    for years, and I still don't know half of what was talked about

3    with respect to these numbers.

4        But there were a couple of points that I heard very

5    clearly, and this was one of them:  Ms. Distler's total profit

6    number, her total profit number, was $500,000.  That's the

7    amount that she said Seirus sells of article of manufacture,

8    $500,000.  That's the total.

9        Now, Seirus sells products, as you know, that are made 100

10   percent from HeatWave fabric, 100 percent.  You heard a closing

11   question, even the cuff is made from HeatWave fabric; it's just

12   folded over.  And that's the way it is in these gloves, both

13   the silver ones, the black glove liners, all of the hat, the

14   skullcaps like this, again, 100 percent HeatWave fabric.  Okay.

15   Same with the socks, 100 percent HeatWave fabric.  If you look

16   at the profits that Seirus made on selling products that are

17   made 100 percent from HeatWave fabric, it's $589,000.  How is

18   it possible that Seirus made $500,000 in profit selling

19   HeatWave when they actually made 500 -- almost $600,000

20   exclusively on products that are made 100 percent from the

21   HeatWave fabric?  It makes no earthly sense.

22       And now as I was sitting here, I was listening to the

23   testimony, and it sounds like what Ms. Distler did is she broke

24   out the costs that are associated with these products like this

25   pair of socks -- 100 percent HeatWave, okay?  She took this

1    pair of socks, and she said, "Well, I'm going to divide it into

2    as many pieces as I can and allocate some of the profit to the

3    sticker, the hangtag, the labor to put it together."  And so

4    what's left in terms of profit that is attributed to the single

10:17    5    piece of fabric that is 100 percent what the consumer is

6    buying, I think she said she's only giving 35 percent value to

7    that piece of fabric.  The entire glove is made of HeatWave,

8    and she's saying only 35 percent of the profit is attributable

9    to HeatWave.  So I -- I mean I stopped at the store this

10:17    10    morning, and I bought myself an apple.  The apple cost me $1.

11    And I'm going to assume that the grocery store probably makes

12    about 20 cents' profit on this apple, but not according to

13    Ms. Distler.  According to Ms. Distler the store doesn't make

14    20 cents' profit on the apple.  The store makes probably

10:18    15    5 cents' profit on the apple, 10 cents' profit on the labor

16    costs of having somebody put the apple on the shelf, 3 cents'

17    profit on the taxes that they had to pay to bring the apple

18    across the border, 2 cents on freight to bring the apple to the

19    store.  There's probably a penny in there of profit that are

10:18    20    attributable to the shopping carts that they have to buy.  So

21    the apple itself, that's not 20 cents' profit.  According to

22    Ms. Distler, the apple would be worth maybe like 3 cents to the

23    store.  That's how much profit she would say that they made on

24    the apple.

10:18    25        I was thinking about another example.  I was struggling to

try to figure out why this made no earthly sense to me that

products that are made 100 percent from HeatWave fabric can

only be 30 percent of the product is attributable.   I was

thinking about going to McDonald's and buying a cup of Coke,

right?  I don't know if you all know this, but the cup costs

McDonald's more than the Coke.   You buy a Coke for $2, they

make $1.50 profit, something like that.   But according to

Ms. Distler, McDonald's makes a whole lot of profit on cups.

They're not making profit on Coke.   They're making profit on

cups, on packaging, on shipping costs, on freight, on labor, on

taxes, on import duties.   The profit on the Coke itself,

10 cents, maybe.   I don't know.   We'd have to get the bill of

materials, I suppose, and figure that out.

    But what I also heard her say was that this approach that

she used that rendered this only 30 -- only 30 percent of the

profit on this is attributable to the infringing product, what

I heard her say is that the analysis she used on this permeates

all of her analysis, 100 percent.   She used that same analysis

to go through all the rest of the products.   And I heard the

explanation for why, and I heard it enough that I wrote it down

on a piece of paper as soon as it came out at trial.   I was

like, "Wow.   That's the answer to the question right there.

How did she get there?"

    That was her answer:   "I was trying to figure out how to

get to the lowest cost I could get to."   That can make 20 cents

1    on an apple be 3 cents.  That can make a Coke at McDonald's

2    where they make $1.50, 10 cents' profit on the Coke.  The rest

3    of it is on stuff you can't even touch.

4        People buy these socks, people buy these gloves because the

10:21    5    technology is there.  That's why they buy it.  People aren't

6    buying a HeatWave glove to have a nice hangtag to put on the

7    wall.  They're not buying this glove, mitten, whatever, they're

8    not buying this because of the insulation.  How do I know that?

9    It's not even mentioned.  It's like -- this hangs on the shelf.

10:21    10    Half of it is talking about HeatWave.  But if you go through

11    and try to apportion down how much of this is HeatWave and then

12    say, well, they only spent a fraction of it on the cost of the

13    fabric itself, we're going to only attribute the fraction that

14    they actually spent on the HeatWave fabric, you end up with

10:22    15    this absurd result where the sole reason people buy it is

16    discounted to the point of being the lowest cost that I can get

17    to.

18        People don't go to McDonald's to buy some labor.  People

19    don't go to McDonald's to buy some freight or duty or taxes.

10:22    20    Or cups.  People go to McDonald's, and they buy a Coke because

21    they want the Coke, and that's what the profit is for.  And if

22    you ask anybody how much profit did McDonald's make on that

23    Coke, they're going to say it was $1.50 on the Coke.  There's

24    no profit on the cup.  That's not what they're selling.

10:22    25        So Seirus' profits from selling articles of manufacture

1    into the United States is the ████████ that they made from

2    selling HeatWave products and selling them prominently as

3    HeatWave products, and we carved out the HeatTouch Torche, so

4    it's -- that's ██████ just taken off the top.

10:23    5         Now, if there's a product that you think -- maybe you think

6    that this product, people aren't buying for HeatWave even

7    though that's the whole front of the product again.  If there's

8    a product that you think that shouldn't be -- the sales

9    shouldn't be what we say it is, you can go adjust the numbers

10:23   10   that you put on the jury verdict form, the -- if you want to

11   write this down, it's Exhibit 705.  That has all of the money

12   that Seirus made on every single product that's accused in the

13   case.  If there's something that you feel the profits that are

14   attributable to the patented invention are not what we say they

10:23   15   are, you can subtract that out if you want.  But I would offer

16   that these products are sold because they're HeatWave products.

17   That's the name.

18        All right.  That's three questions.  There's one last

19   question:  Was Seirus willful?  That means did they act

10:24   20   deliberately?  Did they have knowledge that their acts might

21   have been wrong?  And there's going to be a separate question

22   about whether they were willful with respect to the design

23   patent and the utility patent.

24        Just to go back in time a little bit and set the stage, the

10:24   25   utility patent application as you know was filed in 2010.  And

1    later that year, in November 2010, the patent office published

2    that application so that that application was available to the

3    public for anybody to see.  Anybody that does a patent search

4    through the patent office system can find patent applications

5    for Mr. Blackford or for Columbia, and the law is all of those

6    proceedings are public.  They're all online.  You can -- any --

7    once a patent application has been published, it's -- the

8    entire proceedings are available for the public to see.

9        Now, you've seen a lot of this.  Seirus' Omni-Heat program,

10   they knew that it was patent pending.  They wrote that it was

11   patent pending to their vendors.  On April 4, 2012, the design

12   patent was issued by the patent office.  That's right in the

13   middle of their development.  Right?  They started -- they say

14   they started thinking about this reflective stuff back at the

15   steering committee meeting, I think, in late 2011, early 2012.

16       In April of 2012 the design patent issues, but they

17   continue developing, right?  They continue working on this into

18   July.  There's a July email talking about the Omni-Heat lining

19   material, and they knew it was patent pending.  They actually

20   asked questions internally:  How should I be referring to this

21   Omni-Heat printing that we're doing on this Ventex fabric?  And

22   then they get copies of Columbia's marketing materials to get a

23   photograph of how Columbia advertises its product.  This is

24   still in July 2012.

25       So they continue on their development process, and I think

1    you saw in their slides that January 2013 they had a big trade

2    show booth, and they had it in the corner of the booth as their

3    marquee product, January 2013.  By March 2013 the patent office

4    had now issued its fourth notice of allowability -- maybe it

10:27  5    was five actually.  And the first one was in late 2012, but

6    there were a bunch of subsequent ones, so this patent has been

7    granted by the patent office five times now -- four times, I

8    don't remember.

9        Anyway, Seirus is about to go to market, right?  They are

10:27 10   advertising this as the marquee product in their trade show

11   booths, and they're starting to get success.  Okay.  This is an

12   email March 2013.  The exciting news is that we are getting

13   amazing response on our HeatWave glove styles.  This is an

14   email that's being sent to Ventex.  They're starting to get

10:27 15   amazing response.  In fact, a week later, "I just received some

16   great news.  I got approval to place an additional 10,000-yard

17   order."  They are fully invested at this point.  10,000 more

18   yards to get ready to sell in the upcoming year.  That's March

19   2016 -- 2013.  Sorry.

10:28 20       But something happens.  Three weeks later.  There's a

21   rather alarming email that arrives from Ventex, and the email

22   says, "I believe you already considered the similarity with

23   Columbia's Omni-Heat.  As we are expanding business to America,

24   we are checking patents.  We found a little similar wave

10:28 25   pattern.  I attached Columbia's one for your reference."  And,

1    indeed, Ventex sent a copy of Columbia's design patent to

2    Seirus and said it looks like there's a similar wave pattern

3    out there.

4         The patent -- the email went on a little further, though,

10:29    5    and started to talk about other patent issues.  This is the

6    second paragraph:  "I attached the one doc for helping the

7    potential issue of patent with Columbia for the future."

8    Remember there's that patent pending logo in the middle of the

9    fabric.  And it says -- suggesting there might be a patent

10:29   10    problem in the future.  And, in fact, they attached a copy of

11    the Fottinger patent and said -- here's what they said:  "It

12    means Omni-Heat can be a nullity and anyone can use this

13    technology nowadays, but need to double-check for Columbia's

14    patent carefully.  Please check your legal team with attachment

10:30   15    and Columbia's patent also."

16         And they want to claim that they had no idea that this '270

17    patent was about to come out.  No earthly idea.  How would we

18    know?  Need to double-check Columbia's patent carefully.  Did

19    this email just arrive out of the blue?  And nobody at Seirus

10:30   20    knows what's being talked about?  "Please check with your team

21    carefully," and, again, there were two attachments.  One of

22    them was the design patent, and the other one was Fottinger.

23         Morgan Chin gets this email April 4, 2013.  That date will

24    become important.  April 4, 2013.  And Ms. Chin is concerned.

10:31   25    She sends an email off to Bob Murphy:  "See below from Ventex

1    regarding patent information.  Can you please follow up if

2    there's something we need to do?"

3        And what's the response from Mr. Murphy?  "Have these guys

4    signed our vendor agreement?"  Why does he want to know if

10:31    5    Ventex has signed the vendor agreement?  Why is that his first

6    response?  Maybe it's this:  Maybe it's the clause that says

7    that Ventex will pay for any lawsuits for any laws that were

8    broken.  It's called "indemnification."  Why else would he want

9    to know if Ventex signed?  That's his first response.  Alarming

10:32    10    patent problems, patent problems, patent problems, design

11    patent very similar, potential future problems with Columbia

12    coming up.  Have these guys signed that indemnification

13    agreement?  That's the response.

14        Two months later to the day, the '270 patent issues, but it

10:32    15    has been known for months that the patent office is going to

16    grant that patent.  The patent office first said it was going

17    to grant the patent back in November 2012.  They said it four

18    more times.  Seirus would like to have you believe that they

19    had no earthly idea about the utility patent in this case.  It

10:32    20    said patent pending.  Seirus wants to claim sort of ignorance,

21    if you will, like "We didn't know."  I think they said nobody

22    even read that email.

23        Seirus is a sophisticated party.  They've got 20 patents of

24    their own.  You heard testimony.  They've got like four patent

10:33    25    firms working for them at this time, 2013, four different

patent firms working for them.  They've got this international
firm called Troutman Sanders that was doing work for them, some
firm in Utah, some firm in California.  They have patents
they've applied for in 17 countries around the world, and they
want to say, "We had no earthly idea.  We didn't bother to
check.  We didn't bother to look."

     If anybody had pulled up a search for that '093 patent, the
design patent, it's linked to the utility patent.  They
actually -- you'll see the numbers for the design patent right
on the front page of the utility patent.  Anybody doing a
search would have looked and found the patent if they wanted
to.  But maybe nobody wanted to.  Maybe nobody wanted to find
that utility patent because once you know a patent exists,
you're on the hook for willful infringement.  And at that time
they're placing another order for 10,000 yards.  It's called
"willful blindness."  "I don't want to know about it" --

               MR. MARCHESE:  Your Honor, objection.

               THE COURT:  Overruled.

               MR. ALDRICH:  "I don't want to know about it.  I'll
put my head in the sand.  I won't open the email.  I won't open
the attachments, and then I can say I didn't know."  And that's
willful infringement.  If you had a reason to believe that the
facts were out there, and you chose not to look at them, that's
willful infringement.

     Now, later, Judge Hernandez actually rules that Seirus

1   infringes the design patent.  And what did Seirus do?  Did it
2   withdraw all the products from the shelf?  Did it stop shipping
3   orders?  They said no, we had commitments to mom and pop shops
4   like REI and amazon.com and Dick's Sporting Goods, big box
5   shops.  It's still on their website.  You saw the -- we pulled
6   up the website live last night -- or a few days ago.  I pulled
7   this one up last night saying it's still there.  There's the
8   HeatWave glove.

9       Did they respect the Court?  Did they respect the judge's
10  findings?  Did they stop infringing?  No.  That's willfulness.
11  That's deliberately taking act -- they knew that every single
12  glove that they shipped at that point on was an act of
13  infringement.  The judge had already told them so.  And they
14  said, "Well, no disrespect to the judge, but we've got a
15  commitment to REI."  That's willful infringement.

16      Those are the four questions you'll be asked.  Is there
17  infringement?  Is there invalidity?  What are the damages?  And
18  were their actions willful?  And we respectfully request that
19  you find in our favor on those.

20      These are not -- this isn't a dispute that Columbia ever
21  wanted to have.  Columbia just wanted to make fabric, make a
22  new technology, use it by itself, set up the fence post, get
23  its patent, and just have people respect its boundaries, and
24  that's not what's happened here, and it's been deliberate.
25  That's the end.  Thank you.

1        THE COURT:  Members of the jury, we'll be taking our

2   morning recess at this time.  So that you can kind of plan as

3   things are developing, we'll be in recess for about 15 minutes.

4   I would urge you if you have a snack and get something -- a

5   little snack to eat because what will happen is then the

6   defense closing, plaintiff's rebuttal, and then you're going to

7   lunch.  And so that might be a little bit later than normal.

8   It might be 12:30 or 1:00, so that's why if you have a little

9   something to eat now, go ahead and eat it now.

10       After you go to lunch and then come back, I will instruct

11  you, and you'll begin your deliberations.

12       With that go ahead and take your recess.

13       (Proceedings held outside the presence of the jury panel.)

14        THE COURT:  15 minutes.

15  (Recess.)

16  (Proceedings held in the presence of the jury panel.)

17        THE COURT:  Closing for the defense.

18        MR. MARCHESE:  May I proceed?

19        THE COURT:  You may.

20        MR. MARCHESE:  Thank you, Your Honor.

21       Well, we're almost to the end.  We're really, really close

22  now.  I can tell you that I am tired.  I'm definitely tired.

23  It's been a long trial.  And really thank you guys for your

24  time and attention in this matter.  I know it's a lot of new

25  information.  It's technology.  It's patents.  It's things we

1    don't see in our everyday life unless you're somebody like me

2    who sees it every day, but I just want to thank you guys so

3    much because you've been incredibly attentive.  You've paid

4    attention through the entire trial, through the entire case,

10:57    5    and we couldn't thank you more.  The entire Seirus team, my

6    firm, all the folks working with me, and everybody in the

7    courtroom that's been here really thanks you for your service

8    and your time and your attention.

9        But I want you to be careful in this case.  I don't want

10:57    10    you to get lost in the emails.  I don't want you to get lost in

11    all the accusations of copying and patent pending, all these

12    things like this because you know what this is?  At the bottom,

13    this is a patent case.  And this is about patents.  And this is

14    about whether a patent that they received is valid.  The '270

10:58    15    patent, is it valid, infringed, and are there damages, and then

16    there's a question for the design patent of damages only.

17        And I would like you to think of it very carefully because

18    you've seen the technology.  This is low tech.  And I don't

19    mean that to be dismissive or anything like that.  There's

10:58    20    patents on golf clubs, on putters, on all kind of things that

21    are not particularly high tech.  But there are also patent

22    cases where you have to deal with electronics, software,

23    pharmaceuticals, chemical compositions.  Those are difficult

24    topics, difficult for even the most educated and knowledgeable

10:59    25    people to understand.  But in this case, you're fortunate.  You

1    have a case where you can use your common sense.  You can apply

2    what you know and have learned in your everyday life to try to

3    figure out whether one fabric applied to another and having a

4    particular amount of coverage is patentable, is subject to a

10:59    5    patent.  And we submit that the evidence has shown conclusively

6    that this is old.  It was done before.

7         I'm going to take you through evidence.  I'm going to show

8    you testimony.  I'm going to show you Dr. Cole.  I'm going to

9    show you testimony from Mr. Blackford and other people who have

10:59   10   testified in this case to show you that the concept of having a

11   breathable fabric and then putting one that's not breathable on

12   it and then making holes in it to allow air to go through and

13   to make it a little bit more, a little bit less, a little bit

14   more, a little bit less is common sense.

10:59   15        Dr. Cole told you that.  It was known.  It's common sense.

16   And so we would ask you when you go back to deliberate and when

17   you're looking at the prior art, you take a look at Fottinger.

18   It's two and a half pages.  It's in plain English.  You can

19   look at it and read it for yourself.  You should do that.  You

11:00   20   should take a look at it because I think when you do, you will

21   see that it discloses each and every element of the claim.

22        And I think you will see in addition to that -- well, what

23   you'll conclude from that is that this patent, the '270 patent,

24   is invalid.  Once you've reached that conclusion -- I'm going

11:00   25   to show you this really quickly and you'll become very familiar

1    with it shortly.  This is the verdict form.  This is what

2    you'll eventually fill out.  It's pretty simple.  The Court

3    will give it to you, and you'll get a chance to see, but in it

4    for the '270 patent, you have to check off a few boxes.  Is it

11:01    5    infringed?  Is it invalid?  If you conclude invalidity or

6    noninfringement, you don't have to talk about -- you don't get

7    to damages.  You don't get to willful infringement.  They're

8    irrelevant.

9        And with respect to the design patent, I'd also like to

11:01    10    submit to you it's not particularly complicated.  It's a

11    question of what is the article of manufacture.  Even

12    Mr. Aldrich has told you that.  That's what the patent statute

13    says.  That's what Congress has told you you have to look at.

14    What is the article of manufacture?  Once you figure that

11:01    15    out -- and, by the way, you'll be instructed the article of

16    manufacture can be a component.  It can be a component of a

17    larger thing.  And once you figure out what the article of

18    manufacture is -- is it the fabric?  Or is it an entire

19    glove -- you'll then figure out what the profit is.

11:01    20        But the evidence has made clear that the article of

21    manufacture in this case is the fabric.  It's made,

22    manufactured.  You heard evidence about this, they put it on

23    rolls.  It's a finished product that comes out.  Ventex sells

24    it to Harley.  They sell it to Seirus.  It is a finished

11:02    25    product that can be used in a variety of different ways.  You

1    can make a blanket out of it, a tent, a sock.  You can do what

2    you want with it, but it is an article of manufacture.  And

3    when you've reached that conclusion, I think you'll agree that

4    the number that Columbia is trying to get is way too big.  It's

11:02    5    way too big.

6        They're entitled to some damages in this case.  No

7    question.  They can.  But they can't get something that's

8    grossly excessive.  They can't get something that punishes

9    Seirus, and that's what they're trying to do.

11:02    10        All right.  Let me talk a little bit about what you've seen

11    and heard.  You saw -- remember the video at the beginning of

12    the case?  Judge Vogel talked about patents and the patent

13    process, and he said that the -- he summarized the

14    United States Constitution, and he told you what it says.  It's

11:03    15    intended to promote the progress of science and useful arts.

16    And that means you have to actually have something patentable

17    in order to get a patent from the -- you have to have an

18    invention that's different -- sufficiently different from the

19    prior art.  It's not anticipated.  It's not obvious.

11:03    20        If you get a patent that happens to land on somebody else's

21    property, a public park, whatever it happens to be, if you land

22    on somebody else's property, like, for example, you can't

23    buy -- you can't go down to Balboa Park and set down

24    barbed-wire fences -- right? --  and say, "This is my property

11:03    25    now."  You can't because Balboa Park is owned by, I believe,

1    it's the city, owned by the city.  It's public property.  You

2    can't take it.  You can't go over to Mr. Fottinger's house and

3    set up shop in his backyard and say, "It's my property now."

4    You can't do that because Mr. Fottinger already owns it.

11:04    5        And that's what happened here.  You can't -- you can't get

6    a patent by any means, and we're going to talk about that.  You

7    can't use it to monopolize property, public or otherwise,

8    that's already owned.  That's not what the patent system is all

9    about.  It's about promoting the progress of the science and

11:04    10    the useful arts, not taking somebody else's property.

11        So I think this is what happens in trial so often, you

12    always hear people talk about what you saw.  Well, I saw this,

13    I saw that.  What's equally important is what you did not see.

14    What you did not see, because that leaves you with the ability

11:04    15    to infer, reach conclusions about things that you didn't get a

16    chance to hear about.

17        You didn't get a chance to see the Castelli jacket.  You

18    did not.  Remember those OutDry licenses?  Remember we heard

19    that Columbia bought a company called OutDry, and it had a

11:05    20    bunch of patents, and they had license agreements, and they

21    licensed their patents.  Mr. Merriman talked about it.

22    Ms. Morones talked about it.  You didn't get to see those.  We

23    don't know what the rates are in there.  Are they 2 percent?

24    Are they 4 percent?  Are they 50 percent royalty rates?  I

11:05    25    don't know and you don't know.

11:05

1    What else didn't we see?  We saw Mr. Blackford's lab notes

2    that he presented in -- during patent prosecution.  We've seen

3    that bendy curve over and over.  We'll see it in a minute.  The

4    bendy curve, you know when that happened?  2012.  You know when

5    he filed the patent?  2010.  If you go to the patent and look

6    at it, you will not find that in there.  You won't find it.

7    And you won't find that curve anywhere in prior work that

8    you -- that's been presented to you in this case.  You won't.

9    That was something that they generated and concocted after the

11:06   10    patent was filed.  That's a fact.  And you haven't gotten to

11    see anything else prior.

12    You didn't get to see any kind of independent testing done

13    to determine whether there was coverage in this 30 to 70 range.

14    What you saw was Dr. Cole did her own.  And that can sometimes

11:06   15    be okay, but when you're trying to prove patent infringement

16    and show that somebody's liable for millions and millions of

17    dollars, what you should do is send it out to an independent

18    testing lab.  Have them check it out.  Have them look at it.

19    Have them tell you what the coverage is.

11:06   20    You heard Mr. Blackford tell you that he has his own lab

21    that he uses.  You heard Dr. Cole tell you she didn't bother to

22    talk to Mr. Blackford at all to figure out any of that kind of

23    thing.  You heard Mr. Blackford tell you that the lab he uses

24    has a facility in Atlanta.  They're on the Internet.  You can

11:06   25    search them.  They're a very respected and well-known lab that

1    does this kind of thing.  She could have found that on the

2    Internet.  She's in South Carolina.  It's Atlanta.  It would

3    have been easy to do that, but that didn't get done, and you

4    didn't get to see what that would have generated, and it's

11:07   5    their burden of proof.

6         What questions weren't answered in this case?  You've seen

7    argument after argument, slide after slide, about where

8    Fottinger was disclosed.  Remember the Fottinger timeline?

9    We'll see -- apologies, but we'll see it one more time.  I

11:07   10    can't resist.

11         What happens with Fottinger is that, yes, Fottinger was

12    disclosed at the last minute, right before the -- after the

13    examiner had done all the work, had landed on the 30 to 70

14    range, but you never saw anybody testify as to why they found

11:07   15    it so late.  Is it because they hid it?  Withheld it?  Waited

16    till they got the 30 to 70 range allowed, which we all know

17    Fottinger has, and then submitted it at the very last second

18    when the examiner is like, "I'm done.  I've seen 20-some

19    references in the past few weeks," slip it in, and then let it

11:08   20    get -- sail the patent through.  You didn't get to hear an

21    explanation of why it was disclosed so late.

22         You never heard anybody talk about -- well, you heard a lot

23    about copying.  You heard a lot of allegations that Seirus is a

24    copyist.  But you never heard a motive for that.  What would be

11:08   25    their motive?  I would submit that what you did hear is that

1    Seirus is an innovative company.  Seirus makes its own

2    products.  It's had great success, it has an All Weather glove,

3    the -- which we've seen over and over.  We have the -- here's

4    the All Weather.  It was a huge seller, did really well.  This

11:08    5    is one of their inventions.  The HeatTouch Torche, you heard

6    about that.  You heard about a lot of different gloves,

7    Thermalux that they came up with.  And they have a long history

8    of coming up with their own products, developing their own

9    products, having success with their own products.  Why would

11:09    10    they copy?  They didn't need to, and they didn't.  You heard no

11    motive for it.

12        And then one thing that was eventually answered, but

13    wouldn't have been unless you heard a cross-examination, was

14    about Ms. Morones' Monday opinion.  Do you remember that?

11:09    15    Remember there was one on Friday, then we got one on Monday,

16    and then we got another one about a day or two later on

17    Wednesday, and then you heard testimony on Friday and

18    Monday -- I'm sorry -- Friday and Wednesday, but you didn't

19    hear anything about the Monday opinion because they didn't want

11:09    20    you to hear about it until it was revealed in

21    cross-examination.  So these are questions two of which were

22    never answered, one of which was only answered because of a

23    cross-examination.  Think about that.

24        Well, a patent by any means is not a patent that is legally

11:10    25    enforceable.  Here's what you heard from -- again, from the

1    video at the beginning of the case.  The inventor is required

2    to describe the invention in clear and specific terms so that

3    the public knows what the boundaries are.  Anyone who learns of

4    a patent then can read it and understand it.

11:10    5        Well, what happened here?  Mr. Blackford admitted over and

6    over again that he doesn't understand his own patent.  He

7    didn't know what "base material" meant.  He didn't know what "a

8    discontinuous array of discrete heat-directing elements."  He

9    didn't know what all that stuff was.  He's the inventor.  If he

11:10    10    doesn't know, how is the public supposed to know?  And here,

11    again, you heard Mr. Blackford asked about what does "coupled"

12    mean in the context of this patent.  And I asked him.  That

13    means that the elements, the base layer and the heat-directing

14    elements, don't have to be directly attached to one another.

11:11    15    They actually can be separated.  We talked about the Castelli

16    jacket.  They would have been separated.  It could be a piece

17    like this, apart, and then you could put them together.  That

18    would be "coupled" in this definition of the patent.

19        Mr. Blackford didn't know that, said it wasn't his

11:11    20    understanding even though a clear definition you can see from

21    the patent is right here.  "Coupled" may also mean that two or

22    more elements are not in direct contact.

23        Dr. Cole didn't understand the patent very well either.

24    She was asked about what the term "about" means.  You may

11:11    25    remember this.  It went on for quite a while.  She first said I

think it's reasonable that "about" would be considered to be
29.5.  She was talking about what's the lesser range of 30.
29.5, she said.  And then you heard Mr. Blackford.  He had a
different opinion.  Remember he said, "I disagree with her a
little bit.  I disagree with her a little bit."  And he was
asked, and he said, "Well, I think it's not 29.5.  I think it's
28.5."  The expert who was hired to testify in this case, she
thinks it's one level; Mr. Blackford, the inventor, thinks it's
a different one.  They can't agree, and they're on the same
team.

     And another thing that was really interesting in this case
I think that you should remember -- try to remember this:  You
have a citation to the testimony there -- you're going to get
the testimony; you can look at it.  Mr. Blackford, do you
remember?  He didn't -- he testified twice, remember, twice.
He came up the first time, and the ones that I asked him when I
asked him about what does discontinuous mean, what does base
layer mean, what do all these things mean, he didn't know.  He
didn't know.  Came back a second time, and the term "about" had
now become an issue because Dr. Cole had provided testimony
about it, and she was -- you can look.  She was all over the
map.  She didn't know what it meant.

     And what Mr. Blackford then had was a kind of a revelation.
He comes back, and he knows exactly what "about" means.  He
tells you.  It's plus or it's 5 percent above 70, 5 percent

11:13

1  below 70.  It is -- his numbers are here.  I can't do the math

2  in my head right now.  28.5 at the bottom, 73.5 at the top.

3  Exactly.  That's not what Dr. Cole said.  But what's remarkable

4  about it is this is this revelation that we all get to learn

5  about after he doesn't know anything about what the patent

6  claims mean.  He now knows exactly what "about" means, but it's

7  not in the patent.  You will find that nowhere in the patent,

8  and I would encourage you to look.  When you look at this

9  patent, you will see there is nothing in this patent about what

11:13

10  this meaning of "about" is that Mr. Blackford provided you, 5

11  percent above, 5 percent below.  It's not there.

12      And there's nothing in his patent about this bending curve.

13  You remember the -- if I can find a pen.  We'll look at it

14  again.  But just to remind you, remember it was like a curve

11:14

15  that went like that.  Remember that curve?  It's not in the

16  patent.  The first time you'll ever see it is in 2012 when

17  they're fighting against Levy, fighting to get past Levy.

18  They're battling, and that's the first time this comes to

19  light.

11:14

20      So what you've learned here is that none of this stuff,

21  none of this "about" language, not the curve, it's not in the

22  patent.  It was created after the fact, to create a patent, a

23  patent that could be taken out and enforced against others to

24  try to extract as many millions of dollars as they possibly

11:15

25  can, and they've finally run up against a company that has

1    stood up to them.  You've seen these license agreements,

2    branding agreements, and all these kind of things.  Finally

3    somebody is standing up to them.  Seirus has said this patent

4    is not valid.  This patent is no good.  It should be

11:15   5    invalidated.  I shouldn't have to pay anything for it.  And, by

6    the way, a defense to willful infringement is a good faith

7    belief that you have a defense.  And, hey, we're in a trial

8    right now.  We're in a trial.  We've got all the way to trial.

9    Clearly we have a good faith defense.

11:15   10       So what does this all mean?  Why is this important?  It's

11    important because the quid pro quo, the bargain that Columbia

12    was supposed to make to get a patent, they have to teach the

13    public what they're making was not complied with.  There's no

14    way to know the boundaries.  Dr. Cole doesn't know.  And she

11:16   15    disagreed -- I'm sorry -- Mr. Blackford disagrees with

16    Dr. Cole.  They don't know the boundaries.  We don't know the

17    boundaries.  Seirus doesn't know the boundaries.  Nobody knows

18    the boundaries.

19       Why?  How did it happen?  Because the attorneys wrote it.

11:16   20    It was a theme, I think, throughout this case that you saw.

21    The attorneys wrote things.  The attorneys helped to get people

22    to come up with opinions.  The attorneys delivered license

23    agreements to Mr. Merriman.  Over and over and over.  Same

24    thing here.  The attorneys wrote it.  The attorneys wrote

11:16   25    "about."  There's nothing in the patent about "about," and the

1    only time it ever comes to light about what maybe it means is

2    when we are in litigation after Mr. Blackford has testified

3    once, gone and talked to the attorneys, and come back and

4    testified a second time.  "Our attorneys wrote it."

11:16    5        What did Mr. Snyder tell you?  Remember he doesn't have a

6    dog in this fight, does he?  He doesn't work for the company.

7    He got fired.  He came in -- he got paid.  He came in, and he

8    testified.  But he was truthful because he told you that --

9    remember all the figures that were in the '270 patent?  We'll

11:17    10    look at them.  There's the wavy line.  There's the dots.

11    There's the hexagonals, all that.  That wasn't Mr. Blackford's.

12    That was Mr. Snyder's, and he got design patents on all of

13    that, and when he was asked how that happened, he said, "I

14    didn't put them in there."  We can presume that the lawyers

11:17    15    did.

16        I apologize, but I want to do the timeline with you.  We'll

17    go through it quickly, but I think it's important.  Remember

18    from the opening and now we've heard about it since, with

19    testimony in the record that the patent claims were originally

11:17    20    filed as you can see right here.  There's a timeline on the

21    left on these slides.  You can see it's kind of counting

22    through.

23        The examiner gets ahold of these and says rejection.  Every

24    single claim by Levy, and the examiner says Levy has

11:18    25    everything.  Now, you can see it right here.  Examiner says

it's anticipated.  You now know what that word means.  You now know that "anticipation" means that the prior art has each and every element in the claim.  The examiner says it right here.  Rejects all the claims.

11:18       But what happens?  What does Columbia do?  It has options at this point.  It could say, "You know what?  We give up.  You're right.  Levy is a problem."  They could stand on their claims and say, "Well, you know what?  We think you're wrong, Mr. Examiner.  We think you're wrong, and we refuse to bend.

11:18  We refuse to do anything.  We're not going to amend our claims."  Or the fork in the road, the third option is to amend.  It's effectively concede.  You could push back, you could stand strong and say, "No way, you're wrong," or you could give.  People do it all the time.

11:19       That's what they did, amended the claims.  And here's what they added, "discontinuous discrete independently coupled," all these things that we've heard lots of arguments about, added them.  What was the net result of that?  Rejected.  All the claims.  Levy, again, anticipated, everything, the examiner,

11:19  this person that they told you has done this examination, considered Fottinger, did all these things.  The examiner is telling them, "You guys are out.  Levy has everything."

       Now, what?  Fork in the road.  Same fork.  What do we do?  Abandon it?  Levy's such a problem.  Nothing we can get.  Let's

11:19  give up.  Stand on the claims.  Push back.  Tell them, "No way,

1    you're wrong." Or give. What do they do? They gave. They

2    amended. And what do they add? Well, we all know; we've seen

3    it countless times, the 70:30, the "about 70 to about 30." By

4    the way, when they added this at this point, there's no

11:20    5    explanation whatever about this plus 5 percent, minus 5

6    percent. Nothing. This is added to the claim, and then it is

7    total silence, the first time we've ever heard that theory was

8    in trial.

9        What else happened at this point when they added that

11:20    10    claim? -- I'm sorry -- that limitation, 30 to 70? What

11    happened was Mr. Blackford for the first time ever that I've

12    ever seen comes up with the curve. Here's the curve. And he

13    says -- this is his testimony at the top -- what does this

14    chart show? "So this is what we all expected. It's what I

11:20    15    expected. This is what the other fabric experts that I was

16    working with on my team, everybody expected to see that." His

17    team, expected it.

18        Well, what I've already told you is that these surprising

19    test results, I would submit since we haven't seen anything

11:21    20    prior to the patent application being filed, they were made up

21    during prosecution. They're not in this patent. These figures

22    are not in the patent. You don't see this linear assumption

23    anywhere in the patent. It only shows up in the prosecution

24    history after the examiner said no, no, no, you can't have it.

11:21    25    If you look at the abstract of the patent, you won't find it.

1    The abstract is the summary -- the succinct summary of what the

2    invention is -- not there.  When you see the description in the

3    patent about -- the paragraph that talks about 30 to 70, not

4    there.

11:21    5        So what did Mr. Blackford's sworn declaration tell the

6    patent office when this 30 to 70 range was added?  He went a

7    little further.  He went further than saying his team didn't

8    expect it.  He went further.  He said one of ordinary skill in

9    the art, a skilled person would have -- generally, anybody,

11:22    10   whoever that person is, would not -- would understand that --

11   or would expect there to be a linear -- a linear progression of

12   the curve.  In other words, he's trying to say that instead of

13   the bend, you have a straight line.  That's what everybody

14   would expect.  Not just my team now, but anybody.  Everybody

11:22    15   who's skilled in the art would expect it.

16       Well, what Mr. Blackford didn't tell the patent office is

17   that it was known.  People knew it.  He could have known it.

18   He could have found it.  You heard Dr. Block testify that he

19   spent one hour on Google, one hour, Google web search, type it

11:23    20   in, see expectations of MVTR or permeability.  He found

21   Ogulata -- the Ogulata reference.  You probably remember that

22   discussion about that.  He said it was a theoretical paper

23   written by a professor which gave you the blue dots that you

24   can see here, the squares, and then Dr. Block explained that

11:23    25   the Lawrence patent -- or paper came right after -- these are

1    all predating the patent, 2006 -- and explains and provided

2    more information about the Ogulata theory, made it more

3    concrete.

4        What did it show?  Not the straight line.  Not the

11:23    5    expectation.  No, not at all.  But rather the curve.  It was

6    known.  This was known before they filed their patent.  This

7    was known before the declaration was submitted.  This is old

8    stuff.

9        This is not a patent that should be upheld.  This is a

11:24    10    patent that should never have been granted.  It's built on

11    false assumptions and statements that are untrue.

12        What was Dr. Cole's thoughts about Mr. Blackford?  She

13    said, "I would caution in talking about him and how his

14    invention actually works because he's very humble, and he's not

11:24    15    a scientist."  He's not a scientist.  If he was a scientist,

16    maybe he would have found Ogulata.  Maybe he would have found

17    Lawrence.  Maybe he would have known about those things.

18    Instead of telling the patent office incorrectly that that was

19    unknown, that one of ordinary skill in the art would expect the

11:24    20    curve.

21        What else was a problem in that declaration?  What else?

22    The problem was there was this -- and you've heard it and

23    you've seen it -- 30 to 70 is the magic range.  I think it was

24    called "optimal" in his declaration, optimal range.  So above

11:24    25    70 is no good.  Well, about 70, which I guess is 73.5 now, or

maybe it's 75 -- I think Dr. Cole said it could be 80 and below 30 or about 30, but Dr. -- I'm sorry -- Mr. Blackford when he did this test, he stopped at 67, and he stopped at 40.  He didn't even bother to check and to tell the patent office what would happen in these areas that he's saying are not optimal. In fact he told the patent office that about 30 or below is not optimal.  Never even did a single test from 30 to 40.  Never did a single test from 67 to 70.  Never did a single test between 100 and 67.  How do we know?  How do we know that this curve takes a sharp left turn at 67 and winds up in a straight line at 100 if you didn't bother to test it to find out what happens?

     You can see it on the slide here if you were to draw these lines out from the data point you had, they wouldn't curve in the way he's showing you.  They would point in different directions, and you would need to take more data points to figure out what truly is optimal.

     So after that declaration is submitted with the statement in it that this expectation is what everybody would have of linear, which is not true, and that the 30 to 70 -- about 30 to 70 is an optimal range without any testing outside of that range, in fact, no testing in a big chunk of that range, the claims get allowed.  The patent examiner says, "Okay, 30 to 70, I'm going to give it to you.  Everything else is in Levy.  I'm going to give you 30 to 70."

11:27    But more happens afterwards it's very important for you to consider.  Very important to take this back to the jury room with you when you deliberate.  What happened afterward is just as important as what happened leading up to it.  You heard, again, in the video examiners have a lot of work to do.  There may be facts or arguments they didn't consider.  In addition there's a course of possibilities that mistakes were made or important information overlooked.  Examiners have a lot of work to do, and no process is perfect, and you saw all the files that they showed.  These are busy people.  In 2012 the patent office received 600,000 patent applications and issued 270,000 patents.

    So what did Columbia do?  I think of it this way:  You know how it is when you've accomplished something, a task, a goal, and you've got it, you've finished it, and you think this is great, I did it, and then something else happens and you're like oh, I'm already done.  I don't want to deal with that.  Typically it's not a stretch to say that people when they're done with something and they finish their work are less inclined to take a super close look back at it.  I think that's a fair statement.

    What happened after this examiner had done his work?  Well, Columbia disclosed 17 more references.  17.  That may not seem like a lot.  Maybe not in number, but this is what the examiner was given after he'd already done his work, examined it, said

11:29

1    it was okay.  Columbia gave him, I don't know, 200 pages worth

2    of dense patent text, patent figures, patent, patent, patent,

3    patents.  This is what he was given, said "Hey, take a look."

4    But that wasn't it.  Three more come in.  A few weeks later,

5    three more.  And then again near the end, another one, Worley.

6    You've heard about Worley.  Worley has the range.  Worley is in

7    the range.  Did Columbia say anything when they disclosed

8    Worley to the patent examiner and say, "Well, you might want to

9    look at it.  It's got the range"?  No, nothing.

11:29

10        And then what happened at the end?  The very last straw.

11    Fottinger.  Fottinger, no information.  You can look at these

12    exhibits.  You can look at the prosecution history.  No

13    statement in there about why Fottinger might be particularly

14    more relevant than anything else.  Nothing.  And like I said,

15    no explanation in this trial for why it happened so late.

16    Nothing.

17        So what did Mr. Blackford say about that when he was

18    confronted with this issue?  He said, "Well, there's little

19    stars on the references on the cover of the '270 patent when

11:30

20    the examiner gave them -- he looked a little closer at them

21    than everything else.  They've got a star."  And he said that,

22    you know, Fottinger has a star.  And that means that maybe they

23    were looked at.  Told this by the lawyers.  Well, when you go

24    to the cover of the patent, the '270 patent, and you see what's

11:30

25    there, there are stars for things that are cited by the

1    examiner, not things that are looked at a little more closely.

2    No star next to Fottinger.   No star next to Worley.

3        So what do we know from all this?  We know that -- we know

4    that Fottinger was given to the patent office at the last

5    minute.   It wasn't described in particular as to why it was

6    relevant.   And you remember all that back-and-forth with the

7    examiner about Levy?  The reason why we -- I wanted to go

8    through it, why we wanted to show it to you, is because there's

9    a tremendous amount of give-and-take and back-and-forth about

10   what Levy has, what Levy doesn't have.   There's argument.   None

11   of that happened to Fottinger.   Nothing.   You can flip through

12   it yourself.   You won't see an argument made.   You won't see a

13   distinction made.   You won't see the examiner getting a chance

14   to provide detailed views like you did on Levy because it

15   happened too late.

16       So everybody needs to follow the rules.   Everybody needs to

17   follow the rules.   What else did you hear about that was kind

18   of an interesting point considering the prosecution?  The

19   Castelli jacket.   And that you saw some testimony by -- I think

20   it was Ms. Morones where they underlined a part of a Castelli

21   document that said the author said he didn't like the way the

22   fabric felt, and then when we came up on the cross-examination,

23   we were able to show that the next sentence said, "But other

24   people really like it."   What you didn't see during that

25   testimony was what one of the disclosures about the Castelli

jacket is that it's really -- it was applauded as being

stellar -- a stellar jacket.  The secret to it was an ultra

thin radiation liner that traps the heat.  Well, here's the

liner.  That was -- this was in Dr. Cole's report.  But this

wasn't given to the patent office.  As we can see, Castelli had

holes poked in it.  Holes, which would mean that you had this

piece of foil laid on top of a fabric and holes are punched

through, and I think you heard Mr. Blackford say, "Well, they

punched the holes all the way through.  All the way through,

the foil plus the base layer laying beneath it, so the coverage

was 100 percent."  That's what he told you, and he said he had

a Castelli jacket, but we didn't get to see it.  It wasn't

given to the patent office, never made it into the courtroom.

But what we also heard is that the Castelli jacket had a

separate piece just like this Canadian ski team coat, which, by

the way, why would this Canadian ski team want to use this

coat?  It's just a tiny bit of Omni-Heat, right?  We know why.

Because it's a marketing promotion sponsorship.  They get

money.  That's why they use it.

But in any event, what you heard was even if the holes were

poked all the way through, which I don't know and you don't

know and the patent office doesn't know, you would still have

the holes laying on top of a separate piece of fabric behind

it.  That's what Mr. Blackford told you, and because the

definition in the patent of "coupled" is direct or indirect,

1  you would have holes laying on top of another fabric that would

2  breathe, that would push heat back, that would do exactly what

3  his patent covers, exactly.  Had the patent office gotten a

4  chance to see that, the outcome would have been different.  The

11:34   5  patent office would have had a chance to measure the coverage.

6  Mr. Blackford could have measured the coverage.  He could have

7  told the patent office it's just 10 percent.  It's just 15

8  percent.

9       I tell you I look at it, and I think it's probably in his

11:34  10  range, but you judge for yourselves.

11       Now, another thing you heard from Mr. Blackford was that --

12  so I'm telling you about Castelli, not just because a lot of

13  information wasn't given, but because he said that it was the

14  big one, the one that he remembered the most.  Yes.  I remember

11:35  15  it the most.  He had the jacket.  It had holes in it.  It had a

16  base layer laying behind it that was coupled.  He could have

17  given it to the patent office.  He could have taken photos of

18  it.  He could have measured the coverage.  He could have done

19  all those things but didn't, even though it was the big one,

11:35  20  the one that stood out in his mind.

21       And here you can see him agreeing it wasn't provided to the

22  patent office, and he thought they still had it in their

23  archives.  I think Dr. Cole may have said something about they

24  checked and they couldn't find it, but this is what

11:35  25  Mr. Blackford said.

1    So what's the overview of all this?  The inventor didn't

2    understand the terminology used, but then later figured out

3    what "about" meant with precision, even though Dr. Cole

4    disagreed with him "just a little bit" I think was the words.

11:35   5    And the thing that Columbia is telling you that's novel, this

6    curve that we see here, it's not even in the patent.   What

7    they're telling you is the big aha, this is the magic stuff, is

8    not even in the patent.

9    So let's talk about what was really known in the prior art.

11:36   10   We know Levy had everything.   The examiner told us it had

11   everything.   Finally, when they did 30 to 70, allowed the

12   patent.  Dr. Cole -- well, what I'd like to do is I'd like to

13   walk through Fottinger at this point.   Show you why it has

14   everything.   I think it's important.   I know you've seen it a

11:36   15   lot, you've seen the claims a lot.   I know you're probably

16   tired of it all, but it's very important because this is

17   a -- this is a gating decision on your part.   If it's invalid,

18   everything else falls away with this patent.   Everything else

19   falls away.   You don't have to check those boxes or even look

11:37   20   at those boxes on the verdict form.   Damages, willfulness,

21   gone.

22   Dr. Cole presented a chart, and she said, "Here's all the

23   missing elements."  She agreed that four of the elements were

24   in Fottinger.  I'm not going to spend a lot of time on those

11:37   25   because they're undisputed.   And what she disputed was that

1    there were four of them missing, but what you're going to see

2    as we walk through it, those are all in Fottinger.

3         So what does -- kind of her main point that she made, and

4    you heard this in the closing by Mr. Aldrich -- was that

11:37    5    there's no heat-directing elements in Fottinger, but as we'll

6    see there are, and she admitted it.

7         First heat-management material, undisputed Fottinger has it

8    quite clearly.  It's what it is.  That's what -- in fact, I

9    think I heard Mr. Aldrich slip during his closing argument, and

11:37    10    he said Fottinger is, quote, a patent about heat reflection.

11    And then he tried to change course and correct it.  But that's

12    what he said.  Patent all about heat reflection because it is.

13    Remember when I told you at the beginning you'll have it in

14    your hand?  You'll have a copy of Fottinger.  It's two and a

11:38    15    half pages long.  Take a look at it.  I think you'll agree.

16         Does it have a breathable base material?  No dispute.  It

17    does.  Oh, and by the way, you can see here Halley, Worley, if

18    you get to that point, same thing, breathable materials,

19    breathable base materials.  This is the foundation of making

11:38    20    these outdoor clothing, and even suit coats and things like

21    that have breathable fabrics, wools, and cotton.  Those are all

22    breathable fabrics.

23         So let's get to the meat here of the topic, the discrete

24    heat-directing elements.

11:39    25         What you heard from Dr. Cole, because she was asked about

that, my colleague Mr. Sproul cross-examined her, if you'll

recall, and she made a lot of concessions, a lot of admissions

in her cross-examination.  She was asked Fottinger's

teachings -- whether she would agree, Fottinger's teachings

11:39    certainly suggested he thinks his invention could be used to

reflect heat.  What did she say?  I agree.  I agree.

Why is that crucially important?  Because prior art, as

you'll be instructed, is to be considered for what it teaches,

what it discloses.  Now, if somebody wants to take issue with

11:39    it and say I did testing and I figured out maybe it didn't

work, it's supposed to be taken at face what it discloses, and

it clearly does, and she admits it.

Now, I'll talk about her lack of testing here in a little

bit, but I want you to realize that she admits it's in there,

11:39    and as you look at Fottinger, you will see it talks about

reflecting heat.  That's the purpose of Fottinger.  He's got a

material that he's overlaying on another fabric to keep heat

in.  It's a heat-retention fabric.

Here you can see she's -- Dr. Cole's asked, "Heat from the

11:40    user's body is reflected by a sheet of his invention?" meaning

Fottinger.  "Yes.  It's reflected.  Heat-directing elements."

And where do we see that in the patent?  If you look at

Fottinger in column 4, you'll see it says, "The different

degrees of radiated heat from these zones is reflected.  Heat

11:40    is reflected by the sheet of my invention."  The fabric of his

invention, a discontinuous, discrete array of heat-directing elements.

And what we heard from Dr. Cole on this point was there's not any particular amount of heat direction that's required. Any amount can do it. You'll see that when you look at the claim. It doesn't say 20 percent or 4 degrees or anything. It just says "heat directing," and there's no floor, and there's no upper limit, no lower limit. She -- you may remember that there was some testimony provided by Dr. Cole where I think she was trying to avoid Fottinger by saying, well, Fottinger doesn't have Mylar and it doesn't have mirrors and all that kind of thing. She was trying to distinguish Fottinger by using the language that was in the written description of the patent.

But what matters for what your determination of invalidity is what's in the claim, and in the claim she agreed mirrors are not in there, and Mylar is not in there.

And what did Dr. Block tell us? He told us that Fottinger has a discontinuous coating of dots, and dots is the same thing Omni-Heat has. Fottinger has dots; Omni-Heat has dots. Fottinger was 30 years before. And it's made out of a binder of metal powder. These are heat-directing elements. I don't think there's any dispute about it.

And, further, Dr. Cole -- Dr. Block makes it clear that the concept of -- of the patent -- the Fottinger patent is that

they could be called metallic plastic.  That's what the patent,
the '270 patent says the dots can be, and that's what Fottinger
had already invented.

And when asked about independent coupling, Dr. Cole
admitted, yes, those dots are independently coupled in
Fottinger.  Admitted it.  So this whole argument about there
not being independent coupling, that's out of the window.
Dr. Cole admitted Fottinger has it.  And in here you can see
it.  Fottinger even used the word "discontinuous," "a
discontinuous coating comprising of binder and metal powder."
It makes the heat-reflecting elements the dots.  And the
individual coated areas are mutually separated.  They are
distinct from each other like all dots are.

Who else has this?  When you take it back to the jury room,
you'll see Vaughn.  Vaughn, they try to distinguish Vaughn by
saying it's not about heat reflection.  But you heard testimony
that these other references, Vaughn, Halley, and so forth, are
all about heat direction.  And Vaughn says dots are preferred,
just like Omni-Heat.  Dots are preferred, just like Fottinger.
And why wouldn't somebody combine these references if they were
going to do obviousness?  They each teach dots.  They each
teach patterns of dots in a grid.  These things are used to
reflect heat.

What does Blauer teach us?  50 percent coverage.  '270
patent, 30 to 70.  And I think you'll see when you look at

11:44

1    other references back there, I think it's Halley and Vaughn,

2    they're 30 to 70.  Same range.  And, again, Dr. Block tells you

3    that Fottinger is teaching heat-directing elements that are

4    positioned to point the heat back at you.  The aluminum is for

5    the heat to point back toward you.  That's what it's for.  Here

6    you can see Fottinger.  It says, "The different degrees of

7    radiating heat from the zones are reflected by a sheet of the

8    invention, and this allows the maintenance of existing

9    temperature differences."  Trying to keep the heat in.  And it

10   says, "They may also be used as outer fabrics for articles of

11   clothing in which the coating face will be on the inside of the

12   article directing heat in the desired direction back at the

13   wearer."

14       That's what Fottinger is all about.  It's a fabric made to

15   keep you warmer.  Here you can see in terms -- what I guess I

16   should say before I move on, we have heat-directing elements.

17   We've checked that box.  I think the evidence is beyond

18   substantial.  It's inconclusive [sic] that heat-directing

19   elements are satisfied by Fottinger.

20       Now, let's talk about this 70 to 30, 30 to 70 coverage

21   area.  I think if you read this testimony from Dr. Cole, you

22   will agree that she's not disputing the 30 to 70 ratio.  She's

23   not disputing that the prior art has it and that Fottinger has

24   it.  She's disputing that element because of heat-directing

25   elements.  It's the same argument over and over again.  And so

1    she says "I dispute what's being covered by the wherein

2    clause," -- you can see here with the 30 to 70 -- because the

3    patent claim calls for heat-directing elements in the 30 to 70

4    ratio, not just simple 30 to 70 coverage.  So her opinion is 30

11:45    5    to 70 is old.  Just because it says "heat-directing elements,"

6    she disputes it.

7        And I think if you look at her testimony, you will see that

8    it's very clear that she admits that this whole concept about

9    the tradeoff, you know, more coverage, you get less

11:46    10    breathability, less coverage, you get -- I'm sorry -- less

11    coverage, you get more breathability.  More coverage, you keep

12    more heat in.  That's the tradeoff, the tradeoff.

13        Here she says -- when she's asked.

14        "Question:  Fottinger's concern for the permeability of the

11:46    15    fabric is the basis for his disclosed range of 30 to 70

16    percent."

17        "I agree.  Basically in the industry we know it's a

18    tradeoff."

19        She says it's a continuum.  Too low and you don't get

11:46    20    enough of the property you're trying to design in; too high and

21    you sacrifice the base material properties that you know you

22    actually have to have.

23        I said this earlier in -- when I first talked to you.  This

24    is common sense.  Think about it.  If I take a sheet of plastic

11:46    25    and I cover -- I said this in my opening -- a sheet of plastic

1    or foil and I cover water in a pot, and I turn the heat on,

2    what happens if I don't poke holes through it?  The steam

3    builds up, and it will eventually pop the top off.  The foil

4    will come off.  The plastic will come off.  Maybe it might

11:47    5    melt.  If I poke holes in it -- and we all do this -- put it in

6    microwave oven.  It lets the steam breathe out.

7        If you're running and you're really, really hot, and if you

8    wear like a rubber coat -- I gave you the poncho example.  I

9    used to go backpacking and hiking, and we'd wear these ponchos

11:47    10    when it would rain.  We'd have a rainstorm inside the poncho.

11    If you could have poked holes through it and let it breathe,

12    that would let the heat out, and you wouldn't get so hot.  It's

13    common sense, and that's what Dr. Cole told us.  It's common

14    sense.  Everybody knew that.  So she was asked pointblank did

11:47    15    Mr. Blackford invent the idea of 30 to 70 percent coverage?

16    Answer, no.  It was a concern going back to at least the 1970s

17    that that was a nice range because you were concerned about

18    covering too much up or not enough.  You want to poke a few

19    more holes in, a few less holes in, everybody knew it since at

11:48    20    least the 1970s.  That's even before Fottinger.

21        And then she says somewhere around the middle is probably

22    where you want it to be.  That's what we told you in opening.

23    Around the middle.  That's what they picked.  This is this

24    optimal -- this gee-whiz optimal range, about 30 to about 70,

11:48    25    which, again, you know how you get there?  You pick 50.  That's

1    the middle.  You go plus 20 and minus 20.  This is not some

2    sort of hard core scientific discovery.  This has been known

3    since the '70s, and somewhere in the middle is probably where

4    you want to be, so you go a little bit above and a little

11:48    5    below.

6        That's the alleged invention, and we submit this is no

7    invention at all.

8        You heard from Dr. Block on the same point.  You get

9    Mr. Blackford's range.  Fottinger tells us he's got the range

11:49    10    covered.  Remember we saw from Omni-Heat.  What did they do?

11    They're 30 to 40.  All the time.  30 to 40.  They're right

12    where Fottinger is.  Fottinger has got their sweet spot

13        But that's not all you've seen and heard.  You're going to

14    have Halley with you in the jury room.  You're going to have

11:49    15    Vaughn with you in the jury room.  And you will see that they

16    teach exactly the same range as Mr. Blackford's claiming.

17    Exactly the same range.  This is old stuff since the '70s at

18    least, and so we check the box, and we move on.

19        The next one that we're looking at that's highlighted here,

11:49    20    we're in the placement and spacing of the heat-directing

21    elements permits the base material to retain partial

22    performance.  That is not disputed.  So we won't spend time on

23    that.

24        The next element starts in claim 2 wherein the base

11:50    25    material comprises an innermost layer of the body gear, not

1    disputed.   We can move on.

2        So what's left?  The last claim.   And Dr. Cole argued to

3    you and presented this graphic that we've all seen, the blue

4    and the red jacket.   And told you that the heat clearly comes

5    through Mr. Fottinger's invention and out.  So what I think she

6    was saying is that Fottinger invented a refrigerator jacket, a

7    jacket that makes you colder.   But Fottinger didn't do that.

8    Again, I encourage you to look at Fottinger.   Fottinger teaches

9    and says that I am inventing a pattern of dots that keeps you

10   warmer, that reflects heat back.

11       So think about what this means and what we -- we had some

12   testimony on this.   If you get really, really hot inside of a

13   breathable fabric, the heat's going to come out.   There will be

14   more heat coming out of the side where you're hotter than the

15   side where you're not as hot, and that's what Fottinger is

16   teaching.   That's what Fottinger is disclosing.

17       Now, this is one of the things you didn't see in the case.

18   Dr. Cole had her chance.   She's trying to say this is a

19   refrigerator jacket; the side with the dots is colder than the

20   side without the dots.   And there was an example in the

21   patent -- in the Fottinger patent that talks about this, and

22   she criticized it, and she said that that's the blue and red

23   diagram that comes from the example, but the problem is that

24   Dr. Cole had her chance.   You can't take anything away from her

25   credentials.   She's an incredibly credentialed person,

1    obviously intelligent, studied, learned, professor, all these

2    things.  If you're going to try to debunk a myth what do you

3    do?  Test it.  That's what you do.  Ever seen that MythBusters

4    show or heard of MythBusters?  What do they do when they're

11:52    5    faced with a myth?  Well, what could be a myth, or what could

6    be truth.  They test it.

7        Dr. Cole didn't bother to do that.  You didn't hear about

8    that from her.  You heard nothing from her on that point.  You

9    just heard her say, no, it's not.  That doesn't work.  It

11:52    10    doesn't work.  It's a refrigerator.  And if Mr. Fottinger had

11    invented a jacket that makes you colder, I would submit that he

12    might have had something on that.  Clearly he didn't.

13        So I leave you with -- on Fottinger, probably the last

14    point here that I want to talk about, the argument was made,

11:52    15    and you heard Mr. Aldrich echo it again in his closing

16    argument, that the dots -- and he's called them "rubber

17    dots" -- these were his words -- you would never want them on

18    the inside of your jacket because it would make it hard to

19    wear.  But Fottinger clearly teaches -- you can't unmistakably

11:53    20    read his language, and you will see he says here at the bottom,

21    if we look at this language, "This invention relates to textile

22    sheets which can have good heat retention" -- not a

23    refrigerator -- "and which comprise a nonwoven fabric with a

24    discontinuous coating of binder and metal powder."  And then he

11:53    25    goes on to say that it could be used as an inner lining, which

1    is the thing in the middle between the outer and inner which

2    could be used as a lining fabric like in a suit coat, and it

3    could be on the outer fabric, and then -- so it's -- any option

4    is there, Mr. Fottinger tells you.  Outer, middle, inner.

11:53    5        And then Mr. Fottinger says that "The fine metal

6    particles" -- the dots -- "can be applied to at least one face

7    of a textile sheet."  What does that mean?  What does "at least

8    one" mean?  It means one or more.  How many faces can a textile

9    sheet have?  Two is the only thing I know of.  And so if it's

11:54    10   on at least one face, it's either on the outside, inside, or

11   both.  It could be both.

12       Mr. Fottinger teaches you this.  Explicitly, clearly

13   teaches you that the dots can be on the inside if you choose,

14   and you can put them on the interlining, the inner lining, or

11:54    15   the outer part.  And you'll be warmer.  You will have heat

16   reflection and heat retention.

17       All right.  So what do we conclude from all that?

18   Fottinger has it all.  This claim is anticipated.  And if you

19   agree with that, and we submit that it is the correct

11:54    20   conclusion to reach here, that Fottinger has it all, you look

21   at all the evidence.  There was no invention here.  As you

22   heard Dr. Cole say, since the '70s people have known about this

23   coverage stuff.  You'll find that the patent is invalid.  And

24   if you do, you don't have to think about any of these things

11:55    25   like real-world evidence.  Remember that?  That's irrelevant.

1    Has nothing to do with anticipation.  It is not to be

2    considered.

3        Commercial success, purported and alleged, we'll talk about

4    that in a minute.  This surprise.  Remember skepticism?  They

5    saw the jacket and thought it was garish, I think was the word

6    maybe?  I think that's skepticism about what it looks like, not

7    skepticism of whether it would work or not, but that's all

8    irrelevant.  Irrelevant.  Check it off.  You're done.  Invalid.

9        And so you may be thinking, well, you know, we saw this,

10   the timeline.  I had to go through it again, excruciating

11   timeline, but what you learned was Fottinger came up late, the

12   very, very last thing disclosed.  And so if you're thinking in

13   your mind, well, if the patent office had it, there's nothing I

14   can do, take yourself back in time again to the video and what

15   was said in the video is, prosecution of a patent application

16   takes place without input from people who might later be

17   accused of infringement.  Seirus.  Seirus had no opportunity to

18   take part in that prosecution.  Nor did anybody else.  Nor did

19   any other company.  This was a one-to-one between Columbia and

20   the examiner.

21       And it's important that we provide a chance for someone

22   who's accused of infringement to challenge the patent in court,

23   and in deciding the issues of infringement and invalidity, it's

24   your job to decide.  So the U.S. Patent Office issues patents.

25   In the court of law, we determine whether the patent is valid,

1    and even if Fottinger was before the patent office, and you saw

2    the circumstances that it was, it's your job to take a close

3    look at it with the input from Seirus and see those boxes are

4    all checked off and invalidate it as anticipated.

5        All right.  I want to talk about the secondary

6    considerations because a lot has been made of them.  First you

7    heard that from Mr. Trepanier -- I think he was the first

8    witness.  And now you've heard a lot of arguments that the

9    success of the product line of Omni-Heat was based on the

10   invention.  But we all know now that at most that the examiner

11   had thought the only thing that was different was 30 to 70.  We

12   know that's old, since the '70s as Dr. Cole told you.  That is

13   old.  But that's the only thing the examiner thought was

14   different.  Everything else he said was in the Levy exactly.

15   And Columbia remember had a fork in the road.  It had three

16   choices.  It picked amendment.  It didn't pick push back.

17       So here you are.  What are we left with?  30 to 70.  None

18   of these marketing materials that you have seen ever mention --

19   you will not see it.  You've not heard a single person testify

20   that consumers care about 30 to 70.  They don't know.  If you

21   go to buy an Omni-Heat with that liner in it, do you care if

22   it's 25?  Do you care if it's 21?  80?  No.  Because you're

23   marketed that it's the silver.  It's the -- it's all these --

24   it's marketing.  It's all about marketing.  It's not about what

25   the patent claim covers.

1    And what's important to understand for commercial success

2    is the -- you'll be instructed on this.  The success must have

3    what's called a nexus, a direct connection to the claim.  And

4    the claim -- there's nothing marketed about the coverage.

11:58    5    Nothing that we have seen.  Nothing that we've seen.  And so

6    what we did see was that Omni-Heat was the largest marketing

7    campaign in the company's history; that it was the most

8    comprehensive, integrated, global marketing campaign ever.

9    They spent money on it.  They poured money into silver dots,

11:58    10    into people standing -- remember the polar people in front of

11    the icy lake with -- covered up with the jacket?  That's what

12    they spent their money on.

13    They weren't promoting saying the claim is the thing.  Got

14    to have 30 to 70.  Didn't do it.  The average budget?

11:59    15    $9 million.  And Mr. Trepanier told you that there were dollars

16    spent in advertising up and above and beyond that.  They have

17    relationships, trade agreements.  It's a marketing machine.  A

18    marketing machine.  It's not commercial success based on the

19    patent.  It's a commercial success based on marketing, based on

11:59    20    a very successful company, two-plus billion dollars a year in

21    sales, tremendous amount of money at their disposal to spend

22    and spend and spend to promote this shiny, old idea.

23    And Dr. Cole admitted -- she told you marketing can be a

24    factor that drives commercial success apart from the patented

11:59    25    invention.  Yes, she agreed.  So the commercial success as

1    you've seen is based on -- is based on marketing.

2        Now you heard some -- you heard a lot of testimony about

3    copying, copying, copying, copying.  That was one of the

4    themes, the overarching themes.  It's easier to copy than to

12:00    5    innovate is what I heard.  But what we did, what you heard a

6    lot about in this trial -- you heard it from Mr. Blackford and

7    you heard it from others -- is that this is a very competitive

8    industry.  There's a lot.  There's Patagonia, there's Marmot.

9    We heard about other companies in this field.  They make

12:00   10    outdoor clothing.  Columbia is one of them.  Seirus is one of

11    them.  There's a bunch of companies.  You've got the companies

12    here in San Diego that make snowboard gear like Burton and

13    other companies -- I think they're here, a lot of companies.

14        This is a very competitive industry, and they're making

12:00   15    clothing, and you know where that clothing is?  It's on the

16    shelves.  It's not like a microchip inside of a computer inside

17    of a special space where you can't get access to it and look at

18    it.  These products are on the market.  And what do people do?

19    They go out and get them.  Woody Blackford goes and gets his

12:01   20    competitors' stuff, and he takes a look at it, and he tests it,

21    and he compares his idea and their fabrics and all these things

22    to one another.  That's what they do.  That's what this whole

23    industry does, what you've heard evidence of.

24        And so what -- you know, what did -- what's an example of

12:01   25    that over at Columbia?  Well, what they did, as you heard, is

1    they took a North Face jacket, one of their main competitors --

2    probably everybody has heard of them -- and they cloaked it in

3    a Columbia style and sent it off to Asian manufacturers.    I

4    think they were eight in total, if I'm not -- eight technical

12:01    5    factories -- cloaked a North Face jacket as a Columbia jacket,

6    shot it off to those guys and said, "Make it" -- "tell us how

7    much it would cost to make this?"

8    Can you understand what they're doing?  They're saying,

9    "This is a successful North Face jacket.  We'd like to make it.

12:01    10    Let's put our Columbia labels on it and -- so that the

11    manufacturer, the company, these fabricators in Asia, won't

12    know it's The North Face jacket.    They'll make it for us and

13    tell us how much it costs to make it, and we'll figure out how

14    profitable it is, and if it's really good, we'll make our own.

12:02    15    We'll sell our own."  That's what Columbia does.    That's what

16    Columbia did.    And he was asked about that, and he said there

17    were eight separate factories, and he was trying to figure out

18    whether they could build a coat for Columbia just like the two

19    North Face jackets.    That's exactly what they were doing.

12:02    20    What else did he tell you?  Do they test other companies'

21    products?  Yes, they test competitors' products.  That's what

22    people do in the industry.   You didn't hear him say -- I think

23    he might have even testified they're not copyists.    So if what

24    they're doing is not copying, how can what Seirus do be called

12:03    25    copying?  We didn't cloak.  This cloaking thing, that's what

1    Columbia does, and it tells you it's not a copyist.  Seirus is

2    not a copyist.

3         Well, let's talk about potentially -- you know, this is

4    just giving you a sense of what happened in the past -- what

12:03    5    happened in the past.  You heard Seirus came up with the

6    Thermalux glove in the early 1990s.  It had foil running

7    through it radiating heat back in your hand.  It was done, and

8    if you look at the way the fabric looks, it's like a bunch of

9    foil dots.  It looks just like the Omni-Heat fabric.  Seirus --

12:03    10    we kept seeing over and over again diagram of the Columbia

11    reflector diagram versus the Seirus diagram.  Remember?  And I

12    think even -- you know, the opening had this, and I think even

13    Dr. Cole's testimony in the claim chart she went through was

14    that diagram, diagram, diagram, diagram, over and over again

12:04    15    like we had copied them -- like Seirus had copied their

16    diagram.

17         But in evidence is DDX205.  You'll have it back there with

18    you.  You can look at it.  And you heard Mr. Carey's testimony

19    about it.  The Neofleece diagram early 1980s, this is a Seirus

12:04    20    diagram.  Warmth reflected.  The weather shield trilaminate

21    from 1996, heat reflected.  This diagram that Seirus drew is

22    just another one in the long history of the company in which

23    they have diagnosed breathability and heat on the same thing,

24    and Columbia's diagram comes many -- many years later.

12:05    25         Apologies.  The slide got locked up.

1          I wanted to talk about this 20 percent warmth issue.  Do

2     you remember this one?  Early in the opening we had the 20

3     percent warmth of Seirus, 20 percent warmth of Columbia, and

4     saw it again in closing.  But when it came up during the

12:05  5     evidence that was presented, Mr. Blackford was asked about it,

6     and he said that Columbia first made a claim of 20 percent

7     warmth increase from Omni-Heat, but they had to withdraw it,

8     and I think he said -- his words were "It was not completely

9     accurate."

12:05  10         So any implication that Seirus, who -- you heard

11     testimony -- un-rebutted, unchallenged testimony that Ventex,

12     the fabric supplier, who, as testified by Mr. Carey, is a large

13     fabric supplier in Korea, sophisticated company, did the

14     testing.  Seirus relied on the testing.  Commercially

12:06  15     reasonable to do that.  That testing hasn't been challenged.

16     That testing has never been said to be not completely accurate.

17     That's because it is accurate.  And Seirus has continued to

18     maintain that claim.  Columbia had to withdraw theirs because

19     Mr. Blackford admitted it was wrong.  It was wrong.  It was a

12:06  20     false advertisement.

21         So let's talk a little bit more about this whole copying

22     allegation.  What did you hear from Ms. Chin whose name here is

23     Ms. Haas?  You met her.  She testified in front of you.  She

24     was asked about this document.  She said that there was -- they

12:06  25     needed to get terminology with Shen Li because Shen Li is a

Chinese company, and they needed to get some words they could use in common. Fuzz material was one. Omni-Heat was another. And then she also said when there was a style code like SL66183, they would use that. There was no style code for Omni-Heat. They needed something.

Shen Li brought it to Seirus and said, "Here's this fabric." They were the ones that gave it to Seirus. There was no style code, and so you heard Shen Li started using the term "Omni-Heat," and so that was adopted as language to be able to speak between the two companies. And this is something that you heard from Mr. Blackford that Columbia has to do as well. He was asked about them having a costing language with their Asian suppliers, and he admits they do the same thing. You need to get a language to talk. If you don't have a code, you use a term.

You also heard in terms of the copying concept that foil printing wasn't new to Seirus. Mr. Murphy, remember him? He testified that he'd seen foil printing in the industry for years. He'd been offered samples, and they had samples. This Omni-Heat stuff, as you know, in 2012 when Seirus was receiving it, it had been on the market for two years. You could go out and cut it out of a jacket. It wasn't anything top secret. They didn't receive anything that Columbia was guarding. Columbia was selling tens of millions of dollars worth of the stuff. Anyone could get their hands on it.

1    So why was Ms. Chin saying, "Very important, I want to get

2    this fabric"?  What you heard was that they had a steering

3    committee coming up, a meeting, and if they did not get the

4    fabric in time, then they would be unable to meet the next

12:08    5    year's -- they're on this annual selling cycle.  You have to

6    get your product done a year before you start selling.  So they

7    were on a tight timeline, and she told you they wanted to put

8    foil on MegaHeat RX -- on MegaHeat -- excuse me.  And

9    Mr. Murphy told you the same.  And they were wanting to get it

12:08    10    quickly because they needed to make the steering committee

11    meeting.

12    And what you heard from the evidence and from Ms. Chin is

13    that they never intended to use the dots.  They wanted their

14    own -- I think it was called "artwork."  You'll see in the

12:09    15    documents, "We'd like to put our own artwork on a foil printed

16    fabric" -- and, by the way, foil printing was old to them --

17    "Can you do it for us?"  And it wasn't available, and so they

18    did receive a Columbia swatch, and a sample was made out of it,

19    and as you heard from Mr. Murphy, that sample never went

12:09    20    anywhere, and it was thrown away.  This is not the kind of

21    thing -- this is not copying, trying to figure out.  This is

22    just getting a sample, trying to see if it would work, trying

23    to see if it was a good idea, and then moving away from that.

24    Because what you heard was that Seirus wanted to use MegaHeat

12:09    25    because this is the thing that had the claim of extra heat.  It

 1    was this great Ventex fabric, and they wanted to put foil

 2    printing on it.

 3        And that's exactly what they ended up doing.  The evidence

 4    is clear that they were pushing towards getting -- they wanted

12:09  5    MegaHeat.  They wanted to foil print it.  They ultimately did.

 6    They never used Shen Li, and this whole "Omni-Heat program"

 7    that you've been hearing from Columbia was nothing more than a

 8    convenient label to use to talk about fabrics, foil-printed

 9    fabrics with Shen Li.

12:10 10    So what did Morgan Chin say about foil printing when she

11    was asked?

12        "Question:  When did you see foil printing material near

13    about this time?"

14        And she said, "We have binders in our offices that we have

12:10 15    from years back, and I know we have some from like 2004."

16    Binders of fabric samples with foil-printed fabric in there

17    since 2004.  This is nothing new, not new to Seirus, not new to

18    the industry.

19        What did Dr. Cole say?  "Mr. Blackford did not invent the

12:10 20    process by which aluminum foil was laminated to fabric" -- that

21    was the question.  What was the answer?  "Correct."  He didn't

22    invent it.  It was old.

23        So what happened?  Why is this not copying?  You saw this

24    diagram again and again and again.  Seirus finished its

12:11 25    development by November 2012, and they showed their product

1    openly at trade shows, at the giant trade show that is at SIA.

2    That's not what a copyist does.  When somebody copies or

3    plagiarize, they bury it and hide it.  This is openly sold.

4    This is not copying.

12:11   5        And here you can see the trade show.  Very clear.  It is so

6    prominently marketed that it is the cornerstone.  It's the

7    thing that when you first walk up to their booth at the corner,

8    that's what you see.  That's not what a copyist does.  A

9    copyist doesn't take its -- something you copy and say, "Hey,

12:11   10   world, check out my copy."  What they do is they try to hide

11   it.  They try to cloak it.

12       So now we know with all this information that Fottinger

13   anticipates the claims.  The claims are invalid.  The whole

14   facade of secondary considerations, real-world evidence is

12:12   15   nothing that's relevant.  It's not based on this 30 to 70

16   claim, and this copying thing is a ruse.  It's something

17   they're trying to create when you don't have a good case on the

18   merits of the patent.  What do you do?  You try to create some

19   sort of a story to inflame, and that's what happened here.  You

12:12   20   should reject it.

21       All right, as to infringement, I'll move through this

22   quickly.  What you saw was that there was a -- rolls of fabric

23   that were made of MegaHeat RX.  150 lots approximately is what

24   Mr. Murphy testified to.  150 of those.  What did Dr. Cole do?

12:12   25   She testified she was given fabric by the lawyers, so she

 1    doesn't even know what lot they came from or whether they came

 2    from one lot or two or whatever.  She tested the little

 3    swatches of fabric, she cut them up.  She took photos of them,

 4    and she put them in Photoshop.  What is Photoshop normally used

 5    for?  Have you ever heard that kind of colloquialism, "Did you

 6    Photoshop it?"  When you want to modify how somebody looks,

 7    that's Photoshop.  That's what this is.

 8        What does she do?  She took this histogram, and you heard

 9    testimony that she picked the dividing line between white and

10    black.  That was her selection.  She did that, and consequently

11    came up with numbers that were very close to about 70, although

12    we don't know what "about 70" means.  What she didn't do, she

13    didn't account for the variability that we heard all about, the

14    150 lots and how variable they could be, and she didn't send it

15    out to a third party, an independent testing lab, even though

16    Mr. Blackford testified that there was one in Atlanta that he

17    uses all the time.  Could have used it.  Didn't do it.

18        And what Dr. Block told you, there was parts of what she

19    did the second time -- remember she did two test.  He

20    criticized her the first time.  She went back and did it again.

21    But she didn't change the methodology.  Still used Photoshop,

22    still used the same camera, still used everything else, and he

23    said, "There are parts of what she did the second time that are

24    still open to the same criticisms I made the first time.  She

25    still has got no firm foundation for her conclusions."

1          Why is that important?  Because they bear the burden of

2    proof.  It's not our burden of proof to disprove.  They bear

3    the burden of proof, and they stand on Dr. Cole's testing, and

4    they have to live by its foibles and its problems.

12:14    5          Willfulness, we heard a lot on that during the closing, and

6    I think it's crucial, and I hate to do this to you, but this is

7    what lawyers do.  We draw timelines because I think it's one of

8    the only ways we can keep track of what happened over time.

9    You are going to get an instruction at the end of this case

12:15   10   from the judge concerning willful infringement of the '270

11   patent that says the only relevant time period for which you

12   may consider willful infringement of the utility patent, the

13   '270 patent, is June 4, 2013, to December 4, 2013.  That is the

14   only relevant period.  That's just six months.  In fact, right

12:15   15   on the nose if my math is right.

16         So let's draw.  Here is six -- excuse me.  If I can do this

17   right.  June 4, 2013, to December 4, 2013.  That is the only

18   relevant period in which you may consider evidence of willful

19   infringement for the utility patent, the '270 patent.  What is

12:16   20   everything that you saw Mr. Aldrich do during his closing

21   argument?  Every event he pointed to was outside the window.

22   He said in 2010 the '270 patent was published.  Publication,

23   that's not even close.  He then pointed to -- I think he said

24   that the Omni-Heat fabric, the swatch that was received, it

12:16   25   said "patent pending."  That was received in 2012.  I think it

1    was February 2012.  Then in April 2012, so 4-12, the design

2    patent issues.  I don't know how that could relate to willful

3    infringement of the utility patent, but that's what he said.

4        July 2012 he mentioned something about a glove in my notes.

12:17  5   And January of 2013, he talked about the trade shows as I

6    recall.  I'm not there yet.  His next event that he pointed to,

7    he said in March, March of 2013, 10,000 yards of fabric are

8    ordered.  That's not 10,000 yards of Omni-Heat.  That's

9    MegaHeat RX that Seirus uses in its gloves.  10,000 yards.

12:17  10  That was another event.

11       And then April 4th -- a lot of things happened on the

12   4th -- 2013, the Ventex letter arrives where the design patent

13   was attached and Fottinger was attached.  So Seirus had

14   Fottinger all the way back here, had Fottinger.

12:17  15      But I think if you look at that exhibit -- it's Exhibit

16   501, I would encourage you to take a look at it -- if you think

17   that says you've got a problem with a utility patent that

18   hasn't yet issued, I would be surprised if you could take it

19   out of it.  It's written in very broken English.  It does say,

12:18  20  however, which you will see, "You've got a logo, a repeating

21   logo on your Seirus fabric."  Remember this?  If I can find the

22   fabric.  Here we go.  It says in that letter -- you should look

23   at it -- "You have a repeating logo all over the place."

24   That's not in the design patent at all, not in there.  And it

12:18  25  said, "Our lawyers have taken a look at it, and you're okay."

1    You also heard testimony from Mr. Carey on the same thing.

2    They in good faith thought, and it turned out they were wrong.

3    It's true.  It turned out they were wrong, but in good faith

4    they thought until the Court found otherwise that having this

5    repeating logo in here was different, and I submit there's no

6    question as a matter of fact that is not identical of what you

7    see in the patent.

8         Okay.  So now we have -- if I can find my marker.  I

9    probably buried it over here.  I did.

10        We have nothing else.  This is what I've got.  So what do

11   you see during this period that Mr. Aldrich pointed to?

12   Nothing.  Not a shred of evidence.  Nothing happened in the

13   period.  And that's all you're allowed to look at.  That's it.

14   What did happen that you didn't hear about -- and I would

15   encourage you to look at it, Exhibit 499 -- take a look at

16   that.  That's an email from Ventex to Seirus in November of

17   2013.  That's the only piece of evidence that I can recall

18   seeing in that window, and I encourage you to look at it.

19        So no willfulness.  The '270 patent, you shouldn't ever

20   have to get there.  Shouldn't have to because this patent is

21   invalid.  This is a junk patent.  It's invalid.  It should

22   never have been granted.

23        So let's talk about one of our favorite topics, how much is

24   it worth?  What's the damages?  '270 patent, this one I thought

25   was pretty easy.  What's the value of the technology?  It's all

old.  All old.  Not much.  Shouldn't have to pay much for something that's old.  But the patent is invalid, right?  And if you agree -- if you agree with Seirus' position the patent is invalid, the number is zero.  You don't even have to look at the box.  But if you think it's valid and infringed, you should do what Ms. Distler told you.

You met her.  You saw her testify.  She's an incredibly experienced patent damages expert.  She knows this stuff.  She analyzed it in great detail, and she explained it.  I know sometimes she was speaking fast, and she was telling you a lot of stuff, but that's because she knows a lot.  And I think if you contrast Ms. Distler's background and experience and her wealth of knowledge that she conveyed to you with Ms. Morones, who I don't really need to say a whole lot about her experience -- next to nothing; she didn't do much; changed her mind; changed her positions -- you have to side with Ms. Distler because she's got the credentials, and she did the work.

And what does she come up with?  Yes, she came up you with $111,000.  Why?  Because an old patent, even if you do find it's not invalid, ain't worth much.  Ain't worth much.  Nobody pays much for a patent that barely covers anything.

And you've heard Mr. Aldrich say they would have turned it around if -- they could have turned it around.  They do turn it around.  Seirus does that some, but why turn it around when the

1    patent's not valid?  They don't have to.  They don't need to.

2    This is an invalid patent.  There's no reason to turn it

3    around.  They can do it any way they want.  But if it's not

4    valid, definitely you can turn it around.  You can flip the

5    fabric, and we've heard testimony -- I think you can just use

6    your common sense again.  Remember common sense.  Easy to do.

7    Turn it around.

8        What's another really important data point here for you to

9    think about?  What happened with this Delta Galil license?

10   Remember this one?  You heard about four of them.  They amended

11   the Delta Galil patent to add the Omni-Heat patents.  They

12   first had a deal.  It had a royalty rate in it, and then they

13   amended it later, and they added the Omni-Heat patents to it.

14   What did they charge for the addition?  Zero.  Nothing.  Not a

15   penny.  If these were worth so much money, wouldn't you say,

16   "Hey, Delta Galil, if you're going to get these Omni-Heat

17   patents, if you want those, we'll give them to you here, but

18   it's going to come at a price.  It's going to come at a

19   price."  Well, I think Ms. Morones would tell you she's not

20   sure what the price would be.  Maybe it's 30 percent.  Maybe

21   it's 20 percent.  Maybe it's 10 percent.  Maybe it's 5 percent.

22   She gave you all four -- actually, I take that back.  She gave

23   you 20, 10, 5.  Mr. Merriman said 30.  She didn't agree with

24   Mr. Merriman.  She never did a 30.  She went to 20.

25       But Delta Galil paid zero.  They didn't pay 5 percent or 10

1    percent.   They paid nothing.

2        So what are her opinions?   Her opinions are that --

3    Ms. Morones -- that the base is the entire glove, and she based

4    on the entire market value rule which she did not analyze.   She

12:24   5    was told to assume it applies, and as I said, she had three

6    different rates.   Couldn't decide on which one was right, so

7    she -- like she did with her -- what was it?   The Thursday -- I

8    can't remember -- the Friday, Monday, Wednesday opinion.   Just

9    like that.   She changes her mind.   She doesn't have a firm

12:24   10   grasp.   She's trying -- this is -- I mean this just points out

11   a clear fact that you should take away.

12       What's the theme in this case?   It's a theme of corporate

13   greed.   That's what you're hearing.   How much can I get from

14   this little company?   I want 20.   No, I want 30.   Maybe that's

12:24   15   not so credible.   So Ms. Morones says I'll try 20.   But if I

16   can't get 20, I'll try for 10, and if I can't get 10, then at

17   least give me 5.   This company wants money.   They want as much

18   money as they can get for a patent that should never have been

19   granted, and Ms. Morones is waffling.   Her inconsistent

12:24   20   positions are proof positive that their damages theories are

21   riddled with holes.   They're like the Castelli jacket.   They're

22   full of holes and should be rejected.

23       Her other problem I think is really telling is that she

24   used the starting point for the royalty rate of license

12:25   25   agreements that she admitted are incomparable.   Incomparable.

1    That is where I start my analysis?  These licenses?  Just think

2    about this:  If you're going to go buy a house and you're going

3    to buy a $100,000 house in the neighborhood, and you say, "I

4    have to find comps."  Is it really worth $100,000?  You find

12:25    5    comps, don't you?  You don't go into La Jolla and get the ocean

6    view home right on the coast and say, "Well, that's $4 million.

7    That's a good comp."  No.  That's incomparable.  That's not a

8    comparison that can be made.  That's what she did.  She should

9    be rejected.

12:26    10    What's their entire market value rule theory?  You've heard

11    this before.  Even though the liner is the only place the

12    invention could be, even though it's not a valid patent, they

13    want the whole glove.  But she didn't do the analysis.  She was

14    told to assume it.  What did Mr. Carey tell you?  He told you

12:26    15    that they make the very same glove with and without HeatWave

16    fabric.  What do they sell more of?  This one without.  What

17    drives demand?  Clearly not the HeatWave fabric.  They wouldn't

18    sell 200 times as many of the one without.  Just wouldn't.

19    That just doesn't make any sense.  Again, use your common

12:26    20    sense.  That doesn't make sense.  That that -- if you're going

21    to tell me that HeatWave drives the whole demand for the All

22    Weather Glove, why does Seirus sell 200 times as many of the

23    one without?  The clear answer is it doesn't.  But you don't

24    have to take his word for it.

12:26    25    Mr. Blackford told you time and again -- and many, many

questions he was asked about this.  He agrees that the brand

drives demand.  He agrees the purchasing decisions are made on

brand names.  And they see Seirus on the rack.  That would draw

them in to making a purchasing decision.  Yes.  And the same

for Columbia, yes, brand, brand matters.

Mr. Trepanier, he was asked what kind of things are factors

that consumers consider when they buy gloves.  Color, yes;

sizing, yes; fit, yes; quality, yes; brand name, yes.  And some

people buy Seirus gloves because they're Seirus gloves, right?

These were all ignored by Ms. Morones because she didn't do the

work.  She didn't do the work.  So what happened?  She was told

to make an assumption from the lawyers.  And she identified

five of them.  She was instructed to assume that applied even

though we heard from Mr. Blackford and Mr. Trepanier, their own

witnesses, that purchasing decisions demand is driven by other

features.

What did Mr. Merriman say?  He told you that the attorneys

told him what he needed to know about the lawsuit.  They

brought in the licenses that he reviewed.  They told him what

he needed to know about this patent.  They told him what he

needed to know about the Georgia Pacific case.  They drafted

his report, and they managed his contact with Ms. Morones.  Can

you trust these damages opinions?  I don't think so.

What did he do to come up with his 30 percent rate?  He did

it in less than 24 hours.  He said, "I couldn't see Columbia

1    considering something that was less than 20 percent." Then he

2    was asked.

3        "Question:  This is an opinion you have formed about this

4    case in the last 24 hours?

12:28    5        "Answer:  Well, yes, because I was not aware of the case

6    prior to coming in yesterday or being set up for the

7    deposition, but I didn't know any of the facts of the case

8    prior to yesterday."

9        24 hours.  This is the kind of -- this is the kind of

12:29    10   workmanship, this is the kind of analysis that you're told to

11   rely on for multimillion dollars.

12       We already know about the agreements.  Ms. Morones admitted

13   they're not comparable.  She looked at four, and she also told

14   you they were for branded goods.  The licensee got to use the

12:29    15   Columbia brand.  I think that probably has value.  You can

16   see -- I mean right here, Columbia, the brand, it's one of the

17   biggest sporting goods brand in America, probably in the world

18   for all I know.  Don't you think that's got value?  That's what

19   those companies are buying.  And then you've got patents thrown

12:29    20   in, all of Columbia's 200 patents from their million dollar

21   laboratory, those all go in.  You get Omni-Heat, Omni-Dry,

22   Omni-Freeze I think they were.  You get trademarks, trade

23   names, trade dress.  You get trade secrets, know-how.  You get

24   the whole ball of wax.  You get everything, and you get to make

12:30    25   Columbia products, and they want to charge triple to Seirus for

1    a patent, one that's not valid.

2        So before I switch to design patent damages -- I think I

3    just what want to leave you with try to remember what

4    Ms. Distler did.  Think about what -- how much work she put

12:30    5    into it, how credible she was, and contrast that with what you

6    heard from Mr. Merriman, from Mr. Blackford, from

7    Mr. Trepanier, and Ms. Morones, and I think you'll agree with

8    me that their whole damages theory, as I said, was riddled with

9    holes.  I think it is.  I think you'll agree, and you should

12:30    10    reject it.  You should.  You're given a credible analysis, a

11    argument, and if you don't find the patents valid, which you

12    should, then you should go with Ms. Distler's number.

13        Okay.  We're almost there.  The home stretch.

14        Design patent damages, we talked about this already.  I

12:31    15    want to talk to you a little bit about why there can't be

16    willful infringement here.  We talked about this.  You saw the

17    evidence, you heard the testimony, you've seen the logo.

18    Seirus had a good faith belief to think that they weren't

19    infringing, and they had their logo all over it.  They believed

12:31    20    that differentiated them, and they in good faith relied on

21    that.  They heard from Ventex that their lawyers had looked at

22    it.  You heard Mr. Carey testify about this.  You heard

23    Ms. Chin testify about this.  They told you that they only had

24    a wave pattern.  Ms. Chin said that -- I'm sorry -- Mr. Carey

12:31    25    told you that Columbia doesn't even use the wave pattern.

1    Remember this?  They don't even use it?  It's just on a piece

2    of paper.  That's all it is, just a piece of paper.  And he

3    testified that they -- that Seirus had intricately integrated

4    its logo with the wave, and that is a fundamental part of their

5    design.  Ms. Chin said there would be no problem because of

6    logo and irregular wave, and she agreed.

7        This is the email I told you about before, Exhibit 494, the

8    April 4, 2013, email from Ventex.  Here you can see that

9    Ms. Chin is told, "Per our attorney there will be no problem as

10   your design factor because of logo and irregular wave."  It's a

11   reasonable conclusion to draw.

12       Now, it's true that there was a finding of infringement

13   ultimately about a year ago, and what did Seirus do in response

14   to that?  What did they do?  You heard Mr. Carey tell you they

15   immediately stopped making fabric.  Immediately stopped.  He

16   said they had some commitments, had commitments to sell the

17   product they had made a year before, and they honored those

18   commitments, sold those products off, and then, lastly, they

19   changed their design, and you saw the evidence.  This is the

20   design, and you haven't heard anything about this in terms of

21   infringement.  There's no accusation this infringes.  They now

22   have a sawtooth wave design here.  You've heard nothing about

23   that relative to the design patent, and you won't.

24       So Seirus acted in good faith through its entire period.

25   It cannot be willful infringement for the design patent either.

1      So let's talk about the remedy.  You heard about two, two

2   remedies.  First Columbia tried to tell you that they should

3   get a reasonable royalty for the design patent and for the

4   utility patent, but I asked Ms. Morones on cross-examination,

12:33  5   "Do you have any opinion whatsoever on reasonable royalty for

6   the design patent?"  And what did she say?  No.  None.  Zero.

7   Nothing.  She had nothing to say.  Throw her out.  Can't use

8   her.

9      What did you hear about it from Mr. Merriman?  I searched

12:34  10  the record, and I found two times where he mentioned the design

11  pattern.  Now, you're going to hear argument that there could

12  be a Georgia Pacific analysis.  Remember those 15 lengthy

13  factors and all that?  And they were gone through carefully for

14  the utility patent, the '270 patent.  You never saw one ounce

12:34  15  of evidence applied to that design patent.  We would submit

16  there should be zero royalty, zero royalty for the design

17  patent.

18     And so what are you left with?  You've got this

19  disgorgement remedy, and in that remedy, you're going to be

12:34  20  instructed that there are two issues you need to address.

21  First, identify the appropriate article of manufacture, and

22  then, second, determine the profit earned only -- keyword

23  "only" -- on the article of manufacture.  So if you conclude

24  the article of manufacture is the lining, is the roll of fabric

12:34  25  and not a whole glove, then you have to accept Ms. Distler's

1    opinion because that's how she did it.

2        Here's what she came up with.  She computed $500,000.  Now,

3    you've heard argument about how that's a small number relative

4    to -- I think it was to these gloves.  A lot more goes into

12:35  5    making a glove than the roll of fabric.  And $500,000, I

6    submit, to a small company ain't small change.  It's not.  For

7    a patent that Columbia doesn't even use?  How can it have great

8    value when they don't even use it?

9        So what you would do then is figure out what is the article

12:35  10   of manufacture.  Well, the roll of fabric as you heard -- how

11   is that made?  It's manufactured.  You've got the pieces

12   coming.  You've got the foil.  You've got the base fabric, and

13   those are pressed together in a hot drum.  They make a roll of

14   fabric which Seirus buys.  They buy their own fabric, and then

12:36  15   they take fabric, and they put it in a warehouse, and they ship

16   it off to a glove maker.  That is an article of manufacture.

17   That roll of fabric is a final, finished article of

18   manufacture.  Like I said, Harley buys it.  Harley puts it in a

19   jacket.  Other people can buy it.  You can make whatever you

12:36  20   want with it.  You can use it as a -- I mean if you wanted to,

21   I suppose, you could have a blanket of Omni-Heat.  In fact, I

22   think Columbia makes Omni-Heat blankets.  That is a finished

23   article of manufacture.

24       So once you reach that conclusion, then you have to go with

12:36  25   what Mr. Distler said because that's her theory.  Ms. Morones'

1    theory is based on the whole glove.  You don't have to just

2    take Ms. Distler's word for it.  What did Mr. Snyder say?  He

3    was asked what is the invention in the design patent, what did

4    he get?  And so he says, "Well, I'm hearing it, and we're

12:36    5    talking through it.  This says, 'The ornamental design,' which

6    is essentially what I would call the illustration of the

7    drawing of the artwork itself of a heat-reflective material."

8    Not a glove.  Not a sock.  So that means basically, you know,

9    the art itself is representing what the heat-reflective

12:37    10    material is, as shown and described.  And then he's asked:

11        "Question:  The heat-reflective material here is the

12    fabric.  Is that fair?

13        "Answer:  No."

14        He said no.  What's surprising is what he said next.  "It's

12:37    15    not even the fabric.  It's less than that.  It's not the fabric

16    we're talking about.  It's the actual heat-reflective material

17    itself, the silver."  So really Ms. Distler's damages theory is

18    actually conservative.  She's going for more.  She's including

19    the MegaHeat RX fabric in the article of manufacture whereas

12:37    20    Mr. Snyder would tell you it's just the foil.

21        So what did Ms. Morones tell you?  She agreed that the

22    fabric is made into rolls and sold and purchased -- I'm

23    sorry -- purchased and made into gloves.  So she agrees with

24    that.  It's a manufactured roll.  Mr. Blackford, he said they

12:38    25    even do it the same way.  Columbia gets -- has 12 fabric

1    makers.  They manufacture the rolls of Omni-Heat fabric, and

2    they use it in various types of -- with the various

3    ingredients, the foil, adhesive, and textile, to make a

4    finished fabric.  They do the same thing.

5        And so what does Columbia want you to do?  They want to

6    take one of these whole gloves -- remember these?  We looked at

7    these.  The orange and the yellow glove.  It's Exhibit 1349.

8    It's hard to even find it in there.  There's the fabric inside

9    of there.  What Columbia would have you do is give you every

10   penny that Seirus makes on this product, every single penny,

11   give it to Columbia, even though it's -- according to

12   Mr. Snyder it's just the foil.  Just the foil.

13       You heard this last minute hail Mary that they made.

14   Whoops.  I think we messed up.  We're not going to ask for

15   damages on this.  We were the whole trial until just now.  But

16   guess what?  Because we know this is a problem.  It just points

17   out how absurd our theory is, and we are not even going to try

18   to get damages for it anymore.  That's what they told you.  We

19   don't want damages for it anymore because it doesn't make any

20   sense, but they do want damages for every penny that Seirus

21   makes on every insulated glove, all the All Weather gloves, all

22   the hats, all the -- every penny.  Every single penny.

23   Millions of dollars for a design they don't use and which is

24   just a design of a wave.  They want every -- all that hard

25   work, all that effort that all these Seirus employees put into

1   this, all of that, they want every penny for it.

2       So why is Ms. Morones' opinion something that you should

3   disregard?  One is because, frankly, she actually did the same

4   thing just about as Ms. Distler did.  This was that Monday

12:40   5   opinion that she -- that you didn't get to see until she got

6   cross-examined.  And what did she say?  She said I want to

7   base -- Ms. Morones is on the bottom and Distler on the top.

8       Ms. Morones said I'm going to apportion.  I'm going to come

9   up with a portion based on fabric only, not the whole glove,

12:40   10   and she came up for this particular glove of 44 percent

11   fractional apportionment.  Ms. Distler did the same thing.  She

12   used the fabric as well from the bill of materials and came up

13   with a smaller fraction, but a fraction nonetheless.  So the

14   methodologies they used are effectively the same.  And you also

12:40   15   saw Ms. Morones testify that her opinion was that they would

16   apportion under this theory where they used the bill of

17   materials.

18       And then last, the last point was that she said there's a

19   disagreement.  I think you heard Ms. Morones say she did not

12:41   20   take out some of the cost that Ms. Distler did.  We would just

21   submit -- I don't want to go through these.  You've heard

22   enough about that.  But Ms. Distler took out the right cost,

23   and you should go with her margin and not Ms. Morones'.

24   Ms. Morones admitted that those cost vary with the inventory

12:41   25   and the sale of HeatWave.  And I mentioned this already:

1    Ms. Morones did not have an opinion on the reasonable royalty

2    for the design patent.

3         And so with that I'll wrap up, and I just wanted to finally

4    say -- I mean again thank you so much.  You guys were -- you

12:41    5    paid attention.  You really did the whole way through, and I

6    know this wasn't -- maybe not the most fascinating subject

7    matter that you could have ever heard and sat on a trial for

8    nearly two weeks.  But it was great to have you, and we really

9    appreciate presenting to you, and we thank you for your time

12:41   10    and your consideration.

11         THE COURT:  Does anybody on the jury need a break

12    right now?  If not we're going to -- you need a break.  You're

13    not on the jury.  Go into your room for just about five

14    minutes, and we'll give him a break, and we'll finish the

12:42   15    closings, and then we'll take our lunch.

16         (Recess.)

17         (Proceedings held in the presence of the jury panel.)

18         THE COURT:  Go ahead.

19         MR. ALDRICH:  I'm just getting wired up.

12:48   20    That's a lot to cover.  I'm not going to go back through

21    everything.  There are just a few points that I want to make.

22         The first point has to do with validity or invalidity.  And

23    the judge is going to instruct you, I believe, the only prior

24    art that is in consideration in this case is Fottinger and then

12:49   25    the four other ones we talked about.  Castelli is not prior art

1       in this case that's to be considered.  The Levy reference isn't

2       prior art in the case that's to be considered.  The only ones

3       are Fottinger and these other four.  I mean even if Castelli

4       was considered, it wouldn't be all that helpful because it's

12:49   5       not a discontinuous array.  It is a solid sheet of film with

6       holes.  That's what we call a continuous array.  It's a

7       continuous sheet of film with holes in it.

8               Discontinuous means there has to be separation between a

9       number of elements.  There are other issues with Castelli also.

12:50   10      There's no evidence that it's 30 to 70 percent coverage

11      et cetera, so, anyway, Castelli is not to be considered.

12              At the end of the day, on this whole obviousness question

13      or anticipation question, to me it just comes down to this:  If

14      it was obvious, if this had been done before or even if it was

12:50   15      obvious to put it together, in 2008 Mr. Blackford was meeting

16      with his vendors and trying to come up with a way of getting up

17      to three CLO of increased heat and looking at a table of

18      fabrics from a bunch of different vendors.  There would have

19      been one on the table that would have had partial coverage of

12:51   20      heat-reflecting elements on top of a base material.  If it was

21      that obvious, if this had been known since the '70s, and when

22      he sat down, he would have looked at a table with a bunch of

23      fabrics, and there would have been one with partial coverage of

24      aluminum foil on there, but that wasn't there.  It wasn't there

12:51   25      because nobody had come up with that idea before.

1   Mr. Blackford was the first person to come up with that idea.

2       It's easy as I said to go back and look back with hindsight

3   and say, "Oh, anybody would have done that."  Again innovation

4   is hard.  What's easy is to look back in time and say, "Oh,

12:51   5   anybody would have done that."  But if it was so easy and if

6   there was such a demand for ways of increasing heat in your

7   clothing, the answer would have been there, and we wouldn't be

8   here.

9       I also wanted to respond to this idea that Columbia wants

12:52   10   every last penny of the sales of these gloves.  Again, we

11   didn't want to be here.  Columbia is not a litigious company.

12   They do not go out picking fights.  You'll read all kinds of

13   stories in the news about Apple with disputes with Samsung and

14   a bunch of parties, lots of lawsuits going on.  You won't read

12:52   15   very much about Columbia Sportswear.  As large as Seirus wants

16   to make them sound like they are, as big a company as they are,

17   you will not read stories about Columbia Sportswear going out

18   and suing people.  That's not what they're in the business of.

19   They're in the business of developing innovative clothing and

12:52   20   protecting it and trying to set themselves apart from the

21   competition for having done so.  They have no interest in going

22   out and taking people's money.  But when somebody comes over

23   the fence, they want to protect their property.  And four years

24   ago, Seirus jumped over the fence.  And all that Columbia's

12:53   25   doing is vindicating their rights at this point.

1          And this case should not have gone on this long, but we're

2     still here.  We're at trial.  And Columbia simply wants what it

3     is entitled to for having -- frankly, having defended itself

4     for the last four years in this case that should never be here.

12:53  5     I mean it's kind of a shame, actually, that we're here,

6     frankly, but, again, Columbia needs to stand by its rights.  It

7     needs to protect its intellectual property.

8          If Seirus didn't want to give every penny for infringing

9     the design patent four years ago, Seirus had the power to stop

12:53  10    that.  Four years ago Seirus could have said, "For one man's

11    labor for ten hours and $1,000, we'll make a change."  And they

12    chose not to do that.  And so we're here.

13         I also wanted to go back to the discussion about

14    Ms. Morones' opinions because a lot has been made of that.  We

12:54  15    talked during the first portion of my presentation about

16    Ms. Distler's opinion and what was wrong with it and why it

17    makes no sense, why you would not look at the McDonald's cup of

18    Coke and say that the profit isn't for the Coke.  Why you

19    wouldn't look at one of these gloves and say that the profit is

12:54  20    for something other than the fabric that is the glove, 100

21    percent of the glove.  And so what Ms. Morones did, and I think

22    she explained this very well, is she tried to go back and make

23    corrections to Ms. Distler's report by taking out things like

24    labor and duty and freight, and simply trying to adjust and

12:55  25    make corrections to the approach that Ms. Distler did to

correct for these things that are not components of a piece of clothing at all.

But the data wasn't there.  The Seirus-provided data, it was like one line for fabric, and then one line for everything else.  And so it wasn't possible for Ms. Morones to go back and actually figure out -- and in the end, she said, "This is a nonsense way of doing it anyway, but if the jury finds this helpful, I'm at least going to give the jury some correct numbers of what this would actually look like if you want on a cost-by-cost basis which does each component in the glove, how much does each component cost," and she tried to do that.

And as was shown during her examination, it didn't make any sense either.  And so she said, "I'm not going to put that in front of the jury.  That doesn't make any more sense than what Ms. Distler did," and so she was being straight and honest in saying, "Ms. Distler's calculation doesn't work.  My calculation doesn't work, but, frankly, the entire methodology doesn't work.  You don't look at something and say how much is it worth based on how much individual pieces and components of it may cost because some of those are more valuable to the consumer than others."  And on a HeatWave glove, this buckle is not why people buy it.  This piece of Velcro isn't why people buy it.  This bungie cord isn't why people buy it, but according to Ms. Distler, those things are all going to be given value based on how much they cost Seirus, not based on

1    why people buy it.  People buy it because it has HeatWave

2    fabric.

3         How do you I know that?  Because that's what Seirus wants

4    you to know, that 50 percent of what it looks like when it's on

12:57  5    the store shelf, that's why people buy it.  Her analogy gives a

6    disproportionate amount to everything else, and so that's why

7    Ms. Morones said, "I'm going to try to correct for what

8    Ms. Distler did, but in the end I don't have the data to do it,

9    so I'm not going to give that opinion to the Court, and,

12:57  10   frankly, the entire methodology doesn't work to start with.

11   It's nonsensical."

12        Again, the question that you're being asked, whoever sells

13   or imports for sale any article of manufacture to which the

14   design or colorable limitation has been applied shall be liable

12:57  15   to the owner to the extent of his total profit.

16        What does Seirus sell?  Seirus sells gloves.   Seirus

17   doesn't sell blankets.  Seirus doesn't sell fabric.  Seirus

18   doesn't sell replacement linings for its gloves.  And in the

19   jury instructions that you're going to get, there's going to be

12:58  20   a test that you should look at, and one of the critical parts

21   of the test is this:  If the component bearing the design can

22   be physically separated from the product as a whole or by the

23   user or seller.  You can't separate this out.  There's no way

24   to pull that -- I mean this is -- they want to say it's just

12:58  25   this, but you can't separate that out.

1    Seirus is applying this design to these gloves just like is

2    shown in the patent.  It's applied to gloves, and that's what

3    the profits are attributable to.  That's what Seirus is selling

4    in the marketplace.  They even say it's integrated.  Right

12:58  5    there.  Integrated reflective liner.

6    I want to go back.  I told you that April 4th date was

7    critical.  And I want to go back to that April 4th date because

8    that's the date that Ms. Chin received the email from Ventex

9    that asked Mr. Murphy is there something we need to do?  What

12:59  10    happened after that email?  We saw Mr. Murphy's response.  But

11    there's more to the story.  Mr. Murphy forwarded the email to

12    Mr. Edwards, Mr. Joe Edwards.  Mr. Murphy was asked, "When you

13    received this email, did you look at the attachments?"

14    "I did not."

12:59  15    "What did you do you with it?"

16    "I forwarded it to Mr. Edwards who heads up our

17    coordination with the legal team."

18    Now, this is somewhat remarkable because what you heard a

19    few minutes ago was that Seirus relied in good faith on the

12:59  20    fact that it had its logo on the print.  They said, "We relied

21    in good faith on the fact that we had our logo in the print,

22    and that's why we believed that we didn't infringe the design

23    patent."  There's a really big flaw in that story because

24    nobody looked at the design patent.  If they didn't look at the

01:00  25    design patent, then how did they come up with this excuse that

1    we have the logo and that's why we don't infringe?

2        "When you received this email did you look at the

3    attachments?

4        "No."

01:00    5    This is Ms. Chin.  "Who provides legal review within Seirus

6    at this point in time, 2013?

7        "At this time it would be facilitated through Joe Edwards

8    who would speak with our outside counsel.

9        "Question:  Joe Edwards is one of the owners, a board

01:01    10    member, and an officer at that time, was he not?

11        "Answer:  Correct.

12        "Question:  And you didn't talk to Joe Edwards directly

13    about this communication with Ventex, did you?

14        "Answer:  No, I did not.

01:01    15    "Question:  And are you aware that Mr. Murphy" -- this is

16    Mr. Carey's testimony.

17        "Are you aware that Mr. Murphy forwarded a copy of that

18    email to Mr. Edwards?

19        "Answer:  "Yes, I am.

01:01    20    "And so Mr. Edwards did have a copy of the design patent,

21    didn't he?"

22        The answer was, "Yes, he did have it -- yep, he had it, and

23    I followed up."

24        "But your testimony was that no analysis was done because

01:01    25    none of the executive had a copy of the design patent.  Isn't

1    that what you said?"

2        He said, "No."

3        I said, "Nobody knew about it.  Nobody knew about the

4    design patent?  Correct?  Mr. Murphy received -- had received a

01:02    5    copy, and Mr. Edwards had received a copy, but nobody knew

6    about it.  That's your testimony?

7        "Neither of them opened it."

8        How do they argue today that they believed in good faith

9    that putting their logo on there was a defense to infringement

01:02    10    if they claim they didn't even know there was a patent?

11        "So what did you do after the design patent was received by

12    your firm -- by your company in April 2013 to make sure you

13    didn't infringe?

14        "Answer:  I didn't know.  I didn't receive that information

01:03    15    either.

16        "That would have been left to Mr. Edwards, correct?

17        "Correct."

18        So they got a patent sent to them by the Korean supplier

19    with an alarming notice that it looked an awful lot like the

01:03    20    Columbia patent, and nobody opened the email.  And yet they

21    want to say, "But we believed the logo got us out of that."

22    That's called willful blindness.  That is putting your head in

23    the sand, saying, "I don't want to know."

24        Now, they talked to you about the fact that for the utility

01:03    25    patent, willfulness starts on June 4th, and the reason for that

1    is because that's the date that the patent actually issued.

2    Now, back here it was clear the patent was going to issue, but

3    the willful -- any willful conduct starts on June 4th and goes

4    until December 4th.  That's when they got notice of the

01:04   5    lawsuit.  That's why the judge is limiting you to this range.

6    The judge is not limiting you to this range with respect to the

7    design patent because after they found out that they infringed,

8    a year ago, their actions after that can be willful

9    infringement, of course.

01:04   10         But with respect to the utility patent, they're limited to

11    things that happened in this range, and what they're going to

12    tell you is that nothing happened in this range.  But that's

13    not correct at all.  What happened in this range was sales.

14    Sales of infringing product.  Sales that are the result of

01:04   15    everything that happened back here.  Sales that are the result

16    of the copying.  Copying that they knew was of a patent pending

17    product.  That's what happened in here.  And this is the

18    willful infringement right there.

19         Now, there were also some statements made by Mr. Marchese

01:05   20    about things we did and didn't hear at the trial.

21         There's one thing that I would really like to know that I

22    didn't get to hear at the trial, and I don't know if you guys

23    had the same curiosity, but who is Joe Edwards?  His name has

24    been passed around I don't know how many times.  How many

01:05   25    emails?  How much testimony about Joe Edwards?  Joe Edwards.

1      "This is a company you founded with Joe Edwards, correct?

2      "Yes.

3      "And you guys were joint owners.  Is that right?

4      "Yes.

01:05   5      "There are three directors of the company?

6      "Yes.

7      "Mr. Carey, Ms. Carey, and Mr. Edwards, but with respect to

8   the legal responsibilities, that all fell on Mr. Edwards'

9   shoulders, correct?

01:06   10      "Correct, Mr. Edwards.

11      "Mr. Edwards also received a copy of this email?"  The

12   email that said -- that attached the copy of the Omni-Heat

13   header.

14      Mr. Edwards.  Company founder.  Seirus copresident.

01:06   15   Received the photo of the Columbia products.  Saw Columbia's

16   patent.  Company director.  Responsible for legal affairs.

17   Where is Mr. Edwards?  Why did Mr. Edwards not want to come to

18   trial to talk to you?  Why did Seirus not bring Mr. Edwards to

19   trial?  Mr. Edwards received a copy of that design patent.

01:06   20   Where is he?  Where is the explanation?  This is what I wanted

21   to know through the trial.

22      I told you that April 4th date was important.  Something

23   else happened on April 4th that came out at trial that I

24   thought was extremely interesting.  We started out with the

01:07   25   opening theme.  Innovation is hard.  Innovation is hard work.

1    And on April 4th, the same day that the letter came from

2    Ventex, Columbia launched a new product.  That product was

3    called Omni-Freeze.  New technology keeps you cooler.  Keeps

4    you cooler.  Years went into Omni-Freeze also because

01:07    5    innovation is hard work.  Copying is easy.

6        And on April 4th, Seirus received an email that Columbia

7    was about to launch Omni-Freeze.  And Mr. Carey sent an email

8    to Mr. Murphy, "can we get a line on that fabric too?"

9    Somebody has to blow the whistle.  Somebody has to throw the

01:08    10    flag.  That's all I have.

11        THE COURT:  Members of the jury, we'll be taking our

12    midday.

13        MR. MARCHESE:  Your Honor, may I just have a sidebar

14    very briefly.

01:08    15        THE COURT:  Sure.

16    (The following proceedings were heard at the bench:)

17        MR. MARCHESE:  I am outraged by what Mr. Aldrich just

18    said.  We had an agreement prior to this trial we were going to

19    bring Joe Edwards to this trial.  We told him he was available.

01:10    20    They told us and represented to us that they would not call

21    him, and they would not let him -- we made a trade not to bring

22    him.  He is here and available.  In exchange for them not

23    making this empty chair argument, and now I've heard it.  We

24    told them.  We said we will accept service of the subpoena.  He

01:10    25    will come and he will testify in your case in chief, and they

1    said, "No, we do not want him."  And that is just an

2    outrageous -- and frankly I'm shocked by what I just heard, and

3    this is a total breach of an agreement that we made.

4         THE COURT:  Okay.

01:10    5         MR. MARCHESE:  Can we get a curative instruction on

6    this.  I feel like I need to move for a mistrial.  It's

7    incredible.

8         THE COURT:  Oh, a mistrial.

9         MR. MARCHESE:  Honestly, it's unbelievable.

01:10    10         THE COURT:  I'm sorry.  I'm having back spasms.

11         MR. MARCHESE:  I'm sorry.  It's not the kind of stuff

12    I do.

13         THE COURT:  I'm not joking.  I'm having back spasms.

14    I can barely stand.  I need to send the jury out, and this is

01:10    15    more complicated than us taking this up here.

16         (Proceedings held in the presence of the jury panel.)

17         THE COURT:  Go ahead and go back to your lunch.  You

18    can come back a little after 2:00.

19         (Proceedings held outside the presence of the jury panel.)

01:11    20         THE COURT:  Please be seated.

21         Mr. Marchese.

22         MR. MARCHESE:  Your Honor, as I mentioned at the

23    sidebar, this is a total breach of an agreement that we made

24    prior to trial.  Mr. Edwards is in San Diego; he is available.

01:11    25    We agreed to accept service of his subpoena.  We were each

1    going to put him up, and then we each made an agreement that he

2    would not be brought to the trial in exchange for them agreeing

3    not to mention this empty chair argument.  And that is -- this

4    is documented.  We have this, and I'm just -- frankly just

01:12    5    shocked at what I just heard.  It's a total breach of our

6    agreement, and we had him ready to come and go.  He's been

7    prepped.  He has been met with.  He has been -- you know, he's

8    ready to rock 'n' roll and testify, and he was here the

9    whole -- I mean he's been in San Diego.

01:12    10    We told them he could come in their case in chief, and they

11    said, "No, no, no.  We won't call him," and we made an

12    agreement not to bring him to trial in exchange -- the deal was

13    we wouldn't get this empty chair argument, and here we got it

14    front and center.  The last word in this trial is that.  And

01:12    15    I'm just -- I'm without words about how much I'm shocked by

16    what happened, and, frankly, as I told you at sidebar, I'm

17    contemplating moving for a mistrial.  This is the kind of thing

18    you cannot do.

19    THE COURT:  Thank you.

01:12    20    Do you care to respond?

21    MR. ALDRICH:  I mean there was no agreement.  In fact,

22    I have the emails here.  They consistently offered to us that

23    they would not try to call him if we would agree not to mention

24    the fact that he wasn't here.  We never agreed to that.  And

01:13    25    instead we -- we didn't serve a subpoena, but they didn't bring

1    him either, and they actually said that he was only going to be

2    available for three days which is in the middle of our case in

3    chief, and we said that was unacceptable.

4        I have all the emails right here if Your Honor would like

01:13    5    to see them.  If Seirus wanted to call Mr. Edwards, it was

6    obligated to provide a witness statement for him.  They

7    never --

8            MR. MARCHESE:  We did provide a witness statement.

9            THE COURT:  Wait, wait.  We have a court reporter.  So

01:13    10    slow down and I'll give you a chance.

11           MR. ALDRICH:  This is the email that was sent

12    September 15th.  If Seirus wanted to call Mr. Edwards, it was

13    obligated to provide a witness statement for him on August 1st,

14    to file a lay witness statement for him on August 14th, and to

01:13    15    identify him on his list of witnesses on August 28th.

16           THE COURT:  Mr. Aldrich, I'm sorry to interrupt you.

17    I'm not going to be able to figure this out.

18           MR. ALDRICH:  I'd be happy to send the entire thread.

19           THE COURT:  Yes, send the thread and in context, and

01:14    20    then I can take a look at it.

21           MR. MARCHESE:  He was available to be brought in

22    yesterday, and we would have brought him and had him testify

23    had we known this is what they were going to do.  This is

24    just -- you know, this is the deal that we made, and he may try

01:14    25    to, you know, mince words and things like that, but that is

1    what we agreed to.

2            THE COURT:  Okay.  Again, I'm not going to resolve

3    this without taking a look at it.

4            MR. MARCHESE:  Understood.  I think something has to

01:14    5    be done.  We need to have -- two things.  Number one, we had a

6    slide on willful blindness, and the Court refused to put that

7    in the instruction.  I think that we need to get a curative

8    instruction on that at a minimum.  I mean that was --

9            THE COURT:  I actually disagree with you on that

01:14    10    point -- on that point.  Whether or not willful blindness is

11    something that the jury can consider in determining whether the

12    behavior was willful is something I think they can argue.

13    That's different than willful blindness equals willfulness, and

14    they made the argument.  You objected.  I overruled, and that's

01:15    15    why.  But I think their requested instruction went too far, but

16    I do not believe that it is an irrelevant argument.

17            MR. MARCHESE:  And that's why I objected.  I

18    understood you overruled it.  But this is a different issue.

19    Joe Edwards issue is a different issue.

01:15    20            THE COURT:  I know.  I'll look at the emails, and then

21    I'll tell you what I think.

22            MR. AXELROD:  We have two issues that we want to put

23    on Your Honor's lunch hour because they relate to the jury

24    instructions.

01:15    25            THE COURT:  Sure.

1          MR. AXELROD:   The Court has told us repeatedly that

2     nobody would be arguing that anything but Blauer, Halley,

3     Vaughn, and Worley were the additional prior art references in

4     addition to Fottinger, and we just got through a -- both

01:15   5     lengthy arguments that Thermalux is the same thing and was here

6     20 years earlier, and substantial time devoted on the Castelli

7     jacket, so we think it's imperative that the Court instruct the

8     jury what prior art is at issue in the case.

9          The second part was your court has repeatedly said that

01:16   10    nobody is going to be arguing contrary to your prior summary

11    judgment rulings, and Mr. Marchese clearly told the jury that

12    all of the non-Fottinger references, Halley, Vaughn, Worley,

13    and Blauer, have heat-directing elements, directly contrary to

14    your court's ruling.  We think the jury has to be told that

01:16   15    that is not in the case and that those references do not have

16    that feature.

17          MR. MARCHESE:   May I respond?

18          THE COURT:   Just a minute, please.

19          MR. MARCHESE:   Sure.

01:17   20          THE COURT:   Halley, Vaughn, Worley.

21          MR. AXELROD:   Blauer.

22          THE COURT:   Blauer, thank you.

23          MR. AXELROD:   Those are the four that the cases

24    supposedly limited to.

01:17   25          THE COURT:   All right.  Go ahead.

1           MR. MARCHESE:   Remember the door opened on that issue?

2     We were never making the argument about heat-directing

3     elements, and then they were cross-examining Dr. Block on it,

4     and Your Honor ruled that the door had opened, and so he was

01:17  5     allowed to say that they had heat-directing elements, and he

6     did.   He testified to that.

7           THE COURT:   That's not exactly how I recall it.

8           MR. AXELROD:   Thank you.

9           MR. MARCHESE:   We can go back and look at the

01:17 10     transcript, but that is what happened.   And they had -- the

11     Court said no heat-directing elements on the one side, and it

12     was ordered to take that off.

13           THE COURT:   It is one thing to allow testimony to come

14     in because it helps explain what somebody was saying or the

01:17 15     reasons for their statements, and I think that's what I did.

16     It is another thing to argue that something that has been found

17     as a matter of law and to make -- and then thereafter make a

18     statement contrary to what I have ruled as a matter of law.   I

19     think I allowed the testimony for the former, but I certainly

01:18 20     did not mean to say that the door was open for you to make

21     arguments contrary to what I had already ruled.

22           MR. MARCHESE:   I was just arguing what the evidence

23     was, Your Honor, which came in through Dr. Block.

24           THE COURT:   Again, as I recall this portion of the

01:18 25     testimony, I said he gets to explain why he made the statements

1    that he made as a matter of giving kind of a full explanation,

2    not as a matter of simply allowing you to argue contrary to

3    what I have already ruled.

4           MR. MARCHESE:  I'm sorry.  That's not how I understood

01:18  5    it then.

6           THE COURT:  That's okay.  And I maybe and probably did

7    not explain it as well as I should have.  But that did not open

8    the door to put these other -- or to argue that heat direction

9    was taught by these other references.  Nonetheless, I'm willing

01:19  10   to go -- I mean that argument has already been made.  There's

11   no objection on the closing arguments on that issue, but on the

12   issue of what references are at issue for purposes of

13   obviousness, I am willing to give an instruction that says

14   these are the four references that we are interested in as

01:19  15   regards obviousness.  That is not an issue.

16          MR. MARCHESE:  I thought that was in the instructions

17   already.

18          THE COURT:  I went and looked.  One of you was making

19   the statement -- I think Mr. Aldrich was making a statement,

01:19  20   and I think there is not a specific reference to those four

21   references.

22          MR. MARCHESE:  And we have no objection to that,

23   Your Honor.  I think we had said that.

24          MR. SPROUL:  Five references, Fottinger plus the four

01:19  25   just to be clear.

1          THE COURT:  I think this was just an issue on the --

2     oh, because you still have to add Fottinger in.  Thank you.

3     It's Fottinger plus.  Okay.

4          I'll take a look at the emails, and I'll let you know

01:19   5     whether a curative instruction needs to be had or not, and you

6     can make whatever further motions you wish before we put the

7     jury back in.  The jury's coming back at 5 after, so why don't

8     we get back together in 45 minutes or so.

9                              ---OOO---

10

11                     C-E-R-T-I-F-I-C-A-T-I-O-N

12

13          I certify that the foregoing is a correct transcript from

14     the record of proceedings in the above-entitled matter.

15

16          Dated September 28, 2017, at San Diego, California.

17

18
                          /s/ Dana Peabody
19                        Dana Peabody,
                          Registered Diplomate Reporter
20                        Certified Realtime Reporter

21

22

23

24

25

2353

1                    UNITED STATES DISTRICT COURT

2                   SOUTHERN DISTRICT OF CALIFORNIA

3

4    COLUMBIA SPORTSWEAR NORTH      )
     AMERICA, INC., AN OREGON       )
5    CORPORATION,                   )
                                    )
6                 PLAINTIFF,        ) CASE NO. 17CV1781-HZ
                                    )
7    VS.                            ) SAN DIEGO, CALIFORNIA
                                    )
8    SEIRUS INNOVATIVE ACCESSORIES,) THURSDAY,
     INC., A UTAH CORPORATION,      ) SEPTEMBER 28, 2017
9                                   ) 2:07 P.M.
                  DEFENDANT.        )
10   _____)

11

12

13             REPORTER'S TRANSCRIPT OF PROCEEDINGS

14                          JURY TRIAL

15                  VOLUME  9 - PM SESSION

16                    PAGES 2353 - 2397

17        BEFORE THE HONORABLE MARCO A. HERNANDEZ
                UNITED STATES DISTRICT JUDGE

18

19

20

21

22   REPORTED BY:  CAMERON P. KIRCHER
                   CSR NO. 9427, RPR, CRR, RMR
23                 333 W. BROADWAY, SUITE 420
                   SAN DIEGO, CALIFORNIA  92101
24                 E-MAIL:  CPKIRCHER@GMAIL.COM

25

                    COMPUTER-AIDED TRANSCRIPTION

2354

```
 1    APPEARANCES:

 2    FOR THE PLAINTIFF:    SCHWABE, WILLIAMSON & WYATT, P.C.
                            BY:  NIKA F. ALDRICH, JR., ESQ.
 3                               DAVID W. AXELROD, ESQ.
                                 BRENNA LEGAARD, ESQ.
 4                          1211 SW 5TH AVENUE
                            SUITE 1900
 5                          PORTLAND, OREGON  97204

 6
      FOR THE DEFENDANT:    FISH & RICHARDSON, P.C.
 7                          BY:  CHRISTOPHER S. MARCHESE, ESQ.
                                 SETH M. SPROUL, ESQ.
 8                          12390 EL CAMINO REAL
                            SAN DIEGO, CALIFORNIA  92130
 9
                            MARKOWITZ HERBOLD, P.C.
10                          BY:  RENEE ROTHAUGE, ESQ.
                            1211 SW FIFTH AVENUE
11                          SUITE 3000
                            PORTLAND, OREGON  97204
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

2355

1          SAN DIEGO, CALIFORNIA - THURSDAY, SEPTEMBER 28, 2017

2                            2:07 P.M.

3          (JURY ABSENT.)

4          THE COURT:  PLEASE BE SEATED.

5          I LOOKED AT THE E-MAIL STRING THAT WAS SENT TO ME BY

6    MR. ALDRICH, WHERE THE PARTIES ARE HAVING CONVERSATIONS ABOUT

7    MR. EDWARDS AND WHETHER MR. EDWARDS WOULD BE CALLED AS A

8    WITNESS.  A PART OF THE CONVERSATION INCLUDES COLUMBIA'S

9    POSITION THAT MR. EDWARDS MAY NOT BE ABLE TO BE CALLED AS A

10   WITNESS, BASED ON WHO THE WITNESSES WERE ON THE WITNESS LIST

11   AND TIMING AND THINGS OF THAT NATURE.

12         AND THEN THERE IS OTHER CONVERSATIONS ABOUT

13   DEPOSITION TESTIMONY AND WHETHER OR NOT BY OFFERING SOME

14   DEPOSITION TESTIMONY, THAT MIGHT OPEN THE DOOR TO MR. EDWARDS

15   TESTIFYING OR NOT.  BUT I DON'T SEE, LOOKING THROUGH ALL OF

16   IT, THAT THERE WAS AN AGREEMENT THAT THERE WOULD BE NO

17   MENTION OF MR. EDWARDS' ABSENCE DURING THE COURSE OF THE

18   TRIAL.  IT JUST -- THE NEGOTIATIONS AND CONVERSATIONS JUST

19   DIDN'T GET TO THAT PLACE.

20         MR. SPROUL:  MAY I BE HEARD, YOUR HONOR?

21         THE COURT:  SURE.

22         MR. SPROUL:  CERTAINLY THE E-MAILS DON'T SHOW AN

23   EXPLICIT AGREEMENT ON THAT PARTICULAR POINT, BUT WHAT THEY DO

24   SHOW IS THAT COLUMBIA SOUGHT TO PRECLUDE MR. EDWARDS FROM

25   COMING TO TRIAL.

2356

1        AND IT WAS IN RESPONSE TO THAT THREAT OF PRECLUSION

2   THAT WE DIDN'T CALL HIM, COMBINED WITH A JOINT AGREEMENT THAT

3   THEY WOULDN'T PLAY HIS DEPOSITION TESTIMONY OR CALL HIM IN

4   THEIR CASE-IN-CHIEF AND WE WOULDN'T CALL HIM.  THERE WAS A

5   MUTUAL AGREEMENT TO NOT BRING HIM TO TRIAL, UNDER THE THREAT

6   OF PRECLUSION FROM COLUMBIA.  THEIR THREAT OF PRECLUSION WAS

7   WHAT PRECIPITATED THIS CONVERSATION AND THIS AGREEMENT.

8        AND SO FOR THEM TO NOW SAY HE'S NOT HERE AND HE'S

9   NOT HERE FOR NEFARIOUS REASONS, WHEN THEY HAVE PROCEDURALLY

10  TRIED TO BAR HIM FROM BEING HERE, OR AT LEAST THREATENED TO

11  DO SO, AND THAT'S THE REASON -- AND WHERE THAT'S THE ONLY

12  REASON THAT HE'S NOT HERE.

13       HE WAS READY.  TUESDAY NIGHT WE MADE THE CALL NOT TO

14  BRING HIM BECAUSE IT DIDN'T SEEM LIKE THEY WERE GOING TO CALL

15  HIM, WE WOULDN'T NEED TO DO A QUID PRO QUO OR TIT-FOR-TAT OR

16  WHAT HAVE YOU.  BUT NOW THAT IT COMES UP IN THE LAST THREE

17  MINUTES OF THE ENTIRE LITIGATION AFTER FOUR YEARS IS UNFAIR

18  TO US.

19       THE COURT:  AGAIN, AS I READ IT, I DIDN'T SEE THAT

20  THERE WAS AN AGREEMENT OF ANY KIND.  I JUST SAW YOU KIND OF

21  DOING WHAT YOU DO, LAWYERS DO, NOT YOU, BUT WHERE YOU'RE JUST

22  KIND OF GOING BACK AND FORTH ABOUT A PARTICULAR ISSUE.  NO

23  AGREEMENT WAS ACTUALLY REACHED ON IT.

24       YOU'RE RIGHT THAT THEY WERE ARGUING TO YOU THAT THEY

25  DIDN'T THINK THAT HE WAS GOING TO BE ABLE TO BE CALLED.  I

COMPUTER-AIDED TRANSCRIPTION

2357

1    SEE THAT IN THERE.

2         MR. MARCHESE:  WE SHOULD BE ABLE TO TELL THE JURY

3    THAT, I WOULD THINK.  THEY ARE THE ONES THAT ARGUED ABOUT

4    THIS JACKET --

5         THE COURT:  NO.  I DISAGREE WITH YOU ABOUT THAT

6    POINT.

7         THE ONLY OTHER THING THAT OCCURS TO ME IS THAT IT IS

8    IN THE INSTRUCTIONS, THAT WE TELL THE JURY THAT THEY ARE NOT

9    TO SPECULATE, THAT THEY ARE TO DECIDE THIS CASE ONLY ON THE

10   EVIDENCE AND NOT ON CONJECTURE OR SPECULATION; THEY NEED TO

11   DECIDE IT ON THE EVIDENCE.

12        AND TO MY MIND, TRYING TO FIGURE OUT WHAT

13   MR. EDWARDS MIGHT HAVE SAID OR NOT SAID KIND OF CROSSES INTO

14   THAT REALM.  WHETHER THE JURY WILL ATTACH THOSE TWO POINTS OR

15   NOT IS GOING TO BE UP TO THEM.  BUT THAT IS PART OF THE

16   INSTRUCTIONS.

17        THAT'S ALL I'VE GOT.  IS THERE ANYTHING ELSE YOU

18   WANT TO TELL ME?

19        MR. ALDRICH:  WE HAVE EXHIBIT 696.1 TO OFFER.  IT'S

20   THE PHOTOGRAPHS OF THE JACKET THAT THE PARTIES HAVE AGREED

21   ON.

22        THE COURT:  OKAY.  AND SO YOU CAN TAKE YOUR JACKET

23   HOME AFTERWARDS?

24        AND MICHAEL WAS ADDING THE LANGUAGE OF THE FOUR

25   REFERENCES PLUS FOTTINGER.  DID YOU GET THAT LANGUAGE DONE?

2358

```
1              MR. JETER:  YEAH.

2              THE COURT:  CAN YOU JUST READ IT SO THAT THEY CAN

3    HEAR IT, AND THEN YOU CAN JUST PRINT IT OUT.

4              MR. JETER:  ALL RIGHT.

5              THE COURT:  JUST THE SENTENCE REGARDING THE FOUR

6    REFERENCES.

7              MR. JETER:  IT'S GOING SLOW.  JUST A MINUTE.

8              MR. MARCHESE:  YOUR HONOR, MAY I GRAB THE JACKET?

9              THE COURT:  YES, PLEASE.  THANK YOU.

10             MR. MARCHESE:  AND MAY I PRESERVE THE RIGHT TO MOVE

11   ON THIS ISSUE WITH MR. EDWARDS?

12             THE COURT:  YES.

13             MR. MARCHESE:  THANK YOU.

14             THE COURT:  HAVE YOU GOT IT?  YOU'RE STILL WAITING

15   FOR THE COMPUTER.

16             MR. JETER:  IT'S SLOW.  VERY SLOW.

17             OKAY.  I HAVE IT.

18             THE COURT:  WHAT DOES IT SAY?

19             MR. JETER:  IT JUST SAYS, YOU ARE TO CONSIDER ONLY

20   THE FOLLOWING PRIOR ART REFERENCES WHEN DETERMINING

21   OBVIOUSNESS:  FOTTINGER IN VIEW OF HALLEY, BLAUER, WORLEY AND

22   VAUGHN.

23             THE COURT:  DOES THAT WORK FOR YOU?

24             MR. SPROUL:  AND/OR VAUGHN.

25             MR. ALDRICH:  IT SHOULD BE "OR."
```

COMPUTER-AIDED TRANSCRIPTION

2359

1          MR. SPROUL:  OR VAUGHN.  TECHNICALLY IT'S AND/OR

2    VAUGHN.

3          MR. JETER:  SO AND/OR?

4          MR. AXELROD:  THEY ARE SINGULAR.  FOTTINGER AND

5    HALLEY.  FOTTINGER AND --

6          THE COURT:  RIGHT, YEAH.  YOU CAN PUT AN "OR"

7    BETWEEN EACH ONE OF THEM FOR THAT MATTER.  I THINK THAT THIS

8    GETS US TO WHERE WE NEED TO BE.

9          MR. JETER:  I'M GOING TO MAKE ONE MORE CHANGE.  SO

10   IT READS THE SAME JUST WITH "OR" BETWEEN EACH OF THEM.

11         THE COURT:  THAT WILL WORK.

12         MR. SPROUL:  ACTUALLY, YOUR HONOR, AS I THINK ABOUT

13   IT, IT NEEDS TO BE "AND/OR."  THAT'S THE POSITION THAT WE'VE

14   TAKEN, IS THAT IT'S INDIVIDUALLY FOTTINGER PLUS VAUGHN,

15   FOTTINGER PLUS BLAUER, ET CETERA, BUT THEY ALL CONTRIBUTE IN

16   THE HOLISTIC CONSIDERATION OF OBVIOUSNESS TO WHAT ONE OF

17   ORDINARY SKILL WOULD UNDERSTAND.

18         THE COURT:  OKAY.

19         MR. ALDRICH:  DR. BLOCK'S REPORT DID NOT MAKE ANY

20   FIVE PRIOR ART COMBINATIONS.  HE MADE FOUR SEPARATE TWO PRIOR

21   ART COMBINATIONS.  AND THOSE WERE FOTTINGER PLUS BLAUER,

22   FOTTINGER PLUS HALLEY, BLAH, BLAH, BLAH, BLAH.

23         SO THERE IS NO SUPPORT IN THE RECORD THAT YOU SHOULD

24   PUT FIVE REFERENCES TOGETHER.  IT SHOULD BE "OR."

25         MR. SPROUL:  WE'VE BEEN OVER THIS BEFORE.  IN FACT,

2360

```
1   THE WAY DR. BLOCK PHRASES IT, EXCLUDING WHAT MR. ALDRICH IS

2   TALKING ABOUT, DR. BLOCK TALKS ABOUT IT HOLISTICALLY, THAT

3   ONE OF ORDINARY SKILL WOULD UNDERSTAND DESIRABLE COVERAGES.

4   THIS INCLUDES ALL OF THESE REFERENCES.

5            THE COURT:  PUT "AND/OR."

6            MR. JETER:  OKAY.

7            THE COURT:  GOT IT?

8            MR. JETER:  YEAH.

9            THE COURT:  GO GET THEM.

10           I'M GOING TO NEED A HARD COPY IN ABOUT 20 MINUTES

11   BEFORE WE GET THERE.  IT'S KIND OF TOWARDS THE END.  MAYBE

12   NOT THAT FAR.

13           (JURY PRESENT, 2:16 P.M.)

14           THE COURT:  PLEASE BE SEATED.

15           MEMBERS OF THE JURY:  NOW THAT YOU HAVE HEARD ALL OF

16   THE EVIDENCE AND THE ARGUMENTS OF THE ATTORNEYS, IT IS MY

17   DUTY TO INSTRUCT YOU AS TO THE LAW OF THE CASE.

18           I'M GOING TO BE READING YOU A SERIES OF

19   INSTRUCTIONS.  I WILL GIVE YOU COPIES WORD FOR WORD OF ALL OF

20   THE INSTRUCTIONS, SO YOU WON'T HAVE TO WORRY ABOUT GETTING

21   EVERYTHING DOWN VERBATIM.

22           IT IS YOUR DUTY TO FIND THE FACTS FROM ALL THE

23   EVIDENCE IN THE CASE.  YOU MUST FOLLOW THE LAW AS I GIVE IT

24   TO YOU, WHETHER YOU AGREE WITH IT OR NOT.  YOU MUST NOT BE

25   INFLUENCED BY YOUR OWN LIKES OR DISLIKES, OPINIONS,
```

2361

1    PREJUDICES, SYMPATHY OR PUBLIC OPINION.  THEY HAVE NO PLACE

2    IN YOUR DELIBERATIONS, FOR ALL PARTIES ARE EQUAL BEFORE THE

3    LAW.  LIKEWISE, DO NOT DECIDE THE CASE ON GUESSWORK,

4    CONJECTURE OR SPECULATION.

5         THIS MEANS YOU MUST DECIDE THE CASE SOLELY ON THE

6    EVIDENCE BEFORE YOU AND ACCORDING TO THE LAW.  YOU WILL

7    RECALL YOU TOOK AN OATH PROMISING TO DO SO AT THE BEGINNING

8    OF THE CASE.

9         IN FOLLOWING MY INSTRUCTIONS, YOU MUST FOLLOW ALL OF

10   THEM AND NOT SINGLE OUT SOME AND IGNORE OTHERS.  THEY ARE ALL

11   EQUALLY IMPORTANT.  AND YOU MUST NOT READ INTO THESE

12   INSTRUCTIONS OR INTO ANYTHING I MAY HAVE SAID OR DONE DURING

13   THE COURSE OF THIS TRIAL, AS ANY SUGGESTION AS TO WHAT

14   VERDICT YOU SHOULD RETURN.  THAT MATTER IS ENTIRELY FOR YOU

15   TO DECIDE.

16        YOU MAY USE YOUR NOTES TAKEN DURING THE TRIAL TO

17   ASSIST YOUR MEMORY.  NOTES, HOWEVER, SHOULD NOT BE A

18   SUBSTITUTE FOR YOUR MEMORY, AND YOU SHOULD NOT BE OVERLY

19   INFLUENCED BY THEM.  KEEP IN MIND THAT EACH PARTY IS ENTITLED

20   TO THE CONSIDERED DECISION OF EACH JUROR.  THEREFORE, YOU

21   SHOULD NOT GIVE UNDUE WEIGHT TO ANOTHER JUROR'S NOTES IF

22   THOSE NOTES CONFLICT WITH YOUR RECOLLECTION OF THE EVIDENCE.

23        THE EVIDENCE YOU ARE TO CONSIDER IN DECIDING WHAT

24   THE FACTS ARE CONSISTS OF:

25        ONE, THE SWORN TESTIMONY OF WITNESSES, BOTH ON

COMPUTER-AIDED TRANSCRIPTION

2362

```
1    DIRECT AND CROSS-EXAMINATION, INCLUDING TESTIMONY OF

2    DEPOSITIONS, REGARDLESS OF WHO CALLED THE WITNESS; TWO,

3    EXHIBITS WHICH HAVE BEEN RECEIVED INTO EVIDENCE; AND, THREE,

4    ANY FACTS TO WHICH ALL OF THE LAWYERS HAVE AGREED BY

5    STIPULATION.

6         IN REACHING YOUR VERDICT, YOU MAY CONSIDER ONLY THE

7    TESTIMONY AND EXHIBITS RECEIVED INTO EVIDENCE.  CERTAIN

8    THINGS ARE NOT EVIDENCE AND YOU MAY NOT CONSIDER THEM IN

9    DECIDING WHAT THE FACTS ARE.  I WILL LIST THEM FOR YOU.

10        ARGUMENTS AND STATEMENTS BY LAWYERS ARE NOT

11   EVIDENCE.  THE LAWYERS ARE NOT WITNESSES.  WHAT THEY HAVE

12   SAID IN THEIR OPENING STATEMENTS, CLOSING ARGUMENTS, AND AT

13   OTHER TIMES, IS INTENDED TO HELP YOU INTERPRET THE EVIDENCE,

14   BUT IT IS NOT EVIDENCE.  IF THE FACTS AS YOU REMEMBER THEM

15   DIFFER FROM THE WAY THE LAWYERS HAVE STATED THEM, YOUR MEMORY

16   OF THEM CONTROLS.

17        QUESTIONS AND OBJECTIONS BY LAWYERS ARE NOT

18   EVIDENCE.  ATTORNEYS HAVE A DUTY TO THEIR CLIENTS TO OBJECT

19   WHEN THEY BELIEVE A QUESTION IS IMPROPER UNDER THE RULES OF

20   EVIDENCE.  YOU SHOULD NOT BE INFLUENCED BY THE OBJECTION OR

21   BY THE COURT'S RULING ON IT.

22        TESTIMONY THAT HAS BEEN EXCLUDED OR STRICKEN, OR

23   THAT YOU HAVE BEEN INSTRUCTED TO DISREGARD IS NOT EVIDENCE

24   AND MUST NOT BE CONSIDERED.  IN ADDITION, SOMETIMES TESTIMONY

25   OR EXHIBITS ARE RECEIVED ONLY FOR A LIMITED PURPOSE.  WHEN I
```

2363

1     HAVE GIVEN A LIMITING INSTRUCTION, YOU MUST FOLLOW IT.

2              ANYTHING YOU MAY HAVE SEEN OR HEARD WHEN THE COURT

3     WAS NOT IN SESSION IS NOT EVIDENCE.  YOU ARE TO DECIDE THE

4     CASE SOLELY ON THE EVIDENCE RECEIVED AT TRIAL.

5              EVIDENCE MAY BE DIRECT OR CIRCUMSTANTIAL.  DIRECT

6     EVIDENCE IS DIRECT PROOF OF A FACT, SUCH AS TESTIMONY BY A

7     WITNESS ABOUT WHAT THAT WITNESS PERSONALLY SAW OR HEARD OR

8     DID.  CIRCUMSTANTIAL EVIDENCE IS PROOF OF ONE OR MORE FACTS

9     FROM WHICH YOU CAN FIND ANOTHER FACT.

10             YOU SHOULD CONSIDER BOTH KINDS OF EVIDENCE.  THE LAW

11    MAKES NO DISTINCTION BETWEEN THE WEIGHT TO BE GIVEN TO EITHER

12    DIRECT OR CIRCUMSTANTIAL EVIDENCE.  IT IS FOR YOU TO DECIDE

13    HOW MUCH WEIGHT TO GIVE ANY EVIDENCE.

14             A DEPOSITION IS THE SWORN TESTIMONY OF A WITNESS

15    TAKEN BEFORE TRIAL.  THE WITNESS IS PLACED UNDER OATH TO TELL

16    THE TRUTH AND THE LAWYERS FOR EACH PARTY MAY ASK QUESTIONS.

17    THE QUESTIONS AND ANSWERS ARE RECORDED.

18             IN DECIDING THE FACTS IN THIS CASE, YOU MAY HAVE TO

19    DECIDE WHICH TESTIMONY TO BELIEVE AND WHICH TESTIMONY NOT TO

20    BELIEVE.  YOU MAY BELIEVE EVERYTHING A WITNESS SAYS, OR PART

21    OF IT, OR NONE OF IT.  PROOF OF A FACT DOES NOT NECESSARILY

22    DEPEND ON THE NUMBER OF WITNESSES WHO TESTIFIED ABOUT IT.

23             IN CONSIDERING THE TESTIMONY OF ANY WITNESS, YOU MAY

24    TAKE INTO ACCOUNT:

25             ONE, THE OPPORTUNITY AND ABILITY OF THE WITNESS TO

2364

1    SEE OR HEAR OR KNOW THE THINGS TESTIFIED TO; TWO, THE

2    WITNESS' MEMORY; THREE, THE WITNESS' MANNER WHILE TESTIFYING;

3    FOUR, THE WITNESS' INTEREST IN THE OUTCOME OF THIS CASE OR

4    ANY BIAS OR PREJUDICE; FIVE, WHETHER OTHER EVIDENCE

5    CONTRADICTED THE WITNESS' TESTIMONY; SIX, THE REASONABLENESS

6    OF THE WITNESS' TESTIMONY IN LIGHT OF ALL OF THE EVIDENCE;

7    AND, SEVEN, ANY OTHER FACTORS THAT BEAR ON BELIEVABILITY.

8            THE WEIGHT OF THE EVIDENCE AS TO A FACT DOES NOT

9    NECESSARILY DEPEND ON THE NUMBER OF WITNESSES WHO TESTIFY

10   ABOUT IT.

11           SOME WITNESSES, BECAUSE OF EDUCATION OR EXPERIENCE,

12   ARE PERMITTED TO STATE OPINIONS AND THE REASONS FOR THEIR

13   OPINIONS.

14           OPINION TESTIMONY SHOULD BE JUDGED JUST LIKE ANY

15   OTHER TESTIMONY.  YOU MAY ACCEPT IT OR REJECT IT OR GIVE IT

16   AS MUCH WEIGHT AS YOU THINK IT DESERVES, CONSIDERING THE

17   WITNESS' EDUCATION AND EXPERIENCE, THE REASONS FOR THE

18   OPINIONS AND ALL THE OTHER EVIDENCE IN THE CASE.

19           I WILL GIVE YOU A SUMMARY OF EACH SIDE'S CONTENTIONS

20   IN THIS CASE.  I WILL THEN TELL YOU WHAT EACH SIDE MUST PROVE

21   TO WIN ON EACH OF ITS CONTENTIONS.  AS I PREVIOUSLY TOLD YOU,

22   COLUMBIA SEEKS MONEY DAMAGES FROM SEIRUS FOR ALLEGEDLY

23   INFRINGING U.S. PATENT 8,453,270, THE UTILITY PATENT, BY

24   IMPORTING, SELLING AND OFFERING FOR SALE PRODUCTS THAT

25   COLUMBIA ARGUES ARE COVERED BY CLAIMS 2 AND 23 OF THE UTILITY

2365

1    PATENT.  THESE ARE THE ASSERTED CLAIMS OF THE UTILITY PATENT.

2    THE PRODUCTS THAT ARE ALLEGED TO INFRINGE CONTAIN THE

3    HEATWAVE MATERIAL.

4          SEIRUS DENIES THAT IT HAS INFRINGED THE ASSERTED

5    CLAIMS OF THE UTILITY PATENT AND ARGUES, IN ADDITION, THE

6    CLAIMS ARE INVALID.

7          YOUR JOB IS TO DECIDE WHETHER THE ASSERTED CLAIMS OF

8    THE UTILITY PATENT HAVE BEEN INFRINGED AND WHETHER ANY OF THE

9    ASSERTED CLAIMS OF THE UTILITY PATENT ARE INVALID.

10         YOU WILL THEN NEED TO DECIDE ANY MONEY DAMAGES TO BE

11   AWARDED TO COLUMBIA TO COMPENSATE IT FOR THE INFRINGEMENT OF

12   U.S. PATENT D657,093, THE DESIGN PATENT, AS WELL AS FOR ANY

13   CLAIM OF THE UTILITY PATENT THAT YOU DECIDE HAS BEEN

14   INFRINGED AND IS NOT VALID.

15         IN ADDITION, YOU WILL NEED TO MAKE A FINDING AS TO

16   WHETHER INFRINGEMENT OF THE DESIGN PATENT OR THE UTILITY

17   PATENT WAS WILLFUL.  IF YOU DECIDE ANY INFRINGEMENT WAS

18   WILLFUL, THAT DECISION SHOULD NOT AFFECT ANY DAMAGE AWARD YOU

19   MAKE.  I WILL TAKE WILLFULNESS INTO ACCOUNT LATER.

20         MEASURE OF DAMAGES.  THE COURT HAS PREVIOUSLY FOUND

21   THAT SEIRUS INFRINGES THE DESIGN PATENT BY IMPORTING,

22   OFFERING FOR SALE AND SELLING PRODUCTS THAT INCORPORATE ITS

23   HEATWAVE MATERIAL.  I WILL NOW INSTRUCT YOU ABOUT THE MEASURE

24   OF DAMAGES FOR SEIRUS' INFRINGEMENT OF COLUMBIA'S DESIGN

25   PATENT.

2366

1    YOU MUST DETERMINE THE AMOUNT OF DAMAGES TO AWARD TO

2   COLUMBIA TO ADEQUATELY COMPENSATE IT FOR SEIRUS'

3   INFRINGEMENT.  IN RELATION TO DESIGN PATENTS, THE PATENT LAW

4   PROVIDES BY STATUTE THAT COLUMBIA IS ENTITLED TO EITHER THE

5   TOTAL PROFITS MADE BY SEIRUS FROM SALES OF ANY ARTICLES OF

6   MANUFACTURE TO WHICH THE PATENTED DESIGN IS APPLIED OR A

7   REASONABLE ROYALTY AS THE MEASURE OF RECOVERY WITH RESPECT TO

8   THE SALE OF EACH UNIT OF AN INFRINGING PRODUCT.

9    DETERMINING SEIRUS' TOTAL PROFIT ATTRIBUTABLE TO THE

10   INFRINGEMENT OF THE DESIGN PATENT INVOLVES TWO STEPS.  FIRST,

11   IDENTIFY THE ARTICLE OF MANUFACTURE TO WHICH THE INFRINGED

12   DESIGN HAS BEEN APPLIED.  THE ARTICLE OF MANUFACTURE MAY BE

13   THE PRODUCT AS A WHOLE OR A COMPONENT OF THAT PRODUCT.

14   SECOND, CALCULATE THE INFRINGER'S TOTAL PROFIT MADE ON THAT

15   ARTICLE OF MANUFACTURE.

16    COLUMBIA BEARS THE INITIAL BURDEN OF PRODUCING

17   EVIDENCE IDENTIFYING THE ARTICLE OF MANUFACTURE FOR WHICH IT

18   SEEKS PROFITS.  COLUMBIA MAY MEET THAT BURDEN BY SHOWING THAT

19   SEIRUS APPLIED THE PATENTED DESIGN TO A PRODUCT THAT WAS SOLD

20   AND FURTHER PROVING SEIRUS' TOTAL PROFIT FROM THE SALE.

21    SEIRUS BEARS THE BURDEN OF PROVING THAT THE ARTICLE

22   OF MANUFACTURE IS SOMETHING LESS THAN THE ENTIRE PRODUCT.  IF

23   THE PRODUCT, AS SOLD TO CONSUMERS, IS A SINGLE-COMPONENT

24   PRODUCT, THEN THAT PRODUCT IS THE RELEVANT ARTICLE OF

25   MANUFACTURE.  IF THE PRODUCT, AS SOLD TO CONSUMER, IS A

2367

1    MULTI-COMPONENT PRODUCT, THEN YOU MUST USE THE FACTORS LISTED

2    BELOW TO DETERMINE WHETHER THE ARTICLE OF MANUFACTURE IS THE

3    WHOLE PRODUCT OR A COMPONENT OF THAT PRODUCT.

4         THE SCOPE OF THE DESIGN IN THE DESIGN PATENT,

5    INCLUDING THE DRAWINGS AND WRITTEN DESCRIPTION.  THIS FACTOR

6    PROVIDES INSIGHT INTO WHICH PORTIONS OF THE UNDERLYING

7    PRODUCT THE DESIGN IS INTENDED TO COVER AND HOW THE DESIGN

8    RELATES TO THE PRODUCT AS A WHOLE.

9         THE RELATIVE PROMINENCE OF THE DESIGN WITHIN THE

10   PRODUCT AS A WHOLE.  IF A DESIGN IS A MINOR COMPONENT OF A

11   PRODUCT, FOR EXAMPLE, A LATCH ON A REFRIGERATOR, OR IF THE

12   PRODUCT HAS MANY OTHER COMPONENTS UNAFFECTED BY THE DESIGN,

13   THAT FACT SUGGESTS THAT THE ARTICLE OF MANUFACTURE SHOULD BE

14   THE COMPONENT BEARING THE DESIGN.  ON THE OTHER HAND, IF THE

15   DESIGN IS A SIGNIFICANT ATTRIBUTE OF THE ENTIRE PRODUCT,

16   AFFECTING THE APPEARANCE OF THE PRODUCT AS A WHOLE, THAT FACT

17   MIGHT SUGGEST THAT THE ARTICLE OF MANUFACTURE SHOULD BE THE

18   ENTIRE PRODUCT.

19        WHETHER THE DESIGN IS CONCEPTUALLY DISTINCT FROM THE

20   PRODUCT AS A WHOLE.  IF A PRODUCT CONTAINS OTHER COMPONENTS

21   THAT ARE CONCEPTUALLY DISTINCT, IT MAY BE APPROPRIATE TO

22   CONCLUDE THAT THE COMPONENT IS THE ARTICLE OF MANUFACTURE.

23   FOR EXAMPLE, A BOOK BINDING AND THE LITERARY WORK CONTAINED

24   WITHIN IT ARE CONCEPTUALLY DISTINCT AND DIFFERENT ARTICLES OF

25   MANUFACTURE.

2368

1          THE PHYSICAL RELATIONSHIP BETWEEN THE PATENTED

2     DESIGN AND THE REST OF THE PRODUCT.  IF THE COMPONENT BEARING

3     THE DESIGN CAN BE PHYSICALLY SEPARATED FROM THE PRODUCT AS A

4     WHOLE BY THE USER OR SELLER, THAT FACT SUGGESTS THAT THE

5     ARTICLE OF MANUFACTURE MAY BE THE COMPONENT.

6          IN WEIGHING THESE FACTORS, YOUR OBJECTIVE SHOULD BE

7     TO IDENTIFY THE ARTICLE OF MANUFACTURE THAT MOST FAIRLY CAN

8     BE SAID TO EMBODY SEIRUS' APPROPRIATION OF COLUMBIA'S

9     INNOVATION.

10          AS STATED ABOVE, THE SECOND STEP IS TO CALCULATE THE

11     TOTAL PROFIT SEIRUS MADE FROM THE SALES OF ANY ARTICLES OF

12     MANUFACTURE BEARING THE PATENTED DESIGN.

13          THE TERM "TOTAL PROFIT" MEANS THE ENTIRE PROFIT ON

14     THE SALE OF THE ARTICLE OF MANUFACTURE TO WHICH THE PATENTED

15     DESIGN IS APPLIED.  PROFIT IS DETERMINED BY DEDUCTING CERTAIN

16     EXPENSES FROM GROSS REVENUE.

17          GROSS REVENUE IS ALL OF SEIRUS' RECEIPTS FROM THE

18     SALES OF ANY ARTICLES OF MANUFACTURE USING THE DESIGN

19     PATENT'S DESIGN.  COLUMBIA BEARS THE BURDEN OF PROVING

20     SEIRUS' GROSS REVENUE FROM THE ARTICLES OF MANUFACTURE BY A

21     PREPONDERANCE OF THE EVIDENCE.

22          DEDUCTIBLE EXPENSES INCLUDE COSTS INCURRED IN

23     PRODUCING THE ARTICLES OF MANUFACTURE, SUCH AS THE COST OF

24     THE GOODS, PACKING COSTS AND SHIPPING COSTS.  CERTAIN FIXED

25     COSTS THAT DO NOT VARY WITH INCREASES IN THE PRODUCTION OR

2369

1    SALE, SUCH AS TAXES, INSURANCE, RENT AND ADMINISTRATIVE

2    OVERHEAD SHOULD NOT BE SUBTRACTED FROM THE GROSS REVENUE.

3         OTHER COSTS MAY BE INCLUDED AS DEDUCTIBLE EXPENSES

4    IF THEY ARE DIRECTLY ATTRIBUTABLE TO THE SALE OR MANUFACTURE

5    OF THE INFRINGING PRODUCTS RESULTING IN A NEXUS BETWEEN THE

6    INFRINGING PRODUCTS AND THE EXPENSE.  SEIRUS BEARS THE BURDEN

7    OF PROVING DEDUCTIBLE EXPENSES BY A PREPONDERANCE OF THE

8    EVIDENCE.

9         IF YOU DETERMINE THAT THE ARTICLE OF MANUFACTURE IS

10   THE ENTIRE PRODUCT AS SOLD TO THE CONSUMER, THEN YOU MUST

11   DETERMINE THE AMOUNT OF SEIRUS' TOTAL PROFIT THAT IS

12   ATTRIBUTABLE TO THE ENTIRE PRODUCT.  IF YOU DETERMINE THAT

13   THE ARTICLE OF MANUFACTURE IS SOMETHING LESS THAN WHAT

14   COLUMBIA CLAIMS IT IS, IN OTHER WORDS, A COMPONENT OF THE

15   ENTIRE PRODUCT, THEN YOU MUST DETERMINE THE AMOUNT OF SEIRUS'

16   TOTAL PROFIT THAT IS ATTRIBUTABLE TO THAT COMPONENT.

17        COLUMBIA SEEKS A REASONABLE ROYALTY FOR THE

18   INFRINGEMENT OF ITS DESIGN PATENT.  TOTAL PROFIT AND

19   REASONABLE ROYALTY ARE ALTERNATIVE REMEDIES AVAILABLE TO

20   COLUMBIA.  THEY ARE NOT BOTH AVAILABLE IN THE SAME CASE.

21   HOWEVER, YOU MUST DETERMINE THE AMOUNTS FOR BOTH SEIRUS'

22   TOTAL PROFIT AND A REASONABLE ROYALTY.  THE COURT WILL

23   DETERMINE WHICH IS AVAILABLE IN THIS CASE AFTER YOU HAVE

24   PROVIDED THE COURT WITH THE AMOUNTS.

25        A ROYALTY IS A PAYMENT MADE TO A PATENT HOLDER IN

2370

1    EXCHANGE FOR THE RIGHT TO MAKE, USE OR SELL THE CLAIMED

2    INVENTION.  THAT RIGHT IS CALLED A LICENSE.  A REASONABLE

3    ROYALTY IS THE PAYMENT FOR THE LICENSE THAT WOULD HAVE

4    RESULTED FROM A HYPOTHETICAL NEGOTIATION BETWEEN THE PATENT

5    HOLDER AND THE INFRINGER TAKING PLACE AT THE TIME WHEN THE

6    INFRINGING ACTIVITY FIRST BEGAN.

7          IN CONSIDERING THE NATURE OF THIS NEGOTIATION, YOU

8    MUST ASSUME THAT THE PATENT HOLDER AND INFRINGER WOULD HAVE

9    ACTED REASONABLY AND WOULD HAVE ENTERED INTO A LICENSE

10   AGREEMENT.  YOU MUST ALSO ASSUME THAT BOTH PARTIES BELIEVED

11   THE PATENT WAS VALID AND INFRINGED.

12         YOUR ROLE IS TO DETERMINE WHAT THE RESULT OF THAT

13   NEGOTIATION WOULD HAVE BEEN.  THE TEST FOR DAMAGES IS WHAT

14   ROYALTY WOULD HAVE RESULTED FROM THE HYPOTHETICAL NEGOTIATION

15   AND NOT SIMPLY WHAT EITHER PARTY WOULD HAVE PREFERRED.

16         A ROYALTY CAN BE CALCULATED IN SEVERAL DIFFERENT

17   WAYS, AND IT IS FOR YOU TO DETERMINE WHICH WAY IS THE MOST

18   APPROPRIATE BASED ON THE EVIDENCE YOU HAVE HEARD.  ONE WAY TO

19   CALCULATE A ROYALTY IS TO DETERMINE WHAT IS CALLED AN

20   "ONGOING ROYALTY."

21         TO CALCULATE AN ONGOING ROYALTY, YOU MUST FIRST

22   DETERMINE THE BASE, THAT IS, THE PRODUCT ON WHICH THE

23   INFRINGER IS TO PAY.  YOU THEN NEED TO MULTIPLY THE REVENUE

24   THE DEFENDANT OBTAINED FROM THAT BASE BY THE RATE OR

25   PERCENTAGE THAT YOU FIND WOULD HAVE RESULTED FROM THE

2371

1   HYPOTHETICAL NEGOTIATION.

2         FOR EXAMPLE, IF THE PATENT COVERS A NAIL, AND THE

3   NAIL SELLS FOR $1, AND THE LICENSEE SOLD 200 NAILS, THE BASE

4   REVENUE WOULD BE $200.  IF YOU FIND -- EXCUSE ME.

5         IF THE RATE YOU FIND WOULD HAVE RESULTED FROM THE

6   HYPOTHETICAL NEGOTIATION IS 1 PERCENT, THEN THE ROYALTY WOULD

7   BE $2, OR THE RATE OF .01 TIMES THE BASE REVENUE OF $200.  BY

8   CONTRAST, IF YOU FIND THE RATE TO BE 5 PERCENT, THE ROYALTY

9   WOULD BE $10, OR THE RATE OF .05 TIMES THE BASE REVENUE OF

10  $200.  THESE NUMBERS ARE ONLY EXAMPLES, AND ARE NOT INTENDED

11  TO SUGGEST THE APPROPRIATE ROYALTY RATE.

12        IF THE CLAIMED INVENTION COVERS ONLY PART OF THE

13  PRODUCT THAT THE INFRINGER SELLS, THEN THE BASE WOULD

14  NORMALLY BE ONLY FOR THE FEATURE OR COMPONENT.  FOR EXAMPLE,

15  IF YOU FIND THAT FOR A $100 CAR, THE PATENTED FEATURE IS THE

16  TIRE WHICH SELLS FOR $5, THE BASE REVENUE WOULD BE $5.

17  HOWEVER, IF COLUMBIA PROVES THAT THE CLAIMED INVENTION

18  CREATES THE BASIS FOR THE CUSTOMER DEMAND OR SUBSTANTIALLY

19  CREATES THE VALUE OF THE COMPONENT PARTS, THE BASE REVENUE

20  WOULD BE THE VALUE OF THE WHOLE PRODUCT.

21        IN DETERMINING A REASONABLE ROYALTY, YOU MAY

22  CONSIDER THE FOLLOWING FACTORS:

23        ONE, THE ROYALTIES RECEIVED BY THE PATENTEE FOR THE

24  LICENSING OF THE PATENT-IN-SUIT, PROVING OR TENDING TO PROVE

25  AN ESTABLISHED ROYALTY;

COMPUTER-AIDED TRANSCRIPTION

2372

1        TWO, THE RATES PAID BY THE LICENSEE FOR THE USE OF

2    OTHER PATENTS COMPARABLE TO THE PATENT-IN-SUIT;

3        THREE, THE NATURE AND SCOPE OF THE LICENSE, AS

4    EXCLUSIVE OR NONEXCLUSIVE, OR AS RESTRICTED OR NONRESTRICTED,

5    IN TERMS OF THE TERRITORY OR WITH RESPECT TO WHOM THE

6    MANUFACTURED PRODUCT MAY BE SOLD;

7        THE LICENSOR'S -- EXCUSE ME.  THAT WAS THREE.

8        FOUR, THE LICENSOR'S ESTABLISHED POLICY AND

9    MARKETING PROGRAM TO MAINTAIN HIS OR HER PATENT MONOPOLY BY

10   NOT LICENSING OTHERS TO USE THE INVENTION OR BY GRANTING

11   LICENSES UNDER SPECIAL CONDITIONS DESIGNED TO PRESERVE THAT

12   MONOPOLY;

13       FIVE, THE COMMERCIAL RELATIONSHIP BETWEEN THE

14   LICENSOR AND LICENSEE, SUCH AS WHETHER THEY ARE COMPETITORS

15   IN THE SAME TERRITORY IN THE SAME LINE OF BUSINESS, OR

16   WHETHER THEY ARE INVENTOR AND PROMOTER;

17       SIX, THE EFFECT OF SELLING THE PATENTED SPECIALTY IN

18   PROMOTING SALES OF OTHER PRODUCTS OF THE LICENSEE, THE

19   EXISTING VALUE OF THE INVENTION TO THE LICENSOR AS A

20   GENERATOR OF SALES OF HIS NONPATENTED ITEMS AND THE EXTENT OF

21   SUCH DERIVATIVE OR CONVEYED SALES;

22       SEVEN, THE DURATION OF THE PATENT AND THE TERM OF

23   THE LICENSE;

24       EIGHT, THE ESTABLISHED PROFITABILITY OF THE PRODUCT

25   MADE UNDER THE PATENTS, ITS COMMERCIAL SUCCESS AND ITS

2373

1    CURRENT POPULARITY;

2         NINE, THE UTILITY AND ADVANTAGES OF THE PATENTED

3    PROPERTY OVER THE OLD MODES AND DEVICES, IF ANY, THAT HAD

4    BEEN USED FOR WORKING OUT SIMILAR RESULTS;

5         TEN, THE NATURE OF THE PATENTED INVENTION, THE

6    CHARACTER OF THE COMMERCIAL EMBODIMENT OF IT AS OWNED AND

7    PRODUCED BY THE LICENSOR, AND THE BENEFITS TO THOSE WHO HAVE

8    USED THE INVENTION;

9         AND ELEVEN, THE EXTENT TO WHICH THE INFRINGER HAS

10   MADE USE OF THE INVENTION AND ANY EVIDENCE PROBATIVE OF THE

11   VALUE OF THAT USE;

12        TWELVE, THE PORTION OF THE PROFIT OR THE SELLING

13   PRICE THAT MAY BE THE CUSTOMARY -- THAT MAY BE CUSTOMARY IN

14   THE PARTICULAR BUSINESS OR IN A COMPARABLE BUSINESS TO ALLOW

15   FOR THE USE OF THE INVENTION OR ANALOGOUS INVENTIONS;

16        THIRTEEN, THE PORTION OF THE REALIZABLE PROFITS THAT

17   SHOULD BE CREDITED TO THE INVENTION AS DISTINGUISHED FROM

18   NONPATENTED ELEMENTS, THE MANUFACTURING PROCESS, BUSINESS

19   RISKS OR SIGNIFICANT FEATURES OR IMPROVEMENTS ADDED BY THE

20   INFRINGER;

21        FOURTEEN, THE OPINION AND TESTIMONY OF QUALIFIED

22   EXPERTS;

23        FIFTEEN, THE AMOUNT THAT A LICENSOR, SUCH AS THE

24   PATENTEE, AND THE LICENSEE, SUCH AS THE INFRINGER, WOULD HAVE

25   AGREED UPON AT THE TIME THE INFRINGEMENT BEGAN, IF BOTH HAD

2374

1    BEEN REASONABLY AND VOLUNTARILY TRYING TO REACH AN AGREEMENT;

2    THAT IS, THE AMOUNT WHICH A PRUDENT LICENSEE WHO DESIRED, AS

3    A BUSINESS PROCEED POSITION, TO OBTAIN A LICENSE TO

4    MANUFACTURE AND SELL A PARTICULAR ARTICLE EMBODYING THE

5    PATENTED INVENTION, WOULD HAVE BEEN WILLING TO PAY AS A

6    ROYALTY, AND YET BE ABLE TO MAKE A REASONABLE PROFIT AND

7    WHICH AMOUNT WOULD HAVE BEEN ACCEPTABLE BY A PRUDENT PATENTEE

8    WHO WAS WILLING TO GRANT A LICENSE.

9         IT IS UP TO YOU, BASED ON THE EVIDENCE, TO DECIDE

10   WHAT TYPE OF ROYALTY IS APPROPRIATE IN THIS CASE.

11        IN THIS CASE, COLUMBIA ARGUES THAT SEIRUS WILLFULLY

12   INFRINGED THE DESIGN PATENT.  THE COURT HAS ALREADY

13   DETERMINED THAT SEIRUS INFRINGED THE DESIGN PATENT.  YOU MUST

14   DETERMINE WHETHER COLUMBIA HAS PROVEN WILLFUL INFRINGEMENT BY

15   A PREPONDERANCE OF THE EVIDENCE.  WILLFUL INFRINGEMENT MEANS

16   THAT SEIRUS' INFRINGEMENT WAS DONE INTENTIONALLY OR

17   RECKLESSLY.

18        WHEN MAKING THIS DETERMINATION, YOU SHOULD KEEP IN

19   MIND SEIRUS' KNOWLEDGE AND THE SUBJECTIVE INTENT AT THE TIME

20   OF THE CHALLENGED CONDUCT.

21        ACTING INTENTIONALLY MEANS THAT THE ACTOR DESIRES TO

22   CAUSE THE CONSEQUENCES OF ITS ACT OR BELIEVES THEM TO BE

23   SUBSTANTIALLY CERTAIN TO RESULT FROM IT.

24        ACTING RECKLESSLY MEANS KNOWING OR HAVING REASON TO

25   KNOW THE FACTS THAT WOULD LEAD A REASONABLE ACTOR TO REALIZE

2375

1    THAT ITS ACTIONS ARE UNREASONABLY RISKY.

2          IN DECIDING WHETHER SEIRUS WILLFULLY DESIGNED --

3    EXCUSE ME, WILLFULLY INFRINGED THE DESIGN PATENT, YOU SHOULD

4    CONSIDER ALL OF THE FACTS SURROUNDING THE ALLEGED

5    INFRINGEMENT, INCLUDING, BUT NOT LIMITED TO, THE FOLLOWING

6    FACTORS:

7          ONE, WHETHER SEIRUS ACTED IN A MANNER CONSISTENT

8    WITH THE STANDARDS OF COMMERCE FOR ITS INDUSTRY; TWO, WHETHER

9    SEIRUS INTENTIONALLY COPIED A PRODUCT OF COLUMBIA COVERED BY

10   THE PATENT; THREE, WHETHER SEIRUS REASONABLY BELIEVED THAT

11   THE DESIGN WAS INVALID OR THAT IT DID NOT INFRINGE THE

12   PATENT; FOUR, WHETHER SEIRUS TRIED TO COVER UP ITS

13   INFRINGEMENT.

14         BEFORE YOU DECIDE WHETHER SEIRUS HAS INFRINGED

15   CLAIMS 2 OR 23 OF THE UTILITY PATENT OR WHETHER THE CLAIMS

16   ARE INVALID, YOU WILL NEED TO UNDERSTAND THE PATENT CLAIMS.

17   AS I MENTIONED, THE PATENT CLAIMS ARE NUMBERED SENTENCES AT

18   THE END OF THE PATENT THAT DESCRIBES THE BOUNDARIES OF THE

19   PATENT'S PROSECUTION.  IT'S MY JOB AS JUDGE TO EXPLAIN TO YOU

20   THE MEANING OF ANY LANGUAGE IN THE CLAIMS THAT NEED

21   INTERPRETATION.

22         I HAVE INTERPRETED THE MEANING OF SOME LANGUAGE IN

23   THE PATENT CLAIMS INVOLVED IN THIS CASE.  YOU MUST ACCEPT

24   THOSE INTERPRETATIONS AS CORRECT.  MY INTERPRETATION OF THE

25   LANGUAGE SHOULD NOT BE TAKEN AS AN INDICATION THAT I HAVE A

2376

1    VIEW REGARDING THE ISSUES OF INFRINGEMENT OR INVALIDITY.  THE

2    DECISIONS REGARDING INFRINGEMENT AND INVALIDITY ARE YOURS TO

3    MAKE.

4         FOR THE CLAIM LANGUAGE WHERE I HAVE NOT PROVIDED YOU

5    WITH ANY MEANING, YOU SHOULD APPLY THE CLAIM'S PLAIN AND

6    ORDINARY MEANING.

7         SO FOR CLAIM 2 AND 23, THE TERM "SURFACE AIR RATIO

8    OF HEAT-DIRECTING ELEMENTS TO BASE MATERIAL" MEANS:  THE

9    AMOUNT OF SURFACE AREA OF A SIDE OF THE BASE MATERIAL THAT IS

10   COVERED BY HEAT-DIRECTING ELEMENTS DIVIDED BY THE TOTAL

11   SURFACE AREA OF THE SIDE OF THE BASE MATERIAL ONTO WHICH THE

12   ELEMENTS ARE ATTACHED.

13        THE TERM "HEAT" MEANS:  HEAT SEEN AS A FORM OF

14   ENERGY THAT MAY BE TRANSFERRED BY CONDUCTION, CONVECTION OR

15   RADIATION.

16        THE TERMS "ADAPTED TO" OR "ADAPTED FOR" MEANS:

17   SUITED BY DESIGN TO OR SUITED BY DESIGN FOR.

18        THE TERMS "ADAPTED FOR USE WITH BODY GEAR" MEANS:

19   SUITED BY DESIGN FOR USE WITH BODY GEAR.

20        THE TERMS "ADAPTED TO ALLOW, IMPEDE AND/OR RESTRICT

21   PASSAGE" MEANS:  SUITED BY DESIGN TO ALLOW, IMPEDE AND/OR

22   RESTRICT PASSAGE.

23        THE TERM "DIRECT HEAT" MEANS:  TO ALTER THE

24   DIRECTION OF HEAT.

25        THE TERMS "HEAT-DIRECTING ELEMENT" MEANS:  ELEMENTS

1    THAT ALTER THE DIRECTION OF HEAT.

2         THE TERM "REFLECT HEAT" MEANS:  ALTER THE DIRECTION

3    OF HEAT BY REFLECTION.

4         THE TERM "HEAT-REFLECTING ELEMENT" MEANS:  ELEMENTS

5    THAT ALTER THE DIRECTION OF HEAT BY REFLECTION.

6         AND THE TERM "DISCONTINUOUS ARRAY" MEANS:  AN

7    ARRANGEMENT OF MULTIPLE, DISCRETE HEAT-DIRECTING ELEMENTS,

8    WHEREBY SOME OF THE BASE FABRIC IS EXPOSED BETWEEN ADJACENT

9    ELEMENTS.

10         I WILL NOW INSTRUCT YOU ON THE RULES THAT YOU MUST

11    FOLLOW IN DECIDING WHETHER COLUMBIA HAS PROVEN THAT SEIRUS

12    HAS INFRINGED ONE OR MORE OF THE ASSERTED CLAIMS OF THE

13    UTILITY PATENT.  TO PROVE INFRINGEMENT OF ANY CLAIM, COLUMBIA

14    MUST PERSUADE YOU THAT IT IS MORE LIKELY THAN NOT THAT SEIRUS

15    HAS INFRINGED THAT CLAIM.

16         WE'RE GETTING THERE.

17         A PATENT'S CLAIMS DEFINE WHAT IS COVERED BY THE

18    PATENT.  A PRODUCT DIRECTLY INFRINGES A PATENT IF IT IS

19    COVERED BY AT LEAST ONE CLAIM OF THE PATENT.

20         DECIDING WHETHER A CLAIM HAS BEEN DIRECTLY INFRINGED

21    IS A TWO-STEP PROCESS.  THE FIRST STEP IS TO DECIDE THE

22    MEANING OF THE PATENT CLAIM.  I HAVE ALREADY MADE THIS

23    DECISION AND I HAVE ALREADY INSTRUCTED YOU AS TO THE MEANING

24    OF THE ASSERTED PATENT CLAIMS.

25         THE SECOND STEP IS TO DECIDE WHETHER SEIRUS HAS

2378

1    SOLD, OFFERED FOR SALE OR IMPORTED WITHIN THE UNITED STATES A

2    PRODUCT COVERED BY A CLAIM OF THE UTILITY PATENT.  IF IT HAS,

3    IT INFRINGES.  YOU, THE JURY, MAKE THIS DECISION.

4         WITH ONE EXCEPTION, YOU MUST CONSIDER EACH OF THE

5    ASSERTED CLAIMS OF THE PATENT INDIVIDUALLY, AND DECIDE

6    WHETHER SEIRUS' PRODUCT INFRINGES THAT CLAIM.  THE ONE

7    EXCEPTION TO CONSIDERING CLAIMS INDIVIDUALLY CONCERNS

8    DEPENDENT CLAIMS.  A DEPENDENT CLAIM INCLUDES ALL OF THE

9    REQUIREMENTS OF A PARTICULAR INDEPENDENT CLAIM, PLUS

10   ADDITIONAL REQUIREMENTS OF ITS OWN.

11        CLAIM 2 OF THE UTILITY PATENT IS A DEPENDENT CLAIM.

12   CLAIM 2 INCLUDES ALL OF THE REQUIREMENTS FROM CLAIM 1.  AS A

13   RESULT, IF YOU FIND AN INDEPENDENT CLAIM IS NOT INFRINGED,

14   YOU MUST ALSO FIND THAT ITS DEPENDENT CLAIMS ARE NOT

15   INFRINGED.

16        ON THE OTHER HAND, IF YOU FIND THAT AN INDEPENDENT

17   CLAIM HAS BEEN INFRINGED, YOU MUST STILL SEPARATELY DECIDE

18   WHETHER THE ADDITIONAL REQUIREMENTS OF ITS DEPENDENT CLAIM

19   HAVE ALSO BEEN INFRINGED.

20        YOU'VE HEARD EVIDENCE ABOUT BOTH COLUMBIA'S

21   COMMERCIAL PRODUCT AND SEIRUS' ACCUSED PRODUCTS.  HOWEVER, IN

22   DECIDING THE ISSUE OF INFRINGEMENT, YOU MUST NOT COMPARE

23   SEIRUS' ACCUSED PRODUCT TO COLUMBIA'S COMMERCIAL PRODUCT.

24   RATHER, YOU MUST COMPARE SEIRUS' ACCUSED PRODUCTS TO THE

25   CLAIMS OF -- THE CLAIMS OF THE UTILITY PATENT WHEN MAKING

2379

1    YOUR DECISION REGARDING INFRINGEMENT.

2            WHETHER OR NOT SEIRUS KNEW ITS PRODUCT INFRINGED OR

3    EVEN KNEW OF THE PATENT DOES NOT MATTER IN DETERMINING DIRECT

4    INFRINGEMENT.

5            TO DECIDE WHETHER SEIRUS' PRODUCTS LITERALLY

6    INFRINGE A CLAIM OF THE UTILITY PATENT, YOU MUST COMPARE THAT

7    PRODUCT WITH THE PATENT CLAIMS AND DETERMINE WHETHER EVERY

8    REQUIREMENT OF THE CLAIM IS INCLUDED IN THAT PRODUCT.  IF SO,

9    SEIRUS' PRODUCT LITERALLY INFRINGES THAT CLAIM.

10           IF, HOWEVER, SEIRUS' PRODUCT DOES NOT HAVE EVERY

11   REQUIREMENT IN THE PATENT CLAIM, SEIRUS' PRODUCT DOES NOT

12   LITERALLY INFRINGE THE CLAIM.  YOU MUST DECIDE LITERAL

13   INFRINGEMENT FOR EACH ASSERTED CLAIM SEPARATELY.

14           IF THE PATENT CLAIM USES THE TERM "COMPRISING," THAT

15   PATENT CLAIM IS TO BE -- THAT PATENT CLAIM IS TO BE

16   UNDERSTOOD AS AN OPEN CLAIM.  AN OPEN CLAIM IS INFRINGED AS

17   LONG AS EVERY REQUIREMENT IN THE CLAIM IS PRESENT IN SEIRUS'

18   PRODUCT.  THE FACT THAT SEIRUS' PRODUCT ALSO INCLUDES OTHER

19   PARTS WILL NOT AVOID INFRINGEMENT AS LONG AS IT HAS EVERY

20   REQUIREMENT IN THE PATENT CLAIM.

21           I WILL NOW INSTRUCT YOU ON THE RULES YOU MUST FOLLOW

22   IN DECIDING WHETHER SEIRUS HAS PROVEN CLAIMS 2 OR 23 OF THE

23   UTILITY PATENT ARE INVALID.

24           BEFORE DISCUSSING THE SPECIFIC RULES, I WANT TO

25   REMIND YOU ABOUT THE STANDARD OF PROOF THAT APPLIES TO THIS

2380

1    DEFENSE.  TO PROVE INVALIDITY OF ANY PATENT CLAIM, SEIRUS

2    MUST PERSUADE YOU THAT THE CLAIM IS INVALID BY CLEAR AND

3    CONVINCING EVIDENCE; IN OTHER WORDS, THAT IT IS HIGHLY

4    PROBABLE THAT THE CLAIM IS INVALID.

5         A PATENT CLAIM IS INVALID IF THE CLAIMED INVENTION

6    IS NOT NEW.  IF A PATENT CLAIM IS NOT NEW, WE SAY IT IS

7    ANTICIPATED BY A PRIOR ART REFERENCE.  IN PATENT LAW, PRIOR

8    ART REFERENCES REFER TO PREVIOUS DEVICES, METHODS,

9    PUBLICATIONS OR PATENTS.

10        IN ORDER FOR A PATENT CLAIM TO BE ANTICIPATED BY THE

11   PRIOR ART, EACH AND EVERY LIMITATION OF THE CLAIM MUST BE

12   PRESENT WITHIN A SINGLE ITEM OF PRIOR ART.  YOU MAY NOT FIND

13   THAT THE PRIOR ART ANTICIPATES A PATENT CLAIM BY COMBINING

14   TWO OR MORE ITEMS OF PRIOR ART.

15        A PRIOR ART REFERENCE WILL NOT ANTICIPATE UNLESS IT

16   CONTAINS A DESCRIPTION OF THE INVENTION COVERED BY THE PATENT

17   CLAIMS THAT IS SUFFICIENTLY DETAILED TO TEACH A PERSON OF

18   ORDINARY SKILL IN THE ART HOW TO MAKE AND USE THE INVENTION

19   WITHOUT UNDUE EXPERIMENTATION.

20        THAT MEANS THAT A PERSON SKILLED IN THE FIELD OF THE

21   CLAIMED INVENTION READING THE PRINTED PUBLICATION OR PATENT

22   WOULD BE ABLE TO MAKE AND USE THE INVENTION USING ONLY AN

23   AMOUNT OF EXPERIMENTATION THAT IS APPROPRIATE FOR THE

24   COMPLEXITY OF THE FIELD OF THE INVENTION AND FOR THE LEVEL OF

25   EXPERTISE AND KNOWLEDGE OF PERSONS SKILLED IN THAT FIELD.

2381

1          IN DECIDING WHETHER OR NOT A SINGLE ITEM OF PRIOR

2     ART ANTICIPATES A PATENT CLAIM, YOU SHOULD CONSIDER THAT

3     WHICH IS EXPRESSLY STATED OR PRESENT IN THE ITEM OF PRIOR ART

4     AND ALSO THAT WHICH IS INHERENTLY PRESENT.  SOMETHING IS

5     INHERENT IN AN ITEM OF PRIOR ART IF IT IS ALWAYS PRESENT IN

6     THE PRIOR ART OR ALWAYS THE RESULT FROM THE PRACTICE OF THE

7     PRIOR ART, AND IF A PERSON SKILLED IN THE FIELD OF THE

8     INVENTION WOULD UNDERSTAND THAT TO BE THE CASE.

9          IN THIS CASE, SEIRUS CONTENDS THAT CLAIMS 2 AND 23

10    OF THE UTILITY PATENT ARE INVALID BECAUSE THEY ARE

11    ANTICIPATED BY FOTTINGER.  IF YOU FIND THAT SEIRUS HAS PROVED

12    BY CLEAR AND CONVINCING EVIDENCE THAT CLAIMS 2 AND 23 ARE

13    ANTICIPATED, THEN YOU MUST FIND THAT THE CLAIMS ARE INVALID.

14         OBVIOUSNESS.  NOT ALL INNOVATIONS ARE PATENTABLE.  A

15    PATENT CLAIM IS INVALID IF THE CLAIMED INVENTION WOULD HAVE

16    BEEN OBVIOUS TO A PERSON OF ORDINARY SKILL IN THE FIELD AT

17    THE TIME THE CLAIMED INVENTION WAS MADE.

18         THIS MEANS THAT EVEN IF ALL OF THE REQUIREMENTS OF

19    THE CLAIM CANNOT BE FOUND IN A SINGLE PRIOR ART REFERENCE

20    THAT WOULD ANTICIPATE THE CLAIM OR CONSTITUTE A STATUTORY BAR

21    TO THAT CLAIM, A PERSON OF ORDINARY SKILL IN THE RELEVANT

22    FIELD WHO KNEW ABOUT ALL OF THIS PRIOR ART WOULD HAVE COME UP

23    WITH THE CLAIMED INVENTION.

24         YOU ARE TO CONSIDER ONLY THE FOLLOWING PRIOR ART

25    REFERENCES WHEN DETERMINING OBVIOUSNESS:  FOTTINGER IN VIEW

2382

1        OF HALLEY AND/OR BLAUER AND/OR WORLEY AND/OR VAUGHN.

2                THE ULTIMATE CONCLUSION OF WHETHER A CLAIM IS

3        OBVIOUS SHOULD BE BASED UPON YOUR DETERMINATION OF SEVERAL

4        FACTORS -- EXCUSE ME, SEVERAL FACTUAL DECISIONS.

5                FIRST, YOU MUST DECIDE THE LEVEL OF ORDINARY SKILL

6        IN THE FIELD THAT SOMEONE WOULD HAVE HAD AT THE TIME THE

7        CLAIMED INVENTION WAS MADE.

8                IN DECIDING THE LEVEL OF ORDINARY SKILL, YOU SHOULD

9        CONSIDER ALL THE EVIDENCE INTRODUCED AT TRIAL, INCLUDING:

10       ONE, THE LEVELS OF EDUCATION AND EXPERIENCE OF PERSONS

11       WORKING IN THE FIELD; TWO, THE TYPES OF PROBLEMS ENCOUNTERED

12       IN THE FIELD; AND, THREE, THE SOPHISTICATION OF THE

13       TECHNOLOGY.

14               SECOND, YOU MUST DECIDE THE SCOPE AND CONTENT OF THE

15       PRIOR ART.  THE PARTIES DISAGREE AS TO WHETHER CERTAIN PRIOR

16       ART REFERENCES SHOULD BE INCLUDED IN THE PRIOR ART YOU USE TO

17       DECIDE THE VALIDITY OF CLAIMS 2 AND 23 OF THE UTILITY PATENT.

18       IN ORDER TO BE CONSIDERED AS PRIOR ART TO THE PATENT AT ISSUE

19       HERE, THESE REFERENCES MUST BE REASONABLY RELATED TO THE

20       CLAIMED INVENTION OF THAT PATENT.

21               A REFERENCE IS REASONABLY RELATED IF IT IS IN THE

22       SAME FIELD AS THE CLAIMED INVENTION OR IS FROM ANOTHER FIELD

23       TO WHICH A PERSON OF ORDINARY SKILL IN THE FIELD WOULD LOOK

24       TO SOLVE A KNOWN PROBLEM.

25               THIRD, YOU MUST DECIDE WHAT DIFFERENCE, IF ANY,

2383

1    EXISTED BETWEEN THE CLAIMED INVENTION AND THE PRIOR ART.

2              FINALLY, YOU SHOULD CONSIDER ANY OF THE FOLLOWING

3    FACTORS THAT YOU FIND HAVE BEEN SHOWN BY THE EVIDENCE:

4              ONE, COMMERCIAL SUCCESS OF THE PRODUCT DUE TO THE

5    MERITS OF THE CLAIMED INVENTION; TWO, A LONG FELT NEED FOR

6    THE SOLUTION PROVIDED BY THE CLAIMED INVENTION; THREE,

7    UNSUCCESSFUL ATTEMPTS BY OTHERS TO FIND THE SOLUTION PROVIDED

8    BY THE CLAIMED INVENTION; FOUR, COPYING OF THE CLAIMED

9    INVENTION BY OTHERS; FIVE, UNEXPECTED AND SUPERIOR RESULTS

10   FROM THE CLAIMED INVENTION; SIX, ACCEPTANCE BY OTHERS OF THE

11   CLAIMED INVENTION AS SHOWN BY PRAISE FROM OTHERS IN THE FIELD

12   OR FROM THE LICENSING OF THE CLAIMED INVENTION; AND, SEVEN,

13   INDEPENDENT INVENTION OF THE CLAIMED INVENTION BY OTHERS

14   BEFORE OR AT THE SAME TIME AS THE NAMED INVENTOR THOUGHT OF

15   IT.

16             THE PRESENCE OF FACTORS 1 THROUGH 6 MAY BE

17   CONSIDERED BY YOU AS AN INDICATION THAT THE CLAIMED INVENTION

18   WOULD NOT HAVE BEEN OBVIOUS AT THE TIME THE CLAIMED INVENTION

19   WAS MADE, AND THE PRESENCE OF FACTOR 7 MAY BE CONSIDERED BY

20   YOU AS AN INDICATION THAT THE CLAIMED INVENTION WOULD HAVE

21   BEEN OBVIOUS AT SUCH TIME.  ALTHOUGH YOU SHOULD CONSIDER ANY

22   EVIDENCE OF THESE FACTORS, THE RELEVANCE AND IMPORTANCE OF

23   ANY OF THEM TO YOUR DECISION ON WHETHER THE CLAIMED INVENTION

24   WOULD HAVE BEEN OBVIOUS IS UP TO YOU.

25             A PATENT COMPOSED OF SEVERAL ELEMENTS IS NOT PROVED

2384

1    OBVIOUS MERELY BY DEMONSTRATING THAT EACH OF ITS -- EACH OF

2    THE ELEMENTS WAS INDEPENDENTLY KNOWN IN THE PRIOR ART.  IN

3    EVALUATING WHETHER SUCH A CLAIM WOULD HAVE BEEN OBVIOUS, YOU

4    SHOULD CONSIDER WHETHER SEIRUS HAS IDENTIFIED A REASON THAT

5    WOULD HAVE PROMPTED A PERSON OF ORDINARY SKILL IN THE FIELD

6    TO COMBINE THE ELEMENTS OR CONCEPTS FROM THE PRIOR ART IN THE

7    SAME WAY AS IN THE CLAIMED INVENTION.

8            THERE IS NO SINGLE WAY TO DEFINE THE LINE BETWEEN

9    TRUE INVENTIVENESS, ON THE ONE HAND, WHICH IS PATENTABLE, AND

10   THE APPLICATION OF COMMON SENSE AND ORDINARY SKILL TO SOLVE

11   THE PROBLEM ON THE OTHER HAND, WHICH IS NOT PATENTABLE.

12           FOR EXAMPLE, MARKET FORCES OR OTHER DESIGN

13   INCENTIVES MAY BE WHAT PRODUCED A CHANGE, RATHER THAN THROUGH

14   INVENTIVENESS.  YOU MAY CONSIDER WHETHER THE CHANGE WAS

15   MERELY THE PREDICTABLE RESULT OF USING THE PRIOR ART ELEMENTS

16   ACCORDING TO THEIR KNOWN FUNCTIONS, OR WHETHER IT WAS THE

17   RESULT OF TRUE INVENTIVENESS.  YOU MAY ALSO CONSIDER WHETHER

18   THERE IS SOME TEACHING OR SUGGESTION IN THE PRIOR ART TO MAKE

19   THE MODIFICATION OR COMBINATION OF ELEMENTS CLAIMED IN THE

20   PATENT.

21           ALSO, YOU MAY CONSIDER WHETHER THE INNOVATION

22   APPLIES A KNOWN TECHNIQUE THAT HAD BEEN USED TO IMPROVE A

23   SIMILAR DEVICE OR METHOD IN A SIMILAR WAY.  YOU MAY ALSO

24   CONSIDER WHETHER THE CLAIMED INVENTION WOULD HAVE BEEN

25   OBVIOUS TO TRY, MEANING THAT THE CLAIMED INVENTION WAS ONE OF

2385

1    A RELATIVELY SMALL NUMBER OF POSSIBLE APPROACHES TO THE

2    PROBLEM WITH A REASONABLE EXPECTATION OF SUCCESS BY THOSE

3    SKILLED IN THE ART.

4           HOWEVER, YOU MUST BE CAREFUL NOT TO DETERMINE

5    OBVIOUSNESS BY USING THE BENEFIT OF HINDSIGHT.  MANY TRUE

6    INVENTIONS MIGHT SEEM OBVIOUS AFTER THE FACT.  YOU SHOULD PUT

7    YOURSELF IN THE POSITION OF A PERSON OF ORDINARY SKILL IN THE

8    FIELD AT THE TIME THE CLAIMED INVENTION WAS MADE, AND YOU

9    SHOULD NOT CONSIDER WHAT IS KNOWN TODAY OR WHAT IS LEARNED

10   FROM THE TEACHING OF THE PATENT.

11          I WILL INSTRUCT YOU ABOUT THE MEASURE OF DAMAGES FOR

12   THE CLAIMS OF THE UTILITY PATENT INFRINGEMENT.  BY

13   INSTRUCTING YOU ON DAMAGES, I'M NOT SUGGESTING WHICH PARTY

14   SHOULD WIN ON ANY ISSUE.  IF YOU FIND THAT SEIRUS HAS

15   INFRINGED ANY VALID CLAIM OF A UTILITY PATENT, YOU MUST THEN

16   DETERMINE THE AMOUNT OF MONEY DAMAGES TO BE AWARDED TO

17   COLUMBIA TO COMPENSATE IT FOR THE INFRINGEMENT.

18          THE AMOUNT OF THOSE DAMAGES MUST BE ADEQUATE TO

19   COMPENSATE COLUMBIA FOR THE INFRINGEMENT, BUT IN NO EVENT MAY

20   THE DAMAGES AWARD BE LESS THAN A REASONABLE ROYALTY.

21          YOU SHOULD KEEP IN MIND THAT THE DAMAGES YOU AWARD

22   ARE MEANT TO COMPENSATE THE PATENT HOLDER AND NOT TO PUNISH

23   THE INFRINGER.

24          COLUMBIA HAS THE BURDEN TO PERSUADE YOU OF THE

25   AMOUNT OF ITS DAMAGES.  WHILE COLUMBIA IS NOT REQUIRED TO

2386

1    PROVE ITS DAMAGES WITH MATHEMATICAL PRECISION, IT MUST PROVE

2    THEM WITH REASONABLE CERTAINTY.

3            COLUMBIA IS NOT ENTITLED TO DAMAGES THAT ARE REMOTE

4    OR SPECULATIVE.

5            COLUMBIA SEEKS A REASONABLE ROYALTY FOR THE

6    INFRINGEMENT OF ITS UTILITY PATENT.  THE DEFINITION OF A

7    REASONABLE ROYALTY FOR UTILITY PATENT INFRINGEMENT IS THE

8    SAME AS THE DEFINITION I EXPLAINED TO YOU IN JURY INSTRUCTION

9    NO. 13 FOR THE DESIGN PATENT DAMAGES.  HOWEVER, WHEREVER IN

10   THE INSTRUCTION I REFERRED TO THE PATENTED DESIGN OR DESIGN

11   PATENT, YOU SHOULD NOW FOCUS ON THE PATENTED INVENTION OR THE

12   UTILITY PATENT.

13           IF YOU DETERMINE THAT SEIRUS HAS INFRINGED ANY OF

14   THE UTILITY PATENT'S ASSERTED CLAIMS AND THAT THOSE CLAIMS

15   ARE VALID, YOU MUST THEN DETERMINE WHETHER THAT INFRINGEMENT

16   WAS WILLFUL.  YOU ARE ONLY TO CONSIDER WHETHER INFRINGEMENT

17   OF THE UTILITY PATENT WAS WILLFUL FROM JUNE 4, 2013 THROUGH

18   DECEMBER 4TH, 2013.

19           THE DEFINITION OF WILLFULNESS FOR UTILITY PATENT

20   INFRINGEMENT IS THE SAME AS THE DEFINITION EXPLAINED TO YOU

21   IN JURY INSTRUCTION NO. 14 FOR DESIGN PATENT INFRINGEMENT.

22   HOWEVER, WHEREVER IN THAT INSTRUCTION I REFERRED TO THE

23   PATENTED DESIGN OR A DESIGN PATENTED, YOU SHOULD NOW FOCUS ON

24   THE PATENTED INVENTION OR THE UTILITY PATENT.

25           UPON RETURNING TO THE JURY ROOM, YOU SHOULD ELECT

COMPUTER-AIDED TRANSCRIPTION

2387

1    ONE OF YOUR MEMBERS AS YOUR PRESIDING JUROR.  THAT PERSON

2    WILL PRESIDE OVER THE DELIBERATIONS AND SPEAK FOR YOU HERE IN

3    COURT.  THE PRESIDING JUROR PRESIDES OVER THE DELIBERATIONS

4    AND VOTES, BUT HAS NO GREATER WEIGHT OR VOICE THAN ANY OTHER

5    JUROR.  AFTER SELECTING YOUR PRESIDING JUROR, DELIBERATE

6    UNTIL YOU REACH A VERDICT.  YOUR VERDICT MUST BE UNANIMOUS.

7         EACH OF YOU MUST DECIDE THE CASE FOR YOURSELF, BUT

8    YOU SHOULD DO SO ONLY AFTER YOU'VE CONSIDERED ALL THE

9    EVIDENCE, DISCUSSED IT FULLY WITH THE OTHER JURORS AND

10   LISTENED TO THE VIEWS OF YOUR FELLOW JURORS.  DO NOT BE

11   AFRAID TO CHANGE YOUR OPINION IF THE DISCUSSION PERSUADES YOU

12   THAT YOU SHOULD, BUT DO NOT COME TO A DECISION SIMPLY BECAUSE

13   THE OTHER JURORS THINK IT IS RIGHT.

14        IT IS IMPORTANT THAT YOU ATTEMPT TO REACH A

15   UNANIMOUS VERDICT, BUT, OF COURSE, ONLY IF YOU CAN DO SO

16   AFTER HAVING MADE YOUR OWN CONSCIENTIOUS DECISION.  DO NOT

17   CHANGE AN HONEST BELIEF ABOUT THE WEIGHT AND EFFECT OF THE

18   EVIDENCE SIMPLY TO REACH A VERDICT.

19        A SPECIAL VERDICT FORM HAS BEEN PREPARED FOR YOU.

20   IT PROVIDES YOU WITH A ROAD MAP OF THE SPECIFIC QUESTIONS

21   THAT YOU MUST DETERMINE AND ANSWER TO REACH A COMPLETE

22   VERDICT.

23        AFTER YOU HAVE REACHED YOUR UNANIMOUS AGREEMENT ON A

24   VERDICT, YOUR PRESIDING JUROR SHOULD COMPLETE THE VERDICT

25   FORM ACCORDING TO YOUR DELIBERATIONS, SIGN AND DATE IT, AND

2388

1    ADVISE THE BAILIFF THAT YOU'RE READY TO RETURN TO THE

2    COURTROOM.

3         YOU WILL NOTE THAT THE JURY VERDICT FORM HAS

4    QUESTIONS.  THE ANSWER TO EACH QUESTION MUST BE THE UNANIMOUS

5    ANSWER OF THE JURY.  YOUR PRESIDING JUROR WILL WRITE THE

6    UNANIMOUS ANSWER OF THE JURY IN THE SPACES PROVIDED OPPOSITE

7    EACH QUESTION.  ALL THE JURORS SHOULD PARTICIPATE IN THE

8    DELIBERATIONS AND VOTE ON EACH QUESTION.

9         THE PRESIDING JUROR WILL THEN DATE AND SIGN THE

10   SPECIAL VERDICT FORM AS COMPLETED.  AND, AGAIN, YOU WILL

11   ADVISE THE BAILIFF OUTSIDE YOUR DOOR THAT YOU'RE READY TO

12   RETURN TO THE COURTROOM.  WE WILL THEN BE RECONVENED AND WE

13   WILL RECEIVE YOUR VERDICT.

14        YOUR VERDICT MUST BE BASED SOLELY ON THE EVIDENCE

15   AND THE LAW AS I HAVE GIVEN IT TO YOU IN THESE INSTRUCTIONS.

16   NOTHING I HAVE SAID OR DONE IS INTENDED TO SUGGEST WHAT YOUR

17   VERDICT SHOULD BE.  THAT IS ENTIRELY FOR YOU TO DECIDE.

18        BECAUSE YOU MUST BASE YOUR VERDICT ONLY ON THE

19   EVIDENCE RECEIVED IN THE CASE AND ON THESE INSTRUCTIONS, I

20   REMIND YOU THAT YOU MUST NOT BE EXPOSED TO ANY OTHER

21   INFORMATION ABOUT THE CASE OR TO THE ISSUES IT INVOLVES.

22        EXCEPT FOR DISCUSSING THE CASE WITH YOUR FELLOW

23   JURORS DURING YOUR DELIBERATIONS, DO NOT COMMUNICATE WITH

24   ANYONE, AND DO NOT LET ANYONE ELSE COMMUNICATE WITH YOU IN

25   ANY WAY ABOUT THE MERITS OF THIS CASE OR ANYTHING TO DO WITH

2389

1    IT.  THIS INCLUDES DISCUSSING THE CASE IN PERSON, IN WRITING,

2    BY PHONE OR ELECTRONIC MEANS, VIA E-MAIL, TEXT MESSAGING,

3    CHAT ROOMS, BLOGS, WEBSITES OR OTHER FEATURE.  THIS APPLIES

4    TO COMMUNICATING WITH YOUR FAMILY MEMBERS, YOUR EMPLOYER, THE

5    MEDIA OR PRESS, AND THE PEOPLE INVOLVED IN THE TRIAL.

6          IF YOU ARE ASKED OR APPROACHED IN ANY WAY ABOUT YOUR

7    JURY SERVICE OR ANYTHING ELSE ABOUT THE CASE, YOU MUST

8    RESPOND THAT YOU'VE BEEN ORDERED NOT TO DISCUSS THE CASE AND

9    REPORT THE CONTACT TO THE COURT.

10          DO NOT READ, WATCH OR LISTEN TO ANY NEWS OR MEDIA

11    ACCOUNTS OR COMMENTARY ABOUT THE CASE OR ANYTHING TO DO WITH

12    IT.  DO NOT DO ANY RESEARCH, SUCH AS CONSULTING DICTIONARIES,

13    SEARCHING THE INTERNET OR OTHER REFERENCE MATERIALS.  DO NOT

14    MAKE ANY INVESTIGATION OR IN ANY OTHER WAY TRY TO LEARN ABOUT

15    THE CASE ON YOUR OWN.

16          THE LAW REQUIRES THESE RESTRICTIONS SO THAT THE

17    PARTIES HAVE A FAIR TRIAL BASED ON THE SAME EVIDENCE THAT

18    EACH PARTY HAS HAD AN OPPORTUNITY TO ADDRESS.  A JUROR WHO

19    VIOLATES THESE RESTRICTIONS JEOPARDIZES THE FAIRNESS OF THE

20    PROCEEDINGS.  IF ANY JUROR IS EXPOSED TO OUTSIDE INFORMATION,

21    AGAIN, PLEASE NOTIFY THE COURT IMMEDIATELY.

22          IF IT BECOMES NECESSARY DURING DELIBERATIONS TO

23    COMMUNICATE WITH ME, SEND A NOTE THROUGH THE BAILIFF, SIGNED

24    BY THE PRESIDING JUROR OR BY ONE OR MORE MEMBERS OF THE JURY.

25    NO MEMBER OF THE JURY SHOULD EVER ATTEMPT TO COMMUNICATE WITH

2390

1    ME, EXCEPT THROUGH THE SIGNED WRITING.  UNTIL YOU HAVE

2    REACHED YOUR VERDICT, I WILL ONLY COMMUNICATE WITH JURY

3    MEMBERS ON ANYTHING CONCERNING THE CASE EITHER IN WRITING OR

4    ORALLY HERE IN OPEN COURT.

5          IF YOU SEND OUT A QUESTION, I WILL CONSULT WITH THE

6    PARTIES BEFORE I ANSWER IT.  THAT MAY TAKE SOME TIME.  YOU

7    SHOULD CONTINUE YOUR DELIBERATIONS WHILE WAITING FOR THE

8    ANSWER TO ANY QUESTION.  REMEMBER THAT YOU ARE NOT TO TELL

9    ANYONE, INCLUDING ME, HOW THE JURY STANDS, NUMERICALLY OR

10   OTHERWISE, UNTIL AFTER YOU HAVE REACHED YOUR UNANIMOUS

11   VERDICT OR YOU HAVE BEEN DISCHARGED.

12         THE VERDICT FORM LOOKS LIKE THIS.  YOU WILL HAVE

13   THIS WITH YOU IN THE ROOM.  IT READS:  WE, THE JURY,

14   UNANIMOUSLY AGREE TO THE ANSWERS TO THE FOLLOWING QUESTIONS

15   AND RETURN THEM UNDER THE INSTRUCTIONS OF THIS COURT AS OUR

16   VERDICT IN THIS CASE.

17         THE FIRST PART TALKS ABOUT THE DESIGN PATENT.  THE

18   FIRST QUESTION:  WHAT IS SEIRUS' TOTAL PROFIT FROM SALES OF

19   THE RELEVANT ARTICLE OF MANUFACTURE ADEQUATE TO COMPENSATE

20   COLUMBIA FOR SEIRUS' INFRINGEMENT OF THE DESIGN PATENT?  AND

21   THEN THERE IS A LINE.

22         THE NEXT QUESTION:  WHAT IS THE TOTAL DOLLAR AMOUNT

23   OF A REASONABLE ROYALTY ADEQUATE TO COMPENSATE COLUMBIA FOR

24   SEIRUS' INFRINGEMENT OF THE DESIGN PATENT?

25         NEXT QUESTION:  HAS COLUMBIA PROVEN BY A

2391

1    PREPONDERANCE OF THE EVIDENCE THAT SEIRUS WILLFULLY INFRINGED

2    THE DESIGN PATENT?  THERE ARE TWO LINES.  ONE SAYS "YES" AND

3    ONE SAYS "NO."

4         THEN WE GO TO THE UTILITY PATENT.  HAS COLUMBIA

5    PROVEN BY A PREPONDERANCE OF THE EVIDENCE THAT SEIRUS HAS

6    INFRINGED CLAIMS 2 OR 23 OF THE UTILITY PATENT?

7         THERE IS TWO LINES.  ONE SAYS "YES."  ONE SAYS "NO."

8         NEXT QUESTION:  HAS SEIRUS PROVED BY CLEAR AND

9    CONVINCING EVIDENCE THAT COLUMBIA'S ASSERTED UTILITY PATENTS

10   ARE INVALID AS ANTICIPATED BY FOTTINGER?

11        CLAIM 2, THERE IS TWO LINES, ONE SAYS "YES,

12   INVALID," AND ONE SAYS "NO, VALID."

13        CLAIM 23, TWO LINES, ONE SAYS, "YES, INVALID."  ONE

14   SAYS "NO, VALID."

15        THE NEXT QUESTION:  HAS SEIRUS PROVEN BY CLEAR AND

16   CONVINCING EVIDENCE THAT COLUMBIA'S ASSERTED UTILITY PATENT

17   CLAIMS ARE INVALID AS OBVIOUS?

18        THERE IS ONE FOR CLAIM 2, YES, NO.  ONE FOR

19   CLAIM 23, YES, NO.  KIND OF THE SAME AS ABOVE.

20        AND THEN IT GOES ON TO SAY, IF YOU FIND THAT ANY OF

21   THE UTILITY PATENT'S CLAIMS ARE VALID AND INFRINGED, WHAT IS

22   THE TOTAL DOLLAR AMOUNT OF A REASONABLE ROYALTY ADEQUATE TO

23   COMPENSATE COLUMBIA FOR SEIRUS' INFRINGEMENT OF THE UTILITY

24   PATENT?  THERE IS A LINE.

25        IF YOU FIND THAT ANY OF THE UTILITY PATENT'S

2392

1    ASSERTED CLAIMS ARE VALID AND INFRINGED, HAS COLUMBIA PROVEN

2    BY A PREPONDERANCE OF THE EVIDENCE THAT SEIRUS' INFRINGEMENT

3    OF ANY CLAIM WAS WILLFUL?

4           TWO LINES.  YES, WILLFUL; NO, NOT WILLFUL.

5           AND THEN THERE IS A PLACE FOR THE PRESIDING JUROR TO

6    SIGN AND DATE.  AND AFTER YOU'VE DONE SO, WE WILL BE

7    RECONVENED, AND WE WILL TAKE YOUR VERDICT.

8           DO YOU HAVE AN OATH FORM?

9           (BAILIFF SWORN, 3:11 P.M.)

10          THE COURT:  YOU WILL BE ESCORTED INTO YOUR ROOM BY

11   BERNADETTE.  GO AHEAD AND GET YOURSELVES SETTLED IN THERE.

12   WE WILL SEND IN TO YOU MORE THAN YOU CAN IMAGINE.  ALL OF THE

13   STUFF THAT YOU WANT, YOU WILL HAVE ACCESS TO.  WE'LL TALK

14   ABOUT HOW THAT'S GOING TO HAPPEN IN A MINUTE.  WE WILL HAVE

15   COPIES OF THE INSTRUCTIONS, A COPY OF THE VERDICT FORM.

16   AGAIN, ALL THE EXHIBITS ARE AVAILABLE TO YOU.

17          DON'T START DELIBERATING.  WHAT'S GOING TO HAPPEN IS

18   BERNADETTE IS GOING TO COME BACK INTO THIS ROOM.  YOU WILL

19   WAIT IN THERE, GET YOURSELVES SETTLED, ORGANIZED BUT DON'T

20   START YOUR DELIBERATIONS UNTIL BERNADETTE RETURNS TO YOUR

21   ROOM AND SAYS THREE WORDS:  "YOU MAY BEGIN."

22          OKAY.  GO AHEAD.

23          (JURY DELIBERATIONS, 3:12 P.M.)

24          THE COURT:  EXCEPTIONS, PLAINTIFF?

25          MR. AXELROD:  NO ADDITIONAL EXCEPTIONS BEYOND WHAT

COMPUTER-AIDED TRANSCRIPTION

1    WE'VE ALREADY TAKEN, YOUR HONOR.

2            THE COURT:  AND WHAT WE WILL SAY IS YOU WILL

3    REASSERT THOSE TAKEN EARLIER AND NOT MAKE ME SIT AND LISTEN

4    TO THEM?

5            MR. AXELROD:  CORRECT.  WE REASSERT THE EXCEPTIONS

6    TAKEN EARLIER.  WE WILL NOT MAKE YOU LISTEN TO THEM AGAIN.

7            THE COURT:  THANK YOU.

8            EXCEPTIONS, DEFENSE?

9            MR. MARCHESE:  YOUR HONOR, SAME RESERVATION AS

10   PLAINTIFF'S COUNSEL.

11           ONE THING WE NOTICED AS THE VERDICT FORM WAS GETTING

12   READ, AND I THINK THIS COULD BE A PROBLEM.  I THINK -- IT'S

13   AN EASY FIX.  BUT THE VERDICT FORM UNDER INFRINGEMENT SAYS 2

14   OR 23, AND A YES OR NO FOR EITHER/OR OF THE CLAIMS.

15           THE COURT:  I'M SORRY?

16           MR. MARCHESE:  IF YOU GO TO THE VERDICT FORM, THE

17   QUESTION ON THE '270 PATENT INFRINGEMENT.

18           THE COURT:  I DON'T HAVE A COPY OF IT BECAUSE I JUST

19   HANDED IT --

20           MR. MARCHESE:  I HAVE IT.  CAN I BRING IT UP TO YOU?

21           THE COURT:  SURE.

22           MR. MARCHESE:  IT HAS MY CIRCLE AROUND THE POINT I'M

23   TRYING TO MAKE.

24           THE COURT:  HAVE YOU SHARED IT WITH THE OTHER SIDE?

25           MR. MARCHESE:  I HAVEN'T HAD A CHANCE TO.  I DON'T

1    THINK IT'S ANYTHING EARTH SHATTERING.

2         THE COURT:  THEY NEED TO BE SEPARATELY CONSIDERED?

3    I THOUGHT -- MY THOUGHT WAS IT'S EITHER GOING TO GO ONE WAY

4    OR THE OTHER, THAT THEY DID NOT NEED SEPARATE

5    CONSIDERATIONS.

6         MR. MARCHESE:  THE PROBLEM -- I GET IT.  BUT IT IS

7    POSSIBLE, I'VE SEEN IT BEFORE, WHERE YOU GET AN INCONSISTENCY

8    BETWEEN INVALIDITY AND INFRINGEMENT AND YOU END UP WITH A NEW

9    TRIAL.

10         THE COURT:  IT DOESN'T MATTER TO ME.  DO YOU CARE?

11         MR. ALDRICH:  YEAH.  WE THINK THEY SHOULD BE

12    SEPARATED.  CLAIM 2 AND THEN SEPARATELY CLAIM 23.

13         MR. MARCHESE:  AGREED.

14         THE COURT:  OKAY.  THAT'S WHAT THEY ARE ASKING.

15    OKAY.  ALL RIGHT.  WE'LL FIX IT.

16         MR. MARCHESE:  THANK YOU.

17         THE COURT:  OTHER THAN THAT, I CAN GO AHEAD AND TELL

18    THEM THAT THEY CAN BEGIN THEIR DELIBERATIONS?

19         MR. AXELROD:  FINE BY PLAINTIFF.

20         MR. MARCHESE:  YES, FROM OUR PERSPECTIVE.

21         THE COURT:  YOU CAN ALL BE SEATED, BY THE WAY.

22         SHE'S GOING TO GO AHEAD AND TELL THEM TO BEGIN THEIR

23    DELIBERATIONS.

24         THE CLERK:  I NEED THE ATTORNEYS TO LOOK AT THE

25    EVIDENCE ONE MORE TIME BEFORE I TAKE IT BACK.

2395

1          THE COURT:  AS RECORDS TO THE EXHIBITS?

2          THE CLERK:  YEAH, THESE EXHIBITS.

3          THE COURT:  WHILE SHE'S DOING THAT, SHE WANTS YOU TO

4    DOUBLE-CHECK THE EXHIBITS.  THESE ARE THE REAL EXHIBITS I

5    GUESS, THE REAL EVIDENCE.

6          THE CLERK:  YES.  I NEED ONE MORE TIME, JUST TO MAKE

7    SURE THAT THESE ALL GO IN.

8          THE COURT:  SHE DOESN'T KNOW WHAT YOU DID DURING

9    CLOSING ARGUMENTS, IF YOU BROUGHT SOMETHING UP IN FRONT.

10          MR. ALDRICH:  I DID NOT BRING ANYTHING UP THAT

11    WASN'T HERE BEFORE.

12          MR. MARCHESE:  I DIDN'T, EITHER.

13          MR. ALDRICH:  I SIMPLY MOVED THINGS FROM THIS TABLE

14    TO THIS TABLE.

15          THE CLERK:  AS LONG AS YOU GUYS ARE OKAY WITH WHAT'S

16    ON THE TABLE, I'LL TAKE IT BACK.

17          MR. ALDRICH:  I'M FINE.

18          MR. MARCHESE:  WE'RE OKAY.

19          THE COURT:  THANK YOU.

20          MR. MARCHESE:  AND JUST THAT JACKET WILL NOT GO

21    BACK.

22          THE CLERK:  CORRECT.

23          MR. MARCHESE:  WILL IT GO BACK FOR THE

24    DELIBERATIONS?

25          THE COURT:  WE'LL LEAVE IT HERE, AND JUST USE THE

2396

1    PHOTOGRAPHS INSTEAD.

2            MR. MARCHESE:  OKAY.

3            THE COURT:  WE'LL LEAVE IT HERE.  IF THEY DECIDE

4    THEY WANT TO ACTUALLY SEE IT, WE'LL FIGURE OUT WHAT WE'LL

5    DO.

6            MR. ALDRICH:  WE WOULD NOT OBJECT.

7            THE COURT:  I DON'T KNOW HOW LONG THEY EXPECT TO BE.

8    BEFORE YOU TAKE OFF, LEAVE US SOME CELL PHONE NUMBERS, IF

9    YOU'RE GOING TO GO AWAY.  AND I WOULDN'T EXPECT YOU TO WAIT

10   AROUND.  BUT WHAT I WOULD ASK IS MAYBE FOR ABOUT THE FIRST 30

11   MINUTES -- OH, FIRST QUESTION.

12           SO THE FIRST QUESTION IS, WAS THE VENDOR AGREEMENT

13   SIGNED?  WHICH I WILL RESPOND, I CANNOT ANSWER.

14           SECOND QUESTION:  MERRIMAN ON LICENSES -- I CAN'T

15   EVEN READ IT -- SOMETHING, IS THAT EACH YEAR?

16           MR. ALDRICH:  IS THAT WHAT?

17           MR. AXELROD:  IS THAT WHAT?

18           THE COURT:  I CAN'T READ THE WORD.  I CAN'T READ THE

19   HANDWRITING.  MERRIMAN ON LICENSES SOMETHING, IS THAT EACH

20   YEAR?  BUT, AGAIN, THESE ARE BOTH THINGS THAT TALK ABOUT THE

21   FACTS OF THE CASE.  AND MY RESPONSE ON BOTH OF THEM REGARDING

22   THE FACTS OF THE CASE IS I CANNOT ANSWER THESE QUESTIONS.

23           ANY PROBLEM WITH THAT RESPONSE?

24           MR. AXELROD:  NO, YOUR HONOR.

25           THE COURT:  ANY PROBLEM WITH THAT RESPONSE?

COMPUTER-AIDED TRANSCRIPTION

2397

1          MR. MARCHESE:  NO, YOUR HONOR.

2          THE COURT:  OKAY.  HERE YOU GO.

3          SO DO YOU READ IT TO THEM AND BRING IT BACK?

4          THE CLERK:  I CAN READ IT TO THEM.

5          THE COURT:  CAN YOU READ MY HANDWRITING?

6          THE CLERK:  YES.

7          THE COURT:  ALL RIGHT.  THANK YOU.  IT'S BEEN A

8     PLEASURE.

9          MR. MARCHESE:  THANK YOU, YOUR HONOR.

10         MR. ALDRICH:  THANK YOU VERY MUCH, YOUR HONOR.

11         (RECESS, 3:18 P.M.)

12                        --OOO--

13              C E R T I F I C A T I O N

14         I HEREBY CERTIFY THAT I AM A DULY APPOINTED,
      QUALIFIED AND ACTING OFFICIAL COURT REPORTER FOR THE UNITED
15    STATES DISTRICT COURT; THAT THE FOREGOING IS A TRUE AND
      CORRECT TRANSCRIPT OF THE PROCEEDINGS HAD IN THE
16    AFOREMENTIONED CAUSE; THAT SAID TRANSCRIPT IS A TRUE AND
      CORRECT TRANSCRIPTION OF MY STENOGRAPHIC NOTES; AND THAT THE
17    FORMAT USED HEREIN COMPLIES WITH THE RULES AND REQUIREMENTS
      OF THE UNITED STATES JUDICIAL CONFERENCE.

18
           DATED:  SEPTEMBER 28, 2017, AT SAN DIEGO,
19    CALIFORNIA.

20                         S/CAMERON P. KIRCHER
                           CAMERON P. KIRCHER
21

22

23

24

25

COMPUTER-AIDED TRANSCRIPTION